RECEIPT #_____
AMOUNT $ 10 14
SUMMONS ISSUED Y-2
LOCAL RULE 4.1_____
WAIVER FORM_____
MCF ISSUED_____
BY DPTY. CLK._____
DATE 5-12-05

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br> Plaintiff, <br> v. <br> STEVEN E. NOTHERN, <br> Defendant | Civil Action No. <br><br> COMPLAINT <br><br> **05 cv 10983 NMG** <br><br> MAGISTRATE JUDGE Sorokin |

Plaintiff, the United States Securities and Exchange Commission (the "SEC"), for its Complaint against the Defendant Steven E. Nothern ("Nothern"), alleges the following:

## SUMMARY

1.  On the morning of October 31, 2001, Nothern, a former mutual fund manager at Massachusetts Financial Services Company ("MFS"), violated the federal securities laws' prohibition against insider trading. Specifically, Peter J. Davis, Jr. ("Davis"), a Washington, D.C-based consultant MFS hired, tipped Nothern with material nonpublic information that the United States Department of the Treasury (the "Treasury") was going to suspend issuance of the 30-year bond. Davis procured this information at a Treasury quarterly refunding press conference, and related it to Northern in violation of Davis' obligation to maintain the confidentiality of the information for a specified period of time.

2.  Prior to the release of the Treasury refunding information to the public, Nothern, while in possession of the material nonpublic information—the discontinuance of the

30-year bond—purchased $25 million in par value of 30-year bonds. Furthermore, not only did Nothern purchase bonds for the portfolios he managed, but he also tipped three (3) other MFS portfolio managers with the same material nonpublic information. They likewise immediately purchased $40 million in par value of 30-year bonds for the portfolios they managed.

3. When news of Treasury's suspension of the issuance of the 30-year bond was reported by a wire service, the price of the bond skyrocketed. Nothern and the three (3) MFS portfolio managers made profits of $3.1 million for the portfolios they managed.

4. As a result of his conduct as described herein, Nothern violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §§ 78j (b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, he is likely to engage in such unlawful conduct again. Thus, the SEC seeks injunctive relief, disgorgement of illegal profits, prejudgment interest and civil money penalties.

## JURISDICTION

5. The SEC brings this action pursuant to Sections 21(d), 21(e) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) (A), 78u(e) and 78u-1].

6. This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. 78u(d) (3) (A), 78u(3) and 78aa].

7. Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. Section 78aa] and 28 U.S.C. Sections 1391(b) and (c), because substantial events or omissions giving rise to the SEC's claim occurred in this District.

8.  Nothern used the means or instruments of interstate commerce or the mails in connection with the acts described herein.

## DEFENDANT

9.  Nothern, a resident of Scituate, Massachusetts, was at all relevant times a Senior Vice President at MFS, a Boston, Massachusetts-based investment management company adviser. Nothern's duties included management of seven (7) fixed-income mutual funds, whose combined net asset value at the relevant time was approximately $4 billion. One of the funds under Nothern's management invested in Treasury issues and other high-grade, fixed-income securities.

## FACTUAL ALLEGATIONS

### Peter J. Davis, Jr.

10. Davis, a resident of Washington, D.C., is an economist by training. He had previously been a Congressional aide for approximately eleven (11) years and, as a result, marketed himself to his existing and potential clients as having special access to Washington insiders and news. At all times relevant to this action, through his Washington, D.C.-registered sole proprietorship Davis Capital Investment Ideas, Davis sold his oral and written analyses of Washington political and financial events to broker-dealers, financial analysts and investors. MFS was, at all relevant times, one of Davis' clients.

11. The fact that Davis considered his contacts to Washington policymakers and information to be his major asset is amply demonstrated by the advertising materials he sent to existing and potential clients. For instance, beginning in early 2000, Davis sent an

advertising brochure to prospective clients in which he asserted: "11 years on Capitol Hill and 16 years advising Wall Street clients have taught me how to get Washington information ahead of the media;" "[my] ability to generate such information, before it reaches the media, derives from relationships built over 26 years of working with Washington policymakers;" and "[a]dvance information is only half the battle. The other half is supplying the judgment to turn advance information into an investment idea. Unless the papers are wrong, I avoid current news. My clients pay me for the first call on investment issues they care about." In a later version of the same brochure, Davis claimed that his numerous "relationships" in Washington allowed him to make accurate "predictions" about executive and judicial decisions. In particular, Davis stated that on September 27, 2000, he accurately predicted that Treasury would not change indexed bond payments, and "[t]wo days later, Treasury made it official."

12. During the relevant period, Davis communicated frequently and regularly with his clients by near-daily e-mails, telefax, and telephone calls. Each Monday morning, Davis e-mailed his clients a weekly calendar of upcoming Washington events.

### Davis and Nothern's Relationship

13. Nothern, who was Davis' primary contact at MFS, had known Davis since the mid-1990s. MFS first retained Davis sometime between 1995 and 1997, and paid him $12,000 per year for his services.

14. Davis sent Nothern e-mails approximately three (3) times a week as well as periodic telefaxes. The latter included copies of Treasury refunding announcement press releases.

15. Nothern met with Davis at least twice in Washington, D.C. Specifically, in January 1999 and again in January or February 2000, Nothern attended a day of meetings that Davis arranged between several of his clients and federal government officials. These government officials included officials from Treasury.

### The 30-Year Treasury Bond

16. Treasury, an Executive Department of the United States Government, issues and sells debt obligations of the federal government to finance government operations. Included among the debt obligations Treasury has historically issued are bonds that mature at a term of thirty (30) years.

17. The 30-year, or so-called "long" bond, was at the relevant time the longest-term Treasury issue. In the past, it served as an important benchmark for other United States Government issues and, directly or indirectly, for the bond market generally.

18. The "par value" of a Treasury bond is its face amount, which usually differs from the price at which it trades in the market. For example, a bond with a par value of $1,000 ($1,000 is the lowest denomination sold and is referred to as "one bond") may sell for more or less than $1,000 depending on market factors. Treasury bonds are quoted and priced as a percentage of par value to the nearest 1/32 of one percent. For example, if a $1,000 Treasury bond were priced at "100," it would actually sell at $1,000.

19. At 9:30 a.m. on October 31, 2001, the long bond was trading above its par value. The asked price was 102 18/32 (usually written as 102-18), meaning that dealers were asking $1025.625 for a $1,000 bond, or 102.5625 percent of the par value of the bond. Put another way, a bond that sold at 102-18 would bring $102.5625 for each $100 of par value.

20. Public announcement that Treasury intends to suspend issuance of a particular maturity federal government bond generally drives up the price of outstanding bonds with that maturity because traders anticipate a shortage. Accordingly, traders who know about any such suspension in advance of a public announcement can realize enormous profits by purchasing the bonds before the announcement, while they are comparably priced low, and selling them immediately afterwards, as the market increases on the news of the suspensions.

**Information Disclosed at Treasury Refunding Press Conferences Is Confidential**

21. Each calendar quarter up to and including October 31, 2001, Treasury disclosed the federal government's financing requirements for the coming quarter in announcements at refunding press conferences. On occasion, these announcements included details about Treasury's plans either to issue or buy back its bonds in the coming quarter.

22. Treasury required that all persons granted access to the conferences maintain the strict confidentiality of all information disclosed—that is, to respect and abide by an embargo on such information—until expiration of the embargo at a predetermined announced time. Treasury routinely embargoes for a specified time the information disclosed at refunding press conferences to ensure the accurate, uniform and orderly dissemination of refunding information and to preserve the integrity of the market for its debt issues. Such embargoes ensure that all market participants are afforded equal access to the same information at the same time.

23. All persons on Treasury property are, and during the relevant period were, required by law to abide by Treasury regulations and to "comply with the instructions of

Treasury guards, with official signs of a prohibitory or directory nature, and with the directions of other authorized officials." See 31 C.F.R. 407.5. Violations of this directive are punishable by fine or imprisonment, or both. See 31 C.F.R.§ 407.14. Authorized officials of Treasury's Office of Public Affairs ("Treasury Public Affairs"), who conducted the October 31, 2001 quarterly refunding press conference, explicitly announced to all attendees that an embargo of the information divulged at the press conferences was in effect.

24. Furthermore, a federal criminal statute, effective now and during the relevant period, prohibits any person from converting to his or her own use, or conveying without authority, anything of value belonging to the United States (or any department thereof). Violation of this statute could result in a penalty consisting of a fine or imprisonment for up to ten (10) years, or both. See 18 U.S.C. § 641.

25. During the relevant period, persons lacking a Treasury pass, press credentials or a visitor's pass were not permitted to enter the Treasury building. Visitor's passes were granted only upon the approval of a Treasury official for a visit at a particular time and for a specific purpose. Treasury Public Affairs also granted visitor's passes to non-credentialed members of the press for attendance at specific events. In either case, the visitor was required to supply his or her name and date of birth or social security number so that the United States Secret Service could conduct a background check prior to the issuance of a pass.

26. On October 31, 2001, the Treasury refunding press conference was conducted behind closed doors at Treasury's offices in Washington, D.C., which are located at 1500

Pennsylvania Avenue, N.W., and controlled by the United States Secret Service and Treasury Public Affairs. Access to the press conference was limited to government officials and those persons with either press credentials or visitor's passes.

### Davis' Attendance at the October 31, 2001 Refunding Press Conference

27. Treasury first permitted Davis to attend a refunding press conference in 1994, pursuant to an explicit face-to-face agreement he made with a senior adviser in Treasury's Office of Federal Finance that he would preserve the confidentiality of any embargoed information he learned at such conferences. It was only by reason of this explicit agreement that Treasury permitted Davis, from approximately 1994 to October 31, 2001, to attend refunding press conferences. Davis would have been denied entry to both Treasury's building and the refunding conferences if at any time he had disclosed that he did not intend to obey Treasury's embargoes on information disclosed at the refunding press conferences.

28. On October 30, 2001, Treasury Public Affairs issued a press release announcing that a refunding press conference was scheduled for the next day, and that all announcements made at the refunding conference would be embargoed until 10:00 a.m. on October 31, 2001.

29. Upon learning of the October 31, 2001 refunding press conference, Davis obtained a visitor's pass in the manner described above, and was granted entry to the Treasury building consistent with his usual practice.

30. The refunding press conference began at 9:00 a.m. Immediately before it began, the spokesperson for Treasury Public Affairs instructed all attendees to turn off their cell

phones and pagers, and directed that the doors to the room where the conference was about to commence be closed. The spokesperson announced that an embargo was effective immediately, and that it would remain in effect until 10:00 a.m. She then introduced the speaker, Undersecretary of the Treasury Peter Fisher, and advised that Undersecretary Fisher would take questions until 9:40 a.m. following the conclusion of his statements. The spokesperson concluded her comments by repeating that the embargo on all information disclosed at the press conference would not expire until 10:00 a.m.

31.     At the conclusion of the spokesperson's statements, a hard copy of the press release was distributed to all attendees. Undersecretary Fisher read a prepared statement containing the substance of the press release, including the information that Treasury would suspend issuance of the 30-year bond. He then took questions from the press. Following this question and answer session, the Treasury spokesperson again – for the third time – cautioned attendees to observe the embargo on the information disclosed until its expiration at 10:00 a.m. The refunding press conference concluded at approximately 9:25 a.m.

32.     Notwithstanding the three (3) explicit oral warnings about the embargo given at the press conference, and in direct violation of his explicit prior agreement with a Treasury official to abide by Treasury embargos, Davis violated the embargo in effect for the October 31, 2001 refunding press conference. Between the time Davis left the October 31, 2001 refunding press conference and 9:43 a.m., the time the information was inadvertently posted on Treasury's website, he made at least nine (9) cellular telephone calls to eight (8)

9

of his clients. Davis placed those calls at 9:28 a.m., 9:32 a.m., 9:33 a.m., 9:34 a.m., 9:35 a.m., 9:37 a.m., 9:38 a.m., 9:39 a.m., and 9:41 a.m.

33.     At 9:57 a.m., Reuters news service reported on its newswire: "US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS."

### Davis Tipped Nothern With The Confidential Treasury Information

34.     Davis called Nothern at approximately 9:38 a.m. on October 31, 2001, approximately five (5) minutes before the refunding press conference information was posted on Treasury's website. When Nothern failed to answer his phone, Davis left him a voicemail message advising him that: (a) Peter Fisher had informed Davis that Treasury would cancel the 30-year bond; (b) Treasury would release a press announcement of the cancellation at 10:00 a.m.; and (c) the news was embargoed until that time.

35.     Almost immediately, Nothern retrieved and listened to Davis' voicemail message. Nothern knew: (a) that Peter Fisher was an official at Treasury in the debt finance area who had access to information of the nature reported by Davis; (b) that Treasury refunding announcements conveyed market sensitive information; and (c) the meaning and nature of an embargo.

36.     Immediately upon hearing Davis' message, Nothern told three (3) other MFS portfolio managers that he had just received a voicemail message from Davis, a Washington, D.C. consultant, disclosing that Treasury would cancel the 30-year bond.

37.     While in possession of the information provided by Davis, Nothern purchased $25 million in par value of 30-year bonds. The three (3) other portfolio managers that Nothern tipped respectively purchased $25 million, $10 million, and $5 million in par value of 30-

year bonds. All of these purchases occurred prior to 9:43 a.m., the time at which the suspension of the 30-year bond was publicly disseminated on Treasury's website. As a result of their bond purchases, Nothern and the three (3) other MFS portfolio managers made profits of approximately $3.1 million for the portfolios they managed.

38.    At approximately 9:51 a.m., again prior to the expiration of the embargo that Davis had advised him of, Nothern made an additional $14.25 million purchase of bonds for the portfolios he managed.

39.    Later that same day, supervisors in the MFS fixed-income research department, alerted to the possibility of illegal trading in the 30-year bond, asked Nothern "if Davis had said that this [information] was embargoed and that you couldn't trade on it." Nothern replied, "no." Subsequently, Nothern admitted that Davis had in fact informed him about the embargo in his October 31, 2001 voicemail message.

### Davis Tipped Nothern with Material Nonpublic Information

40.    Davis' tip to Nothern, that sales of the 30-year bond would be suspended, was both material and nonpublic. There was a substantial likelihood that, under all the circumstances, knowledge of the suspension of sales of the 30-year bond would have assumed actual significance in the deliberations of a reasonable investor.

41.    Knowledge of the suspension of sales of the 30-year bond in fact assumed actual significance in the deliberations of Nothern and the MFS portfolio managers who Nothern tipped. All of them immediately invested millions of dollars upon receipt of, and in reliance upon, the tip from Davis.

42. When news of the suspension of the 30-year bond was made public, it materially affected the price of outstanding 30-year bonds. Between 9:30 a.m. on October 31, 2001 and 9:44 a.m. (one minute after Treasury posted the news to its website), the asked price of the 30-year bond increased from 102-18 to 102-23. At 9:57 a.m., when the Reuters newswire reported the information, the asked price for the 30-year bond increased again to 103-12. The asked price reached a high of 108-18 at 12:59 p.m. and closed at 107-25. This was the single largest one-day rally in price of the 30-year bond since the stock market crash of 1987, fourteen (14) years earlier.

### Davis Acted With Intent to Deceive, Manipulate or Defraud

43. Davis' misappropriation of confidential nonpublic Treasury information on October 31, 2001 violated the October 31, 2001 Treasury embargo, his agreement to abide by the embargo, his duty to Treasury, federal criminal law prohibiting conversion of government property, and federal regulations requiring him to obey the instructions of Treasury officials at the refunding press conference.

44. Davis benefited personally by tipping Nothern with the information he misappropriated from Treasury. Davis was in the business of selling information he characterized in his marketing materials as "ahead of the media . . . the first call on investment issues." Davis demonstrated, by illegal tips such as that he gave to Nothern about the 30-year bond, that he could procure and provide significant nonpublic information for clients. This served to enhance his business stature and thus his ability to attract new clients and realize greater fees.

### Davis Violated a Duty of Trust and Confidence He Assumed by Agreeing to Maintain as Confidential the Material Nonpublic Information He Gained Access to at the Refunding Press Conference

45. Rule 10b5-2(b) (1), 17 C.F.R. Section 240.10b5-2(b) (1), provides that a duty of trust and confidence exists for purposes of Section 10(b) of the Exchange Act and Rule10b5 thereunder "whenever a person agrees to maintain information in confidence."

46. As set forth above, in 1994, Davis agreed and promised, in a face-to-face meeting with a Treasury official, that if he were permitted to attend Treasury refunding press conferences, in return he would obey and abide by all Treasury embargos on information disclosed at such conferences.

47. Davis violated the duty of trust and confidence he owed to Treasury by communicating the material nonpublic information disclosed at the October 31, 2001 refunding press conference to Nothern prior to the expiration of the Treasury-imposed embargo on the information.

### Davis Violated a Duty Imposed on Him by Federal Criminal Statute

48. 18 U.S.C. Section 641, a criminal statute, provides that any person who "knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any . . . thing of value of the United States or of any department or agency thereof . . . Shall be fined under this title or imprisoned not more than ten years, or both."

49. For purposes of 18 U.S.C. Section 641, information is a "thing of value."

50. Davis violated 18 U.S.C. Section 641 by knowingly converting to his use and Nothern's use Treasury's confidential information disclosed at the October 31, 2001

Treasury refunding press conference. Davis further violated 18 U.S.C. Section 641 by disposing of and conveying that confidential information to Nothern without authority.

### Nothern Knew, Recklessly Disregarded, or Should Have Known That Davis Tipped Him in Breach of a Duty Owed Treasury

51. Nothern knew, recklessly disregarded, or should have known that Davis tipped him with confidential information, in breach of a duty Davis owed to Treasury, when he advised him of the suspension of the 30-year bond. While in possession of the nonpublic information, Nothern purchased 30-year bonds and also tipped three (3) other MFS portfolio managers, who likewise purchased 30-year bonds. Nothern knew, recklessly disregarded, or should have known that the three (3) portfolio managers would trade on the information with which he provided them.

52. Nothern knew, because Davis specifically told him in the voicemail message he left him, that the information he received from Davis was nonpublic and that it was embargoed until 10:00 a.m.

53. Nothern also knew, because Davis specifically told him in the voicemail message he left him, that Davis obtained the information he communicated to Nothern from Peter Fisher, a Treasury official with access to information concerning Treasury's issuance of debt securities.

### COUNT I

### Nothern Violated Exchange Act Section 10(b) and Rule 10b-5

54. Paragraphs 1 through 53 above are realleged and incorporated herein by reference.

55.     By reason of the foregoing, Nothern violated Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that this Court enter judgment:

(1)     Permanently restraining and enjoining Nothern from further violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder;

(2)     Ordering Northern to disgorge approximately $3.1 million, representing the trading profits realized by the MFS portfolios managed by Nothern and the three (3) other MFS managers Nothern tipped, all of whom traded in 30-year bonds while in possession of the material nonpublic information Davis provided, plus prejudgment interest;

(3)     Ordering Nothern to pay a civil money penalty pursuant to Section 21A(a) of the Exchange Act, 15 U.S.C. § 78u-1(a); and

(4)     Granting such other and further relief as to the Court may seem just and equitable.

Respectfully submitted,

_/s/ Treazure R. Johnson_
Treazure R. Johnson (BBO No. 642828)
John J. Rossetti, Jr.
Attorneys for Plaintiff
UNITED STATES SECURITIES AND EXCHANGE COMMISSION
450 5th Street, N.W.
Washington, DC  20549-0911
Tel: (202) 551-4491
Fax: (202) 772-9246
E-Mail: johnsontr@sec.gov

JS 44 (Rev. 11/04) **CIVIL COVER SHEET**

The JS 44 civil cover sheet and the information contained... in neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
UNITED STATES SECURITIES AND EXCHANGE COMMISSION

**DEFENDANTS**
STEVEN E. NOTHERN

(b) County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Plymouth
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Treazure R. Johnson, U.S. Securities and Exchange Commission, A Fifth St., NW, Washington, DC 20549; 202-551-4491

Attorneys (If Known)
Nicholas Theodorou, Foley Hoag, 155 Seaport Boulevard, Boston, MA 02210; 617-832-1163

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

☒ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

05-10983-NMG

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | **PERSONAL PROPERTY** | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☒ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. §78j(b) and 17 C.F.R. § 240.10b-5
Brief description of cause:
Securities Fraud, Insider Trading

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions) JUDGE _____ DOCKET NUMBER _____

DATE 5/11/05
SIGNATURE OF ATTORNEY OF RECORD  *Treazure R. Johnson*

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) __United States Securities and Exchange Commission__
   __v. Steven E. Nothern__

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

   ☐ I. 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

   ☑ II. 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730, *Also complete AO 120 or AO 121
   740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases

   ☐ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
   315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
   380, 385, 450, 891.

   ☐ IV. 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,
   690, 810, 861-865, 870, 871, 875, 900.

   ☐ V. 150, 152, 153.

   **05 CV 10983 NMG**

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.
   _____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐    NO ☑

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)
   YES ☐    NO ☑
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐    NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐    NO ☑

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☑    NO ☐

   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☑    Central Division ☐    Western Division ☐

   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME __Treazure R. Johnson__
ADDRESS __SEC, 450 Fifth Street, NW, Washington, D.C. 20549-0911__
TELEPHONE NO. __202-551-4491__

(CategoryForm.wpd - 5/2/05)