UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | Civil Action No. 05-10983 (NMG) |
| Plaintiff, | : | |
| v. | : | ORAL ARGUMENT REQUESTED |
| STEVEN E. NOTHERN, | : | |
| Defendant. | : | |

## DEFENDANT'S MEMORANDUM IN
## OPPOSITION TO MOTION TO STRIKE

FOLEY HOAG LLP
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000

Counsel for Steven E. Nothern

Dated: September 21, 2005

## **TABLE OF CONTENTS**

Table of Authorities..................................................................................................................ii

Background.............................................................................................................................1

      A.     Facts Alleged in the Government's Complaint......................................................2

      B.     Facts Reported in the Government's Inspector General Report...........................4

      C.     The SEC's Policy on the Necessary Conditions for Lawful Press Embargos.......7

      D.     Procedural Background.........................................................................................8

Argument................................................................................................................................9

      I.     Motions to Strike Affirmative Defenses Are Disfavored......................................9

      II.    Controlling Case Law Allows Nothern to Assert the Defense of Estoppel Against the Government......................................................................................................12

      III.   The Government Has Failed to Show That It Will Be Prejudiced If Its Motion is Not Granted........................................................................................................18

Conclusion...........................................................................................................................20

Request for Oral Argument...................................................................................................20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Augustus v. Board of Public Instruction*, 306 F.2d 862 (5th Cir. 1962)............................10

*Best v. Stetson*, 691 F.2d 42 (1st Cir. 1982)........................................................................14

*Breedlove v. Cabou*, 296 F. Supp. 2d 253 (S.D.N.Y. 2003)................................................10

*FDIC v. Gladstone*, 44 F. Supp. 2d 81 (D. Mass. 1999).....................................1, 9, 12, 17

*Fredericks v. Commissioner of Internal Revenue*, 126 F.3d 433 (3d Cir. 1997).........12, 15

*Frillz, Inc. v. Lader*, 104 F.3d 515 (1st Cir. 1997)..............................................................14

*Heckler v. Community Health Services, Inc.*, 467 U.S. 51 (1984)........................12, 14, 18

*Honeywell Consumer Products, Inc. v. Windmere Corp.*, 993 F. Supp. 22 (D. Mass. 1998)............................................................................................................................9

*Investors Research Corp. v. SEC*, 628 F.2d 168 (D.C. Cir. 1980) ....................................12

*Lussier v. Runyon*, 50 F.3d 1103 (1st Cir. 1995) ...............................................................15

*Mastrocchio v. Unnamed Supervisor*, 152 F.R.D. 439 (D.R.I. 1993) ...............................19

*Portmann v. United States*, 674 F.2d 1155 (7th Cir. 1982) ...............................................12

*SEC v. Blavin*, 760 F.2d 706 (6th Cir. 1985) .....................................................................15

*SEC v. CS First Boston Corp.*, No. SA CV 96-1253 GLT (EEx), (C.D. Cal. Feb 24, 1997)......................................................................................10, 13

*SEC v. Downe*, No. 92 Civ. 4092 (PKL), 1994 WL. 67826 (S.D.N.Y. Mar. 3, 1994) ........................................................................................................10, 13, 15

*SEC v. Dunlap*, No. 01-8437-CIV-MIDDLEBROOKS (S.D. Fla. Nov. 14, 2001) ..........13

*SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998)...........................................10

*SEC v. Hayes, No. CA 3-90-1054-T*, 1991 WL. 236846 (N.D. Tex. July 25, 1991)...........1

*SEC v. Sands*, 902 F.Supp. 1149 (C.D. Cal. 1995)..........................................10, 12, 15, 18

*SEC v. Sarivola*, No. 95 Civ. 9270 (RPP), 1996 WL. 304371 (S.D.N.Y. June 6, 1996) .................................................................................................................1

*SEC v. Thrasher*, No. 92 Civ. 6987 (JFK), 1995 WL. 456402 (S.D.N.Y. Aug. 2, 1995) ...............................................................................................................19

*Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867 (1st Cir. 1995) .......................................................................................................9, 14

*United States v. Lazy FC Ranch*, 481 F.2d 985 (9th Cir. 1973) .......................................18

*United States v. Rexach*, 558 F.2d 37 (1st Cir. 1977)..................................................13, 18

*United States v. Ven-Fuel, Inc.*, 758 F.2d 741 (1st Cir. 1985)...........................................14

*Watkins v. United States Army*, 875 F.2d 699 (9th Cir. 1989)...........................................12

## ADMINISTRATIVE PROCEEDINGS

*In re Massachusetts Financial Services Co.*, File No. 3-11241 (SEC Sept. 4, 2003) ...................................................................................................................9

## FEDERAL REGULATIONS

Regulation FD, 65 Fed. Reg. 51716 (Aug. 24, 2000)...........................................................7

## FEDERAL RULES

Fed. R. Civ. P. 12(f)............................................................................................................9

## MISCELLANEOUS

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* (3d ed. 2004) ...........................................................................................................10

65 Fed. Reg. 51716 (Aug. 24, 2000)...................................................................................7

James Wm. Moore et al., *Moore's Federal Practice* (3d ed. 2005)...................................10

**DEFENDANT'S MEMORANDUM IN
OPPOSITION TO MOTION TO STRIKE**

Defendant Steven E. Nothern submits this memorandum in opposition to the government's motion to strike his affirmative defense of estoppel. For the reasons set forth below, the motion should be denied.

**BACKGROUND**

Nothern has had no opportunity to conduct discovery, and the Federal Rules of Civil Procedure do not require him to establish a detailed factual basis for any affirmative defense at this stage in the proceedings. Instead, as explained below, the government's motion to strike must be denied if "any state of facts . . . could be proved in support of the defense." *FDIC v. Gladstone*, 44 F. Supp. 2d 81, 84-85 (D. Mass. 1999). With respect to Nothern's estoppel defense, a sufficient factual basis is arguably already provided by the allegations in the government's Complaint; the facts reported in the U.S. Department of Treasury's Inspector General report into its early disclosure of the information on the 30-year bond on October 31, 2001, a copy of which is attached; Nothern's own testimony to the SEC in December 2001, and the Securities and Exchange Commission's own rule on the conditions necessary for the lawful release of material, nonpublic information by press embargo. These known facts are summarized below.[1] It is Nothern's contention that but for this remarkable series of mistakes,

---

[1] Because Nothern is setting forth specific allegations regarding government misconduct in this Opposition, the cases relied upon by the SEC for the contention that Nothern has failed to plead grounds for the affirmative defense of estoppel are inapplicable. *See SEC v. Sarivola*, No. 95 Civ. 9270 (RPP), 1996 WL 304371, at *2 (S.D.N.Y. June 6, 1996) (striking defense where defendant failed to plead "or set forth in their motion papers" any inequitable conduct by government); *SEC v. Hayes*, No. CA 3-90-1054-T, 1991 WL 236846, at *2 (N.D. Tex. July 25, 1991) (defendants failed to set forth government misconduct in either answer or in response to SEC's motion to strike). If the Court prefers, Nothern will amend his Answer to include the allegations set forth herein. Because they have not been tested in the discovery process, Nothern does not accept all of the Government's allegations as necessarily true.

misrepresentations, and misconduct by the government, the alleged conduct challenged in the government's lawsuit would never have occurred. The process of discovery is likely to reveal and clarify additional facts and evidence relating to the government misconduct that caused Nothern to be in his current predicament. Neither the case law nor the Federal Rules of Civil Procedure contemplate the striking of Nothern's defense before he has had an opportunity to discover all the relevant facts.

> **A.**     **Facts Alleged in the Government's Complaint**

In this action, the government seeks to hold Nothern, an outside portfolio manager, liable as an "inside trader" for acting on information relayed to him by a business consultant who learned about the information at a press conference conducted by the government itself.

The government alleges that on October 31, 2001, from 9:00 to 9:25 a.m., Undersecretary Peter Fisher held a press conference at the Department of Treasury's offices in Washington, D.C. Complaint ¶¶ 30-31. At this press conference, Fisher announced that Treasury was going to suspend issuance of the 30-year bond. *Id.* ¶ 1.

Among those attending the press conference was Peter J. Davis, Jr., a Washington-based consultant and sole proprietor of Davis Capital Investment Ideas. *Id.* ¶¶ 10, 29. One of Davis's clients was Massachusetts Financial Services Company ("MFS"), a Massachusetts-based investment management company, *Id.* ¶ 10, where Nothern was working as a mutual fund manager at the time. *Id.* ¶¶ 1, 9. Davis allegedly "communicated frequently and regularly with his clients by near-daily e-mails, telefax, and telephone calls." *Id.* ¶ 12.

According to the government, even though Davis was a business consultant without press credentials, Treasury permitted him to obtain visitor's passes and attend Treasury press conferences from approximately 1994 until October 31, 2001. *Id.* ¶¶ 27, 29. The government alleges that the spokesperson for Treasury Public Affairs told the attendees at the press

conference to turn off their cell phones, closed the room doors, and stated that a press embargo was in effect until 10:00 a.m. *Id.* ¶ 30. The government does not allege, however, that any of the attendees at the press conference — and, in particular, Davis — expressly agreed to keep the disclosed information in confidence until 10:00 a.m. While the government mentions "an explicit face-to-face agreement" supposedly reached seven years earlier in 1994 between Davis and "a senior adviser in Treasury's Office of Federal Finance" to preserve the confidentiality of embargoed information, *id.* ¶ 27, the government does not identify the "senior adviser," describe the terms of the agreement, or explain what it means by the phrase "explicit face-to-face." It also fails to allege that Nothern had — and he did not have — any knowledge of any agreement between Davis and the government regarding Davis's personal obligations with respect to Treasury press embargos.

After the October 31, 2001 press conference ended around 9:25 a.m., Treasury officials opened all their doors and allowed Davis to leave. *See id.* ¶¶ 31-32. The government reports that Davis made at least nine telephone calls to his clients, at 9:28 a.m., 9:32 a.m., 9:33 a.m., 9:34 a.m., 9:35 a.m., 9:37 a.m., 9:38 a.m., 9:39 a.m., and 9:41 a.m. *Id.* ¶ 32.

According to the government, Davis called Nothern at approximately 9:38 a.m. and left a voice mail message stating that Treasury was going to cancel the 30-year bond and that there was a press embargo until 10:00 a.m. *Id.* ¶ 34. After attending to other business, Nothern listened to Davis' message (which itself took almost a minute). After listening to Davis's message, Nothern purchased $25 million in par value of the 30-year bond for the funds that he managed for the benefit of MFS's clients. *Id.* ¶ 37. He also relayed the news to three of his colleagues at MFS, and they purchased $25 million, $10 million, and $5 million in par value of 30-year bonds for allocation in their respective funds. *Id.* The government acknowledges that at 9:43 a.m — 17 minutes before the end of the announced press embargo and at or about the same time, and very

likely before any trading at Nothern's direction — the news about the bond suspension was posted on Treasury's web site. *Id.* ¶ 37.

### B.   Facts Reported in the Government's Inspector General Report

Soon after October 31, 2001, the Office of the Inspector General at Treasury initiated its own investigation into the unintended disclosure of information on the 30-year bond. It finished its investigative report in January 2002. *See* Office of the Inspector General of the United States Department of the Treasury, *Report of Investigation 2001-0104* (Jan. 2002) ("Treasury Report"). A redacted version of this report[2] and accompanying witness statements and exhibits were obtained through the Freedom of Information Act. The report is attached hereto at Exhibit A.

On October 30, 2001, Treasury announced that its quarterly refunding press conference would occur the next day. That announcement stated that "the event would have a 10:00 a.m. news embargo." Treasury Report Ex. 2. According to one Treasury staff member, this was the first time Treasury had set an embargo time (10:00 a.m.) prior to the press conference: "Normally they poll the press at the conclusion of the press conference and then set the embargo time." *Id.* at 7. According to this staff member, if a press member violated the embargo, his Treasury press credentials would be revoked. *Id.* Another Treasury official understood that the reporters at the press conference "were governed by the honor system not to release the information prior to the embargo time." *Id.* at 5-6.

According to the Inspector General report, Treasury officials were confused as to why Davis was allowed to attend the press conference. Apparently, the Office of Market Finance had no written standards for determining who would be allowed to attend press conferences. *Id.* at 8. One Treasury official said that Davis had been cleared into the October 31, 2001 meeting

---

[2] Nothern will be requesting the unredacted version in discovery.

pursuant to the "long standing practice" of admitting individuals like Office of Management and Budget officials and New York Federal Reserve Board members. *Id.* at 9. Another Treasury official, however, stated that "it never occurred to [him] that anyone other than government officials or the press would be in the room attending the press conferences." *Id.* at 7-8. The same official stated that he had been told that Davis had been allowed by Market Finance officials to attend quarterly press conferences because a predecessor at Treasury had allowed Davis to attend the conference. *Id.* at 7.

The Treasury report does not contain any information regarding an agreement — "express" or otherwise — reached with Davis regarding press embargos or the confidentiality of Treasury announcements at any time.[3]

Even though a Treasury spokesperson stated that the press embargo would last until 10:00 a.m., at the conclusion of the press conference Treasury officials distributed to the press copies of Fisher's statement containing the caption "FOR IMMEDIATE RELEASE." Treasury Report Ex. 2. (Treasury had created another version of the statement — one that said "Embargoed Until 10:00 AM" — but did not provide that version to the attendees at the press conference. *Id.*) Another Treasury staff member recalled helping to distribute copies of Fisher's statement — again, marked "FOR IMMEDIATE RELEASE" — <u>before</u> the start of the press conference, and because this staff member was "unaware of the 10:00 a.m. embargo," he or she proceeded to put the statement on the Treasury's Internet "staging server" at around 9:40 a.m. *Id.* at 6 & Ex. 16.

---

[3] It is unlikely that the Office of Inspector General would fail to include such a pertinent fact in its report, and that all of the witnesses interviewed by the Inspector General would neglect to mention it. The existence and nature of any express agreement between Davis and the government is a critical issue in this case, and Nothern intends to seek all relevant facts and documents regarding this issue during discovery.

According to the Inspector General, but based on only crude clock calibrations such as comparison to cell phone clocks and personal watches, Undersecretary Fisher's statement was posted on Treasury's web site at 9:43 a.m. *Id.* at 2. Even before that, however, the news about the 30-year bond apparently got out. An official at Treasury first noticed price increases on the 30-year bond at 9:35 a.m. — three minutes before Davis allegedly left his voice mail for Nothern. *Id.* at 5.[4] Reuters news service issued an announcement at 9:57 a.m. Complaint ¶ 33. By 10:00 a.m., there was a "big rally" in the bond price. Treasury Report at 5.

Davis's voice mail told Nothern that he had learned of the suspension of the 30-year bond from Fisher and that the suspension would be announced subject to a press embargo until 10:00 a.m. Davis did not tell Nothern that either he or Nothern were subject to any agreement not to act on the information. This was not surprising since the purpose of a press embargo is to permit journalists to write better articles without fear that they will be beaten to the punch by their journalistic competitors — not to conceal confidential information. Indeed, Davis did not even tell Nothern that he had learned the information at a press conference.

Immediately following the October 31, 2001 press conference, Treasury officials adopted new procedures for the release of market-sensitive information:

> Effective at the next scheduled refunding announcement, on January 30, 2002, Treasury's Office of Public Affairs will post the announcement on their web site at 9:00 a.m. The announcement will also be delivered to credentialed members of the media in the Treasury Pressroom shortly before 9:00 a.m. with lock-down embargo rules. The previous practice of releasing the quarterly refunding announcement at a news conference will be discontinued.

---

[4] As Nothern explained in his testimony to the SEC, he noticed that the price of 30-year bonds was increasing around 9:30 a.m. At about the same time, a bond broker told him about a rumor on the Chicago Board of Trade that Treasury was going to cancel the 30-year bond. Thus, before he ever listened to Davis's voice mail, Nothern knew that something was happening with the 30-year bond.

*Id.* at 8.  In other words, the government no longer relies on the "honor system" to enforce press embargos, no longer allows members of the press to leave the room before an embargo has been lifted, and no longer discloses market-sensitive information to uncredentialed persons like Peter Davis under any circumstances.

      C.      <u>The SEC's Policy on the Necessary Conditions for Lawful Press Embargos</u>

Before the events in question, in August 2000, the SEC issued its final rule on *Selective Disclosure and Insider Trading*.  *See* 65 Fed. Reg. 51716 (Aug. 24, 2000) ("Adopting Release"). The rule took effect in October 2000.  While this rule, Regulation FD ("Fair Disclosure"), does not by its terms subject government issuers to liability, it represents official SEC policy on the limited circumstances in which an issuer may selectively disclose material, nonpublic information without incurring a duty to make a full public disclosure.

Rule 100(b)(2)(ii) of the Regulation specifically sets the conditions for lawful press embargos by recognizing a limited exemption for disclosures made to "a person who <u>expressly</u> agrees to maintain the disclosed information in confidence" (emphasis added).  In other words, an issuer may release material, nonpublic information by press embargo only if the terms of the embargo are expressly — *i.e.*, not impliedly — agreed to by the recipients of the information. *See* John J. Huber & Thomas J. Kim, *The SEC's Regulation FD -- Fair Disclosure*, PSAMDD GLASS-CLE 200, at \*219 (2001) (summarizing SEC staff's position that an express agreement requires "an oral or written acknowledgment on the part of the person assuming the duty to keep the information confidential," and that the mere receipt of confidential information is insufficient to establish such an agreement); Richard H. Walker, Director, SEC Division of Enforcement, *Remarks Before the Compliance & Legal Division of the Securities Industry Association: Regulation FD -- An Enforcement Perspective*, available at *www.sec.gov/news/speech/spch415.htm* (stating that analyst may be liable for illegal tipping if he

"expressly agrees" to keep confidential information supplied by an issuer under embargo and then breaches the agreement).  As noted above, the government does not allege any oral or written acknowledgment by Davis with respect to the October 31, 2001 press embargo in this case.  Nor does it allege any basis for concluding that Nothern knew about an express agreement between Davis and the government regarding the confidentiality of the information which Davis disclosed by Nothern by voice mail.

**D.**    **Procedural Background**

The SEC commenced an investigation into Treasury's botched disclosure of the information on the 30-year bond almost immediately.  By December 2001, it had obtained testimony from Nothern and others.  The SEC then filed suit against Peter Davis, John Youngdahl (an officer of Goldman Sachs), and Nothern in the Southern District of New York in September 2003.  In November 2003, the SEC voluntarily dismissed its complaint against Nothern, who had objected to jurisdiction.

Also in September 2003, the SEC reached a settlement with Nothern's former employer, MFS.  MFS agreed to receive a censure, pay a civil penalty in the amount of $200,000, and conduct a comprehensive review of its policies and procedures.  Notably, the settlement did not recite that Nothern had committed any violation on behalf of MFS.  Rather, it stated that MFS had failed adequately to train its employees.  In the order setting forth the terms of their settlement, MFS and the SEC included the following findings:

> During the relevant period, MFS retained numerous consultants who provided a wide range of information and analysis concerning the financial markets, as well as political, budgetary, and regulatory developments in Washington.  The fixed income department alone used at least twelve such consultants, not including Peter Davis. . . .

> MFS' procedures manual did not describe the potential that consultants like Peter Davis could obtain and provide material non-public information to the firm.  No written guidelines expressly discussed the use of consultants by MFS or

the handling of information obtained from consultants. The firm's manual only
refers to inside information received from company insiders and their agents. The
manual does not address the use of confidential Government information or
confidential information received from MFS' paid consultants.

*In re Massachusetts Financial Servs. Co.*, File No. 3-11241 (SEC Sept. 4, 2003) ("*Order*

*Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing*

*Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 203(e) and 203(k) of the*

*Investment Advisers Act of 1940*").

        In supposed reliance upon the testimony Nothern gave to the SEC in December 2001, the

government filed the present case on May 11, 2005, more than three and a half years after the

events at issue.[5]

## ARGUMENT

**I.      Motions to Strike Affirmative Defenses Are Disfavored.**

        As this Court has observed, motions to strike affirmative defenses under Fed. R. Civ. P.

12(f) are disfavored and "should be granted only when it is beyond cavil that the defendant[]

could not prevail on them." *Honeywell Consumer Prods., Inc. v. Windmere Corp.*, 993 F. Supp.

22, 24 (D. Mass. 1998) (Gorton, J.) (citing *Coolidge v. Judith Gap Lumber Co.*, 808 F. Supp.

889, 893 (D.N.J. 1991)). *Accord FDIC v. Gladstone*, 44 F. Supp. 2d 81, 84-85 (D. Mass. 1999)

(motion to strike "will be granted only if it clearly appears that the plaintiff would succeed

despite any state of facts which could be proved in support of defense") (citation omitted).

---

[5] As the government notes (*Memorandum* at 2 n.1), it does not challenge Nothern's right to assert
the defense of laches as a counter to the equitable remedy sought by the government. Under
controlling First Circuit authority, this Court will be fully entitled to consider the government's
unexplained and unwarranted delay in pursuing this lawsuit in evaluating the government's
request for injunctive relief, should the occasion arise. *See Texaco Puerto Rico, Inc. v. Dep't of
Consumer Affairs*, 60 F.3d 867, 879 (1st Cir. 1995) ("Government agencies, like private
corporations, have an obligation to conduct their affairs in a reasonably efficient manner. An
entity that chooses to indulge inefficiencies cannot expect to be granted special dispensations.")
(citation omitted).

Courts disfavor such motions because they "are often used as delaying tactics, and because of the limited importance of pleadings in federal practice." *SEC v. Sands*, 902 F.Supp. 1149, 1165-66 (C.D. Cal. 1995) (citations omitted), *aff'd sub nom.*, *SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998); *accord* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1381, at 421 (3d ed. 2004). For these reasons, the moving party must show that it will be prejudiced if the motion is not granted. *See Augustus v. Board of Pub. Instruction*, 306 F.2d 862, 868 (5th Cir. 1962) ("[W]hen there is no showing of prejudicial harm to the moving party, the courts generally are not willing to determined disputed . . . questions of law upon a motion to strike."); *see also Breedlove v. Cabou*, 296 F. Supp. 2d 253, 275 (S.D.N.Y. 2003); 2 James Wm. Moore et al., *Moore's Federal Practice* ¶ 12.37[3] (3d ed. 2005); Wright & Miller § 1381, at 421-22.

Motions to strike affirmative defenses are particularly disfavored where, as here, they are brought prior to the completion of discovery. *See Augustus*, 306 F.2d at 868 ("Under such circumstances, the court may properly, and we think should, defer action on the motion and leave the sufficiency of the allegations for determination on the merits."); Wright & Miller § 1381, at 423-25. Accordingly, district courts have routinely denied pre-discovery motions to strike filed by the SEC. *See, e.g.*, *Sands*, 902 F. Supp. at 1165 (SEC's initial motion to strike defendant's equitable defenses denied without prejudice until after discovery); *SEC v. CS First Boston Corp.*, No. SA CV 96-1253 GLT (EEx), slip op. at 2 (C.D. Cal. Feb. 24, 1997) ("At this pleading stage in the proceedings, the court cannot rule out the possibility the defendants can show the SEC acted in a manner which caused serious injustice to Defendants.") (attached at Exhibit B); *SEC v. Downe*, No. 92 Civ. 4092 (PKL), 1994 WL 67826, at *2 (S.D.N.Y. Mar. 3, 1994) (denying motions to strike defenses because issues are better addressed in concrete factual setting).

Here, it is hardly "beyond cavil" that Nothern will not be able to prevail on his estoppel defense. This Court and the First Circuit have repeatedly held that estoppel may be asserted against the government. Even without the benefit of discovery and relying only on the government's allegations, official report, and policy, Nothern has pointed to substantial evidence of government mistake and misconduct that caused the actions now challenged by the government to occur. Indeed, the Treasury's own Inspector General report and the SEC's own rule on selective disclosure make clear that the government acted improperly when it grossly mishandled the release of information on the 30-year bond; permitted Davis to attend the October 31, 2001 press conference without so much as a review of his credentials or an express agreement obligating him to hold the disclosed information in confidence, despite his obvious financial incentive to disseminate it; relied on the "honor system" to ensure that the attendees of the press conference did not break the announced press embargo; instead of locking down the room where the press conference took place, allowed Davis to walk out long before the embargo ended; contributed to the broad public dissemination of the information on the 30-year bond before Davis left his voice mail for Nothern, to the extent that Treasury officials and Nothern himself had already observed a significant increase in the bond's value; and marked the press release meant for embargo with the heading "FOR IMMEDIATE RELEASE" and posted it on Treasury's web site well before the supposed embargo ended, either before or contemporaneously with Nothern's alleged "insider" trades. More evidence of government misconduct may be obtained through discovery. Because the law permits Nothern to assert estoppel against the government and the Federal Rules permit him to develop a full factual basis for his defense, the government's pre-discovery motion to strike is without merit and must be denied.

## II.    Controlling Case Law Allows Nothern to Assert the Defense of Estoppel Against the Government.

The government wrongly contends (Memorandum at 3-5) that it is never subject to the defense of equitable estoppel.  In *FDIC v. Gladstone*, however, this Court specifically held that the defense may be asserted against the government.  44 F. Supp. 2d at 90.  In fact, the Court based its conclusion on the same Supreme Court decision on which the government primarily relies in its brief (see Memorandum at 4-5):  *Heckler v. Community Health Servs., Inc.*, 467 U.S. 51 (1984).  In *Heckler*, the Supreme Court acknowledged the possibility that "the public interest in ensuring that the Government can enforce the law free from estoppel might be outweighed by the countervailing interest of citizens in some minimum standard of decency, honor, and reliability in their dealings with their Government."  *Id.* at 60-61, *quoted in Gladstone*, 44 F. Supp. 2d at 90.

The *Gladstone* ruling is consistent with the overwhelming weight of authority that has addressed the issue.  *See, e.g.*, *Fredericks v. Commissioner of Internal Revenue*, 126 F.3d 433, 438 (3d Cir. 1997) ("This court is among the majority of circuits recognizing estoppel as an equitable defense against government claims."); *Portmann v. United States*, 674 F.2d 1155, 1165 (7th Cir. 1982) ("Our conclusion that equitable estoppel may be available against the government . . . is supported by numerous decisions of this and other courts of appeal."); *Watkins v. United States Army*, 875 F.2d 699, 706 (9th Cir. 1989) ("where justice and fair play require it, estoppel will be applied against the government") (citations omitted); *Investors Research Corp. v. SEC*, 628 F.2d 168, 174 n.34 (D.C. Cir. 1980) ("The fundamental principle of equitable estoppel applies to government agencies, as well as private parties.") (citations omitted).

Courts have therefore rejected the SEC's argument it is immune to the defense of estoppel.  *See Investors Research Corp. v. SEC*, 628 F.2d at 174 n.34; *SEC v. Sands*, 902 F.

Supp. at 1166 (stating that defendants asserted "viable" estoppel defense and that the "Court should not weigh the evidence for purposes of a motion to strike an affirmative defense"); *SEC v. Dunlap*, No. 01-8437-CIV-MIDDLEBROOKS, slip op. at 4 (S.D. Fla. Nov. 14, 2001) (defendant "should not be precluded now from at least attempting to develop this theory of defense") (attached at Exhibit C); *SEC v. CS First Boston Corp.*, at 2 & n.1 (holding that dismissal was improper at "this pleading stage" and finding "no support in recent case law for the SEC's argument that it cannot be estopped from enforcing laws of general applicability"); *SEC v. Downe*, No. 92 Civ. 4092 (PKL), 1994 WL 67826, at *2 (S.D.N.Y. Mar. 3, 1994) (defense challenging alleged government misconduct "would be better addressed in a concrete factual setting"). Even one of the SEC's own administrative law judges acknowledged that the Supreme Court's decision in *Heckler* "leaves open the possibility that a situation could arise where estoppel would apply against the government." *See In the Matter of Thorn, Welch & Co., Inc.*, Admin. Pro. File No. 3-8400, 1994 WL 570073 (Oct. 13, 1994).

As for the First Circuit: far from "refus[ing] to apply the doctrine of equitable estoppel in cases involving the government" (Government's Memorandum at 3-4), the Court of Appeals applied the doctrine against the federal government in *United States v. Rexach*, 558 F.2d 37 (1st Cir. 1977). In that case, the Department of Justice had originally sought to recover income taxes from a woman living in France who severed her ties with the U.S. after the Department of State had signed a Certificate of Loss of Nationality. Id. at 39, 43. The First Circuit held that the Justice Department could not recover taxes for this period of time based on the State Department's action. It stated that estoppel was "proper against the United States" and that "there are instances where it would be unconscionable to allow the government to reverse an earlier position." Id. at 43. Indeed, the holding of *Rexach* conclusively rebuts the government's

- 13 -

contention that the actions of the Department of the Treasury in this matter could not give rise to an estoppel against another agency of the federal government, such as the SEC.

Further, in a case involving the U.S. Air Force, the First Circuit reversed a grant of summary judgment on the ground that the plaintiff might be able to "prove facts sufficient to estop the government from denying that he was in the competitive service." *Best v. Stetson*, 691 F.2d 42, 44 (1st Cir. 1982). Writing for the court, then-Judge Breyer stated that "courts undeniably have the power to estop the government." *Id.* (citations omitted).

It is well established, of course, that "the government may not be estopped on the same terms as any other litigant." *Heckler*, 467 U.S. at 60. Specifically, the First Circuit has observed that in considering an estoppel defense asserted against the government, a court should weigh private interests and principles of fairness against the public interest in "the enforcement of congressionally mandated public policy." *United States v. Ven-Fuel, Inc.*, 758 F.2d 741, 761 (1st Cir. 1985). Nevertheless, like the Supreme Court, the First Circuit has consistently rejected a "flat rule" against estoppel in cases involving the government, *see Heckler*, 467 U.S. at 60-61, but instead has left it to district courts to exercise their equitable discretion after hearing and assessing all the relevant facts and circumstances. *See, e.g.*, *Frillz, Inc. v. Lader*, 104 F.3d 515, 518 (1st Cir. 1997) (affirming summary judgment where record contained "absolutely no evidence" supporting estoppel claim against government); *Ven-Fuel*, 758 F.2d at 761 (affirming decision to deny estoppel defense where "all of the proof on the question" was before district court, and judge "carefully examined the relevant evidence"). This emphasis on the full development of the factual record is consistent with the First Circuit's general views on equity. *See Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 874 (1st Cir. 1995) (stating that the central feature of equity jurisdiction is "the ability to assess all relevant facts and circumstances and tailor appropriate relief on a case by case basis") (quoting *Rosario-*

*Torres v. Hernandez-Colon*, 889 F.2d 314, 321 (1st Cir. 1989) (en banc)); *Lussier v. Runyon*, 50

F.3d 1103, 1110 (1st Cir. 1995) (stating that "the hallmarks of equity have long been flexibility

and particularity").

The cases relied on by the government demonstrate the overall weakness of its position.

The government's Memorandum cites (at 4 n.2) a 1959 case from the Second Circuit and a 1953

case from the Third Circuit for the broad proposition that "the SEC cannot be subject to estoppel

at all." It fails to note, however, that neither case has been followed within its respective circuit.

*See Fredericks*, 126 F.3d at 438; *SEC v. Downe*, 1994 WL 67826, at *1. Even worse, the

government cites a district court ruling from Michigan for the statement that "[t]here is no

estoppel against the SEC in enforcement actions" (Memorandum at 4 n.2), but fails to

acknowledge that the Sixth Circuit repudiated this statement on appeal. *See SEC v. Blavin*, 760

F.2d 706, 712 (6th Cir. 1985) (describing district court's statement of law as "questionable" and

declaring that "[e]stoppel may be available against the Commission in the present case," but

affirming summary judgment where defendant's evidence did not establish traditional elements

of estoppel).[6]

Clearly, the government in this case wants to preempt any examination into its own

conduct, even as it proceeds with its novel and constitutionally suspect theory of liability against

Nothern. In short, the government seeks to hold Nothern, an outside portfolio manager who

directed the purchase of government bonds for an account he managed, liable for insider trading

based on information he learned as a result of a press conference conducted by the government

---

[6] Even if the question of whether the affirmative defense of equitable estoppel is available against
the government were close, which it is not, the existence of such a disputed legal issue would
preclude striking the defense. *See Sands*, 902 F. Supp. at 1166 ("Even when the defense under
attack presents a purely legal question, courts are reluctant to determine disputed or substantial
questions of law on a motion to strike."); Wright & Miller § 1381, at 423-25.

itself.  The government's theory appears to be that (1) at the beginning of the press conference on

October 31, 2001, Treasury announced that its press release was being "embargoed" for a short

time, (2) Peter Davis, a Washington business consultant (apparently without press credentials)

whom Treasury permitted to attend the press conference, owed an enforceable fiduciary duty to

Treasury to hold the information confidential until the embargo's expiration, as (3) as the

recipient of a voice mail message from Davis that mentioned the information released by

Treasury at the press conference and the existence of the press embargo on the announcement,

Nothern either knew or should have known that the simple word "embargo" operated to impose a

legal responsibility on Davis, and by extension himself, where none would otherwise exist.

        In defending himself against this novel theory of liability, Nothern, who had no training

on any applicability of insider trading rules to Treasury Bonds, no knowledge of any Treasury

press embargo practices or the specific circumstances of the announcement that day, and himself

gained no profit whatsoever from the transaction but who had a fiduciary duty to maximize the

return of the funds he managed, is entitled to assert the defense of estoppel and develop facts

relating to the government misconduct that led to these events.  Specifically — even assuming as

true the government's dubious allegation that Nothern directed trading by MFS before the

government posted the information at issue on its web site — Nothern is entitled to discover and

offer evidence establishing that the government grossly mishandled the release of information

and acted recklessly and contrary to its own policies by failing to place any restraint on the

ability of Davis to attend the press conference and disseminate the information at will.  But for

this remarkable series of mistakes, misrepresentations, and misconduct, the alleged facts

challenged in the government's lawsuit would not have occurred.

        Neither the case law nor the Federal Rules of Civil Procedure permit Nothern's defense

to be struck before he has had any opportunity to conduct discovery.  Again, this Court's ruling

in *Gladstone* is dispositive.  There, the Court refused to strike an estoppel defense that had been asserted against the Federal Deposit Insurance Company.  "Because Defendants' ability to make use of an estoppel defense is a fact intensive question," the Court held, "it would be inappropriate to strike the defense at this early stage."  *FDIC v. Gladstone*, 44 F. Supp. 2d at 90.  The *Gladstone* ruling denied a motion filed *five years* after the assertion of the defense, *see id.* at 85, and its logic applies with even greater force here, where the government filed its motion to strike immediately after receiving Nothern's answer.

In addition, Nothern is entitled to examine other government polices that may relate to the theory of liability being advanced by the government in this case, including but not limited to the policies on selective disclosure promulgated by the Securities and Exchange Commission itself.  As discussed above, even though the SEC's recently promulgated Regulation FD does not establish liability for government issuers, it nevertheless provides authoritative guidance on how material, nonpublic information can be lawfully disclosed.  Under this guidance, an agreement to hold information in confidence — either permanently or, as with a press embargo, for a certain period of time — must be expressly agreed to by the recipient in order to be effective.  Nothern is entitled to discover facts and evidence regarding the SEC's own requirement that any valid embargo be supported by an express — not "implied in fact" — agreement for it to be a permissible disclosure of market-sensitive information.  Indeed, all available information indicates that Treasury did not have an express non-disclosure agreement with Davis when it disclosed the information on the 30-year bond to him on October 31, 2001, and that Nothern certainly had no knowledge of such an agreement between Davis and the government when he received Davis's voice mail message that morning.  It is fundamentally unfair for the SEC to proceed with a theory of liability that contradicts its own policy on selective disclosure.  Either the SEC has changed its policy, or its policy exonerates Nothern of liability under Rule 10b-5.

- 17 -

In either case, the defense of estoppel is appropriately asserted. *See United States v. Rexach*, 558 F.2d at 43 (applying equitable estoppel where government changed its position); *United States v. Lazy FC Ranch*, 481 F.2d 985, 989-90 (9th Cir. 1973) (applying equitable estoppel because agency regulations arguably permitted conduct in question); *Sands*, 902 F. Supp. at 1166 (allegations that SEC "tacitly approved all alleged conduct" were sufficient to state viable estoppel defense).

Even setting aside the relevant rules of the SEC, there is still no basis for the government's contention (Memorandum at 7) that Nothern may not pursue an estoppel defense involving Treasury since his "adversary in this action is the SEC, not Treasury." The key question in evaluating an estoppel defense is whether a citizen like Nothern is entitled to "some minimum standard of decency, honor, and reliability in their dealings with the Government," *see Heckler*, 467 U.S. at 60-61 — not whether he has been treated fairly by the particular government agency that has filed a lawsuit against him. As noted earlier, in *United States v. Rexach*, the First Circuit held that in a case involving misconduct by one government department (the State Department) but prosecuted by a different one (the Justice Department), the defendant could proceed with a defense of estoppel "against the United States." 558 F.2d at 43. "The right hand," the First Circuit explained, "will not be permitted to demand payment for something which the left hand has taken away." *Id.* The same logic applies here. The government's pre-discovery motion to strike must be denied.

### III. The Government Has Failed to Show That It Will Be Prejudiced If Its Motion is Not Granted.

Finally, the government's failure to show that any prejudicial harm will result from the assertion of Nothern's estoppel defense is an independent ground for denying its motion to strike. The government does not suggest that it will experience any unusual hardship if Nothern

is allowed to proceed.  Instead, its memorandum simply asserts (at page 8) without explanation that an order striking Nothern's defense will simplify the case and save the government time and resources.  This is wholly insufficient.  *See SEC v. Thrasher*, No. 92 Civ. 6987 (JFK), 1995 WL 456402, at *5 (S.D.N.Y. Aug. 2, 1995) (denying SEC's motion to strike affirmative defense because it failed "to specify what time or expense would be saved, or what complexity would be eased, by granting the request . . . [and] rel[ied] only on a suggestion that the inclusion of the defense will increase the time and expense of trial"); *see also Mastrocchio v. Unnamed Supervisor*, 152 F.R.D. 439, 441 (D.R.I. 1993) ("Plaintiff has shown no prejudice to himself if his motion is not now granted.").

In fact, the government cannot make a real showing of prejudice because the factual predicates for Nothern's estoppel defense are interwoven with the elements of the government's prime facie case.  Nothern will seek through discovery information about the government's misconduct, mistakes, and misrepresentations not only to prove his affirmative defense, but also to explain why the government should lose under its own strained theory of liability.  For example, the government's inexplicable failure to impose any restraint on Davis's presence or activities at the October 31, 2001 press conference — not even obtaining a written agreement obligating Davis to keep the information confidential until 10:00 a.m. — undermines its contention that Davis owed a legal duty to Treasury for purposes of Section 10(b) and Rule 10b-5.  By way of example only, the government's slipshod administration of its press embargo — including its reliance on an unelaborated "honor system" to police journalists, its marking of the supposedly embargoed statement with the heading "FOR IMMEDIATE RELEASE," and its premature release of the statement to the Internet — undermine its contention that Nothern somehow "should have known" from the mere word "embargo" that he would be liable as an "insider trader" if he acted on the information the government provided to Davis.  These facts are

- 19 -

as relevant to the government's case-in-chief as they are to Nothern's estoppel defense. Because the government has failed to show any prejudice, its motion to strike should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion to strike the affirmative defense of estoppel asserted in Nothern's Answer.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.1, Steven E. Nothern hereby requests the Court to schedule an oral argument in connection with the government's motion to strike the affirmative defense of estoppel.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  September 21, 2005

B3086688.9

- 20 -

REPORT OF INVESTIGATION
2001-0104



Office of Inspector General

United States Department of the Treasury

 # INVESTIGATIVE RECORD REVIEW/COPY LOG

| *Case Number:* | *Case Title:* |
|---|---|
| 2002-0104 | Unknown Treasury Employee(s) |

This file contains information from the Office of the Inspector General's Investigations Database Management System and is subject to provisions of the Privacy Act of 1974 (5 U.S.C. 552a). It is the property of the Office of the Inspector General and is loaned to you for official purposes only.

The material must be safeguarded from unauthorized disclosure. It should not be left unattended or discussed with unauthorized persons and must be retained in an approved security container when not in use. Those individuals who review this material are required to complete the Review Log below.

Reproduction of this file, or any portions thereof, must be accounted for on the Copy Log below.

## REVIEW LOG

| Date | Office/Bureau | Title | Signature |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## COPY LOG

| Copy Number | Copy Recipient | Date Copy Provided | Date Returned To Controlling Office | Date Copy Destroyed |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |



# REPORT OF INVESTIGATION

JAN 2   2001

| | |
|---|---|
| *Date of Report* | |
| *Case Number* | 2002-0104 |
| *Case Title* | Unknown Treasury employee(s) |
| *Report Status* | Final |
| *Alleged Violation(s)* | Unauthorized Disclosure |

## SYNOPSIS

This investigation was predicated upon the assertion that there may have been trading activity in government securities based upon confidential information learned during an embargoed quarterly funding conference at the Department of Treasury. Interviews of Treasury employees were conducted by ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and the Office of Inspector General because of allegations of premature release of information surrounding the government's decision to suspend issuance of the 30-year bond.

The Treasury announcement concerning the long bond was made during the October 31, 2001, quarterly refunding press conference. The information was embargoed until 10:00 a.m., but was prematurely posted on the Treasury web site prior to that time. This investigation did not develop any evidence of unauthorized disclosure of market sensitive information by Treasury employees. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

| Distribution: | Case Agent: | Approved: |
|---|---|---|
| Peter R. Fisher<br>Under Secretary for<br>Domestic Finance | ▮▮▮▮▮▮▮▮▮<br>Investigator | ▮▮▮▮▮▮▮▮▮<br>Acting Special Agent<br>In Charge |
| Michele A. Davis<br>Assistant Secretary for<br>Public Affairs<br>Department of the Treasury | | |
| | (Signature) | (Signature) |

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

## DETAILS

On November 6, 2001, David D. Aufhauser, General Counsel, Department of the Treasury (Treasury), provided information to ▓▓▓▓▓▓▓▓▓▓ concerning events surrounding suspending the issuance of the 30-year Treasury bond.   The focus of the SEC inquiry concerned the assertion of possible trading activities in government securities based upon confidential information learned during an embargoed quarterly funding meeting at the Department of the Treasury.   On this same date, Treasury Office of General Counsel forwarded to the Office of Inspector General (OIG) copies of the same information provided to ▓▓▓▓▓▓  (Exhibit 1)

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Treasury, Under Secretary for Domestic Finance, during the quarterly refunding meeting press conference at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001.   The press conference followed the October 30, 2001, meeting of the Treasury Borrowing Advisory Committee.   Treasury's announcement was embargoed for release until 10:00 a.m. on the 31st.   The Treasury Office of Public Affairs, however, prematurely posted Fisher's statement on their web site, where it appeared at 9:43 a.m.   Members of the Treasury press corps immediately notified Treasury, Office of Public Affairs, that the web posting had gone up early.

Typically, financial information provided at the quarterly press conference is supplied with the explicit oral understanding that it is to be embargoed for a short period of time, usually 10 or 15 minutes after the conference.   At the conclusion of the press conference, members of the press are provided with copies of the minutes of the Borrowing Advisory Committee meeting and the statement of the Treasury policy official, with the understanding that the information is subject to an agreed-upon release of the embargo.   (Exhibit 2)

On November 1, 2001, Treasury Office of General Counsel contacted ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓to determine the exact time of publication of Under Secretary Fisher's remarks at www.treasury.gov/press/release/po749.htm.  ▓▓▓▓▓▓ contacted the Treasury web servers' hosting company,▓▓▓▓▓ and following review of the server logs, determined that the posting time was 9:43 a.m., on October 31, 2001.   (Exhibit 3)

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Printed 1/3/02
Form OI 20                                        Office of the Inspector General - Investigations
Department of the Treasury

## REPORT OF INVESTIGATION

Treasury Office of General Counsel reported in their internal
memorandum of November 6, 2001, that in addition to press,
individuals from the Office of Management and Budget (OMB),
Federal Reserve Bank officials, and others have attended press
conferences following the Borrowing Advisory Committee meetings.
Their memorandum stated that it appeared that, following a long-
standing practice, the Office of Market Finance cleared
consultant ▇▇▇▇▇▇▇ to attend the October 31, 2001, press
conference.  The Office of General Counsel reported that there
did not appear to be written standards for determining who is
able to attend these press conferences.

According to the above memorandum, Assistant Secretary for
Financial Markets Brian Roseboro advised the Office of General
Counsel that on the morning of October 31, 2001, he had received
a phone call from ▇▇▇▇▇▇▇▇ Chairman of Treasury's Borrowing
Advisory Committee and head of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇. ▇▇▇▇▇ reported that a political consultant who worked for
▇▇▇ had advised ▇▇▇ that Treasury was suspending issuance of the
30-year bond.  Roseboro told ▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇ Treasury's
Office of Market Finance, about his conversation with ▇▇▇▇
Based on ▇▇▇ knowledge of attendees at the press conference,
▇▇▇▇▇▇ speculated that the consultant was ▇▇▇▇▇▇▇▇▇.
(Exhibit 2)

▇▇▇▇▇▇▇ Treasury ▇▇▇▇▇▇▇▇▇▇ Counsel, reported in an
internal memorandum, dated November 5, 2001, the Office of
General Counsel's contact with ▇▇▇▇▇▇▇▇▇ a bond trader, who
had called to offer information regarding ▇▇▇ knowledge of the
early disclosure of Treasury's refunding announcement.  ▇▇▇▇▇
recalled that at approximately 9:35 a.m., ▇▇▇▇▇▇▇ had called
▇▇▇ and reported the details of the Treasury announcement.
▇▇▇▇▇ said ▇▇▇▇▇ told ▇▇ that the information was still under
embargo until 10:00 a.m.  ▇▇▇▇▇ reported ▇▇ had been a client
of ▇▇▇▇▇ for several years, but believed this was the first time
▇▇▇▇▇ had called ▇▇ before an embargo time period had been
lifted.  (Exhibit 4)

▇▇▇▇▇▇▇ reported in an internal memorandum, dated November 6,
2001, her contact with ▇▇▇▇▇▇▇▇, General Counsel, for ▇▇▇
▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇.  ▇▇▇▇▇▇▇ stated
that on October 31, 2001, at 9:35 a.m., the day of the Treasury
announcement, ▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇ on

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

the Treasury desk, received a telephone call from ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓ had been ▓▓▓▓ client since early 2001. ▓▓▓▓▓▓▓ said ▓▓▓▓ related to ▓▓▓▓▓▓ that Treasury was withdrawing its 30-year bond. ▓▓▓▓ did not say anything to ▓▓▓▓▓▓ about the information being confidential or under embargo, nor did ▓▓▓▓ report the source of ▓▓▓ information. After receiving the information from ▓▓▓, ▓▓▓▓ contemporaneously informed the traders around ▓▓▓. (Exhibit 5)

The United States Secret Service (USSS), Uniformed Division (UD), Treasury Appointment Center, reviewed the files pertaining to the October 31, 2001, quarterly refunding press conference. ▓▓▓▓ ▓▓▓▓ name did not appear on the initial list of attendees cleared through the Office of Public Affairs. The Appointment Center reported that ▓▓▓▓▓▓▓▓ was cleared in to the Treasury Building on the morning of the 31st to meet with ▓▓▓▓▓▓▓ Office of Market Finance. (Exhibit 6)

Following the review of information provided by Treasury XOffice of General Counsel, ▓▓▓▓▓▓ requested interviews of the following Treasury employees:

▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Office of Foreign Exchange Operations;

▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Office of Public Affairs;

▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, Office of Public Affairs;

▓▓▓▓▓▓▓, ▓▓▓▓▓▓, Office of Public Affairs;

Brian Roseboro, Assistant Secretary for Market Finance;

▓▓▓▓▓▓▓, ▓▓▓▓▓▓, Office of Market Finance;

▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓▓▓, Office of Market Finance;

▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓▓▓▓ Office of Market Finance.
(Exhibit 7)

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

OIG Form 1752
Rev. 01-01

Office of the Inspector General - Investigations
Department of the Treasury

## REPORT OF INVESTIGATION

The above listed individuals were interviewed by attorneys ████████ ████████ and ████████████ of ████████, in conjunction with ████████████ and the OIG.

When interviewed, ████████████ said ███provides market analysis to Treasury through contacts with bond traders and brokerage market strategists. ███ said ███ became aware of the decision to suspend sales of the 30-year bond approximately 30 minutes prior to the official announcement. ███said ███was aware it was market sensitive information and was also aware of the embargo. ███ added that ███spoke to no one between 9:00 a.m. and 10:00 a.m. on October 31, concerning the suspension of sales of the 30-year bond.

████████ said ███had earlier heard speculation, on the part of bond market strategists, that sales of the 30-year bond might be suspended. Specifically, ███said, a week or two prior to the announcement, ███spoke with ████████, a market strategist for ████████ in New York. ████████said that ████████predicted that Treasury would eliminate the 30-year bond. ████████thought ███ was "going out on a limb with that type of speculation." (Exhibit 8)

████████ said ███ was monitoring the bond market from the "market room" at the time the announcement on the 30-year bond was made. ████████ said ███was also aware of the early Treasury Web site posting. Making reference to the Bloomberg Wire Service, October 31, Day Chart, ███ said ███first noticed price increases on the long bond at 9:35 a.m. ███said at 10:00 a.m., the time of the official announcement, there was a "big rally" in the bond price. ████████ memorialized information ███received on October 31, relating to the 30-year bond announcement, in a series of e-mail messages sent to ███Treasury Department supervisors. (Exhibits 8, 9, 10)

When interviewed, ████████████████ said as part of ███official duties, ███helped coordinate the October 31, 2001, press conference where the suspension of the sale of the 30-year bond was announced. ████████said ███announced three times during the press conference that the information presented by Under Secretary Fisher and contained in the press release was embargoed until 10:00 a.m. ███added that ███verbally gave the "ground rules" to all in attendance and the reporters present were governed by the honor system not to release the information prior

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

to the embargo time. ████ said no one left the room prior to the conclusion of the conference, at approximately 9:25 a.m. (Exhibit 11)

████ said ██ did not know how the press announcement was posted on the web site prior to the 10:00 a.m. embargo and that ███ was surprised that it happened. ████ said there were two versions of the press release, one with the soft letterhead format and the final version with the hard letterhead. One version had the embargo time (10:00 a.m.) on it, while the final version did not. ████ said ███ heard that ███████████ of ██ office had a problem formatting the Treasury letterhead on the press release into an electronic file so that it could appear on the web site. (Exhibits 11, 12, 13, 14, 15)

████ said ██ did not know █████████ but learned who ██ was after the controversy surrounding the October 31, 2001, press conference. (Exhibit 11)

When interviewed, ████████████ said ███ has been employed by the Treasury since ███████ immediate supervisor is ██████, ██████████ Office of Public Affairs. ███ official duties at the Office of Public Affairs include formatting and posting press releases on the Treasury Web site.

████████ said ███ attended the October 31 press conference, but was posted outside the Diplomatic Reception Room where the conference was held. ███ said ██████████████ Market Finance, asked ███ to stand out in the hall to keep an eye on some charts that were to be handed out at the conclusion of the conference. ███ said since the doors were closed, ███ did not hear the announcement concerning the 10:00 a.m. press embargo.

At the conclusion of the conference, █████████ said ███ returned to ███ office and sent out the press release via the Treasury Web site. ███ said there had been earlier problems with formatting the press release with the proper Treasury letterhead. The final press release ███ saw said for "immediate release." ███ said ██ posted it on the web site sometime before 10:00 a.m. ███ said ██ did not know the exact time the message went out and that she was unaware of the 10:00 a.m. embargo. (Exhibit 16)

When interviewed, ████████████ said ██ first heard of the decision to suspend sales of the 30-year bond on Thursday, October 26,

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

2001. ██said Under Secretary Peter Fisher informed ██ of the
decision on that date as they discussed procedures for the
October 31st quarterly refunding press conference. ██said the
only people in ██ office who had advance knowledge of the
announcement beside ██ were ███████████
and Assistant Secretary Michele Davis. ██████said ██knew this
information was privileged and discussed it with no outside
individuals.

██████ said ██was present at the October 31, 2001, 9:00 a.m.
quarterly refunding press conference. ██████████████
introduced Under Secretary Fisher and made the 10:00 a.m. embargo
announcement. ██ said to the best of ██knowledge, no one left
the room prior to the 9:25 a.m. conclusion of the conference.

██████stated that the early posting of the Under Secretary's
announcement on the Treasury Web site was as much ████mistake as
anyone. ██████ said it was miscommunication to ████████
██████████ ████████ ██████████ The final copy of the
press announcement did not have the 10:00 a.m. embargo time on
it, but instead read for immediate release. ██████said ██
thought ████████was at the press conference and was aware of the
embargo time. ██████said ██had seen an earlier version of the
press announcement with the 10:00 a.m. embargo printed on it.

██████ said this was the first time Treasury had set an embargo
time (10:00 a.m.) prior to the conference. Normally they poll
the press at the conclusion of the press conference then set the
embargo time. ██said ██was not aware of any member of the
press violating the embargo. ██said if they did, ██would
revoke their Treasury press credentials.

██████ said that ██did not learn who ████████████was until after
the press conference. ██said ██subsequently learned that ██
was cleared to attend the conference by ████████████████
██████████'s ████████ said it was ██
understanding that ████████s predecessor had allowed ████to
attend the quarterly press conferences since ██████and that the
Office of Market Finance has continued that practice to the
present.

██████said it never occurred to ██that anyone other than
government officials or the press would be in the room attending
the quarterly press conferences. ██████said because of this

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

incident, ███ office would be adopting new press conference
procedures.   (Exhibit 17)

Effective at the next scheduled refunding announcement, on
January 30, 2002, Treasury's Office of Public Affairs will post
the announcement on their web site at 9:00 a.m.  The announcement
will also be delivered to credentialed members of the media in
the Treasury Pressroom shortly before 9:00 a.m. with lock-down
embargo rules.  The previous practice of releasing the quarterly
refunding announcement at a news conference will be discontinued.
(Exhibit 17, attachment 1)

█████████, Treasury ███████████████Counsel, was interviewed
by the OIG and said ███ was not aware of an earlier Treasury
policy or written procedures governing press admittance to the
quarterly funding press conferences.  ███████suggested that the
OIG contact ████████████, █████████ Office of Public Affairs, for
further clarification regarding press admission procedures.
(Exhibit 18)

████████was interviewed by the OIG for a second time, concerning
███knowledge of past policy or procedures governing admittance
to the quarterly refunding press conferences.  ██████said ██was
not aware of any formal written policy regarding press admittance
procedures (other than USSS, UD clearance) that were in effect
for the October 31, 2001, refunding conference.  (Exhibit 19)

When interviewed, Brian Roseboro said he was appointed Assistant
Secretary for Financial Markets in July 2001.  Roseboro said he
had the authority to make the decision concerning suspending
sales of the 30-year bond.  In actuality, he said ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████ on suspension of the 30-year bond.

Roseboro said he attended the October 31, 2001, press conference,
where his supervisor, Under Secretary Peter Fisher, announced the
suspension of sales of the 30-year bond.  He said at 9:57 a.m.,
he saw the Treasury announcement, suspending sales of the 30-year
bond, appear on the Bloomberg News Wire.  At that time, he

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

realized the 10:00 a.m. embargo had been somehow violated.
Roseboro said other than the premature Treasury Web site posting,
he was not aware of any early disclosure of Treasury's
announcement to suspend sales of the 30-year bond.

Roseboro said he did not know ▮▮▮▮▮▮▮▮and only became aware
of who ▮▮ was following the controversy surrounding the press
conference.  Roseboro said it was his understanding that ▮▮▮▮▮▮
was not a member of the Press but had been "grand-fathered in" to
attend this and previous Treasury quarterly refunding press
conferences.  (Exhibit 20)

When interviewed, ▮▮▮▮▮▮▮▮▮ said as ▮▮▮▮▮▮▮ Office of Market
Finance, ▮▮tries to provide financial analysis and policy
recommendations to "decision makers" at the Office of the Under
Secretary for Domestic Finance. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮said as part of ▮▮▮job, ▮▮ and ▮▮▮staff regularly talk
to bond dealers and market consultants. ▮▮▮▮▮▮ said ▮▮did not
say anything to dealers that would suggest that Treasury was
going to discontinue the 30-year bond. ▮▮further said ▮▮ had no
reason to believe that anybody in ▮▮▮ financing group would
discuss this with anybody on the outside. ▮▮▮▮▮▮said, "because
of the nature of the business, everybody in this office has an
appreciation of the sensitivity of what they discuss."

▮▮▮▮▮▮ said ▮▮▮office was responsible for the admittance of
▮▮▮▮▮▮▮▮to the quarterly refunding press conference. ▮▮▮▮▮▮
said ▮▮had noticed ▮▮▮▮ at previous press conference's but had
only spoken to ▮▮▮ very briefly.  He said ▮▮▮predecessor and
former supervisor, ▮▮▮▮▮▮▮▮▮, had approved ▮▮▮▮' admittance
to the earlier press conferences. ▮▮▮▮said ▮▮ found out after
the fact, that ▮▮▮▮ had been calling ▮▮▮▮▮▮▮
▮▮▮▮ on a regular basis asking to be admitted to the quarterly
refunding meeting press conferences. ▮▮▮▮▮ said it was ▮▮▮
understanding that ▮▮▮▮ has been attending the quarterly press
conferences since at least ▮▮▮▮ ▮▮▮▮ said ▮▮knew that ▮
"wrote some type of investment news letter." ▮▮▮▮▮added that

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

████ happened to be seated next to ████ during the October 31, 2001, press conference.

████ said ██ was not aware of anyone other than press, OMB, Treasury Officials and ████ who attended the quarterly refunding meeting press conferences. ████ said ██ did not realize until after the fact, that the press conferences were only for "credentialed press."

████ said subsequent to the October 31, 2001, press conference, ████ curiosity prompted ██ to call ██ former supervisor, ████ to find out why ████ was admitted to the press conferences. ████ said that ████ did not recall ████, or ever admitting ██ to a Treasury press conference. (Exhibit 21)

████, ████ Office of Market Finance, Department of the Treasury, was interviewed by the OIG concerning ██ knowledge of ████ and ██ admittance to the quarterly refunding press conferences. ████ from the Department of the Treasury on ████. subordinate, ████, became ████ of the Office of Market Finance following ██ retirement.

████ stated that ██ does not know ████, nor does ██ recall ever admitting ██ to a quarterly refunding press conference. ████ said, however, it is "not impossible that I admitted ██" but ██ did not recall doing so. ████ said if ██ had admitted ██ assumes it was because ██ wrote for some financial publication. (Exhibit 22)

When interviewed, ████ said ██ is employed by Treasury as ████ in the Office of Market Finance. ██ supervisor is ████ said ██ former supervisor, ████, was ████, then ██ ████ of the Office of Market Finance.

████ said ██ has never met ████ though ██ has talked to ██ on the phone numerous times. ████ said ██ first cleared ██ in for a Treasury appointment about eight or nine years ago at the instruction of ████ ██ never said how ██ knew ████ but told ██ to clear ██ in for a quarterly refunding press conferences. ████ said ██ has subsequently received calls from ████ requesting clearance to attend the

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Doc. No. 1-17/31/01
Form 0186                                        Office of the Inspector General - Investigations
                                                 Department of the Treasury

## REPORT OF INVESTIGATION

quarterly press conferences and has subsequently cleared ████ through the USSS, UD, Appointment Center. ████ said ██ never discussed ████ clearance into the building with ████. ████ said ██ never directed ████ to the Office of Public Affairs for clearance into the press conferences. (Exhibit 23)

When interviewed, ██████████ said ██ has been employed as a ██████████████████ in the Treasury, Office of Market Finance, for ████████████████ ██████ responsibilities include market research, analysis and providing financial advice to decision makers at Treasury. ████ said his immediate supervisor is ██████████████.

████ said ██ had first learned of the decision to suspend sales of the 30-year bond in a meeting with Under Secretary Fisher in mid October 2001. ████ said the decision was not discussed widely within Treasury. ████ said to the best of ██ knowledge, the decision to suspend the 30-year bond ███████████████████ ████████████████.

████ said ██ office converses with bond traders and consultants on a regular basis, but "we do not provide them with any confidential information." ███████████████████████ ███████████████████████████████████████████ said ██ was aware of the importance and sensitivity of the information he had concerning the 30-year bond.

████ said ██ attended the quarterly refunding press conference on October 31, 2001. ████ said ██ was aware of the sensitivity of the information at the press conference and heard the press embargo announcement. ████ said ██ saw no one leave the room prior to the conclusion of the press conference. ████ said ██ did not know ████████ but learned of who ██ was after the controversy surrounding the October 31, 2001, press conference. (Exhibit 24)

The scope of this report was limited to interviews of Treasury employees relating to their actions surrounding the October 31, 2001, quarterly refunding conference. This investigation did not develop any evidence of unauthorized disclosures of market sensitive information by Treasury employees. ███████████ ██████████████████████████████████████████

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

# REPORT OF INVESTIGATION



This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Office of the Inspector General - Investigations
Department of the Treasury

## REPORT OF INVESTIGATION

### EXHIBITS

| NUMBER | DESCRIPTION |
|--------|-------------|
| 1 | Referral letter of David D. Aufhauser, General Counsel, dated November 6, 2001. |
| 2 | Memorandum of ███████████████████████ General Counsel, dated November 6, 2001. |
| 3 | Memorandum of ████████ Office of General Counsel, undated. |
| 4 | Memorandum of ████████, █████████ Counsel, dated November 5, 2001. |
| 5 | Memorandum of ████████, A██████████ Counsel, dated November 6, 2001. |
| 6 | Memorandum of ████████ USSS, UD, Appointment Center, dated November 6, 2001. |
| 7 | Memorandum of ████████, █████████ Counsel, dated November 9, 2001. |
| 8 | Memorandum of Activity (MOA) of ████████, dated November 7, 2001. |
| 9 | Bloomberg News Service, Day Chart, October 31, 2001 |
| 10 | E-mail messages of ████████ October 31, 2001. |
| 11 | MOA of ████████ dated November 7, 2001. |
| 12 | Office of Public Affairs, News Release, dated October 31, 2001, (with 10:00 a.m. embargo time). |

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

## REPORT OF INVESTIGATION

| 13 | Office of Public Affairs, News Release, dated October 31, 2001, (immediate release). |

13          Office of Public Affairs, News Release, dated October 31, 2001, (immediate release).

14          Office of Public Affairs, News Release, Draft (No date, time or letterhead).

15          Office of Public Affairs, News Release, electronic file web posting, dated October 31, 2001, (immediate release).

16          MOA of ████████████, dated November 14, 2001.

17          MOA of ████████, dated November 14, 2001, with attachments.

18          MOA of ████████ dated December 19, 2001.

19          MOA of ████████ dated December 19, 2001.

20          MOA of Brian Roseboro, dated November 7, 2001.

21          MOA of ████████, dated November 15, 2001.

22          MOA of ████████, dated December 28, 2001.

23          MOA of ████████ dated November 15, 2001.

24          MOA of ████████ dated November 21, 2001.

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Doc. Issued: 1/2/02
Rev. 09-01



**GENERAL COUNSEL**

# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C.

November 6, 2001

The Honorable Harvey L. Pitt
Chairman
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Dear Mr. Chairman:

Per our conversations of Thursday and Friday of last week, I am referring a matter for investigation by the Securities and Exchange Commission. The focus of the inquiry, as more fully detailed in the enclosures to this letter, is an assertion that there may have been trading activity in government securities based upon confidential information learned during an embargoed quarterly funding meeting at the Treasury.

Please keep me advised.

Very truly yours,

David D. Aufhauser
General Counsel

cc:    Mr. Jeffrey Rush
       Mr. Stephen Cutler



# DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

November 6, 2001

**MEMORANDUM FOR DAVID D. AUFHAUSER**
**GENERAL COUNSEL**

FROM: ███████████████████

SUBJECT:         Events Surrounding the Announcement Suspending Issuance of the 30-Year Treasury Bond

███████████████ and I interviewed Treasury staff and reviewed information concerning events related to the early disclosure at Treasury on the morning of October 31st that Treasury would be suspending issuance of the 30-year Treasury bond. We also spoke with Deputy Assistant General Counsel Francine Kerner and Senior Counsel ██████████ regarding interviews they conducted and documents they gathered last week. Based on all this information, here is what we have found thus far.

- Historically, there is a press conference held on the morning after the quarterly meeting of the Treasury Borrowing Advisory Committee. The conference generally is held at 9:00 a.m. in the Secretary's Conference Room and begins with a statement by the appropriate Treasury policy official of the government's funding needs for the coming quarter. This press conference also may include policy announcements such as changes to Treasury borrowing or debt buy-backs. Following the statement and any announcements, there generally is a question-and-answer session. Typically, any information supplied either orally or in writing at the press conference is supplied with the explicit oral understanding that it is to be embargoed for some short period of time, e.g., 10 or 15 minutes after adjournment of the press event. At the close of the press conference, the press is provided with a copy of the minutes of the Borrowing Advisory Committee meeting and the statement of the Treasury policy official, again with the oral understanding that the information is subject to the agreed-upon embargo.

- The press conference following the October 30 meeting of the Borrowing Advisory Committee was set for 9:00 a.m. on October 31, and an October 30 Treasury announcement of the press conference (PO-746, attached) contained the statement that the event would have a 10:00 a.m. news embargo. The announcement also stated that anyone wishing to attend who did not have White House or Treasury press credentials should contact staff in the Treasury Public Affairs office to make arrangements to attend the press conference.

- On October 31, the press conference began at approximately 9:00 and ended at approximately 9:25. Under Secretary Peter Fisher presided at the conference, reading a statement that later was released (PO-749, attached) and taking questions from the press. The conference began and ended with the statement by a Treasury Public Affairs official regarding the 10:00 a.m. news embargo.

2

At the close of the press conference, hard copies of Mr. Fisher's statement were provided to press staff who attended the conference. It appears that two versions of the statement were created with only minor differences, including two different headers. One header included the caption "FOR IMMEDIATE RELEASE" (PO-749) and the other included instead the phrase "Embargoed Until 10:00 AM" (attached). The hard copies of the statement provided to those who attended the press conference included the former caption "FOR IMMEDIATE RELEASE". The other version was sent by e-mail from a Treasury Public Affairs staffer to others in his office and to Domestic Finance and Legislative Affairs staff.

In addition to the press, individuals from OMB, the New York Federal Reserve Bank, and others have in the past been cleared into Treasury by Treasury Market Finance staff to attend the press conferences following Borrowing Advisory Committee meetings. It appears that, following this long-standing practice, Market Finance cleared into the building for the October 31 press conference consultant Peter Davis, who attended the conference. There do not appear to be written standards in Market Finance for determining who is able to attend these press conferences.

After the press conference, a member of the staff from the Office of Public Affairs posted Under Secretary Fisher's statement to Treasury's web site (web version of PO-749, attached), where it appeared at 9:43 a.m. This individual normally attends the press conference, providing support, and then posts the information on the web. On this occasion, ▇▇▇ was not in the room during the press announcement, including the admonitions regarding the embargo. ▇▇▇ was instead outside of the room with the copies of Mr. Fisher's statement to be handed out after the news conference. ▇▇▇ posting of the statement on the Treasury web site before the 10:00 a.m. embargo time appears to be an error caused by the rush of events that surrounded the press conference. Members of the Treasury press corps called the Treasury Public Affairs Office to tell them that the web posting had gone up early.

Treasury Assistant Secretary for Financial Markets Brian Roseboro received a telephone call on the morning of October 31 from ▇▇▇▇▇▇ ▇▇▇▇▇▇ of Treasury's Borrowing Advisory Committee and head of ▇▇▇▇▇▇▇▇▇▇▇▇▇ in ▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇ reported that a political consultant who worked for ▇▇▇▇ had advised ▇▇▇▇ that Treasury was suspending issuance of the 30-year bond. Roseboro told ▇▇▇▇▇▇ ▇▇▇▇▇▇▇ Treasury's Office of Market Finance, about the conversation with ▇▇▇▇ ▇▇. Based on ▇▇ knowledge of attendees at the press conference, ▇▇▇▇ speculated that the consultant was ▇▇▇▇▇▇▇▇.

This matter has been discussed with staff at the Securities and Exchange Commission and Treasury's Inspector General.

Attachments

## MEMORANDUM

To:    File

From: ██████████████

Re:    My November 1, 2001, Investigation which Showed that the Time of Publication, on the
       Treasury Web Site, of Peter Fisher's Remarks about the 30-Year Bond, was 9:43 a.m.,
       October 31, 2001

─────────────────────────────────────────────────────────────────

Francine Kerner called me from her car at 9:25 a.m. on November 1, 2001, to say that Peter
Fisher's remarks about discontinuing sales of 30-year bonds had been published on the Treasury
Web site perhaps 12 minutes before 10 p.m. on October 31, and to ask whether I could discover the
precise time of publication on the Treasury Web site.  I told her that there might be server logs
showing the time and that I'd look into it.

I checked the Treasury Web site and found at http://www.treasury.gov/press/releases/po749.htm
(po749.htm) the statement of Peter Fisher that "We are suspending issuance of the 30-year bond:
there will be no auction of 30-year securities in February 2002 and we plan no further auctions of
either 30-year nominal or inflation-adjusted bonds."

I telephoned and left a message for Treasury Webmaster ████████████ ███and, because I couldn't
reach ███ immediately, I telephoned and left a message for Deputy CIO Mayi Canales.  In both
cases I said that I needed help with an "emergency."

I checked my browser cache (Tools | Internet Options | Settings | View Files ) for the "Last
Modified" date and time of po749.htm.  It showed "none," however, so that was of no help.  (A
browser can compare the "Last Modified" time of a cached Web page with the "Last Modified"
time of the page on its Web server to find whether there is a match so that the cached page can be
displayed instead of downloading it.  It speeds up the display of pages frequently visited if the
browser can open them from one's local hard disk instead of from the Web.)

I went to the Public Affairs office on the 2300 corridor and inquired of ████████████ ███about
when po749.htm was published on the Internet.  ███ referred me to ██████████████ also in the
Public Affairs office.

So I spoke briefly with ██████████ who, when I inquired about po749.htm, turned to ███ e-mail
and computer documents to explain the times at which various things occurred prior to 10 a.m. on
October 31.  One e-mail showed that ████ had conveyed to ████████████ the text for
po749.htm.  I asked ██ to print for me the e-mails and attachments that ████ thought pertinent and
without copying or reading them I turned them over to Francine Kerner.

From my conversation with ████████████ it was plain that it was ████████ who had caused
po749.htm to be published on the Internet.  In response to my question ████████████ said that ████
████ reports to ████████ (to whom ████████ also reports).  Thinking that I might need
to see records on ████████████ s computer, I asked to meet ████████ to get ██ okay. ████████
████████ arranged a meeting of the three of us in ████████ s nearby office, where I asked ████████

permission to see ████████'s computer records, if need be, at a later time when I could be accompanied by people from the CIO's office whom. As I will set forth below, it did not become necessary to examine records on ████████'s computer.

I got a telephone message from ████████ and returned █ call. █ said that █ would arrange to get for me a Web expert and, in case it became necessary to inspect ████████'s computer, a desktop expert, to help with determining the time of publishing po749.htm on the Internet.

Soon thereafter, at ███'s behest, Webmaster ████████ telephoned. From my short telephone conversation with ███ it seemed that we would indeed be able to find the time of publishing po749.htm on the Web from server logs. As I shall set forth below, we found that po749.htm was published in the Internet at 9:43 a.m. on October 31.

███ said that Public Affairs, in the past, had asked to be able to publish things like po749.htm on the Web, without having to forward such things to one of ███'s colleagues to do it, as is the usual procedure. To satisfy Public Affairs' request, ███ and ██ colleagues, who were chary of giving anyone direct access to the Treasury Web servers hosted by UUNET, had set up a special way for Public Affairs to publish things. That is, they had set up (1) a "staging server" within Treasury and not on the Internet on which Public Affairs directly could put its Web pages, and (2) a script that Public Affairs thereafter could invoke to copy Web pages from the staging server to an Internet server hosted by UUNET. The point was to limit Public Affairs' Web server activities by limiting the script.

So, ███ had not one but two server logs to check: (1) the staging server log and (2) the UUNET server log.

███ checked the staging server log which showed that po749.htm was created on the staging server at 14:40 GMT, which would be 9:40 a.m. Eastern Standard Time, on October 31, 2001. At 11:49 a.m. (November 1) ███ sent me an e-mail saying, in full:

> This is the FTP screen shot showing when the file p0749.htm was placed on this staging server. The file would have been pushed to the production server a few minutes later. I'm working on getting the time stamp from that server for that file.
>
> Dave

staging_stamp.jpg

Treasury Internet/Intranet Program Manager
202 622-████

— 2 —

Below is a screen shot of the "staging_stamp.jpg" log that ▮▮▮ made and attached to his e-mail.



To check the accuracy of the clock on the staging server, ▮▮▮ and I compared the time shown on ▮▮▮ watch, on my computer's clock, and my cell phone clock. We compared the time on those clocks with the time, on the staging server, of ▮▮▮ creation of a dummy folder. All four times agreed, which gave us confidence that 9:40 a.m. on October 31, 2001, was the time at which po749.htm had been put on the staging server.

Next, ▮▮▮ checked with UUNET (via, I think, ▮▮▮ said, a contractor that subcontracts to UUNET). From UUNET's records one could see that po749.htm had been copied (UUNET uses the term "pushed") from the internal Treasury staging server to UUNET's public Internet server (together with a collection of Web pages on the staging server) at 9:43 a.m., as I will further describe below.

UUNET sent to ▮▮▮ an e-mail showing part of a server log for the morning of October 31. In particular, that log showed that the Public Affairs office (shown on the UUNET log as "ustpress") had "pushed" its collection of Web pages at 7:08 a.m., 9:43 a.m., 10:19 a.m., and so on. Because the time of placing po749.htm on the staging server was 9:40 a.m., and because I was informed by Ms. Kerner that po749.htm had been published on the public UUNET Internet server before 10 a.m., and because it was my recollection that the text of po749.htm had been supplied to ▮▮▮ ▮▮▮ after 7:08 a.m., we deduced that the 9:43 a.m. "push" included po749.htm.

-- 3 --

███asked UUNET to check the accuracy of the time clock of the UUNET server; UUNET reported by e-mail that "All dates and times on both production and staging servers are acurate [sic]." I will insert below the full text of ████s 1:05 p.m. e-mail to me, forwarding the UUNET e-mail that included its time records together with an explanation of those records:

███

```
Below is the message from uunet web support. I spoke to ██████████ on the phone. I
asked ███ to do a clock check on the production server and server time and my watch
were the same (as ███ states below.).

To summarize

You can see that the production date and time stamp is, in fact, the same as the
staging that is 10/31 9:40 EST.

You can see all the activity for the press office for 10/31 through today around
10:18.

In the 4th and 5th entry you can see activity at 9:43. his was probably that file
update.
```

███

███Treasury Internet/Intranet Program Manager
202 622-█

```
-----Original Message-----
From: web-support@uu.net [mailto:web-support@uu.net]
Sent: Thursday, November 01, 2001 12:44 PM
To: ████████cio.treas.gov
Cc: ████████do.treas.gov
Subject: OUTT-0000106570: FC Business Systems

Please do not take the (OUTT-xxxxx) information out of the subject header
when replying to this problem.  We use this number to track specific
customer issues.  Thank You.

Hello ███████ and ███

All dates and times on both production and staging servers are accurate.

The file has a time stamp of on the production server:
-rw-r--r--   1 ustpress treas       9175 Oct 31 09:40 po749.htm

This matches the timestamp of the file on the staging server when it was pushed
using CMS.

The file was ftp'd to the staging server at 9:40:23 am on Oct 31:
treas_1-ftp.log:Wed Oct 31 09:40:23 2001 5 tias-gw7.treas.gov 9175
/releases/po749.htm a _ i g ustpress ftp 0 *

Here are the cms push logs for ustpress:
```



```
ustpress        101103107:08:24       199.196.144.16  Update_Collection
ustpress        101103107:08:29       199.196.144.16  Do_Update_Collection      /
```

```
ustpress        101103109:43:23         199.196.144.16   Update_Collection
ustpress        101103109:43:28         199.196.144.16   Do_Update_Collection    /
ustpress        101103110:19:48         199.196.144.16   Update_Collection
ustpress        101103110:19:52         199.196.144.16   Do_Update_Collection    /
ustpress        101103111:37:50         199.196.144.16   Update_Collection
ustpress        101103111:37:57         199.196.144.16   Do_Update_Collection    /
ustpress        101103112:17:21         199.196.144.16   Update_Collection
ustpress        101103112:17:25         199.196.144.16   Do_Update_Collection    /
ustpress        101103112:40:03         199.196.144.16   Update_Collection
ustpress        101103112:44:54         199.196.144.16   Do_Update_Collection    /
ustpress        101103113:53:54         199.196.144.16   Update_Collection
ustpress        101103113:53:58         199.196.144.16   Do_Update_Collection    /
ustpress        101103114:02:30         199.196.144.16   Update_Collection
ustpress        101103114:02:34         199.196.144.16   Do_Update_Collection    /
ustpress        101103117:47:06         199.196.144.16   Update_Collection
ustpress        101103117:47:12         199.196.144.16   Do_Update_Collection    /
ustpress        101110108:15:47         199.196.144.16   Update_Collection
ustpress        101110108:15:56         199.196.144.16   Do_Update_Collection    /
ustpress        101110110:11:33         199.196.144.16   Update_Collection
ustpress        101110110:11:40         199.196.144.16   Do_Update_Collection    /
ustpress        101110110:18:18         199.196.144.16   Update_Collection
ustpress        101110110:18:23         199.196.144.16   Do_Update_Collection    /
```

You can interpret the logs as follows; The first column is the CMS username entered.
The second column is the time/date stamp.  The first three numbers state the year,
2001.  The next two state the month (10 = october, 11 = november).  The next two
state the date.  The next two state the hour (EST, 24 hour clock). then, minutes
and
seconds.

The next column is the IP address of the web browser doing the push.  So, for all
of these, the individual is coming from IP 199.166.144.16.

The final column indicates what was done.  For all of the entries, we show
that ustpress pushed everything they could.

So, taking the first entry apart, we see:

```
ustpress        101103107:08:24         199.196.144.16   Update_Collection
```

user = ustpress
year = 2001
month = October
date = 31
hour = 7 am EST
minutes = 08
seconds = 24
IP = 199.196.144.16
action = update CMS collection


If you need any further information, please let me know.

Thanks,

████████
Web Hosting Support
WorldCom


Telephone 1-800-900-0241 (options 2, 6)
Email web-support@wcom.com

I provided copies of the above mentioned ██████e-mail materials to Francine Kerner.

— 5 —

# MEMORANDUM

**TO:**   File

**FROM:**   

**DATE:**   November 5, 2001

**RE:**   Telephone Call to ██████████████████████████

---

On November 5, 2001, at approximately 9:55 a.m., the General Counsel returned a telephone call from ████████████ a bond trader, who had called to offer information regarding ██ knowledge of the early disclosure of Treasury's refunding announcement regarding 30 year bonds. I witnessed the telephone conversation, which was held on the speaker box.

████████ recalled that, around 9:35 a.m., give or take three minutes, ██████████ had called ██ and told them the details regarding the refunding announcement; ████ having been present in the meeting in which the announcement was made. ████ told ████ that the information was still under embargo until 10:00 a.m. ████████ stated that ████████ has called ██ on previous occasions as ████████ has been a client of ██████ for several years, but believes this was the first time ██ recalls ██ calling before the embargo time period had lifted. ████████ said that the information caught ████ completely off guard and ██ assumed that Treasury had given ████ its tacit approval to release the information.

████████ stated that, although ██ uses the Treasury website, ██ has complained that it is not updated in a timely fashion, such that it is more useful to ██████ ██ subsequently heard that there had been an earlier posting on Treasury's website, but that ██ ████ self, was unaware of it. ████████ did not trade bonds before 10:00 a.m., but ██ entity is a research vehicle, not a trading organization. ████████ ended the conversation offering to provide Treasury with all records regarding when ██████ 's group sent the information out.

**MEMORANDUM**

TO:         File

FROM:       ███████████

DATE:       November 6, 2001

RE:         Telephone call to ████████████ from ████ ███████

On November 6, 2001, at approximately 4:20 p.m., I returned the call of ██ of ████████████ ████████ had contacted ████████ █t ██ because they have a prior association, to report ████████ contacts with ████████ reported the telephone call to DAGC/Enforcement Francine Kerner, who, in turn, reported the conversation to me. I conducted the telephone interview on the speaker box from my office with ██████ ████████ as a witness.

███████ is the General Counsel for the ████████ ision at ████████ thought that, given the press, ████████ should take the initiative and call Treasury regarding ████████ contacts with ████████ also said that ████████ had called Fisher to disclose that it was a client of ████████ has also reported the incident to the SEC.

███████ said that on October 31, 2001, the day of the announcement of the withdrawal of the thirty year bond, ████████ on the Treasury desk, received a telephone call from ████████ at 9:35 a.m. ████████ has been ████ client since early 2001. ████ reports that the conversation lasted no more than a minute or two. ████ related to ████ that Treasury was withdrawing its thirty year bonds. ████ did not say anything to ████ about the information being confidential or under an embargo, nor did ████ report the source of ██ information. After getting off the telephone with ████████ contemporaneously informed the traders around him about the announcement. ████████ s currently reviewing their trading thereafter.

█████████ stated that a Bloomberg report came out at 9:29 a.m., in which it was announced that Treasury would make an announcement at 10:00 a.m. Because no one could ever recall Treasury delaying an announcement from 9:45 a.m. to 10:00 a.m., ████████ reports that the market began speculating that Treasury's announcement would be more significant than previously thought. ████████████ reports that trading in the five minutes after the 9:29 a.m. Bloomberg report, when compared to the preceding 5 minutes, was higher, due to this speculation. ████ also stated that in the days preceding the Treasury announcement, there had been some speculation that Treasury might withdraw its thirty year bonds so that, when the Bloomberg announcement came out, many traders began to position themselves in the market, in the event that it happened. ████████ said that there were no other calls from ████ to anyone else at ████████ ████ that day. ████████ does not know whethe ████████ ████ses the Treasury website. ████████ concluded the conversation, stating that ██ was still gathering information which ████ would forward.

DATE: *November 6, 2001*

TO: *Inspector* ███████████

FROM: *Sgt* ███████████

SUBJECT: *Listed below are the individuals that were clear to attend the press conference for Undersecretary Peter Fisher regarding "Quarterly Refunding". The conference was held in the Diplomatic Reception Room on Wednesday, October 31, 2001 at 0900 am.*

| NAMES | DATES OF BIRTH | SOCIAL SECURITY NUMBERS |
|-------|----------------|-------------------------|
| 1. | | |
| 2. | | |
| 3. | | |
| 4. | | |
| 5. | | |
| 6. | | |
| 7. | | |
| 8. | | |
| 9. | | |
| 10. | | |
| 11. | | |

  

*After talking to* ███████████ *Public Affairs, there was one individual that was present during the conference that was not cleared thru* ██ *office.* ███████ *was informed the name of the individual by a contact with Wall Street Journal, a* ████████ ████ *After researching the Treasury Appointment Center files it was determined that, a* ████████ *was cleared in that morning of the 31ˢᵗ to meet with passholder* ███████

EPORT NO: WAV034BS                    TACS                        PAGE NO. 1

  DATE : 11/06/2001

IN: UT1722 DATE: 10/31/2001 TIME: 0900 ID: LP CANCEL DATE:              TIME:
 ITEE: ██████                                TOTAL VISITORS:      1
 NCY:                       LOCATION: T      AREA/ROOM:
 QUESTOR: ██████                             ROOM: ██████      PHONE: 622-██████
 CKS: ID X NCIC/CCH
 MENTS:


 E                                           SSN              DOB
 ██        ██████        ██████       ─ ─       ██████

```
REPORT NO: WAV034BS                TACS                    PAGE NO: 1

RUN DATE : 11/06/2001

UIN: U11702 DATE: 10/31/2001 TIME: 0845 ID: LP CANCEL DATE:          TIME:
  VISITEE: ████████              TOTAL VISITORS:  1
  AGENCY:              LOCATION: T    AREA/ROOM: ████
  REQUESTOR: ██████              ROOM:           PHONE: 622-████
  CHECKS: ID X NCIC/CCH
  COMMENTS:


  NAME                                    SSN              DOB
        ████████                     ██  ██  ██      ████████

  TOTAL VISITORS:    1
```

ENTER THE NUMBER PRECEEDING THE DESIRED NAME
AND PRESS F1
OR PRESS F16 TO EXIT.

| | LAST NAME | FIRST | M | DOB | SSN | ENTRY CODE |
|---|---|---|---|---|---|---|
| 1 | ███████ | ███████ | | ████████ | | U11701 |
| 2 | | | | | | U11702 |
| 3 | | | J | | | U11722 |
| 4 | | | | 00/00/0000 | | |
| 5 | | | | 00/00/0000 | | |
| 6 | | | | 00/00/0000 | | |
| 7 | | | | 00/00/0000 | | |
| 8 | | | | 00/00/0000 | | |
| 9 | | | | 00/00/0000 | | |
| 10 | | | | 00/00/0000 | | |

F1-SELECT NAME   F2-ADDITIONAL NAMES   F14-PRINT   F15-HELP   F16-EXIT
Record printing OK

# ACCESS CONTROL WORKSHEET

| APPOINTMENT ☐ | WORKER ☐ | PRESS ☐ | ACCESS CONTROL OFFICE (Initials) | REFERENCE NO. 4117017 4117012 | ID | NCIC |
|---|---|---|---|---|---|---|

DATE 10-30 4 10-31    TIME 0845

REQUESTED BY ▇▇▇▇▇    ROOM NO.

OFFICE TEL. O080    COMPANY

| APPOINTMENT WITH ▇▇▇▇▇ | WH ☐ | OEOB ☐ | NEOB ☐ | TREAS ☑ | T-AN |
|---|---|---|---|---|---|

ESCORT NEE▇

NO ESCORT ☐

TYPE OF ESCORT

COMMENTS

| LAST NAME, FIRST NAME, MIDDLE NAME | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|

U.S. CITIZEN  ☐ YES  ☐ NO

| TIME | | |
|---|---|---|
| 2000 OCT 29 PM 12 21 | | |

RECEIVED U.S. SECRET SERVICE

UNITED STATES SECRET SERVICE

A - Front

All information requested on this form is collected under authority derived from 18 USC 3056. The collected information is used to determine suitability for access to secured areas. Submission of the information is mandatory and failure to submit information will cause denial to enter premises.

Executive Order 9397 allows federal agencies to use Social Security Number as an individual to avoid confusion caused by employees with the same or similar names. Furnishing the social security number, as well as other data, is mandatory, and failure to do so may cause refusal to enter the premises.

U.S. SECRET SERVICE
RECEIVED

2001 OCT 29 P 4: 23

SSHRY
LiiI CENTER

A - Back

TACS

PAGE NO: 1

RUN DATE : 11/06/2001

UIN: U11722 DATE: 10/31/2001 TIME: 0900 ID: LP CANCEL DATE:
VISITEE: ███████                                              TIME:
AGENCY:                    LOCATION: T     TOTAL VISITORS:      1
REQUESTOR: ██████                         AREA/ROOM: ████
CHECKS: ID X NCIC/CCH                     ROOM:         PHONE: 622-████
COMMENTS:

NAME ███████          ████████      ████    SSN ─ ─      DOB ████████

# TREASURY APPOINTMENT FORM

| REASON FOR ACCESS: | ○ Appointment | ○ Worker | ◉ Press |
|---|---|---|---|

| DATE | | TIME | ROOM NO. | APPOINTMENT WITH |
|---|---|---|---|---|
| 10/31/01 | to 10/31/01 | 10 ▾ AM ▾ | 3311 | DIP ROOM |

| REQUESTED BY | OFFICE PHONE | FOR ACCESS TO |
|---|---|---|
| ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ | ☑ Treasury ☐ Annex |

**REQUESTOR'S EMAIL ADDRESS (exp: [name]@do.treas.gov)**

Enter comments here:

```
PRESS  CONFERENCE
```

| | Last, First Name | Company Represented | Date of Birth | SSN |
|---|---|---|---|---|
| 1 | ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓▓ |
| 2 | ▓▓▓▓▓▓▓ | ▓▓▓▓▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓▓ |
| 3 | ▓▓▓▓▓▓▓ | ▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓▓ |
| 4 | ▓▓▓▓▓▓▓ | ▓▓▓ | ▓▓▓▓▓ | ▓▓▓▓▓▓ |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

    

Please click the SUBMIT button only once to avoid duplicate requests.

TO FINISH, CLICK HERE AND CLOSE THIS WINDOW.

# TREASURY APPOINTMENT FORM

*PO6023*

| REASON FOR ACCESS: | PRESS |
|---|---|

| DATE | TIME | ROOM NO | APPOINTMENT WITH |
|---|---|---|---|
| 10/31/01 to 10/31/01 | 8 AM | ▮▮▮ | press |

| REQUESTED BY | OFFICE PHONE | FOR ACCESS TO |
|---|---|---|
| ▮▮▮ | ▮▮▮ | Treasury |

| Comments |
|---|
| press |

| Requestor's Email Address: |
|---|
| ▮▮▮@do.treas.gov |

| COUNT | LAST, FIRST NAME | COMPANY REPRESENTED | DATE OF BIRTH | SSN |
|---|---|---|---|---|
| 1 | ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮▮ |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |

Confidential

Printed:10/30/01 4:49 PM

P060022 (2

**From:** ████████████
**Sent:** Tuesday, October 30, 2001 3:13 PM
**To:** SSAPPT
**Subject:** meeting w/ peter fisher

████████ ████████ ████████ and ████████ - ████████ ████████ they are from the fed reserve board. they are attending the Quarterly Refunding Press Conference in the Dip Room (3311) with Peter Fisher at 9am, October 30th  3/ST

2001 OCT 30 P 3 40

RECEIVED
U.S. SECRET SERVICE
C.I.C.V. CENTER

2001 OCT 30 P 3 25

RECEIVED
U.S. SECRET SERVICE
C.I.C.V. CENTER

1

# ACCESS CONTROL WORKSHEET

| APPOINTMENT ☐ | WORKER ☐ | PRESS ☒ | ACCESS CONTROL OFFICE (Initials) _T·H·_ | REFERENCE NO. _FOLD I P_ | ID ☒ | NCIC ☐ |
|---|---|---|---|---|---|---|

| DATE _10-31-01_ | TIME _1030_ |
|---|---|

APPOINTMENT WITH _PRESS EVENT_

| ROOM NO. | WH ☐ | OEOB ☐ | NEOB ☐ | TREAS ☒ | T-ANNEX ☐ |
|---|---|---|---|---|---|

| REQUESTED BY | COMPANY | NO ESCORT ☐ | ESCORT NEEDED — |
|---|---|---|---|

| OFFICE TEL | | | U.S. CITIZEN ☐ YES ☐ NO |
|---|---|---|---|

| TYPE OF ESCORT | COMMENTS |
|---|---|

| TIME | LAST NAME, FIRST NAME, MIDDLE NAME | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

US Secret Service

SSF 2028B (05/98)

_B. Frout_

# PRIVACY ACT STATEMENT

All information requested on this form is collected under authority derived from 18 USC 3056. The collected information is used to determine suitability for access to secured areas. Submission of the information is mandatory and failure to submit information will cause denial to enter premises.

Executive Order 9397 allows federal agencies to use Social Security Number as an individual to avoid confusion caused by employees with the same or similar names. Furnishing the social security number, as well as other data, is mandatory, and failure to do so may cause refusal to enter the premises.

B - Back

may-D

| APPOINTMENT | WORKER | PRESS |
| --- | --- | --- |
| ☐ | ☐ | ☒ |

**DATE** 10-31-01

**TIME** 1000

**REQUESTED BY**

**OFFICE TEL.**

**ROOM NO.**

**TYPE OF ESCORT**

**COMPANY**

**COMMENTS**

**ACCESS CONTROL OFFICE** (Initials T.F. )

**APPOINTMENT WITH** PRESS

**REFERENCE NO.** P06002J

**ID** ☒   **NCIC** ☒

ElLEN T

| WH | OEOB | NEOB | NO ESCORT |
| --- | --- | --- | --- |
| ☐ | ☐ | ☐ | ☐ |

| TREAS | T-ANNEX |
| --- | --- |
| ☒ | ☐ |

**ESCORT NEEDED** ☐

**U.S. CITIZEN** ☐ YES  ☐ NO

**LAST NAME, FIRST NAME, MIDDLE NAME**

**DATE OF BIRTH**

**SOCIAL SECURITY NO.**

UNITED STATES SECRET SERVICE

SSF 2028B (05/98)

# PRIVACY ACT STATEMENT

All information requested on this form is collected under authority derived from 18 USC 3056. The collected information is used to determine suitability for access to secured areas. Submission of the information is mandatory and failure to submit information will cause denial to enter premises.

Executive Order 9397 allows federal agencies to use Social Security Number as an individual to avoid confusion caused by employees with the same or similar names. Furnishing the social security number, as well as other data, is mandatory, and failure to do so may cause refusal to enter the premises.

RECEIVED
U.S. SECRET SERVICE

2001 OCT 31  A  9: 45

TREASURY
APPOINTMENT CENTER

RECEIVED
U.S. SECRET SERVICE

2001 OCT 31  A  9: 34

TREASURY
APPOINTMENT CENTER

C - Buck



| APPOINTMENT | WORKER | PRESS | ACCESS CONTROL OFFICE (Initial) | REFERENCE NO. Y060326 | ID ☑ |
| | | ☑ | | | NCIC ☑ |

| DATE | TIME | | APPOINTMENT WITH | | |

| | | WH ☐ | OEOB ☐ | NEOB ☐ | TREAS ☑ | T-ANNEX ☐ |

| REQUESTED BY | ROOM NO. | | NO ESCORT ☐ | ESCORT NEEDED ☐ |

| OFFICE TEL. | COMPANY | | | |

| TYPE OF ESCORT | COMMENTS | | U.S. CITIZEN ☐ YES ☐ NO |

| TIME | LAST NAME, FIRST NAME, MIDDLE NAME | DATE OF BIRTH | SOCIAL SECURITY NO. |

2001 OCT 31  A 11: 21

RECEIVED
U.S. SECRET SERVICE

UNITED STATES SECRET SERVICE

SSF 2028 B (05/99)

D - Front

# PRIVACY ACT STATEMENT

All information requested on this form is collected under authority derived from 18 USC 3056. The collected information is used to determine suitability for access to secured areas. Submission of the information is mandatory and failure to submit information will cause denial to enter premises.

Executive Order 9397 allows federal agencies to use Social Security Number as an individual to avoid confusion caused by employees with the same or similar names. Furnishing the social security number, as well as other data, is mandatory, and failure to do so may cause refusal to enter the premises.

RECEIVED
U.S. SECRET SERVICE

2001 OCT 31   A 11: 30

ASBRY
...ENT CENTER

D-Brick

# PRIVACY ACT STATEMENT

All information requested on this form is collected under authority derived from 18 USC 3056. The collected information is used to determine suitability for access to secured areas. Submission of the information is mandatory and failure to submit information will cause denial to enter premises.

Executive Order 9397 allows federal agencies to use Social Security Number as an individual to avoid confusion caused by employees with the same or similar names. Furnishing the social security number, as well as other data, is mandatory, and failure to do so may cause refusal to enter the premises.

RECEIVED
U.S. SECRET SERVICE

2001 OCT 31  A 9:47

TREASURY
APPOINTMENT CENTER

RECEIVED
U.S. SECRET SERVICE

2001 OCT 31  A 9:34

TREASURY
APPOINTMENT CENTER

F-Bomb

CONFIDENTIAL

| APPOINTMENT | WORKER | PRESS | ACCESS CONTROL OFFICE (Initials _HH_ ) | REFERENCE NO. P0 60024 | ID | |
|---|---|---|---|---|---|---|
| ☐ | ☐ | ☒ | | | | NCIC |

| DATE 10.31.01 | TIME 1100 | | APPOINTMENT WITH _Press_ | | _EVENT_ |
|---|---|---|---|---|---|

| REQUESTED BY | ROOM NO. | | WH ☐ | OEOB ☐ | NEOB ☐ | T-BLDG ☒ | T-ANNEX ☐ |
|---|---|---|---|---|---|---|---|

| OFFICE TEL | COMPANY | NO ESCORT ☐ | ESCORT NEEDED ☐ |
|---|---|---|---|

| TYPE OF ESCORT | COMMENTS | U.S. CITIZEN ☐ YES ☐ NO |
|---|---|---|

| TIME | LAST NAME, FIRST NAME, MIDDLE NAME | DATE OF BIRTH | SOCIAL SECURITY NO. |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

UNITED STATES SECRET SERVICE

SSF 2028B (OSP8)

F - Front



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 9, 2001

Mr. ▮▮▮▮▮▮▮▮▮
Department of Treasury
Office of the Inspector General
740 15th Street, N.W.
Suite 500
Washington, D.C. 20020

        Re:    <u>SEC Inquiry</u>

Dear ▮▮▮▮▮▮▮▮

        Enclosed please find the information sent by David Aufhauser, Treasury's General Counsel, when referring the October 31, 2001 events to the SEC for inquiry. I also enclose a subsequent memorandum by me, dated November 6, 2001, and copies of the documents, which we discussed during the SEC Interviews on November 7, 2001 . Lastly, I am enclosing documents collected by the ▮▮▮▮▮▮▮▮ General Counsel, ▮▮▮▮▮▮▮▮ relating to the admission of individuals to the press conference on October 31, 2001. Pursuant to the SEC's request, I am also sending these latter documents to them.

        You also asked me to provide the list of individuals to whom the SEC wishes to speak. As you know, the SEC already interviewed Mr. Brian Roseboro, ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ The SEC has also asked to speak to ▮▮▮▮▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮ also asked me to find someone at Treasury who could speak to how individuals are admitted to press conferences and whether attendance is taken. I have arranged to have ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮ Public Affairs, speak to them on these issues.

        ▮▮▮▮▮▮▮▮▮ and I will be meeting with the SEC on Wednesday, November 14, 2001, at 3:00 p.m., in the General Counsel's Conference Room. I am working on setting up the remainder of the interviews, but because today is Friday and Monday is a federal holiday, many individuals are out of the office today. The SEC has also asked that no interviews be scheduled on Tuesday, November 13, 2001.

        If you have any questions or would like to discuss this matter, please do not hesitate to call me. My direct number is 202-622-▮▮▮▮▮

                Sincerely,

                ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ General Counsel

Enclosures: As stated



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview | 2002-0104 | |
| [ ] Telephone Contact | Date: | ██████████ Investigator ██████ |
| [ ] Records Review | November 7, 2001 | |
| [ ] Other (Describe): | Time: | |
| | 4:30 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ██████████ Office of Foreign Exchange Operations Department of the Treasury Washington, DC | Department of the Treasury Office of General Counsel 1500 Pennsylvania Avenue, NW Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████████ (████/████) and ████████████ (████/██████) of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

████████████ stated ████ has worked as an international economist for Treasury for the past four years. ████ provides market analysis to Treasury through contacts with bond traders and brokerage market strategists. ████ said on October 31, 2001, ████ was on duty at 5:30 a.m. working the "market room." ████ said ████ became aware of the decision to suspend sales of the 30-year bond approximately 30 minutes prior to the official announcement.

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

███████ was asked if ████ had received any earlier information of the elimination of the 30-year bond. ████ said ████ had heard speculation, on the part of bond market strategists, that it might be eliminated. Specifically, ████ said, a week or two prior to the announcement, ████ spoke with ████████ a market strategist for ████████████████. in ████████ said that ████ predicted that Treasury would eliminate the 30-year bond. ████ thought ████ was "going out on a limb with that type of speculation."

███████ said ████ was monitoring the bond market at the time the announcement on the 30-year bond was made. ████ said ████ was aware of the early Web site posting. ████ said ████ first noticed price increases on the long bond at 9:35 a.m. ████ said at 10:00 a.m., the time of the official announcement, there was a "big rally" in ~~the~~ bond price.

███████ said when ████ first heard of the elimination of the 30-year bond, 30 minutes prior to the announcement, ████ was aware it was market sensitive information. ████ said ████ was aware of the embargo and added that ████ spoke to no one between 9:00 a.m. and 10:00 a.m. on October 31, concerning the suspension of sales of the 30-year bond.

Reviewed by: ████████  Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form OI-09

Office of the Inspector General — Investigations
Department of the Treasury

Govt   GIP



Bloomberg
PROFESSIONAL



**From:** ▮▮▮▮▮▮▮

**Sent:** Wednesday, October 31, 2001 3:17 PM

**To:** Kerner, Francine; ▮▮▮▮▮▮▮

**Subject:** FW: Looks like Reuters out a bit early with this... it was rumored before the headlines.

-----Original Message-----
**From:** ▮
**Sent:** Wednesday, October 31, 2001 9:55 AM
**To:** Roseboro, Brian; ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Looks like Reuters out a bit early with this... it was rumored before the headlines.

09:57 31Oct2001 US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS
09:57 31Oct2001 US TREASURY SAYS BOND ISSUANCE DISCONTINUATION EFFECTIVE IMMEDIATELY
09:57 31Oct2001 TREASURY'S FISHER-DEBT BUYBACK PROGRAM ON A 'QUARTER-TO-QUARTER' BASIS
09:57 31Oct2001 TREASURY'S FISHER-BUYBACK TARGETS, IF ANY, TO BE ANNOUNCED AT REFUNDINGS
09:57 31Oct2001 TREASURY'S FISHER-GOVERNMENT BORROWING NEEDS 'ELEVATED FOR NEXT YEAR OR SO'
09:57 31Oct2001 TREASURY'S FISHER ANTICIPATES BUDGET GAP IN 2002, 'PERHAPS' IN 2003 AS WELL
09:57 31Oct2001 TREASURY'S FISHER EXPECTS RETURN TO BUDGET SURPLUSES IN COMING YEARS
09:57 31Oct2001 TREASURY'S FISHER-'WE DO NOT NEED' 30-YEAR BOND TO MEET GOVT FINANCE NEEDS
09:57 31Oct2001 TREASURY FISHER--30-YEAR BOND NO LONGER HAS POSITION OF SIGNIFICANCE IN MARKETS
09:57 31Oct2001 TREASURY'S FISHER- 'COSTLESS' TO REINTRODUCE 30-YEAR BOND IN FUTURE, IF NEEDED
09:57 31Oct2001 TREASURY'S FISHER-BUYBACK DECISIONS TO BE MADE IN LIGHT OF FISCAL PROJECTIONS
09:57 31Oct2001 TREASURY SAYS TO REPURCHASE $9 BLN IN DEBT IN Q4, IN LINE WITH ORIGINAL GOAL

For Related News, Double Click on one of these codes:
[M] [T] [NAT] [D] [E] [U] [MNI] [US] [WASH] [DBT] [GVD] [ISU] [INT] [MUNI] [LEN] [RTRS]
 [NEWSYEAR 2000]
ENDS

*International Economist*
*Market Room*
*U.S. Treasury Department*
*202-622-*▮▮▮



**From:** ████████

**Sent:** Wednesday, October 31, 2001 3:18 PM

**To:** Kerner, Francine; ████████

**Subject:** FW: Today's announcement

-----Original Message-----
**From:** ████████
**Sent:** Wednesday, October 31, 2001 10:06 AM
**To:** ████████ Roseboro, Brian; ████████
**Cc:** ████████
**Subject:** Today's announcement

Just had a Treasury market contact call in to complain about how this was released... he claims it was posted on Treasury's website before 10 a.m. so some firms knew about it before it hit the wires.



-----Original Message-----
**From:** ████████
**Sent:** Wednesday, October 31, 2001 9:55 AM
**To:** Roseboro, Brian; ████████
**Cc:** ████████
**Subject:** Looks like Reuters out a bit early with this... it was rumored before the headlines.

09:57 31Oct2001 US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS

09:57 31Oct2001 US TREASURY SAYS BOND ISSUANCE DISCONTINUATION EFFECTIVE IMMEDIATELY

09:57 31Oct2001 TREASURY'S FISHER-DEBT BUYBACK PROGRAM ON A 'QUARTER-TO-QUARTER' BASIS

09:57 31Oct2001 TREASURY'S FISHER-BUYBACK TARGETS, IF ANY, TO BE ANNOUNCED AT REFUNDINGS

09:57 31Oct2001 TREASURY'S FISHER-GOVERNMENT BORROWING NEEDS 'ELEVATED FOR NEXT YEAR OR SO'

09:57 31Oct2001 TREASURY'S FISHER ANTICIPATES BUDGET GAP IN 2002, 'PERHAPS' IN 2003 AS WELL

09:57 31Oct2001 TREASURY'S FISHER EXPECTS RETURN TO BUDGET SURPLUSES IN COMING YEARS

09:57 31Oct2001 TREASURY'S FISHER-'WE DO NOT NEED' 30-YEAR BOND TO MEET GOVT FINANCE NEEDS

09:57 31Oct2001 TREASURY FISHER--30-YEAR BOND NO LONGER HAS POSITION OF SIGNIFICANCE IN MARKETS

09:57 31Oct2001 TREASURY'S FISHER- 'COSTLESS' TO REINTRODUCE 30-YEAR BOND IN FUTURE, IF NEEDED

09:57 31Oct2001 TREASURY'S FISHER-BUYBACK DECISIONS TO BE MADE IN LIGHT OF FISCAL PROJECTIONS

09:57 31Oct2001 TREASURY SAYS TO REPURCHASE $9 BLN IN DEBT IN Q4, IN LINE WITH ORIGINAL GOAL

11/02/2001

For Related News, Double Click on one of these codes:
[M] [T] [NAT] [D] [E] [U] [MNI] [US] [WASH] [DBT] [GVD] [ISU] [INT]
[MUNI] [LEN] [RTRS]
 [NEWSYEAR 2000]
ENDS

*International Economist*
*Market Room*
*U.S. Treasury Department*
*202-622-*

―

**From:** ████████████████
**Sent:** Wednesday, October 31, 2001 3:18 PM
**To:** Kerner, Francine;
**Subject:** FW: Some thoughts on e-mail from a primary dealer contact

-----Original Message-----
**From:** ████████████████
**Sent:** Wednesday, October 31, 2001 10:45 AM
**To:** Roseboro, Brian; ████████████████
**Cc:** ████████████████

**Subject:** Some thoughts on e-mail from a primary dealer contact



— We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

From: ██████████████
Sent: Wednesday, October 31, 2001 3:19 PM
To: Kerner, Francine; ████████████
Subject: FW: Some thoughts on e-mail from a primary dealer contact

-----Original Message-----
From: ██████████████
Sent: Wednesday, October 31, 2001 11:40 AM
To: ████████ Roseboro, Brian; ████████████
Cc: ████████████
Subject: RE: Some thoughts on e-mail from a primary dealer contact

Had a different primary dealer tell me that they received a call from ████████ from ████████ yesterday about a rumor that Treasury would eliminate the long bond. The same dealer reports that the long bond was trading special on repo yesterday.

A third dealer in London said he heard rumor that the long bond would be eliminated yesterday from a European central bank.

-----Original Message-----
From: ██████████████
Sent: Wednesday, October 31, 2001 10:45 AM
To: Roseboro, Brian; ████████████
Cc: ████████████
Subject: Some thoughts on e-mail from a primary dealer contact

██████

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

**From:**
**Sent:**     Wednesday, October 31, 2001 3:19 PM
**To:**       Kerner, Francine;
**Subject:**  FW: Some thoughts on e-mail from a primary dealer contact

**Importance:**   High

-----Original Message-----
**From:**
**Sent:**     Wednesday, October 31, 2001 11:43 AM
**To:**                    Roseboro, Brian;

**Cc:**
**Subject:**  RE: Some thoughts on e-mail from a primary dealer contact
**Importance:** High

Thanks  one market contact who is pretty knowledgeable about this stuff was struck by the view that Treasury was trying to move the curve and attributed it mainly to a WSJ report that suggested this.

On another point, I just got my bleep chewed by an angry market participant who said she could not find the Fisher remarks on the Treasury web site. Can anyone point me in the right direction so I can pass it along to her? Thanks.

-----Original Message-----
**From:**
**Sent:**     Wednesday, October 31, 2001 10:45 AM
**To:**       Roseboro, Brian;
**Cc:**

**Subject:**  Some thoughts on e-mail from a primary dealer contact

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.



**From:**

**Sent:** Wednesday, October 31, 2001 3:19 PM

**To:** Kerner, Francine;

**Subject:** FW: Oct 31 Noon Report — A morning of surprises.. better-than-expected data but the curve flattens

-----Original Message-----
**From:**
**Sent:** Wednesday, October 31, 2001 1:02 PM
**To:** _DL_Market Group;

**Subject:** Oct 31 Noon Report — A morning of surprises.. better-than-expected data but the curve flattens

**A morning of surprises -- preliminary Q3 GDP and Chicago PMI better-than-expected; Treasury eliminates the long bond; buybacks as needed going forward**

**U.S. Markets**

**Treasuries:** Today's advance Q3 GDP data came in somewhat better-than-expected, contracting 0.4% q/q. At 10 a.m. Treasury announced it would eliminate issuance of 30-year nominal and inflation adjusted bonds and that while buybacks would continue for this year future buybacks would be announced quarterly. The decision caught participants off-guard. The bond rallied with the yield falling 29 bps to 4.92% in heavy trading. TIPS also rallied.

However, dealer contacts complained news of the bond's elimination had been leaked -- citing early morning rumors, tightness of the bond in the repo market yesterday, buying of cash and futures ahead of the official release as well as an early posting of the news on Treasury's website. A few dealers noted rumors had also circulated that Treasury would resume monthly 5-year auctions which was not announced today. Some dealers questioned whether the Administration was trying to flatten the Treasury curve to pass on lower rates to corporates and homeowners to stimulate the economy. Short-dated Treasuries underperformed, as accounts reallocated and bought bonds and on strength in U.S. equities. Anecdotally, some participants noted today's data coupled with lower rates at the back-end increased the likelihood the FOMC would cut by 25 bps next Tuesday, not 50 bps. The 2-10 year and 2-30-year curves are 11 and 23 bps flatter relative to this morning. Canadian long bonds benefitted, with the yield falling 16 bp

**U.S. equities** were mostly higher in active trading, in reaction to today's data. News Treasury was halting sales of long bonds also boosted stocks. Enron rose 14.2% to $12.75 on talk of a takeover by GE Capital, Berkshire Hathaway or Royal Dutch Petroleum.

**Global Markets**

**Fx:** The dollar gained following the data, and was also bolstered by strength in equities and Treasury's news about the bond and is currently about 0.5% firmer against most major currencies. This morning's move has pushed the euro and yen to near technically signficant levels at $0.90 and Y122.50, if these levels are broken, further dollar buying

could be triggered. (█████████

**Europe:** European bourses closed flat to 2.1% higher, with the CAC-40 outperforming as a number of firms announced cost-cutting moves and U.S. equities gained. German bund yields were up 2 to down 9 bps, with 30-year bunds outperforming. U.K. gilt yields fell 1 to 6 bps on slumping consumer confidence and expectations for another BOE rate cut. █████████

**Latin America:** Dealers noted this morning continued interest by a large Spanish bank to buy Argentine bonds earlier this morning, triggering further buying by others to cover short positions. However, later in the morning contacts noted rumors Argentina has moved its reserves to the BIS (interpretted as a move to protect Argentine assets from creditors in the event of a default) which has weighed somewhat on Argentine debt. The Argentine 08' bond is currently down 2 points. (█████████ █████████

| Today's Events: Period | Actual Consensus Expectation | Previous |
|---|---|---|
| US Q3 GDP, advance q/q | -0.4% q/q -1.0 q/q | 0.3% |
| US Q3 GDP deflator 2.1% | 2.1% 1.6% | |
| Treasury Quarterly Refunding | 10 a.m. | |
| Chicago PMI 46.6 | 46.2 44.0 | |

In addition to the PDF version of the report, please find text from today's Quarterly Refunding.

11/02/2001

A morning of surprises—preliminary Q3 GDP and Chicago PMI better-than-expected; Treasury eliminates the long bond; buybacks as needed going forward

10/31/01 1:01 PM

**U.S. Markets   Treasuries:** Today's advance Q3 GDP data came in somewhat better-than-expected, contracting 0.4%q/q. At 10a.m. Treasury announced it would eliminate issuance of 30-year nominal and inflation adjusted bonds and that while buybacks would continue for this year future buybacks would be announced quarterly. The decision caught participants off-guard. The bond rallied with the yield falling 29bps to 4.92% in heavy trading. TIPS also rallied. However, dealer contacts complained news of the bond's elimination had been leaked – citing early morning rumors, tightness of the bond in the repo market yesterday, buying of cash and futures ahead of the official release as well as an early posting of the news on Treasury's website. A few dealers noted rumors had also circulated that Treasury would resume monthly 5-year auctions which was not announced today. Some dealers questioned whether the Administration was trying to flatten the Treasury curve to pass on lower rates to corporates and homeowners to stimulate the economy. Short-dated Treasuries underperformed, as accounts reallocated and bought bonds and on strength in U.S. equities. Anecdotally, some participants noted today's data coupled with lower rates at the back-end increased the likelihood the FOMC would cut by 25bps next Tuesday, not 50bps. The 2-10 year and 2-30-year curve are 11 and 23bps flatter relative to this morning. Canadian long bonds benefitted, with the yield falling 16 bp(▒▒▒▒▒▒)

U.S. equities were mostly higher in active trading, in reaction to today's data. News Treasury was halting sales of long bonds also boosted stocks. Enron rose 14.2% to $12.75 on talk of a takeover by GE Capital, Berkshire Hathaway or Royal Dutch Petroleum.
( ▒▒▒▒▒▒▒▒ )

**Global Markets**

**Fx:** The dollar rallied following the data, on the back of strength in equities and Treasury's news about the bond and discurrently about 0.5% firmer against most major currencies. This morning's move has pushed the euro and yen to near technically significant levels at $0.90 and Y122.50, if these levels are broken, further dollar buying could be triggered.
( ▒▒▒▒▒▒▒▒ )

**Europe:** European bourses closed flat to 2.1% higher, with the CAC-40 outperforming as a number of firms announced cost-cutting moves and U.S. equities gained. German bund yields were up 2 to down 9bps, with 30-year bunds outperforming. U.K. gilt yields fell 11 to 6bps on slumping consumer confidence and expectations for another BOE rate cut.
( ▒▒▒▒▒▒▒ )

**Latin America:** Dealers noted this morning continued interest by a large Spanish bank to buy Argentine bonds earlier this morning, triggering further buying by others to cover short positions. However, later in the morning contacts noted rumors Argentina has moved its reserves to the BIS (interpreted as a move to protect Argentine assets from creditors in the event of a default) which has weighed down some whaton Argentine debt. The Argentine 08° bond is currently down 2 points.   ( ▒▒▒▒▒▒▒▒ )

| Equities | 1:01PM | Change |
|---|---|---|
| DJIA | 9,090 | -0.33% |
| Nasdaq | 1,685 | 1.05% |
| S&P500 | 1,061 | 0.09% |
| Wilshire TotMkt | 9,785 | 0.07% |
| DJIA Vol | 127,135,200 | |
| CanadianTSE | 6,354 | 0.41% |
| MexicanBolsa | 5,532 | 0.05% |
| BrazilianBovespa | 11,061 | 0.33% |
| GermanDax | 4,527 | -0.37% |
| FrenchCAC-40 | 4,341 | 2.10% |
| U.K.FTSE | 5,040 | 0.72% |
| Nikkei-225 | 10,366 | -1.39% |

| U.S. Treasuries | 1:01PM | Change bps |
|---|---|---|
| 1-month bill | 2.14% | 7 |
| 3-month bill | 2.07% | 3 |
| 6-month bill | 1.96% | -4 |
| 2-year | 2.47% | 2 |
| 5-year | 3.51% | -8 |
| 10-year | 4.26% | -16 |
| 30-year | 4.83% | -38 |

| Money Markets | 1:01PM | Change bps |
|---|---|---|
| Overnight rate | 2.69% | unchanged |
| December Fed Funds | | |
| contract implied yield | 2.03% | -3 |

| USD performance vs | 1:01PM | Change |
|---|---|---|
| Japanese yen | 122.39 | 0.39% |
| Euro | $ 0.9019 | 0.29% |
| Sterling | $ 1.4565 | -0.36% |
| Swiss franc | 1.6303 | 0.39% |
| Canadian dollar | 1.5871 | 0.60% |
| Mexican peso | 9.273 | 0.29% |
| Brazilian real | 2.695 | -0.99% |

| Other cross rates | 1:01PM | Change |
|---|---|---|
| Euro/yen | 110.34 | 0.05% |
| Euro/sterling | 0.6189 | -0.66% |

| Commodities | 1:01PM | Change |
|---|---|---|
| Gold | $279.30 | -$0.80 |
| Oil(Brent) | $19.63 | -$0.77 |
| Near-dated NYMEX | $21.22 | -$0.65 |
| futures contract | | |

**Today's Events:**

| | Actual | Previous Period | Consensus Expectation |
|---|---|---|---|
| US Q3 GDP advance | -0.4%q/q | 0.3%q/q -1.0q/q | |
| US Q3 GDP deflator | 2.1% | 2.1% 1.6% | |
| Treasury Quarterly Refunding | 9:45a.m. | | |
| Chicago PMI | 46.2 | 46.6 44.0 | |

TreasuryMarketRoom622-2650  GLOBALFINANCIALMARKETS
TimothyDuLaney,Director  10/31/0112:00PM

| | 31-Oct | 20-Oct | 31-Oct | Friday's close | This week | This year |
|---|---|---|---|---|---|---|
| Yen | 122.52 | 122.52 | 121.97 | 0.45% | 122.78 | -0.15% | 114.40 | -7.10% |
| Euro | 0.90 | 0.9001 | 0.9047 | 0.51% | 0.8932 | -0.77% | 0.9426 | -4.51% |
| Sterling | 1.45 | 1.4539 | 1.4513 | -0.18% | 1.4364 | -1.28% | 1.4931 | -2.43% |
| Swiss | 1.63 | 1.6345 | 1.6246 | 0.61% | 1.6512 | -1.01% | 1.6111 | -1.45% |
| Canadian $ | 1.59 | 1.5873 | 1.5783 | 0.57% | 1.5765 | 0.64% | 1.4991 | -5.88% |
| Australian $ | 0.50 | 0.5029 | 0.5046 | 0.34% | 0.5027 | -0.04% | 0.5588 | -10.00% |
| Korean won | 1291.00 | 1291.8 | 1293.8 | -0.15% | 1294.5 | -0.27% | 1265.00 | -2.06% |
| Indonesian rupiah | 10475.00 | 10475 | 10400 | 0.72% | 10260 | 2.10% | 9675.00 | -8.27% |
| Philippine peso | 51.95 | 51.95 | 51.95 | 0.00% | 52.05 | -0.19% | 50.00 | -3.90% |
| Thai baht | 44.71 | 44.71 | 44.70 | 0.02% | 44.58 | -0.38% | 43.40 | -3.02% |
| Taiwan $ | 34.50 | 34.50 | 34.50 | 0.00% | 34.51 | -0.06% | 33.12 | -4.17% |
| Polish zloty | 4.09 | 4.091 | 4.106 | -0.38% | 4.091 | -0.02% | 4.1325 | 1.02% |
| Russian ruble | 29.73 | 29.73 | 29.69 | 0.14% | 29.71 | 0.07% | 28.5410 | -4.17% |
| South African rand | 9.44 | 9.437 | 9.415 | 0.23% | 9.366 | 0.76% | 7.5900 | -24.34% |
| Mexican peso | 9.27 | 9.268 | 9.250 | 0.19% | 9.337 | 0.34% | 9.6410 | 3.87% |
| Brazilian real | 2.70 | 2.700 | 2.723 | -0.84% | 2.724 | -0.84% | 1.9500 | -38.46% |
| 1Wk(ei-Euay) | | | | | | | | |
| Gold | 279.00 | $279.00 | $280.50 | -0.53% | $271.40 | 0.58% | 272.40 | 2.42% |
| European Brent | 19.57 | $19.57 | $20.41 | -4.12% | $20.31 | -3.64% | 22.58 | -13.33% |
| Near Nymex fectures | 21.84 | $21.84 | $21.79 | -3.44% | $21.83 | -4.49% | 26.80 | -21.49% |
| CRB Index | 185.18 | $185.18 | $185.68 | -0.27% | $184.49 | 0.37% | 227.83 | -18.72% |
| Dow Jones | 9121 | 9,121 | 9,122 | -0.01% | 9,545 | -4.45% | 10786.85 | -15.45% |
| Nasdaq | 1700 | 1,700 | 1,667 | 1.94% | 1,769 | -3.91% | 2470.52 | -31.20% |
| S&P 500 | 1064 | 1,064 | 1,060 | 0.44% | 1,105 | -3.64% | 1320.28 | -19.38% |
| Nikkei 225 | 10366 | 10,366 | 10,513 | -1.39% | 10,795 | -3.97% | 13785.69 | -24.80% |
| Japan Topix | 1059 | 1,059 | 1,068 | -0.79% | 1,101 | -3.80% | 1283.67 | -17.47% |
| German DAX | 4559 | 4,559 | 4,544 | 0.33% | 4,820 | -5.42% | 6433.61 | -29.14% |
| French CAC-40 | 4341 | 4,341 | 4,252 | 2.10% | 4,479 | -3.07% | 5926.42 | -26.75% |
| U.K. FTSE-100 | 5040 | 5,040 | 5,004 | 0.72% | 5,189 | -2.87% | 6222.50 | -19.01% |
| H.K. Hang Seng | 10074 | 10,074 | 10,876 | -0.82% | 10,405 | -3.18% | 15095.53 | -33.27% |
| Korean Kospi | 538 | 538 | 534 | 0.74% | 543 | -1.03% | 504.62 | 6.58% |
| Taiwan Weighted | 3903 | 3,903 | 3,916 | -0.31% | 4,044 | -3.46% | 4743.94 | -17.72% |
| Polish Wig | 13736 | 13,736 | 13,691 | 0.33% | 13,895 | -1.14% | 17847.55 | -23.04% |
| South African JSE | 8543 | 8,543 | 8,506 | 0.44% | 8,574 | -0.36% | 8326.20 | 2.61% |
| Mexican Bolsa | 5577 | 5,577 | 5,529 | 0.87% | 5,693 | -2.03% | 5652.19 | -1.32% |
| Brazilian Bovespa | 11199 | 11,199 | 11,024 | 1.59% | 11,781 | -4.94% | 15259.29 | -26.61% |

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Overnight rate | 2.63 | 3 | 0.05 | 0 | 3.76 | 0 | 3.88 | -37 | 3.76 | 0 | 3.76 | 0 | 2.74 | 5 |
| 3-month bill | 2.07 | 3 | 0.01 | 0 | 3.52 | -4 | 4.16 | -6 | 3.41 | 0 | 3.52 | -4 | 2.37 | 2 |
| 2-year bond | 2.52 | 6 | 0.12 | 0 | 3.14 | 2 | 4.17 | 1 | 3.16 | 1 | 3.31 | 2 | 2.99 | 6 |
| 5-year bond | 3.62 | 3 | 0.47 | 1 | 3.74 | 1 | 4.55 | -1 | 3.81 | 1 | 3.88 | 1 | 4.20 | 4 |
| 10-year bond | 4.37 | -4 | 1.31 | -2 | 4.39 | -1 | 4.54 | -3 | 4.54 | -1 | 4.75 | 1 | 4.95 | -4 |
| 30-year bond | 4.94 | -26 | 2.49 | -4 | 5.05 | -4 | 4.32 | -8 | 5.89 | -10 | 5.39 | -6 | 5.39 | -17 |

| FIXEDINCOME | 2-yearFannie | 10-yearFannie | 10-yearswapspread | 2-10yearUSTspread | 2-30yearUSTspread |
|---|---|---|---|---|---|
| Current | 0.00 | 4.92 | 65 | 186 | 243 |
| Bpschange | unchanged | -4 | 0 | -11 | -33 |

| EMERGING FIXED INCOME | Korea '08 | TallIssu'11 | Iodoesia'06 | Russia Minfin'07 | Poland D1 |
|---|---|---|---|---|---|
| Current | 5.58 | 5.54 | 11.08 | 13.61 | 7.05 |
| Bpschange | -5 | -6 | unchanged | unchanged | -1 |
| | ArgentinaPar | BrazilIC | MexicoPar | VenezuelaDCB | |
| Current | 41.08 | 15.93 | 9.34 | 13.44 | |
| Bpschange | 263 | -18 | 6 | 9 | |

GlobalEmergingMarketsPerformance
10/31/0112:50PM

TreasuryMarketsRoom
TimDulancy.Director
622-3052

| Currencies | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| UnitChange(inlocalcurrency terms) | | | Percent Change (In Dollars per Unit Terms) | | | | | |
| | 31-Oct | 30-Oct | 31-Oct | 30-Oct | Thisweek | This month | Thisyear | In'00 | In'99 |
| Japan | 122.52 | 121.97 | -0.5% | 0.0% | 0.1% | -2.5% | -7.1% | -11.9% | 11.3% |
| Euro | 0.9001 | 0.9047 | -0.5% | -0.1% | 0.8% | -1.3% | -4.5% | -6.3% | -14.3% |
| EuroYen | 110.26 | 110.33 | -0.1% | -0.1% | 0.5% | 1.3% | 2.4% | 4.4% | -22.3% |
| UK | 1.4539 | 1.4513 | 0.2% | -0.2% | 1.2% | -1.4% | -2.6% | -7.7% | -2.5% |
| Germany | 2.1733 | 2.1620 | -0.5% # | -0.1% # | 0.8% # | -1.3% # | -.4.7% | -6.8% 2 | -13.8% |
| Australia | 0.5029 | 0.5046 | -0.3% # | -0.9% # | 0.0% # | 2.4% # | -10.0% | -14.9% | -0.5% |
| Canada | 1.5873 | 1.5783 | -0.6% # | 0.0% # | -0.7% # | -0.5% # | -5.9% | -3.7% | -1.0% |
| Gold | 279.00 | 280.50 | -0.5% | 0.3% | 0.6% | -4.8% | 2.4% | -5.5% | -0.4% |
| Thailand | 44.71 | 44.7 | 0.0% | 0.2% | 0.4% | -0.6% | -3.0% | -15.7% | -2.3% |
| Indonesia | 10,475 | 10400 | -0.7% | -1.3% | -2.1% | -7.9% | -8.3% | -38.5% | 14.5% |
| Malaysia | 3.80 | 3.80 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Philippines | 51.95 | 51.95 | 0.0% | 0.0% | 0.2% | -1.2% | -3.9% | -24.1% | -4.2% |
| SouthKorea | 1,291 | 1293 | 0.2% | -0.1% | 0.3% | 1.0% | -2.1% | -11.4% | 6.0% |
| Taiwan | 34.50 | 34.50 | 0.0% | 0.0% | 0.1% | 0.0% | -4.2% | -5.5% | 2.7% |
| Singapore | 1.8231 | 1.8241 | 0.1% | 0.3% | 0.2% | -3.2% | -5.2% | -4.1% | -1.0% |
| China | 8.28 | 8.28 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Brazil | 2.7000 | 2.7230 | 0.8% | 0.0% | 0.9% | -1.1% | -38.5% | -8.0% | -33.1% |
| Mexico | 9.2680 | 9.2500 | -0.2% | 0.2% | -0.3% | 2.4% | 3.9% | -1.4% | 4.1% |
| Chile | 713.45 | 716.35 | 0.4% | -0.1% | 0.2% | -2.9% | -24.3% | -8.3% | -10.7% |
| Colombia | 2,308.00 | 2306.00 | -0.1% | 0.2% | 0.3% | 1.1% | -3.2% | -19.3% | -17.3% |
| Venezuela | 743.41 | 743.65 | 0.0% | 0.0% | 0.0% | -0.1% | -6.3% | -7.8% | -13.0% |
| Poland | 4.0905 | 4.1060 | 0.4% | -0.5% | 0.0% | 3.2% | 1.0% | 0.1% | -15.1% |
| Hungary | 283.58 | 283.20 | -0.1% | -0.8% | -0.2% | -0.6% | -1.0% | -11.0% | -14.5% |
| Czech | 37.333 | 37.199 | -0.4% | -0.3% | 1.0% | -0.2% | 0.8% | -5.1% | -15.7% |
| Russia | 29.731 | 29.690 | -0.1% | 0.0% | -0.1% | -0.9% | -4.2% | -3.6% | -15.2% |
| SouthAfrica | 9.4371 | 9.4151 | -0.2% | 0.4% | -0.8% | -4.5% | -24.3% | -23.5% | -4.5% |
| Turkey | 1,593,500 | 1,595,000 | 0.1% | 0.9% | 1.0% | -4.2% | -137.7% | -23.6% | -41.9% |
| Greece | 378.64 | 376.67 | -0.5% | -0.1% | 0.8% | -1.3% | -4.8% | -10.2% | -13.9% |

| Equities (In local currency terms) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unit Change | | | Percent Change | | | | | |
| | 31-Oct | 30-Oct | 31-Oct | 30-Oct | Thiswk | Thismo | Thisyr | In'00 | In'99 |
| Dow | 9121 | 9122 | 0.0% # | -1.6% # | -4.4% # | 3.1% # | -15.4% | -6.2% | 25.2% |
| Nasdaq | 1700 | 1667 | 1.9% # | -1.9% # | -3.9% # | 13.4% # | -31.2% | -39.3% | 85.6% |
| Nikkei | 10366 | 10513 | -1.4% | -0.9% | -4.0% | 6.1% | -24.8% | -27.2% | 36.8% |
| FT-SE100 | 5040 | 5004 | 0.7% | -1.6% | -2.9% | 2.8% | -19.0% | -10.2% | 17.8% |
| DAX | 4559 | 4544 | 0.3% | -2.5% | -5.4% | 5.8% | -29.1% | -7.5% | 39.1% |
| CAC-40 | 4341 | 4252 | 2.1% | -3.0% | -3.1% | 6.4% | -26.7% | -0.5% | 51.1% |
| Thailand | 275 | 274 | 0.5% | -1.6% | -2.0% | -0.7% | 2.2% | -44.1% | 35.4% |
| Indonesia | 384 | 378 | 1.4% | -1.6% | -1.1% | -2.1% | -7.8% | -38.5% | 70.1% |
| Malaysia | 600 | 603 | -0.5% | -0.4% | -2.0% | -2.5% | -11.7% | -16.3% | 38.6% |
| Philippines | 993 | 995 | -0.2% | 0.0% | -0.9% | -11.8% | -33.5% | -30.3% | 8.8% |
| HongKong | 10074 | 10076 | 0.0% | -1.0% | -3.2% | 1.2% | -33.3% | -11.0% | 68.8% |
| SouthKorea | 538 | 534 | 0.7% | -2.6% | -1.0% | 12.1% | 6.6% | -50.9% | 82.8% |
| Taiwan | 3903 | 3916 | -0.3% | -3.7% | -3.5% | 7.3% | -17.7% | -43.9% | 31.6% |
| Singapore | 1368 | 1383 | -1.1% | -0.7% | -3.1% | 3.7% | -29.0% | -22.3% | 78.0% |
| China | 156 | 155.07 | 0.8% | -1.3% | 0.2% | 3.2% | 74.6% | 136.2% | 32.0% |
| Brazil* | 11199 | 11024 | 1.6% | -3.1% | -4.9% | 5.3% | -26.6% | -10.7% | 151.9% |
| Argentina* | 228 | 224 | 2.1% | 1.8% | -5.1% | -6.3% | -45.2% | -24.3% | 28.0% |
| Mexico* | 5577 | 5529 | 0.9% | -1.2% | -2.0% | 3.2% | -1.3% | -20.7% | 80.1% |
| Chile | 104 | 103 | 0.5% | 0.0% | -1.1% | 4.9% | 7.6% | -32.6% | 41.8% |
| Colombia | 817 | 817 | 0.0% | -0.2% | 0.5% | -12.3% | 14.6% | -28.6% | -9.3% |
| Venezuela | 6582 | 6635 | -0.8% | -0.5% | -1.6% | -6.5% | -3.6% | 26.0% | 14.8% |
| Poland | 13736 | 13691 | 0.3% | -1.9% | -1.1% | 15.5% | -23.0% | -1.3% | 41.3% |
| Hungary | 6773 | 6685 | 1.3% | -2.0% | -0.5% | 9.7% | -13.7% | -11.0% | 39.8% |
| Czech | 375 | 373 | 0.8% | -1.1% | -0.3% | 13.1% | -21.6% | -2.3% | 24.2% |
| Russia | 204 | 205 | -0.3% | 1.8% | 2.5% | 13.2% | 42.4% | -18.2% | 197.4% |
| SouthAfrica | 8543 | 8506 | 0.4% | -1.3% | -0.4% | 5.1% | 2.6% | -2.5% | 57.3% |
| Turkey | 9849 | 9920 | -0.7% | 0.0% | -0.7% | 29.1% | 4.4% | -37.9% | 485.4% |
| Greece | 2468 | 2383 | 3.6% | -0.3% | 4.1% | 10.9% | -27.2% | -38.8% | 102.2% |

*EquitiesbegantradinginBrazil,Argentina,andMexicoat6:00a.m.,9:00a.m.,and9:30a.m.Easterntimerespectively.

# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview | 2002-0104 | ████████ , Investigator ████████ |
| Telephone Contact | Date: | |
| Records Review | November 7, 2001 | |
| Other (Describe): | Time: | |
| | 6:30 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ████████ Public Affairs Specialist Office of Public Affairs Department of the Treasury Washington, DC | Department of the Treasury Office of General Counsel 1500 Pennsylvania Avenue, NW Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████ (202/████) and ████████ (202/████) of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activity in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

████████ said ███ has been employed as a public affairs specialist by the Office of Public Affairs, since ███. ███ immediate supervisors are ████████ Office of Public Affairs and ████████ Public Affairs.

████████ said as part of ███ official duties, ███ helped coordinate the October 31, 2001, press conference where the

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

suspension of the sale of the 30-year bond was announced. ██████ said ███ announced three times at the press conference, that the information presented by Under Secretary Fisher and contained in the press release was embargoed until 10:00 a.m. ██ said ██ mentioned the embargo at the beginning of the press conference, before the question and answer period, and at the conclusion. ████ added that ███ gave the "ground rules" and that the reporters were governed by the honor system to not release the information prior to the embargo time. ████ said no one left the room prior to the conclusion of the conference, at approximately 9:25 a.m.

██████ said ██ did not know how the announcement was posted on the Web site prior to the 10:00 a.m. embargo and that ██ was "shocked" at what happened. ████ said ██ was not aware of a similar incident like this happening before.

██████ said ██ looked at a copy of the press release following the press conference, at approximately 10:15 a.m. and noticed it said for immediate release, instead of an embargo time. ████ said ██ did not know how immediate release got placed on the press announcement. ████ said there were two versions of the press release, one with the soft letterhead and the final version with the hard letterhead. The first version had the embargo time on it, while the final version did not. ████ said ██ heard from ███████████ there was a problem in formatting the press release so that it could appear on the Web site.

████ said ██ did not know ████████ and only heard ████ name after the fact. ███ said ██ did not clear ███ into the press conference.

Reviewed by:  Date: _____

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/2/02
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury



# DEPARTMENT OF THE TREASURY
## OFFICE OF PUBLIC AFFAIRS

**Embargoed until 10:00 AM**
October 31, 2001

Contact Betsy Holahan
at 202-622-2960.

### UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
### PETER R. FISHER
### REMARKS AT THE NOVEMBER 2001 QUARTERLY REFUNDING

As a consequence of the further weakening of the economy and the increased federal outlays that have occurred since the attacks of September 11th, the near-term financing requirements of the federal government are larger than we anticipated just three months ago at our last quarterly refunding in August. In this setting, the management of the Treasury's marketable debt needs to anticipate the possibility of a unified budget deficit for this fiscal year and, perhaps, the following fiscal year as well. However, even if this happens, we expect that the federal government will return to surpluses in the coming years.

With this outlook in mind, today we are announcing:

- The terms of the November refunding, including a new 5-year note in the amount of $16 billion and a reopening of the 5 percent 10-year note issued in August 2001 in the amount of $7 billion; and that

- We are adjusting the debt buyback program as follows:

  - We will continue to conduct buybacks for the remainder of this calendar year;

  - We will make no buybacks in January 2002; and

  - Beginning in February 2002, we will announce at our quarterly refundings the amount and timing of any buyback operations for the subsequent three-month period; and finally that

- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

## Recent Changes in the Fiscal Outlook

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

## Suspension of Thirty-Year Borrowing

The debt management strategy of the Treasury has been to strive to be regular and predictable in the issuance of debt while minimizing borrowing costs over many years and interest rate cycles. The Treasury does not try to outsmart the market at any one moment or to be a "market timer" with respect to any particular shape of the yield curve. However, debt management necessarily involves judgments about the size and duration of the federal government's borrowing needs. This compels us to focus on likely borrowing needs over the coming years but we also take into account the likely consequences of unlikely outcomes.

We do not need the 30-year bond to meet the government's current financing needs, nor those that we expect to face in coming years. Looking beyond the next few years, as I already observed, we believe that the likely outcome is that the federal government's fiscal position will improve after the temporary setback that we are now experiencing.

There are two less likely outcomes that we have also considered.

First, it is possible that the federal government will return to significant and sustained budget surpluses even more quickly than we now expect. In this event, maintaining current issuance levels of 30-year bonds would be unnecessary and expensive to taxpayers.

Second, we face the possibility that sustained surpluses do not materialize as promptly as we now expect. If later in this decade it turns out that 30-year borrowing is necessary to meet the government's financing needs, it is still likely that our decision to suspend 30-year borrowing at this time will have saved the taxpayers money. In addition, the reintroduction of the 30-year bond, at some point in the future, if necessary, would likely be costless to the Treasury.

The 30-year bond no longer maintains a position of significance in the financial markets. Its role and its liquidity have been significantly impaired by the substantial reduction of issuance that has occurred over the last decade. But the markets have functioned smoothly during this period while both activity and attention have shifted to our 10-year offerings.

As long as we have borrowing requirements to finance, the Treasury will seek to maintain the liquidity and depth of the instruments we issue as a means of achieving the lowest cost of borrowing for the taxpayer over time. At this time, the best means for us to do this is to suspend issuance of the 30-year bond and concentrate our borrowing needs on our other instruments.

### Adjustment of the buyback program

In response to the altered budget outlook for this fiscal year, we are also making adjustments in our buyback program. Beginning in February 2002, our decisions on whether to conduct buyback operations, and on the amount and timing of any purchases, will be made at the time of our regular quarterly refunding announcements and will be based upon three factors:

- first, our projections of the federal government's annual, unified surplus or deficit position;

- second, our projections of that three-month period's cash position; and,

- third, our analysis of how best to minimize borrowing costs over time.

In making the transition to these new procedures, our buyback operations for the remainder of this calendar year will continue in line with our prior announcements. In August we stated that we would be purchasing approximately $9 billion during the fourth calendar quarter. So far we have purchased $2.5 billion and the remaining $6.5 billion will be purchased in November and December. Due to the holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the

presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

### Terms of the November Refunding

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.

2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.



TREASURY NEWS

---

### FROM THE OFFICE OF PUBLIC AFFAIRS

FOR IMMEDIATE RELEASE
October 31, 2001
PO-749

### UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
### PETER R. FISHER
### REMARKS AT THE NOVEMBER 2001 QUARTERLY REFUNDING

---

As a consequence of the further weakening of the economy and the increased federal outlays that have occurred since the attacks of September 11th, the near-term financing requirements of the federal government are larger than we anticipated just three months ago at our last quarterly refunding in August. In this setting, the management of the Treasury's marketable debt needs to anticipate the possibility of a unified budget deficit for this fiscal year and, perhaps, the following fiscal year as well. However, even if this happens, we expect that the federal government will return to surpluses in the coming years.

- The terms of the November refunding, including a new 5-year note in the amount of $16 billion and a reopening of the 5 percent 10-year note issued in August 2001 in the amount of $7 billion; and that
- We are adjusting the debt buyback program as follows:
    - We will continue to conduct buybacks for the remainder of this calendar year;
    - We will make no buybacks in January 2002; and
    - Beginning in February 2002, we will announce at our quarterly refundings the amount and timing of any buyback operations for the subsequent three-month period; and finally that
- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

### Recent Changes in the Fiscal Outlook

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

### Terms of the November Refunding

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.
2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.

Search | Email | Treasury Home Page | Sitemap

## UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
### PETER R. FISHER
### REMARKS AT THE NOVEMBER 2001 QUARTERLY REFUNDING

As a consequence of the further weakening of the economy and the increased federal outlays that have occurred since the attacks of September 11th, the near-term financing requirements of the federal government are larger than we anticipated just three months ago at our last quarterly refunding in August. In this setting, the management of the Treasury's marketable debt needs to anticipate the possibility of a unified budget deficit for this fiscal year and, perhaps, the following fiscal year as well. However, even if this happens, we expect that the federal government will return to surpluses in the coming years.

With this outlook in mind, today we are announcing:

- The terms of the November refunding, including a new 5-year note in the amount of $16 billion and a reopening of the 5 percent 10-year note issued in August 2001 in the amount of $7 billion; and that

- We are adjusting the debt buyback program as follows:

  - We will continue to conduct buybacks for the remainder of this calendar year;

  - We will make no buybacks in January 2002; and

  - Beginning in February 2002, we will announce at our quarterly refundings the amount and timing of any buyback operations for the subsequent three-month period; and finally that

- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

### Recent Changes in the Fiscal Outlook

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

### Suspension of Thirty-Year Borrowing

The debt management strategy of the Treasury has been to strive to be regular and predictable in the issuance of debt while minimizing borrowing costs over many years and interest rate cycles. The Treasury does not try to outsmart the market at any one moment or to be a "market timer" with respect to any particular shape of the yield curve. However, debt management necessarily involves judgments about the size and duration of the federal government's borrowing needs. This compels us to focus on likely borrowing needs over the coming years but we also take into account the likely consequences of unlikely outcomes.

We do not need the 30-year bond to meet the government's current financing needs, nor those that we expect to face in coming years. Looking beyond the next few years, as I already observed, we believe that the likely outcome is that the federal government's fiscal position will improve after the temporary setback that we are now experiencing.

There are two less likely outcomes that we have also considered.

First, it is possible that the federal government will return to significant and sustained budget surpluses even more quickly than we now expect. In this event, maintaining current issuance levels of 30-year bonds would be unnecessary and expensive to taxpayers.

Second, we face the possibility that sustained surpluses do not materialize as promptly as we now expect. If later in this decade it turns out that 30-year borrowing is necessary to meet the government's financing needs, it is still likely that our decision to suspend 30-year borrowing at this time will have saved the taxpayers money. In addition, the reintroduction of the 30-year bond, at some point in the future, if necessary, would likely be costless to the Treasury.

The 30-year bond no longer maintains a position of significance in the financial markets. Its role and its liquidity have been significantly impaired by the substantial reduction of issuance that has occurred over the last decade. But the markets have

functioned smoothly during this period while both activity and attention have shifted to our 10-year offerings.

As long as we have borrowing requirements to finance, the Treasury will seek to maintain the liquidity and depth of the instruments we issue as a means of achieving the lowest cost of borrowing for the taxpayer over time. At this time, the best means for us to do this is to suspend issuance of the 30-year bond and concentrate our borrowing needs on our other instruments.

### Adjustment of the buyback program

In response to the altered budget outlook for this fiscal year, we are also making adjustments in our buyback program. Beginning in February 2002, our decisions on whether to conduct buyback operations, and on the amount and timing of any purchases, will be made at the time of our regular quarterly refunding announcements and will be based upon three factors:

- first, our projections of the federal government's annual, unified surplus or deficit position;

- second, our projections of that three-month period's cash position; and,

- third, our analysis of how best to minimize borrowing costs over time.

In making the transition to these new procedures, our buyback operations for the remainder of this calendar year will continue in line with our prior announcements. In August we stated that we would be purchasing approximately $9 billion during the fourth calendar quarter. So far we have purchased $2.5 billion and the remaining $6.5 billion will be purchased in November and December. Due to the holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

**Terms of the November Refunding**

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.

2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.

- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

## Recent Changes in the Fiscal Outlook

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

## Suspension of Thirty-Year Borrowing

The debt management strategy of the Treasury has been to strive to be regular and predictable in the issuance of debt while minimizing borrowing costs over many years and interest rate cycles. The Treasury does not try to outsmart the market at any one moment or to be a "market timer" with respect to any particular shape of the yield curve. However, debt management necessarily involves judgments about the size and duration of the federal government's borrowing needs. This compels us to focus on likely borrowing needs over the coming years but we also take into account the likely consequences of unlikely outcomes.

We do not need the 30-year bond to meet the government's current financing needs, nor those that we expect to face in coming years. Looking beyond the next few years, as I already observed, we believe that the likely outcome is that the federal government's fiscal position will improve after the temporary setback that we are now experiencing.

There are two less likely outcomes that we have also considered.

First, it is possible that the federal government will return to significant and sustained budget surpluses even more quickly than we now expect. In this event, maintaining current issuance levels of 30-year bonds would be unnecessary and expensive to taxpayers.

Second, we face the possibility that sustained surpluses do not materialize as promptly as we now expect. If later in this decade it turns out that 30-year borrowing is necessary to meet the government's financing needs, it is still likely that our decision to suspend 30-year borrowing at this time will have saved the taxpayers money. In addition, the reintroduction of the 30-year bond, at some point in the future, if necessary, would likely be costless to the Treasury.

The 30-year bond no longer maintains a position of significance in the financial markets. Its role and its liquidity have been significantly impaired by the substantial reduction of issuance that has occurred over the last decade. But the markets have functioned smoothly during this period while both activity and attention have shifted to our 10-year offerings.

As long as we have borrowing requirements to finance, the Treasury will seek to maintain the liquidity and depth of the instruments we issue as a means of achieving the lowest cost of borrowing for the taxpayer over time. At this time, the best means for us to do this is to suspend issuance of the 30-year bond and concentrate our borrowing needs on our other instruments.

### Adjustment of the buyback program

In response to the altered budget outlook for this fiscal year, we are also making adjustments in our buyback program. Beginning in February 2002, our decisions on whether to conduct buyback operations, and on the amount and timing of any purchases, will be made at the time of our regular quarterly refunding announcements and will be based upon three factors:

- first, our projections of the federal government's annual, unified surplus or deficit position;

- second, our projections of that three-month period's cash position; and,

- third, our analysis of how best to minimize borrowing costs over time.

In making the transition to these new procedures, our buyback operations for the remainder of this calendar year will continue in line with our prior announcements. In August we stated that we would be purchasing approximately $9 billion during the fourth calendar quarter. So far we have purchased $2.5 billion and the remaining $6.5 billion will be purchased in November and December. Due to the holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the

presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

## Terms of the November Refunding

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.

2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: 2002-0104 | Conducted by (Name, Title, and Signature) |
| --- | --- | --- |
| [X] Personal Interview | Date: November 14, 2001 | ██████ Investigator ██████ |
| Telephone Contact | | |
| Records Review | Time: 4:00 p.m. | |
| Other (Describe): | | |

| Subject of Activity: | Location of Activity: |
| --- | --- |
| ███████████ Public Information Coordinator Office of Public Affairs Department of the Treasury Washington, DC | Department of the Treasury Office of General Counsel 1500 Pennsylvania Avenue, NW Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████ ███/███████ and ███████/ ███████ of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

████████████ said ████ has been employed by the Department of the Treasury since ████ ████ has worked in the Office of Public Affairs for the past ████ years. ████ immediate supervisor is ████ ████████ ██████████, Office of Public Affairs.

████ official duties at the Office of Public Affairs include formatting and posting press releases on the Treasury Web site, calling news producers to announce press conferences and sending

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. 552, 552a.

Date Printed: 1/2/02
Form 01-09

Office of the Inspector General - Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

~~out media advisories.~~ ██ ~~also receives calls from the non~~
Treasury press who need to be cleared through the United States
Secret Service Uniformed Division (UD), in order to attend the
press conferences. ██ in turn gives their name, Social
Security Number, and Date of Birth to the UD control center for
clearance. The name of their employer/affiliation is not
requested by UD.

██████ said ██ attended the October 31, 9:00 a.m. press
conference, but was posted outside the Diplomatic Reception
Room, where the conference was held. ██ said prior to the
start of the press conference, ██ helped pass out the press
releases. ██ said ████████, ████████ Market Finance, asked
██ to stand out in the hall to keep an eye on some charts that
were to be handed out at the conclusion of the conference.
said no one left the room until the conference concluded at
approximately 9:25 a.m. ██ said, since the doors were closed,
██ did not hear an announcement concerning the 10:00 a.m. press
embargo.

At the conclusion of the conference, ██████ said ██ returned
to ██ office to send out the press release on the Treasury Web
site. ██ said there had been earlier problems with formatting
the press release with the proper Treasury letterhead. The
final press release ██ saw said for "immediate release."
said ██ posted it on the WEB sometime before 10:00 a.m.
said ██ did not know the exact time it went out. ██ said ██
was unaware of the 10:00 a.m. embargo.

<u>Investigative Note:</u>  The first version of the Office of Public
Affairs press release contained the 10:00 a.m. embargo and had
the soft letterhead (Treasury Building Logo). The second
version had immediate release and no embargo time. It was
printed on the hard letterhead (Treasury Seal).

Reviewed by ██████  Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is <u>FOR OFFICIAL USE ONLY</u>, and its disclosure
to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General — Investigations
Department of the Treasury

# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: 2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview | | |
| [ ] Telephone Contact | Date: November 14, 2001 | ████████ "Investigator" ████████ |
| [ ] Records Review | | |
| [ ] Other (Describe): | Time: 4:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ████████ Office of Public Affairs Department of the Treasury Washington, DC | Department of the Treasury Office of General Counsel 1500 Pennsylvania Avenue, NW Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████ (████████) and ████████ of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activity in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

████████ said ████ was appointed ████████ of the Office of Public Affairs on ████████, ████. ████████ stated that ████████ ████████ Michele Davis, Assistant Secretary, Public Affairs. ████████ said part of ████ responsibilities include coordinating press conferences and press releases.

████████ said ████ was present at the October 31, 2001, 9:00 a.m. quarterly funding press conference. ████████ subordinate ████████

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

████████, who helped coordinate the briefing, introduced Under Secretary Fisher and made the 10:00 a.m. embargo announcement. ██ said to the best of ████ knowledge no one left the room prior to the 9:25 a.m. conclusion of the conference.

████████ said ██ first heard of the decision to suspend sales of the 30-year bond on Thursday, October 26, 2001. ████said Under Secretary Peter Fisher informed ████ of the decision on that date, as they discussed procedures for the October 31st quarterly refunding press conference. ████████ said this was going to be Fisher's first quarterly funding briefing. ██ said the only people in ████ office that had advance knowledge of the announcement besides ████ were ████████ and Assistant Secretary Michele Davis. ████████ said ██ knew this information was privileged and discussed it with no outside individuals.

████████ stated that the early posting of the Under Secretary's announcement on the Treasury Web site was as much ██ mistake as anybody's. ████ said it was miscommunication to ████ subordinate ████████ The final copy of the press announcement did not have the 10:00 a.m. embargo time on it but instead read for immediate release. ████████ said ██ thought ████████ was at the press conference and was aware of the embargo time. ████████ said ██had seen an earlier version of the press announcement with the 10:00 a.m. embargo printed on it.

████████ said this was the first time they had set an embargo time (10:00 a.m.) prior to the conference. Normally they poll the press at the conclusion of the press conference and then set the embargo time. ████ said ██ was not aware of any member of the press violating the embargo. ██said if they did, ██would revoke their Treasury press credentials.

When asked if ████ knew ████████. ████████responded that ██ did not learn who ██ was until after the fact. ████ said subsequently learned that ████████ was cleared to attend the conference by ████████'s secretary. ████████ said is the ████████ Market Finance. ████████ said it was understanding that ████████'s predecessor had allowed ████████ to

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form OI-09

Office of the Inspector General — Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

attend the quarterly press conferences since 1993 and that the
Office of Market Finance has continued that practice to the
present.

████ said it never occurred to ████ that anyone other than
government officials or the press would be in the room attending
the quarterly press conferences. ████ said because of this
incident, ████ office would be adopting new press conference
procedures, which are appended as attachment (1).

<u>Investigative Note:</u> Subsequent to ████ s November 14, 2001,
interview and pursuant to SECs request to clarify a quotation
made by ████ in the November 15, 2001, <u>Wall Street Journal</u>, ████
was re-contacted by Treasury, Office of General Counsel. As
reported in the article, ████ is quoted as saying, "It's
likely that others in the past" and then the reporter
paraphrased the remainder of the statement as [have participated
in press briefings though they weren't members of the press.]

████ stated that the quotation was incomplete. ████ recalled
sayings words to the effect that "I can't say for certain, but I
think it's likely that others in the past have found their way
into these things." ████ said that ████ meant that, given that
████ had been admitted by the prior administration for
years, ████ found it likely that someone else may also have
wandered in during the past administration. ████ said ████ did not
know of any such occasions, but believed it a reasonable
possibility. ████ s clarification comments appended as
attachment (2).

Attachments:

   (1)   Memorandum from Office of Public Affairs
   (2)   Memorandum to ████████, SEC from ████████
        ████████ General Counsel, dated November 15, 2001



Reviewed by ████ Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is <u>FOR OFFICIAL USE ONLY</u>, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Doc Printed: 11/30/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

From the Office of Public Affairs

Treasury Department Sets Procedures for Quarterly Refunding Announcements

The Treasury Department Office of Public Affairs is modifying its procedure for disseminating the announcement of the government's quarterly refunding needs. The changes are intended to improve the timeliness and transparency of quarterly refunding announcements.

Starting with the next scheduled refunding announcement on January 30, 2002, Treasury's Office of Public Affairs will post the announcement on the Treasury web site (www.Treas.gov) at 9:00AM (EST). The announcement also will be delivered to credentialed members of the media in the Treasury Pressroom shortly before 9:00AM with lock-down embargo rules. The announcements include release of the Treasury Department's borrowing estimates for the following quarter and the policy statement.

The traditional practice of releasing the quarterly refunding announcement at a news conference will be discontinued. A senior Treasury official will brief members of the media subsequent to the announcement at a regularly scheduled time.

The Office of Public Affairs will disseminate Treasury information in the most timely and transparent manner possible while also maintaining confidentiality prior its proper release.



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 15, 2001

**BY TELECOPIER**

███████████, Esq.
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

Re:    <u>SEC Inquiry</u>

Dear ████████:

    Pursuant to the SEC's request to clarify it, I contacted ████████ regarding ██ quote in the November 15, 2001, Wall Street Journal piece by Gregory Zuckerman. As reported in the column, █████████ is quoted as saying, "It's likely that others in the past" and then the reporter paraphrased the remainder of the statement as [have participated in press briefings though they weren't members of the press.]

    █████████ stated that the quotation is incomplete. ██ recalls saying words to the effect that "I can't say for certain, but I think it's likely that others in the past have found their way into these things." ████████ said that ██ meant that, given that ████████ had been admitted by the prior administration for years, ██ found it highly likely that someone else may also have wandered in during the past administration. ██ does not know of any such occasions, but that is just what ██ believes is a reasonable probability.

    I hope this answers your question as to the meaning of the statement.

Sincerely,

████████████

████████████ Counsel

cc: ████████████



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| ☐ Personal Interview | 2002-0104 | |
| ☒ Telephone Contact | Date: | ██████ Investigator ████████████ |
| ☐ Records Review | December 19, 2001 | |
| ☐ Other (Describe): | Time: | |
| | 9:30 a.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ██████ General Counsel<br>Department of the Treasury<br>Washington, DC<br>202/622-8236 | Office of the Inspector General<br>740 15th Street, NW<br>Washington, DC |

On the above date and time, ██████████ ████████████ Counsel, Department of the Treasury, was interviewed by the Office of Inspector General (OIG). ██████ had previously participated with the Securities and Exchange Commission (SEC) and the OIG in interviews of the Treasury employees.

██████ said ████ was aware of the recently adopted press conference procedures, that will go into practice with the next refunding conference announcement, effective January 30, 2002. ██████ said ████ was not aware of an earlier Treasury policy or written procedures governing admittance to the quarterly funding press conferences.

██████ said the Office of Market Finance would not be involved in procedures involving press admittance to the quarterly funding press conferences. ██████ suggested that the OIG contact ████████ ██████ ████████ Office of Public Affairs, for further clarification regarding press admission procedures.



Reviewed by ██████████ Date: 12/27/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury



# MEMORANDUM OF ACTIVITY

| Type of Activity: | | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|---|
| | Personal Interview | 2002-0104 | |
| X | Telephone Contact | Date: | ████████ Investigator ████████████ |
| | Records Review | December 19, 2001 | |
| | Other (Describe): | Time:<br>4:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ████████<br>**Office of Public Affairs**<br>**Department of the Treasury**<br>**Washington, DC**<br>**202/622-**████ | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, ████████, ████████, Office of Public Affairs (PA), was re-contacted by the Office of Inspector General (OIG). ████ confirmed the new press conference procedures instituted by PA and effective January 30, 2002, for the next scheduled refunding announcement. Press attending the future conferences will have to have Treasury or White House press credentials or be cleared through PA and issued press visitor passes. Regular Treasury visitor passes will no longer be accepted.

████████ said when ████ became ████████ of PA; ████ discussed general press conference procedures with former Assistant Secretary for PA, Michelle Smith. ████████ said ████ was not aware of any formal written policy regarding press admittance procedures that were in effect for the October 31, 2001, refunding conference. The PA announcement letters only provided instruction to the media without Treasury credentials, on procedures to follow to gain admittance to the press conference. These included providing their name, date of birth and social security number to PA by a certain announced time.

Reviewed by: ████████ Date 7/24/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/22/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number:<br>2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview<br>[ ] Telephone Contact<br>[ ] Records Review<br>[ ] Other (Describe): | Date:<br>November 7, 2001<br>Time:<br>4:30 p.m. | Michael Knorr, Investigator  *Michael C Knor* |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Brian C. Roseboro**<br>**Assistant Secretary**<br>**For Financial Markets**<br>**Department of the Treasury**<br>**Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████████ ███/██-██ and ████████████ of the Division of Enforcement, United States Securities and Exchange Commission (SEC), in — coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

Brian Roseboro said he was appointed Assistant Secretary for Financial Markets in July of this year. He said he attended the October 31, 2001, press conference, where his supervisor, Under Secretary Peter Fisher, announced the suspension of sales of the 30-year bond. At the conclusion of the press conference, at approximately 9:25 a.m., Roseboro said he returned to his office to get ready for a previously arranged 10:00 a.m. conference call to Congressional staffers concerning the Treasury

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Doc Printed: 12/3/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

announcement. He said at 9:57 a.m., while waiting to make his phone call, he saw the Treasury announcement eliminating sales of the 30-year bond appear on the Bloomberg news wire. At that time, he realized the embargo had been violated.

Roseboro said as the Assistant Secretary for Financial Markets, he had the authority to make the decision concerning suspending sales of the 30-year bond. In actuality, he said



Roseboro said other than the premature Treasury Web site posting, he was not aware of any early disclosure of Treasury's announcement to suspend sales of the 30-year bond.

Roseboro said he did not know ███████████ He said he only became aware of who ████ was after the controversy involving allegations of violation of the embargo of the press announcement. Roseboro said it was his understanding that ████ was not a member of the Press but had been "grand-fathered in" to attend this and previous Treasury quarterly funding press conferences.



Reviewed by ████    Date: 12/4/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Doc Printed: 12/3/01
Form OI-09

Office of the Inspector General — Investigations
Department of the Treasury

 # MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview<br>[ ] Telephone Contact<br>[ ] Records Review<br>[ ] Other (Describe): | 2002-0104 | ███████  Investigator  ███████ |
| | Date:<br>November 15, 2001 | |
| | Time:<br>3:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ████████<br>**Office of Market Finance<br>Department of the Treasury<br>Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████████ (████-█ and ████████████ of the Division of Enforcement, United States Securities and Exchange Commission (SEC), in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

████████ said as ████████, Office of Finance, █tries to remain current with the financial markets and maintain market contacts. In addition, █ said █ provides financial analysis and policy recommendations to "decision makers" at the Office of the Under Secretary for Domestic Finance.

████████ said the possible suspension of sales of the 30-year bond

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is <u>FOR OFFICIAL USE ONLY</u>, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

# MEMORANDUM OF ACTIVITY



███ said as part of ███ job ███ and ███ staff regularly talk
to bond dealers and market consultants. ███ said ███ did not
say anything to dealers that would suggest that Treasury was
going to discontinue the 30-year bond. ███ further said ███ had
no reason to believe that anybody in ███ financing group would
discuss this with anybody on the outside. ███ said ███ was
not aware of any formal policy of keeping information
confidential but because of "the nature of the business,
everybody in this office has an appreciation of the sensitivity
of what they discuss."

███ was asked if ███ knew a ███ of ███
in New York. ███ replied that ███ knew ███ ███ said
███ had stopped by ███ office last month to meet with ███ s
assistant ███. According to ███ who works for
███ of the Borrowing Advisory Committee, ███
met with ███ to discuss a financial spread sheet prepared at
the request of the committee. ███ said ███ spoke with ███
briefly but ███ said nothing about rumors of suspension of the
30-year bond.

███ was asked if ███ knew ███ and ███ acknowledged that
███ had briefly talked to ███ three times, first starting in
1996. At that time in 1996, ███ said ███ had answered a call
in the Market Finance Office from ███ who was seeking
admittance to the quarterly funding meeting press conference.
███ asked the then ███ of the Office of Market Finance,
███ whether ███ should be admitted. ███ approved ███

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Doc Printed: 11/30/01
Form 01-09

Office of the Inspector General — Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

admittance by telling ████ ██ was OK, that's fine." ████████
said ████ introduced ██████ ██ to ██ at that press conference in
1996

████████ said ██ found out after the fact, that ███████had been
calling ████'s secretary ██████████ on a regular basis to be
admitted to the quarterly funding meeting press conferences.
████████ said ██took a call from ████████ approximately six months
ago. █████ had called for ██████but ██ was not in that day. ████
██ called to get cleared in for a press conference and ████████
approved it. ████████ knew that ████"wrote some type of
investment letter." ██████ said the third time ██had contact
with ████ was at the October 31, 2001, press conference, when
██████happened to be seated next to ████. ████████ said██had
observed █████ at other quarterly funding meeting press
conferences but had not spoken with ████████

████████ said ██ was not aware of anyone other than press, Office
of Management and Budget and Treasury Officials and █████ who
attended the quarterly funding meeting press conferences.
████████ said ██did not realize until after the fact that the
press conferences were only for "credentialed press."

████████ said subsequent to the October 31, 2001, press
conference, ████curiosity prompted ████ to call ████former
supervisor ██████████said ██wanted to find out the
reason for ████ admittance to the press conferences. ██████
is currently retired and living in ████████. ████████ said when
spoke with ████. ████ did not recall a ████████ or ever
admitting ████ to a Treasury press conference.

Reviewed by: ████████  Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| ☐ Personal Interview | 2002-0104 | |
| ☒ Telephone Contact | Date: | ██████ Investigator ████████████ |
| ☐ Records Review | December 28, 2001 | |
| ☐ Other (Describe): | Time: | |
| | 10:50 a.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ██████████████ | Office of the Inspector General<br>740 15th Street, NW<br>Washington, DC |

On the above date and time, ████████, ████████, Office of Market Finance, Department of the Treasury, was interviewed by the Office of the Inspector General (OIG) concerning ████ knowledge of a ████████ and ████ admittance to the quarterly refunding press conferences. ████ said ████ retired from the Department of the Treasury on ████. ████ subordinate ████████ became ████ of the Office of Market Finance following ████ retirement.

████ stated that ████ does not know a ████████ nor does ████ recall ever admitting ████ to a quarterly refunding press conference. ████ said however, it is "not impossible that I admitted ████" but ████ did not recall doing so. ████ said if ████ had admitted ████ assumes it was because ████ wrote for some financial publication. ████ said it is possible that after ████ admitted ████ once, ████ may have continued to call ████ secretary, ████, and was admitted to subsequent conferences by that means.

████ said in recent weeks ████ has spoken by phone with ████████ and representatives of the Securities and Exchange Commission concerning ████████ ████ said ████ told them the same thing, that ████ did not remember a ████████ or admitting ████ to a news conference.

Reviewed by ████████ Date: 12/28/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number:<br>2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview | | ██████████  Investigator ███████ |
| ☐ Telephone Contact | Date:<br>November, 15, 2001 | |
| ☐ Records Review | | |
| ☐ Other (Describe): | Time:<br>5:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| ██████████<br>Office of Market Finance<br>Department of the Treasury<br>Washington, DC | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by ████████████████ (███/███-████ and ████████████ ███/███-████ of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activity in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

████████ said ████ is employed by Treasury as an ████████████ ████████ in the Office of Market Finance. ████████ supervisor is ██. ████████ said ████ former supervisor prior to ████ retirement was ████████, then ████████████ of the Office of Market Finance.

████████ said ████ has never met ████████████, though ████ has talked to ████ on the phone numerous times. ████ said ████ first cleared

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

███ in for a Treasury appointment about eight of nine years ago. According to ███████ this was done at the instruction of ██ to ███████ never said how ███ knew ██████ but told ███ to clear ██ in for a quarterly funding conference. ██████ said has subsequently received calls from ██████ requesting clearance to attend the quarterly funding press conferences at Treasury. ██████ said ██ was not aware of what company ████ was affiliated with. ███ said ██ did not know anything about but ██ name and date of birth. ██████ provided that information to the United States Secret Service (USSS), Uniformed Division (UD) to get ██ cleared into the Treasury Building.  USSS UD never requested any additional information concerning ████

██████ was not aware of ██████ going to any other location in Treasury other than where the press briefings were held. ██████ said ██ never discussed ██████ clearance into the building with ████████. ██████ said ██ never directed ████ to the Office of Public Affairs for clearance into the press conferences.

Reviewed by: ██████  Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Doc Printed: 11/30/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 23, 2001

**BY TELECOPIER**

████████████

SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

Re:     SEC Inquiry

Dear ████████

During the interview of ███████ on November 21, 2001, ███████ asked ███████ to check ███ calendar to see whether ███ could ascertain when ███████ visited ███ office and when ███████ made an internal announcement to the Market Financing Staff regarding suspension of the thirty year bond. ███████ checked ███ calendar, which reflects a notation of a meeting with ███████ at 1:30 p.m. on October 22, 2001. ███████ s calendar also bears a notation of a staff meeting on October 15, 2001, where it is likely, but not certain, that the decision to suspend the thirty year bond was internally announced.

███████ also asked me to check with Undersecretary Peter Fisher as to whether, during early to mid-October, there was a definitive date on which the decision to terminate the long bond was made. At that juncture, such a date cannot be provided, as the decision was still undergoing analysis under the deliberative process.

You have currently expressed no desire to interview any other Treasury personnel. I am aware that, based upon any further inquiry by the SEC, this position may change; however, as I told you on November 9, 2001, any new interviews will have to be completed by November 29, 2001, or after December 17, 2001, ████████████████

Sincerely,



Counsel

cc:     Undersecretary Peter Fisher





# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview<br>[ ] Telephone Contact<br>[ ] Records Review<br>[ ] Other (Describe): | 2002-0104<br>**Date:**<br>November 21, 2001<br>**Time:**<br>3:00 p.m. | ███ Investigator  *Michael C Zhm* |

| Subject of Activity: | Location of Activity: |
|---|---|
| ███████<br>**Office of Market Finance**<br>**Department of the Treasury**<br>**Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by ███ ███ ███ and ██████ ███ of the Division of Enforcement, United States Securities and Exchange Commission (SEC), in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend selling Treasury 30-year bonds, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

███ said █ has been employed as a ███████ in the Treasury, Office of Market Finance, for the past ███ ███ years. █ responsibilities include market research, analysis and providing advice to financial decision makers at Treasury. █ said █ immediate supervisor is ██████

███ said █ attended the quarterly funding press conference on October 31, 2001. █ said █ was aware of the sensitivity of

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/3/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

the information at the press conference and heard the press embargo announcement. ██ said ██ saw no one leave the room prior to the conclusion of the press conference.

██ was asked if ██ knew a ████, which ██ said ██ did not. ██ said ██ would not have recognized ██, nor did anyone mention ██ at the press conference. ██ said ██ only learned of who ██ was after the controversy surrounding the October 31, 2001, press conference. .

██ said ██ had first learned of the decision to suspend sales of the 30-year bond in a meeting with Under Secretary Fisher in mid October 2001. ██ said ██ did not recall the exact date. ██ said the decision was not discussed widely within Treasury. ██ said approximately a week before the official announcement, "everyone in our office was notified of the decision." ██ said the announcement was made at a staff meeting, but ██ did not recall the exact date. ██ said ██ would check ██ appointment calendar to see if ██ could be more specific as to the dates of the above meetings.

██ said ██ office converses with bond traders and consultants but, "we do not provide them with any confidential information." ██ stated that ██ did not talk to any broker dealer about the decision to suspend the 30-year bond, prior to the official announcement.

██ said ██ had met with ████, a bond trader from New York, prior to the quarterly funding conference. ██ said their discussion did not involve the possible suspension of sales of the 30-year bond. ██ said ██ wanted to show ██ a computer program showing projections for the next quarter government borrowing needs. ██ was working on the computer projection at the direction of ████ of the Borrowing Advisory Committee. ██ again said ██ did not recall the specific date of ██ meeting with ██, but would check ██ appointment calendar and get back to us.

██ said ██ was aware of the importance and sensitivity of the information ██ had concerning the 30-year bond. ██ said ██ is aware of the confidential nature of financial information at Treasury, but is not aware of any written policy involving disclosure.

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed 12/3/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

## MEMORANDUM OF ACTIVITY

████ checked ████ calendar subsequent to the interview and ████
search results are appended in the attachment.


Attachment:


Reviewed by:  Date: 17/4/01


This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or
reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Doc Printed: 12/3/01                                            Office of the Inspector General -- Investigations
Form OI-09                                                      Department of the Treasury

Case 1:05-cv-10983-NMG     Document 20-5     Filed 09/21/2005     Page 1 of 3



I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
FIRST CLASS MAIL, POSTAGE PREPAID TO ALL COUNSEL
(OR PARTIES) AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
RECORD, IN THIS ACTION, ON THIS DATE: 2/25/97

DATED: R. Bolton

DEPUTY CLERK

FILED

FEB 24 1997

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

SECURITIES AND EXCHANGE COMMISSION )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )
                                    )
CS FIRST BOSTON CORP., et al.,      )
                                    )
                Defendant.          )
_____)

Case No. SA CV 96-1253 GLT (EEx)

[~~TENTATIVE~~] ORDER GRANTING
PLAINTIFF'S MOTION TO STRIKE IN
PART

Calendar Item # 8

The Court GRANTS Plaintiff's Motion to Strike in part.

Under Fed.R.Civ.P. 12(f) a court may "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." A motion to strike a defense is proper when the defense is insufficient as a matter of law. Vokal v. United States, 177 F.2d 619, 625 (9th Cir. 1949). To strike an affirmative defense, however, the moving party must establish "there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed." SEC v. Sands, 902 F.Supp. 1149, 1166 (C.D.Cal. 1995)(quoting Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial § 9:381 (1995).

G:\DOCS\GLTLC1\1996\96-1253.TN1                    1            ENTERED ON ICMS _____ 34

## I.  ESTOPPEL AND WAIVER

In the Ninth Circuit, the affirmative defenses of estoppel and waiver may be asserted against the government "where the government's wrongful act would cause serious injustice, and where the public interest would not be unduly harmed by imposition of the doctrine."  See INS v. Mukherjee, 793 F.2d at 1008-09 (9th Cir. 1986)(quoting Morgan v. Heckler, 779 F.2d 544, 545 (9th Cir. 1985)); see also SEC v. Sands, 902 F.Supp. at 1166 (denying SEC's motion to strike affirmative defenses of estoppel and waiver).

Here, the SEC has failed to establish these affirmative defenses could not succeed under any set of circumstances.[1]  See Sands, 902 F.Supp. at 1166.  At this pleading stage in the proceedings, the court cannot rule out the possibility the Defendants can show the SEC acted in a manner which caused serious injustice to Defendants.  Accordingly, Plaintiff's Motion to Strike Defendants' affirmative defenses of Waiver and Estoppel is DENIED.

## II.  LACHES

The SEC has moved to strike Defendants' affirmative defense of laches on the ground it is "well settled that the United States is not . . . subject to the defense of laches in enforcing its rights."  United States v. Summerlin, 310 U.S. 414, 416 (1940).  Defendants have cited no case which holds otherwise.  Thus, the Court strikes Defendants' affirmative defense of laches.

## III.  OTHER DEFENSES

A.  Compliance With Industry Standards, Duty and Good Faith

---

[1]  Moreover, the Court has reviewed the cases cited by the SEC at oral argument and has found no support in recent case law for the SEC's argument it cannot be estopped from enforcing laws of general applicability.

1    Although phrased in different terms, each defendant has asserted as
2  an affirmative defense that they did not breach any duty imposed by
3  securities laws or regulations, they complied with all statutes,
4  regulations and industry standards, and they acted in good faith.
5  These, however, are not affirmative defenses. Defendants are merely
6  denying an element of the SEC's prima facie case. Accordingly, the
7  Court concludes it is proper to strike CS First Boston's Tenth, Eleventh
8  and Twelfth Affirmative Defenses; Nowlin's Eleventh and Twelfth
9  Affirmative Defenses; and Montague's Third and Fourth Affirmative
10 Defenses.

11 B.   **Insufficient Knowledge**

12    Nowlin and Montague each assert the additional affirmative defense
13 they "have insufficient knowledge as to whether he has additional, as
14 yet unasserted, affirmative defenses." Because this assertion is not
15 a "defense," the Court concludes it is proper to strike it.
16 Accordingly, Nowlin's and Montague's Thirteenth Affirmative Defenses are
17 ordered stricken.

18    In sum, the Court ORDERS Defendant CS First Boston's Tenth,
19 Eleventh and Twelfth Affirmative Defenses; Defendant Nowlin's Seventh,
20 Eleventh, Twelfth, and Thirteenth Affirmative Defenses; and Defendant
21 Montague's Second, Third, Fourth, and Thirteenth Affirmative Defenses
22 STRICKEN from their respective answer.

23
24 DATED: 2-24-97

25
                                          GARY L. TAYLOR
26                                        UNITED STATES DISTRICT JUDGE
27
28

G:\DOCS\GLTLC1\1996\96-1253.TN1              3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 01-8437-CIV-MIDDLEBROOKS

SECURITIES AND EXCHANGE
COMMISSION,

       Plaintiff,

v.

ALBERT J. DUNLAP, *et al.*,

       Defendants.

_____/

> FILED by _____ D.C.
>
> NOV 1 4 2001
>
> CLARENCE MADDOX
> CLERK U.S. DIST. CT.
> S.D. OF FLA. · MIAMI

## ORDER ON SEC'S MOTION TO STRIKE CERTAIN AFFIRMATIVE DEFENSES ASSERTED BY DEFENDANT PHILLIP E. HARLOW

THIS CAUSE comes before the Court upon the Security and Exchange Commission's ("SEC") Motion to Strike Certain Affirmative Defenses Asserted by Defendant Phillip E. Harlow, filed August 17, 2001 (DE#63). The defendant, Phillip E. Harlow ("Harlow"), filed a response on September 4, 2001, to which the SEC has now replied. Accordingly, the motion is ripe for review. The Court has reviewed the record and is advised in the premises.

Due to the nature of the instant dispute, only a brief review of the factual background is necessary at this point. In May of 2001, the SEC brought this enforcement action against several individuals associated with what is alleged to have been a scheme to misrepresent the financial condition of the Sunbeam Corporation ("Sunbeam") in order to bolster its potential value as the target of an acquisition. Harlow is a partner in Arthur Andersen LLP ("AA"), Sunbeam's outside auditors. In this capacity, Harlow is alleged to have caused AA to render unqualified audit opinions on Sunbeam's 1996 and 1997 financial statements despite being aware of several accounting improprieties and failures to disclose on the part of Sunbeam. In late July of 2001, Harlow filed his answer to the SEC's amended complaint. This answer contained numerous affirmative defenses, including the two at issue here. In the instant motion, the SEC moves to strike Harlow's affirmative defenses of estoppel and waiver. The Court now turns to the appropriate standard and the merits of



the motion.

Rule 12(f) authorizes the Court to "order stricken from any pleading any insufficient defense ...." Fed. R. Civ. P. 12(f). "Motions to strike ... are not favored, often being considered 'time wasters,' *Pessin v. Keeneland Assocs.*, 45 F.R.D. 10, 13 (E.D. Ky. 1968), and will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Poston v. American President Lines, Ltd.*, 452 F. Supp. 568, 571 (S.D. Fla. 1978), *citing Augustus v. Board of Public Instruction*, 306 F.2d 862 (5th Cir. 1962); *see also Brown v. Seebach*, 763 F. Supp. 574, 583 (S.D. Fla. 1991) (stating that motions to strike "are viewed with disfavor and are infrequently granted."). This is especially true where, as here, the motion comes at such an early stage of the litigation, where the issues are still relatively undeveloped by the discovery process. *Cf. SEC v. Sands*, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995) (granting motion to strike an affirmative defense and noting that "[d]iscovery is complete. Despite numerous opportunities to do so," the defendants had not produced sufficient evidence to withstand the motion). Accordingly, the SEC bears the rather substantial burden of persuading the Court that the strictures of Rule 12(f) are met. Despite the Court's general hostility toward a motion to strike, defenses which are insufficient as a matter of law should be stricken "in order to avoid unnecessary time and money in litigating invalid and spurious issues." *Lafayette Corp. v. Bank of Boston Int'l South*, 723 F.Supp. 1461 (S.D. Fla. 1989) (internal quotations omitted). As with many pretrial procedures, this Court has broad discretion when considering a motion to strike brought pursuant to Rule 12(f). *See Williams v. Eckerd Family Youth Alternative*, 908 F. Supp. 908, 910 (M.D. Fla. 1995), *citing Anchor Hocking Corp. v. Jacksonville Elec. Auth.*, 419 F. Supp. 992 (M.D. Fla. 1976). In general, there are three requirements a court looks for in determining whether a defense should be stricken: (1) there must be no question of fact which might allow the defense at issue to succeed; (2) there must be no substantial question of law which might allow the defense at issue to succeed; and (3) the plaintiff must show that it is prejudiced by the inclusion of the defense. *See S.E.C. v. Toomey*, 866 F. Supp. 719, 722 (S.D.N.Y. 1992) (citing cases).

Harlow must establish three elements to succeed on his affirmative defense of equitable estoppel: " '(1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things' (2) 'wilfulness or negligence with regard to the acts, conduct or acquiescence' and (3) 'detrimental reliance by the other party upon the state of things so indicated.'" *Tefel v. Reno*, 180 F.3d 1286, 1302 (11th Cir. 1999), *quoting Federal Deposit Ins. Corp. v. Harrison*,

735 F.2d 408, 413 (11th Cir. 1984). *Tefel* is a crucial case to the Court's present analysis, for it is where the Eleventh Circuit for the first time directly addressed and definitively ruled upon "whether, and in what manner, the doctrine of equitable estoppel can be applied against the federal government." 180 F.3d at 1302. In holding that the federal government is amenable to an equitable estoppel defense asserted against it, the Eleventh Circuit stated:

> In this appeal, we hold that to establish a claim for equitable estoppel against the government, the party seeking to establish estoppel must prove, in addition to the traditional elements of estoppel, some affirmative misconduct by the government. The Supreme Court repeatedly has said that the government cannot be estopped on the same terms as a private party, if the government can ever be estopped. *See, e.g., Heckler* [*v. Community Health Servs. of Crawford County, Inc.,*] 467 U.S. [51] at 60 [(1984)]. We agree that a rule requiring misconduct as an essential element of establishing estoppel against the government is the best way to follow the Supreme Court's command until the Court definitively determines whether and under what circumstances estoppel can be asserted against the government.

*Id.* at 1303.[1] Further, "affirmative misconduct is 'more than mere negligence .... It requires an affirmative act to misrepresent or mislead." *LaBonte v. United States,* 233 F.3d 1049, 1053 (7th Cir. 2000), *quoting Gibson v. West,* 201 F.3d 990, 994 (7th Cir. 2000); *see also Russo v. Johnson,* 129 F. Supp.2d 1012, 1022 (S.D. Tex. 2001) (" 'Affirmative misconduct' requires an affirmative misrepresentation or affirmative concealment of a material fact by the government."). In his opposition to the SEC's motion to strike the estoppel defense, Harlow claims that the requisite affirmative misconduct could be found if the SEC attempts retroactively to apply its new materiality criteria to his audit opinions. Harlow claims that the SEC changed the law applying to the determination of whether something was material in the context of preparing and auditing financial statements. Harlow relies heavily on Staff Accounting Bulletin No. 99 ("SAB 99"), issued by the SEC on August 12, 1999.[2] In SAB 99, the SEC stressed the need to weigh qualitative as well as

---

[1] In *Heckler*, the Supreme Court noted that "[w]hen the Government is unable to enforce the law because the conduct of its agents has given rise to an estoppel, the interest of the citizenry as a whole in obedience to the rule of law is undermined. It is for this reason that it is well settled that the Government may not be estopped on the same terms as any other litigant." 467 U.S. at 60.

[2] Although "SAB 99 does not carry with it the force of law," *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 163 (2d Cir. 2000), such Staff Accounting Bulletins " 'constitute a body of experience and informed judgment,' " *id., quoting Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944), and are therefore "persuasive guidance for evaluating the materiality of an alleged

quantitative factors when determining whether something is "material" for auditing purposes. Prior to this, the inquiry was heavily weighted toward quantitative considerations. Harlow contends that this worked a change in the controlling law, which, if applied retroactively to Harlow's audit opinions rendered in 1996, could give rise to a claim of equitable estoppel.

The Court finds that Harlow's affirmative defense of equitable estoppel has sufficient merit to withstand the SEC's motion to strike at this preliminary stage of the proceedings. The Court is mindful of the admonition that "the government may not be estopped on the same terms as any other litigant," *Heckler*, 467 U.S. at 60, and that it appears that acquiescence alone is not sufficient to support a finding that the SEC engaged in "affirmative misconduct." *See Deltona Corp. v. Alexander*, 682 F.2d 888, 892 n.6 (11th Cir. 1982) ("The Supreme Court cases leaving the issue open indicate that silence, acquiescence, or even negligence fall short of 'affirmative misconduct.' "), *quoted in Eagle v. Sullivan*, 877 F.2d 908, 912 n.7 (11th Cir. 1989). However, Harlow should not be precluded now from at least attempting to develop this theory of defense. The SEC points to much authority, including SAB 99 itself, indicating that SAB 99 may have clarified but in no way changed the substance of the law concerning financial materiality. *See, e.g.*, Staff Accounting Bulletin No. 99– Materiality, 64 Fed. Reg. 45,150 (to be codified at 17 C.F.R. pt. 211, subpt. B) ("The staff reminds registrants and the auditors of their financial statements that exclusive reliance on ... any ... numerical threshold has no basis in the accounting literature or the law."); *Ganino*, 228 F.3d 154 at 163 ("... SAB No. 99 is thoroughly reasoned and *consistent with existing law*– its non-exhaustive list of factors is simply an application of the well-established *Basic* analysis to misrepresentations of financial results ....") (emphasis added). However, in his Memorandum of Law in Opposition to Plaintiff's Motion to Strike Affirmative Defenses, Harlow cites to quite a bit of commentary concerning the alleged change that SAB 99 reflected in the SEC's position on an item's materiality. This raises a question of fact. Therefore, Harlow's claim of the SEC committing affirmative misconduct is sufficient for the Court to deny striking at this early stage his defense of equitable estoppel.

The SEC has also failed to make a sufficiently strong showing of prejudice resulting to it from this unsupported affirmative defense to warrant the defense being stricken. Although "[i]ncreased time and expense of trial may constitute sufficient prejudice to warrant granting

---

misrepresentation." *Ganino*, 228 F.3d at 163.

plaintiff's Rule 12(f) motion." *SEC v. Toomey*, 866 F. Supp. 719, 722 (S.D.N.Y. 1992), *citing Metric Hosiery Co. v. Spartans Indus.*, 50 F.R.D. 50, 51-52 (S.D.N.Y. 1970), the time and expense here stems from pre-trial issues, mainly discovery. This alleged prejudice is not enough to overcome the hesitancy courts justifiably demonstrate in granting Rule 12(f) motions to strike.

In short, while of course not passing on the merits of any defense or allegation in this case, Harlow's allegations of the SEC's affirmative misconduct are sufficient to withstand a motion to strike. The SEC has failed to carry its weighty burden concerning this disfavored motion.

The SEC also claims that Harlow's affirmative defense of waiver should be stricken. Although the analysis of waiver and estoppel issues may be rather similar, the Court finds that this aspect of the motion should be granted. "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938). The SEC cites a series of cases that hold that the SEC cannot waive the requirements of federal statutes. *See Capital Funds, Inc. v. SEC*, 348 F.2d 582, 588 (8th Cir. 1965) ("[I]t may be taken as settled that the [Securities and Exchange] Commission may not 'waive' violations of federal law ...."); *SEC v. Morgan, Lewis & Bockius*, 209 F.2d 44, 49 (3d Cir. 1953); *United States v. Brady*, 385 F. Supp. 1347, 1351 (S.D. Fla. ) ("[W]hen the government seeks to enforce a public right or protect a public interest it is acting in its sovereign capacity and cannot be disabled by the past actions of its officers or agents."). This makes sense, as the SEC, a governmental agency, is charged with enforcing the securities laws and in effect acts on behalf of the people. While the SEC may not relinquish a right of enforcement, it appears that a certain level of actual misconduct may prevent it from enforcing that right against a particular individual. The crux of the matter is, unlike in the equitable estoppel context, where *Tefel* and other recent appellate decisions expressly allow for this defense to be raised against the government in particular circumstances, there are no recent cases undermining the prohibition on waiver being asserted against the SEC.[3] Absent some more specific directives from precedent, this Court declines to depart from the established principle that waiver is not available

---

[3] Harlow cites *SEC v. Sands* as an example of a court declining to strike a waiver and estoppel defense asserted against the SEC. *See* 902 F. Supp. at 1166. However, the brief treatment the *Sands* court gave to this point was devoted to the estoppel defense, and did not deal with waiver at all as a separate issue. Therefore, this case is insufficient to overcome the weight of the authority holding otherwise.

against the SEC. Therefore, as a matter of law, this defense is not available and should be stricken.[4]

Based on the foregoing analysis, it is hereby

ORDERED AND ADJUDGED that the SEC's motion is GRANTED IN PART and DENIED IN PART. The Court hereby STRIKES defendant Phillip E. Harlow's eleventh affirmative defense, Waiver. The SEC's motion to strike Harlow's estoppel defense is DENIED without prejudice to renew the motion upon further development of the facts.

DONE AND ORDERED in Chambers in Miami, Florida, this _14_ day of November 2001.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

copies to counsel on attached service list

---

[4] The Court also finds that the time and expense associated with an affirmative defense that cannot as a matter of law succeed would be prejudicial to the SEC.

## SERVICE LIST

Keith Olin, Esq.
Morgan, Lewis & Bockius LLP
5300 First Union Financial Center
200 South Biscayne Boulevard
Miami, FL 33131-2339

Christian J. Mixter, Esq.
Morgan, Lewis & Bockius LLP
1800 M Street, N.W.
Washington, DC 20036-5869

*Attorneys for Defendant Lee B. Griffith*


Brian D. Elias, Esq.
Fowler, White, Burnett, Hurley, Banick
    & Strickroot PA
Bank of America Tower, 17th Floor
100 S.E. 2nd Street
Miami, FL 33131-2107

Frank C. Razzano, Esq.
Dickstein Shapiro Morin & Oshinsky LLP
2101 L Street, N.W.
Washington, DC 20037-1526

Christopher J. Sues, Esq.
Donald S. Zakarin, Esq.
Pryor Cashman Sherman & Flynn LLP
410 Park Avenue, 10th Floor
New York, NY 10022

*Attorneys for Defendants Albert J. Dunlap and Russell A. Kersh*


Lewis N. Brown, Esq.
Dyanne E. Feinberg, Esq.
Gilbride, Heller & Brown, P.A.
One Biscayne Tower, 15th Floor
2 South Biscayne Boulevard
Miami, FL 33131

Gandolfo V. DiBlasi, Esq.

Maite Aquino, Esq.
Erin A. Walter, Esq.
Sullivan & Cromwell
125 Broad Street
New York, NY 10004-2498

*Attorneys for Defendant Phillip E. Harlow*

Thomas J. McGonigle, Esq.
McGuireWoods LLP
Washington Square
1050 Connecticut Avenue, N.W., Suite 1200
Washington, DC 20036-5317

Michael Cavendish, Esq.
McGuireWoods LLP
50 N. Laura Street
Suite 330
Jacksonville, FL 32202-3625

*Attorneys for Defendant Robert J. Gluck*

Brian Rosner, Esq.
Law Offices of Brian Rosner
3 New York Plaza
New York, NY 10004

Jonathan H. Rosenthal
Malman, Malman & Rosenthal
Yankee Clipper Center
3230 Stirling Road, Suite 1
Hollywood, FL 33021

*Attorneys for Defendant Donald R. Uzzi*

2