## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>v.<br><br>STEVEN E. NOTHERN,<br><br>        Defendant. | **Civil Action No. 05-10983 (NMG)**<br><br>**ORAL ARGUMENT REQUESTED** |

## DECLARATION OF KEVIN B. CURRID FILED IN SUPPORT OF DEFENDANT STEVEN E. NOTHERN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Kevin B. Currid, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am an attorney for Steven E. Nothern in the above-referenced matter. I am a member of the Massachusetts bar and the bar of this Court. Except where otherwise indicated, I make this declaration based upon my own personal knowledge, upon public records and upon the documents related to this action.

2.      True and correct excerpts from the SEC Deposition Transcript of Steven E. Nothern (Dec. 4, 2001) are attached hereto as Exhibit A.

3.      A true and correct copy of a press release by the U.S. Department of the Treasury, dated Oct. 30, 2001 produced in this matter is attached hereto as Exhibit B.

4.      A true and correct copy of a memorandum from Francine J. Kerner to David D. Aufhauser, General Counsel of U.S. Department of the Treasury (undated) produced in this matter is attached hereto as Exhibit C.

5.    True and correct copies of a letter from Mary Lou Peters at Morgan Stanley to Andrew B. Sporkin at the SEC, dated Dec. 5, 2001 produced in this matter; and an e-mail message from Jill Cetina at U.S. Department of the Treasury, dated Oct. 31, 2001, 11:40 a.m. produced in this matter are attached hereto as Exhibit D.

6.    A true and correct copy of an e-mail message from Richard Tang at Greenwich Capital to James Book at Goldman Sachs, dated Oct. 31, 2001, 9:10 a.m. produced in this matter is attached hereto as Exhibit E.

7.    True and correct excerpts from the SEC Deposition Transcript of Jill Ouseley (Jan. 7, 2002) are attached hereto as Exhibit F.

8.    A true and correct copy of the report of investigation, by the Office of the Inspector General, U.S. Department of the Treasury (Jan. 2002) produced in this matter is attached hereto as Exhibit G.

9.    A true and correct copy of a press release by U.S. Department of the Treasury dated Oct. 31, 2001 produced in this matter is attached hereto as Exhibit H.

10.    A true and correct copy of a letter from Ann M. Kappler at Federal National Mortgage Association to William M. Hathaway at SEC, dated Dec. 7, 2001 produced in this matter is attached hereto as Exhibit I.

11.    True and correct copies of phone call notes from William M. Hathaway at SEC, dated Nov. 14, 2001 produced in this matter are attached hereto as Exhibit J.

12.    A true and correct copy of a Bloomberg News Service, Day Chart for October 31, 2001 produced in this matter is attached hereto as Exhibit K.

13.    A true and correct copy of a memorandum from Steven Vagle, U.S. Department of the Treasury (undated) produced in this matter is attached hereto as Exhibit L.

14. A true and correct copy of a record of United States Treasury trades executed by Massachusetts Financial Services on October 31, 2001 produced in this matter is attached hereto as Exhibit M.

15. True and correct record excerpts from the SEC Deposition Transcript of D. Richard Smith (Dec. 11, 2001) are attached hereto as Exhibit N.

16. True and correct copies of a letter from Michael Solomon at Merrill Lynch to William (Max) Hathaway at SEC, dated Mar. 20, 2002, and an attached Trade Activity Report for October 31, 2001 produced in this matter are attached hereto as Exhibit O.

17. A true and correct copy of a Reuters News Service, Wire Service Report, dated Oct. 31, 2001 (reported to NewsEdge/Lan at 9:52 a.m., posted at 9:57 a.m.) produced in this matter is attached hereto as Exhibit P.

18. A true and correct copy of letter from David D. Aufhauser, General Counsel of U.S. Department of the Treasury, to Harvey L. Pitt, Chairman of the SEC, dated Nov. 6, 2001 produced in this matter is attached hereto as Exhibit Q.

19. A true and correct copy of a memorandum on the interview of Paul Malvey by SEC and Treasury OIG, dated Nov. 15, 2001 produced in this matter is attached hereto as Exhibit R.

20. True and correct excerpts from the SEC Privilege Log produced in this matter are attached hereto as Exhibit S.

21 A true and correct copy of Defendant Steven E. Nothern's First Request for Production of Documents to the Securities and Exchange Commission served in this matter is attached hereto as Exhibit T.

22.    A true and correct copy of the U.S. Securities and Exchange Commission's Responses to Defendant Steven E. Nothern's First Request for Production of Documents served in this matter is attached hereto as Exhibit U.

23.    True and correct copies of letters exchanged by Counsel for Nothern and Counsel for SEC regarding the duty of the SEC to produce documents held by other federal agencies are attached hereto as Exhibit V.

24.    A true and correct copy of a memorandum on the interview of Jill K. Ouseley by SEC and Treasury OIG, dated Dec. 28, 2001 is attached hereto as Exhibit W.

25.    A true and correct copy of Nothern's FOIA request to the U.S. Department of Justice dated November 11, 2005 is attached hereto as Exhibit X.

26.    A true and correct copy of the U.S. Department of Justice's response to Nothern's FOIA Request dated Dec. 8, 2005 is attached hereto as Exhibit Y.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 17, 2006.

Kevin B. Currid

# EXHIBIT A

**Cited Excerpts from SEC Deposition Transcript of Steven E. Nothern
(Dec. 4, 2001)**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:  )
TRADING IN CERTAIN  )
TREASURY ISSUES  )  File No. HO-9353

WITNESS:  Steven E. Nothern

PAGES:  1 through 213

PLACE:  Securities & Exchange Commission
450 5th Street, N.W. - Room 11602
Washington, D.C. 20549

DATE:  Wednesday, November 28, 2001

The above-entitled matter came on for hearing at
10:38 a.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

ANDREW SPORKIN, ESQ.
WILLIAM M. HATHAWAY, ESQ.
Securities & Exchange Commission
450 5th Street, N.W.
Washington, D.C. 20549
(202) 942-4613

On behalf of the Witness:

JACK PIROZZOLO, ESQ.
NICHOLAS THEODOROU, ESQ.
Foley, Hoag, & Eliot
One Post Office Square
Boston, Mass., 02109.

---

**Page 2**

CONTENTS

WITNESS:                                              Page

Steven Nothern                                           3

EXHIBITS:    DESCRIPTION                         IDENTIFIED

222          Subpoena, nine-page document              5

223          Three-page Letter from the SEC,
             includes subpoena duces tecum            13

224          1/2 floor plan for 23rd floor
             on Boylston Street                       38

225          Other 1/2 of floor plan for 23rd
             floor on Boylston Street                 38

226          Bloomberg message from WI Partners
             and RJ O'Brien & Associates             166

227          ITMO Trading in Certain Treasury Issues  167

228          Five page document; M-000113, 114, 114A,
             115 through M-116                        173

229          Legal and regulatory update by Steve
             Cavan                                    184

230          MFS Co. statement of policy on Personal
             Securities Transactions                 190

231          MFS Statement of Guidelines             191

---

**Page 3**

1       PROCEEDINGS

2       MR. HATHAWAY: We are on the record. It's

3   approximately 10:30. This is December 4, 2001. Would you

4   raise your right hand, sir?

5   Whereupon,

6           STEVEN E. NOTHERN

7   was called as a witness and, having been first duly sworn by

8   the, was examined and testified as follows:

9           EXAMINATION

10      BY MR. HATHAWAY:

11      Q  Would you please state and spell your full name for

12  the record?

13      A  Steven Eric Nothern -- S-t-e-v-e-n -- Eric --

14  Nothern -- N-o-t-h-e-r-n.

15      Q  Thank you. I am William Maxwell Hathaway. I go by

16  Max. I will be joined shortly by my branch chief on this

17  project, Andrew Sporkin. Both Andrew Sporkin and myself are

18  officers of the Commission for the purposes of this

19  proceeding.

20          This is an investigation by the United States

21  Securities and Exchange Commission. It's: In the Matter of

22  Trading in Certain Treasury Issues. Our file number is --

23  HO-9353.

24          It is an investigation is to determine whether

25  there have been any violations of the federal securities

---

**Page 4**

1   laws.

2           However the evidence adduced in this investigation

3   or today's testimony session might constitute violations of

4   other state or federal, civil or criminal statutes.

5           Prior to the opening of the record, which means

6   prior to our actually going the tape recorder on and

7   beginning here today, you were provided with a copy of the

8   formal order of investigation which is in front of you here

9   and I am touching it as I speak.

10          This copy of the formal order will remain available

11  for your examination throughout the course of today's

12  testimony session.

13          Have you had an opportunity to review the formal

14  order of investigation?

15      A  Yes, I have.

16      Q  You were also provided prior to the opening of the

17  record with a copy Exhibit No. 202, which is a copy of the

18  Commission's Form 1662.

19          Have you had an opportunity to read Exhibit No.

20  202?

21      A  Yes, I have.

22      Q  Do you at this time have any questions at this time

23  concerning this exhibit?

24      A  No.

25      Q  Mr. Nothern, are you represented by counsel?

SECNOTH00117214

Page 105

1    Q  Is that a release that is of interest to you?
2    A  Yes, it is.
3    Q  Do you recall one way or the other whether there
4  was to be a GDP release on October 31, 2001?
5    A  I don't remember.
6    Q  When you arrive at work on October 31st, were you
7  aware that there was to be a quarterly refunding announcement
8  that day?
9    A  No.
10    Q  When did you first learn that there was to be a
11  quarterly refunding announcement that day?
12    A  Sometime later in the morning.
13    Q  Approximately when?
14    A  If I had to guess, around 9:40, 9:45.
15    Q  How did you learn that there was to be a quarterly
16  refunding announcement?
17    A  When I had a conversation with our trader, John
18  Cadagan.
19    Q  What did Mr. Cadagan say?
20    A  That at 10 o'clock there was going to be a
21  refunding announcement.
22    Q  How did this come up?
23    A  When I mentioned and he overheard my discussion of
24  a phone mail message left by Peter Davis.
25    Q  Did Mr. Cadagan tell you how it was that he

Page 106

1  understood there was to be an announcement at 10 a.m.?
2    A  No.
3    Q  Did you have any reason to doubt the accuracy of
4  Mr. Cadagan's statement that there was to be an announcement
5  at 10 o'clock?
6    A  No.
7    Q  Did Mr. Cadagan, in telling you this, mention
8  anything at all with regard to restrictions on information at
9  that announcement up until 10 o'clock?
10    A  No. John Cadagan?
11    Q  Yes.
12    A  No.
13    Q  Did you, at some point in time on October 31, 2001,
14  learn that the Treasury had announced some action regarding
15  the 30-year bond?
16    A  Could you repeat that?  You're asking in past
17  tense?
18    Q  Did you, at some point in time, get a voice mail
19  from Peter Davis?
20    A  Yes.
21    Q  When was this?
22    A  I don't know specifically.
23    Q  As well as you remember.
24    A  We checked our phone logs.
25    Q  Who is "we"?

Page 107

1    A  MFS.
2    Q  What do you remember from the check of the phone
3  logs?
4    A  Approximately 9:37 we received a call from him.
5    Q  As you sit here today, do you have any reason to
6  think that that voice mail came in either earlier or later
7  than 9:37?
8    A  No.
9    BY MR. SPORKIN:
10    Q  Are you sure you didn't speak to Mr. Davis that
11  morning?
12    A  Yes.
13    BY MR. HATHAWAY:
14    Q  When did you listen to the message from Mr. Davis?
15    A  Sometime fairly briefly after he left.
16    Q  How do you know that?
17    A  From the timing that I get from logs that we've
18  checked subsequent to this of transactions.
19    Q  Setting aside what you may or may not have surmised
20  from looking at various records that you've seen, I'd like
21  you just to focus on your memory of the events of that day.
22    A  Okay.
23    Q  Is there anything that occurred that day that helps
24  you believe that you licensed to the voice mail shortly after
25  it came in?

Page 108

1    A  The only thing would be that — this is my private
2  line.  It's within eye shot when I'm sitting at the trading
3  desk, and I tend to take those — I take those calls.  So
4  when the little light is on, I know there's a message, and I
5  just get to them.
6    Q  Is that your memory, as you sit here today, of that
7  particular phone mail message, that you were sitting there on
8  the line with someone, and you saw the light go on?
9    A  I didn't see the light go on.  I had a phone
10  conversation.  I had a conversation with a colleague.  When
11  that was completed, I noticed the phone light was — the
12  message light was on.
13    BY MR. SPORKIN:
14    Q  Does your phone ring?
15    A  It does ring.
16    Q  It does ring.  So there is an audible sound when
17  someone is calling you?
18    A  Yes, there is.
19    Q  When you're on the line with somebody and somebody
20  else calls you, does your phone ring, or does it immediately
21  go to voice mail?
22    A  It makes a noise.
23    Q  What type of noise?
24    A  It rings.
25    Q  It rings.  So you have two lines on that phone?

SECNOTH00117240

Page 125

1 after the phone call with either Burfitt or Hinckley, or were
2 these discussions you had following hearing the voice mail
3 with Mr. Davis?
4    A  The latter.
5       BY MR. SPORKIN:
6    Q  Let's go chronologically.  After you received the
7 voice mail from Mr. Davis, what did you do?
8    A  I moved to David Kennedy's desk, which would be
9 location 243 on your Exhibit 224, and shared with Dave
10 Kennedy the fact that I received this phone mail message.
11   Q  The Davis phone message?
12   A  Exactly.  Yeah.
13      BY MR. HATHAWAY:
14   Q  What did you tell him was the content of the voice
15 mail?
16   A  That Pete Davis, our Washington consultant, had
17 said that they'd be canceling the long bond and that they'd
18 be announcing it at 10 o'clock.
19   Q  And did you mention to Mr. Kennedy that Mr. Davis
20 had said the press release was embargoed?
21   A  Not at that point.
22   Q  At what point did you mention that to him?
23   A  Subsequently, we did discuss the fact that this was
24 embargoed, that there was a press release that was going to
25 come at 10:00, but it was embargoed until 10 o'clock.

Page 126

1    Q  When was that discussion about the press release
2 that was to be embargoed?
3    A  Subsequent to describing taking the phone message
4 and that they were going to be announcing cancellation of the
5 long bond at 10 o'clock.
6    Q  Let me try to do it this way:  Did you, at some
7 point in time, place trades based on this information you
8 received from Peter Davis?
9    A  We did place trades, yes.
10   Q  In your subsequent conversation with Mr. Kennedy
11 about the press release and the embargo, did that occur
12 before or after these trades were placed?
13      MR. THEODOROU:  The press release and/or the
14 embargo or the press release or both?
15      MR. HATHAWAY:  Thank you, Counsel.
16      BY MR. HATHAWAY:
17   Q  Did you tell Mr. Kennedy that there was an embargo
18 on the press release about the cancellation of the 30-year
19 bond before or after the trades were placed?
20   A  I don't know exactly.
21   Q  What's your best guess?
22   A  My best guess is -- I don't know.  I can't tell
23 you.  My best guess is that we placed the order and that that
24 discussion was subsequent, but I really don't recall the time
25 frame.

Page 127

1    Q  When you spoke with Mr. Kennedy about the substance
2 the voice mail you had from Mr. Davis, did he ask you any
3 questions?
4    A  Not that I can recall.  Excuse me.  Let me correct
5 that.  He put out the question, "What should we do about
6 this?"
7    Q  Did he say anything at all about, "Well, how did
8 Pete Davis know this?  Where is he getting this information?"
9    A  No.
10   Q  Did he ask you whether you thought this was a
11 rumor?
12   A  No.
13   Q  Did you say to him the word "I've heard a rumor
14 that"?
15   A  Yes.
16      BY MR. SPORKIN:
17   Q  What did you say?
18   A  We discussed the fact that -- the rumor on the
19 Chicago Board of Trade.
20      BY MR. HATHAWAY:
21   Q  Did you present to Mr. Kennedy that Mr. Davis'
22 information to you was a rumor?
23   A  No.  I didn't characterize it like that.
24   Q  How did you characterize it?
25   A  Exactly the way I mentioned earlier, to the best of

Page 128

1 my recollection.
2    Q  What happened after you spoke with Mr. Kennedy?
3 What happened next?
4    A  He posed a question of, you know, what we should do
5 about this.  I said I'd be buying 25 bonds, 25 million bonds.
6 He also decided he was going to be buying 25 million bonds.
7 Two colleagues also -- one bought 5, the other bought 10 or
8 intended to buy.  John Cadagan did the math.  I gave them
9 authorization to go ahead and buy them.
10   Q  The other two individuals, who are they?
11   A  Rick Smith.  On your Exhibit 224, it's in slot 242.
12 And Geoffrey Kurinsky in slot 265.  Rick Smith, 5 million.
13 Geoffrey Kurinsky, 10 million.
14   Q  Did you or Mr. Kennedy in your presence have some
15 conversation with either Smith or Kurinsky about this
16 information?
17   A  My conversation with Dave Kennedy was for general
18 purposes.  I was informing my colleagues.
19   Q  Looking at Exhibit 224, is it your testimony that
20 after you listened to the voice mail you moved from your
21 position 241 to in the vicinity of 243?  Is that correct?
22   A  Exactly.  I stood immediately behind them.
23   Q  Where was Mr. Kurinsky at that time?
24   A  At his desk.
25   Q  And where was Mr. Smith at that time?

Page 125 - Page 128

SECNOTH00117245

Page 145

1    Q  You understood that to be a rumor.  Is that not
2  correct?
3    A  It was characterized to me as a rumor.
4    BY MR. SPORKIN:
5    Q  Did Mr. Davis characterize his voice mail in any
6  way like a rumor?
7    A  Not to my recollection.
8    BY MR. HATHAWAY:
9    Q  Do you believe now you've told us all your thinking
10  as to why it was okay for you to do the trade after you got
11  the information?  Because I don't want to move on until I
12  feel I've --
13    A  In essence, I had no reason to believe that it
14  wasn't okay.
15    MR. THEODOROU:  Did counsel -- you also asked him
16  whether or not Davis said he couldn't do it, correct?
17    MR. HATHAWAY:  That is correct.
18    MR. THEODOROU:  So if you could please again -- and
19  you may be regurgitating what was said.  You received the
20  phone call.  You say there were two bits of information that
21  you can recall.  Again, why did you proceed with the trade,
22  that you could proceed with the trade?
23    THE WITNESS:  There was no indication -- no one
24  indicated in any way that there was any reason not to.
25    MR. THEODOROU:  As well as the other factors that

Page 146

1  you've listed for Mr. Hathaway?
2    THE WITNESS:  The factors that it already seemed
3  public, in essence.
4    BY MR. SPORKIN:
5    Q  Is there anything else?
6    A  I didn't feel in any way that I was restricted, and
7  Pete Davis didn't indicate to me in any way that he was
8  restricted, in that in any way this would be inappropriate to
9  use this information.
10    MR. THEODOROU:  And going back to -- maybe this is
11  rephrasing Mr. Hathaway's question, but the fact that Pete
12  Davis himself was not a member to your press or to your
13  knowledge that he was a member of the press was also a
14  factor?
15    THE WITNESS:  Yes.
16    MR. HATHAWAY:  I think Mr. Hathaway, you asked
17  that.
18    MR. HATHAWAY:  I did.  Thanks you.
19    MR. THEODOROU:  Also, you were not aware -- I don't
20  know, Mr. Hathaway, if this is the appropriate time for me
21  to --
22    MR. HATHAWAY:  Go ahead.
23    MR. THEODOROU:  You were also not aware whether --
24  at that time, were you aware that he attended any press
25  conference?

Page 147

1    THE WITNESS:  No.
2    MR. THEODOROU:  All right.  Were you aware whether
3  he had any agreement at that time with the Treasury
4  Department not to give you the information?
5    THE WITNESS:  I had no knowledge of any such
6  agreement that he was in any way restricted from doing what
7  he was doing.
8    MR. THEODOROU:  And you weren't aware at the time
9  whether he had any restrictions on what he could do with the
10  information that he gave you?
11    THE WITNESS:  No.
12    BY MR. SPORKIN:
13    Q
14    BY MR. SPORKIN:
15    Q  In his voice mail, did he indicate where he was
16  calling from?
17    A  No.  It sounded like a cell phone.
18    Q  And why is that?
19    A  It made a sound like --
20    Q  Excuse me?
21    A  It made a sound like it was off in the fourth
22  dimension, electronic land.  I think it was going to cut out.
23    Q  I believe you testified you went over to
24  Mr. Kennedy's desk?
25    A  Yes.

Page 148

1    Q  And you mentioned Mr. Kennedy, Mr. Smith and
2  Mr. Kurinsky the information that Mr. Davis left on his voice
3  mail?
4    A  I was speaking to -- behind David Kennedy when I
5  mentioned the information.
6    Q  But it was for Mr. Smith and Mr. Kurinsky?
7    A  It was for general purposes.
8    MR. THEODOROU:  Mr. Sporkin, I don't mean to
9  interrupt.  Again, getting back to what we said off the
10  record, sticking to the chronology, after you got the voice
11  mail, you did what --
12    MR. SPORKIN:  Right.  He testified about this
13  already.
14    MR. THEODOROU:  But I think there's some
15  clarification on that.  After you got the voice mail, you did
16  what?
17    THE WITNESS:  I walked over to David Kennedy's --
18  behind David Kennedy and said that I'd gotten this -- got a
19  call from Pete Davis, our Washington consultant, that he said
20  that Treasury would be canceling the long bond, and they'd be
21  announcing it at 10 o'clock.
22    BY MR. SPORKIN:
23    Q  And you didn't use the word "embargo" there?
24    A  At that point, I don't recall using the word
25  "embargo."

SECNOTH00117250

Page 149

1    Q   And happened next?
2    A   Subsequently, a couple things happened. One, John
3 Cadagan mentioned the fact that, "Oh, 10 o'clock is the
4 refunding announcement." And I said, "Oh, they're auctioning
5 the -- they're announcing the auctioning of next week's
6 auction." That was my first connection with the fact that
7 this was a refunding announcement period.
8        Dave Kennedy asked what we should do about this.
9 We combined our order. There was some discussion that Pete
10 Davis had said that there was a press release and that it was
11 embargoed until that 10 o'clock, so it was consistent with
12 the notion of a refunding announcement that was embargoed.
13   Q   So prior to placing the trade there was discussion
14 amongst you and the other individuals that this information -
15 - that the press release was embargoed until 10 o'clock?
16   A   The exact timing of when we might have talked about
17 embargo I'm not 100 percent clear on whether that was before
18 we placed the order or right after we placed the order. The
19 discussion that I've gotten this call from Pete Davis was
20 definitely prior to, and we talked about how many -- or what
21 we were going to do about it. So that was definitely prior
22 to.
23        MR. THEODOROU: Is your question, Mr. Sporkin, when
24 the term "embargo" was used?
25        MR. SPORKIN: Yes.

Page 150

1 BY MR. SPORKIN:
2    Q   You mentioned that you used the term "embargo" when
3 you were discussing amongst the people on the trading floor.
4    A   Right.
5    Q   When did the use that term "embargo"?
6    A   Right, during the process of entering the order and
7 having it executed, in all likelihood, my guess, be
8 subsequent to when we actually placed the order, but it would
9 be contemporaneous with the trader executing the trade.
10   Q   Now, you mentioned that Mr. Cadagan mentioned that
11 the announcement was coming at 10 o'clock?
12   A   That there was a refunding announcement.
13   Q   Did he hear your conversation at Mr. Kennedy's
14 desk?
15   A   Yes.
16   Q   He was reacting to hearing you talk about
17 Mr. Davis' phone message?
18   A   Yes.
19   Q   Did anyone else that you're aware of hear that
20 conversation?
21   A   I'm not specifically aware of who heard what.
22   Q   You've mentioned Mr. Kurinsky, Mr. Kennedy,
23 Mr. Smith and Mr. Cadagan. Did anyone else react to your
24 conversation?
25   A   The only other person that did a trade that morning

Page 151

1 that subsequently came to my desk after I returned to my
2 trading location on the trading desk was Matt Ryan, and I
3 don't know what prompted him, whether he overheard what we
4 were talking about or something else.
5    Q   Where does Mr. Ryan sit?
6    A   If you look at your Exhibit 225, Matt Ryan is at
7 location 248.
8    Q   Was he there at his desk at 248 around this time?
9    A   I don't know.
10   Q   Was he around where you were talking at
11 Mr. Kennedy's desk?
12   A   I don't believe so. I don't recall seeing him.
13   Q   Did you instruct Mr. Cadagan to place an order for
14 the long bond purchase?
15   A   Yeah. I authorized that he should go ahead and
16 execute.
17   Q   And what did he tell him to purchase?
18   A   He added up between us it was -- amongst us, it was
19 65 of the long bond, and I authorized him to go ahead and
20 just execute the trade.
21   Q   What happened next?
22   A   I believe we had the discussion that this press
23 release, the refunding announcement and that that was
24 embargoed. It would be coming out at 10 o'clock.
25   Q   Did anyone indicate that maybe you should not have

Page 152

1 done that trade if it was embargoed?
2    A   No.
3    Q   What happened next?
4    A   I made the comment, "I wonder about -- I wonder
5 what the ethics are of all this."
6    Q   Who did you make that comment to?
7    A   No one in particular. I was standing behind Dave
8 Kennedy at the time.
9    Q   Did anyone react to that?
10   A   Not to my recollection.
11   Q   What happened after that?
12   A   I made a comment to Dave Kennedy as I was leaving
13 his area to go back to my area that I believed there might
14 actually be more risk in the purchasing manager report at 10
15 o'clock than in this thing.
16   Q   What happened next?
17   A   I returned to my desk to enter the transaction into
18 our internal order entry system.
19   Q   And what happened next?
20   A   I allocated -- I bought 25 bonds. I allocated that
21 trade and entered. As I was trying to figure out if I needed
22 to buy more bonds for other accounts, Matt Ryan came over to
23 my desk, and we had a discussion about -- he was trying to
24 decide -- he wanted to know whether he should be buying
25 futures or whether he should be buying cash bonds. He wanted

SECNOTH00117251

Page 153

1 to discuss that with me, and we had a discussion.
2    Q  And what did you tell him?
3    A  I suggested to him that those were two entirely
4 different animals. A futures contract was more a 15- to 20-
5 year instrument. So he was choosing, making a decision which
6 part of the curve to buy. My preference was to buy the 30-
7 year part of the curve, as opposed to the 15- or 20-year part
8 of the curve.
9    Q  Did you mention anything that Mr. Davis had told
10 you?
11    A  I don't recall that we had that discussion.
12    Q  Did you suggest to him that he purchase the 30-year
13 bonds in the cash market?
14    A  Of the two choices, that was my preference.
15 That's, kind of, how I was pushing it.
16    Q  Did you say anything else to Mr. Ryan?
17    A  Not that I recall.
18    Q  What did he say to you?
19    A  I don't remember specifically. I think he was
20 leaning towards buying the futures contract.
21    Q  Do you know what he did?
22    A  I subsequently found out what he did. I believe he
23 bought a futures contract, some futures contracts.
24    Q  What happened after that?
25    A  I determined that I need to buy an additional 14.65

Page 154

1 million of the long bond for other accounts and gave that
2 order to John Cadagan.
3    Q  This was in the cash market?
4    A  Yes.
5    Q  When did you give him the order?
6    A  I don't know exactly when time-wise. Do you want a
7 guess?
8    Q  How long after you gave the initial order?
9    A  Within ten minutes.
10    BY MR. HATHAWAY:
11    Q  Was it before 10 o'clock?
12    A  Yes.
13    BY MR. SPORKIN:
14    Q  How do you know it was before 10 o'clock?
15    A  I know we've reviewed the trading log since then,
16 but I know it wasn't time -- before 10 o'clock. I just
17 recall that.
18    Q  What happened after that?
19    A  At some point, the information was released at 10
20 o'clock, observed what the market was doing.
21    Q  How did you become aware that the information was
22 announced?
23    A  I don't recall specifically whether I overheard it
24 from a colleague or whether I saw it directly on a news
25 ticker.

Page 155

1    Q  Was it right around 10 o'clock that you heard that?
2    A  Yes, around 10 o'clock.
3    Q  Other than the individuals you've mentioned --
4 Mr. Cadagan, Mr. Kurinsky, Mr. Kennedy, Mr. Smith and
5 Mr. Ryan -- did you speak to anyone else prior to 10 o'clock?
6    A  I spoke with my receptionist when she'd come by my
7 desk. I believe that's it.
8    Q  Did you speak to anyone outside the firm prior to
9 10 o'clock?
10    A  In what time frame?
11    Q  Between the time that you listened to the message
12 from Mr. Davis and 10 o'clock.
13    A  No, I did not.
14    Q  Do you know whether Mr. Kurinsky, Mr. Kennedy,
15 Mr. Smith or Mr. Cadagan spoke to anyone outside the firm?
16    A  John Cadagan would have because he was executing
17 trades. The others I don't know specifically.
18    Q  Do you know if any of those individuals told
19 anybody outside the firm the information that Mr. Davis
20 relayed to you?
21    A  I believe that John Cadagan indicated to Merrill
22 that we had been hearing about the cancellation of the long
23 bond.
24    Q  Do you know when Mr. Cadagan told Merrill Lynch
25 that?

Page 156

1    A  I don't. He told me after the fact that he had
2 indicated to them that we were hearing this, referring to the
3 Chicago Board of Trade. We were all familiar with that
4 information. I was not the only one familiar with that
5 information from the Chicago Board of Trade.
6      I don't know if I mentioned it, but that was also
7 part of our discussion when I relayed that I received this
8 call from Pete Davis, "Going to cancel the bond. They're
9 going to announce it at 10 o'clock." John Cadagan tells me
10 that's when the refunding announcement is. I said, "Oh,
11 they're announcing next week's auctions."
12      At that point, we also discussed the fact that this
13 rumor was swirling around the Chicago Board of Trade. I
14 don't know whether I mentioned that first or someone else
15 did, but that was already out there.
16    Q  Did Mr. Cadagan tell you that he had mentioned this
17 information, this rumor, to Merrill Lynch prior to 10
18 o'clock?
19    A  That's my understanding is that he was doing this
20 transaction he was on the phone with them. That's the reason
21 he transacted -- when we bought 65 million bonds, he was on
22 the phone. I'm standing across the opposite side of the
23 desk. It's my understanding he was on the phone at that time
24 with Merrill Lynch, and my understanding is that in that
25 conversation that he shared with them we're hearing this.

SECNOTH00117252

# EXHIBIT B

**Press Release by U.S. Department of the Treasury (Oct. 30, 2001)**



# TREASURY NEWS

## FROM THE OFFICE OF PUBLIC AFFAIRS

FOR IMMEDIATE RELEASE
October 30, 2001
PO-746

### Treasury Department To Hold Quarterly Refunding News Conference

Treasury Under Secretary for Domestic Finance Peter R. Fisher will announce the U.S. government's quarterly refunding needs at a news conference at 9:00 a.m. EDT on Wednesday, October 31, 2001 in the Treasury Department's Diplomatic Reception Room (Room 3311), 1500 Pennsylvania Avenue, NW, Washington, DC.

Under Secretary Fisher will take questions following the announcement. The event will have a 10:00 a.m. news embargo.

The room will be available for pre-set at 8:00 a.m. on Wednesday. Media without Treasury or White House press credentials planning to attend should contact Frances Anderson at Treasury's Office of Public Affairs at (202) 622-2960 by 8:00 a.m. on Wednesday with the following information: name, social security number and date of birth. This information may also be faxed to (202) 622-1999.

SECNOTH00103803

# EXHIBIT C

**Memorandum from Francine J. Kerner to David D. Aufhauser, General Counsel of U.S. Department of the Treasury (undated)**

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

GENERAL COUNSEL

## MEMORANDUM FOR DAVID D. AUFHAUSER

FROM:            FRANCINE J. KERNER
                 DEPUTY ASSISTANT GENERAL COUNSEL (ENFORCEMENT)

SUBJECT:         **Announcement Suspending Issuance of the 30-year Bond**

This memorandum responds to your request for information concerning events at Treasury on the morning of October 31st related to the announcement that Treasury would be suspending issuance of the 30-year bond. Peter Fisher, Under Secretary for Domestic Finance, made the announcement at a press conference held in the Diplomatic Room between approximately 9:00 a.m. and 9:25 a.m. The information was to have a 10:00 a.m. news embargo.

In advance of the 10 a.m. embargo, an employee in the Office of Public Affairs. Frances Anderson, posted the information to Treasury's web site at 9:43 a.m. Attachment 1 shows log information reflecting the posting. Attachment 2 is a copy of the press release.

Starting at approximately 9:25 a.m., the price of the Treasury 30-year bond started to drift upward, accelerating in price sometime before 9:50. Attachment 3 is a Bloomberg graph showing trading in the 30-year bond throughout the course of the morning.

Based on their analysis of the trading data and information they received from the trading community, Jill Cetina and Jim Sharer, analysts in Treasury's Market Room believe that one or more parties were trading on the basis of advance information. Attachment 4 reflects their e-mail traffic on October 31 in connection with this matter. The e-mail exchanges do not reflect the details of the conversations with members of the trading community. I have asked the analysts to memorialize the conversations.

In addition, at approximately ~~9:40~~ 10:30 am a.m., Assistant Secretary Brian Roseboro. Assistant Secretary for Financial Markets, received a telephone call from Jimmy Capra, Chairman of Treasury's Borrowing Advisory Committee and head of Capra Asset Management in Rye. New York. Capra reported that a political consultant who worked for him had advised him that Treasury was suspending issuance of the 30-year bond. Roseboro told Paul Malvey. Director of Treasury's Office of Market Finance, about the conversation with Capra. Based on his knowledge of attendees at the press conference. Malvey speculated that the consultant was Peter Davis. whom he thinks puts out a newsletter on investments. Malvey has examined the trading data for the morning of October 31. Based on his review. Malvey believes that that one or more parties were trading on the basis of advance information.

Jill Cetina reports that she had a conversation with a member of Lehman Brothers last week in which she was asked whether Treasury would be suspending issuance of the 30-year bond. She professed no knowledge about the matter. In discussing this incident with me. she volunteered that the member of Lehman Brothers had just come from a meeting with Paul Malvey. Reflecting upon the value of advance information. Cetina said that she had spoken with a colleague about how easy it would be to make money by using the information to position oneself in the financial markets. She also volunteered that the SF 450s (confidential financial disclosure reports) did not require a filer to list holdings in government securities.

In the course of my review, Malvey sent Steve Berardi, a financial economist on his staff, to speak to me. Berardi wanted me to know that Frances Anderson had been asked to safeguard materials outside the Diplomatic Room during the press conference and that she might not have realized the press materials had been embargoed until 10:00 a.m. In the course of our conversation, Berardi volunteered that he was "amazed" Treasury's decision to suspend issuance of the 30-year bond had not leaked earlier. He noted that two sets of calendars had been sent to the printer weeks in advance. One set showed the Treasury continuing issuance of the 30-year bond. The other didn't. For that reason alone, he was surprised the decision had not become public earlier.

I have briefly discussed this matter with staff at the Securities and Exchange Commission. Alton Harvey, Chief, Office of Market Watch, (202) 942-4167, and Joseph Cella, Chief of the Office of Market Surveillance, (202) 942-4559, are available for further discussion.

Attachments

SECNOTH00102861

# EXHIBIT D

**Letter from Mary Lou Peters at Morgan Stanley to Andrew B. Sporkin at SEC (Dec. 5, 2001); E-mail message from Jill Cetina at U.S. Department of the Treasury (Oct. 31, 2001, 11:40 a.m.)**

*MORGAN STANLEY DEAN WITTER*

*1221 AVENUE OF THE AMERICAS*
*NEW YORK, NEW YORK 10020*
*(212) 761-4000*

**Direct Dial (212) 762-8827**
*Facsimile No: (212) 762-8834*
*Email marylou.peters@morganstanley.com*

December 5, 2001

RECEIVED
ENFORCEMENT
2001 DEC -6  PM 4: 24

**VIA FACSIMILE AND FEDERAL EXPRESS**
Andrew B. Sporkin
Branch Chief
Division of Enforcement
UNITED STATES SECURITIES & EXCHANGE COMMISSION
450 Fifth Street, N.W.
Washington, DC  20549-0805

Re:  **Trading in Certain Treasury Issues**
    **(File Number HO-9353)**

Dear Mr. Sporkin:

I write on behalf of Morgan Stanley & Co. Incorporated in response to your November 29, 2001 request to Lillian Tartamella for information in connection with the above-referenced investigation.

Mark Ficke, an employee on Morgan Stanley's government bond desk, was contacted by John Jacobs of IDEAglobal at approximately 2:00 p.m. on October 30, 2001 (not October 31, as your letter indicates). Mr. Ficke's best recollection is that Mr. Jacobs asked Mr. Ficke if he could confirm or deny that there would be a major announcement concerning the long bond in the U.S. Treasury's refunding announcement the next day. Mr. Ficke recalls replying that he would not be able to share that information with Mr. Jacobs if he had it, but that he had not heard statements of that nature in the market prior to Mr. Jacobs' call and that he (Mr. Ficke) thought it would be "crazy" for the U.S. Treasury to take action with respect to the long bond. Mr. Jacobs may have indicated to Mr. Ficke that the "rumor" relating to the long bond was coming out of London.

Neither Mr. Ficke nor the Firm took any action as a result of Mr. Jacobs' telephone call, except that 1) that afternoon, Mr. Ficke asked David Greenlaw, one of the Firm's economic strategists, whether he thought it was possible that the U.S. Treasury would take action to discontinue the thirty year bond; and 2) the next morning, October 31, 2001, Mr. Ficke informed the Firm's other government bond traders in a regular morning meeting that he had received a

SECNOTH00124484

*MORGAN STANLEY DEAN WITTER*

Andrew B. Sporkin
Branch Chief
December 05, 2001
Page 2

phone call indicating rumors in the market regarding a possible announcement about the long bond.

Finally, Morgan Stanley does not have information, beyond what is set forth above, about how IDEAglobal or Mr. Jacobs obtained information relating to the long bond.

Please let me know if we can be of any further assistance in connection with this investigation.

Sincerely,

Mary Lou Peters
Vice President and Counsel

cc:    Freedom of Information Act Officer
       Securities and Exchange Commission
       450 Fifth Street, N.W.
       Washington, DC  20549

SECNOTH00124485

**Kerner, Francine**

| | |
|---|---|
| **From:** | Sharer, James |
| **Sent:** | Wednesday, October 31, 2001 3:19 PM |
| **To:** | Kerner, Francine; Bieger, Peter |
| **Subject:** | FW: Some thoughts on e-mail from a primary dealer contact |

-----Original Message-----

| | |
|---|---|
| **From:** | Cetina, Jill |
| **Sent:** | Wednesday, October 31, 2001 11:40 AM |
| **To:** | Cetina, Jill; Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul |
| **Cc:** | Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James |
| **Subject:** | RE: Some thoughts on e-mail from a primary dealer contact |

Had a different primary dealer tell me that they received a call from John Jacobs from IDEA yesterday about a rumor that Treasury would eliminate the long bond. The same dealer reports that the long bond was trading special on repo yesterday.

A third dealer in London said he heard rumor that the long bond would be eliminated yesterday from a European central bank.

-----Original Message-----

| | |
|---|---|
| **From:** | Cetina, Jill |
| **Sent:** | Wednesday, October 31, 2001 10:45 AM |
| **To:** | Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul |
| **Cc:** | Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James |
| **Subject:** | Some thoughts on e-mail from a primary dealer contact |

Jill

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

SECNOTH00102877

**Kerner, Francine**

| | |
|---|---|
| From: | Sharer, James |
| Sent: | Wednesday, October 31, 2001 3:18 PM |
| To: | Kerner, Francine; Bieger, Peter |
| Subject: | FW: Some thoughts on e-mail from a primary dealer contact |

-----Original Message-----

| | |
|---|---|
| From: | Cetina, Jill |
| Sent: | Wednesday, October 31, 2001 10:45 AM |
| To: | Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul |
| Cc: | Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James |
| Subject: | Some thoughts on e-mail from a primary dealer contact |

Jill

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

SECNOTH00102876

# EXHIBIT E

**E-mail message from Richard Tang at Greenwich Capital to James Book at Goldman Sachs (Oct. 31, 2001, 9:10 a.m.)**

**Attachment 1**

========================= Count:  6521 =========================
       Message sent: 10/31/2001 at    9:10
 >From: RICHARD                TANG                   - GREENWICH CAPITAL MA
 >Location:HERE
 >To: JAMES                    BOOK                   - GOLDMAN, SACHS & CO.
 >Location: F834
                        >Sent from terminal:          782861 -              0
 > FYI:   THERE ARE MANY PLENTY OF RUMORS FLOATING AROUND ABOUT A
 > POTENTIAL CHANGE TO FUTURE TREASURY ISSUANCE.   THESE ARE ALL
 > UNSUBSTANTIATED RUMORS.
 >     SOME OF WHAT HAS BEEN BANTERED ABOUT:
 > - 30yr ELIMINATION
 > - INCREASE SIZE OF BUYBACKS
 > - MONTHLY 5yr ISSUANCE AGAIN
 >     THE MKT HAS NOT REACTED TO THESE, BUT OBVIOUSLY ANY TRUTH TO
 > THESE WOULD HAVE A HUGE IMPACT ON OTR SPREAD & SWAP
 SPREADS.

GS0010

Confidential Treatment Requested by Goldman, Sachs & Co.

SECNOTH00115997

# EXHIBIT F

**Cited Excerpts from SEC Deposition Transcript of Jill Ouseley
Jan. 7, 2002)**

Page 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:            )
                             )    File No. HO-9353
CERTAIN TREASURY ISSUES )

WITNESS:    Jill Ouseley

PAGES:    1 through 81

PLACE:    Securities and Exchange Commission

          450 Fifth Street, N.W.

          Washington, D.C.

DATE:    Monday, January 7, 2002

          The above-entitled matter came on for

hearing, pursuant to notice, at 10:10 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

     ROSEMARY A. FILOU, ESQ.

     ANDREW B. SPORKIN, ESQ.

     Securities and Exchange Commission

     450 Fifth Street, N.W.

     Washington, D.C.  20549

     (202) 942-4768

On behalf of the Witness:

     JILL K. OUSELEY, PRO SE

     6919 Langley Place

     University Park, Florida 34201

     (941) 358-1764

---

Page 2

CONTENTS

WITNESS:                              EXAMINATION

Jill Ouseley                              3

EXHIBITS:    DESCRIPTION              IDENTIFIED

110          Form 1662                    4

111          Subpoena and cover letter    5

112          Letter from Ms. Ousley to Ms. Filou    12

---

Page 3

1        PROCEEDINGS

2        MS. FILOU:  We're on the record at 10:10 a.m. on

3    January 7, 2002.  Ms. Ouseley, I need to swear you in for the

4    record, so if you could raise your right hand.

5    Whereupon,

6            JILL OUSELEY

7    was called as a witness and, having been first duly sworn,

8    was examined and testified as follows:

9            EXAMINATION

10   BY MS. FILOU:

11       Q  Please state and spell your full name for the

12   record.

13       A  Jill, middle initial K, Ouseley.  J-i-l-l-, middle

14   initial K, O-u-s-e-l-e-y.

15       Q  I'm Rosemary Filou.  This is Andrew Sporkin.  And

16   we are both officers of the Commission for the purposes of

17   this proceeding.  This is an investigation by the United

18   States Securities and Exchange Commission in the Matter of

19   Trading in Certain Treasury Issues, HO-9353, to determine

20   whether there have been violations of certain provisions of

21   the Federal securities laws.  However, the facts developed in

22   this investigation might constitute violations of other

23   Federal or state civil or criminal laws.

24       Prior to the opening of the record, you were

25   provided with a copy of the formal order of investigation in

---

Page 4

1    this matter.  It will be available to you for you examination

2    during the course of this proceeding.  Have you had an

3    opportunity to review the formal order?

4        A  Yes.

5            (SEC Exhibit No. 110 was marked for

6            identification.)

7        Q  Prior to the opening of the record, you were also

8    provided with a copy of the Commission's supplemental

9    information form 1662, which I'm now placing in front of you.

10   A copy of that notice has been marked as Exhibit Number 110.

11   Have you had an opportunity to read the form 1662, Exhibit

12   110?

13       A  Yes.

14       Q  Do you have any questions about that exhibit?

15       A  No.

16       Q  Okay.  Ms. Ouseley, are you represented by counsel

17   today?

18       A  No.

19       Q  Because you're not represented by counsel, I just

20   want to highlight for you a couple of things.  Please be

21   aware that you have the right to have an attorney present to

22   advise you before, during, and after your testimony today.

23   If you wish to have an attorney present, we will adjourn your

24   testimony to give you the opportunity to arrange to have

25   counsel.

---

SECNOTH00117033

Page 25

BY MR. SPORKIN:

1   BY MR. SPORKIN:
2   Q   Is your husband employed?
3   A   Yes, he is.  He's a psychologist.
4   Q   So you -- does -- is he in private practice?  Or
5   does he work for somebody?
6   A   He just finished a postdoctoral year of training at
7   a non-profit called Coastal Recovery Center.  It's a
8   community mental health clinic.  He is still determining what
9   he's going to do with his doctoral degree.
10   Q   Aren't we all?
11   BY MS. FILOU:
12   Q   I feel we should be having some coffee with this
13   conversation.  Let's turn to the primary subject, or the
14   primary reason we have you here today, Ms. Ouseley, somebody
15   named Peter Davis, Jr.  Do you recall anybody by that name?
16   A   No.
17   Q   Okay.  I'm going to show you what's previously been
18   marked as exhibit -- it's been marked a couple times, exhibit
19   102, and I'm going to direct your attention to page 4 of that
20   exhibit.  And there's two photos.  It's the page that's
21   captioned, "Who We Are."  I'd just ask you to look at that.
22   I doubt that the second person there, Allyson
23   Sullivan, will look familiar to you, but I'll ask you to take
24   a look at this photo of Peter J. Davis, Jr.  Does he look
25   familiar to you at all?  Does that refresh your recollection

Page 26

1   at all as to whether or not you knew him, or how you might
2   have known him?
3   A   I just want to read his background for a second,
4   just to see if something will click in my memory.
5   Q   Take your time.
6   (Witness examines the document.)
7   A   I don't know him.
8   Q   Okay.  And reading his background, you don't notice
9   anything -- any way that you may have met him, or anything of
10   that nature?
11   A   No, because his background appears to be in tax,
12   and I really didn't work in tax.
13   Q   Okay.
14   BY MR. SPORKIN:
15   Q   Looking at the picture, you don't recognize the
16   face?
17   A   No.
18   Q   Have you discussed --
19   A   I mean, he might look like somebody I'm acquainted
20   with, but if I saw him, I don't think I would be able to put
21   a name with a face, except with his picture.  But I don't
22   know whether he looks like somebody I know, or if it's just
23   that -- and I might have seen him, actually.  Maybe I saw him
24   at some of the press conferences.  But I don't know him.
25   Q   Are you speculating with regard to whether or not

Page 27

1   you saw him?  Do you actually recall?
2   A   Yeah, I'm speculating.
3   Q   Yes.
4   A   No, I don't actually recall.
5   Q   That's what I just wanted to get at.  Have you
6   discussed Peter Davis with anyone, other than Mr. Sporkin and
7   myself, in the last few months?
8   A   Well, I talked to Paul Malvey, because Paul told me
9   that he had given my name to the SEC.  And he told me why.
10   And at that point, I tried to refresh myself, and I didn't
11   remember -- I don't know him, Peter Davis.
12   Q   And just for the record, what did you and Mr.
13   Malvey discuss?  Can you set forth for the record in some
14   detail what you discussed with Mr. Malvey?
15   A   We discussed the circumstances of what happened,
16   and that was all in the newspaper.
17   Q   And when you say, "what happened," do you mean the
18   fact that Mr. Davis attended a press conference at the
19   Treasury?
20   A   Yes.  And the Treasury apparently didn't put the
21   press release out until 10 o'clock, and they had convened the
22   press conference at about 9 o'clock, which was the usual
23   thing.  And that was where they announced that the long bond
24   was going to be discontinued.  The Treasury borrowing
25   advisory committee had, for several previous meetings, but

Page 28

1   not the then-current meeting, recommended doing away with the
2   30-year bond.
3   And then with that announcement, I guess it was
4   embargoed until 10:00, but somebody -- but Pete Davis,
5   apparently, at about 9:30 went out and called several firms
6   that he's a stringer for and told them.  And then I guess 10
7   minutes later, the Treasury's public affairs office
8   accidentally announced it, and things were pretty messed up.
9   BY MR. SPORKIN:
10   Q   Is that what Mr. Malvey told you?
11   A   Yes.
12   Q   What else did he tell you?
13   A   Well, he told me Jimmy Capra called the Treasury
14   when he saw the announcement -- or when he heard from Pete
15   Davis, and told the Treasury that they had a real problem.
16   And I heard -- but I think it was just by the grapevine --
17   that Goldman, Sachs actually took positions on the
18   information.  They were -- he was working for them.  Peter
19   Davis was working for them.
20   Q   Where did you hear that from?
21   A   Paul.
22   Q   What did Mr. Malvey tell you about Mr. Davis?
23   A   Well, he asked me if I remembered him, and told me
24   that I apparently had signed him in to -- let him come to
25   the press conference, and as a newsletter writer, I guess.

Page 25 - Page 28

Page 29

1  That's the only reason I can think that I would have let him
2  in. And usually they're in from -- their publications are
3  not time-sensitive. They're usually this weekly roundup sort
4  of thing. And I lost my train of thought.
5      MS. FILOU: Take your time.
6      BY MR. SPORKIN:
7  Q  I was asking what Mr. Malvey told you about Mr.
8  Davis.
9  A  Oh. Excuse me. I'm sorry. I think Paul told me
10  that Davis had been coming to the press conferences. But I
11  had no recollection of having let him in the first time.
12  Q  What did Mr. Malvey tell you about your role in
13  letting Mr. Davis attend these conferences?
14  A  It happened on my watch, apparently.
15  Q  He told you this?
16  A  Yeah.
17  Q  What did he say about that?
18  A  Well, he just said that apparently, that Pete Davis
19  had been let in by me the first time.
20  Q  And what did you --
21  A  And then apparently Lula Tyler, having let him in
22  once, thought it was okay, and just continued to do it
23  without consulting me.
24  Q  And what did you -- how did you respond to -- when
25  Mr. Malvey told you this?

Page 30

1  A  I told him I didn't have any recollection of having
2  done that -- let Pete Davis in. Couldn't remember who he
3  was.
4      BY MS. FILOU:
5  Q  Did Mr. Malvey say anything to you about the fact
6  that he had let Mr. Davis in subsequent to your departure
7  from Treasury?
8  A  No, he didn't.
9  Q  Did he say anything to you about having spoken with
10  Mr. Davis at any time?
11  A  No, I don't recall that he did.
12  Q  Okay.
13      BY MR. SPORKIN:
14  Q  Did he tell you anything else about Mr. Davis?
15  A  No, not that I can remember.
16  Q  Did he tell you anything else about the press
17  conference, or the events surrounding the press conference of
18  October 31st?
19  A  There was only a rather personal commentary about
20  the under secretary's hubris.
21  Q  What did he say?
22  A  That the under secretary, Peter Fisher, wanted to
23  have the press conference delayed until 10 o'clock.
24  Q  Why was that?
25  A  Not the press conference. I'm sorry. The press

Page 31

1  release delayed until 10 o'clock. I'm not sure. It had
2  something to do with the time when the news is out or
3  something. I don't know. But he wanted it to be delayed
4  until 10:00. That normal practice had been to try to get it
5  out -- get the announcement out on the wire as quickly as
6  possible, because everybody knew it was coming, and everybody
7  knew there was a chance that it would leak. And nobody
8  really wanted to be tagged with having insider information.
9      And you also have to remember that there are like
10  20 or 22 members of the Treasury borrowing advisory
11  committee, and after the Government Securities Act amendments
12  of 1993 were enacted, they wanted to be very certain, and
13  their lawyers wanted to be very certain, that they didn't
14  have such information.
15      So they wanted to have all of the information that
16  was developed be released at the same time, including the
17  advisory committee's report, the minutes of the meeting taken
18  by the Treasury employee, the -- everything be out in the
19  public domain by about 9:30 or quarter to 10:00.
20      And that was as quickly as we could produce all of
21  that information. So that had been the goal for years and
22  years. So there was a kind of a change in procedure, waiting
23  until a later time.
24      BY MS. FILOU:
25  Q  Other than Mr. Malvey and Mr. Sporkin and myself,

Page 32

1  have you discussed Mr. Davis with anyone else?
2  A  No.
3  Q  Okay.
4      BY MR. SPORKIN:
5  Q  How many conversations did you have with Mr. Malvey
6  concerning Mr. Davis?
7  A  Well, I had the one when he warned me that he had
8  given my name to the SEC, and we talked about what happened,
9  and which I've just described to you. And then when I got
10  the subpoena, I e-mailed him a copy of it, and said, "You
11  were right." And I have not talked to him about it.
12  Q  Since that time?
13  A  I can't remember. I have talked to him. I have
14  talked to him, so we probably did talk about it, but it was
15  just him quizzing me on whether I really couldn't remember
16  Pete Davis, and I couldn't.
17  Q  Let's go back to the first conversation. Did he
18  say anything else during this conversation?
19  A  Not that I recall.
20  Q  Okay. And then you got the subpoena from the SEC,
21  correct?
22  A  Right.
23  Q  And you e-mailed him. What did you say in the e-
24  mail?
25  A  I just said, "Here's the subpoena, thanks a lot.,"

Page 29 - Page 32

Page 41

1    Q -- conference.
2    A -- the legal counsel did it with coaching. The
3  experts, the debt management experts.
4    MS. FILOU: Okay.
5    BY MR. SPORKIN:
6    Q Now, who normally attended these press conferences,
7  these quarterly refunding conferences?
8    A There is a small -- or was -- a small stable of
9  reporters that is in the Treasury building -- or was -- and
10  they were -- well, somebody from the Wall Street Journal
11  would usually be there, the Bond Buyer, Muni newspaper -- I'm
12  trying to remember who Vinnie was with -- oh, Reuters would
13  be there.
14    BY MS. FILOU:
15    Q What about AP?
16    A Market -- no,
17    Q No?
18    A They don't do financial.
19    BY MR. SPORKIN:
20    Q Somebody from Bloomberg?
21    A Market -- I don't remember Bloomberg, but I
22  remember this Market News, Steve Bedner. Know them? Yes --
23    Q So these people had --
24    A And I think they were with Knight Ridder.
25    Q These people had a place in the building, a press

Page 42

1  office in the building?
2    A Yes, there was. I don't know if it's still there.
3    Q And obviously, Treasury employees attended these
4  press conferences.
5    A Yes, and some OMB employees attended also.
6    Q And who else are you aware of that attended these
7  press conferences?
8    A That's about it.
9    BY MS. FILOU:
10    Q Who would clear OMB into the building?
11    A Well, the OMB people had these -- some of them --
12  had these White House passes.
13    Q I see --
14    MR. SPORKIN: Now, you --
15    THE WITNESS: But I think I must have let --
16  Kilpatrick, let's see, what's his first name, why am I having
17  this trouble? A fellow who works on the special analyses of
18  the budget, his last name is Kilpatrick, Bob Kilpatrick,
19  would always come over.
20    BY MS. FILOU:
21    Q And he worked at OMB?
22    A Yes.
23    Q And you cleared him in?
24    A Yes, yes.
25    Q Were you aware -- I mean, you were -- you say you

Page 43

1  were attending each of these quarterly refunding
2  announcements -- were you aware of anyone, other than people
3  who were press, somebody from OMB, or say, you mentioned Joe
4  Slevin, somebody who you had cleared in and specifically told
5  about the embargo, did you notice that there was anybody else
6  there that one of the political appointees may have brought
7  somebody from Wall Street, or anything of that nature?
8    A I don't remember that, no.
9    Q And so it doesn't --
10    A The political appointees usually wouldn't -- most -
11  - would not go to the press conference, just the political
12  appointee who was giving the press conference. And then I
13  was the geek with the big notebook, sitting there at the
14  ready to answer any questions.
15    Q So you would, in fact, answer questions at the
16  quarterly announcement.
17    A Yes.
18    MS. FILOU: Okay.
19    BY MR. SPORKIN:
20    Q You mentioned the two people that you let into the
21  press conference who weren't -- the person with the
22  newsletter, as well as the person from DLJ. What was the
23  actual process to let them into the building, and to attend
24  the conference?
25    A Well, I would ask my secretary to call the guard

Page 44

1  desk downstairs and have them admitted. And they had to give
2  their name and their birthday to get in.
3    Q So they would check in at the guard desk?
4    A Yes.
5    Q Well, once they were in the building, they could go
6  anywhere in the building?
7    A Anywhere.
8    Q They didn't have to go to your office, or go to the
9  press conference?
10    A That's correct.
11    Q Are you aware of any security at the press
12  conference, to attend the press conference?
13    A No.
14    Q So once you were in the building, anyone could
15  attend the press conference?
16    A Yes, that's correct.
17    Q Was it normal practice to close the doors to the
18  press conference?
19    A No.
20    Q Sometimes the doors were open?
21    A The back door, often, would be open. The door at
22  the head of the table would be closed, because the hallway
23  was noisy.
24    Q Was it possible for somebody to leave --
25    A There often would be cameras in the back, doing

SECNOTH00117043

Page 45

1 videotape of the press conference.

2    Q  Where there was an embargo time on the press

3 conference, though, was it possibly for somebody to walk out

4 mid-press conference and leave and --

5    A  Yes.

6    Q  It was possible?

7    A  Yes.

8    Q  So Treasury didn't do anything to prevent that?

9    A  Just setting the embargo time. If someone leaked

10 the information before they should have, then they didn't get

11 to come anymore.

12    Q  Did that ever happen?

13    A  Not that I recall.

14    Q  So you're not aware of anybody leaking information.

15    A  No.

16    Q  And now, you said that if they did leak

17 information, they wouldn't be allowed to come anymore. Was

18 that --

19    A  If we found out about it.

20    Q  If you found out about it.

21    A  Yes.

22    Q  Was that policy sort of announced to the press?

23    A  No.

24    Q  So that was just sort of internally discussed, if

25 that should happen?

Page 46

1    A  It was what I call the "burn your source" rule.

2    BY MS. FILOU:

3    Q  What do you mean by that?

4    A  If someone gives out information that I believe is

5 leaked, I wouldn't let them back into a press conference. If

6 -- there was a fellow who worked at Merrill Lynch who used to

7 call me quite a lot, and he often had interesting questions,

8 and we would just talk about it. And I would just provide

9 him with information that was already on the public record.

10      But, you know, when you're in the course of talking

11 with someone who was working on something, you're often able

12 to understand things better. And I don't know any way that

13 the Treasury can operate without input from the people in the

14 Street, and this advisory committee is a prime example of

15 that.

16      But he apparently thought that he had some scoop,

17 and so he talked to the newspapers. And I wouldn't take his

18 calls after that. And I had several very high-level people

19 at Merrill Lynch call me and ask what the problem was, and I

20 told them that the problem wasn't with Merrill, it was with

21 this one fellow.

22    BY MR. SPORKIN:

23    Q  So that was just the policy that you, personally,

24 set, that if --

25    A  That was the one that was handed down to me from

Page 47

1 the people that had the debt management job before. And

2 there had been circumstances in the past where information

3 had been given out, and it reflected very badly on the

4 Treasury Department. And the staff was very zealous to keep

5 those leaks from happening.

6    Q  When did that happen?

7    A  The -- maybe it was in the mid-1990s that they --

8 the Merrill instance that I was describing.

9    Q  I was talking about the policy of something

10 leaking.

11    A  Oh, this is something that's passed down as the

12 Holy Grail, from person to person.

13    Q  That if somebody leaks, they're not allowed back

14 into the building?

15    A  Not explicitly said, but it's not nice to burn your

16 sources. So that was the operating practice. I don't know

17 that it was ever written down anywhere, or formally

18 discussed. But that was the way we operated.

19    Q  And how did you learn about that policy?

20    A  From the senior officials, who were senior when I

21 was a junior, coming up through the ranks.

22    Q  And you said you were told of an instance where

23 somebody in the press did leak something ahead of time?

24    A  No, it was someone in the Treasury, actually, who -

25 - no, it was somebody -- it was tracked down, it was somebody

Page 48

1 in the Fed who had the information before it was available on

2 the Street. And that person, apparently, was providing some

3 information to people in the Street. I don't have any idea

4 of what the guy's name was.

5    Q  Do you know when that occurred?

6    A  Yes, that would have been back in the '60s.

7    Q  Are you aware of any occasions where somebody from

8 the press got some of this information, or leaked this

9 information to the public before the embargo time had

10 elapsed?

11    A  No, I wasn't aware of that, uh-uh. No, not our

12 usual reporter pool, no.

13    Q  What about any reporters, or anybody --

14    A  I don't recall that happening.

15    Q  So this policy, this unwritten policy of if the

16 reporter leaks the information they wouldn't be allowed back,

17 that was never disclosed to the press?

18    A  No.

19    Q  What was the purpose of doing these press

20 conferences, and having an embargo policy?

21    A  Well, the purpose of doing the press conferences

22 was to update the budget numbers and to tell the people on

23 Wall Street what the Treasury was expecting to need to borrow

24 in the Street, so that they would be able to plan their

25 purchases.

# EXHIBIT G


**Report of Investigation, Office of the Inspector General,**
**U.S. Department of the Treasury (Jan. 2002)**

# REPORT OF INVESTIGATION
## 2002-0104



## Office of Inspector General

## United States Department of the Treasury

SECNOTH00103570

# REPORT OF INVESTIGATION

JAN 2 2001

| | |
|---|---|
| Date of Report | |
| Case Number | 2002-0104 |
| Case Title | Unknown Treasury employee(s) |
| Report Status | Final |
| Alleged Violation(s) | Unauthorized Disclosure |



**COPY**

## SYNOPSIS

This investigation was predicated upon the assertion that there may have been trading activity in government securities based upon confidential information learned during an embargoed quarterly funding conference at the Department of Treasury. Interviews of Treasury employees were conducted by the Securities and Exchange Commission (SEC), Treasury Office of General Counsel, and the Office of Inspector General because of allegations of premature release of information surrounding the government's decision to suspend issuance of the 30-year bond.

The Treasury announcement concerning the long bond was made during the October 31, 2001, quarterly refunding press conference. The information was embargoed until 10:00 a.m., but was prematurely posted on the Treasury web site prior to that time. This investigation did not develop any evidence of unauthorized disclosure of market sensitive information by Treasury employees. The SEC investigation concerning non-Treasury employees is continuing.

| Distribution: | Case Agent: | Approved: |
|---|---|---|
| Peter R. Fisher<br>Under Secretary for<br>Domestic Finance | Michael C. Knorr<br>Investigator | James W. Burke<br>Acting Special Agent<br>In Charge |
| Michele A. Davis<br>Assistant Secretary for<br>Public Affairs<br>Department of the Treasury | *Michael C Knorr*<br>(Signature) | *James W. Burke*<br>(Signature) |

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103571

REPORT OF INVESTIGATION

## DETAILS

On November 6, 2001, David D. Aufhauser, General Counsel,
Department of the Treasury (Treasury), provided information to
the United States Securities and Exchange Commission (SEC)
concerning events surrounding suspending the issuance of the 30-
year Treasury bond.   The focus of the SEC inquiry concerned the
assertion of possible trading activities in government securities
based upon confidential information learned during an embargoed
quarterly funding meeting at the Department of the Treasury.   On
this same date, Treasury Office of General Counsel forwarded to
the Office of Inspector General (OIG) copies of the same
information provided to the SEC.   (Exhibit 1)

The government's decision to suspend issuance of the 30-year bond
was announced by Peter R. Fisher, Treasury, Under Secretary for
Domestic Finance, during the quarterly refunding meeting press
conference at Treasury between 9:00 a.m. and 9:25 a.m. on October
31, 2001.   The press conference followed the October 30, 2001,
meeting of the Treasury Borrowing Advisory Committee.   Treasury's
announcement was embargoed for release until 10:00 a.m. on the
31st.   The Treasury Office of Public Affairs, however,
prematurely posted Fisher's statement on their web site, where it
appeared at 9:43 a.m.   Members of the Treasury press corps
immediately notified Treasury, Office of Public Affairs, that the
web posting had gone up early.

Typically, financial information provided at the quarterly press
conference is supplied with the explicit oral understanding that
it is to be embargoed for a short period of time, usually 10 or
15 minutes after the conference.   At the conclusion of the press
conference, members of the press are provided with copies of the
minutes of the Borrowing Advisory Committee meeting and the
statement of the Treasury policy official, with the understanding
that the information is subject to an agreed-upon release of the
embargo.   (Exhibit 2)

On November 1, 2001, Treasury Office of General Counsel contacted
Treasury Webmaster David Borowski to determine the exact time of
publication of Under Secretary Fisher's remarks at
www.treasury.gov/press/release/po749.htm.   Borowski contacted the
Treasury web servers' hosting company, UUNET, and following
review of the server logs, determined that the posting time was
9:43 a.m., on October 31, 2001.   (Exhibit 3)

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or
reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/3/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103572

## REPORT OF INVESTIGATION

Treasury Office of General Counsel reported in their internal memorandum of November 6, 2001, that in addition to press, individuals from the Office of Management and Budget (OMB), Federal Reserve Bank officials, and others have attended press conferences following the Borrowing Advisory Committee meetings. Their memorandum stated that it appeared that, following a long-standing practice, the Office of Market Finance cleared consultant Peter Davis to attend the October 31, 2001, press conference.  The Office of General Counsel reported that there did not appear to be written standards for determining who is able to attend these press conferences.

According to the above memorandum, Assistant Secretary for Financial Markets Brian Roseboro advised the Office of General Counsel that on the morning of—October 31, 2001, he had received a phone call from Jimmy Capra, Chairman of Treasury's Borrowing Advisory Committee and head of Capra Asset Management, Rye, New York.  Capra reported that a political consultant who worked for him had advised him that Treasury was suspending issuance of the 30-year bond.  Roseboro told Paul Malvey, Director of Treasury's Office of Market Finance, about his conversation with Capra. Based on his knowledge of attendees at the press conference, Malvey speculated that the consultant was Peter Davis. (Exhibit 2)

Megan Hills, Treasury Associate Deputy Counsel, reported in an internal memorandum, dated November 5, 2001, the Office of General Counsel's contact with Ward McCarthy, a bond trader, who had called to offer information regarding his knowledge of the early disclosure of Treasury's refunding announcement.  McCarthy recalled that at approximately 9:35 a.m., Peter Davis had called him and reported the details of the Treasury announcement. McCarthy said Davis told him that the information was still under embargo until 10:00 a.m.  McCarthy reported he had been a client of Davis' for several years, but believed this was the first time Davis had called him before an embargo time period had been lifted.  (Exhibit 4)

Megan Hills reported in an internal memorandum, dated November 6, 2001, her contact with Fran Bermanzohn, General Counsel, for the 6th Income Division, Goldman-Sachs Brokerage.  Bermanzohn stated that on October 31, 2001, at 9:35 a.m., the day of the Treasury announcement, John Youngdahl, Goldman-Sachs' Chief Economist on

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/3/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103573

## REPORT OF INVESTIGATION

the Treasury desk, received a telephone call from Peter Davis. Goldman-Sachs had been Davis' client since early 2001. Bermanzohn said Davis related to Youngdahl that Treasury was withdrawing its 30-year bond. Davis did not say anything to Youngdahl about the information being confidential or under embargo, nor did Davis report the source of his information. After receiving the information from Davis, Youngdahl contemporaneously informed the traders around him. (Exhibit 5)

The United States Secret Service (USSS), Uniformed Division (UD), Treasury Appointment Center, reviewed the files pertaining to the October 31, 2001, quarterly refunding press conference. Peter Davis' name did not appear on the initial list of attendees cleared through the Office of Public Affairs. The Appointment Center reported that Peter Davis was cleared in to the Treasury Building on the morning of the 31st to meet with Paul Malvey, Office of Market Finance. (Exhibit 6)

Following the review of information provided by Treasury Office of General Counsel, the SEC requested interviews of the following Treasury employees:

Jill Cetina, International Economist, Office of Foreign Exchange Operations;

Elizabeth Holahan, Public Affairs Specialist, Office of Public Affairs;

Frances Anderson, Public Information Coordinator, Office of Public Affairs;

Tony Fratto, Director, Office of Public Affairs;

Brian Roseboro, Assistant Secretary for Market Finance;

Paul Malvey, Director, Office of Market Finance;

Lula Tyler, Administrative assistant, Office of Market Finance;

Jeff Huther, Financial Economist, Office of Market Finance. (Exhibit 7)

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/3/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103574

## REPORT OF INVESTIGATION

The above listed individuals were interviewed by attorneys Andrew Sporkin and Rosemary Filou of the SEC, in conjunction with Treasury Office of General Counsel and the OIG.

When interviewed, Jill Cetina said she provides market analysis to Treasury through contacts with bond traders and brokerage market strategists. She said she became aware of the decision to suspend sales of the 30-year bond approximately 30 minutes prior to the official announcement. She said she was aware it was market sensitive information and was also aware of the embargo. She added that she spoke to no one between 9:00 a.m. and 10:00 a.m. on October 31, concerning the suspension of sales of the 30-year bond.

Cetina said she had earlier heard speculation, on the part of bond market strategists, that sales of the 30-year bond might be suspended. Specifically, she said, a week or two prior to the announcement, she spoke with Drew Mathis, a market strategist for Lehman Brothers Inc. in New York. She said that Mathis predicted that Treasury would eliminate the 30-year bond. She thought he was "going out on a limb with that type of speculation." (Exhibit 8)

Cetina said she was monitoring the bond market from the "market room" at the time the announcement on the 30-year bond was made. She said she was also aware of the early Treasury Web site posting. Making reference to the Bloomberg Wire Service, October 31, Day Chart, she said she first noticed price increases on the long bond at 9:35 a.m. She said at 10:00 a.m., the time of the official announcement, there was a "big rally" in the bond price. Cetina memorialized information she received on October 31, relating to the 30-year bond announcement, in a series of e-mail messages sent to her Treasury Department supervisors. (Exhibits 8, 9, 10)

When interviewed, Elizabeth Holahan said as part of her official duties, she helped coordinate the October 31, 2001, press conference where the suspension of the sale of the 30-year bond was announced. Holahan said she announced three times during the press conference that the information presented by Under Secretary Fisher and contained in the press release was embargoed until 10:00 a.m. She added that she verbally gave the "ground rules" to all in attendance and the reporters present were governed by the honor system not to release the information prior

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/31/01
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103575

## REPORT OF INVESTIGATION

to the embargo time. She said no one left the room prior to the conclusion of the conference, at approximately 9:25 a.m. (Exhibit 11)

Holahan said she did not know how the press announcement was posted on the web site prior to the 10:00 a.m. embargo and that she was surprised that it happened. She said there were two versions of the press release, one with the soft letterhead format and the final version with the hard letterhead. One version had the embargo time (10:00 a.m.) on it, while the final version did not. She said she heard that Frances Anderson, of her office had a problem formatting the Treasury letterhead on the press release into an electronic file so that it could appear on the web site. (Exhibits 11, 12, 13, 14, 15)

Holahan said she did not know Peter Davis but learned who he was after the controversy surrounding the October 31, 2001, press conference. (Exhibit 11)

When interviewed, Frances Anderson said she has been employed by the Treasury since 1969. Her immediate supervisor is Tony Fratto, Director, Office of Public Affairs. Her official duties at the Office of Public Affairs include formatting and posting press releases on the Treasury Web site.

Anderson said she attended the October 31 press conference, but was posted outside the Diplomatic Reception Room where the conference was held. She said Paul Malvey, Director, Market Finance, asked her to stand out in the hall to keep an eye on some charts that were to be handed out at the conclusion of the conference. She said since the doors were closed, she did not hear the announcement concerning the 10:00 a.m. press embargo.

At the conclusion of the conference, Anderson said she returned to her office and sent out the press release via the Treasury Web site. She said there had been earlier problems with formatting the press release with the proper Treasury letterhead. The final press release she saw said for "immediate release." She said she posted it on the web site sometime before 10:00 a.m. She said she did not know the exact time the message went out and that she was unaware of the 10:00 a.m. embargo. (Exhibit 16)

When interviewed, Tony Fratto said he first heard of the decision to suspend sales of the 30-year bond on Thursday, October 26,

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/2/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103576

## REPORT OF INVESTIGATION

2001. He said Under Secretary Peter Fisher informed him of the decision on that date as they discussed procedures for the October 31st quarterly refunding press conference. He said the only people in his office who had advance knowledge of the announcement beside him were his subordinate, Elizabeth Holahan, and Assistant Secretary Michele Davis. Fratto said he knew this information was privileged and discussed it with no outside individuals.

Fratto said he was present at the October 31, 2001, 9:00 a.m. quarterly refunding press conference when Elizabeth Holahan introduced Under Secretary Fisher and made the 10:00 a.m. embargo announcement. He said to the best of his knowledge, no one left the room prior to the 9:25 a.m. conclusion of the conference.

Fratto stated that the early posting of the Under Secretary's announcement on the Treasury Web site was as much his mistake as anyone. He said it was miscommunication to his subordinate, Administrative Assistant Frances Anderson. The final copy of the press announcement did not have the 10:00 a.m. embargo time on it, but instead read for immediate release. Fratto said he thought Anderson was at the press conference and was aware of the embargo time. Fratto said he had seen an earlier version of the press announcement with the 10:00 a.m. embargo printed on it.

Fratto said this was the first time Treasury had set an embargo time (10:00 a.m.) prior to the conference. Normally they poll the press at the conclusion of the press conference then set the embargo time. He said he was not aware of any member of the press violating the embargo. He said if they did, he would revoke their Treasury press credentials.

Fratto said that he did not learn who Peter Davis was until after the press conference. He said he subsequently learned that Davis was cleared to attend the conference by Market Finance Director Paul Malvey's secretary, Lula Tyler. Fratto said it was his understanding that Malvey's predecessor had allowed Davis to attend the quarterly press conferences since 1993 and that the Office of Market Finance has continued that practice to the present.

Fratto said it never occurred to him that anyone other than government officials or the press would be in the room attending the quarterly press conferences. Fratto said because of this

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/2/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103577

## REPORT OF INVESTIGATION

incident, his office would be adopting new press conference procedures. (Exhibit 17)

Effective at the next scheduled refunding announcement, on January 30, 2002, Treasury's Office of Public Affairs will post the announcement on their web site at 9:00 a.m. The announcement will also be delivered to credentialed members of the media in the Treasury Pressroom shortly before 9:00 a.m. with lock-down embargo rules. The previous practice of releasing the quarterly refunding announcement at a news conference will be discontinued. (Exhibit 17, attachment 1)

Megan Hills, Treasury Associate Deputy Counsel, was interviewed by the OIG and said she was not aware of an earlier Treasury policy or written procedures governing press admittance to the quarterly funding press conferences. Hills suggested that the OIG contact Tony Fratto, Director, Office of Public Affairs, for further clarification regarding press admission procedures. (Exhibit 18)

Fratto was interviewed by the OIG for a second time, concerning his knowledge of past policy or procedures governing admittance to the quarterly refunding press conferences. Fratto said he was not aware of any formal written policy regarding press admittance procedures (other than USSS, UD clearance) that were in effect for the October 31, 2001, refunding conference. (Exhibit 19)

When interviewed, Brian Roseboro said he was appointed Assistant Secretary for Financial Markets in July 2001. Roseboro said he had the authority to make the decision concerning suspending sales of the 30-year bond. In actuality, he said it was a deliberative decision within Treasury involving the Director of Market Finance, the Under Secretary of Domestic Finance and the Secretary's staff. He said they received White House concurrence on October 26, 2001. He said at the October 30th quarterly funding conference they did not ask the Borrowing Advisory Committee for their opinion on suspension of the 30-year bond.

Roseboro said he attended the October 31, 2001, press conference, where his supervisor, Under Secretary Peter Fisher, announced the suspension of sales of the 30-year bond. He said at 9:57 a.m., he saw the Treasury announcement, suspending sales of the 30-year bond, appear on the Bloomberg News Wire. At that time, he

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/3/02
Form OI-08

Office of the Inspector General – Investigations
Department of the Treasury

SECNOTH00103578

## REPORT OF INVESTIGATION

realized the 10:00 a.m. embargo had been somehow violated.
Roseboro said other than the premature Treasury Web site posting,
he was not aware of any early disclosure of Treasury's
announcement to suspend sales of the 30-year bond.

Roseboro said he did not know Peter Davis and only became aware
of who he was following the controversy surrounding the press
conference. Roseboro said it was his understanding that Davis
was not a member of the Press but had been "grand-fathered in" to
attend this and previous Treasury quarterly refunding press
conferences. (Exhibit 20)

When interviewed, Paul Malvey said as Director, Office of Market
Finance, he tries to provide financial analysis and policy
recommendations to "decision makers" at the Office of the Under
Secretary for Domestic Finance. Malvey said the possible
suspension of sales of the 30-year bond had been discussed within
Treasury for quite some time. In previous quarterly conferences,
the Borrowing Advisory Committee had also discussed it. Malvey
said at the October 30, 2001, quarterly refunding meeting,
however, he did not discuss the 30-year bond with members of the
Borrowing Advisory Committee.

Malvey said as part of his job, he and his staff regularly talk
to bond dealers and market consultants. Malvey said he did not
say anything to dealers that would suggest that Treasury was
going to discontinue the 30-year bond. He further said he had no
reason to believe that anybody in his financing group would
discuss this with anybody on the outside. Malvey said, "because
of the nature of the business, everybody in this office has an
appreciation of the sensitivity of what they discuss."

Malvey said his office was responsible for the admittance of
Peter Davis to the quarterly refunding press conference. Malvey
said he had noticed Davis at previous press conferences but had
only spoken to him very briefly. He said his predecessor and
former supervisor, Jill Ouseley, had approved Davis' admittance
to the earlier press conferences. Malvey said he found out after
the fact, that Davis had been calling Malvey's secretary, Lula
Tyler, on a regular basis asking to be admitted to the quarterly
refunding meeting press conferences. Malvey said it was his
understanding that Davis has been attending the quarterly press
conferences since at least 1996. Malvey said he knew that Davis
"wrote some type of investment news letter." Malvey added that

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/31/01
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103579

## REPORT OF INVESTIGATION

Davis happened to be seated next to him during the October 31, 2001, press conference.

Malvey said he was not aware of anyone other than press, OMB, Treasury Officials and Davis who attended the quarterly refunding meeting press conferences. He said he did not realize until after the fact, that the press conferences were only for "credentialed press."

Malvey said subsequent to the October 31, 2001, press conference, his curiosity prompted him to call his former supervisor, Jill Ouseley, to find out why Davis was admitted to the press conferences. Malvey said that Ouseley did not recall a Peter Davis, or ever admitting him to a Treasury press conference. (Exhibit 21)

Jill Ouseley, former Director, Office of Market Finance, Department of the Treasury, was interviewed by the OIG concerning her knowledge of a Peter Davis and his admittance to the quarterly refunding press conferences. Ouseley retired from the Department of the Treasury on December 31, 1999. Her subordinate, Paul Malvey, became Director of the Office of Market Finance following her retirement.

Ouseley stated that she does not know a Peter Davis, nor does she recall ever admitting him to a quarterly refunding press conference. She said, however, it is "not impossible that I admitted him," but she did not recall doing so. She said if she had admitted him, she assumes it was because he wrote for some financial publication. (Exhibit 22)

When interviewed, Lula Tyler said she is employed by Treasury as an administrative assistant in the Office of Market Finance. Her supervisor is Director Paul Malvey. Tyler said her former supervisor, prior to retirement, was Jill Ouseley, then the Director of the Office of Market Finance.

Tyler said she has never met Peter Davis, though she has talked to him on the phone numerous times. She said she first cleared him in for a Treasury appointment about eight or nine years ago at the instruction of Director Ouseley. Ouseley never said how she knew Davis but told Tyler to clear him in for a quarterly refunding press conferences. She said she has subsequently received calls from Davis requesting clearance to attend the

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/31/01
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103580

## REPORT OF INVESTIGATION

quarterly press conferences and has subsequently cleared him through the USSS, UD, Appointment Center. She said she never discussed Davis' clearance into the building with Malvey. Tyler said she never directed Davis to the Office of Public Affairs for clearance into the press conferences. (Exhibit 23)

When interviewed, Jeff Huther said he has been employed as a financial economist in the Treasury, Office of Market Finance, for the past one and a half years. His responsibilities include market research, analysis and providing financial advice to decision makers at Treasury. He said his immediate supervisor is Paul Malvey.

Huther said he had first learned of the decision to suspend sales of the 30-year bond in a meeting with Under Secretary Fisher in mid October 2001. He said the decision was not discussed widely within Treasury. Huther said to the best of his knowledge, the decision to suspend the 30-year bond was first announced internally at an Office of Market Finance staff meeting, on October 15, 2001.

Huther said his office converses with bond traders and consultants on a regular basis, but "we do not provide them with any confidential information." Huther stated that he did not talk to any broker or dealer about the decision to suspend the 30-year bond, prior to the official announcement. Huther said he was aware of the importance and sensitivity of the information he had concerning the 30-year bond.

Huther said he attended the quarterly refunding press conference on October 31, 2001. He said he was aware of the sensitivity of the information at the press conference and heard the press embargo announcement. He said he saw no one leave the room prior to the conclusion of the press conference. Huther said he did not know Peter Davis but learned of who he was after the controversy surrounding the October 31, 2001, press conference. (Exhibit 24)

The scope of this report was limited to interviews of Treasury employees relating to their actions surrounding the October 31, 2001, quarterly refunding conference. This investigation did not develop any evidence of unauthorized disclosures of market sensitive information by Treasury employees. As of the date of this report, the SEC has not identified any additional Treasury

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/31/01
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103581

## REPORT OF INVESTIGATION

employees to be interviewed. The SEC has declined to disclose to
the OIG the identities of any non-Treasury employees they have
interviewed or intend to interview, nor have they discussed with
the OIG the future direction of their inquiry. In the event of
any new information developed by the SEC involving departmental
employees, a supplemental report will be issued.



---

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/3/02

Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103582

# EXHIBIT H

**Press Release by U.S. Department of the Treasury (Oct. 31, 2001)**



DEPARTMENT OF THE TREASURY

# TREASURY NEWS

OFFICE OF PUBLIC AFFAIRS • 1500 PENNSYLVANIA AVENUE, N.W. • WASHINGTON, D.C. • 20220 • (202) 622-2960

**FOR IMMEDIATE RELEASE**
October 31, 2001

Contact: Betsy Holahan
(202) 622-2960

## UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
## PETER R. FISHER
## REMARKS AT THE NOVEMBER 2001 QUARTERLY REFUNDING

As a consequence of the further weakening of the economy and the increased federal outlays that have occurred since the attacks of September 11th, the near-term financing requirements of the federal government are larger than we anticipated just three months ago at our last quarterly refunding in August. In this setting, the management of the Treasury's marketable debt needs to anticipate the possibility of a unified budget deficit for this fiscal year and, perhaps, the following fiscal year as well. However, even if this happens, we expect that the federal government will return to surpluses in the coming years.

With this outlook in mind, today we are announcing:

- The terms of the November refunding, including a new 5-year note in the amount of $16 billion and a reopening of the 5 percent 10-year note issued in August 2001 in the amount of $7 billion; and that

- We are adjusting the debt buyback program as follows:

  - We will continue to conduct buybacks for the remainder of this calendar year;

  - We will make no buybacks in January 2002; and

  - Beginning in February 2002, we will announce at our quarterly refundings the amount and timing of any buyback operations for the subsequent three-month period; and finally that

PO-749

*U.S. Government Printing Office: 1998 - 619-559

SECNOTH00102855

- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

## Recent Changes in the Fiscal Outlook

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

## Suspension of Thirty-Year Borrowing

The debt management strategy of the Treasury has been to strive to be regular and predictable in the issuance of debt while minimizing borrowing costs over many years and interest rate cycles. The Treasury does not try to outsmart the market at any one moment or to be a "market timer" with respect to any particular shape of the yield curve. However, debt management necessarily involves judgments about the size and duration of the federal government's borrowing needs. This compels us to focus on likely borrowing needs over the coming years but we also take into account the likely consequences of unlikely outcomes.

We do not need the 30-year bond to meet the government's current financing needs, nor those that we expect to face in coming years. Looking beyond the next few years, as I already observed, we believe that the likely outcome is that the federal government's fiscal position will improve after the temporary setback that we are now experiencing.

There are two less likely outcomes that we have also considered.

First, it is possible that the federal government will return to significant and sustained budget surpluses even more quickly than we now expect. In this event, maintaining current issuance levels of 30-year bonds would be unnecessary and expensive to taxpayers.

Second, we face the possibility that sustained surpluses do not materialize as promptly as we now expect. If later in this decade it turns out that 30-year borrowing is necessary to meet the government's financing needs, it is still likely that our decision to suspend 30-year borrowing at this time will have saved the taxpayers money. In addition, the reintroduction of the 30-year bond, at some point in the future, if necessary, would likely be costless to the Treasury.

SECNOTH00102856

The 30-year bond no longer maintains a position of significance in the financial markets. Its role and its liquidity have been significantly impaired by the substantial reduction of issuance that has occurred over the last decade. But the markets have functioned smoothly during this period while both activity and attention have shifted to our 10-year offerings.

As long as we have borrowing requirements to finance, the Treasury will seek to maintain the liquidity and depth of the instruments we issue as a means of achieving the lowest cost of borrowing for the taxpayer over time. At this time, the best means for us to do this is to suspend issuance of the 30-year bond and concentrate our borrowing needs on our other instruments.

**Adjustment of the buyback program**

In response to the altered budget outlook for this fiscal year, we are also making adjustments in our buyback program. Beginning in February 2002, our decisions on whether to conduct buyback operations, and on the amount and timing of any purchases, will be made at the time of our regular quarterly refunding announcements and will be based upon three factors:

- first, our projections of the federal government's annual, unified surplus or deficit position;

- second, our projections of that three-month period's cash position; and,

- third, our analysis of how best to minimize borrowing costs over time.

In making the transition to these new procedures, our buyback operations for the remainder of this calendar year will continue in line with our prior announcements. In August we stated that we would be purchasing approximately $9 billion during the fourth calendar quarter. So far we have purchased $2.5 billion and the remaining $6.5 billion will be purchased in November and December. Due to the holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the

SECNOTH00102857

presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

## Terms of the November Refunding

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.

2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.

SECNOTH00102858

# EXHIBIT I

**Letter from Ann M. Kappler at Federal National Mortgage Association
to William M. Hathaway at SEC (Dec. 7, 2001)**



Ann M. Kappler
Senior Vice President and
General Counsel
Legal Department

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
202 752 6950
202 752 4439 (fax)
ann_kappler@fanniemae.com

December 7, 2001

CONFIDENTIAL TREATMENT REQUESTED
PURSUANT TO 17 C.F.R. § 200.83

<u>Via Facsimile and First-Class Mail</u>

Mr. William M. Hathaway
Senior Counsel
Division of Enforcement
United States Securities and Exchange Commission
450 Fifth St., N.W.
Washington, D.C. 20549-8505

<u>Re: In the Matter of Trading in Certain Treasury Issues (HO-09353-A)</u>

Dear Mr. Hathaway:

This letter is in response to your letter request to Fannie Mae dated November 9, 2001 regarding the above-captioned matter. In accordance with Fannie Mae's letter to you dated November 16, 2001, set forth below is a chronological summary of the actions and communications of Fannie Mae personnel on October 31, 2001, prior to 10:00 a.m., concerning the decision of the U.S. Department of Treasury to suspend issuance of the 30-year bond ("the suspension decision") and the details of Fannie Mae's sole transaction in U.S. Treasury securities on October 31, 2001. The summary set forth below is based on our interviews of all those who we reasonably believe to be knowledgeable about the underlying events. We have not interviewed everyone who might potentially have been in a position to hear others discussing the relevant events, and the time periods of the events described are based on reconstructed recollections and on estimates. We believe this summary is a fair and accurate description and is responsive to the questions you have asked. If we become aware of additional information relevant to this matter, we will advise you promptly.

<u>Chronology of Actions and Communications</u>

At approximately 9:35 a.m., Janis Smith, Director---Financial Communications, received a call from Brian Collins, a reporter at *National Mortgage News*. Mr. Collins informed Ms. Smith that he had attended a press briefing at the U.S. Department of Treasury regarding the suspension decision. He told Ms. Smith that the information was "embargoed" until 10:00 a.m., but he wanted to know what comment (specifically from an economic viewpoint) Fannie Mae would have regarding the news. He also informed

SECNOTH00115338

Ms. Smith that an official press release would be issued by the U.S. Department of Treasury at around 10:00 a.m. Lesia Bullock, Media Relations Manager, was present in Ms. Smith's office and overheard the conversation, as it took place on speaker phone.

Between about 9:40 and 9:45 a.m., Ms. Smith contacted John The Losen, Vice President of Debt Marketing, Jennifer Iba, Director – Regulatory Policy, and Orawin Velz, Senior Economist, to inform them of her conversation with Mr. Collins and to request their comments or views on the matter. She told them the information was embargoed until 10:00 a.m. and that she would forward a copy of the official press release to them as soon as she received it.

At approximately 9:45 a.m., Ms. Smith checked the U.S. Treasury Web site and discovered that the formal announcement of the suspension decision had already been posted and was marked "FOR IMMEDIATE RELEASE". She printed the announcement and reviewed it. At 9:53 a.m., Ms. Smith sent the release via email to Mr. The Losen, Ms. Iba and Ms. Velz.

Prior to receiving the release, between about 9:45 and 9:50 a.m., Mr. The Losen separately approached Ursula O'Donnell, Director – Hedging, Nadine Bates, Director -- Long-term Funding, Ken Barnes, Director -- Liquid Investment Portfolio, and Thomas Lawler, Senior Vice President – Portfolio Management. Mr. The Losen told them of his conversation with Ms. Smith and stated that he was not certain that the information was accurate but that he would forward any formal announcement to them. Although Mr. The Losen directed his remarks to the individuals mentioned above, he did not address them privately, making it possible for persons in the near vicinity to overhear him. Mr. The Losen's remarks to Ms. O'Donnell were overheard by Matt Johnson, a trader who works for Ms. O'Donnell.

After speaking to Mr. The Losen, at approximately 9:50 a.m., Ms. O'Donnell called David Light, a salesperson at Salomon Smith Barney Inc., and asked him whether he had heard any general rumors regarding the Treasury market that morning. She did not reveal the details of her conversation with Mr. The Losen, nor indicate that Fannie Mae had any information regarding the suspension decision. Mr. Light told her that he had not heard anything new, just usual rumors of the elimination of the 30-year Treasury bond and a possible change in the frequency of the 5-year Treasury note auctions. Subsequently, Joe Anderson, a salesperson from Merrill Lynch & Co., called Ms. O'Donnell and asked her if she had heard any rumors or confirmation of the elimination of the 30-year Treasury bond. Ms. O'Donnell said she did not have any information on the subject.

At about the same time that Ms. O'Donnell had these conversations, Matt Johnson called Michael Furman, a salesperson at Credit Suisse First Boston Corporation, and asked him if he had seen any formal announcement regarding the elimination of the 30-year U.S. Treasury bond. Mr. Furman replied that he had heard the rumor but had not received any confirmation of its validity. Mr. Johnson also called Don Clark at Goldman, Sachs & Co. with the same question. Mr. Clark also had heard the rumor but had no confirmation of its validity. Mr. Johnson did not reveal that Fannie Mae had received any information

2

SECNOTH00115339

regarding the suspension decision in either conversation. Following these phone calls, another Fannie Mae trader, Robert Dolecki, asked Mr. Johnson whether he had received any information regarding the potential suspension decision. Mr. Johnson informed Mr. Dolecki of what Mr. The Losen had told Ms. O'Donnell, but told him that he still did not know whether the information was true. During this time, Deborah Perelmuter, Senior Vice President at the Federal Reserve Bank of New York, was meeting with Mr. Dolecki and others in the trading room to discuss Fannie Mae's trading technology. Ms. Perelmuter likely overheard the exchange between Mr. Johnson and Mr. Dolecki or other conversations regarding the news report.

Also around the same time, Mr. Lawler checked the news wires (Reuters, Bloomberg and others) to see if there was any confirmation of the information that Mr. The Losen had shared with him. He did not see any relevant headlines. Mr. Lawler also spoke to a few of his senior traders and informed them of his conversation with Mr. The Losen, advising them that he still did not know whether the information was true. One of his traders, Jack Scott, told Mr. Lawler that he had heard a similar rumor.

Also during this time, Mr. Ken Barnes called a salesperson at Morgan Stanley & Co. Incorporated, Thomas McCaffrey, and asked him if he had heard anything regarding a decision by the U.S. Treasury to suspend issuance of the 30-year bond. Mr. Barnes did not reveal the details of his conversation with Mr. The Losen, nor indicate that Fannie Mae had any information regarding the suspension decision. Mr. McCaffrey said that he would check with his economist, David Greenlaw, and would call back Mr. Barnes. Mr. McCaffrey promptly called back Mr. Barnes and told him that while Morgan Stanley had not received any confirmation of the news, it was Mr. Greenlaw's opinion that the information was false. Mr. Barnes told a number of traders in the area that Morgan Stanley had told him that the rumor was false.

Nadine Bates did not have any communications or take any actions regarding the potential suspension decision following her conversation with Mr. The Losen.

Shortly after 9:53 a.m., Mr. The Losen, Ms. Iba and Ms. Velz received the e-mailed press release from Ms. Smith. Ms. Iba replied to Ms. Smith that Fannie Mae should make no formal comment to the press regarding the announcement. (It is common practice at Fannie Mae for public announcements to be cleared first with the Regulatory Policy department.) Ms. Smith called Ms. Velz and left her a voicemail regarding Ms. Iba's instructions. (Ms. Smith also sent Ms. Velz an e-mail to that effect.) Ms. Smith also called Mr. The Losen and conveyed the same instructions to him. Accordingly, neither Ms. Velz nor Mr. The Losen made any comment regarding the suspension decision to any news service, nor did they discuss the suspension decision with anyone else outside of Fannie Mae prior to 10:00 a.m.

Between 9:55 and 10:00 a.m., Mr. The Losen printed the release and distributed it by hand to Ms. O'Donnell, Mr. Barnes, Ms. Bates and Mr. Lawler. At Ms. Smith's request, Mr. The Losen also faxed a copy to Frank Raines, Chairman and Chief Executive

3

SECNOTH00115340

Officer, and Linda Knight, Senior Vice President and Treasurer, who were traveling in Asia on business.

At 10:00 a.m., several Fannie Mae traders saw reports on the news wires regarding the suspension decision. To the best of our knowledge, no Fannie Mae employee made any comment regarding the suspension decision to any member of the press.

<u>Transaction in U.S. Treasury Securities</u>

As discussed in our letter of November 16, 2001, Fannie Mae executed only one trade in Treasury instruments, a short sale, on October 31, 2001. Attached is a "Debt Order Form" which Fannie Mae's portfolio transactions area uses to instruct the Treasurer's Office to hedge Fannie Mae debt issuance. The Debt Order Form is time-stamped when received by the Treasurer's Office. The attached Debt Order Form was time-stamped "11:05 a.m." Shortly after 11:05 a.m., Mr. Johnson executed a short sale of $100 million 10-year U.S. Treasury notes as a hedge of future debt issuance. Fannie Mae executed the sale with Salomon Smith Barney Inc. Fannie Mae neither purchased nor sold any additional U.S. Treasury securities or derivatives thereof on October 31, 2001.

Please do not hesitate to contact me at (202) 752-4850 or Scott Lesmes at (202) 752-7801 if you have any questions regarding this letter or require any further information.

Sincerely,

4

SECNOTH00115341

# EXHIBIT J

**Phone Call Notes from William M. Hathaway at SEC (Nov. 14, 2001)**

**Hathaway, William**

| | |
|---|---|
| **Subject:** | HO-09353-A -- call from Scott Wesson at FNMA -- 202-752-7801 |
| **Entry Type:** | Phone call |
| **Start:** | Wed 11/14/2001 2:15 PM |
| **End:** | Wed 11/14/2001 2:20 PM |
| **Duration:** | 5 minutes |

Scott Wessen from FNMA called and requested that FNMA give us its response by the first week of December.

Here is why. There are about 70 people who heard some market chatter (through dealer calls and the like) before 10:00a.m. on 10/31/2001 about the suspension of the long bond. There are up to 10 people who had some interaction with a call from a news source to the same effect. This call stands out from among the other rumors.

Next week is Thanksgiving with a lot of employees out of pocket and the next week is the annual FNMA retreat.

SW added that he is 99% sure that FNMA did only one TReasury trade on 10/31/2001 -- a short sale after 11:00a.m. There were no futures trading in Treasuries either.

SW asked whether we would be satisfied with an initial response that included only a report on the up to 10 people.

I said that I would get back with him.

<u>Note</u>: I spoke with Andrew Sporkin who agreed to this request.

I called Scott and gave him our decision and he will embody it in a letter to me.

1

SECNOTH00115357

# EXHIBIT K

**Bloomberg News Service, Day Chart for October 31, 2001**

Govt   **GIP**



# EXHIBIT L

**Memorandum from Steven Vagle, U.S. Department of the Treasury (undated)**

MEMORANDUM

To:   File

From: Steven Vagle

Re:   My November 1, 2001, Investigation which Showed that the Time of Publication, on the
      Treasury Web Site, of Peter Fisher's Remarks about the 30-Year Bond, was 9:43 a.m.,
      October 31, 2001

---

Francine Kerner called me from her car at 9:25 a.m. on November 1, 2001, to say that Peter
Fisher's remarks about discontinuing sales of 30-year bonds had been published on the Treasury
Web site perhaps 12 minutes before 10 p.m. on October 31, and to ask whether I could discover the
precise time of publication on the Treasury Web site. I told her that there might be server logs
showing the time and that I'd look into it.

I checked the Treasury Web site and found at http://www.treasury.gov/press/releases/po749.htm
(po749.htm) the statement of Peter Fisher that "We are suspending issuance of the 30-year bond:
there will be no auction of 30-year securities in February 2002 and we plan no further auctions of
either 30-year nominal or inflation-adjusted bonds."

I telephoned and left a message for Treasury Webmaster Dave Borowski and, because I couldn't
reach Dave immediately, I telephoned and left a message for Deputy CIO Mayi Canales. In both
cases I said that I needed help with an "emergency."

I checked my browser cache (Tools | Internet Options | Settings | View Files ) for the "Last
Modified" date and time of po749.htm. It showed "none," however, so that was of no help. (A
browser can compare the "Last Modified" time of a cached Web page with the "Last Modified"
time of the page on its Web server to find whether there is a match so that the cached page can be
displayed instead of downloading it. It speeds up the display of pages frequently visited if the
browser can open them from one's local hard disk instead of from the Web.)

I went to the Public Affairs office on the 2300 corridor and inquired of Frances Anderson about
when po749.htm was published on the Internet. She referred me to Betsy Holahan, also in the
Public Affairs office.

So I spoke briefly with Betsy Holahan who, when I inquired about po749.htm, turned to her e-mail
and computer documents to explain the times at which various things occurred prior to 10 a.m. on
October 31. One e-mail showed that she had conveyed to Frances Anderson the text for
po749.htm. I asked her to print for me the e-mails and attachments that she thought pertinent and
without copying or reading them I turned them over to Francine Kerner.

From my conversation with Ms. Holahan it was plain that it was Ms. Anderson who had caused
po749.htm to be published on the Internet. In response to my question Ms. Holahan said that Ms.
Anderson reports to Tony Fratto (to whom Ms. Holahan also reports). Thinking that I might need
to see records on Ms. Anderson's computer, I asked to meet Mr. Fratto to get his okay. Ms.
Holahan arranged a meeting of the three of us in Mr. Fratto's nearby office, where I asked his

permission to see Ms. Anderson's computer records, if need be, at a later time when I could be accompanied by people from the CIO's office whom. As I will set forth below, it did not become necessary to examine records on Ms. Anderson's computer.

I got a telephone message from Ms. Canales and returned her call. She said that she would arrange to get for me a Web expert and, in case it became necessary to inspect Ms. Anderson's computer, a desktop expert, to help with determining the time of publishing po749.htm on the Internet.

Soon thereafter, at Mayi's behest, Webmaster Dave Borowski telephoned. From my short telephone conversation with Dave, it seemed that we would indeed be able to find the time of publishing po749.htm on the Web from server logs. As I shall set forth below, we found that po749.htm was published in the Internet at 9:43 a.m. on October 31.

Dave said that Public Affairs, in the past, had asked to be able to publish things like po749.htm on the Web, without having to forward such things to one of Dave's colleagues to do it, as is the usual procedure. To satisfy Public Affairs' request, Dave and his colleagues, who were chary of giving anyone direct access to the Treasury Web servers hosted by UUNET, had set up a special way for Public Affairs to publish things. That is, they had set up (1) a "staging server" within Treasury and not on the Internet on which Public Affairs directly could put its Web pages, and (2) a script that Public Affairs thereafter could invoke to copy Web pages from the staging server to an Internet server hosted by UUNET. The point was to limit Public Affairs' Web server activities by limiting the script.

So, Dave had not one but two server logs to check: (1) the staging server log and (2) the UUNET server log.

Dave checked the staging server log which showed that po749.htm was created on the staging server at 14:40 GMT, which would be 9:40 a.m. Eastern Standard Time, on October 31, 2001. At 11:49 a.m. (November 1), Dave sent me an e-mail saying, in full:

> Steven,
> This is the FTP screen shot showing when the file p0749.htm was placed on this staging server. The file would have been pushed to the production server a few minutes later. I'm working on getting the time stamp from that server for that file.
>
> Dave
>
> 
> staging_stamp.jpg
>
>
> Dave Borowski
> Treasury Internet/Intranet Program Manager
> 202 622-3588

-- 2 --

SECNOTH00103592

Below is a screen shot of the "staging_stamp.jpg" log that Dave made and attached to his e-mail.



To check the accuracy of the clock on the staging server, Dave and I compared the time shown on his watch, on my computer's clock, and my cell phone clock. We compared the time on those clocks with the time, on the staging server, of Dave's creation of a dummy folder. All four times agreed, which gave us confidence that 9:40 a.m. on October 31, 2001, was the time at which po749.htm had been put on the staging server.

Next, Dave checked with UUNET (via, I think Dave said, a contractor that subcontracts to UUNET). From UUNET's records one could see that po749.htm had been copied (UUNET uses the term "pushed") from the internal Treasury staging server to UUNET's public Internet server (together with a collection of Web pages on the staging server) at 9:43 a.m., as I will further describe below.

UUNET sent to Dave an e-mail showing part of a server log for the morning of October 31. In particular, that log showed that the Public Affairs office (shown on the UUNET log as "ustpress") had "pushed" its collection of Web pages at 7:08 a.m., 9:43 a.m., 10:19 a.m., and so on. Because the time of placing po749.htm on the staging server was 9:40 a.m., and because I was informed by Ms. Kerner that po749.htm had been published on the public UUNET Internet server before 10 a.m., and because it was my recollection that the text of po749.htm had been supplied to Ms. Anderson after 7:08 a.m., we deduced that the 9:43 a.m. "push" included po749.htm.

-- 3 --

SECNOTH00103593

Dave asked UUNET to check the accuracy of the time clock of the UUNET server; UUNET reported by e-mail that "All dates and times on both production and staging servers are acurate [sic]." I will insert below the full text of Dave's 1:05 p.m. e-mail to me, forwarding the UUNET e-mail that included its time records together with an explanation of those records:

Steven,

Below is the message from uunet web support. I spoke to Mr. Harris on the phone. I asked him to do a clock check on the production server and server time and my watch were the same (as he states below.).

To summarize

You can see that the production date and time stamp is, in fact, the same as the staging that is 10/31 9:40 EST.

You can see all the activity for the press office for 10/31 through today around 10:18.

In the 4th and 5th entry you can see activity at 9:43. his was probably that file update.

Dave

Dave Borowski
Treasury Internet/Intranet Program Manager
202 622-3588

-----Original Message-----
From: web-support@uu.net [mailto:web-support@uu.net]
Sent: Thursday, November 01, 2001 12:44 PM
To: Jeffery.West@cio.treas.gov
Cc: david.borowski@do.treas.gov
Subject: UUTT-0000106570: FC Business Systems

Please do not take the (UUTT-xxxxx) information out of the subject header when replying to this problem. We use this number to track specific customer issues. Thank You.

Hello Jeffrey and David,

All dates and times on both production and staging servers are acurate.

The file has a time stamp of on the production server:
-rw-r--r-- 1 ustpress treas      9175 Oct 31 09:40 po749.htm

This matches the timestamp of the file on the staging server when it was pushed using CMS.

The file was ftp'd to the staging server at 9:40:23 am on Oct 31:
treas_1-ftp.log:Wed Oct 31 09:40:23 2001 5 tias-gw7.treas.gov 9175
/releases/po749.htm a _ i g ustpress ftp 0 *

Here are the cms push logs for ustpress:

| ustpress | 101103107:08:24 | 199.196.144.16 | Update_Collection |    |
| ustpress | 101103107:08:29 | 199.196.144.16 | Do_Update_Collection | / |

-- 4 --

SECNOTH00103594

```
ustpress        101103109:43:23       199.196.144.16   Update_Collection
ustpress        101103109:43:28       199.196.144.16   Do_Update_Collection    /
ustpress        101103110:19:48       199.196.144.16   Update_Collection
ustpress        101103110:19:52       199.196.144.16   Do_Update_Collection    /
ustpress        101103111:37:50       199.196.144.16   Update_Collection
ustpress        101103111:37:57       199.196.144.16   Do_Update_Collection    /
ustpress        101103112:17:21       199.196.144.16   Update_Collection
ustpress        101103112:17:25       199.196.144.16   Do_Update_Collection    /
ustpress        101103112:40:03       199.196.144.16   Update_Collection
ustpress        101103112:44:54       199.196.144.16   Do_Update_Collection    /
ustpress        101103113:53:54       199.196.144.16   Update_Collection
ustpress        101103113:53:58       199.196.144.16   Do_Update_Collection    /
ustpress        101103114:02:30       199.196.144.16   Update_Collection
ustpress.       101103114:02:34       199.196.144.16   Do_Update_Collection    /
ustpress        101103117:47:06       199.196.144.16   Update_Collection
ustpress        101103117:47:12       199.196.144.16   Do_Update_Collection    /
ustpress        101110108:15:47       199.196.144.16   Update_Collection
ustpress        101110108:15:56       199.196.144.16   Do_Update_Collection    /
ustpress        101110110:11:33       199.196.144.16   Update_Collection
ustpress        101110110:11:40       199.196.144.16   Do_Update_Collection    /
ustpress        101110110:18:18       199.196.144.16   Update_Collection
ustpress        101110110:18:23       199.196.144.16   Do_Update_Collection    /
```

```
You can interpret the logs as follows;  The first column is the CMS username
entered.
The second column is the time/date stamp.  The first three numbers state the year,
2001.  The next two state the month (10 = october, 11 = november).   The next two
state the date.  The next two state the hour (EST, 24 hour clock).  then, minutes
and
seconds.

The next column is the IP address of the web browser doing the push.  So, for all
of these, the individual is coming from IP 199.166.144.16.

The final column indicates what was done.   For all of the entries, we show
that ustpress pushed everything they could.

So, taking the first entry apart, we see:

ustpress        101103107:08:24       199.196.144.16   Update_Collection

user = ustpress
year = 2001
month = October
date = 31
hour = 7 am EST
minutes = 08
seconds = 24
IP = 199.196.144.16
action = update CMS collection


If you need any further information, please let me know.

Thanks,

Dave Harris
Web Hosting Support
WorldCom


Telephone 1-800-900-0241 (options 2, 6)
Email web-support@wcom.com
```

I provided copies of the above mentioned Borowski e-mail materials to Francine Kerner.

-- 5 --

SECNOTH00103595

# EXHIBIT M

**Record of United States Treasury Trades Executed by
Massachusetts Financial Services on October 31, 2001**

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 046113

UST Trades Of 10/31/2001

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/01/2001 | 2000000 | 102.765625 | 2055236.75 | eleban_p | Oct 31 2001 10:26:41:030AM | tab_c | Oct 31 2001 11:20:07:296AM | MOTC |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/01/2001 | 6000000 | 102.765625 | 6165261.55 | eelliy_d | Oct 31 2001 9:42:45:640AM | tab_c | Oct 31 2001 10:27:03:900AM | MOTC |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/02/2001 | 2000000 | 102.828125 | 2056562.51 | vpieau_p | Oct 31 2001 11:41:51:000AM | tab_c | Oct 31 2001 12:15:38:156PM | BEST |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/01/2001 | 2000000 | 102.765625 | 2055302.76 | kennedy_d | Oct 31 2001 10:13:54:820AM | tab_c | Oct 31 2001 11:35:26:000AM | MOTC |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/01/2001 | 2500000 | 102.765625 | 2569140.25 | mefarn_d | Oct 31 2001 9:51:24:273AM | tab_c | Oct 31 2001 11:06:16:130AM | MOTC |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/02/2001 | 1250000 | 102.828125 | 1285440.33 | mefarn_d | Oct 31 2001 10:02:01:031AM | tab_c | Oct 31 2001 10:38:27:203AM | MOTC |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/01/2001 | 6000000 | 102.765625 | 6046904.56 | bushelly_p | Oct 31 2001 11:15:03:000AM | tab_c | Oct 31 2001 12:14:55:070PM | BEST |
| 728905 | 9126100FP | UNITED STATES TREAS | 5.375 FEB 15 31 | 10/31/2001 | 11/01/2001 | 1000000 | 102.23275 | 1073627.5 | bushelly_d | Oct 31 2001 2:38:41:030PM | tab_c | Oct 31 2001 11:56:47:230AM | MOTC |
| | | | | | | | | | | Oct 31 2001 11:56:40:140AM | | Oct 31 2001 2:54:44:616PM | MOR8 |

# EXHIBIT N

**Cited Excerpts from SEC Deposition Transcript of D. Richard Smith
(Dec. 11, 2001)**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     )   File No. HO-9353
TRADING IN CERTAIN TREASURY ISSUES   )

WITNESS:   D. Richard Smith, III

PAGES:     1 through 145

PLACE:     Securities and Exchange Commission
           Room 1C14
           450 Fifth Street, N.W.
           Washington, D.C. 20549

DATE:      Tuesday, December 11, 2001

           The above-entitled matter came on for hearing, pursuant
to notice, at 2:55 p.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

           WILLIAM HATHAWAY, ESQ.
           ANDREW SPORKIN, ESQ.
           Division of Enforcement
           Securities and Exchange Commission
           450 Fifth Street, N.W.
           Washington, D.C.  20549
           (202) 942-4587

On behalf of the Witness:

           BRUCE SINGAL, ESQ.
           Donoghue, Barrett, & Singal, P.C.
           One Beacon Street
           Boston, Massachusetts  02108
           (617) 720-5090

---

**Page 2**

C O N T E N T S

WITNESSES:                              EXAMINATION

D. Richard Smith, III                        3

EXHIBITS    DESCRIPTION              IDENTIFIED

233         Subpoena                      3

234         9 page document               98

235         M 1870-90                    108

236         Document from MFS            119

237         Solomon Analytics            130

---

**Page 3**

1              PROCEEDINGS
2              (SEC Exhibit 233 was
3         marked for identification.)
4         MR. HATHAWAY:  We are on the record.  It is
5  approximately 2:55 p.m.  This is December 11, 2001.
6  Whereupon,
7              DAVID RICHARD SMITH III
8  was called as a witness and, having been duly sworn, was
9  examined and testified as follows:
10         BY MR. HATHAWAY:
11    Q   Thank you very much.  Would you please state and
12  spell your full name for the record?
13    A   My full name is David Richard Smith III; D-a-v-i-d;
14  R-i-c-h-a-r-d; S-m-i-t-h.
15    Q   Thank you, Mr. Smith.  My name is William Maxwell
16  Hathaway, and joining me at some point later today will be
17  Andrew Sporkin.  Myself and Mr. Sporkin are both officers of
18  the Commission for the purpose of this proceeding.
19         This is an investigation by the United States
20  Securities and Exchange Commission in the matter of Trading
21  in Certain Treasury Issues.  Our file number is HO-9353.  The
22  investigation is to determine whether there have been any
23  violations of the federal securities laws; however, the
24  evidence produced in this investigation might constitute
25  violations of other state or federal, civil or criminal

---

**Page 4**

1  statutes.
2         Prior to the opening of the record, which means
3  prior to turning on the microphones here, you were provided
4  with a copy of the formal order of investigation in this
5  matter.  This copy of the formal order will remain available
6  for your examination throughout the course of today's
7  testimony session.
8         Have you had an opportunity to review the formal
9  order of investigation?
10    A   Yes, I have.
11    Q   Also prior to the opening of the record you were
12  provided with a copy of Exhibit 201.  Exhibit 201 is a copy
13  of the Securities and Exchange Commission Supplemental
14  Information on Form 1662.
15         Have you had an opportunity to read the Form 1662?
16    A   Yes.
17    Q   Do you, at this point, have any questions
18  concerning the Form 1662?
19    A   No.
20    Q   Mr. Smith, are you represented by counsel?
21    A   Yes.
22         MR. HATHAWAY:  Counsel, would you please identify
23  yourself for the record?
24         MR. SINGAL:  Bruce Singal from the law firm of
25  Donoghue, Barrett & Singal, One Beacon Street, Boston, Mass,

SECNOTH00117289

Page 85

1   A  No.
2   Q  Did during this time period -- did Mr. Nothern or
3   anyone else say to you or say in your presence anything to
   suggest where Peter Davis had been when he had called Mr.
5   Nothern?
6   A  No.
7   Q  Had you ever at any point in time heard prior to
8   October 31, 2001 that Mr. Davis attending refunding
9   announcements?
10  A  No.
11  Q  Did you on October 31, 2001 at any point in time on
12  that day hear anything or observe anything that suggested to
13  you that Mr. Davis had been at the refunding announcement on
14  that day?
15  A  No.
16  Q  At any point in time between the same period,
17  between first hearing the information from Mr. Nothern about
18  the elimination of the bond and placing your trade for $5
19  million Treasuries -- the 30-year bonds, was there any
20  discussion that you participated in or overheard about
21  whether the information about the 30-year bond was subject to
22  an embargo?
23  A  No.
24  Q  Was the word embargo said by anyone during this
25  time period after first hearing about the -- from Mr. Nothern

Page 86

   about the elimination of the bond and your placing your order
   for $5 million Treasury --
3   A  No.
4   Q  -- bonds?  Thank you.
5   A  I don't know if you were done yet.
6   Q  Thank you.
7   A  Yeah.
8   Q  Did Mr. Nothern or anyone else on October 31, 2001
9   ever say the word embargo?
10  A  No.
11  Q  Did Mr. Nothern or anyone else say anything to you
12  or in your presence on October 31, 2001 to suggest in any way
13  to you that the information about the elimination of the bond
14  was subject to any sort of restriction?
15  A  No.
16  Q  Did you prior to -- in the time period after you
17  first heard the information about elimination of the bond and
18  your placing the order for $5 million in Treasury bonds, were
19  there any discussions that you either overheard or
20  participated in about whether it was proper to trade on this
21  information?
22  A  No.
23  Q  During the same time period, did anyone -- yourself
24  or anyone else that you are aware of -- contact anyone in the
   MFS compliance department concerning this information about

Page 87

1   the elimination of the bond?
2   A  No.
3   Q  Did anyone during that time period either yourself
4   or anyone you're aware of speak to anyone at the MFS legal
5   department about this information?
6   A  No.
7   Q  Did anyone on October 31, 2001 -- either yourself
8   or anyone else at MFS -- speak to either legal, the legal
9   department or the compliance department at MFS about the fact
10  that Mr. Nothern had received information about the
11  elimination of the 30-year bond from Peter Davis?
12  A  Not to my knowledge.
13  Q  In the five or so minutes after you first heard Mr.
14  Nothern words about the elimination of the bond and your
15  placing the trade for the -- for the $5 million Treasury
16  bonds, did you undertake any efforts of any measure to
17  confirm whether or not the Treasury Department had eliminated
18  the 30-year bond or done anything about the 30-year bond?
19  A  No, I did not.
20  Q  Why not?
21  A  As I -- as I think I mentioned before, it's not
22  something I tend to spend a lot of time within my job.  So I
23  didn't consider it that important.
24  Q  Is there any other reason why you did not during
25  this time period prior to placing the trade look to see

Page 88

1   whether there was any information available to you about
2   whether the Treasury had, in fact, eliminated the bond or
3   suspended it?
4       Anything else that you remember thinking?
5   A  That -- no, I didn't -- I didn't take it that
6   seriously when I heard it.
7   Q  Did you -- on October 31, 2001 -- at any point in
8   time have any worries or concerns about having bought the $5
9   million after hearing the information from Mr. Nothern about
10  the elimination of the bond?
11  A  No.
12  Q  Did -- on October 31, 2001, did anyone else, Mr.
13  Nothern, Mr. Kurinsky, Mr. Kennedy, or anyone else at MFS in
14  any way tell you that they had concerns about having
15  purchased bonds after hearing the information about the
16  elimination of the bond through Mr. Nothern?
17  A  No.
18  Q  How much time lapsed between your saying, $5
19  million for me, to Mr. Cadogan and your inputting into the
20  MFS system the $5 million bond trade that you had made?
21  A  I would say that it was done within 60 seconds.
22  Q  Are you pretty certain of that?
23  A  Yes.
24  Q  How do you -- I'll just represent to you that the
25  trading records we have reflect a fairly wide disparity

**Page 89**

1 between when persons entered those trades into the system.

2    A  Yes.

3    Q  How is that you're able to say you're pretty

4 certain you did it within 60 seconds?

5    A  I'm very disciplined about putting my orders in at

6 the time I tell. I take great pride in that, actually.

7    Q  Did you at that point that you inputted your $5

8 million into the MFS system allocate those bonds among your

9 funds?

10    A  I was only making the trade in one account so it

11 was no allocation to be made.

12    Q  From the point in time after you had put in the

13 order for the $5 million --

14    A  Mm-hmm.

15    Q  -- in the 30-year bond, did you in any way

16 communicate to anyone else, either within MFS or outside of

17 MFS that you had heard a rumor or heard something about the

18 elimination of the 30-year bond?

19    A  Can you repeat that question?

20    Q  After -- after you had heard -- after you had

21 placed the order for your --

22    A  Yes.

23    Q  -- your $5 million bonds, did you in any way

24 communicate to others whether at MFS or outside of MFS that

25 you had heard something about the elimination of the 30-year

**Page 90**

1 bond?

2    A  Yes, I did.

3    Q  What did you do?

4    A  I sent a message to a friend at the Chicago Board

5 of Trade that read, rumor, bond elimination. This is a --

6    Q  Was this on the Bloomberg system?

7    A  Bloomberg system, yes.

8    Q  Was this to -- was it Mitch Ito?

9    A  Mitch Ito, yes.

10    Q  Who is Mitch Ito?

11    A  Mitch Ito is -- he's a broker on the Board of

12 Trade. And he works for a firm called R.J. O'Brien.

13    Q  Why did you send a message to Mr. Ito?

14    A  He's probably one of my closest associates in the

15 business who don't work for the same firm. We did work

16 together for a very long time.

17    Q  Where -- where was this?

18    A  Solomon Brothers.

19    Q  Approximately how much time lapsed after -- strike

20 that. Did you send the message to Mr. Ito before or after

21 you had entered the trade into the MFS system, the $5 million

22 Treasury bonds?

23    A  I would suspect after. I would --

24    Q  Why do you say that?

25    A  That's -- there is some element of speculation

**Page 91**

1 there. But I believe those are just my work habits.

2    Q  Did you -- can you definitely say that you sent the

3 message after you had placed the order for the $5 million

4 bonds?

5    A  After I had -- I had put the -- or asked Mr.

6 Cadogan to purchase them is what --

7    Q  Or asked Mr. Cadogan to purchase them is what I

8 mean.

9    A  Yeah, that -- that was done almost simultaneously.

10 It was done within 10 seconds of asking him to buy and my

11 order was in the system, you know, as -- as I'm telling him

12 that, I'm bringing up the screen and inputting it.

13    So as fast as I can scroll down and get that in,

14 it's in the system.

15    Q  Your message to Mr. Ito did that proceed or come

16 after your interchange with Mr. Cadogan and entering the

17 trade?

18    A  I believe it was afterwards, yes.

19    Q  Can you say how much after?

20    A  I would say within a couple minutes, yeah.

21    Q  Did Mr. Ito or anyone else ever reply to that

22 message?

23    A  I believe he did, yes.

24    Q  In what way?

25    A  I think he said, thanks, or something like that,

**Page 92**

1 yeah.

2    Q  Any other reply from him at any point in time --

3    A  I think --

4    Q  -- through the e-mail system?

5    A  I do believe that -- I know this from a review of

6 the records, that he -- after 10:00 he said, that was a

7 really good call.

8    Q  He said that in an e-mail?

9    A  Yes, I believe that's correct.

10    Q  Did you at any point in time on October 31, 2001

11 have a telephone conversation with Mr. Ito about this series

12 of events?

13    A  I remember that later in the day that we -- that we

14 were on the phone and I was talking to him and he asked me

15 about it.

16    And at the time -- at the time I didn't want to get

17 into the conversation with him. He's an extremely long-

18 winded person.

19    And when you have stuff to do, it's -- there's no

20 such thing as 10-second conversation with him. So I just

21 said, I'll talk to you later. And then it never really came

22 up again.

23    Q  Have you -- between that phone call and today

24 spoken --

25    A  Yes.

**Page 89 - Page 92**

SECNOTH00117311

# EXHIBIT O

**Letter from Michael Solomon at Merrill Lynch to William (Max) Hathaway at SEC (Mar. 20, 2002), with attached Trade Activity Report for October 31, 2001**

MAR-21-2002  17:00        MERRILL LYNCH                         212 670 4507          P.02/05

**Michael D. Solomon**
Director &
Assistant General Counsel
Regulatory Affairs

Office of General Counsel

222 Broadway, 13th Floor
New York, New York 10038
212 670 0267
FAX 212 670 4507
MiSolomon@exchange.ml.com

 **Merrill Lynch**

March 20, 2002

<u>VIA FACSIMILE & AIRBORNE</u>
William (Max) Hathaway
U.S. Securities and Exchange Commission
Division of Enforcement
450 5th Street, N.W.
Washington, D.C. 20549-0805

Re:    <u>In the Matter of Trading in Certain Treasury Issues (H0-9353)</u>

Dear Mr. Hathaway:

      In response to your letter dated March 6, 2002 to Carlos Ascensio regarding the matter stated above, we are providing the following documents:

1.     A copy of the Merrill Lynch's Trade Activity Report showing the October 31, 2001 order placed by the Massachusetts Financial Services Company ("MFS") for $65 million (par amount) of 30-year Treasury bonds. Please note that account number 817-03A26 is the MFS account in which this transaction occurred.

2.     A copy of the order ticket completed by the Merrill Lynch Taxable Fixed Income Sales Desk in Boston. The salesperson involved in this transaction was Greg St. Pierre. The trader who executed the transaction was Galen Criqui. None of the telephone conversations related to this transaction were tape-recorded.

The enclosed materials are being submitted solely for the Commission's use in the above-captioned matter with the understanding that Merrill Lynch believes that business confidentiality pertains to each page. Said information was created by Merrill Lynch or supplied to Merrill Lynch by one or more of its clients. The information contained in said documents which was supplied by clients is of a personal and confidential nature, the

William (Max) Hathaway
March 20, 2002
Page 2 of 2

disclosure of which could deprive a person of fair trial or an impartial adjudication or
constitute unwarranted invasion of personal privacy.

Moreover, the materials are considered to be confidential or private internal documents
that are commercially valuable, and, as such, constitute or contain trade secrets, the
disclosure of which may not only violate proprietary rights but grant competitors unfair
competitive advantage or compromise competitive advantages by Merrill Lynch.

Therefore, in accordance with the Commission's procedures with respect to the Freedom
of Information Act ("FOIA") requests (17 C.F.R. § 200.83), I hereby request confidential
treatment of all the pages of the documents provided to you. Each page has been
appropriately labeled to indicate the intention to maintain the confidential status of the
enclosed materials. Confidential treatment of this letter is also requested.

All of the materials are submitted with the further request that they will be kept in a non-
public file and that access to them by any third party will be denied, except as provided
for by the Privacy Act of 1974, or unless such access is specifically permitted by existing
law. In addition, I request that the materials be returned to the undersigned when the
above-captioned investigation is completed.

I understand that upon receipt of any FOIA request for the enclosed materials, the
Commission's staff will make an initial determination as to whether access to the
information should be granted. If no ground appears to the staff to exist that would justify
the withholding of the information, the staff will ask that, within ten days of the FOIA
request, I submit substantiation for affording continued confidential treatment and for the
withholding of the information. Under such circumstances, the undersigned should be
telephoned immediately. If the undersigned is unavailable, please contact Merrill
Lynch's Office of General Counsel, Litigation, Compliance and Regulatory Affairs at
(212) 670-0313.

If you have any further questions or request please contact me immediately at 212 – 670
– 0267.

Sincerely,

Michael Solomon

Encl.

Cc:    Office of Freedom of Information and Privacy Act Operations
       Securities and Exchange Commission
       Operations Center
       6432 General Green Way, Stop 0-5
       Alexandra, VA 22313-2413

SECNOTH00115373

Trade Activity Report Trade Detail

REDACTED



| Time | B/S | Amount(A) | Price | Principal | S/D | Account# |
|------|-----|-----------|-------|-----------|-----|----------|
| 16:41 | SELL | 65,000.00 | 102-34 1/2 | 66,797,556.15 | 1101 | 81728A/24 |

REDACTED

Confidential Treatment Requested
by Merrill Lynch under FOIA
ML 000001



Confidential Treatment Requested

TOTAL P.05

SECNOTH00115375

# EXHIBIT P

**Reuters News Service, Wire Service Report (Oct. 31, 2001:  reported to NewsEdge/Lan at 9:52 a.m., posted at 9:57 a.m.)**

US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED
30-YEAR BONDS

 MORE
Rtr 09:57 10-31-01


:SUBJECT: SPRC MU IR USPO USA
Copyright (c) 2001 Reuters
Received by NewsEDGE/LAN: 10/31/2001 9:52 AM

SECNOTH00103134

# EXHIBIT Q

**Letter from David D. Aufhauser, General Counsel of U.S. Department of the Treasury, to Harvey L. Pitt, Chairman of the SEC (Nov. 6, 2001)**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

GENERAL COUNSEL

November 6, 2001

The Honorable Harvey L. Pitt
Chairman
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Dear Mr. Chairman:

Per our conversations of Thursday and Friday of last week, I am referring a matter for investigation by the Securities and Exchange Commission. The focus of the inquiry, as more fully detailed in the enclosures to this letter, is an assertion that there may have been trading activity in government securities based upon confidential information learned during an embargoed quarterly funding meeting at the Treasury.

Please keep me advised.

Very truly yours,

David D. Aufhauser
General Counsel

cc:    Mr. Jeffrey Rush
       Mr. Stephen Cutler

SECNOTH00102839

# EXHIBIT R

**Memorandum on Interview of Paul Malvey by SEC and Treasury OIG
(Nov. 15, 2001)**

# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: 2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview | | Michael Knorr, Investigator |
| [ ] Telephone Contact | Date: November 15, 2001 | |
| [ ] Records Review | | |
| [ ] Other (Describe): | Time: 3:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Paul Malvey** **Director** **Office of Market Finance** **Department of the Treasury** **Washington, DC** | Department of the Treasury Office of General Counsel 1500 Pennsylvania Avenue, NW Washington, DC |

On the above date and time, the above listed subject was
interviewed by attorneys Andrew Sporkin (202/942-4800) and
Rosemary Filou (202/942-4768) of the Division of Enforcement,
United States Securities and Exchange Commission (SEC), in
coordination with Treasury, Office of General Counsel and the
Office of Inspector General (OIG). Interviews of Treasury
employees were conducted because of an allegation that someone
may have prematurely released market sensitive information about
the government's decision to suspend issuance of the Treasury
30-year bond, thus affecting trading activities in government
securities.

The government's decision to suspend issuance of the 30-year
bond was announced by Peter R. Fisher, Department of the
Treasury, Under Secretary for Domestic Finance, during the
quarterly funding meeting press conference held at Treasury
between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The
announcement was embargoed for release until 10:00 a.m.
Treasury, however, prematurely posted Fisher's statement on their
Web site, where it appeared at 9:43 a.m.

Paul Malvey said as Director, Office of Finance, he tries to
remain current with the financial markets and maintain market
contacts. In addition, he said he provides financial analysis
and policy recommendations to "decision makers" at the Office of
the Under Secretary for Domestic Finance.

Malvey said the possible suspension of sales of the 30-year bond
had been discussed within Treasury for quite some time. In

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103677

## MEMORANDUM OF ACTIVITY

previous quarterly funding meetings, the Borrowing Advisory Committee had also discussed it. Malvey said at the October 30, 2001, quarterly funding meeting, he did not discuss the 30-year bond with members of Borrowing Advisory Committee.

Malvey said that it was his opinion that because of the turmoil following the September 11, disaster, the January 30, 2002, quarterly funding meeting would have been a better forum to announce the suspension of sales of the 30-year bond. It was also Malvey's opinion, that Under Secretary Fisher would have made the announcement at the August quarterly funding meeting, if he had been confirmed at that time.

Malvey said as part of his job he and his staff regularly talk to bond dealers and market consultants. Malvey said he did not say anything to dealers that would suggest that Treasury was going to discontinue the 30-year bond. He further said he had no reason to believe that anybody in his financing group would discuss this with anybody on the outside. Malvey said he was not aware of any formal policy of keeping information confidential but because of "the nature of the business, everybody in this office has an appreciation of the sensitivity of what they discuss."

Malvey was asked if he knew a Mr. Drew Matus of Lehman Brothers in New York. Malvey replied that he knew Matus. Malvey said Matus had stopped by his office last month to meet with Malvey's assistant Jeff Huther. According to Malvey, Matus who works for Woody Jay, Vice-Chairman of the Borrowing Advisory Committee, met with Huther to discuss a financial spread sheet prepared at the request of the committee. Malvey said he spoke with Matus briefly but Matus said nothing about rumors of suspension of the 30-year bond.

Malvey was asked if he knew Pete Davis and he acknowledged that he had briefly talked to Davis three times, first starting in 1996. At that time in 1996, Malvey said he had answered a call in the Market Finance Office from Davis, who was seeking admittance to the quarterly funding meeting press conference. He asked the then Director of the Office of Market Finance, Jill Ouseley, whether Davis should be admitted. She approved his

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

SECNOTH00103678

## MEMORANDUM OF ACTIVITY

admittance by telling Malvey "he was OK, that's fine." Malvey said Davis introduced himself to him at that press conference in 1996

Malvey said he found out after the fact, that Davis had been calling Malvey's secretary Lula Tyler, on a regular basis to be admitted to the quarterly funding meeting press conferences. Malvey said he took a call from Davis approximately six months ago. Davis had called for Tyler but she was not in that day. Davis called to get cleared in for a press conference and Malvey approved it. Malvey said he knew that Davis "wrote some type of investment letter." Malvey said the third time he had contact with Davis was at the October 31, 2001, press conference, when Davis happened to be seated next to him. Malvey said he had observed Davis at other quarterly funding meeting press conferences but had not spoken with him. ___

Malvey said he was not aware of anyone other than press, Office of Management and Budget and Treasury Officials and Davis who attended the quarterly funding meeting press conferences. Malvey said he did not realize until after the fact that the press conferences were only for "credentialed press."

Malvey said, subsequent to the October 31, 2001, press conference, his curiosity prompted him to call his former supervisor Jill Ouseley. He said he wanted to find out the reason for Davis' admittance to the press conferences. Ouseley is currently retired and living in Florida. Malvey said when he spoke with her, she did not recall a Peter Davis or ever admitting him to a Treasury press conference.

Reviewed by: _____ Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

SECNOTH00103679

# EXHIBIT S

**Excerpts from SEC Privilege Log in *SEC v. Steven E. Nothern***

PRIVILEGE LOG
SEC v. STEVEN E. NOTHERN

Authors & Recipients are SEC attorneys unless otherwise indicated.

| Type | Date | Author(s) | Recipient(s) | Addressee(s) | Description | Privilege | Bates Range |
|---|---|---|---|---|---|---|---|
| Attorney Memorandum to File | 1/16/02 | M. Hathaway | File (SEC); A. Sporkin | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: 1/16/02 interview of Mark Hinkley (Bear Stearns) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136387 - 394 |
| Handwritten and typed summaries, notes and outlines prepared by attorneys and contained in attorney work files | Various | M. Hathaway; A Sporkin | File (SEC) | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Mark Hinkley (Bear Stearns) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136395 - 412 |
| Handwritten and typed summaries, notes and outlines prepared by attorneys and contained in attorney work files | 12/5/01 | J. Rossetti; M. Hathaway | File (SEC) | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Raymond Walton (Cantor Fitzgerald) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136413 - 432 |
| Handwritten and typed summaries, notes and outlines prepared by attorneys and contained in attorney work files | Various | J. Ravitz; J. Rossetti; M. Hathaway | File (SEC) | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interviews of James Capra (Capra Asset Management) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136433 - 453; 136458 - 488 |
| Attorney Memorandum to File | 1/24/02 | J. Ravitz | File (SEC); A Sporkin | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: 1/24/02 interview of James Capra (Capra Asset Management) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136454 - 457 |

# PRIVILEGE LOG
## SEC v. STEVEN E. NOTHERN

| Description | Date | Author | Recipient | Copied | Asserted By | Subject Matter | Privilege | Bates |
|---|---|---|---|---|---|---|---|---|
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 11/6/01 | J. Rossetti; R. Filou; A. Sporkin | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interviews of William Cohen (Capra Asset Management) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136489 - 505 |
| Attorney memoranda to file, handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 11/23/01; 7/31/02; Various | J. Raviz; M. Hathaway | File (SEC); A Sporkin | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: 11/19/01 interview of Guy Haselmann (Capra Asset Management) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136506 - 627 |
| Email memorandum prepared by attorneys and contained in attorney work files | 10/11/02 | J. Raviz | File (SEC); W. Baker | A. Sporkin; R. Filou; M. Hathaway; J. Ravitz; J. Rossetti; M. Kreitman | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Peter Davis (Davis Capital Investment Ideas) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136628 - 629 |
| Handwritten summaries, notes and outlines prepared at the direction of attorneys and contained in attorney work files | 10/11/02 | R. Manchack (USAO-SDNY, Investigator) | File (SEC); W. Baker | | SEC; USAO-SDNY | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Peter Davis (Davis Capital Investment Ideas) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136630 - 643 |
| Handwritten summaries, notes and outlines prepared at the direction of attorneys and contained in attorney work files | 2/3/04 | R. Manchack (USAO-SDNY, Investigator) | File (SEC) | | SEC; USAO-SDNY | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Peter Davis (Davis Capital Investment Ideas), William Dudley (Goldman), and Irene Tse (Goldman) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136644 - 683 |

2

## PRIVILEGE LOG
## SEC v. STEVEN E. NOTHERN

| Document Name | Date | Author(s) | Recipient | Copies | Custodian | Subject Matter | Privilege | Bates |
|---|---|---|---|---|---|---|---|---|
| Handwritten summaries, notes and outlines prepared at the directions of attorneys and contained in attorney work files | 1/12/04 | R. Manchack (USAO-SDNY, Investigator) | File (SEC) | | SEC; USAO-SDNY | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of William Dudley (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136765 - 784 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 3/16/04 | J. Rossetti | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of James O'Neill (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136785 - 793 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 3/17/04 | J. Rossetti | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Christian Siva-Jothy (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136794 - 802 |
| Attorney Memorandum to File | 2/25/02 | J. Ravitz | File (SEC); B. Ochs ; A. Sporkin ; J. Rossetti | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Vivek Sukhatme (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136803 - 807 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 12/22/02 | A. Sporkin | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Vivek Sukhatme (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136808 - 811 |

# PRIVILEGE LOG
## SEC v. STEVEN E. NOTHERN

| Title | Date | Author | Recipient | Carbon | Subject matter | Privilege | Bates |
|---|---|---|---|---|---|---|---|
| Handwritten summaries, notes and outlines prepared at the direction of attorneys and contained in attorney work files | 1/12/04 | R. Manchack (USAO-SDNY, Investigator) | File (SEC) | | SEC; USAO-SDNY | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: interview of Irene Tse (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136812 - 818 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 2/22/02 | A. Sporkin | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of John Youngdahl (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136819 – 820; 136825 - 827 |
| Attorney Memorandum to File | 2/25/02 | J. Ravitz | File (SEC); B. Ochs ; A. Sporkin ; J. Rossetti | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of John Youngdahl (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136821 - 824 |
| Handwritten & typed summaries, notes and outlines prepared at the direction of attorneys and contained in attorney work files | 10/29- 10/30/03 | C. Vaccariello (USPS Inspector); | File (SEC) | | USAO-SDNY; USPS Inspector; SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of John Youngdahl (Goldman Sachs & Co.) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136828 - 951 |
| Handwritten & typed summaries, notes and outlines prepared by attorneys and contained in attorney work files | 11/15/01 | M. Hathway; J. Rossetti | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Tomas Jelf (Nexus Research) | Attorney-work product, deliberative process privilege and law enforcement privilege | 136952 - 988 |

5

**PRIVILEGE LOG**
**SEC v. STEVEN E. NOTHERN**

| | Date | Author | Recipient | Copied | Custodian | Subject matter | Privilege | |
|---|---|---|---|---|---|---|---|---|
| Handwritten and typed summaries, notes and outlines prepared by attorneys and contained in attorney work files | 11/14/01 | R. Filou; A. Sporkin | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Francis Anderson (U.S. Treasury Department) | Attorney-work product, deliberative process privilege and law enforcement privilege | 137214 – 245; 137258 - 268 |
| Attorney Memoranda to File | 11/15/01 | R. Filou | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Francis Anderson & Tommy Fratto (U.S. Treasury Department) | Attorney-work product, deliberative process privilege and law enforcement privilege | 137546 – 257; 137270 - 275 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 10/30/02 | J. Rossetti; A. Sporkin | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re:  Interview of Roger Anderson (former U.S. Treasury Department employee) | Attorney-work product, deliberative process privilege and law enforcement privilege | 137269; 137286 -299 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 10/21/02 | R. Manchak (USAO-SDNY) | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Roger Anderson (former U.S. Treasury Department employee) | Attorney-work product, deliberative process privilege and law enforcement privilege | 137276 - 285 |
| Handwritten summaries, notes and outlines prepared by attorneys and contained in attorney work files | 8/1/02 | R. Manchak (USAO-SDNY) | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Timothy Bitgerger (U.S. Treasury Department) | Attorney-work product, deliberative process privilege and law enforcement privilege | 137300 - 310 |

**PRIVILEGE LOG**

**SEC v. STEVEN E. NOTHERN**

| | Date | Author | Recipient | Copied To | Subject Matter | Privilege | Bates Number(s) |
|---|---|---|---|---|---|---|---|
| Correspondence transmitting draft press release prepared by attorneys and contained in attorney work files | 9/3/03 | A. Sporkin | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 140948 - 956 |
| Correspondence transmitting memorandum prepared by attorneys and contained in attorney work files | 2/20/02 | A. Sporkin | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 140957 - 963 |
| Correspondence transmitting memoranda prepared by attorneys and contained in attorney work files | 7/26/02 | A. Sporkin | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Interview of Jill Cetina, Brian Roseboro, and Elizabeth Holahan (U.S. Treasury Department) | Attorney-work product, deliberative process privilege and law enforcement privilege | 140964 - 141016 |
| Correspondence transmitting E-mail Log prepared by attorneys and contained in attorney work files | 10/10/02 | A. Sporkin | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: Goldman Sachs e-mails | Attorney-work product, deliberative process privilege and law enforcement privilege | 141017 - 021 |
| Correspondence transmitting memorandum prepared by attorneys and contained in attorney work files | 11/1/02 | A. Sporkin | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: investigative plan | Attorney-work product, deliberative process privilege and law enforcement privilege | 141022 - 026 |

19

**PRIVILEGE LOG**

**SEC v. STEVEN E. NOTHERN**

| Date | Author | Recipient | Copies | Subject matter | Privilege | |
|---|---|---|---|---|---|---|
| 2/6/03 | A. Sporkin | B. Coad (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege regarding Goldman Sachs prepared by attorneys and contained in attorney work files | 141027 - 040 |
| 4/2/03 | A. Sporkin | B. Coad (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 141041 - 139 |
| 7/28/03 | J. Rossetti | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 141140 - 262 |
| 8/1/03 | J. Rossetti | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 141263 -348 |
| 9/22/03 | J. Rossetti | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 141349 – 355; 141392 - 398 |

Correspondence transmitting draft Administrative Order

Correspondence transmitting draft SEC Civil Complaint prepared by attorneys and contained in attorney work files

Correspondence transmitting draft SEC Civil Complaint prepared by attorneys and contained in attorney work files

Correspondence transmitting  draft SEC Civil Complaint prepared by attorneys and contained in attorney work files

Correspondence transmitting Witness Interview and Testimony List prepared by attorneys and contained in attorney work files

20

**PRIVILEGE LOG**

**SEC v. STEVEN E. NOTHERN**

| Document | Date | Author | Recipient | Copied | Custodian | Subject Matter | Privilege | Bates Nos. |
|---|---|---|---|---|---|---|---|---|
| Correspondence transmitting Master Production Log prepared by attorneys and contained in attorney work files | 9/25/03 | J. Rossetti | R. Hotz (AUSA-SDNY) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 141356 - 391 |
| Various investigation Exhibits prepared by attorneys and containing attorney handwritten notes | Various | Various | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation | Attorney-work product, deliberative process privilege and law enforcement privilege | 141399 – 923; 141950 -142002 |
| | | | | Intentionally Left Blank | | | | 141924 - 949 |
| Telephone records containing attorney handwritten notes and attorney memoranda, charts and notes containing analysis of phone records prepared by attorneys, and contained in attorney work files. Clean copies of these records have been provided to the defense counsel with Plaintiff's initial disclosures. | Various | Rossetti, Filou | File (SEC) | | SEC | Attorney recollections, mental impressions, conclusions, opinions and/or legal theories re: analysis of investigation related to Peter Davis | Attorney-work product, deliberative process privilege and law enforcement privilege | 142003 - 183 |
| | | | | Intentionally Left Blank | | | | 142184-142209 |

21

# EXHIBIT T

**Defendant Steven E. Nothern's First Request for Production of
Documents to the Securities and Exchange Commission**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN E. NOTHERN, <br><br> Defendant. | CIVIL ACTION No. 05-10983 (NMG) |

## DEFENDANT STEVEN E. NOTHERN'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO THE SECURITIES AND EXCHANGE COMMISSION

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Steven E. Nothern ("Nothern") requests that the Securities and Exchange Commission ("SEC") produce the documents described in Section III hereof pursuant to, and in accordance with, the Instructions and Definitions set forth in Sections I and II below within thirty days from the date hereof.

### I. INSTRUCTIONS

1.      Except where otherwise stated, or where the context requires otherwise, each document specification refers to the time period commencing at the beginning of time and continuing to the date of production pursuant to this request.

2.      This request is a continuing request for supplemental responses and/or production pursuant to Rule 26(e) of the Federal Rules of Civil Procedure.

3.      Where any copy or copies of any document whose production is sought, whether a draft or final version, is/are not identical to any other copy thereof, by reason of alterations,

9/27/05

notes, comments, initials, underscoring, indication of routing, or other material contained thereon or attached thereto, produce all such non-identical copies.

4.    In producing documents, leave all documents that are physically attached to each other in files so attached. Leave all documents that are segregated or separated from other documents, whether by inclusion in binders, files, or subfiles, or by use of dividers, tabs, or any other method, so segregated or separated. Retain documents in such order as they are maintained.

5.    If a document is in the possession, custody or control of any department or agency of the United States government, it is deemed to be in the possession, custody or control of the SEC for purposes of this Request.

6.    If any document was, but no longer is, in the possession, custody or control of the SEC, state the circumstances under which the document ceased to be in the possession, custody, or control of the SEC and the location, if known, of the document. If the document was destroyed, state the circumstances under which it was destroyed, including the names and addresses, if known, of the persons involved in its destruction.

7.    Words used in the present tense include the future as well as the present; words used in the masculine gender include the feminine and neuter; the singular number includes the plural and the plural includes the singular; the words "and" and "or" are to be considered both conjunctively and disjunctively; the word "all" also includes "each," and vice versa.

8.    As to each document requested herein but withheld on a claim of privilege, state the following:

> (1)    the title of the document;
>
> (2)    the type of document (letter, note, memorandum, etc.);

-2-

(3)    the date of the document;

(4)    names and positions of all persons who authored the document, or assisted in its preparation, or in whose names the document was prepared;

(5)    names and positions of all persons to whom the document was addressed, or to whom it was sent or who received, have seen, have had possession or custody of, or have had disclosed to them the contents of, the document or any copies thereof;

(6)    names and positions of all persons from whom the document was received;

(7)    the present location of the document and all copies thereof;

(8)    names and positions of all persons having possession, custody, or control of the document and all copies thereof;

(9)    a description of the subject matter of the document; and

(10)   the nature of the privilege or other basis for non-production.

## II. DEFINITIONS

1.    The definitions contained in LR 26.5 are incorporated by reference into all discovery requests.

2.    "Answer" shall mean Nothern's Amended Answer and Jury Demand filed in this action dated August 22, 2005.

3.    "Complaint" shall mean the Complaint filed in this action on or about May 12, 2005.

4.    "Goldman Sachs" shall mean Goldman, Sachs & Company, as well as any division, unit, subsidiary, affiliate, general or limited partner, or parent corporation thereof or predecessor, successor, assignor, or assignee thereto, and any present or former officer, director, counsel, attorney, advisor, consultant, subcontractor, agent, employee, representative, or any other person acting for or on behalf of Goldman, Sachs & Company.

-3-

5.    "Hathaway" shall mean William M. Hathaway, a member of the SEC staff, and any of his servants, agents, and employees, past or present, or any other person acting on behalf of William M. Hathaway.

6.    "Investigation" shall mean the SEC investigation of the matters, facts, and circumstances in In the Matter of: Trading in Certain Treasury Issues, SEC file number HO-9353, whether before or after issuance of a formal order of investigation.

7.    "Johnson" shall mean Treazure R. Johnson, a member of the SEC staff, and any of his servants, agents, and employees, past or present, or any other person acting on behalf of Treazure R. Johnson.

8.    "Massachusetts Financial Services Company," "MFS," or "the Company" shall mean Massachusetts Financial Services Company, as well as any division, unit, subsidiary, affiliate, general or limited partner, or parent corporation thereof or predecessor, successor, assignor, or assignee thereto, and any present or former officer, director, counsel, attorney, advisor, consultant, subcontractor, agent, employee, representative, or any other person acting for or on behalf of Massachusetts Financial Services Company.

9.    "Merrill Lynch" shall mean Merrill Lynch & Company, as well as any division, unit, subsidiary, affiliate, general or limited partner, or parent corporation thereof or predecessor, successor, assignor, or assignee thereto, and any present or former officer, director, counsel, attorney, advisor, consultant, subcontractor, agent, employee, representative, or any other person acting for or on behalf of Merrill Lynch & Company.

10.    "Rosetti" shall mean John J. Rosetti, Jr., a member of the SEC staff, and any of his servants, agents, and employees, past or present, or any other person acting on behalf of John J. Rosetti.

11.  "SEC" shall mean the United States Securities and Exchange Commission and any agents, and employees, past or present, or any other person acting on behalf of the Securities and Exchange Commission.

12.  "Sporkin" shall mean Andrew Sporkin, a member of the SEC staff, and any of his servants, agents, and employees, past or present, or any other person acting on behalf of Andrew Sporkin.

13.  "30-year Bond" or "Long Bond" shall mean the Treasury issued bond defined in the Complaint at paragraphs 16 and 17.

14.  "Treasury" shall mean the Department of the Treasury, an Executive Department of the United States Government and any agents, and employees, past or present, or any other person acting on behalf of the Department of the Treasury.

15.  "U. S. Attorneys' Investigation" shall mean the investigations conducted by the United States Attorneys' Offices, Department of Justice and Grand Juries leading up to and resulting in the Indictments handed down in the criminal actions captioned as, United States of America v. Peter Davis, Criminal Action No. 03-1054 (S.D.N.Y.) and United States of America v. John Youngdahl, Criminal Action No. 03-0991 (S.D.N.Y.).

16.  "You" and/or "Your" shall mean the SEC.

### III.  REQUESTS FOR PRODUCTION

1.  All documents obtained or received by the SEC, by subpoena or otherwise, in connection with the Investigation, including, without limitation, any trade tickets and confirmations, transaction requests, account statements, tax information summaries, correspondence, wires and checks, notes, notes of meetings, notes of telephone conversations,

audiotapes of telephone conversations, transcripts of meetings or telephone conversations, and telephone records.

2.    All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the Investigation.

3.    All documents identifying all persons interviewed, deposed or otherwise questioned by the SEC or any other agency or department of the United States government in connection with the Investigation or the U.S. Attorneys' Investigation.

4.    All notes, audiotapes, videotapes, transcripts or other documentation of interviews, depositions or questioning by the SEC or any other agency or department of United States government in connection with the Investigation or the U.S. Attorneys' Investigation.

5.    All communications concerning the subject matter of this Investigation and/or this action, including, without limitation, all communications concerning the Investigation with any other investigative or regulatory agency of the federal government of the United States of America.

6.    All documents concerning Treasury's Office of Inspector General's Investigation, entitled, Unknown Treasury employee(s), case number 2002-0104, including without limitation the final report of investigation.

7.    All documents concerning Treasury's Office of Inspector General's Investigation, entitled, Unknown Treasury employee(s), case number 2001-0104, including without limitation the final report of investigation.

8.    All documents produced or otherwise provided to the SEC by Treasury in connection with the Investigation or the U.S. Attorneys' Investigation.

-6-

9.     All documents concerning any analysis of MFS' phone system or phone records in connection with the Investigation or the U.S. Attorneys' Investigation.

10.     All documents concerning the SEC's decisions to initiate and continue the Investigation and to file civil lawsuits against Nothern, including, but not limited to, SEC action memos, the SEC's formal order of investigation, and the SEC's formal orders authorizing civil suits.

11.     All documents concerning the Investigation, including, without limitation, all memoranda, reports, and summaries by SEC personnel.

12.     All documents concerning the Investigation or the U.S. Attorneys' Investigation relating to MFS, including, without limitation, all financial statements, balance sheets, documents indicating MFS' compliance function, trading policies and/or procedures, and all communications with MFS and/or counsel for MFS.

13.     All documents concerning MFS trades in the 30-year bond on October 31, 2001, including, without limitation, all financial statements, balance sheets, trade tickets. Documents indicating MFS's compliance function, trading policies and/or procedures, and all communications with the SEC concerning such trades.

14.     All documents concerning MFS's bond trading relationship with Merrill Lynch during 2001.

15.     All documents concerning all communications with Merrill Lynch regarding the Investigation or subject matter of the Investigation and/or MFS trades in the 30-year bond.

16.     All documents concerning communications of Merrill Lynch regarding bond transactions on October 31, 2001 including without limitation documents concerning allegations of insider trading.

17.    All documents concerning MFS's records of trades made through Merrill Lynch on October 31, 2001.

18.    All documents concerning the Investigation or the U.S. Attorneys' Investigation relating to Merrill Lynch, including, without limitation, all financial statements, balance sheets, documents indicating Merrill Lynch's compliance function, trading policies and/or procedures, and all communications with Merrill Lynch and/or counsel for Merrill Lynch.

19.    All documents produced by Merrill Lynch in connection with the Investigation or the U.S. Attorneys' Investigation.

20.    All documents concerning the Investigation or the U.S. Attorneys' Investigation relating to Goldman Sachs, including, without limitation, all financial statements, balance sheets, documents indicating Goldman Sachs' compliance function, trading policies and/or procedures, and all communications with Goldman Sachs and/or counsel for Goldman Sachs.

21.    All documents concerning any internal investigation by MFS of allegations of insider trading by Nothern.

22.    All communications with all witnesses and/or counsel for witnesses in connection with the Investigation, including, without limitation, all "Wells Submissions" and any proposed or final agreements, consents, contracts, or undertakings between or among the SEC and any or all of such witnesses or counsel.

23.    All documents concerning Nothern's communications with the SEC, including, without limitation, all notes, transcripts, and recordings of all purported conversations between the SEC staff, including without limitation Sporkin, Hathaway, Treazure, or Rosetti, and Nothern.

24.     All documents concerning Nothern's communications with MFS supervisors, management, and/or counsel including, without limitation, all notes, transcripts, and recordings of all purported conversations between the MFS supervisors, management, and/or counsel and Nothern.

25.     All documents concerning the SEC's claim of gain or profit earned by Nothern as a result of his trading in 30-year bonds.

26.     All documents concerning the SEC's claim of gain or profit earned by MFS as a result of its trading in 30-year bonds.

27.     All documents concerning MFS's code of conduct or code of ethics and/or compliance function, including without limitation MFS's statement of policy on "personal Securities Transactions" MFS's "Statement of Guidelines," and MFS's insider trading policies for the years 1986 to the present.

28.     All documents concerning allegations of insider trading in or manipulation of the 30-year bond by the following persons, or any of them:

> John Cadagan
>
> Peter J. Davis, Jr.
>
> Peter Fisher
>
> David S. Kennedy
>
> Geoffrey Lee Kurinsky
>
> Steven E. Nothern
>
> D. Richard Smith, III
>
> Joan Batchelder
>
> Robin Slehnach

Rob Manning

Don Myeranz

Mike Roberge

29.    All documents produced in connection with the Investigation or the U.S.

Attorneys' Investigation concerning the following persons, or any of them:

David D. Aufhauser

Joan Batchelder

Steven Bryant

Eric Burns

John Cadogan

James Calmas

Mayi Canales

Steven Cavan

Laura Coyn

Cathy Grahm

Richard Hawkins

Michele A. Davis

Peter J. Davis, Jr.

Peter Fisher

David S. Kennedy

Francine Kerner

Geoffrey Lee Kurinsky

Paul Malvey

Robert Manning

Donald Myeranz

Les Nanberg

Steven E. Nothern

William Paine

Michael Roberge

Brian Roseboro

Matthew Ryan

Lee Sachs

D. Richard Smith, III

Robin Stelmach

James Swanson

Peter Vaream

30.    All computer hard drives, backup tapes or any media containing voice-mails to the following persons, or any of them on October 31, 2001 produced in connection with the Investigation or the U.S. Attorneys' Investigation:

Joan Batchelder

Steven Bryant

Eric Burns

John Cadogan

James Calmas

Steven Cavan

Laura Coyn

Cathy Grahm

Richard Hawkins

David Kennedy

Geoff Kurinsky

Robert Manning

Donald Myeranz

Les Nanberg

Steven E. Nothern

Michael Roberge

Matthew Ryan

D. Richard Smith

Robin Stelmach

James Swanson

Peter Vaream

31.    All documents concerning a summary of line reporting in effect at MFS in October 2001, including without limitation all organization charts.

32.    All documents concerning trading in the 30-year bond on October 31, 2001.

33.    All documents concerning rumors of suspensions of issuance of the 30-year bond in 2001.

34.    All video tapes of the MFS trading room on October 31, 2001, including any time stamp information.

35.    All floor plans of the 23rd floor of the MFS offices located at 500 Boylston St., Boston, Massachusetts 02116-3740 during October 2001.

36.    All documents regarding bond trading by or at the direction of Nothern from January 1, 2001 to October 31, 2001.

37.    All documents regarding policies on press or information embargoes.

38.    All records concerning Nothern's employment by MFS.

39.    All documents concerning your document retention policies from August 1, 2001 to present.

40.    All documents concerning the FITS trading system time stamps of bond transactions on October 31, 2001.

41.    All documents concerning the training of MFS employees regarding insider trading.

42.    All documents concerning any purchase or sale of short-term Treasury bonds by or at the direction of Nothern on October 31, 2001.

43.    All documents concerning MFS's retention of the professional services of Peter J. Davis, Jr., Davis Capital Ideas, or any other entity owned by or affiliated with Peter J. Davis, Jr., including without limitation any advertising or promotional literature provided by them.

44.    All reports, newsletters, emails or other communications from Peter J. Davis, Jr., Davis Capital Ideas, or any other entity owned by or affiliated with Peter J. Davis, Jr.

45.    All documents analyzing the prospective or possible suspension of issuance of the 30-year bond in 2001.

46.    All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241.

47.    All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241.

48.    All documents concerning payment to Merrill Lynch pursuant to the settlement of the Administration Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241.

49.    All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Goldman, Sachs & Co., File No. 3-11240.

50.    All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the SEC Administrative Proceeding entitled In the Matter of Goldman, Sachs & Co., File No. 3-11240.

51.    All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of John M. Youngdahl, File No. 3-11349.

52.    All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the SEC Administrative Proceeding entitled In the Matter of John M. Youngdahl, File No. 3-11349.

53.    All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the civil action captioned as, United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al., Civil Action No. 03-6672 (S.D.N.Y.).

54.    All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the investigation and/or lawsuit relating to the civil action captioned as, <u>United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al.</u>, Civil Action No. 03-6672 (S.D.N.Y.).

55.    All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the criminal action captioned as, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.).

56.    All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the investigation and/or lawsuit relating to the criminal action captioned as, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.).

57.    All documents concerning the lawsuit relating to the civil action captioned as, <u>Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al.</u>, Civil Action No. 04-1851 (N.D. ILL).

58.    All documents produced pursuant to subpoena or otherwise, concerning the lawsuit relating to the civil action captioned as, <u>Premium Plus Partners, L.P. v. Peter J. Davis, Jr. etal.</u>, Civil Action No. 04-1851 (N.D. ILL.).

59.    All subpoenas, document requests or other written information requests issued or made by any party in connection with the lawsuit relating to the civil action captioned as <u>Premium Plus Partners, L.P. v. Peter J. Davis, Jr. etal.</u>, Civil Action No. 04-1851 (N.D. ILL.).

60.    All communications between the SEC and the Department of Justice or the United States Attorney's Office for the Southern District of New York or any other district concerning the Investigation.

61.    All documents identified in the Complaint.

62.    All documents consulted or referred to by the SEC in drafting the Complaint.

63.    All documents referred to, relied upon, consulted by, or provided by the SEC to any expert retained or consulted by the SEC, including, without limitation, all experts who may testify at trial.

64.    All documents supporting or contradicting the allegations of the Complaint.

65.    All documents the SEC seeks to introduce into evidence at trial or at any stage of the proceedings in this case.

66.    To the extent not included in the foregoing requests, all documents relevant to the subject matter of the Investigation and/or any claims and/or defenses set forth in the Complaint and Answer.

STEVEN E. NOTHERN,
By his attorneys,

Nicholas C. Theodorou (BBO # 495730)
John A. Shope (BBO # 562056)
Kevin B. Currid (BBO # 644413)
FOLEY HOAG LLP
Seaport World Trade Center West
155 Seaport Blvd
Boston, MA 02210
Phone: (617) 832-1000
Fax: (617) 832-7000

Dated:  September 27, 2005

## CERTIFICATE OF SERVICE

I, Kevin B. Currid, one of the attorneys for Steven Nothern, hereby certify that on September 27, 2005, I served by Federal Express a true copy of the foregoing on Erica Y. Williams, counsel for the Securities and Exchange Commission at 100 F Street, N.E., Washington, D.C. 20549-4010.

B3039016.1

-17-

# EXHIBIT U

**U.S. Securities and Exchange Commission's Responses to Defendant
Steven E. Nothern's First Request for Production of Documents**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05 -10983 (NMG) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) | |

## U.S. SECURITIES AND EXCHANGE COMMISSION'S RESPONSES TO DEFENDANT STEVEN E. NOTHERN'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Plaintiff, the Securities and Exchange Commission ("SEC" or the "Commission"), serves these responses and objections to defendant Steven E. Nothern's First Request for Production of Documents.

## GENERAL OBJECTIONS

1.     Plaintiff objects to Defendant's Requests to the extent they seek information and documents protected by the attorney-client privilege, work product doctrine, governmental law enforcement privilege, governmental deliberative process privilege, or any other applicable privilege. Inadvertent disclosure of any such information shall not constitute a waiver of any privilege or any other ground for objecting to discovery nor shall such inadvertent production waive the right of Plaintiff to

B3039016.1

object to the use of any such information contained therein during this action or in any other proceeding.

2.    Plaintiff objects to the definition of the term "DOCUMENTS" in Defendant's Requests to the extent that it purports to impose obligations and burdens beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts.

3.    Plaintiff objects to Defendant's Instruction No. 5 on the grounds that the Plaintiff in this action is the SEC, which is an independent agency of the federal government. Documents that are within the possession custody or control of any agency or department of the United States government, other than the SEC are deemed not to be in the possession custody or control of the SEC. See United States v. American Telephone & Telegraph Co., 461 F. Supp. 1314, 1334-1336 (D.D.C. 1978).

4.    Plaintiff objects to Defendant's Instruction No. 8 to the extent that it purports to impose obligations and burdens beyond those imposed by the Federal Rules of Civil Procedure or the Local Rules of the United States District Court for the District of Massachusetts.

5.    Plaintiff objects to Defendant's Requests to the extent they go beyond the requirements of the Federal Rules of Civil Procedure by seeking information not reasonably calculated to lead to the discovery of admissible evidence.

6.    Plaintiff objects to Defendant's Requests, and each request therein, to the extent that it seeks documents that are not available to the Plaintiff, or are not in the Plaintiff's possession, custody or control.

B3039016.1

7.     Plaintiff objects to Defendant's Requests on the grounds of undue burden and oppression to the extent that they call for the production of publicly available documents, documents already in Defendant's possession, or documents equally available to the Defendant.

8.     Plaintiff objects to Defendant's Requests to the extent that they seek all documents that support allegations made in Plaintiff's Complaint as premature on the grounds that the non-expert discovery cutoff in this case is September 15, 2006, and that Plaintiff has not completed its investigation into all of the facts and documents that support its allegations.

9.     Plaintiff's Responses to Defendant's Requests are based on the information available to Plaintiff.  Plaintiff reserves the right, but does not assume the obligation, to amend, supplement, or clarify its answers if it obtains other or additional information and to interpose additional general and specific objections as it deems necessary.

10.     To the extent that Plaintiff responds to the Requests, it does not waive these general objections, nor does it concede that the information requested or provided is relevant to this action.  Plaintiff expressly reserves the right to object to further discovery and to the introduction into evidence of any information produced in response thereto.

B3039016.1

## RESPONSES AND SPECIFIC OBJECTIONS TO REQUESTS FOR PRODUCTION

### Request For Production No. 1

All documents obtained or received by the SEC, by subpoena or otherwise, in connection with the Investigation, including, without limitation, any trade tickets and confirmations, transaction requests, account statements, tax information summaries, correspondence, wires and checks, notes, notes of meetings, notes of telephone conversations, audiotapes of telephone conversations, transcripts of meetings or telephone conversations, and telephone records.

### Objection to Request No. 1

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, governmental law enforcement privilege and the governmental deliberative process privilege.

### Response to Request No. 1

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 2

All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the Investigation.

B3039016.1

**Response to Request No. 2**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 3**

All documents identifying all persons interviewed, deposed or otherwise questioned by the SEC or any other agency or department of the United States government in connection with the Investigation or the U.S. Attorneys' Investigation.

**Objection to Request No. 3**

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, governmental law enforcement privilege and the governmental deliberative process privilege. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

**Response to Request No. 3**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 4**

All notes, audiotapes, videotapes, transcripts or other documentation of interviews, depositions or questioning by the SEC or any other agency or department of United States government in connection with the Investigation or the U.S. Attorneys'

B3039016.1

Investigation.

### Objection to Request No. 4

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, governmental law enforcement privilege and the governmental deliberative process privilege. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

### Response to Request No. 4

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to notes, audiotapes, videotapes, investigative testimony transcripts and other responsive documents produced with Plaintiff's initial disclosures.

### Request For Production No. 5

All communications concerning the subject matter of this Investigation and/or this action, including, without limitation, all communications concerning the Investigation with any other investigative or regulatory agency of the federal government of the United States of America.

### Objection to Request No. 5

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, governmental law enforcement privilege and the governmental deliberative

B3039016.1

process privilege. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

### Response to Request No. 5

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 6

All documents concerning Treasury's Office of Inspector General's Investigation, entitled, Unknown Treasury employee(s), case number 2002-0104, including without limitation the final report of investigation.

### Objection to Request No. 6

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

### Response to Request No. 6

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 7

All documents concerning Treasury's Office of Inspector General's Investigation, entitled, Unknown Treasury employee(s), case number 2001-0104, including without

B3039016.1

limitation the final report of investigation.

**Objection to Request No. 7**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

**Response to Request No. 7**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 8**

All documents produced or otherwise provided to the SEC by Treasury in connection with the Investigation or the U.S. Attorneys' Investigation.

**Response to Request No. 8**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 9**

All documents concerning any analysis of MFS' phone system or phone records in connection with the Investigation or the U.S. Attorneys' Investigation.

**Objection to Request No. 9**

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, the governmental law enforcement privilege and the governmental

B3039016.1

deliberative process privilege.  Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

### Response to Request No. 9

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 10

All documents concerning the SEC's decisions to initiate and continue the Investigation and to file civil lawsuits against Nothern, including, but not limited to, SEC action memos, the SEC's formal order of investigation, and the SEC's formal orders authorizing civil suits.

### Objection to Request No. 10

Plaintiff objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the governmental law enforcement privilege, and the governmental deliberative process privilege.

### Request For Production No. 11

All documents concerning the Investigation, including, without limitation, all memoranda, reports, and summaries by SEC personnel.

### Objection to Request No. 11

Plaintiff objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the governmental law enforcement privilege, and the governmental deliberative process privilege.

B3039016.1

**Response to Request No. 11**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 12**

All documents concerning the Investigation or the U.S. Attorneys' Investigation relating to MFS, including, without limitation, all financial statements, balance sheets, documents indicating MFS' compliance function, trading policies and/or procedures, and all communications with MFS and/or counsel for MFS.

**Objection to Request No. 12**

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, the governmental law enforcement privilege, and the governmental deliberative process privilege. Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

**Response to Request No. 12**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 13**

All documents concerning MFS trades in the 30-year bond on October 31, 2001, including, without limitation, all financial statements, balance sheets, trade tickets. Documents indicating MFS's compliance function, trading policies and/or procedures, and all communications with the SEC concerning such trades.

B3039016.1

**Objection to Request No. 13**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**Response to Request No. 13**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 14**

All documents concerning MFS's bond trading relationship with Merrill Lynch during 2001.

**Response to Request No. 14**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 15**

All documents concerning all communications with Merrill Lynch regarding the Investigation or subject matter of the Investigation and/or MFS trades in the 30-year bond.

**Response to Request No. 15**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 16**

All documents concerning communications of Merrill Lynch regarding bond transactions on October 31, 2001 including without limitation documents concerning

B3039016.1

allegations of insider trading.

### Response to Request No. 16

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 17

All documents concerning MFS's records of trades made through Merrill Lynch on October 31, 2001.

### Response to Request No. 17

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 18

All documents concerning the Investigation or the U.S. Attorneys' Investigation relating to Merrill Lynch, including, without limitation, all financial statements, balance sheets, documents indicating Merrill Lynch's compliance function, trading policies and/or procedures, and all communications with Merrill Lynch and/or counsel for Merrill Lynch.

### Objection to Request No. 18

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

B3039016.1

**Response to Request No. 18**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 19**

All documents produced by Merrill Lynch in connection with the Investigation or the U.S. Attorneys' Investigation.

**Objection to Request No. 19**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it seeks documents that are not within the Plaintiff's possession, custody and control.

**Response to Request No. 19**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 20**

All documents concerning the Investigation or the U.S. Attorneys' Investigation relating to Goldman Sachs, including, without limitation, all financial statements, balance sheets, documents indicating Goldman Sachs' compliance function, trading policies and/or procedures, and all communications with Goldman Sachs and/or counsel for Goldman Sachs.

B3039016.1

**Objection to Request No. 20**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible

evidence. Plaintiff further objects to this Request on the grounds that it seeks documents

that are not within the Plaintiff's possession, custody and control.

**Response to Request No. 20**

Subject to, and without waiving, the foregoing general and specific objections,

Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 21**

All documents concerning any internal investigation by MFS of allegations of

insider trading by Nothern.

**Response to Request No. 21**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers

Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 22**

All communications with all witnesses and/or counsel for witnesses in connection

with the Investigation, including, without limitation, all "Wells Submissions" and any

proposed or final agreements, consents, contracts, or undertakings between or among the

SEC and any or all of such witnesses or counsel.

**Objection to Request No. 22**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible

B3039016.1

evidence. Plaintiff further objects to this Request on the grounds that it seeks documents that are publicly available.

### Response to Request No. 22

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 23

All documents concerning Nothern's communications with the SEC, including, without limitation, all notes, transcripts, and recordings of all purported conversations between the SEC staff, including without limitation Sporkin, Hathaway, Treazure, or Rossetti, and Nothern.

### Objection to Request No. 23

Plaintiff objects on the grounds that it seeks documents that are protected by the attorney client privilege, work-product doctrine, the governmental investigative privilege and/or the governmental deliberative process privilege. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request to the extent it seeks documents that are already in Defendant's possession, custody or control.

### Response to Request No. 23

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

B3039016.1

**Request For Production No. 24**

All documents concerning Nothern's communications with MFS supervisors, management, and/or counsel including, without limitation, all notes, transcripts, and recordings of all purported conversations between the MFS supervisors, management, and/or counsel and Nothern.

**Objection to Request No. 24**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request to the extent it seeks documents that are already in Defendant's possession, custody or control.

**Response to Request No. 24**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 25**

All documents concerning the SEC's claim of gain or profit earned by Nothern as a result of his trading in 30-year bonds.

**Response to Request No. 25**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 26**

All documents concerning the SEC's claim of gain or profit earned by MFS as a result of its trading in 30-year bonds.

B3039016.1

**Response to Request No. 26**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 27**

All documents concerning MFS's code of conduct or code of ethics and/or compliance function, including without limitation MFS's statement of policy on "personal Securities Transactions" MFS's "Statement of Guidelines," and MFS's insider trading policies for the years 1986 to the present.

**Objection to Request No. 27**

Plaintiff objects to this request on the grounds that it is overly broad, unduly burdensome and not likely to lead to the discovery of admissible evidence. Plaintiff further objects to this request to the extent it seeks documents that are already in Defendant's possession, custody or control.

**Response to Request No. 27**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 28**

All documents concerning allegations of insider trading in or manipulation of the 30-year bond by the following persons, or any of them:

John Cadagan

Peter J. Davis, Jr.

Peter Fisher

B3039016.1

David S. Kennedy

Geoffrey Lee Kurinsky

Steven E. Nothern

D. Richard Smith, III

Joan Batchelder

Robin Slehnach

Rob Manning

Don Myeranz

Mike Roberge

### Objection to Request No. 28

Plaintiff objects to this Request on the grounds that it seeks documents protected by the attorney client privilege, work-product doctrine, the governmental law enforcement privilege, and the governmental deliberative process privilege. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in part because it is not limited to any particular time period, and because it does not specify the person or entity who are to have made the "allegations of insider trading or manipulation." Plaintiff further objects to this Request on the grounds that it is vague and ambiguous in the use of the phrase "allegations of insider trading or manipulation."

### Response to Request No. 28

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

B3039016.1

**Request For Production No. 29**

All documents produced in connection with the Investigation or the U.S. Attorneys' Investigation concerning the following persons, or any of them:

David D. Aufhauser

Joan Batchelder

Steven Bryant

Eric Burns

John Cadogan

James Calmas

Mayi Canales

Steven Cavan

Laura Coyn

Cathy Graham

Richard Hawkins

Michele A. Davis

Peter J. Davis, Jr.

Peter Fisher

David S. Kennedy

Francine Kerner

Geoffrey Lee Kurinsky

Paul Malvey

B3039016.1

Robert Manning

Donald Myeranz

Les Nanberg

Steven E. Nothern

William Paine

Michael Roberge

Brian Roseboro

Matthew Ryan

Lee Sachs

D. Richard Smith, III

Robin Stelmach

James Swanson

Peter Vaream

### Objection to Request No. 29

Plaintiff objects to this Request on the grounds that it seeks documents protected

by the attorney client privilege, work-product doctrine, the governmental law

enforcement privilege, and the governmental deliberative process privilege. Plaintiff

also objects to this Request on the grounds that it is overly broad, unduly burdensome

and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff

further objects to this request to the extent it seeks documents that are not within the

Plaintiff's possession, custody or control.

B3039016.1

### Response to Request No. 29

Subject to, and without waiving, the foregoing general and specific objections,

Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 30

All computer hard drives, backup tapes or any media containing voice-mails to the

following persons, or any of them on October 31, 2001 produced in connection with the

Investigation or the U.S. Attorneys' Investigation:

Joan Batchelder

Steven Bryant

Eric Burns

John Cadogan

James Calmas

Steven Cavan

Laura Coyn

Cathy Grahm

Richard Hawkins

David Kennedy

Geoff Kurinsky

Robert Manning

Donald Myeranz

Les Nanberg

B3039016.1

Steven E. Nothern

Michael Roberge

Matthew Ryan

D. Richard Smith

Robin Stelmach

James Swanson

Peter Vaream

### Objection to Request No. 30

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this request to the extent it seeks documents that are not within the Plaintiff's possession, custody or control.

### Response to Request No. 30

Subject to, and without waiving, the foregoing general objections, Plaintiff is not in the possession of any documents responsive to this request.

### Request For Production No. 31

All documents concerning a summary of line reporting in effect at MFS in October 2001, including without limitation all organization charts.

### Objection to Request No. 31

Plaintiff also objects to this request to the extent it seeks documents that are already in Defendant's possession, custody or control.

B3039016.1

**Response to Request No. 31**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 32**

All documents concerning trading in the 30-year bond on October 31, 2001.

**Objection to Request No. 32**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it is vague and ambiguous.

**Response to Request No. 32**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 33**

All documents concerning rumors of suspensions of issuance of the 30-year bond in 2001.

**Objection to Request No. 33**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this Request on the grounds that it is vague and ambiguous in the use of the phrase "rumors of suspensions."

B3039016.1

**Response to Request No. 33**

Subject to, and without waiving, the foregoing general and specific objections,

Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 34**

All video tapes of the MFS trading room on October 31, 2001, including any time

stamp information.

**Response to Request No. 34**

Subject to, and without waiving, the foregoing general objections, the Plaintiff is

not in the possession of any video tapes responsive to this request.

**Request For Production No. 35**

All floor plans of the 23rd floor of the MFS offices located at 500 Boylston St.,

Boston, Massachusetts 02116-3740 during October 2001.

**Response to Request No. 35**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers

Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 36**

All documents regarding bond trading by or at the direction of Nothern from

January 1, 2001 to October 31, 2001.

**Objection to Request No. 36**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible

evidence.

B3039016.1

### Response to Request No. 36

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 37

All documents regarding policies on press or information embargoes.

### Objection to Request No. 37

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this request on the grounds that it is vague and ambiguous in that it does not specify whose policies on press or information embargoes are being requested.

### Response to Request No. 37

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 38

All records concerning Nothern's employment by MFS.

### Objection to Request No. 38

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff also objects to this Request on the grounds that it seeks documents that are already in the possession, custody or control of the Defendant.

B3039016.1

### Response to Request No. 38

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 39

All documents concerning your document retention policies from August 1, 2001 to present.

### Objection to Request No. 39

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

### Response to Request No. 39

Subject to and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to 17 C.F.R. § 200.80(f), which is publicly available. Also subject to the foregoing general and specific objections, Plaintiff will produce documents responsive to this request that are not publicly available.

### Request For Production No. 40

All documents concerning the FITS trading system time stamps of bond transactions on October 31, 2001.

### Objection to Request No. 40

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

B3039016.1

### Response to Request No. 40

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 41

All documents concerning the training of MFS employees regarding insider trading.

### Objection to Request No. 41

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request to the extent it seeks documents that are already in Defendant's possession, custody or control.

### Response to Request No. 41

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 42

All documents concerning any purchase or sale of short-term Treasury bonds by or at the direction of Nothern on October 31, 2001.

### Response to Request No. 42

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

B3039016.1

**Request For Production No. 43**

All documents concerning MFS's retention of the professional services of Peter J. Davis, Jr., Davis Capital Ideas, or any other entity owned by or affiliated with Peter J. Davis, Jr., including without limitation any advertising or promotional literature provided by them.

**Response to Request No. 43**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 44**

All reports, newsletters, emails or other communications from Peter J. Davis, Jr., Davis Capital Ideas, or any other entity owned by or affiliated with Peter J. Davis, Jr.

**Objection to Request No. 44**

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence in part because it is not limited to any particular time period.

**Response to Request No. 44**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 45**

All documents analyzing the prospective or possible suspension of issuance of the 30-year bond in 2001.

B3039016.1

**Objection to Request No. 45**

Plaintiff objects to this Request on the grounds that it is vague and ambiguous in its use of the phrase "analyzing the prospective or possible suspension of issuance."

**Response to Request No. 45**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 46**

All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241.

**Response to Request No. 46**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 47**

All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241.

**Response to Request No. 47**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

B3039016.1

**Request For Production No. 48**

All documents concerning payment to Merrill Lynch pursuant to the settlement of the Administration Proceeding entitled <u>In the Matter of Massachusetts Financial Services Company,</u> File No. 3-11241.

**Response to Request No. 48**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 49**

All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled <u>In the Matter of Goldman, Sachs & Co.,</u> File No. 3-11240.

**Response to Request No. 49**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 50**

All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the SEC Administrative Proceeding entitled <u>In the Matter of Goldman, Sachs & Co.,</u> File No. 3-11240.

**Response to Request No. 50**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

B3039016.1

**Request For Production No. 51**

All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of John M. Youngdahl, File No. 3-11349.

**Response to Request No. 51**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 52**

All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the SEC Administrative Proceeding entitled In the Matter of John M. Youngdahl, File No. 3-11349.

**Response to Request No. 52**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 53**

All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the civil action captioned as, United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al., Civil Action No. 03-6672 (S.D.N.Y.).

**Objection to Request for Production No. 53**

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product

B3039016.1

doctrine, the governmental law enforcement privilege and the governmental deliberative process privilege.

### Response to Request No. 53

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 54

All subpoenas, document requests or other written information requests issued or made by the SEC in connection with the investigation and/or lawsuit relating to the civil action captioned as, <u>United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al.</u>, Civil Action No. 03-6672 (S.D.N.Y.).

### Response to Request No. 54

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 55

All documents obtained or received by the SEC, by subpoena or otherwise, concerning the investigation and/or lawsuit relating to the criminal action captioned as, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.).

### Objection to Request No. 55

Plaintiff objects to this Request on the grounds that it calls for the production of information and documents that are protected from disclosure by the work product doctrine, the governmental law enforcement privilege and the governmental deliberative process privilege.

B3039016.1

### Response to Request No. 55

Subject to, and without waiving, the foregoing general and specific objections,

Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 56

All subpoenas, document requests or other written information requests issued or

made by the SEC in connection with the investigation and/or lawsuit relating to the

criminal action captioned as, <u>United States of America v. Peter Davis,</u> Criminal Action No.

03-1054 (S.D.N.Y.).

### Response to Request No. 56

Subject to, and without waiving, the foregoing general objections, Plaintiff refers

Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 57

All documents concerning the lawsuit relating to the civil action captioned as,

<u>Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al.,</u> Civil Action No. 04-1851 (N.D.

ILL).

### Objection to Request No. 57

Plaintiff objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible

evidence.

B3039016.1

### Response to Request No. 57

Subject to, and without waiving, the foregoing general objections, the Plaintiff is not in the possession of any documents responsive to this request other than documents that are publicly available.

### Request For Production No. 58

All documents produced pursuant to subpoena or otherwise, concerning the lawsuit relating to the civil action captioned as, <u>Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al.</u>, Civil Action No. 04-1851 (N.D. ILL.).

### Objection to Request No. 58

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

### Response to Request No. 58

Subject to, and without waiving, the foregoing general objections, the Plaintiff is not in the possession of any documents responsive to this request other than documents that are publicly available.

### Request For Production No. 59

All subpoenas, document requests or other written information requests issued or made by any party in connection with the lawsuit relating to the civil action captioned as <u>Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al.</u>, Civil Action No. 04-1851 (N.D. ILL.).

B3039016.1

### Objection to Request No. 59

Plaintiff objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

### Response to Request No. 59

Subject to, and without waiving, the foregoing general objections, the Plaintiff is not in the possession of any documents responsive to this request other than documents that are publicly available.

### Request For Production No. 60

All communications between the SEC and the Department of Justice or the United States Attorney's Office for the Southern District of New York or any other district concerning the Investigation.

### Objection to Request No. 60

Plaintiff objects to this Request on the grounds that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the governmental law enforcement privilege, and the governmental deliberative process privilege. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

### Response to Request No. 60

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

B3039016.1

**Request For Production No. 61**

All documents identified in the Complaint.

**Response to Request No. 61**

Subject to, and without waiving, the foregoing general objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 62**

All documents consulted or referred to by the SEC in drafting the Complaint.

**Objection to Request for Production No. 62**

Plaintiff objects to this Request on the grounds that it seeks documents protected from production by the attorney work product doctrine.

**Response to Request No. 62**

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

**Request For Production No. 63**

All documents referred to, relied upon, consulted by, or provided by the SEC to any expert retained or consulted by the SEC, including, without limitation, all experts who may testify at trial.

**Objection to Request No. 63**

Plaintiff objects to this Request on the grounds that it is premature. The SEC will provide Defendant with documents sought by this request by the date provided for expert disclosures in the Court's Scheduling Order in accordance with the Federal Rules of Civil Procedure and any applicable Local Rules.

B3039016.1

### Request For Production No. 64

All documents supporting or contradicting the allegations of the Complaint.

### Objection to Request No. 64

Plaintiff objects to this Request on the grounds that it is premature. Plaintiff also objects to this Request on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

### Response to Request No. 64

Subject to, and without waiving, the foregoing general and specific objections, Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

### Request For Production No. 65

All documents the SEC seeks to introduce into evidence at trial or at any stage of the proceedings in this case.

### Objection to Request No. 65

Plaintiff objects to this Request on the grounds that it is premature. The SEC will provide Defendant with documents sought in this request in accordance with the Federal Rules of Civil Procedure and any applicable Local Rules.

### Request For Production No. 66

To the extent not included in the foregoing requests, all documents relevant to the subject matter of the Investigation and/or any claims and/or defenses set forth in the Complaint and Answer.

### Objection to Request No. 66

Plaintiff objects to this Request on the grounds that it is overly broad, unduly

burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

**Response to Request No. 66**

Subject to, and without waiving, the foregoing general and specific objections,

Plaintiff refers Defendant to documents produced with Plaintiff's initial disclosures.

Respectfully Submitted,

*Erica Y. Williams*

Erica Y. Williams
John J. Rossetti, Jr.
U.S. Securities and Exchange Commissions
100 F Street, N.E.
Washington, D.C. 20549-4010
Phone:   (202) 551-4450 (Williams)
Fax:      (202) 772-9245
williamse@sec.gov

B3039016.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused service of the foregoing U.S. SECURITIES AND EXCHANGE COMMISSION'S RESPONSES TO DEFENDANT STEVEN E. NOTHERN'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS on counsel to Defendant Steven E. Nothern, by sending copies of those pleadings by first class mail to the following:

> John Shope, Esq.
> Counsel for Defendant Steven E. Nothern
> Foley Hoag LLP
> Seaport World Trade Center West
> 155 Seaport Blvd.
> Boston, MA 02210

Erica Y. Williams

B3039016.1

# EXHIBIT V

**Letters Exchanged by Counsel for Nothern and Counsel for SEC Regarding Duty of SEC to Produce Documents Held by Other Federal Agencies**

# FOLEY
# HOAG LLP

ATTORNEYS AT LAW

John A. Shope
Boston Office
617.832.1233
jjs@foleyhoag.com

November 3, 2005

## BY TELECOPIER (202-772-9245) AND FIRST-CLASS MAIL

Erica Y. Williams, Esquire
U.S. Securities and Exchange Commission
100 F Street, N.E., Mail Stop 4010
Washington, D. C. 20549-4010

Re: *United States Securities and Exchange Commission v. Nothern,* Civil
*Action No. 05-10983 (NMG)(D. Mass.)*

Dear Erica:

I am writing regarding three matters involving discovery in this case.

First, following our review of the 51 boxes at your offices on October 12 and 13, 2005 pursuant to the SEC's obligation to make initial disclosures, we agreed that you would have these boxes scanned and OCRed and provided to us forthwith, along with copies of the disks, CDs, or other electronic media found in the 51 boxes. Kevin Currid confirmed this arrangement with John Rossetti in a letter dated October 14, 2005. John Rossetti estimated that the process would take approximately two weeks. Three weeks have passed, and we have not received any documents. Please let me know when you plan to produce these documents.

Second, we agreed to extend the time in which you could respond to our requests for production of documents on the premise that you had two imminent trials. Since there was at least one pending dispositive motion, you agreed to advise us whether the trials would in fact be going forward. Please do so.

Third, during our telephone conversation on October 21, 2005, and contrary to Mr. Rossetti's previous statement, you told me that the SEC has not yet decided whether and to what extent it intends to comply with our documents requests, insofar as they involve documents currently in the possession of federal departments other than the SEC, specifically the Department of the Treasury and the Department of Justice.

We deem the United States Government to be a single party. Furthermore, even if it were not, please note that Rule 34 does not require a responding party to have ownership or immediate possession of the requested documents. Rather, having

Erica Y. Williams, Esquire
November 3, 2005
Page 2

coordinated with several other federal agencies in conducting its investigation, and having now initiated suit against Mr. Nothern, the SEC is obligated to disclose all relevant documents held by the government it represents.

In *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979), the court considered a Rule 34 request served by the defendant on the plaintiff, an agency of the Republic of Ghana. The court ordered the agency-plaintiff to produce all relevant documents held by any branch of the government, "not just those in its immediate possession." *Id.* at 595. It explained:

> When an agency of government institutes suit, any obligation to disclose relevant information extends to the government Qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff. If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.

*Id.* (internal citations omitted).

In other cases involving actions initiated by U.S. agencies, even ones not under the direct control of the President, courts have required the plaintiffs to produce relevant documents held by other federal agencies. In *Harvey Aluminum, Inc. v. NLRB*, 335 F.2d 749 (9th Cir. 1964), the court ruled that the National Labor Relations Board could not maintain an action for unfair labor practices while refusing to produce statements made by key witnesses to the Department of Labor and the FBI. "The Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States," the court explained. *Id.* at 754. "In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements . . . simply because the documents rested in the hands of another federal agency, and we perceive no valid distinction, for this purpose, between that case and this one." *Id.*

Similarly, in *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), the court dismissed an antitrust action brought by the Department of Justice because that agency had failed to comply with a discovery order concerning documents held by the Executive Office of the President. The "true plaintiff" in the case, the court reasoned, was the "Government of the United States acting on behalf of its citizens." *Id.* at 419. Therefore, in determining whether the plaintiff complied with the court's discovery orders, the court "look[ed] to the actions or inaction of the government as a whole, not just the Department of Justice, including any action or inaction of the Executive Office of the President and its staff." *Id.*

. Erica Y. Williams, Esquire
November 3, 2005
Page 3

Here, there is nothing to prevent the SEC from obtaining documents that are relevant to its enforcement action and currently in the possession of Treasury and Justice. Having worked with these two agencies on this matter for several years, the SEC knows which documents are responsive to Mr. Nothern's requests. Both Treasury and Justice allow the SEC to request these documents directly without having to resort to the agencies' complex and burdensome "housekeeping" regulations, which would greatly limit Mr. Nothern's ability to obtain information and greatly prolong the time in which he could obtain any information. *See* 28 C.F.R. § 16.21(c); 31 C.F.R. § 1.12. By contrast, Mr. Nothern's ability to obtain these documents from Treasury and Justice, either through Freedom of Information Act requests or third-party subpoenas, is severely limited. In fact, current law in the D.C. Circuit prohibits him from serving third-party subpoenas on federal agencies at all. *See Lerner v. District of Columbia*, No Civ.A.00-1590 GK, 2005 WL 2375175, at *4 (D.D.C. Jan. 7, 2005); *United States v. Gabelli*, No. MISC.04-534 RJL, 2005 WL 2375173, at *2 (D.D.C. May 3, 2005); *Yousuf v. Samantar*, No. MISC.05-110 (RBW), 2005 WL 1523385, at *4 (D.D.C. May 3, 2005). Furthermore, the mere fact that requested documents might conceivably be obtained through alternative means does not relieve a party of its own duty to comply with the federal discovery rules. *See, e.g., Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003) ("Defendants' efficiency argument, *i.e.*, that Plaintiffs resort to subpoenas . . . , has little merit.").

It would be fundamentally unfair — indeed, a denial of due process — for the government to pursue this enforcement action against Mr. Nothern while denying him access to documents that are critical to his defense and in the government's possession. For these reasons, I urge you to comply fully with Mr. Nothern's discovery requests by obtaining documents from all the government departments that have the information requested.

Thank you for your attention to these matters. I look forward to hearing from you soon.

Sincerely,

John A. Shope

cc:   John J. Rossetti Jr., Esquire (by telecopier (202-772-9237) and first-class mail)
      Nicholas C. Theodorou, Esquire
      Kevin B. Currid, Esquire

Erica Y. Williams, Esquire
November 3, 2005
Page 4


bcc:    Mr. Steven Nothern
        Robin Toone, Esquire
        Ms. Windy Brown



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
100 F STREET, N.E.
WASHINGTON, D.C. 20549-4010

DIVISION OF
ENFORCEMENT

Erica Y. Williams
Assistant Chief Litigation Counsel
Telephone: (202) 551-4450
Facsimile: (202) 772-9246
Williamse@sec.gov

November 18, 2005

*By Facsimile and First Class Mail*
John A. Shope, Esq.
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210

Re:   *Securities and Exchange Commission v. Steven E. Nothern,* Case No. 05-10983
(NMG)(D. Mass)

Dear John:

I am writing to address certain legal issues raised in your November 3, 2005 letter and
Defendant Steven E. Nothern's First Request for Production of Documents, specifically your
contention that the plaintiff in the above-referenced matter is not merely the U.S. Securities and
Exchange Commission ("SEC" or the "Commission"), but the entire United States Government
("Government"). In your November 3rd letter, you maintain that under Rule 34 of the Federal
Rules of Civil Procedure, the Commission is obligated to produce documents that are in the
possession, custody or control of all departments and agencies of the Government because you
"deem the United States Government to be a single party." We disagree. Additionally, we have
carefully reviewed the cases cited in your November 3rd letter, and have determined that they are
factually and legally distinguishable from this case, and in no way support your contention that the
Commission is required to obtain and produce documents from other agencies and departments of
the Government in response to Nothern's discovery requests.

This case was filed on behalf of the SEC, not the United States. The SEC is an independent
regulatory agency of the Government. Unlike like the Department of Justice ("Justice") or the
Department of Treasury ("Treasury"), the SEC is not a part of the Government's Executive Branch
and is essentially free from executive control. *See U.S. v. AT&T,* 461 F. Supp. 1314, 1335-1336
(D.D.C. 1978) ("*AT&T*").While the Commissioners of the SEC are appointed by the President, they
are appointed for fixed terms of five years that do not all lapse at the same time, are representative

John A. Shope, Esq.
November 18, 2005
Page 2

of both political parties, and are not subject to removal or discipline by the President. As an independent regulatory agency, the SEC was "intentionally created to be somewhat apart from the government, in general, and from the White House in particular." *Id*. at 1335. Accordingly, your assertion that the plaintiff in this action includes the entire Government is misplaced.

Indeed, in *AT&T*, which was filed by the Department of Justice on behalf of the United States, the United States District Court for the District of Columbia rejected the defendants' argument that the plaintiff included all agencies of the Government, and denied the defendants' Rule 34 requests for production of documents from the Federal Communications Commission ("FCC") and other independent regulatory agencies. Specifically, the court held that "there is no basis for holding that a quasi-legislative agency, which the law necessarily regards as an independent body created to execute independent responsibilities, becomes a 'plaintiff' when the Department of Justice chooses to file a lawsuit on behalf of the United States." *Id*. at 1335. The court also found that the plaintiff in *AT&T*, specifically Justice and the Executive Branch, are not in control of documents held by the FCC, and could not produce documents which they did not have. *Id*.

Similarly, in this case, the Commission is not in control of the documents and records of Justice, Treasury or any other departments or agencies of the of the Government sought by Nothern in his document requests, other than the documents the SEC produced with its initial disclosures. The SEC is not part of the Executive Branch, does not have any authority over Executive Branch departments or agencies, and cannot compel the production of documents in the possession, custody, or control of those departments or agencies. Thus, the SEC has no obligation, under the federal discovery rules, to produce documents in the control of Justice, Treasury in response to Nothern's document requests. *See generally U.S. v. Davis*, 140 F.R.D. 261, 263 (D.R.I. 1992) (holding that Justice, which initiated the action on behalf of the United States, was not required to obtain and produce a log of documents from a subcommittee of the House of Representatives, finding that the three branches of Government function as "separate and distinct" entities, and rejecting the defendant's argument that the plaintiff included Congress).

The three cases cited in your November 3rd letter, *Ghana Supply Commission v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979)("*Ghana Supply*"), *Harvey Aluminum v. NLRB*, 335 F.2d 749 (9th Cir. 1964)("*Harvey Aluminum*"), and *U.S. v. National Broadcasting Co, Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974)("*NBC*"), fail to support your claim that the SEC is obligated to obtain and produce documents from the Justice, Treasury and all other agencies and departments of the Government in response to Nothern's discovery requests. In *Ghana Supply* the court did not address, let alone decide, whether an independent regulatory agency of the Government has an obligation under Rule 34 of the Federal Rules of Civil Procedure to obtain and produce documents from other agencies of the Government in response to a defendant's discovery requests. Rather, the court found that an agency of the Government may not refuse to produce documents from other governmental agencies on the basis of governmental privilege. The SEC is not refusing to obtain and produce documents from other Government agencies in response to Nothern's requests on the basis of governmental privilege. Thus, the holding in *Ghana Supply* is inapplicable here.

John A. Shope, Esq.
November 18, 2005
Page 2

*Harvey Aluminum* is also distinguishable from this case. *Harvey Aluminum* involved the NLRB's obligations under the Jenks Act to produce statements made by witnesses to the Departments of Labor and Justice ("Labor") and Justice. The court interpreted the Jencks Act to require production of the statements from Labor and Justice, and found that the President, as head of the Executive Branch, was held to have authority over Labor and Justice to procure production of the statements. The holding in *Harvey Aluminum* is inapplicable to this case where Nothern is not seeking production of Jencks Act statements held within one branch of government, but is seeking to have the SEC, an independent agency that is essentially free from executive control, obtain documents responsive to his civil discovery requests from departments of the Executive Branch.

*NBC* also fails to support the claims that the SEC is required to produce documents from Treasury and Justice. *NBC* was an antitrust suit that involved compelling one department of the Executive Branch, Justice, to produce documents located in another office of the Executive Branch, the executive office of the President. Contrary to the assertions made in your November 3rd letter, *NBC* does not "provide the slightest support for the proposition that an independent regulatory commission . . . as distinguished from an Executive Branch agency is to be considered a party plaintiff in an antitrust suit" brought on behalf of the Government of the United States. *AT&T*, 461 F. Supp. 1314, 1336, n.64. The holding in *NBC* also fails to support Nothern's claim that Executive Branch agencies, such as Justice and Treasury, are to be considered plaintiffs in cases, brought on behalf of independent regulatory commissions, like the SEC.

Finally, your argument that the SEC should be forced to obtain and produce documents from other government agencies, because it may be less "complex and burdensome" for the SEC to so, is not persuasive. The Federal Rules of Civil Procedure do not require the SEC to produce documents that are not within its possession, custody or control. Fed. R. Civ. P. 34. While it is unclear what procedures the SEC would have to undertake to obtain documents from other government agencies, or how complex and burdensome those procedures might be, it is clear that the SEC is not under any obligation to conduct Nothern's discovery for him by obtaining and producing documents from Executive Branch agencies like Treasury and Justice in response to Nothern's requests. *See generally AT&T*, 461 F. Supp. at 1335. Contrary to your assertions, by refusing to produce documents from other agencies that it does not have, the SEC is not "denying Nothern access to documents that are critical to his defense." As you are aware, Nothern has several valid means of obtaining the information that he seeks from Treasury, Justice, or any other third party Government agency, including, but not limited to, requesting the documents directly from the agencies and complying with the regulations adopted by the agencies under *Touhy v. Ragen*, 340 U.S. 462 (1951), or seeking the documents through the Freedom of Information Act.

John A. Shope, Esq.
November 18, 2005
Page 2


Thank you for your attention to these matters. I remain hopeful that the parties will be able to resolve any outstanding discovery issues without Court intervention. Should you have any questions, please do not hesitate to call.

Sincerely,

Erica Y. Williams

cc:     John J. Rossetti, Jr.



# FOLEY
# HOAG LLP
### ATTORNEYS AT LAW

John A. Shope
Partner
Boston Office
617.832.1233
jjs@foleyhoag.com

December 7, 2005

## BY TELECOPIER (202-772-9245) AND FIRST-CLASS MAIL

Erica Y. Williams, Esquire
U.S. Securities and Exchange Commission
100 F Street, N.E., Mail Stop 4010
Washington, D. C.  20549-4010

Re:    *United States Securities and Exchange Commission v. Nothern,* Civil
Action No. 05-10983 (NMG)(D. Mass.)

Dear Erica:

I am writing in response to your letter of November 18 indicating the SEC's unwillingness to gather and produce any documents currently in the possession of federal departments other than the SEC, specifically the Department of the Treasury and the Department of Justice.  Pursuant to Local Rule 37.1, I write to request that you reconsider and that we have a conference on this issue tomorrow or Friday.  Please advise when you are available.

In your formal response to Mr. Nothern's *First Request for Production of Documents*, which we received on Friday, November 18, you stated:

> Plaintiff objects to Defendant's Instruction No. 5 on the grounds that the Plaintiff in this action is the SEC, which is an independent agency of the federal government.  Documents that are within the possession custody or control of any agency or department of the United States government, other than the SEC are deemed not to be in the possession custody or control of the SEC.  See United States v. American Telephone & Telegraph Co., 461 F. Supp. 1314, 1334-1336 (D.D.C. 1978).

Your letter of November 18, 2005, likewise argues that "the SEC is not under any obligation to conduct Nothern's discovery for him by obtaining and producing documents from Executive Branch agencies like Treasury and Justice in response to Nothern's requests."

Erica Y. Williams, Esquire
December 7, 2005
Page 2

I suggest that any continued refusal by the SEC to seek to obtain documents responsive to Mr. Nothern's requests from other government departments, is not supported by the law, particularly within the District of Massachusetts.

First, it is a *non sequitur* to contend that because documents in the immediate possession of one federal agency, they are "deemed not to be in the possession custody or control" of any other. Courts routinely require parties to produce documents that are owned or possessed by someone else. Under First Circuit law, so long as the party has the "right, authority, or ability" to obtain the documents, they are within its "possession, custody, or control" for purposes of Federal Rule of Civil Procedure 34. *Green v. Fulton*, 157 F.R.D. 136, 142 (D. Me. 1994); *see also Anderson v. Cryovac, Inc.*, 862 F.2d 910, 928-29 (1st Cir. 1988) (holding that seller of property had control of report held by purchaser, where agreement stated that seller could "reasonably request" records in connection with litigation); *Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003) (compelling defendant state officials to produce documents in possession of non-party agencies); *Haseotes v. Abacab Int'l Computers, Inc.*, 120 F.R.D. 12, 15 (D. Mass. 1988) (stating that "[l]egal ownership is not the determining factor" and ordering officers, directors, and shareholders to produce documents in possession of corporations).

Here, you do not deny that there are documents that are relevant to this case and currently in the possession of Treasury and Justice. As you know, the SEC has worked in close coordination with these two agencies in its investigation of this matter. For example, the SEC participated in the interviews of Treasury employees conducted by Treasury's Office of Inspector General in late 2001, and it coordinated its investigation with the Justice Department's parallel criminal investigation, which ultimately resulted in the 2003 indictments against Peter Davis and John Youngdahl in the Southern District of New York.

You do not deny in your letter that you have the "right, authority, or ability" to obtain relevant documents currently held by Treasury and Justice. You state that it is "unclear what procedures the SEC would have to undertake to obtain from other government agencies, or how complex and burdensome those procedures might be." However, you do not dispute that both Treasury and Justice authorize the SEC to request these documents directly without having to resort to the agencies' "housekeeping" regulations. *See* 28 C.F.R. § 16.21(c); 31 C.F.R. § 1.12. Plainly the SEC has the ability to request documents from other government departments and, unlike Mr. Nothern, will not in so doing be hamstrung by the "housekeeping" regulations granting the agencies discretion to deny Mr. Nothern's requests.

Failure to comply with Rule 34 is not excused by the possibility that other "valid means" of obtaining the information may exist. The very case you chiefly rely on in your response, *United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978), establishes that Rule 45 does not adequately protect the interests of a party seeking discovery from a

Erica Y. Williams, Esquire
December 7, 2005
Page 3

federal agency: Rule 45 discovery typically involves a narrower scope of production, broader claims of government privilege, greater expense for the party making the request, and less effective sanctions for noncompliance. *See id.* at 1331-32. *Accord Rosie D. v. Romney*, 256 F. Supp. 2d at 119 ("Defendants' efficiency argument, *i.e.*, that Plaintiffs resort to subpoenas . . . , has little merit.").

Indeed, the suggestion that Mr. Nothern seek the information necessary to his defense would appear to be disingenuous. The current law in the D.C. Circuit prohibits the enforcement of all third-party subpoenas served on federal agencies. *See Lerner v. District of Columbia*, No Civ.A.00-1590 GK, 2005 WL 2375175, at *4 (D.D.C. Jan. 7, 2005); *United States v. Gabelli*, No. MISC.04-534 RJL, 2005 WL 2375173, at *2 (D.D.C. May 3, 2005); *Yousuf v. Samantar*, No. MISC.05-110 (RBW), 2005 WL 1523385, at *4 (D.D.C. May 3, 2005). Thus, it is no exaggeration to conclude that your refusal to obtain relevant documents currently held by Treasury and Justice is likely to prevent Mr. Nothern from obtaining documents that are critical to his defense — a clear denial of due process.

You rely mainly on the ruling in *AT&T*, which refused to extend the Justice Department's Rule 34 discovery obligations to documents held by the Federal Communications Commission, an independent regulatory agency. "[B]oth as a conceptual and as a practical matter," the district court held in that case, "the Federal Communications Commission is free from executive control and not answerable to instructions from the President or the Attorney General." 461 F. Supp. at 1336. You further distinguish each of the rulings in *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979), *Harvey Aluminum, Inc. v. NLRB*, 335 F.2d 749 (9th Cir. 1964), and *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), on the ground that, unlike *AT&T*, they did not involve requests to obtain documents from independent regulatory agencies.

This case, however, is not controlled by *AT&T* because the additional documents Mr. Nothern seeks are not currently held by an independent regulatory agency. Rather, they are held by Treasury and Justice, two departments fully under executive control. The mere fact that the government agency that initiates the litigation, like the SEC here, is itself independent does not mean that Rule 34 discovery may not be had of documents in the immediate possession of non-independent agencies.

This point was clearly established in *Harvey Aluminum*, where the Ninth Circuit held that the National Labor Relations Board — also an independent agency — could not maintain an action for unfair labor practices while refusing to produce statements made by key witnesses to the Department of Labor and the FBI. "The Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States," the court explained. 335 F.2d at 754. "In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements . . . simply because the documents rested in the hands of another federal

Erica Y. Williams, Esquire
December 7, 2005
Page 4

agency, and we perceive no valid distinction, for this purpose, between that case and this one." *Id.*

In your letter, you appear to try to distinguish *Harvey Aluminum* by suggesting that it involved the production of documents "held within one branch of government." But the situation in that case is exactly the same as the situation here: in an action instituted by an independent regulatory agency (NLRB/SEC), the defendant sought the production of relevant documents held by non-independent executive agencies (Department of Labor/Treasury/Justice). Indeed, the district court in *AT&T* itself distinguished *Harvey Aluminum* on this basis, stating that the Ninth Circuit was concerned with documents "in the possession of executive departments" and observing that the "President was held to have adequate authority over such departments to procure production, and the courts to order it." 461 F. Supp. at 1336 n.63.

Nor can *Harvey Aluminum* be distinguished on the ground that it involved the production of Jencks statements, not a request for documents under Federal Rule of Civil Procedure 34. *Harvey Aluminum* and the other cases cited in our initial letter stand for the proposition that where a duty to produce documents exists in the law, a government agency such as the SEC cannot circumvent that duty by arguing that the documents are currently held by a separate (non-independent) agency, so long as the first agency has the right, authority, or ability to request the documents from the second. Indeed, this is exactly how the District of Massachusetts has interpreted the rule established in *Harvey Aluminum* in the context of a Rule 34 request for production of documents:

> When an agency of government institutes suit, <u>any obligation to disclose relevant information</u> extends to the government Qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff. Annot. 95 L. Ed 425, 445 (1951); see, *Harvey Aluminum (Incorporated) v. N.L.R.B.*, 9 Cir. 1964, 335 F.2d 749, 754-55 . . . .

*Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979) (emphasis added).

There is no reason why the SEC, having coordinated with other federal agencies in conducting its investigation and initiating suit against Mr. Nothern, cannot and should not disclose all relevant documents held by the government whose interests it represents. Since Mr. Nothern is unlikely to get these documents through other means, a refusal by the SEC to obtain and produce relevant documents held by other departments raises serious concerns of due process. Clearly, the $3.1 million disgorgement order and fine sought by the SEC in this case involve significant deprivations of property sufficient to trigger protection under the Due Process Clause of the Fifth Amendment to the United States Constitution. Even more onerous is the requested injunction against "further

Erica Y. Williams, Esquire
December 7, 2005
Page 5

violations" of Section 10(b) and Rule 10b-5, which, as I am sure you are aware, would
have the effect of disqualifying Mr. Nothern for future employment in the securities
industry under Sections 3(a)(39) and 15(b)(4) of the Exchange Act and NASD By-Law
Article III, Section 4. The SEC's refusal to produce the documents in question severely
harms Mr. Nothern's interests and compromises the fundamental fairness of this
proceeding by denying him notice of the evidence that has been compiled against him
and a meaningful opportunity to respond. See *Green v. McElroy*, 360 U.S. 474, 496-97
(1959) (describing principle that "the evidence used to prove the government's case
must be disclosed to the individual so that he has an opportunity to show that it is
untrue" as "immutable in our jurisprudence" and applicable "in all type of cases where
administrative and regulatory actions [are] under scrutiny"). It also increases the
likelihood that an erroneous determination will result. *See United States v. Procter &
Gamble Co.*, 356 U.S. 677, 682 (1958) (stating that full disclosure through discovery
makes "a trial less a game a blindman's bluff and more a fair contest with the basic
issues and facts disclosed to the fullest practicable extent" and that "[o]nly strong public
policies weigh against disclosure") (citations omitted).

By contrast, your interest in not producing the documents held by Treasury and
Justice is, at best, a matter of administrative convenience. At worst, it is the case of an
agency that has the ability to obtain (and has obtained) potentially favorable evidence
from other government agencies, but declines to exercise that authority to obtain
potentially unfavorable evidence that is otherwise unavailable to the defense. Under
these circumstances, we believe that the Due Process Clause requires an order either
directing the SEC to request, obtain, and produce to Mr. Nothern all relevant documents
held by Treasury and Justice or, alternatively, dismissing the SEC's action.

I look forward to hearing from you soon as to when we may have a conference
on these matters.

Sincerely,

John A. Shope

cc:    John J. Rossetti Jr., Esquire (by telecopier (202-772-9237) and first-class mail)
       Nicholas C. Theodorou, Esquire
       Kevin B. Currid, Esquire



# FOLEY
# HOAG LLP
ATTORNEYS AT LAW

John A. Shope
Partner
Boston Office
617.832.1233
jshope@foleyhoag.com

December 16, 2005

## BY TELECOPIER (202-772-9245) AND FIRST-CLASS MAIL

Erica Y. Williams, Esquire
U.S. Securities and Exchange Commission
100 F Street, N.E., Mail Stop 4010
Washington, D. C.  20549-4010

Re:     *United States Securities and Exchange Commission v. Nothern,* **Civil
Action No. 05-10983 (NMG)(D. Mass.)**

Dear Erica:

This will follow up on our lengthy conference call on Tuesday and John Rossetti's and your call to me later that day.  We are disappointed that you have rejected our suggestion that the SEC seek documents from other agencies in an effort to moot our disagreement about whether you are obligated to do so, but without waiver by either side of its position should other agencies and departments not cooperate.

Nick Theodorou and I have considered your counter-proposal to seek documents responsive to our requests in the hands of other government agencies and departments if, and only if, Mr. Nothern waives any right to move to compel production or for sanctions should those agencies and departments decline to provide them and waives any right to seek a privilege log for any documents withheld.

We cannot accede to those conditions.  Given your statement yesterday that we have completed the pre-motion consultation process, and unless you have reconsidered your rejection on Tuesday of our proposal, we will be moving to compel.  Please let me know as soon as possible if you have considered the matter further or otherwise believe that the matter is not ripe for presentation to the court.

Sincerely,

John A. Shope

Erica Y. Williams, Esquire
December 16, 2005
Page 2


cc:    John J. Rossetti Jr., Esquire (by telecopier (202-772-9237) and first-class mail)
       Nicholas C. Theodorou, Esquire
       Kevin B. Currid, Esquire



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
100 F STREET, N.E.
WASHINGTON, D.C. 20549-4010

DIVISION OF
ENFORCEMENT

Erica Y. Williams
Assistant Chief Litigation Counsel
Telephone: (202) 551-4450
Facsimile: (202) 772-9245
Williamse@sec.gov

December 20, 2005

*By Facsimile and First Class Mail*

John Shope, Esq.
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210

   Re: *Securities and Exchange Commission v. Steven E. Nothern,* Case No. 05-10983
     (NMG)

Dear John:

   I am writing to confirm the discussion that we had yesterday regarding the briefing schedule of the motion to compel that you intend to file regarding Mr. Nothern's request that the SEC produce documents currently held by other federal government departments and agencies.

   John Rossetti and I are also disappointed that we were not able to resolve this discovery dispute without court intervention. As we discussed, the SEC has already produced all non-privileged documents that are responsive to Nothern's document requests that it has in its possession, custody and control. By requesting that the SEC produce documents from other government departments and agencies, Nothern is seeking to have the SEC produce documents outside of its possession, custody and control. As we stated during our December 13, 2005 telephone call, although the SEC believes that it has no legal obligation to do so, in an effort to resolve the pending discovery dispute, the SEC was willing to submit Nothern's request for documents to the government departments and agencies you specified along with a cover letter, which we would draft with your input, from us explaining that the SEC wanted the documents as well.. In return for this accommodation, the SEC sought Nothern's agreement not to file a motion to compel against the SEC if the other departments or agencies failed to comply with the document requests, failed to produce a privilege log or were deficient in their document production. In your December 16, 2005 letter, you rejected the SEC's offer to resolve this discovery dispute in the manner we proposed and notified us that you would be filing a motion to compel.

December 20, 2005
Page 2

As you are aware, John and I will be on vacation from December 23, 2005 through January 2, 2006. Thank you for agreeing that the SEC's response to any motion to compel Nothern files regarding his request for production of documents from other government agencies will be due no earlier that January 9, 2006.

Sincerely,

Erica Y. Williams

Erica Y. Williams

cc:     John J. Rossetti, Jr.

# EXHIBIT W

**Memorandum on Interview of Jill K. Ouseley by SEC and Treasury OIG (Dec. 28, 2001)**



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: 2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|
| ☐ Personal Interview | | Michael Knorr, Investigator _M C Khm_ |
| ☒ Telephone Contact | Date: December 28, 2001 | |
| ☐ Records Review | | |
| ☐ Other (Describe): | Time: 10:50 a.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| Jill K. Ouseley<br>6919 Langley Place<br>University Park, Florida 34201<br>(941) 358-1764 | Office of the Inspector General<br>740 15th Street, NW<br>Washington, DC |

On the above date and time, Jill Ouseley, former Director, Office of Market Finance, Department of the Treasury, was interviewed by the Office of the Inspector General (OIG) concerning her knowledge of a Peter Davis and his admittance to the quarterly refunding press conferences. Ouseley said she retired from the Department of the Treasury on December 31, 1999. Her subordinate Paul Malvey became Director of the Office of Market Finance following her retirement.

Ouseley stated that she does not know a Peter Davis nor does she recall ever admitting him to a quarterly refunding press conference. She said however, it is "not impossible that I admitted him" but she did not recall doing so. She said if she had admitted him, she assumes it was because he wrote for some financial publication. She said it is possible that after she admitted Davis once, he may have continued to call her secretary, Lula Tyler, and was admitted to subsequent conferences by that means.

Ouseley said in recent weeks she has spoken by phone with Malvey and representatives of the Securities and Exchange Commission concerning Peter Davis. She said she told them the same thing, that she did not remember a Peter Davis or admitting him to a news conference.

Reviewed by _[signature]_ Date: _12/28/01_

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01

Form OI-09

Office of the Inspector General - Investigations.
Department of the Treasury

Page 1 of 1

SECNOTH00103681

# EXHIBIT X

**Letter to U.S. Dept. of Justice Regarding FOIA Request (Nov. 11, 2005)**

# FOLEY

# HOAG LLP

ATTORNEYS AT LAW

Kevin B. Currid
Boston Office
617.832.1200
KCurrid@foleyhoag.com

November 11, 2005

## FOIA REQUEST

**Via FedEx**

Freedom of Information Act Officer
Executive Office for United States Attorneys
U.S. Department of Justice
BICN Bldg., Room 7100
Washington, D.C. 20530-0001

> **Re:** **FOIA Request: Documents Concerning Criminal Actions, *United States of America v. Peter Davis*, Criminal Action No. 03-1054 (S.D.N.Y.) and *United States of America v. John Youngdahl*, Criminal Action No. 03-0991 (S.D.N.Y.).**

Dear Sir or Madam:

I am writing pursuant to the Freedom of Information Act, 5 U.S.C. § 552 and related Department of Justice regulations, 28 C.F.R. § 16 *et seq.* to request copies of all documents and other information relating to Criminal Actions, United States of America v. Peter Davis, Criminal Action No. 03-1054 (S.D.N.Y.) and United States of America v. John Youngdahl, Criminal Action No. 03-0991 (S.D.N.Y.).

Without limiting the foregoing and for the purposes of enabling the location of the records requested without placing an unreasonable burden upon the Department, please locate, copy and send the undersigned the following documents or any other information relating to such documents:

1.    All documents provided to the Department of Justice by the Department of the Treasury concerning the Department of the Treasury's Office of Inspection Report for case number 2002-0104;

2.    All communications between the Department of Justice and the Department of the Treasury concerning the subject matter of Department of the Treasury's Office of Inspection Report for case number 2002-0104;

3.    All documents provided to the Department of Justice by the United States Securities and Exchange Commission ("SEC") in connection with the events

B3112057.1

Freedom of Information Act Officer
November 11, 2005
Page 2

investigated in Criminal Actions, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.) and <u>United States of America v. John Youngdahl</u>, Criminal Action No. 03-0991 (S.D.N.Y.).

4.    All communications between the SEC and the Department of Justice concerning the events investigated in Criminal Actions, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.) and <u>United States of America v. John Youngdahl</u>, Criminal Action No. 03-0991 (S.D.N.Y.), including without limitation any communications with attorneys Andrew Sporkin and Rosemary Filou;

5.    All documents produced to the Department of Justice in response to a subpoena or otherwise in connection with Criminal Actions, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.) and <u>United States of America v. John Youngdahl</u>, Criminal Action No. 03-0991 (S.D.N.Y.);

6.    All plea agreements entered into in connection with Criminal Actions, <u>United States of America v. Peter Davis</u>, Criminal Action No. 03-1054 (S.D.N.Y.) and <u>United States of America v. John Youngdahl</u>, Criminal Action No. 03-0991 (S.D.N.Y.);

7.    All recordings, transcripts, notes, or summaries from any interview or testimony of Peter Davis;

8.    All recordings, transcripts, notes, or summaries from any interview or testimony of John Youngdahl;

9.    All documents concerning the government's announcement by Peter R. Fisher, Treasury, Under Secretary for Domestic Finance, to suspend issuance of the 30-year bond during the quarterly refunding meeting press conference at Treasury on October 31, 2001;

10.   All documents concerning the Treasury Office of Public Affairs' posting of Mr. Fisher's announcement on the Treasury Department's web site on October 31, 2001;

11.   All documents, including without limitation any interview notes, recordings, transcripts, or summaries from interviews conducted of Treasury Webmaster David Borowski;

12.   All documents concerning the identification of the individuals who attended the quarterly refunding press conference at Treasury on October 31, 2001;

13.   All documents concerning any communications with Goldman-Sachs Brokerage regarding the subject matter of Criminal Actions, <u>United States</u>

Freedom of Information Act Officer
November 11, 2005
Page 3

of America v. Peter Davis, Criminal Action No. 03-1054 (S.D.N.Y.) and
United States of America v. John Youngdahl, Criminal Action No. 03-
0991 (S.D.N.Y.), including without limitation all interview notes,
recordings, transcripts or summaries;

14.     All documents concerning any communications with Massachusetts
Financial Services Company ("MFS") regarding the subject matter of
Criminal Actions, United States of America v. Peter Davis, Criminal
Action No. 03-1054 (S.D.N.Y.) and United States of America v. John
Youngdahl, Criminal Action No. 03-0991 (S.D.N.Y.), including without
limitation all interview notes, recordings, transcripts or summaries;

15.     All documents concerning MFS' trades in the 30-year bond on October 31,
2001, including without limitation all communications, records of trade, and
other financial documents found in the possession of Merrill Lynch;

16.     All documents concerning Merrill Lynch's trades in the 30-year bond on
October 31, 2001;

17.     All documents concerning Department of Justice communications with
Merrill Lynch regarding bond transactions on October 31, 2001 including,
without limitation, documents concerning allegations of insider trading;

18.     All documents concerning Department of Justice communications with MFS
regarding bond transactions on October 31, 2001 including, without
limitation, documents concerning allegations of insider trading;

19.     All documents concerning interviews or testimony of any of the following
individuals, including without limitation all interview notes, transcripts,
recordings, or summaries:

Frances Anderson;

Roger Anderson;

David D. Aufhauser;

Timothy Bitsbeger;

David Borowski;

Mayi Canales;

Jill Cetina;

Michele A. Davis;

Peter J. Davis, Jr.;

Freedom of Information Act Officer
November 11, 2005
Page 4

Peter R. Fisher;

Tony Fratto;

David Harris

Elizabeth Holahan;

Jeff Huther;

Paul Malvey;

Brian Roseboro;

Lula Tyler;

Steven Vagle

Joan Batchelder;

Steven Bryant;

Eric Burns;

John Cadogan;

John Cadogen;

James Calmas;

Steven Cavan;

Laura Coyne;

Cathy Grahm;

Richard Hawkins;

David Kennedy;

Geoff Kurinsky;

Francine Kerner;

Robert Manning;

Freedom of Information Act Officer
November 11, 2005
Page 5

Don Mycrons;

Donald Myeranz;

Donald Mykrantz;

Les Nanberg;

Steven E. Nothern;

Jill Ousley

Mike Robarish;

Michael Roberge;

Matthew Ryan;

Lee Sachs;

D. Richard Smith;

Robin Stelmach;

Allyson Sullivan;

James Swanson;

Peter Vaream;

20.     All documents concerning the admittance of Peter Davis to the quarterly refunding press conference at Treasury on October 31, 2001;

21.     All documents concerning the admittance of Peter Davis to any press conferences at Treasury from 1996 through 2001;

22.     All documents concerning communications between Peter Davis and Paul Malvey, Jill Ouseley, or Lula Tyler;

23.     All documents concerning Department of the Treasury policies concerning information embargos enforced at Treasury press conferences from 1996 through 2001;

24.     All documents concerning any Freedom of Information Requests regarding the subject matter of Criminal Actions, <u>United States of America v. Peter</u>

Freedom of Information Act Officer
November 11, 2005
Page 6

Davis, Criminal Action No. 03-1054 (S.D.N.Y.) and United States of America v. John Youngdahl, Criminal Action No. 03-0991 (S.D.N.Y.);

25.    All documents concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241;

26.    All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241;

27.    All documents concerning the investigation and/or lawsuit relating to the civil action captioned as, United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al., Civil Action No. 03-6672 (S.D.N.Y.);

28.    All documents produced pursuant to subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the civil action captioned as, United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al., Civil Action No. 03-6672 (S.D.N.Y.);

29.    All documents concerning the lawsuit relating to the civil action captioned as, Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al., Civil Action No. 04-1851 (N.D. ILL.), including without limitation all deposition transcripts;

30.    All documents produced pursuant to subpoena, FOIA request or otherwise, concerning the lawsuit relating to the civil action captioned as, Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al., Civil Action No. 04-1851 (N.D.ILL.);

31.    All documents concerning the investigation and/or criminal action captioned as United States of America v. Peter Davis, Criminal Action No. 03-1054 (S.D.N.Y.);

32.    All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or criminal action captioned as United States of America v. Peter Davis, Criminal Action No. 03-1054 (S.D.N.Y.);

33.    All documents concerning the investigation and/or criminal action captioned as United States of America v. John Youngdahl, Criminal Action No. 03-0991 (S.D.N.Y.);

34.    All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or criminal action captioned as United States of America v. John Youngdahl, Criminal Action No. 03-0991 (S.D.N.Y.);

Freedom of Information Act Officer
November 11, 2005
Page 7

35.     All documents produced pursuant to subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled <u>In the Matter of Goldman, Sachs & Co.</u>, File No. 3-11240; and

36.     All documents produced pursuant to subpoena, FOIA Request or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled <u>In the Matter of John M. Youngdahl</u>, File No. 3-11349.

    You are authorized to incur without further notice up to $250.00 in photocopying and other costs, which expenses we will promptly reimburse. Thank you for your time and attention to this request.

                                    Very truly yours,

                                    Kevin B. Currid

cc:     FOIA/PA Mail Referral Unit, Justice Management Division
        Mr. Steven E. Nothern
        Nicholas C. Theodorou, Esquire
        John A. Shope, Esquire

B3112057.1

# EXHIBIT Y

**Response of U.S. Department of Justice to FOIA Request (Dec. 8, 2005)**



**U.S. Department of Justice**

*Executive Office for United States Attorneys*
*Freedom of Information/Privacy Act Unit*
*600 E Street, N.W., Room 7300*
*Washington, D.C. 20530*
*202-616-6757  Fax 202-616-6478*

DEC -8 2005

Request Number:05-3490

Requester: Kevin B. Currid

Subject of Request: U.S. v. Peter Davis, U.S. v. Youngdahl

Dear Requester:

　　The Executive Office for United States Attorneys has received your Freedom of Information Act request and assigned the above number to the request.

　　You have requested records concerning a third party (or third parties). Records pertaining to a third party generally cannot be released absent express authorization and consent of the third party, proof that the subject of your request is deceased, or a clear demonstration that the public interest in disclosure outweighs the personal privacy interest and that significant public benefit would result from the disclosure of the requested records. Since you have not furnished a release, death certificate, or public justification for release, the release of records concerning a third party would result in an unwarranted invasion of personal privacy and would be in violation of the Privacy Act, 5 U.S.C.§552a. These records are also generally exempt from disclosure pursuant to sections (b)(6) and (b)(7)(C) of the Freedom of Information Act, 5 U.S.C. §552.

　　We have not performed a search for records and you must not assume that records concerning the third party exist. We will release, if requested, any public records maintained in our files, such as court records and news clippings, without the express of authorization of the third party, a death certificate, or public justification for release. If you desire to obtain public records, if public records exist in our files, please submit a new request for public documents.

　　Should you obtain the written authorization and consent of the third party for release of the records please submit a new request for the documents accompanied by the written authorization. A form is enclosed to assist you in providing us the authorization and consent of the subject of your request. The authorization must be notarized or signed under penalty of perjury pursuant to 18 U.S.C. §1001. **Please send your new request to the address above.**

This is a final determination and your request for information will be closed. You may appeal my decision in this matter by writing within 60 days from the date of this letter, to:

Office of Information and Privacy
United States Department of Justice
Flag Building, Suite 570
Washington, D.C. 20530

Both the envelope and the letter of appeal must be clearly marked "Freedom of Information Act/Privacy Act Appeal."

After the appeal has been decided, you may have judicial review by filing a complaint in the United States District Court for the judicial district in which you reside or have your principal place of business; the judicial district in which the requested records, if any, are located; or in the District of Columbia.

Sincerely,

Marie A. O'Rourke
Assistant Director

Enclosure

05-3490

**U.S. Department of Justice**

## Certification of Identity



**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Failure to furnish this information will result in no action being taken on the request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to Director, Facilities and Administrative Services Staff, Justice Management Division, U.S. Department of Justice, Washington, DC 20530 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1] _____

Citizenship Status [2] _____ Social Security Number [3] _____

Current Address _____

Date of Birth _____ Place of Birth _____

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] _____ Date _____

## OPTIONAL:  Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

_____

### Print or Type Name

[1] Name of individual who is the subject of the record sought.
[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.
[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.
[4] Signature of individual who is the subject of the record sought.