UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | Civil Action No. 05-10983 (NMG) |
| Plaintiff, | : : | |
| v. | : : | **ORAL ARGUMENT REQUESTED** |
| STEVEN E. NOTHERN, | : : | |
| Defendant. | : : | |

**DEFENDANT STEVEN NOTHERN'S AMENDED MEMORANDUM IN
SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000

Dated:  February 17, 2006

This is not the typical insider-trading case involving public companies and their publicly traded shares. Rather, the Securities and Exchange Commission ("SEC") seeks to hold defendant Steven E. Nothern, a former bond portfolio manager at Massachusetts Financial Services Company (MFS), liable for alleged "insider trading" of government treasuries issued by the United States, based on information Nothern learned from an MFS consultant who obtained it at a press conference conducted by the Treasury Department itself. Treasury's disorganized release of information on October 31, 2001 led to a series of investigations conducted by several different federal agencies, including Treasury, the Justice Department, and the SEC, working in close coordination. Yet the SEC now refuses to produce any documents currently held by the other federal agencies, on the theory that they are strangers to these proceedings. Nothern submits this memorandum in support of his motion to compel the government to comply with its discovery obligations.

## BACKGROUND

**A.      Treasury's Release of the Information.**

Nothern's review of documents produced to date discloses the following facts. At the time in question, Nothern was a portfolio manager who managed mutual funds invested primarily in government bonds. *See* Exhibit ("Ex.") A to Declaration of Kevin B. Currid filed herewith ("Currid Decl.") at 20. One instrument in which the funds Nothern managed invested was the 30-year Treasury bond, also called the "long bond."

On October 30, 2001, Treasury issued a press release stating that Under Secretary of the Treasury Peter R. Fisher, rather than the more typical junior official, would be speaking at the Treasury's quarterly refunding announcement the following day. *See* Ex. B to Currid Decl. There was widespread speculation and rumors that Fisher would announce the suspension or cancellation of the 30-year bond. For example, during the week prior to the announcement, a

member of Lehman Brothers who had just met with Paul Malvey, Director of Treasury's Office of Market Finance, asked another official whether Treasury would be suspending issuance of the 30-year bond. *See* Ex. C to Currid Decl. at 1. An employee of IDEAglobal, a market intelligence firm, called a bond trader at Morgan Stanley at 2:00 p.m. on October 30 to seek confirmation "that there would be a major announcement concerning the long bond in the U.S. Treasury's refunding announcement the next day." *See* Ex. D to Currid Decl. at 1. At 9:10 a.m. on October 31, an e-mail sent to a trader at Goldman Sachs stated that "there are many plenty of rumors floating around about a potential change to future Treasury issuance," including "30yr elimination." *See* Ex. E to Currid Decl.

The press conference on October 31 was ostensibly intended for "credentialed" press, but anyone who had gained access to the Treasury building that morning was free to attend. *See* Ex. F to Currid Decl. at 44. The back door to the room where the conference was held was kept open, and there was no security to prevent anyone from entering or leaving. *Id.* at 44-45. Among those attending was Peter J. Davis, a consultant and former staffer on Capitol Hill. *See* Ex. G to Currid Decl. at 3. Although he wrote a newsletter for his clients, Davis did not have Treasury press credentials. *Id.* at 9-10.

Under Secretary Fisher spoke from approximately 9:00 to 9:25 a.m. He announced that Treasury was going to suspend issuance of the 30-year bond. Treasury officials distributed hard copies of Fisher's statement containing the caption "FOR IMMEDIATE RELEASE." *See* Ex. H to Currid Decl. A Treasury spokesperson, however, announced a press "embargo" time of 10:00 a.m. According to an official cited in Treasury's Office of Inspector General report, this was the first time Treasury itself had purported to set an embargo time prior to the press conference. Ex. G to Currid Decl. at 7. Previous embargo times had been selected by the reporters present in order to allow them to write and file their stories without pressure of being "scooped" by a

competitor.  Jill Ouseley, the former Director of the Office of Market Finance, testified that the
only sanction that reporters who violated the embargoes faced was exclusion from future press
conferences ─ and not even that policy was communicated to the reporters.  Ex. F to Currid
Decl. at 45-48.  Unlike other departments releasing market-sensitive information (such as the
Labor Department), Treasury did not lock attendees in the press conference room, and Davis and
others left when it was over.  *See* Ex. G to Currid Decl.  In a subsequent conversation with
Ouseley, Malvey ascribed the decision to delay the press embargo until 10:00 a.m. to the
"hubris" of Under Secretary Fisher, since "everybody knew there was a chance that it would
leak" before then.  Ex. F to Currid Decl. at 30-31.

At 9:35 a.m., Brian Collins, a reporter from the *National Mortgage News* who had
attended the press conference, called Janis Smith at the Federal National Mortgage Association
(FNMA), told her the news, and asked for a comment.  *See* Ex. I to Currid Decl. at 1.  Another
FNMA employee overheard the call, and by 9:50 a.m. Smith had relayed the news to at least <u>nine</u>
other persons, including a trader and a salesperson at Salomon Smith Barney.  *Id.* at 2.
Furthermore, "about 70 people" at FNMA had "heard some market chatter (through dealer calls
and the like) before 10:00 a.m. on 10/31/2001 about the suspension of the long bond."  *See* Ex. J
to Currid Decl.

That same morning, the funds Nothern managed had excess cash to be invested in
government bonds.  Around 9:30 a.m., Nothern noticed that the price of 30-year bonds was
increasing.  The Bloomberg day chart for October 31, 2001 showed an initial increase in the
price of the 30-year bond from 8:50 to 9:00 a.m., and then a steady climb beginning at
approximately 9:27 a.m.  *See* Ex. K to Currid Decl.

According to the government, Davis made at least nine (9) telephone calls to his clients
after leaving the press conference.  Complaint ¶ 32.  The second-to-last of these was a voice mail

message for Nothern at approximately 9:38 a.m., according to Davis's cell phone bill.  *Id.* ¶ 34.

The government alleges that the announcement on the 30-year bond was posted on the staging server of Treasury's web site at 9:40 a.m. and accessible to the public at 9:43 a.m., as recorded by the Treasury computer system.  *See id.* ¶ 32; Ex. L to Currid Decl.  (The accuracy of the clock on the Treasury computer system was later checked only by comparison with a watch and a cell phone clock.  *See* Ex. L to Currid Decl. at 3.)

At some point, Nothern noticed that his telephone voice mail light was on.  Ex. A to Currid Decl. at 108.   After listening to Davis's message, which took about a minute, Nothern walked over to another MFS portfolio manager and relayed the news about Davis's message, as well as information about suspension of the bond that he had learned was circulating on the Chicago Board of Trade that morning.  *Id.* at 125, 147-48, 156.  Nothern and other MFS portfolio managers then authorized a MFS trader to purchase a total of $65 million in 30-year bonds.  *Id.* at 151.  Less than a minute after having done so verbally, one manager confirmed the order in writing at 9:42:49 as recorded on the MFS system (which the SEC has apparently never determined to be accurate or synchronous with the Treasury Department's system).  *See* Ex. M to Currid Decl.; Ex. N to Currid Decl. at 88-89.  The trader placed the order with Merrill Lynch's office in Boston at 9:42 according to a Merrill Lynch clock, again of undetermined accuracy. *See* Ex. O to Currid Decl.  The Boston office apparently relayed the order to Merrill Lynch's office in New York, which in turn had to offer a price, which the Boston office would pass on to MFS for acceptance.

Notwithstanding the purported 10:00 a.m. embargo, Reuters news service reported the 30-year bond announcement at 9:52 a.m.  *See* Ex. P to Currid Decl.

## B.  Coordinated Government Investigations

On November 6, 2001, Treasury's General Counsel sent the Chairman of the SEC a letter

"referring a matter for investigation" and asking to be kept advised. *See* Ex. Q to Currid Decl. The SEC complied, and by December 2001 it had obtained testimony from Nothern and others.

The SEC also participated in the interviews of Treasury employees conducted by Treasury's Office of Inspector General (OIG) in late 2001. After having supplied drafts to the SEC, OIG completed its report in January 2002. *See* Ex. G to Currid Decl.[1] Eight of the interview memoranda attached to the OIG report state that the subjects were "interviewed by attorneys Andrew Sporkin . . . and Rosemary Filou . . . of the Division of Enforcement, United States Securities and Exchange Commission (SEC), in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG)." *See, e.g.*, Ex. R to Currid Decl.

In September 2003, the SEC filed suit against Davis, John Youngdahl (an officer of Goldman Sachs whom Davis had called first), and Nothern in the Southern District of New York in September 2003. The SEC simultaneously reached a separate settlement with Nothern's former employer, MFS, under which MFS did not admit insider trading but admitted that its employee training manual did not discuss "the use of consultants by MFS or the handling of information obtained from consultants"; "the potential that consultants like Peter Davis could obtain and provide material non-public information to the firm"; or "the potential for misuse of material non-public information relative to debt securities, and in particular Government-issued securities." *In re Massachusetts Financial Servs. Co.*, File No. 3-11241 (SEC Sept. 4, 2003).

At the same time the SEC was conducting its investigation, the U.S. Department of Justice was conducting a parallel criminal investigation, which in 2003 yielded an indictment of Youngdahl and a plea to a criminal information by Davis in the Southern District of New York. *See United States v. Davis*, Criminal Action No. 03-1054 (S.D.N.Y.); *United States v.*

---

[1] Counsel for Nothern provided the Court with an unredacted copy of this report at the scheduling conference on October 14, 2005.

*Youngdahl*, Criminal Action No. 03-0991 (S.D.N.Y.). Nothern voluntarily participated in the Justice Department's investigation. The privilege log recently produced by the SEC shows numerous instances of memoranda, notes, and other legal documents being exchanged between February 2002 and February 2004 between the SEC and the U.S. Attorney's Office in Manhattan. *See* Ex. S to Currid Decl.

In November 2003, the SEC voluntarily dismissed its complaint against Nothern, who had objected to jurisdiction. The SEC filed the present case against Nothern in this district on May 11, 2005, 17 months later and more than three and a half years after the events at issue. Although Nothern personally made no profit, the SEC seeks "disgorgement" of supposed profits in the amount of $3.1 million, an unspecified fine, and an injunction forbidding him from violating the securities laws. The requested injunction would have the practical effect of making Nothern unemployable in the securities industry under Sections 3(a)(39) and 15(b)(4) of the Exchange Act and NASD By-Law Article III, Section 4. *See, e.g.*, *In re Kantrowitz*, No. 3-11372, 2005 WL 424921, at *1 & n.1 (SEC Feb. 22, 2005).

### C.    The SEC's Refusal to Produce Documents

On September 27, 2005, Nothern served his First Request for Production of Documents (attached as Ex. T to Currid Decl.). The instructions to his request stated that "[i]f a document is in the possession, custody or control of any department or agency of the United States government, it is deemed to be in the possession, custody or control of the SEC for purposes of this Request." The SEC's response (attached as Ex. U to Currid Decl.) stated:

> Plaintiff objects to Defendant's Instruction No. 5 on the grounds that the Plaintiff in this action is the SEC, which is an independent agency of the federal government. Documents that are within the possession custody or control of any agency or department of the United States government, other than the SEC are deemed not to be in the possession custody or control of the SEC. *See United States v. American Telephone & Telegraph Co.*, 461 F. Supp. 1314, 1334-1336 (D.D.C. 1978).

**D.     The Parties' Rule 37.1 Conference**

Following an exchange of correspondence, *see* Ex. V to Currid Decl. (letters dated Nov. 3, Nov. 18, and Dec. 7, 2005), the parties held an hour-long telephone conference on December 13, 2005.  In an effort to resolve the dispute, Nothern proposed that the SEC make requests for the documents to the other government agencies.  If the other agencies complied, the issue would become moot; if the agencies refused, then the parties could litigate what the consequences should be, with the SEC being able to claim that it had requested the documents in good faith.

The SEC refused to accept that proposal.  Instead, the SEC stated that it would ask other government agencies for the documents only on four conditions:  (1) that Nothern limit the agencies to which the SEC had to send requests; (2) that he make his requests narrower and more specific; (3) that he waive any right to a privilege log of documents withheld by other agencies; and (4) that he waive the right to file a motion to compel (or for sanctions) against the SEC in the event the other agencies refused to provide documents.  Nothern's counsel agreed to make his document requests more specific for this purpose.  As for limiting the number of government agencies to which the requests would be sent, counsel asked the SEC to identify all the agencies that have been involved in 30-year bond incident and subsequent investigations.  SEC counsel acknowledged that the Commodities Future Trading Commission has been involved, but otherwise refused to provide a definite answer regarding other government departments.

Most importantly, Nothern did not agree to waive the right to move to compel or for dismissal if the government refuses to provide documents relevant to his defense, or to waive a privilege log.  The parties agree that the matter is ripe for resolution by the Court.  *See* Ex. V to Currid Decl. (letters dated Dec. 16 and Dec. 20, 2005).

## ARGUMENT

I. **THE SEC UNJUSTIFIABLY REFUSES TO PRODUCE HIGHLY RELEVANT DOCUMENTS MAINTAINED BY OTHER FEDERAL AGENCIES.**

    A. **Were Nothern's Trades Before or After the Suspension Was Public?**

The documents Nothern seeks from the government are directly relevant to the allegations the SEC has made against him. If these documents are not provided, critical facts about this case may never be disclosed. For example, to establish Nothern's liability for insider trading, the SEC must prove, among other things, that Nothern traded on the information before it was already public. But there is already significant evidence that the news of the suspension of the long bond was public well before 9:38 a.m. on October 31, 2001, and other government departments likely have more.

Nothern's requests encompass all documents concerning rumors and other information on the possible suspension of the 30-year bond (Requests 33 and 45), all documents concerning press embargoes (Request 37), and all documents supporting or contradicting the allegations in the SEC's Complaint (Request 64) — including the allegation that "Treasury required that all persons granted access to the conferences maintain the strict confidentiality of all information disclosed . . . until expiration of the embargo at a predetermined announced time." Complaint ¶ 22. Nevertheless, so far he has received only two documents involving the Federal National Mortgage Association — a four-page letter and notes on a telephone conversation — and no other documents regarding the *National Mortgage News* reporter who broke Treasury's supposed press embargo three minutes before Davis allegedly left a message for Nothern.

Even accepting for sake of argument the SEC's allegation that the information became public at 9:43 a.m., it is doubtful that any trading directed by Nothern was accomplished by then. Relying on the crude comparisons to a cell phone clock and a personal watch noted above, Treasury officials have asserted that Undersecretary Fisher's statement on the 30-year bond was

8

put on Treasury's Internet "staging server" at around 9:40 a.m. and posted on Treasury's web
site at around 9:43 a.m.  The only MFS record of which Nothern is aware with a time is of an
order given at 9:42:49 a.m. to a trader — who in turn had to place the order with a counterparty's
Boston office, which in turn had to contact the New York office.

Where a man's career could turn on a matter of seconds, discovery into the accuracy of
the clocks at the Treasury Department will be required.  So far, the SEC has not produced any
records held by Treasury relating to the timing of its release of the information, beyond the
imprecise estimates set forth in the OIG report.  Furthermore, although the SEC has alleged that
Nothern directed trading before 9:43 a.m., Complaint ¶ 37, it has so far produced <u>no</u> direct record
of the time of trades (as opposed to the placement of an <u>order</u> at 9:42).  At the scheduling
conference held by the Court on October 14, 2005, counsel for the SEC stated that she could
only anticipate that the time of trading would be established in discovery.

### B.    Was Davis Actually Under a Fiduciary Duty of Non-Disclosure?

Treasury and other agencies are also likely to have critical documents bearing on another
element of the SEC's case, that is, whether the Treasury's practices and procedures imposed a
fiduciary duty of non-disclosure on the press conference attendees such as Davis of which
Nothern should have been aware (and whether such a duty would be consistent with the First
Amendment).  *See Dirks v. SEC*, 463 U.S. 646 (1983) ("[T]ippee responsibility must be related
back to insider responsibility by a necessary finding that the tippee knew the information was
given to him in breach of a duty by a person having a special relationship to the issuer not to
disclose the information.") (citation omitted).  In particular, Nothern is entitled to more
information than has been provided about Treasury's policies and procedures for admitting
persons to press conferences and the Treasury building itself; about press "embargos" and
confidentiality requirements for Treasury refunding press conferences; about Secret Service logs

reflecting other occasions when Davis entered the Treasury building prior to June 2001; and about appointment logs, daily calendars, and e-mail correspondence for Jill Ouseley, Paul Malvey, and Lula Tyler — the Treasury employees who apparently permitted Davis to attend press conferences notwithstanding the lack of any credentials.  None of the documents thus far produced by the SEC establishes who made the decision to clear Davis to attend Treasury refunding press conferences.[2]  Furthermore, it is unclear just what the press thought an "embargo" might have meant, since at least one reporter called FNMA for comment at 9:35 and Reuters issued a report at 9:52 a.m. by its clock.  Accordingly, the SEC should obtain this discovery from Treasury.

## II. THE SEC MAY NOT REFUSE TO COMPLY WITH ITS DISCOVERY OBLIGATIONS SIMPLY BECAUSE RELEVANT DOCUMENTS ARE HELD BY OTHER FEDERAL AGENCIES.

### A.    The SEC Must Produce Relevant Documents Held by Other Agencies.

The SEC refuses to produce any documents held by other government agencies, regardless of whether the documents are relevant to this case or have been previously reviewed (but not kept) by SEC attorneys.  It refuses to even make a request to other agencies without a waiver by Nothern of any right to relief for non-compliance.

The law is otherwise.  In *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979), this Court considered a Rule 34 request served by the defendant on the plaintiff, an agency of the Republic of Ghana.  The Court ordered the agency-plaintiff to produce all relevant documents from <u>all</u> agencies of that government, "not just those in its immediate possession."  *Id.* at 595.  It explained:

---

[2] During his interview in November 2001 by the SEC and the Treasury OIG, Paul Malvey, Director of the Office of Market Finance, stated that his predecessor, Jill Ouseley, had approved Davis's admittance to earlier press conferences, beginning in at least 1996.  *See* Ex. R to Currid Decl. at 2-3.  Ouseley, however, stated during her interview, and reiterated in testimony, that she did not know who Peter Davis was, nor did she recall ever admitting him to a refunding press conference.  *See* Ex. F to Currid Decl. at 25-29; Ex. W to Currid Decl.

> When an agency of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff. If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.

*Id.* at 595 (internal citations omitted). Precisely the same reasoning applies here. The SEC is an enforcement agency of the U.S. government. It is undisputed that in this case the SEC worked in coordination with Treasury, Justice, and the CFTC in investigating Treasury's botched release of information on the 30-year bond. It is disingenuous for the SEC now to refuse to produce documents held by these agencies on the ground that they are not in its immediate possession.

In other cases involving actions initiated by U.S. agencies, courts have required the plaintiff agencies to produce documents held by other federal agencies. In *Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964), the court ruled that the National Labor Relations Board could not maintain an action for unfair labor practices while refusing to produce statements made by key witnesses to the Department of Labor and the FBI. "The Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States," the court explained. *Id.* at 754. "In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements . . . simply because the documents rested in the hands of another federal agency, and we perceive no valid distinction, for this purpose, between that case and this one." *Id.*

Similarly, in *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), the court dismissed an antitrust action brought by the Department of Justice because that agency had failed to comply with a discovery order concerning documents held by the Executive Office of the President. The "true plaintiff" in the case, the court reasoned, was the "Government of the United States acting on behalf of its citizens." *Id.* at 419. In determining

11

whether the plaintiff complied with the court's discovery orders, the court "look[ed] to the actions or inaction of the government as a whole, not just the Department of Justice, including any action or inaction of the Executive Office of the President and its staff." *Id. See also Bank Line v. United States*, 76 F. Supp. 801, 803-04 (S.D.N.Y. 1948) (Department of Justice could not bring suit for damages payable to Treasury where Navy refused to produce relevant documents); *Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003) (compelling defendant state officials to produce documents in possession of non-party agencies).

### B.    Nothern Has No Other Means of Obtaining the Information

### 1.    Rule 45 Subpoenas to Other Agencies Are Unenforceable

The SEC cannot justify its failure to comply on the theory that Nothern may obtain the information through other means, such as third-party subpoenas under Rule 45. Nothern would have to litigate his subpoenas against the federal government in the District of the District of Columbia, which currently prohibits the enforcement of <u>all</u> Rule 45 subpoenas served on federal agencies.[3] Indeed, the SEC's position implies that it will likewise refuse to procure the attendance at depositions of Treasury Department employees, who are likewise deemed immune from subpoena.[4]

---

[3] *See Truex v. Allstate Ins. Co.*, No. 05-00439ESHJMF, 2006 WL 47647, at *4 (D.D.C. Jan. 10, 2006); *United States v. Gabelli*, No. MISC.04-534 RJL, 2005 WL 2375173, at *2 (D.D.C. May 3, 2005); *Yousuf v. Samantar*, No. MISC.05-110 (RBW), 2005 WL 1523385, at *4 (D.D.C. May 3, 2005); *Lerner v. District of Columbia*, No. Civ.A.00-1590 GK, 2005 WL 2375175, at *4 (D.D.C. Jan. 7, 2005). In each of these cases, the district court ruled that the term "person" in Rule 45 does not include federal agencies. *See also Al Fayed v. Central Intelligence Agency*, 229 F.3d 272, 275 (D.C. Cir. 2000) (holding that the United States and its agencies are not covered by the term "person" as used in 28 U.S.C. § 1782); *Linder v. Caolero-Portocarrero*, 251 F.3d 178, 181 (D.C. Cir. 2001) ("Although our past decisions have assumed that 'person' in Rule 45 included the federal government, we have never expressly so held and our assumption may need to be reexamined in light of *Al Fayed*.").

[4] In the last year, courts in the D.C. Circuit have refused to enforce deposition subpoenas against federal employees, reasoning either that the term "person" in Rule 45 does not include the federal government, *see, e.g., Lerner v. District of Columbia*, 2005 WL 2375175, at *1, or that sovereign immunity prohibits the enforcement of subpoenas against employees of a federal agency that has enacted housekeeping regulations, *see, e.g., Ho v. United States*, 374 F. Supp. 2d

### 2.    FOIA Is Inadequate

Nor can the SEC argue that Nothern may adequately obtain documents through the Freedom of Information Act (FOIA), 5 U.S.C. § 552.  FOIA contains exemptions from disclosure that are even broader than those recognized under Rule 45 discovery, including exemptions for records or information compiled for law enforcement purposes and records containing information affecting an individual's privacy.  Counsel for Nothern have in fact submitted FOIA requests for relevant documents to the Treasury Department and Justice Department, and so far have received little of use.  Treasury supplied its OIG report, but with nearly every name in the report redacted.  More recently, counsel submitted a FOIA request to the Justice Department asking for documents relating to the prosecutions of Peter Davis and John Youngdahl.  *See* Ex. X to Currid Decl.  In response, Justice invoked FOIA's individual privacy exemption and refused to provide any nonpublic documents involving third parties (such as Davis and Youngdahl) "absent express authorization and consent of the third party," which has not been supplied.  *See* Ex. Y to Currid Decl.

### 3.    Agency "Housekeeping" Rules Make Production Purely Voluntary

The SEC likewise cannot seriously suggest that Nothern has a realistic opportunity of obtaining the documents by requesting them directly from the other government agencies.  Each agency has promulgated "housekeeping regulations" that give the agency or department broad, even limitless, discretion to deny such requests.  *See, e.g.*, 31 C.F.R. § 1.11 *et seq.* (Treasury regulations); 28 C.F.R. § 16.21 *et seq.* (Justice regulations).  For example, Treasury's regulations set forth a long list of justifications for denying requests, including that the requests are "unduly

---

82, 83-84 (D.D.C. 2005).

As noted previously, this is not the typical insider-trading case involving a publicly held company, where the defendant can easily request documents and subpoena witnesses from the company.

burdensome," would involve Treasury "in controversial issues unrelated to the Department's mission," would compromise "the time of employees for conducting official business," would "otherwise . . . be inappropriate under the circumstances," or because of "[a]ny other factor that is appropriate." *See* 31 C.F.R. § 1.11(e)(1). The D.C. Circuit has upheld the right of agencies to refuse document requests so long as they comply with their own minimal standards. *See Al Fayed v. Central Intelligence Agency*, 229 F.3d 272, 275-76 (D.C. Cir. 2000). The SEC, by contrast, has the authority to request documents directly from the other agencies without having to resort to their housekeeping regulations. *See, e.g.*, 31 C.F.R. § 1.12 (stating that Treasury's regulations "shall not be applicable to official requests of other governmental agencies or officers thereof"); 28 C.F.R. § 16.21(c) (same for Justice). Yet it has simply refused to do so.

It is therefore no exaggeration to conclude that the SEC's refusal to request and produce documents currently held by Treasury and other government agencies is likely to prevent Nothern from obtaining documents that are critical to his defense. This is particularly so where the Treasury has an institutional interest in blaming private parties such as Nothern for its own disorganized release of market-moving information.

### C.    The Ruling in *United States v. AT&T* Does Not Support the SEC's Argument for Exceptional Treatment under the Discovery Rules.

In justifying its refusal to produce the documents in question, the SEC has primarily relied on *United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978). Of course, this Court's ruling in *Ghana Supply Comm'n* establishes the law of this District, not *AT&T* (decided a year earlier and in a different district), and to the extent *AT&T* is inconsistent with this controlling law, it should not be followed.

Even assuming that *AT&T*'s analysis controls, it is of little help to the SEC. In *AT&T*, a civil enforcement action under the Sherman Act, the defendants sought documents from forty

14

government agencies.  *Id.* at 1330.  The Justice Department argued that "only it is a party, and that discovery from other government agencies and departments must proceed under the more restrictive provisions of Rule 45" or through voluntary requests.  *Id.* at 1330.  Rejecting Justice's argument with respect to the overwhelming majority of agencies, the district court issued an order "that for purposes of discovery under the Federal Rules of Civil Procedure the plaintiff in this case shall consist of the United States Department of Justice <u>and all other agencies, departments, and subdivisions of the Executive Branch of the United States government</u>, but shall not include the Federal Communications Commission and other independent regulatory agencies, or the United States Postal Service."  *Id.* at 1349 (emphasis added).

As quoted above, the court in *AT&T* declined to extend the Justice Department's Rule 34 discovery obligations to documents held by the FCC, an independent regulatory agency.  "[B]oth as a conceptual and as a practical matter," the district court reasoned, "the [FCC] is free from executive control and not answerable to instructions from the President or the Attorney General."  461 F. Supp. at 1336.  Citing this part of the *AT&T* ruling, the SEC has sought to distinguish the cases cited by Nothern on the ground that, unlike *AT&T*, they did not involve requests to obtain documents from independent regulatory agencies.

Yet Nothern mainly seeks to obtain documents held by <u>non-independent</u> agencies such as Treasury and Justice.[5]  The fact that an independent agency initiates the litigation is irrelevant.  This point was clearly established in *Harvey Aluminum*, where court held that the NLRB — also an independent agency — could not maintain an action for unfair labor practices while refusing to produce statements made by key witnesses to the Department of Labor and the FBI.

---

[5]To counsel's knowledge, the only independent agency other than the SEC that has been involved in this matter is the Commodity Futures Trading Commission (CFTC).  Nothern submits that, in any event, he is entitled to relevant documents held by the CFTC under (a) this Court's holding in *Ghana Supply Comm'n*, as discussed in Section II.A, *supra*, and (b) the Due Process Clause, as discussed in Section III, *infra*.

In one of its letters to Nothern, the SEC attempted to try to distinguish *Harvey Aluminum* by suggesting that it involved the production of documents "held within one branch of government." *See* Ex. R to Currid Decl. (letter dated Nov. 18, 2005, at 2). But that is the situation here: in an action instituted by an independent regulatory agency (NLRB/SEC), the defendant sought the production of relevant documents held by non-independent executive agencies (Department of Labor/Treasury/Justice). Indeed, the court in *AT&T* itself distinguished *Harvey Aluminum* on this basis, stating that the Ninth Circuit was concerned with documents "in the possession of executive departments" and observing that the "President was held to have adequate authority over such departments to procure production, and the courts to order it." 461 F. Supp. at 1336 n.63.

Nor can *Harvey Aluminum* be distinguished on the ground that it involved the production of statements required to be produced under *Jencks v. United States*, 353 U.S. 657 (1957), not a request for documents under Federal Rule of Civil Procedure 34. *Harvey Aluminum*, *Ghana Supply Comm'n*, and *National Broadcasting Co.* stand for the proposition that where a duty to produce documents exists in the law, a government agency such as the SEC cannot circumvent that duty by arguing that the documents are currently held by a separate (non-independent) agency, so long as the first agency has the right, authority, or ability to request the documents from the second. Indeed, this is exactly how this District interpreted the rule established in *Harvey Aluminum* in the context of a Rule 34 request for production of documents:

> When an agency of government institutes suit, <u>any obligation to disclose relevant information</u> extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff. Annot. 95 L. Ed 425, 445 (1951); see, *Harvey Aluminum (Incorporated) v. N.L.R.B.*, 9 Cir. 1964, 335 F.2d 749, 754-55 . . . .

*Ghana Supply Comm'n*, 83 F.R.D. at 595 (emphasis added).

**D.    Inter-Agency Disputes Do Not Excuse the Violation of Nothern's Rights**

As discussed in Section B of the Background, *supra*, the SEC has worked in close coordination with other government agencies in conducting its investigation and initiating suit against Nothern.  Treasury referred this matter for investigation by the SEC, and SEC attorneys interviewed Treasury employees who were summoned under the authority of Treasury's Inspector General.  The SEC also worked closely with prosecutors from Justice, and indeed now claims privilege for multiple memoranda and other legal documents exchanged between the SEC and Justice over a two-year period.  *See* Ex. S to Currid Decl.  Having so coordinated its investigative and litigation efforts with other government agencies, there is no reason why the SEC cannot and should not disclose all relevant documents held by the government whose interests it represents.  Even assuming that the SEC might now experience some difficulty in obtaining documents from other agencies, that is a problem that must be resolved between the agencies or perhaps through legislation, but not suffered by Nothern.

In *Harvey Aluminum*, the NLRB objected that the court's ruling left it "at the mercy of the fortuitous coincidences of investigations conducted by this and other agencies — each concerned only with the administration of its laws."  335 F.2d at 755.  "This may well be true," the court observed, but it was "less defensible still to resolve such agency disputes" by allowing the government to proceed with its enforcement action against a defendant who had been denied documents to which he is entitled.  *Id.*  The interests of a government agency "in maintaining the privacy of its files" cannot take precedence over a defendant's rights.  *See id.*  Similarly, in *AT&T* the court rejected the Justice Department's argument that it had little influence over other agencies of the government:  "Obviously, defendants have even less influence over the agencies, and as the entities which have been sued, they are entitled to their discovery rights irrespective of the effect on inter-departmental relationships."  461 F. Supp. at 1334 n.58.  Thus, even if the

responsibility for the failure to produce relevant documents were to lie not with the SEC, but with another government agency, the appropriate remedy would be dismissal, not the violation of Nothern's rights to discovery and due process.

### III.    THE SEC'S REFUSAL TO PRODUCE RELEVANT DOCUMENTS HELD BY OTHER FEDERAL AGENCIES VIOLATES THE DUE PROCESS CLAUSE.

#### A.    Nothern's Due Process Rights Are Implicated

Federal civil enforcement actions must be conducted in a manner consistent with the Due Process Clause of the Fifth Amendment.  "[T]he laws under which these agencies operate prescribe the fundamentals of fair play.  Their proceedings must satisfy the pertinent demands of due process." *Harvey Aluminum, Inc. v. NLRB*, 335 F.2d at 753 (internal quotation omitted).[6]

Clearly, the $3.1 million disgorgement order and fine sought by the SEC in this case involve significant deprivations of property sufficient to trigger protection under the Due Process Clause of the Fifth Amendment to the United States Constitution.  Even more onerous is the requested injunction which would have the effect of disqualifying Nothern from employment in the securities industry.

#### B.    The SEC's Refusal Compromises the Fairness of This Proceeding

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  In determining what process is required in a given situation, a court must consider the government's interest in pursuing particular procedures, the private interests of those affected by them, the risk of erroneous deprivations through the challenged procedures, and the probable value of additional or substitute procedural

---

[6] The SEC has acknowledged this constitutional duty.  Indeed, in a recent speech the Director of its Division of Enforcement claimed that the SEC's enforcement actions "our actions are the product of more due process than any government prosecutor anywhere in the world gives to putative defendants."  Stephen M. Cutler, *Remarks before the Directors' Education Institute at Duke University:  Staying the Course* (Mar. 18, 2005), available at *http://www.sec.gov/news/speech/spch031805smc.htm*.

safeguards.  *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Here, the SEC refuses to produce potentially exculpatory documents that are in the possession of other government agencies, with which it has coordinated its investigative and prosecutorial efforts during the last four years.  It justifies this refusal on the ground that "the SEC is not under any obligation to conduct Nothern's discovery for him," *see* Ex. R to Currid Decl. (letter dated Nov. 18, 2005, at 3), even though the law is clear that Nothern has no other means of obtaining the information, *see* § II.B, *supra*.  Indeed, under the SEC's theory, it has the right to proceed with its enforcement action even in the event that Nothern is prohibited from deposing Treasury employees with critical information about the SEC's allegations.

It is well established that a denial of discovery that results in gross injustice or otherwise compromises the fundamental fairness of a proceeding violates the Due Process Clause.  S*ee Green v. McElroy*, 360 U.S. 474, 496-97 (1959); *In re Herndon*, 596 A.2d 592, 595 (D.C. 1991). Here, the SEC's refusal to request documents from other government agencies has severely limited Nothern's ability to obtain evidence that could exculpate him from liability and has increased the likelihood that an erroneous determination will result in this proceeding.  By contrast, the SEC's interest in not producing the documents held by the other government agencies is, at best, a matter of administrative convenience.  At worst, it is the case of an agency that has the ability to obtain (and has obtained) potentially favorable evidence from other government agencies, but declines to exercise that authority to obtain potentially unfavorable evidence ─ of which it may even be aware ─ that is otherwise unavailable to the defense.

Under these circumstances, all the *Mathews v. Eldridge* factors support the imposition of a simple procedural safeguard:  an order directing the SEC to request, obtain, and produce to

Nothern all relevant documents held by the federal agencies in question.[7]  In the alternative, or in the event that the SEC continues to withhold relevant documents, this Court should follow well-established precedent and refuse to allow the SEC to proceed with its action against Nothern. *See, e.g.*, *Nat'l Broadcasting Co.*, 65 F.R.D. at 419; *Bank Line v. United States*, 76 F. Supp. at 803-04.  This Court has specifically held that government agencies that impede discovery on this basis risk dismissal of their action.  *See Ghana Supply Comm'n*, 83 F.R.D. at 595 ("If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.").

## CONCLUSION

For the foregoing reasons, the Court should enter an order compelling the government to produce all relevant documents requested by Nothern that are held by the SEC, the Treasury Department, the Justice Department, and any other federal agency.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  February 17, 2006

---

[7] In issuing this order, the Court should decline to excuse production of a privilege log for any documents withheld by the responding agencies as required under Local Rule 34.1(e).  Indeed, the SEC's delay of over three years in filing the present action against Nothern may have resulted in the destruction of documents at their original sources, justifying the disclosure by agencies of documents that would otherwise be protected as work product, and there is thus an even greater need for a log in this as opposed to other cases.