# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05-CV-10983 (NMG) |
| Plaintiff, | ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF JOHN J. ROSSETTI JR. FILED IN SUPPORT OF U.S. SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT STEVEN E. NOTHERN'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

John J. Rossetti Jr., pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury as follows:

1. I am a senior counsel for the Securities and Exchange Commission in the above-captioned matter. I am a member of good standing of the New York, Maryland, and District of Columbia bars. Except where otherwise indicated, I make this declaration based upon my own personal knowledge and information and belief, the source being the public records, the documents thus far produced during discovery, and other documents concerning this action.

2. In early November 2001, based on media reports and communications with Treasury, the Staff of the SEC's Enforcement Division (the "Staff") initiated its pre-lawsuit investigation of possible illegal insider trading in the 30-year bond to determine if there were any violations of the federal securities laws. The Staff conducted its investigation of this matter independent of any investigation being conducted by the Treasury's Office of Inspector General ("OIG"), or any

other office in the Treasury. The SEC did not provide any substantive updates of its investigation to Treasury. Rather, the SEC, as a courtesy, merely notified Treasury of events related to the SEC's investigation, such as the fact that the SEC was filing its September 3, 2003 complaint.

3. From November 7, 2001 through October 30, 2002, the Staff conducted twelve interviews of eleven then present and former Treasury employees. The Staff also took the investigative testimony of one of the eleven employees. The Staff only conducted interviews of employees which it scheduled. Furthermore, OIG did not attend four of the witness interviews scheduled by the SEC, three of which were conducted after OIG issued is January 2, 2002 Report of Investigation.

4. A true and correct copy of a memorandum of activity concerning the Treasury OIG November 7, 2001 interview of Elizabeth Holahan is attached hereto as Exhibit A.

5. A true and correct copy of a memorandum of activity concerning the Treasury OIG November 14, 2001 interview of Tony Fratto is attached hereto as Exhibit B.

6. A true and correct copy of a memorandum of activity concerning the Treasury OIG November 14, 2001 interview of Frances Anderson is attached hereto as Exhibit C.

7. A true and correct excerpt from the Peter J. Davis Jr. September 3, 2003 Criminal Plea Hearing Transcript is attached as Exhibit D.

8. A true and correct excerpt from the Peter J. Davis Jr. March 18, 2005 Criminal Sentencing Hearing Transcript is attached as Exhibit E.

9. A true and correct copy of Peter J. Davis Jr.'s cell phone records from October 31, 2001 is attached hereto as Exhibit F.

10. True and correct excerpts from Steven E. Nothern's December 4, 2001 SEC Investigative Testimony is attached hereto as Exhibit G.

11. A true and correct copies of Geoffrey Kurinsky's December 12, 2001 SEC Investigative Testimony is attached hereto as Exhibit H.

12. A true and correct copies of David Kennedy's December 21, 2001 SEC Investigative Testimony is attached hereto as Exhibit I.

13. A true and correct copies of D. Richard Smith's December 21, 2001 SEC Investigative Testimony is attached hereto as Exhibit J.

14. A true and correct copy of trading records from Merrill Lynch dated October 31, 2001 with MFS are attached hereto as Exhibit K.

15. A true and correct copy of the November 9, 2001 letter from Megan E. Hills, Treasury Associate Deputy General Counsel, to Mike Norr (sic), Treasury Office of Inspector General, is attached hereto as Exhibit L.

16. A true and correct copy of a memorandum of activity concerning the Treasury OIG December 19, 2001 interview of Megan Hills is attached hereto as Exhibit M.

17. A true and correct copy of a memorandum of activity concerning the Treasury OIG December 19, 2001 interview of Tony Fratto is attached hereto as Exhibit N.

18. A true and correct copy of a memorandum of activity concerning the Treasury OIG December 28, 2001 interview of Jill Ousley is attached hereto as Exhibit O.

19. A true and correct copy of the faxed copy of the Treasury OIG's January 2, 2002 Report of Investigation is attached hereto as Exhibit P.

20. True and correct copies of the November 9, 2001 access request by the United States Attorney for the Southern District of New York and the SEC's November 14, 2001 approval of the request are attached hereto as Exhibit Q.

I declare under the penalty of perjury that the foregoing is true and correct. Executed on March 3, 2006.

John J. Rossetti Jr.

# Exhibit A

**Memorandum of Activity Concerning the
Treasury OIG November 7, 2001 Interview of
Elizabeth Holahan**

# MEMORANDUM OF ACTIVITY

| Type of Activity: | | Case Number:<br>2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|---|
| X | Personal Interview | | |
| | Telephone Contact | Date:<br>November 7, 2001 | Michael Knorr, Investigator    _Michael C Knorr_ |
| | Records Review | | |
| | Other (Describe): | Time:<br>6:30 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Elizabeth Holahan**<br>**Public Affairs Specialist**<br>**Office of Public Affairs**<br>**Department of the Treasury**<br>**Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by attorneys Andrew Sporkin (202/942-4800) and Rosemary Filou (202/942-4768) of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activity in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

Elizabeth Holahan said she has been employed as a public affairs specialist by the Office of Public Affairs, since August 6, 2001. Her immediate supervisors are Tony Fratto, Director, Office of Public Affairs and Michele Davis, Assistant Secretary for Public Affairs.

Holahan said as part of her official duties, she helped coordinate the October 31, 2001, press conference where the

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103639

## MEMORANDUM OF ACTIVITY

suspension of the sale of the 30-year bond was announced.
Holahan said she announced three times at the press conference,
that the information presented by Under Secretary Fisher and
contained in the press release was embargoed until 10:00 a.m.
She said she mentioned the embargo at the beginning of the press
conference, before the question and answer period, and at the
conclusion.  She added that she gave the "ground rules" and
that the reporters were governed by the honor system to not
release the information prior to the embargo time.  She said no
one left the room prior to the conclusion of the conference, at
approximately 9:25 a.m.

Holahan said she did not know how the announcement was posted on
the Web site prior to the 10:00 a.m. embargo and that she was
"shocked" at what happened.  She said she was not aware of a
similar incident like this happening before.

Holahan said she looked at a copy of the press release following
the press conference, at approximately 10:15 a.m. and noticed it
said for immediate release, instead of an embargo time.  She
said she did not know how immediate release got placed on the
press announcement.  She said there were two versions of the
press release, one with the soft letterhead and the final
version with the hard letterhead.  The first version had the
embargo time on it, while the final version did not.  She said
she heard from Frances Anderson there was a problem in
formatting the press release so that it could appear on the Web
site.

Holahan said she did not know Peter Davis and only heard his
name after the fact.  She said she did not clear him into the
press conference.

Reviewed by: _____ Date: _____

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/2/02
Form OI-09

Office of the Inspector General -- Investigations
Department of the Treasury

SECNOTH00103640

# Exhibit B

**Memorandum of Activity Concerning the Treasury OIG November 14, 2001 Interview of Tony Fratto**



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview<br>[ ] Telephone Contact<br>[ ] Records Review<br>[ ] Other (Describe): | 2002-0104<br>**Date:**<br>November 14, 2001<br>**Time:**<br>4:00 p.m. | Michael Knorr, Investigator    *Michael C. Knorr* |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Tony Fratto**<br>**Director**<br>**Office of Public Affairs**<br>**Department of the Treasury**<br>**Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by attorneys Andrew Sporkin (202/942-4800) and Rosemary Filou (202/942-4768) of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activity in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

Tony Fratto said he was appointed Director of the Office of Public Affairs on March 1, 2001. He stated that he reports directly to Michele Davis, Assistant Secretary, Public Affairs. He said part of his responsibilities include coordinating press conferences and press releases.

Fratto said he was present at the October 31, 2001, 9:00 a.m. quarterly funding press conference. His subordinate Elizabeth

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

SECNOTH00103664

## MEMORANDUM OF ACTIVITY

Holahan, who helped coordinate the briefing, introduced Under Secretary Fisher and made the 10:00 a.m. embargo announcement. He said to the best of his knowledge no one left the room prior to the 9:25 a.m. conclusion of the conference.

Fratto said he first heard of the decision to suspend sales of the 30-year bond on Thursday, October 26, 2001. He said Under Secretary Peter Fisher informed him of the decision on that date, as they discussed procedures for the October 31st quarterly refunding press conference. Fratto said this was going to be Fisher's first quarterly funding briefing. He said the only people in his office that had advance knowledge of the announcement besides himself were Elizabeth Holahan and Assistant Secretary Michele Davis. Fratto said he knew this information was privileged and discussed it with no outside individuals.

Fratto stated that the early posting of the Under Secretary's announcement on the Treasury Web site was as much his mistake as anybody's. He said it was miscommunication to his subordinate Administrative Assistant Francis Anderson. The final copy of the press announcement did not have the 10:00 a.m. embargo time on it but instead read for immediate release. Frato said he thought Anderson was at the press conference and was aware of the embargo time. Frato said he had seen an earlier version of the press announcement with the 10:00 a.m. embargo printed on it.

Frato said this was the first time they had set an embargo time (10:00 a.m.) prior to the conference. Normally they poll the press at the conclusion of the press conference and then set the embargo time. He said he was not aware of any member of the press violating the embargo. He said if they did, he would revoke their Treasury press credentials.

When asked if he knew Peter Davis, Fratto responded that he did not learn who he was until after the fact. He said he subsequently learned that Davis was cleared to attend the conference by Paul Malvey's secretary. Frato said Paul Malvey is the Director of Market Finance. Fratto said it was his understanding that Malvey's predecessor had allowed Davis to

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/20/01
Form 01-09

Office of the Inspector General – Investigations
Department of the Treasury

SECNOTH00103665

## MEMORANDUM OF ACTIVITY

attend the quarterly press conferences since 1993 and that the Office of Market Finance has continued that practice to the present.

Fratto said it never occurred to him that anyone other than government officials or the press would be in the room attending the quarterly press conferences. Fratto said because of this incident, his office would be adopting new press conference procedures, which are appended as attachment (1).

<u>Investigative Note:</u> Subsequent to Fratto's November 14, 2001, interview and pursuant to SECs request to clarify a quotation made by Fratto in the November 15, 2001, <u>Wall Street Journal</u>, he was re-contacted by Treasury, Office of General Counsel. As reported in the article, Fratto is quoted as saying, "It's likely that others in the past" and then the reporter paraphrased the remainder of the statement as [have participated in press briefings though they weren't members of the press.]

Fratto stated that the quotation was incomplete. He recalled sayings words to the effect that "I can't say for certain, but I think it's likely that others in the past have found their way into these things." Fratto said that he meant that, given that Mr. Davis had been admitted by the prior administration for years, he found it likely that someone else may also have wandered in during the past administration. He said he did not know of any such occasions, but believed it a reasonable possibility. Fratto's clarification comments appended as attachment (2).


Attachments:

    (1)  Memorandum from Office of Public Affairs
    (2)  Memorandum to Andrew Sporkin, SEC from Megan Hills,
         Associate Deputy General Counsel, dated November 15, 2001

Reviewed by: _____ Date: 12/5/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is <u>FOR OFFICIAL USE ONLY</u>, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

SECNOTH00103666

# Exhibit C

**Memorandum of Activity Concerning the
Treasury OIG November 14, 2001 Interview of
Frances Anderson**



# MEMORANDUM OF ACTIVITY

| Type of Activity: | | Case Number:<br>2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|---|
| X | Personal Interview | Date: | Michael Knorr, Investigator |
| | Telephone Contact | November 14, 2001 | |
| | Records Review | Time: | |
| | Other (Describe): | 4:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Frances Anderson**<br>**Public Information Coordinator**<br>**Office of Public Affairs**<br>**Department of the Treasury**<br>**Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by attorneys Andrew Sporkin (202/942-4800) and Rosemary Filou (202/942-4768) of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

Frances Anderson said she has been employed by the Department of the Treasury since 1969. She has worked in the Office of Public Affairs for the past 12 years. Her immediate supervisor is Tony Fratto, Director, Office of Public Affairs.

Her official duties at the Office of Public Affairs include formatting and posting press releases on the Treasury Web site, calling news producers to announce press conferences and sending

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C.  552, 552a.

Date Printed: 1/2/02
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103661

## MEMORANDUM OF ACTIVITY

~~out media advisories.   She also receives calls from the non-~~
Treasury press who need to be cleared through the United States
Secret Service Uniformed Division (UD), in order to attend the
press conferences.   She in turn gives their name, Social
Security Number, and Date of Birth to the UD control center for
clearance.   The name of their employer/affiliation is not
requested by UD.

Anderson said she attended the October 31, 9:00 a.m. press
conference, but was posted outside the Diplomatic Reception
Room, where the conference was held.   She said prior to the
start of the press conference, she helped pass out the press
releases.   She said Paul Malvey, Director, Market Finance, asked
her to stand out in the hall to keep an eye on some charts that
were to be handed out at the conclusion of the conference.   She
said no one left the room until the conference concluded at
approximately 9:25 a.m.   She said, since the doors were closed,
she did not hear an announcement concerning the 10:00 a.m. press
embargo.

At the conclusion of the conference, Anderson said she returned
to her office to send out the press release on the Treasury Web
site.   She said there had been earlier problems with formatting
the press release with the proper Treasury letterhead.   The
final press release she saw said for "immediate release."   She
said she posted it on the WEB sometime before 10:00 a.m.   She
said she did not know the exact time it went out.   She said she
was unaware of the 10:00 a.m. embargo.

<u>Investigative Note:</u>  The first version of the Office of Public
Affairs press release contained the 10:00 a.m. embargo and had
the soft letterhead (Treasury Building Logo).   The second
version had immediate release and no embargo time.   It was
printed on the hard letterhead (Treasury Seal).

Reviewed by: _____  Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG.   It may not be copied or
reproduced without written permission from the OIG.   This report is <u>FOR OFFICIAL USE ONLY</u>, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.   Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General — Investigations
Department of the Treasury

SECNOTH00103662

# Exhibit D

**Excerpts from the Peter J. Davis Jr.
September 3, 2003 Criminal Plea Hearing
Transcript**

1

393fdavp                    SEALED

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4               v.                          03 CR

5    PETER J. DAVIS, JR.

6                    Defendant.

7    ------------------------------x

8
                                           September 3, 2003
9                                          12:40 p.m.

10
     Before:
11
                        HON. DOUGLAS F. EATON,
12
                                    Magistrate Judge
13

14                       APPEARANCES

15   JAMES B. COMEY
          United States Attorney for the
16        Southern District of New York
     BY:  ROBERT H. HOTZ, JR. and BRIAN D. COAD
17        Assistant United States Attorneys

18   BAKER BOTTS
          Attorneys for Defendant Davis
19   MARY C. SPEARING and MARK STANCIL

20

21

22

23

24

25


                  SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

SECNOTH00145728

18

393fdavp                    SEALED

1    e-mail logs of Goldman Sachs.  I think that is the basis of the

2    government's evidence.

3              THE COURT:  All right.  Mr. Davis, at this point I

4    want you to tell me in your own words what did you that leads

5    to you believe that you are guilty of these three charges.

6              MS. SPEARING:  Your Honor, Mr. Davis has a prepared

7    statement he would like to read to the Court.

8              THE COURT:  That's fine.

9              MS. SPEARING:  And I would request that, given the

10   circumstances surrounding this plea, that the minutes of this

11   proceeding be sealed.

12             THE COURT:  I will grant that request.

13             MS. SPEARING:  Thank you, your Honor.

14             THE COURT:  It will be sealed and available to the

15   attorneys for Mr. Davis and the attorneys for to government.

16             MS. SPEARING:  Your Honor, also, I should have said

17   this earlier, but I am a member of the New York bar but not a

18   member of the Southern District, and have not been admitted to

19   the Southern District, and so I would move to be admitted pro

20   haec vice for the purposes of this plea.

21             THE COURT:  I grant that motion.

22             MS. SPEARING:  Thank you.

23             THE DEFENDANT:  Your Honor, since November 1992 I have

24   worked as a Washington, D.C. based economic policy consultant.

25   I advise clients, including hedge funds, banks and research

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145746

393fdavp                         SEALED

1    firms on federal policy development that will affect their

2    investments.  Beginning in the mid 1990's, I began following

3    the Treasury Department's quarterly refunding press conferences

4    for some clients, at which treasury officials would announce

5    the amounts and maturities of various debt issuances.  I

6    eventually obtained direct access to and personally attended

7    these press conferences.  My attendance was pursuant to my

8    agreement with the Treasury Department that I would abide by

9    the embargo and keep all information disseminated there

10   confidential until the embargo expired.

11        The information disseminated in the press conference

12   was embargoed by Treasury officials, such that it could not be

13   published or divulged before a specific time shortly after the

14   press conference concluded.  In 1999, in response to a request

15   from a client who ran a bond research firm but who did not

16   otherwise have direct access to the information in advance of

17   the embargo, I began relaying information to him by telephone

18   as soon as the press conference concluded so, his analyses

19   could come out at the same time as other reporters.  On some

20   occasions those calls occurred in advance of the embargo time.

21        Later in 1999, I began calling other clients I thought

22   might have an interest in the information distributed at the

23   press conferences.  At the time I was making pre-embargo calls,

24   I knew I was breaching my obligation to keep the information

25   confidential until the embargo expired.

SECNOTH00145747

393fdavp                    SEALED

1          With most of my clients, I had no formal agreement to

2   provide pre-embargo information.  With at least one of my

3   clients, however, I entered into an explicit agreement to call

4   and relay the information in advance of the embargo time.

5   Specifically, in May of 2001, I made such a call to John

6   Youngdahl, a vice president and senior economist at Goldman

7   Sachs.  Mr. Youngdahl was a new client, and I hoped that the

8   pre-embargo refunding information would persuade him to remain

9   a client.

10         On July 12, 2001, I received an e-mail from

11  Mr. Youngdahl in which Mr. Youngdahl acknowledged that I had

12  provided him with pre-embargo information relating to the May

13  2001 refunding press conference.  In that e-mail, Mr. Youngdahl

14  also asked me if I would give pre-embargo information to him as

15  a, quote, routine matter, unquote, beginning with the August 1,

16  2001 quarterly refunding press conference.  That same day, I

17  replied to Mr. Youngdahl via e-mail and informed him that I

18  would call him with that information before the embargo

19  expired, quote, with the understanding that everything is

20  embargoed until the embargo time, unquote.  Shortly thereafter,

21  I had a telephone conversation with Mr. Youngdahl in which the

22  details of this arrangement were confirmed.

23         On August 1, 2001, I attended the quarterly refunding

24  press conference at Treasury.  As was my practice, I made a

25  series of phone calls to clients, including Mr. Youngdahl,

SECNOTH00145748

393fdavp                    SEALED

1    before the embargo expired.

2            At the October 31st, 2001, quarterly refunding press

3    conference, the Treasury Department issued the surprising

4    announcement that it was discontinuing the 30-year bond.  The

5    move was widely unexpected and I anticipated that many clients

6    would potentially suffer financial harm when the news became

7    public.  The press conference concluded shortly before 9:30

8    a.m. and it was announced that the information would be

9    embargoed until ten a.m.  I immediately exited the Treasury

10   Department and began calling clients on my cell phone to report

11   the news.  Among the clients I reached was Mr. Youngdahl.  I

12   told Mr. Youngdahl that Treasury had decided to discontinue the

13   30-year bond.  I also told Mr. Youngdahl that the information

14   was embargoed until 10 a.m.  My call to him took place around

15   9:30 a.m.  My expectation was that Mr. Youngdahl and Goldman

16   Sachs would use the information to their advantage in trading

17   government securities.  I believed that once this information

18   became public, prices of the 30-year bond would escalate

19   dramatically, and I knew my pre-embargo repot would allow

20   Mr. Young and my other clients to make significant moves in

21   advance of the market responding to the official public

22   release.

23           THE COURT:  All right.  I had one question, which is

24   do you agree that this embargoed information was government

25   property having value of more than $1,000?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145749

22

393fdavp                      SEALED

1               THE DEFENDANT:  Yes, I do, your Honor.

2               THE COURT:  And do you agree that you intended to

3     defraud the government?

4               THE DEFENDANT:  Yes, your Honor.

5               THE COURT:  Mr. Hotz, do you think any other questions

6     are needed?

7               MR. HOTZ:  No, your Honor.

8               THE COURT:  All right.  We are up to the final

9     question.  I'm going to read these counts.  I'm going to skip

10    practically all of the language, and then I am going to ask you

11    how do you plead, guilty or not guilty.

12              On Count One, I'm turning to paragraph 27.  The United

13    States Attorney charges from on or about July 12, 2001, to or

14    about October 31, 2001, in the Southern District of New York

15    and elsewhere, Peter J. Davis, Jr. and John Youngdahl, together

16    with other persons, unlawfully, willfully and knowingly did

17    conspire to defraud the United States and to commit offenses

18    against the United States, to wit, and now I am summarizing,

19    conversion of property of the U.S. and the Department of

20    Treasury, also securities fraud and also wire fraud.

21              And I am noting at paragraph 33 that there is a

22    detailed statement of some of the means and methods of this

23    conspiracy and then there is a statement about overt acts, and

24    I am just going to read paragraph 34.

25              In furtherance of this conspiracy, and to effect the

SECNOTH00145750

393fdavp                    SEALED

1    unlawful objects of the conspiracy, the following overt acts

2    took place, and reading down to the fifth alleged overt act, E,

3    on or about October 31, 2001, Davis placed a cellular telephone

4    call from Washington D.C. to John Youngdahl at Goldman's

5    offices in New York, New York.   That is the essential elements

6    of this very lengthy Count One, a conspiracy to defraud the

7    United States and to commit wire fraud, securities fraud, and

8    conversion of U.S. property.

9              Mr. Davis, how do you plead to Count One of the

10   information?

11             THE DEFENDANT:  Guilty, your Honor.

12             THE COURT:   Count Two charges you with actually

13   committing the crime of conversion of property in the U.S.   It

14   starts off by re-alleging a number of prior paragraphs, and

15   then it says, as follows at paragraph 36, from at least 1999 up

16   to and including October 31, 2001, Peter J. Davis Jr., in the

17   Southern District of New York and elsewhere, did knowingly

18   convert to his own use and the use of others and without

19   authority, conveyed and disposed things of value of the United

20   States, and departments and agencies of the United States, with

21   a value greater than $1,000; namely, the embargoed

22   confidential, non-public information set forth above in

23   violation of Title 18, U.S. Code Section 641.

24             Mr. Davis, how do you plead to Count Two?

25             THE DEFENDANT:  Guilty, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145751

393fdavp                     SEALED

1          THE COURT:  And, finally, Count Three charges

2    securities fraud.  It re-alleges several prior paragraphs and

3    then it says on or about October 31, 2001, in the Southern

4    District of New York and elsewhere, Peter J. Davis, Jr. and

5    other persons unlawfully, willfully and knowingly, directly and

6    indirectly, by use of a means and instrumentalities of

7    interstate commerce and of the mails, did use and employ in

8    connection with the purchase and sale of securities

9    manipulative and deceptive devices by employing devices,

10   schemes and artifices to defraud and by engaging in acts,

11   practices and courses of business which would operate as a

12   fraud and deceit upon persons in connection with the purchase

13   and sale of 30-year Treasury bonds and 30-year bond futures

14   contracts.

15          That is the essential elements of Count Three.

16   Mr. Davis, how do you plead to Count Three?

17          THE DEFENDANT:  Guilty, your Honor.

18          THE COURT:  I make the following findings for the

19   benefit of Judge Scheindlin.

20          I find that Mr. Davis is fully competent.  I find that

21   he's capable of entering an informed plea.  I find that he's

22   aware of the nature of the charges and aware of the

23   consequences of the plea.  I find that his plea of guilty is a

24   knowing and voluntary plea, supported by an independent basis

25   in fact containing each of the essential elements of the

SECNOTH00145752

393fdavp                    SEALED

1    offense.  I, therefore, recommend that Judge Scheindlin accept

2    the guilty plea and adjudge Mr. Davis guilty of these three

3    felonies.

4              I direct the government to order the transcript and to

5    get it to the district judge as soon as possible.

6              I will also fill out a written form for Judge

7    Scheindlin.  And I direct Mr. Davis to report to the Probation

8    Department so that they can get started on the presentence

9    report.  They may want to just, in effect, register him for a

10   while.

11             MR. HOTZ:  Your Honor, we have a control date for

12   sentencing from Judge Scheindlin of December 3rd at 4:30, and

13   that is, as I said, a control date.

14             THE COURT:  Right.

15             MR. HOTZ:  I will advise probation of that, but I

16   would propose that we not have any interview until such time as

17   Mr. Davis has fulfilled his obligations under the agreement and

18   we will raise it with Judge Scheindlin.

19             THE COURT:  Is there anything further?

20             MR. HOTZ:  Yes, your Honor, there is one other matter.

21   It's just to set bail for Mr. Davis.

22             THE COURT:  Oh, yes.  That was part of the plea

23   agreement near the end, that there would be a $500,000 personal

24   recognizance bond and --

25             MR. HOTZ:  Your Honor, we have --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

393fdavp                          SEALED

1             THE COURT:  -- standard conditions.

2             MR. HOTZ:  Yes.  We have proposed that the defendant,

3    in addition, surrender his passport, which I understand he will

4    do, and that travel be restricted to the 50 states of the

5    United States.

6             THE COURT:  All right.

7             MR. HOTZ:  We also --

8             THE COURT:  We will have to type up a bond here.  That

9    will take maybe half an hour, maybe more since it's lunchtime,

10   and you will be released as soon as you sign this bond.  How

11   soon can the passport be surrendered?

12            MS. SPEARING:  Your Honor, I can get it to Mr. Hotz

13   tomorrow.

14            MR. HOTZ:  Your Honor, within a week is fine.

15            THE COURT:  Well, we will say within a week.  By

16   September 10.

17            All right.  Is there anything further?

18            MS. SPEARING:  No, your Honor.

19            THE COURT:  Okay.  I just need a disposition sheet.  I

20   will fill it out, which will enable the people next door to get

21   started typing the bond.

22            MR. HOTZ:  I'm sorry, your Honor.  There is one other

23   matter, a housekeeping matter that I neglected to mention.

24            Mr. Davis needs to be processed by the marshals, and

25   we would just ask that you direct that at the conclusion of his

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145754

27

393fdavp                    SEALED

1   signing the bail that he be processed the marshals.  He's been

2   processed by the Postal Inspection Service.

3                   THE COURT:  Maybe the marshals can start processing

4   him.

5                   THE DEPUTY CLERK:  We don't have one.  There is no one

6   here.

7                   MR. HOTZ:  We can take him and have it done at the

8   conclusion of signing the bail, your Honor.

9                   THE COURT:  Okay.  Before or after as the case may be.

10                  All right.  Okay.  Everyone is excused.  I will just

11  fill out this disposition sheet and also this short form report

12  and recommendation to Judge Scheindlin.

13                  MS. SPEARING:  Thank you, your Honor.

14                              oOo

15

16

17

18

19

20

21

22

23

24

25

SECNOTH00145755

# Exhibit E

### Excerpts from the Peter J. Davis Jr.
### March 18, 2005 Criminal Sentencing Hearing
### Transcript

1

53IGDAVS                      Sentence

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4          v.                            03 CR 1054 (SAS)

5  PETER DAVIS,

6              Defendant.

7  ------------------------------x

8                                New York, N.Y.
                                 March 18, 2005
9                                4:35 p.m.

10

11 Before:

12            HON. SHIRA A. SCHEINDLIN,

13                                District Judge

14                 APPEARANCES

15 DAVID N. KELLEY
        United States Attorney for the
16      Southern District of New York
   BRIAN D. COAD
17      Assistant United States Attorney

18 BAKER BOTTS, LLP
        Attorneys for Defendant
19 MARY C. SPEARING
   MARK T. STANCIL

20

21

22

23

24

25

             SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

SECNOTH00145756

53IGDAVS                     Sentence

1    anything to undo it.  It's not consistent with my character,

2    and it will never happen again.  Thank you.

3            THE COURT:  Thank you, Mr. Davis.

4            Mr. Coad, do you wish to be heard?

5            MR. COAD:  Your Honor, it's certainly not my place to

6    comment on what my view of the appropriate sentence would be,

7    and I don't intend to do that, but I have had counsel speak,

8    and I certainly will say this:  I don't disagree with anything

9    that counsel for Mr. Davis has said.  Of course, I'm not privy

10   to, perhaps, conversations she's had with her client, but I

11   have read the many submissions, and I have had some dealings

12   with Mr. Davis over the course of the past several years.  And

13   I can say this is certainly an instance where I do not believe

14   that in any respect counsel for Mr. Davis has overstated, in

15   her remarks to the Court, anything.  Thank you, your Honor.

16           THE COURT:  Thank you, Mr. Coad.  Based on all of the

17   sentencing factors set forth in 18 United States Code, section

18   3553, as well as the information provided in the government's

19   5K1 motion, I conclude that a sentence of two years probation

20   is appropriate, together with a fine of $30,000 and a mandatory

21   assessment of $300.

22           For the record, I will review the statutory factors.

23   I begin with the nature and circumstances of the offense.  This

24   defendant released highly sensitive nonpublic information to

25   his client just before it became public, knowing that the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145766

53IGDAVS                     Sentence

1    information was embargoed until a fixed point in time.  His

2    client then traded on that information, but it doesn't appear

3    that he personally profited or knew the extent to which his

4    clients would profit.  As his counsel said, the motivation

5    appeared to keep the client on the monthly retainer and to keep

6    them happy clients.

7          Turning next to the defendant's history and

8    characteristics, this 54-year-old defendant had a spotless

9    record until this offense.  He has always worked and has been

10   an excellent husband and father.  He has also been helpful in

11   his community.  The probation department believes that an

12   aberrant conduct departure may be warranted here, because this

13   conduct is completely inconsistent with defendant's prior

14   conduct.  Indeed, it appears that this conduct may have been

15   more akin to a grievous mistake in judgment than an intentional

16   effort to defraud the government.  In addition, the defendant

17   has provided full cooperation to the authorities, something

18   that he initiated very early on.

19         The next factor is the need for the sentence imposed.

20   While I am not planning to give a jail sentence, I believe the

21   sentence I impose is appropriate under the circumstances of

22   this case.

23         The next factor is to reflect the seriousness of the

24   offense and to promote respect for the law and to provide just

25   punishment.  I must say that a felony conviction itself does

SECNOTH00145767

53IGDAVS                    Sentence

1   reflect the seriousness of this offense and promotes respect

2   for the law.  I mean, having to go around being a felon for the

3   rest of one's life -- a prior convicted felon is a very serious

4   punishment.

5        Given the defendant's full and early cooperation, a

6   term of probation, in addition to being a convicted felon, does

7   provide the just punishment, together with a fine.

8        The next factor is to adequately deter such conduct.

9   Again, I think that a felony conviction, as well as a period of

10  probation supervision, does provide adequate deterrence to

11  people who might be able to commit the crime that this

12  defendant committed, which was, I gather, a very small group of

13  people.

14       The third factor is to protect the public from further

15  crimes by this defendant.  I don't think the public needs much

16  protection from Mr. Davis, and to the extent they do, I think

17  he's more than learned his lesson.

18       The next factor is to provide the defendant with

19  needed educational or vocational training, medical care, etc.

20  Being at liberty, in my view, will provide the most appropriate

21  access to those services.  The factors, the kind of sentence

22  that is available, the choices here would have been jail,

23  community confinement or probation.  I think probation is the

24  appropriate sentence of these types.

25       The next factor is the guidelines sentence and all

SECNOTH00145768

53IGDAVS                    Sentence

1   applicable policy statements.  The guidelines here call for a

2   sentence of 27 to 33 months.  I agree with defense counsel that

3   this range would be high, even if there had been no

4   cooperation, because it is driven primarily by the loss amount.

5   I do not think this defendant had any knowledge or intention of

6   causing a loss in the range of $4 million, and I also believe

7   as to his probation that an aberrant conduct departure would

8   have been warranted.

9          But overriding all of this is that cooperators almost

10  always received a sentence reduction from the guideline range

11  in recognition of the assistance they have provided to the

12  government.  So this sentence does account for the guideline

13  range but makes an appropriate adjustment based on the nature

14  and extent of the defendant's cooperation and all of the other

15  factors that I spoke about.

16         Finally, there is the need to avoid unwarranted

17  sentencing disparities, and that's important, because that was

18  the purpose behind the Sentencing Reform Act of 1984.  And it

19  survives the Booker case.  The guideline system was promulgated

20  to set a national norm for types of criminal conduct, but, as

21  I've noted, cooperators have always received a sentence

22  reduction for their substantial assistance, and this defendant,

23  considering his history and his circumstances and his

24  motivation, would have fallen outside the guideline range

25  anyway.

SECNOTH00145769

53IGDAVS                    Sentence

1        The final factor is restitution, which was not a

2   factor here.  I, therefore, conclude that considering the

3   Goldman sentencing and the individual I'm sentencing, that this

4   is the appropriate sentence.  So I am imposing a sentence of

5   two years probation.  In addition, the defendant is required to

6   pay a fine of $30,000 in equal monthly installments throughout

7   the two-year period of probation.  He's also required to pay

8   the special assessment of $300.

9        The defendant is to be supervised in the district of

10  his residence, and the standard conditions of probation as

11  recommended by the probation department shall apply, and the

12  mandatory ones, which are, one, the defendant shall not commit

13  another federal, state or local crime; two, defendant shall not

14  illegally possess a controlled substance; and, three, defendant

15  shall not possess a firearm or other destructive device.

16       The mandatory drug testing condition is suspended due

17  to this Court's conclusion that this defendant poses little or

18  no risk of any drug abuse.

19       The following special conditions are imposed:  One,

20  the defendant shall provide the probation office with access to

21  any requested financial information; and, two, the defendant

22  shall not incur new credit charges or open additional lines of

23  credit without the approval of the probation department.

24       Are there any legal objections before sentence is

25  finally imposed?

SECNOTH00145770

53IGDAVS                    Sentence

1          MS. SPEARING:  No, your Honor.

2          MR. COAD:  No, your Honor.

3          THE COURT:  All right.  Then the sentence is imposed

4     as stated.  Mr. Davis, you have the right to appeal the

5     sentence within ten days, but only to the extent permitted by

6     your plea agreement.  If you cannot pay the cost of appeal, you

7     have the right to apply for leave to appeal in forma pauperis.

8          Is there anything further, Mr. Coad to dismiss?

9          MR. COAD:  No, your Honor.

10         THE COURT:  Anything further?

11         MS. SPEARING:  No, your Honor.

12         THE COURT:  It's probably too late to report to

13    probation, but it has to be arranged for Monday.

14         MS. SPEARING:  All right, your Honor.

15         MR. COAD:  Thank you, your Honor.

16                              o0o

17

18

19

20

21

22

23

24

25

SECNOTH00145771

# Exhibit F

**Copy of Peter J. Davis Jr.'s Verizon Wireless Cell
Phone Records for the Period October 20-31, 2001**

**Page:** 9 of 16
**Billing Date:** November 19, 2001
**Customer Account No:** 302481721-00001
**Invoice Number:** 0319403124

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | Airtime Charges Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Related Call Charges Rate Period | Type | Amt | Total Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 10/20 | 6:37 PM | 81 | Washington DC | Washington DC 202-966-4366 | W | 1 | AF | | .00 | | | .00 | .00 |
| 2 | 10/22 | 2:12 PM | 01 | Silver Spr MD | Washington DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 3 | 10/23 | 2:41 PM | 01 | Chevy Chas MD | Washington DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 4 | 10/24 | 2:56 PM | 01 | Chevy Chas MD | Chicago IL 312-984-1331 | P | 5 | AF | | .00 | PEAK | VWL | 1.10 | 1.10 |
| 5 | 10/24 | 3:59 PM | 01 | Chevy Chas MD | Washington DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 6 | 10/24 | 4:03 PM | 01 | Chevy Chas MD | Washington DC 202-224-3394 | P | 1 | AF | | .00 | | | .00 | .00 |
| 7 | 10/24 | 4:06 PM | 01 | Bethesda MD | Washington DC 202-225-6760 | P | 2 | AF | | .00 | | | .00 | .00 |
| 8 | 10/24 | 4:08 PM | 01 | Bethesda MD | New York NY 212-219-9058 | P | 4 | AF | | .00 | PEAK | VWL | .88 | .88 |
| 9 | 10/25 | 7:39 AM | 01 | Washington DC | Washington DC 202-363-2346 | P | 2 | AF | | .00 | | | .00 | .00 |
| 10 | 10/25 | 11:45 AM | 01 | Linthicum MD | Silver Spg MD 301-454-8180 | P | 3 | AF | | .00 | | | .00 | .00 |
| 11 | 10/29 | 1:47 PM | 01 | Chevy Chas MD | Washington DC 202-363-7266 | P | 1 | AF | | .00 | | | .00 | .00 |
| 12 | 10/29 | 4:48 PM | 01 | Chevy Chas MD | Washington DC 202-362-1954 | P | 1 | AF | | .00 | | | .00 | .00 |
| 13 | 10/29 | 4:49 PM | 01 | Chevy Chas MD | Washington DC 202-363-2346 | P | 3 | AF | | .00 | | | .00 | .00 |
| 14 | 10/29 | 4:55 PM | 01 | Chevy Chas MD | Washington DC 202-363-2346 | P | 2 | AF | | .00 | | | .00 | .00 |
| 15 | 10/31 | 9:28 AM | 01 | Washington DC | Princeton NJ 609-683-3921 | P | 4 | AF | | .00 | PEAK | REG | .88 | .88 |
| 16 | 10/31 | 9:32 AM | 01 | Washington DC | Rye NY 914-925-7707 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 17 | 10/31 | 9:33 AM | 01 | Washington DC | Greenwich CT 203-863-6713 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 18 | 10/31 | 9:34 AM | 01 | Washington DC | Stamford CT 203-614-2400 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 19 | 10/31 | 9:35 AM | 01 | Washington DC | New York NY 212-902-8124 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 20 | 10/31 | 9:37 AM | 01 | Washington DC | Chicago IL 312-984-1331 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 21 | 10/31 | 9:38 AM | 01 | Washington DC | Boston MA 617-654-5887 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 22 | 10/31 | 9:39 AM | 01 | Washington DC | Boston MA 617-563-7788 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 23 | 10/31 | 9:41 AM | 01 | Washington DC | Washington DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 24 | 10/31 | 9:44 AM | 01 | Washington DC | Boston MA 617-573-0573 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 25 | 10/31 | 9:45 AM | 01 | Washington DC | Boston MA 617-563-0573 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 26 | 10/31 | 9:46 AM | 01 | Washington DC | New York NY 212-397-3672 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 27 | 10/31 | 9:47 AM | 01 | Washington DC | New York NY 212-834-5102 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 28 | 10/31 | 9:49 AM | 01 | Washington DC | New York NY 212-834-5102 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 29 | 10/31 | 9:51 AM | 01 | Washington DC | New York NY 212-219-8096 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 30 | 10/31 | 9:53 AM | 01 | Washington DC | Boston MA 617-760-4616 | P | 2 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 31 | 10/31 | 9:55 AM | 01 | Washington DC | New York NY 212-397-3672 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 32 | 10/31 | 9:56 AM | 01 | Washington DC | Charlotte NC 704-386-1839 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 33 | 10/31 | 9:58 AM | 01 | Washington DC | Washington DC 202-462-7909 | P | 5 | AF | | .00 | | | .00 | .00 |
| 34 | 10/31 | 10:02 AM | 01 | Washington DC | Washington DC 202-822-2133 | P | 8 | AF | | .00 | | | .00 | .00 |
| 35 | 10/31 | 10:08 AM | 01 | Washington DC | Washington DC 202-736-0671 | P | 2 | AF | | .00 | | | .00 | .00 |
| 36 | 10/31 | 10:09 AM | 01 | Washington DC | Washington DC 202-295-5352 | P | 2 | AF | | .00 | | | .00 | .00 |
| 37 | 10/31 | 10:10 AM | 01 | Washington DC | Washington DC 202-585-5868 | P | 2 | AF | | .00 | | | .00 | .00 |
| 38 | 10/31 | 4:02 PM | 01 | Chevy Chas MD | Washington DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 39 | 10/31 | 4:05 PM | 01 | Chevy Chas MD | New York NY 212-761-6657 | P | 8 | AF | | .00 | PEAK | VWL | 1.76 | 1.76 |

+Designates the location, city and state, of the call tower or switching center which processed the call.
Legends

| Airtime Rate Period: | Usage Type: | Special Feature: | Related Call Type: |
|---|---|---|---|
| P  Peak | A  Price Plan Allowance | CW  Call Waiting | REG  Cellular Regional Call |
| W  Night/Weekend | F  Full Call | | VWL  VWL Long Distance |
| | I  Incoming Call | | |
| | X  Partial Allowance | | |

SECNOTH00113800

# Exhibit G

**Excerpts from Steven E. Nothern's
December 4, 2001 SEC Investigative Testimony**

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

```
In the Matter of:          )
TRADING IN CERTAIN         )
TREASURY ISSUES            )  File No. HO-9353
```

WITNESS:  Steven E. Nothern

PAGES:  1 through 213

PLACE:    Securities & Exchange Commission
          450 5th Street, N.W. - Room 11602
          Washington, D.C. 20549

DATE:     Wednesday, November 28, 2001

          The above-entitled matter came on for hearing at
10:38 a.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

          ANDREW SPORKIN, ESQ.
          WILLIAM M. HATHAWAY, ESQ.
          Securities & Exchange Commission
          450 5th Street, N.W.
          Washington, D.C. 20549
          (202) 942-4613

On behalf of the Witness:

          JACK PIROZZOLO, ESQ.
          NICHOLAS THEODOROU, ESQ.
          Foley, Hoag, & Eliot
          One Post Office Square
          Boston, Mass., 02109.

---

Page 2

C O N T E N T S

| WITNESS: | | Page |
|---|---|---|
| Steven Nothern | | 3 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|---|---|---|
| 222 | Subpoena, nine-page document | 5 |
| 223 | Three-page Letter from the SEC, includes subpoena duces tecum | 13 |
| 224 | 1/2 floor plan for 23rd floor on Boylston Street | 38 |
| 225 | Other 1/2 of floor plan for 23rd floor on Boylston Street | 38 |
| 226 | Bloomberg message from WI Partners and RJ O'Brien & Associates | 166 |
| 227 | ITMO Trading in Certain Treasury Issues | 167 |
| 228 | Five page document; M-000113, 114, 114A, 115 through M-116 | 173 |
| 229 | Legal and regulatory update by Steve Cavan | 184 |
| 230 | MFS Co. statement of policy on Personal Securities Transactions | 190 |
| 231 | MFS Statement of Guidelines | 191 |

---

Page 3

1           PROCEEDINGS

2       MR. HATHAWAY:  We are on the record.  It's

3  approximately 10:30.  This is December 4, 2001.  Would you

4  raise your right hand, sir?

5       Whereupon,

6           STEVEN E. NOTHERN

7  was called as a witness and, having been first duly sworn by

8  the, was examined and testified as follows:

9           EXAMINATION

10      BY MR. HATHAWAY:

11      Q  Would you please state and spell your full name for

12  the record?

13      A  Steven Eric Nothern -- S-t-e-v-e-n -- Eric --

14  Nothern -- N-o-t-h-e-r-n.

15      Q  Thank you.  I am William Maxwell Hathaway.  I go by

16  Max.  I will be joined shortly by my branch chief on this

17  project, Andrew Sporkin.  Both Andrew Sporkin and myself are

18  officers of the Commission for the purposes of this

19  proceeding.

20      This is an investigation by the United States

21  Securities and Exchange Commission.  It's:  In the Matter of

22  Trading in Certain Treasury Issues.  Our file number is --

23  HO-9353.

24      It is an investigation is to determine whether

25  there have been any violations of the federal securities

---

Page 4

1  laws.

2       However the evidence adduced in this investigation

3  or today's testimony session might constitute violations of

4  other state or federal, civil or criminal statutes.

5       Prior to the opening of the record, which means

6  prior to our actually going the tape recorder on and

7  beginning here today, you were provided with a copy of the

8  formal order of investigation which is in front of you here

9  and I am touching it as I speak.

10      This copy of the formal order will remain available

11  for your examination throughout the course of today's

12  testimony session.

13      Have you had an opportunity to review the formal

14  order of investigation?

15      A  Yes, I have.

16      Q  You were also provided prior to the opening of the

17  record with a copy Exhibit No. 202, which is a copy of the

18  Commission's Form 1662.

19      Have you had an opportunity to read Exhibit No.

20  202?

21      A  Yes, I have.

22      Q  Do you at this time have any questions at this time

23  concerning this exhibit?

24      A  No.

25      Q  Mr. Nothern, are you represented by counsel?

SECNOTH00117214

Page 97

1    Q  Did you know how information is disseminated at a
2  conference, refunding conference?
3    A  I don't.
4    Q  Did you know whether people were given press
5  releases?
6    A  I don't.
7    Q  Do you know whether persons attending a conference
8  are given reports of any nature?
9    A  I don't know.  Can I add one thing?
10   Q  Yes.
11   A  I am familiar with the fact that they distribute a
12  press release, because I've had those faxed to me.
13   Q  Do you know whether or not that distribution of the
14  press release occurred at the conference or --
15   A  That's what I don't know.
16      BY MR. SPORKIN:
17   Q  How did you get the faxes?
18   A  Mr. Davis would fax those after the quarterly
19  refunding announcements.  I've seen them before.
20      BY MR. HATHAWAY:
21   Q  Do these faxes occur the day of the conference or
22  the day after or --
23   A  I would guess same day.
24   Q  Why do you guess that?
25   A  Because I don't know specifically when they come

Page 98

1  in.
2    Q  Do you know whether there are any live feeds to the
3  media at a quarterly refunding conference?
4    A  No, I don't.
5    Q  Does CSPAN cover these conferences?
6    A  Not to my knowledge.
7    Q  Does CNN cover these conferences?
8    A  Not to my knowledge.
9    Q  Does any media or news service provide live
10  coverage of these conferences?
11   A  I don't to my knowledge.
12   Q  Do persons attending a refunding conference receive
13  information from Treasury before Treasury makes it generally
14  available to the public?
15   A  I don't know the process.
16   Q  Are any restrictions placed on the ability of
17  persons to use the information that they receive from
18  Treasury at the refunding conference?
19   A  Not to my knowledge.
20   Q  Do persons receiving such information have to wait
21  any wait any amount of time before passing this information
22  along to others?
23   A  Not to my knowledge.
24   Q  Have you ever heard the term "embargo,"
25  e-m-b-a-r-g-o, as it relates to information?

Page 99

1      MR. THEODOROU:  As of what date?
2      BY MR. HATHAWAY:
3    Q  As of today, have you heard that term "embargo"
4  used in the context of information?
5    A  Yes.
6    Q  What does it mean to you, as you sit here today?
7    A  With regards to the Treasury, I don't know what it
8  means.  To me it's a term that applies to the press.
9    Q  What does it mean to you in terms of that?
10   A  Other departments, and I know Labor Department
11  specifically, so one other department, has a process for
12  release of what they deem to be market sensitive information
13  whereby they actually lock the press in a room, it's my
14  understanding at Labor Department, for releases such as the
15  employment report, and they also release the CPI report.
16      They give information to the press, and the doors
17  aren't unlocked at a point in, and also has access, to my
18  understanding, electronic media.  So they can actually digest
19  the information they're being given and write their story.
20      But there is some sort of mechanism whereby it
21  doesn't get filed with the home office, or whatever their
22  process -- you know, the reporter's procedures are, until
23  there's some sort of release of the electronic media.
24      So I think the Labor Department controls both the
25  physical environment and the electronic dissemination of the

Page 100

1  report, but they want to give them time to construct their
2  stories that will hit the wires.
3    Q  How did you learn of this process at Labor?
4    A  Specifically, it's just general knowledge.
5    Q  How long have you known this?
6    A  I don't know.  Specifically, it's just general
7  knowledge.
8    Q  Have you known this for at least a year?
9    A  Oh, yes.
10   Q  Five years?
11   A  I don't know the answer.
12   Q  It is your testimony that you've known for at least
13  a year that the Labor Department used the process you just
14  testified to when it came to releasing market sensitive
15  information?
16   A  Yes.
17   Q  How does the term "embargo, in your mind, fit in
18  that context that you just testified to?
19   A  That process is described as an embargo process.
20      BY MR. SPORKIN:
21   Q  Are you aware of any other U.S. agencies or
22  departments that use this process?
23   A  No, I'm not.
24   Q  Do you know whether the Federal Reserve uses this
25  process in releasing interest rates?

Page 97 - Page 100

SECNOTH00117238

## Page 101

1   A   I don't.

2   Q   Do you know whether the Department of Treasury uses

3   this?

4   A   I don't.

5       BY MR. HATHAWAY:

6   Q   Is it any part of your understanding of a Labor

7   embargo process, as you've described it, that the release --

8   that the fact that if it's market sensitive information

9   that's being released that requires the use of these

10  procedures?

11  A   Can I stop you for one second?

12  Q   Yes.

13  A   Your questions with regard to the Treasury is

14  before 10/31?

15  Q   Yes.

16  A   My answer stands.

17  Q   Is any part of your understanding of the embargo

18  procedures that you've described regarding Labor that they

19  are needed because market sensitive information is being

20  released?

21  A   It's a process they employ.  I couldn't tell you

22  why.

23  Q   In your mind, do you connect this process with the

24  type of information that's involved?

25  A   In my mind, information that the Labor Department

## Page 102

1   releases marked sensitive the market is interested in its

2   data.

3   Q   And the fact in your mind that this is market

4   sensitive information, does that correlate to why these types

5   of procedures are being used by Labor?

6   A   Yes.

7   Q   Do you have any -- in terms of quarterly refunding

8   conferences, do you consider the type of information released

9   there to be market sensitive?

10  A   Yes.

11  Q   As you sit here today, do you have any reason to

12  think that Treasury would employ -- would not employ similar

13  procedures for safeguarding that market sensitive

14  information?

15  A   I'm sorry.

16  Q   You've testify to certain procedures used at Labor

17  surrounding market sensitive information.  You've testified

18  that to your mind information released at quarterly refunding

19  conferences is market sensitive.  My question now is whether

20  you have any reason to believe that the Treasury Department

21  would not also use some sort of procedures to safeguard the

22  market sensitive information?

23  A   I have no knowledge of what the procedures are at

24  Treasury.

25  Q   Aside from specific procedures that might or might

## Page 103

1   not be employed, do you have any reason to think that the

2   Treasury Department would not be interested in safeguarding

3   the market sensitive information before its release?

4       I'm putting my questions in a negative form, and I

5   apologize for that.

6   A   Right.  Can you just rephrase it?

7   Q   Let me see if I can.  To your way of thinking, does

8   the Treasury Department have a reason to safeguard the market

9   sensitive information that it will release at a quarterly

10  refunding conference?

11  A   I can't speak to their --

12  Q   To your mind.

13      MR. THEODOROU:  I think the reason why my client

14  might be confused is he has testified he doesn't really

15  know -- you're assuming that he says he knows it's absolutely

16  market sensitive.

17      MR. HATHAWAY:  He has testified, I believe, that

18  the information is market sensitive, to his mind.

19      BY MR. HATHAWAY:

20  Q   What I'm trying to get my arms around here is

21  whether, in your mind, have you any reason to believe that

22  the Treasury Department would not also have some sort of

23  procedures to safeguard that information.

24  A   I have no knowledge of what their procedures are

25  with regards to information.

## Page 104

1   Q   Aside from specific procedures, whether they lock

2   people in a room or whether they give them a fingerprint

3   test, or whatever, putting specifics aside, do you think the

4   Treasury Department has some procedures, whatever they may

5   be, for safeguarding market sensitive information at a

6   quarterly refunding conference?

7   A   Yes.

8   Q   What is your basis for thinking that?

9   A   It's speculation.

10  Q   Were you at work on October 31, 2001?

11  A   Yes.

12  Q   When did you arrive?

13  A   I don't recall specifically.

14  Q   Typically, when do you arrive?

15  A   7:30.

16  Q   Were there any events, announcements or releases

17  that you intended to look for that day?

18  A   Yes.  There was a 10 o'clock release of a Chicago

19  index.

20  Q   Any other reports and releases that you were

21  continuing to look for that day?

22  A   No.

23  Q   Have you heard of something called the G, as in

24  George, D, as in dog, P as in Peter, GDP?

25  A   Yes.

Page 101 - Page 104

SECNOTH00117239

Page 105

1    Q  Is that a release that is of interest to you?
2    A  Yes, it is.
3    Q  Do you recall one way or the other whether there
4  was to be a GDP release on October 31, 2001?
5    A  I don't remember.
6    Q  When you arrive at work on October 31st, were you
7  aware that there was to be a quarterly refunding announcement
8  that day?
9    A  No.
10   Q  When did you first learn that there was to be a
11  quarterly refunding announcement that day?
12   A  Sometime later in the morning.
13   Q  Approximately when?
14   A  If I had to guess, around 9:40, 9:45.
15   Q  How did you learn that there was to be a quarterly
16  refunding announcement?
17   A  When I had a conversation with our trader, John
18  Cadagan.
19   Q  What did Mr. Cadagan say?
20   A  That at 10 o'clock there was going to be a
21  refunding announcement.
22   Q  How did this come up?
23   A  When I mentioned and he overheard my discussion of
24  a phone mail message left by Peter Davis.
25   Q  Did Mr. Cadagan tell you how it was that he

Page 106

1  understood there was to be an announcement at 10 a.m.?
2    A  No.
3    Q  Did you have any reason to doubt the accuracy of
4  Mr. Cadagan's statement that there was to be an announcement
5  at 10 o'clock?
6    A  No.
7    Q  Did Mr. Cadagan, in telling you this, mention
8  anything at all with regard to restrictions on information at
9  that announcement up until 10 o'clock?
10   A  No.  John Cadagan?
11   Q  Yes.
12   A  No.
13   Q  Did you, at some point in time on October 31, 2001,
14  learn that the Treasury had announced some action regarding
15  the 30-year bond?
16   A  Could you repeat that?  You're asking in past
17  tense?
18   Q  Did you, at some point in time, get a voice mail
19  from Peter Davis?
20   A  Yes.
21   Q  When was this?
22   A  I don't know specifically.
23   Q  As well as you remember.
24   A  We checked our phone logs.
25   Q  Who is "we"?

Page 107

1    A  MFS.
2    Q  What do you remember from the check of the phone
3  logs?
4    A  Approximately 9:37 we received a call from him.
5    Q  As you sit here today, do you have any reason to
6  think that that voice mail came in either earlier or later
7  than 9:37?
8    A  No.
9        BY MR. SPORKIN:
10   Q  Are you sure you didn't speak to Mr. Davis that
11  morning?
12   A  Yes.
13       BY MR. HATHAWAY:
14   Q  When did you listen to the message from Mr. Davis?
15   A  Sometime fairly briefly after he left.
16   Q  How do you know that?
17   A  From the timing that I get from logs that we've
18  checked subsequent to this of transactions.
19   Q  Setting aside what you may or may not have surmised
20  from looking at various records that you've seen, I'd like
21  you just to focus on your memory of the events of that day.
22   A  Okay.
23   Q  Is there anything that occurred that day that helps
24  you believe that you licensed to the voice mail shortly after
25  it came in?

Page 108

1    A  The only thing would be that -- this is my private
2  line.  It's within eye shot when I'm sitting at the trading
3  desk, and I tend to take those -- I take those calls.  So
4  when the little light is on, I know there's a message, and I
5  just get to them.
6    Q  Is that your memory, as you sit here today, of that
7  particular phone mail message, that you were sitting there on
8  the line with someone, and you saw the light go on?
9    A  I didn't see the light go on.  I had a phone
10  conversation.  I had a conversation with a colleague.  When
11  that was completed, I noticed the phone light was -- the
12  message light was on.
13       BY MR. SPORKIN:
14   Q  Does your phone ring?
15   A  It does ring.
16   Q  It does ring.  So there is an audible sound when
17  someone is calling you?
18   A  Yes, there is.
19   Q  When you're on the line with somebody and somebody
20  else calls you, does your phone ring, or does it immediately
21  go to voice mail?
22   A  It makes a noise.
23   Q  What type of noise?
24   A  It rings.
25   Q  It rings.  So you have two lines on that phone?

Page 105 - Page 108

SECNOTH00117240

Page 109

1   A  I have two phones.
2   Q  You have two phones.
3   A  So particular phone does scroll. So yes, you can
4  be on that phone, and it will scroll to I think it's the same
5  line.
6   Q  So when you saw the voice mail indicator blinking,
7  you were just ending another phone conversation?
8   A  No.
9   Q  Where were you when you --
10   A  My recollection is I took a phone call on our
11  direct lines with a broker. Subsequent to that I had a
12  conversation with a colleague. And subsequent to that I
13  noticed the light was on.
14   Q  At the time you were talking to the direct line to
15  the broker, where were you located?
16   A  At the trading desk, at my slot.
17      BY MR. HATHAWAY:
18   Q  241 here on the --
19   A  We have it here. (Examining) 241.
20      MR. HATHAWAY: 241 on Exhibit 224.
21      BY MR. SPORKIN:
22   Q  So you were sitting there at 241. At the time you
23  were talking to your colleague, where were you?
24   A  The same, 241.
25   Q  And who were you talking to?

Page 110

1   A  Kathy Graham.
2   Q  Where does she sit?
3   A  She's our receptionist. She's on the south side,
4  central part of the floor.
5   Q  She doesn't work --
6   A  She's on the 23rd floor on the south side of the
7  building. This (indicating) is the north side of the
8  building.
9   Q  She doesn't work in this room, though?
10   A  She just brings our mail. She's the receptionist.
11  So she frequently is going through this delivering mail.
12   Q  And where does Mr. Cadagan sit?
13   A  John Cadagan is -- the location marked here on 224
14  as spot 238.
15   Q  Okay. It's marked as spot 238?
16   A  Yeah. That's John Cadagan's.
17   Q  So at approximately 9:37, you were at your trading
18  desk slot?
19   A  Yes.
20      BY MR. HATHAWAY:
21   Q  How long was your conversation with the
22  receptionist?
23   A  About how --
24   Q  The conversation you were having with the
25  receptionist that you'd referenced --

Page 111

1   A  Yeah. I don't know specifically how long it would
2  have been. It would have been, I could guess, less than a --
3  a couple minutes.
4   Q  When you listened to the voice mail from Mr. Davis,
5  was there anyone else listening with you on that line?
6   A  No.
7   Q  Had you placed the voice mail on speaker phone?
8   A  No.
9   Q  Did you, at any point in time after you first
10  listened to it, place the voice mail on speaker phone?
11   A  No. I immediately deleted it.
12   Q  What did Mr. Davis say in the voice mail?
13   A  I don't remember verbatim what he said.
14   Q  Do the best you can, please.
15   A  Well, in substance, I took away two things, that
16  Peter Fisher had indicated to Pete Davis they'd be canceling
17  the long bond and that there would be a press release,
18  because it was embargoed until 10 o'clock.
19   Q  Anything else in substance you took away from
20  listening to that voice mail?
21   A  No.
22   Q  How many times did you listen to the voice mail?
23   A  Once.
24   Q  Did you understand that the press release that was
25  to be embargoed until 10 o'clock was to contain the

Page 112

1  information about the canceling of the long bond?
2   A  That was my understanding.
3   Q  Did Mr. Davis in his voice mail mention anything
4  about TIPS?
5   A  Not to my recollection.
6   Q  Did he mention anything about the size and the
7  issuance of five-year notes?
8   A  No. Not to my recollection.
9   Q  Did he mention anything about the need to reopen
10  the 10-year bond or 10-year note?
11   A  I don't recall that.
12   Q  Did he mention anything about Treasury buy-back of
13  the long bond?
14   A  I don't recall.
15      BY MR. SPORKIN:
16   Q  How long was the message?
17   A  Less than a minute. I found out subsequent to this
18  the time was .8 minutes.
19      BY MR. HATHAWAY:
20   Q  Is this from the phone records you reviewed?
21   A  Yes. Specifically, I think my counsel --
22      MR. THEODOROU: Wait. Don't go into what company
23  counsel asked you. They're not going to get into it, I
24  assume.
25      BY MR. HATHAWAY:

SECNOTH00117241

Page 113

1  Q Did Mr. Davis say --
2      MR. SPORKIN: We're not going to ask you questions
3  we don't want you to answer regarding conversations you've
4  had with counsel.
5      THE WITNESS: This is information that was
6  developed away from me that was shown to me.
7      MR. HATHAWAY: Thank you.
8      BY MR. HATHAWAY:
9  Q Did Mr. Davis say that Mr. Fisher had told him that
10 Treasury was canceling the long bond?
11 A In substance, yeah.
12     BY MR. SPORKIN:
13 Q Did he mention the name Fisher in the voice mail?
14 A Yes.
15     BY MR. HATHAWAY:
16 Q After you hung up, did you have any reason in your
17 mind to think that this information about the cancellation of
18 the long bond was a rumor?
19 A Yes.
20 Q Why so?
21 A The phone call I'd taken prior to that with a
22 broker was specifically to inform me that there was a rumor
23 on the Chicago Board of Trade to the effect that the long
24 bond was going to be canceled, and also the rumor was
25 circulating on the Chicago Board of Trade that Treasury was

Page 114

1  going to shift to a monthly issuance of five-years rather
2  than a quarterly issuance of five-year Treasuries.
3  Q Who was this broker?
4  A I can't recall. I could guess.
5  Q Which dealer --
6  A It would be one of two. My best guess would be a
7  broker at UBS Securities, or Bankers Trust -- I'm sorry.
8  Bear Stearns. He used to work at Bankers Trust.
9  Q The UBS person, who is that?
10 A Steve Burfitt, B-u-r-f-i-t-t, I believe.
11 Q Bear Stearns person?
12 A Mark Hinckley, H-i-n-c-k-l-e-y.
13 Q Whether it was Mr. Burfitt or Mr. Hinckley, had
14 this person given you a call?
15 A Yes.
16 Q Was the purpose of the call to -- from what you
17 could tell, was the purpose of the call just to let you know
18 about this rumor?
19 A Yes.
20 Q Did the individual tell you how they had learned of
21 the rumor?
22 A Specifically, no.
23 Q Once you hung up, did you have any idea how they
24 had learned, whoever it was, Burfitt or Hinckley, about the
25 rumor?

Page 115

1  A On the Chicago Board -- didn't mention any --
2  Q Had they heard people shouting in the pit or --
3  A Well, they work in offices away from Chicago.
4      BY MR. SPORKIN:
5  Q Where do they work?
6  A UBS is in Stamford, Connecticut. Bear Stearns is
7  midtown Manhattan. They both work in a treasury room
8  environment very close to the traders.
9  Q These individuals respectively work in Connecticut
10 and New York?
11 A Yes. They're both salespeople for their respective
12 firms.
13     BY MR. HATHAWAY:
14 Q Is it your testimony that you understood after you
15 listened to the voice mail from Peter Davis that Treasury was
16 going to issue a press release that would indicate that the
17 long bond was to be canceled? Is that your testimony?
18 A Yes.
19 Q How is it that in your mind, after hearing that,
20 you believe that the information about the cancellation of
21 the long bond was a rumor?
22 A I don't know how to characterize his information.
23 The information from the prior phone call was characterized
24 as a rumor.
25 Q Did Mr. Davis, in his voice mail, do anything to

Page 116

1  characterize his information as a rumor?
2  A No, not to my recollection.
3  Q Did he use any words like "probably"? Do you
4  remember hearing that word?
5  A I don't recall specifically.
6  Q Did you hear the word "might cancel"?
7  A I don't recall.
8  Q Did you hear the words "could cancel"?
9  A I don't recall.
10 Q I'm just trying to jog your memory. "Possibly will
11 cancel"?
12 A I don't recall that.
13 Q "Is likely to cancel"?
14 A I don't recall that.
15 Q Do you remember any words at all in the voice mail
16 that in any way qualified the substance of the message about
17 this 30-year bond being canceled?
18 A In substance, what I took away was that Peter
19 Fisher had indicated it would be.
20 Q And who did you understand Peter Fisher to be?
21 A I understand him to be a Treasury official --
22 Q Did you --
23 A -- in the debt finance area.
24 Q Did you understand that as of October 31, 2001?
25 A Yes.

Page 113 - Page 116

SECNOTH00117242

Page 117

1    Q   Did you understand him to be an official that had
2   access to knowledge of that nature?
3    A   Yes.
4    Q   We'll spend more time with this today. It's
5   important for us to get our arms around whether or not you
6   believe the information you had from Mr. Davis, not from
7   Mr. Burfitt or Mr. Hinckley, was a rumor. Is it your
8   testimony you believe it was a rumor?
9    A   I don't know how to characterize his information.
10    Q   Did you believe it to be information that was
11   accurate?
12    A   Yes.
13    Q   Did you believe it to be information that upon
14   the --
15    A   Excuse me. If I can just -- accurate to the best
16   of his understanding.
17    Q   Did you --
18    A   I didn't think he was making it up.
19    Q   I'm sorry to interrupt you. Thank you. Did you
20   have any -- did you give any thought that upon the issuance
21   of the press release that you might, in fact, learn that the
22   long bond was not going to be canceled?
23    A   If at 10 o'clock there had been an announcement and
24   the long bond wasn't canceled, I wouldn't have been
25   surprised.

Page 118

1    Q   You would or would not?
2    A   I would not have been surprised.
3    Q   Why not?
4    A   It's just the nature of business. We have people
5   calling us frequently pounding the table that they're sure
6   XYZ is going to happen, or they're sure you should do XYZ.
7   Ultimately, the decision rests on us to make investment
8   decisions. These things may or may not happen.
9    Q   Had Peter Davis ever before called you and pounded
10   on table and said X was going to happen and have it not turn
11   out to happen?
12    A   Not that I can recall.
13    Q   Had Peter Davis ever called you before and told you
14   whether in a voice mail or in person that he'd spoken with an
15   official at Treasury who had given him information and that
16   information not turn out to be accurate?
17    A   Not that I can recall.
18    BY MR. SPORKIN:
19    Q   Did Peter Davis ever call you on a prior quarterly
20   refunding announcement?
21    A   Not that I can recall. If you want to guess, I'd
22   guess no. The honest answer is I just don't remember.
23    BY MR. HATHAWAY:
24    Q   Was it your understanding when you finished
25   listening to the voice mail from Mr. Davis that the

Page 119

1   information about the cancellation of the long bond had not
2   yet been announced by Treasury?
3    A   My understanding is they were about to announce it
4   at 10 o'clock.
5    Q   Had you seen anything in any of the wire services
6   or other information sources available to you to indicate
7   that Treasury had, in fact, already released that
8   information?
9    A   No.
10    Q   Did you look?
11    A   Prior or subsequent?
12    Q   After listening to the voice mail and having in
13   your mind the piece of information that Treasury was going to
14   cancel long bond, did you look to see if Treasury had, in
15   fact, already released that information?
16    A   I didn't specifically look for that bit of
17   information. That information did not cross my desk.
18    Q   Did you undertake any efforts after you heard the
19   voice mail to check and see whether the information had been
20   released or not?
21    A   No.
22    Q   Why not?
23    A   Do you want me to guess?
24    Q   Yes. It was your mind. You were the person there.
25   I'm just trying to understand what was in your mind at the

Page 120

1   time. Why did you not look?
2    A   If I had to get, because there would be no reason
3   to look. I did not see a reason at the time to look.
4    Q   Did you not see a reason because Mr. Davis had told
5   you it had not yet been released?
6    A   No. I just did not see a reason to go -- could
7   have gone to the web site. Didn't cross my mind. I could
8   have done a search on Reuters. It didn't occur to me.
9    Q   Did there come a point in time that you learned
10   that Treasury announced the information about the long bond?
11   When did you first learn that there had been an announcement
12   about the cancellation of the long bond?
13    A   There was talk prior to 10 o'clock that the
14   information had been released, and then there was an
15   announcement at 10 o'clock. I don't remember what time I
16   would have actually seen the wire story, but there would have
17   been a wire story on one of my services. I don't recall
18   observing it.
19    Q   The talk about a release, is that something you've
20   come to learn about after 10 o'clock on October 31st, or were
21   you aware of it as it was happening?
22    A   I received an e-mail, and I think it was time
23   stamped 9:55, but I no longer have that e-mail, from a
24   dealer, I believe Lehman Brothers, and I think it was, like,
25   one sentence, "Check out this web site," or something. It

SECNOTH00117243

Trading in Certain Treasury Issues  **Multi-Page™**  Steven Nothern, 12/4/01

---

Page 121

1 was a reference to the Treasury web site, some reference to
2 there was information there.
3   Q  Did you check out the web site?
4   A  No.
5   Q  Did you already know what was on the web site?
6   A  No.
7   Q  Why did you not check out the web site?
8   A  I was otherwise occupied.
9     BY MR. SPORKIN:
10   Q  When did you see this e-mail?
11   A  I don't remember when I saw it first.
12   Q  Was it after 10 o'clock?
13   A  I don't remember.
14     BY MR. HATHAWAY:
15   Q  When an e-mail comes in of this nature, is there
16 some signal to you at your work station that you have an e-
17 mail?
18   A  If I have my e-mail up, it scrolls the top.
19   Q  Did you have your e-mail up at that time?
20   A  I don't recall.
21   Q  At the time that you stopped listening to the voice
22 mail and had in your mind the information about the
23 cancellation of the long bond, did you understand that to be
24 confidential information?
25   A  No.

Page 122

1   Q  Why not?
2   A  It was being shared with me. There was no
3 indication that it was confidential.
4   Q  Did you in any way in your mind connect Mr. Davis'
5 statement that the press release was embargoed until 10 a.m.
6 with the piece of information you had about the cancellation
7 of the long bond? Did you bring those two concepts together?
8   A  Part of the press release would have been to that -
9 - would have directly addressed that issue. Is that what
10 you're asking?
11   Q  Yeah. Did you --
12   A  There would be a connection, if that's your
13 question.
14   Q  Right. And what is the connection?
15   A  That the press release would contain that
16 information.
17   Q  Did you, at that point in time or at any point in
18 time until you saw that the information -- that the press
19 release had been made, did you draw the conclusion that the
20 information you had about the long bond being canceled was
21 embargoed information?
22   A  Yes.
23   Q  Did you think at that point in time that this was
24 therefore confidential information that you had?
25   A  No.

Page 123

1   Q  Did you consider the information about the
2 cancellation of the long bond to be important -- strike that.
3 Did you consider the information about the long bond being
4 canceled to be market sensitive?
5   A  Yes.
6   Q  Why?
7   A  The market is already reacting. By definition, it
8 was market sensitive.
9   Q  What do you mean the market was already reacting?
10   A  I observed that the market had been fairly stable
11 earlier in the day, if I'm using the long bond as an
12 indicator, or the Treasury futures contract as an indicator.
13 Sometime around 9:30 did observe the market went up 8 ticks,
14 10 ticks contemporary to the time that we're talking about
15 here of receiving the first call from the broker. At that
16 point, the market had already ticked up, you know, maybe a
17 quarter point.
18     BY MR. SPORKIN:
19   Q  Is 8 ticks a significant amount to you?
20   A  In what sense? Yeah. I mean, it's --
21   Q  Is that considered a big movement, 8 ticks?
22   A  It's not a big movement, but I think it's a
23 significant movement. The nature of the broker's call is
24 that the market is reacting, and this is possibly what the
25 market's reacting to.

Page 124

1     BY MR. HATHAWAY:
2   Q  Was this 8 ticks on the long cash long bond or
3 on --
4   A  Yeah, on the cash long bond.
5     BY MR. SPORKIN:
6   Q  You mentioned before that there was conversations
7 about this rumor, and you referenced this e-mail. Was there
8 any other conversations or discussions amongst any other
9 people?
10   A  The e-mail was referencing a Treasury web site.
11   Q  Right.
12   A  I think it was hindsight referencing the fact that
13 there was already information posted on the web site.
14   Q  Right. I understand that. But you responded to a
15 question that Mr. Hathaway asked about whether there was any
16 discussions about this prior to 10 o'clock, and you said
17 there were, and you referenced this e-mail. Was there
18 anything else? Did you have discussions with anyone else?
19   A  With my colleagues, yes.
20   Q  Anyone outside of MFS?
21   A  No.
22   Q  Who within MFS did you have discussions with?
23   A  David Kennedy and the trader John Cadagan.
24     BY MR. HATHAWAY:
25   Q  Let me just understand here. Are these discussions

SECNOTH00117244

Page 125

1 after the phone call with either Burfitt or Hinckley, or were
2 these discussions you had following hearing the voice mail
3 with Mr. Davis?
4    A  The latter.
5       BY MR. SPORKIN:
6    Q  Let's go chronologically.  After you received the
7 voice mail from Mr. Davis, what did you do?
8    A  I moved to David Kennedy's desk, which would be
9 location 243 on your Exhibit 224, and shared with Dave
10 Kennedy the fact that I received this phone mail message.
11   Q  The Davis phone message?
12   A  Exactly.  Yeah.
13      BY MR. HATHAWAY:
14   Q  What did you tell him was the content of the voice
15 mail?
16   A  That Pete Davis, our Washington consultant, had
17 said that they'd be canceling the long bond and that they'd
18 be announcing it at 10 o'clock.
19   Q  And did you mention to Mr. Kennedy that Mr. Davis
20 had said the press release was embargoed?
21   A  Not at that point.
22   Q  At what point did you mention that to him?
23   A  Subsequently, we did discuss the fact that this was
24 embargoed, that there was a press release that was going to
25 come at 10:00, but it was embargoed until 10 o'clock.

Page 126

1    Q  When was that discussion about the press release
2 that was to be embargoed?
3    A  Subsequent to describing taking the phone message
4 and that they were going to be announcing cancellation of the
5 long bond at 10 o'clock.
6    Q  Let me try to do it this way:  Did you, at some
7 point in time, place trades based on this information you
8 received from Peter Davis?
9    A  We did place trades, yes.
10   Q  In your subsequent conversation with Mr. Kennedy
11 about the press release and the embargo, did that occur
12 before or after these trades were placed?
13      MR. THEODOROU:  The press release and/or the
14 embargo or the press release or both?
15      MR. HATHAWAY:  Thank you, Counsel.
16      BY MR. HATHAWAY:
17   Q  Did you tell Mr. Kennedy that there was an embargo
18 on the press release about the cancellation of the 30-year
19 bond before or after the trades were placed?
20   A  I don't know exactly.
21   Q  What's your best guess?
22   A  My best guess is -- I don't know.  I can't tell
23 you.  My best guess is that we placed the order and that that
24 discussion was subsequent, but I really don't recall the time
25 frame.

Page 127

1    Q  When you spoke with Mr. Kennedy about the substance
2 the voice mail you had from Mr. Davis, did he ask you any
3 questions?
4    A  Not that I can recall.  Excuse me.  Let me correct
5 that.  He put out the question, "What should we do about
6 this?"
7    Q  Did he say anything at all about, "Well, how did
8 Pete Davis know this?  Where is he getting this information?"
9    A  No.
10   Q  Did he ask you whether you thought this was a
11 rumor?
12   A  No.
13   Q  Did you say to him the word "I've heard a rumor
14 that"?
15   A  Yes.
16      BY MR. SPORKIN:
17   Q  What did you say?
18   A  We discussed the fact that -- the rumor on the
19 Chicago Board of Trade.
20      BY MR. HATHAWAY:
21   Q  Did you present to Mr. Kennedy that Mr. Davis'
22 information to you was a rumor?
23   A  No.  I didn't characterize it like that.
24   Q  How did you characterize it?
25   A  Exactly the way I mentioned earlier, to the best of

Page 128

1 my recollection.
2    Q  What happened after you spoke with Mr. Kennedy?
3 What happened next?
4    A  He posed a question of, you know, what we should do
5 about this.  I said I'd be buying 25 bonds, 25 million bonds.
6 He also decided he was going to be buying 25 million bonds.
7 Two colleagues also -- one bought 5, the other bought 10 or
8 intended to buy.  John Cadagan did the math.  I gave them
9 authorization to go ahead and buy them.
10   Q  The other two individuals, who are they?
11   A  Rick Smith.  On your Exhibit 224, it's in slot 242.
12 And Geoffrey Kurinsky in slot 265.  Rick Smith, 5 million.
13 Geoffrey Kurinsky, 10 million.
14   Q  Did you or Mr. Kennedy in your presence have some
15 conversation with either Smith or Kurinsky about this
16 information?
17   A  My conversation with Dave Kennedy was for general
18 purposes.  I was informing my colleagues.
19   Q  Looking at Exhibit 224, is it your testimony that
20 after you listened to the voice mail you moved from your
21 position 241 to the vicinity of 243?  Is that correct?
22   A  Exactly.  I stood immediately behind them.
23   Q  Where was Mr. Kurinsky at that time?
24   A  At his desk.
25   Q  And where was Mr. Smith at that time?

SECNOTH00117245

Page 129

1    A    Also at his desk.
2    Q    Did these individuals turn their attention to you?
3    A    I don't recall. They're both -- just to paint a
4 picture, there are large monitors on either side. So between
5 location 265 and 243, for example, Geoffrey Kurinsky had
6 those two large monitors on that desk space, occupying that
7 desk space between, you know, 265 and 243. So it virtually
8 creates a wall.
9        There is the same thing between location 243 and
10 242. Rick Smith has one large monitor creating a bit of a
11 barrier. Mr. Kennedy has one of his large monitors kind of
12 back to back with Geoffrey Kurinsky's monitors, I guess three
13 large monitors creating a bit of a barrier.
14    Q    Where was Mr. Cadagan at this time that you walked
15 over to --
16    A    His desk, which would be location 238.
17    Q    When you spoke to Mr. Kennedy about the substance
18 of the voice mail from Mr. Davis, were you speaking in a
19 conversational tone or louder or quieter?
20    A    Conversational tone.
21    Q    Did you intend for your words to be heard by
22 persons other than just Mr. Kennedy?
23    A    Yeah.
24    Q    Describe that for me. Explain that to me.
25    A    It was sharing this information with a group. I

Page 130

1 had made a decision that my next ticket was going to be a buy
2 ticket, and I went over to the group to share, A, the
3 information that I collected and, B, the fact that I was
4 going to be doing a transaction, the intention being that if
5 we were going to be doing a similar thing that we should all
6 do it together and get in as one order, as opposed to a
7 series of sequential orders.
8    Q    How much type lapsed between hearing the voice mail
9 from Mr. Davis and you reaching the decision to buy 25
10 million of Treasury bonds?
11    A    I don't know specifically. I'd say within five
12 minutes.
13    Q    During that period of time, however long it took
14 before you reached your decision, did you speak with anyone
15 else about what you'd heard from Mr. Davis?
16    A    I had, in essence, made my decision before I got up
17 from my desk to go and share this with my colleagues.
18    Q    In that time frame between listening to the message
19 from Mr. Davis and making that decision in your mind to buy
20 25 million bonds, did you do anything else? Did you take any
21 steps? Did you look anywhere? Did do you have an
22 understanding?
23    A    What do you mean "do anything"?
24    Q    Well, you have monitors in front of you. You've
25 got a phone. I mean, there's all kinds of things you could

Page 131

1 do. Did you do anything?
2    A    I observed the monitors, observed the market, which
3 I will typically do as I'm on the phone, in any case.
4    Q    Were you looking for anything in particular during
5 that time period?
6    A    Not that I recall. I mean, I would have been
7 looking at the price of the long bond and the Treasury market
8 in general, a wide array of information. I'm just looking
9 for market changes.
10    Q    Did you see anything in your monitors during that
11 time period that helped you reach the conclusion to buy the
12 bond?
13    A    The only thing I observed is that the bond had
14 moved up 8, 10 ticks in the last 10 minutes, 15 minutes.
15    Q    How did that help you reach a decision to buy
16 bonds?
17    A    The market was moving. It was digesting
18 information. It was collaborative of the fact that there was
19 information hitting the market.
20    Q    Did you give any conversation to the fact that the
21 8 to 10 ticks might represent the full digestion by the
22 market of the information?
23    A    You wouldn't -- couldn't know that.
24    Q    Did you give it any consideration?
25    A    I did not.

Page 132

1        BY MR. SPORKIN:
2    Q    Would you expect the market to react more than 8 to
3 10 ticks on news like this?
4    A    In the abstract?
5    Q    Yes.
6    A    Given what I know about the circumstances that day?
7    Q    Yes. Prior to 10 o'clock would you have expected
8 the market to react more than 8 to 10 ticks on the news that
9 the long bond was not going to be issued anymore?
10    A    I didn't quantify. If it moved 5 and a half points
11 that day, it was beyond anybody's expectation. It's, I
12 think, linked to circumstances not just linked to that,
13 linked to the condition of the market at the time. I'm just
14 telling you -- I'm struggling with -- I've read a Financial
15 Times story quoting Peter Fisher saying he thought the market
16 would go down.
17        So yes, this is information that you'd expect and
18 you would have expect the market that morning to make the market
19 move up, but in the abstract you couldn't know how much of it
20 would go. You have one participant. I should think it would
21 go down.
22    Q    Did you think it would move more than 8 to 10
23 ticks?
24    A    No.
25    Q    Going back a second to the conversation -- the

Page 129 - Page 132

SECNOTH00117246

# Exhibit H

**Excerpts from Geoffrey Kurinsky's
December 12, 2001 SEC Investigative Testimony**

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:        )
                         )  File No. HO-9353
TRADING IN CERTAIN       )
TREASURY ISSUES          )

WITNESS:  Geoffrey Lee Kurinsky

PAGES:    1 through 174

PLACE:    Room 1C25C
          Securities and Exchange Commission
          450 Fifth Street, N.W.
          Washington, D.C.  20549

DATE:     Wednesday, December 12, 2001

          The above-entitled matter came on for hearing, pursuant
to notice, at 11:02 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

          WILLIAM M. HATHAWAY, ESQ.
          U.S. Securities and Exchange Commission
          Division of Enforcement
          450 Fifth Avenue, N.W.
          Washington, D.C.  20549
          (202) 942-4704

On behalf of the Witness:

          BRUCE SINGAL, ESQ.
          Donoghue, Barrett & Singal, P.C.
          One Beacon Street
          Boston, Massachusetts  02108
          (617) 720-5090

---

Page 2

## C O N T E N T S

| WITNESSES: | | EXAMINATION |
|---|---|---|
| Geoffrey Lee Kurinsky | | 5 |
| EXHIBITS: | DESCRIPTION | IDENTIFIED |
| 238 | Subpoena ad testificandum | 5 |
| 239 | Documents produced by MFS | 71 |

---

Page 3

1           P R O C E E D I N G S

2           MR. HATHAWAY:  We are on the record.  It's

3  approximately 11:01 a.m.  This is December 12, 2001.

4  Whereupon,

5           GEOFFREY LEE KURINSKY

6  was called as a witness and, having been first duly sworn,

7  was examined and testified as follows:

8           MR. HATHAWAY:  Would you please state and spell

9  your full name for the record.

10          THE WITNESS:  Geoffrey Lee Kurinsky,

11  G-e-o-f-f-r-e-y  L-e-e  K-u-r-i-n-s-k-y.

12          MR. HATHAWAY:  I am William Maxwell Hathaway.  I go

13  by Max Hathaway.  And I'm an officer of the Commission for

14  the purpose of this proceeding.  This is an investigation by

15  the United States Securities & Exchange Commission, "In the

16  Matter of Trading in Certain Treasury Issues."  Our file

17  number is HO-9353.

18          This is an investigation to determine whether there

19  have been any violations of the federal securities laws.

20  However, the evidence adduced in this investigation could

21  constitute violations of other state or federal civil or

22  criminal statutes.

23          Prior to the opening of the record, which means

24  prior to turning the microphones on and having you sworn to

25  tell the truth, you were provided with a copy of the Formal

---

Page 4

1  Order of Investigation, which I'm pointing to now in front of

2  you.

3           This copy of the Formal Order will remain available

4  for your examination throughout the course of today's

5  proceeding.  Have you had an opportunity to review the Formal

6  Order of Investigation?

7           THE WITNESS:  Yes, I have.

8           MR. HATHAWAY:  Also prior to the opening of the

9  record you were provided with a copy of Exhibit 201.  Exhibit

10  201 is a copy of the Securities & Exchange Commission

11  Supplemental Information on Form 1662.

12          Have you had an opportunity to read the Form 1662?

13          THE WITNESS:  Yes, I have.

14          MR. HATHAWAY:  Do you at this time have any

15  questions concerning the Form 1662?

16          THE WITNESS:  Not at this time.

17          MR. HATHAWAY:  Mr. Kurinsky, are you represented by

18  counsel?

19          THE WITNESS:  Yes.

20          MR. HATHAWAY:  Counsel, would you please identify

21  yourself for the record.

22          MR. SINGAL:  Yes.  I'm Bruce Singal from the law

23  firm of Donoghue, Barrett & Singal, One Beacon Street,

24  Boston, Mass 02108.  Telephone (61) 720-5090.

SECNOTH00117153

Page 133

1 that reflected information about the elimination of the 30-
2 year bond?
3    A  Yes.
4    Q  What did you see?
5    A  At 10:00, in the book is --
6    Q  Which book are you referencing?
7    A  My book of e-mails.
8    Q  Okay, go on.
9    A  An e-mail from Beau Coash at Lehman Bros. saying
10 the Treasury announced the elimination of the 30-year
11 Treasury, something to that effect.
12    Q  The e-mail from Beau Coash, is that the first
13 indication you had from all the information sources available
14 to you that the Treasury had announced the elimination of the
15 30-year bond?
16    A  No.  I thought the information was public at the
17 time when I received it from Pete Davis.
18    Q  My question is whether in terms of what you saw
19 printed.
20    A  Right, it was the first -- correct.
21    Q  At 10:00 -- did you see that at approximately
22 10:00?
23    A  I don't remember, 10:01, 10:02.
24    Q  In and about 10:00?
25    A  Right, yes.

Page 134

1    Q  In between approximately 9:40, when you went back
2 to your work routine after buying the bonds, and in or about
3 10:00, when you saw the first printed information about the
4 Treasury announcing the elimination of the bond, did you give
5 any thought to whether or not the information that you had
6 heard from Steve Nothern about the elimination of the bond,
7 did you give any thought as to whether that information had
8 not been publicly released yet?
9    A  I didn't.
10    Q  How important was that information to your decision
11 to buy ten million bonds?
12    A  I'd say it was a small part of the mosaic.  We had
13 had -- we already had determined as a group -- first of all,
14 I already owned roughly 100 million 30-year Treasury bonds.
15    Q  100 million?
16    A  Right.  That includes tips, and that includes old
17 bonds.  So the Treasury bond series, bonds that would move in
18 high correlation.  We had talked about the fact that the
19 curve was too steep, it wasn't consistent with our view that
20 we wanted a long Treasury bond.
21        The market activity, you know, from roughly 9:20 to
22 9:30 showed that a long Treasury was, you know, up and short
23 Treasuries were down.  And I'd say this was sort of a final
24 put me over the top.  I don't know.  This made it seem
25 obvious that it was more likely yes than no.

Page 135

1    Q  What was more likely?
2    A  More likely to be eliminated, was not -- you know,
3 I'd say it was two to one.  They had a good risk return at
4 that point.  And that's why we bought a relatively small
5 amount.
6    Q  What had your testimony been earlier as to the
7 amount of cash you thought yourself to have available on that
8 day?
9    A  I don't remember, but it was 15 or 20.
10    Q  All right.  Aside from the fact that you already
11 owned about 100 million of the longer term bonds --
12    A  Right.
13    Q  -- that you, in your view, the curve was too steep,
14 and that you'd seen the long bond trading up and the short
15 maturities trading down between 9:20 and 9:30, is there
16 anything else besides that you just testified to that
17 contributed to the mosaic that pulled you in the direction of
18 making this purchase?
19    A  Nothing -- not that comes to mind.
20    Q  As well as you're able to answer this question, if
21 you had not heard the information you did from Steve Nothern
22 about the elimination of the 30-year bond, do you believe you
23 would have purchased the ten million bonds, or any amount of
24 bonds before 10:00 on October 31, 2001?
25    A  I probably wouldn't have.

Page 136

1    Q  Would not have?  Did you give any thought to buying
2 -- at any point on October 31, 2001, did you give any thought
3 to buying more than the ten million you'd already bought?
4    A  No.
5    Q  What happened to those bonds?
6    A  Can you be more precise as to time or --
7    Q  Do you still own those bonds?
8    A  Well, it's hard to say because 30-year Treasuries
9 are fungible.  I always own a lot of them in the portfolio.
10    Q  On October 31, 2001, did you sell ten million 30-
11 year bonds?
12    A  Yes.
13    Q  Approximately when did that occur?
14    A  In the next hour or two.
15    Q  Why did you do that?
16    A  What did I do that?
17    Q  Yes.
18    A  Because the market was up, and it looked like the
19 market was probably over-reacting.  I mean, whenever the
20 market is up a lot, it typically subsequently sells off.
21    Q  Was any part of your thinking in selling these
22 bonds to capture some profit?
23    A  Oh, yes.
24    Q  Why ten million, and not five million or not 20
25 million or some other figure?  How did you arrive at selling

SECNOTH00117186

# Exhibit I

## Excerpts from David Kennedy's
## December 21, 2001 SEC Investigative Testimony

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:                    )
                                     ) File No. HO-9353
TRADING IN CERTAIN TREASURY ISSUES   )

WITNESS: David Kennedy

PAGES:   1 through 123

PLACE:   Securities and Exchange Commission
         Room 1C14
         450 Fifth Street, N.W.
         Washington, D.C. 20549

DATE:    Tuesday, December 11, 2001

         The above-entitled matter came on for hearing, pursuant
to notice, at 10:32 a.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

         WILLIAM HATHAWAY, ESQ.
         ANDREW SPORKIN, ESQ.
         Division of Enforcement
         Securities and Exchange Commission
         450 Fifth Street, N.W.
         Washington, D.C.  20549
         (202) 942-4587

On behalf of the Witness:

         BRUCE SINGAL, ESQ.
         Donoghue, Barrett, & Singal, P.C.
         One Beacon Street
         Boston, Massachusetts  02108
         (617) 720-5090

---

Page 2

C O N T E N T S

WITNESSES:                                  EXAMINATION

David S. Kennedy                                 3

EXHIBITS       DESCRIPTION              IDENTIFIED

231            MFS insider trading policy      108

232            Subpoena from the SEC to
               David S. Kennedy                 5

---

Page 3

P R O C E E D I N G S

1      MR. HATHAWAY:  We're on the record.  It's
2  approximately 10:32.  This is December 11, 2201.
3      Whereupon,
4
5              DAVID SCOTT KENNEDY
6  was called as a witness and, having been first duly sworn,
7  was examined and testified as follows:
8      MR. HATHAWAY:  Would you please state and spell
9  your full name for the record?
10     THE WITNESS:  David Scott Kennedy, D-a-v-i-d --
11  David Scott, S-c-o-t-t Kennedy, K-e-n-n-e-d-y.
12     MR. HATHAWAY:  Mr. Kennedy, I'm William Maxwell
13  Hathaway, and joining me at some point today will be my
14  branch chief on this project, Andrew Sporkin.
15         Myself and Mr. Sporkin are both officers of the
16  Commission for the purpose of this proceeding.
17         This is an investigation by the United States
18  Securities and Exchange Commission in the matter of trading
19  in certain Treasury issues.
20         Our file number is HO-9353.  It's an investigation
21  to determine where there have been any violations of the
22  federal security laws; however, the facts developed in this
23  investigation might constitute violations of other federal or
24  state civil or criminal laws.
25         Prior to the opening of the record, which means

---

Page 4

1  prior to turning on the tape recorders here, you were
2  provided with a copy of the formal order of investigation in
3  this matter.  It will be available for your examination
4  through out the course of today's testimony session.
5         Have you had an opportunity to review the formal
6  order of investigation?
7      THE WITNESS:  Yes, I have.
8      MR. HATHAWAY:  Also prior to the opening of the
9  record you were also provided with a copy of the Commission's
10  Supplemental Information on Form 1662, which had been marked
11  previously as Exhibit 201 in this investigation.  Have you
12  had an opportunity to read the Form 1662?
13     THE WITNESS:  Yes I have.
14     MR. HATHAWAY:  Do you at this point in time have
15  any questions concerning Exhibit 201?
16     THE WITNESS:  No, I do no.
17     MR. HATHAWAY:  Mr. Kennedy, are you represented by
18  counsel?
19     THE WITNESS:  Yes.
20     MR. HATHAWAY:  Counsel, would you please identify
21  yourself for the record?
22     MR. SINGAL:  yes, my name is Bruce Singal from the
23  law firm of Donoghue, Barrett & Singal, in Boston.
24     MR. HATHAWAY:  What is your street address and
25  phone number, sir?

SECNOTH00117109

**Trading in Certain Treasury Issues**    Multi-Page™    **David Kennedy, 12/11/01**

Page 73

1 increase.

2    So that, I know, was in the back of my mind, when I

3 heard what Steve said. And it's feasible that they would do

4 this.

5    Q   Had you, before, traded on any of the discussions

6 or speculations about the elimination of the 30-year bond?

7    A   Yes.

8    Q   In what way?

9    A   In early 2000 -- I was at Harvard Capital at the

10 time -- we bought more long Treasurys on the possibility that

11 the 30-year would be eliminated, and if not entirely

12 eliminated, that the subsequent refundings would get smaller

13 -- 30-year refundings would get smaller, and there would be a

14 premium paid for 30-year Treasurys.

15    Q   Did you in any way tie Mr. Nothern's statements

16 about what he'd heard from Mr. Davis concerning the 30-year

17 bond, to the quarterly refunding announcement when you heard

18 it?

19    A   I did not, no.

20    Q   Did there come a --

21    A   Not to my recollection did I put those two

22 together.

23    Q   Did there come a point in time that you put those

24 two together?

25    A   Not until after.

Page 74

1    Q   After what?

2    A   Not until the following week, when -- the story of

3 Peter Davis at the refunding, did I put those two together.

4 Until that time, I thought of them as entirely different

5 issues for the Treasury.

6    Q   Did Mr. Nothern -- prior to your placing your trade

7 for $25 million in Treasurys, did Mr. Nothern say anything

8 about TIPS -- T-I-P-S, in terms of what he'd heard from Mr.

9 Davis?

10    A   Not that I remember.

11    Q   Did Mr. Nothern mention anything about buybacks of

12 30-year bonds during that time frame?

13    A   And what was the time frame?

14    Q   From when he first mentioned what he'd heard from

15 Mr. Davis until the point in time that you placed your order

16 for $25 million in Treasurys.

17    A   Not that I remember.

18    Q   Did Mr. Nothern during that time frame say anything

19 about the amount of five-year notes Treasury was going to

20 issue in the next quarter?

21    A   Not that I can recall.

22    Q   Did he mention anything about a reopened 10-year

23 note?

24    A   Not that I remember.

25    Q   And speaking about his -- what he'd heard from Mr.

Page 75

1 Davis, did Mr. Nothern seem to be forecasting what Treasury

2 was going to do, or reporting to you what had happened?

3    MR. SINGAL:  I'll object to the form of the

4 question.

5    BY MR. HATHAWAY:

6    Q   Do you understand my question?

7    A   I do.  I mean, if I had to choose between the two

8 -- was it reporting and --

9    Q   Forecasting.

10    A   Forecasting?  He seemed to be reporting what Peter

11 Davis had told him.

12    Q   Did Mr. Nothern say anything to you that suggested

13 to you that he was passing a rumor on to you?

14    A   The way I interpreted what he said, it was not a

15 fact that the Treasury was eliminating the 30-year.

16    Q   But rather?

17    A   Rather that it was a possibility.

18    Q   Was there -- prior to your placing the trade for

19 $25 million Treasurys, and after having heard what you did

20 from Mr. Nothern, did you have any doubts in your mind as to

21 whether Treasury would, in fact, eliminate the 30-year bond?

22    A   Yes, I did.

23    Q   Please explain that for me.

24    A   As I had mentioned before, after placing the order,

25 sitting down at my trading desk watching the monitors, and

Page 76

1 the Treasury began to decline -- the 30-year Treasury began

2 to decline, I thought that I had made a bad move.

3    Q   My question was, prior to placing the trade, did

4 you have any doubt in your mind as to whether Treasury would,

5 in fact, eliminate the 30-year bond?

6    A   Oh. Yes, I did.

7    Q   Please explain that for me.

8    A   I didn't know who Pete Davis was.  This was one

9 source of information, and so yeah -- yes, briefly I

10 questioned whether or not I should buy.

11    Q   You testified earlier in response to Mr. Sporkin's

12 questions that Mr. Davis -- Mr. Nothern had explained at some

13 point who Mr. Davis was; is that not correct?

14    A   Yes.

15    Q   Did that explanation of who Mr. Davis was occur

16 before or after you placed your order for the $25 million

17 Treasurys?

18    A   To the best of my memory, it was right after I had

19 placed the order.

20    Q   Why did you place the order for the $25 million

21 Treasurys?

22    A   I have confidence in Steve Nothern, and Steve was

23 buying $25 million.  And if he thought this was a reasonable

24 thing to do, it was going to follow suit.

25    Q   Any other reason as to why you bought the $25

Page 73 - Page 76

**Diversified Reporting Services, Inc. (202) 296-9626**

SECNOTH00117127

## Page 77

1 million?

2    A   If what Steve told us was true, then long Treasury
3 prices were going up, and I did not want to -- I already
4 owned the 30-year, but I felt it prudent to add to my
5 position.

6    Q   Was it your anticipation that if this information
7 proved accurate, that there would be a large increase in the
8 price of the Treasury?

9    A   At the time I -- I can't recall for certain whether
10 I thought it was going to go up one point, two points. I
11 thought it would probably go up.

12    Q   Did -- prior to your placing your order for the $25
13 million Treasurys, did Mr. Nothern say anything to suggest
14 that the information he had given you from Pete Davis was not
15 public information?

16    A   No.

17    Q   Did Mr. --

18    A   Not to my memory. I don't recall him, in any way.

19    Q   Prior to your placing the trade for the $25 million
20 Treasurys, did Mr. Nothern ever use the word, "embargo"?

21    A   Not to my memory. Not that I can recall.

22    Q   Did Mr. Nothern, after or -- at the time of, or
23 after you placed that order, use the word, "embargo" to
24 describe the information he'd given you?

25    A   I don't recall him using the word, "embargo."

## Page 78

1    Q   Between the time that Mr. Nothern first spoke to
2 you about the information from Mr. Davis, until today, has
3 Mr. Nothern ever suggested to you in any way that the
4 information from Mr. Davis was confidential?

5    A   I'm not sure how I answer that. I only -- Steve
6 and I had a discussion the following Monday, regarding a New
7 York Times article.

8    MR. SINGAL: Before you go on, I just wanted to
9 make sure that this is not privileged discussion. If this
10 pertains -- if this was either in the presence of counsel, or
11 if its substance relates to the substance of what was
12 discussed with counsel, then I would counsel the witness not
13 to answer the question, but I'm not sure if that is the case.

14    BY MR. HATHAWAY:

15    Q   Was there any attorney present when you had the
16 discussion with Mr. Nothern about the New York Times article?

17    A   No, there was not.

18    Q   What did Mr. -- what was said in this conversation?

19    MR. SINGAL: Well, I need to consult with the
20 client, because there's -- let me speak to him outside.

21    MR. HATHAWAY: Wait a minute, I'm not understanding
22 what the purpose is.

23    MR. SINGAL: Well, I need to consult with him to
24 determine whether this conversation is privileged, in that it
25 would relate to a discussion with counsel. I understand your

## Page 79

1 position that there's no counsel present, but if the
2 conversation repeated and related to a conversation he had
3 with counsel, then it would be privileged, and I would
4 instruct him not to answer. So I want to consult with him to
5 determine if that's the case.

6    MR. HATHAWAY: Okay. We're off the record. It's
7 approximately 12:34.

8    (A brief recess was taken.)

9    MR. HATHAWAY: We're back on the record at
10 approximately 12:35, and in the short break, counsel has
11 indicated that he is not going to instruct the witness not to
12 answer that question.

13    BY MR. HATHAWAY:

14    Q   Do you remember the question?

15    A   No, would you please repeat it.

16    Q   Yes. You had a conversation, did you not, on the
17 next Monday with Mr. Nothern concerning the New York Times
18 article?

19    A   Yes.

20    Q   What was said in that conversation?

21    A   I approached Steve Nothern with the New York Times
22 article in hand, and stated, "Look what happened here." And
23 this was really the first time I had seen the word, or heard
24 the word, "embargo" used in this context regarding the press'
25 use of information, and you know, Steve and I -- I think --

## Page 80

1 well, we discussed, or just talked about Pete Davis' role.
2 He was -- we read this article. I don't know if he read it
3 -- he had read it before, but that Pete had been in this
4 meeting, he was not press. I know I was, I think, surprised
5 at how the events unfolded.

6    Q   In that conversation, did Mr. Nothern say anything
7 at all about whether Mr. Davis had conveyed to him that this
8 information was embargoed?

9    A   I don't recall him ever mentioning to me that Pete
10 Davis had told him the information was embargoed.

11    Q   On October 31, 2001, did Mr. Nothern ever use the
12 word, "embargo" at any point in time?

13    A   Not that I remember.

14    Q   On October 31, 2001, did Mr. Nothern say to you, or
15 in your presence, any words that suggested to you that the
16 information from Mr. Davis was subject to any kind of
17 restriction whatsoever?

18    A   Not that I remember.

19    Q   On October 31, 2001, did Mr. Nothern either say to
20 you, or in your presence, any words that in any way suggested
21 to you that the information from Mr. Davis was confidential
22 information?

23    A   No.

24    Q   On October 31, 2001, did Mr. Nothern say any words
25 to you, or in your presence, that suggested to you that you

SECNOTH00117128

# Exhibit J

**Excerpts from D. Richard Smith's
December 21, 2001 SEC Investigative Testimony**

Page 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

```
In the Matter of:              )
                               )  File No. HO-9353
TRADING IN CERTAIN TREASURY ISSUES )
```

WITNESS: D. Richard Smith, III

PAGES:    1 through 145

PLACE:    Securities and Exchange Commission
          Room 1C14
          450 Fifth Street, N.W.
          Washington, D.C. 20549

DATE:     Tuesday, December 11, 2001

        The above-entitled matter came on for hearing, pursuant
to notice, at 2:55 p.m.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

        WILLIAM HATHAWAY, ESQ.
        ANDREW SPORKIN, ESQ.
        Division of Enforcement
        Securities and Exchange Commission
        450 Fifth Street, N.W.
        Washington, D.C.  20549
        (202) 942-4587

On behalf of the Witness:

        BRUCE SINGAL, ESQ.
        Donoghue, Barrett, & Singal, P.C.
        One Beacon Street
        Boston, Massachusetts  02108
        (617) 720-5090

---

Page 2

CONTENTS

WITNESSES:                                    EXAMINATION

D. Richard Smith, III                              3

EXHIBITS     DESCRIPTION                      IDENTIFIED

233          Subpoena                              3

234          9 page document                      98

235          M 1870-90                            108

236          Document from MFS                    119

237          Solomon Analytics                    130

---

Page 4

1  PROCEEDINGS
2      (SEC Exhibit 233 was
3      marked for identification.)
4      MR. HATHAWAY:  We are on the record.  It is
5  approximately 2:55 p.m.  This is December 11, 2001.
6  Whereupon,
7      DAVID RICHARD SMITH III
8  was called as a witness and, having been duly sworn, was
9  examined and testified as follows:
10     BY MR. HATHAWAY:
11     Q  Thank you very much.  Would you please state and
12  spell your full name for the record?
13     A  My full name is David Richard Smith III; D-a-v-i-d;
14  R-i-c-h-a-r-d; S-m-i-t-h.
15     Q  Thank you, Mr. Smith.  My name is William Maxwell
16  Hathaway, and joining me at some point later today will be
17  Andrew Sporkin.  Myself and Mr. Sporkin are both officers of
18  the Commission for the purpose of this proceeding.
19     This is an investigation by the United States
20  Securities and Exchange Commission in the matter of Trading
21  in Certain Treasury Issues.  Our file number is HO-9353.  The
22  investigation is to determine whether there have been any
23  violations of the federal securities laws; however, the
24  evidence produced in this investigation might constitute
25  violations of other state or federal, civil or criminal

---

Page 4

1  statutes.
2      Prior to the opening of the record, which means
3  prior to turning on the microphones here, you were provided
4  with a copy of the formal order of investigation in this
5  matter.  This copy of the formal order will remain available
6  for your examination throughout the course of today's
7  testimony session.
8      Have you had an opportunity to review the formal
9  order of investigation?
10     A  Yes, I have.
11     Q  Also prior to the opening of the record you were
12  provided with a copy of Exhibit 201.  Exhibit 201 is a copy
13  of the Securities and Exchange Commission Supplemental
14  Information on Form 1662.
15     Have you had an opportunity to read the Form 1662?
16     A  Yes.
17     Q  Do you, at this point, have any questions
18  concerning the Form 1662?
19     A  No.
20     Q  Mr. Smith, are you represented by counsel?
21     A  Yes.
22     MR. HATHAWAY:  Counsel, would you please identify
23  yourself for the record?
24     MR. SINGAL:  Bruce Singal from the law firm of
25  Donoghue, Barrett & Singal, One Beacon Street, Boston, Mass,

SECNOTH00117289

Page 77

1 Treasury bonds?

2    A  Did I reach a decision?

3    Q  You testified earlier that --

4    A  Yes.

5    Q  -- you had in mind that you would buy bonds for $5

6 million that day?

7    A  Yes.

8    Q  During this five-minute period did those thoughts

9 ever reach a concrete decision to buy the $5 million?

10    A  I think that it was a combination of factors during

11 that period of time that would make me think about things,

12 think about purchasing, that the market was rallying.

13        I had the cash to spend and that, you know, over

14 the course of that five minutes it was becoming evident that

15 my co-worker was recommending it --

16    Q  How did it -- how did it become evident to you --

17 are you referring to Mr. Nothern?

18    A  Yes, I am.  Yeah.

19    Q  How did it become evident to you that Mr. Nothern

20 was recommending buying Treasuries?

21    A  Well, when they first asked the trader to buy $60

22 million it became evident that, you know, he was -- he was

23 deciding that was the time to put money to work.

24    Q  Is that asking Mr. Cadogan to get the $60 million

25 is that something other than the event of learning that Mr.

Page 78

1 Cadogan was asking Merrill Lynch for an offer on the $60

2 million?  Or is that the same event?

3    A  There was only one.  You know, the group of people

4 to my right -- Mr. Nothern, Mr. Kennedy and Mr. Kurinsky --

5 jointly decided, either individually or collectively that

6 they were going to be purchasing securities at that point in

7 time.

8    Q  Did you hear their discussion in that regard?

9    A  No, I did not.

10    Q  Did you hear the conclusion of that discussion

11 being, we're going to buy $60 million?

12    A  I don't remember the specific words.  I do remember

13 the specific words of John asking Merrill Lynch to offer the

14 securities.

15    Q  And you tied that into what Mr. Nothern and Mr.

16 Kurinsky --

17    A  Yeah, I was aware that --

18    Q  -- and what Mr. Kennedy were wanting to do with

19 regard to Treasuries, as opposed to some other managers on

20 the floor?

21    A  I just want to make sure I understanding what you

22 say correctly.

23        MR. SINGAL:  Well, if you understand it, answer it.

24 If you don't understand it, tell him you don't understand it.

25        BY MR. HATHAWAY:

Page 79

1    Q  You -- you had heard -- did someone ask Mr. Cadogan

2 to look for $60 million of Treasuries?  Or did you hear that

3 Mr. Cadogan was on the phone talking to someone on about $60

4 million?

5    A  I'm still not clear.  Yeah, yeah, I would only be

6 -- I don't remember the exact which one of the people said --

7 I don't remember who talked to John specifically at that

8 point in time.

9        I do -- John has a very deep voice.  So when he

10 talks you really hear it.  And the others it's not as

11 recognizing or memorable -- as memorable to me.

12    Q  Is it your testimony that you heard either Mr.

13 Kennedy, Mr. Kurinsky, or Mr. Nothern say to Mr. Cadogan that

14 they wanted $60 million in bonds?  Is that your testimony?

15    A  I'm aware that it was communicated to John.  One of

16 those people -- three people either individually or

17 collectively communicated that to Mr. Cadogan, yes.

18    Q  Is it your testimony that upon hearing that --

19    A  Yes.

20    Q  -- that you said, make that 65?  Is that your

21 testimony?

22    A  That's correct, yes.

23    Q  Why did you do that?

24    A  Why did I do that?

25    Q  Yes.

Page 80

1    A  Because I was thinking of -- of -- of putting some

2 money to work because I understood that the economic scenario

3 that I had forecasted was in certain ways accurate, but the

4 market reaction to that was not accurate.

5    Q  This is in reference to the GDP announcement?

6    A  Exactly.  And that -- and that there's a point

7 where as a manager if the market is rallying, it's risk

8 management not to get run over by the market when you're

9 long.  And you can be right, but the market can go a

10 different way.

11    Q  In your uttering, make that 65 million --

12    A  Yes.

13    Q  -- was there any thought in your mind about what

14 you had heard Mr. Nothern say about the elimination of the

15 bond?

16    A  At that point in time I was not thinking about

17 that, no.

18    Q  Is it your testimony that your decision to place an

19 order for $5 million Treasury bonds --

20    A  Mm-hmm.

21    Q  -- was not in any way based upon what you heard Mr.

22 Nothern say about the elimination of the bond?  Is that your

23 testimony?

24    A  I would have to say that that comment would have to

25 factor into the decision.

Page 77 - Page 80

SECNOTH00117308

Page 81

1  Q My question is not what would have or could have or
2  should have, but what did happen. As well as you remember --
3  A Yes.
4  Q -- did that statement from Mr. Nothern about the
5  elimination of the bond play any role in your decision to by
6  $5 million bonds?
7  A I would have to say yes.
8  Q You do say yes.
9  A I would have to say yes.
10 Q And why do you say that?
11 A It was a piece of information that had been
12 discussed in the last five minutes. It was not contrary to
13 what was going on.
14     I may not have put a great deal of credence or
15 reliability, but it was information that was mentioned within
16 the context.
17     So to say that we purchased securities and it did
18 not factor in, I think with -- it really doesn't make sense,
19 you know --
20 Q At that point in time that you ordered -- placed
21 the order for $5 million Treasuries --
22 A Yes.
23 Q -- had you not heard the statement from
24 Mr. Nothern --
25 A Yes.

Page 82

1  Q -- about the 30-year bonds --
2  A Yeah, yes --
3  Q -- being eliminated --
4  A Yes, yes.
5  Q -- would you placed the order for $5 million bonds?
6  A I believe it's possible. Perhaps likely, but I
7  would only be speculating.
8  Q I'm going to ask you just a couple more questions
9  and then we're going to take a short break and come back to
10 this.
11 A Okay.
12 Q The 9:00 meeting, when did it end?
13 A I would say approximately 9:30.
14 Q How long after the ending of the 9:30 meeting did
15 Mr. Nothern make the statement about what he had heard from
16 Peter Davis about the elimination of the bond?
17 A I would -- I would say it was within 15 minutes.
18 Q Prior to the 9:00 meeting had you on October 31,
19 2001 seen any e-mails or seen any faxes or seen anything
20 about rumors of -- about the elimination of the 30-year bond?
21 A No, I did not.
22 Q In the meeting from 9:00 to 9:30 or whenever it
23 ended --
24 A Mm-hmm.
25 Q -- was there any discussion about rumors concerning

Page 83

1  the elimination of the 30-year bond?
2  A No.
3  Q During the time after the ending of the meeting,
4  but before Mr. Nothern spoke the words he did about the
5  elimination of the bond to Mr. Davis did you see anything to
6  suggest there were rumors in the market about the elimination
7  of the 30-year bond?
8  A No.
9  Q During the time after you had heard those words
10 from Mr. Nothern about the elimination of the bond, but
11 before you placed your order for the $5 million bonds, did
12 you hear or see anything concerning rumors about the
13 elimination of the 30-year bond?
14 A No.
15 Q Okay, we're off the record at approximately 10 till
16 5:00.
17     (Break.)
18     MR. HATHAWAY:  Okay, we're back on the record.
19 It's approximately 10 after 5:00.
20     There were no substantive discussions in the break
21 between the witness and staff and counsel for the witness.
22 Is that correct, counsel?
23     MR. SINGAL:  That's correct.
24     BY MR. HATHAWAY:
25 Q Between the point in time that Mr. Nothern first

Page 84

1  spoke the words about the elimination of the bond and Mr.
2  Davis and the time that you placed the order for $5 million
3  Treasuries --
4  A Yes.
5  Q -- did Mr. Nothern or anyone else during that time
6  period say anything to you or in your presence that in any
7  way suggested to you that this was information that the
8  Treasury was going to announce but had not yet announced?
9  A No.
10 Q During the same time period did Mr. Nothern or
11 anyone else say to you or in your presence anything in any
12 way to suggest that this was information that was
13 confidential or non-public?
14 A No, he did not.
15 Q Did -- during this same time period, did Mr.
16 Nothern or anyone else say to you or in your presence
17 anything to suggest to you that the information about the
18 elimination of the 30-year bond had not yet been released by
19 Treasury to the media?
20 A No.
21 Q During this time period did Mr. Nothern or anyone
22 else say to you or say in your presence anything that
23 suggested to you that the information about the elimination
24 of the 30-year bond would give MFS a jump on the market, or
25 words to that effect?

# Exhibit K

**Copies of Merrill Lynch Trading Records from October 31, 2001**

Michael D. Solomon
Director &
Assistant General Counsel
Regulatory Affairs

Office of General Counsel

222 Broadway, 13th Floor
New York, New York 10038
212 670 0267
FAX 212 670 4507
MiSolomon@exchange.ml.com


**Merrill Lynch**

March 20, 2002

<u>VIA FACSIMILE & AIRBORNE</u>
William (Max) Hathaway
U.S. Securities and Exchange Commission
Division of Enforcement
450 5th Street, N.W.
Washington, D.C. 20549-0805

Re:    <u>In the Matter of Trading in Certain Treasury Issues (H0-9353)</u>

Dear Mr. Hathaway:

In response to your letter dated March 6, 2002 to Carlos Ascensio regarding the matter stated above, we are providing the following documents:

1.    A copy of the Merrill Lynch's Trade Activity Report showing the October 31, 2001 order placed by the Massachusetts Financial Services Company ("MFS") for $65 million (par amount) of 30-year Treasury bonds. Please note that account number 817-03A26 is the MFS account in which this transaction occurred.

2.    A copy of the order ticket completed by the Merrill Lynch Taxable Fixed Income Sales Desk in Boston. The salesperson involved in this transaction was Greg St. Pierre. The trader who executed the transaction was Galen Criqui. None of the telephone conversations related to this transaction were tape-recorded.

The enclosed materials are being submitted solely for the Commission's use in the above-captioned matter with the understanding that Merrill Lynch believes that business confidentiality pertains to each page. Said information was created by Merrill Lynch or supplied to Merrill Lynch by one or more of its clients. The information contained in said documents which was supplied by clients is of a personal and confidential nature, the

SECNOTH00115372

William (Max) Hathaway
March 20, 2002
Page 2 of 2

disclosure of which could deprive a person of fair trial or an impartial adjudication or constitute unwarranted invasion of personal privacy.

Moreover, the materials are considered to be confidential or private internal documents that are commercially valuable, and, as such, constitute or contain trade secrets, the disclosure of which may not only violate proprietary rights but grant competitors unfair competitive advantage or compromise competitive advantages by Merrill Lynch.

Therefore, in accordance with the Commission's procedures with respect to the Freedom of Information Act ("FOIA") requests (17 C.F.R. § 200.83), I hereby request confidential treatment of all the pages of the documents provided to you. Each page has been appropriately labeled to indicate the intention to maintain the confidential status of the enclosed materials. Confidential treatment of this letter is also requested.

All of the materials are submitted with the further request that they will be kept in a non-public file and that access to them by any third party will be denied, except as provided for by the Privacy Act of 1974, or unless such access is specifically permitted by existing law. In addition, I request that the materials be returned to the undersigned when the above-captioned investigation is completed.

I understand that upon receipt of any FOIA request for the enclosed materials, the Commission's staff will make an initial determination as to whether access to the information should be granted. If no ground appears to the staff to exist that would justify the withholding of the information, the staff will ask that, within ten days of the FOIA request, I submit substantiation for affording continued confidential treatment and for the withholding of the information. Under such circumstances, the undersigned should be telephoned immediately. If the undersigned is unavailable, please contact Merrill Lynch's Office of General Counsel, Litigation, Compliance and Regulatory Affairs at (212) 670-0313.

If you have any further questions or request please contact me immediately at 212 – 670 – 0267.

Sincerely,

Michael Solomon

Encl.

Cc:     Office of Freedom of Information and Privacy Act Operations
        Securities and Exchange Commission
        Operations Center
        6432 General Green Way, Stop 0-5
        Alexandra, VA 22313-2413

SECNOTH00115373

MAR-21-2002  12:01    MERRILL LYNCH    212 449 4997    P.15/23

Trade Activity Report / Trade Blotter

REDACTED



| Time | B/S | Amount(M) | Price | Principal | S/D | Account# |
|------|-----|-----------|-------|-----------|-----|----------|
| 09:41 | SELL | 65,000.00 | 102-34 1/2 | 66,797,568.13 | 11/01 | 11172UA24 |

REDACTED

Confidential Treatment Requested
by Merrill Lynch under FOIA
ML 000001

SECNOTH00115374



| SOLD TO (CUSTOMER BUYS) | BOT OF (CUSTOMER SELLS) |

**ACCOUNT TITLE**

MFS

A.E. USE ONLY

F28

**DELIVERY INX**

67538.77.35

FOR CREDIT CIRCLE   A  B  C  D  W  OTHER
1  2  3  4  5  6  7  8  9  0

AS OF 10/31

Confidential Treatment Requested

SECNOTH00115375

Michael D. Solomon
Director &
Assistant General Counsel
Regulatory Affairs

Office of General Counsel

222 Broadway, 13th Floor
New York, New York 10038
212 670 0267
FAX 212 670 4507
MiSolomon@exchange.ml.com



April 25, 2002

VIA FACSIMILE & AIRBORNE
William (Max) Hathaway
U.S. Securities and Exchange Commission
Division of Enforcement
450 5th Street, N.W.
Washington, D.C. 20549-0805

     Re:    In the Matter of Trading in Certain Treasury Issues (H0-9353)

Dear Mr. Hathaway:

    This letter is in response to your request for information dated April 9, 2002. Enclosed please find a spreadsheet that shows all transactions in Galen Criqui's book on October 31, 2001 from 9:42 a.m. to 10:10 a.m. As you can see, transaction 1 on the spreadsheet is the sale of $65 million par amount of 30-year bonds to Massachusetts Financial Services Company ("the MFS trade"). According to Mr. Criqui, his book was flat at the time of that transaction. The MFS trade therefore caused Mr. Criqui's book to be short $65 million. Transactions 2 through 7 show that Mr. Criqui immediately began to cover this short position. While Mr. Criqui intended transaction 8 to be a covering trade, he made a key-stroke error on the electronic trading system and entered a sell instead of a buy. He then continued to cover the short position created by the MFS trade in transactions 9 and 10. Transactions 11 through 13 were "reverse-inquiry trades" whereby a customer asked Mr. Criqui for a price and he was obligated to sell to that customer to fulfill his obligations as a market maker. Twenty million of the $25 million par amount bought in transaction 14 completed Mr. Criqui's covering of the original $65 million short position caused by the MFS trade.

    As can be seen on the spreadsheet, the profit or loss for each covering trade was obtained by comparing its price to the price associated with the MFS trade. Those profit and loss figures were then aggregated to arrive at the total $654,843.75 loss on the covering trades.

SECNOTH00115376

William (Max) Hathaway
April 25, 2002
Page 2 of 3

The enclosed materials are being submitted solely for the Commission's use in the above-captioned matter with the understanding that Merrill Lynch believes that business confidentiality pertains to each page. Said information was created by Merrill Lynch or supplied to Merrill Lynch by one or more of its clients. The information contained in said documents which was supplied by clients is of a personal and confidential nature, the disclosure of which could deprive a person of fair trial or an impartial adjudication or constitute unwarranted invasion of personal privacy.

Moreover, the materials are considered to be confidential or private internal documents that are commercially valuable, and, as such, constitute or contain trade secrets, the disclosure of which may not only violate proprietary rights but grant competitors unfair competitive advantage or compromise competitive advantages by Merrill Lynch.

Therefore, in accordance with the Commission's procedures with respect to the Freedom of Information Act ("FOIA") requests (17 C.F.R. § 200.83), I hereby request confidential treatment of all the pages of the documents provided to you. Each page has been appropriately labeled to indicate the intention to maintain the confidential status of the enclosed materials. Confidential treatment of this letter is also requested.

All of the materials are submitted with the further request that they will be kept in a non-public file and that access to them by any third party will be denied, except as provided for by the Privacy Act of 1974, or unless such access is specifically permitted by existing law. In addition, I request that the materials be returned to the undersigned when the above-captioned investigation is completed.

I understand that upon receipt of any FOIA request for the enclosed materials, the Commission's staff will make an initial determination as to whether access to the information should be granted. If no ground appears to the staff to exist that would justify the withholding of the information, the staff will ask that, within ten days of the FOIA request, I submit substantiation for affording continued confidential treatment and for the withholding of the information. Under such circumstances, the undersigned should be telephoned immediately. If the undersigned is unavailable, please contact Merrill Lynch's Office of General Counsel, Litigation, Compliance and Regulatory Affairs at (212) 670-0313.

If you have any further questions or request please contact me immediately at 212 – 670 – 0267.

Sincerely,

Michael Solomon

Encl.

SECNOTH00115377

William (Max) Hathaway
April 25, 2002
Page 3 of 3

Cc:    Office of Freedom of Information and Privacy Act Operations
Securities and Exchange Commission
Operations Center
6432 General Green Way, Stop 0-5
Alexandra, VA 22313-2413

SECNOTH00115378

**Excerpted Trading Book of Galen Criqui, October 31, 2001**

| Ref. | Time | Buy/Sell | Price | Quantity | Principal | P/L | Opposing Acct. | Left to Cover |
|------|------|----------|-------|----------|-----------|-----|----------------|---------------|
| 1 | 9:42am | S | 102.7656 | 65,000,000 | 66,797,656 | | 817-30A26 | 65,000,000 |
| 2 | 9:43am | B | 102.7188 | 14,000,000 | 14,380,625 | 6,562.50 | 476-95006 | 51,000,000 |
| 3 | 9:44am | B | 102.7188 | 5,000,000 | 5,135,937 | 2,343.75 | 476-95006 | 46,000,000 |
| 4 | 9:45am | B | 102.6875 | 5,000,000 | 5,134,375 | 3,906.25 | 476-11107 | 41,000,000 |
| 5 | 9:45am | B | 102.6875 | 5,000,000 | 5,134,375 | 3,906.25 | 476-95006 | 36,000,000 |
| 6 | 9:45am | B | 102.6875 | 6,000,000 | 6,161,250 | 4,687.50 | 476-95006 | 30,000,000 |
| 7 | 9:57am | B | 103.2500 | 1,000,000 | 1,032,500 | -4,843.75 | 476-11107 | 29,000,000 |
| 8 | 9:58am | S | 103.3750 | 10,000,000 | 10,337,500 | | 476-95006 | --------- |
| 9 | 10:01am | B | 104.0313 | 5,000,000 | 5,201,562 | -63,281.25 | 476-95006 | 24,000,000 |
| 10 | 10:01am | B | 104.1406 | 4,000,000 | 4,165,625 | -55,000.00 | 476-95006 | 20,000,000 |
| 11 | 10:08am | S | 105.1172 | 15,000,000 | 15,767,578 | | 21C-08M04 | --------- |
| 12 | 10:08am | S | 105.2188 | 6,598,000 | 6,942,333 | | 83Q-05031 | --------- |
| 13 | 10:08am | S | 105.2969 | 20,000,000 | 21,059,375 | | 61M-30T07 | --------- |
| 14 | 10:10am | B | 105.5313 | 20,000,000 * | 21,106,250 | -553,125.00 | 476-95006 | 0 |

\* Actual total amount of trade was $25 million--$20 million indicates remaining amount needed to cover original $65 million short position.

\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Profit/loss attributable to covering $65 million short position:   -654,843.75

\*\*\*\*\*\*\*\*\*\*\*\* \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | Acct. No. | Counterparty |
|---|-----------|--------------|
| 1 | 817-30A26 | MFS |
| 2 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 3 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 4 | 476-11107 | BrokerTec |
| 5 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 6 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 7 | 476-11107 | BrokerTec |
| 8 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 9 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 10 | 476-95006 | Cantor Fitzgerald Sec. Corp. |
| 11 | 21C-08M04 | Brookstreet Securities Corp. |
| 12 | 83Q-05031 | Royal Bank of Canada |
| 13 | 61M-30T07 | Hamilton Partners Allocation Account |
| 14 | 476-95006 | Cantor Fitzgerald Sec. Corp. |

SECNOTH00115379

# Exhibit L

**Copy of November 9, 2001 Letter from
Megan E. Hills, Treasury Associate General
Counsel to Mike Knorr, Treasury Office of
Inspector General**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 9, 2001

Mr. Mike Norr
Department of Treasury
Office of the Inspector General
740 15th Street, N.W.
Suite 500
Washington, D.C. 20020

Re:    SEC Inquiry

Dear Mr. Norr:

Enclosed please find the information sent by David Aufhauser, Treasury's General Counsel, when referring the October 31, 2001 events to the SEC for inquiry. I also enclose a subsequent memorandum by me, dated November 6, 2001, and copies of the documents, which we discussed during the SEC Interviews on November 7, 2001. Lastly, I am enclosing documents collected by the Counselor to the General Counsel, Tom McGivern, relating to the admission of individuals to the press conference on October 31, 2001. Pursuant to the SEC's request, I am also sending these latter documents to them.

You also asked me to provide the list of individuals to whom the SEC wishes to speak. As you know, the SEC already interviewed Mr. Brian Roseboro, Ms. Betsy Holohan, and Ms. Jill Cetina. The SEC has also asked to speak to Mr. Paul Malvey, Ms. Frances Anderson, Ms. Lula Tyler, and Mr. Jeff Huther. Mr. Sporkin also asked me to find someone at Treasury who could speak to how individuals are admitted to press conferences and whether attendance is taken. I have arranged to have Mr. Tony Fratto, the Director of Public Affairs, speak to them on these issues.

Mr. Fratto, Ms. Anderson, and I will be meeting with the SEC on Wednesday, November 14, 2001, at 3:00 p.m., in the General Counsel's Conference Room. I am working on setting up the remainder of the interviews, but because today is Friday and Monday is a federal holiday, many individuals are out of the office today. The SEC has also asked that no interviews be scheduled on Tuesday, November 13, 2001.

If you have any questions or would like to discuss this matter, please do not hesitate to call me. My direct number is 202-622-8236.

Sincerely,

Megan E. Hills
Associate Deputy General Counsel

Enclosures: As stated

SECNOTH00103620

# Exhibit M

## Memorandum of Activity Concerning the Treasury OIG December 19, 2001 Interview of Megan Hills



# MEMORANDUM OF ACTIVITY

| Type of Activity: | | Case Number: 2002-0104 | Conducted by (Name, Title, and Signature): |
|---|---|---|---|
| | Personal Interview | | |
| X | Telephone Contact | Date: December 19, 2001 | Michael Knorr, Investigator ___ |
| | Records Review | | |
| | Other (Describe): | Time: 9:30 a.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Megan E. Hills**<br>**Associate General Counsel**<br>**Department of the Treasury**<br>**Washington, DC**<br>**202/622-8236** | Office of the Inspector General<br>740 15th Street, NW<br>Washington, DC |

On the above date and time, Megan Hills, Associate General Counsel, Department of the Treasury, was interviewed by the Office of Inspector General (OIG). Hills had previously participated with the Securities and Exchange Commission (SEC) and the OIG in interviews of the Treasury employees.

Hills said she was aware of the recently adopted press conference procedures, that will go into practice with the next refunding conference announcement, effective January 30, 2002. Hills said she was not aware of an earlier Treasury policy or written procedures governing admittance to the quarterly funding press conferences.

Hills said the Office of Market Finance would not be involved in procedures involving press admittance to the quarterly funding press conferences. Hills suggested that the OIG contact Tony Fratto, Director, Office of Public Affairs, for further clarification regarding press admission procedures.

Reviewed by: _____ Date: 12/27/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103670

# Exhibit N

**Memorandum of Activity Concerning the
Treasury OIG December 19, 2001 Interview of
Tony Fratto**



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| ☐ Personal Interview<br>☒ Telephone Contact<br>☐ Records Review<br>☐ Other (Describe): | 2002-0104<br>Date:<br>December 19, 2001<br>Time:<br>4:00 p.m. | Michael Knorr, Investigator _M c Knorr_ |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Tony Fratto**<br>**Director**<br>**Office of Public Affairs**<br>**Department of the Treasury**<br>**Washington, DC**<br>**202/622-2960** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, Tony Fratto, Director, Office of Public Affairs (PA), was re-contacted by the Office of Inspector General (OIG). He confirmed the new press conference procedures instituted by PA and effective January 30, 2002, for the next scheduled refunding announcement. Press attending the future conferences will have to have Treasury or White House press credentials or be cleared through PA and issued press visitor passes. Regular Treasury visitor passes will no longer be accepted.

Fratto said when he became Director of PA; he discussed general press conference procedures with former Assistant Secretary for PA, Michelle Smith. Fratto said he was not aware of any formal written policy regarding press admittance procedures that were in effect for the October 31, 2001, refunding conference. The PA announcement letters only provided instruction to the media without Treasury credentials, on procedures to follow to gain admittance to the press conference. These included providing their name, date of birth and social security number to PA by a certain announced time.

Reviewed by: _[signature]_ Date _[illegible]_

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103672

# Exhibit O

## Memorandum of Activity Concerning the Treasury OIG December 28, 2001 Interview of Jill Ousley



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| ☐ Personal Interview<br>☒ Telephone Contact<br>☐ Records Review<br>☐ Other (Describe): | 2002-0104<br>Date:<br>December 28, 2001<br>Time:<br>10:50 a.m. | Michael Knorr, Investigator   _M C Ron_ |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Jill K. Ouseley**<br>**6919 Langley Place**<br>**University Park, Florida 34201**<br>**(941) 358-1764** | Office of the Inspector General<br>740 15th Street, NW<br>Washington, DC |

On the above date and time, Jill Ouseley, former Director, Office of Market Finance, Department of the Treasury, was interviewed by the Office of the Inspector General (OIG) concerning her knowledge of a Peter Davis and his admittance to the quarterly refunding press meetings. Ouseley said she retired from the Department of the Treasury on December 31, 1999. Her subordinate Paul Malvey became Director of the Office of Market Finance following her retirement.

Ouseley stated that she does not know a Peter Davis nor does she recall ever admitting him to a quarterly refunding press conference. She said however, it is "not impossible that I admitted him" but she did not recall doing so. She said if she had admitted him, she assumes it was because he wrote for some financial publication. She said it is possible that after she admitted Davis once, he may have continued to call her secretary, Lula Tyler, and was admitted to subsequent conferences by that means.

Ouseley said in recent weeks she has spoken by phone with Malvey and representatives of the Securities and Exchange Commission concerning Peter Davis. She said she told them the same thing, that she did not remember a Peter Davis or admitting him to a news conference.

Reviewed by: _____ Date: 12/28/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/28/01

Form OI-09

Office of the Inspector General - Investigations.
Department of the Treasury

SECNOTH00103681

# Exhibit P

**Faxed Copy of Treasury OIG's January 2, 2002
Report of Investigation**



### Facsimile Transmittal Sheet

# DEPARTMENT OF THE TREASURY
## OFFICE OF INSPECTOR GENERAL
## OFFICE OF INVESTIGATIONS
740 15th Street, N.W., Suite 500
Washington, DC 20220



Telephone Number: (202) 927-5260
Facsimile Number: (202) 927-5421

DATE: 1/14/02  (1/15/02)

TO: Andrew Sporkin - SEC

FAX NUMBER: 628 - 1471

VOICE NUMBER: _____

FROM: Mike Knorr

COMMENTS/SPECIAL INSTRUCTIONS:
2nd try

_____

_____

_____

_____

*PORTIONS OF THIS INFORMATION MAY BE SENSITIVE.*

TOTAL NUMBER OF PAGES (INCLUDING FAX HEADER): 15

SECNOTH00103691



# REPORT OF INVESTIGATION

JAN 2

| | |
|---|---|
| *Date of Report* | |
| *Case Number* | 2002-0104 |
| *Case Title* | Unknown Treasury employee(s) |
| *Report Status* | Final |
| *Alleged Violation(s)* | Unauthorized Disclosure |

**COPY**

## SYNOPSIS

This investigation was predicated upon the assertion that there may have been trading activity in government securities based upon confidential information learned during an embargoed quarterly funding conference at the Department of Treasury. Interviews of Treasury employees were conducted by the Securities and Exchange Commission (SEC), Treasury Office of General Counsel, and the Office of Inspector General because of allegations of premature release of information surrounding the government's decision to suspend issuance of the 30-year bond.

The Treasury announcement concerning the long bond was made during the October 31, 2001, quarterly refunding press conference. The information was embargoed until 10:00 a.m., but was prematurely posted on the Treasury web site prior to that time. This investigation did not develop any evidence of unauthorized disclosure of market sensitive information by Treasury employees. The SEC investigation concerning non-Treasury employees is continuing.

| *Distribution:* | *Case Agent:* | *Approved:* |
|---|---|---|
| Peter R. Fisher<br>Under Secretary for<br>Domestic Finance | Michael C. Knorr<br>Investigator | James W. Burke<br>Acting Special Agent<br>In Charge |
| Michele A. Davis<br>Assistant Secretary for<br>Public Affairs<br>Department of the Treasury | *(Signature)* | *(Signature)* |

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Form Number TP/2601
Version 08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103692

# REPORT OF INVESTIGATION

## DETAILS



On November 6, 2001, David D. Aufhauser, General Counsel, Department of the Treasury (Treasury), provided information to the United States Securities and Exchange Commission (SEC) concerning events surrounding suspending the issuance of the 30-year Treasury bond.   The focus of the SEC inquiry concerned the assertion of possible trading activities in government securities based upon confidential information learned during an embargoed quarterly funding meeting at the Department of the Treasury.   On this same date, Treasury Office of General Counsel forwarded to the Office of Inspector General (OIG) copies of the same information provided to the SEC.   (Exhibit 1)

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Treasury, Under Secretary for Domestic Finance, during the quarterly refunding meeting press conference at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001.   The press conference followed the October 30, 2001, meeting of the Treasury Borrowing Advisory Committee.   Treasury's announcement was embargoed for release until 10:00 a.m. on the 31st.   The Treasury Office of Public Affairs, however, prematurely posted Fisher's statement on their web site, where it appeared at 9:43 a.m.   Members of the Treasury press corps immediately notified Treasury, Office of Public Affairs, that the web posting had gone up early.

Typically, financial information provided at the quarterly press conference is supplied with the explicit oral understanding that it is to be embargoed for a short period of time, usually 10 or 15 minutes after the conference.   At the conclusion of the press conference, members of the press are provided with copies of the minutes of the Borrowing Advisory Committee meeting and the statement of the Treasury policy official, with the understanding that the information is subject to an agreed-upon release of the embargo.   (Exhibit 2)

On November 1, 2001, Treasury Office of General Counsel contacted Treasury Webmaster David Borowski to determine the exact time of publication of Under Secretary Fisher's remarks at www.treasury.gov/press/release/po749.htm.   Borowski contacted the Treasury web servers' hosting company, UUNET, and following review of the server logs, determined that the posting time was 9:43 a.m., on October 31, 2001.   (Exhibit 3)

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed 1/5/02                                Office of the Inspector General - Investigations
Form O1 02                                                        Department of the Treasury

SECNOTH00103693

## REPORT OF INVESTIGATION



Treasury Office of General Counsel reported in their internal memorandum of November 6, 2001, that in addition to press, individuals from the Office of Management and Budget (OMB), Federal Reserve Bank officials, and others have attended press conferences following the Borrowing Advisory Committee meetings. Their memorandum stated that it appeared that, following a long-standing practice, the Office of Market Finance cleared consultant Peter Davis to attend the October 31, 2001, press conference. The Office of General Counsel reported that there did not appear to be written standards for determining who is able to attend these press conferences.

According to the above memorandum, Assistant Secretary for Financial Markets Brian Roseboro advised the Office of General Counsel that on the morning of October 31, 2001, he had received a phone call from Jimmy Capra, Chairman of Treasury's Borrowing Advisory Committee and head of Capra Asset Management, Rye, New York. Capra reported that a political consultant who worked for him had advised him that Treasury was suspending issuance of the 30-year bond. Roseboro told Paul Malvey, Director of Treasury's Office of Market Finance, about his conversation with Capra. Based on his knowledge of attendees at the press conference, Malvey speculated that the consultant was Peter Davis. (Exhibit 2)

Megan Hills, Treasury Associate Deputy Counsel, reported in an internal memorandum, dated November 5, 2001, the Office of General Counsel's contact with Ward McCarthy, a bond trader, who had called to offer information regarding his knowledge of the early disclosure of Treasury's refunding announcement. McCarthy recalled that at approximately 9:35 a.m., Peter Davis had called him and reported the details of the Treasury announcement. McCarthy said Davis told him that the information was still under embargo until 10:00 a.m. McCarthy reported he had been a client of Davis' for several years, but believed this was the first time Davis had called him before an embargo time period had been lifted. (Exhibit 4)

Megan Hills reported in an internal memorandum, dated November 6, 2001, her contact with Fran Bermanzohn, General Counsel, for the 6th Income Division, Goldman-Sachs Brokerage. Bermanzohn stated that on October 31, 2001, at 9:35 a.m., the day of the Treasury announcement, John Youngdahl, Goldman-Sachs' Chief Economist on

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

SECNOTH00103694

## REPORT OF INVESTIGATION



the Treasury desk, received a telephone call from Peter Davis.
Goldman-Sachs had been Davis' client since early 2001.
Bermanzohn said Davis related to Youngdahl that Treasury was
withdrawing its 30-year bond.  Davis did not say anything to
Youngdahl about the information being confidential or under
embargo, nor did Davis report the source of his information.
After receiving the information from Davis, Youngdahl
contemporaneously informed the traders around him.  (Exhibit 5)

The United States Secret Service (USSS), Uniformed Division (UD),
Treasury Appointment Center, reviewed the files pertaining to the
October 31, 2001, quarterly refunding press conference.  Peter
Davis' name did not appear on the initial list of attendees
cleared through the Office of Public Affairs.  The Appointment
Center reported that Peter Davis was cleared in to the Treasury
Building on the morning of the 31st to meet with Paul Malvey,
Office of Market Finance.  (Exhibit 6)

Following the review of information provided by Treasury XOffice
of General Counsel, the SEC requested interviews of the following
Treasury employees:

Jill Cetina, International Economist, Office of Foreign Exchange
Operations;

Elizabeth Holahan, Public Affairs Specialist, Office of Public
Affairs;

Frances Anderson, Public Information Coordinator, Office of
Public Affairs;

Tony Fratto, Director, Office of Public Affairs;

Brian Roseboro, Assistant Secretary for Market Finance;

Paul Malvey, Director, Office of Market Finance;

Lula Tyler, Administrative assistant, Office of Market Finance;

Jeff Huther, Financial Economist, Office of Market Finance.
(Exhibit 7)

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or
reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/3/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103695

## REPORT OF INVESTIGATION

The above listed individuals were interviewed by attorneys Andrew Sporkin and Rosemary Filou of the SEC, in conjunction with Treasury Office of General Counsel and the OIG.

When interviewed, Jill Cetina said she provides market analysis to Treasury through contacts with bond traders and brokerage market strategists.  She said she became aware of the decision to suspend sales of the 30-year bond approximately 30 minutes prior to the official announcement.  She said she was aware it was market sensitive information and was also aware of the embargo. She added that she spoke to no one between 9:00 a.m. and 10:00 a.m. on October 31, concerning the suspension of sales of the 30-year bond.

Cetina said she had earlier heard speculation, on the part of bond market strategists, that sales of the 30-year bond might be suspended.  Specifically, she said, a week or two prior to the announcement, she spoke with Drew Mathis, a market strategist for Lehman Brothers Inc. in New York.  She said that Mathis predicted that Treasury would eliminate the 30-year bond.  She thought he was "going out on a limb with that type of speculation." (Exhibit 8)

Cetina said she was monitoring the bond market from the "market room" at the time the announcement on the 30-year bond was made. She said she was also aware of the early Treasury Web site posting.  Making reference to the Bloomberg Wire Service, October 31, Day Chart, she said she first noticed price increases on the long bond at 9:35 a.m.  She said at 10:00 a.m., the time of the official announcement, there was a "big rally" in the bond price. Cetina memorialized information she received on October 31, relating to the 30-year bond announcement, in a series of e-mail messages sent to her Treasury Department supervisors. (Exhibits 8, 9, 10)

When interviewed, Elizabeth Holahan said as part of her official duties, she helped coordinate the October 31, 2001, press conference where the suspension of the sale of the 30-year bond was announced.  Holahan said she announced three times during the press conference that the information presented by Under Secretary Fisher and contained in the press release was embargoed until 10:00 a.m.  She added that she verbally gave the "ground rules" to all in attendance and the reporters present were governed by the honor system not to release the information prior

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

SECNOTH00103696

# REPORT OF INVESTIGATION 

to the embargo time.  She said no one left the room prior to the conclusion of the conference, at approximately 9:25 a.m. (Exhibit 11)

Holahan said she did not know how the press announcement was posted on the web site prior to the 10:00 a.m. embargo and that she was surprised that it happened.  She said there were two versions of the press release, one with the soft letterhead format and the final version with the hard letterhead.  One version had the embargo time (10:00 a.m.) on it, while the final version did not.  She said she heard that Frances Anderson, of her office had a problem formatting the Treasury letterhead on the press release into an electronic file so that it could appear on the web site.  (Exhibits 11, 12, 13, 14, 15)

Holahan said she did not know Peter Davis but learned who he was after the controversy surrounding the October 31, 2001, press conference.  (Exhibit 11)

When interviewed, Frances Anderson said she has been employed by the Treasury since 1969.  Her immediate supervisor is Tony Fratto, Director, Office of Public Affairs. Her official duties at the Office of Public Affairs include formatting and posting press releases on the Treasury Web site.

Anderson said she attended the October 31 press conference, but was posted outside the Diplomatic Reception Room where the conference was held.  She said Paul Malvey, Director, Market Finance, asked her to stand out in the hall to keep an eye on some charts that were to be handed out at the conclusion of the conference.  She said since the doors were closed, she did not hear the announcement concerning the 10:00 a.m. press embargo.

At the conclusion of the conference, Anderson said she returned to her office and sent out the press release via the Treasury Web site.  She said there had been earlier problems with formatting the press release with the proper Treasury letterhead.  The final press release she saw said for "immediate release."  She said she posted it on the web site sometime before 10:00 a.m.  She said she did not know the exact time the message went out and that she was unaware of the 10:00 a.m. embargo.  (Exhibit 16)

When interviewed, Tony Fratto said he first heard of the decision to suspend sales of the 30-year bond on Thursday, October 26,

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed 1/2002
Form OI 08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103697

## REPORT OF INVESTIGATION



2001. He said Under Secretary Peter Fisher informed him of the decision on that date as they discussed procedures for the October 31st quarterly refunding press conference. He said the only people in his office who had advance knowledge of the announcement beside him were his subordinate, Elizabeth Holahan, and Assistant Secretary Michele Davis. Fratto said he knew this information was privileged and discussed it with no outside individuals.

Fratto said he was present at the October 31, 2001, 9:00 a.m. quarterly refunding press conference when Elizabeth Holahan introduced Under Secretary Fisher and made the 10:00 a.m. embargo announcement. He said to the best of his knowledge, no one left the room prior to the 9:25 a.m. conclusion of the conference.

Fratto stated that the early posting of the Under Secretary's announcement on the Treasury Web site was as much his mistake as anyone. He said it was miscommunication to his subordinate, Administrative Assistant Frances Anderson. The final copy of the press announcement did not have the 10:00 a.m. embargo time on it, but instead read for immediate release. Fratto said he thought Anderson was at the press conference and was aware of the embargo time. Fratto said he had seen an earlier version of the press announcement with the 10:00 a.m. embargo printed on it.

Fratto said this was the first time Treasury had set an embargo time (10:00 a.m.) prior to the conference. Normally they poll the press at the conclusion of the press conference then set the embargo time. He said he was not aware of any member of the press violating the embargo. He said if they did, he would revoke their Treasury press credentials.

Fratto said that he did not learn who Peter Davis was until after the press conference. He said he subsequently learned that Davis was cleared to attend the conference by Market Finance Director Paul Malvey's secretary, Lula Tyler. Fratto said it was his understanding that Malvey's predecessor had allowed Davis to attend the quarterly press conferences since 1993 and that the Office of Market Finance has continued that practice to the present.

Fratto said it never occurred to him that anyone other than government officials or the press would be in the room attending the quarterly press conferences. Fratto said because of this

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed  11/2/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103698

## REPORT OF INVESTIGATION    

incident, his office would be adopting new press conference procedures. (Exhibit 17)

Effective at the next scheduled refunding announcement, on January 30, 2002, Treasury's Office of Public Affairs will post the announcement on their web site at 9:00 a.m. The announcement will also be delivered to credentialed members of the media in the Treasury Pressroom shortly before 9:00 a.m. with lock-down embargo rules. The previous practice of releasing the quarterly refunding announcement at a news conference will be discontinued. (Exhibit 17, attachment 1)

Megan Hills, Treasury Associate Deputy Counsel, was interviewed by the OIG and said she was not aware of an earlier Treasury policy or written procedures governing press admittance to the quarterly funding press conferences. Hills suggested that the OIG contact Tony Fratto, Director, Office of Public Affairs, for further clarification regarding press admission procedures. (Exhibit 18)

Fratto was interviewed by the OIG for a second time, concerning his knowledge of past policy or procedures governing admittance to the quarterly refunding press conferences. Fratto said he was not aware of any formal written policy regarding press admittance procedures (other than USSS, UD clearance) that were in effect for the October 31, 2001, refunding conference. (Exhibit 19)

When interviewed, Brian Roseboro said he was appointed Assistant Secretary for Financial Markets in July 2001. Roseboro said he had the authority to make the decision concerning suspending sales of the 30-year bond. In actuality, he said it was a deliberative decision within Treasury involving the Director of Market Finance, the Under Secretary of Domestic Finance and the Secretary's staff. He said they received White House concurrence on October 26, 2001. He said at the October 30th quarterly funding conference they did not ask the Borrowing Advisory Committee for their opinion on suspension of the 30-year bond.

Roseboro said he attended the October 31, 2001, press conference, where his supervisor, Under Secretary Peter Fisher, announced the suspension of sales of the 30-year bond. He said at 9:57 a.m., he saw the Treasury announcement; suspending sales of the 30-year bond, appear on the Bloomberg News Wire. At that time, he

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed 1/1/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103699

REPORT OF INVESTIGATION 

realized the 10:00 a.m. embargo had been somehow violated.
Roseboro said other than the premature Treasury Web site posting,
he was not aware of any early disclosure of Treasury's
announcement to suspend sales of the 30-year bond.

Roseboro said he did not know Peter Davis and only became aware
of who he was following the controversy surrounding the press
conference. Roseboro said it was his understanding that Davis
was not a member of the Press but had been "grand-fathered in" to
attend this and previous Treasury quarterly refunding press
conferences. (Exhibit 20)

When interviewed, Paul Malvey said as Director, Office of Market
Finance, he tries to provide financial analysis and policy
recommendations to "decision makers" at the Office of the Under
Secretary for Domestic Finance. Malvey said the possible
suspension of sales of the 30-year bond had been discussed within
Treasury for quite some time. In previous quarterly conferences,
the Borrowing Advisory Committee had also discussed it. Malvey
said at the October 30, 2001, quarterly refunding meeting,
however, he did not discuss the 30-year bond with members of the
Borrowing Advisory Committee.

Malvey said as part of his job, he and his staff regularly talk
to bond dealers and market consultants. Malvey said he did not
say anything to dealers that would suggest that Treasury was
going to discontinue the 30-year bond. He further said he had no
reason to believe that anybody in his financing group would
discuss this with anybody on the outside. Malvey said, "because
of the nature of the business, everybody in this office has an
appreciation of the sensitivity of what they discuss."

Malvey said his office was responsible for the admittance of
Peter Davis to the quarterly refunding press conference. Malvey
said he had noticed Davis at previous press conferences but had
only spoken to him very briefly. He said his predecessor and
former supervisor, Jill Ouseley, had approved Davis' admittance
to the earlier press conferences. Malvey said he found out after
the fact, that Davis had been calling Malvey's secretary, Lula
Tyler, on a regular basis asking to be admitted to the quarterly
refunding meeting press conferences. Malvey said it was his
understanding that Davis has been attending the quarterly press
conferences since at least 1996. Malvey said he knew that Davis
"wrote some type of investment news letter." Malvey added that

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed 12/10/01
Form OI 8F                                                    Office of the Inspector General - Investigations
                                                             Department of the Treasury

SECNOTH00103700

REPORT OF INVESTIGATION    

Davis happened to be seated next to him during the October 31, 2001, press conference.

Malvey said he was not aware of anyone other than press, OMB, Treasury Officials and Davis who attended the quarterly refunding meeting press conferences. He said he did not realize until after the fact, that the press conferences were only for "credentialed press."

Malvey said subsequent to the October 31, 2001, press conference, his curiosity prompted him to call his former supervisor, Jill Ouseley, to find out why Davis was admitted to the press conferences. Malvey said that Ouseley did not recall a Peter Davis, or ever admitting him to a Treasury press conference. (Exhibit 21)

Jill Ouseley, former Director, Office of Market Finance, Department of the Treasury, was interviewed by the OIG concerning her knowledge of a Peter Davis and his admittance to the quarterly refunding press conferences. Ouseley retired from the Department of the Treasury on December 31, 1999. Her subordinate, Paul Malvey, became Director of the Office of Market Finance following her retirement.

Ouseley stated that she does not know a Peter Davis, nor does she recall ever admitting him to a quarterly refunding press conference. She said, however, it is "not impossible that I admitted him," but she did not recall doing so. She said if she had admitted him, she assumes it was because he wrote for some financial publication. (Exhibit 22)

When interviewed, Lula Tyler said she is employed by Treasury as an administrative assistant in the Office of Market Finance. Her supervisor is Director Paul Malvey. Tyler said her former supervisor, prior to retirement, was Jill Ouseley, then the Director of the Office of Market Finance.

Tyler said she has never met Peter Davis, though she has talked to him on the phone numerous times. She said she first cleared him in for a Treasury appointment about eight or nine years ago at the instruction of Director Ouseley. Ouseley never said how she knew Davis but told Tyler to clear him in for a quarterly refunding press conferences. She said she has subsequently received calls from Davis requesting clearance to attend the

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed 12/1001
Form OI 08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103701

## REPORT OF INVESTIGATION

COPY

quarterly press conferences and has subsequently cleared him
through the USSS, UD, Appointment Center.  She said she never
discussed Davis' clearance into the building with Malvey.  Tyler
said she never directed Davis to the Office of Public Affairs for
clearance into the press conferences.  (Exhibit 23)

When interviewed, Jeff Huther said he has been employed as a
financial economist in the Treasury, Office of Market Finance,
for the past one and a half years.  His responsibilities include
market research, analysis and providing financial advice to
decision makers at Treasury.  He said his immediate supervisor is
Paul Malvey.

Huther said he had first learned of the decision to suspend sales
of the 30-year bond in a meeting with Under Secretary Fisher in
mid October 2001.  He said the decision was not discussed widely
within Treasury.  Huther said to the best of his knowledge, the
decision to suspend the 30-year bond was first announced
internally at an Office of Market Finance staff meeting, on
October 15, 2001.

Huther said his office converses with bond traders and
consultants on a regular basis, but "we do not provide them with
any confidential information."  Huther stated that he did not
talk to any broker or dealer about the decision to suspend the
30-year bond, prior to the official announcement.  Huther said he
was aware of the importance and sensitivity of the information he
had concerning the 30-year bond.

Huther said he attended the quarterly refunding press conference
on October 31, 2001.  He said he was aware of the sensitivity of
the information at the press conference and heard the press
embargo announcement.  He said he saw no one leave the room prior
to the conclusion of the press conference.  Huther said he did
not know Peter Davis but learned of who he was after the
controversy surrounding the October 31, 2001, press conference.
(Exhibit 24)

The scope of this report was limited to interviews of Treasury
employees relating to their actions surrounding the October 31,
2001, quarterly refunding conference.  This investigation did not
develop any evidence of unauthorized disclosures of market
sensitive information by Treasury employees.  As of the date of
this report, the SEC has not identified any additional Treasury

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or
reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and may subject the disclosing party to liability.  Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed  12/11/01                                          Office of the Inspector General - Investigations
Form OI-08                                                          Department of the Treasury

SECNOTH00103702

## REPORT OF INVESTIGATION    COPY

employees to be interviewed.  The SEC has declined to disclose to
the OIG the identities of any non-Treasury employees they have
interviewed or intend to interview, nor have they discussed with
the OIG the future direction of their inquiry.  In the event of
any new information developed by the SEC involving departmental
employees, a supplemental report will be issued.

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or
reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure
to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be
determined under 5 U.S.C. §§ 552, 552a.

Date Printed 1/30/02                                                Office of the Inspector General - Investigations
Form OI-08                                                                          Department of the Treasury

SECNOTH00103703

# REPORT OF INVESTIGATION

## EXHIBITS



| NUMBER | DESCRIPTION |
|---|---|
| 1 | Referral letter of David D. Aufhauser, General Counsel, dated November 6, 2001. |
| 2 | Memorandum of Thomas M. McGivern, Counsel to the General Counsel, dated November 6, 2001. |
| 3 | Memorandum of Steven Vagle, Office of General Counsel, undated. |
| 4 | Memorandum of Megan Hills, Associate Deputy Counsel, dated November 5, 2001. |
| 5 | Memorandum of Megan Hills, Associate Deputy Counsel, dated November 6, 2001. |
| 6 | Memorandum of Sgt. John Muskett, USSS, UD, Appointment Center, dated November 6, 2001. |
| 7 | Memorandum of Megan Hills, Associate Deputy Counsel, dated November 9, 2001. |
| 8 | Memorandum of Activity (MOA) of Jill Cetina, dated November 7, 2001. |
| 9 | Bloomberg News Service, Day Chart, October 31, 2001 |
| 10 | E-mail messages of Jill Cetina, October 31, 2001. |
| 11 | MOA of Elizabeth Holahan, dated November 7, 2001. |
| 12 | Office of Public Affairs, News Release, dated October 31, 2001, (with 10:00 a.m. embargo time). |

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/1/02
Form OI-04

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103704

# REPORT OF INVESTIGATION

13    Office of Public Affairs, News Release, dated October 31, 2001, (immediate release).

14    Office of Public Affairs, News Release, Draft (No date, time or letterhead).

COPY

15    Office of Public Affairs, News Release, electronic file web posting, dated October 31, 2001, (immediate release).

16    MOA of Frances Anderson, dated November 14, 2001.

17    MOA of Tony Fratto, dated November 14, 2001, with attachments.

18    MOA of Megan Hills, dated December 19, 2001.

19    MOA of Tony Fratto, dated December 19, 2001.

20    MOA of Brian Roseboro, dated November 7, 2001.

21    MOA of Paul Malvey, dated November 15, 2001.

22    MOA of Jill Ouseley, dated December 28, 2001.

23    MOA of Lula Tyler, dated November 15, 2001.

24    MOA of Jeff Huther, dated November 21, 2001.

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and may subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 1/2/02
Form OI-08

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103705

# Exhibit Q

**Copies of November 9, 2001 Access Request by the
United States Attorney for the Southern District
of New York and the SEC's November 14, 2001
Approval of the Request**

# Recommendation To Grant Access
## To Enforcement Files

$\beta + C$

Run on 11/13/2001

| | | |
|---|---|---|
| Control Number: | 2002-0081 | |
| Name of Requestor: | ROBERT  KHUZAMI | Case Name:   TRADING IN CERTAIN TREASURY IS |
| Title of Requestor: | CHIEF, SECURITIES AND COMMODII | Case Number:   HO-09353-A |
| Requesting Agency: | U.S. DEPARTMENT OF JUSTICE | |
| Address: | U.S. ATTORNEY - SDNY | |
| | FRAUD TASK FORCE | |
| | THE SILVIO J. MOLLO BUILDING | |
| | ONE SAINT ANDREW'S PLAZA | |
| | NEW YORK, NY 10007 | |

Name of SEC Contact:   FILOU, ROSEMARY A

Telephone:  -   202-942-4768

---

The request for access meets applicable requirements of the Division of Enforcement Access Manual and RFPA Manual. In particular:

The request is in writing and the requester occupies, or the request has been ratified by a person in, a sufficiently senior or supervisory position so as to make and enforce the representations in the request.

The request contains required representations by the requester regarding the need for, and safekeeping and confidential treatment of, the information.

If the case is open, the request contains the required language acknowledging the continued interest of the Commission.

If applicable, RFPA customer notice will be provided.

Granting this request is not adverse to Commission enforcement efforts or contrary to the public interest.  I recommend that access be granted.

| | | |
|---|---|---|
| OCHS, BRIAN A | | 11/13/01 |
| **Recommending Official** | **Signature** | **Date** |

| | | |
|---|---|---|
| | | |
| **Concurring Official** | **Signature** | **Date** |

*This request is to be reviewed at the Home Office, and may be granted only by a Home Office official at or above the level of Associate Director.*

| | | |
|---|---|---|
| | | 11-14-01 |
| **Approving Official** | **Signature** | **Date** |

> Note: Send this form and the Access Request Letter to Office of Chief Counsel, Division of Enforcement, Mail-Stop 0809 (Attn: Don Chumley). OCC will obtain necessary signatures, file the original documents, and record the access grant in the case tracking system.

**RECEIVED**

NOV 1 9 2001

**DIVISION OF ENFORCEMENT**
**OFFICE OF CHIEF COUNSEL**

SECNOTH00129640



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 9, 2001

**BY TELECOPIER**

William Baker
Associate Director of Enforcement
United States Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549
Fax: (202) 942-9636

In re: Trading in Certain Treasury Issues
MOU-9353

Dear Mr. Baker:

We request access to the investigative and other non-public files of the U.S. Securities and Exchange Commission (the "Commission") related to the captioned matter. This request is made in connection with an ongoing lawful investigation or official proceeding inquiring into a violation of, or failure to comply with, a criminal or civil statute or regulation, rule or order issued pursuant thereto, being conducted by the United States Attorney's Office for the Southern District of New York.

We understand that the files in this matter contain "financial records" of "customers," as those terms are defined in the Right to Financial Privacy Act of 1978 [12 U.S.C. §§ 3401-22]. We have reason to believe that information is relevant to our investigation and/or proceeding.

We will establish and maintain such safeguards as are necessary and appropriate to protect the confidentiality of files to which access is granted and information derived therefrom. The files and information may, however, be used for the purpose of our investigation and/or proceeding, and any resulting proceedings. They may also be transferred to criminal law enforcement authorities and self-regulatory organizations subject to our oversight. We shall notify you of any such transfer and use our best efforts to obtain appropriate assurances of confidentiality.

SECNOTH00129641

Other than as set forth in the preceding paragraph,
we will:

make no public use of these files or information without prior
approval of your staff;

notify you of any legally enforceable demand for the files or informa-
tion prior to complying with the demand, and assert such legal
exemptions or privileges on your behalf as you may request; and

not grant any other demand or request for the files or information
without prior notice to and lack of objection by your staff.

We recognize that until this matter has been closed, the Commission
continues to have an interest and will take further investigatory or other steps as it
considers necessary to discharge its duties and responsibilities.

Should you have any questions, please contact me at  (718) 422-5429

Very truly yours,

MARY JO WHITE
United States Attorney

By: _____
ROBERT KHUZAMI
Chief, Securities and Commodities Fraud Task Force

2

SECNOTH00129642



**DEPUTY CHIEF ROBERT KHUZAMI**
UNITED STATES ATTORNEY'S OFFICE
SOUTHERN DISTRICT OF NEW YORK
ONE ST. ANDREW'S PLAZA
NEW YORK, NEW YORK 10007

TELEPHONE    (718) 422-5429
FAX          (718) 422-1712

## FACSIMILE TRANSMISSION COVER PAGE

**TO:**

**NAME:**        **WILLIAM BAKER**
         **ASSOCIATE DIRECTOR OF ENFORCEMENT**

**FAX NUMBER::**        **(202) 942-9636**

**∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗**

CONFIDENTIAL U.S. ATTORNEY FACSIMILE COMMUNICATION

The information contained in this facsimile message, and any and all accompanying documents constitutes confidential information. This information is the property of the U.S. Attorney's Office. If you are not the intended recipient of this information, any disclosure, copying, distribution, or the taking of any action in reliance on this information is strictly prohibited. If you received this message in error, please notify us immediately at the above number to make arrangements for its return to us.

**∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗∗**

**DATE: NOVEMBER 9, 2001**        **PAGES: 3**        **(including cover sheet)**

**REMARKS:**

_____
_____
_____
_____
_____

**INSTRUCTIONS:**    PLEASE NOTIFY SENDER OF RECEIPT BY TELEPHONE

SECNOTH00129643

*Disclosure of Nonpublic Information*
*and Obtaining Information from Other Agencies*

## EXCERPTS FROM SECTION 21(h) OF THE SECURITIES EXCHANGE ACT OF 1934

(7)(A) Following the expiration of the period of delay of notification ordered by the court pursuant to paragraph (4) of this subsection, the customer may, upon motion, reopen the proceeding in the district court which issued the order.  If the presiding judge or magistrate finds that the movant is the customer to whom the records obtained by the Commission pertain, and that the Commission has obtained financial records or information contained therein in violation of this subsection, other than paragraph (1), it may order that the customer be granted civil penalties against the Commission in an amount equal to the sum of --

  (i) $100 without regard to the volume of records involved;

  (ii) any out-of-pocket damages sustained by the customer as a direct result of the disclosure; and

  · (iii) if the violation is found to have been willful, intentional, and without good faith, such punitive damages as the court may allow, together with the costs of the action and reasonable attorneys' fees as determined by the court.

(9)(B) The Commission may, without notice to the customer pursuant to Section 1112 of the Right to Financial Privacy Act of 1978, transfer financial records or the information contained therein to . . . to the Department of Justice.  Financial records or information transferred by the Commission to the Department of Justice . . . pursuant to the provisions of this subparagraph may be disclosed or used only in an administrative, civil, or criminal action or investigation by the Department of Justice . . . which arises out of or relates to the acts, practices, or courses of conduct investigated by the Commission, except that if the Department of Justice . . . determines that the information should be disclosed or used for any other purpose, it may do so if it notifies the customer, except as otherwise provided in the Right to Financial Privacy Act of 1978, within 30 days of its determination, or complies with the requirements of Section 1109 of such Act regarding delay of notice.

(10) Any government authority violating paragraph (9) shall be subject to the procedures and penalties applicable to the Commission under paragraph (7)(A) with respect to a violation by the Commission in obtaining financial records.

SECNOTH00129644