# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

_____ )
                                   )
UNITED STATES SECURITIES AND       )
EXCHANGE COMMISSION,               )
                                   )
            Plaintiff,             )        **Civil Action No. 05-10983 (NMG)**
                                   )
      v.                           )
                                   )
STEVEN E. NOTHERN,                 )
                                   )
            Defendant.             )
_____ )

## DEFENDANT'S MOTION FOR LEAVE TO FILE
## <u>REPLY MEMORANDUM AND SUPPORTING DECLARATION</u>

Pursuant to Local Rule 7.1(B)(3), defendant Steven E. Nothern hereby moves for leave to file the attached reply memorandum and supporting Supplemental Declaration of Kevin Currid in support of his Motion to Compel Production of Documents (filed February 17, 2006). As grounds for the motion, Nothern states that the reply memorandum and supporting declaration are necessary to correct misstatements of fact and law in the opposing brief of the plaintiff Securities and Exchange Commission, and, in particular, to rebut repeated but unwarranted accusations that Nothern has misrepresented the record. In addition, Nothern believes that consideration of the reply memorandum and supporting declaration will be helpful to the Court in resolving the pending motion.

Counsel for Nothern has conferred by telephone with counsel for the SEC regarding the subject of this motion. The SEC stated that it would consent for leave to file a reply brief of ten (10) pages only. Nothern did not agree to that condition because (i) the length of reply memoranda is governed by Local R. Civ. 7.1(B)(4); (ii) greater length was required to rebut the

SEC's allegations of "disingenuous" misrepresentation of the record; and (iii) Nothern had not

conditioned his assent to the SEC's motion for leave to file a reply brief in support of its earlier

motion to strike and for sanctions and, unlike the present circumstance, in that instance the

SEC's reply brief exceeded its opening brief in length.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

**CERTIFICATION PURSUANT TO LOCAL RULES 7.1(A)(2) AND 37.1**

I, John A. Shope, hereby certify that on March 9, 2006, I conferred with counsel for the

SEC and attempted in good faith to resolve or narrow the issues raised in the present motion.

/s/ John A. Shope

Dated:  March 17, 2006

B3178159.3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | Civil Action No. 05-10983 (NMG) |
| Plaintiff, | : : | |
| v. | : : | **ORAL ARGUMENT REQUESTED** |
| STEVEN E. NOTHERN, | : : | |
| Defendant. | : : : | |

**DEFENDANT STEVEN NOTHERN'S REPLY MEMORANDUM IN
SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000

Dated:  March 17, 2006

## <u>TABLE OF CONTENTS</u>

I.     The Ruling in *AT&T* Supports Nothern............................................................... 1

    A.     The Court in *AT&T* Ruled that Fairness Requires the Production of Documents Held by Other Government Agencies................................ 1

    B.     *AT&T* and Other Key Rulings Establish that Independent Agencies May Be Required to Produce Documents Held by Non-Independent Departments................................................................................................. 4

II.    Having Closely Coordinated Its Investigation with Treasury and Justice, the SEC Should Be Able to Obtain Documents from Those Departments Now ........ 9

III.   Full Discovery from Treasury and Other Involved Government Agencies is Critical to This Case ............................................................................................ 14

Conclusion ..................................................................................................................... 17

## <u>TABLE OF AUTHORITIES</u>

### CASES

*In re Air Crash at Dallas/Fort Worth Airport*, 117 F.R.D. 392 (N.D. Tex. 1987)..............7

*Al Fayed v. Central Intelligence Agency*, 229 F.3d 272 (D.C. Cir. 2000)........................12

*Bank Line v. United States*, 76 F. Supp. 801 (S.D.N.Y. 1948) ........................................ 7-8

*COMSAT Corp. v. National Science Found.*, 190 F.3d 269 (4th Cir. 1999) ....................12

*Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979) ......................................................................................................................... 3-9

*Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964)................................ 3, 5-9

*Jencks v. United States*, 353 U.S. 657 (1957) .....................................................................7

*United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978)............................................. 1-9

*United States v. Davis*, 140 F.R.D. 261 (D.R.I. 1992)........................................................7

*United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974) .......7, 8

### CONSTITUTIONAL PROVISION, STATUTES, AND REGULATIONS

U.S. Const. art. II, § 3 .........................................................................................................6

5 U.S.C. § 552a ..................................................................................................................13

28 C.F.R. § 16.21 ...............................................................................................................13

28 C.F.R. § 16.26 ...............................................................................................................13

31 C.F.R. § 1.11 .................................................................................................................12

31 C.F.R. § 1.12 ............................................................................................................13, 14

Defendant Steven Nothern respectfully submits this reply memorandum in support of his motion to compel production of documents. In its opposition to the motion ("Opp."), the plaintiff U.S. Securities and Exchange Commission ("SEC") unfortunately misstates the law and groundlessly accuses Nothern of misrepresenting the factual record.

## I.    THE RULING IN *AT&T* SUPPORTS NOTHERN.

The SEC continues to rely primarily on *United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978), as support for its categorical refusal to request and produce documents held by other government agencies in this case. Indeed, the SEC contends (Opp. at 9) that *AT&T* "summarily rejected the very legal argument that Nothern asserts in his motion." Not so.

### A.    The Court in *AT&T* Ruled that Fairness Requires the Production of Documents Held by Other Government Agencies.

*AT&T* involved a antitrust lawsuit brought by the Justice Department against three telecommunications companies. 461 F. Supp. at 1317-18. The defendants served a request for production of documents upon the government. *Id.* at 1319. The court initially responded by establishing a mechanism for the voluntary production of documents from approximately forty government agencies, *id.* at 1320, 1330 & n.49 — an approach that the SEC refuses even to attempt here, *see* Opp. at 7-8. When that proved inadequate, the defendants moved for a proposed order subjecting "all agencies and departments of the government to discovery under Rule 34 of the Federal Rules of Civil Procedure." 461 F. Supp. at 1330. The Justice Department opposed the motion, arguing that the voluntary system of production, "together with whatever discovery defendants may be able to secure under Rule 45, adequately protects defendants' interests." *Id.*

The court rejected Justice's position as "not well taken, for a number of reasons." *Id.* First, it found that there were serious problems with the voluntary system, which were "likely to

become magnified in the future." *Id.* at 1331. Agencies other than Justice had "little to gain by their cooperation, whether by discovery or otherwise, [and] would be likely to limit the level of their participation in voluntary discovery to the minimum dictated by their own parochial interests." *Id.* Second, "[w]hen dealing with the government, effective sanctions are not available for noncompliance with requests under Rule 45." *Id.* Third, "Rule 34 is a more manageable discovery mechanism than Rule 45 in a number of different respects." *Id.* Rule 45 discovery involves unique logistical problems, a narrower scope of production, broader claims of governmental privileges, and greater expense to the party seeking discovery. *Id.* at 1332. Fourth, there was "no assurance that the voluntary commitments of the several agencies and departments, such as they are, will stand the test of time." *Id.*

The same considerations apply here with even greater force. While Nothern's requests implicate only a few agencies, in *AT&T* the government's case was "likely to involve the documents and the activities of a great number of government departments." *See id.* at 1334. The defendants in *AT&T* sought to establish that their corporate structure and practices were the result of regulations and policies issued by various government departments. *Id.* In this case, key elements of the 10b-5 claim against Nothern involve documents held by non-independent federal agencies, in particular the Treasury Department and its employees. The General Counsel for Treasury referred this matter to the SEC for investigation and asked to be kept advised. The alleged inside information was revealed by Treasury. The trade in question involved Treasury bonds. The alleged duty to keep the information confidential was established by an (as-yet unidentified) "senior adviser in Treasury's Office of Federal Finance" in an alleged conversation with Peter Davis. *See* Complaint ¶ 27. Nothern's alleged violation of the securities laws is predicated on the contention that, because Davis's voice mail message mentioned that there would be a press embargo, Nothern should have understood that both Davis and he had a

fiduciary duty to Treasury to abstain from trading.[1]

Just as Justice argued in *AT&T* that it had "little influence over other agencies of the government," 461 F. Supp. at 1334 n.58, the SEC argues here (Opp. at 12) that it has "no authority over any other agencies of the government."  The court quickly disposed of this argument:  "Obviously, defendants have even less influence over the agencies, and as the entities which have been sued, they are entitled to their discovery rights irrespective of the effect on inter-departmental relationships."  461 F. Supp. at 1334 n.58.[2]  The issue was one of fundamental fairness:  "it is apparent that defendants will need access to the records of many government agencies, and that fairness to them requires that such access be as unencumbered as the Federal Rules will allow."  *Id.* at 1334.

If anything, the need for court intervention here is even stronger than it was in *AT&T*.  Unlike Justice in *AT&T*, the SEC has not agreed to ask other government agencies to produce documents even on a voluntary basis, except on the condition that Nothern agrees to relinquish

---

[1] In a footnote (Opp. at 20 n.18), the SEC suggests that this Court's ruling on the SEC's motion to strike Nothern's estoppel defense, Memorandum & Order (Nov. 4, 2005), forecloses Nothern's right to seek documents relating to "Treasury's conduct during and around its announcement of the suspension of the 30-year bond."  But Treasury's conduct relates directly to the elements that the SEC must prove to establish Nothern's liability.  For example, Treasury's failure to impose any restraint on Davis's presence or departure from the press conference undermines the SEC's contention that Davis owed a legal duty to Treasury for purposes of Section 10(b) and Rule 10b-5.  Treasury's slipshod administration of its press "embargo" undermines the SEC's contention that Nothern should have know from the mere word "embargo" that he would be liable for inside trading if he acted on the information Treasury provided to Davis.  It was for these reasons that the Court observed that the SEC "has done little to point out specific instances where Nothern's estoppel defense would actually cause it to expend inordinate amounts of time and money."  Memorandum & Order at 12.

[2] *See also Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964) (holding that while it "may well be true" that discovery obligation left NLRB "at the mercy" of other agencies, it was "less defensible still to resolve such agency disputes" by allowing government to proceed with action against defendant who had been denied documents to which he is entitled); *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979) ("If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.").

all rights to enforce his document requests.  *See* Opp. at 7-8.  (It is ironic that the SEC describes

Nothern's position as "setting the SEC up to fail," Opp. at 8, when its own position may be

summarized as "unwilling to try to succeed.")  Furthermore, Nothern has even <u>less</u> ability to

obtain documents from other agencies than the defendants did in *AT&T*, since, as he explained in

his initial brief (Memorandum ("Mem.") at 12), courts in the D.C. Circuit currently prohibit the

enforcement of <u>all</u> Rule 45 subpoenas served on federal agencies.  ***The SEC does not even***

***attempt to address this point in its opposition.***

> **B.**     ***AT&T* and Other Key Rulings Establish that Independent Agencies May**
> **Be Required to Produce Documents Held by Non-Independent Departments.**

The SEC asserts (Opp. at 9) that in *AT&T* "the court found that the plaintiff did not

include all agencies of the United States government."  In fact, the court in *AT&T* ruled that for

purposes of discovery, the plaintiff included <u>nearly</u> <u>every</u> agency of the U.S. government.  The

*AT&T* court ordered as follows:

> ORDERED That for purposes of discovery under the Federal Rules of
> Civil Procedure the plaintiff in this case shall consist of the United States
> Department of Justice and all other agencies, departments, and subdivisions of the
> Executive Branch of the United States government, but shall not include the
> Federal Communications Commission and other independent regulatory agencies,
> or the United States Postal Service, and it is further
>
> ORDERED That the Attorney General or his agents in the United States
> Department of Justice, as counsel for plaintiff, shall bring this order to the
> attention of all agencies, departments, and other subdivisions of the Executive
> Branch of the United States government from which defendants have hereto
> sought discovery, and shall assist them with the discharge of their obligation to
> comply with appropriate discovery requests heretofore or hereafter made by
> defendants.

*Id.* at 1349.

Nothern acknowledged in his initial brief (Mem. at 14-16) that the court in *AT&T* did not

extend Justice's Rule 34 obligations to documents held by independent regulatory agencies like

the FCC (or, for that matter, the SEC or NLRB).  To Nothern's knowledge, the only independent

4

agency other than the SEC that has been involved in this case is the Commodity Futures Trading Commission (CFTC).[3]  The larger and more important question in this case involves documents held by <u>non-independent</u> agencies like Treasury.  *AT&T* stands for the proposition that such documents <u>must</u> be produced.

While the SEC eventually admits that "the roles of the agencies in this case are reversed from the roles of the agencies in *AT&T*," it dismisses this critical point as irrelevant — "a distinction without a difference."  Opp. at 10.  The only thing that matters in the SEC's view is the fact that it <u>itself</u> is an independent agency.  This status, the SEC argues (Opp. at 11), gives it sweeping immunity from having to "produce documents from other government departments or agencies that are not within its possession."

The court in *AT&T*, however, distinguished another key ruling, *Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964), on precisely the basis the SEC deems irrelevant.  In *Harvey Aluminum*, the court ruled that the National Labor Relations Board — an independent agency, like the SEC — could not maintain an action for unfair labor practices while refusing to produce statements made by key witnesses to the Department of Labor and the FBI.  "The Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States," the court explained.  *Id.* at 754.  "In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements . . . simply because the documents rested in the hands of another federal agency, and we perceive no valid distinction, for this purpose, between that case and this one."  *Id.*

In the course of explaining why Justice could not be compelled to produce documents

---

[3] Nothern maintains his argument (Mem. at 15 n.5) that even though *AT&T* does not support his position with respect to the CFTC, he is entitled to its documents under (a) the broader holding in *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979), which establishes the law of this District; and (b) the Due Process Clause.

held by independent agencies, *AT&T* specifically noted that *Harvey Aluminum* "is not to the contrary." 461 F. Supp. at 1336 n.63. *Harvey Aluminum*, it explained, involved documents "in the possession of executive departments":

> The President was held to have adequate authority over such departments to procure production, and the courts to order it. The President lacks that capacity with respect to regulatory agencies . . . .

*Id.* Indeed, it is the duty of the President (and not necessarily that of every parochial independent agency) to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The key difference, therefore, is the status of the department or agency <u>from which production was sought</u>: under *AT&T*, if the department is non-independent (*i.e.*, subject to the President's authority), then production of the documents can be compelled. If the department is independent (*i.e.*, not subject to the President's authority), then production cannot be compelled. The fact that the litigation was <u>initiated</u> by an independent agency — such as the NLRB, or the SEC — makes no difference.

The SEC fails to acknowledge the critical distinction between independent agencies that initiate litigation (like the SEC here, or the NLRB in *Harvey Aluminum*) and non-independent agencies from which documents are sought. Instead, the SEC argues that *Harvey Aluminum* is inapposite because it involved an effort to compel the production of documents "in the possession of executive departments," whereas Nothern seeks to compel documents "from every agency, in every branch of government." Opp. at 14; *see also* Opp. at 8 (incorrectly stating that Nothern maintains that "the entire government, including all of its departments and agencies in all three branches, should be considered party plaintiffs to this action"). This supposed distinction is specious. Nothern has never sought to compel the SEC to produce documents held by Congress or the federal courts, but only documents held by Executive Branch departments

6

and independent agencies.[4]  Although he would disagree for other reasons, Nothern recognizes that the Court might apply *AT&T* to exclude documents held by CFTC from the scope of a motion to compel.  However, both *AT&T* or *Harvey Aluminum* provide strong support for Nothern's right to obtain documents held by executive departments such as Treasury.[5]

Nor can the SEC distinguish *Harvey Aluminum* on the ground that it involved documents required to be produced under *Jencks v. United States*, 353 U.S. 657 (1957), not Rule 34.  As explained in Nothern's initial brief (Mem. at 16), this Court in *Ghana Supply Comm'n* established that the rule in *Harvey Aluminum* applies to Rule 34 requests for production of documents as well.  Specifically, it cited *Harvey Aluminum* for the broad proposition that "[w]hen an agency of government institutes suit, <u>any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff.</u>"  83 F.R.D. at 595 (emphasis added, citations omitted).[6]

---

[4] The SEC's reliance (Opp. at 11) on *United States v. Davis*, 140 F.R.D. 261 (D.R.I. 1992), is therefore misplaced.  In that case, an enforcement action bought by the Justice Department on behalf of the Environmental Protection Agency, the defendants asked the court to require Justice to produce a log of relevant documents "in the possession, custody, or control of the United States Congress."  *Id.* at 262.  The court ruled that separation of powers issues and the privilege afforded to Congress by the Speech and Debate Clause prevented it from issuing the requested order.  The ruling in *Davis* has no application here.  As the court observed:  "This is not a question of a different executive agency; this in fact is an entirely separate branch of the federal government."  *Id.* at 263; *see also id.* (distinguishing the ruling in *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), which "involved documents located in the executive office of the President").

[5] Similarly, the SEC cites *In re Air Crash at Dallas/Fort Worth Airport*, 117 F.R.D. 392 (N.D. Tex. 1987), in which the court refused to order production of documents held by the non-party National Transportation Safety Board on the ground that it is "an independent agency."  *Id.* at 393.  Again, this ruling does not support the SEC's argument that even though it is a party in this case, it does not have to produce documents held by non-independent agencies and departments.

[6] Contrary to the SEC's argument (Opp. at 13-14), *Ghana Supply Comm'n* is not "inapplicable" because the plaintiff in that case asserted an intragovernmental or executive privilege.  While the Court, applying Massachusetts law, held that the plaintiff had waived any available privilege, *see* 83 F.R.D. at 594, its discussion of the duty of government agencies to produce documents beyond those "in the immediate possession of the particular agency-plaintiff" was not limited to

Tellingly, the SEC ignores this part of the ruling in *Ghana Supply Comm'n*, and instead attempts (Opp. at 13) to distinguish that case on the ground that it does not address "whether an independent regulatory agency of the government has an obligation under Rule 34 to obtain and produce documents from other agencies of the government in response to a defendant's discovery request." That is the issue, however, that the court decided in *Harvey Aluminum*, which both *AT&T* and *Ghana Supply Comm'n* cite with approval.

The SEC tries to distinguish *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), through a similar sleight of hand. In that case, the court dismissed an antitrust action brought by the Department of Justice because it had failed to comply with a discovery order concerning documents held by the Executive Office of the President. In its opposition (at 15), the SEC cites a footnote in *AT&T* noting that *National Broadcasting Co.* does not address the issue whether "an independent regulatory commission — as distinguished from an Executive Branch agency — is to be considered a party plaintiff" for purposes of discovery. *See* 461 F. Supp. at 1336 n.64. The SEC fails, however, to mention an earlier, more pertinent passage in *AT&T*, where the court cites both *National Broadcasting Co.* and *Harvey Aluminum* as "decisions more or less in point [that] lend at least some support to defendants' position": *i.e.*, the position that Executive Branch agencies should be treated as the plaintiff for purposes of discovery in lawsuits initiated by the federal government — the position that the court ultimately adopted for non-independent agencies. *See* 461 F. Supp. at 1333.

The SEC has not cited a single case that supports its position that independent agencies may never be compelled to produce documents held by non-independent executive departments. Indeed, the ruling in *Harvey Aluminum* directly contradicts that position. Far from discrediting

---

that issue, *see id.* at 595. Furthermore, neither of the cases relied on by the Court — *Harvey Aluminum* and *Bank Line v. United States*, 76 F. Supp. 801, 803-04 (S.D.N.Y. 1948) — involved a claim of governmental privilege.

*Harvey Aluminum*, the court in *AT&T* specifically approved its reasoning as applied to documents held by non-independent executive departments — even when the lawsuit has been initiated by an independent agency like the NLRB or SEC. Furthermore, this District made clear in *Ghana Supply Comm'n* that the reasoning in *Harvey Aluminum* applies with equal force to document requests under Rule 34.

## II. HAVING CLOSELY COORDINATED ITS INVESTIGATION WITH TREASURY AND JUSTICE, THE SEC SHOULD BE ABLE TO OBTAIN DOCUMENTS FROM THOSE DEPARTMENTS NOW.

In his initial brief (Mem. at 4-6), Nothern observed that certain government agencies, including the SEC and Treasury, coordinated their investigations into the allegedly improper disclosure of information about the 30-year-bond. The SEC acknowledges that on November 6, 2001, David D. Aufhauser, the General Counsel for Treasury, referred the matter to the SEC for investigation and asked to be kept advised. *See* Ex. Q to Declaration of Kevin B. Currid Filed in Support of Defendant Steven E. Nothern's Motion to Compel Production of Documents ("Currid Mtn Decl."). The SEC disputes, however, Nothern's characterization of the manner in which it conducted interviews of Treasury employees beginning in November 2001. It writes (Opp. at 5) that the SEC staff "conducted its investigation of this matter <u>independent</u> of any limited investigation being conducted by the Treasury's Office of Inspector General ("OIG"), or any other office in the Treasury" (emphasis added). It further describes as "baseless" (Opp. at 5 n.7) the allegation that the SEC participated in interviews conducted by the OIG.

The SEC's contention that it acted independently of Treasury and the OIG is belied by the OIG's report. The first page states, "<u>Interviews of Treasury employees were conducted by the Securities and Exchange Commission (SEC), Treasury Office of General Counsel, and the Office of Inspector General</u> . . . ." *See* Ex. G to Currid Mtn Decl. at 1 (emphasis added). Each Memorandum of Activity attached to the report identifies the relevant activity as a "Personal

Interview," is signed by an OIG investigator, and contains a text box stating "This report . . . is

the property of the OIG."  *See, e.g.*, Ex. R to Currid Mtn. Decl. at 1 (emphasis added).  Eight of

the memoranda begin with the following sentence:

> On the above date and time, the above listed subject was interviewed by
> attorneys Andrew Sporkin . . . and Rosemary Filou . . . of the Division of
> Enforcement, United States Securities and Exchange Commission (SEC), <u>in
> coordination with the Treasury, Office of General Counsel and the Office of
> Inspector General (OIG).</u>

*See, e.g.*, *id.* (emphasis added).  The SEC describes as "erroneous" and "baseless" (Opp. at 5 &

n.7) the statement that the SEC conducted interviews under Treasury's authority.  The OIG

report, however, states that following the SEC's review of information provided by Treasury,

"the SEC requested interviews" of eight Treasury employees.  Ex. G to Currid Mtn. Decl. at 4.

Regardless of which agency "scheduled" joint interviews under whose "authority" (although

without a subpoena from the SEC an interview of Treasury employees in which Treasury's OIG

participates would appear to occur under Treasury authority), it is clear that the SEC acted in

close coordination with Treasury and its OIG, and had special access to key Treasury employees,

during the critical early months of its investigation.  The SEC's emphasis on its "requests" and

selection of interview dates sidesteps that critical fact.

Likewise, the SEC acknowledges (Opp. at 6 & n.8) that it received an unredacted copy of

the OIG report on January 15, 2002, but suggests that because the report was "issued" on January

2, the SEC obtained no special access or treatment.[7]  The report that OIG faxed to the SEC on

January 15, however, was not final.  According to the counsel for OIG, OIG reports are not final

---

[7] In a letter dated January 9, 2002, the SEC asked Treasury's Assistant Inspector General for
Investigations for "a copy of the report to the [SEC] Division of Enforcement prior to its release
to the Department of Treasury."  Ex. A to Supp. Currid Decl. (letter by William R. Baker III
dated Jan. 9, 2002).  The Assistant Inspector General declined the SEC's request on January 10,
stating that the "Inspector General did not wish to release an advance copy of the report" before
it had been sent "to the appropriate personnel at the Department of Treasury."  *Id.* (letter dated
Jan. 10, 2002).

or "ready for release" until thirty days after they have been distributed to the appropriate bureau in Treasury for review.  *See* Supplemental Declaration of Kevin B. Currid Filed in support of Reply Memorandum ("Supp. Currid Decl.") at ¶¶ 4-10.  The OIG may supplement or amend its reports based on responses or "management action" taken by bureaus during that 30-day period. *Id.* at ¶¶ 6-8. [8]

The SEC's receipt of the pre-finalized OIG report is just one of many examples of the extraordinary coordination and access it has received from Treasury.  By way of example, the SEC and Treasury exchanged a series of letters from November 2001 to May 2002 — ten sent by the SEC, ten sent by Treasury or its employees — requesting or providing documents relevant to the SEC's investigation.  The documents requested by and/or provided to the SEC include:

- "a chronology of all disclosures of any kind to any member of the press or public concerning any proposal to suspend the 30-year bond" (11/7/01)
- "a description of Treasury's policies and practices for press conferences at which embargoed information is presented" (11/7/01)
- business, home, and cellular telephone numbers for particular Treasury employees (12/19/01)
- information concerning any Treasury rules and regulations with respect to visitor passes (1/9/02)
- Treasury employee Paul Malvey's copy of a 1999 newsletter by Peter Davis (1/16/02)
- "pre-announcement" statements issued by Treasury in May, August, and October 2001 (5/2/02)

*See* Ex. A to Supp. Currid Decl.

It is illuminating to contrast the extensive cooperation that the SEC obtained from Treasury with Nothern's own efforts to obtain documents from Treasury.  In a letter dated March 7, 2002, an SEC attorney asked Treasury's Assistant Inspector General for Investigations for

---

[8] Before discovery began in this case, Nothern received a redacted copy of the final OIG report as the result of a FOIA request submitted by another individual.  He received an unredacted copy only as a result his request for documents from the SEC, which had an unredacted copy in its file.  In its opposition (at 17-18 n.17), the SEC asserts that Nothern "neglected to mention" in his initial brief that he "obtained an unredacted version of Treasury's OIG report, which he filed with this Court on October 14, 2005."  However, Nothern's initial brief clearly states (Mem. at 5 n.1):  "Counsel for Nothern provided the Court with an unredacted copy of this report at the scheduling conference on October 14, 2005."

information regarding reports of leaks "stemming from any quarterly refunding press announcement at Treasury in the last ten years" and any subsequent investigations. *See id.* (letter dated Mar. 7, 2002). Following several telephone conversations between the SEC and Treasury, a special agent at Treasury wrote a letter dated March 21, 2002 stating that OIG had conducted an extensive record search of its Investigation Data Management System to try to find the requested information. *See id.* (letter dated Mar. 21, 2002).

By contrast, as part of his efforts to obtain documents from Treasury for this case, Nothern submitted a Freedom of Information Act (FOIA) request on November 11, 2005. On November 29, 2005, Treasury replied that it "is experiencing a substantial backlog of FOIA requests and cannot meet the normal time limits." *See* Ex. B to Supp. Currid Decl. It also directed Nothern to submit a separate request for Secret Service documents to the Department of Homeland Security, which Nothern did on December 20, 2005. *See* Ex. C to Supp. Currid Decl. As of the date of this reply brief three months later, neither agency has produced any documents in response to his requests.[9]

Contrast also the SEC's coordination with Justice with Nothern's attempt to obtain documents from that department. The SEC concedes (Opp. at 6 n.9) that it and the U.S. Attorney's Office in Manhattan shared information during the course of their parallel investigations. *See also* Ex. S to Currid Mtn. Decl. (privilege log showing numerous memoranda and notes exchanged between the two agencies). Now, in its opposition, the SEC cites at length

---

[9] The SEC argues (Opp. at 16) that the discretion set forth in Treasury's housekeeping regulations is "far from 'limitless.'" These regulations, however, authorize Treasury to deny any request that is "unduly burdensome," would involve Treasury in "controversial issues," would compromise "the time of employees for conducting official business," or because of "[a]ny other factor that is appropriate." *See* 31 C.F.R. § 1.11(e)(1). Judicial review is limited to the extremely deferential standard overruling only arbitrary or capricious decisions. *See, e.g.*, *COMSAT Corp. v. National Science Found.*, 190 F.3d 269, 277 (4th Cir. 1999); *Al Fayed v. Central Intelligence Agency*, 229 F.3d 272, 276 (D.C. Cir. 2000). The SEC, moreover, does not cite a single case in which a Rule 34 request was denied on the ground that the party did not seek documents through an agency's housekeeping regulations.

excerpts from the transcript of Peter Davis's plea on September 23, 2003.  What the SEC does not mention is that this transcript was unsealed only on February 1, 2006, upon the application of the U.S. Attorney's Office, just before the SEC would use it for its brief.

Yet rather than simply request that Justice also produce the documents that Nothern seeks for his defense, the SEC argues (Opp. at 18) that Nothern should first "exhaust the means available to him under such provisions as FOIA and the *Touhy* [housekeeping] regulations" — including litigating a separate FOIA enforcement action in federal court!  As Nothern explained in his initial brief (Mem. at 13), Justice responded to his FOIA request by refusing to provide nonpublic documents involving third parties such as Peter Davis.[10]  In its opposition (at 18), the SEC argues that "Nothern admits that he has not yet provided Justice with the third party consent, and therefore has not taken the necessary steps to legally obtain all of the documents that Justice is willing to produce under FOIA."  But as Nothern noted in his initial brief (Mem. at 13), Davis refused Nothern's request to supply third-party consent.  Therefore, there are no more steps that Nothern can take to obtain relevant documents from Justice through FOIA.

There is, of course, no "exhaustion" requirement under Rule 34, and there is no realistic chance in any event that Nothern could obtain the relevant documents he needs through FOIA or the agency housekeeping rules by the discovery deadline in this case.  Furthermore, as noted above, the SEC does not dispute that courts in the District of the District of Columbia prohibit the enforcement of all Rule 45 subpoenas served on federal agencies.  While the housekeeping regulations of Justice and Treasury explicitly exempt requests made by other government agencies, *see* 28 C.F.R. § 16.21(c); 31 C.F.R. § 1.12, the SEC argues (Opp. at 17) that there is no

---

[10] Justice stated that without the consent of the relevant third parties, its release of records "would result in an unwarranted invasion of personal privacy and would be in violation of the Privacy Act, 5 U.S.C. § 552a."  *See* Ex. Y to Currid Mtn. Decl.  This same rationale clearly applies under Justice's housekeeping regulations, which prohibit among other things any disclosure that would "violate a statute."  *See* 28 C.F.R. § 16.26(b)(1).

guarantee that it will be exempted if it is perceived as requesting documents "on behalf of a defendant in a litigation."  That scenario is highly unlikely, but even assuming that the SEC were to experience difficulties in obtaining documents from these other agencies, that is a problem for these agencies or Congress to resolve, not Nothern.  Having so closely coordinated its investigation with other government agencies, there is no reason why the SEC cannot and should not disclose all relevant documents held by the government it represents.

## III.    FULL DISCOVERY FROM TREASURY AND OTHER INVOLVED GOVERNMENT AGENCIES IS CRITICAL TO THIS CASE.

Finally, the SEC tries to avoid its discovery obligations by arguing that Nothern's requests are too broad to be applied to other agencies.  Nothern, it argues (Opp. at 7 & n.10), has "essentially defined the plaintiff in this case" as encompassing the entire United States government, such that every single agency and department would have to produce its document retention and embargo policies.  It further suggests that Nothern refuses to narrow his requests for documents held by other agencies, stating (Opp. at 17 n.15) that he "makes much of the fact" that the SEC proposed this during the parties' Rule 37.1 conference.

This argument is baseless.  Nothern has not "made much" of the SEC's request for narrower requests.  To the contrary, as his initial brief states (Mem. at 7), "Nothern's counsel agreed to make his document requests more specific for this purpose" during the Rule 37.1 conference.  Nothern's counsel also asked the SEC to identify all the agencies that have been involved in the 30-year bond incident and subsequent investigations precisely so that he could limit "the number of government agencies to which the requests would be sent."  Mem. at 7.  For whatever reason, counsel for the SEC refused to identify all the relevant agencies.  *Id.*

The SEC also argues (Opp. at 15) that Nothern's request should be denied because he does not have "proof" that the documents he seeks at Treasury and other agencies "actually

exist." What proof could Nothern have if he is denied access to the documents themselves? The purpose of Rule 34 is to allow a party to determine whether certain documents actually exist, as well as to obtain those that do. Nothern is entitled to find out, among other things, whether there are any documents at Treasury or Justice that show that Davis had a duty to honor Treasury "embargoes"; that establish the terms and scope of that duty; that explain why other people, including Nothern, knew or should have known of any duty Davis might have had; that show whether and how Treasury enforced its "embargoes" when they were "violated" by other persons; and that show precisely when the trade in question occurred and when Treasury's information on the 30-year bond became public, since the information appears to have been public at least twenty minutes before the trade.

The SEC argues (Opp. at 3 n.5) that Nothern has no justification to inquire into the circumstances under which another attendee at the October 31, 2001 press conference — reporter Brian Collins from the *National Mortgage News* — shared the news about the 30-year bond with an official at the Federal National Mortgage Association at 9:35 a.m. But this reporter's disregard for the purported "embargo" (and Treasury's apparent failure to take any action against him) relate directly to the existence and scope of any duty held by Davis to honor the "embargo." The reporter's action also shows that there is no reason why Nothern in Boston should have understood from the mere mention of the word "embargo" that Davis had a duty which also applied to him. Finally, the fact that Collins's news had been relayed to at least nine additional persons, including a trader and a salesperson at Salomon Smith Barney, by 9:50 a.m. seriously undermines the SEC's position that the information was "non-public" at the time of Nothern's trades.[11]

---

[11] In its statement of the facts, the SEC asserts (Opp. at 4) that MFS placed its trade order with Merrill Lynch at 9:42 a.m., apparently relying on a Merrill Lynch order ticket bearing that time, based upon a clock that was evidently never compared to the clock used by Treasury's computer

Finally, the SEC contends (Opp. at 2-3 n.3) that Nothern "disingenuously" misstated the record by citing former Market Finance Director's Jill Ouseley's testimony about the doors to the Diplomatic Reception Room where Treasury's press conference was held.  While the full facts will not be known until after the discovery that the SEC opposes, Nothern did not misrepresent the record to date.  As Nothern wrote in his initial brief (Mem. at 2) and Ouseley testified in her SEC deposition, *see* Ex. F to Currid Mtn. Decl. at 44, Treasury's practice at such conferences was to keep open the "<u>back door</u> to the room where the conference was held" (emphasis added). Treasury did not do anything to prevent attendees from walking out the back door in the middle of a press conference.  *Id.* at 45.  The SEC cites the unsworn statement of Public Information Coordinator Frances Anderson, who said that she was asked to "stand out in the hall to keep an eye on some charts that were to be handed out at the conclusion of the conference," and that "since the doors were closed," she did not hear any announcement about an embargo.  *See* Ex. C to Rossetti Decl. at 2.  Anderson was apparently referring to a different set of doors.  As Ouseley explained in her deposition, "The door <u>at the head of the table</u> would be closed, <u>because the hallway was noisy</u>."  Ex. F to Currid Mtn. Decl. at 44 (emphasis added).  In any event, the issue of whether the doors were closed or open to anyone in the Treasury building highlights the need for full discovery from Treasury.  At a minimum, Nothern, who did not attend the press conference himself, should not be required to accept as fact unsworn statements from Treasury employees attempting to defend their careless handling of market-moving information.

---

system.  The SEC's case rests on the assumption that the trade occurred between the placement of the order and 9:43 a.m., per the Treasury's computer, when the SEC alleges Treasury posted its press release on its website.  In its opposition (at 3 n.5, 5), the SEC makes the novel argument that Treasury's information did not become public until it was "fully impounded into the market."  This argument is completely without merit.  In response to the widespread reports and rumors circulating in the market that morning, the price of the 30-year bond began moving up at 9:30 a.m. — eight minutes before Davis called to leave his voice mail for Nothern — and continued to rise until 12:59 p.m.  Complaint ¶ 42.  The SEC's "impoundment" argument would implicate as unlawful every bond trade made before 1:00 p.m.

These and other critical issues remain unresolved in this case, and discovery from the government agencies involved is essential to shed light on them.  The SEC seeks an order from the Court not only fining Nothern but also preventing him as a practical matter from pursuing his profession.  Yet it refuses to exercise its ability (unique among the present parties) to obtain documents that might exculpate him from other departments of the government the SEC itself represents.  Neither the Federal Rules, the Due Process Clause, nor common sense permits such an unfair process.

## **CONCLUSION**

For the foregoing reasons, the Court should enter an order compelling the government to produce all relevant documents requested by Nothern that are held by the SEC, the Treasury Department, the Justice Department, and any other federal agency.

STEVEN E. NOTHERN

By his attorneys,


/s/ John A. Shope_____
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000


Dated:  March 17, 2006


B3176112.5

17

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES SECURITIES AND        )
EXCHANGE COMMISSION,                )
                                    )       Civil Action No. 05-10983 (NMG)
            Plaintiff,              )
                                    )
      v.                            )       ORAL ARGUMENT REQUESTED
                                    )
STEVEN E. NOTHERN,                  )
                                    )
            Defendant.              )
                                    )
```

## SUPPLEMENTAL DECLARATION OF KEVIN B. CURRID
## FILED IN SUPPORT OF REPLY MEMORANDUM

Kevin B. Currid, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am an attorney for Steven E. Nothern in the above-referenced matter. I am a member of the Massachusetts bar and the bar of this Court. Except where otherwise indicated, I make this declaration based upon my own personal knowledge, upon public records and upon the documents related to this action.

2.      On Thursday, March 9, 2006, I spoke to Richard K. Delmar, counsel to the Inspector General for the Department of the Treasury regarding the process followed in 2001 by the Office of Inspector General in completing and distributing a report of investigation and the significance of the date stamped on a report.

3.      Mr. Delmar informed me that the process is governed by chapter 12 of the Special Agent's handbook, which was revised in July 2002, but that the process remained substantially unchanged from the process described in the handbook effective in 2001.

4.      Mr. Delmar stated that the date of the report is merely the date that the assigned assistant inspector general completed the report.  The date does not indicate when the investigation was closed or when the report was considered final.

5.      When the report is completed by the assistant inspector general, it is dated and distributed to the management of the bureau implicated in the investigation for comment and possible revision or other follow-up.

6.      Bureau management then has, pursuant to chapter 12.6 of the Special Agent's handbook, thirty (30) days to respond to the report.

7.      Bureau management may choose not to respond, may choose to suggest revisions to the report, or may suggest that additional investigative work should be done.

8.      Mr. Delmar informed me that until the thirty (30) days for possible "management action" have lapsed, the report is not "ready for release" and that sometimes bureau management requires follow-up work to be performed, or for a supplemental report to be written.

9.      Consequently, Mr. Delmar stated that if a Freedom of Information Act ("FOIA") request were submitted during the 30-day period after a report of investigation has been dated and signed, the report of investigation would not be released.

10.     After the 30-day period has lapsed or any follow-up work is completed, the report of investigation is considered final and ready for release.  It is not, however, re-dated, but continues to bear the date it was given when the assistant inspector general initially completed the report even if revisions have been made or supplemental information was supplied.

11.     Finally, Mr. Delmar stated that a report of investigation may be subject to a FOIA request and on a case by case basis may be released in response to such a request.  If released,

the report of investigation would be redacted to prevent disclosure of sensitive or department personnel information.

12.    I asked Mr. Delmar if the report of investigation is ever released generally to the Department of the Treasury, and he stated he was not aware of such a practice.

13.    I asked if I could receive a copy of the Special Agent's handbook or the relevant chapter and was told that I would have to submit a FOIA request, which I have done. I have not received a copy of the handbook as of the date of this declaration.

14.    In this litigation the Securities and Exchange Commission ("SEC") has produced an unredacted copy of a Report of Investigation, dated January 2, 2001, concerning the Department of the Treasury's Office of Inspector General's investigation of alleged unauthorized disclosure by unknown Treasury employees of information regarding the suspension of the 30-year bond.

15.    The SEC has also produced a copy of the Report of Investigation, with a fax cover sheet dated January 15, 2002 indicating that it received a copy of the Report of Investigation before the 30-day period for bureau management action lapsed. A copy of this fax cover sheet is included in the letters and facsimile transmissions attached hereto as Exhibit A.

16.    Based on my conversation with Mr. Delmar and his description of the Report of Investigation process, I believe that the record in this litigation shows that the SEC received a copy of the Report of Investigation before it was final, at a time when revisions could still be made, and before it would have been released to the public.

17.    True and correct copies of letters and facsimile transmissions exchanged between the U.S. Department of the Treasury and the U.S. Securities and Exchange Commission between November 2001 and May 2002 and produced in this matter are attached hereto as Exhibit A.

- 3 -

18.     A true and correct copy of the U.S. Department of the Treasury's response to Nothern's FOIA request dated November 29, 2005 is attached hereto as Exhibit B.

19.     A true and correct copy of the U.S. Department of Homeland Security's response to Nothern's FOIA request (undated, but received by Nothern in January 2006) is attached hereto as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 17, 2006.

_____
Kevin B. Currid

B3174533.4

- 4 -

# EXHIBIT A

**Letters and Facsimile Transmissions Exchanged Between
U.S. Department of Treasury and U.S. Securities and
Exchange Commission between November 2001-May 2002**



GENERAL COUNSEL

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

November 6, 2001

The Honorable Harvey L. Pitt
Chairman
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549

Dear Mr. Chairman:

Per our conversations of Thursday and Friday of last week, I am referring a matter for investigation by the Securities and Exchange Commission. The focus of the inquiry, as more fully detailed in the enclosures to this letter, is an assertion that there may have been trading activity in government securities based upon confidential information learned during an embargoed quarterly funding meeting at the Treasury.

Please keep me advised.

Very truly yours,

David D. Aufhauser
General Counsel

cc:    Mr. Jeffrey Rush
       Mr. Stephen Cutler

SECNOTH00102839

11/6/01

To: Andrew Sporkin  SEC
    Phone  202 942 4800
    FAX   202 628 1471

From:  Francine Kerner  Treas
       Phone  202 622 1931 (currently @
                             703 747 2205
                              or 2214)
       FAX   202 622 1944
       e-mail  Francine.Kerner @ do.treas.go

Comments:
①  10/30  Press Release
②  Draft press Release circulated in building
   via e-mail by Betsy Holahan
③  Press Release handed - out 10/31 @ end of press
                                         conference
④  Press Release about early posting
⑤  E-mail on file update

SECNOTH00103785



**UNITED STATES**
## SECURITIES AND EXCHANGE COMMISSION
**450 Fifth Street, N.W.**
**Washington, D.C. 20549-0805**

DIVISION OF
ENFORCEMENT

Rosemary A. Filou
Staff Attorney
Direct dial: 202-942-4768
Facsimile: 202-628-1471

November 7, 2001

**BY HAND**

David Aufhauser, Esq.
General Counsel
Department of the Treasury
1500 Pennsylvania Avenue, N.W., Suite 3000
Washington, D.C. 20220
Telephone: (202) 622-0283
Facsimile: (202) 622-2882

Re: In the Matter of Trading in Certain Treasury Issues (HO-09353)

Dear Mr. Aufhauser:

The staff of the Division of Enforcement is conducting a non-public inquiry in the above matter, regarding trading in certain Treasury issues. In connection therewith, the staff requests that the Department of the Treasury ("Treasury") voluntarily provide us with the documents and information set forth below regarding Treasury's announcement on October 31, 2001, that it would suspend future issuance of the thirty-year Treasury bond (the "30-year bond").

First, the staff asks that Treasury supply a chronology of all disclosures of any kind to any member of the press or public concerning any proposal to suspend the 30-year bond, including but not limited to the circumstances and events surrounding the October 31, 2001 announcement. The chronology should begin with the first disclosure of any kind to any member of the press or public that Treasury might suspend issuance of the 30-year bond, and should continue with a minute-by-minute detail from the start of the October 31, 2001 press conference to its conclusion, the dissemination of materials to the conference attendees, security at the conference, any "embargo" at the conference, the movements of the attendees during and immediately following the conclusion of the conference, the posting of information on the Treasury internet website, any telephone calls Treasury

SECNOTH00121319

David Aufhauser, Esq.
General Counsel
Department of the Treasury
November 7, 2001
Page 2

received pertaining to the announcement, any further action taken regarding the
announcement that morning, and any and all other facts and details concerning the
announcement that took place prior to 10:00 a.m. on October 31, 2001. With respect to each
event identified in the chronology, please include the date and time at which it occurred, the
location of the event, the participants and other persons with knowledge or access to
knowledge -- including their full names, positions, addresses, and telephone numbers -- and
the substance of any communications concerning the 30-year bond announcement. With
respect to security and any embargo at the conference, please also indicate in the context of
the chronology how the security and embargo were enforced.

     Second, please supply the staff with all documents concerning the press conference
on October 31, 2001, including but not limited to all documents concerning:
    (a) the agenda for the press conference;
    (b) the speakers at the conference;
    (c) a list of all attendees at the conference and their affiliation;
    (d) all documents distributed at the press conference (please also indicate when
        those documents were distributed);
    (e) security at the conference -- particularly in relation to who was permitted to
        attend, and Treasury's policy regarding cellular telephones at press conferences;
        and
    (f) any "embargo" at the conference, including but not limited to all documents
        distributed to participants and all documents that participants signed agreeing to
        embargo information.

In addition, please provide the following information and documents:
    (a) A description of Treasury's policies and practices for press conferences at which
        embargoed information is presented, including but not limited to how they are
        typically conducted and where, who is invited to attend, and who is permitted to
        attend, and all documents related thereto;
    (b) A description of Treasury's policies and practices for embargoes, and all
        documents related thereto;
    (c) All information and documents concerning Peter Davis, including but not limited
        to any and all contacts he has had with Treasury since January 1, 2001.
    (d) Identify all announcements, since January 1, 2001, in which information was
        embargoed, the dates and times of the press conferences and when the
        embargoes were lifted, and whether Peter Davis was in attendance.

     This request should not be construed as an indication by the Commission or its staff
that any violations of law have occurred, nor should it be considered an adverse reflection
upon any person, entity or security.

David Aufhauser, Esq.
General Counsel
Department of the Treasury
November 7, 2001
Page 3


     With the understanding that production of the requested information is voluntary, please ensure delivery of these documents no later than November 13, 2001 to the following address:

               Rosemary A. Filou, Esq.
               450 Fifth Street, N.W., Mailstop 8-5
               Washington D.C. 20549-0805


     For your information, enclosed please find a copy of SEC Form 1662, which addresses important matters pertaining to Commission requests for information. If you should have any questions regarding this matter, please contact me at (202) 942-4768, or Andrew Sporkin at (202) 942-4800. Thank you.

               Sincerely,



               Rosemary A. Filou
               Staff Attorney

Enclosure



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 13 , 2001

**VIA TELECOPIER**

Andrew Sporkin, Esq.
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

      Re:    <u>SEC Inquiry</u>

Dear Mr. Sporkin:

      Confirming my telephone messages to you and pursuant to your request, I have arranged to have you meet with Ms. Frances Anderson and Mr. Tony Fratto at 4:00 p.m. on Wednesday, November 14, 2001, in the General Counsel's Conference Room. I have also arranged for your requested interviews of Mr. Paul Malvey and Ms. Lula Tyler at 3:00 p.m. on Thursday, November 15, 2001. Based upon your representations of how much time you would like to have to speak to each person, I have reserved the conference room for an hour and a half for each session. I have also cleared my schedule from 12:00 to 12:45 p.m., so that we can discuss your document requests.

      Lastly, Mr. Huther is available at 2:30 p.m. on Tuesday, November 20, 2001. Please let me know at your earliest convenience if you can conduct an interview at that time.

      Attached please find documents related to the admission of individuals to the press conference on October 31, 2001. I will have hard copies awaiting you when you arrive tomorrow.

      Sincerely,

      Megan E. Hills
      Associate Deputy General Counsel

Attachments: As stated

SECNOTH00103046



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 14, 2001

**BY HAND**

Andrew Sporkin, Esq.
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

   Re: <u>SEC Inquiry</u>

Dear Mr. Sporkin:

   Enclosed please find four separate documents: print-out of a Bloomberg story, dated November 12, 2001 (3 pages), document entitled, "Davis Capital Investment Ideas," (2 pages), Email Print-out entitled, "Treasury Department Sets Procedures for Quarterly Refunding Announcement," from the Office of Public Affairs (1 page), and an email from Peter Fisher, dated November 6, 2001, regarding this investigation (1 page).

      Sincerely,

      Megan E. Hills

      Megan E. Hills
      Associate Deputy General Counsel

Enclosures: As stated



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 23, 2001

<u>**BY TELECOPIER**</u>

Andrew Sporkin, Esq.
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

Re:    <u>SEC Inquiry</u>

Dear Mr. Sporkin:

During the interview of Mr. Jeff Huther on November 21, 2001, Mr. Ochs asked Mr. Huther to check his calendar to see whether he could ascertain when Mr. Drew Matus visited his office and when Paul Malvey made an internal announcement to the Market Financing Staff regarding suspension of the thirty year bond. Mr. Huther checked his calendar, which reflects a notation of a meeting with Drew Matus at 1:30 p.m. on October 22, 2001. Mr. Huther's calendar also bears a notation of a staff meeting on October 15, 2001, where it is likely, but not certain, that the decision to suspend the thirty year bond was internally announced.

Mr. Ochs also asked me to check with Undersecretary Peter Fisher as to whether, during early to mid-October, there was a definitive date on which the decision to terminate the long bond was made. At that juncture, such a date cannot be provided, as the decision was still undergoing analysis under the deliberative process.

You have currently expressed no desire to interview any other Treasury personnel. I am aware that, based upon any further inquiry by the SEC, this position may change; however, as I told you on November 9, 2001, any new interviews will have to be completed by November 29, 2001, or after December 17, 2001, as I will be on my honeymoon.

Sincerely,

*Megan E Hills*

Megan E. Hills
Associate Deputy General Counsel

cc:    Undersecretary Peter Fisher
       Mr. Jeff Huther
       Mike Norr, Esq.

SECNOTH00103169

ENVIADO: EMBASSY SUITES HOTEL CARACAS;    582122870922;    DIC-3-01 19:52;    PAGINA 2/2

6919 Langley Place
University Park, Florida 34201
December 3, 2001

Ms. Rosemary A. Filou
Senior Attorney
U.S. Securities and Exchange Commission
Division of Enforcement
450 5th Street, N.W.
Washington, D.C. 20549-0805

Re: Subpoena Number HO-9353, Trading in Certain Treasury Issues

Dear Ms. Filou:

I am replying to your letter of November 26, enclosing the above-referenced subpoena.
As we discussed in our telephone conversation, I have received the letter and subpoena
by fax at my hotel in Caracas, Venezuela. I am faxing my response to you and will mail
the original to you when I reach my home on December 8, 2001.

1. I do not have in my possession, custody or control any documents concerning
   Peter Davis' attendance at press conferences at Treasury.

2. I do not have in my possession, custody or control any documents concerning any
   communications, discussions, or contacts with Peter Davis at any time.

3. I do not keep telephone records. Therefore, I do not have in my possession,
   custody or control any telephone records from October 1, 2001 to the present.

4. No telephone numbers have been assigned to me from October 1, 2001 to the
   present.

Sincerely,

Jill K. Ouseley

Jill K. Ouseley

EXHIBIT
# 112
HO-9353 1-7-02

SECNOTH00119480



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

DIVISION OF
ENFORCEMENT

Rosemary A. Filou
Staff Attorney
Direct dial: 202-942-4768
Facsimile: 202-628-1471

December 19, 2001

**VIA FACSIMILE**
**AND FIRST-CLASS MAIL**

Megan Hills, Esq.
Associate Deputy General Counsel
Department of the Treasury
Washington, D.C. 20220
Facsimile: (202) 622-2882

Re:  Trading in Certain Treasury Securities, HO-9353

Dear Megan:

As we discussed on the telephone yesterday afternoon, the staff requests that you voluntarily provide certain additional information to us in conjunction with the above matter. Please provide the following at your earliest opportunity:

1.    Business, home, and cellular telephone numbers for (1) Tim Bitsberger;
      (2) Brian Roseboro; (3) Jeff Huther; and (4) Paul Malvey.

2.    (a) The telephone numbers for any telephone lines in the Treasury press room;
      and (b) The business and cellular telephone numbers for all members of the
      Treasury press pool, and any other member of the press who typically reports
      on Treasury.

If you should have any questions about this matter, please feel free to contact me at (202) 942-4768.  Thank you for you cooperation.

Sincerely,

Rosemary A. Filou
Senior Attorney

SECNOTH00125932



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

DIVISION OF
ENFORCEMENT

Rosemary A. Filou
Staff Attorney
Direct dial: 202-942-4768
Facsimile: 202-628-1471

January 9, 2002

**VIA FACSIMILE**
**AND FIRST-CLASS MAIL**

Megan Hills, Esq.
Associate Deputy General Counsel
Department of the Treasury
Washington, D.C. 20220
Facsimile: (202) 622-2882

Re: Trading in Certain Treasury Securities, HO-9353

Dear Megan:

As we discussed on the telephone, the staff requests that you voluntarily provide information concerning any Treasury rules and regulations with respect to visitor passes, specifically those rules and regulations that govern or establish the responsibilities of persons who receive visitor passes.

If you should have any questions about this matter, please feel free to contact me at (202) 942-4768. Thank you for you cooperation.

Sincerely,

Rosemary A. Filou
Senior Attorney



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

**DIVISION OF**
**ENFORCEMENT**

January 9, 2002

**BY FACSIMILE**
**AND FIRST-CLASS MAIL**

Mr. Michael Tarr
Assistant Inspector General for Investigations
Department of the Treasury
740 Fifteenth Street, N.W., Suite 500
Washington, D.C. 20220
Facsimile: (202) 927-5421

Re: In the Matter of Trading in Certain Treasury Issues, HO-9353

Dear Mr. Tarr:

Your special agent, Michael Knorr, has informed the staff of the Division of Enforcement that your office has completed a report of investigation concerning the matter of the Department of the Treasury's October 31, 2001, quarterly refunding announcement. We understand that you will send the report to the General Counsel at Treasury, as well as the Office of Public Affairs and Undersecretary Fisher. The Division of Enforcement requests that you voluntarily provide a copy of the report to the Division of Enforcement prior to its release to the Department of Treasury.

If you should have any questions about this matter, please contact Rosemary Filou at (202) 942-4768. Thank you for you cooperation.

Sincerely,

William R. Baker III
Associate Director



**OFFICE OF
INSPECTOR GENERAL**

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

JAN 1 0 2002

William R. Baker III
Associate Director
Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

Subject: Matter of Trading in Certain Treasury Issues, HO-9353
       OIG Case Number: 2002-0104

Dear Mr. Baker:

Reference is made to your facsimile letter dated January 9, 2001, requesting an advance
copy of our Report of Investigation (ROI) relating to the captioned subject.

The ROI was issued on this date to the appropriate personnel at the Department of the
Treasury. The Inspector General did not wish to release an advance copy of the report. It
is my understanding that Senior Investigator Knorr of my staff informed members of
your staff as to the recipients of the report.

If you have any questions concerning this matter, please contact me at (202) 927-5260, or
a member of your staff may contact Senior Investigator Mike Knorr, at (202) 927-5369.

                           Sincerely,

                           Michael C. Tarr
                           Assistant Inspector General
                             for Investigations

SECNOTH00124405



**Facsimile Transmittal Sheet**



## DEPARTMENT OF THE TREASURY
### OFFICE OF INSPECTOR GENERAL
### OFFICE OF INVESTIGATIONS
740 15th Street, N.W., Suite 500
Washington, DC 20220

Telephone Number: (202) 927-5260
Facsimile Number: (202) 927-5421

DATE: _____ 0-2   ( 1 / 15 / 02 )

TO: _____ Andrew  Sporkin - SEC

FAX NUMBER: _____ 628 - 1471

VOICE NUMBER: _____

FROM: _____ Mike  Knorr

COMMENTS/SPECIAL INSTRUCTIONS:
_____ 2nd  try
_____
_____
_____
_____

*PORTIONS OF THIS INFORMATION MAY BE SENSITIVE.*

TOTAL NUMBER OF PAGES (INCLUDING FAX HEADER): __15__

SECNOTH00103706



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

DIVISION OF
ENFORCEMENT

Rosemary A. Filou
Staff Attorney
Direct dial: 202-942-4768
Facsimile: 202-628-1471

January 16, 2002

**VIA FACSIMILE**
**AND FIRST-CLASS MAIL**

John Vardaman, Esq.
Special Assistant to the General Counsel
Department of the Treasury
Washington, D.C. 20220
Facsimile: (202) 622-2882

Re: <u>Trading in Certain Treasury Issues, HO-9353</u>

Dear John:

I write to memorialize the staff's request that you voluntarily produce Paul Malvey's copy of the 1999 Davis Capital Investment Ideas newsletter regarding a "crack debt management team" at Treasury. In addition, the staff asks that you voluntarily inform us of the current address along with any other contact information Treasury may possess for former Deputy Assistant Secretary of the Treasury Roger Anderson.

If you should have any questions about this matter, please feel free to contact me at (202) 942-4768. Thank you for you cooperation.

Sincerely,

Rosemary A. Filou
Senior Attorney



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

DIVISION OF
ENFORCEMENT

Rosemary A. Filou
Staff Attorney
Direct dial: 202-942-4768
Facsimile: 202-628-1471

February 26, 2002

**VIA FACSIMILE**
**AND FIRST-CLASS MAIL**

John Vardaman, Esq.
Special Assistant to the General Counsel
Department of the Treasury
Washington, D.C. 20220
Facsimile: (202) 622-2882

      Re:  <u>Trading in Certain Treasury Issues, HO-9353</u>

Dear John:

      I write to request that you voluntarily produce the embargo times for the May 2, 2001, and August 1, 2001, quarterly refunding announcements.  To the extent that the information was documented in any form, please supply those documents.  If the embargo was orally announced, please indicated who announced the embargo time and when the announcement was made, as well as the embargo time itself.  Please provide the information via fax to me at (202) 628-1471.

      If you should have any questions about this matter, please feel free to contact me at (202) 942-4768.  Thank you for you cooperation.

           Sincerely,

           Rosemary A. Filou
           Senior Attorney



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

*RECEIVED*

*2002 MAR 18  AM 8: 36*

March 4, 2002

*ENFORCEMENT*

**BY FACSIMILE AND FIRST CLASS MAIL**

Rosemary A. Filou, Esq.
Senior Attorney
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

          Re:   <u>SEC Inquiry</u>

Dear Rosemary:

     This letter is in response to your letter dated February 26, 2002, wherein you requested information regarding the May 2, 2001, and August 1, 2001, quarterly refunding announcements.

     I forwarded your request to Tony Fratto, Director of the Office of Public Affairs, who was responsible for announcing the embargo at both the May 2, 2001, and August 1, 2001, quarterly refunding announcements. Though it has been some time, Mr. Fratto recalls that the May 2nd announcement started shortly after 9:00 a.m. and ended around 9:25 a.m., while the August 1st announcement started precisely at 9:00 a.m. and lasted until approximately 9:30 a.m. As is the custom, Mr. Fratto orally issued a 15-20 minute embargo at the conclusion of the news conference following both announcements. Accordingly, the May 2nd embargo was in effect from approximately 9:25 a.m. until 9:45 a.m., and the August 1st embargo from 9:30 a.m. until 9:50 a.m. The Treasury Department did not issue any documents in regard to either embargo, nor is it the Treasury Department's practice to do so.

     If you have any further inquiries, please do not hesitate to call me (202) 622-1963.

                      Sincerely,

                      John W. Vardaman, III
                      Special Assistant to the General Counsel

cc:    Michael C. Knorr

SECNOTH00103313



**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

DIVISION OF
ENFORCEMENT

Rosemary A. Filou
Staff Attorney
Direct dial: 202-942-4768
Facsimile: 202-628-1471

March 7, 2002

**BY FACSIMILE**
**AND FIRST-CLASS MAIL**

Mr. Michael Tarr
Assistant Inspector General for Investigations
Department of the Treasury
740 Fifteenth Street, N.W., Suite 500
Washington, D.C. 20220
Facsimile: (202) 927-5421

Re:  In the Matter of Trading in Certain Treasury Issues, HO-9353

Dear Mr. Tarr:

As we discussed with Special Agent Michael Knorr earlier today, we request that you inform us whether anyone has reported to the Office of Inspector General a leak stemming from any quarterly refunding press announcement at Treasury in the last ten years, and, if so, whether or not the Office of Inspector General investigated the report.

If you should have any questions about this matter, please feel free to contact me at (202) 942-4768. Thank you.

Sincerely,

Rosemary A. Filou
Senior Attorney

SECNOTH00125664



**OFFICE OF**
**INSPECTOR GENERAL**

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

MAR 2 1 2002

Ms. Rosemary A. Filou
Staff Attorney
United States
Securities and Exchange Commission
Division of enforcement
450 Fifth Street, NW
Washington, D.C. 20549-0805

Re: In the Matter of Trading in Certain Treasury Issues, HO-9353

Dear Ms. Filou:

Reference is made to your facsimile request, dated March 7, 2002, and to subsequent telephone conversations between Senior Attorney Andrew Sporkin of your office and Michael Knorr.

On March 14 and 18, 2002, a record search was conducted by the Office of Inspector General, Office of Investigations, through the Investigation Data Management System (IDMS). Names and phrases within the parameters of our query included quarterly refunding, press announcements, Market Finance, and the name Peter Davis. With the exception of information contained in our most recent Report of Investigation, a copy of which was previously provided to your office, our IDMS record search disclosed no relevant information.

Sincerely,

*for* James W. Burke
Special Agent in Charge

ENFORCEMENT
2002 MAR 25 PM 4: 27
RECEIVED

SECNOTH00124364



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

April 5, 2002

**BY FACSIMILE AND FIRST CLASS MAIL**

Rosemary A. Filou, Esq.
Senior Attorney
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

                Re:    SEC Inquiry

Dear Rosemary:

        In response to your request, this letter is intended to clarify my March 4, 2002, letter regarding the embargo times for the May 2, 2001, and August 1, 2001, quarterly refunding announcements.

        To be clear, at the conclusion of the press conference on May 2, Tony Fratto, Director of the Office of Public Affairs, announced that an embargo was in effect until approximately 9:45 a.m.  At the conclusion of the press conference on August 1, Mr. Fratto announced that an embargo was in effect until approximately 9:50 a.m.

        If you have any further inquiries, please do not hesitate to call me at (202) 622-1963.

                                Sincerely,

                                John W. Vardaman, III
                                Special Assistant to the General Counsel

cc:    Michael C. Knorr

SECNOTH00103322



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

April 19, 2002

**BY FACSIMILE AND FIRST CLASS MAIL**

Rosemary A. Filou, Esq.
Senior Attorney
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

Re:    SEC Inquiry

Dear Rosemary:

In response to your letter dated April 17, 2002, enclosed please find a November 14, 2001 press release from the Office of Public Affairs regarding the Treasury Department's new procedures for quarterly refunding announcements. This constitutes the only official Treasury communication of the change in procedures.

As we discussed this morning, I am still in the process of determining how to obtain records reflecting each occasion that Peter J. Davis, Jr. entered the Main Treasury building. I will keep you apprised as more information becomes available.

If you have any further inquiries, please do not hesitate to call me at (202) 622-1963.

Sincerely,

John W. Vardaman, III
Special Assistant to the General Counsel

cc:    Michael C. Knorr

SECNOTH00103326



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C. 20220

May 2, 2002

**<u>BY FACSIMILE AND FIRST CLASS MAIL</u>**

Rosemary A. Filou, Esq.
Senior Attorney
SEC
450 Fifth Street, N.W.
Washington, D.C. 20549-0805

        Re:   <u>SEC Inquiry</u>

Dear Rosemary:

     Yesterday you requested copies of the "pre-announcement" statements issued by the Treasury Department prior to the May, August and October 2001 Quarterly Refunding Press Conferences.

     As we discussed today, there are three components to a Quarterly Refunding announcement. The announcement itself always takes place on a Wednesday morning at the end of the first month of a quarter. On Monday of that week, Treasury announces its Market Financing Estimates, which set forth Treasury's public debt activity during the preceding quarter, the ending cash balance, borrowing estimates for the following quarter, and projected ending cash balances. On Tuesday, the Director of the Office of Macroeconomic Analysis (usually) delivers a status report on the current state of the U.S. economy to the Treasury Borrowing Advisory Committee.

     Copies of both documents issued pursuant to the May, August and October 2001 Quarterly Refunding announcements are enclosed herewith.

     If you have any further inquiries, please do not hesitate to call me at (202) 622-1963.

                   Sincerely,

                   John W. Vardaman, III
                   Special Assistant to the General Counsel

cc:   Michael C. Knorr

SECNOTH00103347

# EXHIBIT B

**U.S. Department of Treasury's Response To
Nothern's FOIA Request dated November 29, 2005**



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C. 20220

November 29, 2005

RE: 2005-11-046

Mr. Kevin B. Currid
Foley Hoag LLP
Attorneys At Law
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210-2600

Dear Mr. Currid:

Your Freedom of Information Act (FOIA) request dated November 11, 2005, was received in this office.

One of the offices to which your request has been assigned is experiencing a substantial backlog of FOIA requests and cannot meet the normal time limits. They have established an orderly procedure for responding to requests, which is generally on a first-in, first-out basis. Be assured that your request will be answered as soon as possible.

Further inquiries concerning this request should make reference to the identification number at the top of this letter and should be faxed to 202-622-3895 or mailed to:

> FOIA/PA Request
> Disclosure Services
> Department of the Treasury
> Washington, DC 20220

As of March 1, 2003, the U.S. Secret Service was transferred to the Department of Homeland Security and is no longer a bureau of the Department of the Treasury. You may want to also send your FOIA request to the following address:

> Freedom of Information Act Request
> U. S. Secret Service
> 950 H Street, NW
> Suite 3000
> Washington, DC 20223

Sincerely,

Alana Johnson
Director, Disclosure Services

# EXHIBIT C

## U.S. Department of Homeland Security's Response To Nothern's FOIA Request received January 2006



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

*Received Jan. 2006*

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

*[signature]*

Foley Hoag LLP
Attorneys At Law
Seaport World Trade Center West
1550 Seaport Blvd
Boston, MA 02210-2600
Attn: Kevin B. Currid

File Number:   20050765 - 20050803

Dear Requester:

This letter is intended to acknowledge the receipt of your recent Freedom of Information/Privacy Acts requests received by the United States Secret Service on December 20, 2005, for information pertaining to the following:

File No. 20050765 - Copies, including drafts and supplemental reports of the United States Department of the Treasury, Office of Inspector General's, Report of Investigation No. 2002-0104;

File No. 20050766 - All documents provided to the United States Securities and Exchange Commission ("SEC") concerning the events investigated in case number 2002-0104;

File No. 20050767 - All communications with the SEC concerning the events investigated in case number 2002-0104, including without limitation all communications with SEC attorneys Andrew Sporkin and Rosemary Filou;

File No. 20050768 - All documents concerning the government's announcement by Peter R. Fisher, Treasury, Under Secretary for Domestic Finance, to suspend issurance of the 30-year bond during the quarterly refunding meeting press conference at Treasury on October 31, 2001;

File No. 20050769 - All documents concerning the Treasury Office of Public Affair's posting of Mr. Fisher's announcement on the Treasury Department's web site on October 31, 2001;

File No. 20050770 - All documents, including without limitation any interview notes or summaries from interviews conducted of Treasury Webmaster David Borowski;

File No. 20050771 - All documents concerning the identification of the individuals who attended the quarterly refunding press conference at Treasury on October 31, 2001;

File No. 20050772 - All documents, including drafts, concerning a memorandum, dated November 5, 2001 by Treasury Associate Deputy Counsel Megan Hills regarding the Office of General Counsel's contact with Ward McCarthy;

File No. 20050773 - All documents, including drafts, concerning a memorandum, dated November 6, 2001 by Treasury Associate Deputy Counsel Megan Hills regarding the Office of General Counsel's contact with Fran Bermanzohn, General Counsel, for the 6th Income Division, Goldman Sachs Brokerage;

File No. 20050774 - All documents, including drafts, concerning a memorandum, dated November 9, 2001 by Treasury Associate Deputy Counsel Megan Hills;

File No. 20050775 - All documents concerning any communications with Goldman Sachs Brokerage in connection with the Office of Inspector General's case number 2002-0104, including without limitation all interview notes, transcripts or summaries;

File No. 20050776 - All documents concerning any communications with Massachusetts Financial Services Company ("MFS") in connection with the Office of Inspector General's case number 2002-0104, including without limitation all interview notes, transcripts or summaries;

File No. 20050777 - All documents, including drafts, concerning a memorandum, dated November 5, 2001 from the Treasury Office of General Counsel regarding the identification of the individuals who attended the quarterly refunding press conference at Treasury on October 31, 2001;

File No. 20050778 - All documents concerning referral letter of David D. Aufhauser, General Counsel, dated November 6, 2001;

File No. 20050779 - All documents concerning a memorandum of Thomas M. McGivern, Counsel to the General Counsel, dated Novermber 6, 2001;

File No. 20050780 - All documents concerning a memorandum of Steven Vagle, Office of the General Counsel, undated;

File No. 20050781 - All documents concerning a memorandum of Sgt. John Muskette, USSS, UD, Appointment Center dated Novermber 6, 2001;

File No. 20050782 - All documents concerning e-mail messages of Jill Cetina, dated October 31, 2001;

File No. 20050783 - All documents regarding Office of Inspector General's case number 2002-0104 concerning any of the following individuals, including without limitation all interview notes, transcripts, or summaries: Frances Anderson, Public Information Coordinator, Office of Public Affairs, Jill Cetina, International Economist, Office of Foreign Exchange Operations, Peter Davis, Tony Fratto, Director, Office of Public Affairs, Elizabeth Holahan, Public Affairs Specialist, Office of Public Affairs, Jeff Huther, Financial Economist, Office of Market Finance, Paul Malvey, Director, Office of Market Finance, Brian Roseboro, Assistant Secretary for Market Finance, and Lula Tyler, Administrative Assistant, Office of Market Finance;

File No. 20050784 - All documents concerning the admittance of Peter Davis to the quarterly refunding press conference at Treasury on October 31, 2001;

File No. 20050785 - All documents concerning the admittance of Peter Davis to any press conference at Treasury from 1996 through 2001;

File No. 20050786 - All documents concerning communications between Peter Davis and Paul Malvey, Jill Ouseley, or Lula Tyler;

File No. 20050787 - All documents concerning Department of the Treasury policies concerning information embargos enforced at Treasury press conference from 1996 through 2001;

File No. 20050788 - All documents concerning the implementation and enforcement by the Department of Treasury of 31 C.F.R. §§ 407.5 and 407.14 and all other regulations concerning the requirement of all persons on Treasury property to comply with the instructions of Treasury guards, with official signs of a prohibitory nature, and with the directions of other authorized officials;

File No. 20050789 - All documents concerning any Freedom of Information Requests regarding Office of Inspector General, case number 2002-0104;

File No. 20050790 - All documents concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241;

File No. 20050791 - All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled In the Matter of Massachusetts Financial Services Company, File No. 3-11241;

File No. 20050792 - All documents concerning the investigation and/or lawsuit relating to the civil action captioned as, United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al., Civil Action No. 03-6672 (S.D.N.Y.);

File No. 20050793 - All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the civil action captioned as, United States Securities and Exchange Commission v. Peter J. Davis, Jr. et al., Civil Action No. 03-6672 (S.D.N.Y.);

File No. 20050794 - All documents concerning the lawsuit relating to the civil action captioned as, Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al., Civil Action No. 04-1851 (N.D.ILL.), including without limitation all deposition transcripts;

File No. 20050795 - All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the lawsuit relating to the civil action captioned as, Premium Plus Partners, L.P. v. Peter J. Davis, Jr. et al., Civil Action No. 04-1851 (N.D.ILL.);

File No. 20050796 - All documents concerning the investigation and/or criminal action captioned as, United States of America v. Peter Davis, Criminal Action No. 03-1054 (S.D.N.Y.);

concerning the investigation and/or criminal action captioned as, <u>United States of America v. Peter Davis,</u> Criminal Action No. 03-1054 (S.D.N.Y.);

File No. 20050798 - All documents concerning the investigation and/or criminal action captioned as, <u>United States of America v. John Youngdahl,</u> Criminal Action No. 03-0991 (S.D.N.Y.);

File No. 20050799 - All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or criminal action captioned as, <u>United States of America v. John Youngdahl,</u> Criminal Action No. 03-0991 (S.D.N.Y.);

File No. 20050800 - All documents concerning communications with Merrill Lynch regarding bond transactions on October 31, 2001 including, without limitation, documents concerning allegations of insider trading;

File No. 20050801 - All communications with, MFS, the SEC, or the Department of Justice or the United States Attorney's Office for the Southern District of New York or any other district concerning the subject matter of Office of Inspector General case number 2002-0104;

File No. 20050802 - All documents produced pursuant to subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled <u>In the Matter of Goldman, Sachs & Co.,</u> File No. 3-11240; and

File No. 20050803 - All documents produced pursuant to a subpoena, FOIA request or otherwise, concerning the investigation and/or lawsuit relating to the SEC Administrative Proceeding entitled <u>In the Matter of John M. Youngdahl,</u> File No. 3-11349.

A search for files responsive to your requests is being conducted. When the results of the search are known, you will be notified.

Please use the file numbers indicated above in all future correspondence with this office.

We solicit your cooperation and assure you that the search will be conducted as expeditiously as possible.

Sincerely,

Kathy J. Lyerly
SAIC
Freedom of Information &
Privacy Acts Officer