UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>            v.<br><br>STEVEN E. NOTHERN,<br><br>                    Defendant. | Civil Action No. 05-10983 (NMG)<br><br>**ORAL ARGUMENT REQUESTED** |

# DEFENDANT STEVEN NOTHERN'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION TO COMPEL PRODUCTION OF DOCUMENTS

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000

Dated: March 17, 2006

# TABLE OF CONTENTS

I. The Ruling in *AT&T* Supports Nothern................................................................................ 1

    A. The Court in *AT&T* Ruled that Fairness Requires the Production of Documents Held by Other Government Agencies................................. 1

    B. *AT&T* and Other Key Rulings Establish that Independent Agencies May Be Required to Produce Documents Held by Non-Independent Departments.................................................................................................... 4

II. Having Closely Coordinated Its Investigation with Treasury and Justice, the SEC Should Be Able to Obtain Documents from Those Departments Now ........ 9

III. Full Discovery from Treasury and Other Involved Government Agencies is Critical to This Case ................................................................................................. 14

Conclusion ................................................................................................................................ 17

# TABLE OF AUTHORITIES

## CASES

*In re Air Crash at Dallas/Fort Worth Airport*, 117 F.R.D. 392 (N.D. Tex. 1987)............7

*Al Fayed v. Central Intelligence Agency*, 229 F.3d 272 (D.C. Cir. 2000).........................12

*Bank Line v. United States*, 76 F. Supp. 801 (S.D.N.Y. 1948)........................................7-8

*COMSAT Corp. v. National Science Found.*, 190 F.3d 269 (4th Cir. 1999) ....................12

*Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979) ............................................................................................................................3-9

*Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964)................................3, 5-9

*Jencks v. United States*, 353 U.S. 657 (1957)......................................................................7

*United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978).............................................. 1-9

*United States v. Davis*, 140 F.R.D. 261 (D.R.I. 1992).........................................................7

*United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974) .......7, 8

## CONSTITUTIONAL PROVISION, STATUTES, AND REGULATIONS

U.S. Const. art. II, § 3 ..........................................................................................................6

5 U.S.C. § 552a...................................................................................................................13

28 C.F.R. § 16.21................................................................................................................13

28 C.F.R. § 16.26................................................................................................................13

31 C.F.R. § 1.11..................................................................................................................12

31 C.F.R. § 1.12............................................................................................................13, 14

Defendant Steven Nothern respectfully submits this reply memorandum in support of his motion to compel production of documents. In its opposition to the motion ("Opp."), the plaintiff U.S. Securities and Exchange Commission ("SEC") unfortunately misstates the law and groundlessly accuses Nothern of misrepresenting the factual record.

## I. THE RULING IN *AT&T* SUPPORTS NOTHERN.

The SEC continues to rely primarily on *United States v. AT&T*, 461 F. Supp. 1314 (D.D.C. 1978), as support for its categorical refusal to request and produce documents held by other government agencies in this case. Indeed, the SEC contends (Opp. at 9) that *AT&T* "summarily rejected the very legal argument that Nothern asserts in his motion." Not so.

### A. The Court in *AT&T* Ruled that Fairness Requires the Production of Documents Held by Other Government Agencies.

*AT&T* involved a antitrust lawsuit brought by the Justice Department against three telecommunications companies. 461 F. Supp. at 1317-18. The defendants served a request for production of documents upon the government. *Id.* at 1319. The court initially responded by establishing a mechanism for the voluntary production of documents from approximately forty government agencies, *id.* at 1320, 1330 & n.49 — an approach that the SEC refuses even to attempt here, *see* Opp. at 7-8. When that proved inadequate, the defendants moved for a proposed order subjecting "all agencies and departments of the government to discovery under Rule 34 of the Federal Rules of Civil Procedure." 461 F. Supp. at 1330. The Justice Department opposed the motion, arguing that the voluntary system of production, "together with whatever discovery defendants may be able to secure under Rule 45, adequately protects defendants' interests." *Id.*

The court rejected Justice's position as "not well taken, for a number of reasons." *Id.* First, it found that there were serious problems with the voluntary system, which were "likely to

become magnified in the future." *Id.* at 1331. Agencies other than Justice had "little to gain by their cooperation, whether by discovery or otherwise, [and] would be likely to limit the level of their participation in voluntary discovery to the minimum dictated by their own parochial interests." *Id.* Second, "[w]hen dealing with the government, effective sanctions are not available for noncompliance with requests under Rule 45." *Id.* Third, "Rule 34 is a more manageable discovery mechanism than Rule 45 in a number of different respects." *Id.* Rule 45 discovery involves unique logistical problems, a narrower scope of production, broader claims of governmental privileges, and greater expense to the party seeking discovery. *Id.* at 1332. Fourth, there was "no assurance that the voluntary commitments of the several agencies and departments, such as they are, will stand the test of time." *Id.*

The same considerations apply here with even greater force. While Nothern's requests implicate only a few agencies, in *AT&T* the government's case was "likely to involve the documents and the activities of a great number of government departments." *See id.* at 1334. The defendants in *AT&T* sought to establish that their corporate structure and practices were the result of regulations and policies issued by various government departments. *Id.* In this case, key elements of the 10b-5 claim against Nothern involve documents held by non-independent federal agencies, in particular the Treasury Department and its employees. The General Counsel for Treasury referred this matter to the SEC for investigation and asked to be kept advised. The alleged inside information was revealed by Treasury. The trade in question involved Treasury bonds. The alleged duty to keep the information confidential was established by an (as-yet unidentified) "senior adviser in Treasury's Office of Federal Finance" in an alleged conversation with Peter Davis. *See* Complaint ¶ 27. Nothern's alleged violation of the securities laws is predicated on the contention that, because Davis's voice mail message mentioned that there would be a press embargo, Nothern should have understood that both Davis and he had a

fiduciary duty to Treasury to abstain from trading.[1]

Just as Justice argued in *AT&T* that it had "little influence over other agencies of the government," 461 F. Supp. at 1334 n.58, the SEC argues here (Opp. at 12) that it has "no authority over any other agencies of the government." The court quickly disposed of this argument: "Obviously, defendants have even less influence over the agencies, and as the entities which have been sued, they are entitled to their discovery rights irrespective of the effect on inter-departmental relationships." 461 F. Supp. at 1334 n.58.[2] The issue was one of fundamental fairness: "it is apparent that defendants will need access to the records of many government agencies, and that fairness to them requires that such access be as unencumbered as the Federal Rules will allow." *Id.* at 1334.

If anything, the need for court intervention here is even stronger than it was in *AT&T*. Unlike Justice in *AT&T*, the SEC has not agreed to ask other government agencies to produce documents even on a voluntary basis, except on the condition that Nothern agrees to relinquish

---

[1] In a footnote (Opp. at 20 n.18), the SEC suggests that this Court's ruling on the SEC's motion to strike Nothern's estoppel defense, Memorandum & Order (Nov. 4, 2005), forecloses Nothern's right to seek documents relating to "Treasury's conduct during and around its announcement of the suspension of the 30-year bond." But Treasury's conduct relates directly to the elements that the SEC must prove to establish Nothern's liability. For example, Treasury's failure to impose any restraint on Davis's presence or departure from the press conference undermines the SEC's contention that Davis owed a legal duty to Treasury for purposes of Section 10(b) and Rule 10b-5. Treasury's slipshod administration of its press "embargo" undermines the SEC's contention that Nothern should have know from the mere word "embargo" that he would be liable for inside trading if he acted on the information Treasury provided to Davis. It was for these reasons that the Court observed that the SEC "has done little to point out specific instances where Nothern's estoppel defense would actually cause it to expend inordinate amounts of time and money." Memorandum & Order at 12.

[2] *See also Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964) (holding that while it "may well be true" that discovery obligation left NLRB "at the mercy" of other agencies, it was "less defensible still to resolve such agency disputes" by allowing government to proceed with action against defendant who had been denied documents to which he is entitled); *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979) ("If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.").

3

all rights to enforce his document requests. *See* Opp. at 7-8. (It is ironic that the SEC describes Nothern's position as "setting the SEC up to fail," Opp. at 8, when its own position may be summarized as "unwilling to try to succeed.") Furthermore, Nothern has even less ability to obtain documents from other agencies than the defendants did in *AT&T*, since, as he explained in his initial brief (Memorandum ("Mem.") at 12), courts in the D.C. Circuit currently prohibit the enforcement of all Rule 45 subpoenas served on federal agencies. ***The SEC does not even attempt to address this point in its opposition.***

### B. *AT&T* and Other Key Rulings Establish that Independent Agencies May Be Required to Produce Documents Held by Non-Independent Departments.

The SEC asserts (Opp. at 9) that in *AT&T* "the court found that the plaintiff did not include all agencies of the United States government." In fact, the court in *AT&T* ruled that for purposes of discovery, the plaintiff included nearly every agency of the U.S. government. The *AT&T* court ordered as follows:

> ORDERED That for purposes of discovery under the Federal Rules of Civil Procedure the plaintiff in this case shall consist of the United States Department of Justice and all other agencies, departments, and subdivisions of the Executive Branch of the United States government, but shall not include the Federal Communications Commission and other independent regulatory agencies, or the United States Postal Service, and it is further
>
> ORDERED That the Attorney General or his agents in the United States Department of Justice, as counsel for plaintiff, shall bring this order to the attention of all agencies, departments, and other subdivisions of the Executive Branch of the United States government from which defendants have hereto sought discovery, and shall assist them with the discharge of their obligation to comply with appropriate discovery requests heretofore or hereafter made by defendants.

*Id.* at 1349.

Nothern acknowledged in his initial brief (Mem. at 14-16) that the court in *AT&T* did not extend Justice's Rule 34 obligations to documents held by independent regulatory agencies like the FCC (or, for that matter, the SEC or NLRB). To Nothern's knowledge, the only independent

4

agency other than the SEC that has been involved in this case is the Commodity Futures Trading Commission (CFTC).[3] The larger and more important question in this case involves documents held by <u>non-independent</u> agencies like Treasury. *AT&T* stands for the proposition that such documents <u>must</u> be produced.

While the SEC eventually admits that "the roles of the agencies in this case are reversed from the roles of the agencies in *AT&T*," it dismisses this critical point as irrelevant — "a distinction without a difference." Opp. at 10. The only thing that matters in the SEC's view is the fact that it <u>itself</u> is an independent agency. This status, the SEC argues (Opp. at 11), gives it sweeping immunity from having to "produce documents from other government departments or agencies that are not within its possession."

The court in *AT&T*, however, distinguished another key ruling, *Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964), on precisely the basis the SEC deems irrelevant. In *Harvey Aluminum*, the court ruled that the National Labor Relations Board — an independent agency, like the SEC — could not maintain an action for unfair labor practices while refusing to produce statements made by key witnesses to the Department of Labor and the FBI. "The Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States," the court explained. *Id.* at 754. "In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements . . . simply because the documents rested in the hands of another federal agency, and we perceive no valid distinction, for this purpose, between that case and this one." *Id.*

In the course of explaining why Justice could not be compelled to produce documents

---

[3] Nothern maintains his argument (Mem. at 15 n.5) that even though *AT&T* does not support his position with respect to the CFTC, he is entitled to its documents under (a) the broader holding in *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979), which establishes the law of this District; and (b) the Due Process Clause.

5

held by independent agencies, *AT&T* specifically noted that *Harvey Aluminum* "is not to the contrary." 461 F. Supp. at 1336 n.63. *Harvey Aluminum*, it explained, involved documents "in the possession of executive departments":

> The President was held to have adequate authority over such departments to procure production, and the courts to order it. The President lacks that capacity with respect to regulatory agencies . . . .

*Id.* Indeed, it is the duty of the President (and not necessarily that of every parochial independent agency) to "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The key difference, therefore, is the status of the department or agency <u>from which production was sought</u>: under *AT&T*, if the department is non-independent (*i.e.*, subject to the President's authority), then production of the documents can be compelled. If the department is independent (*i.e.*, not subject to the President's authority), then production cannot be compelled. The fact that the litigation was <u>initiated</u> by an independent agency — such as the NLRB, or the SEC — makes no difference.

The SEC fails to acknowledge the critical distinction between independent agencies that initiate litigation (like the SEC here, or the NLRB in *Harvey Aluminum*) and non-independent agencies from which documents are sought. Instead, the SEC argues that *Harvey Aluminum* is inapposite because it involved an effort to compel the production of documents "in the possession of executive departments," whereas Nothern seeks to compel documents "from every agency, in every branch of government." Opp. at 14; *see also* Opp. at 8 (incorrectly stating that Nothern maintains that "the entire government, including all of its departments and agencies in all three branches, should be considered party plaintiffs to this action"). This supposed distinction is specious. Nothern has never sought to compel the SEC to produce documents held by Congress or the federal courts, but only documents held by Executive Branch departments

6

and independent agencies.[4] Although he would disagree for other reasons, Nothern recognizes that the Court might apply *AT&T* to exclude documents held by CFTC from the scope of a motion to compel. However, both *AT&T* or *Harvey Aluminum* provide strong support for Nothern's right to obtain documents held by executive departments such as Treasury.[5]

Nor can the SEC distinguish *Harvey Aluminum* on the ground that it involved documents required to be produced under *Jencks v. United States*, 353 U.S. 657 (1957), not Rule 34. As explained in Nothern's initial brief (Mem. at 16), this Court in *Ghana Supply Comm'n* established that the rule in *Harvey Aluminum* applies to Rule 34 requests for production of documents as well. Specifically, it cited *Harvey Aluminum* for the broad proposition that "[w]hen an agency of government institutes suit, <u>any obligation to disclose relevant information</u> extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff." 83 F.R.D. at 595 (emphasis added, citations omitted).[6]

---

[4] The SEC's reliance (Opp. at 11) on *United States v. Davis*, 140 F.R.D. 261 (D.R.I. 1992), is therefore misplaced. In that case, an enforcement action bought by the Justice Department on behalf of the Environmental Protection Agency, the defendants asked the court to require Justice to produce a log of relevant documents "in the possession, custody, or control of the United States Congress." *Id.* at 262. The court ruled that separation of powers issues and the privilege afforded to Congress by the Speech and Debate Clause prevented it from issuing the requested order. The ruling in *Davis* has no application here. As the court observed: "This is not a question of a different executive agency; this in fact is an entirely separate branch of the federal government." *Id.* at 263; *see also id.* (distinguishing the ruling in *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), which "involved documents located in the executive office of the President").

[5] Similarly, the SEC cites *In re Air Crash at Dallas/Fort Worth Airport*, 117 F.R.D. 392 (N.D. Tex. 1987), in which the court refused to order production of documents held by the non-party National Transportation Safety Board on the ground that it is "an independent agency." *Id.* at 393. Again, this ruling does not support the SEC's argument that even though it is a party in this case, it does not have to produce documents held by non-independent agencies and departments.

[6] Contrary to the SEC's argument (Opp. at 13-14), *Ghana Supply Comm'n* is not "inapplicable" because the plaintiff in that case asserted an intragovernmental or executive privilege. While the Court, applying Massachusetts law, held that the plaintiff had waived any available privilege, *see* 83 F.R.D. at 594, its discussion of the duty of government agencies to produce documents beyond those "in the immediate possession of the particular agency-plaintiff" was not limited to

7

Tellingly, the SEC ignores this part of the ruling in *Ghana Supply Comm'n*, and instead attempts (Opp. at 13) to distinguish that case on the ground that it does not address "whether an independent regulatory agency of the government has an obligation under Rule 34 to obtain and produce documents from other agencies of the government in response to a defendant's discovery request." That is the issue, however, that the court decided in *Harvey Aluminum*, which both *AT&T* and *Ghana Supply Comm'n* cite with approval.

The SEC tries to distinguish *United States v. National Broadcasting Co., Inc.*, 65 F.R.D. 415 (C.D. Cal. 1974), through a similar sleight of hand. In that case, the court dismissed an antitrust action brought by the Department of Justice because it had failed to comply with a discovery order concerning documents held by the Executive Office of the President. In its opposition (at 15), the SEC cites a footnote in *AT&T* noting that *National Broadcasting Co.* does not address the issue whether "an independent regulatory commission — as distinguished from an Executive Branch agency — is to be considered a party plaintiff" for purposes of discovery. *See* 461 F. Supp. at 1336 n.64. The SEC fails, however, to mention an earlier, more pertinent passage in *AT&T*, where the court cites both *National Broadcasting Co.* and *Harvey Aluminum* as "decisions more or less in point [that] lend at least some support to defendants' position": *i.e.*, the position that Executive Branch agencies should be treated as the plaintiff for purposes of discovery in lawsuits initiated by the federal government — the position that the court ultimately adopted for non-independent agencies. *See* 461 F. Supp. at 1333.

The SEC has not cited a single case that supports its position that independent agencies may never be compelled to produce documents held by non-independent executive departments. Indeed, the ruling in *Harvey Aluminum* directly contradicts that position. Far from discrediting

---

that issue, *see id.* at 595. Furthermore, neither of the cases relied on by the Court — *Harvey Aluminum* and *Bank Line v. United States*, 76 F. Supp. 801, 803-04 (S.D.N.Y. 1948) — involved a claim of governmental privilege.

8

*Harvey Aluminum*, the court in *AT&T* specifically approved its reasoning as applied to documents held by non-independent executive departments — even when the lawsuit has been initiated by an independent agency like the NLRB or SEC. Furthermore, this District made clear in *Ghana Supply Comm'n* that the reasoning in *Harvey Aluminum* applies with equal force to document requests under Rule 34.

## II. HAVING CLOSELY COORDINATED ITS INVESTIGATION WITH TREASURY AND JUSTICE, THE SEC SHOULD BE ABLE TO OBTAIN DOCUMENTS FROM THOSE DEPARTMENTS NOW.

In his initial brief (Mem. at 4-6), Nothern observed that certain government agencies, including the SEC and Treasury, coordinated their investigations into the allegedly improper disclosure of information about the 30-year-bond. The SEC acknowledges that on November 6, 2001, David D. Aufhauser, the General Counsel for Treasury, referred the matter to the SEC for investigation and asked to be kept advised. *See* Ex. Q to Declaration of Kevin B. Currid Filed in Support of Defendant Steven E. Nothern's Motion to Compel Production of Documents ("Currid Mtn Decl."). The SEC disputes, however, Nothern's characterization of the manner in which it conducted interviews of Treasury employees beginning in November 2001. It writes (Opp. at 5) that the SEC staff "conducted its investigation of this matter <u>independent</u> of any limited investigation being conducted by the Treasury's Office of Inspector General ("OIG"), or any other office in the Treasury" (emphasis added). It further describes as "baseless" (Opp. at 5 n.7) the allegation that the SEC participated in interviews conducted by the OIG.

The SEC's contention that it acted independently of Treasury and the OIG is belied by the OIG's report. The first page states, "<u>Interviews of Treasury employees were conducted by the Securities and Exchange Commission (SEC), Treasury Office of General Counsel, and the Office of Inspector General</u> . . . ." *See* Ex. G to Currid Mtn Decl. at 1 (emphasis added). Each Memorandum of Activity attached to the report identifies the relevant activity as a "Personal

9

Interview," is signed by an OIG investigator, and contains a text box stating "This report . . . is the property of the OIG." *See, e.g.*, Ex. R to Currid Mtn. Decl. at 1 (emphasis added). Eight of the memoranda begin with the following sentence:

> On the above date and time, the above listed subject was interviewed by attorneys Andrew Sporkin . . . and Rosemary Filou . . . of the Division of Enforcement, United States Securities and Exchange Commission (SEC), <u>in coordination with the Treasury, Office of General Counsel and the Office of Inspector General (OIG)</u>.

*See, e.g., id.* (emphasis added). The SEC describes as "erroneous" and "baseless" (Opp. at 5 & n.7) the statement that the SEC conducted interviews under Treasury's authority. The OIG report, however, states that following the SEC's review of information provided by Treasury, "the SEC requested interviews" of eight Treasury employees. Ex. G to Currid Mtn. Decl. at 4. Regardless of which agency "scheduled" joint interviews under whose "authority" (although without a subpoena from the SEC an interview of Treasury employees in which Treasury's OIG participates would appear to occur under Treasury authority), it is clear that the SEC acted in close coordination with Treasury and its OIG, and had special access to key Treasury employees, during the critical early months of its investigation. The SEC's emphasis on its "requests" and selection of interview dates sidesteps that critical fact.

Likewise, the SEC acknowledges (Opp. at 6 & n.8) that it received an unredacted copy of the OIG report on January 15, 2002, but suggests that because the report was "issued" on January 2, the SEC obtained no special access or treatment.[7] The report that OIG faxed to the SEC on January 15, however, was not final. According to the counsel for OIG, OIG reports are not final

---

[7] In a letter dated January 9, 2002, the SEC asked Treasury's Assistant Inspector General for Investigations for "a copy of the report to the [SEC] Division of Enforcement prior to its release to the Department of Treasury." Ex. A to Supp. Currid Decl. (letter by William R. Baker III dated Jan. 9, 2002). The Assistant Inspector General declined the SEC's request on January 10, stating that the "Inspector General did not wish to release an advance copy of the report" before it had been sent "to the appropriate personnel at the Department of Treasury." *Id.* (letter dated Jan. 10, 2002).

or "ready for release" until thirty days after they have been distributed to the appropriate bureau in Treasury for review. *See* Supplemental Declaration of Kevin B. Currid Filed in support of Reply Memorandum ("Supp. Currid Decl.") at ¶¶ 4-10. The OIG may supplement or amend its reports based on responses or "management action" taken by bureaus during that 30-day period. *Id.* at ¶¶ 6-8.[8]

The SEC's receipt of the pre-finalized OIG report is just one of many examples of the extraordinary coordination and access it has received from Treasury. By way of example, the SEC and Treasury exchanged a series of letters from November 2001 to May 2002 — ten sent by the SEC, ten sent by Treasury or its employees — requesting or providing documents relevant to the SEC's investigation. The documents requested by and/or provided to the SEC include:

- "a chronology of all disclosures of any kind to any member of the press or public concerning any proposal to suspend the 30-year bond" (11/7/01)
- "a description of Treasury's policies and practices for press conferences at which embargoed information is presented" (11/7/01)
- business, home, and cellular telephone numbers for particular Treasury employees (12/19/01)
- information concerning any Treasury rules and regulations with respect to visitor passes (1/9/02)
- Treasury employee Paul Malvey's copy of a 1999 newsletter by Peter Davis (1/16/02)
- "pre-announcement" statements issued by Treasury in May, August, and October 2001 (5/2/02)

*See* Ex. A to Supp. Currid Decl.

It is illuminating to contrast the extensive cooperation that the SEC obtained from Treasury with Nothern's own efforts to obtain documents from Treasury. In a letter dated March 7, 2002, an SEC attorney asked Treasury's Assistant Inspector General for Investigations for

---

[8] Before discovery began in this case, Nothern received a redacted copy of the final OIG report as the result of a FOIA request submitted by another individual. He received an unredacted copy only as a result his request for documents from the SEC, which had an unredacted copy in its file. In its opposition (at 17-18 n.17), the SEC asserts that Nothern "neglected to mention" in his initial brief that he "obtained an unredacted version of Treasury's OIG report, which he filed with this Court on October 14, 2005." However, Nothern's initial brief clearly states (Mem. at 5 n.1): "Counsel for Nothern provided the Court with an unredacted copy of this report at the scheduling conference on October 14, 2005."

11

information regarding reports of leaks "stemming from any quarterly refunding press announcement at Treasury in the last ten years" and any subsequent investigations. *See id.* (letter dated Mar. 7, 2002). Following several telephone conversations between the SEC and Treasury, a special agent at Treasury wrote a letter dated March 21, 2002 stating that OIG had conducted an extensive record search of its Investigation Data Management System to try to find the requested information. *See id.* (letter dated Mar. 21, 2002).

By contrast, as part of his efforts to obtain documents from Treasury for this case, Nothern submitted a Freedom of Information Act (FOIA) request on November 11, 2005. On November 29, 2005, Treasury replied that it "is experiencing a substantial backlog of FOIA requests and cannot meet the normal time limits." *See* Ex. B to Supp. Currid Decl. It also directed Nothern to submit a separate request for Secret Service documents to the Department of Homeland Security, which Nothern did on December 20, 2005. *See* Ex. C to Supp. Currid Decl. As of the date of this reply brief three months later, neither agency has produced any documents in response to his requests.[9]

Contrast also the SEC's coordination with Justice with Nothern's attempt to obtain documents from that department. The SEC concedes (Opp. at 6 n.9) that it and the U.S. Attorney's Office in Manhattan shared information during the course of their parallel investigations. *See also* Ex. S to Currid Mtn. Decl. (privilege log showing numerous memoranda and notes exchanged between the two agencies). Now, in its opposition, the SEC cites at length

---

[9] The SEC argues (Opp. at 16) that the discretion set forth in Treasury's housekeeping regulations is "far from 'limitless.'" These regulations, however, authorize Treasury to deny any request that is "unduly burdensome," would involve Treasury in "controversial issues," would compromise "the time of employees for conducting official business," or because of "[a]ny other factor that is appropriate." *See* 31 C.F.R. § 1.11(e)(1). Judicial review is limited to the extremely deferential standard overruling only arbitrary or capricious decisions. *See, e.g., COMSAT Corp. v. National Science Found.*, 190 F.3d 269, 277 (4th Cir. 1999); *Al Fayed v. Central Intelligence Agency*, 229 F.3d 272, 276 (D.C. Cir. 2000). The SEC, moreover, does not cite a single case in which a Rule 34 request was denied on the ground that the party did not seek documents through an agency's housekeeping regulations.

12

excerpts from the transcript of Peter Davis's plea on September 23, 2003. What the SEC does not mention is that this transcript was unsealed only on February 1, 2006, upon the application of the U.S. Attorney's Office, just before the SEC would use it for its brief.

Yet rather than simply request that Justice also produce the documents that Nothern seeks for his defense, the SEC argues (Opp. at 18) that Nothern should first "exhaust the means available to him under such provisions as FOIA and the *Touhy* [housekeeping] regulations" — including litigating a separate FOIA enforcement action in federal court! As Nothern explained in his initial brief (Mem. at 13), Justice responded to his FOIA request by refusing to provide nonpublic documents involving third parties such as Peter Davis.[10] In its opposition (at 18), the SEC argues that "Nothern admits that he has not yet provided Justice with the third party consent, and therefore has not taken the necessary steps to legally obtain all of the documents that Justice is willing to produce under FOIA." But as Nothern noted in his initial brief (Mem. at 13), Davis refused Nothern's request to supply third-party consent. Therefore, there are no more steps that Nothern can take to obtain relevant documents from Justice through FOIA.

There is, of course, no "exhaustion" requirement under Rule 34, and there is no realistic chance in any event that Nothern could obtain the relevant documents he needs through FOIA or the agency housekeeping rules by the discovery deadline in this case. Furthermore, as noted above, the SEC does not dispute that courts in the District of the District of Columbia prohibit the enforcement of <u>all</u> Rule 45 subpoenas served on federal agencies. While the housekeeping regulations of Justice and Treasury explicitly exempt requests made by other government agencies, *see* 28 C.F.R. § 16.21(c); 31 C.F.R. § 1.12, the SEC argues (Opp. at 17) that there is no

---

[10] Justice stated that without the consent of the relevant third parties, its release of records "would result in an unwarranted invasion of personal privacy and would be in violation of the Privacy Act, 5 U.S.C. § 552a." *See* Ex. Y to Currid Mtn. Decl. This same rationale clearly applies under Justice's housekeeping regulations, which prohibit among other things any disclosure that would "violate a statute." *See* 28 C.F.R. § 16.26(b)(1).

13

guarantee that it will be exempted if it is perceived as requesting documents "on behalf of a defendant in a litigation." That scenario is highly unlikely, but even assuming that the SEC were to experience difficulties in obtaining documents from these other agencies, that is a problem for these agencies or Congress to resolve, not Nothern. Having so closely coordinated its investigation with other government agencies, there is no reason why the SEC cannot and should not disclose all relevant documents held by the government it represents.

### III.  FULL DISCOVERY FROM TREASURY AND OTHER INVOLVED GOVERNMENT AGENCIES IS CRITICAL TO THIS CASE.

Finally, the SEC tries to avoid its discovery obligations by arguing that Nothern's requests are too broad to be applied to other agencies. Nothern, it argues (Opp. at 7 & n.10), has "essentially defined the plaintiff in this case" as encompassing the entire United States government, such that every single agency and department would have to produce its document retention and embargo policies. It further suggests that Nothern refuses to narrow his requests for documents held by other agencies, stating (Opp. at 17 n.15) that he "makes much of the fact" that the SEC proposed this during the parties' Rule 37.1 conference.

This argument is baseless. Nothern has not "made much" of the SEC's request for narrower requests. To the contrary, as his initial brief states (Mem. at 7), "Nothern's counsel agreed to make his document requests more specific for this purpose" during the Rule 37.1 conference. Nothern's counsel also asked the SEC to identify all the agencies that have been involved in the 30-year bond incident and subsequent investigations precisely so that he could limit "the number of government agencies to which the requests would be sent." Mem. at 7. For whatever reason, counsel for the SEC refused to identify all the relevant agencies. *Id.*

The SEC also argues (Opp. at 15) that Nothern's request should be denied because he does not have "proof" that the documents he seeks at Treasury and other agencies "actually

14

exist." What proof could Nothern have if he is denied access to the documents themselves? The purpose of Rule 34 is to allow a party to determine whether certain documents actually exist, as well as to obtain those that do. Nothern is entitled to find out, among other things, whether there are any documents at Treasury or Justice that show that Davis had a duty to honor Treasury "embargoes"; that establish the terms and scope of that duty; that explain why other people, including Nothern, knew or should have known of any duty Davis might have had; that show whether and how Treasury enforced its "embargoes" when they were "violated" by other persons; and that show precisely when the trade in question occurred and when Treasury's information on the 30-year bond became public, since the information appears to have been public at least twenty minutes before the trade.

The SEC argues (Opp. at 3 n.5) that Nothern has no justification to inquire into the circumstances under which another attendee at the October 31, 2001 press conference — reporter Brian Collins from the *National Mortgage News* — shared the news about the 30-year bond with an official at the Federal National Mortgage Association at 9:35 a.m. But this reporter's disregard for the purported "embargo" (and Treasury's apparent failure to take any action against him) relate directly to the existence and scope of any duty held by Davis to honor the "embargo." The reporter's action also shows that there is no reason why Nothern in Boston should have understood from the mere mention of the word "embargo" that Davis had a duty which also applied to him. Finally, the fact that Collins's news had been relayed to at least nine additional persons, including a trader and a salesperson at Salomon Smith Barney, by 9:50 a.m. seriously undermines the SEC's position that the information was "non-public" at the time of Nothern's trades.[11]

---

[11] In its statement of the facts, the SEC asserts (Opp. at 4) that MFS placed its trade order with Merrill Lynch at 9:42 a.m., apparently relying on a Merrill Lynch order ticket bearing that time, based upon a clock that was evidently never compared to the clock used by Treasury's computer

15

Finally, the SEC contends (Opp. at 2-3 n.3) that Nothern "disingenuously" misstated the record by citing former Market Finance Director's Jill Ouseley's testimony about the doors to the Diplomatic Reception Room where Treasury's press conference was held. While the full facts will not be known until after the discovery that the SEC opposes, Nothern did not misrepresent the record to date. As Nothern wrote in his initial brief (Mem. at 2) and Ouseley testified in her SEC deposition, *see* Ex. F to Currid Mtn. Decl. at 44, Treasury's practice at such conferences was to keep open the "<u>back door</u> to the room where the conference was held" (emphasis added). Treasury did not do anything to prevent attendees from walking out the back door in the middle of a press conference. *Id.* at 45. The SEC cites the unsworn statement of Public Information Coordinator Frances Anderson, who said that she was asked to "stand out in the hall to keep an eye on some charts that were to be handed out at the conclusion of the conference," and that "since the doors were closed," she did not hear any announcement about an embargo. *See* Ex. C to Rossetti Decl. at 2. Anderson was apparently referring to a different set of doors. As Ouseley explained in her deposition, "The door <u>at the head of the table</u> would be closed, <u>because the hallway was noisy</u>." Ex. F to Currid Mtn. Decl. at 44 (emphasis added). In any event, the issue of whether the doors were closed or open to anyone in the Treasury building highlights the need for full discovery from Treasury. At a minimum, Nothern, who did not attend the press conference himself, should not be required to accept as fact unsworn statements from Treasury employees attempting to defend their careless handling of market-moving information.

---

system. The SEC's case rests on the assumption that the trade occurred between the placement of the order and 9:43 a.m., per the Treasury's computer, when the SEC alleges Treasury posted its press release on its website. In its opposition (at 3 n.5, 5), the SEC makes the novel argument that Treasury's information did not become public until it was "fully impounded into the market." This argument is completely without merit. In response to the widespread reports and rumors circulating in the market that morning, the price of the 30-year bond began moving up at 9:30 a.m. — eight minutes before Davis called to leave his voice mail for Nothern — and continued to rise until 12:59 p.m. Complaint ¶ 42. The SEC's "impoundment" argument would implicate as unlawful every bond trade made before 1:00 p.m.

16

These and other critical issues remain unresolved in this case, and discovery from the government agencies involved is essential to shed light on them. The SEC seeks an order from the Court not only fining Nothern but also preventing him as a practical matter from pursuing his profession. Yet it refuses to exercise its ability (unique among the present parties) to obtain documents that might exculpate him from other departments of the government the SEC itself represents. Neither the Federal Rules, the Due Process Clause, nor common sense permits such an unfair process.

## CONCLUSION

For the foregoing reasons, the Court should enter an order compelling the government to produce all relevant documents requested by Nothern that are held by the SEC, the Treasury Department, the Justice Department, and any other federal agency.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Kevin B. Currid, BBO #644413
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: March 17, 2006

B3176112.5

17