UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : Civil Action No. 05-10983 (NMG) |
| Plaintiff, | : : |
| v. | : **ORAL ARGUMENT REQUESTED** : |
| STEVEN E. NOTHERN, | : : |
| Defendant. | : : |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**HIS RENEWED MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

**Table of Contents**

**Page**

Background ..................................................................................................................1

      A.     Status of Motion ............................................................................1

      B.     Production from CFTC ...................................................................2

      C.     Production from Treasury ...............................................................3

      D.     Production from DOJ .....................................................................14

Argument ....................................................................................................................15

      A.     The SEC Must Produce Documents Held by Other Federal Agencies. ................15

      B.     Treasury's Production Has Been Dilatory and Inadequate....................15

      C.     Rule 6(e) Does Not Shield All Documents Held by DOJ. ....................17

Conclusion ..................................................................................................................20

Defendant Steven E. Nothern respectfully submits this memorandum of law in support of his renewed motion to compel the production of documents held by the Treasury Department ("Treasury") and the Justice Department ("DOJ"):  two federal agencies that worked in close coordination with the Securities and Exchange Commission ("SEC") in investigating Treasury's differential disclosure on October 31, 2001 of its decision to suspend issuance of the 30-year bond.

## Background

The SEC alleges that Nothern engaged in illegal insider trading by directing trades in the 30-year bond for portfolios he managed after receiving a voicemail message from a consultant who had learned of the suspension at a press conference conducted by Undersecretary of the Treasury Peter Fisher.  Sharply contested issues in the case include (i) whether the information announced at the press conference was actually confidential, (ii) whether the Treasury could impose an "embargo" on its announcement consistent with the First Amendment, (iii) whether the consultant, Peter Davis, had any fiduciary duty to the Treasury not to disclose what he had learned at the press conference, (iv) whether, even assuming such a duty, Nothern knew of it, and (v) whether Nothern's trades actually preceded the Treasury's posting of the information on the Internet.  The Treasury seeks an injunction that would make Nothern unemployable in the securities industry as well as a fine and "disgorgement" of the profits experienced by the funds Nothern managed for his employer at the time, Massachusetts Financial Services (MFS).

### A.    Status of Motion

Nothern served his First Request for Production of Documents to the SEC on September 27, 2005.  Citing *United States v. AT&T Co.*, 461 F. Supp. 1314 (D.D.C. 1978), the SEC objected to Nothern's instruction that "[i]f a document is in the possession, custody or control of

any department or agency of the United States government, it is deemed to be in the possession, custody or control of the SEC for purposes of this Request." In conferences and correspondence exchanged pursuant to Local Rule 37.1, Nothern suggested that the SEC request documents from other government agencies and departments without waiver of its position that it was not required to do so, since if the other agencies and departments cooperated the issue would be moot. The SEC stated that it would do so only if Nothern waived any right to receive a privilege log and to file a motion to compel in the event the other agencies refused to provide documents. Nothern refused these conditions and filed his motion to compel on February 17, 2006.

At a hearing on the motion on June 14, 2006, the Court asked the parties if they would attempt to resolve Nothern's request without Court intervention. In response, the SEC changed its position and agreed to forward Mr. Nothern's document requests, which Nothern narrowed at the SEC's request, to Treasury, DOJ, and the Commodity Futures Trading Commission ("CFTC") with cover letters asking the agencies to voluntarily produce the documents. Nothern did not waive any rights to receive a privilege log or seek relief in court if the voluntary efforts were unsuccessful.

The SEC forwarded Nothern's requests to Treasury, DOJ, and the CFTC on June 30, 2006. As discussed below, the other agencies began some production. Therefore, on August 15, 2006, the Court denied Nothern's motion to compel without prejudice "as moot at this time in light of the United States' voluntary discovery efforts." The Court further stated that Nothern "may renew the motion, or a portion of it, in the future, if appropriate."

**B.    Production from CFTC**

On August 24, 2006, CFTC produced time and sales reports concerning trades in Treasury futures and options on October 31, 2001, including trades in the 30-year bond. CFTC has since informed counsel that no other responsive documents exist. Nothern does not seek any

further relief with respect to CFTC.

### C.    Production from Treasury

#### 1.    Treasury's Inadequate Response

Treasury's production to date has been characterized by intransigence and delay.  As discussed in more detail below, many relevant documents have still not been produced.  In a letter to the SEC dated August 3, 2006, counsel for Treasury, Thomas McGivern, stated that Treasury would respond "to the remainder of your request in the coming weeks."  However, in a letter accompanying Treasury's most recent production, on October 19, 2006, he stated that the production would last until November 30, 2006, "[u]nless we face additional, unexpected challenges in searching for potentially responsive documents."  The current deadline for non-expert discovery in this action is December 15, 2006.

In his letter of August 3, 2006, McGivern also stated that "Treasury's response to your letter is governed by its *Touhy* regulations, found at 31 C.F.R. § 1.8-1.12."  Those regulations, he stated, list factors for Treasury to consider in deciding whether to produce the documents, including whether the request is reasonable in scope, "genuinely is necessary to the proceedings," and "relates to the Department's mission."  Treasury's position on the applicability of the regulations is incorrect.  Under 31 C.F.R. § 1.12, "regulations in this part shall not be applicable to official requests of other governmental agencies or officers thereof acting in their official capacities."  Although the request was made by the SEC, Treasury has invoked the inapplicable *Touhy* regulations to justify its refusal to produce certain relevant documents and its heavy redaction of others.

Asked to explain the redactions, Attorney McGivern stated that the redactions "protect privileged information," but did not identify the privilege that Treasury is claiming.  Many of the redacted communications are neither to nor from attorneys.  In letters dated September 8 and 28,

2006, McGivern stated that Treasury will produce a privilege log "when all privileged documents have been produced."

### 2.    Impact on Nothern's Defense

Treasury's inadequate and dilatory production has undermined Nothern's ability to present a defense.  As set forth below, Treasury has failed to produce, and limited through sweeping redactions, documents in its possession that relate directly to the elements of the SEC's insider trading claim.

### a.    Confidentiality of Treasury's information

To proceed with its claim, the SEC must prove that Treasury treated the information on the 30-year bond as confidential.  In this case, the SEC relies on an alleged "embargo" supposedly restricting the press from releasing the information until a time designated by the Treasury after the press conference was completed, in this instance 10:00 a.m.  Critical questions are whether the "embargo" actually meaningfully preserved confidentiality and, even if so, whether any such embargo would be consistent with the First Amendment to the Constitution, which imposes on the government "a heavy burden of showing justification" for a prior restraint on speech.  *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (citations omitted).

The evidence obtained thus far in the case establishes that the press embargo procedures used by Treasury on October 31, 2001 were vigorously opposed by Under Secretary Peter Fisher, the official who announced the information, because he "thought the risk of a leak or some . . . procedural malfunction was too high."  Fisher Dep. at 101.[1]  Because the policy maker whose decisions were being announced did not believe an embargo was appropriate, the government cannot meet its burden under the First Amendment.

_____

[1] Deposition citations refer to depositions taken in this action.  Nothern will provide copies of the cited deposition excerpts upon request.

Rather than release the information directly (for example, on the Internet), as Fisher had recommended, *id.* at 102; Fratto Dep. at 131-37, or use the same press "lockdown" procedures that Treasury used for securities auctions and Federal Open Market Committee announcements, *see* Fratto Dep. at 61-62, 83, officials in the Office of Public Affairs decided, for the first time in Treasury's history of quarterly refunding conferences, to set in advance an embargo time of 10:00 a.m., *id.* at 129.  As a result, a full hour passed between the start of Fisher's press conference at 9:00 a.m. and the embargo time -- and 35 minutes passed between the <u>conclusion</u> of the press conference and the embargo time.  *See* Holahan Dep. at 63.  Previous quarterly refunding embargo periods had been 10 or 15 minutes long.  Fratto Dep. at 59; Ouseley Dep. at 50-51.

There is also ample evidence that the Treasury did not meaningfully protect the information as confidential in this period.  Even though the conference was supposedly only for "credentialed press," anyone who gained access to the Treasury building was free to enter or exit the press conference at will.  Fratto Dep. at 160-62; Holahan Dep. at 126; Ouseley Dep. at 61-62. The evidence further establishes that Treasury officials did not obtain the consent of the attendees at the press conference to abide by its announced embargo.  Holahan Dep. at 64.  Betsy Holahan, the Office of Public Affairs employee who announced the embargo time at the press conference, testified that the embargo applied to "members of the media who are being invited to attend the press conference," but that these members were obligated only under "the honor system" to hold their news stories until the announced time.  *Id.* at 68, 106.  In fact, even though reporter Brian Collins of the *National Mortgage News* disclosed Fisher's announcement to an employee at the Federal National Mortgage Association at 9:35 a.m., Treasury did not take any action against him.  Collins Dep. at 60-61.

Treasury has failed to produce documents critical to Nothern's defense that the "embargo" process did not in fact make the information confidential after it had been announced at the press conference and that any such embargo would be unconstitutional. Notwithstanding Nothern's requests, Treasury has not produced any documents concerning: (i) the use of embargoes at Treasury from 1994 to October 2001; (ii) changes to Treasury's policies, procedures, or practices on the release of information made prior to October 2001; (iii) violations of Treasury embargoes from 1990 to October 2001; or (iv) alleged violations of Treasury's embargo on October 31, 2001, including the disclosure by reporter Brian Collins at 9:35 a.m.

In addition, Treasury has deliberately withheld information about its planning for the October 31, 2001, press conference. For example, consider the following page produced by Treasury:



From:        Roseboro, Brian
Sent:        Monday, October 29, 2001 3:07 PM
To:          Malvey, Paul
Cc:          Holahan, Betsy
Subject:     RE: Rough Estimate of Wed. events - comments welcome

-----Original Message-----
From:        Malvey, Paul
Sent:        Monday, October 29, 2001 2:48 PM
To:          Roseboro, Brian
Cc:          Holahan, Betsy
Subject:     FW: Rough Estimate of Wed. events - comments welcome

-----Original Message-----
From:        Holahan, Betsy
Sent:        Monday, October 29, 2001 12:44 PM
To:          Davis, Michele; Fratto, Tony; Nichols, Robert
Cc:          Bitsberger, Timothy; Roseboro, Brian; Gross, Jared; Huther, Jeff; Malvey, Paul
Subject:     Rough Estimate of Wed. events - comments welcome

Quarterly Refunding Timetable - DRAFT

The page appears to contain a draft timetable for the upcoming conference and an e-mail exchange between Director of Market Finance Paul Malvey, Assistant Secretary Brian Roseboro, and Holahan (none of whom is an attorney). Treasury refuses to disclose the contents of this clearly relevant document. Indeed, over 45 documents provided by Treasury bear similar extensive redaction.

b.      **Knowledge of Davis's Duty To Treasury**

Under the misappropriation theory of insider trading, the SEC must establish: "(i) a breach by the tipper of a duty owed to the owner of the nonpublic information; and (ii) the

tippee's knowledge that the tipper had breached the duty." *United States v. Liberia*, 989 F.2d 596, 600 (2d Cir. 1993), *quoted in SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000); *see also United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) ("Rule 10b-5 requires that the defendant [tippee] *subjectively* believe that the information was obtained in breach of a fiduciary duty.") (emphasis added).

Here, the SEC must prove that the alleged "tipper" Peter Davis had a fiduciary duty to Treasury -- and that Nothern actually knew about that duty. The SEC alleges that Davis attended refunding press conferences from 1994 to 2001 "only by reason" of an "explicit agreement" he reached with a "senior adviser" at Treasury. Complaint ¶ 27. In fact, Davis's testimony on this issue contradicts that of the purported "senior adviser," Roger Anderson, on every pertinent point.[2] Furthermore, Davis admitted that he never told anyone about the purported agreement, Davis Dep. at 263-64, 290, and there is no evidence that anyone else at Treasury knew about it either.[3]

So far, Treasury has not produced any agreement signed by Davis, any document reflecting a non-written agreement by Davis, or any document indicating any employee's

---

[2] Davis testified that he and Anderson signed an agreement in his office, and that Anderson retained the original copy. Davis Dep. at 96-97. By contrast, Anderson testified that he "never had any agreement with Mr. Davis, no." Anderson Dep. at 100. Davis stated that he did not attend a quarterly refunding press conference before meeting with Anderson. Davis Dep. at 98. By contrast, Anderson stated that Davis was already attending press conferences when they met -- and that another Treasury employee in fact introduced them at a refunding event. Anderson Dep. at 51-52, 95. Anderson further testified that even though he told Davis he would not oppose his attendance at future press conferences, *id.* at 56-57, he never admitted Davis to a press conference, *id.* at 95-97, and did not recall discussing Davis's attendance with anyone else at Treasury, *id.* at 58-61, 119-20.

[3] Davis gained admission to Treasury press conferences mainly through Lula Tyler. Davis Dep. at 87-88. Tyler testified that she admitted Davis at Jill Ouseley's direction. Tyler Dep. at 54-55. Ouseley testified that she was unaware of any agreement involving Anderson or Davis. Ouseley Dep. at 27-28, 49. So did Holahan and Tony Fratto, the Office of Public Affairs employees who ran the press conference that day. Holahan Dep. at 130-31, 141-42; Fratto Dep. at 176-77.

knowledge of such an agreement.  It has not produced any correspondence between Davis and

any Treasury employee, or any appointment logs, daily calendars, or other documents showing

meetings with Davis.  Treasury has produced a document listing the dates on which Davis

attended refunding events from May 1998 to October 2001, but not from 1994 until May 1998.

Documents reflecting Davis's admission during this earlier period are critical because they will

likely show which employees were originally responsible for admitting Davis and whether, as

alleged, Davis gained access to the press conferences "only by reason" of an "explicit

agreement" he reached with Anderson.

　　　　Some of the e-mails produced by Treasury show confusion as to how Davis was able to

attend the press conference, but have been heavily redacted.  For example, this exchange

between Holahan and the top two press officials at Treasury occurred two days after the press

conference on October 31, 2001, in response to a *Wall Street Journal* reporter's inquiry:

```
From:        Holahan, Betsy
Sent:        Friday, November 02, 2001 2:26 PM
To:          Davis, Michele
Subject:     RE: leak

FYI...I just saw Tony as he was leaving and he said that

-----Original Message-----
From: Fratto, Tony
Sent: Friday, November 02, 2001 12:56 PM
To: Davis, Michele; Holahan, Betsy
Subject: RE: leak

-----Original Message-----
From: Davis, Michele
Sent: Friday, November 02, 2001 12:36 PM
To: Holahan, Betsy; Fratto, Tony
Subject: FW: leak

has either of you spoken to him?

-----Original Message-----
From: Connor, John [mailto:John.Connor@dowjones.com]
Sent: Friday, November 02, 2001 11:08 AM
To: 'michele.davis@do.treas.gov'
Subject: FW: leak


> Michelle, i've been trying unsuccessfully since late yesterday to
> reach tony fratto in your shop for comment on apparent leak from the
> refunding briefing (separate from treasury's own embargo break). i
> know you're preoccupied with argentina and all but appreciate a
> callback. 862-9273. certainty don't want to say repeated attempts to
> obtain comment from treasury were unsuccessful. thanks. jconnor
```

Treasury's redactions to this document clearly prejudice Nothern, since the reaction of Treasury officials on November 2nd relates directly to the question of what, if anything, an outsider like Nothern could have known about Davis' Treasury access on the morning of October 31st.

Similarly, the following exchange on November 6, 2001 reflects the first time when Assistant Secretary for Public Affairs Michele Davis learned that a different office at Treasury was admitting persons to quarterly refunding press conferences, thereby contradicting the theory that Treasury had preserved confidentiality by permitting access by "credentialed" press only:

```
-----Original Message-----
From:     Fratto, Tony
Sent:     Tuesday, November 06, 2001 1:39 PM
To:       Davis, Michele
Subject:  RE: procedures for clearing in reporters

I'll stop by to talk to discuss this afternoon; I spoke to Peter about this twice today and want to review with you. ███████

   -----Original Message-----
   From:     Davis, Michele
   Sent:     Tuesday, November 06, 2001 1:16 PM
   To:       Fratto, Tony
   Subject:  RE: procedures for clearing in reporters

   ██████████████████████████████████████████████████
   ██████████████████████████████████████████████████
   ██████████████████████████████████████████████████

      -----Original Message-----
      From:     Fratto, Tony
      Sent:     Tuesday, November 06, 2001 12:46 PM
      To:       Davis, Michele
      Subject:  RE: procedures for clearing in reporters

   Frances independently asks them who they work for & checks with me if she's not sure they should be
   cleared in; I don't think she's had any requests from non-media.  Pete Davis was cleared by Paul Malvey's
   secretary -- not Public Affairs.

         -----Original Message-----
         From:     Davis, Michele
         Sent:     Monday, November 05, 2001 2:56 PM
         To:       Fratto, Tony
         Subject:  procedures for clearing in reporters

         when someone calls Frances and asks to be cleared into an event, do we confirm that they are really
         press people?  Or does Frances just take their info and clear them in?
         ██████████████                                ██████████████
```

There is no legitimate reason for Treasury to redact the response Michele Davis, Peter Fisher, or
Director of Public Affairs Tony Fratto had to this revelation.

### c.    Trade on Nonpublic Information

Another key issue in this case is timing:  even assuming that Treasury effectively kept its

information on the 30-year bond confidential and was entitled to do so even after announcement

at the conference through an "embargo," did Nothern trade before the information became

"public"?  Information becomes public when it is disclosed "to achieve a broad dissemination to

the investing public generally and without favoring any special person or group."  *SEC v.

Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (quoting *Dirks v. SEC*, 463 U.S. 646, 654 n.12 (1983)).

"It is, of course, axiomatic that trading on public information does not violate Section 10(b)."

*Liberia*, 989 F.2d at 601.

Documents gathered from non-government sources indicate that Nothern's first trade

11

occurred sometime between 9:42 and 9:45 a.m., as recorded on the clocks of the institutions involved. Documents further show that Treasury employee Frances Anderson placed Fisher's statement on the Internet at 9:40 a.m. as recorded by the computer clock. Harris Dep. at 93-94; Verizon Dep. at 75-76, 149-56. Specifically, Anderson transferred Fisher's statement to a staging server which was located at a publicly accessible Internet address, Harris Dep. at 89-90; Verizon Dep. at 153 -- even though she and other Treasury employees erroneously believed that it was internal to Treasury, *see* Anderson Dep. at 183; Vagle Dep. at 48. The document was last modified on the staging server at 9:40 a.m., Harris Dep. at 67-68; Verizon Dep. at 168-69, and then immediately transferred to Treasury's web site at another address on the Internet, Anderson Dep. at 286-87. The SEC contends that the information was not posted to Treasury's website until 9:43 a.m. and that the posting to the Internet site at 9:40 was not "public" because it was not a publicized website. Apart from the question of whether the relevant clocks were reliably synchronized to reflect the seconds at issue, there is a critical question of why there should be a three minute "gap" between 9:40 a.m. and 9:43 a.m.

Treasury has failed to produce documents that would likely resolve this critical timing issue. It has not produced documents showing the accuracy of its computer and server clocks on October 31, 2001. It has also failed to produce a computer disk on which Frances Anderson saved electronic data that may reveal exactly when the statement was posted on the Internet. *Id.* at 262-63. Anderson testified that she saved that data to a disk, which she stored in a file cabinet, but that the cabinet disappeared from her office for unexplained reasons. *Id.* at 266-68. This occurred well after the SEC, DOJ, and Treasury began their joint investigation.

### 3.    Treasury's Incentive Not to Cooperate

It is important to keep in mind that this is not the typical insider-trading case involving

public companies and their publicly traded shares. Rather, the SEC seeks to hold Nothern liable for trading on information relayed to him as the result of a remarkable series of mistakes and misjudgments by Treasury, including: the decision to overrule Fisher's judgment that the announcement should be made directly to the public; the suggested disclosure of the information to an investment bank representative by a senior Treasury official during the week prior to the announcement; setting an embargo period for the announcement that was more than twice as long as any previous one; failure to train Frances Anderson, the employee responsible for posting Fisher's statement on the Internet, that Treasury's "staging server" was in fact publicly accessible on the Internet; failure to inform Anderson not to post the information until 10:00 a.m.; circulation of copies of Fisher's statement at the press conference with the heading "FOR IMMEDIATE RELEASE"; allowing a private citizen like Peter Davis to attend the press conference, and then allowing Davis to leave Treasury more than a half hour before the embargo period had ended.

Treasury has clearly encouraged the SEC's prosecution of this action as a means of deflecting critical attention from its many mistakes. At the time the SEC initially charged Nothern with insider trading, Treasury's General Counsel David Aufhauser told a reporter that he "couldn't be happier that this concluded with punishing action against those responsible for violating our rules." He continued, "I equally couldn't be happier with the finding that no one within the Treasury building did anything inappropriate and indeed that all people who participated in the investigation in this building have been found to have behaved above board, honorably in the service of their department and county." John Connor & Colleen DeBaise, *Youngdahl Indictment Tops US Action in Tsy Leak Case*, Wall St. J., Sept. 24, 2003. Although acknowledging that Nothern is entitled to depose Aufhauser, Treasury counsel has refused to

cooperate in scheduling such a deposition.  It has also directed its employees not to answer

questions about disciplinary actions taken by Treasury in response to the events of October 31,

2001.  *See, e.g.*, Malvey Dep. at 269-72; Roseboro Dep. at 136.

Treasury's interest is in placing all the blame for October 31, 2001 on private parties like

Nothern, who was simply doing his job and whose investors would have been penalized had he

postponed his plans to purchase 30-year bonds for his government bond portfolios.  Treasury has

assiduously assisted the SEC's efforts to prosecute Nothern.  It has no incentive to locate or

produce documents that exculpate him.  The likelihood that Treasury's discovery efforts will

improve in the next month, absent an order from this Court recognizing Nothern's right to obtain

all relevant materials from the government, is therefore remote.

### D.    Production from DOJ

DOJ has categorically refused to produce any documents.  Although DOJ did not

prosecute Nothern, it investigated the events of October 31, 2001, and has shared many of its

investigative materials with the SEC, which has refused to produce them to Nothern.  On July

27, 2006, Assistant United States Attorney Brian Coad responded that to the extent DOJ has

responsive materials not provided to it by the SEC, "those materials were obtained pursuant to

federal grand jury subpoenas and in the course of a criminal investigation."[4]  "As such," Coad

stated, "any disclosure by this Office, under the facts and circumstances your letter presents, is

prohibited by Rule 6(e) of the Federal Rules of Criminal Procedure."  As set forth below, DOJ's

position is not correct.

---

[4] DOJ's letter is attached as Exhibit C to the *Status Report Regarding the Production of Documents From Other Government Departments and Agencies* filed by the SEC on July 31, 2006 (Docket Doc. # 39).

## Argument

**A.      The SEC Must Produce Documents Held by Other Federal Agencies.**

In renewing his motion to compel, Nothern incorporates the argument set forth in his

initial and reply memoranda (Docket Doc. ## 31 & 36).[5]

**B.      Treasury's Production Has Been Dilatory and Inadequate.**

The Court should order the SEC to produce all responsive documents held by Treasury.

While Treasury has produced to the SEC some documents since the Court's motion hearing in

June, it is apparent that other relevant documents and things exist.  As discussed above, these

include items that relate directly to contested issues in this case, including any steps Treasury

took to preserve the confidentiality of its information on the 30-year bond, the means by which

Peter Davis first gained access to quarterly refunding press conferences, and the time at which

Treasury's announcement on the 30-year bond was placed on the Internet.

Three aspects of Treasury's production to date raise doubts that its voluntary efforts will

---

[5] Since Nothern submitted his reply memorandum, the D.C. Circuit reversed several lower court decisions cited at page 12 of his initial memorandum and held that the United States government is a "person" within the meaning of Rule 45 and therefore subject to subpoenas issued under that rule.  *Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006).  This ruling does not change the fundamental principle on which Nothern relies here:  "When an agency of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff." *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979) (citing *Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749, 754 (9th Cir. 1964)).  As explained by the court in *AT&T*, Rule 45 subpoenas are a poor substitute for Rule 34 discovery.  Rule 45 discovery involves unique logistical problems, a narrower scope of production, broader claims of governmental privileges, greater expense to the party seeking discovery, and less effective sanctions for noncompliance.  461 F. Supp. at 1331-32.  It could also further prolong these proceedings as Nothern would be required to serve subpoenas on Treasury and DOJ and then commence collateral enforcement efforts in the District of Columbia.

satisfy the SEC's discovery obligations under Fed. R. Civ. P. 34.  First, the pace of the

production has been glacial.  The 30-year bond disclosure incident on October 31, 2001 has now

been the subject of government investigations for five (5) years.  This case has been pending for

more than 17 months.  Because of Treasury's delay, the parties were forced to request a three-

month extension of fact discovery.  Treasury now states that it anticipates that it will complete its

production only by November 30, 2006, barring any "additional, unexpected challenges."

Absent an order by the Court, however, there is no guarantee that this target will be met, or even

that Treasury will produce all relevant documents before the discovery deadline of December 15,

2006.  That deadline itself will almost certainly need to be moved in light of the additional

depositions that will likely be necessary given the further documents being produced.  Some of

the documents that Treasury has recently produced in fact contradict the previous testimony of

its employees, likely making further testimony necessary.

Second, Treasury has chosen to treat the document requests as "governed by its *Touhy*

regulations"-- even though the requests were made by the SEC and Treasury's *Touhy*

regulations expressly provide that they do not apply to "official requests of other governmental

agencies."  31 C.F.R. § 1.12.  Treasury's groundless invocation of those regulations threatens

Nothern's ability to defend himself, since the *Touhy* regulations give Treasury broad, even

limitless, discretion to limit or deny requests as it sees fit.  For example, a request may be denied

on the ground that it is "unduly burdensome," would involve Treasury "in controversial issues

unrelated to the Department's mission," would compromise "the time of employees for

conducting official business," would "otherwise . . . be inappropriate under the circumstances,"

or because of "[a]ny other factor that is appropriate."  *See* 31 C.F.R. § 1.11(e)(1).  In its letter to

the SEC dated August 3, 2006, Treasury in fact stated that it is considering these factors as it

16

responds to the document requests here. Such an approach is completely contrary to the policy of full disclosure embodied in the Federal Rules of Civil Procedure.

Third, as shown above, Treasury has chosen to redact large portions of highly relevant e-mails, on the basis of no discernible privilege. While it has stated that it will produce a privilege log at the completion of its production (*i.e.*, perhaps by November 30, 2006), Treasury has refused Nothern's repeated requests to identify its claim of privilege now.

Each of these points warrants an order from the Court recognizing Nothern's right under Rule 34 to obtain relevant documents from other government agencies. Specifically, the Court should declare Treasury's *Touhy* regulations inapplicable to this action and establish firm deadlines for the production of Treasury's documents and the assertion of any claims of privilege.

In the alternative, this Court should follow settled precedent and refuse to allow the SEC to proceed with this action. As discussed in Nothern's initial brief (Mem. at 11-12, 20), the government may not pursue an enforcement action while denying the defendant documents that are relevant to his defense. The principle of fundamental fairness underlying the federal constitution's Due Process Clause requires that the government the SEC represents either produce all relevant documents or dismiss this action.

### C.  Rule 6(e) Does Not Shield All Documents Held by DOJ.

There is also no excuse for the SEC's failure to produce documents held by DOJ. The privilege log produced by the SEC shows that it and DOJ exchanged numerous memoranda and notes during the course of their parallel investigations.[6] DOJ provided the SEC with

---

[6] The SEC's privilege log is attached as Exhibit S to the *Declaration of Kevin B. Currid Filed in Support of Defendant Steven E. Nothern's Motion to Compel Production of Documents* filed by Nothern on February 17, 2006 (Docket Doc. # 30).

approximately 112 pages of notes and summaries on interviews of important witnesses,

including Peter Davis, conducted by a DOJ employee (U.S. Attorney's Office investigator

Robert Manchak). In turn, the SEC provided DOJ with approximately 443 pages of memoranda

and draft pleadings.

Invoking Federal Rule of Criminal Procedure 6(e), DOJ has refused to produce <u>any</u>

documents. This rule, however, does not categorically prohibit the production of documents to

other government agencies. To the contrary, Rule 6(e)(3)(A)(i) allows disclosure to "an attorney

for the government for use in the performance of such attorney's duty." In addition, Rule

6(e)(3)(E)(i) provides that a court may order disclosure of materials "preliminarily to or in

connection with a judicial proceeding." In *Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958),

Judge Hand defined the phrase "judicial proceeding" to mean "any proceeding determinable by a

court, having for its object the compliance of any person, subject to judicial control, with

standards imposed upon his conduct in the public interest, even though such compliance is

enforced without the procedure applicable to the punishment of crime." The present civil

enforcement action clearly falls within this definition.

Furthermore, Rule 6(e) does not shield all documents generated "in the course a criminal

investigation," as the DOJ letter suggests. As the D.C. Circuit has explained:

> We have never embraced a reading of Rule 6(e) so literal as to draw "a veil
> of secrecy . . . over all matters occurring in the world that happen to be
> investigated by a grand jury." *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368,
> 1382 (D.C. Cir. 1980). There is no *per se* rule against disclosure of any and all
> information which has reached the grand jury chambers; as the district court
> correctly observed, the touchstone is whether disclosure would "tend to reveal
> some secret aspect of the grand jury's investigation," such matters as "the
> identities of witnesses and jurors, the substance of testimony, the strategy or
> direction of the investigation, the deliberations or questions of jurors, and the like."

*Senate of Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574, 582 (D.C. Cir. 1987). In *Dresser*,

the D.C. Circuit upheld enforcement of a SEC subpoena for documents that had also been the subject of a grand jury subpoena.  In holding that compliance with the subpoena was not blocked by Rule 6(e), the court emphasized that the documents at issue were created for independent corporate purposes unrelated to the grand jury's investigation and were subpoenaed directly from the defendant without mention of the grand jury.  *Dresser*, 628 F.2d at 1382-83.  *See also In re Sealed Case No. 99-3091*, 192 F.3d 995, 1003 (D.C. Cir. 1999) ("[I]nternal deliberations of prosecutors that do not directly reveal grand jury proceedings are not Rule 6(e) material.").

Here, Nothern seeks documents that are relevant to the claims and defenses in this action. He has not specifically sought materials generated by a grand jury.  Furthermore, the SEC's own privilege log indicates that the documents held by DOJ include interview notes and summaries that were generated by a DOJ employee independent of any grand jury proceeding.  A categorical refusal to produce documents held by DOJ is therefore not supported by Rule 6(e). The Court should order the SEC to produce all responsive documents held by DOJ.

Indeed, the SEC already has many of the documents generated by DOJ, but has withheld them from production purportedly under the "work-product" doctrine.  But Fed. R. Civ. P. 26(b)(3), which codifies the work-product doctrine, provides that the protection applies only to documents that are prepared in anticipation of trial "by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  "Documents prepared for one who is not a party to the present suit are wholly unprotected by Rule 26(b)(3) even though the person may be a party to a closely related lawsuit in which he will be disadvantaged if he must disclose in the present suit."  8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2024 (2d ed. 2006).  *See, e.g.*, *Green v. Sauder Mouldings, Inc.*, 223 F.R.D 304, 306-07 (E.D. Va. 2004) (holding that

plaintiff may not assert work-product privilege to prevent disclosure of report prepared by non-party); *Gomez v. City of Nashua*, 126 F.R.D. 432, 434 n.1 (D.N.H. 1989) ("Because the State of New Hampshire and the Attorney General's Office are not parties to this litigation, Rule 26(b)(3) does not apply to this action.").

In its opposition to Nothern's motion, the SEC has vigorously argued that it is a separate and distinct party from other government agencies, and that those agencies' documents are therefore not the possession of a party subject to Rule 34.  It cannot at the same time argue that the work-product doctrine shields from disclosure documents that it has exchanged with such agencies.  If, contrary to Nothern's position, the Court agrees with the SEC that Rule 34 does not apply to the entire federal government, and that Nothern may be refused the documents held by other agencies consistently with due process, then at a minimum the Court should order the SEC to produce the following documents listed on its privilege log:  Bates Nos. SECNOTH136630-136683, 136765-136784, 136812-136818, 137276-137310, and 140948-141391.

<u>Conclusion</u>

For the foregoing reasons, the Court should enter an order compelling the government to produce all relevant documents held by the SEC, DOJ, and Treasury.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
jjs@foleyhoag.com

Dated:  October 30, 2006