UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> STEVEN E. NOTHERN, <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : Civil Action No. 05-10983 (NMG) <br> : <br> : <br> : <br> : |

**DEFENDANT'S RESPONSE TO SEC STATUS REPORT ON THE PRODUCTION OF DOCUMENTS AND PRIVILEGE LOG FROM THE TREASURY DEPARTMENT**

Defendant Steven Nothern respectfully submits this response to the status report and exhibits filed by the Securities and Exchange Commission on December 22, 2006 (Docket # 60).[1]

On December 19, 2006 – four (4) days after the close of discovery and almost fifteen (15) months after Nothern served his document requests in this case – the Department of Treasury ("Treasury") made its final production of documents in response to the SEC's request of June 30, 2006. Once again, Treasury indicated in its cover letter that it was responding "pursuant to Treasury's *Touhy* regulations," *see* Docket # 60, Ex. 1 at 1-2, even though those regulations provide that they "shall not be applicable to official requests of other government agencies." 31 C.F.R. § 1.12. Once again, the documents produced by Treasury contain extensive redactions of clearly relevant information.

After many requests by counsel for Nothern, Treasury the same day also produced a

---

[1] The Court (Gorton, J.) stated that it would allow this response to be filed at the motions hearing held on January 4, 2007.

privilege log summarily stating the reasons for its redactions, as well as for its decision to withhold an additional one hundred seventy (170) pages of documents in their entirety. *See* Docket # 60, Ex. 2. This log sets forth a smorgasbord of purported privilege claims, including "deliberative process," "law enforcement," attorney work product, attorney-client, and the Privacy Act, 5 U.S.C. § 552.[2] Treasury's application of these privileges is contrary to law and indicative that the agency's real purpose is to withhold embarrassing information, no matter how critical it may be to the claims and defenses in this case.

### A.  The Deliberative Process Privilege

Treasury has based most of its redactions on the "deliberative process" privilege. *See* Docket # 60, Ex. 2 at 1-10. The privilege is cited, for example, as Treasury's justification for redacting all three documents included as exhibits in Nothern's brief in support of his renewed motion to compel Treasury and Justice Department documents. *See* Docket # 45, at 7, 10, 11. Treasury has also relied on this privilege in withholding many additional documents in full. *See* Docket # 60, Ex. 2 at 26-38.

#### 1.  Discussion of Treasury's errors is not privileged.

The overwhelming majority of these documents do not meet the threshold test for the deliberative process privilege. To qualify, the information withheld must be predecisional and related to the formulation of official policy, not an observation of fact or comment about a

---

[2] Treasury's *Touhy* regulations state that disclosure "will not ordinarily be authorized" if it would not be "appropriate or necessary under the relevant substantive law concerning privilege." *See* 31 C.F.R. § 1.11(e)(2)(iv). With respect to this issue, counsel for Mr. Nothern note that they mistakenly stated in the reply brief in support of his motion to show cause (Docket # 59, at 2) that 31 C.F.R. § 1.11 "says nothing about the factors Treasury counsel may or may not consider" in deciding whether to authorize the testimony of agency employees. In fact, § 1.11(e)(1)(iv) allows Treasury counsel to consider whether the request "demonstrates that the information requested is relevant and material to the action pending, genuinely necessary to the proceeding, unavailable from other sources, and reasonable in its scope," and § 1.11(e)(1)(ix) allows Treasury counsel to consider "[a]ny other factor that is appropriate." Counsel apologize for this error, which resulted from reference to outdated regulations.

decision already made or an administrative matter that does not rise to the level of an official agency policy. *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 884, 884-85 (1st Cir. 1995). The privilege does not authorize Treasury to redact, as it has, communications that discuss why things went wrong on October 31, 2001.

For example, the second document inserted in Nothern's initial brief (Docket #45, at 10; identified as TREAS-00059 on Treasury's privilege log) is an e-mail exchange between Elizabeth Holahan, the press affairs employee who organized the October 31, 2001 press conference; Anthony Fratto, the Director of the Office of Public Affairs; and Michele Davis, the Assistant Secretary for Public Affairs. The exchange took place on November 2, 2001 – two days after the press conference – and began with an inquiry from a Wall Street Journal reporter about the "apparent leak from the refunding briefing." Treasury redacted all of Fratto's message to Holahan and Davis, as well as Holahan's subsequent message to Davis stating what Fratto told her in person, on the ground that the "document contains advice and recommendations from agency personnel about agency [policies] and statements." Docket # 60, Ex. 2 at 7. The deliberative process privilege, however, does not shield comments about events that have already occurred – including discussion about what response should be given to a reporter's factual inquiry.

Similarly, the third document in Nothern's initial brief (Docket #45, at 11; TREAS-00021) is an e-mail exchange between Fratto and Michele Davis on November 6, 2001, which reflects the first time that Assistant Secretary Davis learned that a different office at Treasury had admitted persons to the quarterly refunding press conferences (thereby contradicting the theory that Treasury had preserved the announcement's confidentiality by permitting access to "credentialed" press only). Treasury redacted all of Davis's response, as well as the substance of relevant remarks made to Fratto by Under Secretary Peter Fisher. Again, Treasury claimed

3

privilege on the ground that the exchange was an "[i]nternal document containing opinions and advice from agency personnel relating to Treasury Department's procedures for clearing in reporters." Docket # 60, Ex. 2 at 3. The context, however, makes clear this exchange was focused on the revelation that Treasury had been admitting the alleged tipper (not a member of the press) to press conferences on a regular basis. This exchange may be embarrassing to Treasury – and it is certainly relevant to this case – but it is not shielded by the deliberative process privilege. The same is true for nearly every document listed on Treasury's privilege log that was generated after 10:00 a.m. on October 31, 2001.

**2.     Nothern's need overcomes any qualified privilege.**

Furthermore, the First Circuit has made clear that the deliberative process privilege is "qualified" and "not absolute": even if a document satisfies the threshold test for protection under the privilege, "nondisclosure is not automatic." *Texaco Puerto Rico*, 60 F.3d at 885. In the *Texaco Puerto Rico* case, the First Circuit assumed that certain documents satisfied the criteria, but nevertheless concluded that disclosure was warranted based on "the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." 60 F.3d at 885; *see also id.* (observing that privilege is "routinely denied" when "the documents sought may shed light on alleged government malfeasance") (citation omitted); *Williams v. City of Boston*, 213 F.R.D. 99, 102 (D. Mass. 2003) (rejecting privilege claim because "the public's confidence in the workings of the police department is of utmost importance").

Here, disclosure is warranted for even those documents for which Treasury has arguably met the threshold test for the deliberative process privilege. For example, the first document inserted in Nothern's initial brief (Docket # 45, at 7; TREAS-00008) is an e-mail exchange between Brian Roseboro, Assistant Secretary for Financial Markets; Paul Malvey, the Director of

4

the Office of Market Finance; and Holahan. The exchange contains a draft timetable for events on the day of the press conference, and comments on it by Malvey and Roseboro. Treasury redacted the entire exchange, stating that it is an "[i]nternal draft document from agency personnel regarding schedule and strategy of communicating Quarterly Refunding." Docket # 60, Ex. 2, at 2.

But Treasury's schedule and strategy for communicating its refunding announcement is a critical – perhaps the most critical – issue in this case. Evidence gathered to date shows that Treasury rejected Under Secretary Peter Fisher's vigorous recommendation to release the information directly to the public, without an embargo, and instead set a 35-minute embargo that was unprecedented in length for quarterly refunding announcements. Treasury also imposed no physical or legal restraint on the attendees at the press conference, and in fact released the announcement to the news network CNBC – and, according to an e-mail just produced by Treasury, staffers on Capitol Hill – approximately one hour before the announced embargo time of 10:00 a.m. and well before Nothern's alleged trading time of 9:42 a.m.

Full disclosure is warranted for documents that show how Treasury prepared for the October 31, 2001 quarterly refunding announcement, so that Nothern may prepare his defense that Treasury failed to protect the confidentiality of its announcement before and during the press conference. Such documents also support his defense that he lacked knowledge of the alleged tipper Peter Davis's access to Treasury press conferences, since no one at Treasury responsible for running the press conference appeared to know about it either. Lastly, Treasury's sweeping reliance on the deliberative process privilege is also improper because the documents implicate the public's interest in honest, effective government.

### B.     Attorney-Client Privilege

#### 1.     The standard for attorney-client privilege.

The attorney-client privilege protects confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services. *See In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). The party claiming the privilege bears the burden of proving that the communications are protected. *In re Keeper of the Records*, 348 F.3d 16 (1st Cir. 2003) (citing *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 71 (1st Cir. 2002)); *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). Specifically, it must show that the person to whom the communication was made is "a member of the bar of a court" who "in connection with th[e] communication is acting as a lawyer" and that the communication was made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *In re Sealed Case*, 737 F.2d at 98-99 (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)); *accord State of Maine*, 298 F.3d at 71.

#### 2.     Communications without attorneys are not privileged.

Here, Treasury claims attorney-client privilege for numerous communications that do not satisfy this rule. In some communications, neither the author nor the recipients were attorneys. *See, e.g.*, Docket # 60, Ex. 2 at 14, document listed as TREAS-00107 (e-mail from Paul Malvey to Jeff Huther). In others, the e-mail was sent to multiple Treasury employees, only one or two of whom were attorneys. *See, e.g.*, *id.* at 30, document listed as TREAS-00207 (e-mail from Paul Malvey to eleven other Treasury employees, including General Counsel David Aufhauser). Such broad dissemination calls into question whether the purpose of the communication was to obtain the advice of counsel; otherwise any corporation could shield all of its dealings from

scrutiny with a mere "cc" to counsel. Furthermore, "[t]he burden is on the agency to demonstrate that confidentiality was expected in the handling of these communications, and that it was reasonably careful to keep this confidential information protected from general disclosure." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980) (holding that agency failed to establish and maintain confidentiality of documents); *see also State of Maine*, 298 F.3d at 72 (concluding that documents were unprotected by privilege where agency failed "to identify any circumstance expressly or inferentially supporting confidentiality").

### 3. Political and policy advice is not privileged.

Moreover, the subject matter identified by Treasury for nearly all communications for which it asserts the privilege – either "30 year bond investigation" or "discussion related to quarterly refunding," *see* Docket # 60, Ex. 2 at 10-16, 30-37 – does not involve a discrete legal issue or proceeding. For example, Treasury redacted one e-mail on the ground that it contained "a confidential attorney client communication which discusses legal strategy in responding to press inquiries concerning the 30 year bond investigation." *See id.* at 12, document listed as TREAS-00094. It is well established, however, that advice by a federal employee on "political, strategic, or policy issues" is not privileged. *In re Lindsey*, 158 F.3d at 1270. Treasury's addition of the term "legal" does not transform a press strategy into a protected opinion on the law.

### C.    Work Product Protection

Treasury similarly claims work-product protection throughout its privilege log even though there is no reason to believe that the Treasury Department even anticipated that it would itself litigate. *See* Docket # 60, Ex. 2 *passim*. Some of the documents it claims as work product involve requests for information by the SEC or the Justice Department. *See, e.g.*, Docket # 60,

Ex. 2 at 21-25, document listed as TREAS-00138-160 (identifying subject matter as "SEC Inquiry"). Other claims rest solely on the ground that the documents were generated "for the dominant purpose of conducting or aiding in the conduct of contemplated legal proceedings" (with no further explanation of the legal proceedings contemplated). None of these claims has merit.

     The work product doctrine provides qualified protection for documents generated in anticipation of litigation. To qualify for the protection, however, the document must be generated by a "party" to such litigation or by a "party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3). It is not sufficient simply to have "aided" a separate party's investigation or responded to its inquiry. *See State of Maine*, 298 F.3d at 69 ("The mere relation of documents to litigation does not automatically endow those documents with privileged status."); *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 237 (1st Cir. 1994) ("[A]t a minimum, an agency seeking to withhold a document . . . must identify the litigation for which the document was created (either by name or through factual description) and explain why the work-product privilege applies to all portions of the document."). Here, there is no evidence that Treasury anticipated that it would itself initiate any kind of litigation in response to the events of October 31, 2001, and in fact it never did. To the contrary, Treasury has vigorously defended its inadequate response to the SEC's document request on the ground that it is <u>not</u> a party to this litigation. The work product doctrine does not allow it to now withhold and redact relevant documents.

     It is ironic, of course, that Treasury claims work-product protection after the SEC has spent more than a year defending its failure to produce Treasury documents on the ground that the two agencies are separate and distinct. It is clear that the agencies worked in close coordination in investigating Treasury's failure to maintain the confidentiality of its decision to

suspend the 30-year bond; indeed, Treasury clearly encouraged the SEC's prosecution of this action as a means of deflecting critical attention from its many mistakes. Treasury's effort to withhold documents on this basis now only reinforces Nothern's primary argument that Federal Rule of Civil Procedure 34 requires the SEC to produce all relevant documents held by Treasury in unredacted form.

### D. The Law Enforcement Privilege

Lastly, the SEC also claims the "law enforcement" privilege almost every time it claims work-product protection. *See, e.g.*, Docket # 60, Ex. 2 at 10-28. This privilege, however, applies only to "documents that would tend to reveal law enforcement investigative techniques or sources." *Association for Reduction of Violence v. Hall*, 734 F.2d 63, 65-66 (1st Cir. 1984) (quoting *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 545 (D.C. Cir. 1977)). It is also a qualified privilege only, and even documents legitimately covered by it must be disclosed upon a showing of need. *Id.* at 66.

Here, it borders on ludicrous for Treasury to maintain that the documents for which it cites this privilege would "reveal law enforcement investigative techniques or sources." None of Treasury's four law enforcement bureaus at the time (ATF, Customs Service, IRS Criminal Investigations Unit, or Secret Service) was responsible for conducting the 30-year bond investigation, much less for generating the documents listed in Treasury's privilege log.[3] Treasury has withheld on this basis information and documents generated by employees whose duties were entirely unrelated to law enforcement. *See, e.g.*, Docket # 60, Ex. 2, TREAS-00098-100, 138-39, 160 (documents authored by Anthony Fratto, Director of the Office of Public Affairs); *id.*, TREAS-00132, 134-36 (documents authored by Brian Roseboro, Assistant

---

[3] The Secret Service (at the time, a part of Treasury) may have provided documents in response to a request by investigators, but there is no reference to the Secret Service in Treasury's privilege log.

9

Secretary for Financial Markets). Treasury's stated basis for invoking the privilege in each instance – *i.e.*, that the document "contains information contemplated for law enforcement purposes" – goes far beyond the limited scope of the privilege as recognized by the First Circuit and other courts. Indeed, such a purported standard could make just about any fact considered by the government to be privileged.

        E.        **Regardless of Their Merit, Treasury's Privilege Claims Do Excuse the SEC's Obligations under Rule 34.**

As shown above, nearly every claim of privilege made in Treasury's log is either unfounded on its face or at least highly suspect. The clear invalidity of Treasury's privilege claims – combined with its reliance on its *Touhy* regulations notwithstanding their stated inapplicability to the SEC's request, *see* 31 C.F.R. § 1.12, and its categorical refusal to allow any more depositions of Treasury employees – strongly suggests that for its own institutional reasons Treasury wishes to withhold information and documents from Nothern that are necessary for his defense.

As previously discussed in Nothern's briefs, the applicable case law, the Federal Rules of Civil Procedure, and the Due Process Clause of the Fifth Amendment clearly establish his right to obtain such information so that he may prepare his defenses. This would be true <u>even if</u> Treasury's privilege claims were well founded (they are not). *See, e.g.*, *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979) ("If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit."); *United States v. Nat'l Broadcasting Co., Inc.*, 65 F.R.D. 415, 421-22 (C.D. Cal. 1974) (dismissing three antitrust actions because of refusal by Executive Office of the President to respond to discovery requests based on assertion of privilege). This

Court should either compel the government to produce all information, documents, and testimony relevant to the claims and defenses in this case, or dismiss this action.

>  **F.  Treasury Has Failed to Conduct An Adequate Search for a Computer Diskette Containing Important Electronic Data.**

Lastly, the SEC attached to its report a letter from Treasury dated December 19, 2006 stating that it had failed to locate a computer diskette that was identified during the deposition of Treasury employee Frances Anderson and which may contain electronic data that shows exactly when Treasury posted its quarterly refunding announcement to its website.  *See* Docket # 60, Ex. 3.  Because the information clearly became public at this time, Treasury has long been aware of the need to preserve evidence relating to this critical timing issue (and surely this is so if it was "anticipating litigation" as its "work product" log contends).  The matter is particularly critical because there is evidence that Anderson saved her last edits to the document at 9:40 a.m. and immediately transferred it from the Treasury "staging server" (itself publicly accessible on the Internet) to the website at least two minutes before Nothern's alleged trade time of between 9:42 and 9:42:49 a.m.  Yet the SEC contends that the information was not on the official website until 9:43 a.m.  Since Anderson testified on cross-examination that she had proofed all of her changes <u>before</u> saving her work and making the transfer (which itself would take only a few seconds), there is no explanation for the three minute gap, which Nothern believes may be explained by asynchronous computer clocks.

In her deposition, Ms. Anderson testified that she stored the computer diskette (which likely has electronic data to resolve the question) in a file cabinet, but that the file cabinet somehow disappeared from her office in 2001 or 2002.  Treasury's letter stated that Ms. Anderson "conducted a search for this document on computer diskettes" and that its staff "searched for the document on the hard drive of Ms. Anderson's computer."  It did not, however,

11

indicate whether Treasury actually searched for the <u>file cabinet</u> that contained the diskette or tried to determine where the contents of that file cabinet were sent in late 2001 or 2002. Counsel for Nothern accordingly sent Treasury a letter on December 20, 2006 (attached hereto as Exhibit A) urging it to conduct a more thorough search, consistent with Ms. Anderson's testimony about where the diskette is located. Treasury has not responded.

                                            Respectfully submitted,

                                            STEVEN E. NOTHERN

                                            By his attorneys,

                                            /s/ John A. Shope
                                            Nicholas C. Theodorou, BBO #495730
                                            John A. Shope, BBO #562056
                                            Robert E. Toone, BBO #6443249
                                            FOLEY HOAG LLP
                                            155 Seaport Boulevard
                                            Boston, MA 02210
Dated: January 5, 2007                        (617) 832-1000

# Exhibit A

# FOLEY HOAG LLP
ATTORNEYS AT LAW

John A. Shope<br>
Partner<br>
Boston Office<br>
617.832.1233<br>
jshope@foleyhoag.com

December 20, 2006

**BY TELECOPIER (202-622-2961) AND FIRST-CLASS MAIL**

Thomas McGivern, Esquire
Office of the General Counsel
Department of the Treasury
Room 20191500 Pennsylvania Avenue, N.W.
Washington, D. C. 20220

Re:  *United States Securities and Exchange Commission v. Nothern,*
     **Civil Action No. 05-10983 (NMG) (D. Mass.)**

Dear Mr. McGivern:

In a letter dated September 19, 2006, I expressed my concern about Treasury employee Frances Anderson's testimony regarding the location of a computer disk containing electronic data that might be critical in ascertaining exactly when the announcement of suspension of issuance of the 30-year bond was posted to the Internet on October 31, 2001.

In her deposition, Ms. Anderson testified (pp. 262-66) that while she saved document "PO 749" to her C: drive on October 31, 2001, she subsequently deleted that document from her C: drive. Ms. Anderson further testified (pp. 263, 266) that she saved the document to a computer diskette, but could not say where the diskette is now. She testified (pp. 267-68) that she stored the computer diskette in a file cabinet, but that the file cabinet somehow disappeared from her office in 2001 or 2002.

In your letter sent yesterday evening, you stated that Ms. Anderson "conducted a search for this document on computer diskettes" and that Treasury information technology staff "searched for the document on the hard drive of Ms. Anderson's computer." However, you did not indicate whether Treasury has searched for the file cabinet that contained the computer diskette or tried to determine where the contents of that file cabinet were sent in late 2001 or 2002.

You noted that "a number of copies of PO 749 have previously been produced." That, however, is irrelevant. As you know, the issue of timing has been critical to this case since Treasury, the SEC, and the Justice Department began their investigations in November 2001. Electronic data accompanying the computer file that Ms. Anderson

Thomas McGivern, Esquire
December 20, 2006
Page 2

saved on October 31, 2001 are likely to show exactly when the document was posted on Treasury's staging server, edited, and moved to Treasury's production server. That information, in turn, may determine whether the information set forth in the document was public at the time of the relevant trades by my client. I therefore urge you to conduct a more thorough search for the computer diskette in question, including a search for the file cabinet in which it was stored in late 2001.

In addition, during our initial review of the documents you produced yesterday, we saw for the first time the e-mail from Assistant Secretary Roseboro, sent at 10:31 a.m. on October 29, 2001, in which he directed John Duncan to e-mail the quarterly refunding announcement to "key Hill staffers" just as Under Secretary Fisher started "to read it to press": *i.e.*, at 9:00 a.m. on October 31, 2001. You have not produced any other document reflecting Treasury's transmission of the quarterly refunding announcement to Capitol Hill staff. Because Treasury's disclosure of the announcement to outside parties prior to the 10:00 a.m. "embargo" time is a critical issue in this case, I urge you to search for and produce any additional documents relating to this issue. Please let me know right away whether you will do so.

                                                  Sincerely,

                                                  John A. Shope

cc:   Erica Y. Williams, Esquire
      John J. Rossetti Jr., Esquire
      Nicholas C. Theodorou, Esquire
      Robert E. Toone, Esquire