# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Civil Action No. 05-10983 (NMG)** |
| STEVEN E. NOTHERN, | ) ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF ROBERT E. TOONE FILED IN SUPPORT OF DEFENDANT'S OBJECTIONS TO MAGISTRATE JUDGE'S ORDER ON RENEWED MOTION TO COMPEL AND MOTION FOR AN ORDER TO SHOW CAUSE

Robert E. Toone, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am an attorney for Steven E. Nothern in the above-referenced matter.  I am a member of the Massachusetts bar and the bar of this Court.  Except where otherwise indicated, I make this declaration based upon my own personal knowledge, upon public records, and upon the documents related to this action.

2.      True and correct excerpts from the deposition transcript of Frances Anderson (Aug. 3, 2006) are attached hereto as Exhibit A.

3.      True and correct excerpts from the deposition transcript of Roger Anderson (June 20, 2006) are attached hereto as Exhibit B.

4.      True and correct excerpts from the deposition transcript of Brian Collins (May 12, 2006) are attached hereto as Exhibit C.

5.      True and correct excerpts from the deposition transcript of Peter Davis (April 19-20, 2006) are attached hereto as Exhibit D.

6.      True and correct excerpts from the deposition transcript of Peter Fisher (Aug. 8, 2006) are attached hereto as Exhibit E.

7.      True and correct excerpts from the deposition transcript of Anthony Fratto (Aug. 30, 2006) are attached hereto as Exhibit F.

8.      True and correct excerpts from the deposition transcript of David Harris (July 25, 2006) are attached hereto as Exhibit G.

9.      True and correct excerpts from the deposition transcript of Elizabeth Holahan (Aug. 23, 2006) are attached hereto as Exhibit H.

10.      True and correct excerpts from the deposition transcript of Paul Malvey (June 23, 2006) are attached hereto as Exhibit I.

11.      True and correct excerpts from the deposition transcript of Jill Ouseley (July 24, 2006) are attached hereto as Exhibit J.

12.      True and correct excerpts from the deposition transcript of Brian Roseboro (June 27, 2006) are attached hereto as Exhibit K.

13.      True and correct excerpts from the Rule 30(b)(6) deposition transcript of Verizon Business (Anne Wilson) (Oct. 6, 2006) are attached hereto as Exhibit L.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on February 7, 2007.

_____
Robert E. Toone

**EXHIBIT A**

**Cited Excerpts from the Deposition Transcript of Frances Anderson**
**(Aug. 3, 2006)**

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - - - - )

 4     UNITED STATES SECURITIES AND      )

 5     EXCHANGE COMMISSION,              )

 6                    Plaintiff,         )

 7            v.                         ) No. 05-10983 (NMG)

 8     STEVEN E. NOTHERN,               )

 9                    Defendant.         )

10     - - - - - - - - - - - - - - - - )

11                         Washington, D.C.

12                         Thursday, August 3, 2006

13     Videotape Deposition of FRANCES ESTELLE ANDERSON,

14     called for examination by counsel for Defendant in

15     the above-entitled matter, the witness being duly

16     sworn by CHERYL A. LORD, a Notary Public in and for

17     the District of Columbia, taken at the offices of

18     FOLEY HOAG LLP, 1875 K Street, N.W., Suite 800,

19     Washington, D.C., at 10:10 a.m., Thursday, August 3,

20     2006, and the proceedings being taken down by

21     Stenotype by CHERYL A. LORD, RPR, CRR, and

22     transcribed under her direction.
```

Frances Estelle Anderson

August 3, 2006

Washington, D.C.

Page 266

1  on me. And they would tell me, you have to get rid
2  of some of this stuff that you're not using, and
3  that's how I started deleting old press releases that
4  I had on my system to --
5      BY MR. SHOPE:
6      Q.  Would you transfer them to a disk so that
7  they could be saved?
8      A.  Most of my stuff was on a disk.
9      Q.  Okay. So what you had on the C drive, do
10 you think you saved that to a disk?
11     A.  I saved it to the disk, but I couldn't
12 tell you where the disk was.
13     Q.  Do you have any idea where it might be?
14     A.  No.
15     Q.  What would you do with those disks?
16     MS. WILLIAMS:  Objection.
17     A.  I don't have an idea where the disks are.
18     BY MR. SHOPE:
19     Q.  Okay. But that was not my question.
20     My question was, what would you do with
21 the disks to which you were saving things?
22     MS. WILLIAMS:  Objection.

Page 267

1      A.  We had a -- back when we were saving stuff
2  to the disk, we had just like a little thing that --
3  a cabinet or a file thing that the disks were stored
4  in.
5      What happened throughout the years, I
6  couldn't tell you, because it's all in the file
7  cabinet.
8      BY MR. SHOPE:
9      Q.  Is there somebody who is in charge of that
10 file cabinet?
11     A.  The file cabinet is -- no longer exists,
12 because that's when we were storing, saving the paper
13 copies and the tapes all at the same time.
14     Q.  So when did they get rid of the file
15 cabinet?
16     A.  I have no idea.
17     Q.  Do you know who was in charge of it before
18 they got rid of it?
19     A.  Some of the stuff went to archives. I
20 don't know when the rest of it. All I was in charge
21 of was sending old press releases to the archives.
22     Q.  Who was in charge of the file cabinet

Page 268

1  before they got rid of it?
2      MS. WILLIAMS:  Objection.
3      A.  I was.
4      BY MR. SHOPE:
5      Q.  You were?
6      A.  Yes.
7      Q.  Can you tell me approximately when they
8  got rid of it?
9      A.  It was right -- we was in the second
10 floor. That's back in 2001 when we was keeping all
11 the paper copies.
12     Q.  So you got rid of the file cabinet in
13 2001?
14     A.  Maybe 2002.
15     Q.  So getting back to the chronology of what
16 happened here, after the press conference was over
17 and you had to post the press release to the Web, you
18 went back to your C drive. You had what
19 Ms. Anderson -- what you had -- what Ms. Holahan --
20 excuse me -- what Ms. Holahan had emailed you before.
21 You compared it to what was on your C drive just to
22 make sure there had been no version changes.

Page 269

1      Right?
2      A.  Correct.
3      Q.  Okay. At that point you had to again add
4  the words for immediate release?
5      MS. WILLIAMS:  Objection.
6      MR. ROSETTI:  Objection.
7      A.  No.
8      BY MR. SHOPE:
9      Q.  Correct?
10     Why not?
11     A.  Because I generated a copy of what Betsy
12 sent me. I select all. I started procedure to
13 select the -- went to the Internet Explorer and
14 pulled up the icon to go on the Internet to start
15 posting FTP. Once you save the document on the C
16 drive, when you go to FTP, you can pull up your FTP
17 from -- you can pull up your C drive from the FTP.
18     Q.  So you went to the staging server, and
19 then from there, you went back to your C drive?
20     A.  I went to my C drive first.
21     Q.  Okay. And you selected all?
22     A.  Yes.

68 (Pages 266 to 269)

Page 286

1      A.   It's showing me the document.
2      Q.   It's showing you the document, but it's
3  showing you the document as reformatted by the
4  staging server?
5      A.   Correct.
6      Q.   Okay.  You're comparing that to the hard
7  copy -- to a hard copy of what Ms. Holahan had
8  emailed you at the beginning of the day?
9      A.   Correct.
10     Q.   Okay.  You go through it to see -- to try
11 to match up your form -- the format on the staging
12 server as closely as you can to what she had emailed
13 you earlier in the day?
14     A.   Correct.
15     Q.   And at some point, you satisfied
16 yourself that the 2 matched as closely as you were
17 going to be able to make the match.
18          Correct?
19     A.   Correct.
20     Q.   Okay.  So at that point you saved all the
21 work that you'd done.
22          Correct?

Page 287

1      A.   Correct.
2      Q.   Okay.  And thereafter, you began the
3  process to transfer from the staging server to the
4  actual Treasury Web site?
5      A.   Correct.
6      Q.   Okay.  And that's simply the update
7  command?
8          MS. WILLIAMS:  Objection.
9      A.   I forgot what the word was.
10         BY MR. SHOPE:
11     Q.   You don't remember -- you don't
12 remember -- you recall -- you said "post" before.
13     A.   Post, yeah.
14     Q.   So your memory is that the command is
15 called "post" or something like that?
16         MS. WILLIAMS:  Objection.
17     A.   Correct.
18         BY MR. SHOPE:
19     Q.   All right.  You have no idea whether the
20 staging server and the Web site are synchronized.
21         Is that a fair statement?
22         MR. ROSETTI:  Objection.

Page 288

1      A.   I have no idea.
2          MR. SHOPE:  I have nothing further.
3          MR. ROSETTI:  I don't have any further
4  questions.
5          Thank you.
6          THE VIDEOGRAPHER:  Here marks the end of
7  videotape deposition of Frances Anderson.  Time on
8  the screen is 15:38:11.  We're going off the record.
9          (Whereupon, at 3:41 p.m., the taking of
10 the instant deposition ceased.)
11
12
13
14          _____
              Signature of the Witness
15 SUBSCRIBED AND SWORN to before me this _____ day of
16 _____, 20_____.
17
18          _____
19              Notary Public
20 My Commission Expires:_____

Page 289

1          CERTIFICATE OF COURT REPORTER
2  UNITED STATES OF AMERICA   )
3  DISTRICT OF COLUMBIA       )
4          I, CHERYL A. LORD, the reporter before
5  whom the foregoing deposition was taken, do hereby
6  certify that the witness whose testimony appears in
7  the foregoing deposition was sworn by me; that the
8  testimony of said witness was taken by me in machine
9  shorthand and thereafter transcribed by
10 computer-aided transcription; that said deposition is
11 a true record of the testimony given by said witness;
12 that I am neither counsel for, related to, nor
13 employed by any of the parties to the action in which
14 this deposition was taken; and, further, that I am
15 not a relative or employee of any attorney or counsel
16 employed by the parties hereto, or financially or
17 otherwise interested in the outcome of this action.
18
19          CHERYL A. LORD
20          Notary Public in and for
21          the District of Columbia
22 My Commission expires April 30, 2011

73 (Pages 286 to 289)

**EXHIBIT B**


**Cited Excerpts from the Deposition Transcript of Roger Anderson**
**(June 20, 2006)**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. CV-10983NMG
USDC-DMASS

2

3

4     SECURITIES AND                :     **ORIGINAL**
      EXCHANGE COMMISSION,           :

5                                    :
             Plaintiff,              :     DEPOSITION UPON
6                                    :     ORAL EXAMINATION
         vs.                         :          OF
7                                    :
      STEVEN E. NOTHERN,             :     ROGER L. ANDERSON
8                                    :
             Defendant.              :
9     ---------------------          :

10

11

12

13         T R A N S C R I P T of the deposition of ROGER

14    L. ANDERSON, before ROSEMARY MARINO, a Certified

15    Shorthand Reporter and Notary Public of the State of

16    New Jersey, at the offices of MC CARTER & ENGLISH,

17    Gateway 4, Newark, New Jersey on Tuesday, June 20,

18    2006, commencing at 10:35 in the forenoon.

19

20

21

22

23

24

25



**Rizman**
**Rappaport**
**Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

50

1    A.    On the phone.
2    Q.    And how long did that last?
3    A.    Less than an hour.
4    Q.    And so what did they discuss with you?
5    A.    Whether -- most of it was whether or not
6    there was a confidentiality agreement signed by
7    Mr. Davis.
8    Q.    Okay.  And what else did you discuss
9    with them?
10    A.    Other meetings with Mr. Davis, and my
11    decision to allow him into one of the press
12    conferences.
13    Q.    Anything else?
14    A.    I don't recall if we discussed
15    procedures or not.
16    Q.    Did you do anything else to prepare for
17    your deposition today?
18    A.    Reviewed the documents that I gathered.
19    Q.    Okay.
20    MR. SHOPE:  Off the record.
21    (Discussion held off the record.)
22    (Recess.)
23    Q.    You mentioned before we broke that you
24    had discussed with Ms. Williams, Mr. Rossetti and Mr.
25    McGivern various matters relating to Peter Davis.  So

51

1    why don't we get into that right now.
2    First of all, when did you first become aware
3    of Peter Davis?
4    A.    I met him at one of the refunding
5    events.  I don't recall if it was one of the Tuesday
6    presentations or one of the Wednesday press
7    conferences.
8    Q.    And how did you -- did he introduce
9    himself to you?
10    A.    My recollection is that he was
11    introduced to me.
12    Q.    And do you recall who did that?
13    A.    It was somebody whose a staff member at
14    Treasury, but I don't know who.
15    Q.    Is there sort of a group of people from
16    whom -- I am sorry.  Let me rephrase that.
17    Was it likely one or a small group of people?
18    In other words, could you say who was the pool of
19    people who are the likely candidates for having
20    introduced you to Peter Davis?
21    A.    It would have been somebody who was a
22    regular, if you will, or regularly involved in the
23    press conferences, but that would have included -- it
24    could have been anybody in the Office of Federal
25    Finance, it could have been anybody in the Office of

52

1    the Fiscal Assistant Secretary, could have been
2    anybody from the Bureau of Public Debt, I just don't
3    remember.
4    Q.    So it could have been Paul Malvey, for
5    example?
6    MS. WILLIAMS:  Objection.
7    A.    It's possible, yes.
8    Q.    Could it have been Jill Lousen?
9    A.    Ouseley, yes.
10    MS. WILLIAMS:  Objection.
11    Q.    Ouseley, I am sorry.
12    And was this at the point when you were
13    yourself delivering the announcement?
14    A.    No.
15    Q.    It was before then?
16    A.    Yes.
17    Q.    And do you recall at all what was said
18    on that occasion?
19    A.    I believe Mr. Davis was introduced to me
20    as something of a Treasury regular, to that effect.
21    Q.    By the way, was this at the point when
22    you were the senior advisor?
23    A.    Yes.
24    Q.    And was this fairly early in your tenure
25    as the senior advisor?

53

1    A.    That I don't remember.
2    Q.    And did you -- now, during your tenure
3    as senior advisor, were you attending the quarterly
4    refunding conference on a regular basis?
5    A.    I believe I went to all of the press
6    conferences, the Wednesday press conferences, yes.
7    Q.    And so during your tenure as senior
8    advisor, did you see Mr. Davis at those press
9    conferences on a fairly regular basis?
10    A.    I don't remember.
11    Q.    Speaking of that initial meeting, do you
12    recall anything else other than that Mr. Davis was
13    introduced to you as a Treasury regular?
14    A.    No.
15    Q.    Now, did you have any understanding as
16    to whether or not Mr. Davis was a reporter?
17    A.    I don't recall if it was at the first
18    meeting I had with him or a later one where he told
19    me that he wrote a newsletter.
20    Q.    And so after the -- you first met him, I
21    take it, that was a fairly brief conversation.
22    MS. WILLIAMS:  Objection.
23    A.    Yes.
24    Q.    Was there any discussion at that time as
25    to how it was that he happened to be attending a

14 (Pages 50 to 53)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

94

1  did you have any communication with anybody else
2  about Mr. Youngdahl's case?
3      A.    I discussed it with people in New Jersey
4  who knew Mr. -- who know Mr. Youngdahl, and I believe
5  also with Mr. Malvey.
6      Q.    And what did -- in that connection, what
7  did Mr. Malvey say to you and what did you say to
8  Mr. Malvey?
9      A.    We were both surprised because we liked
10  Mr. Youngdahl.
11      Q.    Anything else?
12      A.    No.
13      Q.    Did you discuss with Mr. Malvey whether
14  or not there were other people at Goldman, Sachs who
15  might have been aware prematurely of the suspension
16  of issuance of the long bond?
17      A.    I don't recall.
18      Q.    Did you discuss with Mr. Malvey the
19  possibility that other people besides Mr. Davis might
20  have been aware prematurely of the decision to
21  suspend issuance of the long bond?
22      MS. WILLIAMS:  Objection.
23      A.    No.
24      MR. SHOPE:  If I could just have a
25  short break, I can go through my notes.

95

1      MS. WILLIAMS:  Sure.
2      (Recess.)
3      Q.    Just want to clarify a few things.
4      First of all, just so I'm understanding the
5  chronology correctly, Mr. Davis was attending the
6  quarterly refunding conference before he ever had a
7  conversation with you about following embargoes; is
8  that correct?
9      MS. WILLIAMS:  Objection.
10      A.    That's my understanding.
11      Q.    And did you ever have any understanding
12  as to the circumstances under which he had gotten
13  into the quarterly refunding conferences prior to the
14  conversation that you had about -- with him about the
15  embargo?
16      A.    No.
17      Q.    Okay.  And did you ever -- so you don't
18  know whether it was Jill Ouseley, for example, who
19  authorized him to attend?
20      MS. WILLIAMS:  Objection.
21      A.    I do not.
22      Q.    Now, I believe you testified that you
23  said you would not stand in the way if the press
24  office wanted to continue to exclude Mr. Davis from
25  the quarterly refunding conferences; correct?

96

1      A.    That's correct.
2      MS. WILLIAMS:  Objection.
3      Q.    Is it, in fact, the case that you,
4  yourself, didn't really have authority to
5  affirmatively admit Mr. Davis to the quarterly
6  refunding conferences, you are simply stating that
7  you, yourself, had no objection.
8      MS. WILLIAMS:  Objection.
9      A.    Correct.
10      Q.    Who would have had authority to admit
11  Mr. Davis to the quarterly refunding conferences?
12      A.    Well, the press office dealt with the
13  press people and the various Treasury offices decided
14  which Treasury staff or Federal Reserve staff was
15  there, and I took it upon myself to allow one of the
16  Borrowing Advisory Committee members to attend one.
17      Q.    Now, when you said you took it upon
18  yourself to allow one of the Borrowing Advisory
19  Committee persons to attend, what did you have to do?
20      A.    I just invited him to stay.
21      Q.    Okay.  Was that something he had
22  requested or she had requested?
23      A.    No.  This was back when the Borrowing
24  Advisory Committee was making its report to the
25  undersecretary Wednesday morning.  He was not headed

97

1  back to his office, it was his last meeting, I
2  intended to say something to recognize his
3  contributions at the press conference. So since he
4  wasn't in a hurry to leave, I invited him to stay so
5  that I could be public about our thanks for his
6  efforts.
7      Q.    So you felt you had the authority to
8  invite him.
9      A.    Yes.
10      Q.    Okay.  But you didn't think that you had
11  the authority to invite Mr. Davis.
12      MS. WILLIAMS:  Objection.
13      Q.    Is that fair?
14      A.    I didn't think I had the authority to
15  overrule the press office.
16      Q.    Well, let me flip it around the other
17  way.
18      Let's suppose that the press office had no
19  objection to his being there, but you didn't want him
20  to be there, would you have had the authority to
21  exclude him?
22      A.    Oh, I probably would have had a
23  conversation with the press office about it, we would
24  have come to an agreement one way or another, but I
25  can't give a definite answer because it never

25 (Pages 94 to 97)

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

**66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com**

98

1  happened.
2      Q.    Now, in theory if you and the press
3  office had not been able to see eye-to-eye you would
4  have had to go up higher in the chain of command in
5  the Treasury; fair statement?
6      A.    Yes.
7      Q.    And I apologize if I asked you this.
8  Did you or with your knowledge your secretary ever
9  clear Mr. Davis into the quarterly refunding
10  conference?
11      A.    I did not and I don't know whether my
12  secretary ever did.
13      Q.    Was there ever any handouts at the
14  quarterly refunding conferences besides press
15  releases of the sort that we reviewed with Exhibit 1?
16      A.    On Wednesday press conferences there
17  would be traditionally three handouts, the press
18  release, the recommendations of the Borrowing
19  Advisory Committee and the minutes of the Borrowing
20  Advisory Committee meeting as taken by member of the
21  Treasury staff.
22      Q.    Do you recall whether -- well, would Mr.
23  Davis has received those handouts in the ordinary
24  course if he attended the quarterly refunding
25  conference?

99

1      A.    He could of.
2      Q.    Do you remember whether or not he ever
3  asked for those items or had expressed interest in
4  those items?
5      A.    I don't recall.
6      Q.    Okay.  Now, my client, Steven Nothern,
7  is he somebody that you know at all?
8      A.    I don't recognize the name at all.
9      Q.    Now, you mentioned before that although
10  you weren't sure where it came from you had an
11  understanding that if a reporter didn't follow the
12  embargo the reporter would not be permitted to attend
13  future refunding conferences.  Did I remember that
14  right?
15      A.    Yes.
16      Q.    Did that ever occur during, to your
17  knowledge?
18      A.    Not to my knowledge.
19      Q.    And other than the one incident that you
20  heard about with regard to Mr. Davis, did you ever
21  hear about anyone else ever being excluded from a
22  quarterly refunding conference?
23      A.    No.
24      Q.    You mentioned that you had discussed
25  with Ms. Williams and Mr. Rossetti the question of

100

1  whether or not there was ever a written agreement
2  between -- that Treasury had made with Mr. Davis.  Do
3  you recall that?
4      A.    Yes.
5      Q.    Okay.  What did Mr. Rossetti and Ms.
6  Williams say to you and what did you say to them?
7      A.    They asked me if I knew of such an
8  agreement, I told them no.  They mentioned that Mr.
9  Davis had testified that there was such an agreement
10  and I told them that my recollection was different.
11      Q.    Okay.  If -- now this is, we are talking
12  about events that, if it did happen, it would have
13  been around like ten years ago; right?
14          MS. WILLIAMS:  Objection.
15      A.    Nine or ten years ago, yes.
16      Q.    So bearing that in mind, is it at least
17  possible that you had some agreement or there was
18  some agreement, written agreement with Mr. Davis and
19  you just don't remember it?
20      A.    I never had any agreement with Mr.
21  Davis, no.
22      Q.    I am talking about something you would
23  have done on behalf of Treasury.
24      A.    No.
25      Q.    I know you don't remember having made

101

1  it, but if you had, is that the sort of thing that
2  you would have held on to?
3          MS. WILLIAMS:  Objection.
4      A.    It is not something I would have
5  considered part of my personal papers.  Had there
6  ever been such a document, it would have been part of
7  an official Treasury paper.
8      Q.    And where would a document like that be
9  stored in Treasury?
10          MS. WILLIAMS:  Objection.
11      A.    I don't know.
12      Q.    When you left Treasury, did you have --
13  you had files that you had been maintaining in the
14  course of your duties; correct?
15      A.    Correct.
16      Q.    What happened to those?
17      A.    I left them there.
18      Q.    Was there somebody who was charged with
19  sort of going through your papers and figuring out
20  whether they go to the archives?
21      A.    I don't know.  I mean there's a set
22  procedure for the secretary, but certainly not for
23  lower, and I don't know how far down the procedure
24  goes.
25      Q.    So nobody ever said to you in substance,

26 (Pages 98 to 101)

**Rizman**
**Rappaport**
**Dillon&Rose**, LLC
Certified Court Reporters

**66 W. Mt. Pleasant Avenue**
**Livingston, NJ 07039**
**(973) 992-7650   Fax (973) 992-0666**
**1-888-444-DEPS**
**E-mail: reporters@rrdrcsr.com**

# EXHIBIT C

## Cited Excerpts from the Deposition Transcript of Brian Collins
## (May 12, 2006)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - X

UNITED STATES SECURITIES AND    :

EXCHANGE COMMISSION,            :

     Plaintiff,            :

  V.                         :   Civil Action No.

STEVEN E. NOTHERN,              :   05-10983(NMG)

     Defendant.            :

- - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 12, 2006

    Videotape Deposition of BRIAN COLLINS, a

witness herein, called for examination by counsel for

the Defendant in the above-entitled matter, pursuant

to notice and subpoena, the witness being duly sworn

by PENNY M. DEAN, a Notary Public in and for the

District of Columbia, taken at the law offices of

Foley Hoag, LLP, 1875 K Street, NW, Washington, D.C.,

at 10:44 a.m., Friday, May 12, 2006, and the

proceedings being taken down by Stenotype by PENNY M.

DEAN, RPR, and transcribed under her direction.

Page 58

1      Q.   Do you recall whether the person to whom
2  you spoke was Mr. Rossetti, who is here today?
3      A.   The name sounds familiar, but I can't -- I
4  don't remember.
5      Q.   Do you remember whether it was a man or a
6  woman with whom you spoke?
7      A.   I spoke with a man.
8      Q.   By the way, was it only one person with
9  whom you spoke, or was it two people or more?
10     A.   I think there was two people on the -- on
11  the phone.
12         MR. RITTINGER:  It's the SEC, it's got to
13  be at least two.  Sorry.
14         BY MR. SHOPE:
15     Q.   So -- and how long did the conversation
16  occur, do you remember?
17     A.   I don't remember.
18     Q.   Can you give me an estimate?  In other
19  words, was it something where you had to spend half a
20  day on it, or was it just like a 15 minute call or a
21  half hour or an hour?  Just any kind of parameters
22  you can put on it.
23     A.   I would say maybe 20 minutes.
24     Q.   And to the best of your -- can you give me
25  the best recollection you have about what was asked

Page 59

1  and what you -- in other words, what was the
2  conversation that you had with the SEC?
3      A.   They basically asked me about my call to
4  Fannie Mae.
5      Q.   And did you tell them what you've told us
6  here today?
7      A.   I told them that, yes, I had made a call
8  to Fannie Mae, just like I told you.
9      Q.   Did you tell them anything different from
10  what you have said today as far as you can recall?
11     A.   I don't think so.
12     Q.   And mark that as the next exhibit.
13         (Exhibit No. 2 was marked for
14          identification.)
15         MR. SHOPE:
16     Q.   Mr. Collins, I'm showing you what's been
17  marked as Exhibit 2 to your deposition; do you see
18  that?
19     A.   Yes.
20     Q.   Is this a -- do you recall having received
21  Exhibit 2?
22     A.   Yes, I do.
23     Q.   So is this -- in other words, does this
24  suggest to you that you did, in fact, speak with the
25  SEC staff on December 14th, 2001?

Page 60

1      A.   I think it was before December 14th, but
2  yeah, I received this after I spoke to them in the
3  mail.  I think it might have been certified or
4  something, I can't remember now.
5      Q.   The -- well, Mr. Hathaway says, "thank you
6  for speaking with the staff today."
7      A.   Um-hum.
8      Q.   You don't have any reason to believe that
9  that was an incorrect statement?
10     A.   Oh, no.
11     Q.   And did you -- have you attended any
12  Treasury conferences, press conferences, refunding
13  conferences, conferences of any kind after October
14  31, 2001?
15     A.   I probably have.
16     Q.   And did anyone from the Treasury
17  Department ever say that your ability or right to
18  attend press conferences was going to be restricted
19  or diminished in any way?
20     A.   No, no one ever said anything.
21     Q.   Did anyone from the Treasury Department
22  ever tell you that -- or anyone from anywhere ever
23  tell you that -- I'm sorry, I'm tired today.
24         Did anyone within the government ever tell
25  you that your ability to -- whether you were going to

Page 61

1  be punished in any way for the events of October 31,
2  2001?
3      A.   I have not.
4      Q.   And just so I'm clear, as far as you're
5  aware, the SEC never conducted any investigation of
6  your conduct apart from simply having interviewed you
7  on or about December 14, 2001; is that correct?
8      A.   They interviewed me, they sent me this
9  letter and that's the last I've heard of it.
10     Q.   Okay.
11     A.   Until I got a subpoena from you guys.
12     Q.   Did you ever hear of any change in the
13  policy of the Treasury Department with regard to
14  press embargoes after the events of October 31, 2001?
15     A.   No.
16     Q.   Have you ever -- have you written any
17  stories about Treasury refunding conferences or press
18  conferences or -- yeah, Treasury conferences of any
19  kind after October 31, 2001?
20     A.   I'm sure I have, I can't -- I can't point
21  to one right now.
22         (Exhibit No. 3 was marked for
23          identification.)
24         BY MR. SHOPE:
25     Q.   Mr. Collins, we've passed to you what's

16  (Pages 58 to 61)

**EXHIBIT D**

**Cited Excerpts from the Deposition Transcript of Peter Davis**
**(April 19-20, 2006)**

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - - X

4     UNITED STATES SECURITIES AND    :

5     EXCHANGE COMMISSION,            :

6              Plaintiff,            :

7        V.                         :    Civil Action No.

8     STEVEN E. NOTHERN,            :    05-10983(NMG)

9              Defendant.           :

10    - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          Wednesday, April 19, 2006

13              Videotape Deposition of PETER DAVIS, JR.,

14    a witness herein, called for examination by counsel

15    for the Plaintiff in the above-entitled matter,

16    pursuant to notice and subpoena, the witness being

17    duly sworn by PENNY M. DEAN, a Notary Public in and

18    for the District of Columbia, taken at the offices of

19    U.S. Securities and Exchange Commission, 100 F

20    Street, NE, Washington, D.C., at 9:37 a.m.,

21    Wednesday, April 19, 2006, and the proceedings being

22    taken down by Stenotype by PENNY M. DEAN, RPR, and

23    transcribed under her direction.

24

25

Peter Davis, Jr.                                                                                      April 19, 2006
Washington, DC

| Page 94 |
| --- |

1    Q.    And would this have been around '94, '95?
2    A.    I guess.  That's so long ago, I can't be
3    certain about the date.
4    Q.    But it was before the year 2000?
5    A.    Oh, yeah, for sure.
6    Q.    How did you contact Mr. Anderson?
7    A.    I seem to recall a telephone -- a short
8    telephone conversation and a follow-up letter.
9    Q.    What was discussed during the
10   conversation?
11   A.    Same thing as in the letter, you know,
12   I've been having difficulty getting these documents
13   after they have been publicly released, would it be
14   possible for me to get authorization to attend the
15   meetings to get them -- get them there.
16   Q.    Were you -- you say you had a conversation
17   and then you sent a letter?
18   A.    Right.
19   Q.    The letter was basically the same --
20   A.    The letter that I attend the meetings.
21            MR. STANCIL:  Make sure you let her finish
22   her question before you answer, because she's got to
23   take it all down and he's going to object.
24            THE WITNESS:  I understand.
25            BY MS. WILLIAMS:

| Page 95 |
| --- |

1    Q.    Were you ever given authorization to
2    attend the meetings?
3    A.    Yes.
4    Q.    By whom?
5    A.    By Roger Anderson.
6    Q.    And how did Mr. Anderson communicate to
7    you that you had been given authorization to attend
8    the quarterly refunding meetings?
9            MR. THEODOROU:  Objection.
10           THE WITNESS:  He called me up and said,
11   you can attend, if you swear to honor the embargo and
12   sign the confidentiality agreement.
13           BY MS. WILLIAMS:
14   Q.    You say to honor the embargo, what do you
15   mean by that?
16   A.    To not release the information that was
17   passed out at the meetings until the embargo time.
18   Q.    What was an embargo?
19   A.    It is a period of time after the
20   information is passed out until it can be released.
21   Q.    And then you said -- did you agree to
22   honor the embargo?
23   A.    Yes.
24   Q.    You also mentioned signing a
25   confidentiality agreement.  Could you tell me whether

| Page 96 |
| --- |

1    an agreement was signed?
2    A.    Yes.
3    Q.    Who was the agreement between?
4    A.    It was between me and the Treasury
5    Department.
6    Q.    Did you sign the agreement?
7    A.    Yes.
8    Q.    Did someone from Treasury sign the
9    agreement?
10   A.    Yes, I -- I remember doing it in Roger's
11   office.  I assume he signed it, but --
12   Q.    And who drafted the agreement?
13   A.    Treasury did.
14           MR. THEODOROU:  Objection.
15           BY MS. WILLIAMS:
16   Q.    So you did not prepare the agreement?
17   A.    No.
18   Q.    Did you retain a copy of the agreement?
19   A.    Yes.
20   Q.    Do you still have a copy of the agreement?
21   A.    No.
22   Q.    What happened to it?
23   A.    I pitched it in August of 2001.
24   Q.    Why did you throw it away?
25   A.    At that point, I had violated it and I

| Page 97 |
| --- |

1    threw it away.
2    Q.    Do you know if Mr. Anderson retained a
3    copy of the agreement?
4    A.    When I walked out of his office, it was
5    sitting on his desk.
6    Q.    Did you sign one document or did you sign
7    multiple documents?
8    A.    It was one document.
9    Q.    Did you have that document photocopied?
10   A.    I was given a copy, which I pitched in
11   August 2001.
12   Q.    Was anyone else given a copy of that
13   document that you know of?
14   A.    No, not that I'm aware of.
15   Q.    Do you know approximately how long after
16   you sent the letter to Mr. Anderson asking for
17   authorization to attend the conferences as to when
18   you met with him in his office to sign this
19   confidentiality agreement?
20   A.    It was within a week, a few days later.
21   Q.    Did you keep a copy of the letter you sent
22   to Mr. Anderson asking for authorization?
23   A.    I really don't recall.  It must have been
24   on my word processor, but hard drives die and I don't
25   recall seeing it.

25  (Pages 94 to 97)

## Page 98

1    Q.    Before you had these conversations and
2  sent the letters to Mr. Anderson, had you ever
3  attended a quarterly refunding conference?
4    A.    No.
5    Q.    Just before we go to lunch, let me ask
6  you, you mentioned Mr. McCarthy was interested in
7  documents for the conference.
8    A.    Um-hum.
9    Q.    Did you start getting the documents that
10 you mentioned from the Tuesday conference as a result
11 of Mr. McCarthy's requesting those?
12   A.    Yes.
13   Q.    Did any other clients express interest in
14 documents from the quarterly refunding conference?
15   A.    Yeah, there were one or two. I just
16 started broadcast faxing them out to all of my
17 clients.
18   Q.    When you received them, you just started
19 to send them?
20   A.    Yeah.
21   Q.    How would you send them to your clients?
22   A.    I just said I would start -- when the
23 documents had been publicly released, I'd take them,
24 I would go back to my office and broadcast fax
25 portions of them. I didn't broadcast fax everything,

## Page 99

1  but there were certainly tables they cared about.
2    Q.    Initially you would send them via fax?
3    A.    Right.
4    Q.    Did you ever E-mail those documents?
5    A.    No, because they -- it was just easier to
6  broadcast fax them. At some point in the late '90s,
7  Treasury started posting them on their website.
8    Q.    I just have two more questions before we
9  go to lunch. Besides agreeing to honor the embargo,
10 was there anything else that you agreed to as a
11 condition to gain authorization to the quarterly
12 refunding conference?
13   A.    No.
14   Q.    Did you ever mention -- did you express to
15 Mr. Anderson why you wanted to attend the
16 conferences?
17   A.    I just told him I was having trouble
18 getting the documents, and I was told that if I
19 attended the meetings, I could get the documents.
20 There were certain tables of data that were of
21 interest, and I just wanted to find a way to get
22 those.
23   MS. WILLIAMS: I'd like to break for
24 lunch.
25   THE VIDEOGRAPHER: This is the end of tape

## Page 100

1  number 2 in the video deposition of Mr. Peter Davis.
2  Off the record at 12:04:01 p.m. on April 19, 2006.
3    (Whereupon, at 12:04 p.m., the deposition
4  in the above-entitled matter was recessed, to
5  reconvene at 12:45 p.m., this same day.)

## Page 101

1    AFTERNOON SESSION
2    (1:02 p.m.)
3  Whereupon,
4    PETER DAVIS, JR.,
5  the witness testifying at the time of recess, having
6  been previously duly sworn, was further examined and
7  testified further as follows:
8  EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
9    THE VIDEOGRAPHER: This is the beginning
10 of tape number 3 in the videotape deposition of
11 Mr. Peter Davis. On the record at 1:02:56 p.m. on
12 April 19th, 2006.
13   BY MS. WILLIAMS:
14   Q.    Mr. Davis, before lunch, we were talking
15 about a meeting that you had with Roger Anderson in
16 which you discussed gaining access to the quarterly
17 refunding conferences at Treasury. Was anyone else
18 present at the meeting besides you and Mr. Anderson?
19   A.    One of his assistants.
20   Q.    Was it a male or female?
21   A.    It was a female.
22   Q.    And you don't recall the assistant's name?
23   A.    She was the one who brought in the
24 document.
25   Q.    Do you know what she looked like?

Page 261

```
 1    A.   Right.
 2    Q.   In one document?
 3    A.   Yes.
 4    Q.   So it had a front side that had writing it
 5  on and a second side?
 6    A.   That's right.  And it seemed to be a form,
 7  it wasn't even necessarily a Treasury form and it had
 8  some blanks to fill in.
 9    Q.   Did the agreement mention embargo in it?
10    A.   Whew.
11        MS. WILLIAMS:  Objection.
12        MR. STANCIL:  If you recall.
13        THE WITNESS:  I don't recall.
14    BY MR. THEODOROU:
15    Q.   Did you review the agreement before you
16  signed it?
17    A.   I took three or four minutes to read it in
18  a cursory fashion, but said I was to keep the
19  information I received confidential and it mentioned
20  some U.S. code sections, if I didn't and I signed it,
21  that was it.
22    Q.   So the agreement as best you can recall
23  said what?
24    A.   That I --
25        MS. WILLIAMS:  Objection, sorry.
```

Page 262

```
 1        THE WITNESS:  -- was to withhold, divulging
 2  any information that I obtained from the quarterly
 3  refunding meetings, you know, until it was authorized
 4  for public release.
 5    BY MR. THEODOROU:
 6    Q.   Did the agreement define what embargo
 7  meant?
 8        MS. WILLIAMS:  Objection.
 9        THE WITNESS:  Not that I recall.
10        MR. STANCIL:  Make sure you -- wait for
11  him to finish the question, give her a chance --
12        MR. THEODOROU:  We have plenty of time,
13  don't worry about it.  Listen to the question and
14  then you can answer it.
15        BY MR. THEODOROU:
16        Do you remember the agreement defining
17  embargo?
18        MS. WILLIAMS:  Objection.
19        THE WITNESS:  I don't recall seeing the
20  word embargo in the agreement, there was no
21  definition section, there was -- I just don't recall
22  that much about the agreement.
23        BY MR. THEODOROU:
24    Q.   Were you the only party whose signature
25  appears in the agreement?
```

Page 263

```
 1    A.   Anderson signed it, I signed it and he had
 2  an assistant there who signed it as a witness.
 3    Q.   And do you remember who that assistant
 4  was?
 5    A.   No.
 6    Q.   How long did the meeting with Mr. Anderson
 7  last?
 8    A.   Ten minutes.
 9    Q.   Did you obtain a copy of the agreement
10  after you signed it?
11    A.   Yes.
12    Q.   After you got the agreement, what did you
13  do with it?
14    A.   Took it back to my office and filed it.
15    Q.   Was there a particular file that you put
16  it in?
17    A.   It was a file folder, it was -- years
18  later I discovered it wasn't even marked, it was just
19  a blank file folder sitting next to my quarterly
20  refunding file.
21    Q.   Did you ever show that agreement to
22  anybody else?
23    A.   No.
24    Q.   Did you discuss the contents of that
25  agreement with anybody else?
```

Page 264

```
 1    A.   No.
 2    Q.   So it's fair to say you never discussed
 3  the contents of that agreement with Mr. Nothern,
 4  correct?
 5    A.   Correct.
 6    Q.   Where was the agreement signed?
 7    A.   On the back, on the second page, bottom of
 8  the second page.
 9    Q.   Physically where were you when at the time
10  when you signed it?
11    A.   In Roger Anderson's office at the Treasury
12  Department.
13    Q.   Did you ever discuss the existence of the
14  agreement with anybody else?
15    A.   No.
16    Q.   So that it is fair to say you didn't
17  discusses the existence of that agreement with your
18  customers?
19    A.   No.
20    Q.   And you never discussed the existence of
21  the agreement with Mr. Nothern, correct?
22    A.   Correct.
23    Q.   Did you ever tell your customers what
24  embargo meant?
25    A.   No.
```

Peter Davis, Jr.

April 20, 2006

Washington, DC

Page 289

```
 1        BY MR. THEODOROU:
 2    Q.  So there were cases where reporters called
 3  in information to somebody before the embargo time
 4  expired?
 5    A.  For sure.
 6        MS. WILLIAMS:  Objection.
 7        THE WITNESS:  For sure.
 8        BY MR. THEODOROU:
 9    Q.  Did you ever discuss with Anderson at your
10  meeting the duration of the agreement, that is how
11  long it would last or allow you to do what you wanted
12  to do?
13        MS. WILLIAMS:  Objection.
14        THE WITNESS:  Never came up, it was
15  never -- it was never discussed.
16        BY MR. THEODOROU:
17    Q.  Based on your understanding of the
18  agreement, the agreement allowed you to share
19  information with others as long as they also honored
20  the embargo, correct?
21        MS. WILLIAMS:  Objection.
22        THE WITNESS:  That was -- yes.
23        BY MR. THEODOROU:
24    Q.  That was your understanding?
25    A.  Well, I was going to say that's what lead
```

Page 290

```
 1  me to -- disclosing information, starting in 1999 to
 2  Word McCarthy, because I knew he would keep the
 3  embargo.
 4    Q.  But you didn't review the terms of your
 5  agreement with your customers, correct?
 6    A.  Correct, that just never came up.
 7    Q.  Which included not reviewing what embargo
 8  meant?
 9    A.  Correct.  It was just something that was
10  never discussed.
11    Q.  Now, the agreement with Mr. Anderson, did
12  anyone else at Treasury know about that agreement?
13    A.  Well, I had no way of knowing whether they
14  knew it or not, all I knew is whether they let me
15  into the meetings.
16    Q.  I think you testified about this earlier,
17  you didn't tell anyone else about the agreement?
18        MS. WILLIAMS:  Objection.
19        THE WITNESS:  No.  That's correct.
20        BY MR. THEODOROU:
21    Q.  Now after you enter into this agreement
22  you started attending the refunding conferences?
23    A.  Meetings, yes.
24    Q.  And what process did you follow in order
25  to attend?
```

Page 291

```
 1    A.  On Monday of the meeting week, I would at
 2  some point on Monday call up Lulu Tyler or whoever
 3  was at that phone number and make sure that I was
 4  cleared in, that they had my full name, they had my
 5  birth date and Social Security number and so that
 6  when I showed up to the Treasury window on Tuesday
 7  for the Tuesday meeting and -- say I showed up at
 8  8:45 or 8:30 or whenever it was, that I would be on
 9  the computer, that the guard would give me a badge
10  and that I would be buzzed into the building to go
11  upstairs and attend the meeting.
12    Q.  Now, were you already in the computer when
13  you made the call?  In other words, when you called
14  Lulu, did she know to look you up and were in the
15  computer and already signed off to attend the meeting
16  or was it ad hoc, that is meeting by meeting?
17        MS. WILLIAMS:  Objection.
18        THE WITNESS:  Most of the time, she would
19  tell me that she had already put me in and my call
20  was just to guard against the possibility that
21  somehow she had forgotten or she was on vacation or
22  whatever, because once or twice my name wasn't on the
23  list and I was in the position of having to call up
24  to Paul Malvey's office and someone would actually
25  come down an get me.
```

Page 292

```
 1        BY MR. THEODOROU:
 2    Q.  When you say that she said you were
 3  already in the computer, what does that mean you were
 4  already in?
 5    A.  I took that to mean that she had entered a
 6  list of names, I don't know if mine was the only name
 7  on that list or not of authorized persons to get a
 8  badge to go to that meeting.
 9    Q.  And in 1994, what was Ms. Tyler's
10  position?
11    A.  I don't recall her title, I just knew her
12  as -- she was an assistant to either Mr. Malvey or
13  Mr. Anderson and she was the person who was my
14  contact for gaining authorization to attend the
15  meeting.
16    Q.  So you would call her on Monday?
17    A.  Right.
18    Q.  And then what would happen?
19    A.  I'd say, Hi, Lulu, it is Pete Davis, just
20  calling to make sure I'm on the computer to -- just
21  on the computer to gain authorization of the meeting
22  tomorrow.  And she'd say, you're all set.  And I'd
23  say, thanks, and that was it.
24    Q.  And then what happened?
25    A.  The next morning on Tuesday, I would
```

11 (Pages 289 to 292)

**EXHIBIT E**


**Cited Excerpts from the Deposition Transcript of Peter
Fisher
(Aug. 8, 2006)**

1

2

3

4          UNITED STATES DISTRICT COURT

5      FOR THE DISTRICT OF MASSACHUSETTS

6

UNITED STATES SECURITIES    )

7 AND EXCHANGE COMMISSION,    )

                             )

8              Plaintiff,    )

                             )

9         vs.               ) No. 05-10983

                             )      (NMG)

10 STEVEN E. NOTHERN,         )

                             )

11            Defendant.     )

   - - - - - - - - - - - - - - - - - - - - - - - - )

12

13

14              VIDEOTAPED

15      DEPOSITION OF PETER R. FISHER

16         New York, New York

17          August 8, 2006

18

19

20

21

22

23

24 Reported by:

   PAMELA J. MAZZELLA, RPR

25 JOB NO. 7046

Page 98

```
 1           Fisher
 2  made?
 3     A.  When I was subsequently informed of
 4  the extreme price swings that took place
 5  prior to 10 o'clock, I certainly was
 6  surprised.
 7     Q.  And that was notwithstanding the
 8  fact that you were expecting price
 9  volatility?
10     A.  Yes, I was expecting some price
11  volatility.  I did not anticipate it would be
12  prior to the announcement.
13     Q.  But you were expecting price
14  volatility after the announcement?
15     A.  Yes.
16     Q.  But you did see the price start to
17  jump up before you made the announcement?
18     A.  I don't believe I was in a position
19  to actually follow the market during that
20  time.  I may have been working on another
21  matter.
22     Q.  But it was brought to your
23  attention after the fact that that had
24  happened?
25     A.  Yes, it was brought to my attention
```

Page 100

```
 1           Fisher
 2  third floor of the Treasury building just
 3  outside of the Office of Domestic Finance.
 4     Q.  And do you know what that room is
 5  called within Treasury?
 6     A.  Secretary's Conference Room.  I
 7  don't recall.
 8     Q.  Are you aware of a room called the
 9  Diplomatic Reception Room?
10     A.  That sounds like the name of the
11  room.
12     Q.  And are you aware of another room
13  called the Secretary's Conference Room?
14     A.  That would be the matching one on
15  the far side.
16     Q.  Do you know whether or not the
17  Diplomatic Reception Room had been used for
18  the Quarterly Refunding Conference before?
19     A.  Prior to -- no, I don't.  As I say,
20  I never participated in, never attended a
21  press briefing for the quarterly refunding
22  before, so I have no knowledge of what rooms
23  it took place in.
24     Q.  So would it be fair to say you had
25  no involvement in the selection of which room
```

Page 99

```
 1           Fisher
 2  after the fact, yes.
 3     Q.  So let's just go to the lead up to
 4  that day to October 31.
 5        First of all, did you make any
 6  changes to how Quarterly Refunding
 7  Conferences had been handled in the past by
 8  the Treasury Department?
 9     A.  I don't recall doing so on that
10  occasion.
11     Q.  Do you recall there having been a
12  press release announcing that you would be
13  the person giving the presentation at the
14  Quarterly Refunding Conference?
15     A.  I don't recall that, no.
16     Q.  That wasn't anything that you had
17  commissioned?
18     A.  I don't recall.
19     Q.  Okay.  Now, what room was the press
20  conference held on October 31?
21        That's not a grammatical sentence.
22        What was the room that you used for
23  the press conference for the quarterly
24  refunding on October 31, 2001?
25     A.  There is a conference room on the
```

Page 101

```
 1           Fisher
 2  to use?
 3     A.  Yes, that's correct.
 4     Q.  Okay.  And --
 5     A.  I don't recall having any
 6  involvement in that.
 7     Q.  Okay.  And now prior to the
 8  Quarterly Refunding Conference actually
 9  taking place on October 31, did you have any
10  discussion with anyone, this is not just on
11  October 31, but any other time in the lead up
12  did you have any discussion with anyone in
13  Treasury about the embargo procedure?
14     A.  Yes.  I recall a conversation with
15  Michelle Davis, the assistant secretary for
16  public affairs, about my discomfort with the
17  use of an embargo, that I would have been
18  much more comfortable with making a direct
19  announcement either on the internet or
20  without that use of an embargo.
21     Q.  And why were you uncomfortable with
22  the use of an embargo?
23     A.  I thought the risk of a leak or
24  some malfunction, some procedural malfunction
25  was too high.
```

26 (Pages 98 to 101)

**EXHIBIT F**


**Cited Excerpts from the Deposition Transcript of Anthony
Fratto
(Aug. 30, 2006)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

-------------------------X

UNITED STATES SECURITIES :

AND EXCHANGE COMMISSION, :

Plaintiff, :

v. : Case No. 05-10983

STEVEN E. NOTHERN, :

Defendant. :

-------------------------X

Washington, D.C.

AUGUST 30, 2006

Videotaped deposition of ANTHONY FRATTO, a witness herein, called for examination by counsel for Defendant, in the above-entitled matter, pursuant to notice, the witness being sworn by Raymond Heer, a Notary Public in and for the District of Columbia, taken at the offices of Foley Hoag, Washington, D.C. on August 30, 2006, at 10:35 a.m. and the proceedings being taken down by stenotype by Desirae S. Jura, RPR, and transcribed under her direction.

Anthony Fratto

August 30, 2006

Washington, DC

Page 158

1  The catch room at the time, which is a horrible
2  place to try to do a press event, was -- still
3  wasn't opened yet, it was still under
4  reconstruction.  So it was the only room available
5  for a press conference of any size.
6      Q.  Was the May quarterly refunding conference
7  held in the diplomatic reception room?
8      A.  Yeah.  I'm pretty sure it was.
9      Q.  Was the August 2001 conference held in that
10  room?
11      A.  I can't recall that one.
12      Q.  Was the secretary's conference room ever
13  used?
14      A.  The secretary's conference room?  From time
15  to time for different press conferences, it was.
16  And there were -- you know, there were different,
17  it was used for different events.  Was it used for
18  a quarterly refunding press announcement?  I'm just
19  not sure.
20      Q.  You're not sure if the secretary's room was
21  used?
22      A.  No, it was.  Actually, the May 2nd event was

Page 159

1  in the -- actually, the May 2nd event was in the
2  large conference room.
3      Q.  The secretary's room is larger than the
4  diplomatic room?
5      A.  No.  They are fairly identical in size.
6  Maybe it's a little bit larger.  But the large
7  conference room is dominated by a massive
8  conference table.
9      Q.  So why was the diplomatic reception room,
10  Room 3311, used on October 31?
11      A.  It was just more -- it was available, and it
12  was -- it's easier to set it up as a press
13  conference.  If you ever want to hold a press
14  conference, a large conference room isn't a useful
15  room for a press conference.  It's got a large --
16  imagine this room three times as big, you know,
17  with a table in the middle.  It doesn't look like a
18  press conference.  You want the podium and
19  classroom seating.  And say you don't get that in a
20  large conference room, but you can set up the
21  diplomatic reception room for that kind of event.
22      Q.  Now, directing your attention to October

Page 160

1  31st, 2001.
2      A.  Um-hmm.
3      Q.  The conference that day started at 9:00?
4      A.  It started at 9:00 or shortly after 9:00,
5  yeah.
6      Q.  Was there anyone there from Treasury who had
7  the job of keeping people out of the conference
8  room?
9      MS. WILLIAMS:  Objection.
10      A.  I don't know if that job had been assigned
11  to anyone.  I have no knowledge of it was.  I don't
12  know if Betsy gave direction on that or not, but I
13  didn't give anyone direction on that.
14      BY MR. THEODOROU:
15      Q.  So, there was nobody -- you did not give
16  anybody any direction to prevent people from coming
17  in and out of the conference room?
18      A.  No.  Again, Treasury -- it's a different
19  building.  You know, if you follow the rules of the
20  building and you are a visitor to the Treasury
21  Building, you should be escorted by a Treasury
22  staffer, who would meet you at the entrance, take

Page 161

1  you where you need to be.  It's not -- and I'll
2  say, it's not that -- I'm sure there have been
3  cases where people conclude a meeting and file out
4  of the Treasury Building, you know, unescorted.
5  But, that's not -- but anyone who's walking through
6  the halls of the Treasury Building should have a
7  specific reason to be there.
8      Q.  Did you take any steps to keep people from
9  leaving the room once the conference started?
10      A.  No.
11      Q.  Were there any Treasury employees assigned
12  to keep people from leaving the room once the
13  conference started?
14      A.  No.
15      Q.  Did you take any steps from allowing -- did
16  you take any steps to prevent people from entering
17  the room once the conference started?
18      A.  No.
19      Q.  Do you know if any Treasury employees were
20  assigned the task of preventing people from
21  entering the room once the press conference
22  started?

41 (Pages 158 to 161)

Anthony Fratto

August 30, 2006

Washington, DC

---

Page 162

1    A. No. I can't think of a reason why we would
2 prevent people from entering the room.
3    Q. Did you take any steps to check the identity
4 of people who were in the room at the time of the
5 press conference?
6    A. No.
7    Q. Did you take any steps to check the press
8 credentials of people in the room at the time of
9 the press conference?
10    A. Well, if they have press — they couldn't
11 get into the Treasury Building without press
12 credentials. I mean, if they have a press
13 credential, check the press credential? No.
14    Q. Did you take any steps that day to determine
15 that only the press was attending the conference?
16    A. No.
17    Q. So what happened at the conference? What
18 time did it start?
19    A. It started at 9:00 or shortly after 9:00. I
20 walked into the press conference, into the
21 diplomatic reception room with Peter. I remember
22 Betsy was already in the room. We were about to —

---

Page 163

1 so Peter walked up to the podium. Betsy was about
2 to announce and then did announce that — she
3 introduced Peter, and then announced that there
4 would be a 10:00 embargo on the press conference.
5 I stood up off to the side. If you want to imagine
6 it, think of it very much like this room with two
7 doors.
8    Q. I'm going to have you draw it out.
9    A. Sure.
10    (Witness complying.)
11    BY MR. THEODOROU:
12    Q. So now let's mark that. That's going to be
13 marked as Exhibit 8. You are going to draw out as
14 best you can —
15    A. As best I can.
16    Q. I don't have a ruler — entitled The
17 Diplomatic Reception Room. Right?
18    A. Yep.
19    (FRATTO Exhibit Number 8 was marked for
20 identification.)
21    BY MR. THEODOROU:
22    Q. So if you could please mark the doors, the

---

Page 164

1 podium, and relevant hallways on that document.
2    A. Um-hmm. So here's the hallway. I will
3 just — this may be helpful also. Peter fisher's
4 office was right across the hall.
5    Q. Could you please mark —
6    A. Sure.
7    Q. — Mr. Fisher's office.
8    So when you say you came into the conference
9 room with Mr. Fisher, you entered into that door?
10 Could you mark that door as door A. And then mark
11 the other doors as B, C, and D.
12    All right. What else was in that room that
13 day?
14    A. So I've got a podium here.
15    Q. Could you mark that as podium.
16    A. And then I'm not going to get the number
17 right, but —
18    Q. And the Xs indicate chairs?
19    A. Chairs. This is — I couldn't tell you how
20 many, I'm not good at this kind of estimating, but
21 how many chairs are in the room. But I think this
22 is probably fairly representative. So what we

---

Page 165

1 would call, yeah, classroom style seating.
2    Q. Now, you entered with Mr. Fisher. And
3 approximately where were you during the press
4 conference?
5    A. Standing right here.
6    Q. By the door which is — if you'd indicate
7 with your last name where you were.
8    A. Sure.
9    Q. So your back was to door B?
10    A. Near door A. My back was to — well.
11    Q. You would have been facing the podium?
12    A. I would have been facing the podium, and
13 then the reporters here.
14    Q. And where was Ms. Holahan?
15    A. I think Betsy was right next to me, but I
16 don't remember specifically.
17    MS. WILLIAMS: At what point?
18    BY MR. THEODOROU:
19    Q. To the best of your knowledge.
20    MS. WILLIAMS: At what point?
21    A. When we walked in, Betsy was here. And this
22 is —

---

42 (Pages 162 to 165)

## Page 234

1  de-link press conference from the release of the
2  statements. So we released the statement first in
3  the Treasury pressroom, and then the press
4  conference is held an hour later. So the statement
5  is down in the Treasury pressroom for release at
6  9:00 a.m., and the press conference is held at
7  10:00.
8      Q. Any other changes?
9      A. We try to keep a closer watch on who's in
10  our press conferences, although it's not quite as
11  important at that time since the news has already
12  been released. But we keep a tighter rein on all
13  of our press conferences.
14     Q. Was there any change in whether the
15  attendees were to be press members or members of
16  the public?
17     A. They can be members -- basically, the Office
18  of Public Affairs has complete authority on who
19  attends a press conference. So even if policy
20  staff within Treasury, if general counsel wants to
21  attend a press conference, they need to ask our
22  permission.

## Page 235

1      (FRATTO Exhibit Number 17 was marked for
2  identification.)
3      BY MR. THEODOROU:
4      Q. Mr. Fratto, let me show you what's been
5  marked as Exhibit 17. Do you see that?
6      A. I do.
7      Q. Have you seen that document before?
8      A. Yes.
9      Q. And what is it?
10     A. It's our statement on procedures for
11  quarterly refunding announcements.
12     Q. And when did this set of procedures go into
13  effect?
14     A. January 30th of 2002.
15     Q. Now, according to this, if you look at the
16  second paragraph, it says, "Starting with the next
17  scheduled refunding announcement on January 30,
18  2002, Treasury's Office of Public Affairs will post
19  the announcement on the Treasury Web site at 9:00
20  a.m." Do you see that?
21     A. Yes.
22     Q. So the announcement, does that mean that the

## Page 236

1  announcement goes public -- the announcement of the
2  conference goes on the Web site. Correct?
3      MS. WILLIAMS: Objection.
4      A. It's saying we will post the announcement.
5  The announcement, meaning the statement of the
6  quarterly refunding --
7      BY MR. THEODOROU:
8      Q. That it's going to take place?
9      MS. WILLIAMS: Objection.
10     A. No. That's referring to the statement. To
11  the news.
12     BY MR. THEODOROU:
13     Q. The statement would go out at 9:00. So it
14  goes public at 9:00?
15     A. That's exactly right.
16     Q. And the announcement also will be delivered
17  to credentialed members of the media in the
18  Treasury pressroom shortly before 9:00 a.m. with
19  lockdown embargo rules.
20     Correct?
21     A. Correct.
22     Q. So the difference between this and the

## Page 237

1  procedures that govern the prior conferences was
2  the announced -- you set a time at which the
3  announcement will go out. Right?
4      A. Yes.
5      MS. WILLIAMS: Objection.
6      A. Oh, I'm sorry. We set a time. In both
7  cases, we're setting a time.
8      BY MR. THEODOROU:
9      Q. But in this case, you said that the
10  announcement, beginning on January 30, 2002, would
11  go out at 9:00 a.m. Correct?
12     A. Yes.
13     Q. That announcement would also be delivered to
14  credentialed members of the media in the Treasury
15  pressroom shortly before 9:00 a.m. Correct?
16     A. Correct.
17     Q. It also says with lockdown embargo rules.
18  Do you see that?
19     A. Yes.
20     Q. And what did that mean?
21     A. That means that when we deliver the
22  documents to the Treasury pressroom, that they

Alderson Reporting Company
1-800-FOR-DEPO

Page 238

1  cannot leave the pressroom.
2      Q. And there were no lockdown rules in effect
3  before January 30th, 2002. Correct?
4      A. That's correct.
5      Q. And it says, "The traditional practice of
6  releasing the quarterly refunding announcement at a
7  news conference will be discontinued."
8         Do you see that?
9      A. Yes.
10     Q. That meant that there would no longer --
11  does that mean that there would no longer be a news
12  conference?
13     A. No. It just meant that the release of the
14  statement and the news conference wouldn't be
15  de-linked. That the events, they wouldn't occur in
16  the same event.
17     Q. So the statement, in contrast to October
18  31st where a statement was released there and given
19  to members of the media --
20     A. And all previous quarterly refunding
21  announcements, that I'm aware of.
22     Q. Beginning on January 30, 2002, it would not

Page 239

1  be released to them at the press conference?
2      A. That's right. They would have had it
3  already.
4      Q. Now, under these new policies, are reporters
5  allowed to make telephone calls before 9:00 a.m.?
6      A. You mean before 9:00 a.m. after receiving
7  the document?
8      Q. Yes.
9      A. It depends on who they call.
10     Q. But it doesn't state in here who they can
11  call. Does it?
12     A. No. That would be -- the rules of an
13  embargo are the rules of an embargo.
14     Q. But are they allowed to call someone?
15     A. Who?
16     Q. Before 9:00 a.m.?
17     A. Who? It depends on who they may decide to
18  call. Can they call a member of the general
19  public? No. Can they call their editor? Yes.
20     Q. And have you instructed members of the press
21  that they can only call their editors?
22         MS. WILLIAMS: Objection.

Page 240

1      A. No. It's not necessary.
2         BY MR. THEODOROU:
3      Q. Can they call anybody else besides their
4  editors at the media outlets?
5      A. They can call members of their news
6  organization. They can talk to each other.
7      Q. So they can call anybody at their news
8  organization?
9      A. They can call anyone at their news
10  organization.
11     Q. When it says shortly before 9:00 a.m., what
12  does that mean?
13     A. That's purposefully ambiguous. It could be
14  five minutes before, it could be 15 minutes before.
15  We can decide.
16     Q. And it's Treasury who decides this.
17  Correct?
18     A. Yes.
19     Q. Not the press?
20     A. No.
21     Q. Now, have you taken the discretion away from
22  the press with these new procedures?

Page 241

1         MS. WILLIAMS: Objection.
2      A. We've give the press exceptional discretion
3  in setting embargoes. If you are asking about this
4  specific case?
5         BY MR. THEODOROU:
6      Q. Yes.
7      A. I would say we maintain control of the
8  discretion as we have the discretion in October.
9      Q. Well, in the case of quarterly refunding
10  conferences, the press is no longer polled about
11  what time the embargo or how long the embargo
12  should be. Correct?
13     A. The embargo is pre-set. The embargo is 9:00
14  a.m. The question of how long they have the
15  document before the embargo, that's completely at
16  our discretion.
17     Q. Now, under the new procedures, does an
18  employee of Public Affairs explain the embargo
19  policy when the press conference takes place at the
20  quarterly refunding conferences?
21     A. No. Not that I'm aware of.
22     Q. Does anybody from the Office of Public

61 (Pages 238 to 241)

**EXHIBIT G**


**Cited Excerpts from the Deposition Transcript of David Harris**
**(July 25, 2006)**

David Harris
Tampa, FL
July 25, 2006

Page 1

1                  UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4      - - - - - - - - - - - - - x

5    UNITED STATES SECURITIES        :

6    AND EXCHANGE COMMISSION,        :

7              Plaintiff,            : C.A. 05-10983 (NMG)

8    vs.                             :

9    STEVEN E. NOTHERN,              :

10             Defendant.            :

11     - - - - - - - - - - - - - x

12

13

14        VIDEOTAPED DEPOSITION OF DAVID HARRIS

15

16

17                        Reported by:

18

19             Linda C. Mead, CSR, CCR

20             Tampa, FL

21             Tuesday, July 25, 2006

22

23

24

25

## Page 66

1   Q   Okay.
2   A   So there would have been no clerical
3 errors through there.
4   Q   Okay. Let's go through your -- the
5 information you have on your entry at 12:40 and 11
6 seconds. You say, The file has a timestamp of on
7 the production server RWRR. What does that mean?
8   A   Okay. This file -- This information was
9 gathered from the production machine. That first
10 field, RWRR, is the file permissions. What that
11 tells us is who has -- who has access to that file,
12 whether it's read, write, execute, which are
13 standard Unix permissions.
14   Q   What does that -- What does that mean?
15   A   Okay. This means that the world basically
16 has read access to the file and the owner has the
17 ability to read and write or make changes to the
18 file.
19   Q   Then there's a 1UST press treas. What
20 does that -- Actually I guess it's 1 space UST press
21 space. What does that 1 mean?
22   A   The 1 I have no idea.
23   Q   What does UST press mean?
24   A   That would have been the user name that
25 owned that file.

## Page 67

1   Q   And treas, t-r-e-a-s?
2   A   Would have been the group that owned that
3 file.
4   Q   What does 9175 indicate?
5   A   That is the size of the file in bytes.
6   Q   October 31, what is that?
7   A   That is the date that that file was last
8 changed.
9   Q   And then there's a date there at 9:40.
10 What does that mean?
11   A   That would have been 9:40 a.m. And that
12 would have been when the file was last changed.
13   Q   How do you know that's 9:40 a.m.?
14   A   It would have been on 24-hour time.
15   Q   Military time?
16   A   That's correct.
17   Q   And then PO749 dot HTM. What does that
18 mean?
19   A   That is the name of the file.
20   Q   That's the file that the treasury was
21 asking you when did it go from staging to
22 production?
23   A   That's correct.
24   Q   Now, what does that time 9:40 mean?
25   A   That means when the file was last changed.

## Page 68

1 When a file is changed into Unix, it records when
2 that file -- the time and date when that file was
3 last edited.
4   Q   When it was last edited?
5   A   Edited. Changed.
6   Q   So in terms of the process going from
7 desktop to staging, staging to production, what
8 would that mean?
9   A   The way that the -- our -- the WorldCom
10 Solaris product worked is when a file was uploaded
11 from their desktop to the staging machine it got a
12 timestamp. And then when that file was pushed from
13 staging to production using CMS it would have
14 preserved that timestamp that was on the staging
15 machine.
16   So in this case it would have meant that
17 file was moved from their desktop to the staging
18 machine on October 31st at 9:40 a.m.
19   Q   Now, you say that's a -- it's an actual
20 timestamp that's put on the file?
21   A   That's correct.
22   Q   All right. And you're saying that that
23 9:40 represents when it went from the desktop to the
24 staging server?
25   A   That's correct. That is the time that the

## Page 69

1 staging server reports.
2   Q   And the source of this information, this
3 UST press, the 9175, the date and the time of 9:40
4 and then the file name PO749, what was the source of
5 that?
6   A   That was from the production server
7 itself. The operating system reported that as the
8 time, date, name and server of the owner and the
9 file permissions.
10   Q   And you cut and pasted that information
11 from the production server to the -- to your ticket
12 here?
13   A   That's correct.
14   Q   And the reason why this 9:40 is listed on
15 the production server because that -- You get a
16 timestamp. When you go from desktop to staging, you
17 get a timestamp. In this case it was 9:40, correct?
18   A   That's correct.
19   Q   And then when it's pushed from the pro --
20 staging server to the production server, it
21 preserves that timestamp, that original timestamp?
22   A   That's correct.
23   Q   You say on page two, it says, This matches
24 the timestamp of the file on the staging server when
25 it was pushed using CMS. What does that mean?

18 (Pages 66 to 69)

David Harris

July 25, 2006

Tampa, FL

Page 86

1    questions and I'll be finished and Mr. Toone can ask
2    you some questions.
3            With regard to when information is on the
4    staging server, are you aware of any searches that
5    you can do on Google, Yahoo, whatever, that would
6    get you to information that would be on the staging
7    server?
8            MR. TOONE:  Objection.
9            THE DEPONENT:  It's possible that they
10    might.  Like I said, I'm not exactly sure how
11    they go about building their searching database
12    to do stuff, but it's possible that they could.
13    I doubt it, but it's possible.
14    BY MR. ROSSETTI:
15    Q    Why do you doubt it?
16    A    I think most of the time those sites work
17    by gathering what people already view and then
18    indexing that and then making it easier to search
19    from there.  For the most part people who would be
20    visiting the staging machine would only be people
21    who would be involved in the development of the
22    server.
23            MR. ROSSETTI:  Okay.  Mr. Harris, I don't
24    have any further questions for you.  Mr. Toone
25    will ask you questions, and then based on his

Page 87

1    questioning I might have some further
2    clarifying questions for you.
3            THE DEPONENT:  All right.
4            EXAMINATION
5    BY MR. TOONE:
6    Q    Are you okay with going ahead or would you
7    like to take a break?
8    A    Oh, no.  I'm good right now.
9    Q    Okay.  Well, let me know if you want to
10    take a break, because we've been going for awhile.
11    A    Okay.
12    Q    First of all, thank you very much for
13    coming today and testifying.  And my knowledge of
14    computer technology is not very well advanced, so I
15    apologize if I repeat or ask questions that you may
16    have already covered with Mr. Rossetti, but I just
17    want to make sure my understanding is clear.  Okay?
18    A    Okay.
19    Q    What exactly is an IP address?
20    A    IP address is what the internet uses to
21    designate a server or a device on the internet.
22    It's a method for identifying where something is.
23    So the -- So each server would have at least one IP
24    address on it where anybody who wants to find
25    something would go to it, and devices would also

Page 88

1    have an IP address, routers, gateways, whatever,
2    which is a method of identifying each individual
3    piece of hardware.
4    Q    So is an IP address a location on the
5    internet?
6    A    It's a location of a piece of device.  It
7    doesn't necessarily have to be on the internet.
8    Every network device that exists that uses TCPIP has
9    an IP address.  It could be --
10            For instance, a home network, each device
11    in a home network would also have an IP address.  It
12    may not be accessible to the entire internet itself,
13    but anything that runs TCPIP as a network would have
14    an IP address.
15    Q    Well, how do you know if an IP address is
16    accessible by the internet?
17    A    You would know by -- There are certain IP
18    addresses that are not routable to the internet.
19    There are some that are firewalled that are not
20    accessible by the internet.
21            For instance, if you own a company you --
22    and you want to have internet access for all your
23    employees but you don't want the internet to be able
24    to connect to servers inside your company, you would
25    block that access from the outside in.  You can do

Page 89

1    that.
2    Q    Can you tell by looking at an IP address
3    whether or not it is available on the internet?
4    A    Some of them you can.  Some you can't.
5    Q    How can you tell those that you can --
6    that you know are available on the internet, how can
7    you tell?
8    A    They have a specific network range that
9    are called non-routable IP addresses that you know
10    are not accessible.
11    Q    Okay.  Now, looking at Exhibit 3 at the
12    first page there are 10 IP addresses listed on the
13    first page.  Can you tell by looking at those IP
14    addresses whether or not they're available on the
15    internet?
16    A    They are all available.
17    Q    They are.  And how do you know that?
18    A    Because they are all routable IP
19    addresses.
20    Q    And can you just explain what -- what in
21    those IP addresses tells you that those -- that they
22    are available on the internet?
23    A    The first -- The first set of numbers, the
24    208, is all you really need to know.
25    Q    What does that tell you?

23 (Pages 86 to 89)

## Page 90

1    A   It tells us that it's not in that list of
2  IP addresses that's public, that's private.
3    Q   Okay.  Now, a file that is moved to one of
4  these IP addresses that is available on the
5  internet, does that mean that that document -- that
6  file, excuse me, is available at a particular
7  internet location?
8    A   That's correct.  On the web.  Because
9  we're all dealing with web servers for all this
10  stuff.
11    Q   Right.  Can you just explain what that
12  distinction means.
13    A   The whole -- Using like Internet Explorer,
14  Netscape, whatnot, to view a serve -- view a web
15  page is a method of accessing files on the internet.
16  It's one specific program I guess basically using
17  html and stuff.
18      There are different parts of the internet
19  that most people don't deal with that don't involve
20  web pages.  Because we did nothing but web pages --
21  well, mostly web pages here, all this stuff would
22  have been dealing with web pages.
23    Q   Okay.  That's helpful.  Thank you.
24      Now, in November 2001 you worked for
25  WorldCom, correct?

## Page 91

1    A   I believe it was WorldCom, yeah.
2    Q   And you didn't work for the treasury
3  department directly?
4    A   No.
5    Q   Okay.  Did you have any experience in
6  setting up either the production machine or the
7  staging machine used by treasury?
8    A   I may have done some initial setups.  I
9  don't recall at that time.
10    Q   Okay.  Do you recall now having worked on
11  any of the setups?
12    A   Actually physically setting them up?
13    Q   Yes.
14    A   I don't know.
15    Q   Do you have any specific knowledge as to
16  where exactly the IP address is listed on --
17  under -- on Exhibit 3, page 1, the five IP addresses
18  listed under host location 1 colon STAG dash 13A?
19  Do you have any direct recollection working on those
20  particular IP addresses?
21      MR. ROSSETTI:  I'm sorry.  What was the
22  question?
23  BY MR. TOONE:
24    Q   The question -- Well, let me --
25      Do you understand the question?

## Page 92

1    A   I'm get -- I'm thinking you're asking me
2  if I've -- if I recall actually working on any of
3  those specific IP addresses.
4    Q   That is my question, yes.
5    A   Specifically no.
6    Q   Do you have any knowledge as to who had
7  access to any of those five IP addresses?
8    A   It would have been -- Specifically it
9  would have been any of the people listed under
10  technical contacts.  Whether or not they actually
11  excess -- accessed them, I don't know.
12    Q   Okay.
13    A   We know the IP address they came from and
14  the user name and password -- well, user name they
15  used.  Which individual person did all that we don't
16  know.
17    Q   Okay.  So you're pointing to on page 1 of
18  Exhibit 3 the technical contacts; Brad Green,
19  Jeffrey West, Tim Clapin.  Are those the contacts
20  that you're referring to?
21    A   That's correct.
22    Q   And your testimony is that you believe
23  that those people had access to the IP addresses
24  associated with the staging server?
25    A   They would have, yes.

## Page 93

1    Q   Okay.  Do you know who else did or did not
2  have access to those IP addresses?
3    A   No, I don't.  We know that -- We know that
4  they were given a specific IP address and a user
5  name and password.  Whether the customer had a
6  development team of more than 3 people or 20 people
7  we don't know.
8    Q   Do you know anything about whether
9  treasury had procedures to keep these IP addresses
10  from being known to other people?
11    A   I don't know.
12    Q   And just to clarify what I believe you
13  testified to earlier, a document that is FTP'd -- Is
14  that a proper term FTP'd?
15    A   That's correct.
16    Q   -- from a desktop to this staging server,
17  that document is placed on the internet; is that
18  correct?
19    A   That's correct.
20    Q   So looking on page 2 of Exhibit 3, the
21  second line down, the file was FTP'd to the staging
22  server at 9:40 colon 23 a.m. on October 31st -- Did
23  I read that correctly?
24    A   That's correct.
25    Q   That sentence means that the file in

24 (Pages 90 to 93)

David Harris                                                                                          July 25, 2006

Tampa, FL

Page 94

1    question was moved to the internet at that time?
2        MR. ROSSETTI: Objection.
3        THE DEPONENT: On the staging server,
4    that's correct.
5    BY MR. TOONE:
6        Q    But in being moved to the staging server
7    it was placed on the internet; is that correct?
8        A    Yes.
9        Q    Let me just back up a little bit. Do you
10   read computer magazines or other periodicals?
11       A    Yes.
12       Q    Which ones do you read?
13       A    Oh, God. There are so many.
14       Q    Can you just list some that you tend --
15   that you typically read.
16       A    There's The Wired magazine. Computer
17   Shopper. Slash Dot's a website of computer
18   articles. There's several of them. Some of the
19   ones I can think of off the top of my head.
20       Q    Okay. Great.
21            And why do you read those publications?
22       A    Basically to -- entertainment and to keep
23   up with what's going on.
24       Q    Right. Right. To keep yourself current
25   with current developments and information

Page 95

1    technology?
2        A    That's correct.
3        Q    What did you do to prepare for this
4    deposition?
5        A    I spoke with Mr. Rossetti on the phone
6    going over the contents of this ticket.
7        Q    And you're referring to Exhibit 3?
8        A    Yes.
9        Q    Sorry. I need to do that for the record.
10       A    That's fine. Yes.
11       Q    When did you speak with Mr. Rossetti?
12       A    I don't know the exact times and dates.
13       Q    Approximately how long ago did you first
14   speak with Mr. Rossetti?
15       A    Maybe a month ago I guess. I don't have
16   the dates and times listed on me.
17       Q    That's fine. Did you speak with him by
18   telephone?
19       A    That's correct.
20       Q    And how long did you speak with
21   Mr. Rossetti for?
22       A    The first time I believe may have been two
23   hours, three hours. I don't recall.
24       Q    Two or three hours?
25       A    Something like that.

Page 96

1        Q    And what did Mr. Rossetti tell you he was
2    calling in regards to?
3        A    The contents of this ticket. He said that
4    there was some investigation going on about what was
5    going on back then.
6        Q    Did he explain to you how this ticket was
7    relevant to the investigation?
8        A    He may have. I don't recall.
9        Q    What knowledge do you have now about this
10   case?
11       A    I -- Basically from my understanding there
12   was -- that around this time frame that the treasury
13   department was -- excuse me, was making some kind of
14   notification they weren't going to be issuing the
15   30-year bond or something, and that this went out
16   early before it was supposed to. Something around
17   that effect. I don't know too many details.
18       Q    Anything else that you recall?
19       A    No, not really.
20       Q    And is that information based on your
21   conversation with Mr. Rossetti?
22       A    I don't know. It could have been
23   knowledge from what was happening back then. It
24   could have been from calls. I don't know where that
25   came from. It's floating around in here somewhere.

Page 97

1        Q    Now, you said you spoke with Mr. Rossetti
2    approximately maybe a month ago; is that correct?
3        A    I'm guessing, yeah.
4        Q    Okay. Did you speak with him again since
5    then?
6        A    Yes.
7        Q    When do you last -- When did you speak
8    with him next, sir?
9        A    I don't recall. Actually thinking back,
10   the first time might have been like two or three
11   months ago, and then another time maybe a month ago
12   when we were going over this again and setting up a
13   deposition date.
14       Q    And on both occasions you reviewed
15   Exhibit 3, the ticket?
16       A    I think so. I don't know if we did it
17   when we actually set the date up.
18       Q    How did you have a copy of the ticket
19   during these phone calls?
20       A    It was e-mailed to me by Mr. Rossetti.
21       Q    Do you recall when he e-mailed the ticket
22   to you?
23       A    It would have been the first time we
24   talked.
25       Q    Had you seen the ticket before

25  (Pages 94 to 97)

# EXHIBIT H

## Cited Excerpts from the Deposition Transcript of Elizabeth Holahan
## (Aug. 23, 2006)

Page 1

1            UNITED STATES DISTRICT COURT

2            DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - )

4    UNITED STATES SECURITIES AND      )

5    EXCHANGE COMMISSION,             )

6              Plaintiff,            )

7          ·v.                      ) No. 05-10983 (NMG)

8    STEVEN E. NOTHERN,               ) August 23, 2006

9              Defendant.            )

10   - - - - - - - - - - - - - - )

11                        Washington, D.C.

12   Videotape Deposition of ELIZABETH HOLAHAN SCHMUTZ, a

13   witness herein, called for examination by counsel for

14   Defendant in the above-entitled matter, the witness

15   being duly sworn by CHERYL A. LORD, a Notary Public

16   in and for the District of Columbia, taken at the

17   offices of FOLEY HOAG LLP, 1875 K Street, N.W., Suite

18   800, Washington, D.C., at 10:16 a.m., Wednesday,

19   August 23, 2006, and the proceedings being taken down

20   by Stenotype by CHERYL A. LORD, RPR, CRR, and

21   transcribed under her direction.

22

' Elizabeth Schmutz                                                      August 23, 2006
Washington, DC

| Page 62 |
|---|
| 1    Q.   Turning your attention -- directing your |
| 2   attention to October 31, 2001, the refunding |
| 3   conference, did you address the attendees? |
| 4    A.   Yes. |
| 5    Q.   What did you say? |
| 6    A.   I informed the attendees of the press |
| 7   conference that there would be an embargo in place |
| 8   until 10 AM. |
| 9    Q.   Did you tell them what embargo meant? |
| 10    A.   I did not. |
| 11    Q.   Were you aware that there were attendees |
| 12   who were not members of the press at that conference? |
| 13    A.   I was not aware of attendees at the press |
| 14   conference not being members of the press or the |
| 15   Treasury Department. |
| 16    Q.   How long did you speak to the audience? |
| 17    A.   A few seconds. |
| 18    Q.   A few seconds? |
| 19    A.   A few seconds. |
| 20    Q.   About what time did you address them? |
| 21    A.   Approximately 9 AM before the press |
| 22   conference began. |

| Page 64 |
|---|
| 1    MR. THEODOROU:   During the time that she |
| 2   was there from October -- she started in August -- |
| 3    MS. WILLIAMS:   August. |
| 4    MR. THEODOROU:   -- to her knowledge before |
| 5   October 31st, 2001. |
| 6    BY MR. THEODOROU: |
| 7    Q.   To your knowledge, did Treasury ever |
| 8   obtain the consent of the attendees to abide by |
| 9   the -- by an embargo? |
| 10    A.   To my knowledge, no. |
| 11    Q.   All right.  Did you obtain a consent from |
| 12   anybody who attended the October 31, 2001, refunding |
| 13   conference to abide by the embargo? |
| 14    A.   No. |
| 15    Q.   Did you ask any of the attendees to |
| 16   express their consent to the terms of the embargo? |
| 17    A.   No. |
| 18    Q.   So you simply told them an embargo time |
| 19   and assumed that they would honor it? |
| 20    MS. WILLIAMS:   Objection. |
| 21    A.   I told members of the media the ground |
| 22   rules for the press conference. |

| Page 63 |
|---|
| 1    Q.   As best you can recall, could you please |
| 2   tell us what you said. |
| 3    A.   I said, approximately something along the |
| 4   lines of, this information is embargoed until 10 AM. |
| 5    I reannounced -- I reannounced that at the |
| 6   end of the press conference. |
| 7    Q.   And about what time was that? |
| 8    A.   9:25 AM. |
| 9    Q.   When you addressed them at about 9 AM, you |
| 10   did not tell them what the embargo meant. |
| 11    Correct? |
| 12    A.   Correct. |
| 13    Q.   When you readdressed them at 9:25 AM, did |
| 14   you tell them what embargo meant? |
| 15    A.   No. |
| 16    Q.   Do you know before October 31, 2001, if |
| 17   Treasury ever obtained the consent of the attendees |
| 18   at quarterly refunding conferences to abide by |
| 19   embargoes? |
| 20    MS. WILLIAMS:   Objection. |
| 21    And just to clarify, back to the beginning |
| 22   of time, or -- |

| Page 65 |
|---|
| 1    BY MR. THEODOROU: |
| 2    Q.   And those ground rules were what? |
| 3    A.   There was an embargo in place until 10 AM. |
| 4    MR. THEODOROU:   I have an exhibit. |
| 5    (Holahan Exhibit No. 1 |
| 6    was marked for |
| 7    identification.) |
| 8    BY MR. THEODOROU: |
| 9    Q.   All right.  Ms. Holahan, I'm showing you |
| 10   what's been marked as exhibit 1. |
| 11    Do you see that? |
| 12    A.   I do see it. |
| 13    Q.   Do you recognize that document? |
| 14    A.   I do recognize it. |
| 15    Q.   And what is it? |
| 16    A.   It's a summary of an interview that I gave |
| 17   on November 7th, 2001. |
| 18    Q.   And you've seen that document before. |
| 19    Correct? |
| 20    A.   Correct. |
| 21    Q.   When did you see it the first time? |
| 22    A.   When I met with the attorneys from the |

17  (Pages 62 to 65)

Elizabeth Schmutz                                        August 23, 2006
                        Washington, DC

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  Securities and Exchange Commission and the Treasury
2  Department this past spring.
3      Q.   And most recently, when did you see it?
4      A.   Yesterday.
5      Q.   And you reviewed it.
6          Correct?
7      A.   I reviewed it at both of those meetings,
8  yes.
9      Q.   All right.  Now, if you -- since you've
10  reviewed it, if you want to take your time and look
11  at it again, because I'm going to be asking you some
12  questions, you can take the time to look at it.
13          (Pause.)
14          BY MR. THEODOROU:
15      Q.   Do you see it?
16      A.   I see it.
17      Q.   All right.  And you recall being
18  interviewed by officials from the SEC and the
19  Treasury Department inspector general's office in
20  2001.
21          Correct?
22      A.   Correct.

**Page 68**

1      Q.   All right.  And what did you tell them
2  about the honor system?
3      A.   I explained that there's an agreement
4  between the office of public affairs and the
5  reporters that we will give them information in
6  advance of the event to help them write their
7  stories, we will not post the item on the Web site
8  until the agreed-upon time, the embargo time, and
9  that then they are to hold their stories until said
10  time, and then release them at the same time, so if
11  that agreement is not honored, then we will not give
12  them the privilege of having the information in
13  advance.
14      Q.   You remember talking about an agreement
15  with the reporters?
16      A.   I don't recall my exact words.
17      Q.   Did you are tell reporters what would
18  happen to them if the embargo was not honored?
19      A.   When?
20      Q.   At the conference, the press conference --
21      A.   No, I did not.
22      Q.   -- when you spoke on October 31st?

| Page 67 | Page 69 |
|---|---|

**Page 67**

1      Q.   Now, during the interview, you told the
2  SEC and the OIG from the Department of the Treasury
3  that reporters were governed by the honor system not
4  to release the information before the embargo time.
5          Do you remember saying that?
6          MS. WILLIAMS:  Objection.
7          MR. ROSSETTI:  Which page are you on?
8          Which page are you on, Nick?
9          MR. THEODOROU:  I would quote it.
10          BY MR. THEODOROU:
11      Q.   Page 2, the end of the first paragraph:
12  She added that she gave -- all right? -- the ground
13  rules and that the reporters are governed by the
14  honor system to not release the information prior to
15  the embargo time.
16          Correct?
17      A.   I do recall describing that to the
18  interviewers at that day.
19      Q.   Okay.  So by looking at this document, it
20  refreshes your recollection about some additional
21  details about what you said that day?
22      A.   Yes.

**Page 69**

1      A.   No.
2      Q.   Now, you didn't obtain any consents from
3  them to honor the embargo.
4          Correct?
5      A.   Correct.
6      Q.   You simply spoke about the embargo time?
7      A.   Correct.
8      Q.   Now, you testified earlier you addressed
9  the reporters twice.
10      A.   That is what --
11      Q.   Right?
12      A.   -- I recall today, yes.
13      Q.   Now, you testified -- not "testified," but
14  when you were interviewed, you said you addressed
15  them 3 times.
16      A.   Correct.
17      Q.   Does this refresh your recollection as to
18  talking to them a third time?
19      A.   Sitting here today --
20      Q.   Exhibit 1?
21      A.   -- I do not recall addressing them the
22  third time before the question-and-answer period.

18 (Pages 66 to 69)

Elizabeth Schmutz                                    August 23, 2006

Washington, DC

## Page 106

1  until 10 AM.
2  Q.   Yeah, a news embargo.
3       And it applies to whom?
4  A.   The members of the media who are being
5  invited to attend the press conference.
6  Q.   Now, again directing your attention to
7  October 31, 2001, who was allowed to attend the
8  quarterly refunding conferences?
9  A.   Are you referring to the press conference?
10  Q.  Yes.
11      When I say, refunding conference, I mean,
12  press conference also.
13  MR. ROSSETTI:  Just for your
14  clarification, there's --
15  MR. THEODOROU:  I know there's --
16  MR. ROSSETTI:  -- a 3-day thing.
17  BY MR. THEODOROU:
18  Q.   I'm talking about the actual October 31st,
19  9 AM conference.
20       Who is allowed to attend that conference,
21  the refunding --
22  A.   Members of the media are invited to

## Page 107

1  attend.
2  Q.   Is anyone else invited?
3  A.   Not to my knowledge.
4  Q.   To your knowledge, were private business
5  consultants ever allowed to attend those conferences?
6  MS. WILLIAMS:  Objection.
7  A.   The office of public affairs which hosted
8  the news conference did not invite anyone except for
9  the media.
10  BY MR. THEODOROU:
11  Q.   Well, who at Treasury was responsible for
12  deciding who could attend the press conferences?
13  A.   News conferences were open to all members
14  of the media.
15  Q.   Did anyone else have the authority to
16  allow others outside of the media to attend the
17  conferences?
18  A.   I'm not aware of anyone having that
19  authority.
20  Q.   And who at the office of public affairs
21  was in charge of determining who could attend the
22  conferences?

## Page 108

1  A.   As I just said, news events hosted by the
2  office of public affairs were open to all
3  credentialed news media.
4  Q.   And what was the process in obtaining
5  credentials?
6       In other words, if I wanted to attend the
7  press conference, what would I be required to do?
8  A.   I'm speculating here, but if you called
9  the office of public affairs and wanted to attend an
10  event, you would be asked, what media outlet are you
11  associated with.
12      If you did not have a media outlet, you
13  would be told you could not attend.
14  Q.   What do you mean by, a media outlet?
15  A.   Do you write for a newspaper, do you have
16  a radio program, do you have a television program.
17  Q.   And did the office of public affairs look
18  for some kind of proof that the person was actually
19  from a newspaper, radio program, or television
20  station?
21  A.   In order to be cleared into the building,
22  you have to present your -- you have to give your

## Page 109

1  Social Security number, your date of birth, your full
2  name, and your media organization name to Frances
3  Anderson, and she will then relay that information to
4  the Secret Service, and they will do a quick
5  background check on you, cursory, and then you will
6  be put on a list and you will be admitted to the
7  building.
8  Q.   And to your knowledge, was this the
9  procedure in effect in October 2001?
10  A.   Yes, it was.
11  Q.   Did the Department of the Treasury have
12  official written policies on who could and could not
13  attend quarterly refunding press conferences?
14  A.   Not to my knowledge.
15  Q.   Directing your attention again to exhibit
16  1, which was your recorded memorandum of interview
17       Look at the bottom paragraph, the last
18  paragraph.
19       It says:  Holahan said she did not know
20  Peter Davis and only heard his name after the fact.
21  She did not clear him into the press conference.
22       Do you see that?

28 (Pages 106 to 109)

'Elizabeth Schmutz                                                      August 23, 2006
Washington, DC

| Page 126 | Page 128 |
|---|---|
| 1    A.   It's a reasonable assumption to make that | 1    Q.   Okay.  And is that your recollection |
| 2  Tera would have not allowed them to leave once the | 2  today? |
| 3  press conference was under way and the information | 3    A.   Yes. |
| 4  was being disseminated. | 4    Q.   All right.  Is it that no one left the |
| 5    Q.   But do you recall charging her with the | 5  room, or you do not recall -- or you did not see |
| 6  responsibility of doing that? | 6  anyone leave the room? |
| 7    A.   Not specifically, no. | 7      MS. WILLIAMS:  Objection. |
| 8    Q.   And do you know if she did that? | 8    A.   I did not see anyone leave the room. |
| 9    A.   I recall seeing her standing back by the | 9      BY MR. THEODOROU: |
| 10  door. | 10    Q.   Okay.  So you really don't know whether |
| 11    Q.   Right. | 11  someone left the room. |
| 12      But do you recall whether she prevented | 12      You just did not see anybody leave the |
| 13  anyone from leaving once the conference started? | 13  room? |
| 14    A.   I don't recall anyone trying to leave. | 14    A.   Correct. |
| 15    Q.   Okay.  Were there any Treasury Department | 15    Q.   Okay.  Were there any procedures in place |
| 16  employees outside of the door to prevent someone from | 16  to prevent the attendees from leaving the conference |
| 17  coming into the conference once it started? | 17  before it was over? |
| 18    A.   I don't recall. | 18    A.   I believe I just answered that. |
| 19    Q.   Did any Treasury employee check the | 19    Q.   And what was your answer? |
| 20  identity of the credentials of people who entered the | 20    A.   I just asked me a series of questions |
| 21  room? | 21  about if there was someone there to block them, and I |
| 22    A.   No. | 22  answered those questions. |

| Page 127 | Page 129 |
|---|---|
| 1    Q.   Was there a guard to prevent someone from | 1    Q.   Now, you testified -- now, the room at the |
| 2  leaving the room other than -- | 2  time when the conference was taking place, there were |
| 3    A.   No. | 3  cameras in the room. |
| 4      MS. WILLIAMS:  Objection. | 4      Correct? |
| 5    A.   No, not to my knowledge. | 5    A.   Correct. |
| 6      BY MR. THEODOROU: | 6    Q.   And there were also cameras and lights in |
| 7    Q.   Do you know if there was any guard that | 7  the room? |
| 8  was assigned to prevent someone from leaving before | 8    A.   I recall cameras being in the room. |
| 9  the conference was over? | 9    Q.   Again to your own knowledge, you did not |
| 10    A.   Not to my knowledge. | 10  see anybody leave the room? |
| 11    Q.   Now, directing your attention again to | 11    A.   I did not see anyone leave the room. |
| 12  exhibit 1, which is your memorandum of interview -- | 12    Q.   Okay.  But you do not know if someone left |
| 13    A.   M-hm. | 13  the room? |
| 14    Q.   -- if you take a look at it. | 14      MS. WILLIAMS:  Objection. |
| 15      You said in there at the bottom of the | 15    A.   Correct. |
| 16  first paragraph on the second page, and I quote:  She | 16      I did not see anyone leave the room. |
| 17  said no one left the room prior to the conclusion of | 17      BY MR. THEODOROU: |
| 18  the conference at approximately 9:25 AM. | 18    Q.   The doors were not locked. |
| 19      Now, do you remember testifying about | 19      Correct? |
| 20  that -- I mean, telling them about that in your | 20    A.   Correct. |
| 21  interview? | 21    Q.   To your knowledge, has the Department of |
| 22    A.   Yes. | 22  the Treasury used written confidentiality agreements? |

Alderson Reporting Company
1111 14th Street, NW Suite 400                    1-800-FOR-DEPO                    Washington, DC 20005

Elizabeth Schmutz                                           August 23, 2006

Washington, DC

| Page 250 | Page 252 |
|---|---|
| 1  Q.  It's all right. | 1  office before that, the Inspector General's Office? |
| 2  A.  -- coming into the office and -- | 2  A.  I don't recall. |
| 3  Q.  I knew that was coming. | 3  Q.  Now, when you met with the SEC and someone |
| 4  A.  -- having a conversation and giving him | 4  from the Office of General Counsel of the Treasury on |
| 5  the email. I recall giving him the emails. | 5  November 7th, did they explain the reason for the |
| 6  Q.  And those are the emails you testified | 6  investigation? |
| 7  about earlier -- | 7  A.  Yes. |
| 8  A.  Yes. | 8  Q.  Okay. And what did they say? |
| 9  Q.  -- the emails -- | 9  A.  They explained that the Securities and |
| 10  A.  Correct. | 10  Exchange Commission was there to interview people |
| 11  Q.  -- to Ms. Anderson that are in the | 11  that had been involved with this particular situation |
| 12  document? | 12  and to answer the questions truthfully. |
| 13  A.  The ones -- exhibits 6 and 7. | 13  Q.  Did anyone at Treasury ever tell you that |
| 14  Q.  Now, in his report, he said that you | 14  you violated any Treasury policies or rules on |
| 15  arranged a meeting for -- with Mr. Fratto. | 15  embargoes? |
| 16  Do you see that at the bottom of -- | 16  A.  No. |
| 17  A.  I do. | 17  Q.  Were you ever informed by anyone at |
| 18  Q.  -- page -- | 18  Treasury that you had done something wrong on October |
| 19  A.  I think we walked down to Tony's office. | 19  31st? |
| 20  Q.  Who was at that meeting? | 20  A.  No. |
| 21  You, Mr. Vagle, Mr. Fratto? | 21  Q.  Do you know if Treasury took any |
| 22  A.  I don't remember exactly that meeting, but | 22  disciplinary or employment action against anyone |

| Page 251 | Page 253 |
|---|---|
| 1  that's what it appears to indicate from this memo. | 1  because of the events of October 31st? |
| 2  Q.  Do you remember what was discussed at that | 2  A.  I'm not aware of any action taken. |
| 3  meeting with Mr. Fratto? | 3  Q.  And after October 31st, did you continue |
| 4  A.  I don't specifically recall the meeting | 4  to work on quarterly refunding press conferences |
| 5  itself, so I'm just going off the memo here. | 5  announcements? |
| 6  Q.  All right. Now, I showed you as exhibit 1 | 6  A.  I did, yes. |
| 7  today the memorandum of activity or the summary of | 7  Q.  Did Treasury make any changes to its |
| 8  your interview with Mr. Sporkin and Ms. Filou of the | 8  policies and procedures in quarterly refunding press |
| 9  SEC. | 9  conferences following October 31st? |
| 10  Do you remember that? | 10  A.  Yes, it did. |
| 11  A.  I do. | 11  Q.  Okay. And when were those changes made? |
| 12  Q.  Was the Office of Inspector General of the | 12  A.  Immediately after the 31st, and they were |
| 13  Department of the Treasury present, someone from | 13  in place for the subsequent quarterly refunding |
| 14  Treasury present at that? | 14  announcements. |
| 15  A.  I mean, according to the memorandum, it | 15  Q.  And who contributed to the changes? |
| 16  says that there was someone there from IG's office, | 16  A.  Tony Fratto, myself. |
| 17  but I don't recall who that person was. | 17  Q.  Anybody else? |
| 18  Q.  But you do remember somebody from the | 18  A.  Not that I can recall. |
| 19  general counsel's office? | 19  Q.  All right. And what kind of changes were |
| 20  A.  It was Megan. | 20  made? |
| 21  Q.  Now, before that meeting on November 7, | 21  A.  Instead of having a press conference in |
| 22  2001, did you speak to anybody else from the IG's | 22  order to announce the information, the information |

64 (Pages 250 to 253)

# EXHIBIT I

# Cited Excerpts from the Deposition Transcript of Paul Malvey
# (June 23, 2006)

Page 1

1              UNITED STATES DISTRICT COURT

2                DISTRICT OF MASSACHUSETTS

3    - - - - - - - - - - - - - - - - )

4    UNITED STATES SECURITIES AND      )

5    EXCHANGE COMMISSION,              )

6                    Plaintiff,        )

7              v.                      )  No. 05-10983 (NMG)

8    STEVEN E. NOTHERN,               )

9                    Defendant.        )

10   - - - - - - - - - - - - - - - - )

11                        Washington, D.C.

12                        Friday, June 23, 2006

13   Deposition of PAUL FRANCIS MALVEY, a witness herein,

14   called for examination by counsel for Defendant in

15   the above-entitled matter, pursuant to agreement, the

16   witness being duly sworn by CHERYL A. LORD, a Notary

17   Public in and for the District of Columbia, taken at

18   the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

19   Suite 800, Washington, D.C., at 10:10 a.m., Friday,

20   June 23, 2006, and the proceedings being taken down

21   by Stenotype by CHERYL A. LORD, RPR, CRR, and

22   transcribed under her direction.

23

24

25

Page 266

```
 1      Q.  -- the one that we've made an exhibit?
 2      A.  Well, let me just make sure, because this
 3  is the folder I had.
 4          Oh, gee, yeah, my doodles.
 5      Q.  Okay.
 6      A.  All right.  Okay.
 7          Now, why don't we mark that as the next
 8  exhibit.  Give that here.
 9      Q.  I'm showing you what's been marked as
10  exhibit 12 to your deposition.
11      A.  Okay.  Do you want what I'm doodling on
12  today?
13      Q.  Well, why don't we just deal with exhibit
14  12 for the time being.
15      A.  Okay.  All right.
16      Q.  Now, for exhibit 12, first of all, the top
17  line says, attorney-client priv.  I assume that's --
18      A.  Privilege.
19      Q.  -- attorney-client privilege.
20          What's that a reference to?
21      A.  I met with the SEC and Tom McGivern there.
22  I don't know whether he said I did or -- somebody
23  said I either did or did not have any attorney-client
24  privilege.  I don't recall.
25          The second one was Privacy Act.  That's
```

Page 267

```
 1  why I should -- I don't recall why I -- I do know I
 2  said, don't speculate -- they said, don't speculate,
 3  if you know it, say it, if you don't know it, don't
 4  speculate.
 5          But Privacy Act, I -- I --
 6      Q.  Now, there's -- to the right of that --
 7  the box that has the words in it, there's some lines
 8  to it, another box that looks something like the
 9  Confederate flag.
10          Does that have any meaning?
11      A.  It's pure doodle.
12      Q.  Okay.  And then I assume that the
13  geometric figure below that is also a pure doodle?
14      A.  Yeah.
15          Started out as an egg, and I tried to make
16  it a -- a hectagon (phonetic) or sexagon
17  (phonetic) -- or sentagon (phonetic)?
18      Q.  All right.  Sort of in the middle of the
19  page, it looks like 4 numbers, 34, 12, 22, and 11,
20  each within its own unique geometric figure.
21      A.  They weren't there when I was written
22  by -- but I created it, yeah.
23      Q.  Do those numbers represent anything?
24      A.  Yeah.
25          I was talking about the Friday before our
```

Page 268

```
 1  announcement, I was coming up in here -- me and
 2  somebody else in my office and a political appointee,
 3  usually deputy assistant secretary, goes up to New
 4  York Fed and interviews primary dealers all day-long.
 5          And on the Friday before that, we put on
 6  our Web site the gender (sic) of questions I'm
 7  interested in asking these primary dealers so that
 8  everybody knows what we're interested in terms of
 9  policy.
10          And at the height of the primary -- of the
11  primary dealer community, there were 44.  And while
12  was talking, I said, you know, at one time there were
13  44.  That meant we'd see roughly 12 every quarter.
14  And then there was 22.  I said, that means we see
15  half the community every quarter.
16          And now I -- then I said -- I didn't write
17  down now -- I think there's only a dozen or so
18  primary dealers, so they probably see them all every
19  quarter.
20          So that's total number of primary dealers,
21  how many per quarter, number of primary dealers more
22  recently, number of -- number per quarter, and now
23  they probably --
24      Q.  Adjacent to the 44, it looks like there's
25  something like a bullhorn.
```

Page 269

```
 1          Does that have any meaning?
 2      A.  Not -- not related to this or anything
 3  like this.  I figure -- I was trying to -- I was
 4  trying to draw some type of horn.  You're right.  I
 5  mean, I -- I drew 2 lines, and once I flared this one
 6  out, I tried to make that into a horn.  I said, well,
 7  let me see if I can do it the other --
 8      Q.  But it has nothing to do with the events
 9  of October 31, 2001?
10      A.  No.
11          You talk to SEC lawyers for a while,
12  you'll find yourself doing this.
13      Q.  Okay.  And then on the left side, there's
14  again some geometric figures.
15          Any meaning?
16      A.  None whatsoever.
17      Q.  Okay.  Well, perhaps you pursued the wrong
18  career.  Maybe modern art --
19      A.  Yeah, right.
20      Q.  Okay.  And now did you become aware of
21  any -- well, let me ask you this:  Did Treasury take
22  any personnel action with regard to the release of
23  the decision to suspend the long bond?
24          MR. McGIVERN:  Objection.
25          I'm directing the witness not to answer.
```

Page 270

1    MR. SHOPE: I'm just asking a general
2  question without getting into any particular person
3  at this time.
4    MR. McGIVERN: Objection.
5    MR. SHOPE: Well, first of all, I don't
6  think it's proper for you under the Federal Rules of
7  Civil Procedure or anything else to be directing the
8  witness not to answer.
9    In fact, it's in my view sanctionable
10  under the local rules of the District of
11  Massachusetts. That's point 1.
12    Point 2, I'm not asking about any
13  particular person at this time, so let's just start
14  out with a general question. I can't invade
15  anybody's privacy.
16    MR. McGIVERN: Objection.
17    BY MR. SHOPE:
18    Q.  Could you go ahead and answer the
19  question.
20    THE WITNESS: Do I answer or not?
21  No.
22    MR. SHOPE: All right. We're going --
23  again, right now, let's take this bit by bit.
24    I think you're on very thin ice,
25  Mr. McGivern, and at this point -- first of all,

Page 271

1  you've represented to me that you don't represent
2  this witness. So the idea that you can be
3  instructing him not to answer questions I think is
4  doubly questionable.
5    MR. McGIVERN: No.
6    And I represent the Department of the
7  Treasury, and the Department of the Treasury
8  employees at interest.
9    Now, as I mentioned to you in our
10  conversations, witnesses can waive their own privacy
11  rights, but witnesses cannot waive other people's
12  privacy rights.
13    MR. SHOPE: Well, I'm not -- my starting
14  question without even agreeing that it's improper for
15  me to ask about particular individuals, right now I'm
16  just asking it as a general question.
17    MR. McGIVERN: Yeah, but you have other
18  forums including asking the Department of the
19  Treasury if they did that. So you know there are
20  other --
21    MR. SHOPE: You may recall that the
22  government has taken the position in this case that
23  it doesn't have to produce any documents from the
24  Department of the Treasury, so --
25    MS. WILLIAMS: I disagree with that

Page 272

1  representation. That's not at all the government's
2  position. In fact the SEC has produced many
3  documents from the Department of the Treasury.
4    MR. SHOPE: Well, I think the record
5  speaks for itself on that point.
6    MS. WILLIAMS: I do too.
7    MR. McGIVERN: I do as well.
8    MR. SHOPE: So the bottom line is that
9  this is in my view outrageous instruction. So I'm
10  going to give a last chance to withdraw the
11  objection.
12    MR. McGIVERN: I don't withdraw the
13  objection.
14    MR. SHOPE: Well, it's obvious that there
15  was some discipline, and it's very damaging to the
16  government's position.
17    MS. WILLIAMS: I object to that statement.
18    MR. McGIVERN: Objection.
19    BY MR. SHOPE:
20    Q.  Okay. Was there any criticism by anyone
21  of your own actions in connection with the release of
22  the decision to suspend the long bond?
23    A.  No.
24    Q.  Okay. Are you familiar with a phone
25  number, 202-543-6078?

Page 273

1    A.  That's my fax number.
2    Q.  Okay. Fax number at home?
3    A.  Yeah.
4    Q.  Okay. Do you -- are you familiar with a
5  phone number, 202-530-3901?
6    A.  3901 -- I'm --
7    Q.  What about 202-543-6078?
8    A.  That's -- that was the first one.
9    Q.  Okay. I apologize.
10    THE VIDEOGRAPHER: Is this a good place to
11  change the tape?
12    MR. SHOPE: I just have one more question.
13    BY MR. SHOPE:
14    Q.  Were you aware that the SEC subpoenaed
15  your telephone records?
16    A.  I don't recall. I don't think I was aware
17  of that.
18    Q.  It's the sort of thing that you would
19  remember, wouldn't you?
20    A.  Yeah, I guess.
21    MR. SHOPE: Okay. Why don't we go ahead
22  and take a break and change the tape.
23    THE VIDEOGRAPHER: This is the end of tape
24  number 4 in the video deposition of Paul F. Malvey.
25  Off the record at 4:28:50 PM on June 23rd, 2006.

69 (Pages 270 to 273)

**EXHIBIT J**

**Cited Excerpts from the Deposition Transcript of Jill Ouseley**
**(July 24, 2006)**

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          DISTRICT OF MASSACHUSETTS
 3        CASE NO. 05-CV-10983 NMG
 4
 5   Securities and Exchange
     Commission,
 6
             Plaintiff,
 7
          vs.
 8
     Steven E. Nothern,
 9
             Defendant.
10
     -----------------------------/
11
12
13      VIDEOTAPED DEPOSITION OF JILL OUSELEY
14
15             July 24, 2006
               1:58 p.m. - 5:17 p.m.
16
17          Esquire Deposition Services
               1819 Main Street
18                 Suite 250
               Sarasota, Florida  34236
19
20          -----------------------------
21
     REPORTED BY:
22   NANCY E. PAULSEN
     Registered Professional Reporter
23   Notary Public, State of Florida at Large
     Esquire Deposition Services - Sarasota, Florida
24   941-364-2200 (800-838-2814)
     Job No.:  N 811629
25
```

Page 3

```
 1   Thomas M. McGivern, Esquire,
     Assistant General Counsel
 2   U.S. Department of the Treasury
     1500 Pennsylvania Avenue, NW
 3   Washington, D.C.  20220
     202-622-2317
 4
 5        Attorney for Department of the Treasury
 6
 7
     Also Present:
 8
 9        Cliff Biram, III, videographer
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 2

```
 1
     APPEARANCES:
 2
 3      Robert E. Toone, Esquire
        Foley Hoag, LLP
 4      Seaport World Trade Center West
        155 Seaport Boulevard
 5      Boston, Massachusetts  02210-2600
        617-832-1000 / fax 617-832-7000
 6
 7
           Attorney for Defendant
 8
 9
10      John J. Rossetti, Jr., Esquire
        U.S. Securities and Exchange Commission
11      100 F Street, N.E.
        Washington, D.C.  20549-8549B
12
        202-551-4819 / fax 202-772-9245
13
14         Attorney for Plaintiff
15
16
17      Jordan A. Thomas, Esquire
        U.S. Securities and Exchange Commission
18      100 F Street, N.E.
        Washington, D.C.  20549-8549B
19
        202-551-4819 / fax 202-772-9245
20
21         Attorney for Plaintiff
22
23
24
25
```

Page 4

```
 1              I N D E X
 2                              Page
 3   DIRECT EXAMINATION BY MR. TOONE          6
 4   CROSS-EXAMINATION BY MR. ROSSETTI       92
 5   REDIRECT EXAMINATION BY MR. TOONE      118
 6   RECROSS EXAMINATION BY MR. ROSSETTI    124
 7   FURTHER DIRECT EXAMINATION BY MR. TOONE   124
 8   FURTHER RECROSS EXAMINATION BY MR. ROSSETTI  125
 9
10   CERTIFICATE OF OATH              127
11   CERTIFICATE OF REPORTER          128
12   SIGNATURE PAGE/ERRATA SHEET         129
13   ATTORNEY NOTIFICATION LETTER        130
14
15
16              E X H I B I T S
17   No.   Description          Page
18   1   Subpoena                 24
19   2   Minutes of Borrowing Advisory Committee    42
20       from April 30th and May 1 of '96
21   3   Transcript of deposition from 1/7/02     54
22   4   Promotional material by Davis Capital     64
23       Investment Ideas
24   5   Memorandum of Activity by Knorr dated    67
25       12/28/01
```

Page 61

1   security official guarding the doors to the room where
2   the press conference was held?
3        MR. ROSSETTI: Objection.
4        A.   The building, as you know, is rather heavily
5   guarded.  I don't recall any specific guards at the door
6   --
7   BY MR. TOONE:
8        Q.   Okay.
9        A.   -- of the conference room.
10       Q.   Do you recall any other Treasury employee
11  guarding the doors to the conference room?
12       MR. ROSSETTI: Objection.
13       A.   No.
14  BY MR. TOONE:
15       Q.   Once a person had made it into the Treasury
16  building, was there anything to prevent that person from
17  entering the room where the press conference was being
18  held?
19       MR. ROSSETTI: Objection.
20       A.   Not that I know of.  Except if a public
21  affairs person didn't recognize them and might ask them
22  who they are.  But I don't know.
23  BY MR. TOONE:
24       Q.   Did you ever see that happen, where a public
25  affairs person asked a -- an attendee --

Page 62

1        A.   I don't remember any.
2        Q.   So that -- you're speculating about what might
3   have happened, --
4        A.   Could.
5        Q.   -- but you never actually saw it happen?
6        A.   That's correct.
7        Q.   Was there anything to prevent someone who was
8   attending the press conference from walking out before
9   it was over?
10       MR. ROSSETTI: Objection.
11       A.   No.
12  BY MR. TOONE:
13       Q.   Now, who normally attended the quarterly
14  refunding press conferences?  What kind of people?
15       A.   People from the news wire service, and
16  Treasury staff, and O.M.B., one gentleman from O.M.B.
17  came over from time to time, but he's an economist.
18       Q.   Do you recall any officials from any
19  government agencies other than this person from O.M.B.
20  attending the conferences?
21       A.   No.
22       MR. ROSSETTI: You just might want to ask her
23  the acronym.
24       MR. TOONE: O.M.B.?  Oh, yes.
25       MR. ROSSETTI: Yeah.

Page 63

1   BY MR. TOONE:
2        Q.   Can you tell us for the record what O.M.B. is?
3        A.   Office of Management and Budget.
4        MR. TOONE: For the record, I already knew
5   that, but that's good, thank you, John, for making
6   the record clear.  That's one of the few acronyms I
7   can say I know from past experience.
8   BY MR. TOONE:
9        Q.   Were you familiar with most the people who
10  attended conferences on a regular basis?
11       A.   Yes.  Most.
12       Q.   Would you go --
13       A.   How do you mean familiar?
14       MR. ROSSETTI: You can just stick it on your
15  tie like this.
16       MR. TOONE: Oh, that's a good idea.  Thank
17  you.
18  BY MR. TOONE:
19       Q.   I guess would you know generally who they were
20  or what office or company they were associated with?
21       A.   I'd recognize faces.
22       MR. TOONE: Could you mark this as an exhibit,
23  please?
24       (Marked Deposition Exhibit Number 4.)
25  BY MR. TOONE:

Page 64

1        Q.   I'm showing you what's been marked Exhibit
2   Number 4.  And this is a promotional material by an
3   office called Davis Capital Investment Ideas.  And for
4   the record, it's Bates stamped -- the first page of the
5   document is Bates stamped SEC/NOTH 00107206.
6        Mrs. Ouseley, do you recall seeing this
7   document before?
8        A.   No.
9        Q.   Can you look on the fourth page of this
10  document, Exhibit 4?
11       Do you see the heading "Who we are"?
12       A.   Yes.
13       Q.   And you see that picture on the right-hand
14  side at the top of the page?
15       A.   I see the picture.
16       Q.   And under that picture is the caption "Peter
17  J. Davis, Jr., President"?
18       A.   I see that.
19       Q.   Do you recognize this man?
20       A.   No.
21       Q.   Have you ever seen him before in any context?
22       A.   Not that I remember.
23       Q.   Do you think it's possible that a person like
24  Peter Davis could have attended multiple refunding
25  conferences during your time and you would not have seen

**EXHIBIT K**

**Cited Excerpts from the Deposition Transcript of Brian Roseboro (June 27, 2006)**

```
1

2       UNITED STATES DISTRICT COURT

3       FOR THE DISTRICT OF MASSACHUSETTS

4       ----------------------------------------X

5       UNITED STATES SECURITIES AND

6       EXCHANGE COMMISSION,

7                         Plaintiff,

8             - against -

9       STEVEN E. NORTHERN,

10                        Defendant.

11      CIVIL ACTION NO.: 05-10983(NMG)

12      ----------------------------------------X

13                   450 Lexington Avenue
                     New York, New York
14
                     June 27, 2006
15                   2:06 p.m.

16

17           VIDEOTAPED DEPOSITION of BRIAN

18      ROSEBORO, pursuant to Notice, before Melissa

19      Gilmore, a Notary Public of the State of New

20      York.

21

22

23

24

25
```

Brian Roseboro                                                June 27, 2006

New York, NY

Page 134

1    A.   I'm saying I don't have firsthand
2  knowledge of it.
3    Q.   And you don't have secondhand
4  knowledge of it or thirdhand knowledge?
5    MS. WILLIAMS:  Objection.
6    A.   Correct.
7    Q.   Sitting here today, you don't
8  remember anybody at Treasury telling you that
9  they had consulted with the White House, but it
10 may have happened?
11   A.   Correct.
12   Q.   It says, "Roseboro said other than
13 the premature web site posting, he was not
14 aware of any early disclosure of the Treasury's
15 announcement to suspend sales of the 30-year
16 bond."  Was that accurate?
17   A.   No, because, again, as I told you,
18 Jimmy Capra called me.  Does this refer to the
19 Jimmy Capra call anywhere here?  Jimmy Capra
20 called me somewhere in the window between 9:20,
21 9:40, something like that.  So, no, it's not
22 accurate.
23   Q.   Had you told the SEC and Treasury
24 investigators about Mr. Capra's call?
25   A.   I'm sure I did.

Page 135

1    Q.   Now, it then says in -- the last
2  paragraph on the second page of Exhibit 5 says,
3  "Roseboro said he did not know Peter Davis.  He
4  said he only became aware of who he was after
5  the controversy involving allegations of
6  violation of the embargo of the press
7  announcement."
8       Those two sentences were accurate, I
9  take it?
10   A.   Um-hum.
11   Q.   You have got to say yes or no.
12   A.   Yes.
13   Q.   Then it says, "Roseboro said it was
14 his understanding that Davis was not a member
15 of the press but had been 'grand-fathered in'
16 to attend this and previous Treasury quarterly
17 funding press conferences."  Do you see that?
18   A.   Yes.
19   Q.   Is this Inspector General report
20 accurately recording what your statement was to
21 the investigators with regard to that last
22 sentence that I just read?
23   A.   As it relates to the first sentence
24 after the controversy, yes, people continued to
25 talk about this, of course, in talking with

Page 136

1  Paul Malvey, okay, who is this guy, and that's
2  where I gathered that understanding of it.
3    Q.   So notwithstanding the fact that
4  there was an investigation pending, you did
5  actually go back and talk to Mr. Malvey to try
6  to get more details about what had happened?
7    A.   No, I wouldn't necessarily
8  characterize it that way.  In the going back
9  and forth of the day, the event, the week, that
10 information came out.  I did not -- did I go to
11 Paul Malvey and go, Paul, who was this guy,
12 give me the history of him, why is he here, how
13 did he get in here?  No, I did not do that.
14   Q.   Without getting into any particular
15 names, was anybody at Treasury disciplined in
16 connection with the premature release of the
17 decision to suspend the long bond?
18 DI   MR. McGIVERN:  Objection.  I'm
19    directing the witness not to answer.
20   Q.   Are you going to follow
21 Mr. McGivern's instruction?
22   A.   Yes.
23   Q.   Was there any discipline of you in
24 connection with the premature release of the
25 decision to suspend the long bond?

Page 137

1    A.   No.
2    Q.   Was there any criticism of you by
3  anyone in connection with the premature release
4  of the decision to suspend the long bond?
5    A.   Not that I know of.
6    Q.   At some point Mr. Fisher left,
7  correct?
8    A.   October '03.
9    Q.   Just about two years after these
10 events, correct?
11   A.   Correct.
12   Q.   At that point were you then
13 appointed the Undersecretary of domestic
14 finance to replace him?
15   A.   No, I was appointed the Acting
16 Undersecretary of domestic finance.  There was
17 a person -- intent to nominate person for the
18 Undersecretary position, Ken Lead of Goldman
19 Sachs.
20   Q.   What happened with that nomination?
21   A.   I don't recall the technical thing,
22 whether his nomination was withdrawn or -- but
23 he did not continue on the path to get the job.
24   Q.   When were you nominated?
25   A.   To best of my recollection, maybe

35 (Pages 134 to 137)

**EXHIBIT L**

**Cited Excerpts from the Rule 30(b)(6) Deposition
Transcript of Verizon Business (Anne Wilson)
(Oct. 6, 2006)**

Page 1

1          IN THE UNITED STATES DISTRICT COURT FOR THE

2               DISTRICT OF MASSACHUSETTS

3                    (Boston Division)

4     - - - - - - - - - - - - - - - x

5     UNITED STATES SECURITIES AND     )

6     EXCHANGE COMMISSION,             )

7                    Plaintiff,        )

8          v.                         ) Civil Action

9     STEVEN E. NOTHERN,               ) No. 05-10983

10                 Defendant.          ) (NMG)

11    - - - - - - - - - - - - - - - x

12                    Washington, D.C.

13                    Friday, October 6, 2006

14    Video 30(b)(6) Deposition of:

15               ANNE LAWRENCE WILSON,

16    a witness called for examination in the

17    above-entitled action, beginning at 10:14 a.m.

18    before JOE W. STRICKLAND, RPR, CRR, a notary

19    public in and for the District of Columbia, taken

20    at the offices of the Securities and Exchange

21    Commission, 100 F Street, NE, Washington, DC

22    20549, when were present:

Anne L. Wilson 30(b)(6)                                                    October 6, 2006
Washington, DC

---

Page 74

1    A.  Because of the way our system works,
2  the rdist system that copies the file from one
3  server to another maintains the file header info,
4  the timestamp.  So it would have, when it copied
5  the file from the staging server over to the
6  production server, it copied -- it used the same
7  timestamp.
8    Q.  So this 9:40, just to clarify, is not
9  the time that it landed on the production server?
10   A.  Right.
11   Q.  It would have been the time it was last
12 updated on the staging server?
13   A.  Uh-huh.  Yeah, updated on the staging
14 server or initially copied onto the staging
15 server.  FTP doesn't work the same way rdist
16 does.  Once the file was uploaded, it would have
17 gotten a new stamp on the staging server.
18 Because it was most likely changing operating
19 systems going from Windows to Solaris.
20   Q.  If you could turn to the second page of
21 the document.
22   A.  Uh-huh.

---

Page 75

1    Q.  The top line: "This matches the
2  timestamp of the file on the staging server when
3  it was pushed using CMS."  What does that mean?
4    A.  The timestamp -- well, when it -- I
5  think I may have misspoken here.  Because he's
6  telling you the time -- it matches the timestamp
7  that he shows us, which is when it was FTP'd to
8  the staging server.  The next line is more
9  relevant.
10   Q.  Okay.  Explain the next line to me.
11   A.  Okay.  The file was FTP'd to the
12 staging server at 9:40 and 23 seconds.  It was --
13 which means from the user or whether they were at
14 the Department of Treasury or Jeffery West's
15 house, they FTP'd, uploaded it on to the staging
16 server using the FTP protocol.  FTP keeps a log
17 of any file transfers and that's what he's pulled
18 out here.  So this is --
19   Q.  This TREAS underline?
20   A.  Underscore 1-FTP.LOG.  That's the file
21 name.  Then we have the time that that file entry
22 was made.  October 31st, 9:40:23 of 2001.  Then

---

Page 76

1  we have -- this is the host name where the file
2  was uploaded from.  This TIAS-GW7.TREAS.GOV.  The
3  size of the file that was uploaded, 9175 bytes,
4  and then the full name of the file including the
5  path that was in the releases directory.  The
6  name of the file was PO749.HTM.  HTM is an HTML
7  file or a web page.
8    Q.  Where did this entry come from, the
9  staging or production server?
10   A.  This came from the staging server.
11 There was no FTP running on the production
12 server.
13   Q.  And so in order to get this line, would
14 Mr. Harris need to cut and paste it?
15   A.  Correct.  He would have gone on the
16 staging server and gripped the log.  He would
17 have displayed the log file.  It's going to show
18 you the last entries first, so he would have just
19 gone and pulled -- you can display it on the
20 screen and do a copy and paste.
21   Q.  And the log file contains what kind
22 of -- what information?

---

Page 77

1    A.  The log file would include any uploads
2  or downloads, any transmission via FTP.  This log
3  file would only show FTP transmission.
4    Q.  And so this log file that we see in
5  this document tells us what about the timing?
6    A.  It tells us that the file first landed
7  on the staging server at 9:40 and 23 seconds.
8  These logs would have been more precise than what
9  we just looked at which just doesn't give
10 seconds.  As far as the file list itself, it
11 shows only hours and minutes.
12   Q.  Okay.  You said that TIAS-GW7.TREAS.GOV
13 is a host name?
14   A.  Yeah.
15   Q.  What is a host name?
16   A.  Host name would match up with an IP
17 address.  It's an origin identifier.  That's
18 where the person uploading was coming from.  In
19 some logs we record IP addresses and in some logs
20 we record host names.  Here host names give you
21 more information, it's just easier to read.  It
22 is less literal.

---

20 (Pages 74 to 77)

Anne L. Wilson 30(b)(6)                                           October 6, 2006
Washington, DC

---

**Page 146**

1    Q.  You were working for UUNET and UUNET
2    was owned by WorldCom?
3    A.  Yes, but UUNET paid my paycheck.  We
4    were a separate unit.
5    Q.  Okay.  When you were working for UUNET
6    in 2001, did you personally work on the servers
7    that the Treasury Department had?
8    A.  I may have in some capacity.  I was
9    responsible for backups and web reporting on
10   those servers.
11   Q.  Do you recall ever speaking to anyone
12   at the Treasury Department in the course of your
13   work?
14   A.  No.
15   Q.  Which employees at UUNET dealt directly
16   with representatives from the Treasury Department
17   at that time?
18   A.  Well, no one would have been
19   specifically assigned.  It would have been the
20   Level 1 people answering the phone and whoever
21   picked up the ticket per their request.
22   Q.  But there was never an occasion where

---

**Page 147**

1    you got drawn into a dialogue between -- a
2    dialogue with the Treasury Department?
3    MS. WILLIAMS:  Objection.
4    THE WITNESS:  Not that I recall.
5    BY MR. TOONE:
6    Q.  Do you recall ever speaking with any
7    employee from the Treasury Department?
8    MS. WILLIAMS:  Objection.
9    THE WITNESS:  No, but I wouldn't
10   necessarily remember.
11   BY MR. TOONE:
12   Q.  As with Ms. Williams, I apologize that
13   my level of technological knowledge isn't, you
14   know, a hundredth as developed as yours, so I'm
15   going to ask some kind of basic questions.
16   A.  Sure.
17   Q.  What is the Internet?
18   A.  Internet is a network of networks that
19   operates over the IP protocol.
20   Q.  A network of networks?
21   A.  Correct.  Meaning we can all work for
22   different companies.  All of our companies have

---

**Page 148**

1    our own networks.  But those networks can be
2    connected via the Internet.
3    Q.  Is there another term for the network
4    that exists within a particular company?
5    A.  A local area network.  A LAN.  Or even
6    a wide area network.  A WAN.
7    Q.  And the Internet is the network that
8    connects all of those smaller networks; is that
9    right?
10   A.  Yes.
11   Q.  You mentioned IP protocol.  What is
12   that?
13   A.  It's a standard way for computers to
14   talk to each other.  It's a way of transmitting
15   bits and bytes.
16   Q.  Is that protocol maintained by a
17   particular organization?
18   A.  It's a standard.  Used to be the
19   Internet Society that maintained those
20   standards.
21   Q.  Is that Internet Society, is that a
22   private organization?

---

**Page 149**

1    A.  With funding from the U.S. Government.
2    Q.  You said the Internet Society used to
3    maintain those standards.  They don't do it
4    anymore?
5    A.  I don't recall what the name of the
6    organization is now.
7    Q.  Are there parts of the Internet that
8    are not public?
9    MS. WILLIAMS:  Objection.
10   THE WITNESS:  By definition, the
11   Internet is public.  But certain things can be
12   secured.
13   BY MR. TOONE:
14   Q.  Let's go back.  By definition the
15   Internet is public.  What do you mean by that?
16   A.  We get into semantics here, I'm
17   afraid.  You know, there's a fine line when you
18   have a network of networks as to what is the
19   Internet and what is private space.  So I'm
20   sorry, your question again?
21   Q.  I'm just trying to get a better
22   understanding.  You said by definition the

---

38 (Pages 146 to 149)

**Page 150**

1   Internet is public, but there are things that can
2   be secured. I'd just like you, if you can, to
3   say a little bit more about that.
4        A.   IP addresses, we call them publicly
5   routable, meaning they're announced to the -- to
6   the Internet. It's like having a telephone
7   network. But anybody that has a telephone number
8   generally can be dialed. Right? And that's a
9   public telephone because somebody can connect to
10  it via the network. Although you might have some
11  access control by having a switchboard in the
12  middle.
13       So the stuff behind the switchboard
14  would be on the big Internet, but it's local.
15  It's protected.
16       Q.   Can you have -- I'm sorry; I thought
17  you were finished.
18       A.   So someone may think they're on the
19  Internet, but they are really on a network
20  connected to the Internet.
21       Q.   If an IP address is publicly
22  routable --

**Page 151**

1        A.   Uh-huh?
2        Q.   -- can you control access to that IP
3   address?
4        A.   Yes, you can.
5        Q.   How?
6        A.   With the use of filters. Depends on
7   what operating system or software is running.
8   But you can configure a server. If, you know,
9   it's on a server, to reject connections if they
10  don't meet certain criteria. Perhaps you want
11  them only to come from a certain IP address or
12  within a certain range. You only want to allow
13  people from a certain network to attach.
14       Q.   So what does "publicly routable" mean,
15  then?
16       A.   Meaning it's -- it's announced. It's
17  like having a phone number, versus having an
18  extension. An extension -- like my extension
19  might be 347. That's not publicly routable.
20  Somebody in Kalamazoo couldn't call me if they
21  just knew my extension 347. But if I had a 703,
22  XYZ, XYZ, that, is publicly routable.

**Page 152**

1        Q.   So anybody can reach that main number,
2   but you may not be able to reach the extension?
3        A.   Right. But even in that main number,
4   to bring it back to the analogy, could have some
5   security protocols. And that's one way the
6   Internet would be different than your public
7   phone system, because you could control who dials
8   that number, so to speak, on the Internet.
9        Q.   So I'm just trying to understand this
10  better.
11       A.   Yeah.
12       Q.   There are publicly routable IP
13  addresses that I as a normal citizen cannot get
14  access to?
15       A.   Right. Right. Correct.
16       Q.   And how is that access controlled?
17       A.   Because someone may have configured the
18  system to only allow connections from specific
19  sources.
20       Q.   Let's look at the Exhibit Number 6.
21       A.   Uh-huh.
22       Q.   And on the first page -- we looked at

**Page 153**

1   this earlier. On the first page the Treasury
2   production server and the Treasury staging server
3   are listed. Do you see that?
4        A.   Uh-huh.
5        Q.   And below each of those are five IP
6   addresses each?
7        A.   Yes.
8        Q.   Can you tell from just looking at those
9   IP addresses whether or not they are publicly
10  routable?
11       A.   They would all be publicly routable,
12  yes.
13       Q.   How can you tell that?
14       A.   Because I know that those networks in
15  Tysons Corner were publicly routable. That all
16  of our networks in Tysons Corner were publicly
17  routable.
18       Q.   If you didn't have that information
19  about what was on the Tysons network, would it be
20  possible to look at these numbers and know
21  whether or not they were publicly routable?
22       MS. WILLIAMS:   Objection.

39 (Pages 150 to 153)

## Page 154

1  THE WITNESS: Well, yes, you would
2  expect them to be because of the 208 and source.
3  BY MR. TOONE:
4  Q. The 208, those are the first three
5  digits on each number?
6  A. Yeah.
7  Q. What does that tell you?
8  A. That it's -- most nonroutable addresses
9  would be -- start with 111 or 193. Other
10  prefixes.
11  Q. Have you heard of the Internet assigned
12  number authority?
13  A. Uh-huh.
14  Q. What is that?
15  A. They would keep track of the IP
16  addresses.
17  Q. Has that authority set aside specific
18  blocks of IP addresses that are available for use
19  as nonroutable network addresses?
20  MS. WILLIAMS: Objection.
21  THE WITNESS: I don't know the
22  specifics of how that's done.

## Page 155

1  BY MR. TOONE:
2  Q. Now, you said earlier that you knew
3  from your experience that UUNET that all of these
4  IP addresses on the first page of Exhibit 6 were
5  publicly routable; is that right?
6  A. But that doesn't mean that they're
7  publicly accessible.
8  Q. Well, what do you know about these
9  numbers being publicly accessible?
10  A. I know that the IP addresses on the
11  production server would have been publicly
12  accessible. The IP addresses on the staging
13  server would have had filters on them so that
14  only specified addresses could FTP or otherwise
15  actually connect to that system.
16  Q. Now, you're saying -- you've testified
17  that the IP filters prevented outsiders from
18  using the FTP function on these --
19  A. Right.
20  Q. -- on these staging servers; correct?
21  A. Correct.
22  Q. Did those filters also prevent people

## Page 156

1  from simply viewing them?
2  A. Not those filters. There would or
3  could have been additional filters, but those
4  were under control of the customer.
5  Q. Are you aware of any such filters being
6  used by the Treasury Department in 2001?
7  A. No.
8  Q. And UUNET itself did not maintain any
9  filters that prevented outsiders from viewing
10  these IP addresses in 2001?
11  A. Not to my knowledge.
12  MR. TOONE: We will take a break, if
13  that's all right.
14  VIDEOGRAPHER: This is the end of tape
15  2. Off the record at 2:41:21.
16  (Recess.)
17  VIDEOGRAPHER: This is the beginning of
18  tape 3 in the deposition in the corporate
19  deposition of Verizon by Anne Wilson. On the
20  record at 2:44:47.
21  BY MR. TOONE:
22  Q. Let me direct your attention briefly to

## Page 157

1  documents that were marked, I believe, Exhibit 4
2  and Exhibit 5.
3  A. Okay.
4  Q. Do you recall discussing these
5  documents with Ms. Williams?
6  A. Yes.
7  Q. Just now, just today.
8  A. Oh, yes.
9  Q. Did I understand you correctly that
10  this was a request from Jeffery West to be able
11  to FTP documents on Treasury's staging server
12  from his home computer?
13  A. Uh-huh.
14  Q. That's a yes?
15  A. Yes.
16  Q. Did you say that it wasn't necessary,
17  if the FTP request was coming from within
18  Treasury Department, to make this kind of a
19  request?
20  MS. WILLIAMS: Objection.
21  THE WITNESS: I don't think I
22  specifically said that.

40 (Pages 154 to 157)