# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | **Civil Action No. 05-10983 (NMG)** |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) | |

## ASSENTED-TO MOTION FOR LEAVE TO FILE
## REPLY MEMORANDUM AND SUPPORTING DECLARATION

Pursuant to Local Rule 7.1(B)(3), defendant Steven E. Nothern hereby moves for leave to file the attached reply memorandum and declaration in support of his Objections (Docket # 65) to the Magistrate Judge's Order on discovery issues (Docket # 63). As grounds for the motion, Nothern states that the proposed reply memorandum and declaration are necessary to address statements of fact and law in the SEC's proposed response (Docket # 71, Ex. 1). Counsel for Nothern has conferred by telephone with counsel for the SEC regarding the subject of this motion, and the SEC has consented to Nothern's motion.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO #6443249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

**CERTIFICATION PURSUANT TO LOCAL RULES 7.1(a)(2) AND 37.1**

I, John A. Shope, hereby certify that on March 5, 2007, I conferred with counsel for the

SEC, and she assented to this motion.

/s/ John A. Shope

Dated:  March 7, 2007

B3326677.1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

_____
:
UNITED STATES SECURITIES AND              :
EXCHANGE COMMISSION,                       :        Civil Action No. 05-10983 (NMG)
:
Plaintiff,              :
:
v.                                   :        **ORAL ARGUMENT REQUESTED**
:
STEVEN E. NOTHERN,                         :
:
Defendant.              :
_____:

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
OF HIS OBJECTIONS TO MAGISTRATE JUDGE'S ORDER**

Nicholas C. Theodorou, BBO #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO #6443249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA  02210
(617) 832-1000

Dated:  March 7, 2007

# <u>TABLE OF CONTENTS</u>

A.    The SEC Mischaracterizes and Misstates the Facts. ...............................1

B.    Nothern Has Diligently Sought Discovery Through Alternative Means................6

    1.    APA Action on Treasury Depositions .........................................6

    2.    FOIA Request to Treasury.....................................................6

    3.    FOIA Request to Secret Service / DHS ......................................8

C.    The Applicable Case Law Supports Nothern's Requests for Discovery. ...............9

Conclusion.........................................................................................13

## TABLE OF AUTHORITIES

### CASES

*In re Air Crash at Dallas/Fort Worth Airport*, 117 F.R.D. 392 (N.D. Tex. 1987)............13

*Association for Reduction of Violence v. Hall*, 734 F.2d 63 (1st Cir. 1984) ......................9

*Bank Line v. United States*, 76 F. Supp. 801 (S.D.N.Y. 1948) ..........................................11

*Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224 (1st Cir. 1994) .............9

*Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586 (D. Mass. 1979)................................................................................................................11, 14

*Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749 (9th Cir. 1964)................................ 11-14

*SEC v. Biopure Corp.*, No. 05-00506 (RWR/AK), 2006 WL. 2789002 (D.D.C. Jan. 20, 2006)................................................................................................12

*State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60 (1st Cir. 2002)................................9

*Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 884 (1st Cir. 1995)................................................................................................................9

*United States v. AT&T Co.*, 461 F. Supp. 1314 (D.D.C. 1978) ................................... 12-13

*United States v. Davis*, 140 F.R.D. 261 (D.R.I. 1992) ......................................................12

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ...............................................................8

*Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006).........................................................13

### DOCKETED CASES

*Steven E. Nothern v. United States Department of the Treasury*, Civil Action No. 07-10347-NMG (D. Mass.) ........................................................................................7

### OTHER AUTHORITIES

U.S. Const. art. II, § 3 ........................................................................................................12

5 U.S.C. § 551 .....................................................................................................................7

5 U.S.C. § 552 ................................................................................................................ 9-10

29 U.S.C.A. § 161 ..............................................................................................................13

31 C.F.R. § 1.5 ....................................................................................................................9

31 C.F.R. § 1.12..................................................................................................................6

Fed. R. Civ. P. 26.............................................................................................................9

Fed. R. Civ. P. 45...........................................................................................................13

Defendant Steven Nothern respectfully submits this reply brief in further support of his Objections to the Order of Magistrate Judge Leo T. Sorokin (Docket # 63), which denied (i) Nothern's renewed motion to compel documents held by the U.S. Department of the Treasury ("Treasury") and the U.S. Department of Justice ("DOJ") (Docket # 44), and (ii) Nothern's motion for an order to show cause why the SEC's case should not be dismissed in light of Treasury's refusal to allow depositions of five current and former Treasury employees (Docket # 49).

### A.    The SEC Mischaracterizes and Misstates the Facts.

In his Order (Docket # 63, at 12), the Magistrate Judge described the discovery that Nothern seeks as "relevant," but not "central in its importance" to Nothern's defense.  In his Objections (Docket # 65, at 7-12), Nothern showed why this finding was clearly erroneous:  the documents and testimony which he has been denied are in fact central to the elements of the SEC's insider trading claim and his potential defenses.

In its response (Docket # 71, Ex. 1 at 4), the SEC contends – for the first time in these proceedings – that the discovery Nothern seeks is "arguably irrelevant."  Yet the SEC does not address how that discovery does or does not bear on the disputed issues discussed by Nothern in his Objections, such as whether the information announced at Treasury's press conference was actually confidential, or whether Nothern knew of any duty of confidentiality owed by Davis to Treasury.  Many of the factual contentions the SEC does make are either at best incomplete or simply untrue.

First, the SEC makes the incredible claim (Docket 71, Ex. 1 at 4) that "Treasury did not play a major role in the facts that give rise to this insider trading case."  Consider:  The securities in question in this case were issued by Treasury.  The "inside information" was created by Treasury, and then released at an official Treasury press conference.  The alleged "embargo" was created and purportedly enforced by Treasury.  Treasury officials allowed the alleged tipper

Peter Davis to enter the Treasury building for the express purpose of attending the press confer-

ence, and then allowed him (and other attendees) to leave the conference room and building

while the "embargo" was still in effect.  The alleged tipper's fiduciary duty – which the SEC

maintains Nothern somehow knew about – resulted from an alleged agreement in the 1990s

between the tipper and a senior Treasury official.  David Aufhauser, the General Counsel for

Treasury, referred this matter to the SEC for investigation in 2001 and asked to be kept advised.

Later, that same top official (authorization for whose deposition Treasury first provided, then

withdrew) publicly endorsed action against Nothern as appropriate "punishing action against

those responsible for violating our rules" and vindication of Treasury's employees for having

"behaved above board, honorably in the service of their department and country."  John Connor

& Colleen DeBaise, *Youngdahl Indictment Tops US Action is Tsy Leak Case*, Wall St. J., Sept.

24, 2003.

These undisputed facts show why key contested issues in this case may be resolved only

through the production of relevant Treasury documents and the testimony of Treasury wit-

nesses.[1]  It is inconceivable that in an insider trading case involving a private corporation, the

accused tippee would be denied the right to depose, for example:  the employee who admitted

---

[1] In a footnote (Docket 71, Ex. 1 at 19 n.19), the SEC suggests that the Court's ruling on the SEC's motion to strike Nothern's estoppel defense, Docket # 25 (Nov. 4, 2005), forecloses discovery into "mistakes made by Treasury."  Treasury's mistakes, however, relate directly to the elements that the SEC must prove to establish Nothern's liability.  For example, Treasury's failure to impose any restraint on the presence or departure of attendees at the October 31, 2001 press conference undermines the SEC's contention that the information was "confidential" at the time it was released at 9:00 a.m.  The Court thus observed in its Order that the SEC "has done little to point out specific instances where Nothern's estoppel defense would actually cause it to expend inordinate amounts of time and money."  Docket # 25, at 12.  In addition, at the time of briefing on the SEC's motion to strike, and unlike the SEC, Nothern did not have access to an unredacted version of Treasury's 2002 Office of Inspector General (OIG) report, which contains information that appears to show actual misconduct (not just negligence) on the part of Treasury officials.  For example, Treasury employee Jill Cetina provided the OIG with information regarding apparent leaks by Treasury officials to a European central bank and to an employee at Lehman Brothers.  Nothern reserves his right to move for reconsideration of the Court's ruling on the estoppel defense based on the full evidentiary record.

the tipper into the corporation on the day the tipper obtained the relevant information; an employee with knowledge of reported advance disclosures of the information by a European central bank, and who remarked at the time "how easy it would be" for her colleagues to use information to position themselves in the financial markets; or a high-level official who instituted a 35-minute, honor-system embargo period over the vigorous objections of her colleagues.  Yet that is precisely what Treasury, abetted by the SEC, now seeks to do in denying the requested depositions of Elnora Bowser, Jill Cetina, and Michele Davis.

Some facts asserted by the SEC need amplification.  The SEC writes that Treasury posted its announcement on its own web site at 9:43:28 a.m., *see* Docket 71, Ex. 1 at 7 & n.8, but ignores the fact that Treasury posted it on another publicly accessible Internet address at 9:40:23 a.m.  Docket # 66, Ex. G (Harris Dep. at 89-90, 93-94), Ex. L (Verizon Dep. at 75-76, 149-56).  And the SEC cites the self-serving testimony of reporter Brian Collins to claim that Nothern's statement that Collins disclosed the information on the 30-year bond to Fannie Mae at 9:35 a.m. "is untrue."  Docket 71, Ex. 1 at 8 n.10.  But in making this claim, the SEC neglects the more contemporaneous letter sent by counsel for Fannie Mae to the SEC itself stating that its employee received a call from Collins at 9:35 a.m.  *See* Collins Dep. at 66 & Ex. 6 (Toone Decl. Ex. A).[2]

The SEC also claims that Nothern has "admitted that when he received Davis' voicemail he was aware of the meaning of the term embargo as it applied to information from government agencies."  Docket 71, Ex. 1 at 6.  In fact, Nothern testified at his SEC deposition in 2002 that while he knew nothing about the procedures used by Treasury or most other federal agencies, he did know that the Department of Labor had embargo procedures "whereby they actually lock

---

[2] Cited deposition excerpts and exhibits not already contained in the record are attached as exhibits to the Declaration of Robert E. Toone filed herewith ("Toone Decl.").

press in a room." Nothern SEC Dep. at 99-100. Toone Decl. Ex. B. Treasury specifically chose

to institute "lockdown" procedures for its quarterly refunding announcements only following the

October 31, 2001 press conference at issue. Fratto Dep. at 236-38; Holahan Dep. at 253.

Finally, the SEC misstates the record with respect to the documents and testimony

Nothern has sought. It writes that the "more Treasury employees Nothern deposed, the more

employees he sought to depose," and misleadingly suggests that the depositions Treasury has

denied relate to "five additional witnesses." Docket 71, Ex. 1 at 3-4. But Nothern submitted

only two *Touhy* request letters to Treasury for deposition testimony – on May 18 and August 16,

2006 – and two of the depositions denied by Treasury were requested in Nothern's first letter. In

fact, Treasury initially approved one of those depositions (David Aufhauser) on June 9, 2006,

then <u>withdrew</u> its authorization two business days before his scheduled deposition in November.

*See* Docket # 51, Exs. B & N. Moreover, the contention that Nothern has sought an excessive

number of depositions is belied by the parties' early stipulation that each side could take twenty

(20) fact depositions, instead of the presumptive limit of ten (10) set forth in Local Rule 26.1(c).

*See* Docket # 21 (Joint Statement Pursuant to Local Rule 16.1(D)).

The SEC further claims that it first proposed sending, on a "voluntary" basis, narrowed

document requests to DOJ and Treasury, but that Nothern "rejected it." Docket 71, Ex. 1 at 3 n.3.

That is false. <u>Nothern</u> proposed in December 2005 that the SEC forward narrowed requests to

other involved agencies as a means of avoiding the present dispute and without waiver of either

its or Nothern's legal positions – but SEC refused to proceed unless Nothern waived "any right

to move to compel production or for sanctions should those agencies and departments decline to

provide them and waives any right to seek a privilege log for documents withheld." Docket #

30, Ex. V (letter of Dec. 16, 2005).

Indeed, even though it has been clear throughout this case that Treasury documents and

- 4 -

testimony would be critical, the SEC has refused on several occasions to assist Nothern's efforts

in obtaining such discovery.  For example, after the SEC agreed, at Magistrate Judge Sorokin's

prompting, to forward Nothern's document requests to Treasury, Treasury responded by treating

them as "*Touhy* requests" and therefore subject to the broad limitations set forth under Treas-

ury's *Touhy* regulations.  Those regulations, however, state that they "shall not be applicable to

official requests of other government agencies."  31 C.F.R. § 1.12.  Notwithstanding this lan-

guage, the SEC contends (Docket 71, Ex. 1 at 13 n.16) that it is "incorrect" to say that the

regulations "do not apply to the SEC" because "they do not confer any legal obligation on the

part of Treasury … to release the documents or witnesses to the SEC."  This is a non sequitur.

Treasury's invocation of its inapplicable *Touhy* regulations created a substantial and unnecessary

barrier to Nothern's efforts to obtain discovery in this case – and the SEC has done nothing to

remedy the problem despite Nothern's request that it simply clarify to Treasury that its requests

were in fact "official."

Similarly, in an effort to resolve the dispute on Treasury depositions, counsel for Nothern

proposed on November 8, 2006 that the SEC request Treasury to authorize the depositions at

issue.  *See* Docket # 51, Ex. M. at 1.  The SEC rejected this proposal.  *Id.*; Docket # 50, at 9-10.

Now, the SEC argues that Nothern's "criticism is misplaced especially in light of the fact that

prior to filing his motion to show cause Nothern never sought reconsideration of Treasury's

decisions."  Docket # 71, Ex. 1 at 18 n.17.  But, in fact, Nothern <u>did</u> urge Treasury to reconsider

its decisions to deny his requests to depose Jill Cetina, *see* Docket # 51, Ex. I at 2 ("I urge you to

reconsider your statement regarding Treasury's denial of our request."), and David Aufhauser,

*see id.*, Ex. O. at 1 ("I am shocked and deeply disappointed by Treasury's decision, which clearly

reflects a deliberate decision on your part no longer to cooperate with our discovery efforts in

this case.").  Treasury ignored both letters.  Treasury might not have ignored a reconsideration

request from the SEC, but the SEC refused to make one.

**B.    Nothern Has Diligently Sought Discovery Through Alternative Means.**

The SEC erroneously contends (Docket 71, Ex. 1 at 1) that Nothern has failed to take "full advantage" of alternative means to obtain the documents and testimony he seeks from the other agencies.  In fact, as the Magistrate Judge recognized (Docket # 63, at 14), Nothern has diligently pursued this discovery through a variety of means.  Given the recalcitrance of Treasury, however, there is no assurance that those other means will succeed.

**1.    APA Action on Treasury Depositions**

On February 21, 2007, Nothern filed an action in this District under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, challenging Treasury's refusal to allow depositions of its five employees.  *Steven E. Nothern v. United States Department of the Treasury*, Civil Action No. 07-10347-NMG (D. Mass.).  This suit contends that Treasury's actions in denying Nothern's requests were arbitrary, capricious, and not premised on any valid and applicable federal regulation and statute.  Treasury has been served with the complaint and has 60 days to respond.

**2.    FOIA Request to Treasury**

Nothern has also pushed Treasury and the United States Secret Service (an agency formerly located at Treasury, now at the Department of Homeland Security ("DHS")) to respond to the FOIA requests he submitted over a year ago on, respectively, November 11 and December 20, 2005.  *See* Docket # 37, Exs. B & C.  As noted in the parties' Joint Motion for an Extension of Time (Docket # 64, at 2-3), on January 23, 2007 Nothern filed an administrative appeal of his FOIA request based on the representation of Treasury's Office of General Counsel on December 19, 2006 that its production of responsive documents was "final" and "complete."  *See* Docket # 60, Ex. 1.  In this production, Treasury redacted or withheld completely 276 pages of documents it asserted to be immune from disclosure on grounds of "deliberative process" and other privi-

leges.  Nothern has contended that Treasury's withholding was contrary to applicable law and his

ability to obtain a fair adjudication of his case.  *See* Docket # 62, at 2-10.

On February 23, 2007, Treasury informed Nothern that its December 19, 2006 production

was <u>not</u>, in fact, its response to his 2005 FOIA request, and that "the appeal of Treasury's pro-

duction in your January 23, 2007 letter was not yet ripe."  Toone Decl. Ex. C at 1.  Treasury

stated that it was only now (*i.e.*, 14 months after Nothern's request) making its final production,

which included 603 pages released in full and 135 redacted pages.  *Id.*  Treasury further stated

that it was withholding 137 pages in full, and concluded, "now that Treasury's production is

complete ... , you have the right to appeal the partial denial of the FOIA request."  *Id.*

Even though a plaintiff in a FOIA case is entitled to an itemized index of all documents

that an agency has withheld, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), Treasury did

not provide such an index with its February 23, 2007 letter.  However, Treasury did disclose

some documents that it had previously withheld in its prior production to Nothern and the SEC –

describing them as "discretionary disclosures of some otherwise exempt material."  Toone Decl.

Ex. C at 1.  These documents fully confirm Nothern's belief that Treasury has improperly ap-

plied legal privileges to withhold clearly relevant information.

To take just one example, one of the documents previously withheld by Treasury and

now disclosed on a "discretionary" basis contained the following e-mail message from former

Director of Office of Public Affairs Tony Fratto:

> I meant that long before the highly professional and competent Bush
> Administration Treasury appointees arrived on the scene, this place leaked like a
> sieve; and that we wouldn't be talking if our predecessors hadn't been letting
> jokers like Pete Davis into refunding announcements for the past eight years.

A copy of this unredacted document is set forth at Toone Decl. Ex. D.  Even though this message

is highly relevant to the claims and defenses in this case, Treasury had previously justified its

decision to withhold it by invoking the attorney-client privilege, law-enforcement privilege, work-product doctrine, and deliberative-process privilege. *See* Docket # 60, Ex. 2 at 4 (document identified as TREAS-00024-00027 on Treasury's privilege log); Toone Decl. Ex. E (copy of document as initially redacted). But none of those privileges applied, since there was no pertinent or anticipated legal issue or proceeding, no law enforcement investigative techniques or sources were involved, and the message was unrelated to the formulation of official policy. *See* Fed. R. Civ. P. 26(b)(3); *State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 69, 72 (1st Cir. 2002); *Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 884, 884-85 (1st Cir. 1995); *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 237 (1st Cir. 1994); *Association for Reduction of Violence v. Hall*, 734 F.2d 63, 65-66 (1st Cir. 1984).

The clearly invalid privilege claims asserted with respect to this and other documents suggests that Treasury has improperly withheld many more. Accordingly, on March 1, 2007, Nothern submitted, again, an administrative appeal asking Treasury to reverse its adverse determinations "and produce the requested materials as soon as possible." *See* Toone Decl. Ex. F. Treasury must respond to Nothern's appeal within 20 working days, at which time its response will be final and subject to judicial review. Nothern is prepared to file suit immediately thereafter. *See* 5 U.S.C. § 552(a)(6)(ii); 31 C.F.R. § 1.5(i)(3).

### 3.    FOIA Request to Secret Service / DHS

Nothern is also prepared to file a FOIA complaint against the Secret Service, another agency that has engaged in inexcusable delay in responding to Nothern's document requests.

Nothern first submitted his requests to the Secret Service on December 9, 2005. Docket # 37, Ex. C. On August 18, 2006, the agency requested narrowed requests, which Nothern provided on August 28, 2006. Docket # 58, Ex. 2. On September 18, 2006, Secret Service sent a letter treating Nothern's narrowed requests as new FOIA requests, but stating that it would con-

duct its search "as expeditiously as possible." *Id.*, Ex. 3.

Then, on February 1, 2007, the Secret Service sent a new letter claiming for the first time that three of Nothern's requests constitute "a third party request" and require "a properly notarized release from each individual." Toone Decl. Ex. G.[3]  One of those requests seeks documents relating to a November 6, 2001 memorandum of Sgt. John Muskett, a Secret Service employee.  This memorandum, which listed the individuals who were cleared to attend the October 31, 2001 press conference at Treasury, was attached as an exhibit to Treasury's Office of Inspector General report of January 2002.  *See* Toone Decl. Ex. H.  The other two requests seeks documents concerning the admittance of Peter Davis – the alleged tipper – to Treasury press conferences from 1993 through 2001.

In a response dated March 2, 2007, Nothern explained why the privacy provisions of FOIA do not require requesters to submit notarized releases for requests relating to official government actions and memoranda, and why the substantial public interest in the underlying events at Treasury would outweigh any hypothetical privacy interests.  *See* Toone Decl. Ex. I at 2-4.  If the Secret Service does not produce the requested materials, Nothern is prepared to file a FOIA action against it at the same time it files against Treasury.  The agencies will have 30 days to respond.  5 U.S.C. § 552(a)(4)(C).[4]

## C.    The Applicable Case Law Supports Nothern's Requests for Discovery.

The legal principle on which Nothern relies is clear and unequivocal: "When an agency

---

[3] Due to the Secret Service's failure to address its letter to any individual, Nothern's counsel did not receive its letter until the end of February 2007.

[4] The parties' pending Joint Motion to Extend Case Deadlines describes Nothern's plan to file in the District of Massachusetts his APA action against Treasury and his FOIA actions against Treasury and the Secret Service / DHS, and requests that the Court accordingly extend all existing discovery and dispositive motion deadlines in this case "until such time as the Court is able to render a decision on the related FOIA and APA actions."  Docket # 64, at 4-5.

of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff." *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979) (citing *Harvey Aluminum (Inc.) v. NLRB*, 335 F.2d 749, 754 (9th Cir. 1964)).  The reasoning in *Ghana Supply Commission* applies with equal force here.  The SEC is an enforcement agency of the U.S. government.  It is undisputed that in this case the SEC worked in coordination with Treasury and DOJ in investigating the events of October 31, 2001.  The SEC may not now withhold discovery from these agencies on the ground it is not in its immediate possession.

In its response (Docket 71, Ex. 1 at 13), the SEC criticizes Nothern for not citing *Ghana Supply Commission* during oral argument, but fails to acknowledge Nothern's extensive and repeated discussion of the case in his briefs.  *See* Docket # 31, at 10-11, 14, 16, 20; Docket # 36, at 3-9; Docket # 45, at 15; Docket # 50, at 14; Docket # 57, at 4, 6, 14; Docket # 59, at 10-11.  The SEC then argues that *Ghana Supply Commission* has "no bearing whatsoever" (Docket 71, Ex. 1 at 14) because the plaintiff agency in that case asserted an intragovernmental or executive privilege.  Yet while the court, applying Massachusetts law, held that the plaintiff had waived any available privilege, *see* 83 F.R.D. at 594, its discussion of the duty of government agencies to produce documents beyond those "in the immediate possession of the particular agency-plaintiff" was not limited to that issue, *see id.* at 595.  Furthermore, neither of the cases cited by the court as support for its holding ?  *Harvey Aluminum* and *Bank Line v. United States*, 76 F. Supp. 801, 803-04 (S.D.N.Y. 1948) ?  involved a claim of governmental privilege.[5]

In its effort to distinguish away *Harvey Aluminum*, the SEC begins by misstating No-

---

[5] In *Bank Line v. United States*, 76 F. Supp. 801, 803-04 (S.D.N.Y. 1948), the court ruled that the Justice Department could not bring suit for damages payable to Treasury where the Navy refused to produce relevant documents.

thern's brief.  In his Objections, Nothern wrote:

> Importantly, Nothern has not cited *Harvey Aluminum* as authority for the SEC's duty to produce documents.  That duty is established independently by Rule 34.  Instead, as the court in *Ghana Supply Commission* recognized, *Harvey Aluminum* stands for the proposition that when a duty to produce documents exists in the law, even an independent agency like the NLRB or SEC cannot circumvent that duty by arguing that the documents are held by a separate agency, so long as that agency (like DOJ and Treasury here) is subject to the President's authority.

Docket # 65, at 16.  In its response (Docket 71, Ex. 1 at 12), the SEC maintains that this passage constitutes an admission "that *Harvey* does not serve as authority for the SEC's duty to produce documents from other government agencies" (emphasis added).  But that is not what Nothern admitted, and that is not what *Harvey* held.  To the contrary, the ruling in *Harvey Aluminum* made clear that even independent agencies like the SEC must produce responsive documents held by Executive Branch agencies like DOJ and Treasury.  Indeed, that was precisely the point made by the court in *United States v. AT&T Co.*, 461 F. Supp. 1314 (D.D.C. 1978) – the case chiefly relied on by the SEC – when it explained why *Harvey Aluminum* "is not to the contrary":

> The court there was essentially concerned with Jencks Act statements in the possession of executive departments.  The President was held to have adequate authority over such departments to procure production, and the courts to order it.  The President lacks that capacity with respect to regulatory agencies ….

461 F. Supp. at 1336 n.63 (emphasis added).  DOJ and Treasury are subject to an executive officer, the President, whose duties include the faithful execution of all federal laws, including the securities laws.  U.S. Const. art. II, § 3.  That is why both *Harvey Aluminum* and *AT&T* ruled that an agency's discovery obligations extend to documents held by such Executive Branch entities, regardless of the independent or non-independent status of the agency that initiated the litigation. [6]

---

[6] None of the other cases cited by the SEC supports its position.  In *United States v. Davis*, 140 F.R.D. 261 (D.R.I. 1992) (*see* Docket # 71, Ex. 1 at 12 n.15), the court held that separation of powers issues and the Constitution's Speech and Debate Clause prevented it from ordering DOJ

The SEC further contends (Docket 71, Ex. 1 at 13) that the Magistrate Judge distinguished *Harvey Aluminum* on the ground that a statute, 29 U.S.C.A. § 161(b), allowed the NLRB "to obtain documents from other government agencies upon request by the Board at the direction of the President." But while the Magistrate Judge did mention § 161(b), he did not find that it made this case "materially different" from *Harvey Aluminum*. *See* Docket # 63, at 11. And, in fact, there is no difference between the two. Rather than impose an obligation on the President to order Executive departments to produce statements, § 161(b) recognized his discretion to direct it. Similarly, there is no guarantee in this case that the President will order DOJ and Treasury to provide discovery that Nothern seeks – but he certainly has the authority to do so and his constitutional obligation to execute the laws provides that he should.

Just as DOJ unsuccessfully argued in *AT&T* that it had "little influence over other agencies of the government," 461 F. Supp. at 1334 n.58, the SEC hinges its argument on its lack of control over other federal agencies. Clearly, the SEC could have done far more to assist Nothern's efforts in obtaining discovery from DOJ and Treasury. As discussed in Section A, *supra*, the SEC could have asked Treasury to authorize the five depositions in question, or urged Treasury not to treat the SEC's document requests as *Touhy* requests in violation of its own regulations. But even if these measures had not been available to the SEC, Nothern – the individual the SEC chose to sue – "obviously" has "even less influence over the agencies" than the SEC, and he is entitled to his "discovery rights irrespective of the effect on inter-departmental

---

to produce documents held by Congress. As the court observed: "This is not a question of a different executive agency; this in fact is an entirely separate branch of the federal government." *Id.* at 263. In *In re Air Crash at Dallas/Fort Worth Airport*, 117 F.R.D. 392, 393 (N.D. Tex. 1987) (Docket # 71, Ex. 1 at 12 n.15), the relevant documents were held by the National Transportation Safety Board – an "independent agency," unlike DOJ and Treasury in this case. Finally, in *SEC v. Biopure Corp.*, No. 05-00506 (RWR/AK), 2006 WL 2789002, *4 (D.D.C. Jan. 20, 2006) (Docket # 71, Ex. 1 at 12), the court quashed subpoenas served on the Food and Drug Administration, another independent agency, on the ground that the word "person" in Federal Rule of Civil Procedure 45 does not apply to federal agencies (an interpretation subsequently reversed in *Yousuf v. Samantar*, 451 F.3d 248 (D.C. Cir. 2006)).

relationships." *Id. Accord Harvey Aluminum*, 335 F.2d at 754-55 (holding that while it "may well be true" that discovery obligation left NLRB "at the mercy" of other agencies, it was "less defensible still to resolve such agency disputes" by allowing government to proceed against defendant who had been denied discovery); *Ghana Supply Comm'n*, 83 F.R.D. at 595 ("If the government sues through one of its agencies and another agency possesses the information that must be disclosed, it is only fair that the government or other agency decide whether secrecy of the materials is worth dismissal of the lawsuit.").  The applicable case law, as well as the princi-ple of fundamental fairness that underlies the Due Process Clause, requires the government to produce all relevant discovery or dismiss this action.

## **CONCLUSION**

For the reasons discussed above and in Nothern's Objections (Docket # 65), the Court should set aside the Magistrate Judge's Order denying Nothern's motions and enter an order directing the government to produce all relevant documents and allowing Nothern to conduct his requested depositions.

STEVEN E. NOTHERN

By his attorneys,


/s/ John A. Shope
Nicholas C. Theodorou, BBO #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO #6443249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000


Dated:  March 7, 2007

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ John A. Shope

B3325931.6

- 14 -

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Civil Action No. 05-10983 (NMG)** |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF ROBERT E. TOONE FILED IN SUPPORT
## OF DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
## OF HIS OBJECTIONS TO MAGISTRATE JUDGE'S ORDER

Robert E. Toone, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am an attorney for Steven E. Nothern in the above-referenced matter.  I am a member of the Massachusetts bar and the bar of this Court.  I make this declaration based upon my own personal knowledge, upon public records, and upon the documents related to this action.

2.      True and correct excerpts from the deposition transcript of Brian Collins (May 12, 2006) are attached hereto as Exhibit A.

3.      True and correct excerpts from the SEC deposition transcript of Steven E. Nothern (Dec. 4, 2001) are attached hereto as Exhibit B.

4.      A true and correct copy of a letter from Richard K. Delmar, Counsel to the Inspector General, and Thomas M. McGivern, Assistant to the General Counsel, at the Department of the Treasury, to Robert Toone at Foley Hoag LLP, dated February 23, 2007, is attached hereto as Exhibit C.

5.      A true and correct copy of an unredacted e-mail exchange between Tony Fratto and Megan Hills on November 15, 2001, as produced by Treasury in its FOIA response on February 23, 2007 (FOIA Doc. Nos. 630-33), is attached as Exhibit D.

6.      A true and correct copy of a redacted e-mail exchange between Tony Fratto and Megan Hills on November 15, 2001, as produced by Treasury in its *Touhy* production to the SEC and Nothern (Doc. Nos. TREAS-00024-27), is attached as Exhibit E.

7.      A true and correct copy of a FOIA appeal to Treasury submitted by Robert E. Toone at Foley Hoag LLP on behalf of Steven Nothern on March 1, 2007 is attached hereto as Exhibit F.

8.      A true and correct copy of a letter from Kathy J. Lyerly, SAIC, United States Secret Service, Department of Homeland Security, to Foley Hoag LLP, dated February 1, 2007, is attached hereto as Exhibit G.

9.      A true and correct copy of a memorandum written by Sgt. John F. Muskett, United States Secret Service, dated November 6, 2001, is attached hereto as Exhibit H.

10.      A true and correct copy of a letter from Robert E. Toone at Foley Hoag LLP to Kathy J. Lyerly, SAIC, United States Secret Service, Department of Homeland Security, dated March 2, 2007, is attached hereto as Exhibit I.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 7, 2007.

_____
Robert E. Toone

**EXHIBIT A**

**Cited Excerpts from the Deposition
Transcript of Brian Collins
(May 12, 2006)**

Brian Collins                                              May 12, 2006

Washington, DC

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - X

UNITED STATES SECURITIES AND     :

EXCHANGE COMMISSION,             :

       Plaintiff,            :

   v.                            :   Civil Action No.

STEVEN E. NOTHERN,               :   05-10983(NMG)

      Defendant.            :

- - - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 12, 2006

     Videotape Deposition of BRIAN COLLINS, a

witness herein, called for examination by counsel for

the Defendant in the above-entitled matter, pursuant

to notice and subpoena, the witness being duly sworn

by PENNY M. DEAN, a Notary Public in and for the

District of Columbia, taken at the law offices of

Foley Hoag, LLP, 1875 K Street, NW, Washington, D.C.,

at 10:44 a.m., Friday, May 12, 2006, and the

proceedings being taken down by Stenotype by PENNY M.

DEAN, RPR, and transcribed under her direction.

Brian Collins                                                    May 12, 2006

Washington, DC

Page 66

1    Q.   I believe you testified before that you
2  recalled receiving a press announcement hand out on
3  October 31, 2001, correct?
4    A.   Yes.
5    Q.   As best you recall, is Exhibit 5 a copy of
6  what you received on that date?
7    A.   It looks very much like it.
8         (Exhibit No. 6 was marked for
9         identification.)
10    BY MR. SHOPE:
11    Q.   And just to save time, Mr. Collins, you're
12  welcome to read the entire Exhibit 6, but I'm going
13  to be asking you about the bottom paragraph on the
14  first page, and then the top of the second page.  And
15  just let me know when you're ready.  All set?
16    A.   Yes.
17    Q.   First of all, Exhibit 6 recounts a call
18  from you to Janice Smith.  And the letter, which is
19  Exhibit 6, states that this occurred approximately
20  9:35 a.m., is that consistent with your own memory?
21    A.   No.
22    Q.   That your call to her was some time before
23  10 o'clock that day, correct?
24    A.   Correct.
25    Q.   So when you say it's not consistent with

Page 67

1  your memory, what's -- what are you disagreeing with?
2  This is specifically on the 9:35 a.m. piece, we'll
3  break it down into bits and pieces.
4         MR. RITTINGER:  I object to the use of the
5  word or the form of disagreeing.  I don't think it's
6  a disagreement, I think it's just a different
7  recollection.
8         BY MR. SHOPE:
9    Q.   Okay, I'm asking -- basically, what I'm
10  asking for is just to get as best your memory I can.
11  And I recognize that this was five years ago, so I
12  understand that we're testing your memory to the
13  limit here.  I just -- what I'm trying to get at is,
14  what's your best memory as to when it was that you
15  called Ms. Smith at Fannie Mae?
16    A.   I would guess it would had to have been at
17  least about 10:45 or 10:50.  I mean 9:45 to 9:50.
18    Q.   And you're basing that on what?
19    A.   I'm basing it on the fact that I walked
20  back from the Treasury Department, got into any
21  office, I think I as I mentioned I talked to
22  Mr. Muolo for at least a minute or something.  I sat
23  down and tried to write something first, and it just
24  didn't have much pizzazz to it.  I went over and
25  looked at the TV, CNBC.  And then I put -- I figured

Page 68

1  I'd try to call somebody, see if I can get some
2  comment.
3    Q.   By the way, was there a reason why it was
4  Fannie Mae in particular?
5    A.   They are a big mortgage company.
6    Q.   And I apologize if I asked you this
7  before, but had you heard anything about the possible
8  suspension of the long bond before October 31, 2001?
9    A.   I can't recall.
10    Q.   Now, there's reference here to a Lesia or
11  Lesia Bullock, media relations manager; do you see
12  that?
13    A.   Um-hum, yes.
14    Q.   Do you know Ms. Bullock?
15    A.   I'm not sure, I don't think so.
16    Q.   And so did you have any awareness that she
17  was at all privy to what you were saying on October
18  31, 2001?
19    A.   No.
20    Q.   Okay, okay.  And I take it nobody from
21  Fannie Mae ever called you back with any kind of a
22  comment, right?
23    A.   No.
24    Q.   Did you make any notes of your -- the
25  message that you had left for Ms. Smith?

Page 69

1    A.   No.
2    Q.   Did you make any notes of your discussion
3  with Mr. -- with your executive editor?
4    A.   No.
5    Q.   Okay.  And did you take any notes at the
6  press conference itself?
7    A.   Geez, I don't remember.  I don't think I
8  even got a chance to sit down.
9    Q.   Was that because it was standing room only
10  in the room where the press conference was being
11  conducted?
12    A.   I know I was in the back, that's for sure.
13    Q.   So in other words, you came in late, you
14  were in the back, and at least there weren't any
15  chairs that were in close proximity to somebody
16  coming in at the back?
17    A.   I just don't remember sitting down.
18    Q.   But, I mean -- well, let me put it this
19  way, would it have been your preference to sit if
20  there had been an open chair that was readily
21  accessible?
22         MR. ROSSETTI:  Objection.
23         THE WITNESS:  I don't know.  Usually I do
24  sit down at press conferences.
25         BY MR. SHOPE:

18 (Pages 66 to 69)





Ann M. Kappler

Senior Vice President and
General Counsel
Legal Department

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
202 752 4850
202 752 4439 (fax)
ann_kappler@fanniemae.com

December 7, 2001

CONFIDENTIAL TREATMENT REQUESTED
PURSUANT TO 17 C.F.R. § 200.83

<u>Via Facsimile and First-Class Mail</u>

Mr. William M. Hathaway
Senior Counsel
Division of Enforcement
United States Securities and Exchange Commission
450 Fifth St., N.W.
Washington, D.C. 20549-8505

    <u>Re: In the Matter of Trading in Certain Treasury Issues (HO-09353-A)</u>

Dear Mr. Hathaway:

This letter is in response to your letter request to Fannie Mae dated November 9, 2001 regarding the above-captioned matter. In accordance with Fannie Mae's letter to you dated November 16, 2001, set forth below is a chronological summary of the actions and communications of Fannie Mae personnel on October 31, 2001, prior to 10:00 a.m., concerning the decision of the U.S. Department of Treasury to suspend issuance of the 30-year bond ("the suspension decision") and the details of Fannie Mae's sole transaction in U.S. Treasury securities on October 31, 2001. The summary set forth below is based on our interviews of all those who we reasonably believe to be knowledgeable about the underlying events. We have not interviewed everyone who might potentially have been in a position to hear others discussing the relevant events, and the time periods of the events described are based on reconstructed recollections and on estimates. We believe this summary is a fair and accurate description and is responsive to the questions you have asked. If we become aware of additional information relevant to this matter, we will advise you promptly.

<u>Chronology of Actions and Communications</u>

At approximately 9:35 a.m., Janis Smith, Director---Financial Communications, received a call from Brian Collins, a reporter at *National Mortgage News*. Mr. Collins informed Ms. Smith that he had attended a press briefing at the U.S. Department of Treasury regarding the suspension decision. He told Ms. Smith that the information was "embargoed" until 10:00 a.m., but he wanted to know what comment (specifically from an economic viewpoint) Fannie Mae would have regarding the news. He also informed

SECNOTH00115338

Ms. Smith that an official press release would be issued by the U.S. Department of Treasury at around 10:00 a.m. Lesia Bullock, Media Relations Manager, was present in Ms. Smith's office and overheard the conversation, as it took place on speaker phone.

Between about 9:40 and 9:45 a.m., Ms. Smith contacted John The Losen, Vice President of Debt Marketing, Jennifer Iba, Director – Regulatory Policy, and Orawin Velz, Senior Economist, to inform them of her conversation with Mr. Collins and to request their comments or views on the matter. She told them the information was embargoed until 10:00 a.m. and that she would forward a copy of the official press release to them as soon as she received it.

At approximately 9:45 a.m., Ms. Smith checked the U.S. Treasury Web site and discovered that the formal announcement of the suspension decision had already been posted and was marked "FOR IMMEDIATE RELEASE". She printed the announcement and reviewed it. At 9:53 a.m., Ms. Smith sent the release via email to Mr. The Losen, Ms. Iba and Ms. Velz.

Prior to receiving the release, between about 9:45 and 9:50 a.m., Mr. The Losen separately approached Ursula O'Donnell, Director – Hedging, Nadine Bates, Director – Long-term Funding, Ken Barnes, Director – Liquid Investment Portfolio, and Thomas Lawler, Senior Vice President – Portfolio Management. Mr. The Losen told them of his conversation with Ms. Smith and stated that he was not certain that the information was accurate but that he would forward any formal announcement to them. Although Mr. The Losen directed his remarks to the individuals mentioned above, he did not address them privately, making it possible for persons in the near vicinity to overhear him. Mr. The Losen's remarks to Ms. O'Donnell were overheard by Matt Johnson, a trader who works for Ms. O'Donnell.

After speaking to Mr. The Losen, at approximately 9:50 a.m., Ms. O'Donnell called David Light, a salesperson at Salomon Smith Barney Inc., and asked him whether he had heard any general rumors regarding the Treasury market that morning. She did not reveal the details of her conversation with Mr. The Losen, nor indicate that Fannie Mae had any information regarding the suspension decision. Mr. Light told her that he had not heard anything new, just usual rumors of the elimination of the 30-year Treasury bond and a possible change in the frequency of the 5-year Treasury note auctions. Subsequently, Joe Anderson, a salesperson from Merrill Lynch & Co., called Ms. O'Donnell and asked her if she had heard any rumors or confirmation of the elimination of the 30-year Treasury bond. Ms. O'Donnell said she did not have any information on the subject.

At about the same time that Ms. O'Donnell had these conversations, Matt Johnson called Michael Furman, a salesperson at Credit Suisse First Boston Corporation, and asked him if he had seen any formal announcement regarding the elimination of the 30-year U.S. Treasury bond. Mr. Furman replied that he had heard the rumor but had not received any confirmation of its validity. Mr. Johnson also called Don Clark at Goldman, Sachs & Co. with the same question. Mr. Clark also had heard the rumor but had no confirmation of its validity. Mr. Johnson did not reveal that Fannie Mae had received any information

SECNOTH00115339

regarding the suspension decision in either conversation. Following these phone calls, another Fannie Mae trader, Robert Dolecki, asked Mr. Johnson whether he had received any information regarding the potential suspension decision. Mr. Johnson informed Mr. Dolecki of what Mr. The Losen had told Ms. O'Donnell, but told him that he still did not know whether the information was true. During this time, Deborah Perelmuter, Senior Vice President at the Federal Reserve Bank of New York, was meeting with Mr. Dolecki and others in the trading room to discuss Fannie Mae's trading technology. Ms. Perelmuter likely overheard the exchange between Mr. Johnson and Mr. Dolecki or other conversations regarding the news report.

Also around the same time, Mr. Lawler checked the news wires (Reuters, Bloomberg and others) to see if there was any confirmation of the information that Mr. The Losen had shared with him. He did not see any relevant headlines. Mr. Lawler also spoke to a few of his senior traders and informed them of his conversation with Mr. The Losen, advising them that he still did not know whether the information was true. One of his traders, Jack Scott, told Mr. Lawler that he had heard a similar rumor.

Also during this time, Mr. Ken Barnes called a salesperson at Morgan Stanley & Co. Incorporated, Thomas McCaffrey, and asked him if he had heard anything regarding a decision by the U.S. Treasury to suspend issuance of the 30-year bond. Mr. Barnes did not reveal the details of his conversation with Mr. The Losen, nor indicate that Fannie Mae had any information regarding the suspension decision. Mr. McCaffrey said that he would check with his economist, David Greenlaw, and would call back Mr. Barnes. Mr. McCaffrey promptly called back Mr. Barnes and told him that while Morgan Stanley had not received any confirmation of the news, it was Mr. Greenlaw's opinion that the information was false. Mr. Barnes told a number of traders in the area that Morgan Stanley had told him that the rumor was false.

Nadine Bates did not have any communications or take any actions regarding the potential suspension decision following her conversation with Mr. The Losen.

Shortly after 9:53 a.m., Mr. The Losen, Ms. Iba and Ms. Velz received the e-mailed press release from Ms. Smith. Ms. Iba replied to Ms. Smith that Fannie Mae should make no formal comment to the press regarding the announcement. (It is common practice at Fannie Mae for public announcements to be cleared first with the Regulatory Policy department.) Ms. Smith called Ms. Velz and left her a voicemail regarding Ms. Iba's instructions. (Ms. Smith also sent Ms. Velz an e-mail to that effect.) Ms. Smith also called Mr. The Losen and conveyed the same instructions to him. Accordingly, neither Ms. Velz nor Mr. The Losen made any comment regarding the suspension decision to any news service, nor did they discuss the suspension decision with anyone else outside of Fannie Mae prior to 10:00 a.m.

Between 9:55 and 10:00 a.m., Mr. The Losen printed the release and distributed it by hand to Ms. O'Donnell, Mr. Barnes, Ms. Bates and Mr. Lawler. At Ms. Smith's request, Mr. The Losen also faxed a copy to Frank Raines, Chairman and Chief Executive

3

SECNOTH00115340

Officer, and Linda Knight, Senior Vice President and Treasurer, who were traveling in Asia on business.

At 10:00 a.m., several Fannie Mae traders saw reports on the news wires regarding the suspension decision. To the best of our knowledge, no Fannie Mae employee made any comment regarding the suspension decision to any member of the press.

<u>Transaction in U.S. Treasury Securities</u>

As discussed in our letter of November 16, 2001, Fannie Mae executed only one trade in Treasury instruments, a short sale, on October 31, 2001. Attached is a "Debt Order Form" which Fannie Mae's portfolio transactions area uses to instruct the Treasurer's Office to hedge Fannie Mae debt issuance. The Debt Order Form is time-stamped when received by the Treasurer's Office. The attached Debt Order Form was time-stamped "11:05 a.m." Shortly after 11:05 a.m., Mr. Johnson executed a short sale of $100 million 10-year U.S. Treasury notes as a hedge of future debt issuance. Fannie Mae executed the sale with Salomon Smith Barney Inc. Fannie Mae neither purchased nor sold any additional U.S. Treasury securities or derivatives thereof on October 31, 2001.

Please do not hesitate to contact me at (202) 752-4850 or Scott Lesmes at (202) 752-7801 if you have any questions regarding this letter or require any further information.

Sincerely,

4

SECNOTH00115341

# EXHIBIT B

## Cited Excerpts from the SEC
## Deposition Transcript of Steven E. Nothern
## (Dec. 4, 2001)

Page 1

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

```
In the Matter of:          )
TRADING IN CERTAIN         )
TREASURY ISSUES            )    File No. HO-9353
```

WITNESS: Steven E. Nothern

PAGES:  1 through 213

PLACE:  Securities & Exchange Commission
        450 5th Street, N.W. - Room 11602
        Washington, D.C. 20549

DATE:   Wednesday, November 28, 2001

        The above-entitled matter came on for hearing at
10:38 a.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

        ANDREW SPORKIN, ESQ.
        WILLIAM M. HATHAWAY, ESQ.
        Securities & Exchange Commission
        450 5th Street, N.W.
        Washington, D.C. 20549
        (202) 942-4613

On behalf of the Witness:

        JACK PIROZZOLO, ESQ.
        NICHOLAS THEODOROU, ESQ.
        Foley, Hoag, & Eliot
        One Post Office Square
        Boston, Mass., 02109.

---

Page 2

C O N T E N T S

WITNESS:                                         Page

Steven Nothern                                    3

EXHIBITS:       DESCRIPTION                  IDENTIFIED

222             Subpoena, nine-page document        5

223             Three-page Letter from the SEC,
                includes subpoena duces tecum       13

224             1/2 floor plan for 23rd floor
                on Boylston Street                  38

225             Other 1/2 of floor plan for 23rd
                floor on Boylston Street            38

226             Bloomberg message from WI Partners
                and RJ O'Brien & Associates         166

227             ITMO Trading in Certain Treasury Issues  167

228             Five page document; M-000113, 114, 114A,
                115 through M-116                   173

229             Legal and regulatory update by Steve
                Cavan                               184

230             MFS Co. statement of policy on Personal
                Securities Transactions             190

231             MFS Statement of Guidelines         191

---

Page 3

1            P R O C E E D I N G S
2       MR. HATHAWAY:  We are on the record.  It's
3  approximately 10:30.  This is December 4, 2001.  Would you
4  raise your right hand, sir?
5  Whereupon,
6            STEVEN E. NOTHERN
7  was called as a witness and, having been first duly sworn by
8  the, was examined and testified as follows:
9            EXAMINATION
10      BY MR. HATHAWAY:
11      Q  Would you please state and spell your full name for
12  the record?
13      A  Steven Eric Nothern -- S-t-e-v-e-n -- Eric --
14  Nothern -- N-o-t-h-e-r-n.
15      Q  Thank you.  I am William Maxwell Hathaway.  I go by
16  Max.  I will be joined shortly by my branch chief on this
17  project, Andrew Sporkin.  Both Andrew Sporkin and myself are
18  officers of the Commission for the purposes of this
19  proceeding.
20          This is an investigation by the United States
21  Securities and Exchange Commission.  It's: In the Matter of
22  Trading in Certain Treasury Issues.  Our file number is --
23  HO-9353.
24          It is an investigation is to determine whether
25  there have been any violations of the federal securities

---

Page 4

1  laws.
2          However the evidence adduced in this investigation
3  or today's testimony session might constitute violations of
4  other state or federal, civil or criminal statutes.
5          Prior to the opening of the record, which means
6  prior to our actually going the tape recorder on and
7  beginning here today, you were provided with a copy of the
8  formal order of investigation which is in front of you here
9  and I am touching it as I speak.
10          This copy of the formal order will remain available
11  for your examination throughout the course of today's
12  testimony session.
13          Have you had an opportunity to review the formal
14  order of investigation?
15      A  Yes, I have.
16      Q  You were also provided prior to the opening of the
17  record with a copy Exhibit No. 202, which is a copy of the
18  Commission's Form 1662.
19          Have you had an opportunity to read Exhibit No.
20  202?
21      A  Yes, I have.
22      Q  Do you at this time have any questions at this time
23  concerning this exhibit?
24      A  No.
25      Q  Mr. Nothern, are you represented by counsel?

Page 1 - Page 4

SECNOTH00117214

Page 97

1    Q  Did you know how information is disseminated at a
2 conference, refunding conference?
3    A  I don't.
4    Q  Did you know whether people were given press
5 releases?
6    A  I don't.
7    Q  Do you know whether persons attending a conference
8 are given reports of any nature?
9    A  I don't know.  Can I add one thing?
10    Q  Yes.
11    A  I am familiar with the fact that they distribute a
12 press release, because I've had those faxed to me.
13    Q  Do you know whether or not that distribution of the
14 press release occurred at the conference or --
15    A  That's what I don't know.
16    BY MR. SPORKIN:
17    Q  How did you get the faxes?
18    A  Mr. Davis would fax those after the quarterly
19 refunding announcements.  I've seen them before.
20    BY MR. HATHAWAY:
21    Q  Do these faxes occur the day of the conference or
22 the day after or --
23    A  I would guess same day.
24    Q  Why do you guess that?
25    A  Because I don't know specifically when they come

Page 98

1 in.
2    Q  Do you know whether there are any live feeds to the
3 media at a quarterly refunding conference?
4    A  No, I don't.
5    Q  Does CSPAN cover these conferences?
6    A  Not to my knowledge.
7    Q  Does CNN cover these conferences?
8    A  Not to my knowledge.
9    Q  Does any media or news service provide live
10 coverage of these conferences?
11    A  Not to my knowledge.
12    Q  Do persons attending a refunding conference receive
13 information from Treasury before Treasury makes it generally
14 available to the public?
15    A  I don't know the process.
16    Q  Are any restrictions placed on the ability of
17 persons to use the information that they receive from
18 Treasury at the refunding conference?
19    A  Not to my knowledge.
20    Q  Do persons receiving such information have to wait
21 any wait any amount of time before passing this information
22 along to others?
23    A  Not to my knowledge.
24    Q  Have you ever heard the term "embargo,"
25 e-m-b-a-r-g-o, as it relates to information?

Page 99

1    MR. THEODOROU:  As of what date?
2    BY MR. HATHAWAY:
3    Q  As of today, have you heard that term "embargo"
4 used in the context of information?
5    A  Yes.
6    Q  What does it mean to you, as you sit here today?
7    A  With regards to the Treasury, I don't know what it
8 means.  To me it's a term that applies to the press.
9    Q  What does it mean to you in terms of that?
10    A  Other departments, and I know Labor Department
11 specifically, so one other department, has a process for
12 release of what they deem to be market sensitive information
13 whereby they actually lock the press in a room, it's my
14 understanding at Labor Department, for releases such as the
15 employment report, and they also release the CPI report.
16    They give information to the press, and the doors
17 aren't unlocked at a point in, and also has access, to my
18 understanding, electronic media.  So they can actually digest
19 the information they're being given and write their story.
20    But there is some sort of mechanism whereby it
21 doesn't get filed with the home office, or whatever their
22 process -- you know, the reporter's procedures are, until
23 there's some sort of release of the electronic media.
24    So I think the Labor Department controls both the
25 physical environment and the electronic dissemination of the

Page 100

1 report, but they want to give them time to construct their
2 stories that will hit the wires.
3    Q  How did you learn of this process at Labor?
4    A  Specifically, it's just general knowledge.
5    Q  How long have you known this?
6    A  I don't know.  Specifically, it's just general
7 knowledge.
8    Q  Have you known this for at least a year?
9    A  Oh, yes.
10    Q  Five years?
11    A  I don't know the answer.
12    Q  It is your testimony that you've known for at least
13 a year that the Labor Department used the process you just
14 testified to when it came to releasing market sensitive
15 information?
16    A  Yes.
17    Q  How does the term "embargo, in your mind, fit in
18 that context that you just testified to?
19    A  That process is described as an embargo process.
20    BY MR. SPORKIN:
21    Q  Are you aware of any other U.S. agencies or
22 departments that use this process?
23    A  No, I'm not.
24    Q  Do you know whether the Federal Reserve uses this
25 process in releasing interest rates?

Page 97 - Page 100

SECNOTH00117238

**EXHIBIT C**


**Letter from Richard K. Delmar, Counsel to the
Inspector General, and Thomas M. McGivern,
Assistant to the General Counsel, at the Department of the
Treasury, to Robert Toone at Foley Hoag LLP
(Feb. 23, 2007)**



# DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

February 23, 2007

**BY E-MAIL**

Robert Toone
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2600

Re: Freedom of Information Act Request No. 2005-11-046

Dear Mr. Toone:

We received your letter dated January 23, 2007, in which you appealed Treasury's partial response to the November 11, 2005 Freedom of Information Act (FOIA) request submitted by Kevin Currid.

Treasury made an initial production to this FOIA request on June 13, 2006. Enclosed with this letter is Treasury's final production to the November 11, 2005 FOIA request. For clarity, a Bates labeled copy of the June 13, 2006 production is included in this final production.

In responding to this FOIA request, Treasury staff: recalled hard-copy documents from off-site storage; restored the e-mail accounts of former employees to search for potentially responsive electronic documents; and extensively searched a significant amount of hard-copy and electronic files at Treasury. With this production, Treasury is releasing 738 pages that were found to be responsive to the request, including 603 pages released in full, and 135 pages that are partially released. Included within this material being released are discretionary disclosures of some otherwise exempt material. Treasury is withholding 137 pages of materials in full. Information has been withheld pursuant to Treasury's authority under 5 U.S.C. § 552(b)(5), (b)(6), and (b)(7). No other responsive records were located. Treasury is not producing to you documents that already were released to you in full by the Securities and Exchange Commission in the fall of 2005.

Because this letter and the enclosed documents constitute Treasury's final production under the November 11, 2005 FOIA request, the appeal of Treasury's production in your January 23, 2007 letter was not yet ripe. However, now that Treasury's production is complete, pursuant to 5 U.S.C. § 552(a)(6)(A), you have the right to appeal the partial denial of the FOIA request. Treasury regulations found at 31 C.F.R. Part 1.5 outline the procedures for appeal. If you wish to appeal, you must do so within 35 days of the date of this letter. Your appeal must be in writing,

signed by you, and should be addressed to:

> Freedom of Information Appeal
> Disclosure Services, DO
> Department of the Treasury
> Washington, D.C. 20220

The appeal should identify November 11, 2005 as the date of the initial request, Treasury FOIA Request No. 2005-11-046, and the date of this final FOIA production letter.  If you choose to appeal, the deciding official on your appeal for Treasury Inspector General documents will be Harold Damelin, the Inspector General.  For other documents, the deciding official on the appeal will be Bernard J. Knight, Jr., from the Office of the General Counsel.

Sincerely,

Richard K. Delmar
Counsel to the Inspector General

Thomas M. McGivern
Assistant to the General Counsel
(Legislation and Litigation)

cc: Kevin Currid, Esq.
    Foley Hoag LLP

**EXHIBIT D**

**Unredacted E-mail Exchange between Tony Fratto and Megan Hills on November 15, 2001, as Produced by Treasury in its FOIA response on February 23, 2007**

**Alvarado, Carmen**

| | |
|---|---|
| **From:** | Hills, Megan |
| **Sent:** | Thursday, November 15, 2001 6:34 PM |
| **To:** | Fratto, Tony |
| **Subject:** | RE: Documents for SEC Inquiry |

Thank you.  Attached is my reply (let me know if you want any changes,  I will be faxing it later tonight)  Megan

sec4letter.wpd (6
KB)

------Original Message------
**From:** Fratto, Tony
**Sent:** Thursday, November 15, 2001 6:10 PM
**To:** Hills, Megan
**Subject:** RE: Documents for SEC Inquiry

Wrong paper -- Wall Street Journal - see below

I was asked if this was the first time that someone got into a Treasury press conference.  I replied:  "I can't say for certain, but I think it's likely that others in the past have found their way into these things."

Not particularly articulate.  I meant that I think it's very likely that others have gotten into these things in the past.  I think it unlikely that others have not gotten into these things in the past.

I meant that long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years.

```
Credit Markets:
In Wake of Criticism, Treasury Plans Regulations
Aimed at Stopping Leaks of Market-Moving News
----
By Gregory Zuckerman
Staff Reporter of The Wall Street Journal

The Wall Street Journal via Dow Jones

   The Treasury Department, facing criticism after an industry consultant
attended a press-only briefing last month and leaked market-moving news,
yesterday outlined new rules to try to keep its news under wraps.

   The changes, which some bond traders said were overdue, will bring the
Treasury more in line with the way other government agencies, including the
Federal Reserve and the Labor Department, release market-sensitive news.

   In announcing the changes, Treasury officials acknowledged the recent leak
probably wasn't the first time that someone from outside the press corps found
their way into a Treasury press briefing, raising the possibility that bond
traders have been receiving early word on market-moving news from Treasury for
years.

   "It's likely that others in the past" have participated in press briefings
though they weren't members of the press, said Tony Fratto, a spokesman for the
Treasury Department.

   Some of the changes are quite elementary. Now, for instance, instead of
releasing information to the press an hour or so before it is publicly
```

.1

available, the department is shortening the embargo period to a matter of minutes , easing disseminating 00933ANGY in the way the Federal Reserve operates.

In addition, the Treasury will require that people attending its briefings show press credentials to get into the room, as the Labor Department does. Until now, a simple piece of identification was enough.

The Treasury has been under fire since Oct. 31, when consultant Peter Davis leaked to his clients news that the government planned to stop selling the 30-year bond. The decision, which Mr. Davis told clients in advance of a Treasury embargo, resulted in the biggest bond-market rally in 14 years. Regulators are investigating the trading activities of his clients.

The new procedures will take effect on Jan. 30, 2002, at the next scheduled quarterly refunding announcement.

"The changes are intended to improve the timeliness and transparency of quarterly refunding announcements," the Treasury said in a statement.

Bond-market executives said the department's changes, while welcome, should have come a long time ago. "They should have done a better job policing their audience," said Bill Kirby, senior vice president at Prudential Securities. "Unfortunately, it's too little, too late. Some serious damage has already been done. Some people [in the bond market] are livid."

After a press-only briefing announcing the decision to stop selling the long bond, Mr. Davis contacted some of his clients, including Goldman Sachs, with the news. In the time between the end of the briefing and an inadvertent posting of the news on the Treasury Web site, trading in the 30-year bond was unusually active, leading some analysts to assume that word had leaked out to some traders.

The Securities and Exchange Commission has launched a probe into the trading activities at Goldman Sachs and those of Mr. Davis's other clients. A spokesman for Goldman Sachs wouldn't comment. While Mr. Davis has said he advised all his clients about the government embargo, he also said that he has been attending Treasury press briefings for years.

As for the posting of the information prematurely on the department's Web site, Treasury Inspector General Jeffrey Rush said last week said he was investigating whether there should be disciplinary action against the Treasury employees involved.


Treasurys


Treasurys prices fell sharply on news of unexpectedly strong retail spending in October. The market also was hurt by sharp early gains in stocks, surging corporate debt issuance and upbeat news about the war in Afghanistan.

At 4 p.m., the benchmark 10-year Treasury note was down 1 4/32 points, or $11.25 per $1,000 face value, at 103 26/32. Its yield rose to 4.511% from 4.372% Tuesday, as yields move inversely to prices.

The 30-year Treasury bond's price fell 1 23/32 points to 105 12/32 for a yield of 5.022%, up from 4.915% Tuesday.

An early catalyst for the selloff was a Commerce Department estimate that retail sales rose 7.1% in October after a revised 2.2% drop in September. Economists had forecast a 2.5% increase in October.

The underlying mood in Treasurys had been very bullish recently, but analysts had cautioned in advance that the sales report could be unfriendly from a bond perspective. Some said afterward that the sales report didn't conclusively show that the economy has recovered.

2

Four-Week Bills

Here are the results of yesterday's Treasury auction of four-week bills. All bids are awarded at a single price at the market-clearing yield. Rates are determined by the difference between that price and the face value.

```
Applications ......................... $42,733,135,000
Accepted bids ........................ $19,000,165,000
Bids at market-clearing yld accepted . 35.86%
Accepted noncompetitively ............ $31,770,000
Accepted frgn noncomp ................ $0
Auction price (Rate) ................. 99.847 (1.970%)
Coupon equivalent .................... 1.998%
Cusip number ......................... 912795HX2
```

The bills are dated Nov. 15 and mature Dec. 13, 2001


Corporate Bonds


AT&T Corp. was preparing a multicurrency deal for today totaling an equivalent of $10.09 billion, increased from an earlier indicated $5 billion size. With demand apparently strong, yield margins were trimmed from earlier indications. A $1.5 billion, five-year portion will likely be priced at a yield of 2.60 percentage points above Treasurys; a $2.75 billion, 10-year part at 2.80 percentage points above Treasurys; and a $2.75 billion, 30-year portion at 2.95 to three percentage points above Treasurys.

Other parts, denominated in euros, will have floating and fixed-rate coupons. The issue is rated single-A-3 by Moody's Investors Service and triple-B-plus by Standard & Poor's Corp. and will be lead-managed by Credit Suisse First Boston, Goldman Sachs and Salomon Smith Barney.

Elsewhere, Singapore Telecommunications was preparing a $2.35 billion-equivalent global offering of Rule 144a securities for today. A $1.35 billion portion of 10-year securities was indicated to yield 1.85 to 1.90 percentage points above Treasurys. Rated single-A-1 by Moody's and double-A-minus by S&P, the offering will be led by Goldman Sachs and Salomon Smith Barney.

Fleet Finance sold $1 billion of global debt through Credit Suisse First Boston, Bear Stearns and Fleet. The five-year securities were priced at a yield of 1.18 percentage points above Treasurys and rated single-A-1 by Moody's and single-A by S&P.


---

Michael Schroeder, Michael S. Derby and Michael C. Barr contributed to this article.

WSJviaNewsEDGE
:PAGE: C13
:TICKER: FBF SGT,SG T
:SUBJECT: BNKE TLLD MA NY SING WSJ COBO GS CMKT UTIL
Copyright (c) 2001 Dow Jones and Company, Inc.
Received by NewsEDGE/LAN: 11/15/2001 3:41 AM



-----Original Message-----
From:   Hills, Megan

3

Tony:

   Apparently in some article in the Washington Post, there is a quote from you which the SEC infers that you are saying that it is not uncommon for people, other than press, to be in the press conferences. They interpret this to mean private people (not gov't officials or employees). They have asked me to clarify it with you. As delighted as I would be to see your name in print, I could not find the article, but I am passing the request along in the hopes that you have had it framed for your personal collection. What did you mean by whatever you said? How's that for a legal question. Megan

4

**EXHIBIT E**


**Redacted E-mail Exchange between Tony Fratto and Megan Hills on November 15, 2001, as Produced by Treasury in its *Touhy* production to the SEC and Nothern**

**Alvarado, Carmen**

| | |
|---|---|
| **From:** | Hills, Megan |
| **Sent:** | Thursday, November 15, 2001 6:34 PM |
| **To:** | Fratto, Tony |
| **Subject:** | RE: ████████████████████████ |

Thank you.  ███████████████████████████████████████████████████  Megan

sec4letter.wpd (6
KB)


-----Original Message-----

| | |
|---|---|
| **From:** | Fratto, Tony |
| **Sent:** | Thursday, November 15, 2001 6:10 PM |
| **To:** | Hills, Megan |
| **Subject:** | RE: ████████████████████ |

Wrong paper -- Wall Street Journal - see below

Credit Markets:
In Wake of Criticism, Treasury Plans Regulations
Aimed at Stopping Leaks of Market-Moving News
----
By Gregory Zuckerman
Staff Reporter of The Wall Street Journal

The Wall Street Journal via Dow Jones

     The Treasury Department, facing criticism after an industry consultant
attended a press-only briefing last month and leaked market-moving news,
yesterday outlined new rules to try to keep its news under wraps.

     The changes, which some bond traders said were overdue, will bring the
Treasury more in line with the way other government agencies, including the
Federal Reserve and the Labor Department, release market-sensitive news.

     In announcing the changes, Treasury officials acknowledged the recent leak
probably wasn't the first time that someone from outside the press corps found
their way into a Treasury press briefing, raising the possibility that bond
traders have been receiving early word on market-moving news from Treasury for
years.

     "It's likely that others in the past" have participated in press briefings
though they weren't members of the press, said Tony Fratto, a spokesman for the
Treasury Department.

     Some of the changes are quite elementary. Now, for instance, instead of
releasing information to the press an hour or so before it is publicly

1

available, the department is shortening the embargo period to a matter of minutes, bringing the Treasury in line with the way the Federal Reserve operates.

In addition, the Treasury will require that people attending its briefings show press credentials to get into the room, as the Labor Department does. Until now, a simple piece of identification was enough.

The Treasury has been under fire since Oct. 31, when consultant Peter Davis leaked to his clients news that the government planned to stop selling the 30-year bond. The decision, which Mr. Davis told clients in advance of a Treasury embargo, resulted in the biggest bond-market rally in 14 years. Regulators are investigating the trading activities of his clients.

The new procedures will take effect on Jan. 30, 2002, at the next scheduled quarterly refunding announcement.

"The changes are intended to improve the timeliness and transparency of quarterly refunding announcements," the Treasury said in a statement.

Bond-market executives said the department's changes, while welcome, should have come a long time ago. "They should have done a better job policing their audience," said Bill Kirby, senior vice president at Prudential Securities. "Unfortunately, it's too little, too late. Some serious damage has already been done. Some people [in the bond market] are livid."

After a press-only briefing announcing the decision to stop selling the long bond, Mr. Davis contacted some of his clients, including Goldman Sachs, with the news. In the time between the end of the briefing and an inadvertent posting of the news on the Treasury Web site, trading in the 30-year bond was unusually active, leading some analysts to assume that word had leaked out to some traders.

The Securities and Exchange Commission has launched a probe into the trading activities at Goldman Sachs and those of Mr. Davis's other clients. A spokesman for Goldman Sachs wouldn't comment. While Mr. Davis has said he advised all his clients about the government embargo, he also said that he has been attending Treasury press briefings for years.

As for the posting of the information prematurely on the department's Web site, Treasury Inspector General Jeffrey Rush said last week said he was investigating whether there should be disciplinary action against the Treasury employees involved.


Treasurys


Treasurys prices fell sharply on news of unexpectedly strong retail spending in October. The market also was hurt by sharp early gains in stocks, surging corporate debt issuance and upbeat news about the war in Afghanistan.

At 4 p.m., the benchmark 10-year Treasury note was down 1 4/32 points, or $11.25 per $1,000 face value, at 103 26/32. Its yield rose to 4.511% from 4.372% Tuesday, as yields move inversely to prices.

The 30-year Treasury bond's price fell 1 23/32 points to 105 12/32 for a yield of 5.022%, up from 4.915% Tuesday.

An early catalyst for the selloff was a Commerce Department estimate that retail sales rose 7.1% in October after a revised 2.2% drop in September. Economists had forecast a 2.5% increase in October.

The underlying mood in Treasurys had been very bullish recently, but analysts had cautioned in advance that the sales report could be unfriendly from a bond perspective. Some said afterward that the sales report didn't conclusively show that the economy has recovered.

2

TREAS-00025

Four-Week Bills

Here are the results of yesterday's Treasury auction of four-week bills. All bids are awarded at a single price at the market-clearing yield. Rates are determined by the difference between that price and the face value.

```
Applications ......................... $42,733,135,000
Accepted bids ........................ $19,000,165,000
Bids at market-clearing yld accepted . 35.86%
Accepted noncompetitively ............ $31,770,000
Accepted frgn noncomp ................ $0
Auction price (Rate) ................. 99.847 (1.970%)
Coupon equivalent .................... 1.998%
Cusip number ......................... 912795HX2
```

The bills are dated Nov. 15 and mature Dec. 13, 2001

Corporate Bonds

AT&T Corp. was preparing a multicurrency deal for today totaling an equivalent of $10.09 billion, increased from an earlier indicated $5 billion size. With demand apparently strong, yield margins were trimmed from earlier indications. A $1.5 billion, five-year portion will likely be priced at a yield of 2.60 percentage points above Treasurys; a $2.75 billion, 10-year part at 2.80 percentage points above Treasurys; and a $2.75 billion, 30-year portion at 2.95 to three percentage points above Treasurys.

Other parts, denominated in euros, will have floating and fixed-rate coupons. The issue is rated single-A-3 by Moody's Investors Service and triple-B-plus by Standard & Poor's Corp. and will be lead-managed by Credit Suisse First Boston, Goldman Sachs and Salomon Smith Barney.

Elsewhere, Singapore Telecommunications was preparing a $2.35 billion-equivalent global offering of Rule 144a securities for today. A $1.35 billion portion of 10-year securities was indicated to yield 1.85 to 1.90 percentage points above Treasurys. Rated single-A-1 by Moody's and double-A-minus by S&P, the offering will be led by Goldman Sachs and Salomon Smith Barney.

Fleet Finance sold $1 billion of global debt through Credit Suisse First Boston, Bear Stearns and Fleet. The five-year securities were priced at a yield of 1.18 percentage points above Treasurys and rated single-A-1 by Moody's and single-A by S&P.

---

Michael Schroeder, Michael S. Derby and Michael C. Barr contributed to this article.

WSJviaNewsEDGE
:PAGE: C13
:TICKER: FBF SGT.SG T
:SUBJECT: BNKE TLLD MA NY SING WSJ COBO GS CMKT UTIL
Copyright (c) 2001 Dow Jones and Company, Inc.
Received by NewsEDGE/LAN: 11/15/2001 3:41 AM

-----Original Message-----
**From:**   Hills, Megan

3

TREAS-00026

**Sent:**      Thursday, November 15, 2001 5:40 PM
**To:**        Fratto, Tony
**Subject:** RE:

Tony:

Megan

TREAS-00027

**EXHIBIT F**


**FOIA Appeal to Treasury Submitted by Robert E. Toone at Foley Hoag LLP on Behalf of Steven Nothern (Mar. 1, 2007)**

# FOLEY
# HOAG LLP
ATTORNEYS AT LAW

Robert E. Toone
Boston Office
617.832.1242
rtoone@foleyhoag.com

March 1, 2007

**BY FEDERAL EXPRESS DELIVERY**

Freedom of Information Appeal
Disclosure Services, DO
Department of the Treasury
Washington, DC  20220

> Re:    **Appeal of Freedom of Information Act Request No. 2005-11-046**
> **made on behalf of Steven E. Nothern on November 11, 2005**

Dear FOIA Officer:

This is an appeal pursuant to 5 U.S.C. § 552(a)(6) and 31 C.F.R. § 1.5(i), concerning the refusal of the Department of the Treasury ("Treasury") to disclose certain documents within its control.

This firm submitted a Freedom of Information Act ("FOIA") request (No. 2005-11-046) to Treasury on behalf of our client Steven Nothern on November 11, 2005. Ms. Alana Johnson, Director of Disclosure Services, acknowledged receipt of this request in a letter dated November 29, 2005. On June 13, 2006, Mr. Richard K. Delmar from the Office of Inspector General provided us with what he described as "an interim response" to our request.

From approximately June 30 through December 19, 2006, Mr. Thomas M. McGivern and Mr. Christian Furey in the Office of General Counsel produced some responsive documents to us and the Securities and Exchange Commission ("SEC") pursuant to a request by the SEC for substantially the same documents, made at the suggestion of the United States District Court for the District of Massachusetts, in which an action filed by the SEC is pending. That action arises from Treasury's announcement on October 31, 2001 that it would suspend issuance of the 30-year bond. Because this case is currently scheduled for trial in June 2007, the need for Treasury to produce all responsive records is urgent.

In a letter dated December 19, 2006, Mr. McGivern stated that Treasury's response was final. Accordingly, and because Treasury had provided no further response to our FOIA request in the preceding seven months, this firm submitted a FOIA

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 2

appeal on behalf of Steven Nothern on January 23, 2007. Mr. Hugh Gilmore from
Treasury's office of Disclosure Services acknowledged receipt of this FOIA appeal on
February 1, 2007.

Then, on February 23, 2007, Mr. Delmar and Mr. McGivern sent a letter stating
that because Treasury had not yet made its final production in response to our November
11, 2005 FOIA request, "the appeal of Treasury's production in your January 23, 2007
letter was not yet ripe." Mr. Delmar and Mr. McGivern stated that Treasury was now
making its final production, which includes a total of 738 pages: "603 pages released in
full, and 135 pages that are partially released." They further stated that Treasury is
withholding 137 pages of materials in full. They concluded: "now that Treasury's
production is complete, pursuant to 5 U.S.C. § 552(a)(6)(A), you have the right to appeal
the partial denial of the FOIA request."

Therefore, on behalf of our client Steven Nothern, we hereby appeal, again,
Treasury's refusal to disclose certain documents within its control. We respectfully
request that you reverse these adverse determinations and produce all requested
materials – and that you do so promptly, since Treasury's delays in responding to our
now fifteen-month-old FOIA request have substantially hindered Mr. Nothern's ability
to defend himself in the action pending in the District of Massachusetts.

The policy underlying FOIA is one of broad disclosure, and the government must
supply any information requested by a person unless it determines that a specific
exemption, narrowly construed, applies. *Aronson v. IRS*, 973 F.2d 962, 966 (1st Cir.
1992). The government bears the burden of demonstrating the applicability of a claimed
exemption. *Maynard v. CIA*, 986 F.2d 547, 557-58 (1st Cir. 1993).

In Mr. Delmar and Mr. McGivern's letter of February 23, 2007, they state that
information "has been withheld pursuant to Treasury's authority under 5 U.S.C. §
552(b)(5), (b)(6), and (b)(7)." In responding to our FOIA request, however, Treasury
has failed to provide an itemized index explaining each of its decisions to withhold
information. It is well established that a plaintiff in a FOIA case is entitled to an index
of all documents and/or portions of documents that have been withheld by the agency.
*See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). Such an index must supply "a
relatively detailed justification, specifically identifying and correlating those claims with
the particular part of a withheld document to which they apply," and must afford "the
FOIA requester a meaningful opportunity to contest, and the district court an adequate
foundation to review, the soundness of the withholding." *Church of Scientology Int'l v.
U.S. Dep't of Justice*, 30 F.3d 224, 231 (1st Cir. 1994) (citations omitted); *accord
Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979) (description
of each withheld material must be "sufficiently specific to permit a reasoned judgment
as to whether the material is actually exempt under FOIA").

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 3

In addition, FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). In determining the segregability of a record, "courts must construe the exemptions narrowly with the emphasis on disclosure"; an agency may withhold non-exempt information only if it "is so interspersed with exempt material that separation by the agency, and policing of this by the courts would impose an inordinate burden." *Wightman v. Bureau of Alcohol, Tobacco & Firearms*, 755 F.2d 979, 983 (1st Cir. 1985). As one court observed, "the focus in the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citations omitted).

Here, Treasury has failed to explain any of its decisions to withhold information responsive to the FOIA request. Instead, it has simply marked next to each withholding the statutory subsection – "(b)(5)," etc. – on which it relies. Treasury's failure to explain its withholdings and determinations of non-segregability sharply limits our ability to challenge those decisions on appeal.

On December 19, 2006, however, Treasury did provide an index of withheld documents summarily stating its reasons for withholding information in response to the requests made by the SEC at Nothern's and the Court's request – which, again, are substantially similar to the document requests we have made under FOIA. The explanations set forth under that log indicate that many, if not all, of the FOIA exemptions claimed by Treasury now are unfounded.

For example, Treasury cites FOIA Exemption 5 for the majority of its withholding. This exemption protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5), and it has been interpreted by courts to incorporate the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege. Treasury has also cited FOIA Exemption 7, which protects certain "records or information compiled for law enforcement purposes."

These claimed exemptions relate closely to the privileges claimed by Treasury in its index stating its reasons for withholding information in response to the SEC's requests. Yet a cursory comparison of that index with the corresponding documents – some of which were recently disclosed by Treasury in response to our FOIA requests ("discretionary disclosures of some otherwise exempt material," according to Mr. Delmar and Mr. McGivern) – shows that the claimed exemptions clearly do not apply. For example, FOIA Document Nos. 647-48 contains an e-mail exchange between Fratto and General Counsel David Aufhauser regarding the need to institute a "lock-down embargo" following the events of October 31, 2001 and a description of how a lock-down embargo actually works. Treasury cited the attorney-client privilege as a ground

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 4

for withholding this information from the SEC (Doc. Nos. TREAS-00041-42), but has since disclosed the information on a "discretionary" basis in its more recent FOIA production.

The attorney-client privilege, however, protects only confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services. *See In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). The party claiming the privilege must show, *inter alia*, that the communication was made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *Id.* at 98-99 (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)); *accord State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 71 (1st Cir. 2002). Advice by a federal employee on "political, strategic, or policy issues" is not privileged. *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). Treasury repeatedly cited the attorney-client privilege in its index prepared for the SEC, but failed to identify a discrete legal issue or proceeding that would justify the privilege. *See generally State of Maine*, 298 F.3d at 72 (concluding that documents were unprotected by privilege where agency failed "to identify any circumstance expressly or inferentially supporting confidentiality").

Similarly, FOIA Document No. 630 contains an e-mail message dated November 15, 2001 from then-Director of Office of Public Affairs Tony Fratto discussing a recent statement made by him to the *Wall Street Journal*: "I meant that long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years." In justifying its earlier decision to withhold this information (Doc. No. TREAS-00024) – information that is highly relevant to the pending suit in the District of Massachusetts – Treasury cited the attorney-client privilege, the law-enforcement privilege, the work-product doctrine, and the deliberative-process privilege.

Again, there is no reference to a discrete legal issue or proceeding that would justify the attorney-client privilege. The work-product doctrine is similarly inapplicable, since there is no evidence that Treasury anticipated that it would itself initiate any kind of litigation in response to the events of October 31, 2001. (In fact, it never did.) *See* Fed. R. Civ. P. 26(b)(3) (to qualify for work-production protection, document must be generated by "party" to litigation or by "party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)"); *see also State of Maine*, 298 F.3d at 69 ("The mere relation of documents to litigation does not automatically endow those documents with privileged status."); *Church of Scientology Int'l*, 30 F.3d at 237 ("[A]t a minimum, an agency seeking to withhold a document . . . must identify the litigation for which the document was created (either by name or through factual description) and explain why the work-product privilege applies to all portions of the document.").

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 5 ·

The "law enforcement" privilege applies only to "documents that would tend to reveal law enforcement investigative techniques or sources." *Association for Reduction of Violence v. Hall*, 734 F.2d 63, 65-66 (1st Cir. 1984) (quoting *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 545 (D.C. Cir. 1977)). Here, none of Treasury's four law enforcement bureaus at the time (ATF, Customs Service, IRS Criminal Investigations Unit, or Secret Service) was responsible for conducting the 30-year bond investigation, much less for generating the documents produced by Treasury now. By withholding on this basis information generated by employees whose duties were unrelated to law enforcement, Treasury has gone far beyond the limited scope of the privilege as recognized by the federal courts.

Finally, the "deliberative process" privilege applies only to information that is predecisional and related to the formulation of official policy, not an observation of fact or comment about a decision or statement already made or an administrative matter that does not rise to the level of an official agency policy. *See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 884, 884-85 (1st Cir. 1995). The privilege simply does not allow Treasury to withhold, as it has, communications that discuss after the fact why things went wrong with its release of information on October 31, 2001.[1]

While we are pleased that Treasury has now disclosed the particular documents mentioned above – even if on a "discretionary" basis – we are concerned that Treasury may be relying on the same erroneous understanding of the legal privileges discussed above and the related FOIA exemptions in continuing to withhold other critical information. It is our belief that the vast majority, if not all, of the materials redacted or withheld by the Treasury are subject to FOIA's mandatory release provisions, and that Treasury has acted arbitrarily and capriciously, and in violation of the FOIA statute and its own FOIA regulations, in denying the disclosure of these materials. We respectfully

---

[1] Furthermore, the deliberative process privilege is "qualified" and "not absolute": even if a document satisfies the threshold test for protection under the privilege, "nondisclosure is not automatic." *Texaco Puerto Rico*, 60 F.3d at 885. In the *Texaco Puerto Rico* case, the First Circuit assumed that certain documents satisfied the criteria, but nevertheless concluded that disclosure was warranted based on "the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *Id.* at 885; *see also id.* (observing that privilege is "routinely denied" when "the documents sought may shed light on alleged government malfeasance") (citation omitted). Here, even assuming that some documents withheld by Treasury meet the threshold test for the deliberative process privilege, disclosure would still be warranted based on the interests of the litigants in the pending suit in the District of Massachusetts and the public's interest in honest, effective government.

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 6

request that you reverse these adverse determinations and produce the requested materials promptly.

In addition, we challenge Treasury's failure to conduct an adequate search for a computer diskette containing electronic data that might be critical in ascertaining exactly when the announcement of suspension of issuance of the 30-year bond was posted to the Internet on October 31, 2001. In a letter to Mr. McGivern dated September 19, 2006, attorney John Shope at my firm expressed his concern about Treasury employee Frances Anderson's deposition testimony regarding the location of this diskette. At her deposition, Ms. Anderson testified that she stored the diskette in a file cabinet, but that the file cabinet somehow disappeared from her office in 2001 or 2002. In a letter dated December 19, 2006, Mr. McGivern responded that Ms. Anderson "conducted a search for this document on computer diskettes" and that Treasury information technology staff "searched for the document on the hard drive of Ms. Anderson's computer." However, he did not indicate whether Treasury has searched for the file cabinet that contained the computer diskette or tried to determine where the contents of that file cabinet were sent in late 2001 or 2002. Mr. Shope raised this matter again in a letter to Mr. McGivern dated December 20, 2006, but he did not respond. As you know, an agency must conduct a search that is "reasonably calculated to discover the requested documents." *Maynard v. CIA*, 986 F.2d at 559 (citation omitted). By apparently failing to search for the file cabinet that contains the computer diskette identified by Ms. Anderson, Treasury has failed to meet its obligations under FOIA here.

Again, because time is of the essence, we ask that you reverse these adverse determinations and produce the requested materials as soon as possible. In the event this appeal is denied, you are required to provide a written response describing the reasons for the denial, names and titles of each person responsible for the denial, and procedures required to invoke judicial assistance in this matter. 5 U.S.C. § 552(a)(6)(ii); 31 C.F.R. § 1.5(i)(3). If this appeal is denied or Treasury's response is not forthcoming within 20 working days, we reserve our rights under FOIA to seek judicial review, including the award of attorney's fees. We await your prompt reply.

Sincerely,

Robert E. Toone

cc:    Nicholas C. Theodorou, Esquire
       John A. Shope, Esquire

Enclosures

**EXHIBIT G**

**Letter from Kathy J. Lyerly, SAIC, U.S. Secret Service, Department of Homeland Security, to Foley Hoag LLP (Feb. 1, 2007)**



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

Foley Hoag LLP                                          FEB 1 2007
Attorneys at Law
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA  02210-2600

File Number:    20060496
                20060497
                20060498

Dear Requester:

This letter is pertaining to your Freedom of Information/Privacy Acts request received by the United States Secret Service on August 29, 2006, for information pertaining to as follows:

File No. 20060496 – Memorandum of Sgt. John Muskette, USSS, UD, appointment center dated November 6, 2001;

File No. 20060497 – Admittance of Peter Davis to the quarterly refunding press conference at Treasury on October 31, 2001;

File No. 20060498 – Admittance of Peter Davis to any press conference at Treasury from 1993 through 2001.

The following applies to these requests:

Your request constitutes a third party request, and without a properly notarized release from each individual, we can neither confirm nor deny the existence of information pertaining to the person named in your request.

Also, please furnish your complete name, date of birth, place of birth, and any additional identifying data, which would assist us in locating records responsive to your request.  In the case of a third party request, please furnish the aforementioned information for the third party.

In addition, the Secret Service requires that an individual seeking access to personal records through the mail, must provide a written request which includes an original signature in the form of a notarized statement attesting to their identity or a statement of declaration added 28USC 1746.  The official certification of an individual's identity is necessary to ensure that an individual's file is not sent to an unauthorized third party. An individual's request for information pertaining to himself/herself is processed under both the Freedom of Information and Privacy Acts to afford maximum access to records.

Please note that upon receipt of a perfected request, we will proceed to continue a search for responsive information, and you will then be advised as to the status of your request.

Please use the file numbers indicated above in all correspondence with this office. Please note that failure to respond within 60 days of the above date will result in the administrative closure of your files.

Sincerely,

Kathy J. Lyerly
SAIC
Freedom of Information &
Privacy Acts Officer

Enclosure(s):

Homeland Security Freedom of Information and Privacy Act Guidelines

# EXHIBIT H

## Memorandum Written by Sgt. John F. Muskett, United States Secret Service (Nov. 6, 2001)

DATE: *November 6, 2001*

TO: *Inspector Richard E. Teter*

FROM: *Sgt. John F. Muskett*

SUBJECT: *Listed below are the individuals that were clear to attend the press conference for Undersecretary Peter Fisher regarding "Quarterly Refunding". The conference was held in the Diplomatic Reception Room on Wednesday, October 31, 2001 at 0900 am.*

| NAMES | DATES OF BIRTH | SOCIAL SECURITY NUMBERS |
|---|---|---|
| 1. Ferrari, Shaun | 03-21-58 | 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 |
| 2. Wild, Jason | 06-10-78 | 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 |
| 3. Pardue, Douglas | 09-09-47 | 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 |
| 4. Schroeder, Michael | 02-14-52 | 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 |
| 5. Tyson, James | 06-12-58 | 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 |
| 6. Snyder, Charles | 09-06-41 | 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 |
| 7. Savoy, Greg | 01-28-01 | 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 |
| 8. Urban, Robert | 09-06-57 | 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 |
| 9. Andrejczak, Matt | 05-13-72 | 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 |
| 10. Gordon, Marcy | 04-20-51 | 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 |
| 11. Cowden, Richard | 03-11-50 | 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 |

*After talking to Ms. Frances Anderson, Public Affairs, there was one individual that was present during the conference that was not cleared thru her office. Ms. Anderson was informed the name of the individual by a contact with Wall Street Journal, a Mr. Peter Davis, 05-12-50. After researching the Treasury Appointment Center files it was determined that, a Mr. Peter Davis was cleared in that morning of the 31st to meet with passholder MALVEY.*

# EXHIBIT I

## Letter from Robert E. Toone at Foley Hoag LLP to Kathy J. Lyerly, SAIC, United States Secret Service, Department of Homeland Security (Mar. 2, 2007)

# FOLEY
# HOAG LLP
ATTORNEYS AT LAW

Robert E. Toone
Boston Office
617.832.1242
rtoone@foleyhoag.com

March 2, 2007

**BY FEDERAL EXPRESS DELIVERY**

Kathy J. Lyerly, SAIC
Attn: Donald Hawkins
Freedom of Information & Privacy Acts Officer
United States Secret Service
Department of Homeland Security
245 Murray Drive, Building 410
Washington, DC 20223

      Re:    Freedom of Information Act requests, File Nos. 20050765 – 20050803,
               20060495 – 20060501

Dear Special Agent Lyerly:

      This is a response to your letter dated February 1, 2007. In order to expedite our correspondence, please address future letters to my attention at this firm.

      We are disappointed by the dilatory and inconsistent manner in which your office has responded to the referenced Freedom of Information Act ("FOIA") requests.

      Acting on behalf of our client Steven Nothern, this firm first submitted FOIA requests (Nos. 20050765 – 20050803) to the United States Secret Service ("Secret Service") on December 9, 2005. On August 10, 2006, Mr. Donald Hawkins of your office called regarding our requests. On August 18, 2006, Mr. Hawkins asked us to send a list of narrowed requests by facsimile transmission to his attention. We did so on August 28, 2006, along with a brief description of the facts relevant to our requests. On September 18, 2006, Secret Service sent us a letter treating our narrowed requests as <u>new</u> FOIA requests (Nos. 20060495 – 20060501), but assuring us "that the search will be conducted as expeditiously as possible."

      Now, more than four months later, you have sent us a letter stating that three of our requests (Nos. 20060496, 20060497, and 20060498) constitute "a third party request" and require "a properly notarized release from each individual." Your letter did not mention the status of our other pending requests, but nevertheless stated that "failure

March 2, 2007
Page 2

to respond within 60 days of the above date will result in the administrative closure of your files."

First, please advise us immediately of the status of the other FOIA requests we submitted on August 28, 2006: Nos. 20060495, 20060499 – 20060501. Even though the applicable statutory time limit for the processing of these requests expired several months ago, you have neither disclosed responsive agency records, denied the existence of such records, nor explained what search, if any, you have conducted for such records.

Second, please reconsider your statement that FOIA requests Nos. 20060496, 20060497, and 20060498 are "third party requests" or requests for "personal records" that require a notarized release or certification of identity. This statement conflicts with the plain language of FOIA and the applicable case law.

The policy underlying FOIA is one of broad disclosure, and the government must supply any information requested by a person unless it determines that a specific exemption, narrowly construed, applies. *Aronson v. IRS*, 973 F.2d 962, 966 (1st Cir. 1992). The government bears the burden of demonstrating the applicability of a claimed exemption. *Maynard v. CIA*, 986 F.2d 547, 557-58 (1st Cir. 1993).

FOIA Exemptions 6 and 7(C) generally protect against the disclosure of information that would result in an unwarranted invasion of personal privacy. Neither exemption, however, applies to our requests. We have not asked for any information contained in a personnel, medical, or similar file. *See* 5 U.S.C. § 552(b)(6). We have not asked for any individual's place of birth, date of birth, date of marriage, employment history, or other intimate or "damaging information." *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982). Rather, we seek information about official acts performed by the Secret Service and the United States Department of the Treasury ("Treasury") – an objective that is fully consistent with FOIA's underlying policy of allowing citizens to know "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989).

Specifically, FOIA request No. 20060496 seeks all documents concerning a November 6, 2001 memorandum of Sgt. John Muskett, an employee of the Uniformed Division of the Secret Service. A full copy of this memorandum was attached as an exhibit to the Report of Investigation 2002-0104 drafted by Treasury's Office of Inspector General in January 2002. This is an official government memorandum, and we seek any and all related documents. It is ludicrous to suggest that we may not obtain such related documents under FOIA "without a properly notarized release from each individual" (*i.e.*, presumably, Sgt. Muskett himself). FOIA does not require citizens to submit notarized releases from the authors of official government documents in order to learn how such documents were created.

FOIA request No. 20060497 seeks all documents concerning the admittance of Peter Davis to the quarterly refunding press conference at Treasury on October 31, 2001.

FOIA request No. 20060498 seeks all documents concerning the admittance of Peter
Davis to any press conference at Treasury from 1993 through 2001. Again, we do not
seek any personnel, medical, or otherwise intimate information concerning Davis.
Instead, we seek information regarding the decisions of the Secret Service and Treasury
to admit Mr. Davis to Treasury's press conferences.

These actions by the Secret Service and Treasury are a matter of great public
interest. As we explained in our letter dated August 28, 2006, Mr. Davis was a private
business consultant who was able to attend various meetings and press conferences at
the Treasury from 1993 until October 31, 2001. Mr. Davis did not have press
credentials, and instead gained admission to these meetings and press conferences by
having various employees at Treasury (possibly including Roger Anderson, Jill Ouseley,
Paul Malvey, Lula Tyler, and Elnora Bowser) arrange with Secret Service personnel for
his admittance into the main Treasury building. At the quarterly refunding press
conference on October 31, 2001, which was allegedly subject to a 10:00 a.m. news
embargo, Mr. Davis left the Treasury building at around 9:25 a.m. and made various
telephone calls to third parties in which he revealed information about Treasury's
announcement of its decision to suspend sales of the 30-year bond. In an e-mail dated
November 15, 2001, one Treasury employee summarized his view of the relevant
events: "[L]ong before the highly professional and competent Bush Administration
Treasury appointees arrived on the scene, this place leaked like a sieve; and that we
wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into
refunding announcements for the past eight years."

These events have been reported at length in such publications as the *New York
Times*, the *Washington Post*, and the *Wall Street Journal*. They have also led to official
investigations by Treasury's Office of General Counsel, Treasury's Office of Inspector
General, the U.S. Department of Justice ("Justice"), and the U.S. Securities and
Exchange Commission ("SEC"). Justice's investigation ultimately yielded a plea to a
criminal information by Mr. Davis and an indictment of an employee at Goldman Sachs.
The SEC's investigation resulted in a number of enforcement actions, including an
action pending against our client, Steven Nothern, in the United States District Court for
the District of Massachusetts.

Because our requests do not implicate a significant privacy interest, FOIA
demands disclosure. *See National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d
873, 875 (D.C. Cir. 1989) (citing *Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989)).
Furthermore, even if a privacy interest existed, disclosure of the information would not
constitute an unwarranted invasion of privacy because the public's interest in disclosure
is overwhelming. Disclosure will serve "the core purposes of FOIA" by "contribut[ing]
significantly to public understanding of the operations and activities of the government."
*National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33-34 (D.C. Cir. 2002)
(quoting *United States Dep't of Def. v. FLRA*, 510 U.S. 487, 495 (1994)). This public
interest includes, but is not limited to, understanding when, how, and under whose
authority a private business consultant with no press credentials was allowed to attend

March 2, 2007
Page 4

closed press conferences at the Treasury from 1993 to 2001, and therefore contribute to the public dissemination of an important announcement on the 30-year bond on October 31, 2001 prior to the purported 10:00 a.m. news embargo.

We therefore reject your statement that under FOIA we are required to provide any kind of notarized release or certification in order to receive these agency records. We further reject your suggestion that our FOIA requests have not been "perfected" or that your substantial delay in responding to these requests is consistent with the text and purposes of the statute.

Because time is of the essence, we respectfully ask that you withdraw your request for a notarized release or certification and produce the requested materials as soon as possible. We reserve our rights under FOIA to file suit to compel compliance, including an award of attorney's fees. We await your prompt reply.

Sincerely,

Robert E. Toone

cc:     Nicholas C. Theodorou, Esquire
        John A. Shope, Esquire