# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05-CV-10983 (NMG) |
| Plaintiff, | ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF JOHN J. ROSSETTI JR. FILED IN SUPPORT OF
U.S. SECURITIES AND EXCHANGE COMMISSION'S RESPONSE
TO DEFENDANT STEVEN E. NOTHERN'S
OBJECTIONS TO MAGISTRATE JUDGE'S ORDER ON DEFENDANT'S RENEWED
MOTION TO COMPEL AND MOTION FOR AN ORDER TO SHOW CAUSE**

John J. Rossetti Jr., pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury as follows:

1.   I am a senior counsel for the Securities and Exchange Commission in the above-captioned matter.  I am a member of good standing of the New York, Maryland, and District of Columbia bars.  Except where otherwise indicated, I make this declaration based upon the documents thus far produced during discovery.

2.   A true and correct excerpt from the August 30, 2006 deposition of Salvatore Antonio Fratto is attached as Exhibit A.

3.   A true and correct excerpt from the June 23, 2006 deposition of Paul Malvey is attached as Exhibit B.

4.   A true and correct excerpt from the August 8, 2006 deposition of Peter Fisher is attached as Exhibit C.

5.   A true and correct excerpt from the September 7, 2006 deposition of Geoffrey Kurinsky is attached as Exhibit D.

6.   A true and correct excerpt from the June 19, 2006 deposition of David Smith is attached as Exhibit E.

7.   A true and correct excerpt from the June 26, 2006 deposition of David Kennedy is attached as Exhibit F.

8.   A true and correct excerpt from the January 30, 2007 deposition of Steven Nothern is attached as Exhibit G.

9.   A true and correct excerpt of Exhibit 3 from the November 2, 2006 deposition of Bloomberg LP, by Patrick Eldridge, is attached as Exhibit H.

10. A true and correct excerpt from the September 27, 2006 deposition of Galen Criqui is attached as Exhibit I.

11. A true and correct excerpt from the October 6, 2006 deposition of Verizon Business, by Anne Wilson, is attached as Exhibit J.

12. A true and correct excerpt from the November 3, 2006 deposition of Bloomberg LP, by Darin Langone, is attached as Exhibit K.

13. A true and correct copy of a Memorandum of Activity concerning the Treasury Office of Inspector General's November 7, 2001 interview of Jill Cetina is attached hereto as Exhibit L.

14. A true and correct excerpt from the May 12, 2006 deposition of Brian Collins is attached as Exhibit M.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed on February 20, 2007.

John J. Rossetti Jr.

# EXHIBIT A

**Cited Excerpts from the Deposition Transcript
of Salvatore Antonio Fratto
(August 30, 2006)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------X

UNITED STATES SECURITIES :

AND EXCHANGE COMMISSION, :

       Plaintiff,  :

.   .  V.        :   Case No. 05-10983

STEVEN E. NOTHERN,    :

       Defendant.  :

------------------------X

            Washington, D.C.

            AUGUST 30, 2006

      Videotaped deposition of ANTHONY

FRATTO, a witness herein, called for examination by

counsel for Defendant, in the above-entitled

matter, pursuant to notice, the witness being sworn

by Raymond Heer, a Notary Public in and for the

District of Columbia, taken at the offices of Foley

Hoag, Washington, D.C. on August 30, 2006, at 10:35,

a.m. and the proceedings being taken down by

stenotype by Desirae S. Jura, RPR, and transcribed

under her direction.

Page 2

```
 1  A P P E A R A N C E S
 2
 3  On behalf of United States Securities and Exchange
 4  Commission:
 5      ERICA Y. WILLIAMS, ESQUIRE
 6      JOHN J. ROSSETTI, JR., ESQUIRE
 7      United States Securities and Exchange
 8      Commission
 9      Mail Stop 8549-D
10      100 F Street N.E.
11      Washington, D.C. 20549
12      (202) 551-4450
13
14  On behalf of United States Department of Treasury:
15      CHRISTIAN FUREY, ESQUIRE
16      THOMAS M. McGIVERN, ESQUIRE
17      United States Department of the Treasury
18      1500 Pennsylvania Avenue, N.W.
19      Washington, D.C. 20220
20      (202) 622-5441
21
22
```

Page 3

```
 1
 2  A P P E A R A N C E S(continued)
 3
 4  On behalf of the Defendant:
 5      NICHOLAS THEODOROU, ESQUIRE
 6      Foley Hoag
 7      Seaport World Trade Center West
 8      155 Seaport Boulevard
 9      Boston, MA 02210
10      (617) 832-1000
11
12
13
14
15
16
17
18
19
20
21
22
```

Page 4

C O N T E N T S

```
 1
 2  ANTHONY FRATTO                         PAGE
 3      Examination by Mr. Theodorou          8
 4      Examination by Ms. Williams         243
 5      Examination by Mr. Theodorou        269
 6
 7              E X H I B I T S
 8  FRATTO
 9  EXHIBIT NO.        DESCRIPTION         PAGE
10    1      Memorandum of Activity         66
11    2      Memorandum of Activity         68
12    3      The Washington Post article
13           Dated 11/06/2001              79
14    4      Letter from John W. Vardaman
15           Dated March 4, 2002           90
16    5      Reuters article dated
17           October 31, 2001             115
18    6      Bloomberg article dated
19           Oct 31 2001                  119
20    7      Department of the Treasury
21           Treasury News For Immediate
22           Release dated October 30, 2001   150
```

Page 5

```
 1              E X H I B I T S - Continued
 2  FRATTO
 3  EXHIBIT NO.        DESCRIPTION         PAGE
 4    8      Hand-drawn diagram            163
 5    9      The Wall Street Journal
 6           Article dated November 15, 2001   177
 7   10      E-mail from Betsy Holahan
 8           Dated October 31, 2001 with
 9           Attachment                   195
10   11      E-mail from Betsy Holahan
11           Dated October 31, 2001       198
12   12      Department of the Treasury
13           Office of Public Affairs
14           Under Secretary of the Treasury
15           For Domestic Finance
16           Remarks at the November 2001
17           Quarterly Refunding          202
18   13      Treasury News For Immediate
19           Release dated October 31, 2001   206
20   14      E-mail from Betsy Holahan
21           Dated October 31, 2001 with
22           Attachment                   213
```

Page 62

1    Q. I'm sorry.
2    A. FOMC. That was the way they had always done
3  it.
4    Q. Did anyone ever consider lockdowns for the
5  refunding conferences?
6       MS. WILLIAMS: Objection.
7       BY MR. THEODOROU:
8    Q. Before October 31st, 2001?
9    A. Not to my knowledge.
10   Q. Did you ever have a discussion with anybody
11  at Treasury about using a lockdown procedure for
12  refunding conferences?
13   A. No.
14   Q. Did anyone at Treasury ever suggest that the
15  lockdown should be used for refunding conferences?
16   A. No.
17      MS. WILLIAMS: Objection.
18      THE WITNESS: Sorry.
19   A. No, never. Again, I think it would be -- my
20  view is that it would have been a solution in
21  search of a problem.
22      BY MR. THEODOROU:

Page 63

1    Q. And why is that?
2    A. Because I had never seen any event of a
3  reporter willfully breaking an embargo.
4       MR. THEODOROU: Why don't we take a
5  five-minute break.
6       THE VIDEOGRAPHER: This concludes tape one
7  in the deposition of Tony Fratto. Off the record
8  at 11:41:30.,
9       (Recess taken.)
10      THE VIDEOGRAPHER: This begins tape two in
11  the deposition of Tony Fratto. On the record at
12  11:48:50.,
13      BY MR. THEODOROU:
14   Q. Mr. Fratto, turning your attention to
15  October 31st, 2001, after your discussions with
16  these reporters, what was your understanding as of
17  October 31st of Treasury's policy on the use of
18  embargoes?
19      MS. WILLIAMS: Objection.
20   A. That we had a -- in terms of, you know,
21  whether it was a policy, my view is that we had a
22  policy of setting embargoes, that it was a

Page 64

1  traditional thing. And, as I learned more about
2  it, that it was a useful and appropriate way to
3  release information at Treasury.
4       BY MR. THEODOROU:
5    Q. What exactly did an embargo prevent a person
6  from doing?
7    A. It prevented a member of the news media from
8  releasing the information that they received,
9  disseminating that information to the general
10  public.
11   Q. Before a particular time?
12   A. Before a particular time. That's right.
13   Q. Did it prevent them from disclosing the
14  information to anyone?
15      MS. WILLIAMS: Objection.
16   A. It -- no. I'd say, my view is the general
17  -- is that it prevented them from just releasing
18  the information to the general public. My view,
19  and I think it was the common understanding among
20  the reporters in the Treasury pressroom, that it
21  was perfectly appropriate to discuss information
22  with members of the news organization, like an

Page 65

1  editor.
2    Q. Did you define for them who at their press
3  organizations they could discuss the information
4  with?
5    A. No. Not specifically.
6    Q. Now, a press person who received the
7  information at a press conference could discuss
8  that information with another Treasury employee?
9       MS. WILLIAMS: Objection.
10   A. They could discuss that information with a
11  member of the Office of Public Affairs.
12      BY MR. THEODOROU:
13   Q. How about another, an employee who did not
14  work at the Office of Public Affairs?
15   A. Reporters are not -- let me put it this way.
16  Treasury employees outside the Office of Public
17  Affairs are not permitted to talk to reporters
18  except by authority granted to them and in the
19  presence of a member of the Office of Public
20  Affairs. That's been a standard policy at Treasury
21  for a long time, since the beginning.
22   Q. Now, before October 31st, 2001, did you

Page 110

1  speak, of breaking an embargo. There's absolutely
2  no evidence of it. And so I don't -- didn't then
3  and I certainly don't today see the need at every
4  press event where we employ an embargo, which is a
5  daily occurrence, to cite the potential penalties
6  if the embargo is broken.
7      BY MR. THEODOROU:
8      Q. Did Treasury obtain the consent from
9  everybody attending the conference that they would
10 abide by the embargo?
11     A. No.
12     Q. Now, directing your attention to October
13 31st, 2001. You attended that refunding
14 conference. Correct?
15     A. Yes.
16     Q. Now, did Elizabeth Holahan ask the attendees
17 at that press conference whether they agreed to
18 honor the 10:00 a.m. embargo that day?
19     A. No. She simply announced the embargo time
20 twice.
21     Q. Did she require the attendees to sign a form
22 stating that or any document that they would honor

Page 111

1  an embargo?
2      A. No. We relied on their ethical
3  responsibilities.
4      Q. So that Treasury officials assumed that the
5  attendees would honor whatever embargo time was
6  announced. Correct?
7      A. Yes.
8      MS. WILLIAMS: Objection.
9      BY MR. THEODOROU:
10     Q. So as of October 31st, 2001, reporters were
11 governed by an honor system not to release
12 information before the embargo time expired?
13     MS. WILLIAMS: Objection.
14     A. Is that an honor system? I don't know.
15     BY MR. THEODOROU:
16     Q. But they were self --
17     A. They were self-enforcing.
18     Q. Self-enforcing.
19     A. Yeah.
20     Q. Now, you testified you were not aware of any
21 instance before October 31st in which an embargo at
22 Treasury was violated?

Page 112

1      MS. WILLIAMS: Objection.
2      A. Willfully violated. Before October 31st?
3  No, the only event that I really recall was
4  subsequent to October 31st.
5      BY MR. THEODOROU:
6      Q. Apart from willfully, do you remember --
7  prior to October 31st, 2001, do you remember any
8  instance of a premature disclosure of information
9  from a press conference at Treasury?
10     MS. WILLIAMS: Objection.
11     A. An event was brought to my attention, but I
12 wasn't -- I didn't have first-hand experience with
13 it.
14     Q. What, so there was an event brought to your
15 attention where an embargo had been violated?
16     MS. WILLIAMS: Objection.
17     A. I couldn't make a judgment whether the
18 embargo was violated. I was asked -- I think I was
19 asked yesterday about an event involving our deputy
20 secretary Ken Dam, and in your letter specific date
21 referring to October 22nd, it was mentioned. I

Page 113

1  haven't had any first-hand knowledge or experience
2  with that. If I have, I'm just not aware. It
3  wasn't an issue area that was in my jurisdiction at
4  that time.
5      Q. Before the October 31st conference, did the
6  issue regarding Mr. Dam's press conference, was
7  that brought to your attention?
8      A. Before October 31st?
9      Q. Before October 31st, 2001.
10     A. I have no recollection of that.
11     Q. I will see if it refreshes your
12 recollection.
13     A. Okay.
14     Q. If it does, it doesn't.
15     MR. THEODOROU: Could we go off the record
16 just a second?
17     THE VIDEOGRAPHER: Off the record at
18 12:46:43.,
19     (Recess taken.)
20     THE VIDEOGRAPHER: On the record at
21 1:25:522.,
22     BY MR. THEODOROU:

Page 130

1  was obviously a unique announcement, and I wanted
2  to make sure, A, that they had enough time to, you
3  know, ask questions at the press conference,
4  thoroughly consume the news that they were getting,
5  and write thoughtful -- write thoughtful stories.
6  And, if they had any questions -- you know, it's
7  not unusual for after a press conference or the
8  release of information that the reporters, they get
9  down to their desks, they get down to their desk
10  and get into writing and they realize they have got
11  two or three questions on the news you just gave
12  them.
13       In this case, for example, they might ask
14  was it -- I mean, it wasn't the case, but, you
15  know, had 30-year ever been discontinued before?
16  They would want a little historical data to add
17  into their stories, things like that. So I wanted
18  to make sure going into this that they had enough
19  time on this important piece of news to write good
20  accurate stories, and so I wanted to make sure they
21  got that amount of time.
22    Q.  And when did you decide it was going to be

Page 131

1  at 10:00 a.m.?
2    A.  It was late the previous week.
3    Q.  Did you discuss the issue of setting the
4  time with anybody?
5    A.  Yes. I discussed it with -- discussed it
6  with Betsy. I discussed it with I certainly
7  discussed it with Peter Fisher. And there were
8  certainly others in the room when we had that
9  discussion, most likely Brian Roseborough and/or
10  Tim Bitsberger or Jeff Luther, maybe Paul Malvey.
11  I don't recall who else was in the room, but I know
12  there were others in the room and that's the likely
13  group that would have been there.
14    Q.  Was there one discussion with the group?
15    A.  There was at least one discussion. There
16  may have been more. I don't remember specifically.
17    Q.  All right. And what was said in that
18  discussion?
19    A.  Well, Peter -- Peter first had the idea that
20  he wanted to have the press conference be live web
21  cast. And I objected to that. I thought that, you
22  know, we already have a fairly sizeable piece of

Page 132

1  news here. I don't think we should try to be --
2  you know, let's not try to break ground everywhere.
3  You know, the time to try new things with
4  established events like a quarterly press
5  conference was not when you have a major piece of
6  news because you are just increasing the risk that
7  something could go wrong. And I never had a whole
8  lot of faith in the ability of Treasury's Internet
9  infrastructure to carry off a web cast in a timely
10  way. So I thought it was a bad idea and argued
11  against it. And I thought we should actually go,
12  you know, far more conservative to the other, on
13  the other extreme, which was what I in the end
14  advocated and what we agreed to, which was to set a
15  hard and fast time for lifting the embargo for all
16  the reasons I just said earlier.
17    Q.  When you had this discussion with Mr.
18  Fisher, how did having a live web cast increase the
19  chances of something going wrong?
20    A.  Well, I mean, most obviously, you know, we
21  have a history at Treasury of servers going down.
22  You know? I mean, it wasn't a particularly

Page 133

1  reliable Internet infrastructure at Treasury, and I
2  didn't have faith that we'd get to 10 minutes
3  before the press conference and someone from the IT
4  office would call up and say, you know, we can't
5  web cast it, or there's going to be a delay, or the
6  server went down. Something like that. And I
7  wanted us to be, you know, tried and true,
8  reliable, give the news to actual human beings who
9  will get the news out the normal, you know, the
10  normal way. The only change was to give them, you
11  know, more time in a hard set embargo.
12    Q.  And your concern was that those who attended
13  the conference would have a leg up on others who
14  may be watching it in the general public if there
15  was something wrong with the web cast?
16       MS. WILLIAMS: Objection.
17    A.  No.
18       BY MR. THEODOROU:
19    Q.  What does the Internet have to do with it,
20  the Internet being down, if you are having a live
21  press conference on TV?
22    A.  He was asking about web casting it, not

Page 134

1  doing a live --
2    Q.  Okay.
3    A.  And that would have been an additional
4  problem.  He said, well, why -- he said, well,
5  can't we go, can't we just go live?  And I said --
6  and in that case it would be broadcast on TV.  And
7  I said, "Peter, I can't guarantee that --" you
8  know, the only usual suspects on the TV side that
9  would consider coming to cover a quarterly
10  refunding announcement, you know, would have been
11  Bloomberg, CNBC, you know, maybe Reuters.  I would
12  have to ask them, do you plan on going live?  And
13  they would say, is he going to make news?  And I'd
14  say, I can't tell you.  And then you get into a
15  very tricky discussion that I definitely don't want
16  to have.  I don't want to tip TV guys that we might
17  be making special news at a quarterly refunding
18  announcement, so I can't talk them into covering
19  events.  So I couldn't guarantee to Peter that it
20  would be covered live.  The only way you could
21  guarantee that it would be broadcast live would be
22  in the form of a web cast, but I didn't have good

Page 135

1  confidence in the reliability of web casting.
2    Q.  Because of the Treasury's Internet
3  facilities?
4    A.  Yeah.
5      THE VIDEOGRAPHER:  This concludes tape two
6  in the deposition of Tony Fratto.  Off the record
7  at 1:48:53.,
8      (Brief recess taken.)
9      THE VIDEOGRAPHER:  This begins tape three in
10  the deposition of Tony Fratto.  On the record at
11  1:49:30.,
12      BY MR. THEODOROU:
13    Q.  Why was October 31st different than the May
14  and August press conference, quarterly refunding
15  press conferences where you had to set a time, as
16  opposed to polling the reporters?
17    A.  The news, you know, that we were
18  discontinuing the 30-year bond.  That it was
19  definitely -- you know, I knew that.  I knew that
20  it was going to be bigger news than, you know --
21  you know, a quarterly refunding press conference is
22  a relatively sleepy affair.  It's not usual that

Page 136

1  you find much news there.
2    Q.  And why did Mr. Fisher want to go live?
3    A.  Peter had been looking at -- Peter comes
4  from, had been up at the New York Fed and had a
5  high degree of interest in trying to find ways to
6  increase efficiency in markets, and one of the ways
7  that you increase efficiency in markets is by
8  reducing the time span in terms of information and
9  transmission of information.  So, for example, on
10  the auction results, there was, there had been, you
11  know, time lags.  You have to think about the size
12  of these markets and the margins that traders are
13  dealing with.  You know, you would get auction
14  results, and sometimes it would take four or five
15  minutes to get from the closing of an auction to
16  get the results published.  And Peter worked to
17  find ways to squeeze that down to one to two
18  minutes.  He would like to make it instantaneous.
19  So any way that you can find to get instantaneous
20  news to the market in the most transparent way
21  possible, that's something that Peter had a high
22  degree of interest in and just felt it would

Page 137

1  improve market efficiency.
2    Q.  Did he have any concern that there would be
3  a release, a premature release of the information
4  discussed at the press conference before the
5  embargo?
6      MS. WILLIAMS:  Objection.
7    A.  I don't recall him expressing that to me.
8      BY MR. THEODOROU:
9    Q.  And what was his response to your proposal?
10    A.  In the end he agreed.  I mean, he made this
11  philosophy of his, you know -- I was well aware, I
12  spent a lot of time with Peter and I knew that
13  that's what his reasoning was.  But I just told him
14  that, in my judgment, it wasn't worth the risk.  It
15  just wasn't -- you know, we don't -- if we want to
16  do that, let's do it, but let's do it over some
17  period of time.  Let's do it over the next three
18  quarterly refundings, you know, where we -- you
19  know, at one quarterly refunding we say we are
20  considering doing a live web cast.  You know?  Four
21  months later at the next quarterly refunding we
22  say, at the next quarterly refunding we will web

Page 138

1 cast. And then on the third quarterly refunding,
2 we actually web cast. And then that way, number
3 one, it gives us a lot of time to make sure that we
4 have a rigorous infrastructure to be able to
5 reliably web cast; and, number two, you tell the
6 markets what to expect and they have a lot of time
7 to know how, you know, how to expect news to come
8 to them. And, you know, so I just wanted us to be
9 cautious about doing big changes, and I just did
10 not think that it was appropriate to try to do a
11 major change when we were also making major news.
12 It just wasn't worth the risk.
13    Q. Was your concern -- well, given your
14 concerns about the Internet capability at Treasury,
15 was your concern that something could have gone
16 wrong with the web cast, and at the same time you
17 were releasing information to reporters who would
18 then have advanced information compared to the
19 general public?
20    A. Reporters always have advanced information
21 ahead of the general public. It's their job; we
22 rely on them to disseminate news to the general

Page 139

1 public. So I didn't have a concern about that. In
2 fact, I relied -- when I say, I really mean this.
3 I rely on the Treasury press corps to disseminate
4 news to the markets and the general public. I have
5 much more confidence in that part of dissemination
6 than I do on the web page dissemination. Everyone
7 who has a Web site that they deal with knows that,
8 you know, at the most unpredictable times you have
9 problems with the web page. So I'm not ready and I
10 certainly wasn't ready in the year 2001, I'm not
11 even sure I'm ready in the year 2006 to say I can
12 put full faith and confidence in Internet
13 infrastructure to get that information out on a
14 precise time. We're not there yet.
15    Q. Especially after what happened in October
16 2001.
17       MS. WILLIAMS: Objection.
18    A. No. I mean, that had nothing to do with it.
19 That was human error, that wasn't even
20 infrastructure error. There is lots of
21 infrastructure error. I have seen infrastructure
22 error with our web platform. But that was human

Page 140

1 error. You know? And that human error is going to
2 happen.
3       BY MR. THEODOROU:
4    Q. But I guess my question is, my question is,
5 you had concerns about their ability that -- their
6 Internet capability and, therefore, they might not
7 be able to web cast at the same time. So he would
8 be doing a live press conference to a group of
9 reporters and people attending the conference. And
10 if the web cast couldn't go out, so what? What
11 difference would that make?
12       MS. WILLIAMS: Objection.
13    A. We would have raised expectations that you
14 will find the news on the web cast, and then they
15 wouldn't see it. That was the risk.
16       BY MS. THEODOROU:
17    Q. So it wasn't an issue of market sensitive
18 information getting out ahead?
19    A. No.
20    Q. Okay.
21    A. No. Not at all.
22    Q. Did Mr. Fisher, was Mr. Fisher -- how many

Page 141

1 discussions did you have about this issue with Mr.
2 Fisher?
3    A. Just, I mean, no more than two.
4    Q. Was Mr. Fisher concerned about the danger
5 that that information might leak out before 10:00,
6 a.m.?
7       MS. WILLIAMS: Objection.
8    A. You would have to ask him. If he was, he
9 didn't express it to me.
10       BY MR. THEODOROU:
11    Q. So Mr. Fisher did not express a concern
12 about the leaking out of information?
13    A. Not that I recall.
14    Q. If you could go to Exhibit 1, Mr. Fratto.
15    A. Okay.
16    Q. Page 2, the second paragraph. Do you see
17 that?
18    A. Yes.
19    Q. Now, when did you first learn about the
20 decision to suspend the 30-year bond?
21    A. That sounds about right. I recall it being
22 on Thursday, the 26th.

Page 154

1  until 10:00 a.m. on that date.
2    Q.  Were any steps taken to advise attendees who
3  were not members of the press that the news embargo
4  also applied to them when they attended these
5  conferences?
6    A.  I wasn't aware --
7      MS. WILLIAMS:  Objection.
8    A.  I wasn't aware of anyone in attendance --
9  other than some Treasury policy staff, I wasn't
10  aware of others who were not members of the media
11  who were in attendance.
12     BY MR. THEODOROU:
13    Q.  So before the October 31st, 2001 conference,
14  you were not aware of anyone other than media
15  attending the quarterly refunding conferences?
16    A.  That's right.
17     MS. WILLIAMS:  Objection.
18     BY MR. THEODOROU:
19    Q.  Did you take any steps before October 31 to
20  determine whether anyone outside of the media
21  attended quarterly refunding press conferences?
22    A.  No.

Page 155

1    Q.  Do you know if anybody at Treasury ever took
2  any steps before October 31st, 2001 to determine
3  whether nonmedia persons attended the quarterly
4  refunding press conferences?
5    A.  I don't know if they did.
6    Q.  Now, directing your attention again to
7  Exhibit 1.
8      Before we get there, who was allowed to
9  attend quarterly refunding press conferences before
10  October 31st, 2001?
11    A.  There wasn't a policy on who was allowed to
12  attend.  But I never had any expectations that
13  anybody -- that anyone except excepting members of
14  the news media and Treasury staff would attend.
15    Q.  But there was no policy as to who could
16  attend?
17    A.  Not that I'm aware of.  I didn't have a
18  policy.
19    Q.  Have you ever heard anybody talk about a
20  policy as to who could attend the quarterly
21  refunding press conferences --
22    A.  No.

Page 156

1    Q.  -- before October 31st, 2001?
2    A.  No.
3    Q.  As of October 31st, 2001, do you know who at
4  Treasury was responsible for deciding who could
5  attend the quarterly refunding press conferences?
6    A.  I'm sorry, could you say that again?
7    Q.  As of October 31st, 2001, do you know who at
8  Treasury was responsible for deciding who could
9  attend press conferences, refunding press
10  conferences?
11    A.  No.  All I can say is the Office of Public
12  Affairs was responsible for inviting members of the
13  media and clearing them in for press conferences,
14  including quarterly refunding announcements.
15    Q.  Do you know if there was a comprehensive
16  list of everyone who attended the October 31st,
17  2001 press conference?
18    A.  No.
19    Q.  Now, how did those individuals who were
20  attending the quarterly refunding press conferences
21  as of October 31st, 2001 get into the Treasury
22  Building on the morning of the press conference?

Page 157

1    A.  Those individuals, meaning members of the --
2  are you make a distinction between members of the
3  media or nonmembers of the media?
4    Q.  Anybody who was attending.
5    A.  Well, for anyone to enter the Treasury
6  Building, they need to be cleared by Secret
7  Service.  And unless they have a permanent badge,
8  they need to be -- a permanent Treasury badge, in
9  which they can't wouldn't have to be cleared in.
10  So if they were cleared in, they had to be escorted
11  to wherever they need to be in the building by a
12  Treasury official.
13    Q.  And what room in the Treasury Building was
14  normally used for the quarterly refunding press
15  conferences?
16    A.  The diplomatic reception room.
17    Q.  And is there a reason why the diplomatic
18  reception room as opposed to another conference
19  room was used for that particular kind of
20  conference?
21    A.  There is no other conference -- there was no
22  other conference room at the time.  The cash room.

**EXHIBIT B**

**Cited Excerpts from the Deposition Transcript
of Paul Malvey
(June 23, 2006)**

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )

UNITED STATES SECURITIES AND        )

EXCHANGE COMMISSION,                )

        Plaintiff,              )

      v.                          ) No. 05-10983 (NMG)

STEVEN E. NOTHERN,                  )

        Defendant.             )

- - - - - - - - - - - - - - - - )

Washington, D.C.

Friday, June 23, 2006

Deposition of PAUL FRANCIS MALVEY, a witness herein,

called for examination by counsel for Defendant in

the above-entitled matter, pursuant to agreement, the

witness being duly sworn by CHERYL A. LORD, a Notary

Public in and for the District of Columbia, taken at

the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

Suite 800, Washington, D.C., at 10:10 a.m., Friday,

June 23, 2006, and the proceedings being taken down

by Stenotype by CHERYL A. LORD, RPR, CRR, and

transcribed under her direction.

Page 2

```
1  APPEARANCES:
2
3  On behalf of Plaintiff:
4      JOHN J. ROSSETTI JR., ESQ.
5      Senior Counsel
6      ERICA WILLIAMS, ESQ.
7      UNITED STATES SECURITIES AND EXCHANGE COMMISSION
8      Division of Enforcement
9      100 F Street, N.E.
10     Washington, D.C.  20549
11     (202) 551-4819
12
13 On behalf of Defendant:
14     JOHN A. SHOPE, ESQ.
15     FOLEY HOAG LLP
16     155 Seaport Boulevard
17     Seaport World Trade Center West
18     Boston, MA  02210-2600
19     (617) 832-1000
20
21
22
23
24
25
```

Page 3

```
1  APPEARANCES CONTINUED:
2
3  On behalf of United States Department of the
4  Treasury:
5      THOMAS M. McGIVERN, ESQ.
6      UNITED STATES DEPARTMENT OF THE TREASURY
7      1500 Pennsylvania Avenue, N.W.
8      Washington, D.C.  20220
9      (202) 622-2317
10
11 ALSO PRESENT:
12     Erica L. Ruddy and Dustin Lavallee, videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

# CONTENTS

```
WITNESS              EXAMINATION
                     PAGE NO.
PAUL FRANCIS MALVEY
    By Mr. Shope               7
    Afternoon Session        120
    By Ms. Williams          293
    By Mr. Shope             325
    By Ms. Williams          338
```

## EXHIBITS

(Exhibits attached.)

```
MALVEY EXHIBIT NO.                    PAGE NO.
 1   Letter, 6-21-06              16
 2   Subpoena in a Civil Case        18
 3   Hand-drawn diagram          71
 4   Letter, 1-28-00, No. DC 001660    111
 5   Memorandum, 11-6-01, and attachments 132
 6   Minutes, 10-30-01, Nos. DC
     000042-44              174
 7   Email, 10-31-01            199
 8   Bloomberg graph           203
 9   Email, 10-31-01            210
10   Email, 10-31-01            216
11   Memorandum of Activity, 11-15-01  242
```

Page 5

## EXHIBITS CONTINUED

```
MALVEY EXHIBIT NO.                    PAGE NO.
12   Hand-drawn diagram         265
13   Article by John Connor     276
14   Treasury News              284
15   Minutes, 10-30-01          301
```

Page 118

1    If -- if you go back, we're talking about
2 a period of time when we were talking about paying
3 down the federal debt by 2009 or 2011.
4    Q.   M-hm.
5    A.   We had paid down 670 billion dollars --
6    Q.   M-hm.
7    A.   -- so there was -- I remember briefing I
8 think Senate fi- -- or Senate budget and House
9 financial services committee staff about Treasury
10 financing and what the world would look like without
11 treasuries.
12    Q.   Okay.  And had there been reports that
13 Mr. Fisher had a view on -- on whether or not the
14 long bond should be eliminated?
15    A.   No, no.
16    I mean, that's -- no.  I don't mean to
17 smile, but I mean, we wouldn't -- if you're an
18 official in that position, you don't hold views in
19 public.
20    Q.   Okay.  No.
21    I'm talking about whether he had views on
22 the subject even before he was confirmed.
23    A.   Don't know.  He was in charge of the
24 market divisions of the New York Fed.
25    Q.   Okay.  Now, the --

Page 119

1    MR. ROSSETTI:  I'm sorry.
2    John, how much longer are you going to be
3 going before we break?
4    MR. SHOPE:  Well, I was hoping to go for a
5 little bit since I think both I and the witness had
6 something to eat not too long ago.
7    MR. ROSSETTI:  All right.  Can we just
8 take a quick break?
9    MR. SHOPE:  Okay.  Sure.
10    We can take it right now if you like.
11    MR. ROSSETTI:  Yeah.
12    Let me do that, and I'll be right back.
13    THE VIDEOGRAPHER:  Off the record at
14 12:21:42 AM.
15    (Whereupon, at 12:21 p.m., the deposition
16 in the above-entitled matter was recessed, to
17 reconvene at 12:50 p.m., this same day.)
18
19
20
21
22
23
24
25

Page 120

1    AFTERNOON SESSION
2    (12:50 p.m.)
3
4 Whereupon,
5    PAUL FRANCIS MALVEY,
6 the witness testifying at the time of recess, having
7 been previously duly sworn, was further examined and
8 testified further as follows:
9
10    THE VIDEOGRAPHER:  We're back on the
11 record at 12:50:33 PM.
12
13 EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
14    BY MR. SHOPE:
15    Q.   Actually, before we continue on to the
16 suspension of the long bond, I wanted to follow up on
17 a little bit of some of the things we were talking
18 about with regard to press embargoes before we had
19 the lunch break.
20    First of all, did you -- other than the
21 matter with -- regarding Mr. Davis that we'll get
22 into in some detail, did you ever hear of any other
23 violation of the embargo rule as you understood it
24 with regard to any quarterly refunding conference?
25    A.   I mentioned one, but it was 30 years ago.

Page 121

1    Q.   I'm sorry?
2    A.   30 years ago.
3    I don't have any direct information on it,
4 but there was -- and what -- wasn't like this, but
5 something happened 30 years ago.
6    Q.   And what was -- what was that?
7    A.   It was that the Federal Reserve used to --
8 I'm sorry -- Treasury would send the press release to
9 the Federal Reserve, and -- to the Federal Reserve
10 Bank in Philadelphia -- and the Federal Reserve Bank
11 in Philadelphia would fax it to the other 11 banks.
12    And so they would send it to -- fax it to
13 the Federal Reserve Bank in Philadelphia about 15
14 minutes in advance so that he could fax to the other
15 11 banks so the presidents of the other 11 banks
16 would have the news.
17    And it turned out that he was being wined
18 and dined and being taken to baseball -- Yankee
19 baseball fan -- games and other things by somebody in
20 New York and so he would give this one person in New
21 York a heads-up on the news, but that's -- was mid-
22 to late '70s.
23    Q.   Okay.  And that was a scandal about which
24 you heard at the time?
25    MR. ROSSETTI:  Objection.

Page 122

1    A.   It wasn't a scandal.
2    Q.   Oh.
3    A.   I mean, I don't think -- I have no idea
4  whether it was even in the public domain.
5        All I -- an old-timer told me that.
6    Q.   M-hm.  And do you know what happened to
7  the individual?
8    A.   I have no idea.
9    Q.   Okay.  And were there ever to your
10 knowledge any violations of the -- I'm sorry.
11       So just to be clear:  Other than that
12 incident about which you had heard from an old-timer,
13 there -- there -- there weren't any other re- --
14 violations of the quarterly refunding embargoes to
15 your knowledge?
16   A.   Not to my knowledge, no.
17   Q.   Okay?  Did you ever -- now, we talked
18 about earlier about the embargo that related to the
19 weekly auction notice.
20       Do you recall that?
21   A.   Yes.  Okay.  Right.
22   Q.   In other words we were talking about that
23 earlier today.
24   A.   M-hm.
25   Q.   Was that embargo ever violated to your

Page 123

1  knowledge?
2    A.   Not to my knowledge, no.
3    Q.   Okay.  If there had been a violation,
4  would you likely have been told about it?
5    A.   I suspect so.
6    Q.   M-hm.  By the way, if there had been an
7  embargo -- if there had been a violation of the
8  quarterly refunding embargo would you likely have
9  heard about it?
10   A.   I suspect so.
11   Q.   Okay.  And was there -- was there any
12 penalty if somebody did violate the embargo for the
13 quarterly refunding announcement?
14   A.   I'm an economist.  I have no idea.
15   Q.   Is the answer you don't know?
16   A.   I don't know.
17       Yeah.
18       No, I don't know.
19   Q.   I guess what I'm getting at, as far as --
20 as far as -- as far as -- I'm not just asking about
21 criminal penalty.
22       I'm just asking about, was there anything
23 that would happen to the person, you know --
24   A.   I have --
25   Q.   -- from the point of view of the Treasury

Page 124

1  Department, for example.
2    A.   I have no idea.
3        (Discussion off the record.)
4        BY MR. SHOPE:
5    Q.   Let me rephrase the question.
6        As far as you're aware, was there any
7  policy that the Treasury Department had with regard
8  to what would happen if one of the persons attending
9  the quarterly refunding conference were to fail to
10 abide the embargo and to disclose the information in
11 advance of the embargo?
12       MR. ROSSETTI:  Objection.
13   A.   I have no idea.  It's not my area.
14       BY MR. SHOPE:
15   Q.   Okay.  That's fine.
16       Were the press releases that were read at
17 the quarterly refunding conference, what you referred
18 to as the talking points earlier -- would those be
19 posted on the Treasury Web site?
20   A.   They would go up eventually.
21   Q.   Okay.  And do you know who was in charge
22 of making that happen?
23   A.   A career person in -- in the public
24 affairs office.
25   Q.   Do you know who that was?

Page 125

1    A.   I can't remember her name.
2        Florence or --
3    Q.   Frances?
4    A.   Frances.
5    Q.   Frances Anderson?
6    A.   I -- Helen Anderson worked for me --
7    Q.   I'm sorry?
8    A.   Helen Anderson worked for me --
9    Q.   Oh.
10   A.   -- and I just knew her as Frances.  I'm
11 not quite sure what her last name was.
12   Q.   Okay.  And the -- now, other than with
13 regard to October, the quarterly refunding conference
14 on October 31, 2001, did you ever hear of any
15 incidents where press releases were posted on the Web
16 site of the Treasury Department before it was
17 intended or at least intended by somebody that they
18 go up?
19       MR. ROSSETTI:  Objection.
20   A.   I -- I'm not familiar with that, no.
21       BY MR. SHOPE:
22   Q.   Do you know -- do you know who a Kenneth
23 Dam is?
24   A.   Ken Dam?
25   Q.   M-hm.

**EXHIBIT C**

**Cited Excerpts from the Deposition Transcript
of Peter Fisher
(August 8, 2006)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
UNITED STATES SECURITIES  )
AND EXCHANGE COMMISSION,   )
                          )
          Plaintiff,       )
                          )
     vs.                   ) No. 05-10983
                          )      (NMG)
STEVEN E. NOTHERN,         )
                          )
          Defendant.       )
-------------------------)
```

VIDEOTAPED

DEPOSITION OF PETER R. FISHER

New York, New York

August 8, 2006

Reported by:
PAMELA J. MAZZELLA, RPR
JOB NO. 7046

Page 2

```
 1
 2                 August 8, 2006
 3                 10:03 a.m.
 4
 5         Deposition of PETER R. FISHER,
 6   held at the offices of Davis Polk &
 7   Wardwell, 450 Lexington Avenue, New
 8   York, New York, pursuant to Amended
 9   Notice, before Pamela J. Mazzella, RPR,
10   a Notary Public of the State of New
11   York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2   A P P E A R A N C E S:  (Cont'd.)
 3
 4     MORVILLO, ABRAMOWITZ, GRAND, IASON &
 5       SILBERBERG, P.C.
 6       Attorneys for the Witness
 7         565 Fifth Avenue
 8         New York, New York 10017
 9     BY:  CYRUS R. VANCE, JR., ESQ.
10
11
12   ALSO PRESENT:
13       IAN PAOLA - Videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4   UNITED STATES SECURITIES AND EXCHANGE
 5     COMMISSION
 6   DIVISION OF ENFORCEMENT
 7     Attorneys for Plaintiff
 8       100 F Street, N.E.
 9       Washington, D.C. 20549-4010
10     BY:  ERICA Y. WILLIAMS, ESQ.
11     AND:  JOHN J. ROSSETTI, JR.,  ESQ.,
12         Senior Counsel
13
14   DEPARTMENT OF THE TREASURY
15       1500 Pennsylvania Avenue, NW
16       Washington, D.C. 20220
17     BY:   THOMAS M. McGIVERN, ESQ.
18
19   FOLEY HOAG LLP
20     Attorneys for Defendant
21       Seaport World Trade Center West
22       155 Seaport Boulevard
23       Boston, MA 02210-2600
24     BY:   JOHN A. SHOPE, ESQ.
25
```

Page 5

```
 1
 2         THE VIDEOGRAPHER:   Good morning.
 3   Here begins tape number 1 of the
 4   videotaped deposition of Mr. Peter
 5   Fisher in the matter of United States
 6   Securities and Exchange Commission
 7   versus Steven E. Nothern in the United
 8   States District Court for the District
 9   of Massachusetts.
10         This deposition is being held at
11   450 Lexington Avenue, New York, New
12   York, on August 8, 2006 at approximately
13   10:03 a.m.
14         My name is Ian Paola from the firm
15   of Esquire Deposition Services and I am
16   the legal video specialist.  The court
17   reporter is Pam Mazzella in association
18   with Esquire Deposition Services.
19         Will counsel please introduce
20   themselves for the record.
21         MR. SHOPE:   Yes, my name is John
22   Shope, S-H-O-P-E, and I'm from the law
23   firm of Foley Hoag in Boston and I
24   represent the defendant, Steven Nothern.
25         MS. WILLIAMS:  Erica Williams for
```

Page 174

```
 1          Fisher
 2     Q.  And so he didn't give any more
 3  detail other than it was a shame that the
 4  information had gotten out early?
 5     A.  I -- as I had been talking to
 6  Michelle Davis, I assume the secretary had
 7  also.  I didn't expect for him to talk to me
 8  about, in any detail about press office
 9  procedures.
10     Q.  Now, you mentioned to Ms. Williams
11  that the market is constantly trying to
12  anticipate what it is the Treasury is going
13  to do at the Refunding Conferences, correct?
14     A.  Yes.
15     Q.  And would it be also fair to say
16  that it is a goal of the Treasury to make its
17  announcement at those Refunding Conferences
18  regular and predictable?
19     MS. WILLIAMS:  Objection.
20     A.  The phrase "regular and
21  predictable" refers to the -- there is a term
22  used in Treasury debt management to convey
23  that auctions occur on regular and
24  predictable dates.
25     Many sovereign borrowers change
```

Page 175

```
 1          Fisher
 2  when they will be auctioning their bonds.
 3  They do not provide a forward calendar that
 4  commits them to auctioning securities at
 5  particular dates.  Whereas the United States
 6  Treasury since the 1970s has committed itself
 7  to a practice of regular and predictable
 8  auctions.
 9     So that phrase refers to the
10  auction calendar.  The announcement process
11  is in advance of those auctions to specify
12  the quantities that will be announced, that
13  will be auctioned on those specified dates.
14     Q.  So there is no policy goal within
15  Treasury in your understanding of trying to
16  make policies themselves, as opposed to the
17  specific dates of auctions, regularly and
18  predictable?
19     MS. WILLIAMS:  Objection.
20     A.  Well, policies change from one
21  administration to another.  I think that it's
22  very important to recognize the difference
23  between creating a regular and predictable
24  calendar of auctions, which allows investors
25  to anticipate when they can acquire Treasury
```

Page 176

```
 1          Fisher
 2  securities at auction, and never changing
 3  your policies or inducing a great deal of
 4  inertia in the policy-making process.
 5     I don't think there is anything in
 6  the fact of regular and predictable auction
 7  calendar that suggests a policy is best
 8  pursued which changes the auction, changes
 9  debt management policies the least.
10     Changes are being made all the time
11  in increments and are then being announced as
12  clearly as one can to the market.  So I would
13  see it rather differently than your question
14  implied.
15     Q.  Do you recall there being criticism
16  that the announcement on October 31 just took
17  the market by surprise?
18     A.  I recall some people saying it took
19  them by surprise and other people saying they
20  anticipated it.
21     Q.  But do you recall anyone saying in
22  substance that the Treasury did a bad job
23  here because it failed to prepare the market
24  for this information in advance?
25     A.  Well, you have shown me various
```

Page 177

```
 1          Fisher
 2  clippings which say as much, and that's the
 3  distinction I'm trying to draw, is if you
 4  leak it to the market in advance, then you
 5  don't surprise the market, but then you've
 6  leaked it, and that would be a bad process in
 7  my view.
 8     Q.  One last question.  Ms. Williams
 9  was asking you about your regrets.
10     Do you regret not having been more
11  forceful with Michelle Davis about
12  distributing the decision to cancel the long
13  bond in the form of an internet announcement
14  without an embargo?
15     A.  No because I think that she and I
16  had a very full discussion about the pros and
17  cons of that.  I feel I informed her of my
18  feeling and she informed me of hers.  And I
19  feel I have been involved enough in
20  government and public decision-making to know
21  that you don't always get the outcome you
22  want, but if you got a chance to debate the
23  pros and cons of something and made as good a
24  decision as the responsible person could,
25  which was Michelle in that case, then it's
```

Page 178

```
 1          Fisher
 2   pretty good.
 3       Q.  Did you ever tell anybody about the
 4   conversation that you had had with Ms. Davis
 5   in anticipation of the conference on October
 6   31 in which you had suggested not using an
 7   embargo?
 8       A.  Did I ever -- have I ever told
 9   anyone since or did I ever tell anyone at the
10   time?  Please rephrase.
11       Q.  Before today did you ever tell
12   anybody oh, by the way, I had this
13   conversation with Miss Davis in which I
14   suggested that we get rid of the embargo?
15       A.  I'm confident I discussed it with
16   my staff at the time, the pros and cons of
17   it.  I don't recall making a public matter of
18   it after the fact.
19       Q.  In other words, your memory is that
20   you discussed with your staff prior to
21   October 31 the fact that you were having a
22   conversation with Ms. Davis in which you were
23   proposing not using the embargo?
24       MS. WILLIAMS:  Objection.
25       A.  That's my recollection.
```

Page 179

```
 1          Fisher
 2       Q.  And did you ever hear any
 3   suggestion by your staff that the events of
 4   October 31 were attributable to your own
 5   hubris?
 6       A.  No.
 7       MR. SHOPE:  I have nothing
 8   further.
 9       MS. WILLIAMS:  I have one
10   question.
11   EXAMINATION (Cont'd.)
12   BY MS. WILLIAMS:
13       Q.  Do you recall who told you that Mr.
14   Malvey had let Mr. Davis attend the October
15   31 conference?
16       A.  I don't recall, I don't recall who
17   informed me of that.
18       Q.  Did you have any knowledge about
19   the circumstances under which Mr. Malvey
20   allowed Mr. Davis to attend?
21       A.  No prior knowledge.  After the fact
22   only what I was told about, what I said a few
23   minutes ago, about his being, Mr. Malvey
24   signing him in somehow or giving him
25   permission to attend the press briefings.
```

Page 180

```
 1          Fisher
 2       Q.  Do you know if Mr. Davis had agreed
 3   to abide by the embargo?
 4       MR. SHOPE:  Objection.
 5       A.  I don't have any specific knowledge
 6   of that.
 7       MS. WILLIAMS:  I have no further
 8   questions.
 9       MR. SHOPE:  I have nothing.
10       THE VIDEOGRAPHER:  The time is
11   1:27 p.m. and this marks the end of the
12   videotaped deposition of Mr. Peter
13   Fisher.
14          (Time noted:  1:27 p.m.)
15   _____
16          PETER R. FISHER
17
18   Subscribed and sworn to before me
19   this ___ day of _____, 2006.
20
21   _____
22
23
24
25
```

Page 181

```
 1
 2       C E R T I F I C A T E
 3   STATE OF NEW YORK    )
 4                  :  ss.
 5   COUNTY OF NEW YORK   )
 6
 7       I, PAMELA J. MAZZELLA, RPR, a
 8   Notary Public within and for the State
 9   of New York, hereby certify:
10       That PETER R. FISHER, the witness
11   whose deposition is hereinbefore set
12   forth, was duly sworn by me and that
13   such deposition is a true record of the
14   testimony given by the witness.
15       I further certify that I am not
16   related to any of the parties to this
17   action by blood or marriage, and that I
18   am in no way interested in the outcome
19   of this matter.
20       IN WITNESS WHEREOF, I have
21   hereunto set my hand this 11th day of
22   August, 2006.
23
24   _____
25          PAMELA J. MAZZELLA, RPR
```

**EXHIBIT D**

**Cited Excerpts from the Deposition Transcript
of Geoffrey Kurinsky
(September 7, 2006)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


--------------------------------x

UNITED STATES SECURITIES AND   ) C.A. 05-10983

EXCHANGE COMMISSION,         ) (NMG)

Plaintiff,              )

                         )VOLUME:      I

vs.                  )PAGES:   1-242

                         )EXHIBITS:  1-12

STEVEN E. NOTHERN,       )

Defendant.            )

--------------------------------x


VIDEOTAPED DEPOSITION OF GEOFFREY

KURINSKY, a witness called on behalf of the

Plaintiff, pursuant to the provisions of the

Massachusetts Rules of Civil Procedure,

before Jill Shepherd, Registered

Professional Reporter and Notary Public, in

and for the Commonwealth of Massachusetts,

at the offices of U.S. Securities and

Exchange Commission, 33 Arch Street, Boston,

Massachusetts, on Thursday, September 7, 2006,

commencing at 10:18 a.m.

Page 2

1  APPEARANCES:
2
3  UNITED STATES SECURITIES AND EXCHANGE
4  COMMISSION
5  (By John J. Rossetti, Jr., Esquire)
6  (By Erica Williams, Esquire)
7  100 F Street, N.E.
8  Mail Stop 8549-D
9  Washington, D.C. 20549
10  Tel: 202.551.4819
11  Fax: 202.772.9237
12  E-mail: rossettij@sec.gov
13  On Behalf of the Plaintiff.
14
15  DONOGHUE, BARRETT & SINGAL, P.C.
16  (By Richard Goldstein, Esquire)
17  One Beacon Street
18  Suite 1320
19  Boston, Massachusetts 02108-3113
20  Tel: 617.720.5090
21  Fax: 617.720.5092
22  E-mail: rgoldstein@dbslawfirm.com
23  On Behalf of the Witness,
24  Geoffrey Kurinsky.
25

Page 3

1  APPEARANCES, CONTINUED
2
3  FOLEY HOAG, LLP
4  (By John Shope, Esquire)
5  155 Seaport Boulevard
6  Boston, Massachusetts 02210
7  Tel: 617.832.1233
8  Fax: 617.832.7000
9  E-mail: jshope@foleyhoag.com
10  On Behalf of the Defendant,
11  Steven Nothern.
12
13
14  ALSO PRESENT: George Dobrenty, Videographer
15          Steve Nothern, Defendant
16
17          * * * * *
18
19
20
21
22
23
24
25

Page 4

1              I N D E X
2  WITNESS:                    PAGE
3  GEOFFREY KURINSKY
4  Examination by Mr. Rossetti        6, 219
5  Examination by Mr. Shope           177
6
7         E X H I B I T S
8  NO.      DESCRIPTION         PAGE
9  1      Notice of Taking Deposition   5
10  2      Subpoena                      5
11  3      SECNOTH00130192-             61
12         SECNOTH00130193
13  4      SECNOTH00117152-            118
14         SECNOTH00117213
15  5      M000565-M000579             128
16  6      M000113-M000114A            131
17  7      SECNOTH00131632-            148
18         SECNOTH00131637
19  8      DC002018-DC002023           185
20  9      DC002359-DC002361           191
21  10     DC002464-DC002467           233
22  11     DC002451-DC002454           236
23  12     Pages 1-4 of the            239
24         Deposition of
25         S. Nothern

Page 5

1       P R O C E E D I N G S
2       (Exhibit Nos. 1-2 marked)
3       THE VIDEOGRAPHER:  Good morning.
4  We're recording and are now on the record.
5  Today's date is September 7, 2006, and the
6  time is 9:24 a.m.  My name is George
7  Dobrenty.  I am a legal videographer for
8  Alderson Court Reporters.
9       This is a deposition of Geoffrey
10  Kurinsky in the matter of the SEC vs. Steven
11  Nothern in the U.S. District Court for the
12  District of Massachusetts, Boston division,
13  C.A. No. 05-10983 (NMG).  This deposition is
14  being taken at 33 Arch Street, Boston,
15  Massachusetts.  The court reporter is Jill
16  Shepherd.  Counsel will state their
17  appearances and the court reporter will
18  administer the oath.
19       MR. ROSSETTI:  John Rossetti for
20  the plaintiff, United States Securities And
21  Exchange Commission.
22       MS. WILLIAMS:  Erica Williams for
23  the United States Securities and Exchange
24  Commission.
25       MR. SHOPE:  John Shope,

Page 98

1       money?
2   A.  Every day I would look at the, you know -- -
3       talking about the corporate bond market, I
4       mean, I could look at the portfolio. There
5       was no rush to spend that money that day. I
6       managed -- I used portfolio duration, which
7       is a measure of the interest rate
8       sensitivity as the prime position -- as the
9       prime input in the position of my portfolio,
10      what the duration was.
11  Q.  Based on what your most significant holdings
12      were?
13  A.  Right. I got that from a system,
14      calculated.
15  Q.  Okay. And when would you typically perform
16      that sort of analysis?
17  A.  First hour. Get ready for the day, and I
18      had all my accounts.
19  Q.  In determining how you might spend the money
20      that was available to you on a given day,
21      what else would you do to do an analysis?
22  A.  You know, I'd get market color. I mean, I'd
23      see if opportunities came up. You know,
24      particular corporate issues that looked
25      attractive, an idea from any one of my

Page 99

1       specialists, mortgage idea, asset-backed
2       idea, Treasury idea, that I would evaluate.
3   Q.  When you said you'd get ideas from your
4       specialists, you are meaning whether it was
5       Mr. Nothern or Vaream or Smith?
6   A.  Right. Right.
7   Q.  Okay. You said you'd look to get market
8       color. What did you mean by that?
9   A.  Talk to the dealers. You know, what's going
10      on in the market? What's happening to, you
11      know, corporate trends? What's happening to
12      interest rates in general. Sort of general,
13      you know, "How's the marketing opening?
14      What's the tone for the day?"
15  Q.  Did there come a point in time on
16      October 31st that you made a decision that
17      you were going to spend some of the
18      $15 million to buy some securities?
19  A.  Yes.
20  Q.  And what securities did you purchase?
21  A.  Bought 10 million Treasury bonds.
22  Q.  That's the 30-year bonds?
23  A.  Correct.
24  Q.  What led you to that decision to purchase
25      those Treasury bonds?

Page 100

1   A.  Well, it was a trade that they were doing on
2       the trading desk.
3   Q.  When you say "we," who are you referring to?
4   A.  It was a trade that Steve Nothern, Rick
5       Smith, Peter Vaream -- it was a general --
6       we were doing a Treasury trade, and it was
7       -- you know, it was a trade that I went
8       along with the group and I bought 10 million
9       bonds.
10  Q.  Do you know if David Kennedy was in on that
11      transaction?
12  A.  I believe he was.
13  Q.  Do you know if Peter Vaream was in on that?
14  A.  I believe Peter was out. If that was the
15      case, we may have put some in his accounts.
16      I think he was out that day.
17  Q.  So as you sit here today, you think that
18      Peter Vaream was out of the office that day?
19  A.  Yeah, I'm not sure, but...
20  Q.  Okay.
21  A.  But I know the fact that Rick Smith, Dave
22      Kennedy, Steve Nothern, I was there, Jim
23      Calmas was there.
24  Q.  Of those people that you just mentioned, who
25      was involved in this purchase for Treasury

Page 101

1       bonds that you described?
2   A.  I think Steve, Rick, David and myself. I
3       don't think Jim was.
4   Q.  What was the total amount of the purchase?
5   A.  Of the whole desk?
6   Q.  Yes.
7   A.  I believe it was 70 million.
8   Q.  Of that 70 million, you said you purchased
9       10 million?
10  A.  That's correct.
11  Q.  Do you know how much of that 70 million or
12      remaining 60 million the others purchased?
13  A.  Yeah. I think Steve bought 25, Dave Kennedy
14      bought 25, Rick bought 10. Again, this is
15      my recollection, and I bought 10. And I
16      might have -- I'm thinking if -- I am not
17      sure if I was thinking Peter's accounts or
18      not.
19  Q.  Would have been included in the 10 million?
20  A.  Yeah.
21  Q.  I see. Now, what led up to this group --
22      this was a group decision to purchase these?
23  A.  Yeah.
24  Q.  What led up to this decision to purchase
25      these bonds?

Page 102

1  A. Well, there was discussion as to whether the
2    Treasury Department would eliminate -- you
3    know, there was a lot of speculation about
4    what the Treasury Department would do with
5    the 30-year Treasury, whether they would,
6    you know, auction bonds this time or not.
7    And there was discussion -- Steve got up and
8    said that there was a discussion that they
9    might -- you know, that they might -- that
10   someone thought that the 30-year Treasury
11   bond might be eliminated from the auction.
12 Q. Did he say who that someone was that thought
13   the Treasury would eliminate the 30-year
14   bond?
15 A. Yeah, I recall it was from Pete Davis.
16 Q. Can you tell me specifically what it is that
17   Steve Nothern mentioned about Pete Davis?
18 A. He said that he had -- Pete Davis told him
19   that the Treasury was not going to have a
20   30-year bond auction in the refunding.
21 Q. When did Steve Nothern make that statement?
22 A. I remember it around 9:30ish. I don't
23   remember exactly.
24 Q. I think you said "he got up." What did you
25   mean, "he got up"?

Page 103

1  A. I was on the phone talking about a corporate
2    trade and Steve was standing up talking to
3    Rick, he's in his station, and then Dave
4    afterwards, and they are talking about it
5    and they are starting to put a trade
6    together. And then I got attention, and
7    then said, you know, "Take me along. I will
8    take 10 million." I was focused on a
9    corporate -- something else, and it was a
10   trade that the desk was doing, so take me
11   along.
12 Q. Now, you said that you were on the phone?
13 A. Yeah.
14 Q. Who were you on the phone with at the time?
15 A. I don't remember, but it was related to a
16   corporate trade. I don't remember whether I
17   was getting information but I think I stood
18   up, two people were up. I'm thinking,
19   "What's going on?" I'm still on the phone
20   and talking, and then I overhear the buy,
21   and I said, "I will take 10 million."
22 Q. When you were on the phone, were you
23   standing or seated?
24 A. I was seated, and then I got up because I
25   realized other people were up and discussing

Page 104

1    something.
2  Q. While you were seated at your desk and on
3    the phone, did you see that other -- did you
4    notice that other people were standing?
5  A. Yeah.
6  Q. And the people that you noticed were
7    standing, were whom?
8  A. If I remember, Steve and Rick.
9  Q. Steve Nothern and --
10 A. Right.
11 Q. -- and Rick Smith?
12 A. Correct.
13 Q. Two of the portfolio managers you work with?
14 A. That's correct.
15 Q. All right. And you saw them standing. Were
16   they in a discussion with one other?
17 A. Steve was in his work station standing up
18   and Rick was in his work station standing
19   up. The way we always -- they talked about
20   things all the time.
21 Q. And at that point, did you notice anybody
22   else standing?
23 A. Not that I can recall.
24 Q. Did you notice David Kennedy at all at this
25   point?

Page 105

1  A. No.
2  Q. Was David Kennedy on the desk at that point?
3  A. I think so.
4  Q. Was he standing or seated?
5  A. I don't -- I'm guessing he was probably
6    seated, but I don't remember.
7  Q. Now, I thought you said when you were on the
8    phone you noticed some people standing and
9    then you stood up.
10 A. Yeah.
11 Q. What prompted you to stand up?
12 A. Well, it's like commotion. I mean,
13   something is happening; something is going
14   on. It's a natural instinct to see what's
15   going on.
16 Q. You said there was a commotion. What do you
17   mean, "There was a commotion"?
18 A. People were up, discussing about a trade,
19   and I'm part of the team, and, you know, I,
20   like, want to know what's going on because
21   maybe I want to get involved. It was a --
22   happened many times a day. I mean...
23 Q. How did you -- you said they were discussing
24   a trade. How did you know they were
25   discussing a trade?

Page 106

1  A.  Well, I guess they were standing up.  I
2    could see that there was conversation --
3    there was John Cadogan, not specifically,
4    there was some dialogue going on and John's
5    a trader, so something was happening.
6  Q.  Could you hear what they were saying?
7  A.  Not specifically.
8  Q.  All right.  And what did you do?  Let me
9    withdraw that.
10  A.  Right.
11  Q.  At this point, you are on the phone, you see
12    Nothern standing, you see Rick Smith
13    standing --
14  A.  Yeah.  And people saying what they are doing
15    -- saying they are --
16        MR. GOLDSTEIN:  Just wait for
17    Mr. Rossetti to finish his question.
18        MR. ROSSETTI:  Thanks.
19  Q.  You are hearing that they are going to be
20    doing something and they are talking with
21    John Cadogan; is that correct?
22  A.  (No audible response.)
23  Q.  You got to verbalize your answer.
24  A.  They are talking among themselves.
25  Q.  Rick, Steve Nothern?

Page 107

1  A.  Right.
2  Q.  And John?
3  A.  Correct.
4  Q.  The trader?
5  A.  That's correct.
6  Q.  At that point, could you hear what they were
7    discussing among themselves?
8  A.  Well, I knew they were buying Treasuries.
9  Q.  How did you know that?
10  A.  Because I could hear it.
11  Q.  What did you hear?
12  A.  By then, I was aware of the refunding
13    announcement.  At that point I was aware the
14    Treasury market was up, so my senses were
15    risen to the fact that there was information
16    that had been -- that had apparently been
17    released.
18  Q.  Okay.  So, specifically, what did you
19    hear -- you said there they were purchasing
20    Treasury bonds?
21  A.  Right.
22  Q.  What specifically did you hear at that
23    point?
24  A.  I heard that there would have been a call
25    and -- from Pete Davis that the Treasury

Page 108

1    might be eliminating the 30-year Treasury
2    bond from the auction.
3  Q.  When you heard that, were you still in your
4    work station or had you moved over to where
5    Steve Nothern --
6  A.  I was in my work station.
7  Q.  All right.  So did Steve Nothern make that
8    statement?
9  A.  Right.  Yeah.
10  Q.  So was he announcing it to you as well?
11  A.  Yeah.  He was talking -- talking about it
12    with Rick, I assume.  I didn't hear what
13    they were talking about, but that was the
14    topic, topic du jour.
15  Q.  But when Steve Nothern made this statement
16    about Peter Davis -- if you go to
17    Exhibit 3 --
18  A.  Yeah.
19  Q.  -- you see station 240 is where Nothern sat?
20  A.  Right.
21  Q.  And you sat at 265?
22  A.  Correct.
23  Q.  What was the distance between Nothern's work
24    station and your work station?
25  A.  25 feet.  I don't know.

Page 109

1  Q.  Okay.
2  A.  Not a lot.  I mean, you could easily be
3    heard.
4  Q.  Right.  But he'd have to be intending to
5    speak to you --
6  A.  Right.  Right.
7  Q.  -- in a louder voice?
8  A.  Right.
9  Q.  And that's what he did to tell you what --
10  A.  Right.
11  Q.  -- Pete Davis had told him?
12  A.  That's correct.
13  Q.  All right.  Was this before or after you had
14    heard people purchasing bonds?
15        MR. SHOPE:  Note my objection.
16  A.  Could you repeat the question?
17  Q.  I thought you had said that at some point
18    you heard Steve Nothern and Rick Smith
19    giving an order to Cadogan to purchase
20    bonds.  Did I have that correct?
21  A.  Right.
22  Q.  All right.  This statement that Steve
23    Nothern said about Peter Davis --
24  A.  Right.
25  Q.  -- did that come before or after you hearing

Page 110

1    Steve Nothern and --
2  A. It was before.
3  Q. -- Rick's Smith --
4  A. Right.
5  Q. -- telling Cadogan they wanted to purchase
6     bonds?
7  A. It was before.
8  Q. So the first statement you heard was Nothern
9     making this announcement about what he heard
10    from Pete Davis?
11 A. Correct.
12 Q. At this point you are on the phone?
13 A. Right.
14 Q. All right.  What's the -- after Nothern
15    makes that statement, what's the next thing
16    you observe?
17 A. At this point, I'm on the phone and I'm
18    already aware that the Treasury market is
19    up.
20 Q. You are seeing some information on your --
21 A. I have a screen so I'm sort of like, oh, I'm
22    on the phone.  I'm thinking, "Something is
23    going on," so...
24 Q. When you say "the Treasury market is going
25    up," what do you mean by that?

Page 111

1  A. I have a screen that has actual quotes and
2     the 30-year Treasury bond is up.  I don't
3     know, three-quarters of a point.  Something
4     is happening.
5  Q. All right.  As you sit here today, do you
6     know how much it was going up or it had gone
7     up?
8  A. I think it was three-quarters of a point.
9  Q. After you see your screen and you see the --
10 A. Right.
11 Q. -- the bond going up, what's the next thing
12    you recall happening?
13 A. Well, then they're standing up and doing
14    something, and then I -- that -- the Pete
15    Davis discussion, and then they are doing
16    the trade, and I'm saying, you know, "I
17    could use 10 million."
18 Q. So you are saying "they're standing up," you
19    are referring to Steve Nothern --
20 A. Steve Nothern --
21 Q. -- and Rick Smith?
22 A. And John Cadogan is taking instruction.
23 Q. Is John Cadogan standing as well?
24 A. I remember him sitting, but I don't know.
25 Q. What's the discussion that's going on among

Page 112

1     Cadogan, Steve Nothern and Rick Smith at
2     this point?
3  A. It's figuring out a number.  It's collecting
4     orders to get to how many did we want to
5     buy, to -- so John can go buy them.
6  Q. Was there anybody who was taking the lead
7     and trying to find out how much everybody
8     wanted?
9  A. I mean, not -- it seemed like Steve and Rick
10    were putting it together.
11 Q. All right.  And did there -- after you
12    observed this interaction between Nothern,
13    Cadogan and Rick Smith, what's the next
14    thing you recall occurring?
15 A. John Cadogan executed, you know, the trade,
16    bought 70 million Treasury bonds.
17 Q. So, by this point, you had heard whatever
18    Nothern wanted to purchase, whatever Rick
19    Smith wanted to purchase and whatever David
20    Kennedy wanted to purchase?
21 A. Right.
22 Q. And you told them, "I wanted to purchase 10
23    million"?
24 A. Right.
25 Q. How exactly did you tell them that "I wanted

Page 113

1     to purchase 10 million"?
2  A. I looked at John and said, "I will take 10."
3  Q. When you say, "I will take 10," you were
4     intending for him to purchase for you
5     10 million Treasury bonds?
6  A. That's correct.
7  Q. You see, we will get this working out at
8     some point today.
9        After Mr. Nothern had made this
10    statement about Peter Davis, did you engage
11    in any discussion with anybody else about
12    what exactly Davis had said or get any
13    clarification or anything like that?
14 A. No.
15 Q. Did you engage in any conversation -- after
16    you heard this statement that Nothern said
17    about Davis, but before you asked Cadogan or
18    anybody else to purchase 10 million, did you
19    get involved in any other discussion with
20    anybody there about what was going on?
21 A. No.
22 Q. Prior to you indicating to Cadogan that you
23    wanted to purchase the 10 million in bonds,
24    did you see anything on the news wires
25    indicating that the Treasury refunding

Page 114

1    announcement had been released?
2    A. No.
3    Q. Had you received any e-mails or any
4    information from anybody in which they
5    indicated that the 30-year bond was going to
6    be cancelled?
7    A. No.
8    Q. So the only information you had that morning
9    that there may be a cancellation of the
10    30-year bond was coming from Steve Nothern?
11    MR. SHOPE: Objection.
12    A. Correct, but there had been speculation for
13    weeks about whether they would or not. I
14    mean, it was...
15    Q. And it had been speculation for --
16    A. Wall Street Journal, right.
17    Q. But the speculation had been going on for a
18    couple of years --
19    A. Right.
20    Q. -- correct? And people thought because
21    the --
22    A. The surplus.
23    Q. -- surplus the U.S. government was running,
24    that they might cancel the 30-year bond?
25    A. Right.

Page 115

1    Q. Right.
2    A. Now we'll probably need the 50 years, 60
3    years, 70 year and 80 year-bonds. I'm sorry
4    I said that.
5    Q. That's because the government is now running
6    such huge deficits?
7    A. Right. I won't do that again.
8    Q. Did you ever -- were you working as a
9    portfolio manager when there had been an
10    announcement about a cancellation of the
11    20-year bond?
12    A. I don't remember that.
13    MR. ROSSETTI: We can go off the
14    record, take a quick break here.
15    THE VIDEOGRAPHER: The time is
16    11:50, and we are off the record.
17    (A recess was taken from
18    11:50 a.m. to 12:00 p.m.)
19    THE VIDEOGRAPHER: The time is
20    12 o'clock noon, and we are back on the
21    record.
22    Q. Mr. Kurinsky, when Mr. Nothern had made the
23    statement that Davis had -- when he made the
24    statement about what Davis had told him, did
25    Steve Nothern mention anything about an

Page 116

1    embargo?
2    A. No.
3    Q. Did he mention that Peter Davis had just
4    gotten out of a meeting?
5    A. No.
6    Q. Did he mention -- did Steve Nothern say that
7    -- anything about Davis mentioning a press
8    release was going to be issued?
9    A. No.
10    Q. Did Mr. Nothern mention that Peter Davis
11    said the Treasury Department was going to
12    make an announcement at 10 a.m.?
13    A. No.
14    Q. Did Mr. Nothern mention anything about TIPS,
15    Treasury Inflation Protected Securities?
16    A. No.
17    Q. Did you make any mention of a buyback?
18    A. No.
19    Q. Did Mr. Nothern make any statement about
20    five-year notes?
21    A. No.
22    Q. Did he mention -- did Steve Nothern mention
23    that Peter Davis had mentioned the name
24    "Peter Fisher"?
25    A. No.

Page 117

1    Q. Now, you had discussed earlier this morning
2    that you had provided some testimony to the
3    Securities and Exchange Commission back in
4    December of 2001; is that correct?
5    A. That's correct.
6    Q. When you provided that testimony to the
7    Securities and Exchange Commission, was the
8    testimony you provided under oath?
9    A. It was.
10    Q. And was that testimony subject to any
11    penalty of perjury?
12    A. I assume it was.
13    Q. When you gave your investigative testimony
14    in December of 2001, were the events of
15    October 31, 2001 fresh in your mind?
16    A. Yes.
17    Q. Did your investigative testimony reflect
18    your knowledge of the events of -- correctly
19    reflect your knowledge of the events of
20    October 31st correctly?
21    A. You mean, in terms of written notes that
22    came out of it?
23    Q. No, no, no, no, no.
24    A. Oh.
25    Q. The testimony you were providing --

# EXHIBIT E

## Cited Excerpts from the Deposition Transcript
## of David Smith
## (June 19, 2006)

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X
UNITED STATES SECURITIES AND                Civil Action No.
EXCHANGE COMMISSION,                        05-10983 (NMG)

                    Plaintiff.

v.


STEVEN E. NOTHERN,

                    Defendant.
------------------------------------X
Volume I

                              June 19, 2006
                              New York, New York



          Videotape deposition of DAVID R. SMITH, taken on

behalf of the Plaintiff, at the United States Securities and

Exchange Commission, WTC, 3 World Financial Center, Suite

4300, New York, New York, 10281, commencing at 10:20 a.m.,

June 19, 2006, before Anthony Armstrong, a Certified

Shorthand Reporter of the State of New York.

Page 2

1  A P P E A R A N C E S
2
   On Behalf of the Plaintiff:
3
   ERICA Y. WILLIAMS, ESQ.
4  JOHN J. ROSSETTI, JR., ESQ.
   United States Securities and Exchange Commission
5  3 World Financial Center, Suite 4300
   New York City, New York 10281
6  (202)551-4450
   (202)551-4819
7
   On Behalf of the Defendant:
8
   NICHOLAS THEODOROU, ESQ.
9  Foley & Hoag, LLP
   Seaport World Trade Center West
10 155 Seaport Boulevard
   Boston, Massachusetts 02210-2600
11 (617)832-1000
12 On Behalf of the Witness:
13 RICHARD GOLDSTEIN, ESQ.
   Donoghue Barrett & Singal, P.C.
14 One Beacon Street, Suite 1320
   Boston, Massachusetts 02108-3113
15 (617)720-5090
   (617)720-5092
16
17 Also Present:
18 Juan Torres, videographer
   Steven E. Nothern
19
20
21
22
23
24
25

Page 3

1              I N D E X
2  WITNESS      EXAMINATION BY        PAGES
3  DAVID R. SMITH     Mr. Rossetti      5, 278
                Mr. Theodorou    248,
4
5              E X H I B I T S
   EXHIBIT NO.      DESCRIPTION        PAGES
6
   DS-1   Notice                    10
7  DS-2   Subpoena                  10
   DS-3   Floor plan                51
8  DS-4   Press release            109
   DS-5   Calendar                 119
9  DS-6   Transcript               125
   DS-7   Printouts of Bloomberg terminal   125
10 DS-8   High grade trading letter    182
   DS-9   Report                   191
11 DS-10  Bloomberg message        206
   DS-11  Response                 207
12 DS-12  E-mail                   207
   DS-13  E-mail                   215
13 DS-14  E-mail                   217
14
15     (Whereupon, exhibits were retained
16  by Mr. Rossetti.)
17
18
19
20
21
22
23
24
25

Page 4

1          Proceedings
2      THE VIDEOGRAPHER:  This is tape number one
3  of the videotaped deposition of Mr. David R.
4  Smith, in the United States -- in the matter
5  of United States Securities and Exchange
6  Commission, Plaintiff, versus Steven E.
7  Nothern, Defendant, in the United States
8  District Court for the District of
9  Massachusetts.
10     This deposition is being held at the SEC,
11 3 World Financial Center, New York, New York,
12 on June 19th, 2006, at approximately 10:20
13 a.m.
14     My name is Juan Torres from the firm of
15 Alderson Reporting, and I am the legal video
16 specialist.
17     Will counsel please introduce themselves
18 beginning with the party noticing this
19 proceeding.
20     MR. ROSSETTI:   John Rossetti for the
21 Securities and Exchange Commission, plaintiff.
22     MS. WILLIAMS:   Erica Williams for the
23 United States Securities and Exchange
24 Commission.
25     MR. THEODOROU:  Nicholas Theodorou for the

Page 5

1  defendant Steven Nothern.
2      MR. GOLDSTEIN:   And Richard Goldstein for
3  the witness Mr. Smith.
4      THE VIDEOGRAPHER:  Will the court reporter
5  please swear in the witness.
6  D A V I D   S M I T H, a witness, having first been duly
7      sworn, testified as follows:
8  DIRECT EXAMINATION
9  BY MR. ROSSETTI:
10     Q.   Good morning, Mr. Smith.  Could you state your
11 full name and spell it for the record.
12     A.   Sure.  My name is David Richard Smith, III.
13 That's D-A-V-I-D, R-I-C-H-A-R-D, S-M-I-T-H.
14     Q.   And can you please state your Social Security
15 number.
16     A.   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.
17     Q.   And your present address, please.
18     A.   4 Mohawk Street, Rye, New York, 10580.
19     Q.   What is your telephone number, present
20 telephone number?
21     A.   Sure.  914-967-0104.
22     Q.   Is that a home number?
23     A.   Home number, yes.
24     Q.   Do you have a cell number as well?
25     A.   I do.

Page 138

1      MR. GOLDSTEIN:  Yeah.
2      MR. ROSSETTI:  -- from the 9 a.m. meeting.
3      MR. THEODOROU:  Objection.
4   A.   I don't recall any specific conversations I
5   had with Steve Nothern.
6   BY MR. ROSSETTI:
7   Q.   Any general conversations you recall?
8   A.   No.
9   Q.   Did there come a point in time when you had
10  any discussions with Mr. Nothern about the 30th year
11  bond?
12     MR. THEODOROU:  When?
13     MR. ROSSETTI:  On October 31st, 2001.
14  A.   There was a point in time that I do recall
15  Steve being back at the desk.  I do recall him being
16  next to me.  I do recall something about Pete Davis and
17  elimination of the bond.
18  Q.   When you say the bond, what do you mean, the
19  long bond, the 30th year bond?
20  A.   The bond is industry -- industry terminology
21  for the US Treasury 30th year long bond -- 30 year
22  maturity bond.
23  Q.   You said that Steve Nothern was back at his
24  desk?
25  A.   Uh-huh.

Page 139

1   Q.   When you say back at his desks, is that -- let
2   me hand you Exhibit 3.
3   A.   Uh-huh.
4   Q.   Are you referring to the area that's marked
5   241 on Exhibit 3?
6   A.   Yes, I believe that's correct.
7   Q.   Was he away from his desk prior to that that
8   you noticed?
9      MR. THEODOROU:  Objection.
10  A.   I believe he was.
11  Q.   Alright.  What happened after he returned to
12  his desk?
13  A.   I believe that he was -- the tough part about
14  this is you don't know what's going on at that moment
15  or what you'll learn later.  But I believe he was
16  either on the phone or checked his messages and then,
17  you know, he stated there was kind a Pete Davis, bond
18  elimination was part of the conversation.
19  Q.   Specifically, what did he state --
20     MR. THEODOROU:  Objection.
21  Q.   -- about Steve Nothern stating --
22  A.   I think I shared with you about the degree of
23  precision that I can share about that matter.
24  Q.   Okay.  And when he was making this statement
25  about Pete Davis and elimination of the bond, where was

Page 140

1   he?
2   A.   I believe he was -- I believe he was at his --
3   I believe Steve was at his trading station No. 241.
4   Q.   And was he sitting or standing in 241?
5   A.   I don't recall.
6   Q.   Let me have you turn back to Exhibit 6, which
7   is the copy of your transcript.
8   A.   Okay.
9   Q.   And I will have you turn to page 59.
10  A.   Okay.
11  Q.   Let me know when you get to 59 and I will
12  further direct you.
13  A.   Okay.
14  Q.   I want to have you start reading from line 11
15  there.  Do you see that?
16  A.   Yes.
17  Q.   Okay.  And I will have you read down to the
18  next page on page seven.
19  A.   From 59 to 60 on page seven?
20  Q.   That's correct.
21  A.   Can you remind me on page 59 what line I'm
22  supposed to --
23  Q.   Line 11.
24  A.   Line 11?
25  Q.   Yes.

Page 141

1   A.   To seven on 60?
2   Q.   That's correct.
3   A.   Okay.
4      (Perusing.)
5   Q.   Actually I'm going to have you go down to line
6   16 on 60.
7   A.   Okay.
8      (Perusing.)
9   Q.   I'm sorry.  I'm just going to have you read
10  eight lines down further on 24.  I apologize.
11  A.   Okay.  Let's try again here.
12     (Perusing.)
13     Okay, I have read it.
14  Q.   Okay.  You had testified that your
15  recollection of what Mr. Nothern said was something
16  about Pete Davis and elimination of the bond.
17     After reading this section of the transcript
18  that I just asked you to read -- you've read that, by the
19  way?
20  A.   Yes, I have just read it.
21  Q.   Okay.  I went just want to make sure that
22  have.
23  A.   Yes.
24  Q.   After reading that section of the transcript,
25  does it refresh your memory as to any other details of

Page 142

1  what Mr. Nothern said that morning?
2      A.   I think the additional piece of information
3  was that they had just got out of some meeting which
4  seems like the piece of information I did not mention a
5  few moments ago.
6      Q.   And after reading this transcript, that
7  refreshes your recollection as to that point?
8          MR. THEODOROU:  Objection.
9      Q.   I'm sorry?
10     A.   I believe that's correct, yes.
11     Q.   Okay.  So when -- having read that transcript,
12 what is it you can recall now that Steve Nothern said
13 on October 31st, 2001?
14     A.   Right.  I think probably approximately the
15 same that I mentioned before:  That, you know, there
16 was a kind of blurb about the bond elimination, Pete
17 Davis.  You know I can't quote him directly of what
18 exactly he said.
19     Q.   You can't quote --
20     A.   -- to either me or the group.  I cannot quote
21 Steve Nothern directly.  I cannot even tell you that he
22 was speaking directly at me at that time.  I do believe
23 that there was elimination, Pete Davis, bond.
24         You have refreshed my memory that it had
25 something to do with the meeting at that point in time,

Page 143

1  but I do remember what I have just shared with you.
2      Q.   And what was your understanding as to what
3  that all meant?
4          MR. THEODOROU:  Objection.
5      Q.   -- of what --
6      A.   Right.
7      Q.   Steve Nothern had said to you, what was your
8  understanding of what that meant?
9          MR. THEODOROU:  Objection.
10     A.   Right.  At that moment in time?
11     Q.   Yes.
12     A.   I don't recall it meaning a lot to me.  I
13 recall -- you know, I recall hearing the information.
14 And, you know, I don't remember thinking, oh, wow,
15 that's like a really great new piece of information, or
16 something like that.  I kind of heard it and didn't
17 really get too excited about it.
18     Q.   Did you understand, though, that the substance
19 of it was that Pete Davis was indicating that the
20 thirty year bond was going to be eliminated?
21         MR. THEODOROU:  Objection.
22     A.   I think there had been talk in the marketplace
23 about the elimination of bond for an extended period of
24 time.  It's kind of one of those old stories you
25 probably heard so many times and probably didn't

Page 144

1  believe it by the time you heard it.
2      Q.   But what was your understanding as to the
3  substance of what Nothern was saying --
4      A.   Right.
5      Q.   -- about Pete Davis and the bond?
6          MR. THEODOROU:  Objection.
7      A.   What was the substance of what he was saying?
8      Q.   Yes.  What did you understand to be the
9  substance of what Steve Nothern was saying about Pete
10 Nothern -- Pete Davis --
11     A.   Pete Davis, yes.
12     Q.   -- and the thirty year bond?
13         MR. THEODOROU:  John Nothern.
14         MR. ROSSETTI:  I'm sorry?
15         MR. THEODOROU:  John Nothern.
16     A.   Are you talking about at that moment in time
17 what was I thinking about, or right now thinking about
18 it what are the possible interpretations to what you
19 are talking about?
20     Q.   Putting yourself back in time on
21 October 31st, 2001, you said that you -- Steve Nothern
22 made a statement, Pete Davis, elimination --
23     A.   Right.
24     Q.   -- thirty year bond?  And you also were
25 refreshed that Davis had just gotten out of the

Page 145

1  meeting --
2      A.   A meeting or something, yeah, yeah.
3      Q.   What did you --
4      A.   Right.
5      Q.   What was your understanding of what that meant
6  at that time, October 31st, 2001?
7          MR. THEODOROU:  Objection, asked and
8  answered.
9      Q.   You can answer.
10     A.   Okay.  I think at that there is some
11 recognition of what he was talking about, but there was
12 not a real revelation or tremendous amount of thought
13 gone into what was said.
14     Q.   But what was your recognition of what he was
15 saying -- what Steve Nothern was saying?
16         MR. THEODOROU:  Objection.
17     A.   I don't know if I really --
18     Q.   Well, did you --
19     A.   Yeah --
20     Q.   Steve Nothern mentions Pete Davis gets out of
21 the meeting and says that -- the thirty year bond is
22 going to be eliminated.
23     A.   Uh-huh.
24     Q.   What did you take that to mean?
25         MR. THEODOROU:  Objection.

Page 162

1    MR. ROSSETTI:  You could ask him on
2  cross-examination.
3    MR. THEODOROU:  Clearly it says perhaps
4  likely --
5    MS. WILLIAMS:  We read that part into the
6  record.
7  BY MR. ROSSETTI:
8    Q.  Mr. Smith, the -- your decision to purchase
9  bonds, the 5 million bonds on October 31st, 2001 --
10    A.  Yes.
11    Q.  -- it was motivated for however percentile you
12  would want to assign it by -- in part by Mr. Nothern's
13  statement about P. Davis and elimination of the bond;
14  is that correct?
15    MR. THEODOROU:  Objection.
16    A.  I would not say it was motivated by Steve
17  Nothern's statement.
18    Q.  You're saying by any degree?
19    A.  I think that it was something that was
20  mentioned in the conversation.  If something was talked
21  about in the room, it's very difficult to say it's
22  zero.  But I would say if he had said that and the
23  market was trading down, you know, I wouldn't have
24  bought it, you know.  The way I was looking at it was I
25  had a market that I was short that was running away

Page 163

1  from me and there was enough damage for something that
2  I really didn't understand what was going on.
3    I mean we're talking about an environment
4  that's October '01 after we went through September 11th
5  of '01.  And I remember that -- one thing I do remember
6  is on 9 o'clock in the morning September 11th, '01 the
7  market traded up like crazy.  From a pure portfolio
8  management standpoint, it was one of the best
9  opportunities to make money of that year because the
10  market was open and was trading up.  So there were times
11  that there are things that go on in the marketplace that
12  technicals take over and starts running, you don't know
13  what's going on.
14    And I look backwards at that information in
15  September of '01 and said that be it nimble at that one
16  important time could have been something that made my
17  year.  I mean as someone whose job is to look at the
18  portfolio, for all I know it could have been another
19  terrorist attack going on, you know.
20    Q.  Are you stating here today that Mr. Nothern's
21  statement about elimination of the bond didn't play any
22  factor at all in your decision to purchase bonds on
23  October 31st, 2001 you'd told Catigan make it 65?
24    MR. THEODOROU:  Objection.
25    MR. GOLDSTEIN:  I'm going to object to

Page 164

1  that also.
2    A.  Yes.
3    MR. ROSSETTI:  We'll go off the record.
4  It's --
5    THE VIDEOGRAPHER:  The time is 3:28 p.m.
6  This ends Tape No. 4 of the videotaped
7  deposition of Mr. David R. Smith.
8    (There was a recess.)
9    *********
10    THE VIDEOGRAPHER:  The time is 3:40 p.m.
11  This begins Tape No. 5 of the videotaped
12  deposition of Mr. David R. Smith.
13  BY MR. ROSSETTI:
14    Q.  Mr. Smith, did the statement from Mr. Nothern
15  about the elimination of the bond play any role in your
16  decision to buy 5 million bonds?
17    MR. THEODOROU:  Objection.
18    A.  I believe that it was something that was
19  discussed in the time period approximately associated
20  with the trading, and I think there were a large
21  variety of factors.  I don't believe that it was
22  something I was thinking a lot about, but I do
23  recognize it was something that was mentioned in the
24  room, so I can't say it was zero, but I can also say
25  that it wasn't a major part of my decision-making

Page 165

1  process.
2    Q.  Now, did the statement from Mr. Nothern about
3  the elimination of the bond, was it one of the factors
4  that entered into your decision to purchase
5  50 million -- 5 million in bonds?
6    MR. THEODOROU:  Objection.
7    A.  I would repeat the same response that I had
8  said to you in my previous response.
9    Q.  You had mentioned that there was an extended
10  period of discussion about the elimination of the
11  thirty year bond.
12    Can you explain what you meant by that?
13    A.  I don't recall there was an extended
14  discussion about the elimination of the thirty year
15  bond.
16    Q.  Let me put this way:  Prior to October 31st,
17  had you ever heard anything about the possible
18  elimination of the 30 year bond?
19    A.  I believe there were rumors in the marketplace
20  about the possible elimination.
21    Q.  Prior to October 31st, 2001, when was the last
22  time you had heard any rumors about the possible
23  elimination of the 30 year bond?
24    A.  I don't recall.
25    Q.  Upon hearing those other rumors about possible

1  elimination of the 30 year bond, did you buy any bonds
2  as a result of hearing those rumors?
3      A.  I don't recall.
4      Q.  The rumors that you did hear prior to
5  October 31st, 2001, over what period of time did
6  they -- had you been hearing those?
7      A.  I don't recall.
8      Q.  Was it a matter of years you were hearing
9  this?
10          MR. THEODOROU:  Objection, asked and
11      answered.
12      A.  I don't recall.  Yeah.
13      Q.  Matter of months?
14      A.  I don't recall specifically.
15      Q.  Okay.  You said there was -- when I was just
16  asking you questions about whether the Nothern
17  statement played a role, you had mentioned something
18  that there was a discussion.
19          What discussion were you referring to?
20          MR. THEODOROU:  Objection.
21      A.  I don't know what you are talking about.
22      Q.  You had -- I thought you had said that there
23  was a discussion about the bond, and I was -- did I not
24  hear that correctly?
25      A.  What you're saying is not triggering anything

1  that we have talked about today.
2      Q.  Okay.
3      A.  Yes.
4      Q.  Now, after you said to Mr. Catigan -- withdraw
5  that.
6          When you heard Catigan say -- state in his loud
7  voice buy 60 --
8      A.  Offer 60.
9      Q.  Offer 60.  Where were you?
10      A.  Sitting at my desk.
11      Q.  And when you told Catigan make it 65, were you
12  seated?  Did you stand up?
13      A.  I don't recall.
14      Q.  How did you communicate that to Catigan?
15      A.  Verbally.
16      Q.  Did you shout it out make it 65?
17      A.  Correct.
18      Q.  What's -- what happened after you said make it
19  65?
20      A.  He -- I believe he asked the broker-dealer to
21  refresh the offering for an amount of 65 million.
22      Q.  How long after he had said offer 60 did he
23  refresh his offer and say make it 65?
24      A.  I think when he was saying can you offer me
25  60 million bonds, I kind of looked up and I said, John,

1  make it 65.  I think it was -- I thought it was pretty
2  quick.
3      Q.  So a few seconds perhaps?
4          MR. THEODOROU:  Objection.
5      A.  I would be speculating if I said anything more
6  than what I said I think.
7      Q.  Well, after he said offer 60, did you sit
8  there contemplating it or did you immediately react and
9  say offer 65?
10          MR. THEODOROU:  Objection.
11      A.  I don't recall.
12      Q.  After you said make it 65, what did you
13  hear -- did you hear Catigan actually offer 65?
14      A.  He asked the salesperson on the line can you
15  make it 65.
16      Q.  What was the response?
17          MR. THEODOROU:  Objection.
18      A.  I don't know.  He was on the telephone with
19  the broker.  I don't know what was being said on the
20  other end of the line.
21      Q.  Did Mr. Catigan take any steps to acknowledge
22  that the -- he had gotten the offer in for the 65 --
23  acknowledge to you?
24      A.  I think -- as I said before, what was going on
25  at that point in time was the market was really

1  starting to move up pretty rapidly.  And I do recall
2  that there was -- you know, sometimes you look at
3  government bond markets, it will say 10 plus 11 on the
4  screen.  You say offer a large amount of securities.
5  Say offer them at 11.  And using my example, I have no
6  idea what the price was.  This is illustrative.
7          I do recall a market that was moving, and I
8  don't think that Merrill Lynch, or whoever the broker
9  was, was very fast at making the offering.  Typical in a
10  volatile market the trader is put at risk and they are
11  slower.  They want the market to settle down before they
12  make the offering.  And as I recall, the market was
13  rallying quite a bit that day.  It was at a point where
14  he probably felt that I offer it at X price, by the time
15  you say done, it would be higher.
16          It was one of those times that things were just
17  moving on its own.  So I do recall that John was -- John
18  was saying do you have an offering.  So it wasn't -- it
19  wasn't like immediate, you know.  It wasn't like a calm
20  market.  It took some time.
21      Q.  Did he get a confirmation, though, about the
22  65?
23          MR. THEODOROU:  Objection.
24      Q.  Catigan, that is.
25      A.  I believe he was offered a price that I

Page 202

1  say it was not frequent, you know, like -- I would just
2  like to leave it at that.  Not frequent.
3     Q.   Was it once a year, twice a year, more often
4  than that per year?
5          MR. THEODOROU:  Objection.
6     A.   I couldn't say the frequency.  It's not
7  something I kept track of.  I --
8     Q.   Okay.  At any time, October 31st, 2001, did
9  you hear Nothern state anything that the information he
10  got from Peter Davis, Peter Davis had gotten from Peter
11  Fisher?
12         MR. THEODOROU:  Objection.
13    A.   I don't think I heard the word Peter Fisher
14  that morning.
15    Q.   Did you hear the term embargo from Steve
16  Nothern before you traded on October -- before you
17  asked Catigan to increase the 65?
18    A.   No.
19    Q.   Did you hear the term embargo from Nothern at
20  all that day?
21    A.   No.
22    Q.   Did you hear from Nothern that day that there
23  would be -- that the information would be --
24  information about the elimination of the bond would be
25  released at 10 o'clock that day?

Page 203

1     A.   No.
2     Q.   Did Nothern indicate anything to you that led
3  you to believe that the information about the bond was
4  confidential to a certain time?
5          MR. THEODOROU:  Objection.
6     A.   No.
7     Q.   Did Nothern say anything that the source of
8  the information from Davis was the Treasury Department?
9          MR. THEODOROU:  Objection.
10    A.   No.
11    Q.   Did you come -- did you come to learn after
12  you placed -- you told Catigan to increase the
13  65 million how was it that Nothern had gotten
14  information from Davis?
15         MR. THEODOROU:  Objection.
16    A.   Did I know?
17    Q.   Did you learn.
18    A.   When?
19    Q.   At any time after you told Catigan to place
20  65 -- to order -- to offer 65.  I'm sorry.
21    A.   After did I learn?
22    Q.   Yeah.  At any point after you told Catigan
23  offer 65 --
24    A.   Right.
25    Q.   -- did you learn how it was that Nothern got

Page 204

1  this information from Davis?
2          MR. THEODOROU:  Objection.
3     Q.   Peter Davis.
4          MR. GOLDSTEIN:  I would just caution the
5  witness not to disclose any information you
6  might have learned from counsel.
7          THE WITNESS:  Yeah.
8     A.   Sorry.  A few distractions here.
9       I -- can you repeat it one more time?
10    Q.   Yes.  After you placed the -- or after you
11  told Catigan offer 65 --
12    A.   Right.
13    Q.   Any time after that, did you learn how it was
14  that Nothern got the information from Pete Davis the
15  information --
16         MR. THEODOROU:  Objection.
17    A.   I believe there was -- I believe it was in the
18  newspaper.
19    Q.   And what did you learn from the newspaper?
20         MR. THEODOROU:  Objection.
21    A.   I think the newspaper said that Davis had
22  called a variety of people.
23    Q.   Did you learn if Nothern had actually spoken
24  with Davis that important?
25         MR. THEODOROU:  Objection.

Page 205

1     A.   I'm -- I don't know the answer to that
2  question.  I don't know if Steve talked to Pete Davis
3  that day.
4     Q.   Do you know if he had received a voice mail
5  from Pete Davis that day?
6          MR. THEODOROU:  Objection.
7     A.   My understanding that day that there was some
8  communication between Pete Davis and Steve Nothern.  I
9  believe I was unsure of whether it was a phone call or
10  a voice mail.
11    Q.   Did you -- at any time did you learn --
12    A.   At some point I did learn that it was a voice
13  mail.
14    Q.   And from who -- I'm sorry.
15      From whom did you learn that?
16         MR. THEODOROU:  Objection.
17    A.   I don't remember who it came from.
18    Q.   And what did you learn?
19         MR. THEODOROU:  Objection.
20    A.   What did I learn?
21    Q.   Yes.  Was it a voice mail or did he actually
22  speak with him?  Did Nothern speak with Davis?
23    A.   I believe I learned it was a voice mail, yes.
24    Q.   Was that something that you learned from the
25  newspaper article?

**EXHIBIT F**

**Cited Excerpts from the Deposition Transcript
of David Kennedy
(June 26, 2006)**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
|  | ) |
| UNITED STATES SECURITIES AND | ) |
| EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) |
|  | ) |
| vs. | ) |
|  | ) |
| STEVEN E. NOTHERN, | ) |
| Defendant. | ) |

C.A. 05-10983 (NMG)


VIDEOTAPED DEPOSITION OF DAVID

KENNEDY, a witness called on behalf of the

Plaintiff, pursuant to the provisions of the

Massachusetts Rules of Civil Procedure,

before Jill Shepherd, Registered

Professional Reporter and Notary Public, in

and for the Commonwealth of Massachusetts,

at the offices of U.S. Securities and

Exchange Commission, 33 Arch Street, Boston,

Massachusetts, on Monday, June 26, 2006,

commencing at 10:18 a.m.

Page 2

1 APPEARANCES:
2 UNITED STATES SECURITIES AND EXCHANGE
3 COMMISSION
4 (By John J. Rossetti, Jr., Esquire)
5 (By, Erica Williams, Esquire)
6 Senior Counsel
7 100 F. Street, N.E.
8 Washington, D.C. 20549
9 Tel: 202.551.4819
10 E-mail: rossettij@sec.gov
11 On Behalf of the Plaintiff.
12
13 DONOGHUE, BARRETT & SINGAL, P.C.
14 (By Richard Goldstein, Esquire)
15 One Beacon Street
16 Suite 1320
17 Boston, Massachusetts 02108-3113
18 Tel: 617.720.5090
19 Fax: 617.720.5092
20 E-mail: rgoldstein@dbslawfirm.com
21 On Behalf of the Witness,
22 David Kennedy.
23
24
25

Page 4

1            I N D E X
2
3 WITNESS:                PAGE
4 DAVID KENNEDY
5 Examination by Mr. Rossetti    6, 116, 125
6 Examination by Mr. Shope        102, 124
7
8          E X H I B I T S
9 NO.    DESCRIPTION        PAGE
10 1    Notice of Taking Deposition   5
11 2    Subpoena              5
12 3    2001 Investigative Testimony  5
13 4    SECNOTH00130192      31
14 5    SECNOTH00131647      52
15 6    SECNOTH00131632-1637    87
16
17
18 (ALL EXHIBITS RETAINED BY MR. ROSSETTI)
19
20
21
22
23
24
25

Page 3

1 APPEARANCES, CONTINUED
2
3 FOLEY HOAG, LLP
4 (By John Shope, Esquire)
5 155 Seaport Boulevard
6 Boston, Massachusetts 02210
7 Tel: 617.832.1233
8 E-mail: jshope@foleyhoag.com
9 On Behalf of the Defendant,
10 Steven Nothern.
11
12
13 ALSO PRESENT: RALPH SCOPA, VIDEOGRAPHER
14
15
16         * * * * *
17
18
19
20
21
22
23
24
25

Page 5

1         P R O C E E D I N G S
2    (Exhibit Nos. 1-3 marked)
3    THE VIDEOGRAPHER: We are now
4 recording and on the record. My name is
5 Ralph Scopa. I am a legal video specialist
6 for G & M Court Reporters, Limited. Our
7 business address is 42 Chauncy Street,
8 Boston, Mass., 02111.
9    Today's date is June 26, 2006. The
10 time is 10:18 a.m. This is the deposition
11 of David Kennedy in the matter of the
12 Securities and Exchange Commission vs.
13 Nothern, U.S. District Court, District of
14 Massachusetts. Civil action: 05-10983
15 (NMG).
16    This deposition is being taken at the
17 Securities and Exchange Commission,
18 33 Arch Street, Boston, Mass.
19    The court reporter is Jill Shepherd.
20 Counsel will state their appearances and the
21 court reporter will administer the oath.
22    MR. ROSSETTI: John Rossetti for
23 the Plaintiff, United States Securities and
24 Exchange Commission.
25    MS. WILLIAMS: Erica Williams for

Page 58

1  Q. Where was that TV?
2  A. It was directly behind me.
3  Q. And --
4  A. Hanging from the ceiling.
5  Q. Was that TV on during the workday?
6  A. Yes.
7  Q. Was the sound up on it?
8  A. No.
9  Q. Did you use the TV to get -- as a source of
10    information during the course of your
11    workday?
12 A. Not often.
13 Q. Did you glance up at it occasionally during
14    a workday?
15 A. Rarely.
16 Q. Do you know who did, if anybody?
17 A. No.
18 Q. Okay. Was it tuned to any particular
19    channel?
20 A. Yeah.
21 Q. What channel was that?
22 A. I believe it was MSNBC. I think that's what
23    it was. Anyone could have changed the
24    station and I would not have known it.
25 Q. Well, if there were guys present in the room

Page 59

1     and there was a remote control, I'm sure
2     somebody was changing it, right?
3  A. Whenever there was golf, it would have been
4     on.
5  Q. In your time in the industry, have you taken
6     any professional exams?
7  A. Yes.
8  Q. What professional exams?
9  A. I held my series 7 from 1985, I think, 1987.
10 Q. What was a series 7?
11 A. It's the -- you will know this better than
12    I. It's the broker's, you know, sales
13    license.
14 Q. Did you have any other professional exams
15    that you passed?
16 A. There was one other that went with it, and I
17    don't remember the designation.
18 Q. Series 65?
19 A. 65.
20 Q. And what did a series 65 do?
21 A. I don't remember.
22 Q. Were there any others that you have taken?
23 A. No.
24 Q. Do you have a series 65?
25 A. Not prior to October 31st.

Page 60

1  Q. After October 31st?
2  A. Yes.
3  Q. What have you taken?
4  A. With my current employer, I took the -- Oh,
5     series 55, 53. Something like that. We
6     don't really use it, so I have to kind of
7     take it and forget about it.
8  Q. Okay. On October 31, 2001, you said you
9     looked over your -- let me withdraw that.
10    You indicated that your typical day at work,
11    you'd come in and you'd look at the
12    portfolios and see that the trades were
13    done.
14        Would you make any determination
15    during the course of the day that you had
16    funds that you wanted to invest that day?
17        MR. SHOPE: I'm sorry, could I have
18    the question reread.
19        (Question read.)
20 A. Yes.
21 Q. When, during the course of the day, would
22    you make that determination?
23 A. I would be -- watch how much cash was
24    available in each portfolio and whether I
25    thought it was too little or too much.

Page 61

1  Q. On October 31, 2001, had you made any
2     determination of how much cash you had?
3  A. I only remember from what I have read in my
4     transcript that there was cash available.
5  Q. Okay. If you didn't have cash available,
6     would you be able to make purchases?
7  A. Yes.
8  Q. And how would you pay for those purchases if
9     you didn't have cash available?
10 A. I could sell something else.
11 Q. I see. On October 31, 2001, did you hear
12    information about the Treasury Department's
13    30-year bond?
14 A. Yes.
15 Q. All right. When was the first time you
16    heard anything about the Treasury
17    Department's 30-year bond on October 31,
18    2001?
19 A. When Steve Nothern said he had heard the
20    Treasury was going to eliminate the 30-year
21    Treasury.
22 Q. And did he say who he heard that from?
23 A. I think my memory was better when I gave my
24    first deposition, and I think according to
25    that it was that Pete Davis had told him

Page 62

```
 1      that the Treasury was going to eliminate the
 2      30-year Treasury.
 3  Q.  Did you know -- well, approximately what
 4      time was it that Steve Nothern made this
 5      statement?
 6  A.  Again, I'd have to refer to my transcript.
 7  Q.  Okay.
 8  A.  I just don't remember.
 9  Q.  All right.  Why don't you go ahead and do
10      that and let me see if I can help you with
11      the page.
12  A.  (Witness reading.)
13  Q.  Well, you know, on that specific question,
14      we're going to come back to that --
15  A.  Okay.
16  Q.  -- and just move on to some other questions
17      regarding that.
18          When -- as you sit here today, what do
19      you recall is it that Steve Nothern said?
20  A.  Again, my memory has been refreshed by the
21      transcript that, you know, Steve said, you
22      know, "I heard from Pete Davis that the
23      Treasury was going to eliminate the 30-year
24      Treasury."
25  Q.  And had you -- prior to Steve Nothern making
```

Page 63

```
 1      this statement, had you ever heard the name
 2      Pete Davis?
 3  A.  No.
 4  Q.  And referring to Exhibit 4, can you indicate
 5      for me on that exhibit where Steve Nothern
 6      was when he made that statement?
 7  A.  I remember Steve standing roughly behind
 8      Rick Smith's position.
 9  Q.  Let me hand you a pen and write the initials
10      "SN" for Steve Nothern, where he was.
11  A.  Okay.  (Witness complies.)
12  Q.  Okay.  And you've just circled that?
13  A.  I have.
14  Q.  We'll have the record reflect that the
15      witness has drawn in the initials "SN" and
16      circled it in the station between Nothern
17      and Smith, a little closer to Smith's
18      location.
19          MR. SHOPE:  May I take a look at
20      that.
21          MR. ROSSETTI:  Sure.
22  Q.  And was he standing at that location?
23  A.  Yes.
24  Q.  Just prior to Mr. Nothern making that
25      statement, what were you doing?
```

Page 64

```
 1  A.  I don't remember.
 2  Q.  Where were you just prior to Nothern making
 3      that statement?
 4  A.  I was sitting at my station.
 5  Q.  And that would have -- as you look at
 6      Exhibit 4, that would have been station 243?
 7  A.  Yes.
 8  Q.  What would you say the approximate distance
 9      from where you have noted Steve Nothern was
10      to where you were?
11  A.  10 feet.
12  Q.  And how loud was the statement; you know,
13      what level of voice did he make that
14      statement in?
15  A.  It was loud enough for me to hear it.
16  Q.  When you heard it, did you hear it well or
17      did it seem faint to you?
18          MR. SHOPE:  Objection.
19  A.  It was clear.
20  Q.  Okay.  What did you do when you heard that
21      statement?
22  A.  I don't remember specifically what I did
23      after.  A conversation ensued about the
24      Treasury and what we should do.
25  Q.  A conversation ensued between whom?
```

Page 65

```
 1  A.  Steve Nothern, Rick Smith, Geoff Kurinsky,
 2      myself.  That's what I remember.
 3  Q.  And what did you -- what was stated during
 4      this discussion?
 5  A.  What we should do.  Whether we should buy or
 6      not buy the Treasury, the 30-year Treasury.
 7  Q.  What did you say?
 8  A.  I don't remember specifically what...
 9  Q.  Did Steve Nothern say anything?
10  A.  I do recall at one point saying, "Well, what
11      are we going to do?"  Or "What are you going
12      to do?"  And, you know, Steve saying, "I'm
13      going to buy the Treasury" --
14  Q.  When you say --
15  A.  -- "the 30-year Treasury."
16  Q.  Okay.  The 30-year Treasury bond, is that --
17  A.  Yes.
18  Q.  Did Smith say anything?
19  A.  At some point, he put in an order to buy --
20  Q.  Smith?
21  A.  -- Smith put in an order to buy the 30-year
22      Treasury bond with John Cadogan.
23  Q.  Do you know how many Rick Smith put in an
24      order with Cadogan?
25  A.  I don't remember.
```

Page 74

```
 1   A.  Yes.
 2   Q.  Does that refresh your memory as to anything
 3       else that Steve Nothern stated about who
 4       Peter Davis was?
 5   A.  Yes.  I think it's a fair recollection of
 6       the comments.
 7   Q.  And with your memory now refreshed, what
 8       else is it that Nothern stated about Davis?
 9   A.  What it says in here, well-connected in
10       Washington, served on the committees, and
11       this is what I remember.
12   Q.  Okay.  After you placed the order with John
13       Cadogan, did you get any acknowledgment from
14       Cadogan that the trade had been placed and
15       executed?
16           MR. SHOPE:  Objection to the form.
17   A.  I don't remember specifically, but he
18       probably told us at what level he bought
19       them, at what price.
20   Q.  How soon after you placed the order did you
21       get an acknowledgment from Nothern [sic]
22       that the trade had been placed?
23           MR. SHOPE:  Objection.
24   A.  Do you mean John Cadogan?
25   Q.  John Cadogan, I'm sorry.
```

Page 75

```
 1           MR. SHOPE:  Note my objection.
 2   A.  I doubt much time passed.  I don't remember
 3       specifically.
 4   Q.  I withdraw that.  Actually, there's nothing
 5       to withdraw.
 6           Are you familiar with a system at MFS
 7       called the "fixed-income trading system"?
 8   A.  Yes.
 9   Q.  And can you tell me what that system was at
10       MFS?
11   A.  It was an online portfolio management tool
12       where you could access your portfolios'
13       security holdings and you could -- it was
14       the instrument by which you traded.
15   Q.  And who created that system?
16   A.  I believe it was MFS-created internally.
17   Q.  And, excuse me, in order to have a trade
18       executed, did you need to have information
19       put in this fixed-income trading system
20       before any action could be done on a trade?
21   A.  In theory, you were supposed to enter the
22       trade through the FITS system.  It would
23       then go to the traders and the traders would
24       see it and then execute the trade.
25   Q.  How did it work in practice?
```

Page 76

```
 1   A.  In practice, most often, that's the way it
 2       worked, but it was not uncommon -- John
 3       Cadogan sat directly across from me -- that
 4       I would say, "John buy X and I'm putting it
 5       in the system right now."
 6   Q.  When you made this order, you told Cadogan
 7       to purchase 25 million bonds.  At that
 8       point, did you put the information into the
 9       FITS system?
10   A.  I don't remember putting it in the system
11       immediately.
12   Q.  Okay.  Did you do it sometime that day?
13   A.  Yes.
14   Q.  When was it that you put it in the system
15       that day?
16   A.  I didn't remember until I saw a document
17       that it was sometime after 10 o'clock.  Now,
18       part of why I didn't put it in was because
19       there was a portfolio manager not on the
20       desk, that was Peter Vaream.  We -- after
21       placing our trades, we then kind of looked
22       around and said, "Peter is not here.  Peter
23       would want some of the 30-year Treasury."  I
24       had put in an order for 25, but then decided
25       to give Peter two.  So eventually I only put
```

Page 77

```
 1       in an order into the FITS system for $23
 2       million.
 3   Q.  At any point on October 31st did you have a
 4       conversation with Peter Vaream about you
 5       reserving two million of your 25 million
 6       purchase for his accounts?
 7   A.  Yes.
 8   Q.  What did you and he discuss?
 9   A.  I don't remember the specifics.  It was some
10       time later he returned to the desk and he
11       was made aware of the purchases.
12   Q.  You have been recounting to us that Steve
13       Nothern had gotten up and made this
14       statement and there was some discussion and
15       you purchased bonds.  Did you relay that to
16       Vaream?
17   A.  I don't remember.
18   Q.  The -- prior to October 31, 2001, had you
19       heard any information that the Treasury may
20       be cancelling the 30-year bond?
21   A.  Yes.
22   Q.  When did you hear that information?
23   A.  This had been an ongoing story for 12 or 18
24       months, that it was financially feasible
25       that the Treasury would cancel or eliminate
```

Page 78

1  the 30-year Treasury as the government
2  surplus -- it actually was a surplus -- at
3  one point, the Treasury yield curve was flat
4  and it just didn't make sense to issue
5  30-year bonds. So it had been discussed in
6  different strategy pieces. It had been
7  discussed at Harbor Capital before I went to
8  MFS.
9  Q. You mentioned that there was a government
10  surplus. A government surplus of what?
11  A. That they were taking in more revenues than
12  they were spending.
13  Q. The good old days, right?
14  A. Good old days.
15  Q. And you mentioned this yield curve. What do
16  you -- when you said "yield curve," what are
17  you talking about?
18  A. The "yield curve" is nothing but a graphical
19  representation of the Treasury yields going
20  from the 90-day T-bill to the 30-year, and
21  if you graph it along a plot, you have the
22  yield curve.
23  Q. So would it be fair to say as a result of
24  the government surplus, it was one of the
25  things that was driving this discussion

Page 79

1  about the elimination of the bond, 30-year
2  bond?
3      MR. SHOPE: I'm sorry, can I have
4  that reread?
5      (Question read.)
6      MR. SHOPE: Objection to the form.
7  I don't think that's really a question.
8      MR. ROSSETTI: Yeah.
9  Q. So was it this discussion about -- or the
10  fact that the government was running
11  surpluses, budget surpluses, was that one of
12  the factors that was driving this discussion
13  about the potential cancellation of the
14  bond?
15  A. Yes.
16  Q. Now, when Nothern made this statement that
17  he had heard from Davis that the bond was
18  going to be eliminated, what was his tone of
19  voice?
20  A. Matter of fact.
21      MR. GOLDSTEIN: By that, you mean
22  Nothern's tone of voice?
23      MR. ROSSETTI: Nothern's tone of
24  voice.
25  A. Yes.

Page 80

1  Q. Nothern's voice was matter of fact?
2  A. Yes.
3  Q. Did there come a point in time on October
4  31, 2001 that you learned that the Treasury
5  had actually announced that they were going
6  to cancel the 30-year bond?
7  A. Yes.
8  Q. When was that?
9  A. I recall that John Cadogan announced that it
10  had appeared on the Treasury website.
11  Q. What time was it that John Cadogan made that
12  announcement?
13  A. I don't remember.
14  Q. Did John Cadogan state if he had gone to the
15  website to see for himself?
16  A. I don't remember if he did himself.
17  Q. And did John Cadogan state where he had
18  learned that information?
19  A. I don't remember.
20  Q. Did you go visit the Treasury Department's
21  website?
22  A. No, I did not.
23  Q. Did John Cadogan make that statement before
24  you placed the order for the bonds?
25  A. It was after.

Page 81

1  Q. How much after you placed the order for the
2  bonds did Cadogan make that statement?
3  A. I don't remember.
4  Q. Was it a matter of minutes?
5      MR. SHOPE: Objection.
6  A. Well, minutes, 20 minutes, five minutes? I
7  mean, I don't remember. It was after the
8  orders were placed.
9  Q. Okay. When you heard from -- when you heard
10  Cadogan make the statement that the
11  cancellation of the bond or elimination of
12  the bond was posted on the Treasury website,
13  did you connect that at all with the
14  statement that Nothern had made earlier?
15  A. Yes.
16  Q. And what connected it in your mind?
17  A. I guess it's true.
18  Q. When Nothern made this statement that he had
19  heard from Peter Davis that the Treasury was
20  going to eliminate the bond, did he mention
21  the name Peter Fisher?
22  A. Not that I remember.
23  Q. On October 31, 2001, prior to you placing
24  the trade, did you know who Peter Fisher
25  was?

Page 82

1    A. Yes.
2    Q. Who was Peter Fisher?
3    A. To the best of my recollection, Peter Fisher
4       at one time worked for the Treasury in
5       New York City, made some headlines with the
6       Long-Term Capital Management hedge fund
7       issue, and then at some point his career
8       moved from the New York office to
9       Washington.
10   Q. Do you know if he was with the Treasury
11      Department or the Federal Reserve?
12         MR. SHOPE: Objection.
13   A. I thought he was with the Treasury.
14   Q. So the morning of October 31, 2001, you knew
15      that Peter Fisher was a member of the
16      Treasury Department?
17   A. I think if someone had asked me about him I
18      would have said he works for the Treasury.
19   Q. I see. And you didn't hear Peter Fisher's
20      name mentioned that morning by Steve
21      Nothern?
22   A. I don't recall hearing his name that day.
23   Q. Did Steve Nothern mention anything in this
24      statement that he heard from Davis, the bond
25      was going to be eliminated, did he mention

Page 83

1       anything about a press release?
2    A. No, not that I remember.  No.
3    Q. Did Steve Nothern mention anything about a
4       10 a.m. announcement?
5    A. When he stood up and made his statement to
6       the trading desk?
7    Q. Yes.
8    A. No.
9    Q. Did he make a statement that there was going
10      to be a 10 a.m. announcement at any point
11      that morning?
12   A. Not that I remember.  Again, I only say that
13      he may have mentioned something at the
14      9 o'clock meeting and I just -- I don't
15      remember.
16   Q. When Steve Nothern had stood up and made the
17      statement that Pete Davis indicated -- he
18      heard from Pete Davis that the Treasury was
19      going to eliminate the bond, did Steve
20      Nothern mention anything else that indicated
21      to you that the information that he was
22      providing was confidential?
23         MR. SHOPE: Objection.
24   A. No.
25   Q. Did he say anything at that point indicating

Page 84

1       that the information was nonpublic?
2    A. No.
3    Q. Did he mention the term "embargo" at all?
4    A. No.
5    Q. Did you hear the term "embargo" from Steve
6       Nothern on October 31, 2001?
7    A. No.
8          MR. ROSSETTI:  If we can go off the
9       record.
10         THE VIDEOGRAPHER:  Off the record
11      at 12:02.
12         (Short recess.)
13         THE VIDEOGRAPHER:  The time is
14      12:04.  This is the end of cassette one.  We
15      are off the record.
16         (Short recess.)
17         THE VIDEOGRAPHER:  The time is
18      12:14.  This is the beginning of cassette
19      two in the deposition of Mr. David Kennedy.
20      We are on the record.
21         (Pause.)
22   Q. Mr. Kennedy, you indicated that you placed a
23      $25 million trade with Cadogan for the
24      bonds.  In relation to other bond trades you
25      have made for the 30-year Treasury bond,

Page 85

1       where was this trade in order of magnitude
2       compared to others?
3    A. It was one of my larger trades.
4    Q. Did you typically trade blocks of $25
5       million in Treasury bonds?
6    A. No.
7    Q. Why did you place such a large trade on this
8       particular occasion?
9    A. The answer to your question:  I thought the
10      news was significant enough to warrant a
11      larger position -- a larger single trade.
12      In the past, I would have broken the trades
13      down into smaller pieces, whereas the -- so
14      if you added my trades up throughout a day
15      or even two-day period, it would have been
16      more than 25 million.
17   Q. I see.
18   A. Another factor is the funds had grown over
19      the last -- it's a two-year period that I
20      managed them, so you had to buy increasingly
21      larger pieces.
22   Q. Did you -- you said Nothern placed a trade,
23      you placed a trade, you thought Smith and
24      Kurinsky did as well.  Did you all place
25      individual trades or did you aggregate it

# EXHIBIT G

## Cited Excerpts from the Deposition Transcript
## of Steven Nothern
## (January 30, 2007)

Volume:  I

Pages:  1-221

Exhibits:  1-10


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Boston Division)

Civil Action No. 05-CV-10983 (NMG)

- - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES SECURITIES AND EXCHANGE

COMMISSION,

　　　　　Plaintiff,

　　v.

STEVEN E. NOTHERN,

　　　　　Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -

Deposition of Steven E. Nothern

January 30, 2007

9:19 a.m. - 4:00 p.m.

Securities and Exchange Commission

33 Arch Street

Boston, Massachusetts


Reporter:  Daria L. Romano, RPR/CRR

Page 2

1 A P P E A R A N C E S :
2 UNITED STATES SECURITIES AND
3    EXCHANGE COMMISSION
4    (by Erica Y. Williams,
5    Assistant Chief Litigation Counsel;
6    John J. Rossetti, Jr., Senior Counsel
7    Division of Enforcement)
8    100 F Street, N.E.
9    Washington, D.C. 20549-4010
10    (202) 551-4450
11    williamse@sec.gov
12    rossettij@sec.gov
13    for the Plaintiff.
14
15    FOLEY HOAG, LLP
16    (by Nicholas Theodorou, Esq. and
17    John Shope, Esq.)
18    155 Seaport Boulevard
19    Boston, Massachusetts 02210
20    (617) 832-3061
21    jtheodorou@foleyhoag.com
22    jshope@foleyhoag.com
23    for the Defendant.
24
25 ALSO PRESENT:   Ian McWilliams, Videographer

---

Page 3

1              I N D E X
2 Deposition of:          Page
3 STEVEN E. NOTHERN
4 By Ms. Williams            6
5
6
7           E X H I B I T S
8 No.                     Page
9  1 Notice of deposition        8
10  2 Transcript              9
11  3 Statement of Guidelines With Respect
12    to Receipt and Use of Material
13    Nonpublic Inside Information      69
14  4 Floor plan          81
15  5 David Capital Investment Ideas    111
16  6 E mail            131
17  7 E mail            135
18  8 Treasury News document      148
19  9 Answers to interrogatories    166
20 10 Mass. Financial Services Department
21    Report from 10/31/2001 to 10/31/2001    182
22
23 *Original exhibits returned to Ms. Williams
24
25

---

Page 4

1              P R O C E E D I N G S
2
3        THE VIDEOGRAPHER:  Here begins
4 videotape number one in the deposition of Steven
5 Nothern in the matter of the United States
6 Securities Exchange Commission versus Steven
7 Nothern in the United States District Court for
8 the District of Massachusetts, Civil Action
9 05-CV-10983 (NMG).
10        Today's date is January 30th, year
11 2007.  The time on the video monitor is 9:19
12 a.m.
13        The video operator today is Ian
14 McWilliams of New England Trial Services
15 contracted by Jones Reporting Company.
16        This deposition is taking place at the
17 offices of the SEC, 33 Arch Street, Boston,
18 Massachusetts.
19        Counsel, please voice identify
20 yourselves and state whom you represent.
21        MS. WILLIAMS:  Erica Williams,
22 United States Securities and Exchange
23 Commission.
24        MR. ROSSETTI:  John Rossetti for
25 the plaintiff, US Securities and Exchange

---

Page 5

1 Commission.
2        MR. THEODOROU:  Nicholas Theodorou
3 for the defendant, Steven Nothern.
4        MR. SHOPE:  John Shope for the
5 defendant, Steven Nothern.
6        THE VIDEOGRAPHER:  The court
7 reporter today is Daria Romano of Jones
8 Reporting Company.
9        Would the reporter please swear in the
10 witness.
11
12        STEVEN E. NORTHERN DULY SWORN
13
14        THE VIDEOGRAPHER:  Please begin.
15        MR. THEODOROU:  Before we start, we
16 will talk about the stipulations.
17        MS. WILLIAMS:  Absolutely.  The
18 same stipulations that we've had in the other
19 depositions, all objections, except as to the
20 form of the question, are reserved, including
21 motions to strike.
22        MR. THEODOROU:  Reserved until the
23 time of trial.
24        MS. WILLIAMS:  Yes.
25        MR. THEODOROU:  Fine.

Page 162

```
 1    Q.  Was he talking to all of the people
 2  that you mentioned when he made this statement?
 3    A.  This is a statement -- this is an
 4  exchange between the two of us.  Others could
 5  well have overheard it.
 6    Q.  So Mr. Cadogan was just talking -- was
 7  directing the statement to you?
 8    A.  As I recall, we were looking at each
 9  other, maybe six feet apart having that -- and
10  he added that piece of information that they
11  were having a quarterly refunding announcement,
12  and it was at ten o'clock.
13    Q.  Was there anyone else that Mr. Cadogan
14  was directing that statement to beside you?
15        MR. THEODOROU:  Objection.
16    A.  I'm uncertain who he was trying to
17  address it to.  I know he was addressing it to
18  me.  I was chatting with him.  I think he was --
19  well, it was a general comment he was making, so
20  I know he was addressing it to me.
21    Q.  Do you know if anyone else overheard
22  the comment that Mr. Cadogan made?
23        MR. THEODOROU:  Objection.
24    A.  No.
25    Q.  Was there a 9 a.m. meeting for the
```

Page 163

```
 1  Fixed Income Group on October 31, 2001?
 2    A.  I don't recall specifically a 9 a.m.
 3  meeting that day.
 4    Q.  So just to clarify, you don't recall
 5  attending a 9 a.m. meeting that day?
 6    A.  I don't.
 7    Q.  Do you recall participating in any
 8  telephone calls that morning, October 31, 2001?
 9    A.  Yes.
10    Q.  What telephone calls do you recall
11  participating in?
12    A.  I remember receiving a phone call from
13  one of our dealers.
14    Q.  Which dealer?
15    A.  I don't remember.  One of my principal
16  government coverage guys.  I can't remember
17  specifically which one.
18    Q.  Do you recall where the dealer worked?
19    A.  I don't recall specifically which
20  dealer it was.  So the answer to that question
21  is no.
22    Q.  What line did this call come in on?
23    A.  I don't remember.
24    Q.  Would it -- did it come in on a direct
25  line versus your personal line?
```

Page 164

```
 1    A.  Not my personal line but possibly a
 2  direct -- possibly one of the general phone
 3  lines on our phone turret.
 4    Q.  Who called whom?
 5    A.  I received the phone call from one of
 6  the dealers.
 7    Q.  Approximately what time did you
 8  receive this call?
 9    A.  Some time between 9:30 and ten
10  o'clock.
11    Q.  What was discussed during this call?
12  I'm sorry.
13    A.  Ordinarily some time between 9:30 and
14  10 of, quarter of.
15        MR. ROSSETTI:  10 of 10?
16        THE WITNESS:  Yeah, yes.
17  BY MS. WILLIAMS:
18    Q.  What did you discuss during this call?
19    A.  The broker was calling me to discuss
20  that the market had been moving, and he had a
21  possible explanation for it.
22        He had heard talk that people on the
23  Chicago Board of Trade thought that the long
24  bond was going to be cancelled, and he was
25  imparting that as a possible explanation for why
```

Page 165

```
 1  the market was drifting up that morning.
 2    Q.  Do you know who on the Chicago
 3  Board -- excuse me.
 4        Do you know how the person that you
 5  were talking to learned about this information
 6  on the Chicago Board of Trade?
 7    A.  No.
 8    Q.  Did the person you were talking to
 9  work at this Chicago Board of Trade?
10    A.  I don't believe so.
11    Q.  Did the person you were talking to
12  characterize the information, where you called
13  it talk, on the Chicago Board of Trade as a
14  rumor?
15    A.  Yeah, yes.
16    Q.  Do you recall if this person told you
17  anything else during the conversation?
18    A.  That's all I can recall.
19    Q.  Prior to this conversation, what, if
20  anything, had you noticed about the market?
21    A.  The market had been ticking up that
22  morning.
23    Q.  And specifically what market are you
24  referring to?
25    A.  The bond market.  Specifically, the
```

Page 166

1  long bond had been moving up that morning at
2  that point in time at least a quarter point with
3  eight, 10 ticks.
4      Q.  And you said that this call came in
5  between 9:30 and 9:50?
6      A.  Some time after 9:30.  I don't know
7  exactly what time.
8      Q.  Was it around 9:30?
9      A.  I don't know exactly what time.
10         MS. WILLIAMS:  I'd like to have
11 this marked as Exhibit 9.
12         (Exhibit 9 marked
13          for identification)
14         MR. SHOPE:  Are there any
15 particular numbers you're going to be referring
16 to?
17         MS. WILLIAMS:  I'm going to be
18 talking about page five.
19 BY MS. WILLIAMS:
20     Q.  Do you recognize this document,
21 Mr. Nothern?
22     A.  Yes.
23     Q.  What is it?
24     A.  It's labeled Defendant Steven E.
25 Nothern's Responses to the Plaintiff US

Page 167

1  Securities and Exchange Commission's First Set
2  of Interrogatories.
3      Q.  If I could refer you to page 15.  And
4  on the second half of the page, do you see your
5  signature there, sir?
6      A.  Yes.
7      Q.  And it says, "I, Steven E. Nothern,
8  state under the penalty of perjury that the
9  foregoing responses are true and correct."
10        Did I read that correctly?
11     A.  Yes.
12     Q.  Okay.  On page five, I'm at the first
13 line, "Around 9:30 a.m. on October 31, 2001, I
14 had a telephone conversation with a bond broker
15 who informed me that there was information
16 circulating on the Chicago Board of Trade that
17 the Treasury was going to cancel the issuance of
18 the 30-year bond and that Treasury was going to
19 shift to a monthly issuance of five-year bonds
20 rather than the quarterly issuance of five-year
21 bonds."
22        Did I read that correctly?
23     A.  Yes.
24     Q.  Does that refresh your recollection at
25 all of anything else that was discussed during

Page 168

1  the conversation with the broker that morning?
2      A.  Yes.
3      Q.  What else was discussed?
4      A.  Apparently Treasury was going to shift
5  to a monthly issuance of five years as opposed
6  to a quarterly issuance.
7      Q.  And you agree that the conversation
8  took place around 9:30 a.m.?
9      A.  Yes.
10     Q.  Prior to receiving this call, what, if
11 anything, had you heard regarding Treasury's
12 possible cancellation of a 30-year bond on
13 October 31st?
14     A.  Prior to October 31, 2001?
15     Q.  No, no.  On October 31st, prior to
16 receiving this call, what, if anything, had you
17 heard about the possible cancellation of the
18 bond, just on that day?
19     A.  That morning?
20     Q.  Yes.
21     A.  Nothing that I recall.
22     Q.  What did you say in response to the
23 broker's -- information that the broker gave you
24 during this call?
25     A.  I don't recall.

Page 169

1      Q.  What was your reaction to this
2  information?
3      A.  It was twofold.  One is here we go
4  again.  We'd had a similar thing at the
5  August refunding.
6         And then it jogged my memory of what
7  had happened at the quarterly refunding, which
8  there had been wide anticipation at that point
9  in time that the treasurer was going to announce
10 the cancellation of the 30-year Treasury bond.
11        Their arrangements that they were
12 making was that it just didn't make sense to
13 continue issuing them.
14        So there was an expectation in
15 August that they were going to announce the
16 cancellation.  So I did remember that.
17        And I did remember also that the
18 postmortem on -- because they didn't in fact
19 announce that in August, postmortem was that
20 they didn't done it because the fellow in charge
21 while nominated hadn't yet been confirmed, and
22 he might not yet have the -- I guess the sort of
23 official ability to stand before the cameras and
24 make that sort of an announcement, to the extent
25 that he wanted to be the guy making that sort of

Page 170

1  announcement.
2      Q.  Do you recall if you'd received any
3  calls from brokers prior to the August refunding
4  conference?
5      A.  I don't recall.
6      Q.  When you say that a similar thing had
7  happened at the August refunding, what do you
8  mean?
9      A.  That there was a lot of talk about
10 whether they were going to do it or not do it in
11 terms of whether they were going to cancel
12 issuance of 30 years or not do it.  So there was
13 a lot of speculation about that.
14          This is an issue that had been
15 outstanding for a long period of time, well over
16 a year, and it dated to the prior
17 administration.
18          And in a sense the prior
19 administration, this is my take on it, that sort
20 of punted and left the issue to the new
21 administration.
22     Q.  How did you become aware of the talks
23 surrounding the August refunding?
24     A.  It was very -- I don't recall
25 specifically.  It was very widely talked about,

Page 171

1  though.
2      Q.  Prior to the August refunding
3  conference, do you recall there being any
4  movement in the market on the morning of the
5  conference?
6      A.  I don't.
7          MR. SHOPE:  I'm sorry, can I have
8  that question and answer read back?
9          (Record read)
10         MR. SHOPE:  Okay.  Thank you.
11 BY MS. WILLIAMS:
12     Q.  In the course of your work at MFS, how
13 often would you receive calls of this nature,
14 meaning the call that you got from the broker on
15 the morning of October 31st --
16         MR. THEODOROU:  Objection.
17     Q.  -- regarding rumors about market
18 activity?
19         MR. THEODOROU:  Objection.
20     A.  Rarely.
21     Q.  Do you not agree that you frequently
22 got calls from individuals with rumors regarding
23 what the market was going to do?
24         MR. THEODOROU:  Objection.
25     A.  What was your question?  Cow could you

Page 172

1  just repeat that, please?
2      Q.  Sure.  I said did you not frequently
3  get calls from individuals with rumors regarding
4  what the market was going to do?
5      A.  You're confusing me with your nots.
6      Q.  Okay.  Would you agree that you
7  frequently got calls from individuals with
8  rumors regarding what the market was going to
9  do?
10     A.  No.  I think it was extremely rare.
11     Q.  If I could refer you to Exhibit 2,
12 page 118.
13         MS. WILLIAMS:  And if we could go
14 off the record and change the tape.
15         MR. THEODOROU:  Can we just take a
16 short break?
17         MS. WILLIAMS:  Sure.
18         THE VIDEOGRAPHER:  This marks the
19 end of videotape number two in the deposition of
20 Steven Nothern.
21         Going off the record, 2:32 p.m.
22         (Recess taken)
23         THE VIDEOGRAPHER:  Here begins
24 videotape number three in the deposition of
25 Steven Nothern.

Page 173

1          On the record, 2:49 p.m.
2  BY MS. WILLIAMS:
3      Q.  Mr. Nothern, if you could read to
4  yourself on Exhibit 2, page 117, line 19 through
5  page 119, line --
6      A.  I'm sorry, page?
7      Q.  117.
8      A.  Okay.
9      Q.  Line 19 through page 118, line 8, and
10 let me know when you finished.
11         (Pause)
12     A.  Okay.
13     Q.  I wanted to refer you to page 118, and
14 I'm reading line four.  "It's just the nature of
15 business.  We have people calling us frequently
16 pounding the table that they're sure XYZ is
17 going to happen, or they're sure you should do
18 XYZ."
19          And I wanted to know what you meant by
20 that statement.
21     A.  We have people -- well, when I worked
22 in the business there were people calling
23 frequently, our insurer, the curve was going to
24 flatten, which is jargon to say that the
25 Treasury market yields with change in a certain

Page 174

1  manner, or that the Fed was at the next meeting
2  going to tighten 50 basis points, or that the
3  next CPI number was going to be .8.
4        You know, so we had people calling in
5  all the time who thought that, you know, they
6  had an analysis of how the market might react to
7  things that they were certain were going to
8  occur in their analysis, in their opinion
9  certain things were going to happen, and they
10 were darn sure of it.
11       At the end of the day, I think I say
12 that here, at the end of the day, we as
13 portfolio managers have to make our own analysis
14 of what we think, you know, the investment
15 environment is going to be going forward, and we
16 take the responsibility for structuring the
17 portfolios appropriately.
18       You can't rely on other people's
19 analysis. It's useful input. Often they're
20 darn sure, but they can also be darn wrong. And
21 if it's wrong, it's your responsibility as a
22 portfolio manager.
23       I don't blame them, but they call a
24 lot confident that such-and-such is going to
25 happen and, you know, you should do

Page 175

1  such-and-such, you know, as a consequence of it.
2        Q.  When you received this call from the
3  broker saying that -- relaying the rumor on the
4  floor of the Chicago Board of Trade, you said
5  that one reaction you had was that this was
6  similar to information you heard surrounding the
7  August refunding conference; is that right?
8        A.  Yes.
9        Q.  What, if anything, in your --
10 triggered in your mind after you received the
11 call from the broker on October 31st as to
12 whether Treasury was going to make a refunding
13 announcement that day?
14       A.  It didn't -- I didn't have any thought
15 of a refunding -- quarterly refunding at that
16 point in time.
17       Q.  How long did the call with the broker
18 last?
19       A.  I don't remember. It was brief.
20       Q.  By "brief," can you give me a
21 ballpark?
22       A.  Less than two, three minutes.
23       Q.  What happened -- what did you do after
24 you had this call with the broker?
25       A.  As I recall, I was doing portfolio

Page 176

1  work. I had several portfolios I was working to
2  restructure. I was doing trades, primarily
3  selling intermediate maturity or short maturity
4  notes and bonds in exchange for longer
5  maturities.
6        Q.  Okay. You mentioned earlier you
7  received a voicemail from Peter Davis. Were you
8  doing this portfolio work prior to receiving
9  that voicemail?
10       A.  Yes.
11       Q.  Did you sell any intermediate
12 securities that day prior to receiving the
13 voicemail from Mr. Davis?
14       A.  Yes.
15       Q.  Did you purchase any longer term
16 securities that day prior to receiving the
17 voicemail from Mr. Davis?
18       A.  No.
19       Q.  What do you recall happening next?
20       MR. SHOPE:  Next after what?
21       MS. WILLIAMS:  He said that after
22 the call with the broker, he did some portfolio
23 work. I want to know what he recalls doing
24 thereafter.
25       A.  At some point I was interrupted by

Page 177

1  Kathy Graham who was our receptionist. She had
2  an issue related to a laptop that was going to
3  be picked up for servicing by Dell.
4        Q.  How were you interrupted by
5  Ms. Graham?
6        A.  She came to my desk and presented me
7  the problem that we were having, and Dell was to
8  come pick up this computer for servicing, and
9  she explained to me the complexity.
10       After 9/11, vendors -- pick up
11 companies were no longer allowed up into the
12 building, so the laptop would have to be brought
13 down to, I guess, a receiving area of the lobby.
14       Q.  Okay. How long was this conversation
15 with Miss Graham?
16       A.  I don't remember. I'd say it was
17 fairly brief, a few minutes.
18       Q.  Besides you and Ms. Graham, was there
19 anyone else involved in this conversation?
20       A.  No.
21       Q.  And just to clarify, were you sitting
22 at your station on the high grade trading desk
23 when you had this conversation with Ms. Graham?
24       A.  Yes.
25       Q.  What happened after you had this

**EXHIBIT H**

**Cited Excerpts of Exhibit 3 from the
Deposition Transcript
of Bloomberg LP, by Patrick Eldridge
(November 2, 2006)**

CONFIDENTIAL

<HELP> for explanation, WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  **TBLT**
Enter 2 <GO> to cancel, 99 <GO> for options. 0 <PAGE> to see original sales tkt.
                                                          NY 10/31/01 09:45
GALEN          APPROVED  TICKET              As of 10/31/01 09:42:02
T 5 $\frac{3}{8}$  02/15/31                                        H2633

| SELL | 65M (m) | | | | |
|---|---|---|---|---|---|
| Price | 102-24$\frac{1}{2}$ | Yield | 5.189718( | Yield to | 02/15/31 at 100.00) |
| Settlement | 11/01/01 | | | | |
| A Account | 81730A26 | 81730A26 MASS FINANCIAL SERVICES | | Sales | 817-9584 |

| Sales Commission | CodeC | Rate | .150 | 9750.00 USD | |
|---|---|---|---|---|---|
| | | | | | ↑↑ |

| WIRE | NOE | 9584 | CONFIRM BY |
|---|---|---|---|
| ORIGIN | BLB2 | 606311 | PARTIAL |
| FC # | 9584 | NOE | DELIV INST |
| SETT TYPES | DAC | | DELIV INST |

| Principal | USD | 66,797,656.25 | Principal/Agency |
|---|---|---|---|
| Accrued | ( 78) | 740,523.10 | |
| Transaction Costs | | 0.00 | Settlement Loc FED |
| Total | USD | 67,538,179.35 | |
| | | | Ticket Number |
| View in USD | Rate | 1.00000    Invert N (Y/N) | 606314 |

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                          G230-82-3 07-Sep-06 15:30:10

Bloomberg

# EXHIBIT I

**Cited Excerpts from the Deposition Transcript
of Galen Criqui
(September 27, 2006)**

Page 1

1

2              UNITED STATES DISTRICT COURT

3          FOR THE DISTRICT OF MASSACHUSETTS

4

   UNITED STATES SECURITIES )
5  AND EXCHANGE COMMISSION, )
                            )
6          Plaintiff,       )
                            ) Civil Action
7          vs.              ) No. 05-10983(NMB)
                            )
8  STEVEN E. NOTHERN,       )
                            )
9          Defendant.       )
   ------------------------)
10

11

12

13      VIDEOTAPED DEPOSITION OF GALEN CRIQUI

14            New York, New York

15        Wednesday, September 27, 2006

16

17

18

19

20

21

22

23

24 Reported by:
   Elia E. Carrion
25 JOB NO. 7530

Page 2

1
2        September 27, 2006
3        10:01 a.m.
4
5        Videotaped Deposition of
6    GALEN CRIQUI, held at the offices of
7    Davis Polk & Wardwell, 450 Lexington
8    Avenue, New York, New York, pursuant to
9    Amended Notice, before Elia E. Carrion,
10    a Notary Public of the State of New
11    York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2  A P P E A R A N C E S :  (Cont'd)
3
4    ALSO PRESENT:
5        Rudolfo Duran, Legal Video Specialist
6        Julian Swearenguin, Merrill Lynch
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S :
3
4    UNITED STATES SECURITIES AND EXCHANGE
5    COMMISSION
6    Division of Enforcement
7    Attorneys for Plaintiff
8        100 F Street, N.E.
9        Washington, D.C. 20549-4010
10    BY:  ERICA Y. WILLIAMS, ESQ.
11        -and-
12        JOHN J. ROSSETTI, JR., ESQ.
13
14    FOLEY HOAG LLP
15    Attorneys for Defendant
16        Seaport World Trade Center West
17        155 Seaport Boulevard
18        Boston, Massachusetts 02210-2600
19    BY:  ROBERT E. TOONE, ESQ.
20
21    CLIFFORD CHANCE US LLP
22    Attorneys for Witness
23        31 West 52nd Street
24        New York, New York 10019-6131
25    BY:  KEVIN M. FUMAI, ESQ.

Page 5

1
2        IT IS HEREBY STIPULATED AND AGREED,
3    by and among the attorneys for the
4    respective parties herein, that filing
5    and sealing be and the same are hereby
6    waived.
7        IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the
9    form of the question, shall be reserved
10    to the time of the trial.
11        IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be sworn
13    to and signed before any officer
14    authorized to administer an oath, with
15    the same force and effect as if signed
16    and sworn to before the Court.
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

Page 182

```
1        G. Criqui
2 willing to sell bonds at par 21.
3        It might only be one million, it
4 might be 10 million, they might have 50
5 million offered there.
6    Q.   So is it safe to say the difference
7 the bid and the offer is the difference
8 between the price at which someone in the
9 market is going to buy a bond and the price
10 at which someone in the market is going to
11 sell the bond?
12   A.   Yes.
13   Q.   You had mentioned par in your
14 answer.
15        Could you explain what par is?
16   A.   Par, basically, is a hundred.  And
17 that's basically when the market, the present
18 yield or interest rate in the marketplace
19 coincides with the coupon --
20   Q.   Or interest rate?
21   A.   -- on the underlying -- or the
22 interest rate on the underlying whole bond.
23        So for instance, in
24 February of 2001 they issued this 5 and
25 three-eighths at Feb 31 as a 30-year bond.
```

Page 183

```
1        G. Criqui
2        At the time of this trade, the
3 October -- by October of '01, eight,
4 nine months later, it had rallied roughly 18,
5 19 basis points.  So the bond went from 100
6 par to 102, almost 103, 102.24 plus, that's
7 close to 103.  That reflects the fact that
8 the market has rallied.
9        So basically par is just when the
10 present yield, present interest rate on the
11 bond is the same as the coupon, the
12 underlying interest rate on the bond when it
13 was originally issued.
14   Q.   So when you say par in 20, is that
15 120 ticks --
16   A.   Thirty -- yes, that's correct.
17   Q.   Which would be 120.32.
18   A.   120 thirty-secondths.  Not a
19 hundred -- it's a little less than 101.
20   Q.   Right, 132 thirty-secondths --
21   A.   Would be 101.
22   Q.   Would be 101, okay.
23        Sorry.  I know that this is very
24 basic.
25   A.   No, I don't even know the answers.
```

Page 184

```
1        G. Criqui
2    Q.   Mr. Toone asked you to go through
3 the process that you generally went through
4 at Merrill Lynch, when you executed a trade
5 with a customer in Boston like MFS.  I want
6 to walk through what actually occurred on
7 October 31st, 2001, regarding this trade of
8 65 par value of 30-year bonds.
9        Could you tell me what you recall
10 on that morning?
11   A.   Certainly, certainly.  I'll refrain
12 from using the actual time at which it took
13 place, 'cause five years later I can't really
14 remember.
15        But at some point before the
16 expected 10 a.m. refunding announcement,
17 anywhere from 15 to 20 minutes before that,
18 Greg Saint-Pierre used the government's
19 squawk while he's in Boston, I'm in Jersey
20 City on a temporary basis.  He used the
21 government squawk, Galen, pick up Boston for
22 a trade.
23        I proceeded to press the Boston
24 direct, hey, Greg.  Hey, Galen, offer 65
25 million long bonds to MFS for regular
```

Page 185

```
1        G. Criqui
2 settlement.
3        And I can't exactly recall where
4 the bond market, where the bond was in the
5 broker screens at the time, where the bid and
6 offer was, but it was probably pretty close
7 to where I did the trade.  So anyway, let's
8 say there were 102.23, 102.24, which is
9 probably accurate, but I offered him at
10 102.24 plus, a plus concession for me,
11 plus --
12   Q.   A plus is --
13   A.   A half a tick.
14   Q.   -- a half of a thirty-secondth.
15   A.   Yes, one 64th.
16   Q.   Great.
17   A.   I offered a 24 plus, which was
18 fair, market was pretty volatile at the time
19 all that September 11th, and I offered him
20 there.  Greg reflects that to the customer,
21 and within a second or two Greg comes back to
22 me, you're done, customer accepts.  I go
23 okay, you're done, too, okay, fine.  Trade's
24 done.  Like millions of trades I've done
25 before.
```

47 (Pages 182 to 185)

Page 186

1        G. Criqui
2    Q.   At the time that you executed this
3 trade, what, if anything, did you know about
4 treasury's decision to cancel the 30-year
5 bond?
6    A.   At the time of the execution of the
7 trade, zero.
8    Q.   What, if any, rumors had you heard
9 that morning about the possibility of the
10 bond being cancelled?
11    A.   I hadn't heard one word, one rumor.
12    Q.   What, if any, indication did you
13 get by the market that morning, prior to this
14 trade, that there might be a cancellation of
15 the bond?
16    A.   Zero.
17    Q.   Had --
18    A.   Sorry.
19    Q.   Had you been looking at the market
20 for the 30-year bond, before you executed
21 this trade?
22    A.   Oh, yeah.
23    Q.   What happened -- what did you
24 proceed to do, after you said done?
25    A.   I -- standard practice is I would

Page 187

1        G. Criqui
2 slate the trade, but I'm not required to
3 slate the trade.  There's not like a rule
4 that I have to slate it the second it's done.
5    Q.   When you say "slate the trade" --
6    A.   Remember, we were talking about
7 that before, when I actually input it into my
8 system, what I did.
9    Q.   Okay.
10    A.   You know, where I put sell 65 bonds
11 at 102.24 plus to NOE.
12    Q.   In the Bloomberg?
13    A.   In my Bloomberg trading system,
14 yeah.  I have to do that at some point, but
15 it's not like I have to do it immediately.
16 It's not like that slate gets done the second
17 we verbally commit to this trade with the
18 customer.
19    Q.   Okay.
20    A.   So I don't know exactly when I
21 slated it with regard to this trade.  It was
22 probably pretty soon thereafter, but not
23 immediately.
24        But what I proceeded to do then was
25 try to get some bonds back, and I did; I got

Page 188

1        G. Criqui
2 roughly 30, 34 million back, at a profit,
3 small profit, maybe a tick, tick and a half
4 lower.
5        And then, you know, when he was
6 referring before, you know, basically, what,
7 could you have gotten them all back, why
8 didn't you buy 65 million, that's kind of
9 like, that's why, you know, that's why I have
10 a job.  If it was just where you could offer
11 65 bonds and just buy 65 million back, there
12 really wouldn't be a need for me or anyone to
13 do this job, you know.  It's not very liquid,
14 there's not a lot of offers, there's not a
15 lot of bids for these things, they move
16 around a lot, not a lot of people want to
17 trade them.  So I was lucky to get half of
18 them back; and you know, I still had 15
19 minutes before this refunding announcement.
20 And refunding announcement is, you know,
21 they're not earth-shattering things.  They
22 never have been, you know.  So you know,
23 maybe, maybe I'll go a little bit short into
24 it.
25        But all of a sudden well before the

Page 189

1        G. Criqui
2 10 o'clock, I'd say about 9:45, 9:46, there
3 was no offer, and it started to tick up a
4 little bit, it got a little, a little weird,
5 you know, but whatever.  It happens, you
6 know.  And then all of a sudden it got really
7 weird, you know.
8    Q.   Okay.  Let me ask some follow-up
9 questions.
10        First, did you proceed to put your
11 slate in while you were still on the phone
12 with --
13    A.   No.
14    Q.   -- with Greg Saint-Pierre?
15    A.   I mean I can't answer that
16 accurately, but most likely not.  I usually
17 just don't do that.  I guess I'm not that
18 talented, where I can do both at the same
19 time.  But I would probably -- I'm not on the
20 phone with Greg for very long, and I don't
21 know if the customer is going to say done
22 either.  Offer is 65 bonds, 102.24 plus,
23 done, okay, then, then you're off the phone.
24        So if I maybe started to slate it
25 while at the end of the phone call, sure, but

48 (Pages 186 to 189)

**EXHIBIT J**

**Cited Excerpts from the Deposition Transcript
of Verizon Business, by Anne Wilson
(October 6, 2006)**

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

(Boston Division)

- - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND    )

EXCHANGE COMMISSION,            )

       Plaintiff,          )

    v.                          ) Civil Action

STEVEN E. NOTHERN,              ) No. 05-10983

     Defendant.            ) (NMG)

- - - - - - - - - - - - - - - - x

Washington, D.C.

Friday, October 6, 2006

Video 30(b)(6) Deposition of:

ANNE LAWRENCE WILSON,

a witness called for examination in the

above-entitled action, beginning at 10:14 a.m.

before JOE W. STRICKLAND, RPR, CRR, a notary

public in and for the District of Columbia, taken

at the offices of the Securities and Exchange

Commission, 100 F Street, NE, Washington, DC

20549, when were present:

Page 2

1   A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFF:
3       ERICA Y. WILLIAMS, ESQ.
4       JOHN J. ROSSETTI, JR.
5       U.S. Securities and Exchange Commission
6       100 F Street, NE
7       Washington, D.C.  20549-4010
8       (202) 551-4450
9       williamse@sec.gov
10  ON BEHALF OF THE DEFENDANT:
11      ROBERT E. TOONE, ESQ.
12      Foley Hoag, LLP
13      Seaport World Trade Center West
14      155 Seaport Boulevard
15      Boston, Massachusetts 02210-2600
16      (617) 832-1242
17      rtoone@foleyhoag.com
18
19
20
21
22

Page 4

1   E X H I B I T S

| 2   WILSON EXHIBIT NO.: | PAGE NO: |
|---|---|
| 3   No. 1 | 11 |
| 4   No. 2 | 11 |
| 5   No. 3 | 26 |
| 6   No. 4 | 38 |
| 7   No. 5 | 46 |
| 8   No. 6 | 54 |
| 9   No. 7 | 61 |
| 10  No. 8 | 85 |
| 11  No. 9 | 109 |
| 12  No. 10 | 201 |

13
14
15
16
17
18
19
20
21
22

Page 3

1   APPEARANCES (Continued)
2   ON BEHALF OF THE WITNESS:
3       TODD S. SCHULMAN, ESQ.
4       Verizon, Assistant General Counsel
5       One Verizon Way
6       VC54N079
7       Basking Ridge, New Jersey 07920-1097
8       (908) 559-5664
9       todd.s.schulman@verizon.com
10
11  ALSO PRESENT:  Conway Barker, Videographer
12
13          C O N T E N T S
14  WITNESS NAME            EXAMINATION
15  ANNE WILSON
16    By Ms. Williams        6, 180, 199
17    By Mr. Toone           117, 192
18      Afternoon Session        117
19
20
21
22

Page 5

1           P R O C E E D I N G S
2       VIDEOGRAPHER:  In the United States
3   District Court for the District of Massachusetts,
4   in the matter of the United States Securities and
5   Exchange Commission versus Steven E. Nothern,
6   Case Number 05-10983 (NMG).  This is the
7   corporate deposition of Verizon by Anne Wilson.
8       Today's date is October 6th, 2006.  The
9   location of the deposition is the U.S. Securities
10  and Exchange Commission, 100 F Street, Northeast,
11  Washington, D.C.
12      Will Counsel please identify themselves
13  and state whom you represent.
14      MS. WILLIAMS:  Erica Williams for the
15  Plaintiff, U.S. Securities and Exchange
16  Commission.
17      MR. TOONE:  Robert Toone from Foley
18  Hoag, LLP, in Boston, Massachusetts, for the
19  Defendant, Steven Nothern.
20      MR. SCHULMAN:  Todd Schulman, Verizon
21  Communications, Inc.
22      VIDEOGRAPHER:  The court reporter is

Page 78

1    Q.  So a host name corresponds to a
2  computer, an IP address?
3    A.  Exactly.  Right.  So it was the IP
4  address that was in the access control list, but
5  the computer can look one up and find the other.
6  It knows which belongs to which.
7    Q.  And would the host name be unique to a
8  specific computer at Treasury?
9    A.  Not necessarily.  They could have gone
10  through a proxy.  But it would definitely be
11  coming through the Treasury gateway.
12    Q.  I want to move down to the next entry
13  here:  "Here are the CMS push logs for USTPRESS"
14  and then I see a clump of information.  What is
15  all that?
16    A.  That would be the logs and it shows the
17  logs that this user or that for this web site.
18  It shows when files were updated.  They happen in
19  pairs, each update sequence.  There's an update
20  collection and then do update.  That's because a
21  number of things can happen, happen in a push and
22  it can take -- it can take several seconds or in

Page 79

1  some cases even minutes to do a push because the
2  system has to compare which files are on the two
3  systems and compare information about those
4  files.
5    Q.  So here which, if any, of these push
6  logs relate to this particular file, PO749?
7    A.  The second set.  So starting with the
8  third entry, USTPRESS, that's the user name of
9  the web site.  And then 9:43 and 23 seconds is
10  the beginning of the process.  And then 9:43 and
11  28 seconds is the end of the process.
12    Q.  When you say the beginning of the
13  process and that started at 9:43 and 23 seconds,
14  what do you mean?
15    A.  Of the update process.  I think I
16  referred before the user clicks a button and says
17  I want to push these documents to production.
18  And then it does the -- well, first of all it has
19  to get the Kerberos ticket and the two servers
20  have to open up that encrypted line of
21  communication.  And then there is a comparison of
22  which files are on each of the two servers and

Page 80

1  the date, time, size of those files.  And CMS
2  decides which files it's going to copy over and
3  then it does the copy.
4    Q.  Does the program do this automatically
5  when the person clicks whatever they need to do
6  to say push?
7    A.  Clicks the button; right.
8    Q.  What is this fourth entry here, the
9  9:43:28?  What does that signify?
10    A.  That would be when the process was
11  completed.  Or when that file was actually moved.
12    Q.  At what time would someone from the
13  public who logs onto the Treasury production
14  server via the Internet be able to view PO749?
15    MR. TOONE: Objection.
16    THE WITNESS:  9:43 and 28 seconds.
17    BY MS. WILLIAMS:
18    Q.  And why do you say that?
19    A.  Because this log indicates that that's
20  when the CMS system was complete with its
21  transfer, which would mean that the file was then
22  on the production server.

Page 81

1    Q.  Would it have been possible at 9:43 and
2  23 seconds to view the information on the
3  production server?
4    A.  No.
5    Q.  Why not?
6    A.  The process was just starting.  The
7  file wouldn't have been copied yet.  And those
8  other things had to happen first.
9    Q.  If you could go down below the copy --
10  well, first, this -- these entries from the log,
11  which server would those have come from?
12    A.  I would have looked for them myself on
13  the staging server.  That's where the interface
14  was for the customers to view these logs.
15    Q.  Was it also available on the production
16  server?
17    A.  It may have been.  I personally don't
18  know.
19    Q.  Okay.  Below this information with the
20  CMS push logs, Mr. Harris writes some other
21  information interpreting the logs.  Do you see
22  that?

Page 82

1    A.   Uh-huh.
2    Q.   Is there anything in that that you
3 disagree with?
4    A.   No, not at all.  This is he's pulled
5 out, you know, just copied bits and pieces of
6 it.  What -- what looks odd is that this
7 101103107 is -- computers have a different way of
8 keeping time.  They don't use month, day, year.
9 So it's -- I don't know what the algorithm is.
10 It is like a number of seconds past some start
11 date.  So he's converted this numeric set of
12 strange numbers into the actual year, month, and
13 date that they convert to.
14    Q.   Was it possible for someone to type in
15 WWW.TREAS.GOV and connect to Treasury's staging
16 server?
17    A.   No.
18    Q.   Why not?
19    A.   Because that entry would have only been
20 made for the production system.
21    Q.   Were there any other WWW. type
22 addresses that connected to the production

Page 83

1 server?  At Treasury?
2    A.   Yes.  The WWW.USTREAS.GOV and
3 WWW.TREASURY.GOV.
4    Q.   And would all of those connect to the
5 same IP address on the production server?
6    A.   Right.  There would have been multiple
7 domain name entries, all with the same IP
8 address.
9    Q.   What is a domain name?
10    A.   Domain name is that host's name.  It
11 refers to the DNS, domain name system, which is
12 another protocol of how the Internet works.  And
13 there are servers, databases around the world
14 that match up domain names with IP addresses.
15 And it's the domain name that you're going to
16 write in your web browser, because people
17 wouldn't be expected to know what the IP
18 addresses are.  They're a little too confusing.
19    Q.   Do you know if Treasury's staging
20 server had a domain name in 2001?
21    A.   No, I don't know.  We did not create
22 one for that.

Page 84

1    Q.   UUNET didn't create one?
2    A.   Right.
3    Q.   So just to clarify, an IP address like
4 Treasury's production server's IP address could
5 have multiple domain names --
6    A.   Uh-huh.
7    Q.   -- that pointed to it?
8    A.   Right.
9    Q.   Are you familiar with the term network
10 time protocol?
11    A.   Yes.
12    Q.   What is it?
13    A.   It's a standard throughout the
14 Internet.  It's a method of synchronizing clocks
15 that's considered very robust and redundant, so
16 that no one is depending on a single clock but on
17 a network of clocks going back to very
18 authoritative sources.
19    Q.   When you say it's a standard throughout
20 the Internet, what do you mean?
21    A.   It's common, accepted practice that the
22 official clocks from U.S. Naval Observatory or

Page 85

1 the National Institute of Standards and
2 Technology distribute their time via NTP.  And it
3 syncs up with the universal coordinated time
4 worldwide.  So it's universally accepted.
5    Q.   Did UUNET have an NTP protocol in place
6 for its customer servers?
7    A.   Yes, we did.  That was a standard
8 package that was installed on all of our customer
9 boxes.
10    Q.   Was that true in the fall of 2001?
11    A.   Yes, it was.
12    Q.   Did UUNET have an NTP protocol in place
13 for the Treasury servers that it maintained?
14    A.   Yes.
15    Q.   Could you explain how the NTP --
16 actually, before you do that, let me mark this
17 document as an exhibit.
18        (Wilson Exhibit No. 8 was
19        marked for
20        identification.)
21    BY MS. WILLIAMS:
22    Q.   Ms. Wilson, do you recognize this

Page 178

1  protocol was running at the time?

2      A.   He would have done a process command to

3  see what processes were running.

4      Q.   Was there any process that Mr. Harris

5  could have performed on November 1st at 12:40

6  p.m. as to whether the network time protocol was

7  running correctly on the morning of October 31st,

8  2001?

9          MS. WILLIAMS:  Objection.

10         THE WITNESS:  No.

11         BY MR. TOONE:

12     Q.   I'm sorry?

13     A.   Perhaps log files may have shown that.

14     Q.   Are you aware of any evidence showing

15  that -- showing whether the network time protocol

16  was running correctly on October 31st, 2001?

17     A.   Not direct -- I'm not sure.  How did

18  you phrase that?

19     Q.   Are you aware any of evidence that

20  shows whether or not the network time protocol

21  was functioning correctly on October 31st, 2001?

22         MS. WILLIAMS:  Objection.

Page 179

1          THE WITNESS:  I have no evidence to the

2  contrary.  And the server was working.  By

3  inference, it was.

4          BY MR. TOONE:

5      Q.   What do you mean the server was

6  working?

7      A.   CMS was working.  The server was up and

8  responding.  The operating system was running and

9  NTP is part of the operating system.

10     Q.   So because the other functions were

11  working, it's possible to conclude that the

12  network time protocol was also working?

13     A.   It certainly should have been.

14     Q.   It should have been, but can you say

15  for sure that it was?

16         MS. WILLIAMS:  Objection.

17         THE WITNESS:  Not for absolutely sure,

18  but with a high degree of certainty, yes.

19         MR. TOONE:  Could we take a short

20  break.  I would like to review my notes one more

21  time.

22         VIDEOGRAPHER:  Off the record,

Page 180

1  3:15:20.

2          (Recess.)

3          VIDEOGRAPHER:  On the record at

4  3:33:58.

5          BY MR. TOONE:

6      Q.   Ms. Wilson, I'm done with all my

7  questions for now.  Thank you very much.

8  FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF

9          BY MS. WILLIAMS:

10     Q.   I have a couple of follow-up

11  questions.

12     A.   Okay.

13     Q.   Mr. Toone asked you some questions

14  about the ability of someone in the public to

15  view content on Treasury's staging server?

16     A.   Uh-huh.

17     Q.   What would a person need to know to

18  view, rather than post, content on Treasury's

19  staging server?

20     A.   They would need to know that address.

21  The IP address of that staging server.

22     Q.   And how would someone in the public

Page 181

1  know the IP address of a staging server?

2          MR. TOONE:  Objection.

3          THE WITNESS:  I don't know how they

4  could come by that information.

5          BY MS. WILLIAMS:

6      Q.   Why do you say that?

7          MR. TOONE:  Objection.

8          THE WITNESS:  Because to my knowledge,

9  it was not part of the DNS record or announced in

10  that way.

11         BY MS. WILLIAMS:

12     Q.   When you say not part of the DNS

13  record, what do you mean?

14     A.   That I know of no -- well, even to know

15  the IP address they would have to know the domain

16  name, or they would have to know the domain name

17  to know the IP address.  They would have to know

18  that address.  It wouldn't have been posted on

19  the Treasury web site, for example.

20     Q.   I think you testified that you don't

21  know if there was a domain name for Treasury's

22  staging server?

Page 198

1 files posted on the staging server were available
2 on the Internet?
3      MS. WILLIAMS: Objection.
4      THE WITNESS: Yeah. I mean it said
5 that, you know, if you want to protect your
6 content, you can do XYZ to keep others from
7 viewing it.
8      BY MR. TOONE:
9      Q. Did you produce those documents to the
10 S.E.C.?
11     A. No, I don't believe we discussed that.
12     Q. Are those documents still available?
13     A. Perhaps.
14     Q. Would it surprise to you learn that
15 Treasury's senior counsel for technology policy,
16 a man named Steven Vagle, believed that files
17 transferred to the staging server were not
18 available on the Internet?
19     MS. WILLIAMS: Objection.
20     MR. SCHULMAN: Objection.
21     BY MR. TOONE:
22     Q. You can answer if you understand the

Page 199

1 question.
2      A. I don't know. I mean I have no
3 opinion.
4      Q. Do you know whether Treasury employees
5 received any specific training on this aspect of
6 the staging server?
7      MS. WILLIAMS: Objection.
8      THE WITNESS: I don't know.
9      MR. TOONE: That's all I have.
10     MS. WILLIAMS: I have a couple
11 follow-ups.
12 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
13     BY MS. WILLIAMS:
14     Q. You never worked at the Department of
15 Treasury, did you Ms. Wilson?
16     A. No.
17     Q. You don't know Treasury's policies and
18 procedures?
19     A. No.
20     Q. Mr. Toone was asking you about files on
21 the staging server being available on the
22 Internet. What would someone need to do to get

Page 200

1 these files off the staging server on the
2 Internet?
3      A. They would have -- to view the files?
4      Q. Yes.
5      A. They would have to know the IP address
6 of the staging server. They would have to -- if
7 a domain name existed, they could use that. But
8 that's only if that existed. They'd have to know
9 one or the other. And you know depending on how
10 the files were indexed, they might have to know
11 specific file name to view that file.
12     Q. What if Treasury had additional
13 security protocols?
14     MR. TOONE: Objection.
15     THE WITNESS: In that case, they would
16 either have had to enter a user name password or
17 come from a specific network or range of IP
18 addresses.
19     BY MS. WILLIAMS:
20     Q. Did UUNET advertise which of its
21 clients had staging servers?
22     A. No.

Page 201

1      Q. How would someone in the public know
2 that Treasury had a staging server at UUNET?
3      MR. TOONE: Objection.
4      THE WITNESS: It should not know. That
5 was considered proprietary information. Any
6 information about our customers was tightly held.
7      MS. WILLIAMS: I'd like to mark this as
8 Exhibit 10.
9          (Wilson Exhibit No. 10 was
10         marked for
11         identification.)
12     BY MS. WILLIAMS:
13     Q. Have you seen this document before
14 Ms. Wilson?
15     A. Yes.
16     Q. What is it?
17     A. It's a snapshot of a trouble ticket
18 from the Remedy Trouble Ticket Database.
19     Q. Do you know how this document was
20 generated?
21     A. I myself accessed this ticket from the
22 Remedy database.

EXHIBIT K

**Cited Excerpts from the Deposition Transcript
of Bloomberg LP, by Darin Langone
(November 3, 2006)**

UNITED STATES DISTRICT COURT FOR THE
     DISTRICT OF MASSACHUSETTS
          (Boston Division)
----------------------------------------x
UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

                              Plaintiff,

                              Civil Action
                              No. 05-10983

          -against-


STEVEN E. NOTHERN,

                              Defendant.
----------------------------------------x



   VIDEOTAPED DEPOSITION OF DARIN LANGONE

          New York, New York

       Friday, November 3, 2006




Reported by:
DOROTHY H. LONDON, RPR

Page 2

1        November 3, 2006
          1:09 p.m.
2
3
4
5        VIDEOTAPED DEPOSITION OF DARIN LANGONE, held at
6    the offices of Securities and Exchange Commission, 3
7    World Financial Center, New York, New York, pursuant
8    to 30(b)(6) Notice, before Dorothy H. London, a
9    Registered Professional Reporter and Notary Public
10   of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                    INDEX
2    WITNESS          EXAMINATION BY        PAGE
3
4    DARIN LANGONE        Ms. Williams        6
5                        101
6
7              Mr. Toone          63
8
9              EXHIBITS
10   LANGONE
11            DESCRIPTION          PAGE
12   1      Notice of Deposition and        10
13          Subpoena for 30(b)(6)
14          deposition from Bloomberg
15          LP
16   2      Configuration files for        31
17          Server N010
18   3      "A Survey of the NTP          86
19          Network"
20
21          REQUEST FOR DOCUMENTS
22          PAGE          LINE
23
24          15          17
25

Page 3

1  A P P E A R A N C E S :
2
3        U.S. SECURITIES AND EXCHANGE COMMISSION
            Attorneys for Plaintiff
4           100 F Street, N.E.
            Washington, D.C. 20549
5
        BY:  ERICA Y. WILLIAMS, ESQ.
6
7
8    FOLEY HOAG, LLP
            Attorneys for Defendant
9           Seaport World Trade Center West
            155 Seaport Boulevard
10          Boston, Massachusetts 02210
11       BY:  ROBERT E. TOONE, ESQ.
12
13
        BLOOMBERG
14          Attorneys for Witness
            731 Lexington Avenue
15          New York, New York 10022
16       BY:  CATHERINE MARTEN, ESQ.
17
     ALSO PRESENT:
18
19       JUAN TORRES, VIDEOGRAPHER
20
21
22
23
24
25

Page 5

1        THE VIDEOGRAPHER:  This is Tape No. 1 of
2    the videotaped deposition of Mr. Darin Langone in
3    the matter of the United States Securities and
4    Exchange Commission versus Steven Nothern in the
5    United States District Court for the District of
6    Massachusetts.
7        This deposition is being held at the SEC
8    offices, 3 World Financial Center, New York, New
9    York on November 2, 2006 at approximately 1:09 p.m.
10   My name is Juan Torres, and I'm the legal video
11   specialist.  The court reporter is Dorothy London.
12       Will counsel please introduce themselves
13   beginning with the party noticing this proceeding?
14       MS.  WILLIAMS:  Erica Williams for the
15   plaintiff, United States Securities and Exchange
16   Commission.
17       MR.  TOONE:  Robert Toone from Foley Hoag
18   in Boston for the defendant, Steven Nothern.
19       MS.  MARTEN:  Catherine Marten, counsel to
20   Bloomberg LP.
21       THE VIDEOGRAPHER:  Will the court reporter
22   please swear in the witness?
23
24              o0o
25

Page 30

1  is used is it gives all the computers in this
2  particular grouping on a network the ability to keep
3  time with one another. It's almost as if -- you
4  know, we all wear watches. You know, some people's
5  individual watches are fast. Some people's
6  individual watches run slow. You know, the watch on
7  your wrist might be easily equated to the hardware
8  clock that's on your motherboard, so if you're going
9  to interact, if you're a computer and you're going
10  to interact with some other computers and then maybe
11  a clock is a little slower or faster, you're going
12  to have a difficult time doing these transactions.
13  You know, I might go to you and say hey, you know,
14  give me this and you give me that and I give you
15  something else, and we look at our watch to try to
16  synchronize, but there's differences.
17       But if somehow our watches were
18  interconnected and the statefulness of time was
19  maintained between two of them, we wouldn't have
20  this difficulty, and that's probably why it is that
21  NTP is utilized between systems on a network, and I
22  think it's going to also get into why it is that
23  there's differences between why a computer has a
24  hardware clock and why if it does have a hardware
25  clock, why it is that we need this NTP thing, as

Page 31

1  well.
2       Q.  Without getting into too many technical
3  details, how did NTP or how did NTP affect the
4  accuracy of clocks on the TOMS system that Bloomberg
5  maintained in 2001?
6       MR. TOONE:  Objection.
7       Q.  You can answer.
8       A.  Well, NTP maintains the statefulness of
9  the clocks on the TOMS system and every other system
10  that we have by basically going out on to the
11  Internet at that time and being in sync with some of
12  the well known atomic clocks, GPS clocks that are
13  out there for that specific purpose.
14       So it might have been a server for the
15  TOMS system or any other server for that matter.
16  It's really a generic thing. So that system would
17  be up and running, and it would essentially be
18  synchronizing its time with one of the well known
19  clocks on the Internet.
20       Q.  Are you familiar with the NTP
21  configuration for Server N010?
22       A.  Yes, I am.
23       MS. WILLIAMS:  I'd like to have this
24  marked as Exhibit 2.
25       (Langone Exhibit 2,

Page 32

1            Configuration files for Server
2            N010, marked for identification,
3            as of this date.)
4  BY MS. WILLIAMS:
5       Q.  Mr. Langone, if you could take a minute
6  and review Exhibit 2.
7       A.  (Perusing.)
8       Q.  Do you recognize what's been marked as
9  Exhibit 2?
10       A.  Yes, I do.
11       Q.  What is it?
12       A.  These are configuration files that would
13  have been used at the time on these machines to --
14  for the NTP process.
15       Q.  When you say "these machines," what do you
16  mean?
17       A.  Oh, N010.
18       Q.  If I could refer you to the document
19  that's immediately behind Section 3(a), so that
20  would be the fourth page of the exhibit.
21       A.  Yes.
22       Q.  Do you see that fourth page of the Exhibit
23  2?
24       A.  Yes.
25       Q.  Yes, okay. What is -- have you seen this

Page 33

1  page before?
2       A.  Yes, I have.
3       Q.  What is this?
4       A.  This is the configuration file that would
5  have been on N010 for its NTP configuration.
6       Q.  Is this a document that you printed?
7       A.  Yes.
8       Q.  Is it a true and correct copy of the
9  document that you generated?
10       A.  Yes, it is.
11       Q.  At the top of the document under the --
12  the sixth line down, I see a pound sign and then
13  less than sign at and some other information and
14  then ntp.conf.proto and then some additional
15  information. Do you see that line?
16       A.  Yes, I do.
17       Q.  What does that line mean?
18       A.  Well, this denotes this file as being the
19  NTP configuration prototype.
20       Q.  When you say "NTP configuration
21  prototype," what is that?
22       A.  Well, when the system would have come from
23  the vendor, the operating system, that is, it would
24  have come with this file, and it probably would have
25  been blank. So this serves as the prototype. It's

# EXHIBIT L

## Memorandum of Activity concerning the Treasury Office of Inspector General's Interview of Jill Cetina (November 7, 2001)



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview<br>[ ] Telephone Contact<br>[ ] Records Review<br>[ ] Other (Describe): | 2002-0104<br>Date:<br>November 7, 2001<br>Time:<br>4:30 p.m. | Michael Knorr, Investigator  *Michael C. Knorr* |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Jill Cetina**<br>**International Economist**<br>**Office of Foreign Exchange Operations**<br>**Department of the Treasury**<br>**Washington, DC** | Department of the Treasury<br>Office of General Counsel<br>1500 Pennsylvania Avenue, NW<br>Washington, DC |

On the above date and time, the above listed subject was interviewed by attorneys Andrew Sporkin (202/942-4800) and Rosemary Filou (202/942-4768) of the Division of Enforcement, United States Securities and Exchange Commission (SEC) in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend issuance of the Treasury 30-year bond, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference held at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury, however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

Jill Cetina stated she has worked as an international economist for Treasury for the past four years. She provides market analysis to Treasury through contacts with bond traders and brokerage market strategists. She said on October 31, 2001, she was on duty at 5:30 a.m. working the "market room." She said she became aware of the decision to suspend sales of the 30-year bond approximately 30 minutes prior to the official announcement.

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103622

## MEMORANDUM OF ACTIVITY

Cetina was asked if she had received any earlier information of the elimination of the 30-year bond. She said she had heard speculation, on the part of bond market strategists, that it might be eliminated. Specifically, she said, a week or two prior to the announcement, she spoke with Drew Matus, a market strategist for Lehman Brothers Inc. in New York. She said that Matus predicted that Treasury would eliminate the 30-year bond. She thought he was "going out on a limb with that type of speculation."

Cetina said she was monitoring the bond market at the time the announcement on the 30-year bond was made. She said she was aware of the early Web site posting. She said she first noticed price increases on the long bond at 9:35 a.m. She said at 10:00 a.m., the time of the official announcement, there was a "big rally" in the bond price.

Cetina said when she first heard of the elimination of the 30-year bond, 30 minutes prior to the announcement, she was aware it was market sensitive information. She said she was aware of the embargo and added that she spoke to no one between 9:00 a.m. and 10:00 a.m. on October 31, concerning the suspension of sales of the 30-year bond.

Reviewed by: _____ Date: 12/3/01

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is **FOR OFFICIAL USE ONLY**, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 11/30/01
Form OI-09

Office of the Inspector General — Investigations
Department of the Treasury

SECNOTH00103623

# EXHIBIT M

## Cited Excerpts from the Deposition Transcript of Brian Collins (May 12, 2006)

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - X

UNITED STATES SECURITIES AND      :

EXCHANGE COMMISSION,              :

   Plaintiff,        :

  V.            :    Civil Action No.

STEVEN E. NOTHERN,          :    05-10983(NMG)

   Defendant.       :

- - - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 12, 2006

  Videotape Deposition of BRIAN COLLINS, a

witness herein, called for examination by counsel for

the Defendant in the above-entitled matter, pursuant

to notice and subpoena, the witness being duly sworn

by PENNY M. DEAN, a Notary Public in and for the

District of Columbia, taken at the law offices of

Foley Hoag, LLP, 1875 K Street, NW, Washington, D.C.,

at 10:44 a.m., Friday, May 12, 2006, and the

proceedings being taken down by Stenotype by PENNY M.

DEAN, RPR, and transcribed under her direction.

Page 2

```
 1  APPEARANCES:
 2
 3     On behalf of the Plaintiff:
 4        ERICA Y. WILLIAMS, ESQ.
 5        JOHN J. ROSSETTI, JR., ESQ.
 6        U.S. Securities and Exchange Commission
 7        100 F Street, NE
 8        Washington, D.C.  20549-4010
 9        (202) 551-4450
10        (202) 551-4819
11
12     On behalf of the Defendant:
13        JOHN A. SHOPE, ESQ.
14        Foley Hoag, LLP
15        Seaport World Trade Center West
16        155 Seaport Boulevard
17        Boston, MA  02210-2600
18        (617) 832-1000
19
20     On behalf of the witness:
21        JAMES RITTINGER, ESQ.
22        Satterlee, Stephens, Burke & Burke
23        230 Park Avenue
24        New York, NY  10169-0079
25        (212) 818-9200
```

Page 4

```
 1              C O N T E N T S
 2  WITNESS          EXAMINATION BY COUNSEL FOR
 3  BRIAN COLLINS         PLAINTIFF    DEFENDANT
 4  By Mr. Shope                 6
 5  By Ms. Williams             72
 6
 7              E X H I B I T S
 8  COLLINS EXHIBIT NO.              PAGE NO.
 9  1 Subpoena                       10
10  2 Letter to Collins from SEC         59
11  3 Document containing page Bates numbered 62
12    SEC NOTH 00103667
13  4 Unidentified document          65
14  5 Press announcement hand out      65
15  6 Letter recounting call to Smith    66
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  ALSO PRESENT:
 3     Rick Sanborn, Videographer
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1       THE VIDEOGRAPHER:  In the United States
 2  District Court for the District of Massachusetts, in
 3  the matter of the United States Securities and
 4  Exchange Commission versus Steven E. Northern -- no,
 5  sorry, Nothern, civil action number 05-10983 (NMG).
 6  This is the deposition of Brian Collins.  The date is
 7  May 12th, 2006.  The location of the deposition is
 8  the offices of Foley Hoag L.L.P., 1875 K Street,
 9  Northwest, Washington, D.C.
10       Noticing the deposition on behalf of the
11  defendant is John Shope, Esquire.  Appearing on
12  behalf of the SEC are Erica Williams, Esquire, and
13  John Rossetti, Esquire.  Appearing on behalf of the
14  witness is James Rittinger, Esquire.
15       The officer before whom this videotaped
16  deposition is taken and sworn by is Penny Dean.  The
17  video camera operator is Rick Sanborn, representing
18  Alderson Reporting Company, 1111 14th Street
19  Northwest, Washington, D.C.  This videotaped
20  deposition commences at 10:44:54 a.m.  Please swear
21  in the witness.
22  Whereupon,
23            BRIAN COLLINS,
24  residing at 2405 Dexter Avenue, Silver Spring,
25  Maryland, was called as a witness by counsel for the
```

Page 66

1    Q.    I believe you testified before that you
2    recalled receiving a press announcement hand out on
3    October 31, 2001, correct?
4    A.    Yes.
5    Q.    As best you recall, is Exhibit 5 a copy of
6    what you received on that date?
7    A.    It looks very much like it.
8            (Exhibit No. 6 was marked for
9            identification.)
10   BY MR. SHOPE:
11   Q.    And just to save time, Mr. Collins, you're
12   welcome to read the entire Exhibit 6, but I'm going
13   to be asking you about the bottom paragraph on the
14   first page, and then the top of the second page. And
15   just let me know when you're ready. All set?
16   A.    Yes.
17   Q.    First of all, Exhibit 6 recounts a call
18   from you to Janice Smith. And the letter, which is
19   Exhibit 6, states that this occurred approximately
20   9:35 a.m., is that consistent with your own memory?
21   A.    No.
22   Q.    That your call to her was some time before
23   10 o'clock that day, correct?
24   A.    Correct.
25   Q.    So when you say it's not consistent with

Page 67

1    your memory, what's -- what are you disagreeing with?
2    This is specifically on the 9:35 a.m. piece, we'll
3    break it down into bits and pieces.
4    MR. RITTINGER: I object to the use of the
5    word or the form of disagreeing. I don't think it's
6    a disagreement, I think it's just a different
7    recollection.
8    BY MR. SHOPE:
9    Q.    Okay, I'm asking -- basically, what I'm
10   asking for is just to get as best your memory I can.
11   And I recognize that this was five years ago, so I
12   understand that we're testing your memory to the
13   limit here. I just -- what I'm trying to get at is,
14   what's your best memory as to when it was that you
15   called Ms. Smith at Fannie Mae?
16   A.    I would guess it would had to have been at
17   least about 10:45 or 10:50. I mean 9:45 to 9:50.
18   Q.    And you're basing that on what?
19   A.    I'm basing it on the fact that I walked
20   back from the Treasury Department, got into any
21   office, I think I as I mentioned I talked to
22   Mr. Muolo for at least a minute or something. I sat
23   down and tried to write something first, and it just
24   didn't have much pizzazz to it. I went over and
25   looked at the TV, CNBC. And then I put -- I figured

Page 68

1    I'd try to call somebody, see if I can get some
2    comment.
3    Q.    By the way, was there a reason why it was
4    Fannie Mae in particular?
5    A.    They are a big mortgage company.
6    Q.    And I apologize if I asked you this
7    before, but had you heard anything about the possible
8    suspension of the long bond before October 31, 2001?
9    A.    I can't recall.
10   Q.    Now, there's reference here to a Lesia or
11   Lesia Bullock, media relations manager; do you see
12   that?
13   A.    Um-hum, yes.
14   Q.    Do you know Ms. Bullock?
15   A.    I'm not sure, I don't think so.
16   Q.    And so did you have any awareness that she
17   was at all privy to what you were saying on October
18   31, 2001?
19   A.    No.
20   Q.    Okay, okay. And I take it nobody from
21   Fannie Mae ever called you back with any kind of a
22   comment, right?
23   A.    No.
24   Q.    Did you make any notes of your -- the
25   message that you had left for Ms. Smith?

Page 69

1    A.    No.
2    Q.    Did you make any notes of your discussion
3    with Mr. -- with your executive editor?
4    A.    No.
5    Q.    Okay. And did you take any notes at the
6    press conference itself?
7    A.    Geez, I don't remember. I don't think I
8    even got a chance to sit down.
9    Q.    Was that because it was standing room only
10   in the room where the press conference was being
11   conducted?
12   A.    I know I was in the back, that's for sure.
13   Q.    So in other words, you came in late, you
14   were in the back, and at least there weren't any
15   chairs that were in close proximity to somebody
16   coming in at the back?
17   A.    I just don't remember sitting down.
18   Q.    But, I mean -- well, let me put it this
19   way, would it have been your preference to sit if
20   there had been an open chair that was readily
21   accessible?
22   MR. ROSSETTI: Objection.
23   THE WITNESS: I don't know. Usually I do
24   sit down at press conferences.
25   BY MR. SHOPE: