# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>STEVEN E. NOTHERN,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No. 05-10983 (NMG)** |

### DECLARATION OF ROBERT E. TOONE FILED IN SUPPORT
### OF DEFENDANT'S REPLY MEMORANDUM IN SUPPORT
### OF HIS OBJECTIONS TO MAGISTRATE JUDGE'S ORDER

Robert E. Toone, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.  I am an attorney for Steven E. Nothern in the above-referenced matter. I am a member of the Massachusetts bar and the bar of this Court. I make this declaration based upon my own personal knowledge, upon public records, and upon the documents related to this action.

2.  True and correct excerpts from the deposition transcript of Brian Collins (May 12, 2006) are attached hereto as Exhibit A.

3.  True and correct excerpts from the SEC deposition transcript of Steven E. Nothern (Dec. 4, 2001) are attached hereto as Exhibit B.

4.  A true and correct copy of a letter from Richard K. Delmar, Counsel to the Inspector General, and Thomas M. McGivern, Assistant to the General Counsel, at the Department of the Treasury, to Robert Toone at Foley Hoag LLP, dated February 23, 2007, is attached hereto as Exhibit C.

5.    A true and correct copy of an unredacted e-mail exchange between Tony Fratto and Megan Hills on November 15, 2001, as produced by Treasury in its FOIA response on February 23, 2007 (FOIA Doc. Nos. 630-33), is attached as Exhibit D.

6.    A true and correct copy of a redacted e-mail exchange between Tony Fratto and Megan Hills on November 15, 2001, as produced by Treasury in its *Touhy* production to the SEC and Nothern (Doc. Nos. TREAS-00024-27), is attached as Exhibit E.

7.    A true and correct copy of a FOIA appeal to Treasury submitted by Robert E. Toone at Foley Hoag LLP on behalf of Steven Nothern on March 1, 2007 is attached hereto as Exhibit F.

8.    A true and correct copy of a letter from Kathy J. Lyerly, SAIC, United States Secret Service, Department of Homeland Security, to Foley Hoag LLP, dated February 1, 2007, is attached hereto as Exhibit G.

9.    A true and correct copy of a memorandum written by Sgt. John F. Muskett, United States Secret Service, dated November 6, 2001, is attached hereto as Exhibit H.

10.    A true and correct copy of a letter from Robert E. Toone at Foley Hoag LLP to Kathy J. Lyerly, SAIC, United States Secret Service, Department of Homeland Security, dated March 2, 2007, is attached hereto as Exhibit I.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 7, 2007.

_____
Robert E. Toone

# EXHIBIT A

## Cited Excerpts from the Deposition
## Transcript of Brian Collins
## (May 12, 2006)

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - X

UNITED STATES SECURITIES AND    :

EXCHANGE COMMISSION,            :

       Plaintiff,              :

    V.                          :    Civil Action No.

STEVEN E. NOTHERN,              :    05-10983(NMG)

       Defendant.              :

- - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 12, 2006

     Videotape Deposition of BRIAN COLLINS, a

witness herein, called for examination by counsel for

the Defendant in the above-entitled matter, pursuant

to notice and subpoena, the witness being duly sworn

by PENNY M. DEAN, a Notary Public in and for the

District of Columbia, taken at the law offices of

Foley Hoag, LLP, 1875 K Street, NW, Washington, D.C.,

at 10:44 a.m., Friday, May 12, 2006, and the

proceedings being taken down by Stenotype by PENNY M.

DEAN, RPR, and transcribed under her direction.

Page 66

1    Q.   I believe you testified before that you
2  recalled receiving a press announcement hand out on
3  October 31, 2001, correct?
4    A.   Yes.
5    Q.   As best you recall, is Exhibit 5 a copy of
6  what you received on that date?
7    A.   It looks very much like it.
8         (Exhibit No. 6 was marked for
9         identification.)
10   BY MR. SHOPE:
11   Q.   And just to save time, Mr. Collins, you're
12 welcome to read the entire Exhibit 6, but I'm going
13 to be asking you about the bottom paragraph on the
14 first page, and then the top of the second page.  And
15 just let me know when you're ready.  All set?
16   A.   Yes.
17   Q.   First of all, Exhibit 6 recounts a call
18 from you to Janice Smith.  And the letter, which is
19 Exhibit 6, states that this occurred approximately
20 9:35 a.m., is that consistent with your own memory?
21   A.   No.
22   Q.   That your call to her was some time before
23 10 o'clock that day, correct?
24   A.   Correct.
25   Q.   So when you say it's not consistent with

Page 67

1  your memory, what's -- what are you disagreeing with?
2  This is specifically on the 9:35 a.m. piece, we'll
3  break it down into bits and pieces.
4         MR. RITTINGER:  I object to the use of the
5  word or the form of disagreeing.  I don't think it's
6  a disagreement, I think it's just a different
7  recollection.
8         BY MR. SHOPE:
9    Q.   Okay, I'm asking -- basically, what I'm
10 asking for is just to get as best your memory I can.
11 And I recognize that this was five years ago, so I
12 understand that we're testing your memory to the
13 limit here.  I just -- what I'm trying to get at is,
14 what's your best memory as to when it was that you
15 called Ms. Smith at Fannie Mae?
16   A.   I would guess it would had to have been at
17 least about 10:45 or 10:50.  I mean 9:45 to 9:50.
18   Q.   And you're basing that on what?
19   A.   I'm basing it on the fact that I walked
20 back from Treasury Department, got into any
21 office, I think I as I mentioned I talked to
22 Mr. Muolo for at least a minute or something.  I sat
23 down and tried to write something first, and it just
24 didn't have much pizzazz to it.  I went over and
25 looked at the TV, CNBC.  And then I put -- I figured

Page 68

1  I'd try to call somebody, see if I can get some
2  comment.
3    Q.   By the way, was there a reason why it was
4  Fannie Mae in particular?
5    A.   They are a big mortgage company.
6    Q.   And I apologize if I asked you this
7  before, but had you heard anything about the possible
8  suspension of the long bond before October 31, 2001?
9    A.   I can't recall.
10   Q.   Now, there's reference here to a Lesia or
11 Lesia Bullock, media relations manager; do you see
12 that?
13   A.   Um-hum, yes.
14   Q.   Do you know Ms. Bullock?
15   A.   I'm not sure, I don't think so.
16   Q.   And so did you have any awareness that she
17 was at all privy to what you were saying on October
18 31, 2001?
19   A.   No.
20   Q.   Okay, okay.  And I take it nobody from
21 Fannie Mae ever called you back with any kind of a
22 comment, right?
23   A.   No.
24   Q.   Did you make any notes of your -- the
25 message that you had left for Ms. Smith?

Page 69

1    A.   No.
2    Q.   Did you make any notes of your discussion
3  with Mr. -- with your executive editor?
4    A.   No.
5    Q.   Okay.  And did you take any notes at the
6  press conference itself?
7    A.   Geez, I don't remember.  I don't think I
8  even got a chance to sit down.
9    Q.   Was that because it was standing room only
10 in the room where the press conference was being
11 conducted?
12   A.   I know I was in the back, that's for sure.
13   Q.   So in other words, you came in late, you
14 were in the back, and at least there weren't any
15 chairs that were in close proximity to somebody
16 coming in at the back?
17   A.   I just don't remember sitting down.
18   Q.   But, I mean -- well, let me put it this
19 way, would it have been your preference to sit if
20 there had been an open chair that was readily
21 accessible?
22         MR. ROSSETTI:  Objection.
23         THE WITNESS:  I don't know.  Usually I do
24 sit down at press conferences.
25         BY MR. SHOPE:

18  (Pages 66 to 69)



EXHIBIT
Collins
5/12/06 PMP

Ann M. Kappler

Senior Vice President and
General Counsel
Legal Department

3900 Wisconsin Avenue, NW
Washington, DC 20016-2892
202 752 4850
202 752 4439 (fax)
ann_kappler@fanniemae.com

December 7, 2001

CONFIDENTIAL TREATMENT REQUESTED
PURSUANT TO 17 C.F.R. § 200.83

<u>Via Facsimile and First-Class Mail</u>

Mr. William M. Hathaway
Senior Counsel
Division of Enforcement
United States Securities and Exchange Commission
450 Fifth St., N.W.
Washington, D.C. 20549-8505

Re: In the Matter of Trading in Certain Treasury Issues (HO-09353-A)

Dear Mr. Hathaway:

This letter is in response to your letter request to Fannie Mae dated November 9, 2001 regarding the above-captioned matter. In accordance with Fannie Mae's letter to you dated November 16, 2001, set forth below is a chronological summary of the actions and communications of Fannie Mae personnel on October 31, 2001, prior to 10:00 a.m., concerning the decision of the U.S. Department of Treasury to suspend issuance of the 30-year bond ("the suspension decision") and the details of Fannie Mae's sole transaction in U.S. Treasury securities on October 31, 2001. The summary set forth below is based on our interviews of all those who we reasonably believe to be knowledgeable about the underlying events. We have not interviewed everyone who might potentially have been in a position to hear others discussing the relevant events, and the time periods of the events described are based on reconstructed recollections and on estimates. We believe this summary is a fair and accurate description and is responsive to the questions you have asked. If we become aware of additional information relevant to this matter, we will advise you promptly.

Chronology of Actions and Communications

At approximately 9:35 a.m., Janis Smith, Director---Financial Communications, received a call from Brian Collins, a reporter at *National Mortgage News*. Mr. Collins informed Ms. Smith that he had attended a press briefing at the U.S. Department of Treasury regarding the suspension decision. He told Ms. Smith that the information was "embargoed" until 10:00 a.m., but he wanted to know what comment (specifically from an economic viewpoint) Fannie Mae would have regarding the news. He also informed

SECNOTH00115338

Ms. Smith that an official press release would be issued by the U.S. Department of Treasury at around 10:00 a.m. Lesia Bullock, Media Relations Manager, was present in Ms. Smith's office and overheard the conversation, as it took place on speaker phone.

Between about 9:40 and 9:45 a.m., Ms. Smith contacted John The Losen, Vice President of Debt Marketing, Jennifer Ibo, Director – Regulatory Policy, and Orawin Velz, Senior Economist, to inform them of her conversation with Mr. Collins and to request their comments or views on the matter. She told them the information was embargoed until 10:00 a.m. and that she would forward a copy of the official press release to them as soon as she received it.

At approximately 9:45 a.m., Ms. Smith checked the U.S. Treasury Web site and discovered that the formal announcement of the suspension decision had already been posted and was marked "FOR IMMEDIATE RELEASE". She printed the announcement and reviewed it. At 9:53 a.m., Ms. Smith sent the release via email to Mr. The Losen, Ms. Iba and Ms. Velz.

Prior to receiving the release, between about 9:45 and 9:50 a.m., Mr. The Losen separately approached Ursula O'Donnell, Director – Hedging, Nadine Bates, Director – Long-term Funding, Ken Barnes, Director – Liquid Investment Portfolio, and Thomas Lawler, Senior Vice President – Portfolio Management. Mr. The Losen told them of his conversation with Ms. Smith and stated that he was not certain that the information was accurate but that he would forward any formal announcement to them. Although Mr. The Losen directed his remarks to the individuals mentioned above, he did not address them privately, making it possible for persons in the near vicinity to overhear him. Mr. The Losen's remarks to Ms. O'Donnell were overheard by Matt Johnson, a trader who works for Ms. O'Donnell.

After speaking to Mr. The Losen, at approximately 9:50 a.m., Ms. O'Donnell called David Light, a salesperson at Salomon Smith Barney Inc., and asked him whether he had heard any general rumors regarding the Treasury market that morning. She did not reveal the details of her conversation with Mr. The Losen, nor indicate that Fannie Mae had any information regarding the suspension decision. Mr. Light told her that he had not heard anything new, just usual rumors of the elimination of the 30-year Treasury bond and a possible change in the frequency of the 5-year Treasury note auctions. Subsequently, Joe Anderson, a salesperson from Merrill Lynch & Co., called Ms. O'Donnell and asked her if she had heard any rumors or confirmation of the elimination of the 30-year Treasury bond. Ms. O'Donnell said she did not have any information on the subject.

At about the same time that Ms. O'Donnell had these conversations, Matt Johnson called Michael Furman, a salesperson at Credit Suisse First Boston Corporation, and asked him if he had seen any formal announcement regarding the elimination of the 30-year U.S. Treasury bond. Mr. Furman replied that he had heard the rumor but had not received any confirmation of its validity. Mr. Johnson also called Don Clark at Goldman, Sachs & Co. with the same question. Mr. Clark also had heard the rumor but had no confirmation of its validity. Mr. Johnson did not reveal that Fannie Mae had received any information

SECNOTH00115339

regarding the suspension decision in either conversation.  Following these phone calls, another Fannie Mae trader, Robert Dolecki, asked Mr. Johnson whether he had received any information regarding the potential suspension decision.  Mr. Johnson informed Mr. Dolecki of what Mr. The Losen had told Ms. O'Donnell, but told him that he still did not know whether the information was true.  During this time, Deborah Perelmuter, Senior Vice President at the Federal Reserve Bank of New York, was meeting with Mr. Dolecki and others in the trading room to discuss Fannie Mae's trading technology.  Ms. Perelmuter likely overheard the exchange between Mr. Johnson and Mr. Dolecki or other conversations regarding the news report.

Also around the same time, Mr. Lawler checked the news wires (Reuters, Bloomberg and others) to see if there was any confirmation of the information that Mr. The Losen had shared with him.  He did not see any relevant headlines.  Mr. Lawler also spoke to a few of his senior traders and informed them of his conversation with Mr. The Losen, advising them that he still did not know whether the information was true.  One of his traders, Jack Scott, told Mr. Lawler that he had heard a similar rumor.

Also during this time, Mr. Ken Barnes called a salesperson at Morgan Stanley & Co. Incorporated, Thomas McCaffrey, and asked him if he had heard anything regarding a decision by the U.S. Treasury to suspend issuance of the 30-year bond.  Mr. Barnes did not reveal the details of his conversation with Mr. The Losen, nor indicate that Fannie Mae had any information regarding the suspension decision.  Mr. McCaffrey said that he would check with his economist, David Greenlaw, and would call back Mr. Barnes.  Mr. McCaffrey promptly called back Mr. Barnes and told him that while Morgan Stanley had not received any confirmation of the news, it was Mr. Greenlaw's opinion that the information was false.  Mr. Barnes told a number of traders in the area that Morgan Stanley had told him that the rumor was false.

Nadine Bates did not have any communications or take any actions regarding the potential suspension decision following her conversation with Mr. The Losen.

Shortly after 9:53 a.m., Mr. The Losen, Ms. Iba and Ms. Velz received the e-mailed press release from Ms. Smith.  Ms. Iba replied to Ms. Smith that Fannie Mae should make no formal comment to the press regarding the announcement. (It is common practice at Fannie Mae for public announcements to be cleared first with the Regulatory Policy department.)  Ms. Smith called Ms. Velz and left her a voicemail regarding Ms. Iba's instructions.  (Ms. Smith also sent Ms. Velz an e-mail to that effect.)  Ms. Smith also called Mr. The Losen and conveyed the same instructions to him.  Accordingly, neither Ms. Velz nor Mr. The Losen made any comment regarding the suspension decision to any news service, nor did they discuss the suspension decision with anyone else outside of Fannie Mae prior to 10:00 a.m.

Between 9:55 and 10:00 a.m., Mr. The Losen printed the release and distributed it by hand to Ms. O'Donnell, Mr. Barnes, Ms. Bates and Mr. Lawler. At Ms. Smith's request, Mr. The Losen also faxed a copy to Frank Raines, Chairman and Chief Executive

3

SECNOTH00115340

Officer, and Linda Knight, Senior Vice President and Treasurer, who were traveling in Asia on business.

At 10:00 a.m., several Fannie Mae traders saw reports on the news wires regarding the suspension decision. To the best of our knowledge, no Fannie Mae employee made any comment regarding the suspension decision to any member of the press.

<u>Transaction in U.S. Treasury Securities</u>

As discussed in our letter of November 16, 2001, Fannie Mae executed only one trade in Treasury instruments, a short sale, on October 31, 2001. Attached is a "Debt Order Form" which Fannie Mae's portfolio transactions area uses to instruct the Treasurer's Office to hedge Fannie Mae debt issuance. The Debt Order Form is time-stamped when received by the Treasurer's Office. The attached Debt Order Form was time-stamped "11:05 a.m." Shortly after 11:05 a.m., Mr. Johnson executed a short sale of $100 million 10-year U.S. Treasury notes as a hedge of future debt issuance. Fannie Mae executed the sale with Salomon Smith Barney Inc. Fannie Mae neither purchased nor sold any additional U.S. Treasury securities or derivatives thereof on October 31, 2001.

Please do not hesitate to contact me at (202) 752-4850 or Scott Lesmes at (202) 752-7801 if you have any questions regarding this letter or require any further information.

Sincerely,

4

# EXHIBIT B

## Cited Excerpts from the SEC
## Deposition Transcript of Steven E. Nothern
## (Dec. 4, 2001)

Page 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:        )
TRADING IN CERTAIN       )
TREASURY ISSUES          )    File No. HO-9353

WITNESS:  Steven E. Nothern

PAGES:    1 through 213

PLACE:    Securities & Exchange Commission
          450 5th Street, N.W. - Room 11602
          Washington, D.C. 20549

DATE:     Wednesday, November 28, 2001

          The above-entitled matter came on for hearing at
10:38 a.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

          ANDREW SPORKIN, ESQ.
          WILLIAM M. HATHAWAY, ESQ.
          Securities & Exchange Commission
          450 5th Street, N.W.
          Washington, D.C. 20549
          (202) 942-4613

On behalf of the Witness:

          JACK PIROZZOLO, ESQ.
          NICHOLAS THEODOROU, ESQ.
          Foley, Hoag, & Eliot
          One Post Office Square
          Boston, Mass., 02109.

Page 2

                    C O N T E N T S

WITNESS:                                          Page

Steven Nothern                                      3

EXHIBITS:    DESCRIPTION                  IDENTIFIED

222          Subpoena, nine-page document        5

223          Three-page Letter from the SEC,
             includes subpoena duces tecum      13

224          1/2 floor plan for 23rd floor
             on Boylston Street                 38

225          Other 1/2 of floor plan for 23rd
             floor on Boylston Street           38

226          Bloomberg message from WI Partners
             and RJ O'Brien & Associates       166

227          ITMO Trading in Certain Treasury Issues  167

228          Five page document; M-000113, 114, 114A,
             115 through M-116                  173

229          Legal and regulatory update by Steve
             Cavan                              184

230          MFS Co. statement of policy on Personal
             Securities Transactions           190

231          MFS Statement of Guidelines       191

Page 3

1          P R O C E E D I N G S
2    MR. HATHAWAY:  We are on the record.  It's
3  approximately 10:30.  This is December 4, 2001.  Would you
4  raise your right hand, sir?
5  Whereupon,
6          STEVEN E. NOTHERN
7  was called as a witness and, having been first duly sworn by
8  the, was examined and testified as follows:
9          EXAMINATION
10  BY MR. HATHAWAY:
11    Q  Would you please state and spell your full name for
12  the record?
13    A  Steven Eric Nothern -- S-t-e-v-e-n -- Eric --
14  Nothern -- N-o-t-h-e-r-n.
15    Q  Thank you.  I am William Maxwell Hathaway.  I go by
16  Max.  I will be joined shortly by my branch chief on this
17  project, Andrew Sporkin.  Both Andrew Sporkin and myself are
18  officers of the Commission for the purposes of this
19  proceeding.
20          This is an investigation by the United States
21  Securities and Exchange Commission.  It's:  In the Matter of
22  Trading in Certain Treasury Issues.  Our file number is --
23  HO-9353.
24          It is an investigation is to determine whether
25  there have been any violations of the federal securities

Page 4

1  laws.
2          However the evidence adduced in this investigation
3  or today's testimony session might constitute violations of
4  other state or federal, civil or criminal statutes.
5          Prior to the opening of the record, which means
6  prior to our actually going the tape recorder on and
7  beginning here today, you were provided with a copy of the
8  formal order of investigation which is in front of you here
9  and I am touching it as I speak.
10          This copy of the formal order will remain available
11  for your examination throughout the course of today's
12  testimony session.
13          Have you had an opportunity to review the formal
14  order of investigation?
15    A  Yes, I have.
16    Q  You were also provided prior to the opening of the
17  record with a copy Exhibit No. 202, which is a copy of the
18  Commission's Form 1662.
19          Have you had an opportunity to read Exhibit No.
20  202?
21    A  Yes, I have.
22    Q  Do you at this time have any questions at this time
23  concerning this exhibit?
24    A  No.
25    Q  Mr. Nothern, are you represented by counsel?

Page 1 - Page 4

SECNOTH00117214

Page 97

1   Q  Did you know how information is disseminated at a
2   conference, refunding conference?
3   A  I don't.
4   Q  Did you know whether people were given press
5   releases?
6   A  I don't.
7   Q  Do you know whether persons attending a conference
8   are given reports of any nature?
9   A  I don't know.  Can I add one thing?
10  Q  Yes.
11  A  I am familiar with the fact that they distribute a
12  press release, because I've had those faxed to me.
13  Q  Do you know whether or not that distribution of the
14  press release occurred at the conference or --
15  A  That's what I don't know.
16  BY MR. SPORKIN:
17  Q  How did you get the faxes?
18  A  Mr. Davis would fax those after the quarterly
19  refunding announcements.  I've seen them before.
20  BY MR. HATHAWAY:
21  Q  Do these faxes occur the day of the conference or
22  the day after or --
23  A  I would guess same day.
24  Q  Why do you guess that?
25  A  Because I don't know specifically when they come

Page 98

1   in.
2   Q  Do you know whether there are any live feeds to the
3   media at a quarterly refunding conference?
4   A  No, I don't.
5   Q  Does CSPAN cover these conferences?
6   A  Not to my knowledge.
7   Q  Does CNN cover these conferences?
8   A  Not to my knowledge.
9   Q  Does any media or news service provide live
10  coverage of these conferences?
11  A  Not to my knowledge.
12  Q  Do persons attending a refunding conference receive
13  information from Treasury before Treasury makes it generally
14  available to the public?
15  A  I don't know the process.
16  Q  Are any restrictions placed on the ability of
17  persons to use the information that they receive from
18  Treasury at the refunding conference?
19  A  Not to my knowledge.
20  Q  Do persons receiving such information have to wait
21  any wait any amount of time before passing this information
22  along to others?
23  A  Not to my knowledge.
24  Q  Have you ever heard the term "embargo,"
25  e-m-b-a-r-g-o, as it relates to information?

Page 99

1   MR. THEODOROU:  As of what date?
2   BY MR. HATHAWAY:
3   Q  As of today, have you heard that term "embargo"
4   used in the context of information?
5   A  Yes.
6   Q  What does it mean to you, as you sit here today?
7   A  With regards to the Treasury, I don't know what it
8   means.  To me it's a term that applies to the press.
9   Q  What does it mean to you in terms of that?
10  A  Other departments, and I know Labor Department
11  specifically, so one other department, has a process for
12  release of what they deem to be market sensitive information
13  whereby they actually lock the press in a room, it's my
14  understanding at Labor Department, for releases such as the
15  employment report, and they also release the CPI report.
16  They give information to the press, and the doors
17  aren't unlocked at a point in, and also has access, to my
18  understanding, electronic media.  So they can actually digest
19  the information they're being given and write their story.
20  But there is some sort of mechanism whereby it
21  doesn't get filed with the home office, or whatever their
22  process -- you know, the reporter's procedures are, until
23  there's some sort of release of the electronic media.
24  So I think the Labor Department controls both the
25  physical environment and the electronic dissemination of the

Page 100

1   report, but they want to give them time to construct their
2   stories that will hit the wires.
3   Q  How did you learn of this process at Labor?
4   A  Specifically, it's just general knowledge.
5   Q  How long have you known this?
6   A  I don't know.  Specifically, it's just general
7   knowledge.
8   Q  Have you known this for at least a year?
9   A  Oh, yes.
10  Q  Five years?
11  A  I don't know the answer.
12  Q  It is your testimony that you've known for at least
13  a year that the Labor Department used the process you just
14  testified to when it came to releasing market sensitive
15  information?
16  A  Yes.
17  Q  How does the term "embargo, in your mind, fit in
18  that context that you just testified to?
19  A  That process is described as an embargo process.
20  BY MR. SPORKIN:
21  Q  Are you aware of any other U.S. agencies or
22  departments that use this process?
23  A  No, I'm not.
24  Q  Do you know whether the Federal Reserve uses this
25  process in releasing interest rates?

Page 97 - Page 100

SECNOTH00117238

EXHIBIT C


**Letter from Richard K. Delmar, Counsel to the
Inspector General, and Thomas M. McGivern,
Assistant to the General Counsel, at the Department of the
Treasury, to Robert Toone at Foley Hoag LLP
(Feb. 23, 2007)**



# DEPARTMENT OF THE TREASURY
## WASHINGTON, D.C. 20220

February 23, 2007

**BY E-MAIL**

Robert Toone
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2600

Re: Freedom of Information Act Request No. 2005-11-046

Dear Mr. Toone:

We received your letter dated January 23, 2007, in which you appealed Treasury's partial response to the November 11, 2005 Freedom of Information Act (FOIA) request submitted by Kevin Currid.

Treasury made an initial production to this FOIA request on June 13, 2006. Enclosed with this letter is Treasury's final production to the November 11, 2005 FOIA request. For clarity, a Bates labeled copy of the June 13, 2006 production is included in this final production.

In responding to this FOIA request, Treasury staff: recalled hard-copy documents from off-site storage; restored the e-mail accounts of former employees to search for potentially responsive electronic documents; and extensively searched a significant amount of hard-copy and electronic files at Treasury. With this production, Treasury is releasing 738 pages that were found to be responsive to the request, including 603 pages released in full, and 135 pages that are partially released. Included within this material being released are discretionary disclosures of some otherwise exempt material. Treasury is withholding 137 pages of materials in full. Information has been withheld pursuant to Treasury's authority under 5 U.S.C. § 552(b)(5), (b)(6), and (b)(7). No other responsive records were located. Treasury is not producing to you documents that already were released to you in full by the Securities and Exchange Commission in the fall of 2005.

Because this letter and the enclosed documents constitute Treasury's final production under the November 11, 2005 FOIA request, the appeal of Treasury's production in your January 23, 2007 letter was not yet ripe. However, now that Treasury's production is complete, pursuant to 5 U.S.C. § 552(a)(6)(A), you have the right to appeal the partial denial of the FOIA request. Treasury regulations found at 31 C.F.R. Part 1.5 outline the procedures for appeal. If you wish to appeal, you must do so within 35 days of the date of this letter. Your appeal must be in writing,

signed by you, and should be addressed to:

> Freedom of Information Appeal
> Disclosure Services, DO
> Department of the Treasury
> Washington, D.C. 20220

The appeal should identify November 11, 2005 as the date of the initial request, Treasury FOIA Request No. 2005-11-046, and the date of this final FOIA production letter. If you choose to appeal, the deciding official on your appeal for Treasury Inspector General documents will be Harold Damelin, the Inspector General. For other documents, the deciding official on the appeal will be Bernard J. Knight, Jr., from the Office of the General Counsel.

Sincerely,

Richard K. Delmar
Counsel to the Inspector General

Thomas M. McGivern
Assistant to the General Counsel
(Legislation and Litigation)

cc: Kevin Currid, Esq.
    Foley Hoag LLP

# EXHIBIT D

**Unredacted E-mail Exchange between Tony Fratto and
Megan Hills on November 15, 2001, as Produced by
Treasury in its FOIA response on February 23, 2007**

**From:**        Hills, Megan
**Sent:**        Thursday, November 15, 2001 6:34 PM
**To:**          Fratto, Tony
**Subject:**     RE: Documents for SEC Inquiry


Thank you.  Attached is my reply (let me know if you want any changes,  I will be faxing it later tonight)  Megan

sec4letter.wpd (6
    KB)


-----Original Message-----
**From:**        Fratto, Tony
**Sent:**        Thursday, November 15, 2001 6:10 PM
**To:**          Hills, Megan
**Subject:**     RE: Documents for SEC Inquiry

Wrong paper -- Wall Street Journal - see below

I was asked if this was the first time that someone got into a Treasury press conference.  I replied: "I can't say for certain, but I think it's likely that others in the past have found their way into these things."

Not particularly articulate.  I meant that I think it's very likely that others have gotten into these things in the past.  I think it unlikely that others have not gotten into these things in the past.

I meant that long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years.


Credit Markets:
In Wake of Criticism, Treasury Plans Regulations
Aimed at Stopping Leaks of Market-Moving News
----
By Gregory Zuckerman
Staff Reporter of The Wall Street Journal

The Wall Street Journal via Dow Jones

  The Treasury Department, facing criticism after an industry consultant
attended a press-only briefing last month and leaked market-moving news,
yesterday outlined new rules to try to keep its news under wraps.

  The changes, which some bond traders said were overdue, will bring the
Treasury more in line with the way other government agencies, including the
Federal Reserve and the Labor Department, release market-sensitive news.

  In announcing the changes, Treasury officials acknowledged the recent leak
probably wasn't the first time that someone from outside the press corps found
their way into a Treasury press briefing, raising the possibility that bond
traders have been receiving early word on market-moving news from Treasury for
years.

  "It's likely that others in the past" have participated in press briefings
though they weren't members of the press, said Tony Fratto, a spokesman for the
Treasury Department.

  Some of the changes are quite elementary. Now, for instance, instead of
releasing information to the press an hour or so before it is publicly

                                        1

...the department is shortening the embargo period to a matter of minutes, bringing the Treasury in line with the way the SEC operates.

In addition, the Treasury will require that people attending its briefings show press credentials to get into the room, as the Labor Department does. Until now, a simple piece of identification was enough.

The Treasury has been under fire since Oct. 31, when consultant Peter Davis leaked to his clients news that the government planned to stop selling the 30-year bond. The decision, which Mr. Davis told clients in advance of a Treasury embargo, resulted in the biggest bond-market rally in 14 years. Regulators are investigating the trading activities of his clients.

The new procedures will take effect on Jan. 30, 2002, at the next scheduled quarterly refunding announcement.

"The changes are intended to improve the timeliness and transparency of quarterly refunding announcements," the Treasury said in a statement.

Bond-market executives said the department's changes, while welcome, should have come a long time ago. "They should have done a better job policing their audience," said Bill Kirby, senior vice president at Prudential Securities. "Unfortunately, it's too little, too late. Some serious damage has already been done. Some people [in the bond market] are livid."

After a press-only briefing announcing the decision to stop selling the long bond, Mr. Davis contacted some of his clients, including Goldman Sachs, with the news. In the time between the end of the briefing and an inadvertent posting of the news on the Treasury Web site, trading in the 30-year bond was unusually active, leading some analysts to assume that word had leaked out to some traders.

The Securities and Exchange Commission has launched a probe into the trading activities at Goldman Sachs and those of Mr. Davis's other clients. A spokesman for Goldman Sachs wouldn't comment. While Mr. Davis has said he advised all his clients about the government embargo, he also said that he has been attending Treasury press briefings for years.

As for the posting of the information prematurely on the department's Web site, Treasury Inspector General Jeffrey Rush said last week said he was investigating whether there should be disciplinary action against the Treasury employees involved.

Treasurys

Treasurys prices fell sharply on news of unexpectedly strong retail spending in October. The market also was hurt by sharp early gains in stocks, surging corporate debt issuance and upbeat news about the war in Afghanistan.

At 4 p.m., the benchmark 10-year Treasury note was down 1 4/32 points, or $11.25 per $1,000 face value, at 103 26/32. Its yield rose to 4.511% from 4.372% Tuesday, as yields move inversely to prices.

The 30-year Treasury bond's price fell 1 23/32 points to 105 12/32 for a yield of 5.022%, up from 4.915% Tuesday.

An early catalyst for the selloff was a Commerce Department estimate that retail sales rose 7.1% in October after a revised 2.2% drop in September. Economists had forecast a 2.5% increase in October.

The underlying mood in Treasurys had been very bullish recently, but analysts had cautioned in advance that the sales report could be unfriendly from a bond perspective. Some said afterward that the sales report didn't conclusively show that the economy has recovered.

2

Here are the results of yesterday's Treasury auction of four-week bills. All bids are awarded at a single price at the market-clearing yield. Rates are determined by the difference between that price and the face value.

```
Applications ......................... $42,733,135,000
Accepted bids ........................ $19,000,165,000
Bids at market-clearing yld accepted . 35.86%
Accepted noncompetitively ............ $31,770,000
Accepted frgn noncomp ................ $0
Auction price (Rate) ................. 99.847 (1.970%)
Coupon equivalent .................... 1.998%
Cusip number ......................... 912795HX2
```

The bills are dated Nov. 15 and mature Dec. 13, 2001

Corporate Bonds

AT&T Corp. was preparing a multicurrency deal for today totaling an equivalent of $10.09 billion, increased from an earlier indicated $5 billion size. With demand apparently strong, yield margins were trimmed from earlier indications. A $1.5 billion, five-year portion will likely be priced at a yield of 2.60 percentage points above Treasurys; a $2.75 billion, 10-year part at 2.80 percentage points above Treasurys; and a $2.75 billion, 30-year portion at 2.95 to three percentage points above Treasurys.

Other parts, denominated in euros, will have floating and fixed-rate coupons. The issue is rated single-A-3 by Moody's Investors Service and triple-B-plus by Standard & Poor's Corp. and will be lead-managed by Credit Suisse First Boston, Goldman Sachs and Salomon Smith Barney.

Elsewhere, Singapore Telecommunications was preparing a $2.35 billion-equivalent global offering of Rule 144a securities for today. A $1.35 billion portion of 10-year securities was indicated to yield 1.85 to 1.90 percentage points above Treasurys. Rated single-A-1 by Moody's and double-A-minus by S&P, the offering will be led by Goldman Sachs and Salomon Smith Barney.

Fleet Finance sold $1 billion of global debt through Credit Suisse First Boston, Bear Stearns and Fleet. The five-year securities were priced at a yield of 1.18 percentage points above Treasurys and rated single-A-1 by Moody's and single-A by S&P.

---

Michael Schroeder, Michael S. Derby and Michael C. Barr contributed to this article.

WSJviaNewsEDGE
:PAGE: C13
:TICKER: FBF SGT.SG T
:SUBJECT: BNKE TLLD MA NY SING WSJ COBO GS CMKT UTIL
Copyright (c) 2001 Dow Jones and Company, Inc.
Received by NewsEDGE/LAN: 11/15/2001 3:41 AM

-----Original Message-----
From:   Hills, Megan

3

Thursday, November 15, 2001 5:40 PM

To: Fratto, Tony
Case 1:04-cv-10983-NMG     Document 78-5     Filed 03/13/2007     Page 5 of 5
Subject: RE: Documents for SEC Inquiry

Tony:

Apparently in some article in the Washington Post, there is a quote from you which the SEC infers that you are saying that it is not uncommon for people, other than press, to be in the press conferences. They interpret this to mean private people (not gov't officials or employees). They have asked me to clarify it with you. As delighted as I would be to see your name in print, I could not find the article, but I am passing the request along in the hopes that you have had it framed for your personal collection. What did you mean by whatever you said? How's that for a legal question. Megan

4

**EXHIBIT E**

**Redacted E-mail Exchange between Tony Fratto and Megan Hills on November 15, 2001, as Produced by Treasury in its *Touhy* production to the SEC and Nothern**

**Alvarado, Carmen**

| | |
|---|---|
| **From:** | Hills, Megan |
| **Sent:** | Thursday, November 15, 2001 6:34 PM |
| **To:** | Fratto, Tony |
| **Subject:** | RE: ████████████████████ |

Thank you. ████████████████████████████████████████████████████████ Megan



sec4letter.wpd (6 KB)

-----Original Message-----

| | |
|---|---|
| **From:** | Fratto, Tony |
| **Sent:** | Thursday, November 15, 2001 6:10 PM |
| **To:** | Hills, Megan |
| **Subject:** | RE: ████████████████ |

Wrong paper -- Wall Street Journal - see below

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

```
Credit Markets:
In Wake of Criticism, Treasury Plans Regulations
Aimed at Stopping Leaks of Market-Moving News
----
By Gregory Zuckerman
Staff Reporter of The Wall Street Journal
```

The Wall Street Journal via Dow Jones

   The Treasury Department, facing criticism after an industry consultant attended a press-only briefing last month and leaked market-moving news, yesterday outlined new rules to try to keep its news under wraps.

   The changes, which some bond traders said were overdue, will bring the Treasury more in line with the way other government agencies, including the Federal Reserve and the Labor Department, release market-sensitive news.

   In announcing the changes, Treasury officials acknowledged the recent leak probably wasn't the first time that someone from outside the press corps found their way into a Treasury press briefing, raising the possibility that bond traders have been receiving early word on market-moving news from Treasury for years.

   **"It's likely that others in the past"** have participated in press briefings though they weren't members of the press, said Tony Fratto, a spokesman for the Treasury Department.

   Some of the changes are quite elementary. Now, for instance, instead of releasing information to the press an hour or so before it is publicly

1

TREAS-00024

available, the department is shortening the embargo period to a matter of minutes, bringing the Treasury in line with the way the Federal Reserve operates.

In addition, the Treasury will require that people attending its briefings show press credentials to get into the room, as the Labor Department does. Until now, a simple piece of identification was enough.

The Treasury has been under fire since Oct. 31, when consultant Peter Davis leaked to his clients news that the government planned to stop selling the 30-year bond. The decision, which Mr. Davis told clients in advance of a Treasury embargo, resulted in the biggest bond-market rally in 14 years. Regulators are investigating the trading activities of his clients.

The new procedures will take effect on Jan. 30, 2002, at the next scheduled quarterly refunding announcement.

"The changes are intended to improve the timeliness and transparency of quarterly refunding announcements," the Treasury said in a statement.

Bond-market executives said the department's changes, while welcome, should have come a long time ago. "They should have done a better job policing their audience," said Bill Kirby, senior vice president at Prudential Securities. "Unfortunately, it's too little, too late. Some serious damage has already been done. Some people [in the bond market] are livid."

After a press-only briefing announcing the decision to stop selling the long bond, Mr. Davis contacted some of his clients, including Goldman Sachs, with the news. In the time between the end of the briefing and an inadvertent posting of the news on the Treasury Web site, trading in the 30-year bond was unusually active, leading some analysts to assume that word had leaked out to some traders.

The Securities and Exchange Commission has launched a probe into the trading activities at Goldman Sachs and those of Mr. Davis's other clients. A spokesman for Goldman Sachs wouldn't comment. While Mr. Davis has said he advised all his clients about the government embargo, he also said that he has been attending Treasury press briefings for years.

As for the posting of the information prematurely on the department's Web site, Treasury Inspector General Jeffrey Rush said last week said he was investigating whether there should be disciplinary action against the Treasury employees involved.


Treasurys


Treasurys prices fell sharply on news of unexpectedly strong retail spending in October. The market also was hurt by sharp early gains in stocks, surging corporate debt issuance and upbeat news about the war in Afghanistan.

At 4 p.m., the benchmark 10-year Treasury note was down 1 4/32 points, or $11.25 per $1,000 face value, at 103 26/32. Its yield rose to 4.511% from 4.372% Tuesday, as yields move inversely to prices.

The 30-year Treasury bond's price fell 1 23/32 points to 105 12/32 for a yield of 5.022%, up from 4.915% Tuesday.

An early catalyst for the selloff was a Commerce Department estimate that retail sales rose 7.1% in October after a revised 2.2% drop in September. Economists had forecast a 2.5% increase in October.

The underlying mood in Treasurys had been very bullish recently, but analysts had cautioned in advance that the sales report could be unfriendly from a bond perspective. Some said afterward that the sales report didn't conclusively show that the economy has recovered.

2

Four-Week Bills

Here are the results of yesterday's Treasury auction of four-week bills. All bids are awarded at a single price at the market-clearing yield. Rates are determined by the difference between that price and the face value.

```
Applications ........................ $42,733,135,000
Accepted bids ....................... $19,000,165,000
Bids at market-clearing yld accepted . 35.86%
Accepted noncompetitively ........... $31,770,000
Accepted frgn noncomp ............... $0
Auction price (Rate) ................ 99.847 (1.970%)
Coupon equivalent ................... 1.998%
Cusip number ........................ 912795HX2
```

The bills are dated Nov. 15 and mature Dec. 13, 2001


Corporate Bonds


AT&T Corp. was preparing a multicurrency deal for today totaling an equivalent of $10.09 billion, increased from an earlier indicated $5 billion size. With demand apparently strong, yield margins were trimmed from earlier indications. A $1.5 billion, five-year portion will likely be priced at a yield of 2.60 percentage points above Treasurys; a $2.75 billion, 10-year part at 2.80 percentage points above Treasurys; and a $2.75 billion, 30-year portion at 2.95 to three percentage points above Treasurys.

Other parts, denominated in euros, will have floating and fixed-rate coupons. The issue is rated single-A-3 by Moody's Investors Service and triple-B-plus by Standard & Poor's Corp. and will be lead-managed by Credit Suisse First Boston, Goldman Sachs and Salomon Smith Barney.

Elsewhere, Singapore Telecommunications was preparing a $2.35 billion-equivalent global offering of Rule 144a securities for today. A $1.35 billion portion of 10-year securities was indicated to yield 1.85 to 1.90 percentage points above Treasurys. Rated single-A-1 by Moody's and double-A-minus by S&P, the offering will be led by Goldman Sachs and Salomon Smith Barney.

Fleet Finance sold $1 billion of global debt through Credit Suisse First Boston, Bear Stearns and Fleet. The five-year securities were priced at a yield of 1.18 percentage points above Treasurys and rated single-A-1 by Moody's and single-A by S&P.


---

Michael Schroeder, Michael S. Derby and Michael C. Barr contributed to this article.

WSJviaNewsEDGE
:PAGE: C13
:TICKER: FBF SGT.SG T
:SUBJECT: BNKE TLLD MA NY SING WSJ COBO GS CMKT UTIL
Copyright (c) 2001 Dow Jones and Company, Inc.
Received by NewsEDGE/LAN: 11/15/2001 3:41 AM


-----Original Message-----
**From:**  Hills, Megan

3

**Sent:**     Thursday, November 15, 2001 5:40 PM
**To:**      Fratto, Tony
**Subject:** RE:

Tony:

Megan

4

TREAS-00027

# EXHIBIT F

## FOIA Appeal to Treasury Submitted by Robert E. Toone at Foley Hoag LLP on Behalf of Steven Nothern (Mar. 1, 2007)

# FOLEY
# HOAG LLP
ATTORNEYS AT LAW

Robert E. Toone
Boston Office
617.832.1242
rtoone@foleyhoag.com

March 1, 2007

**BY FEDERAL EXPRESS DELIVERY**

Freedom of Information Appeal
Disclosure Services, DO
Department of the Treasury
Washington, DC 20220

Re:     **Appeal of Freedom of Information Act Request No. 2005-11-046
made on behalf of Steven E. Nothern on November 11, 2005**

Dear FOIA Officer:

This is an appeal pursuant to 5 U.S.C. § 552(a)(6) and 31 C.F.R. § 1.5(i), concerning the refusal of the Department of the Treasury ("Treasury") to disclose certain documents within its control.

This firm submitted a Freedom of Information Act ("FOIA") request (No. 2005-11-046) to Treasury on behalf of our client Steven Nothern on November 11, 2005. Ms. Alana Johnson, Director of Disclosure Services, acknowledged receipt of this request in a letter dated November 29, 2005. On June 13, 2006, Mr. Richard K. Delmar from the Office of Inspector General provided us with what he described as "an interim response" to our request.

From approximately June 30 through December 19, 2006, Mr. Thomas M. McGivern and Mr. Christian Furey in the Office of General Counsel produced some responsive documents to us and the Securities and Exchange Commission ("SEC") pursuant to a request by the SEC for substantially the same documents, made at the suggestion of the United States District Court for the District of Massachusetts, in which an action filed by the SEC is pending. That action arises from Treasury's announcement on October 31, 2001 that it would suspend issuance of the 30-year bond. Because this case is currently scheduled for trial in June 2007, the need for Treasury to produce all responsive records is urgent.

In a letter dated December 19, 2006, Mr. McGivern stated that Treasury's response was final. Accordingly, and because Treasury had provided no further response to our FOIA request in the preceding seven months, this firm submitted a FOIA

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 2

appeal on behalf of Steven Nothern on January 23, 2007. Mr. Hugh Gilmore from Treasury's office of Disclosure Services acknowledged receipt of this FOIA appeal on February 1, 2007.

Then, on February 23, 2007, Mr. Delmar and Mr. McGivern sent a letter stating that because Treasury had not yet made its final production in response to our November 11, 2005 FOIA request, "the appeal of Treasury's production in your January 23, 2007 letter was not yet ripe." Mr. Delmar and Mr. McGivern stated that Treasury was now making its final production, which includes a total of 738 pages: "603 pages released in full, and 135 pages that are partially released." They further stated that Treasury is withholding 137 pages of materials in full. They concluded: "now that Treasury's production is complete, pursuant to 5 U.S.C. § 552(a)(6)(A), you have the right to appeal the partial denial of the FOIA request."

Therefore, on behalf of our client Steven Nothern, we hereby appeal, again, Treasury's refusal to disclose certain documents within its control. We respectfully request that you reverse these adverse determinations and produce all requested materials – and that you do so promptly, since Treasury's delays in responding to our now fifteen-month-old FOIA request have substantially hindered Mr. Nothern's ability to defend himself in the action pending in the District of Massachusetts.

The policy underlying FOIA is one of broad disclosure, and the government must supply any information requested by a person unless it determines that a specific exemption, narrowly construed, applies. *Aronson v. IRS*, 973 F.2d 962, 966 (1st Cir. 1992). The government bears the burden of demonstrating the applicability of a claimed exemption. *Maynard v. CIA*, 986 F.2d 547, 557-58 (1st Cir. 1993).

In Mr. Delmar and Mr. McGivern's letter of February 23, 2007, they state that information "has been withheld pursuant to Treasury's authority under 5 U.S.C. § 552(b)(5), (b)(6), and (b)(7)." In responding to our FOIA request, however, Treasury has failed to provide an itemized index explaining each of its decisions to withhold information. It is well established that a plaintiff in a FOIA case is entitled to an index of all documents and/or portions of documents that have been withheld by the agency. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). Such an index must supply "a relatively detailed justification, specifically identifying and correlating those claims with the particular part of a withheld document to which they apply," and must afford "the FOIA requester a meaningful opportunity to contest, and the district court an adequate foundation to review, the soundness of the withholding." *Church of Scientology Int'l v. U.S. Dep't of Justice*, 30 F.3d 224, 231 (1st Cir. 1994) (citations omitted); *accord Founding Church of Scientology v. Bell*, 603 F.2d 945, 949 (D.C. Cir. 1979) (description of each withheld material must be "sufficiently specific to permit a reasoned judgment as to whether the material is actually exempt under FOIA").

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 3

In addition, FOIA provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). In determining the segregability of a record, "courts must construe the exemptions narrowly with the emphasis on disclosure"; an agency may withhold non-exempt information only if it "is so interspersed with exempt material that separation by the agency, and policing of this by the courts would impose an inordinate burden." *Wightman v. Bureau of Alcohol, Tobacco & Firearms*, 755 F.2d 979, 983 (1st Cir. 1985). As one court observed, "the focus in the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993) (citations omitted).

Here, Treasury has failed to explain any of its decisions to withhold information responsive to the FOIA request. Instead, it has simply marked next to each withholding the statutory subsection – "(b)(5)," etc. – on which it relies. Treasury's failure to explain its withholdings and determinations of non-segregability sharply limits our ability to challenge those decisions on appeal.

On December 19, 2006, however, Treasury did provide an index of withheld documents summarily stating its reasons for withholding information in response to the requests made by the SEC at Nothern's and the Court's request – which, again, are substantially similar to the document requests we have made under FOIA. The explanations set forth under that log indicate that many, if not all, of the FOIA exemptions claimed by Treasury now are unfounded.

For example, Treasury cites FOIA Exemption 5 for the majority of its withholding. This exemption protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5), and it has been interpreted by courts to incorporate the deliberative process privilege, the attorney work-product privilege, and the attorney-client privilege. Treasury has also cited FOIA Exemption 7, which protects certain "records or information compiled for law enforcement purposes."

These claimed exemptions relate closely to the privileges claimed by Treasury in its index stating its reasons for withholding information in response to the SEC's requests. Yet a cursory comparison of that index with the corresponding documents – some of which were recently disclosed by Treasury in response to our FOIA requests ("discretionary disclosures of some otherwise exempt material," according to Mr. Delmar and Mr. McGivern) – shows that the claimed exemptions clearly do not apply. For example, FOIA Document Nos. 647-48 contains an e-mail exchange between Fratto and General Counsel David Aufhauser regarding the need to institute a "lock-down embargo" following the events of October 31, 2001 and a description of how a lock-down embargo actually works. Treasury cited the attorney-client privilege as a ground

for withholding this information from the SEC (Doc. Nos. TREAS-00041-42), but has since disclosed the information on a "discretionary" basis in its more recent FOIA production.

The attorney-client privilege, however, protects only confidential communications made between clients and their attorneys when the communications are for the purpose of securing legal advice or services. *See In re Sealed Case*, 737 F.2d 94, 98-99 (D.C. Cir. 1984). The party claiming the privilege must show, *inter alia*, that the communication was made "for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding." *Id.* at 98-99 (quoting *United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358-59 (D. Mass. 1950)); *accord State of Maine v. U.S. Dep't of Interior*, 298 F.3d 60, 71 (1st Cir. 2002). Advice by a federal employee on "political, strategic, or policy issues" is not privileged. *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998). Treasury repeatedly cited the attorney-client privilege in its index prepared for the SEC, but failed to identify a discrete legal issue or proceeding that would justify the privilege. *See generally State of Maine*, 298 F.3d at 72 (concluding that documents were unprotected by privilege where agency failed "to identify any circumstance expressly or inferentially supporting confidentiality").

Similarly, FOIA Document No. 630 contains an e-mail message dated November 15, 2001 from then-Director of Office of Public Affairs Tony Fratto discussing a recent statement made by him to the *Wall Street Journal*: "I meant that long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years." In justifying its earlier decision to withhold this information (Doc. No. TREAS-00024) – information that is highly relevant to the pending suit in the District of Massachusetts – Treasury cited the attorney-client privilege, the law-enforcement privilege, the work-product doctrine, and the deliberative-process privilege.

Again, there is no reference to a discrete legal issue or proceeding that would justify the attorney-client privilege. The work-product doctrine is similarly inapplicable, since there is no evidence that Treasury anticipated that it would itself initiate any kind of litigation in response to the events of October 31, 2001. (In fact, it never did.) *See* Fed. R. Civ. P. 26(b)(3) (to qualify for work-production protection, document must be generated by "party" to litigation or by "party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)"); *see also State of Maine*, 298 F.3d at 69 ("The mere relation of documents to litigation does not automatically endow those documents with privileged status."); *Church of Scientology Int'l*, 30 F.3d at 237 ("[A]t a minimum, an agency seeking to withhold a document . . . must identify the litigation for which the document was created (either by name or through factual description) and explain why the work-product privilege applies to all portions of the document.").

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 5 ·

The "law enforcement" privilege applies only to "documents that would tend to reveal law enforcement investigative techniques or sources." *Association for Reduction of Violence v. Hall*, 734 F.2d 63, 65-66 (1st Cir. 1984) (quoting *Black v. Sheraton Corp. of Am.*, 564 F.2d 531, 545 (D.C. Cir. 1977)). Here, none of Treasury's four law enforcement bureaus at the time (ATF, Customs Service, IRS Criminal Investigations Unit, or Secret Service) was responsible for conducting the 30-year bond investigation, much less for generating the documents produced by Treasury now. By withholding on this basis information generated by employees whose duties were unrelated to law enforcement, Treasury has gone far beyond the limited scope of the privilege as recognized by the federal courts.

Finally, the "deliberative process" privilege applies only to information that is predecisional and related to the formulation of official policy, not an observation of fact or comment about a decision or statement already made or an administrative matter that does not rise to the level of an official agency policy. *See Texaco Puerto Rico, Inc. v. Dep't of Consumer Affairs*, 60 F.3d 884, 884-85 (1st Cir. 1995). The privilege simply does not allow Treasury to withhold, as it has, communications that discuss after the fact why things went wrong with its release of information on October 31, 2001.[1]

While we are pleased that Treasury has now disclosed the particular documents mentioned above – even if on a "discretionary" basis – we are concerned that Treasury may be relying on the same erroneous understanding of the legal privileges discussed above and the related FOIA exemptions in continuing to withhold other critical information. It is our belief that the vast majority, if not all, of the materials redacted or withheld by the Treasury are subject to FOIA's mandatory release provisions, and that Treasury has acted arbitrarily and capriciously, and in violation of the FOIA statute and its own FOIA regulations, in denying the disclosure of these materials. We respectfully

---

[1] Furthermore, the deliberative process privilege is "qualified" and "not absolute": even if a document satisfies the threshold test for protection under the privilege, "nondisclosure is not automatic." *Texaco Puerto Rico*, 60 F.3d at 885. In the *Texaco Puerto Rico* case, the First Circuit assumed that certain documents satisfied the criteria, but nevertheless concluded that disclosure was warranted based on "the interests of the litigants, society's interest in the accuracy and integrity of factfinding, and the public's interest in honest, effective government." *Id.* at 885; *see also id.* (observing that privilege is "routinely denied" when "the documents sought may shed light on alleged government malfeasance") (citation omitted). Here, even assuming that some documents withheld by Treasury meet the threshold test for the deliberative process privilege, disclosure would still be warranted based on the interests of the litigants in the pending suit in the District of Massachusetts and the public's interest in honest, effective government.

FOIA Appeal, Request No. 2005-11-046
March 1, 2007
Page 6

request that you reverse these adverse determinations and produce the requested materials promptly.

In addition, we challenge Treasury's failure to conduct an adequate search for a computer diskette containing electronic data that might be critical in ascertaining exactly when the announcement of suspension of issuance of the 30-year bond was posted to the Internet on October 31, 2001. In a letter to Mr. McGivern dated September 19, 2006, attorney John Shope at my firm expressed his concern about Treasury employee Frances Anderson's deposition testimony regarding the location of this diskette. At her deposition, Ms. Anderson testified that she stored the diskette in a file cabinet, but that the file cabinet somehow disappeared from her office in 2001 or 2002. In a letter dated December 19, 2006, Mr. McGivern responded that Ms. Anderson "conducted a search for this document on computer diskettes" and that Treasury information technology staff "searched for the document on the hard drive of Ms. Anderson's computer." However, he did not indicate whether Treasury has searched for the file cabinet that contained the computer diskette or tried to determine where the contents of that file cabinet were sent in late 2001 or 2002. Mr. Shope raised this matter again in a letter to Mr. McGivern dated December 20, 2006, but he did not respond. As you know, an agency must conduct a search that is "reasonably calculated to discover the requested documents." *Maynard v. CIA*, 986 F.2d at 559 (citation omitted). By apparently failing to search for the file cabinet that contains the computer diskette identified by Ms. Anderson, Treasury has failed to meet its obligations under FOIA here.

Again, because time is of the essence, we ask that you reverse these adverse determinations and produce the requested materials as soon as possible. In the event this appeal is denied, you are required to provide a written response describing the reasons for the denial, names and titles of each person responsible for the denial, and procedures required to invoke judicial assistance in this matter. 5 U.S.C. § 552(a)(6)(ii); 31 C.F.R. § 1.5(i)(3). If this appeal is denied or Treasury's response is not forthcoming within 20 working days, we reserve our rights under FOIA to seek judicial review, including the award of attorney's fees. We await your prompt reply.

Sincerely,

Robert E. Toone

cc:    Nicholas C. Theodorou, Esquire
       John A. Shope, Esquire

Enclosures

**EXHIBIT G**

**Letter from Kathy J. Lyerly, SAIC, U.S. Secret Service,
Department of Homeland Security, to Foley Hoag LLP
(Feb. 1, 2007)**



**DEPARTMENT OF HOMELAND SECURITY**
UNITED STATES SECRET SERVICE
WASHINGTON, D.C. 20223

Freedom of Information and Privacy Acts Branch
245 Murray Drive
Building 410
Washington, D.C. 20223

Foley Hoag LLP
Attorneys at Law
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210-2600

FEB 1 2007

File Number:    20060496
                20060497
                20060498

Dear Requester:

This letter is pertaining to your Freedom of Information/Privacy Acts request received by the United States Secret Service on August 29, 2006, for information pertaining to as follows:

File No. 20060496 – Memorandum of Sgt. John Muskette, USSS, UD, appointment center dated November 6, 2001;

File No. 20060497 – Admittance of Peter Davis to the quarterly refunding press conference at Treasury on October 31, 2001;

File No. 20060498 – Admittance of Peter Davis to any press conference at Treasury from 1993 through 2001.

The following applies to these requests:

Your request constitutes a third party request, and without a properly notarized release from each individual, we can neither confirm nor deny the existence of information pertaining to the person named in your request.

Also, please furnish your complete name, date of birth, place of birth, and any additional identifying data, which would assist us in locating records responsive to your request. In the case of a third party request, please furnish the aforementioned information for the third party.

In addition, the Secret Service requires that an individual seeking access to personal records through the mail, must provide a written request which includes an original signature in the form of a notarized statement attesting to their identity or a statement of declaration added 28USC 1746. The official certification of an individual's identity is necessary to ensure that an individual's file is not sent to an unauthorized third party. An individual's request for information pertaining to himself/herself is processed under both the Freedom of Information and Privacy Acts to afford maximum access to records.

Please note that upon receipt of a perfected request, we will proceed to continue a search for responsive information, and you will then be advised as to the status of your request.

Please use the file numbers indicated above in all correspondence with this office.  Please note that failure to respond within 60 days of the above date will result in the administrative closure of your files.

Sincerely,

Kathy J. Lyerly
SAIC
Freedom of Information &
Privacy Acts Officer

Enclosure(s):

Homeland Security Freedom of Information and Privacy Act Guidelines

**EXHIBIT H**

**Memorandum Written by Sgt. John F.
Muskett, United States Secret Service
(Nov. 6, 2001)**

DATE: *November 6, 2001*

TO: *Inspector Richard E. Teter*

FROM: *Sgt. John F. Muskett*

SUBJECT: *Listed below are the individuals that were clear to attend the press conference for Undersecretary Peter Fisher regarding "Quarterly Refunding". The conference was held in the Diplomatic Reception Room on Wednesday, October 31, 2001 at 0900 am.*

| NAMES | DATES OF BIRTH | SOCIAL SECURITY NUMBERS |
|---|---|---|
| 1. Ferrari, Shaun | 03-21-58 | 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 |
| 2. Wild, Jason | 06-10-78 | 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 |
| 3. Pardue, Douglas | 09-09-47 | 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 |
| 4. Schroeder, Michael | 02-14-52 | 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 |
| 5. Tyson, James | 06-12-58 | 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 |
| 6. Snyder, Charles | 09-06-41 | 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 |
| 7. Savoy, Greg | 01-28- 01 | 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 |
| 8. Urban, Robert | 09-06-57 | 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 |
| 9. Andrejczak, Matt | 05-13-72 | 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 |
| 10. Gordon, Marcy | 04-20-51 | 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 |
| 11. Cowden, Richard | 03-11-50 | 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 |

*After talking to Ms. Frances Anderson, Public Affairs, there was one individual that was present during the conference that was not cleared thru her office. Ms. Anderson was informed the name of the individual by a contact with Wall Street Journal, a Mr. Peter Davis, 05-12-50. After researching the Treasury Appointment Center files it was determined that, a Mr. Peter Davis was cleared in that morning of the 31st to meet with passholder MALVEY.*

**EXHIBIT I**

**Letter from Robert E. Toone at Foley Hoag LLP
to Kathy J. Lyerly, SAIC, United States Secret Service,
Department of Homeland Security
(Mar. 2, 2007)**

# FOLEY
# HOAG LLP
ATTORNEYS AT LAW

Robert E. Toone
Boston Office
617.832.1242
rtoone@foleyhoag.com

March 2, 2007

## BY FEDERAL EXPRESS DELIVERY

Kathy J. Lyerly, SAIC
Attn:  Donald Hawkins
Freedom of Information & Privacy Acts Officer
United States Secret Service
Department of Homeland Security
245 Murray Drive, Building 410
Washington, DC  20223

Re:     Freedom of Information Act requests, File Nos. 20050765 – 20050803,
        20060495 – 20060501

Dear Special Agent Lyerly:

This is a response to your letter dated February 1, 2007.  In order to expedite our correspondence, please address future letters to my attention at this firm.

We are disappointed by the dilatory and inconsistent manner in which your office has responded to the referenced Freedom of Information Act ("FOIA") requests.

Acting on behalf of our client Steven Nothern, this firm first submitted FOIA requests (Nos. 20050765 – 20050803) to the United States Secret Service ("Secret Service") on December 9, 2005.  On August 10, 2006, Mr. Donald Hawkins of your office called regarding our requests.  On August 18, 2006, Mr. Hawkins asked us to send a list of narrowed requests by facsimile transmission to his attention.  We did so on August 28, 2006, along with a brief description of the facts relevant to our requests.  On September 18, 2006, Secret Service sent us a letter treating our narrowed requests as new FOIA requests (Nos. 20060495 – 20060501), but assuring us "that the search will be conducted as expeditiously as possible."

Now, more than four months later, you have sent us a letter stating that three of our requests (Nos. 20060496, 20060497, and 20060498) constitute "a third party request" and require "a properly notarized release from each individual."  Your letter did not mention the status of our other pending requests, but nevertheless stated that "failure

March 2, 2007
Page 2

to respond within 60 days of the above date will result in the administrative closure of your files."

First, please advise us immediately of the status of the other FOIA requests we submitted on August 28, 2006: Nos. 20060495, 20060499 – 20060501. Even though the applicable statutory time limit for the processing of these requests expired several months ago, you have neither disclosed responsive agency records, denied the existence of such records, nor explained what search, if any, you have conducted for such records.

Second, please reconsider your statement that FOIA requests Nos. 20060496, 20060497, and 20060498 are "third party requests" or requests for "personal records" that require a notarized release or certification of identity. This statement conflicts with the plain language of FOIA and the applicable case law.

The policy underlying FOIA is one of broad disclosure, and the government must supply any information requested by a person unless it determines that a specific exemption, narrowly construed, applies. *Aronson v. IRS*, 973 F.2d 962, 966 (1st Cir. 1992). The government bears the burden of demonstrating the applicability of a claimed exemption. *Maynard v. CIA*, 986 F.2d 547, 557-58 (1st Cir. 1993).

FOIA Exemptions 6 and 7(C) generally protect against the disclosure of information that would result in an unwarranted invasion of personal privacy. Neither exemption, however, applies to our requests. We have not asked for any information contained in a personnel, medical, or similar file. *See* 5 U.S.C. § 552(b)(6). We have not asked for any individual's place of birth, date of birth, date of marriage, employment history, or other intimate or "damaging information." *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982). Rather, we seek information about official acts performed by the Secret Service and the United States Department of the Treasury ("Treasury") – an objective that is fully consistent with FOIA's underlying policy of allowing citizens to know "what their government is up to." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989).

Specifically, FOIA request No. 20060496 seeks all documents concerning a November 6, 2001 memorandum of Sgt. John Muskett, an employee of the Uniformed Division of the Secret Service. A full copy of this memorandum was attached as an exhibit to the Report of Investigation 2002-0104 drafted by Treasury's Office of Inspector General in January 2002. This is an official government memorandum, and we seek any and all related documents. It is ludicrous to suggest that we may not obtain such related documents under FOIA "without a properly notarized release from each individual" (*i.e.*, presumably, Sgt. Muskett himself). FOIA does not require citizens to submit notarized releases from the authors of official government documents in order to learn how such documents were created.

FOIA request No. 20060497 seeks all documents concerning the admittance of Peter Davis to the quarterly refunding press conference at Treasury on October 31, 2001.

FOIA request No. 20060498 seeks all documents concerning the admittance of Peter Davis to any press conference at Treasury from 1993 through 2001. Again, we do not seek any personnel, medical, or otherwise intimate information concerning Davis. Instead, we seek information regarding <u>the decisions of the Secret Service and Treasury</u> to admit Mr. Davis to Treasury's press conferences.

These actions by the Secret Service and Treasury are a matter of great public interest. As we explained in our letter dated August 28, 2006, Mr. Davis was a private business consultant who was able to attend various meetings and press conferences at the Treasury from 1993 until October 31, 2001. Mr. Davis did not have press credentials, and instead gained admission to these meetings and press conferences by having various employees at Treasury (possibly including Roger Anderson, Jill Ouseley, Paul Malvey, Lula Tyler, and Elnora Bowser) arrange with Secret Service personnel for his admittance into the main Treasury building. At the quarterly refunding press conference on October 31, 2001, which was allegedly subject to a 10:00 a.m. news embargo, Mr. Davis left the Treasury building at around 9:25 a.m. and made various telephone calls to third parties in which he revealed information about Treasury's announcement of its decision to suspend sales of the 30-year bond. In an e-mail dated November 15, 2001, one Treasury employee summarized his view of the relevant events: "[L]ong before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years."

These events have been reported at length in such publications as the *New York Times*, the *Washington Post*, and the *Wall Street Journal*. They have also led to official investigations by Treasury's Office of General Counsel, Treasury's Office of Inspector General, the U.S. Department of Justice ("Justice"), and the U.S. Securities and Exchange Commission ("SEC"). Justice's investigation ultimately yielded a plea to a criminal information by Mr. Davis and an indictment of an employee at Goldman Sachs. The SEC's investigation resulted in a number of enforcement actions, including an action pending against our client, Steven Nothern, in the United States District Court for the District of Massachusetts.

Because our requests do not implicate a significant privacy interest, FOIA demands disclosure. *See National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989) (citing *Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989)). Furthermore, even if a privacy interest existed, disclosure of the information would not constitute an unwarranted invasion of privacy because the public's interest in disclosure is overwhelming. Disclosure will serve "the core purposes of FOIA" by "contribut[ing] significantly to public understanding of the operations and activities of the government." *National Ass'n of Home Builders v. Norton*, 309 F.3d 26, 33-34 (D.C. Cir. 2002) (quoting *United States Dep't of Def. v. FLRA*, 510 U.S. 487, 495 (1994)). This public interest includes, but is not limited to, understanding when, how, and under whose authority a private business consultant with no press credentials was allowed to attend

March 2, 2007
Page 4

closed press conferences at the Treasury from 1993 to 2001, and therefore contribute to the public dissemination of an important announcement on the 30-year bond on October 31, 2001 prior to the purported 10:00 a.m. news embargo.

We therefore reject your statement that under FOIA we are required to provide any kind of notarized release or certification in order to receive these agency records. We further reject your suggestion that our FOIA requests have not been "perfected" or that your substantial delay in responding to these requests is consistent with the text and purposes of the statute.

Because time is of the essence, we respectfully ask that you withdraw your request for a notarized release or certification and produce the requested materials as soon as possible. We reserve our rights under FOIA to file suit to compel compliance, including an award of attorney's fees. We await your prompt reply.

Sincerely,

Robert E. Toone

cc:     Nicholas C. Theodorou, Esquire
        John A. Shope, Esquire