UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : : |
| Plaintiff, | : : |
| v. | :    Civil Action No. 05-10983 (NMG) |
| STEVEN E. NOTHERN, | : : : |
| Defendant. | : : |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**HIS MOTION TO TAKE SUPPLEMENTAL DEPOSITIONS**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO #6443249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: March 21, 2008

**Table of Contents**

BACKGROUND ........................................................................................................................... 1

    A.    Factual Background ..............................................................................................1

    B.    Procedural History ................................................................................................2

    C.    Effort to Obtain the SEC's Stipulations on Newly Discovered Evidence ...............5

ARGUMENT .................................................................................................................................. 7

I.    THIS COURT HAS BROAD DISCRETION TO AUTHORIZE NEEDED
DISCOVERY .................................................................................................................... 7

II.    THE EVIDENCE NOTHERN SEEKS TO ADMIT IS CRITICAL TO HIS
DEFENSE AND WAS DISCLOSED ONLY AS A RESULT OF THIS COURT'S
ORDERS IN THE RELATED APA AND FOIA LITIGATION....................................... 8

    A.    Kehoe report on rumor from European central bank ..............................................8

    B.    Other reports by traders on "rumors as early as 9 a.m." .......................................10

    C.    Treasury Official Paul Malvey's Family Relationship with a Top Bond
Strategist at Lehman Brothers...............................................................................11

Conclusion ................................................................................................................................... 13

Defendant Steven Nothern respectfully submits this memorandum in support of his motion for leave to conduct additional depositions for the limited purpose of establishing the admissibility of certain newly-disclosed evidence that is critical to the claims and defenses in this action. Nothern does not seek amendment of any other deadline in the existing schedule for this case.

## BACKGROUND

### A.  Factual Background

In this action, the SEC alleges that on October 31, 2001 Nothern violated the federal securities laws by trading on information released at the quarterly refunding press conference held by the Department of the Treasury ("Treasury") that day. The information in question was Treasury's decision to suspend issuance of the 30-year bond. According to evidence gathered to date, in the days and weeks preceding October 31 Treasury officials disclosed the decision to several outside officials and, apparently, an employee of Lehman Brothers. On October 31, Treasury e-mailed a statement announcing the decision to the news network CNBC at 8:57 a.m., to the New York Times at 9:30 a.m., and to the Wall Street Journal at 9:32 a.m. The decision was formally announced at a press conference on October 31 beginning at 9:00 a.m. During the press conference a Treasury press officer stated that there was a "press embargo" time of 10:00 a.m. Although no one on that occasion agreed to the embargo, which was much longer than any previously used, those in attendance were free to leave the Treasury building after the press conference concluded at around 9:25 a.m.

At around 9:30 a.m., Nothern received a call from a broker reporting rumors of the news on the Chicago Board of Trade. Nothern noticed that the price of 30-year bonds was rising. Around 9:38 a.m., Peter Davis, a private business consultant whom Treasury had allowed to

attend the press conference, left a voice-mail message for Nothern with the news sometime after having left similar messages with several larger Wall Street clients. When Nothern subsequently listened to the message, he noted a further rise in the bond price. Treasury placed the announcement on a publicly accessible Internet site at 9:40 a.m., and transferred it to Treasury's official web site either at 9:43 a.m. or earlier. Believing the information to be public and the press embargo inapplicable to Davis or himself, Nothern directed purchases of 30-year bonds for accounts he managed at MFS. The SEC alleges that these trades occurred sometime between 9:42 and 9:42:49 a.m.

The SEC's theory of liability is that Nothern, upon hearing the term "embargo," should have known that Davis had obtained the information in violation of a fiduciary-like duty owed to Treasury, even though it is undisputed that Nothern knew nothing about Treasury's quarterly refunding press conferences or embargo polices, Davis's ability to attend such press conferences, or any confidentiality agreement entered into by Treasury and Davis.

Contested issues in the case include (i) whether the information remained confidential both before and after it was announced at Treasury's 9:00 a.m. press conference, (ii) whether the information was already public at the time Nothern traded, (iii) whether the "embargo" had any practical or legal effect whatsoever, (iv) whether, assuming that it did, Treasury could impose such an "embargo" consistent with the First Amendment, (v) whether the consultant, Peter Davis, had a fiduciary or "fiduciary-like" duty to the Treasury not to disclose the information, and (vi) whether, even assuming such a duty, Nothern knew (or, the SEC contends, should have known) of it.

B.    **Procedural History**

After conducting a lengthy investigation in close coordination with Treasury and the U.S.

Department of Justice, the SEC filed suit against Davis, John Youngdahl (an officer of Goldman Sachs whom Davis had called first), and Nothern in the Southern District of New York in September 2003. In November 2003, the SEC voluntarily dismissed its complaint against Nothern, who had objected to jurisdiction. The SEC filed the present action against Nothern on May 11, 2005. It seeks an injunction that would make Nothern unemployable in the securities industry as well as a fine and "disgorgement" of the millions of dollars of profits experienced by the funds Nothern managed for his employer at the time, Massachusetts Financial Services (MFS).

On September 27, 2005, Nothern served a request for production of documents. On November 11, 2005, he also sent a request to Treasury under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. After initially objecting to Nothern's instruction that it produce documents in the possession of the federal government, the SEC agreed, at the prompting of the Court, to forward Nothern's document requests to Treasury and other agencies on June 30, 2006. On December 19, 2006 – purportedly pursuant to inapplicable "*Touhy* regulations" – Treasury stated that it was withholding 276 pages of documents under a variety of asserted privileges. In the preceding month, Treasury had further notified Nothern that it was denying his requests – again, pursuant to its internal "*Touhy*" regulations – to depose employees Steve Berardi, Elnora Bowser, Jill Cetina, and Michele Davis, and that it was withdrawing its prior authorization for the deposition of David Aufhauser.

After Nothern moved to compel production by the SEC, Magistrate Judge Sorokin acknowledged that while the information Nothern sought was relevant, "a separate process exists (albeit a potentially cumbersome and time-consuming one)" for Nothern to challenge the agency action denying him such information, namely a FOIA suit against Treasury. Dkt. #63, at 12.

3

Treasury stated that its production was final, and therefore ripe for challenge under FOIA, on February 23, 2007. After exhausting administrative appeals, Nothern promptly filed separate actions against Treasury under FOIA and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*. Both actions were heard by this Court.

In the FOIA case, *Nothern v. U.S. Department of the Treasury*, No. 07-cv-10661-NMG (D. Mass.), Treasury disclosed hundreds of documents on a "discretionary" basis in response to Nothern's administrative appeal, *see* No. 07-cv-10661, Dkt. #8, Ex. N at 1, and later Nothern's motion for summary judgment, *see id.*, Dkt. # 11, Ex. 4. With respect to the documents Treasury continued to withhold, the Court ruled on October 4, 2007 that "Treasury has substantially overreached its authority to exempt materials from FOIA production" and granted Nothern's motion for summary judgment. *See id.*, Dkt. #8, at 1; #28, Ex. D at 33. Treasury thereafter disclosed more than 130 pages of new materials, and submitted other documents to the Court for *in camera* review. *See id.*, Dkt. #19. In its Order of December 3, 2007, the Court again rejected Treasury's privilege claims and ordered it to produce (i) 59 additional pages of handwritten interview notes on the 30-year bond investigation, and (ii) an important e-mail exchange on October 31, 2001 regarding Treasury's history of leaks of market-moving information. *See id.*, Dkt. #23, at 3. Treasury produced these documents on December 10, 2007. *See* Declaration of Robert E. Toone ("Toone Decl.") ¶ 2.

In the APA case, *Nothern v. U.S. Department of the Treasury*, No. 07-cv-10347-NMG (D. Mass.), the Court granted Nothern's motion for summary judgment on October 4, 2007 as well. The parties in this case made a joint motion, which the Court allowed, to extend the deadline for discovery for the purpose of taking the additional depositions that had been authorized. The Court also issued two orders specifically requiring Treasury to make its

4

employees available by February 29, 2008.  *See* Dkt. #93, at 1-2; No. 07-cv-10347, Dkt. #17, at 1-2.  The parties conducted the depositions of Cetina, Davis, Bowser, Berardi, and Aufhauser on February 8, 11, 12, and 22, 2008.  These dates were the soonest offered by Treasury and Aufhauser's private counsel after repeated requests by Nothern's counsel.  *See* Toone Decl., Ex. C.

The discovery that Nothern obtained as a result of this Court's orders in the FOIA and APA cases produced information that is highly relevant to the claims and defenses in this case.  For example, Treasury economist Jill Cetina identified three (3) bond traders who reported to her advance information on Treasury's 30-year bond decision at a European Central Bank and in the U.S. bond markets.  *See* Section II.A & II.B, *infra*.  The e-mail exchange disclosed by the Court in its December 3, 2007 order revealed a "history of leaks involving Treasury's quarterly refunding announcements," as well as another leak of information "attributed to" the Treasury Borrowing Advisory Committee that occurred a few weeks prior to the 30-year bond announcement.  *See* No. 07-cv-10661, Dkt. #23, at 3.  The interview notes produced by Treasury revealed that SEC officials believed that some Treasury employees "were not totally forthcoming" in regard to their contacts with Peter Davis, and that Treasury official Paul Malvey is related to Lehman Brothers' chief global fixed-income strategist Jack Malvey, *see* Toone Decl., Ex. B at 6 & 11 – a fact which Cetina testified in her deposition that she had learned from another staff member as well.  *See* Section II.C *infra*.

      **C.**      **Effort to Obtain the SEC's Stipulations on Newly Discovered Evidence**

In a letter dated February 25, 2008, Nothern's counsel requested that the SEC stipulate to the admissibility of certain evidence discovered as a result of Nothern's related FOIA and APA actions against Treasury.  *See* Toone Decl., Ex. D.  As the letter explained, a critical issue in this

5

case is the extent to which Treasury adequately protected the confidentiality of its information prior to its purported 10:00 a.m. embargo, and the availability of information through such sources as "trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources" is relevant to whether it is "nonpublic" at a particular time. *United States v. Cusimano*, 123 F.3d 83, 89 n.6 (2d Cir. 1997). *See also* Leonard B. Sand *et al., Modern Federal Jury Instructions*, Instruction 82-6, at 82-39 (2006) ("[i]n general, information is nonpublic if it is not yet available to the public through such sources as press releases, Securities and Exchange Commission filings, trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources").

Furthermore, even if the information concerning elimination of the 30-year bond were nonetheless still non-public, the existence of the reports and rumors — which Nothern has testified were reported to him — bears both on his credibility and on the reasonableness of his belief that the single mention of the word "embargo" did not put him on notice of any fiduciary-like duty on the part of Peter Davis not to disclose the news of the decision before 10:00 a.m. Indeed, the government's position in this case is that Nothern was required to assume that Treasury had not leaked or otherwise carelessly disclosed the information despite a history of having done so.

Because important evidence bearing on both of these points was not obtained until the most recent document productions by Treasury and depositions of Treasury employees ordered by the Court, Nothern requested that, in order to "avoid the need for additional or reopened depositions," the SEC stipulate to the admissibility of the items of evidence discussed below. Toone Decl., Ex. D. at 1.

In response, the SEC stated that the "rules do not require the SEC to unilaterally stipulate

6

to the admissibility of a subset of documents and deposition designations seven months prior to the pretrial conference and before discovery is complete." Toone Decl., Ex. E at 1. Arguing that "the existence of reports or rumors regarding the elimination of the 30-year bond" provides no defense for Nothern, the SEC denied that any of the newly obtained documents or testimony disclosed "any new topic" or identified "any new witnesses" that would justify further depositions. *Id.* at 2. The SEC proceeded "in the interest of cooperation" to stipulate to the authenticity of certain documents, but refused to stipulate to the admissibility of the items discussed below. *See id.* at 2-5.

Following conferences under Local Rule 7.1, the SEC did agree to a limited stipulation as to two of the new e-mails, which reported that Treasury "leaked like a sieve" and that Treasury's quarterly refunding process had "been criticized for years because of suspected leaks," including a leak earlier concerning issuance of 10-year notes in October 2001 "attributed to" Treasury's Borrowing Advisory Committee. The parties, however, were unable to resolve or narrow the issues with respect to the remaining relief requested in this motion.

## ARGUMENT

### I. THIS COURT HAS BROAD DISCRETION TO AUTHORIZE NEEDED DISCOVERY

District courts have inherent authority "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Luis C. Forteza e Hijos, Inc. v. Mills*, 534 F.2d 415, 518 (1st Cir. 1976). This authority includes broad discretion to deem evidence admissible in advance of summary judgment or trial or, in the alternative, to permit additional discovery necessary for the resolution of a case. *See Bates through Murphy v. Shearson Lehman Bros.*, 42 F.3d 79, 83 (1st Cir. 1994) ("The admission and exclusion of evidence is primarily committed to the discretion of the trial court . . . ."); *Brandt v. Wand Partners*, 242 F.3d 6, 18 (1st Cir. 2001)

7

(following pre-trial conference after close of discovery, Court permitted each side to take additional 20 hours of depositions before trial).

Here, Nothern does not seek to discover or develop new facts for his defense. Instead, he seeks only to establish the admissibility of critical evidence that, as the result of Treasury's prolonged intransigence, came to light too late for it to be addressed under the previous schedule. Furthermore, Nothern does not seek to continue <u>any</u> deadlines set by the Court, including the trial date of November 3, 2008. To the contrary, all depositions for which he seeks leave can be conducted prior to the current deadline for dispositive motions, June 15, 2008.

## II.   THE EVIDENCE NOTHERN SEEKS TO ADMIT IS CRITICAL TO HIS DEFENSE AND WAS DISCLOSED ONLY AS A RESULT OF THIS COURT'S ORDERS IN THE RELATED APA AND FOIA LITIGATION.

Pursuant to the Court's orders in the related APA case against Treasury, Nothern was finally able to take the deposition of Jill Cetina on February 8, 2008. A key issue in that deposition was the series of reports that Cetina received on the morning of October 31, 2001 from various traders with advance information about Treasury's decision to suspend the 30-year bond. Without identifying the traders, Cetina had memorialized their reports in a group of e-mails that Treasury's Office of Inspector General ("OIG") subsequently attached as an exhibit to its January 2002 report. *See* Toone Decl., Ex. F. Handwritten notes released by Treasury in December 2007 (at the order of this Court in the FOIA case) indicate that Cetina informed the SEC and Treasury of some of the traders' identities during her interview on November 7, 2001, *see id.*, Ex. A at 3, but that information was <u>not</u> included in the memorandum summarizing Cetina's interview for the OIG report or otherwise previously disclosed to Nothern.

### A.   Kehoe report on rumor from European central bank

While the OIG report noted the report that a "European central bank" had learned of

8

Treasury's 30-year bond decision by October 30, 2001, Nothern was not able to determine the source of this report until his deposition of Cetina. At her deposition, Cetina identified James Derek Kehoe from HSBC Securities (USA) Inc. in London as the "dealer in London" who told her that he had heard a "rumor that the long bond would be eliminated yesterday [the day before the quarterly refunding announcement] from a European central bank." Toone Decl., Ex. H at 103-05. Cetina found Kehoe's report to be "noteworthy and worth sharing with others in the department." *Id.* at 105. As other witnesses in the case have made clear, it is quite plausible that information about Treasury's decision reached European central banks days prior to October 31, 2001.[1] Contrary to the SEC's suggestion, *see* Toone Decl., Ex. E at 3, no document produced to Nothern (including the handwritten Treasury notes produced in December 2007) had previously identified Kehoe as the source of the European central bank report.

Because evidence relating to advance knowledge in foreign markets of Treasury's decision on the 30-year bond is clearly relevant, Nothern asked the SEC to stipulate to the admissibility of (i) Cetina's e-mails memorializing the substance of Kehoe's report, and (ii) the portion of her testimony identifying Kehoe as the source of this report. Toone Decl., Ex. D at 2. The SEC refused both requests and made clear that it will seek to exclude this evidence as hearsay at trial. *Id.*, Ex. E at 3. Accordingly, Nothern requests leave to depose Kehoe on this issue, since he apparently lives and works outside of this Court's subpoena power.

---

[1] As Under Secretary Peter Fisher (the official who made the refunding announcement) testified, approximately one week prior to the announcement he informed multiple outside officials about the decision – including Larry Lindsey, director of the National Economic Council; Glenn Hubbard, chairman of the Council of Economic Advisors; and Alan Greenspan, chairman of the Federal Reserve. Toone Decl., Ex. I at 77-86. General Counsel David Aufhauser testified that he would not be surprised if the Secretary had discussed such a confidential matter with the head of the Central Bank of England: "surely highly confidential discussions take place at the highest level." *Id.*, Ex. J at 38-39.

9

### B. Other reports by traders on "rumors as early as 9 a.m."

At her deposition, Cetina also testified that either Robert Sbarra from HSBC or Patrick Haskell from Credit Suisse First Boston sent her an e-mail on the morning of October 31, 2001 stating, "Jill, We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news . . . ." Toone Decl., Ex. H at 94-96. The "flattening" refers to the drop in yield of the 30-year bond as its price increased that morning. *See id.* at 95-96. Cetina subsequently cut and paste this message (without identifying the sender) and forwarded it to several top officials at Treasury with the heading "[s]ome thoughts on e-mail from a primary dealer contact." The forwarded message is included on the fourth, fifth, and sixth pages of the collection of e-mails attached as an exhibit to the January 2002 OIG Report. *Id.*, Ex. F at 4-6. Again, Nothern was not advised that Haskell was the source.

In addition, Cetina testified that either or both of Sbarra or Haskell complained about the leakage of the decision to reopen the 10-year note a few weeks earlier in connection with their complaints about Treasury's errant release of information on the 30-year bond. *Id.*, Ex. H at 34-36. Haskell complained that certain firms "had an inside track on what Treasury was doing," *id.* at 44-45, 82-84, and he specifically identified Goldman Sachs and Lehman Brothers as two firms that had been buying the 30-year bond prior to 10:00 a.m., *id.* at 49-50. As discussed in Section II.C, *infra*, evidence of advance purchases in the 30-year bond by Lehman Brothers is highly relevant to Nothern's defense that Treasury failed to protect the confidentiality of its information on the 30-year bond prior to its announcement on October 31, 2001.

Again, contrary to the SEC's suggestion, *id.*, Ex. E at 3, even though documents produced by Treasury in the FOIA litigation in February 2007 indicated that Sbarra or Haskell may have had concerns about "non-website related leaks," *see id.*, Ex. G, Nothern's counsel assumed that they were among the many who objected to the disclosure by Davis to many Wall

10

Street houses, starting at around 9:28 a.m. No document produced to Nothern before December 2007 identified either individual as the "primary dealer contact" who sent this particular e-mail to Cetina. By contrast, the handwritten notes which this Court ordered Treasury to disclose in December 2007 indicate that Cetina told the SEC and Treasury about her communications with Sbarra or Haskell (misspelled "Hascal") in November 2001 – but neither agency provided that information to Nothern. *See id.*, Ex. A at 3.

Because evidence demonstrating that information on the 30-year bond decision was circulating in the bond markets before Treasury's press conference began – and long before any information was relayed to Nothern – is unquestionably highly relevant, Nothern asked the SEC to stipulate to the admissibility of (i) Cetina's e-mails memorializing the substance of this primary dealer's report, and (ii) the relevant portions of Cetina's testimony cited above. Again, the SEC refused both requests. *Id.*, Ex. E at 3. Accordingly, Nothern requests leave to depose Sbarra and Haskell on these issues.

      **C.    Treasury Official Paul Malvey's Family Relationship with a Top Bond Strategist at Lehman Brothers**

Lastly, Nothern asked the SEC to stipulate to the admissibility of excerpts from Jill Cetina's deposition testimony in which she testified that Treasury's former Director of Market Finance Paul Malvey was identified to her as the cousin of Jack Malvey, the chief global fixed-income (*i.e.*, bond) strategist at Lehman Brothers. *See* Toone Decl., Ex. H at 51-53, 167-69.

This relationship between the two Malveys was disclosed by Paul Malvey to the SEC and Treasury during their joint interview on January 14, 2002, according to Treasury's handwritten interview notes. *See id.*, Ex. B at B.[2] Nothern, however, did not learn about it until the Court

---

[2] The SEC admits that its representatives were present at this interview, but has indicated its view that Treasury's interview notes and Cetina's testimony on this point are not reliable.

11

ordered Treasury to disclose those notes in December 2007.

The importance of this relationship cannot be overstated. At his deposition, Malvey testified that Timothy "Woody" Jay – then the head of Treasury trading at Lehman and vice chairman of the Treasury Borrowing Advisory Committee – directed his employee Drew Matus to meet with Treasury officials to review Lehman's financial forecasts. *Id.*, Ex. K at 249. The meeting occurred on or about October 22, 2001, nine days before the official announcement. At the meeting, Malvey testified, he may have asked Matus, "do you have an alternative scenario if the long bond is not there, or something like that." *Id.* at 249-50; *see also id.* at 252 ("I wouldn't be surprised if I said things like . . . what if the long bond is eliminated sometime in the next year, do you have an alternative for that."). In other words, Malvey admitted that he may have tipped Lehman, one of the largest bond traders in the nation, about Treasury's 30-year bond decision nine days before it was officially announced.

At her deposition, Cetina testified that she met with Matus just after his meeting with Malvey – and that Matus told her that Treasury was going to eliminate the 30-year bond (a report that made Cetina "a bit taken aback" because "it was an unusual view" that she had not heard from other dealers). *Id.*, Ex. H at 53-59. Cetina testified that she was concerned and "surprised" that Malvey had tipped Matus about the 30-year bond, *id.* at 164-66, and that her subsequent discovery of Malvey's family connection with Lehman Brothers contributed to her "colored" perception of him, *id.* at 166-68.

Cetina also testified that she relayed the reports she had received about advance information on the 30-year bond directly to Assistant Secretary Brian Roseboro, in part because she had "concerns" about discussing the issue with Paul Malvey. *Id.* at 111-13. As discussed in Section II.B, *supra*, Credit Suisse First Boston bond trader Patrick Haskell informed Cetina that

12

Lehman Brothers had been buying 30-year bonds prior to 10:00 a.m. on October 31, 2001, *id.* at 49-50, and evidence independently obtained by the SEC confirms that Lehman Brothers made large purchases in 30-year bond futures contracts prior to 9:32 a.m. *See id.*, Ex. L at 41-51 (SEC investigative testimony and corresponding e-mails of Cantor Fitzgerald trader Raymond Walton).

Because the SEC has declined to stipulate to the admissibility of these deposition excerpts and indicated that it may seek to exclude the relevant excerpt from Cetina's testimony on hearsay and other grounds, *see id.*, Ex. E at 3, Nothern requests leave to re-open the deposition of Paul Malvey himself to establish this fact (to which Malvey admitted according to Treasury's interview notes) so as to avoid the SEC's objection of "hearsay."

## CONCLUSION

For the foregoing reasons, Nothern respectfully requests that the Court grant him leave to depose Derek Kehoe, Robert Sbarra, and Patrick Haskell and to reopen the deposition of Paul Malvey.

        STEVEN E. NOTHERN

        By his attorneys,

        /s/ John A. Shope
        Nicholas C. Theodorou, BB0 #495730
        John A. Shope, BBO #562056
        Robert E. Toone, BBO # 663249
        FOLEY HOAG LLP
        155 Seaport Boulevard
        Boston, MA 02210
        (617) 832-1000
        jjs@foleyhoag.com

Dated: March 21, 2008

## **CERTIFICATE OF SERVICE**

    I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                                 /s/ John A. Shope