UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 05-10983 (NMG) |
| | : | |
| STEVEN E. NOTHERN, | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF ROBERT E. TOONE FILED IN SUPPORT OF
DEFENDANT'S MOTION TO TAKE SUPPLEMENTAL DEPOSITIONS**

Robert E. Toone, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as

follows:

1.    I am an attorney for Steven E. Nothern in the above-referenced matter.  I am a

member of the Massachusetts bar and the bar of this Court.  Except where otherwise indicated, I

make this declaration based upon my own personal knowledge, upon public records, and upon

the documents related to this action.

2.    Pursuant to this Court's December 3, 2007 Order in the related Freedom of

Information Act case *Nothern v. U.S. Department of the Treasury*, No. 07-cv-10661-NMG (D.

Mass.), the Department of the Treasury ("Treasury") produced 59 pages of handwritten interview

notes on December 10, 2007.  True and correct copies of notes from this production relating to a

2001 interview of Treasury employee Jill Cetina are attached hereto as Exhibit A.  True and

correct copies of notes from this production relating to a January 14, 2002 interview of Treasury

Director of Market Finance Paul Malvey, conducted by Treasury and the SEC, are attached

hereto as Exhibit B.

3.      True and correct copies of e-mail correspondence documenting efforts by Nothern's counsel to schedule promptly the depositions of Treasury employees Jill Cetina, Michele Davis, Elnora Bowser, Steve Berardi, and David Aufhauser, pursuant to this Court's Orders in the related Administrative Procedure Act case *Nothern v. U.S. Department of the Treasury*, No. 07-cv-10347-NMG (D. Mass.), are attached as Exhibit C.

4.      A true and correct copy of a letter from John A. Shope at Foley Hoag LLP to Erica Y. Williams at the Securities and Exchange Commission, dated February 25, 2008, is attached hereto as Exhibit D.

5.      A true and correct copy of a letter from Erica Y. Williams at the Securities and Exchange Commission to John A. Shope at Foley Hoag LLP, dated February 28, 2008, is attached hereto as Exhibit E.

6.      A true and correct copy of e-mail messages of Jill Cetina, set forth as Exhibit 10 to the Report of the Office of the Inspector General, Department of the Treasury (Jan. 2002), is attached hereto as Exhibit F.

7.      True and correct copies of e-mails Bates-stamped FOIAKBC 400, 401, and 437 and produced by Treasury in its February 2007 FOIA production are attached hereto as Exhibit G.

8.      True and correct excerpts from the deposition transcript of Jill Cetina (February 8, 2008) in *United States Securities and Exchange Commission v. Steven E. Nothern*, No. 1:05-cv-10983-NMG (D. Mass.), are attached hereto as Exhibit H.

9.      True and correct excerpts from the deposition transcript of Peter Fisher (August 8, 2006) in *United States Securities and Exchange Commission v. Steven E. Nothern*, No. 1:05-cv-10983-NMG (D. Mass.), are attached hereto as Exhibit I.

10.    True and correct excerpts from the deposition transcript of David Aufhauser (February 22, 2008) in *United States Securities and Exchange Commission v. Steven E. Nothern*, No. 1:05-cv-10983-NMG (D. Mass.), are attached hereto as Exhibit J.

11.    True and correct excerpts from the deposition transcript of Paul Malvey (August 8, 2006) in *United States Securities and Exchange Commission v. Steven E. Nothern*, No. 1:05-cv-10983-NMG (D. Mass.), are attached hereto as Exhibit K.

12.    True and correct excerpts and corresponding exhibits from the SEC investigative testimony of Raymond Walton (April 23, 2003) are attached hereto as Exhibit L.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on March 21, 2008.


/s/ Robert E. Toone

# Exhibit A

4:36 pm                                    Sell

Andrew Sparkin        942-4800
Rosemary Falvi
John

    4 years            International Economist at Market Room
                          ↳ 2 years.

- Provide info. to market analysts/ participants -
  hedge funds, primary dealers.

- Contacts are bilateral.

- 4 professionals in dept. One currently on detail
  for terrorism.

- there were only

- Tim Dulaney - Office Dir. Market Room
  Lois Quinn
  Jim Sherer -
  Kathleen Byrne

Mike New (Tax)
927-5421

FOIAKBC                                                    874

2.

- Officially aware of suspension at 9:30 am.
from press release

10/22/01 morning w/ market participant - regular talk
he raised eliminating the bond  - told her he had
met w/ other people at Treasury prior to her.
Drew Matus - Lehman Bros. — Strategist for Treasury
mkt.

- Told him she didn't know anything @ it. She thought
opinion was quirky.

- Wrote up on 10/23/01  — speaking w/ Drew +
he said Treasury could eliminate bond + buy back
programs.

- Everyone thought time was 9:45 am.  Fact that Fisher
was doing conference.

- Night beforehand a person from Domestic Financing
said., Norm Carlton, said there could be
mkt. moving event the next day.

- 5:30 am - comes in in the morning - called a
2 couple of calls  in Treasury mkt. to London,
everyone was talking @ GDP.
Primary dealers' London desk

3.

- GDP # came ~~up~~ out at 8:30, which was better than expected, but didn't make bond move lower.

- At @ 9:35, price of bond went up.
- A little before 10:00 am, Reuters' headline had suspension and she emailed grp. that it came out early.

MCM Currency Watch — 9:45 am — suspension didn't see it at 9:45 am.

- 10 year notes were announced on Oct. 4th at 11:00 am. Some clients alleged — HSBC — New York desk — Bob Sbarra — Credits just Bonds — Pat Hascal they mentioned 10 year in conjunction w/ complaining @ release of info. early on the bond.
  a) Lehman Bros.          ] mentioned on the 31st.
  b) Goldman Sachs

- Thinks Bob complained after 10 yr. Pat was listing 10 yr. as another incident.

- ~~Office~~
- She's not aware of a written policy but Tim Delaney had said no discussions re mkt sensitive info.

4.

– Drew said he was meeting w/ Paul Malvey
Jeff Huther of Treasury – he met w/
them before he met w/ her.

– Drew has claimed in the past to be plugged in.

– Jordan guy said someone had told them that they
heard @ refused @ 7:00am (Europe – lunch time).

– Lehman put out an

**Exhibit B**

- Paul Malvey - Director, Office of Market Finance

- 1st Interview: November 15, 2001

- in regular contact w/ financial markets / makes policy recommendations

- suspension of 30 yr bond had been discussed
   - would have preferred announcing in 1/02
   - no word to bond dealers re suspension of bond

- Drew Matus = Malvey [strikethrough] saw him in October ; said nothing of suspension
   week before 10/31, he predicted to Jill Cotina that bond would be suspended

- Pete Davis: met him 3 times since '96
   1) call in '96 => got Davis admitted to quarterly funding info.
         press conference w/ approval by Jill Ouseley (then Director)
   2) call @ 5/01 => approved Davis admittance to press conference
   3) 10/31 press conference => sat next to him

- did not know at the time that press conf. reserved for
      "credentialed press"

- called Jill Ouseley => why was Davis admitted? she did not recall him

- Malvey's secretary, Lela Tyler, cleared [strikethrough] Davis for 10/31 press conf.
   - Davis had been calling her regularly for admittance
   * - was she secretary to Ouseley? yes
- Malvey understood that Davis had been attending since '96



4/17 · Mike Dorn, AIG

\* → directives, e-mails, internal comm re a limiton ⇒ Request from SEC

- Interview of Paul Mulvey :

→ telephone calls : work, home, cell

  - call in last 6/8 months ⇒ "Davis" he was fishing for something "

  - may have been another call earlier

  - 10/29 : approved him for 10/31 mtg

  - saw article re Crack Debt Management team → Davis news letter
    - mentioned Mulvey ⇒ said he was world class gather, so
      someone who new him must have spoken w/ Davis
    →

\* → article ⇒ SEC wants a copy of This ; Megan

→ Gensler ⇒ he frustrated Dusty (after she had confronted him)
    ↳ This was in the newsletter
    - ∴ there was anti-Gensler attitude

→ how did he see article ? maybe Roger Anderson gave it to him
    - RA knew him (Dusty) too → maybe Roger was source of info for story

→ no other meetings did he see Davis ; never saw Davis b/g clients in

→ who does he know at N.Y. financial firms

JP Morgan : Jim Glassman

Fidelity : no
(Boston)

Goldman Sachs :    Turnenson → knew the Boxwood Cert, it
                                                    factory mtgs

            - never met in D.C.

                - John Youngdal → knows him

?    Sangamon
     Tutor Investment → Chris Long
     Nexus
     Thomas Jelf
     P. Anora
     Mellon
     BOA
     **S**tone & McCarthy → knows the principal
            - saw McCarthy at Treasury once

was not
talked
to any
of them
re Davis

→ January 2000 → Maley was
        → Davis brought in clients to discuss
              TIPS, buybacks
        ⇒ recalls Maley being at the mtg

they say
they spoke
to someone
who says
this

→

Capra => Chairman of Borrowing Committee
= known since '94
- Nov. '95 => saw him at Heritage Foundation
- talked 2-3 times in 2001

=> Borrowing Advisory Comm: must keep involve confid. until released publicly
    - have a statutory obligation
=> No one on Committee calls for substantive info.
=> last spoke w/ him when considering changing quarterly => mid-Dec., 2001
    - did not discuss Davis / have never discussed 10/31

=> recall Will McCarthy being at mtg. / maybe 2000 mtg.
    - Lee Sachs was there
    - does not recall what was discussed
    - remembers people from outside the Treasury being there

=> Barclay capital => last summer brought some folks to discuss inflation securities.
    - another example of mtg w/ outsiders

    => were there other such meetings year before?
        - does not recall

=> handout => 5/22/01 => Peter Davis e-mail

=> 5/01 => spoke w/ Davis; was fishing for info
    - did not give him any information, did
        not direct him elsewhere
    - did he speak w/ anyone else re rebate at the time
        - Borrowing Advisory Committ => does not recall

-> would have given this info at ?
   - does not remember this issue
-> does not recall anyone speaking w/ Davis at the time

2nd handout => e-mail 7/12

  - did he speak w/ Davis on 7/12 ?
    - could have been this date or the May date
    - yeah, did not give information

- did not speak w/b Argentina w/ anyone else
- does not know know anything a/b Arg. issue

Davis e-mail => 9/6/01
   -> did he speak w/ Davis at this time; did
      he discuss Rosharo
      => too close to last interview; does not recall Rector interview
         ⤷ doesn't think so
      -> doesn't know anyone that spoke w/ Davis a/b this.

Davis e-mail => 10/16        a/b this
   -> did he speak to Davis ? => does not recall ;
   -> did not discuss w/ non-Treas.
   -> does not know anyone that spoke w/ Davis
   -> did not discuss this w/ anyone on  committee

Davis e-mail 10/15
→ does not recall ~~talking about~~ talking to Davis re this
   but he was talking to people a/b this
   • gave briefings to people on the Hill ⇒ here is what we want to do?
   - the info in the email is correct
- this information was not being kept confidential
- does not recall talking to Peter Davis a/b this :

<u>Berardi</u> + <u>Anderson</u> ⇒ only two other T people that talked [were Davis's
                                    (we both)
   - would have discussed this issue w/ Milligan
      one else that called

Relatives in Financial industry:
        ⟶  • Jade Maloney at Lehman ⇒ had lunch 10 yrs ago
Global           - 2-3 yrs ago called him re gov't debt
Fixed            - have not spoken since
Income
Strategy
                 no
               communication w/ him in Oct./01

⇒ did a he ever ~~$~~ e-mail w/ him ? no
                     ~~three~~ 4 times ⇒ 2 were answered by secretary,
                                          2 others went to him
⇒ Davis called him ~~twice~~ on Nov 2.
         - left a message ⇒ "call me, it's important"
     1) sec. took message
     2) ⟶
     3) did not answer

- Dick Teeter: Treasury security possible for

- responsibility of oversight of

⟶ no rules, nothing for Treasury security
no written T. policy no resp. for
people that clear into the bldg

- White House does have a policy
  ↳ Treasury will adopt new stand.,
  probably use this as a model

⇒ Any request ⇒ put in writing
    — fax it over / all the request

our recollection
1) ⇒ newsletter ⇒ we provided it before

2) ⇒ former ee ⇒ don't have rite, or means to give out info.

3) ⇒ to our knowledge, no written policy re
        admission of visitors

4/16 Phone call w/ Myers, Doughaty

⇒ No one comes into Treasury w/o appointment

⇒ NCIC check, Wireless check, ~~PI~~ check ⇒ O'Neill

⇒ anyone else ⇒ P I check only

⇒ Muskett ⇒ makes the call a/b excluding someone

2 requests

⇒ we will give them policy; want Muskett
to review it to make sure it is
up to speed + current

→ we can produce a list of those people
that had an appointment; ~~the~~ person
Logs        that made appt; time of arrival;
true arrival, true departure
→ hard copy + CD Rom
Entry
Process → History of Davis' entry into Treasury
over the last few years?

Mastercard
800 307-7309

→ RF ⟹ was he attending other conferences;
     who else was he meeting with

→ What constitutes a Threat to the ~~that~~ Sec. ?
     ↳ judgment call

To do:
─────────
   - send log. of 10/31
   - what they have on Davis
   - background: only put in writing
      if feel comfortable

SEC Investigation
→ Bill Baker ⟹ 942-4570

<u>observation</u>:

⇒ surprised that IG report was
made public by T as soon as
it was; did not get to
review + comment before being
released

⇒ in the hands
of reporters
almost as soon
as it was completed

1) Is anyone at Treasury implicated guilty/implicated
of anything more than sloppiness?

Will not
recommend to Comm.
that any
action be
taken by about

— Won't recommend to ~~Comm~~ [Comm.] to charge T ee, even
though they feel that some any T ees were not
totally forthcoming in re to contacts w/ Davis

2) Other than Davis, did anyone else disseminate
this information in violation of the embargo?

out,
reported,
called the
trading desk
at a firm;
asked for
comments
on the
news before
the embargo
expired

→ don't know of anyone else that they
can trace trading to

⇒ another press person who also violated embargo; but did
not leave
to trading

3) What are the <u>Wall St. firms</u> implicated?
How serious are the charges?

— Goldman ~~Sachs~~
— Mass. Financial Services

} they were
Davis clients, he called them
+ led to trading

4) Does the fact that Treasury mistakenly posted
the info on its web site mitigate/minimize
the use of the info?

yes & no; only looking at trading that
occurred pre-posting; post-posting, the
info is public

# Exhibit C

**Toone, Robert**

---

| | |
|---|---|
| **From:** | Shope, John |
| **Sent:** | Thursday, December 06, 2007 10:34 AM |
| **To:** | 'Freeborne, Paul (CIV)' |
| **Cc:** | Rossetti, John; 'Williams, Erica Y.'; Toone, Robert; Theodorou, Nicholas |
| **Subject:** | Nothern v. Treasury |

Dear Paul:

Counsel for the SEC (copied here) and I are trying to schedule the depositions permitted in the Nothern v. Treasury APA case. We have two questions:

1. Can you pdf to us today the additional documents to be disclosed under the FOIA case order earlier this week?

2. Will you be involved in scheduling or attending any of the depositions and, if not, with whom should we speak about scheduling? Tom McGivern?

Please let us know. Thanks very much.

Regards, John Shope

1

## Toone, Robert

| | |
|---|---|
| **From:** | Freeborne, Paul (CIV) [Paul.Freeborne@usdoj.gov] |
| **Sent:** | Thursday, December 06, 2007 10:36 AM |
| **To:** | Shope, John |
| **Cc:** | Rossetti, John; Williams, Erica Y.; Toone, Robert; Theodorou, Nicholas |
| **Subject:** | RE: Nothern v. Treasury |

I will be involved in the depositions.  I'll try to get the documents together today.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel. (202) 353-0543**
**Fax. (202) 616-8460**

---

**From:** Shope, John [mailto:JJS@foleyhoag.com]
**Sent:** Thursday, December 06, 2007 10:34 AM
**To:** Freeborne, Paul (CIV)
**Cc:** Rossetti, John; Williams, Erica Y.; Toone, Robert; Theodorou, Nicholas
**Subject:** Nothern v. Treasury

Dear Paul:

Counsel for the SEC (copied here) and I are trying to schedule the depositions permitted in the Nothern v. Treasury APA case.  We have two questions:

1.  Can you pdf to us today the additional documents to be disclosed under the FOIA case order earlier this week?

2.  Will you be involved in scheduling or attending any of the depositions and, if not, with whom should we speak about scheduling?  Tom McGivern?

Please let us know.  Thanks very much.

Regards, John Shope

United States Treasury Regulations require us to disclose the following: Any tax advice included in this document and its attachments was not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code.

This email message and any attachments are confidential and may be privileged. If you are not the intended recipient, please notify Foley Hoag LLP immediately -- by replying to this message or by sending an email to postmaster@foleyhoag.com -- and destroy all copies of this message and any

## Toone, Robert

| | |
|---|---|
| **From:** | Freeborne, Paul (CIV) [Paul.Freeborne@usdoj.gov] |
| **Sent:** | Thursday, December 06, 2007 10:45 AM |
| **To:** | Shope, John |
| **Cc:** | Rossetti, John; Williams, Erica Y.; Toone, Robert; Theodorou, Nicholas |
| **Subject:** | RE: Nothern v. Treasury |

I will be out of the office Christmas week.  I'll see what the witness' schedules look like.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel. (202) 353-0543**
**Fax. (202) 616-8460**

---

**From:** Shope, John [mailto:JJS@foleyhoag.com]
**Sent:** Thursday, December 06, 2007 10:41 AM
**To:** Freeborne, Paul (CIV)
**Cc:** Rossetti, John; Williams, Erica Y.; Toone, Robert; Theodorou, Nicholas
**Subject:** RE: Nothern v. Treasury

Thanks very much.  For scheduling purposes, I would like to get started with the depositions later this month, although hopefully we can avoid the period between the holidays.  (That is not an issue for me, but it may be for others.)  Since some of these will be very short, we should try to combine them.  I suggest, for example, that we combine Davis, Berardi, and Bowser, who I believe all may still be at Treasury, in a single day.  Please let us know about that as well.

Regards, John Shope

---

**From:** Freeborne, Paul (CIV) [mailto:Paul.Freeborne@usdoj.gov]
**Sent:** Thursday, December 06, 2007 10:36 AM
**To:** Shope, John
**Cc:** Rossetti, John; Williams, Erica Y.; Toone, Robert; Theodorou, Nicholas
**Subject:** RE: Nothern v. Treasury

I will be involved in the depositions.  I'll try to get the documents together today.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel. (202) 353-0543**
**Fax. (202) 616-8460**

**Toone, Robert**

---

| | |
|---|---|
| **From:** | Toone, Robert |
| **Sent:** | Monday, January 07, 2008 12:41 PM |
| **To:** | 'paul.freeborne@usdoj.gov' |
| **Cc:** | Shope, John |
| **Subject:** | Nothern v. Treasury |

Dear Paul:

Happy new year.

With respect to the deposition of the five Treasury employees at issue in the APA case, we have still not received any suggested dates from you.  Because there is limited time in this matter, we are going to go ahead and issue notices and subpoenas for these witnesses.  I'm assuming that as counsel for Treasury you will accept service of these notices and subpoenas; please advise me immediately if that is not the case.

Sincerely,

Robin Toone
Foley Hoag LLP
155 Seaport Blvd · Boston, MA 02210-2600
617-832-1242 (direct) · 617-832-7000 (fax)
rtoone@foleyhoag.com

1

## Toone, Robert

**From:**      Freeborne, Paul (CIV) [Paul.Freeborne@usdoj.gov]
**Sent:**      Monday, January 07, 2008 12:55 PM
**To:**        Toone, Robert
**Cc:**        Shope, John
**Subject:** RE: Nothern v. Treasury

Robin,

Please hold off on issuing notices and subpoenas.  I will see if I can get dates.  I will also check on service for the current and former employees you seek to serve.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel. (202) 353-0543**
**Fax. (202) 616-8460**

---

**From:** Toone, Robert [mailto:RToone@foleyhoag.com]
**Sent:** Monday, January 07, 2008 12:41 PM
**To:** Freeborne, Paul (CIV)
**Cc:** Shope, John
**Subject:** Nothern v. Treasury

Dear Paul:

Happy new year.

With respect to the deposition of the five Treasury employees at issue in the APA case, we have still not received any suggested dates from you.  Because there is limited time in this matter, we are going to go ahead and issue notices and subpoenas for these witnesses.  I'm assuming that as counsel for Treasury you will accept service of these notices and subpoenas; please advise me immediately if that is not the case.

Sincerely,

Robin Toone
Foley Hoag LLP
155 Seaport Blvd · Boston, MA 02210-2600
617-832-1242 (direct) · 617-832-7000 (fax)
rtoone@foleyhoag.com

United States Treasury Regulations require us to disclose the following: Any tax advice included in this document and its attachments was not intended or written to be used, and it cannot be used, for the purpose of avoiding penalties under the Internal Revenue Code.

3/12/2008

## Toone, Robert

| | |
|---|---|
| **From:** | Freeborne, Paul (CIV) [Paul.Freeborne@usdoj.gov] |
| **Sent:** | Tuesday, January 08, 2008 10:24 AM |
| **To:** | Toone, Robert |
| **Cc:** | Shope, John |
| **Subject:** | RE: Nothern v. Treasury |

Robin,

Davis, Berardi, and Bowser are available for deposition in D.C. February 8th,11th,12th, or the 13th. I can accept service on their behalf.

Cetina is no longer with Treasury. Treasury counsel is reaching out to her to determine availability and to determine whether I can accept service.

Aufhauser is represented by Joe Warin of Gibson Dunn. E-mail for Joe is fwarin@gibsondunn.com. I would contact Joe directly.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel. (202) 353-0543**
**Fax. (202) 616-8460**

---

**From:** Toone, Robert [mailto:RToone@foleyhoag.com]
**Sent:** Monday, January 07, 2008 12:41 PM
**To:** Freeborne, Paul (CIV)
**Cc:** Shope, John
**Subject:** Nothern v. Treasury

Dear Paul:

Happy new year.

With respect to the deposition of the five Treasury employees at issue in the APA case, we have still not received any suggested dates from you. Because there is limited time in this matter, we are going to go ahead and issue notices and subpoenas for these witnesses. I'm assuming that as counsel for Treasury you will accept service of these notices and subpoenas; please advise me immediately if that is not the case.

Sincerely,

Robin Toone
Foley Hoag LLP
155 Seaport Blvd · Boston, MA 02210-2600
617-832-1242 (direct) · 617-832-7000 (fax)
rtoone@foleyhoag.com

3/12/2008

**Toone, Robert**

| | |
|---|---|
| **From:** | Toone, Robert |
| **Sent:** | Tuesday, January 08, 2008 12:15 PM |
| **To:** | 'Freeborne, Paul (CIV)' |
| **Cc:** | Shope, John; Theodorou, Nicholas |
| **Subject:** | RE: Nothern v. Treasury |

Thanks, Paul.  We will check the SEC's availability on those dates.

With respect to Ms. Cetina, it's our understanding that she lives in Alexandria.  We would like to depose her in D.C. during the week of <u>February 4-8</u>.  Please let us know if you have any conflicts during that week; we will also check with the SEC.

--Robin

---

**From:** Freeborne, Paul (CIV) [mailto:Paul.Freeborne@usdoj.gov]
**Sent:** Tuesday, January 08, 2008 10:24 AM
**To:** Toone, Robert
**Cc:** Shope, John
**Subject:** RE: Nothern v. Treasury

Robin,

Davis, Berardi, and Bowser are available for deposition in D.C. February 8th,11th,12th, or the 13th.  I can accept service on their behalf.

Cetina is no longer with Treasury.  Treasury counsel is reaching out to her to determine availability and to determine whether I can accept service.

Aufhauser is represented by Joe Warin of Gibson Dunn.  E-mail for Joe is <u>fwarin@gibsondunn.com</u>.  I would contact Joe directly.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel.  (202) 353-0543**
**Fax. (202) 616-8460**

---

**From:** Toone, Robert [mailto:RToone@foleyhoag.com]
**Sent:** Monday, January 07, 2008 12:41 PM
**To:** Freeborne, Paul (CIV)
**Cc:** Shope, John
**Subject:** Nothern v. Treasury

Dear Paul:

Happy new year.

3/12/2008

## Toone, Robert

| | |
|---|---|
| **From:** | Freeborne, Paul (CIV) [Paul.Freeborne@usdoj.gov] |
| **Sent:** | Friday, January 11, 2008 10:10 AM |
| **To:** | Toone, Robert |
| **Cc:** | Timothy.Kollar@do.treas.gov; Tom.McGivern@do.treas.gov |
| **Subject:** | RE: Nothern v. Treasury |

Robin,

Ms. Cetina is available on the 8th.  Please let me know the dates for all depositions.  Please cc: Tim and Tom.  Thanks.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel.  (202) 353-0543**
**Fax. (202) 616-8460**

---

**From:** Toone, Robert [mailto:RToone@foleyhoag.com]
**Sent:** Tuesday, January 08, 2008 3:23 PM
**To:** Freeborne, Paul (CIV)
**Cc:** Theodorou, Nicholas; Shope, John
**Subject:** FW: Nothern v. Treasury

Paul:

With respect to Ms. Cetina's deposition, the SEC informs us that they are available on <u>February 7 or 8</u>, but not February 4-6.

The SEC is also available to participate in the Davis, Berardi, and Bowser depositions on February 11-13.  We will set up a schedule for these depositions and notify you shortly.

--Robin

---

**From:** Toone, Robert
**Sent:** Tuesday, January 08, 2008 12:15 PM
**To:** 'Freeborne, Paul (CIV)'
**Cc:** Shope, John; Theodorou, Nicholas
**Subject:** RE: Nothern v. Treasury

Thanks, Paul.  We will check the SEC's availability on those dates.

With respect to Ms. Cetina, it's our understanding that she lives in Alexandria.  We would like to depose her in D.C. during the week of <u>February 4-8</u>.  Please let us know if you have any conflicts during that week; we will also check with the SEC.

--Robin

## Toone, Robert

| | |
|---|---|
| **From:** | Toone, Robert |
| **Sent:** | Friday, January 11, 2008 4:44 PM |
| **To:** | 'Freeborne, Paul (CIV)' |
| **Cc:** | 'Timothy.Kollar@do.treas.gov'; 'Tom.McGivern@do.treas.gov'; 'Williams, Erica Y.'; 'Rossetti, John'; Theodorou, Nicholas; Shope, John |
| **Subject:** | RE: Nothern v. Treasury |

Thanks, Paul.

Here is our proposed schedule. All depositions will take place at our D.C. office, 1875 K Street, Suite 800. I'm cc'ing Erica Williams and John Rossetti at the SEC also.

| | |
|---|---|
| **Jill Cetina** | **Friday, Feb. 8, 10:00 a.m.** |
| **Michele Davis** | **Monday, Feb. 11, 1:00 p.m.** |
| **Elnora Bowser** | **Tuesday, Feb. 12, 10:00 a.m.** |
| **Steve Berardi** | **Tuesday, Feb. 12, 1:00 p.m.** |

Have a good weekend,


Robin Toone
Foley Hoag LLP
155 Seaport Blvd · Boston, MA 02210-2600
617-832-1242 (direct) · 617-832-7000 (fax)
rtoone@foleyhoag.com

---

**From:** Freeborne, Paul (CIV) [mailto:Paul.Freeborne@usdoj.gov]
**Sent:** Friday, January 11, 2008 10:10 AM
**To:** Toone, Robert
**Cc:** Timothy.Kollar@do.treas.gov; Tom.McGivern@do.treas.gov
**Subject:** RE: Nothern v. Treasury

Robin,

Ms. Cetina is available on the 8th. Plesase let me know the dates for all depositions. Please cc: Tim and Tom. Thanks.

**Paul G. Freeborne**
**Trial Attorney**
**United States Department of Justice**
**Civil Division**
**Federal Programs Branch**
**20 Massachusetts Ave., N.W.**
**Room 6108**
**Washington, D.C. 20001**
**Tel. (202) 353-0543**
**Fax. (202) 616-8460**

3/12/2008

# Exhibit D



**FOLEY HOAG** LLP

ATTORNEYS AT LAW

John A. Shope
Partner
Boston Office
617.832.1233
jshope@foleyhoag.com

February 25, 2008

**BY E-MAIL AND FIRST-CLASS MAIL**

Erica Y. Williams, Esquire
Securities and Exchange Commission
100 F Street, N.E., Mail Stop 4010
Washington, D.C. 20549-4010

Re: *United States Securities and Exchange Commission v. Nothern,*
*Civil Action No. 05-10983 (NMG) (D. Mass.)*

Dear Erica:

As you know, we contend that a critical issue in this case is the extent to which the Treasury Department adequately protected the confidentiality of its information on the 30-year bond prior to its purported 10:00 a.m. embargo. As the Second Circuit has observed, the availability of information through such sources as "trade publications, analysts' reports, newspapers, magazines, rumors, word of mouth or other sources" is relevant to whether it is "nonpublic" at a particular time. *United States v. Cusimano,* 123 F.3d 83, 89 n.6 (2d Cir. 1997). Furthermore, even if the information were non-public, the existence of the reports and rumors — which Mr. Nothern has testified were reported to him — bears on the reasonableness of Mr. Nothern's belief that the single mention of the words "news embargo" did not put him on notice of any fiduciary or similar duty on the part of Mr. Davis not to report the Treasury's decision to suspend issuance of the 30 year bond. Significant evidence that bears on both of these points, however, was not obtained until the most recent document productions by the Treasury Department and depositions of Treasury personnel ordered by Judge Gorton under the Freedom of Information and Administrative Procedure Acts in our collateral litigation against Treasury.

To avoid the need for additional or reopened depositions and to ensure that there is no dispute regarding the jury's ability to consider evidence bearing on this question, we are asking the SEC to stipulate to the admissibility of the following items:

1.    The eleven pages of e-mails attached as Exhibit 10 to the January 2002 report of the Office of Inspector General. According to that report, in this exhibit "Cetina memorialized information she received on October 31, relating to the 30-year

Erica Y. Williams, Esquire
February 25, 2008
Page 2

bond announcement, in a series of e-mail messages sent to her Treasury Department superiors."

In addition, at her deposition from earlier this month (pp. 94-96), Ms. Cetina testified that the cut-and-paste e-mail set forth on the fourth, fifth, and sixth pages of this Exhibit – beginning "Jill, We definitely heard rumors as early as 9am . . ." – was sent to her by either Robert Sbarra from HSBC or Patrick Haskel from Credit Suisse First Boston. Ms. Cetina further testified (pp. 103-05) that Derrick Kehoe from HSBC was the "dealer in London" referred to the fifth page of this Exhibit and that he heard a "rumor that the long bond would be eliminated yesterday from a European central bank."

We ask that you stipulate to the authenticity and admissibility of OIG Report Exhibit 10 and all information contained therein. We also ask that you stipulate to the admissibility of Ms. Cetina's testimony referenced above.

We also ask that you stipulate to the admissibility of the following excerpts from Ms. Cetina's testimony:

- page 34, line 19 -- page 36, line 13
- page 44, line 2 -- page 45, line 16
- page 46, line 17 -- page 48, line 3
- page 49, line 10 -- page 51, line 4
- page 51, line 16 -- page 53, line 11
- page 68, line 14 -- page 69, line 15
- page 82, line 10 -- page 84, line 13
- page 89, line 3 -- page 97, line 11
- page 102, line 9 -- page 106, line 6
- page 131, line 6 -- page 132, line 18

Please note that we may seek admission of other portions of Ms. Cetina's testimony as well.

2.    The November 5, 2001 e-mail from Tony Fratto to Megan Hills, identified as FOIAKBC 630 by Treasury in its FOIA production, stating that "long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years." Even though this e-mail is obviously relevant to the case, Treasury initially redacted it, then disclosed it more than five months after our deposition of Mr. Fratto. We ask that you stipulate to the authenticity and admissibility of FOIAKBC 630 and all information contained therein.

Erica Y. Williams, Esquire
February 25, 2008
Page 3


       3.      The October 31, 2001 e-mail exchange between Timothy Bitsberger and Tony Fratto, identified as FOIAKBC 651 by Treasury. In this exchange, Bitsberger (a high-level official in Treasury's Office of Domestic Finance) revealed that (i) Treasury's "refunding process has been criticized for years because of suspected leaks," and (ii) there had been a leak "attributed to the borrowing committee" in connection with the emergency reopening of the 10-year note on October 4, 2001. Judge Gorton ordered the disclosure of the cited portions of this e-mail in his December 4, 2007 order in our pending FOIA suit against Treasury – more than a year after the Fratto deposition and the previous fact discovery deadline. We ask that you stipulate to the authenticity and admissibility of FOIAKBC 651 and all information contained therein.

       4.      Finally, we ask that you stipulate to the authenticity of the following documents set forth in your production:

- SECNOTH00007555
- SECNOTH00007577
- SECNOTH00094043
- SECNOTH00094044
- SECNOTH00094037
- SECNOTH00094108
- SECNOTH00094110
- SECNOTH00094358
- SECNOTH00097766
- SECNOTH00119838
- SECNOTH00119991
- SECNOTH00121007
- SECNOTH00124489
- SECNOTH00132152

      Again, we may wish to introduce other items from your production, but are seeking your stipulation now in relation to avoiding further discovery.

      Please let me know if you will agree to these proposed stipulations by Thursday, February 28, 2008. I look forward to hearing from you.

                    Sincerely,

                    John A. Shope

cc:    John J. Rossetti Jr., Esquire
       Nicholas C. Theodorou, Esquire
       Robert E. Toone, Esquire

# Exhibit E



UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
100 F STREET, N.E.
WASHINGTON, D.C. 20549-4010

DIVISION OF
ENFORCEMENT

Erica Y. Williams
Assistant Chief Litigation Counsel
Telephone:  (202) 551-4450
Facsimile:  (202) 772-9245
Williamse@sec.gov

February 28, 2008

*By Facsimile and First Class Mail*

John Shope, Esq.
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Blvd.
Boston, MA 02210

> Re:   *Securities and Exchange Commission v. Steven E. Nothern,* Case No. 05-10983
>         (NMG)

Dear John:

I am writing in response to your letter that I received on the evening of February 25, 2008. In your letter you request that the SEC stipulate to the authenticity and admissibility of certain documents and testimony, including documents that the SEC did not create or produce that contain objectionable and unreliable hearsay evidence, and testimony from a witness, Jill Cetina, who admitted under oath that she had no personal knowledge about the matters that are the subject of the testimony you are seeking to admit.

As an initial matter, your request that the SEC stipulate to the authenticity and admissibility of certain documents and testimony prior to the end of fact discovery, before the parties exchange expert disclosures and conduct expert discovery, and before the filing of dispositive motions is premature. Under Rule 26(a)(3) of the Federal Rules of Civil Procedure and Local Rule 16.5, the parties are to exchange pretrial disclosures, (i.e., witness lists, exhibit lists and deposition designations) no later than 30 days before the date of the final pretrial conference, and are to confer no later than 15 days before the final pretrial conference about any objections to the use of evidence identified in the pretrial disclosures. The rules do not require the SEC to unilaterally stipulate to the admissibility of a subset of documents and deposition designations seven months prior to the pretrial conference and before discovery is complete.

John Shope, Esq.
February 28, 2008
Page 2

You claim that you are requesting that the SEC enter into these premature stipulations because they are necessary "[t]o avoid the need for additional or reopened depositions." This claim is far fetched. As you are aware, the SEC filed this action on May , 2005. During the course of fact discovery, which began in September 2006, the defense has deposed a total of 18 witnesses, including 15 current or former Treasury employees. At these depositions, you explored every topic that could possibly be relevant to the trial of this matter, including the existence of reports or rumors about the elimination of the 30-year bond. Contrary to your assertions, the documents and testimony Nothern received in his collateral action against Treasury did not disclose any new topic areas, or identify any new witnesses that would justify any further depositions or an extension of the February 29, 2008 fact discovery deadline.

You have had the benefit of Treasury's FOIA production since at least December 4, 2007. Indeed, the large majority of the production was provided to you in March 2007. If you desired to take any additional depositions, you had plenty of time to raise that issue with the SEC and the Court before now. With full knowledge of the information contained in Treasury's subsequent document production, you proposed a fact discovery deadline of February 29, 2008 and then waited until days before the deadline to assert an alleged "need" for additional discovery. The SEC will oppose any effort on Nothern's part to further protract this litigation and delay the trial of this matter by conducting any additional fact witness depositions.

Additionally, the SEC disagrees with your claim that information about the existence of reports or rumors regarding the elimination of the 30-year bond somehow provide a defense for Nothern's trading in the 30-year bond based on the tip that he received from Peter Davis. The case you cite in your letter, *U.S. v. Cusimano*, 123 F.3d 83, 89 (2d. Cir. 1997) makes clear that a "tip from a corporate insider which is more reliable or specific than public rumors is non-public despite the existence of such rumors." (citing *SEC v. Mayhew*, 121 F.3d 44, 49-50 (2d Cir. 1997)). In fact, many of the rumors contained in the documents and testimony identified in your February 25 letter appear to have been circulated after Nothern placed his order to trade in the 30-year bond. Furthermore, there is no evidence that any of the alleged rumors referenced in the documents and testimony identified in your letter ever reached Nothern.

Although your request for stipulations is unwarranted, in the interest of cooperation, I have explained below which stipulations the SEC will and will not enter into at this time. However, because of the premature nature of your request, the SEC reserves the right to revise or amend the following authenticity or admissibility stipulations until the parties finalize and submit their joint pretrial memorandum to the Court.

The SEC submits the following initial responses to the stipulation requests raised in your February 25, 2008 letter:

1.      The SEC stipulates to the authenticity of Exhibit 10 to the January 2002 report of the Treasury's Office of Inspector General.

John Shope, Esq.
February 28, 2008
Page 3

      The SEC stipulates to the admissibility of the October 31, 2001, 9:55 a.m email from Jill Cetina to various Treasury employees, Subject: Looks like Reuters out a bit early with this . . . it was rumored before the headlines. (SECNOTH00103627). The SEC does not stipulate to the admissibility of any other documents contained in Treasury OIG Report, Exhibit 10.

      The SEC does not stipulate to the admissibility of any of the deposition excerpts of Jill Cetina's testimony contained on page 2 of your February 25, 2008 letter and reserves the right to raise additional objections to the admissibility of that testimony, and any other testimony that you may wish to designate from that deposition. The deposition excerpts that you seek to admit from Ms. Cetina are objectionable for a variety of reasons, including, but not limited to, the fact that they contain irrelevant, speculative, hearsay testimony. The excerpts are also objectionable because Ms. Cetina admitted that she had no personal knowledge on many of the matters that were the subject of her testimony.[1]

      In your February 25 letter, you contend that new evidence bearing on the existence of rumors regarding the cancellation of the 30-year bond was only recently discovered in recent depositions, including the deposition of Ms. Cetina. The fact is that you have had documents in your possession for nearly a year that identified the rumors that Ms. Cetina claims were relayed to her on October 31, 2001 through second-hand accounts after Treasury's refunding announcement had been made public, and the sources of those rumors. *See* FOIAKBC 400, 401, 437, 872, Treasury OIG Report Exhibit 10. Ms. Cetina's deposition did not uncover any new information or identify any new witnesses that would warrant further fact witness depositions in this case.

2.     The SEC stipulates to the authenticity of the November 5, 2001 email from Tony Fratto to Megan Hills, FOIAKBC 630.

---

[1] *See* Cetina dep. at 156:14-157:17, 167:16-168:19, 170:20-171:17, 197:21-198:20, 206:17-207:15, 209:1-212:5, 215:6-16, 258:1-20 (Ms. Cetina admits, *inter alia*, that she has: (1) no personal knowledge about anyone at Treasury leaking any information concerning the elimination of the 30-year bond prior to the October 31, 2001, (2) no personal knowledge about whether Lehman Brothers traded in the 30-year bond, (3) no personal knowledge about whether the 30-year bond traded special on the repo market on October 30, 2001, (4) no personal knowledge about why Paul Malvey retired from Treasury, (5) no personal knowledge about whether Mr. Malvey ever communicated with any relatives that worked at Lehman Brothers, (6) no personal knowledge of any rumors or complaints regarding Treasury's re-opening of the 10-year note in October 2001, (7) no personal knowledge about any rumors circulating in the market on October 31, 2001 prior to the public announcement about the cancellation of the 30-year bond through either Treasury's website or over the news wires).

John Shope, Esq.
February 28, 2008
Page 4

The SEC does not stipulate to the admissibility of FOIAKBC 630, which contains information that is irrelevant and prejudicial.  The SEC also reserves the right to raise additional objections to the admissibility of this document.

You received the unredacted version of  FOIAKBC 630 nearly a year ago and have used it to question numerous witnesses, including Mr. Fratto's former supervisor, Michelle Davis. During Mr. Frattos's deposition, you examined him extensively on his knowledge regarding the history of individuals gaining access to Treasury refunding conferences. While the SEC believes this email and its contents are wholly irrelevant to any issues in this insider trading case against Mr. Nothern, and that the email should be excluded from trial, the record shows that you had the opportunity to fully explore the irrelevant statements contained in the email with Mr. Fratto and other witnesses.  No further discovery on this email or its contents is needed.

3.      The SEC stipulates to the authenticity of the October 31, 2001 email exchange between Timothy Bitsberger and Tony Fratto, FOIAKBC 651.

The SEC does not stipulate to the admissibility of FOIAKBC 651 and reserves the right to raise additional objections to its admissibility. FOIAKBC 651 contains information concerning alleged leaks by Treasury that preceded the announcement of the cancellation of the 30-year bond. This historical information is prejudicial and is not relevant to any claims or valid defenses in this case.  Even if the information contained in this document were relevant – which it is not – you already examined Mr. Fratto and numerous other witnesses about suspected leaks resulting from Treasury announcements that occurred before the announcement at issue in this case, including alleged leaks related to the reopening of the 10-year note, and supposed criticisms of the Treasury refunding process. Additionally, you have known about the existence of this email for nearly three months.  Nothing in this email supports a request to allow you to take additional fact witness depositions or justifies your delay in seeking additional fact discovery.

4.      The SEC stipulates to the authenticity of the following documents:

SECNOTH00007555
SECNOTH00007577
SECNOTH00094043
SECNOTH00094044
SECNOTH00094018
SECNOTH00094110
SECNOTH00094358
SECNOTH00119838
SECNOTH00119991
SECNOTH00121007
SECNOTH00124489
SECNOTH00132152

John Shope, Esq.
February 28, 2008
Page 5

The SEC docs not stipulate to the authenticity of the following documents:

    SECNOTH00094037
    SECNOTH00097766

The SEC does not stipulate to the admissibility of the following documents and
reserves the right to make additional objections to the admissibility of these documents:

    SECNOTH00007555
    SECNOTH00007577
    SECNOTH00094043
    SECNOTH00094044
    SECNOTH00094037
    SECNOTH00094018
    SECNOTH00094110
    SECNOTH00094358
    SECNOTH00119838
    SECNOTH00119991
    SECNOTH00097766
    SECNOTH00121007
    SECNOTH00124489
    SECNOTH00132152

Should you have any questions about the information contained above, please do not
hesitate to call. Also, please note that I will be out of the country March 1 – 8, 2008 and will have
limited access to telephone and email. During that time please copy my colleagues Sarah Levine
and John Rossetti on any correspondence that you send to me and direct your telephone calls to
them. Thank you for your cooperation.

                          Sincerely,

                          Erica Y. Williams

cc:    Nicholas Theodorou, Esq.
       Robert Toone, Esq.
       Sarah Levine, Esq.
       John J. Rossetti, Jr., Esq.

# Exhibit F

Page 1 of 1

**Kerner, Francine**

| | |
|---|---|
| **From:** | Sharer, James |
| **Sent:** | Wednesday, October 31, 2001 3:17 PM |
| **To:** | Kerner, Francine; Bieger, Peter |
| **Subject:** | FW: Looks like Reuters out a bit early with this... it was rumored before the headlines. |

-----Original Message-----
**From:** Cetina, Jill
**Sent:** Wednesday, October 31, 2001 9:55 AM
**To:** Roseboro, Brian; Bitsberger, Timothy; Malvey, Paul; Gross, Jared
**Cc:** Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James
**Subject:** Looks like Reuters out a bit early with this... it was rumored before the headlines.

09:57 31Oct2001 US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS
09:57 31Oct2001 US TREASURY SAYS BOND ISSUANCE DISCONTINUATION EFFECTIVE IMMEDIATELY
09:57 31Oct2001 TREASURY'S FISHER-DEBT BUYBACK PROGRAM ON A 'QUARTER-TO-QUARTER' BASIS
09:57 31Oct2001 TREASURY'S FISHER-BUYBACK TARGETS, IF ANY, TO BE ANNOUNCED AT REFUNDINGS
09:57 31Oct2001 TREASURY'S FISHER-GOVERNMENT BORROWING NEEDS 'ELEVATED FOR NEXT YEAR OR SO'
09:57 31Oct2001 TREASURY'S FISHER ANTICIPATES BUDGET GAP IN 2002, 'PERHAPS' IN 2003 AS WELL
09:57 31Oct2001 TREASURY'S FISHER EXPECTS RETURN TO BUDGET SURPLUSES IN COMING YEARS
09:57 31Oct2001 TREASURY'S FISHER-'WE DO NOT NEED' 30-YEAR BOND TO MEET GOVT FINANCE NEEDS
09:57 31Oct2001 TREASURY FISHER--30-YEAR BOND NO LONGER HAS POSITION OF SIGNIFICANCE IN MARKETS
09:57 31Oct2001 TREASURY'S FISHER- 'COSTLESS' TO REINTRODUCE 30-YEAR BOND IN FUTURE, IF NEEDED
09:57 31Oct2001 TREASURY'S FISHER-BUYBACK DECISIONS TO BE MADE IN LIGHT OF FISCAL PROJECTIONS
09:57 31Oct2001 TREASURY SAYS TO REPURCHASE $9 BLN IN DEBT IN Q4, IN LINE WITH ORIGINAL GOAL

For Related News, Double Click on one of these codes:
[M] [T] [NAT] [D] [E] [U] [MNI] [US] [WASH] [DBT] [GVD] [ISU] [INT] [MUNI] [LEN] [RTRS]
[NEWSYEAR 2000]
ENDS
*Jill Cetina,*
*International Economist*
*Market Room*
*U.S. Treasury Department*
*202-622-2017*

**Kerner, Francine**

---

**From:** Sharer, James
**Sent:** Wednesday, October 31, 2001 3:18 PM
**To:** Kerner, Francine; Bieger, Peter
**Subject:** FW: Today's announcement

-----Original Message-----
**From:** Cetina, Jill
**Sent:** Wednesday, October 31, 2001 10:06 AM
**To:** Cetina, Jill; Roseboro, Brian; Bitsberger, Timothy; Malvey, Paul; Gross, Jared
**Cc:** Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James
**Subject:** Today's announcement

Just had a Treasury market contact call in to complain about how this was released... he claims it was posted on Treasury's website before 10 a.m. so some firms knew about it before it hit the wires.

[Cetina, Jill]  -----Original Message-----
**From:** Cetina, Jill
**Sent:** Wednesday, October 31, 2001 9:55 AM
**To:** Roseboro, Brian; Bitsberger, Timothy; Malvey, Paul; Gross, Jared
**Cc:** Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James
**Subject:** Looks like Reuters out a bit early with this... it was rumored before the headlines.

09:57 31Oct2001 US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS
09:57 31Oct2001 US TREASURY SAYS BOND ISSUANCE DISCONTINUATION EFFECTIVE IMMEDIATELY
09:57 31Oct2001 TREASURY'S FISHER-DEBT BUYBACK PROGRAM ON A 'QUARTER-TO-QUARTER' BASIS
09:57 31Oct2001 TREASURY'S FISHER-BUYBACK TARGETS, IF ANY, TO BE ANNOUNCED AT REFUNDINGS
09:57 31Oct2001 TREASURY'S FISHER-GOVERNMENT BORROWING NEEDS 'ELEVATED FOR NEXT YEAR OR SO'
09:57 31Oct2001 TREASURY'S FISHER ANTICIPATES BUDGET GAP IN 2002, 'PERHAPS' IN 2003 AS WELL
09:57 31Oct2001 TREASURY'S FISHER EXPECTS RETURN TO BUDGET SURPLUSES IN COMING YEARS
09:57 31Oct2001 TREASURY'S FISHER-'WE DO NOT NEED' 30-YEAR BOND TO MEET GOVT FINANCE NEEDS
09:57 31Oct2001 TREASURY FISHER--30-YEAR BOND NO LONGER HAS POSITION OF SIGNIFICANCE IN MARKETS
09:57 31Oct2001 TREASURY'S FISHER- 'COSTLESS' TO REINTRODUCE 30-YEAR BOND IN FUTURE, IF NEEDED
09:57 31Oct2001 TREASURY'S FISHER-BUYBACK DECISIONS TO BE MADE IN LIGHT OF FISCAL PROJECTIONS
09:57 31Oct2001 TREASURY SAYS TO REPURCHASE $9 BLN IN DEBT IN Q4, IN LINE WITH ORIGINAL GOAL

For Related News, Double Click on one of these codes:
[M] [T] [NAT] [D] [E] [U] [MNI] [US] [WASH] [DBT] [GVD] [ISU] [INT]
[MUNI] [LEN] [RTRS]
 [NEWSYEAR 2000]
ENDS
*Jill Cetina,*
*International Economist*
*Market Room*
*U.S. Treasury Department*
*202-622-2017*

11/02/2001

Kerner, Francine

| | |
|---|---|
| **From:** | Sharer, James |
| **Sent:** | Wednesday, October 31, 2001 3:18 PM |
| **To:** | Kerner, Francine; Bieger, Peter |
| **Subject:** | FW: Some thoughts on e-mail from a primary dealer contact |

-----Original Message-----

| | |
|---|---|
| **From:** | Cetina, Jill |
| **Sent:** | Wednesday, October 31, 2001 10:45 AM |
| **To:** | Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul |
| **Cc:** | Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James |
| **Subject:** | Some thoughts on e-mail from a primary dealer contact |

Jill

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

Kerner, Francine
From:     Sharer, James
Sent:     Wednesday, October 31, 2001 3:19 PM
To:       Kerner, Francine; Bieger, Peter
Subject:  FW: Some thoughts on e-mail from a primary dealer contact


-----Original Message-----
From:     Cetina, Jill
Sent:     Wednesday, October 31, 2001 11:40 AM
To:       Cetina, Jill; Roseboro, Brian; Bitsberger, Timothy; Gross, Jared;
          Malvey, Paul
Cc:       Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer,
          James
Subject:  RE: Some thoughts on e-mail from a primary dealer contact


Had a different primary dealer tell me that they received a call from John Jacobs from IDEA yesterday about a rumor that Treasury would eliminate the long bond. The same dealer reports that the long bond was trading special on repo yesterday.

A third dealer in London said he heard rumor that the long bond would be eliminated yesterday from a European central bank.

-----Original Message-----
From:     Cetina, Jill
Sent:     Wednesday, October 31, 2001 10:45 AM
To:       Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul
Cc:       Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer,
          James
Subject:  Some thoughts on e-mail from a primary dealer contact


Jill

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

**Kerner, Francine**

| | |
|---|---|
| From: | Sharer, James |
| Sent: | Wednesday, October 31, 2001 3:19 PM |
| To: | Kerner, Francine; Bieger, Peter |
| Subject: | FW: Some thoughts on e-mail from a primary dealer contact |

Importance:    High

-----Original Message-----

| | |
|---|---|
| From: | Dulaney, Tim |
| Sent: | Wednesday, October 31, 2001 11:43 AM |
| To: | Cetina, Jill; Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul |
| Cc: | Byrne, Kathleen; Corfield, Anna; Quinn, Lois; Sharer, James |
| Subject: | RE: Some thoughts on e-mail from a primary dealer contact |
| Importance: | High |

Thanks, Jill.  One market contact who is pretty knowledgeable about this stuff was struck by the view that Treasury was trying to move the curve and attributed it mainly to a WSJ report that suggested this.

On another point, I just got my bleep chewed by an angry market participant who said she could not find the Fisher remarks on the Treasury web site.  Can anyone point me in the right direction so I can pass it along to her?  Thanks.

-----Original Message-----

| | |
|---|---|
| From: | Cetina, Jill |
| Sent: | Wednesday, October 31, 2001 10:45 AM |
| To: | Roseboro, Brian; Bitsberger, Timothy; Gross, Jared; Malvey, Paul |
| Cc: | Byrne, Kathleen; Corfield, Anna; Dulaney, Tim; Quinn, Lois; Sharer, James |
| Subject: | Some thoughts on e-mail from a primary dealer contact |

Jill

We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news...Someone told me they actually saw it on your website at 9:50am

For the content of it, many here do NOT believe that the deficits are temporary. While agreed that reintroducing 30yrs would be costless, much is being made of the Fed's desire to see lower long-term

rates as a key ingredient here. My main concern is the impact on 5yr and 10yr rates of more supply.

### Kerner, Francine

| | |
|---|---|
| **From:** | Sharer, James |
| **Sent:** | Wednesday, October 31, 2001 3:19 PM |
| **To:** | Kerner, Francine; Bieger, Peter |
| **Subject:** | FW: Oct 31 Noon Report – A morning of surprises.. better-than-expected data but the curve flattens |

-----Original Message-----
**From:** Cetina, Jill
**Sent:** Wednesday, October 31, 2001 1:02 PM
**To:** _DL_Market Group; Andrew Sacher; ClayLowery; Eric Otto; Griffiths; Hoffman; MegLundsager; Paul Reid; PMalmgren; Wayne
**Subject:** Oct 31 Noon Report -- A morning of surprises.. better-than-expected data but the curve flattens

**A morning of surprises -- preliminary Q3 GDP and Chicago PMI better-than-expected; Treasury eliminates the long bond; buybacks as needed going forward**
**U.S. Markets**

**Treasuries:** Today's advance Q3 GDP data came in somewhat better-than-expected, contracting 0.4% q/q. At 10 a.m. Treasury announced it would eliminate issuance of 30-year nominal and inflation adjusted bonds and that while buybacks would continue for this year future buybacks would be announced quarterly. The decision caught participants off-guard. The bond rallied with the yield falling 29 bps to 4.92% in heavy trading. TIPS also rallied.

However, dealer contacts complained news of the bond's elimination had been leaked -- citing early morning rumors, tightness of the bond in the repo market yesterday, buying of cash and futures ahead of the official release as well as an early posting of the news on Treasury's website. A few dealers noted rumors had also circulated that Treasury would resume monthly 5-year auctions which was not announced today. Some dealers questioned whether the Administration was trying to flatten the Treasury curve to pass on lower rates to corporates and homeowners to stimulate the economy. Short-dated Treasuries underperformed, as accounts reallocated and bought bonds and on strength in U.S. equities. Ancedotally, some participants noted today's data coupled with lower rates at the back-end increased the likelihood the FOMC would cut by 25 bps next Tuesday, not 50 bps. The 2-10 year and 2-30-year curves are 11 and 23 bps flatter relative to this morning. Canadian long bonds benefitted, with the yield falling 16 bp (JCetina 2-2017)

**U.S. equities** were mostly higher in active trading, in reaction to today's data. News Treasury was halting sales of long bonds also boosted stocks. Enron rose 14.2% to $12.75 on talk of a takeover by GE Capital, Berkshire Hathaway or Royal Dutch Petroleum. (JSharer 2-2042)

Global Markets

**Fx:** The dollar gained following the data, and was also bolstered by strength in equities and Treasury's news about the bond and is currently about 0.5% firmer against most major currencies. This morning's move has pushed the euro and yen to near technically signficant levels at $0.90 and Y122.50, if these levels are broken, further dollar buying

could be triggered. (JCetina 2-2017)

**Europe:** European bourses closed flat to 2.1% higher, with the CAC-40 outperforming as a number of firms announced cost-cutting moves and U.S. equities gained. German bund yields were up 2 to down 9 bps, with 30-year bunds outperforming. U.K. gilt yields fell 1 to 6 bps on slumping consumer confidence and expectations for another BOE rate cut. (JSharer 2-2042)

**Latin America:** Dealers noted this morning continued interest by a large Spanish bank to buy Argentine bonds earlier this morning, triggering further buying by others to cover short positions. However, later in the morning contacts noted rumors Argentina has moved its reserves to the BIS (interpretted as a move to protect Argentine assets from creditors in the event of a default) which has weighed somewhat on Argentine debt. The Argentine 08' bond is currently down 2 points. (JCetina 2-2017)

| Today's Events: | Actual | Previous |
|---|---|---|
| Period | Consensus Expectation | |
| US Q3 GDP, advance | -0.4% q/q | 0.3% |
| q/q | -1.0 q/q — | |
| US Q3 GDP deflator | 2.1% | |
| 2.1% | 1.6% | |
| Treasury Quarterly Refunding | 10 a.m. | |
| Chicago PMI | 46.2 | |
| 46.6 | 44.0 | |

In addition to the PDF version of the report, please find text from today's Quarterly Refunding.

11/02/2001

**A morning of surprises—preliminary Q3 GDP and Chicago PMI better-than-expected; Treasury eliminates the long bond; buybacks as needed going forward**

10/31/01 1:01 PM

**U.S. Markets**  Treasuries: Today's advance Q3 GDP data came in somewhat better-than-expected, contracting 0.4%/q/q. At 10 a.m. Treasury announced it would eliminate issuance of 30-year nominal and inflation adjusted bonds and that while buybacks would continue for this year future buybacks would be announced quarterly. The decision caught participants off-guard. The bond rallied with the yield falling 29 bps to 4.92% in heavy trading. TIPS also rallied. However, dealer contacts complained news of the bond's elimination had been leaked—citing early morning rumors, tightness of the bond in the repo market yesterday, buying of cash and futures ahead of the official release as well as an early posting of the news on Treasury's website. A few dealers noted rumors had also circulated that Treasury would resume monthly 5-year auctions which was not announced today. Some dealers questioned whether the Administration was trying to flatten the Treasury curve to pass on lower rates to corporates and home owners to stimulate the economy. Short-dated Treasuries underperformed, as accounts reallocated and bought bonds and on strength thin U.S. equities. Anecdotally, some participants noted today's data coupled with lower rates at the back-end increased the likelihood the FOMC would cut by 25 bps next Tuesday, not 50 bps. The 2-10 year and 2-30 year curve are all and 23 bps flatter relative to this morning. Canadian long bonds benefitted, with the yield falling 16 bp (JCetina2-2017)

U.S. equities were mostly higher in active trading, in reaction to today's data. News Treasury was halting sales of long bonds also boosted stocks. Enron rose 14.2% to $12.75 on talk of a takeover by GE Capital, Berkshire Hathaway or Royal Dutch Petroleum. (JSharer2-2042)

**Global Markets**
Fx: The dollar rallied following the data, on the back of strength in equities and Treasury's news about the bond and is currently about 0.5% firmer against most major currencies. This morning's move has pushed the euro and yen to near technically significant levels at $0.90 and Y122.50, if these levels are broken, further dollar buying could be triggered. (JCetina2-2017)

Europe: European bourses closed flat to 2.1% higher, with the CAC-40 outperforming as a number of firms announced cost-cutting moves and U.S. equities gained. German bund yields were up 2 to down 9 bps, with 30-year bunds outperforming. U.K. gilt yields fell 11 to 6 bps on slumping consumer confidence and expectations for another BOE rate cut. (JSharer2-2042)

Latin America:  Dealers noted this morning continued interest by a large Spanish bank to buy Argentine bonds earlier this morning, triggering further buying by others to cover short positions. However, later in the morning contacts noted rumors Argentina has moved its reserve to the BIS (interpreted as a move to protect Argentina assets from creditors in the event of a default) which has weighed on somewhat on Argentine debt. The Argentine 08' bond is currently down 2 points.   (JCetina2-2017)

| Equities | 1:01PM | Change |
|---|---|---|
| DJIA | 9,090 | -0.35% |
| Nasdaq | 1,685 | 1.05% |
| S&P500 | 1,061 | 0.09% |
| Wilshire TotMkt | 9,785 | 0.07% |
| DJIA Vol. | 127,135,200 | |
| Canadian TSE | 6,854 | 0.41% |
| Mexican Bolsa | 5,532 | 0.05% |
| Brazilian Bovespa | 11,061 | 0.33% |
| German Dax | 4,527 | -0.37% |
| French CAC-40 | 4,341 | 2.10% |
| U.K. FTSE | 5,040 | 0.72% |
| Nikkei-225 | 10,366 | -1.39% |

| U.S. Treasuries | 1:01PM | Change bps |
|---|---|---|
| 1-month bill | 2.14% | 7 |
| 3-month bill | 2.07% | 3 |
| 6-month bill | 1.96% | -4 |
| 2-year | 2.47% | 2 |
| 5-year | 3.51% | -8 |
| 10-year | 4.26% | -16 |
| 30-year | 4.83% | -38 |

| Money Markets | 1:01PM | Change bps |
|---|---|---|
| Overnight rate | 2.69% | unchanged |
| December Fed Funds contract implied yield | 2.03% | 3 |

| USD performance vs | 1:01PM | Change |
|---|---|---|
| Japanese yen | 122.39 | 0.38% |
| Euro | $ 0.9019 | 0.29% |
| Sterling | $ 1.4565 | -0.36% |
| Swiss franc | 1.6303 | 0.39% |
| Canadian dollar | 1.5871 | 0.60% |
| Mexican peso | 9.275 | 0.29% |
| Brazilian real | 2.695 | -0.99% |

| Other cross rates | 1:01PM | Change |
|---|---|---|
| Euro/yen | 110.34 | 0.05% |
| Euro/sterling | 0.6189 | -0.66% |

| Commodities | 1:01PM | Change |
|---|---|---|
| Gold | $279.30 | -$0.80 |
| Oil (Brent) | $19.63 | -$0.77 |
| Near-dated NYMEX futures contract | $21.22 | -$0.65 |

| Today's Events: | Actual | Previous Period | Consensus Expectation |
|---|---|---|---|
| US Q3 GDP, advance | -0.4% q/q | 0.3% q/q | -1.0q/q |
| US Q3 GDP deflator | 2.1% | 2.1% | 1.6% |
| Treasury Quarterly Refunding | 9:45 a.m. | | |
| Chicago PMI | 46.2 | 46.6 | 44.0 |

Drafted by: Jill Cetina
10/31/01 1:01PM

Treasury Market Room 622-2650
Timothy DuLaney, Director

GLOBAL FINANCIAL MARKETS
10/31/01 12:00 PM

| | 31-Oct | 30-Oct | 31-Oct | Friday's close | This week | | This year | |
|---|---|---|---|---|---|---|---|---|
| Yen | 122.52 | 122.52 | 121.97 | 0.45% | 122.70 | -0.15% | 114.40 | -7.10% |
| Euro | 0.90 | 0.9001 | 0.9047 | 0.51% | 0.8932 | -0.77% | 0.9426 | -4.51% |
| Sterling | 1.45 | 1.4539 | 1.4513 | -0.18% | 1.4364 | -1.20% | 1.4931 | -2.63% |
| Swiss | 1.63 | 1.6345 | 1.6246 | 0.61% | 1.6512 | -1.01% | 1.6111 | -1.45% |
| Canadian $ | 1.59 | 1.5873 | 1.5783 | 0.57% | 1.5765 | 0.68% | 1.4991 | -5.88% |
| Australian $ | 0.50 | 0.5029 | 0.5046 | 0.34% | 0.5027 | -0.04% | 0.5588 | -10.00% |
| Korean won | 1291.00 | 1291.0 | 1293.0 | -0.15% | 1294.5 | -0.27% | 1265.00 | -2.06% |
| Indonesian rupiah | 10475.00 | 10475 | 10400 | 0.72% | 10260 | 2.10% | 9675.00 | -8.27% |
| Philippine peso | 51.95 | 51.95 | 51.95 | 0.00% | 52.05 | -0.19% | 50.00 | -3.90% |
| Thai baht | 44.71 | 44.71 | 44.70 | 0.02% | 44.88 | -0.38% | 43.40 | -3.02% |
| Taiwan $ | 34.50 | 34.50 | 34.50 | 0.00% | 34.52 | -0.06% | 33.12 | -4.17% |
| Polish zloty | 4.09 | 4.091 | 4.106 | -0.38% | 4.091 | -0.02% | 4.1325 | 1.02% |
| Russian ruble | 29.73 | 29.73 | 29.69 | 0.14% | 29.71 | 0.07% | 28.5410 | -4.17% |
| South African rand | 9.44 | 9.437 | 9.415 | 0.23% | 9.366 | 0.76% | 7.5900 | -24.34% |
| Mexican peso | 9.27 | 9.268 | 9.250 | 0.19% | 9.237 | 0.34% | 9.6410 | 3.87% |
| Brazilian real | 2.70 | 2.700 | 2.723 | -0.84% | 2.724 | -0.88% | 1.9500 | -38.46% |

**[W3(ER-BUGE1)]**

| | 31-Oct | 30-Oct | 31-Oct | Friday's close | This week | | This year | |
|---|---|---|---|---|---|---|---|---|
| Gold | 279.00 | $279.00 | $280.50 | -0.53% | $277.40 | 0.58% | 272.40 | 2.42% |
| European Brent | 19.57 | $19.57 | $20.41 | -4.12% | $20.31 | -3.64% | 22.58 | -13.33% |
| Near Nymex futures | 21.04 | $21.04 | $21.79 | -3.44% | $22.03 | -4.49% | 26.80 | -21.49% |
| CRB Index | 185.18 | $185.18 | $185.68 | -0.27% | $184.49 | 0.37% | 227.83 | -18.72% |

| | 31-Oct | 30-Oct | 31-Oct | Friday's close | This week | | This year | |
|---|---|---|---|---|---|---|---|---|
| Dow Jones | 9121 | 9,121 | 9,122 | -0.01% | 9,545 | -4.45% | 10786.85 | -15.45% |
| Nasdaq | 1700 | 1,700 | 1,692 | 0.44% | 1,769 | -3.91% | 2470.52 | -31.20% |
| S&P 500 | 1064 | 1,064 | 1,060 | 0.44% | 1,105 | -3.64% | 1320.28 | -19.38% |
| Nikkei 225 | 10366 | 10,366 | 10,513 | -1.39% | 10,795 | -3.97% | 13785.69 | -24.80% |
| Japan Topix | 1059 | 1,059 | 1,068 | -0.79% | 1,101 | -3.80% | 1283.67 | -17.47% |
| German DAX | 4559 | 4,559 | 4,544 | 0.33% | 4,820 | -5.42% | 6433.61 | -29.14% |
| French CAC-40 | 4341 | 4,341 | 4,253 | 2.10% | 4,479 | -3.07% | 5926.42 | -26.75% |
| U.K. FTSE-100 | 5040 | 5,040 | 5,004 | 0.72% | 5,189 | -2.87% | 6222.50 | -19.01% |
| H.K. Hang Seng | 10074 | 10,074 | 10,076 | -0.02% | 10,405 | -3.18% | 15095.53 | -33.27% |
| Korean Kospi | 538 | 538 | 534 | 0.74% | 543 | -1.03% | 504.62 | 6.58% |
| Taiwan Weighted | 3903 | 3,903 | 3,916 | -0.31% | 4,044 | -3.46% | 4743.94 | -17.72% |
| Polish Wig | 13736 | 13,736 | 13,691 | 0.33% | 13,895 | -1.14% | 17847.55 | -23.04% |
| South African JSE | 8543 | 8,543 | 8,506 | 0.44% | 8,574 | -0.36% | 8326.20 | 2.61% |
| Mexican Bolsa | 5577 | 5,577 | 5,529 | 0.87% | 5,693 | -2.03% | 5652.19 | -1.32% |
| Brazilian Bovespa | 11199 | 11,199 | 11,024 | 1.59% | 11,781 | -4.94% | 15259.29 | -26.61% |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Overnight rate | 2.63 | 3 | 0.05 | 0 | 3.76 | 0 | 3.88 | -37 | 3.76 | 0 | 2.74 | 5 |
| 3-month bill | 2.07 | 3 | 0.01 | 0 | 3.52 | -4 | 4.16 | -6 | 3.41 | 0 | 2.37 | 2 |
| 2-year bond | 2.52 | 6 | 0.12 | 0 | 3.14 | 2 | 4.17 | 1 | 3.16 | 1 | 2.99 | 6 |
| 5-year bond | 3.62 | 3 | 0.47 | 1 | 3.74 | 1 | 4.55 | -1 | 3.81 | 1 | 4.20 | 4 |
| 10-year bond | 4.37 | -4 | 1.31 | -2 | 4.39 | -1 | 4.54 | -3 | 3.88 | 1 | 4.95 | 4 |
| 30-year bond | 4.94 | -26 | 2.49 | -4 | 5.05 | -6 | 4.32 | -8 | 5.09 | -10 | 5.39 | -17 |

| U.S. FIXED INCOME | 2-year Fannie | 10-year Fannie | 10-year Swap spread | 2-year EU spreads | 2-year EU spreads |
|---|---|---|---|---|---|
| Current | 0.00 | 4.92 | 65 | 186 | 243 |
| Bps change | unchanged | -4 | 0 | -11 | -33 |

| EMERGING FIXED INCOME | Korea '08 | Thailand '11 | Indonesia '06 | Russia MinFin '07 | Poland PD1 |
|---|---|---|---|---|---|
| Current | 5.58 | 5.54 | 11.08 | 13.61 | 7.05 |
| Bps change | -5 | -6 | unchanged | unchanged | -1 |
| | Argentina Par | Brazil C | Mexico Par | Venezuela DCB | |
| Current | 41.08 | 15.93 | 9.34 | 13.44 | |
| Bps change | 263 | -18 | 6 | 9 | |

GlobalEmergingMarketsPerformance
10/31/0112:00PM

TreasuryMarketRoom
TimDulaney,Director
622-2052

## Currencies

| | Unit Change (in local currency terms) | | Percent Change (In Dollars per Unit Terms) | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 31-Oct | 30-Oct | 31-Oct | 30-Oct | Thisweek | This month | Thisyear | In'00 | In'99 |
| Japan | 122.52 | 121.97 | -0.5% | 0.0% | 0.1% | -2.5% | -7.1% | -11.9% | 11.3% |
| Euro | 0.9001 | 0.9047 | -0.5% | -0.1% | 0.0% | -1.3% | -4.5% | -6.3% | -14.3% |
| EuroYen | 110.26 | 110.33 | -0.1% | 0.5% | 1.3% | 2.4% | 4.4% | | -22.3% |
| UK | 1.4539 | 1.4513 | 0.2% | -0.2% | 1.2% | -1.4% | -2.6% | -7.7% | -2.5% |
| Germany | 2.1733 | 2.1620 | -0.5% # | -0.1% # | 0.8% # | -1.3% # | -4.7% | -6.8% 2 | -13.8% |
| Australia | 0.5029 | 0.5046 | -0.3% # | -0.9% # | 0.0% # | 2.4% # | -10.0% | -14.9% | -0.5% |
| Canada | 1.5873 | 1.5783 | 0.0% # | 0.0% # | -0.7% # | -0.5% # | -5.9% | -3.7% | -1.0% |
| Gold | 279.00 | 280.50 | -0.5% | 0.3% | 0.6% | -4.8% | 2.4% | -5.5% | -0.4% |
| Thailand | 44.71 | 44.7 | 0.0% | 0.2% | 0.4% | -0.6% | -3.0% | -15.7% | -2.3% |
| Indonesia | 10,475 | 10400 | -0.7% | -1.3% | -2.1% | -7.9% | -8.3% | -38.5% | 14.5% |
| Malaysia | 3.80 | 3.80 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Philippines | 51.95 | 51.95 | 0.0% | 0.0% | 0.2% | -1.2% | -3.9% | -24.1% | -4.2% |
| SouthKorea | 1,291 | 1293 | 0.2% | -0.1% | 0.3% | 1.0% | -2.1% | -11.4% | 6.0% |
| Taiwan | 34.50 | 34.50 | 0.0% | 0.0% | 0.1% | 0.0% | -4.2% | -5.5% | 2.7% |
| Singapore | 1.8231 | 1.8241 | 0.1% | 0.3% | 0.2% | -3.2% | -5.2% | -4.1% | -1.0% |
| China | 8.28 | 8.28 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Brazil | 2.7000 | 2.7230 | 0.8% | 0.0% | 0.9% | -1.1% | -38.5% | -8.0% | -33.1% |
| Mexico | 9.2680 | 9.2500 | -0.2% | 0.2% | -0.3% | 2.4% | 3.9% | -1.4% | 4.1% |
| Chile | 713.45 | 716.35 | 0.4% | -0.1% | 0.2% | -2.9% | -24.3% | -8.3% | -10.7% |
| Colombia | 2,308.00 | 2306.00 | -0.1% | 0.0% | 0.2% | 0.3% | 1.1% | -19.3% | -17.3% |
| Venezuela | 743.41 | 743.65 | 0.0% | 0.0% | 0.0% | -0.1% | -6.3% | -7.8% | -13.0% |
| Poland | 4.0905 | 4.1060 | 0.4% | -0.5% | 0.0% | 3.2% | 1.0% | 0.1% | -15.1% |
| Hungary | 283.58 | 283.20 | -0.1% | -0.8% | -0.2% | -0.6% | -1.0% | -11.0% | -14.5% |
| Czech | 37.333 | 37.199 | -0.4% | -0.3% | 1.0% | -0.2% | 0.8% | -5.1% | -15.7% |
| Russia | 29.731 | 29.690 | -0.1% | 0.0% | -0.1% | -0.9% | -4.2% | -3.6% | -25.2% |
| SouthAfrica | 9.4371 | 9.4151 | -0.2% | 0.4% | -0.8% | -4.5% | -24.3% | -23.5% | -4.5% |
| Turkey | 1,593,500 | 1,595,000 | 0.1% | 0.9% | 1.0% | -4.2% | -137.7% | -23.6% | -41.9% |
| Greece | 378.64 | 376.67 | -0.5% | -0.1% | 0.8% | -1.3% | -4.8% | -10.2% | -13.9% |

## Equities (In local currency terms)

| | Unit Change | | Percent Change | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 31-Oct | 30-Oct | 31-Oct | 30-Oct | Thiswk | Thismo | Thisyr | In'00 | In'99 |
| Dow | 9121 | 9122 | 0.0% # | -1.6% # | -4.4% | 3.1% # | -15.4% | -6.2% | 25.2% |
| Nasdaq | 1700 | 1667 | 1.9% # | -1.9% # | -3.9% # | 13.4% # | -31.2% | -39.3% | 85.6% |
| Nikkei | 10366 | 10513 | -1.4% | -0.9% | -4.0% | 6.1% | -24.8% | -27.2% | 36.8% |
| FT-SE100 | 5040 | 5004 | 0.7% | -1.6% | -2.9% | 2.8% | -19.0% | -10.2% | 17.8% |
| DAX | 4559 | 4544 | 0.3% | -2.5% | -5.4% | 5.8% | -29.1% | -7.5% | 39.1% |
| CAC-40 | 4341 | 4252 | 2.1% | -3.0% | -3.1% | 6.4% | -26.7% | -0.5% | 51.1% |
| Thailand | 275 | 274 | 0.5% | -1.6% | -2.0% | -0.7% | 2.2% | -44.1% | 35.4% |
| Indonesia | 384 | 378 | 1.4% | -1.6% | -1.1% | -2.2% | -7.8% | -38.5% | 70.1% |
| Malaysia | 600 | 603 | -0.5% | -0.4% | -2.0% | -2.5% | -11.7% | -16.3% | 38.6% |
| Philippines | 993 | 995 | -0.2% | 0.0% | -0.9% | -11.8% | -33.5% | -30.3% | 8.8% |
| HongKong | 10074 | 10076 | 0.0% | -1.0% | -3.2% | 1.2% | -33.3% | -11.0% | 68.8% |
| SouthKorea | 538 | 534 | 0.7% | -2.6% | -1.0% | 12.1% | 6.6% | -50.9% | 82.8% |
| Taiwan | 3903 | 3916 | -0.3% | -3.7% | -3.5% | 7.3% | -17.7% | -43.9% | 31.6% |
| Singapore | 1368 | 1383 | -1.1% | -0.7% | -3.1% | 3.7% | -29.0% | -22.3% | 78.0% |
| China | 156 | 155.07 | 0.8% | -1.3% | 0.2% | | 74.6% | 136.2% | 32.0% |
| Brazil* | 11199 | 11024 | 1.6% | -3.1% | -4.9% | 5.3% | -26.6% | -10.7% | 151.9% |
| Argentina* | 228 | 224 | 2.1% | 1.8% | -5.1% | -6.3% | -45.2% | -24.3% | 28.0% |
| Mexico* | 5577 | 5529 | 0.9% | -1.2% | -2.0% | 3.2% | -1.3% | -20.7% | 80.1% |
| Chile | 104 | 103 | 0.5% | 0.0% | -1.1% | 4.9% | 7.6% | -32.6% | 41.8% |
| Colombia | 817 | 817 | 0.0% | -0.2% | 0.5% | -12.3% | 14.6% | -28.6% | -9.3% |
| Venezuela | 6582 | 6635 | -0.8% | -0.5% | -1.6% | -1.6% | -3.6% | 26.0% | 14.8% |
| Poland | 13736 | 13691 | 0.3% | -1.9% | -1.1% | 15.5% | -23.0% | -1.3% | 41.3% |
| Hungary | 6773 | 6685 | 1.3% | -2.0% | -0.5% | 9.7% | -13.7% | -11.0% | 39.8% |
| Czech | 375 | 373 | 0.8% | -1.1% | -0.3% | 13.1% | -21.6% | -2.3% | 24.2% |
| Russia | 204 | 205 | -0.3% | 1.8% | 2.5% | 13.2% | 42.4% | -18.2% | 197.4% |
| SouthAfrica | 8543 | 8506 | 0.4% | -1.3% | -0.4% | 5.1% | 2.6% | -2.5% | 57.3% |
| Turkey | 9849 | 9920 | -0.7% | 0.0% | -0.7% | 29.1% | 4.4% | -37.9% | 485.4% |
| Greece | 2468 | 2383 | 3.6% | -0.3% | 4.1% | 10.9% | -27.2% | -38.8% | 102.2% |

*Equities begin trading in Brazil, Argentina, and Mexico at 8:00 a.m., 9:00 a.m., and 9:30 a.m. Eastern time respectively.

**Exhibit G**

**DeSabla, Christine**

| | |
|---|---|
| **From:** | Cetina, Jill |
| **Sent:** | Thursday, March 02, 2006 11:51 AM |
| **To:** | Ludwick, CM |
| **Subject:** | FW: Per our conversation today... |

Jill Cetina, CFA
Financial economist
Office of Debt Management
U.S. Treasury Department
202-622-9469

-----Original Message-----
**From:** Cetina, Jill
**Sent:** Thursday, November 01, 2001 3:46 PM
**To:** 'patrick.haskel@csfb.com'
**Subject:** Per our conversation today...

Pat --

I tried to buzz you in the early afternoon but you were off the desk. I wanted to encourage you to call Brian Roseboro (the Asst. Secretary for Fin. Markets & Peter's deputy) to share your views about the Quarterly Refunding. Brian is a good guy -- I talked with him about my conversation with you (not mentioning you by name) and one other contact who is also the head of a desk and said you had both expressed strong concerns about non-website related leaks. Brian said it would be fine for you to call him.

Encourage you to consider it. His # is 202-622-1715. Think it would be useful for both you.

rgds,

Jill

*Treasury Market Room*
*202-622-2017*

5/25/2006

FOIAKBC

400

**om:** Cetina, Jill
**ent:** Thursday, March 02, 2006 11:52 AM
**To:** Ludwick, CM
**Subject:** FW: Per our earlier conversations

Jill Cetina, CFA
Financial economist
Office of Debt Management
U.S. Treasury Department
202-622-9469

-----Original Message-----
**From:** Cetina, Jill
**Sent:** Thursday, November 01, 2001 3:58 PM
**To:** 'robert.sbarra@us.hsbc.com'
**Subject:** Per our earlier conversations

Bob --

I wanted to encourage you to call Brian Roseboro (the Asst. Secretary for Fin. Markets & Peter's deputy) to share your views about the Quarterly Refunding. Brian is a good guy -- I talked with him about my conversation with you (not mentioning you by name) and one other contact who is also the head of a desk and said you had both expressed strong concerns about non-website related leaks. Brian said it would be fine for you to call him.

Encourage you to consider it. His # is 202-622-1715. Think it could be useful for both you.

rgds,

Jill

1

FOIAKBC

401

Butler, Deborah E.

**From:** Cetina, Jill
**Sent:** Wednesday, October 31, 2001 10:11 AM
**To:** 'DEREK KEHOE, HSBC, TSY & CAP MKTS'
**Subject:** RE: Treasury QR Announcement

You are most welcome.  Be curious in the reaction you all are hearing from clients and your views on the announcement.  Bob called in just before I sent this out to say it was rumored.

-----Original Message-----
From: DEREK KEHOE, HSBC, TSY & CAP MKTS [mailto:DKEHOE@bloomberg.net]
Sent: Wednesday, October 31, 2001 10:10 AM
To: Jill.Cetina@do.tress.gov
Subject: Re: Treasury QR Announcement

Thanks Jill!
------ Original Message ------
From: Jill Cetina   <Jill.Cetina@do.tress.gov>
At: 10/31 15:04

This document has been prepared for information only and is issued by HSBC Bank plc, regulated by SFA.  In the UK it is not intended for "Private Customers" and in USA is for "major US institutional investors" (as defined in rule 15a-6 of the US Securities Exchange Act of 1934).  It may not be distributed to any other person in UK or USA.  This document is not an invitation to buy or to sell securities or derivatives.  It is based on information obtained from sources believed to be reliable but HSBC Bank plc makes no representation and accepts no responsibility as to it's completeness or accuracy.

# Exhibit H

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - x

 4    UNITED STATES SECURITIES AND    :
      EXCHANGE COMMISSION,            :
 5                                    :
                                      :
 6              Plaintiffs,           :
                                      :
 7    v.                              :  Civil Action No.
                                      :
 8    STEVEN E. NOTHERN,              :  05-10983 (NMG)
                                      :
 9              Defendant.            :
      - - - - - - - - - - - - - - x

10

11        Videotaped Deposition of JILL CETINA

12              Washington, D.C.

13          Friday, February 8, 2008

14                  9:56 a.m.

15

16

17              *     *     *     *

18

19

20

21    Reported by:  Okeemah S. Henderson, LSR

22
```

Jill Cetina                                                    February 8, 2008
Washington, DC

| Page 34 | Page 36 |
|---|---|
| 1    A.   Okay. | 1    Q.   His name may be misspelled. |
| 2    Q.   Great. Okay. If we go to the middle | 2    A.   It is misspelled then. Yes. |
| 3  of the page it says at least according to my | 3    Q.   And the proper spelling is? |
| 4  reading here, "10-year notes were announced on | 4    A.   I believe, H-A-S-K-A-L. |
| 5  October 4 at 11 a.m. Some viewers | 5    Q.   Or perhaps, H-A-S-K-E-L-L? |
| 6  alleged-HSBC-New York Desk-Bob Sbarra", | 6    A.   It could be. It's been a long time |
| 7  S-B-A-R-R-A-and I'm not sure, oh, Credit First -- | 7  since I sent Pat an E-mail. |
| 8  "Credit Suisse". | 8    Q.   It's not a spelling bee. |
| 9    A.   Credit Suisse First Boston, Pat | 9    A.   I know it's not with a C. |
| 10  Haskel. | 10    Q.   And what was Mr. Haskel's position? |
| 11    Q.   -- "they mentioned tenure in | 11    A.   It was a similar position, you know, |
| 12  conjunction with complaining about release of | 12  basically sort of like head of the treasury desk |
| 13  information early on the bond." Do you see that? | 13  at Credit Suisse First Boston. |
| 14    A.   Yes, I do. | 14    MR. SHOPE: If you could mark this as |
| 15    Q.   And then down below, it says, "Thinks | 15  the next exhibit. |
| 16  Bob complained after 10 year. Pat was listing 10 | 16    (Deposition Exhibit No. 3 was marked for |
| 17  year as another incident." Do you see that? | 17        identification.) |
| 18    A.   Uh-huh. Okay. | 18    BY MR. SHOPE: |
| 19    Q.   Does this refresh your recollection | 19    Q.   And I'm showing you what's been marked |
| 20  that at the time that there was a controversy | 20  as Exhibit 3. If you look in the middle of the |
| 21  about the events of October 31 relating to the | 21  page, the E-mail from Mr. Bitsberger. First of |
| 22  30-year bond that you also heard complaints about | 22  all, do you know who Mr. Bitsberger was? |

| Page 35 | Page 37 |
|---|---|
| 1  a similar incident earlier in the month? | 1    A.   At that time, yes, and later he was |
| 2    MS. WILLIAMS: Objection. | 2  the assistant secretary in the division in which I |
| 3    A.   From looking at these notes. Yes. | 3  worked in 2004. |
| 4  Now, it would appear that that was what I said, | 4    Q.   And Mr. Bitsberger's E-mail says under |
| 5  and I do remember having conversations with Pat | 5  point 3, "There was a leak a few weeks ago at the |
| 6  and Bob. Some of the aspects of the conversation | 6  emergency reopening. The refunding process has |
| 7  I still recall that they particularly mentioned | 7  been criticized for years because of suspected |
| 8  the surprise reopening of the 10 year, I didn't | 8  leaks." Had you heard any report of the facts |
| 9  recall, but looking at this now, you know, this is | 9  that Mr. Bitsberger is reporting here? |
| 10  what I said to her at the time. | 10    A.   That there had been a leak during the |
| 11    So, you know, I'm sure that was correct. I | 11  tenure reopening? |
| 12  was trying to help the Department by sharing what | 12    Q.   Yes. |
| 13  other people had shared with me. | 13    A.   There had been articles in the press |
| 14    BY MR. SHOPE: | 14  but, no. This E-mail hadn't, I don't believe, |
| 15    Q.   And let's just talk about who those | 15  been shared with me. |
| 16  folks are. Who is Bob Sbarra? | 16    Q.   But putting aside whether you received |
| 17    A.   At that time, he was the head of the | 17  this particular E-mail, within Treasury around |
| 18  trading desk for treasury securities at HSBC, I | 18  this October, November time frame, had there been |
| 19  think he may have since retired from that | 19  any kind of an internal discussion about suspected |
| 20  position. | 20  leaks in connection with the 10-year reopening? |
| 21    Q.   And? | 21    MS. WILLIAMS: Objection. |
| 22    A.   Pat Haskel. | 22    A.   Not in my area. But my area was not |

Jill Cetina                                                    February 8, 2008
Washington, DC

---

Page 42

1    A.   It's the quote here in the Reuters
2  article, which --
3    Q.   Just.  So try to maybe I can simplify
4  things here.  This article states that Mr. Roberts
5  is quoted, "When they did the reopening of the 10
6  year, there was advance information on the street,
7  there's advanced information here and so there are
8  a number of people on the street who are pretty
9  upset about it."  Roberts said.  Is that the quote
10  to which you are referring?
11    A.   That as well as the quote above it in
12  the third paragraph.
13    Q.   So could you read that quote aloud
14  into the record?
15    A.   "There is going to be a lot of noise
16  about that quote", said John Roberts.  Quote,
17  "It's a fluke and it's wrong that people have
18  information.  It's like being able to trade on
19  inside information" unquote, he said.
20    Q.   And that's referring to the fact that
21  Treasury had advised some people about this
22  development sooner than others or at least that's

---

Page 43

1  what Mr. Roberts is alleging?
2       MS. WILLIAMS:  Objection.
3    A.   Can you restate the question?
4       MR. FREEBORNE:  Yes.  If you know.
5       BY MR. SHOPE:
6    Q.   Sure.  First of all, it says down here
7  that "There is suspected insider trading by market
8  players who sit on the treasury borrowing advisory
9  committee."  Do you see that?
10    A.   That's what is stated in the Reuters
11  article, that's not Mr. Roberts's statement.
12    Q.   I understand but did that aspect of
13  the Reuters article also cause consternation
14  within Treasury?
15       MR. FREEBORNE:  Are you asking her with
16  her or?
17       MR. SHOPE:  Within Treasury is my
18  question.
19       MS. WILLIAMS:  Objection.
20    A.   I'm sure it did.  I think this whole
21  topic caused a lot of consternation in Treasury,
22  need less to say.

---

Page 44

1       BY MR. SHOPE:
2    Q.   And getting back to the interview
3  notes that we talked about earlier, were you
4  receiving complaints from market participants that
5  treasury either in the 10-year reopening at the
6  beginning of October or with regard to the
7  decision to suspend issuance of the long bonds on
8  October 31, that treasury was distributing the
9  information in an uneven way?
10       MS. WILLIAMS:  Objection.
11       MR. FREEBORNE:  Objection.
12    A.   I received complaints that, not that
13  Treasury had necessarily been the party
14  responsible for it to be distributed in an uneven
15  way but that there had been, people called because
16  they were angry, they felt that there had been a
17  leak of this information.
18       I don't think people -- I'm trying to think
19  about some of the statements that were made to me
20  at that time.  At least one participant may have
21  stated it that bluntly that he felt that certain
22  people, you know, had an inside track on what

---

Page 45

1  Treasury was doing.
2       That was his opinion that he asserted to me,
3  his view, which I felt was my responsibility to
4  share with senior policymakers that there were
5  people in senior positions trading who routinely
6  trade treasury securities who felt this way and
7  that that was important that they know.
8       BY MR. SHOPE:
9    Q.   And who was the individual who made
10  the blunt statement?
11    A.   The person that I'm thinking of is Pat
12  Haskel.  I don't recall the quotes, but I recall
13  that he had a -- that we had at least one phone
14  call and possibly two in which he expressed
15  anger/concern about, you know, this type of
16  situation?
17    Q.   And when you say this type -- let me
18  just make sure I understand the anger.  The anger
19  that he was expressing was that he thought that
20  there were other market players, not at his firm,
21  who had an inside track on information about what
22  Treasury was going to do with its debt

---

12 (Pages 42 to 45)

| Page 46 | Page 48 |
|---|---|

Page 46

1  instruments. Is that the summary of his position?
2      MS. WILLIAMS: Objection.
3      MR. ROSSETTI: I'm sorry. Are you
4  talking about the 30-year bond at this point or
5  are you talking about the 10-year note. I'm
6  unclear.
7      MR. SHOPE: I think we're talking about
8  both and that's indeed the context of these notes
9  that we've been discussing.
10      MR. FREEBORNE: I believe that was the
11  grounds for the objection.
12      MR. SHOPE: That's why I said that
13  instrument, so that includes --
14      THE WITNESS: Can we just rewind on
15  what the question was, just so I'm clear.
16      BY MR. SHOPE:
17      Q.  Yes. I want to understand what Mr.
18  Haskel's statement was to you as best you can
19  recall it. You obviously may not remember the
20  words verbatim so many years later, but you can
21  give me the best of the substance of what his
22  complaint was?

Page 47

1      A.  Well, I think the substance of his
2  complaint was that it appeared to him that some
3  individuals knew in advance of the official
4  announcement time, debt management decisions that
5  were potentially of market relevance, that was,
6  you know, one of the things that he communicated
7  to me.
8      Now, in the job that I had, you always had
9  to be aware that people's prospectives on policy
10  actions also depended on what position they were
11  running for their particular firm. So, you know,
12  if Mr. Haskel or any of these other individuals
13  who called to complain were they short the 30
14  year, the morning that that occurred? I have no
15  idea, but, you know, it wasn't the first time I've
16  had people call and be upset about something that
17  happened in financial markets and that their
18  emotions, shall I say, may have been influenced
19  also by their profit and loss on that particular
20  day.
21      All I'm trying to say is that his emotional
22  state or his anger that he expressed to me may

Page 48

1  have been on the issue substantively but also
2  informed by the meeting for his firm in financial
3  terms.
4      Q.  The E-mail from Mr. Bitsberger that we
5  looked at a moment ago, Exhibit 3, states that
6  "The suspected leak in connection with the
7  reopening of the 10-year note was attributed to
8  the borrowing committee." Do you see that, it's
9  up at the top?
10      A.  Uh-huh.
11      Q.  Was Mr. Haskel making the same
12  allegation essentially, that people who were
13  sitting on the borrowing advisory committee of
14  Treasury had an inside track to Treasury's debt
15  management decisions?
16      MS. WILLIAMS: Objection.
17      A.  No. I don't recall that Pat was
18  specifically making any reference to the borrowing
19  advisory committee. When I do seem to recall that
20  from my conversation with him, he particularly
21  with respect to the 30 year, noted to other
22  primary dealers who he said had been, you know,

Page 49

1  buying the 30 year that morning, in his words,
2  aggressively, but other than reference to those
3  two specific firms, he didn't particularly allege
4  anything about who had benefitted.
5      BY MR. SHOPE:
6      Q.  And if we look at the notes of the
7  interview that you gave back in 2001, those
8  handwritten notes.
9      A.  This is Exhibit 2.
10      Q.  Yes. If you can pull that out. If we
11  go to the page 3 of Exhibit 2 where there's
12  reference to your discussions with Mr. Sbarra and
13  Mr. Haskel, it says, "(A) Lehman Brothers; (B)
14  Goldman Sachs mentioned on the 31st." Are Lehman
15  Brothers and Goldman Sachs the two firms that Mr.
16  Haskel said had been buying aggressively based on
17  inside track information?
18      MS. WILLIAMS: Objection.
19      A.  I believe those are -- my recollection
20  is those are the two firms he referred to. I
21  don't believe he went so far as to say they had
22  inside information. What he conveyed to me,

13  (Pages 46 to 49)

Jill Cetina                                                    February 8, 2008
Washington, DC

---

Page 50

1    however, was that they had been buying the 30 year
2    that morning prior to 10 a.m.
3        BY MR. SHOPE:
4        Q.    Well --
5        A.    Which with the inference being that he
6    had some concern about the source of their
7    information and why they were engaging in those
8    trades. I think he was also trying to be careful
9    in what he said to me and how he said it.
10       Q.    But the implication was that the
11   reason that Goldman Sachs and Lehman were buying
12   so heavily was that they had some knowledge?
13       A.    That they must have known that they
14   had preknowledge.
15       MS. WILLIAMS: Objection.
16       BY MR. SHOPE:
17       Q.    That would be the reason why he would
18   be angry?
19       A.    Right.
20       MR. FREEBORNE: Objection.
21       MS. WILLIAMS: Objection.
22       A.    Again, as I indicated, you know, he

---

Page 51

1    could have been angry because he got caught short
2    but clearly he could have also been angry because,
3    you know, if he felt that there was inside
4    information or information being leaked.
5        BY MR. SHOPE:
6        Q.    Do you know a Woody Jay?
7        A.    The name is familiar.
8        Q.    Are you aware that Woody Jay was a
9    vice chair of borrowing advisory committee in
10   2001?
11       A.    I may have been aware of it after the
12   fact. At that time, I don't think I was.
13       Q.    At the time, was Woody Jay working for
14   Lehman Brothers?
15       A.    I don't know.
16       Q.    Lehman Brothers was a major market
17   participant with respect to treasury securities;
18   is that fair to say?
19       MS. WILLIAMS: Objection.
20       A.    Lehman Brothers was one of the New
21   York Feds primary dealers in the treasury market,
22   one of, I don't know how many at that time, but

---

Page 52

1    approximately 20 something.
2        BY MR. SHOPE:
3        Q.    And did you know of a Jack Malvey at
4    Lehman Brothers?
5        A.    Yes. He's one of their fixed income,
6    analyst is too low. I don't know what his title
7    is but he's one of their senior fixed income
8    strategists at Lehman. Yes.
9        Q.    So he would be someone at Lehman whose
10   job would include strategizing about the 30-year
11   bond?
12       MS. WILLIAMS: Objection.
13       A.    I mean, my experience from reading his
14   pieces is that he thinks about credit strategy
15   which could include the treasury market, it could
16   include other markets as well for Lehman Brothers.
17   So anything relating to fixed income, i.e. bonds
18   potentially.
19       BY MR. SHOPE:
20       Q.    And were you aware that Jack Malvey at
21   Lehman Brothers was related to Paul Malvey at the
22   Treasury Department?

---

Page 53

1        MS. WILLIAMS: Objection.
2        A.    I wondered about that at the time. I
3    learned that later.
4        BY MR. SHOPE:
5        Q.    How did you learn that later?
6        A.    I asked someone. Not in 2001 but
7    later. I don't know what year. It may have been
8    when I moved in domestic finance.
9        Q.    So possibly like 2002?
10       A.    2002 I wasn't in domestic finance. I
11   don't think I moved until 2004.
12       Q.    Now, turning back to your interview
13   notes --
14       MR. FREEBORNE: I think that misstates
15   the record about her notes.
16       MR. SHOPE: Oh, I'm sorry. The notes
17   of your interview. I apologize.
18       BY MR. SHOPE:
19       Q.    There's reference to a meeting that
20   you had with a Drew Matus?
21       A.    Drew Matus.
22       Q.    Or Matus. And he also was employed by

14  (Pages 50 to 53)

Jill Cetina                                                                February 8, 2008

Washington, DC

| Page 54 | Page 56 |
|---|---|
| 1  Lehman Brothers, correct? | 1      It was mostly just to discuss sort of big |
| 2      A.   Correct. | 2  picture what was going on in the financial |
| 3      Q.   Do you know whether he was working for | 3  markets, particularly fixed income. |
| 4  Woody Jay at that time? | 4      Q.   Mr. Matus in the past I gather had |
| 5      A.   They all worked at Lehman Brothers but | 5  told you that he was kind of plugged in as far as |
| 6  I presume but it's really beyond my -- I don't | 6  what Treasury was going to be doing, correct? |
| 7  understand. I didn't understand in 2001 what the | 7      MS. WILLIAMS:   Objection. |
| 8  reporting structure of Lehman Brothers was. | 8      A.   I don't specifically recall that. |
| 9      Q.   Sure. And when you met with Mr. | 9  That's what's written here in the notes. So. |
| 10 Matus, he had just come from a meeting with Paul | 10     BY MR. SHOPE: |
| 11 Malvey and Jeff Huther, correct? | 11     Q.   I'm sorry. You say it's written in |
| 12     MS. WILLIAMS:   Objection. | 12 the notes but you're just sitting here |
| 13     A.   I believe that was what he told me or | 13 today you're -- |
| 14 that was my sense. And later when I was in debt | 14     MR. FREEBORNE:   I'm confused as to what |
| 15 management, I actually asked Jeff if he had met | 15 the question is. |
| 16 with Drew and if he and Paul had met with Drew and | 16     BY MR. SHOPE: |
| 17 he confirmed that to me, he, being Jeff. | 17     Q.   Sure. Well, the question is does she |
| 18     BY MR. SHOPE: | 18 recall Mr. Matus indicating that he was plugged |
| 19     Q.   Jeff Huther had confirmed that. Okay. | 19 into what Treasury would be doing on debt |
| 20 And I see in the notes on page 4 it says at the | 20 management? |
| 21 top Drew -- | 21     MR. FREEBORNE:   When you say plugged |
| 22     MR. FREEBORNE:   Can you give her a | 22 in, what do you mean? |

| Page 55 | Page 57 |
|---|---|
| 1  second to catch up? | 1      MR. SHOPE:   I'm simply quoting from the |
| 2      MR. SHOPE:   Certainly. "Drew said he | 2  notes of the interview. |
| 3  was meeting with Paul Malvey, Jeff Huther of | 3      A.   Drew always seemed very knowledgeable |
| 4  treasury -- he met with them before he met with | 4  about the treasury market, but that -- I don't |
| 5  her." So is that consistent with your memory? | 5  specifically remember that from that time. It's |
| 6      A.   Yes. | 6  here in the notes from, you know, the interview |
| 7      Q.   At the meeting that you had -- first | 7  with me. You just have to -- I'm not trying to be |
| 8  of all, what was the purpose of the meeting with | 8  difficult. I just don't specifically recall that. |
| 9  Mr. Matus on -- first of all, that was on | 9      BY MR. SHOPE: |
| 10 October 22nd; is that correct? | 10     Q.   But you have no reason to believe that |
| 11     A.   Right. | 11 you didn't say that; is that fair to say? |
| 12     Q.   And what was the purpose of the | 12     MS. WILLIAMS:   Objection. |
| 13 meeting with Mr. Matus on October -- | 13     MR. FREEBORNE:   You can answer. I |
| 14     A.   My meeting? | 14 mean, I don't think it's, there's no quotes around |
| 15     Q.   Yes. | 15 it. It could have very well been the person that |
| 16     A.   Drew was someone who I would speak to. | 16 took the notes, that's her interpretation of what |
| 17 He was a contact and one of my, he had many | 17 was said or so I don't think that's a fair |
| 18 contacts in fixed income and foreign exchange | 18 question. |
| 19 markets, so somebody that I talked to from time to | 19     A.   It's just so long ago, I don't |
| 20 time. He had let me know that he was going to be | 20 remember that aspect of it. |
| 21 in Treasury. He said how about we get together | 21     BY MR. SHOPE: |
| 22 and talk. So that was what we did. | 22     Q.   But you're saying Mr. Matus always |

Jill Cetina                                                        February 8, 2008
                          Washington, DC

---

Page 58

1    appeared to be very knowledgeable; is that at
2    least a fair summary?
3        A.    I think that's a fair summary.
4        Q.    Again, going to the notes in Ms.
5    Kerner's subsequent memorandum, which we can
6    review in a minute --
7        A.    So we're done with --
8        Q.    No. I think we're going to stick on
9    the notes for a second. With regard to Mr. Matus,
10   do you recall in the course of your meeting on the
11   22nd he went on to suggest that Treasury would be
12   eliminating 30-year bond?
13       MS. WILLIAMS:    Objection?
14       A.    I seem to recall him saying that, and
15   I seem to recall being a bit taken aback by him
16   saying that. I have some recollection of that, I
17   don't fantastic, you know, what his precise
18   sentence was, but I have some recollection of it.
19       BY MR. SHOPE:
20       Q.    And why were you taken aback by that
21   suggestion that Mr. Matus made about eliminating
22   30-year bond?

---

Page 59

1        A.    Because it wasn't something that I
2    heard other dealers talking about as an
3    expectation that they had for treasury debt
4    management; hence, it was an unusual view and thus
5    I thought noteworthy.
6        MR. SHOPE:    I'd like to show you a
7    document here.
8        (Deposition Exhibit No. 5 was marked for
9              identification.)
10       BY MR. SHOPE:
11       Q.    I'm going to focus on the portion of
12   this memorandum that's under the heading
13   treasuries?
14       A.    Yes.
15       MR. FREEBORNE:    Is the underlining in
16   the original or is that somebody else's?
17       MR. SHOPE:    That's as it was produced
18   to us by the Government. Just let me know when
19   you're ready. I'm not going to ask you any
20   questions about the indices on the right.
21       THE WITNESS:    Okay.
22       BY MR. SHOPE:

---

Page 60

1        Q.    Under the heading treasuries, there is
2    in Exhibit 5 there is an underline sentence that
3    says, "Some analysts wondered whether Treasury
4    might cancel buybacks and the long bond
5    simultaneously to prevent long term rates from
6    rising." Do you see that?
7        A.    Yes.
8        Q.    First of all, this Exhibit 5 is a
9    document that you drafted, correct?
10       A.    Correct.
11       Q.    Does that sentence relate to your
12   meeting with Mr. Matus?
13       A.    Yes. Because I would never -- 'm
14   sorry to speak over you, but when we would write
15   these type of reports, you were never supposed to
16   identify the firms because this was disseminated
17   very broadly within the Department.
18       You typically did not identify the firms
19   that or the people, the individuals that were
20   articulating those views. So, I wouldn't have
21   said Drew Matus said blah. I would have said some
22   analyst.

---

Page 61

1        Q.    And so when it says analysts in the
2    plural, they're actually, for the reason you just
3    mentioned, there really weren't multiple analysts,
4    it was just Mr. Matus at Lehman Brothers?
5        MS. WILLIAMS:    Objection.
6        A.    That I was aware of. I can't speak to
7    was there anybody in the market analyzing the
8    treasury market but at that moment in time the
9    person -- I only had one person in mind and that
10   was Lehman Brothers. Drew at Lehman.
11       BY MR. SHOPE:
12       Q.    Sure. And when you, I guess eight
13   days after you prepared this report, we had the
14   events of October 31, 2001, correct?
15       A.    Yes.
16       Q.    And there was obviously a lot of
17   controversy about allegations that some people
18   knew about the decision to cancel the long bond
19   before other people did, correct?
20       MS. WILLIAMS:    Objection.
21       A.    I'm sorry. Can you -- whenever
22   there's an objection. I get a little confused.

---

Alderson Reporting Company
1-800-FOR-DEPO

Jill Cetina                                                    February 8, 2008
                        Washington, DC

| Page 82 | Page 84 |
|---|---|

**Page 82**

1   you were aware of a 10 o'clock embargo; was that
2   correct at the time?
3      A.  I believe so.
4      Q.  How was that? I mean, in other words,
5   how did you come to know that there was such a
6   10 o'clock time that had been set?
7      A.  Again, my recollection is not perfect.
8   I really don't know. I think someone may have
9   come in and told us but I don't remember.
10      Q.  And would it be fair to say that as
11   the morning proceeded, you received communications
12   from various market participants complaining about
13   the fact that some people appeared to know of the
14   decision to suspend the long bond before others
15   did?
16      MS. WILLIAMS: Objection.
17      A.  Yes. I think that's a fair statement.
18      BY MR. SHOPE:
19      Q.  And we've talked about the complaint
20   that Mr. Haskel had mentioning Lehman Brothers and
21   Goldman Sachs?
22      A.  Yes.

**Page 83**

1      Q.  Correct. And included in that would
2   also be a similar complaint from Mr. Sbarra?
3      A.  Mr. Sbarra made a complaint. Sitting
4   here today, I cannot recall whether he also
5   mentioned those two firms specifically or not.
6      Q.  If we look at the interview notes on
7   page 3, about two thirds of the way down it says
8   "Think Bob complained after 10 year. Pat was
9   listing 10 year as another incident." I know
10   we've touched on this a little earlier but perhaps
11   since we've been talking your memories have been
12   refreshed a little bit. Do you remember Mr.
13   Sbarra having complained earlier that month about
14   the incident with the 10 year reopening?
15      A.  It's entirely possible that he made a
16   complaint like that to me. Again, I sort of -- he
17   was someone that called in or that we might call
18   out to. But I don't have a specific recollection
19   of a conversation. It's possible, but I don't
20   recall it. I seem to recall it more with Pat and
21   perhaps because the conversation with Pat was a
22   little more heated, it stuck with me a little

**Page 84**

1   more.
2      Q.  When you say it was a little more
3   heated, can you give me some more detail on that?
4      A.  I just mean that again, when
5   someone -- when you're in that type of a position
6   and someone is angry about something that the
7   department is doing, you're the receiving --
8   you're the in-box for the complaint and you get
9   all the everything and it was, he was very unhappy
10   and so I recall that unhappiness being conveyed
11   and that, you know, about these concerns that
12   other firms knew about things in advance perhaps
13   of his own. In advance of a public release time.
14      MR. SHOPE: Sure. Maybe we can mark
15   this as the next exhibit.
16      (Deposition Exhibit No. 9 was marked for
17      identification.)
18      BY MR. SHOPE:
19      Q.  These are some two very short E-mails.
20   I just want to ask you about, just some of
21   terminology. They both come from the files of
22   Goldman Sachs and were provided to us by the

**Page 85**

1   Government and you can see the first one has an
2   E-mail from Ray Walton of Cantor Fitzgerald. Did
3   you know who Ray Walton was?
4      A.  No.
5      Q.  Was Cantor Fitzgerald a participant in
6   the bond market?
7      A.  Yes.
8      Q.  They were a very major participant?
9      A.  Yes.
10      Q.  This E-mail says Lehman buys 1.5 K USC
11   USC, that's a reference to the 30-year bond,
12   correct?
13      A.  Not -- I presume that's what they're
14   referring to.
15      Q.  And then it says up to 17 still
16   buying. Do you know what the up to 17 refers to?
17      A.  It may refer to the price of the bond
18   that it was up to $117 dollars but I don't have
19   any data to support that.
20      Q.  And that's because when you say $117
21   dollars that's off of a par of --
22      A.  It's off par. So when they say 17,

Alderson Reporting Company
1-800-FOR-DEPO

Jill Cetina                                                    February 8, 2008
Washington, DC

| Page 94 |
|---|

1 somebody coming in at some point that morning and
2 sort of explaining that maybe something posted
3 improper or I don't know.
4     Q.    So in other words, even before
5 10 o'clock, someone might have been coming in and
6 saying, you know, oh, we're having a problem with
7 this one up on the website too early?
8         MS. WILLIAMS:  Objection.
9     A.    I don't know.  Maybe, maybe not.  I'm
10 not sure.  I know that -- I don't recall that
11 well.  Sorry.
12         BY MR. SHOPE:
13     Q.    This was a while ago.  If we can flip
14 the page I guess a couple of pages until we get to
15 the fourth page of the exhibit, which it ends in
16 876 on the lower right corner.  Subject line --
17 this is from you at 10:45 a.m. to a group of
18 others.  The addressees are all within the
19 Treasury Department, correct?
20     A.    Yes.
21     Q.    And it says, "Some thoughts on the
22 E-mail from a primary dealer contact."  Do you

| Page 96 |
|---|

1 about earlier?
2     A.    Yes.  Flattening the five-year note
3 relative to the 30-year bond.
4     Q.    Basically that would reflect the idea
5 that the price of the 30-year bond would be going
6 up, correct?
7         MS. WILLIAMS:  Objection.
8     A.    Generally that would be a way to
9 interpret it.  Yes.
10         BY MR. SHOPE:
11     Q.    Because the price moves inversely to
12 the yield.
13     A.    Right.
14     Q.    So if the price goes up, the yield on
15 the 30 comes down?
16     A.    Comes down and yield curve flattens.
17         MS. WILLIAMS:  Objection.
18         BY MR. SHOPE:
19     Q.    And generally speaking historically,
20 typically the yield on the 30-year bond has been
21 higher than the yield on the five-year bond,
22 correct?

| Page 95 |
|---|

1 know who that was?
2     A.    This may have been an E-mail from Pat
3 or it could have been Bob.  I don't know.
4     Q.    You're saying Pat Haskel or Bob
5 Sbarra?
6     A.    Yes.
7     Q.    So is it your belief that in addition
8 to speaking with you, one of them might have sent
9 you an E-mail as well?
10     A.    Mm-hmm, mm-hmm, mm-hmm.  Yes.
11     Q.    Would there have been a reason why
12 whoever sent the E-mail would have done that in
13 addition to having spoken with you?
14     A.    When something like this happens, you
15 can have people like multiple traders on a desk
16 and, you know, so you -- it could be that they
17 learned something additional and sent it to me in
18 E-mail.  I don't know.
19     Q.    Now, this statement is, We definitely
20 heard rumors as early as 9 o'clock a.m. which were
21 flattening 5/30s.  Is that a reference to a
22 flattening of the yield curve that we were talking

| Page 97 |
|---|

1     A.    Yield curve is usually a bit sloping
2 but not always.
3     Q.    All right.  Did you follow up with
4 this primary dealer to find out where the rumors
5 had been heard or from whom they had been heard?
6     A.    Again, I think this was Pat or Bob, so
7 I'm sure I was in some further contact with them.
8     Q.    Would it be fair to say that with
9 respect to this page this was a cut and paste of
10 an E-mail?
11     A.    Yes.
12     Q.    So what happened to the E-mail that
13 the primary dealer had actually sent to you in the
14 first place?
15     A.    Should be -- well, in theory, it
16 should be somewhere in the E-mail record.
17     Q.    Well, did you delete that E-mail?
18     A.    I don't know.  I don't believe I would
19 have recognizing that this -- you know.  No.
20     Q.    It was an important subject of
21 controversy, correct?
22     A.    Yes.

25 (Pages 94 to 97)

Jill Cetina                                                    February 8, 2008
Washington, DC

| Page 102 |
| --- |

1  of perhaps of who I spoke with that day.
2      BY MR. SHOPE:
3      Q.   Well, it says to memorialize the
4  conversation.  So presumably that would have been
5  a summary of what people had said in the different
6  conversations.
7      MS. WILLIAMS:  Objection.
8      BY MR. SHOPE:
9      Q.   So going back to Exhibit 10, if we go
10  to the page which in the lower right corner ends
11  in 877.  In the E-mail from you that's 11:40 a.m.
12  on October 31, it says, "I had a different primary
13  dealer tell me that they received a call from John
14  Jacobs from IDEA yesterday about a rumor that
15  Treasury would eliminate the long bond."  Do you
16  know which primary dealers that?
17      A.   I have to say I don't.
18      Q.   Now, this indicates a rumor yesterday.
19  In other words, a rumor on October 30 about
20  elimination of the long bond, correct?
21      A.   Correct.
22      Q.   And did anyone else report a rumor on

| Page 103 |
| --- |

1  the day preceding as opposed to just the morning
2  of October 31?
3      A.   Well, according to this E-mail, the
4  same E-mail, there was someone else, who actually
5  I know who that person was.  This is a person
6  about that they heard it from a European Central
7  Bank the prior day.  That would be, I believe that
8  would be Derrick Kehoe also at HSBC but in their
9  London office who I spoke with from time to time
10  because he dealt with Central Bank clients.
11      Q.   How do you spell Mr. Kehoe's last
12  name?
13      A.   K-E-H-O-E.
14      Q.   And he was with HSBC at the time?
15      A.   At the time, and Central bank
16  Services, I don't know the precise title, but did
17  treasuries predominantly of Central banks.
18      Q.   In other words, there are foreign
19  Central banks that buy and sell U.S. treasury
20  bonds?
21      A.   Correct.
22      Q.   And he provided a brokerage service

| Page 104 |
| --- |

1  for that?
2      A.   Correct.  Because he had sort of a
3  unique view on that particular subsector of the
4  treasury market, he was an interesting person to
5  talk to.
6      Q.   Unique view in the sense that his
7  customers --
8      A.   His customers were Central Bank.  So
9  that's a unique window into Central Bank purchases
10  of treasury securities.
11      Q.   So the conversation with Mr. Kehoe was
12  on the morning of October 31?
13      A.   Must have been.  Yes.
14      Q.   And but you had spoken with him on
15  other occasions?
16      A.   Yes.  Mostly about foreign exchange,
17  to a lesser extent treasuries.
18      Q.   Is he still at HSBC, do you know?
19      A.   I have no idea.
20      Q.   Did he say what Central Bank was
21  involved?
22      A.   No, he did not.

| Page 105 |
| --- |

1      Q.   Were you surprised to get this report
2  from Mr. Kehoe that a European Central Bank had
3  advanced knowledge of a decision to eliminate the
4  long bond?
5      MS. WILLIAMS:  Objection.
6      A.   I thought it was noteworthy and worth
7  sharing with others in the department.  So you can
8  take that for what it is.
9      BY MR. SHOPE:
10      Q.   Well, was there any follow up with Mr.
11  Kehoe either by you or anybody else, to your
12  knowledge?
13      A.   Not that I'm aware of.  I mean, again
14  at some point, it was communicated to me that
15  further follow up from me was not required.  And I
16  sense that there was, how should I put it, some
17  sensitivity on the part of Domestic Finance that
18  this was their problem, that they wanted to handle
19  it themselves, and I decided that the best curse
20  of action after having shared at that point in
21  time what I knew, was to take a step back.
22      Q.   Had there been any other occasions

27 (Pages 102 to 105)

Jill Cetina                                                        February 8, 2008
Washington, DC

---

## Page 110

1  Roseboro, who was the assistant secretary at the
2  time in Domestic Finance, where I, this was after
3  having the conversation with Brian I said there
4  were some people who commented who were very upset
5  and really had some strong views about what had
6  happened that morning, and that I thought it could
7  be useful for him to perhaps talk to those people
8  and hear their concerns, you know, to take some of
9  it in himself.
10      And so I believe I sent some E-mail to some
11  individuals saying, you know, Brian Roseboro is a
12  nice guy, you know, very open to hearing what
13  people have to say about the situation, this
14  unfortunate situation, here's his number, give him
15  a call.
16      Q.  Did Mr. Roseboro make any follow up to
17  your discussion, to your knowledge?
18      A.  I don't know.
19      Q.  Did he give you any reaction to your
20  suggestion?
21      A.  He was supportive of trying to get
22  these people to call him, and I think he may have

---

## Page 111

1  had a concern about doing it in a way that was non
2  threatening to them i.e., they had spoken to me
3  perhaps I should send them an E-mail indicating
4  the Treasury is very receptive to hearing what you
5  have to say.
6      Q.  Was there anybody else besides Mr.
7  Roseboro in Domestic Finance which whom you were
8  sharing the information that you had gathered
9  about reactions from the participants, you know,
10  the complaints that you received and so forth?
11      A.  Well, I mean, these E-mails went to
12  Tim Bitsberger and to Paul Malvey who were also as
13  well as Gerry Gross, all of whom were in Domestic
14  Finance.
15      Q.  I'm sorry.  What I meant to ask was
16  the --
17      A.  The verbal.
18      Q.  Well, the verbal and the detail that
19  is not in these E-mails, for example, the names of
20  the people involved?
21      A.  At some point that day, I may have
22  also seen Paul Malvey and Tim Bitsberger.  I don't

---

## Page 112

1  recall the specifics of what I may or may not have
2  said to them.  Candidly for me, Brian was always,
3  I thought he was the most senior in that whole
4  chain.  He was always the easier individual to
5  talk to.  I'm fairly confident I shared this with
6  him.
7      Q.  Did you have any concern that
8  Mr. Malvey potentially having given advance
9  information about this to Lehman Brothers might
10  not be the best person to be making any kind of
11  follow-up investigation?
12      MR. FREEBORNE:  Objection.
13      MS. WILLIAMS:  Objection.
14      MR. FREEBORNE:  You've got to break
15  that up.  There's a predicate there that I think
16  is a false one.
17      BY MR. SHOPE:
18      Q.  Well, we had the discussion earlier
19  about the meeting that you had with Mr. Matus and
20  your concern that Mr. Matus might have learned in
21  his meeting with Mr. Malvey about the decision to
22  eliminate the long bond; you recall that, right?

---

## Page 113

1      A.  Yes.
2      Q.  We then have a controversy on
3  October 31.  There are at least complaints and
4  allegations some people have learned this
5  information before others, correct?
6      A.  Yes.
7      MS. WILLIAMS:  Objection.
8      BY MR. SHOPE:
9      Q.  In light of what you had already noted
10  about Mr. Malvey, did you have any concern that he
11  might not be the best person to be conducting a
12  follow-up investigation?
13      MS. WILLIAMS:  Objection.
14      A.  I had some concerns and I had no such
15  concerns about Brian Roseboro who I thought to be
16  a highly-ethical, outstanding individual, which
17  was why I'm fairly confident that I shared this
18  information with Brian.
19      BY MR. SHOPE:
20      Q.  In other words, that was one reason
21  why you went up to Mr. Roseboro?
22      A.  Possibly.  Yes.  Possibly.

29 (Pages 110 to 113)

Jill Cetina

February 8, 2008

Washington, DC

| Page 162 | Page 164 |
|---|---|
| 1  is a difficult individual to talk to, in my | 1  with more senior domestic finance staff or |
| 2  experience. I'm not sure how my question would | 2  management. |
| 3  have been received. | 3     Paul was management, I guess, so and I don't |
| 4     BY MS. WILLIAMS: | 4  think that view was limited to Paul alone. But |
| 5     Q.  How was your working relationship with | 5  there were some -- domestic finance was not a big |
| 6  Mr. Malvey? | 6  user of information from the group with the |
| 7     A.  It was fairly minimal but again, we | 7  exception of assistant secretary, Rose Pearl who |
| 8  were supposed to be in a group that was joint | 8  was more interested, he was in the domestic |
| 9  between domestic and international, I think Paul | 9  finance chain and more interested in what the |
| 10  felt, my sense was that he felt that was a fairly | 10  group put out and produced. |
| 11  useless exercise and which was a bit of a | 11     Q.  The meetings that you said Mr. Malvey |
| 12  different situation than, for example, the view I | 12  and some more senior people in the international |
| 13  believe his superior, Brian Roseboro had. | 13  division, were you part of those meetings? |
| 14     He seemed to think that there was some value | 14     A.  No, I was not part of these meetings. |
| 15  in it. There was some -- how should I put it, | 15  Some of the discussions were conveyed or somewhat |
| 16  strains in the relationship between international | 16  shared with staff. |
| 17  and domestic finance over the whole operation of | 17     Q.  Now, you know when Mr. Shope was |
| 18  the group and how it was run and who paid for what | 18  questioning you said you had some concerns about |
| 19  and I think that, so, it wasn't easy necessarily | 19  Mr. Malvey's conversation with Mr. Matus; is that |
| 20  to go and talk to Paul about stuff like that. | 20  a fair statement? |
| 21     Q.  When you said you had minimal, I think | 21     A.  Yes. |
| 22  is the term you used, how often do you all have to | 22     Q.  And on what do you base the concerns? |

| Page 163 | Page 165 |
|---|---|
| 1  communicate in the course of your job? | 1     A.  I had some concerns because again, I |
| 2     A.  When, you know, you say communicate -- | 2  was a little surprised to have Drew talking about |
| 3     Q.  I don't mean by E-mail. I mean, how | 3  the elimination of the bond. Again, you know, he |
| 4  often did you have to have a conversation with | 4  seemed to have this view. He had met with Paul |
| 5  him? | 5  and the concern really became -- I wasn't that |
| 6     A.  Fairly infrequently. I mean, again, I | 6  worried about it, you know, around the 20th, 23rd |
| 7  think Paul thought that, you know, sort of the | 7  whenever it was that those meetings occurred, it |
| 8  group was useless that, you know, he knew all he | 8  was more when I had other dealers on the morning |
| 9  needed to know about what was going on in the | 9  of the 31st attributing some of the trading |
| 10  treasury market and so. | 10  activities to Lehman Brothers that I became |
| 11     Q.  Did you have a conversation with him | 11  concerned about whether there was any kind of link |
| 12  ever about his thoughts on that issue? | 12  between a meeting that Drew may have had and so. |
| 13     A.  On what issue? | 13     Q.  You stated that Mr. Matus also met |
| 14     Q.  Whether the group was useful or not? | 14  with Mr. Huther? |
| 15     A.  No. | 15     A.  That's what I was told. |
| 16     Q.  On what do you base your statement | 16     Q.  Did you talk to Mr. Huther about the |
| 17  that you thought, about his thoughts. I'm just | 17  meeting that he participated in with Mr. Matus on |
| 18  trying to figure out how you knew his thoughts? | 18  the 22nd? |
| 19     A.  That was some of the senior people in | 19     A.  A little bit. |
| 20  international affairs which is the reporting | 20     Q.  What did you discuss? |
| 21  channel which time I worked in shared with me some | 21     A.  I believe at some point I may have |
| 22  of the feedback that they had gotten from meetings | 22  even said to Jeff, that I had a concern as to |

42 (Pages 162 to 165)

Jill Cetina
Washington, DC

February 8, 2008

| Page 166 | Page 168 |
|---|---|
| 1  whether Paul may have shared -- this was later | 1  debt management but I'm not completely sure of |
| 2  when I worked for Jeff after Paul had left that I | 2  that. At some point I did ask. |
| 3  may have had a concern about whether anything with | 3      Q.  When were you in debt management? |
| 4  Drew seemed to have a view that the bond was going | 4      A.  That started, I believe, in 2004. |
| 5  to be eliminated and whether anything might have | 5      Q.  So you found out that Mr. Malvey had a |
| 6  been shared that shouldn't have been shared in | 6  relative at Lehman Brothers you believe in 2004? |
| 7  that meeting and Jeff indicated to me that, you | 7      A.  I believe. |
| 8  know, that I believe what he said was that nothing | 8      Q.  So at the time that you had this |
| 9  like that had happened. | 9  concern on the 22nd when you talked to Mr. |
| 10     Q.  Did you have a similar concern about | 10 Matus -- |
| 11 Mr. Huther conveying information to Mr. -- | 11     A.  I knew there was someone at Lehman |
| 12     A.  No. | 12 Brothers who had a similar last name, I didn't |
| 13     Q.  Why not? | 13 have the name. |
| 14     A.  I guess part of it comes to about | 14     Q.  Do you know how often Mr. Malvey |
| 15 having had some experience working with Jeff | 15 communicated with that person at Lehman Brothers? |
| 16 later.  I think Jeff would not in my professional | 16     A.  No, I don't. |
| 17 experience with him not have crossed that kind of | 17     Q.  Do you know if they were ever in |
| 18 a line, you know.  This is again a personal view, | 18 communications? |
| 19 not a something that I can state with fact, but I | 19     A.  No, I don't. |
| 20 have a different perception of Mr. Malvey which is | 20     Q.  Do you know how close a relative that |
| 21 perhaps unkind to say, but that's my perception of | 21 person was to Mr. Malvey? |
| 22 him, which is colored by a few things that other | 22     A.  In 2001? |

| Page 167 | Page 169 |
|---|---|
| 1  people have shared with me about their experiences | 1      Q.  Yes. |
| 2  with him working with him. | 2      A.  No. |
| 3      Q.  Is your perception based on anything | 3      Q.  Do you know now? |
| 4  other than people's perceptions about Mr. Malvey | 4      A.  I believe it's his cousin, but I'm not |
| 5  that they shared with you? | 5  100 percent sure. |
| 6      A.  I always found Paul to be very -- I'm | 6      Q.  Do you know how often he talks or |
| 7  sorry.  Can you restate the question? | 7  communicates with his cousin? |
| 8      Q.  Yes.  Your perception of Mr. Malvey | 8      A.  No. |
| 9  you said in part it was based on perceptions of | 9      Q.  Do you know how often he communicated |
| 10 him that other people had that they had shared | 10 with him in 2001? |
| 11 with you.  I wanted to know if there was anything | 11     A.  No, idea.  Since we're on the issue |
| 12 besides that that helped form your perception? | 12 though of Paul -- |
| 13     A.  I had some concerns also knowing that | 13     Q.  Wait.  No.  Question.  Unless it's in |
| 14 Paul had a relative at Lehman Brothers about the | 14 response to the last question about whether or not |
| 15 whole Lehman Brothers, that connection. | 15 you knew he communicate with him? |
| 16     Q.  When did you learn Mr. Malvey had a | 16     A.  No. |
| 17 relative at Lehman Brothers? | 17     MR. SHOPE:  Or if she needs to correct |
| 18     A.  I believe it was -- I had wondered | 18 or give a complete answer to the prior question. |
| 19 about it when I had seen Jack Malvey's name on | 19     MS. WILLIAMS:  Is there another answer |
| 20 some Lehman Brothers publications when I was in | 20 to a question that was incomplete? |
| 21 the marketing group but I had not directly ever | 21     A.  You are asking a question about my |
| 22 asked.  I think I found it out later when I was in | 22 perception of Paul and what colored that.  One of |

43 (Pages 166 to 169)

# Exhibit I

Page 1

```
 1
 2
 3
 4            UNITED STATES DISTRICT COURT
 5        FOR THE DISTRICT OF MASSACHUSETTS
 6
   UNITED STATES SECURITIES    )
 7 AND EXCHANGE COMMISSION,     )
                                )
 8            Plaintiff,        )
                                )
 9            vs.               ) No. 05-10983
                                )      (NMG)
10 STEVEN E. NOTHERN,           )
                                )
11            Defendant.        )
   -------------------------)
12
13
14            VIDEOTAPED
15     DEPOSITION OF PETER R. FISHER
16         New York, New York
17          August 8, 2006
18
19
20
21
22
23
24 Reported by:
   PAMELA J. MAZZELLA, RPR
25 JOB NO. 7046
```

Page 74

Fisher

1     October, but since you just mentioned the
2
3     conversation that you are specifically
4     remembering with Secretary O'Neill, I want to
5     ask you about that.
6        Where were you?
7     A.  I believe I was in his office.
8     Q.  And the --
9     A.  Might have been his dining room, I
10    don't recall.
11    Q.  And do you remember what time of
12    day it was, anything like that?
13    A.  No.  I remember discussing with him
14    and his suggestion that I also -- the main
15    import of that conversation was that he asked
16    that I also discuss the matter with Al
17    Greenspan.
18    Q.  And Mr. Greenspan was chairman of
19    the Federal Reserve board at that time,
20    correct?
21    A.  Yes.
22    Q.  So as we're getting into
23    mid-October, besides the people whom you have
24    identified, was the elimination of the long
25    bond being discussed by anyone in the

Page 75

Fisher

1
2     Treasury Department to your knowledge other
3     than persons whom you have identified?
4        MS. WILLIAMS:  Objection.
5     A.  I have no recollection of any.
6     Q.  So at the time that you had the
7     discussion with Secretary O'Neill in which he
8     requested that you discuss the matter with
9     Mr. Greenspan, had you discussed elimination
10    of the long bond with anyone other than the
11    persons whom you have identified?
12    A.  Not that I can recall.
13    Q.  Okay.  Now, do you know whether
14    Secretary O'Neill had discussed elimination
15    of the long bond with anyone other than the
16    persons that we have identified so far?
17       MR. ROSSETTI:  Objection.
18    A.  I have no basis for speculating on
19    that.
20    Q.  So he didn't give you any
21    indication as to whether or not he had spoken
22    to anybody else in the administration at that
23    point?
24    A.  I have no basis for having an
25    opinion on that.

Page 76

Fisher

1
2     Q.  Well, we have a report of the
3     Office of the Inspector General into the
4     events of October 31, 2001.
5        First of all, were you aware that
6     the Inspector General looked into the events
7     surrounding the disclosure of the elimination
8     of the long bond on October 31, 2001?
9     A.  Yes.
10    Q.  Did you ever read the Inspector
11    General's report?
12    A.  No, I don't believe I ever did read
13    it.
14    Q.  Did you ever see any kind of a
15    draft or anything like that?
16    A.  I don't -- I mean, I have seen
17    copies of it.  I certainly have not read it
18    cover to cover and I don't recall reading a
19    draft of it.
20    Q.  Even though the distribution for
21    the report lists two people, yourself and Ms.
22    Davis, Michelle Davis, you don't believe you
23    actually ever read through the thing?
24    A.  That's correct.
25    Q.  Well, we have already marked this

Page 77

Fisher

1
2     as an exhibit so many times, hopefully we can
3     keep the record uncluttered and I'll just
4     read from it.  But the --
5        MR. ROSSETTI:  Do you have a page,
6     John?
7        MR. SHOPE:  Yes, I do.
8     Q.  If you go to Exhibit 20, in the
9     Inspector General's report, it's a memorandum
10    of an interview with Brian Roseboro and in
11    the second page of the memorandum of the
12    interview with Mr. Roseboro it is stated --
13    I'll just read a few sentences to you.
14    "Roseboro said as the assistant secretary for
15    financial markets, he had the authority to
16    make the decision concerning suspending sales
17    of the 30-year bond.  In actuality, he said
18    it was a deliberate decision within Treasury
19    involving director of market finance, the
20    undersecretary of domestic finance, and the
21    secretary of staff.  He said they received
22    White House concurrence on October 26, 2001."
23       So let's start with the last point.
24    Do you recall there being White House
25    concurrence with the decision to eliminate

20 (Pages 74 to 77)

Page 78

Fisher

1
2 the 30-year bond?
3    A.   Prior to making the announcement I
4 consulted with both Larry Lindsey, who was
5 the director of the National Economic
6 Council, and with Glenn Hubbard, the chairman
7 of the Council of Economic Advisors,
8 informing them of our intention of
9 eliminating the 30-year bond.
10        I would not recall a date, but if
11 Brian's testimony is there is a specific date
12 where White House concurrence was sought,
13 that's likely to refer to the same event.
14    Q.   It's consistent with your memory
15 this took place approximately a week before
16 the announcement?
17    A.   Yes.
18    Q.   And let's take those two
19 conversations one by one.
20        You said Mr. Hubbard, did I get
21 that right?
22    A.   Yes, Mr. Hubbard.
23    Q.   So how did that conversation take
24 place?
25    A.   I called him on the telephone.

Page 79

Fisher

1
2    Q.   And what did you say and what did
3 he say?
4    A.   I explained to him of our intention
5 of eliminating the 30-year bond and the
6 rationale for doing so, and I don't recall
7 him saying anything other than generally it
8 made sense to him, he understood.
9    Q.   What was the rationale that you
10 explained to him on that day?
11    A.   Not an efficient form of financing.
12 With both Mr. Hubbard and Mr. Lindsey, they
13 had a great deal of contact and conversation.
14 I don't think it required a lot of ground to
15 be covered.  I probably highlighted a few of
16 the points covered in my statement.
17    Q.   So at that point you were already
18 drafting what your announcement was going to
19 be?
20    A.   I think that's likely.  I don't
21 have a specific recollection, but that seems
22 likely.
23    Q.   That's what ultimately culminated
24 in your prepared remarks which were
25 distributed in a press release on October 31?

Page 80

Fisher

1
2    A.   Yes.
3    Q.   What about Mr. Lindsey, the
4 conversation with Mr. Lindsey?
5    A.   I remember a similar conversation
6 with Larry Lindsey and perhaps a little
7 briefer than my conversation with Glenn
8 Hubbard.
9    Q.   You may have said it, but just for
10 the record what was Mr. Lindsey's commission?
11    A.   He was the director of the National
12 Economic Council.
13    Q.   And that is something that is part
14 of the White House, right?
15    A.   As is the Council of Economic
16 Advisors, both of them would report directly
17 to the president.
18    Q.   And how many members are there of
19 those two council, the Council and the
20 Committee?
21    A.   The Council of Economic Advisors
22 has I think three members by statute.  I
23 wouldn't recall the membership of the
24 National Economic Council.  A number of
25 cabinet officers, perhaps eight or nine.  I

Page 81

Fisher

1
2 don't have a recollection.
3    Q.   Do you know whether Mr. Lindsey or
4 Mr. Hubbard discussed the plan with the other
5 members of their respective Committee or
6 Council?
7    A.   I don't know.  Neither one of them
8 anticipated my conversation with them, so
9 from that I did not think this issue was
10 being discussed inside the White House prior
11 to my raising it with them.
12        They both understood the
13 sensitivity of the information.  I have no
14 anticipation that they would share it with
15 others, but that was clearly up to them.  I
16 don't know whether they did or not.
17    Q.   You didn't ask them not to disclose
18 it?
19    A.   No.
20    Q.   And so I take it did both of them
21 concur in the decision?
22    A.   I didn't ask for their concurrence.
23 I informed them of our intention and I didn't
24 ask for approval.  That left it open to them
25 to object if they wanted to, and no

21 (Pages 78 to 81)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 82

```
 1          Fisher
 2 objections were heard.
 3    Q.  If they had objected, is that
 4 something that would have caused you to
 5 change course?
 6    A.  I would have changed my
 7 conversation with them.  I don't think it
 8 would have changed the fact that it was in
 9 the Treasury's authority to make these
10 decisions.
11    Q.  But I'm not asking about what was
12 the legal authority of people to take action.
13 I'm asking about what your policy
14 decision-making would have been had the two
15 officials of the White House said no, don't
16 do it?
17        MS. WILLIAMS:  Objection.
18    A.  It obviously would have caused
19 matters.  I don't want to speculate on how.
20 I disagreed with them frequently on all sorts
21 of matters, so that would be a rather routine
22 process.
23    Q.  But you were giving them a week's
24 notice of this plan that you had so that they
25 would have a chance to object and you would
```

Page 83

```
 1          Fisher
 2 then have the opportunity to reconsider your
 3 position in light of their objection.
 4      Isn't that fair?
 5        MS. WILLIAMS:  Objection.
 6    A.  No, I don't think that's accurate.
 7    Q.  This wasn't just a courtesy, "This
 8 is what I'm going to do in a week," was it?
 9    A.  It's something in between the two
10 versions you have just offered.
11    Q.  It was important to you that the
12 White House concur with this, was it not?
13        MS. WILLIAMS:  Objection.
14    A.  No.
15    Q.  Did Mr. O'Neill tell you to consult
16 with the White House about this?
17    A.  No.
18    Q.  You had just done this on your own
19 initiative?
20    A.  Yes.
21    Q.  So at the time that you spoke with
22 Secretary O'Neill had you already spoken to
23 the White House?
24    A.  No, I don't believe so.
25    Q.  And did you follow up on Mr.
```

Page 84

```
 1          Fisher
 2 O'Neill's direction to speak with Mr.
 3 Greenspan?
 4    A.  Yes, I did.
 5    Q.  And when did you have that
 6 conversation?
 7    A.  I don't recall the date.  Some time
 8 in the latter half of October, so
 9 contemporaneous with these other
10 conversations.
11    Q.  And what did you say to Mr.
12 Greenspan and what did he say to you?
13    A.  I went over to his office, I
14 described the, our intention and our
15 rationale.  And again I think it's fairly
16 standard practice, such conversations, for
17 people to understand who has the authority to
18 make a decision, whose opinion is being
19 sought, and Chairman Greenspan was certainly
20 understanding of that.  But the import of the
21 conversation again was it made sense to him,
22 he understood why we were planning on doing
23 that.
24    Q.  In other words, what you're saying,
25 it wasn't Chairman Greenspan's decision to
```

Page 85

```
 1          Fisher
 2 make?
 3    A.  That's correct, and he would not
 4 pretend it was.
 5    Q.  But you and Mr. O'Neill were very
 6 interested in his opinion?
 7    A.  That's correct, yes.
 8    Q.  So if Mr. Greenspan had given his
 9 opinion this was a lousy idea, that would
10 have been an occasion for you to go back and
11 reconsider.
12        MS. WILLIAMS:  Objection.
13    Q.  Fair statement?
14    A.  It would have required for a vote
15 on our part.
16    Q.  Now, did you discuss with Mr.
17 Greenspan whether or not this decision would
18 have any effect on long-term interest rates?
19    A.  I think it may well have come up,
20 but I don't have a specific recollection.
21    Q.  And did you discuss the question of
22 whether or not the elimination of the long
23 bond would have an effect on long-term
24 interest rates with Mr. Lindsey?
25    A.  I believe the topic came up with
```

22 (Pages 82 to 85)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 86

1        Fisher
2 Mr. Lindsey.
3    Q.   And what did you say on that
4 subject and what did he say?
5    A.   I don't recall what he said.  What
6 I recall that I said is that since we were
7 also planning on eliminating the Buyback
8 Program, the impact on long-term interest
9 rates was ambiguous.  It was very hard to
10 predict, once you looked at the net effect of
11 the two decisions together, whether long-term
12 interest rates would rise or fall on the
13 announcement.
14    Q.   So you had no expectation one way
15 or the other?
16    A.   I expected that markets would
17 respond and they would respond with some
18 volatility.  There was a possibility of
19 dramatic movements in prices.  But given the
20 combined decisions to suspend issuance of
21 30-year bonds, but also to suspend the
22 Buyback Program, if you work through the math
23 of all of that, we were actually going to be
24 increasing the supply of long-term Treasury
25 bonds over what the market would otherwise

Page 87

1        Fisher
2 have been anticipating over the coming year,
3 which you would have thought would have led
4 to an increase in long-term interest rates as
5 more supply was on the market.
6    Q.   So if there is more supply, the
7 price of the long bond goes down, right?
8    A.   The yield would go up.
9    Q.   Because the yield is the exact
10 converse of the price, or moves conversely I
11 should say?
12    A.   But if the market only focused on
13 half of the equation and only focused on the
14 suspension of the long bond, then they would
15 see the other, they would only see part of
16 the math.  They would only see reduction in
17 supply at the long end, meaning price goes
18 up, yield goes down.
19        And so I recall being very careful
20 in my conversation with Mr. Lindsey, but, as
21 I said, the topic may have come up with Mr.
22 Greenspan and also Mr. Hubbard that I thought
23 it very difficult to anticipate what the net
24 impact on long-term interest rates would be.
25    Q.   And, I'm sorry, are you saying you

Page 88

1        Fisher
2 don't recall what Mr. Lindsey said about
3 long-term interest rates?
4    A.   I don't recall him responding to
5 that.  I do recall him describing the
6 ambiguity about how interest rates might
7 respond.
8    Q.   That was something that you just
9 raised on your own initiative then?
10    A.   Yes.
11    Q.   What about Mr. Hubbard, I take it
12 you raised the subject with him about the
13 effect on long-term interest rates?
14    A.   I probably did.  I don't have a
15 specific recollection.  I do recall Mr.
16 Lindsey.  I don't specifically recall Mr.
17 Hubbard, but I likely had the same outline,
18 thumbnail conversation.
19    Q.   Do you recall any response by him
20 on that subject?
21    A.   No, I don't.
22    Q.   Now, you knew, obviously, this was
23 a subject of great interest to the
24 administration, correct?
25        MR. ROSSETTI:  Objection.

Page 89

1        Fisher
2        MS. WILLIAMS:  Objection.
3    A.   No, I don't know that it was of
4 great interest to the rest of the
5 administration.
6    Q.   In other words, the possible
7 decline in long-term interest rates you don't
8 believe was of great interest to the
9 administration?
10        MS. WILLIAMS:  Objection.
11    A.   Some members of the administration
12 may view a particular level of interest rate
13 as being a good or a bad thing.  That
14 certainly wasn't my view.  And I think we all
15 had maintained a view in the administration
16 that interest rate policy is left to the
17 Federal Reserve, monetary policy is something
18 to be conducted by independent Central Bank.
19        So I don't, I don't view this as
20 something that was acutely of interest to the
21 rest of the administration, no.
22    Q.   Let's just back up a little bit.
23        Do you recall there being concern
24 in August and September of 2001 that the
25 economy was slowing down, even before the

23 (Pages 86 to 89)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

# Exhibit J

David Aufhauser                                                February 22, 2008
Washington, DC

```
1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
2
   ----------------------------x
3  UNITED STATES SECURITIES      :
   AND EXCHANGE COMMISSION,       :
4                                 :
               Plaintiff,         :
5                                 :   Civil Action No.
          vs.                     :    05-10983 (NMG)
6                                 :
   STEVEN E. NOTHERN,             :
7                                 :
               Defendant.         :
8  ----------------------------x

9
                    Washington, D.C.
10
                Friday, February 22, 2008
11

12 Videotape Deposition of:

13            DAVID AUFHAUSER,

14 the witness, was called for examination by counsel

15 for the Defendant, pursuant to notice, commencing

16 at 1:30 p.m., at the law offices of Foley

17 Hoag LLP, 1875 K Street, Northwest, Suite 800,

18 Washington, D.C., before Dawn A. Jaques, Certified

19 Shorthand Reporter and Notary Public in and for

20 the District of Columbia, when were present on

21 behalf of the respective parties:

22
```

David Aufhauser                                       February 22, 2008

Washington, DC

---

Page 38

1   e-mail.

2       MR. FREEBORNE: Are you asking separate

3   and apart from the e-mail, or in connection with

4   the e-mail?

5       BY MR. SHOPE:

6     Q   I'm asking you in connection with --

7   separate and apart from the e-mail, just

8   generally.

9     A   No.

10     Q   Would you -- just sort of backing up

11   just generally speaking, would you have considered

12   the news that a European central bank had known of

13   the decision to suspend the long bond a day in

14   advance of its official announcement, would that

15   have been information of concern to you at the

16   time?

17       MS. WILLIAMS: Objection.

18       MR. WARIN: Objection.

19       THE WITNESS: I don't know. I don't

20   know. If the Secretary of Treasury was talking to

21   the head of Central Bank of England, they talk

22   about all sorts of confidential matters. I don't

---

Page 39

1   know whether it would have struck me as unusual.

2       MR. SHOPE:

3     Q   Okay.

4     A   As a matter of fact, you do a lot of

5   advanced planning at that level on macro issues,

6   particularly four weeks within the largest

7   terrorist event in history.

8     Q   So it would not be surprising to you if

9   someone in the high level of Treasury Department

10   had shared that decision to suspend the long bond

11   with other central banks in advance of it being

12   announced?

13     A   I thought I was being careful. I didn't

14   say surprised.

15       MR. WARIN: Objection.

16       THE WITNESS: I said I didn't know, but

17   surely highly confidential discussions take place

18   at the highest level. As I put it, at the

19   Secretary's level. I did put it at a senior

20   level. So without knowing the facts and

21   circumstances, I don't know.

22       BY MR. SHOPE:

---

Page 40

1     Q   Okay. And were you aware that

2   Undersecretary Fisher had discussed in advance of

3   October 31 the decision to suspend issuance of the

4   long bond with persons in the White House?

5       MR. KOLLAR: Objection.

6       THE WITNESS: No, I'm not aware.

7       BY MR. SHOPE:

8     Q   If Secretary Fisher had testified to

9   that, as he has, would that be surprising to you?

10       MS. WILLIAMS: Objection.

11       MR. WARIN: Objection.

12       THE WITNESS: No.

13       BY MR. SHOPE:

14     Q   So I apologize if I asked this, but --

15     A   Okay.

16     Q   Would it be fair to say, then, you're

17   not aware of any follow-up investigation, at least

18   within the Treasury Department, as far as whether

19   or not someone in the European Central Bank did

20   have the information a day in advance?

21     A   No.

22       MR. WARIN: Finished with Exhibit 4?

---

Page 41

1       MR. SHOPE: I think so. We may get back

2   to it, but if we could mark this as the next

3   exhibit.

4       (Aufhauser Deposition Exhibit No. 5 was

5       marked for identification.)

6       MR. WARIN: What is this?

7       MR. SHOPE: Exhibit 5 has been

8   represented to us to be notes of Treasury

9   personnel. And in particular, this is understood

10   to be notes of discussions with the SEC.

11       MS. WILLIAMS: By who?

12       MR. SHOPE: By Treasury personnel.

13       MS. WILLIAMS: No. Who made that

14   representation? I wasn't aware. I just got the

15   document. It's by Treasury. That's the only

16   representation. I knew there were documents

17   produced by Treasury.

18       MR. SHOPE: Well, my understanding is

19   these are documents produced by Treasury. They

20   have been previously withheld. We can get into

21   when we're off the record.

22       MR. WARIN: Whose notes are these?

---

11 (Pages 38 to 41)

# Exhibit K

Paul F. Malvey
Washington, DC
June 23, 2006

Page 1

```
 1                  UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - - -  )

 4     UNITED STATES SECURITIES AND       )

 5     EXCHANGE COMMISSION,               )

 6                    Plaintiff,          )

 7              v.                        ) No. 05-10983 (NMG)

 8     STEVEN E. NOTHERN,                 )

 9                    Defendant.          )

10     - - - - - - - - - - - - - - -  )

11                        Washington, D.C.

12                        Friday, June 23, 2006

13     Deposition of PAUL FRANCIS MALVEY, a witness herein,

14     called for examination by counsel for Defendant in

15     the above-entitled matter, pursuant to agreement, the

16     witness being duly sworn by CHERYL A. LORD, a Notary

17     Public in and for the District of Columbia, taken at

18     the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

19     Suite 800, Washington, D.C., at 10:10 a.m., Friday,

20     June 23, 2006, and the proceedings being taken down

21     by Stenotype by CHERYL A. LORD, RPR, CRR, and

22     transcribed under her direction.

23

24

25
```

Paul F. Malvey                                                      June 23, 2006
Washington, DC

| Page 246 | Page 248 |
|---|---|

**Page 246**

1  of sales of the 30-year bond, so that is -- that's
2  not going to the question of whether or not there's a
3  last bite at the apple.
4       That's going to the question as to when
5  you announce.
6       A.  No, because --
7       MS. WILLIAMS:  Objection.
8       A.  -- the reason that January 30 would be
9  better is because we had a scheduled 30-year auction
10 in February, and that's why it would have been better
11 to announce it, because the investors -- it's just
12 not finished out in this sentence here, because
13 whoever wrote these notes didn't make the connection
14 between the January 30 announcement and the February
15 15 settlement of a 30-year bond.
16      That's what -- that's the reason I was
17 saying Jan 30 would would have been better for the
18 announcement, because that would have been right
19 before the sale of a preschedule -- already on the
20 schedule 30-year bond.
21      That's what I meant.
22      BY MR. SHOPE:
23      Q.  Yeah, but you could have made the
24 announcement on October 31 and then announced that
25 there would be a last bite at the apple in February.

**Page 247**

1       Right?
2       MS. WILLIAMS:  Objection.
3       A.  He could have.
4       I mean, coulda, woulda, shoulda.
5       It's -- it would have -- I'm sorry.
6       I didn't mean to be disrespectful, but
7  because there was such a scarcity premium on the
8  security to start with, that would have given 3
9  months for the markets to gyrate around and be more
10 volatile at the long end because of all the
11 uncertainty about its future, where if you made the
12 announcement on January 30, the sale would be 5 days
13 later, and WY market would have established the
14 market price, and there was much less chance for
15 volatility.
16      BY MR. SHOPE:
17      Q.  Okay.  So what else was inaccurate in
18 exhibit 11?
19      A.  I'm not saying inaccurate.
20      I'm just saying it didn't convey the
21 flavor.
22      And it's -- it -- the next sentence says:
23 It was also Malvey's opinion that undersecretary
24 Fisher would have made the announcement at the
25 quarterly funding meeting if he had been confirmed of

**Page 248**

1  the time.
2       And somebody asked me that, and after
3  having been at the other side of the table listening
4  to Peter's arguments about his view of the 30-year
5  and having made my arguments about my view of the
6  30-year, I think he would have made the same
7  arguments in August.
8       And so, yes, I -- I -- who the hell knows,
9  but I think he would have made the same arguments in
10 August.  Whether we would have made the announcement
11 in August is another thing, because he would have had
12 to justify making the announcement in August to the
13 rest of us too.
14      Q.  But I mean, but basically this gets the
15 gist -- that was your opinion?
16      A.  Yeah, it gets the gist, yeah.
17      Right.
18      MS. WILLIAMS:  Objection.
19      A.  All right.  And the one, 2, 3 -- third
20 full paragraph talking about Drew Matus.
21      He came in -- I think he may have
22 scheduled to meet with Jeff, but Jeff was also new.
23 I think Jeff had only been there since August, I
24 think.
25      BY MR. SHOPE:

**Page 249**

1       Q.  You're speaking of Jeff Huther now?
2       A.  Jeff Huther.  Right.
3       And I think it was because Woody was
4  either about -- was -- oh, here it is.
5       He was vice chairman.  The -- usually the
6  chairman of the borrowing advisory committee, his
7  staff works up these pro forma forecasts that I
8  mentioned earlier today, and for some -- and the
9  vice-chairman usually follows the chairman -- that's
10 also almost pro forma.
11      And the October meeting would have been
12 the last meeting for the outgoing chairman, and Drew,
13 some reason Woody asked Drew to do these things.  He
14 had never done them before.
15      So he worked up these pro forma
16 forecasts -- he had access to other ones out there
17 and previous ones, and he worked up these pro forma
18 forecasts.  And I don't know if he came down to
19 Washington specifically for that, but he asked Jeff,
20 is it okay if I run these by you to tell me whether
21 they're reasonable, a reality test or something like
22 that.
23      And I mean, it says that I spoke with him
24 briefly, but it might have been -- "briefly" is --
25 the 2 of them came into my office, and we put these

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
                                      1-800-FOR-DEPO

Paul F. Malvey                                                    June 23, 2006
Washington, DC

| Page 250 | Page 252 |
|---|---|

**Page 250**

1  things out on the table in front of us, and asking
2  me, you know, does all this stuff look reasonable and
3  stuff, so I -- it was -- I forget exactly what the
4  nature of the conversation, but I might have said
5  something like, what if it -- do you have any
6  alternatives, what if Woody says, how about this, are
7  you ready to go with alternatives, I mean, because
8  the meeting is going to be next Tuesday, he's
9  going -- he has -- he has -- well, proper prior
10  preparation, so I was trying to help him out like I
11  help a lot of people.
12      Q.   One of those alternatives would have been
13  suspending the issuance of the long bond.
14          Right?
15          MS. WILLIAMS:  Objection.
16      A.   It -- not necessarily would have been, but
17  it may have come up.  I don't recall it coming up.
18      I mean, I don't -- I don't recall him
19  having 2 scenarios, but maybe he did.  I don't know.
20      I just remember looking and seeing if it's
21  feasible, because we were making so many changes,
22  and, you know, I may have asked him, do you have an
23  alternative scenario if the long bond is not there,
24  or something like that.
25      I don't know.  I don't recall saying it,

**Page 251**

1  but I -- it just seems like --
2          BY MR. SHOPE:
3      Q.   Well, that was the elephant in the room,
4  wasn't it?
5          MS. WILLIAMS:  Objection.
6      A.   I don't think so.
7          BY MR. SHOPE:
8      Q.   I thought -- didn't you refer to that as
9  the elephant in the room earlier today in your
10  deposition?
11          MS. WILLIAMS:  Objection.
12      A.   I don't recall my context.
13          BY MR. SHOPE:
14      Q.   To suspending the long bonds.
15      A.   Yeah, I know, but --
16      Q.   This is an issue at the October 30 --
17  there was an elephant in the room, as you say, at the
18  October 30 meeting of the borrowing advisory
19  committee.
20          MS. WILLIAMS:  Objection.
21          I think this mischaracterizes his
22  testimony.
23      A.   I don't recall saying that.  And we just
24  went over the minutes, and it doesn't -- it's not
25  included in there.

**Page 252**

1          BY MR. SHOPE:
2      Q.   So you're saying you just don't remember
3  one way or the other whether or not the suspension of
4  the long bond came up in your discussion with
5  Mr. Matus of William Brothers?
6      A.   I don't recall the discussion coming up.
7          But I wouldn't be surprised if I said
8  things like, do you have an alt- -- what if -- what
9  if we -- the -- what if the long bond is eliminated
10  sometime in the next year, do you have an alternative
11  for that.  What if we go from quarterly to semiannual
12  tens, 10-year securities.
13          And it was more like I'd say, well, what
14  if Woody says, how about this.  It was kind of like
15  asking him questions trying to get him prepared for
16  his boss to get ready for this meeting, you know.
17      Q.   M-hm.
18      A.   But I don't recall the context of this
19  300- -- or 800-pound elephant.
20      Q.   Well, the testimony obviously will speak
21  for itself.
22          Now, were there any other inaccuracies
23  that you noted --
24      A.   Yeah.
25      Q.   -- in exhibit 11?

**Page 253**

1      A.   I don't know.  All right.
2          The last paragraph on page 2 continues
3  on -- I'm not quite -- I'm -- it's a long time ago,
4  but I -- I remember answering the phone and asking
5  Jill.
6          Then the next page says, I introduced
7  myself to him at a press conference in 1996.  And
8  it's -- it -- this is something I have a recollection
9  of, is, I walked over, and Jill and Roger were
10  standing over -- point out exactly where they were
11  standing.
12          They were standing by the side door.  And
13  Roger had done the press conference, so I think -- so
14  that had to have been pre-Gensler.  They were just
15  standing there making small talk.
16          And I was Jill's deputy and just walked
17  over and say, good job, Roger, or something like
18  that.  And he introduced me to -- Paul, this is Pete
19  Davis, Pete Davis, Paul Malvey.  And, hi.
20          And Roger says, he's one of the good guys.
21  And I think I mentioned that earlier today, because
22  Roger just -- Roger is a man of few words.
23      Q.   M-hm.
24      A.   And for him to say, one of the good guys,
25  I remember saying, I wonder what he means by that,

# Exhibit L

## Page 1

1    UNITED STATES SECURITIES AND EXCHANGE COMMISSION

2

3    In the Matter of:                    )

4                                         )  File No. HO-09353-A

5    TRADING IN CERTAIN TREASURY ISSUES   )

6    WITNESS:  Raymond E. Walton

7    PAGES:    1 through 135

8    PLACE:    Securities and Exchange Commission

9              Midwest Regional Office

10             175 West Jackson Boulevard

11             Suite #900

12             Chicago, Illinois,  60604

13   DATE:     Wednesday, April 23, 2003

14

15       The above-entitled matter came on for hearing, pursuant

16   to notice, at 2:00 p.m.

17

18

19

20

21

22

23

24             Diversified Reporting Services, Inc.

25                     (202) 467-9200

## Page 2

1    APPEARANCES:

2    On behalf of the Securities and Exchange Commission:

3        JOHN J. ROSSETTI, JR., Senior Attorney

4        ANDREW SPORKIN, Branch Chief

5        Securities and Exchange Commission

6        Midwest Regional Office

7        175 West Jackson Boulevard

8        Suite 900

9        Chicago, Illinois  60604

10       (202) 942-4672  (Rossetti questioned by phone)

11

12   On behalf of the Witness:

13       ERIC A. BENSKY

14       Dickstein, Shapiro, Morin & Oshinsky, LLP

15       2101 L Street, N.W.

16       Washington, D.C. 20037-1526

17       (202) 955-6613

18

19

20

21

22

23

24

25

## Page 3

### C O N T E N T S

2

3    WITNESSES                                     EXAMINATION

4    Ray Walton                                         4

5

6    EXHIBITS:       DESCRIPTION                   IDENTIFIED

7    67        Subpoena to Mr. Walton                   7

8    68        Emails from R. Walton                   41

9    69        Reuters news report                     79

10   70        Cantor Fitzgerald trading records       79

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## Page 4

1              P R O C E E D I N G S

2         MR. ROSSETTI:  It's April 23rd, 2003.  This is John

3    Rossetti.  I'm on the telephone from Washington D.C. on with

4    Andrew Sporkin.  The time here is 2:57.  The time in Chicago

5    where the witness and counsel and the court reporter are is

6    1:57.

7    Whereupon,

8              RAYMOND E. WALTON

9    was called as a witness, and having been first duly sworn,

10   was examined and testified as follows:

11              EXAMINATION

12       BY MR. ROSSETTI:

13       Q  Would you please state your full name and spell it

14   for the record?

15       A  Raymond Edward Walton.  That's R-a-y-m-o-n-d.

16   Middle name Edward, E-d-w-a-r-d.  Last name Walton, W-a-l-t-

17   o-n.

18       Q  Mr. Walton, I'm John Rossetti and with me is Andrew

19   Sporkin.  We are both officers of the Commission for this

20   proceeding.  This is an investigation of the United States

21   Securities and Exchange Commission In the Matter of Trading

22   in Certain Treasury Issues to determine whether there have

23   been violations of certain provisions in the federal

24   securities laws.

25            However, the facts developed in this case might

Page 41

1  in connection with information?
2      A  Yes.
3      Q  And, what did you learn?
4      A  I seemed to remember learning that it was common
5  that reporters would learn of announcements before they were
6  actually released and that they were required then to not
7  release any information about it until the actual release
8  time. Until the actual data was actually released.
9      Q  And from where did you learn that?
10     A  If I'm not mistaking, I'm not 100 percent sure, but
11 I believe this series of Wall Street Journal articles
12 concerning the activities around the Treasury announcement
13 from the 31st.
14     Q  At this time I'd ask the Court reporter to hand the
15 witness Exhibit 68. Just let me know when you've done that.
16     Mr. Walton, do you have Exhibit 68 now?
17         (SEC Exhibit No. 68 was marked for
18         identification.)
19     A  I do. I'm reviewing it now.
20     Q  Okay. And for the record, this is a series of
21 three e-mails on October 31st, 2001 from Ray Walton to
22 undisclosed recipients at 9:28 a.m., 9:31 a.m. and 9:42 a.m.
23     Let me know when you're through reviewing those,
24 Mr. Walton.
25     A  I have reviewed them, yes.

Page 42

1      Q  Are those e-mails that you sent out to undisclosed
2  recipients?
3      A  Apparently, yes.
4      Q  And I'll have you turn to the first one, there.
5  And you'll see in the lower right hand corner the base number
6  is GSO3306. Do you see that?
7      A  Correct.
8      Q  Okay. And this says that subject Lehman buys 1.5K,
9  USZ up to 17. Still buying. Can you translate for me what
10 that means?
11     A  That means that the house or Lehman desk was buying
12 1,500 December Treasury bond contracts up to 17 and
13 apparently, looks like they were still bidding for more, or
14 trying to buy more at that time.
15     Q  What do you mean up to 17? Is that 17, 30 seconds?
16     A  That is correct.
17     Q  And they were still bidding beyond that? Beyond
18 the 17, 30 seconds?
19     A  Difficult for me to say that they were bidding at a
20 higher price. Or they may have been bidding the same price
21 or even potentially a lower price.
22     Q  Based on this e-mail, were you conveying that they
23 bought 1,500 contracts and were still buying more?
24     A  Correct.
25     MR. SPORKIN: Just to clarify something, John.

Page 43

1      Ray, when you said a moment ago that it appears that you sent
2  this e-mail, you based that on the fact that you see your
3  name in the firm line?
4      THE WITNESS: Correct.
5      MR. SPORKIN: Do you base that on anything else?
6      THE WITNESS: Just from the come line.
7      MR. SPORKIN: Okay.
8      BY MR. ROSSETTI:
9      Q  There's a mail to there, it says
10 rwal@bloomburg.net. Do you recognize that e-mail address?
11     A  Yes.
12     Q  Is that your e-mail address?
13     A  Yes, it is.
14     MR. SPORKIN: This is Andrew Sporkin. Is there
15 somebody else that could have sent this e-mail besides
16 yourself?
17     THE WITNESS: Yes, it's possible. Either Gus or
18 Wes could have sent it because we only have one machine and
19 its got my name on it. One address.
20     MR. SPORKIN: Do you recall sending this message?
21     THE WITNESS: Yes, I do.
22     MR. SPORKIN: And why is that you sent this
23 message? Let me ask you this, it says undisclosed
24 recipients. Are you able to tell us who those recipients
25 were?

Page 44

1      THE WITNESS: At that time, this is my best
2  recollection, I would have guessed it would have gone to Nick
3  and Zizek, certainly. Probably a guy at Lehman.
4      MR. SPORKIN: Who would that have been?
5      THE WITNESS: Jon Hoffman. Probably one of two
6  guys, potentially at UBS.
7      MR. SPORKIN: Who would they have been?
8      THE WITNESS: Eric Mohammed and Mark Gannon. Boy,
9  difficult for me to be sure of who else might have been on
10 that list at that time.
11     MR. SPORKIN: I understand that you don't know for
12 sure, but tell me, who do you think might have been on that
13 list, as well?
14     THE WITNESS: Potentially Claude Lamedica, HSBC.
15 Oh, boy.
16     MR. SPORKIN: While we're here. Can you spell
17 Lamedica for the record?
18     THE WITNESS: It's L-a-m-e-d-i-c-a.
19     MR. SPORKIN: Anybody else that you can recall?
20     THE WITNESS: Not specifically, no.
21     MR. SPORKIN: Is there any question in your mind
22 that Nick Buhta and Zizek Sukhatne would have been a
23 recipient of this e-mail, or would have been somebody that
24 you would have sent it to?
25     THE WITNESS: I would have, it definitely would

SECNOTH00116638

Page 45

1 have been somebody I sent it to. I can't remember with any
2 certainty if they were on this list of people that I sent
3 this to.
4       MR. SPORKIN: Right, okay.
5       THE WITNESS: Because there's times, there were
6 times when they wouldn't always have been on the list because
7 I was on the phone with them so much. So it's difficult for
8 me to say with any certainty. But my guess would be, yes.
9       MR. SPORKIN: All right. And the next question is,
10 why, did you send this e-mail?
11      THE WITNESS: Lehman is certainly a big player in
12 the fixed income market. I recall them being active during
13 this general time frame. When I say that, you know, several
14 weeks, months they've been coming in, doing large trades on a
15 pretty regular basis. This, from what I recall, struck me as
16 potentially being part of what was being build a bigger
17 trade.
18      BY MR. ROSSETTI:
19   Q  What do you mean by that?
20   A  Just by the phrasing, and from what I remember,
21 they say, I'm saying that they bought 1,500 up to 17 and
22 they're still buying. It seems to me that, you know, it
23 looked like they were still bidding the market and that, you
24 know, the market was, you know, well bid and to some degree.
25   Q  Let me just represent to you that at the time of

Page 46

1 his e-mail, at 9:28, the bond, the futures contracts were
2 trading in the 108 range, it would be like 108. So, putting
3 that in context with the 17 there, it would be 108, 17, 30
4 seconds?
5   A  Right. You saying the handle was 108, it would
6 have been 108, 17, that is correct.
7   Q  Okay. Now, we were discussing, you said earlier
8 that Lehman was one of your clients?
9   A  Correct.
10  Q  Were they purchasing these contracts through you or
11 any of your agents?
12  A  No.
13  Q  Who were they purchasing them through, do you know?
14  A  Another broker in the bond pit. I honestly
15 wouldn't, I can't recall which broker it was.
16  Q  Would you have known, at that point?
17  A  I would have known --
18  Q  You sent this out, you would have known, I mean, it
19 was something you would have known then but you don't recall
20 now?
21  A  I, oh, yes. Which broker executed trade in the
22 pit?
23  Q  Yes.
24  A  I would have known, yes.
25  Q  Now, the, Lehman was one of your clients. Why is

Page 47

1 it that you would have advised another client, that being at
2 least Goldman Sachs, to Nick Buhta and Zizek Sukhatne, that
3 Lehman was doing this?
4   A  Lehman is one of my clients. They are, but I have
5 a relationship with an individual. I think at that time,
6 maybe two individuals at Lehman, specific traders. Lehman,
7 when I, when I generically refer to Lehman in this regard, it
8 could be any potential trader or customer that may have been
9 executing a trade through Lehman Brothers. There are, one of
10 their desks on the floor. So, I just observed in the, you
11 know, on the floor, that the Lehman desk was buying, in this
12 case, apparently, 1,500 contracts up to 17 and since I was
13 observing that and not a trade that I was involved in, you
14 know, that's definitely information that I would pass along.
15  Q  If you were, if they had purchased those 1,500
16 contracts through you, would you have conveyed that
17 information to Goldman Sachs or any other, any of your other
18 clients?
19  A  I may have conveyed to them that we have been
20 seeing a buyer. I would not have referred to them,
21 specifically, at all.
22      MR. SPORKIN: Now, this is Andrew Sporkin, Mr.
23 Walton. When you say that they buy, that Lehman buys 1,500
24 contracts, is this something out of the ordinary for them to
25 buy 1,500 contracts?

Page 48

1       THE WITNESS: Certainly not out of the ordinary.
2 Again, as I remember it, it just in the context of the fact
3 that they had been coming in on a fairly regular basis and
4 doing some large trades. So, one of my jobs is to observe in
5 the market if I'm seeing things that may look similar to
6 activities that we've seen in the past. So, I probably felt
7 compelled to pass this information along, you know, thinking
8 that maybe this was going to be part of a bigger trade.
9       MR. BENSKY: Just a second please, Andrew. I'm
10 sorry.
11      COURT REPORTER: Note for the record that counsel's
12 conferring with his client.
13      MR. BENSKY: Thank you.
14      BY MR. ROSSETTI:
15  Q  Now you said that you were seeing, as part of a
16 larger trade, was this like other trades that morning or
17 prior days?
18  A  Prior days.
19  Q  Now, 1,500, the 1,500 contracts, in and of itself,
20 is that a large, is that, would you consider that a large
21 trade?
22  A  Yes.
23  Q  But it's not something that was out of the
24 ordinary?
25  A  No.

SECNOTH00116639

Page 49

1  Q  The, you sort of touched on, is one of your jobs as
2  being a representative of your various client to keep them
3  apprised of the action that's going on in the floor?
4  A  Yes.
5  Q  In advising your client of what's going on in the
6  floor, is that something you advise all your clients of, or
7  do you pick and choose?  You're just going to tell some and
8  not others?
9  A  Difficult to characterize that specifically.  You
10  know, there's a lot of information that could come from a
11  variety of sources.  It's really client specific.
12  Q  When we, you and I had a discussion a while back,
13  December 5th, 2001.  Do you recall that telephone
14  conversation we had?
15  A  I recall the conversation, us having a
16  conversation, yes.
17  Q  Thanks.  One of the things we discussed, you know,
18  prior to this e-mail, that it was a relatively quiet morning
19  in terms of trading.  Do you recall that, at all?
20  A  That's my recollection, yes.
21  Q  Would this, this Lehman trade, was that, would have
22  been the most significant trade that occurred that morning in
23  the bond futures?
24  A  Difficult for me to say.
25  Q  Let me have you turn to the next e-mail.  It's

Page 50

1  bates number, still on Exhibit 68, it's bates stamped number
2  GS03308.  You see that --
3  A  Yes.
4  Q  Again, is this an e-mail that you sent out?
5  A  Yes.
6  Q  And would the undisclosed recipients be the same
7  people we discussed earlier?
8  A  Again, difficult for me to say, but, likely, yes.
9  Q  It says here Lehman 2K, now still buying.  What
10  does that mean?
11  A  It means Lehman's bought a total of 2,000 and still
12  buying.
13  Q  Is that accumulative or is that in addition to the
14  1.5 from the previous e-mails?
15  A  I would say accumulative based on what I've, I'm
16  seeing here.
17  Q  That was up, as of 9:31 they had purchased that
18  morning 2,000 bond futures contracts?
19  A  Not necessarily that morning, in this little time
20  frame.
21  Q  Well, I mean, from, from the 9:28 to 9:31 they
22  would have purchased, well they had the 1,500, then they
23  would have purchased an additional 500 that morning?
24  A  Apparently, from what I've wrote, yes, that's
25  correct.

Page 51

1  Q  All right.  And that was the bond futures
2  contracts?
3  A  Yes.
4  Q  The, you said you didn't' do the 15, did you do the
5  500 contracts?  The additional 500 contracts that they
6  apparently purchased?
7  A  I'm sorry.  Can you repeat that question?
8  MR. SPORKIN:  He's asking you whether --
9  BY MR. ROSSETTI:
10  Q  They purchased 1,500 contracts --
11  A  Right.
12  Q  -- that morning.  And then, you said they're up to
13  a total of 200, which means they purchased an additional 500.
14  A  Correct.
15  Q  My question is did you do that transaction for
16  them?
17  A  Oh, no.  I did not execute that, no.
18  Q  Okay.  Then there is another e-mail.  The last in
19  this series.  Is GS3310.  Again, is this an e-mail that you
20  sent out, Mr. Walton?
21  A  Yes.
22  Q  And again, the recipients would have been the same
23  people that we've been discussing?
24  A  Likely, yes.
25  Q  All right.  Can you, the subject line says size

Page 52

1  buyers of US selling TY.  Can you explain what that means?
2  A  It's what we would call an Op trade.  So, in this
3  instance, people were, the same person, or the same desk, was
4  buying bonds selling 10 year contracts.  Buying December
5  bond, or bond contracts, December bond contracts in this
6  case, selling December 10 year contracts.
7  Q  And how did you learn that information?
8  A  I would guess that I observed it as, you know, as
9  it was being transacted on the floor.
10  Q  The pit area, where the 10 year were being
11  transacted, is that the same pit area where the 30 years are
12  being transacted?
13  A  No.
14  Q  No.  Where is the ten year pit in relation to the
15  30 year pit?
16  A  As I'm looking at it, it is to my left.
17  Q  To you left.  I mean, by, from where you sit and
18  you're looking at the 30 year pit --
19  A  Correct.
20  Q  Okay.  Where is the 30 year pit in relation to you?
21  A  To my right.
22  Q  About 20 yards?
23  A  Yeah.  Up in front of me to my right.
24  Q  All right.
25  A  20 yards.

**Goldman Sachs E-Mail**

From:       RAY WALTON, CANTOR, FITZGERALD & [RWALT@bloomberg.net]
Sent:       Wednesday, October 31, 2001 9:28 AM
To:         undisclosed-recipients
Subject:    lehman buys 1.5k usz up to 17, still buying

Confidential Treatment
Requested by
Goldman Sachs Group

**GS 00105**

1

SECNOTH00094350

**Attachment 3**

```
-----Original Message-----
From: RAY WALTON, CANTOR, FITZGERALD & [mailto:RWALT@bloomberg.net]
Sent: Wednesday, October 31, 2001 9:28 AM
To: undisclosed-recipients
Subject: lehman buys 1.5k usz up to 17, still buying
```

**GS 01779**

Confidential Treatment Requested by Goldman, Sachs & Co.

**Goldman Sachs E-Mail**

| | |
|---|---|
| From: | RAY WALTON, CANTOR, FITZGERALD & [RWALT@bloomberg.net] |
| Sent: | Wednesday, October 31, 2001 9:31 AM |
| To: | undisclosed-recipients |
| Subject: | lehman 2k now still buying |

Confidential Treatment
Requested by
Goldman Sachs Group

1

GS 00106

SECNOTH00094351

**Attachment 5**

-----Original Message-----
From: RAY WALTON, CANTOR, FITZGERALD & [mailto:RWALT@bloomberg.net]
Sent: Wednesday, October 31, 2001 9:31 AM
To: undisclosed-recipients
Subject: lehman 2k now still buying

**GS 01781**

Confidential Treatment Requested by Goldman, Sachs & Co.

SECNOTH00096031