UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05-CV-10983 (NMG) |
| Plaintiff, | ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) | |

## U.S. SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT'S MOTION TO TAKE SUPPLEMENTAL DEPOSITIONS

## TABLE OF CONTENTS

TABLE OF AUTHORITES ........................................................................................................ ii

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 4

PROCEDURAL HISTORY .................................................................................................. 6

ARGUMENT ....................................................................................................................... 8

  A. THE DEPOSITION NOTHERN IS SEEKING TO RE-OPEN OF
     FORMER TREASURY EMPLOYEE PAUL MALVEY IS UNNECESSARY
     AND SHOULD BE DENIED ........................................................................................... 8

  B. THE BELATED DEPOSITIONS NOTHERN IS SEEKING TO TAKE
     OF THREE BOND TRADERS ARE BURDENSOME, UNNECESSARY,
     UNLIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE
     AND SHOULD BE DENIED ......................................................................................... 11

       1.  The Deposition of James Derek Kehoe of London, England Is Unduly
           Burdensome and Will Delay the Resolution of This Case ............................. 11

       2.  The Rumor Evidence That Nothern Is Seeking To Admit
           Through Kehoe, Sbarra and Haskel Is Cumulative And Unnecessary .......... 13

       3.  The Testimony Concerning Rumors That Nothern Is Seeking
           To Obtain From Kehoe, Sbarra and Haskel Is Likely To Be
           Inadmissible Hearsay ...................................................................................... 15

  C. THERE IS NO EXCUSE FOR NOTHERN'S FAILURE TO COMPELTE
     FACT DISCOVERY  PRIOR TO THE FACT DISCOVERY CUTOFF ......................... 16

CONCLUSION .................................................................................................................... 19

## TABLE OF AUTHORITIES

### CASES

*Nothern v. U.S. Depart. of Treasury*, No. 07-10661-NMG (D. Mass.) ..............................7

*Nothern v. U.S. Depart. of Treasury*, No. 07-10347- NMG (D. Mass.) ............................7

*Nothern v. U.S. Depart. of Homeland Security*, No. 07-10865-NMG (D. Mass.)..............7

*Ruffin v. City of Boston*, 146 Fed. Appx. 501(1st Cir. 2005)............................................12

*SEC v. Mayhew*, 121 F.3d 44 (2d. Cir. 1997) ..................................................................14

*U.S. v. Blackwell*, 459 F.3d 739 (6th Cir. 2006) ..............................................................15

### FEDERAL RULES

Fed. R. Civ. P. 28(b) ..........................................................................................................12

Fed. R. Evid. 801 ...............................................................................................................15

Fed. R. Evid. 802 ...............................................................................................................15

**INTRODUCTION**

The Securities and Exchange Commission ("SEC" or the "Commission") files this opposition to Defendant Steven E. Nothern's Motion to Take Supplemental Depositions.[1] The parties to this action had nearly two-and-a-half years to complete fact discovery. Fact discovery closed on February 29, 2008. Despite the extraordinary amount of time he had to obtain and establish the admissibility of evidence for his defense, defendant Steve E. Nothern now comes before this Court seeking additional time to take the depositions of three bond traders, who he has known about for over a year, and to reopen the deposition of a former U.S. Department of Treasury ("Treasury") employee, who he already deposed at length. Nothern sets forth four arguments in support of his untimely request to extend fact discovery. All of these arguments should be rejected.

First, Nothern claims that he needs to re-open the deposition of former Treasury employee, Paul Malvey to ask him whether he is the cousin of John V. Malvey (a.k.a. "Jack Malvey"), an employee at Lehman Brothers, Inc. ("Lehman"), who happens to share his last name. Without explaining why he neglected to ask Paul Malvey whether he was related to Jack Malvey or anyone else in the bond industry during his nearly six-hour deposition in 2006, Nothern attempts to justify his request to re-depose Malvey by concocting an unsupportable conspiracy theory. Relying on pure speculation, Nothern suggests that Paul Malvey may have tipped Drew Matus, another employee of Lehman with advance information concerning Treasury's decision to cancel the 30-year bond in an effort to help his "cousin" Jack Malvey. Nothern's theory has no basis in fact and no relevance to this case. The SEC has obtained declarations that confirm that: (1) Paul Malvey did not tip Drew Matus, Jack Malvey or anyone else; (2) Paul Malvey and Jack Malvey are not cousins, were not in contact during the relevant

---

[1] All references to Defendant's Memorandum In Support of His Motion to Take Supplemental Depositions, Dkt. # 95, will be referred to herein as ("Motion" or "Nothern's Motion").

time period, and may be, at best, characterized as persons who share a common Irish ancestry; and (3) re-opening the deposition of Paul Malvey is pointless and would be a waste of time.

Second, Nothern argues that the evidence he seeks to admit through the additional fact witness depositions he is requesting is "critical" to his case. As explained above, Nothern's request to re-open Paul Malvey's deposition is not only not "critical," it is unnecessary. In addition to Malvey, Nothern also seeks to depose three bond traders, Patrick Haskel, Robert Sbarra, and James Derek Kehoe, to testify about rumors they claimed they heard prior to Treasury's announcement on October 31, 2001 regarding the cancellation of the 30-year bond. There is no evidence that any of these alleged rumors ever reached Nothern before he placed his October 31, 2001 order to trade the 30-year bond. The evidence of general rumors circulating in the market that Nothern seeks to admit through these witnesses has already been established through documents and other witness testimony and would be unnecessarily cumulative. Further, the testimony that Nothern seeks to illicit from Sbarra, Haskel and Kehoe about conversations they had with other market participants is inadmissible hearsay. Allowing Nothern to take the depositions of these traders – one of whom appears to reside in London, England – over a month after the close of fact discovery, after the parties have disclosed expert reports in this case, and while they are conducting expert discovery, would be burdensome and prejudicial to the SEC.

Third, Nothern claims that he filed his untimely motion to take four additional depositions because the SEC would not stipulate to his proposed designations of the deposition testimony of former Treasury employee Jill Cetina. Nothern seeks to introduce Cetina's testimony of her speculation that Paul Malvey and Jack Malvey are cousins – which is based solely on information that "someone" told her in 2004, [2] and is not true – and her recounting of telephone conversations she allegedly had with Kehoe, Sbarra and Haskell on the morning of

---

[2] During her deposition, Cetina admitted that she "learned" that Jack Malvey was related to Paul Malvey after she "asked someone." *See* Declaration of John J. Rossetti Jr. ("Rossetti Decl.") Exh. A at 52:20-53:8.

October 31, 2001 concerning rumors they allegedly heard from other market participants about the possible cancellation of the 30-year bond. The testimony Nothern wishes to admit from Cetina on these issues contains multiple layers of inadmissible hearsay. Nothern's suggestion that the SEC should have stipulated to the admission of this hearsay testimony is nonsensical. Compounding the evidentiary problems with Cetina's testimony are her own admissions that she had no personal knowledge about many of the subject matters in the testimony Nothern seeks to admit. Cetina testified, *inter alia*, that she has: (1) no personal knowledge of anyone at Treasury leaking any information concerning Treasury's decision to cancel the 30-year bond; (2) no personal knowledge of any rumors circulating in the market on October 31, 2001 prior to the public announcement of the bond cancellation on Treasury's website or the news wires; (3) no personal knowledge of whether Lehman Brothers traded in the 30-year bond on the morning of October 31, 2001; and (4) no personal knowledge of whether Paul Malvey communicated anything to Drew Matus of Lehman Brothers about the 30-year bond.[3] Cetina's credibility and reliability as a witness are further undermined by the fact that she was wrong in her belief that Paul Malvey and Jack Malvey are cousins. The SEC's refusal to stipulate to the admission of Cetina's objectionable testimony, seven months prior to the trial of this action, in no way justifies Nothern's belated request to take additional fact witness depositions.

Finally, Nothern tries to blame his unjustifiable delay in seeking four additional fact witness depositions on Treasury for its alleged delay in producing documents. Treasury is not to blame for Nothern's failure to seek depositions during the prolonged discovery period in this case. For over a year, Nothern has been in possession of documents that identified Sbarra,

---

[3] *See* Rossetti Decl. Exh. A at 156:14-157:17, 170:20-171:3, 171:8-171:17, 197:21-198:20, 206:17-207:15, 209:1-212:5. Cetina also admits that she has no personal knowledge about why Paul Malvey retired from Treasury, no personal knowledge as to whether Mr. Malvey ever communicated with anyone at Lehman to whom he was purportedly related, no personal knowledge of any rumors or complaints concerning Treasury's re-opening of the 10-year note in October 2000, and no personal knowledge of whether the 30-year bond traded special on the repo market on October 30, 2001. *See id.* at 167:16-168:19, 215:6-16, 258:1-20.

3

Haskel and Kehoe. Since December 2007, he has been in possession of a document that he claims references Paul Malvey's alleged relation to Jack Malvey. There is no excuse for Nothern's failure to purse the depositions of Kehoe, Sbarra, Haskel and Malvey prior to the close of fact discovery in this case. Nothern's untimely motion to take additional fact witness depositions should be denied.

## FACTUAL BACKGROUND

On October 31, 2001, Peter J. Davis Jr., a Washington, D.C.-based consultant, hired by Massachusetts Financial Services Company ("MFS"), attended a refunding press conference at Treasury. Treasury subjected the information released at this conference to an embargo until a specified time.[4] The October 31, 2001 conference was not the first refunding conference attended by Davis. He had been attending Treasury refunding conferences for several years "pursuant to an agreement that he had with the Treasury Department that he would abide by the embargo and keep all information disseminated there confidential until the embargo expired." Docket # 33, Exh. D at 19.

"[A]t the beginning of the [October 31] press conference, before the question and answer period, and at the conclusion" of the conference, a Treasury Public Affairs Specialist announced that the information provided at the conference would be embargoed until 10:00 a.m. *See* Docket # 33, Exh. A at 2. Despite his agreement with Treasury, and the directives he was given by a Treasury employee during the conference to abide by the embargo, as soon as the conference ended, Davis left the Treasury building, and once outside used his cell phone to call a

---

[4] For at least thirty years prior to October 31, 2001, Treasury had been using an embargo procedure to protect the confidentiality of information released at its quarterly refunding conferences. *See* Dkt. # 76, Exh. A at 62:4-63:3. Treasury officials testified that they were not aware of any time in the thirty years prior to October 31, 2001 where an attendee at any of Treasury's press conferences, or any news organization provided with the information during the embargo period, had intentionally violated an embargo. *See id.* Exh. A at 62:14-63:2, 111:20-112:4; Exh. B at 120:15-121:5, 122:9-16.

number of clients, including Nothern, to notify them about Treasury's decision to cancel the 30-year bond.[5]

The evidence that the SEC has gathered in this case establishes that Davis called Nothern at approximately 9:38 a.m. on October 31 and left a voice-mail message. *See* Docket # 33, Exh. F. Nothern immediately retrieved and listened to the message in which Davis informed Nothern that "Peter Fisher had indicated to Pete Davis that they'd be canceling the long bond and that there would be a press release because it was embargoed until 10 o'clock." *See* Docket # 33, Exh. G at 111-112. Nothern has admitted that he understood that Peter Fisher was a Treasury official in the debt finance area who would have had access to market-sensitive information such as Treasury's decision to suspend or cancel the 30-year bond. *See id.* at 116-117. Nothern has also admitted that when he received Davis' voicemail he was aware of the meaning of the term embargo as it applied to information from government agencies. *See id.* at 99:3-100:19.

Immediately after retrieving the voicemail message, Nothern relayed the material nonpublic information that he had received from Davis regarding Treasury's cancellation of the 30-year bond to three other MFS portfolio managers. *Id.* at 125-130. When conveying this information Nothern conveniently neglected to tell the other portfolio managers that the information was embargoed, that Davis advised Nothern he had gotten the information from Peter Fisher, or that Treasury planned to issue a press release announcing the cancellation of the bond at 10:00 a.m.[6] Nothern then placed an order to purchase $25 million in par value of the 30-

---

[5] On September 3, 2003, Davis pleaded guilty to criminal charges resulting from the actions that he took to disclose Treasury's decision to cancel the 30-year bond to clients during the embargo period. Davis has admitted that he knew that "the information disseminated in the press conference was embargoed by Treasury officials, such that it could not be published or divulged before a specific time shortly after the press conference concluded." Docket # 33, Exh. D at 19, 21. He has also admitted that he violated his duty to Treasury to keep the information that he heard at the Treasury's October 31, 2001 refunding press conference confidential until the embargo expired by calling clients that he thought might have an interest in the information. *Id.* at 21.

[6] *See* Dkt. # 76, Exh. D (Kurinsky dep.) at 101:24-102:23, 107:18:108:2, 115:22-116:25; Exh. E (Smith dep.) at 138:9-139:18, 141:14-143:1, 202:8-203:10); and Exh. F (Kennedy dep.) at 61:15-63:3, 81:18 84:7.

year bond for the portfolios that he managed. *See* Docket # 33, Exh. G at 125.[7] Based on the limited information they received from Nothern, the three other portfolio managers also placed orders to purchase 30-year bonds for the portfolios they managed. *See* Docket # 33, Exh. H at 135-136, Exh. I at 76-77, and Exh. J at 79-82. In total, the amount of bonds purchased by Nothern and the three other portfolio managers equaled $65 million in par value. *See* Docket # 33, Exh. G at 128.

Records from Merrill Lynch, the broker executing the trade, indicate that Nothern and the three other portfolio managers authorized an MFS trader to place the order for the $65 million in bonds, and that the trader verbally confirmed the telephone order for the bonds with Merrill Lynch prior to 9:42 a.m. *See* Docket # 33, Exh. K. At 9:43 a.m., Treasury inadvertently posted a press release on its website announcing that it was canceling issuance of the 30-year bond. *See* Docket # 30, Exh. L. The price and volume data on the 30-year bond from October 31, 2001, testimony from numerous witnesses, and many of the documents produced in this litigation, show that the information that Nothern used to trade was nonpublic at the time he placed his trade order, and did not become public until sometime close to 10:00 a.m., after it was released on the news wires. *See* Docket # 30, Exh. K.

## PROCEDURAL HISTORY

The parties to this action have been engaged in fact discovery for over two years. Fact discovery closed on February 29, 2008. Nothern served his first discovery requests on the SEC on September 27, 2005. Since that time, Nothern's counsel has taken the depositions of 18 fact witnesses, including 14 witnesses from Treasury, and through joint requests with the SEC, sought three extensions of the fact discovery cutoff.

---

[7] Although Nothern claims that he had heard a rumor about the cancellation of the bond on the morning of October 31, prior to receiving Davis' voicemail, he took no action to purchase the bonds until after he received the material nonpublic information about the bond's cancellation from Davis. *See* Dkt. #76, Exh. G at 163:7-165:15, 176:15-18.

In February 2007, Nothern filed three collateral actions, two against Treasury, and one against the U.S. Department of Homeland Security.[8] In his collateral action for additional deposition testimony from Treasury witnesses, the Court allowed Nothern to take the depositions of five additional current and former Treasury employees on top of the thirteen depositions he had already taken in the case. Although the Court permitted Nothern to take these additional depositions, it limited the depositions to ten total hours of questioning. No. 07-cv-10347, Dkt. #17 at 1-2. Between February 2007 and December 10, 2007, in part due to this Court's Orders, Treasury provided Nothern with additional documents responsive to Nothern's FOIA requests. *See* No. 07-cv-10661, Dkt. ## 8, 11, 19, 23, Toone Decl. ¶ 2. Specifically Treasury produced approximately 738 pages of documents in February 2007, 62 pages on June 28, 2007, 1 page on April 29, 2007, 133 pages on October 29, 2007 and 60 pages on December 10, 2007. *See id.* Nothern had Treasury's complete document production in his possession for more than three months prior to filing his Motion to take supplemental depositions, including documents that identified the four witnesses he is now seeking to depose.

With full knowledge of the documents contained in Treasury's supplemental FOIA productions, including those identifying Sbarra, Haskel and Kehoe, and the notes referencing Paul Malvey's knowledge of Jack Malvey, on December 21, 2007, Nothern joined in the filing of a stipulation that requested the Court set February 29, 2008 as the new fact discovery cutoff. *See* Dkt. # 92. On January 11, 2008, the Court issued a revised scheduling order that adopted the February 29 fact witness deposition cutoff that had been proposed by the parties. *See* Dkt. # 93.

In February 2008, Nothern took the depositions of five additional Treasury witnesses: Jill Cetina, Michelle Davis, Steven Berardi, Elnora Bowser and David Aufhauser. Nothern's counsel completed Cetina's deposition on February 8, 2008, but waited until February 25, 2008 to notify the SEC that he believed Cetina's testimony revealed new evidence that was important

---

[8] *Nothern v. U.S. Depart. of Treasury*, No. 07-10661-NMG (D. Mass.), *Nothern v. U.S. Depart. of Treasury*, No. 07-10347-NMG (D. Mass.) and *Nothern v. U.S. Depart. of Homeland Security*, No. 07-10865-NMG (D. Mass.).

to his defense. *See* Toone Decl. Exh. D. On February 29, 2008, the SEC notified Nothern that he had had months before the close of fact discovery to obtain the depositions that he is now seeking, and that there was no justification for Nothern's failure to complete discovery prior to the February 29 discovery deadline that he requested. *See id.* The SEC noted that it would oppose his efforts to further protract this litigation and delay the trial of this matter by conducting any additional fact witness depositions. *See id.*

For the reasons set forth below, the SEC respectfully requests that the Court deny Nothern's belated Motion to Take Supplemental Depositions.

**ARGUMENT**

**A.    THE DEPOSITION NOTHERN IS SEEKING TO REOPEN OF FORMER TREASURY EMPLOYEE PAUL MALVEY IS UNNECESSARY AND SHOULD BE DENIED.**

In an effort to deflect attention away from the fact that he traded in the 30-year bond based on a tip of material non-public information that he received from Peter Davis, Nothern is attempting to forward factually baseless and far-fetched conspiracy theories about third parties. One of these theories is that Paul Malvey, former Director of Treasury's Department of Market Finance, transmitted information regarding Treasury's decision to cancel the 30-year bond to Drew Matus, an employee at Lehman, several weeks prior to Treasury's October 31, 2001 announcement of the bond cancellation. In furtherance of his theory, Nothern relies primarily on the unsubstantiated deposition testimony of Jill Cetina, who testified that she believed that Paul Malvey may have tipped Drew Matus with information about the impending cancellation of the 30-year bond, and that Paul Malvey was the cousin of Matus' co-worker, Jack Malvey. The conspiracy theory Nothern has concocted to impugn the character of Paul Malvey, Drew Matus, Jack Malvey and Lehman, and to complicate this simple insider trading case, is complete fiction.

As an initial matter, Cetina herself acknowledged that she based her "belief" that Paul Malvey and Jack Malvey were cousins solely on information "someone" told her in 2004. *See* Rossetti Decl. Exh. A at 52:20-53:8. As stated above, Cetina also admits that she has no personal

8

knowledge of anyone at Treasury tipping anyone at Lehman or anywhere else with pre-announcement information concerning Treasury's decision to cancel the 30-year bond. *See id.* at 171:8-171:12.

In support of this opposition, the SEC has submitted declarations from Paul Malvey, Jack Malvey and Drew Matus. *See* Declaration of Paul Malvey ("P. Malvey Decl."), Declaration of John V. Malvey ("J. Malvey Decl.") and Declaration of Drew Matus ("Matus Decl."). These declarations confirm that: (1) Paul Malvey and Jack Malvey are not cousins, and *may be*, at best, a very distant relatives based on their common Irish heritage; (2) Paul Malvey and Jack Malvey have not communicated since the late 1990's, years prior to the events at issue in this litigation; and (3) Paul Malvey did not disclose non-public concerning Treasury's decision to cancel the 30-year bond to Drew Matus, Jack Malvey or anyone else at Lehman prior to Treasury's October 31, 2001 announcement. *See* P. Malvey Decl. ¶¶ 2-4, J. Malvey Decl. ¶¶ 5-6, Matus Decl. ¶ 5.

Even if part of Nothern's fictionalized story were accurate, and Paul Malvey was closely related to Jack Malvey – which he is not – there is still no evidence to support Nothern's claim that Paul Malvey tipped Drew Matus weeks before Treasury's October 31, 2001 announcement. In fact, evidence bearing on this issue confirms the opposite – that Matus had no idea of Treasury's decision to cancel the 30-year bond before the decision was made public. In his declaration, Matus states that "[o]n the morning of October 31, 2001, I learned from public sources that the United States Department of Treasury intended to immediately suspend the 30-year Treasury bond." Matus Decl. ¶ 5. Matus further states that Treasury's decision to suspend issuance of the bond "came as a surprise" to him. *Id.* Additionally Matus affirms that he distributed an email on or around October 24, 2001 to individuals inside and outside of Lehman entitled "Fourth Quarter 2001 Refunding Preview," in which he predicted that Treasury *would not* cancel the 30-year bond on October 31, 2001 and would continue to issue the bond in 2002.

*Id.*, ¶¶ 3, 4.[9]  Matus distributed this *after* the meeting that Nothern alleges Matus attended with

Malvey on October 22, 2001.  *See* Motion at 12.

     In addition to the declarations submitted by the SEC with this opposition, other evidence

in the record reveals the specious nature of Nothern's claim that Paul Malvey leaked information

about the 30-year bond to Lehman.  During his deposition in this case, Paul Malvey confirmed

the accuracy of the portion of interview notes taken by the Treasury's Office of Inspector

General (the "Treasury OIG") in November 2001 which states that "Malvey did not say anything

to [bond] dealers that would suggest that Treasury was going to discontinue the 30-year bond."

Rossetti Decl. Exh. C at 243:6-244:4, 247:17-248:24, 252:20-254:13, 255:15-259:2, 259:17-

260:5, 261:12-265:14.[10]  Additionally, the same handwritten interview notes from January 2002,

which Nothern relies on to support his false assertion that Paul Malvey is related to Jack Malvey,

clearly state that: (1) Malvey "said nothing [to Drew Matus] of [the] suspension" of the 30-year

bond, (2) Paul Malvey and Jack Malvey had not spoken in "2-3 years", and (3) Paul Malvey had

"no communication with him [Jack Malvey] in Oct./01." Toone Decl. Exh. B at pages 2 and 10

(of 12 ).  Moreover, the Treasury OIG's memorandum of a November 21, 2001 interview of Jeff

Huther, a former Financial Economist at Treasury who participated in the October 2001 meeting

with Matus and Malvey, states that the discussion between Huther, Matus and Malvey "did not

involve the possible suspension of the 30-year bond."[11]  Rossetti Decl. Exh. D.

---

[9] The evidentiary record also contains a Lehman newsletter dated October 31, 2001, distributed
after Treasury's announcement of the cancellation of the 30-year bond, which states that Lehman
was "surprised by the elimination of the long bond . . . [and] didn't expect the Treasury to
eliminate any issue given the outlook for the fiscal budget over the next 1-2 years."  Rossetti
Decl. Exh. B.

[10] Nothern claims that during his deposition, Paul Malvey admitted that he "may have tipped
Lehman." Motion at 12.  Malvey made no such admission. Nothern fails to note that when his
counsel asked Malvey "whether or not the suspension of the long bond came up in [Malvey's]
discussion with Mr. Matus," Malvey responded:  "I don't recall the discussion coming up."
Rossetti Decl. Exh. C at 252:2-16.

[11] Nothern also cites to the investigative testimony and exhibits of Cantor Fitzgerald trader,
Raymond Walton in an effort to support his baseless theory about Paul Malvey, Drew Matus,

Finally, Nothern's request to re-open the deposition of Paul Malvey should be denied because he already had a full and fair opportunity to question Malvey about his relationship with members of the bond industry. Nothern offers no explanation for his failure to ask Paul Malvey about whether he had relatives in the bond industry during his nearly six-hour deposition in June 2006. Nothing precluded Nothern from asking these questions. Nothern's counsel's failure to ask Paul Malvey about the occupation of members of his family does not justify re-opening Malvey's deposition – especially to inquire about a non-existent familial relationship with someone that Malvey has not spoken to since the late 1990's.

**B.      THE BELATED DEPOSITIONS NOTHERN IS SEEKING TO TAKE OF THREE BOND TRADERS ARE BURDENSOME, UNNECESSARY, UNLIKELY TO LEAD TO THE DISCOVERY OF ADMISSIBLE EVIDENCE AND SHOULD BE DENIED.**

Nothern seeks to further extend the two-plus year fact discovery period in this case to allow him to depose three bond traders, James Derek Kehoe, Robert Sbarra and Patrick Haskel. Nothern's request for these depositions should be denied.

**1.      The Deposition of James Derek Kehoe of London, England Is Unduly Burdensome and Will Delay the Resolution of This Case.**

In his Motion, Nothern neglected to inform the Court that James Derek Kehoe appears to reside and work in London, England.[12] To compel Kehoe's attendance at a deposition in this

---

Jack Malvey and Lehman. *See* Motion at 13. Although Walton testified that he believed Lehman was purchasing large 30-year future contracts on the morning of October 31, 2001, he further testified that "Lehman is a big player in the fixed income market" who had been trading large 30-year future contracts for "several weeks [and] months . . . on a pretty regular basis." Toone Decl. Exh. L at 42:4-24, 45:9-24. Walton also testified that his observation of Lehman purchasing 30-year future contracts on the morning of October 31, 2001 was "[c]ertainly not out of the ordinary" because "they had been coming in on a fairly regular basis doing some large trades." *Id.* at 47:22- 48:8.

[12] The SEC has conducted research on the Financial Industry Regulatory Authority's ("FINRA") Web CRD database, which FINRA uses to maintain the qualification, employment and disclosure histories of more than half a million registered securities employees of member firms.

case, Nothern will likely have to apply to the Court for issuance of letters rogatory pursuant to Fed. R. Civ. P. 28(b). The letters rogatory process can involve procedural complications and take months to complete. In order for the letters rogatory process to even begin, Nothern must submit the appropriate application for foreign discovery under Fed. R. Civ. P. 28(b) to this Court. If this Court grants Nothern's yet-to-be-submitted application for issuance of letters rogatory, and issues a letter of request to the English court, Nothern will still have to obtain an order from the English court allowing Kehoe's deposition to proceed. The English court will have sole discretion as to when it rules on Nothern's application and whether it grants his request to take the deposition of Kehoe. Contrary to Nothern's assertion, there is no guarantee that he will be able to complete Kehoe's deposition by the June 15, 2008 dispositive motion deadline in this case, or even before the November trial date.

This Court has broad discretion to manage discovery and may exercise that discretion to deny Nothern's belated request to take the deposition of Kehoe in London. In *Ruffin v. City of Boston*, 146 Fed. Appx. 501, 511 (1st Cir. 2005), the United States Court of Appeals for the First Circuit upheld the district court's decision to deny Ruffin's request to take the telephone deposition of an additional fact witness who resided in Ireland. The First Circuit found that, *inter alia*, "the lateness of the request after the discovery deadline . . . the lack of justification for not making the request earlier," Ruffin's failure to recognize the potential procedural complications involved in taking foreign discovery, and the fact that the foreign witness's testimony was not indispensable, provided adequate justification for the district court's decision to deny Ruffin's request for the deposition. Similar factors provide a valid basis for this Court to deny Nothern's request to depose Kehoe.

Allowing the foreign deposition of Kehoe will undoubtedly delay the prompt resolution of this case, which has been pending since 2005. The SEC has an interest in promptly resolving this case. If Kehoe's deposition is allowed, the SEC will be burdened by having to expend costly

---

The results of the SEC's Web CRD research indicate that Kehoe currently resides and works in London, England. Rossetti Decl. Exh. E.

resources to participate in the deposition of Kehoe abroad at the same time it is conducting

expert discovery in the United States. Nothern's request to depose Kehoe should be denied.

### 2.    The Rumor Evidence That Nothern Is Seeking To Admit Through Kehoe, Sbarra and Haskel Is Cumulative and Unnecessary.

During his deposition, Nothern testified that the only rumor about the possible

elimination of the 30-year bond that he heard before he placed his first order to trade in the bond

on October 31, 2001 was from a broker who called to say that "he had heard . . . [a rumor] that

people on the Chicago Board of Trade thought that the long bond was going to be cancelled."

Dkt. # 76, Exh. G at 163:7-165:15. There is no evidence that Nothern ever became aware of any

other rumor, including a rumor that Kehoe allegedly heard, which purportedly came from a

European central bank, or any of the purported rumors that supposedly reached Sbarra and

Haskel. The evidence that Nothern seeks to admit through Kehoe, Sbarra and Haskel concerns

general rumors circulating in the market about the possible cancellation of the 30-year bond, not

rumors that led to Nothern's trading. This additional rumor evidence is cumulative and

unnecessary.

Through documents and witness testimony, the parties in this case have already

established evidence that general rumors about the possibility of Treasury cancelling the 30-year

bond were circulating in the market on or about October 31, 2001. At least nine witnesses have

testified that general rumors and speculation regarding the possible elimination of the bond had

been circulating in the market in the days and months prior to Treasury's October 31, 2001

announcement.[13]   Indeed, witnesses testified that there had been speculation and rumors in the

U.S. and European markets about the possible elimination of the 30-year bond for over a year.

*See id.* Some of the evidence obtained by the parties also suggests that rumors about the possible

---

[13] *See* Dkt. 76, Exh. D at 114:8-115:6, Exh. E at 143:18-144:1, Exh. F at 77:18-78:8, Exh. G at 163:7-165:15, 170:6-21, Rossetti Decl. Exh. C at 198:11-24, 200:3-201:1, Exh. F at 237:2-12, Exh. G at 171:16-172:16, Exh. H at 164:21-165:16, Exh. I at 68:17-69:1, 70:2-24, Exh. J at 132:17-135:23.

cancellation of the bond may have been circulating on the morning of October 31, 2001, prior to the conclusion of Treasury's refunding announcement. *See e.g.*, Dkt. # 76, Exh. G at 163:7-165:15, Rossetti Decl. Exh. F at 195:18-196:3, Exh. K at 172:4-9. The parties need not extend discovery to establish the admissibility of any further evidence on this issue.

Nothern claims that, despite the existence of other evidence concerning general rumors, he should be allowed to take the depositions of Kehoe, Sbarra and Haskel after the discovery cutoff to establish the admissibility of rumors they purportedly heard. In support of this claim, Nothern argues the rumor evidence he is seeking from Kehoe, Sbarra and Haskel supports his assertion that Treasury's decision to cancel the 30-year bond was public at the time that Nothern placed his order to trade the bond. *See* Motion at 6. The rumors allegedly reported by Kehoe, Sbarra and Haskel are not appreciably different from the other general rumor evidence that has already been developed in this case. More importantly, the SEC does not allege that Nothern traded on the basis of general rumors circulating in the market, rather it contends that Nothern traded while in possession of, and based on, a tip that he received from Peter Davis, which was more trustworthy and detailed than any of the general rumor evidence Nothern now seeks to admit through Kehoe, Sbarra and Haskel.

It is well-established that a "tip from a corporate insider [like the tip Nothern received from Davis] which is more reliable or specific than public rumors is non-public despite the existence of such rumors." *SEC v. Mayhew*, 121 F.3d 44, 49-50 (2d. Cir. 1997). Nothern has admitted that the tip he received from Davis was definitive, not characterized as a rumor, was credited to Peter Fisher, a politically-appointed Treasury official in the debt finance area, and referenced a 10:00 a.m. press embargo. *See* Docket # 33, Exh. G at 111-112, 116-117. The rumor evidence Nothern seeks to admit through Kehoe, Sbarra and Haskell, does nothing more to prove that the specific and reliable tip that Nothern received from Davis was public at the time Nothern traded, than does the other general rumor evidence that has already been established in this case.

14

**3.    The Testimony Concerning Rumors That Nothern Is Seeking To Obtain From Kehoe, Sbarra and Haskel Is Likely To Be Inadmissible Hearsay.**

Nothern argues that he should be allowed to prolong fact discovery so that he can question Kehoe about a rumor he allegedly "heard" from a European central bank on October 30, 2001 "that the long bond would be eliminated,"[14] and rumors that Sbarra and Haskel supposedly "heard" on the morning of October 31, 2001 concerning the elimination of the bond. Motion at 9-11. Testimony that Nothern is seeking to obtain concerning purported rumors that Kehoe, Sbarra and Haskel heard from other market participants is likely to be inadmissible hearsay.

Under the rule against hearsay, a witness may not testify about statements "other than one made by the declarant while testifying at the trial or hearing, offered in evidence o prove the truth of the matter asserted." *See* Fed. R. Evid. 801 and 802. In *U.S. v. Blackwell*, 459 F.3d 739, 755 (6th Cir. 2006), relying on the rule against hearsay, the Sixth Circuit upheld the district court's decision to exclude from trial the testimony of one witness (Adams) recounting his conversation with another witness (Jehn) about rumors of a buyout. The defense argued that Adams' testimony was not being offered to prove the truth of the buyout, but the existence of rumors. The court nonetheless found that Adams' testimony was inadmissible hearsay because it was "recounting statements made out of court offered to prove the matter asserted in the statements, that Adams and Jehn both heard rumors of the buyout." *Id.*

Similarly, any testimony that Nothern obtains from Kehoe, Sbarra and Haskel about rumors they allegedly heard from other market participants concerning the possible cancellation of the 30-year bond would be hearsay that should be excluded from the trial of this matter. Motion at 9. Nothern's motion to further prolong fact discovery to allow him to take the depositions of these traders should be denied.

---

[14] Kehoe is alleged to have communicated with one of the more than twelve European central banks that exist. Rossetti Decl. Exh. A at 215:17-216:8.

15

C.    **THERE IS NO EXCUSE FOR NOTHERN'S FAILURE TO COMPELTE FACT DISCOVERY PRIOR TO THE FACT DISCOVERY CUTOFF.**

Nothern claims that he just learned information that sparked his untimely request to take the additional depositions of bond traders, Kehoe, Sbarra and Haskel and to re-open the deposition of former Treasury employee Paul Malvey. This claim is not true. As explained in detail below, Nothern has had documents in his possession for months that identified these witnesses and the evidence Nothern is seeking to admit. There is no excuse for Nothern's failure to diligently pursue the depositions of Kehoe, Sbarra, Haskel and Malvey in the two-plus years he has had to conduct fact discovery in this case.

In September 2005, Nothern received a copy of the Treasury's OIG report which contained a memorandum of an interview of former Treasury employee, Jill Cetina, dated November 2001. The email exhibits that accompany Cetina's interview memorandum contain Cetina's recounting of communications she allegedly had with three bond traders (referred to in the email exhibits as "primary dealers") on the morning of October 31, 2001, after Treasury announced the cancellation of the 30-year bond.

Over a year ago, in February 2007, Nothern received two emails in Treasury's supplemental FOIA production that unequivocally identify Sbarra, of HSBC Bank plc, and Haskel, of Credit Suisse First Boston, as two of the three bond traders that contacted Cetina on October 31, 2001. *See* Toone Decl. Exh. G (Bates label FOIAKBC 400, 401). The emails, both dated November 1, 2001, when read together clearly indicate that Sbarra and Haskel, who were both heads of trading desks at their respective employers, were two of the "primary dealers" Cetina spoke to who allegedly expressed concerns about "non-website related leaks" of Treasury's decision to cancel the 30-year bond. *Id.* In these emails, Cetina confirms that she shared the concerns raised by Sbarra and Haskel with Brian Roseboro, then Treasury's Assistant Secretary for Financial Markets. *See id.*

In a third email from Cetina to Kehoe, of HSBC London, dated October 31, 2001, which Nothern received from Treasury in February 2007, Cetina writes "Bob called in just before I sent

16

this to say it was rumored." *See* Toone Decl. Exh. G at FOIAKBC 437. This email also confirms that Robert Sbarra, Kehoe's colleague at HSBC, was one of the three dealers Cetina communicated with on October 31 about complaints regarding Treasury's refunding announcement that were referenced in the emails attached to her Treasury OIG interview memorandum. Toone Decl. Exh. F. In addition, this email shows that Kehoe was the primary dealer "in London" that Cetina claims she communicated with on October 31, 2001, and who is referenced in the email exhibits to Cetina's OIG interview memorandum. *See id.* Nothern had these three emails for more than a year prior to the February 29, 2008 discovery cutoff. During this time, he made no attempts to depose Kehoe, Sbarra or Haskel.

Even if it was true – which it is not – that Nothern only learned of Kehoe, Sbarra and Haskel's alleged communications with Cetina as a result of Orders issued by this Court in his collateral actions against Treasury, Nothern admits that on December 10, 2007, he received handwritten notes relating to a 2001 interview of Cetina that also identified Sbarra and Haskel as the primary dealer contacts that complained to Cetina on October 31, 2001. *See* Motion at 11, Toone Decl. ¶ 2, Exh. A at 3. These handwritten notes, combined with the emails from Cetina to Kehoe, Sbarra and Haskel, referenced above, leave no doubt as to the identity of the three traders who voiced the complaints that were referenced in the email attachments to Cetina's OIG interview memorandum. There is no excuse for Nothern's failure to diligently pursue discovery from Sbarra, Haskel and Kehoe during the nearly two months of additional fact discovery that was provided in the Court's January 11, 2008 scheduling Order. *See* Docket # 92. Nothern's self-serving assertion that, although he knew that Sbarra and Haskel were two of three traders who voiced concerns to Cetina on October 31, 2001, for more than a year he made no effort to depose them because he "assumed that they were among the many who objected to the disclosure by Davis" makes no sense. Motion at 10-11. Nothern knew well before Cetina's deposition that Sbarra, Haskel and Kehoe were the primary dealers who had raised concerns about possible leaks and the substance of their concerns. His failure to seek their depositions in the year that has gone by since he became aware of this information, or to at least notice their

17

depositions in the three weeks between Cetina's February 8, 2008 deposition and the February 29, 2008 discovery cutoff in this case is unjustified.

Nothern's untimely request to re-open the deposition of Paul Malvey is also unjustified. On December 10, 2007, Nothern received handwritten notes that indicate that during an interview Paul Malvey was asked if he was related to anyone in the financial industry, including Lehman employee Jack Malvey.[15]  Toone Decl. Exh. A at 7 (of 12).  Nothern does not, and indeed cannot, provide a reason why he did not seek to re-open Paul Malvey's deposition in the three months between the time Nothern received these notes and the February 29, 2008 discovery cutoff that Nothern himself requested from the Court.

In his motion, Nothern insinuates that the SEC should have stipulated to the admissibility of Cetina's deposition testimony and emails recounting her communications with bond traders, Sbarra, Haskel and Kehoe.  *See* Motion at 5-6, 11, 13.  Cetina's testimony and emails both contain multiple levels of inadmissible hearsay.  *See* Toone Decl. Exhs. F, H at 34:1-35:13, 44:2-50:14, 102:9-104:22.  Nothern has known for over two years about the problems with the admissibility of Cetina's emails and should have known that these problems could not be cured by taking Cetina's deposition.  During her deposition on February 8, 2008, Cetina merely relayed her recollection of the substance of her conversations with these traders.  Toone Decl. Exh. H at 46:17-50:1, 94:13-95:6, 102:9-104:22.  It should have come as no surprise to Nothern when the SEC indicated that it intended to object to the admissibility of this testimony on hearsay grounds. *See* Toone Decl. Exh. E.  If Nothern were truly interested in obtaining admissible evidence concerning the rumors that Kehoe, Sbarra and Haskel claimed to have heard, he should have sought their depositions a year ago, when their names first surfaced, and prior to the close of fact discovery in this case.

---

[15] These notes do not state that Paul Malvey ever confirmed that he was related in any way to Jack Malvey, or anyone else in the financial industry.

## CONCLUSION

For all of the foregoing reasons, the SEC respectfully requests that the Court deny Defendant's Motion to Take Supplemental Depositions.

Dated: April 3, 2008                    Respectfully Submitted,


                                        /s/ Erica Y. Williams
                                        Erica Y. Williams
                                        Sarah L. Levine
                                        John J. Rossetti, Jr.
                                        U.S. Securities and Exchange Commissions
                                        100 F Street, N.E.
                                        Washington, D.C. 20549-4010
                                        Phone:   (202) 551-4450
                                        Fax:     (202) 772-9245
                                        williamse@sec.gov

19

## CERTIFICATE OF SERVICE

I hereby certify that this document and the supporting declarations, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Erica Y. Williams