UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05-CV-10983 (NMG) |
| Plaintiff, | ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) | |

DECLARATION OF JOHN J. ROSSETTI JR. FILED IN SUPPORT OF
U.S. SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUPPLEMENTAL DEPOSITIONS

John J. Rossetti Jr., pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury as follows:

1.    I am a senior counsel for the Securities and Exchange Commission in the above-captioned matter.  I am a member of good standing of the New York, Maryland, and District of Columbia bars.  Except where otherwise indicated, I make this declaration based upon the documents thus far produced during discovery.

2.    A true and correct excerpt from the February 8, 2008 deposition of Jill Cetina is attached as Exhibit A.

3.    A true and correct copy of the October 31, 2001, Lehman Brothers Fixed Income Research, "Interest Rate Strategies, Treasuries, Agencies, Swaps, Futures &Options" is attached as Exhibit B.

4.  A true and correct excerpt from the June 23, 2006 deposition of Paul Malvey is attached as Exhibit C.

5.  A true and correct copy of is a Memorandum of Activity concerning the Treasury Office of Inspector General's November 21, 2001 interview of Jeff Huther is attached as Exhibit D.

6.  A true and correct copy of search results from the Financial Industry Regulatory Authority's WEB CRD database is attached as Exhibit E.

7.  A true and correct excerpt from the January 30-31, 2007 deposition of Steven Nothern is attached as Exhibit F.

8.  A true and correct excerpt from the April 19, 2006 deposition of Peter Davis is attached as Exhibit G.

9.  A true and correct excerpt of Exhibit 3 from the August 8, 2006 deposition of Peter Fisher is attached as Exhibit H.

10. A true and correct excerpt from the June 27, 2006 deposition of Brian Roseboro is attached as Exhibit I.

11. A true and correct excerpt from the September 27, 2006 deposition of Galen Criqui is attached as Exhibit J.

12. A true and correct excerpt from the November 29, 2006 deposition of John Cadogen is attached as Exhibit K.

I declare under the penalty of perjury that the foregoing is true and correct.  Executed on April 3, 2008.

John J. Rossetti Jr.

# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - x

 4    UNITED STATES SECURITIES AND    :
      EXCHANGE COMMISSION,            :
 5                                    :
                Plaintiffs,           :
 6                                    :
      v.                              : Civil Action No.
 7                                    :
      STEVEN E. NOTHERN,              : 05-10983 (NMG)
 8                                    :
                Defendant.           :
 9    - - - - - - - - - - - - - - - x

10

11        Videotaped Deposition of JILL CETINA

12                 Washington, D.C.

13            Friday, February 8, 2008

14                    9:56 a.m.

15

16

17              *       *       *       *

18

19

20

21   Reported by:  Okeemah S. Henderson, LSR

22
```

Jill Cetina                                                              February 8, 2008
Washington, DC

---

**Page 50**

1  however, was that they had been buying the 30 year
2  that morning prior to 10 a.m.
3       BY MR. SHOPE:
4       Q.   Well --
5       A.   Which with the inference being that he
6  had some concern about the source of their
7  information and why they were engaging in those
8  trades. I think he was also trying to be careful
9  in what he said to me and how he said it.
10      Q.   But the implication was that the
11  reason that Goldman Sachs and Lehman were buying
12  so heavily was that they had some knowledge?
13      A.   That they must have known that they
14  had preknowledge.
15      MS. WILLIAMS: Objection.
16      BY MR. SHOPE:
17      Q.   That would be the reason why he would
18  be angry?
19      A.   Right.
20      MR. FREEBORNE: Objection.
21      MS. WILLIAMS: Objection.
22      A.   Again, as I indicated, you know, he

---

**Page 51**

1  could have been angry because he got caught short
2  but clearly he could have also been angry because,
3  you know, if he felt that there was inside
4  information or information being leaked.
5       BY MR. SHOPE:
6       Q.   Do you know a Woody Jay?
7       A.   The name is familiar.
8       Q.   Are you aware that Woody Jay was a
9  vice chair of borrowing advisory committee in
10  2001?
11      A.   I may have been aware of it after the
12  fact. At that time, I don't think I was.
13      Q.   At the time, was Woody Jay working for
14  Lehman Brothers?
15      A.   I don't know.
16      Q.   Lehman Brothers was a major market
17  participant with respect to treasury securities;
18  is that fair to say?
19      MS. WILLIAMS: Objection.
20      A.   Lehman Brothers was one of the New
21  York Feds primary dealers in the treasury market,
22  one of, I don't know how many at that time, but

---

**Page 52**

1  approximately 20 something.
2       BY MR. SHOPE:
3       Q.   And did you know of a Jack Malvey at
4  Lehman Brothers?
5       A.   Yes. He's one of their fixed income,
6  analyst is too low. I don't know what his title
7  is but he's one of their senior fixed income
8  strategists at Lehman. Yes.
9       Q.   So he would be someone at Lehman whose
10  job would include strategizing about the 30-year
11  bond?
12      MS. WILLIAMS: Objection.
13      A.   I mean, my experience from reading his
14  pieces is that he thinks about credit strategy
15  which could include the treasury market, it could
16  include other markets as well for Lehman Brothers.
17  So anything relating to fixed income, i.e. bonds
18  potentially.
19      BY MR. SHOPE:
20      Q.   And were you aware that Jack Malvey at
21  Lehman Brothers was related to Paul Malvey at the
22  Treasury Department?

---

**Page 53**

1       MS. WILLIAMS: Objection.
2       A.   I wondered about that at the time. I
3  learned that later.
4       BY MR. SHOPE:
5       Q.   How did you learn that later?
6       A.   I asked someone. Not in 2001 but
7  later. I don't know what year. It may have been
8  when I moved in domestic finance.
9       Q.   So possibly like 2002?
10      A.   2002 I wasn't in domestic finance. I
11  don't think I moved until 2004.
12      Q.   Now, turning back to your interview
13  notes --
14      MR. FREEBORNE: I think that misstates
15  the record about her notes.
16      MR. SHOPE: Oh, I'm sorry. The notes
17  of your interview. I apologize.
18      BY MR. SHOPE:
19      Q.   There's reference to a meeting that
20  you had with a Drew Matus?
21      A.   Drew Matus.
22      Q.   Or Matus. And he also was employed by

---

14  (Pages 50 to 53)

| Page 154 | Page 156 |
|---|---|
| 1    Q.   When you mean the piece supposedly get<br>2   distributed?<br>3    A.   I'm sorry.<br>4    Q.   When were you told that the piece<br>5   was --<br>6    A.   I was told this on the 31st but I<br>7   wasn't given any more information other than<br>8   something to the affect that Lehman Brothers had<br>9   put a piece out to their clients saying they felt<br>10  this was going to happen. I even recall asking<br>11  the New York Fed desk if they had seen any such<br>12  piece.<br>13    Q.   So just to clarify, would the piece<br>14  have gone out prior, were they saying the piece<br>15  went out prior to October 31st?<br>16    A.   They seem to be implying that the<br>17  piece had gone out prior to the quarterly<br>18  refunding.<br>19    Q.   But you personally never saw the<br>20  piece?<br>21    A.   I never saw the piece and the attempts<br>22  that I made to see if anyone had a copy of the | 1    Q.   You said you never saw it?<br>2    A.   Exactly. Exactly.<br>3    Q.   Did Mr. Haskel tell you where he was<br>4   getting this information about Lehman Brothers<br>5   putting out a piece?<br>6    A.   I believe he said from other people,<br>7   from their clients presumably people he was<br>8   entering into trades with, but I didn't try to ask<br>9   him to name parties.<br>10    Q.   Just to clarify, where did Mr. Haskel<br>11  work at that time?<br>12    A.   At the Credit Suisse First Boston at<br>13  that time.<br>14    Q.   Did you do anything to personally<br>15  verify whether Lehman Brothers had taken a<br>16  position in the 30-year bond on the morning of<br>17  October 31st?<br>18    A.   Personally verify. I'm not sure what<br>19  mechanism -- I mean, other than what reports<br>20  people would give to me about --<br>21    Q.   Yes, other than those.<br>22    A.   About their trading. No, there's not. |

| Page 155 | Page 157 |
|---|---|
| 1   piece never produced anything.<br>2    Q.   Who did you make these attempts to?<br>3    A.   I first asked the person who told me<br>4   there was such a piece. I believe I asked Pat<br>5   Haskel do you have a copy. So you heard there's<br>6   this piece, do you have a copy of it and I think I<br>7   may have also asked, like I said, the New York Fed<br>8   if they were aware of any research piece like<br>9   that, that's my recollection at least that I may<br>10  have asked them that as well.<br>11    Q.   Just to clarify, again, was your<br>12  understanding the piece went out before October<br>13  31st or before the announcement on October 31st?<br>14    A.   When I -- the sense that I had from<br>15  talking, I believe, to Pat was that a piece had<br>16  been distributed again some time prior to the<br>17  quarterly refunding announcement in which Lehman<br>18  Brothers expressed a view to their clients that<br>19  the 30 year would be eliminated. The details on<br>20  what time that was distributed --<br>21    Q.   Or if it was distributed?<br>22    A.   Right. What do you mean? | 1   Unless treasury issues a position call report,<br>2   there isn't, that I'm aware of, perhaps through<br>3   the New York Fed, there aren't a huge number of<br>4   mechanisms I guess is where I'm trying to go to<br>5   determine someone's position in a particular<br>6   security.<br>7       You can look if you have access to certain<br>8   trading platforms at particular moments in time<br>9   where someone might be trading, again, those are<br>10  all things that from the vantage point that I was<br>11  in, I didn't have access to.<br>12    Q.   So the statements that people were<br>13  making that Lehman Brothers were taken that<br>14  position, how do you know those were accurate?<br>15    A.   I don't. I'm not trying to say they<br>16  are accurate but I felt it was important to share<br>17  with other people what was being stated to me.<br>18    Q.   Let me go back to Mr. Matus for just a<br>19  second. Do you know why Mr. Matus was meeting<br>20  with Mr. Malvey and Mr. Huther?<br>21    A.   I presume in the run up to the next<br>22  weekly quarterly refunding just to talk with them. |

**Page 166**

1  whether Paul may have shared -- this was later
2  when I worked for Jeff after Paul had left that I
3  may have had a concern about whether anything with
4  Drew seemed to have a view that the bond was going
5  to be eliminated and whether anything might have
6  been shared that shouldn't have been shared in
7  that meeting and Jeff indicated to me that, you
8  know, that I believe what he said was that nothing
9  like that had happened.
10     Q.  Did you have a similar concern about
11  Mr. Huther conveying information to Mr. --
12     A.  No.
13     Q.  Why not?
14     A.  I guess part of it comes to about
15  having had some experience working with Jeff
16  later.  I think Jeff would not in my professional
17  experience with him not have crossed that kind of
18  a line, you know.  This is again a personal view,
19  not a something that I can state with fact, but I
20  have a different perception of Mr. Malvey which is
21  perhaps unkind to say, but that's my perception of
22  him, which is colored by a few things that other

**Page 167**

1  people have shared with me about their experiences
2  with him working with him.
3     Q.  Is your perception based on anything
4  other than people's perceptions about Mr. Malvey
5  that they shared with you?
6     A.  I always found Paul to be very -- I'm
7  sorry.  Can you restate the question?
8     Q.  Yes.  Your perception of Mr. Malvey
9  you said in part it was based on perceptions of
10  him that other people had that they had shared
11  with you.  I wanted to know if there was anything
12  besides that that helped form your perception?
13     A.  I had some concerns also knowing that
14  Paul had a relative at Lehman Brothers about the
15  whole Lehman Brothers, that connection.
16     Q.  When did you learn Mr. Malvey had a
17  relative at Lehman Brothers?
18     A.  I believe it was -- I had wondered
19  about it when I had seen Jack Malvey's name on
20  some Lehman Brothers publications when I was in
21  the marketing group but I had not directly ever
22  asked.  I think I found it out later when I was in

**Page 168**

1  debt management but I'm not completely sure of
2  that.  At some point I did ask.
3     Q.  When were you in debt management?
4     A.  That started, I believe, in 2004.
5     Q.  So you found out that Mr. Malvey had a
6  relative at Lehman Brothers you believe in 2004?
7     A.  I believe.
8     Q.  So at the time that you had this
9  concern on the 22nd when you talked to Mr.
10  Matus --
11     A.  I knew there was someone at Lehman
12  Brothers who had a similar last name, I didn't
13  have the name.
14     Q.  Do you know how often Mr. Malvey
15  communicated with that person at Lehman Brothers?
16     A.  No, I don't.
17     Q.  Do you know if they were ever in
18  communications?
19     A.  No, I don't.
20     Q.  Do you know how close a relative that
21  person was to Mr. Malvey?
22     A.  In 2001?

**Page 169**

1     Q.  Yes.
2     A.  No.
3     Q.  Do you know now?
4     A.  I believe it's his cousin, but I'm not
5  100 percent sure.
6     Q.  Do you know how often he talks or
7  communicates with his cousin?
8     A.  No.
9     Q.  Do you know how often he communicated
10  with him in 2001?
11     A.  No, idea.  Since we're on the issue
12  though of Paul --
13     Q.  Wait.  No.  Question.  Unless it's in
14  response to the last question about whether or not
15  you knew he communicate with him?
16     A.  No.
17        MR. SHOPE:  Or if she needs to correct
18  or give a complete answer to the prior question.
19        MS. WILLIAMS:  Is there another answer
20  to a question that was incomplete?
21     A.  You were asking a question about my
22  perception of Paul and what colored that.  One of

43 (Pages 166 to 169)

Page 170

1  the things that after 2001 colored my perception
2  of Paul was a story that was shared with me by
3  someone in debt management.
4      BY MS. WILLIAMS:
5      Q.   After you spoke to Mr. Huther and he
6  told you that the 30-year bond didn't come up in
7  his conversation with Mr. Matus, how did that
8  affect your perception about whether or not
9  Mr. Malvey had discussed the 30-year bond with Mr.
10  Matus?
11      A.   It affected it somewhat. But
12  candidly, I still had some concerns. Paul, after
13  leaving Treasury went to work as an advisor for a
14  primary dealer. In the role that I had, I saw
15  Paul fairly frequently at -- not -- I don't,
16  fairly frequently, I would see him from time to
17  time at conferences and -- I'm sorry. Your
18  question? I feel like I'm wandering on your
19  question, so.
20      Q.   That's okay. My question had to do
21  with Mr. Huther, but I'll ask a different
22  question. Do you have any personal knowledge that

Page 171

1  Mr. Malvey communicated anything about the 30-year
2  bond to Mr. Matus?
3      A.   No.
4      Q.   Do you have any personal knowledge he
5  communicated anything about the 30-year bond prior
6  to October 31st to anyone outside of Treasury?
7      A.   No.
8      Q.   Do you have any personal knowledge
9  that anyone inside Treasury leaked any information
10  about the elimination of the 30-year bond to
11  anyone outside of Treasury before October 31st?
12      A.   No.
13      Q.   Do you have any personal knowledge
14  that Lehman Brothers traded in a 30-year bond
15  prior to the announcement on October 31st?
16      A.   No. I have no way to verify what
17  people said to me.
18      Q.   Let me ask you about Exhibit 8,
19  Ms. Kerner's memo. Mr. Shope touched on this a
20  little bit. I want to ask some questions about
21  the form 450s. Could you first tell us what a
22  form 450 is?

Page 172

1      A.   Sure. Well, if you're in an area that
2  is market sensitive or your GS level exceeds a
3  certain, GS level being your rank in Government
4  service, exceeds a certain level or your
5  supervisor, I'm not an ethics expert but you're
6  basically asked to fill out a form where you
7  disclose your income, assets, outside positions,
8  things like that, things that could potentially
9  represent ethical conflicts of interest.
10      So that's and that was something in the
11  market room that everyone on staff irrespective of
12  their GS level was asked to file.
13      Q.   You stated the last sentence on page 1
14  of Exhibit 8, She also volunteered that the SF
15  450, parenthesis, confidential financial
16  disclosure report, closed parenthesis, did not
17  require filing (inaudible) --
18      MR. FREEBORNE: This is not a document
19  that she originated. I just want to make that
20  clear.
21      MS. WILLIAMS: I understand. So this
22  is the last sentence of Ms. Kerner's memo. Do you

Page 173

1  recall discussing the form 50 issue with
2  Ms. Kerner or with someone in GC?
3      MR. SHOPE: You mean the form SF 450.
4      BY MS. WILLIAMS:
5      Q.   Yes. 450.
6      A.   I may not have discussed it with her.
7  I know that I had at least two other conversations
8  with ethics in the time that I was at Treasury
9  about that there wasn't anything -- any reporting
10  requirements or government securities for people
11  who were in areas that might have knowledge about
12  Treasury issuance decision.
13      Q.   Is the SF 450 the only thing that
14  prevents a filer from trading information that
15  they obtain in a treasury role in government
16  securities?
17      A.   It doesn't prevent you but I believe
18  that the idea behind the SF 450 is that it allows
19  your supervisor to identify potential conflicts of
20  interest that you might have based on what type of
21  holdings you have or outside position or income.
22  So if you don't even know, you can't identify for

44  (Pages 170 to 173)

Jill Cetina                                                                February 8, 2008

Washington, DC

| Page 194 | Page 196 |
|---|---|
| 1       MR. SHOPE: Note my objection. | 1   trade? |
| 2       A.   I'm sorry. Can you just restate your | 2       A.   Well, obviously, if you're buying 30 |
| 3   question because I'm not sure I'm following you. | 3   years, somebody else is selling them to you, |
| 4       BY MS. WILLIAMS: | 4   right, so. |
| 5       Q.   My question was about flattening | 5       Q.   So then the person selling, what |
| 6   trade. One side of a flattening trade, if it's a | 6   would, if the person buying thought it would go up |
| 7   flattening trade between 5s and 30s, would one | 7   to the person selling -- |
| 8   person be betting that the price of the bond would | 8       A.   Well, if you're a market maker, that's |
| 9   go up; meaning that they would make money if the | 9   just your job to, you know, somebody comes in, |
| 10   price of a 30-year bond went up? | 10   you're a dealer, you're a primary dealer. And |
| 11       MR. SHOPE: Note my objection that we | 11   it's not that you're necessarily taking a |
| 12   haven't been talking about flattening trades that | 12   position, per se, or may not be that you're taking |
| 13   are 5s and 30s. | 13   a position. You just make a market in that |
| 14       MS. WILLIAMS: I have. That's been my | 14   security. |
| 15   question. | 15       So if somebody comes in this week and says |
| 16       BY MS. WILLIAMS: | 16   what would you sell a hundred million worth of |
| 17       Q.   My first question was are you familiar | 17   30 years to me for? You're not necessarily making |
| 18   with flattening trades involving the 5 and 30-year | 18   a bet, you're engaging in your activity which is |
| 19   bonds. Are you? | 19   to make a market in treasury security. |
| 20       A.   Yes. | 20       Q.   That's if you're a market maker but |
| 21       Q.   Do you know if that's what they were | 21   there were other people involved in the market -- |
| 22   referring to here? | 22       A.   That's certainly true. |

| Page 195 | Page 197 |
|---|---|
| 1       A.   I don't think that they're talking | 1       Q.   So they may not be just making a |
| 2   about the flattening trade here. | 2   market in that securing the 30-year bond that day, |
| 3       Q.   Why not? | 3   they might be selling -- |
| 4       A.   Because it says we heard rumors as | 4       A.   That's certainly true people could be |
| 5   early as 9 a.m. which were flattening 5s and 30s. | 5   establishing directional bets but I was talking |
| 6   There's no word trade there. It's possible but I | 6   more about people who are primary dealer, make |
| 7   don't -- that wasn't how I interpreted the E-mail. | 7   markets in securities, it's their job to, all |
| 8   It's possible but the way I read it was they were | 8   kinds of people come at them from different angles |
| 9   talking about this was changing the shape of the | 9   saying I want to buy this, I want to sell that. |
| 10   curve in the 5 to 30-year section, but. | 10       Q.   But my question was a little broader? |
| 11       Q.   Okay. The rumors were -- what was | 11       A.   Okay. Sorry. |
| 12   changing the size of the curve? | 12       Q.   Now, the next sentence, "Someone told |
| 13       A.   Well, according to this person's | 13   me they actually saw it on their website at 9:50." |
| 14   E-mail, these rumors and people, presumably people | 14   Do you know who this someone is that you're |
| 15   trading, obviously the rumors themselves don't | 15   referring to in this E-mail? |
| 16   change the shape of the yield curve, so it has to | 16       A.   No. |
| 17   be people's trading activity. | 17       Q.   Just to clarify, do you know who sent |
| 18       Q.   Okay. If one person is trading, let's | 18   this E-mail to you? |
| 19   take a flat injury. One person is trading on the | 19       A.   I believe it was Pat Haskel, but I'm |
| 20   price of a bond and they're trade is that, is | 20   not -- that's what I believe. |
| 21   based on the price of the bond going up and then | 21       Q.   Did you personally hear any rumors, |
| 22   making money, would there be another party to that | 22   just to go back about flattening, in the 5s and |

Alderson Reporting Company
1-800-FOR-DEPO

Jill Cetina                                                    February 8, 2008
Washington, DC

| Page 198 | Page 200 |
|---|---|
| 1  30s? | 1    A.    My understanding is that it was. |
| 2    A.    People putting out flattening trades | 2    Q.    Based on what? |
| 3  or just. | 3    A.    I believe what I was told later. |
| 4    Q.    You said rumors as early as 9 a.m. | 4    Q.    Personally, did you ever -- did you do |
| 5  which were flattening the 5s and 30s.  Did you | 5  anything to personally -- besides what you were |
| 6  observe any flattening in the 5s and 30s? | 6  told, besides what someone else told you, do you |
| 7        MR. FREEBORNE:  Flattening of the yield | 7  have any personal knowledge? |
| 8  curve or? | 8        MR. FREEBORNE:  The question is:  Did |
| 9        BY MS. WILLIAMS: | 9  you actually, as opposed to conversations you had |
| 10    Q.    Flattening of the yield curve? | 10  with others, did you undertake any efforts to |
| 11    A.    I don't recall it sitting here today. | 11  personally observe the website had it at 9:50? |
| 12    Q.    Do you recall observing any flattening | 12        MS. WILLIAMS:  Or before. |
| 13  trades in the 5s and 30s on October 31st? | 13    A.    I think I may have.  I also know that |
| 14    A.    Again, from our vantage point in the | 14  the document that is attached here in terms of the |
| 15  market from the treasury, we didn't have the | 15  quarterly funding announcement. |
| 16  capacity to observe trading activity, we didn't | 16        BY MS. WILLIAMS: |
| 17  have access to a trading platform, all we had | 17    Q.    When you say here, what are you |
| 18  access to was prices on Bloomberg and Reuters. | 18  talking about? |
| 19    Q.    So no? | 19    A.    I'm talking about Exhibit 14.  That is |
| 20    A.    No.  Correct. | 20  -- I would not have had that file.  The only two |
| 21    Q.    Did you go to the Treasury website | 21  ways I could have had that file, by the file, I'm |
| 22  before 10 a.m. on October 31st? | 22  talking about the quarterly refunding document, |

| Page 199 | Page 201 |
|---|---|
| 1    A.    I believe I may have. | 1  would have been either from the website or if |
| 2    Q.    Did you see the press release | 2  someone in Domestic Finance had sent it to me |
| 3  announcing the elimination of the bond? | 3  because I was not -- this is a document -- all of |
| 4    A.    I believe I may have but I don't know. | 4  the quarterly refunding documents are kept in a |
| 5  I don't know. | 5  quarterly refunding folder by Domestic Finance. |
| 6    Q.    So you don't know what time you would | 6      They only people who are in the Office |
| 7  have done that? | 7  of Federal Finance or later the Office of Debt |
| 8    A.    I don't know. | 8  Management have rights to that folder, and I also |
| 9    Q.    At the time you received this E-mail | 9  didn't even work, because I worked in |
| 10  do you know if it had been placed on the Treasury | 10  International Affairs, I wasn't even on the same |
| 11  website? | 11  server as Domestic Finance, so I couldn't have |
| 12    A.    I think I knew at that point.  Yes. | 12  accessed this document unless it was either from |
| 13    Q.    This is at 10:45? | 13  the website or someone in Domestic Finance had |
| 14    A.    Yes.  Okay. | 14  sent it to me. |
| 15    Q.    Do you know if it was placed on the | 15    Q.    What about someone in public affairs, |
| 16  website before 9:50 as it says in this, stated by | 16  would they have had access to this press release? |
| 17  someone who might be Mr. Haskel? | 17    A.    It could have been someone in public |
| 18    A.    I'm sorry.  Your question was whether | 18  affairs, that's fair. |
| 19  I know?  Do I know if it was -- | 19    Q.    Do you know if someone in public |
| 20    Q.    Do you have any personal knowledge | 20  affairs sent this to you? |
| 21  that the press release was on Treasury's website | 21    A.    I don't think so.  But I don't know |
| 22  at 9:50 a.m.? | 22  that for a fact. |

Jill Cetina                                                          February 8, 2008
Washington, DC

| Page 206 |
|---|

1    MS. WILLIAMS: The E-mail that Mr.
2  Haskel sent out. We don't know the time.
3    MR. SHOPE: Which there's no time and
4  date stamp but it's been cut and pasted in.
5    A.   Right.
6    MR. SHOPE: Okay.
7    A.   I'm not sure.
8    BY MS. WILLIAMS:
9    Q.   If Treasury hadn't already announced
10 it, what could you have told Mr. Haskel about the
11 decision?
12   A.   If Treasury hadn't already announced
13 it at that point, I couldn't have said anything.
14   Q.   Do you recall if you did talk about
15 whether Treasury cancelled it?
16   A.   No, I would not have.
17   Q.   Do you recall during your conversation
18 with Mr. Haskel, do you recall actually talking a
19 the fact that Treasury canceled it?
20   A.   I think it must have been after,
21 certainly after it was either up on the website or
22 that there was something official that one could

| Page 207 |
|---|

1  hang one's hat on that Treasury had, in fact, made
2  some type of decision, whether it was the website
3  or some of the stories on Reuters or Bloomberg,
4  I'm not quite sure, but because he was so --
5  because it wasn't about -- the conversation as I
6  recall it wasn't about that there's a speculation
7  but we don't know if it's really true, it was
8  there's a speculation and it's been proven to be
9  true.
10    Am I making sense that at that point it had
11 already been kind of validated and confirmed. So
12 but whether that was all -- whether that was prior
13 to 10 o'clock but during the time in which it had
14 already gone to the website, I don't actually
15 know.
16    MS. WILLIAMS: Let me mark this as 16.
17 (Deposition Exhibit No. 16 was marked for
18       identification.)
19    BY MS. WILLIAMS:
20   Q.   Have you seen this document before,
21 Ms. Cetina?
22   A.   No.

| Page 208 |
|---|

1    Q.   This is an, it appears to be an E-mail
2  from you to Robert.sbarra@us.hsbc.com on October
3  31st at 1056 a.m. and attaches a copy of the
4  quarterly refunding press release from that day?
5    A.   Yes.
6    Q.   Do you recall forwarding the press
7  release to Mr. Sbarra on the morning of October
8  31st, 2001?
9    A.   No, but you, know, obviously I did do
10 that.
11   Q.   If you could look at Exhibit 14 with
12 Exhibit 16.
13   A.   Yes.
14   Q.   On the list of recipients on
15 Exhibit 14 I don't see Mr. Sbarra's name, do you?
16   A.   Nope.
17   Q.   Do you know why he wasn't included in
18 this E-mail that you sent around 9:58 on October
19 31st?
20   A.   Probably because I at that point
21 hadn't thought to put him on it but there were
22 other people at HSBC that were on it.

| Page 209 |
|---|

1    Q.   Well, besides Mr. Berardi, do you
2  remember having any conversation with anyone else
3  at HSBC on the morning of October 31st about the
4  cancellation of the bond?
5    A.   I think at some point I had a
6  conversation with Derrick Kehoe who was in London.
7  He was the gentleman I mentioned earlier who
8  worked with Central Bank services.
9    Q.   Do you know in the crinology of what
10 happened that morning when you talked to Mr.
11 Kehoe?
12   A.   Derrick was later, I mean, it was
13 certainly wasn't -- that was something that just
14 would happen later in the day.
15   Q.   So after you had spoken to Mr. Haskel?
16   A.   Definitely.
17   Q.   Was it after you had spoken to Mr.
18 Sbarra?
19   A.   I think it probably was.
20   Q.   Your conversation with Mr. Sbarra, do
21 you know if that was after Mr. Haskel?
22   A.   I think Pat may have been the first

53  (Pages 206 to 209)

Jill Cetina

Washington, DC

February 8, 2008

## Page 210

1    person I spoke to.

2        Q.   Do you know if the conversation with

3    Mr. Sbarra was after you received an E-mail from

4    Mr. Haskel, this E-mail that we've been talking

5    about that you forwarded at 10:45?

6        A.   My conversation with --

7        Q.   Mr. Sbarra?

8        A.   Was --

9        Q.   After you received this E-mail from

10   Mr. Haskel that you forwarded at 10:45?

11       A.   I don't think so.  I don't think it

12   was that late in the morning but I don't know the

13   precise time.

14       Q.   Let me ask you a couple of more

15   questions and --

16       A.   I'm sorry.  If I might.  I think it

17   was after, in some fashion it was fairly clear

18   that the decision was out there.  So it wasn't

19   purely again a phone call simply saying there's

20   just rumors but we don't know yet if this was

21   true, it was after it was clear that, certain that

22   it was that the policy of Treasury was taken.

## Page 211

1        Q.   So did you have any discussions with

2    Mr. Sbarra about rumors that the information had

3    leaked before the announcement?

4        A.   I seem to recall, yes, that there was

5    some type of conversation to that affect.

6        Q.   Just to clarify, your conversation

7    with him you believe was after the information had

8    been made public and thereby the Treasury --

9        A.   Correct.  So that it wasn't just him

10   calling in at say 9 and saying I'm hearing this

11   but we don't know what happened, you know,

12   something like that, but it was already known.

13       Q.   Did you have any communications with

14   him before it had been made public either by the

15   website or the wires regarding Treasury maybe

16   eliminating the 30-year bond?

17           MR. SHOPE:  This is with Mr. Sbarra?

18           MS. WILLIAMS:  Yes.

19       A.   I don't think so.  No.  I mean, I

20   don't know if he and I may have had an earlier

21   conversation that morning about the treasury

22   market but I don't think we would have.  So we may

## Page 212

1    have had some earlier communication that morning,

2    but I don't think we would have concluded -- I

3    don't know.

4        Q.   You don't have personal recollection?

5        A.   No.

6        Q.   Let me ask you about the next E-mail

7    that appears in Exhibit 10 on page 877.  And I'm

8    looking at the one that's at 11:41 a.m.  Do you

9    see that?

10       A.   Yes.

11       Q.   First sentence says, "Had a different

12   primary dealer tell me that they received a call

13   from John Jacobs from IDEA."  Do you know John

14   Jacobs?

15       A.   For some reason the name sounds

16   familiar but I don't know why, so I think the

17   answer is no.

18       Q.   What's IDE A?

19       A.   They do sort of reports on, I'm not

20   quite sure how to describe them.  They do kind of

21   financial-type consulting.  They do reports on

22   different economic issues.  I mean, they do, for

## Page 213

1    example, reports on merging markets, reports on

2    foreign exchange, different kinds of and so

3    different kinds of asset classes.

4        Q.   Just to clarify, do you have any

5    recollection of ever speaking directly to Mr.

6    Jacobs?

7        A.   No.

8        Q.   Do you have any recollection about

9    speaking directly to anyone from IDEA on October

10   31st?

11       A.   No.  I never confirmed any of this in

12   the E-mail.

13       Q.   Did this primary dealer tell you how

14   Mr. Jacobs supposedly obtained information about

15   Treasury?

16       A.   No.

17       Q.   Did you ever ask this dealer why he

18   didn't bring this information to your attention on

19   the 30th of October because this says had a

20   different primary dealer tell me they received a

21   call from John Jacobs from IDEA yesterday?

22       A.   Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Jill Cetina
Washington, DC

February 8, 2008

---

Page 214

1    Q.   Did you ask him why he hadn't called
2  you on October 30th about this supposed E-mail?
3    A.   Not really.  No.  There were lots of
4  rumors in the market and people don't, sometimes
5  they call Treasury about them and sometimes they
6  don't when the rumors are about Treasury.
7    Q.   Then says, "The same dealer reports
8  the law is trading special on repo."  Mr. Shope
9  asked you some questions about trading on repo.
10  Do you know if the 30 year had ever traded special
11  on repo prior to October 30th, 2001?
12    A.   I'm sure at times it may have.  One
13  would have to go back and look at the data to see
14  how often that had occurred.
15    Q.   Is there anything that prompts
16  something to be trading, would have prompted the
17  long bond to be trading special on repo prior to
18  the 30th of October?  I'm just the trying to
19  figure out why something trades special?
20    A.   I mean, certainly if there's some lack
21  of desire in the people who own the security to
22  put it into repo, that can cause it to trade

---

Page 215

1  special.  The events around September 11th could
2  have caused it to trade special.  Though again, one
3  would have to look at the data to see whether the
4  30 year was, there was any -- whether that would
5  have been unusual at that particular time.
6    Q.   Did you -- besides this dealer
7  reporting to you that the borrower was trading
8  special on repo, did you have any personal
9  knowledge of whether it was trading special on
10  repo on the 30th of October?
11    A.   You mean, did I check to see whether
12  it was itself?
13    Q.   Yes.
14    A.   I can't recall whether or not I did.
15  I don't think there's any documentation here
16  indicating that I did.
17    Q.   Then the next sentence, "The third
18  dealer in London said he heard a rumor that the
19  long bond would be eliminated yesterday
20  from European Central Bank."  Did you talk to
21  anyone at a European Central Bank about any rumors
22  about the elimination of the long-term bond?

---

Page 216

1    A.   Nope.  Certainly that person didn't
2  identify which European Central Bank.  He did not
3  say the European Central Bank, which would be ECB.
4  He said a European Central Bank, which would mean
5  a national Central Bank in the Europe system.
6    Q.   Approximately how many of those are
7  there?
8    A.   12, plus.  I don't know.
9    Q.   More than one?
10    A.   Many.  So obviously not something that
11  would be easy to confirm and what would you say.
12  Would you call up and say, I mean, unless the
13  dealer identified to you what Europe Central Bank,
14  you would have no way to independently verify and
15  I don't think that, how can I say this, the people
16  that would call us and we would call and discuss
17  things with, they might describe the customer to
18  you, but it would certainly get very awkward if
19  persistently you were asking them who, the actual
20  identify of the customer.
21    In our particular business, certainly if
22  that was something that someone else wanted to

---

Page 217

1  follow up on but they weren't in the business of
2  naming by name who their customers were or who
3  they were talking to.
4    Q.   Are you aware of whether or not there
5  being rumors going around any European Central
6  Bank that Treasury might eliminate the 30-year
7  bond any previous times?
8    A.   No.
9    Q.   Have you ever heard of the phrase
10  buyer on the rumor still in effect?
11    A.   Yes.
12    Q.   What is that phrase?
13    A.   Just that you there's some kind of
14  speculation about something so let's say there's
15  speculation that the feds can cut rates, so you
16  buy the two-year note, for example, thinking that
17  it will, the price will go up if the FMC cuts
18  rates.  Again, this is not meant as a example from
19  the point of view of a federal reserve employee,
20  it would be just a generic example.
21    So again, someone in a long two-year note, I
22  even bought it.  The FMC cuts rates and then you

---

55  (Pages 214 to 217)

Jill Cetina                                                    February 8, 2008
Washington, DC

Page 258

1    Q.   I know Mr. Shope asked you previously
2    about Mr. Malvey's retirement.  Do you have any
3    personal knowledge as to why Mr. Malvey actually
4    retired?
5    A.   No.  I actually would have no personal
6    knowledge because I'm not his supervisor, that's
7    something really only people in the management
8    chain would know.  So everything about that is
9    treasury rumor, treasury gossip and I don't think
10   anyone really knows.
11   Q.   My last question and I meant to ask
12   this earlier, prior to the, is it the cancellation
13   of the 10-year note that you were asked about
14   earlier?  The 10-year note --
15   A.   The surprise reopening.
16   Q.   Surprise reopening.  Thank you.  Had
17   you heard any rumors personally about the opening
18   of the 10-year note before it was announced by
19   Treasury?
20   A.   I don't recall.
21       MS. WILLIAMS:  I have no further
22   questions.

Page 259

1        MR. SHOPE:  I'll just mark the time,
2    then I'll have one.
3        THE VIDEO OPERATOR:  The time is
4    4:13:42.
5        MR. SHOPE:  Hopefully one last
6    question, Ms. Cetina.
7        MR. FREEBORNE:  Well, this is the last
8    round.
9        FURTHER REDIRECT EXAMINATION
10   BY MR. SHOPE:
11   Q.   You said you wouldn't know about Mr.
12   Malvey's retirement because you weren't his
13   supervisor.  Who was his supervisor who would have
14   that knowledge?
15   A.   I presume a decision like that would
16   have been made and this is a presumption, not that
17   I have knowledge, but I would think Tim Bitsberger
18   and/or Brian Roseboro would have been involved in
19   that kind of significant personnel decision.
20   Q.   Anybody else?
21   A.   I have no idea.  That would be pure
22   speculation on my part.

Page 260

1        MR. SHOPE:  Great.  Thank you very much
2    for your time.  I appreciate it.
3        THE VIDEO OPERATOR:  This concludes the
4    videotape deposition of Jill Cetina.  It consists
5    of four videotapes.  We're off the record at
6    4:14:42.
7        (Deposition concluded at 4:14 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 261

1        ACKNOWLEDGMENT OF DEPONENT
2    I, JILL CETINA, do hereby acknowledge that I have
3    read and examined the foregoing pages of
4    testimony, and the same is a true, correct and
5    complete transcription of the testimony given by
6    me, and any changes and/or corrections appear on
7    the attached errata sheet signed by me.
8
9
10
11
12   (Date)        JILL CETINA
13
14
15
16
17
18
19
20
21
22

Alderson Reporting Company
1-800-FOR-DEPO

# EXHIBIT B



# LEHMAN BROTHERS

## FIXED INCOME RESEARCH

**Wednesday October 31, 2001**

# Interest Rate Strategies
Treasuries, Agencies, Swaps, Futures & Options

Jeffrey D. Biby
jbiby@lehman.com
201-524-2291

**Governments/Swaps**
Doug Johnston
djohnst@lehman.com
201-524-4539

**Agencies**
Mukul Chadda
mchadda@lehman.com
201-524-4539

Judy Goldfarb
jgoldfar@lehman.com
201-524-4539

**Derivatives**
Shashank Agrawal
shaagraw@lehman.com
201-524-4539

**Mortgages**
Srinivas Modukuri
modukuri@lehman.com
201-524-4539

**Economics**
Drew Matus
dmatus@lehman.com
201-524-4539

## Treasury Refunding

Treasury refunding announcements have become one of the more volatile days and yesterday's announcement was not a disappointment. The 5-year note was larger than expected but that played second fiddle to the announcement of the suspension of bond issuance and the possible curtailment of the buyback program. Clearly the U.S. Treasury sees the same value in curve flatteners as we do and, coupled with the better than expected economic news, this could be the event that reverses the steepening trend that has been in place since the middle of 2000. Yesterday was certainly a good start.

By the end of the day on Wednesday, the bond had rallied 33 bp, tens 15 bp, fives 8.5bp, and twos only 4 bp. The bond richened to the old bond by 5 bp and 5.5 bp versus the fitted curve. On spread to swaps, the long-end richened up 14 bp, while other maturity spreads were stable to tighter. For example, 10-year spreads were 2 bp tighter on convexity hedging as fears of a rally-flattener mount. The 5-year roll closed at around +7.25 bp, which is reasonable given the shape of the curve and the larger the expected size ($16 bn).

Were we surprised by the elimination of the long bond? Yes. We didn't expect the Treasury to eliminate any issue given the outlook for the fiscal budget over the next 1-2 years. Were we very surprised by the elimination? No. We knew the Treasury was going to focus increased net issuance in the front-end of the yield curve and, we felt they had an inert desire not to be "responsible" for an increase in long-term yields. With the very real possibility of needing to stop repurchasing debt in long-end, the Treasury probably felt that there would be have less of an impact if it was offset by cutting the bond at the same time. They will repurchase $5.5 bn over the next 2-months for sure, helping off the run bonds. They will not buy anything back in Jan and then shift their buyback announcements to be in synch with the refundings.

One thing we did know going into the refunding announcement, however, is that there is relative value in the long-end and curve flatteners. Long forward rates, which were reflecting concerns around supply, in addition to some fairly robust, and distant, economic assumptions, were set to rally. The only thing missing was the spark. The signal the Treasury sent was 1) they see value in curve flatteners and 2) they believe the longer-term surplus story. Between the lines, however, was the hidden desire, by them and the Fed, to see long-term rates move lower. The steep curve is not doing much to liquify the consumer, as mortgage rates have not rallied nearly as much as short rates. With fiscal and monetary policy in high gear, the administration wants to do everything, much like in early '93, to insure long-term rates move lower to join the cause.

We reiterate our message that we have been preaching over the last month: Flatteners offer the best risk/reward at this point in the economic cycle with the short-end fully priced and the long-end relatively cheap.

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 000461

SECNOTH00130122

# EXHIBIT C

Paul F. Malvey
Washington, DC
June 23, 2006

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2               DISTRICT OF MASSACHUSETTS

 3     - - - - - - - - - - - - - - - -  )

 4   UNITED STATES SECURITIES AND       )

 5   EXCHANGE COMMISSION,                )

 6              Plaintiff,               )

 7         v.                           ) No. 05-10983 (NMG)

 8   STEVEN E. NOTHERN,                  )

 9              Defendant.               )

10   - - - - - - - - - - - - - - - -    )

11                    Washington, D.C.

12                    Friday, June 23, 2006

13   Deposition of PAUL FRANCIS MALVEY, a witness herein,

14   called for examination by counsel for Defendant in

15   the above-entitled matter, pursuant to agreement, the

16   witness being duly sworn by CHERYL A. LORD, a Notary

17   Public in and for the District of Columbia, taken at

18   the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

19   Suite 800, Washington, D.C., at 10:10 a.m., Friday,

20   June 23, 2006, and the proceedings being taken down

21   by Stenotype by CHERYL A. LORD, RPR, CRR, and

22   transcribed under her direction.

23

24

25
```

Paul F. Malvey                                                          June 23, 2006

Washington, DC

| Page 198 | Page 200 |
|---|---|

**Page 198**

1  come in here, they'd walk in here and either go here
2  or go here.
3        This wasn't for commoners. This wasn't
4  for other people. It was -- it was -- it was kind of
5  a private hallway that usually -- I don't want to say
6  private, but secretary or undersecretary would enter
7  so they could enter the front of the room and not
8  have to walk up all the way through the room.
9        I wouldn't use that. I went in here, and
10  I was SES and director of the office.
11   Q.   Now, did you ever hear of any reports in
12  advance of October 31 that the long bond was going to
13  be suspended?
14        MR. ROSSETTI:  Objection.
15   A.   Reports in the media, you mean?
16        BY MR. SHOPE:
17   Q.   Yeah, or within the market.
18   A.   Don't recall.
19        I mean, if you want to say, just before
20  October 31, yeah, I probably heard reports over the
21  previous 2 years, because I mentioned -- you know, a
22  lot of them were mentioned in these articles, and
23  they were -- there were articles, don't kill the long
24  bill. There were articles, kill the long bill.
25   Q.   Okay. Now, I'm not asking you about

**Page 199**

1  people who are discussing as a matter of policy
2  whether it's a good idea or a bad idea, because
3  that's -- those are the articles that you just
4  referenced.
5        Right?
6   A.   Yeah, I think so.
7   Q.   I'm asking about a report that says,
8  Treasury is going to do this.
9   A.   A specific report?
10   Q.   Yeah.
11   A.   I don't recall.
12   Q.   Okay.
13   A.   Saying they are going to do it?
14   Q.   Yeah.
15   A.   With certainty?
16   Q.   Yeah.
17   A.   No.
18   Q.   All right.
19        (Malvey Exhibit No. 7
20        was marked for
21        identification.)
22        BY MR. SHOPE:
23   Q.   Show you what's been marked as exhibit 7.
24   A.   James Sharer.
25        (Pause.)

**Page 200**

1   A.   I recall this, yeah.
2        BY MR. SHOPE:
3   Q.   Okay. So you recall receiving exhibit 7?
4   A.   No, no, no.
5        I recall the rumor that the long bond may
6  be eliminated.
7   Q.   Okay. And is that something that you
8  heard -- that you learned about after the fact that
9  it had been circulating in advance of October 31, or
10  did you hear it -- did you hear it even before
11  October 31?
12   A.   I don't recall, but I mean, I -- I
13  remember this was part of the discussion that day
14  about a rumor on the long bond, and I don't know
15  about this guy from John Jacobs -- I don't know who
16  he is, but I heard a rumor something about on the
17  euro market. I forget where it was, but I heard
18  something on the euro.
19        Yeah, I'm on the list. I'm addressed on
20  this list. Yeah. I saw it, and that's -- and I said
21  that definitely Treasury was going to do it, and this
22  just -- this is a rumor.
23        And I'm not being flip. I mean, rumors
24  fly around the fixed income market, just -- Pete
25  wouldn't -- I mean, talk to people about fixed income

**Page 201**

1  rumors -- fixed income markets and rumors.
2        MR. ROSSETTI:  Which Pete are you
3  referring to?
4        THE WITNESS:  Pete Davis.
5   A.   It's a rumor.
6        BY MR. SHOPE:
7   Q.   Okay. Well, did anybody at Treasury to
8  your knowledge ever follow up to try to find out
9  which European central bank it might have been that
10  might have been disseminating this information?
11   A.   I think it -- well, I'm not quite sure,
12  but I think it means the ECB, because it's the euro.
13  There's an institution called the European Central
14  Bank. And I thought that was it, but I don't know.
15   Q.   So the question is, was there ever any
16  followup to try to find out whether or not --
17   A.   I think there was, but I'm not familiar
18  with it. I think -- I think there was, but I'm not
19  familiar with it. I don't recall anything about,
20  yeah, there was -- you know, so-and-so said this.
21   Q.   Do you know who it was that would have
22  done the followup?
23   A.   I don't.
24        And let me just explain something.
25        Treasury is a very, very small place. I

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
1-800-FOR-DEPO

Paul F. Malvey                                                   June 23, 2006
Washington, DC

---

**Page 242**

1    A. I saw some --
2        MS. WILLIAMS: Objection.
3        BY MR. SHOPE:
4    Q. Okay. I'll show -- and I believe you also
5    said -- correct me if I'm wrong -- that you had
6    pointed out what you thought were some inaccuracies
7    in the memorandum that you reviewed with Ms. Williams
8    and Mr. Rossetti; is that correct?
9    A. I saw something, and then I read it, and
10   got -- right, and I saw some inaccuracy, right.
11   Q. Okay. All right.
12       I'm showing you what's been marked as
13   exhibit 11 to your deposition.
14       (Malvey Exhibit No. 11
15       was marked for
16       identification.)
17       BY MR. SHOPE:
18   Q. And obviously you'll spend some time with
19   it, but -- now, I've got too many -- the first
20   question -- and if you need to take time, that's
21   fine -- the first question is whether or not exhibit
22   11 is the memorandum that you reviewed with
23   Ms. Williams and Mr. Rossetti during your meeting in
24   advance of the deposition.
25   A. Do you mind if I just re-read it?

---

**Page 243**

1    I think it's --
2    Q. Please. Take as much time as you need.
3    A. Yeah. All right.
4        (Pause.)
5        BY MR. SHOPE:
6    Q. Okay. Have you had a chance to look
7    through exhibit 11?
8    A. Sure.
9    Q. First of all, is that the memorandum that
10   you reviewed with Ms. Williams and Mr. Rossetti at
11   the SEC in preparation for your deposition?
12   A. I wouldn't say, reviewed.
13       They showed me this and asked me if I
14   thought it was correct, and I pointed out a couple
15   things that I didn't think were accurate.
16   Q. What were the things that you pointed out
17   of things in exhibit 11 that you thought were
18   inaccurate?
19   A. I -- the first full par on the second page
20   -- well, I'm sorry.
21       Just stepping back, the third paragraph on
22   the first page, it says, I've -- as director of
23   market financing, I try to remain current with the
24   financial markets and maintain market current
25   contacts.

---

**Page 244**

1        I mean, I wouldn't view those 2 things as
2    my most important things, because having market
3    contacts comes with the job. I don't go out and try
4    to maintain them. They -- anyway, that's a nit.
5    Q. So in other words, you do -- you were
6    maintaining market contacts, but it wasn't something
7    you were trying to do.
8        It just came with the territory?
9    A. Exactly. Yeah.
10       I'm -- correct. I mean, I would say,
11   remain current with financial markets and financial
12   analysis and policy recommendations, is how I'd
13   describe my job. But that's a nit anyway.
14       And then on the first full paragraph,
15   second page, I said that: Because the turmoil
16   following September 11 disaster, January -- because
17   of the turmoil following the September 11 disaster,
18   the January 30, 2002, quarterly financing meeting
19   would have been a better forum.
20       I mean, September -- I did mention that
21   September 11 may have directed people's attention
22   elsewhere away from debt management policy. But that
23   was not the reason I said it would be better to
24   postpone it.
25       And this was the arguments I made in-house

---

**Page 245**

1    with Peter, was that this whole notion of giving the
2    markets another bite at the apple, make an
3    announcement that we're killing it, but have a last
4    auction, which would have been February 15th, so
5    that's what -- really the reason that I thought the
6    postponement would have been better.
7    Q. Well, hold it.
8        Actually, let's follow up on that.
9        If the idea was to have an announcement
10   and then give a second bite at the apple --
11   A. Last bite.
12   Q. -- last bite of the apple, how would that
13   relate to when you made the announcement?
14       Because by hypothesis, when you're making
15   the announcement, there's going to be a further bite
16   at the apple at a later date.
17       Right?
18       MS. WILLIAMS: Objection.
19   A. No, because that's what happened. Peter
20   made the announcement. No more bites.
21       BY MR. SHOPE:
22   Q. I understand that, but what it says here
23   in the first full paragraph on page 2 is that the
24   January 30, 2002, quarterly funding meeting would
25   have been a better forum to announce the suspension

---

62 (Pages 242 to 245)

Page 246

1  of sales of the 30-year bond, so that is -- that's
2  not going to the question of whether or not there's a
3  last bite at the apple.
4        That's going to the question as to when
5  you announce.
6     A.  No, because --
7        MS. WILLIAMS:  Objection.
8     A.  -- the reason that January 30 would be
9  better is because we had a scheduled 30-year auction
10 in February, and that's why it would have been better
11 to announce it, because the investors -- it's just
12 not finished out in this sentence here, because
13 whoever wrote these notes didn't make the connection
14 between the January 30 announcement and the February
15 15 settlement of a 30-year bond.
16       That's what -- that's the reason I was
17 saying Jan 30 would would have been better for the
18 announcement, because that would have been right
19 before the sale of a preschedule -- already on the
20 schedule 30-year bond.
21'      That's what I meant.
22       BY MR. SHOPE:
23    Q.  Yeah, but you could have made the
24 announcement on October 31 and then announced that
25 there would be a last bite at the apple in February.

Page 247

1        Right?
2        MS. WILLIAMS:  Objection.
3     A.  He could have.
4        I mean, coulda, woulda, shoulda.
5        It's -- it would have -- I'm sorry.
6        I didn't mean to be disrespectful, but
7  because there was such a scarcity premium on the
8  security to start with, that would have given 3
9  months for the markets to gyrate around and be more
10 volatile at the long end because of all the
11 uncertainty about its future, where if you made the
12 announcement on January 30, the sale would be 5 days
13 later, and WY market would have established the
14 market price, and there was much less chance for
15 volatility.
16       BY MR. SHOPE:
17    Q.  Okay.  So what else was inaccurate in
18 exhibit 11?
19    A.  I'm not saying inaccurate.
20       I'm just saying it didn't convey the
21 flavor.
22       And it's -- it -- the next sentence says:
23 It was also Malvey's opinion that undersecretary
24 Fisher would have made the announcement at the
25 quarterly funding meeting if he had been confirmed of

Page 248

1  the time.
2        And somebody asked me that, and after
3  having been at the other side of the table listening
4  to Peter's arguments about his view of the 30-year
5  and having made my arguments about my view of the
6  30-year, I think he would have made the same
7  arguments in August.
8        And so, yes, I -- I -- who the hell knows,
9  but I think he would have made the same arguments in
10 August.  Whether we would have made the announcement
11 in August is another thing, because he would have had
12 to justify making the announcement in August to the
13 rest of us too.
14    Q.  But I mean, but basically this gets the
15 gist -- that was your opinion?
16    A.  Yeah, it gets the gist, yeah.
17       Right.
18       MS. WILLIAMS:  Objection.
19    A.  All right.  And the one, 2, 3 -- third
20 full paragraph talking about Drew Matus.
21       He came in -- I think he may have
22 scheduled to meet with Jeff, but Jeff was also new.
23 I think Jeff had only been there since August, I
24 think.
25       BY MR. SHOPE:

Page 249

1     Q.  You're speaking of Jeff Huther now?
2     A.  Jeff Huther.  Right.
3        And I think it was because Woody was
4  either about -- was -- oh, here it is:
5        He was vice chairman.  The -- usually the
6  chairman of the borrowing advisory committee, his
7  staff works up these pro forma forecasts that I
8  mentioned earlier today, and for some -- and the
9  vice-chairman usually follows the chairman -- that's
10 also almost pro forma.
11       And the October meeting would have been
12 the last meeting for the outgoing chairman, and Drew,
13 some reason Woody asked Drew to do these things.  He
14 had never done them before.
15       So he worked up these pro forma
16 forecasts -- he had access to other ones out there
17 and previous ones, and he worked up these pro forma
18 forecasts.  And I don't know if he came down to
19 Washington specifically for that, but he asked Jeff,
20 is it okay if I run these by you to tell me whether
21 they're reasonable, a reality test or something like
22 that.
23       And I mean, it says that I spoke with him
24 briefly, but it might have been -- "briefly" is --
25 the 2 of them came into my office, and we put these

63  (Pages 246 to 249)

Paul F. Malvey                                                    June 23, 2006
Washington, DC

Page 250

1  things out on the table in front of us, and asking
2  me, you know, does all this stuff look reasonable and
3  stuff, so I -- it was -- I forget exactly what the
4  nature of the conversation, but I might have said
5  something like, what if it -- do you have any
6  alternatives, what if Woody says, how about this, are
7  you ready to go with alternatives, I mean, because
8  the meeting is going to be next Tuesday, he's
9  going -- he has -- he has -- well, proper prior
10 preparation, so I was trying to help him out like I
11 help a lot of people.
12     Q.   One of those alternatives would have been
13 suspending the issuance of the long bond.
14          Right?
15          MS. WILLIAMS: Objection.
16     A.   It -- not necessarily would have been, but
17 it may have come up. I don't recall it coming up.
18          I mean, I don't -- I don't recall him
19 having 2 scenarios, but maybe he did. I don't know.
20          I just remember looking and seeing if it's
21 feasible, because we were making so many changes,
22 and, you know, I may have asked him, do you have an
23 alternative scenario if the long bond is not there,
24 or something like that.
25          I don't know. I don't recall saying it,

Page 251

1  but I -- it just seems like --
2          BY MR. SHOPE:
3     Q.   Well, that was the elephant in the room,
4  wasn't it?
5          MS. WILLIAMS: Objection.
6     A.   I don't think so.
7          BY MR. SHOPE:
8     Q.   I thought -- didn't you refer to that as
9  the elephant in the room earlier today in your
10 deposition?
11          MS. WILLIAMS: Objection.
12     A.   I don't recall my context.
13          BY MR. SHOPE:
14     Q.   To suspending the long bonds.
15     A.   Yeah, I know, but --
16     Q.   This is an issue at the October 30 --
17 there was an elephant in the room, as you say, at the
18 October 30 meeting of the borrowing advisory
19 committee.
20          MS. WILLIAMS: Objection.
21          I think this mischaracterizes his
22 testimony.
23     A.   I don't recall saying that. And we just
24 went over the minutes, and it doesn't -- it's not
25 included in there.

Page 252

1          BY MR. SHOPE:
2     Q.   So you're saying you just don't remember
3  one way or the other whether or not the suspension of
4  the long bond came up in your discussion with
5  Mr. Matus or William Brothers?
6     A.   I don't recall the discussion coming up.
7          But I wouldn't be surprised if I said
8  things like, do you have an alt- -- what if -- what
9  if we -- the -- what if the long bond is eliminated
10 sometime in the next year, do you have an alternative
11 for that. What if we go from quarterly to semiannual
12 tens, 10-year securities.
13          And it was more like I'd say, well, what
14 if Woody says, how about this. It was kind of like
15 asking him questions trying to get him prepared for
16 his boss to get ready for this meeting, you know.
17     Q.   M-hm.
18     A.   But I don't recall the context of this
19 300- -- or 800-pound elephant.
20     Q.   Well, the testimony obviously will speak
21 for itself.
22          Now, were there any other inaccuracies
23 that you noted --
24     A.   Yeah.
25     Q.   -- in exhibit 11?

Page 253

1     A.   I don't know. All right.
2          The last paragraph on page 2 continues
3  on -- I'm not quite -- I'm -- it's a long time ago,
4  but I -- I remember answering the phone and asking
5  Jill.
6          Then the next page says, I introduced
7  myself to him at a press conference in 1996. And
8  it's -- it -- this is something I have a recollection
9  of, is, I walked over, and Jill and Roger were
10 standing over -- point out exactly where they were
11 standing.
12          They were standing by the side door. And
13 Roger had done the press conference, so I think -- so
14 that had to have been pre-Gensler. They were just
15 standing there making small talk.
16          And I was Jill's deputy and just walked
17 over and say, good job, Roger, or something like
18 that. And he introduced me to -- Paul, this is Pete
19 Davis, Pete Davis, Paul Malvey. And, hi.
20          And Roger says, he's one of the good guys.
21 And I think I mentioned that earlier today, because
22 Roger just -- Roger is a man of few words.
23     Q.   M-hm.
24     A.   And for him to say, one of the good guys,
25 I remember saying, I wonder what he means by that,

64  (Pages 250 to 253)

Paul F. Malvey                                                                June 23, 2006
Washington, DC

| Page 254 | Page 256 |
|---|---|
| 1  cause he doesn't usually say much about anybody, | 1  policy of keeping information confidential because of |
| 2  da-da-da-da -- excuse me. | 2  the nature of the business. Everybody in this office |
| 3     Q.  So that's one memory that you have a lot | 3  has appreciation of sensitivity of what they discuss. |
| 4  of confidence in? | 4     I mean, it's -- I mean, that's true, but |
| 5     A.  Right. Yeah. | 5  I -- and in the financial markets, your word is your |
| 6        And I think that's the first time I shook | 6  bond, and it's kind of like with us. We say, well -- |
| 7  his hand, said hello, or whatever. So I don't think | 7  it's -- our word is our bond. It means everything. |
| 8  I walked -- I wouldn't have a reason to walk up to | 8     And so we know you're not supposed to talk |
| 9  him -- I wouldn't have a reason to walk up to anybody | 9  about something, you're not going to talk about it. |
| 10 in the room to be honest with you. | 10 That's what I -- just making that point. |
| 11       Conference is over. I'm standing there | 11    Q.  Okay. So it's not really that this is |
| 12 tired as hell waiting for everybody to leave and go | 12 inaccurate. |
| 13 home. | 13    It's just that's a -- |
| 14    Q.  Now, is that an incident that you just | 14    A.  It's a really strong thing that was |
| 15 forgot when you were talking to the people who | 15 instilled in me when I first got there back in '78. |
| 16 prepared exhibit 11? | 16    Q.  But otherwise -- |
| 17    A.  Well, I -- | 17    A.  Yeah. |
| 18       MS. WILLIAMS: Objection. | 18    I mean, it's the same thing. I'm just |
| 19    A.  I wouldn't say, forgot, because I don't | 19 giving it time. It's nit-picking. |
| 20 know how the hell -- you know, they're taking notes. | 20    (Pause.) |
| 21 I don't know, you know, when -- what -- | 21    A.  It says the third time that I had contact |
| 22       BY MR. SHOPE: | 22 with Davis was at this specific con- -- thing. But |
| 23    Q.  All right. | 23 it's my recollection I took -- talked to him twice on |
| 24    A.  I don't know when -- how long later the | 24 the phone back in '96 and again maybe even before |
| 25 notes were written and whether the person's | 25 this conference about clearing him in, but there was |

| Page 255 | Page 257 |
|---|---|
| 1  recollection -- whether the person was looking at the | 1  another time that I had contact with him where he |
| 2  clock on the wall when I was saying this and came | 2  called and he was looking for information, and I |
| 3  back and wrote that I introduced myself and missed | 3  mentioned that earlier today, and I said I felt |
| 4  the first part of the thing. | 4  awkward. I didn't give him any. |
| 5        I don't -- I'm just saying, this is what I | 5        BY MR. SHOPE: |
| 6  see, and this is what I recall. I'm just saying | 6     Q.  So was that just an incident that you had |
| 7  they're different. | 7  forgotten about when you were talking to the |
| 8        I'm not saying this is -- | 8  Inspector General's office? |
| 9     Q.  Okay. I'm sorry. | 9        MS. WILLIAMS: Objection. |
| 10       The line about you introduced yourself. | 10    A.  You know, this is 5 years ago. All I'm |
| 11    A.  Yeah, top of page 2 -- oh, I'm sorry -- | 11 saying is, I remember -- and I thought that I had |
| 12 top of page 3. | 12 mentioned it then, because I was much closer to it, |
| 13    Q.  Okay. Okay. | 13 that sometime in the few months leading up to the |
| 14       So -- okay. | 14 '01 -- October '01 press conference, Peter called -- |
| 15       So you -- so basically what you're saying | 15 my line started, hi, how you doing, |
| 16 is, your memory is that Anderson -- that Roger | 16 da-da-da-da-da-da, and stuff, and started asking me |
| 17 Anderson introduced Davis to you rather than Davis | 17 questions about our plans for debt management policy. |
| 18 having introduced himself? | 18       I don't recall what they were, whether it |
| 19    A.  You know, no big deal. | 19 was 30-year bond, not 30-year bond, whatever. It |
| 20    Q.  Yeah. | 20 was -- I thought they were very forward questions, |
| 21    A.  But can I go back to page 2 or 3? | 21 and I thought it was unusual for him to think that I |
| 22    Q.  Yeah. | 22 may answer them even. |
| 23    A.  I'm sorry. | 23       BY MR. SHOPE: |
| 24    Second full par, he said -- last sentence | 24    Q.  M-hm. |
| 25 was: Malvey said he was not aware of any formal | 25    A.  And I said something -- you know, Pete, |

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
                                        1-800-FOR-DEPO

Paul F. Malvey                                                                June 23, 2006
Washington, DC

| Page 258 | Page 260 |
|---|---|

**Page 258**

1  you know, I can't talk about that or whatever it was.
2      Q.  M-hm.
3      A.  And I hung up.
4          I mean, we ended the call.  I didn't hang
5  up on him.
6          And the last par -- it wasn't my curiosity
7  to call Jill.  It was somebody who was setting up a
8  meeting for me asked me if I knew were Jill Ousley
9  was.  I said yes.  Do you have her telephone number,
10  can we have it.
11          I said, well, let me give her a call
12  first -- I don't know if it was Treasury or SEC --
13  and the reason for me calling her, you know, was
14  saying, there's an investigation going on, you
15  probably heard about da-da-da-da-da -- I'm sorry --
16  and they want to talk to you.
17          And at that conver- -- in that
18  conversation, I said, it's about Pete Davis, remember
19  that guy that used to come to these meetings.  And
20  she said, Pete who.  And I said, Pete Davis.  And she
21  says, I don't recall -- Davis? -- whatever.
22          It went along those lines.  And I was
23  just -- I was just amazed.  And I -- and she's a
24  friend of mine, so I didn't pursue it.  I didn't --
25  she was going to say she didn't remember him, she

**Page 259**

1  didn't remember him for whatever her reasons.  She
2  didn't want to remember him.
3      Q.  But you could have just given the SEC or
4  the Inspector General Ms. Ousley's telephone number
5  in Florida and just left it at that.
6          Right?
7          MS. WILLIAMS:  Objection.
8      A.  No, because I thought it was a courtesy
9  to -- I mean, I would have given to them.  I thought
10  it was a courtesy to call a friend and say, listen,
11  so-and-so is asking me for your number, I'm just
12  giving you a heads-up.  Okay.  And I thought that was
13  a common courtesy.
14          I did that and then I gave the number.
15  That's the way I was brought up.
16          BY MR. SHOPE:
17      Q.  Now, did you note any other inaccuracies
18  in the memorandum of -- it's exhibit 11.
19      A.  Did you?
20          I'm sorry.
21          Well, this -- I guess the second line par:
22  I was not aware of anyone other than press, OMB, and
23  Treasury officials, and Davis.  And I had mentioned
24  that GAO, CBO, other people had called me, so there
25  were other people.

**Page 260**

1          But on the other hand, I was -- I did not
2  know the universe of people who showed up, so there
3  were people I didn't recognize, and so I don't know
4  where they came from, but I do know that other people
5  beyond being in Treasury.
6      Q.  It says here that, Malvey said that he did
7  not realize until after the fact that the press
8  conferences were only for credentialed press.
9      A.  Oh, that -- that -- excuse me -- yes.
10      Q.  That's in the second full paragraph of
11  page 3.
12      A.  Yeah, that's like a time-shift thing.
13          Where is that?
14          Is that the same sentence?
15          MS. WILLIAMS:  Second-to-last paragraph,
16  last sentence.
17      A.  I did not -- yes.
18          That's true -- I did not realize and I
19  don't think anybody in my office or outside of the
20  press office realized that that was only for
21  credentialed press.
22          BY MR. SHOPE:
23      Q.  Well, I mean, everybody knew that it was
24  okay for people from the other federal agencies to
25  attend.

**Page 261**

1          Right?
2      A.  Well, after all this happened, the press
3  office said, oh, this is only for credentialed press.
4  I had never heard that before.
5      Q.  Well, did -- from -- after October 31,
6  2001, did the press office begin excluding
7  representatives from --
8      A.  I don't know.
9      Q.  You got to wait till I'm done.
10      A.  I'm sorry.
11          Yeah.
12      Q.  So after October 31, 2001, did the press
13  office start excluding representatives of other
14  federal agencies from the quarterly refunding
15  conferences --
16      A.  I don't know.
17      Q.  You've got to wait until I'm done.
18      A.  Okay.  I'm sorry.
19      Q.  So take it from the top.
20          After October 31, 2001, did the press
21  office or for that matter anybody else at Treasury
22  begin excluding from the quarterly refunding
23  conference representatives of other federal agencies?
24      A.  I'm not aware of it.
25          I'm trying to think:  Bob Fitzpatrick, who

66 (Pages 258 to 261)

Paul F. Malvey                                                                    June 23, 2006
Washington, DC

Page 262

1  was the budget person over at OMB, was at just about
2  every one of these. I -- I don't know. There's 2
3  things.
4          Maybe they -- you know, like CBO or GAO.
5  Maybe she just didn't happen to call me for the next
6  month because they weren't working on anything, but
7  if anybody from another agency had asked to be
8  admitted, it would be this guy, Bob Fitzpatrick,
9  because he was so interested in stuff, and I can call
10  and ask him or you can call and ask him or whatever.
11  I'm not aware of anything.
12     Q.   Okay. Did you note any other inaccuracies
13  in the -- in the exhibit 11?
14     A.   Exhibit 11.
15     Q.   This is the memorandum of interview.
16     A.   Well, I said, possible suspension of sales
17  of Treasury 30-year bond have been discussed within
18  Treasury for quite -- I mean, within Treasury and
19  without Treasury.
20          I mean, it was a common -- it wasn't
21  uncommon. That's why I mentioned, the American
22  Enterprise Institute even had a conference on
23  financing.
24          And I mentioned the January and I
25  mentioned -- I made little dots here as I was going

Page 263

1  down.
2          When I called Jill, I may have asked her,
3  you know, the reason for Davis's admittance, but she
4  claimed she didn't even know him, so that question
5  didn't even make that much sense.
6          Okay. I didn't notice any more.
7          Do you want to ask me any more?
8     Q.   Well, I wanted to ask you, on the -- on
9  the third page of exhibit 11 in the first full
10  paragraph, it says: Malvey said he found out after
11  the fact that Davis had been calling Malvey's
12  secretary, Lula Tyler, on a regular basis to be
13  admitted to the quarterly funding meeting press
14  conferences.
15     A.   Yeah.
16     Q.   Do you see that?
17     A.   I have a dot there, and I'm sorry I didn't
18  mention it. I put a dot there.
19          I don't know after the fact -- see, I was
20  confused. I don't know if "after the fact" followed
21  the sentence up above or "after the fact" meant after
22  October 31, but I think I did ask Lula, you know, has
23  he been cleared through for every conference, and
24  then, do you do it, but I -- maybe -- it's -- maybe I
25  never asked her before, but I assumed it was

Page 264

1  happening.
2          I mean, I understand the distinction.
3  After -- I went to Lula afterwards, and I said, does
4  he call you every time. She said, yeah.
5          And it's maybe I just -- I never asked
6  Lula that before. I just assumed that that -- he was
7  getting in cleared through somebody, and I -- I just
8  wanted to confirm it myself.
9     Q.   M-hm.
10     A.   It's not like I found out after the fact.
11  I confirmed after the fact that that's what -- it had
12  been Lula all the time. It was curiosity.
13     Q.   But in fact as it was happening over the
14  years with Mr. Davis coming in, periodically -- or I
15  mean, not periodically, but occasionally, from time
16  to time you would happen to know just because were
17  you the one who picked up the phone --
18     A.   Yeah, 3 times in 5 years, yeah.
19          MS. WILLIAMS: Objection.
20          THE WITNESS: I'm sorry.
21          BY MR. SHOPE:
22     Q.   You got to wait till I'm done.
23     A.   I'm sorry.
24          Okay. Yeah.
25     Q.   Every now and again --

Page 265

1          MS. WILLIAMS: It's been a long day.
2          BY MR. SHOPE:
3     Q.   -- over the years --
4     A.   I'm sorry.
5     Q.   -- when Mr. Davis called in to be cleared
6  in, you would be aware of it either because you took
7  the call yourself or because Lula or Elnora said to
8  you, Dave wants to be cleared in?
9     A.   Or I saw him there and more or less
10  assumed that's how he got cleared through.
11          Right. And I just confirmed it with Lula.
12     Q.   All right. But otherwise, exhibit 11 is
13  accurate in your understanding?
14     A.   Yeah.
15          Make me so hesitant to say things.
16          MR. SHOPE: Now mark this as the next --
17               (Malvey Exhibit No. 12
18               was marked for
19               identification.)
20          BY MR. SHOPE:
21     Q.   By the way, when you met with the SEC, did
22  you prepare any other diagrams or drawings besides
23  the --
24     A.   No.
25          Just the one I did for you here.

67  (Pages 262 to 265)

# EXHIBIT D



# MEMORANDUM OF ACTIVITY

| Type of Activity: | Case Number: | Conducted by (Name, Title, and Signature): |
|---|---|---|
| [X] Personal Interview | 2002-0104 | |
| ☐ Telephone Contact | Date: | Michael Knorr, Investigator *Michael C Knorr* |
| ☐ Records Review | November 21, 2001 | |
| ☐ Other (Describe): | Time: | |
| | 3:00 p.m. | |

| Subject of Activity: | Location of Activity: |
|---|---|
| **Jeff Huther** <br> **Financial Economist** <br> **Office of Market Finance** <br> **Department of the Treasury** <br> **Washington, DC** | Department of the Treasury <br> Office of General Counsel <br> 1500 Pennsylvania Avenue, NW <br> Washington, DC |

On the above date and time, the above listed subject was interviewed by attorneys Andrew Sporkin (202/942-4800) and Rosemary Filou (202/942-4768) of the Division of Enforcement, United States Securities and Exchange Commission (SEC), in coordination with Treasury, Office of General Counsel and the Office of Inspector General (OIG). Interviews of Treasury employees were conducted because of an allegation that someone may have prematurely released market sensitive information about the government's decision to suspend selling Treasury 30-year bonds, thus affecting trading activities in government securities.

The government's decision to suspend issuance of the 30-year bond was announced by Peter R. Fisher, Department of the Treasury, Under Secretary for Domestic Finance, during the quarterly funding meeting press conference at Treasury between 9:00 a.m. and 9:25 a.m. on October 31, 2001. The announcement was embargoed for release until 10:00 a.m. Treasury however, prematurely posted Fisher's statement on their Web site, where it appeared at 9:43 a.m.

Jeff Huther said he has been employed as a financial economist in the Treasury, Office of Market Finance, for the past one and a half years. His responsibilities include market research, analysis and providing advice to financial decision makers at Treasury. He said his immediate supervisor is Paul Malvey.

Huther said he attended the quarterly funding press conference on October 31, 2001. He said he was aware of the sensitivity of

This report contains sensitive law enforcement material and is the property of the OIG. It may not be copied or reproduced without written permission from the OIG. This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability. Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/3/01
Form OI-09

Office of the Inspector General - Investigations
Department of the Treasury

SECNOTH00103686

## MEMORANDUM OF ACTIVITY

the information at the press conference and heard the press embargo announcement.  He said he saw no one leave the room prior to the conclusion of the press conference.

Huther was asked if he knew a Peter Davis, which he said he did not.  He said he would not have recognized Davis, nor did anyone mention him at the press conference.  He said he only learned of who Davis was after the controversy surrounding the October 31, 2001, press conference. ..

Huther said he had first learned of the decision to suspend sales of the 30-year bond in a meeting with Under Secretary Fisher in mid October 2001.  He said he did not recall the exact date.  He said the decision was not discussed widely within Treasury.  Huther said approximately a week before the official announcement, "everyone in our office was notified of the decision."  He said the announcement was made at a staff meeting, but he did not recall the exact date.  Huther said he would check his appointment calendar to see if he could be more specific as to the dates of the above meetings.

Huther said his office converges with bond traders and consultants but, "we do not provide them with any confidential information."  Huther stated that he did not talk to any broker dealer about the decision to suspend the 30-year bond, prior to the official announcement.

Huther said he had met with Mr. Drew Matus, a bond trader from New York, prior to the quarterly funding conference.  He said their discussion did not involve the possible suspension of sales of the 30-year bond.  Huther said Matus wanted to show him a computer program showing projections for the next quarter government borrowing needs.  Matus was working on the computer projection at the direction of the Vice-Chairman of the Borrowing Advisory Committee.  Huther again said he did not recall the specific date of his meeting with Matus, but would check his appointment calendar and get back to us.

Huther said he was aware of the importance and sensitivity of the information he had concerning the 30-year bond.  He said he is aware of the confidential nature of financial information at Treasury, but is not aware of any written policy involving disclosure.

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/3/01
Form OI-09

Office of the Inspector General – Investigations
Department of the Treasury

SECNOTH00103687

## MEMORANDUM OF ACTIVITY

Huther checked his calendar subsequent to the interview and his search results are appended in the attachment.

Attachment:

Reviewed by: _____ Date: 17/4/01

This report contains sensitive law enforcement material and is the property of the OIG.  It may not be copied or reproduced without written permission from the OIG.  This report is FOR OFFICIAL USE ONLY, and its disclosure to unauthorized persons is strictly prohibited and my subject the disclosing party to liability.  Public availability to be determined under 5 U.S.C. §§ 552, 552a.

Date Printed: 12/3/01
Form O1-09

Office of the Inspector General — Investigations
Department of the Treasury

SECNOTH00103688

# EXHIBIT E

## Composite Information

| Individual CRD#: 2719539 | Individual Name: KEHOE, JAMES D |
|---|---|

| Full Legal Name: | KEHOE, JAMES DEREK | | | | |
|---|---|---|---|---|---|
| Social Security #: | | | | | |
| Date Of Birth: | 10/31/1959 | | | | |
| Employment | **Name** | HSBC SECURITIES (USA) INC. (19585) | | | |
| | **Firm Billing Code** | INSTL-UK | | | |
| | **Position** | Registered Representative | | | |
| | **Independent Contractor** | No | | | |
| | **CRD Branch Number** | **Address** | | **Firm Billing Code** | **NYSE Branch Code Number** |
| | 118202 - Located At | 8 CANADA SQUARE CANARY WHARF LONDON, UNITED KINGDOM E14 5HQ | | 814UN | 814UN |
| Residential Address | LONDON, Unknown | | | | |
| Reportable Disclosures? | The specified individual has no disclosure that qualifies under this section (i.e., disclosure required to be reported on Form U4 or Form U5). Regulatory and Broker/Dealer Users: Please note that there are three types of disclosure in Web CRD: Reportable, Legacy and Archive disclosure. An individual with no reportable disclosure may or may not have Legacy or Archive disclosure. Investment Adviser Users: Please note that IARD does not include Legacy disclosure. Information reported on previous form filings through IARD is available under Filing History. | | | | |
| Statutory Disqualification Status | Clear | | | | |
| Has Material Difference in Disclosure? | No | | | | |
| Current CE Status | Satisfied | | | | |
| Disclosure Counts – Current Disclosures | Criminal 0 | Regulatory Action 0 | | Customer Complaint 0 | Other 0 |
| Disclosure Counts – Historical Disclosures | Criminal 0 | Regulatory Action 0 | | Customer Complaint 0 | Other 0 |

# EXHIBIT F

1                              Volume:   I

2                              Pages:  1-221

3                              Exhibits:   1-10

4

5              UNITED STATES DISTRICT COURT

6              DISTRICT OF MASSACHUSETTS

7                   (Boston Division)

8     Civil Action No. 05-CV-10983 (NMG)

9     - - - - - - - - - - - - - - - - - - - - - - -

10    UNITED STATES SECURITIES AND EXCHANGE

11    COMMISSION,

12                      Plaintiff,

13        v.

14    STEVEN E. NOTHERN,

15                      Defendant.

16    - - - - - - - - - - - - - - - - - - - - - - -

17          Deposition of Steven E. Nothern

18              January 30, 2007

19            9:19 a.m. - 4:00 p.m.

20       Securities and Exchange Commission

21             33 Arch Street

22          Boston, Massachusetts

23

24       Reporter:   Daria L. Romano, RPR/CRR

25

Steven E. Northern                                              January 30, 2007
                        Boston, MA

Page 194

1  10 million, and Mr. Smith said he would be
2  buying 5 million bonds.
3      Q.  What, if anything, did you tell the
4  group during this conversation about Peter
5  Fisher?
6      A.  I believe that Peter Fisher had -- I
7  actually don't recall specifically.  I believe
8  that Davis had said that -- I actually don't
9  recall.
10     Q.  What, if anything, did you say at this
11 time about embargo?
12     A.  I don't recall bringing up embargo.
13     Q.  What, if anything, did you mention
14 about a press release?
15     A.  At that point in time?
16     Q.  Yes.
17     A.  When I was speaking with Mr. Kennedy?
18     Q.  And the group, yes.
19     A.  I didn't mention -- I think I
20 mentioned there would be -- they were going to
21 be announcing it at 10.  I don't think I
22 mentioned a press release.
23     Q.  At the time that you told Mr. Kennedy
24 and the group this information that you received
25 from Mr. Davis, had you heard from Mr. Cadogan

Page 195

1  the Treasury was going to be announcing its
2  refunding needs at 10?
3      A.  You have to rephrase that.  Can you
4  just repeat that?
5      Q.  Sure.
6          You previously testified that you
7  learned about the Treasury refunding
8  announcement, that that was going to be made on
9  October 31st from Mr. Cadogan; is that right?
10     A.  Yes.
11     Q.  And I wanted to know at the time you
12 had your conversation with Mr. Kennedy and the
13 other colleagues to convey the information you
14 got from Mr. Davis's voicemail, had you already
15 been told by Mr. Cadogan the Treasury was having
16 a refunding announcement?
17     A.  I don't think so.  I believe not.
18     Q.  Besides stating that they were going
19 to buy certain amounts of bonds, what, if
20 anything, did Mr. Kennedy, Kurinsky, Smith, or
21 Cadogan say when you told them about Mr. Davis's
22 voicemail?
23     A.  I believe we discussed the fact that
24 we'd heard rumors from the Board of Trade that
25 morning to the same -- exactly the same effect.

Page 196

1          I think I might have shared with them
2  that I'd heard that, and I think they confirmed
3  that they also had heard that.
4      Q.  When you say "they," is there any
5  particular person who you recall confirming that
6  they'd heard about rumors?
7      A.  I don't recall.
8      Q.  What happened after you all stated how
9  much of the 30-year bond you were going to
10 purchase?
11     A.  I believe John Cadogan summed up, you
12 know, what the total amount would be amongst us,
13 and we authorized him to go ahead and make the
14 purchase.
15     Q.  At what I point did Mr. Cadogan tell
16 you there was going to be a Treasury refunding
17 announcement at 10?
18     A.  I'm not certain.  I believe it was
19 subsequent to him starting to work on placing
20 the order, but I'm not certain.
21     Q.  I might have asked this before, but I
22 forgot.  When Mr. Cadogan made the statement
23 about there being a Treasury refunding
24 announcement at 10 a.m., I know you said it was
25 directed to you, was it directed to anyone else

Page 197

1  on the high grade trading desk?
2      A.  Not to my knowledge.  I was looking at
3  him the way that we are looking at each other
4  right now, so we were -- I know we were
5  communicating, as I was communicating to
6  Mr. Kennedy in a manner that everyone could
7  share in that information if they were
8  interested in listening, I believe he was doing
9  exactly the same.
10     Q.  Do you recall where you were standing
11 when Mr. Cadogan informed you about the
12 refunding announcement?
13     A.  Yes.
14     Q.  Where were you?
15     A.  I was standing.
16     Q.  Do you want to look at, I guess it's
17 Exhibit 4?
18     A.  I was standing behind or next to
19 Mr. Kennedy in 243 on your diagram Exhibit 4.
20     Q.  So Mr. Kennedy was either in front of
21 you or next to you when Mr. Cadogan made that
22 statement?
23     A.  Yes.
24     Q.  Do you know if Mr. Kennedy was sitting
25 when Mr. Cadogan made the statement?

50  (Pages 194 to 197)

Steven E. Northern                                      January 31, 2007

Boston, MA

Page 222

```
 1                        Volume:  II

 2                        Pages:   222-326

 3                        Exhibits:  11-23

 4

 5            UNITED STATES DISTRICT COURT

 6            DISTRICT OF MASSACHUSETTS

 7                 (Boston Division)

 8    Civil Action No. 05-CV-10983 (NMG)

 9    - - - - - - - - - - - - - - - - - - - - - - -

10    UNITED STATES SECURITIES AND EXCHANGE

11    COMMISSION,

12                    Plaintiff,

13        v.

14    STEVEN E. NOTHERN,

15                    Defendant.

16    - - - - - - - - - - - - - - - - - - - - - - -

17       Continued Deposition of Steven E. Nothern

18               January 31, 2007

19            9:13 a.m. - 11:53 a.m.

20       Securities and Exchange Commission

21                33 Arch Street

22              Boston, Massachusetts

23

24       Reporter:  Daria L. Romano, RPR/CRR

25
```

Steven E. Northern                                                    January 31, 2007
                              Boston, MA

Page 235

1   A.  This was on the table.
2   Q.  I understand.
3       And I'm wondering how, if at all, the
4   fact that you believe the long bond would be
5   eliminated at some point, how, if at all, that
6   factored into your strategy to shift away from
7   short term to long term?
8       MR. THEODOROU:  Objection.
9   A.  I did believe at the time that the
10  30-year treasury represented value.  Treasuries,
11  both tips and nominal bonds or regular bonds, it
12  was my opinion at the time represented value.
13      One of the reasons would certainly be
14  that -- that there were probably not going to be
15  enough 30-year treasury bonds to go around,
16  either because they stopped issuing, or they
17  slowed down issuing, or they were just put away
18  and not available in the marketplace.
19      30-year treasuries provide a useful
20  function for insurance company portfolios, for
21  mutual fund portfolios, for pension funds that
22  have long-term liabilities to match, and we were
23  facing the very real prospect of there just
24  plain not being enough to go around, at which
25  case they represent value.

Page 236

1       There are other reasons at the time,
2   but that was certainly one of them.
3   Q.  Prior to October 31, 2001, did you
4   have any idea as to when you thought Treasury
5   might cancel the 30-year bond?
6   A.  We'd been looking at that issue for a
7   long time.  I concluded that the prior
8   administration was probably inclined to suspend
9   issuance or stop issuing 30-year treasuries.
10      I had sort of concluded at the time
11  that they punted that issue and sort of left it
12  to the next administration, which is the current
13  administration that took office in early 2001.
14      I think they didn't -- it was
15  appropriate.  They didn't want to tie the hands
16  of the next Treasury secretary, so they let the
17  next administration -- that was sort of my
18  judgment.  Otherwise, I think they were inclined
19  to do it in 2000.
20  Q.  So you thought it would happen with
21  the current administration, which you said took
22  office in early 2001.
23      Did you have any idea of how long
24  after the current administration took office as
25  to when it might be cancelled?

Page 237

1   A.  No.
2   Q.  Did you expect the bond cancellation
3   to be announced at a refunding?
4   A.  No.
5   Q.  Why not?
6   A.  I had no expectations of how they
7   would announce it or decide it.
8   Q.  But you had heard rumors surrounding
9   the August refunding, the possible cancellation
10  being announced at that refunding?
11  A.  I do recall that the August period
12  there had been a lot of talk about it.
13  Q.  I asked you yesterday some questions
14  about what factored into your decision to
15  purchase 30-year bonds on October 31st, and you
16  mentioned the strategy, and I wanted to follow
17  up on that.
18      Was there anything else besides your
19  strategy to shift from intermediate bonds to
20  long-term bonds that factored into your decision
21  to purchase 30-year bonds on October 31st?
22  A.  Yes.
23  Q.  What else?
24  A.  Generally I thought they represented
25  value.  We discussed some of the reasons.  There

Page 238

1   are many other reasons.
2       I think we touched upon yesterday
3   probably the most important reason is that we
4   were in a period of economic slow down.  The
5   shock -- you have to remember, this is just
6   after September 11.  We had taken a kick in the
7   teeth, in a sense.  And, you know, Americans
8   after a few days, we stiffened, but it was a
9   shock to the system.
10      And at this point in time, October 31,
11  there was a lot of uncertainty surrounding what
12  the impact -- and we were at war at that period
13  of time.  So there was a lot of uncertainty in
14  terms of moving forward what the economic
15  environment would be.
16      When business is faced with that and
17  households are faced with that kind of
18  uncertainty, they often become more
19  conservative.  So it tends to lead to more
20  conservative behavior, more modest economic
21  growth, which is the underpinnings for an
22  environment which is less inflationary.
23      We were already in a disinflationary
24  environment at that point in time.  My judgment
25  was that the disinflationary trends would, if

5 (Pages 235 to 238)

# EXHIBIT G

Peter Davis, Jr.                                        April 19, 2006
                        Washington, DC

Page 1

1                  UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3        - - - - - - - - - - - - - - - X

4      UNITED STATES SECURITIES AND   :

5      EXCHANGE COMMISSION,            :

6                 Plaintiff,           :

7         V.                          :   Civil Action No.

8      STEVEN E. NOTHERN,              :   05-10983(NMG)

9                 Defendant.           :

10       - - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          Wednesday, April 19, 2006

13                 Videotape Deposition of PETER DAVIS, JR.,

14     a witness herein, called for examination by counsel

15     for the Plaintiff in the above-entitled matter,

16     pursuant to notice and subpoena, the witness being

17     duly sworn by PENNY M. DEAN, a Notary Public in and

18     for the District of Columbia, taken at the offices of

19     U.S. Securities and Exchange Commission, 100 F

20     Street, NE, Washington, D.C., at 9:37 a.m.,

21     Wednesday, April 19, 2006, and the proceedings being

22     taken down by Stenotype by PENNY M. DEAN, RPR, and

23     transcribed under her direction.

24

25

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

Page 170

1   A.  Yes, they did.
2   Q.  How long did Mr. Fisher speak before the
3   questions?
4   A.  Well, the meeting started at like 9:02 or
5   9:03 or something like that.  And he started taking
6   questions about -- I don't know, 9:15, 9:18,
7   something like that.  And my recollection -- I looked
8   at my watch when I left and it was 9:30.  And I'm
9   very careful about making sure my watch is accurate,
10  I always call up the national time clock.
11  Q.  Did you ask any questions during the
12  October 31st --
13  A.  I raised my hand and almost did, and then
14  I decided I was so angry about what they were doing
15  that I just put my hand down and he called on
16  somebody else.
17  Q.  Why were you angry about what they were
18  doing?
19  A.  Because they were going to stick the
20  taxpayers with roughly a billion dollars worth of
21  interest expense by not issuing long bonds when
22  interest rates were the lowest they had been in two
23  generations since the Depression.  And every other
24  homeowner in the country was trying to lengthen their
25  maturities to get lower payments, Treasury was doing

Page 171

1   the opposite, which was creating an expense, a future
2   expense when the shorter maturities rolled over,
3   taxpayers today are now paying a lot more interest
4   expense.
5   Q.  So what, if any, impact did you believe
6   that the announcement that the 30-year bond would no
7   longer be issued, what if any impact did you think
8   that would have on the market?
9   MR. THEODOROU:  Objection.
10  THE WITNESS:  I anticipated it was going
11  to surprise the market, that it was a total reversal
12  of Treasury policy, that it was done for political
13  reasons and I was just furious at what they were
14  doing.
15  BY MS. WILLIAMS:
16  Q.  Had you heard any rumors that the 30-year
17  bond might be cancelled before you attended this --
18  A.  No, but there was a lot of speculation
19  starting in early 2000 that they would.  And I kept
20  asking people and they kept saying the standard
21  response.  You know, several times Treasury officials
22  told me in these meetings, and you know, for
23  attribution later on and all that, that, you know, no
24  change in policy, you know, we anticipate offering
25  the 30-year.

Page 172

1   And so the last time, in my estimation,
2   that the market expected the 30-year to be -- you
3   know, expected the cessation of the 30-year was in
4   the May or possibly in the August meeting.  And by
5   the October 31st meeting of 2001, the market had
6   given up, just concluded that it doesn't make any
7   sense for Treasury to get rid of it now.
8   Over the summer, in fact, even earlier
9   than that, in the spring and the summer, I had been
10  one of the first people in Washington to say that the
11  federal deficit was going straight up.  And if the
12  deficit is going straight up, the last thing you want
13  to do is take away one of the ways to finance it,
14  especially when interest rates are the lowest they've
15  been in 70 years.  And so it just made no sense and
16  so I was pretty upset about it.
17  Q.  Did you think that this announcement that
18  the 30-year bond was going to be cancelled would have
19  any impact on your clients?
20  A.  Sure.
21  Q.  And what kind of impact did you think it
22  might have?
23  MR. THEODOROU:  Objection.
24  THE WITNESS:  I thought it might hurt
25  them.  I knew it was going to hurt the public, I

Page 173

1   impulsively warned people.
2   BY MS. WILLIAMS:
3   Q.  Did you think that this announcement would
4   have any effect on the price of the bond?
5   A.  Sure.
6   Q.  What kind of --
7   A.  Goes straight up, the biggest one day move
8   in the 30-year in history of the country.
9   Q.  Did you take any notes during this
10  conference?
11  A.  No, I had the materials in front -- at
12  least not that I recall.  I don't -- I don't recall
13  taking any notes.
14  Q.  Let me ask you to look at this --
15  A.  Maybe, I don't know.  It's a long time
16  ago, I don't recall.
17  Q.  Let me ask you to look at what I'm going
18  to have marked as Exhibit 26.
19  (Davis Exhibit No. 26 was marked for
20  identification.)
21  THE WITNESS:  Yes, I did take notes, this
22  is my handwriting.
23  BY MS. WILLIAMS:
24  Q.  You recognize the handwriting on this
25  document?

44  (Pages 170 to 173)

# EXHIBIT H

Page 1

1

2

3

4         UNITED STATES DISTRICT COURT

5      FOR THE DISTRICT OF MASSACHUSETTS

6

  UNITED STATES SECURITIES  )

7 AND EXCHANGE COMMISSION,  )

                    )

8          Plaintiff,  )

                    )

9       vs.       ) No. 05-10983

                    )     (NMG)

10 STEVEN E. NOTHERN,  )

                    )

11         Defendant.  )

  --------------------------)

12

13

14             VIDEOTAPED

15     DEPOSITION OF PETER R. FISHER

16       New York, New York

17        August 8, 2006

18

19

20

21

22

23

24 Reported by:

   PAMELA J. MAZZELLA, RPR

25 JOB NO. 7046

Page 162

1         Fisher
2 recollection. I think the purpose of the
3 meeting would have been to sensitize her to
4 the fact that we would be announcing both the
5 discontinuation of the 30-year bond and a
6 suspension of the Buyback Program, so in all
7 likelihood I conveyed that information to her
8 so she would understand the sensitivity of
9 it, and thus I was concerned about the
10 embargo, but I don't have a specific
11 recollection of the conversation on those
12 points.
13    Q.  I understand.  On October 31, 2001
14 you stated that after the Treasury Refunding
15 Conference you had a discussion with some
16 people on your staff and they conveyed that
17 there had been extraordinary movement of
18 long-term interest rates; is that right?
19    A.  Yes.
20    Q.  What did you mean by "extraordinary
21 movement"?
22    A.  Well, a sudden movement of 3 or 4
23 or 5 basis points, which is, you know, seems
24 rather small, but a very abrupt movement of
25 that size would constitute abrupt volatile

Page 163

1         Fisher
2 movements. 10 basis points in a short period
3 of time would be a huge movement given the
4 context that we're talking about.
5         I don't recall the magnitude of the
6 movements that morning now, but I recall them
7 being -- them bringing to my attention and we
8 all felt rather nervous and awkward about
9 them and understood they portrayed something
10 we should be nervous about.
11    Q.  Now, were these movements -- do you
12 know about the time that the market started
13 moving?  Do you know if this was before or
14 after you made your statement at the
15 Refunding Conference?
16      MR. SHOPE:  Objection.
17    A.  I -- let me understand your
18 question. I don't recall what time the staff
19 came to speak to me.
20    Q.  Okay.  That wasn't really my
21 question.
22    A.  I'm just trying to narrow it down.
23 I recall them showing me, taking me to either
24 a screen I could look at or showing me pieces
25 of paper that would show me movements in

Page 164

1         Fisher
2 long-term interest rates over the period of
3 time after 9 o'clock and before 10 o'clock,
4 so we would collectively be looking at a
5 graph that showed movements in those prices
6 that period of time between roughly 9:30 and
7 10 o'clock.
8    Q.  Okay.  Do you recall, and I don't
9 know if you just answered this, if the
10 movement was between 9 o'clock and 10
11 o'clock?
12      MR. SHOPE:  Objection.
13    A.  I -- my recollection is that it was
14 movements in prices after I finished speaking
15 in my press conference and prior to the
16 release, either 10 o'clock or the several
17 minutes before 10 o'clock when the mistaken
18 electronic announcement was made, so it was a
19 window of time between approximately 9:25 and
20 10 o'clock.
21    Q.  Prior to October 31 had you ever
22 heard of any rumors that the long bond would
23 be eliminated?
24    A.  Let me be very clear.  I don't
25 recall any rumors that the long bond would be

Page 165

1         Fisher
2 eliminated, that is, people speculating they
3 knew what I had concluded to do; that there
4 was debate about whether the Treasury would
5 or wouldn't and some people thought maybe
6 Treasury will and some people thought maybe
7 the Treasury won't.
8         Do you see the distinction I'm
9 drawing?
10    Q.  Yes.
11    A.  I'm trying to draw a distinction
12 between people guessing or anticipating or
13 thinking they make an educated forecast about
14 what the Treasury would do versus someone
15 asserting they knew what the Treasury would
16 do, and I have no recollection of the latter.
17    Q.  Regarding the former, the
18 speculation, the kind of prognosticating what
19 the Treasury might do, do you know in your
20 experience, would those, I'm going to
21 characterize it as rumors, ever move the
22 market?
23    A.  Well, that's a very broad question
24 and the answer to the broad question is yes.
25 In anticipation of what the Treasury might do

42 (Pages 162 to 165)

# EXHIBIT I

Page 1

1

2    UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF MASSACHUSETTS

4    ---------------------------------------X

5    UNITED STATES SECURITIES AND

6    EXCHANGE COMMISSION,

7                       Plaintiff,

8              - against -

9    STEVEN E. NORTHERN,

10                      Defendant.

11   CIVIL ACTION NO.: 05-10983(NMG)

12   ---------------------------------------X

13                   450 Lexington Avenue

                     New York, New York

14

                     June 27, 2006

15                   2:06 p.m.

16

17          VIDEOTAPED DEPOSITION of BRIAN

18   ROSEBORO, pursuant to Notice, before Melissa

19   Gilmore, a Notary Public of the State of New

20   York.

21

22

23

24

25

Brian Roseboro                                                        June 27, 2006
New York, NY

Page 66

1  how active he was.  I don't recall how active
2  he was in the editing process because he was
3  still pretty new to Treasury.  I think he may
4  have come in mid-October or something.
5      Q.   Secretary O'Neal, as far as you were
6  aware, he was the highest decision maker of
7  which you were aware, correct?
8      A.   Correct.
9      Q.   So besides Secretary O'Neal,
10 Mr. Fisher, Mr. Malvey, Mr. Bitsberger and
11 yourself, was there anybody else at Treasury
12 who knew in advance of October 31 that the long
13 bond was no longer going to be issued?
14      MS. WILLIAMS:  Objection.
15      A.   Those are the only people I know for
16 sure.
17      Q.   Is there anybody that you think may
18 have known or probably knew?
19      MS. WILLIAMS:  Objection.
20      A.   Mr. Huther, who worked for
21 Mr. Malvey.  I can't go any deeper than that.
22      Q.   So you're conjecturing that possibly
23 Mr. Malvey had told some of his staff?
24      MS. WILLIAMS:  Objection.
25      A.   Again, Mr. Huther was at some of the

Page 67

1  meetings.  So, again, it's a possibility is the
2  best I can say.
3      Q.   Did you have any anticipation that
4  the announcement that the long bond would no
5  longer be issued would have any affect on the
6  market value of long bonds?
7      A.   We were -- I was not sure as to -- I
8  thought they may have some affect.  I didn't
9  know what type of magnitude or actually what
10 direction it may take.
11      Q.   So as far -- before the
12 announcement, as far as your thought process
13 was concerned, you thought that the market
14 might react by causing long bonds to be less
15 expensive?
16      MS. WILLIAMS:  Objection.
17      A.   There is a saying in financial
18 markets, "You are going to buy on the rumor,
19 sell on the fact."  And given, as I mentioned
20 earlier, this was a topic that had been debated
21 for a while, the idea that the market may have
22 a contrary in reaction to supply being taken
23 away was not out of the realm of possibilities
24 for financial markets, at least in the short
25 term.

Page 68

1      Q.   As far as your own state of mind, as
2  far as you -- your thought was that it was
3  quite possible that the market reaction to the
4  announcement of suspension of the issuance of
5  the long bond might be that the price of long
6  bonds could go down?
7      MS. WILLIAMS:  Objection.
8      A.   That was a possibility.
9      Q.   Did you give any consideration to
10 the idea that it might cause the price of long
11 bonds to go up?
12      A.   Again, it's possible it could go
13 down.  A scenario where it could go up, it
14 could go down, but we were not trading our
15 position, so that was not something I gave a
16 lot of thought to, to be perfectly honest.
17      Q.   Did you consider that the decision
18 to suspend the issuance of the long bond would
19 be market sensitive?
20      A.   Again, it was all conjecture.  The
21 market had been expecting this for a while.  I
22 received questions at the July Quarterly Press
23 Conference from the press about us eliminating
24 the long bond.  I had no idea whether or not
25 they would take it as expected or a surprise,

Page 69

1  no idea.
2      Q.   Was it your belief, going into the
3  October 31 press conference, that the market
4  was actually expecting an announcement that the
5  long bond would be suspended?
6      A.   To be perfectly honest, that wasn't
7  my focus.  Again, our focus is what is the best
8  steps for us to take the Treasury's debt
9  management policy.
10      In the market that we deal with we
11 recognize some people are long, some people are
12 short.  It's not our position to worry about
13 which one of those is it going to affect more.
14 It was our responsibility to worry about what
15 were best steps to take for Treasury's debt
16 management policy.
17      Q.   Okay, but my question wasn't about
18 what your job is.  I understand what you job
19 is.
20      A.   Well, that's what I focused on, my
21 job in terms -- I didn't think about what was
22 happening.  Getting the announcement out,
23 getting the memo, going through our process of
24 getting documents to Public Affairs to be
25 posted, handed out, whatever their procedure

18 (Pages 66 to 69)

Brian Roseboro                                                                June 27, 2006

New York, NY

Page 70

1  was, giving the press conference.
2      Q.   Just to be clear, you had absolutely
3  no awareness as far as what the market was
4  expecting with regard to suspension or not of
5  issuance of the long bond?
6      A.   No.  As I said previously, the
7  market had been expecting it to be eliminated
8  even before we came to Washington to some
9  extent.  So every quarterly refunding it looks
10 like -- if we didn't do it then, then questions
11 would have likely happened in January at the
12 next refunding.
13     Q.   Was it your state of mind that that
14 expectation was continuing going into the
15 October 31, 2001 Refunding Conference?
16     A.   My expectation was the market's
17 state of mind was pretty much on this issue as
18 it was in July.
19     Q.   In other words, that there was still
20 an expectation out there that the Treasury was
21 going to announce suspension of issuance of the
22 long bond?
23     A.   By some, and by some who thought we
24 wouldn't.  That's what makes it a market.
25     Q.   Had you heard -- before October 31,

Page 71

1  2001, had you heard of any rumors that the
2  Treasury was going to be making this decision
3  to suspend issuance of the long bond?
4      A.   No.
5      Q.   So nobody ever called you up and
6  said is it true that you are going to do this?
7          MS. WILLIAMS:  Objection.
8      A.   No, the market was focused on some
9  other issues in October of '01.
10     Q.   Before October 31, 2001, did you
11 become aware of any speculation that the
12 terrorist attacking of September 11, 2001 might
13 cause the Treasury not to suspend issuance of
14 the long bond?
15     A.   Say that again, please.
16     Q.   Sure.  You mentioned that going into
17 the -- let me back up.
18         You had conducted the quarterly
19 refunding conference on August 1 of 2001,
20 right?
21     A.   Correct.
22     Q.   And you had gotten questions at that
23 time about is Treasury going to suspend the
24 long bond, et cetera?
25     A.   Correct.

Page 72

1      Q.   And this was a subject that the
2  market continued to speculate about and discuss
3  going into the October 31 conference, right?
4      A.   Correct.
5      Q.   Had you heard of any discussion
6  going into the October 31 conference that
7  because there had been terrorist attacks on
8  September 11, 2001 that the Treasury might not
9  go ahead and suspend issuance of the long bond?
10     A.   I had not -- I do not recall hearing
11 that.
12     Q.   Did you have any concern that there
13 might be leaks of -- this is before the
14 conference actually occurred on October 31,
15 2001.  Did you have any concern that there
16 might be leaks of the information in advance of
17 the public announcement?
18     A.   I do not recall ever having that
19 concern.
20     Q.   If at any point we need to take a
21 break or you have some sort of emergency call,
22 just let me know.
23     A.   No, keep going, please.
24     Q.   Would you monitor the movements of
25 the markets in the federal debt?

Page 73

1          MS. WILLIAMS:  Objection.
2      A.   More specific, please.
3      Q.   Obviously, in a general way, you had
4  to for your job, but what I'm talking about is
5  like on a daily basis.  In other words, would
6  you get a report or would you even have a
7  Bloomberg screen at yours desk?
8      A.   There was a Bloomberg screen in my
9  office.
10     Q.   That meant that second by second the
11 prices of federal debt securities were on a
12 screen in your office, correct?
13         MS. WILLIAMS:  Objection.
14     A.   They were available to me.  It was
15 not what I was looking at on a second-by-second
16 basis.
17     Q.   Occasionally, would you glance at
18 the screen just to see how the various federal
19 issues were doing?
20         MS. WILLIAMS:  Objection.
21     A.   To be perfectly honest, at the time
22 I had a lot of other things I was working on.
23     Q.   So it was -- well, was there
24 somebody who was under you who had the job of
25 monitoring the prices in the market of the

19 (Pages 70 to 73)

# EXHIBIT J

Page 1

1

2            UNITED STATES DISTRICT COURT

3         FOR THE DISTRICT OF MASSACHUSETTS

4

 UNITED STATES SECURITIES  )

5 AND EXCHANGE COMMISSION,  )
                           )
6            Plaintiff,     )
                           ) Civil Action
7            vs.            ) No. 05-10983(NMB)
                           )
8 STEVEN E. NOTHERN,       )
                           )
9            Defendant.     )
  -------------------------)

10

11

12

13    VIDEOTAPED DEPOSITION OF GALEN CRIQUI

14           New York, New York

15        Wednesday, September 27, 2006

16

17

18

19

20

21

22

23

24 Reported by:
   Elia E. Carrion
25 JOB NO. 7530

Page 130

G. Criqui

1
2 blue sheet said about this announcement that
3 day?
4      A.  I don't.  I don't have that good of
5 a memory.
6      Q.  And you said you expected it to
7 come out at 10 a.m.?
8      A.  Yes.
9      Q.  What was your basis for thinking
10 10 a.m. was the time?
11      A.  Just that's what the sheet had
12 written down.
13          You know, I must say, usually
14 refunding announcements, they're not
15 earth-shattering events; 99 percent of the
16 time they're not.  It just, you know, in this
17 situation something strange was part of the
18 announcement, and that's what made this one
19 very unique.
20      Q.  Did earlier notes regarding an
21 upcoming refunding announcement always have
22 the time of the announcement included?
23      A.  Yes.
24      Q.  And do you recall any previous
25 times for previous announcements?

Page 131

G. Criqui

1
2      A.  No.  No, usually came out as
3 expected.
4      Q.  But it's your recollection that
5 there was always a fixed time for the
6 announcement?
7          MS. WILLIAMS: Objection.
8      A.  Yes, but I wouldn't, I wouldn't
9 testify to that, though.  I don't know for
10 sure, you know.
11      Q.  Do you know the process that the
12 Treasury Department used to make these
13 announcements?
14      A.  I actually do not know.  It's
15 probably something I should know, as a
16 trader.  But we get, we're so dependent on
17 this Bloomberg trading system, which also
18 releases news headlines as well.  With
19 Bloomberg, you have all your functionality,
20 your trading functionality.  At the bottom
21 there's like six or seven lines of news
22 headlines, so I would just look at that.
23          And they're pretty quick, and they
24 get stuff out there quick.  Payroll number on
25 Friday morning at 8:30, it's right there

Page 132

G. Criqui

1
2 quick.  It's just like the refunding
3 announcement is.
4      Q.  But did you have any knowledge
5 regarding whether this information was
6 announced live on TV or at a press
7 conference --
8      A.  No.
9      Q.  -- or through other means?
10         MS. WILLIAMS: Objection.
11      A.  Not, certainly not at that time,
12 no.
13      Q.  Did you know whether the Treasury
14 Department released its information pursuant
15 to any kind of embargo?
16      A.  No.
17      Q.  Now, in 2001, were you familiar
18 with any kind of speculation about the
19 possible suspension or elimination of the
20 bond, prior to October 2001?
21         MS. WILLIAMS: Objection.
22      A.  Yeah, I mean just, just
23 speculating, it was, it was a, it was a
24 remote, remote possibility.
25         And I really only say this more so

Page 133

G. Criqui

1
2 from a positional standpoint.  At that time,
3 and I think this is relevant, at that time I
4 had my Galen book, I'm trading the bond,
5 yield bond; but I also mentioned I was part
6 of this strip book, which is bigger, bigger
7 operation and the, you know, we had a big
8 position over there.  We were short some
9 bonds, and I was -- we were short a pretty
10 significant portion of bonds on spread versus
11 off-the-run bonds, just a spread trade, not a
12 duration, we're not short outright.  And you
13 know, the treasury had just done buy-backs
14 the year before, so they bought at least 30
15 billion long bonds back, old bonds, old long
16 bonds in particular.
17          So, you know, I guess there's
18 always the possibility that they could cancel
19 it, but like I said, number one, they'd just
20 done all these buy-backs; and number two, we
21 were just about to go into war with
22 Afghanistan, which involves a lot of
23 spending, a lot of deficit spending and
24 whatnot, so the market was not anticipating a
25 cancellation whatsoever.

34 (Pages 130 to 133)

Page 134

1          G. Criqui
2          And lastly, in hindsight, judging
3 by the way the market reacted to this news,
4 it really was not -- it wasn't even a tenth
5 of one percent priced in that they would
6 cancel this bond.
7     Q.  You mentioned buy-backs earlier.
8          What's the purpose of buying back a
9 certain kind of debt by the Treasury
10 Department?
11    A.  Just to narrow the deficit when --
12 you know, during the Clinton years the
13 economy was in great shape, and they had,
14 they had treasury surpluses.  What do you do
15 with that money?  They bought back some of
16 the debt, just to bring down the deficit, the
17 outstanding deficit.
18    Q.  And is the point to make liquidity
19 in a certain part of the treasuries market?
20    A.  Nah, I don't know, I couldn't
21 really answer.  Liquidity's a pretty vague
22 term as it is.
23          Did it provide more liquidity to
24 buy-backs?  Probably less, probably reduced
25 it.

Page 135

1          G. Criqui
2     Q.  You cited the fact that treasury
3 had been carrying out these buy-backs of long
4 term debt; is that correct?
5     A.  Yes.
6     Q.  And you cited that as, you know,
7 one possible reason why suspension or
8 elimination of 30-year bond may, might occur?
9     A.  Yeah, just very remote, remote
10 possibility.
11          Like I said, when we were carrying
12 a short in the bond in our other book, pretty
13 significant size, you know, you just -- those
14 are the kind of things, as a cynical trader,
15 which most goods ones are, are in the back of
16 your head.  You know, they did do some
17 buy-backs here in the 30-year; you know, who
18 knew that in one year's time we'd go from a
19 surplus to a deficit?
20          But it was, you know, it was
21 definitely something in the back of our head,
22 but mainly and primarily because of the size
23 of the position we had in our big book.
24    Q.  Do you know who Peter Fisher is?
25    A.  I believe he was one of the Fed,

Page 136

1          G. Criqui
2 New York chairman, something like that,
3 right?  Was it -- at the time, though, he
4 might have been the -- I don't want to sound
5 too stupid here, but he was, what was he?  I
6 should remember.
7          I'm not supposed to ask you
8 questions, but he was the treasure --
9     Q.  I'll represent to you at the time
10 of this --
11    A.  -- treasury secretary.
12    Q.  -- he was the undersecretary --
13    A.  Undersecretary, that's it.
14    Q.  -- of the Treasury Department.
15    A.  Thank you.
16    Q.  Are you aware of any comments that
17 Mr. Fisher may have made in 2001, regarding
18 treasury's plans on buying back debt?
19    A.  Not, not that I could quote, no,
20 not that I could remember very well.
21    Q.  Are you familiar with the treasury
22 borrowing advisory committee?
23    A.  The TBAC, a little bit.  Sometimes
24 I would see the recommendations over the top
25 and no one really took them too seriously,

Page 137

1          G. Criqui
2 because there were some major customers that
3 were on the TBAC that were somewhat in
4 question, their motives; some of the
5 recommendations, you know, self-serving,
6 perhaps, or whatever; but nothing that I
7 could really comment on or really remember
8 that well now.
9     Q.  Just tell me about your
10 understanding of the TBAC and self-serving
11 interest.
12    A.  Well, that there's, I would say
13 there's probably ten to twelve members, and I
14 would say maybe even half, this is all off
15 top of my head, half of them probably
16 represented buy side customers, maybe even a
17 couple of hedge fund representation even on
18 there.  And, you know, you never know what
19 they're recommending and how that, you know,
20 relates to their trading position, you know.
21    Q.  Do you know what weight the senior
22 officials in the Treasury Department gave to
23 recommendations of the borrowing advisory
24 committee?
25    A.  I don't know.  Probably nothing.

35 (Pages 134 to 137)

# EXHIBIT K

Page 1

Volume:  I

Pages:  1-183

Exhibits:  1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND

EXCHANGE COMMISSION,

          Plaintiff,

     v.          Civil Action No.  05-10983(NMG)

STEVEN E. NOTHERN,

          Defendant.

- - - - - - - - - - - - - - - - - - x


DEPOSITION OF JOHN CADOGAN

Wednesday, November 29, 2006

8:44 a.m.

FOLEY HOAG LLP

155 Seaport Boulevard

Boston, Massachusetts  02210-2600



Court Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

Videographer:   Jody Urbati

John Cadogan                                                                11/29/2006

---

Page 170

1    A. Market convention is typically you tell them
2  that they are done.
3    Q. So to actually say the word "done"?
4    A. That is correct.
5    Q. At the time that you say "done," is that
6  when the trade is executed?
7         ATTY. SHOPE: Objection.
8    A. As a rule of thumb market convention is when
9  I say "done," the trade is done. The only time
10 there is a change is if the salesperson says, before
11 I say "done," say "change" or "subject."
12   Q. Do you recall if Mr. St. Pierre, on October
13 31, said "change" or "subject" with regard to this
14 execution of $65 million?
15   A. I don't remember.
16   Q. If the salesperson says -- person says
17 "change" or "subject," what happens to the execution
18 of that trade?
19   A. There is no trade if they say "change" or
20 "subject," and I haven't already said "done."
21   Q. I believe you testified that you were on the
22 telephone and received some sort of indication from
23 the Portfolio Managers on the morning of October 31,
24 2001 before this execution of the $65 million

---

Page 171

1  trade; is that correct?
2    A. Yes.
3         ATTY. SHOPE: I'm sorry, may I have that
4  question and answer reread.
5         (Question and answer read.)
6         ATTY. SHOPE: Note my objection to the
7  form of the question.
8    Q. Do you --
9         ATTY. SHAPIRO: I'm sorry. Mr. Cadogan,
10 just -- I know we have been at it a while, just
11 before you answer a question, give a pause or two in
12 case Mr. Shope or myself wants to object, or Ms.
13 Williams wants to object to her own questions.
14   Q. Do you recall who was signalling to you?
15   A. I don't recall, no.
16   Q. I believe you also testified that you
17 received a verbal, verbal order, before you placed
18 the $65 million.
19   A. Yes.
20   Q. Did you check the FITS system to see if
21 there had been any orders entered into that system?
22   A. I don't believe I did, no.
23   Q. Do you know when the Portfolio Managers who
24 placed orders that then became the $65 million

---

Page 172

1  trade entered information regarding those orders
2  into the FITS system?
3    A. I don't remember the exact time.
4    Q. I believe you testified that you had heard
5  some rumors on October 31 regarding the possible
6  elimination of the long bond?
7         ATTY. SHAPIRO: Objection.
8    Q. Is that true?
9    A. I do have some memory of hearing that, yes.
10   Q. Do you know how you learned of these rumors?
11   A. I don't remember exactly, no.
12   Q. Did you ever, on October 31, learn that the
13 Treasury had made a refunding announcement
14 announcing the elimination of the 30-year bond?
15   A. Could you say that again.
16   Q. Did you ever learn on October 31 that the
17 Treasury Department had made an announcement
18 announcing the elimination of the 30-year bond?
19   A. I believe it was announced publicly at 10:00
20 a.m. that morning.
21   Q. How did you learn about this public
22 announcement?
23   A. I believe it was released on the news
24 services.

---

Page 173

1    Q. Do you recall seeing the announcement on a
2  news service?
3    A. I don't remember specifically, no.
4    Q. Do you recall having any conversations with
5  any Portfolio Managers about the announcement that
6  came at 10:00 a.m. from the Treasury?
7    A. Before 10:00 a.m. or in general?
8    Q. In general.
9    A. I believe it might have been discussed
10 generally on the desk, but I don't remember any
11 specifics.
12   Q. And this is after the announcement had been
13 made by the Treasury Department?
14   A. From what I can remember, yes.
15   Q. Do you recall having any discussions before
16 the announcement was made by the Treasury
17 Department?
18   A. No.
19   Q. If you could refer to Exhibit 7, please,
20 Page 2, and I'm referring to the bottom box
21 reflecting the $14 million trade; do you see that
22 box?
23   A. Yes.
24   Q. Did Mr. Nothern provide you any reasons for

---

44 (Pages 170 to 173)