UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 05-10983 (NMG) |
| | : | |
| v. | : | |
| | : | |
| STEVEN E. NOTHERN, | : | **Leave to file granted on April 28, 2008** |
| | : | |
| Defendant. | : | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF
HIS MOTION TO TAKE SUPPLEMENTAL DEPOSITIONS**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO #6443249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  April 15, 2008

## <u>TABLE OF CONTENTS</u>

A.    Based on the Declarations Obtained by the SEC, Nothern Withdraws His
      Request to Reopen the Deposition of Paul Malvey. ....................................................1

B.    Nothern Has Diligently Sought Information Relating to Treasury's Advance
      Disclosures and the SEC's Factual Assertions Are Untrue. ...................................2

      1.    Nothern's discovery efforts...........................................................................2

      2.    Kehoe's report from the European central bank ........................................3

      3.    Other reports on "rumors as early as 9 a.m." ............................................4

      4.    The SEC's longstanding knowledge of these witnesses' identities ............5

C.    The Information Sought is Relevant and Admissible. ............................................6

      1.    The witnesses received specific and credible advance information
            about Treasury's decision. ..........................................................................6

      2.    The information received by Kehoe, Sbarra, and Haskell is
            "appreciably different." ................................................................................7

      3.    There is no cumulativeness of evidence. ....................................................9

      4.    The hearsay rule is inapplicable................................................................10

      5.    Lehman's trading on October 31, 2001 is highly relevant........................11

D.    The Requested Depositions May Be Conducted Without Extending Any
      Other Case Deadlines.............................................................................................14

Conclusion ........................................................................................................... 15

Defendant Steven Nothern respectfully submits this reply memorandum in further support of his motion for leave to conduct additional depositions for the limited purpose of establishing the admissibility of certain newly-disclosed evidence (Dkt. #94). In this brief, Nothern (i) withdraws his request to reopen the deposition of Paul Malvey, and (ii) corrects several misstatements in the SEC's opposition brief (Dkt. #97, referred to herein as "Opp.") with respect to Nothern's continuing request for leave to depose Derek Kehoe, Robert Sbarra, and Patrick Haskell.

## A.    Based on the Declarations Obtained by the SEC, Nothern Withdraws His Request to Reopen the Deposition of Paul Malvey.

As Nothern explained in his initial brief, Dkt. #95 at 11-13, he sought to reopen the deposition of the Treasury Department's former Director of Market Finance Paul Malvey for the limited purpose of inquiring into his family relationship with John "Jack" Malvey, a prominent bond strategist at Lehman Brothers. This possible relationship appeared to have been discussed by Paul Malvey with the SEC and Treasury during their joint interview on January 14, 2002, according to handwritten interview notes produced by Treasury to Nothern in December 2007. *See* Dkt. #96, Ex. B at 6 (notes stating "Relatives in financial industry: Jack Malvey at Lehman"). Furthermore, at her deposition on February 8, 2008, former Treasury economist Jill Cetina testified that in 2004 she had heard that the two men were related and "had some concerns . . . knowing that Paul had a relative at Lehman Brothers." *See id.*, Ex. H at 52-53, 167-69.

In the series of phone conferences conducted by the parties pursuant to Local Rule 7.1, the SEC admitted that its attorneys were present at the interview of Paul Malvey on January 14, 2002, but indicated its view that Treasury's interview notes and Cetina's testimony might not be accurate on this point. *See* Dkt. #95, at 11 n.2. The SEC did not, however, provide any further

information. Although it is unfortunate that the SEC did not provide affidavits or other information attesting to the absence of a family relationship until after Nothern filed his motion, in light of these affidavits Nothern withdraws his request to reopen the deposition of Paul Malvey.

**B.    Nothern Has Diligently Sought Information Relating to Treasury's Advance Disclosures and the SEC's Factual Assertions Are Untrue.**

The SEC's primary argument with respect to Nothern's remaining requests is that he should have sought this discovery earlier. "There is no excuse," it argues (Opp. at 4), "for Nothern's failure to pursue the depositions of Kehoe, Sbarra, [and] Haskel prior to the close of fact discovery in this case." The asserted factual basis for this argument is simply untrue.

**1.    Nothern's discovery efforts**

As the Court is aware, fact discovery in this case was initially scheduled to conclude on December 15, 2006. *See* Dkt. #40 (parties' joint motion, granted on August 10, 2006). This deadline was extended first indefinitely, *see* Dkt. #64 (parties' joint motion, granted on March 13, 2007), and then by the Court to February 29, 2008, *see* Dkt. #93, for the limited purpose of permitting depositions of key witnesses, such as Jill Cetina, whom Treasury had refused to provide, and to obtain documents that Treasury had refused to produce. Only after litigating two separate actions against Treasury under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, was Nothern able to obtain this critical information.

It is therefore incorrect for the SEC to suggest (Opp. at 17) that Nothern has failed "to diligently pursue discovery" in this matter. To the contrary, for the last three years Nothern has pursued every available legal avenue to obtain the information needed for his defense. The SEC has in fact vigorously criticized Nothern for his efforts. *See, e.g.*, Dkt. #69 at 1 (criticizing

Nothern for his "overly broad and unduly burdensome document requests"); Dkt. #75 at 3-4 ("The more Treasury employees Nothern deposed, the more employees he sought to depose.").

### 2.    Kehoe's report from the European central bank

With respect to the currently requested deposition of Derek Kehoe, Nothern explained in his initial brief that, prior to the deposition of Jill Cetina, no witness or document produced to him had identified Kehoe as the "dealer in London" who told Cetina about the "rumor that the long bond would be eliminated yesterday [October 30, 2001 – the day before Treasury's announcement] from a European central bank." *See* Dkt. #8-9. In its opposition, the SEC contends (Opp. at 16) that "[t]his claim is not true." It points to a single e-mail exchange produced by Treasury in February 2007 – Dkt. #96, Ex. G (FOIAKBC 437) – sent from Cetina to Kehoe at 10:11 a.m. on October 31, 2001. This e-mail, the SEC writes (Opp. at 17), "shows that Kehoe was the primary dealer 'in London' that Cetina claims she communicated with on October 31, 2001."

But the cited e-mail exchange shows no such thing. First, the e-mail does not contain any reference to information received or reported by Kehoe, or to any communications between Kehoe and a European central bank. In fact, the only message from Kehoe consists of two words: "Thanks Jill!" (Cetina had apparently just sent Kehoe a copy of Treasury's refunding announcement.) Furthermore, even though the SEC describes the e-mail as being sent from "Kehoe, of HSBC London" and claims that it identifies Kehoe as "the primary dealer 'in London'", there is no indication of Kehoe's London location in either his e-mail address ("DEREK KEHOE, HSBC, TSY & CAP MKTS [mailto: DKEHOE@bloomberg.net]") or the text of the messages below. In any event, as an "international economist" in Treasury's market room, *see* Dkt. #96, Ex. F at 1, Cetina was presumably in contact with more than one dealer in London, one of the world's financial centers. There is simply no basis for the SEC's claim that

Nothern could have concluded from this single and obscure e-mail exchange, or any other documents, that Kehoe was the bond dealer in London who told Cetina that a European central bank had reported the plan to suspend the 30-year bond a day before Treasury's official announcement.

### 3.    Other reports on "rumors as early as 9 a.m."

The SEC's argument with respect to Robert Sbarra and Patrick Haskell is similarly unfounded.  To recap, Jill Cetina testified that either Sbarra from HSBC or Haskell from Credit Suisse First Boston sent her an e-mail on the morning of October 31, 2001 stating, "Jill, We definitely heard rumors as early as 9am which were flattening 5s/30s prior to the official news . . . ."  Dkt. #96, Ex. H at 94-96.  Cetina subsequently cut and paste this message (without identifying the sender) and forwarded it to several top officials at Treasury with the heading "[s]ome thoughts on e-mail from a primary dealer contact."  *See id.*, Ex. F at 4-6.  According to the handwritten notes that this Court ordered Treasury to disclose in December 2007, Cetina told the SEC and Treasury about these reports from Sbarra or Haskell (misspelled "Hascal") in November 2001.  *See id.*, Ex. A at 3.  Neither agency, however, provided that information to Nothern.

Now, the SEC contends (Opp. at 16) that two e-mails in Treasury's FOIA production of February 2007 – Dkt. #96, Ex. G (FOIAKBC 400, 401) – "unequivocally" and "clearly" identify Sbarra and Haskell as the "primary dealers" in question.  Once again, the cited documents contradict the SEC's position.  Each document consists of only one substantive e-mail message, from Cetina to the trader.  In each message, Cetina referred to an earlier conversation in which the trader "expressed strong concerns about non-website related leaks," and encouraged the trader to contact Assistant Secretary Brian Roseboro.  There is no reference in either message to rumors heard "as early as 9 a.m.," or to the "flattening" effect on the yield curve resulting from

the drop in yield of the 30-year bond. It is important to note that "as early as 9 a.m." would mean <u>before</u> Treasury even began the press conference attended by Peter Davis.

Thus, contrary to the SEC's claim (Opp. at 17), neither of these e-mails revealed "the substance of [the trader's] concerns." There was no basis for Nothern to conclude that Cetina's reference to "non-website related leaks" referred to anything other than the anger and disbelief generally experienced in the financial markets at the obvious dissemination of the information in advance of the supposed 10:00 a.m. embargo, starting with Davis's first call around 9:28 a.m. after the press conference had ended. The SEC can hardly say that Nothern was obligated to depose each of the many market participants who had complained about Treasury's mismanagement of the release that morning.

**4.    The SEC's longstanding knowledge of these witnesses' identities**

The identity of the "primary dealers" who informed Cetina about the advance reports of Treasury's decision has been a matter of vital interest to Nothern for years. Nothern cited these reports in his *Touhy* request to depose Cetina on May 18, 2006. *See* Dkt. #51, Ex. A at 5. He cited them again in his motion in this case challenging Treasury's refusal to allow the Cetina deposition, *see* Dkt. #45 at 4-5, in his objections to the Magistrate Judge's ruling, *see* Dkt. #65 at 5, 12, and in his separate APA action against the agency, *see Nothern v. U.S. Department of the Treasury*, No. 07-cv-10347-NMG (D. Mass.). The SEC, by contrast, has known about the identity of these traders since <u>November 2001</u>, according to the handwritten notes disclosed by Treasury on December 10, 2007, but has done nothing to assist Nothern in his discovery efforts.[1]

---

[1] For example, in an effort to resolve the dispute on Treasury depositions, counsel for Nothern proposed on November 8, 2006 that the SEC make a written request asking Treasury asking to authorize the depositions at issue. *See* Dkt. #51, Ex. M. at 1. The SEC rejected Nothern's proposal. *Id.*; Dkt. #50, at 9-10.

It is therefore disingenuous for the SEC to argue now (Opp. at 17) that Nothern failed to act "diligently" by not seeking depositions of Kehoe, Sbarra, and Haskell during the two-month period between Treasury's disclosure of its handwritten notes and the deposition of Cetina herself on February 8, 2008 (a deposition which Nothern succeeded in scheduling only after repeated requests by counsel and two additional orders by this Court, *see* Dkt. #95 at 4-5). Nothern had no entitlement to take these depositions then (the previous extension was solely for purposes of the witnesses Treasury had withheld). Nothern did not know of their importance until after Cetina's deposition, and Nothern reasonably sought to moot the issue by seeking a stipulation as to Cetina's testimony, the transcript of which was not prepared until February 11, 2008. *See* Dkt. #96, Ex. D. Contrary to the SEC's suggestion (Opp. at 3), Nothern does not condemn the SEC for failing to make certain stipulations, but it was reasonable for him to request that it do so in order to minimize the expense to both parties before seeking additional depositions.

### C. The Information Sought is Relevant and Admissible.

The SEC further argues, somewhat inconsistently, that the Court should deny leave to depose Kehoe, Sbarra, and Haskell because their testimony would be (i) cumulative "additional rumor evidence, and (ii) inadmissible hearsay. Neither point has merit.

#### 1. The witnesses received specific and credible advance information about Treasury's decision.

First, the SEC argues (Opp. at 13-14) that the testimony of Kehoe, Sbarra, and Haskell would be cumulative because "the parties in this case have already established evidence that general rumors about the possibility of Treasury cancelling the 30-year bond were circulating in the market on or about October 31, 2001," and that the anticipated testimony of Kehoe, Sbarra, and Haskell would be "not appreciably different." It writes:

> At least nine witnesses have testified that general rumors and speculation regarding the possible elimination of the bond had been circulating the market in the days and months prior to Treasury's October 31, 2001 announcement. Indeed, witnesses testified that there had been speculation and rumors in the U.S. and European markets about the possible elimination of the 30-year bond for over a year.

Opp. at 13.

Nothern agrees that such rumors and speculation are relevant insofar as they show the market's general anticipation of Treasury's decision. Information "that has become public through rumors or other sources should not be considered non-public for purposes of § 10(b) and Rule 10b-5." *United States v. Cusimano*, 123 F.3d 83, 89 (2d Cir. 1997). Thus, evidence regarding the existence of "rumors, word of mouth or other sources," *see id.* at 89 n.6; Leonard B. Sand *et al., Modern Federal Jury Instructions*, Instruction 82-6, at 82-39 (2006), may well establish that Treasury failed to preserve the information's confidentiality prior to October 31, 2001.

### 2. The information received by Kehoe, Sbarra, and Haskell is "appreciably different."

The SEC errs, however, when it suggests (Opp. at 14) that the information that Kehoe, Sbarra, and Haskell received on October 30 and the early morning of October 31, 2001 was "not appreciably different" from other rumors and speculation. On October 30, for example, Derek Kehoe received from a European central bank – a far more definite and reliable source than the typical rumor in the marketplace – information that the 30-year bond would be eliminated the next day. *See* Dkt. #96, Ex. H at 103-05. As discussed in Nothern's initial brief, due to regular consultations of this type, officials at Treasury or the White House may have disclosed this information to European central banks in the days prior to October 31, 2001. *See* Dkt. #95 at 9 & n.1.

Indeed, one of Nothern's key defenses in this case is that Treasury failed to maintain the confidentiality of its decision on the 30-year bond information prior to Treasury's 9:00 a.m. press conference. Nothern contends that Treasury failed to do so as a result of a remarkable series of mistakes and misjudgments, including its decision to reject Under Secretary Peter Fisher's recommendation that the announcement be made directly to the public; its failure to use "lock-down" embargo methods used by other federal agencies; its distribution of the announcement to CNBC at 8:57 a.m.; its circulation of the announcement at the press conference with the heading "FOR IMMEDIATE RELEASE"; and allowing Davis, a private citizen, to attend the press conference and then leave (along with the other attendees) more than a half hour before the embargo period purportedly ended. Kehoe's, Sbarra's, and Haskell's specific advance knowledge of Treasury's announcement on October 30 or the early morning of October 31, 2001 is indisputably relevant to that defense.

The SEC's inability to distinguish general rumors and speculation from Kehoe's report of the decision from a highly credible source is ironic, since the SEC elsewhere contends (Opp. at 14) that the voice-mail message left for Nothern at around 9:38 a.m. was itself more "specific and reliable" that the other information circulating through the markets and that for this reason he is guilty of insider trading.[2] Of course, because Kehoe, Sbarra, and Haskell have not been questioned about the nature of the information they received, that contention is only speculation. Treasury economist Cetina believed that their reports were "noteworthy and worth sharing with others in the department," Dkt. #96, Ex. H at 105, and the SEC and Treasury considered it

---

[2] Of course, if Kehoe, Sbarra, and Haskell testify that, as a result of both apparent leaks and inadequate procedures, Treasury's decision was obtained by market participants before Treasury announced it at its 9:00 a.m. press conference, the SEC's claim will fail regardless of the purported specificity and reliability of the 9:38 a.m. message.

necessary to conduct multiple interviews of Cetina in 2001 and 2002 to find out what she knew. Now that Nothern has learned what the SEC knew years ago about Cetina's market sources, he is entitled to question those sources themselves about their specific advance knowledge of Treasury's decision to suspend the 30-year bond.

### 3.    There is no cumulativeness of evidence.

Next, the SEC argues (Opp. at 13-14) that "[s]ome of the evidence obtained by the parties" already shows that there were "rumors about the possible cancellation of the bond" on the morning of October 31, 2001. Because such rumors were supposedly "not appreciably different" from the information received by Kehoe, Sbarra, and Haskell, the SEC argues, any further evidence would be "cumulative." However, it is clear that the SEC seeks to "whipsaw" Nothern by challenging the other evidence at trial either on grounds of credibility or hearsay, while precluding him from obtaining the evidence of Kehoe, Sbarra, and Haskell. Notably, the SEC has refused to stipulate to the admissibility of other rumor evidence. *See* Dkt. #96, Ex. E at 2, 4-5.

Significantly, one item of evidence cited by the SEC (*see* Opp. at 14), is Nothern's own testimony that he had heard "rumors from the [Chicago] Board of Trade that morning" about Treasury's 30-year bond decision. Dkt. #98, Ex. F at 195-96. Yet elsewhere in its brief, the SEC makes clear its plan to challenge the credibility of this testimony. *See* Opp. at 6 n.7 (arguing that "Nothern claims that he had heard a rumor about the cancellation of the bond" but "took no action to purchase bonds" on it). Indeed, the SEC apparently intends to challenge Nothern's testimony generally, since if credited the SEC would have no case. Thus, in addition to showing Treasury's failure to protect the confidentiality of its decision, testimony from Kehoe, Sbarra, and Haskell will also corroborate Nothern's testimony on this important point.

Moreover, a critical aspect of Nothern's defense is that, even if the information were not "public," Nothern was justified in believing that it was based on the report from the Board of Trade, his observation of general upward price movement (which Cetina and others confirmed), and his knowledge that Peter Davis had likely called several other major market players first (as Davis in fact had). In other words, testimony as to the existence of other rumors of similar specificity relates directly to the key element of scienter in this case.

### 4.    The hearsay rule is inapplicable.

The SEC next argues (Opp. at 15) that testimony "concerning purported rumors that Kehoe, Sbarra and Haskel heard from other market participants is likely to be inadmissible hearsay." The SEC is mistaken. As discussed above, evidence of rumors and "word of mouth" reports in the markets is directly relevant to whether information is "nonpublic" under Section 10(b) and Rule 10b-5. *Cusimano*, 123 F.3d at 89; *SEC v. Gonzalez de Castilla*, 145 F. Supp. 2d 402, 412 (S.D.N.Y. 2001) ("Evidence of widespread speculation or rumors of impending corporate actions weighs against a finding that the information in nonpublic."). Evidence relating to the existence of rumors is not hearsay when, as here, it is not offered for the truth of the rumors but for the fact that the rumors existed. *Southerland v. Sycamore Comm. Sch. Dist. Bd. of Educ.*, 277 F. Supp. 2d 807, 816 (S.D. Ohio 2003).

The authority cited by the SEC actually supports Nothern. In *United States v. Blackwell*, 459 F.3d 739 (6th Cir. 2006), the court ruled that one witness (Adams) had been properly excluded from recounting a <u>conversation</u> with another individual (Jehn) in which the two had discussed the existence of rumors. This testimony had been offered to prove that <u>both</u> witnesses had heard rumors. *Id.* at 755. "Importantly," the court observed, "Adams, who actually saw the rumor on Yahoo, was permitted to testify that there was a rumor on Yahoo about the buyout." *Id.* In other words, testimony about a witness's direct observation of rumors is admissible,

whereas testimony about a conversation discussing rumors obtained from other sources is not. Because Nothern seeks to introduce only the former with respect to Kehoe, Sbarra, and Haskell – *i.e.*, their direct receipt of advance information on the 30-year bond on October 30 and 31, 2001 – the SEC's evidentiary objection is without merit.

### 5.    Lehman's trading on October 31, 2001 is highly relevant.

In addition, leave should be granted for the deposition of Patrick Haskell so that he may testify regarding the role of Lehman Brothers, one of the largest bond traders in the nation, in these events.  According to Jill Cetina, Haskell complained that certain firms "had an inside track on what Treasury was doing," Dkt. #96, Ex. H at 44-45, 82-84, and specifically identified Goldman Sachs and Lehman as two firms that had been buying the 30-year bond prior to 10:00 a.m., *id.* at 49-50.  According to evidence obtained by the SEC during its investigation, Lehman Brothers made large purchases in 30-year bond futures contracts prior to 9:32 a.m.  *See id.*, Ex. L at 41-51.  (The SEC itself has affirmatively alleged the purchases by Goldman Sachs.)

In its brief (Opp. at 8-10), the SEC responds angrily to Nothern's observations about the evidence gathered to date regarding the relationship between Treasury and Lehman, calling Nothern's account "factually baseless and far-fetched," "fictionalized," and "specious," among other things.  But it is the SEC's brief that is based on fiction.

Regarding Nothern's claim that Treasury's former Director of Market Finance Paul Malvey "may have tipped Lehman," the SEC writes (Opp. at 10 n.10) that Malvey "made no such admission."  But Malvey's deposition speaks for itself.  He testified that Timothy "Woody" Jay – at the time, both the head of Treasury trading at Lehman and vice chairman of the Treasury Borrowing Advisory Committee – directed his employee Drew Matus to meet with Treasury officials to review Lehman's financial forecasts. Dkt. #96, Ex. K at 249.  The meeting occurred on or about October 22, 2001, nine days before Treasury's official announcement.  After

reviewing Matus's draft forecasts, Malvey asked if he was "ready to go with alternatives."  *Id.* at

250.  "I just remember looking and seeing if it's feasible, because we were making so many

changes, and, you know, I may have asked him, do you have an alternative scenario if the long

bond is not there, or something like that."  *Id.* (emphasis added).  He continued:

> I don't recall the discussion coming up.  But I wouldn't be surprised if I
> said things like, do you have an alt – what if – what if we – the – what if the long
> bond is eliminated sometime in the next year, do you have an alternative for that.

*Id.* at 252 (emphasis added).

Immediately following his meeting with Malvey, Matus told Jill Cetina that Treasury was

going to eliminate the 30-year bond.  *Id.*, Ex. H at 53-59.  Even though Cetina worked at

Treasury, she did not yet know about the 30-year bond decision, and Matus's comment made her

"a bit taken aback" because "it was an unusual view" that she had not heard from other dealers.

*Id.*  She testified:

> I had some concerns because again, I was a little surprised to have Drew
> talking about the elimination of the bond.  Again, you know, he seemed to have
> this view.  He had met with Paul and the concern really became – I wasn't that
> worried about it, you know, around the 20th, 23rd whenever it was that those
> meetings occurred, it was more when I had other dealers on the morning of the
> 31st attributing some of the trading activities to Lehman Brothers that I became
> concerned about whether there was any kind of link between a meeting that Drew
> may have had . . .

*Id.* at 165.

There is therefore compelling evidence that Malvey may have tipped Lehman about

Treasury's 30-year bond decision nine days before it was officially announced.  The SEC,

however, has apparently now chosen to look the other way, even though Treasury's notes

indicate that the SEC deemed certain unnamed Treasury employees "not totally forthcoming."

Dkt. # 96, Ex. B at 11.  The SEC describes Cetina's testimony as "unsubstantiated" (Opp. at 8)

and has submitted rebuttal declarations from both Drew Matus and Paul Malvey, Dkt. ##99, 101.

Significantly, Matus does <u>not</u> deny in his declaration that he received information from Malvey about elimination of the 30-year bond, but instead states only that Treasury's October 31, 2001 announcement of an "<u>immediate</u>" suspension of the 30-year bond "came as a surprise." Dkt. #101 at ¶ 5. This careful drafting implies that Matus expected what Malvey testified he was recommending internally at Treasury – the initial announcement of a suspension prior to a final scheduled 30-year auction in 2002, a decision that itself could move the market. *See* Malvey Dep. at 244-47 (attached as Exhibit A).[3]

Similarly, Malvey does not discuss his October 22 meeting with Matus, and states only that he did not provide "pre-announcement information concerning [Treasury's] decision to cancel the 30-year bond <u>in October 2001</u>." Dkt. #99 at ¶ 4 (emphasis added). Because Malvey's testimony is that he may have told Matus to consider cancellation "sometime in the next year," Dkt. #96, Ex. K at 252, the same proposal he was recommending to his superiors at the time, *see* Malvey Dep. at 244-47 (Exhibit A), on this critical point these two declarations amount to "non-denial denials." And indeed, Matus's report to his clients on October 24, 2001 that there was "[c]ontinued talk of the elimination of the 30-year bond" but that issuance would continue into 2002, *see* Dkt. #101, Ex. A, is consistent. The SEC's contention (Opp. at 9) that "Matus had no idea of Treasury's decision" is unsupported, and evidence of advance trading by Lehman on the morning of October 31, 2001, which Haskell apparently has, is plainly relevant.

Clearly, the SEC would prefer to set this troubling evidence aside so as not "to complicate this simple insider trading case." Opp. at 8. Because Malvey's apparent leak to Lehman shows that Treasury did not adequately protect the confidentiality of its information –

---

[3] Matus apparently shared Paul Malvey's recommendation with others at Lehman, since Jack Malvey was likewise surprised by the news that Treasury intended to "immediately" suspend the 30-year bond. *See* Dkt. #100, ¶¶ 3-4.

and indeed allowed the information to escape to other major market participants before its

official announcement – Nothern is entitled to ask witnesses with relevant knowledge, such as

Haskell, about it.

> **D.     The Requested Depositions May Be Conducted Without Extending Any Other Case Deadlines.**

Lastly, as Nothern clearly stated in both his motion and his initial brief, he seeks to

conduct the depositions of Kehoe, Sbarra, and Haskell "without amendment of any other

deadline in the existing schedule for this case."  *See* Dkt. #94, #95 at 1.  He further stated:

> Here, Nothern does not seek to discover or develop new facts for his
> defense.  Instead, he seeks only to establish the admissibility of critical evidence
> that, as the result of Treasury's prolonged intransigence, came to light too late for
> it to be addressed under the previous schedule.  Furthermore, Nothern does not
> seek to continue any deadlines set by the Court, including the trial date of
> November 3, 2008.  To the contrary, all depositions for which he seeks leave can
> be conducted prior to the current deadline for dispositive motions, June 15, 2008.

Dkt. #95 at 8.

Nevertheless, the SEC suggests (Opp. at 8) that Nothern's motion should be denied

because he seeks "to further protract this litigation and delay the trial of this matter."  He does

not.  Upon the court's leave, Nothern will, in coordination with the SEC, make all arrangements

necessary for the depositions to occur, including any arrangements required under Federal Rule

of Civil Procedure 28(b).[4]  Even if the parties cannot complete the depositions before the

---

[4] The SEC oddly asserts (Opp. at 11) that "Nothern neglected to inform the Court that James
Derek Kehoe appears to reside and work in London, England."  In fact, Nothern referred in his
initial brief to "James Derek Kehoe from HSBC Securities (USA) Inc. in London" (emphasis
added), noted that Kehoe was the individual whom Cetina had described as the "dealer in
London," and further observed that Kehoe "apparently lives and works outside of this Court's
subpoena power."  *See* Dkt. #95 at 9.  The SEC's complaint about the "burden" of a London
deposition is ironic in light of (i) the burden that the SEC has placed on Nothern by failing to use
its offices to seek information from other government agencies; (ii) London's status as a leading
financial center in which 30-year bonds are traded; and (iii) the SEC's own practice of taking
depositions abroad.

deadline for dispositive motions, Nothern will not move for an extension, but will rather proceed with the depositions in order to prepare for trial.  No delay in the Court's effort to bring this case to a final resolution will be required.

### CONCLUSION

For the reasons set forth above and in his initial memorandum, Nothern respectfully requests that the Court grant him leave to depose Derek Kehoe, Robert Sbarra, and Patrick Haskell.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
jjs@foleyhoag.com

Dated:  April 15, 2008

### CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ John A. Shope

B3488612.9

- 15 -

**EXHIBIT A**


**Cited excerpts from the deposition transcript of
Paul Malvey in *United States Securities
and Exchange Commission v. Steven E. Nothern*
(June 23, 2006)**

1                    UNITED STATES DISTRICT COURT

2                    DISTRICT OF MASSACHUSETTS

3       - - - - - - - - - - - - - - - - )

4    UNITED STATES SECURITIES AND        )

5    EXCHANGE COMMISSION,                 )

6                    Plaintiff,           )

7              v.                         ) No. 05-10983 (NMG)

8    STEVEN E. NOTHERN,                   )

9                    Defendant.           )

10      - - - - - - - - - - - - - - - - )

11                            Washington, D.C.

12                            Friday, June 23, 2006

13   Deposition of PAUL FRANCIS MALVEY, a witness herein,

14   called for examination by counsel for Defendant in

15   the above-entitled matter, pursuant to agreement, the

16   witness being duly sworn by CHERYL A. LORD, a Notary

17   Public in and for the District of Columbia, taken at

18   the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

19   Suite 800, Washington, D.C., at 10:10 a.m., Friday,

20   June 23, 2006, and the proceedings being taken down

21   by Stenotype by CHERYL A. LORD, RPR, CRR, and

22   transcribed under her direction.

23

24

25

| Page 238 | Page 240 |
|---|---|
| 1   A.  Yeah, that's true. | 1         And now they have it come out at 2:30 or |
| 2         And it was about you saying me saying | 2   2:15, something like that.  He just wanted to set up |
| 3   something to your colleague or somebody else about if | 3   a regular time, and that's -- he wanted to do it at |
| 4   it hadn't been for Peter Fisher, this wouldn't have | 4   that time, you know, and I -- hubris? |
| 5   happened, and I just -- I just wanted to -- I hope | 5         He was a large personality, but not on |
| 6   this is clarifying, but there is -- if something | 6   hubris.  He just wanted to set things and could see |
| 7   happens and something happens as -- after that, | 7   no reason for delaying. |
| 8   sometimes we attribute causality when there really | 8   BY MR. SHOPE: |
| 9   isn't causality. | 9    Q.   So as far as you're aware, there is no |
| 10         And I hope this helps. | 10   blame that may be attributed to Pete Fisher with |
| 11         There's an old Midwestern phrase.  When | 11   regard to the premature release of the decision to |
| 12   someone says, oh, if only I hadn't done this, I would | 12   suspend the long bond. |
| 13   have won the race.  And in the Midwest, they say, oh, | 13         MS. WILLIAMS:  Objection. |
| 14   yeah, right, and only if the dog hadn't stopped to | 14   BY MR. SHOPE: |
| 15   relieve himself, it would have caught the rabbit too. | 15    Q.   Is that your testimony? |
| 16         And so it's not necessarily functionally | 16    A.   I don't know. |
| 17   related or causally related, but it's an expression | 17         I mean -- |
| 18   of frustration.  So I can see that I -- I don't | 18         MS. WILLIAMS:  Objection. |
| 19   recall saying it, but I can see that I may have said, | 19    A.   Let's say there was a greater time limit |
| 20   yeah, if the whole process had not changed at that | 20   between the close of the press conference and the |
| 21   time, this probably wouldn't have happened, but -- | 21   announcement.  And that may provide somebody more |
| 22    Q.   Well, do you deny using the word fault? | 22   opportunity -- more time to do -- to do something. |
| 23         MS. WILLIAMS:  Objection. | 23         BY MR. SHOPE: |
| 24   BY MR. SHOPE: | 24    Q.   And in fact, you gave the opinion of you |
| 25    Q.   In connection with Mr. Fisher and these | 25   thought that it was foolish to have such a lengthy |

| Page 239 | Page 241 |
|---|---|
| 1   events. | 1   period of time between the conclusion of the press |
| 2         MS. WILLIAMS:  Objection. | 2   conference and the embargo time; isn't that correct, |
| 3    A.   I don't recall using those words. | 3   sir? |
| 4         I mean, I can -- while we were taking a | 4    A.   I don't -- |
| 5   break -- I mean, I just remember having the sentiment | 5         MS. WILLIAMS:  Objection. |
| 6   of saying, you know, Christ, if we hadn't changed all | 6    A.   I said that to whom? |
| 7   that stuff -- it was kind of like a frus- -- feeling | 7         BY MR. SHOPE: |
| 8   of frustration but at an intellectual level. | 8    Q.   I'm asking you whether or not that was |
| 9         I know that's not the case. | 9   your opinion. |
| 10   BY MR. SHOPE: | 10         MS. WILLIAMS:  Objection. |
| 11    Q.   Well, are you certain that you never told | 11    A.   No. |
| 12   Ms. Ousley that this debacle was -- are you sure that | 12         I don't recall. |
| 13   you never told Ms. Ousley that the problem with the | 13         I remember looking at the clock and saying |
| 14   premature release of the information about the | 14   to myself, damn, this a long amount -- long period of |
| 15   financial long bond was the result of hubris on the | 15   time, but it was just -- |
| 16   part of Mr. Fisher? | 16         BY MR. SHOPE: |
| 17         MS. WILLIAMS:  Objection. | 17    Q.   Okay.  Now, I believe at the beginning of |
| 18    A.   No, I wouldn't have used that. | 18   the deposition, you indicated that you had spent -- |
| 19         I may have said something to the effect | 19   when you had met with Ms. Williams and Mr. Rossetti |
| 20   that Peter from his background at the New York Fed | 20   for 3 or 4 hours, one of the things that you had |
| 21   was determined to have things come out at the same | 21   looked at was a memorandum that related to an |
| 22   time all the time.  Like the board of governors after | 22   interview that you had given to the Office of |
| 23   FOMC meetings now have -- the announcement of the | 23   Inspector General and to the SEC back in the -- at |
| 24   monetary policy thing would come out any time between | 24   the -- back in 2001. |
| 25   12 and 3. | 25         Correct? |

1111 14th Street, NW Suite 400         Alderson Reporting Company         Washington, DC 20005
1-800-FOR-DEPO

Paul F. Malvey
June 23, 2006

Washington, DC

Page 242

1    A.  I saw some --
2        MS. WILLIAMS:  Objection.
3        BY MR. SHOPE:
4    Q.  Okay.  I'll show -- and I believe you also
5  said -- correct me if I'm wrong -- that you had
6  pointed out what you thought were some inaccuracies
7  in the memorandum that you reviewed with Ms. Williams
8  and Mr. Rossetti; is that correct?
9    A.  I saw something, and then I read it, and
10  got -- right, and I saw some inaccuracy, right.
11    Q.  Okay.  All right.
12        I'm showing you what's been marked as
13  exhibit 11 to your deposition.
14            (Malvey Exhibit No. 11
15            was marked for
16            identification.)
17        BY MR. SHOPE:
18    Q.  And obviously you'll spend some time with
19  it, but -- now, I've got too many -- the first
20  question -- and if you need to take time, that's
21  fine -- the first question is whether or not exhibit
22  11 is the memorandum that you reviewed with
23  Ms. Williams and Mr. Rossetti during your meeting in
24  advance of the deposition.
25    A.  Do you mind if I just re-read it?

Page 243

1        I think it's --
2    Q.  Please.  Take as much time as you need.
3    A.  Yeah.  All right.
4        (Pause.)
5        BY MR. SHOPE:
6    Q.  Okay.  Have you had a chance to look
7  through exhibit 11?
8    A.  Sure.
9    Q.  First of all, is that the memorandum that
10  you reviewed with Ms. Williams and Mr. Rossetti at
11  the SEC in preparation for your deposition?
12    A.  I wouldn't say, reviewed.
13        They showed me this and asked me if I
14  thought it was correct, and I pointed out a couple
15  things that I didn't think were accurate.
16    Q.  What were the things that you pointed out
17  of things in exhibit 11 that you thought were
18  inaccurate?
19    A.  I -- the first full par on the second page
20  -- well, I'm sorry.
21        Just stepping back, the third paragraph on
22  the first page, it says, I've -- as director of
23  market financing, I try to remain current with the
24  financial markets and maintain market current
25  contacts.

Page 244

1        I mean, I wouldn't view those 2 things as
2  my most important things, because having market
3  contacts comes with the job.  I don't go out and try
4  to maintain them.  They -- anyway, that's a nit.
5    Q.  So in other words, you do -- you were
6  maintaining market contacts, but it wasn't something
7  you were trying to do.
8        It just came with the territory?
9    A.  Exactly.  Yeah.
10        I'm -- correct.  I mean, I would say,
11  remain current with financial markets and financial
12  analysis and policy recommendations, is how I'd
13  describe my job.  But that's a nit anyway.
14        And then on the first full paragraph,
15  second page, I said that:  Because the turmoil
16  following September 11 disaster, January -- because
17  of the turmoil following the September 11 disaster,
18  the January 30, 2002, quarterly financing meeting
19  would have been a better forum.
20        I mean, September -- I did mention that
21  September 11 may have directed people's attention
22  elsewhere away from debt management policy.  But that
23  was not the reason I said it would be better to
24  postpone it.
25        And this was the arguments I made in-house

Page 245

1  with Peter, was that this whole notion of giving the
2  markets another bite at the apple, make an
3  announcement that we're killing it, but have a last
4  auction, which would have been February 15th, so
5  that's what -- really the reason that I thought the
6  postponement would have been better.
7    Q.  Well, hold it.
8        Actually, let's follow up on that.
9        If the idea was to have an announcement
10  and then give a second bite of the apple --
11    A.  Last bite.
12    Q.  -- last bite of the apple, how would that
13  relate to when you made the announcement?
14        Because by hypothesis, when you're making
15  the announcement, there's going to be a further bite
16  at the apple at a later date.
17        Right?
18        MS. WILLIAMS:  Objection.
19    A.  No, because that's what happened.  Peter
20  made the announcement.  No more bites.
21        BY MR. SHOPE:
22    Q.  I understand that, but what it says here
23  in the first full paragraph on page 2 is that the
24  January 30, 2002, quarterly funding meeting would
25  have been a better forum to announce the suspension

62 (Pages 242 to 245)

Paul F. Malvey                                                                                      June 23, 2006
Washington, DC

---

Page 246

1  of sales of the 30-year bond, so that is -- that's
2  not going to the question of whether or not there's a
3  last bite at the apple.
4       That's going to the question as to when
5  you announce.
6    A.   No, because --
7       MS. WILLIAMS:  Objection.
8    A.   -- the reason that January 30 would be
9  better is because we had a scheduled 30-year auction
10 in February, and that's why it would have been better
11 to announce it, because the investors -- it's just
12 not finished out in this sentence here, because
13 whoever wrote these notes didn't make the connection
14 between the January 30 announcement and the February
15 15 settlement of a 30-year bond.
16      That's what -- that's the reason I was
17 saying Jan 30 would would have been better for the
18 announcement, because that would have been right
19 before the sale of a preschedule -- already on the
20 schedule 30-year bond.
21      That's what I meant.
22      BY MR. SHOPE:
23   Q.   Yeah, but you could have made the
24 announcement on October 31 and then announced that
25 there would be a last bite at the apple in February.

---

Page 247

1       Right?
2       MS. WILLIAMS:  Objection.
3    A.   He could have.
4       I mean, coulda, woulda, shoulda.
5       It's -- it would have -- I'm sorry.
6       I didn't mean to be disrespectful, but
7  because there was such a scarcity premium on the
8  security to start with, that would have given 3
9  months for the markets to gyrate around and be more
10 volatile at the long end because of all the
11 uncertainty about its future, where if you made the
12 announcement on January 30, the sale would be 5 days
13 later, and WY market would have established the
14 market price, and there was much less chance for
15 volatility.
16      BY MR. SHOPE:
17   Q.   Okay.  So what else was inaccurate in
18 exhibit 11?
19   A.   I'm not saying inaccurate.
20      I'm just saying it didn't convey the
21 flavor.
22      And it's -- it -- the next sentence says:
23 It was also Malvey's opinion that undersecretary
24 Fisher would have made the announcement at the
25 quarterly funding meeting if he had been confirmed of

---

Page 248

1  the time.
2       And somebody asked me that, and after
3  having been at the other side of the table listening
4  to Peter's arguments about his view of the 30-year
5  and having made my arguments about my view of the
6  30-year, I think he would have made the same
7  arguments in August.
8       And so, yes, I -- I -- who the hell knows,
9  but I think he would have made the same arguments in
10 August.  Whether we would have made the announcement
11 in August is another thing, because he would have had
12 to justify making the announcement in August to the
13 rest of us too.
14   Q.   But I mean, but basically this gets the
15 gist -- that was your opinion?
16   A.   Yeah, it gets the gist, yeah.
17      Right.
18      MS. WILLIAMS:  Objection.
19   A.   All right.  And the one, 2, 3 -- third
20 full paragraph talking about Drew Matus.
21      He came in -- I think he may have
22 scheduled to meet with Jeff, but Jeff was also new.
23 I think Jeff had only been there since August, I
24 think.
25      BY MR. SHOPE:

---

Page 249

1    Q.   You're speaking of Jeff Huther now?
2    A.   Jeff Huther.  Right.
3       And I think it was because Woody was
4  either about -- was -- oh, here it is.
5       He was vice chairman.  The -- usually the
6  chairman of the borrowing advisory committee, his
7  staff works up these pro forma forecasts that I
8  mentioned earlier today, and for some -- and the
9  vice-chairman usually follows the chairman -- that's
10 also almost pro forma.
11      And the October meeting would have been
12 the last meeting for the outgoing chairman, and Drew,
13 some reason Woody asked Drew to do these things.  He
14 had never done them before.
15      So he worked up these pro forma
16 forecasts -- he had access to other ones out there
17 and previous ones, and he worked up these pro forma
18 forecasts.  And I don't know if he came down to
19 Washington specifically for that, but he asked Jeff,
20 is it okay if I run these by you to tell me whether
21 they're reasonable, a reality test or something like
22 that.
23      And I mean, it says that I spoke with him
24 briefly, but it might have been -- "briefly" is --
25 the 2 of them came into my office, and we put these

---

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
1-800-FOR-DEPO

## Page 250

1  things out on the table in front of us, and asking
2  me, you know, does all this stuff look reasonable and
3  stuff, so I -- it was -- I forget exactly what the
4  nature of the conversation, but I might have said
5  something like, what if it -- do you have any
6  alternatives, what if Woody says, how about this, are
7  you ready to go with alternatives, I mean, because
8  the meeting is going to be next Tuesday, he's
9  going -- he has -- he has -- well, proper prior
10  preparation, so I was trying to help him out like I
11  help a lot of people.
12      Q.   One of those alternatives would have been
13  suspending the issuance of the long bond.
14      Right?
15      MS. WILLIAMS:  Objection.
16      A.   It -- not necessarily would have been, but
17  it may have come up.  I don't recall it coming up.
18      I mean, I don't -- I don't recall him
19  having 2 scenarios, but maybe he did.  I don't know.
20      I just remember looking and seeing if it's
21  feasible, because we were making so many changes,
22  and, you know, I may have asked him, do you have an
23  alternative scenario if the long bond is not there,
24  or something like that.
25      I don't know.  I don't recall saying it,

## Page 251

1  but I -- it just seems like --
2      BY MR. SHOPE:
3      Q.   Well, that was the elephant in the room,
4  wasn't it?
5      MS. WILLIAMS:  Objection.
6      A.   I don't think so.
7      BY MR. SHOPE:
8      Q.   I thought -- didn't you refer to that as
9  the elephant in the room earlier today in your
10  deposition?
11      MS. WILLIAMS:  Objection.
12      A.   I don't recall my context.
13      BY MR. SHOPE:
14      Q.   To suspending the long bonds.
15      A.   Yeah, I know, but --
16      Q.   This is an issue at the October 30 --
17  there was an elephant in the room, as you say, at the
18  October 30 meeting of the borrowing advisory
19  committee.
20      MS. WILLIAMS:  Objection.
21      I think this mischaracterizes his
22  testimony.
23      A.   I don't recall saying that.  And we just
24  went over the minutes, and it doesn't -- it's not
25  included in there.

## Page 252

1  BY MR. SHOPE:
2      Q.   So you're saying you just don't remember
3  one way or the other whether or not the suspension of
4  the long bond came up in your discussion with
5  Mr. Matus of William Brothers?
6      A.   I don't recall the discussion coming up.
7      But I wouldn't be surprised if I said
8  things like, do you have an alt- -- what if -- what
9  if we -- the -- what if the long bond is eliminated
10  sometime in the next year, do you have an alternative
11  for that.  What if we go from quarterly to semiannual
12  tens, 10-year securities.
13      And it was more like I'd say, well, what
14  if Woody says, how about this.  It was kind of like
15  asking him questions trying to get him prepared for
16  his boss to get ready for this meeting, you know.
17      Q.   M-hm.
18      A.   But I don't recall the context of this
19  300- -- or 800-pound elephant.
20      Q.   Well, the testimony obviously will speak
21  for itself.
22      Now, were there any other inaccuracies
23  that you noted --
24      A.   Yeah.
25      Q.   -- in exhibit 11?

## Page 253

1      A.   I don't know.  All right.
2      The last paragraph on page 2 continues
3  on -- I'm not quite -- I'm -- it's a long time ago,
4  but I -- I remember answering the phone and asking
5  Jill.
6      Then the next page says, I introduced
7  myself to him at a press conference in 1996.  And
8  it's -- it -- this is something I have a recollection
9  of, is, I walked over, and Jill and Roger were
10  standing over -- point out exactly where they were
11  standing.
12      They were standing by the side door.  And
13  Roger had done the press conference, so I think -- so
14  that had to have been pre-Gensler.  They were just
15  standing there making small talk.
16      And I was Jill's deputy and just walked
17  over and say, good job, Roger, or something like
18  that.  And he introduced me to -- Paul, this is Pete
19  Davis, Pete Davis, Paul Malvey.  And, hi.
20      And Roger says, he's one of the good guys.
21  And I think I mentioned that earlier today, because
22  Roger just -- Roger is a man of few words.
23      Q.   M-hm.
24      A.   And for him to say, one of the good guys,
25  I remember saying, I wonder what he means by that,

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
1-800-FOR-DEPO