UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : | Civil Action No. 05-10983 (NMG) |
| Plaintiff, | : : | |
| v. | : : | **ORAL ARGUMENT REQUESTED** |
| STEVEN E. NOTHERN, | : : | |
| Defendant. | : : | |

### DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendant Steven E. Nothern submits the following statement of undisputed facts in support of his motion for a summary judgment of dismissal of the sole count of the Complaint.[1]  The referenced deposition excerpts and other documents are set forth as exhibits to the Declaration of Robert E. Toone filed herewith.

#### *Press embargoes*

1.   In general use, a news or press embargo is a reverse "deadline" for journalists. Instead of the time by which a story must written, it is the first time at which the story may supposedly be published.  But unlike deadlines imposed by editors and publishers, an embargo is an artificial time constraint requested by an external entity – the news source.  Declaration of Clyde H. Bentley, PhD. ¶ 5 (Ex. A).

2.       Embargoes have traditionally been used to advance the narrow interests of news sources and the anti-competitive interests of established media organizations, not the public's interest in obtaining information.  *Id.* ¶ 6.

---

[1] Pursuant to Rule 56, Nothern assumes that the following facts are undisputed for the purposes of this motion only.  He reserves the right to dispute these facts and present additional facts in subsequent proceedings, including trial.

3.      Embargoes are often timed to favor certain television newscasts, so that the source gets "face time" on television, or to ensure maximum publicity by giving an embargoed news release to particular newspaper or magazine in advance of releasing it to the media in general.  *Id.* ¶ 8.

4.      Embargoes are also anti-competitive insofar as they give advance notice of information to a limited number of favored media organizations, instead of releasing the information to the general public.  They coddle reporters of lesser skill who do not have the ability to write quickly and accurately, preventing reporters with superior ability from using those professional skills as a competitive edge.  *Id.* ¶ 9.

5.      The advent of the World Wide Web in the 1990s increased the immediacy of news delivery to micro-seconds, instead of the hours or days required by the traditional media to produce and publish stories.  The Internet also removed the monopoly on the control and distribution of information enjoyed by the traditional media.  *Id.* ¶ 11.

6.      In the Internet era, where journalists and non-journalists alike can release information to the world instantaneously, requests for press embargoes are routinely disregarded. For example, after the White House distributed at 8:21 p.m. the text of President Bush's 2007 State of the Union Address with a caption stating "EMBARGOED – this cannot be used until delivery at 9:01:30PM EDT," the popular web site Drudge Report posted it minutes later.  The White House took no action, stating "it's hard to police the embargo."  *Id.* ¶ 12.

7.      Today, journalists are able to identify newsworthy items in a government announcement and report them to the public – via radio, television, a wire service, or the Internet – in a matter of seconds.  The "embargo" concept is outdated because it is premised on preparation of a single story for a publication with a single publication time, rather than the continual updates and revisions provided by electronic media.  *Id.* ¶ 13.

8.      Any reasonably skilled reporter would have been able to quickly identify the "lead" in Treasury's October 31, 2001 press release and post a powerful and accurate one-sentence story:  "The Treasury Department today suspended sales of the benchmark 30-year

'long bond.'" This story could have been followed in succeeding minutes and hours by more detailed stories with additional background information. *Id.* ¶ 15.

9.     There are no generally accepted rules of conduct or professional procedures for the treatment of press embargoes. Some journalists choose to honor requested embargoes, while others choose to ignore them. Many journalists believe that embargoes are unnecessary and even unethical. *Id.* ¶ 16.

10.     There is no convention that requires a journalist to state whether he or she will comply with a requested embargo before learning and reporting any news that may be announced. *Id.*

11.     The mere fact that a journalist may have complied or agreed to comply with an embargo request in the past does not mean that he or she will necessarily comply with all embargo requests in the future. *Id.*

12.     Many embargoes are simply unilateral requests that journalists believe that they are completely free to disregard. *Id.* ¶ 19.

13.     It is common for journalists to disregard embargo requests to which they have not expressly agreed. *Id.*

14.     Even most journalists who agree to embargo requests believe that the ultimate choice to honor or break the embargo remains theirs. For example, embargo agreements are frequently disregarded when journalists or editors believe that they are arbitrary, the information is already circulating, the information is available through other sources, or the importance of the story is compelling. *Id.* ¶ 20.

15.     There are no accepted means of enforcing embargoes in the journalism profession. A news source has no ability to enforce an embargo other than to restrict a journalist's access to information in the future, and even that sanction is untenable if the source depends on the journalist for dissemination of its information. *Id.* ¶ 21.

16.     Technology was readily available in 2001 to allow a federal agency like Treasury to distribute its 30-year bond decision to the press and the public at a precise moment without

use of an embargo.  For example, Treasury could have ensured even dissemination of its information through Internet posting, e-mail distribution, and webcasting of its news conference. *Id.* ¶ 24.

### *Treasury's policies on press embargoes and confidential information*

17.    On October 4, 2001, there was a reported leak in connection with Treasury's emergency reopening of the 10-year bond.  Stipulation and Agreement (Ex. B) ¶ 1.b; Deposition of Peter Fisher 53-60 (Ex. C).

18.    According to Deputy Assistant Secretary for Federal Finance Timothy Bitsberger, the leak that occurred in connection with Treasury's reopening of the 10-year bond had been attributed to the Treasury Borrowing Advisory Committee, a body composed of market participants from private industry.  Stipulation and Agreement (Ex. B) ¶ 1.c.

19.    In an e-mail dated October 31, 2001, Timothy Bitsberger stated that "[t]he refunding process has been criticized for years because of suspected leaks."  Stipulation and Agreement (Ex. B) ¶ 1.a.

20.    In an e-mail dated November 15, 2001, Treasury Director of Public Affairs Tony Fratto, stated that "long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years."  *Id.* ¶ 2.

21.    In a Reuters article published on the afternoon of October 31, 2001, John Roberts, the head of government trading at Barclays Capital, stated the following with respect to Treasury:  "When they did the reopening of the 10-year, there was advance information on the Street.  There's advance information here, and so there are a number of people on the Street who are pretty upset about it."  Daniel Sternoff, "Wall Street sees red over leak of T-bond's demise," Reuters, Oct. 31, 2001 (Ex. DD).

22.    As of October 31, 2001, Treasury did not have written policies on the release of market-sensitive information. Deposition of Michele Davis ("M. Davis") at 34 (Ex. D); Deposition of Elizabeth Holahan at 44 (Ex. E).

23.     As of October 31, 2001, Treasury did not have written policies on how to conduct press conferences.  Holahan at 44 (Ex. E); M. Davis at 34-35 (Ex. D).

24.     As of October 31, 2001, Treasury did not have written policies on the use of embargoes.  Holahan at 44-45 (Ex. E); Deposition of Tony Fratto at 47-48 (Ex. F); M. Davis at 28-29 (Ex. D).

25.     At her deposition, former spokesperson Elizabeth Holahan believed that under Treasury's embargo policy reporters could disclose embargoed information to "members of the news organization, like an editors," but not "to the general public."  Holahan at 64-65 (Ex. E).

26.     At her deposition, Assistant Secretary for Public Affairs Michele Davis believed that under Treasury's embargo policy reporters could selectively disclose embargoed information to the public for "a news gathering purpose" – for example, to obtain a market participant's reaction to the news.  M. Davis at 243-45 (Ex. D).

27.     Treasury never explained to reporters at the press conferences or anywhere else what an embargo supposedly required.  Deposition of Brian Collins at 35-36 (Ex. Q); Fratto at 64-65, 166-67.

28.     As of October 31, 2001, Treasury used "more casual" embargo procedures for its quarterly refunding press conferences than for its Federal Open Market Committee and securities auctions announcements.  Fratto at 61-62, 80-83 (Ex. F).

29.     At its Federal Open Market Committee and securities auctions announcements, Treasury required reporters to stay in the Treasury press room during the embargo period and restricted their communications with the outside world.  *Id.* at 80-81 (Ex. F).  For example, the Federal Reserve Board faxed its Federal Open Market Committee announcements to the Treasury pressroom, copies were distributed to the reporters, and the reporters had "three minutes to write their stories and disseminate it" – during which time they could not leave the room.  *Id.* at 86-87.

30.     According to former Director of Public Affairs Fratto, as of October 31, 2001, no one at Treasury had considered using lockdown procedures for quarterly refunding

announcements because "it would have been a solution in search of a problem." Fratto at 62 (Ex. F).

31.    Following the October 31, 2001 press conference, Treasury announced that it would thereafter use lockdown procedures for future quarterly refunding announcements. Fratto at 235-38 & Ex. 17 (Ex. F).

32.    Under its policy for quarterly refunding announcements adopted subsequent to October 31, 2001, Treasury no longer releases the announcement at a press conference, but instead posts it on the Internet at 9:00 a.m., provides a copy to "credentialed members of the media in the Treasury Pressroom shortly before 9:00AM with lock-down embargo rules," and conducts a briefing after the announcement's release. *Id.*

33.    Prior to October 31, 2001, the embargoes for quarterly refunding press conferences had been 10 or 15 minutes long. Deposition of Peter Davis ("P. Davis") at 117-18 (Ex. G); Fratto at 59 (Ex. F); Deposition of Jill Ouseley at 50-51 (Ex. H).

34.    Prior to October 31, 2001, these embargo periods had been set during the press conference and in consultation with the attending reporters. Fratto at 58-60 (Ex. F); Deposition of Paul Malvey at 62 (Ex. I).

35.    According to former Director of Public Affairs Fratto, prior to October 31, 2001, reporters would propose an embargo time at quarterly refunding press conferences even when he "didn't have an interest in what the embargo time should be." Fratto at 58-59 (Ex. F). In those instances, Treasury declared an embargo to please the reporters. *Id.* at 55-56. According to Fratto, the reporters had a saying on embargoes: "Everyone goes in together, everyone comes out together, nobody gets hurt." *Id.* at 55.

36.    Prior to October 31, 2001, Treasury treated the embargo as a "honor system." Holahan at 67-68 (Ex. E).

37.    Prior to October 31, 2001, Treasury merely assumed that the reporters who attended the press conference would follow it. Fratto at 110-11 (Ex. F).

38.    Prior to October 31, 2001, Treasury's response to disclosure ahead of an embargo time ranged from "sort of a slap on the wrist to losing your Treasury press pass, depending how serious it is."  M. Davis at 55 (Ex. D).

39.    No one at Treasury ever told attendees what penalty they would face if they violated an embargo.  Fratto at 108 (Ex. F); Ouseley at 52 (Ex. H).

### *Peter Davis's consulting business*

40.    Nothern and his colleagues at MFS Investment Management used a broad array of resources for research and analysis.  Deposition of Steven Nothern at 39 (Ex. J).

41.    The resources used by Nothern and his colleagues for research and analysis included electronic services such as Bloomberg; large Wall Street brokerage and investment banks; and smaller research boutiques like International Strategy & Investment, Inc. (ISI) and Davis Capital Investment Ideas, run by Peter Davis.  *Id.* at 39-40.

42.    Prior to founding Davis Capital Investment Ideas, Davis worked as a staffer in the United States Congress for the Joint Committee on Taxation, for the Senate Budget Committee, and for Senator Robert C. Byrd.  P. Davis at 17-21 (Ex. G).

43.    Davis's business as a consultant was to provide information and analysis about fiscal and budgetary policy developments in Washington, D.C.  P. Davis at 22-23 (Ex. G); Nothern at 115 (Ex. J).

44.    As of October 2001, Davis's clients included a broad range of firms and consultants across the U.S., including JPMorgan Chase Securities, Morgan Stanley Dean Witter, Fidelity Investments, and Goldman Sachs.  P. Davis at 44-45 & Ex. 7 (Ex. G).

45.    MFS became a client of Davis Capital Investment Ideas sometime in the mid-1990s.  *Id.* at 56.

46.    Davis considered MFS to be a "small client" because it had less demand for his services and paid a smaller fee.  *Id.* at 47-48.

47.     Nothern spoke with Davis infrequently, a "handful of times" each year.  Nothern at 126 (Ex. J).

48.     Nothern received and occasionally reviewed the e-mails that Davis regularly sent all his clients.  *Id.* at 120.  Davis assisted MFS with specific research projects, id. at 115-18, and in 1999 and 2000 Davis set up a series of meetings in D.C. for Nothern and other clients to meet with economists and policy-makers at the Federal Reserve, the Office of Management and Budget, Treasury, and on Capitol Hill, P. Davis at 70-71 (Ex. G); Nothern at 43-44 (Ex. J).

### *Davis's attendance at Treasury press conferences*

49.     Davis regularly attended quarterly refunding press conferences at Treasury from the mid-1990s to October 31, 2001.  P. Davis at 103-06 (Ex. G).

50.     Davis was never denied access to or asked to leave a quarterly refunding press conference at Treasury.  *Id.* at 106-07.

51.     On one occasion, Davis arranged for his assistant, Allyson Sullivan, to attend a quarterly refunding press conference in his absence.  *Id.* at 107.

52.     Davis gained access to quarterly refunding press conferences by calling Lula Tyler (the secretary for Jill Ouseley, and then Paul Malvey in the Office of Market Finance), who in turn called the guard station at the entrance of the Treasury building with Davis's name and birth date.  P. Davis at 103-04 (Ex. G); Deposition of Lula Tyler at 57-59 (Ex. K).

53.     On the morning of a quarterly refunding press conference, Davis would arrive at the entrance to the Treasury building, show his I.D. to the guard, receive a badge, and proceed unescorted to the press conference.  P. Davis at 103, 292-93 (Ex. G).

54.     As of October 31, 2001, Treasury did not have any written policies on who could attend quarterly refunding press conferences.  M. Davis at 92 (Ex. D); Fratto at 47-48 (Ex. F); Holahan at 44-45, 109 (Ex. E).

55.    None of the Treasury employees responsible for conducting the October 31, 2001 press conference knew who Peter Davis was or that he was in attendance.  M. Davis at 134-37 (Ex. D); Fisher at 161 (Ex. C); Fratto at 171-72 (Ex. F); Holahan at 136-37 (Ex. E).

56.    After October 31, 2001, former spokesperson Holahan and Assistant Secretary Davis testified that Peter Davis's attendance was inconsistent with their understanding of the rules.  M. Davis at 93 (Ex. D); Holahan at 137 (Ex. E).

57.    At his deposition, Peter Davis testified that he attended press conferences from 1994 to October 31, 2001 as a result of a written agreement he reached with Treasury official Roger Anderson.  P. Davis at 93-96, 260, 267 (Ex. G).

58.    According to Davis, he met with Anderson in 1994 at the suggestion of Lula Tyler, a secretary who worked for Director of Market Finance Jill Ouseley.  *Id.* at 93, 260.

59.    According to Davis, Anderson called Davis to his office, where they signed a written agreement.  *Id.* at 95-96.

60.    According to Davis, he gave the agreement a "cursory reading" before he signed it, but "didn't have a specific detailed understanding of it."  *Id.* at 347-48.

61.    Although Davis subjectively believed that the effect of the agreement he signed was to prevent him from disclosing information prior to the announced embargo times at quarterly refunding press conferences, he does not recall the agreement mentioning the word "embargo."  *Id.* at 262, 271-72, 278-79.

62.    Davis does not recall whether the agreement he signed mentioned quarterly refunding conferences:  "I just can't recall with specificity how well it was defined."  *Id.* at 270-72.

63.    According to Davis, after signing the agreement in Anderson's office, Davis took his copy of the agreement home, filed it in a drawer, and forgot about it until August 2001 – at which point he threw it away.  *Id.* at 96-97, 348-49.

64.     Davis never showed the purported written agreement to anyone, and never discussed its existence or contents with anyone.  *Id.* at 263-64, 290.

65.     No copy of any confidentiality agreement involving Davis has ever been produced by Davis, Anderson, Treasury, the SEC, or anyone else.

66.     In a letter to Nothern's counsel dated November 2, 2006, Treasury's Office of General Counsel stated:  "There is no information from any current or former Treasury employee to indicate that there was any written confidentiality agreement between Peter Davis and the Treasury Department.  In fact, all these witnesses have denied that any such agreement existed, and searches of Treasury documents have failed to reveal evidence of any such agreement.  This topic has been covered numerous times with current and former Treasury employees, all with the same conclusion that no such document existed.  See the deposition transcripts of Roger Anderson (pages 100-101), Tony Fratto (pages 176-177), Jill Ouseley (page 49), Elizabeth Holahan (page 141), and Paul Malvey (page 114)."  Ex. FF at 2.

67.     At his deposition, Roger Anderson denied that he entered into any agreement with Peter Davis.  Deposition of Roger Anderson at 58, 100-01 (Ex. L).

68.     Anderson began work at Treasury in June 1995.  *Id.* at 9.

69.     According to Anderson, Peter Davis was already attending quarterly refunding press conferences at Treasury when they first met in the 1990s.  *Id.* at 95.

70.     According to Anderson, at some point he and Davis had a brief conversation in the back of or outside the conference room, during which Anderson said that he would not personally oppose Davis's attendance at future press conferences if Davis did not disclose information before the embargo time.  *Id.* at 56-57, 105.

71.     According to Anderson, he was not responsible to decide whether Peter Davis could attend, did not admit him to any press conference, and did not discuss his attendance with anyone else.  *Id.* at 58-61, 96-97, 119-20.

72.     Lula Tyler initially admitted Davis at Jill Ouseley's direction.  Tyler at 54-55 (Ex. K).  She was unaware of any agreement involving Davis.  *Id.* at 61-62.

73.     Jill Ouseley was unaware of any agreement involving Roger Anderson or Peter Davis.  Ouseley at 27-28, 49 (Ex. H).

74.     Paul Malvey, Ouseley's successor, was unaware of any agreement involving Roger Anderson or Peter Davis.  Malvey at 99 (Ex. I).

75.     Elnora Bowser, the employee in Malvey's office who actually arranged for Davis's admission to the October 31, 2001 press conference, was unaware of any agreement involving Roger Anderson or Peter Davis.  Deposition of Elnora Bowser at 49-50 (Ex. M).

76.     Steve Berardi, a long-time employee in the Office of Market Finance who had seen Davis at several refunding press conferences prior to October 31, 2001, was unaware of any agreement involving Roger Anderson or Peter Davis.  Deposition of Steven Berardi at 66-69 (Ex. N).

77.     Treasury's Office of Public Affairs was responsible for conducting the October 31, 2001 quarterly refunding press conference.  Holahan at 116, 144-45.  At that time, Michele Davis was Assistant Secretary for Public Affairs, Tony Fratto was Director of the Office of Public Affairs, and Elizabeth Holahan was spokesperson for domestic finance in the Office of Public Affairs.  M. Davis at 19-20, 22-23; Holahan at 23-24; Fratto at 19-20.

78.     Former Treasury spokesperson Elizabeth Holahan was unaware of any agreement involving Roger Anderson or Peter Davis.  Holahan at 130-31, 141-42 (Ex. E).

79.     Former Director of Public Affairs Tony Fratto was unaware of any agreement involving Roger Anderson or Peter Davis.  Fratto at 176-77 (Ex. F).

80.     Assistant Secretary Michele Davis was unaware of any agreement involving Roger Anderson or Peter Davis.  M. Davis at 141 (Ex. D).

### *Nothern's lack of knowledge of Davis's attendance*

81.     Peter Davis never told Nothern that Davis was able to attend quarterly refunding press conferences at Treasury.  P. Davis at 132 (Ex. G); Nothern at 146-47 (Ex. J).

82.    Peter Davis never told Nothern about the existence or contents of any purported confidentiality agreement with Anderson.  *Id.* at 263-64.

83.    Peter Davis never discussed with Nothern embargoes or what the term "embargo" meant.  *Id.* at 264-65, 278-79; Nothern at 189-90 (Ex. J).

84.    The issue of embargoes "just never came up" in Peter Davis's conversations with Nothern.  P. Davis at 265 (Ex. G).

85.    Nothern never expressed any interest to Peter Davis in refunding conferences at Treasury.  *Id.* at 133.

86.    While Peter Davis on occasion sent Nothern materials from quarterly refundings, Nothern at 120, 125 (Ex. J), he never provided Nothern with purportedly embargoed information prior to October 31, 2001, Davis at 133-34 (Ex. G).

87.    Since MFS was a "small client" of Davis, Nothern was at the end of Davis's call list.  *Id.* at 47-48.

88.    Because quarterly refunding press conferences prior to October 31, 2001 had short embargoes, and it took Davis three to four minutes to leave the Treasury building before making any calls, before that date Davis never got to Nothern on his call list before the embargoes expired.  *Id.* at 134.

### *Treasury's 30-year bond decision*

89.    At the January 30, 2001 meeting of the Treasury Borrowing Advisory Committee of the Bond Market Association, the members voted in favor of elimination of the 30-year bond after the August refunding.  Ex. EE at 1-2.

90.    At the July 31, 2001 meeting of the Treasury Borrowing Advisory Committee of the Bond Market Association, the Committee debated whether to comment further on continued issuance of the 30-year bond.  "Some members of the Committee said that the market expects Treasury to make a statement on the 30-year bond, while others said that Treasury should keep

its option given increased policy and economic uncertainty."  Deposition of Brian Roseboro at 60-63 & Ex. 1 at 2 (Ex. O).

91.    Treasury officials decided to suspend issuance of the 30-year bond in October 2001.  Fisher at 67 (Ex. C); Malvey at 117 (Ex. I).

92.    Several Treasury officials and employees were involved in making the decision to suspend the 30-year bond, including Under Secretary Peter Fisher, Paul Malvey, Jeff Huther, Brian Roseboro, and Timothy Bitsberger.  Fisher at 71-72 (Ex. C); Malvey at 160-62 (Ex. I).

93.    Fisher briefed Secretary Paul O'Neill on the decision to suspend the 30-year bond on or about October 21, 2001.  Fisher at 73-74 (Ex. C).

94.    Secretary O'Neill directed Fisher to inform Alan Greenspan (then chairman of the Federal Reserve) of the decision to suspend the 30-year bond.  *Id.*

95.    Approximately one week before the October 31, 2001 announcement, Fisher informed Greenspan, Director of the National Economic Council Lawrence Lindsey, and Chairman of the Council of Economic Advisors Glenn Hubbard "of our intention of eliminating the 30-year bond."  *Id.* at 77-78, 84-86.

96.    Fisher did not ask Greenspan, Lindsey, or Hubbard to refrain from disclosing the information to others.  *Id.* at 81.

97.    Fisher informed Treasury's Office of Public Affairs staff about the decision to suspend the 30-year bond within ten days prior to the October 31 announcement.  Fisher at 102 (Ex. C).

98.    Prior to the October 31, 2001 announcement, Fisher expressed to Assistant Secretary Davis his "discomfort with the use of an embargo" and his preference for "a direct announcement either on the Internet or without that use of an embargo."  *Id.* at 101.  He "thought the risk of a leak or some malfunction, some procedural malfunction was too high."  *Id.*

99.    Assistant Secretary Davis rejected Fisher's view by stating that elimination of the embargo "was not the appropriate thing to do" and that she did not want to change procedures. *Id.* at 103-04.

### *The October 31, 2001 press conference*

100.    On October 30, 2001, Treasury issued a media advisory announcing the next day's quarterly refunding press conference and stating that "[t]he event will have a 10:00 a.m. news embargo."  Holahan at 92-95 & Ex. 4 (Ex. E).

101.    The announced 10:00 a.m. embargo time for the October 31, 2001 press conference was the first fixed embargo time for a quarterly refunding press conference in Treasury's history.  P. Davis at 117-18, 168 (Ex. G); Fratto at 59 (Ex. F); Malvey at 328 (Ex. I); Ouseley at 75-76 (Ex. H).

102.    Director of Public Affairs Fratto set the 10:00 a.m. embargo time because he "presumed that reporters would have . . . lots of questions" and "would want to be especially careful of how they reported the news."  Fratto at 129 (Ex. F).

103.    Fratto expected the October 31, 2001 press conference to last until 9:40 a.m.  M. Davis at 203-05 & Ex. 15 (Ex. D).

104.    At 8:57 a.m. on October 31, 2001, spokesperson Holahan e-mailed a copy of the quarterly refunding announcement, which contained the news on Treasury's decision to suspend the 30-year bond, to the cable network CNBC.  Holahan at 190-98 & Ex. 10 (Ex. E).

105.    By telephone, Holahan told a CNBC producer on the morning of October 31, 2001 that "Treasury had made an announcement that CNBC would be interested in" and that "he would want to interview Peter [Fisher] afterwards."  *Id.* at 197-98.  The producer orally agreed to the embargo.  *Id.* at 198.

106.    Holahan e-mailed Treasury's quarterly refunding announcement to the New York Times at 9:30 a.m. and the Wall Street Journal at 9:32 a.m.  *Id.* at 190-91 & Ex. 10.  In contrast to the discussion with CNBC, Holahan did not obtain either newspaper's agreement to the embargo.  *Id.* at 202-05.

107.    The October 31, 2001 quarterly refunding press conference took place in the Diplomatic Reception Room at the main Treasury building, beginning at 9:00 a.m.. Fratto at 157 (Ex. F); Holahan at 62 (Ex. E).

108.    According to press spokesperson Holahan, the press conference was "open to all members of the media." Holahan at 107 (Ex. E).

109.    According to Treasury employee Steve Berardi, who attended every quarterly refunding press conference from May 1991 to August 2001, the press conference was "open to the public." Berardi at 41, 67, 69, 145-46 (Ex. N).

110.    Anyone admitted to the Treasury building was free to enter the October 31, 2001 quarterly refunding press conference. *Id.* at 145.

111.    On October 31, 2001, no employee was stationed at the doors to prevent persons from entering the room, Collins at 41 (Ex. Q); P. Davis at 309 (Ex. G); Malvey at 78 (Ex. I), or from leaving before the press conference had ended, Fratto at 161 (Ex. F); Holahan at 127 (Ex. E).

112.    No one checked the identity or credentials of attendees at the October 31, 2001 press conference. Deposition of Frances Anderson ("F. Anderson") at 66 (Ex. R); Fratto at 162 (Ex. F).

113.    No other steps were taken to limit access to the October 31, 2001 press conference. Fratto at 162 (Ex. F).

114.    Director of Public Affairs Fratto could not "think of a reason why we would prevent people from entering the room" at the October 31, 2001 press conference. *Id.*

115.    At least 40 people attended the October 31, 2001 press conference. P. Davis at 110 (Ex. G); Holahan at 212 (Ex. E).

116.    There is no comprehensive list of all the attendees at the October 31, 2001 press conference. Fratto at 156 (Ex. F); Holahan at 110-11 (Ex. E).

117.    Shortly before the press conference began, Treasury employees distributed to the attendees a copy of the quarterly refunding announcement on Treasury letterhead, with the heading "FOR IMMEDIATE RELEASE."  F. Anderson at 119-22 & Ex. 6 (Ex. R); Holahan at 185-86 & Ex. 6 (Ex. E).

118.    Spokesperson Holahan declared a 10:00 a.m. embargo at the beginning of the press conference.  Holahan at 62 (Ex. E).

119.    Spokesperson Holahan did not tell the attendees at the press conference what "embargo" meant, or what would happen if they did not follow it.  *Id.* at 62, 68; Fratto at 166-67 (Ex. F).

120.    Neither spokesperson Holahan nor anyone else at Treasury asked for, or received, any attendee's consent to the embargo at the October 31, 2001 press conference.  Fratto at 110-11 (Ex. F); Holahan at 64, 69 (Ex. E).

121.    Attendees at the press conference were not required to enter into a confidentiality agreement, oral or written.  Holahan at 130-31 (Ex. E).

122.    At the press conference, Fisher read the refunding announcement, which took approximately 15 minutes, then asked for questions.  Fratto at 167-68 (Ex. F).

123.    Only three or four reporters asked questions at the press conference.  *Id.* at 168.

124.    Fratto could not believe that the reporters at the press conference did not ask more questions.  *Id.*

125.    After Holahan restated the embargo time, the press conference ended at 9:25 a.m.. Holahan at 63 (Ex. E).

126.    Treasury did not take any steps to restrict the ability of attendees at the October 31, 2001 press conference to leave the building or to communicate by telephone, e-mail, or page with whomever they liked.  Collins at 48-49 (Ex. Q); P. Davis at 178-79 (Ex. G).

127.    At the end of the press conference, 35 minutes were left in the embargo period –
far longer than any previous embargo.  Paul Malvey remembers "looking at the clock and saying,
holy s__, that's a long time. . . .  It was probably too much time."  Malvey at 235-36 (Ex. I).

128.    It is "obvious on its face" that a longer embargo period results in a greater risk of
early disclosure.  Ouseley at 77-78 (Ex. H).

### *Further dissemination of the information*

129.    *National Mortgage News* reporter Brian Collins arrived at the October 31, 2001
press conference during Fisher's question-and-answer period.  Collins at 43 (Ex. Q).

130.    After the press conference ended, Collins walked two blocks back to his office,
drafted a short story on the 30-year suspension, and then – at some time between 9:35 and 9:50
a.m. – disclosed the information to an employee at Federal National Mortgage Association
(Fannie Mae), a market participant.  *Id.* at 48-53, 68 & Ex. 6.

131.    Even though the SEC interviewed Collins in December 2001, neither Treasury
nor the SEC took any disciplinary action against him, and he continued to attend Treasury press
conferences.  *Id.* at 59-61.

132.    At the end of the October 31, 2001 press conference, Peter Davis left the Treasury
building, walked to a public bench, and began to call clients and potential clients with the news.
P. Davis at 178-80 (Ex. G).

133.    At 9:28 a.m., according to phone records, Davis called Stone & McCarthy, a
market research firm, and had a detailed conversation about Treasury's decision to suspend the
30-year bond with one of its principals.  *Id.* at 190-91 & Ex. 30.

134.    At 9:32, 9:33, and 9:34 a.m., Davis had detailed conversations about Treasury's
decision to suspend the 30-year bond with three hedge funds:  Capra Asset Management, Tudor
Investment Corporation, and SAC Capital Partners, respectively.  *Id.* at 197-200 & Ex. 30.

135.    At 9:35 a.m., Davis had a detailed conversation about Treasury's decision to
suspend the 30-year bond with John Youngdahl at Goldman Sachs.  *Id.* at 200-01 & Ex. 30.

136.    At 9:37 a.m., Davis relayed Treasury's decision to suspend the 30-year bond to Sangamon Trading, a commodity trading firm in Chicago.  *Id.* at Ex. 30; SEC Deposition of Robert Falconer at 173-79 (Ex. S).

137.    At around 9:38 a.m., Davis called Nothern at MFS and left a short voice-mail message reporting the decision.  P. Davis at 183-91 & Ex. 30 (Ex. G).

138.    Unaware of the purported 10:00 a.m. embargo, F. Anderson at 113 (Ex. R), Treasury's Frances Anderson posted Treasury's quarterly refunding announcement on the Internet at 9:40 a.m. (according to a computer clock).  Deposition of David Harris at 93-94 (Ex. T); Deposition of Verizon Business (Anne Wilson) at 75-76, 149-56 (Ex. U).

139.    Specifically, Anderson transferred the announcement to a staging server which, unknown to her, was located at a publicly accessible Internet address, F. Anderson at 183 (Ex. R); Harris at 89-90 (Ex. T); Verizon at 153 (Ex. U).

140.    Anderson last modified the announcement on the staging server at 9:40 a.m., Harris at 67-68 (Ex. T); Verizon at 168-69 (Ex. U), and then transferred it to Treasury's web site at another address on the Internet, F. Anderson at 286-87 (Ex. R).

141.    At 12:53 p.m. on October 31, 2001, Assistant Secretary Michele Davis sent an e-mail to Peter Fisher and others stating:  "I apologize to all of you for the early posting on the website.  I thought our public affairs staff understood that embargo means embargo.  I certainly will make sure they do now.  The early posting was far more than 'unfortunate' – it was careless and I'll make sure we don't have such lapses in the future.  I'm sorry that all of you are having to take a lot of criticism for the carelessness in my shop."  M. Davis at 137-39 & Ex. 10 (Ex. D).

142.    According to Treasury's press officials, the embargo no longer applied after the announcement was posted on the web site.  Holahan at 221 (Ex. E); M. Davis at 132 (Ex. D).

143.    Sometime around 9:45 a.m., various Treasury employees and a reporter from Reuters informed Fratto that the announcement had been posted on Treasury's web site.  Fratto at 218-21 (Ex. F).  Fratto told the reporter, "Get your story out.  Go get it out."  *Id.* at 220.

144.    Before 10:00 a.m., Reuters published on its news wire: "US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS."  Holahan at 217 & Ex. 11 (Ex. E).

### *Nothern's trade*

145.    After Nothern arrived at work around 7:00 or 7:30 a.m. on October 31, 2001, he began work on restructuring his portfolios.  Nothern at 153-54, 180 (Ex. J).  Specifically, he began selling some shorter- and intermediate-maturity notes and bonds to raise cash so that he could buy longer-maturity bonds.  *Id.*

146.    As of the early morning on October 31, 2001, Nothern believed that longer-term securities, such as the 30-year bond, represented value under the present economic conditions. *Id.* at 206-10.

147.    Around 9:30 a.m., Nothern received a call from a broker reporting rumors on the Chicago Board of Trade that the 30-year bond had been cancelled.  *Id.* at 163-68.

148.    Prior to the call from the broker, Nothern had observed that the price of the 30-year bond had been increasing, "at least a quarter point with eight, 10 ticks."  *Id.* at 165-66.

149.    Nothern's colleagues John Cadogan, David Kennedy, Geoffrey Kurinsky, and Richard Smith all observed upward movement in the price of the 30-year bond, prior to hearing of Davis's voice-mail message and deciding to trade at the same time Nothern did.  Deposition of John Cadogan at 140, 178 (Ex. V); Deposition of David Kennedy at 104-06 (Ex. W); Deposition of Geoffrey Kurinsky at 110-11, 201 (Ex. X); Deposition of Richard Smith at 156-57, 168-69, 253-54 (Ex. Y).

150.    Treasury economist Jill Cetina observed increases in the price of the 30-year bond around 9:30 a.m. on October 31, 2001.  Cetina at 77-78 (Ex. P).

151.    Later that morning, Malvey printed out a Bloomberg chart on the price of the 30-year bond, observed upward price movement prior to 10:00 a.m., and was concerned that the market had acted on the information before the announced embargo time.  Malvey at 202-04, 228-30.

152.    The SEC's expert, Jeffrey Davis, testified that there were several statistically significant increases in the price of the 30-year bond between 9:25 and 9:38 a.m. on October 31, 2001.  See Deposition of Jeffrey Davis at 125-28, 135-37, 153-66 (Ex. Z).

153.    After receiving the call from the broker, Nothern continued to work on restructuring his portfolios, primarily selling off short- and intermediate-maturity notes and bonds.  Nothern at 175-76 (Ex. J).  He had a conversation with a receptionist about the servicing of a laptop computer.  *Id.* at 176-77.  At some point, he observed the light on his phone indicating a voice-mail message.  *Id.* at 178.  Nothern listened to the message.  *Id.* at 180.

154.    According to MFS records, the message was less than one minute in length. Nothern at 182-84 & Ex. 10.

155.    While Nothern does not recall verbatim what Davis said, he took away two things:  (i) Peter Fisher had told Davis that Treasury was canceling the 30-year bond, and (ii) there was a press release reporting the decision under embargo until 10 o'clock.  *Id.* at 180-81.

156.    Nothern understood Peter Fisher to be a low-level political appointee at Treasury. *Id.* at 185.

157.    Davis's voice-mail message did not state that Nothern could not trade on the information set forth therein.  *Id.* at 271, 275.

158.    Nothern knew that the term "embargo" could apply to information, but did not know what that term meant at Treasury or what, if any, embargo procedures Treasury used.  *Id.* at 148; SEC Deposition of Steven Nothern ("Nothern SEC") at 99-103 (Ex. AA).

159.    Nothern did have a vague understanding of embargo procedures used at the Labor Department – under which reporters who receive the information are locked down in a room, with no ability to leave or call out until the embargo time arrives.  Nothern SEC at 99-100, 138 (Ex. AA).

160.    Nothern understood "embargo" to apply to the press, Nothern at 253-54 (Ex. J), and understood Davis to be a Washington consultant, not a member of the press, *id.* at 254.

161.    After Nothern listened to Davis's voice-mail message, he noted a further rise in the bond price.  *Id.* at 191.

162.    Believing that the information was public, *id.* at 205, 243; that the press embargo was inapplicable to Davis or himself, *id.* at 254; and that the 30-year bond represented good value, *id.* at 206-10, Nothern directed purchases of 30-year bonds for the portfolios he managed at MFS, *id.* at 191-93.

163.    The records of the counterparty, Merrill Lynch, for the trade in the 30-year bond indicate that the trade time of this transaction was 9:45:49 a.m.  Deposition of Bloomberg LLP (Patrick Eldridge) at 69, 76-77 (Ex. BB).

Respectfully submitted,

STEVEN E. NOTHERN
By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated:  June 16, 2008

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ John A. Shope