UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Civil Action No. 05-10983 (NMG) |
| Plaintiff, | |
| v. | **ORAL ARGUMENT REQUESTED** |
| STEVEN E. NOTHERN, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: June 16, 2008

## Table Of Contents

Table Of Authorities .................................................................................................................iii

*Treasury's failure to use a "lockdown" embargo* ............................................................1

*Davis's consulting business* ..............................................................................................3

*Davis's attendance at Treasury press conferences for seven years* .................................3

*Nothern's lack of knowledge of Davis's attendance* .........................................................4

*The October 31, 2001 press conference* ..........................................................................4

*Nothern's trade* ................................................................................................................6

Argument ...........................................................................................................................7

I.      THE INFORMATION WAS PUBLIC AFTER 9:00 A.M. ........................................7

        A.      Treasury Did Not Restrain Dissemination. ...............................................7

        B.      The "Embargo" Was Not Legally Binding. ................................................7

                1.      Treasury's housekeeping regulation did not apply. ......................8

                2.      No attendee consented to the embargo. ........................................8

                3.      Any promises of confidentiality were unenforceable. ...................9

        C.      The Purported Embargo Was Unconstitutional. .......................................10

II.     NOTHERN DID NOT KNOW OF ANY FIDUCIARY-LIKE DUTY .........................12

        A.      The Possession of Nonpublic Information Does Not Establish Liability Under Rule 10b-5. .......................................................................................12

        B.      Davis Owed No Fiduciary Duty To Treasury. ..........................................13

                1.      The embargo request did not establish a duty for Davis. .............13

                2.      Davis's alleged regulatory and statutory violations did not establish a duty under § 10(b). ...................................................................13

                3.      Any agreement did not create a fiduciary duty. ..........................13

                        a.      Davis was not admitted pursuant to any agreement. ......14

                        b.      Any agreement could not establish a fiduciary-like duty. ............14

                                i.      To the extent it purports to redefine fiduciary duty under § 10(b), Rule 10b5-2(b)(1) is invalid. ....................14

                                ii.     Davis was not Treasury's fiduciary. ................................16

i

C.      Nothern Had No Knowledge of Any Duty of Davis....................................................17

      1.      Davis never told Nothern about any agreement with Treasury or his ability to attend Treasury press conferences. ...............................................18

      2.      Davis's voice-mail message did not reveal any duty. ...............................18

      3.      Nothern had no reason to assume that Treasury carefully protected the confidentiality of its information since it clearly did not...........................19

Conclusion ................................................................................................................................ 20

## Table Of Authorities

## FEDERAL CASES

*Alexander v. United States*, 509 U.S. 544 (1993) ..............................................................10

*Chiarella v. United States*, 445 U.S. 222 (1980) .................................................. 12, 15-16

*City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988) ........................10

*Dirks v. SEC*, 463 U.S. 646 (1983) ........................................................................ 12, 15-16

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976).........................................................15

*Financial Planning Association v. SEC*, 482 F.3d 481 (D.C. Cir. 2007) .........................15

*In the matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986).........................10

*Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978).................................10

*Nebraska Press Association v. Stuart*, 427 U.S. 539 (1976) ...........................................10

*New York Times Co. v. United States*, 403 U.S. 713 (1971)...............................................11

*Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1 (D.D.C. 2008) .....................................15

*Pierce v. Clarion Ledger*, 452 F. Supp. 2d 661 (S.D. Miss. 2006), *aff'd*, 236 Fed. Appx. 887 (5th Cir 2007)....................................................................................10

*SEC v. Dorozhko*, No. 07-Civ. 9606(NRB), 2008 WL 126612 (S.D.N.Y. Jan. 8, 2008) ..............................................................................................................13

*SEC v. Monarch Fund*, 608 F.2d 938 (2d Cir. 1979)........................................................17

*SEC v. Sargent*, 229 F.3d 68 (1st Cir. 2000).....................................................................17

*SEC v. Switzer*, 590 F. Supp. 756 (W.D. Okla. 1984) ......................................................12

*SEC v. Talbot*, 430 F. Supp. 2d 1029 (C.D. Cal. 2006)...........................................8, 14, 16

*Steele v. Isikoff*, 130 F. Supp. 2d 23 (D.D.C. 2000)..................................................9-10, 15

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761 (2008) ..........15

*United States v. Carpenter*, 791 F.2d 1024 (2d Cir. 1986)..............................................10

*United States v. Cassese*, 273 F. Supp. 2d 481 (S.D.N.Y. 2003), *aff'd*, 428 F.3d 92 (2d Cir. 2005).........................................................................................................17

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) .......................................... *passim*

*United States v. Kim*, 184 F. Supp. 2d 1006 (N.D. Cal. 2002) ................................... 16-17

iii

*United States v. Liberia*, 989 F.2d 596 (2d Cir. 1993)..............................................7, 12, 17

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) ..........................................................17

*United States v. O'Hagan*, 521 U.S. 642 (1997).................................................... 12-13, 15

*Walton v. Morgan Stanley & Co.*, 623 F.2d 796 (2d Cir. 1980)...................................... 8-9

## OTHER AUTHORITIES

Securities Exchange Act of 1934, 15 U.S.C. § 78j ..............................................................1

31 C.F.R. § 407 ..................................................................................................................8

17 C.F.R. § 243.100(b)(2)..............................................................................................9, 15

17 C.F.R. § 240.10b5-2(b)(1) .................................................................................... 14-16

Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716 (Aug. 24, 2000) ..... *passim*

*Developments in the Law - Prosecuting the Press,* 120 Harv. L. Rev. 1007 (2007) .........19

Kathleen Coles, *The Dilemma of the Remote Tippee,* 41 Gonz. L. Rev. 181 (2006) ........12

Kristina Hammond, *Plugging the Leaks: Applying the Model Rules to Leaks Made by Government Lawyers*, 18 Geo. J. Legal Ethics 783 (2005) .........................20

Ray J. Grzebielski, *Friends, Family, Fiduciaries: Personal Relationships as a Basis for Insider Trading Violations,* 51 Cath. U. L. Rev. 467, 492 (2002).......... 15-16

Richard B. Kielbowicz, *The Role of News Leaks in Governance and the Law of Journalists' Confidentiality, 1795-2005,* 43 San Diego L. Rev. 425 (2006) ......... 19-20

In this case, the SEC alleges that on October 31, 2001 Steven Nothern, a bond portfolio manager for MFS Investment Management in Boston, violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, by trading on information released at the quarterly refunding press conference held by the Department of the Treasury that day, namely, its decision to suspend issuance of the 30-year bond.  The SEC's theory of liability is that Treasury's unilateral announcement of a 10:00 a.m. press "embargo" maintained the confidential nature of its information (at least until Treasury released it on the Internet at about 9:40 a.m.); and that Nothern, upon being told before 10:00 a.m. by a consultant who had attended the press conference, Peter Davis, that the information was subject to a press embargo, should have known that Davis had obtained the information in violation of a fiduciary-like duty owed to Treasury.

Summary judgment must be granted for Nothern on several grounds, any one of which is sufficient:  (i) the information upon which Nothern traded was already public no later than the commencement of the press conference at 9:00 a.m., given Treasury's undisputed failure to physically restrain or secure any obligation purporting to bind the attending reporters to a duty of confidentiality, as well as its posting on the Internet at least two minutes before Nothern's alleged trade at 9:42 a.m.; (ii) even if the embargo were binding on its face, it was unenforceable under the First Amendment; (iii) the alleged agreement between Davis and Treasury is an inadequate basis for liability under § 10(b); and (iv) it is undisputed that Nothern was never informed of any duty on the part of Davis to comply with any press embargo.

### *Treasury's failure to use a "lockdown" embargo*

As of October 31, 2001, Treasury did not have written policies on press embargoes, never explained what they meant, and even its employees disagreed as to what they required.  UF 22-27,

141.[1]  While Treasury used "lockdown" embargo procedures for its Federal Open Market Committee and securities auctions announcements, under which reporters were physically prevented from reporting information before a designated time, its procedures for quarterly refunding press conferences were "more casual."  UF 28-30.  Anyone admitted to the Treasury building was free to attend, no one checked attendees' identification or credentials, and Treasury did not take any steps to keep attendees from leaving the building or communicating with whomever they liked.  UF 110-14, 126.

As a general matter, a press "embargo" is nothing more than a request by a source that information remain confidential for a period of time.  UF 1, 12-14.  There is no general ethic, regulation, or rule of law that requires reporters to agree to embargo requests or even state that they are declining to agree, and reporters routinely ignore them.  UF 9-10.  Nor is there any convention that reporters who have agreed to abide by an embargo in the past will do so in the future.  UF 11.  The only remedy for a source whose request for an embargo is not honored is to discontinue communications in the future.  UF 15.  Press embargoes are actually often requested by certain members of the press, including those covering Treasury, for anti-competitive reasons, or are used by sources to curry favor with particular media outlets.  UF 2-4.  Embargoes date from the era of production of a single article prepared for a press deadline and have no application in the Internet era of a 24/7 news cycle and continually updated stories.  UF 5-7.  Any skilled reporter could have in any event promptly filed an accurate story without the embargo, and Treasury could have ensured even dissemination of its decision through Internet posting or webcasting of its news conference.  UF 7-8, 16.

Treasury's casual approach had consequences.  As deputy assistant secretary Timothy

---

[1] "UF" refers to Defendant's Rule 56.1 Statement of Undisputed Facts in Support of His Motion for Summary Judgment filed herewith.  Referenced exhibits and deposition transcripts in that Statement are attached as exhibits to the Declaration of Robert E. Toone ("Toone Decl.").

Bitsberger noted, "[t]he refunding process has been criticized for years because of suspected leaks." UF 19. Treasury Public Affairs Director Tony Fratto observed, "this place leaked like a sieve," UF 20.

### Davis's consulting business

In his work as a bond portfolio manager for MFS Investment Management in Boston, Nothern and his colleagues used an array of resources for research and analysis, including smaller research boutiques like that run by Peter Davis, a former Capitol Hill staffer. UF 40-42. Davis provided information and analysis about fiscal and budgetary policy developments in Washington, D.C. UF 43. His clients included such firms as JPMorgan Chase Securities, Fidelity Investments, and Goldman Sachs. UF 44. Davis considered MFS to be a "small client." UF 46.

### Davis's attendance at Treasury press conferences for seven years

Peter Davis regularly attended quarterly refunding press conferences from 1994 to October 31, 2001. UF 49. He gained access by calling a secretary in the Office of Market Finance, who in turn arranged for his admission with guards at the entrance of the Treasury building. UF 52. The SEC alleges that "Treasury first permitted Davis to attend a refunding press conference in 1994, pursuant to an explicit face-to-face agreement he made with a senior adviser in Treasury's Office of Federal Finance," and that it was "only by reason of this explicit agreement that Treasury permitted Davis, from approximately 1994 to October 31, 2001, to attend refunding press conferences." Cmplt. ¶ 27. The SEC identifies that adviser as Roger Anderson. Resp. to Nothern's Int. No. 3 (Toone Decl., Ex. CC).

At his deposition, Davis testified that Anderson and he signed a written agreement of an unknown nature in 1994. According to Davis, he gave the agreement a "cursory reading" and "didn't have a specific detailed understanding of it." UF 60. Although he subjectively understood it to foreclose disclosure before an embargo, he did not recall any mention of "embargo" in the

agreement itself.  UF 61.  Davis discarded the alleged agreement in August 2001.  UF 63.

Treasury denies knowledge of any agreement, and no copy has ever been produced by Treasury,

Davis, Anderson, or anyone else.  UF 65-66.

For his part, Anderson, who began work at Treasury in June 1995, denied that he or Davis

entered into any agreement.  UF 67-68.  Davis was already attending quarterly refunding press

conferences at Treasury when they first met in the 1990s, and Anderson merely told him that he

would not personally oppose Davis's attendance at future press conferences if he did not disclose

information before the embargo time.  UF 69-70.  Anderson was not responsible to decide whether

Davis could attend, never admitted Davis to a press conference, and never discussed his

attendance with anyone else.  UF 71.  There is no evidence that any other Treasury employee

knew about a confidentiality agreement, oral or written, involving Davis.  UF 72-80.

### Nothern's lack of knowledge of Davis's attendance

Peter Davis never told Nothern that he was able to attend quarterly refunding press

conferences at Treasury.  UF 81.  He never told Nothern about the existence or contents of his

purported confidentiality agreement with Anderson, and he never discussed with Nothern

embargoes or what the term "embargo" meant.  UF 82-84.  And while Davis occasionally sent

Nothern materials from quarterly refundings, he never provided Nothern with purportedly

embargoed information prior to October 31, 2001.  UF 86.

### The October 31, 2001 press conference

In preparing for the October 31, 2001 press conference, Under Secretary Peter Fisher, the

policymaker who would be speaking, expressed to Assistant Secretary Michele Davis, who was

responsible for press affairs at Treasury, his "discomfort with the use of an embargo" based on his

belief that "the risk of a leak or some malfunction, some procedural malfunction was too high."

UF 98.  Davis rejected Fisher's recommendation that the information be directly released to the

public because she did not want to change procedures.  UF 98-99.

On October 30, Treasury issued a media advisory announcing the conference and stating that "[t]he event will have a 10:00 a.m. news embargo."  UF 100.  This was the first pre-set embargo time for a refunding conference in Treasury's history, and it was based on Treasury Public Affairs Director Fratto's erroneous belief that reporters would want to ask questions until about 9:40 a.m.  UF 101-03.  Before October 31, 2001, Treasury had typically requested embargos for a period of only 10 or 15 minutes after consultation with the reporters.  UF 33-35.

On October 31, Treasury e-mailed a copy of the quarterly refunding announcement before the 10:00 a.m. embargo time to CNBC at 8:57 a.m., to the New York Times at 9:30 a.m., and to the Wall Street Journal at 9:32 a.m.  UF 104-06.  Unlike CNBC, neither the New York Times nor the Wall Street Journal agreed to the embargo.  UF 106.  Shortly before the press conference began at 9:00 a.m., Treasury employees distributed to attendees a copy of the announcement with the heading "FOR IMMEDIATE RELEASE."  UF 117.

At least 40 people attended the press conference, but there is no comprehensive list.  UF 115-16.  Spokesperson Elizabeth Holahan declared a 10:00 embargo at the beginning and end of the press conference, but neither she nor anyone else at Treasury asked for, or received, any attendee's consent to it.  UF 118-21.  It took Fisher 15 minutes to read the refunding announcement.  UF 122.  After questions from only a few reporters, the press conference ended at 9:25 a.m., at which point the attendees left.  UF 123-26.  The resulting 35-minute embargo period was the longest in Treasury's history.  UF 127.

Attendees at the press conference proceeded to disclose the information before 10:00 a.m. UF 129-44.  *National Mortgage News* reporter Brian Collins disclosed the information to Fannie Mae, a market participant, between 9:35 and 9:50 a.m.  UF 130.  Peter Davis left the Treasury building, and then began calling clients and potential clients with the news.  UF 132.  He disclosed

the news to a market research firm at 9:28 a.m.; to three hedge funds at 9:32, 9:33, and 9:34 a.m.; to Goldman Sachs at 9:35 a.m.; and to a commodity trading firm at 9:37 a.m. UF 133-35. At around 9:38 a.m., Davis called Nothern at MFS and left a short voice-mail message. UF 137.

Unaware of the purported embargo, a Treasury employee posted the announcement on a publicly accessible Internet site at 9:40 a.m., and then transferred it to Treasury's official web site at, the SEC alleges, 9:43 a.m. UF 138-40; Cmplt. ¶ 32. According to Treasury's press officials, at that point the embargo no longer applied. UF 142.

### Nothern's trade

After Nothern arrived at work on October 31, 2001, he began to restructure his portfolios, selling some shorter- and intermediate-maturity notes and bonds to raise cash so that he could buy longer-maturity bonds. UF 145. Around 9:30 a.m., he received a call from a broker reporting rumors on the Chicago Board of Trade of cancellation of the 30-year bond. UF 147. Prior to that call, Nothern had observed that the price of the 30-year bond had been increasing significantly, as did Nothern's colleagues at MFS and Treasury economist Jill Cetina. UF 148-50. The SEC's own expert, Jeffrey Davis, has conceded that there were several statistically significant increases in the price of the 30-year bond between 9:25 and 9:38 a.m. UF 152.

At some point after 9:38 a.m., Nothern observed the light on his phone indicating a voice-mail message. UF 153. After listening to Davis's message (which was less than a minute long), Nothern took away two things: (i) Peter Fisher had told Davis that Treasury was canceling the 30-year bond, and (ii) a press release to announce the decision was under embargo until 10:00 a.m. UF 154-55. Davis's message did not indicate that Nothern could not trade on the information. UF 157. While Nothern did not know anything about embargoes at Treasury, he did have a vague understanding of the "lockdown" procedures used by the Labor Department. UF 158-59. In any event, Nothern understood the term "embargo" to apply to the press, not Davis. UF 160. Nothern

then noted a further rise in the bond price.  UF 161.  Believing that the press embargo was inapplicable, that the information was public, and that any delay in purchasing would be detrimental to the pension and mutual funds he managed, Nothern directed purchases of 30-year bonds and advised his colleagues, who made purchases for the funds they managed as well.  UF 162.  The SEC alleges that the trades occurred between 9:42:00 and 9:42:49, although trading records indicate a trade time of 9:45.  Resp. to Nothern's Int. No. 16 (Toone Decl., Ex. CC); UF 163.  After market complaints that Goldman Sachs and others had traded on the information before 10:00 a.m., Treasury changed its practice to use of only a brief lockdown embargo before the announcement.  UF 31-32.

## Argument

### I.    THE INFORMATION WAS PUBLIC AFTER 9:00 A.M.

#### A.    Treasury Did Not Restrain Dissemination.

It is "axiomatic" that § 10(b) does not prohibit trading on public information.  *See United States v. Liberia*, 989 F.2d 596, 601 (2d Cir. 1993).  At least two minutes before Nothern traded, the information was posted on a publicly available web site, and at least 42 minutes earlier, had been announced at a press conference.  The announcement "at a conference of which the public had notice and to which the public was granted access" is a paradigmatic example of how information should be publicly disclosed.  Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,723 (Aug. 24, 2000).  The conference was effectively "open to the public."  UF 109.  Anyone already in the Treasury building was free to attend.  UF 110.  No employee checked the identities or credentials of the attendees, UF 111-12, who were free to leave and communicate with whomever they liked.  UF 126.

#### B.    The "Embargo" Was Not Legally Binding.

Nor did Treasury impose any legal restraint.  The SEC alleges that Treasury "required that

all persons granted access to the conference maintain the strict confidentiality of all information disclosed – that it, to respect and abide by an embargo on such information – until expiration of the embargo at a predetermined announced time." Cmplt. ¶ 22. But this allegation is simply false. While spokesperson Holahan announced the embargo time at the press conference, neither she nor anyone else at Treasury did anything to require the attendees' compliance. UF 119-21.

### 1.    Treasury's housekeeping regulation did not apply.

The SEC contends that a Treasury regulation, 31 C.F.R. § 407.5 (titled "Conformity with signs and directions"), requiring persons on Treasury property to "comply with the instructions of Treasury guards, with official signs of a prohibitory or directory nature, and with the directions of other authorized officials," imposed a legal obligation to comply with the embargo. *See* Cmplt. ¶ 23. But § 407.5 is only a housekeeping regulation, intended to promote safe and orderly conditions on Treasury property. (Accompanying regulations address such issues as vandalism, littering, and the carrying of intoxicating beverages. *See* 31 C.F.R. § 407.4, .6-.8.) In any event, the regulation expressly applies only to "[p]ersons in and on the property"; it did not restrict the actions of attendees (like *National Mortgage News* reporter Brian Collins and alleged tipper Peter Davis) who left the Treasury building before making telephone calls. UF 130, 132.

### 2.    No attendee consented to the embargo.

Because none of the attendees expressly agreed to Treasury's embargo October 31, 2001, Holahan's announcement amounted to nothing more than a request that the attendees withhold the information until 10:00 a.m. UF 12-13, 120-21. It is well established that a duty of confidentiality "cannot be imposed unilaterally by entrusting a person with confidential information." *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991); *see also Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir. 1980); *SEC v. Talbot*, 430 F. Supp. 2d 1029, 1059-60 (C.D. Cal. 2006). Rather, to establish a duty, the recipient of the information must – at the very least – have

expressly agreed to do so.  Under the SEC's own Fair Disclosure regulation, an issuer may selectively disclose information to an outside party only if that party "*expressly* agrees to maintain the disclosed information in confidence."  17 C.F.R. § 243.100(b)(2)(i), (ii) (emphasis added).[2]

This rule is consistent with how journalists deal with press embargoes.  Many embargoes, such as the one at issue here, are simply requests that journalists believe they are completely free to disregard, and there is no law or binding ethical rule to the contrary.  UF 9, 12.  There is no convention that requires a journalist to state whether he or she will comply with a requested embargo before learning and reporting any news that may be announced.  UF 10.  In fact, journalists commonly disregard embargo requests to which they have not expressly agreed.  UF 13.  Treasury might have been right to assume that some of the attendees would seek to remain in favor and comply with its request, but it could not reasonably assume that all would do so.

### 3.    Any promises of confidentiality were unenforceable.

Furthermore, even if the reporters attending Treasury's press conference *had* consented to the embargo, they would have still been under no legal duty to observe it.  Under District of Columbia law, a "reporter's promise of confidentiality is a moral obligation, not a contractual requirement," and as such "does not give rise to express or implied contractual duties."  *Steele v. Isikoff*, 130 F. Supp. 2d 23, 31 (D.D.C. 2000).  In the *Steele* case, the court dismissed a claim that a reporter breached a contract by violating a promise of confidentiality to his source.  *Id.* at 31-32; *accord Pierce v. Clarion Ledger*, 452 F. Supp. 2d 661, 663-65 (S.D. Miss. 2006), *aff'd*, 236 Fed. Appx. 887 (5th Cir 2007).  "[N]o court in any jurisdiction has ever recognized the existence of a

---

[2] *See also* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,720 n.28 (Aug. 24, 2000) ("This agreement to maintain confidentiality must be express.").  In this case, the SEC makes the disputed allegation that Peter Davis attended the October 31, 2001 press conference "only by reason" of an "explicit agreement" that he reached with a senior Treasury official in 1994.  *See* Cmplt. ¶ 27.  Even if this were so, there is no evidence that any other attendee on October 31, 2001 agreed with Treasury to comply with the announced embargo or otherwise maintain the information's confidentiality.

fiduciary or confidential relationship between a reporter and his or her source." *Steele*, 130 F. Supp. 2d at 36.

### C.    The Purported Embargo Was Unconstitutional.

Finally, even assuming that Treasury's embargo request was an enforceable contract or administrative order, either with Peter Davis or the members of the press, it was an impermissible prior restraint forbidden by the First Amendment.  A government-imposed embargo is a prior restraint on speech, that is, an "administrative and judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted); *contrast United States v. Carpenter*, 791 F.2d 1024, 1034 (2d Cir. 1986) (rejecting First Amendment argument where "the confidential restrictions stem from the Wall Street Journal and Dow Jones company rules, not from any action by the government.").  Prior restraints are presumptively unconstitutional.  "In its nearly two centuries of existence, the Supreme Court has never upheld a prior restraint on pure speech."  *In the matter of Providence Journal Co.*, 820 F.2d 1342, 1348 (1st Cir. 1986); *see also Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (prior restraints are "the most serious and least tolerable infringement on First Amendment rights"); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).  Prior restraints fail constitutional muster even if they purport to restrain speech for only a limited period of time.  *See Providence Journal Co.*, 820 F.2d at 1351; *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 849 (1978) (Stewart, J., concurring) ("Though government may deny access to information and punish its theft, government may not prohibit or punish the publication of that information once it falls into the hands of the press, unless the need for secrecy is manifestly overwhelming"; restraint on disclosure of judicial discipline proceedings included); Laurence H. Tribe, *American Constitutional Law* § 12-36, at 1050 (2d ed. 1988) (observing that delay of publication is as

obnoxious as outright prohibition).

The government bears a "heavy burden of showing justification" for a prior restraint on speech. *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) ("the *Pentagon Papers* case"). The SEC cannot satisfy this burden here. While it alleges that Treasury used embargoes "to ensure the accurate, uniform and orderly dissemination of refunding information," Cmplt. ¶ 22, this administrative concern does not come close to the level of the national security interests asserted, and rejected, in the *Pentagon Papers* case. Indeed, Peter Fisher, the Treasury official responsible for making and announcing the decision to suspend the 30-year bond, opposed the use of an embargo altogether. UF 98. Moreover, Assistant Secretary Michele Davis's contention[3] that embargoes keep reporters from "scanning a piece of paper and throwing something in the wire that's out of context" fundamentally misapprehends the practice of modern journalism. Today, journalists are able to identify newsworthy items in a press release and report them to the public – via radio, television, a wire service, or the Internet – in a matter of seconds. UF 7. Any skilled reporter would have been able to quickly identify the "lead" in Treasury's announcement – its decision to suspend the 30-year bond – and post a powerful and accurate one-sentence story, which could have been followed in succeeding minutes and hours by more detailed stories with additional background information. UF 8. No valid newsgathering purpose, much less a compelling one, was advanced by Treasury's purported prohibition on the dissemination of this information for a full hour after its press conference began. It was certainly not the minimum restraint necessary, as Treasury itself has recognized in subsequently adopting short lockdown embargoes for its quarterly refunding announcements. UF 31-32. In fact, to advance any goal of uniform release, Treasury could easily have placed its announcement on its web site, sent a mass e-mail, and/or conducted a live webcast of the conference. UF 16.

_____

[3] *See* Deposition of Michele Davis at 176-77 (Ex. D to Toone Decl.).

## II.    NOTHERN DID NOT KNOW OF ANY FIDUCIARY-LIKE DUTY.

Even if Treasury's decision to suspend the 30-year bond had not been public at the time of

Nothern's trade, Nothern cannot be held liable because there is no evidence that he knew that the

alleged tipper, Peter Davis, had breached any fiduciary-like duty to that department.

### A.    The Possession of Nonpublic Information Does Not Establish Liability Under Rule 10b-5.

"[T]here is no 'general duty between all participants in market transactions to forgo actions

based on material, nonpublic information.'"  *United States v. O'Hagan*, 521 U.S. 642, 663 (1997)

(quoting *Dirks v. SEC*, 463 U.S. 646, 655 (1983)).  In *Chiarella v. United States*, 445 U.S. 222

(1980), the Supreme Court rejected the SEC's argument that "the mere possession of nonpublic

market information" gives rise to a duty to disclose or refrain from trading.  *Id.* at 235.  Three

years later, the Court reaffirmed this ruling in *Dirks*, rejecting the SEC's argument "that anyone

who knowingly receives nonpublic material information from an insider has a fiduciary duty to

disclose before trading."  463 U.S. at 656.[4]  What matters is whether the tippee has a derivative

duty to the source of the information based on his knowledge of the tipper's breach of a duty of

trust and confidence – such that the tippee becomes "a participant after the fact in the [tipper's]

breach of a fiduciary duty."  *Id.* at 659.  The SEC, however, apparently still resists the point.  S*ee*

Kathleen Coles, *The Dilemma of the Remote Tippee*, 41 Gonz. L. Rev. 181, 184 & n.21 (2006)

(citing report that "SEC staff [are] developing enforcement cases that may be reverting to the

possession theory of insider trading").

In this case, the SEC seeks to hold Nothern liable under the "misappropriation" theory,

since Peter Davis was not an insider at Treasury.  *See O'Hagan*, 521 U.S. at 652-55.  The

misappropriation theory "requires the establishment of two elements:  (i) a breach by the tipper of

---

[4] It is not unlawful, for example, to trade on the basis of inadvertently overhead information, even if the trader knows that the information is not public.  *SEC v. Switzer*, 590 F. Supp. 756, 762-63, 766 (W.D. Okla. 1984).

a duty owed to the owner of the nonpublic information; and (ii) the tippee's knowledge that the

tipper had breached the duty." *United States v. Liberia*, 989 F.2d 596, 600 (2d Cir. 1993), *cited

with approval in SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000).

**B.      Davis Owed No Fiduciary Duty To Treasury.**

The SEC must first prove that Davis had a fiduciary-like duty to Treasury not to disclose

information he learned at its press conferences. "Absent any violation by the tippers, there could

be no derivative liability for the tippee." *O'Hagan*, 521 U.S. at 663.

**1.      The embargo request did not establish a duty for Davis.**

The SEC cannot establish that Davis had any duty by pointing to spokesperson Holahan's

unilateral announcement of an embargo at the press conference because, as discussed in Section

I.B.2, *supra*, a fiduciary-like duty "cannot be imposed unilaterally by entrusting a person with

confidential information." *Chestman*, 947 F.2d at 566. As noted, no one, including Davis, agreed

to the embargo on that occasion. UF 120-21.

**2.      Davis's alleged regulatory and statutory violations did not establish a
duty under § 10(b).**

The SEC also cannot establish a fiduciary-like duty of Davis based on his alleged

violations of a Treasury housekeeping regulation and federal statute prohibiting conversion of

government property. *See* Cmplt. ¶¶ 23-24, 48-50. Even assuming that this regulation and statute

applied (they do not), they are irrelevant. *See SEC v. Dorozhko*, No. 07-Civ. 9606(NRB), 2008

WL 126612, at *2 (S.D.N.Y. Jan. 8, 2008) (even though defendant may have broken the law by

hacking into computer network and stealing information, "he is not liable in a civil action under

§ 10(b) because he owed no fiduciary or similar duty either to the source of his information or to

those he transacted with in the market").

**3.      Any agreement did not create a fiduciary duty.**

Nor can the SEC establish that Davis had a duty to Treasury by relying on the

contradictory evidence regarding an agreement that he may have reached with Roger Anderson, even when all inferences are taken in its favor.

### a.    Davis was not admitted pursuant to any agreement.

The SEC alleges that Davis gained access to quarterly refunding press conferences "only by reason" of an "explicit agreement" that he reached with a senior Treasury official.  *See* Complt. ¶ 27.  But there is no evidence that Treasury admitted Davis to the press conference on October 31, 2001 pursuant to any agreement of confidentiality, since no person responsible was aware of it.  UF 65-66, 72-80.

### b.    Any agreement could not establish a fiduciary-like duty.

Even assuming that the SEC could make out such proof, it would still be insufficient to establish a fiduciary-like duty under § 10(b).

### i.    To the extent it purports to redefine fiduciary duty under § 10(b), Rule 10b5-2(b)(1) is invalid.

In its Complaint, the SEC cites its own Rule 10b5-2(b)(1) as a basis for establishing Davis's duty to Treasury.  Cmplt. ¶ 45.  This rule, which the SEC promulgated in 2000, purports to enumerate three circumstances additional to those recognized in the case law in which a "duty of trust or confidence" (or fiduciary-like duty) shall exist under the misappropriation theory.  In this case, the SEC relies on the new provision for a duty "[w]henever a person agrees to maintain information in confidence."  17 C.F.R. § 240.10b5-2(b)(1).

According to the SEC's accompanying interpretation, Rule 10b5-2 "provides a non-exclusive list of three situations in which a person has a duty of trust or confidence for purposes of the 'misappropriation' theory of the Exchange Act and Rule 10b-5 thereunder."  Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,730 (Aug. 24, 2000) (emphasis added).  The SEC recognized that the law of insider trading has generally been "defined by judicial opinions construing Rule 10b-5," including the Second Circuit's influential 1991 ruling in *United*

*States v. Chestman*. *See id.* at 51,729-30 & n.134; *see also SEC v. Talbot*, 430 F. Supp. 2d at

1051.  With Rule 10b5-2, the SEC sought to create new conditions under which a fiduciary-like

duty would exist, but did not – in its words – purport to "modify the scope of insider trading law in

any other respect."  Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,730 &

n.134 (Aug. 24, 2000) (emphasis added).

  The SEC does not, however, have authority to expand liability under § 10(b) by modifying

its statutory elements.  The Supreme Court has repeatedly held that the SEC lacks the power to

interpret Rule 10b-5 in a manner inconsistent with the language of § 10(b) itself.  *See, e.g.*,

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 128 S. Ct. 761, 768 (2008); *Ernst & Ernst v.*

*Hochfelder*, 425 U.S. 185, 214 (1976).  The SEC "has no power to correct flaws that it perceives

in the statute it is empowered to administer," and that its rulemaking authority is "limited to

adopting regulations to carry into effect the will of Congress as expressed in the statute."

*Financial Planning Ass'n v. SEC*, 482 F.3d 481, 493 (D.C. Cir. 2007) (citation omitted).

  As discussed in Section II.A, *supra*, insider trading qualifies as a "deceptive device" under

§ 10(b) only insofar as the use of the information violates a fiduciary-like duty as defined by the

courts.  *See O'Hagan*, 521 U.S. at 651-53 (citing *Chiarella* and *Dirks*).  Under District of

Columbia law, "the mere existence of a contract does not create a fiduciary duty."  *Paul v. Judicial*

*Watch, Inc.*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008) (emphasis added); *see also Steele v. Isikoff*, 130

F. Supp. 2d at 36-37.  Instead, a plaintiff must show that the parties "extended their relationship

beyond the limits of the contractual obligations to a relationship founded upon trust and

confidence."  *Paul*, 543 F. Supp. 2d at 6 (citation omitted).[5]  Thus, "Rule 10b5-2(b)(1) directly

---

[5] Significantly, under the SEC's Regulation FD – promulgated at the same time as Rule 10b5-2(b)(1) – the SEC itself distinguishes between fiduciary-like duties and confidentiality agreements.  *See* 17 C.F.R. § 243.100(b)(2)(i)-(ii) (providing that an issuer may selectively disclose information to an outside party if that party "owes a duty of trust or confidence to the issuer (such as an attorney, investment banker, or accountant)" or if that party "expressly agrees to

contradicts the Supreme Court's ruling in *Chiarella* and *Dirks* that a relationship of trust and

confidence must be breached to violate Rule 10b-5." Ray J. Grzebielski, *Friends, Family,*

*Fiduciaries: Personal Relationships as a Basis for Insider Trading Violations*, 51 Cath. U. L.

Rev. 467, 492 (2002).

> While the Rule's requirement of an agreement to keep information
> confidential is slightly different from saying possession of information, without
> more, can violate Rule 10b-5, a contractual agreement for confidentiality does not
> necessarily create a fiduciary duty. . . . An agreement to keep the information
> confidential does not create a fiduciary relationship. The SEC claims that Rule
> 10b5-2 only embodies what case law has already acknowledged. Yet any
> agreement on confidentiality must be linked with a pre-existing fiduciary
> relationship.

*Id.* at 492-93.

In *United States v. Kim*, 184 F. Supp. 2d 1006 (N.D. Cal. 2002), the court dismissed an

insider-trading indictment after finding that a confidentiality agreement signed by the members of

exclusive business club did not create or affirm a legal duty, but merely "memorialize[d] a moral

and ethical one." *Id.* at 1012-13. Addressing Rule 10b5-2(b)(1), the court described as "difficult

to take seriously" the government's contention that it "merely restate[s] the principles articulated

in *Chestman*." *Id.* at 1014-15; *see also id.* at 1014 (stating that SEC's release "makes clear that the

proposed rule was designed to establish new law, not clarify existing law"). Notwithstanding the

terms of Rule 10b5-2(b)(1), the court concluded, an express confidentiality agreement "can

provide the basis for misappropriation liability only if the express agreement sets forth a

relationship with the hallmarks of a fiduciary relationship." *Id.* at 1015. *See also SEC v. Talbot*,

430 F. Supp. 2d at 1062 n.91 (declining to apply Rule 10b5-2 and instead applying the three-part

test for "fiduciary-like dominance" set forth in *United States v. Kim*, discussed below).

### ii.    Davis was not Treasury's fiduciary.

Here, there is no evidence of a pre-existing fiduciary-like relationship between Davis and

---

maintain the disclosed information in confidence").

Treasury. The "common law has recognized some associations as inherently fiduciary," such as "attorney and client, executor and heir, guardian and ward, principal and agent, trustee and trust beneficiary, and senior corporate official and shareholder." *Chestman*, 947 F.2d at 568. None of those associations applies here. Nor is there any evidence that a duty arose out of some "'functional equivalent of a fiduciary relationship.'" *See Kim*, 184 F. Supp. 2d at 1010 (quoting *Chestman*, 947 F.2d at 568). The mere act of reposing information with a person does not suffice. *Chestman*, 947 F.2d at 568. Rather, to establish a fiduciary-like relationship outside the traditional associations recognized under common law, the person must exercise "superiority, dominance, or control" over the entity that is entrusting him with information. *See Kim*, 184 F. Supp. 2d at 1011; *United States v. Cassese*, 273 F. Supp. 2d 481, 486-87 (S.D.N.Y. 2003), *aff'd*, 428 F.3d 92 (2d Cir. 2005). Peter Davis, of course, never exercised any kind of superiority, dominance, or control over Treasury.

## C.    Nothern Had No Knowledge of Any Duty of Davis.

For a tippee to be held liable for trading on information disclosed by a misappropriator, "Rule 10b-5 requires that the defendant [tippee] subjectively believe that the information was obtained in breach of a fiduciary duty." *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996); *see also Liberia*, 989 F.2d at 600 (misappropriation theory requires proof of "the tippee's knowledge that the tipper had breached the duty"), *cited with approval in SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000). While one who receives information directly from a corporate insider may be charged with constructive knowledge of the insider's status as a fiduciary, no such presumption is appropriate in a case alleging "misappropriation." *See SEC v. Monarch Fund*, 608 F.2d 938, 942 (2d Cir. 1979) (distinguishing "tipper who knows or ought to know that he is trading on inside information" from "outsider who has no reason to know he is trading on the basis of such knowledge"). In this case, even if Peter Davis were Treasury's fiduciary, there is no

17

evidence that Nothern knew as much.

### 1. Davis never told Nothern about any agreement with Treasury or his ability to attend Treasury press conferences.

It is undisputed that at the time Nothern listened to Davis's voice-mail message, Nothern did not know that Treasury allowed Davis to attend its press conferences or obtain embargoed information. UF 81-84. And he was completely unaware of any alleged agreement that might have been made between Davis and Roger Anderson in the 1990s. UF 64, 82.

The SEC contends that Nothern knew that Davis had contacts at Treasury; attended meetings that Davis arranged with Treasury officials; and received documents that "referenced and/or were created by Treasury, including, but not limited to, documents related to Treasury's quarterly refunding conferences." Resp. to Nothern's Int. No. 9 (Toone Decl., Ex. CC). But these facts are irrelevant to the question of Nothern's knowledge of Davis's duty. The fact that an outside consultant interacts with a federal agency does not mean that he owes a duty to it.

### 2. Davis's voice-mail message did not reveal any duty.

The SEC's case for proving the requisite knowledge ultimately rests on Davis's statement in his voice-mail message that Peter Fisher had told him that Treasury would be canceling the 30-year bond, and that there was a press release with the news under embargo until 10:00 a.m. UF 155. But there is no support for the proposition that this reference to an embargo made Nothern subjectively aware that (i) Davis had a fiduciary-like duty to Treasury, and (2) Davis was breaching that duty by disclosing the information to Nothern. Davis did not tell Nothern that he could not trade on the information, or that the information was subject to any kind of duty of non-disclosure. UF 157. The reference to an embargoed press release did not reveal how Davis got this information (Fisher could have told Davis over breakfast, for example), or that Davis had a pre-existing duty not to disclose the information to others. UF 1-16.

As for the term "embargo," Nothern understood it to apply to the press, not Davis. UF

160.  He did not know what the term specifically meant at Treasury or what, if any, embargo

procedures Treasury used.  UF 158.  He did have a vague understanding of embargo procedures

used at the Labor Department, but that understanding involved the confinement of reporters in a

room, with no ability to leave or call out until the embargo expired.  UF 159.  Of course, had

Treasury used such "lockdown" procedures for the conference on October 31, 2001, Davis would

never have been able to leave a voice-mail message for Nothern in the first place.

### 3.    Nothern had no reason to assume that Treasury carefully protected the confidentiality of its information since it clearly did not.

The SEC has also argued that Nothern "should have known" that Peter Fisher and other

officials at Treasury would never have disclosed "embargoed" information to a non-journalist like

Davis, except under a fiduciary-like duty of confidentiality that automatically conveyed to

whomever Davis relayed the information.  This argument fails for several reasons.

First, as discussed in Section II.C, *supra*, a tippee's liability in a misappropriation case can

be established only through subjective, not constructive, knowledge of the breach of duty.

Second, as discussed in Section I.B, *supra*, embargo announcements do not in fact impose

fiduciary-like duties, or any other kind of duties, upon those who receive the information.  They

are at most requests – unenforceable under contract law and (when issued by government

agencies) the First Amendment, and routinely disregarded in the Internet era – which journalists

and others are free to disregard.

Third, it is common knowledge that government officials leak information all the time.

*See Developments in the Law – Prosecuting the Press*, 120 Harv. L. Rev. 1007, 1008 (2007)

("Leaks from government officials to the press are as old as the Republic."); Richard B.

Kielbowicz, *The Role of News Leaks in Governance and the Law of Journalists' Confidentiality,

1795-2005*, 43 San Diego L. Rev. 425, 494 (2006) ("[B]y the mid-twentieth century, leaks had

become a common tool of governance, even during such crises as World War II and the Cold

War."); Kristina Hammond, *Plugging the Leaks: Applying the Model Rules to Leaks Made by Government Lawyers*, 18 Geo. J. Legal Ethics 783, 784-85 (2005) (leaks of confidential information "appear at all levels of government" and are used to advance policy goals or for political or financial gain).

Treasury was no exception. UF 17-21. One top official reported on October 31, 2001 that the "refunding process has been criticized for years because of suspected leaks," while another observed that "this place leaked like a sieve." UF 19-20. In fact, a leak had occurred just three weeks earlier in connection with Treasury's intermediate issuance of 10-year notes, and market participants reported being "pretty upset" about Treasury's failure to control its information. UF 17-18, 21. And the evidence of Treasury's carelessness with respect to the confidentiality of its 30-year bond decision is substantial and undisputed. UF 91-128, 138-44.

Accordingly, the SEC cannot proceed with its § 10(b) claim on the theory that Nothern "should have known" something that was untrue: namely, that Treasury assiduously protected the confidentiality of its "embargoed" information by releasing it only to persons under a fiduciary or like duty not to disclose it.

<u>**Conclusion**</u>

For the foregoing reasons, the Court should enter a summary judgment of dismissal.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: June 16, 2008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ John A. Shope       </u>