UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 05-10983 (NMG) |
| | : | |
| STEVEN E. NOTHERN, | : | |
| | : | |
| Defendant. | : | |

**DECLARATION OF ROBERT E. TOONE FILED IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Robert E. Toone, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am an attorney for Steven E. Nothern in the above-referenced matter.  I am a member of the Massachusetts bar and the bar of this Court.  I make this declaration based upon my own personal knowledge, upon public records, and upon the documents related to this action.

2.      A true and correct copy of the Declaration of Clyde H. Bentley, Ph.D. executed on May 29, 2008 is attached hereto as Exhibit A.

3.      A true and correct copy of the Stipulation and Agreement signed by the parties on March 21, 2008 is attached hereto as Exhibit B.

4.      True and correct excerpts from the deposition transcript of Peter Fisher (August 8, 2006) are attached hereto as Exhibit C.

5.      A true and correct copy of the deposition transcript of Michele Davis and cited exhibits (February 11, 2008) are attached hereto as Exhibit D.

6.      A true and correct copy of the deposition transcript of Elizabeth Holahan and cited exhibits (August 23, 2006) are attached hereto as Exhibit E.

7.      A true and correct copy of the deposition transcript of Tony Fratto and cited exhibit (August 30, 2006) are attached hereto as Exhibit F.

8.      A true and correct copy of the deposition transcript of Peter Davis and cited exhibits (April 19-20, 2006) are attached hereto as Exhibit G.

9.      True and correct excerpts from the deposition transcript of Jill Ouseley (July 24, 2006) are attached hereto as Exhibit H.

10.     True and correct excerpts from the deposition transcript of Paul Malvey (June 23, 2008) are attached hereto as Exhibit I.

11.     A true and correct copy of the deposition transcript of Steven Nothern (January 30-31, 2007) and cited exhibit are attached hereto as Exhibit J.

12.     True and correct excerpts from the deposition transcript of Lula Tyler (September 14, 2006) are attached hereto as Exhibit K.

13.     True and correct excerpts from the deposition transcript of Roger Anderson (June 20, 2006) are attached hereto as Exhibit L.

14.     True and correct excerpts from the deposition transcript of Elnora Bowser (February 12, 2008) are attached hereto as Exhibit M.

15.     True and correct excerpts from the deposition transcript of Steven Berardi (February 12, 2008) are attached hereto as Exhibit N.

16.     True and correct excerpts from the deposition transcript of Brian Roseboro and corresponding exhibit (June 27, 2006) are attached hereto as Exhibit O.

17.     True and correct excerpts from the deposition transcript of Jill Cetina (February 8, 2008) are attached hereto as Exhibit P.

18. True and correct excerpts from the deposition transcript of Brian Collins and corresponding exhibit (May 12, 2006) are attached hereto as Exhibit Q.

19. True and correct excerpts from the deposition transcript of Frances Anderson and corresponding exhibit (August 3, 2006) are attached hereto as Exhibit R.

20. True and correct excerpts from the SEC investigative testimony of Robert Falconer (November 28, 2001) are attached hereto as Exhibit S.

21. True and correct excerpts from the deposition transcript of David Harris (July 25, 2006) are attached hereto as Exhibit T.

22. True and correct excerpts from the deposition transcript of Verizon Business (Anne Wilson) (October 6, 2006) are attached hereto as Exhibit U.

23. True and correct excerpts from the deposition transcript of John Cadogan (November 29, 2006) are attached hereto as Exhibit V.

24. True and correct excerpts from the deposition transcript of David Kennedy (June 26, 2006) are attached hereto as Exhibit W.

25. True and correct excerpts from the deposition transcript of Geoffrey Kurinsky (September 7, 2006) are attached hereto as Exhibit X.

26. True and correct excerpts from the deposition transcript of Richard Smith (June 19, 2006) are attached hereto as Exhibit Y.

27. True and correct excerpts from the deposition transcript of Jeffry Davis (May 1, 2008) are attached hereto as Exhibit Z.

28. True and correct excerpts from the SEC investigative testimony of Steven Nothern (December 4, 2001) are attached hereto as Exhibit AA.

29. True and correct excerpts from the deposition transcript of Bloomberg LLP (Patrick Eldridge) (November 2, 2006) are attached hereto as Exhibit BB.

30.     True and correct excerpts from the SEC's Responses to Nothern's Interrogatories are attached hereto as Exhibit CC.

31.     A true and correct copy of a Reuters article produced by the SEC – Daniel Sternoff, "Wall Street sees red over leak of T-bond's demise," Reuters, Oct. 31, 2001 – is attached hereto as Exhibit DD.

32.     A true and correct copy of the Minutes of the Meeting of the Treasury Borrowing Advisory Committee of the Bond Market Association (January 31, 2001) is attached hereto as Exhibit EE.

33.     A true and correct copy of a letter from Thomas McGivern in the Office of General Counsel at the Department of the Treasury to John A. Shope at Foley Hoag LLP, dated November 2, 2006, is attached hereto as Exhibit FF.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 16, 2008.


_/s/ Robert E. Toone_


## **CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_/s/ Robert E. Toone_____

**Exhibit A**

**Declaration of Clyde H. Bentley, Ph.D.
(May 29, 2008)**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 05-10983 (NMG) |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF CLYDE H. BENTLEY, Ph.D.

Clyde H. Bentley, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury as follows:

1.      I am a tenured associate professor at the Missouri School of Journalism at the University of Missouri in Columbia, Missouri.  I have held this position since 2001.

2.      I have spent most of my career as a newspaper journalist, both as a reporter and copy editor and as a news and publication manager.  My academic career has focused on the practical application of theory and research in the news media, with emphases on online journalism, user-generated content, and blogging.  A true and accurate copy of my curriculum vitae is attached as Exhibit A to this declaration.

3.      I have been asked by attorneys for Steven E. Nothern to provide an expert opinion regarding the quarterly refunding press conference held by the U.S. Department of Treasury on October 31, 2001 and the embargoed news release issued at that press conference.

4.      In addition to the Complaint in this matter, I have read the transcripts and exhibits for the depositions of the following individuals: Stephen Berardi, Brian Collins, Michele Davis, Peter Davis, Peter Fisher, Elizabeth Holahan, Steven Nothern, and Tony Fratto.

5.      In general use, a news or press embargo is a reverse "deadline" for journalists. Instead of the time by which a story must written, it is the first time at which the story may supposedly be published. But unlike deadlines imposed by editors and publishers, an embargo is an artificial time constraint requested by an external entity – the news source.

6.      Embargoes have traditionally been used to advance the narrow interests of news sources and the anti-competitive interests of established media organizations.

7.      The embargo has its roots in the days when newspapers were openly partisan, as indicated by their names (*e.g.*, "Tallahassee Democrat," "Springfield Republican"). It was a common practice for politicians to hold news conferences or release information just in time for publication in the newspaper that supported them.

8.      Embargoes serve a similar function today. Embargoes are often timed to favor certain television newscasts, so that the source gets "face time" on television, or to ensure maximum publicity by giving an embargoed news release to particular newspaper or magazine in advance of releasing it to the media in general.

9.      Embargoes are also anti-competitive insofar as they give advance notice of information to a limited number of favored media organizations, instead of releasing the information to the general public. They coddle reporters of lesser skill who do not have the ability to write quickly and accurately, preventing reporters with superior ability from using those professional skills as a competitive edge.

10.    While some have theorized that embargoes give journalists time to report and write accurate articles on complex issues, there is no evidence that embargoes actually accomplish this goal or otherwise enhance the quality of reporting.

11.    The advent of the World Wide Web in the 1990s was a death knell for press embargoes.  First, the Internet increased the immediacy of news delivery to micro-seconds, instead of the hours or days required by the traditional media to produce and publish stories.  Second, and even more important, the Internet removed the monopoly on the control and distribution of information enjoyed by the traditional media.

12.    As Treasury's Assistant Secretary for Public Affairs Michele Davis herself acknowledged, embargoes were designed for a time when reporters "often had to go through an editors desk to get onto the wire," whereas "now the technology is different."  In the Internet era, where journalists and non-journalists alike can release information to the world instantaneously, requests for press embargoes are routinely disregarded.  For example, after the White House distributed at 8:21 p.m. the text of President Bush's 2007 State of the Union Address with a caption stating "EMBARGOED – this cannot be used until delivery at 9:01:30PM EDT," the popular web site Drudge Report posted it minutes later.  The White House took no action, stating "it's hard to police the embargo."  An account of this incident is set forth at <http://blogs.abcnews.com/theblotter/2007/01/drudge_breaks_w.html>.

13.    Today, journalists are able to identify newsworthy items in a government announcement and report them to the public – via radio, television, a wire service, or the Internet – in a matter of seconds.  The "embargo" concept is outdated because it is premised on preparation of a single story for a publication with a single publication time, rather than the continual updates and revisions provided by electronic media.

3

14.    At her deposition, Assistant Secretary Davis testified that embargoes are "useful when there's information that needs to be digested so that you don't just get someone scanning a piece of paper and throwing something in the wire that's out of context." It is important to observe that Ms. Davis has neither formal training nor professional experience in the news media. She is what working journalists call a "flak" – a public relations / public affairs worker, whose expertise is manipulating the news, not reporting it.

15.    In fact, contrary to Assistant Secretary Davis's opinion, any reasonably skilled reporter would have been able to quickly identify the "lead" in Treasury's October 31, 2001 press release and post a powerful and accurate one-sentence story: "The Treasury Department today suspended sales of the benchmark 30-year 'long bond.'" This story could have been followed in succeeding minutes and hours by more detailed stories with additional background information. No valid newsgathering purpose was advanced by Treasury's request that journalists refrain from releasing this information for a full hour after its press conference began.

16.    There are no generally accepted rules of conduct or professional procedures for the treatment of press embargoes. Some journalists choose to honor requested embargoes, while others choose to ignore them. Many journalists believe that embargoes are unnecessary and even unethical. There is no convention that requires a journalist to state whether he or she will comply with a requested embargo before learning and reporting any news that may be announced. And the mere fact that a journalist may have complied or agreed to comply with an embargo request in the past does not mean that he or she will necessarily comply with all embargo requests in the future.

17.    Treasury officials were very casual in their use of embargoes. There were no written policies and procedures on the use of embargoes or the release of market-sensitive

4

information, and Treasury did not define the term "embargo" to the attendees at the press conference on October 31, 2001. Rather, as Assistant Secretary Davis testified, "all [these] embargo things are usually determined by the circumstances of the announcement or the release," and there was no specific rule on how embargo times were set for quarterly refunding press conferences.

18.     In fact, Treasury officials themselves did not agree on what the embargo meant. For example, spokesperson Elizabeth Holahan testified that reporters could disclose embargoed information to "members of the news organization, like an editor," but not "to the general public." By contrast, Assistant Secretary Davis testified that reporters could disclose embargoed information to the public for "a news gathering purpose" – for example, to obtain a market participant's reaction to the news.

19.     Many embargoes are simply requests that journalists believe that they are completely free to disregard. In this case, the embargo announced by Treasury at its press conference on October 31, 2001 was nothing more than a request by Treasury, to which none of the reporters in attendance actually agreed. It is common for journalists to disregard embargo requests to which they have not expressly agreed.

20.     Even most journalists who agree to embargo requests believe that the ultimate choice to honor or break the embargo remains theirs. For example, embargo agreements are frequently disregarded when journalists or editors believe that they are arbitrary, the information is already circulating, the information is available through other sources, or the importance of the story is compelling.

21.     There are no accepted means of enforcing embargoes in the journalism profession. There is no organization or authority that can effectively censure an American

5

journalist. A news source has no ability to enforce an embargo other than to restrict a journalist's access to information in the future, and even that sanction is untenable if the source depends on the journalist for dissemination of its information. As Assistant Secretary Davis testified, Treasury's response to embargo violations ranged from "sort of a slap on the wrist to losing your Treasury press pass, depending how serious it is." Treasury never told reporters about any penalties that it might impose on those who disregard its embargo requests.

22.     The embargo announced by Treasury at its October 31, 2001 press conference did not serve Treasury well. It did not facilitate the simultaneous release of information on Treasury's decision to suspend the 30-year bond, since that information was not secure. While the key information could have been clearly and accurately reported in one sentence, the approximately 35-minute period from the conclusion of the press conference (9:25 a.m.) to the announced embargo time (10:00 a.m.) was insufficient for reporters to substantially research the background of Treasury's action in a manner that would change the immediate "first lead" story. As noted, with electronic media, such a story could follow as the morning proceeded.

23.     Treasury's embargo was also anticompetitive because it gave advance notice to a limited number of media outlets (including CNBC, the New York Times, and the Wall Street Journal) who received the news by e-mail ahead of the embargo, and to those reporters who had the means to attend the press conference in person. The advance disclosure to CNBC before the press conference began, and the early e-mails to the New York Times and the Wall Street Journal, suggest a desire to curry favor with these influential media. Other news outlets, including regional news media in Boston and elsewhere, did not receive any pre-embargo information unless they could afford to maintain a staff reporter or wire service representative in Washington. There was no e-mail of the press release to the press officer's general press list

6

until after 10:00 a.m.  Clearly, Treasury gave preferential treatment to certain media outlets, much the way 19th-century politicians favored the partisan press.

24.    Technology was readily available in 2001 to allow a federal agency like Treasury to distribute text, audio, and video information to the press and the public at a precise moment. For example, Treasury could have simultaneously posted the announcement on its web site, e-mailed the announcement to media around the country, and conducted a press conference by webcast.  In addition, if it wished, Treasury could have preserved the confidentiality of its information even while giving advance notice of information to a select group of journalists through the use of "lockdown" procedures – the same procedures which Treasury used for other market-sensitive announcements at the time, but not its quarterly refunding announcements. Indeed, following the events of October 31, 2001, Treasury did adopt "lockdown" procedures for its quarterly refunding announcements.

25.    In sum, Treasury's declaration of an embargo on October 31, 2001 did not bind the journalists in attendance to comply with it, and in any event was completely unnecessary.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on May 29, 2008.

_____
Clyde H. Bentley

7

# EXHIBIT A

# Curriculum Vitae of Clyde H. Bentley

## Curriculum vitae

**Education**

**The University of Oregon**
Doctor of Philosophy, School of Journalism and Communication.  June 2000.
**The University of Texas at Austin**
Master of Arts in journalism, minor in management.  May 1990.

**Pepperdine University at Los Angeles**
Bachelor of Arts in Journalism (cum laude), 1973.

**Shasta Community College**
Associate of Arts in Journalism, 1971.

**Academic Experience**

**Associate Professor**
**University of Missouri**
**Columbia, Missouri**
Teach in the print and digital news sequence of the Missouri School of Journalism, with
additional teaching in research methods and media management.  Founded
MyMissourian, a citizen journalism Web publication with a print edition. Member of the
Center for the Digital Globe. Member of the Center on Religion and the.  August 2001 to
present

**Adjunct Assistant Professor**
**University of Oregon**
**Eugene, Oregon**
Taught both a large lecture class in mass media and a small seminar for pre-journalism
majors plus a lab-based class in newspaper editing.  June 2000 to June 2001

**Graduate Teaching Fellow**
**University of Oregon**
**Eugene, Oregon**
Taught reporting, newspaper editing, media management and mass media & society .
Assisted with newspaper editing class for four terms, overseeing all newspaper and new
media editing labs.  Also served as assistant coordinator for a journalism workshop for
minority high school students for two years.   September 1997 to June 2000

**Journalism Instructor**
**Shasta College**
**Redding, California**
Taught news reporting and mass communication classes at a community college with a
long reputation of quality.  Adviser to college newspaper. January to June 1997.

**Graduate Teaching Assistant**
**University of Texas**
**Austin, Texas**
Supervised the news-writing laboratory, assisted with newspaper design class. 1989-90

**Substitute Journalism Instructor**
**Shasta College**
**Redding, California**
Taught introductory reporting classes while the regular instructor was ill, 1977.

**Professional Experience**

**General Manager**
**The East Oregonian**
**Pendleton, Oregon**
Directed the financial, advertising, operational and personnel functions of a 12,700-circulation daily newspaper. Formulated and administered a multi-million dollar budget, managed 80 employees and maintained strong records of profitability and consumer satisfaction. July 1993 to January 1997.

**Advertising Manager**
**The Irving News**
**Irving, Texas**
Directed the retail advertising department of the flagship of the A.H. Belo Corporation's suburban newspaper group. Recruited and trained the sales staff, developed the marketing strategy and worked closely with both the readers and business community. April 1991 to July 1993.

**Marketing Director**
**The Recorder-Times**
**San Antonio, Texas**
Directed a 17-person sales staff, planned market strategy, researched demographics, produced marketing materials and revamped marketing strategy to produce record profits. April 1990 to January 1991.

**Managing Editor**
**The Coeur d'Alene Press**
**Coeur d'Alene, Idaho**
Formulated strategic plan and budget for the editorial department, wrote editorials, coordinated newsroom efforts and provided community relations for a daily newspaper. Prior positions at paper included news editor and city editor. June 1981 to June 1988.

**Assistant to the Publisher**
**The Headlight-Herald**
**Tillamook, Oregon**
Managed the production department, directed public relations and sold advertising for a
four-newspaper group.  January 1980 to June 1981.

**Editor**
**The Tahoe World**
**Tahoe City, California**
Managed a prize-winning weekly newspaper with an absentee publisher.  October 1978
to December 1979.

**Managing Editor**
**The Redding Outlook**
**Redding, California**
Managed the news staff of a large suburban newspaper.   Also supervised a rural weekly
and an 11-state agricultural publication.  September 1976 to October 1978.

**Reporter**
**The Record-Searchlight**
**Redding, California**
Covered a variety of beats for a daily newspaper.   April 1973 to September 1976.

**Intern**
**Newsweek Magazine, Los Angeles Bureau**
**Los Angeles, California**
Covered national and regional stories, filed bureau reports on Hollywood personalities.
September 1972 to April 1973.

**Reporter**
**The Community Informer**
**Los Angeles, California**
Covered hard news and features for an urban weekly newspaper part time while pursuing
an undergraduate degree.  April 1972 to August 1972.

**Other experience**

**Founding Faculty**
MyMissourian, a citizen journalism publication.  Oct. 4, 2004- present

**Freelance writer**
Magazine articles include a major feature for <u>Trailer Boat,</u> 1988.

**Radio announcer**
Taped a daily promotion for the Coeur d'Alene Press, 1987-1988.

**Television**
NBC interview, 1987.  Panelist for a local "Meet the Press" show, 1975.  Editorial writer-announcer, 1971

**Dissertation:**
"Make My Day: Ritual, Dependency and the Habit of Newspaper Reading"
Explores, via three empirical studies and one qualitative study, the power of ritual and habit to affect the consumption of newspapers.  June 2000.

**Book Chapters:**
"Internet advertising in online newspapers."
In D. W. Schumann & E. Thorson (Eds.), *Internet advertising:  Theory and practice.*
Mahwah, NJ: Lawrence Erlbaum Associates. (2006)

"The citizen journalism movement:  Mymissourian as a case study." In M. Tremayne (Ed.), *Blogging, citizenship and the future of media (in press)*. New York: Routledge, Inc. (2006) With Hamman, B., Littau, J., Meyer, H., Watson, B., & Welsh, B.

**Academic Papers**

"Citizen Journalism and the TMC: User content as a driver for a free-circulation print newspaper." Presented to the Newspaper Division at the AEJMC annual conference, Washington, D.C, August 2007.

"Constructing community: Missouri students practice citizen journalism in the heartland." *Foundation Update*. Newspaper Association of America. Winter 2006. With Hans Meyer and Jeremy Littau.

"Reconnecting with the audience: What they say – not what we think – is what counts." *Nieman Reports, 59*(4), 26-28. Winter 2006

"Interactive journalism summit: When consumers become creators". *J-Lab*  Web site August, 2005. http://www.j-lab.org/aejmc05clyde.shtml

"MyMissourian: A case study of open source journalism" Presented to the
Communications Technology and Policy Division at the AEJMC annual conference, San
Antonio, Texas,  August 2005. With Brian Hamman, Hans Ibold, Hans Meyer and
Jeremy Littau.

 "Mac-in-the-box:" Expertise on the Go"  presented at The Digital Revolution:
The Impact of Digital Media and Information Technologies
October 14-16, 2004, Columbia, South Carolina

"Digitizing the News: Innovation in Online Newspapers" (Book Review). Journalism &
Mass Communication Quarterly, Autumn2004, Vol. 8, Issue 3.

 "Digital Contest:  Newspapers and Web Advertising" in Savid W. Schummann and
Esther Thorson (Eds.) Internet Advertising, Theory and Research, Mahwah, NJ:
Lawrence Earlbaum. (forthcoming)

"You've got news: A Permission Marketing Model Using Electronic Newsletters." With
Anca Micu.  Presented to the International Symposium  on Online Journalism, University
of Texas at Austin April 16, 2004.

"An Economic Model of Permission Marketing: Win-Win-Win Relationship Building
Among Marketers, ISP, and Internet Users."  With Anca Micu, Jin Yan and Glen
Cameron.  Presented to the American Marketing Association 2004 Educators Conference,
Scottsdale, AZ, Feb 9-13, 2004.

"Are There Early Adopters of Unsolicited E-Mails? With Anca Micu.  Presented to
Expanding Convergence: Media Use in a Changing Information Environment, University
of South Carolina, Aug. 12, 2003.

Are There Early Adopters of Unsolicited E-Mails? With Anca Micu.  Presented to the
International Conference on Politics and Information Systems:  Technologies and
Applications (PISTA), Orlando, FL July 26, 2003

News and the Net (Review): Journalism and Mass Communications Quarterly, 80:3
(2003): 7:52-53.

"No Newspaper is No Fun:  Failed delivery, Berelson revisited and what missing the
newspaper means." Newspaper Research Journal 22:4, Feb. 2002.

"The E-Mail is Down:  Using a 1940s method to analyze a 21st century problem."  With
Brooke Fisher.  Presented to the Communications Technology and Policy Division at the
AEJMC Annual Conference, Miami, Aug.7, 2002.

"Use of online news sites: Development of habit and automatic procedural processing"
With Maria E. Len-Rios.  Presented to the Theory and Methodology Division at the
AEJMC Annual Conference, Washington, D.C., August  2001.

"By the Numbers:  Documenting the Newspaper Habit."  Paper presented to the
Communications Theory and Methodology Division at the AEJMC Annual Conference,
Phoenix, Aug. 9, 2000.

"The Daily Habit:  Ritual Behaviors and Their Effects on Newspaper Research."
Paper presented to the American Association for Public Opinion Research for
presentation at its 55th annual conference in Portland, Oregon May 18-21

"In the Public's Interest, or Interesting to the Public? Who Defines "News?" ,
Paper presented to the Communications Theory and Methodology Division for
presentation at the AEJMC Annual Conference, New Orleans, Aug. 6, 1999.

"Who is My Paper, Anyway?: Personality Profiling to Assess Newspaper Brand
Identity", Presented to the Huck Boyd National Center for Community Newspapers for
the Community Media Newspapers and Community-Building Seminar held in
conjunction with the National Newspaper Association's 114th Annual Convention in
Boston, Sept. 30 and Oct. 1, 1999.

"The Ad Rep as Business Coach:  Account Planning for Community Newspapers."
Presented to the Huck Boyd National Center for Community Media Newspapers and
Community-Building Seminar Sept. 24-25, 1998, in Reno, Nev., in conjunction with the
National Newspaper Association's 113th Annual Convention.

"News for the Newsroom: A Study of Employee Communications Practices Used
by Newspaper Editors," by Andi Stein, Clyde Bentley, and Wayne Wanta.
Presented to the Public Relations/Corporate Communications Track of the
Eleventh Annual Meeting of the International Academy of Business
Disciplines, March 25-28, 1999, Chicago, and published in conference proceedings.

"50 Years Later: "What It Means to Miss the Newspaper." Paper presented to the AEJMC
Annual Conference, Baltimore, MD, Aug. 5, 1998

"Life Style and the Daily News:  A Comparison of Newspaper Non-Readers, Infrequent
Readers and Frequent Readers."  Master's thesis at the University of Texas, 1990

## General Publications

Guest host, "Mediashift," PBS blog (http://www.pbs.org/mediashift ).  November 2007.

"Forget the backpack, 'pocket journalism' is coming."  Online Journalism Review, Dec. 20, 2006 (http://www.ojr.org/ojr/stories/061216_Bentley/ )

"The NNA Community Newspaper Management Handbook" Online book published in cooperation with the Newspaper Association of America.  2006.
http://citizenjournalism.missouri.edu/webnnaversions/indexfiles/indexnna.html

"Citizen Journalism at the Missouri School of Journalism"  Research Web site.
http://citizenjournalism.missouri.edu/

Putting ink in their blood:  Real-world project persuades students to take a fresh look a community newspapers as a career choice."  Publishers' Auxiliary, Sept. 18, 2000. Presented at the Newspapers & Community-Building Symposium VII, part of the 115th Annual National Newspaper Association Convention, Louisville, KY.

"What It Means to Miss the Newspaper."  Cover story for Ideas magazine, the journal of the International Newspaper Marketing Association.  September 1998.

"Building Media Brands"    Selected for annual "Brand Champions of the Future" edition of The Advertiser magazine, journal of the Association of National Advertisers.  October 1998

"Newsroom Awards:  Cost is not the point – the style is in the delivery,"  with John Russial in Presstime, the magazine of the Newspaper Association of America, April 1996.

"The ABCs of Branding for Newspapers."  National training video filmed by Newstar Communications, Oct. 9, 1998.

"Call Me Coach:  Account Planning for Newspapers."  National training video filmed by Newstar Communications, Oct. 9, 1998.

Bentley: News Embargoes                                              Page 27

## Seminars, Presentations and Conferences

### Great Ideas for Teachers
Jury-selected presenter for the AEJMC annual convention
2007 "A sweet way to teach innovation: Banana Split 2.0"
2002 -- "A fairy tale approach to writing for the Web: How to use a well-known
children's story to demonstrate how Web writing differs from print media writing")

### AEJMC 2007
Panel presenter: "The Missouri experience" for Citizen Journalism: Global initiatives,
local reverberations--creating a convergent global village.

Panel presenter:  "Pocket journalism:  Walking around with your office" for Teaching
and working in a multimedia world workshop.

### Readers' Revolution:  Journalism.co.uk
Presenter: Opening the door:  Making citizen journalism work
London, UK, Dec. 4, 2006

### Suburban Newspapers of America

National teleconference presentation: "Is the boom in user-generated content a boon or a
threat to suburban newspapers?" June 28, 2007

Presentation: Small steps or huge leaps… What are you planning for your local website
in the future?
Las Vegas, NV, May 18, 2006

### Connections:  Newspaper Association of America
Presenter: Growing the audience with citizen journalism
Orlando FL Feb. 20-21, 2006

Panelist, Dallas, TX 18-19, 2005

### Web+10
Poynter Institute, St. Petersburg, FL.  Jan. 31-Feb. 2, 2005

### The Digital Revolution:
### The Impact of Digital Media and Information Technologies
Newsplex, Columbia, South Carolina, October 14-16, 2004

### International Symposium on Online Journalism
University of Texas at Austin, TX.
Presenter, April  6-8, 2006
Presenter April 16-17,2004

**New Media Conference, 2002, 2001 and 2000**
Annual conference co-sponsored by UC Berkeley and USC.

**Defining Convergence Conference, IFRA**
University of South Carolina, Columbia, SC.  Nov. 12-13, 2002

**The Dynamics of Convergent Media**
University of South Carolina, Columbia, SC.  Nov. 14-16, 2002

**American Copy Editors Society (ACES)**
National convention in Portland, OR, September 11-12, 1998.

**American Press Institute**
Cost and Revenue Management seminar, 1995.
Studied methods of increasing revenue and controlling costs at all levels of newspaper management.   Learned to use the Inland Daily Press Association Cost and Revenue Study.

**Tom Hopkins International**
Professional Selling A to Z, 1991.
Completed sales and sales management courses.

**The Poynter Institute for Media Studies**
Media Management and Entrepreneurship Program, 1989.
Studied market analysis, strategic planning, leadership skills, communication and motivation, problem solving, coaching and staff development.  The 10-week program also covered financial analysis, media economics, ethics, labor issues, and newspaper design.

**Society of Newspaper Design**
National convention, 1988.
Participated in publication redesign and new technology seminars.

**Arnold DeLucca & Associates**
Advertising sales seminar, 1981.
Reviewed tactics for account management.

**National Newspaper Foundation**
Small Newspaper Management Institute, 1979.
Learned strategies for motivation, budgeting and production at a weeklong academy.

**International**

**Missouri Global Scholars**
Mongolia: Empire and Democracy Study Seminar
Ulaanbaatar, Mongolia
June 1-15 (scheduled)

**Missouri London Program**
Professor and internship supervisor
London, UK
August – December 2006

**OhmyNews International Citizen Reporters' Forum**
Invited presenter
Seoul, Korea
June 22-26, 2005

**Visiting instructor, Media Management**
Guangzhou Daily
Guangzhou, China
July 16-28, 2005

**International Symposium on Online Journalism**
University of Texas at Austin, TX. April 16-17,2004

**Visiting Professor, Online Journalism**
European Journalism Academy, Vienna, Austria, Nov. 3-4, 2003

**Beyond the Printed Word Conference**
Ifra, Rome, Italy, Oct. 30-31, 2003

**Online Journalism for Editors. Mongolia Press Institute**
Ulaanbaatar, Mongolia, April 4-April 13 2002.

**Service activities**

**National Newspaper Association**

**Columbia Kiwanis Club**
Member, 2006-2006

**University of Missouri Facebook Taskforce**
Member, 2005-2006
Presenter, all-university seminar, March 8, 2006
**Columbia Independent School**
Invited speaker, Marc 16, 2006

**Missouri School of Journalism Policy Committee**
Member, 2003-2005

**Missouri School of Journalism Technology Committee**
Member, 2003-2004

**Center for the Digital Globe**
Executive Board, 2004-6.  Certification committee, 2002-2003

**Newspaper Division,  Association for Education in Journalism and Mass Communications**
Head, 2002 – 2003.  Program chair, 2001-2002.

**Search Committee, Advertising Department Faculty**
Chair.  University of Missouri,   2002.

**Research and Development Committee**
Member.  University of Missouri, 2002-2003.

**Search Committee, Daily Missourian General Manager**
Chair.  University of Missouri, October-December 2001.

**Kiwanis International**
Columbia, MO. Club 2006 - .Tillamook, Ore., Club 1980-81.  Idaho Panhandle Club, 1986-88.

**Oregon Daily Emerald Board of Directors**
University of Oregon, two-year appointment October 2000.

**Minority Journalist Workshop**
Helped coordinate a workshop for minority high school journalists, matching students with professionals
June 1998

**Kappa Tau Alpha**
Member, national journalism honor society
1998 to present

**Toastmasters International**
Competent Toastmaster certification, 1993.

**Pendleton Chamber of Commerce**
Board of directors, 1994-1995

**Research emphasis**

As an experienced journalist and newspaper manager, I have a long-held fascination with the interface between the media organization and the various audiences it attempts to serve. A research focus on the audience is natural for me. My master's thesis explored the lifestyle differences of frequent readers, infrequent readers and non-readers. I have since also studied media systems dependency theory and audience satisfaction, and I have extensively studied the impact of brand equity on newspapers.

My major research attempts to differentiate between reader "preference" and reader "desire," the goal of defining and quantifying the factors that lead to reader loyalty. My current research works in the online journalism field, specifically the role of "citizen journalism." I founded a citizen journalism publication and continue to conduct research on the phenomenon.

I have explored the non-content factors that drive people to read newspapers, despite the availability of similar information in cheaper and often faster electronic forms. My dissertation looked at the "ritual" or habitual aspect of newspaper readership, using a combination of quantitative survey methodology and qualitative interviews..

**Exhibit B**

**Stipulation and Agreement**
**(March 21, 2008)**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | :      Civil Action No. 05-10983 (NMG) |
| STEVEN E. NOTHERN, | : |
| Defendant. | : |

## STIPULATION AND AGREEMENT

The parties to the above-entitled action hereby stipulate and agree as follows:

1.  Attached as Exhibit A is an e-mail exchange from October 31, 2001 produced by the U.S. Department of the Treasury ("Treasury") and labeled FOIAKBC 651. The parties stipulate to the authenticity of document labeled FOIAKBC 651. The parties agree to waive their right to object under Federal Rules of Evidence 602 and 802 to certain statements contained in document labeled FOIAKBC 651, insofar as the parties seek to introduce the statements for the following limited purposes:

    a.    The parties may seek to introduce the statement "The refunding process has been criticized for years because of suspected leaks" to prove the existence of criticism of Treasury's quarterly refunding process because of suspected leaks, but not to prove that leaks occurred.

    b.    The parties may seek to introduce the statement "There was a leak a few weeks ago at the emergency re-opening" and Timothy Bitsberger's response "Yes" to Tony Fratto's question "There was a leak during the emergency reopening?" to prove that a leak occurred in connection with Treasury's intermediate issuance of

10-year notes on October 4, 2001.

c.    The parties may seek to introduce the statement "Attributed to the borrowing

committee" to prove that if a leak occurred in connection with Treasury's

intermediate issuance of 10-year notes on October 4, 2001, it was "attributed" to

the Treasury Borrowing Advisory Committee, but not to prove that the Treasury

Borrowing Advisory Committee was responsible for the leak.

The parties reserve their right to object to the admission of document labeled FOIAKBC 651 and

the statements contained in that document on all grounds other than those set forth under Federal

Rules of Evidence 602 and 802, including, but not limited to, relevance and prejudice.  The

parties also reserve their right to object to the admission of any deposition testimony relating to

document labeled FOIAKBC 651 on any grounds.  The parties agree not to seek the deposition

of Timothy Bitsberger in this action unless there is hereafter additional production of documents

by Treasury or the parties that contain any information not previously disclosed relating to Mr.

Bitsberger.

2.    Attached as Exhibit B is a portion of an e-mail exchange dated November 15,

2001 produced by Treasury and labeled FOIAKBC 630.  The parties stipulate to the authenticity

of document labeled FOIAKBC 630.  The parties agree to waive their right to object under

Federal Rule of Evidence 802 to the admission of the following statements in document labeled

FOIAKBC 630:

> **I was asked if this was the first time that someone got into a Treasury
> press conference.  I replied, "I can't say for certain, but I think it's likely that
> others in the past have found their way into these things."**

> **Not particularly articulate.  I meant that I think it's very likely that
> others have gotten into these things in the past.  I think it <u>unlikely</u> that others
> <u>have not</u> gotten into these things in the past.**

> **I meant that long before the highly professional and competent Bush**

2

**Administration Treasury appointees arrived on the scene, this place leaked like a sieve; and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years.**

The parties reserve their right to raise a hearsay objection to any other statements made in document labeled FOIAKBC 630. The parties also reserve their right to object to the admission of document labeled FOIAKBC 630 and all statements contained in that document on all grounds other than those set forth under Federal Rule of Evidence 802, including, but not limited to, relevance and prejudice. Additionally, the parties agree not to seek to re-open the deposition of Tony Fratto unless there is hereafter additional production of documents by Treasury or the parties that contain any information not previously disclosed relating to Mr. Fratto.

3.      This Stipulation and Agreement does not apply to any other documents or testimony in the case.

Respectfully submitted,

FOR THE PLAINTIFF:

_Erica Y. Williams_
Erica Y. Williams
Sarah L. Levine
John J. Rossetti, Jr.
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-4010
Phone: (202) 551-4450
Fax:    (202) 772-9245
williamse@sec.gov

Dated: March 21, 2008

FOR THE DEFENDANT:

_J. Shope_
Nicholas C. Theodorou (BBO # 495730)
John A. Shope (BBO # 562056)
Robert E. Toone (BBO # 663249)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Phone: (617) 832-1000
Fax:    (617) 832-7000
jshope@foleyhoag.com

3

# EXHIBIT A

Alvarado, Carmen

**From:**       Bitsberger, Timothy
**Sent:**       Wednesday, October 31, 2001 3:54 PM
**To:**         Fratto, Tony
**Subject:**    RE: Proposed statement re pre embargo release of Q4 refunding

Yes. Attributed to the borrowing committee.

-----Original Message-----
**From:**       Fratto, Tony
**Sent:**       Wednesday, October 31, 2001 3:52 PM
**To:**         Bitsberger, Timothy; Davis, Michele; Malvey, Paul
**Cc:**         Roseboro, Brian; Gross, Jared; Holahan, Betsy; Huther, Jeff
**Subject:**    RE: Proposed statement re pre embargo release of Q4 refunding

There was a leak during emergency reopening?

-----Original Message-----
**From:**       Bitsberger, Timothy
**Sent:**       Wednesday, October 31, 2001 3:19 PM
**To:**         Aufhauser, David; Fratto, Tony; Davis, Michele; Malvey, Paul; Fisher, Peter; Adams, Tim
**Cc:**         Roseboro, Brian; Gross, Jared; Nichols, Robert; Holahan, Betsy; Huther, Jeff
**Subject:** RE: Proposed statement re pre embargo release of Q4 refunding

(b)(5)

3. There was a leak a few weeks ago at the emergency re-opening. The refunding    process has been criticized for years because of suspected leaks.

-----Original Message-----
**From:**       Aufhauser, David
**Sent:**       Wednesday, October 31, 2001 2:47 PM
**To:**         Fratto, Tony; Davis, Michele; Malvey, Paul; Fisher, Peter; Adams, Tim
**Cc:**         Roseboro, Brian; Gross, Jared; Nichols, Robert; Bitsberger, Timothy; Holahan, Betsy; Huther, Jeff
**Subject:**    RE: Proposed statement re pre embargo release of Q4 refunding

(b)(5)

-----Original Message-----
**From:**       Fratto, Tony
**Sent:**       Wednesday, October 31, 2001 2:37 PM
**To:**         Aufhauser, David; Davis, Michele; Malvey, Paul; Fisher, Peter; Adams, Tim
**Cc:**         Roseboro, Brian; Gross, Jared; Nichols, Robert; Bitsberger, Timothy; Holahan, Betsy; Huther, Jeff
**Subject:**    RE: Proposed statement re pre embargo release of Q4 refunding
**Importance:** High

1

FOIAKBC

651

# EXHIBIT B

Alvarado, Carmen

From:          Hills, Megan
Sent:          Thursday, November 15, 2001 6:34 PM
To:            Fratto, Tony
Subject:       RE: Documents for SEC inquiry

Thank you. Attached is my reply (let me know if you want any changes. I will be faxing it later tonight). Megan

secletter.wpd (6
KB)

-----Original Message-----
From:          Fratto, Tony
Sent:          Thursday, November 15, 2001 6:10 PM
To:            Hills, Megan
Subject:       RE: Documents for SEC inquiry

Wrong paper -- Wall Street Journal - see below

I was asked if this was the first time that someone got into a Treasury press conference. I replied: "I can't say for certain, but I think it's likely that others in the past have found their way into these things."

Not particularly articulate. I meant that I think it's very likely that others have gotten into these things in the past. I think it unlikely that others have not gotten into these things in the past.

I meant that long before the highly professional and competent Bush Administration Treasury appointees arrived on the scene, this place leaked like a sieve, and that we wouldn't be talking if our predecessors hadn't been letting jokers like Pete Davis into refunding announcements for the past eight years.


Credit Markets:
In Wake of Criticism, Treasury Plans Regulations
Aimed at Stopping Leaks of Market-Moving News
----
By Gregory Zuckerman
Staff Reporter of The Wall Street Journal

The Wall Street Journal via Dow Jones

   The Treasury Department, facing criticism after an industry consultant
attended a press-only briefing last month and leaked market-moving news,
yesterday outlined new rules to try to keep its news under wraps.

   The changes, which some bond traders said were overdue, will bring the
Treasury more in line with the way other government agencies, including the
Federal Reserve and the Labor Department, release market-sensitive news.

   In announcing the changes, Treasury officials acknowledged the recent leak
probably wasn't the first time that someone from outside the press corps found
their way into a Treasury press briefing, raising the possibility that bond
traders have been receiving early word on market-moving news from Treasury for
years.

   "It's likely that others in the past" have participated in press briefings
though they weren't members of the press, said Tony Fratto, a spokesman for the
Treasury Department.

   Some of the changes are quite elementary. Now, for instance, instead of
releasing information to the press an hour or so before it is publicly

                                    1

**Exhibit C**

**Cited Excerpts from the Deposition of Peter Fisher
(August 8, 2006)**

Page 1

1

2

3

4                UNITED STATES DISTRICT COURT

5            FOR THE DISTRICT OF MASSACHUSETTS

6

  UNITED STATES SECURITIES     )

7 AND EXCHANGE COMMISSION,      )
                               )
8              Plaintiff,       )
                               )
9           vs.                 ) No. 05-10983
                               )        (NMG)
10 STEVEN E. NOTHERN,           )
                               )
11            Defendant.        )
   -------------------------)

12

13

14               VIDEOTAPED

15      DEPOSITION OF PETER R. FISHER

16          New York, New York

17           August 8, 2006

18

19

20

21

22

23

24 Reported by:

   PAMELA J. MAZZELLA, RPR

25 JOB NO. 7046

Page 50

1          Fisher
2 back to work, it's the beginning of
3 September, and so suddenly you have got back
4 to work and the big issue is do we get rid of
5 the long bond?
6       MS. WILLIAMS:  Objection.
7    A.  No, the big issue was 9/11.
8    Q.  All right.  And 9/11, you're
9 talking about the terrorist attacks on
10 September 11, 2001?
11    A.  Yes.
12    Q.  And you had work to do in
13 connection with that, correct?
14    A.  Yes, I did.
15    Q.  And what work did you have to do?
16    A.  After, on September 12 I came to
17 New York with SEC Commissioner Harvey Pitt to
18 try and work on re-opening the markets.
19    Q.  And from a domestic finance point
20 of view did you take any action to try to
21 mitigate the effects of the terrorist attacks
22 of September 11, 2001?
23    A.  Yes.
24    Q.  What was that?
25    A.  We, on September 11 we worked with

Page 51

1          Fisher
2 the Bond Market Association and other market
3 participants to effectively give the approval
4 of the president's working group on financial
5 markets, for the U.S. Treasury market to be
6 closed on September 12, among other things,
7 because that was the first initiative to
8 confirm that the markets would not trade on
9 September 12, and then we began to work on
10 when and how, with both equity and fixed
11 income markets, it would be reopened.
12    Q.  So with regard to discussions about
13 eliminating a long bond, is it your testimony
14 that you didn't discuss that subject with
15 your colleagues at Treasury in between your
16 confirmation in the early part of August and
17 September 11?
18    A.  I have no recollection of doing so.
19 I was on a train going back to New Jersey to
20 be with my family at the time, and my Senate
21 confirmation, and then spent the next two
22 weeks moving my family and having a little
23 vacation, so I don't have any recollection at
24 all of discussing it with staff during the
25 month of August.  If it came up prior to

Page 52

1          Fisher
2 9/11, it was again just one of a number of
3 topics in the laundry list of things to do
4 managing the nation's debt.
5    Q.  Do you remember whether you were
6 back from vacation on September 11, 2001?
7    A.  I was in my office on that day,
8 yes.
9    Q.  Had you already been back for a few
10 days?
11    A.  A couple -- a few days.  I don't
12 recall exactly how many.
13    Q.  Now, with regard to the attacks of
14 September 11, 2001, do you recall being
15 concerned that trading in Treasury bond was
16 experiencing a phenomena of an increased
17 failure in settlement so that, in other
18 words, when people would make a deal to trade
19 the bonds and then a couple of days later
20 they went to actually exchange the paperwork
21 that would be necessary to complete the
22 transaction, that people were not able to do
23 that?
24       MS. WILLIAMS:  Objection.
25    A.  That was not an issue on September

Page 53

1          Fisher
2 11 itself.  It was self-evident that there
3 would be a number of -- there would be great
4 difficulties in reconciling trading from
5 September 11 given the disruption took place
6 during the trading day, the attack.
7       The issue I think you're referring
8 to really came up in subsequent weeks as
9 there were the failures that took place as a
10 result of the terrorist attacks to Federal
11 Government securities began to accumulate,
12 and that really took place over subsequent
13 weeks.
14    Q.  And these were the reports of
15 so-called fails?
16    A.  Yes.
17    Q.  Failed trades?
18    A.  Yes.
19    Q.  And did you take any action to try
20 to address the issue of failed trades?
21    A.  Several weeks later we chose to
22 have a, what is called a snap auction of
23 5-year notes to try to provide an additional
24 supply to reduce the bottleneck of the
25 shortage of 5-year notes that we experienced

14 (Pages 50 to 53)

Page 54

1        Fisher
2 in the market.
3    Q.   When you say a "snap auction,"
4 meaning it was not something that had been
5 regularly scheduled?
6    A.   That is correct.
7    Q.   It came up on very short notice?
8    A.   Yes.
9    Q.   And do you recall re-opening the
10 10-year note?
11    A.   I don't believe -- I may have it
12 backwards.  I know the question of the
13 10-year or the 5-year note, I know we, I
14 recall now we have reopened one of them.  I'm
15 not recalling right now which one it was.  I
16 thought it was the 5-year note.  Maybe in
17 your notes it tells you it's the 10-year
18 note.
19    Q.   So if there are new accounts that
20 say you opened the 10-year note, you believe
21 that is reliable?
22    A.   Then I'm inclined to believe that
23 that's what we did rather than reopen the
24 files.
25    Q.   Then did you consult with the

Page 55

1        Fisher
2 Borrowing Advisory Committee members in
3 advance of making a decision to reopen the
4 10-year note?
5    A.   We did have a telephone call with
6 them prior to announcing the decision to
7 reopen the 10-year note, yes.
8    Q.   And what was the purpose of that
9 conference call?
10    A.   To elicit their advice about
11 whether that would be, whether it was likely
12 to be effective in reducing the backlog of
13 fails.
14    Q.   And what did people say?
15    A.   There was a range of opinion, as is
16 often the case with Borrowing Advisory
17 Committee.
18    Q.   How often -- I'm sorry, how far in
19 advance of your announcement of the snap
20 auction was that meeting with the Borrowing
21 Advisory, the telephone conference with the
22 Borrowing Advisory Committee about re-opening
23 the 10-year note?
24    A.   It would have been measured in
25 hours.

Page 56

1        Fisher
2    Q.   And so when this telephone
3 conference occurred, people were still at
4 their offices.
5        Is that fair to say?
6        MS. WILLIAMS:  Objection.
7    A.   I don't recall whether they were at
8 their offices or somewhere else.
9    Q.   When the Borrowing Advisory
10 Committee meets ordinarily for the, in
11 connection with the Quarterly Refunding
12 Conference, the members actually travel to
13 Washington, correct?
14    A.   That's correct.
15    Q.   And then they meet privately,
16 correct?
17    A.   Yes.
18    Q.   Is there any restriction on their
19 communication with their offices during the
20 periods of their meetings?
21    A.   Yes, there is.
22    Q.   How is that set forth?
23    A.   Some of it I believe is set forth
24 in statute and some in Treasury rule, my
25 recollection.  It specifies that during the

Page 57

1        Fisher
2 period of the meeting, that until the
3 announcement of the Treasury action they are
4 prescribed from trading or communicating with
5 other members of their firms.
6    Q.   So these are written rules that you
7 have reviewed at some point?
8    A.   I may have reviewed them, I don't
9 recall now, but I was certainly aware of
10 them.
11    Q.   Are you aware of a rule that
12 prescribes their going back to their offices
13 for a set period?
14    A.   Yes.
15    Q.   So obviously when you arranged the
16 telephone conference call, that rule couldn't
17 be in effect?
18    A.   That's correct.
19    Q.   And do you recall hearing
20 complaints that people who were members of
21 the Borrowing Advisory Committee had known in
22 advance about the snap auction or the
23 re-opening of the 10-year bond, and that they
24 had derived a financial advantage from that
25 advanced knowledge?

15 (Pages 54 to 57)

Page 58

Fisher

1
2    A.   I had not -- the latter part of
3 your statement, I have not heard that, that
4 anyone traded on or had some financial
5 advantages as a consequence.
6        There were complaints expressed
7 about the advance knowledge.  Yes, I was
8 aware of complaints about that by some
9 parties, I don't recall who, but it came up,
10 yes.
11    Q.   This is in connection with the snap
12 auction?
13    A.   Yes.
14    Q.   Well, why would anyone complain
15 about advance knowledge by the Borrowing
16 Advisory Committee if no one traded on it to
17 financial advantage?
18        MS. WILLIAMS:   Objection.
19    A.   I don't know what -- they can
20 complain for any reasons.  You're asking me
21 to get inside their heads.
22    Q.   Actually, what I'm trying to get
23 at, and I apologize since I asked it perhaps
24 inartfully, is I'm trying to get what more,
25 as best you can recall what the gist of the

Page 59

Fisher

1
2 complaint was.
3        In other words, you said you did
4 hear a complaint that members of the
5 Borrowing Advisory Committee knew in advance
6 about the snap auction re-opening the 10-year
7 note, correct?
8    A.   I recall.
9    Q.   Who made that complaint?
10    A.   I don't recall who.  I recall it
11 being such concerns were identified.  Staff
12 may have informed me.
13    Q.   Other than people being upset about
14 the fact that somebody else knew in advance,
15 there was no other meat on the bone as far as
16 why that was considered to be a bad thing?
17        MS. WILLIAMS:   Objection.
18    A.   I have no recollection of specific
19 allegations that any member of the Borrowing
20 Committee in fact traded on the information.
21 And on the telephone call we made clear to
22 them, I do recall, that they were going to be
23 prescribed from trading until we were able to
24 make the announcement.
25    Q.   You said you weren't aware of any

Page 60

Fisher

1
2 specific allegations.
3        Were you aware of any general
4 allegations or insinuations along that line?
5    A.   The complaints actually included an
6 insinuation, but I was not aware of any
7 accusation that members of the Borrowing
8 Committee actually traded on the information.
9 I have no recollection of that.
10    Q.   So now this complaint that you
11 heard, was that shortly after the decision
12 you had taken to, or shortly after the
13 announcement of the snap auction?
14    A.   I have no recollection whether it
15 was immediate or in subsequent days.
16    Q.   But now those people didn't wait a
17 month to make this complaint, right?
18        MS. WILLIAMS:   Objection.
19    A.   Presumably not.
20        MR. SHOPE:   In fact, why don't we
21 mark this as the next exhibit.
22        (Fisher Exhibit 3, two-page
23    article, marked for identification, as
24    of this date.)
25        MR. ROSSETTI:   While you're

Page 61

Fisher

1
2 marking the exhibit, can we take a one-minute
3 break here, please?
4        MR. SHOPE:   Sure.
5        THE VIDEOGRAPHER:   The time is
6    11:02 and we're going off the record.
7        (Recess taken.)
8        THE VIDEOGRAPHER:   The time is
9    11:06 a.m. and we're back on the record.
10 BY MR. SHOPE:
11    Q.   First of all, we just were off the
12 record and took a short break, Mr. Fisher,
13 and you had a chance to consult with Mr.
14 Vance.
15        Do you have any changes or
16 amendments or clarifications of any of your
17 testimony at this point?
18    A.   No.
19    Q.   You have in front of you what has
20 been marked as Exhibit 3, which is an article
21 from an outfit called AFX News, Limited.
22        Do you know that organization?
23    A.   No, I don't.
24    Q.   But you see this article here about
25 the re-opening of the 10-year note in

16 (Pages 58 to 61)

Page 66

```
1              Fisher
2     Q.  Isn't there also a concern that if
3 the market perceives that there are insiders
4 who have advance information of what Treasury
5 is going to do, that there are going to be
6 fewer people who are going to be willing to
7 participate in that market?
8     A.  I think that's what I just said.
9     Q.  And as a consequence, if there are
10 fewer people who are willing to participate
11 in a market, the Treasury may actually have
12 to pay a higher yield on the notes that it
13 issues in order to finance the federal debt.
14         Is that fair?
15        MS. WILLIAMS:  Objection.
16     A.  I think that's a little simplistic,
17 but that would be the gist.
18     Q.  So honesty isn't just the best
19 policy, it's also perhaps the most
20 cost-effective policy for the Treasury.
21     Would that be a fair statement?
22        MS. WILLIAMS:  Objection.
23     A.  I think it's really a matter of
24 transparency.  I don't think anyone's
25 suggesting that the Treasury is being
```

Page 68

```
1              Fisher
2     Q.  Now, would the political appointees
3 have periodic meetings amongst themselves?
4     A.  Certainly, yes.
5     Q.  In other words, would it be, for
6 example, a weekly breakfast meeting with
7 Secretary O'Neill and some of the other
8 political appointees?
9     A.  Yes.
10     Q.  So you would discuss the
11 possibility of eliminating the long bond in
12 those meetings?
13     A.  I don't recall doing so, certainly
14 not in the month of September.
15     Q.  What about in October?
16     A.  It's possible, but I don't have any
17 specific recollection.
18     Q.  Just generally speaking, wasn't one
19 of the purposes of those meetings to discuss
20 significant policy initiatives that were
21 being considered?
22     A.  Yes.
23     Q.  And elimination of the long bond
24 was significantly important that it might
25 have merited mention at one of these
```

Page 67

```
1              Fisher
2 dishonest, but transparency and clarity is
3 highly to be desired in conducting the
4 Treasury's financial affairs.
5     Q.  Now, we we talked about the
6 decision-making, you had been back at the
7 office for a few days from your vacation,
8 September 11 had happened, obviously that was
9 a distraction.
10         What's your best recollection of
11 when you began to discuss, again this isn't
12 the post-confirmation world, the possibility
13 of eliminating the long bond?
14     A.  I don't have a specific
15 recollection of when that would happen.  Most
16 likely not until October, although it might
17 have come up in staff conversations prior to
18 that.
19     Q.  And when you say "staff
20 conversations," whose staff are we talking
21 about?
22     A.  My staff at the Treasury working at
23 the Office of Domestic Finance.  You have
24 heard of Mr. Malvey and members of his staff
25 and other Treasury officials.
```

Page 69

```
1              Fisher
2 meetings, correct?
3     A.  Yes, could have, but I don't have a
4 specific recollection of doing so.
5     Q.  Bearing in mind that you don't have
6 a specific recollection, given the importance
7 of the matter, would you say it is more
8 likely than not that it was discussed at one
9 of the weekly breakfast meetings with
10 Secretary O'Neill and one of the other
11 political appointees?
12        MS. WILLIAMS:  Objection.
13     A.  No, I think I would disagree with
14 that.  It's possible that I brought it up at
15 perhaps whatever the ultimate such breakfast
16 was before an announcement was made.
17         It also seems to be very likely
18 that it was never brought up in that large
19 forum.  Sensitive topics might not be brought
20 up even in that meeting of senior political
21 appointees.
22     Q.  So in September you might have
23 discussed it with Mr. Malvey and his
24 subordinates, correct?
25        MS. WILLIAMS:  Objection.
```

18 (Pages 66 to 69)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

Page 70

Fisher

1
2    A.   Yes, it's possible.
3    Q.   Who else might you have discussed
4 it with in September?
5    A.   I don't have any recollection of
6 doing so. I don't have any specific
7 recollection of discussing it with anyone in
8 September. I'm allowing the possibility that
9 it may have been discussed with Mr. Malvey
10 and members of his staff.
11    Q.   And what about Secretary O'Neill in
12 September?
13    A.   I don't have a specific
14 recollection. I think that the premise of
15 your questioning that this was a topic at the
16 top of agenda in September is really not
17 appropriate. There were a huge numbers of
18 issues we were working on.
19        I was charged with trying to
20 persuade Congress not to enact a Loan
21 Guarantee Program for the airlines. And when
22 Congress did enact the guarantee loan of the
23 airline, I was put on the board of the
24 Airline Transportation Stabilization Board
25 implementing that process. That's just one

Page 71

Fisher

1
2 example of a host of initiatives that we were
3 working on in the month of September. The
4 30-year bond was not at the top of the list.
5    Q.   Well, I'm trying not to make my
6 past questions have premises, I'm just trying
7 to get at the truth. So don't worry about
8 whether there is a premise or not, just get
9 to the factual matter.
10        So turning into October, I take it
11 you're pretty sure this was discussed in
12 October, right?
13    A.   Yes.
14    Q.   And so besides Mr. Malvey and his
15 staff, who else did you discuss it with?
16    A.   Certainly Mr. Roseboro.
17    Q.   Mister?
18    A.   Roseboro, Brian Roseboro.
19    Q.   What about, do you know Mr.
20 Bitsberger?
21    A.   Yes, Tim Bitsberger.
22    Q.   And who is Mr. Bitsberger?
23    A.   He currently works at Freddie Mac,
24 at the time was a Treasury appointee,
25 assistant secretary. I'm not quite

Page 72

Fisher

1
2 remembering his confirmation date. He was
3 also a Treasury official at the time.
4    Q.   And where was he in relation to you
5 in the hierarchy of the Treasury?
6    A.   Under Roseboro and on top of
7 Malvey.
8    Q.   Where was Roseboro in relation to
9 you?
10    A.   Directly under me as assistant
11 secretary.
12    Q.   So Mr. Bitsberger reported to
13 somebody who reported to you?
14    A.   That's correct.
15    Q.   So did you discuss elimination of
16 the 30-year bond with Mr. Bitsberger?
17    A.   Yes, I think it likely that I did.
18 I don't have a specific recollection.
19    Q.   So let's talk about in the
20 beginning of October.
21        Who else were you discussing this
22 with beside Mrs. Malvey and his staff?
23        MR. ROSSETTI:   Objection?
24    A.   In terms of planning for the
25 process I think we have identified within the

Page 73

Fisher

1
2 Treasury Mr. Bitsberger, Mr. Roseboro, Mr.
3 Malvey and his staff. The topic may have
4 come up with Secretary O'Neill and General
5 Counsel Aushauser. I don't have a specific
6 recollection.
7    Q.   You think it may have come up with
8 Secretary O'Neill.
9        Are you that tentative, or do you
10 think it is highly likely that it came up
11 with Secretary O'Neill?
12        MS. WILLIAMS:   Objection.
13    A.   I recall a specific conversation
14 about it prior, it might be in the
15 announcement, a single specific conversation.
16 I have no other specific recollection.
17    Q.   When was the single specific
18 recollection -- or a conversation? Excuse
19 me.
20    A.   That would have been 10 days, so
21 around the 21st, 10 days prior to the
22 announcement, somewhere in that window, late
23 October. You have been referring to early
24 October.
25    Q.   I'm going to get back to early

19 (Pages 70 to 73)

Fisher

1 October, but since you just mentioned the
2 conversation that you are specifically
3 remembering with Secretary O'Neill, I want to
4 ask you about that.
5       Where were you?
6    A.  I believe I was in his office.
7    Q.  And the --
8    A.  Might have been his dining room, I
9 don't recall.
10    Q.  And do you remember what time of
11 day it was, anything like that?
12    A.  No.  I remember discussing with him
13 and his suggestion that I also -- the main
14 import of that conversation was that he asked
15 that I also discuss the matter with Al
16 Greenspan.
17    Q.  And Mr. Greenspan was chairman of
18 the Federal Reserve board at that time,
19 correct?
20    A.  Yes.
21    Q.  So as we're getting into
22 mid-October, besides the people whom you have
23 identified, was the elimination of the long
24 bond being discussed by anyone in the

Fisher

1 Treasury Department to your knowledge other
2 than persons whom you have identified?
3    MS. WILLIAMS:  Objection.
4    A.  I have no recollection of any.
5    Q.  So at the time that you had the
6 discussion with Secretary O'Neill in which he
7 requested that you discuss the matter with
8 Mr. Greenspan, had you discussed elimination
9 of the long bond with anyone other than the
10 persons whom you have identified?
11    A.  Not that I can recall.
12    Q.  Okay.  Now, do you know whether
13 Secretary O'Neill had discussed elimination
14 of the long bond with anyone other than the
15 persons that we have identified so far?
16    MR. ROSSETTI:  Objection.
17    A.  I have no basis for speculating on
18 that.
19    Q.  So he didn't give you any
20 indication as to whether or not he had spoken
21 to anybody else in the administration at that
22 point?
23    A.  I have no basis for having an
24 opinion on that.

Fisher

1    Q.  Well, we have a report of the
2 Office of the Inspector General into the
3 events of October 31, 2001.
4       First of all, were you aware that
5 the Inspector General looked into the events
6 surrounding the disclosure of the elimination
7 of the long bond on October 31, 2001?
8    A.  Yes.
9    Q.  Did you ever read the Inspector
10 General's report?
11    A.  No, I don't believe I ever did read
12 it.
13    Q.  Did you ever see any kind of a
14 draft or anything like that?
15    A.  I don't -- I mean, I have seen
16 copies of it.  I certainly have not read it
17 cover to cover and I don't recall reading a
18 draft of it.
19    Q.  Even though the distribution for
20 the report lists two people, yourself and Ms.
21 Davis, Michelle Davis, you don't believe you
22 actually ever read through the thing?
23    A.  That's correct.
24    Q.  Well, we have already marked this

Fisher

1 as an exhibit so many times, hopefully we can
2 keep the record uncluttered and I'll just
3 read from it.  But the --
4    MR. ROSSETTI:  Do you have a page,
5 John?
6    MR. SHOPE:  Yes, I do.
7    Q.  If you go to Exhibit 20, in the
8 Inspector General's report, it's a memorandum
9 of an interview with Brian Roseboro, and on
10 the second page of the memorandum of the
11 interview with Mr. Roseboro it is stated --
12 I'll just read a few sentences to you.
13 "Roseboro said as the assistant secretary for
14 financial markets, he had the authority to
15 make the decision concerning suspending sales
16 of the 30-year bond.  In actuality, he said
17 it was a deliberate decision within Treasury
18 involving director of market finance, the
19 undersecretary of domestic finance, and the
20 secretary of staff.  He said they received
21 White House concurrence on October 26, 2001."
22       So let's start with the last point.
23 Do you recall there being White House
24 concurrence with the decision to eliminate

20 (Pages 74 to 77)

Page 78

```
1        Fisher
2 the 30-year bond?
3    A.  Prior to making the announcement I
4 consulted with both Larry Lindsey, who was
5 the director of the National Economic
6 Council, and with Glenn Hubbard, the chairman
7 of the Council of Economic Advisors,
8 informing them of our intention of
9 eliminating the 30-year bond.
10       I would not recall a date, but if
11 Brian's testimony is there is a specific date
12 where White House concurrence was sought,
13 that's likely to refer to the same event.
14   Q.  It's consistent with your memory
15 this took place approximately a week before
16 the announcement?
17   A.  Yes.
18   Q.  And let's take those two
19 conversations one by one.
20       You said Mr. Hubbard, did I get
21 that right?
22   A.  Yes, Mr. Hubbard.
23   Q.  So how did that conversation take
24 place?
25   A.  I called him on the telephone.
```

Page 79

```
1        Fisher
2    Q.  And what did you say and what did
3 he say?
4    A.  I explained to him of our intention
5 of eliminating the 30-year bond and the
6 rationale for doing so, and I don't recall
7 him saying anything other than generally it
8 made sense to him, he understood.
9    Q.  What was the rationale that you
10 explained to him on that day?
11   A.  Not an efficient form of financing.
12 With both Mr. Hubbard and Mr. Lindsey, they
13 had a great deal of contact and conversation.
14 I don't think it required a lot of ground to
15 be covered.  I probably highlighted a few of
16 the points covered in my statement.
17   Q.  So at that point you were already
18 drafting what your announcement was going to
19 be?
20   A.  I think that's likely.  I don't
21 have a specific recollection, but that seems
22 likely.
23   Q.  That's what ultimately culminated
24 in your prepared remarks which were
25 distributed in a press release on October 31?
```

Page 80

```
1        Fisher
2    A.  Yes.
3    Q.  What about Mr. Lindsey, the
4 conversation with Mr. Lindsey?
5    A.  I remember a similar conversation
6 with Larry Lindsey and perhaps a little
7 briefer than my conversation with Glenn
8 Hubbard.
9    Q.  You may have said it, but just for
10 the record what was Mr. Lindsey's commission?
11   A.  He was the director of the National
12 Economic Council.
13   Q.  And that is something that is part
14 of the White House, right?
15   A.  As is the Council of Economic
16 Advisors, both of them would report directly
17 to the president.
18   Q.  And how many members are there of
19 those two council, the Council and the
20 Committee?
21   A.  The Council of Economic Advisors
22 has I think three members by statute.  I
23 wouldn't recall the membership of the
24 National Economic Council.  A number of
25 cabinet officers, perhaps eight or nine.  I
```

Page 81

```
1        Fisher
2 don't have a recollection.
3    Q.  Do you know whether Mr. Lindsey or
4 Mr. Hubbard discussed the plan with the other
5 members of their respective Committee or
6 Council?
7    A.  I don't know.  Neither one of them
8 anticipated my conversation with them, so
9 from that I did not think this issue was
10 being discussed inside the White House prior
11 to my raising it with them.
12       They both understood the
13 sensitivity of the information.  I have no
14 anticipation that they would share it with
15 others, but that was clearly up to them.  I
16 don't know whether they did or not.
17   Q.  You didn't ask them not to disclose
18 it?
19   A.  No.
20   Q.  And so I take it did both of them
21 concur in the decision?
22   A.  I didn't ask for their concurrence.
23 I informed them of our intention and I didn't
24 ask for approval.  That left it open to them
25 to object if they wanted to, and no
```

21 (Pages 78 to 81)

Page 82

Fisher

1    objections were heard.
2    Q.   If they had objected, is that
3    something that would have caused you to
4    change course?
5    A.   I would have changed my
6    conversation with them.  I don't think it
7    would have changed the fact that it was in
8    the Treasury's authority to make these
9    decisions.
10    Q.   But I'm not asking about what was
11    the legal authority of people to take action.
12    I'm asking about what your policy
13    decision-making would have been had the two
14    officials of the White House said no, don't
15    do it?
16    MS. WILLIAMS:  Objection.
17    A.   It obviously would have changed
18    matters.  I don't want to speculate on how.
19    I disagreed with them frequently on all sorts
20    of matters, so that would be a rather routine
21    process.
22    Q.   But you were giving them a week's
23    notice of this plan that you had so that they
24    would have a chance to object and you would

*(Line numbers 1–25)*

Page 83

Fisher

1    then have the opportunity to reconsider your
2    position in light of their objection.
3    Isn't that fair?
4    MS. WILLIAMS:  Objection.
5    A.   No, I don't think that's accurate.
6    Q.   This wasn't just a courtesy, "This
7    is what I'm going to do in a week," was it?
8    A.   It's something in between the two
9    versions you have just offered.
10    Q.   It was important to you that the
11    White House concur with this, was it not?
12    MS. WILLIAMS:  Objection.
13    A.   No.
14    Q.   Did Mr. O'Neill tell you to consult
15    with the White House about this?
16    A.   No.
17    Q.   You had just done this on your own
18    initiative?
19    A.   Yes.
20    Q.   So at the time that you spoke with
21    Secretary O'Neill had you already spoken to
22    the White House?
23    A.   No, I don't believe so.
24    Q.   And did you follow up on Mr.

Page 84

Fisher

1    O'Neill's direction to speak with Mr.
2    Greenspan?
3    A.   Yes, I did.
4    Q.   And when did you have that
5    conversation?
6    A.   I don't recall the date.  Some time
7    in the latter half of October, so
8    contemporaneous with these other
9    conversations.
10    Q.   And what did you say to Mr.
11    Greenspan and what did he say to you?
12    A.   I went over to his office, I
13    described the, our intention and our
14    rationale.  And again I think it's fairly
15    standard practice, such conversations, for
16    people to understand who has the authority to
17    make a decision, whose opinion is being
18    sought, and Chairman Greenspan was certainly
19    understanding of that.  But the import of the
20    conversation again was it made sense to him,
21    he understood why we were planning on doing
22    that.
23    Q.   In other words, what you're saying,
24    it wasn't Chairman Greenspan's decision to

Page 85

Fisher

1    make?
2    A.   That's correct, and he would not
3    pretend it was.
4    Q.   But you and Mr. O'Neill were very
5    interested in his opinion?
6    A.   That's correct, yes.
7    Q.   So if Mr. Greenspan had given his
8    opinion this was a lousy idea, that would
9    have been an occasion for you to go back and
10    reconsider.
11    MS. WILLIAMS:  Objection.
12    Q.   Fair statement?
13    A.   It would have required for a vote
14    on our part.
15    Q.   Now, did you discuss with Mr.
16    Greenspan whether or not this decision would
17    have any effect on long-term interest rates?
18    A.   I think it may well have come up,
19    but I don't have a specific recollection.
20    Q.   And did you discuss the question of
21    whether or not the elimination of the long
22    bond would have an effect on long-term
23    interest rates with Mr. Lindsey?
24    A.   I believe the topic came up with

22 (Pages 82 to 85)

1          Fisher
2 Mr. Lindsey.
3     Q.   And what did you say on that
4 subject and what did he say?
5     A.   I don't recall what he said.  What
6 I recall that I said is that since we were
7 also planning on eliminating the Buyback
8 Program, the impact on long-term interest
9 rates was ambiguous.  It was very hard to
10 predict, once you looked at the net effect of
11 the two decisions together, whether long-term
12 interest rates would rise or fall on the
13 announcement.
14     Q.   So you had no expectation one way
15 or the other?
16     A.   I expected that markets would
17 respond and they would respond with some
18 volatility.  There was a possibility of
19 dramatic movements in prices.  But given the
20 combined decisions to suspend issuance of
21 30-year bonds, but also to suspend the
22 Buyback Program, if you work through the math
23 of all of that, we were actually going to be
24 increasing the supply of long-term Treasury
25 bonds over what the market would otherwise

1          Fisher
2 have been anticipating over the coming year,
3 which you would have thought would have led
4 to an increase in long-term interest rates as
5 more supply was on the market.
6     Q.   So if there is more supply, the
7 price of the long bond goes down, right?
8     A.   The yield would go up.
9     Q.   Because the yield is the exact
10 converse of the price, or moves conversely I
11 should say?
12     A.   But if the market only focused on
13 half of the equation and only focused on the
14 suspension of the long bond, then they would
15 see the other, they would only see part of
16 the math.  They would only see reduction in
17 supply at the long end, meaning price goes
18 up, yield goes down.
19          And so I recall being very careful
20 in my conversation with Mr. Lindsey, but, as
21 I said, the topic may have come up with Mr.
22 Greenspan and also Mr. Hubbard that I thought
23 it very difficult to anticipate what the net
24 impact on long-term interest rates would be.
25     Q.   And, I'm sorry, are you saying you

1          Fisher
2 don't recall what Mr. Lindsey said about
3 long-term interest rates?
4     A.   I don't recall him responding to
5 that.  I do recall him describing the
6 ambiguity about how interest rates might
7 respond.
8     Q.   That was something that you just
9 raised on your own initiative then?
10     A.   Yes.
11     Q.   What about Mr. Hubbard, I take it
12 you raised the subject with him about the
13 effect on long-term interest rates?
14     A.   I probably did.  I don't have a
15 specific recollection.  I do recall Mr.
16 Lindsey.  I don't specifically recall Mr.
17 Hubbard, but I likely had the same outline,
18 thumbnail conversation.
19     Q.   Do you recall any response by him
20 on that subject?
21     A.   No, I don't.
22     Q.   Now, you, you know, obviously, this was
23 a subject of great interest to the
24 administration, correct?
25          MR. ROSSETTI:  Objection.

1          Fisher
2          MS. WILLIAMS:  Objection.
3     A.   No, I don't know that it was of
4 great interest to the rest of the
5 administration.
6     Q.   In other words, the possible
7 decline in long-term interest rates you don't
8 believe was of great interest to the
9 administration?
10          MS. WILLIAMS:  Objection.
11     A.   Some members of the administration
12 may view a particular level of interest rate
13 as being a good or a bad thing.  That
14 certainly wasn't my view.  And I think we all
15 had maintained a view in the administration
16 that interest rate policy is left to the
17 Federal Reserve, monetary policy is something
18 to be conducted by independent Central Bank.
19          So I don't, I don't view this as
20 something that was acutely of interest to the
21 rest of the administration, no.
22     Q.   Let's just back up a little bit.
23          Do you recall there being concern
24 in August and September of 2001 that the
25 economy was slowing down, even before the

23 (Pages 86 to 89)

Page 98

1          Fisher
2 made?
3    A.  When I was subsequently informed of
4 the extreme price swings that took place
5 prior to 10 o'clock, I certainly was
6 surprised.
7    Q.  And that was notwithstanding the
8 fact that you were expecting price
9 volatility?
10    A.  Yes, I was expecting some price
11 volatility.  I did not anticipate it would be
12 prior to the announcement.
13.    Q.  But you were expecting price
14 volatility after the announcement?
15    A.  Yes.
16    Q.  But you did see the price start to
17 jump up before you made the announcement?
18    A.  I don't believe I was in a position
19 to actually follow the market during that
20 time.  I may have been working on another
21 matter.
22    Q.  But it was brought to your
23 attention after the fact that that had
24 happened?
25    A.  Yes, it was brought to my attention

Page 99

1          Fisher
2 after the fact, yes.
3    Q.  So let's just go to the lead up to
4 that day to October 31.
5        First of all, did you make any
6 changes to how Quarterly Refunding
7 Conferences had been handled in the past by
8 the Treasury Department?
9    A.  I don't recall doing so on that
10 occasion.
11    Q.  Do you recall there having been a
12 press release announcing that you would be
13 the person giving the presentation at the
14 Quarterly Refunding Conference?
15    A.  I don't recall that, no.
16    Q.  That wasn't anything that you had
17 commissioned?
18    A.  I don't recall.
19    Q.  Okay.  Now, what room was the press
20 conference held on October 31?
21        That's not a grammatical sentence.
22        What was the room that you used for
23 the press conference for the quarterly
24 refunding on October 31, 2001?
25    A.  There is a conference room on the

Page 100

1          Fisher
2 third floor of the Treasury building just
3 outside of the Office of Domestic Finance.
4    Q.  And do you know what that room is
5 called within Treasury?
6    A.  Secretary's Conference Room.  I
7 don't recall.
8    Q.  Are you aware of a room called the
9 Diplomatic Reception Room?
10    A.  That sounds like the name of the
11 room.
12    Q.  And are you aware of another room
13 called the Secretary's Conference Room?
14    A.  That would be the matching one on
15 the far side.
16    Q.  Do you know whether or not the
17 Diplomatic Reception Room had been used for
18 the Quarterly Refunding Conference before?
19    A.  Prior to -- no, I don't.  As I say,
20 I never participated in, never attended a
21 press briefing for the quarterly refunding
22 before, so I have no knowledge of what rooms
23 it took place in.
24    Q.  So would it be fair to say you had
25 no involvement in the selection of which room

Page 101

1          Fisher
2 to use?
3    A.  Yes, that's correct.
4    Q.  Okay.  And --
5    A.  I don't recall having any
6 involvement in that.
7    Q.  Okay.  And now prior to the
8 Quarterly Refunding Conference actually
9 taking place on October 31, did you have any
10 discussion with anyone, this is not just on
11 October 31, but any other time in the lead up
12 did you have any discussion with anyone in
13 Treasury about the embargo procedure?
14    A.  Yes.  I recall a conversation with
15 Michelle Davis, the assistant secretary for
16 public affairs, about my discomfort with the
17 use of an embargo, that I would have been
18 much more comfortable with making a direct
19 announcement either on the internet or
20 without that use of an embargo.
21    Q.  And why were you uncomfortable with
22 the use of an embargo?
23    A.  I thought the risk of a leak or
24 some malfunction, some procedural malfunction
25 was too high.

26 (Pages 98 to 101)

1          Fisher
2    Q.   And so in your view the embargo
3 wasn't actually necessary in order for you to
4 get out the information that you needed to
5 get out?
6    A.   I thought direct publication on the
7 internet, direct release of some kind by the
8 Treasury.  I didn't -- I mean I didn't have a
9 particular proposal, but I would have
10 preferred to have avoided the embargo and I
11 recall discussing that with Michelle Davis.
12   Q.   And when did you have that
13 discussion with Miss Davis?
14   A.   I don't recall the date, but again
15 probably within the 10 days prior to the
16 announcement.
17   Q.   And did you say anything else to
18 Miss Davis other than what you just
19 mentioned?
20   A.   I don't recall the conversation.  I
21 undoubtedly described the nature of the
22 announcements were making.
23   Q.   In other words, you told her that
24 this was going to be suspension of the long
25 bond, it might meet the price volatility,

1          Fisher
2 that sort of thing?
3    A.   Yes, it would be a newsworthy item.
4    Q.   And did she have any response to
5 your comment that there really was no need to
6 have an embargo?
7    A.   We had a good conversation, I think
8 she may have thought about it.  I don't
9 recall whether we concluded at the time or we
10 had a subsequent conversation.  And her view
11 was that on reflection, changing procedures
12 in the face of a major announcement was not a
13 good policy, was not the right way to do it,
14 so we had a conversation about the pros and
15 cons, and she, in charge of public affairs,
16 felt strongly that changing procedures at
17 that moment was not a good idea.
18   Q.   And I'm going to see if I can get
19 as best your recollection, and I know you're
20 working hard and I appreciate that.
21        Beyond just a sort of general
22 avoidance or general desire not to change
23 procedures, was there anything that Ms. Davis
24 identified as a reason to keep the embargo?
25   A.   No, I don't recall anything other

1          Fisher
2 than -- I mean I thought she made, I
3 understood she made a good explanation of why
4 she felt changing press procedures in the
5 face of a major announcement was not, was not
6 the appropriate thing to do, she felt
7 strongly about that, and I deferred to her.
8    Q.   And again --
9    A.   I don't recall any other rationale
10 on her part.
11   Q.   Again, as far as I can get any meat
12 that may be on that bone, as far as why it
13 was that Ms. Davis thought that changing
14 procedures at this juncture was a bad idea?
15   A.   The short notice, sort of -- I
16 don't recall anything beyond that, that
17 changing procedures on relatively short
18 notice she thought was not a good idea.
19   Q.   Did she make any comment on what
20 the pros would think about the change in
21 procedures or whether the press would prefer
22 to have an embargo, or anything like that?
23   A.   No, I don't recall that coming up.
24   Q.   Other than the conversation that
25 you had with Ms. Davis, did you discuss in

1          Fisher
2 advance of the conference itself anything
3 about the embargo?
4    A.   I'm sorry, I'm not following your
5 question.
6    Q.   I apologize.  You mentioned that in
7 the run up to the October 31 conference you
8 had a discussion with Ms. Davis that you have
9 described in which you said let's get rid of
10 the embargo either then or in a follow-up
11 conversation she said no, let's not change
12 procedures now?
13   A.   Yes, that's correct.
14   Q.   Apart from that conversation with
15 Ms. Davis, did you have any discussion with
16 anyone about the embargo before the
17 conference itself began?
18   A.   I don't have a specific
19 recollection, but I, it's highly likely that
20 I also spoke to other members of her staff,
21 Tony Fratto and Betsy Holahan, who each
22 worked for her.  It's likely that the same
23 topic came up, but it's more likely that we
24 simply worked on the process of preparing for
25 the press conference.

27 (Pages 102 to 105)

**ESQUIRE DEPOSITION SERVICES**
**1-866-619-3925**

**Exhibit D**

**Deposition of Michele Davis and Cited Exhibits
(February 11, 2008)**

Michele Davis

Washington, DC

February 11, 2008

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - x

 4  UNITED STATES SECURITIES AND   :
    EXCHANGE COMMISSION,           :
 5                                 :
              Plaintiffs,          :
 6                                 :
    v.                             :  Civil Action No.
 7                                 :
    STEVEN E. NOTHERN,             :  05-10983 (NMG)
 8                                 :
         Defendant.                :
 9    - - - - - - - - - - - - - - x

10

11        Videotaped Deposition of MICHELE DAVIS

12                Washington, D.C.

13            Monday, February 11, 2008

14                 12:57 p.m.

15

16

17              *     *     *     *

18

19

20

21  Reported by:  Okeemah S. Henderson, LSR

22
```

Michele Davis                                                    February 11, 2008

Washington, DC

---

Page 2

1    Deposition of MICHELE DAVIS, held at the
2    offices of:
3
4        FOLEY HOAG, LLP
5        1875 K Street, Northwest
6        Washington, D.C.  20006
7        (202) 223-1200
8
9
10
11
12
13
14
15
16
17        Pursuant to agreement, before Okeemah S.
18    Henderson, Licensed Shorthand Reporter and Notary
19    Public in and for The District of Columbia.
20
21            *    *    *    *    *
22

---

Page 4

1                    I-N-D-E-X
2
3            Deposition of Michele Davis
4               February 11, 2008
5
6    EXAMINATION BY:                    PAGE:
7    Mr. Theodorou                    7, 234
8    Mr. Rossetti                    155, 247
9
10    EXHIBITS                         PAGE
11    1   Subpoena                       10
12    2   Notice of deposition           10
13    3   Washington Post article        46
14    4   Reuters report 10/31/01        59
15    5   E-mail dated 10/31/01          63
16    6   Bloomberg message 10/31/01     80
17    7   E-mail dated 11/15/01         103
18    8   Treasury News memo dated 10/31/01   119
19    9   Reuters report on bond suspension   131
20    10  E-mail dated 10/31/01         137
21    11  E-mail dated 11/5/01          141
22    *** Exhibits continued to Page 5.

---

Page 3

1    A P P E A R A N C E S
2
3    ON BEHALF OF MICHELE DAVIS:
     PAUL G. FREEBORNE, ESQUIRE
     U.S. Department of Justice
4    Civil Division, Federal Programs Branch
     20 Massachusetts Avenue, Northwest
5    Washington, D.C. 20001
     (202) 353-0543
6
7    ON BEHALF OF DEPARTMENT OF TREASURY:
     TIM KOLLAR, ESQUIRE
     OFFICE OF GENERAL COUNSEL
8    U.S. Department of Treasury, Rm. 2019
     1500 Pennsylvania Avenue, Northwest
9    Washington, D.C. 20220
10
     ON BEHALF OF STEVEN NOTHERN:
11    NICHOLAS C. THEODOROU, ESQUIRE
     Foley Hoag LLP
12    Seaport World Trade Center
     155 Seaport Boulevard
13    Boston, Massachusetts 02210
     (617) 832-1000
14
     ON BEHALF OF UNITED STATES SECURITIES
15    AND EXCHANGE COMMISSION:
     JOHN J. ROSSETTI, JR., ESQUIRE
16    ERICA Y. WILLIAMS, ESQUIRE
     United States Securities and Exchange
17    Commission
     Division of Enforcement
18    100 F Street, Northeast
     Washington, D.C. 20549
19    (202) 551-4450
20
     ALSO PRESENT:
21    Raymond Heer, III Videographer
     Matthew Lees, Intern
22    Steven E. Nothern

---

Page 5

1    *** Exhibits continued from Page 4.
2
3    EXHIBITS                         PAGE
4    12  Office of Public Affairs memo   144
5    13  E-mail dated 4/5/02            152
6    14  E-mail dated 10/29/01          201
7    15  E-mail dated 10/29/01          203
8    16  Press release                  247
9
10
11
12
13
14
15
16
17
18
19
20
21        (Exhibits included with transcript.)
22

---

2 (Pages 2 to 5)

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 6 | Page 8 |
|---|---|
| 1        P-R-O-C-E-E-D-I-N-G-S | 1  defendant, Mr. Nothern, in this matter. I'm going |
| 2        (12:57 p.m.) | 2  to be taking your deposition this morning. I'm |
| 3     THE VIDEO OPERATOR:  This is in the | 3  sure you reviewed what the deposition is about and |
| 4  United States District Court for the District of | 4  you're testifying under oath. |
| 5  Massachusetts. The plaintiff is the United States | 5     If you have a problem with understanding a |
| 6  Securities and Exchange Commission. The | 6  question, please, tell me and you also can consult |
| 7  defendant is Steven E. Nothern. Today's date is | 7  with your counsel at any time during the |
| 8  February 11, 2008. This is Civil Action No. | 8  deposition. Would you, please, state your full |
| 9  05-10983 (NMG). The witness is Michele Davis. | 9  name, for the record? |
| 10    The location of deposition is 1875 K Street, | 10    A.  Michele Eileen Davis. |
| 11  Northwest, Washington, D.C.  Appearing on behalf | 11    Q.  Ms. Davis. Where do you live? |
| 12  of the plaintiff are John J. Rossetti, Jr. and | 12    A.  Arlington -- do you want the address? |
| 13  Erica Y. Williams of the United States Securities | 13    Q.  Yes. |
| 14  and Exchange Commission. Appearing on the deposition | 14    A.  1200 North Jefferson Street in |
| 15  on behalf of the Defendant is Nick Theodorou of | 15  Arlington, Virginia. |
| 16  Foley Hoag. | 16    Q.  Did you do anything to prepare for the |
| 17    Appearing on behalf of the witness is Paul | 17  deposition this morning? |
| 18  G. Freeborne of the United States Department of | 18    A.  Talked to them about coming over here. |
| 19  Justice. Appearing on behalf of the Department of | 19    Q.  So you met with counsel. Whom did you |
| 20  the Treasury is Tim Kollar. Also present is | 20  meet with? |
| 21  Matthew Lees and Steven E. Nothern. | 21    MR. FREEBORNE:  Mr. Freeborne and |
| 22    The officer before whom this videotaped | 22  Mr. Kollar. |

| Page 7 | Page 9 |
|---|---|
| 1  deposition is taken and sworn by is Okeemah | 1    BY MR. THEODOROU: |
| 2  Henderson. The video camera operator is Raymond | 2    Q.  Did you meet with the SEC attorneys? |
| 3  Heer representing Alderson Reporting Company, 1111 | 3    A.  No. |
| 4  14th Street, Northwest, Suite 400, Washington, | 4    Q.  Is that a no? |
| 5  D.C. 20005. This videotaped deposition commenced | 5    A.  No. |
| 6  at 12:57:15. Please swear in the witness. | 6    Q.  How long did you meet with Mr. |
| 7  Whereupon, | 7  Freeborne and Mr. Kollar? |
| 8     MICHELE DAVIS, | 8    A.  Maybe 20, 30 minutes, something like |
| 9  called as a witness, having been first duly sworn | 9  that. |
| 10  to tell the truth, the whole truth, and nothing | 10    Q.  When did you meet with them? |
| 11  but the truth, was examined and testified as | 11    A.  This morning. |
| 12  follows: | 12    Q.  Did you review any documents in your |
| 13    MR. THEODOROU:  Usual stipulations. | 13  meeting with them? |
| 14    MR. ROSSETTI:  All objections except as | 14    A.  Yes. |
| 15  to the form of the question will be reserved until | 15    Q.  What documents did you review? |
| 16  trial. | 16    A.  They showed me a few press releases |
| 17    MR. THEODOROU:  Including motions to | 17  and a couple of E-mails. |
| 18  strike. | 18    Q.  Do you remember what the E-mails were? |
| 19    DIRECT EXAMINATION | 19    MR. FREEBORNE:  Are you going to ask if |
| 20  BY MR. THEODOROU: | 20  they refreshed her recollection? |
| 21    Q.  Good morning, Ms. Davis. Ms. Davis, | 21    MR. THEODOROU:  Well, I'm just going to |
| 22  my name is Nicholas Theodorou. I represent the | 22  ask her if she remembers what the E-mails were as |

Michele Davis                                                February 11, 2008
Washington, DC

| Page 10 | Page 12 |
|---|---|
| 1　opposed to refreshing her recollection? | 1　Q.　Do you recall in October, 2001 what |
| 2　　　BY MR. THEODOROU: | 2　was your position? |
| 3　　Q.　Do you remember what the E-mails were? | 3　　A.　Assistant secretary for public |
| 4　　A.　Obviously related to E-mails about | 4　affairs. |
| 5　getting ready for the early refunding | 5　　Q.　At the Department of Treasury? |
| 6　announcement. | 6　　A.　Yes.　Sorry. |
| 7　　Q.　Do you remember whon they were from? | 7　　Q.　When were you first contacted by the |
| 8　　A.　A couple of them were from me. | 8　SEC regarding this matter?　When I refer to this |
| 9　　Q.　Do you remember if they were from | 9　matter, I mean the issue surrounding October 31st, |
| 10　anybody else? | 10　2001? |
| 11　　A.　There were a couple.　I don't remember | 11　　　MR. ROSSETTI:　Objection. |
| 12　who actually sent them. | 12　　A.　When was I first contacted by the SEC? |
| 13　　Q.　Now, other than the Department of | 13　　Q.　Yes. |
| 14　Justice attorneys and Mr. Kollar from the | 14　　A.　I don't recall if I was ever contacted |
| 15　Department of Treasury, did you meet with anybody | 15　by the SEC. |
| 16　else? | 16　　　BY MR. THEODOROU: |
| 17　　A.　No. | 17　　Q.　Was it shortly thereafter, after the |
| 18　　Q.　I want to show you what has been | 18　refunding -- |
| 19　marked as exhibits, Nothern Exhibits 1 and 2. | 19　　　MR. FREEBORNE:　There's been no |
| 20　　(Deposition Exhibit Nos. 1-2 were marked for | 20　predicate laid for -- |
| 21　　　identification.) | 21　　　MR. ROSSETTI:　I'm sorry.　Can you -- |
| 22　　　BY MR. THEODOROU: | 22　　　MR. THEODOROU:　What is your objection? |

| Page 11 | Page 13 |
|---|---|
| 1　　Q.　What I have shown you what are | 1　　　MR. ROSSETTI:　It's not an objection. |
| 2　Exhibits 1 and 2 in this case.　Exhibit 1 being a | 2　If the witness can just speak a little more |
| 3　subpoena, Exhibit 2 being a notice of deposition. | 3　clearly or slowly because. |
| 4　Have you seen these before? | 4　　A.　Oh, I'm sorry.　I don't know that I |
| 5　　A.　No. | 5　was ever contacted by the SEC.　I don't remember. |
| 6　　Q.　So how did you find out about the | 6　　Q.　You don't recall being contacted by |
| 7　deposition? | 7　the SEC? |
| 8　　A.　Tim called me. | 8　　A.　No. |
| 9　　Q.　When were you called about the | 9　　Q.　Were you interviewed by anybody from |
| 10　deposition? | 10　the Treasury about the events October 31st, 2001? |
| 11　　A.　I don't know, it was long enough ago | 11　　A.　Someone came to see me at another job, |
| 12　that when I saw it on my calendar, I had forgotten | 12　so it must have been at least 2003 and I just |
| 13　about it. | 13　don't remember whether it was the Justice |
| 14　　Q.　You forgot the date? | 14　Department or I don't remember who it was. |
| 15　　A.　I honestly don't know when it was I | 15　　Q.　Were you ever interviewed by the |
| 16　put it on my calendar.　I'm sorry. | 16　Treasury Inspector General's office? |
| 17　　Q.　So you didn't get a subpoena or the | 17　　A.　I don't remember that.　Not that I can |
| 18　notice of deposition? | 18　remember. |
| 19　　A.　No. | 19　　Q.　But you were interviewed about what |
| 20　　Q.　But you understand that you were | 20　happened on October 31st, 2001 at some point, |
| 21　subpoenaed for this deposition, correct? | 21　correct? |
| 22　　A.　I do now. | 22　　A.　Yes.　Like I said, a couple of years |

4 (Pages 10 to 13)

Michele Davis                                                    February 11, 2008
                            Washington, DC

Page 14

1  later because I wasn't there anymore.
2      Q.   And did, were they lawyers or were
3  they law enforcement agents who interviewed you?
4      A.   I don't remember. I'm sorry. This
5  is --
6      Q.   Did they explain to you what they were
7  investigating?
8          MR. ROSSETTI:  Objection.
9      A.   I'm sorry. I'm not sure I understand.
10  Did they explain to me that they were asking
11  questions about that day.
12         BY MR. THEODOROU:
13     Q.   Yes. And what did they tell you they
14  were investigating?
15     A.   I don't remember.
16     Q.   Do you remember the questions they
17  asked you?
18     A.   No.
19     Q.   Do you remember the topics they asked
20  you about?
21     A.   I'm sure they asked about, like, the
22  proceedings that day.

Page 15

1          MR. FREEBORNE:  Don't speculate. Just
2  testify based upon personal knowledge.
3          BY MR. THEODOROU:
4      Q.   What do you recall they asked you
5  about?
6      A.   The events of that day.
7      Q.   Do you recall more specifically about
8  what they asked you about in terms of that day?
9      A.   No. It was three years ago or longer.
10     Q.   Do you recall at all being interviewed
11  by the SEC?
12     A.   Like I said, someone came and
13  interviewed me. I don't remember what agency they
14  were with.
15     Q.   Did the person who interviewed you
16  talk about whether anybody at Treasury may have
17  violated federal laws?
18         MR. ROSSETTI:  Objection.
19     A.   Not that I recall.
20         BY MR. THEODOROU:
21     Q.   Let me rephrase the question. Did the
22  person ask you whether anybody at Treasury had

Page 16

1  violated any federal laws or regulations?
2          MR. FREEBORNE:  Objection.
3      A.   Like I said, I don't remember any of
4  the specific of the conversation. It was several
5  years ago.
6          BY MR. THEODOROU:
7      Q.   Generally, do you remember anything
8  generally?
9          MR. FREEBORNE:  What do you mean by
10  generally?
11         MR. THEODOROU:  As opposed to a
12  specific recollection or general recollection.
13     A.   All I remember is we were discussing
14  the events of that day. I'm sorry. That's all.
15         BY MR. THEODOROU:
16     Q.   Did the person, was it one person or
17  more than one person who interviewed you?
18     A.   It was either one or two.
19     Q.   Did the person or persons who
20  interviewed you suggest in any way that someone at
21  Treasury had violated the laws?
22         MR. ROSSETTI:  Objection.

Page 17

1      A.   I don't remember.
2      Q.   You don't recall. Were you asked to
3  produce any documents to the people interviewing
4  you?
5      A.   Not at that time. No.
6      Q.   Not at that time?
7      A.   Because I didn't work at Treasury at
8  that time.
9      Q.   At some point, though, even though you
10  did not work at Treasury, were you asked to
11  produce documents that you might have in your
12  personal possession?
13     A.   No.
14     Q.   Did the Treasury Inspector General's
15  Office ever ask you to produce documents?
16     A.   I know we did a lot of things after
17  that day, and I don't remember. Again, I don't
18  know there was the inspector general. I mean, we
19  were all involved in trying to figure out how
20  things had happened that day.
21     Q.   What is our current position at
22  Treasury?

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                                February 11, 2008
Washington, DC

| Page 18 | Page 20 |
|---------|---------|
| 1   A.  Assistant secretary of public affairs. | 1   August of '01. |
| 2   Q.  What are your responsibilities as | 2       BY MR. THEODOROU: |
| 3   assistant secretary of public affairs? | 3   Q.  And that was through when, December |
| 4   A.  Managing all the external | 4   '02? |
| 5   communications for the Department. | 5   A.  Yes. |
| 6   Q.  You have been assistant secretary of | 6   Q.  Now, what did you do between December |
| 7   public affairs for how long? | 7   '02 and the Fannie Mae job? |
| 8   A.  October of 2006.  So 15 months the | 8   A.  Well, like December 30th, then January |
| 9   second time. | 9   1st.  There was no break there. |
| 10      MR. FREEBORNE:  Yes.  I was going to | 10   Q.  So your next job, so there hasn't been |
| 11  say.  I think you need to break that down. | 11  any break in terms of the jobs.  You went from |
| 12      MR. THEODOROU:  I'm going to back it | 12  assistant secretary of pulic affairs to Fannie Mae |
| 13  up. | 13  and then after Fannie Mae to The White House and |
| 14      BY MR. THEODOROU: | 14  then back to Treasury, correct? |
| 15   Q.  So in this particular period, the | 15   A.  Yes. |
| 16  latest tenure started when as assistant secretary? | 16   Q.  What did you do before Fannie Mae? |
| 17   A.  October of 2006. | 17   A.  I worked at Treasury. |
| 18   Q.  So you've been assistant secretary | 18   Q.  What did you do before that first |
| 19  since October of 2006, and what did you do before | 19  stint at Treasury? |
| 20  that? | 20   A.  I worked on Capitol Hill. |
| 21   A.  Deputy assistant to the president for | 21   Q.  What did you do there? |
| 22  communications. | 22   A.  I was communications director for |

| Page 19 | Page 21 |
|---------|---------|
| 1   Q.  For all communications? | 1   house majority leader, Dick Army. |
| 2   A.  No.  Form policy communications. | 2   Q.  How long did you do that? |
| 3   Q.  How long did you do that? | 3   A.  From 1995 through the end of 2000. |
| 4   A.  That was July of 2005 to October of | 4       MR. ROSSETTI:  What was that? |
| 5   2006. | 5   A.  Through to end of 2001.  January of |
| 6   Q.  What did you do before that? | 6   2001 -- |
| 7   A.  Senior vice president for regulatory | 7       MR. ROSSETTI:  If you could just speak |
| 8   policy at Fannie Mae. | 8   up.  You're trailing off there. |
| 9   Q.  And how long were you at Fannie Mae? | 9       THE WITNESS:  Oh, I'm sorry. |
| 10   A.  January of '03 to July of '05. | 10      MR. THEODOROU:  Take your time, speak |
| 11   Q.  Why did you leave Fannie Mae? | 11  up.  Make sure Mr. Rossetti can hear about your |
| 12   A.  Because it was a really interesting | 12  answer to my next question. |
| 13  job at The White House. | 13      BY MR. THEODOROU: |
| 14   Q.  What did you do before Fannie Mae? | 14   Q.  What did you do as the senior vice |
| 15   A.  Assistant secretary for public affairs | 15  president for the regulatory affairs of Fannie |
| 16  at Treasury. | 16  Mae? |
| 17   Q.  When did you start as assistant | 17   A.  I managed basically, like, an internal |
| 18  secretary of public affairs at Treasury? | 18  (inaudible) for the company in looking at housing |
| 19      MR. FREEBORNE:  During this stint, I | 19  policy issues and regulatory reform proposals. |
| 20  take it. | 20   Q.  What is your educational background? |
| 21      MR. THEODOROU:  During that stint. | 21   A.  I have a masters in economics. |
| 22   A.  During that stint.  Okay.  That was in | 22   Q.  From where? |

6 (Pages 18 to 21)

Michele Davis

February 11, 2008

Washington, DC

## Page 22

1     A.   American University.
2     Q.   When did you get that?
3     A.   1991.
4     Q.   Where did you get your undergraduate
5 degree?
6     A.   Georgetown University.
7     Q.   And in what?
8     A.   Bachelor of science in foreign
9 service.
10     Q.   When did you get that degree?
11     A.   1988.
12     Q.   1988?
13     A.   1988.
14     Q.   I want to direct your attention to
15 your first stint as assistant secretary of public
16 affairs, which you testified started around August
17 of 2001?
18     A.   Yes. I was there from January on, but
19 I wasn't confirmed in the position until August.
20     Q.   So you started in January, 2001?
21     A.   Yes. At the Department. Yes.
22     Q.   Now, when you started as assistant

## Page 23

1 secretary of public affairs, did you receive any
2 type of training as to what you were supposed to
3 do in your job?
4     A.   Training?
5     Q.   As to how you were supposed to handle
6 the press, what you were supposed to do with a
7 press?
8     A.   My background on Capitol Hill was more
9 than enough for that.
10     MR. ROSSETTI: Objection. I'm sorry.
11 After he asks the question, if you could first,
12 let him ask the question before you answer, but if
13 you could just give a moment, I might have an
14 objection. A lot of this is for the record so
15 we're not all talking over each other.
16     MR. THEODOROU: And you'll still be
17 required to answer even after his objection. He
18 just wants to get that on the record, whatever it
19 is.
20     BY MR. THEODOROU:
21     Q.   But did you ever receive any training
22 as to what you were supposed to do as assistant

## Page 24

1 secretary of public affairs? Did anyone ever tell
2 you what your job responsibilities were and
3 duties?
4     MR. ROSSETTI: Objection.
5     A.   I mean, there's obviously a lot -- I
6 mean, you go through the transition office and
7 work on the responsibilities to the Department and
8 all the other issues. My background in this
9 communications was plenty in terms of talking how
10 to deal with reporters.
11     BY MR. THEODOROU:
12     Q.   Did you ever receive any training on
13 how Treasury press conferences were to be
14 conducted?
15     MR. FREEBORNE: In what respect?
16     BY MR. THEODOROU:
17     Q.   Well, I'm going to build a case
18 foundation, generally, how press conferences were
19 to be conducted, what was to be distributed to the
20 press, what kind of information should be given to
21 the press, things of that nature?
22     MR. ROSSETTI: Objection.

## Page 25

1     A.   I don't really follow the question. I
2 mean, I don't know who would, that's a decision
3 that the Department makes and the secretary -- I
4 mean, that's not, there is no --
5     BY MR. THEODOROU:
6     Q.   Let me be more specific. Did you ever
7 receive any training on the use of embargoes at
8 press conferences?
9     MR. FREEBORNE: When you say training,
10 do you mean formal training?
11     BY MR. THEODOROU:
12     Q.   We'll go from formal to informal. Did
13 you ever receive any training --
14     A.   I'm not even sure who would do that.
15     Q.   Well, my question isn't whether you're
16 sure or not. My question is did you ever get any
17 training on the use of embargoes with the press?
18     MR. ROSSETTI: Objection.
19     A.   I had already been working in public
20 affairs for a number of years.
21     BY MR. THEODOROU:
22     Q.   Were you familiar with the use of

7 (Pages 22 to 25)

Michele Davis

February 11, 2008

Washington, DC

| Page 26 | Page 28 |
|---|---|
| 1 embargoes?<br>2    A.  Yes.<br>3    Q.  In what context?<br>4    A.  Having issued press releases in<br>5 previous jobs.<br>6    Q.  Had you used embargoes on the press in<br>7 previous jobs?<br>8    A.  Yes. In some circumstances. Yes.<br>9    Q.  Which --<br>10    MR. ROSSETTI: I'm sorry.<br>11    A.  In some circumstances. Yes.<br>12    BY MR. THEODOROU:<br>13    Q.  And what circumstances had you used<br>14 embargoes?<br>15    A.  Whenever there was a reason to give<br>16 reporters a text or anything ahead of time that<br>17 was going to be delivered. If someone was going<br>18 to give remarks at night, for example. Reporters<br>19 don't want to wait around for that, we'd give them<br>20 the embargo text earlier in the afternoon so they<br>21 would have it embargoed because he wanted to do an<br>22 interview ahead of announcement but not have it | 1    Q.  Were there particular procedures that<br>2 governed the use of embargoes?<br>3    A.  No. I mean, not that I'm aware of. I<br>4 mean, not that, I guess I don't understand. Again<br>5 I don't understand the question.<br>6    Q.  Were there any written procedures that<br>7 governed the use of embargoes when you, for<br>8 instance, let's take the first instance, when you<br>9 gave information that was going to be released<br>10 late at night, you gave the information earlier in<br>11 the day, was there any written procedures as to<br>12 how the embargo worked in that situation?<br>13    A.  I have never seen anything written<br>14 down about an embargo. It's a common practice.<br>15 It's a widely-understood practice in public<br>16 affairs and among the media.<br>17    Q.  So you've never seen any written<br>18 procedures that govern the use of embargoes?<br>19    A.  No.<br>20    Q.  Are there any written procedures in<br>21 place at Treasury today governing the use of<br>22 embargoes? |

| Page 27 | Page 29 |
|---|---|
| 1 hit the press until the announcement was done so<br>2 there would be full contact to the announcement.<br>3 It's a variety of circumstances.<br>4    Q.  What jobs had you used embargoes?<br>5    A.  In working on Capitol Hill and my job<br>6 before that I was, I did a lot of interviews<br>7 working for a group called Citizens for a Sound<br>8 Economy.<br>9    Q.  Well, let's talk about the use of<br>10 embargoes at Capitol Hill. What circumstances<br>11 when you were at Capitol Hill were embargoes used?<br>12    A.  Again, if there was something going to<br>13 be happening late at night that you would want to<br>14 give it out to the media early so that, just so<br>15 they would have it, so you wouldn't have to be<br>16 tracking down whom.<br>17    Or again, you might grant an interview to<br>18 somebody ahead of an announcement and embargo it<br>19 because just schedule didn't permit for the<br>20 interview to take place after. It just was<br>21 managing the new cycle and depending on the time of<br>22 day. | 1    A.  No.<br>2    Q.  There was no embargo procedures that<br>3 were developed after October, 2001 about embargoes<br>4 and how to deal with press conferences at<br>5 Treasury?<br>6    MR. ROSSETTI: Objection.<br>7    MR. FREEBORNE: Is your question as to<br>8 whether there were written policies?<br>9    BY MR. THEODOROU:<br>10    Q.  Yes. I'm asking are there any written<br>11 procedures today on how embargoes are to be used<br>12 at Treasury?<br>13    A.  No.<br>14    Q.  Are there written procedures as to how<br>15 press conferences should be conducted?<br>16    A.  Every press conference is a unique<br>17 event, so no.<br>18    Q.  When you took over the first time as<br>19 assistant secretary of public affairs in 2001, did<br>20 you receive any training on how to handle<br>21 market-sensitive information?<br>22    MR. ROSSETTI: Objection. |

8 (Pages 26 to 29)

Michele Davis                                                    February 11, 2008
Washington, DC

|  | Page 30 |
|---|---|
| 1 | MR. FREEBORNE: Training in what |
| 2 | respect? |
| 3 | BY MR. THEODOROU: |
| 4 | Q. Training on the disclosure of |
| 5 | market-sensitive information for the press or any |
| 6 | other people outside of Treasury? |
| 7 | A. Certainly there was an awareness of |
| 8 | market-sensitive information. Again, I don't know |
| 9 | what you mean by training. |
| 10 | Q. Well, did anybody instruct you as to |
| 11 | this is how market-sensitive information should be |
| 12 | handled or disclosed to others outside of |
| 13 | Treasury? Did you receive any type of training on |
| 14 | that? |
| 15 | A. Every release of information is a we |
| 16 | would go through the process by release, not in |
| 17 | a -- that would be very difficult to do in a |
| 18 | general sense. |
| 19 | Q. So is your answer that you never got |
| 20 | any formal training on it? |
| 21 | MR. ROSSETTI: Objection. |
| 22 | A. Again, I don't know who would do that. |

|  | Page 31 |
|---|---|
| 1 | BY MR. THEODOROU: |
| 2 | Q. So when you say you don't know who |
| 3 | would do that, is that an answer -- |
| 4 | A. I mean, no. |
| 5 | Q. A yes or no question? |
| 6 | A. I mean, no. There was no single |
| 7 | training. |
| 8 | Q. Did you receive any kind of training |
| 9 | regarding the release of information at a |
| 10 | quarterly refunding announcement? |
| 11 | MR. FREEBORNE: I'm sorry. Can I have |
| 12 | that question read back? I didn't have an |
| 13 | understanding. |
| 14 | MR. ROSSETTI: Objection. |
| 15 | BY MR. THEODOROU: |
| 16 | Q. How about if I just rephrase it. Did |
| 17 | you ever receive any training as to how |
| 18 | information should be released to the press at a |
| 19 | quarterly refunding announcement? |
| 20 | A. We had, every press event was a unique |
| 21 | event and at every, for all of those things when |
| 22 | we first, first we were all new in 2001, so we |

|  | Page 32 |
|---|---|
| 1 | went through the procedures that we were going to |
| 2 | use for any press event where we were releasing |
| 3 | information by event. |
| 4 | Q. So the procedures regarding the |
| 5 | release of information at press conferences was |
| 6 | they were developed press conference by press |
| 7 | conference? |
| 8 | MR. ROSSETTI: Objection. |
| 9 | A. If it was a unique press conference, |
| 10 | if it was something that was done every three |
| 11 | months, would be routine each time. |
| 12 | BY MR. THEODOROU: |
| 13 | Q. Who was your predecessor as assistant |
| 14 | secretary? |
| 15 | A. Michelle Smith. |
| 16 | Q. Did you ever discuss, have any |
| 17 | discussions with Michelle Smith about how to |
| 18 | handle press conferences on quarterly refunding |
| 19 | announcements? |
| 20 | A. She and I had a lot of conversations |
| 21 | kind of in transition about a lot, the whole |
| 22 | variety of issues there. I don't recall that |

|  | Page 33 |
|---|---|
| 1 | topic in particular, but we could very well have. |
| 2 | I don't know. |
| 3 | Q. So you don't specifically recall but |
| 4 | you could have had a discussion about how to |
| 5 | handle -- |
| 6 | A. Yes. Because we walked through, I |
| 7 | mean, she was very helpful in walking through all |
| 8 | the various public affairs activities. |
| 9 | Q. Did you ever discuss how embargoes |
| 10 | should be used? |
| 11 | A. Again, we walked through a variety of |
| 12 | things there, and I'm sure she would have told me |
| 13 | here's how we did it or here's how she did it on a |
| 14 | whole variety of things. Whether it was specific |
| 15 | to that question, I just don't remember. |
| 16 | Q. So your testimony is you don't recall |
| 17 | her talking to you about it or you don't recall |
| 18 | what she said? |
| 19 | MR. ROSSETTI: Objection. |
| 20 | A. Either one. |
| 21 | BY MR. THEODOROU: |
| 22 | Q. So you don't recall her talking to you |

9 (Pages 30 to 33)

Michele Davis

February 11, 2008

Washington, DC

| Page 34 | Page 36 |
|---|---|
| 1 about how embargoes should be used? | 1 your understanding of Treasury's policy, if there |
| 2  A.  No. | 2 was a policy, on the use of embargoes? |
| 3  Q.  Do you recall talking to her about how | 3   A.  I'm not sure I understand. |
| 4 quarterly refunding press conferences should be | 4   Q.  Let me rephrase that.  Embargoes were |
| 5 conducted? | 5 used at press conferences when you were at |
| 6   A.  No, I don't. | 6 Treasury, right? |
| 7   Q.  Now, directing your attention to | 7       MR. ROSSETTI:  Objection. |
| 8 October 31st, 2001, at that time, did Treasury | 8       BY MR. THEODOROU: |
| 9 have any written policies and procedures on how | 9   Q.  Were embargoes used? |
| 10 market-sensitive information should be released to | 10   A.  At press conferences and not at press |
| 11 the press or the public? | 11 conferences. |
| 12       MR. ROSSETTI:  Objection. | 12   Q.  Well, let's talk about press |
| 13       MR. THEODOROU:  You still have to | 13 conferences.  Did Treasury have a policy on the |
| 14 answer. | 14 use of embargoes at press conference? |
| 15   A.  Not that I remember. | 15   A.  Like I said, every press conference is |
| 16       BY MR. THEODOROU: | 16 different. |
| 17   Q.  So is your testimony you can't recall | 17   Q.  What did you understand in October, |
| 18 or is it that Treasury did not have any? | 18 2001 -- strike that.  What was your understanding |
| 19       MR. ROSSETTI:  Objection. | 19 of the term embargo in October, 2001? |
| 20   A.  I don't remember any. | 20   A.  It's a practice within the public |
| 21       BY MR. THEODOROU: | 21 affairs, within the media and it means that |
| 22   Q.  Now, again directing your attention to | 22 whatever is embargoed cannot be distributed or put |

| Page 35 | Page 37 |
|---|---|
| 1 October 31st, 2001, did Treasury have any written | 1 on the wire or on the air or anywhere into the |
| 2 policies and procedures on how press conferences | 2 public domaine before that time. |
| 3 should be conducted? | 3   Q.  Did an embargo prevent a person from |
| 4   A.  No.  Every press conference is a | 4 disclosing the information to anybody else?  In |
| 5 different event. | 5 other words, did the embargo mean that the person |
| 6   Q.  As of October 31st, 2001, did Treasury | 6 attending the press conference could not disclose |
| 7 have any written policies and procedures on how | 7 it to anyone until an embargo time? |
| 8 embargoes were to be used at press conferences? | 8       MR. ROSSETTI:  Objection. |
| 9   A.  Not that I remember. | 9   A.  I mean, our use of it is only with the |
| 10   Q.  And again, directing your attention to | 10 media and it means that the media not make it |
| 11 October, 2001 did Treasury have any written | 11 public. |
| 12 policies and procedures on how information was to | 12       BY MR. THEODOROU: |
| 13 be released to the press at a quarterly refunding | 13   Q.  So the use of the embargo at Treasury |
| 14 announcement? | 14 was only with the media? |
| 15   A.  I don't remember if that was in | 15   A.  That's what an embargo is, it's a |
| 16 writing or not. | 16 media practice. |
| 17   Q.  Now, as of October 31st, 2001 -- and | 17   Q.  Did that mean that a reporter who got |
| 18 by the way when I ask these questions, I'm not | 18 embargoed information at a press conference could |
| 19 trying to trip you up or anything.  I am trying to | 19 not discuss the information with another Treasury, |
| 20 just find out generally what the information is? | 20 with a Treasury employee after he or she got the |
| 21   A.  Yes. | 21 information? |
| 22   Q.  So as of October 31st, 2001, what was | 22       MR. ROSSETTI:  Objection. |

10 (Pages 34 to 37)

Michele Davis                                                February 11, 2008
Washington, DC

---

Page 38

1      A.  I think that's a yes or no question
2  but I don't know which way yes goes. I'm sorry.
3      BY MR. THEODOROU:
4      Q.  In other words, if there was an
5  embargo at a press conference and information was
6  given to the press and there was a time when the
7  information was going to be released to the
8  public, did that mean that a reporter who received
9  the so-called embargoed information could not
10  discuss that information with a Treasury employee?
11      A.  If someone who already knows about it
12  inside Treasury.
13      Q.  What about someone in the Treasury who
14  didn't know about it?
15      A.  I have never run across that.
16      Q.  Could a reporter who received the
17  embargo information in October, 2001 at a press
18  conference relay that information to his editor
19  during the embargo period?
20      MR. ROSSETTI:  Objection.
21      A.  Yes.  That would be -- but that's an
22  accepted practice within the media.

---

Page 39

1      BY MR. THEODOROU:
2      Q.  So was that accepted practice?
3      A.  Yes.
4      Q.  It was a practice.  So a reporter who
5  got the embargoed information during the press
6  conference could relay that to his editor,
7  correct?
8      A.  That would be my understanding of an
9  embargo.
10      Q.  What pre embargo disclosures were
11  permissible --
12      MR. FREEBORNE:  I think you have to
13  give a little more.  It's a pretty broad question.
14      MR. ROSSETTI:  Objection.
15      BY MR. THEODOROU:
16      Q.  Well, let me ask you this.  There's a
17  team at which it becomes public, right?
18      A.  Yes.
19      Q.  And you just testified that it was
20  customary for a reporter or it was acceptable for
21  a reporter to call his or her editor with
22  embargoed information before the embargo time was

---

Page 40

1  up, correct?
2      MR. ROSSETTI:  Objection.
3      A.  You know, I think the different media
4  work different ways but in order to get, you know,
5  get things processed so that they come out in the
6  wire on time, now the technology is different, but
7  then you often had to go through an editors desk
8  to get onto the wire.
9      BY MR. THEODOROU:
10      Q.  But a reporter who attended a press
11  conference where there was a time set at which the
12  information would be disclosed to the public could
13  get that information before the time at which it
14  was going to be disclosed and could send it to his
15  or her editor; is that correct?
16      MR. ROSSETTI:  Objection.
17      A.  Yes.
18      MR. THEODOROU:  Now --
19      A.  Keeping it within the embargo or the
20  media organization respecting the embargo.
21      BY MR. THEODOROU:
22      Q.  I'm going to call that pre embargo

---

Page 41

1  disclosure, right, it's pre embargo time
2  disclosure.  Were there other disclosures that
3  were permissible besides calling your editor?
4      MR. FREEBORNE:  You mean recipients?
5      BY MR. THEODOROU:
6      Q.  Yes.  Were there other instances,
7  besides calling an editor, where someone who
8  attended a press conference whether it was an
9  embargo could relay that information.
10      In other words, were there other allowable
11  instances besides sending it to an editor?
12      MR. FREEBORNE:  Focused on recipients
13  though?
14      MR. THEODOROU:  Correct.
15      A.  I can't think of any but there might
16  be some circumstance but I can't think of any.
17      BY MR. THEODOROU:
18      Q.  And as of October 31st, 2001, do you
19  know of any other instances besides sending the
20  information to an editor where a reporter could
21  disclose the information before the embargo time?
22      A.  Could like was physically able to or

---

11 (Pages 38 to 41)

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                              February 11, 2008
Washington, DC

| Page 42 | Page 44 |
|---|---|

**Page 42**

1  could --
2      Q.   Just relay the information besides
3  sending it to an editor?
4      A.   Like --
5          MR. THEODOROU:  Let me clarify the
6  question before you all jump.  You know, he's
7  counsel for the witness, I know you're counsel for
8  the party, but let me just clarify the question.
9          BY MR. THEODOROU:
10     Q.   You just testified that it was
11  customary or it was permissible for a reporter to
12  relay the information he or she learns at a press
13  conference in which there is an embargo --
14     A.   In order to facilitate release of the
15  time of the embargo.
16     Q.   -- could send that information to an
17  editor, correct?
18     A.   To facilitate the --
19     Q.   Do you know of any other instances in
20  October, 2001 where besides sending it to an
21  editor, a reporter could send the information to
22  someone else outside of the press conference

**Page 43**

1  before the release of the information?
2      A.   Without it being an embargo violation?
3      Q.   Correct.  Besides an editor?
4      A.   Not that I can think of.
5      Q.   Now, in your role as an assistant
6  secretary in 2001 beginning in January, did you
7  normally attend quarterly refunding press
8  conferences?
9      A.   No.
10     Q.   Do you recall, did you attend the
11  press conference on October 31st, 2001?
12     A.   No.
13     Q.   Do you recall whether you attended
14  assistant secretary Brian Roseboro's quarterly
15  refunding press conference in August of 2001?
16     A.   I don't think I went.  I don't
17  remember going.
18     Q.   Now, before October 31st, 2001, do you
19  know how embargo times were set for quarterly
20  refunding conferences?  How they were set?
21     A.   What do you mean, like who decided?
22     Q.   Yes.  How did they set, before the

**Page 44**

1  October 31st, 2001 conference, quarterly refunding
2  conference, do you know how Treasury set the
3  embargo times for prior refunding conferences?
4      A.   I don't recall anymore.  Again, these
5  things are usually depend on the timing of the
6  event, the timing, how much time you think you
7  need in a room to talk about things.  I mean, it's
8  they're each individually unique.
9      Q.   Did you ever learn after October 31st,
10  2001 how the embargo times were set?
11     A.   How the embargo times were set --
12     Q.   For quarterly refunding conferences?
13     A.   I don't remember hearing of any
14  specific rule.  We would send an embargo based on
15  the time that whoever was going make a
16  presentation was going to make the presentation,
17  how long it was going to take and how long we
18  wanted for Q and A before the event was over.
19     Q.   Did you ever learn what factors --
20  strike that.  Again, before the October 31st, 2001
21  refunding conference, do you know what factors
22  went into determining what the embargo time should

**Page 45**

1  be?
2      A.   I think it was just those that I just
3  said, what time was going to be the announcement,
4  how much time we thought the discussion would
5  take, so that the embargo, so that it would all
6  happen before the embargo was over.
7      Q.   When you say discussion?
8      A.   Q and A with reporters, with whatever.
9      Q.   Were you aware or did you ever become
10  aware that for quarterly refunding conferences
11  before October 31st, 2001 public affair officials
12  as Treasury pulled the reporters present to
13  determine how much time they needed to prepare
14  their stories?
15         MR. ROSSETTI:  Objection.
16     A.   I know we, that's a normal practice on
17  a lot of things, not just quarterly refunding.  We
18  try to do exactly that to make sure they have
19  enough time so they can write a complete story
20  rather than just having to scan something and not
21  necessarily understand it and put out headlines.
22         BY MR. THEODOROU:

12 (Pages 42 to 45)

Michele Davis                                                              February 11, 2008
Washington, DC

---

Page 46

1     Q.   So that before October 31st, 2001, did
2   Treasury set fixed embargo times in advance?
3         MR. FREEBORNE:  What do you mean by
4   fixed?
5         BY MR. THEODOROU:
6     Q.   Before the press conference.  Did they
7   set an embargo time in advance or was it through
8   this informal process you just described?
9     A.   Again, it would depend on the event.
10        MR. ROSSETTI:  I don't know if you were
11  talking strictly refunding conferences or all
12  press conferences.
13        MR. THEODOROU:  No.  I'm talking about
14  refunding.
15    A.   I don't know.
16        MR. THEODOROU:  Mark this, please.
17  (Deposition Exhibit No. 3 was marked for
18        identification.)
19        BY MR. THEODOROU:
20    Q.   I want to show you what's been marked
21  as Northern Exhibit No. 3.  Do you see that?  It's
22  a Washington Post article, Ms. Davis?

---

Page 47

1     A.   Yes.
2     Q.   And the top it says, "Treasury
3   suspects insider bond trading."
4     A.   Yes.  I'm sorry.
5     Q.   Do you see that?  And it's dated
6   November 6, 2001?
7     A.   Yes.
8     Q.   Now, before I ask you something about
9   this press conference, I mean, excuse me, this
10  article.  Did Treasury's procedures for quarterly
11  refunding announcements, excuse me, did Treasury's
12  embargo procedures for quarterly refunding
13  announcements did they differ from the embargo
14  procedures that you used for securities auctions?
15    A.   I don't remember.
16    Q.   Well, let's turn to a few paragraphs
17  down and if you want to read the whole thing, feel
18  free to read it.  Okay.  You see a few paragraphs
19  down, seven paragraphs down it says, "Treasury
20  officials announce both before and at the end of
21  the news conference that Fisher's statement and
22  his replies to reporters' questions were embargoed

---

Page 48

1   for release at 10 a.m., meaning that the people
2   present understood that their access to the
3   information was conditioned on their agreement not
4   to distribute it publically before 10 a.m., but
5   reporters and others who attended were not
6   required to remain in the room until the embargo
7   expired.
8         The reporters, many of whom work regularly
9   in the building's press room, left to prepare
10  stories to be sent to their media outlets and were
11  released at 10 a.m." Do you see that?
12    A.   Yes.
13    Q.   And this is making reference, when we
14  say to Mr. Fisher's statement, that's a reference
15  to his statement on October 31st, 2001, correct?
16    A.   Yes.
17    Q.   Now, look at a next paragraph, "That
18  procedure was far more casual, for instance, than
19  that followed regularly at Treasury when the
20  results of securities auctions are announced.  In
21  such cases, reporters are given the information
22  ahead of time so they can prepare stories but they

---

Page 49

1   are kept in the press room until the release time
2   when they are all allowed to send their stories
3   out simultaneously." Do you see that paragraph?
4     A.   Yes.
5     Q.   Now, was there the case in October,
6   2001 of how securities auctions were handled?
7         MR. ROSSETTI:  Objection.
8         MR. FREEBORNE:  If you know.
9     A.   I just don't recall.
10        BY MR. THEODOROU:
11    Q.   Do you recall, other than securities
12  auctions, where the embargoed procedures were
13  different than quarterly refunding announcements?
14        MR. FREEBORNE:  That assumes an answer
15  to your previous question.
16        MR. THEODOROU:  No other than
17  securities auctions.
18        MR. FREEBORNE:  Well, she didn't know
19  about any of the securities auctions.
20        MR. THEODOROU:  Well, she's got to
21  answer it may way.
22        MR. FREEBORNE:  But you're assuming

---

13  (Pages 46 to 49)

Michele Davis                                                February 11, 2008
Washington, DC

| Page 50 | Page 52 |
|---|---|
| 1   again -- | 1   I can probe it. |
| 2      MR. THEODOROU: Let's assume -- I don't | 2      MR. FREEBORNE: She said she doesn't |
| 3   want to get into an argument. Let me rephrase the | 3   recall what the procedures are in terms of |
| 4   question. I'm not trying to trick you, it's | 4   securities auctions. So I really do think its's |
| 5   pretty -- securities auctions, this newspaper | 5   an unfair question. If you want to rephrase it, |
| 6   reporter is basically saying that securities | 6   that's fine. |
| 7   auctions, they basically had a lock-down | 7      BY MR. THEODOROU: |
| 8   procedure; isn't that what they're really saying | 8     Q. All right. Let me rephrase it. You |
| 9   here? | 9   don't know -- we'll leave it like that. Let's go |
| 10      MR. ROSSETTI: Objection. | 10   a few more paragraphs down. Do you see where it |
| 11     A. More or less. Yes. | 11   says Michele Davis? |
| 12      BY MR. THEODOROU: | 12     A. Yes. |
| 13     Q. Now, is it your testimony that in | 13     Q. "The Department's assistant secretary |
| 14   October, 2001 you didn't know how securities | 14   of public affairs said the early posting was human |
| 15   auctions' press conferences were conducted or how | 15   error in her office. It was a careless mistake, |
| 16   embargoes were implemented? | 16   she told reporters." |
| 17      MR. ROSSETTI: Objection. | 17   Now, look at the paragraph before that. It |
| 18     A. That's not what I said. I said I | 18   says, "The Treasury investigations have not |
| 19   don't recall now. | 19   determined how anyone received information about |
| 20      BY MR. THEODOROU: | 20   haulting bond sales between the end of the news |
| 21     Q. So you don't recall now. Besides | 21   conference at 9:49 a.m. when the Department |
| 22   securities auctions, were lock-down procedures | 22   mistakenly posted Fisher's statement in its |

| Page 51 | Page 53 |
|---|---|
| 1   used for any other kind of press conferences in | 1   website. |
| 2   October, 2001 at Treasury? | 2   At that point, some news organizations felt |
| 3      MR. ROSSETTI: Objection. | 3   free to release the information." Then it says, |
| 4     A. I don't recall right now. We again, | 4   "Michele Davis, the Department's assistant |
| 5   all this embargo things are usually determined by | 5   secretary of public affairs said the early posting |
| 6   the circumstances of the announcement or the | 6   was a human error in her office. It was a |
| 7   release. So there are times when we're just | 7   careless mistake." Right? |
| 8   giving data to reporters and we take it to the | 8     A. Right. |
| 9   press room and set an informal embargo that's | 9     Q. Would you, please, describe for me how |
| 10   established when you get there, that's X minutes | 10   it was a mistake? |
| 11   from when the paper is handed out. That's more | 11      MR. ROSSETTI: Objection. |
| 12   like a lock-down process on a variety of data | 12     A. It was supposed to be posted at |
| 13   that's released. | 13   10 o'clock. |
| 14      BY MR. THEODOROU: | 14      BY MR. THEODOROU: |
| 15     Q. Why were the procedures for the | 15     Q. And what happened? |
| 16   quarterly refunding announcement for the embargo | 16     A. The person who posted it on the |
| 17   that day different than securities auctions? | 17   website posted it early. |
| 18      MR. ROSSETTI: Objection. Nick, you're | 18     Q. Do you know any other details about |
| 19   assuming that what is printed in the media is | 19   that as to why she posted it early? |
| 20   accurate. I think your questions are unfair at | 20     A. No. |
| 21   this point. | 21     Q. Go back to use of embargoes at |
| 22      MR. THEODOROU: Well, I don't think so. | 22   quarterly refunding press conferences, you said |

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 54 | Page 56 |
|---|---|

**Page 54**

1  that the embargo time would be set at the time of
2  the conference?
3      A.  I said that in a general.  I wasn't
4  speaking just about quarterly refunding?
5      Q.  But do you recall how they were set at
6  quarterly refunding conferences specifically in
7  October, 2001?
8      A.  No.
9      Q.  How did Treasury enforce embargoes at
10  press conference?
11      MR. FREEBORNE:  What do you mean by
12  enforce?
13      BY MR. THEODOROU:
14      Q.  Well, let me strike that.  What would
15  happen to someone if they violated the embargo?
16      A.  To a reporter?
17      Q.  Yes.
18      A.  Again, it would depends on the
19  circumstances.  But they're, usually an embargo is
20  a fairly self-enforcing thing because the wire
21  reporters, they all want to go to print, hit the
22  wire at the same time so that nobody is last

**Page 55**

1  because they think that's bad blood.
2      So you rarely run into a problem.  When it
3  does happen, it can range from, depending on the
4  seriousness of it, it can range from sort of a
5  slap on the wrist to losing your Treasury press
6  pass depending how serious it is.
7      Q.  So if a reporter from a wire service
8  disclosed the news of the suspension of a 30-year
9  bond before that 10 a.m. on October 31st, 2001,
10  that reporter could face a penalty, correct?
11      MR. ROSSETTI:  Objection.
12      A.  Could.  Yes.
13      BY MR. THEODOROU:
14      Q.  And as you said, it could range from a
15  slap on the wrist to having the press credentials
16  revoked, correct?
17      A.  Right.
18      Q.  Was it the practice at Treasury to
19  tell reporters about penalties for violating
20  embargoes?
21      A.  Not that I'm aware of.  No.
22      MR. ROSSETTI:  I'm sorry.

**Page 56**

1      A.  No.  I'm not aware of that.  No.
2      BY MR. THEODOROU:
3      Q.  Was it the practice at Treasury to
4  obtain some type of signed agreement from
5  reporters that they would not disclose any
6  information before the embargo time expired?
7      MR. ROSSETTI:  Objection.
8      A.  No.
9      BY MR. THEODOROU:
10      Q.  Do you know who Elizabeth Holahan?
11      A.  Yes.
12      Q.  Who is she?
13      A.  She worked for me.
14      Q.  What was her position?
15      A.  Public affairs specialist.
16      Q.  Do you know if she had anything to do
17  with the quarterly refunding announcement press
18  conference on October 31st, 2001?
19      A.  Yes.  She was part of getting it set
20  up and getting the materials ready and released.
21      Q.  Do you know whether she asked those
22  who attended the press conference to agree to

**Page 57**

1  comply with a 10 a.m. embargo time?
2      A.  I wasn't there.
3      Q.  Did she ever tell you what she did at
4  the press conference?
5      A.  I'm sure she did but I don't remember
6  that --
7      Q.  No.  I'm just asking, that wasn't my
8  question.  My question was:  Did she ever tell you
9  what she did at the press conference?
10      MR. ROSSETTI:  Objection.
11      A.  We had many discussions after that
12  day.  So I'm sure she did but that's all I know.
13      BY MR. THEODOROU:
14      Q.  So is it your testimony you don't
15  recall how she set the embargo time with the press
16  that day?
17      A.  Right.
18      MR. ROSSETTI:  Objection.
19      BY MR. THEODOROU:
20      Q.  Did you ever learn that those
21  attending the October 31st, 2001 press conference
22  were essentially asked to abide by an honor system

15 (Pages 54 to 57)

Michele Davis

February 11, 2008

Washington, DC

Page 58

1  not to release the information before the embargo
2  time?
3      MR. ROSSETTI: Objection.
4      A. I'm sorry. They were asked that in
5  the room?
6      BY MR. THEODOROU:
7      Q. Yeah. Did you ever learn that the way
8  the embargo was implemented that day was that
9  Ms. Holahan had basically called out those
10  attending and asked them -- strike that. Did you
11  ever learn that they were just basically pulled
12  and they all decided on an embargo time?
13      MR. ROSSETTI: Objection.
14      A. I wasn't there, and I don't remember
15  discussion afterwards.
16      BY MR. THEODOROU:
17      Q. Now, before October, 2001, were you
18  aware of any instance in which a reporter or
19  someone else violated the embargo at a Treasury
20  press conference?
21      A. Not that I can recall. No.
22      Q. Before October, 2001, do you recall

Page 59

1  any instance in which the credentials of any
2  member of the press were revoked for violating a
3  Treasury embargo?
4      A. No.
5      MR. THEODOROU: I'm going to show you
6  the next exhibit.
7      (Deposition Exhibit No. 4 was marked for
8         identification.)
9      BY MR. THEODOROU:
10      Q. Do you have Exhibit 4 in front of you,
11  Ms. Davis?
12      A. Yes.
13      Q. This is a Reuters report, October
14  31st, 2001. Do you see that?
15      A. Yes.
16      Q. Have you ever seen this report before?
17      A. I probably saw it then but I don't
18  recall.
19      Q. Well, the report starts off by saying
20  if the Reuters report, "If Wall Street shed any
21  tears over the U.S. Treasury's decision to send
22  the 30-year bond to an early grave, there were

Page 60

1  tears of range over a news leak that gave some
2  dealers a head start in the biggest bond rally in
3  history." Do you see that?
4      A. Yes.
5      Q. At the end of this where it quotes
6  Pete Fisher saying, We cannot run this business if
7  people think we're trying to time the market or
8  outsmart the market, Fisher said in an interview
9  with cable television network CNBC. Do you see
10  that?
11      A. Yes.
12      Q. Now, right under that there's a
13  paragraph that says, "But those remarks rank
14  haulover traders who best saw hand handed
15  handling of the announcement and at worst,
16  suspected insider trading by market players who
17  sit on a Treasury borrowing advisory committee.
18  Barclay's Roberts recalled a similar flaque
19  earlier this month when the Treasury decided to
20  flood the market with more of the 10-year notes to
21  ease a liquidity log jam caused by failed trades
22  after the September 11 attacks on Washington and

Page 61

1  New York.
2      When they did the reopening of the 10-year,
3  there was advance information on street, there's
4  advance information here and so there are a number
5  of people on the street who are pretty upset about
6  it, Roberts said." Do you see that?
7      A. Yes.
8      Q. Were you aware in October, 2001 about
9  an instance in which advance information got out
10  before treasury's issuance of 10-year notes?
11      MR. ROSSETTI: Objection.
12      A. No.
13      BY MR. THEODOROU:
14      Q. Do you recall that incident that
15  they're talking about at all?
16      A. No.
17      Q. Is it that you don't recall at all?
18  You don't recall at all anyone bringing that to
19  your attention?
20      A. Right.
21      Q. Is this the first time you've heard
22  about this incident when I have asked you about

16 (Pages 58 to 61)

Michele Davis                                                                    February 11, 2008
Washington, DC

---

Page 62

1  it?
2      A.  One of the E-mails I saw earlier today
3  was an E-mail where someone, it was either that
4  day or right after, where someone had said this
5  had happened earlier.  I think my response on that
6  E-mail was I didn't know about this, did you, so I
7  didn't know about it.
8      Q.  So before -- but did you learn about
9  it some time after the October 31st, incident?
10      A.  Yes.  Based on an E-mail I looked at
11  earlier today.
12      Q.  But before October 31st, you weren't
13  aware of this incident?
14      A.  Right.
15      Q.  Now, after October 31st, 2001, was
16  this incident referred to in the Reuters report?
17  Was it investigated?
18          MR. ROSSETTI:  Objection.
19          MR. FREEBORNE:  If you know.
20      A.  I don't know.
21          BY MR. THEODOROU:
22      Q.  I can preface.  Do you know whether

---

Page 63

1  the incident -- we can do that, if you want to do
2  that.  Do you know whether that incident was
3  investigated?
4      A.  No. I don't know.
5      Q.  You don't know or you don't recall?
6      A.  I don't know.
7          MR. THEODOROU:  Why don't we take a
8  break.
9          THE VIDEO OPERATOR:  Off the record at
10  1:54:45.
11          On the record at 2:03:44.
12          BY MR. THEODOROU:
13      Q.  Ms. Davis, I want to show you what's
14  been marked as Northern Exhibit 5.  Do you see
15  that?
16      A.  Yes.
17      (Deposition Exhibit No. 5 was marked for
18          identification.)
19          BY MR. THEODOROU:
20      Q.  It's a series of e-mails, correct?
21      A.  Yes.
22      Q.  Have you seen it before today?

---

Page 64

1      A.  No.
2      Q.  Let's take a look at it from the
3  bottom.  Do you see it's from Tony Fratto?
4      A.  Yes.
5      Q.  To a series of people, correct.
6      A.  Yes.
7      Q.  One of those people is you?
8      A.  Yes.
9      Q.  And it's dated October 31st, 2001?
10      A.  Yes.
11      Q.  That's the day of the refunding
12  conference at issue in this case?
13      A.  Right.
14      Q.  Then it goes from, and who was Tony
15  Fratto at that time?
16      A.  Director of public affairs.
17      Q.  And he reported to who?
18      A.  Me.
19      Q.  Mr. Fratto reported to you, correct?
20      A.  Yes.
21      Q.  Did Ms. Holahan report to you also?
22      A.  She reported to him.

---

Page 65

1      Q.  Now, if you follow this, the next
2  E-mail is from David Aufhauser?
3      A.  Aufhauser.
4      Q.  Who is David Aufhauser?
5      A.  General counsel.
6      Q.  Of the Department of Treasury?
7      A.  Yes.
8      Q.  And he's writing to a series of people
9  including you, right?
10      A.  Yes.
11      Q.  Then the next E-mail is from Timothy
12  Bitsberger.  Do you see that at 3:19 p.m.?
13      A.  Yes.
14      Q.  Who is Timothy Bitsberger?
15      A.  One of Peter Fisher's deputies.  I
16  don't remember his exact title.  Deputy assistant
17  secretary for something.
18      Q.  Now, he sends an E-mail to
19  Mr. Aufhauser, Tony Fratto and you, correct?
20      A.  Yes.
21      Q.  As well as others?
22      A.  Mm-hmm.

---

17 (Pages 62 to 65)

Michele Davis                                                February 11, 2008
Washington, DC

Page 66

1    Q.   And Mr. Fratto again worked under your
2    supervision?
3    A.   Yes.
4    Q.   And then he says in his E-mail to
5    Mr. Bitsberger, "There was a leak a few weeks ago
6    at the emergency reopening. The refunding process
7    has been criticized for years because of suspected
8    leaks." Do you see that?
9    A.   Yes.
10   Q.   Did you ever discussion that issue
11   with Mr. Bitsberger?
12       MR. ROSSETTI: Objection.
13   A.   Not that I recall.
14       BY MR. THEODOROU:
15   Q.   When he's talking about a leak a few
16   weeks ago in the emergency reopening, what is the
17   emergency reopening that he's referring to, if you
18   know?
19       MR. ROSSETTI: Objection.
20   A.   We did a lot of things right after
21   September 11th to get liquidity into markets one
22   of which I think was reopening some of the 10-year

Page 67

1    bond issues.
2    Q.   So it's the 10-year bond issue that I
3    just talked about?
4    A.   Could have been.
5    Q.   Well, let's just clear the record for
6    a second. He talks about an emergency reopening.
7    Do you know what he's talking about when he says
8    emergency reopening?
9    A.   Like I said, I think that was the
10   10-year reopening issue but that was a while ago.
11   I don't remember all the things we did back then.
12   Q.   So you believe he may have been
13   referring to the reopening of that 10-year bond?
14   A.   Yes. That could be.
15   Q.   What does reopening mean?
16       MR. FREEBORNE: In the E-mail? I mean,
17   she didn't write the E-mail.
18   Q.   What does reopening mean in the --
19   A.   I'm not --
20   Q.   Was the term reopening used at
21   Treasury ever?
22       MR. ROSSETTI: Objection.

Page 68

1        BY MR. THEODOROU:
2    Q.   Have you ever heard it used,
3    reopening?
4    A.   Yes.
5    Q.   What does it mean customarily at
6    Treasury when they say a reopening of something?
7        MR. ROSSETTI: Objection.
8    A.   Sell more of them.
9        BY MR. THEODOROU:
10   Q.   So when they say emergency reopening,
11   you believe that he could be referring to the
12   10-year reopening -- the reopening of the 10-year
13   bond, correct?
14   A.   That's only one I do remember.
15   Q.   So you do you recall there was a
16   reopening of the 10-year bond, right?
17   A.   Yes.
18       MR. FREEBORNE: Just make sure he
19   finishes the question.
20       BY MR. THEODOROU:
21   Q.   So you don't recall there was a
22   reopening of the 10-year bond, correct?

Page 69

1    A.   Yes.
2    Q.   And he says in his E-mail,
3    Mr. Bitsberger, that there was a leak a few weeks
4    ago at the emergency reopening. And that he was
5    referring to the reopening of the 10-year bond,
6    correct?
7        MR. ROSSETTI: Objection.
8        MR. THEODOROU: You have to answer.
9    A.   Probably.
10       BY MR. THEODOROU:
11   Q.   So he probably was referring to the
12   emergency reopening of the 10-year bond, correct?
13       MR. ROSSETTI: Objection.
14   A.   Yes.
15       BY MR. THEODOROU:
16   Q.   Now, do you know or does this refresh
17   your recollection as to whether that leak
18   concerning the emergency reopening of the 10-year
19   bond was investigated?
20       MR. ROSSETTI: Objection.
21   A.   I don't know.
22       BY MR. THEODOROU:

18 (Pages 66 to 69)

Michele Davis                                                February 11, 2008
Washington, DC

**Page 70**

1    Q.   Now, the next E-mail is from Mr.
2    Fratto.  Do you see that?
3    A.   Yes.
4    Q.   And it's from Mr. Fratto to
5    Mr. Bitsberger, Michele Davis, that's you,
6    correct?
7    A.   Yes.
8    Q.   And a fellow named Paul Malvey.  Who
9    is Paul Malvey?
10   A.   I believe he was --
11   Q.   Do you know who Paul Malvey was?
12   A.   Yes.
13        MR. ROSSETTI:  I was going to object to
14   that.  I think it would be only fair, those
15   weren't the only recipients just to make it clear.
16        MR. THEODOROU:  I know that.  The
17   document speaks for itself.  I'm trying to move
18   this so we can move.  She's got to go back to the
19   workings of government here.
20        BY MR. THEODOROU:
21   Q.   Do you know who Paul Malvey was at the
22   time?

**Page 71**

1    A.   Yes.
2    Q.   Who was he?
3    A.   He worked for Tim Bitsberger.
4    Q.   Now, you see where Mr. Fratto says,
5    writes, "There was a leak during emergency
6    reopening?"
7    A.   Yes.  I see that.
8        MR. ROSSETTI:  Question mark.
9    A.   Question mark.
10       MR. THEODOROU:  I was going to say
11   question mark but thought you would understand by
12   the tone of my voice that it was a question.
13       MR. ROSSETTI:  Well, we don't get the
14   tone of your voice on the record.
15       BY MR. THEODOROU:
16   Q.   Well, there was a leak during the
17   emergency reopening.  Do you see that?
18   A.   Yes.
19   Q.   Mr. Bitsberger responds, yes,
20   attributed to borrowing committee.  Do you see
21   that?
22   A.   Yes.

**Page 72**

1    Q.   That's his answer.  Now, what was the
2    borrowing committee, the Treasury borrowing
3    committee?
4        MR. ROSSETTI:  Objection.
5    A.   It's a private sector group that makes
6    recommendations to the Treasury every quarter.
7        BY MR. THEODOROU:
8    Q.   So it's a private sector group?
9    A.   Yes.
10   Q.   How many members does it have?
11   A.   I don't know.
12   Q.   Does it have more than five, to your
13   knowledge.  Do you know?
14   A.   I don't know the numbers.
15   Q.   You say that it is composed of
16   individuals from the private sector?
17   A.   Yes.
18   Q.   Do you know who were the individuals
19   who were members of the Treasury in October, 2001?
20   A.   No.
21   Q.   Did these individuals who you say
22   worked on the private sector, did they work for

**Page 73**

1    financial institutions?
2        MR. ROSSETTI:  Objection.
3    A.   I don't know who they were.  They have
4    some connection to the bond market but I don't
5    know the names of people.  I don't know their
6    names or what they worked in.
7        BY MR. THEODOROU:
8    Q.   So was your understanding that they
9    had connections to the bond or financial markets,
10   correct?
11   A.   Yes.
12   Q.   Do you know whether any of them worked
13   for companies who traded in bonds or
14   Treasury-issued securities?
15   A.   I don't know.
16   Q.   Did you ever learn at any time whether
17   the Treasury took any actions about this alleged
18   leak from the borrowing committee that took place
19   before October, 2001?
20       MR. ROSSETTI:  Objection.
21       MR. FREEBORNE:  Objection.  I didn't
22   understand that question.

19 (Pages 70 to 73)

Michele Davis                                                  February 11, 2008
                        Washington, DC

| Page 74 | Page 76 |
|---|---|

**Page 74**

1        BY MR. THEODOROU:
2        Q.   All right. I'll rephrase it. Did you
3    ever learn whether Treasury investigated -- this
4    is different than what I asked you before whether
5    at that time it was investigated, but did you ever
6    learn in your capacity as assistant secretary of
7    public affairs, did you ever learn whether
8    Treasury investigated a leak that was attributed
9    to the borrowing committee that Mr. Bitsberger is
10   talking about in this E-mail?
11       MR. ROSSETTI:  Objection.
12       MR. FREEBORNE:  Objection.
13   A.   Not that I recall.
14       BY MR. THEODOROU:
15       Q.   If Treasury had investigated the leak
16   or leak from the borrowing committee as assistant
17   secretary of public affairs, someone would have
18   told you about that, correct?
19       MR. ROSSETTI:  Objection.
20   A.   Someone would have told me about an
21   investigation?
22   Q.   Yes.

**Page 75**

1    A.   I don't know.
2        BY MR. THEODOROU:
3        Q.   But you can't recall any investigation
4    of that alleged incident?
5    A.   No.
6        Q.   Now, in this E-mail where
7    Mr. Bitsberger, in the E-mail in the middle of
8    this page where Mr. Bitsberger wrote there was a
9    leak a few weeks ago at the emergency reopening,
10   it also says the refunding process has been
11   criticized for years because of suspected leaks.
12   Do you see that?
13   A.   Yes.
14   Q.   When he talks about refunding process,
15   he's referring to the quarterly refunding
16   announcements, isn't he?
17       MR. ROSSETTI:  Objection.
18   A.   That would make sense.
19       BY MR. THEODOROU:
20   Q.   Did anybody ever talk to you about
21   these alleged suspected leaks associated with
22   refunding conferences?

**Page 76**

1    A.   No.
2    Q.   So is it fair to say that you don't
3    recall any investigations of those alleged
4    suspected leaks?
5        MR. ROSSETTI:  Objection.
6    A.   I don't recall any.
7        BY MR. THEODOROU:
8    Q.   As assistant secretary of public
9    affairs in October of 2001, when Mr. Bitsberger
10   said there was a leak during the emergency
11   reopening attributed to the borrowing committee
12   that's referred to this E-mail, correct?
13   A.   Yes.
14   Q.   Now, as assistant secretary of public
15   affairs in 2001, weren't you curious about what
16   Bitsberger was, about the leaks?
17       MR. ROSSETTI:  Objection.
18       MR. FREEBORNE:  You haven't established
19   that she even recalls this E-mail, so that's an
20   unfair question.
21       BY MR. THEODOROU:
22   Q.   Do you recall this E-mail?

**Page 77**

1    A.   No.
2    Q.   Do you recall the subject matter in
3    this E-mail?
4    A.   No.
5    Q.   So you don't recall Mr. Bitsberger
6    raising this issue about leaks coming from the
7    borrowing committee?
8    A.   No.
9    Q.   Do you have any reason to believe that
10   you didn't get this E-mail at the time?
11   A.   Yes. I'm not at the top where he
12   makes that comment.
13   Q.   Let's forget about the top, but the
14   middle one, there was a leak weeks ago at the
15   emergency reopening. Do you see that?
16   A.   Yes. I'm on it. I'm sure I got it,
17   the one I'm on.
18   Q.   Right. "And the refunding process has
19   been criticized for years because of suspected
20   leaks." Right? Correct?
21   A.   Uh-huh.
22   Q.   Then it goes on to talk about there

20 (Pages 74 to 77)

Michele Davis                                                    February 11, 2008
                          Washington, DC

---

**Page 78**

1  was a leak during the emergency reopening. You
2  got that E-mail, right?
3      A.  Yes.
4      Q.  And then Mr. Bitsberger says to Mr.
5  Fratto, "Yes. Attributed to the borrowing
6  committee."
7      MR. FREEBORNE:  And she's not on that.
8      MR. THEODOROU:  And you were not on
9  that. Because I don't want to be unfair about it.
10  You're not on that, that's right. Now, do you
11  recall anybody talking to you, I just want to get
12  it clear, do you recall anybody talking to you
13  about the leak coming from the borrowing
14  committee.
15      MR. ROSSETTI:  Objection.
16      A.  No, I don't recall that.
17      BY MR. THEODOROU:
18      Q.  And it's also fair to say again that
19  you don't recall any investigation being done
20  about the leak coming from the borrowing
21  committee; is that right?
22      MR. ROSSETTI:  Objection.

---

**Page 79**

1      A.  That's right.
2      BY MR. THEODOROU:
3      Q.  Did you follow up after getting this
4  E-mail about suspected leaks related to the
5  refunding process. Did you follow up with Mr.
6  Bitsberger or anybody else about the suspected
7  leaks that he's talking about in that E-mail that
8  you did get?
9      MR. ROSSETTI:  Objection.
10      A.  There were lots of meetings after this
11  October 31st that were how what happened and it
12  was, I don't even remember if it was the IG or
13  somebody but someone looked into it and that sort
14  of meant let them do what they're going to do
15  rather than have us all talking to each other.
16      BY MR. THEODOROU:
17      Q.  Do you know whether the IG followed up
18  on Mr. Bitsberger's statement that the refunding
19  process has been criticized for years because of
20  suspected leaks?
21      MR. ROSSETTI:  Objection.
22      A.  I have no idea.

---

**Page 80**

1      BY MR. THEODOROU:
2      Q.  Do you know whether inspector
3  general's office or anybody else followed up on
4  the allegation of suspected leaks in the refunding
5  process?
6      MR. ROSSETTI:  Objection.
7      A.  I don't know.
8      BY MR. THEODOROU:
9      Q.  Were you concerned about what he said
10  in this -- well, you don't recall the E-mail,
11  correct?
12      A.  I'm sure I got it. I don't recall it
13  now.
14      MR. THEODOROU:  Let's go to the next
15  document.
16      (Deposition Exhibit No. 6 was marked for
17          identification.)
18      BY MR. THEODOROU:
19      Q.  What I want to show you is Nothern
20  Exhibit 6. Do you have that in front you?
21      A.  Yes.
22      Q.  This is a Bloomberg report entitled

---

**Page 81**

1  U.S. Treasury leaks decision to end 30-year bond
2  on website. Do you see that?
3      A.  Yes.
4      Q.  Now, 6 paragraphs down, there's a
5  paragraph that begins, "Treasury officials
6  declined to comment on the early release other
7  than to confirm it occurred. It was the second
8  time the department has posted embargoed
9  information on the website before it was scheduled
10  to enter the public domain." Do you see that
11  paragraph?
12      A.  Yes.
13      Q.  It says, "On October 22nd, the
14  Treasury posted remarks by deputy Treasury
15  secretary Kenneth Dam almost an hour before he
16  spoke about the government's efforts to curve
17  terrorist financing." Do you see that?
18      A.  Yes.
19      Q.  Do you recall that incident on October
20  22nd in which remarks by Kenneth Dam were posted
21  on Treasury's website an hour before his remarks?
22      MR. ROSSETTI:  Objection.

---

21 (Pages 78 to 81)

Michele Davis                                                            February 11, 2008
Washington, DC

| Page 82 |
| --- |

```
 1      A.  No.
 2          BY MR. THEODOROU:
 3      Q.  Did you have any involvement in
 4  coordinating Secretary Dam's press conference that
 5  day?
 6      A.  I don't know that it was a press
 7  conference but no.
 8      Q.  Do you know whether his remarks were
 9  subject to an embargo?
10      A.  No.  I really don't.
11      Q.  Do you know if an investigation was
12  conducted into this incident?
13          MR. ROSSETTI:  Objection.
14      A.  I have no idea.
15          BY MR. THEODOROU:
16      Q.  Did anybody on or about October 31st
17  or shortly thereafter talk about the October 22nd
18  press conference and the early release of
19  secretary Dam's remarks to you?
20          MR. ROSSETTI:  Objection.
21      A.  Not that I recall.
22          BY MR. THEODOROU:
```

| Page 83 |
| --- |

```
 1      Q.  When did you first learn about the
 2  decision to suspend the 30-year bond?
 3      A.  A couple of days in advance and that's
 4  my best recollection.  I don't have more specific.
 5      Q.  How did you learn it?
 6      A.  I don't remember.
 7      Q.  When did you first learn when under
 8  Secretary Fisher was going to deliver his remarks
 9  as a refunding conference?
10      A.  I'm not --
11      Q.  Well, there's a difference.  My first
12  question was when did you first learn that they
13  were going to suspend the 30-year bond and when
14  did you learn that Secretary Fisher was going to
15  deliver remarks at the refunding conference?
16      A.  I don't know.  I don't remember.  I
17  mean.
18      Q.  Were both -- was it approximately --
19      A.  It could have been the same.  Yes.
20      Q.  Did you meet with Secretary Fisher to
21  discuss the procedures for the press conference?
22      A.  Probably.
```

| Page 84 |
| --- |

```
 1      Q.  Do you know where you met?
 2      A.  No.
 3      Q.  Do you know if anybody else was
 4  present?
 5      A.  I don't remember.
 6      Q.  So you don't recall Tony Fratto being
 7  there or Elizabeth Holahan?
 8      A.  They were definitely involved in
 9  getting ready for the press conference but I don't
10  recall a specific meeting and who was there.
11      Q.  Do you recall where you met with
12  Secretary Fisher?
13          MR. ROSSETTI:  Objection.
14          MR. THEODOROU:  She said probably.
15          MR. ROSSETTI:  Probably not, I mean,
16  let's establish that she did.
17          BY MR. THEODOROU:
18      Q.  Do you recall where you met?
19      A.  No, I don't.
20      Q.  When you met with Secretary Fisher
21  about issues, was there a particular place you
22  usually met with him?
```

| Page 85 |
| --- |

```
 1      A.  No.  He would come to my office, I
 2  would go to his office.
 3      Q.  Do you recall discussing anything with
 4  him about the press conference?
 5      A.  Nothing in particular.
 6      Q.  So is it fair to say you don't recall
 7  discussing anything about an embargo?
 8          MR. ROSSETTI:  Objection.
 9      A.  I know we had conversations in getting
10  ready for the press conference.  I don't remember
11  specific details of those conversations.
12          BY MR. THEODOROU:
13      Q.  So you do recall having conversations
14  with him about getting ready for the press
15  conference, correct?
16      A.  Yes.
17      Q.  So is it fair to say that you don't
18  recall discussing anything about an embargo with
19  him?
20      A.  I don't recall any specifics of those
21  conversations.
22      Q.  Do you recall anything at all about an
```

22 (Pages 82 to 85)

Michele Davis                                                February 11, 2008
Washington, DC

Page 86

1  embargo as opposed to specifics and let me
2  rephrase that. Do you recall anything general
3  about discussing embargoes?
4       MR. ROSSETTI: Objection.
5       A.   Discussing an embargo would have been
6  part of preparing for a press conference but I
7  don't remember any specifics.
8       BY MR. THEODOROU:
9       Q.   So you don't recall any specific
10 conversations with him about the embargo
11 procedures for that conference?
12      A.   I don't recall them. No.
13      Q.   Who made the decision that the
14 information released at the October 31st, 2001
15 press conference should be subject to a 10 a.m.
16 embargo time?
17      MR. ROSSETTI: Objection.
18      A.   It would have been a collective
19 decision as they planned the event?
20      BY MR. THEODOROU:
21      Q.   Do you know whether it was a
22 collective decision that day to set the 10 a.m.

Page 87

1  embargo time?
2       A.   I'm sure we decided it before that
3  day. I don't know what you mean do I know it was
4  a collective decision, I'm not sure I don't.
5       Q.   Well, when you say I am sure we
6  decided before that day, who is we?
7       A.   It would have been Peter Fisher and
8  his team and my team of people working on and
9  whoever else was involved in the announcement.
10      Q.   And who on Peter Fisher's team would
11 have been involved?
12      A.   I'm sure I'll leave somebody out but
13 Brian Roseboro, Tim Bitsberger and other staff
14 that I'm just not remembering.
15      Q.   And who on your team would have been
16 involved?
17      A.   Tony Fratto and Betsy Holahan.
18      Q.   Do you recall any discussions about
19 saying the embargo time for that quarterly
20 refunding conference?
21      A.   Not specifically, no.
22      Q.   Well, as opposed to specifically, do

Page 88

1  you recall anything at all?
2       A.   No.
3       Q.   Do you recall the discussions
4  concerning the -- do you recall any discussions
5  concerning the embargo?
6       A.   No.
7       MR. FREEBORNE: This is before
8  October 31?
9       BY MR. THEODOROU:
10      Q.   Before the October 31 quarterly
11 refunding conference, do you recall any
12 discussions about setting the embargo for that
13 day?
14      A.   No.
15      Q.   Do you recall Peter Fisher proposing
16 that his announcement -- do you recall Peter
17 Fisher's telling you that he did not want to have
18 an embargo that day but simply -- do you
19 recall Peter Fisher telling you that he did not
20 want to have an embargo that day?
21      MR. ROSSETTI: Objection.
22      A.   No.

Page 89

1       BY MR. THEODOROU:
2       Q.   So is it fair to say that you don't
3  recall objecting to his idea that there should not
4  be an embargo that day?
5       MR. ROSSETTI: Objection.
6       A.   I don't recall that.
7       BY MR. THEODOROU:
8       Q.   And you don't recall Tony Fratto
9  objecting to Pete Fisher's plan to not have an
10 embargo?
11      MR. ROSSETTI: Objection.
12      A.   I don't recall.
13      MR. THEODOROU: Why don't we change the
14 tape.
15      THE VIDEO OPERATOR: This concludes
16 tape 1 in the deposition of Michele Davis. Off
17 the record at 2:28:52 p.m.
18      This begins tape 2 in the deposition of
19 Michele Davis. On the record at 2:31:33.
20      BY MR. THEODOROU:
21      Q.   As of, Ms. Davis, as of October 31st,
22 2001, who were allowed, excuse me. Let me strike

23 (Pages 86 to 89)

Michele Davis                                                    February 11, 2008
                        Washington, DC

| Page 90 |
|---|

1   that. As of October 31st, 2001, who was allowed
2   to attend quarterly refunding press conferences?
3       MR. FREEBORNE: From the outside?
4       MR. THEODOROU: Yes.
5     A. It was supposed to be for media.
6       BY MR. THEODOROU:
7     Q. So reporters could attend, correct?
8     A. Yes.
9     Q. But those reporters had to be
10  credentialed by the Department of Treasury to
11  attend?
12     A. No.
13       MR. ROSSETTI: Objection.
14     A. No. They had to either have the
15  Treasury press pass or call to be cleared in.
16       BY MR. THEODOROU:
17     Q. Treasury employees could attend the
18  quarterly refunding press conferences?
19     A. I believe so. Yes.
20     Q. Was there a particular group of
21  Treasury employees who could attend or any
22  Treasury employees?

| Page 91 |
|---|

1     A. I don't recall there being any rule
2  about that.
3     Q. Could other Government employees
4  attend?
5       MR. ROSSETTI: Are you saying outside
6  of Treasury?
7       MR. THEODOROU: Outside of Treasury?
8     A. No.
9       BY MR. THEODOROU:
10     Q. What about nonreporters who were not
11  Treasury Department employees, could they attend,
12  other people?
13     A. It was the event was meant for the
14  media only.
15     Q. But my question is I guess you did
16  answer it in a way, but my question is could
17  nonreporters who were nonGovernment employees
18  attend quarterly refunding press conferences?
19     A. That's not the way it was supposed to
20  work.
21     Q. So is it your testimony that a private
22  business consultant could not attend the

| Page 92 |
|---|

1   conference?
2       MR. ROSSETTI: Objection.
3     A. I mean, obviously they were physically
4  able to because it happened but it was not the way
5  it was supposed to work.
6       BY MR. THEODOROU:
7     Q. Right. But when you say it was not
8  the way it was up supposed to work, under the
9  practice at Treasury, only reporters and
10  Government employees could attend, correct?
11     A. Treasury employees.
12     Q. Treasury employees could attend?
13     A. Correct.
14     Q. Was there any type of written
15  procedure regarding who could attend and who could
16  not attend?
17     A. Not that I'm aware of. No.
18     Q. So when you say that reporters and
19  Treasury employees could attend, you're talking
20  about the practice?
21     A. Right. Right.
22     Q. Correct.

| Page 93 |
|---|

1     A. Exactly.
2     Q. So it's your testimony that private
3  business consultants should not have been allowed
4  at a quarterly refunding conference, correct?
5       MR. ROSSETTI: Objection.
6     A. Yes.
7       BY MR. THEODOROU:
8     Q. As of October 31st?
9     A. Right.
10     Q. As of October 31st, 2001, do you know
11  who at Treasury, as opposed to my question of who
12  was responsible, do you know who at Treasury was
13  responsible for deciding who could attend the
14  press conferences?
15       MR. ROSSETTI: Objection.
16     A. No. Again, it would have been a
17  discussion with Peter Fisher his staff and me and
18  my staff.
19       BY MR. THEODOROU:
20     Q. So the Office of Public Affairs was
21  involved in the decision as to who could attend,
22  correct?

24 (Pages 90 to 93)

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 94 | Page 96 |
|---|---|

**Page 94**

1    A.   Yes.
2    Q.   And the Office of Market Finance was
3  involved?
4    A.   The Office of Domestic Finance.  Yes.
5    Q.   Domestic finance.  Now, to your
6  knowledge, during the time you've been at the
7  Department of Treasury, do you know if Treasury
8  has ever used written confidentiality agreements
9  with people attending quarterly refunding
10  conferences?
11    A.   Not that I'm aware of.
12    Q.   Do you know if it was the practice at
13  Treasury as of October 31st, 2001 to ask or to ask
14  reporters not to disclose anything or were
15  reporters understood that they could not disclose
16  information before the embargo press time?
17       MR. ROSSETTI:  Objection.
18    A.   An embargo is a standard practice in
19  the across the media.
20       BY MR. THEODOROU:
21    Q.   Was it the practice, though, of
22  Treasury to require confidentiality agreements

**Page 95**

1  from reporters attending press conferences?
2    A.   No.
3       MR. ROSSETTI:  Objection.
4    Q.   No?
5    A.   No.
6       BY MR. THEODOROU:
7    Q.   Did you know who Peter Davis was in
8  October, 2001?
9    A.   No.
10    Q.   When did you -- did you ever learn who
11  Peter Davis is?
12    A.   Just from these accounts.
13    Q.   And what did you learn?
14    A.   That he was --
15       MR. ROSSETTI:  Objection.
16    A.   That he was in the room and not a
17  reporter.
18       BY MR. THEODOROU:
19    Q.   And he was not a reporter, correct?
20  So do you know how Davis was able to attend
21  quarterly refunding press conferences?
22       MR. ROSSETTI:  Objection?

**Page 96**

1       BY MR. THEODOROU:
2    Q.   Is that a yes or no?
3    A.   Do I know --
4    Q.   Do you know how he was able to
5  attend -- in other words, do you know how he was
6  able to get into a press conference?
7    A.   I don't know how he got into the
8  building.  Once he was in the building, he just
9  walked into the press conference.
10    Q.   He would have needed some credentials
11  to get into the building, correct?
12       MR. ROSSETTI:  Objection.
13    A.   No.  He would have needed to be
14  cleared in but there's no and advance credentials.
15       BY MR. THEODOROU:
16    Q.   Do you know who cleared him?
17    A.   No.
18    Q.   Do you know how it was that he was
19  able to attend these conferences?
20    A.   I don't --
21    Q.   In other words, let me rephrase that.
22  You know that he attended the conference, correct?

**Page 97**

1    A.   Yes.
2    Q.   And you know that he was not a member
3  of the press, correct?  Is that a yes?
4    A.   Yes.
5    Q.   And you also know that he wasn't a
6  Treasury Department employee?
7    A.   Right.
8    Q.   So under the practice you testified
9  about, he should not have been at that press
10  conference?
11       MR. ROSSETTI:  Objection.
12       BY MR. THEODOROU:
13    Q.   Is that correct?
14    A.   That's correct.
15    Q.   Because you testified that the
16  practice was only to have reporters and Treasury
17  employees, correct?
18    A.   Yes.
19    Q.   So how was it that he got into that
20  press conference?
21       MR. FREEBORNE:  If you know.
22       MR. ROSSETTI:  Objection.

25 (Pages 94 to 97)

Michele Davis                                                February 11, 2008
Washington, DC

| Page 98 | Page 100 |
|---|---|

**Page 98**

1    A.   I have no idea.
2        BY MR. THEODOROU:
3    Q.   Did you ever learn how he got in?
4    A.   No. Because I don't know who cleared
5    him into the building.
6    Q.   Well, given that the practice wasn't
7    followed on October 31st, 2001, weren't you
8    concerned as assistant secretary of public affairs
9    that this consultant off the street got into one
10   of these Treasury press conferences?
11   A.   Yes.
12   Q.   So did you make inquiry as to how this
13   guy got in?
14   A.   Like I said, we had lots of meetings
15   after that happened to talk, to figure out how it
16   all happened and then whether, I don't remember if
17   it was the IG or the general counsel's office but
18   someone kind of took on the responsibility of
19   investigating this and we left it to the people
20   who were in charge of investigating it.
21   Q.   Did you ever learn how he got in?
22       MR. ROSSETTI: Objection.

**Page 99**

1    A.   Other than just walking through the
2    door, no. I mean, that's all I know.
3        BY MR. THEODOROU:
4    Q.   But your testimony is his attendance
5    at this -- did you learn that he had been at other
6    quarterly refunding press conferences besides the
7    October 31st, 2001 conference?
8        MR. ROSSETTI: Objection.
9    A.   Somewhere after the fact that I heard
10   that from somewhere.
11       BY MR. THEODOROU:
12   Q.   And his attendance at the conference
13   was not consistent with Treasury policy, correct?
14       MR. ROSSETTI: Objection.
15   A.   That's right.
16       BY MR. THEODOROU:
17   Q.   Is that a yes?
18   A.   That's right.
19   Q.   Did you ever learn that Mr. Davis had
20   attended one of these press conferences and had
21   been kicked out of the press conference?
22       MR. ROSSETTI: Objection.

**Page 100**

1    A.   No.
2        BY MR. THEODOROU:
3    Q.   Do you know who Lula Tyler is?
4    A.   No.
5    Q.   Do you know someone named Elnora
6    Bowser?
7    A.   No.
8    Q.   Do you know Paul Malvey?
9    A.   Yes.
10   Q.   Who is Paul Malvey?
11   A.   He works somewhere in domestic
12   finance. I think he worked for Tim Bitsberger.
13   Q.   Does he still work at Treasury?
14   A.   I don't think so.
15   Q.   And he worked for him?
16   A.   For Tim Bitsberger, I think.
17   Q.   In what area?
18   A.   Domestic finance.
19   Q.   Do you know what his position was?
20   A.   I don't recall the title.
21   Q.   Did he have the authority to clear
22   persons at the press conference?

**Page 101**

1        MR. ROSSETTI: Objection.
2    A.   Into press conferences? There wasn't
3    a media into the press conference. The press had
4    to go through the public affairs office.
5        BY MR. THEODOROU:
6    Q.   Did he have the authority to clear
7    media?
8    A.   No.
9    Q.   Do you know if he had authority to
10   clear Mr. Davis into the press conference on
11   October 31st?
12       MR. ROSSETTI: Objection.
13   A.   Not that I'm aware of. No.
14       BY MR. THEODOROU:
15   Q.   As far as you know, if Mr. Malvey
16   facilitated Mr. Davis's attendance at the press
17   conference, Mr. Malvey's actions were contrary to
18   Treasury policy, correct?
19       MR. ROSSETTI: Objection.
20   A.   I don't -- I'm not -- I'm sorry.
21       BY MR. THEODOROU:
22   Q.   Well, if Mr. Malvey, based on what you

26 (Pages 98 to 101)

Michele Davis                                                    February 11, 2008
Washington, DC

**Page 102**

1  testified, if Mr. Malvey facilitated Davis's
2  attendance at the October 31st, 2001 press
3  conference, Mr. Malvey acted contrary to customary
4  Treasury policy, correct?
5      MR. ROSSETTI:  Objection.
6      A.   If anybody cleared him, a nonmedia
7  person for that press conference, that was not
8  with the way it was supposed to work.
9      BY MR. THEODOROU:
10     Q.   Did you ever have any discussions with
11 Mr. Malvey about who could and could not attend
12 quarterly refunding press conference?
13     MR. ROSSETTI:  Objection.
14     A.   Not that I recall.
15     MR. THEODOROU:  What is your objection
16 other than the fact that you don't like the
17 question?
18     MR. ROSSETTI:  I'm sorry.
19     MR. THEODOROU:  What is your objection
20 other than the fact that you don't like the
21 question.
22     MS. WILLIAMS:  Didn't we stipulate that

**Page 103**

1  all objections are reserved to the form?
2      MR. ROSSETTI:  Yes.
3      MS. WILLIAMS:  Okay.  Then why are you
4  asking --
5      BY MR. THEODOROU:
6      Q.   All right.  Do you know who Jill
7  Ouseley is?
8      A.   I don't think so.
9      Q.   Do you know who Roger Anderson is?
10     A.   No.
11     Q.   Do you know if Peter Davis ever had a
12 confidentiality agreement with an employee or any
13 representative of the Treasury Department?
14     MR. ROSSETTI:  Objection.
15     A.   Not that I know of.
16     MR. THEODOROU:  Let's go to the next
17 exhibit.
18     (Deposition Exhibit No. 7 was marked for
19          identification.)
20     BY MR. THEODOROU:
21     Q.   Now, do you have Exhibit 7, Ms. Davis?
22     A.   Yes.

**Page 104**

1      Q.   And you see where it begins where
2  there's an E-mail from Tony Fratto to someone
3  named Meghan Hills, do you see that?
4      A.   Yes.
5      Q.   Do you know who Meghan Hills was?
6      A.   No.
7      Q.   Now, attached to his E-mail there's a
8  Wall Street Journal article.  Do you see that at
9  the bottom?
10     A.   Yes.
11     Q.   And it starts off by saying, "The
12 Treasury Department facing criticism after an
13 industry consultant attended a press only briefing
14 last month and leaked market moving news yesterday
15 outlined new rules to try to keep it's news under
16 wraps."  Do you see that?
17     A.   Yes.
18     Q.   "The changes which some bond trader
19 said were overdue would bring the Treasury more in
20 line with the way other government agencies
21 including the Federal Reserve and the labor
22 department will release market-sensitive news."

**Page 105**

1  Do you see that?
2      A.   Correct.
3      Q.   Do you recall this article?
4      A.   No.
5      Q.   What changed were implemented?
6      A.   What changes?  How we did the
7  quarterly refunding?
8      Q.   It talks about this particular article
9  said that outline new rules to try to keep its
10 news under wraps?
11     A.   Well, that's the reporter's words.
12     Q.   So what changes were implemented?
13     MR. ROSSETTI:  Objection.
14     A.   We do the release in the Treasury
15 press room, which is where the reporters work and
16 check everyone's ID coming in the room.
17     BY MR. THEODOROU:
18     Q.   What other changes were implemented?
19     A.   Those were the main ones, there's
20 still an embargo and there's --
21     Q.   When it says in announcing the
22 changes, let me go to the next paragraph,

27 (Pages 102 to 105)

Michele Davis                                              February 11, 2008
Washington, DC

---

Page 106

1    "Treasury officials acknowledge the recent leak
2    probably wasn't the first time that someone from
3    outside the press core found their way into a
4    Treasury press briefing, raising the possibility
5    that bond traders had been receiving early word on
6    market-moving news at Treasury for years."
7        Then the next paragraph, "It's likely that
8    others in the past have participated in press
9    briefings, though they weren't members of the
10   press, said Tony Fratto, a spokesman for the
11   Treasury Department." Do you see that?
12       A. Yes.
13       Q. Do you remember Mr. Fratto saying
14   that?
15           MR. FREEBORNE: Objection.
16       A. No.
17           BY MR. THEODOROU:
18       Q. But you have no reason to believe that
19   he didn't say that?
20           MR. ROSSETTI: Objection.
21       A. No.
22           BY MR. THEODOROU:

---

Page 107

1        Q. Now, it says, "Some of the changes are
2    quite elementary. Now, for instance, instead of
3    releasing information to the press an hour or so
4    before it is publically" -- well, I guess, well, I
5    guess I don't have the full portion of it there on
6    that. I don't know whether you can read it the
7    rest?
8        A. No. It's missing a couple of lines.
9        Q. So why don't we go through what you
10   remember about these changes again?
11       A. We moved into the press room where the
12   reporters work and we checked everyone's ID on the
13   way in, make sure they were reporters.
14       Q. Well, it says that you were also going
15   to bring, it says that you were going to bring,
16   the changes will bring the Treasury more in line
17   with the way other agencies including the Federal
18   Reserve and Labor Department work, release
19   market-sensitive news is what it says.
20           MR. FREEBORNE: It's what you said.
21           MR. ROSSETTI: It's what the article
22   says.

---

Page 108

1            BY MR. THEODOROU:
2        Q. Right. The article. The article says
3    that, "The changes will bring Treasury more in
4    line with the way other government agencies
5    including the Federal Reserve and the Labor
6    Department release market-sensitive news." So you
7    remember now the release was to occur in the press
8    room, correct?
9        A. Yes.
10       Q. Credentials were to be checked,
11   correct?
12       A. Yes.
13       Q. What else do you recall about the
14   changes?
15       A. Those are the main changes.
16       Q. What about the timing? Would the
17   timing of the embargo be announced ahead of time?
18   Or is it announced ahead of time?
19       A. It's always said at the beginning of
20   the month, at the beginning of the release.
21       Q. Now, are these procedures in writing?
22       A. I don't know.

---

Page 109

1        Q. What about the time for the embargo,
2    was that reduced?
3        A. I don't recall what the time used to
4    be.
5        Q. Now, that article stated and then I
6    read the paragraph to you that, "Treasury
7    officials acknowledge the release of the leak
8    probably wasn't the first time that someone from
9    outside the press core found their way into a
10   Treasury briefing raising the possibility that
11   bond traders had been receiving early word of
12   market-moving news from Treasury for years." Do
13   you see that?
14       A. I'm sorry. I don't know what page
15   you're on.
16           MR. FREEBORNE: He's on the first page.
17       A. I'm sorry. Yes. I see that.
18           BY MR. THEODOROU:
19       Q. Now, based upon what you knew in
20   October or based on what you knew after October
21   31st, 2001, do you agree with that statement that
22   nonjournalists were probably able to attend the

---

28 (Pages 106 to 109)

Michele Davis                                                February 11, 2008
Washington, DC

| Page 110 |
|---|

1    press briefings?
2         MR. ROSSETTI: Objection.
3         BY MR. THEODOROU:
4         Q.   Before October 31?
5         A.   From what I recall, this person came,
6    it wasn't the first time he had come to one of
7    these press briefings, so.  Yes.
8         Q.   Now, were you familiar or did you --
9    let me rephrase that.  After October 31st, 2001,
10   as the assistant secretary in charge of public
11   affairs, did you become familiar with the
12   procedures used by the Federal Reserve and the
13   Labor Department regarding embargoes?
14        A.   Not the Labor Department but the
15   Federal Reserve.
16        Q.   How did the Federal Reserve handle
17   press conferences and embargo information?
18        A.   I don't know how they handle press
19   conferences but they handle their releases by
20   faxing them to the Treasury press room.
21        Q.   Do you know whether anybody ever
22   checked for any identification of people attending

| Page 111 |
|---|

1    the press conferences before October 31st, 2001?
2         MR. ROSSETTI: Objection.
3         A.   Not that I know.
4         BY MR. THEODOROU:
5         Q.   Do you know whether Treasury verified
6    the identification of those attending the October
7    31st, 2001 press conference?
8         MR. ROSSETTI: Objection.
9         A.   Obviously they didn't.
10        BY MR. THEODOROU:
11        Q.   Well, I'm just asking.  Do you agree
12   with the statement in the article that Treasury
13   did not do a good job policing its audience at the
14   October 31st press conference?
15        MR. ROSSETTI: Objection.
16        A.   Yes.  It must not have at the time.
17        BY MR. THEODOROU:
18        Q.   Now, if you look at Tony Fratto's
19   E-mail on November 15, 2001 to Meghan Hills, he
20   says he was asked if this was the first time that
21   someone got into a Treasury press conference.  I
22   replied, I can't say for certain, but I think it's

| Page 112 |
|---|

1    likely that others in the past have found their
2    way into these things.  Do you see that?
3         A.   Yes.
4         Q.   Did Tony Fratto ever tell you that or
5    something to that effect?
6         A.   Like I said, I think that was the
7    conclusion we all came to once this happened that
8    we'll never be able to say for certain but it
9    certainly was not an impossible thing to do.
10        Q.   Then he says in the last paragraph, I
11   meant that long before the highly professional and
12   competent Bush Administration Treasury appointees
13   arrived on the scene the place leaked like a siv.
14   Do you see that?
15        A.   Yes.
16        Q.   Did you have any discussions with him
17   about what he meant when he said it leaked like a
18   siv?
19        MR. ROSSETTI: Objection.
20        A.   I'm not on this E-mail.
21        BY MR. THEODOROU:
22        Q.   Well, I know you're not on the E-mail.

| Page 113 |
|---|

1    I'm asking whether you ever had any discussions
2    about the Treasury Department leaking like a siv
3    before the Bush Administration appointees got in?
4         A.   No.
5         Q.   And he goes on to say that we wouldn't
6    be talking if our predecessors hadn't been letting
7    jokers like Pete Davis into refunding
8    announcements for the past eight years.  Do you
9    see that?
10        A.   Yes.
11        Q.   Did you have any discussions with Mr.
12   Fratto about what your predecessors had been doing
13   about nontreasury employees attending quarterly
14   refunding conferences?
15        A.   No.  Other than it came up pretty
16   quickly that he had been attending these things
17   for quite some time.
18        Q.   After October 31st, 2001, the
19   Department found it necessary, though, to
20   implement procedures as to how these press
21   conferences and embargoes were going to be
22   handled, correct?

                                      29 (Pages 110 to 113)

Michele Davis                                         February 11, 2008
Washington, DC

Page 114

1    A.   Yes.
2    Q.   And those procedures are written
3    somewhere?
4    A.   Like it say, I don't know.  You asked
5    me that before and I don't know.
6    Q.   But before October 31st, 2001, you're
7    not aware of any written procedures in effect?
8    A.   Not that I recall.
9    Q.   When I say written procedures, I'm
10   talking about written procedures about quarterly
11   refunding press conferences and embargoes,
12   correct?
13   A.   Right.  I don't recall any written
14   procedures for those events.
15   Q.   Being in effect.  Okay.  In that
16   E-mail where Mr. Fratto wrote that he thought it
17   was very likely that others have gotten into these
18   things in the past, do you agree with that
19   statement?
20       MR. ROSSETTI:  Objection.
21   A.   He was closer to it than I was.  I
22   don't -- I didn't attend those events.

Page 115

1        BY MR. THEODOROU:
2    Q.   Do you agree with the statement that
3    Treasury leaked like a siv before the Bush
4    Administration's arrival?
5        MR. ROSSETTI:  Objection.
6        MR. FREEBORNE:  I think you already
7    asked that.
8        MR. THEODOROU:  I don't remember the
9    answer.
10   A.   I don't -- it was much fresher in my
11   memory in 2001 than it is today.  It's too long
12   ago.  I don't remember.
13       BY MR. THEODOROU:
14   Q.   Do you believe that the Bush
15   Administration did a better job than the prior
16   administration protecting the confidentiality of
17   Treasury information?
18       MR. ROSSETTI:  Objection.
19   A.   Same answer.  I don't remember
20   anymore.  In 2001 what the situation was when we
21   came in was much more clearer to me than it is now
22   seven years later.

Page 116

1        BY MR. THEODOROU:
2    Q.   So you don't recall whether the Bush
3    Administration did a better job than the prior
4    administration protecting the confidentiality of
5    information?
6        MR. ROSSETTI:  Objection.
7    A.   I don't recall what was being
8    inherited from the previous administration, so I
9    can't make a comparison.
10       BY MR. THEODOROU:
11   Q.   Now, was it customary for the copies
12   of quarterly refunding refunding statement to be
13   handed out to attendees at the quarterly refunding
14   press conferences?
15   A.   I didn't attend those events.
16   Q.   Well, do you know whether or not --
17   A.   I don't know.
18   Q.   -- they handed out statements?
19   A.   I don't know.
20   Q.   Do you know who was in charge of
21   preparing Mr. Fisher's statement that went out on
22   October 31st?

Page 117

1    A.   No.
2        MR. ROSSETTI:  I'm sorry, Nick, what
3    was your last question?
4        MR. THEODOROU:  I asked first do you
5    know who was responsible or in charge of preparing
6    Mr. Fisher's statement that was going to be handed
7    out to the attendees at the press conference or
8    something to that effect, was my question.  And
9    your answer is?
10   A.   I said no.
11       BY MR. THEODOROU:
12   Q.   Do you know Frances Anderson is?
13   A.   Yes.
14   Q.   Who is that?
15   A.   She's a member of my staff.
16   Q.   Do you know whether she had any
17   responsibility for preparing the statement that
18   was to be distributed at the conference?
19   A.   She would not have prepared a
20   statement, no.  She would have been involved in
21   distributing it.
22   Q.   And do you know if she was involved in

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                                          February 11, 2008
Washington, DC

| Page 118 | Page 120 |
|---|---|
| 1  distributing the statement that day? | 1  release? |
| 2     A.  Yes. | 2     A.  Yes. |
| 3     MR. ROSSETTI:  I'm sorry.  Are you | 3     Q.  Were you aware on October 30th, the |
| 4  aware that she was or she did? | 4  morning of October 31st, 2001 this version that |
| 5     MR. THEODOROU:  She said yes. | 5  says immediate release was distributed to some of |
| 6     MR. ROSSETTI:  Well, you asked her if | 6  the attendees at the conference? |
| 7  she was aware. | 7     MR. ROSSETTI:  Objection. |
| 8     MR. THEODOROU:  I said whether she was | 8     A.  No. |
| 9  aware of Ms. Anderson being involved in the | 9     BY MR. THEODOROU: |
| 10  distribution. | 10     Q.  Do you know why for immediate release |
| 11     MR. ROSSETTI:  And she said yes.  So | 11  was put on this version of the statement? |
| 12  your question doesn't answer whether or not she | 12     MR. ROSSETTI:  Objection. |
| 13  knows if indeed she was. | 13     A.  No. |
| 14     BY MR. THEODOROU: | 14     BY MR. THEODOROU: |
| 15     Q.  Do you know whether Frances Anderson | 15     Q.  If this was distributed at the October |
| 16  distributed the statement that day to the people | 16  31st, 2001 conference, who had the responsibility |
| 17  attending the conference? | 17  of putting this version of the statement together |
| 18     A.  No, I wasn't there. | 18  or preparing this version of the statement? |
| 19     Q.  So you don't know whether Frances | 19     MR. ROSSETTI:  Objection. |
| 20  Anderson prepared the version, when I say not | 20     A.  I don't know.  It wasn't any of my |
| 21  prepared the actual statement but the version that | 21  staff. |
| 22  went out to the various people attending the | 22     BY MR. THEODOROU: |

| Page 119 | Page 121 |
|---|---|
| 1  conference.  In other words -- | 1     Q.  If there is an embargo that's in place |
| 2     A.  Like -- | 2  or if there was an embargo in place at the press |
| 3     Q.  -- what it looked like? | 3  conference, it's unusual to have for immediate |
| 4     A.  No. | 4  release put on the version of the statement; isn't |
| 5     MR. THEODOROU:  So let me show you | 5  that right? |
| 6  this. | 6     MR. ROSSETTI:  Objection. |
| 7     (Deposition Exhibit No. 8 was marked for | 7     A.  Yes. |
| 8        identification.) | 8     BY MR. THEODOROU: |
| 9     BY MR. THEODOROU: | 9     Q.  Was that a yes? |
| 10     Q.  Directing your attention to what's | 10     A.  Yes. |
| 11  been marked Nothern Exhibit 8.  Do you see that? | 11     Q.  Thank you.  And in fact, it would be |
| 12     A.  Yes. | 12  contrary to the practice, to Treasury practice |
| 13     Q.  Have you seen this document before? | 13  concerning announcements at quarterly refunding |
| 14     A.  Probably back then. | 14  conferences where there was an embargo to have |
| 15     Q.  Do you know whether -- so when you say | 15  something like an immediate release on a version |
| 16  probably, you saw this back at the time? | 16  of the statement that was going to the press and |
| 17     A.  Yes. | 17  others at the conference? |
| 18     Q.  Did you see it before it was | 18     MR. ROSSETTI:  Objection? |
| 19  distributed at the October 31st, 2001 press | 19     BY MR. THEODOROU: |
| 20  conference? | 20     Q.  Isn't that right? |
| 21     A.  Not that I recall. | 21     A.  Contrary to the practice, I don't |
| 22     Q.  Do you see where it says for immediate | 22  recall. |

31 (Pages 118 to 121)

Michele Davis                                                    February 11, 2008
                           Washington, DC

| Page 122 | Page 124 |
|---|---|

**Page 122**

1    Q.   When you had an embargo at press
2  conferences, was it Treasury's practice to have
3  for immediate release put on statements?
4    A.   No.
5    Q.   It was not, correct?
6    A.   Correct.
7    Q.   Was it the practice at these quarterly
8  refunding press conferences to hand out versions,
9  hand out the statements that were being made?
10    A.   You already asked me that. I said I
11  don't know. I wasn't there.
12    Q.   Oh, you don't know. I'm sorry.
13  Turning to the quarterly refunding conference in
14  October, 2001, did Treasury provide embargoed
15  information or alleged embargoed information
16  directly to the press by any other means other
17  than handing out a statement at the press
18  conference or having them just attend the press
19  conference and listening to the announcement?
20    In other words, did the statement get
21  distributed by any other means other than directly
22  to the reporters at the conference?

**Page 124**

1    BY MR. THEODOROU:
2    Q.   Yes. Before the embargoed time?
3    A.   I don't know.
4    Q.   Would that have been acceptable to
5  give a reporter information who wasn't at the
6  conference for someone in Treasury to send the
7  information to a reporter or a press outlet who
8  didn't, where the press outlet didn't have a
9  representative at the conference?
10    MR. ROSSETTI: Objection.
11    A.   It would only be appropriate for a
12  Treasury public affairs person to do it, not
13  anyone else and it would depend on the
14  circumstances and knowing if a reporter was going
15  to respect the embargo.
16    BY MR. THEODOROU:
17    Q.   Did that happen on October 31st, 2001?
18    A.   I don't know.
19    Q.   Did you know about Ms. Holahan
20  E-mailing someone named Chip Aiken at CNBC at 8:57
21  a.m. with the information?
22    A.   I may have known that. I don't recall

**Page 123**

1    MR. ROSSETTI: Objection?
2    MR. FREEBORNE: Which question is she
3  supposed to respond to?
4    BY MR. THEODOROU:
5    Q.   I'll break it down. At these
6  quarterly refunding press conferences, was alleged
7  embargoed information given out to the press by
8  any other means besides handing out a statement or
9  just having the press in the room listening to the
10  statement. In other words, was it sent to members
11  of the press who weren't in the room?
12    MR. FREEBORNE: That's broken down?
13    MR. THEODOROU: Yes.
14    MR ROSSETTI: Objection.
15    A.   Not that I know of.
16    BY MR. THEODOROU:
17    Q.   Not that you know of. Okay. Did
18  Treasury provide embargoed information to
19  reporters who weren't present at the conference?
20    A.   I don't know.
21    MR. FREEBORNE: Before 10 a.m., I
22  assume?

**Page 125**

1  now.
2    Q.   Would that have been acceptable?
3    A.   Yes.
4    Q.   Now, why could she send the
5  information to Chip Aiken at CNBC?
6    A.   Because reporters respect embargoes.
7  It's the whole purpose of the embargo to be able
8  to give something to the reporter earlier.
9    Q.   Did you say the reporters respect the
10  embargo or reporters are expected to respect the
11  embargo?
12    A.   They're expected to respect the
13  embargo.
14    Q.   Now, my question is before the press
15  conference, does anybody explain what the embargo
16  was about; in other words, what an embargo is?
17    MR. ROSSETTI: Objection.
18    BY MR. THEODOROU:
19    Q.   Do you know whether on October 31st,
20  2001 someone from Treasury told the attendees at
21  the conference what the embargo was?
22    MR. ROSSETTI: Objection. I think

32  (Pages 122 to 125)

Michele Davis                                                    February 11, 2008
Washington, DC

## Page 126

1  you've asked that question like five times today.
2  Really.
3       MR. THEODOROU:  Fine.
4    A.  I wasn't there.
5       BY MR. THEODOROU:
6    Q.  Did you know that Ms. Holahan E-mailed
7  Jonathan Ferber at the New York Times?
8    A.  No.
9    Q.  At 9:30 a.m.?
10   A.  No.
11   Q.  Do you know that she E-mailed someone
12 named Greg Ipp at the Wall Street Journal at 9:32
13 a.m.?
14   A.  No.  Those would have all been
15 standard.
16   Q.  That's all standard practice to go to
17 outside outlets?
18   A.  That's the purpose of the embargo
19 press release is to give text early to reporters
20 so they'd have it before the embargo is up.
21   Q.  Before October 31st, 2001 in our
22 experience as assistant secretary of public

## Page 127

1  affairs, do you know of any instances where people
2  from your office in one of these press conferences
3  explained to the press what the embargo is?
4       MR. ROSSETTI:  Objection.
5    A.  I don't understand the premise of your
6  question.
7       BY MR. THEODOROU:
8    Q.  Do you know were there anybody from
9  your office --
10      MR. FREEBORNE:  We need to make sure --
11      BY MR. THEODOROU:
12   Q.  Okay.  Here we go.  Do you know
13 whether anybody from your office ever stood before
14 reporters or anybody attending one of these
15 quarterly refunding press conferences and
16 described to them what an embargo means?
17      MR. ROSSETTI:  Objection.
18   A.  I never attended any of these events.
19      BY MR. THEODOROU:
20   Q.  So is that that you don't know whether
21 someone told them what an embargo means?
22   A.  Right.  I mean, I don't know what

## Page 128

1  anyone said at any of these events.
2    Q.  So is it your testimony that you don't
3  know whether anybody from your office ever defined
4  for the people attending the event what the term
5  embargo is?
6       MR. ROSSETTI:  Objection.
7    A.  I can't imagine any reporter needing
8  to have the word embargo defined to them.
9       BY MR. THEODOROU:
10   Q.  Right.  But that's not my question.
11 My question is whether anybody from your office.
12 Do you know whether anybody from your office ever
13 described, defined or told the people attending
14 the press conference what an embargo means?
15      MR. ROSSETTI:  Objection.
16   A.  I was not at any of these events, so I
17 don't know what anyone said there.
18      MR. THEODOROU:  Let's take a 5 minute
19 break.
20      THE VIDEO OPERATOR:  Off the record at
21 3:10:41.
22      On the record at 3:19:36.

## Page 129

1       BY MR. THEODOROU:
2    Q.  Ms. Davis, you testified earlier that
3  you learned about the elimination of the 30-year
4  bond a few days before the press conference?
5    A.  That's my best recollection.
6    Q.  Was that information made available to
7  other people in Government outside of Treasury?
8       MR. ROSSETTI:  Objection.
9    A.  Not that I'm aware of.
10      BY MR. THEODOROU:
11   Q.  Do you know if it was made available
12 to any foreign banks or foreign central banks?
13   A.  Not that I'm aware of.
14      BY MR. THEODOROU:
15   Q.  Did you ever learn of any reporters
16 who attended the October 31 press conference who
17 disclosed the information on the 30-year bond
18 before the 10 a.m. embargo time?
19   A.  I don't recall but once it was posted
20 on the website, the embargo was sort of -- I mean,
21 that would be a signal to most reporters that they
22 didn't have to wait until 10.

33  (Pages 126 to 129)

Michele Davis                                                                February 11, 2008
                              Washington, DC

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    Q.   Did you ever learn that reporters from
2  Reuters published the information before 10 a.m.?
3    A.   I may have then, I don't recall now.
4    Q.   In fact, did you ever learn that they
5  published it about 9:52?
6      MR. ROSSETTI:  Objection.
7    A.   I don't recall.
8      BY MR. THEODOROU:
9    Q.   Do you know if -- well let me -- do
10  you recall a reporter named Jonathan Nicholson
11  from Reuters disclosing the information about
12  9:52?
13      MR. ROSSETTI:  Objection.
14    A.   I just said I don't recall.
15      BY MR. THEODOROU:
16    Q.   So is it fair to say that you don't
17  know if Treasury took any action against him for
18  reporting it?
19      MR. ROSSETTI:  Objection.
20    A.   We already had the information on the
21  web site.
22      BY MR. THEODOROU:

**Page 131**

1    Q.   Because the information had gone up at
2  9:43?
3    A.   I don't remember the exact time but
4  whatever time it was.
5    Q.   So given that -- and let me show you
6  an exhibit for a second.
7    (Deposition Exhibit No. 9 was marked for
8          identification.)
9      BY MR. THEODOROU:
10    Q.   I want to show you what's been marked
11  Exhibit 9.  Do you have that?
12    A.   Yes.
13    Q.   And you see where that's a Reuters
14  report on the bond suspension?
15    A.   Yes.
16    Q.   It says U.S. Treasury, it say
17  discontinuing sales regular index 30-year bonds?
18    A.   Yes.
19    Q.   Do you see where the date on that is
20  it says received by news E-D-G-E slash L-A-N?
21    A.   Yes.
22    Q.   9:52 a.m.?

**Page 132**

1    A.   Yes.
2    Q.   Now, you just testified that given
3  that the information had gone out at 9:43 or
4  before 9:52, correct, that there was no reason to
5  discipline the reporter who sent this out, this
6  information, correct?
7    A.   Once we had released the information,
8  that was essentially the end of the embargo.
9    Q.   So it's your -- so the embargo no
10  longer applied because the information already had
11  been released --
12    A.   Was on our website.
13    Q.   -- before that.  Do you know who Brian
14  Collins is?
15    A.   No.
16    Q.   Well, let me represent to you that he
17  was a columnist in October, 2001 for National
18  Mortgage News.  Are you aware that at
19  approximately 9:35 a.m. on October 31st he called
20  Janice Schmidt, an official at Fannie Mae and told
21  her about the decision to suspend the 30-year
22  bond?

**Page 133**

1      MR. ROSSETTI:  Objection.
2    A.   No.
3      BY MR. THEODOROU:
4    Q.   So you've never heard about this
5  incident?
6    A.   No, not that I recall.  I may have
7  then.
8    Q.   So it's fair to say that you cannot
9  recall any disciplinary action being taken against
10  Mr. Collins by Treasury?
11      MR. ROSSETTI:  Objection?
12    A.   No.
13      BY MR. THEODOROU:
14    Q.   If Mr. Collins did send out that
15  information to National Mortgage at 9:35 a.m., he
16  violated the embargo, didn't he?
17      MR. ROSSETTI:  Objection.
18    A.   If he did -- I'm sorry.
19      BY MR. THEODOROU:
20    Q.   If Mr. Collins, assume that the
21  embargoed information went out on the website at
22  9:4 3, if Mr. Collins notified Fannie Mae about

                                    34  (Pages 130 to 133)

Page 134

1   the decision to suspend the 30-year bond at 9:35
2   a.m. that morning, he violated the embargo, didn't
3   he?
4           MR. ROSSETTI:  Objection.
5       A.   That's not the same as making it
6   public but it would not be appropriate to do.
7           BY MR. THEODOROU:
8       Q.   It would not, it was not appropriate
9   for him to notify Fannie Mae, correct?
10          MR. ROSSETTI:  Objection.
11      A.   Correct.
12          BY MR. THEODOROU:
13      Q.   You say it's not the same as making it
14  public.  Why isn't it the same as making it
15  public?
16      A.   An embargo is about when you release
17  information when it goes out on the wire, when it
18  goes out on TV.
19      Q.   So when you talk about embargo, the
20  embargo that applied that day is about a press
21  embargo as to when the press alerts the world
22  about the information; isn't that right?

Page 135

1       A.   Yes.
2       Q.   And to your knowledge -- well, you
3   don't have -- to your knowledge, Treasury hasn't
4   taken any action against Mr. Collins regarding his
5   conduct?
6           MR. ROSSETTI:  Objection.
7       A.   Not that I know of.
8           BY MR. THEODOROU:
9       Q.   On October, 2001 what was the
10  procedure posting quarterly refunding statements
11  on the website?
12      A.   I don't recall.
13      Q.   When the information was posted on the
14  internet, that information was disseminated to the
15  general public; isn't that right?
16          MR. ROSSETTI:  Objection.
17      A.   I'm sorry?
18          BY MR. THEODOROU:
19      Q.   In other words, once the information
20  went out on the website, the information was
21  public, correct?
22      A.   Yes.

Page 136

1           MR. ROSSETTI:  Objection.
2           BY MR. THEODOROU:
3       Q.   Posting the information on the
4   internet resulted in the information being
5   disseminated to the public, correct?
6           MR. ROSSETTI:  Objection.
7       A.   Yes.
8           BY MR. THEODOROU:
9       Q.   Now, did you, yourself investigate how
10  Mr. Fisher's statement got posted on the website
11  before the 10 a.m. embargo time?
12      A.   Like I said, there were many meetings
13  at the time looking into all aspect of this.
14      Q.   What is your understanding as to how
15  it got on the website before 10 a.m.?
16      A.   I mean, it was posted on the website
17  before the embargo was up.
18      Q.   And do you know who did that?
19      A.   Frances.
20      Q.   And why did she do it before then --
21      A.   I don't know.
22          MR. ROSSETTI:  Objection.

Page 137

1       A.   I don't know.
2           MR. THEODOROU:  Let me show you the
3   next exhibit.
4       (Deposition Exhibit No. 10 was marked for
5           identification.)
6           BY MR. THEODOROU:
7       Q.   You see Exhibit 10?  Do you have
8   Exhibit 10 in front of you, Ms. Davis?
9       A.   Yes.
10      Q.   Do you see it's an E-mail at the top
11  from you to a series of people?
12      A.   Yes.
13      Q.   Mr. Malvey, correct, is one of them?
14      A.   Yes.
15      Q.   Mr. Fratto?
16      A.   Uh-huh.
17      Q.   Correct.  Pete Fisher?
18      A.   Yes.
19      Q.   And it mentions Tim Adams.  Who is Tim
20  Adams?
21      A.   He was the chief of staff then.
22      Q.   Then David Aufhauser?

Michele Davis                                                February 11, 2008
Washington, DC

| Page 138 | Page 140 |
|---|---|
| 1   A.  Yes. | 1      MR. ROSSETTI:  Objection. |
| 2   Q.  And then a number of other people are | 2   A.  I'm sorry. |
| 3  copied, correct? | 3      BY MR. THEODOROU: |
| 4   A.  Yes. | 4   Q.  Strike that. Was any disciplinary |
| 5   Q.  What it says is -- you have seen this | 5  employment action taken against any employee for |
| 6  before, haven't you? | 6  what happened, any Treasury employee for what |
| 7   A.  Yes. | 7  happened on October 31st? |
| 8   Q.  "I apologize to all of you for the | 8   A.  I don't recall. |
| 9  early posting of the website.  I thought our | 9   Q.  After the October -- after October |
| 10  public affairs staff understood that embargo means | 10  31st, 2001, Treasury conducted an investigation |
| 11  embargo.  I certainly make sure they do now.  The | 11  about what happened that day, correct? |
| 12  early posting was for more than unfortunate, it | 12   A.  Yes. |
| 13  was careless and I'll make sure we don't have such | 13   Q.  And did you were you interviewed by |
| 14  lapses in the future.  I'm sorry that all of you | 14  any, and who conducted the investigation at |
| 15  are having to take a lot of criticism for the | 15  Treasury? |
| 16  carelessness in my shop."  Do you recall that, | 16   A.  I don't recall. |
| 17  sending that E-mail? | 17   Q.  Were you interviewed as part of that |
| 18   A.  I recall that, saying that many times. | 18  investigation? |
| 19   Q.  Now, you say I thought our public | 19   A.  Yes. |
| 20  affairs staff understood that embargo means | 20   Q.  Do you remember who interviewed you? |
| 21  embargo.  What did embargo mean? | 21   A.  No. |
| 22   A.  What? | 22      MR. THEODOROU:  Mark this Exhibit 11. |

| Page 139 | Page 141 |
|---|---|
| 1   Q.  When you say that, "I thought our | 1      (Deposition Exhibit No. 11 was marked for |
| 2  public affairs staff understood that embargo means | 2         identification.) |
| 3  embargo." | 3      BY MR. THEODOROU: |
| 4   A.  That she wasn't supposed to put it up | 4   Q.  Now, did you discuss this matter with |
| 5  on the website until 10 o'clock. | 5  the general counsel's office? |
| 6   Q.  Now, how was your shop careless? | 6   A.  Like I said, I don't remember who |
| 7   A.  She posted the thing on the website | 7  looked into it. I can imagine they would have |
| 8  before 10 o'clock. | 8  been involved. |
| 9   Q.  Was it only Ms. Anderson who was | 9   Q.  Were you first contacted by the |
| 10  careless that day? | 10  general counsel's office before being contacted by |
| 11   A.  I have no idea. I don't remember if | 11  the inspector general of Treasury? |
| 12  anyone else was involved in that, in putting the | 12   A.  I don't recall. |
| 13  paper on the website. | 13      MR. ROSSETTI:  Objection. |
| 14   Q.  Now, earlier I asked about Brian | 14   A.  I don't recall. |
| 15  Collins calling Fannie Mae and you said that | 15      BY MR. THEODOROU: |
| 16  calling Fannie Mae was not disseminating to the | 16   Q.  Let me ask you this: Who contacted |
| 17  public, correct? | 17  you first the general counsel's office about what |
| 18      MR. ROSSETTI:  Objection. | 18  happened that day or was it the inspector general? |
| 19   A.  Yes. | 19      MR. FREEBORNE:  I don't think she's -- |
| 20      BY MR. THEODOROU: | 20      MR. ROSSETTI:  I don't think she's |
| 21   Q.  As opposed to getting a press release | 21  testified that either one of them contacted her. |
| 22  out; is that right? | 22      MR. THEODOROU:  Let me ask her. |

36 (Pages 138 to 141)

Michele Davis                                           February 11, 2008
                        Washington, DC

| Page 142 | Page 144 |
|---|---|

**Page 142**

1  MR. ROSSETTI: You can ask her if they
2 did?
3  BY MR. THEODOROU:
4  Q. Do you remember being contacted by the
5 general counsel' office?
6  A. I don't recall.
7  Q. Do you remember being contacted by the
8 inspector general's office?
9  A. I don't recall.
10  Q. Do you remember being contacted by the
11 SEC?
12  A. No.
13  MR. ROSSETTI: Are you going to ask her
14 to repeat the first 20 minutes of the deposition
15 Nick? I mean, really. I don't like to be
16 argumentative or anything but you're repeating the
17 same questions over and over.
18  MR. THEODOROU: Well, look, it's not
19 the same question over and over. If you listen,
20 there are some differences in the question.
21 Secondly, let me just take and finish up the
22 deposition, John, all right?

**Page 144**

1  A. I don't remember who I spoke to about
2 this.
3  MS. WILLIAMS: Do you have a copy where
4 the second page isn't cut off at the top?
5  MR. THEODOROU: No. Mine has been cut
6 off. The copy got cut off. It got cut off. I
7 can get everybody clean copies of those if we need
8 them.
9  BY MR. THEODOROU:
10  Q. You testified earlier today that at
11 some points have changed. Do you remember I asked
12 you about changes that were being made regarding
13 the press conferences? I asked you about 30
14 minutes ago?
15  A. About changes being made to the
16 quarterly refunding?
17  Q. Yes. Correct.
18  A. Yes.
19  MR. THEODOROU: Let me show you the
20 next exhibit.
21  (Deposition Exhibit No. 12 was marked for
22   identification.)

| Page 143 | Page 145 |
|---|---|

**Page 143**

1  BY MR. THEODOROU:
2  Q. This is an E-mail which you did not
3 receive. However, it is an E-mail let me turn of
4 the bottom page it's from --
5  MR. FREEBORNE: What page?
6  MR. THEODOROU: First page it's says at
7 the bottom, Tom McGivens to a series of people.
8 Do you see that at the bottom?
9  A. Yes.
10  BY MR. THEODOROU:
11  Q. If you turn to the next page,
12 Mr. McGivens writes, "If there aren't changes
13 underway already, I'll talk to Michele Davis about
14 the process of press briefing. We'll need to find
15 out if this guy had kind some of credentials to
16 get into the building or if someone cleared him."
17 Do you see that?
18  A. Yes.
19  Q. Do you remember speaking with
20 Mr. McGivens about these issues?
21  A. I spoke to --
22  MR. ROSSETTI: Objection.

**Page 145**

1  BY MR. THEODOROU:
2  Q. Do you have Exhibit 12 in front of
3 you, Ms. Davis?
4  A. Yes.
5  Q. Have you seen this before?
6  A. I may have. I'm sure I must have if
7 it went out.
8  Q. Does it look familiar?
9  A. I just don't recall it from that long
10 ago.
11  Q. It says from the Office of Public
12 Affairs. Do you see that?
13  A. Yes.
14  Q. And it says Treasury sets procedures
15 for quarterly refunding announcements?
16  A. Yes.
17  Q. Is it your testimony that -- do you
18 know who could have drafted this?
19  MR. FREEBORNE: Does she know who
20 drafted it?
21  A. I don't know specifically who drafted
22 it.

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                      February 11, 2008
Washington, DC

---

Page 146

1    BY MR. THEODOROU:
2       Q.   Let's go through some of these
3    procedures, though, that were set.  It says that,
4    "The Treasury Department of Office is notifying
5    it's procedure for disseminating the announcement
6    of the government's quarterly refunding needs.
7    The changes are intended to improve the timeliness
8    and transparency of quarterly refunding
9    announcements."
10      It says, "Starting with the next scheduled
11   refunding announcement on January 30, 2002,
12   Treasury's Office of Public Affairs will post the
13   announcement of the Treasury website."  Was that a
14   change posting it on the website?
15      A.   No.  It (inaudible) posted it on the
16   website.
17      Q.   "The announcement also will be
18   delivered to credentialed members of the media in
19   the Treasury press room shortly before 9 a.m. with
20   lock down embargo rules."  Was that a change?
21      A.   From the October one.  Yes.
22      Q.   And how was that a change?

---

Page 147

1       A.   It's in the press room instead of
2    being in the room upstairs.
3       Q.   What about the lock down embargo
4    rules, were those a change?
5       A.   There were more specific rules about
6    what time instead of setting a time, setting a
7    time in terms of exact number of minutes from the
8    time the paper is released instead of an absolute
9    time.
10      Q.   And what is a lock down embargo?
11      A.   That's what I just described.
12      Q.   Describe it again for me?
13      A.   Once everyone is in the room then
14   there's, like, a countdown and someone stays in
15   the room to count it down.
16      Q.   So they cannot leave the room,
17   correct?
18      A.   Right.
19      Q.   And that was a change?
20      A.   Yes.
21      Q.   "The announcements include release of
22   the Treasury Department's borrowing estimates on

---

Page 148

1    the following quarter on the policy statement."
2    That was not a change, correct?
3       A.   Right.
4       Q.   "The traditional practice of releasing
5    the quarterly refunding announcement in a news
6    conference will be discontinued."  So the
7    announcement itself was not going to be given out?
8       A.   What?
9       Q.   "It says the traditional practice of
10   releasing the quarterly refunding announcement at
11   a news conference will be discontinued."  Do you
12   see that?
13      A.   Yes.  I didn't understand your
14   question.
15      Q.   So how was that a change?  They were
16   no longer giving out the announcement itself?
17      A.   No.  The announcement was given out at
18   the lock down.
19      Q.   Oh, okay.  So the lock down itself
20   just simply you can't leave the room until the
21   embargo goes out, correct?
22      A.   Right.

---

Page 149

1       Q.   When did those procedures take affect?
2       A.   The next quarterly refunding.
3       Q.   Are they still in effect today?
4       A.   We may have made some minor
5    modifications along the way but as far as I know,
6    yes.
7       Q.   Now, it says, "The announcement also
8    will be delivered to credentialed members of the
9    media in the Treasury press room shortly before 9
10   a.m. with lock down embargo rules."  I asked you
11   about that a couple of minutes ago, correct.  Now,
12   did that mean that the reporters no longer could
13   make calls to their editors with the information?
14      A.   It means you can't have any
15   conversations outside the room.
16      Q.   So nothing can leave the room
17   including calls to editors or anybody at the press
18   offices; is that right?
19      A.   That's correct.
20      Q.   And does that also mean that Treasury
21   has discontinued the practice of faxing or calling
22   in information to outlets who don't have

---

38 (Pages 146 to 149)

Michele Davis                                                                    February 11, 2008
Washington, DC

| Page 150 | Page 152 |
|---|---|
| 1 representatives there, like MSNBC, the New York | 1    Q.  Do they explain what the embargo |
| 2 Times, the Wall Street Journal? | 2 means? |
| 3        MR. ROSSETTI: Objection. | 3    A.  They are all members, so everybody in |
| 4    A.  You have to come to the room. | 4 there knows what an embargo is. |
| 5        BY MR. THEODOROU: | 5    Q.  So what you're saying is you assume |
| 6    Q.  So members of the press have to be in | 6 that everybody, you assume that all members of the |
| 7 the room, you can no longer just call their | 7 press who are there for that press conference |
| 8 editors and nobody at Treasury is calling an | 8 knows what embargo means? |
| 9 outlet? | 9        MR. ROSSETTI: Objection. |
| 10    A.  That's right. | 10    A.  They all can't have any contact |
| 11    Q.  Now, when it says that the | 11 outside the room. |
| 12 announcement also be delivered to credentialed | 12        MR. THEODOROU: Let me show you the |
| 13 members of the media in the press room shortly | 13 next exhibit. |
| 14 before 9 a.m. with the lock down embargo rules, | 14    (Deposition Exhibit No. 13 was marked for |
| 15 how much time do reporters now get to write their | 15        identification.) |
| 16 stories? | 16        BY MR. THEODOROU: |
| 17    A.  It's usually 15 minutes. | 17    Q.  Do you have Exhibit 13 in front of |
| 18    Q.  I beg your pardon? | 18 you, Ms. Davis? |
| 19    A.  It's usually 15 minutes. | 19    A.  Yes. |
| 20    Q.  All right.  And when are they allowed | 20    Q.  You see where it's an E-mail from Tony |
| 21 to publish their stories, right at 9 a.m. when the | 21 Fratto of April 5, 2002 to a series of people, |
| 22 announcement is posted on the website? | 22 Peter Fisher, Brian Roseboro and you and others? |

| Page 151 | Page 153 |
|---|---|
| 1    A.  Yes.  That's when the embargo is set | 1    A.  Yes. |
| 2 for. | 2    Q.  And Tony Fratto says, "I wasn't sure |
| 3    Q.  Now, given these new procedures, does | 3 if you saw this already."  But then he has an |
| 4 anybody from the Office of Public Affairs explain | 4 attached, what looks like an attached article, |
| 5 the embargo policies to those in the press room or | 5 correct? |
| 6 are they supposed to have a copy of these | 6    A.  Yes. |
| 7 procedures and be familiar with these procedures? | 7    Q.  Have you seen this E-mail before? |
| 8    A.  The members of the Treasury press room | 8    A.  Not since then. |
| 9 are familiar with the lock down procedure. | 9    Q.  It's a Bloomberg article.  I'll |
| 10    Q.  They are expected to be familiar with | 10 represent to you that it's a Bloomberg article. |
| 11 the procedures? | 11 "Goldman says no basis for charges over bond |
| 12    A.  Yes. | 12 trading."  Do you see that? |
| 13    Q.  Does anybody from your office explain | 13    A.  Yes. |
| 14 to them this new embargo policy? | 14    Q.  Now, down at the, do you see where it |
| 15    A.  I'm sure there were discussions with | 15 says anticipation and confusion in the middle of |
| 16 members of the press and people in our press room | 16 that article? |
| 17 at this time back then about the procedures. | 17    A.  Yes. |
| 18    Q.  But as a matter of practice today, | 18    Q.  A couple of paragraphs -- |
| 19 does anybody at Treasury explain to them the | 19        MR. ROSSETTI: The one attributed to |
| 20 policy only the day of the press conference? | 20 Henry Paulson, the former CEO of Goldman Sachs? |
| 21    A.  They announce the embargo in the | 21        BY MR. THEODOROU: |
| 22 beginning before they hand anything out. | 22    Q.  Correct.  Do you see where it's the |

39 (Pages 150 to 153)

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 154 | Page 156 |
|---|---|
| 1  third paragraph there, "There was a lot of | 1  Treasury as assistant secretary of public affairs |
| 2  anticipation and confusion surrounding the 30 year | 2  you were working for Congress; is that correct? |
| 3  auction," said Paulson, who was the chairman of | 3      A.  Right. |
| 4  Goldman Sachs at the time described the call to | 4      Q.  And can you explain for me what it |
| 5  the firm you see as on an unsolicited basis.  Do | 5  was, what was your job at Congress? |
| 6  you see that? | 6      A.  I was communications director for the |
| 7      A.  Yes. | 7  majority leader in the house. |
| 8      Q.  Do you agree with that statement that | 8      Q.  I'm sorry? |
| 9  there was a lot of anticipation and confusion | 9      A.  Communications director for the house |
| 10 surrounding the ending of the 30-year auction? | 10 majority leader. |
| 11     MR. ROSSETTI:  Objection. | 11     Q.  How long did you have that position? |
| 12     A.  I mean, there was a lot of | 12     A.  Six years. |
| 13 anticipation.  Yes. | 13     Q.  What was your responsibilities as the |
| 14     BY MR. THEODOROU: | 14 communications director to the house majority |
| 15     Q.  And do you agree that there was a lot | 15 leader? |
| 16 of confusion surrounding what happened on October | 16     A.  Manage all of his interactions with |
| 17 31st? | 17 the press, keeping the press informed on the house |
| 18     MR. ROSSETTI:  Objection. | 18 floor schedule and floor votes and legislation |
| 19     A.  Yes.  In the building.  Yes. | 19 meetings through the house. |
| 20     BY MR. THEODOROU: | 20     Q.  Did you have a staff? |
| 21     Q.  There was confusion at Treasury, | 21     A.  Yes. |
| 22 correct? | 22     Q.  How many people were on your staff? |

| Page 155 | Page 157 |
|---|---|
| 1      A.  Yes. | 1      A.  Just two. |
| 2      MR. THEODOROU:  I don't have any | 2      Q.  And did you have interaction with the |
| 3  further -- well, give me 2 minutes off the record | 3  press over that six-year period of time? |
| 4  to check my notes.  Okay. | 4      A.  Yes.  Constantly. |
| 5      THE VIDEO OPERATOR:  Off the record at | 5      Q.  Would you say it was on a daily basis? |
| 6  3:46:51.  On the record at 3:51:16. | 6      A.  Every day.  Yes. |
| 7      MR. THEODOROU:  No further questions at | 7      Q.  And you also said that during that |
| 8  this time. | 8  position you dealt with the use of embargoed |
| 9      THE VIDEO OPERATOR:  This concludes | 9  information, correct? |
| 10 tape 2 in the deposition of Michele Davis.  Off | 10     A.  Yes. |
| 11 the record at 3:51:33. | 11     Q.  Can you, please, explain for us what |
| 12     This begins tape 3 in the deposition of | 12 your involvement of using embargoed information |
| 13 Michele Davis on the record at 3:52:09. | 13 was during that six-year period of time? |
| 14     CROSS EXAMINATION | 14     MR. THEODOROU:  Objection. |
| 15 BY MR. ROSSETTI: | 15     A.  Again, it was a matter of managing the |
| 16     Q.  Good afternoon, Ms. Davis.  My name is | 16 deadline times, so if something was happening in |
| 17 John Rossetti, and I represent the plaintiff's, | 17 the evening and we wanted to make sure that the |
| 18 Securities and Exchange Commission.  I'm just | 18 reporters had it before so they could get it in |
| 19 going to be asking you some follow up questions | 19 the paper, get you to put out something embargoed |
| 20 based on what Mr. Theodorou was asking you. | 20 a couple of hours ahead of time so they could have |
| 21     You had explained your employment history | 21 it, write their stories and then it would be in |
| 22 earlier and you explained prior to joining the | 22 the paper the next day after the embargo was over. |

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                                   February 11, 2008
Washington, DC

| Page 158 | Page 160 |
|---|---|
| 1     Other times when you have some announcement | 1   embargoed information while you were, the six |
| 2  that was at a certain time but you wanted to make | 2  years that you were worked at the Congress? |
| 3  sure the reporters that you talked to them ahead | 3     A.   Not as often as at Treasury. I can't |
| 4  of the announcement, give them background | 4  even -- it's hard to gave a ballpark because |
| 5  information, embargo that, so they couldn't use it | 5  things out there are very driven by the |
| 6  until the announcement was made. | 6  legislative calendar, so the office in the month |
| 7     BY MR. ROSSETTI: | 7  of August there's nothing, then there's busy |
| 8     Q.   Generally, what was the deadline that | 8  months of September and October when things happen |
| 9  the media had on a nightly basis? | 9  24 hours a day, so it kind of depended on the |
| 10     A.   It depends on the media and television | 10  circumstances. |
| 11  has no deadlines. | 11     Q.   Can you explain for me what was the |
| 12     Q.   To print? | 12  procedure that you used as member of Congress -- |
| 13     A.   Print could be anywhere from 8 o'clock | 13  well, not, working for the staff of Congress, what |
| 14  at night to 11 o'clock at night depending on which | 14  was the procedures you used for the embargo there? |
| 15  one. Nightly news obviously is nightly news so | 15     MR. THEODOROU: Objection. |
| 16  5:30, 6 o'clock, the network news. It depended on | 16     A.   You would put it on the, if it was a |
| 17  the reporter. | 17  paper release that you were handing out, you would |
| 18     Q.   When was -- is it in that job when you | 18  write it up on the top of the release or if it was |
| 19  were the communications director for the house, | 19  a conversation one or more with a reporter, you |
| 20  the majority leader that you learned what an | 20  just state it at the beginning of the |
| 21  embargo was as it related to press information? | 21  conversation. |
| 22     A.   Yes. | 22     BY MR. ROSSETTI: |

| Page 159 | Page 161 |
|---|---|
| 1     Q.   How did you learn that? | 1     Q.   So did when you used the embargo, was |
| 2     A.   Well, when I was first in that office | 2  it ever in Congress, was it in the setting of like |
| 3  I wasn't the communications director the whole six | 3  a press conference or was it just basically one on |
| 4  years, I was the press secretary of communications | 4  one? |
| 5  director. He ran the office the first year and a | 5     A.   Usually one on one interviews or |
| 6  half I was there, so I was mostly learning from | 6  handing out paper. |
| 7  him and learning from other people I worked with. | 7     Q.   I see. Was there any lock down |
| 8     Q.   Who was that? | 8  utilized when you worked on the Hill? |
| 9     A.   Ed Gallesby. | 9     A.   No. |
| 10     Q.   So of the six years, so four and a | 10     Q.   And when you worked on the Hill or |
| 11  half of those you were actually a communications | 11  when you explained to a reporter that I'll give |
| 12  director? | 12  you this information but it's embargoed, did you |
| 13     A.   Yes. | 13  have a reporter ask you what's embargoed |
| 14     Q.   And for the first half you were press | 14  information? |
| 15  secretary? | 15     A.   No. |
| 16     A.   Press secretary. | 16     Q.   Did you ever have any reporters while |
| 17     Q.   What were your duties as press | 17  you worked on the Hill express any confusion to |
| 18  secretary? | 18  you about what the embargo was? |
| 19     A.   Second to him, just same duties, | 19     A.   No. |
| 20  talked to press every day, but, you know, just we | 20     Q.   Did you have any written procedures on |
| 21  do a lot of things together. | 21  the Hill of how you would implement the embargo |
| 22     Q.   How often was it that you dealt with | 22  you were utilizing? |

41 (Pages 158 to 161)

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 162 |
| --- |

1    A.   No.
2    Q.   Why is that?
3    A.   It's a widely understood practice in
4  the media.
5    Q.   In the six years you were on the Hill,
6  did you ever have any instances where another
7  reporter came to you and said, you know, working
8  with somebody else here and they don't seem to
9  understand what your embargo means?
10       MR. THEODOROU: Objection.
11   A.   No.
12       BY MR. ROSSETTI:
13   Q.   Did you have any instance on the Hill
14 where you thought that there was some
15 misunderstanding about what the embargo meant;
16 misunderstanding between you and any number of the
17 media?
18   A.   No, never.
19   Q.   Now, you left the Hill and then you
20 went to the Treasury as the assistant secretary,
21 correct?
22   A.   Right.

| Page 163 |
| --- |

1    Q.   And you explained that you got
2  confirmed and took your position officially in
3  August of '01 but that you were at Treasury
4  starting in January?
5    A.   Right.
6    Q.   Is that right. During that period
7  from January to August, you were an acting
8  secretary at that time?
9    A.   No.  I was officially, I was there as
10 a consultant in the department.
11   Q.   Was there anybody who was the acting
12 assistant secretary at that time?
13   A.   My deputy or I hired someone to be the
14 deputy assistant secretary and he was the
15 acting -- he was technically the acting, just
16 waiting for me to be confirmed.
17   Q.   Who was that?
18   A.   Rob Nichols.
19   Q.   So Rob Nichols was basically caretaker
20 for your position for the seven months it took for
21 you to get confirmed?
22   A.   While I was there doing the job for

| Page 164 |
| --- |

1  the most part.
2    Q.   Did you, in fact, supervise him even
3  though he had -- did he have the title -- let me
4  withdraw that.  Did he have the title of acting
5  assistant secretary?
6    A.   I'm not sure.  I don't remember.
7    Q.   Were you actually supervising him
8  during that seven-month period of time?
9        MR. THEODOROU: Objection.
10   A.   Technically, I was just there as a
11 consultant.
12       BY MR. ROSSETTI:
13   Q.   Right.  But in practice, were you
14 supervising him?
15   A.   Right.  In the Public Affairs
16 Department.
17   Q.   You were?
18   A.   Yes.
19   Q.   Okay.  And you explained to
20 Mr. Theodorou that your predecessor, Michelle
21 Smith, spent some time with you on a transition
22 period; is that right?

| Page 165 |
| --- |

1    A.   Yes.
2    Q.   How long did that period of time last,
3  that transition period?
4    A.   She and I met probably several times
5  over the first month and, you know, it wasn't a
6  set period of time, we just got together several
7  times over the first month and then talked on the
8  phone, you know, there wasn't a regularly
9  scheduled thing.
10   Q.   When was it that you started having
11 any discussions with Michelle Smith --
12   A.   Probably the first or second --
13   Q.   Let me withdraw that.  President Bush
14 came into office January 20st, 2000, correct?
15   A.   Right.  And I started --
16   Q.   2001.  I'm sorry?
17   A.   I started at Treasury one week later
18 and within a few -- she made contact very soon
19 just to offer to break me through up on anything
20 and we got together probably within the first
21 several days I'm sure.
22   Q.   So after Bush was inaugurated she

42 (Pages 162 to 165)

Page 166

1   stayed in that position --
2       A.   No.   She left the day of the
3   inauguration, she was not there at all.   She had
4   left and I was there but she would come in and
5   just to meet with me and walk me through things.
6       Q.   I see.   And how was that arranged for
7   her to come in after President Bush --
8       A.   She called and offered and I set up
9   meetings.
10      Q.   And how many hours do you think it was
11  that you met with her?
12          MR. THEODOROU:   Objection.
13      A.   It's very hard to remember.   I
14  don't -- I mean, I know her very well now because
15  so many years later, but it's hard to remember
16  exactly then.
17      Q.   What types of information were you and
18  she exchanging?
19      A.   Everything from standard practice on
20  the dealing with the press room guys and the guys
21  who worked down there in the building, their
22  access across the building, things like that, the

Page 167

1   new website, how to -- one thing I had never done
2   before was have traveling press go on an
3   international trip with us, so we spent a lot of
4   time on that and how that all works, just kind of
5   walked me through the mechanics of reporters
6   traveling with the secretary and then very much
7   just the mechanics of the building.   Because
8   obviously, I didn't need to be briefed on any of
9   the policy positions because it was a new
10  administration so it was just mechanics.
11      Q.   Right.   You mentioned there was a
12  press room, that was the room in the --
13      A.   It was a room in the basement of the
14  building where reporters work.
15      Q.   What you need to do is wait for me to
16  finish my question, you might be anticipating what
17  it is --
18      A.   Sorry.
19      Q.   -- and you might be correct, but for
20  purposes of making sure we have a clear record
21  here, you need to let me finish.   Okay.   You
22  explained there was a press room.   There's

Page 168

1   actually a room inside of Treasury where media
2   personnel can go and use as their office?
3       A.   Yes.
4       Q.   The other assignments only certain
5   press can go into that press room or how does that
6   work?
7           MR. THEODOROU:   Objection.
8       A.   There are -- different media
9   organizations have to apply for a desk in that
10  room and then they can assign a couple of, it
11  depends on the organization, they'll assign one,
12  two or three reporters to work out of that desk
13  which the desk that I was manned and then those
14  reporters have hard passes to get in and out of
15  the building.
16      Q.   Just getting back to your discussions
17  with Michelle Smith, what if any discussion did
18  you have with her about the embargo policy that
19  the Treasury had used or was using?
20      A.   I don't recall specific conversation
21  on about that and we talked about the way that
22  everything about the way she delivered information

Page 169

1   to the press room.   So I'm sure we walked through
2   it, but I don't, nothing sticks out in my memory
3   about particular practice on embargoes.   She just
4   explained that they bring down information on a
5   embargo basis and that is respected.
6       Q.   Let me ask you this:   What were the
7   different ways that Treasury -- let me withdraw
8   that.   How was it -- what did Michelle Smith
9   explain to you in terms of how the Treasury
10  released information to the media?
11          MR. THEODOROU:   Objection.
12      A.   Again, it depends on the information,
13  but there are a lot of standard releases, whether
14  they're monthly or quarterly of data that are
15  simply hand-delivered on paper to that room with
16  an embargo set by the room itself.
17      Most of the time the reporters in the room
18  while a Treasury person is there before they hand
19  it out will say okay, here we are.   I'm about to,
20  I have got the X, Y, Z data today and they would
21  all gather and look at their watches and set an
22  embargo and they would hand out the paper and they

43 (Pages 166 to 169)

Michele Davis                                                        February 11, 2008
Washington, DC

| Page 170 | Page 172 |
|---|---|
| 1 would all, you know, write the stories in time for | 1 If it was a press conference about leaving on a |
| 2 the embargoes. | 2 foreign trip and having a press conference |
| 3      BY MR. ROSSETTI: | 3 beforehand to talk about it, there was no reason |
| 4      Q.   Would it be fair to say that depending | 4 to embargo it.  Embargo was normally used for |
| 5 to type of information that's being released, | 5 something that's, something that's market |
| 6 there's a different way that the information is | 6 sensitive so that everyone gets the information |
| 7 actually released to the media? | 7 out exactly the same time. |
| 8      MR. THEODOROU:  Objection. | 8      Q.   You said the information was market |
| 9      A.   Definitely.  I mean, data things that | 9 sensitive.  What do you mean by market sensitive? |
| 10 like that were much it's more of a -- there's | 10      A.   Information that other people in the |
| 11 nothing really for anyone to say.  It's just a | 11 building, the policy professionals in the building |
| 12 matter of going down there and handing them | 12 felt would be a value to people trading somewhere |
| 13 something procedurally.  Other times I or someone | 13 in the world. |
| 14 on my staff directly or if we were handing out | 14      Q.   So once that -- was it that if once |
| 15 testimony and speeches, things like that that they | 15 that information was released, market would trade |
| 16 have an embargoed just because we want them to | 16 on that information? |
| 17 have it and be able to read it and post it and | 17      A.   Yes. |
| 18 write their stories the moment the secretary | 18      MR. THEODOROU:  Objection.  You got to |
| 19 starts speaking, those aren't necessarily news | 19 wait until I raise my objections. |
| 20 making, but the embargo is set just to be equal | 20      A.   Okay. |
| 21 with the time that it marks. | 21      BY MR. ROSSETTI: |
| 22      BY MR. ROSSETTI: | 22      Q.   Did anyone explain to you in Treasury |

| Page 171 | Page 173 |
|---|---|
| 1      Q.   Let me just be clear about how that | 1 what market sensitive meant? |
| 2 operates, how it operated in 2001 in terms of | 2      A.   They would just say this is market |
| 3 matter of releasing of information.  Were there | 3 sensitive and you know, we treated all data as -- |
| 4 press conferences that were actually being held? | 4 we treat every data release as something that is |
| 5      A.   We have press conferences in the | 5 being embargoed. |
| 6 building.  Yes. | 6      Q.   Just so we're clear, I just want to |
| 7      Q.   There was a discussion earlier about | 7 focus on the 2001 time frame? |
| 8 treasury refunding conferences, do you recall | 8      A.   Okay. |
| 9 that?  You got to answer yes or no. | 9      Q.   As opposed to your dealings there now. |
| 10      A.   Yes.  I'm sorry. | 10      A.   I see. |
| 11      Q.   In addition to those press | 11      Q.   What was your understanding in 2001 |
| 12 conferences, were there other press conferences | 12 about what market-sensitive information, what that |
| 13 held? | 13 meant? |
| 14      A.   Yes. | 14      A.   You mean what that -- |
| 15      Q.   Was there a difference, did every | 15      Q.   What was your understanding of what |
| 16 press conference, regardless of whether it was | 16 that meant? |
| 17 just run-of-the-mill press conference or a special | 17      MR. THEODOROU:  Objection. |
| 18 Treasury refunding conference, did they all use | 18      MR. ROSSETTI:  In 2001. |
| 19 embargoes? | 19      A.   Again, anything that someone would |
| 20      A.   No. | 20 trade on. |
| 21      Q.   Why not? | 21      BY MR. ROSSETTI: |
| 22      A.   It depends on the nature of the event. | 22      Q.   And why was it that -- with regards to |

44  (Pages 170 to 173)

Michele Davis                                                    February 11, 2008
                        Washington, DC

| Page 178 | Page 180 |
|---|---|
| 1    A.  Yes.  In cases with a lot of data. | 1    A.  Maybe a month later. |
| 2        BY MR. ROSSETTI: | 2    Q.  But he was part -- that's what I'm |
| 3    Q.  What about with market-sensitive | 3    asking, who your staff was? |
| 4    information? | 4    A.  He came on about a month later, Tony |
| 5        MR. THEODOROU:  Objection. | 5    Fratto a few months after that. |
| 6    A.  Whenever the Treasury is releasing | 6    Q.  What about Betsy Holahan? |
| 7    market-sensitive information, we want to have | 7    A.  Betsy was not until the summer. |
| 8    procedures in place to make sure that that | 8    Q.  Now, did you have conversations with |
| 9    information is released accurately and clearly. | 9    your staff about the use of embargoes at the |
| 10       BY MR. ROSSETTI: | 10   Treasury Department? |
| 11   Q.  Are there any other reasons why you | 11       MR. THEODOROU:  Objection. |
| 12   want to, the Treasury wanted to use an embargo for | 12   A.  We would have conversations about |
| 13   market-sensitive information. | 13   specific events and I mean, in the interview |
| 14       MR. THEODOROU:  Objection. | 14   process in interviewing anybody to come to work |
| 15   A.  I think that covers it. | 15   there was when you would get an assessment of how |
| 16       BY MR. ROSSETTI: | 16   well they understood engaging with the press and |
| 17   Q.  Other than Treasury wanting it and | 17   then, you know, every day we would talk about |
| 18   you've indicated the press wanted it, was there | 18   upcoming events and how we would -- how that |
| 19   anybody else who wanted an embargo? | 19   specific event needed to be handled. |
| 20       MR. THEODOROU:  Objection. | 20       BY MR. ROSSETTI: |
| 21   A.  Not that I can think of. | 21   Q.  Did you interview Tony Fratto? |
| 22       BY MR. ROSSETTI: | 22   A.  Yes. |

| Page 179 | Page 181 |
|---|---|
| 1    Q.  When you got to Treasury you had a | 1    Q.  And during his -- this was his job |
| 2    staff of people working for you; is that right? | 2    interview? |
| 3    A.  Yes. | 3    A.  Yes. |
| 4    Q.  Who was that staff? | 4    Q.  When you interviewed him, did you ask |
| 5    A.  When I first got there, all the | 5    him questions about whether he knew about what an |
| 6    political slots were empty so the staff was only | 6    embargo was? |
| 7    the career staff which was the three staff | 7        MR. THEODOROU:  Objection. |
| 8    assistants and the photographer and two people who | 8    A.  I don't recall asking him that |
| 9    do the clips. | 9    particular question. |
| 10   Q.  Who were they? | 10       BY MR. ROSSETTI: |
| 11   A.  You want names of everybody? | 11   Q.  After you interviewed him, were you |
| 12   Q.  Yes. | 12   confident that he understood what the position |
| 13   A.  Okay.  This is a memory test. | 13   entailed? |
| 14   Q.  In 2001? | 14   A.  Yes. |
| 15   A.  Yes.  This is a test.  Frances | 15       MR. THEODOROU:  Objection. |
| 16   Anderson, Sharon Lee, Sam Reese, Bill Robertson, | 16       BY MR. ROSSETTI: |
| 17   Chris Taylor and I cannot remember the other | 17   Q.  What about, who else did you hire in |
| 18   assistant's name whose not there anymore.  Marie | 18   2001 to work underneath you? |
| 19   Stickler. | 19   A.  That was mostly Rob and Tony, they |
| 20   Q.  And what about Rob Nichols? | 20   hired the rest of the staff. |
| 21   A.  No.  I hired him. | 21   Q.  Now, you said you'd have discussions |
| 22   Q.  When did he come on? | 22   about specific events.  So let's see if my |

                                        46  (Pages 178 to 181)

Michele Davis
Washington, DC
February 11, 2008

**Page 174**

1  market-sensitive information, what was the
2  procedure that you had in place to release that
3  information?
4       MR. THEODOROU: Objection.
5       A.  We would take other releases of I
6  guess of data we would take to the press room and
7  release I and give it to them with an embargo.
8       BY MR. ROSSETTI:
9       Q.  So you would give it to them and then
10 do what with it in terms of telling them it was an
11 embargo?
12      A.  We would either set an embargo on the
13 piece of paper we handed them or go into the room
14 and collectively they would all establish an
15 embargo.
16      Q.  So in the first instance, you could
17 have a piece of paper with the information on it
18 that you're releasing and on that, it would say
19 embargo at say, for example, 9 clock; is that
20 correct?
21      A.  Yes.
22      Q.  What would be the other way, another

**Page 175**

1  matter of doing it?
2       A.  It would be to just walk in with a
3  paper and, you know, usually the press room knows,
4  they know when data releases are coming and you're
5  not walk in there with a surprise, it would be to
6  just walk in and say I've got such and such data
7  and they would all kind of finish what they were
8  doing and make sure everyone was ready for it, and
9  then they would among themselves whoever was the
10 most senior reporter in the room would be the buy
11 who everyone looked to and it was like, okay, it's
12 2:06, let the embargo for 2:15 and they would all
13 agree and they would get their paper.
14      Q.  So you would tell them that this
15 information is subject to an embargo and then
16 they, among themselves, would agree that this
17 information was going to be embargoed until X
18 time?
19      MR. THEODOROU: Objection.
20      A.  It usually didn't even require us to
21 say this is going to be a embargoed.  These are
22 regular releases that are, they know as soon as we

**Page 176**

1  walk in with it that they need to set an embargo.
2       BY MR. ROSSETTI:
3       Q.  But you wanted it to be embargoed,
4  it's not like you're going down there with
5  nonembargoed information and they're going to set
6  an embargo?
7       A.  I mean, they've done that before, too.
8  I mean, there are times when they have if they're
9  talking, they have an interview with the senior
10 official, they will among themselves set an
11 embargo just because none of them want to be last
12 to hit the wire.
13      Q.  I see.  What is the, why is it that
14 treasury wanted an embargo?
15      MR. THEODOROU: Objection.  Asked and
16 answered three times.
17      A.  It again, it depends.  When there's
18 more information, it depends on the volume of
19 information that you're giving them.  An embargo
20 is useful when in a lot of circumstances but it's
21 also useful when there's information that needs to
22 be digested so that you don't just get someone

**Page 177**

1  scanning a piece of paper and throwing something
2  in the wire that's out of context.
3       BY MR. ROSSETTI:
4       Q.  And why does -- so would it be fair to
5  say that the Treasury wants orderly dissemination
6  of information it's providing?
7       MR. THEODOROU: Objection.
8       A.  To have the information be presented
9  as clearly as possible.
10      BY MR. ROSSETTI:
11      Q.  Does the, was the Treasury also
12 concerned that the information being released --
13 that the press was releasing was accurate.
14      MR. THEODOROU: Objection.
15      A.  Yes.  Accurate and clear.
16      BY MR. ROSSETTI:
17      Q.  And those are at least two reasons for
18 Treasury employing an embargo?
19      A.  Yes.
20      MR. THEODOROU: Objection.  You got to
21 wait for the objection.
22      MR. ROSSETTI: I'm sorry.  Your answer?

45 (Pages 174 to 177)

Michele Davis                                                          February 11, 2008
                              Washington, DC

| Page 182 | Page 184 |
|---|---|

**Page 182**

1  understanding is correct, does that mean then if
2  you had a specific release, you would then discuss
3  how that information was to be released?
4      A.   Yes.  Yes.  You know, information to
5  be released or a press conference to hold for one
6  to announce one thing or another.  Every time
7  there was some information to be made public, we
8  would have a discussion about is the best way a
9  paper release, is this something we want to do at
10  a press conference, is this one that goes to a
11  speech, what's the right way to make sure this
12  information gets out completely and accurately.
13      Q.   In 2001, were you involved in
14  discussions about how each release would be made?
15      MR. THEODOROU:  Objection.
16      A.   I mean, if something was a regular
17  weekly or monthly release, we didn't revisit every
18  single time unless there was something new and
19  unusual about it but other than that yes, that was
20  my job.
21      BY MR. ROSSETTI:
22      Q.   Did you -- did you become familiar

**Page 183**

1  with the Treasury refunding conferences?
2      A.   Yes.
3      Q.   How did you become familiar with those
4  conferences?
5      A.   In preparing for the first one.
6      Q.   When was the first one that you were,
7  you had any involvement with?
8      A.   I'm not going to remember the date,
9  but there were two before that one in October.
10      Q.   So prior to October 31st, 2001 there
11  were two prior Treasury refunding conferences
12  while you were at the Treasury Department?
13      A.   Yes.
14      Q.   What did you do -- what was your
15  involvement in learning anything about it or
16  preparing for them?
17      A.   I don't recall specifically, but I'm
18  sure we walked through sort of the process for how
19  this all, it's a three-day event, there's three
20  days of materials released in different events and
21  when the first one I was there for was the first
22  one that several senior officials were there for.

**Page 184**

1  So we all -- we walked through the process
2  in getting ready for it, but I don't recall any a
3  lot of specifics about that.
4      Q.   When you say senior officials, what do
5  you mean by that?
6      A.   Well, I mean, all the political
7  appointees.  It was new for everybody.
8      Q.   So because it was new for everyone,
9  did everyone wanted to go to this meeting and make
10  sure that they knew what the procedures were?
11      MR. THEODOROU:  Objection.
12      A.   I mean, I can't speak for their
13  motivations but I mean, everybody -- it was, you
14  know, like the first time you do anything, you pay
15  more attention to how it all works.
16      BY MR. ROSSETTI:
17      Q.   In those meetings, was there a
18  situation where you were explaining how it was
19  going to be done or did someone explain in those
20  meetings or career staff --
21      A.   Usually --
22      Q.   Let me finish the question.

**Page 185**

1      A.   I'm sorry.
2      Q.   During those meetings, did you explain
3  how the information was going to be released?
4      A.   The approach we took when, the
5  approach I took when we first got there on not all
6  these issues, but any kind of release was to first
7  hear from the career staff what had been done over
8  time and what was the standard procedure up until
9  then and make sure I understood the standard
10  procedure up until, that had been in effect and
11  then, you know, just usually we would then just
12  ask questions, make sure I understood and then we
13  would just usually have discussions about whether
14  or not there was anything else we wanted to
15  change.
16      Q.   Did the career staff explain to you
17  what their practice had been for the Treasury
18  refunding conferences?
19      MR. THEODOROU:  Objection.
20      A.   As far as I recall.  Yes.  I don't
21  recall a lot of what they explained but I recall
22  walking through it.

47 (Pages 182 to 185)

Michele Davis                                                    February 11, 2008
Washington, DC

Page 186

1    BY MR. ROSSETTI:
2        Q.   Did you make any changes to the policy
3    that had been in effect for releasing information
4    as Treasury refunding conferences?
5        A.   Not that I recall.
6        Q.   Were you confident then at that point
7    that the procedures in place ensured that there
8    was going to be the accurate release of the
9    Treasury information?
10       A.   Past practice was indicated to me that
11   those procedures were fine until hindsight later.
12       Q.   Right.  And how long had those
13   procedures that had been used at the Treasury
14   refunding conferences been in place?
15       MR. FREEBORNE:  If you know.
16       A.   I don't know.
17       BY MR. ROSSETTI:
18       Q.   After the first meeting that you had
19   with your staff and career people about Treasury
20   refunding conferences, did you make it a point
21   then to attend these pre meetings for subsequent
22   refunding conferences?

Page 187

1        A.   No.  Actually, the first one after we
2    completed the first one and it went according to
3    plan, that was something that Tony and then later
4    Tony and Betsy took on.
5        Q.   And was Tony given the responsibility
6    then to take care of coordinating the release of
7    the information at the Treasury refunding
8    conferences?
9        A.   Yes.
10       Q.   Did you have confidence in his ability
11   to handle that responsibility?
12       MR. THEODOROU:  Objection.
13       A.   Yes.  Yes.
14       BY MR. ROSSETTI:
15       Q.   Did you and he have, outside of these
16   preparatory meetings, did you have any meetings
17   with him in which he gave you an update on how
18   things were going with the upcoming refunding
19   conference?
20       A.   Yes.  We had staff meetings on a
21   regular basis, if not every day.  So anything that
22   and always with the entire staff to look ahead at

Page 188

1    what was coming up.  So we would have had
2    conversations at least in that context, if not
3    separate from that.
4        Q.   I see.  In terms of the -- withdraw
5    that.  Other than Tony Fratto, was anybody else
6    responsible in your office, directly responsible
7    for organizing and coordinating the Treasury
8    refunding conference?
9        A.   The other people were just, you know,
10   reporting to Tony as they helped with it.
11       Q.   And he was responsible for helping to
12   coordinate the October 31st, 2001 conference as
13   well; is that correct?
14       MR. THEODOROU:  Objection.
15       A.   Yes.
16       BY MR. ROSSETTI:
17       Q.   You indicated earlier that you thought
18   that you first learned that the bond was going to
19   be cancelled a few days before the October 31st
20   announcement, correct?
21       A.   That's my best recollection.
22       Q.   What was the situation under which you

Page 189

1    learned that the bond was going to be cancelled?
2        A.   I really don't recall.  There was a
3    lot and this was, we were still dealing with
4    things in the wake of September 11th and there was
5    a lot going on.  My memory is just that, you know,
6    the TBAC had recommended it and I think there had
7    been a general assumption in the market and
8    everywhere that that was likely to happen because
9    it had been recommended, but then because of
10   September 11th that was in doubt, and so it was
11   kind of something that was a discussion we were
12   getting outside the building there was a lot of
13   discussion of whether or not and I don't remember
14   internally when.
15       Q.   You just threw a lot of stuff out
16   there.  I'm not sure it was responsive to the
17   question.
18       A.   I'm sorry.  I'm trying to remember
19   myself and I just don't.
20       Q.   I'll ask you follow ups.  First off,
21   going back to October 31st, 2001, were you
22   involved in -- was there anything else going on in

48 (Pages 186 to 189)

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                    February 11, 2008
Washington, DC

Page 190

1  Treasury that you were more involved with than
2  Treasury refunding conferences?
3      MR. THEODOROU: Objection.
4      A.  Definitely all the aftermath of
5  September 11th and the financial markets and the
6  beginnings of the Treasury -- the terrorist
7  financing investigations doing up all of that.
8      BY MR. ROSSETTI:
9      Q.  Were those things taking up the bulk
10  of your time at Treasury then?
11      A.  Yes.
12      Q.  And you also recall that there was
13  some Anthrax letters sent to the Congress as well
14  as NBC News, correct?
15      MR. THEODOROU: Objection.
16      A.  Yes.
17      BY MR. ROSSETTI:
18      Q.  Was there also an Anthrax letter sent
19  or thought to be an Anthrax letter sent to the
20  Treasury Department?
21      A.  That rings a bell. I don't recall
22  much about it.

Page 191

1      Q.  Now, going back to the bond
2  cancellation, you said that the TBAC had
3  recommended that. Okay. First of all, I want to
4  just put some more flesh on the bone about the
5  Treasury borrowing advisory committee. What is
6  your understanding of what that committee does?
7      A.  Just makes recommendations to the
8  Department about the functioning of the market and
9  the best way to finance the government.
10      Q.  Is that a statutory committee, meaning
11  that's actually a statute that set up that
12  Treasury borrowing advisory committee?
13      A.  I don't even know.
14      Q.  And it's basically comprises people in
15  the market who advice -- who would give any advice
16  that the Treasury needs on a particular issue?
17      MR. THEODOROU: Objection.
18      A.  I think that's right.
19      BY MR. ROSSETTI:
20      Q.  Now, you said that the Treasury
21  borrowing advisory committee had recommended
22  cancellation of the 30-year bond. Did I hear that

Page 192

1  correctly?
2      A.  Yes.
3      Q.  What do you mean by that?
4      A.  That it wasn't needed anymore.
5      Q.  When did they make that
6  recommendation?
7      A.  They make recommendations the
8  quarter -- I don't remember when they specifically
9  had that one, but they make recommendations every
10  quarter and these are made public.
11      Q.  I thought I also heard you make a
12  statement that the market was anticipating that
13  the bond would be cancelled. Did I hear that
14  correctly?
15      A.  Again, my recollection is that once
16  the advisory committee put out its statement,
17  there was an expectation that that would happen
18  and then the expectation was in doubt because
19  after September 11th and suddenly we were going to
20  be more likely to be using deficit financing and
21  there were a lot of other operations going on in
22  the market to a liquidity and there were a lot of

Page 193

1  other focuses.
2      Q.  So do you recall if it was the July,
3  2001 Treasury borrowing advisory committee where
4  the committee made its recommendation to cancel
5  the bond at that time?
6      A.  Usually these are recommendations
7  quarter to quarter. So I just don't recall the
8  exact date, that would be what I would assume.
9      Q.  But because of the, so the Treasury
10  borrowing advisory committee made this
11  recommendation to cancel the bond and you've
12  explained that because of the events of 911, there
13  was a thought that that recommendation wouldn't be
14  acted upon because of financing concerns?
15      MR. THEODOROU: Objection.
16      Q.  Is that correct?
17      A.  That was some of the public discussion
18  around the issue at the time.
19      BY MR. ROSSETTI:
20      Q.  Now, again, you said you didn't recall
21  the manner in which you learned about the Treasury
22  was going to be cancelling the 30-year bond?

49 (Pages 190 to 193)

Michele Davis                                                    February 11, 2008
Washington, DC

Page 194

1    A.  No.
2        MR. THEODOROU:  Objection.
3        BY MR. ROSSETTI:
4    Q.  And you know Peter Fisher; is that
5    correct?
6    A.  Yes.
7    Q.  When is it that you first met Peter
8    Fisher?
9    A.  When he was confirmed for the job.
10   Q.  Did he -- was he at Treasury before he
11   was concerned similar to like you were?
12   A.  Not that I recall.
13   Q.  When you, did you have a specific
14   meeting with him or was it to meet him and discuss
15   things with him or was it like a group meeting?
16       MR. THEODOROU:  Objection.  Referring
17   to what?
18       MR. ROSSETTI:  When she first met him.
19   A.  I don't recall the first meeting I had
20   with him, but I met with each new senior official
21   as they came on to talk about dealing with the
22   press.

Page 195

1        BY MR. ROSSETTI:
2    Q.  I'm sorry.
3    A.  To talk about how to deal with the
4    press and what their role was going to entail in
5    terms of dealing with the press.
6        BY MR. ROSSETTI:
7    Q.  You had that conversation with
8    Mr. Fisher?
9    A.  Yes.  With every senior official when
10   they came on.
11   Q.  Was anybody else with you from your
12   staff or was it just you and he?
13   A.  I don't recall.  There's no reason it
14   would have been anyone else.
15   Q.  Did you have conversations with him
16   about the use of embargoed information?
17       MR. THEODOROU:  Objection.
18   A.  I doubt it.
19       BY MR. ROSSETTI:
20   Q.  Did you explain to him that embargo --
21   that the Treasury Department had an embargo
22   procedure in place for the release of any

Page 196

1    information?
2        MR. THEODOROU:  Objection.
3    A.  That would have not come up unless we
4    were talking about the specific release.
5        BY MR. ROSSETTI:
6    Q.  I see.  And were there any specific
7    releases dealing with Peter -- that Peter Fisher
8    was involved in that you had a conversation with
9    him about?
10       MR. THEODOROU:  About what?
11       BY MR. ROSSETTI:
12   Q.  About that release?
13   A.  About the quarterly refunding, you
14   mean?
15       MR. THEODOROU:  Objection.
16       BY MR. ROSSETTI:
17   Q.  No.  You indicated that you wouldn't
18   have had a conversation with Mr. Fisher about the
19   embargo procedure at Treasury unless there was an
20   event coming up, correct?
21   A.  Right.
22   Q.  Do you recall what was, whether there

Page 197

1    was an event that you discussed the Treasury
2    embargo procedure with Mr. Fisher?
3    A.  I don't -- not that I recall.
4    Q.  When was it that you first had any
5    meetings or discussions with anybody about the
6    October 31st, 2001 Treasury refunding conference?
7        MR. THEODOROU:  Objection.
8    A.  I don't recall a specific date.  My
9    recollection is within a couple of days beforehand
10   is when we started focussing on the release.
11       BY MR. ROSSETTI:
12   Q.  And was there -- do you think it's
13   that same time when you first had those meetings,
14   you think that's when you first learned that the
15   bond would be cancelled?
16   A.  As far as I recall.
17       MR. THEODOROU:  Objection.
18       BY MR. ROSSETTI:
19   Q.  Were you, and what was your
20   involvement in helping to coordinate the refunding
21   conference for October 31st, 2001?
22   A.  Mostly was getting, you know, getting

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 198 | Page 200 |
|---|---|
| 1 reports from Tony and Betsy about what, how the | 1   A.   What do you mean? |
| 2 planning was going and chiming in as needed. | 2   Q.   What was your understanding of how |
| 3   Q.   But you were basically letting them | 3 information got onto the website? |
| 4 run the show on that? | 4   MR. FREEBORNE:  You mean generally or |
| 5   A.   Yes. | 5 with reference to this? |
| 6   Q.   As part -- as the secretary of public | 6   MR. THEODOROU:  Objection. |
| 7 affairs, would it have been your role to review | 7   MR. ROSSETTI:  Generally for any press |
| 8 press releases, the press release that was going | 8 items. |
| 9 to be made for the refunding conference? | 9   A.   At the time, there was a specific |
| 10   MR. THEODOROU:  Objection. | 10 software thing that had to be on that you had to |
| 11   A.   I would normally clear on any release | 11 have access to put something on our website and |
| 12 going out of the building. | 12 that was at two desks in the office and, you know, |
| 13   BY MR. ROSSETTI: | 13 there was a complicated process for uploading text |
| 14   Q.   Including the Treasury refunding | 14 and putting it on the website. |
| 15 conference release? | 15   BY MR. ROSSETTI: |
| 16   A.   Including Peter Fisher's remarks. | 16   Q.   You weren't involved in that, though? |
| 17 Yes. | 17   A.   No. |
| 18   Q.   So the one that was released on | 18   Q.   I see.  At some point there was a |
| 19 October 31st, you had seen it before it was | 19 decision made to use an embargo at the October |
| 20 approved? | 20 31st, 2001 refunding conference; is that fair to |
| 21   A.   I mean, right now I can't recall | 21 say? |
| 22 specifically but that would have been practice. | 22   MR. THEODOROU:  Objection. |

| Page 199 | Page 201 |
|---|---|
| 1   Q.   I see.  And who had the final say on | 1   A.   Yes. |
| 2 the final version? | 2   BY MR. ROSSETTI: |
| 3   MR. FREEBORNE:  In terms of what? | 3   Q.   And who made that decision? |
| 4   MR. ROSSETTI:  Of the release. | 4   A.   It would have been a collective |
| 5   MR. THEODOROU:  Objection. | 5 decision between Peter Fisher, his staff and my |
| 6   A.   Of the text or of the? | 6 staff. |
| 7   BY MR. ROSSETTI: | 7   Q.   Do you recall there being any |
| 8   Q.   Of anything in it.  Did you, was there | 8 discussion that Peter Fisher wanted to do it in |
| 9 an area where public affairs had the final say on | 9 some other manner that didn't have an embargo? |
| 10 one aspect of it and Office of Domestic Finance | 10   MR. THEODOROU:  Objection. |
| 11 had a say on another part of it? | 11   A.   Not that I recall. |
| 12   A.   No.  It gets cleared by everybody who | 12   MR. ROSSETTI:  Let me have this marked |
| 13 needs to clear on it and release equities on the | 13 as Exhibit 14. |
| 14 issue as text and then it gets formatted in the | 14   (Deposition Exhibit No. 14 was marked for |
| 15 public affairs office for release. | 15     identification.) |
| 16   Q.   You weren't involved in the -- let me | 16   BY MR. ROSSETTI: |
| 17 ask, were you involved in the formatting of it at | 17   Q.   And Ms. Davis, I have asked the Court |
| 18 all? | 18 Reporter to hand you what's been marked Exhibit |
| 19   A.   No. | 19 14, and I'm asking you to read through, there's a |
| 20   Q.   And what was your understanding of how | 20 series of E-mails here.  It has a Bate stamp |
| 21 your understanding, if any, of how information was | 21 number on it FOIAKBC 613, it's series of E-mails |
| 22 posted on the Treasury Department website? | 22 from October 29, 2001. |

51 (Pages 198 to 201)

Michele Davis                                                                February 11, 2008

Washington, DC

| Page 202 |
|---|

```
1      A.  Yes.
2      Q.  Do you see the first E-mail, it's from
3   Betsy Holahan to you Tony Fratto, Rob Nichols and
4   a number of people on the CC line.  Do you see
5   that?
6      A.  Yes.
7      Q.  The people that are on the CC line,
8   are those people who are in the Office of Domestic
9   Finance?
10      A.  Yes.
11      Q.  And you'll see that there's a schedule
12   for October 31st, 2001.  Do you see that?
13      A.  Yes.
14      Q.  Then you go to there's a second E-mail
15   from Betsy Holahan to you, Fratto and Rob Nichols
16   again?
17      A.  Yes.
18      Q.  With a number of people CCed from
19   Office of Domestic Finance.  And Betsy writes,
20   "Okay, Tony and I just spoke with Peter and he
21   agreed to embargo on the announcement until 10
22   a.m.  That means the announcement occurs at 9 to
```

| Page 204 |
|---|

```
1      A.  Yes.
2      Q.  Again, there was the first E-mail
3   here, from Betsy Holahan it the same one that was
4   on the previous exhibit and there's a second
5   E-mail discussing about some reporters and then
6   there's an E-mail from Tony Fratto at 1:45 p.m. to
7   you, Betsy Holahan and Rob Nichols.  And Tony
8   states, "FYI, Betsy and I talked Peter out of
9   going live on Wednesday.  Press conference will
10   end at 9:40 with a 10 a.m. embargo.  He will then
11   come back at 10:10 for background."  Do you see
12   that?
13      A.  Yes.
14      Q.  Does this refresh your memory at all
15   that apparently Peter Fisher wanted to have a live
16   press conference rather than an embargo for this
17   refunding information?
18      MR. THEODOROU:  Objection.
19      A.  I mean, that's certainly what this
20   indicates but I just don't recall any of that
21   discussion.
22      BY MR. ROSSETTI:
```

| Page 203 |
|---|

```
1   9:15, Q and A until 9:40 and then the embargo
2   lifted at 10 a.m.  No live TV.  Peter will later
3   be available for background questions perhaps at
4   10:15 a.m."
5      Were you aware that whether Peter Fisher
6   wanted the release of information on this
7   refunding conference other than using an embargo?
8      MR. THEODOROU:  Objection.
9      A.  I don't recall that.
10      BY MR. ROSSETTI:
11      Q.  Does this E-mail refresh your memory
12   at all?
13      MR. THEODOROU:  Objection.
14      A.  I don't recall that being an issue.
15   It may have been but.
16      MR. ROSSETTI:  15, please.
17      (Deposition Exhibit No. 15 was marked for
18          identification.)
19      BY MR. ROSSETTI:
20      Q.  Exhibit 15 is another series of
21   E-mails from October 29, 2001 and this is FOIAKBC
22   Exhibit No. 612 in the lower right-hand corner?
```

| Page 205 |
|---|

```
1      Q.  Do you have any reason to believe to
2   think that this information that Tony Fratto was
3   indicating here is not accurate?
4      A.  No.
5      Q.  Do you have any reason to believe that
6   the information that Betsy Holahan indicated in
7   her E-mail on Exhibit 14, the E-mail at 10:48 --
8   1:48 p.m. is not correct?
9      A.  No.
10      Q.  At the time of the refunding
11   conference on October 31st, 2001, were you in your
12   office or were you out traveling have?
13      A.  I don't recall.  I'm not sure.
14      Q.  Now, it's my understanding, correct,
15   that you had not attended any of the refunding
16   conferences from the time you started Treasury in
17   January of '01 up through October 31st, 2001?
18      A.  Right.
19      Q.  Did anyone explain to you how they
20   ran?
21      MR. THEODOROU:  Objection.
22      A.  Like I said, we talked it through at
```

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                    February 11, 2008
Washington, DC

| Page 206 | Page 208 |
|---|---|
| 1  the beginning before the first one, it appears we | 1  was there for laid out this is the standard |
| 2  kind of walked through here's how it goes. | 2  practice and there was not a discussion or |
| 3      BY MR. ROSSETTI: | 3  decision to change that. |
| 4      Q.  Now, you had indicated earlier -- | 4      Q.  Was it explained that people from the |
| 5      MR. THEODOROU:  Indicated or testified? | 5  Federal Reserve or The White House had come to |
| 6      MR. ROSSETTI:  She probably did both, | 6  these conferences in the past? |
| 7  indicated and testified.  Bear with me one moment. | 7      MR. THEODOROU:  Objection. |
| 8      BY MR. ROSSETTI: | 8      A.  I don't recall that.  But it doesn't |
| 9      Q.  In response to some questions from Mr. | 9  mean.  I just don't recall that. |
| 10  Theodorou about who was responsible for deciding | 10      BY MR. ROSSETTI: |
| 11  who attends press conferences, you indicated it | 11      Q.  Was there discussions that no one from |
| 12  was the Office of Public Affairs and the Office of | 12  outside of Treasury could attend this conference? |
| 13  Domestic Finance; is that correct? | 13      MR. THEODOROU:  Objection. |
| 14      A.  To attend that particular press | 14      A.  That discussion as I recall it was |
| 15  conference; is that what you're asking about that | 15  this is for reporters only. |
| 16  particular one? | 16      BY MR. ROSSETTI: |
| 17      Q.  The Treasury refunding conferences? | 17      Q.  But you don't recall any discussion |
| 18      A.  Yes. | 18  that practice was, there were some people from the |
| 19      Q.  And as far as the, was there then | 19  outside who could attend? |
| 20  responsibility -- how is the responsibility | 20      A.  I don't recall that. |
| 21  divided between public affairs who public affairs | 21      MR. THEODOROU:  Objection. |
| 22  would decide could attend and who domestic finance | 22      BY MR. ROSSETTI: |

| Page 207 | Page 209 |
|---|---|
| 1  decided could attend? | 1      Q.  You don't recall that at all? |
| 2      MR. THEODOROU:  Objection. | 2      A.  No. |
| 3      MR. FREEBORNE:  I think that | 3      Q.  Do you know who actually was attending |
| 4  mischaracterize her testimony, but. | 4  those quarterly refunding conferences? |
| 5      A.  It's not like a separate, it's not | 5      MR. THEODOROU:  Objection. |
| 6  like there's one list or another list or anything | 6      A.  Do I personally know who? |
| 7  like that. | 7      Q.  Right? |
| 8      BY MR. ROSSETTI: | 8      A.  No, I didn't know who. |
| 9      Q.  Let me restate the question.  Is it | 9      BY MR. ROSSETTI: |
| 10  your testimony earlier that you said that it was | 10      Q.  Do you have any knowledge of who was |
| 11  in terms of who could attend the Treasury | 11  attending? |
| 12  refunding conferences it was the responsibility of | 12      MR. THEODOROU:  Objection. |
| 13  the Office of Public Affairs and the Office of | 13      MR. FREEBORNE:  Are we talking about |
| 14  Domestic Finance? | 14  the October 31st refunding or any other refunding? |
| 15      MR. THEODOROU:  Objection. | 15      MR. ROSSETTI:  Yes. |
| 16      BY MR. ROSSETTI: | 16      MR. FREEBORNE:  Person by person or |
| 17      Q.  Do I have that correct? | 17  entity by entity? |
| 18      A.  To determine it together.  One joint | 18      MR. ROSSETTI:  Person by person start. |
| 19  decision, not two separate lists of people. | 19      A.  Do I personally know? |
| 20      Q.  And when was that joint decision made? | 20      MR. ROSSETTI:  Right. |
| 21      A.  Well, again, the standard practice | 21      A.  No. |
| 22  that we walk through before the first one that I | 22      BY MR. ROSSETTI: |

53 (Pages 206 to 209)

Michele Davis                                                    February 11, 2008
Washington, DC

---

Page 210

1    Q.   What about entities?
2    A.   No.
3    Q.   Do you know what practices the Office
4  of Domestic Finance had with regards to allowing
5  people to attend the Treasury refunding
6  conferences?
7    A.   What practices they have? No.
8        BY MR. ROSSETTI:
9    Q.   You were asked earlier about Peter
10 Davis whether you knew him or not. Did you learn
11 that he had been permitted by people in the Office
12 of Domestic Finance to attend those conferences,
13 the Treasury refunding conferences since some time
14 in the mid to late '90s?
15       MR. THEODOROU: Objection.
16   A.   I learned that he had been attending
17 for some time. I don't remember for how long.
18       BY MR. ROSSETTI:
19   Q.   So this wasn't just a first-time
20 occurrence that he came into the building?
21   A.   Right. I learned that after the fact
22 that he had been attending for some time.

---

Page 211

1        MR. THEODOROU: Objection.
2        BY MR. ROSSETTI:
3    Q.   And that was as a result of a practice
4  between he and the Office of Domestic Finance?
5        MR. THEODOROU: Objection.
6    A.   The first thing we did after that was
7  to look and see who cleared him in and it was not
8  through the press office. We didn't -- I didn't
9  look past that to see who it was.
10       BY MR. ROSSETTI:
11   Q.   How did you learn that someone from
12 the Office to Domestic Finance had allowed Peter
13 Davis to attend the refunding conferences?
14   A.   I just heard that over the next few
15 days somewhere in the building that it was someone
16 in Domestic Finance who had cleared him in. I
17 never heard the name.
18   Q.   Do you know under what conditions he
19 was allowed to enter and attend the quarterly
20 refunding conference?
21       MR. THEODOROU: Objection.
22   A.   No.

---

Page 212

1        BY MR. ROSSETTI:
2    Q.   Do you know if there were any
3  conditions set on his ability to attend?
4    A.   No.
5    Q.   Did you ever hear that Roger Anderson
6  had told him he could attend if he abided by the
7  terms of the press embargo?
8        MR. THEODOROU: Objection.
9    A.   No. I don't even know who that is.
10       BY MR. ROSSETTI:
11   Q.   You never heard there was an
12 individual named Roger Anderson who was a
13 predecessor of Peter Fisher's years before?
14   A.   No.
15   Q.   Do you know if the Office of Domestic
16 Finance used any sort of confidentiality agreement
17 between it and Peter Davis?
18   A.   No.
19   Q.   Based on this meeting you said you had
20 about the refunding conferences when you first
21 came on board, what was your understanding of how
22 the embargo were set at the Treasury refunding

---

Page 213

1  conferences prior to October 31st, 2001?
2        MR. THEODOROU: Objection.
3    A.   I really don't recall.
4        BY MR. ROSSETTI:
5    Q.   Was there a difference in how the
6  embargo was set on October 31st, 2001 from the
7  prior refunding conferences?
8        MR. THEODOROU: Objection.
9        MR. FREEBORNE: In terms of time or in
10 terms of policy?
11       MR. ROSSETTI: In terms of how it was
12 set.
13       MR. FREEBORNE: In terms of time?
14       MR. ROSSETTI: In terms of how it was
15 set.
16       MR. FREEBORNE: Okay. Procedure.
17   A.   It was definitely a unique event
18 because there was so much more attention for it
19 and so like I said, I don't recall what the
20 practice exactly was before that but it would have
21 been, we would have set this procedure for that
22 event based on the much greater news attention

---

54  (Pages 210 to 213)

Michele Davis
Washington, DC

February 11, 2008

Page 214

1  directed at that particular quarterly refunding
2  agreement.
3      BY MR. ROSSETTI:
4      Q.  Because it was thought the
5  cancellation of the bond was market-sensitive
6  information?
7      MR. THEODOROU: Objection.
8      A.  Or the decision not to cancel it.
9  Whatever the decision was, it was going to be big
10 news because there was so much attention focused
11 on it. So we -- I mean, Peter Fisher and those
12 aren't always done by the under secretary, it was
13 a unique thing to have him do it, it was a, that
14 whole, we treated the entire event as a much
15 higher profile news event than a normal quarterly
16 refunding.
17     BY MR. ROSSETTI:
18     Q.  Were you aware on the night before
19 October 30th, 2001 that the treasury issued a
20 press release in which it announced the 10 a.m.
21 embargo and also announced that Peter Fisher would
22 be speaking at the press conference?

Page 215

1      MR. THEODOROU: Objection.
2      A.  I don't recall that specifically but
3  we always let people know about the next day's
4  events.
5      BY MR. ROSSETTI:
6      Q.  I see. Did you ever have any
7  conversations with Tony Fratto in which he
8  expressed concern to you that reporters didn't
9  seem to understand what the Treasury procedure
10 was?
11     MR. THEODOROU: Objection --
12     BY MR. ROSSETTI:
13     Q.  The Treasury embargo procedure was?
14     MR. THEODOROU: Objection.
15     A.  No.
16     Q.  Did you have such conversations with
17 Betsy Holahan?
18     A.  No.
19     Q.  Did you ever have any conversations
20 with reporters with the media at the Treasury
21 Department in which they indicated to you that
22 they did not understand the embargo procedure?

Page 216

1      MR. THEODOROU: Objection.
2      A.  No.
3      BY MR. ROSSETTI:
4      Q.  Did you ever have conversations in
5  which one reporter told you that he didn't think
6  that another reporter knew what the embargo
7  procedures were?
8      MR. THEODOROU: Objection.
9      A.  No.
10     BY MR. ROSSETTI:
11     Q.  Did you ever while you were at
12 Treasury in October in 2001, prior to October
13 31st, 2001, did you receive any complaints from
14 anybody that they didn't think somebody was
15 abiding by the terms of the embargo?
16     A.  Not that I can recall.
17     Q.  Did anyone bring to your attention
18 alleged media violations of the Treasury embargo?
19     MR. THEODOROU: Objection.
20     A.  Reporters are constantly trying to
21 point fingers at each other for competitive edge,
22 so I can't leave it out entirely but I don't

Page 217

1  recall anybody specifically raising that.
2      BY MR. ROSSETTI:
3      Q.  Do you know of anyone prior to October
4  31st, any media people intentionally violating the
5  Treasury Department embargo.
6      MR. THEODOROU: Objection.
7      A.  No.
8      BY MR. ROSSETTI:
9      Q.  You were asked some questions about
10 the early posting of the Treasury refunding press
11 release on the Treasury website. Do you recall
12 those?
13     A.  Yes.
14     Q.  And you said you learned that Frances
15 Anderson had posted it early; is that correct?
16     A.  Yes.
17     Q.  And Mr. Theodorou showed you some
18 exhibits. Exhibit 10 if you can get that in front
19 of you.
20     A.  Yes.
21     Q.  You sent an E-mail to some of your
22 colleagues in the public affairs office and the

Michele Davis
February 11, 2008
Washington, DC

| Page 218 | | Page 220 |
|---|---|---|

**Page 218**

1  Office of Domestic Finance and you characterized
2  it as posting was unfortunate and you're
3  apologizing for carelessness in your office.
4      Did you reach any conclusion that the early
5  posting of the information on the website was
6  anything but was just carelessness?
7      MR. THEODOROU: Objection.
8      BY MR. ROSSETTI:
9      Q.  As opposed to anything else?
10     A.  Carelessness. To this day, I believe
11  it was just carelessness.
12     Q.  You didn't conclude there was any
13  intentional wrongdoing on anybody's part regarding
14  that?
15     A.  No.
16     Q.  Did anyone tell you that they had
17  learned that it was anything but carelessness?
18     MR. THEODOROU: Objection.
19     A.  No.
20     BY MR. ROSSETTI:
21     Q.  You were asked some questions about
22  the Treasury borrowing advisory committee. Did

**Page 219**

1  the Office of Public Affairs have any
2  responsibility for the treasury borrowing advisory
3  committee at all?
4      A.  Just releasing every quarter their one
5  document at the quarterly refunding -- the day
6  before the quarterly refunding announcement.
7      Q.  But did you have any responsibility
8  monitoring what the members of the committee did?
9      A.  No. Just that one quarterly release
10  that we did on their behalf.
11     Q.  Are you aware of any rules,
12  confidentiality rules that the members of the
13  Treasury borrowing advisory committee have to
14  abide by?
15     MR. THEODOROU: Objection.
16     A.  Not that I know of. I don't know
17  anything about them.
18     MR. ROSSETTI: I'm sorry?
19     A.  I don't know anything about them.
20     BY MR. ROSSETTI:
21     Q.  Were you aware of any sort of
22  confidentiality agreement being used at Treasury

**Page 220**

1  with nonemployees about setting forth their use of
2  any information that they learned at Treasury?
3      MR. THEODOROU: Objection.
4      A.  Not that I know of. No.
5      BY MR. ROSSETTI:
6      Q.  You indicated earlier that you learned
7  that Peter Davis had attended the Treasury
8  refunding conference. How is it you learned that?
9      A.  I read it in some wire story, it was
10  the first I heard of it.
11     Q.  And you had never heard of Peter Davis
12  prior to that?
13     A.  No.
14     Q.  Mr. Theodorou was asking you some
15  questions about if you look at Exhibit 7?
16     A.  (The witness complies.) Yes.
17     Q.  There's some comments attributed to
18  Tony Fratto about thinking it's likely that some
19  of those may have gotten into the conference or
20  his clarification that, quote, I think it is
21  unlikely that others have not gotten into these
22  things in the past.

**Page 221**

1      Did you have any understanding as to his
2  reference to that whether he was meaning that
3  Peter Davis had been attending these in the past,
4  it just wasn't October 31st, 2001?
5      MR. THEODOROU: Objection.
6      A.  I don't know if he was referring
7  particularly to him, and I think as we looked at
8  the, as we in hindsight reviewed the process, it
9  just became clear to us that it could have easily
10  been additional people.
11     BY MR. ROSSETTI:
12     Q.  Did you have any conversations with
13  him in which he said I know that there are other
14  people who attended who should not have.
15     MR. THEODOROU: Objection.
16     A.  Not that I recall.
17     BY MR. ROSSETTI:
18     Q.  Did anyone ever tell you that?
19     A.  Not that I recall.
20     Q.  Did you ever learn that yourself
21  personally?
22     A.  No.

56 (Pages 218 to 221)

Michele Davis                                                February 11, 2008
Washington, DC

| Page 222 | Page 224 |
|---|---|

**Page 222**

1     MR. THEODOROU: Objection.
2     BY MR. ROSSETTI:
3     Q.   What's your understanding as to the
4  basis of Fratto's statement then that he thinks
5  it's unlikely that others have not gotten into the
6  Treasury refunding conferences in the past.
7     MR. THEODOROU: Objection.
8     A.   We were all pretty disappointed in
9  what we learned about the process once this all
10  happened.
11     BY MR. ROSSETTI:
12     Q.   Right.  But other than being
13  disappointed in the process, did you have any
14  information that lead you to believe that other
15  people other than Peter Davis were getting into
16  the conference.
17     MR. THEODOROU: Objection.
18     A.   No.  We were just concerned about the
19  whole process that would have allowed other
20  people.
21     BY MR. ROSSETTI:
22     Q.   Getting back to the issue of the

**Page 223**

1  media, the Treasury Department and the embargo,
2  the time that you were there in October of 2001
3  and the interaction that you had with -- well, let
4  me ask you this: Did you have interaction with
5  the media who were covering the Treasury
6  Department in 2001?
7     MR. THEODOROU: Objection.
8     A.   Every day.
9     MR. ROSSETTI: I'm sorry?
10     A.   Every day.
11     BY MR. ROSSETTI:
12     Q.   In your interaction -- prior to
13  October 31st, 2001, your office was employing a
14  press embargo, correct?
15     MR. THEODOROU: Objection.
16     A.   We would employ them on certain
17  instances.  Yes.
18     BY MR. ROSSETTI:
19     Q.   Depending on with the release, you had
20  been employing embargoes during that time?
21     A.   Yes.
22     Q.   Correct?

**Page 224**

1     A.   Yes.
2     Q.   In your interaction, your experiences
3  with the interactions of the press you were
4  covering in the Treasury Department, did you have
5  any reason -- did you think it was necessary at
6  all to explain to them what an embargo meant?
7     MR. THEODOROU: Objection.
8     A.   No.
9     BY MR. ROSSETTI:
10     Q.   Let me ask you to look at Exhibit 5.
11     A.   (The witness complies.)
12     Q.   There's this E-mail from Timothy
13  Bitsberger at 3:19 p.m.  Do you see that?
14     A.   Yes.
15     Q.   And there's a whole area that's
16  blocked out there.  Do you have any idea what was,
17  what the contents of that were?
18     A.   No.
19     Q.   Do you know what the contents of any
20  of that was in relation to No. 3 that is not
21  blacked out?
22     MR. THEODOROU: Objection.

**Page 225**

1     A.   It just looks like we were just trying
2  to decide what to say publically about the whole
3  incident.
4     MR. THEODOROU: Objection.  Isn't this
5  what this remain confidential?
6     MR. ROSSETTI: She said she doesn't
7  know.
8     BY MR. ROSSETTI:
9     Q.   He discusses there was a leak a few
10  weeks ago at emergency reopening.  Did you have
11  any discussions with Bitsberger about that?
12     MR. THEODOROU: Objection.
13     A.   No.
14     BY MR. ROSSETTI:
15     Q.   Do you know what the basis for the
16  statement was?
17     A.   No.
18     Q.   Did he ever tell you what the basis of
19  his statement was?
20     MR. THEODOROU: Objection.
21     A.   No.
22     BY MR. ROSSETTI:

57 (Pages 222 to 225)

Michele Davis                                                              February 11, 2008
Washington, DC

| Page 226 |
|---|

1    Q.   Did you ever learn what the basis of
2  his statement was?
3    A.   No.
4    Q.   Did you have discussions with anybody
5  else about his statement that there was a leak a
6  few weeks ago at the emergency reopening?
7    A.   It would have been with Tony.
8    Q.   I'm sorry?
9    A.   It would have been with Tony Fratto.
10    Q.   But --
11    A.   That's the only person I would have
12  discussed this with.
13    Q.   Do you recall having a discussion with
14  Tony Fratto?
15    A.   No.
16    Q.   Did you learn whether or not, in fact,
17  there was, in fact, ever a leak?
18    A.   No.
19    Q.   He says, "The refunding process has
20  been criticized for years because of suspected
21  leaks."  Do you have any -- did you have any
22  discussions with Bitsberger or who was

| Page 227 |
|---|

1  criticizing?
2    A.   No.
3    Q.   Did you ever learn who was apparently
4  making this criticism?
5    A.   No.
6    Q.   Do you have any idea if Bitsberger's
7  statement that there was a leak a few weeks ago at
8  the emergency reopening was even true?
9    MR. THEODOROU:  Objection.
10    A.   No.
11    BY MR. ROSSETTI:
12    Q.   Do you have any personal knowledge of
13  any criticism about the refunding process and that
14  there had been suspected leaks?
15    MR. THEODOROU:  Objection.
16    A.   No.
17    BY MR. ROSSETTI:
18    Q.   In the last E-mail at 3:54 it says, in
19  response to a question from Tony Fratto, "There
20  was a leak during the emergency reopening,
21  question mark and Bitsberger responds, yes,
22  attributed to the borrowing committee."  Did you

| Page 228 |
|---|

1  ever learn who attributed the leak to the
2  borrowing committee?
3    A.   Again, I wasn't a part of that E-mail,
4  so I didn't know.
5    MR. THEODOROU:  Objection.
6    BY MR. ROSSETTI:
7    Q.   Did you ever learn that the alleged
8  leak at the reopening was attributed to the
9  Treasury borrowing advisory committee?
10    MR. THEODOROU:  Objection.
11    A.   No.
12    BY MR. ROSSETTI:
13    Q.   If you look at Exhibit 6.
14    A.   (The witness complies.)
15    Q.   There's a sentence here, paragraph's
16  in the middle of the page it says Treasury
17  officials declined to comment on the early release
18  other than to determine the curve, that's the
19  release on October 31st.
20    This article then goes on to say it was the
21  second time the Department has posted embargo
22  information on the website before it was scheduled

| Page 229 |
|---|

1  to enter the public domain and it talks about the
2  October 22nd Kenneth Dam incident.  Did you ever
3  learn if that, in fact, is an incident that
4  actually happened?
5    MR. THEODOROU:  Objection.
6    A.   No.  But I mean, if it was a speech,
7  we wouldn't have -- I mean, the embargo was just
8  for the sake of having it hit the wires when he
9  was actually speaking.  It wouldn't have been a
10  market-sensitive issue.
11    BY MR. ROSSETTI:
12    Q.   I see.  You had indicated earlier
13  that, I believe you indicated earlier, let me
14  restate that, that the refunding conference for
15  October 31st, 2001 the information that was
16  released contained market-sensitive information;
17  is that correct.
18    MR. THEODOROU:  Objection.
19    A.   Yes.
20    BY MR. ROSSETTI:
21    Q.   In your experience up to that point
22  dealing with the refunding conference at Treasury,

Alderson Reporting Company
1-800-FOR-DEPO

Michele Davis                                                          February 11, 2008
Washington, DC

| Page 230 |
|---|

1  did the other, the previous refunding conferences,
2  did they also contain market-sensitive
3  information?
4         MR. THEODOROU: Objection.
5      A.   As far as I can recall, we treat them
6  all as if they're market-sensitive information.
7         BY MR. ROSSETTI:
8      Q.   Why is that?
9      A.   Data about how much the Treasury is
10 going to borrow is something that is useful to
11 people in the bond market.
12        BY MR. ROSSETTI:
13     Q.   Let's go off the record and take a
14 quick break.
15        MR. THEODOROU: I'm going to have a few
16 minutes.
17        THE VIDEO OPERATOR: Off the record at
18 5:07:16. On record at 5:11:50. This concludes
19 Tape 3 in the deposition of Michele Davis. Off
20 the record at 5:12:02. The this begins tape 4 in
21 the deposition of Michele Davis. On the record at
22 5:13:07.

| Page 231 |
|---|

1         BY MR. ROSSETTI:
2      Q.   Ms. Davis, you were asked some
3  questions earlier by Mr. Theodorou about Brian
4  Collins. Do you know Brian Collins?
5      A.   No.
6      Q.   Do you know if he attended the
7  Treasury refunding conference?
8      A.   I have no idea.
9      Q.   Do you know if he contacted anyone at
10 Fannie Mae?
11     A.   I have no idea.
12     Q.   If he did, do you know why he would
13 contact anyone at Fannie Mae?
14     A.   No.
15     Q.   Do you know what information if any he
16 provided to anyone at Fannie Mae?
17        MR. THEODOROU: Objection.
18     A.   No.
19        BY MR. ROSSETTI:
20     Q.   You indicated -- well, let me ask you
21 this: We were discussing about the embargo that
22 Treasury had, the information, would it be

| Page 232 |
|---|

1  permissible for someone to take embargoed
2  information and give it to somebody else to tip
3  them with information?
4         MR. THEODOROU: Objection.
5         BY MR. ROSSETTI:
6      Q.   In the embargo.
7         MR. THEODOROU: Objection.
8      A.   The embargo is about public release,
9  so you know, whatever purpose anybody uses it is
10 supposed to be just, the embargo is supposed to be
11 a period for writing a story and not releasing it
12 publically until the embargo time.
13        BY MR. ROSSETTI:
14     Q.   Would it be appropriate for somebody
15 to take embargoed information and trade on it?
16        MR. THEODOROU: Objection.
17     A.   No.
18        MR. THEODOROU: Objection.
19        BY MR. ROSSETTI:
20     Q.   Would it be appropriate for someone to
21 take embargoed information and attempt to make
22 money for either themselves or their clients?

| Page 233 |
|---|

1         MR. THEODOROU: Objection.
2      A.   No.
3         BY MR. ROSSETTI:
4      Q.   Do you have any idea how many people
5  logged on the Treasury Department website after
6  the information was posted by a Frances Anderson
7  but before Reuters released the information on the
8  news wire?
9         MR. THEODOROU: Objection.
10     A.   I don't know that.
11        BY MR. ROSSETTI:
12     Q.   Do you know how it came about that
13 Reuters actually posted the information on the
14 wires?
15     A.   I don't know.
16     Q.   There was that exhibit that had the
17 Reuters headline on it, this Exhibit 9. Let me
18 know when you have that?
19     A.   Yes.
20     Q.   It says on the bottom there it says,
21 received by news edge E-D-G-E capital letter/LAN
22 10/31/2001 9:52 a.m. Do you know what News

59 (Pages 230 to 233)

Michele Davis                                          February 11, 2008
                        Washington, DC

Page 234

1  Edge/LAN is?
2      A.   It's a service we subscribe to to get
3  news clips.
4      Q.   That?
5      A.   The treasury.
6      Q.   I see.  Do you have any idea when this
7  information, the U.S. Treasury said discontinuing
8  sales of regular index 30-year bonds that's
9  indicated in Exhibit 9 was actually posted to the
10 news wires?
11     A.   I don't.
12         MR. ROSSETTI:  I don't have any further
13 questions.  Thank you.
14         REDIRECT EXAMINATION
15 BY MR. THEODOROU:
16     Q.   Ms. Davis, Mr. Rossetti asked you
17 about the work you did in Congress.  Do you
18 remember that?
19     A.   Yes.
20     Q.   And he also asked you about how
21 embargoes were handled when you were in Congress?
22     A.   Yes.

Page 235

1      Q.   And you testified that one of the ways
2  that you'd alert reporters to an embargo is by
3  placing an embargo on any announcement that was
4  going out, right?
5      A.   Yes.
6      Q.   Now, the format and announcement that
7  I showed you earlier that was distributed at the
8  press conference on October 31st had for immediate
9  release only.  Now, that would not, when we're
10 looking at that, that is not what you would
11 normally see on a embargoed statement, correct,
12 for immediate release only?
13         MR. ROSSETTI:  Objection.
14 BY MR. THEODOROU:
15     Q.   Isn't that right?
16     A.   Yes.
17     Q.   Now, you also said that the reporters
18 widely understood in the media what embargo meant,
19 correct?
20     A.   Yes.
21     Q.   But it is true that different agencies
22 had different procedures for embargoes; isn't that

Page 236

1  right?
2          MR. ROSSETTI:  Objection.
3      A.   Agencies meaning?
4          BY MR. THEODOROU:
5      Q.   For instance, the Department of Labor
6  had a particular embargo procedure in how it
7  handled embargoed information, right?
8      A.   I don't know that.
9      Q.   Well, I showed you earlier today --
10 well, isn't it true that the Department of Labor
11 had a particular way of dealing with it using a
12 lock-down procedure?
13         MR. ROSSETTI:  Objection.
14     A.   For one unemployment data release a
15 month, not for every single release or embargoed
16 release data.
17         BY MR. THEODOROU:
18     Q.   But different agencies treated
19 embargoed information or the procedures of
20 releasing the embargoed information differently,
21 correct; some had lock-down procedures and some
22 didn't have lock-down procedures?

Page 237

1      A.   And even the agencies that have
2  lock-down procedures those apply to only some
3  embargoed releases.
4      Q.   Only some embargoed releases, right,
5  but when you say, you said earlier that it was
6  widely understood by the media what embargoed
7  meant?  Is that the case for lay people also that
8  they understood it, to your knowledge?
9          MR. ROSSETTI:  Objection.
10     A.   I wouldn't say that.  Not that I know
11 of.
12         BY MR. THEODOROU:
13     Q.   You don't know?
14     A.   I don't know that everybody --
15     Q.   Understood what embargoed did like the
16 press did, correct?
17     A.   Yes.
18     Q.   Now, you were asked by Mr. Rossetti
19 when you first got there you met with your
20 predecessor about Treasury Department protocols,
21 procedures, things of that nature, correct?
22     A.   Yes.

60 (Pages 234 to 237)

Michele Davis                                                February 11, 2008
Washington, DC

Page 238

1    Q.   And you also met with various senior
2    staff members; is that right?
3    A.   Yes.
4    Q.   And Mr. Rossetti asked you to
5    generally describe how the embargo at Treasury was
6    to be handled at the quarterly refunding
7    conferences; isn't that right?
8    A.   Yes.
9    Q.   Do you remember answering some
10   questions about that?
11   A.   Yes.
12   Q.   Now, on that particular day, if the
13   press release on that day said or excuse me, you
14   say that you had some input in the actual press
15   statement that was being given out; is that
16   correct?
17   A.   The text of the statement.
18   Q.   But not the formatting of the
19   statement?
20   A.   Right.
21   Q.   So that the formatting of the
22   statement that resulted in for immediate release,

Page 239

1    that statement for immediate release doesn't
2    comply with what an embargo should be, right?
3    A.   Yeah, it depends.  I don't know what
4    time that was produced but if it was just before
5    the embargo, yes.  Right.
6    Q.   So if that statement was produced
7    before 10 a.m. and given to members of the press
8    before 10 a.m., it didn't really comply with the
9    standard procedure and policy for an embargo?
10   MR. ROSSETTI: Objection.
11   A.   If it was not also stated verbally.
12   BY MR. THEODOROU:
13   Q.   Right.  But normally if you had an
14   embargoed press release, you stated it would say
15   embargo?
16   A.   Right.
17   Q.   And the embargo time on it; is that
18   right?
19   A.   Yes.
20   Q.   Mr. Rossetti asked you a series of
21   questions about the suspected leaks including the
22   suspected leak in the Treasury borrowing advisory

Page 240

1    committee as well as suspected leaks concerning
2    past refunding conferences.  Do you remember that?
3    A.   Yes.
4    Q.   Now, as an assistant secretary of
5    public affairs at that time, you did not conduct
6    any review about those leaks, did you; the alleged
7    leaks?
8    A.   I'm sorry the --
9    Q.   As assistant secretary of public
10   affairs at that time, you did not conduct your own
11   review of any of those leaks, correct?
12   A.   I'm not even sure I was aware of them,
13   the allegation.
14   Q.   So your testimony is you don't recall
15   being aware of them?
16   A.   Of the allegations, correct.
17   MR. ROSSETTI: Objection.
18   BY MR. THEODOROU:
19   Q.   Now, he ended your cross-examination
20   of you by talking about Brian Collins and Brian
21   Collins calling Fannie Mae with information about
22   the termination of the 30-year bond, correct?

Page 241

1    A.   Yes.
2    MR. ROSSETTI: Objection.  That's not
3    what I asked her.  I just asked her if she knew
4    him.  I didn't ask any of the substance --
5    MR. THEODOROU: Well, I'll let it
6    stand.  Let me ask my question, all right ?
7    BY MR. THEODOROU:
8    Q.   Brian Collins, a reporter for the
9    National Mortgage News called Janice Smith, an
10   official of Fannie Mae about 9:35 a.m. and told
11   her about the Treasury's decision to suspend the
12   30-year bond.  Your office did not take any action
13   against Mr. Collins for calling Fannie Mae, did
14   they?
15   MR. ROSSETTI: Objection.  What are you
16   referring to there?
17   A.   I didn't even know that that --
18   MR. ROSSETTI: Excuse me.  Hold on.
19   Are you referring to any document?
20   MR. THEODOROU: I asked her -- no, I'm
21   not referring to a document.
22   MR. ROSSETTI: Okay.  Objection.

61 (Pages 238 to 241)

Michele Davis                                                           February 11, 2008
Washington, DC

Page 242

1        MR. THEODOROU: All right. Object.
2     A.   I don't even known that that happened.
3        BY MR. THEODOROU:
4     Q.   Well, assume that Mr. Collins called
5  at 9:35 a.m. on October 31st, Janice Smith, an
6  official of Fannie Mae. Should Mr. Collins have
7  been subjected to any disciplinary action?
8        MR. FREEBORNE: Objection. That's an
9  improper question. She's a fact witness. Ask
10 about facts. You're asking about opinions.
11       MR. THEODOROU: Well, the question is
12 -- well, are you instructing her not to answer?
13       MR. FREEBORNE: It's an objectionable
14 question.
15       MR. THEODOROU: Well, all right. Go
16 ahead.
17    A.   I don't even -- I don't know.
18       BY MR. THEODOROU:
19    Q.   Well, had Mr. Collins called --
20       MR. FREEBORNE: Are you going to give
21 her a chance to respond?
22    A.   I don't even known how I would know

Page 243

1  that if it did happen in order to do anything
2  about it.
3        BY MR. THEODOROU:
4     Q.   But had Mr. Collins called Fannie Mae,
5  wouldn't that have violated the embargo policy if
6  he did it at 9:35?
7        MR. ROSSETTI: Objection.
8     A.   It depends. I mean, I don't know what
9  you're suggesting he called to say.
10       BY MR. THEODOROU:
11    Q.   Listen. Well, last question. Had Mr.
12 Collins called Fannie Mae at 9:35 a.m. and told
13 Fannie Mae about the Treasury's decision to
14 suspend the 30-year bond, would that action
15 violate the embargo?
16       MR. ROSSETTI: Objection.
17    A.   Only calling to tell someone else
18 about embargoed information would violate
19 embargoes. Calling to find out how, if that were
20 an announcement how it would affect Fannie Mae's
21 debt issuance and how it would affect mortgages,
22 that is getting information for his story.

Page 244

1        BY MR. THEODOROU:
2     Q.   But my question is that if he alerted
3  someone at Fannie Mae before 10 o'clock or even
4  before it went public at 9:43, at 9:35, would that
5  violate the embargo?
6        MR. ROSSETTI: Objection.
7     A.   If he called and just randomly giving
8  out embargoed information for no purpose, for not
9  to -- not for news gathering purpose, not calling
10 to get information for a story would be, yeah,
11 that's not, there's no reason to do that with an
12 embargo.
13       BY MR. THEODOROU:
14    Q.   That would violate the embargo?
15       MR. ROSSETTI: Objection.
16    A.   The embargo is time to collect news so
17 you can write a complete story, and one of the
18 issues in this story is what it would mean for
19 mortgage rates and for mortgage companies. So if
20 he -- I don't know if someone would call a lot of
21 people wanted reaction and wanted to know how it
22 would affect any other 30 year things like

Page 245

1  mortgages.
2        So if he, I mean if he called just to say
3  hey, if this happened what would it mean or how
4  would you guys react, that's part of gathering
5  news. I mean, it's just calling saying hey, I got
6  a hot tip for you, then that's not part of writing
7  a news story.
8        BY MR. THEODOROU:
9     Q.   To your knowledge, was any
10 disciplinary action taken against any reporters
11 for the events of October 31?
12       MR. ROSSETTI: Objection.
13    A.   What would they have --
14       BY MR. THEODOROU:
15    Q.   To your knowledge, was any action
16 taken against any reporters concerning disclosures
17 of --
18    A.   I'm not aware of any reporters who
19 would have, we would have, there would have been
20 any reason to take any action on.
21    Q.   Well, my question is to your
22 knowledge, was any disciplinary action taken

62  (Pages 242 to 245)

Michele Davis

February 11, 2008

Washington, DC

### Page 246

1  against any reporters because of disclosures were
2  made before the embargoed time on October 31st,
3  2001?
4      MR. ROSSETTI: Objection.
5      A.  I'm not aware of any reporters making
6  disclosures ahead of the embargo time on that day.
7      Q.  Okay.
8      A.  Once the material is posted on our
9  website, that was the end of the embargo.
10      Q.  At 9:43.
11      MR. THEODOROU:  No further questions.
12      MR. FREEBORNE:  Can I have the elapsed
13  time for --
14      MR. ROSSETTI:  I still have some
15  questions.
16      MR. FREEBORNE:  How much?
17      MR. ROSSETTI:  A few.  It's not going
18  to be long.
19      MR. FREEBORNE:  All right.  A couple of
20  minutes.  She's a busy woman.  Let's go.
21      MR. ROSSETTI:  I understand but we're
22  within our rights to ask recross questions.  Do

### Page 247

1  you still want the time?
2      MR. FREEBORNE:  We'll get the time at
3  the end.  Go ahead.
4      RECROSS EXAMINATION
5  BY MR. ROSSETTI:
6      Q.  Ms. Davis, you were asked about the
7  press release that's Exhibit 8.  I'll have this
8  marked as Exhibit 16.
9      (Deposition Exhibit No. 16 was marked for
10      identification.)
11  BY MR. ROSSETTI:
12      Q.  I'm showing you what's been marked as
13  Exhibit 16.  That also is a copy of the press
14  release from October 31st, 2001, and on the upper
15  left-hand corner, is there any information in that
16  about an embargo?
17      A.  It says embargoed until 10 a.m.
18      Q.  Do you know which copies, if any of
19  those press releases, were released at the
20  refunding conference?
21      A.  I wasn't there, so I don't know.  This
22  is an actual hard letterhead and this is something

### Page 248

1  we use that is done electronic.
2      Q.  Pointing to --
3      A.  I'm sorry.  The one No. 8 or 9 or not
4  whatever this is, not No. 8 is a letterhead.  This
5  is letterhead that photocopy a statement onto
6  letterhead.
7      Q.  The heading itself?
8      A.  Yes.
9      Q.  It is consistent with something you
10  would hand out versus Exhibit 16 which has?
11      A.  Which has an electronic letterhead.
12      Q.  What is this consistent with, if
13  anything?
14      A.  Just E-mailing something.
15      Q.  Okay.  Were you aware whether or not
16  anybody at the Treasury refunding conference
17  announced that there was going to be a 10 a.m.
18  embargo?
19      MR. THEODOROU:  Objection.
20      A.  I wasn't there.
21      BY MR. ROSSETTI:
22      Q.  Did you have any conversation with

### Page 249

1  Betsy Holahan when she explained numerous times
2  before and at the end of the conference she
3  announced the 10 a.m. embargo?
4      MR. THEODOROU:  Objection.
5      A.  That's what everyone, that's what was
6  reported to me after the fact.
7      BY MR. ROSSETTI:
8      Q.  But you didn't have conversations with
9  her about that?
10      A.  Not -- I don't remember having them.
11      Q.  And you were asked a question about,
12  Mr. Theodorou asked you about a layperson if they
13  understood, you would expect them to understand
14  the terms of the term embargo.  If someone told
15  you that they understood the embargo and that by
16  releasing the information they were violating the
17  embargo, would you have any question in your mind
18  that they understood what an embargo meant?
19      MR. THEODOROU:  Objection.
20      A.  Well, yes.
21      MR. ROSSETTI:  And I don't have any
22  further questions.

63 (Pages 246 to 249)

Michele Davis                                                          February 11, 2008
Washington, DC

| Page 250 | Page 252 |
|---|---|
| 1    MR. FREEBORNE: Okay. | 1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC |
| 2    MR. THEODOROU: Thank you. | 2     I, Okeemah S. Henderson, Professional |
| 3    THE VIDEO OPERATOR: This concludes the | 3  Shorthand Reporter, the officer before whom the |
| 4  deposition of Michele Davis. It consists of the | 4  foregoing deposition was taken, do hereby certify |
| 5  four videotapes. Off the record at 5:31:31. | 5  that the witness named herein was duly sworn by |
| 6    MR. FREEBORNE: I'd like the total | 6  me; that the foregoing transcript is a true, |
| 7  elapsed time. Can we have that on the record? | 7  correct, and complete record of the testimony |
| 8    THE COURT REPORTER: Did you all want | 8  given; that said testimony was taken by me |
| 9  your same standing orders? | 9  stenographically and thereafter reduced to |
| 10    MS. WILLIAMS: Yes. | 10  typewriting by me; and that I am neither counsel |
| 11    MR. THEODOROU: Yes. | 11  for, related to, nor employed by any of the |
| 12    THE VIDEO OPERATOR: Mr. Theodorou used | 12  parties to this litigation and have no interest, |
| 13  2 hours and 44 minutes and Mr. Rossetti used an | 13  financial or otherwise, in its outcome. |
| 14  hour and 23 minutes. | 14     IN WITNESS WHEREOF, I have hereunto set my |
| 15    (Deposition concluded at 5:31 p.m.) | 15  hand and affixed my notarial seal. |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | 19     Okeemah S. Henderson, LSR |
| 20 | 20 |
| 21 | 21  Notary Public in and |
| 22 | 22  for the District of Columbia |
|  | 22  My Commission expires February 28, 2010 |

| Page 251 | |
|---|---|
| 1    ACKNOWLEDGMENT OF DEPONENT | |
| 2    I, MICHELE DAVIS, do hereby acknowledge that | |
| 3  I have read and examined the foregoing pages of | |
| 4  testimony, and the same is a true, correct and | |
| 5  complete transcription of the testimony given by | |
| 6  me, and any changes and/or corrections appear on | |
| 7  the attached errata sheet signed by me. | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12    (Date)      MICHELE DAVIS | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

64  (Pages 250 to 252)

| From: | Davis, Michele |
|---|---|
| Sent: | Wednesday, October 31, 2001 12:53 PM |
| To: | Malvey, Paul; Fratto, Tony; Fisher, Peter; Adams, Tim; Aufhauser, David |
| Cc: | Roseboro, Brian; Gross, Jared; Nichols, Robert; Bitsberger, Timothy; Holahan, Betsy; Huther, Jeff |
| Subject: | RE: Proposed statement re pre embargo release of Q4 refunding |

I apologize to all of you for the early posting on the website. I thought our public affairs staff understood that embargo means embargo. I certainly will make sure they do now. The early posting was far more than "unfortunate" -- it was careless and I'll make sure we don't have such lapses in the future. I'm sorry that all of you are having to take a lot of criticism for the carelessness in my shop.

-----Original Message-----
| From: | Malvey, Paul |
|---|---|
| Sent: | Wednesday, October 31, 2001 12:29 PM |
| To: | Fratto, Tony; Davis, Michele; Fisher, Peter; Adams, Tim; Aufhauser, David |
| Cc: | Roseboro, Brian; Gross, Jared; Nichols, Robert; Bitsberger, Timothy; Holahan, Betsy; Huther, Jeff |
| Subject: | RE: Proposed statement re pre embargo release of Q4 refunding |

DEFENDANT'S DEPOSITION EXHIBIT
10
2|11|08 OST

In addition though, in the same or different release, I think we have to acknowledge its presence on our web site around 10:45-50 and say it was unfortunate, etc. It's the web site that most (not all) of the complaints from market participants are referring to..

-----Original Message-----
| From: | Fratto, Tony |
|---|---|
| Sent: | Wednesday, October 31, 2001 12:15 PM |
| To: | Davis, Michele; Fisher, Peter; Adams, Tim; Aufhauser, David |
| Cc: | Roseboro, Brian; Malvey, Paul; Gross, Jared; Nichols, Robert; Bitsberger, Timothy; Holahan, Betsy |
| Subject: | Proposed statement re embargo release of Q4 refunding |
| Importance: | High |

Please get back to me with edits on this as soon as possible. I think this should be attributed to me:

Following Treasury's Quarterly Refunding press conference this morning it came to my attention that the content of the announcement was made public prior to the 10:00AM embargo time. Treasury considers this breach of confidence a serious matter. The integrity of the dissemination of Treasury information should be beyond question. We have begun an investigation of the cause of the pre-embargo release of information today. Furthermore, procedures and policies for Treasury's release of sensitive information is officially under review.

1

From:           Fratto, Tony
Sent:           Monday, October 29, 2001 1:45 PM
To:             Davis, Michele; Holahan, Betsy; Nichols, Robert
Subject:        RE: Rough Estimate of Wed. events - comments welcome


FYI - Betsy and I talked Peter out of going live on Wednesday; press conference will end at 9:40am with a 10:00am embargo. Peter then will come back at 10:10am for background briefing.

        -----Original Message-----
From:           Davis, Michele
Sent:           Monday, October 29, 2001 1:22 PM
To:             Holahan, Betsy; Fratto, Tony; Nichols, Robert
Subject:        RE: Rough Estimate of Wed. events - comments welcome

DEFENDANT'S DEPOSITION
EXHIBIT
15
2/1/08 007
PBN/GAO 000-631-6989

thanks:
What reporters from the NYT, WSJ etc do you think Peter should talk to?  It's my impression that the right folks are in NY.  Feuerbringer, Ip, etc.  Should we call them tomorrow and see if they want to make the trip down, rather than do this by conference call?
Also, please add the op-ed into your timeline -- Tuesday review by Public Affairs, call placed to WSJ Tuesday, etc.

Should we consider a single columnist for an interview with Peter, probably Samuelson?  Maybe as part of the major paper group?



        -----Original Message-----
From:           Holahan, Betsy
Sent:           Monday, October 29, 2001 12:44 PM
To:             Davis, Michele; Fratto, Tony; Nichols, Robert
Cc:             Bitsberger, Timothy; Roseboro, Brian; Gross, Jared; Huther, Jeff; Malvey, Paul
Subject:        Rough Estimate of Wed. events - comments welcome

Quarterly Refunding Timetable - DRAFT


Tuesday, Oct. 30
        5:00 pm         Notify Treasury newsroom that Peter's statement will be available, embargoed, at
                        8:45 am on Wed. morning
Wednesday, Oct. 31
        8:45 am         Release embargoed copy of Peter's announcement to the Treasury newsroom
        9:00 am         Doors are closed to Dip Room; Statement posted on Treasury web site
        9:01 am         Peter makes announcement in Dip Room, followed by Q&A
                        (he wants live TV for this, but ??)
        9:05 am         Brian begins conference call with Hill staffers
        9:30 am         Q&A at news conference ended by Public Affairs officials
                        (no embargo on TV or newspaper coverage)
        9:35 am         Peter begins making his calls to analysts, economists, etc.
        10:30 am        Peter conducts roundtable interview with Treasury wire reporters
        11:00 am        Peter begins interviews with WSJ, NY Times, Wash. Post, FT
        4 pm            Peter conducts interview with CNBC for Market Wrap


                                        1



FOIAKBC                                                                                     612

**Exhibit E**

**Deposition of Elizabeth Holahan and Cited Exhibits
(August 23, 2006)**

Page 1

1                 UNITED STATES DISTRICT COURT

2                  DISTRICT OF MASSACHUSETTS

3      - - - - - - - - - - - - - - - -  )

4      UNITED STATES SECURITIES AND          )

5      EXCHANGE COMMISSION,                   )

6                      Plaintiff,            )

7             ·v.                    ) No. 05-10983 (NMG)

8      STEVEN E. NOTHERN,                ) August 23, 2006

9                      Defendant.            )

10     - - - - - - - - - - - - - - - -  )

11                          Washington, D.C.

12     Videotape Deposition of ELIZABETH HOLAHAN SCHMUTZ, a

13     witness herein, called for examination by counsel for

14     Defendant in the above-entitled matter, the witness

15     being duly sworn by CHERYL A. LORD, a Notary Public

16     in and for the District of Columbia, taken at the

17     offices of FOLEY HOAG LLP, 1875 K Street, N.W., Suite

18     800, Washington, D.C., at 10:16 a.m., Wednesday,

19     August 23, 2006, and the proceedings being taken down

20     by Stenotype by CHERYL A. LORD, RPR, CRR, and

21     transcribed under her direction.

22

Elizabeth Schmutz                                                    August 23, 2006
                            Washington, DC

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | On behalf of Plaintiff: |
| 4 | JOHN J. ROSSETTI JR., ESQ. |
| 5 | Senior Counsel |
| 6 | ERICA WILLIAMS, ESQ. |
| 7 | UNITED STATES SECURITIES AND EXCHANGE COMMISSION |
| 8 | Division of Enforcement |
| 9 | 100 F Street, N.E. |
| 10 | Washington, D.C. 20549 |
| 11 | (202) 551-4819 |
| 12 | |
| 13 | On behalf of Defendant: |
| 14 | NICHOLAS THEODOROU, ESQ. |
| 15 | FOLEY HOAG LLP |
| 16 | 155 Seaport Boulevard |
| 17 | Seaport World Trade Center West |
| 18 | Boston, MA 02210-2600 |
| 19 | (617) 832-1000 |
| 20 | |
| 21 | |
| 22 | |

|  | Page 4 |
|---|---|
| 1 | C O N T E N T S |
| 2 | WITNESS            EXAMINATION |
| 3 | PAGE NO. |
| 4 | ELIZABETH HOLAHAN SCHMUTZ |
| 5 | By Mr. Theodorou          8 |
| 6 | Afternoon Session        120 |
| 7 | By Ms. Williams          266 |
| 8 | By Mr. Theodorou         310 |
| 9 | By Ms. Williams          316 |
| 10 | By Mr. Theodorou        320 |
| 11 | By Ms. Williams          321 |
| 12 | By Ms. Theodorou         322 |
| 13 | E X H I B I T S |
| 14 | (Exhibits attached.) |
| 15 | HOLAHAN EXHIBIT NO.          PAGE NO. |
| 16 | 1  Memorandum of Activity, 11-7-01    65 |
| 17 | 2  "Printed by Reuters," No. |
| 18 | Nothern - 0386          73 |
| 19 | 3  BN article, Nos. SECNOTH00135977-78  77 |
| 20 | 4  Treasury News announcement |
| 21 | 10-30-01, No. SECNOTH00103448      93 |
| 22 | 5  Hand-drawn diagram        148 |

|  | Page 3 |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | |
| 3 | On behalf of United States Department of the |
| 4 | Treasury: |
| 5 | THOMAS M. McGIVERN, ESQ. |
| 6 | CHRISTIAN FUREY, ESQ. |
| 7 | UNITED STATES DEPARTMENT OF THE TREASURY |
| 8 | 1500 Pennsylvania Avenue, N.W. |
| 9 | Washington, D.C. 20220 |
| 10 | (202) 622-2317 |
| 11 | |
| 12 | ALSO PRESENT: |
| 13 | Dustin Lavallee, videographer |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

|  | Page 5 |
|---|---|
| 1 | E X H I B I T S  C O N T I N U E D |
| 2 | HOLAHAN EXHIBIT NO.          PAGE NO. |
| 3 | 6  Email, 10-31-01, and attachments, |
| 4 | Nos. SECNOTH00103773-77      154 |
| 5 | 7  Email, 10-31-01, No. |
| 6 | SECNOTH00103778          164 |
| 7 | 8  Department of the Treasury |
| 8 | announcement, 10-31-01      174 |
| 9 | 9  Treasury News announcement, |
| 10 | 10-30-01          182 |
| 11 | 10  Email, 10-31-01, and attachments, |
| 12 | Nos. SECNOTH00103779-82      190 |
| 13 | 11  Announcement, No. SECNOTH00103778  216 |
| 14 | 12  Treasury News, 10-31-01      230 |
| 15 | 13  Treasury News announcement, |
| 16 | 10-30-01, No. SECNOTH00119424    237 |
| 17 | 14  Memorandum, Nos. |
| 18 | SECNOTH00103040-44        247 |
| 19 | 15  From the Office of Public Affairs  259 |
| 20 | |
| 21 | |
| 22 | |

2 (Pages 2 to 5)

Elizabeth Schmutz

Washington, DC

August 23, 2006

Page 6

PROCEEDINGS

1
2
3      THE VIDEOGRAPHER: This is tape number 1
4  in the videotape deposition of Ms. Elizabeth Holahan
5  in the matter of United States Securities Exchange
6  Commission -- Securities and Exchange Commission
7  versus Steven E. Nothern, in the United States
8  District Court for the District of Massachusetts,
9  case number 05, dash, 10983, parenthesis, NMG, close
10  paren.
11      The deposition is being held at the law
12  offices of Foley Hoag LLP at 1875 K street N.W.,
13  Washington, D.C., 20006.  And we're on the record at
14  10:16 AM on August 23rd, 2006.
15      My name is Dustin Lavallee, in association
16  with Alderson Reporting, 1111 14th Street, suite 400,
17  Washington, D.C., 20005, and I'm the legal video
18  specialist.  The court reporter is Cheryl Lord, also
19  in association with Alderson Reporting.
20      For the record, will counsel please
21  introduce themselves.
22      MR. THEODOROU: Nicholas Theodorou, from

Page 7

1  Foley Hoag in Boston, representing Mr. Nothern.
2      MS. WILLIAMS: Erica Williams from the
3  United States Securities and Exchange Commission.
4      MR. ROSSETTI: John Rossetti representing
5  the U.S. Securities and Exchange Commission as well.
6      MR. McGIVERN: Tom McGivern from the U.S.
7  Department of the Treasury.
8      MR. FUREY: Christian Furey from the U.S.
9  Department of the Treasury.
10      THE VIDEOGRAPHER:  Court reporter please
11  swear in the witness.
12
13  Whereupon,
14      ELIZABETH HOLAHAN SCHMUTZ
15  was called as a witness by counsel for Defendant,
16  and, having been duly sworn by the Notary Public, was
17  examined and testified as follows:
18
19      MR. THEODOROU: For the matter of the
20  record, I'll go through the stipulations governing
21  the deposition.
22      It is hereby stipulated by and between

Page 8

1  counsel that all objections except as to matter of
2  form, including motions to strike, are reserved until
3  the time of trial.
4      MS. WILLIAMS:  We agree.
5
6      EXAMINATION BY COUNSEL FOR DEFENDANT
7      BY MR. THEODOROU:
8      Q.   Good morning, Ms. Holahan.
9      A.   Good morning.
10      Q.   And that's the proper pronunciation of
11  your last name?
12      A.   Correct.
13      Q.   Thank you.
14      My name is Nicholas Theodorou, and I
15  represent Mr. Nothern, the defendant in this case.
16      This morning, I'm going to be asking you a
17  series of questions concerning events that took
18  place, primarily events in October of 2001.
19      As you know, you're under oath, and if
20  you've got a problem understanding any of the
21  questions, then you can ask me to clarify some of the
22  questions.

Page 9

1      During the course of the deposition, there
2  may be some objections raised by counsel in this
3  case.  You are still required to answer the questions
4  even after the objections, unless you are directed by
5  your own counsel not to answer the questions.
6      Are you represented by counsel today?
7      A.   No.
8      Q.   All right.  So you do not have your
9  personal counsel?
10      A.   Correct.
11      Q.   All right.  But if you're directed in any
12  way to not answer a question, it's the only time that
13  you can't answer a question.  There been
14  instances I assume where the Department of the
15  Treasury has raised certain objections where they've
16  required present and former employees of the
17  Department of the Treasury not to answer the
18  questions, and we'll deal with that, but the
19  objections may be stated by counsel, and you're still
20  going to be required to answer.
21      You understand that?
22      A.   Yes.

3 (Pages 6 to 9)

Elizabeth Schmutz                                                August 23, 2006

Washington, DC

| Page 10 | Page 12 |
|---|---|
| 1 Q. Also, because this is a deposition and we | 1 the Senate. |
| 2 record what you say as well as how you look on the | 2 I then went to work for the U.S. Treasury |
| 3 videotape, I ask that you answer each question, not | 3 Department in August of 2001. I was there for |
| 4 simply nod your head in response. | 4 approximately 3 and a half years. And. |
| 5 Do you understand that? | 5 I began employment with the U.S. Senate |
| 6 A. I do. | 6 budget committee in June of 2005. And that's where I |
| 7 Q. Would you please state your full name for | 7 currently work. |
| 8 the record. | 8 Q. And what is the Oil Daily? |
| 9 A. My full legal name is Elizabeth Holahan | 9 A. Oil Daily is a newsletter. It's a company |
| 10 Schmutz. | 10 that puts out newsletters that cover the energy |
| 11 Q. And where do you live? | 11 industry. |
| 12 A. I live at 8407 Crossley Place, Alexandria, | 12 Q. What did you do there? |
| 13 Virginia, 22308. | 13 A. I was originally working for a newsletter |
| 14 Q. Would you please summarize for us your | 14 called Natural Gas Week when I was first hired, and I |
| 15 educational background. | 15 did — I was sort of an entry-level reporter. I |
| 16 A. I have an undergraduate degree from | 16 was then moved over to the newsletter called the Oil |
| 17 Syracuse University, and that's it. | 17 Daily, and I wrote a daily column on the New York |
| 18 Q. And when did you graduate from Syracuse? | 18 Mercantile Exchange on the oil futures market. |
| 19 A. 1992. | 19 THE COURT REPORTER: Slow down a little |
| 20 Q. What kind of degree do you have? | 20 bit, please. |
| 21 A. It's an arts and sciences degree, major in | 21 BY MR. THEODOROU: |
| 22 English. | 22 Q. You want to slow down for the reporter so |

| Page 11 | Page 13 |
|---|---|
| 1 Q. A Bachelor of Arts? | 1 that she gets it all right. |
| 2 A. Correct. | 2 A. The New York Mercantile Exchange, NYMEX. |
| 3 Q. Do you have any postgraduate degrees? | 3 It's a commodity exchange in New York that handles |
| 4 A. I do not. | 4 oil futures. |
| 5 Q. Could you please summarize for us your | 5 Q. What did you do for the Farm Credit |
| 6 employment background beginning with your graduation | 6 Council? |
| 7 from Syracuse. | 7 A. I was their communications manager, and I |
| 8 A. My first job out of college was working | 8 handled all their internal and external |
| 9 for a company called the Oil Daily Company here in | 9 communications needs. |
| 10 Washington, D.C. I worked there for approximately 3 | 10 Q. What is the Farm Credit Council? |
| 11 years. | 11 A. It's the lobbying arm of the farm credit |
| 12 I then went to work for a trade | 12 system, which is a government-sponsored enterprise. |
| 13 association in Washington, D.C., called the Farm | 13 It's a group of cooperative banks that lend to |
| 14 Credit Council. I worked there for approximately a | 14 agriculture. |
| 15 year and a half. | 15 Q. And you testified that you worked for |
| 16 I then went to work for U.S. Senator Pat | 16 Senator Roberts for 3 and a half years; is that |
| 17 Roberts from Utah. I worked there for | 17 correct? |
| 18 approximately 3 and a half years. | 18 A. Correct. |
| 19 I then worked for the U.S. Senate joint | 19 Q. And what did you do for Senator Roberts? |
| 20 economic committee on the Senate side for U.S. | 20 A. I was his press secretary. |
| 21 Senator Robert Bennett from Utah. I was there for | 21 Q. You then worked for the U.S. Senate joint |
| 22 approximately 6 months due to a political shift in | 22 economic committee? |

4 (Pages 10 to 13)

· Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

| Page 14 | Page 16 |
|---|---|
| 1    A.   Yes. | 1    Q.   Mr. McGivern, and who else? |
| 2         The joint economic committee is actually | 2    A.   Mr. Furey, at the end of the table. |
| 3    the House and Senate joint committee.  And I worked | 3    Q.   And that was a few months ago? |
| 4    for the vice-chairman on the Senate side, who was at | 4    A.   Yes. |
| 5    the time Senator Bennett from Utah, and I was their | 5    Q.   Approximately when? |
| 6    press secretary as well. | 6    A.   May. |
| 7    Q.   Press secretary for the committee? | 7    Q.   How long was the meeting? |
| 8    A.   For the -- for Senator Bennett.  He was | 8    A.   Approximately 2 and a half, 3 hours. |
| 9    the vice-chairman.  The chairmanship switches back | 9    Q.   What was discussed at the meeting? |
| 10   and forth. | 10   A.   This case. |
| 11   Q.   And what was your position at the | 11   Q.   Did you review any documents? |
| 12   Department of the Treasury? | 12   A.   I did. |
| 13   A.   I was the spokesperson for domestic | 13   Q.   What documents did you review? |
| 14   finance for the first let's say 2 years, and for the | 14   A.   I reviewed a series of emails that I had |
| 15   last  year that I was there, I was a senior adviser | 15   send on the morning of October 31st, 2001. |
| 16   to the assistant secretary for public affairs, Rob | 16   Q.   Anything else? |
| 17   Nichols. | 17   A.   I reviewed this memorandum of activity |
| 18   Q.   And you currently work for the U.S. Senate | 18   that I had signed back in 2001 after being |
| 19   budget committee? | 19   interviewed by attorneys from the Securities and |
| 20   A.   Correct. | 20   Exchange Commission. |
| 21   Q.   And what is your position? | 21   Q.   And the memorandum of activity is what |
| 22   A.   Communications director. | 22   date? |

| Page 15 | Page 17 |
|---|---|
| 1    Q.   Did you do anything to preparation for | 1    A.   My copy is dated November 7th, 2001. |
| 2    this deposition before this morning? | 2    Q.   Did you review any other documents? |
| 3    A.   No. | 3    A.   Not that I recall. |
| 4    Q.   Did you meet with any lawyers? | 4    Q.   Now, you say you discussed this case. |
| 5    A.   I met with the attorneys from the SEC and | 5         Correct? |
| 6    also from the Treasury Department. | 6    A.   Correct. |
| 7    Q.   When was that? | 7    Q.   All right.  Did the SEC or the Treasury |
| 8    A.   I last met with them yesterday. | 8    Department lawyers tell you anything about what the |
| 9    Q.   When was the first time that you met with | 9    allegations are in this case? |
| 10   the SEC lawyers who are here today? | 10   A.   They explained to me that there was a |
| 11   A.   Several months ago. | 11   defendant in question who they were -- I guess they |
| 12   Q.   Where? | 12   were filing a suit against a defendant.  They gave me |
| 13   A.   At their offices. | 13   his name. |
| 14   Q.   Was anyone else -- when I say, SEC | 14   Q.   Did you -- did they give you any details |
| 15   lawyers, I mean, Mr. Rossetti. | 15   about what he allegedly did? |
| 16        Was he present? | 16   A.   They did. |
| 17   A.   Yes. | 17   Q.   What did they tell you? |
| 18   Q.   And was Ms. Williams present? | 18   A.   They told me that he had received |
| 19   A.   Yes. | 19   information that morning and had acted on it and that |
| 20   Q.   Were there any other lawyers present at | 20   he was I believe the one person that had not agreed |
| 21   that first meeting? | 21   to settle the case, had proclaimed his innocence. |
| 22   A.   Mr. McGivern and Mr. Furey were attending. | 22   Q.   And did they agree with his alle- -- with |

5 (Pages 14 to 17)

Elizabeth Schmutz                                                    August 23, 2006
                              Washington, DC

Page 18

1  his claim that he was innocent?
2  A.  No, they did not.
3  MR. ROSSETTI:  Is that what's called a
4  softball?
5  BY MR. THEODOROU:
6  Q.  Did they tell you what -- what specifics
7  did they tell you about what he allegedly did?
8  A.  I don't recall them getting into
9  specifics.
10  Q.  Did you take any notes of the meeting?
11  A.  I did not.
12  Q.  Do you know if the attorneys for the SEC
13  took notes of the meeting?
14  A.  They did.
15  Q.  Do you know if Mr. McGivern and Mr. Furey
16  took notes?
17  A.  I can't recall.
18  Q.  Did you meet with the SEC attorneys again
19  before today's deposition?
20  A.  Yes.
21  Q.  When was that?
22  A.  It was yesterday.

Page 19

1  Q.  Where?
2  A.  At their office.
3  Q.  How long was the meeting?
4  A.  An hour and a half.
5  Q.  Was anyone else present?
6  A.  Mr. Furey was present.
7  Q.  Did you review any documents at that
8  meeting?
9  A.  Yes.
10  Q.  What did you review?
11  A.  I reviewed some of the emails, and I
12  reviewed the memorandum of activity again.
13  Q.  What did you discuss at that meeting?
14  A.  This case.
15  Q.  What specifically about this case?
16  A.  The time line of events, today's
17  deposition.
18  Q.  Did they give you any advice about how you
19  should act at this deposition?
20  A.  Yes.
21  Q.  What did they say?
22  A.  Tell the truth.

Page 20

1  Q.  Did they tell you anything else?
2  A.  If I didn't understand a question, to ask
3  for the question to be repeated, that it would be
4  videotaped.
5  Q.  And who was giving you this advice?
6  A.  These 2 attorneys from the SEC.
7  Q.  Did they talk to you about how you should
8  answer my questions today?
9  A.  Directly.
10  Q.  All right.  Did they talk to you about how
11  much you should volunteer in terms of information to
12  my questions today?
13  A.  They advised me to answer the questions as
14  they were asked.
15  Q.  And did they advise you not to go beyond
16  the scope of the question?
17  A.  Yes.
18  Q.  And are you going to accept their advice?
19  A.  Yes, I am.
20  Q.  Okay.  And you understand that you have to
21  answer my questions completely, fully?
22  A.  I understand that.

Page 21

1  Q.  Did they advise you that omitting any
2  information that -- in answer to a question is the
3  same as not answering the question truthfully?
4  A.  No.
5  Q.  All right.  Then I would ask that you not
6  omit any material information in response to a
7  question that I ask.
8  Did they go through the questions they
9  were going to ask you today?
10  A.  No.
11  Q.  But you understand that in answering a
12  question completely, you can't omit material
13  information in answering the question.
14  Correct?
15  A.  I understand that.
16  Q.  What particular areas -- did they discuss
17  what I may be asking you today?
18  A.  Not in specifics.
19  Q.  Did they talk about certain areas that I
20  would be asking about today?
21  A.  Not specifically, no.
22  Q.  Okay.  Did you take any notes of that

6 (Pages 18 to 21)

1111 14th Street, NW Suite 400        1-800-FOR-DEPO        Washington, DC 20005

Page 22

1  meeting yesterday?
2    A.  No.
3    Q.  Do you know if the attorneys for the SEC
4  did?
5    A.  They did.
6    Q.  All right. And how about Mr. Furey?
7    A.  I believe so.
8    Q.  Have you ever testified before?
9    A.  No, I have not.
10   Q.  Now, let's go back.
11     You're currently the communications
12 director of the Senate budget committee?
13   A.  Correct.
14   Q.  All right. Do you work for a particular
15 senator?
16   A.  I do.
17   Q.  And who is that?
18   A.  U.S. Senator Judd Gregg from New
19 Hampshire.
20   Q.  And what are your duties as the
21 communications director of the Senate budget
22 committee?

Page 23

1    A.  I oversee the efforts of the
2  communications office at the budget committee to
3  liaison with the media, to liaison with the press
4  members, the press secretaries for the members of the
5  committee, also with external groups.
6    Q.  And how long have you held this position?
7    A.  Approximately a year and a half.
8    Q.  Now, I want to direct your attention to
9  your employment at Treasury.
10     When did you start at Treasury?
11   A.  August 6th of 2001.
12   Q.  And when did you end?
13   A.  My last day was at the end of May 2005.
14   Q.  And why did you leave the Treasury
15 Department?
16   A.  I was offered a position with the Senate
17 budget committee and I accepted it.
18   Q.  What was your position at Treasury in
19 October of 2001?
20   A.  I was the spokesperson for domestic
21 finance.
22   Q.  Did you have a supervisor?

Page 24

1    A.  I did.
2    Q.  Who was that?
3    A.  Tony Fratto.
4      His title was director of public affairs.
5    Q.  And what were your responsibilities as
6  director -- excuse me -- spokesperson for domestic
7  finance?
8    A.  I served as the media liaison for the
9  office of domestic finance.
10   Q.  And what is the office of domestic
11 finance?
12   A.  It's an office within the Treasury
13 Department. It's headed up by the undersecretary for
14 domestic finance, and there are 3 assistant
15 secretaries under him.
16   Q.  What does it do?
17   A.  Well, oversees financial markets,
18 financial institutions, fiscal matters pertaining to
19 the U.S. Treasury.
20   Q.  Does it have to do with government bonds?
21   A.  Yes.
22   Q.  What does it do with government bonds?

Page 25

1    A.  Treasury Department issues federal bonds.
2    Q.  And what does the office do of domestic
3  finance in relation to federal bonds?
4    A.  Makes decisions regarding how many bonds
5  will be issued.
6    Q.  How long did you work as the media liaison
7  for the office of domestic finance?
8    A.  I was there from August of 2001 until --
9  think -- October -- roughly, September, October of
10 either 2003 or 2004. I'd have to go back and look at
11 my resume actually.
12     I think I spent 2 years in the domestic
13 finance office as spokesperson, and the last year
14 that I was at Treasury, I was the senior advisor.
15   Q.  Did you report to Mr. Fratto during that
16 entire time?
17   A.  No.
18     I was -- I reported to Tony Fratto when I
19 was a spokesperson for domestic finance. Once I
20 became the senior adviser to the senior secretary, I
21 reported to Rob Nichols.
22   Q.  And how long were you spokesperson for

Elizabeth Schmutz                                                    August 23, 2006
                         Washington, DC

| Page 26 |
|---|

1  domestic finance?
2     A.   Approximately 2 and a half years.
3     Q.   You were the only spokesperson for the
4  division?
5     A.   Yes.
6     Q.   And so that was during the entire time you
7  worked for domestic finance, 2 and a half years?
8     A.   M-hm.
9     Q.   And then you moved on as a senior adviser
10  in what department?
11     A.   I was still within public affairs. I had
12  a different role.
13     Q.   Okay. And what was the role?
14     A.   Senior adviser to the assistant secretary
15  of public affairs.
16     Q.   And who was that?
17     A.   Rob Nichols.
18     Q.   So what were your duties and
19  responsibilities as spokesperson for the domestic
20  finance department?
21     A.   I was the contact. If the media wanted to
22  interview any of the officials in the office, they

| Page 27 |
|---|

1  would contact me. I would set up the interview. I
2  issued press releases, media advisories, accompanied
3  the principals when they went to events.
4     Q.   Did you have a staff?
5     A.   The office of domestic finance had some
6  administrative staff, but I did not personally have
7  someone assigned to me.
8     Q.   Did you have anybody reporting directly to
9  you?
10     A.   No.
11     Q.   And what -- did you have a particular
12  title as this press liaison?
13          Did you have a technical title?
14     A.   My technical title was public affairs
15  specialist.
16     Q.   Now, before you started on August of 2001,
17  did Treasury train you in any way for your job as to
18  what you were to do?
19     A.   No, not formally.
20     Q.   After you started in August 2001, did
21  you receive any training as to what you were to do as
22  a public affairs specialist for the office of

| Page 28 |
|---|

1  domestic finance?
2     A.   I met with the different officials, and
3  some officials gave me information about what their
4  particular office did. I also had some bureaus that
5  I was liaison to.
6          We have many bureaus at Treasury, and so I
7  met with bureau heads and other spokespeople at those
8  bureaus, and they gave me information on what the
9  bureaus did, so I had materials.
10     Q.   Okay. What officials did you meet with?
11     A.   Peter Fisher was the undersecretary for
12  domestic finance, Brian Roseboro, who was the
13  assistant secretary for financial markets. Sheila
14  Barr (phonetic) was the assistant secretary for
15  financial institutions. Don Hammond was the
16  assistant secretary for fiscal.
17          We had a U.S. treasurer that I was
18  responsible for her media. Her name was Rosario
19  Marin.
20     Q.   So the assistant secretary for fiscal was
21  Don Hammond and the U.S. Treasurer was who?
22     A.   Rosario Marin, spelled M-A-R-I-N.

| Page 29 |
|---|

1     Q.   All right. Then you said you talked to
2  the various bureaus.
3          Correct?
4     A.   (Nodding head.)
5     Q.   What bureaus?
6     A.   The bureau of public debt, bureau of
7  engraving and printing, the U.S. Mint.
8     Q.   Anybody else?
9     A.   Yes.
10          I can't recall.
11          Let me think.
12          There's 2 more I'm forgetting. I can't
13  recall.
14     Q.   Now, was this over -- you started in
15  August of 2001.
16          Obviously you spoke to this group of
17  people, these officials over a period of time?
18     A.   Over several weeks.
19     Q.   Several weeks?
20     A.   M-hm.
21     Q.   Had you spoken to all of them before the
22  October 31st, 2001, refunding conference?

8 (Pages 26 to 29)

**Page 30**

1     A.   To the best of my recollection, yes.
2     Q.   Now, you said you met with secretary
3   Fisher.
4        Correct?
5     A.   Correct.
6     Q.   What did he tell him about or what kind of
7   training and advice did he give you about your job?
8     A.   I don't recall.
9     Q.   You also said you met with the assistant
10  secretary for financial markets, Brian Roseboro?
11    A.   Yes.
12    Q.   And what kind of training or advice did he
13  give you about your job?
14    A.   I don't recall.
15    Q.   You also said you met with someone called
16  Sheila Barr (phonetic)?
17    A.   Yes.
18    Q.   And her job was -- is that a yes or a no?
19    A.   Yes, I did meet with her, yes.
20       She was the assistant secretary for
21  financial institutions.
22    Q.   What kind of training or advice did she

**Page 31**

1   give you about your job?
2     A.   I don't recall.
3     Q.   You said you met with Don Hammond; is that
4   correct?
5     A.   That's correct.
6     Q.   And he was the assistant secretary of
7   financial institutions?
8     A.   For fiscal.
9     Q.   Excuse me.
10       Assistant secretary for fiscal.
11       What does that mean, assistant secretary
12  for fiscal?
13    A.   The best way to describe it is that it's
14  sort of looking at the checkbook of the United States
15  government, what's going out, what's coming in.
16    Q.   Most of it is going out.
17       (Laughter.)
18       BY MR. THEODOROU
19    Q.   But that's basically what he does?
20    A.   Yes.
21       He's not a political appointee.  He's a
22  government employee that's there.

**Page 32**

1     Q.   Do you remember what kind of training or
2   advice he gave you about what you were to do in your
3   job?
4     A.   I don't recall.
5     Q.   All right.  How about Rosario Marin?
6        Do you remember what she -- the training
7   or advice she gave you about your job?
8     A.   I don't recall.
9     Q.   Now, you also said -- testified you met
10  with various bureaus such as the bureau of public
11  debt, engraving and printing, and mint.
12       Correct?
13    A.   Correct.
14    Q.   Do you remember what kind of training or
15  advice any of the officials at those bureaus gave
16  you?
17    A.   They gave me materials about what the
18  bureaus did, but they had their own spokespeople in
19  place, so they were not giving me training or advice.
20    Q.   But you can't recall what the officials
21  you met with told you?
22    A.   To summarize, I think most of them gave me

**Page 33**

1   basic information about what their particular offices
2   did, the function of the office.
3     Q.   Did Tony Fratto, your supervisor, train
4   you in any way as to what you would be doing at
5   Treasury?
6     A.   In an ad hoc manner, yes.  He gave me
7   information as it was needed.
8     Q.   Did you ever receive any training on how
9   to deal with the release of market-sensitive
10  information?
11    A.   Not formally, no.
12    Q.   All right.  Informally you received some
13  training?
14    A.   As situations would come up and I would
15  have questions, they would be answered.
16    Q.   Before October -- the October 31st, 2001,
17  refunding conference, did you receive any training on
18  how to deal with market-sensitive information?
19    A.   No.
20    Q.   Did you receive any training on how
21  Treasury press conferences were to be conducted in
22  your area?

9 (Pages 30 to 33)

Elizabeth Schmutz                                                    August 23, 2006
                        Washington, DC

| Page 34 | Page 36 |
|---|---|
| 1    A.  Can you restate the question. | 1    through what the time line would be, what to expect, |
| 2    Q.  All right.  Before the October 31st, 2001, | 2    gave me information on who to speak to within the |
| 3  refunding conference, did you receive any training | 3    office of domestic finance for more details about the |
| 4  from the Department of the Treasury or any of your | 4    different strategies of the refunding announcement. |
| 5  supervisors about how press conferences were to be | 5    Q.  What else did he say? |
| 6  conducted? | 6    A.  I don't recall. |
| 7    A.  I don't recall. | 7    Q.  What did he say the event was about? |
| 8    Q.  Before the October 31st refunding | 8    A.  I don't recall. |
| 9  conference, did you ever receive any training as to | 9    Q.  Okay.  You testified that you talked about |
| 10  what the term embargo means? | 10   a time line as to what you should expect. |
| 11   A.  I did not. | 11        Correct? |
| 12   Q.  Before the October 31st, 2001, refunding | 12   A.  Correct. |
| 13  conference, did you receive any training regarding | 13   Q.  And what did he say about the time line? |
| 14  the procedures to be used for the release of | 14   A.  The refunding is a 3-day event. |
| 15  information that's discussed at the quarterly | 15   Q.  What else did he say about this other than |
| 16  refunding conferences to the public? | 16  saying the refunding was a 3-day event? |
| 17   A.  I did have a conversation with Tony Fratto | 17   A.  He explained there was information |
| 18  about the general procedures of that particular | 18  released the first day, which is a Monday, second day |
| 19  event. | 19  is a Tuesday, and the third day is a Wednesday.  He |
| 20   Q.  For the October 31st conference? | 20  previously handled the refunding before I — |
| 21   A.  Yes. | 21   Q.  He previously handled the refunding |
| 22   Q.  When did you have this discussion with | 22  conferences? |

| Page 35 | Page 37 |
|---|---|
| 1  Tony Fratto? | 1    A.  Well, before I arrived and inquired, yeah. |
| 2    A.  I don't recall the exact date. | 2    Q.  Well, did he say what happens on Monday? |
| 3    Q.  Do you recall approximately when? | 3    A.  I don't recall. |
| 4    A.  That fall, September or October. | 4    Q.  Did he say what was going to happen on a |
| 5    Q.  And where did this discussion take place? | 5  Tuesday? |
| 6    A.  To the best of my recollection, it was in | 6    A.  I don't recall. |
| 7  his office. | 7    Q.  Did he say what was going to happen on a |
| 8    Q.  Where is his office? | 8  Wednesday? |
| 9    A.  His office is at the end of the office in | 9    A.  There would be a press conference on |
| 10  which the public affairs staff sat. | 10  Wednesday. |
| 11   Q.  And where is the public affairs office? | 11   Q.  Did he say anything about how the press |
| 12   A.  At that time, it was on the second floor | 12  conference was to be handled? |
| 13  of the Treasury Department. | 13   A.  I don't recall exactly what he told me |
| 14   Q.  Was anybody else present at this | 14  about the press conference. |
| 15  discussion? | 15   Q.  Would anything refresh your recollection? |
| 16   A.  Not to my recollection. | 16   A.  I don't know.  It depends on what it was. |
| 17   Q.  What did Mr. Fratto say? | 17   Q.  Well, were there -- is there any written |
| 18   A.  I don't recall his exact words. | 18  procedure as to how these press conferences are to be |
| 19   Q.  What was the substance of the | 19  handled? |
| 20  conversation? | 20   A.  Not at that time. |
| 21   A.  He explained that the Treasury Department | 21   Q.  As to the press conference, did he talk to |
| 22  had this event called a refunding and walked me | 22  you about embargo and what that means? |

10 (Pages 34 to 37)

' Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

| Page 38 | Page 40 |
|---|---|

Page 38

1    A.   I knew what embargo meant.
2    Q.   So you knew what embargo meant.
3         And what was your understanding of what
4    embargo means --
5    A.   That the information --
6    Q.   -- or meant?
7         Excuse me.
8         Meant.
9    A.   What an embargo means to the media?
10   Q.   No.
11        I'm asking you what at that time -- you
12   said you knew what embargo meant.
13        What was your understanding of what
14   embargo was at that time?
15   A.   It meant that the press received
16   information, and they would hold that information
17   until an agreed-upon time, at which point it would be
18   released to the public.
19   Q.   But as to your discussion with Mr. Fratto
20   about the press conference in October that was going
21   to take place in October of 2001, did he talk to you
22   about what embargo meant vis-a-vis that press

Page 39

1    conference?
2    A.   No, he did not.
3         MR. ROSSETTI:  Nick, are you asking
4    questions specifically about October 31st refunding
5    conference?
6         MR. THEODOROU:  No.
7         I'm asking questions about -- I'll
8    clar- -- I'm asking questions about her meeting with
9    Fratto, about she testified that meeting was
10   regarding the upcoming October conference that took
11   place sometime in September.
12        MS. WILLIAMS:  Or October.
13        BY MR. THEODOROU:
14   Q.   If I mischaracterized your testimony,
15   correct me, but I think I --
16        You had a meeting with Fratto to discuss
17   the upcoming refunding conference in October.
18        Correct?
19   A.   Correct.
20   Q.   All right.  And that meeting you think
21   took place in the fall.
22        Correct?

Page 40

1    A.   Correct.
2    Q.   Approximately September or October?
3    A.   Yes.
4    Q.   Okay.  Now, at that meeting, did
5    Mr. Fratto discuss with you what -- discuss with you
6    the embargo that was to be imposed on that
7    conference, that press conference -- refunding
8    conference?
9         Excuse me.
10   A.   I don't recall the exact conversation.
11   Q.   Now, when you say you don't recall, does
12   that mean you have some -- you think you have some
13   recollection about a discussion of embargo, or you
14   just don't recall any discussion?
15   A.   I have a vague recollection that we had a
16   conversation about what the refunding event was.  And
17   he explained to me the time line.
18   Q.   But you do not recall any discussion about
19   what kind of embargo was to be imposed?
20   A.   Correct.
21   Q.   How long did this meeting last?
22   A.   To the best of my recollection, probably

Page 41

1    10 minutes.
2    Q.   Did -- during the course of that
3    discussion, did he discuss how the press release for
4    that refunding conference was to be handled?
5    A.   I don't recall.
6    Q.   Do you recall him discussing anything
7    about the procedure for releasing information from
8    that conference?
9    A.   I don't recall the exact conversation.
10   Q.   Now, when you met with the SEC lawyers
11   yesterday, did they specifically tell you, if you
12   can't recall something, say you can't recall?
13   A.   Told me to tell the truth, and they told
14   me if I couldn't recall something, be direct and to
15   be truthful about it.
16   Q.   Well, I'm going to ask you a question.
17        I'm going to ask you:  What do you think
18   happened?  What do you think he discussed?
19        MS. WILLIAMS:  Objection.
20        BY MR. THEODOROU:
21   Q.   I do want you to speculate.
22   A.   I'm going to decline to speculate.

11 (Pages 38 to 41)

Elizabeth Schmutz                                                    August 23, 2006
                          Washington, DC

Page 42

1    Q.   Well, then, you decline to speculate, but
2    I'm asking you to speculate.
3          What do you think you talked about?
4          MS. WILLIAMS:  Objection.
5          MR. THEODOROU:  You can state the
6    objection.  You have no privileges to whether --
7          BY MR. THEODOROU.
8    Q.   I'm going to expect you to answer the
9    question.
10         MR. ROSSETTI:  She's here to --
11         MS. WILLIAMS:  I'm going to keep --
12         MR. ROSSETTI:  -- answer questions of
13   fact.
14         MR. THEODOROU:  Who is going to be raising
15   the objections today?
16         MS. WILLIAMS:  I'm going to be raising an
17   objection.
18         MR. THEODOROU:  All right.
19   A.   I'm declining to speculate.
20         BY MR. THEODOROU:
21   Q.   You don't have any recollection of what --
22   a discussion of how the embargo is to be handled.

Page 43

1    Correct?
2          MS. WILLIAMS:  Objection.
3          You're talking about this first
4    conversation she had --
5          MR. THEODOROU:  -- with Fratto.
6          MS. WILLIAMS:  -- in September or
7    October --
8          MR. THEODOROU:  Correct.
9          MS. WILLIAMS:  -- the 10-minute
10   conversation?
11         THE COURT REPORTER:  Okay.  You guys have
12   to slow down, all of you, and we have to talk one at
13   a time.
14         Okay?
15         MS. WILLIAMS:  Yes.
16         THE COURT REPORTER:  I'm making a record,
17   or I'm trying to.
18         BY MR. THEODOROU:
19   Q.   You don't have a recollection of him
20   discussing about in that September conversation how
21   the embargo was to be handled.
22         Correct?

Page 44

1    A.   Correct.
2    Q.   All right.  Now, as of October 31st, 2001,
3    did the Department of the Treasury have any written
4    policies and procedures about how market-sensitive
5    information was released?
6    A.   Prior to October 31st?
7    Q.   As of October 31, 2001.
8    A.   Not to my knowledge.
9    Q.   Okay.  Was there any -- were there any
10   written policies and procedures as of October 31,
11   2001, as to how Treasury press conferences were to be
12   conducted?
13   A.   Not to my knowledge.
14   Q.   Were there any policies and procedures as
15   of October 31, 2001, as to how refunding conferences
16   were to be conducted?
17   A.   Not to my knowledge.
18   Q.   Were there any policies and procedures at
19   Treasury as of October 31, 2001, as to -- concerning
20   the use of embargoes at Treasury?
21   A.   Not to my knowledge.
22   Q.   Were there any policies and procedures to

Page 45

1    your knowledge as of October 31, 2001, concerning the
2    procedures for the release of information at a
3    quarterly refunding announcement?
4    A.   Not to my knowledge.
5    Q.   Before October 31, 2001, did anyone at
6    Treasury ever explain to you the difference between
7    market-sensitive information and other information?
8    A.   No.
9    Q.   Did anyone ever talk to you about what
10   market-sensitive information is?
11   A.   At the Treasury Department?
12   Q.   Yes.
13   A.   No.
14   Q.   Did anyone at Treasury before October 31,
15   2001, ever talk to you about the need to keep certain
16   information confidential?
17   A.   I received -- I had a classification for
18   the ability to review classified documents -- I'm
19   trying -- I had clearance.  I had classified
20   clearance.
21         So I understood --
22   Q.   I'm not going to ask you about classified

12 (Pages 42 to 45)

## Page 46

1  documents.

2      But go ahead.

3      A.  I understood there were things that took

4  place at Treasury that were market-sensitive and that

5  considered top secret, an understanding of that.

6      Q.  There was nothing concerning the October

7  31, 2001, conference that would be considered top

8  secret though.

9      MS. WILLIAMS:  Objection.

10     A.  I'm not in a position to classify that as

11 anything.

12     BY MR. THEODOROU:

13     Q.  I'm sure I would have heard from

14 Mr. McGivern or Mr. Furey on that.

15     As of October 31, 2001, did you have any

16 understanding of Treasury's policies on the use of

17 embargoes?

18     A.  Please repeat the question.

19     Q.  As of October 31, 2001, did you have any

20 understanding of Treasury's policies on the use of

21 embargoes?

22     A.  Yes.

## Page 47

1      Q.  What was your understanding?

2      A.  My understanding, that was -- was that

3  embargoes were used to give to the Treasury pressroom

4  documents that were not public until an agreed-upon

5  time.

6      Q.  And where did you get this understanding

7  from?

8      A.  From working in the office of public

9  affairs.

10     Q.  And did you have that understanding as of

11 October 31, 2001, or after October 31, 2001?

12     A.  Prior to October 31st.

13     Q.  And you say you got it from work in the

14 office of public affairs between August and October

15 31, 2001?

16     A.  Yes.

17     Q.  All right.  And during those 3 months from

18 August 6 until October 31, 2001, how did you arrive

19 at that understanding specifically?

20     A.  Specifically we had a group of reporters

21 that worked from the Treasury Department called the

22 pressroom.  And I witnessed them receiving documents

## Page 48

1  that were embargoed.

2      Q.  Now -- and what did you -- again, what did

3  understand the term embargo to mean as of October 31,

4  2001?

5      A.  That the media is given information prior

6  to public release in order to write their stories.

7  Their information is not released to the public until

8  an agreed-upon time.

9      Q.  Did that prohibit the -- now, when you

10 talk about "the media," you're talking about the

11 media at Treasury press conferences?

12     A.  I'm referring to the media in general.

13     Q.  So did the embargo prevent a member of the

14 media from disclosing the information to anyone at

15 all before a set time?

16     A.  The embargo prevents a member of the media

17 from disclosing the information to the general

18 public.

19     Q.  How do you define the general public?

20     A.  Someone who does not work for a media

21 outlet.

22     Q.  Well, did it prevent a person who received

## Page 49

1  information at a press conference from discussing the

2  information with the Treasury employee?

3      A.  If a reporter was given information as

4  embargoed, they could discuss that information with a

5  member of the press office if they had questions

6  about the material they received.

7      Q.  Could they discuss it with any other

8  member of the Treasury -- or excuse me -- employee o

9  the Treasury?

10     A.  Our policy was that the reporters seeking

11 information from officials at the Treasury Department

12 had to go through the office of public affairs.

13     Q.  And was this in writing, this policy?

14     A.  There was a memo emailed to all Treasury

15 officials from the assistant secretary of public

16 affairs, Michelle Davis, on behalf of secretary Paul

17 O'Neill.

18     Q.  As of October 31, 2001?

19     A.  I don't recall the date.

20     Q.  Do you know if it was before or after

21 October 31, 2001?

22     A.  I don't recall.

13 (Pages 46 to 49)

Elizabeth Schmutz                                                    August 23, 2006
                        Washington, DC

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  Q.  So you can't recall whether this memo was
2  in effect in October of 2001?
3  A.  No.
4  Q.  And what was the substance of the memo?
5  A.  That the office of public affairs plays a
6  role at the Treasury Department to liaison with the
7  media and that officials should refer any inquiring
8  phone calls, emails, office visits to the office of
9  public affairs.
10  Q.  So that a member of the press who received
11  alleged embargoed information at a press conference
12  could relay that information to his editor during the
13  embargo period.
14       Correct?
15  A.  Correct.
16  Q.  And it was -- could relay it to someone in
17  his media outlet.
18       Correct?
19  A.  Correct.
20  Q.  Was there a written procedure at Treasury
21  that said this could be done as of October 31, 2001?
22  A.  Not to my knowledge.

**Page 51**

1  Q.  Could a member of the press receive the
2  embargoed information in a press conference, relay
3  the information to any executive at his media
4  corporation?
5       MS. WILLIAMS:  Objection.
6  A.  I don't know.
7       BY MR. THEODOROU:
8  Q.  Well, you testified that he could -- he
9  could relay it to someone in his media outlet.
10       Correct?
11  A.  I did.
12  Q.  All right.  And that would include his
13  editor.
14       Right?
15  A.  Correct.
16  Q.  Could he relay it to someone like the
17  chief financial officer of the media outlet?
18  A.  He should not.
19  Q.  Well, if he's allowed to relay it to his
20  media outlet, did you have a procedure whereby you
21  told reporters exactly to whom they could communicate
22  the information to at their media corporation?

**Page 52**

1  A.  We did not tell them that, no.
2  Q.  Did you specifically tell reporters at any
3  time before October 31, 2001, including October 31,
4  2001, that they could communicate to someone at their
5  media companies or outlets?
6  A.  I did not, no.
7  Q.  Okay.  Do you know if anybody at Treasury
8  ever communicated that to reporters, that they were
9  allowed to talk to people at their media outlets?
10  A.  I have no knowledge of that.
11  Q.  So how did you develop your understanding
12  that reporters could communicate to someone at their
13  media outlets as you've defined it?
14  A.  The reporters in the Treasury pressroom
15  for the most part were wire reporters, and so they
16  filed wire stories with their editors back at their
17  desks at their bureaus, and they were in constant
18  communication with their editors about their stories
19  that they were filing.
20  Q.  But did you or anybody else before October
21  31 and as of October 31, 2001, ever define or tell
22  them who they could communicate to -- who they could

**Page 53**

1  talk to and who they could not talk to at their media
2  companies?
3       MS. WILLIAMS:  Objection.
4       BY MR. THEODOROU:
5  Q.  Go ahead.  You still have to answer.
6  A.  Not to my knowledge.
7  Q.  Did you ever before or as of October 31,
8  2001, ever tell -- lay down the rules for reporters
9  as to whom they could communicate to?
10  A.  Ever?
11       MS. WILLIAMS:  Objection.
12       BY MR. THEODOROU:
13  Q.  Yeah.
14       As of October 31, 2001.
15  A.  No.
16  Q.  Do you remember doing it on October 31,
17  2001?
18  A.  No.
19  Q.  Turning to October 31, 2001, did you
20  address the attendees of the refunding conference?
21  A.  Yes.
22  Q.  All right.  And did you give -- did you

14 (Pages 50 to 53)

'Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

**Page 54**

1  provide them any guidance as to whom they could talk
2  to at the conclusion of the conference?
3      A.  No, I did not.
4      MR. THEODOROU:  Why don't we take a
5  5-minute break.
6      THE VIDEOGRAPHER:  Off the record at
7  11:03:20 PM -- AM.
8      (Recess.)
9      THE VIDEOGRAPHER:  We're back on the
10 record at 11:10:35 AM.
11     BY MR. THEODOROU:
12     Q.  Ms. Holahan, before October 31, 2001, had
13 you ever attended any quarterly refunding press
14 conferences?
15     A.  No.
16     Q.  Before October 31, 2001, had you
17 participated in any Treasury press conferences?
18     A.  Yes.
19     Q.  How many?
20     A.  I don't recall the exact number.
21     Q.  Was it fewer than 5?
22     A.  No.

**Page 56**

1      A.  Myself.
2      Q.  Set by you?
3      A.  Correct.
4      Q.  Did you run that time by anybody else or
5  get approval for that time?
6      A.  Yes.
7      Q.  Who?
8      A.  Tony Fratto.
9      Q.  Anybody else review it, the decision?
10     A.  I don't recall.
11     Q.  And did you discuss setting the time for
12 10 AM with Mr. Fratto?
13     A.  Yes.
14     Q.  When did you discuss setting time?
15     A.  I don't recall.
16     Q.  Where did you discuss this?
17     A.  I don't recall.
18     Q.  Is your decision -- was your decision
19 recorded on paper anywhere?
20     A.  Yes.
21     Q.  Where?
22     A.  On the media advisory.

**Page 55**

1      Q.  Fewer than 10?
2      A.  Yes.
3      Q.  Did any of them involve embargoed
4  information?
5      A.  I don't recall.
6      Q.  Now, as of October 31, 2001, what was the
7  Treasury Department's policy for setting embargo
8  times at quarterly refunding press conferences?
9      A.  I'm not aware.
10     Q.  So you're not aware of how the embargo
11 time was set?
12     A.  Prior to that day?
13     Q.  Or as of October 31, 2001.
14     A.  I'm aware of how it was set on October
15 31st.
16     Q.  But not before that day?
17     A.  Correct.
18     Q.  Okay.  How was it set on October 31st?
19     A.  It was preset at 10 AM.
20     Q.  Preset to be at a 10 AM embargo time?
21     A.  Correct.
22     Q.  By whom?

**Page 57**

1      Q.  And that's the document that went out
2  before the refunding conference?
3      A.  Correct.
4      Q.  Why was 10 AM set to be the embargo time?
5      A.  To allow enough time for Mr. Fisher's
6  statement for the press, question-and-answer period,
7  and for the writing and filing of the stories.
8      Q.  Now, before October 31, 2001, it's your
9  testimony you did not know how the embargo times were
10 set for the refunding conferences; is that right?
11     A.  Correct.
12     Q.  After October 31, 2001, did you learn how
13 they were set in the past, the embargo times?
14     A.  I was aware that the previous quarterly
15 refunding, they had done a 10-minute embargo at the
16 end of the event.
17     Q.  Were you aware of a practice whereby a
18 public affairs official polled the reporters present
19 to determine how much time they needed to write their
20 stories?
21     A.  Yes.
22     Q.  Did you know about that before the October

15 (Pages 54 to 57)

Elizabeth Schmutz                                           August 23, 2006

Washington, DC

Page 58

1    31, 2001, conference?
2        A.   Yes.
3        Q.   But you decided not to use that system?
4        A.   Correct.
5        Q.   Why?
6        A.   Because of the sensitivity of the
7    information being disseminated at the press
8    conference and because of the question of how to
9    handle television cameras.
10       Q.   Well, how did you know that the
11   information at that particular press conference on
12   October 31, 2001, had particular sensitivity?
13       A.   Because I was told that.
14       Q.   By whom?
15       A.   Undersecretary Fisher.
16       Q.   All right.  And when was that?
17       A.   In the weeks leading up to the event.
18       Q.   What did he say?
19       A.   I don't recall the exact conversation.
20       Q.   What was the substance of the
21   conversation?
22       A.   Just that the information, the decision

Page 59

1    that was being announced at that quarterly refunding
2    was going to be something that the markets would care
3    a great deal about, and it was very important that
4    the information not be mishandled.
5        Q.   And where did he tell you this?
6        A.   The best of my recollection, in his
7    office.
8        Q.   Anybody else present?
9        A.   I don't recall.
10       Q.   How long was the discussion?
11       A.   I don't recall.
12       Q.   Did he say anything to you in writing
13   about this?
14       A.   Not to my recollection.
15       Q.   But before the October 31, 2001,
16   conference, Treasury did not as a practice set the
17   embargo times in advance.
18            Correct?
19            MS. WILLIAMS:  Objection.
20       A.   That is my understanding now, yes.
21            BY MR. THEODOROU:
22       Q.   Now, before the refunding conference of

Page 60

1    October 31, 2001, did Treasury ever require the
2    attendees of the conference to stay in the room
3    during the embargo period?
4        A.   I don't recall.
5        Q.   Before the October 31, 2001, conference,
6    to your knowledge, did Treasury ever take any steps
7    to prevent the attendees from leaving the room before
8    the embargo period had ended?
9        A.   Not to my knowledge.
10       Q.   Did -- before the October 31, 2001,
11   conference, did Treasury take any steps at -- in
12   press conferences where there were embargoes to
13   prevent the attendees from making telephone calls
14   before the embargo period ended?
15       A.   I don't recall.
16       Q.   Before October 31, 2001, how did Treasury
17   enforce its embargoes?
18       A.   If I became aware of an embargo being
19   broken, my practice was to speak to the reporter that
20   had filed the story early.
21       Q.   And before October 31st, you had
22   supervised press conferences where embargoed

Page 61

1    information was released?
2        A.   I don't recall specific press conference
3    where embargoed information was released.
4        Q.   So you don't recall supervising a press
5    conference where market-sensitive information was
6    released and there was an embargo before October
7    31st?
8        A.   Correct.
9        Q.   So before October 31st, you didn't have an
10   opportunity to reprimand any reporter for release of
11   embargoed information because you can't recall
12   whether you handled a conference where there was
13   embargoed information; is that right?
14       A.   In my time at the Treasury Department,
15   there was --
16       Q.   Not your time at Treasury.
17            Before October 31, 2001.
18       A.   I don't recall.
19            MS. WILLIAMS:  Objection to you cutting
20   off the witness.
21       A.   I don't recall.
22            BY MR. THEODOROU:

16 (Pages 58 to 61)

· Elizabeth Schmutz                                                        August 23, 2006
Washington, DC

---

Page 62

1    Q.   Turning your attention -- directing your
2    attention to October 31, 2001, the refunding
3    conference, did you address the attendees?
4    A.   Yes.
5    Q.   What did you say?
6    A.   I informed the attendees of the press
7    conference that there would be an embargo in place
8    until 10 AM.
9    Q.   Did you tell them what embargo meant?
10   A.   I did not.
11   Q.   Were you aware that there were attendees
12   who were not members of the press at that conference?
13   A.   I was not aware of attendees at the press
14   conference not being members of the press or the
15   Treasury Department.
16   Q.   How long did you speak to the audience?
17   A.   A few seconds.
18   Q.   A few seconds?
19   A.   A few seconds.
20   Q.   About what time did you address them?
21   A.   Approximately 9 AM before the press
22   conference began.

---

Page 63

1    Q.   As best you can recall, could you please
2    tell us what you said.
3    A.   I said, approximately something along the
4    lines of, this information is embargoed until 10 AM.
5        I reannounced -- I reannounced that at the
6    end of the press conference.
7    Q.   And about what time was that?
8    A.   9:25 AM.
9    Q.   When you addressed them at about 9 AM, you
10   did not tell them what the embargo meant.
11       Correct?
12   A.   Correct.
13   Q.   When you readdressed them at 9:25 AM, did
14   you tell them what embargo meant?
15   A.   No.
16   Q.   Do you know before October 31, 2001, if
17   Treasury ever obtained the consent of the attendees
18   at quarterly refunding conferences to abide by
19   embargoes?
20       MS. WILLIAMS:  Objection.
21       And just to clarify, back to the beginning
22   of time, or --

---

Page 64

1        MR. THEODOROU:  During the time that she
2    was there from October -- she started in August --
3        MS. WILLIAMS:  August.
4        MR. THEODOROU:  -- to her knowledge before
5    October 31st, 2001.
6        BY MR. THEODOROU:
7    Q.   To your knowledge, did Treasury ever
8    obtain the consent of the attendees to abide by
9    the -- by an embargo?
10   A.   To my knowledge, no.
11   Q.   All right.  Did you obtain a consent from
12   anybody who attended the October 31, 2001, refunding
13   conference to abide by the embargo?
14   A.   No.
15   Q.   Did you ask any of the attendees to
16   express their consent to the terms of the embargo?
17   A.   No.
18   Q.   So you simply told them an embargo time
19   and assumed that they would honor it?
20       MS. WILLIAMS:  Objection.
21   A.   I told members of the media the ground
22   rules for the press conference.

---

Page 65

1        BY MR. THEODOROU:
2    Q.   And those ground rules were what?
3    A.   There was an embargo in place until 10 AM.
4        MR. THEODOROU:  I have an exhibit.
5        (Holahan Exhibit No. 1
6                    was marked for
7                    identification.)
8        BY MR. THEODOROU:
9    Q.   All right.  Ms. Holahan, I'm showing you
10   what's been marked as exhibit 1.
11       Do you see that?
12   A.   I do see it.
13   Q.   Do you recognize that document?
14   A.   I do recognize it.
15   Q.   And what is it?
16   A.   It's a summary of an interview that I gave
17   on November 7th, 2001.
18   Q.   And you've seen that document before.
19       Correct?
20   A.   Correct.
21   Q.   When did you see it the first time?
22   A.   When I met with the attorneys from the

---

17  (Pages 62 to 65)

Elizabeth Schmutz                                                    August 23, 2006
                              Washington, DC

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  Securities and Exchange Commission and the Treasury
2  Department this past spring.
3      Q.   And most recently, when did you see it?
4      A.   Yesterday.
5      Q.   And you reviewed it.
6          Correct?
7      A.   I reviewed it at both of those meetings,
8  yes.
9      Q.   All right.  Now, if you -- since you've
10  reviewed it, if you want to take your time and look
11  at it again, because I'm going to be asking you some
12  questions, you can take the time to look at it.
13         (Pause.)
14         BY MR. THEODOROU:
15     Q.   Do you see it?
16     A.   I see it.
17     Q.   All right.  And you recall being
18  interviewed by officials from the SEC and the
19  Treasury Department inspector general's office in
20  2001.
21         Correct?
22     A.   Correct.

**Page 68**

1      Q.   All right.  And what did you tell them
2  about the honor system?
3      A.   I explained that there's an agreement
4  between the office of public affairs and the
5  reporters that we will give them information in
6  advance of the event to help them write their
7  stories, we will not post the item on the Web site
8  until the agreed-upon time, the embargo time, and
9  that then they are to hold their stories until said
10  time, and then release them at the same time, so if
11  that agreement is not honored, then we will not give
12  them the privilege of having the information in
13  advance.
14     Q.   You remember talking about an agreement
15  with the reporters?
16     A.   I don't recall my exact words.
17     Q.   Did you are tell reporters what would
18  happen to them if the embargo was not honored?
19     A.   When?
20     Q.   At the conference, the press conference --
21     A.   No, I did not.
22     Q.   -- when you spoke on October 31st?

| Page 67 | Page 69 |
|---|---|

**Page 67**

1      Q.   Now, during the interview, you told the
2  SEC and the OIG from the Department of the Treasury
3  that reporters were governed by the honor system not
4  to release the information before the embargo time.
5          Do you remember saying that?
6          MS. WILLIAMS:  Objection.
7          MR. ROSSETTI:  Which page are you on?
8          Which page are you on, Nick?
9          MR. THEODOROU:  I would quote it.
10         BY MR. THEODOROU:
11     Q.   Page 2, the end of the first paragraph:
12  She added that she gave -- all right? -- the ground
13  rules and that the reporters are governed by the
14  honor system to not release the information prior to
15  the embargo time.
16         Correct?
17     A.   I do recall describing that to the
18  interviewers at that day.
19     Q.   Okay.  So by looking at this document, it
20  refreshes your recollection about some additional
21  details about what you said that day?
22     A.   Yes.

**Page 69**

1      A.   No.
2      Q.   Now, you didn't obtain any consents from
3  them to honor the embargo.
4          Correct?
5      A.   Correct.
6      Q.   You simply spoke about the embargo time?
7      A.   Correct.
8      Q.   Now, you testified earlier you addressed
9  the reporters twice.
10     A.   That is what --
11     Q.   Right?
12     A.   -- I recall today, yes.
13     Q.   Now, you testified -- not "testified," but
14  when you were interviewed, you said you addressed
15  them 3 times.
16     A.   Correct.
17     Q.   Does this refresh your recollection as to
18  talking to them a third time?
19     A.   Sitting here today --
20     Q.   Exhibit 1?
21     A.   -- I do not recall addressing them the
22  third time before the question-and-answer period.

18 (Pages 66 to 69)

Page 70

1    But this document was taken at a time when
2  my memory was obviously a lot fresher.
3    Q.  Right.
4    But I'm asking you for the purpose of
5  testimony what your present recollection is.
6    A.  My present recollection is announcing the
7  embargo time at the beginning of the press conference
8  and at the conclusion of the press conference.
9    Q.  Who else from the Department of the
10 Treasury spoke at this press conference?
11   A.  Undersecretary Fisher.
12   Q:  And other than undersecretary Fisher, were
13 you the only person from Treasury to address the
14 attendees?
15   A.  Yes.
16   Q.  All right.  Did undersecretary Fisher talk
17 to -- or tell the attendees what the embargo meant?
18   A.  No, he did not.
19   Q.  All right.  To your knowledge, did anyone
20 tell the attendees what embargo meant?
21   A.  Not to my knowledge.
22   Q.  You simply announced an embargo time?

Page 71

1    A.  To the media.
2    MS. WILLIAMS:  Objection.
3    BY MR. THEODOROU:
4    Q.  To the attendees.
5    MS. WILLIAMS:  Objection.
6    A.  To the media.  It was a press conference.
7    BY MR. THEODOROU:
8    Q.  Right.  Correct.
9    You announced an embargo time --
10   A.  -- to the media.
11   Q.  Okay.  And were you aware that there were
12 nonmedia members there?
13   A.  I was aware there were Treasury staff
14 members there in addition to the media.
15   Q.  But you -- outside of Treasury and the
16 media, were you aware that there were other nonmedia
17 and non-Treasury attendees at the conference?
18   A.  No, I was not.
19   Q.  Okay.  So that the embargo time was a
20 press embargo time.
21   Correct?
22   A.  Correct.

Page 72

1    It was a press conference.
2    Q.  Were you aware of any instance before
3  October 31, 2001, in which an embargo at Treasury was
4  violated?
5    A.  I don't recall a specific instance.
6    Q.  Okay.  How about general instances?
7    A.  Yes.
8    Q.  Okay.  And what do you recall?
9    A.  There were times when a reporter's story
10 would be filed, a very short period of time before
11 the embargo time.  Generally, it was an accident, or
12 it was only by a minute or so, but it did happen.
13   Q.  Appreciate you answering beyond the scope
14 of my question in that instance.
15   How many instances before October 31st did
16 this occur?
17   A.  I don't recall.
18   Q.  Did anything happen to the person who
19 violated the embargo in those instances?
20   A.  If the person who violated the embargo in
21 those instances was turned in to the office of public
22 affairs, that person received a phone call from a

Page 73

1  member of the public affairs staff inquiring as to
2  the nature of why the story was filed early and
3  reminding them of the practices regarding the
4  embargoes and that it was a privilege to receive the
5  information in advance of the embargo time.
6    Q.  Okay.  Do you recall before October 31,
7  2001, of anybody getting reprimanded by Treasury for
8  an advance release of embargoed information, alleged
9  embargoed information?
10   A.  I don't recall a specific instance, no.
11   Q.  Do you recall anyone before October 31,
12 2001, being barred from attending future Treasury
13 conferences or meetings because they leaked,
14 disclosed alleged embargo information?
15   A.  No.
16   Q.  You do?
17   A.  I said no.
18   Q.  Oh.
19   A.  I do not.
20   Q.  Okay.
21   MR. THEODOROU:  Another exhibit.
22   (Holahan Exhibit No. 2

19  (Pages 70 to 73)

Elizabeth Schmutz                                                    August 23, 2006
                          Washington, DC

| Page 74 | Page 76 |
|---|---|

**Page 74**

1      was marked for
2      identification.)
3    BY MR. THEODOROU:
4    Q. Ms. Holahan, I want to show you what's
5 been marked as exhibit 2.
6     Do you see that document?
7    A. I do see it.
8    Q. Did you ever – have you seen this before,
9 this document?
10    A. Not to my recollection.
11    Q. Why don't you take a look at it, read
12 through it.
13    (Pause.)
14    BY MR. THEODOROU:
15    Q. Have you had a chance to look at it?
16    A. Yes.
17    Q. Now, does that refresh your recollection
18 about any instances where advance information got out
19 before a Treasury announcement?
20    A. Repeat the question, please.
21    Q. All right. Well, if you take a look at
22 the document, you'll see that it deals with advance

**Page 75**

1 information getting out before Treasury's
2 intermediate issuance of 10-year notes on October
3 4th, 2001.
4     Correct?
5     If you look at the lower portion of the
6 document.
7    A. M-hm.
8    Q. Last paragraph -- 2 paragraphs.
9    A. Okay. I'm sorry.
10     I was looking for the date.
11     Yes, I do see the last 2 paragraphs, m-hm.
12    Q. And the document is -- it's a – what is
13 the document?
14     It's a Reuters report.
15     Correct?
16    A. It's a story, yes, a wire story.
17    Q. It's a story from Reuters which talks
18 about what happened at Treasury on 10-31-
19    A. Correct.
20    Q. -- -2001?
21     Correct?
22    A. That's the date the story was filed at

**Page 76**

1 1528.
2    Q. Correct.
3     Now, the last couple paragraphs in the
4 document state that: Barclay's – this man's name is
5 John Roberts -- recalled a similar flap earlier this
6 month when the Treasury decided to flood the market
7 with more 10-year notes to ease the liquidity logjam
8 caused by failed trades after the September 11
9 attacks on Washington and New York.
10     And it quotes Mr. Roberts as saying: When
11 they did the reopening of the 10-year, there was
12 advance information on the street. There's advance
13 information here, and so there were a number of
14 people in the street who were pretty upset about it,
15 Roberts said.
16     Now, were you aware of an instance where
17 advance information got out before Treasury's
18 intermediate issuance of the 10-year notes?
19    A. No, I'm not.
20    Q. You don't recall that incident?
21    A. No.
22    Q. Do you know if that incident was -- have

**Page 77**

1 you ever heard of that incident happening where there
2 was concern about something happening on October 4th,
3 2001, concerning 10-year notes?
4    A. I recall the issuance of the 10-year
5 notes, but I do not recall --
6    Q. -- an issue about advance information?
7    A. No.
8    Q. So do you recall whether Treasury ever
9 investigated advance information getting out about
10 the 10-year notes in early October?
11    A. I have no knowledge of that.
12    Q. All right.
13    MR. THEODOROU: Another exhibit.
14    (Holahan Exhibit No. 3
15     was marked for
16     identification.)
17    BY MR. THEODOROU:
18    Q. I'm showing you now, Ms. Holahan, what's
19 been marked as exhibit 3.
20     Do you see that?
21    A. I do.
22    Q. All right. Have you seen that document

20 (Pages 74 to 77)

Elizabeth Schmutz                                                     August 23, 2006
Washington, DC

Page 78

1  before, the Bloomberg report dated 10-31-01?
2      A.  I don't specifically recall seeing this
3  news story, but I know this reporter, and so I'm
4  quite sure I saw it at the time.
5      Q.  All right.  Why don't you take a look
6  through just to refresh your recollection.
7          (Pause.)
8      BY MR. THEODOROU:
9      Q.  Have you had a chance to review it?
10     A.  Almost.
11         (Pause.)
12     A.  Okay.
13     BY MR. THEODOROU:
14     Q.  You see where the report refers to -- I'll
15  quote it:  Treasury -- this report by Bloomberg
16  concerns the October 31, 2001, refunding conference
17         Correct?
18     A.  Correct.
19     Q.  And it talks about the information getting
20  out on the Treasury Web site before 10 AM.
21         Correct?
22     A.  Correct.

Page 79

1      Q.  All right.  But it also says:  Treasury
2  officials declined to comment on the early release
3  other than to confirm it occurred.  It was the second
4  time the department has posted embargoed information
5  on the Web site before it was scheduled to enter the
6  public domain.  On October 22nd the Treasury posted
7  remarks by deputy Treasury secretary Kenneth Dam
8  almost an hour before he spoke about the government's
9  efforts to curb terrorist financing.
10         Do you see where it says that?
11     A.  I see that.
12     Q.  All right.  Now, do you recall that
13  incident on October 21st, 2001, in which remarks by
14  deputy Treasury secretary Dam were posted on the Web
15  site an hour before he began his remarks?
16     MS. WILLIAMS:  October 22nd?
17     MR. THEODOROU:  Yes.
18     A.  I do not recall that.
19     Q.  October 22nd, 2001.
20         (Talking at the same time.)
21     MS. WILLIAMS:  You said October 21st.
22     I was just trying to clear --

Page 80

1      MR. THEODOROU:  No, no.
2      22nd I thought I said.
3      MR. ROSSETTI:  You said, October 21st.
4      BY MR. THEODOROU:
5      Q.  Do you recall that incident on October
6  22nd, 2001, in which deputy Treasury secretary Dam's
7  comments were posted on the Web site almost an hour
8  before he began?
9      A.  No.
10     Q.  Did anybody bring that issue to your
11  attention before the October 31st refunding
12  conference?
13     A.  Not to my recollection.
14     Q.  Did you coordinate that press conference
15  with deputy Treasury secretary Dam?
16     A.  No.
17     Q.  Who did?
18     A.  I don't know who did specifically, but I
19  know who handled his media.
20     Q.  Who handled his media?
21     A.  Rob Nichols was the deputy assistant
22  secretary of public affairs at that time and deputy

Page 81

1  Treasury secretary Dam was his principal.  Tasia
2  Scolinos handled terrorist financing.
3      Q.  Who did?
4      A.  Tasia, T-A-S-I-A.
5      Q.  T-A-F-I-A?
6      A.  T-A- , S as in Sam, -I-A, Scolinos, S as
7  in Sam, -C-O-L-I- , N as in Nancy, -O- , S as in Sam.
8      Q.  That's one name I can pronounce, Tasia
9  Scolinos.
10     A.  She handled the issue of terrorist
11  finance.
12         So one of those 2 or both together most
13  likely handled that press conference.
14     Q.  And Tasia worked in what department?
15     A.  She worked in the office of public
16  affairs.  She was the spokesperson for terrorist
17  finance.
18     Q.  And she reported to whom?
19     A.  Tony Fratto.
20     Q.  Well, do you remember her -- or did
21  anybody in the office of public affairs ever discuss
22  with you the early disclosure of embargoed

21 (Pages 78 to 81)

Elizabeth Schmutz                                                          August 23, 2006
Washington, DC

| Page 82 | Page 84 |
|---|---|
| 1  information of Kenneth Dam's remarks? | 1      Strike that. |
| 2     A.  I don't recall. | 2      THE VIDEOGRAPHER: Excuse me, |
| 3     Q.  Do you know if any investigation was | 3  Mr. Theodorou. |
| 4  conducted of that incident? | 4      I need to change the tape in a minute. |
| 5     A.  I don't have any knowledge of that. | 5      MR. THEODOROU: Oh, okay. |
| 6     Q.  Did you learn anything about this early | 6      He's going to change the tape. |
| 7  disclosure of secretary Dam's remarks after October | 7      THE VIDEOGRAPHER: This is the end of tape |
| 8  31st? | 8  number 1 of the video deposition of Elizabeth |
| 9     A.  I have no recollection of that. | 9  Holahan. Off the record at 11:45:42 AM on August |
| 10    Q.  In other words, when people became | 10  23rd, 2006. |
| 11  concerned about what happened on October 31st at the | 11      (Recess.) |
| 12  refunding conference, did anybody talk to you about | 12      THE VIDEOGRAPHER: This is the beginning |
| 13  what happened with secretary Dam's press conference? | 13  of tape number 2 in the video deposition of |
| 14    A.  I don't recall any conversations taking | 14  Ms. Elizabeth Holahan. On the record at 11:50:26 AM |
| 15  place. | 15  on August 23rd, 2006. |
| 16    Q.  So you had no involvement in coordinating | 16      BY MR. THEODOROU: |
| 17  secretary Dam's conference; is that right? | 17    Q.  Ms. Holahan, earlier, you testified about |
| 18    A.  That's correct. | 18  a conversation you had with secretary Fisher about |
| 19    Q.  And to your recollection, Tasia Scolinos | 19  the sensitivity of the information at the refunding |
| 20  may have been involved in it? | 20  conference. |
| 21    A.  I'm making an assumption. | 21      Correct? |
| 22    Q.  Do you know who was responsible for | 22    A.  Correct. |

| Page 83 | Page 85 |
|---|---|
| 1  posting secretary Dam's remarks on the Treasury Web | 1     Q.  All right.  Did secretary Fisher make a |
| 2  site? | 2  proposal to put the announcement in the Internet |
| 3     A.  I know who was responsible for posting all | 3  immediately at the start of the press conference? |
| 4  documents on the Web site. | 4     A.  He did. |
| 5     Q.  Who was that? | 5     Q.  And what do you remember him saying? |
| 6     A.  Frances Anderson. | 6     A.  My recollection is that he suggested that |
| 7     Q.  And who is Frances Anderson? | 7  the information be released live without an embargo |
| 8     A.  She's an administrative assistant within | 8  time. |
| 9  the office of public affairs. | 9     Q.  And why wasn't his proposal implemented? |
| 10    Q.  And did she report to you? | 10    A.  Tony Fratto objected. |
| 11    A.  No, she did not. | 11    Q.  What did Mr. Fratto say? |
| 12    Q.  Whom did she report to? | 12    A.  To paraphrase, his concern was that there |
| 13    A.  Tony Fratto. | 13  would be TV cameras there, and for cameras to come |
| 14    Q.  Did you ever hear about any Treasury | 14  and carry something live, we would have to give them |
| 15  employee being reprimanded about the Dam incident? | 15  some type of advance indication of what was to be |
| 16       MR. McGIVERN: Objection. | 16  announced. |
| 17    A.  Not to my recollection. | 17    Q.  Were there TV cameras at the refunding |
| 18       BY MR. THEODOROU: | 18  conference? |
| 19    Q.  Not to your recollection? | 19    A.  There were. |
| 20    A.  No. | 20    Q.  From what outlets? |
| 21    Q.  Are you aware of any changes that Treasury | 21    A.  I don't recall. |
| 22  made to its embargo procedures — excuse me. | 22    Q.  What did secretary Fisher say to |

22 (Pages 82 to 85)

Page 86

1  Mr. Fratto?
2      A.   I don't recall the exact conversation.
3      Q.   Well, you do remember Mr. Fratto talking
4  to secretary Fisher about the issue?
5      A.   I do.
6      Q.   And again what do you remember?
7      A.   I remember that undersecretary Fisher made
8  a suggestion.  I relayed it to Mr. Fratto.
9          Mr. Fratto objected, and Mr. Fratto and
10 Mr. Fisher and myself had a quick meeting in
11 Mr. Fisher's office, where both sides stated their --
12 sort of their position, and Mr. Fisher agreed to go
13 with Mr. Fratto's plan of having it released with an
14 embargo time.
15     Q.   And what did Mr. Fisher say?
16     A.   I don't recall his exact words.
17     Q.   Well, what do you remember generally?
18     A.   I remember generally that he did not think
19 that was a good idea.
20     Q.   And what do you remember Mr. Fratto saying
21 in response?
22     A.   I don't recall exactly what he said.

Page 87

1      Q.   Well, what do you remember generally?
2      A.   That he thought that everything would be
3  fine and that this was the way to handle the event.
4      Q.   That everything would be fine how?
5          MS. WILLIAMS:  Objection.
6      A.   I'm just giving you an indication of the
7  conversation as I recall it.
8          BY MR. THEODOROU:
9      Q.   I thought you testified earlier that you
10 remembered him talking about television cameras.
11     A.   I do.
12     Q.   All right.  Did he talk to Mr. Fisher
13 about television cameras?
14     A.   Yes, he did.
15     Q.   All right.  So you remember a little bit
16 more?
17     A.   I remember the general conversation as
18 I've described it to you.
19     Q.   All right.  Just so I'm not confused, why
20 don't you describe for me what you remember about
21 that conversation.
22     A.   I remember sitting in Mr. Fisher's office

Page 88

1  with Mr. Fratto and Mr. Fisher saying that he was --
2  he was -- you know, I'm paraphrasing here -- that he
3  was generally, you know, uncomfortable with an
4  embargo with the opportunity for the information to
5  leak out somehow, and that I recall Mr. Fratto
6  explaining to him that -- I do remember him
7  explaining that there's always an embargo at these
8  events and that we have to allow for the television
9  cameras to be there, but for them to come and do it
10 live, they have to bring their satellite trucks.
11 Satellite trucks require parking, being parked at the
12 curb, running the lines into the building up into
13 this room.  It's a great deal of setup.
14         So for the TV cameras to do that, we would
15 have to give them some sort of advance notice of what
16 we were going to be announcing, and that in itself
17 would be more likely to result in a problem or a leak
18 of information.  So therefore, it was advisable to
19 have the embargo in place.
20         And I remember I recall Mr. Fisher
21 basically deferring to Mr. Fratto on this, saying
22 that, you are -- you know, this is your area of

Page 89

1  expertise, I don't agree, but I will go along with
2  it.
3          And I'm paraphrasing all of that.
4      Q.   That the advance notice of the conference
5  Mr. Fratto said would lead to a potential leak?
6          MS. WILLIAMS:  Objection.
7      A.   To the best of my recollection, he was
8  explaining to Mr. Fisher that to call a TV producer
9  and say that we were having a live event at the
10 Treasury Department, we would need to give them
11 additional details about what was to be announced.
12         And that in itself could tip off the
13 market that there was going to be a big
14 announcement.
15         BY MR. THEODOROU:
16     Q.   That it was a live event?
17     A.   Correct.
18         MS. WILLIAMS:  Objection.
19     A.   If it were to be a live event.
20         BY MR. THEODOROU:
21     Q.   Because you actually did give media
22 outlets advance notice of the conference.

23 (Pages 86 to 89)

Elizabeth Schmutz                                                          August 23, 2006

Washington, DC

| Page 90 | Page 92 |
|---|---|
| 1  Correct? | 1  play the event live versus taping it and playing it |
| 2  A.  Yes. | 2  later, you were giving them advance warning that it's |
| 3     In a media advisory, we did alert them | 3  going to be a significant announcement. |
| 4  that an event would take place.  That was standard | 4     Q.  Now, directing your attention again to the |
| 5  operating procedure. | 5  October 31st conference, how was that conference |
| 6     You could not have an event without | 6  scheduled? |
| 7  letting the media know to come and cover it. | 7     A.  I don't understand the question. |
| 8     Q.  I'm trying to understand what the | 8     Q.  Well, how was it announced? |
| 9  distinction is between what you actually did and what | 9     A.  Announced to the media? |
| 10  Mr. Fratto's concern was. | 10     MS. WILLIAMS:  Objection. |
| 11     What was it? | 11  BY MR. THEODOROU: |
| 12     MS. WILLIAMS:  Objection. | 12     Q.  Yes. |
| 13     A.  Restate the question, please. | 13     A.  Announced to the media via a media |
| 14  BY MR. THEODOROU: | 14  advisory. |
| 15     Q.  I'm trying to understand the distinction | 15     Q.  And what is a media advisory? |
| 16  between what you actually did, which is to give the | 16     A.  A media advisory is a standard operating |
| 17  media advance notice of the conference, and what | 17  procedure where the public affairs office announces |
| 18  Mr. Fratto's concern was about giving the media | 18  that an event will take place, and it gives details |
| 19  advance notice of the conference. | 19  as to the time, date, and location of the event. |
| 20     MS. WILLIAMS:  Objection. | 20     At the Treasury Department, because you |
| 21     A.  And what is your question? | 21  have to get into the building through Secret Service, |
| 22  BY MR. THEODOROU: | 22  our media advisories also included information about |

| Page 91 | Page 93 |
|---|---|
| 1     Q.  What is the distinction between the 2? | 1  how to be cleared in for the event through the office |
| 2     Seems like there was none. | 2  of public affairs. |
| 3     MS. WILLIAMS:  Objection. | 3     Q.  And is the media advisory also printed on |
| 4  BY MR. THEODOROU: | 4  the Web site? |
| 5     Q.  You did it anyway. | 5     A.  Yes. |
| 6     MS. WILLIAMS:  Objection, mischaracterizes | 6     I believe that most media advisories were |
| 7  testimony. | 7  posted on the Web site. |
| 8     A.  I shouldn't answer on behalf of | 8     Q.  And was the media advisory to your |
| 9  Mr. Fratto. | 9  knowledge concerning the October 31st conference on |
| 10  BY MR. THEODOROU: | 10  the Web site? |
| 11     Q.  Okay. | 11     A.  It's my understanding that it was posted |
| 12     A.  He could tell you what the distinction | 12  on the Web site. |
| 13  is -- | 13     MR. THEODOROU:  Another exhibit. |
| 14     Q.  Okay. | 14     (Holahan Exhibit No. 4 |
| 15     A.  -- and why he made the argument. | 15     was marked for |
| 16     Q.  But do you see any distinction between | 16     identification.) |
| 17  Mr. Fratto's concern and what you did anyway? | 17     (Discussion off the record.) |
| 18     A.  Yes. | 18     BY MR. THEODOROU: |
| 19     Q.  What was the distinction? | 19     Q.  I want to direct your attention to what's |
| 20     A.  The distinction is, we very rarely held | 20  been marked as exhibit 4. |
| 21  events that were live where the news was announced | 21     Do you see that? |
| 22  live without an embargo, so if the TV cameras were to | 22     A.  I do see it. |

24 (Pages 90 to 93)

'Elizabeth Schmutz                                     August 23, 2006

Washington, DC

**Page 94**

1   Q.  Have you seen it before?
2   A.  I have.
3   Q.  When was the last time you saw it?
4   A.  Yesterday.
5   Q.  What is it?
6   A.  It's a media advisory.
7   Q.  For what?
8   A.  For the October 31st quarterly refunding
9  news conference.
10   Q.  Were you involved in drafting this
11 document?
12   A.  Yes, I was.
13   Q.  What did you draft?
14   A.  I wrote the media advisory and I -- I
15 wrote it.
16   Q.  Was anyone else involved in the draft of
17 this document?
18   A.  It was reviewed by others.
19   Q.  Reviewed by whom?
20   A.  Tony Fratto.
21   Q.  Anybody else?
22   A.  Not that I recall.

**Page 95**

1   Q.  Were you involved in the distribution of
2 this document to the media?
3   A.  Somewhat.
4   Q.  How?
5   A.  I believe that it was posted to the Web
6 site by Frances Anderson and that I emailed it to
7 reporters from my personal computer in my office.
8   Q.  Was posted by Frances Anderson on the
9 Treasury Web site?
10   A.  That is my assumption.
11   Q.  Did you authorize Ms. Anderson to post it
12 on the Web site?
13   A.  I don't recall specifically giving her
14 those instructions, but it would be not unusual for
15 it to be posted and for me to have given it to her.
16   Q.  So it's fair to say it was your practice
17 to authorize Ms. Anderson to post press releases or
18 announcements on the Web site.
19   Correct?
20   MS. WILLIAMS: Objection.
21   Repeat the question, please.
22   BY MR. THEODOROU:

**Page 96**

1   Q.  Was it your practice when it concerned
2 press conferences that you organized and were
3 responsible for and involved announcements on the Web
4 site -- was it your practice to authorize
5 Ms. Anderson to place announcements on the Web site?
6   A.  It was my practice to request that she
7 post items on the Web site.
8   Q.  Now, this was posted on the Web site to
9 your knowledge.
10   Correct?
11   A.  Correct.
12   Q.  All right. You also said that you
13 notified certain members of the media yourself; is
14 that right?
15   A.  Correct.
16   Q.  Whom did you notify?
17   A.  I don't have a specific list in my head of
18 reporters that I had on my press list, but I had a
19 list of reporters.
20   Q.  Well, do you recall notifying anybody
21 about this notice?
22   A.  As I said I don't specifically remember

**Page 97**

1 emailing this out, but I'm reasonably certain that I
2 did.
3   Q.  Do you recall who were the reporters on
4 your list?
5   A.  I recall members of the Treasury pressroom
6 were on the list. I recall that reporters from
7 newspapers such as the Wall Street Journal, The New
8 York Times, Washington Post, the Financial Times, and
9 other financial publications would be on that list.
10   Q.  And when you say, members of the Treasury
11 pressroom, are these members of the press who are
12 credentialed by Treasury?
13   A.  Yes, they are.
14   Q.  And who determines their credentials?
15   A.  It's my understanding that their
16 credentials are reviewed by senior members of the
17 office of public affairs before issued.
18   Q.  And who would have been in October 31,
19 2001, the senior members of the office of public
20 affairs who reviewed the credentials of the press and
21 allowed them to become members of the Treasury
22 pressroom?

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                              Washington, DC 20005

Elizabeth Schmutz                                                                August 23, 2006
Washington, DC

| Page 98 | Page 100 |
|---|---|
| 1  A.  At that time, the senior members of the | 1  A.  Floyd Norris was a columnist at The New |
| 2  office of public affairs were Michelle Davis, | 2  York Times. |
| 3  assistant secretary for public affairs, Rob Nichols | 3  Q.  How about The Washington Post? |
| 4  was the deputy assistant secretary for public | 4  A.  At that time, John Barry was at the |
| 5  affairs, and Tony Fratto was the director of public | 5  Washington Post. |
| 6  affairs. | 6  And there were others, but I don't recall. |
| 7  Q.  Now, you said that you contacted certain | 7  Q.  How about the Financial Times? |
| 8  newspapers yourself; is that right? | 8  A.  Reporters that have since left, I don't |
| 9  A.  Correct. | 9  recall the names. |
| 10  Q.  Okay. Whom did -- what newspapers were | 10  Q.  Now, why would you go out of your way to |
| 11  they? | 11  call them about these conferences? |
| 12  A.  On my press list? | 12  MS. WILLIAMS:  Objection. |
| 13  Q.  Yes. | 13  A.  I didn't say that I called them. |
| 14  A.  A variety of reporters on my press list. | 14  BY MR. THEODOROU: |
| 15  Some of the examples I gave you were the | 15  Q.  You said you called people on your list |
| 16  Wall Street Journal, The New York Times, The | 16  about this. |
| 17  Washington Post, the Financial Times. There were | 17  A.  I emailed them the media advisory. |
| 18  others. | 18  Q.  I'm sorry. |
| 19  Q.  Who did you contact at the Wall Street | 19  You're right. |
| 20  Journal? | 20  Why would you contact them? |
| 21  A.  When? | 21  A.  To let them know the event was taking |
| 22  Q.  October 2001. | 22  place. |

| Page 99 | Page 101 |
|---|---|
| 1  A.  October what? | 1  Q.  And why was that? |
| 2  Q.  October 31st, 2001, about this notice. | 2  Why couldn't they just check the Web site |
| 3  A.  I don't recall. | 3  on their own? |
| 4  Q.  Who was your contact at the Wall Street | 4  Why did you give them advance notice? |
| 5  Journal in -- | 5  A.  It was standard operating procedure to |
| 6  A.  There were a number of reporters at the | 6  alert the media to an event. |
| 7  Wall Street Journal that I talked to on a regular | 7  Q.  Well, when you say, the media, you're not |
| 8  basis. | 8  talking about any media. |
| 9  Q.  And who were some of those reporters that | 9  You're talking about -- you're not talking |
| 10  you can recall? | 10  about the Lowell Sun (phonetic) and Lowell Mast |
| 11  A.  I can recall Greg Ip being a reporter that | 11  (phonetic). |
| 12  I spoke to on a regular basis, Jake Schlesinger, | 12  A.  Right. |
| 13  David Wessel, Mike Schroeder. | 13  Q.  I mean, you're talking about -- so -- |
| 14  There were others. | 14  THE COURT REPORTER:  I'm sorry? |
| 15  Q.  All right. And who do you recall at The | 15  MR. THEODOROU:  The Lowell (phonetic) -- |
| 16  New York Times? | 16  (indiscernible). |
| 17  A.  The reporter at The New York Times who | 17  BY MR. THEODOROU: |
| 18  covered the Treasury Department at that time I | 18  Q.  You're not talking about any media. |
| 19  believe was Richard Stevenson, but there were other | 19  You're not talking about -- |
| 20  reporters in New York as well that we worked with. | 20  (indiscernible). |
| 21  Jonathan Fuerbringer. | 21  A.  I'm talking about financial reporters for |
| 22  Q.  Anybody else that you can recall? | 22  national publications. |

26 (Pages 98 to 101)

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  Q.  National publications.
2  A.  Correct.
3  Q.  And who made the call as to which national
4  publications should be provided this advance notice?
5  A.  For my list, I created the list.  I
6  decided.
7  Q.  You decided.
8  A.  They were reporters that wrote about the
9  Treasury Department and that showed an interest in
10  the activities of the Treasury Department.
11  Q.  Now, how did the office of public affairs
12  know when a refunding conference was going to take
13  place?
14    How did they find out?
15  A.  To the best of my recollection, the
16  refunding events were scheduled by the office of
17  domestic finance and that they were on -- they were
18  on, you know, their calendar.  So as the media
19  liaison between the office of public affairs and the
20  office of domestic finance, I would have been alerted
21  to that particular event by someone in the office of
22  domestic finance.

**Page 103**

1  Q.  And how did you find out about this
2  particular October 31st refunding conference?
3  A.  I don't recall.
4  Q.  Was it the practice of the office of
5  public affairs to distribute these media advisories
6  about upcoming quarterly refunding conferences?
7  A.  Yes.
8  Q.  Now, turning your direction to the
9  exhibit, it says on the first paragraph, Treasury
10  undersecretary for domestic finance, Peter R. Fisher,
11  will announce the U.S. government's quarterly
12  refunding needs at a news conference at 9 AM EDT on
13  Wednesday, October 31, 2001.
14    Do you see that?
15  A.  I do.
16  Q.  Okay.  When did you first learn that
17  undersecretary Fisher was going to deliver those
18  remarks?
19  A.  I don't recall.
20  Q.  You testified earlier you did have a
21  conversation with Treasury secretary Fisher -- excuse
22  me -- secretary Fisher about the conference.

**Page 104**

1    Correct?
2  A.  Can you rephrase the question.
3  Q.  You testified earlier that you did have a
4  conversation before the conference with Treasury
5  secretary Fisher about the conference?
6  A.  Regarding the embargo.
7    MS. WILLIAMS:  Objection.
8    BY MR. THEODOROU:
9  Q.  Regarding the embargo?
10  A.  Correct.
11  Q.  All right.  But you don't -- you can't
12  recall when you first learned that he was going to
13  deliver the remarks?
14  A.  No.
15  Q.  Now, the event -- you drafted this
16  document?
17  A.  Yes.
18  Q.  Okay.  Now, when it talks about an
19  embargo, if you look at the second paragraph, it
20  mentions news embargo; isn't that right?
21  A.  Yes.
22  Q.  All right.  Now, did the Treasury

**Page 105**

1  Department define what a news embargo was in any
2  document as of October 31, 2001?
3  A.  Not to my knowledge.
4  Q.  All right.  To your knowledge, is news
5  embargo defined anywhere?
6    MS. WILLIAMS:  Objection.
7  A.  In the world?
8    BY MR. THEODOROU:
9  Q.  Yeah.
10    To your knowledge have you ever seen any
11  kind of definition on what a news embargo is in a
12  regulation document or anywhere else?
13    MS. WILLIAMS:  Objection.
14  A.  I myself have not seen such a description.
15    BY MR. THEODOROU:
16  Q.  Okay.  Doesn't talk about a general
17  embargo, does it?
18    MS. WILLIAMS:  Objection, vague.
19  A.  Rephrase the question.
20    BY MR. THEODOROU:
21  Q.  Well, what is a news embargo?
22  A.  A news that it's being given as embargoed

27 (Pages 102 to 105)

Elizabeth Schmutz                                              August 23, 2006
                          Washington, DC

| Page 106 | Page 108 |
|---|---|

**Page 106**

1  until 10 AM.
2      Q.  Yeah, a news embargo.
3          And it applies to whom?
4      A.  The members of the media who are being
5  invited to attend the press conference.
6      Q.  Now, again directing your attention to
7  October 31, 2001, who was allowed to attend the
8  quarterly refunding conferences?
9      A.  Are you referring to the press conference?
10     Q.  Yes.
11         When I say, refunding conference, I mean,
12  press conference also.
13         MR. ROSSETTI:  Just for your
14  clarification, there's --
15         MR. THEODOROU:  I know there's --
16         MR. ROSSETTI:  -- a 3-day thing.
17         BY MR. THEODOROU:
18     Q.  I'm talking about the actual October 31st,
19  9 AM conference.
20         Who is allowed to attend that conference,
21  the refunding --
22     A.  Members of the media are invited to

**Page 107**

1  attend.
2      Q.  Is anyone else invited?
3      A.  Not to my knowledge.
4      Q.  To your knowledge, were private business
5  consultants ever allowed to attend those conferences?
6         MS. WILLIAMS:  Objection.
7      A.  The office of public affairs which hosted
8  the news conference did not invite anyone except for
9  the media.
10         BY MR. THEODOROU:
11     Q.  Well, who at Treasury was responsible for
12  deciding who could attend the press conferences?
13     A.  News conferences were open to all members
14  of the media.
15     Q.  Did anyone else have the authority to
16  allow others outside of the media to attend the
17  conferences?
18     A.  I'm not aware of anyone having that
19  authority.
20     Q.  And who at the office of public affairs
21  was in charge of determining who could attend the
22  conferences?

**Page 108**

1      A.  As I just said, news events hosted by the
2  office of public affairs were open to all
3  credentialed news media.
4      Q.  And what was the process in obtaining
5  credentials?
6          In other words, if I wanted to attend the
7  press conference, what would I be required to do?
8      A.  I'm speculating here, but if you called
9  the office of public affairs and wanted to attend an
10  event, you would be asked, what media outlet are you
11  associated with.
12         If you did not have a media outlet, you
13  would be told you could not attend.
14     Q.  What do you mean by, a media outlet?
15     A.  Do you write for a newspaper, do you have
16  a radio program, do you have a television program.
17     Q.  And did the office of public affairs look
18  for some kind of proof that the person was actually
19  from a newspaper, radio program, or television
20  station?
21     A.  In order to be cleared into the building,
22  you have to present your -- you have to give your

**Page 109**

1  Social Security number, your date of birth, your full
2  name, and your media organization name to Frances
3  Anderson, and she will then relay that information to
4  the Secret Service, and they will do a quick
5  background check on you, cursory, and then you will
6  be put on a list and you will be admitted to the
7  building.
8      Q.  And to your knowledge, was this the
9  procedure in effect in October 2001?
10     A.  Yes, it was.
11     Q.  Did the Department of the Treasury have
12  official written policies on who could and could not
13  attend quarterly refunding press conferences?
14     A.  Not to my knowledge.
15     Q.  Directing your attention again to exhibit
16  1, which was your recorded memorandum of interview,
17  look at the bottom paragraph, the last
18  paragraph.
19         It says:  Holahan said she did not know
20  Peter Davis and only heard his name after the fact.
21  She did not clear him into the press conference.
22         Do you see that?

28 (Pages 106 to 109)

' Elizabeth Schmutz                                                                    August 23, 2006
                              Washington, DC

| Page 110 | Page 112 |
|---|---|

**Page 110**

1  A. I do.

2  Q. All right. What does it mean to say clear

3  someone?

4  A. To be cleared into the building.

5  Q. And when you say, cleared, to be -- allow

6  someone into the building?

7  A. That Secret Service would have conducted a

8  security clearance on that person and had put them on

9  the list and admitted them into the building.

10  Q. Now, as of October 31, 2001, at the time

11  of that press conference, did you have the authority

12  to clear persons into the building to attend

13  conferences?

14  A. I had the authority to send information to

15  the U.S. Secret Service appointment desk for that

16  background check to be done.

17  Q. Okay. Did you personally clear anyone

18  into that October 31st press conference?

19  A. To the best of my recollection, no, I did

20  not.

21  Q. Do you know if there is a list,

22  comprehensive list of everybody who attended the

**Page 111**

1  October 31, 2001, conference?

2  A. I don't have any direct knowledge of that,

3  but it's a reasonable assumption that the U.S. Secret

4  Service office at the Treasury Department has a

5  listing of who was cleared in that day and at what

6  times.

7  Q. Okay. So the U.S. Secret Service at the

8  Treasury Department?

9  A. Correct.

10  Q. Does the Secret Service have an office at

11  the Treasury Department?

12  It's actually based at the Treasury

13  Department.

14  Correct?

15  A. Not any longer, no.

16  Q. The Secret Service isn't in -- they kicked

17  them out of that building a long time ago probably?

18  A. They're with the Department of Homeland

19  Security.

20  Q. Oh, they moved them out to -- okay. All

21  right.

22  But at the time, Secret Service was

**Page 112**

1  assigned as part of the Treasury.

2  Correct?

3  MS. WILLIAMS: Objection.

4  A. I don't recall.

5  BY MR. THEODOROU:

6  Q. Okay. Who -- you said that Secret Service

7  would maintain -- if there was a list they would

8  maintain the list of who was -- of the attendees of

9  the conference; is that right?

10  A. No.

11  I said that they would have a list of who

12  was cleared into that -- into the building that day,

13  and you'd have to speak to them for additional

14  details on that.

15  Q. And where was this list maintained?

16  MS. WILLIAMS: Objection.

17  BY MR. THEODOROU:

18  Q. Or do you know why this list was

19  maintained?

20  A. I don't.

21  MS. WILLIAMS: Objection.

22  BY MR. THEODOROU:

**Page 113**

1  Q. Was there a particular Secret Service

2  agent who was assigned to these refunding

3  conferences?

4  A. Not to my knowledge.

5  Q. Was there -- apart from the list of those

6  who were cleared, was there a sign-in sheet for those

7  who attended these conferences?

8  A. Not on that day.

9  Q. Not on that day?

10  A. Nope.

11  Q. Now, when there was a refunding

12  conference, how do attendees get into the Treasury

13  building on the morning of the conferences?

14  A. They would approach the front door, enter,

15  go to the desk where the Secret Service is sitting,

16  present their photo ID, and receive a visitors badge

17  if they're on the list and had previously been

18  requested for clearance.

19  Q. You're talking about having Treasury

20  credentials.

21  Could reporters with White House press

22  credentials attend?

29 (Pages 110 to 113)

Elizabeth Schmutz                                                                August 23, 2006

Washington, DC

|  | Page 114 |
|---|---|
| 1 | A.   I don't recall right now when the |
| 2 | procedure changed, but there was a time when White |
| 3 | House press credentials were enough to get into the |
| 4 | Treasury building, but at some point that did change |
| 5 | and we had to reissue Treasury credentials to all |
| 6 | White House reporters as well. |
| 7 | Q.   But as of October 31st, what was the |
| 8 | policy? |
| 9 | MS. WILLIAMS:  Objection. |
| 10 | A.   I don't recall when that policy changed. |
| 11 | BY MR. THEODOROU: |
| 12 | Q.   October 31, 2001, do you know what the |
| 13 | policy was? |
| 14 | A.   No. |
| 15 | Q.   If someone was not a member of the press |
| 16 | but wanted to attend the quarterly refunding |
| 17 | conference, what was the procedure in order to gain |
| 18 | access to the conference? |
| 19 | A.   There was not a procedure. |
| 20 | Q.   There was no procedure? |
| 21 | A.   The press conference was hosted by the |
| 22 | office of public affairs.  As a media advisory |

|  | Page 115 |
|---|---|
| 1 | indicates, that you need to go through the office of |
| 2 | public affairs to gain access to that event. |
| 3 | Q.   You subsequently learned that Peter Davis |
| 4 | attended this conference. |
| 5 | Correct? |
| 6 | A.   I did learn that. |
| 7 | Q.   So obviously there was somebody at |
| 8 | Treasury who did not follow the proper procedures in |
| 9 | allowing Mr. Davis to attend the conference. |
| 10 | MS. WILLIAMS:  Objection. |
| 11 | A.   That's a reasonable assumption. |
| 12 | BY MR. THEODOROU: |
| 13 | Q.   So is it fair to say that someone did not |
| 14 | follow the proper procedures -- |
| 15 | MS. WILLIAMS:  Objection. |
| 16 | BY MR. THEODOROU: |
| 17 | Q.   -- when he they allowed Mr. -- |
| 18 | MR. THEODOROU:  I haven't finished my |
| 19 | question. |
| 20 | MS. WILLIAMS:  Sorry. |
| 21 | I thought you had. |
| 22 | MR. THEODOROU:  I have not. |

|  | Page 116 |
|---|---|
| 1 | MS. WILLIAMS:  Okay.  I'll -- |
| 2 | MR. THEODOROU:  Please. |
| 3 | MS. WILLIAMS:  -- reserve my objection |
| 4 | until you finish your question. |
| 5 | MR. THEODOROU:  Right. |
| 6 | BY MR. THEODOROU: |
| 7 | Q.   So is it fair to say that someone did not |
| 8 | follow proper procedures in allowing Mr. Davis to |
| 9 | attend that conference that day? |
| 10 | MS. WILLIAMS:  Objection. |
| 11 | A.   If Mr. Davis was cleared into the building |
| 12 | to attend the press conference by someone outside of |
| 13 | the office of public affairs, then that would be a |
| 14 | violation of what the office of public affairs was |
| 15 | trying to do, hold a press conference for the media. |
| 16 | BY MR. THEODOROU: |
| 17 | Q.   No. |
| 18 | What room in the Treasury building was -- |
| 19 | before October 31st, do you know what rooms were used |
| 20 | for the refunding conferences or what room was used? |
| 21 | A.   I don't have direct knowledge, no, of |
| 22 | that. |

|  | Page 117 |
|---|---|
| 1 | Q.   What room was used for the quarterly |
| 2 | refunding press conference on October 31, 2001? |
| 3 | A.   The diplomatic reception room on the third |
| 4 | floor. |
| 5 | Q.   Was there a reason why the diplomatic |
| 6 | reception room was used as opposed to another room? |
| 7 | A.   Yes. |
| 8 | Q.   What was the reason? |
| 9 | A.   The reason was, it was the room where |
| 10 | press conferences at that time were traditionally |
| 11 | being held because of renovations to the building, |
| 12 | and it was literally the only room that we had |
| 13 | available. |
| 14 | Q.   It had nothing to do with the fact that |
| 15 | Peter Fisher was delivering the remarks? |
| 16 | A.   No. |
| 17 | Q.   Nor did it have anything to do with the |
| 18 | importance of the announcement? |
| 19 | A.   No. |
| 20 | Q.   Who selected the room? |
| 21 | A.   I did. |
| 22 | Q.   How large is that room? |

30 (Pages 114 to 117)

'Elizabeth Schmutz                                                      August 23, 2006
Washington, DC

|                                                                                          |
|------------------------------------------------------------------------------------------|

Page 118

1    A.   I don't have an approximate foot-by-foot
2    description --
3    Q.   Right.
4         But approximately.
5    A.   -- but it would be approximately --
6    theater-style seating would be approximately 40 or 50
7    people.
8    Q.   And where is the podium located in the
9    room?
10        Or rather, is there a podium in the room?
11        MS. WILLIAMS:  Objection.
12   A.   Well, the podium can be placed in the
13   room. It's not a permanent podium.
14        BY MR. THEODOROU:
15   Q.   Was there a podium placed in the room that
16   day?
17   A.   Yes, there was.
18   Q.   Where was it placed?
19   A.   At one end of the room.
20   Q.   How many sets of doors does the room have?
21   A.   3 -- 4.
22   Q.   Where are they located?

Page 119

1    A.   Do you have a diagram of the room?
2    Q.   I'm going to ask you to draw one for me.
3         I just want to get your sense of -- your
4    testimony.
5    A.   Along one wall, there is a room -- a door
6    in the, quote-unquote, backroom, middle of the room,
7    and there's a door behind where the podium is on the
8    left side and also on the right side.
9    Q.   Okay.
10        MR. THEODOROU:  Let's go off the record
11   for a second.
12        THE VIDEOGRAPHER:  Off the record at
13   12:23:26 PM.
14        MR. THEODOROU:  Take a 5-minute break.
15        (Whereupon, at 12:23 p.m., the deposition
16   in the above-entitled matter was recessed, to
17   reconvene at 1:03 p.m., this same day.)
18
19
20
21
22

Page 120

1         AFTERNOON SESSION
2            (1:03 p.m.)
3
4    Whereupon,
5         ELIZABETH HOLAHAN SCHMUTZ,
6    the witness testifying at the time of recess, having
7    been previously duly sworn, was further examined and
8    testified further as follows:
9
10        THE VIDEOGRAPHER:  We're back on the
11   record at 1:03:51 PM.
12
13   EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
14        BY MR. THEODOROU:
15   Q.   All right. Ms. Holahan, I just handed you
16   a blank piece of paper.
17        Before we broke, I talked about it might
18   be easier for you to draw out, and I understand these
19   are not the specific dimensions of what the
20   diplomatic reception room looked like, so I was
21   wondering if you could draw it out, point it out to
22   us -- if you could draw -- do you have a pen in front

Page 121

1    of you --
2    A.   (Gesturing.)
3    Q.   -- draw what the diplomatic reception room
4    looked like.
5         (Cellular telephone ringing.)
6         THE WITNESS:  Pardon me.
7         MR. THEODOROU:  Go off the -- no --
8         BY MR. THEODOROU:
9    Q.   And if you could just label that as,
10   diplomatic reception room, and we'll label that as an
11   exhibit too after you're done.
12        (Pause.)
13        BY MR. THEODOROU:
14   Q.   Would you please locate -- you know, you
15   testified about the doors and where the doors are
16   located.
17        Can you identify where the doors are
18   leading into the room, and just label them with doors
19   and numbers, door 1, door 2.
20   A.   (Complying.)
21   Q.   Now -- I'm sorry.
22        Did you label those?

31 (Pages 118 to 121)

Elizabeth Schmutz                                                    August 23, 2006
                            Washington, DC

| Page 122 | Page 124 |
|---|---|

**Page 122**

1    A.   (Gesturing.)
2    Q.   Great.
3         Now, is there -- do those doors lead to
4    hallways?
5    A.   Some do, some do not.
6    Q.   And of the doors you noted on that
7    diagram, which doors led to hallways?
8    A.   Door 1 and door 2 lead to what I would
9    call the main hallway on the second floor.
10   Q.   And would you please label that as the
11   main hallway.
12   A.   (Complying.)
13   Q.   Okay.
14   A.   And then --
15   Q.   Where does door 3 lead to?
16   A.   To a hallway that runs between the
17   diplomatic reception room and the secretary's large
18   conference room, which is down over here.
19        There's actually a second door here, so
20   I'm not going to -- it goes that way, though.
21   Q.   And that's called the secretary's large
22   conference room?

**Page 123**

1    A.   This room over here is, yes.
2    Q.   That's the word.
3         Could you just put an arrow and put,
4    secretary's large conference room, to show that it
5    leads to the secretary's large conference room.
6    A.   (Complying.)
7    Q.   And then door 4?
8    A.   Back here -- it leads into the kitchen.
9    Q.   That goes into the kitchen?
10   A.   Yeah.
11   Q.   Now, on October 31, 2001, secretary Fisher
12   entered through what door?
13   A.   Door 3.
14   Q.   All right.  Where was the podium located?
15        Between doors 3 and 4?
16   A.   Correct.
17   Q.   Now, the attendees to the conference would
18   have entered through doors 1 and 2?
19   A.   Initially, and then later as we got closer
20   to the beginning of the press conference, simply door
21   1.
22   Q.   As you get closer, door 2 was closed?

**Page 124**

1    A.   Yeah.
2         People were standing along the wall there.
3    Q.   All right.  Now, before the press
4    conference began on October 31, 2001, was there any
5    Treasury employee guarding the doors to the rooms to
6    close them or to prevent people from leaving?
7    A.   To the best of my recollection, I believe
8    that a colleague of mine from the office of public
9    affairs, Tera Bradshaw, was standing in the back of
10   the room by door 1.
11   Q.   And do you know if Tera Bradshaw was
12   charged with preventing people from leaving after the
13   conference started, or was she just in the back of
14   the room?
15   A.   To the best of my recollection, I believe
16   I asked her to monitor the door.  The implicit
17   meaning is, don't -- you know, people should not
18   leave once the conference has begun.
19   Q.   But do you recall telling her that --
20   A.   No --
21   Q.   -- that you --
22   A.   -- I don't recall that.

**Page 125**

1    Q.   All right.  So you don't recall telling
2    her, your job is to make sure people don't get --
3    make sure people get out?
4    A.   I don't recall telling her that, no.
5    Q.   Once someone was admitted to the
6    conference and it started after 9 o'clock, there was
7    not anything that prevented the attendee from --
8    strike that.
9         Once the conference started and a person
10   had already gotten into the conference, there wasn't
11   anything to prevent them from leaving the room once
12   it started.
13        Correct?
14   A.   Well, the doors were closed, and Tera was
15   standing by the back door.
16   Q.   Right.
17        But to your knowledge, you don't remember
18   telling Tera or whether Tera was stopping them.
19        They could just open the door and walk
20   out.
21        Right?
22        MS. WILLIAMS:  Objection.

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

| Page 126 | Page 128 |
|---|---|
| 1   A.   It's a reasonable assumption to make that | 1   Q.   Okay.  And is that your recollection |
| 2   Tera would have not allowed them to leave once the | 2   today? |
| 3   press conference was under way and the information | 3   A.   Yes. |
| 4   was being disseminated. | 4   Q.   All right.  Is it that no one left the |
| 5   Q.   But do you recall charging her with the | 5   room, or you do not recall -- or you did not see |
| 6   responsibility of doing that? | 6   anyone leave the room? |
| 7   A.   Not specifically, no. | 7   MS. WILLIAMS:  Objection. |
| 8   Q.   And do you know if she did that? | 8   A.   I did not see anyone leave the room. |
| 9   A.   I recall seeing her standing back by the | 9   BY MR. THEODOROU: |
| 10   door. | 10   Q.   Okay.  So you really don't know whether |
| 11   Q.   Right. | 11   someone left the room. |
| 12   But do you recall whether she prevented | 12   You just did not see anybody leave the |
| 13   anyone from leaving once the conference started? | 13   room? |
| 14   A.   I don't recall anyone trying to leave. | 14   A.   Correct. |
| 15   Q.   Okay.  Were there any Treasury Department | 15   Q.   Okay.  Were there any procedures in place |
| 16   employees outside of the door to prevent someone from | 16   to prevent the attendees from leaving the conference |
| 17   coming into the conference once it started? | 17   before it was over? |
| 18   A.   I don't recall. | 18   A.   I believe I just answered that. |
| 19   Q.   Did any Treasury employee check the | 19   Q.   And what was your answer? |
| 20   identity of the credentials of people who entered the | 20   A.   I just asked me a series of questions |
| 21   room? | 21   about if there was someone there to block them, and I |
| 22   A.   No. | 22   answered those questions. |

| Page 127 | Page 129 |
|---|---|
| 1   Q.   Was there a guard to prevent someone from | 1   Q.   Now, you testified -- now, the room at the |
| 2   leaving the room other than -- | 2   time when the conference was taking place, there were |
| 3   A.   No. | 3   cameras in the room. |
| 4   MS. WILLIAMS:  Objection. | 4   Correct? |
| 5   A.   No, not to my knowledge. | 5   A.   Correct. |
| 6   BY MR. THEODOROU: | 6   Q.   And there were also cameras and lights in |
| 7   Q.   Do you know if there was any guard that | 7   the room? |
| 8   was assigned to prevent someone from leaving before | 8   A.   I recall cameras being in the room. |
| 9   the conference was over? | 9   Q.   Again to your own knowledge, you did not |
| 10   A.   Not to my knowledge. | 10   see anybody leave the room? |
| 11   Q.   Now, directing your attention again to | 11   A.   I did not see anyone leave the room. |
| 12   exhibit 1, which is your memorandum of interview -- | 12   Q.   Okay.  But you do not know if someone left |
| 13   A.   M-hm. | 13   the room? |
| 14   Q.   -- if you take a look at it. | 14   MS. WILLIAMS:  Objection. |
| 15   You said in there at the bottom of the | 15   A.   Correct. |
| 16   first paragraph on the second page, and I quote: She | 16   I did not see anyone leave the room. |
| 17   said no one left the room prior to the conclusion of | 17   BY MR. THEODOROU: |
| 18   the conference at approximately 9:25 AM. | 18   Q.   The doors were not locked. |
| 19   Now, do you remember testifying about | 19   Correct? |
| 20   that -- I mean, telling them about that in your | 20   A.   Correct. |
| 21   interview? | 21   Q.   To your knowledge, has the Department of |
| 22   A.   Yes. | 22   the Treasury used written confidentiality agreements? |

33 (Pages 126 to 129)

Elizabeth Schmutz                                                    August 23, 2006
                              Washington, DC

| Page 130 | Page 132 |
|---|---|

**Page 130**

1    MS. WILLIAMS: Objection, vague.

2    A.  Regarding?

3    BY MR. THEODOROU:

4    Q.  Well, do you know whether the Department

5    of the Treasury has ever used written confidentiality

6    agreements with persons attending refunding

7    conferences?

8    MS. WILLIAMS: Objection.

9    A.  I have no knowledge of such agreements.

10   BY MR. THEODOROU:

11   Q.  Do you know of Treasury using

12   confidentiality agreements in any context?

13   A.  I'm not aware of it.

14   Q.  Do you know whether Treasury had a

15   practice of using nonwritten or oral confidentiality

16   agreements with attendees to refunding conferences?

17   A.  Can you elaborate on that question?

18   Q.  Well, I'll be -- be more specific you

19   mean?

20   A.  Correct.

21   Q.  Do you know whether Treasury -- whether

22   anyone at Treasury ever had an agreement with someone

**Page 131**

1    attending the refunding conference, an oral

2    agreement, where someone at Treasury said, do you

3    understand that the condition of you attending this

4    conference is that you can't disclose the

5    information, a one-on-one agreement?

6    MS. WILLIAMS: Objection.

7    A.  You mean -- is that different from me

8    announcing the embargo time?

9    BY MR. THEODOROU:

10   Q.  Yeah.

11   An actual agreement between someone at

12   Treasury and some other person.

13   MS. WILLIAMS: Objection.

14   BY MR. THEODOROU:

15   Q.  As opposed to simply announcing an embargo

16   time.

17   MS. WILLIAMS: Objection.

18   A.  I'm not aware of such an agreement.

19   BY MR. THEODOROU:

20   Q.  Okay. As you testified earlier, you

21   weren't aware of anybody who attended the conferences

22   consenting to the embargo.

**Page 132**

1    Correct?

2    A.  Correct, not consenting verbally or in a

3    written manner.

4    Q.  Correct.

5    Consenting in any way --

6    A.  I mean, it was --

7    Q.  -- verbally or written.

8    A.  It was a --

9    (Talking at the same time.)

10   MR. THEODOROU: I'm sorry.

11   I'm interrupting the witness.

12   MS. WILLIAMS: You are.

13   A.  By announcing an embargo to the media

14   about the release of the news and no one raised their

15   hand and objected, then that is an implicit agreement

16   in my mind.

17   BY MR. THEODOROU:

18   Q.  In your mind, but my question was a little

19   different.

20   Nobody either orally or in writing

21   consented to this.

22   A.  Correct.

**Page 133**

1    MS. WILLIAMS: Objection.

2    BY MR. THEODOROU:

3    Q.  Correct?

4    A.  Yes.

5    Q.  And to your knowledge, you do not know

6    whether someone came into the room after you

7    announced the embargo?

8    MS. WILLIAMS: Objection.

9    A.  I'm reasonably certain they did not.

10   BY MR. THEODOROU:

11   Q.  But I'm asking you, do you know, your own

12   recollection?

13   MS. WILLIAMS: Objection.

14   She announced it a couple of times --

15   MR. THEODOROU: No.

16   I --

17   MS. WILLIAMS: -- I think her testimony

18   is.

19   MR. THEODOROU: You can object all you

20   want.

21   MS. WILLIAMS: Right.

22   I'm trying to clarify --

34 (Pages 130 to 133)

Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

---

**Page 134**

1    MR. THEODOROU: She's going to answer the
2    question.
3        BY MR. THEODOROU:
4    Q.  Which is, do you know whether someone
5    entered into the room after it started.
6        MS. WILLIAMS: Objection.
7    A.  I do not recall anyone entering the room
8    after the press conference began.
9        BY MR. THEODOROU:
10   Q.  Turning to your memorandum of interview
11   again on page 2 -- do you have that in front of you?
12   A.  I do.
13   Q.  All right.  You said you did not know
14   Peter Davis -- and this is second page -- Holahan
15   said she did not know Peter Davis and only heard his
16   name after the fact.  She said she did not clear him
17   into the press conference.
18       Correct?
19   A.  Correct.
20   Q.  All right.  When did you first learn about
21   who Peter Davis was?
22   A.  When did I first hear his name?

---

**Page 135**

1        What is your question?
2    Q.  Yeah.
3        When did you first hear his name?
4    A.  I first heard his name from Paul Malvey
5    the morning of the 31st.
6    Q.  And did you have a conversation with
7    Mr. Malvey?
8    A.  I did.
9    Q.  Where?
10   A.  In the office of public affairs section --
11   there's an open section of the office by where the
12   administrative assistants sit.
13   Q.  Was anybody else present?
14   A.  There were others in the room.
15   Q.  Who else was in the room?
16   A.  Frances Anderson.
17   Q.  Anyone else?
18   A.  Not that I recall.
19       There were others present, you know, but
20   not participating in a conversation or couldn't even
21   hear it.  It was a one-on-one conversation.
22   Q.  What did Mr. Malvey say?

---

**Page 136**

1    A.  In the course of a conversation about the
2    information from the news conference being
3    disseminated before the 10 AM embargo, I relayed to
4    him what I had heard about a consultant being at the
5    press conference, a nonmedia person.
6        And he said that he knew of a consultant
7    that had come into the building to attend the news
8    conference.
9    Q.  Did he say anything else?
10   A.  Yes.
11   Q.  What did he say?
12   A.  He told me that -- I believe I asked him,
13   how would this person have gotten in, and he told me
14   that his secretary had cleared this person in.
15   Q.  And who was his secretary?
16   A.  I don't know her full name, but I believe
17   her first name is Rosemary.
18   Q.  Have you ever heard the name Lula Tyler?
19   A.  No.
20   Q.  Did you say anything in response to
21   Mr. Malvey?
22   A.  I don't recall what I said.

---

**Page 137**

1    Q.  Was Davis's attendance -- and did he
2    mention who the person was, what his name was?
3    A.  He did.  That's the first time I heard his
4    name.
5    Q.  First time you heard the name Peter Davis?
6    A.  Correct.
7    Q.  Was Mr. Davis's attendance at that
8    quarterly refunding press conference consistent with
9    your understanding of the Treasury policies?
10   A.  No.
11   Q.  And so how did it violate Treasury
12   policies?
13       MS. WILLIAMS: Objection.
14   A.  The news conference was being hosted by
15   the office of public affairs for the media, and this
16   was a person who was not a member of media attending
17   the press conference.
18       BY MR. THEODOROU:
19   Q.  Did you ever hear about Mr. Davis getting
20   kicked out of prior Treasury press conferences after
21   October 31st?
22       MS. WILLIAMS: Objection.

---

35  (Pages 134 to 137)

Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

| Page 138 | Page 140 |
|---|---|
| 1    BY MR. THEODOROU: | 1    A.  There were 3 assistant secretaries who |
| 2    Q.  Ever hear of it after October 31st, that | 2  reported to him.  Under the assistant secretaries, |
| 3  he had been kicked out of press conferences in the | 3  there were deputy assistant secretaries. |
| 4  past? | 4    THE COURT REPORTER:  You have to slow |
| 5    A.  No. | 5  down. |
| 6    I'm unaware of that. | 6    A.  Under the deputy assistant secretaries, |
| 7    Q.  Did anyone tell you -- did you ever learn | 7  there were directors.  He was a director. |
| 8  that -- are you aware of someone named Jon Murchison? | 8    BY MR. THEODOROU: |
| 9    A.  No. | 9    Q.  Did Mr. Malvey have the authority to clear |
| 10    Q.  And I think I asked you this. | 10  persons into the press conferences in October 31st, |
| 11    Lula Tyler, do you know her? | 11  2001? |
| 12    A.  I'm not familiar with that name. | 12    MS. WILLIAMS:  Objection. |
| 13    Q.  Do you know if this woman -- strike that. | 13    A.  In my opinion, he did not. |
| 14    You're not familiar with that and you | 14    BY MR. THEODOROU: |
| 15  don't know whether she had any authority to allow | 15    Q.  Do you know who Jill Ousley is? |
| 16  people into the building? | 16    A.  I do not. |
| 17    MS. WILLIAMS:  Objection. | 17    Q.  Or was? |
| 18    A.  I don't know who she is. | 18    Do you know who Roger Anderson is? |
| 19    BY MR. THEODOROU: | 19    A.  Yes. |
| 20    Q.  Okay.  How about someone named Elnora | 20    Q.  Who was Roger Anderson? |
| 21  Bowser? | 21    A.  He was -- I think he was -- I can't recall |
| 22    A.  I don't know who that is. | 22  his title, but he worked within the office of |

| Page 139 | Page 141 |
|---|---|
| 1    Q.  What was Mr. Malvey's position at the time | 1  domestic finance as well and he was. |
| 2  when he had that conversation with you on the 31st? | 2    Q.  I'm sorry? |
| 3    A.  I don't recall his exact title, but he was | 3    A.  He was the deputy assistant secretary, I |
| 4  in -- he worked within the office of domestic | 4  believe. |
| 5  finance, and he reported to the assistant secretary | 5    Q.  Deputy assistant secretary for federal |
| 6  for financial markets, Brian Roseboro. | 6  finance? |
| 7    And Paul Malvey, who has since retired, | 7    A.  That sounds right. |
| 8  was a career Treasury employee.  He was not a | 8    A lot of titles. |
| 9  political appointee. | 9    Q.  Did you ever learn after October 31st |
| 10    Q.  Was the office of domestic finance the | 10  about an agreement between Mr. Anderson and Mr. Davis |
| 11  same as the office of market finance? | 11  concerning the confidentiality of what was said at a |
| 12    A.  No. | 12  refunding conference? |
| 13    Q.  Okay.  Are there differences between the | 13    A.  No. |
| 14  2? | 14    Q.  Do you know of any confidentiality |
| 15    A.  The office of domestic finance is like the | 15  agreement reached between Pete Davis and any employee |
| 16  umbrella office. | 16  or representative of the Treasury Department? |
| 17    And as I went through earlier, the | 17    A.  I'm not aware of any, no. |
| 18  hierarchy was, undersecretary Fisher was the | 18    Q.  Have you heard about any such agreement? |
| 19  undersecretary for domestic finance. | 19    A.  No. |
| 20    THE COURT REPORTER:  You've got to slow | 20    Q.  If an agreement -- if such agreement |
| 21  down. | 21  existed, would the office of public affairs have been |
| 22    (Discussion off the record.) | 22  notified about the agreement? |

36 (Pages 138 to 141)

'Elizabeth Schmutz                                                                August 23, 2006

Washington, DC

| Page 142 | Page 144 |
|---|---|
| 1      MS. WILLIAMS: Objection. | 1  announced. |
| 2      A.   That's an opinion I don't have. I can't | 2         Do you see that? |
| 3  give you a sense of that. | 3      A.   I do. |
| 4      BY MR. THEODOROU: | 4      Q.   All right. Again, what planning went into |
| 5      Q.   If there was an agreement -- I understand | 5  the release of the information on the 30-year bond |
| 6  that. | 6  that day? |
| 7         And I'm just asking -- I'm not trying to | 7         What kind of planning was done? |
| 8  trick you into anything by asking these questions. | 8         MS. WILLIAMS: Objection. |
| 9  I'm just trying to find out what happened. | 9      A.   Are you asking -- well, can you please |
| 10        If there was an agreement between Peter | 10  restate the question with more specifics. |
| 11  Davis and Mr. Anderson, in other words, oral or | 11        BY MR. THEODOROU: |
| 12  written, where it was a confidentiality agreement | 12      Q.   All right. In terms of setting up the |
| 13  that you, Mr. Davis -- we'll allow you to attend the | 13  press conference -- okay? -- who was in charge of |
| 14  refunding conferences, but you can't disclose what's | 14  that? |
| 15  said there, would it have been the practice of | 15      A.   I was. |
| 16  somebody in Mr. Anderson's office or Mr. Malvey's | 16      Q.   All right. Were there any other offices |
| 17  office to inform public affairs of such an agreement? | 17  involved at Treasury? |
| 18        MS. WILLIAMS: Objection. | 18      A.   The office of domestic finance. |
| 19      A.   I'm not aware of any such agreement. | 19      Q.   And who in the office of domestic finance |
| 20        Hypothetically if one -- if someone in the | 20  was working with you to set up the press conference? |
| 21  building was giving information to people, nonmedia | 21      A.   They weren't working with me to set up the |
| 22  people to attend a public affairs event then, yes, in | 22  press conference. |

| Page 143 | Page 145 |
|---|---|
| 1  my opinion, we should have been informed. | 1         They were aware of what the office of |
| 2      BY MR. THEODOROU: | 2  public affairs was doing regarding setting up the |
| 3      Q.   And if someone had allowed someone who was | 3  press conference. |
| 4  not a member of the media to attend the refunding | 4      Q.   And what do you do when you set up a press |
| 5  conference, you would have wanted to have known about | 5  conference? |
| 6  that. | 6         What do you have to do? |
| 7         Correct? | 7      A.   Make a decision about the time and the |
| 8      A.   Yes. | 8  location, draft a media advisory. |
| 9         MS. WILLIAMS: Objection. | 9      Q.   Which is the document we looked at -- |
| 10        BY MR. THEODOROU: | 10      A.   Correct. |
| 11      Q.   In this case, you were never told about | 11      Q.   -- earlier today? |
| 12  Mr. Davis attending the conference. | 12        Right? |
| 13        Correct? | 13      A.   Disseminate that media advisory to the |
| 14      A.   Correct. | 14  media so that they know an event is taking place that |
| 15      Q.   All right. Now, going back to exhibit 1 | 15  they are invited to come and cover. There's a |
| 16  again. | 16  statement that is drafted for the official to give at |
| 17        This is -- let me just find where -- if | 17  the press conference. There's planning regarding, |
| 18  you turn to page 1 there, Ms. Holahan. | 18  you know, the statement being formatted, when it's to |
| 19        It says at the bottom of page 1: Holahan | 19  be released, things of that nature. |
| 20  said as part of her official duties she helped | 20      Q.   Who drafts the statement for the official |
| 21  coordinate the October 31, 2001, press conference | 21  to read at the press conference? |
| 22  where a suspension of the sale of 30-year bond was | 22      A.   Mr. Fisher's statements were generally |

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                                          Washington, DC 20005

Elizabeth Schmutz                                                    August 23, 2006
                              Washington, DC

| Page 146 | Page 148 |
|---|---|

**Page 146**

1  drafted by Mr. Fisher and his aides.
2      Q.   Did you have any input?
3      A.   I did not.
4      Q.   And the statement that he reads is the
5  same as the statement that goes out over the Web once
6  the conference is over?
7      A.   Generally speaking, yes.
8      Q.   And was that the case on October 31st?
9      A.   Yes.
10     Q.   So he reads verbatim a particular
11  statement?
12     A.   Yes.
13     Q.   And then does he take questions?
14     A.   Yes, he does.
15     Q.   All right. On that day, what happened?
16          Would you describe for me what happened?
17          The conference you said began at 9 AM?
18     A.   I announced to the media present there
19  would be an embargo upon the information announced
20  until 10 AM. Undersecretary Fisher stood at the
21  podium, read his statement.
22     Q.   And when did he come into the

**Page 148**

1          (Holahan Exhibit No. 5
2          was marked for
3          identification.)
4          BY MR. THEODOROU:
5      Q.   I'm sorry.
6          So he came in?
7      A.   Through door 3.
8      Q.   Correct.
9      A.   Right there.
10     Q.   You made your announcement?
11     A.   Made my announcement.
12          He made -- he read his statement.
13          According to the memorandum of activity, I
14  reiterated the embargo time before the
15  question-and-answer period began.
16  Question-and-answer period ensued.
17          And once there were no more questions,
18  Mr. Fisher thanked the media for coming, and I for
19  the third time reiterated the embargo time until 10
20  AM.
21     Q.   Now, when you say, for the third time --
22          MS. WILLIAMS: Objection.

**Page 147**

1  conference?
2      A.   At approximately 9:05.
3      Q.   What door did he enter into on the
4  exhibit?
5      A.   Door 3.
6      Q.   And that exhibit would have been --
7          MR. THEODOROU: What number would that
8  exhibit be?
9          THE COURT REPORTER: It will be 5.
10         MR. THEODOROU: We'll mark that as an
11  exhibit.
12         BY MR. THEODOROU:
13     Q.   All right. Exhibit 5.
14         You would have come in through what door?
15         MR. ROSSETTI: You want to mark it?
16         MS. WILLIAMS: She has to put the sticker
17  on.
18         MR. THEODOROU: She's going to mark it as
19  exhibit 3.
20         MR. ROSSETTI: 5.
21         MR. THEODOROU: 5.
22         Excuse me.

**Page 149**

1          BY MR. THEODOROU:
2      Q.   -- is that your actual recollection today,
3  or are you reading off that memorandum of interview?
4      A.   As I said earlier, what I recall today is
5  that I gave the embargo time at the beginning and at
6  the conclusion of the press conference.
7      Q.   Do you remember --
8      A.   As I sit here today, I recall doing it
9  twice.
10     Q.   Correct. All right.
11         Now, as you sit here today, you recall
12  doing it twice, and that does not independently
13  refresh your recollection whether you did it a third
14  time?
15     A.   Does not.
16     Q.   Now, you hadn't been involved in planning
17  any other quarterly refunding conference before the
18  October 31st one.
19         Correct?
20     A.   Correct.
21     Q.   Now, do you know that there was a
22  quarterly refunding conference on October 1st, 2001,

38 (Pages 146 to 149)

'Elizabeth Schmutz                                              August 23, 2006
                           Washington, DC

Page 150

1   before you started -- excuse me -- on August 1st,
2   2001?
3        A.   I'm not aware of it.
4        Q.   So you don't know who coordinated that?
5        A.   My understanding was that Tony Fratto was
6   the person handling domestic finance before I started
7   on August the 6th, so it is also my understanding
8   that he handled that particular press conference.
9        Q.   Now, this particular quarterly refunding
10  conference was different than the others in that
11  usually they used a different room than the
12  diplomatic reception room; isn't that right?
13       MS. WILLIAMS:  Objection.
14       A.   I have no knowledge of where --
15       BY MR. THEODOROU:
16       Q.   Did you know they used different rooms in
17  the past?
18       A.   No.
19       MS. WILLIAMS:  Objection.
20       BY MR. THEODOROU:
21       Q.   Did you also know that -- well, you
22  testified to this earlier, that they did not preset

Page 152

1        (Mr. McGivern left the room.)
2        A.   If you're referring to undersecretary
3   Fisher's statement, his statement was sent to me
4   electronically from members of his staff, and then I
5   passed it along to our administrative assistant,
6   Frances Anderson, to have her format it.
7        BY MR. THEODOROU:
8        Q.   And do you know who provided the office of
9   public affairs with the statement to be released?
10       A.   It came from -- I believe it came from
11  officials in the office of financial markets.
12       Q.   Okay.  Do you know who at the office of
13  financial markets sent it to your office?
14       A.   I believe it was Tim Bitsberger.
15       Q.   And who was he?
16       A.   At the time he was the deputy assistant
17  secretary for financial markets, but that title might
18  not be a hundred percent accurate.
19       He was deputy assistant secretary for
20  something, but it was -- it was -- he reported to
21  assistant secretary for financial markets, Brian
22  Roseboro, which is, R-O-S-E-B-O-R-O.

Page 151

1   the embargo time in the past.
2        Correct?
3        MS. WILLIAMS:  Objection.
4        A.   That's my understanding.
5        BY MR. THEODOROU:
6        Q.   Do you know whether the embargo period in
7   this case was longer than usual?
8        A.   Do I know now?
9        Yes.
10       Q.   And did you know at the time?
11       A.   At the time we didn't know what the
12  embargo time would be, the length of time to the end
13  of the event and 10 o'clock, we did not know at the
14  time.
15       Q.   What's the procedure -- or what was the
16  procedure at the time in October 2001 for creating
17  press releases for quarterly refunding press
18  conferences, for creating the actual press release?
19       A.   Can you be more specific with your
20  question?
21       Q.   How was the press release created on
22  October -- for October 31, 2001?

Page 153

1        Q.   Did the office of public affairs edit the
2   statement that came to it?
3        A.   No.
4        Q.   Does anyone review the document before it
5   is distributed to the press?
6        MS. WILLIAMS:  Objection.
7        BY MR. THEODOROU:
8        Q.   Or did anyone review the document before
9   it was distributed to the press that day?
10       MS. WILLIAMS:  Objection.
11       A.   Can you be more specific?
12       Did anyone review the file that was sent
13  to me at 8:30 in the morning?
14       BY MR. THEODOROU:
15       Q.   Yes.
16       A.   No.
17       It was written and finalized by the office
18  of domestic finance, substance of what he was going
19  to say.
20       Q.   So the substance before it goes on to the
21  Treasury Web site, it was not edited to your
22  knowledge?

39 (Pages 150 to 153)

Elizabeth Schmutz                                                    August 23, 2006
                          Washington, DC

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  A.  The text itself was not edited.
2      MS. WILLIAMS: Objection.
3      BY MR. THEODOROU:
4  Q.  And who was responsible for approving the
5  final product that goes onto the Web site?
6  A.  In this situation, I was.
7  Q.  Do you recall when the office of public
8  affairs received a copy of the statement to be
9  released?
10  A.  8:39 AM.
11  Q.  And why are you -- how are you so specific
12  about the time?
13  A.  Because I've reviewed the email.
14  Q.  You reviewed it yesterday?
15  A.  It was my email.
16      (Holahan Exhibit No. 6
17      was marked for
18      identification.)
19      BY MR. THEODOROU:
20  Q.  Now, I'm showing you what's been marked as
21  exhibit 6.
22      Have you seen this before, Ms. Holahan?

**Page 155**

1  A.  Yes, I have.
2  Q.  Okay.  What is it?
3  A.  It's an email that I received from Tim
4  Bitsberger at 8:39 AM and then forwarded it on to
5  Frances Anderson at 8:41 AM.
6  Q.  Okay.  And this particular document was
7  printed from your computer at Treasury.
8      Correct?
9  A.  That's correct.
10  Q.  All right.  And the message at the top as
11  you say is from you to Frances Anderson at 8:41?
12  A.  That's correct.
13  Q.  And the message below is from Tim
14  Bitsberger to Peter Fisher, you, Paul Malvey, and
15  Jared Gross.
16      Correct?
17  A.  That's correct.
18  Q.  Who is Jared Gross?
19  A.  Jared Gross at the time was the senior
20  adviser to Peter Fisher.
21  Q.  Okay.  What was Mr. Bitsberger's position
22  at the time?

**Page 156**

1  A.  As I just said, he was the deputy
2  assistant secretary in the office of financial
3  markets.
4  Q.  And the subject of his message,
5  Mr. Bitsberger to Mr. Fisher, to you, Mr. Malvey, and
6  Jared Gross, the subject is final version.
7      Correct?
8  A.  Yes, that's correct.
9  Q.  All right.  Now, it contained an
10  attachment in Microsoft Word format, doesn't it?
11  A.  It appears to be, yes.
12  Q.  And it looks like it was a 4-page document
13  containing undersecretary Fisher's remarks for the
14  upcoming press conference?
15  A.  Correct.
16  Q.  And do you remember this was the
17  attachment to this email?
18  A.  I do.
19  Q.  Now, the document name in small type at
20  the bottom of the email message reads: NOVQ, dash,
21  final, dot, doc.
22      Do you see that?

**Page 157**

1  A.  I do.
2  Q.  Now, "NOVQ" refers to what?
3  A.  I don't know.
4  Q.  Could it refer to the November quarterly
5  refunding announcement?
6      MS. WILLIAMS: Objection.
7  A.  It's possible.  You'd have to ask the
8  person who named it.
9      BY MR. THEODOROU:
10  Q.  All right.  And "final" refers to the
11  final version of this announcement?
12  A.  Like I said, you'd have to ask the person
13  who named it.  I did not --
14  Q.  Are you saying you don't know what that
15  means, final?
16  A.  Do I understand what final means?
17      (Talking at the same time.)
18      BY MR. THEODOROU:
19  Q.  Yeah.
20      THE COURT REPORTER: Okay.  Wait.
21      (Discussion off the record.)
22      MS. WILLIAMS: Objection.

Alderson Reporting Company
1111 14th Street, NW Suite 400        1-800-FOR-DEPO        Washington, DC 20005

'Elizabeth Schmutz                                          August 23, 2006
Washington, DC

| Page 158 | Page 160 |
|---|---|
| 1    (Discussion off the record.) | 1   Q.  Did she report to you? |
| 2    BY MR. THEODOROU. | 2   A.  No, she did not. |
| 3   Q.  And "final" refers to the final version of | 3   Q.  Did she report to Mr. Fratto? |
| 4  the announcement? | 4   A.  Yes, she did. |
| 5    MS. WILLIAMS: Objection. | 5   Q.  And did you give Ms. Anderson -- |
| 6   A.  As I just stated, I did not name the | 6  work -- (indiscernible) -- |
| 7  document. I cannot tell you what that means. But | 7   A.  On occasion, I did. |
| 8  it's a reasonable assumption to believe that it is a | 8   Q.  Was Mr. Bitsberger's email to you at 8:39 |
| 9  final version of the document. | 9  the first time you saw Mr. Fisher's statement? |
| 10    BY MR. THEODOROU: | 10   A.  It was. |
| 11   Q.  And it's a reasonable assumption to | 11   Q.  Did you review this statement? |
| 12  believe "NOVQ" refers to November quarterly refunding | 12   A.  I don't recall reading through it word for |
| 13  announcement? | 13  word. It's a reasonable assumption that I opened it, |
| 14    MS. WILLIAMS: Objection. | 14  looked at it briefly, and then closed it. |
| 15   A.  That's not my reasonable assumption. | 15   Q.  All right. When you met with the SEC the |
| 16  That's yours. | 16  last couple times, did they show you this document? |
| 17    BY MR. THEODOROU: | 17   A.  Yes, they did. |
| 18   Q.  What does "NOVQ" stand for? | 18   Q.  All right. Mr. Fisher's statement does |
| 19   A.  I don't know. | 19  not contain any information about an embargo or |
| 20    MS. WILLIAMS: Objection. | 20  release time, does it? |
| 21   A.  I did not name the document. | 21   A.  No, it does not. |
| 22    MS. WILLIAMS: Objection. | 22   Q.  Was it the job of the office of public |

| Page 159 | Page 161 |
|---|---|
| 1    THE COURT REPORTER: You guys need to give | 1  affairs at the time to add the appropriate |
| 2  me a shot at it here. | 2  information about embargo release time? |
| 3    MS. WILLIAMS: I need a chance to object | 3   A.  Yes. |
| 4  before you answer the question. That's what | 4    That was standard procedure, to add the |
| 5  happened. | 5  information about the release time and the name and |
| 6    BY MR. THEODOROU: | 6  the phone number of the contact person. |
| 7   Q.  But you recall receiving and sending the | 7   Q.  And who was responsible for adding this |
| 8  emails. | 8  information with the office of public affairs? |
| 9    Correct? | 9   A.  At the time, it was standard procedure for |
| 10   A.  Correct. | 10  Frances Anderson to format the document with the |
| 11   Q.  All right. Now, Frances Anderson, she was | 11  letterhead, with the release time, and with the |
| 12  the public information coordinator at the time? | 12  contact information. |
| 13   A.  I am not sure of her title. She was | 13   Q.  Did anyone have the responsibility of |
| 14  essentially the secretary, the administrative | 14  telling Frances Anderson about an embargo? |
| 15  assistant. | 15   A.  It was my responsibility to inform her |
| 16   Q.  She worked in the office of public | 16  about the embargo. |
| 17  affairs? | 17   Q.  Besides the embargo time and adding, you |
| 18   A.  She did. | 18  say -- letterhead? |
| 19   Q.  All right. Did she have a higher- or | 19    Correct? |
| 20  lower-ranking position than you in the office of | 20   A.  Yes. |
| 21  public affairs? | 21   Q.  What kind of letterhead was to be added to |
| 22   A.  Lower. | 22  this document, Mr. Fisher's statement? |

41 (Pages 158 to 161)

Elizabeth Schmutz                                                    August 23, 2006
                            Washington, DC

| Page 162 | Page 164 |
|---|---|

**Page 162**

1    A.   A letterhead indicating that it was coming
2  from the Department of the Treasury office of public
3  affairs.
4    Q.   Besides adding the letterhead and adding
5  embargo, did Ms. Anderson have to do anything with
6  the formatting of this document?
7    A.   That was formatting it.
8    Q.   How about spellchecking?
9    A.   No.
10    Q.   Did anyone at the office of public affairs
11  have the responsibility of making any substantive
12  edits?
13    A.   No.
14    Q.   Now, you sent Ms. Anderson an email at
15  8:41 with the document.
16        Correct?
17    A.   Correct.
18    Q.   You said, please format and email a
19  formatted copy back to me.
20        Correct?
21    A.   Correct.
22    Q.   All right.  What exactly did you want

**Page 163**

1  Ms. Anderson to do?
2    A.   I wanted her to take this text that I had
3  received from Mr. Bitsberger and format it
4  electronically so there was a letterhead, a release
5  time, and my name and phone call as the contact.
6    Q.   Had you ever asked Ms. Anderson to format
7  a document like this before?
8    A.   Yes.
9    Q.   Your particular email does not mention the
10  embargo time, though, does it?
11    A.   Correct.
12    Q.   Did you orally inform her about the
13  embargo time?
14    A.   It was my understanding that she was aware
15  of the event that we were having that morning, that
16  there was an embargo.
17    Q.   My question is, did you orally inform her.
18    A.   That morning, I did not.
19    Q.   Prior to that morning, did you inform her
20  of the embargo time?
21    A.   I do not recall specifically informing her
22  of the embargo time.

**Page 164**

1    Q.   Do you know if anyone told Ms. Anderson
2  about the embargo time for the October 31st
3  conference?
4    A.   I can only speak for myself.
5    Q.   My question -- so your answer is, you
6  don't know of anyone else who spoke to her about it?
7    A.   No, I do not.
8        MR. THEODOROU:  Let's go to the next
9  document.
10        (Holahan Exhibit No. 7
11             was marked for
12             identification.)
13        BY MR. THEODOROU:
14    Q.   I'm now showing you, Ms. Holahan, what's
15  been marked as exhibit 7.
16        Do you see that document?
17    A.   I do.
18    Q.   Have you seen it before today?
19    A.   I have.
20    Q.   All right.  When was the last time you saw
21  it?
22    A.   I believe yesterday.

**Page 165**

1    Q.   And this is another email printed out from
2  your computer at Treasury?
3    A.   That's correct.
4    Q.   And the message at the top was from Tony
5  Fratto to you and other people -- 7 other people --
6  at 8:53 AM on October 31, 2001?
7    A.   M-hm, that's correct.
8    Q.   All right.  And the message below that was
9  a message from you to a number of other people?
10    A.   Correct.
11    Q.   On October 31, 2001, at 8:46.
12        Correct?
13    A.   M-hm, correct.
14    Q.   And the message below that was a message
15  from Timothy Bitsberger to Peter Fisher, you, Paul
16  Malvey, and Jared Gross at 8:39 --
17    A.   Correct.
18    Q.   -- AM?
19        And that's a message we've already
20  discussed.
21        Correct?
22    A.   Yes.

42 (Pages 162 to 165)

Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

---

Page 166

1    Q.   All right. Directing your attention to
2  your message at 8:46 AM to a group of people, who --
3  you mention here Robert Nichols.
4    Q.   Who is Robert Nichols?
5    A.   The deputy assistant secretary for public
6  affairs.
7    Q.   You also sent this to J.T. Young.
8         Do you see that?
9    A.   I do.
10   Q.   Who was J.T. Young?
11   A.   He was in the office of legislative
12 affairs.
13   Q.   You also sent it to someone named Amy
14 Best.
15        Who is Amy Best?
16   A.   In the office of legislative affairs.
17   Q.   You also sent it to someone named Tim
18 Dulaney?
19   A.   Dulaney.
20   Q.   Do you know who that was?
21   A.   I believe he was in the office of
22 legislative affairs.

---

Page 167

1    Q.   Why did you forward Mr. Fisher's statement
2  to these Treasury employees?
3    A.   Because they were in the office of
4  legislative affairs, and they would be charged with
5  informing congressional members of the announcement.
6    Q.   Okay. Now, in your message, you state to
7  Paul Malvey, J.T. Young, and Tim Dulaney, please
8  email to your key people at 10 AM today, not before.
9    A.   Correct.
10   Q.   Correct?
11        And what do you mean by the phrase -- what
12 did you mean by, key people?
13   A.   The people outside of the building that
14 would need to be informed, that should be informed.
15   Q.   And who were these people?
16   A.   Well, J.T. and Tim were in the office of
17 legislative affairs, so that means members of
18 Congress.
19   Q.   Who would have been those members of
20 Congress that they had to inform?
21   A.   I'm not going to speculate on who they
22 would have informed, but it's reasonable to assume

---

Page 168

1  committee chairs for the committees that oversee
2  Treasury and things of that nature.
3    Q.   And what committees would those have been?
4    A.   I believe the finance committee, anyone
5  who has to do with financial issues, but I'd have to
6  refer you to the office of legislative affairs. They
7  can tell you who they would send information to on a
8  regular basis.
9    Q.   And how about Mr. Malvey?
10        Who were his key people?
11        MS. WILLIAMS:  Objection.
12   A.   You'd have to ask him.
13        BY MR. THEODOROU:
14   Q.   Was there a reason why Treasury would send
15 these key people the statement by email directly as
16 opposed to having them hear the news like everyone
17 else at a conference?
18   A.   When the conference would be over and the
19 embargo was lifted at 10 AM. So it's public
20 information as of 10 AM.
21        MR. THEODOROU:  I've just been informed we
22 have to make a tape change, so we'll make the change.

---

Page 169

1        THE VIDEOGRAPHER:  This is the end of tape
2  number 2 in the video deposition of Ms. Elizabeth
3  Holahan.  We're off the record at 1:49:24 PM on
4  August 23rd, 2006.
5        (Recess.)
6        THE VIDEOGRAPHER:  This is the beginning
7  of tape 3 in the videotape deposition of
8  Ms. Elizabeth Holahan.  On the record at 1:55:20 PM
9  on August 23rd, 2006.
10        BY MR. THEODOROU:
11   Q.   Ms. Holahan, your message you wrote:
12 Frances says she cannot format this into electronic
13 file with Treasury letterhead, so send as is.  Sorry.
14        Do you see that?
15   A.   I do.
16   Q.   And you're referring to Frances Anderson
17 there?
18   A.   I am.
19   Q.   And you had sent Mr. Fisher's statement to
20 Ms. Anderson 5 minutes earlier at 8:41 AM?
21   A.   Correct.
22   Q.   Between the time that you had sent

43 (Pages 166 to 169)

Elizabeth Schmutz                                                    August 23, 2006
                            Washington, DC

| Page 170 | Page 172 |
|---|---|

**Page 170**

1   Mr. Fisher's statement and when you sent this email,
2   had you spoken with Ms. Anderson?
3       A.   I had.
4       Q.   You had?
5       A.   Yes.
6       Q.   What exactly did you say to her?
7       A.   She walked past my office door.  I asked
8   her if she had a chance to format it, because I
9   needed it back.
10          And she informed me verbally that she was
11  having some sort of a problem with the letterhead and
12  she couldn't do it.
13      Q.   What kind of problem with the letterhead?
14      A.   She didn't specify.
15      Q.   And at that time, did you tell her -- give
16  her the embargo time?
17          MS. WILLIAMS:  Objection.
18      A.   No.
19          BY MR. THEODOROU:
20      Q.   Now, take a look at Mr. Fratto's email
21  above yours at 8:53 AM.
22          Do you see it?

**Page 172**

1   has a plus symbol added.
2           Do you notice -- do you compare it --
3   isn't that right?
4       A.   It appears to be.
5       Q.   In fact there's a difference.
6           Now, did you look at the document at this
7   time that Mr. Fratto attached to his email?
8       A.   Yes.
9       Q.   And did that particular document have the
10  soft letterhead that you wanted?
11      A.   Yes.
12      Q.   And what is the soft letterhead again?
13      A.   It's an electronic graphic.
14      Q.   A graphic of what?
15      A.   The Treasury Department.
16      Q.   Why do they call it, soft letterhead?
17      A.   Because it's -- it's considered a hard
18  copy on paper, and something that's soft is the
19  opposite of hard.
20      Q.   What was on -- like on a computer?
21      A.   Yeah.
22      Q.   Okay.

**Page 171**

1       A.   I do.
2       Q.   And the context reads:  Here is a copy
3   with Treasury letterhead suitable for email or fax.
4           Do you see that?
5       A.   I do.
6       Q.   Now, did Mr. Fratto attach a revised
7   version of Mr. Fisher's statement to his email?
8       A.   It appears so.
9       Q.   Do you remember him doing that?
10      A.   I do.
11      Q.   In fact if you look at the document
12  notation in his email.
13          Do you see that?
14      A.   I do.
15      Q.   It says -- the document name in small type
16  at the bottom of email message reads, NOVQ, dash --
17  and then it says, final, in capital letters, capital
18  F-I-N-A-L, plus dot, doc, D-O-C.
19          Do you see that?
20      A.   I do.
21      Q.   All right.  Now, that's the same document
22  used by Mr. Bitsberger in his message, but this one

**Page 173**

1       A.   It's a graphic file.
2       Q.   That's what this is?
3           MS. WILLIAMS:  Just to clarify:  When you
4   said, this, were you referring to exhibit 4?
5           MR. THEODOROU:  Well, we were on the --
6           THE WITNESS:  Correct, yes.
7           MR. THEODOROU:  Yes.
8           MS. WILLIAMS:  She pointed to something.
9           MR. THEODOROU:  Yes.
10          BY MR. THEODOROU:
11      Q.   You were referring to exhibit 4 and we
12  were talking about, that was the exhibit --
13      A.   That's --
14      Q.   -- that was sent to Frances Anderson?
15      A.   That's the media advisory --
16      Q.   Okay.  Excuse me.
17      A.   -- is the soft letterhead.
18      Q.   Okay.
19      A.   That just means that that is on the
20  physical paper itself.
21      Q.   Okay.  I'll show you the next exhibit that
22  we'll have marked.

44 (Pages 170 to 173)

Elizabeth Schmutz

Washington, DC

August 23, 2006

Page 174

1    MR. ROSSETTI: You should talk to your
2 kids, Nick. They'll teach you computer language.
3    MR. THEODOROU: "Soft letterhead" and
4 "hard letterhead"?
5        (Holahan Exhibit No. 8
6        was marked for
7        identification.)
8    BY MR. THEODOROU:
9    Q. Now, directing your attention to what's
10 marked as exhibit 8.
11    Do you see that document?
12    A. I do.
13    Q. And have you seen that before?
14    A. Yes.
15    Q. When was the last time you saw it?
16    A. Yesterday.
17    Q. Okay. And what is it?
18    A. It is undersecretary Fisher's statement at
19 the quarterly refunding press conference.
20    Q. Now, is that the document that was
21 attached to Mr. Fratto's message?
22    A. I believe so, yes.

Page 175

1    Q. And do you know how he created it?
2    A. Yes.
3    Q. What did he do?
4    A. He opened up the graphic that had the
5 picture of the Treasury Department and the words
6 Department of the Treasury, office of public affairs,
7 and he most likely cut-and-pasted the document there,
8 or vice versa. There's different ways of doing it.
9 I can't be sure how he did it that day.
10    Q. Did he add anything else to the document?
11    A. Yes, he did.
12    Q. What did he add?
13    A. He added the embargo time, the date, my
14 name, and my phone number.
15    Q. Now, could you have created this document
16 yourself?
17    A. I could have.
18    Q. And this is the example, exhibit 8, of
19 what they call the soft Treasury letterhead?
20    A. I'd like to restate something.
21        Actually on that date I don't believe I
22 had this particular file, so, no, I could not have on

Page 176

1 this date done that.
2    Q. And when you say, the particular file,
3 what do you mean by that?
4    A. The soft letterhead file.
5    Q. So -- because you were a new employee at
6 Treasury?
7    A. Yes. Correct.
8        Frances normally formatted all of the
9 documents for us.
10    Q. So you didn't have the capability of doing
11 the soft letterhead?
12    A. I didn't have -- I did not possess the
13 soft letterhead at that time. I later formatted my
14 own documents.
15    Q. And the 10 AM embargo time was inserted by
16 Mr. Fratto too.
17    Correct?
18    A. That's my understanding.
19    Q. All right. Did you send this document to
20 Ms. Anderson?
21    A. I don't recall doing so.
22    Q. Now, was it the normal procedure to hand

Page 177

1 out copies of the quarterly refunding statement to
2 attendees at the press conference?
3    A. Yes, it was.
4    Q. And when was this normally done?
5    A. At the very beginning of the press
6 conference.
7    Q. So before the conference began?
8    A. Yes.
9    Q. Is that what happened on October 31st?
10    A. Yes.
11    Q. And what kind of letterhead was used for
12 the copies of the statement that was distributed?
13    A. It's my understanding Frances used the
14 hard letterhead, exhibit 4.
15    Q. Now, why is -- when it says, Treasury
16 News, that's called hard letterhead?
17    A. Yes, because it's on the physical paper.
18    Q. As opposed to being placed on the paper?
19    A. To create this document, she would print
20 off this text from the words for immediate release
21 down to this number. She would print that off on
22 a -- on a piece of paper that had this letterhead

45 (Pages 174 to 177)

Elizabeth Schmutz                                                          August 23, 2006

Washington, DC

| Page 178 |
|---|

1  along the top on it. It's blue.
2      Q.   Okay. Because we're in the -- doing a
3  deposition, you want to refer to what exhibit, for
4  instance, you referred to.
5      Let me show you --
6      A.   I'm using exhibit 4 as an example.
7      Q.   All right. Let's take exhibit 4 as an
8  example.
9      Hold on.
10     And exhibit 4 for the record is the
11 Treasury Department's announcement of a quarterly
12 refunding news conference sent out on October 31,
13 2001.
14     Correct?
15     A.   Correct.
16     Q.   All right. Now, why is this an example of
17 hard as opposed to soft letterhead?
18     A.   As I stated earlier, hard letterhead is a
19 piece of paper that comes in a box with other pieces
20 of paper, and they all have a blue letterhead on
21 them. It looks like this without the text.
22     Q.   So it looks like this exhibit 4?

| Page 179 |
|---|

1      A.   Correct.
2      Q.   Without text?
3      A.   Correct.
4      Q.   And then on the hard letterhead document,
5  Frances Anderson would put information into it?
6      A.   She would put the physical piece of paper
7  into the printer, and she would then print out this
8  text spaced so that it would come underneath the blue
9  letterhead, and then she would make photocopies of
10 it, which is why you now see it in black and white.
11     Q.   All right. As opposed to a soft
12 letterhead where the computer would put the
13 letterhead on it?
14     A.   It would be a graphic.
15     Q.   A graphic that a -- the computer would
16 put --
17     A.   It's a graphic. It's a file that you have
18 in your computer. There's no boxes of paper with
19 that letterhead on it.
20     It's simply a graphic, and that you insert
21 it onto your text or you put your text onto the
22 graphic, either way. And then you save it as a file.

| Page 180 |
|---|

1      Q.   So the hard letterhead with the Treasury
2  seal is what was used and distributed at the
3  conference.
4      Correct?
5      A.   My understanding is that Frances formatted
6  onto the hard letterhead and distributed it at the
7  press conference.
8      Q.   And Frances was in charge of preparing the
9  version of Mr. Fisher's statement that was going to
10 be handed out to attendees at the press conference?
11     A.   Yes.
12     Q.   Okay. Now, did you review the version of
13 Mr. Fisher's statement that she had prepared?
14     A.   I did not.
15     Q.   So you didn't stop by her desk that
16 morning to talk --
17     A.   She was upstairs --
18     Q.   -- about what --
19     A.   -- with these in her possession, and she
20 did not show them to me.
21     Q.   Did you see the stack -- you did not see
22 the stack of press releases that she had prepared?

| Page 181 |
|---|

1      A.   They were with her in the crook of her arm
2  physically. They were not available to review.
3      Q.   Did you review any of the documents?
4      MS. WILLIAMS: Objection.
5      A.   What documents are you referring to?
6      Q.   That was she was going to distribute at
7  the press preference.
8      A.   As I just said, she had the copies with
9  her physically, and she did not show them to me for
10 my review.
11     Q.   Did you ask to review?
12     A.   I did not.
13     Q.   Did you ever tell her that you approved
14 her version of the press release?
15     A.   I did not. I did not have any
16 conversation with Frances about what she formatted.
17     Q.   When you were -- when you met with the
18 lawyers from the SEC and Treasury before this
19 deposition today, did they tell you anything about
20 Ms. Anderson's testimony in this case?
21     A.   No.
22     Q.   Did Ms. Anderson ever ask you whether she

46 (Pages 178 to 181)

Page 182

1    should hand out the press release before or after the
2    press conference?
3        A.  She did not.
4        Q.  So you don't remember telling her that she
5    should hand it out before the press conference began?
6        A.  I don't recall that conversation taking
7    place.
8            It's not unreasonable to think that it
9    might have.  Normal -- it was standard procedure for
10   documents to be handed out at the start of a press
11   conference.
12       Q.  Let me show you what's been marked as
13   exhibit 9.
14           (Holahan Exhibit No. 9
15           was marked for
16           identification.)
17       BY MR. THEODOROU:
18       Q.  Before I get to exhibit 9, let me go back
19   to exhibit 8.
20           Do you have that in front of you?
21       A.  Yes.
22       Q.  That's what Mr. Fratto sent you.

Page 183

1           Correct?
2       A.  Correct.
3       Q.  All right.  And did you ever give this --
4    this version of Mr. Fisher's statement, what has been
5    marked as exhibit 8, to Ms. Anderson?
6       A.  I don't recall giving this to her, no.
7       Q.  Okay.  I'm showing you what has been
8    marked as exhibit 9.
9           Do you have that in front of you?
10      A.  I do.
11      Q.  And do you recognize it?
12      A.  I do.
13      Q.  What is it?
14      A.  It is a version of Mr. Fisher's statement
15   for hard letterhead with "for immediate release" in
16   the upper left-hand corner.
17      Q.  And it also says, for immediate release.
18          Correct?
19      A.  That's what I just said, yes.
20      Q.  Now, did you review that document that
21   morning on October 31, 2001?
22      A.  I did not review this version of it, no.

Page 184

1       Q.  You don't remember seeing that document on
2    Ms. Anderson's desk on the morning of October 31,
3    2001?
4           MS. WILLIAMS:  Objection.
5       A.  As I just said, I sent her the form -- the
6    file.  She formatted onto a hard letterhead.
7           I did not have a chance to review it.  She
8    had it with her physically.  It was not on her desk.
9           BY MR. THEODOROU:
10      Q.  Now, when you sent her the file, you're
11   talking about the -- what was exhibit 6.
12          Correct?
13      A.  Correct.
14      Q.  You say, please format an email?
15      A.  Correct.
16      Q.  So you did not look at that document after
17   she did the formatting?
18      A.  I did not.
19      Q.  Why not?
20      A.  We were very busy.
21      Q.  Okay.  And this is the version of
22   Mr. Fisher's statement that was distributed to the

Page 185

1    attendees at the press conference on the morning of
2    October 31, 2001.
3           Correct?
4       A.  Which exhibit?
5       Q.  Exhibit 9.
6       A.  That's my understanding, that this is what
7    she handed out to the members of the press that were
8    attending the press conference.
9       Q.  And it was handed out at the beginning of
10   the conference.
11          Correct?
12      A.  That's my -- yes, my recollection is, it
13   was handed out at the beginning of the press
14   conference.
15      Q.  And when did you learn that it was handed
16   out to the attendees at the beginning of the
17   conference?
18      A.  I watched her handing the document out at
19   the press conference as I was making the announcement
20   about the embargo.
21      Q.  And were you aware at the time you
22   addressed the press that the -- or the attendees at

47 (Pages 182 to 185)

Elizabeth Schmutz                                      August 23, 2006
                        Washington, DC

| Page 186 | Page 188 |
|---|---|

**Page 186**

1  the press conference that the attendees had received
2  a press release that stated, for immediate release?
3      A.  I was not aware of that.
4      MS. WILLIAMS:  Objection.
5      BY MR. THEODOROU:
6      Q.  So you were not aware that exhibit 9 was
7  distributed to the attendees at the press conference?
8      MS. WILLIAMS:  Objection.
9      A.  I was aware that Frances Anderson was
10  handing out Peter Fisher's statement.
11      I was not aware what she was handing out
12  said, for immediate release.
13      Q.  I just want to rephrase my question for
14  Ms. Williams.
15      You were not aware that she was handing
16  out Mr. Fisher's statement that said, for immediate
17  release.
18      Correct?
19      A.  That's correct.
20      I was not aware that Mr. Fisher's
21  statement said, for immediate release, on it.
22      Q.  Do you know why Ms. Anderson included the

**Page 187**

1  caption, for immediate release, in this version
2  containing Mr. Fisher's statement?
3      A.  That is a question for Ms. Anderson.
4      Q.  Do you know if anyone at Treasury ever
5  told Ms. Anderson about the 10 AM embargo time?
6      MS. WILLIAMS:  Objection.
7      A.  I don't have any direct knowledge of
8  someone telling Frances of the embargo time, no.
9      BY MR. THEODOROU:
10      Q.  Did anybody in the office of public
11  affairs have the responsibility to tell Ms. Anderson
12  about the embargo time?
13      A.  It's my responsibility to coordinate with
14  Frances regarding the press event on October 31st.
15  Based on those conversations, it was my understanding
16  that she knew it was a 10 AM embargo.
17      Q.  Well, how do you know she knew about it?
18      A.  I don't know what she knew.  I'm telling
19  you what I know.
20      Q.  But based on your conversations, you did
21  not tell her about the embargo time.
22      Correct?

**Page 188**

1      A.  I do not have a recollection of telling
2  her specifically it was a 10 AM embargo on the 31st.
3      Q.  Now, did Treasury have policies and
4  procedures in October 2001 for providing embargoed
5  information directly to the press by means other than
6  press conferences?
7      A.  Can you restate the question, please.
8      Q.  Well, actually let me rephrase that.
9      When you testified earlier today about
10  contacting — about contacting The New York Times,
11  the Wall Street Journal, and other what you call
12  financial media outlets.
13      Correct?
14      A.  Correct.
15      Q.  All right.  Was there any policy or
16  procedure at Treasury for providing embargoed
17  information directly to those media outlets where
18  their reporters do not attend the press conferences?
19      A.  There's no policy in place regarding that.
20      Q.  Now, on October 31st, you provided this
21  embargoed information directly to several major media
22  outlets.

**Page 189**

1      Correct?
2      A.  Correct.
3      Q.  One of them was CNBC?
4      A.  Correct.
5      Q.  The New York Times was another?
6      A.  Correct.
7      Q.  Wall Street Journal was another?
8      A.  Correct.
9      Q.  The Associated Press was another?
10      A.  M-hm.
11      Q.  Correct?
12      A.  Correct.
13      Q.  And Bloomberg was another.
14      A.  Correct.
15      Q.  All right.
16      MR. THEODOROU:  I'd like to get all of
17  these marked.
18      MR. ROSSETTI:  Would it be easier to
19  staple them together and make them one exhibit?
20      MR. THEODOROU:  I've got them stapled,
21  John.
22      Hold on.

48 (Pages 186 to 189)

Page 190

1  I've got them. Let's make this as the
2  next exhibit, exhibit 10.
3  (Holahan Exhibit No. 10
4  was marked for
5  identification.)
6  BY MR. THEODOROU:
7  Q.  All right.
8  Do you see exhibit 10, Ms. Holahan?
9  A.  Yeah.
10  Q.  This is a series of emails that you sent.
11  Correct?
12  A.  Correct.
13  Q.  And there's an email to Chip Akin at CNBC
14  at 8:57 AM on October 31st?
15  A.  Correct.
16  Q.  There's also an email to Jonathan --
17  A.  -- Fuerbringer.
18  Q.  -- Fuerbringer, F-U-E-R-B-R-I-N-G-E-R, at
19  The New York Times on October 31 at 9:30 AM.
20  Correct?
21  A.  Correct.
22  Q.  There's also an email from you to Greg Ip

Page 191

1  at the Wall Street Journal at 9:32 AM on October
2  31st?
3  A.  Correct.
4  Q.  And finally, there's an email to Robert
5  Nichols. It says, DAS -- I'm not sure I know what
6  that is.
7  A.  Deputy assistant secretary.
8  Q.  -- of public affairs.
9  The person you testified about earlier?
10  A.  Correct.
11  Q.  All right. So you sent him at 9:54?
12  MR. ROSSETTI:  You got to come to more of
13  these depositions.
14  MR. THEODOROU:  For Robert Nichols --
15  MR. ROSSETTI:  You'd know the acronyms.
16  MR. THEODOROU:  Believe me, I come to
17  enough. I know what an embargo is.
18  (Discussion off the record.)
19  BY MR. THEODOROU:
20  Q.  Do you recognize the handwriting on these
21  pages?
22  A.  I do.

Page 192

1  Q.  Whose handwriting is that?
2  A.  It's mine.
3  Q.  Okay. And did you -- did you write "CNBC"
4  and "New York Times" and identify these for a reason?
5  A.  Yes.
6  Q.  What was the reason?
7  A.  I was asked by the attorneys back in
8  November of 2001 to produce emails pertaining to this
9  particular day, the situation, so I was identifying
10  the person to whom I was sending the documents.
11  Q.  And who were the attorneys who asked for
12  this?
13  A.  I don't recall their names.
14  Q.  And do you recall sending those emails in
15  the morning of October 31st?
16  A.  I do.
17  Q.  Okay. Who is Chip Akins --
18  A.  Chip --
19  Q.  -- Akin?
20  A.  -- Akin is a producer for CNBC, which is a
21  business cable network.
22  Q.  And had you dealt with him before October

Page 193

1  31st?
2  A.  Yes.
3  Q.  In what context?
4  A.  He was a producer for CNBC, and they
5  covered the Treasury Department.
6  Q.  Did you attach any documents to the
7  emails?
8  A.  Yes, I did.
9  Q.  All right. Do you remember what document
10  you attached to the email?
11  A.  The document that Tony Fratto sent me,
12  which was the formatted version with the embargo time
13  on it of Peter Fisher's statement at the quarterly
14  refunding press conference.
15  Q.  All right. The document that was attached
16  to Tony Fratto's email message from 8:53 AM?
17  A.  That's correct.
18  Q.  And that was the version on soft
19  letterhead?
20  MR. THEODOROU:  See, John, I got "soft
21  letterhead" down.
22  Okay?

49 (Pages 190 to 193)

Elizabeth Schmutz                                              August 23, 2006
                        Washington, DC

| Page 194 | Page 196 |
|---|---|
| 1     MR. ROSSETTI: You're getting better. | 1  with anyone else at CNBC? |
| 2  Your kids would be proud. | 2     A.  No. |
| 3     BY MR. THEODOROU: | 3     Q.  Now, under the Treasury embargo policy, |
| 4     Q.  Now, Mr. -- in this case, Mr. Akin | 4  was Akin free to share that information with other |
| 5  received this before the attendees of the press | 5  people? |
| 6  conference received any statement. | 6     A.  He was free to share it with the reporter |
| 7     Correct? | 7  who was going to be conducting the interview. |
| 8     A.  That's correct. | 8     Q.  Was he free to share it with other colleagues |
| 9     Q.  Did Treasury policies on embargoes | 9  at CNBC besides the reporter conducting the |
| 10  authorize you to provide more than an hour's notice | 10  interview? |
| 11  to certain media outlets? | 11     A.  As I recall, the conversation I had with |
| 12     A.  There was not a policy in place. It's up | 12  Chip was that he was going share it with the |
| 13  to my discretion. | 13  reporter, and that was it. |
| 14     Q.  So to your knowledge, there was no limits | 14     Q.  Okay. When did you speak to Chip? |
| 15  on how much advance notice Treasury could provide? | 15     A.  That morning. |
| 16     A.  Correct. | 16     Q.  About what time? |
| 17     Q.  Did Treasury give Mr. Fratto a statement | 17     A.  I don't recall. |
| 18  or Mr. -- excuse me -- Mr. Fisher's statement in | 18     Q.  Did you talk to him in person or by phone? |
| 19  whatever form it was formatted to any other media | 19     A.  By phone. |
| 20  outlets before 9 AM to your knowledge? | 20     Q.  Was anybody else on the line? |
| 21     A.  No. | 21     A.  No. |
| 22     Q.  And why did CNBC get it before 9 AM? | 22     Q.  Okay. What was the substance of the |

| Page 195 | Page 197 |
|---|---|
| 1     A.  Because there was to be a CNBC interview | 1  conversation? |
| 2  with undersecretary Fisher prior -- post-press | 2     A.  Setting up the interview between the |
| 3  conference but prior to 10 AM, and I wanted -- | 3  reporter in question and Mr. Fisher. |
| 4  because I was going to physically be at the press | 4     And as you can see in the email here, it |
| 5  conference I knew to give them the statement | 5  says, again, the number is, and that's the number for |
| 6  beforehand to allow them time to read it, to digest | 6  Peter's office, and that's Peter's secretary, Anna |
| 7  it, and formulate their questions so that the | 7  Hart. So I'm reiterating the instructions that I |
| 8  interview would be a reasonable interview with | 8  gave him over the phone, which is to call and leave |
| 9  substantial questions. | 9  the reporter's name and phone number with Anna and |
| 10     Q.  Now, the subject line on this email says, | 10  that Peter would call this reporter back as soon as |
| 11  embargoed until 10 AM. | 11  the press conference was concluded. |
| 12     Do you see that? | 12     Q.  Okay. But let me go back to my question. |
| 13     A.  I do. | 13     What did you say to him and what did he |
| 14     Q.  How did you know that Chip Akin understood | 14  say to you? |
| 15  what that meant? | 15     A.  I just told you. |
| 16     A.  Because he's a member of the media. | 16     Q.  All right. Well, I'd like to get some |
| 17     Q.  Did you tell him what it meant? | 17  clarification because I misunderstood it, so I'd like |
| 18     A.  I did not. | 18  to -- what did you say to him in your telephone |
| 19     Q.  Had you ever discussed Treasury's embargo | 19  conversation? |
| 20  policy with him? | 20     A.  I don't recall word for word what we said. |
| 21     A.  No. | 21     Q.  What was the substance of the |
| 22     Q.  Did you ever discuss the embargo policy | 22  conversation? |

50 (Pages 194 to 197)

Elizabeth Schmutz                                                 August 23, 2006

Washington, DC

Page 198

1    A.   Was that Treasury had made an announcement
2  that CNBC would be interested in and that we were
3  going to have a press conference and that he would
4  want to interview Peter afterwards, I could get him
5  the information before the press conference with the
6  understanding that it was embargoed until 10 AM, it
7  would help the reporter prepare for the interview
8  post-press conference.
9        And he agreed to that embargo.
10   Q.   He agreed to the embargo, but I don't hear
11 you saying that it was only restricted him talking to
12 the reporter.
13       Do you remember saying that to him, or you
14 don't have a recollection?
15   A.   I remember speaking to him and saying that
16 the embargo was at 10 AM and that he could give the
17 information to his reporter.
18       I do not recall saying he could not give
19 it to anyone else, if that's what you're asking.
20   Q.   That's what I was going to ask.
21   A.   Okay.
22   Q.   So you don't know whether you provided it

Page 199

1  to anybody else at CNBC, such as anchors or any other
2  people?
3    A.   I don't have any knowledge of that.
4    Q.   Okay.  Do you know when CNBC first
5  reported Treasury's decision to suspend the 30-year
6  bond?
7    A.   I do not.
8    Q.   Did you ever check?
9    A.   If I did, I don't recall.
10   Q.   What would have happened if CNBC had
11 reported before 10 AM?
12   A.   If -- in your hypothetical situation,
13 would this leak have occurred?
14       MS. WILLIAMS:  Objection.
15       BY MR. THEODOROU:
16   Q.   What would have happened if they had
17 reported it before 10 AM?
18   A.   It depends on the scenario.
19       MS. WILLIAMS:  Objection.
20       BY MR. THEODOROU:
21   Q.   Well, what do you mean, depends on the
22 scenario?

Page 200

1    A.   If the embargo was broken and they were
2  the only ones breaking the embargo, then it would
3  have been a real serious problem.
4    Q.   Now, the text of your mail says:  Again,
5  the number is 202-622-1703, leave reporter's name and
6  number with Anna Hart.
7        Do you see that?
8    A.   I do.
9    Q.   And Anna Hart was Mr. Fisher's
10 administrative assistant?
11   A.   Correct.
12   Q.   CNBC usually have a reporter cover
13 quarterly refunding conferences?
14   A.   You'd have to ask CNBC.
15   Q.   All right.  Let's turn to the next email.
16       Jonathan Fuerbringer.
17       Do you see that?
18   A.   I do.
19   Q.   Why did you send him an email at 9:30 AM
20 that day?
21   A.   The press conference was concluded.  The
22 information had been given to the press.

Page 201

1        Jonathan Fuerbringer works out of The New
2  York Times office in New York City, so he could not
3  have physically been at the press conference.  So I
4  sent it to him by email.
5    Q.   Well, it could have been the press
6  conference he flew down for.
7        Correct?
8        MS. WILLIAMS:  Objection.
9    A.   I'm not going to speculate.
10       BY MR. THEODOROU:
11   Q.   Well, you're speculating when you said he
12 couldn't have been there.
13       Right?
14       MS. WILLIAMS:  Objection.
15   A.   He was not present.
16       BY MR. THEODOROU:
17   Q.   All right.  Now, you attached the same
18 version of Fisher's statement that Tony Fratto had
19 sent you on this one too, on your email to --
20   A.   Yes.
21   Q.   -- Mr. Fuerber- --
22   A.   Fuerbringer.

51 (Pages 198 to 201)

Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

Page 202

1    Q.   Fuerbringer.
2         Did The New York Times -- The New York
3    Times did not have a reporter at the press conference
4    that day?
5    A.   I don't know.
6    Q.   Did the Times usually have a reporter at
7    the quarterly refunding press conferences?
8    A.   I don't know.
9    Q.   Now, did you discuss the embargo policy
10   with Mr. Fuerbringer?
11   A.   In the subject line, it says, embargoed
12   until 10 AM today, and the document itself is
13   indicates that it's embargoed until 10 AM.
14   Q.   But as is in the case of CNBC, did you
15   have an oral discussion with him about embargo and
16   what it meant?
17   A.   I did not.
18   Q.   Did you have any discussion with anybody
19   at The New York Times about embargo and what it
20   meant?
21   A.   No, I did not.
22        MS. WILLIAMS:  Objection.

Page 203

1         BY MR. THEODOROU:
2    Q.   Do you recall having a discussion with
3    anybody about The New York Times about the embargo?
4    A.   No, I do not.
5    Q.   From what computer did you send this
6    email?
7    A.   My own.
8    Q.   And how far away was that computer from
9    the diplomatic reception room?
10   A.   It was on the floor beneath the diplomatic
11   reception room.
12   Q.   Okay.  And do you remember when you left
13   the diplomatic reception room on October 31st,
14   approximately?
15   A.   Approximately 9:28.
16   Q.   So it doesn't take that long to get to
17   your office?
18   A.   It doesn't.
19        MS. WILLIAMS:  Objection.
20        BY MR. THEODOROU:
21   Q.   Do you know when The New York Times first
22   reported the Treasury decision to suspend the 30-year

Page 204

1    bond?
2    A.   I don't have an exact recollection, but
3    the reasonable assumption is the next day.  They
4    publish on a daily basis.
5    Q.   Turning to the next document in this batch
6    in this exhibit, it's your email to Greg Ip.
7         Correct?
8    A.   Correct.
9    Q.   And who is Greg Ip?
10   A.   Greg Ip is a reporter at the Washington
11   Journal.
12   Q.   And why did you send him this email at
13   9:32 AM?
14   A.   For the same reason I sent it to Jonathan
15   Fuerbringer.
16   Q.   And again that was -- you sent him the
17   same version of Mr. Fisher's statement that Tony
18   Fratto had sent you at 8:53?
19   A.   Correct.
20        But to clarify, Greg Ip does work out of
21   the Washington D.C. bureau.  He simply was not able
22   to attend.  But he's a reporter that covers the

Page 205

1    Treasury Department, covers domestic finance very
2    closely.
3    Q.   Did you discuss the embargo policy with
4    Mr. Ip?
5    A.   How so?
6    Q.   Did you have an oral -- besides sending
7    him the email, do you remember talking to him that
8    day?
9    A.   No.
10   Q.   The next -- Robert Nichols --
11        Do you remember sending Mr. Fisher's
12   statement to any other media outlet before 10 AM on
13   October 31st other than the ones you just testified
14   about?
15   A.   I do not recall sending it to anyone else.
16   Q.   Do you know if anyone at Treasury sent out
17   Mr. Fisher's statement to any other media outlets?
18   A.   I don't have any knowledge of that.
19   Q.   Other than your testimony about your
20   telephone conversation with the producer at CNBC, did
21   you have -- did you speak by telephone with any other
22   reporters or media officials before 10 AM on October

52 (Pages 202 to 205)

'Elizabeth Schmutz                                                August 23, 2006

Washington, DC

### Page 206

1  31st about Mr. Fisher's statement?
2     A.  Yes.
3     Q.  Who?
4     A.  I spoke to several wire reporters in the
5  Treasury pressroom.
6     Q.  And who were they?
7     A.  I don't recall exactly who they were.
8     Q.  From what organizations?
9     A.  I believe it was Reuters and Dow Jones. I
10 believe it was Jonathan Nicholson from Reuters and
11 Deborah Lagamarsino from Dow Jones, but I can't be a
12 hundred percent certain.
13    Q.  And where was Mr. Nicholson when you spoke
14 to him?
15    A.  My recollection is that they were on the
16 third floor in the hallway outside of the diplomatic
17 reception room.
18    Q.  And you spoke to them when?
19       Before or after the press conference?
20    A.  After.
21    Q.  Direct -- turning first -- did you
22 discuss -- were you talking to them both at the same

### Page 207

1  time or --
2     A.  Yes.
3     Q.  Both at the same time?
4     A.  Yes.
5     Q.  All right. What did you say to them?
6     A.  They approached me to tell me that -- that
7  the statement had been posted to the Web site and
8  therefore they were planning to run their -- they --
9  or had run their stories prior to 10 AM, had to do
10 with the 10 AM embargo time.
11    Q.  All right. Now, you testified earlier
12 Mr. Fisher read his statement.
13       Correct?
14    A.  Correct.
15    Q.  And when was he finished reading his
16 statement?
17       About what time?
18    A.  9:25 --
19    Q.  All right.
20    A.  -- AM.
21    Q.  And then he took questions?
22    A.  He did.

### Page 208

1     Q.  Until about what time?
2     A.  The event concluded at 9:25, so he read
3  his statement for 10 minutes, roughly 10 minutes.
4     Q.  Beginning at about 9?
5     A.  9, 9:05 for about 10 minutes, and there
6  was about 10 minutes or so of questions.
7     Q.  Okay. And then you went -- after 9:25,
8  you went to your office.
9        Correct?
10    A.  Correct.
11    Q.  And sent out those emails you just
12 testified about?
13    A.  Correct.
14    Q.  You went to your office at about what
15 time?
16    A.  Approximately 9:28.
17    Q.  And how long were you in your office?
18    A.  To the best of my recollection, 10
19 minutes.
20    Q.  And what did you do during that time?
21    A.  I sent the emails to these particular
22 reporters and prepared the email that would go out to

### Page 209

1  my press lists at 10 AM with the statement attached.
2     Q.  Prepared the email to go to whom?
3     A.  My press lists.
4     Q.  And then what did you do?
5     A.  To the best of my recollection, then I
6  went back upstairs to Mr. Fisher's office to talk to
7  him at the CNBC interview.
8     Q.  So you prepared the email, but you did not
9  send it out, the one that was going to go to your
10 press contacts?
11    A.  Correct.
12    Q.  You would wait till 10 o'clock, and then
13 you would -- intending to come back and then send.
14       Now, you went back to Mr. Fisher's office,
15 which was on the same floor as the --
16    A.  Yes --
17    Q.  -- diplomatic reception --
18    A.  -- third floor.
19    Q.  -- area?
20       Was his office behind the diplomatic
21 reception?
22       In other words to reach his office, you

Elizabeth Schmutz                                                          August 23, 2006

Washington, DC

| Page 210 |
|---|

1  would have gone through what door on our exhibit?
2      A.   His office was across the hall from the
3  diplomatic reception room, and it was across the
4  hall -- his -- the door to his office was across the
5  hall from door number 1.
6      Q.   Okay.  Could you mark Mr. Fisher's office.
7           And that is exhibit what, Ms. Holahan?
8      A.   5.
9      Q.   On exhibit 5, could you mark where
10 Mr. Fisher's office would have been.
11     A.   (Complying.)
12     Q.   So you went back to go to Mr. Fisher's
13 office to discuss with him the CNBC interview coming
14 up?
15     A.   Correct.
16     Q.   All right.  And what happened?
17          You left your office, and then what
18 happened?
19     A.   To the best of my knowledge or my
20 recollection, I was in Mr. Fisher's office, and Tim
21 Bitsberger, who was the deputy assistant secretary
22 for -- in the office of financial markets -- and

| Page 211 |
|---|

1  Bitsberger is B-I-T-S-B-E-R-G-E-R -- and he came in
2  and announced or said that he believed that the
3  markets were moving based on the information and that
4  somehow it had gotten out.
5      Q.   And so Mr. Bitsberger was there with you
6  and Mr. Fisher.
7           Correct?
8      A.   Correct.
9      Q.   All right.  Did Mr. Fisher say anything?
10     A.   I don't recall exactly what he said, but
11 he was not happy to hear that.
12     Q.   Do you recall the substance of what he
13 said?
14     A.   He wanted -- he wanted more information
15 from Mr. Bitsberger about why Mr. Bitsberger thought
16 that.
17     Q.   Did Mr. Bitsberger say anything else?
18     A.   He did.
19          But at that time -- at that point, I left
20 to go back downstairs to my office.  And it was at
21 that time to the best of my recollection that I
22 encountered the 2 reporters who told me that they

| Page 212 |
|---|

1  were going to file their stories earlier or they had
2  filed their stories earlier because of the posting
3  onto the Web site.
4      Q.   And what do you remember them saying and
5  who said what?
6      A.   I don't recall who said what.
7           I recall them giving me the information.
8  I recall being very surprised, shocked, and dismayed.
9           And I recall then going back downstairs,
10 talked to Frances, and she was the person who posted
11 items to the Web site.
12     Q.   Do you remember talking to any other
13 reporters that day other than CNBC and those 2
14 reporters?
15     A.   I don't have a specific recollection of
16 talking to other reporters, but I must have.  It was
17 a very, very busy day.
18     Q.   About how many people had attended the
19 October 31st press conference?
20     A.   To the best of my recollection, there were
21 approximately 40-plus bodies in the room.
22     Q.   Do you recall -- was that -- was that

| Page 213 |
|---|

1  press conference more crowded than the press
2  conferences you had covered before?
3      A.   No.
4      Q.   And where were you during the press
5  conference?
6           Where were you located?
7      A.   I stood to the left of the podium.
8      Q.   Okay.  And you're going to mark that with
9  an X or your name?
10     A.   Yes.
11     Q.   And that's on the exhibit?
12     A.   Yes.
13     Q.   Again for the record, it's exhibit --
14          MR. ROSSETTI:  5.
15          BY MR. THEODOROU:
16     Q.   -- 5.
17          And you saw Frances Anderson at the
18 beginning of the conference, correct, passing out
19 copies of Mr. Fisher's statement?
20     A.   I did.
21     Q.   But you did not take a copy?
22     A.   No.

54 (Pages 210 to 213)

'Elizabeth Schmutz                                          August 23, 2006
Washington, DC

## Page 214

1  Q.  Okay. Nor did you see what she was
2  handing out?
3  A.  No.
4  Q.  All right. Now, when you testified
5  earlier that you spoke first at the conference and
6  you talked about embargo, you didn't say what embargo
7  meant.
8  Correct?
9  A.  Correct.
10  Q.  How long was the question-and-answer
11  period after Mr. Fisher?
12  A.  Roughly 10 to 15 minutes.
13  Q.  Do you remember where Frances Anderson was
14  during the press conference?
15  A.  I recall seeing her handing out the
16  document, and I recall seeing her standing in the
17  back of the room between doors 1 and 2 against the
18  wall.
19  Q.  Do you remember whether she — can you
20  remember her being outside of the room?
21  A.  I recall her being in the hallway as well
22  before and after the press conference.

## Page 215

1  Q.  And when did you -- when was she out in
2  the hallway?
3  A.  I recall seeing her in the hallway before
4  the press conference began, and I recall seeing her
5  afterwards.
6  Q.  How about during the conference?
7  A.  I was in the room, so I couldn't see what
8  was in the hallway.
9  Q.  Did you see her in the room when you were
10  talking?
11  A.  I did, yes. She was handing out the
12  document when I was in -- first announced the embargo
13  time was 10 o'clock.
14  Q.  Besides the 2 reporters you just testified
15  about who told you that they were going to print
16  their stories before the 10 AM embargo time, Jonathan
17  Nicholson and Deborah Lagamarsino --
18  A.  M-hm.
19  Q.  -- are you aware of any other reporters
20  who attended the October 31st press conference who
21  disclosed information on the 30-year bond suspension
22  before the 10 AM embargo time?

## Page 216

1  A.  I'm not specifically aware of whose
2  stories ran at what time, but it is a reasonable
3  assumption that if the 2 of -- if those 2 media
4  outlets were running their story early because it was
5  on the Web site, then the entire pressroom knew about
6  it.
7  Q.  Okay. Now, with Frances Anderson, wasn't
8  she sent outside the conference by Paul Malvey to
9  deal with charts during the conference?
10  A.  You'd have to ask her that. I don't know.
11  Q.  And wasn't it -- wasn't she outside the
12  room when you were speaking?
13  A.  I specifically remember as I was giving
14  the announcement, the first announcement about the
15  embargo time, I was watching her hand out the
16  document, the statement of Mr. Fisher.
17  Q.  All right.
18  MR. THEODOROU:  Let's go to the next --
19  our next exhibit.
20  (Holahan Exhibit No. 11
21  was marked for
22  identification.)

## Page 217

1  MR. ROSSETTI:  Do you have a copy, please?
2  MR. THEODOROU:  I do.
3  She's got -- can I have that back?
4  THE WITNESS:  Oh.
5  I'm sorry. Pardon me.
6  MR. THEODOROU:  Thank you.
7  My fault.
8  MR. ROSSETTI:  I'm sorry.
9  We're on 11 now?
10  MR. THEODOROU:  11.
11  BY MR. THEODOROU:
12  Q.  All right. Directing your attention,
13  Ms. Holahan, to exhibit 11.
14  Have you seen that document before?
15  A.  No.
16  Q.  The document -- do you know where this --
17  what this document is?
18  A.  Yes.
19  Q.  What is it?
20  A.  It is a copy of a headline that was
21  running on the wire, the news wire, and it ran on
22  October 31, 2001. It was posted at 9:52 AM, and it

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

Elizabeth Schmutz                                                    August 23, 2006
                        Washington, DC

| Page 218 | Page 220 |
|---|---|

**Page 218**

1  was posted by Reuters, which is a news wire.

2     Q.  Okay.  Did you ever learn about Reuters

3  posting before -- posting the information about the

4  suspension of the long bond before 10 AM?

5     A.  Did I ever learn about it?

6     Q.  Yeah, after October 31, or on that day,

7  did you learn that Reuters ran?

8     A.  Yes.

9       Because the Reuters reporter approached me

10  in the hallway and told me --

11     Q.  Okay.

12     A.  -- and that's how I learned of the posting

13  to the Web site.

14     Q.  In terms of when he came up to you?

15     A.  Yes.

16     Q.  It was Jonathan Nicholson.

17       Correct?

18     A.  Correct.

19     Q.  All right.  Now, at what time was this

20  published?

21       Was it 9:52 or 9:57?

22     A.  You know, I don't know.  That would be a

**Page 220**

1  would this story have been on there?

2     MS. WILLIAMS:  Objection.

3     A.  I don't have technical knowledge of how

4  that works.  I just don't know.

5     BY MR. THEODOROU:

6     Q.  Okay.  But the story came out before 10

7  o'clock?

8     A.  Correct.

9     Q.  By Reuters?

10     A.  Correct.

11     Q.  Now, did Treasury -- so Reuters violated

12  the 10 AM embargo by publishing the report.

13       Correct?

14     A.  They did.

15     MS. WILLIAMS:  Objection.

16     BY MR. THEODOROU:

17     A.  Yes.

18     Q.  Did Reuters violate the embargo?

19     A.  Yes, they did.

20     Q.  Did Treasury take any action against the

21  reporter or --

22     A.  No.

| Page 219 | Page 221 |
|---|---|

**Page 219**

1  question for Reuters.  I don't know -- I mean, it

2  says, received by the News Edge.  News Edge was

3  the -- was the wire itself.

4     Q.  So when it says, News Edge -- it's, News,

5  and then capital E-D-G-E, slash, capital L-A-N.

6       Do you see where it says, News Edge LAN?

7     A.  Yeah, I do.

8     Q.  What is that?

9     A.  News Edge is the organization that -- that

10  runs all of the -- the wire stories.  Like I could go

11  onto News Edge and find the stories, find the

12  headlines on the stories.  Some are Reuters, some are

13  Dow Jones, some are Associated Press, different

14  wires.

15     Q.  Does Reuters use that service to

16  distribute its reports?

17     A.  It does.

18       Well, Reuters is its own wire, and then

19  I'm not sure of how technically stories -- like if

20  News Edge picks up stories from the Reuters wire or

21  if Reuters pushes them to News Edge.  I'm not sure.

22     Q.  If I got onto News Edge LAN at 9:52 AM,

**Page 221**

1     Q.  -- Reuters itself regarding this report?

2       Why not?

3     A.  Because Treasury made the information

4  public when it posted the document on the Web site.

5  So at that point, we did not expect the newsroom to

6  adhere to the embargo.

7     Q.  So the embargo no longer applied after the

8  information had gotten out publicly from another

9  source?

10     A.  It no longer applied after it was put out

11  publicly by Treasury.

12     Q.  So the embargo didn't prohibit anyone from

13  publishing or otherwise acting on Fisher's statements

14  once Treasury posted on it -- posted it on its Web

15  site.

16       Correct?

17     MS. WILLIAMS:  Objection.

18     A.  Can you please rephrase the question.

19     BY MR. THEODOROU:

20     Q.  The embargo did not prohibit anyone from

21  publishing anything about the press conference once

22  Mr. Fisher's statement was on Treasury's Web site.

56 (Pages 218 to 221)

'Elizabeth Schmutz                                                    August 23, 2006

Washington, DC

| Page 222 | Page 224 |
|---|---|
| 1    Correct? | 1    A.    Correct. |
| 2    A.    Correct. | 2    Q.    All right. I'm not trying to trick you. |
| 3    Q.    And it didn't prohibit anyone from acting | 3    But I will just for the record -- I mean, |
| 4    on the information once Mr. Fisher's statement was on | 4    you know, whether you're going to decline or not, |
| 5    the Web site? | 5    I'll file a motion to compel for failure to answer. |
| 6    MS. WILLIAMS: Objection. | 6    MR. ROSSETTI: Nick, in all fairness to |
| 7    A.    I'm going to decline to respond to that. | 7    the witness, I think what she was trying to explain |
| 8    BY MR. THEODOROU: | 8    was that you're asking questions beyond her basis of |
| 9    Q.    Well, I don't think you can decline, or | 9    knowledge. |
| 10    I'll file -- I will go on record: I'll file a motion | 10    (Talking at the same time.) |
| 11    to compel with the judge, because you got to answer | 11    MR. THEODOROU: Hold on. |
| 12    questions, and responding -- failure to decline is no | 12    One person speaks. |
| 13    reason. I'm going to state that on the report. I | 13    Who is speaking? |
| 14    don't know if you have counsel here today, but I'm | 14    MR. ROSSETTI: I am. |
| 15    going to ask you the question again. | 15    MS. WILLIAMS: I am. |
| 16    Did the embargo -- once it went on that | 16    MR. THEODOROU: It's double. One person |
| 17    Web site, did it prohibit anyone from acting or using | 17    speaks. |
| 18    the information? | 18    MS. WILLIAMS: I am -- |
| 19    MS. WILLIAMS: Objection. | 19    (Talking at the same time.) |
| 20    A.    The word acting is the word that I can't | 20    MS. WILLIAMS: (Indiscernible.) |
| 21    respond to. | 21    MR. THEODOROU: That's fair. That's fair. |
| 22    I deal with the media. And if the media | 22    Okay? |

| Page 223 | Page 225 |
|---|---|
| 1    wants to run a story after we've made it public on | 1    I understand that. |
| 2    our own Web site, then I cannot object. | 2    I don't want any speaking objections, |
| 3    In terms of someone acting on the | 3    either. |
| 4    information itself, that's not a question that I can | 4    But I think we clarified it. |
| 5    answer. | 5    BY MR. THEODOROU: |
| 6    BY MR. THEODOROU: | 6    Q.    Do you know who Brian Collins is? |
| 7    Q.    Well, the embargo -- | 7    A.    Yes, I do. |
| 8    A.    We don't prohibit anyone from acting on | 8    Q.    All right. Who is he? |
| 9    the information to begin with. The Treasury | 9    A.    He's a reporter for National Mortgage |
| 10    Department, office of public affairs doesn't. | 10    News. |
| 11    Q.    Right. | 11    Q.    Are you aware that on approximately 9:35 |
| 12    So once it got on the Web site, it's | 12    AM on October 31, 2001, Mr. Collins called Janice |
| 13    public information. | 13    Smith, an official of Fannie Mae, and told her about |
| 14    Correct? | 14    Treasury's decision to suspend the 30-year bond? |
| 15    A.    Correct. | 15    MS. WILLIAMS: Objection. |
| 16    Q.    All right. So the embargo did not | 16    A.    I'm not aware of that conversation. |
| 17    prohibit anyone from using that information? | 17    BY MR. THEODOROU: |
| 18    MS. WILLIAMS: Objection. | 18    Q.    Did you ever become aware of it after |
| 19    A.    From knowing that information. | 19    October 31st? |
| 20    BY MR. THEODOROU: | 20    A.    No. |
| 21    Q.    It did not prohibit them from knowing it. | 21    MS. WILLIAMS: Objection. |
| 22    Correct? | 22    BY MR. THEODOROU: |

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                                Washington, DC 20005

Elizabeth Schmutz                                                      August 23, 2006

Washington, DC

---

Page 226

1    Q.   Are you aware that he disclosed
2    information about the press conference to someone
3    before the 10 AM embargo?
4         MS. WILLIAMS: Objection.
5    A.   I was not previously aware of that.
6         BY MR. THEODOROU:
7    Q.   Until I just talked to you about it?
8    A.   Correct.
9         MS. WILLIAMS: Objection.
10        BY MR. THEODOROU:
11   Q.   Did the SEC talk to you about this?
12   A.   The SEC mentioned -- they asked me if I
13   knew Brian Collins.
14   Q.   Did they mention that Mr. Collins
15   disclosed information before the 10 AM embargo time?
16   A.   They did not tell me that, no.
17   Q.   Okay. When I just asked you this
18   question, this is the first time that you learned
19   about Mr. Collins doing that?
20        MS. WILLIAMS: Objection.
21   A.   To the best of my recollection, yes.
22        BY MR. THEODOROU:

---

Page 227

1    Q.   Before today, did you know that at least 9
2    additional people learned about Treasury's decision
3    by 10 -- 9:50 AM?
4    A.   No, I'm --
5         MS. WILLIAMS: Objection.
6    A.   -- not aware of that.
7         BY MR. THEODOROU:
8    Q.   And did you know that at least 9
9    additional persons learned about Treasury's decision
10   to suspend the long bond by 9:50 AM as a result of
11   Mr. Collins' call to Fannie Mae?
12        MS. WILLIAMS: Objection.
13   A.   I'm not aware of that.
14        BY MR. THEODOROU:
15   Q.   Do you were not aware of any call that
16   Mr. Collins made regarding the press conference
17   before 10 AM that day?
18   A.   That's correct.
19   Q.   In October 2001, what was the procedure
20   for posting quarterly refunding statements on the Web
21   site?
22        In other words, how did the refunding

---

Page 228

1    statement get on the Web site?
2    A.   Frances Anderson posted all documents to
3    the Web site.
4    Q.   Before Frances Anderson, had you ever
5    directed any other employee to post a document on the
6    Web site?
7    A.   We had a backup Web team that could post
8    to the Web site, but it was Frances's responsibility
9    to do so, and she would -- and she was the person who
10   posted items unless she was out sick.
11   Q.   Did you know that previous -- before
12   that -- that before October 31, 2001, that previous
13   quarterly refunding announcements did not have fixed
14   embargo times on the announcements?
15        MS. WILLIAMS: Objection.
16   A.   I'm not aware of that.
17        BY MR. THEODOROU:
18   Q.   Were you aware that on October 31, 2001,
19   that prior announcements did not have embargo times
20   on the announcements?
21        MS. WILLIAMS: Objection.
22   A.   Can you be more specific about your

---

Page 229

1    question, please.
2         BY MR. THEODOROU:
3    Q.   Well, we showed you an announcement that
4    Tony Fratto sent to you and had an embargo time, 10
5    AM.
6         Correct?
7    A.   Yes.
8    Q.   Did you know in October 2001, the prior
9    announcements did not list embargo times?
10        MS. WILLIAMS: Objection.
11   A.   I don't have any knowledge of that.
12        BY MR. THEODOROU:
13   Q.   You did not review the press releases that
14   Ms. Anderson distributed at the press conference; is
15   that right?
16   A.   Correct.
17        MS. WILLIAMS: Objection.
18        BY MR. THEODOROU:
19   Q.   After you learned that the announcement
20   had gone out on the Web site before 10 AM, did you go
21   to the Web site and look at the document?
22   A.   The first thing I did was talk to Frances

---

Alderson Reporting Company

1111 14th Street, NW Suite 400        1-800-FOR-DEPO        Washington, DC 20005

## Page 230

1  and ask her if she had posted it, and she said that
2  she had, so, no, I did not look it at on the Web
3  site.
4        MR. THEODOROU:  Exhibit 12.
5        (Holahan Exhibit No. 12
6              was marked for
7              identification.)
8  BY MR. THEODOROU:
9   Q.  Ms. Holahan, do you see exhibit 12 that
10 I've just given you?
11  A.  I do.
12  Q.  Do you recognize it?
13  A.  Yes.
14      It is Mr. Fisher's statement.
15  Q.  And in fact that was Mr. Fisher's
16 statement that was posted on the Web site.
17      Correct?
18  A.  Yes, that's my understanding.
19      That's the way it looks when I come
20 (phonetic) -- when it's on the Web site.
21  Q.  In fact the Internet address is at the
22 bottom of the page?

## Page 231

1   A.  Yes.
2   Q.  Now, there's a document name to this.
3       It says, PO 749?
4   A.  Correct.
5   Q.  What does that stand for?
6   A.  "PO" stands for Paul O'Neill, and the
7  "749" is the sequence number.
8   Q.  And Paul O'Neill at the time was the
9  Treasury secretary?
10  A.  Correct.
11  Q.  And 749 as a sequence number meant that
12 this was the -- what?
13  A.  749th release under Paul O'Neill?
14      I'm not entirely sure.  Frances would be
15 able to answer that.
16  Q.  749th press release?
17  A.  Like I said, I -- this is not -- I did not
18 number them.  Frances did, so she'd be the person to
19 answer that question.
20  Q.  Do you know at what time this document was
21 posted on the Web site?
22  A.  I have since learned that it was posted at

## Page 232

1  roughly 9:43 AM.
2   Q.  And how did you learn that?
3   A.  I've read news reports of the event.
4   Q.  Once you learned that this document was
5  posted before 10 AM or that the announcement went out
6  before 10 AM on the Web site, what did you do?
7   A.  When I learned that information from the
8  reporters?
9   Q.  Yes.
10  A.  I went down and I asked Frances if it was
11 true, if she had posted the document in advance of 10
12 AM.
13  Q.  All right.  And what did she say?
14  A.  She said that she had.
15  Q.  Was anybody with you?
16  A.  That very moment, no.
17  Q.  Okay.  Do you recall walking to her desk
18 at around 10 AM and telling her that she could post
19 the statement on the Web site?
20  A.  Strangely I do.  I do recall that.
21  Q.  Okay.  You do.
22  A.  Well, it was 6 years ago.

## Page 233

1       You know, I don't know.  It sounds
2  familiar.
3   Q.  All right.  Well, what do you remember?
4   A.  I remember having -- I remember being at
5  her desk having a conversation about the fact that it
6  had gone on the Web site early.  I remember having a
7  conversation with the reporter that it had gone on
8  the Web site early.
9   Q.  Was Mr. Bitsberger there at that time?
10  A.  I don't recall.
11  Q.  Was Mr. Brown -- Roseboro?
12  A.  I don't recall.
13  Q.  Okay.
14  A.  Things happened very quickly that morning.
15  Q.  What was your reaction when you learned
16 that Ms. Anderson had put it out at 10:43 --
17  A.  Dismay.
18  Q.  -- or -- excuse me -- when she put it out
19 before 10 AM.
20  A.  Dismay.
21  Q.  Were you angry with her?
22  A.  Yes.

Elizabeth Schmutz                                      August 23, 2006
                        Washington, DC

Page 234

1    Q.   Do you recall yelling at her?
2    A.   I did not yell at her.
3    Q.   Do you recall -- was there any change in
4  your tone of voice when you spoke with her?
5    A.   I'm sure there was.
6    Q.   And how would you describe your tone with
7  her?
8    A.   Unhappy.
9    Q.   Now, you testified earlier today that you
10  didn't communicate with her orally before the
11  embargo, correct, the embargo time?
12    A.   I don't recall telling her that morning
13  that the embargo was at 10 AM.
14    Q.   Okay.  Did you tell her when you
15  confronted her that morning that you had told her
16  about the embargo by email?
17    A.   I don't recall.
18    Q.   But in fact there was no email where you
19  told her about an embargo.
20      Correct?
21    A.   I don't recall.
22    Q.   Did you subsequently discuss the early

Page 235

1  disclosure of the information with Tony Fratto?
2    A.   I did.
3    Q.   Okay.  When -- did you discuss it that
4  day?
5    A.   Yes.
6    Q.   When that day?
7    A.   It's my recollection that as soon as I
8  learned from Frances that she had posted it to the
9  Web site early, I told Tony.  Tony was her
10  supervisor.
11      I was not.  It was not my place to
12  reprimand her.  Obviously it was his -- you know, his
13  area of responsibility and authority to handle.
14    Q.   What did you say to her, I mean, to
15  Ms. Fratto -- Mr. Fratto?
16    A.   I don't remember the exact words.
17    Q.   What did he say to you?
18    A.   I don't remember the exact words.
19    Q.   Well, what was the substance of the
20  conversation that you had with him?
21    A.   I recall telling him that she posted it
22  early.

Page 236

1    Q.   And do you recall what he said?
2    A.   I don't.
3    Q.   Are you aware that Mr. Fratto told
4  Ms. Anderson that she did nothing wrong?
5      MS. WILLIAMS:  Objection.
6    A.   I have no recollection of that.
7      BY MR. THEODOROU:
8    Q.   Did he ever tell you that she had not
9  done -- that she did not do anything wrong?
10      MS. WILLIAMS:  Objection.
11    A.   No, I don't recall him ever telling me
12  that.
13      MR. THEODOROU:  Could we go off the record
14  for a second?
15      Could we just take a 5-minute break?
16      THE VIDEOGRAPHER:  This is --
17      MR. THEODOROU:  I'm actually going pretty
18  well.
19      THE VIDEOGRAPHER:  -- the end of tape
20  number 3.  Off the record at 2:55:09 PM.
21      (Recess.)
22      (Mr. Rossetti left the room.)

Page 237

1      THE VIDEOGRAPHER:  This is tape number 4
2  in the videotape deposition of Elizabeth Holahan.  On
3  the record at 3:06:21 PM on August 23rd, 2006.
4      (Holahan Exhibit No. 13
5          was marked for
6          identification.)
7      (Discussion off the record.)
8      BY MR. THEODOROU:
9    Q.   All right.  Ms. Holahan, do you see
10  exhibit 13?
11    A.   I do.
12    Q.   Okay.  Have you seen this document before?
13    A.   I don't recall, but I must have.
14    Q.   Okay.  So this wasn't one of the documents
15  that the SEC showed you before today?
16    A.   Correct.
17    Q.   All right.  Do you see where it says,
18  statement that the office of public affairs put out
19  later in the day of October 31, 2001?
20    A.   Yes.
21    Q.   All right.  And this is after the release
22  of the statement on the Web site at 9:43.

60 (Pages 234 to 237)

Elizabeth Schmutz                                                    August 23, 2006

Washington, DC

Page 238

1      Now, what it said here was -- it says --
2   if you look at the document, it says:  This
3   announce-- the announcement was inadvertently
4   posted on the Treasury Web site at approximately 9:50
5   AM.  Treasury regrets that this occurred and will
6   work to ensure the integrity of the announcement
7   process.
8      Do you see that?
9   A.  I do.
10   Q.  Okay.  Do you know who at Treasury
11   prepared this document?
12   A.  I believe Tony Fratto wrote it.
13   Q.  Do you recall if you were involved in the
14   preparation of this document?
15   A.  I don't recall.
16   Q.  All right.  Do you recall whether an
17   investigation was conducted about the timing at which
18   the -- Mr. Fisher's statement was posted on the Web
19   site?
20   A.  I believe there was an investigation.
21   Q.  Yeah.
22      I'm talking about that day when they

Page 239

1   said -- how did they conclude it was 9:50 AM?
2   A.  Oh, I don't know.
3   Q.  Okay.  And do you know what were the
4   basis -- what was the basis for stating that Fisher's
5   statement was inadvertently posted on the Web site
6   approximately 9:50 AM?
7   A.  About the information had been embargoed
8   until 10 and then it was disposed of early, I assume.
9   Q.  All right.  But did you subsequently learn
10   that it was actually released at least at 9:43 AM?
11   A.  I wasn't involved with that.
12   Q.  So you don't know how the --
13   A.  Tony Fratto was sort of, because Frances
14   was someone that reported to him.  He was involved
15   with what had happened on her end.
16   Q.  So you don't know how Treasury came up
17   with the 9:50 AM in this particular document?
18   A.  I don't.
19   Q.  Did you ever learn that Mr. Fisher's
20   statement was posted on the Internet earlier than
21   9:50 AM?
22   A.  Where on the Internet?

Page 240

1   Q.  Well, did you ever learn that it was
2   posted on the server at least at 9:40 AM?
3      MS. WILLIAMS:  Objection.
4   A.  You know, I don't have any information
5   about the timing of when it was posted.
6   BY MR. THEODOROU:
7   Q.  Okay.
8   A.  I just know that I read press reports at
9   9:43.
10      BY MR. THEODOROU:
11   Q.  Besides Tony Fratto, did you talk to
12   anybody else at Treasury about the premature posting
13   of Mr. Fisher's statements on the Web site?
14   A.  I don't recall specifically who, but I
15   know there was a number of conversations back and
16   forth between the office of public affairs and the
17   office of domestic finance, so I'm sure that I did.
18   Q.  All right.  Did you ever talk with
19   Michelle Davis about the premature posting?
20   A.  I don't recall.
21      I wonder if she was away maybe when this
22   occurred.  She was traveling with the secretary.  I

Page 241

1   can't definitely recall having a conversation with
2   her about it.
3   Q.  Other than the discussion that you had
4   with Mr. Fratto and Mr. Fisher that day, did you have
5   any other discussions with Mr. Fisher about the
6   premature posting on the Web site?
7   A.  I'm sorry.
8      Other than the conversation I had with him
9   that day, did I have any other conversation?
10   Q.  Yeah.
11      Did you have any other conversations with
12   him concerning the early release of information?
13   A.  I mean, we -- I'm not sure what you're
14   asking.  I mean, I talked to him that day.  He was
15   aware of it and then --
16   Q.  Right.
17      I asked you about that.
18      Other than that conversation, did you have
19   any other conversations with Pete Fisher about the
20   early posting of this statement on the Web site?
21   A.  I recall going somewhere with him -- I
22   think it was that day -- and we were in a cab, and we

61  (Pages 238 to 241)

Elizabeth Schmutz                                                                    August 23, 2006

Washington, DC

| Page 242 | Page 244 |
|---|---|

**Page 242**

1  were talking about it in the cab.
2     Q.  Okay.  And what did he say?
3     A.  I recall him saying that, you know, what's
4  done is done, essentially.
5     Q.  Do you recall anything else?
6     A.  I don't, no.
7     Q.  Did you say anything in that conversation?
8     A.  I recall apologizing to him on behalf of
9  public affairs for what had occurred, yes.  It was my
10  responsibility to ensure the event went seamlessly
11  and it did not, so I apologized to him.
12     Q.  Did you say anything else?
13     A.  I don't recall exactly what I said.
14     Q.  Did you ever have a discussion with
15  Timothy Bitsberger about the premature disclosure of
16  Mr. Fisher's statements?
17     A.  I may have.  I don't recall.
18     Q.  Brian Roseboro?
19     A.  I may have.  I don't recall.
20     Q.  Do you recall in any way discussions that
21  you had with either of those men?
22     A.  That day and this particular matter, I

**Page 243**

1  mean, I'm sure I talked to them, but I don't recall
2  exactly when the conversation was and when it
3  occurred and where.
4     Q.  How about after that day?
5        Do you recall any conversations regarding
6  the premature release of information about Ms. Davis,
7  Michelle Davis?
8     A.  I don't specifically recall, but it's
9  not -- it wouldn't -- I mean, she was the head of
10  public affairs, so it's not unreasonable assumption
11  that I would have discussed with her --
12     Q.  And you --
13     A.  -- and told her about it.
14        I mean, I remember having a conversation
15  with Rob Nichols about it, who was her deputy, and
16  so -- and I'm wondering if I did that because she was
17  out of town, is why I'm thinking -- I can't
18  specifically recall though.
19     Q.  When did you have the conversation with
20  Rob Nichols?
21     A.  I can't recall if it was that day or the
22  next day.  I just can't recall.

**Page 244**

1     Q.  How long was the discussion?
2     A.  5 minutes.
3     Q.  Was anybody else present?
4     A.  No.
5     Q.  What did Mr. Nichols say or what was the
6  substance of the discussion?
7     A.  I recall giving him a rundown of all the
8  things that had gone wrong and telling him, and just,
9  you know, expressing my -- I said I felt badly about
10  it.
11     Q.  And what were all the things that went
12  wrong?
13     A.  Well, there was a consultant that was
14  somehow in this press conference that was meant for
15  the media.  The information was leaked out.  There
16  was press reports of early trading.
17        This press release was posted to the Web
18  site early, which is something that we could control,
19  and we had been forced to apologize for it, and so
20  just -- you know, there were a number of things that
21  did not go as planned.
22     Q.  Not the best day?

**Page 245**

1        MS. WILLIAMS:  Object --
2     A.  Some things -- well, we'll just leave it
3  at that.
4        BY MR. THEODOROU:
5     Q.  Anything else besides, you know, the
6  leaking out of the press report, the early trading,
7  the early release, Mr. Davis being there?
8        Anything else in terms of what went wrong?
9     A.  Nothing comes to mind.
10     Q.  Subsequent to October 31, 2001, did you
11  have any other discussions with Mr. Fisher about the
12  premature leak -- I mean, the premature disclosure of
13  the information?
14     A.  I don't recall.
15     Q.  How about Mr. Bitsberger?
16     A.  I don't recall.
17     Q.  Mr. Roseboro?
18     A.  I don't recall.
19     Q.  Do you recall -- other than the general
20  counsel's office at Treasury, do you recall talking
21  to anybody else at Treasury about the premature
22  disclosure of information besides those people and

62 (Pages 242 to 245)

Elizabeth Schmutz

August 23, 2006

Washington, DC

| Page 250 | Page 252 |
|---|---|
| 1  Q.   It's all right. | 1  office before that, the Inspector General's Office? |
| 2  A.   -- coming into the office and -- | 2  A.   I don't recall. |
| 3  Q.   I knew that was coming. | 3  Q.   Now, when you met with the SEC and someone |
| 4  A.   -- having a conversation and giving him | 4  from the Office of General Counsel of the Treasury on |
| 5  the email. I recall giving him the emails. | 5  November 7th, did they explain the reason for the |
| 6  Q.   And those are the emails you testified | 6  investigation? |
| 7  about earlier -- | 7  A.   Yes. |
| 8  A.   Yes. | 8  Q.   Okay. And what did they say? |
| 9  Q.   -- the emails -- | 9  A.   They explained that the Securities and |
| 10  A.   Correct. | 10  Exchange Commission was there to interview people |
| 11  Q.   -- to Ms. Anderson that are in the | 11  that had been involved with this particular situation |
| 12  document? | 12  and to answer the questions truthfully. |
| 13  A.   The ones -- exhibits 6 and 7. | 13  Q.   Did anyone at Treasury ever tell you that |
| 14  Q.   Now, in his report, he said that you | 14  you violated any Treasury policies or rules on |
| 15  arranged a meeting for -- with Mr. Fratto. | 15  embargoes? |
| 16        Do you see that at the bottom of -- | 16  A.   No. |
| 17  A.   I do. | 17  Q.   Were you ever informed by anyone at |
| 18  Q.   -- page -- | 18  Treasury that you had done something wrong on October |
| 19  A.   I think we walked down to Tony's office. | 19  31st? |
| 20  Q.   Who was at that meeting? | 20  A.   No. |
| 21        You, Mr. Vagle, Mr. Fratto? | 21  Q.   Do you know if Treasury took any |
| 22  A.   I don't remember exactly that meeting, but | 22  disciplinary or employment action against anyone |

| Page 251 | Page 253 |
|---|---|
| 1  that's what it appears to indicate from this memo. | 1  because of the events of October 31st? |
| 2  Q.   Do you remember what was discussed at that | 2  A.   I'm not aware of any action taken. |
| 3  meeting with Mr. Fratto? | 3  Q.   And after October 31st, did you continue |
| 4  A.   I don't specifically recall the meeting | 4  to work on quarterly refunding press conferences |
| 5  itself, so I'm just going off the memo here. | 5  announcements? |
| 6  Q.   All right. Now, I showed you as exhibit 1 | 6  A.   I did, yes. |
| 7  today the memorandum of activity or the summary of | 7  Q.   Did Treasury make any changes to its |
| 8  your interview with Mr. Sporkin and Ms. Filou of the | 8  policies and procedures in quarterly refunding press |
| 9  SEC. | 9  conferences following October 31st? |
| 10        Do you remember that? | 10  A.   Yes, it did. |
| 11  A.   I do. | 11  Q.   Okay. And when were those changes made? |
| 12  Q.   Was the Office of Inspector General of the | 12  A.   Immediately after the 31st, and they were |
| 13  Department of the Treasury present, someone from | 13  in place for the subsequent quarterly refunding |
| 14  Treasury present at that? | 14  announcements. |
| 15  A.   I mean, according to the memorandum, it | 15  Q.   And who contributed to the changes? |
| 16  says that there was someone there from IG's office, | 16  A.   Tony Fratto, myself. |
| 17  but I don't recall who that person was. | 17  Q.   Anybody else? |
| 18  Q.   But you do remember somebody from the | 18  A.   Not that I can recall. |
| 19  general counsel's office? | 19  Q.   All right. And what kind of changes were |
| 20  A.   It was Megan. | 20  made? |
| 21  Q.   Now, before that meeting on November 7, | 21  A.   Instead of having a press conference in |
| 22  2001, did you speak to anybody else from the IG's | 22  order to announce the information, the information |

64 (Pages 250 to 253)

**Page 246**

1  Ms. Anderson?

2      A.  I recall there just being general

3  discussions amongst the other spokespeople and myself

4  about how to avoid something like that from happening

5  again.

6      Q.  And who were the other spokespeople?

7      A.  Tera Bradshaw and Tasia Scolinos.

8      Q.  Okay.  Now, subsequent to October 31st,

9  2001, did you ever meet with anybody from the

10  Treasury Department's general counsel's office about

11  the incident -- about what happened on October 31st?

12     A.  I recall the meeting on December the

13  7th -- not December -- November the 7th, I believe

14  that was -- resulted in a memorandum of activity,

15  exhibit 1 --

16     Q.  Right.

17     A.  -- and there were general counsel

18  attorneys present at that, but I don't recall

19  additional conversations.

20     Q.  Did you ever meet with David Aufhauser of

21  the general counsel's office about this?

22     A.  I don't recall meeting with David, no.

**Page 247**

1      Q.  Did you ever meet with Megan Hills?

2      A.  Yes.

3          Megan was the general counsel attorney

4  that was present for the initial interview with the

5  SEC on November the 7th.

6      Q.  Okay.  So Megan was present for that.

7          Did you ever meet with Megan again about

8  this incident?

9      A.  I don't recall doing so.

10     Q.  How about Francine Kerner?

11     A.  That name rings a bell, but, no, I don't

12  have a specific recollection of a meeting with her.

13     Q.  How about Steve Vagle?

14     A.  Again, the name rings a bell, but I don't

15  have a specific recollection of a subsequent meeting.

16     Q.  All right.

17         MR. THEODOROU:  Exhibit 14.

18         (Holahan Exhibit No. 14

19                  was marked for

20                  identification.)

21         BY MR. THEODOROU:

22     Q.  Now, directing your attention to what's

**Page 248**

1  been marked as exhibit 14, Ms. Holahan, have you ever

2  seen that document before?

3      A.  I have not.

4      Q.  So this was not one of the documents that

5  was showed to you by the SEC or Treasury.

6          Correct?

7      A.  Pardon me?

8      Q.  This was not one of the documents showed

9  to you before today's deposition --

10     A.  Correct.

11     Q.  -- with the SEC lawyers?

12     A.  Correct.

13     Q.  All right.  Well, it says -- do you know

14  who Steven Vagle is?

15     A.  I don't recall.

16         The name is familiar, but I don't recall

17  if he was in the Office of General Counsel.

18     Q.  I'll represent to you that he was.

19     A.  Okay.

20     Q.  And it says on the re line of this

21  memorandum to file:  My November 1st, 2001,

22  investigation showed that the time of publication on

**Page 249**

1  the Treasury Web site of Peter Fisher's remarks on

2  the 30-year bond was 9:43 AM October 31, 2001.

3          Do you see that?

4      A.  I do.

5      Q.  Now, do you recall speaking to him on or

6  about November 1st, 2001?

7      A.  Vaguely.

8      Q.  All right.

9      A.  I -- you know, I don't know.

10     Q.  If you look, 1, 2 --

11     A.  May I read this, please?

12     Q.  I beg your pardon?

13     A.  Can I read through this, please?

14     Q.  Sure.

15         (Pause.)

16     A.  Okay.

17         BY MR. THEODOROU:

18     Q.  Have you looked at it?

19     A.  I have, yes.

20     Q.  So do you recall meeting with Mr. Vagle?

21     A.  I do now, yes.  I do remember vaguely --

22  sorry -- him --

63 (Pages 246 to 249)

Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

Page 254

1  was given to the Treasury pressroom reporters in
2  advance of a 9 o'clock embargo. It was done in -- in
3  the Treasury pressroom in what is referred to as a
4  lockdown.
5       So the Treasury reporters would be in the
6  room. The doors would be shut. No one was allowed
7  to leave. No one was allowed to enter once the
8  information was about to be disseminated.
9       There was a reading of rules, ground
10 rules, that I would read verbally. Everyone present
11 would have to stand there and listen. I would
12 tape-record myself reading those rules. I would ask,
13 are there any questions.
14      I was very specific about the meaning of
15 the word embargo. I was very specific about who the
16 information could be disseminated to other than the
17 reporter himself, and it was a very -- you know, that
18 we allowed them a very brief time to write their
19 stories.
20      Then at 9 AM the embargo was lifted and
21 the information was posted upon the Treasury Web
22 site, and they filed their stories at the same time.

Page 255

1       Q.  So there was no press conference?
2       A.  Correct.
3       Q.  Now, you said you were very specific of
4  who they could disseminate the information to.
5            Who could they disseminate the information
6  to?
7       A.  Only their editors.
8       Q.  And they would get the press -- the
9  announcement at what time under the new rules?
10      A.  Approximately 8:45.
11      Q.  And they were given how much time to write
12 the story?
13      A.  15 minutes.
14      Q.  And during that time, they could call
15 their editors?
16      A.  Yes.
17      Q.  And you were specific about -- you were
18 very specific that only their editors at their media
19 outlets?
20      A.  Correct.
21      Q.  So this was a change in procedure from
22 what you had done on October 31st, 2001?

Page 256

1            Correct?
2       A.  Correct.
3       Q.  And when you say, lockdown, were they
4  actually locked in the room?
5       A.  The doors were shut.
6            They were not physically locked. That
7  would be a fire hazard.
8       Q.  The doors were shut.
9            And was someone then posted outside to
10 ensure that nobody left or entered?
11      A.  I stood by one door, and the other door at
12 the time was right next to our reporter's desk, and
13 that reporter agreed not to -- you know, not to
14 permit anyone to come or go.
15      Q.  So in contrast to what happened on October
16 31st, there was no press conference.
17           Correct?
18      A.  Correct.
19      Q.  There was a lockdown?
20      A.  Correct.
21      Q.  Which was not in place on October 31st.
22           Correct?

Page 257

1       A.  That's correct.
2            All credentials were checked, and there
3  was a sign-in sheet.
4       Q.  Credentials were checked, and there was a
5  sign-in sheet, which was not in effect on October
6  31st?
7       A.  Correct.
8       Q.  Who checked the credentials under the new
9  procedures?
10      A.  I did.
11      Q.  And they were to be credentials issued by
12 your office --
13      A.  Correct.
14      Q.  -- as opposed to anybody else?
15      A.  That's correct.
16      Q.  So that you would not have the situation
17 of Mr. Malvey's office issuing credentials in the
18 future.
19           Correct?
20      A.  When I say, credentials, I mean, they were
21 media credentials. Mr. Malvey's office could not
22 have issued a media credentials. They were simply

65 (Pages 254 to 257)

Elizabeth Schmutz                                              August 23, 2006
                            Washington, DC

**Page 258**

1  allowing someone to be cleared into the building.
2      Q.   Was anybody -- were any nonmedia people
3  under these news procedures allowed into these
4  conferences?
5      A.   Absolutely not.
6      Q.   So then you would not have nonmedia
7  people?
8      A.   Correct.
9           The procedures are very closely aligned
10 with how the Treasury pressroom handles the Fed open
11 market committee announcement of the interest rates.
12 Very similar. Actually it was more stringent than
13 that.
14     Q.   And there was no question-and-answer
15 session?
16     A.   Correct.
17     Q.   Because there was no press conference?
18     A.   Correct.
19          We -- I believe we would have an official
20 there to answer questions, general questions, sort of
21 a background, because obviously it's in our interest
22 that the stories are accurate, so we had to have a

**Page 259**

1  policy person there to answer some questions, but not
2  of a -- you know -- they're just basic questions, not
3  anything more complicated.
4           (Holahan Exhibit No. 15
5           was marked for
6           identification.)
7  BY MR. THEODOROU:
8      Q.   Okay. Ms. Holahan, I have -- now you have
9  in front of you exhibit 15.
10          Do you recognize that document?
11     A.   I do.
12          I have not seen it in a long time, though.
13     Q.   Okay. But do you know what it is?
14     A.   I'd like to read it if you don't mind.
15     Q.   Sure.
16          (Pause.)
17     A.   Okay.
18 BY MR. THEODOROU:
19     Q.   Have you looked at it?
20     A.   I have.
21     Q.   And do you recognize the document?
22     A.   Yes.

**Page 260**

1      Q.   And what is it?
2      A.   It is a press release that we issued -- I
3  don't know the date -- but we issued it to the media
4  to explain how the procedures would be handled going
5  forward.
6           Basically, there would not be a news
7  conference.
8      Q.   And who drafted this press release?
9      A.   To the best of my recollection, I did.
10     Q.   But you don't recall exactly when it went
11 out?
12     A.   I don't.
13     Q.   But it was to govern the next refunding
14 conference after the October 31st conference.
15          Correct?
16     A.   Correct.
17     Q.   And that was to take place on January
18 30th, 2002?
19     A.   January 30th?
20          Yes.
21     Q.   Okay. Now, it says -- if I can direct
22 your attention to the second paragraph, it says:

**Page 261**

1  Starting with the next scheduled refunding
2  announcement on January 30th, 2002, Treasury's office
3  of public affairs will post the announcement on the
4  Treasury Web site at 9 AM.
5           So is that when it would officially be
6  announced?
7      A.   Yes.
8      Q.   To the world?
9      A.   Yes.
10     Q.   And again the announcement also be
11 delivered to credentialed members of the media in the
12 Treasury pressroom shortly before 9 AM.
13          And you testified a few minutes ago that
14 would be at 8:45?
15     A.   Roughly.
16     Q.   All right. With lockdown embargo rules?
17     A.   Correct.
18     Q.   And that ties into what you testified
19 about earlier that there was a lockdown, so that they
20 could not leave and nobody could enter beginning at
21 what time?
22     A.   If we gave them the documents at 8:45,

66 (Pages 258 to 261)

Elizabeth Schmutz                                                    August 23, 2006
Washington, DC

| Page 262 |
| --- |

1  then at 8:45. The documents were not given out until
2  the doors to the room were closed.
3      Q.  The next paragraph says: The traditional
4  practice for releasing the quarterly refunding
5  announcement at a news conference will be
6  discontinued.
7          That is, the news conference was held
8  (phonetic) -- was -- there would not be a news
9  conference.
10         Correct?
11     A.  Correct.
12     Q.  Which is what you testified earlier.
13         So then in contrast to the October
14 conference, there was no press conference.
15         Correct?
16         There was a lockdown so that after a
17 certain period of time, nobody could come or go, in
18 contrast to the October conference where there was no
19 lockdown in effect.
20         Correct?
21     A.  M-hm, correct.
22     Q.  Only credentialed media, credentialed by

| Page 263 |
| --- |

1  the office of public affairs, could attend?
2      A.  No.
3          "Credentialed" means that you are a member
4  of media with a press pass, a press credential from
5  your organization with a photo ID.  That's
6  credentialed.
7      Q.  But those credentials could only come from
8  your office?
9      A.  As a -- no.  Let me explain.
10         A member of the media has credentials from
11 their own organization --
12     Q.  Yes.
13     A.  -- to prove who they are --
14     Q.  Yes.
15     A.  -- and then in order to get into the
16 Treasury Department, they have to have something that
17 we issue them.
18         In order to get what we issue them, they
19 have to show us their own credentials.
20         So then we --
21     Q.  So in order -- right.
22         In order -- in contrast to the October 31,

| Page 264 |
| --- |

1  2001, conference with Mr. Davis, who was not a member
2  the media got in, only members of the media could
3  attend --
4      A.  Correct.
5      Q.  -- these conferences in the future.  That
6  was the difference.
7          And there were also -- in contrast to the
8  October 31st conference, there were -- there was also
9  sign-in sheets and credential checks by you?
10     A.  Yes.
11     Q.  Were there any other differences that you
12 can recall between October 31st and the quarterly
13 refunding conferences that followed?
14         Any other differences?
15     A.  We explained to them -- I explained to
16 them what an embargo was, even though as reporters
17 they obviously knew what that was.  I explained what
18 it meant, and I asked if there were any questions for
19 anyone who might not understand.
20     Q.  So you explained beginning in January
21 specifically what an embargo is?
22     A.  Yes.

| Page 265 |
| --- |

1      Q.  And what did you say an embargo is?
2      A.  I --
3      Q.  As best you can recall.
4      A.  Okay.  As best I can recall, I explained
5  that an embargo means that the information is not to
6  be disseminated outside of this room or to your
7  editor only before 9 AM.  Does anyone understand --
8  does anyone have a question about that.  Does
9  everyone understand that.
10         And everyone would have to either nod or
11 say yes or acknowledge in some way that they'd heard
12 what I said.
13         MR. THEODOROU:  Okay.  I have no further
14 questions at this time.
15         Thank you.
16         THE WITNESS:  You're welcome.
17         MS. WILLIAMS:  I have a few questions,
18 Ms. Holahan.
19         MR. THEODOROU:  Can we take a 5-minute
20 break before you start?
21         MS. WILLIAMS:  Sure.
22         THE VIDEOGRAPHER:  Off the record at

67 (Pages 262 to 265)

Elizabeth Schmutz                                                      August 23, 2006
Washington, DC

| Page 266 | Page 268 |
|---|---|
| 1  3:38:08 PM. | 1      MR. THEODOROU:  Give me a break. |
| 2      (Recess.) | 2  (Phonetic.) |
| 3      THE VIDEOGRAPHER:  Back on the record at | 3      I'm not interested -- |
| 4  3:42:31 PM. | 4      BY MS. WILLIAMS: |
| 5 | 5  Q.  -- would be top secret -- |
| 6      EXAMINATION BY COUNSEL FOR PLAINTIFF | 6      MR. THEODOROU:  -- nor I would think you |
| 7      BY MS. WILLIAMS: | 7  are. |
| 8  Q.  Ms. Holahan, I have a few questions. | 8      (Talking at the same time.) |
| 9      First, I think you testified in response | 9  A.  No, no, no -- |
| 10  to Mr. Theodorou's questions that you had some sort | 10      BY MS. WILLIAMS: |
| 11  of security clearance at Treasury? | 11  Q.  -- and the types of information. |
| 12  A.  I did. | 12  A.  And things that were top secret were, the |
| 13  Q.  Could you tell me what you had to do to | 13  documents were formatted a certain way, and I never |
| 14  get that clearance? | 14  saw anything.  I mean, I was aware of their |
| 15  A.  I had to be interviewed and background | 15  existence, but I myself did not ever have to handle |
| 16  check conducted by -- I believe it was GPO. | 16  anything like that, so there was no further |
| 17  Q.  What does GPO stand for? | 17  explanation. |
| 18  A.  Government personnel office. | 18  Q.  What if any explanation were you provided |
| 19  Q.  Okay.  And was there anything else? | 19  as to whether you would be given any sort of |
| 20  A.  No. | 20  market -- or being given any access to any |
| 21  Q.  Was there any sort of explanation provided | 21  market-sensitive information? |
| 22  to you about information that you could and could not | 22  A.  What type of explanation was there offered |

| Page 267 | Page 269 |
|---|---|
| 1  share at Treasury as a result of you having a | 1  to me? |
| 2  security clearance? | 2  Q.  Yes. |
| 3      MR. THEODOROU:  Objection. | 3      Was there any explanation given? |
| 4  A.  Can you restate the question? | 4  A.  To me? |
| 5      BY MS. WILLIAMS: | 5  Q.  Yes. |
| 6  Q.  Yes. | 6  A.  From whom? |
| 7      You said that you had some sort of | 7  Q.  From anyone who was providing you with the |
| 8  security clearance? | 8  security clearance. |
| 9  A.  Correct. | 9      MR. THEODOROU:  Objection. |
| 10  Q.  And you understood that there was some | 10  A.  There was not any -- no.  There was no |
| 11  information that you would learn in your job that | 11  information given to me by those providing the |
| 12  would be top secret. | 12  clearance. |
| 13      Do you recall giving that testimony? | 13      BY MS. WILLIAMS: |
| 14  A.  Yes. | 14  Q.  What if any information were you given as |
| 15  Q.  Was there any sort of explanation as to | 15  to what you were allowed to do, who you were allowed |
| 16  what kind of information was top secret? | 16  to disseminate top-secret information to? |
| 17      MR. THEODOROU:  Objection. | 17  A.  I didn't receive any information about |
| 18      BY MS. WILLIAMS: | 18  that. |
| 19  Q.  Without telling me top-secret information. | 19  Q.  Did you have any understanding as to |
| 20      MR. THEODOROU:  Exactly. | 20  what -- who you would provide top-secret information |
| 21      BY MS. WILLIAMS: | 21  to? |
| 22  Q.  I said, what kind of information -- | 22  A.  Yes, I did. |

68 (Pages 266 to 269)

Elizabeth Schmutz                                                August 23, 2006
                        Washington, DC

| Page 270 | Page 272 |
|---|---|

**Page 270**

1    MR. THEODOROU: Objection.
2    A.    Only someone else who was -- had the same
3    type of clearance that I did.
4    BY MS. WILLIAMS:
5    Q.    Okay. We had some discussion today about
6    embargo.
7         How did you first come to the
8    understanding of what an embargo is?
9         And that's outside of the Treasury if your
10   understanding came before you started working at
11   Treasury.
12   A.    I don't recall when I first in my career
13   learned what an embargo was, but it's something that
14   when you work with the media, I mean, you just
15   understand what that is. At some point, I had -- I
16   don't recall if it was in college or if it was
17   working physically with the press, but I was a member
18   of the media, so I just -- I knew what it was.
19   Q.    What, if any, exposure to the media did
20   you have or working for the media did you have in
21   college?
22   A.    I worked for the Syracuse University

**Page 271**

1    school newspaper. I was a reporter there. I was
2    enrolled in Newhouse school of communications as a
3    public relations major. And I later was a reporter
4    at the Oil Daily Company for 3 years.
5         And then on the other side of the fence, I
6    dealt with the media from a communications manager
7    role at the Farm Credit Council and for Senator Pat
8    Roberts and for the joint economic committee.
9    Q.    Did you have any exposure to embargoes
10   while you were a reporter at Syracuse University?
11   A.    No.
12   Q.    What about at the Oil Daily?
13   A.    I don't think so, although -- I don't
14   recall.
15   Q.    And you mentioned that you also worked for
16   the Farm Credit Council?
17   A.    Correct.
18   Q.    Did you have any sort of exposure to
19   embargoes at the Farm Credit Council?
20   A.    No.
21        We didn't use embargoes there.
22   Q.    Do you know if you had any exposure to

**Page 272**

1    embargoes prior to coming to Treasury?
2    A.    I don't recall using them as -- there was
3    no need for me to use them as a public affair --
4    public relations person, and I don't remember what
5    the nature of my writing was -- I don't recall using
6    them as a reporter either, so, no.
7         I think my first time using them in
8    practice was at the Treasury Department.
9    Q.    And when you worked on the Hill, were you
10   ever involved in any sort of press conferences where
11   information was embargoed?
12   A.    No.
13   Q.    Besides the Treasury Department, do you
14   know if other government agencies employ embargoes?
15   A.    I don't have direct knowledge, but I'm
16   reasonably certain that they do.
17   Q.    And you haven't had any experience with
18   embargoes from other government agencies?
19   A.    No.
20        I mean, I was at -- I was at one
21   government agency. Then I went back -- I was still a
22   federal employee, so --

**Page 273**

1    Q.    I mean, while you were a reporter.
2    A.    While I was a reporter.
3         I'm sorry.
4    Q.    At any time in your career.
5    A.    No.
6    Q.    Do you know if all -- do you know if other
7    than the Treasury embargo procedure if all other
8    embargo procedures -- excuse me.
9         Scratch that.
10        Do you know if the lockdown procedure is a
11   common procedure used with embargoes?
12        MR. THEODOROU: Objection.
13   A.    It's a reasonable assumption that it's
14   not -- it's not a regular operating procedure. It's
15   fairly unusual.
16        BY MS. WILLIAMS:
17   Q.    Why do you say that?
18   A.    Because there aren't a lot of agencies
19   that have a Treasury -- a pressroom within the agency
20   itself. So to have a lockdown, you like a
21   location pressroom to do it in. You can't just --
22   where else would you hold the reporters.

69 (Pages 270 to 273)

Elizabeth Schmutz                                                                      August 23, 2006

Washington, DC

| Page 274 | Page 276 |
|---|---|

**Page 274**

1    So Treasury has a pressroom. I believe

2 that -- I believe that State does. And I think maybe

3 Justice does.

4    But those are the only 3 agencies that

5 have a pressroom within the building where something

6 like that could occur.

7    Q.  Do you know if the Department of Labor has

8 a pressroom?

9    A.  I don't know.

10    Q.  Before October 31, 2001, did Treasury use

11 embargoes for the release of information besides

12 information released at quarterly refunding

13 conferences?

14    A.  Yes.

15    Q.  What kinds of other press conferences did

16 Treasury use an embargo?

17    A.  Every speech was embargoed.

18    Q.  And how was the embargo set for those

19 press conferences?

20    MR. THEODOROU:  Objection.

21    A.  Actually it's a speech.

22    BY MS. WILLIAMS:

**Page 275**

1    Q.  Speeches.

2    A.  So if a government official at the

3 Treasury Department is giving a speech at let's say

4 hypothetically 2 PM, then at roughly, you know, 1:30,

5 the text of the speech would be taken out of the

6 pressroom with an embargo on it and given to the

7 reporters, and we would reiterate that it's embargoed

8 verbally as well as being on the document itself.

9    Q.  Now, you were asked on direct about

10 exhibit 15.

11    Do you have that exhibit?

12    A.  I do.

13    Q.  And this exhibit discusses some changes in

14 the embargo procedure for a quarterly refunding

15 conferences.

16    Correct?

17    A.  Yes. Correct.

18    Q.  Do you know if the embargo procedure

19 changed for other -- for speeches that were embargoed

20 after October 31, 2001?

21    A.  No, it did not change.

22    Q.  Do you know if a lockdown was put in place

**Page 276**

1 for speeches that were embargoed at Treasury?

2    A.  No, it was not.

3    MR. THEODOROU:  Objection.

4    BY MS. WILLIAMS:

5    Q.  After October 31, 2001.

6    A.  No.

7    The lockdown was not used for anything

8 except for the quarterly refunding.

9    Q.  Setting aside the events of October 31,

10 2001, in your tenure at Treasury, did you ever find

11 out if anyone ever intentionally violated the

12 Treasury embargo?

13    A.  Not to my knowledge.

14    Q.  What about unintentional violations?

15    MR. THEODOROU:  Objection.

16    A.  There were unintentional violations.

17    MR. THEODOROU:  Just for the record:  Now

18 it's my turn to get a chance to object, so after she

19 asks the question, you got to give me a little -- a

20 couple seconds to get my objection --

21    MS. WILLIAMS:  Now you see what my issue

22 was, Nick.

**Page 277**

1    MR. THEODOROU:  -- onto the record.

2    MS. WILLIAMS:  Could you repeat the

3 question and answer.

4    (The reporter read the last question, the

5    objection, and the last answer.)

6    BY MS. WILLIAMS:

7    Q.  How often did unintentional violations

8 occur during your tenure at Treasury?

9    MR. THEODOROU:  Objection.

10    A.  It's my experience that every 3 to 6

11 months, somebody would file their story early

12 accidentally.

13    BY MS. WILLIAMS:

14    Q.  How did these unintentional violations

15 come to your attention?

16    A.  Usually another member of the press corps

17 would contact me and complain.

18    Q.  Did you ever find out about these

19 violations through any other means?

20    A.  I think maybe once or twice I noticed it

21 myself in looking at the stories that they were filed

22 before the embargo time, but it was only by a minute

Alderson Reporting Company

1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

· Elizabeth Schmutz                                                August 23, 2006
Washington, DC

Page 278

1  or so, but, you know, we would follow up and remind
2  them of the procedure, and getting the information in
3  advance was a privilege and that we could revoke that
4  at any time if we wanted to.
5     Q.  Now, you said that it was usually a minute
6  or 2.
7        What was the longest period of time that
8  you found out that someone had violated an embargo
9  before the embargo time?
10    A.  No more than a minute or 2.
11    Q.  Did you ever take any action to prohibit
12  anyone from receiving embargoed information as a
13  result of their violation of the embargo?
14    A.  It was certainly threatened, but we never
15  actually revoked anyone else's ability to receive
16  information. We know -- we understood that for the
17  most part these are people that are just doing their
18  jobs and accidents happen, and it was never
19  intentional.
20    Q.  What explanations did you receive from
21  reporters who had filed their stories before the
22  embargo time?

Page 279

1        MR. THEODOROU:  Objection.
2     A.  The explanations I received was that it
3  was an accident. The editors had inadvertently sent
4  the story a few minutes early, it was not anything
5  that was intentional.
6        They apologized. They were reporters that
7  we dealt with on a daily basis. They worked from the
8  Treasury Department building and they were people
9  that we knew and that, you know, we worked with
10  closely, so we gave them the benefit of the doubt.
11       BY MS. WILLIAMS:
12    Q.  Okay. Now, just to clarify, were there
13  any written procedures regarding embargoes or the
14  release of -- excuse me.
15       Were there any written procedures
16  regarding the embargo policy at Treasury?
17    A.  No.
18    Q.  What about unwritten policies or
19  procedures?
20    A.  Yes.
21    I mean, I think that, you know, the
22  understanding between the office of public affairs

Page 280

1  and members of the Treasury press corps was that, you
2  know, we -- it was a 2-way street and that we gave
3  them information in advance or to help them write
4  their stories and have everybody have their story out
5  at the same time, and so we wouldn't withhold the
6  information. We wouldn't post it on the Web site
7  until the embargo time that we agreed upon. It
8  helped them. It helped us.
9        And so we felt it was, you know, mutually
10  beneficial. It was an understanding that was not in
11  writing, but everybody was very clear on what the
12  rules were and what the understanding was.
13    Q.  Did you ever receive any questions from
14  any reporters about what they were or were not
15  allowed to do with embargoed information while you
16  were at Treasury before October 31, 2001?
17    A.  No.
18    Q.  And I think you were asked on direct about
19  whether there were written policies and procedures
20  regarding how refunding conferences were to be
21  handled.
22       Were there any written policies or

Page 281

1  procedures regarding how refunding conferences were
2  to be handled prior to October 31, 2001?
3     A.  There were not to my knowledge.
4     Q.  What about unwritten policies or
5  procedures?
6     A.  Yes.
7        There were traditions, long-standing
8  traditions of how these things had been done in the
9  past. As we acknowledge in exhibit 15, we talk about
10  the traditional practice of releasing the quarterly
11  refunding announcement at a news conference, so there
12  were traditional practices that the press corps,
13  especially those who worked at Treasury, grew to
14  expect to be handled a certain way, and a lot of
15  times they were pretty clear, this is how it's always
16  been done.
17    Q.  Were there also these traditional
18  practices about how Treasury was going to release
19  information regarding quarterly refunding
20  conferences?
21    A.  Well, that we had a press conference,
22  would be the expected manner of dissemination.

71 (Pages 278 to 281)

Elizabeth Schmutz                                                                August 23, 2006
Washington, DC

Page 282

1    Q.   And what about with regard to the press
2  release itself?
3        Any traditions as to how you were going to
4  distribute the press release or make the press
5  release public?
6        MR. THEODOROU:  Objection.
7    A.   So we would -- that we would hand it out
8  to the media, either take it to the pressroom or wait
9  and hand it out at the press conference.
10       BY MS. WILLIAMS:
11   Q.   And what about with regard to posting on
12 Treasury's Web site?
13       Any traditional practices as to -- excuse
14 me -- traditional practices that Treasury employed
15 regarding the posting of the press release to its Web
16 site.
17       MR. THEODOROU:  Objection.
18   A.   We traditionally posted things to the Web
19 site at the time of the embargo, so I mean, they
20 didn't expect things to be on the Web site until the
21 time of the embargo was lifted.
22       BY MS. WILLIAMS:

Page 283

1    Q.   Did you ever receive any complaints that
2  Treasury had delayed in posting a press release to
3  its Web site, had not put it up right at the embargo
4  time?
5    A.   Occasionally, we would get calls from
6  reporters outside of the building looking for a
7  document that had not yet been posted, so, yes.
8    Q.   And why would that occur, that delay in
9  posting?
10   A.   We either -- sometimes we had problems
11 with the computer.  Frances was away from her desk,
12 didn't have a chance to post it.  There were a
13 variety of reasons why she might be delayed somehow
14 in getting it posted at the time that we intended to
15 have it posted.
16   Q.   Did you ever post any press releases to
17 the Treasury Web site?
18   A.   I didn't know how to do it.
19       We -- Frances was the only person outside
20 of the Web team that had an understanding of how to
21 post documents to the Web site.
22       Tony might have, but I did not.

Page 284

1    Q.   So are you familiar with the term staging
2  server?
3    A.   I've heard it, but it's -- I have a very
4  vague understanding of how that works.
5    Q.   Have you ever posted something on the
6  staging server at Treasury?
7    A.   I think there was a time when Tony tried
8  to train all of us to do this, and no one wanted to
9  do it, and so we had the instructions, but it was so
10 complicated, it just was not worth doing.  We had
11 Frances there to do it, and she was -- that was her
12 job.
13   Q.   Was that before or after October 31, 2001,
14 this training that Mr. Fratto tried to provide?
15   A.   I don't recall, but I think it was after.
16       I think we had some problems with things
17 not getting posted properly, and Frances was away,
18 and he thought he could do that by getting everyone
19 to post their own documents, and it didn't stick.
20   Q.   During your tenure at Treasury, did you
21 ever learn that a reporter had provided embargoed
22 information to anyone other than their editor during

Page 285

1  the embargo period, setting aside the events of
2  October 31, 2001?
3    A.   I wasn't aware of that happening, no.
4    Q.   Were you ever made aware that a reporter
5  had provided embargoed information to someone to
6  receive a comment for their article before -- during
7  the embargoed time?
8    A.   I wasn't aware of a specific instance, but
9  I certainly knew that reporters would call me trying
10 to get comment based on information, so it's not a
11 surprise to me that they might try to do that with
12 our information, but what can we do.
13   Q.   Was that something that was allowed under
14 the embargo procedures?
15   A.   No, but we didn't have written procedures.
16   Q.   What about the unwritten procedures?
17       Was that something that was allowed?
18   A.   No, it was not.
19       They -- I mean -- if that were to occur
20 with a reporter in the Treasury pressroom and I were
21 to hear about that, I mean, I would call them and be
22 upset about it, and I'd be -- I'd have reason to be,

Page 286

1  because it would be Treasury information that they
2  were then disseminating to a noneditor, to a
3  nonreporter. I mean, that's the same as just going
4  out and telling someone on the street.
5      Q.  Were you ever made aware that that
6  happened during your tenure at Treasury, that someone
7  had --
8      A.  I don't recall any specific instances
9  until I heard about this one today.
10     Q.  Do you have any personal knowledge that
11 Mr. Collins called anyone at Fannie Mae regarding the
12 October 31, 2001, announcement?
13     A.  I did not have any prior knowledge to
14 today of that happening.
15     Q.  Today, do you have any personal
16 knowledge --
17     A.  Right now?
18     Q.  Yes.
19     A.  I've been told by Mr. Theodorou that he
20 did.
21     Q.  And other than being told by
22 Mr. Theodorou, do you have any other independent

Page 287

1  knowledge yourself?
2      A.  No.
3      Q.  Have you read any documents that suggested
4  that Mr. Collins --
5      A.  No.
6      Q.  -- contacted someone?
7          Have you spoken to Mr. Collins to confirm
8  whether or not --
9      A.  No.
10     Q.  -- he's provided information to someone --
11         Have you spoken to anyone at Fannie Mae to
12 learn that Mr. Collins called October 31, 2001?
13     A.  No.
14     Q.  What about Mr. -- I think Mr. Theodorou
15 asked -- also mentioned 9 additional people who might
16 have learned information.
17         Do you have -- do you know of any -- do
18 you have any personal knowledge that 9 additional
19 people learned information from Mr. Collins?
20     A.  I do not.
21     Q.  You started working at Treasury in August
22 of 2001.

Page 288

1      A.  Correct.
2      Q.  Is that right?
3          Was Mr. Roger Anderson also working at
4  Treasury while -- when you started working there?
5      A.  My recollection is that he joined Treasury
6  after I was working there.
7      Q.  And what was his title?
8      A.  He was the deputy assistant secretary for
9  federal finance, I believe.
10     Q.  And you believe he worked in that position
11 while you were working --
12         MR. THEODOROU:  Objection.
13         BY MS. WILLIAMS:
14     Q.  -- at Treasury?
15     A.  If we're referring to the same Roger
16 Anderson and he was there when I was there, but he
17 joined the Treasury Department after I started in
18 August of '01, so he came after I was already there,
19 but we worked together for the duration of my tenure
20 there. He was still there when I left.
21     Q.  Oh, he was still there when -- this is
22 Roger Anderson you're referring to was still at

Page 289

1  Treasury when you left?
2      A.  (Nodding head) -- am I thinking of the
3  right person?
4          Glasses, big guy?
5          MR. FUREY:  Roger Kodat.
6          MR. THEODOROU:  Why don't we let her
7  answer the question.
8          THE COURT REPORTER:  Did you say a last
9  name?
10     A.  Need to clarify based on some information.
11 This is a different Roger. I'm thinking of somebody
12 else.
13         I'm sorry.
14         BY MS. WILLIAMS:
15     Q.  Okay. I'm asking about a Roger Anderson.
16         Did you know someone who worked at
17 Treasury during your tenure there named Roger
18 Anderson?
19     A.  His name is not -- no. His name is not
20 familiar to me right now. I don't recollect this
21 person. I was thinking of a different man named
22 Roger who worked at the Treasury Department.

73 (Pages 286 to 289)

Elizabeth Schmutz                                          August 23, 2006

Washington, DC

| Page 290 | Page 292 |
|---|---|
| 1   Q.  Okay.  And the person that you are | 1    I vaguely recall that there was a small |
| 2 referring to, what was their position at Treasury? | 2 group of these other government like staff people |
| 3   A.  The deputy assistant secretary under -- he | 3 that came in for the Tuesday event in the conference |
| 4 reported to -- he reported to Brian Roseboro.  He was | 4 room.  It's the second stage of the quarterly |
| 5 the deputy assistant secretary for I think federal | 5 refunding process before the press conference that |
| 6 finance, I think.  He handled the air transportation | 6 takes place on Tuesday, and they like to attend that |
| 7 stabilization board.  Roger Kodat. | 7 particular slide show, so it's possible they may have |
| 8    I'm sorry.  I apologize. | 8 come for the press conference as well. |
| 9    It's been so long. | 9   Q.  So just to clarify:  The Tuesday event, |
| 10   Q.  And so the Roger that you're referring to | 10 was that open to the public? |
| 11 last name is Kodat? | 11   A.  The first 10 minutes were open to the |
| 12   A.  That's correct. | 12 press in order to make it a public meeting, but then |
| 13   THE COURT REPORTER:  Kodak? | 13 the press would be excused and the meeting would |
| 14   THE WITNESS:  No. | 14 continue without them. |
| 15   K-O-D-A-T. | 15   Q.  And who would be continuing with this |
| 16   BY MS. WILLIAMS: | 16 meeting that the press was not -- |
| 17   Q.  I'm going to be asking questions about | 17   A.  The Treasury borrowing advisory committee. |
| 18 Roger Anderson. | 18   Q.  Did you participate in the Tuesday public |
| 19   Do you know Roger Anderson? | 19 portion of the meeting? |
| 20   A.  I don't, no. | 20   A.  Yes, I did. |
| 21   Q.  Do you know of any Roger Anderson who | 21   Q.  What about on October 30th, 2001 -- |
| 22 worked at the Treasury Department before you started | 22   MR. THEODOROU:  31st. |

| Page 291 | Page 293 |
|---|---|
| 1 working with the Treasury Department? | 1   Oh, 30th. |
| 2   A.  I just -- I can't recollect who Roger | 2   I'm sorry. |
| 3 Anderson is to be honest with you.  I may have known | 3   BY MS. WILLIAMS: |
| 4 him when I was there, but I don't at this -- today I | 4   Q.  No. |
| 5 don't recollect who that is. | 5   October 30th, 2001. |
| 6   Q.  Okay.  So you don't know if Mr. Davis had | 6   Did you attend -- |
| 7 any agreement with Mr. Anderson regarding abiding by | 7   A.  I did. |
| 8 Treasury's embargoes? | 8   Q.  -- the public portion of that meeting? |
| 9   A.  No. | 9   A.  I did. |
| 10   I have no knowledge of that. | 10   Q.  Do you know if Mr. Davis attended that |
| 11   Q.  You mentioned that the Treasury refunding | 11 meeting? |
| 12 conferences were for the press. | 12   A.  I don't know who Mr. Davis is, so it's my |
| 13   Do you know if any attendees from -- any | 13 understanding he did not. |
| 14 people attended from other government agencies? | 14   Q.  Do you know if there were any nonpress and |
| 15   A.  It's possible. | 15 non-Treasury employees present for that public |
| 16   Q.  Did you ever clear anyone in from any | 16 portion of the October 30th meeting? |
| 17 other government agency to attend the quarterly | 17   A.  Well, yes. |
| 18 refunding conferences? | 18   The members of the borrowing advisory |
| 19   A.  It's possible that -- that there's a | 19 committee themselves.  And then if -- a |
| 20 couple people from the Office of Management and | 20 representative from OMB came over or CBO or the Fed |
| 21 Budget, OMB, and perhaps congressional budget office | 21 came over, then they would have been there as well |
| 22 or the Federal Reserve. | 22 for the public portion. |

74 (Pages 290 to 293)

Elizabeth Schmutz                                          August 23, 2006
Washington, DC

Page 294

1    Q.   What happened after the public portion of
2    the October 30th meeting?
3    A.   The borrowing advisory committee continued
4    the meeting behind closed doors.
5    Q.   Where was the October 30th, 2001, meeting
6    held?
7    A.   In the secretary's large conference room.
8    Q.   And you didn't stay for the borrowing
9    advisory committee's closed portion of the meeting?
10   A.   Correct.
11        I did not.
12   Q.   And was anyone who was a member of the
13   press allowed to stay for that portion of the
14   meeting?
15   A.   No.
16   Q.   What about members of these other offices
17   that you mentioned, OMB, CBO?
18   A.   No.
19   Q.   And you said that -- I think you testified
20   that the funding conference was a 3-day event.
21        What happened on Monday of the conference?
22   A.   At 3 PM, there's some charts and some

Page 295

1    other information that's released to the press, and
2    it sort of helps them prepare for the Wednesday
3    announcement.
4    Q.   How are these charts distributed?
5    A.   They're given to the pressroom by hand.
6    We take them down there and give them to them.  It's
7    like the bureau of public debt brings them a calendar
8    over and there's some charts, and we take them down
9    there and give them -- we would take them down there
10   and give them to the press.
11        And that was it.
12   Q.   Did you prepare any of the charts or other
13   information distributed for the October 29th, 2001,
14   Monday portion of the conference?
15   A.   No.
16   Q.   Besides just taking into the pressroom,
17   were these charts and other information distributed
18   any other way?
19   A.   I believe they were posted on our Web site
20   as well, I believe.
21   Q.   Okay.  So that was the Monday portion.
22        Now, going back to this Tuesday, October

Page 296

1    30th, meeting, do you know how non-Treasury
2    employees, specifically individuals who work for
3    other government agencies, gained clearance into the
4    Treasury building for the Tuesday portion of the
5    refunding conference?
6    A.   They asked permission of public affairs,
7    and I would agree and get -- and send their names,
8    their date of birth, and their Social Security
9    numbers to the Secret Service office for clearance.
10   Q.   Were any other offices at Treasury besides
11   the office of public affairs allowed to clear in
12   other government officials to this Tuesday portion of
13   the meeting?
14   A.   There wasn't really an issue of being
15   allowed.  I mean, I don't know they if did or not.  I
16   don't recall ever seeing anything that wasn't --
17   hadn't gone through public affairs there other than
18   the borrowing advisory committee themselves, so, you
19   know, I don't know if anyone else was clearing anyone
20   else in.
21   Q.   Did you know everyone who was at that
22   October 30th, 2001, Tuesday portion of the meeting?

Page 297

1    A.   I knew all the members of the media and I
2    knew who the people were that came over from other
3    agencies, because they all left with me.  I made sure
4    they were all out of the room.  So at that point, I
5    mean, whoever was left was a member of the borrowing
6    advisory committee, and while I didn't know those
7    people, they knew each other, and so if there was
8    somebody who didn't fit in any of the above groups,
9    it would kind of be obvious.
10        It's a conference room.  It's not --
11   Q.   Now, moving back to the Wednesday press
12   conference, specifically October 31, 2001, do you
13   know if other government -- officials from other
14   government agencies attended that press conference?
15   A.   It's possible.
16        I don't recall specifically that date if I
17   cleared in the OMB folks.
18   Q.   And if officials from other government
19   agencies did attend, would they have to be cleared
20   into the office of public affairs?
21   A.   Yes.
22   Q.   Were any other offices allowed to clear in

75 (Pages 294 to 297)

Elizabeth Schmutz                                                     August 23, 2006
                              Washington, DC

| Page 298 | Page 300 |
|---|---|

**Page 298**

1  officials from other government agencies?

2          MR. THEODOROU: Objection.

3      A.  They should not have.

4      BY MS. WILLIAMS:

5      Q.  When you say, they should not have, why?

6      A.  Because --

7          MR. THEODOROU: Objection.

8      A.  -- because the press conference was an

9  event being hosted and put on by the office of public

10  affairs, and therefore, it was a press event that --

11  it would not have been appropriate for another office

12  to start inviting people to a press event, any more

13  than it would be appropriate for us to show up at

14  their meetings.

15          BY MS. WILLIAMS:

16      Q.  Do you know if members of the Treasury

17  borrowing advisory committee attended that October

18  31, 2001, meeting?

19      A.  The 31st?

20      Q.  The 31st, yes.

21      A.  To my knowledge, they did not attend that

22  press conference.  They left Washington, went back up

**Page 299**

1  to New York prior to the press conference.

2      Q.  Do you know if they ever attended the

3  Wednesday press conferences for quarterly refunding?

4      A.  I don't have any knowledge prior to the

5  31st, but it's my understanding that they did not.

6      Q.  Individuals from other government

7  agencies, would they have been required to abide by

8  the embargo that was in place at the October 31,

9  2001, conference?

10          MR. THEODOROU: Objection.

11      A.  They would be expected to respect that,

12  yes, and not be disseminating the information to the

13  media or to the general public, and they were

14  government employees.

15          BY MS. WILLIAMS:

16      Q.  During your tenure at Treasury, did you

17  ever hear any complaints that any official from

18  another government agency had violated the embargo?

19      A.  No.

20      Q.  On October 31st, 2001, did any attendees

21  ask any questions about what embargo meant after you

22  made your announcement about the 10 AM embargo?

**Page 300**

1      A.  No, they did not.

2      Q.  Could you refer to exhibit 1.  This is an

3  memorandum of activity.

4      A.  M-hm.  Yes.

5          I'm reviewing it.

6      Q.  Okay.  And on page -- if you could refer

7  to page 2, and I'm at the first full sentence:

8  Holahan said she announced 3 times at the press

9  conference that the information presented by

10  undersecretary Fisher and contained in the press

11  release was embargoed until 11 AM.

12      A.  10 AM.

13      Q.  10 AM.

14          Excuse me.

15          Now, today during Mr. Theodorou's

16  questioning, you said that you did not specifically

17  recall mentioning the embargo 3 times.

18          You only recall mentioning it 2 times; is

19  that right?

20      A.  I'm a hundred percent certain that I

21  announced at the beginning and at the end of the

22  press conference.  I vaguely remember making that

**Page 301**

1  second announcement, but I am not a hundred percent

2  certain.

3          That's why today I said -- I clarified

4  that, that this was a very -- this is an accurate

5  depiction of what I recall.  It was a week after the

6  event, less than a week after the event, and -- but

7  today, 6 years later, my memory is not as good.

8      Q.  Okay.  So this interview was taken

9  November 7, 2001.

10      A.  Correct.

11      Q.  Is that correct?

12      A.  That's right.

13      Q.  And at the time of this interview, the

14  events of October 31, 2001, were more fresh in your

15  mind.

16          Is that a fair statement?

17      A.  Yes, it is.

18      Q.  And do you have any reason to believe that

19  the statements in this memorandum are incorrect?

20      A.  Not at all.

21          MR. THEODOROU: Objection.

22          BY MS. WILLIAMS:

76 (Pages 298 to 301)

'Elizabeth Schmutz                                                    August 23, 2006
                            Washington, DC

| Page 302 |
|---|
| 1    Q.   Did you review this memorandum today? |
| 2    A.   Yes. |
| 3    Q.   Did you see anything in here that you |
| 4   believe is incorrect? |
| 5    A.   No, I did not. |
| 6    Q.   Do you know -- since you started at |
| 7   Treasury August of 2001, do you know prior to your |
| 8   tenure at Treasury prior to the time you started |
| 9   there if an embargo time had ever been set in advance |
| 10   of a press conference? |
| 11    A.   Not to my knowledge. |
| 12    Q.   When you say, not to your knowledge, are |
| 13   you saying that none ever had or you just don't know |
| 14   if one had ever been sent in advance of a press |
| 15   conference? |
| 16    A.   The latter. |
| 17    Q.   When you worked with the Oil Daily, you |
| 18   were a reporter; is that right? |
| 19    A.   Correct. |
| 20    Q.   And the Oil Daily distributed a |
| 21·  newsletter; is that right? |
| 22    A.   Correct. |

| Page 303 |
|---|
| 1    Q.   Did you consider yourself to be part of |
| 2   the press when you worked at the Oil Daily? |
| 3    A.   Yes. |
| 4    Q.   And one of your responsibilities was to |
| 5   help write blurbs for the newsletter? |
| 6    A.   Initially. |
| 7    Q.   Okay.  And during that time initially when |
| 8   you were writing blurbs for this newsletter, did you |
| 9   consider yourself to be part of the press? |
| 10    A.   Yes. |
| 11    Q.   Did the Oil Daily put forth any other |
| 12   publication besides the newsletter? |
| 13    A.   They had several different newsletters. |
| 14    Q.   Did they have any sort of newspaper that |
| 15   they put out? |
| 16    A.   No. |
| 17    Q.   TV program -- |
| 18    A.   No. |
| 19    Q.   -- that they did? |
| 20        Radio program? |
| 21    A.   No. |
| 22    Q.   Do you know of any written Treasury policy |

| Page 304 |
|---|
| 1   that said only the office of public affairs could |
| 2   clear people into refunding conferences? |
| 3    A.   I'm not aware of that, no. |
| 4    Q.  ·Could you refer to exhibit 5, the picture |
| 5   of the hallway and the diplomatic room that you drew. |
| 6        And I note that at the bottom there you |
| 7   wrote, Peter Fisher's office. |
| 8        Do you see that? |
| 9    A.   Yes. |
| 10    Q.   Did that doorway actually lead directly |
| 11   into Mr. Fisher's office? |
| 12    A.   No. |
| 13    Q.   Where did it that doorway lead? |
| 14    A.   It led into the area that -- where his 2 |
| 15   secretaries sat. |
| 16    Q.   Could you draw in there where Mr. Fisher's |
| 17   actual office was? |
| 18    A.   (Complying.) |
| 19    Q.   Do you know who Mr. Fisher's secretaries |
| 20   were in October of 2001? |
| 21    A.   Yes. |
| 22    Q.   Who were they? |

| Page 305 |
|---|
| 1    A.   Anna Hart was his more senior secretary. |
| 2   She's since retired.  And the other person was |
| 3   Diana -- I can't remember Diana's last name, but it |
| 4   was Anna and Diana. |
| 5    Q.   Okay.  Could you refer to exhibit 10 for |
| 6   me. |
| 7        These are the emails that you sent out on |
| 8   the morning of October 31, 2001; is that correct? |
| 9    A.   Correct. |
| 10    Q.   And I just want to go through a few of |
| 11   them. |
| 12        The first page, the email to Mr. Akin, a |
| 13   CNBC producer, was sent at 8:57 AM? |
| 14    A.   Correct. |
| 15    Q.   And that was before the press conference |
| 16   started? |
| 17    A.   Correct. |
| 18    Q.   Okay.  If you could turn to the next page. |
| 19        The next email was sent at 9:30 AM to |
| 20   Mr. Fuerbringer. |
| 21        And that was after the press conference |
| 22   had ended. |

                                        77 (Pages 302 to 305)

Elizabeth Schmutz                                                    August 23, 2006
                           Washington, DC

| Page 306 | Page 308 |
|---|---|

**Page 306**

1      Correct?

2      A.   Correct.

3      Q.   Were you in your office at the time you

4   sent this email?

5      A.   Yes.

6      Q.   If you could turn to the next page.

7           This is to Mr. Ip, Wall Street Journal

8   reporter, at 9:32 AM.

9           This is also after the press conference

10   had ended?

11      A.   Correct.

12      Q.   And were you in your office when you sent

13   this email?

14      A.   Yes.

15      Q.   And then the final page.

16           This is an email to Mr. Nichols.

17           Mr. Nichols worked inside the Treasury

18   Department?

19      A.   Correct.

20      Q.   And this was sent at 9:54 AM, also after

21   the press conference ended.

22           Right?

**Page 308**

1      BY MS. WILLIAMS:

2      Q.   Do you know why you would tell Mr. Nichols

3   to send something out at 10 AM if it had already been

4   put on the Treasury's Web site?

5      MR. THEODOROU:   Objection.

6      A.   I don't know why I would tell him that.

7           It's a reasonable assumption that I didn't

8   know and that I was -- I didn't find out until after

9   10 o'clock, and at that point when I sent this email

10   that I still believed that the embargo was in place.

11      BY MS. WILLIAMS:

12      Q.   You stated that Ms. Anderson -- you saw

13   Ms. Anderson handing out the press release on the

14   hard Treasury letterhead when you were making your

15   first announcement about the embargo during the

16   October 31st conference.

17           Correct?

18      A.   Correct.

19      Q.   Do you know if she was listening to your

20   announcement?

21      MR. THEODOROU:   Objection.

22      A.   I can't answer that for her.

| Page 307 | Page 309 |
|---|---|

**Page 307**

1      A.   Correct.

2      Q.   Now, if you could refer to the subject

3   line: Rob, please send to your press list at 10 AM,

4   thanks.

5           Do you see this?

6      A.   Yes.

7      Q.   Do you know whether if at the time you

8   sent this email you knew that the information about

9   the cancellation of the 30-year bond had been placed

10   on Treasury's Web site?

11      MR. THEODOROU:   Objection.

12      A.   I don't recall if I knew at 9:54 whether

13   it was on the Web site or not.  I thought that I did,

14   but I don't.  I'm not sure now.

15      BY MS. WILLIAMS:

16      Q.   When you say you thought that you did,

17   what do you mean?

18      MR. THEODOROU:   Objection.

19      A.   Recalling conversations in the time line 6

20   years later, I could have had that conversation with

21   the reporters before 10, but now I'm thinking maybe I

22   did not, so I just don't recall.

**Page 309**

1      BY MS. WILLIAMS:

2      Q.   Did you ever ask her if she heard you

3   announce the 10 AM embargo?

4      A.   I did not ask her, but I did make the

5   assumption that she was in the room and right in

6   front of me when I verbally said it, that she was

7   aware of it.

8      Q.   After you found out that the press release

9   had been posted before 10 AM, did you ask

10   Ms. Anderson then if she'd heard you announce the 10

11   AM embargo?

12      MR. THEODOROU:   Objection.

13      A.   Can you repeat the question?

14      BY MS. WILLIAMS:

15      Q.   Once you realized that the press release

16   had been put on Treasury's Web site by Mr. Anderson

17   before 10 AM, I believe you stated you had a

18   conversation with Ms. Anderson.

19      A.   Correct.

20      Q.   During that conversation, did you ask her

21   whether she had heard you announce the 10 AM embargo

22   at the conference?

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400                          Washington, DC 20005

Elizabeth Schmutz                                                      August 23, 2006
                          Washington, DC

Page 310

1    MR. THEODOROU: Objection.
2    A.   I may have asked her that, but I don't
3    recall.
4    BY MS. WILLIAMS:
5    Q.   Did Ms. Anderson ever tell you that she
6    did not know about the 10 AM embargo?
7    MR. THEODOROU: Objection.
8    A.   I don't recall.
9    MS. WILLIAMS: I don't have any further
10   questions at this time.
11   MR. THEODOROU: I just have a couple.
12
13   FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
14   BY MR. THEODOROU:
15   Q.   You were asked on cross-examination by
16   Ms. Williams about your understanding of embargoes
17   and the refunding conferences.
18   Do you remember that?
19   A.   Yes.
20   Q.   Okay.  Directing your attention to October
21   31, 2001.
22   You had only been at Treasury for 2

Page 311

1    months.
2    Correct?
3    A.   Correct -- 3 months.
4    Q.   And you had not received any training on
5    what embargo meant in the context of the press
6    conference; isn't that right?
7    MS. WILLIAMS: Objection.
8    A.   Correct.
9    BY MR. THEODOROU:
10   Q.   In fact, before you joined Treasury, you
11   had no exposure to embargoes before coming to
12   Treasury.
13   Correct?
14   A.   No.
15   I said that I myself had not used them,
16   but I was exposed to them.
17   Q.   Well, I think you said -- well, all right.
18   I can go back to the testimony, but I
19   won't.
20   But when you were talking about embargoes,
21   on the day of October 31st, though, other than saying
22   there was an embargo in place, you didn't describe

Page 312

1    what the embargo meant.
2    Correct?
3    A.   Correct.
4    Q.   To the press.
5    Correct?
6    A.   Correct.
7    Q.   Now, you were also asked questions about
8    your memorandum of interview and the accuracy of that
9    memorandum.
10   Correct?
11   A.   Correct.
12   Q.   All right.  You don't have any
13   recollection talking about an embargo today for the
14   third time that day, do you?
15   MS. WILLIAMS: Objection.
16   BY MR. THEODOROU:
17   Q.   Present recollection.
18   MS. WILLIAMS: Objection.
19   A.   My present recollection is very strong for
20   the beginning and the end of the news conference.  My
21   recollection of announcing it before the
22   question-and-answer period is somewhat vague, but

Page 313

1    it's not -- I do recall something, yes.  I do recall
2    something.
3    I believe it's -- once Peter Fisher
4    concluded his remarks, he turned to me, and I stepped
5    forward and said, now we'll have the
6    question-and-answer period, and a reminder that it's
7    embargoed --
8    BY MR. THEODOROU:
9    Q.   Well, you also --
10   A.   -- until 10 o'clock.
11   Q.   All right.  You also said in your
12   statement -- you said you heard from Frances Anderson
13   that there was a problem in formatting the press
14   release so that it could appear on the Web site.
15   A.   Yes.
16   Q.   Correct?
17   A.   Correct.
18   Q.   Isn't it a fact though that she did not
19   have a problem with formatting the document with the
20   soft letterhead?
21   MS. WILLIAMS: Objection.
22   A.   To my knowledge, she didn't format it on

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400                        Washington, DC 20005

Elizabeth Schmutz

Washington, DC

August 23, 2006

### Page 314

1 the soft letterhead ever.
2     BY MR. THEODOROU:
3   Q. Correct.
4     That's because Tony Fratto had done it
5 before as of 8:53 AM earlier that day.
6     Correct?
7   A. Correct.
8   Q. All right. In fact, she did not have a
9 problem formatting the document so that it could
10 appear on the Web site after Tony Fratto had
11 formatted; isn't that right?
12     MS. WILLIAMS: Objection.
13   A. To post it on the Web site, you don't need
14 a letterhead.
15     BY MR. THEODOROU:
16   Q. Okay.
17     (Pause.)
18     MR. THEODOROU: Let me just check one more
19 thing in my notes.
20     (Pause.)
21     BY MR. THEODOROU:
22   Q. You testified earlier today that you first

### Page 315

1 learned about the premature posting on the Web site
2 from 2 reporters.
3     Correct?
4   A. That was to the best of my recollection.
5   Q. And that was before 10 AM?
6     MS. WILLIAMS: Objection.
7   A. I'm not sure about that now.
8     BY MR. THEODOROU:
9   Q. So you're not sure about what you
10 testified about earlier today?
11     MS. WILLIAMS: Objection.
12   A. I'm not sure that I learned about it
13 before 10 AM or after 10 AM. I'm simply not sure.
14 That was 6 years ago.
15     BY MR. THEODOROU:
16   Q. All right. Well, earlier today, you
17 testified -- you gave a sequence of events in which
18 you returned back to the room and you learned, she
19 said, that it's gone out on the Web site before 10 AM
20 and they're going to run with the story.
21     So are you saying that that was not true,
22 what you told me earlier today?

### Page 316

1   A. I'm telling you --
2     MS. WILLIAMS: Objection, mischaracter-
3 -- sorry.
4     Objection, mischaracterizes testimony.
5   A. I'm trying to be as honest and truthful as
6 I can based on what I recall from 6 years.
7     BY MR. THEODOROU:
8   Q. Okay. Then I will let stand what you
9 testified to when I asked those questions, and I
10 won't mischaracterize your testimony.
11     MR. THEODOROU: I have no further
12 questions.
13     MS. WILLIAMS: I have a couple.
14
15 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
16     BY MS. WILLIAMS:
17   Q. You said that you had been exposed to
18 embargoes before coming to Treasury.
19     How had you been exposed to embargoes?
20   A. I worked in a newsroom at the Oil Daily,
21 and I had an understanding of what an embargo was. I
22 just simply did not receive information with

### Page 317

1 embargoes on them, so I was aware what they were. I
2 just simply didn't use them.
3     And then when I was working as a public
4 relations manager at the Farm Credit Council and for
5 Senator Roberts, I didn't have occasion to use them,
6 but I was aware of what an embargo is, and -- but
7 being at Treasury and actually using them, that was
8 my first time actually using them in practice.
9   Q. And when you became aware of what an
10 embargo was, do you know how you came to that
11 awareness?
12   A. No --
13     MR. THEODOROU: Objection.
14   A. -- I don't.
15     BY MS. WILLIAMS:
16   Q. Now, you testified that other information
17 besides quarterly refunding information was embargoed
18 at Treasury, specifically speeches?
19   A. Correct.
20   Q. Did you have any experience with embargoes
21 at Treasury before October 31, 2001?
22     MR. THEODOROU: Objection.

80 (Pages 314 to 317)

Elizabeth Schmutz                                                    August 23, 2006
                              Washington, DC

## Page 318

1    A.   Yes.
2         BY MS. WILLIAMS:
3    Q.   Could you tell me about that, the
4    experience you had with embargoes before October 31
5    2001.
6    A.   Any speech that was given by a member of
7    the office of domestic finance, any of the officials
8    in that office, was embargoed and given to the press
9    corps in the Treasury pressroom roughly 30 minutes
10   before the speech began, and it was given the
11   embargo, and the embargo time was lifted, and they
12   were able to run their stories.
13        So I was very familiar with the way it
14   worked and what the procedure was.
15   Q.   Did you ever have occasion to give the
16   press the speeches that were embargoed before October
17   31st?
18        MR. THEODOROU: Objection.
19   A.   Yes.
20        BY MS. WILLIAMS:
21   Q.   And about how many occasions had you done
22   that before October 31st, 2001, while you were at

## Page 319

1    Treasury?
2    A.   At least a dozen.
3    Q.   Referring to exhibit 1, Mr. Theodorou
4    asked you about the last paragraph -- I mean, the
5    last sentence in the second-to-last paragraph -- I'm
6    sorry -- I'm on the second page.
7         It says, she heard -- she said she heard
8    from Frances Anderson there was a problem in
9    formatting the press release so it could appear on
10   the Web site.
11        Was the Web site letterhead the same
12   letterhead as the soft letterhead?
13   A.   No.
14        The second part of that sentence is that
15   it could appear on the Web site. I heard from France
16   Anderson there was a problem in formatting the press
17   release that I asked for her to format and send back
18   to me.
19   Q.   Do you know if she had any problems
20   formatting it for the Web site?
21   A.   Not to my knowledge.
22        MS. WILLIAMS: I have no further

## Page 320

1    questions.
2
3         FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
4         BY MR. THEODOROU:
5    Q.   You were asked -- you were asked about
6    embargoes on the press conferences.
7         You said you had experience in them 2
8    months before the October 2001 press conference.
9         Correct?
10        MS. WILLIAMS: Objection.
11   A.   I was asked if I had experience with
12   embargoes prior to October 31st and I said yes.
13        BY MR. THEODOROU:
14   Q.   At Treasury.
15        Correct?
16   A.   Yes.
17   Q.   Okay.  Could you please tell us:  Did you
18   define for the members of the press or anybody
19   attending those press conferences what embargo
20   meant?
21   A.   I did not.
22        MR. THEODOROU: Thank you.  No questions.

## Page 321

1    FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
2         BY MS. WILLIAMS:
3    Q.   One question.
4         Did anyone ever ask you or have any
5    questions about what embargo meant prior to October
6    31st, 2001?
7         MR. THEODOROU: Objection.
8    A.   No one asked me any questions about it
9    because they were members of the media and they
10   understood what it meant.
11        MR. THEODOROU: Objection.
12        And if I could strike -- I'd move to
13   strike that last.
14        MS. WILLIAMS: However, it stands because
15   we have a stipulation.
16        MR. THEODOROU: And I'll wait until we get
17   to trial.
18        MS. WILLIAMS: I have no further
19   questions.
20        MR. THEODOROU: One last question.
21
22

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

Elizabeth Schmutz                                                        August 23, 2006
                              Washington, DC

---

**Page 322**

1    FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
2        BY MR. THEODOROU:
3    Q.   You testified earlier that other members
4    of other government agencies attended conferences --
5    strike that.
6        Is there anywhere at the Department of the
7    Treasury today a definition of what embargo meant in
8    the context of the quarterly refunding conference to
9    your knowledge?
10       MS. WILLIAMS:  Objection.
11       She doesn't work at the Treasury today.
12       MR. THEODOROU:  I meant to her knowledge.
13       MS. WILLIAMS:  Objection.
14   A.   To my knowledge, there is a description of
15   what an embargo is laid out in the ground rules that
16   are read to the media in the lockdown prior to them
17   receiving the quarterly refunding information that --
18       BY MR. THEODOROU:
19   Q.   On the new procedures --
20   A.   Yes.
21   Q.   -- that happened after October 31st?
22   A.   That's correct.

---

**Page 323**

1    Q.   But those did not exist obviously on
2    October 31.
3        Correct?
4    A.   That's correct.
5        MR. THEODOROU:  No further questions.
6        All set.  Thanks.
7        THE VIDEOGRAPHER:  This concludes the
8    videotape deposition of Elizabeth Holahan.  Off the
9    record at 4:33:38 PM on August 23rd, 2006, consisting
10   of 4 videotapes.
11       (Whereupon, at 4:33 p.m., the taking of
12   the instant deposition ceased.)
13
14
15       _____
16       Signature of the Witness
17   SUBSCRIBED AND SWORN to before me this _____ day of
18   _____, 20_____.
19
20       _____
21       Notary Public
22   My Commission Expires:_____

---

**Page 324**

1        CERTIFICATE OF COURT REPORTER
2    UNITED STATES OF AMERICA   )
3    DISTRICT OF COLUMBIA       )
4        I, CHERYL A. LORD, the reporter before
5    whom the foregoing deposition was taken, do hereby
6    certify that the witness whose testimony appears in
7    the foregoing deposition was sworn by me; that the
8    testimony of said witness was taken by me in machine
9    shorthand and thereafter transcribed by
10   computer-aided transcription; that said deposition is
11   a true record of the testimony given by said witness;
12   that I am neither counsel for, related to, nor
13   employed by any of the parties to the action in which
14   this deposition was taken; and, further, that I am
15   not a relative or employee of any attorney or counsel
16   employed by the parties hereto, or financially or
17   otherwise interested in the outcome of this action.
18
19       CHERYL A. LORD
20       Notary Public in and for
21       the District of Columbia
22   My Commission expires April 30, 2011

---

82 (Pages 322 to 324)

Printed By Reuters : Unknown                                      Wednesday, 31 October 2001 17:37:1

15:28  31 Oct   RTRS-Wall Street sees red over leak of T-bond's demise
    By Daniel Sternoff
    NEW YORK, Oct 31 (Reuters) - If Wall Street shed any tears over the U.S. Treasury's decision to send the 30-year bond to an early grave, they were tears of rage over a news leak that gave some dealers a head start on the biggest bond rally in history
    Not only did Treasury spring a Halloween surprise by declaring it had no further use for the one-time benchmark, it had bond dealers feeling doubly duped for posting the news on its Web site well before the scheduled announcement of its fourth-quarter borrowing needs.
    "There's going to be a lot of noise about that," said John Roberts, head of governments trading at Barclays Capital in New York.
    "It's a fluke and it's wrong that people have information. It's like being able to trade on inside information," he said.
    The Treasury was due to make its quarterly refunding announcement at 10:00 a.m. (1500 GMT) on Wednesday.
    But the news appeared on the Treasury's Web site around 15 to 20 minutes before the scheduled refunding announcement, leaving many players scrambling to understand why the soon-to-be scarce long bond started flying higher.
    And while the Treasury market has long mulled the eventual demise of the 30-year bond, few were expecting the government would retire the long bond at a time when Washington is raising funds to fight a war and a budding recession.
    "It came out of nowhere," said Steve Saslow, proprietary bond trader at HSBC Securities. "The rumors started going around and the bonds started going crazy, so obviously somebody had a lead of a few minutes.'
    That lead will probably earn some lucky traders a fat year-end bonus for an early jump on the long bond's unprecedented rally of more than 5-1/2 points and largest decline in yields since the 1987 stock market crash.
    Peter Fisher, Treasury's undersecretary for domestic finance, insisted the government was not manipulating the market in the world's most secure assets.
    "We cannot run this business if people think we are trying to time the market or outsmart the market," Fisher said in an interview with cable television network CNBC.
    But those remarks rang hollow for traders who at best saw ham-handed handling of the announcement, and at worst suspected insider trading by market players who sit on a Treasury Borrowing Advisory Committee.
    Barclays' Roberts recalled a similar flap earlier this month, when the Treasury decided to flood the market with more 10-year notes to ease a liquidity logjam caused by failed trades after the Sept. 11 attacks on Washington and New York.
    "When they did the reopening of the 10-year, there was advance information on the Street. There's advance information here, and so there are a number of people on the Street who are pretty upset about it," Roberts said.
    ((U.S. Financial Markets Desk, 646 223 6323))

For related news, double click on one of the following codes:
[MNI] [E] [U] [M] [T] [D] [NAT] [RNP] [DNP] [PTD] [CRD] [US] [DBT] [GVD] [WASH] [FIN] [BNK] [DRV] [AGN] [MUNI] [MTG] [LEN] [RTRS]
[US30YT=RR\c]

For related price quotes, double click on one of the following codes:
<US30YT=RR>

Wednesday, 31 October 2001 15:28:21
RTRS [nN31550341]



EXHIBIT
Z-Holahan
8-23-06

Nothern - 0386

# DEPARTMENT OF THE TREASURY

# TREASURY NEWS

OFFICE OF PUBLIC AFFAIRS • 1500 PENNSYLVANIA AVENUE, N.W. • WASHINGTON, D.C. • 20220 • (202) 622-2960

For Immediate Release
October 30, 2001

Contact:    Betsy Holahan
            202-622-2960

## Treasury Department To Hold Quarterly Refunding News Conference

Treasury Under Secretary for Domestic Finance Peter R. Fisher will announce the U.S. government's quarterly refunding needs at a news conference at 9:00 a.m. EDT on Wednesday, October 31, 2001 in the Treasury Department's Diplomatic Reception Room (Room 3311), 1500 Pennsylvania Avenue, NW, Washington, DC.

Under Secretary Fisher will take questions following the announcement. The event will have a 10:00 a.m. news embargo.

The room will be available for pre-set at 8:00 a.m. on Wednesday. Media without Treasury or White House press credentials planning to attend should contact Frances Anderson at Treasury's Office of Public Affairs at (202) 622-2960 by 8:00 a.m. on Wednesday with the following information: name, social security number and date of birth. This information may also be faxed to (202) 622-1999.

-30-

PO-746



*For press releases, speeches, public schedules and official biographies, call our 24-hour fax line at (202) 622-2040*

SECNOTH00103448

**Holahan, Betsy**

| | |
|---|---|
| **From:** | Holahan, Betsy |
| **Sent:** | Wednesday, October 31, 2001 8:41 AM |
| **To:** | Anderson, Frances |
| **Subject:** | FW: FINAL VERSION |

please frormat and e-mail a formatted copy back to me

-----Original Message-----

| | |
|---|---|
| **From:** | Bitsberger, Timothy |
| **Sent:** | Wednesday, October 31, 2001 8:39 AM |
| **To:** | Fisher, Peter; Holahan, Betsy; Malvey, Paul; Gross, Jared |
| **Subject:** | FINAL VERSION |

NOVQ - FINAL.doc

EXHIBIT
6 Holahan
8-23-00CL
PENGAD 800-631-6989

SECNOTH00103773

### UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
### PETER R. FISHER
### REMARKS AT THE NOVEMBER 2001 QUARTERLY REFUNDING

As a consequence of the further weakening of the economy and the increased federal outlays that have occurred since the attacks of September 11th, the near-term financing requirements of the federal government are larger than we anticipated just three months ago at our last quarterly refunding in August. In this setting, the management of the Treasury's marketable debt needs to anticipate the possibility of a unified budget deficit for this fiscal year and, perhaps, the following fiscal year as well. However, even if this happens, we expect that the federal government will return to surpluses in the coming years.

With this outlook in mind, today we are announcing:

- The terms of the November refunding, including a new 5-year note in the amount of $16 billion and a reopening of the 5 percent 10-year note issued in August 2001 in the amount of $7 billion; and that

- We are adjusting the debt buyback program as follows:

  - We will continue to conduct buybacks for the remainder of this calendar year;

  - We will make no buybacks in January 2002; and

  - Beginning in February 2002, we will announce at our quarterly refundings the amount and timing of any buyback operations for the subsequent three-month period; and finally that

- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

SECNOTH00103774

**Recent Changes in the Fiscal Outlook**

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

**Suspension of Thirty-Year Borrowing**

The debt management strategy of the Treasury has been to strive to be regular and predictable in the issuance of debt while minimizing borrowing costs over many years and interest rate cycles. The Treasury does not try to outsmart the market at any one moment or to be a "market timer" with respect to any particular shape of the yield curve. However, debt management necessarily involves judgments about the size and duration of the federal government's borrowing needs. This compels us to focus on likely borrowing needs over the coming years but we also take into account the likely consequences of unlikely outcomes.

We do not need the 30-year bond to meet the government's current financing needs, nor those that we expect to face in coming years. Looking beyond the next few years, as I already observed, we believe that the likely outcome is that the federal government's fiscal position will improve after the temporary setback that we are now experiencing.

There are two less likely outcomes that we have also considered.

First, it is possible that the federal government will return to significant and sustained budget surpluses even more quickly than we now expect. In this event, maintaining current issuance levels of 30-year bonds would be unnecessary and expensive to taxpayers.

Second, we face the possibility that sustained surpluses do not materialize as promptly as we now expect. If later in this decade it turns out that 30-year borrowing is necessary to meet the government's financing needs, it is still likely that our decision to suspend 30-year borrowing at this time will have saved the taxpayers money. In addition, the reintroduction of the 30-year bond, at some point in the future, if necessary, would likely be costless to the Treasury.

The 30-year bond no longer maintains a position of significance in the financial markets. Its role and its liquidity have been significantly impaired by the substantial reduction of issuance that has occurred over the last decade. But the markets have

functioned smoothly during this period while both activity and attention have shifted to our 10-year offerings.

As long as we have borrowing requirements to finance, the Treasury will seek to maintain the liquidity and depth of the instruments we issue as a means of achieving the lowest cost of borrowing for the taxpayer over time. At this time, the best means for us to do this is to suspend issuance of the 30-year bond and concentrate our borrowing needs on our other instruments.

### Adjustment of the buyback program

In response to the altered budget outlook for this fiscal year, we are also making adjustments in our buyback program. Beginning in February 2002, our decisions on whether to conduct buyback operations, and on the amount and timing of any purchases, will be made at the time of our regular quarterly refunding announcements and will be based upon three factors:

- first, our projections of the federal government's annual, unified surplus or deficit position;

- second, our projections of that three-month period's cash position; and,

- third, our analysis of how best to minimize borrowing costs over time.

In making the transition to these new procedures, our buyback operations for the remainder of this calendar year will continue in line with our prior announcements. In August we stated that we would be purchasing approximately $9 billion during the fourth calendar quarter. So far we have purchased $2.5 billion and the remaining $6.5 billion will be purchased in November and December. Due to the holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

SECNOTH00103776

**Terms of the November Refunding**

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.

2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.

SECNOTH00103777

**Holahan, Betsy**

| | |
|---|---|
| **From:** | Holahan, Betsy |
| **Sent:** | Wednesday, October 31, 2001 8:57 AM |
| **To:** | Chip Aiken (E-mail) |
| **Subject:** | EMBARGOED UNTIL 10 AM |

*CNBC producer*

**Importance:** High

NOVO - FINAL + .doc

Again, the # is 202-622-1703 - leave reporters name and # with Anna Hart



1

SECNOTH00103779

**Holahan, Betsy**

| | |
|---|---|
| **From:** | Holahan, Betsy |
| **Sent:** | Wednesday, October 31, 2001 9:30 AM |
| **To:** | Jonathan Fuerbringer (E-mail) |
| **Subject:** | EMBARGOED UNTIL 10 AM TODAY! |

*NY Times reporter*

**Importance:**    High

NOVQ - FINAL + .doc

1

SECNOTH00103780

**Holahan, Betsy**

| | |
|---|---|
| From: | Holahan, Betsy |
| Sent: | Wednesday, October 31, 2001 9:32 AM |
| To: | Greg Ip (E-mail) |
| Subject: | EMBARGOED UNTIL 10 AM TODAY! |
| Importance: | High |

*WSJ reporter*

NOVQ - FINAL + .doc

· 1

SECNOTH00103781

**Holahan, Betsy**

| | |
|---|---|
| **From:** | Holahan, Betsy |
| **Sent:** | Wednesday, October 31, 2001 9:54 AM |
| **To:** | Nichols, Robert |
| **Subject:** | Rob - please send to your press list at 10 am - thanks! |

*DAS,*
*Public Affairs*

**Importance:**    High

NOVQ - FINAL + .doc

1

SECNOTH00103782

US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED
30-YEAR BONDS

 MORE
Rtr 09:57 10-31-01


:SUBJECT: SPRC MU IR USPO USA
Copyright (c) 2001 Reuters
Received by NewsEDGE/LAN: 10/31/2001 9:52 AM



SECNOTH00103134

**Exhibit F**

**Deposition of Tony Fratto and Cited Exhibit
(August 30, 2006)**

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3

 4     ------------------------X

 5   UNITED STATES SECURITIES :

 6   AND EXCHANGE COMMISSION, :

 7              Plaintiff,   :
           V.              :    Case No. 05-10983
 8   STEVEN E. NOTHERN,       :

 9           Defendant.    :

10     ------------------------X

11                    Washington, D.C.

12                    AUGUST 30, 2006

13         Videotaped deposition of ANTHONY

14   FRATTO, a witness herein, called for examination by

15   counsel for Defendant, in the above-entitled

16   matter, pursuant to notice, the witness being sworn

17   by Raymond Heer, a Notary Public in and for the

18   District of Columbia, taken at the offices of Foley

19   Hoag, Washington, D.C. on August 30, 2006, at 10:35

20   a.m. and the proceedings being taken down by

21   stenotype by Desirae S. Jura, RPR, and transcribed

22   under her direction.
```

Anthony Fratto                                                              August 30, 2006
                              Washington, DC

| | Page 2 |
|---|---|
| 1 | A P P E A R A N C E S |
| 2 | |
| 3 | On behalf of United States Securities and Exchange |
| 4 | Commission: |
| 5 | ERICA Y. WILLIAMS, ESQUIRE |
| 6 | JOHN J. ROSSETTI, JR., ESQUIRE |
| 7 | United States Securities and Exchange |
| 8 | Commission |
| 9 | Mail Stop 8549-D |
| 10 | 100 F Street N.E. |
| 11 | Washington, D.C. 20549 |
| 12 | (202) 551-4450 |
| 13 | |
| 14 | On behalf of United States Department of Treasury: |
| 15 | CHRISTIAN FUREY, ESQUIRE |
| 16 | THOMAS M. McGIVERN, ESQUIRE |
| 17 | United States Department of the Treasury |
| 18 | 1500 Pennsylvania Avenue, N.W. |
| 19 | Washington, D.C. 20220 |
| 20 | (202) 622-5441 |
| 21 | |
| 22 | |

| | Page 4 | |
|---|---|---|
| 1 | C O N T E N T S | |
| 2 | ANTHONY FRATTO | PAGE |
| 3 | Examination by Mr. Theodorou | 8 |
| 4 | Examination by Ms. Williams | 243 |
| 5 | Examination by Mr. Theodorou | 269 |
| 6 | | |
| 7 | E X H I B I T S | |
| 8 | FRATTO | |
| 9 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 10 | 1    Memorandum of Activity | 66 |
| 11 | 2    Memorandum of Activity | 68 |
| 12 | 3    The Washington Post article | |
| 13 | Dated 11/06/2001 | 79 |
| 14 | 4    Letter from John W. Vardaman | |
| 15 | Dated March 4, 2002 | 90 |
| 16 | 5    Reuters article dated | |
| 17 | October 31, 2001 | 115 |
| 18 | 6    Bloomberg article dated | |
| 19 | Oct 31 2001 | 119 |
| 20 | 7    Department of the Treasury | |
| 21 | Treasury News For Immediate | |
| 22 | Release dated October 30, 2001 | 150 |

| | Page 3 |
|---|---|
| 1 | |
| 2 | A P P E A R A N C E S (continued) |
| 3 | |
| 4 | On behalf of the Defendant: |
| 5 | NICHOLAS THEODOROU, ESQUIRE |
| 6 | Foley Hoag |
| 7 | Seaport World Trade Center West |
| 8 | 155 Seaport Boulevard |
| 9 | Boston, MA 02210 |
| 10 | (617) 832-1000 |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

| | Page 5 | |
|---|---|---|
| 1 | E X H I B I T S - Continued | |
| 2 | FRATTO | |
| 3 | EXHIBIT NO.    DESCRIPTION | PAGE |
| 4 | 8    Hand-drawn diagram | 163 |
| 5 | 9    The Wall Street Journal | |
| 6 | Article dated November 15, 2001 | 177 |
| 7 | 10    E-mail from Betsy Holahan | |
| 8 | Dated October 31, 2001 with | |
| 9 | Attachment | 195 |
| 10 | 11    E-mail from Betsy Holahan | |
| 11 | Dated October 31, 2001 | 198 |
| 12 | 12    Department of the Treasury | |
| 13 | Office of Public Affairs | |
| 14 | Under Secretary of the Treasury | |
| 15 | For Domestic Finance | |
| 16 | Remarks at the November 2001 | |
| 17 | Quarterly Refunding | 202 |
| 18 | 13    Treasury News For Immediate | |
| 19 | Release dated October 31, 2001 | 206 |
| 20 | 14    E-mail from Betsy Holahan | |
| 21 | Dated October 31, 2001 with | |
| 22 | Attachment | 213 |

2 (Pages 2 to 5)

Anthony Fratto                                                                    August 30, 2006
Washington, DC

| Page 6 | Page 8 |
|---|---|
| 1   E X H I B I T S - Continued | 1  Northwest, Suite 400, Washington, D.C. 20005. |
| 2  FRATTO | 2      This videotaped deposition commenced at |
| 3  EXHIBIT NO.      DESCRIPTION      PAGE | 3  10:38:02. |
| 4   15    Treasury News from the Office of | 4      MR. THEODOROU:  Ask for stipulations that |
| 5      Public Affairs, for Immediate | 5  will be the same stipulations that we have used in |
| 6      Release, October 31, 2001 | 6  prior depositions.  Correct? |
| 7      Under Secretary of the Treasury | 7      MS. WILLIAMS:  Yes. |
| 8      For Domestic Financing Peter | 8      MR. THEODOROU:  So it is hereby stipulated |
| 9      Fisher Remarks at the November | 9  by and between counsel that all objections except |
| 10      2001 Quarterly Refunding      227 | 10  as to matter of form, including motions to strike, |
| 11   16    Treasury News from the Office of | 11  are reserved until the time of trial. |
| 12      Public Affairs, for Immediate | 12  WHEREUPON, |
| 13      Release dated October 31, 2001, | 13      ANTHONY FRATTO |
| 14      Statement from the Office of | 14  Called as a witness, and having been duly sworn, |
| 15      Public Affairs Regarding the | 15  was examined and testified as follows: |
| 16      Quarterly Refunding Announcement  229 | 16      EXAMINATION |
| 17   17    Typed document, From the Office | 17  BY MR. THEODOROU: |
| 18      Of Public Affairs, Treasury | 18  Q.  Good morning, Mr. Fratto. |
| 19      Department Sets Procedures for | 19  A.  Good morning. |
| 20      Quarterly Refunding Announcements  235 | 20  Q.  My name is Nicholas Theodorou.  As you know, |
| 21 | 21  I represent the plaintiff in this case, Steven |
| 22 | 22  Nothern.  I'm going -- |

| Page 7 | Page 9 |
|---|---|
| 1      THE VIDEOGRAPHER:  This is in the United | 1  A.  Defendant. |
| 2  States District Court for the District of | 2  Q.  Excuse me, defendant, soon to be the |
| 3  Massachusetts.  The plaintiff is the United States | 3  plaintiff, against the Securities and Exchange |
| 4  Securities and Exchange Commission.  The defendant | 4  Commission when the case gets dismissed.  But |
| 5  is Steven E. Nothern.  Today's date is August 30, | 5  nevertheless. |
| 6  2006.  This is civil action number 05-10983. | 6      MS. WILLIAMS:  Objection. |
| 7      The witness is Tony Fratto.  The location of | 7      BY MR. THEODOROU: |
| 8  the deposition is 1875 K. Street Northwest, | 8  Q.  I represent Mr. Nothern, the defendant in |
| 9  Washington, D.C. | 9  this case.  And I'm glad you were listening to what |
| 10      Appearing on behalf of the plaintiff are | 10  I had to say. |
| 11  Erica Y. Williams and John J Rossetti, Jr., of the | 11      I'm going to be asking you several questions |
| 12  Securities and Exchange Commission.  Calling the | 12  this morning.  If you don't understand any |
| 13  deposition on behalf of the defendant is Nicholas | 13  questions -- and I'm not trying to trick you into |
| 14  Theodorou of Foley Hoag.  Appearing on behalf of | 14  any answers or anything like that.  If the question |
| 15  the witness and the Department of the Treasury, is | 15  has to be clarified, you ask me to clarify the |
| 16  Thomas M. McGivern and Christian Furey of the | 16  question. |
| 17  Department of the Treasury. | 17      During the course of the deposition, some |
| 18      The officer before whom this videotaped | 18  objections will be raised.  All right?  That is not |
| 19  deposition is taken is Desirae Jura; the officer | 19  unusual in a deposition; there are lawyer |
| 20  before whom this witness is sworn and the video | 20  objections that are going to be resolved by the |
| 21  camera operator is Raymond Heer, representing | 21  court.  Unless you are directed not to answer the |
| 22  Alderson Reporting Company, 1111 14th Street | 22  question, you still must answer the question, and |

3  (Pages 6 to 9)

Anthony Fratto

August 30, 2006

Washington, DC

---

### Page 10

1  the objections go in the record and we raise them
2  with the judge if and when it becomes appropriate
3  to raise any of those objections with the judge
4  regarding your testimony.
5      I'm going to ask you this morning a series
6  of questions, as I said, and I ask that you answer
7  them completely and truthfully.
8      Would you please state your full name for
9  the record.
10     **A. Salvatore Antonio Fratto.**
11     Q. Mr. Fratto, did you do anything to prepare
12  for this deposition?
13     **A. Only spent some time with the SEC attorneys**
14  **yesterday afternoon.**
15     Q. When you say the SEC attorneys, do you mean
16  Ms. Williams and Mr. Rossetti?
17     **A. I do.**
18     Q. How long did you meet with them?
19     **A. Approximately, three hours.**
20     Q. Where did you meet with them?
21     **A. In my office.**
22     Q. Was anyone else present?

---

### Page 11

1      **A. No. I'm sorry. Treasury attorneys Tom**
2  **McGivern and Christian Furey also. Mr. McGivern**
3  **for part of it and Christian Furey for all of it.**
4      Q. Did you review any documents during the
5  course of your meeting?
6      **A. Yes. There were a few.**
7      Q. What documents did you review?
8      **A. Some of the press releases that were issued**
9  **on the day of the announcement. I think two**
10 **e-mails relating to this. A report of a -- a**
11 **report of an interview with me that I believe**
12 **was -- actually, I'm not even certain of the**
13 **source. I can't recall the source of the document.**
14 **It might have been the OIT.**
15     Q. A memorandum of their interview with you?
16     **A. That is what it was. Yeah.**
17     Q. Did they show you one or two of the
18  memoranda? Do you remember seeing one or two?
19     **A. I just recall seeing one.**
20     Q. What --
21     **A. And --**
22     Q. I'm sorry.

---

### Page 12

1      **A. And a Wall Street Journal news article.**
2      Q. What did the SEC attorneys tell you about
3  this case?
4      **A. No more that they were -- that they were**
5  **prosecuting the case on having to do with this**
6  **northern -- or Nothern. And that's -- I can't**
7  **think of anything specific. When you say about the**
8  **case, I don't -- asked me lots of questions**
9  **about --**
10     Q. About the incidents of October 31st and the
11  documents?
12     **A. Exactly.**
13     Q. Did they tell you what their allegations
14  against Mr. Nothern are?
15     **A. They said that the case involved insider**
16  **trading. I don't know if that was specific to Mr.**
17  **Nothern or not.**
18     Q. Did they comment on whether or not he
19  actually was liable for insider trading?
20     **A. No.**
21     Q. Did they discuss with you the questions that
22  I would be asking you this morning?

---

### Page 13

1      **A. In nature. Yeah.**
2      Q. What did they say?
3      **A. They said that you would ask a number of**
4  **questions about the events and how they occurred**
5  **and that you were likely to ask them in various**
6  **ways and numerous times.**
7      Q. And did they say anything else about the way
8  I would approach the deposition this morning?
9      **A. No. They said that you were a good**
10 **attorney, and you are going to ask lots of**
11 **questions.**
12     Q. And you understand you have to tell the
13  truth.
14     THE WITNESS: Sorry, guys.
15     MR. THEODOROU: I didn't hear an objection
16  from Ms. Williams on that.
17     BY MR. THEODOROU:
18     Q. Did Mr. McGivern discuss anything about the
19  case with you?
20     **A. No.**
21     Q. Did he discuss anything with you before you
22  met with the SEC attorneys?

---

4 (Pages 10 to 13)

Anthony Fratto                                                      August 30, 2006
                              Washington, DC

| Page 14 | Page 16 |
|---|---|
| 1   A. No. Just dealt with scheduling. | 1   Q. Okay. Before yesterday, had you met with |
| 2   Q. Did Mr. Furey discuss the case with you? | 2  any attorneys from the SEC? |
| 3   A. No. | 3   A. We had met with both attorneys a number of |
| 4   Q. Did Mr. McGivern say anything at the meeting | 4  months ago, when we were -- I think we were looking |
| 5  yesterday? | 5  at scheduling this testimony. I can't recall what |
| 6   A. No. Not that I recall. No. | 6  the date was. |
| 7   Q. Did Mr. Furey? | 7   Q. And when you say attorneys, do you mean |
| 8   A. No. | 8  Ms. Williams and Mr. Rossetti? |
| 9   Q. Did you take any notes during the meeting? | 9   A. Mr. Rossetti. Yes. |
| 10   A. No. | 10   Q. And you met with them some months ago? |
| 11   Q. Did the attorneys for the SEC take notes? | 11   A. Yeah. I honestly don't recall the date. |
| 12   A. Yes. | 12   Q. Do you recall approximately how many months |
| 13   Q. And how about the attorneys for the | 13  ago? |
| 14  Treasury? | 14   A. It had to be late spring or early summer, I |
| 15   A. I honestly don't recall. | 15  guess. |
| 16   Q. Have you testified before under oath in any | 16   Q. Where was the meeting? |
| 17  context? | 17   A. In my office. |
| 18   A. No. | 18   Q. And how long was the meeting? |
| 19   Q. So you haven't testified in your capacity as | 19   A. It might have been an hour. I don't |
| 20  an Assistant Secretary to Congress? | 20  remember. |
| 21   A. I'm sorry. Yeah, to Congress I have, at my | 21   Q. Was anyone else present at the meeting? |
| 22  confirmation hearing. Yeah. | 22   A. I think Tom McGivern and Chris Furey were |

| Page 15 | Page 17 |
|---|---|
| 1   Q. Have you ever testified at a deposition | 1  there as well. |
| 2  before? | 2   Q. What was discussed at that meeting? |
| 3   A. No. | 3   A. Just some more details on -- or some of the |
| 4   Q. Other than your confirmation hearing, have | 4  same questions we went over yesterday, the very |
| 5  you ever testified under oath before? | 5  same questions. And explaining to me that there |
| 6   A. Not that I recall. No. I mean, does | 6  was a -- you know, that there was an additional |
| 7  traffic court count? I don't think I was sworn in | 7  case and that I may be called on to be deposed. |
| 8  on traffic court. | 8  And I don't recall it being much more in depth than |
| 9   Q. What was the traffic court allegation? | 9  that. |
| 10   A. I think I was fighting a speeding ticket. | 10   Q. Do you recall any documents at that meeting? |
| 11   Q. I think we can all relate to that. | 11   A. I don't remember. I don't think so, but I |
| 12   A. Yeah. | 12  don't remember. |
| 13   Q. Did the policeman show up that day? | 13   Q. What is your current position at Treasury, |
| 14   A. Yeah, he did. And I won. | 14  Mr. Fratto? |
| 15   Q. That's even better. | 15   A. Assistant Secretary of the Treasury for |
| 16       In your meeting yesterday, did the SEC | 16  Public Affairs. |
| 17  attorneys tell you what I was going to try to | 17   Q. And how long have you been in that position? |
| 18  accomplish through your testimony? | 18   A. I was named the acting assistant secretary |
| 19   A. No. | 19  in May of 2005. I was confirmed by the Senate in |
| 20   Q. Did they tell you what I was going to try to | 20  December of 2005. |
| 21  establish through your testimony? | 21   Q. And what are your duties and |
| 22   A. No. | 22  responsibilities? |

Anthony Fratto                                                                August 30, 2006
Washington, DC

---

### Page 18

1  A. I oversee the external communications for
2  the Department of the Treasury. It includes
3  working with the Secretary of the Treasury on his
4  communications through the media, and overseeing
5  the staff of public affairs spokesmen and other
6  administrative staff. And, you know, so it
7  includes all of the tools we use to try to
8  communicate messages to the public and through the
9  news media.
10  Q. And how many people do you supervise in your
11  department?
12  A. When we're fully staffed, 18.
13  Q. How long have you been at Treasury?
14  A. About five and a half years. Since March of
15  2001.
16  Q. Before you became assistant secretary for
17  public affairs, what was your prior position?
18  A. I was the Deputy Assistant Secretary for
19  Public Affairs.
20  Q. And who was the assistant secretary?
21  A. Rob Nichols.
22  Q. Is Mr. Nichols still at the Treasury

### Page 19

1  Department?
2  A. No.
3  Q. And what were your duties as deputy
4  assistant secretary?
5  A. As deputy assistant secretary, I backed up
6  the assistant secretary on his duties; and I also
7  managed the communications efforts for the
8  international affairs, international economic
9  affairs portfolio for Treasury.
10  Q. And how long were you the deputy assistant
11  secretary?
12  A. Since July of 2003.
13  Q. What was your position before July 2003?
14  A. Director of the Office of Public Affairs.
15  Q. And what were your duties as the director of
16  Office of Public Affairs?
17  A. For director of public affairs, I was the
18  direct supervisor for the other public affairs
19  spokesmen in the office. I also had the
20  international economic affairs portfolio for
21  Treasury. So I dealt primarily with international
22  economic issues, and also oversaw -- was the direct

### Page 20

1  supervisor for the administrative staff and what we
2  call the lower press office. So, not
3  administrative staff reporting to the deputy
4  assistant secretary or the assistant secretary.
5  Q. And when you say that you supervised other
6  public affairs spokespersons, how many
7  spokespersons were there that you supervised?
8  A. Three.
9  Q. Who were they?
10  A. Tara Bradshaw who handled tax policy, Tasia
11  Skalinos who handled enforcement issues, and Betsy
12  Holahan who handled domestic finance issues.
13  Q. You reported to whom as the director of the
14  Office of Public Affairs?
15  A. To the assistant secretary of public
16  affairs.
17  Q. And who --
18  A. Michele Davis.
19  Q. Is Ms. Davis still at the Treasury
20  Department?
21  A. No.
22  Q. Where is Ms. Davis?

### Page 21

1  A. She is at the National Security Council.
2  Q. And what is her position there?
3  A. The titles are confusing, but I think she's
4  deputy assistant to the president, deputy national
5  security advisor for public affairs. I think
6  that's right.
7  Q. And on October 31st, 2001, which is the date
8  of issue in this case, at that time you were the
9  director of the Office of Public Affairs. Correct?
10  A. Um-hmm.
11  Q. Is that a yes?
12  A. Yes, I was.
13  Q. And you supervised Ms. Holahan?
14  A. Yes.
15  Q. At that time? Now, before you were the
16  director of the Office of Public Affairs, did you
17  hold any other positions before that at Treasury?
18  A. For a very brief time, I was hired as a
19  public affairs specialist and then quickly became
20  director. I can't remember the exact date on the
21  beginning of that.
22  Q. And what does a public affairs specialist

---

6 (Pages 18 to 21)

Anthony Fratto                                                                    August 30, 2006
                                    Washington, DC

Page 22

1    do?
2       A.  As a spokesman.
3       Q.  Spokesman?
4       A.  Yeah.
5       Q.  And you were a spokesman for what area?
6       A.  International affairs and domestic finance.
7       Q.  And you reported to whom?
8       A.  To Michele Davis.  There was no director at
9    the time, and I quickly became director.
10      Q.  Now, would you please summarize your
11   educational background for us.
12      A.  Yeah.  I have an undergraduate degree from
13   the University of Pittsburgh, a B.A. degree in
14   economics, and a few degrees or a few credits shy
15   of a master's degree from the graduate school
16   public international affairs at the University of
17   Pittsburgh.
18      Q.  After you graduated from the University of
19   Pittsburgh in 1988, what did you do in terms of
20   employment?
21      A.  Boy.  I drove a coffee delivery truck in
22   southwestern Pennsylvania, in the four-state area,

Page 23

1    including southeastern Ohio and the panhandle of
2    West Virginia, parts of Maryland; and also coached
3    basketball.
4       Q.  Where?  In high school?
5       A.  High school basketball.  Yeah.
6       Q.  Where?
7       A.  Montore High School in Pittsburgh,
8    Pennsylvania.
9       Q.  And how long did you do that?
10      A.  Well, I coached basketball through
11   undergraduate and graduate school, and maybe
12   finished up my last year in graduate school.
13      Q.  Did you go straight from college to graduate
14   school?
15      A.  No.  I took about maybe a year, less than a
16   year.
17      Q.  And during that year, you coached basketball
18   and worked driving a truck?
19      A.  Um-hmm.  Right.
20      Q.  And while you were in graduate school, after
21   graduate school, what was your employment history?
22      A.  Well, in addition to working at the library

Page 24

1    at the University of Pittsburgh, after graduate
2    school I went to work in Congress for a new
3    freshman congressman, and that initial summer of
4    employment was as a paid intern.
5       Q.  What summer was that?
6       A.  That was the summer of 1990.  I'm sorry,
7    1991.
8       Q.  So you were a paid intern for a congressman
9    in the summer of 1991?
10      A.  Um-hmm.
11      Q.  Is that a yes?
12      A.  Yes.
13      Q.  You have to say yes, because --
14      A.  I understand.  I will try to remember.
15      Q.  And who was the congressman?
16      A.  Rick Santorum.
17      Q.  And after the summer of 1991 as his intern,
18   what did you do?
19      A.  I was hired as a legislative assistant in
20   his office.
21      Q.  For then Congressman Santorum?
22      A.  For then Congressman Santorum.  That's

Page 25

1    right.
2       Q.  And how long were you a legislative
3    assistant?
4    1992, I became press secretary.
5       Q.  For Congressman Santorum?
6       A.  For Congressman Santorum.  Yeah.
7       Q.  And how long did you do that?
8       A.  I was his press secretary while we were in
9    the House, so that took us through to January of
10   1995.  In January of 1995, I became -- he had won
11   election as a U.S. Senator.  I became a statewide
12   press secretary, and served as his statewide press
13   secretary working from our Pittsburgh office in
14   1995.  In 1996, I became communications director.
15   In January of 1996.
16      Q.  What were your duties as communications
17   director?  Handling all press for Senator Santorum?
18      A.  That's right.
19      Q.  How long did you do that?
20      A.  I did that until January of 1998.
21      Q.  What did you do then?
22      A.  I moved back to Pennsylvania, and worked as

                                              7 (Pages 22 to 25)

Anthony Fratto                                                          August 30, 2006
                              Washington, DC

| Page 26 | Page 28 |
|---|---|
| 1   a political director on the reelection campaign for | 1   together all the other groups. But like I said, I |
| 2   then Governor Tom Ridge in Pennsylvania. | 2   was directly employed -- my paycheck came from the |
| 3       Q. What did you do in the campaign? | 3   Chamber of Commerce. |
| 4       A. A lot of outreach events to coalition | 4       Q. And you worked on legislative affairs for |
| 5   groups. Spoke to media, organized events, spoke at | 5   whom? |
| 6   political -- in political events. | 6       A. Government affairs. |
| 7       Q. And -- well, and Ridge got elected. | 7       Q. Government affairs? |
| 8   Correct? | 8       A. Yeah. |
| 9       A. He got elected. Yeah. | 9       Q. Dealing with both the State and the Federal |
| 10      Q. And what did you do? | 10  Governments? |
| 11      A. I spent a brief -- | 11      A. Not really the Federal Government. All of |
| 12      Q. After November. | 12  our projects were State projects. |
| 13      A. Yeah. I spent a brief period of time, no | 13      Q. And what kind of work did you do? I mean, |
| 14  more than a month or so, working in the Governor's | 14  what were your duties? |
| 15  office after the campaign, and then went to work | 15      A. I spent a lot of time, typical advocacy |
| 16  for a consortium of economic development groups in | 16  activities where you encourage, you know, advocates |
| 17  southwestern Pennsylvania where I advocated in | 17  for a project to contact their legislators. I |
| 18  Harrisburg for economic development -- regional | 18  would meet with legislators. I would attend their |
| 19  economic development projects and policy change. | 19  golf outings and occasionally do some fund raising |
| 20      Q. And what was the consortium, or what did it | 20  for them. I would spend a lot of time in meetings |
| 21  consist of? | 21  trying to encourage legislators and officials in |
| 22      A. It was a group that was included -- I was | 22  state government to support projects that we were |

| Page 27 | Page 29 |
|---|---|
| 1   directly employed by the Greater Pittsburgh Chamber | 1   advocating and why our projects deserved funding |
| 2   of Commerce, but the group where I took my guidance | 2   over other projects. |
| 3   from included an organization called the Pittsburgh | 3       Q. The fund raising was done for whom? |
| 4   Regional Alliance. They've since merged. The | 4       A. Numerous candidates. |
| 5   Pittsburgh Regional Alliance was largely just a | 5       Q. Candidates? |
| 6   marketing, a regional marketing group. And the | 6       A. Yeah. |
| 7   group also included the Pittsburgh Technology | 7       Q. And how long did you do this job? |
| 8   Council, which is an association of technology | 8       A. About 20 months. Until approximately |
| 9   companies in the region, and an organization called | 9   September of -- well, whatever the date was. |
| 10  the Allegheny Conference on Community Development, | 10  August or September of 2000, when I joined the |
| 11  which was arranged and created by a group of CEOs | 11  Bush-Cheney campaign. |
| 12  in southwestern Pennsylvania where they would try | 12      Q. And what did you do for the campaign? |
| 13  to prioritize economic development priorities, you | 13      A. My title was a communications specialist, |
| 14  know, for the region. | 14  but I did lots of things, including press advance. |
| 15      Q. But you were an employee? | 15  So I was advancing sites for events in the state of |
| 16      A. I was the vice president of government | 16  Pennsylvania that included some speaking to the |
| 17  affairs. | 17  media, it included helping to organize coalitions |
| 18      Q. Vice president of government affairs. For | 18  and other surrogate groups that were coming into |
| 19  which of the groups or for whom? | 19  the state to campaign on behalf of then Governor |
| 20      A. Well, it was always confusing. I would | 20  Bush. |
| 21  rather refer to it as the Pittsburgh Regional | 21      Q. And your focus was Pennsylvania? |
| 22  Alliance, because it was the group that brought | 22      A. Yeah. |

8 (Pages 26 to 29)

Anthony Fratto                                                    August 30, 2006
Washington, DC

Page 30

1    Q. You were the lead press person for
2    Pennsylvania?
3    A. Umm.
4    Q. For the campaign?
5    A. That's probably overstating it, yeah, in
6    title. But, I mean, the communications for the
7    campaign came from the campaign, from Austin. So I
8    would take some direction and I would do some
9    communication with the media and do some
10   interviews, but there were lots of people in the
11   state that communicated.
12   Q. And you worked right through November 2000?
13   A. Yes.
14   Q. And then what did you do?
15   A. Then, you might remember we had things going
16   on in Florida.
17   Q. Right.
18   A. So I went to Florida for five glorious
19   weeks, and worked on lots of activities in Florida
20   having to do with jams and other things.
21   Q. Pennsylvania went blue.
22   A. It did. It went close. I batted 500 that

Page 31

1    night because I said that both Pennsylvania and
2    Florida.
3    Q. West Virginia did not. Right? Pennsylvania
4    went blue?
5    A. That's right.
6    Q. So you went down to Florida for five weeks.
7    And what did you do in Florida?
8    A. Anything. We were organizing press events
9    to, you know, get public sentiment in favor of our
10   view of how events were playing out in Florida.
11   Q. And after Florida, what happened? What did
12   you do next?
13   A. I submitted -- well, maybe while -- I guess
14   it was after Florida, I went back home to
15   Pittsburgh and submitted my information to the
16   White House for possible employment in the
17   administration. And after the holidays, after
18   Christmas holidays, went to -- came down to
19   Washington to work on the inaugural. So I worked
20   for the presidential inaugural committee.
21   Q. Did you have a title in Florida?
22   A. No.

Page 32

1    Q. No?
2    A. No.
3    Q. And when you worked on the inaugural
4    committee, you reported to whom?
5    A. That's a good question. You know, I was
6    part of a team setting up one of the inaugural
7    balls. The lead person on the ball was a guy named
8    Mike Heath. I guess I reported to the executive
9    director, who was Jean Johnson Phillips.
10   Q. And then --
11   A. I don't think she knew me, though.
12   Q. And after January of 2001, you started
13   working --
14   A. After January 2001, I went back -- I guess
15   went back home to Pittsburgh. And then, because
16   I've had advanced experience, the White House
17   office of public advance asked me while they were
18   figuring out -- I requested to go to Treasury. And
19   while they were determining whether I would in fact
20   go to Treasury, asked me to do a number of advanced
21   jobs for the President. So I did I think four
22   advanced trips for the President, and sometime

Page 33

1    during January learned -- or during February, early
2    February, learned that the Treasury wanted to hire
3    me. And --
4    Q. Why did you want to go to Treasury?
5    A. Well, it fit my interests. I mean, I knew
6    that -- a lot of people didn't know -- weren't
7    fully aware of Treasury's whole in international
8    economics and in development in particular. And I
9    had strong interest, I had strong interest in that.
10   I have a degree in economics and cared about the
11   issues of Treasury. I also know it's the second
12   best address in town, and they pay better than the
13   first best address in town. So --
14   Q. That's a pretty good address.
15   A. Yeah. I needed to be able to afford -- I
16   could have gone to work in the White House, but I
17   couldn't afford to work in the White House.
18   Q. Now, when you started to work at the Office
19   of Public Affairs, did you receive any training for
20   your work that you would be doing?
21   A. No formal training.
22   Q. How about informal training?

9 (Pages 30 to 33)

Anthony Fratto
Washington, DC
August 30, 2006

| Page 34 |
|---|

1      A. Yeah. I spent a lot of time discussing how
2  the job works with some individuals there, and I
3  also talked to one tremendous resource. Well, one
4  resource who was at Treasury who was Michael Polis
5  who was in the Office of Domestic Finance, was a
6  great resource. And also the previous assistant
7  secretary of Treasury, a woman named Michelle
8  Smith, who had after the Clinton administration had
9  gone on to work at the Fed for Alan Greenspan was
10 someone who I spent a lot of time on the phone with
11 just asking advice on how Treasury conducts its
12 public affairs business.
13     Q. And you talked to these various individuals
14 including Mr. Polis and Ms. Smith when you were the
15 director of public affairs, when you were first
16 starting in that job?
17     A. Yeah. And I talked to Michael a lot when he
18 was there. He left in late spring, I think. I
19 actually can't remember the date now that Michael
20 left. Michael stayed for a while. But Michael's
21 office was close to mine, so I spent a lot of time
22 talking to Michael. And Michele, I probably spoke

| Page 35 |
|---|

1  to weekly, just sometimes long conversations,
2  sometimes short.
3      Q. And what was Mr. Polis's position when you
4  were director of public affairs?
5      A. He was a deputy assistant secretary in the
6  Office of Domestic Finance.
7      Q. When did he leave Treasury?
8      A. I think it was the summer of -- maybe early
9  summer of 2001. I honestly can't remember the
10 date.
11     Q. Did you ever discuss with him how Treasury
12 was to handle the release of information to the
13 press and the public?
14     MS. WILLIAMS: Objection.
15     A. Yeah.
16     BY MR. THEODOROU:
17     Q. What did you discuss with him, or what do
18 you remember about those discussions?
19     A. Well, I had never -- I had never, you know,
20 watched a quarterly funding announcement before I
21 came to Treasury, so I asked him: How do you do
22 the announcements? Why do you do them this way?

| Page 36 |
|---|

1      I admit at the time I was more -- I was very
2  interested in just learning more about the Treasury
3  bond market, but we spent a lot of time talking
4  about the process also, which I think it was fairly
5  straightforward.
6      Q. About how many times did you discuss with
7  him how the announcements were to be handled?
8      A. A handful of times. I couldn't put a finer
9  point on it.
10     Q. Do you recall what he told you about how
11 refunding conferences were to be conducted?
12     A. Refunding press conferences?
13     Q. Yes.
14     A. He said traditionally the press conference
15 is -- that someone at his level, someone like a
16 deputy assistant secretary or a director of market
17 finance would do a press conference. It wasn't
18 entirely unusual from time to time for an assistant
19 secretary to do a press conference, and maybe once
20 or twice an under secretary. But overwhelmingly it
21 was they were press conferences that were held by
22 someone at his level. There were -- they would

| Page 37 |
|---|

1  prepare a statement and read the statement. He
2  would -- his preference was just read a statement
3  at the press conference, take some questions; and
4  my job was to basically run the press conference in
5  the sense of announcing who was speaking, what
6  the -- you know. And then cutting off questions at
7  the end. One of the great things we get to do is
8  to end a press conference when it's over.
9      Q. Did your discussions, did you ever discuss
10 the use of embargoes at Treasury?
11     A. I don't think I discussed them with Michael.
12 No.
13     Q. Did you discuss them with anyone else?
14     A. I'm fairly certain. I couldn't remember a
15 specific conversation, but I'm very certain that I
16 discussed embargoes with Michelle Smith.
17     Q. Do you remember anything else that Mr. --
18     A. I discussed embargoes with our reporters
19 also.
20     Q. With whom?
21     A. With our reporters, with Treasury press
22 corps reporters.

10 (Pages 34 to 37)

Anthony Fratto                                                August 30, 2006

Washington, DC

| Page 38 |
| --- |

1    Q. With Mr. Polis, do you remember anything
2    else he told you about how to conduct conferences
3    and the release of information?
4        MS. WILLIAMS:  Objection.
5        A. No. Other than to, you know, rescue him at
6    the end when the -- don't let the reporters try to
7    have too much time for more creative questions.
8        BY MR. THEODOROU:
9        Q. Did anyone at Treasury ever tell you that
10   the information at the refunding conferences was
11   market sensitive information?
12       A. Yes.
13       Q. Who?
14       A. I think everyone in the Office of Domestic
15   Finance that I spoke to was very sensitive to that
16   fact. It was also part of my -- I think it was
17   mentioned, not specifically quarterly refundings,
18   but we had -- you know, we were required to have
19   security, you know, security briefings and ethics
20   briefings and that. So we were sensitized coming
21   into the job in our early briefings that Treasury,
22   you know, information at Treasury is at least

| Page 39 |
| --- |

1    market sensitive, and some of it reaches higher
2    classification levels, also. Although market
3    sensitive isn't technically you would call it a
4    classification level.
5        Q. What do you recall about the training that
6    you got on how information was market sensitive?
7        A. I think it was just noted that, you know,
8    information we deal with at Treasury, like
9    information on our securities markets, information
10   regarding future policy decisions could have an
11   impact on the market. I know that -- I mean, you
12   don't want to be remembered as the guy who
13   inadvertently crashed the dollar market by letting
14   information out that is out of context or not
15   authorized at that time.
16       Q. Now, you testified -- and you can correct me
17   if I'm wrong. You testified that when you started,
18   there some briefings on this?
19       A. Um-hmm.
20       Q. Is that, yes, there were some briefings?
21       A. Yes. I remember being -- I remember having
22   briefings coming in to Treasury.

| Page 40 |
| --- |

1    Q. Do you remember who told you this about
2    market sensitive information at these briefings?
3        A. No.
4        Q. Now, apart from Mr. --
5        A. Michael Polis certainly told me the fact
6    that it was market sensitive.  No question about
7    that.
8        Q. That what was market sensitive?
9        A. That the quarterly funding information was
10   market sensitive.  When I think you asked me, I
11   think I said everyone, I could tell you without a
12   doubt that Michael certainly told me that and
13   emphasized it.
14       Q. And you don't recall discussing embargoes
15   though with Michael?
16       A. No.
17       Q. Now, you testified that you may have
18   discussed embargoes with Michelle Smith?
19       A. Um-hmm.  Yes.
20       Q. Do you remember discussing that with
21   Michelle Smith?
22       A. I do remember.  I couldn't pinpoint the

| Page 41 |
| --- |

1    exact conversation or what the context of
2    discussion of embargoes were, but I do recall
3    asking her how they use -- how they use embargoes,
4    and that they do use embargoes and what the
5    understanding at Treasury was of embargoes.
6        Q. What did she tell you about -- or, how many
7    times did you discuss the issue of embargoes with
8    her?
9        A. I remember one phone call.  There might have
10   been more.
11       Q. How long was the phone call?
12       A. I don't recall.
13       Q. Do you remember when it was?
14       A. I couldn't put a specific date on it.  I
15   would -- it must have been March of 2001.
16       Q. Do you remember how long it lasted?
17       A. No.
18       Q. Was anybody else on the phone call?
19       A. No.
20       Q. Where were you when you had the phone call?
21       A. In my office at Treasury.
22       Q. And where was she?

11 (Pages 38 to 41)

Anthony Fratto                                                    August 30, 2006
Washington, DC

Page 42

1    A. She was at her office at the Fed.
2    Q. What was her job at the Fed at the time?
3    A. I'm not certain of her title at the Fed.
4  I'm sure it's on their Web site. I don't know what
5  their structure of titles are over there.
6    Q. Did she call you, or did you call her?
7    A. I'm sure I — I'm sure I called her.
8  Whether I had to leave a message and she called me
9  back, I don't know.
10   Q. What did you call her —
11   A. I called her a lot.
12   Q. But I'm zooming in on this particular
13 conversation as to what you can recall. And what
14 do you recall about the discussion of embargoes in
15 that telephone call?
16   A. I asked her how they traditionally set
17 embargoes at Treasury for documents, because it
18 was — it was impressive to me that the reporters
19 we were dealing with on our documents wanted
20 embargoes. They were — it was very important to
21 them that we have, that we have embargoes on
22 documents. And certainly it was intuitive to me on

Page 43

1  something involving data, that we would want
2  embargoes, but it seemed to me that for any
3  document that came down to the Treasury pressroom,
4  the Treasury press reporters wanted to have
5  embargoes.
6    Q. And what was the substance of your
7  conversation with her? What did you say and what
8  did she say?
9    A. I asked her whether that was the case when
10 she was here, or whether it was something new with
11 the new group of people at Treasury. Did she set
12 the embargoes, or did the reporters set the
13 embargoes for themselves?
14   She said that there wasn't — there wasn't a
15 standard way for doing it that way. Sometimes —
16 she agreed that reporters always do, they always
17 want embargoes. She confirmed what I thought, was
18 that it was probably in everyone's interest that we
19 do have an embargo. She said that it really
20 depended on the document, whether it was — whether
21 we set the embargo or whether, if it was a document
22 that we didn't have much interest in in terms of

Page 44

1  whether an embargo is necessary or not, it was
2  perfectly fine to let the reporters set their own
3  embargo for themselves.
4    Q. Did she say in this conversation as to why
5  reporters wanted embargoes?
6    A. We had a conversation about that. There
7  was, it was — yes. I mean, so it was — I mean,
8  it was a dialogue back and forth, and what we were
9  discussing was the reason why reporters feel that
10 they need embargoes. And as I said earlier, in my
11 mind it made a lot of sense to have an embargo
12 because you're putting information out and you want
13 to make sure that reporters have sufficient time to
14 consume the information and disseminate it as
15 accurately as possible. And, you know, that's
16 obviously really important.
17   I understood why it was really important to
18 us, but one of the really pleasant surprises when I
19 came to Treasury was this, from my perspective, a
20 much higher standard for reporting accurately what
21 information is given to Treasury reporters. They
22 are — there is no better — you know, we talk

Page 45

1  about the markets. Right? A lot of people ask me
2  about the markets and, like, how do you talk to the
3  markets? Well, there is no more efficient way to
4  talk to the markets than through the financial
5  wires or in the Treasury pressroom. So we give
6  information to them directly. And, you know, when
7  I say the markets, you might think of some trading
8  floors up in New York, but the markets are
9  everywhere. They are in Tokyo, London, and
10 Johannesburg, and Chicago, and the only way to
11 speak directly to them quickly is through the
12 financial wires.
13   They recognize that a lot of investors are
14 looking at their stories and trading on the news
15 that comes from those stories; and if their stories
16 are inaccurate, they are probably going to cost
17 somebody some money or make — you know, make money
18 for someone based on that information. Either way,
19 it hurts their reputation as reporters. So they
20 have — and I distinguish that from reporters that
21 I dealt with in politics or on Capitol Hill, where
22 those reporters can get away with writing a he

12 (Pages 42 to 45)

Anthony Fratto                                                                    August 30, 2006

Washington, DC

## Page 46

1  said/she said story. It's really easy to have a
2  balanced story, you just get somebody on the other
3  side to say something in opposition and you throw
4  the story out and it's okay. And that's sort of —
5  that's sort of okay for political rhetoric.
6      Q. Like reporters in red states?
7      A. Red states or blue states. But it's real
8  easy, you know, to write that kind of story and
9  say -- they don't have to be as concerned with the
10 question of accuracy as they do with balance. You
11 know. Their ethic of fairness is balance, where it
12 seems like the ethic of fairness for reporters at
13 least covering Treasury is accuracy, to report
14 faithfully what the information is that they are
15 getting. And it's not that they don't look for
16 opposition voices or, you know, ways to counter.
17 But on straight news for an initial story that
18 comes out, they want to make sure that they are
19 reporting accurately and faithfully the news,
20 because that information is going out to reporters.
21      That was a pleasant surprise for me at
22 Treasury. It's great to deal with reporters that

## Page 47

1  were very, you know, professional about reporting
2  the news that way.
3      Q. So when you started at Treasury and when you
4  became the director of the Office of Public Affairs
5  and had these discussions with Ms. Smith, there was
6  no set embargo policy at Treasury?
7      A. No.
8      MS. WILLIAMS: Objection.
9      BY MR. THEODOROU:
10     Q. There was no definition of embargo in any
11 Treasury policy?
12     A. There was no --
13     MS. WILLIAMS: Objection.
14     THE WITNESS: Sorry.
15     A. There was no -- I would say there was no
16 formal written -- if you were looking for a formal
17 written policy on embargoes, none that I was aware
18 of.
19     BY MR. THEODOROU:
20     Q. So do you know if there was a written policy
21 on embargoes?
22     A. I don't know.

## Page 48

1      Q. Do you know if there was a set of written
2  procedures on how embargoes are to be handled at
3  Treasury at that time?
4      A. No. Not at that time. And, I mean, from my
5  perspective, it would have been a -- and especially
6  looking back, it would have been a, you know,
7  solution in search of a problem, because there
8  didn't seem to me to be an embargo problem at
9  Treasury.
10     Q. Do you know, as of October 31, 2001, whether
11 there were any written procedures about how
12 embargoes were to be handled for refunding
13 conferences?
14     A. No.
15     Q. Do you know if there were such written
16 procedures?
17     A. I don't know.
18     Q. Getting back to your discussion with
19 Michelle Smith. What else do you remember her
20 telling you about embargoes, other than she said
21 reporters wanted embargoes?
22     MS. WILLIAMS: Objection.

## Page 49

1      A. I don't recall -- specifically on the
2  question of embargoes, I don't recall what else,
3  what other points we may have said. I think we
4  agreed that having time between the release of the
5  news and the actual publication of the news, some
6  element of time was beneficial both for them and
7  for us. And so we agreed, embargoes are good and
8  we should have embargoes.
9      BY MR. THEODOROU:
10     Q. Now, was your call prompted by you, by
11 reporters talking to you about embargoes?
12     MS. WILLIAMS: Objection.
13     A. No.
14     BY MR. THEODOROU:
15     Q. You had said that when you started -- let me
16 strike that.
17     You said that you had discussions with
18 reporters who wanted embargoes. Is that right?
19     A. Yes.
20     Q. Do you remember who the reporters were?
21     A. There were a number of reporters I had
22 discussions with about embargoes. And I could tell

13 (Pages 46 to 49)

Anthony Fratto                                                      August 30, 2006

Washington, DC

| Page 50 |
| --- |

1  you for certain Marty Krutsinger who was and still
2  is the Associated Press reporter covering Treasury.
3  Glenn Somerville.
4      Q. Who is he with?
5      A. He was a Reuters, he still is a Reuters
6  reporter also still covering Treasury. Simon
7  Kennedy who was a -- he's a Bloomberg reporter. He
8  is no longer covering Treasury, he is based in
9  Paris. Those three in particular I know for
10 certain I had conversations with.
11     Q. Now, did you have conversations with them
12 about the use of embargoes before October 31, 2001?
13     A. Yes. Before and after.
14     Q. Let's focus on before.
15     A. Okay.
16     Q. Did they educate you about embargoes and how
17 they were used at these conferences?
18     A. You're asking specifically about these
19 conferences?
20     Q. Quarterly refunding conferences.
21     A. Yeah. I think our discussion -- we may have
22 touched on quarterly refunding conferences, but I

| Page 51 |
| --- |

1  doubt it. I think our discussions were more
2  general than that.
3      Q. What do you remember about your discussions
4  with Mr. Krutsinger? If that's correct?
5      A. Krutsinger.
6      Q. Krutsinger?
7      A. I'm not sure that -- I'll be honest, I'm not
8  sure the discussions -- I can, I'm certain that I
9  had individual one-on-one discussions with Simon
10 Kennedy from time to time, who at the time
11 actually, now that I also recall, he wasn't with
12 Bloomberg at the time, he was with Bridge News
13 which is now defunct. So he was with Bridge News
14 at the time. And I know that I had individual
15 conversations with Simon about it.
16     Q. But you're not --
17     A. About these and other -- I mean, I was
18 trying to get familiar with how the Treasury press
19 corps interacted with the press officers at
20 Treasury.
21     Q. But you are not sure that you had
22 discussions with Mr. Somerville and Mr. Krutsinger

| Page 52 |
| --- |

1  about embargoes?
2      A. No. I definitely had --
3          MS. WILLIAMS: Objection.
4      A. They were absolutely present in discussions.
5  But you are asking if I had individual discussions
6  with them? I don't recall if they were individual
7  or whether they were -- or whether those
8  discussions -- now that I'm thinking about it, I
9  think those discussions took place in the open
10 space of the Treasury pressroom. So they were
11 there, there were others who were in the room as
12 well. And so I just don't recall who else was
13 within listening distance.
14     Q. So let's focus, before October 31st, 2001,
15 you recall having discussions with reporters about
16 the use of embargoes in the open space of the
17 Treasury pressroom?
18     A. Yes.
19     Q. Okay. Do you remember what reporters were
20 present?
21     A. Not at any one point in time. No. Other
22 than I know Marty was always there, and I remember

| Page 53 |
| --- |

1  talking to Marty. And he was a long-time Treasury
2  reporter, so I was interested in his past.
3  Jonathan Nichols was maybe there. There's no way I
4  can recall who specifically was there.
5      Q. As best you can recall, how many discussions
6  did you have with reporters in the room about
7  embargoes and how they were to be used at refunding
8  conferences?
9      A. I couldn't -- specifically about refunding
10 conferences?
11     Q. Yes.
12     A. I don't know.
13     Q. How about embargoes generally as to
14 conferences, press conferences at Treasury?
15     A. I would say two to three conversations in
16 the Treasury pressroom with the reporters who were
17 probably present there.
18     Q. Now, and we are focusing again before
19 October 31, 2001. So you remember two to three?
20     A. Yeah. If I can put it in a little better
21 context. I was spending a lot of time in March of
22 2001, March and April of 2001 talking to Treasury

14 (Pages 50 to 53)

Anthony Fratto                                                    August 30, 2006
                        Washington, DC

---

**Page 54**

1  reporters just about basic procedures, how we
2  interact with each other. We were, I talked to
3  them about things like, how early do you get
4  testimony, you know, before it's given on Capitol
5  Hill? I talked to them about, when we travel, who
6  gets -- if we're traveling and we give a speech,
7  who gets the speech? You know. You reporters who
8  are traveling, or does it go back to the Treasury
9  pressroom?
10     So lots of those really just sort of, you
11  know, what are the sort of standard operating
12  procedures for interaction on our business.
13     Q. So you were talking to the equivalent, the
14  equivalent of Helen Thomas --
15     A. Exactly.
16     Q. -- at Treasury about how things are
17  conducted?
18     A. Don't ever say that I characterized Marty
19  that way, though.
20     Q. What was the substance of the conversation?
21  So they were educating you about how embargoes were
22  to be conducted?

---

**Page 55**

1     A. Yeah, how they traditionally used embargoes.
2  And they said, they had a saying on embargoes.
3  They still have the same saying: Everyone goes in
4  together, everyone comes out together, nobody gets
5  hurt. You know? They want the -- you know, they
6  want to know that they are all getting the news at
7  the same time and that they will all be publishing
8  the news at the same time. And, you know, that's
9  helpful for them, it's good for the markets so that
10  the markets don't have to be searching across
11  different sources of news to find out who is
12  getting it first and who is getting it out first.
13  And that was -- that made me comfortable also.
14     Q. All right. These two to three meetings
15  regarding embargoes, what do you remember about the
16  substance of the conversation with the reporters?
17     A. I think, just what I said, that -- I mean,
18  there was also a discussion of the procedures for
19  the release of the Federal Open Market Committee
20  statements during FOMC meetings that comes from the
21  Treasury pressroom.
22     Q. Let's break it down as to the best you can

---

**Page 56**

1  recall. As best you can recall what the substance
2  of what was said about embargoes, what did you say,
3  what did they say at these two or three meetings?
4     A. I recall saying, do you like -- you know,
5  you guys seem to want embargoes for all documents.
6  Is that something that you want us to continue?
7  You know, you want embargoes?
8     And they said, yeah, we definitely want
9  embargoes. You know, it helps us. It helps us be
10  consistent in all of us delivering the news. You
11  don't have to worry about picking favorites for
12  releasing news. It's standard in the way that we
13  do our business, and it will make -- it just makes
14  life easier for all of us. And you can -- from
15  your perspective, you can be certain that when the
16  news goes out to the market, it's coming out in a
17  standard, predictable, reliable way.
18     And that all made sense to me.
19     We had conversations about whether they
20  prefer that I set the embargo or they set the
21  embargo. They said it doesn't really matter to
22  them which way it's done. Either way, you know,

---

**Page 57**

1  it's the same.
2     We talked a little bit about what an
3  embargo -- you know, about what an embargo means.
4  So, you know, who -- what do you do with the news
5  when you get it? Does it -- do you, you know, can
6  you send it back to your -- you know, can you send
7  it back to your news organization? And I know
8  that, from my perspective, you know, dissemination
9  and publishing, well, publishing news in a way
10  that -- you know, I make a distinction between news
11  organizations and general public. So if it's in a
12  place where the general public can get it, then
13  that's disseminating. If you're a news
14  organization, then, you know, you can definitely
15  communicate with your news organizations.
16     Q. So that was concluded, that they could
17  communicate with the news organizations, you said,
18  at one of these meetings?
19     A. I said I have no problem with reporters
20  communicating with their news organizations.
21     Q. Did you say anything about discussing the
22  information with anybody outside of the news

---

15 (Pages 54 to 57)

Anthony Fratto                                                              August 30, 2006
Washington, DC

---

Page 58

1    organizations?
2        A. I don't recall.
3        Q. You mentioned that you discussed the time,
4    setting the time for the embargo.
5        A. (Nodding head.)
6        Q. In these discussions, did you arrive at any
7    procedure or conclusion as to how to set the time
8    for embargo?
9        A. Just that it would, you know, that we should
10   just, you know, whatever -- their feeling is it
11   should be left up to me. But where I didn't have
12   an interest in what the embargo time should be,
13   that they are going to want -- they are going to
14   set their own embargo on their own anyway.
15       So if I come down with a document that
16   wasn't going to generate news or going to be
17   anticipated to generate news, that maybe wouldn't
18   be market sensitive, they would still want to set
19   an embargo amongst themselves. And this happens
20   frequently. We bring down, say, a statement from
21   the senior Treasury official, and they will ask,
22   what's the embargo? And I'll say, you guys decide

---

Page 59

1    whatever you want. And they all talk amongst
2    themselves and say, you know, what do you think, 10
3    minutes, 15 minutes? Whatever the consensus agrees
4    to. And they note the time on the clock. So let's
5    say it's 9:25 and they say we need 10 minutes, and
6    they all agree, yeah, 10 minutes. And then they
7    will say, okay, let's lift it at 9:35. And
8    everyone goes back to their computers and agrees to
9    9:35. And then I make a commitment in that case
10   that, if they set an embargo, that I won't release
11   it on the Web site before their embargo is lifted.
12       Q. Were you aware of any Treasury Department
13   procedures as to how it was to be handled on the
14   Web site other than your discussions with the
15   reporters?
16       A. No.
17       Q. And was this procedure followed before
18   October 31, 2001, that reporters set the embargo
19   time?
20       MS. WILLIAMS: Objection.
21       A. For?
22       BY MR. THEODOROU:

---

Page 60

1        Q. For quarterly refunding conferences before
2    October 31?
3        MS. WILLIAMS: Objection.
4        A. I had only -- I had only witnessed one
5    quarterly refunding announcement before October
6    31st, so I couldn't say whether that was standard.
7        BY MR. THEODOROU:
8        Q. Was --
9        A. But for?
10       Q. For press conferences.
11       A. Yeah. It just really depended.
12       Q. For the press conferences that you handled
13   and supervised before October 31, was the procedure
14   that the reporters would set the embargo time?
15       A. It really depended. They did set the
16   embargo time at the quarterly refunding press
17   conference in May, at the end of May.
18       Q. Reporters set the embargo time?
19       A. Um-hmm. Yes.
20       Q. Did they also set the time at which they
21   would get the statement, the copy of the statement?
22       A. No.

---

Page 61

1        Q. Okay. And when we say embargo time, we're
2    talking about the amount of time between getting
3    the statement and when it could be released?
4        A. Yeah. When we say the embargo time, we're
5    talking about the time that the statement will be
6    publicly released, where it can be allowed to be
7    disseminated to the public.
8        Q. In these two to three discussions that you
9    had with the reporters, did you discuss anything
10   about lockdown rules or keeping people in and out
11   from the press conferences?
12       A. We talked about -- not in terms of people,
13   letting people in or out for the press conferences.
14   We did discuss that, for FOMC announcements, that
15   there is a lockdown procedure.
16       Q. What is FOMC?
17       A. Federal Open Market Committee, Federal
18   Reserve Boards, Monetary Policy Making Committee.
19       Q. Why was there a lockdown procedure with the
20   Federal Open Market Committee and Federal Reserve
21   Open Policy Committee, and not with --
22       A. That's one thing.

---

16 (Pages 58 to 61)

Anthony Fratto                                                                August 30, 2006
                              Washington, DC

| Page 62 | Page 64 |
|---|---|
| 1   Q. I'm sorry. | 1   traditional thing. And, as I learned more about |
| 2   A. FOMC. That was the way they had always done | 2   it, that it was a useful and appropriate way to |
| 3   it. | 3   release information at Treasury. |
| 4   Q. Did anyone ever consider lockdowns for the | 4   BY MR. THEODOROU: |
| 5   refunding conferences? | 5   Q. What exactly did an embargo prevent a person |
| 6   MS. WILLIAMS: Objection. | 6   from doing? |
| 7   BY MR. THEODOROU: | 7   A. It prevented a member of the news media from |
| 8   Q. Before October 31st, 2001? | 8   releasing the information that they received, |
| 9   A. Not to my knowledge. | 9   disseminating that information to the general |
| 10  Q. Did you ever have a discussion with anybody | 10  public. |
| 11  at Treasury about using a lockdown procedure for | 11  Q. Before a particular time? |
| 12  refunding conferences? | 12  A. Before a particular time. That's right. |
| 13  A. No. | 13  Q. Did it prevent them from disclosing the |
| 14  Q. Did anyone at Treasury ever suggest that the | 14  information to anyone? |
| 15  lockdown should be used for refunding conferences? | 15  MS. WILLIAMS: Objection. |
| 16  A. No. | 16  A. It -- no. I'd say, my view is the general |
| 17  MS. WILLIAMS: Objection. | 17  -- is that it prevented them from just releasing |
| 18  THE WITNESS: Sorry. | 18  the information to the general public. My view, |
| 19  A. No, never. Again, I think it would be -- my | 19  and I think it was the common understanding among |
| 20  view is that it would have been a solution in | 20  the reporters in the Treasury pressroom, that it |
| 21  search of a problem. | 21  was perfectly appropriate to discuss information |
| 22  BY MR. THEODOROU: | 22  with members of the news organization, like an |

| Page 63 | Page 65 |
|---|---|
| 1   Q. And why is that? | 1   editor. |
| 2   A. Because I had never seen any event of a | 2   Q. Did you define for them who at their press |
| 3   reporter willfully breaking an embargo. | 3   organizations they could discuss the information |
| 4   MR. THEODOROU: Why don't we take a | 4   with? |
| 5   five-minute break. | 5   A. No. Not specifically. |
| 6   THE VIDEOGRAPHER: This concludes tape one | 6   Q. Now, a press person who received the |
| 7   in the deposition of Tony Fratto. Off the record | 7   information at a press conference could discuss |
| 8   at 11:41:30. | 8   that information with another Treasury employee? |
| 9   (Recess taken.) | 9   MS. WILLIAMS: Objection. |
| 10  THE VIDEOGRAPHER: This begins tape two in | 10  A. They could discuss that information with a |
| 11  the deposition of Tony Fratto. On the record at | 11  member of the Office of Public Affairs. |
| 12  11:48:50. | 12  BY MR. THEODOROU: |
| 13  BY MR. THEODOROU: | 13  Q. How about another, an employee who did not |
| 14  Q. Mr. Fratto, turning your attention to | 14  work at the Office of Public Affairs? |
| 15  October 31st, 2001, after your discussions with | 15  A. Reporters are not -- let me put it this way. |
| 16  these reporters, what was your understanding as of | 16  Treasury employees outside the Office of Public |
| 17  October 31st of Treasury's policy on the use of | 17  Affairs are not permitted to talk to reporters |
| 18  embargos? | 18  except by authority granted to them and in the |
| 19  MS. WILLIAMS: Objection. | 19  presence of a member of the Office of Public |
| 20  A. That we had a -- in terms of, you know, | 20  Affairs. That's been a standard policy at Treasury |
| 21  whether it was a policy, my view is that we had a | 21  for a long time, since the beginning. |
| 22  policy of setting embargoes, that it was a | 22  Q. Now, before October 31st, 2001, did you |

17 (Pages 62 to 65)

Anthony Fratto                                                                August 30, 2006

Washington, DC

|  | Page 66 |
|---|---|
| 1 | attend any quarterly refunding press conferences at |
| 2 | Treasury? |
| 3 | **A. Before October 31st?** |
| 4 | Q. Yes. |
| 5 | **A. Yes.** |
| 6 | Q. Which one? |
| 7 | **A. May 31st.** |
| 8 | Q. May 31st, or May 2nd? |
| 9 | **A. I remember it being in May. It was May.** |
| 10 | Q. And who spoke at that conference? |
| 11 | **A. Michael Polis.** |
| 12 | Q. So you didn't attend Assistant Secretary |
| 13 | Roseborough's conference in August? |
| 14 | **A. I don't believe I did. I think I had -- I** |
| 15 | **don't have a recollection. I remember that Brian** |
| 16 | **did do the quarterly refunding announcement. I** |
| 17 | **honestly don't even remember whether I was there or** |
| 18 | **not.** |
| 19 | Q. Okay. |
| 20 | (FRATTO Exhibit Number 1 was marked for |
| 21 | identification.) |
| 22 | BY MR. THEODOROU: |

|  | Page 67 |
|---|---|
| 1 | Q. I want you to look at this document. Have |
| 2 | you seen it before? |
| 3 | **A. I think it was the one I saw yesterday.** |
| 4 | **Yeah.** |
| 5 | Q. Now, it appears that -- and what is the |
| 6 | document? |
| 7 | **A. It's titled a Memorandum of Activity.** |
| 8 | **Memorandum of Activity from the Office of Inspector** |
| 9 | **General.** |
| 10 | Q. For what date? |
| 11 | **A. November 14, 2001.** |
| 12 | Q. Further on in the document there's another |
| 13 | memorandum of activity. Excuse me, I'm sorry. |
| 14 | MS. WILLIAMS: Mine doesn't have one. |
| 15 | MR. THEODOROU: I'm sorry. |
| 16 | MR. McGIVERN: It just has the one with the |
| 17 | exhibits that were attached to it initially. |
| 18 | MR. THEODOROU: Okay, I've got it. I'm |
| 19 | sorry. All right. |
| 20 | BY MR. THEODOROU: |
| 21 | Q. So this one is the November 14th, 2001 |
| 22 | interview that you had? |

|  | Page 68 |
|---|---|
| 1 | MS. WILLIAMS: Can I just get the copy back? |
| 2 | MR. THEODOROU: I'm sorry. |
| 3 | BY MR. THEODOROU: |
| 4 | Q. That's the November 14th, 2001 interview you |
| 5 | testified about earlier. Correct? |
| 6 | **A. (Nodding head.)** |
| 7 | Q. Now, besides being interviewed on November |
| 8 | 14, 2001, you were interviewed again, weren't you, |
| 9 | by OIG? |
| 10 | **A. I think so. I don't remember right now.** |
| 11 | (FRATTO Exhibit Number 2 was marked for |
| 12 | identification.) |
| 13 | BY MR. THEODOROU: |
| 14 | Q. I want to show you what's been marked as |
| 15 | Exhibit 2. Have you seen that document before? |
| 16 | **A. Not that I recall.** |
| 17 | Q. You don't remember reviewing this yesterday |
| 18 | with the SEC attorneys? |
| 19 | **A. No.** |
| 20 | Q. This makes reference to a second interview. |
| 21 | Do you see that? |
| 22 | **A. Yes.** |

|  | Page 69 |
|---|---|
| 1 | Q. On December 19, 2001? |
| 2 | **A. Yes.** |
| 3 | Q. Do you recall having a second interview with |
| 4 | the Office of Inspector General? |
| 5 | **A. I honestly don't specifically remember it.** |
| 6 | **I don't doubt that it happened, I just don't** |
| 7 | **remember it.** |
| 8 | Q. Now, turning to Exhibit 1, the first of the |
| 9 | two documents that I gave you. On page 2, |
| 10 | directing your attention to page 2, the fourth |
| 11 | paragraph on this page makes reference to the |
| 12 | October 31st, 2001 quarterly refunding press |
| 13 | conference. |
| 14 | Before I ask any questions of the document, |
| 15 | do you want to take some time reading it, or do you |
| 16 | think you're pretty familiar after having it? |
| 17 | **A. I think I'm relatively familiar with it.** |
| 18 | **Yeah.** |
| 19 | Q. Okay. Do you see where it says, Fratto said |
| 20 | this was the first time that they had set an |
| 21 | embargo time prior to the conference? |
| 22 | **A. Yes.** |

18 (Pages 66 to 69)

Anthony Fratto                                                    August 30, 2006
Washington, DC

| Page 70 | Page 72 |
|---|---|

**Page 70**

1  Q. And in fact it says: Fratto said this was
2  the first time they had set an embargo time, 10:00
3  a.m., prior to the conference. Normally they poll
4  the press at the conclusion of the press conference
5  and then set the embargo time.
6      Correct?
7  A. Yes.
8      Q. Now, when you say this was the first time
9  that an embargo time was set prior to the
10  conference, is that in reference to a quarterly
11  refunding conference or to any news conference?
12  A. To my knowledge, a quarterly refunding
13  conference. Not -- no, definitely not referring to
14  other news conferences.
15  Q. So before this October 31st, 2001
16  conference, a public affairs official polled
17  reporters present to determine how much time they
18  needed to prepare their stories at the conclusion
19  of the conference?
20      MS. WILLIAMS: Objection.
21  A. At the one quarterly refunding announcement
22  that I recall attending, that's the way it was

**Page 72**

1  A. No.
2      MS. WILLIAMS: Objection.
3      BY MR. THEODOROU:
4  Q. How did they arrive at the time then?
5  A. I asked them out loud, with all of them in
6  attendance before they left the room, how much time
7  do you need for an embargo? And, actually, I
8  remember this fairly clearly. It was Simon Kennedy
9  who said out loud, suggested about 15 minutes. And
10  then another voice said a specific time, and they
11  all said, yeah, that's good, okay. So -- and then
12  said so then I repeated the time that they had all
13  agreed to.
14  Q. Did you tell them what they could and could
15  not do during that time period, other than setting
16  a time period?
17  A. No. That would have been unusual. They
18  knew exactly what they could and couldn't do: The
19  news that had been -- the news that they had gained
20  from the press conference could not be publicly
21  disseminated.
22  Q. And how do you know they knew that?

| Page 71 | Page 73 |
|---|---|

**Page 71**

1  done. So when this says what is normal, I can't
2  really attest to that other than it definitely had
3  been done previously within my experience.
4      BY MR. THEODOROU:
5  Q. So when you attended the May 2001 quarterly
6  refunding conference, did you poll the reporters as
7  to determine how much time they needed to prepare
8  their stories?
9  A. Yes, I did.
10  Q. And how much time did they need?
11  A. I don't remember the exact time. It was
12  about -- it was about 15 minutes. I think the way
13  they did it was they picked a quarter hour, the
14  next closest quarter hour time period. So I
15  couldn't -- I can give you a type of example. I
16  don't remember the exact time. But it was, for
17  example, if it was -- if the press conference was
18  over at 9:17, they picked 9:30. So they picked a
19  round, a relatively round time that they could all
20  agree on.
21  Q. And when you say you polled the reporters,
22  did you have them take a vote?

**Page 73**

1  A. I presume the same. Besides from the
2  conversations I had with a number of people, a
3  number of reporters in that group, the same way I
4  presume that you know how to conduct a deposition
5  interview. You know, I've witnessed it with other
6  documents, and I can see that -- you know, that
7  wasn't the first time that we had used an embargo.
8  We used embargos on a relatively regular daily
9  basis well up to October 31st. It wasn't like it
10  was an episodic event. We used embargoes many
11  times on a daily basis and sometimes multiple times
12  on a given day.
13  Q. But at that point with refunding
14  conferences, other than setting a time, nobody
15  defined for the reporters, both veteran and
16  nonveteran reporters, what they could and couldn't
17  do during the embargo?
18      MS. WILLIAMS: Objection.
19  A. That's right. No one defined it.
20      BY MR. THEODOROU:
21  Q. And nobody --
22  A. And if you're asking me why I didn't define

Alderson Reporting Company
1-800-FOR-DEPO

Anthony Fratto                                                    August 30, 2006

Washington, DC

Page 74

1  it, I saw no reason to.
2      Q. You assume they understood?
3      MS. WILLIAMS: Objection.
4      A. I had good reason to assume that they
5  understood.
6      BY MR. THEODOROU:
7      Q. Okay. Let me rephrase my question.
8      Do you know whether anyone at that May
9  conference told the reporters in the room what they
10  could and could not do during the embargo period?
11     A. No.
12     Q. Do you know -- now, you testified earlier
13  about Simon Kennedy. Who is he again?
14     A. At the time, he was a reporter with Bridge
15  News.
16     Q. And do you recall having a discussion about
17  embargoes with Simon Kennedy, specifically with Mr.
18  Kennedy, as opposed to those two to three meetings
19  you talked about?
20     A. Yes.
21     Q. Before October 31, 2001, do you recall
22  having a discussion with Mr. Kennedy about the use

Page 75

1  of embargoes?
2      A. Yes.
3      Q. Okay. How many discussions did you have
4  with him about the use of embargoes?
5      A. I don't know if it was more than one.
6      Q. What do you recall about your discussions
7  with Mr. Kennedy?
8      A. They were similar to the other conversations
9  I had in the Treasury pressroom; just asking his
10  experience with the nature of embargoes, whether --
11  surveying lots of views on that particular practice
12  and other ways that we interacted with the Treasury
13  press corps.
14     Q. Let me ask you this. Specifically with your
15  discussion with Mr. Kennedy, what do you remember
16  about the specifics of the discussion regarding
17  embargoes, with just that specific discussion?
18     A. Yeah. I don't really remember a specific --
19  his specific reactions. I think I would have
20  remembered if he had expressed views that differed
21  from mine. But I don't -- I couldn't tell you the
22  words he used.

Page 76

1      Q. Now, before the quarterly refunding press
2  conference of October 31st, 2001, did Treasury
3  require attendees at press conferences to stay in
4  the room during the embargo period?
5      MS. WILLIAMS: Objection.
6      A. I don't recall it being an issue.
7      MS. WILLIAMS: I'm sorry, could we repeat
8  the question?
9      MR. THEODOROU: Do you want me to restate
10  the question?
11     MS. WILLIAMS: Yes. Could you restate the
12  question?
13     BY MR. THEODOROU:
14     Q. Before the October 31st, 2001 quarterly
15  refunding conference, did Treasury require those
16  attending the press conference, any press
17  conference, to stay in the room where the press
18  conference was being conducted during the embargo
19  period?
20     A. And I responded, I don't recall it being an
21  issue that was specific, that ever came up.
22     Q. I just have to rephrase the question.

Page 77

1      MS. WILLIAMS: Thank you.
2      MR. THEODOROU: You're welcome.
3      THE WITNESS: And your objection on the
4  second retelling of the question?
5      MS. WILLIAMS: No, I have no objection.
6      MR. THEODOROU: She's all set. She never
7  has a problem with objections.
8      BY MR. THEODOROU:
9      Q. Before October 31, 2001, did Treasury take
10  any steps to prevent attendees of news conferences
11  from making telephone calls before the embargo
12  period ended?
13     MS. WILLIAMS: Objection.
14     A. Yes. If there was an embargo in effect,
15  reporters are not permitted to use their cell
16  phones. And, in fact, we enforced the policy even
17  for open events of discouraging the use of cell
18  phones during events where there wasn't an embargo.
19     BY MR. THEODOROU:
20     Q. Well, how were they allowed to communicate
21  with their press organizations during the embargo
22  period?

20 (Pages 74 to 77)

Anthony Fratto                                                              August 30, 2006
                              Washington, DC

Page 78

1  A.  Well, during the embargo period, they were
2  in there, they would be in the Treasury pressroom
3  or on the way to the Treasury pressroom.  But
4  you're talking about during the event itself or
5  just during the embargo period?  Maybe I
6  misunderstood your question.
7  Q.  Let me clarify that.  During the embargo
8  period.
9  A.  Yes, absolutely, they can get on their cell
10  phones.
11  Q.  And they were allowed to communicate with
12  their press organizations?
13  A.  Yeah.  But part of the embargo period for an
14  event with a set embargo might include a period of
15  time of the event itself.  So if it's a press
16  conference or a speech, we wouldn't allow reporters
17  to get on the phone.  And we would and have noted
18  on a number of occasions.  In fact, I recall one
19  news organization in particular that made it a
20  chronic -- it was a chronic thing with them that we
21  noted our displeasure with them.  Not during an
22  embargo period, during open press events.  No one,

Page 79

1  to my knowledge, did it during an embargo, during
2  the event itself.  But, yes, during an embargo
3  period, yes.
4  (FRATTO Exhibit Number 3 was marked for
5  identification.)
6  BY MR. THEODOROU:
7  Q.  Mr. Fratto, I'm showing you what's been
8  marked as Exhibit 3.  Have you seen this before, a
9  Washington Post article that's entitled Treasury
10  Suspects Insider Bond Trading?
11  A.  I'm sorry?
12  Q.  Have you seen this article before?  Do you
13  recall seeing this article, November 6th?
14  A.  Yeah.  It's been a long time, but I do.
15  Q.  Why don't you take a look through it.
16  A.  Okay.
17  Q.  I want to direct your attention to the
18  middle of the first page.  Do you see where it
19  says:  Treasury officials announced both before and
20  at the end of the news conference that Fisher's
21  statement and his replies to reporters' questions
22  were embargoed for release at 10:00 a.m., meaning

Page 80

1  the people present understood that their access to
2  the information was conditioned on their agreement
3  not to distribute it publicly before 10:00 a.m.
4  Do you see that?
5  A.  Yes.
6  Q.  And it also continues:  But reporters and
7  others who attended were not required to remain in
8  the room until the embargo expired.
9  It also states:  The reporters, many of whom
10  work regularly in the building's pressroom, left to
11  prepare stories to be sent to their media outlets
12  and released at 10:00 a.m.
13  Do you see that paragraph?
14  A.  Yes, I do.
15  Q.  The next paragraph states:  That procedure
16  was far more casual, for instance, than that
17  followed regularly at Treasury when the results of
18  securities auctions are announced.  In such cases,
19  reporters are given the information ahead of time
20  so they can prepare stories, but they are kept in
21  the pressroom until the release time when they are
22  all allowed to send their stories out

Page 81

1  simultaneously.
2  Do you see that paragraph?
3  A.  I do.
4  Q.  Now, how did the procedures for the
5  quarterly refunding announcements compare to the
6  procedures used for announcing the results of
7  securities auctions?
8  A.  Well, the results of the securities auctions
9  are delivered directly to the Treasury pressroom by
10  way of fax, similar to the way the statement of the
11  FOMC committee is sent directly to the Treasury
12  pressroom.
13  But I would -- while I wouldn't disagree
14  that the procedure is, as the reporter noted, more
15  casual than how we handle securities auctions, how
16  securities auctions are announced, they are not --
17  they do not differ in any way from how we employ
18  embargoes in lots of other ways within the Treasury
19  Building.
20  Q.  Well, why were they locked down for
21  securities auctions and not for the quarterly
22  refunding announcement?

21 (Pages 78 to 81)

Anthony Fratto                                          August 30, 2006
Washington, DC

---

Page 82

1    A. Because the quarterly refunding
2  announcement, the way it had always been done, the
3  way it had always been released was in the form of
4  a press conference. And a press conference can
5  cannot be held in the Treasury pressroom, and the
6  reporters are not -- don't have the capability of
7  disseminating and producing the news from the
8  diplomatic reception room which we used at that
9  time for press conferences. So the only way to
10 allow the Treasury reporters to get to a place
11 where, A, where we can have a place to conduct our
12 press conference, and point B, where they can
13 produce their stories and disseminate it is to
14 allow them to walk from point A to point B.
15    Q. Right. So they were allowed to go to their
16 pressroom during the embargo time. Correct?
17    A. Correct.
18    Q. And to contact their media organizations?
19    A. Correct.
20    Q. Why weren't they locked down in their
21 pressroom? If they were there with the written
22 statement that they were writing their stories

---

Page 83

1  about, why weren't they locked down while they were
2  locked down in these securities auctions?
3    A. There was no need to. There was not -- to
4  my knowledge, speaking to people both reporters who
5  dealt with it in the past and public affairs
6  officials at Treasury, they had never had a problem
7  of broken embargoes. My experience at that point,
8  which was eight or nine months, or seven or eight
9  months at Treasury had not had experience with
10 broken embargoes; and, that this was relatively
11 customary and usual for the way we did lots of
12 briefings that involved embargoes.
13    Q. Right. But why did you have to lock them
14 down in the securities auctions?
15    A. That was the way they did it. That's the
16 way it had been done at Treasury, that they did a
17 lockdown for securities auctions. But I will tell
18 you, even out of -- you know, at the time, even for
19 securities auctions and for FOMC statements, you
20 know, we work in a unique place where the
21 facilities have not kept up with what they needed.
22 So, for example, there wasn't a copier in the

---

Page 84

1  Treasury pressroom. And in order for them to
2  disseminate the news of an auction or an FOMC
3  statement, they had to allow the reporters or the
4  reporters had developed the custom of doing
5  something, you know, which someone might look at as
6  unusual but it was relatively safe, which was
7  allowed to walk across the hall with an FOMC
8  statement, two reporters keeping an eye on each
9  other and making copies of the FOMC statement and
10 walking back into the Treasury pressroom. That was
11 even under a lockdown condition they were leaving
12 the room with a key document, but they were
13 self-enforcing.
14    You know, reporters do not want to break
15 embargoes. That's the quickest way to find
16 yourself off one of the best beats in Washington,
17 is to try to -- is to break an embargo willfully.
18    Q. What is a securities auction?
19    A. Treasury bonds, notes. You know, the
20 Treasury securities bonds that we sell, they are
21 auctioned at the Bureau of Engraving and Print --
22 I'm sorry, the Bureau of Public Debt. And they are

---

Page 85

1  electronic auctions. And the results of those
2  auctions are disseminated in the Treasury
3  pressroom.
4    Q. As to who bought?
5    A. How many were bought, what the, you know,
6  the price, how much, at what price.
7    Q. The materials?
8    A. Exactly. How did the -- what were the
9  results of the sale.
10    Q. So that information was certainly as market
11 sensitive as what was going on at the quarterly
12 refunding conference. Correct?
13    MS. WILLIAMS: Objection.
14    A. I couldn't compare. In fact, I don't think
15 I'm qualified to say which is more or less market
16 sensitive.
17    BY MR. THEODOROU:
18    Q. Were they both market sensitive, though?
19    A. Yeah. I would call them both market
20 sensitive.
21    Q. Did Treasury use a lockdown procedure for
22 any other kinds of press conferences other than --

---

22 (Pages 82 to 85)

Anthony Fratto                                                      August 30, 2006
Washington, DC

Page 86

1  or, excuse me. Did Treasury use any lockdown
2  procedures outside of the auctions?
3      A. I'm only aware of it for auctions and for
4  FOMC statements?
5      Q. And what are FOMC statements?
6      A. There are six policy-making meetings of the
7  Federal Open Market Committee, which is a committee
8  of those that includes the chairman of the Federal
9  Reserve Board, the permanent members of the Federal
10 Reserve Board, and the rotating group of Federal
11 Reserve bank presidents. They meet six times
12 throughout the year, and they announce what the
13 overnight -- the rate for overnight borrowing
14 between banks will be, which is known as the
15 Federal funds rate. They announce what that rate
16 will be. And that affects interest rates for lots
17 of -- for all bond market activity.
18     Q. And how does the press get the FOMC
19 statements?
20     A. The Federal Reserve Board faxes the Federal
21 Reserve Board statement to the Dow Jones fax
22 machine in the Treasury pressroom. A Dow Jones

Page 87

1  reporter plus one other reporter will take that
2  document and walk it to the copy machine and make
3  sufficient copies for the entire pressroom, and
4  then distribute those documents in the pressroom.
5  At that point, the room has three minutes to write
6  their stories and disseminate it.
7      Q. And there's a lockdown procedure in place?
8      A. There's a lockdown procedure in place.
9  Meaning that they can't leave the room.
10     Q. And why is there a lockdown procedure in
11 that case, as opposed to when they go in there with
12 their refunding information?
13     MS. WILLIAMS: Objection.
14     A. They are not getting the refunding -- at
15 that time, they were not getting the refunding
16 information in the pressroom.
17     BY MR. THEODOROU:
18     Q. Right. But you testified earlier that they
19 leave the refunding conferences, and during the
20 embargo time they can go back to their offices,
21 write their stories, and contact their
22 organizations. Correct?

Page 88

1      A. Correct.
2      Q. So my question is, why was there a lockdown
3  when they went back to the pressroom to do that
4  with the refunding conferences?
5      A. It just wasn't necessary. They had one goal
6  in mind, and that was to get to their desks,
7  produce their stories. They weren't looking to go
8  anywhere else.
9      Q. And when they got the information from the
10 FOMC statements and the securities auction
11 information, they also were at their desks in the
12 pressroom writing their stories and contacting
13 their organizations. Correct?
14     A. Um-hmm.
15     Q. And yet they were not allowed to leave.
16 Right?
17     MS. WILLIAMS: Objection.
18     A. Let me be clear on this. Treasury does not
19 enforce the lockdowns in the Treasury pressroom.
20 All the lockdowns, including the FOMC lockdowns,
21 are self-enforcing by the reporters. We do not
22 tell them how to conduct their lockdowns. We don't

Page 89

1  oversee their lockdowns. They are responsible for
2  conducting their lockdowns, even for the FOMC
3  announcements and for the Treasury auction
4  announcements.
5      BY MR. THEODOROU:
6      Q. Right. But for the FOMC announcement and
7  the auction announcement, do you require -- did
8  Treasury, before October 31, 2001, require a
9  lockdown?
10     A. Did we require a lockdown for the FOMC? No.
11 Like I said, we don't -- we don't set the policy on
12 lockdowns in the Treasury pressroom. It is
13 self-enforcing. And, technically speaking, that's
14 not Treasury's announcement. That FOMC
15 announcement is not a Treasury announcement.
16     Now, it's possible that the Federal Reserve
17 Board -- and you contact Michelle Smith and ask
18 her -- whether they require a lockdown in the
19 Treasury pressroom for their announcements. But we
20 don't require it. And no one from the Federal
21 Reserve Board is there in the room overseeing the
22 lockdown.

23 (Pages 86 to 89)

Anthony Fratto                                                                August 30, 2006
Washington, DC

| Page 90 | Page 92 |
|---|---|
| 1   Q. Did Treasury require a lockdown for the | 1   A. I do. |
| 2   security auction? | 2   Q. And you attended the May 2nd but not the |
| 3   A. No. | 3   August 1st, 2001 announcement? |
| 4   Q. They did not? | 4      MS. WILLIAMS: Objection. |
| 5   A. No. | 5   A. I'm sorry. Actually, what I said is I don't |
| 6   Q. So that's something that the press came up | 6   recall attending the August one. Let me — if I |
| 7   with? | 7   could just put some context in that. |
| 8   A. Yes. You know, when I say "no," I never | 8      Brian Roseborough I think did a few |
| 9   required it; it was never required while I worked | 9   quarterly refunding announcements, so I don't |
| 10  at Treasury. Whether there was some legacy of some | 10  remember. You know, I have a picture in my head of |
| 11  previous Treasury official that did require it back | 11  Brian doing a quarterly funding announcement. I |
| 12  at the origins of it, I suppose that's possible. | 12  have no idea whether it was the August 2nd or some |
| 13  But I don't have any knowledge of it. | 13  subsequent one that he did, or August 1st. |
| 14  Q. And as of October 31, 2001, were you at that | 14     BY MR. THEODOROU: |
| 15  time aware of any policy that required a lockdown | 15  Q. But you do recall attending the May one? |
| 16  for the securities? | 16  A. Yeah. That one I remember very well, |
| 17  A. No. | 17  because it was the first one that I had done. |
| 18     (FRATTO Exhibit Number 4 was marked for | 18  Q. If you look, the second paragraph of the |
| 19  identification.) | 19  letter, of the March 4th, 2002 letter. All right? |
| 20     BY MR. THEODOROU: | 20  A. Yes. |
| 21  Q. I want to show you, Mr. Fratto, Exhibit 4. | 21  Q. He states in here that: I forwarded your |
| 22  Have you seen this document before? | 22  request to Tony Fratto, director of the Office of |

| Page 91 | Page 93 |
|---|---|
| 1   A. I might have. I honestly really don't | 1   Public Affairs, who was responsible for announcing |
| 2   remember. I think, I remember having a | 2   the embargo, both the May 2nd, 2001 and August 1st, |
| 3   conversation with John Vardaman about this. So | 3   2001 quarterly refunding announcements. |
| 4   it's possible that he showed it to me, but I | 4      Do you see that? |
| 5   honestly don't remember it. | 5   A. I do. |
| 6   Q. There are actually two letters, one from | 6   Q. Now, does that refresh your recollection as |
| 7   March 4th, 2002, and one from April 5th, 2002, from | 7   to whether you attended on August 1st, 2001? |
| 8   John Vardaman to Rosemary Filou at the SEC. Do you | 8   A. I don't dispute it. But I honestly don't |
| 9   see that? | 9   really have a very good recollection of that, of |
| 10  A. Yes. | 10  that announcement. |
| 11  Q. Did the SEC lawyer show you this document at | 11  Q. Now, if you would go further down in that |
| 12  all? | 12  paragraph, it states: As is the custom, Mr. Fratto |
| 13  A. Not yesterday. And I don't think I saw this | 13  orally issued a 15- to 20-minute embargo at the |
| 14  in our previous conversation. | 14  conclusion of the news conference following both |
| 15  Q. Do you want to take some time to look at the | 15  announcements. |
| 16  letters? | 16     Is that what happened? |
| 17  A. Okay. | 17  A. Like I said, I have a fairly good |
| 18  Q. Okay. Now, the letters, if you look at the | 18  recollection of doing that with communication with |
| 19  first paragraph of each letter, the letters refer | 19  the reporters present at the May 2nd one, but I |
| 20  to information that Ms. Filou wanted regarding the | 20  don't really remember the August 1st one. |
| 21  May 2nd, 2001 and the August 1st, 2001 quarterly | 21  Q. Okay. And what does a 15- to 20-minute |
| 22  refunding announcements. Do you see that? | 22  embargo announcement mean? Does that mean the period of time |

24 (Pages 90 to 93)

Anthony Fratto
Washington, DC

August 30, 2006

## Page 94

1  that they can write the stories or contact?
2      MS. WILLIAMS: Objection.
3      BY MR. THEODOROU:
4      Q. Well, I will ask you. What did that mean, a
5  15- to 20-minute embargo?
6      A. I'm not sure what John Vardaman's -- what
7  exactly he's writing. I would suspect that John
8  asked me what kind of embargo was set for one or
9  both of those news conferences, and I said it was,
10  you know, 15 -- it would be around 15 or 20
11  minutes.
12     Q. So was the October 31st, 2001 press
13  conference, quarterly refunding press conference,
14  was that the first time to your knowledge in which
15  an embargo time was printed on a document ahead of
16  time?
17     A. Yes. To my knowledge, yeah.
18     MS. WILLIAMS: Objection.
19     A. I'm sorry. For a quarterly refunding
20  announcement.
21     BY MR. THEODOROU:
22     Q. Correct.

## Page 95

1      A. But we have had pre-set embargoes for other
2  kinds of documents.
3      Q. Right. So the October 31st, 2001 press
4  conference was the first time that Treasury had
5  issued documents ahead of time noting an embargo
6  time for a quarterly press conference, to your
7  knowledge?
8      A. Yes. That's correct.
9      Q. Now, in the second letter attached to
10  Exhibit 4, Mr. Vardaman -- and, by the way, who is
11  Mr. Vardaman?
12     A. I know John worked in the general counsel's
13  office.
14     Q. As a special assistant to the general
15  counsel?
16     A. Yeah.
17     Q. Is he a lawyer?
18     A. He is an attorney. I don't know whether --
19  I know John went off to Iraq for a while and did
20  some work there. I don't know if he ever came
21  back.
22     Q. I'm not following up on any questions on

## Page 96

1  that.
2      All right. It states -- if you look at that
3  second letter, Vardaman states. Do you see that,
4  the second paragraph?
5      A. Yeah.
6      Q. States that the May -- at the conclusion of
7  the press conference on May 2nd, Tony Fratto,
8  director of the Office of Public Affairs, announced
9  that an embargo was in effect until approximately
10  9:45 a.m.
11     All right. Do you see that?
12     A. Yes.
13     Q. All right. Now, it says until approximately
14  a certain time. Now, what does he base
15  "approximately" on?
16     MS. WILLIAMS: Objection.
17     BY MR. THEODOROU:
18     Q. To your knowledge.
19     A. To my knowledge -- I'm sure John was
20  responding to my answer to him at the time, and I
21  am sure that I used the word approximately because
22  I didn't know the specific time that Peter Fisher's

## Page 97

1  statement was posted to the Web site. And the
2  moment that Peter Fisher's statement was posted to
3  the Web site, the embargo was lifted.
4      MS. WILLIAMS: Just to clarify, are we
5  talking about the May 2nd?
6      MR. THEODOROU: Yeah, the May 2nd.
7      A. I'm sorry. I thought we were talking about
8  October 31st.
9      BY MR. THEODOROU:
10     Q. No, not October 31st. To be clear, let me
11  ask again. Okay? Look at that whole paragraph.
12  The paragraph states: To be clear, at the
13  conclusion of the press conference on May 2nd, Tony
14  Fratto, director of Office of Public Affairs,
15  announced that an embargo was in effect until 9:45
16  a.m.
17     A. Yeah.
18     Q. Do you see that?
19     A. Sorry about that.
20     Q. The second sentence was: At the conclusion
21  of the press conference on August 1st, Mr. Fratto
22  announced an embargo was in effect until

25 (Pages 94 to 97)

Anthony Fratto                                                      August 30, 2006
                        Washington, DC

Page 98

1   approximately 9:30.
2       Correct?  Do you see that?
3       A.  That's what it says.  Yeah.
4       Q.  And what did he base his statement that it
5   was approximately 9:45 for May 2nd and
6   approximately 9:50 for August 1st?
7       MS. WILLIAMS:  Objection.
8       A.  I'm sure John asked me, and my answer to him
9   was approximately.
10      BY MR. THEODOROU:
11      Q.  So at these quarterly refunding conferences,
12  though, these two, May 2nd and August 1, there was
13  no fixed time at which the embargo expired.
14  Correct?
15      MS. WILLIAMS:  Objection.
16      A.  Yes.  I think we stated that.
17      BY MR. THEODOROU:
18      Q.  Okay.  Now, if you look at the first letter
19  where it states:  As is the custom, Mr. Fratto
20  orally issued a 15- to 20-minute embargo at the
21  conclusion of the news conference following both
22  announcements.

Page 99

1       Do you see that?
2       A.  I do.
3       Q.  So if it was 15 to 20 minutes, how did the
4   attendees know exactly when they were allowed to
5   disclose the information publicly?
6       A.  Because when we would establish the
7   approximate time needed for an embargo, that would
8   then be followed up with, okay, we agree that's
9   then a specific time.  So a specific time would
10  have been orally discussed with the group of
11  reporters attending the event.
12      So you talk about, first, how much time do
13  the reporters need to produce their stories.
14  Sometimes it's as few as three to five minutes,
15  sometimes on something more complex they will
16  request upwards of 15 to 20 minutes.  And once you
17  establish how much time the reporters need to
18  produce their stories, then you fix a time that is
19  relatively close to the time that they request to
20  produce their stories.
21      Q.  Well, you remember you talked to Mr.
22  Vardaman?

Page 100

1       A.  I remember talking to Mr. Vardaman.  I don't
2   remember what all we talked about.
3       Q.  Do you see where Mr. Vardaman in the first
4   letter says:  Accordingly, the May 2nd embargo was
5   in effect from approximately 9:25 until 9:45.  And
6   the August 1st embargo was from 9:30 until 9:50.
7       A.  Yeah.  I know that that's not perfectly
8   accurate, because an embargo period begins at the
9   beginning of the event, not -- you know, not at the
10  conclusion of an event.  The embargo begins from
11  the -- the embargo begins from the first moment
12  that information is disseminated.  So if they were
13  handed paper or the principal was speaking, that's
14  when the embargo begins.  So you would announce
15  before the event that this information is
16  embargoed.
17      Q.  Is there a record anywhere of a set embargo
18  time after you discussed it with the attendees of
19  those quarterly refunding conferences of what the
20  set embargo time was?
21      A.  Not to my knowledge.  It's likely that I
22  would have noted it on paper somewhere, but nothing

Page 101

1   that I would have retained.
2       Q.  Because I notice that -- I mean, is Vardaman
3   a pretty careful lawyer?
4       MS. WILLIAMS:  Objection.
5       MR. THEODOROU:
6       A.  To your knowledge, pretty careful what he
7   does?
8       MS. WILLIAMS:  Objection.
9       A.  I don't know John well enough in terms of
10  his lawyering skills.  I would leave that to other
11  experts.
12      BY MR. THEODOROU:
13      Q.  But you notice he uses the term
14  "approximately" a few times.  Is that right?
15      A.  He uses it on numerous times.  Yeah.
16      Q.  And these letters are based on discussions
17  with you?
18      A.  Um-hmm.
19      Q.  Correct?
20      A.  Yes.
21      Q.  Okay.  And you understood, during the course
22  of this investigation, after October 31, after the

26 (Pages 98 to 101)

Anthony Fratto                                                    August 30, 2006
                            Washington, DC

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  events of October 31, how important it was to be as
2  precise as possible --
3    A. That's right.
4    Q. -- in talking to OIG and lawyers for the
5  Treasury and the SEC?
6    A. Yes, I do. And I'm sure John's response is
7  reflective of the fact that he was asking me about
8  events that occurred upwards of a year previously.
9  So my ability to recall specific times a year or
10 five months later is probably limited, just as
11 limited as it is now.
12   Q. Now, you testified you do remember being at
13 the August 1st -- or the May 2nd conference, but
14 not the August 1st. Right?
15   A. Yeah.
16   Q. But at the May 2nd conference, did you tell
17 the attendees that the embargo would last 15
18 minutes from a certain time, or did you announce an
19 exact time at which it would end?
20   A. I announced an exact time.
21   Q. Do you recall today what that exact time
22 was?

**Page 103**

1    A. No.
2    Q. Is it written anywhere, that exact time?
3    A. No. But it is standard in -- any time. I
4  know of no case where the discussion of the time
5  required for an embargo is discussed with reporters
6  that isn't followed up by a consensus agreement on
7  a specific time. That's always the case.
8    Q. And what, is there -- is there to your
9  knowledge a record anywhere of this set time?
10   A. No. I would be surprised to find one.
11   Q. Now, if you'd turn to Exhibit 1. Directing
12 your attention to page 2. All right, the fourth
13 paragraph, beginning: Fratto said that this was
14 the first time they had set an embargo time 10:00
15 a.m. prior to the conference.
16   Do you see that, Mr. Fratto?
17   A. I do.
18   Q. All right. And then later on in the
19 paragraph you say: He said he was not aware of any
20 member of the press violating the embargo. He said
21 -- let me take it in context for the purpose of
22 completeness here.

**Page 104**

1    A. Yeah.
2    Q. The whole paragraph.
3      Fratto said that this was the first time
4  they had set an embargo 10:00 a.m. prior to the
5  conference. Normally they poll the press at the
6  conclusion of the press conference and then set the
7  embargo time. He said he was not aware of any
8  member of the press violating the embargo. He said
9  that, if they did, he would revoke their Treasury
10 press credentials.
11     Do you remember talking to the OIG and the
12 SEC about that?
13   A. Yes.
14   Q. How did Treasury enforce embargoes at their
15 refunding conferences, refunding press conferences?
16   A. That's a more complicated question and more
17 complicated answer than what I think you are
18 asking. You are asking how we deal.
19   Q. Just like the case. It's a much more
20 complicated case?
21   A. How we deal with reporters who would violate
22 a an embargo. Say, first of all, I have no -- I

**Page 105**

1  have had in five and a half years in Treasury no
2  instances that I'm aware of a reporter willfully
3  violating an embargo. However --
4    Q. What do you mean by willfully?
5    A. Doing it on purpose. Purposely violating an
6  embargo. I'm aware of one instance, and I honestly
7  can't recall what the date was, but it was I
8  believe in 2003 where an Associated Press reporter
9  had accidentally violated an embargo, or the
10 Associated Press news organization had accidentally
11 violated an embargo. And that was because the
12 reporter, when they sent their story to their
13 editor for review, wasn't clear that the story was
14 embargoed and so they had -- they accidentally sent
15 the story out before the embargo was lifted, and
16 they self-reported themselves. They called me, as
17 did every other reporter in the pressroom
18 subsequent to that. But AP had called me to tell
19 me that they had violated the embargo and
20 apologized.
21   Q. But as of October 31, 2001, how did Treasury
22 enforce its embargoes?

27 (Pages 102 to 105)

Anthony Fratto                                                                  August 30, 2006
                            Washington, DC

Page 106

1      MS. WILLIAMS: Objection.
2      A. It up to that point had not had an
3  opportunity to use any of the potential penalties
4  at my disposal for someone violating an embargo.
5  But I was clear, and I think going back to some of
6  the conversations we had with reporters on this
7  topic -- and I couldn't tell you specifically which
8  reporters that we had this conversation with, but
9  it was -- I recall expressing my feeling that if a
10  reporter violated an embargo -- first of all, they
11  were clear in telling me that they would be sure to
12  let me know about it if anyone did because they
13  watch each other. But if a reporter violated an
14  embargo, that, you know, some of the potential
15  penalties that I can use to enforce an embargo
16  would be to limit access to that reporter to, you
17  know, covering Treasury events, and could revoke
18  that reporter's Treasury press credentials and not
19  allow them into the Treasury building to cover
20  Treasury events. I could even go so far as, if it
21  was a news organization that was based in the
22  Treasury building, had a permanent Treasury room

Page 107

1  press credentials, to remove the organization from
2  the Treasury pressroom. So those were just some of
3  the tools that I could use.
4      And it says here that I responded that I
5  would revoke their Treasury press credentials if I
6  found out that a reporters at that press conference
7  had broken the embargo. I think that is probably
8  accurate. That would have been my reaction.
9      BY MR. THEODOROU:
10      Q. Directing your attention to the May 1st
11  conference, which is the one you remember attending
12  before October 31st, how do you ensure that all of
13  the attendees of the press conference knew that
14  their press credentials were going to be revoked or
15  could be revoked if they violated the embargo?
16      MS. WILLIAMS: Objection.
17      BY MR. THEODOROU:
18      Q. Did you tell everybody who attended that day
19  what would happen if they did?
20      A. No.
21      MS. WILLIAMS: Objection.
22      A. No. And I saw absolutely no reason to do

Page 108

1  that. The Treasury -- this is a unique group of
2  reporters. I said this earlier and I'm going to
3  say it again. They don't want to -- it is career
4  threatening to break an embargo. Not just -- it's
5  not just a question of what I would do to them,
6  it's what their news organizations would do to
7  them. You know, none of these news organizations
8  would tolerate a reporter who breaks embargoes.
9      BY MR. THEODOROU:
10      Q. My question is, to your knowledge, did
11  anybody at Treasury address everybody attending
12  what would happen if the embargo was broken?
13      A. No.
14      Q. Okay. What steps did you take to ensure
15  that everybody who attended the refunding
16  conference in May 2001 understood what would happen
17  if the embargo was broken? I'm talking about
18  everybody. Not one particular person you talked to
19  or one discussion or a couple of reporters, but the
20  people, everybody attending that conference.
21      MS. WILLIAMS: Objection.
22      A. I'd take the step of announcing that an

Page 109

1  embargo -- that an embargo is in effect. And I
2  would see it no different than -- I don't see the
3  necessity when you put, you know, a speed limit
4  sign up on the highway to also state what the
5  penalties are for exceeding the speed limit. I
6  know what the speed limit is, and reporters know
7  what an embargo is.
8      BY MR. THEODOROU:
9      Q. But there's a record of people, when people
10  are driving there's a record that they have driver
11  education programs.
12      A. Um-hmm.
13      Q. In this case, did the reporters get training
14  on what the embargoes were about so you knew that
15  all reporters, veterans and cub reporters alike,
16  understood that?
17      MS. WILLIAMS: Objection.
18      A. I would consider it -- I would consider it
19  on-the-job training. But, again, like I said
20  earlier, you're talking about solutions in search
21  of a problem. I haven't had a problem prior or
22  since of reporters exceeding the speed limit, so to

28 (Pages 106 to 109)

Anthony Fratto                                                              August 30, 2006
Washington, DC

| Page 110 |
|---|
| 1  speak, of breaking an embargo.  There's absolutely |
| 2  no evidence of it.  And so I don't -- didn't then |
| 3  and I certainly don't today see the need at every |
| 4  press event where we employ an embargo, which is a |
| 5  daily occurrence, to cite the potential penalties |
| 6  if the embargo is broken. |
| 7     BY MR. THEODOROU: |
| 8     Q. Did Treasury obtain the consent from |
| 9  everybody attending the conference that they would |
| 10  abide by the embargo? |
| 11     A. No. |
| 12     Q. Now, directing your attention to October |
| 13  31st, 2001.  You attended that refunding |
| 14  conference.  Correct? |
| 15     A. Yes. |
| 16     Q. Now, did Elizabeth Holahan ask the attendees |
| 17  at that press conference whether they agreed to |
| 18  honor the 10:00 a.m. embargo that day? |
| 19     A. No.  She simply announced the embargo time |
| 20  twice. |
| 21     Q. Did she require the attendees to sign a form |
| 22  stating that or any document that they would honor |

| Page 111 |
|---|
| 1  an embargo? |
| 2     A. No.  We relied on their ethical |
| 3  responsibilities. |
| 4     Q. So that Treasury officials assumed that the |
| 5  attendees would honor whatever embargo time was |
| 6  announced.  Correct? |
| 7     A. Yes. |
| 8     MS. WILLIAMS:  Objection. |
| 9     BY MR. THEODOROU: |
| 10     Q. So as of October 31st, 2001, reporters were |
| 11  governed by an honor system not to release |
| 12  information before the embargo time expired? |
| 13     MS. WILLIAMS:  Objection. |
| 14     A. Is that an honor system?  I don't know. |
| 15     BY MR. THEODOROU: |
| 16     Q. But they were self -- |
| 17     A. They were self-enforcing. |
| 18     Q. Self-enforcing. |
| 19     A. Yeah. |
| 20     Q. Now, you testified you were not aware of any |
| 21  instance before October 31st in which an embargo at |
| 22  Treasury was violated? |

| Page 112 |
|---|
| 1     MS. WILLIAMS:  Objection. |
| 2     A. Willfully violated.  Before October 31st? |
| 3  No, the only event that I really recall was |
| 4  subsequent to October 31st. |
| 5     BY MR. THEODOROU: |
| 6     Q. Apart from willfully, do you remember -- |
| 7  prior to October 31st, 2001, do you remember any |
| 8  instance of a premature disclosure of information |
| 9  from a press conference at Treasury? |
| 10     MS. WILLIAMS:  Objection. |
| 11     A. An event was brought to my attention, but I |
| 12  wasn't -- I didn't have first-hand experience with |
| 13  it. |
| 14     BY MR. THEODOROU: |
| 15     Q. What, so there was an event brought to your |
| 16  attention where an embargo had been violated? |
| 17     MS. WILLIAMS:  Objection. |
| 18     A. I couldn't make a judgment whether the |
| 19  embargo was violated.  I was asked -- I think I was |
| 20  asked yesterday about an event involving our deputy |
| 21  secretary Ken Dam, and in your letter specific date |
| 22  referring to October 22nd, it was mentioned.  I |

| Page 113 |
|---|
| 1  haven't had any first-hand knowledge or experience |
| 2  with that.  If I have, I'm just not aware.  It |
| 3  wasn't an issue area that was in my jurisdiction at |
| 4  that time. |
| 5     Q. Before the October 31st conference, did the |
| 6  issue regarding Mr. Dam's press conference, was |
| 7  that brought to your attention? |
| 8     A. Before October 31st? |
| 9     Q. Before October 31st, 2001. |
| 10     A. I have no recollection of that. |
| 11     Q. I will see if it refreshes your |
| 12  recollection. |
| 13     A. Okay. |
| 14     Q. If it does, it doesn't. |
| 15     MR. THEODOROU:  Could we go off the record |
| 16  just a second? |
| 17     THE VIDEOGRAPHER:  Off the record at |
| 18  12:46:43. |
| 19     (Recess taken.) |
| 20     THE VIDEOGRAPHER:  On the record at |
| 21  1:25:522. |
| 22     BY MR. THEODOROU: |

29 (Pages 110 to 113)

Anthony Fratto                                                    August 30, 2006
                              Washington, DC

---

Page 114

1   Q. Before October 31st, 2001, did you ever
2   revoke the credentials of any member of the press
3   for violating an embargo?
4   A. No.
5   Q. Do you know if any Treasury Department
6   official revoked the credentials of any member of
7   the press for violating an embargo before October
8   31st, 2001?
9   A. Only -- unless there was some violation of
10  law. Only the Office of Public Affairs can do
11  that. So, I mean, of course it's a building where
12  you need to go through a security check to get in,
13  so there are instances where there are some
14  reporters who can't get cleared in the building.
15  That's not the same as revoking their credentials,
16  but they can't get credentials to get in.
17  Q. Before we broke earlier, did you testify
18  that you were not aware of a situation before
19  October 31st, 2001, in which market sensitive
20  information was prematurely released by Treasury?
21  A. I think -- I can't testify to whether it was
22  market sensitive or not. I don't have any

---

Page 115

1   knowledge of that. It was mentioned yesterday of
2   this event, and I think I noted it was mentioned in
3   your letter of the October 22nd date. And I don't
4   have any memory of that. I don't recall being
5   informed about it.
6   Q. And this was Kenneth Dam's press conference?
7   A. That's what I was told. Yeah.
8   Q. And you don't recall any of the specifics of
9   what happened with Kenneth Dam?
10  A. No.
11  Q. All right.
12  A. I didn't handle Ken Dam's press. Rob
13  Nichols did. And so anything that would have
14  occurred, he would have dealt with. I wouldn't
15  have dealt with it.
16  (FRATTO Exhibit Number 5 was marked for
17  identification.)
18  BY MR. THEODOROU:
19  Q. Let me direct your attention to Exhibit 5,
20  which we just marked. Mr. Fratto, have you seen
21  this news story before today?
22  A. I don't remember seeing this before.

---

Page 116

1   Q. Why don't you take a look at it.
2   A. Okay.
3       Okay.
4   Q. Do you recall ever seeing this article?
5   A. I don't remember seeing it. There were lots
6   of things written.
7   Q. Directing your attention to the last
8   paragraph of Exhibit 5, do you see that where it
9   starts off with Barclays' Roberts?
10  A. Yeah.
11  Q. It says Barclays' Roberts recalled a similar
12  flap earlier this month when the Treasury decided
13  to flood the market with more ten-year notes to
14  ease a liquidity log jam caused by failed trades
15  after the September 11th attacks on Washington and
16  New York.
17      And then it quotes Mr. Roberts, "when they
18  did the reopening of the ten-year, there was
19  advance information on the street. There's advance
20  information here, and so there are a number of
21  people on the street who are pretty upset about
22  it," Roberts said. And when he talks about "here,"

---

Page 117

1   he's referring to the October 31st -- what happened
2   on October 31st.
3   A. Um-hmm.
4   Q. Do you recall this, were you aware of this
5   issue on advanced information getting out before
6   Treasury's intermediate issuance of ten-year notes
7   on October 4th, 2001?
8       MS. WILLIAMS: Objection.
9   A. I recall -- I recall the fact that we were
10  reopening the ten-year to deal with this liquidity
11  situation.
12      BY MR. THEODOROU:
13  Q. So --
14  A. But --
15  Q. I'm sorry.
16  A. Go ahead.
17  Q. So you recall the Treasury was doing an
18  intermediate issuance of ten-year notes in October
19  2001?
20  A. Yes. And the reasons for that. And,
21  actually, I do recall some chatter about, you know,
22  that some people thought that there was advanced

---

Alderson Reporting Company
1-800-FOR-DEPO

Anthony Fratto                                                    August 30, 2006
                              Washington, DC

| Page 118 | Page 120 |
|---|---|
| 1  notice, that there was -- that some people knew | 1  Q. And this is a Bloomberg report. Correct? |
| 2  about it. | 2  A. Yep. |
| 3      I should say, though, that, you know, market | 3  Q. So it's talking about the events of October |
| 4  rumors are out there every day. I mean, you can go | 4  31st, 2001. Do you want to take a look at the |
| 5  and check Reuters stories today and you will see | 5  document? |
| 6  market rumors on something that we may or may not | 6  A. Sure. |
| 7  be doing. | 7      Okay. |
| 8  Q. And you say you recall chatter of advanced | 8  Q. Directing your attention to the middle of |
| 9  information. | 9  the page where it starts off, the paragraph: |
| 10  A. After the announcement. | 10  Treasury officials declined to comment on the early |
| 11  Q. After the announcement? | 11  release other than to confirm it occurred. |
| 12  A. Yeah. | 12      Do you see that paragraph? |
| 13  Q. And how did you learn about this chatter? | 13  A. Yes. |
| 14  A. I think probably just seeing it in stories | 14  Q. All right. Now, the story deals with the |
| 15  like this. | 15  events of October 31st. Correct? |
| 16  Q. Do you know if Treasury did an investigation | 16      MS. WILLIAMS: Objection. |
| 17  as to whether information was prematurely | 17  A. I think that paragraph refers to October |
| 18  disclosed? | 18  31st. |
| 19  A. I don't know. | 19      BY MR. THEODOROU: |
| 20  Q. Do you know whether Treasury changed any of | 20  Q. Right. In fact, the lead sentence of the |
| 21  its procedures regarding the release of market | 21  story is: The U.S. Treasury Department |
| 22  sensitive information after the intermediate | 22  inadvertently leaked the decision to eliminate the |

| Page 119 | Page 121 |
|---|---|
| 1  issuance of the ten-year notes? | 1  30-year bond by posting it on the Treasury Internet |
| 2  A. Not that I'm aware of. | 2  Web site about 20 minutes ahead of the scheduled |
| 3      (FRATTO Exhibit Number 6 was marked for | 3  release time. Correct? The first sentence? |
| 4  identification.) | 4  A. That is what the first sentence says. |
| 5      BY MR. THEODOROU: | 5  Q. It's the lead sentence? |
| 6  Q. Mr. Fratto, I'm showing you what's been | 6  A. That's what the lead of the article says. |
| 7  marked as Exhibit 6. Have you seen this document | 7  Q. All right. |
| 8  before? | 8  A. I would object to the word "leak." |
| 9  A. It's the same thing. It's possible that I | 9  Q. But the first sentence of the article -- |
| 10  read it at the time, but I don't have any | 10  A. That's what it says. |
| 11  recollection of it. | 11  Q. And that first sentence refers to the events |
| 12  Q. Was this one of the documents -- do you | 12  of October 31st? |
| 13  recall whether the SEC showed this to you in your | 13  A. Yes. |
| 14  meetings? | 14  Q. And the date of this Bloomberg article is |
| 15  A. I'm certain that they did not. | 15  October 31st? |
| 16  Q. And the topic at the top says: U.S. | 16  A. Right. |
| 17  Treasury Leaks Decision to End 30-Year Bond on Web | 17  Q. And this article came out on -- rather, this |
| 18  Site. | 18  was issued approximately at 4:53 that day in the |
| 19      Do you see that? | 19  afternoon on October 31st? |
| 20  A. I do see that. | 20  A. Right. |
| 21  Q. And the date is October 31st, 2001? | 21  Q. Now, if you look at the paragraph I just |
| 22  A. Yep. | 22  directed your attention to, which says: Treasury |

August 30, 2006

Anthony Fratto

Washington, DC

Page 122

1  officials declined to comment on the early release
2  other than to confirm it occurred. It was the
3  second time the Department has posted embargoed
4  information on the Web site before it was scheduled
5  to enter the public domain.
6      Do you see that?
7  A. Yes.
8  Q. Then it says: On October 22nd, the Treasury
9  posted remarks by Deputy Secretary Kenneth Dam
10 almost an hour before he spoke about the
11 government's efforts to curb terrorist financing.
12     Do you see that?
13 A. I do.
14 Q. Now, does that refresh your recollection at
15 all about the incident on October 22nd?
16 A. Only a bit. Only -- I mean, the only
17 information it gives me more is that it was on
18 terrorist financing. But I don't recall firsthand
19 having dealt with it at all.
20 Q. So you did not have any involvement in
21 coordinating that event?
22 A. None at all.

Page 123

1  Q. And who at Public Affairs was involved with
2  this event?
3  A. That would have been Rob Nichols, who -- Rob
4  Nichols at the time was the deputy assistant
5  secretary for public affairs. And at that time the
6  deputy assistant secretary for public affairs
7  handled all the media relations for the deputy
8  secretary exclusively, unless he was on vacation or
9  something.
10 Q. Other than hearing about this Kenneth Dam
11 incident yesterday, you don't have any independent
12 recollection of this incident?
13 A. No.
14 Q. So you don't know why Dam's remarks were
15 subject to an embargo?
16 A. It's not unusual to have any, to have -- you
17 know, like I said, all of our documents subject to
18 some form of embargo. A speech. You know, for a
19 speech, you would -- here's what's customary and
20 usual for a speech, is we would give a speech to
21 the pressroom an hour before. A speech being a
22 much longer document than, say, a short statement.

Page 124

1  The pressroom would get it an hour beforehand, and
2  so they would have an hour to digest the speech and
3  produce their stories. And the speech would be --
4  you could do it different ways. You could say
5  embargoed until a certain specific point in time,
6  you could say embargoed until the principal begins
7  to speak, so embargoed until the start of the
8  event. You know, that's the most usual way of
9  doing it.
10 Q. Would someone from your office have
11 coordinated this event?
12 A. It would have been Rob. I mean, I don't
13 know for a fact that he did that, but -- actually,
14 it's possible that Tasia Skalinos was involved,
15 too, just noting it involved terrorist financing,
16 she handled enforcement, so it's possible that
17 Tasia was involved, also, but I don't have any --
18 Q. And at the time did Skalinos report to you?
19 A. She did. Yeah.
20 Q. It states here that, on October 22nd, the
21 Treasury posted remarks by Deputy Treasury
22 Secretary Kenneth Dam almost an hour before he

Page 125

1  spoke about the government's efforts to curb
2  terrorist financing.
3      Who at Treasury was responsible for putting,
4  or would have been responsible for putting Mr.
5  Dam's remarks on the Web site?
6  A. I can only say most likely it would have
7  been Frances Anderson. But I don't know that for
8  certain.
9  Q. And who was Frances Anderson?
10 A. She's an administrative staffer in our
11 office. I think you guys have deposed her already
12 on this case.
13 Q. Have you read her testimony?
14 A. No.
15 Q. Have you read the testimony of any witnesses
16 in this case?
17 A. No.
18 Q. She's an administrative staffer. And how do
19 you know she was deposed in this case?
20 A. How do I know? She told me.
21 Q. When did she tell you?
22 A. Whenever it was scheduled.

32 (Pages 122 to 125)

Anthony Fratto                                                          August 30, 2006
Washington, DC

| Page 126 | Page 128 |
|---|---|

**Page 126**

1   Q. Because Mrs. Anderson still works under you?

2   **A. She does. Yeah.**

3   Q. And as her supervisor she would tell you?

4   **A. I'm not her direct -- she doesn't directly**

5   **report to me. There are a couple steps. But she**

6   **told me she was going to be deposed for this.**

7   Q. Did she testify, did she say anything about

8   her testimony?

9   **A. No. I didn't ask her and she didn't tell**

10   **me.**

11   Q. Now, was she in charge in October of 2001 of

12   posting information on the Web site for the press

13   office?

14   **A. Yes.**

15   Q. So it is likely that she posted Kenneth

16   Dam's remarks on the Web site?

17   **A. Yeah.**

18   MS. WILLIAMS: Objection.

19   **A. I would say it's likely. But, like I said,**

20   **repeating, I have no knowledge that she did or**

21   **didn't on that particular day.**

22   BY MR. THEODOROU:

**Page 127**

1   Q. Do you know whether an investigation was

2   conducted about the Dam incident?

3   **A. I don't know.**

4   Q. To your knowledge, did Treasury change its

5   embargo procedures after this incident, the Dam

6   incident?

7   **A. Not to my knowledge. No.**

8   Q. Now, after October 31st, 2001 --

9   **A. It would have nothing to do with the embargo**

10   **procedures. But.**

11   Q. Why is that?

12   **A. Well, an embargo applies to reporters. In**

13   **this case, if this is what happened, it was the**

14   **Treasury Department, you know, releasing**

15   **information, not -- it had nothing to do with**

16   **whether -- of the activities of reporters.**

17   Q. This was the Treasury Department prematurely

18   releasing his speech?

19   **A. Right.**

20   MS. WILLIAMS: Objection.

21   **A. Apparently.**

22   BY MR. THEODOROU:

**Page 128**

1   Q. So in this case, what allegedly happened was

2   there was a premature release of his speech before

3   he gave it.

4   MS. WILLIAMS: Objection.

5   BY MR. THEODOROU:

6   Q. Correct?

7   **A. That's what I'm told.**

8   Q. Now, after the October 31st, 2001 refunding

9   conference, did Treasury take any steps to change

10   its embargo procedures?

11   **A. We took a step to change how the quarterly**

12   **refunding announcements are carried out.**

13   Q. All right. Before we get to that, all

14   right, did Treasury make any change to its -- you

15   testified about how you conducted the May, 2001,

16   conference, and you testified about the August 2001

17   conference, and you testified about your

18   discussions with various reporters. Do you

19   remember that?

20   **A. I do.**

21   Q. About the embargo. Now, did Treasury make

22   any changes to embargo procedures for the October

**Page 129**

1   31st, 2001 press conference?

2   **A. No. Oh, other than to -- in that case, to**

3   **state an embargo time prior to the press**

4   **conference.**

5   Q. And what was the embargo time that was

6   stated?

7   **A. 10:00 a.m. on October 31st.**

8   Q. And what time was the press conference

9   supposed to start?

10   **A. It was supposed to start at 9:00 a.m.**

11   Q. Who at Treasury was responsible for setting

12   the embargo time at 10:00 a.m.?

13   **A. Me.**

14   Q. And why did you set it at 10:00 a.m. that

15   day, rather than going through the polling of the

16   reporters?

17   **A. Because, obviously going into it, once I**

18   **learned that we had a relatively major**

19   **announcement, I had presumed that reporters would**

20   **have -- would, number one, have lots of questions**

21   **and, number two, would want to be especially**

22   **careful of how they reported the news; that this**

33 (Pages 126 to 129)

Anthony Fratto                                                    August 30, 2006
Washington, DC

Page 130

1  was obviously a unique announcement, and I wanted
2  to make sure, A, that they had enough time to, you
3  know, ask questions at the press conference,
4  thoroughly consume the news that they were getting,
5  and write thoughtful -- write thoughtful stories.
6  And, if they had any questions -- you know, it's
7  not unusual for after a press conference or the
8  release of information that the reporters, they get
9  down to their desks, they get down to their desk
10 and get into writing and they realize they have got
11 two or three questions on the news you just gave
12 them.
13     In this case, for example, they might ask
14 was it -- I mean, it wasn't the case, but, you
15 know, had 30-year ever been discontinued before?
16 They would want a little historical data to add
17 into their stories, things like that. So I wanted
18 to make sure going into this that they had enough
19 time on this important piece of news to write good
20 accurate stories, and so I wanted to make sure they
21 got that amount of time.
22     Q. And when did you decide it was going to be

Page 131

1  at 10:00 a.m.?
2     A. It was late the previous week.
3     Q. Did you discuss the issue of setting the
4  time with anybody?
5     A. Yes. I discussed it with -- discussed it
6  with Betsy. I discussed it with -- I certainly
7  discussed it with Peter Fisher. And there were
8  certainly others in the room when we had that
9  discussion, most likely Brian Roseborough and/or
10 Tim Bitsberger or Jeff Luther, maybe Paul Malvey.
11 I don't recall who else was in the room, but I know
12 there were others in the room and that's the likely
13 group that would have been there.
14     Q. Was there one discussion with the group?
15     A. There was at least one discussion. There
16 may have been more. I don't remember specifically.
17     Q. All right. And what was said in that
18 discussion?
19     A. Well, Peter -- Peter first had the idea that
20 he wanted to have the press conference be live web
21 cast. And I objected to that. I thought that, you
22 know, we already have a fairly sizeable piece of

Page 132

1  news here. I don't think we should try to be --
2  you know, let's not try to break ground everywhere.
3  You know, the time to try new things with
4  established events like a quarterly press
5  conference was not when you have a major piece of
6  news because you are just increasing the risk that
7  something could go wrong. And I never had a whole
8  lot of faith in the ability of Treasury's Internet
9  infrastructure to carry off a web cast in a timely
10 way. So I thought it was a bad idea and argued
11 against it. And I thought we should actually go,
12 you know, far more conservative to the other, on
13 the other extreme, which was what I in the end
14 advocated and what we agreed to, which was to set a
15 hard and fast time for lifting the embargo for all
16 the reasons I just said earlier.
17     Q. When you had this discussion with Mr.
18 Fisher, how did having a live web cast increase the
19 chances of something going wrong?
20     A. Well, I mean, most obviously, you know, we
21 have a history at Treasury of servers going down.
22 You know? I mean, it wasn't a particularly

Page 133

1  reliable Internet infrastructure at Treasury, and I
2  didn't have faith that we'd get to 10 minutes
3  before the press conference and someone from the IT
4  office would call up and say, you know, we can't
5  web cast it, or there's going to be a delay, or the
6  server went down. Something like that. And I
7  wanted us to be, you know, tried and true,
8  reliable, give the news to actual human beings who
9  will get the news out the normal, you know, the
10 normal way. The only change was to give them, you
11 know, more time in a hard set embargo.
12     Q. And your concern was that those who attended
13 the conference would have a leg up on others who
14 may be watching it in the general public if there
15 was something wrong with the web cast?
16     MS. WILLIAMS: Objection.
17     A. No.
18     BY MR. THEODOROU:
19     Q. What does the Internet have to do with it,
20 the Internet being down, if you are having a live
21 press conference on TV?
22     A. He was asking about web casting it, not

34 (Pages 130 to 133)

Anthony Fratto                                             August 30, 2006

Washington, DC

Page 134

1  doing a live --
2      Q. Okay.
3      A. And that would have been an additional
4  problem. He said, well, why -- he said, well,
5  can't we go, can't we just go live? And I said --
6  and in that case it would be broadcast on TV. And
7  I said, "Peter, I can't guarantee that --" you
8  know, the only usual suspects on the TV side that
9  would consider coming to cover a quarterly
10  refunding announcement, you know, would have been
11  Bloomberg, CNBC, you know, maybe Reuters. I would
12  have to ask them, do you plan on going live? And
13  they would say, is he going to make news? And I'd
14  say, I can't tell you. And then you get into a
15  very tricky discussion that I definitely don't want
16  to have. I don't want to tip TV guys that we might
17  be making special news at a quarterly refunding
18  announcement, so I can't talk them into covering
19  events. So I couldn't guarantee to Peter that it
20  would be covered live. The only way you could
21  guarantee that it would be broadcast live would be
22  in the form of a web cast, but I didn't have good

Page 135

1  confidence in the reliability of web casting.
2      Q. Because of the Treasury's Internet
3  facilities?
4      A. Yeah.
5      THE VIDEOGRAPHER: This concludes tape two
6  in the deposition of Tony Fratto. Off the record
7  at 1:48:53.
8      (Brief recess taken.)
9      THE VIDEOGRAPHER: This begins tape three in
10  the deposition of Tony Fratto. On the record at
11  1:49:30.
12      BY MR. THEODOROU:
13      Q. Why was October 31st different than the May
14  and August press conference, quarterly refunding
15  press conferences where you had to set a time, as
16  opposed to polling the reporters?
17      A. The news, you know, that we were
18  discontinuing the 30-year bond. That it was
19  definitely -- you know, I knew that. I knew that
20  it was going to be bigger news than, you know --
21  you know, a quarterly refunding press conference is
22  a relatively sleepy affair. It's not usual that

Page 136

1  you find much news there.
2      Q. And why did Mr. Fisher want to go live?
3      A. Peter had been looking at -- Peter comes
4  from, had been up at the New York Fed and had a
5  high degree of interest in trying to find ways to
6  increase efficiency in markets, and one of the ways
7  that you increase efficiency in markets is by
8  reducing the time span in terms of information and
9  transmission of information. So, for example, on
10  the auction results, there was, there had been, you
11  know, time lags. You have to think about the size
12  of these markets and the margins that traders are
13  dealing with. You know, you would get auction
14  results, and sometimes it would take four or five
15  minutes to get from the closing of an auction to
16  get the results published. And Peter worked to
17  find ways to squeeze that down to one to two
18  minutes. He would like to make it instantaneous.
19  So any way that you can find to get instantaneous
20  news to the market in the most transparent way
21  possible, that's something that Peter had a high
22  degree of interest in and just felt it would

Page 137

1  improve market efficiency.
2      Q. Did he have any concern that there would be
3  a release, a premature release of the information
4  discussed at the press conference before the
5  embargo?
6      MS. WILLIAMS: Objection.
7      A. I don't recall him expressing that to me.
8      BY MR. THEODOROU:
9      Q. And what was his response to your proposal?
10      A. In the end he agreed. I mean, he made this
11  philosophy of his, you know -- I was well aware, I
12  spent a lot of time with Peter and I knew that
13  that's what his reasoning was. But I just told him
14  that, in my judgment, it wasn't worth the risk. It
15  just wasn't -- you know, we don't -- if we want to
16  do that, let's do it, but let's do it over some
17  period of time. Let's do it over the next three
18  quarterly refundings, you know, where we -- you
19  know, at one quarterly refunding we say we are
20  considering doing a live web cast. You know? Four
21  months later at the next quarterly refunding we
22  say, at the next quarterly refunding we will web

35 (Pages 134 to 137)

Anthony Fratto                                                                August 30, 2006
Washington, DC

---

Page 138

1  cast. And then on the third quarterly refunding,
2  we actually web cast. And then that way, number
3  one, it gives us a lot of time to make sure that we
4  have a rigorous infrastructure to be able to
5  reliably web cast; and, number two, you tell the
6  markets what to expect and they have a lot of time
7  to know how, you know, how to expect news to come
8  to them. And, you know, so I just wanted us to be
9  cautious about doing big changes, and I just did
10 not think that it was appropriate to try to do a
11 major change when we were also making major news.
12 It just wasn't worth the risk.
13    Q. Was your concern -- well, given your
14 concerns about the Internet capability at Treasury,
15 was your concern that something could have gone
16 wrong with the web cast, and at the same time you
17 were releasing information to reporters who would
18 then have advanced information compared to the
19 general public?
20    A. Reporters always have advanced information
21 ahead of the general public. It's their job; we
22 rely on them to disseminate news to the general

---

Page 139

1  public. So I didn't have a concern about that. In
2  fact, I relied -- when I say, I really mean this.
3  I rely on the Treasury press corps to disseminate
4  news to the markets and the general public. I have
5  much more confidence in that part of dissemination
6  than I do on the web page dissemination. Everyone
7  who has a Web site that they deal with knows that,
8  you know, at the most unpredictable times you have
9  problems with the web page. So I'm not ready and I
10 certainly wasn't ready in the year 2001, I'm not
11 even sure I'm ready in the year 2006 to say I can
12 put full faith and confidence in Internet
13 infrastructure to get that information out on a
14 precise time. We're not there yet.
15    Q. Especially after what happened in October
16 2001.
17    MS. WILLIAMS: Objection.
18    A. No. I mean, that had nothing to do with it.
19 That was human error, that wasn't even
20 infrastructure error. There is lots of
21 infrastructure error. I have seen infrastructure
22 error with our web platform. But that was human

---

Page 140

1  error. You know? And that human error is going to
2  happen.
3    BY MR. THEODOROU:
4    Q. But I guess my question is, my question is,
5  you had concerns about their ability that -- their
6  Internet capability and, therefore, they might not
7  be able to web cast at the same time. So he would
8  be doing a live press conference to a group of
9  reporters and people attending the conference. And
10 if the web cast couldn't go out, so what? What
11 difference would that make?
12    MS. WILLIAMS: Objection.
13    A. We would have raised expectations that you
14 will find the news on the web cast, and then they
15 wouldn't see it. That was the risk.
16    BY MS. THEODOROU:
17    Q. So it wasn't an issue of market sensitive
18 information getting out ahead?
19    A. No.
20    Q. Okay.
21    A. No. Not at all.
22    Q. Did Mr. Fisher, was Mr. Fisher -- how many

---

Page 141

1  discussions did you have about this issue with Mr.
2  Fisher?
3    A. Just, I mean, no more than two.
4    Q. Was Mr. Fisher concerned about the danger
5  that that information might leak out before 10:00
6  a.m.?
7    MS. WILLIAMS: Objection.
8    A. You would have to ask him. If he was, he
9  didn't express it to me.
10    BY MR. THEODOROU:
11    Q. So Mr. Fisher did not express a concern
12 about the leaking out of information?
13    A. Not that I recall.
14    Q. If you could go to Exhibit 1, Mr. Fratto.
15    A. Okay.
16    Q. Page 2, the second paragraph. Do you see
17 that?
18    A. Yes.
19    Q. Now, when did you first learn about the
20 decision to suspend the 30-year bond?
21    A. That sounds about right. I recall it being
22 on Thursday, the 26th.

---

36 (Pages 138 to 141)

Anthony Fratto                                            August 30, 2006
Washington, DC

| Page 142 | Page 144 |
|---|---|

**Page 142**

1  Q. And it says: Fratto said he first heard the
2  decision to suspend sales of the 30-year bond on
3  Thursday, October 26, 2001.
4     Do you see that?
5  A. Yes, sir.
6  Q. And you remember talking to OIG about that
7  date?
8  A. Vaguely. Yeah.
9  Q. Why were you so accurate with the date that
10 you learned about it on Thursday, October 26, 2001?
11    MS. WILLIAMS: Objection.
12 A. Probably just it was fresh in my mind at the
13 time.
14    BY MR. THEODOROU:
15 Q. Okay. When did you first learn that Under
16 Secretary Fisher was going to deliver his remarks
17 at the refunding conference?
18 A. It was around that time. It was probably
19 the same day.
20 Q. How did you learn about the decision to
21 suspend the 30-year bond?
22 A. Peter invited me into his office and told

**Page 143**

1  me.
2  Q. Was anybody else there?
3  A. There might have been. I don't remember.
4  Q. What did he say?
5  A. He said, we're going to have an important
6  announcement at this next quarterly refunding.
7  That we will, you know, we'll be discontinuing the
8  issuance of the long bond. And I, you know,
9  immediately knew that that was a big deal.
10 Q. Why was that?
11 A. The market loves the long bond. I mean,
12 it's a big deal. It's a big deal.
13 Q. And why does the market love the long bond?
14    MS. WILLIAMS: Objection.
15 A. You could talk to market participants. But
16 they base a lot of things on the interest rate. A
17 lot of things are based on the interest rate
18 associated with the 30-year bond.
19    BY MR. THEODOROU:
20 Q. Was anybody else present at that meeting?
21 A. There might have been. I'm sure there were,
22 I just don't remember who specifically was there.

**Page 144**

1  Q. Was it the same meeting at which the embargo
2  time was discussed or decided upon?
3  A. No. It was a subsequent meeting.
4  Q. Other than your knowledge -- strike that.
5     Did Mr. Fisher say anything about whether
6  this is market sensitive information?
7  A. I don't know whether he did or didn't. But
8  he certainly didn't have to. I knew that it was.
9  Q. Given that you knew that it was, did you
10 discuss with Mr. Fisher about taking special
11 precautions so that this information would not be
12 disclosed ahead of the embargo time?
13    MS. WILLIAMS: Objection.
14    MR. THEODOROU: What's the objection?
15    MS. WILLIAMS: Form as to what he said.
16    MR. THEODOROU: What form? It's a
17 foundation question.
18 A. I'm sorry. The question was whether I
19 discussed with him?
20    BY MR. THEODOROU:
21 Q. Did you at this meeting, did you discuss
22 with Mr. Fisher the issue of taking special

**Page 145**

1  precautions at the quarterly refunding press
2  conference so that the information would not be
3  disclosed ahead of any embargo time?
4     MS. WILLIAMS: Objection.
5  A. I dealt with market sensitive information
6  with Peter Fisher and others at Treasury on a daily
7  basis. No one would have had to have had that
8  conversation with me.
9     BY MR. THEODOROU:
10 Q. After you learned that the suspension of the
11 long bond would be discussed at this quarterly
12 refunding press conference, did you ever warn any
13 employees at Treasury to be particularly careful on
14 how they handled that information?
15    MS. WILLIAMS: Objection.
16 A. I had the conversation with Betsy Holahan.
17 And I do remember specifically saying that this is
18 big news and, you know, we just need to be careful
19 with it.
20    BY MR. THEODOROU:
21 Q. So you do recall discussing it with
22 Ms. Holahan what was going to be discussed at the

Alderson Reporting Company
1-800-FOR-DEPO

**Page 146**

1  quarterly refunding press conference?

2  A. Yes. And Betsy was -- I don't know when

3  exactly Betsy learned of this, whether -- I can't

4  recall whether she learned it first from me or if

5  she'd learned it separately from Peter or someone

6  else in domestic finance. But we did have a

7  conversation about it.

8  Q. And would you please describe the substance

9  of the conversation.

10  A. I'm pulling on a thin thread of memory on

11  that conversation. I remember talking about the

12  fact that we were going to have to, you know, just

13  make sure that we are -- you know, that things go

14  right at the press conference, things go right with

15  the announcement. That we should try to be clear

16  on things. I think that may have been actually

17  when I first raised the idea of setting a specific

18  time. I don't know whether I had thought about

19  10:00 or not, setting a specific time to lift the

20  embargo.

21  Q. Did you discuss -- outside of Ms. Holahan,

22  did you discuss the issue of -- strike that.

**Page 147**

1  You remember talking to Ms. Holahan about

2  setting a particular time?

3  A. I definitely did. Yeah. And I'm sure we

4  talked about it numerous times.

5  Q. Did you talk to her about the sensitivity of

6  the information?

7  A. Yes. But like me, she was aware of the

8  sensitivity of the information.

9  Q. What did you say?

10  A. I think what I just said. I, said this is

11  pretty big news, and so, you know, be careful and

12  we can't let this out. You know, no one can know

13  about this.

14  Q. Did you have such a conversation with any

15  other Treasury employees?

16  A. You know, I was asked about that previously,

17  and I would be very, very surprised. I mean, I

18  don't have specific recollection of it but I would

19  be surprised if I didn't have this conversation

20  with Michele Davis. But I don't remember actually

21  doing it. But it would be hard to going back to

22  that time. I don't believe I would, you know, be

**Page 148**

1  doing this press conference without having a

2  conversation with Michele.

3  Q. But you don't recall?

4  A. I don't believe a specific conversation. I

5  just don't.

6  Q. Do you recall whether you had such a

7  conversation with any other employees besides

8  Betsy?

9  A. Yeah. I mean, yes. Those policy staffers

10  in the office of market finance. People like Paul

11  Malvey, Jeff Hoother, Brian Roseborough and Tim

12  Bitsberger. Yeah, I definitely discussed it with

13  those guys.

14  Q. Did you have such a conversation with

15  Frances Anderson?

16  A. No.

17  Q. Do you know if Ms. Holahan had a discussion

18  with Frances Anderson?

19  A. I don't know.

20  Q. Do you know if Ms. Holahan had any

21  discussion with any other employees about the

22  sensitivity of this information?

**Page 149**

1  A. I don't know.

2  Q. And why were you discussing it with her?

3  A. With Betsy?

4  Q. Yes.

5  A. This was her portfolio.

6  Q. I know you're assuming that I know.

7  A. I understand.

8  Q. But it's sort of like, unlike the press

9  conferences, I can ask.

10  A. I understand.

11  Q. So I know you're assuming that I know, but

12  why did you discuss it with Betsy?

13  A. This was going to be the first refunding

14  announcement that she was going to handle the press

15  conference. This was her portfolio, domestic

16  finance.

17  Q. Do you have any notes of your meeting with

18  Mr. Fisher discussing the embargo time?

19  A. No.

20  Q. Do you have any notes of your meetings with

21  Mr. Fisher talking about the quarterly refunding

22  conference of October 31?

38 (Pages 146 to 149)

Anthony Fratto                                                          August 30, 2006
Washington, DC

| Page 150 | Page 152 |
|---|---|
| 1   **A. No.** | 1   exactly proof, but it's got the PO. This is a |
| 2   Q. Do you have any notes? | 2   tracking number. This is the Paul O' Neal 746. |
| 3   **A. I don't keep notes. I don't have any notes.** | 3   Q. The left-hand corner of the document is |
| 4   Q. So you don't have any notes about your | 4   PO-746. What does that mean? |
| 5   discussion with Ms. Holahan? | 5   **A. That means that Frances Anderson took a** |
| 6   **A. No.** | 6   **draft and added what we call -- we called back then** |
| 7   THE VIDEOGRAPHER: Off the record at | 7   **the PO number, and which means that she would have** |
| 8   20:04:29. | 8   **done the rest of the activity with it which to post** |
| 9   (Brief recess taken.) | 9   **it and disseminate it.** |
| 10   THE VIDEOGRAPHER: On the record at 2:07:35. | 10   Q. What does PO stand for? |
| 11   (FRATTO Exhibit Number 7 was marked for | 11   **A. Paul O' Neal.** |
| 12   identification.) | 12   Q. Who is the Treasury Secretary? |
| 13   BY MR. THEODOROU: | 13   **A. Was the Treasury Secretary at the time. So** |
| 14   Q. Mr. Fratto, directing your attention to | 14   **we had a JWS number and now we have an HNP number** |
| 15   what's been marked as Exhibit 7. Have you seen | 15   Q. So -- |
| 16   that document before? | 16   **A. It's just a tracking number.** |
| 17   **A. Yes.** | 17   Q. So this was the 746th -- |
| 18   Q. And what is it? | 18   **A. That's --** |
| 19   **A. This is the media advisory announcing the** | 19   Q. -- document? |
| 20   **quarterly refunding news conference. It gives** | 20   **A. I can only attest to what the first, the** |
| 21   **direction to reporters on who, what, when, where,** | 21   **initials mean. I don't know, that seems like a** |
| 22   **and how the media event.** | 22   **high number of documents.** |

| Page 151 | Page 153 |
|---|---|
| 1   Q. Were you involved in drafting this document? | 1   Q. You don't know what 746 was? |
| 2   **A. I reviewed it.** | 2   **A. It just seems like a high number for even** |
| 3   Q. Do you know who drafted it? | 3   **October of 2001. I don't know how they get the** |
| 4   **A. Betsy Holahan did.** | 4   **numbers. But it's possible that it's the 746th** |
| 5   Q. Did the Office of Public Affairs always | 5   **document to come through public affairs during the** |
| 6   distribute media advisories about upcoming | 6   **term of Paul O' Neal, but I don't know that for** |
| 7   quarterly refunding conferences? | 7   **certain.** |
| 8   **A. I'm not sure.** | 8   Q. So this is announcing that the quarterly |
| 9   Q. Do you know if you had distributed such an | 9   refunding news conference will take place at 9:00 |
| 10   advisory before the May conference? | 10   a.m. on Wednesday October 31st, 2001. Correct? |
| 11   **A. Before the May conference? I'm not sure. I** | 11   **A. Correct.** |
| 12   **don't know.** | 12   Q. All right. Now, the document states that |
| 13   Q. Was this advisory also posted on the Web | 13   the event will have a 10:00 a.m. news embargo. |
| 14   site? | 14   Do you see where that's stated in the -- |
| 15   **A. I think so. Yeah. You mean would it be or** | 15   **A. Yes.** |
| 16   **is it? You're asking me is it? Has it been?** | 16   Q. -- in the document? You've seen that. |
| 17   Q. Well, let me go back to this one. Was this | 17   Right? |
| 18   posted on the Web site? | 18   **A. Yes.** |
| 19   **A. It would have been, yes, I presume. Yeah.** | 19   Q. All right. Now, what does the term news |
| 20   **Definitely.** | 20   embargo mean? |
| 21   Q. And how do you know that? | 21   **A. It means that members of the media cannot** |
| 22   **A. Because it's got the PO. Well, this isn't** | 22   **disseminate the news that they gain from this event** |

Anthony Fratto                                                                 August 30, 2006
                                Washington, DC

| Page 154 | Page 156 |
|---|---|
| 1  until 10:00 a.m. on that date. | 1  Q. -- before October 31st, 2001? |
| 2  Q. Were any steps taken to advise attendees who | 2  A. No. |
| 3  were not members of the press that the news embargo | 3  Q. As of October 31st, 2001, do you know who at |
| 4  also applied to them when they attended these | 4  Treasury was responsible for deciding who could |
| 5  conferences? | 5  attend the quarterly refunding press conferences? |
| 6  A. I wasn't aware -- | 6  A. I'm sorry, could you say that again? |
| 7  MS. WILLIAMS: Objection. | 7  Q. As of October 31st, 2001, do you know who at |
| 8  A. I wasn't aware of anyone in attendance -- | 8  Treasury was responsible for deciding who could |
| 9  other than some Treasury policy staff, I wasn't | 9  attend press conferences, refunding press |
| 10  aware of others who were not members of the media | 10  conferences? |
| 11  who were in attendance. | 11  A. No. All I can say is the Office of Public |
| 12  BY MR. THEODOROU: | 12  Affairs was responsible for inviting members of the |
| 13  Q. So before the October 31st, 2001 conference, | 13  media and clearing them in for press conferences, |
| 14  you were not aware of anyone other than media | 14  including quarterly refunding announcements. |
| 15  attending the quarterly refunding conferences? | 15  Q. Do you know if there was a comprehensive |
| 16  A. That's right. | 16  list of everyone who attended the October 31st, |
| 17  MS. WILLIAMS: Objection. | 17  2001 press conference? |
| 18  BY MR. THEODOROU: | 18  A. No. |
| 19  Q. Did you take any steps before October 31 to | 19  Q. Now, how did those individuals who were |
| 20  determine whether anyone outside of the media | 20  attending the quarterly refunding press conferences |
| 21  attended quarterly refunding press conferences? | 21  as of October 31st, 2001 get into the Treasury |
| 22  A. No. | 22  Building on the morning of the press conference? |

| Page 155 | Page 157 |
|---|---|
| 1  Q. Do you know if anybody at Treasury ever took | 1  A. Those individuals, meaning members of the -- |
| 2  any steps before October 31st, 2001 to determine | 2  are you make a distinction between members of the |
| 3  whether nonmedia persons attended the quarterly | 3  media or nonmembers of the media? |
| 4  refunding press conferences? | 4  Q. Anybody who was attending. |
| 5  A. I don't know if they did. | 5  A. Well, for anyone to enter the Treasury |
| 6  Q. Now, directing your attention again to | 6  Building, they need to be cleared by Secret |
| 7  Exhibit 1. | 7  Service. And unless they have a permanent badge, |
| 8  Before we get there, who was allowed to | 8  they need to be -- a permanent Treasury badge, in |
| 9  attend quarterly refunding press conferences before | 9  which they can't wouldn't have to be cleared in. |
| 10  October 31st, 2001? | 10  So if they were cleared in, they had to be escorted |
| 11  A. There wasn't a policy on who was allowed to | 11  to wherever they need to be in the building by a |
| 12  attend. But I never had any expectations that | 12  Treasury official. |
| 13  anybody -- that anyone except excepting members of | 13  Q. And what room in the Treasury Building was |
| 14  the news media and Treasury staff would attend. | 14  normally used for the quarterly refunding press |
| 15  Q. But there was no policy as to who could | 15  conferences? |
| 16  attend? | 16  A. The diplomatic reception room. |
| 17  A. Not that I'm aware of. I didn't have a | 17  Q. And is there a reason why the diplomatic |
| 18  policy. | 18  reception room as opposed to another conference |
| 19  Q. Have you ever heard anybody talk about a | 19  room was used for that particular kind of |
| 20  policy as to who could attend the quarterly | 20  conference? |
| 21  refunding press conferences -- | 21  A. There is no other conference -- there was no |
| 22  A. No. | 22  other conference room at the time. The cash room. |

40 (Pages 154 to 157)

Anthony Fratto

Washington, DC

August 30, 2006

## Page 158

1   The catch room at the time, which is a horrible
2   place to try to do a press event, was -- still
3   wasn't opened yet, it was still under
4   reconstruction. So it was the only room available
5   for a press conference of any size.
6      Q. Was the May quarterly refunding conference
7   held in the diplomatic reception room?
8      A. Yeah. I'm pretty sure it was.
9      Q. Was the August 2001 conference held in that
10  room?
11     A. I can't recall that one.
12     Q. Was the secretary's conference room ever
13  used?
14     A. The secretary's conference room? From time
15  to time for different press conferences, it was.
16  And there were -- you know, there were different,
17  it was used for different events. Was it used for
18  a quarterly refunding press announcement? I'm just
19  not sure.
20     Q. You're not sure if the secretary's room was
21  used?
22     A. No, it was. Actually, the May 2nd event was

## Page 159

1   in the -- actually, the May 2nd event was in the
2   large conference room.
3      Q. The secretary's room is larger than the
4   diplomatic room?
5      A. No. They are fairly identical in size.
6   Maybe it's a little bit larger. But the large
7   conference room is dominated by a massive
8   conference table.
9      Q. So why was the diplomatic reception room,
10  Room 3311, used on October 31?
11     A. It was just more -- it was available, and it
12  was -- it's easier to set it up as a press
13  conference. If you ever want to hold a press
14  conference, a large conference room isn't a useful
15  room for a press conference. It's got a large --
16  imagine this room three times as big, you know,
17  with a table in the middle. It doesn't look like a
18  press conference. You want the podium and
19  classroom seating. And say you don't get that in a
20  large conference room, but you can set up the
21  diplomatic reception room for that kind of event.
22     Q. Now, directing your attention to October

## Page 160

1   31st, 2001.
2      A. Um-hmm.
3      Q. The conference that day started at 9:00?
4      A. It started at 9:00 or shortly after 9:00,
5   yeah.
6      Q. Was there anyone there from Treasury who had
7   the job of keeping people out of the conference
8   room?
9         MS. WILLIAMS: Objection.
10     A. I don't know if that job had been assigned
11  to anyone. I have no knowledge if it was. I don't
12  know if Betsy gave direction on that or not, but I
13  didn't give anyone direction on that.
14     BY MR. THEODOROU:
15     Q. So, there was nobody -- you did not give
16  anybody any direction to prevent people from coming
17  in and out of the conference room?
18     A. No. Again, Treasury -- it's a different
19  building. You know, if you follow the rules of the
20  building and you are a visitor to the Treasury
21  Building, you should be escorted by a Treasury
22  staffer, who would meet you at the entrance, take

## Page 161

1   you where you need to be. It's not -- and I'll
2   say, it's not that -- I'm sure there have been
3   cases where people conclude a meeting and file out
4   of the Treasury Building, you know, unescorted.
5   But, that's not -- but anyone who's walking through
6   the halls of the Treasury Building should have a
7   specific reason to be there.
8      Q. Did you take any steps to keep people from
9   leaving the room once the conference started?
10     A. No.
11     Q. Were there any Treasury employees assigned
12  to keep people from leaving the room once the
13  conference started?
14     A. No.
15     Q. Did you take any steps from allowing -- did
16  you take any steps to prevent people from entering
17  the room once the conference started?
18     A. No.
19     Q. Do you know if any Treasury employees were
20  assigned the task of preventing people from
21  entering the room once the press conference
22  started?

41 (Pages 158 to 161)

Anthony Fratto                                                                August 30, 2006
                              Washington, DC

Page 162

1    A. No. I can't think of a reason why we would
2  prevent people from entering the room.
3    Q. Did you take any steps to check the identity
4  of people who were in the room at the time of the
5  press conference?
6    A. No.
7    Q. Did you take any steps to check the press
8  credentials of people in the room at the time of
9  the press conference?
10   A. Well, if they have press -- they couldn't
11 get into the Treasury Building without press
12 credentials. I mean, if they have a press
13 credential, check the press credential? No.
14   Q. Did you take any steps that day to determine
15 that only the press was attending the conference?
16   A. No.
17   Q. So what happened at the conference? What
18 time did it start?
19   A. It started at 9:00 or shortly after 9:00. I
20 walked into the press conference, into the
21 diplomatic reception room with Peter. I remember
22 Betsy was already in the room. We were about to --

Page 163

1  so Peter walked up to the podium. Betsy was about
2  to announce and then did announce that -- she
3  introduced Peter, and then announced that there
4  would be a 10:00 embargo on the press conference.
5  I stood up off to the side. If you want to imagine
6  it, think of it very much like this room with two
7  doors.
8    Q. I'm going to have you draw it out.
9    A. Sure.
10   (Witness complying.)
11   BY MR. THEODOROU:
12   Q. So now let's mark that. That's going to be
13 marked as Exhibit 8. You are going to draw out as
14 best you can --
15   A. As best I can.
16   Q. I don't have a ruler -- entitled The
17 Diplomatic Reception Room. Right?
18   A. Yep.
19   (FRATTO Exhibit Number 8 was marked for
20 identification.)
21   BY MR. THEODOROU:
22   Q. So if you could please mark the doors, the

Page 164

1  podium, and relevant hallways on that document.
2    A. Um-hmm. So here's the hallway. I will
3  just -- this may be helpful also. Peter fisher's
4  office was right across the hall.
5    Q. Could you please mark --
6    A. Sure.
7    Q. -- Mr. Fisher's office.
8    So when you say you came into the conference
9  room with Mr. Fisher, you entered into that door?
10 Could you mark that door as door A. And then mark
11 the other doors as B, C, and D.
12   All right. What else was in that room that
13 day?
14   A. So I've got a podium here.
15   Q. Could you mark that as podium.
16   A. And then I'm not going to get the number
17 right, but --
18   Q. And the Xs indicate chairs?
19   A. Chairs. This is -- I couldn't tell you how
20 many, I'm not good at this kind of estimating, but
21 how many chairs are in the room. But I think this
22 is probably fairly representative. So what we

Page 165

1  would call, yeah, classroom style seating.
2    Q. Now, you entered with Mr. Fisher. And
3  approximately where were you during the press
4  conference?
5    A. Standing right here.
6    Q. By the door which is -- if you'd indicate
7  with your last name where you were.
8    A. Sure.
9    Q. So your back was to door B?
10   A. Near door A. My back was to -- well.
11   Q. You would have been facing the podium?
12   A. I would have been facing the podium, and
13 then the reporters here.
14   Q. And where was Ms. Holahan?
15   A. I think Betsy was right next to me, but I
16 don't remember specifically.
17   MS. WILLIAMS: At what point?
18   BY MR. THEODOROU:
19   Q. To the best of your knowledge.
20   MS. WILLIAMS: At what point?
21   A. When we walked in, Betsy was here. And this
22 is --

42 (Pages 162 to 165)

Anthony Fratto                                                                    August 30, 2006

Washington, DC

Page 166

1      BY MR. THEODOROU:
2      Q. Why don't you mark that with H-1 as to where
3   she was when you first walked in.
4      A. Okay. You know, in terms of --
5      Q. And where were you and Mr. Fisher when you
6   first walked in?
7      A. In his office.
8      Q. And then you walked in, and then you went to
9   the right of -- to the right of door A?
10     A. I always stand in the same spot.
11     Q. And Mr. Fisher went to the podium?
12     A. And he went to the podium. Yeah.
13     Q. Now, did Ms. Holahan address the room while
14  Mr. Fisher was at the podium?
15     A. Yeah. As he approached the podium and while
16  he was standing there.
17     Q. And what did she say?
18     A. Just said, I want to introduce Under
19  Secretary Peter Fisher. He will lead this news
20  conference. And I just want to remind you that
21  this event has a 10:00 embargo.
22     Q. Did she tell those who were attending what

Page 167

1   embargo meant?
2      A. No.
3      Q. Do you remember any other Treasury employees
4   being in that room?
5      A. I know that there were. I just -- I don't
6   specifically remember seeing them in the room, but
7   I know that they were in there.
8      Q. You just don't know who they were?
9      A. No. I mean, I know that Peter Fisher and
10  Jeff Hoother for sure were in the room during the
11  press conference. I remember seeing them outside
12  just before the press conference, and I think I saw
13  them go in that door.
14     Q. Do you recall any other employees there?
15     A. Not specifically. I just remember those two
16  for sure.
17     Q. All right. So she announces this at the
18  beginning. Do you recall anything else she said
19  with her initial remarks?
20     A. No.
21     Q. Then what happened?
22     A. Then Peter began the press conference by

Page 168

1   reading his statement, his prepared remarks. And
2   at the conclusion of reading his remarks, he said
3   he would take some questions. And rather than
4   selecting for reporters for him, which I might do
5   on some occasions for some people, I let Peter call
6   on reporters on his own. So he called on I think a
7   total of three, maybe four reporters that had
8   questions. And I was surprised by the lack of
9   questions. I just remember thinking, I can't
10  believe there aren't more questions.
11     Q. And how long did it take him to read his
12  statement?
13     A. I would guess 15 minutes or so. Maybe a
14  little more.
15     Q. And did you and Mr. Fisher arrive there
16  promptly at 9:00?
17     A. You know, I don't know for certain exactly
18  what time we started. It wasn't -- we definitely
19  didn't start before 9:00. I don't have a -- you
20  know, I knew that we were relatively close to on
21  time, but so it had to be somewhat short --
22  sometime shortly after 9:00.

Page 169

1      Q. And how long did the give-and-take with the
2   reporters, the question-and-answer period take?
3      A. I mean, you know, it could be, what, eight
4   minutes, you know, ten minutes. I'm guessing. It
5   wasn't 20 minutes and it wasn't five minutes. It
6   was -- you know, I would say in the eight to ten
7   minute range.
8      Q. Then what happened after that?
9      A. Then so, you know, there was a lot of time
10  between like whether it was the second and third
11  question or the third and fourth question, I can't
12  remember exactly how many questions were asked.
13  But usually, you know, it's like making popcorn in
14  a microwave, you know, you wait until the pops slow
15  down and then try to end the press conference
16  before the kernels burn. Right? So it was sort of
17  the same thing. You know, you don't -- as soon as
18  there's a lot of space in between the questions,
19  you know, I'll get a sense that questions are
20  slowing down and I'll announce last question. In
21  this case, Betsy did it. So Betsy announced last
22  question. And then you end the conference by

43 (Pages 166 to 169)

Anthony Fratto                                                                    August 30, 2006
                         Washington, DC

---

Page 170

1  simply saying, thank you. You know? So the press
2  are there, which would say thank you. And Betsy
3  did. You know, after she announced last question
4  there was a last question, Peter gave the answer.
5  Betsy said thank you, and then said, and just as a
6  another reminder, the embargo is for 10:00.
7      Q. And, again, did she state what the embargo
8  meant?
9      A. No.
10     Q. Then what happened? Where did you go?
11     A. I crossed the hall with Peter Fisher into
12  his office. And I remember just remarking, wow,
13  you know, I can't believe there weren't more
14  questions. You know. And then it was sort of at
15  that moment that it occurred to me that, you know,
16  the reason there weren't more questions is because
17  they realized that it was big news, and there would
18  be lots of times for questions later, they just
19  wanted to report the news.
20     Q. To your knowledge, has the Treasury
21  Department ever used confidentiality agreements?
22     A. Not —

---

Page 171

1      MS. WILLIAMS: Objection.
2      A. Not to my knowledge. I consider us all
3  under — you mean with — I only know what they do
4  with us as employees.
5      BY MR. THEODOROU:
6      Q. To your knowledge, has the Treasury
7  Department ever asked a non-Treasury Department
8  employee to sign a confidentiality agreement with
9  Treasury?
10     MS. WILLIAMS: Objection.
11     A. Not to my knowledge.
12     BY MR. THEODOROU:
13     Q. Do you know whether Treasury has ever used
14  confidentiality agreements?
15     MS. WILLIAMS: Objection.
16     A. I don't know.
17     BY MR. THEODOROU:
18     Q. Do you know who Peter Davis is?
19     A. I have learned a few things about him, but I
20  couldn't pick him out of a line-up.
21     Q. And when did you first learn about Peter
22  Davis?

---

Page 172

1      A. Someone on that day, on October 31st,
2  mentioned his name to me, and said that when there
3  was a — there was a suspicion raised that the news
4  was — that the news of the 30-year bond being
5  discontinued was in the markets even before
6  Treasury had inadvertently posted the statement.
7  Someone remarked that they thought that Peter Davis
8  was in the press conference.
9      Q. Who told you that?
10     A. It was someone from the Office of Domestic
11  Finance. I can't recall who used his name.
12     Q. And do you know how Mr. Davis was able to
13  attend the refunding press conference?
14     A. Paul Malvey, who told me that his office had
15  cleared in Peter Davis.
16     Q. Who is Mr. Malvey?
17     A. Paul Malvey at the time was the director of
18  market finance in the Office of Domestic Finance.
19     Q. And when did he tell you that his office had
20  cleared Mr. Davis to attend the conference?
21     A. That afternoon.
22     Q. The afternoon of October 31st?

---

Page 173

1      A. Yes.
2      Q. Now, was his attendance at the quarterly
3  refunding press conference consistent with your
4  understanding of Treasury Department policy?
5      MS. WILLIAMS: Objection.
6      A. I have no — I know of no Treasury
7  Department policy having to do with either
8  specifically Peter Davis or any other individual in
9  terms of attending a quarterly refunding press
10  conference.
11     BY MR. THEODOROU:
12     Q. Are you familiar with any Treasury
13  Department policy that prohibited nonpress from
14  attending the quarterly refunding press conference?
15     A. Not specifically. No.
16     Q. Did you ever hear, have you ever heard about
17  Mr. Davis getting kicked out of prior Treasury
18  press conferences?
19     A. No. I heard the opposite; that he had
20  previous — Paul Malvey told me that he had
21  previously been in previous quarterly refunding
22  press conferences.

---

44 (Pages 170 to 173)

Anthony Fratto                                                                    August 30, 2006

Washington, DC

| Page 174 | Page 176 |
|---|---|
| 1  Q. Did Mr. Malvey tell you why he allowed Mr. | 1  A. No. |
| 2  Davis to attend? | 2  Q. Do you know Roger Anderson? |
| 3  A. No. | 3  A. No. |
| 4  Q. Did you ask him? | 4  Q. Have you ever become aware of a |
| 5  A. No. | 5  confidentiality agreement reached between Peter |
| 6  Q. Were you concerned? | 6  Davis and any employee or representative of the |
| 7  A. Yes. | 7  Treasury Department as to whether he could disclose |
| 8  Q. So why didn't you ask him? | 8  information? |
| 9  A. Because I figured investigators could ask | 9  A. No. |
| 10  him and ask other questions. | 10  Q. Did you ever become of a confidentiality |
| 11  Q. Did you ever hear of Mr. Davis being barred | 11  agreement between the Treasury Department and Mr. |
| 12  from prior press conferences by someone named John | 12  Davis? |
| 13  Murchison? | 13  A. No. |
| 14  A. No. But I wish I'd known that. | 14  Q. Have you ever been told of such an |
| 15  Q. Do you know who John Murchison is? | 15  agreement? |
| 16  A. No. The name is really familiar to me, but | 16  A. I have been asked questions similar of the |
| 17  I don't know. I don't know why I'd know it. | 17  way that you are asking them now. |
| 18  Q. He'll fill you in. | 18  Q. By? |
| 19  A. Okay. | 19  A. But I've never -- by them. But I've never |
| 20  Q. Do you know a woman by the name of Lula | 20  been told by anyone. |
| 21  Tyler? | 21  Q. If such an agreement had existed, should the |
| 22  A. No. | 22  Office of Public Affairs have been informed of |

| Page 175 | Page 177 |
|---|---|
| 1  Q. Do you know Elenora Bowser? | 1  that? |
| 2  A. No. | 2  MS. WILLIAMS: Objection. |
| 3  Q. Did Mr. Malvey have the authority to clear | 3  A. I don't know how to answer that question. I |
| 4  persons into the Treasury Building? | 4  would want to be informed of anyone who's attending |
| 5  A. Yes. | 5  my press conferences. |
| 6  Q. Did he have authority to clear people into | 6  BY MR. THEODOROU: |
| 7  press conferences? | 7  Q. You would have liked to have known that Mr. |
| 8  A. I don't know. Not -- you know. There | 8  Davis was attending your press conferences. Right? |
| 9  wasn't a formal policy that I was aware of on | 9  A. Yes. |
| 10  clearing people in to press conferences, other than | 10  MS. WILLIAMS: Objection. |
| 11  media. | 11  BY MR. THEODOROU: |
| 12  Q. Before you talked to Mr. Malvey about Mr. | 12  Q. Would you have liked to know that Mr. Davis |
| 13  Davis on October 31, had you ever discussed with | 13  was attending the press conference on October 31? |
| 14  Mr. Malvey who should or should not be allowed to | 14  A. Yes. |
| 15  attend Treasury press conferences? | 15  (FRATTO Exhibit Number 9 was marked for |
| 16  A. No. Never. | 16  identification.) |
| 17  Q. And so that would include you never | 17  BY MR. THEODOROU: |
| 18  discussed with Mr. Malvey who should or should not | 18  Q. Before we get to that, let's go back to your |
| 19  be allowed to attend quarterly refunding press | 19  Exhibit 1. Now, there's some exhibits attached to |
| 20  conferences. Right? | 20  Exhibit 1 from the OIG. If you could turn to it, |
| 21  A. Right. | 21  the last page of Exhibit 1. It's a November 15th, |
| 22  Q. Do you know Jill Usely? | 22  2001 letter from Megan Hills to Mr. Andrew Sporkin |

45 (Pages 174 to 177)

Anthony Fratto                                                    August 30, 2006
                          Washington, DC

| Page 178 | Page 180 |
|---|---|
| 1 of the Securities and Exchange Commission. | 1 weren't members of the press. |
| 2    Do you see that? | 2         MS. WILLIAMS: Objection. |
| 3    **A. Yes.** | 3    **A. Yeah.  I mean, I think it's -- I think** |
| 4    Q. Now, if you look at that, if you look at | 4 **that's true.** |
| 5 that page.  Have you seen this letter before? | 5         BY MR. THEODOROU: |
| 6    **A. Yes.** | 6    Q. Okay. |
| 7    Q. And do you see where it says, "Dear Mr. | 7    **A. I mean.** |
| 8 Sporkin, pursuant to the SEC's request to clarify | 8    Q. What did you base that statement on? |
| 9 it, I contacted Tony Fratto regarding his quote in | 9    **A. Based on Paul Malvey's comment to me that,** |
| 10 the November 15, 2001 Wall Street Journal piece by | 10 **as explained in Megan Hill's letter that Peter** |
| 11 Gregory Zuckerman.  As reported in the column, Mr. | 11 **Davis had attended quarterly refunding press** |
| 12 Fratto was quoted as saying, 'It's likely that | 12 **conferences for some time.** |
| 13 others in the past.'  And then the reporter | 13    Q. Did Mr. Malvey tell you about any other |
| 14 paraphrased the remainder of the statement is, to | 14 nonpress individuals who had attended these |
| 15 say that, have participated in press briefings | 15 conferences? |
| 16 though they weren't members of the press." | 16    **A. (Shaking head.)** |
| 17    Do you see that? | 17    Q. Is that a yes or a no? |
| 18    **A. I do.** | 18    **A. I'm sorry.  That's a no.** |
| 19    Q. Now, in that article -- by the way, I've | 19    Q. So Ms. Hill's letter was a clarification of |
| 20 given you Exhibit 9.  Have you seen that document | 20 what you said in the Journal? |
| 21 before? | 21    **A. Yes.** |
| 22    **A. Yes.** | 22    Q. Correct? |

| Page 179 | Page 181 |
|---|---|
| 1    Q. And that's the article that's talking about | 1    **A. Yes.** |
| 2 Exhibit 9? | 2    Q. And what you say in Ms. Hill's letter says, |
| 3    **A. Yes.** | 3 Mr. Fratto says he meant that given that Mr. Davis |
| 4    Q. November 15, 2001 the Wall Street Journal. | 4 had been admitted by the prior administration for |
| 5 Do you see that? | 5 years, he found it highly unlikely that someone |
| 6    **A. Yes.** | 6 else may have wandered in during the past |
| 7    Q. And there was is a quote in the middle of | 7 administration. |
| 8 page 1, "It's likely that others in the past have | 8    Correct? |
| 9 participated in press briefings though they weren't | 9    **A. Correct.** |
| 10 members of the press," said Tony Fratto, a | 10    Q. Do you know of anybody else who may have |
| 11 spokesman for the Treasury Department. | 11 wandered in? |
| 12    **A. (Nodding head.)** | 12    **A. I don't.** |
| 13    Q. Correct? | 13    Q. You are speculating here? |
| 14    **A. Yes.** | 14    **A. Yes.** |
| 15    Q. Now, this statement in the Wall Street | 15    Q. Based on the fact that someone, that Mr. |
| 16 Journal, was that correct? | 16 Davis had attended a number of these press |
| 17         MS. WILLIAMS: Objection. | 17 conferences? |
| 18    **A. Is what correct, exactly?** | 18    **A. Based on the fact that I was told that he** |
| 19         BY MR. THEODOROU: | 19 **had attended a number of press conferences.** |
| 20    Q. Well, it says here the statement that others | 20    Q. All right.  Well, isn't it accurate that, in |
| 21 had attended.  It is likely that others in the past | 21 Ms. Hill's letter, when she said that someone else |
| 22 have participated in press briefings though they | 22 may have wandered in during the past |

46 (Pages 178 to 181)

Anthony Fratto                                                          August 30, 2006
                              Washington, DC

Page 182

1  administration, he had wandered in also during the
2  current administration?
3      MS. WILLIAMS: Objection.
4      A. That's possible. Yeah. I don't know, I
5  don't have independent knowledge of Peter Davis's
6  attendance at any Treasury quarterly refunding
7  announcement. What I know is that he attended the
8  one on October 31st because he admitted to that.
9  And then I have the information that Paul Malvey
10  told me that he was in attendance that day and had
11  attended in the past, including -- and he was
12  specific about the previous administration. He had
13  said the previous administration had allowed Peter
14  Davis to attend. Now, I don't know whether that
15  was allowed or wanted him to attend or permitted
16  him to attend or what the nature of it was, but
17  Paul Malvey in his conversation with me was very
18  specific, the previous administration had allowed
19  Peter Davis to attend quarterly refunding
20  announcements. So that's what my quote is based
21  on.
22      BY MR. THEODOROU:

Page 183

1      Q. And what do you mean by, previous
2  administration?
3      A. The Treasury secretaries during the Clinton
4  administration.
5      Q. Do you know, did Mr. Malvey tell you --
6      A. Let me -- just previous administration. I
7  don't really care previous administration or not.
8  It's immaterial to me. I'm not being -- in saying
9  that, I'm not trying to be critical of the previous
10  administration. That wasn't my point then, either.
11      Q. Do you know whether Peter Davis attended the
12  May and August 2001 conferences?
13      A. I don't know. Even honestly, today, if I
14  was walking down the street and someone said Peter
15  Davis walked by, I wouldn't know. I don't know
16  what he looks like or have never met him.
17      Q. Did Mr. Malvey tell you why he allowed Mr.
18  Davis to attend the conference?
19      A. When Paul Malvey told me that his office
20  cleared in Peter Davis, he heaved a huge sigh of
21  relief that the Office of Public Affairs didn't
22  clear in Peter Davis for some bizarre reason.

Page 184

1  Whatever else we did wrong that day, we didn't
2  clear in Peter Davis. And I was pretty happy about
3  that. I was also, you know, very cognizant of the
4  fact that, you know, we were going to be spending
5  some time answering questions on the events of that
6  day with general counsel and others, and I actually
7  didn't want to have a whole lot of knowledge of
8  what the nature of Peter Davis's attendance was. I
9  figured someone will ask Paul and Paul can answer
10  for it but I'm not going to answer for him.
11      Q. So he didn't tell you why he let him in?
12      A. I told you everything of -- everything that
13  Paul told me about Peter Davis, I just told you.
14      Q. All right.
15      A. Yeah.
16      Q. If you would turn to Exhibit 9.
17      Do you see on the first page, this is
18  written November 15, 2001, this Wall Street
19  article. It says -- well, beginning on the first
20  paragraph. It says, "The Treasury Department,
21  facing criticism after an industry consultant
22  attended a press only briefing last month and

Page 185

1  leaked market moving news yesterday, outlined new
2  rules to try to keep its news under wraps."
3      Do you see that?
4      A. I do.
5      Q. "The changes, which some bond traders said
6  were overdo, will bring the Treasury more in line
7  with the way other government agencies, including
8  the Federal Reserve and the Labor Department,
9  release market sensitive news."
10      Do you see that?
11      A. I do.
12      Q. All right. And then further on, about the
13  fifth paragraph, "Some of the changes are quite
14  elementary. Now, for instance, instead of
15  releasing information to the press an hour or so
16  before it is publicly available, the Department is
17  shortening the embargo period to a matter of
18  minutes, bringing the Treasury in line with the way
19  Federal Reserve operates."
20      Do you see that?
21      A. I do.
22      Q. And then the next paragraph, "In addition,

Anthony Fratto                                                        August 30, 2006
Washington, DC

---

Page 186

1  the Treasury will require that people attending its
2  briefings now show press credentials to get into
3  the room as the Labor Department does."
4      Do you see that?
5  A. I do.
6  Q. "Until now, a simple piece of information
7  was enough."
8      And that's what it says. Right?
9  A. That's what it says.
10  Q. Now, these were some of the procedures that
11  were implemented after October 31?
12  A. Yes.
13  Q. All right. So Treasury procedures were --
14  A. I'm not stipulating to the accuracy of some
15  of the -- for example, you know, I don't know what
16  the reporter's referring to, until now a simple
17  piece of identification was enough. I mean.
18  Q. Okay.
19  A. That's obviously understating access to an
20  event in the Treasury Department. You know, a
21  simple piece of paper, and a Secret Service
22  background check.

Page 187

1  Q. But as to the reference, Treasury's
2  procedures were inconsistent with the way at least
3  the Federal Reserve and the Department of Labor
4  handled market sensitive information. Correct?
5  A. Yeah.
6      MS. WILLIAMS: Objection.
7      BY MR. THEODOROU:
8  Q. Is that right?
9      MS. WILLIAMS: Objection.
10  A. Can you ask it again?
11      BY MR. THEODOROU:
12  Q. The Treasury Department's procedures for the
13  quarterly refunding press conferences were
14  inconsistent the way the Department of Labor
15  released market sensitive information.
16      MS. WILLIAMS: Objection.
17  A. I don't really know how the Department of
18  Labor does theirs.
19      BY MR. THEODOROU:
20  Q. Were you familiar with the procedures used
21  by the Federal Reserve and Labor Department?
22  A. Yeah. It happens in the Treasury pressroom.

Page 188

1      MS. WILLIAMS: I'm sorry, and the Labor
2  Department?
3      MR. THEODOROU: Let me backtrack.
4      BY MR. THEODOROU:
5  Q. When the changes were made at Treasury after
6  October 31 --
7  A. Yes.
8  Q. -- did you become familiar with the
9  procedures used by the Federal Reserve for handling
10  market sensitive information in press conferences?
11  A. I was abundantly aware of the handling of
12  Federal Reserve information, because the Treasury
13  pressroom handles Federal Reserve information.
14  Q. And how about the Labor Department? Did you
15  ever become of the Labor Department?
16  A. No. I'm told that they do a lockdown, but I
17  never -- I never have talked to Labor about it or
18  witnessed it.
19  Q. But Treasury's, at some point did you learn
20  after October 31 that the way the quarterly
21  refunding press conference was handled, the release
22  of the information and the embargo was different

Page 189

1  than other agencies?
2      MS. WILLIAMS: Objection.
3  A. No. In fact, I made -- we made the changes
4  to -- we made these two changes in particular to
5  deal with what were exposed as possible weaknesses.
6  Clearly, you know, we wanted to make sure that
7  people knew that if we're going to do a press
8  conference, aside from Treasury staff or authorized
9  individuals in the room, we needed to know about
10  it, and we were going to have a policy on who
11  attends Treasury press conferences.
12      I didn't go around and ask other departments
13  or agencies how they did their procedures. It
14  wasn't -- it just wasn't -- that wasn't the problem
15  that was trying that we were trying to fix.
16      BY MR. THEODOROU:
17  Q. And after October 31, though, Treasury did
18  develop a written procedure?
19  A. Yes.
20  Q. Now, what's the procedure for creating?
21  What was the procedure for creating a press release
22  for the quarterly refunding press conference as of

48 (Pages 186 to 189)

Anthony Fratto
Washington, DC
August 30, 2006

Page 190

1  October 31?
2    A. For creating it?
3    Q. Yeah. How was it created?
4    A. Well, I'm not there for inception, so you
5  would have to talk to the guys in the Office of
6  Domestic Finance on where they begin with the
7  draft. Where Public Affairs comes into it is very
8  late in the process, where there is a relatively
9  final draft and it's relatively late in the
10  process. So within days of the actual press
11  conference, sometimes not even until the night
12  before a press conference will Public Affairs
13  actually see the press release. So in that case we
14  are a final eye on the press release and, you know,
15  we don't -- we sign off on anything that gets
16  disseminated publicly at Treasury, so I insist on
17  having public affairs review anything that
18  goes out. But that might just be hours before it
19  goes out. For other things, it could be days or
20  weeks.
21    Q. So on October 31, for the October 31 press
22  conference, do you know who provided the Office of

Page 191

1  Public Affairs with the statement to be released?
2    A. I don't know specifically. I mean, I know
3  from the group of individuals from where it would
4  have come, but I don't know specifically who did
5  it.
6    Q. Where would it have come from?
7    A. It would have come either directly from
8  Peter Fisher, Tim Bitsberger. I recall actually
9  from seeing an e-mail yesterday that Tim Bitsberger
10  sent the final, but I don't know if there had been
11  a previous one shared in any way. And that was on
12  the morning of October 31st.
13    Q. And who drafted?
14    A. So Brian, Tim, Jeff Hoother, again Paul
15  Malvey, Peter Fisher. Those. And his -- Peter's
16  senior adviser at the time. Do you recall his
17  name? Jared? Jared Gross. Jared Gross.
18    Q. And that were with what office, this group?
19    A. Office of Domestic Finance.
20    Q. Do you edit the statement?
21    A. I would review the statement for any -- you
22  know, any glaring errors and certainly for grammar,

Page 192

1  spelling. So I have an opportunity to edit it,
2  whether it needs it or not.
3    Q. Did you edit Mr. Fisher's statement that was
4  going out on October 31?
5    A. I read it before it went out. I don't
6  remember if I suggested any changes or edits.
7    Q. Does anyone in your office review the final
8  document before it is distributed to the press at
9  the press conference?
10    A. It always -- someone in my office always
11  reviews the document before it's distributed, or at
12  least we always try to.
13    Q. Did anyone review the document before it was
14  distributed to the press on October 31st?
15    A. I didn't review it. I don't know if Betsy
16  did.
17    Q. So you don't know if Betsy reviewed Mr.
18  Fisher's statement before it was distributed?
19    A. Betsy reviewed Peter's statement that day.
20  I reviewed Peter's statement that day. Yes. But
21  whether we reviewed the document that was handed
22  out at the press conference, I don't know.

Page 193

1    Q. But you did not review the document that
2  went out at the press conference.
3    A. No.
4    Q. Correct? And you don't know --
5    A. It was handed to me at the press conference.
6    Q. And you don't know whether Ms. Holahan
7  reviewed that document that was handed out at the
8  press conference?
9    A. I don't know.
10    Q. Does anybody review it before it is posted
11  on the Web site?
12    A. Yes.
13    Q. Who?
14    A. That's the same. It's the same. Whatever
15  the final document is before it goes to the Web
16  site. There's usually a final draft, someone will
17  mark a draft final. And so before we would send it
18  to Frances Anderson, for example, for posting and
19  distribution, we would take a final read on it.
20    Q. Did you review the document of Mr. Fisher's
21  statement that went out on the Web site?
22    A. I reviewed the text of that document. So I

49 (Pages 190 to 193)

| Page 194 | Page 196 |
|---|---|

**Page 194**

1  reviewed the final draft of that document. I don't
2  recall reviewing if in its -- you know, the same
3  document that was sent to Frances for posting was
4  sent to me. I read it, saw no problems with it,
5  and let the system go.
6      Q. Do you recall reviewing the document in the
7  form that it went on the Web site?
8      A. I don't know how that's possible. I'm not
9  sure what you're -- I'm not sure that I know what
10 you're asking. I mean, we're talking about an
11 electronic copy of a document. It was e-mailed to
12 me in a Word Perfect -- in a Word, sorry, format.
13 I read it, and I don't think I had any edits or
14 changes to it. I know that that document was
15 forwarded to Frances Anderson for posting. I trust
16 that she cut and paste the content of that document
17 on to the web platform for posting. That's all I
18 can say.
19     Q. But you received a copy of the document at
20 the pressroom as to what was distributed to the
21 press? You received the document that was
22 distributed?

**Page 196**

1      A. I don't know if I saw it before yesterday,
2  but I saw it yesterday.
3      Q. Okay. And who is Tim Bitsberger?
4      A. At the time, he was the deputy assistant
5  secretary for financial markets.
6      Q. And what was Ms. Anderson's job at the time?
7      A. You know, administrative. I can't remember
8  her exact title, but she's an administrative
9  staffer with the Office of Public Affairs.
10     Q. Public information coordinator?
11     A. That sounds right.
12     Q. At the time?
13     A. It's hard to keep track.
14     Q. I'm learning. Did she directly report to
15 you?
16     A. Yes, she did.
17     Q. What were her responsibilities again?
18     A. Her responsibilities included handling mail,
19 phone calls, posting documents to the Internet,
20 helping to set up rooms for press conferences,
21 clearing in members of the media for interviews.
22 So that range.

**Page 195**

1      A. Yeah.
2          (FRATTO Exhibit Number 10 was marked for
3  identification.)
4      BY MR. THEODOROU:
5      Q. Mr. Fratto, you have before you Exhibit 10?
6      A. Yes.
7      Q. It's an e-mail. At the top, it's an e-mail
8  from Betsy Holahan October 31st, 2001, 8:41 a.m. to
9  Frances Anderson. Have you seen that?
10     A. Yes.
11     Q. And when was the last time you saw this
12 document?
13     A. Yesterday.
14     Q. And below that there's a message from Tim
15 Bitsberger to Peter Fisher, Betsy Holahan, Paul
16 Malvey, Jared Gross. And who is Jared Gross?
17     A. He was Peter Fisher's senior adviser.
18     Q. And it says, subject, final version.
19 Correct?
20     A. Yes.
21     Q. All right. Have you seen this document
22 before?

**Page 197**

1      Q. Is this the final version of the Fisher
2  statement?
3      A. On the next page?
4      Q. Yes.
5      A. Yeah. This looks like the Word version of
6  the document that I would have seen that morning in
7  exactly this way.
8      Q. Ms. Holahan says in this, please format and
9  e-mail a formatted copy back to me.
10     A. Yes.
11     Q. What does Ms. Holahan want Ms. Anderson to
12 do?
13         MS. WILLIAMS: Objection.
14     A. When she's asking for a formatted copy,
15 she's asking for a copy of it on letterhead and
16 with the date time and contact.
17     BY MR. THEODOROU:
18     Q. What kind of letterhead?
19     A. I don't know what Betsy's asking for
20 specifically. But if she's asking it to be
21 e-mailed, she's probably asking for the electronic
22 letterhead.

Anthony Fratto                                                    August 30, 2006
Washington, DC

| Page 198 | Page 200 |
|---|---|
| 1    Q. All right. Let me show you the next | 1    as is. Sorry." |
| 2    document. | 2        Do you see that? |
| 3        (FRATTO Exhibit Number 11 was marked for | 3    A. Yes. |
| 4    identification.) | 4    Q. Now, when she refers to Frances, Ms. Holahan |
| 5        BY MR. THEODOROU: | 5    is referring to Frances Anderson? |
| 6    Q. Now, I'm showing you now what's been marked | 6    A. Yes. |
| 7    as Exhibit 11. Have you seen this document before? | 7    Q. And do you know what the formatting problem |
| 8    A. Yes, I have. | 8    was? |
| 9    Q. And this is a series of e-mails. At the top | 9    A. It's possible that she didn't have the |
| 10   there's an e-mail from you to Betsy Holahan and a | 10   electronic, the soft copy of the letterhead. |
| 11   series of other people, correct, at 8:53 a.m.? | 11   Q. And what is soft copy. |
| 12   A. That's correct. | 12   A. It's an electronic copy of the -- |
| 13   Q. And it says, "Here's a copy with Treasury | 13   Q. Of the letterhead? |
| 14   letterhead suitable for e-mail or fax." Correct? | 14   A. Of the letterhead. Yeah. |
| 15   A. Correct. | 15   Q. And the letterhead would be the Treasury |
| 16   Q. Now, this starts with Mr. Bitsberger's, the | 16   Building or what is called Treasury News? Aren't |
| 17   one we just looked at, his e-mail to Peter Fisher, | 17   there two forms of letterhead, one with a picture |
| 18   Betsy Holahan, Paul Malvey, Jared Gross on October | 18   of the Department of Treasury? |
| 19   31st at 8:39. Correct? | 19   A. That's the electronic right there. |
| 20   A. Correct. | 20   Q. And the other is Treasury News? |
| 21   Q. Where it says file:NOVQ-final.doc, D-O-C? | 21   A. And that's on pre-printed paper. |
| 22   A. Right. | 22   Q. So when you're talking about soft copy, |

| Page 199 | Page 201 |
|---|---|
| 1    Q. And then next is an e-mail from Betsy | 1    you're talking about the Department of Treasury |
| 2    Holahan to a series of people at 8:46 a.m., it says | 2    letterhead? |
| 3    Peter's statement. Do you see that? | 3    A. Yes. |
| 4    A. Yes. | 4    Q. With the building? |
| 5    Q. And she says in her statement at 8:46 a.m., | 5    A. With the building. |
| 6    Paul, JT. Who is JT? | 6    Q. So in your message, on 8:53 a.m. you wrote? |
| 7    A. JT Young. | 7    "Here's a copy suitable for e-mail or fax." |
| 8    Q. And who is JT Young? | 8        Do you see that? |
| 9    A. JT was in legislative affairs at the time. | 9    A. I do. |
| 10   Q. And Tim, it says Delaney? | 10   Q. What did you do? You attached a version of |
| 11   A. Yeah. | 11   Fisher's statement to that e-mail? |
| 12   Q. Is that Tim Delaney? | 12   A. I'm sure that's what I did, yeah. Probably |
| 13   A. Tim Delaney, yeah. | 13   with that electronic letterhead. |
| 14   Q. And who is he? | 14   Q. And said, the document name is in small type |
| 15   A. Tim is the director of the office of -- we | 15   at the bottom of your e-mail message. Right? |
| 16   call it the markets office. It was a market, it | 16   A. Yes. |
| 17   was the market room. | 17   Q. And you see where it says NOVQ-final, plus, |
| 18   Q. Now, what she said to them in this e-mail | 18   then there's a dot, and then it says doc? |
| 19   that got forwarded to you, "Please e-mail to your | 19   A. Yes. |
| 20   key people at 10:00 a.m. today, not before. | 20   Q. That's the same document name used by Tim |
| 21   Frances says she cannot format this into an | 21   Bitsberger in his message at 8:39 to Peter Fisher, |
| 22   electronic file with Treasury letterhead, so send | 22   Betsy Holahan, Paul Malvey, and Jared Gross, excep |

Alderson Reporting Company
1-800-FOR-DEPO

Anthony Fratto                                                                    August 30, 2006
                                    Washington, DC

Page 202

1  you had a plus added.
2     A. Yes.
3     Q. What does the plus mean?
4     A. Probably to distinguish it as the one with
5  letterhead now.
6     Q. Where you put Treasury letterhead on it?
7     A. Yeah. I'm presuming that's what I meant by
8  it.
9     Q. Let me show you Exhibit 12.
10    (FRATTO Exhibit Number 12 was marked for
11 identification.)
12    BY MR. THEODOROU:
13    Q. Do you see that, Mr. Fratto?
14    A. I do.
15    Q. Have you seen this document before that I'm
16 showing you?
17    A. Yes.
18    Q. Is that the document that you attached to
19 your e-mail message?
20    A. I presume it is. It looks like it is.
21    Q. Now, how did you create this document?
22    A. Let me begin by saying I don't actually

Page 203

1  remember sitting at my computer and doing this.
2  But what I would suspect I did was to add language
3  on the embargo time.
4     Q. So let's take a look. You're looking at
5  Exhibit 10.
6     A. Yes.
7     Q. With the attached statement of Mr. Fisher.
8  Correct?
9     A. That's right.
10    Q. That was sent by Mr. Bitsberger to Betsy
11 Holahan and other people?
12    A. That's right.
13    Q. Correct?
14    A. Yes.
15    Q. And you sent that at 8:39. And I'm showing
16 you now Exhibit 12, and you're saying you did what
17 to the document?
18    A. I added the embargo time, the date, the
19 contact information, and the soft copy letterhead.
20    Q. Okay. Now, why did you create this document
21 and Holahan or Anderson did not?
22    A. I think it's not unusual. We're a pretty

Page 204

1  small shop at public affairs, and we're frequently
2  helping each other on these kinds of things. So
3  sometimes it's whoever is sitting at a desk and
4  able to make a last-minute edit or get something to
5  Frances or down to the pressroom, you're asking one
6  of our colleagues to do that all of the time.
7     Q. And you recall putting in embargoed until
8  10:00 a.m. on this document?
9     MS. WILLIAMS: Objection.
10    A. I don't specifically recall doing it, but I
11 would expect that I did. I probably did.
12    BY MR. THEODOROU:
13    Q. Let's go back to your e-mail that says -- on
14 your e-mail that says, "Here's a copy with Treasury
15 letterhead suitable for e-mail or fax."
16    So when you're talking about Treasury
17 letterhead, it's the letterhead on Exhibit 12
18 you're talking about?
19    A. Yes. It could only be that document.
20    Q. And is this the document suitable for e-mail
21 or fax?
22    A. That document would be suitable for e-mail

Page 205

1  or fax. Yes.
2     Q. But is this the document that you --
3     A. I think so. Yeah.
4     Q. All right.
5     THE VIDEOGRAPHER: This concludes tape three
6  in the deposition of Tony Fratto. Off the record
7  at 3:05:45.
8     (Recess taken.)
9     THE VIDEOGRAPHER: This begins tape four in
10 the deposition of Tony Fratto. On the record at
11 3:18:30.
12    BY MR. THEODOROU:
13    Q. Mr. Fratto, were copies of the quarterly
14 refunding statement normally handed out at a press
15 conference, quarterly refunding press conference?
16    A. And you're asking me if that was usual, and
17 I don't know if it was usual. I think we had done
18 it at the May 2nd one. I can't recall what we did
19 at the August 1st one.
20    Q. And you also did it at the October 31st one.
21 Correct?
22    A. And we did it at the October 31st one.

52 (Pages 202 to 205)

Anthony Fratto                                                    August 30, 2006
Washington, DC

Page 206

1  **Right.**
2    Q. And when is the statement handed out?  At
3  what point?  Before the conference begins, at the
4  end of the conference?  Or is it simply made
5  available to be picked up?
6    MS. WILLIAMS: Objection.
7    BY MR. THEODOROU:
8    Q. I'll rephrase it.  How was it distributed?
9    **A. How was it distributed that day.  I believe**
10 **it was distributed at the beginning of the press**
11 **conference.**
12   Q. By whom?
13   **A. I think Frances and Betsy.**
14   Q. And how did they distribute it?
15   **A. By hand, walking through the room.**
16   Q. And what kind of letterhead was used on the
17 version, the statement that was distributed?
18   **A. I don't remember.**
19   (FRATTO Exhibit Number 13 was marked for
20 identification.)
21   BY MR. THEODOROU:
22   Q. I'm going to show you, Mr. Fratto, what's

Page 207

1  been marked as Exhibit 15.  You've seen that
2  document before.  Right?
3    **A. 13. Yes.**
4    Q. I'm sorry, 13.  You've seen that document
5  before.  Right?
6    **A. Yes.**
7    Q. And you saw that yesterday when you were
8  preparing for your deposition?
9    **A. Yes.**
10   Q. Is this the version of Mr. Fisher's
11 statement that was distributed at the press
12 conference that day, on October 31st, 2001?
13   **A. I don't know.**
14   Q. Did you ever see the -- did you ever see a
15 copy of what was distributed that day?  Have you
16 ever seen a copy?
17   **A. Well, I was handed a copy at the press**
18 **conference, but I can't say that I looked at it**
19 **closely enough to remember which version it was.**
20   Q. All right.  Did you ever learn that the
21 version that was distributed at the press
22 conference said "for immediate release" on the

Page 208

1  document?
2    **A. I remember being told that there was this**
3  **other document and I was told that day, but I don't**
4  **remember if I was told that that was the one that**
5  **was handed out at the press conference.**
6    Q. Have you ever seen the document that was
7  handed out at the press conference?
8    **A. Yes.**
9    Q. And is this a copy of that document?
10   **A. I don't know.**
11   Q. Did the copy of the document that was handed
12 out at the press conference state "for immediate
13 release"?
14   **A. I don't remember.**
15   Q. Has anyone told you that the document stated
16 "for immediate release"?
17   **A. Betsy told me that there was a second**
18 **document, you know, a second press release that**
19 **Frances had prepared that had "for immediate**
20 **release" on it.  I don't remember which one was**
21 **distributed at the press conference.**
22   Q. Do you know why Ms. Anderson included the

Page 209

1  caption "for immediate release" on the statement
2  that she prepared?
3    **A. I don't.**
4    Q. Do you know if anybody at Treasury ever told
5  her about the 10:00 a.m. embargo time?
6    **A. I told Frances about the 10:00 a.m. embargo**
7  **time.**
8    Q. You told Frances yourself that day about it?
9    **A. Yeah.**
10   Q. When did you tell her about it?
11   **A. That morning in the suite, that there's a**
12 **10:00 embargo on the press conference.**
13   Q. About what time did you tell her?
14   **A. I couldn't give a precise time, but it was**
15 **when -- the best range I could put it in is**
16 **probably between 8:30 and 8:45.**
17   Q. Was anybody else present when you told her
18 this?
19   **A. I don't know.**
20   Q. And what did she say?
21   **A. I don't remember her specific words.  She**
22 **heard me.  She acknowledged that in some way, that**

Alderson Reporting Company
1-800-FOR-DEPO

---

Page 210

1  she heard what I said.
2  Q. What specifically do you recall telling her?
3  A. I asked Frances if she had -- if she had
4  what she needed for the press conference. Are we
5  all set up? Because I was going up to Peter
6  Fisher's office. I said, do you have what we need?
7  Yeah. And, you're going to be ready to post this
8  at 10:00. Right? And she acknowledged in some
9  way, I don't remember the exact words, yes, she's
10  ready to post it at 10:00.
11  Q. And did you use the word embargo time to
12  her?
13  A. I don't remember specifically using the word
14  embargo time.
15  Q. Do you remember telling her that she was
16  going -- excuse me, I don't want to put words in
17  your mouth. If I'm wrong, correct me; I'm sure you
18  will. Do you remember telling her to post at
19  10:00?
20  A. Yes. That, I definitely remember that.
21  Q. But you do not recall tell her anything
22  about an embargo time?

---

Page 211

1  A. I don't remember.
2  Q. Do you recall using the word "embargo" with
3  her?
4  A. I don't remember.
5  Q. Do you recall ever telling her to make sure
6  she put the word embargo in the statement that she
7  was posting?
8  A. I don't remember doing that.
9  Q. Do you recall telling her that she should
10  put the word embargo in the statement that was
11  being distributed at the press conference?
12  A. No. I don't recall doing that.
13  Q. Do you know if Ms. Holahan told her to put
14  the word embargo in the statement going into the
15  press conference?
16  A. I don't know.
17  Q. Did the Treasury -- as of October 2001, did
18  the Treasury have any policies of providing
19  embargoed information directly to press outlets by
20  means other than press conferences?
21  A. That wouldn't be unusual.
22  Q. Why is that?

---

Page 212

1  A. Because -- why is what? Why would --
2  Q. In other words, if someone didn't attend the
3  press conference --
4  A. Could I e-mail them a copy with an embargo
5  time?
6  Q. Yes.
7  A. Yes.
8  Q. Could you do that?
9  A. That day?
10  Q. Did you do that on October 31st?
11  A. I don't recall doing that. I wouldn't be
12  surprised if I did, but I don't think I did and I
13  don't have any recollection of it.
14  Q. Had you done it in the past for the
15  refunding conferences; that is, you e-mailed the
16  statement that was going to be distributed at the
17  conference to those who weren't attending?
18  A. I have. I know that I've done it countless
19  times for many different kinds of events. I don't
20  have a specific recollection of ever doing it for a
21  quarterly refunding announcement.
22  Q. Okay. Do you know whether Ms. Holahan did

---

Page 213

1  that on October 31, sending a statement before the
2  10:00 a.m. embargo?
3  A. I don't know.
4  Q. To --
5  A. I don't know.
6  (FRATTO Exhibit Number 14 was marked for
7  identification.)
8  BY MR. THEODOROU:
9  Q. Do you see Exhibit 14?
10  A. I do.
11  Q. Have you seen this exhibit before?
12  A. No.
13  Q. It's a series of e-mails. Correct?
14  A. Yes.
15  Q. Do you know any of these people? Betsy
16  Holahan is sending a series of e-mails.
17  A. Yes.
18  Q. Do you know who these people are?
19  A. I know just about all these.
20  Q. All right. Who is Chip Aiken?
21  A. As it says, Chip was -- I'm not sure whether
22  he still is -- a producer at CNBC.

---

54 (Pages 210 to 213)

Anthony Fratto

Washington, DC

August 30, 2006

Page 214

1    Q. And Jonathan Fuerbringer?
2    **A. New York Times.**
3    Q. Greg Ip?
4    **A. Journal.**
5    Q. He's at the Wall Street Journal?
6    **A. Yes.**
7    Q. And Robert Nichols was at the Office of
8 Public Affairs?
9    **A. Yes.**
10    Q. So he worked for Treasury?
11    **A. Yes.**
12    Q. So each of the documents has a notation for
13 the attachment, NOVQ-FINAL, in capital letters,
14 plus.doc. Do you see that?
15    **A. Yes.**
16    Q. And that's the same document that you
17 attached to your e-mail at 8:53 that day. Right?
18    **A. Yes.**
19    Q. And that was the version of Fisher's
20 statement with the soft letterhead with the picture
21 of Treasury Building?
22    **A. Yes.**

Page 215

1    Q. And you have that document in front of you.
2 Right?
3    **A. I have it in front of me, the other**
4 **document.**
5    Q. Right. Do you know why she was sending
6 these -- and that's Exhibit 12, the one that you
7 had put the picture of the Treasury Building on.
8 Right?
9    **A. Um-hmm.**
10    Q. Is that a yes?
11    **A. Yes.**
12    Q. Okay. Do you know why she was sending a
13 copy of that document to these various media
14 persons before the 10:00 a.m. embargo time?
15    **A. I don't know specifically. Although I can**
16 **presume, but you can just as easily ask Betsy.**
17 **This is the first I've known she did it.**
18    Q. Did you send Mr. Fisher's statement to any
19 other media before 10:00 a.m.?
20    **A. I don't recall doing that. I don't think**
21 **so.**
22    Q. Did anybody else besides Ms. Holahan do it?

Page 216

1    **A. I don't know.**
2    Q. Do you know whether she told these reporters
3 that she sent the statement to that they were not
4 to disclose it to anybody before 10:00 a.m.?
5    **A. They have a -- in the subject line, it says**
6 **in capital letters, embargoed until 10:00 a.m. And**
7 **if she sent the document that is marked there, she**
8 **sent them the document with the embargoed times**
9 **stated on it.**
10    Q. Ms. Holahan, you testified about Ms. Holahan
11 at the quarterly refunding press conference on
12 October 31st, correct, earlier? She was there.
13 Right?
14    **A. Yes.**
15    Q. Was that the first quarterly refunding press
16 conference she had ever organized?
17    **A. Yes.**
18    Q. Do you know whether she had ever attended
19 one before?
20    **A. I don't recall specifically.**
21    Q. Were you concerned about her lack of
22 experience?

Page 217

1    **A. No.**
2    Q. Okay. After the conference ended, you said
3 you then went to Mr. Fisher's office?
4    **A. Yes.**
5    Q. Do you know where Frances Anderson was
6 during the press conference?
7    **A. I don't know specifically.**
8    Q. Were there charts outside of the room for
9 reporters to pick up?
10    **A. Charts? It's possible. I don't recall. I**
11 **was asked that question yesterday also. I don't**
12 **remember.**
13    Q. You were asked that also? Did they have a
14 transcript in front of you while they were asking
15 these questions?
16    **A. No.**
17    Q. All right. So you went back to Mr. Fisher's
18 office on October 31. Then what happened?
19    **A. I went to Peter's office and just remarked**
20 **on the press conference, and just noting that there**
21 **wasn't, you know, weren't a whole lot of questions.**
22 **Went downstairs back to my desk. And I knew that I**

55 (Pages 214 to 217)

Anthony Fratto                                                                    August 30, 2006
                                        Washington, DC

| Page 218 | Page 220 |
|---|---|
| 1 had other business that day in my portfolio dealing | 1 And so I said, "So you posted it?" And she said, |
| 2 with the international side that I was looking at, | 2 "Yeah. I thought it was supposed to go out." And |
| 3 so I wanted to take some time to look at some | 3 someone else said, "Yeah, but no, there was |
| 4 things I needed to read and look at some press | 4 something else at 9:30 or somewhere around the 9:30 |
| 5 lists. So I went on-line, and just wanted to wait | 5 range." And I said, "Look, if we posted it, then |
| 6 until 10:00 when the news broke and see, you know, | 6 we posted it, that's a problem. But I don't know |
| 7 see what the stories were. | 7 anything about 9:30." And just then Glenn, I |
| 8   So I was at my desk, and was told that Brian | 8 remember Glen Somerville walking in. I seem to |
| 9 Roseborough and Tim Bitsberger and I think Jeff | 9 think Marty Krutsinger was with him, also. But |
| 10 Hoother were out in the main suite out front where | 10 Glenn Somerville came up and said, "Tony, we have |
| 11 Frances was, and I think Frances buzzed me. And I | 11 to, we have to let our stories go. You guys posted |
| 12 can't remember the specific time, it was probably | 12 the statement early." |
| 13 9:45, you know, somewhere in that range, that they | 13   Q. Somerville was from where? |
| 14 were in there saying something about the news | 14   A. Reuters. And I said -- and I could see on |
| 15 getting out. And so I came out and said, you know, | 15 France's screen that it was posted. I could see, |
| 16 what's up? And they said that, you know, people | 16 you know, she had it on her screen that it was |
| 17 are saying that the news got out early and that, | 17 posted. And I said, "Glenn. Get your story |
| 18 you know, that we posted the -- we posted the | 18 out. Go get it out." And I don't know whether he |
| 19 statement early. And then there was some confusion | 19 was telling me -- I can't remember if he was |
| 20 because there was discussion over whether -- | 20 telling me that he already sent it out or now I'm |
| 21 actually, now that I think about it, it must have | 21 giving him authority to send it out. You know. I |
| 22 been a little bit later because the confusion was | 22 think he was just informing me that they need to |

| Page 219 | Page 221 |
|---|---|
| 1 over whether they were talking about us posting the | 1 get it out before -- or they're getting it out |
| 2 statement or whether it had to do with some, you | 2 before the embargo because we posted it already. |
| 3 know, chatter in the markets about news coming out | 3 And I said, "Yes, get it out. And tell the |
| 4 about the announcement prior to the release. So | 4 pressroom everyone can get it out." You know, |
| 5 we're -- | 5 essentially I'm lifting the embargo. |
| 6   Q. And who are you talking to at this time? | 6   Q. You said this to whom? |
| 7   A. Bitsberger, Roseborough, and Jeff Hoother, | 7   A. Glenn Somerville. |
| 8 who my recollection is that those three there. | 8   Q. Who was from? |
| 9 There might have been somebody else there, also, | 9   A. Reuters. |
| 10 but I seem to remember those three. | 10   Q. And was Jonathan Nichols from Reuters, too? |
| 11   Q. At what time? | 11   A. Yeah. Jonathan might have been there. I |
| 12   A. Sometime between 9:45 and 10:00. There is | 12 remember specifically talking to Glenn. He's just |
| 13 some time mark somewhere on whenever the statement | 13 the one I remember walking in. |
| 14 was actually posted. It was after the statement | 14   Q. What did Frances say at that conversation? |
| 15 was actually posted, because it was a question of | 15   A. I could tell that Frances was pretty upset. |
| 16 whether it was -- what we were talking about. | 16 You know, she's got a lot of bunch of senior |
| 17 Because someone was throwing around the word leak. | 17 officials in her office, you know, talking about |
| 18 There was a leak. And then they said, yeah, we | 18 something bad that happened that she was involved |
| 19 posted the statement. And I said -- I said, wait. | 19 in. And I didn't want to talk to her about it |
| 20 We posted the statement. And then Frances was | 20 specifically with the others there because I could |
| 21 sitting there, and said, "What happened?" And | 21 see that it was -- she was really upset. You know. |
| 22 Frances said, "I thought it was supposed to go." | 22 And I said, "Just hold on, guys. Let's, you know, |

56 (Pages 218 to 221)

Anthony Fratto                                                                        August 30, 2006

Washington, DC

Page 222

1  let's sort this out and just figure out what the
2  heck, what happened here. And if we made a
3  mistake, we made a mistake, and there's nothing we
4  can do about that. It's done. Let's lifts the
5  embargo and so it's out." And then it was, you
6  know, somebody else said, "Yeah. But what happened
7  at 9:30?" And it was at that point that somebody
8  walked in with a chart, a Bloomberg chart and said,
9  you know, "Something moved the markets at 9:30."
10 And I said, "I don't know anything, I don't know
11 anything about that. I didn't hear anything, I
12 didn't see anything. You know, if we released it
13 early at whatever that specific time was, we did,
14 it was a mistake, I'm sorry, but there's nothing we
15 can do about it now. It's just out there."
16    Q. Did Frances say why she had put it on the
17 Web site before 10:00?
18    A. All she said to me was, "I thought it was
19 supposed to go out." You know, she just -- and
20 repeated it a couple times. "I thought it was
21 supposed to go out. I thought it was supposed to
22 go out." And I said, "It's okay, we'll talk about

Page 223

1  it later. It's okay. Just, you know, let's make
2  sure you get it out to everybody."
3     Q. Did you talk to her about it later?
4     A. Afterwards? Oh, yes.
5     Q. And what did she say?
6     A. She said the same thing. She said, "I
7  didn't -- you know." I said, "But, Frances, we did
8  talk about -- I said we did talk about, you know,
9  that it shouldn't be posted until 10:00." And she
10 said, "I know, I just -- I wasn't -- I got it
11 loaded up, and I just did the next thing that I
12 always do, which is just to -- I posted it. I
13 just, I wasn't thinking."
14    Q. But she posted it at what time?
15    A. I don't remember.
16    Q. Did she say?
17    A. There is a record somewhere of the exact
18 time. I don't know what the exact time was.
19    Q. Do you --
20    A. And then talked about it subsequently with
21 her and sort of -- you know, we do reviews, and we
22 talked about it in reviews about the importance of

Page 224

1  being especially careful and those types of things.
2  That's all. She hasn't done it since, to my
3  knowledge.
4     Q. Did you learn that she had passed out the
5  statement where it said "for immediate release"
6  from her?
7        MS. WILLIAMS: Objection.
8     A. I don't remember. You mean did she tell me
9  that? I don't remember. I'm not even sure at that
10 -- you're talking about at that time after that
11 meeting in my office?
12       BY MR. THEODOROU:
13    Q. Yes.
14    A. No. I don't remember. I didn't know at
15 that point in time. It was later than that that I
16 found out.
17    Q. Do you know who Brian Collins is?
18    A. I know the name.
19    Q. Okay. He's a columnist for the National
20 Mortgage News. Have you heard of that?
21    A. I've heard of National Mortgage News. I
22 don't know much about them.

Page 225

1     Q. Did you ever know that -- did you ever
2  become aware of that about 9:35 a.m. on October 31st,
3  Collins called Janice Smith, an official at Fannie
4  Mae, and told her about the Treasury's decision to
5  call the 30-year bond?
6     A. No.
7        MS. WILLIAMS: Objection.
8        BY MR. THEODOROU:
9     Q. You never learned about that?
10    A. No.
11       MS. WILLIAMS: Objection.
12    A. This is the first I've heard about that.
13       BY MR. THEODOROU:
14    Q. You never became aware of Mr. Collins making
15 calls about Mr. Fisher's statement?
16    A. No.
17       MS. WILLIAMS: Objection.
18       BY MR. THEODOROU:
19    Q. You never became aware of Mr. Collins making
20 calls about Mr. Fisher's statement before 10:00
21 a.m. that day?
22       MS. WILLIAMS: Objection.

57 (Pages 222 to 225)

Anthony Fratto                                          August 30, 2006
Washington, DC

| Page 226 | Page 228 |
|---|---|

**Page 226**

1    A. I didn't find out about him making calls
2  about the official statement until you telling me
3  right now.
4       BY MR. THEODOROU:
5    Q. Did you ever learn that at least nine
6  additional persons learned about the decision by
7  9:50 a.m. that day?
8       MS. WILLIAMS: Objection.
9       BY MR. THEODOROU:
10   Q. Treasury's?
11   A. No.
12   Q. Had Mr. Collins, who is a reporter, released
13  the information about 9:35 a.m.?
14   A. Was he a reporter?
15   Q. He's a reporter, and he released it at 9:35.
16   A. Was he a reporter?
17   Q. He was a reporter.
18   A. I want to verify that he was in fact a
19  reporter.
20   Q. So you have another person who wasn't a
21  reporter at the press conference?
22       MS. WILLIAMS: Objection.

**Page 227**

1    A. I don't know. I don't know that he was at
2  the press conference.
3       BY MR. THEODOROU:
4    Q. Do you know whether Treasury ever took any
5  action against Brian Collins?
6    A. This is the first I've learned that Brian
7  Collins did something that we would object to. So
8  — or may have done something.
9    Q. Do you know if Treasury ever reprimanded any
10  individuals for their conduct on October 31st?
11   A. No. Or, I don't know, I should say.
12   Q. Did you ever see the version of Mr. Fisher's
13  statement printed on the Web site?
14   A. Yes.
15   Q. You looked at it?
16   A. Yeah.
17       (FRATTO Exhibit Number 15 was marked for
18  identification.)
19       BY MR. THEODOROU:
20   Q. I'm showing you what's been marked as
21  Exhibit 15. Do you see that document?
22   A. I do.

**Page 228**

1    Q. Had you seen it before?
2    A. I don't think so.
3    Q. All right. Take a look at it. Is this the
4  version of Mr. Fisher's statement that went out on
5  the Web site?
6    A. I don't know.
7    Q. Well, does it refresh your recollection when
8  you look at the bottom?
9    A. Oh, yeah.
10   Q. In fact, it says it's the Treasury Web site
11  there?
12   A. Yes.
13   Q. And this particular version says "for
14  immediate release." Doesn't it?
15   A. It does.
16   Q. Did Frances Anderson ever tell you why she
17  put "for immediate release" on the document?
18   A. Well, she was — she's never told me. No.
19  I can make a point that having a release or an
20  embargo guidance on a document on the Web site is
21  inconsequential because it's live when it's posted.
22  It doesn't matter whether you say for release or

**Page 229**

1  not for release.
2    Q. It's out in the public domain?
3    A. Yeah.
4    Q. And is that the case when it gets on the
5  server?
6       MS. WILLIAMS: Objection.
7    A. When it gets on the server?
8       BY MR. THEODOROU:
9    Q. Yeah. Once it's posted to the server.
10   A. When it's posted to the public space where
11  it can be accessed by someone in the public, that's
12  when it's matters.
13       BY MR. THEODOROU:
14   Q. Let me show you what's being marked as
15  Exhibit 16.
16       (FRATTO Exhibit Number 16 was marked for
17  identification.)
18       BY MR. THEODOROU:
19   Q. I want to direct your attention to Exhibit
20  16. Do you see the document that's before you?
21   A. I do.

58 (Pages 226 to 229)

Anthony Fratto                                                    August 30, 2006
                          Washington, DC

| Page 230 | Page 232 |
|---|---|

**Page 230**

1    Q. Have you seen it before?
2    A. Yes.
3    Q. And what is it?
4    A. It's a statement from the Office of Public
5    Affairs just commenting on what happened that
6    morning.
7    Q. And who prepared this document?
8    A. I did.
9    Q. And was it posted to the Web site at
10   Treasury?
11   A. It was.
12   Q. Now, at the time this was released in
13   October 31st, 2001, about what time of day was this
14   released?
15   A. I don't remember.
16   Q. Now, in this document you state, "The
17   announcement was inadvertently posted on the
18   Treasury Web site at approximately 9:50 a.m.
19   Treasury regrets that this occurred and will work
20   to ensure the integrity of the announcement
21   process."
22       Do you see that?

**Page 231**

1    A. I do.
2    Q. Actually, let's put the whole thing into
3    context. It says, "Following Treasury's quarterly
4    refunding press conference this morning, it came to
5    our attention that the content of the announcement
6    was made public prior to the 10:00 a.m. embargo.
7    The announcement was inadvertently posted on the
8    Treasury Web site at approximately 9:50 a.m.
9    Treasury regrets that this occurred and will work
10   to ensure the integrity of the announcement
11   process."
12       Do you see that?
13   A. I do.
14   Q. What was the basis for you stating that it
15   was inadvertently posted on the Web site at
16   approximately 9:50?
17   A. My conversation with Frances.
18   Q. And what did she say?
19   A. She said that she posted it, and she thought
20   it was at around 9:50.
21   Q. So at that time, Treasury had not done a
22   complete review of the computer server system.

**Page 232**

1    Correct?
2        MS. WILLIAMS: Objection.
3        A. I don't know if someone had or hadn't. But
4    I wasn't aware of a specific time at that time.
5        BY MR. THEODOROU:
6        Q. But the time you state in here, 9:50, was
7    based on your discussion with Ms. Anderson.
8    Correct?
9        A. Yes.
10       Q. And what she said she thought she put it on
11   at 9:50?
12       A. Yes. That's why, I mean, I used the word
13   approximately, because I wasn't certain of the
14   specific time.
15       Q. And subsequent to this, you learned that the
16   Fisher statement was posted on the Internet before
17   9:50.
18       MS. WILLIAMS: Objection.
19       A. I have heard that it was something like
20   9:47, 9:48. Something like that.
21       BY MR. THEODOROU:
22       Q. Did you learn on October 31 or after October

**Page 233**

1    31 that it was posted earlier than 9:50?
2        A. I don't remember.
3        MS. WILLIAMS: Objection.
4        BY MR. THEODOROU:
5        Q. You don't remember whether it was on October
6    31 or after October 31. Is that what you don't
7    remember?
8        A. Yes, that's right.
9        Q. But at some point, you learned after this
10   statement went out on the Web site that --
11       A. There was a --
12       Q. -- Mr. Fisher's statement was posted on the
13   Web site before 9:50?
14       A. At some point after this statement went out,
15   I was told that.
16       Q. And after October 31st, did Treasury make
17   changes in how it handled quarterly refunding press
18   conferences?
19       A. Yes.
20       Q. What changes were made?
21       A. We decided to release the statement in the
22   Treasury pressroom. We essentially decided to

59 (Pages 230 to 233)

Anthony Fratto                                                                    August 30, 2006
                        Washington, DC

| Page 234 | Page 236 |
|---|---|
| 1  de-link press conference from the release of the | 1  announcement goes public -- the announcement of the |
| 2  statements.  So we released the statement first in | 2  conference goes on the Web site.  Correct? |
| 3  the Treasury pressroom, and then the press | 3      MS. WILLIAMS:  Objection. |
| 4  conference is held an hour later.  So the statement | 4      A. It's saying we will post the announcement. |
| 5  is down in the Treasury pressroom for release at | 5  The announcement, meaning the statement of the |
| 6  9:00 a.m., and the press conference is held at | 6  quarterly refunding -- |
| 7  10:00. | 7      BY MR. THEODOROU: |
| 8      Q. Any other changes? | 8      Q. That it's going to take place? |
| 9      A. We try to keep a closer watch on who's in | 9      MS. WILLIAMS:  Objection. |
| 10  our press conferences, although it's not quite as | 10      A. No.  That's referring to the statement.  To |
| 11  important at that time since the news has already | 11  the news. |
| 12  been released.  But we keep a tighter rein on all | 12      BY MR. THEODOROU: |
| 13  of our press conferences. | 13      Q. The statement would go out at 9:00.  So it |
| 14      Q. Was there any change in whether the | 14  goes public at 9:00? |
| 15  attendees were to be press members or members of | 15      A. That's exactly right. |
| 16  the public? | 16      Q. And the announcement also will be delivered |
| 17      A. They can be members -- basically, the Office | 17  to credentialed members of the media in the |
| 18  of Public Affairs has complete authority on who | 18  Treasury pressroom shortly before 9:00 a.m. with |
| 19  attends a press conference.  So even if policy | 19  lockdown embargo rules. |
| 20  staff within Treasury, if general counsel wants to | 20      Correct? |
| 21  attend a press conference, they need to ask our | 21      A. Correct. |
| 22  permission. | 22      Q. So the difference between this and the |

| Page 235 | Page 237 |
|---|---|
| 1      (FRATTO Exhibit Number 17 was marked for | 1  procedures that govern the prior conferences was |
| 2  identification.) | 2  the announced -- you set a time at which the |
| 3      BY MR. THEODOROU: | 3  announcement will go out.  Right? |
| 4      Q. Mr. Fratto, let me show you what's been | 4      A. Yes. |
| 5  marked as Exhibit 17.  Do you see that? | 5      MS. WILLIAMS:  Objection. |
| 6      A. I do. | 6      A. Oh, I'm sorry.  We set a time.  In both |
| 7      Q. Have you seen that document before? | 7  cases, we're setting a time. |
| 8      A. Yes. | 8      BY MR. THEODOROU: |
| 9      Q. And what is it? | 9      Q. But in this case, you said that the |
| 10      A. It's our statement on procedures for | 10  announcement, beginning on January 30, 2002 would |
| 11  quarterly refunding announcements. | 11  go out at 9:00 a.m.  Correct? |
| 12      Q. And when did this set of procedures go into | 12      A. Yes. |
| 13  effect? | 13      Q. That announcement would also be delivered to |
| 14      A. January 30th of 2002. | 14  credentialed members of the media in the Treasury |
| 15      Q. Now, according to this, if you look at the | 15  pressroom shortly before 9:00 a.m.  Correct? |
| 16  second paragraph, it says, "Starting with the next | 16      A. Correct. |
| 17  scheduled refunding announcement on January 30, | 17      Q. It also says with lockdown embargo rules. |
| 18  2002, Treasury's Office of Public Affairs will post | 18  Do you see that? |
| 19  the announcement on the Treasury Web site at 9:00 | 19      A. Yes. |
| 20  a.m."  Do you see that? | 20      Q. And what did that mean? |
| 21      A. Yes. | 21      A. That means that when we deliver the |
| 22      Q. So the announcement, does that mean that the | 22  documents to the Treasury pressroom, that they |

60 (Pages 234 to 237)

Anthony Fratto                                                      August 30, 2006
Washington, DC

Page 238

1   cannot leave the pressroom.
2       Q. And there were no lockdown rules in effect
3   before January 30th, 2002. Correct?
4       A. That's correct.
5       Q. And it says, "The traditional practice of
6   releasing the quarterly refunding announcement at a
7   news conference will be discontinued."
8           Do you see that?
9       A. Yes.
10      Q. That meant that there would no longer --
11  does that mean that there would no longer be a news
12  conference?
13      A. No. It just meant that the release of the
14  statement and the news conference would be
15  de-linked. That the events, they wouldn't occur in
16  the same event.
17      Q. So the statement, in contrast to October
18  31st where a statement was released there and given
19  to members of the media --
20      A. And all previous quarterly refunding
21  announcements, that I'm aware of.
22      Q. Beginning on January 30, 2002, it would not

Page 239

1   be released to them at the press conference?
2       A. That's right. They would have had it
3   already.
4       Q. Now, under these new policies, are reporters
5   allowed to make telephone calls before 9:00 a.m.?
6       A. You mean before 9:00 a.m. after receiving
7   the document?
8       Q. Yes.
9       A. It depends on who they call.
10      Q. But it doesn't state in here who they can
11  call. Does it?
12      A. No. That would be -- the rules of an
13  embargo are the rules of an embargo.
14      Q. But are they allowed to call someone?
15      A. Who?
16      Q. Before 9:00 a.m.?
17      A. Who? It depends on who they may decide to
18  call. Can they call a member of the general
19  public? No. Can they call their editor? Yes.
20      Q. And have you instructed members of the press
21  that they can only call their editors?
22      MS. WILLIAMS: Objection.

Page 240

1       A. No. It's not necessary.
2       BY MR. THEODOROU:
3       Q. Can they call anybody else besides their
4   editors at the media outlets?
5       A. They can call members of their news
6   organization. They can talk to each other.
7       Q. So they can call anybody at their news
8   organization?
9       A. They can call anyone at their news
10  organization.
11      Q. When it says shortly before 9:00 a.m., what
12  does that mean?
13      A. That's purposefully ambiguous. It could be
14  five minutes before, it could be 15 minutes before.
15  We can decide.
16      Q. And it's Treasury who decides this.
17  Correct?
18      A. Yes.
19      Q. Not the press?
20      A. No.
21      Q. Now, have you taken the discretion away from
22  the press with these new procedures?

Page 241

1       MS. WILLIAMS: Objection.
2       A. We've give the press exceptional discretion
3   in setting embargoes. If you are asking about this
4   specific case?
5       BY MR. THEODOROU:
6       Q. Yes.
7       A. I would say we maintain control of the
8   discretion as we have the discretion in October.
9       Q. Well, in the case of quarterly refunding
10  conferences, the press is no longer polled about
11  what time the embargo or how long the embargo
12  should be. Correct?
13      A. The embargo is pre-set. The embargo is 9:00
14  a.m. The question of how long they have the
15  document before the embargo, that's completely at
16  our discretion.
17      Q. Now, under the new procedures, does an
18  employee of Public Affairs explain the embargo
19  policy when the press conference takes place at the
20  quarterly refunding conferences?
21      A. No. Not that I'm aware of.
22      Q. Does anybody from the Office of Public

61 (Pages 238 to 241)

Anthony Fratto
Washington, DC
August 30, 2006

Page 242

1 Affairs define what embargo means to those
2 attending the conferences?
3    **A. No, we don't. As I said, it's not**
4 **necessary. An embargo is an embargo.**
5    Q. An embargo's an embargo.
6    **A. Yeah.**
7    Q. So today, the Treasury Department still
8 doesn't have any -- to your knowledge, anything in
9 writing that defines what embargo is?
10    **A. No.**
11    MS. WILLIAMS: Objection.
12    BY MR. THEODOROU:
13    Q. Do you know whether the Treasury Department
14 has anything in writing that defines embargo?
15    **A. Not to my knowledge.**
16    Q. Do you know whether the Treasury Department
17 has anything in writing that defines news embargo?
18    **A. I know of nothing at the Treasury Department**
19 **that defines a news embargo, nor do I think one is**
20 **necessary. A reporter knows what embargo means.**
21    Q. Has anyone told you that embargo is the
22 defined differently by various agencies?

Page 243

1    **A. No.**
2    MR. THEODOROU: No further questions at this
3 time.
4    MS. WILLIAMS: Can we take a short break?
5    THE VIDEOGRAPHER: Off the record at
6 3:57:30.
7    (Recess taken.)
8    THE VIDEOGRAPHER: On the record at 4:12:19.
9       EXAMINATION
10    BY MS. WILLIAMS:
11    Q. Mr. Fratto, I have a few questions. Besides
12 the press, were employees from other government
13 agencies allowed to attend Treasury refunding
14 conferences?
15    MR. THEODOROU: Objection.
16    **A. I wouldn't be surprised if they did. I**
17 **don't recall having specific conversations about**
18 **it.**
19    BY MS. WILLIAMS:
20    Q. And do you know if any government employees
21 ever attended any Treasury refunding conferences
22 before October 31, 2001?

Page 244

1    **A. Besides Treasury?**
2    Q. Besides Treasury staff?
3    **A. I'm just not aware.**
4    Q. What about at the October 31st, 2001
5 refunding conference?
6    **A. I don't recall.**
7    Q. What about members of the Treasury Borrowing
8 Advisory Committee? Do you know if they were
9 allowed to attend the refunding conferences?
10    **A. I don't -- again, I don't recall that there**
11 **was a specific allowance, whether there was a**
12 **specific policy on it. I wouldn't be surprised if**
13 **they did, and I wouldn't have objected to them.**
14 **They are a part of the refunding process.**
15    Q. If a Treasury Borrowing Advisory Committee
16 member attended, would you expect them to abide by
17 the embargo?
18    MR. THEODOROU: Objection.
19    **A. I personally expect anyone in the room to**
20 **abide by the embargo.**
21    BY MS. WILLIAMS:
22    Q. So that includes if they were employees from

Page 245

1 other government agencies?
2    MR. THEODOROU: Objection.
3    A. Yes.
4    **BY MS. WILLIAMS:**
5    Q. And Treasury employees also?
6    **A. Yes.**
7    Q. You consider the embargo to apply to them as
8 well?
9    **A. I expect the embargo to apply to anyone who**
10 **is within earshot of the direction given at the**
11 **press conference.**
12    Q. Do you know how other government employees
13 who wish to attend Borrowing Advisory Committee
14 meetings were, what they were required to do to
15 gain entrance into those conferences?
16    **A. The only way -- the only way they could get**
17 **into the conference is to be cleared into the**
18 **building by someone at the Treasury Department. So**
19 **someone would have to clear them in. And either if**
20 **they knew where the room is, they would go to the**
21 **room. But my office was only involved in clearing**
22 **in members of the media, so I presume they did with**

Alderson Reporting Company
1-800-FOR-DEPO

Anthony Fratto                                                    August 30, 2006
Washington, DC

Page 246

1  their policy counterparts.
2      Q. And when you say their policy counterparts,
3  are you referring to other offices in Treasury
4  besides the Office of Public Affairs?
5      A. That's right.
6      Q. During Mr. Theodorou's questioning, you
7  discussed embargoes that were Treasury imposed, and
8  then there were some embargoes that were imposed by
9  the press. Is that accurate statement of your
10 testimony?
11     MR. THEODOROU: Objection.
12     BY MS. WILLIAMS:
13     Q. That sometimes Treasury imposed an embargo,
14 and sometimes the press self-imposed an embargo?
15     MR. THEODOROU: Objection.
16     A. There were times when Treasury would impose
17 the -- would state the time, a specific time for an
18 embargo. There were other times that -- because
19 the press always wants an embargo, that they would
20 self-set an embargo on their own. And then there
21 were times that it would happen within some
22 negotiation between us and the reporters.

Page 247

1      BY MS. WILLIAMS:
2      Q. My question is a little different. Not as
3  to what the embargo time would be, but whether
4  there would be an embargo at all. Were there times
5  that Treasury decided there would be an embargo?
6      A. Yes.
7      Q. Were there times where the press themselves
8  decided there would be an embargo?
9      A. I'm sorry. Yes, there were times when we
10 had an interest in absolutely setting an embargo.
11 There were other times where we had -- we would
12 have documents that, you know, it wasn't -- we
13 didn't have a strong interest on whether there was
14 an embargoed time set or not. So -- and so the
15 reporters would announce that they would, on their
16 own that they would like to have an embargo. So
17 they would set their own embargo time.
18     Q. What, if any, interest did Treasury have in
19 setting an embargo, having an embargo with respect
20 to Treasury refunding conferences?
21     MR. THEODOROU: Objection.
22     A. That the information would be released in a

Page 248

1  uniformed -- at a uniformed time, so that it wasn't
2  coming out from different outlets at different
3  times. We didn't want to have -- we didn't want to
4  create a situation where -- you know, there's
5  nothing preventing us from giving the news to any
6  specific news organization. We can choose to make
7  that decision, and decide that all of our news is
8  going to go to Bloomberg. But we don't want to
9  pick favorites in terms of who delivers the news at
10 what time. We don't want to get involved in that
11 competitive relationship between, especially the
12 financial wires, but all members of the media, and
13 so we want to have a standard and predictable time
14 for when news is disseminated and that all of the
15 relevant news outlets get it and release it at the
16 same time.
17     BY MS. WILLIAMS:
18     Q. Do you recall there ever being a Treasury
19 refunding conference where Treasury decided it did
20 not want to impose an embargo?
21     MR. THEODOROU: Objection.
22     A. No. I have never heard of one.

Page 249

1      BY MS. WILLIAMS:
2      Q. And what kind of information was released by
3  Treasury that Treasury would decide they did not
4  want an embargo, did not feel one was necessary?
5      MR. THEODOROU: Objection. Foundation.
6      A. There were occasions where we would release
7  a statement that, in our judgment, was after the
8  fact of a news event. So we were maybe commenting
9  on something that already happened, and it
10 wasn't -- you know, it didn't involve the release
11 of data or didn't involve a policy change, it was
12 maybe just a statement on an event. In those
13 cases, I could think of lots of them, there really
14 wasn't a market -- there really wasn't a market
15 sensitive item from our perspective, probably not
16 sensitive in any way, and we would walk, you know,
17 the documents down to the pressroom and announce to
18 them, just tell them here's a statement from me or
19 the secretary or someone else. And they would say
20 we would like to set an embargo. And I'd say fine.
21 You know, if you want one, go right ahead.
22     BY MS. WILLIAMS:

Alderson Reporting Company
1-800-FOR-DEPO

Anthony Fratto                                              August 30, 2006
                        Washington, DC

| Page 250 | Page 252 |
|---|---|

**Page 250**

1   Q. And I know that you also discussed the
2   setting of embargo times. Sometimes the embargoed
3   times would be set by the press. Is that an
4   accurate statement?
5      A. Yes.
6      Q. And I believe on direct examination you used
7   the term self-policing, the press?
8      A. Self-enforcing.
9      Q. Or self-enforcing. What do you mean by
10  self-enforcing?
11     A. I meant that all of the reporters, reporters
12  who cover Treasury that I've ever dealt with are
13  very aware of any potential infraction by their
14  colleagues. And they don't want say, you know,
15  sort of a dog eat dog world with them. But they're
16  competitors and they watch what each other does, or
17  news organizations watch what each other does. So
18  if a news organization would break an embargo, you
19  know, I would hear about it, but they would hear
20  about it first. They would hear about it from each
21  other. And they are very aware and cognizant of
22  embargo times. They know that their -- if the

**Page 252**

1   would be to, you know, to fix -- if that problem
2   existed, to fix that problem, but that you
3   shouldn't presume that it wouldn't come without
4   some costs. And that's one of the costs, is that
5   stories would be written and that could have
6   misinformation or inaccurate information or
7   reported with little appropriate interpretation by
8   the reporters.
9      Q. I wanted to draw your attention to the May
10  2001 Treasury refunding conference.
11     A. Um-hmm.
12     Q. And I believe you said that an embargo was
13  set at that conference?
14     A. It was.
15     Q. And it was set at the end of the conference?
16     A. Yes.
17     Q. By polling the press to see how much time
18  they needed?
19     A. That's right.
20     Q. Is that correct? Do you recall anyone in
21  the room asking any questions about the embargo?
22     A. No.

**Page 251**

1   Treasury press corps had a problem with dealing
2   with embargoes, we would have absolutely no
3   recourse but to stop giving them news in advance.
4      Now, that wouldn't be optimal for us because
5   we gain something from having reporters having
6   sufficient time to thoughtfully look at the news
7   they get and report it accurately, and help them on
8   an occasion where during an embargo a reporter
9   noticed an error in one of the numbers in the
10  document, and we were able to correct that error
11  before they print it. Now, I mean, they also
12  printed that they found an error in our original
13  document and that we had to correct it, but that's
14  a much better case than having the error go out
15  without any correction. I mean, so like we get
16  something out of them, you know, looking at an
17  embargo time.
18     But if they had a problem dealing with
19  embargoes, if they were constantly or even with any
20  regularity breaking an embargo or releasing things
21  outside the embargo time, we would have no choice
22  but to just only deliver things live. And that

**Page 253**

1      Q. Do you recall anyone asking what they were
2   allowed to do with embargoed information at that
3   May 2001 conference?
4      A. No.
5         MR. THEODOROU: Objection.
6         BY MS. WILLIAMS:
7      Q. Do you recall receiving any questions from
8   any attendees regarding the embargo policies or
9   procedures at the May 2001 conference?
10        MR. THEODOROU: Objection.
11     A. No.
12        BY MS. WILLIAMS:
13     Q. The Treasury refunding conferences, are they
14  open to press that does not have space in the
15  Treasury pressroom?
16     A. Yes.
17     Q. Do you know if any cameras were present at
18  the May 2001 conference, May 2nd, 2001?
19     A. I don't remember.
20     Q. Do you recall if anyone broke the embargo at
21  the May 2001 refunding conference?
22     A. No. No one broke the embargo.

64  (Pages 250 to 253)

Anthony Fratto

Washington, DC

August 30, 2006

## Page 254

1  Q. What about the October 31st, 2001
2  conference? Do you recall anyone calling prior to
3  the conference but after the October 30th media
4  advisory came out asking you questions about
5  Treasury's embargoed policies or procedures?
6      MR. THEODOROU: Objection.
7  A. No.
8      BY MS. WILLIAMS:
9  Q. At that conference, do you recall any
10  questions being asked about what embargo meant?
11      MR. THEODOROU: Objection.
12  A. I've never had a reporter ask me what an
13  embargo meant.
14      BY MS. WILLIAMS:
15  Q. At the October 2001 refunding conference, do
16  you recall anyone asking what Treasury's embargo
17  procedures were?
18      MR. THEODOROU: Objection.
19  A. No.
20      BY MS. WILLIAMS:
21  Q. Do you recall if the doors were open during
22  the October 31st 2001 Treasury refunding

## Page 255

1  conference?
2  A. I'm not sure that I can recall well enough
3  to answer. I have a feeling that they were closed,
4  but I don't know that I can say with absolute
5  certainty.
6  Q. Can I refer you to Exhibit 1. And before I
7  ask you any questions about this, do you recall if
8  anyone left the conference early?
9  A. I don't recall anyone leaving it early.
10  Q. And what about showing up late? Do you
11  recall if anyone showed up to the October 31st,
12  2001 conference late?
13  A. I don't remember anybody walking in late.
14  Q. Do you know if Betsy Holahan assigned anyone
15  to watch the doors to keep people from leaving the
16  room after the conference started?
17  A. I don't know.
18  Q. Do you recall seeing Tara Bradshaw at the
19  October 2001 conference?
20  A. I don't have a good memory of that, if she
21  was or wasn't there.
22  Q. Did Treasury make any changes to embargo

## Page 256

1  procedures for any other conferences besides
2  Treasury refunding conferences after the October
3  31st, 2001 conference?
4  A. No.
5  Q. Why not?
6  A. Because we don't have any problem with
7  embargoes. Even the new procedures for -- the new
8  procedures for the quarterly refunding announcement
9  wasn't specifically to fix an embargo problem. It
10  was really to fix a room access problem. We
11  separated the statement from the press conference
12  and put in new procedures to -- you know, again,
13  not really to fix a problem that had to do with our
14  relationship with the news media, it had to do with
15  people that were not -- you know, not in the news
16  media. But we haven't had a reason to do it for
17  any other events. We keep -- the only thing we do
18  is keep a tighter rein and ensuring that we know
19  who is in our events, and that we have authority on
20  who is in our events. But we have never had a
21  problem of embargoes with members of the news
22  media.

## Page 257

1  Q. So for --
2      MR. THEODOROU: Objection.
3      BY MS. WILLIAMS:
4  Q. For conferences at Treasury, other than
5  Treasury refunding conferences, after October 31st,
6  2001, were there any lockdown procedures put in
7  place for the release of information?
8  A. I'm sorry. After October 31st?
9  Q. After October 31st.
10  A. Just for the quarterly refunding
11  announcement statements, announcements.
12  Q. Prior to coming to the Treasury, did you
13  have an understanding of what an embargo was?
14  A. Yes.
15  Q. What did you understand embargo meant?
16  A. An embargo means that the news media can't
17  publish or broadcast information until the time
18  specified by the embargo has expired.
19  Q. How did you come to that understanding of
20  what an embargo was?
21  A. I think I first learned of it in a
22  journalism class in 1987 at the University of

65 (Pages 254 to 257)

Anthony Fratto                                                    August 30, 2006
                          Washington, DC

Page 258

1   Pittsburgh, and then used and dealt with embargoes
2   throughout my career.
3      Q.  When you say you dealt with embargoes
4   throughout your career, in what jobs did you deal
5   with embargoes prior to coming to Treasury?
6      A.  As a press secretary on Capitol Hill most
7   extensively.
8      Q.  Who was imposing embargoes that you were
9   exposed to while you were a press secretary on
10  Capitol Hill?
11     MR. THEODOROU:  Objection.
12     A.  Sometimes we would impose our own embargoes,
13  but frequently we had embargoes associated with
14  major speeches that occurred on Capitol Hill,
15  testimony that would be given that we would have
16  access to and that reporters would have access to,
17  but it would be embargoed until the time was
18  delivered.  We would get even, you know, advanced
19  copies on the evening of the State of the Union
20  address, for example, with the knowledge that it
21  was embargoed.  So it's something that's used daily
22  in the news media and where the news media -- and

Page 259

1   from my experience, where the news media and
2   government communicate and use documents, it's a
3   daily -- we use it daily.  We use embargoes every
4   day.
5      BY MS. WILLIAMS:
6      Q.  And these embargoes that you said you had
7   been exposed to when you were a press secretary on
8   Capitol Hill, did any of them involve lockdowns?
9      A.  No.  I don't think any of them involved
10  lockdowns.
11     Q.  Can I refer you to what's been marked as
12  Exhibit 13.  I notice at the top of the document it
13  says "for immediate release."  Do you see that?
14     A.  I do.
15     Q.  In your experience at Treasury, did you ever
16  have press releases that said for immediate release
17  that were distributed to the press during an
18  embargoed period?
19     A.  Yes.
20     Q.  And what, if any -- why would the press
21  release say for immediate release even though there
22  was an embargo in place?

Page 260

1      A.  Because it was -- we didn't want, when that
2   document was further distributed, to just to have
3   -- by the time that document would be further
4   distributed, it would be for immediate release.
5      Q.  And what, if any, effect is the fact that
6   the document said immediate release had on whether
7   it could have been distributed to the press during
8   the embargoed period?
9      MR. THEODOROU:  Objection.
10     A.  That depends.  I mean, you know, my
11  perspective, my view of it is that -- and I don't
12  know whether or not this was the document
13  distributed.  But the press officer who is
14  directing the press conference announces the
15  policy, you know, when it's -- or does it in
16  coordination with the press.  And when it's
17  announced, it's announced.  And that is -- that's
18  the rule.
19     BY MS. WILLIAMS:
20     Q.  When you say that's the rule, does that mean
21  that -- I'm trying to figure out the fact that the
22  document makes it for immediate release and the

Page 261

1   press officer makes it as an embargo, which one of
2   those apply?
3      A.  The press officer.
4      Q.  Have you ever had any experience where a
5   reporter released information because he thought
6   the document was for immediate release even though
7   there was an embargo in place?
8      MR. THEODOROU:  Objection.
9      A.  I have no experience with that.
10     BY MS. WILLIAMS:
11     Q.  Have you ever posted any documents to the
12  Treasury Web site?
13     A.  Myself?
14     Q.  Yes.
15     A.  Yes.
16     Q.  Could you explain the procedure that you
17  have to go through in order to post something to
18  the Web site?
19     A.  Sure.  It's in its form, it's not a whole
20  lot different from composing an e-mail, except for
21  instead of giving an address at the top you give a
22  in -- what would be sort of the subject line you

66 (Pages 258 to 261)

Anthony Fratto                                                    August 30, 2006
Washington, DC

Page 262

1  give a title, and then in what looks like a body
2  for creating an e-mail you can type in original
3  text or you can cut and paste from another document
4  like a Word document. You can cut and paste, you
5  know, text, and cut it, paste it into the body of
6  what would be -- what you intend to have posted.
7  And then you have usually a button that you can
8  click on that would say something like "publish."
9  You know. And you click that button, and what you
10 traditionally get is an intermediate step where you
11 get a chance to look at the document to see what it
12 looks like were it to be actually live and posted.
13 So it's not live, but it is translated into the
14 language they use for Web-based publications, and
15 it looks like a web page and you have a chance to
16 review it and see if it looks the way you want it
17 to look. And if there are any mistakes in it, you
18 can go back and edit it at that point. And then
19 there is another button that again would say
20 "publish" button. And it asks you, are you sure
21 that you're ready to publish this document? And so
22 there's usually a yes, no, check box. And if you

Page 263

1  are in fact ready to do that, you click yes, and it
2  goes to the live server that's available on the
3  Internet.
4      Q. Are you familiar with the term staging
5  server?
6      A. Yes.
7      Q. What is the staging server?
8      MR. THEODOROU: Objection.
9      A. My understanding is it's that intermediate
10 step, where the document is held while you're
11 looking at it; it's been translated into the web
12 language and it's on the -- it's waiting to be --
13 it's waiting for you to make that decision to do
14 actual final publication or not. So you need to --
15 it's that intermediate step that I talked about.
16 That's my understanding of it.
17     BY MS. WILLIAMS:
18     Q. And under your understanding, is information
19 on the staging server accessible by the public?
20     A. No.
21     MR. THEODOROU: Objection.
22     A. My understanding is that it's not.

Page 264

1      BY MS. WILLIAMS:
2      Q. When you say that you can make sure a
3  document looks the way you want it to look, what do
4  you mean?
5      MR. THEODOROU: Objection.
6      A. If you take a document like a document
7  created on Word or Word Perfect, it goes through a
8  -- you know, the software on the computer for web
9  publishing changes the code behind that document,
10 and it can change the, you know, it could change
11 the format. Also, when you publish to a web you're
12 not -- where you might have a document that's three
13 pages long, when you publish it to the web you
14 get instead is one long page that you can scroll
15 all the way down. So you may have things that may
16 in your document like page numbers, you might have,
17 you know, a header and a footer that if you -- you
18 know, if you just cut and paste the whole document
19 and put it on the Web site, you would still see
20 those things like page numbers and headers and
21 footers that would seem bizarre to you reading it
22 on the web, you know, as you scroll down a

Page 265

1  document. So you want to -- you know, you want to
2  be able to remove those things and translate this
3  document better for web posting. And so it goes
4  through that process. And it also sometimes
5  changes things like simple characters, like
6  quotation marks or, you know, if you have bulleted
7  texts sometimes it changes the bullets to squares
8  and all kinds of funky things happen that you need
9  to just take a look at and be able to fix.
10     BY MS. WILLIAMS:
11     Q. Do you know if this procedure that you
12 talked about for posting information to the Web
13 site, was the same procedure in place on October
14 31, 2001?
15     A. Yes.
16     MR. THEODOROU: Objection.
17     BY MS. WILLIAMS:
18     Q. Once the information, the press release from
19 October 31st, 2001 was posted on the Treasury Web
20 site, was the embargo still in place?
21     A. No.
22     Q. What were reporters allowed to do after the

67 (Pages 262 to 265)

Anthony Fratto                                                                                                August 30, 2006
Washington, DC

| Page 266 | Page 268 |
|---|---|
| 1  information was published on Treasury's Web site? | 1      MR. THEODOROU: Objection. |
| 2      A. Anything they wanted. | 2      A. I don't remember. It must have been after. |
| 3      Q. I think you mentioned one occasion where you | 3      BY MS. WILLIAMS: |
| 4  learned that an Associated Press reporter or | 4      Q. Can you refer to Exhibit 16. |
| 5  organization, Associated Press organization had | 5      A. Um-hmm. |
| 6  accidentally violated a Treasury embargo. Is that | 6      Q. 16. |
| 7  right? | 7      A. Oh, that's 17. I'm sorry. Got it. |
| 8      A. That's right. | 8      Q. Okay. And I'm looking at the first sentence |
| 9      MR. THEODOROU: Objection. | 9  of the second paragraph. "The announcement was |
| 10      BY MS. WILLIAMS: | 10  inadvertently posted on the Treasury Web site at |
| 11      Q. Do you know how far in advance of the | 11  9:50 a.m." |
| 12  expiration of the embargo that they accidentally | 12      A. Yes. |
| 13  disclosed embargoed information? | 13      Q. And I think when Mr. Theodorou was asking |
| 14      A. I recall it being a matter of minutes. It | 14  you questions, you stated that you drafted this |
| 15  was in the range of, you know, four to six minutes. | 15  announcement. Is that right? |
| 16      Q. On October 31st, 2001, do you know if | 16      A. That's right. |
| 17  Domestic Finance had any other press events | 17      Q. And that you got this approximate 9:50 a.m. |
| 18  scheduled that day after the Treasury refunding | 18  time from discussions with Ms. Anderson? |
| 19  conference? | 19      A. Yes. |
| 20      A. Yes. | 20      Q. And so the discussions with Ms. Anderson |
| 21      Q. Can you recall what other events were | 21  that you had, did those take place after 9:50 a.m. |
| 22  scheduled for Domestic Finance? | 22  regarding her posting the press releases on the Web |

| Page 267 | Page 269 |
|---|---|
| 1      A. One thing, I do know there was scheduled is | 1  site? |
| 2  a background, a background briefing that was to | 2      MR. THEODOROU: Objection. |
| 3  follow later that sometime after the press | 3      A. They had to have. Yeah. |
| 4  conference. I can't recall whether it was Peter | 4      MS. WILLIAMS: I have no further questions. |
| 5  Fisher or it was one of someone on his staff who | 5      MR. THEODOROU: I just have a couple. |
| 6  would host it. And that would be for just some | 6      EXAMINATION |
| 7  more in-depth background of the decision to | 7      BY MR. THEODOROU: |
| 8  discontinue the clearing. | 8      Q. You were asking several questions by |
| 9      Q. Who was allowed to attend the background | 9  Ms. Williams just now. Right? |
| 10  briefing that was scheduled that day? | 10      A. (Nodding head.) |
| 11      A. Those are strictly by invitation. | 11      Q. Yesterday, you met with the SEC lawyers for |
| 12      Q. Do you know who was invited for that | 12  three hours? |
| 13  particular briefing? | 13      A. Yeah. It wasn't more than that. |
| 14      A. I don't remember. | 14      Q. Did Ms. Williams ask you the same questions |
| 15      Q. Do you know what time that briefing was | 15  she just asked you yesterday? The questions she |
| 16  scheduled to begin? | 16  just asked you, did she ask you those questions |
| 17      A. I don't remember. | 17  yesterday? |
| 18      Q. Do you know if the briefing actually took | 18      A. No. |
| 19  place? | 19      Q. So you are saying that all the questions she |
| 20      A. I'm fairly certain it took place. Yeah. | 20  just asked, she did not ask you about any of those |
| 21      Q. Was it before you learned that the | 21  yesterday? |
| 22  information was posted on Treasury Web site? | 22      A. I'm trying to remember if -- |

68 (Pages 266 to 269)

Anthony Fratto

August 30, 2006

Washington, DC

Page 270

1    Q. It's your memory that controls.
2    A. Yeah. I don't think so. I mean, I'm trying
3    to think of if it -- if we could read back the
4    series of questions. I wasn't thinking that well.
5    Q. I didn't expect you. But the topics she
6    just went over, she reviewed those topics with you
7    yesterday. Didn't she?
8        MS. WILLIAMS: Objection.
9    A. Boy. There were a lot of things covered.
10   Those may have been. Those may have been.
11       BY MR. THEODOROU:
12   Q. When you sat down and spoke with the SEC
13   lawyers yesterday, were you asked whether anybody
14   ever raised any questions about embargo at
15   quarterly refunding conferences?
16   A. No.
17   Q. She didn't ask you that?
18   A. No.
19   Q. Now, she asked you about were there any
20   cameras at the October 31st press conference,
21   cameras at the press conference?
22   A. I honestly don't remember. I don't remember

Page 271

1    whether there were or weren't.
2    Q. Do you remember, was there any videotape
3    made?
4    A. Not that I'm aware of. I don't remember --
5    I just don't remember whether I saw a camera in the
6    room or not.
7    Q. Do you know if there was any taping at all,
8    voice recordings?
9    A. Yeah. Definitely.
10   Q. There was?
11   A. Yeah. Reporters recorded it.
12   Q. They recorded the conference?
13   A. Absolutely.
14   Q. And where is that tape?
15       MS. WILLIAMS: Objection.
16   A. You would have to ask the reporters in
17   attendance.
18       BY MR. THEODOROU:
19   Q. Reporters tape the conference?
20       MS. WILLIAMS: Objection.
21   A. Yes.
22       BY MR. THEODOROU:

Page 272

1    Q. Did Treasury tape the conference?
2    A. No.
3    Q. Okay. Today, does Treasury tape any part of
4    the refunding conference?
5    A. I don't know. I mean, it depends.
6    Actually, we -- in fact, some of the press
7    conferences we web cast, so they are archived and
8    web casted. I make a practice of taping everything
9    now.
10   Q. Does Treasury tape -- at the quarterly
11   refunding conferences today, does Treasury tape the
12   embargo being announced?
13   A. Let me just be clear. I haven't even
14   attended a quarterly refunding press conference in
15   years.
16   Q. Now, you were asked several questions about
17   Mr. Fisher's statement by Ms. Williams. Now, you
18   testified earlier today that Exhibit 12 is what you
19   were -- why don't you take a look at Exhibit 12?
20   A. Yes.
21   Q. That you worked on, and you added embargoed
22   until 10:00 a.m. Correct?

Page 273

1        MS. WILLIAMS: Objection.
2    A. I'm presuming that I added the embargoed
3    time. Yeah.
4        BY MR. THEODOROU:
5    Q. Somebody added embargoed until 10:00 a.m.?
6    A. It was probably me.
7    Q. And it was probably you who added embargoed
8    until 10:00 a.m. Right?
9        MS. WILLIAMS: Objection.
10   A. I'm sorry?
11       BY MR. THEODOROU:
12   Q. It was probably you who added --
13   A. Probably. But I don't have a specific
14   recollection.
15       MS. WILLIAMS: Objection.
16       BY MR. THEODOROU:
17   Q. You don't have a specific recollection. But
18   the bottom line, Mr. Fratto, is that this
19   particular document that said embargoed until 10:00
20   a.m. -- actually, the document that you worked on,
21   that was not the document that was distributed at
22   that press conference. Was it?

69 (Pages 270 to 273)

Anthony Fratto                                                    August 30, 2006
Washington, DC

| Page 274 | Page 276 |
|---|---|
| 1    MS. WILLIAMS: Objection. | 1    your Web site. Isn't it from the Treasury Web |
| 2    A. I don't know. | 2    site? |
| 3    BY MR. THEODOROU: | 3    A. It is. |
| 4    Q. Well, the document that was distributed at | 4    Q. And it also says for immediate release. |
| 5    the press conference was a document that stated | 5    Doesn't it? |
| 6    "for immediate release," Exhibit 15. | 6    A. It does. |
| 7    MS. WILLIAMS: Objection. | 7    Q. Okay. And it doesn't say embargoed until |
| 8    BY MR. THEODOROU: | 8    10:00 a.m. Does it? |
| 9    Q. All right. Do you see that? | 9    A. No. |
| 10    A. I see the document. | 10    Q. All right. So this document, Exhibit 12, |
| 11    Q. You did not review the document at the press | 11    that you presume that you created, that you added |
| 12    conference that was distributed. Correct? | 12    embargoed until 10:00 a.m. |
| 13    MS. WILLIAMS: Objection. | 13    A. Yes. |
| 14    A. I received a copy of whatever document was | 14    Q. This document did not go out on the Web |
| 15    distributed at the press conference, at the press | 15    site. Did it? |
| 16    conference. | 16    BY MS. WILLIAMS: Objection. |
| 17    BY MR. THEODOROU: | 17    A. I don't know. |
| 18    Q. And did you review that document to see | 18    BY MR. THEODOROU: |
| 19    whether it said immediate release, or embargoed | 19    Q. You don't know whether this document ever |
| 20    until 10:00 a.m.? | 20    went out on the web side. |
| 21    BY MS. WILLIAMS: Objection. | 21    MS. WILLIAMS: Objection. |
| 22    A. I don't think I paid that close attention to | 22    A. I don't know. |

| Page 275 | Page 277 |
|---|---|
| 1    it. | 1    BY MR. THEODOROU: |
| 2    BY MR. THEODOROU: | 2    Q. You don't know what document went out on the |
| 3    Q. And the document that went out on the | 3    Web site? |
| 4    Treasury Web site said for immediate releases. | 4    MS. WILLIAMS: Objection. |
| 5    Didn't it? And that's Exhibit 13. | 5    A. No. I don't think anyone knows which |
| 6    MS. WILLIAMS: Objection. | 6    document went out on the Web site that day. |
| 7    A. I believe so. Yeah. | 7    BY MR. THEODOROU: |
| 8    BY MR. THEODOROU: | 8    Q. Are you sure about that? |
| 9    Q. Take a look at Exhibit 13. | 9    MS. WILLIAMS: Objection. |
| 10    A. I recall it. | 10    A. I'm sure you can -- one can find out. |
| 11    MS. WILLIAMS: Exhibit 13? | 11    You're asking me if I know? And you're asking me |
| 12    MR. THEODOROU: Exhibit 13. I'm sorry. | 12    if this document is the document? Unless it was |
| 13    Exhibit 15. | 13    printed off, off the Web site that day, I don't |
| 14    BY MR. THEODOROU: | 14    know. |
| 15    Q. Take a look at Exhibit 15. | 15    BY MR. THEODOROU: |
| 16    A. I see it. But just -- no. But just to be | 16    Q. When -- |
| 17    clear, you're asking me was this, is this | 17    A. And neither do you. |
| 18    representation -- when did you pull this off the | 18    Q. Don't be so sure. |
| 19    Web site? | 19    A. Okay. |
| 20    Q. Well, let's take a look. | 20    Q. Assuming that this was the document that |
| 21    A. That's what I don't know. | 21    went out on the Web site, Exhibit 15, which says at |
| 22    Q. It's a document for October 31st. It's from | 22    the bottom, www.treas.gov/press/releases, and then |

70 (Pages 274 to 277)

Anthony Fratto                                                        August 30, 2006
Washington, DC

| Page 278 | Page 280 |
|---|---|

**Page 278**

1  it's dated October 31st, 2001, it is likely that
2  that is what went out on the Web site.  Isn't it?
3      MS. WILLIAMS:  Objection.
4      A. Let me be perfectly clear in stating that I
5  would not stipulate to that.  I don't know that for
6  certain.  There have been numerous instances where
7  we find a document on the Web site, we locate an
8  error of some sort later that the author of the
9  document wants to edit some changes to it.  We pull
10  that document down and put a new document up that
11  would have the same date.  Now, I'm not saying that
12  it's not.  I'm just saying that I don't know.
13      BY MR. THEODOROU:
14      Q. But this particular document, if you look at
15  the bottom.
16      A. Yeah.
17      Q. Isn't that the Web site location for the
18  Treasury?
19      A. It is.  But what I'm saying is -- and I'm
20  not saying this to be tricky.  You're just asking
21  me to stipulate to something.
22      Q. I'm just asking you, what is it at the

**Page 279**

1  bottom of that document?
2      A. That's the Treasury Web site.
3      Q. It says the Treasury Web site.
4      A. Yeah.
5      Q. And does that document say for immediate
6  release?
7      A. It does.
8      Q. Okay.  That's what I'm asking.
9      A. Okay.
10      Q. Now, this particular other document has the
11  Treasury Building on it, Exhibit 12 that I asked
12  you about earlier today.
13      A. Yeah.
14      Q. What does that say in the right-hand?  It
15  says embargoed until 10 a.m.  Correct?
16      A. Correct.
17      Q. And then this particular document, Exhibit
18  13 that says Treasury News, do you see that
19  document?
20      A. Yes.
21      Q. What does they say in the right-hand?
22      A. It says for immediate release.

**Page 280**

1      Q. Again, you did not review the -- you do not
2  recall reviewing what was distributed to the press
3  at the news conference.  Do you?
4      MS. WILLIAMS:  Objection.
5      A. Before it was released?
6      BY MR. THEODOROU:
7      Q. Yes.
8      A. No.
9      Q. Oh.  One other question.  Isn't it a fact
10  that today -- I'm sorry, you answered that.
11      MR. THEODOROU:  I'm done.
12      MS. WILLIAMS:  I have a couple questions.
13          EXAMINATION
14      BY MS. WILLIAMS:
15      Q. I recall in your direct testimony from Mr.
16  Theodorou that you said that someone walked in on
17  October 31st, 2001 into the press office with a
18  Bloomberg chart.  Do you recall that?
19      A. I do.
20      Q. And that that person said that they noticed
21  market movement at 9:30 in the 30-year bond.
22      A. They said around 9:30.

**Page 281**

1      Q. Do you know what caused the market to move
2  at 9:30?
3      A. I didn't --
4      MR. THEODOROU:  Objection.
5      A. I didn't at the time, and would only
6  subsequently -- I'm not an expert on what could
7  make a market move.  It seems to me that some of
8  the leaking that went on from Peter Davis and
9  whoever else contributed to that.
10      BY MS. WILLIAMS:
11      Q. Do you have, do you know if rumors ever
12  cause the market to move?
13      MR. THEODOROU:  Objection.
14      A. Rumors frequently cause the market to move.
15      BY MS. WILLIAMS:
16      Q. When you say they frequently cause the
17  market to move, on what do you base that statement?
18      A. Just my experience watching the markets.
19  And, you know, again, I'm not an expert on markets;
20  you can bring in traders and get -- you know, get
21  their views on it.  But I have seen rumors out
22  there that, you know, people who are experts in the

71 (Pages 278 to 281)

Anthony Fratto                                                    August 30, 2006
                           Washington, DC

```
                              Page 282
 1   markets attribute to — attribute market movements
 2   to those rumors.
 3       Q.  Have you ever heard the statement buy on the
 4   rumors, sell on the fact?
 5       MR. THEODOROU:  Objection.
 6       A.  Yes.  All the time.
 7       MS. WILLIAMS:  I have no further questions.
 8       MR. THEODOROU:  Thank you, Mr. Fratto.
 9       THE VIDEOGRAPHER:  This concludes the
10   deposition of Tony Fratto, consisting of four
11   videotapes.  We are off the record at 4:55:03.
12       (WHEREUPON, the deposition was concluded.)
13
14       _____
15           Signature of the Witness
16
17   SUBSCRIBED AND SWORN to before me this _____
18
19   day of _____, 20___.
20       _____
21               NOTARY PUBLIC
22   My Commission expires: _____
```

72 (Page 282)

From the Office of Public Affairs

Treasury Department Sets Procedures for Quarterly Refunding Announcements

The Treasury Department Office of Public Affairs is modifying its procedure for disseminating the announcement of the government's quarterly refunding needs. The changes are intended to improve the timeliness and transparency of quarterly refunding announcements.

Starting with the next scheduled refunding announcement on January 30, 2002, Treasury's Office of Public Affairs will post the announcement on the Treasury web site (www.Treas.gov) at 9:00AM (EST). The announcement also will be delivered to credentialed members of the media in the Treasury Pressroom shortly before 9:00AM with lock-down embargo rules. The announcements include release of the Treasury Department's borrowing estimates for the following quarter and the policy statement.

The traditional practice of releasing the quarterly refunding announcement at a news conference will be discontinued. A senior Treasury official will brief members of the media subsequent to the announcement at a regularly scheduled time.

The Office of Public Affairs will disseminate Treasury information in the most timely and transparent manner possible while also maintaining confidentiality prior its proper release.



EXHIBIT
/7
Fratto

**Exhibit G**

**Deposition of Peter Davis and Cited Exhibits
(April 19-20, 2006)**

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - X

 4    UNITED STATES SECURITIES AND    :

 5    EXCHANGE COMMISSION,            :

 6              Plaintiff,            :

 7       V.                          :   Civil Action No.

 8    STEVEN E. NOTHERN,             :   05-10983(NMG)

 9              Defendant.           :

10    - - - - - - - - - - - - - - - X

11                          Washington, D.C.

12                          Wednesday, April 19, 2006

13              Videotape Deposition of PETER DAVIS, JR.,

14    a witness herein, called for examination by counsel

15    for the Plaintiff in the above-entitled matter,

16    pursuant to notice and subpoena, the witness being

17    duly sworn by PENNY M. DEAN, a Notary Public in and

18    for the District of Columbia, taken at the offices of

19    U.S. Securities and Exchange Commission, 100 F

20    Street, NE, Washington, D.C., at 9:37 a.m.,

21    Wednesday, April 19, 2006, and the proceedings being

22    taken down by Stenotype by PENNY M. DEAN, RPR, and

23    transcribed under her direction.

24

25
```

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

| Page 2 |
|---|
| 1  APPEARANCES: |
| 2 |
| 3  On behalf of the Plaintiff: |
| 4  ERICA Y. WILLIAMS ESQ. |
| 5  JOHN J. ROSSETTI, JR., ESQ. |
| 6  U.S. Securities and Exchange Commission |
| 7  100 F Street, NE |
| 8  Washington, D.C. 20549-4010 |
| 9  (202) 551-4450 |
| 10  (202) 551-4819 |
| 11 |
| 12  On behalf of the Defendant: |
| 13  NICHOLAS THEODOROU, ESQ. |
| 14  ROBERT E. TOONE, ESQ. |
| 15  Foley Hoag, LLP |
| 16  Seaport World Trade Center West |
| 17  155 Seaport Boulevard |
| 18  Boston, MA 02210-2600 |
| 19  (617) 832-1000 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 4 |
|---|
| 1  C O N T E N T S |
| 2  WITNESS        EXAMINATION BY COUNSEL FOR |
| 3  PETER DAVIS, JR.        PLAINTIFF |
| 4  By Ms. Williams        8 |
| 5 |
| 6  Afternoon Session - Page 101 |
| 7 |
| 8  E X H I B I T S |
| 9  DAVIS EXHIBIT NO.        PAGE NO. |
| 10  1  Notice of deposition        15 |
| 11  2  Subpoena        15 |
| 12  3  Documents subpoena        16 |
| 13  4  Electronic brochure        35 |
| 14  5  Electronic brochure        35 |
| 15  6  Electronic brochure        35 |
| 16  7  List from address book        44 |
| 17  8  Call list        46 |
| 18  9  Printout of contact manager data file  53 |
| 19  10  Invoice to Femino        67 |
| 20  11  Meeting list for January 15th, 1998   72 |
| 21  12  Letter from Davis to Sachs        78 |
| 22  13  E-mail from Davis to Hathaway, et al.  81 |
| 23       dated January 19th, 2000 |
| 24  14  Printout from contact manager        82 |
| 25  15  Document from Davis to Malvey        107 |

| Page 3 |
|---|
| 1  APPEARANCES: |
| 2 |
| 3  On behalf of the Witness: |
| 4  MARK STANCIL, ESQ. |
| 5  Baker Botts LLP |
| 6  The Warner |
| 7  1299 Pennsylvania Avenue, NW |
| 8  Washington, D.C. 20004-2400 |
| 9  (202) 639-7894 |
| 10 |
| 11  ALSO PRESENT: |
| 12  Dustin Lavallee, Videographer |
| 13  Steven E. Nothern, Plaintiff |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |
| 25 |

| Page 5 |
|---|
| 1  E X H I B I T S |
| 2  DAVIS EXHIBIT NO.        PAGE NO. |
| 3  16  Document dated January 24th, 2001        123 |
| 4       from Davis to Sullivan |
| 5  17  Plea hearing transcript        142 |
| 6  18  Transcript of sentencing hearing,        144 |
| 7       March 18th of 2005 |
| 8  19  Consent entered into with SEC        147 |
| 9  20  Subpoena        147 |
| 10  21  Treasury news release dated        151 |
| 11       October 29, 2001 |
| 12  22  E-mail of calendar on October 29, 2001  154 |
| 13  23  Treasury press release dated        158 |
| 14       October 30th, 2001 |
| 15  24  Fax cover page dated        160 |
| 16       October 30th, 2001 |
| 17  25  Report of faxes dated        162 |
| 18       October 30th, 2001 |
| 19  26  Notes by Davis dated 10/31/01        173 |
| 20  27  Written remarks of Fisher dated        176 |
| 21       October 31st, 2001 |
| 22  28  List of phone calls from        181 |
| 23       October 31st, 2001 |
| 24  29  Verizon Wireless phone bill dated        183 |
| 25       October 19th, 2001 |

2 (Pages 2 to 5)

Peter Davis, Jr.                                                          April 19, 2006

Washington, DC

---

## Page 6

```
 1           E X H I B I T S
 2  DAVIS EXHIBIT NO.              PAGE NO.
 3    30 Memo from Davis dated        188
 4       November 5th, 2001
 5    31 E-mail from Davis            229
 6    32 Sprint phone bill for billing period  231
 7       ending August 26th, 2001
 8    33 Sprint phone bill for billing period  232
 9       ending September 26th, 2001
10    34 Excerpt from October Sprint phone bill  234
11    35 Broadcast fax delivery report    235
12    36 Notes from Davis dated August 1, 2001  240
13    37 Verizon phone bill dated       241
14       August 19th, 2001
15
16
17
18
19
20
21
22
23
24
25
```

---

## Page 7

```
 1           P R O C E E D I N G S
 2       THE VIDEOGRAPHER:  This is tape number
 3  in the videotape deposition of Mr. Peter Davis, Jr.
 4  in the matter of United States Securities and
 5  Exchange Commission versus Steven E. Nothern in the
 6  United States District Court for the District of
 7  Massachusetts, Boston Division, Civil Action Number
 8  05-10983 NMG.
 9       The deposition is being held at the
10  Securities and Exchange Commission, 100 F Street,
11  Northeast, Washington, D.C., 20549, and we're on the
12  record at 9:37 a.m. on Wednesday, April 19th, 2006.
13  My name is Dustin Lavallee in association with
14  Alderson Reporting at 1111 14th Street, suite 400,
15  Washington D.C., 20005.  And I'm the legal video
16  specialist.  The court reporter is Penny Dean, also
17  in association with Alderson Reporting.
18       For the record, will counsel please
19  introduce themselves.
20       MR. STANCIL:  Mark Stancil for Peter J.
21  Davis.
22       MS. WILLIAMS:  Erica Williams for the
23  Securities and Exchange Commission.
24       MR. ROSSETTI:  John Rossetti for the
25  Securities and Exchange Commission.
```

---

## Page 8

```
 1       MR. THEODOROU:  Nicholas Theodorou for --
 2  from Foley Hoag representing Mr. Steven Nothern.
 3       MR. TOONE:  Robert Toone from Foley Hoag
 4  representing Steven Nothern.
 5       THE VIDEOGRAPHER:  Will the court reporter
 6  please swear in the witness?
 7       Whereupon,
 8            PETER DAVIS, JR.,
 9  residing at 3015 Tennyson Street, Northwest,
10  Washington, D.C., was called as a witness by counsel
11  for Plaintiff, and having been duly sworn by the
12  Notary Public, was examined and testified as follows:
13       EXAMINATION BY COUNSEL FOR PLAINTIFF
14       BY MS. WILLIAMS:
15    Q.  Good morning, Mr. Davis.
16    A.  Good morning.
17    Q.  Could you please state --
18       MR. THEODOROU:  Before we start, can we
19  put the stipulation on the record?
20       MS. WILLIAMS:  Absolutely.  The parties
21  have stipulated that all objections including hearsay
22  will be reserved and that question -- except for
23  questions -- objections as to the form of the
24  question.
25       MR. THEODOROU:  So that what we stipulate
```

---

## Page 9

```
 1  is all objections except as to the matter of form,
 2  including objections to hearsay, have been reserved
 3  until the time of trial.
 4       MS. WILLIAMS:  And also any motion to
 5  strike has been reserved until the time of trial.
 6       MR. THEODOROU:  Correct, including motions
 7  to strike.
 8       BY MS. WILLIAMS:
 9    Q.  Mr. Davis, could you please state your
10  full name and spell your last name for the court
11  reporter?
12    A.  It's Peter Joseph Davis, Jr., and it's
13  D-a-v-i-s.
14    Q.  What's your date of birth, Mr. Davis?
15    A.  May 12th, 1950.
16    Q.  And your Social Security number?
17    A.  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.
18    Q.  What's your home addresses?
19    A.  3015 Tennyson Street, Northwest, that's
20  T-e-n-n-y-s-o-n, D.C.
21    Q.  What is your home phone number?
22    A.  It's (202) 966-3386.
23    Q.  Do you have a cellular telephone?
24    A.  Yes.
25    Q.  What is your cell phone number?
```

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                          Washington, DC 20005

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

|  | Page 10 |
|---|---|

```
 1      A.   (202) 365-7624.
 2      Q.   Do you have a fax?
 3      A.   Well, I take faxes over my home phone.
 4      Q.   Do you have an E-mail address?
 5      A.   Yes.
 6      Q.   What is your E-mail address?
 7      A.   It is Pete, p-e-t-e @daviscap.com, it's
 8   daviscap.com.
 9      Q.   Do you have any phone numbers that you
10   haven't already told us about?
11      A.   No.
12      Q.   Do you have any web addresses other than
13   an E-mail, do you have a website?
14      A.   No.
15      Q.   Have you ever been deposed before?
16      A.   I was deposed here, wasn't I?  Back four
17   years ago.
18      Q.   Are you referring to the testimony that
19   you gave in the SEC's investigation?
20      A.   Yeah.
21      Q.   And except for that testimony, have you
22   ever been deposed before?
23      A.   No.
24      Q.   Have you ever testified at trial?
25      A.   No.
```

|  | Page 11 |
|---|---|

```
 1      Q.   Do you have any medical conditions that
 2   might affect your memory or your ability to testify
 3   truthfully today?
 4      A.   No.
 5      Q.   Are you represented by counsel?
 6      A.   Yes.
 7      Q.   Who is your counsel?
 8      A.   Mark Stancil, Baker Botts.
 9      Q.   Did you meet with Mr. Stancil prior to
10   this deposition?
11      A.   We had a telephone conversation yesterday.
12      Q.   How long was your telephone conversation?
13      MR. STANCIL:  Objection, privilege, how
14   long we talked, don't answer that.
15      BY MS. WILLIAMS:
16      Q.   Was anyone else present or anyone else on
17   the phone besides you and Mr. Stancil?
18      MR. STANCIL:  Objection.  Don't answer
19   that.
20      MS. WILLIAMS:  If anyone was on the phone
21   besides you, it might break the privilege.
22      MR. STANCIL:  I can stipulate that no one
23   else was on the telephone conversation.
24      MS. WILLIAMS:  Thank you.
25      BY MS. WILLIAMS:
```

|  | Page 12 |
|---|---|

```
 1      Q.   Did you meet with any attorneys for the
 2   SEC prior to this deposition?
 3      A.   No.
 4      Q.   Did you meet with -- have you ever met
 5   with any attorneys from the U.S. Attorney's office?
 6      A.   I'm trying to remember.
 7      MR. STANCIL:  I think he may have misheard
 8   you.
 9      MS. WILLIAMS:  Okay.
10      BY MS. WILLIAMS:
11      Q.   Have you ever met with any attorneys from
12   the United States Attorney's Office, specifically in
13   connection with their investigation into trading in
14   the 30-year bond?
15      A.   I mean, I don't recall all the attorneys
16   that were there at the SEC four years ago.
17      Q.   Was there a meeting, though, between you
18   and some attorneys four years ago regarding an
19   investigation into the 30-year bond?
20      MR. STANCIL:  I don't want to mess -- I
21   don't want to dissuade you from where you're going, I
22   think she's talking about the criminal authorities in
23   New York.  Rod Hoates, Brian Coad.
24      THE WITNESS:  Oh, yeah.  Oh, up in New
25   York, sure, yes.
```

|  | Page 13 |
|---|---|

```
 1      MR. STANCIL:  I don't think Mr. Davis --
 2   he wasn't always sure who at the table was from which
 3   office.
 4      THE WITNESS:  Yeah, I mean, there were
 5   lots of people at various times who interrogated me
 6   including Mr. Hoates up in New York.
 7      BY MS. WILLIAMS:
 8      Q.   Do you know if any attorneys from the SEC
 9   were present during that what you call an
10   interrogation?
11      A.   There was an interrogation here at the
12   SEC.  And then at a subsequent date, I went up to New
13   York and I was integrated up in New York.
14      Q.   So you don't know whether -- who was
15   present at that particular interrogation, except for
16   the individuals you just named, Mr. Coad and Mr. --
17      A.   Mr. Coad and the other guy up in New York.
18   And then there were a number of attorneys from the
19   SEC, including Mr. Rossetti here four years ago, so
20   those were two different occasions.
21      Q.   Mr. Rossetti was present during that
22   interrogation?
23      A.   I think so.  I mean, that was a long time
24   ago.
25      Q.   When you say analogy interrogation, can
```

4 (Pages 10 to 13)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

| Page 14 | Page 16 |
|---|---|

**Page 14**

1  you describe to me what went on during that meeting?
2     A.  Which one, the SEC or --
3     Q.  The one in New York?
4     A.  The one in New York?  They basically asked
5  me about the events leading up to and the events of
6  October 31st, 2001.  I disclosed information about
7  the 30-year bond.
8     Q.  Do you know if that meeting was on the
9  record, was it transcribed by a court reporter?
10    A.  Whew --
11      MR. STANCIL:  Do you know?
12      THE WITNESS:  I don't recall.
13      BY MS. WILLIAMS:
14    Q.  Before you go any further, I'm going to
15 describe the deposition process to you.  Your
16 testimony is being taken under oath and it is being
17 transcribed by the court reporter --
18    A.  Sure.
19    Q.  -- and it is taken under penalty of
20 perjury.
21    A.  I understand.
22    Q.  Please give oral, audible responses so the
23 court reporter can transcribe them.  Please don't
24 talk while I'm talking, and I will try to extend to
25 you the same courtesy, because then we will have a

**Page 15**

1  clean record.  If you need to take a break, let me
2  know and we will take a break unless a question is
3  pending.
4       Do you have any questions about the
5  deposition processes?
6     A.  No.
7     Q.  I want to go back to the meeting in New
8  York, was your counsel present during that meeting?
9     A.  Yes.
10    Q.  And who was present?  Mr. Stancil?
11    A.  And Mary Spearing from Baker Botts.
12      MS. WILLIAMS:  I'd like to have these
13 marked as Exhibits 1 and 2.
14      (Davis Exhibit Nos. 1 & 2 were
15      marked for identification.)
16      BY MS. WILLIAMS:
17    Q.  Do you recognize these documents?
18    A.  It's the first time I've seen them.
19    Q.  And were you aware that a notice was sent
20 for your deposition today?
21    A.  My counsel called me or E-mailed me a few
22 months ago, and said that I was going to be deposed
23 today.
24    Q.  Are you appearing today pursuant to that
25 notice of deposition?

**Page 16**

1     A.  Yes.
2     Q.  And the subpoena was also sent.  Are you
3  appearing pursuant to the subpoena that was sent for
4  your deposition?
5     A.  I guess, yes.
6       MR. THEODOROU:  So which -- excuse me,
7  counsel, which is Exhibit 1?
8       MS. WILLIAMS:  Exhibit 1 is the notice of
9  deposition and Exhibit 2 is the subpoena.
10      I'd like to have this marked as Exhibit 3.
11      (Davis Exhibit No. 3 was marked for
12      identification.)
13      BY MS. WILLIAMS:
14    Q.  Do you recognize this document, sir?
15    A.  This is the first time I've seen it.
16    Q.  Were you aware that a subpoena was sent in
17 this case, SEC versus Mr. Nothern, for documents
18 that -- for documents from you, that a subpoena was
19 sent requesting that you produce documents?
20    A.  I recall my attorney calling me or you
21 know, calling me a few months ago and discussing
22 that, but I never saw the subpoena, I have no idea
23 which documents, but --
24    Q.  Do you know if you did produce documents?
25    A.  You know, my attorneys had all my

**Page 17**

1  documents for like since four and a half years ago,
2  so I don't -- I don't recall what documents, if any,
3  were conveyed.
4     Q.  Can you please provide your educational
5  history since high school?
6     A.  Since high school, yeah.  I have a BA in
7  economics from the University of Rochester in 1972.
8  And I took nine courses towards a master's degree in
9  economics at American University, but I never
10 completed that degree.
11    Q.  After you come -- after you finished
12 college, what jobs did you hold?
13    A.  My first job was -- as a research
14 assistant at the Center for Naval Analysis in
15 Rosslyn, Virginia.  And that I started in August of
16 '72.  And in March of '74, I was hired by the Joint
17 Committee on Taxation, U.S. Congress.
18      February 1 of '81, I was hired by the
19 Senate Budget Committee.  October of '83, I was hired
20 by Prudential Bache Securities in their Washington
21 research office in Rosslyn, Virginia.  I forget, some
22 time early in 1990, February maybe or March, I was
23 hired by Ernst & Young in their national tax office.
24      In February of 1992, I was hired by the
25 president pro tempore of the Senate, Robert C. Byrd.

5 (Pages 14 to 17)

Peter Davis, Jr.                                                                    April 19, 2006

Washington, DC

## Page 18

1  And I worked for him until some time in October '92,
2  at which point I established my own business which I
3  called Davis Capital Investment Ideas where I've
4  worked ever since as a sole proprietor.
5      Q.  I want to go back to some of the jobs that
6  you mentioned.  When you worked for Prudential Bache
7  Securities, what was your job title?
8      A.  Vice president.
9      Q.  And what were your job responsibilities as
10 vice president?
11     A.  To follow Washington policy developments
12 that might affect investors, clients of the firm, to
13 write a weekly article for the Strategy Weekly, which
14 was sort of the main publication of the research
15 department, to travel throughout the U.S. and Western
16 Europe visiting clients, and you know, giving
17 speeches and basically talking about what's going to
18 happen mostly to tax policy and to the deficit, what
19 fiscal policy changes were occurring in Washington.
20     Q.  And you left Prudential Bache Securities
21 to join Ernst & Young?
22     A.  Yes.
23     Q.  Why did you leave Prudential to join Ernst
24 & Young?
25     A.  I discovered that there were some things I

## Page 19

1  didn't like in the firm, and so I just left.
2      Q.  What kind of things?
3      A.  The CEO, George Ball, was -- allegedly had
4  been doing some questionable activities regarding the
5  finances of the firm.
6      Q.  How did you find out about these alleged
7  questionable activities?
8      A.  I think it was in the papers.  I didn't
9  find it internally.
10     Q.  Do you know what -- what do you mean by
11 alleged questionable activities?
12     A.  My recollection is that he was -- well,
13 there were two areas.  One was questionable tax
14 shelters, which I had no involvement in, but I was
15 kind of surprised the firm was still selling them as
16 I was publishing articles on a regular basis pointing
17 out how the '86 Tax Reform Act was sharply curtailing
18 tax shelters.
19         The second area was, as I recall, he was
20 brought before the SEC on -- some other regulatory
21 body possibly on issues about the float in finances
22 with local branches and the interest, you know,
23 whether there was, you know, improper management of
24 the float, you know, cash float of the firm.
25     Q.  What was your job title at Ernst & Young?

## Page 20

1      A.  I think it was -- it was senior manager.
2      Q.  And what were your responsibilities there?
3      A.  They were similar, I was to follow tax
4  policy and economic policy, and to advise clients on
5  what sort of policy developments they should expect
6  from Washington.
7      Q.  And then you said you went to work for
8  Senator Byrd?
9      A.  Yes.
10     Q.  What was your job title when you worked
11 for Senator Byrd?
12     A.  I'm trying to remember.
13         MR. STANCIL:  If you remember.
14         THE WITNESS:  I should remember.  What the
15 heck was it?  Um, I don't recall.
16         BY MS. WILLIAMS:
17     Q.  Why did you leave Ernst & Young to go work
18 for Senator Byrd?
19     A.  I liked the people, but I didn't like the
20 culture.  Accounting firms were -- I mean, I had a
21 lot of friends at accounting firms, that's why I got
22 hired, but I just didn't like the culture.  And so
23 when I got an opportunity, I went back there.
24     Q.  Can you describe your job responsibilities
25 when you worked for Senator Byrd?

## Page 21

1      A.  Yes, he was chair of the Senate
2  Appropriations Committee, he was very concerned that
3  the potential tax cuts might take funding away from
4  discretionary spending and -- which he's well-known
5  for caring a lot about discretionary spending.  So I
6  was there to supply arguments and speeches, testimony
7  to counter tax cuts.
8      Q.  You said that you left in October of '92
9  to start Davis Capital?
10     A.  Right.
11     Q.  Approximately how long did you work for
12 Senator Byrd?
13     A.  I worked for him for ten months, and I
14 forgot to mention, I was hired specifically on a
15 temporary basis, you know, I took the job knowing
16 that it would be at least six months and probably not
17 a year and --
18     Q.  When you left, was your temporary job up
19 or had it ended
20     A.  Yeah, well, you know, we got to the end of
21 the year, Congress was winding down and it was Jim
22 English, the staff director said, well, time's up.  I
23 said, fine, thanks, and went out and started
24 establishing my business.
25     Q.  Is it okay if I refer to Davis Capital

6 (Pages 18 to 21)

Peter Davis, Jr.

Washington, DC

April 19, 2006

**Page 22**

1   Investment Ideas as Davis Capital during the
2   deposition?
3       A.  Yeah, of course, that's how I refer to it,
4   too.
5       Q.  Why did you decide to start Davis Capital?
6       A.  A friend of mine who had worked at CBO,
7   Congressional Budget Office, and later had gone on to
8   run the bond desk at Shearson and then set up his own
9   hedge fund was in the habit of calling me every, I
10  don't know, four or five months to get my views on
11  what the deficit outlook was.
12      And so while I was working for Senator
13  Byrd some time that summer of '92, he called me and
14  asked me, you know, what I thought about the deficit
15  and we got into quite an extended conversation. And
16  at the end of the conversation, he said to me, gee, I
17  can't get this information anywhere else. And you
18  know, it's public information, but it's the judgment
19  of how to use the various sources of data, like what
20  potential tax cuts might look like and what potential
21  spending plans might look like.
22      And then I would come up with my own views
23  on those policies, and then come up with my own
24  estimate of what the deficit was going to be. So at
25  the end of the conversation, he asked me if I was

**Page 23**

1   thinking -- if I would think about going out and
2   forming my own business. And so it was at his
3   instigation that I did go out and form my own
4   business.
5       Q.  Does Davis Capital still exist?
6       A.  Sure. I work out of my home now, but I
7   have some paying clients left, and I send out an
8   E-mail occasionally describing Washington policy,
9   mostly fiscal policy developments that I think might
10  affect the market.
11      Q.  Could you tell me who your clients are?
12      A.  I have contractual arrangements with some
13  of them not to disclose that.
14      Q.  Okay. And the others you don't have
15  contractual arrangements?
16      A.  Some of these are just handshakes. I only
17  have contracts with one or two clients and it's
18  probably not a good idea to be disclosing clients. I
19  mean -- I don't know whether this becomes public
20  record.
21      MR. STANCIL:  This will be public record
22  so if you have an agreement with a client not to
23  disclose it, we'd ask you to -- I don't think it will
24  be a big deal, but we would ask for some arrangement
25  to be made for it to be confidential.

**Page 24**

1       MS. WILLIAMS:  That's fine.
2       THE WITNESS:  If it remains confidential,
3   fine.
4       MR. STANCIL:  It's not confidential until
5   we agree on how it would be. So for now, if we can
6   just set that aside, I'm sure we can work something
7   out.
8       BY MS. WILLIAMS:
9       Q.  Could you tell me how many clients you
10  have right now?
11      A.  Well, there's -- there's six and one that
12  gives me an occasional project, so seven maybe.
13      Q.  You said that you send out occasional
14  E-mails, how often do you send out E-mails?
15      A.  It's based on whether I have something
16  that I think is worse saying. So I mean, one of the
17  problems with Wall Street research is it comes out on
18  a regular basis and it just stacks up on managers'
19  desks. So I purposely put mine out on an irregular
20  basis. And when Congress is in town, I'll probably
21  put something out every day, usually in the morning,
22  but sometimes in the afternoon. Congress is out of
23  town this week, I put something out Monday morning
24  and I haven't put out anything since.
25      Q.  When Congress is out of town,

**Page 25**

1   approximately how many do you send out per month?
2       A.  Like I said, it's usually daily, so if
3   there's 20 days or 21 days in the month it might be
4   that many. Sometimes there's two in a day. It
5   depends on what's happening. I mean, if something
6   really important happens and I think the market is
7   misinterpreting it, I'll put out an E-mail instantly.
8       Q.  Besides E-mails, what other services do
9   you offer the clients?
10      A.  Well, now, basically available to talk to
11  them, to talk on conference calls to their clients,
12  to answer their questions, to do custom research on
13  the side. I mean, my standard maintenance product is
14  the E-mail, and but, you know, I -- especially for my
15  very good clients, I'm doing other research and
16  following issues on an ongoing basis and alerting
17  them.
18      There are some issues that are so esoteric
19  that they are not of general interest to all my
20  clients. So like this morning, I found out that, you
21  know, from the Bureau of National Affairs Daily
22  Report For Executives that U.S. may enter into
23  renewed trade negotiations on Canadian soft wood
24  lumber. I mean, there's only one client who cares
25  about that, I sent him an E-mail saying, hey, here's

7 (Pages 22 to 25)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

**Page 26**

1  the article.
2    Q.   Where do you get the information that you
3  include in your E-mails to your clients?
4    A.   I subscribe to a wide range of information
5  services, I already mentioned the BNA Daily
6  Executive, Daily Report For Executives. The National
7  Journal has a real good service in the morning and in
8  the afternoon, the White House bulletin, their a.m.
9  service and the Congressional Quarterly puts out a
10  good weekly and has a lot of good research material
11  on line. Those are the basic ones.
12      And then I also am in conversation and
13  E-mail contact with friends of mine on the Hill and
14  in the Administration. And I call them up and ask
15  them questions, you know. I then formulate my views
16  on like is the tax bill going to, you know, tax bill
17  conference going to conclude this week and I write
18  about it. I don't quote people, but I -- usually I
19  don't quote people. And I just put out my view on
20  what's going to happen in the future.
21    Q.   Are any of the friends that you call at
22  the Treasury Department?
23    A.   Sure.
24    Q.   Can you tell me who those people are?
25    A.   I know tons of people at Treasury

**Page 27**

1  Department. I don't talk to anybody in public debt
2  in the last -- you know, since October 31st, 2001,
3  but I have lots of economist friends who are working
4  on tax policy and, you know, usually it's issues
5  around they've published a revenue estimate on a tax
6  bill or something, and I call them up, and since I
7  used to be a revenue estimator, I can ask them, well,
8  gee, you know, why does it look like this?
9      I run -- I'm the cofounder of a
10  professional group that meets every couple of weeks
11  on all the tax economists in town, a number of tax
12  economists at Treasury attend those meetings so, you
13  know. And I, you know, I also know some people in
14  economic policy, who'll come out with a report
15  saying that, you know, say something about the
16  economy or something like that.
17    Q.   When you pick up the phone to call a
18  friend at Treasury, though, I'm trying to find out
19  the names of the different people you would call, if
20  you could just tell me some of the friends that you
21  typically call there?
22    A.   So you're going to call up all my friends
23  at Treasury?
24    Q.   No, I'm not, I'm just trying to find
25  information.

**Page 28**

1    A.   I don't know, do I have to name people? I
2  can spend all day naming people.
3      MR. STANCIL: One of our concerns is this
4  is his business. And if he has competitors and if
5  it's going to be public record who his contacts are
6  at Treasury -- I think he would be happy to give them
7  to you if we could put this under seal or under a
8  confidentiality agreement. But for his purposes,
9  this is his livelihood.
10      MS. WILLIAMS: I'm just asking him to
11  name -- he said he calls friends. And I'm just
12  asking him the names of the friends at Treasury that
13  he currently calls. So I don't think that that is
14  really -- that's not confidential information, the
15  friends the Treasury that Mr. Davis has that he
16  calls, I don't see how that even comes --
17      THE WITNESS: I've lost two-thirds of my
18  clients already.
19      MS. WILLIAMS: I understand.
20      MR. STANCIL: For his business, this is
21  basically his trade secret who his people are. And I
22  understand that's relevant to your investigation, and
23  he's not trying to make it difficult, but he is
24  understandably sensitive to the idea that, you know,
25  it would be a matter of public record who he knows at

**Page 29**

1  Treasury, and doesn't know.
2      I think there's got to be an easy way we
3  can resolve this. You can have it for the purposes
4  of your litigation, but I think you can understand
5  why he is sensitive. This is sensitive business
6  information for him, and maybe we could work out a
7  protective order or something that this isn't going
8  to be a matter of public record.
9      MR. THEODOROU: I mean, I would raise an
10  objection as to the relevance of the questioning,
11  vis-a-vis Mr. Davis, as to why it's relevant to the
12  instant case, but that's my objection.
13      MS. WILLIAMS: As far as I know, I don't
14  know who his current contacts are, so I am unable to
15  determine at this point the relevance or irrelevance
16  of it. In the discovery, we're just trying to
17  discover evidence that may lead to --
18      MR. THEODOROU: I can tell you and we can
19  stipulate that one of the people he is not contacting
20  is Mr. Nothern, who is the core of this case.
21      MS. WILLIAMS: Mr. Nothern doesn't work at
22  Treasury, so my question doesn't go to that right
23  now, but --
24      MR. THEODOROU: But anyway, I'm just
25  raising a relevance objection as to what the

8 (Pages 26 to 29)

Page 30

1  relevance of it is, but go ahead.
2      MS. WILLIAMS: Right. Right now, since we
3  don't have an answer to the question, we're unable to
4  determine whether it is relevant or irrelevant.
5      Nonetheless, we can discuss this off the
6  record, but I do believe that it is a valid question
7  to ask, it could lead to the discovery of admissible
8  evidence. And I understand your objection, I dispute
9  whether or not the names of people, Mr. Davis's
10 friends at Treasury, are really trade secret, but
11 we'll discuss this off the record and I'll come back
12 to it.
13     MR. STANCIL: That would be great, thanks.
14     BY MS. WILLIAMS:
15 Q.  Do you have any employees currently at
16 Davis Capital?
17 A.  No.
18 Q.  When did you start working out of your
19 home?
20 A.  Last fall, I'm trying to remember, I guess
21 it was October 1st, it might have been November 1st,
22 I'd have to look it up.
23 Q.  Why did you start working out of your
24 home?
25 A.  To save money.

Page 31

1  Q.  And before you started working out of your
2  home, where was your office?
3  A.  1100 17th Street, Northwest, I'm trying to
4  remember the suite number.
5  Q.  Was it 604?
6  A.  Yeah, I think it was 604, yeah.
7  Q.  Did Davis Capital's office always reside
8  at 1100 17th Street before you started working in
9  your home?
10 A.  No, no. Actually, I was nine years right
11 across the street from here at Capitol Court, 503
12 Capital Court from -- I think I moved in there some
13 time in the spring of -- actually, it was early in
14 the year, it was like February of '93. And in
15 November '01, my landlord just decided after all
16 those years to kick me out for a bigger tenant, and I
17 was forced to find other space.
18 Q.  Before you moved in to Capital Court in
19 February of '93, where did -- where was Davis
20 Capital's offices, because you said you had formed it
21 in November.
22 A.  Right, a friend of mine in the trade
23 association just let me use an office for a few
24 months to see if I could get a viable business going.
25 Q.  Does Davis Capital have a website?

Page 32

1  A.  Not now.
2  Q.  Did it ever have a website?
3  A.  Yeah, we did have a website. It was
4  developed in pieces. I mean, it first went up some
5  time like, I don't know, '96 maybe. And I took it
6  down when I moved at the end of 2001, November 2001.
7  Q.  What was the web address?
8  A.  The web address?
9  Q.  If I was to try to log on?
10 A.  Yeah. I think it was daviscap.com. I
11 really don't remember.
12 Q.  What kind of information was available on
13 your website?
14 A.  Well, we maintained like a brochure, you
15 know, my bio, my assistant's bio, sample E-mail. On
16 Monday mornings, when the Congress was in, I would
17 put a calendar out and a sample of that. And a
18 description of what I could do for clients and so on.
19 And then there was also later on sort of a password
20 protected area where you could go in and look up
21 everything that I'd put out for like the last year or
22 something like that.
23 Q.  Who had passwords?
24 A.  What's that?
25 Q.  Who had passwords?

Page 33

1  A.  Paying clients.
2  Q.  Did anyone else have a password besides
3  the paying clients and employees at Davis Capital?
4  A.  Whew, that's a good question. I mean, I
5  comp my services to some -- you know, there's some
6  people that I comp my service to, and so they might
7  have had that.
8  Q.  And besides -- when you say that certain
9  things were password protected, was -- did certain
10 clients have different passwords?
11 A.  Yeah.
12 Q.  Were there different areas that were
13 password protected for certain clients?
14 A.  No, there was just one password, that just
15 got you into what I'd put out.
16 Q.  So there was a body of information that
17 was password protected, and if someone had the
18 password they could view that body of information?
19 A.  Right. I mean, we had different passwords
20 for each client, but it got you into the same, you
21 know, it was basically everything that I had put out
22 in the past year.
23 Q.  What was your job title at Davis Capital?
24 A.  I made it up, I'm president of Davis
25 Capital Investment Ideas.

9 (Pages 30 to 33)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

Page 34

1    Q.   And as president of Davis Capital, what
2  did you do?  I understand what you do now, I'm trying
3  to find out what you did before you moved the company
4  to your home?
5    A.   Show up at work at 7:30 in the morning,
6  read a whole lot of information from various
7  information services, newspapers, start writing
8  material for an E-mail to clients, you know, or get
9  my assistant to start writing it and start calling
10 around collecting information, searching the web for
11 information.
12       And, you know, at some point during the
13 day, put something out.  I would also be developing
14 information sources, meeting new staff on the Hill or
15 new people at Congress -- in the Administration.  I
16 would be helping people look for jobs, you know, as a
17 way of getting to know them, and that sort of thing.
18       I would occasionally have clients in for
19 meetings with Administration officials and people on
20 the Hill, but I mean, the last one of those meetings
21 was I think in, I don't know, some time in early
22 2001.  I haven't had any since.
23   Q.   Did you put out E-mails to clients when
24 Davis Capital was located at 1100 17th Street?
25   A.   Oh, sure.

Page 35

1    Q.   How often did the E-mails go out at that
2  time?
3    A.   Same, same frequency all along.
4    Q.   Did you also send faxes to clients?
5    A.   Yeah, faxes were the main way we -- we put
6  things out up until, geez, I don't know, '95 or '96,
7  I forget exactly when we stopped doing faxes and
8  shifted to E-mail.  But when I started the business,
9  I was faxing exclusively, you know, broadcast faxing
10 and at some point in the mid-'90s, that shifted over
11 to E-mail.
12       MS. WILLIAMS:  I'd like to have this
13 marked as Exhibit 4.
14           (Davis Exhibit Nos. 4, 5 & 6 were
15            marked for identification.)
16       BY MS. WILLIAMS:
17   Q.   I'd want to refer you to the date at the
18 bottom, which is how you can distinguish the
19 documents.
20       MR. THEODOROU:  So we have three exhibits,
21 4, 5 and 6, right?
22       MS. WILLIAMS:  Yes.
23       BY MS. WILLIAMS:
24   Q.   Do you recognize these documents, sir?
25   A.   Yes, I do.

Page 36

1    Q.   What are they?
2    A.   My electronic brochure for my business.
3    Q.   Are they true and correct copies of an
4  electronic brochure from your business?
5    A.   Yes.
6    Q.   Could you tell me the dates of these three
7  documents?  And I'd refer you to the first page at
8  the bottom.
9    A.   October 4, '01, April 5, '01, and August
10 30 of 2000.
11   Q.   Were you involved in the creation of these
12 documents?
13   A.   Sure.
14   Q.   When you say they were electronic
15 documents, were they available on Davis Capital's
16 website?
17   A.   Yes.
18   Q.   Did anyone assist you in the creation of
19 the documents?
20   A.   Yes.
21   Q.   Who?
22   A.   My assistant, Allyson Sullivan.
23   Q.   What was Ms. Sullivan's job title at Davis
24 Capital?
25   A.   Policy analyst.

Page 37

1    Q.   When did she come to work for Davis
2  Capital?
3    A.   I don't remember the exact date, but it
4  was some time in early 2000, like, I don't know, I
5  can't remember whether it was January, February,
6  March, some time early in 2000.
7    Q.   What were Ms. Sullivan's job
8  responsibilities as policy analyst?
9    A.   I would rely on her to take some of the
10 information sources we'd get every morning.  And you
11 know, I'd pick out the ones that I thought were worth
12 writing up.  And she would summarize them into like a
13 paragraph and look for a link for any associated
14 information source and that would be the basis for
15 forming our E-mail.
16   Q.   Were there any other employees of Davis
17 Capital, besides Ms. Sullivan?
18   A.   Well, I had assistants before her, a
19 number of them starting in, geez, I don't know, I
20 can't remember.  Some time in '93 or '94, I started
21 hiring assistants and I had a succession of
22 assistants, you know, one at a time.
23   Q.   Did you have a secretary?
24   A.   I said I just had one assistant, that was
25 it.

10 (Pages 34 to 37)

Peter Davis, Jr.                                                              April 19, 2006
Washington, DC

Page 38

1    Q.   So no secretary, just the one policy
2  analyst?
3    A.   Well, she'd pick up the phone, I'd pick up
4  the phone and you know --
5    Q.   Besides posting these brochures on your
6  website, did you do anything else with the brochures?
7    A.   We'd print them out and take them with us
8  when we went on a marketing trip.
9    Q.   When you updated the brochure, did you
10 remove the old brochure from the website and then
11 post the updated version?
12   A.   I don't really recall, but I think so.  I
13 mean, there's no reason to leave up old brochures.  I
14 couldn't swear to it that there wasn't an old one
15 hanging around, I mean websites get full of all kinds
16 of old stuff lying around.  In other words, it could
17 have been on the website and no link, I have no idea.
18   Q.   I'd like you to refer to Exhibit 4, it's
19 dated 10/4/01 and turn to the second page 106970?
20   A.   Okay.
21   Q.   I'm referring to the Bates number now.
22   A.   Right.
23   Q.   On this page, it states, and I'm looking
24 at the second sentence here that starts with "my."
25 "My 11 years on Capitol Hill and 16 years advising

Page 39

1  Wall Street clients have taught me how to get
2  Washington information ahead of the media."
3    A.   Um-hum.
4    Q.   How did you go about getting this
5  information ahead of the media?
6    A.   Because I can anticipate better than they
7  can what's going to happen in the areas I used to
8  work -- you know, work in.
9    Q.   Why were you able to anticipate better
10 than the media?
11      MR. THEODOROU:  Objection.
12      MR. STANCIL:  Don't answer.
13      THE WITNESS:  What's that?
14      MR. THEODOROU:  You can answer after I
15 object.
16      MR. STANCIL:  Unless I tell you not to
17 answer, go ahead and answer it.
18      THE WITNESS:  Oh, I wanted to make sure I
19 understand.  I'm sorry, repeat the question.
20      BY MS. WILLIAMS:
21   Q.   You said that you could anticipate better
22 than the media and I wanted it know why you were able
23 to anticipate Washington information better?
24   A.   Based on my experience.  I mean, for
25 example -- I mean, the House is working on a tax

Page 40

1  bill, there are certain things that the Ways and
2  Means Committee puts in it.  And as soon as I see
3  what they put in it, I know that certain of those
4  items are going to be a problem on the Senate side,
5  or something is likely to drop out in conference.
6  And I will say that to a client based on my
7  experience.
8    Q.   Can you turn to page 106975?
9    A.   Yes.
10   Q.   Sample weekly calendar, who would prepare
11 this calendar?
12   A.   Sometimes I would, my assistant would.  I
13 mean, it was a joint effort.  I would -- certainly I
14 would review it before it went out.
15   Q.   And what would you do with these weekly --
16 these weekly calendars after you prepared them?
17   A.   We'd send them out and we'd post them on
18 the website.
19   Q.   Where did you get the information
20 contained in the weekly calendars?
21   A.   Two main sources.  The National Journal
22 keeps a day book that lists a lost these hearings.
23 And then the BNA Daily Report For Executives has
24 another list.
25      And then there are a lot of things that

Page 41

1  happen on the Hill, or downtown, in the
2  Administration that aren't on those lists that I may
3  know are coming up.  And I will go directly to the
4  source and call up the press secretary of the Banking
5  Committee and say, hey, are you going to markup this
6  week and if I get it yes, then I will put it down.
7    Q.   So some of the information in the calendar
8  came from contacting people on the Hill or in the
9  Administration?
10      MR. THEODOROU:  Objection.
11      THE WITNESS:  Once in a rare while.  I
12 mean, usually it was just out of the National Journal
13 and the BNA Executive Daily Report.  But once in a
14 while, I would know of an impending hearing or -- you
15 know, I'd report it.
16      BY MS. WILLIAMS:
17   Q.   Going back to the questions I was asking
18 before about getting information ahead of the media,
19 did any of the information that you were able to
20 obtain ahead of the media come from any of your
21 contacts on the Hill?
22   A.   Of course.
23   Q.   Was it your practice to -- and also
24 contacts in the Administration?
25   A.   Sure.

11 (Pages 38 to 41)

Peter Davis, Jr.                                                          April 19, 2006

Washington, DC

---

## Page 42

1  Q.   Was it your practice to notify clients
2  regarding events at Treasury in your weekly calendar?
3  A.   Oh, you know, sometimes I'd put down if --
4  I mean, Treasury posts a schedule for the Secretary
5  every Friday afternoon. And I'd -- in fact, they
6  expanded it to include the assistant secretaries and
7  undersecretaries, their appointments.
8       And so, you know, it's public record and
9  I'd sometimes pull that information in, the same way
10 I would -- you know, the Fed, Federal Reserve Bank
11 also has a calendar, the State Department has a
12 calendar. There are all kinds of calendars that are
13 available if you know where to go for them, they are
14 public. And I just -- sometimes I would fold that
15 information into this if I thought it was important
16 to investors.
17 Q.   Would you include information about the
18 dates of the Treasury's quarterly refunding press
19 conference?
20 A.   Yeah, I usually would. Not always, but
21 I -- yeah, I would usually put that down.
22 Q.   Was Davis Capital incorporated?
23 A.   No.
24 Q.   Was it registered as a partnership?
25 A.   No.

## Page 43

1  Q.   Did it have any -- a board of directors?
2  A.   No.
3  Q.   What was the salary of Ms. Sullivan?
4  A.   It was -- the gross salary was $2,000 on
5  the 15th and 30th of each month so 24,000 per year.
6  Q.   How did Davis Capital go about obtaining
7  clients?
8  A.   I'd ask current clients to refer me to
9  people, I would -- in the course of my speeches
10 sometimes I would meet people. Sometimes people
11 would call me up out of the blue if they saw me on
12 CNBC or if they heard about -- I would encourage my
13 clients if they thought someone was interested in
14 another firm to forward my E-mail to them, and
15 sometimes that would generate some contact.
16 Sometimes I'd meet people at professional meetings of
17 the National Association of Business Economists or
18 the National Economists Club.
19 Q.   Approximately how many clients did Davis
20 Capital have in October of 2001?
21 A.   In the papers my attorney has, there's a
22 list, but I can't remember off the top of my head.
23 It was, I don't know, 15 or 16. But, you know,
24 that's a rough estimate. I don't, you know, there's
25 a list and --

## Page 44

1  Q.   Okay. Was Massachusetts Financial
2  Services a client of Davis Capital in October of
3  2001?
4  A.   Yes, it was.
5  Q.   I'd like to mark this as Exhibit 7.
6       (Davis Exhibit No. 7 was marked for
7       identification.)
8  BY MS. WILLIAMS:
9  Q.   Do you recognize this document, sir?
10 A.   Yes.
11 Q.   What is it?
12 A.   It's a list out of my address book.
13 Q.   A list of what?
14 A.   Most of them are clients, there are one or
15 two on here that were comped.
16 Q.   When you say comped, what do you mean?
17 A.   No charge. Like for example, the second
18 one, Stu Sweet, capital analyst, he's a consultant
19 doing similar kinds of work that I am, we knew each
20 other on the Hill and we would share each other's
21 information. So I would send him what I wrote, he
22 would send me what he wrote. We had very different
23 ways of working, but it was helpful for him to see my
24 stuff and it was helpful for me to see his stuff
25 Q.   I'd like to refer to you the top of the

## Page 45

1  document, address book list 3, all clients last
2  modified on 5/11/01?
3  A.   Um-hum.
4  Q.   When you say all clients, you say this
5  also includes clients who were comped?
6  A.   I'm saying Stu Sweet never paid me a dime.
7  We would share information. I think all the rest on
8  here -- let me just check. Well, for example I don't
9  remember Macquarie Holdings being a client, they ma
10 have been a potential client. So, you know, they
11 were -- I don't recall that they ever paid me, but
12 they would be on the list as a potential client.
13      Putnam, they were a client at one point,
14 but they were not a client at that time. And Dean
15 Mackey, for example, was an economist at the Fed
16 involved in tax policy and I knew him. And when he
17 went to Putnam, I put him on my list as a potential
18 client. Yeah, I mean -- I don't recall Stark
19 Investment, I mean, they must have been a potential
20 client. Gail Fosler of the conference board was
21 someone that I comped my service to.
22 Q.   So is it fair to say that this list
23 includes clients that were comped and some potential
24 clients and also it might include a former client?
25 A.   Right. But mostly it was my current

---

12 (Pages 42 to 45)

Peter Davis, Jr.                                                                          April 19, 2006
                                    Washington, DC

---

Page 46

1   clients.
2       Q.   Were there any clients that you had as of
3   May 11th, 2001 who were left off of this list that
4   you know of?
5       A.   I don't think so.  It just seems to --
6   this -- I recognize all my major clients.  I mean,
7   one of the problems in my business is that from month
8   to month, there can be variation in who is a client
9   and who isn't, somebody calls you up, sorry, Pete, we
10  had a budget cut, we've got to go.  Somebody new
11  comes on.  And so there's always sort of the existing
12  client base and potential clients and comped clients.
13  And there's all this flux, but I'm pretty sure all my
14  clients are included in this list.
15      Q.   Do you see Mr. Nothern's name on the list?
16      A.   Yes, I do.
17      Q.   I'd like to have this marked as Exhibit 8.
18           (Davis Exhibit No. 8 was marked for
19           identification.)
20      BY MS. WILLIAMS:
21      Q.   Do you recognize this document?
22      A.   Yes, I do.
23      Q.   What is it?
24      A.   Oh, it's what I call my call list.  It's a
25  rank ordering of if I'm going to call clients, the

---

Page 47

1   order in which I will call them.
2       Q.   How did you determine the order in which
3   you were going to call clients?
4       A.   By longevity, by how much they were paying
5   me.  For example, some clients were big clients where
6   I'm dealing with 40 people at one firm.  And so they
7   are paying me a larger fee because I'm doing more
8   work for them.
9            And also some firms are -- I mean, the
10  last criterion was that there were some firms that
11  reacted very quickly to information and some firms
12  that reacted very slowly to it.  And so I would tend
13  to call up the ones who cared about the timeliness of
14  the information more than others first.
15      Q.   Did you consider Massachusetts Financial
16  Services to be -- which I'm going to call MFS, if
17  that's okay?
18      A.   That's what I call them, too.
19      Q.   Did you consider them to be a big client?
20      A.   No.
21      Q.   Were they a small client?
22      A.   Yes.
23      Q.   And why did you consider them to be a
24  small client?
25      A.   Two reasons.  One, they were -- they had

---

Page 48

1   less demand for my services than other clients.  And
2   therefore, the second reason, they were paying me
3   what I sort of thought of as my minimum fee, and I'm
4   trying to remember what that was.  I guess it was a
5   1,000 a month, it could have been 10,000 a year, I
6   think it was a 1,000 a month.
7       Q.   You said that some firms reacted quickly.
8       A.   Um-hum.
9       Q.   What did you mean by that?
10      A.   That if I called up, I might be talking to
11  my contact, but I might also be phoned into their
12  chief trader.  You could be sitting there waiting to
13  execute trades based on my information.
14      Q.   Who prepared this document?
15      A.   I did.
16      Q.   Do you know whose handwriting is on it?
17      A.   It's mine.
18      Q.   Do you know when the document was created?
19      A.   Yeah, there's a date stamp on the bottom
20  of it from the -- my personal contract manager's
21  software said this was printed 8:29 a.m., May 2nd of
22  2001.
23      Q.   Do you see Mr. Nothern's name on this
24  document?
25      A.   Yes, I do.

---

Page 49

1       Q.   Why are some of the names -- some names
2   and numbers are written at the bottom of the list.
3   Do you know why they weren't included in the
4   typewritten portion of the list?
5       A.   Yes, because they were potential clients,
6   they were not current clients, although I think Nexis
7   did become a client for a few months that summer, but
8   I'd have to check that.
9       Q.   I'd like to have this marked -- one
10  second.
11           What occasions did you use this call list?
12      A.   Whenever I had something that I felt was
13  market moving to report to my clients.  I was in the
14  habit of when something was really hot, like the
15  conference on the tax bill just blew up, don't look
16  like there's going to be a tax bill, I would
17  immediately E-mail all my clients a paragraph saying
18  that.  And then I would start calling to give
19  clients -- make sure they got it, focused on it.  And
20  then sometimes they might have a quick question.  And
21  I would try to get through my whole list as fast as I
22  could, I would just start calling people one after
23  the other, all the way to the bottom.
24      MR. STANCIL:  Erica, I don't want to
25  interrupt, do you have a break planned at any point,

---

13 (Pages 46 to 49)

Peter Davis, Jr.                                                                 April 19, 2006
Washington, DC

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  we need some water at some point soon. I don't want
2  to interrupt where you're going, we can go a little
3  bit longer.
4  　　　MS. WILLIAMS: We can take a break here.
5  　　　MR. STANCIL: It's totally up to you.
6  　　　MS. WILLIAMS: Before I mark the next
7  exhibit, absolutely.
8  　　　MR. STANCIL: Is that okay?
9  　　　THE WITNESS: Absolutely.
10 　　　THE VIDEOGRAPHER: This is the end of tape
11 number 1 in the video deposition of Peter Davis. Off
12 the record at 10:38:19 a.m. on April 19th, 2006.
13 　　　(Recess.)
14 　　　THE VIDEOGRAPHER: This is the beginning
15 of tape number 2 in the videotaped deposition of
16 Mr. Peter Davis. On the record at 10:56:46 a.m. on
17 April 19th, 2006.
18 　　　BY MS. WILLIAMS:
19 　　Q. Mr. Davis, I wanted to ask you a few more
20 questions about what's been marked as Exhibit 8.
21 　　A. Um-hum.
22 　　Q. I notice that there are fax numbers listed
23 on the exhibit; do you see those?
24 　　A. Yes.
25 　　Q. Did you send clients faxes in 2001?

**Page 52**

1  in May.
2  　　Q. Did you typically carry a hard copy of the
3  list with you?
4  　　A. Yes.
5  　　Q. Did you consider Goldman Sachs to be a big
6  client?
7  　　A. Yes, they were new.
8  　　Q. Can you tell me why, and I'm referring to
9  the last typewritten line here, John Youngdahl,
10 Goldman Sachs, do you see that on this document?
11 　　A. Yes.
12 　　Q. Why Mr. Youngdahl's name appears near the
13 bottom of the document?
14 　　A. Because they were new, I had had him down
15 at the bottom, and just hadn't taken time to move him
16 up. I mean, I think he was a potential client when
17 this list was printed, whereas they became a client a
18 few months later.
19 　　Q. Do you know if between May 2nd, 2001 and
20 October 31st, 2001 if you updated this list?
21 　　A. I probably did, but I don't recall
22 specifically. I updated whenever I got time to
23 update it. Sometimes I went around saying, geez, I
24 have to update this list and just not get around to
25 it for a month or two.

| Page 51 | Page 53 |
|---|---|

**Page 51**

1  　　A. Once in a rare while. By that point, I
2  was sending E-mail, but sometimes we'd get a document
3  or something that, you know, I couldn't get scanned
4  very easily or something. So on rare occasions, we'd
5  fax something.
6  　　Q. You also -- you stated before we took a
7  break that you would send E-mails when there was some
8  market movement, when you said the market -- you had
9  marked moving information?
10 　　A. Right.
11 　　Q. Do you recall saying that?
12 　　A. Right.
13 　　Q. And you gave an example of some market
14 moving information.
15 　　A. Right.
16 　　Q. Did you consider Treasury's announcement
17 on October 31st, regarding the cancellation of the
18 30-year bond to be market moving information?
19 　　MR. THEODOROU: Objection.
20 　　BY MS. WILLIAMS:
21 　　Q. You can answer.
22 　　A. Yes.
23 　　Q. Did you use this list on October 31st,
24 2001 to call clients?
25 　　A. Yes, or one like it. This was printed out

**Page 53**

1  　　Q. Did you carry a PDA?
2  　　A. Yes, I did at the time.
3  　　Q. Was the client information that is
4  contained on this list also contained in your PDA?
5  　　A. Yes.
6  　　Q. When did you first start using a PDA?
7  　　A. I don't recall.
8  　　Q. Were you still using a PDA October 31st,
9  2001?
10 　　A. Yes.
11 　　Q. Did you also have a Blackberry?
12 　　A. No.
13 　　Q. I'd like to have it marked as Exhibit 9.
14 　　(Davis Exhibit No. 9 was marked for
15 　　　identification.)
16 　　BY MS. WILLIAMS:
17 　　Q. Do you recognize this document, sir?
18 　　A. Yes.
19 　　Q. What is it?
20 　　A. It's a printout of my contact manager data
21 file.
22 　　Q. Is it a true and correct copy of the
23 printout from your data file?
24 　　A. Yes.
25 　　Q. Do you know the date of this document?

14 (Pages 50 to 53)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

## Page 54

1  A.  Yeah, it was printed out 10:16 a.m. 11 --
2  November 9th, 2001.
3  Q.  Who entered or created this data file?
4  A.  I did.
5  Q.  And could you tell me who -- what names
6  appear on this data file, like what kind of
7  information you entered into the data file?
8  A.  Everybody that I called.
9  Q.  And did this include clients of Davis
10 Capital?
11 A.  Yes.
12 Q.  Did it include people who were not clients
13 of Davis Capital?
14 A.  Yes.
15 Q.  Is it fair to say that this is -- this was
16 an address for business and personal use?
17 A.  Yes.
18 Q.  Did Davis Capital, and I might have
19 already asked this, charge a standard fee to clients?
20 A.  Yes, but there was variation also.
21 Q.  What was the variation based on?
22 A.  Utilization.
23 Q.  What was the standard fee?
24 A.  $1500 a month.
25 Q.  Do you know if that standard fee was

## Page 55

1  charged to MFS?
2  A.  I said earlier that I recall that they
3  were paying me $1,000 a month.
4  Q.  So less than the standard fee?
5  A.  Right.
6  Q.  Do you know why they were paying less than
7  the standard fee?
8  A.  Less demand.  We would negotiate, you
9  know, every client based on their demand.
10 Q.  When you say demand, what are you
11 referring to?
12 A.  How much of my time I spent.  Some clients
13 needed explanations about Washington, others didn't
14 so --
15 Q.  Did MFS receive E-mails that you would
16 send to -- did you send mass E-mails to clients,
17 meaning E-mails that were sent to more than one
18 client?
19 A.  Yes.
20 Q.  Did MFS receive those E-mails as a general
21 matter?
22 A.  I assume they did, yeah.  I sent them.
23 Q.  So when you say less demand, you don't
24 mean that you would leave them off of E-mails that --
25 A.  No, the E-mail was my standard product,

## Page 56

1  that was the base product.  Everybody got that.  And
2  the additional services were phone calls, custom
3  research, meetings, talking to their clients,
4  answering their questions.
5  Q.  How are you compensated by Davis Capital?
6  A.  Clients send me checks, I deposit them.
7  Q.  Let me be more specific.  Did you receive
8  a salary from Davis Capital?
9  A.  No.
10 Q.  A set salary?
11 A.  No, I'm a sole prop.  I mean, I take in
12 gross income, I pay expenses and whatever's left is
13 mine.
14 Q.  Do you know approximately how much you
15 earned from Davis Capital in 2001?
16 A.  Geez.  Not offhand, I'd have to go check
17 my tax records.  It was -- I don't know, it was a
18 little over 200,000, I don't know, I'd have to check
19 my tax records.
20 Q.  You testified that MFS was one of Davis
21 Capital's clients.  Do you know when MFS became a
22 client of Davis Capital?
23 A.  I don't recall specifically, some time in
24 the mid-'90s.
25 Q.  How did MFS become a client of Davis

## Page 57

1  Capital?
2  A.  It was a referral from another client.
3  Q.  What other client?
4  A.  Bob Faulkner at Sangamon Trading.
5  Q.  How did -- and when you say it was a
6  referral, did someone from MFS contact you?
7  A.  Bob Faulkner at Sangamon Trading said you
8  might call Steve Nothern over at MFS.
9  Q.  So you contacted MFS?
10 A.  Right.
11 Q.  And specifically Mr. Nothern?
12 A.  Yes.
13 Q.  Do you recall what you discussed with
14 Mr. Nothern when you contacted him?
15 A.  Hi, Bob Faulkner said I should give you a
16 call, just wanted to introduce myself, arrange to
17 send you my material.  I seem to recall I paid a
18 visit to Boston to visit Steve.
19 Q.  Had you met Mr. Nothern before you called
20 him regarding the referral that you had received from
21 Mr. Faulkner?
22 A.  No.
23 Q.  Had -- was Mr. Nothern expecting your call
24 when you called, had he also heard from Mr. Faulkner?
25 A.  Yeah, I think so.

15 (Pages 54 to 57)

Peter Davis, Jr.                                                         April 19, 2006
Washington, DC

## Page 58

1    Q.   Did Mr. Nothern discuss anything about
2    what kind of services he would be looking for from
3    Davis Capital?
4    A.   I don't recall.  I told him what I did and
5    you know, we talked about whether that would be
6    useful to him.
7    Q.   What is your recollection as to what
8    Mr. Nothern said as to whether it would be useful to
9    him?
10   MR. THEODOROU:  Objection.
11   MR. STANCIL:  If you remember, go ahead
12   and answer.
13   THE WITNESS:  I don't have any
14   recollection of what he said.  That was -- that was
15   at least ten years ago.
16   BY MS. WILLIAMS:
17   Q.   Did you have any understanding as to
18   whether Mr. Nothern was interested in the services of
19   Davis Capital based on that conversation?
20   MR. THEODOROU:  Objection.
21   BY MS. WILLIAMS:
22   Q.   You can answer.
23   MR. STANCIL:  If you remember, go ahead
24   and answer.
25   THE WITNESS:  Well, I mean, if he seemed

## Page 59

1    interested, we talked.
2    BY MS. WILLIAMS:
3    Q.   You said that you eventually went to
4    Boston.  Do you recall when that meeting was?
5    A.   No.
6    Q.   Do you know how long after the
7    conversation you had with Mr. Nothern that you went
8    to Boston?
9    A.   I don't recall.
10   Q.   Do you know if it was a year later?
11   A.   No, no, it was some time a few months
12   later, I had some other clients to visit in Boston.
13   Q.   Whose idea was it for you to go to Boston
14   to visit MFS?
15   A.   I don't recall.  I -- I had other clients
16   up in Boston.  And I think I suggested that, you
17   know -- I mean, I called -- I think I said, hey, how
18   about if I drop in, because I'm going to be up there
19   visiting other clients.
20   Q.   Do you recall who was present at the
21   meeting that you had at MFS?
22   A.   No.
23   Q.   Do you know if Mr. Nothern was present at
24   that meeting?
25   A.   Yes.

## Page 60

1    Q.   Were other people besides Mr. Nothern
2    present?
3    A.   I'm not clear.  I just don't remember.
4    Q.   Do you recall what happened during that
5    meeting?
6    A.   We talked about Washington policy issues.
7    Q.   Do you recall if you discussed your
8    background at all?
9    A.   Sure.
10   Q.   Do you recall if you provided anyone with
11   a copy of your firm brochure?
12   A.   Yes, I probably presented it to him.  I
13   don't have a specific recollection, but I probably
14   already sent it to him before I arrived.  But I'm
15   sure I had one with me, because it was a standard
16   practice.
17   Q.   Do you know if you entered into any
18   agreements with anyone at the meeting?
19   A.   Entered into agreements?
20   Q.   Were there any documents signed?
21   A.   No.
22   Q.   Were you retained during that meeting?
23   A.   I don't recall.  It was probably a follow
24   up phone call later on that said, you know, we'll
25   retain you or something, but, you know, I don't think

## Page 61

1    it was on the spot.
2    Q.   Do you know if MFS ever entered into a
3    written agreement retaining the services of Davis
4    Capital?
5    A.   I don't recall one.  I mean, most of my
6    relationships were a handshake.
7    Q.   Do you recall how long the meeting lasted?
8    A.   No.
9    Q.   When you were -- first started providing
10   service to MFS, did they go through any sort of trial
11   period?
12   A.   Hmm, I don't recall.  I mean, I have a
13   standard practice where as soon as I make contact
14   with a potential client, I just put them on my E-mail
15   list and start sending them stuff.  And if they
16   haven't retained me within a few months, my standard
17   practice is to drop them off.
18   Q.   Were you ever provided with any E-mail --
19   E-mail contacts at MFS?
20   A.   Yes.
21   Q.   Who provided you with the list of E-mail
22   contacts?
23   A.   Steve.
24   Q.   Do you recall how many E-mails were on
25   that list?

16 (Pages 58 to 61)

Peter Davis, Jr.
Washington, DC
April 19, 2006

Page 62

1    A.   Not really.  I mean, it was a handful, I
2  really don't recall.
3    Q.   When you say a handful, less than 10?
4    A.   Yeah.
5    Q.   But more than just Mr. Nothern?
6    A.   Yeah, there were a few other people there.
7    Q.   Do you recall any of those other people's
8  names as far as the E-mails that you would send to
9  MFS?
10   A.   No.
11   Q.   Did you have any other contacts that you
12 recall at MFS besides Mr. Nothern?
13   A.   There was one other person that I talked
14 to once in a rare while, but I don't even remember
15 his name.
16   Q.   It was a man?
17   A.   Yes.
18   Q.   Do you know what department that person
19 worked in?
20   A.   No.
21   Q.   When you say that you sent -- did you add
22 MFS -- you eventually added MFS to your E-mail list?
23   A.   Correct.
24   Q.   Did they receive the weekly calendars that
25 you sent out?

Page 63

1    A.   Sure.
2    Q.   And if you sent faxes to clients, did they
3  also receive those?
4    A.   Yes.
5        MR. STANCIL:  To be clear, you sent them.
6  Do you have knowledge as to whether they received
7  them or not?
8        THE WITNESS:  No.
9        BY MS. WILLIAMS:
10   Q.   Did you ever discuss with Mr. Nothern if
11 he had received E-mails that you sent?
12       MR. THEODOROU:  Objection.
13       BY MS. WILLIAMS:
14   Q.   You can answer.
15   A.   Um, I don't recall.  I mean, all I know is
16 I sent the stuff out.
17   Q.   Did he ever complain that he wasn't
18 receiving E-mails?
19   A.   Not that I recall, no.
20   Q.   Do you recall ever having any discussions
21 with Mr. Nothern regarding any content of any E-mails
22 you might have sent him?
23       MR. THEODOROU:  Objection.
24       THE WITNESS:  Um, I don't have any
25 specific recollection.

Page 64

1        BY MS. WILLIAMS:
2    Q.   Do you have a general recollection?
3        MR. THEODOROU:  Objection.
4        THE WITNESS:  He might have called me up a
5  few times, usually I was calling him.
6        BY MS. WILLIAMS:
7    Q.   How often did you call Mr. Nothern?
8    A.   Not that often, once in a while, once
9  every month or so maybe.
10   Q.   Why did you call Mr. Nothern?
11   A.   To stay in touch, he was a client.
12   Q.   What kind of things were discussed during
13 these calls?
14       MR. THEODOROU:  Objection.
15       THE WITNESS:  Usually, you know, I'd be
16 calling about Washington policy information, you
17 know, that --
18       BY MS. WILLIAMS:
19   Q.   Was there any information that you felt
20 Mr. Nothern was particularly interested in?
21       MR. THEODOROU:  Objection.
22       THE WITNESS:  He was generally interested
23 in, you know, the deficit and what was -- what
24 federal borrowing was going to be required.
25       BY MS. WILLIAMS:

Page 65

1    Q.   And besides the deficit and fed -- federal
2  borrowing, was there anything else that you thought
3  Mr. Nothern was interested in?
4    A.   I don't recall him asking me to
5  investigate anything in particular, I -- I would just
6  give him what I was giving all my clients.
7    Q.   Did you ever call anyone else at MFS
8  besides Mr. Nothern?
9    A.   This other guy whose name I can't
10 remember, I might have called, oh, a few times you
11 know, over a few years.  I just -- I don't remember
12 the guy's name, I -- it was one other guy that I did
13 call once on a few occasions.
14   Q.   Did you ever meet Jeffrey Corinski?
15   A.   I have no recollection of meeting him.
16   Q.   Do you know Mr. -- did you ever speak to
17 Mr. Corinski?
18   A.   I have no recollection of him.
19   Q.   What about Peter Sullivan?
20   A.   I just don't recall these people.
21   Q.   Matt Ryan?
22   A.   The name sounds familiar, but I don't
23 recall.  My main contact was Steve.
24   Q.   What about Bob Persons?
25   A.   I don't recall that name at all.

17 (Pages 62 to 65)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

Page 66

1    Q.  Jim Swanson?
2    A.  That -- you know, that name sounds a
3  little familiar, but I don't recall any conversations
4  or meetings.
5    Q.  Mark Dow?
6    A.  I don't recall that at all.
7    Q.  What about Richard Hawkins?
8    A.  No recollection of that person.
9    Q.  Or Bill Adams?
10   A.  No recollection of that person.
11   Q.  When you sent faxes to MFS who did you
12 send them to?
13   A.  To Steve.
14   Q.  Do you know if you included the other
15 gentleman that you can't remember his name on that
16 fax?
17       MR. THEODOROU:  Objection.
18       THE WITNESS:  I don't recall.  Usually
19 when I sent a fax, it was to one person at each firm.
20       BY MS. WILLIAMS:
21   Q.  Did you ask that person to distribute the
22 fax to others?
23   A.  No.
24   Q.  Did you ever ask Mr. Nothern to spread
25 information that he received from you to other

Page 67

1  people?
2    A.  Well, like with a lot of my clients, you
3  know, I might have asked him if he knew of other
4  potential clients I might approach.  But no, other
5  than that, I can't -- and I don't have any specific
6  recollection of any of that.
7    Q.  Do you recall who at MFS you sent your
8  bills to?
9    A.  No.
10   Q.  I'd like to have this marked as Exhibit
11 10.
12       (Davis Exhibit No. 10 was marked for
13       identification.)
14       BY MS. WILLIAMS:
15   Q.  Do you recognize this document, sir?
16   A.  It looks like one of my invoices.
17   Q.  Who is this invoice to?
18   A.  Bridgett Femino.
19   Q.  Where did Ms. Femino work?
20   A.  MFS, Boston.
21   Q.  Are those your initials at the bottom?
22   A.  Yes, they are.
23   Q.  There's some handwriting at the top, do
24 you know whose handwriting that is?
25   A.  No idea.  When I send these out, I initial

Page 68

1  them at the bottom and mail them, or some clients I
2  faxed them to.
3    Q.  And why was this sent to Ms. Femino?
4    A.  She must have been the payable person at
5  that time.  I mean --
6    Q.  What was this invoice for?
7    A.  It was for $12,000 for a full year's
8  service from October 1, 2000 through September 30th,
9  2001.
10   Q.  Was it your practice to bill by the year?
11   A.  It varied from client to client depending
12 on what they felt was most convenient.  So evidently,
13 I was billing them on an annual basis at $1,000 a
14 month.
15   Q.  I see the document says consulting
16 services for Steven Nothern, Massachusetts Financial
17 Services?
18   A.  Right.
19   Q.  Were you consulting for anyone else at MFS
20 during this time period?
21   A.  Well, I would be available to basically
22 anybody at the firm who had a question that I could
23 answer about Washington policy.  Our standard
24 practice was when I had a client, there would be a
25 main contact, but I would be available to anybody who

Page 69

1  needed to, you know, for the same fee -- you know,
2  for that one fee, I would be available to answer
3  questions from other people at the firm.
4    Q.  So you were available to answer questions
5  from other people at MFS besides Mr. Nothern?
6    A.  Yes.
7    Q.  You stated that you met with Mr. Nothern
8  and possibly others at MFS, did you ever have any
9  other in-person meetings with Mr. Nothern?
10   A.  He came to Washington once or twice, and I
11 met with him here.
12   Q.  When did -- do you recall Mr. Nothern
13 first came to Washington to meet with you?
14   A.  I -- I don't recall.
15   Q.  Do you know approximately the year?
16   A.  Some time in the year or so maybe after he
17 became a client he -- I don't have any specific
18 recollection.
19   Q.  Who arranged the meeting?
20   A.  I don't recall.
21   Q.  Did you suggest that Mr. Nothern come to
22 Washington?
23   A.  One of my services was to arrange meetings
24 with people in Washington.  And I do recall that
25 Steve came down for one of those meetings, and so

18 (Pages 66 to 69)

## Page 70

1  obviously that would have been at my suggestion. But
2  I don't -- you know, there were other reasons for him
3  to be here, like, say, he could have possibly
4  attended the National Association of Business
5  Economists meeting or something, just been here on
6  his own.
7      Q.   Who paid for Mr. Nothern's trip to
8  Washington?
9      A.   I don't know.
10     Q.   Did you pay for that trip?
11     A.   No, no.
12     Q.   Were there other clients involved in this
13 meeting?
14     A.   Yes.
15     Q.   Do you know who those other clients were?
16     A.   I think Ward McCarthy was there from Stone
17 & McCarthy. And I think there were probably one or
18 two others, but I don't recall who they were.
19     Q.   Was anyone else there from MFS?
20     A.   No.
21     Q.   What was your purpose of setting up these
22 meetings with clients?
23     A.   To introduce my clients to leading
24 economists and policy makers, and the Administration
25 and on Capitol Hill.

## Page 71

1      Q.   Do you know where you took the clients
2  during this meeting?
3      A.   To -- I don't have a specific recollection
4  about that specific meeting, but my general practice
5  was to arrange for meetings with, say, three or four
6  economists on Capitol Hill in the morning, and maybe
7  at a lunch. And then with Administration economists
8  in the afternoon, clients would typically fly home in
9  the afternoon.
10     Q.   And who would the economists that you
11 arranged the meeting with, who would they work for?
12     A.   They'd work for congressional committees
13 or the Congressional Budget Office, for other
14 government agencies.
15     Q.   Which agencies?
16     A.   Which agencies? You know, I don't recall
17 specifically for that meeting, but typically it would
18 be OMB Council of Economic Advisors, the Fed,
19 Treasury, CBO, Joint Tax Committee, Senate Budget
20 Committee, House Budget Committee, Joint Economic
21 Committee.
22     Q.   How do you decide where to take the
23 clients during the meeting?
24     A.   Whoever's available and whoever is the
25 most knowledgeable person I can get to talk about how

## Page 72

1  the economy's doing, and how the -- you know, what's
2  going on with policy matters in Washington.
3      Q.   Had Mr. Nothern ever mentioned any people
4  that he would like to meet with in Washington?
5      A.   No.
6      Q.   Did he ever mention any agencies that he
7  was interested in visiting?
8      A.   No.
9      Q.   Did you notify your clients in advance as
10 to who they would be meeting with during their trips
11 to Washington?
12     A.   Yes. However, that was always subject to
13 change, because meetings can evaporate very quickly.
14 So that was all in flux, right up until you would
15 walk into someone's office.
16     Q.   How did you provide the notification, what
17 means did you use?
18     A.   I don't recall. It was probably E-mail or
19 a fax, but I don't recall.
20          MS. WILLIAMS: I'd like to mark this as
21 Exhibit 11.
22          (Davis Exhibit No. 11 was marked for
23          identification.)
24          BY MS. WILLIAMS:
25     Q.   Have you seen this document before?

## Page 73

1      A.   Yes.
2      Q.   What is it?
3      A.   It's a meeting list for January 15th of
4  '98.
5      Q.   And why was this meeting list prepared?
6      A.   So I would have the contact information
7  for who we were meeting with.
8      Q.   Do you know if Mr. Nothern participated in
9  this January 15th, '98 meeting?
10     A.   I know he participated in some meeting
11 around, you know, this time. But I don't know if it
12 was this specific meeting. It easily could have
13 been.
14     Q.   Do you recognize the handwriting on the
15 document?
16     A.   Some of it. The handwriting at the top is
17 mine, but the other handwriting is not.
18     Q.   And I -- who from Treasury was scheduled
19 to participate in this January 15th, '98 meeting?
20     A.   Allen Cohen, Jim Lister and Roger Anderson
21 and John Karl Scholz -- oh, and furthermore, I guess
22 David Wilcox, too. It is cut off on the side, I
23 think it says TENT there, which would probably mean
24 tentative.
25     Q.   That's your handwriting?

19 (Pages 70 to 73)

Peter Davis, Jr.                                                April 19, 2006
Washington, DC

---

**Page 74**

1    A.   Yeah, that looks like my handwriting on
2  the side there.
3    Q.   Who would you have sent this document to?
4    A.   It's possible that I faxed this to clients
5  who were going to attend.
6    Q.   Would you have sent this document to
7  anyone who was not planning to attend?
8    A.   No, at least not that I recall. I have no
9  recollection of sending this.
10   Q.   What was Mr. Cohen's job title at
11 Treasury, if you recall?
12   A.   I think he was special assistant to the
13 Secretary.
14   Q.   What about Mr. Lister?
15   A.   I don't recall. I think he was G-7 in
16 international, but I really don't recall.
17   Q.   Roger Anderson?
18   A.   He was Assistant Secretary for -- geez, I
19 forget. You know, financial management, it was -- he
20 was the Assistant Secretary for debt manage -- it
21 wasn't -- the title wasn't debt management, but
22 that's what he was doing.
23   Q.   And what about Mr. Scholz?
24   A.   He's a tax economist who had been in the
25 Office of Tax Analysis. In fact, I think he was

---

**Page 76**

1    A.   Occasionally, once every few months.
2    Q.   Did you consider Mr. Anderson to be a
3  friend of yours?
4    A.   It was a professional acquaintance, we
5  didn't socialize together.
6    Q.   What about Mr. Scholz, how did you know
7  him?
8    A.   He's a tax economist, he would
9  occasionally speak to this professional group of tax
10 economists that I co-founded.
11   Q.   How often would you speak to Mr. Scholz?
12   A.   Occasionally, not that often.
13   Q.   Where was the meeting held that you had at
14 Treasury in January '98?
15   A.   I don't recall. It was probably in
16 Roger's office, but -- in fact, I don't even recall
17 whether it was one meeting, there might have been
18 two.
19   Q.   Okay.
20   A.   In other words, sometimes I would move
21 around within the building, visit with one group and
22 then visit another.
23   Q.   Did you and the clients that you brought
24 to Treasury have to go through any security to gain
25 access to the building?

---

**Page 75**

1  director of the Office of Tax Analysis.
2    Q.   And Mr. Wilcox, what was his job title?
3    A.   I don't recall. He might have been
4  Assistant Secretary for Economic Policy.
5    Q.   How do you determine who the people you
6  were going to meet with on January 15th, '98?
7    A.   I mean, I -- I don't recall. Generally, I
8  would be looking for people who could talk about
9  economic policy making, and then the state of the
10 economy.
11   Q.   To set up these meetings, did you contact
12 the individuals on this list directly?
13   A.   Yes.
14   Q.   Had you previously met Mr. Cohen?
15   A.   He and I worked together on the Hill.
16   Q.   And how did you know Mr. Lister?
17   A.   It was probably a referral from Alan or
18 someone else at Treasury, you know, I don't recall
19 Lister at all. And that might have been the only
20 time I met him.
21   Q.   And what about Mr. Anderson, how did you
22 know him?
23   A.   I had met him on a number of occasions at
24 Treasury.
25   Q.   How often did you and Mr. Anderson talk?

---

**Page 77**

1    A.   Yes.
2    Q.   And did you have a contact that you left
3  the name with security, that you said you were going
4  to see?
5        MR. THEODOROU: Objection.
6        THE WITNESS: I don't recall. It was -- I
7  mean, someone obviously cleared us in. It could have
8  been Roger, Roger's secretary, but I have no
9  recollection of you know who cleared us in.
10       BY MS. WILLIAMS:
11   Q.   Do you know the name of Mr. Anderson's
12 secretary?
13   A.   I don't recall.
14   Q.   Does the name Patricia Walton ring a bell?
15   A.   No.
16   Q.   What about Anna Hart?
17   A.   No.
18   Q.   Do you know what you discussed during the
19 meetings at Treasury that you had on January -- in
20 January '98?
21   A.   I don't have any specific recollection.
22   Q.   Do you recall having any other meetings
23 where Mr. Nothern came to Washington?
24   A.   I remember he came once. I don't recall
25 if -- it's possible there was another one. But I

---

Alderson Reporting Company
1111 14th Street, NW Suite 400        1-800-FOR-DEPO        Washington, DC 20005

Peter Davis, Jr.

April 19, 2006

Washington, DC

## Page 78

1  don't recall. I mean, I remember him coming down for
2  one for sure.
3      Q.  I'd like to have this marked as Exhibit
4  12.
5          (Davis Exhibit No. 12 was marked for
6          identification.)
7      BY MS. WILLIAMS:
8      Q.  Do you recognize this document, sir?
9      A.  It's a letter from me to Lee Sachs.
10     Q.  Is that your signature at the bottom?
11     A.  Yes, it is.
12     Q.  Did you prepare this document?
13     A.  Yes.
14     Q.  Is it a true and correct copy of the
15 letter that you prepared to Mr. Sachs?
16     A.  Yes.
17     Q.  What is this letter regarding?
18     A.  It's about a meeting at Treasury on
19 January 20th of 2000.
20     Q.  A meeting with whom?
21     A.  I would assume with Mr. Sachs. I don't
22 recall who else was there.
23     Q.  I'd like to refer you to the second line,
24 it says, attending will be and then there's a colon,
25 do you see that?

## Page 79

1      A.  Yes, I do.
2      Q.  Who did you list would be attending the
3  meeting?
4      A.  Ward McCarthy and Ray Stone from Stone &
5  McCarthy, Steve Nothern and Larry Hathaway from --
6  yeah, Larry Hathaway from Warburg Dillon Read.
7      Q.  Do you recall whether Mr. Nothern attended
8  a meeting at Treasury on, would have been January
9  20th?
10     A.  I assume he attended this. This seems
11 documented. I know he attended some meeting at
12 Treasury that I was at, this was probably it.
13     Q.  Do you know who arranged the meeting at
14 Treasury?
15     A.  I did.
16     Q.  Do you know if anyone besides Mr. Sachs
17 from Treasury participated in the meeting?
18     A.  I don't have any specific recollection.
19 There were almost certainly other people there, you
20 don't just go in and meet with an Assistant Secretary
21 without somebody else being there.
22     Q.  Do you know if Mr. Paul Malvey was in
23 attendance?
24     A.  He probably was.
25     Q.  Who was Mr. Malvey?

## Page 80

1      A.  I forget his exact title. Something like
2  Director of Office of Tax -- Office of Debt
3  Management or something like that. He was the chief
4  civil servant under the Assistant Secretary.
5      Q.  How did you know Mr. Malvey?
6      A.  I met him on a number occasions at
7  Treasury.
8      Q.  Were you introduced by someone to
9  Mr. Malvey?
10     A.  I don't recall how I met him.
11     Q.  Do you know when you first met Mr. Malvey,
12 about the year?
13     A.  Some time in the mid-'90s, probably in '94
14 or '95, I guess. It's hard to say.
15     Q.  How often would you speak to Mr. Malvey?
16     A.  Not that often, once every few months
17 maybe.
18     Q.  Did you and Mr. Malvey have a personal
19 relationship?
20     A.  No.
21     Q.  Your relationship was strictly
22 professional?
23     A.  We had a professional relationship, there
24 would be questions and I'd call up and ask him.
25     Q.  What kind of questions would you ask

## Page 81

1  Mr. Malvey?
2      A.  Well, you know -- I don't know, I'm trying
3  to recall. When the quarterly refunding meetings
4  would be, when they might be releasing any studies
5  they were doing. Once in a while they do a special
6  study.
7      Q.  How did you know Mr. Sachs?
8      A.  That was probably the only time I met with
9  him, so I didn't really know him.
10     Q.  How was this meeting with Mr. Sachs
11 arranged?
12         MR. THEODOROU: Objection.
13         THE WITNESS: I called up and asked to
14 meet and then followed up with this letter.
15     BY MS. WILLIAMS:
16     Q.  Did you call Mr. Sachs directly?
17     A.  No, and I put in -- I mean, almost
18 certainly I had a written request that went in, you
19 know, it was faxed or mailed to him, and then had to
20 follow up. And then when I knew who the clients were
21 who were going to go, then I sent this letter.
22     MS. WILLIAMS: I'd like to mark this as
23 Exhibit 13.
24         (Davis Exhibit No. 13 was marked for
25         identification.)

21 (Pages 78 to 81)

| Page 82 | Page 84 |
|---|---|
| 1    MS. WILLIAMS: And I'd actually like to | 1    Q.   When you wrote this document, do you |
| 2  mark this as Exhibit 14. | 2  believe that the information contained in it was |
| 3        (Davis Exhibit No. 14 was marked for | 3  fresh in your mind? |
| 4        identification.) | 4    A.   Sure. |
| 5    BY MS. WILLIAMS: | 5    Q.   Do you have any reason to doubt any of the |
| 6    Q.   Do you recognize what's been marked as | 6  accuracy of the information that's contained in the |
| 7  Exhibit 13? | 7  document? |
| 8    A.   Yes. | 8        MR. THEODOROU: Objection. |
| 9    Q.   What is it? | 9    BY MS. WILLIAMS: |
| 10    A.   It's an E-mail with a tentative schedule | 10    Q.   Besides the handwritten notes? |
| 11  of meetings in Washington. | 11    A.   Besides handwritten notes, it looks like |
| 12    Q.   Who is it an E-mail from? | 12  something I prepared. |
| 13    A.   From me to Larry Hathaway, Ward McCarthy, | 13    Q.   Exhibit 14, do you recognize this |
| 14  Steve Nothern and Ray Stone. | 14  document? |
| 15    Q.   What's the date of this document? | 15    A.   It's a printout from my contact manager, |
| 16    A.   January 19th, 2000, 8:58 a.m. | 16  the contact information of the people, some of the |
| 17    Q.   Did you draft this document? | 17  people we were going to meet with that day. |
| 18    A.   Yes. | 18    Q.   When you say that date, what date are you |
| 19    Q.   Do you recognize the handwriting on the | 19  referring to? |
| 20  document? | 20    A.   January 20th -- well, it's interesting |
| 21    A.   No. | 21  there it's cut off. There's no date on this, so I |
| 22    Q.   Why did you send this document? | 22  can't be sure of that, but it does list some of the |
| 23    A.   To notify my clients of the meeting | 23  same people that were on the previous exhibit. |
| 24  schedule. | 24    Q.   Did you create the document except for the |
| 25    Q.   The meeting schedule for what day? | 25  handwritten notes? |

| Page 83 | Page 85 |
|---|---|
| 1    A.   The following day, January 20th. | 1    A.   It's printed out from my contact manager |
| 2    Q.   And besides Mr. Sachs, does this document | 2  so I must have. |
| 3  help refresh your recollection as to other people you | 3    Q.   Do you recognize the handwriting on the |
| 4  met with on January 20th? | 4  document? |
| 5    A.   Yeah, I mean, it's got a list of other | 5    A.   No. |
| 6  people we met with. | 6    Q.   Do you know if you sent this document to |
| 7        MR. STANCIL: To be clear, she's asking | 7  anyone? |
| 8  you if based on this document you have an independent | 8    A.   I -- I don't recall. |
| 9  recollection or just reading the document -- | 9    Q.   Was it your practice to send a print out |
| 10        THE WITNESS: Oh, oh. | 10  from your contact manager to people? |
| 11        MR. STANCIL: I want you to be real clear | 11        MR. THEODOROU: Objection. |
| 12  about what you remember. | 12        THE WITNESS: I probably did. I don't |
| 13        THE WITNESS: Yeah. | 13  have any specific recollection. |
| 14        MR. STANCIL: And what the document says. | 14        MS. WILLIAMS: Okay. |
| 15  Maybe the document changes what you remember, maybe | 15    BY MS. WILLIAMS: |
| 16  it doesn't. | 16    Q.   Did you ever discuss with any clients how |
| 17        THE WITNESS: I have a specific | 17  you knew individuals that you were going to be |
| 18  recollection of a meeting with Vince Reinhardt at the | 18  meeting with in Washington? |
| 19  Fed. I recall a meeting at Treasury some, but I | 19    A.   Sure. |
| 20  don't remember Lee Sachs. And I -- you know, the | 20        MR. THEODOROU: Objection. |
| 21  rest of it, I don't really recall. | 21    BY MS. WILLIAMS: |
| 22    BY MS. WILLIAMS: | 22    Q.   And what would you tell your clients? Or |
| 23    Q.   Did you draft this document on January | 23  specifically what did you tell the clients regarding |
| 24  19th, 2000? | 24  this January 20th meeting about people that you were |
| 25    A.   Yes, I must have, it certainly -- | 25  going to be meeting with? |

22 (Pages 82 to 85)

Peter Davis, Jr.                                                      April 19, 2006
                          Washington, DC

| Page 86 | Page 88 |
|---|---|

**Page 86**

1    A.   Sometimes -- I don't have any specific
2  recollection of it, but I -- standard practice was to
3  discuss their backgrounds.
4    Q.   Do you know if you informed the clients
5  how you knew Mr. Malvey?
6    A.   No, I really don't recall.  I told them I
7  knew him, you know.
8    Q.   Do you have any recollection of what you
9  discussed with Mr. Malvey during the January 20th
10 meeting?
11   A.   I recall discussing the economic outlook,
12 the -- what effect that might have on the deficit and
13 Treasury borrowing requirements.  But other than
14 that, I don't have any specific recollections.
15   Q.   Do you know if there was any discussion
16 about Treasury's quarterly refunding conference?
17         MR. THEODOROU:  Objection.
18         THE WITNESS:  I mean, I don't -- I don't
19 recall any discussion like that.
20         BY MS. WILLIAMS:
21   Q.   Do you recall how long the meeting with
22 Mr. Malvey lasted?
23   A.   No.  It wasn't just him, there was --
24 there was a, you know, a group from Treasury, I
25 forget who was in it, but, you know, he was certainly

**Page 87**

1  there.
2    Q.   Do you know about approximately how many
3  people were in the group from Treasury?
4    A.   Two or three.
5    Q.   Do you know if Mr. Nothern said anything
6  during the meeting?
7    A.   I -- I don't recall.
8    Q.   Did you know Jill Ousley?
9    A.   Yes, I'd met her over at Treasury.
10   Q.   And when did you meet Ms. Ousley?
11   A.   Sometime in the mid-'90s.
12   Q.   How did you meet Ms. Ousley?
13   A.   Probably at quarterly refunding meetings.
14   Q.   And what was Ms. Ousley's title at
15 Treasury?
16   A.   I don't recall her title, she was under
17 Mr. Malvey.
18   Q.   How often would you and Ms. Ousley
19 communicate?
20   A.   Rarely.
21   Q.   When you say rarely, approximately how
22 many times a year?
23   A.   I don't recall.  Basically, I would call
24 her if I couldn't get through to Malvey.
25   Q.   Did you know Lulu Tyler?

**Page 88**

1    A.   Yeah, I recall she was the main contact
2  for me to attend quarterly refunding meetings, or to
3  try and get documents that had been publicly released
4  by the Treasury regarding debt management.
5    Q.   Do you know what Ms. Tyler's job title was
6  at Treasury?
7    A.   No, I don't know, no.
8    Q.   Do you know who she worked for?
9    A.   Not really sure whether she worked for
10 Malvey or whether she worked for the Assistant
11 Secretary, I don't recall.
12   Q.   How did Ms. Tyler become the main contact
13 for you to attend quarterly refunding meetings?
14   A.   I -- I don't -- I don't really recall.
15   Q.   Do you know how you met Ms. Tyler?
16   A.   I meet her over the phone some time in say
17 '94 maybe.  I'm unclear as to the year.  At the
18 quarterly refunding meetings, they would put out
19 documents and I would contact her to get them.  They
20 would release them and I would go over and pick them
21 up, fax them over to clients or fax select parts of
22 them to clients.
23   Q.   I'm trying to find out how you came to
24 contact Ms. Tyler to gain access to the quarterly
25 refunding conferences.

**Page 89**

1         MR. STANCIL:  Is there -- what's the
2  question?
3         BY MS. WILLIAMS:
4    Q.   How did you contact Ms. Tyler to gain
5  access to the quarterly refunding conference?
6         MR. THEODOROU:  Objection.
7         MR. STANCIL:  He answered that he didn't
8  recall.
9         MS. WILLIAMS:  Right.
10         BY MS. WILLIAMS:
11   Q.   And I'm asking --
12         MR. STANCIL:  If you're asking a different
13 question, that's fine, I want to make sure we're all
14 answering the same question.
15         BY MS. WILLIAMS:
16   Q.   Well, how did you come to contact Ms.
17 Tyler to obtain these documents that you were
18 referring to?
19         MR. THEODOROU:  Objection.
20         THE WITNESS:  Well, after quarterly
21 refunding meetings, it was standard practice to have
22 a stack of the documents available at the messenger
23 window, the 15th Street Treasury entrance to the
24 Treasury.  After Ward McCarthy became a client, he
25 was very interested in getting those documents and so

                                        23 (Pages 86 to 89)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

Page 90

1  starting in, I don't know, I can't remember when Ward
2  became a client, but sometime in '93 or '94, I
3  started going down to the Treasury to pick up those
4  documents, or send my assistant to pick them up.
5       Sometimes Treasury would not have the
6  documents there, even though they'd been released.
7  And so then I would call asking for the documents and
8  I would usually be referred to Lulu.
9       Q.  How often would you speak to Ms. Tyler?
10      A.  You know, basically whenever I went to the
11 window and the documents weren't there, I'd call her
12 up.  So it wasn't that often.  If the documents were
13 there, I'd just get them.
14      Q.  You said she was also a contact, though,
15 for you to attend the quarterly refunding
16 conferences?
17      A.  Right.
18      Q.  Would you have conversations with her --
19      A.  That was later.
20      Q.  When did she become a contact, then, for
21 you to attend the conferences?
22      A.  Boy, I don't recall when I started
23 attending quarterly refunding meetings.  It was some
24 time in the mid-'90s and she would be the person that
25 I would call up to get cleared into Treasury.

Page 91

1       Q.  You said that you would call up Treasury
2  and someone would refer you to Ms. Tyler when you
3  were looking for the documents?
4       A.  Right.
5       Q.  Who would you first initially call?
6       A.  I don't have a specific recollection, but
7  it was probably Malvey.
8       Q.  And why would you call Mr. Malvey?
9       A.  Because he was the person who produced the
10 documents.
11      Q.  Would he create the documents?
12      A.  Well, there were other people in Treasury
13 that put them together, but he was the person in
14 charge of those documents.
15      Q.  Do you know if Ms. Tyler worked for
16 Mr. Malvey?
17      A.  I think so, but I don't really recall.
18      MS. WILLIAMS:  I was wondering if we went
19 until noon, we could break for lunch.  That's about
20 ten more minutes.  Is that all right?
21      MR. STANCIL:  That's fine.
22      MS. WILLIAMS:  Is that okay?  So about ten
23 more minutes.
24      BY MS. WILLIAMS:
25      Q.  We've mentioned quarterly refunding

Page 92

1  conferences a couple of times.  What were the
2  quarterly refunding conferences?
3       A.  They were a series of meetings to -- well,
4  Tuesday, on the first Tuesdays of like February, May,
5  August and November, they would have a meeting of
6  their advisory committee.  And they would -- there
7  would be a briefing on the economy, and that would
8  end and then some of the charts and data about the
9  economy would be released at that meeting.
10      And then the next day on Wednesday, there
11 would be another meeting, and Treasury would put out
12 its press release identifying their debt schedule for
13 the next quarter, and also another set of additional
14 charts and data would be released also.  And also the
15 minutes of the advisory committee's meeting.
16      Q.  You mentioned a meeting on Tuesdays and
17 then there was a meeting on Wednesday.
18      A.  Right.
19      Q.  Were both of those meetings collectively
20 to be considered the quarterly refunding conference?
21      A.  Right.  There are other parts to it.  The
22 advisory committee would meet elsewhere, and there
23 were other parts to it, but those were the two that I
24 would attend.  And the press, you know, the press
25 would generally attend.

Page 93

1       Q.  So you would attend the Tuesday meetings
2  and then you would attend the Wednesday meetings?
3       A.  Right.
4       Q.  Do you know what time those meetings were
5  usually held?
6       A.  Yeah, they start at 9 o'clock.
7       Q.  How did you come to attend these quarterly
8  refunding conferences?
9       A.  Some time in '94 or '95, Treasury was
10 unable to produce these charts that had already been
11 released publicly.  And, you know, I'd be calling
12 Lulu to get them and I'd say, Lulu, I know they were
13 passed out, I was down at the window right on time
14 and they didn't get them.  How can I get them?
15      And then the answer would be, well, gee,
16 we passed them all out, I don't have any more copies.
17 I'd say I need to get some, how can I get them?  And
18 sometimes it took days to get somebody to give me a
19 copy.  And so at some point, she suggested that I ask
20 the Assistant Secretary for authorization to attend
21 the meetings so I could get the charts.
22      Q.  Who was the Assistant Secretary?
23      A.  Roger Anderson.
24      Q.  Did you contact Mr. Anderson?
25      A.  Yes, I did.

24 (Pages 90 to 93)

Peter Davis, Jr.                                                     April 19, 2006
Washington, DC

| Page 94 |
|---|

1    Q.   And would this have been around '94, '95?
2    A.   I guess. That's so long ago, I can't be
3  certain about the date.
4    Q.   But it was before the year 2000?
5    A.   Oh, yeah, for sure.
6    Q.   How did you contact Mr. Anderson?
7    A.   I seem to recall a telephone -- a short
8  telephone conversation and a follow-up letter.
9    Q.   What was discussed during the
10 conversation?
11   A.   Same thing as in the letter, you know,
12 I've been having difficulty getting these documents
13 after they have been publicly released, would it be
14 possible for me to get authorization to attend the
15 meetings to get them -- get them there.
16   Q.   Were you -- you say you had a conversation
17 and then you sent a letter?
18   A.   Right.
19   Q.   The letter was basically the same --
20   A.   The letter that I attend the meetings.
21      MR. STANCIL:  Make sure you let her finish
22 her question before you answer, because she's got to
23 take it all down and he's going to object.
24      THE WITNESS:  I understand.
25      BY MS. WILLIAMS:

| Page 95 |
|---|

1    Q.   Were you ever given authorization to
2  attend the meetings?
3    A.   Yes.
4    Q.   By whom?
5    A.   By Roger Anderson.
6    Q.   And how did Mr. Anderson communicate to
7  you that you had been given authorization to attend
8  the quarterly refunding meetings?
9       MR. THEODOROU:  Objection.
10      THE WITNESS:  He called me up and said,
11 you can attend, if you swear to honor the embargo and
12 sign the confidentiality agreement.
13      BY MS. WILLIAMS:
14   Q.   You say to honor the embargo, what do you
15 mean by that?
16   A.   To not release the information that was
17 passed out at the meetings until the embargo time.
18   Q.   What was an embargo?
19   A.   It is a period of time after the
20 information is passed out until it can be released.
21   Q.   And then you said -- did you agree to
22 honor the embargo?
23   A.   Yes.
24   Q.   You also mentioned signing a
25 confidentiality agreement. Could you tell me whether

| Page 96 |
|---|

1  an agreement was signed?
2    A.   Yes.
3    Q.   Who was the agreement between?
4    A.   It was between me and the Treasury
5  Department.
6    Q.   Did you sign the agreement?
7    A.   Yes.
8    Q.   Did someone from Treasury sign the
9  agreement?
10   A.   Yes, I -- I remember doing it in Roger's
11 office. I assume he signed it, but --
12   Q.   And who drafted the agreement?
13   A.   Treasury did.
14      MR. THEODOROU:  Objection.
15      BY MS. WILLIAMS:
16   Q.   So you did not prepare the agreement?
17   A.   No.
18   Q.   Did you retain a copy of the agreement?
19   A.   Yes.
20   Q.   Do you still have a copy of the agreement?
21   A.   No.
22   Q.   What happened to it?
23   A.   I pitched it in August of 2001.
24   Q.   Why did you throw it away?
25   A.   At that point, I had violated it and I

| Page 97 |
|---|

1  threw it away.
2    Q.   Do you know if Mr. Anderson retained a
3  copy of the agreement?
4    A.   When I walked out of his office, it was
5  sitting on his desk.
6    Q.   Did you sign one document or did you sign
7  multiple documents?
8    A.   It was one document.
9    Q.   Did you have that document photocopied?
10   A.   I was given a copy, which I pitched in
11 August 2001.
12   Q.   Was anyone else given a copy of that
13 document that you know of?
14   A.   No, not that I'm aware of.
15   Q.   Do you know approximately how long after
16 you sent the letter to Mr. Anderson asking for
17 authorization to attend the conferences as to when
18 you met with him in his office to sign this
19 confidentiality agreement?
20   A.   It was within a week, a few days later.
21   Q.   Did you keep a copy of the letter you sent
22 to Mr. Anderson asking for authorization?
23   A.   I really don't recall. It must have been
24 on my word processor, but hard drives die and I don't
25 recall seeing it.

25 (Pages 94 to 97)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

---

Page 98

1    Q.   Before you had these conversations and
2  sent the letters to Mr. Anderson, had you ever
3  attended a quarterly refunding conference?
4    A.   No.
5    Q.   Just before we go to lunch, let me ask
6  you, you mentioned Mr. McCarthy was interested in
7  documents for the conference.
8    A.   Um-hum.
9    Q.   Did you start getting the documents that
10 you mentioned from the Tuesday conference as a result
11 of Mr. McCarthy's requesting those?
12   A.   Yes.
13   Q.   Did any other clients express interest in
14 documents from the quarterly refunding conference?
15   A.   Yeah, there were one or two.  I just
16 started broadcast faxing them out to all of my
17 clients.
18   Q.   When you received them, you just started
19 to send them?
20   A.   Yeah.
21   Q.   How would you send them to your clients?
22   A.   I just said I would start -- when the
23 documents had been publicly released, I'd take them,
24 I would go back to my office and broadcast fax
25 portions of them.  I didn't broadcast fax everything,

---

Page 99

1  but there were certainly tables they cared about.
2    Q.   Initially you would send them via fax?
3    A.   Right.
4    Q.   Did you ever E-mail those documents?
5    A.   No, because they -- it was just easier to
6  broadcast fax them.  At some point in the late '90s,
7  Treasury started posting them on their website.
8    Q.   I just have two more questions before we
9  go to lunch.  Besides agreeing to honor the embargo,
10 was there anything else that you agreed to as a
11 condition to gain authorization to the quarterly
12 refunding conference?
13   A.   No.
14   Q.   Did you ever mention -- did you express to
15 Mr. Anderson why you wanted to attend the
16 conferences?
17   A.   I just told him I was having trouble
18 getting the documents, and I was told that if I
19 attended the meetings, I could get the documents.
20 There were certain tables of data that were of
21 interest, and I just wanted to find a way to get
22 those.
23        MS. WILLIAMS:  I'd like to break for
24 lunch.
25        THE VIDEOGRAPHER:  This is the end of tape

---

Page 100

1  number 2 in the video deposition of Mr. Peter Davis.
2  Off the record at 12:04:01 p.m. on April 19, 2006.
3        (Whereupon, at 12:04 p.m., the deposition
4  in the above-entitled matter was recessed, to
5  reconvene at 12:45 p.m., this same day.)

---

Page 101

1        AFTERNOON SESSION
2            (1:02 p.m.)
3  Whereupon,
4            PETER DAVIS, JR.,
5  the witness testifying at the time of recess, having
6  been previously duly sworn, was further examined and
7  testified further as follows:
8    EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
9        THE VIDEOGRAPHER:  This is the beginning
10 of tape number 3 in the videotape deposition of
11 Mr. Peter Davis.  On the record at 1:02:56 p.m. on
12 April 19th, 2006.
13        BY MS. WILLIAMS:
14   Q.   Mr. Davis, before lunch, we were talking
15 about a meeting that you had with Roger Anderson in
16 which you discussed gaining access to the quarterly
17 refunding conferences at Treasury.  Was anyone else
18 present at the meeting besides you and Mr. Anderson?
19   A.   One of his assistants.
20   Q.   Was it a male or female?
21   A.   It was a female.
22   Q.   And you don't recall the assistant's name?
23   A.   She was the one who brought in the
24 document.
25   Q.   Do you know what she looked like?

---

26 (Pages 98 to 101)

Peter Davis, Jr.                                                    April 19, 2006

Washington, DC

## Page 102

1    A.  I really don't recall.
2    Q.  Did Mr. Anderson know that you worked for
3  Davis Capital when you met with him --
4    A.  Yes.
5    Q.  -- to discuss that?  Did he know that you
6  were not a member of the press?
7    A.  Yes.
8    Q.  Did you all have any discussions regarding
9  the fact that you wanted to gain access to the
10  conference, but you were not a member of the press?
11    A.  Yeah.
12    Q.  What did you discuss?
13      MR. THEODOROU:  Objection, go ahead.
14      BY MS. WILLIAMS:
15    Q.  You can answer.
16      MR. STANCIL:  If you recall.
17      THE WITNESS:  I mean, I don't recall it so
18  much being a discussion.  He told me that, you know,
19  I could attend these meetings if I signed this
20  confidentiality agreement.  And I said, fine.
21      BY MS. WILLIAMS:
22    Q.  So it did not appear to you that
23  Mr. Anderson had a problem with you attending the
24  meetings, even though you were not a member of the
25  press?

## Page 103

1      MR. THEODOROU:  Objection.
2      BY MS. WILLIAMS:
3    Q.  You can answer.
4    A.  I mean, obviously he let me into the
5  meeting so --
6    Q.  After you had this conversation with
7  Mr. Anderson and signed the confidentiality
8  agreement, how did you go about gaining clearance
9  into Treasury to attend the quarterly refunding
10  conferences?
11    A.  I would call up Lulu and make sure I was
12  cleared in.  And I'd show up downstairs on the
13  appointed days and my name would be on the list and
14  I'd get a badge and I'd go up to the third floor.
15    Q.  Did Mr. Anderson have any conversations
16  with you about what you should do to gain access --
17  gain clearance into Treasury to attain -- to attend
18  the quarterly refunding conferences?
19      MR. THEODOROU:  Objection.
20      THE WITNESS:  No.  I mean, I had gone into
21  Treasury for lots of meetings for years, you know,
22  for tax policy.  So I knew the procedure for getting
23  into Treasury.
24      BY MS. WILLIAMS:
25    Q.  So Mr. Anderson did not tell you what to

## Page 104

1  do to gain clearance into Treasury?
2    A.  No.  I mean, I already knew it.
3    Q.  What if any discussions did you have with
4  Ms. Tyler about your attending the quarterly
5  refunding conferences or having been given permission
6  to attend by Mr. Anderson?
7    A.  I just made a habit of calling her on
8  Monday to make sure I was cleared in.  And she'd say
9  yeah -- because you had to -- she had to put my name
10  into the computer and my birth date and my Social
11  Security number each time.  And so I'd call her and
12  she'd enter it into the Secret Service computer and
13  I'd show up and get a badge.
14    Q.  Did you tell Ms. Tyler that Mr. Anderson
15  had given you permission to attend the quarterly
16  refunding conferences?
17      MR. THEODOROU:  Objection.
18      THE WITNESS:  It didn't work that way.
19  She was the one who said, oh gee, if you could go to
20  the meetings you could get the charts.  And then
21  Anderson approved it.  You know, she knew.
22      BY MS. WILLIAMS:
23    Q.  I'm trying to find out how she came to
24  find out that Mr. Anderson had approved it, because
25  you --

## Page 105

1    A.  How am I supposed to know?
2    Q.  You said she wasn't in attendance at the
3  meeting that you had with Mr. Anderson?
4    A.  I didn't say that.
5    Q.  I asked who else was present at the
6  meeting, and you said Mr. Anderson's assistant.  Was
7  Ms. Tyler present?
8    A.  It's possible it was her.  I just don't
9  know.  She was a voice on the other end of the phone,
10  I'm not sure I met her maybe twice and that was a
11  long time ago.
12    Q.  Was it your understanding that Ms. Tyler
13  was one of Mr. Anderson's assistants?
14    A.  She could have been or she could have been
15  Mr. Malvey's, that's a matter of record at Treasury.
16  I just -- all I know is that she was the person that
17  I would call for clearance to attend the quarterly
18  refunding meetings.
19    Q.  Besides Ms. Tyler, did you ever -- and I
20  might have asked this before, but I've forgotten --
21  did you ever call anyone else to gain clearance into
22  Treasury?
23    A.  There was one meeting when I showed up and
24  somehow, even though she said I was on the list, I
25  wasn't.  And I called upstairs and Paul Malvey

27 (Pages 102 to 105)

Peter Davis, Jr.                                                            April 19, 2006
Washington, DC

| Page 106 | Page 108 |
|---|---|
| 1 actually came down and cleared me in himself on the | 1 instead of Ms. Tyler? |
| 2 spot. | 2    A.  I don't know.  Paul was the person who -- |
| 3    Q.  Besides that time when Mr. Malvey came | 3 I don't know.  It didn't occur to me to send it to |
| 4 down, do you recall anyone else clearing you into | 4 her. |
| 5 Treasury? | 5         MR. STANCIL:  To be clear, do you remember |
| 6    A.  Well, I mean, there were times when like | 6 one way or the other or are you -- or do you know? |
| 7 she would be out or something and I'd call her number | 7         THE WITNESS:  No, I don't recall why I |
| 8 and she wouldn't be in, and somebody else would pick | 8 sent to him. |
| 9 up and I wouldn't even know who I was talking to. | 9         BY MS. WILLIAMS: |
| 10    Q.  I'm sorry. | 10    Q.  You don't recall why you sent it to |
| 11    A.  I would just explain that I'm just calling | 11 Mr. Malvey and not to Ms. Tyler? |
| 12 to get cleared into the meeting.  And you know, | 12    A.  Right or Mr. Anderson, I just don't recall |
| 13 whoever it was would take care of it. | 13 why. |
| 14    Q.  Did you ever -- were you ever denied | 14    Q.  Did you ever contact Ms. Ousley to gain |
| 15 access to the quarterly refunding conference after | 15 access -- to gain clearance to the Treasury? |
| 16 you had gotten permission from Mr. Anderson to | 16    A.  It's possible, but I don't recall any -- I |
| 17 attend? | 17 don't recall ever doing that. |
| 18    A.  No. | 18    Q.  Where in the Treasury building were the |
| 19    Q.  Do you know Mr. John Merchantson? | 19 quarterly refunding conferences held, specifically |
| 20    A.  I don't have a clear recollection of him | 20 the Wednesday meeting? |
| 21 at all.  The name sounds a little familiar, but I | 21    A.  Well, they are all held in the same place. |
| 22 don't have any recollection. | 22 I'm trying to remember whether it was the third floor |
| 23    Q.  And just a variation of my previous | 23 or the fourth floor.  I remember the room number was |
| 24 question.  You said you were never denied access. | 24 4323, and I -- what I can't remember is -- I think |
| 25 Were you ever asked to leave a quarterly refunding | 25 the second number is the floor number.  So it was the |

| Page 107 | Page 109 |
|---|---|
| 1 conference? | 1 main Treasury conference room opposite the |
| 2    A.  No. | 2 Secretary's office for these meetings. |
| 3         MS. WILLIAMS:  I'd like to mark this as | 3    Q.  How big is the room? |
| 4 Exhibit 15. | 4    A.  It's got a large conference table, it had |
| 5         (Davis Exhibit No. 15 was marked for | 5 seating around it for maybe 20 people.  There was |
| 6         identification.) | 6 seating around the edges for maybe another dozen. |
| 7         BY MS. WILLIAMS: | 7    Q.  Did you usually sit during the meeting? |
| 8    Q.  Do you recognize this document, sir? | 8    A.  Yes. |
| 9    A.  Yes. | 9    Q.  Where did you sit? |
| 10    Q.  What is it? | 10    A.  It varied.  Sometimes in the back, |
| 11    A.  It's a request to Paul Malvey to allow my | 11 sometimes right at the table. |
| 12 assistant, Allyson Sullivan, to attend the February | 12    Q.  Did you ever ask any questions during the |
| 13 2000 quarterly refunding in my absence. | 13 meetings? |
| 14    Q.  Who drafted the document? | 14    A.  Not initially in the early meetings -- for |
| 15    A.  I did. | 15 years I would just attend, get the documents and |
| 16    Q.  Is this your signature at the bottom? | 16 leave.  And some time in the later '90s, I would |
| 17    A.  Yes. | 17 start asking a question now and then, yeah. |
| 18    Q.  Why did you send this document to | 18    Q.  Was there a time set aside for asking |
| 19 Mr. Malvey? | 19 questions? |
| 20    A.  Because I needed to get the charts to my | 20    A.  Yes.  I mean, both on Tuesday and on |
| 21 clients as usual and I was going to be out of town. | 21 Wednesday, once the Treasury officials made standard |
| 22    Q.  Did Mr. Malvey respond to this letter? | 22 presentations, there would be a time for questions. |
| 23    A.  I don't recall that he did, I don't think | 23    Q.  Were these meetings open to the public? |
| 24 he did.  But Allyson was cleared in. | 24    A.  No. |
| 25    Q.  Why did you send this to Mr. Malvey | 25    Q.  Who could attend the meetings? |

28 (Pages 106 to 109)

Page 110

1   A.   Basically --
2        MR. THEODOROU: Objection.
3        MR. STANCIL:
4        BY MS. WILLIAMS:
5   Q.   You can answer.
6        MR. STANCIL: If you know.
7        THE WITNESS: It was the press and me.
8        BY MS. WILLIAMS:
9   Q.   Approximately how many people on average
10  attended the meeting?
11  A.   It varied a lot. Sometimes there would
12  only be a few of the Treasury beat reporters there,
13  sometimes there would be more.
14  Q.   When you say a few, could you give me a
15  ballpark number there?
16  A.   There was always going to be about
17  anywhere from say 6 to 10 Treasury people there. And
18  there was usually at least as many reporters.
19  Sometimes I think on a few occasions there were only
20  five or six reporters, but on other occasions, like
21  especially October 31st, 2001, there was like maybe
22  40 or 50 reporters and far more Treasury officials.
23  Q.   About how many Treasury officials would
24  you estimate were present at the October 31st, 2001
25  conference?

Page 111

1   A.   Well, that was Peter Fisher's first
2   announcement when he became undersecretary. And
3   Malvey was there, Ousley was there, there were at
4   least another dozen Treasury officials of various --
5   you know, and staff. And you know, there were
6   communications people just set up, you know, like,
7   you know, communications. And there were people, you
8   know, clerks handling the documents and so on.
9   Q.   Did you speak to Mr. Malvey at the October
10  31st, 2001 meeting?
11  A.   Yes.
12  Q.   Do you recall what you discussed?
13  A.   I was sitting in the front row and he came
14  in with Fisher. And before the meeting started and
15  this of course was on the Wednesday, on the final
16  announcement, October 31st. And there wasn't --
17  there weren't enough chairs for him and for Fisher
18  and for one other Treasury official. And so I
19  forget, I said, Paul, do you went to take my chair
20  and we did some discussion about the chairs.
21  Q.   Did you have any other discussions with
22  Mr. Malvey?
23  A.   No.
24  Q.   Did you say Ms. Ousley was present?
25  A.   She must have been, but I don't

Page 112

1   specifically recall her there, it was a very crowded
2   meeting.
3   Q.   Were the doors to the Treasury quarterly
4   refunding conferences usually closed?
5   A.   It varied. I mean, sometimes they were,
6   and sometimes they weren't.
7   Q.   Do you know why they were sometimes not
8   closed?
9   A.   No.
10       MR. THEODOROU: Objection.
11       BY MS. WILLIAMS:
12  Q.   Do you recall whether they were open or
13  closed on October 31st, 2001?
14  A.   They were closed.
15  Q.   Did you stay for the entire October 31st,
16  2001 conference on that Wednesday?
17  A.   Yes.
18  Q.   Did you usually stay for the entire
19  Wednesday conference?
20  A.   Yes.
21  Q.   Do you know if Ms. Ousley still works for
22  the Treasury Department?
23  A.   I have no idea. She was fairly close to
24  retirement age back then, but I have no idea.
25  Q.   How far in advance of the quarterly

Page 113

1   refunding conferences did you find out the date of
2   the conference?
3   A.   They would announce them in the documents
4   that came out at each quarterly refunding. So when
5   you got the documents, it would say on it when the
6   next one was going to be. And it was pretty standard
7   according to the calendar anyway, it was always the
8   first Tuesday and Wednesday of February, May, August,
9   November. Sometimes it was straddled another month
10  like it did on October 31st, so therefore the
11  November meeting was actually in October.
12  Q.   You mentioned that the conference had an
13  element that went on on Tuesday, there was a meeting.
14  And then Wednesday.
15  A.   Right.
16  Q.   Did anything occur on Monday, the Monday
17  before --
18  A.   Well, on Monday afternoons usually at 2 or
19  3 o'clock, Treasury would issue a press release
20  announcing their borrowing requirement for the
21  quarter. But that would not be at a meeting, they
22  would just announce it.
23  Q.   Would you pick up a copy of this press
24  release?
25  A.   I didn't deal with that. That was

29 (Pages 110 to 113)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

| Page 114 | Page 116 |
|---|---|

**Page 114**

1  something that was like just when it came out it
2  instantly went over the wires, there was no
3  particular reason for me -- I couldn't really add
4  anything, so I just didn't go to it. In fact, there
5  was no meeting, so there was just nothing to do there
6  so -- so that's not anything I paid any attention to.
7      Q.  Before lunch we were discussing the term
8  embargo.
9      A.  Right.
10     Q.  And that you agreed to abide by the
11 embargo at the Treasury quarterly refunding
12 conferences. How did you come to an understanding of
13 what the embargo was?
14         MR. THEODOROU: Objection.
15         THE WITNESS: I mean, when I signed that
16 confidentiality agreement, there was language in
17 there that said not to disclose the information until
18 the embargo time. So that was pretty much it.
19         BY MS. WILLIAMS:
20     Q.  Before you signed the confidentiality
21 agreement, had you heard the term embargo used with
22 regard to information at Treasury?
23     A.  No.
24     Q.  Did you have any discussions with
25 Mr. Anderson about what the term embargo meant?

**Page 116**

1  quarterly refunding conferences?
2      A.  Sure.
3      Q.  Can you tell me where you had experience
4  with embargoes before you started attending the
5  quarterly refunding conferences?
6      A.  They happen all the time on the Hill where
7  I worked. When there are briefings for press,
8  certain kinds of information. And there's an embargo
9  until a certain time before it is released to the
10 public.
11     Q.  And during the time the embargo is in
12 place, what are people who are subject to the embargo
13 allowed to do or what are they not allowed to do?
14         MR. THEODOROU: Objection.
15         THE WITNESS: All I know is I'd be sitting
16 there as a staff person, there'd be a briefing, the
17 reporters would leave, I'd leave. And, you know,
18 that was -- that was -- you know, they were told it
19 was embargoed until a certain time and everybody
20 left. I -- that's all I saw.
21         BY MS. WILLIAMS:
22     Q.  Were the reporters allow to disclose the
23 information that was embargoed prior to the time the
24 embargo time was up?
25         MR. THEODOROU: Objection.

| Page 115 | Page 117 |
|---|---|

**Page 115**

1      A.  Not really.
2      Q.  When you signed the confidentiality
3  agreement, did you have an understanding of what the
4  embargo --
5      A.  Sure. It's a common term of art in
6  Washington.
7          MR. THEODOROU: Objection.
8          BY MS. WILLIAMS:
9      Q.  When you say it is a common term of art in
10 Washington, can you tell me what you mean?
11         MR. THEODOROU: Objection.
12         THE WITNESS: I mean, like I was aware
13 that the Bureau of Labor and Statistics puts out the
14 unemployment rate. The reporters are given a report
15 for a period of time, and it is embargoed until it
16 comes out. This is sort of common knowledge.
17         BY MS. WILLIAMS:
18     Q.  When you say this is sort of common
19 knowledge, what do you mean by that?
20         MR. THEODOROU: Objection.
21         THE WITNESS: It's common knowledge, you
22 know, it's --
23         BY MS. WILLIAMS:
24     Q.  Had you had any prior experience with
25 embargoes before you started attending the Treasury

**Page 117**

1          THE WITNESS: They would be calling their
2  editors or whatever, or at least I assumed they were
3  calling their editors.
4          BY MS. WILLIAMS:
5      Q.  Were they allowed to release information
6  to the public before the embargo time was up?
7          MR. THEODOROU: Objection.
8          THE WITNESS: My understanding was that
9  embargo meant that it wouldn't be released to the
10 public until the embargo time.
11         BY MS. WILLIAMS:
12     Q.  What was your understanding of the purpose
13 of the embargo at Treasury?
14         MR. THEODOROU: Objection.
15         THE WITNESS: The purpose was not to
16 release it to the public before the embargo time.
17         BY MS. WILLIAMS:
18     Q.  How was the embargo with regard to the
19 Treasury quarterly refunding conferences set?
20     A.  It varied. There would usually be a press
21 officer of some kind from the Treasury at these
22 meetings, and it varied who it was. And at the end
23 of the question period, that press officer would
24 stand up and say, okay, it's such and such time, how
25 about a ten-minute embargo. And the reporters would

30 (Pages 114 to 117)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

## Page 118

1   nod and say -- he would say, okay, it's 10 minutes,
2   the embargo time would be X. It was usually ten
3   minutes.
4       Q.   And you said that sometimes it varied.
5       A.   Right.
6       Q.   How did it vary from what you just
7   discussed?
8       A.   It would -- well, first of all, it varied
9   in duration. Most of the embargoes were ten minutes.
10  I seem to recall one for 15 and the only other time
11  that I recall any other -- in other words, almost all
12  of them were ten minutes. One was I think 15 and the
13  one on October 31st, 2001 was half an hour, which was
14  unprecedented in my experience.
15      Q.   How was the embargo on October 31st, 2001
16  set?
17      MR. THEODOROU: Objection.
18      THE WITNESS: The press officer stood up
19  before the meeting and said this is embargoed and
20  we'll set the embargo time at the end. At the end,
21  he stood up and said, okay, this is embargoed until
22  10:00 a.m. and the meeting ended at 9:30.
23      BY MS. WILLIAMS:
24      Q.   Who was the press officer that stood --
25      A.   I don't recall.

## Page 119

1       Q.   Do you recall if it was a male or a
2   female?
3       A.   It was a male.
4       Q.   Prior to the October 31st, 2001 meeting,
5   did you have any knowledge as to what the embargo was
6   going to be on October 31st?
7       A.   No. The only time you'd find out the
8   embargo time is on the spot in the room at the end of
9   the question and answer period.
10      Q.   Now, you stated that the purpose of the
11  embargo was not to release the information to the
12  public until the embargo time was up.
13      A.   Right.
14      Q.   Do you know why the information was not to
15  be released to the public until the embargo time?
16      MR. THEODOROU: Objection.
17      THE WITNESS: Nobody ever told me that.
18      BY MS. WILLIAMS:
19      Q.   Did you ever ask anyone?
20      A.   No.
21      Q.   Were you given any information as to
22  whether there was a penalty for violating the embargo
23  at Treasury?
24      A.   When I signed the confidentiality
25  agreement, there was language at the end of the form

## Page 120

1   about that. I don't really recall what it said or --
2   but, you know, it did refer to some U.S. code section
3   or something like that.
4       Q.   Did you agree that if you violated the
5   embargo, you would be subject to that penalty?
6       MR. THEODOROU: Objection.
7       THE WITNESS: That was part of the written
8   document, that's what I signed, yeah.
9       BY MS. WILLIAMS:
10      Q.   Do you know who enforced the penalty at
11  Treasury?
12      A.   No.
13      Q.   For the quarterly refunding conferences
14  that you attended at Treasury, was there always an
15  embargo discussed during those conferences?
16      A.   Yes. On Wednesday --
17      Q.   On Wednesday.
18      A.   Well, I'm trying to think, on Tuesdays?
19  I'm not sure. I think there were embargoes on both
20  days, but I'm certain there were on Wednesdays. I'm
21  not sure.
22      Q.   With regard to the Wednesday portion of
23  the conference, do you recall whether an embargo was
24  always set?
25      A.   Yes, it was. Yes, there was -- there was

## Page 121

1   always an embargo on Wednesdays.
2       Q.   What, if any, documents were distributed
3   at the Wednesday quarterly refunding conferences?
4       A.   There were several different sets of
5   documents. There would be the Treasury press release
6   announcing the quarterly refunding issuance itself,
7   particular notes and bonds and so on.
8       There would be the minutes of the advisory
9   committee, and the recommendation of the advisory
10  committee. And there would be the same set of charts
11  that had been handed out the day before, but with
12  certain additional tables added to it that pertained
13  to the other documents. And so there was a more
14  complete set of charts that came out. And so you'd
15  get a big stack of paper at the end of the meeting or
16  actually they'd have it available during the meeting
17  and, you know, you could ask questions off of it and
18  so on.
19      Q.   Did you obtain the documents -- just to
20  clarify, did you obtain the documents when you went
21  into the conference?
22      A.   Usually. Sometimes they had copying
23  problems or they discovered an error at the last
24  minute and you'd get the documents at the end.
25      Q.   Do you recall if any of the documents

31 (Pages 118 to 121)

Peter Davis, Jr.                                                       April 19, 2006
Washington, DC

| Page 122 | Page 124 |
|---|---|

**Page 122**

1  contained any language regarding an embargo?
2     A.   The Treasury press release on the
3  refunding details certainly had language like that.
4  None of the other documents did.
5     Q.   Do you know if any of the releases that
6  you obtained at the conference ever said that they
7  were -- this is a press release -- ever said that
8  they were for immediate release?
9     A.   You know, that was one of the weird things
10 on October 31st was I recollected it did say that on
11 the press release, which was kind of weird because
12 they still went ahead and set an embargo time.
13    Q.   Did you understand that the information
14 was still embargoed until 10:00 a.m. even though it
15 said for immediate release?
16       MR. THEODOROU:  Objection.
17       THE WITNESS:  Yes, yes.
18       MS. WILLIAMS:  Can we take a short break,
19 like a two-minute.
20       THE WITNESS:  Sure.
21       THE VIDEOGRAPHER:  Off the record at
22 1:32:38 p.m.
23       (Discussion off the record.)
24       THE VIDEOGRAPHER:  Back on the record at
25 1:34:30 p.m.

**Page 124**

1     A.   I had an outgoing assistant, Kristen
2  Caiola, and so I think they both saw it.
3     Q.   Why did you draft this document?
4     A.   Because I wasn't going to be there, and I
5  just wanted to make sure that she knew how to get
6  there and knew what the drill was.
7     Q.   Did you follow these same instructions
8  when you attended Treasury's quarterly refunding
9  conferences?
10    A.   Yes.  So I see I had the room number
11 wrong, it was 3223.
12    Q.   Instead of the number --
13    A.   I remembered it was on the third floor,
14 but the room number was 3223 here in the
15 instructions.
16    Q.   And you believe that this was a correct
17 room number?
18    A.   Yes.
19    Q.   Was the -- that was for the Tuesday
20 meeting.  Was the Wednesday meeting also head in room
21 3223, you believe?
22    A.   Yes.
23    Q.   The memo states that -- and I'm 1, 2, 3,
24 the fourth paragraph down.
25    A.   Um-hum.

**Page 123**

1        MS. WILLIAMS:  I would like to have this
2  document marked as Exhibit 16.
3        (Davis Exhibit No. 16 was marked for
4        identification.)
5     BY MS. WILLIAMS:
6     Q.   Do you recognize this document, sir?
7     A.   Yes.
8     Q.   What is it?
9     A.   It was a sort of step by step instructions
10 for Allyson before that meeting that I couldn't
11 attend in early February of 2001.
12    Q.   Who drafted the document?
13    A.   I did.
14    Q.   Is it a true and correct copy of the
15 document you drafted --
16    A.   Yes.
17    Q.   -- January 24th, '01?
18       You said that this was created for Ms.
19 Sullivan?
20    A.   Um-hum.
21    Q.   Did you distribute this document to Ms.
22 Sullivan?
23    A.   Um-hum.
24    Q.   Did anyone else receive a copy of the
25 document?

**Page 125**

1     Q.   Sit on the back left.  Why did you write
2  that?  Do you see where I'm referring, the fourth
3  sort of paragraph down?
4     A.   I guess that's just where I usually sat.
5     Q.   Is there any particular reason why you
6  instructed Ms. Sullivan in this document to sit on
7  the back left?
8     A.   I just said, it's where I usually sat.  I
9  mean, this is a fairly small room so you're still 20
10 feet away from the speaker.
11    Q.   And then under Wednesday, and I'm below
12 number 4, the line, when you get back to the office
13 fax the auction schedule 2, 3, 4 to list 3; what does
14 that mean?
15    A.   Those were particular pages in the -- 2, 3
16 and 4 -- those were particular pages in the charts
17 that I was talking about.  And list 3 was the
18 broadcast fax list for distributing those particular
19 pages to clients.
20    Q.   Who would have been listed on list 3?
21       MR. THEODOROU:  Objection.
22       THE WITNESS:  You know, clients.
23       BY MS. WILLIAMS:
24    Q.   Clients of Davis Capital?
25    A.   Right.

32 (Pages 122 to 125)

## Page 126

1    Q.   You then wrote, note the embargo time,
2  what did you mean by that?
3         MR. THEODOROU:  Objection.
4         THE WITNESS:  That it shouldn't go out
5  before the embargo time.
6         BY MS. WILLIAMS:
7    Q.   When you say it, what are you referring
8  to?
9    A.   That facts of those particular charts and
10  schedules.
11   Q.   And then under that, I see, immediately
12  after exiting Treasury, call the following clients in
13  order; do you see that?
14   A.   Um-hum.
15   Q.   When you say immediately after exiting
16  Treasury, what do you mean by that?
17        MR. THEODOROU:  Objection.
18        THE WITNESS:  It says immediately after
19  exiting Treasury, call the following clients.
20        BY MS. WILLIAMS:
21   Q.   Let me be more specific.  Did you mean
22  during the time when the information was embargoed?
23        MR. THEODOROU:  Objection.
24        THE WITNESS:  Yes.
25        BY MS. WILLIAMS:

## Page 127

1    Q.   And then under that, it says, stating,
2  number 1, the embargo time.  Do you see that?
3    A.   Yes.
4    Q.   Why did you include in these instructions
5  that immediately after exiting Treasury, call the
6  following clients, in order, stating the embargo
7  time?
8         MR. THEODOROU:  Objection.
9         THE WITNESS:  I wasn't sure they would
10  know it.  They might, and I just want to make sure.
11        BY MS. WILLIAMS:
12   Q.   What if any expectations did you have that
13  the clients would obey the embargo?
14        MR. THEODOROU:  Objection.
15        THE WITNESS:  I didn't.  There was no -- I
16  mean, Ward had asked me and said he would honor the
17  embargo time, but I had no understanding with anybody
18  else.
19        BY MS. WILLIAMS:
20   Q.   Mr. McCarthy had told you that he would
21  honor the embargo?
22   A.   (The witness nodded.)
23   Q.   You say he asked you, what had he asked
24  you?
25        MR. THEODOROU:  Objection.

## Page 128

1         THE WITNESS:  Well, he was the person who
2  had originally expressed interest in getting these
3  charts.  And you know, it was his interest that
4  prompted me to go contact Treasury to get the charts
5  and set off the whole -- just set off the whole
6  sequence of events that led to my attending the
7  quarterly refunding meetings.
8         BY MS. WILLIAMS:
9    Q.   And what if any discussions did you have
10  with Mr. McCarthy about him honoring the embargo?
11   A.   Well, at some point in 1999, and I'm not
12  sure exactly when, but say a year and a half before
13  the October 31st 2001 meeting, somewhere around in
14  there, Ward McCarthy called me up and asked if I
15  could share the information with him before the
16  embargo time so that he could have his story ready to
17  go at the embargo time, you know, like as if he
18  were -- I mean, because otherwise, you know, he was
19  at a disadvantage because of all the reporters in the
20  room would have their stories go up right at the
21  embargo time and his would come out 15, 20, 30
22  minutes later.
23   Q.   Did you have any discussions with any of
24  the other people at the bottom of this list, 1
25  through 7, about honoring the embargo?

## Page 129

1    A.   No, no.
2    Q.   Why did you include in this instruction to
3  state the embargo time?
4         MR. THEODOROU:  Objection.
5         THE WITNESS:  I just thought it was
6  important for them to know the embargo time, so
7  that's why it's there.
8         BY MS. WILLIAMS:
9    Q.   Why did you think it was important for the
10  people -- the clients to know the embargo time?
11        MR. THEODOROU:  Objection.
12        THE WITNESS:  So they could honor it.
13        BY MS. WILLIAMS:
14   Q.   You then on number 2, you write describe
15  the securities.  And then there's a parenthetical
16  there.
17   A.   Um-hum.
18   Q.   What securities are you referring to?
19   A.   Well, that's what's in the press release.
20  It's just the -- you know, the amount of 5, 10s and
21  30s that Treasury was going to issue in the coming
22  refunding?
23   Q.   And then under number 3, I see cite
24  Treasury and remarks of interest, do you see that?
25   A.   Yes, I do.

Peter Davis, Jr.                                                                    April 19, 2006
Washington, DC

| Page 130 | Page 132 |
|---|---|

**Page 130**

1  Q.  Can you give some examples of what remarks
2  of interest?
3  A.  It was important to know if a particular
4  security was going to be new issue or whether it was
5  going to be reopened, reopening of an old issue.
6  Sometimes there would be buy backs, and so there was
7  additional information that was important.
8  Q.  Was there -- were there any Treasury
9  remarks of interest mentioned at the October 31st,
10  2001 conference?
11  A.  Well, I mean, the most important and the
12  thing that dwarfed everything else was the cessation
13  of the 30-year bond.
14  Q.  At the bottom of this Exhibit 16, I see a
15  list of names.  Who are these individuals?
16  A.  Clients.
17  Q.  Does Mr. Nothern's name appear on this
18  list?
19  A.  Yes.
20  Q.  Does the number that appears next to
21  Mr. Nothern's name a number that you used to contact
22  him?
23  A.  Yes.
24  Q.  Do you know what number that was?
25  A.  It is a telephone number.

**Page 131**

1  Q.  Do you know if it was his home, cell, work
2  number?
3  A.  It's his work number, at MFS.
4  Q.  Is this list in any particular order?
5  A.  It's in the order I would make calls.
6  Q.  Why did you make the calls in this order?
7  Why did you, for example, call Mr. McCarthy first?
8  A.  Like I said before, it would depend on the
9  longevity and what my -- you know, if they were a big
10  client or small client.  And sort of, you know, how
11  important, you know, the information was to them and
12  so on.  So that was just my order in which I called
13  people.
14  Q.  In January -- specifically on January 24th
15  of 2001, did you have clients that do not appear on
16  this document?
17  A.  Sure, I had lots of clients.
18  Q.  How did you determine whose name would
19  appear on this document?
20  MR. THEODOROU: Objection.
21  THE WITNESS: It was -- in Ward's case, it
22  was his expressed interest.  In every other case, it
23  was people that I just, on my own volition, contacted
24  without any request on their part.
25  BY MS. WILLIAMS:

**Page 132**

1  Q.  What, if anything, did you tell the
2  clients on this list besides Mr. McCarthy, who we've
3  already discussed, the other people on the list, what
4  if anything did you tell them about your attendance
5  at the Treasury quarterly refunding conference?
6  MR. THEODOROU: Objection.
7  THE WITNESS: I'm not even sure if they
8  knew.  Ward knew, but, you know, I'm not -- in fact,
9  I'm pretty sure some of those people on that list
10  didn't know.
11  BY MS. WILLIAMS:
12  Q.  Did you ever tell Mr. Nothern that you
13  attended Treasury's quarterly refunding conferences?
14  A.  No.
15  Q.  Did you ever tell him you attended any
16  meetings at Treasury, besides the meetings that he
17  attended with you?
18  A.  No.
19  Q.  Did you ever tell him you had any sources
20  at Treasury?
21  A.  Sure.
22  Q.  Did Mr. Nothern -- did you ever discuss
23  with Mr. Nothern that were you able to obtain
24  information from Treasury before the information was
25  announced in the media?

**Page 133**

1  A.  No.
2  MR. THEODOROU: Objection.  What was that
3  answer?
4  THE WITNESS: No.
5  MR. ROSSETTI: Object anyway.
6  BY MS. WILLIAMS:
7  Q.  So Mr. Nothern never expressed interest in
8  obtaining information from Treasury refunding
9  conferences?
10  A.  No, no.
11  Q.  But you would send him information from
12  those conferences?
13  A.  Right, when I got back to the office, long
14  after the embargo time, I'd broadcast fax the charts
15  that we selected.
16  Q.  You had instructions to call him before
17  the embargo was expired?
18  MR. THEODOROU: Objection.
19  THE WITNESS: You have to understand that
20  the embargo time almost invariably expired before any
21  such calls could be made.  In fact, on the particular
22  date that Allyson was there, she didn't even get out
23  of the building.  None of the calls were ever made.
24  BY MS. WILLIAMS:
25  Q.  Did you ever call Mr. Nothern before the

34 (Pages 130 to 133)

Peter Davis, Jr.

April 19, 2006

Washington, DC

Page 134

1 embargo expired?
2     A.   On October 31st, 2001, I placed a call to
3 him. It didn't get through.
4     Q.   Did you ever call him besides October
5 31st, 2001 before the embargo expired?
6     A.   There were a few prior quarterly
7 refundings, but it was almost -- in fact, I'm sure
8 all of those were after the embargo time because
9 those were 10-minute embargoes. It takes 3 or 4
10 minutes at least to get out of the building.
11          And, you know, I would certainly have at
12 least a minute or two conversation with Ward. You
13 know, he was at the end of the list so, you know --
14 you know, the only time that I am sure that I called
15 him before the embargo time was on October 31st, 2001
16 and I got an answering machine.
17     Q.   Did you leave a voicemail?
18     A.   Yes.
19     Q.   Did you mention the embargo in your
20 voicemail?
21     A.   I'm not sure of that at all. I am sure
22 with some of the other people I called, but I'm not
23 sure in that particular voicemail.
24     Q.   Was it your practice to mention the
25 embargo when you made these calls?

Page 135

1          MR. THEODOROU: Objection.
2          THE WITNESS: I usually mentioned it, but
3 because he was at the end of the list, and all the
4 previous times it had been after the embargo, except
5 this one time, I'm not sure I mentioned the embargo
6 time at all. You know, I'm -- yeah.
7          BY MS. WILLIAMS:
8     Q.   Did any of your clients ever ask you not
9 to provide them with information before the embargo
10 expired?
11     A.   Yes.
12     Q.   Who -- who asked to you do that?
13     A.   The one I remember the best is Kathy
14 Bostjancic at Merrill Lynch. She certainly asked me
15 not to. And what's his name -- Dave Greenlawn at
16 Morgan Stanley, who was not on this list, asked me
17 not to call him before the embargo.
18     Q.   Had you called Mr. Greenlawn before the
19 embargo prior to asking him not to do that anymore?
20     A.   There was one time when I might have
21 gotten a call through to him like one minute before
22 the embargo or right at the embargo time, but the
23 next time like a quarter later, I called him, and
24 even though it was after the embargo, he said please
25 just don't call.

Page 136

1     Q.   Did he tell you why he didn't want to
2 receive --
3     A.   No, he just said don't call before the
4 embargo time. I said, fine.
5     Q.   Did he have an understanding that you were
6 attending the quarterly refunding conferences?
7          MR. THEODOROU: Objection.
8          THE WITNESS: I don't -- I don't think so,
9 I don't know. I mean, I didn't -- I just called him
10 up and said, hey, you know, here's what the refunding
11 is. And I don't recall -- I mean, I don't recall
12 ever having a conversation with anybody besides Ward
13 about actually attending those meetings.
14          BY MS. WILLIAMS:
15     Q.   How did Mr. Greenlawn know that the
16 information was embargoed?
17          MR. THEODOROU: Objection.
18          THE WITNESS: I don't know. I mean, he --
19 after the fact, you know, the next time I called him
20 up said, you know, don't call. But that's all I
21 know, I don't know how he figured it out, but that's
22 what happened.
23          BY MS. WILLIAMS:
24     Q.   Do you recall ever mentioning the embargo
25 to Mr. Greenlawn before that conversation where he

Page 137

1 said please don't call me until the embargo expires?
2     A.   I don't think I did, because it was right
3 around the embargo time. You know, it was like right
4 at the embargo time. He was also down the list and
5 ahead of Nothern.
6     Q.   What about Ms. Bostjancic, how did she
7 come to ask you not to call her before the embargo?
8          MR. THEODOROU: Objection.
9          THE WITNESS: It was the same thing. I
10 just called her up and said, hey, Treasury is going
11 to do this. And she would not say much and then, you
12 know, like a quarter later, I called up, and she
13 said, Pete, don't call up. Okay.
14          BY MS. WILLIAMS:
15     Q.   She said don't call ever? Can you tell me
16 exactly what she asked you not to do?
17     A.   She meant regarding the quarterly
18 refundings.
19     Q.   Did she tell you when you could call or
20 she just didn't want to receive calls at all?
21     A.   Oh, we talk all the time about tax cuts
22 and deficits and so on, but what she meant was in
23 regard to the quarterly refundings don't call.
24     Q.   Did she specify don't call during the
25 embargo time?

35 (Pages 134 to 137)

Peter Davis, Jr.                                                    April 19, 2006
                          Washington, DC

| Page 138 | Page 140 |
|---|---|

**Page 138**

1    A.  No.
2    Q.  Or don't call ever?
3    A.  She didn't, she just said don't call us
4    about this.
5    Q.  Did Ms. Bostjancic understand that you
6    attended the quarterly refunding conferences?
7    A.  I don't think so. I mean, you know, Ward
8    and I had specifically talked about it. The rest of
9    the people I would just sort of some time in late
10   '89 -- '99 just called up and volunteered the
11   information.
12   Q.  How did Ms. Bostjancic come to ask you not
13   to call her about the Treasury quarterly refunding
14   conferences if you never told her that you attended
15   the quarterly refunding conferences?
16   A.  You know, all I can tell you is I called
17   her up one time. And then I called her up a quarter
18   later and she said, Pete, you know, we don't want
19   this information, so I said, fine.
20   Q.  Did she tell you why she didn't want the
21   information?
22   A.  No.
23       MR. THEODOROU: Objection.
24       BY MS. WILLIAMS:
25   Q.  Do you know why Mr. McCarthy wanted

**Page 139**

1    information from the quarterly refunding conferences?
2    A.  Well, he wanted this data from these
3    charts, some of the charts themselves because he's
4    head of one of the main bond market research funds --
5    research organizations.
6        And, you know, he would analyze that data
7    and come to conclusions and publish those to his
8    clients. So he was finding that he was putting his
9    analyses of the quarterly refunding out long after,
10   15, 20, 30 minutes after the wire services had put it
11   out. And so he was trying to get on to an equal
12   footing with the wire services.
13   Q.  What, if anything, did Mr. McCarthy say
14   about his willingness to abide by the embargo?
15   A.  He specifically said that, you know, if I
16   would convey the information to him, he would abide
17   by the embargo.
18   Q.  Do you know if Mr. McCarthy ever divulged
19   the information to anyone before the embargo expired?
20   A.  I have no way of knowing that, I just
21   believe that he honored it.
22   Q.  Approximately how many times did you
23   provide Mr. McCarthy with information when the
24   embargo was still in place?
25   A.  He asked me some time in '99, the first

**Page 140**

1    half, I don't remember whether it was before the
2    February meeting or before the May meeting, it was
3    one of those two. And then for the next few meetings
4    I was just calling him. And then some time in late
5    '99, early 2000, I started voluntarily just calling
6    other people.
7    Q.  Back to Mr. Greenlawn and Ms. Bostjancic
8    for a second. When you called them the time you
9    called when the embargo was still on, what, if
10   anything, did you say was your source of the
11   information that were you providing to them?
12   A.  I just called them up and said, hey,
13   Treasury is going to do X billion 5s, X billion 10s,
14   X billion 30s, and that was it.
15   Q.  Did you say anything about how you came to
16   find out that information?
17   A.  No, I didn't.
18   Q.  Have you ever been convicted of a crime?
19   A.  Yes.
20   Q.  When?
21   Q.  When?
22   Q.  When.
23   A.  I don't know, I'd have to consult some
24   documents. I know when I was sentenced, but I don't
25   know when I was convicted.

**Page 141**

1    Q.  When were you sentenced?
2    A.  I was sentenced on March 18th, 2005,
3    right?
4    Q.  What crimes were you convicted of
5    committing?
6    A.  I pled guilty to conspiracy,
7    misappropriation of government property and
8    securities fraud.
9    Q.  When you say conspiracy, was that
10   conspiracy to defraud the United States?
11       MR. STANCIL: If you remember the exact
12   nature of the plea agreement, say so, but don't try
13   to -- I don't want you to try to --
14       THE WITNESS: I don't remember. You've
15   got the charges.
16       BY MS. WILLIAMS:
17   Q.  I'm just trying to find out your
18   recollection.
19   A.  My recollection, it's conspiracy. I don't
20   know what else went with it.
21   Q.  In which court was this criminal action
22   against you?
23   A.  It was the U.S. District Court in southern
24   Manhattan.
25   Q.  Southern District of New York?

36 (Pages 138 to 141)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

| Page 142 | Page 144 |
|---|---|

**Page 142**

1    A.   Right.
2    Q.   You said you pled guilty?
3    A.   Right.
4    Q.   Did you participate in a plea hearing
5    during that criminal case?
6    A.   Plea hearing?
7    Q.   A hearing in which you entered a plea of
8    guilty?
9    A.   Oh, yeah, sure.
10   Q.   Did you make a statement to the court at
11   that hearing?
12   A.   Yes.
13   Q.   Do you believe the statement that you made
14   to the court was true and correct?
15   A.   Yes.
16   Q.   During the hearing, did the court present
17   you with the charges against you?
18   A.   Yes.
19   Q.   Do you believe the court correctly
20   presented the charges against you during that
21   hearing?
22   A.   Yes.
23   Q.   I'd like to mark this as an exhibit.
24        (Davis Exhibit No. 17 was marked for
25        identification.)

**Page 144**

1    A.   On October 31st, 2001.
2    Q.   Was the information that you disclosed
3    subject to the embargo?
4    A.   Yes.
5    Q.   Did you agree that you had a duty to not
6    disclose that information before the embargo expired?
7        MR. THEODOROU:  Objection.
8        THE WITNESS:  Yes.
9        BY MS. WILLIAMS:
10   Q.   You say you were sentenced as a result of
11   your guilty plea?
12   A.   Yes.
13   Q.   I'd like to have this marked as an
14   exhibit.
15        (Davis Exhibit No. 18 was marked for
16        identification.)
17       BY MS. WILLIAMS:
18   Q.   Do you recognize this document, sir?
19   A.   Yes.
20   Q.   What is it?
21   A.   It's a transcript of my sentencing
22   hearing, March 18th of 2005.
23   Q.   Did you make any statements during your
24   sentencing hearing?
25   A.   Yes.

**Page 143**

1        BY MS. WILLIAMS:
2    Q.   Do you recognize this document, sir?
3    A.   Yes.
4    Q.   What is it?
5    A.   It's the plea hearing.
6    Q.   Transcript?
7    A.   Yeah, right, transcript.
8    Q.   Could you briefly summarize the behavior
9    that you're charged with engaging in and which you
10   plead guilty to?
11       MR. THEODOROU:  Objection.
12       THE WITNESS:  I don't understand what
13   you're asking.
14       BY MS. WILLIAMS:
15   Q.   You said you pled guilty to certain
16   criminal charges.  Could you tell us what you did
17   that gave rise to those charges?
18   A.   I disclosed --
19       MR. THEODOROU:  Objection.
20       THE WITNESS:  30-year bond information
21   before the embargo time.
22       BY MS. WILLIAMS:
23   Q.   To who?
24   A.   To some clients.
25   Q.   And when did you do that?

**Page 145**

1    Q.   Do you believe the statements you made to
2    the court during the sentencing hearing were true and
3    correct?
4    A.   Yes.
5    Q.   Could you turn to -- and the numbers I'm
6    referring to are going to be on the right-hand side.
7    A.   I see.
8    Q.   Page 9.
9    A.   Okay.
10   Q.   I'm starting with line 20, do you see that
11   line 20 on the right side?
12   A.   Um-hum, um-hum.
13   Q.   It reads, the defendant, do you agree the
14   defendant is you, Mr. Davis?
15   A.   Do I what?
16   Q.   Do you agree -- when it says the
17   defendant, that's you?
18   A.   Defendant was me.
19   Q.   Okay.  "I'm very sorry for what I did that
20   brings me here today, I understand it's wrong and I
21   make no excuses, I apologize to those who I've hurt
22   and seek their forgiveness.  I do ask you to consider
23   that other than this instance, I've lived a good and
24   ethical life.  Since this happened, I've done
25   everything I can to make amends.  I'd give anything

37  (Pages 142 to 145)

Peter Davis, Jr.                                                    April 19, 2006
                          Washington, DC

| Page 146 | Page 148 |
|---|---|

**Page 146**

1  to undo it, it's not consistent with my character and
2  it will never happen again, thank you."
3      Did I read that correctly?
4     A.  Yes, you did.
5     Q.  Sitting here today, are you still sorry
6  for what you did that gave rise to the case against
7  you?
8      MR. THEODOROU:  Objection.
9      THE WITNESS:  Yes.
10     BY MS. WILLIAMS:
11    Q.  What were you sentenced to?
12    A.  A $30,000 fine and two years probation.
13    Q.  Were you also ordered to pay a special
14 assessment of $300?
15    A.  Yes.
16    Q.  With regard to the $30,000 fine, my
17 understanding it was payable in monthly installments
18 throughout a two-year period; is that correct?
19    A.  Correct.
20    Q.  So are you currently on probation?
21    A.  Yes.
22    Q.  Have you been paying your monthly
23 installments of the $30,000 fine?
24    A.  Yes.
25    Q.  Besides this conviction that we just

**Page 147**

1  discussed, have you ever been convicted of any other
2  crimes?
3     A.  No.
4     Q.  Have you ever been charged with any other
5  crimes?
6     A.  No.
7     Q.  Have you ever been sued in a civil matter?
8     A.  No.
9     Q.  Were you also involved in an investigation
10 by the SEC?
11    A.  Yes.
12    Q.  Regarding trading in the 30-year bond?
13    A.  Yeah.
14    Q.  Was the SEC's investigation of you
15 resolved?
16    A.  I don't know.  Yeah, I guess.
17    Q.  I'd like to have --
18    A.  I paid an SEC fine.
19    Q.  I'd like to have these documents marked as
20 Exhibits 19 and 20.
21     MR. STANCIL:  John, don't tell me you lost
22 the check.
23     (Davis Exhibit Nos. 19 & 20 were
24     marked for identification.)
25     BY MS. WILLIAMS:

**Page 148**

1     Q.  Do you recognize what's been marked as
2  Exhibit 19?
3     A.  It's been a long time, but it looks like
4  some sort of -- it says consent.
5     Q.  Could you turn to the last page of the
6  document.
7     A.  Okay.
8     Q.  SEC NOTH 00145688.  Do you see your
9  signature?
10    A.  Yes, that's my signature.
11    Q.  And do you believe this is a copy of the
12 consent that you entered into with the SEC?
13    A.  Yes, yes.
14    Q.  And then if you could turn to Exhibit 20,
15 do you recognize this document?
16    A.  I'm trying to find out what this is.  Is
17 this --
18     MR. STANCIL:  I'm not even sure you've
19 seen the subpoena.
20     THE WITNESS:  No, I don't think I've seen
21 this before.
22     BY MS. WILLIAMS:
23    Q.  Do you know if a judgment was entered
24 against you in the SEC's case?
25    A.  Yes.

**Page 149**

1     Q.  And in that judgment, will you -- were you
2  ordered to pay certain monies?
3     A.  Yes, I paid $150,000 to the SEC.
4     Q.  A total of $150,000?
5     A.  Right.
6     Q.  Were you also permanently enjoined from
7  violating certain sections of the Securities Act --
8  Securities Exchange Act?
9      MR. THEODOROU:  Objection.
10     THE WITNESS:  Yes.
11     BY MS. WILLIAMS:
12    Q.  Except for the case that the SEC brought
13 against you, have you ever been sued in any other
14 case?
15    A.  I'm not sure.
16     MR. STANCIL:  Yes.
17     THE WITNESS:  I --
18     MR. STANCIL:  Chicago?
19     THE WITNESS:  Yes, there's one other case.
20     BY MS. WILLIAMS:
21    Q.  Who sued you in --
22     MR. THEODOROU:  Objection.
23     THE WITNESS:  I forget the name of the
24 firm.
25     BY MS. WILLIAMS:

38 (Pages 146 to 149)

Peter Davis, Jr.

Washington, DC

April 19, 2006

## Page 150

1    Q.    Could you tell me what that other case was
2    about?
3    A.    There was a firm that claimed damages and
4    sued Goldman and me, and I forget who else.
5    Q.    Damages for what?
6    A.    For money lost in Treasury bond trades or
7    options on Treasury bonds, I don't know.
8    Q.    When was that case filed?
9    A.    I don't know.
10   Q.    Can you give me -- was it after 2000?
11   A.    Oh, it was after 2001. It was, I don't
12   know, a few years ago.
13        MR. STANCIL: Maybe I could clear this up
14   Was this related to the October 31, 2001 refunding?
15        THE WITNESS: Yeah.
16        BY MS. WILLIAMS:
17   Q.    Where was that case filed?
18   A.    I think in Chicago.
19   Q.    In Federal Court in Illinois?
20   A.    I have no idea which court it was.
21   Q.    Do you know if it was resolved?
22   A.    I don't think it's resolved.
23   Q.    Are you still involved in the case?
24        MR. THEODOROU: Objection.
25        THE WITNESS: It's -- I'm named as a -- I

## Page 151

1    forget what I'm named as --
2        MR. STANCIL: Whatever you remember is
3    fine. If they have questions for me, they can send
4    them to me later.
5        THE WITNESS: I don't know much about the
6    case.
7        BY MS. WILLIAMS:
8    Q.    And you don't recall who the plaintiff in
9    the case was?
10   A.    It was some firm that was in the market,
11   I don't remember the name of the firm.
12   Q.    Have you ever sued anyone?
13   A.    No.
14   Q.    Just to follow up, besides this case that
15   you think was pending in Chicago or may still be,
16   have you ever been sued by anyone else?
17   A.    No.
18   Q.    And you've never sued anyone?
19   A.    No.
20   Q.    I'd like to have this marked as Exhibit
21   21.
22        (Davis Exhibit No. 21 was marked for
23        identification.)
24        BY MS. WILLIAMS:
25   Q.    Do you recognize this document, sir?

## Page 152

1    A.    Well, this is a Treasury news release
2    regarding their borrowing requirement, you know,
3    Monday afternoon.
4    Q.    What's the date of the document?
5    A.    October 29, 2001.
6    Q.    Do you recall if you have seen this
7    document before today?
8    A.    I don't specifically recall it. I may
9    have seen it at the time, but like I say, I didn't
10   pay too much attention to the Monday press release of
11   the borrowing requirement.
12   Q.    Is this a document that would have been
13   sent out on the Monday of the quarterly --
14   A.    This was -- yes, this was the Monday
15   document before the Tuesday and Wednesday meetings
16   that I did attend.
17        MS. WILLIAMS: Do you want it take a break
18   now? It's been a little over an hour.
19        MR. THEODOROU: Just for the record --
20   just a second, sake of the record, there is a line of
21   questioning about the -- his plea. And I raised a
22   series of objections, a standing objection. I had an
23   objection because Mr. Nothern was not a part of that
24   plea. And that's something that we'll have to take
25   up, I guess, with the court.

## Page 153

1        MS. WILLIAMS: Mr. Nothern --
2        MR. THEODOROU: Was never part of that
3    plea.
4        MS. WILLIAMS: You're referring to --
5        MR. THEODOROU: To his statement to the
6    court as to what he was pleading guilty to.
7        MS. WILLIAMS: Right, I didn't refer to
8    Mr. Nothern when asking about the plea.
9        MR. THEODOROU: Okay, I just want to make
10   sure on the record on that.
11       MS. WILLIAMS: Yes, he wasn't present, but
12   I do believe clients were mentioned, not by name, but
13   generally speaking.
14       MR. THEODOROU: Two clients.
15       MS. WILLIAMS: But the word clients was
16   generally mentioned in the hearing transcript.
17   Whether or not that includes Mr. Nothern is yet to be
18   determined.
19       MR. THEODOROU: I'll take that up on
20   cross, but --
21       THE VIDEOGRAPHER: This is the end of tape
22   number 3 in the videotape deposition of Peter Davis.
23   Off the record at 2:15:26 p.m. on April 19, 2006.
24       (Recess.)
25       THE VIDEOGRAPHER: This is the beginning

39 (Pages 150 to 153)

Peter Davis, Jr.                                                        April 19, 2006
Washington, DC

## Page 154

1  of tape number 4 in the videotape deposition of
2  Mr. Peter Davis. On the record at 2:38:56 p.m. on
3  April 19th, 2006.
4      MS. WILLIAMS: Exhibit 22, I'd like to
5  have this marked.
6          (Davis Exhibit No. 22 was marked for
7          identification.)
8      BY MS. WILLIAMS:
9      Q.  Do you recognize this document, Mr. Davis?
10     A.  Yeah, it's an E-mail of my calendar on the
11 morning of October 29, 2001. And it shows the E-mail
12 addresses in the BCC of all the clients and others
13 who are on my -- who are on my E-mail list as of that
14 morning.
15     Q.  Who drafted this document?
16     A.  I did in conjunction with my assistant,
17 Allyson.
18     Q.  What time did you send this document?
19     A.  The time stamp on it is 9:15 in the
20 morning.
21     Q.  And I want to know if Mr. Nothern's name
22 appears on the document and --
23     A.  I see it.
24     Q.  -- refer you to 12 lines up?
25     A.  Yes, snothern@mfs.com.

## Page 155

1      Q.  Where did you get the information that
2  appears in the body of the E-mail?
3      A.  I already told you, it comes from my
4  culling of various calendars at the beginning of the
5  week, National Journal, BNA Daily Report For
6  Executives, and my own research.
7      Q.  In the document, do you see the date
8  Wednesday 31?
9      A.  Yes.
10     Q.  And then right under that 9:00 a.m.?
11     A.  Yeah.
12     Q.  Fisher, Treasury quarterly refunding,
13 D.C.?
14     A.  Yes, I see that.
15     Q.  Who is Fisher?
16     A.  Peter Fisher was the undersecretary for
17 federal finance.
18     Q.  And why does his name appear on that line?
19     A.  Because he was the person who was going to
20 speak.
21     Q.  How did you know Mr. Fisher was going to
22 speak at that quarterly refunding conference on the
23 31st?
24     A.  Pretty sure Treasury announced it. His
25 nomination had been held up by Jessie Helms for

## Page 156

1  unrelated reasons. And so he was sort of known to be
2  taking the position for a long time, and then finally
3  it happened.
4      Q.  Was it your practice to notify your
5  clients of the dates of the quarterly refunding
6  conference in a weekly calendar before the
7  conference?
8      A.  I usually did. I don't think I -- I don't
9  think I was religious about it, but I usually did.
10     Q.  Did you usually notify them of who would
11 be speaking at the conference?
12         MR. THEODOROU: Objection.
13         THE WITNESS: Usually I wouldn't
14 necessarily know until I got in the room. I mean,
15 usually Malvey would say some things and usually John
16 Auten would do the economics on Tuesday mornings.
17 See, part of the problem was when the position was
18 vacant, you know, when Fisher's position or say Roger
19 Anderson's position was vacant, then Malvey would
20 present.
21     Q.  Would Mr. Anderson ever present at the
22 quarterly refunding conferences?
23     A.  Yes.
24     Q.  And just to clarify, did you usually not
25 know who was going to be speaking until you actually

## Page 157

1  attended the conferences?
2          MR. THEODOROU: Objection.
3          THE WITNESS: Yes.
4      BY MS. WILLIAMS:
5      Q.  Do you know why you were notified that
6  Mr. Fisher would be speaking at the October 31st
7  conference?
8      A.  Like I say, my recollection is that
9  Treasury announced it. But I don't know, I don't
10 recall for sure.
11     Q.  Do you know if there's anything
12 significant or did you find anything significant
13 about Mr. Fisher presenting at the October 31st
14 conference?
15         MR. THEODOROU: Objection.
16         THE WITNESS: He was newly appointed and
17 everybody was anticipating what sort of policy he
18 might put out. I mean, usually when a senior
19 official assumes office and speaks for the first
20 time, people are interested in hearing what he has to
21 say.
22     BY MS. WILLIAMS:
23     Q.  Did you go to Treasury on October 30th,
24 2001?
25     A.  I don't have a clear recollection. I

40 (Pages 154 to 157)

Peter Davis, Jr.

Washington, DC

April 19, 2006

---

**Page 158**

1  assume I did.  I distinctly remember going on the
2  31st.
3         MS. WILLIAMS:  I'd like to have this
4  marked as Exhibit 23.
5         (Davis Exhibit No. 23 was marked for
6         identification.)
7  BY MS. WILLIAMS:
8     Q.   Do you recognize this document, Mr. Davis?
9     A.   It's -- yes, it's a Treasury press release
10 announcing Fisher would speak on the -- 9:00 a.m.,
11 Wednesday, the 31st.
12    Q.   And what's the date of this document?
13    A.   October 30th.
14    Q.   Of?
15    A.   2001.
16    Q.   Do you know if you saw this release prior
17 to October 31st, 2001?
18    A.   I'm sorry, say again?
19    Q.   Do you know if you saw this press release
20 before October 31st?  It is dated October 30th, do
21 you know if you saw it on October 30th, 2001?
22    A.   I don't recall, I mean --
23    Q.   I wanted to refer to you the second
24 paragraph of the document.  The last sentence in that
25 paragraph, "the event will have a 10 o'clock a.m.

---

**Page 159**

1  news embargo," do you see that?
2     A.   That's the first time I recall seeing
3  that.  I'm very clear the first time I ever heard
4  that there was going to be a 10 o'clock embargo was
5  at the meeting itself.
6     Q.   So just to clarify, prior to the actual
7  Wednesday, October 31st meeting, you were not
8  aware --
9     A.   No.
10    Q.   That the embargo time --
11    A.   Right.
12    Q.   Was 10:00 a.m.?
13    A.   Right.  I learned that the embargo time
14 was 10:00 a.m. at the meeting, I didn't learn it
15 before.
16    Q.   Do you know if this document was publicly
17 available?
18         MR. THEODOROU:  Objection.
19         MR. STANCIL:  Do you know?
20         THE WITNESS:  No, I don't have any
21 specific knowledge.  It is a Treasury press release.
22 I didn't see this before that meeting.
23  BY MS. WILLIAMS:
24    Q.   Do you recall any time when Treasury set
25 the embargo time before a Wednesday meeting?

---

**Page 160**

1     A.   No, that's unique.
2     Q.   I'd like to have this marked as Exhibit
3  24.
4         (Davis Exhibit No. 24 was marked for
5         identification.)
6  BY MS. WILLIAMS:
7     Q.   Do you recognize this document, sir?
8     A.   Yes, it's a fax cover page dated October
9  30th, 2001.
10    Q.   And who is the fax from?
11    A.   Me.
12    Q.   To whom?
13    A.   Clients.
14    Q.   Do you know -- did you prepare this fax
15 cover sheet?
16    A.   Yes.
17    Q.   It says in bold, "five pages including
18 this cover."
19    A.   Right.
20    Q.   "Charts from this morning's Treasury
21 refunding follow."
22    A.   Right.
23    Q.   Do you recall sending clients a fax on
24 October 30th, 2001?
25    A.   Sure.

---

**Page 161**

1         MR. THEODOROU:  Objection.
2         MR. STANCIL:  Do you recall sending it or
3  you think you must have based on this document?
4         MR. THEODOROU:  And I object.
5         THE WITNESS:  Well, this is a standard
6  cover sheet for the charts.
7         MR. STANCIL:  She needs to know -- she's
8  entitled to know whether you have a specific
9  recollection of standing at the fax machine and
10 sending it, or whether based on this, you would
11 assume you did.
12         THE WITNESS:  I don't remember faxing it.
13 I mean, it all blurs together.  I mean, I did it
14 every three months.
15  BY MS. WILLIAMS:
16    Q.   You did what every three months?
17    A.   Faxed certain charts out to the clients on
18 the Tuesday of the quarterly refundings.
19    Q.   Would have you drafted a fax cover sheet
20 when you were transmitting these charts to the
21 clients?
22    A.   Yes.
23    Q.   Would the fax cover sheet have looked like
24 the sheet here?
25    A.   Yes.

41 (Pages 158 to 161)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

| Page 162 | Page 164 |
|---|---|

**Page 162**

1    Q.   Do you believe that this fax cover sheet
2  was used to transmit documents to clients?
3         MR. THEODOROU:  Objection.
4         THE WITNESS:  Yes.
5         BY MS. WILLIAMS:
6    Q.   What charts -- do you know what charts you
7  would have been referring to here?
8    A.   I recall one particular table.  The other
9  ones, I don't recall.  But there was a particular
10  table about foreign holdings of Treasuries that was
11  the key piece of information that people wanted once
12  it was released.  There were other -- the chart book
13  had like 20, 30 pages of charts and tables in it and
14  I forget which other ones I would pull out.
15    Q.   I'd like to have this marked as Exhibit
16  25.
17         (Davis Exhibit No. 25 was marked for
18         identification.)
19         BY MS. WILLIAMS:
20    Q.   I'm just going to be referring actually to
21  the first page of the document.
22    A.   Um-hum.
23    Q.   Do you -- do you recognize this document?
24    A.   Yeah, I forget the name of the company,
25  but I had a -- you know, broadcast fax service.  And

**Page 164**

1    A.   Right.
2    Q.   That also was a five-page document that
3  you sent with the fax cover sheet?
4    A.   Um-hum.
5         MR. THEODOROU:  Objection.
6         BY MS. WILLIAMS:
7    Q.   Is that correct?
8    A.   Yes.
9    Q.   Do you know whether this report is related
10  to the fax that --
11    A.   I don't.
12    Q.   -- the fax cover sheet?
13    A.   I don't.
14    Q.   But do you think that you sent a five-page
15  fax on October 30th, 2001, which relates to this
16  delivery report?
17    A.   I don't know if this delivery report
18  relates to this cover page or not.
19    Q.   I understand.  Separating those two
20  documents, just this delivery report, does this
21  indicate to you that you sent a five-page fax to the
22  people on this list?
23    A.   Yes.
24    Q.   On October 30th.  And then if you could
25  refer to the last column, STAT?

| Page 163 | Page 165 |
|---|---|

**Page 163**

1  I had a preexisting list to which I -- so remember
2  earlier when we talked about list 3, I just dial-up
3  the service, I'd punch in list 3, and it would send
4  out the documents to these.  And this is a report of
5  what was sent out.
6    Q.   On what date?
7    A.   October 30th.
8    Q.   Of what year?
9    A.   2001.
10    Q.   And so the people who are listed under
11  recipient on this list, would those have been people
12  on list 3?
13    A.   Yes, you notice on the left there, where
14  it says list number 3.
15    Q.   Do you see Mr. Nothern's name on this
16  list?  And I'd refer to you the third from the
17  bottom.
18    A.   Yes.
19    Q.   And then under PGS, which I think is
20  pages --
21    A.   Um-hum.
22    Q.   -- do you see the number 5?
23    A.   Yes, it says five pages.
24    Q.   If I could refer you back to number --
25  Exhibit Number 24, the fax cover sheet.

**Page 165**

1    A.   Right.
2    Q.   What does that show?
3    A.   It is just an indication on whether the
4  fax was received by another fax machine at the other
5  end, so it is an abbreviation for successful
6  transmission.
7    Q.   With regard to Mr. Nothern, the line with
8  Mr. Nothern, does this document indicate to you or
9  what does this document indicate to you with regard
10  to whether the fax was sent through successfully?
11    A.   It says that it was successfully received
12  by a fax machine at that phone number.
13    Q.   Sitting here today, do you have any
14  recollection as to what this five-page fax contained?
15    A.   None.
16    Q.   I want to talk to you a little bit about
17  the October 31st Treasury quarterly refunding
18  conference, did you attend that conference?
19    A.   Yes.
20    Q.   What time did the conference start?
21    A.   9:00 a.m.
22    Q.   Did you arrive on time?
23    A.   I was there early.
24    Q.   How early did you arrive?
25    A.   I don't know, 8:30, 8:40.  I was there at

42 (Pages 162 to 165)

Peter Davis, Jr.

Washington, DC

April 19, 2006

## Page 166

1  least 15 or 20 minutes ahead of the meeting.
2     Q.  Where was the conference held?
3     A.  It was in a different room.  And I forget
4  which one.  It was a bigger room.  It's in this
5  release, yeah, 33 -- 3311.
6     Q.  Had you attended any other conferences in
7  room 3311?
8     A.  No.
9     Q.  You said it was a bigger room, could you
10 describe the layout of the room?
11    A.  It was just a larger room, there was a
12 podium set up in the front and there was theater
13 seating with an aisle down the middle with seating
14 for maybe 50 or 60 people.
15    Q.  What did you do when you arrived at 8:30?
16    A.  I moved to the front row and sat -- sat
17 down.
18    Q.  Did you speak to anyone when you arrived
19 before the meeting started?
20    A.  I might have.  I -- the only specific
21 recollection I have is that when Malvey came in with
22 Fisher and there was not seating there, I remember
23 talking to Paul and offering him a seat.
24    Q.  And I might have asked this, but just to
25 clarify, how did you gain access to Treasury on

## Page 167

1  October 31st?
2     A.  I called up as usual, I don't have a
3  specific recollection as to whether it was to Lulu or
4  not, and it was that phone number -- but I got
5  cleared in.  And when I went to get my badge that
6  morning I was given a visitor's pass, which was
7  different than what I had received at every other
8  meeting.  And I didn't question it, I just took the
9  pass and went up to the room.
10    Q.  What did you usually receive at meetings
11 instead of a visitor's pass?
12    A.  Usually it was a yellow official -- I
13 forget what it said on it, but it was a different
14 badge.  I mean, it's not like I was just going to see
15 the exhibits in the cash room or something, it was a
16 budge.
17    Q.  When you arrived at Treasury, did someone
18 come to greet you?
19    A.  No.
20    Q.  Where did you go once you arrived at the
21 building on October 31st?
22    A.  Well, you go through security, you go to
23 the officer who checks your I.D. and he sees me on
24 the list, he gave me a visitor's pass.  And then he
25 buzzed me in, I was on my own to get up to the room.

## Page 168

1     Q.  When the conference started, can you walk
2  me through what happened generally at that
3  conference?
4     A.  Lights and cameras came on, Peter Fisher
5  read a statement, took some questions.  There was an
6  announcement that there would be an embargo before,
7  and then there was a specific -- in fact, that's
8  right, the embargo time was declared to be 10 o'clock
9  before, and that was unusual, too.  And that was the
10 first I'd heard it.  And then it was repeated at the
11 end.
12    Q.  Just to clarify, did someone make a
13 statement that the embargo time was 10:00 a.m.?
14    A.  Yes, the press officer, whoever it was,
15 made a statement at the beginning of the meeting that
16 this is embargoed until 10:00, and he repeated that
17 at the end, which was really unusual because it had
18 never happened before that there was an embargo time
19 announced before the meeting.
20    Q.  Did you pick up any documents before the
21 conference started?
22    A.  They eventually passed out documents
23 shortly before it started.
24    Q.  Do you recall what those documents were.
25    A.  It was a standard press release.  I don't

## Page 169

1  recall whether the rest of the materials that were
2  usually released were released before or after -- you
3  know, there was a standard packet of documents,
4  advisory committee minutes and report and charts and
5  so on.
6     Q.  You said that Mr. Fisher read a statement.
7     A.  Yes.
8     Q.  What was his statement about?
9     A.  It was the quarterly refunding
10 announcement, but he had some additional remarks.
11 And I don't really remember what they were.  I mean,
12 you know, something about sort of a general policy
13 statement about Treasury debt management or something
14 like that.  I didn't focus on that part of it.
15    Q.  What, if anything, did Mr. Fisher's
16 statement include regarding the 30-year bond?
17    MR. THEODOROU:  Objection.
18    THE WITNESS:  Mr. Fisher stated that
19 Treasury would cease issuing the 30-year, it was not
20 going to issue the 30-year as the market expected.
21    BY MS. WILLIAMS:
22    Q.  Was this included in that statement that
23 he read?
24    A.  Yes.
25    Q.  You said that they took questions after --

43 (Pages 166 to 169)

Peter Davis, Jr.                                                                April 19, 2006
                              Washington, DC

---

**Page 170**

1    A.   Yes, they did.
2    Q.   How long did Mr. Fisher speak before the
3  questions?
4    A.   Well, the meeting started at like 9:02 or
5  9:03 or something like that. And he started taking
6  questions about -- I don't know, 9:15, 9:18,
7  something like that. And my recollection -- I looked
8  at my watch when I left and it was 9:30. And I'm
9  very careful about making sure my watch is accurate,
10 I always call up the national time clock.
11   Q.   Did you ask any questions during the
12 October 31st --
13   A.   I raised my hand and almost did, and then
14 I decided I was so angry about what they were doing
15 that I just put my hand down and he called on
16 somebody else.
17   Q.   Why were you angry about what they were
18 doing?
19   A.   Because they were going to stick the
20 taxpayers with roughly a billion dollars worth of
21 interest expense by not issuing long bonds when
22 interest rates were the lowest they had been in two
23 generations since the Depression. And every other
24 homeowner in the country was trying to lengthen their
25 maturities to get lower payments, Treasury was doing

---

**Page 171**

1  the opposite, which was creating an expense, a future
2  expense when the shorter maturities rolled over,
3  taxpayers today are now paying a lot more interest
4  expense.
5    Q.   So what, if any, impact did you believe
6  that the announcement that the 30-year bond would no
7  longer be issued, what if any impact did you think
8  that would have on the market?
9        MR. THEODOROU: Objection.
10       THE WITNESS: I anticipated it was going
11 to surprise the market, that it was a total reversal
12 of Treasury policy, that it was done for political
13 reasons and I was just furious at what they were
14 doing.
15       BY MS. WILLIAMS:
16   Q.   Had you heard any rumors that the 30-year
17 bond might be cancelled before you attended this --
18   A.   No, but there was a lot of speculation
19 starting in early 2000 that they would. And I kept
20 asking people and they kept saying the standard
21 response. You know, several times Treasury officials
22 told me in these meetings, and you know, for
23 attribution later on and all that, that, you know, no
24 change in policy, you know, we anticipate offering
25 the 30-year.

---

**Page 172**

1        And so the last time, in my estimation,
2  that the market expected the 30-year to be -- you
3  know, expected the cessation of the 30-year was in
4  the May or possibly in the August meeting. And by
5  the October 31st meeting of 2001, the market had
6  given up, just concluded that it doesn't make any
7  sense for Treasury to get rid of it now.
8        Over the summer, in fact, even earlier
9  than that, in the spring and the summer, I had been
10 one of the first people in Washington to say that the
11 federal deficit was going straight up. And if the
12 deficit is going straight up, the last thing you want
13 to do is take away one of the ways to finance it,
14 especially when interest rates are the lowest they've
15 been in 70 years. And so it just made no sense and
16 so I was pretty upset about it.
17   Q.   Did you think that this announcement that
18 the 30-year bond was going to be cancelled would have
19 any impact on your clients?
20   A.   Sure.
21   Q.   And what kind of impact did you think it
22 might have?
23       MR. THEODOROU: Objection.
24       THE WITNESS: I thought it might hurt
25 them. I knew it was going to hurt the public, I

---

**Page 173**

1  impulsively warned people.
2        BY MS. WILLIAMS:
3    Q.   Did you think that this announcement would
4  have any effect on the price of the bond?
5    A.   Sure.
6    Q.   What kind of --
7    A.   Goes straight up, the biggest one day move
8  in the 30-year in history of the country.
9    Q.   Did you take any notes during this
10 conference?
11   A.   No, I had the materials in front -- at
12 least not that I recall. I don't -- I don't recall
13 taking any notes.
14   Q.   Let me ask you to look at this --
15   A.   Maybe, I don't know. It's a long time
16 ago, I don't recall.
17   Q.   Let me ask you to look at what I'm going
18 to have marked as Exhibit 26.
19       (Davis Exhibit No. 26 was marked for
20       identification.)
21       THE WITNESS: Yes, I did take notes, this
22 is my handwriting.
23       BY MS. WILLIAMS:
24   Q.   You recognize the handwriting on this
25 document?

---

44 (Pages 170 to 173)

Peter Davis, Jr.                                                          April 19, 2006

Washington, DC

## Page 174

1    A.   It is my handwriting.

2    Q.   What date did you take these notes?

3    A.   It is dated 10/31/01.

4    Q.   Do you know where you were when you took

5    these notes?

6    A.   3311 U.S. Treasury Department.

7         MR. STANCIL:  Can I ask you a question?

8    I'm sorry to interrupt.

9         MS. WILLIAMS:  Sure.

10        MR. STANCIL:  Does this go with other

11   pages or --

12        MS. WILLIAMS:  This was the only page that

13   I found.

14        MR. STANCIL:  Can we go off the record for

15   one second?

16        MS. WILLIAMS:  Sure.

17        THE VIDEOGRAPHER:  Off the record at

18   3:06:26 p.m.

19        (Discussion off the record.)

20        THE VIDEOGRAPHER:  Back on the record at

21   3:07:59 p.m.

22        BY MS. WILLIAMS:

23   Q.   Mr. Davis, before we went off the record,

24   I was asking you about what's been marked as Exhibit

25   26.

## Page 175

1    A.   Um-hum.

2    Q.   You stated that these were handwritten

3    notes that you took and that the document was dated

4    10/31/01?

5    A.   Correct.

6    Q.   And as far as -- where were you when you

7    took these notes?

8    A.   I was in the quarterly refunding meeting

9    in room 3311 of the U.S. Treasury.

10   Q.   Can I refer you to the top right-hand

11   corner of the notes?

12   A.   Yes.

13   Q.   What's written in the top right-hand

14   corner?

15   A.   10:00 a.m. embargo.

16   Q.   Did you take any of these notes before the

17   conference started?

18   A.   No.

19   Q.   In the body of the document, I see some

20   phrases, and I see some quotation marks, do you see

21   those?

22   A.   Yes.

23   Q.   Do you know why there are certain things

24   on this document that are in quotation marks?

25   A.   I was quoting Fisher.

## Page 176

1    Q.   Peter Fisher was making the statement

2    during the Wednesday quarterly refunding conference

3    meeting?

4    A.   Correct.

5    Q.   Did you distribute these notes to anyone?

6    A.   No.

7    Q.   Did you use --

8    A.   Although I did -- I may have extracted

9    some of the quotes in an E-mail to clients later on.

10   In other words, I didn't just send out my notes, but,

11   you know, I may have taken some of the quotations and

12   put them into an E-mail to clients.

13        MS. WILLIAMS:  I'd like to have this

14   marked as Exhibit 27.

15        (Davis Exhibit No. 27 was marked for

16        identification.)

17        BY MS. WILLIAMS:

18   Q.   Do you recognize what's been marked as

19   Exhibit 27?

20   A.   Yes, these are the written remarks of

21   Undersecretary Peter Fisher on October 31st, 2001.

22   Q.   Do you know if you obtained a copy of this

23   document on October 31st, 2001?

24   A.   Yes, this was passed out just prior to his

25   making the remarks.

## Page 177

1    Q.   Did you -- were you able to read the

2    document before Mr. Fisher made his remarks?

3    A.   It was passed out shortly before, so

4    people were perusing it for a few seconds before he

5    started.

6    Q.   Can I refer you to the top left-hand

7    corner where it says for immediate release?

8    A.   Yes, it does say that.

9    Q.   Do you remember seeing that on the

10   document?

11   A.   Yeah, I did.

12   Q.   Did that phrase on the top of the document

13   have any -- or what -- what did that phrase for

14   immediate release appearing on this document do to

15   your understanding with regard to the embargo that

16   you mentioned was announced on October 31st?

17   A.   It was confusing.

18   Q.   Did you understand that Mr. Fisher's

19   remarks were embargoed?

20        MR. THEODOROU:  Objection.

21        THE WITNESS:  I believed that what the

22   press official was telling me, that it was embargoed

23   to 10:00, was the operative -- you know, there was

24   operative -- but it's still confusing.  It does say

25   for immediate release.

45  (Pages 174 to 177)

1111 14th Street, NW Suite 400                          Washington, DC 20005

Peter Davis, Jr.                                                                April 19, 2006
                          Washington, DC

| Page 178 | Page 180 |
|---|---|
| 1     BY MS. WILLIAMS: | 1  to do it outside of the building. |
| 2     Q.   Did you believe that this release that you | 2         BY MS. WILLIAMS: |
| 3  obtained before the meeting, this was also subject to | 3     Q.   The embargo was in effect when you started |
| 4  the embargo? | 4  calling your clients on October 31st? |
| 5     A.   Yes. | 5     A.   Yes, it was. |
| 6     Q.   I might have asked you this, but did you | 6     Q.   Did you call the clients in any particular |
| 7  stay for the entire conference on October 31st? | 7  order on that day? |
| 8     A.   Yes. | 8     A.   Yes, I did. |
| 9     Q.   What time did you say the conference ended | 9     Q.   You mentioned Mr. McCarthy, did you call |
| 10  that day? | 10  Mr. McCarthy first? |
| 11     A.   I looked at my watch when I walked out and | 11     A.   Yes. |
| 12  it said 9:30. My phone records for some reason | 12     Q.   Who else did you call before the embargo |
| 13  showed different times, but a few minutes earlier, | 13  expired on October 31st? |
| 14  but, you know, that was the time when I walked out of | 14     A.   I'd have to see my phone records to be |
| 15  that meeting. | 15  sure, but you know, I went down my usual list, |
| 16     Q.   What did you do after the conference | 16  starting with Ward. |
| 17  ended? | 17     Q.   Besides Mr. McCarthy, do you recall anyone |
| 18     A.   I walked out of the building and down F | 18  else that you called? |
| 19  Street to the end and called Ward McCarthy and other | 19     A.   Well, I know I talked to Bill Cohen, Capra |
| 20  clients for about the next 20 minutes or so. | 20  C-a-p-r-a, Asset Management. And I remember I talked |
| 21     Q.   Did you speak to anyone before you left | 21  to John Youngdahl at Goldman. There were others, but |
| 22  the building? | 22  I don't have a clear recollection. It's in my phone |
| 23     A.   No. | 23  records, I mean, you know, I can -- if I saw my phone |
| 24     Q.   You stated that you walked down F Street | 24  records, I could tell you exactly who I talked to. |
| 25  and then you called clients? | 25     Q.   Okay. Did you call Mr. Nothern before the |

| Page 179 | Page 181 |
|---|---|
| 1     A.   Right. | 1  embargo expired on October 31st? |
| 2     Q.   What did you use to make these phone | 2     A.   Yes. |
| 3  calls? | 3         MR. THEODOROU: Objection. |
| 4     A.   I had a cell phone. | 4         THE WITNESS: But I didn't reach him. |
| 5     Q.   Can you tell me what the number of your | 5         BY MS. WILLIAMS: |
| 6  cell phone was? | 6     Q.   But you left a voicemail? |
| 7     A.   I don't remember. | 7     A.   I did leave a voicemail. |
| 8     Q.   Do you know who provided your cell phone | 8     Q.   I would like to have it marked as Exhibit |
| 9  service at that time? | 9  28. |
| 10     A.   My lawyer has all that information, I -- I | 10         (Davis Exhibit No. 28 was marked for |
| 11  don't -- I don't remember it now, that was a long | 11         identification.) |
| 12  time ago. | 12         BY MS. WILLIAMS: |
| 13     Q.   Was anyone present when you made these | 13     Q.   Do you recognize this document, sir? |
| 14  calls? | 14     A.   Yes, it is a list of the phone calls of |
| 15     A.   No. | 15  that morning. |
| 16     Q.   Why did you -- | 16     Q.   When you say of that morning, what morning |
| 17     A.   I mean, I was -- I was sitting on a bench | 17  are you referring to? |
| 18  in front of Borders bookstore at 14th and F, I mean, | 18     A.   October 31st, 2001. |
| 19  there were people walking by and trucks and cars | 19     Q.   Whose handwriting is this? |
| 20  driving by. | 20     A.   It's my handwriting. |
| 21     Q.   Why did you leave the Treasury building | 21     Q.   Did you prepare the document yourself? |
| 22  before you called clients? | 22     A.   I must have. I think I was copying my |
| 23         MR. THEODOROU: Objection. | 23  phone records for some reason. |
| 24         THE WITNESS: I just did. You know, I was | 24     Q.   Does Mr. Nothern's name appear on this |
| 25  warning people before the embargo time, I was going | 25  list? |

46 (Pages 178 to 181)

1111 14th Street, NW Suite 400                                    Washington, DC 20005

Peter Davis, Jr.                                                April 19, 2006

Washington, DC

Page 182

1    A.   Yes.
2    Q.   Where does his name appear?
3    A.   Seventh call. On the phone records, they
4  show 9:38. I think it was actually a little later
5  than that.
6    Q.   Why --
7    A.   And it says, and it says his phone
8  number -- it says Boston, his phone number, Steve
9  Nothern and dash message.
10   Q.   You said the phone records indicate the
11  call was made at 9:38?
12   A.   Right.
13   Q.   But you thought it was later than that?
14   A.   Well, I mean, the phone record showed that
15  I called Ward at 9:28, but I didn't leave the
16  building until at least 9:33 or 9:34 or so. I've
17  never been able to understand that discrepancy.
18   Q.   But were you looking at your phone records
19  when you made this document?
20   A.   Yes. I forget the company, but every
21  month I would get a bill, and it would have the phone
22  records. So, you know, I copied those down.
23   Q.   Do you know when you prepared this
24  document?
25       MR. STANCIL: Do you have a specific

Page 183

1  recollection?
2       THE WITNESS: I don't have a clear
3  recollection, but I must have done it for my
4  attorneys soon thereafter. I don't know when.
5       BY MS. WILLIAMS:
6    Q.   In, 2001?
7    A.   Yes. I contacted attorneys a few days
8  later.
9    Q.   A few days after October 31st, 2001?
10   A.   Right, right.
11   Q.   Was it your understanding that the
12  information that you had obtained at the October 31st
13  meeting was still embargoed at 9:38?
14       MR. THEODOROU: Objection.
15       THE WITNESS: Yes.
16       BY MS. WILLIAMS:
17   Q.   You mentioned your phone records, and I
18  want to have this document marked as Exhibit 29.
19       (Davis Exhibit No. 29 was marked for
20       identification.)
21       BY MS. WILLIAMS:
22   Q.   Do you recognize this document?
23   A.   It's a Verizon Wireless phone bill with a
24  billing date of October 19th, 2001.
25   Q.   And if you refer to SEC NOTH 00114193.

Page 184

1    A.   Oh, okay, there is a phone record for
2  November 19, right.
3    Q.   What was -- do you believe -- do you see
4  your name on this 114193, and I'm near the bottom of
5  the page?
6    A.   Yes.
7    Q.   Do you believe this is a copy of the phone
8  bill that you received from Verizon Wireless?
9    A.   Yes.
10   Q.   November 2001?
11   A.   Yes, um-hum.
12   Q.   And if you could turn to the next page,
13  114194.
14   A.   Um-hum.
15   Q.   Do you recall if your cell phone number in
16  October of 2001 was 202-365-7624?
17   A.   Yes. Actually, that's still my current
18  one. For some reason, I thought that phone had died
19  and I had gotten another number. I guess not.
20   Q.   I'd like to refer you to line 21, the
21  lines go down the left-hand side of the page.
22   A.   Sure, I see it.
23   Q.   What does the line 21 reflect?
24   A.   It says there was a phone call at 9:38 to
25  Boston, Massachusetts.

Page 185

1    Q.   Do you recognize that phone number?
2    A.   It's Steve Nothern's phone number at MFS.
3    Q.   And the call was two minutes, do you --
4    A.   Yeah, um, it took a number of rings to get
5  to a voicemail, and it may have flipped to another
6  number to get to a voicemail, I don't know. It took
7  a while to get the voicemail and that's why it ran
8  over.
9    Q.   What did you say in the voicemail that you
10  left for Mr. Nothern?
11       MR. THEODOROU: Objection.
12       THE WITNESS: I have a clear recollection
13  of saying that they are going to kill the 30-year,
14  but I don't have any recollection of mentioning an
15  embargo time.
16       BY MS. WILLIAMS:
17   Q.   Do you believe you may have mentioned it
18  and you don't recall?
19       MR. THEODOROU: Objection, that's not what
20  he said.
21       THE WITNESS: No, I --
22       MS. WILLIAMS: I asked the question.
23       MR. THEODOROU: Correct.
24       BY MS. WILLIAMS:
25   Q.   Right. Do you believe you may have

47 (Pages 182 to 185)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

Page 186

1  mentioned it, but you do not recall is the question?
2       MR. THEODOROU: Objection.
3       BY MS. WILLIAMS:
4    Q.  You can answer.
5    A.  I don't have any recollection of leaving
6  an embargo time on that phone message. It was a
7  quick call, the two minutes mostly reflects the
8  amount of time that it took to get through to the
9  voicemail. And I was on to the next call, so --
10   Q.  What, if anything, else do you remember
11 about leaving him that message?
12      MR. STANCIL: Can we take a quick break,
13 Erica?
14      MS. WILLIAMS: As soon as he answers that
15 question, sure.
16      THE WITNESS: Nothing.
17      THE VIDEOGRAPHER: Off the record at
18 3:23:38 p.m.
19      (Recess.)
20      THE VIDEOGRAPHER: Back on the record at
21 3:31:02 p.m.
22      MR. STANCIL: Erica, if you'll indulge me,
23 the reason I stopped, I wanted to give Mr. Davis an
24 opportunity to make sure that he is perfectly clear.
25 This has obviously been something that's taken a lot

Page 187

1  of his -- consumed a large portion of his life. And
2  I want to make sure that he's perfectly clear on the
3  record with his answers to your last question. So I
4  don't know if you want to ask it again, or I can ask
5  him a question, but I just want to make sure there is
6  no ambiguity on the record in terms of his
7  recollection.
8       MS. WILLIAMS: I don't recall what my
9  question is. If you could ask him the question to
10 clarify, that would be helpful.
11      MR. STANCIL: Pete, sitting here today,
12 what's your recollection of what you left on the
13 voicemail for Mr. Nothern on October 31st, 2001?
14      THE WITNESS: The only clear recollection
15 I have is, Steve, they are killing the 30-year -- you
16 know, this is four and a half years after the fact,
17 so a long time after. And I don't have a
18 recollection of leaving an embargo time on the
19 message. I can't -- I can't be 100 percent sure I
20 didn't. But to the best of my recollection, I did
21 not leave the embargo time.
22      MS. WILLIAMS: I'd like to have this
23 document -- thanks, Mark.
24      MR. STANCIL: Sure.
25      BY MS. WILLIAMS:

Page 188

1    Q.  I would like to have this document marked
2  as Exhibit 30.
3       MR. THEODOROU: For the record, thank you
4  Mark.
5       (Davis Exhibit No. 30 was marked for
6       identification.)
7       BY MS. WILLIAMS:
8    Q.  Mr. Davis, I'm going to ask you questions
9  starting with the subject, do you see subject in the
10 middle of that -- not the middle, a fourth -- a
11 quarter of the way down that first page? I'm going
12 to ask questions about what appears below that, and
13 then continuing on to the next page. Do you
14 recognize that portion of the document that's been
15 marked as Exhibit 30?
16   A.  Can I ask my counsel something?
17      MR. STANCIL: Take a break.
18      THE VIDEOGRAPHER: Off the record at
19 3:33:26 p.m.
20      (Recess.)
21      THE VIDEOGRAPHER: Back on the record at
22 3:40:26 p.m.
23      BY MS. WILLIAMS:
24   Q.  Mr. Davis, before we went on a break, I
25 was asking you about Exhibit 30.

Page 189

1    A.  Right.
2    Q.  And I don't recall if we answered the
3  question, but do you recognize this document? And
4  I'm really starting with the first page starting with
5  subject all the way through to the second page?
6    A.  Yes, I do recognize it.
7    Q.  What is it?
8    A.  It is a memo I wrote to my attorneys on
9  November 5th of 2001.
10   Q.  Do you see the second page of the document
11 where it says redacted, do you know -- do you see
12 that?
13   A.  Yeah.
14   Q.  Do you know who did that redaction?
15   A.  I have no idea.
16   Q.  You did not do that redaction?
17   A.  No, no redaction is shown. I mean, is
18 something at the bottom crossed out, you mean?
19   Q.  Yes.
20   A.  I have no idea what was down there.
21   Q.  What's the date of this document?
22   A.  It says November 5th, 2001. It looks like
23 an E-mail.
24   Q.  An E-mail from who?
25   A.  From me to my attorneys at 4:39 in the

48 (Pages 186 to 189)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

---

Page 190

1   afternoon.
2       Q.   And what does this E-mail contain?
3       A.   It says I called the Verizon Wireless
4   people and they read to me my phone calls of October
5   31 before 10:00 a.m. And I, further down, recorded
6   the time and the phone number and the place and who
7   talked to, and some notes about what transpired in
8   the conversation.
9       Q.   Independent of this document, do you
10  recall having a conversation with Verizon in which
11  they read your phone calls to you?
12      A.   Yeah. I called Verizon to -- I hadn't
13  received my bill yet, and I had gone to my attorneys
14  seeking counsel. And I called Verizon and got the
15  information over the phone.
16      Q.   Can you look down -- and I'm starting with
17  what's remarked as 9:28 a.m., do you see 9:28 a.m.?
18      A.   Yes.
19      Q.   That second line where it starts,
20  "McCarthy 10:00 a.m. embargo," and then I see
21  detailed conversation. Where did that part, the
22  detailed conversation part of the E-mail come from?
23      A.   What do you mean?
24      Q.   Did that -- did you --
25      A.   I wrote detailed conversation.

---

Page 191

1       Q.   So there's information contained in this
2   that you did not receive from the Verizon -- phone
3   call with Verizon that you had?
4       A.   I'm saying I took the information I got
5   from Verizon which was time, phone number, city and
6   supplied additional information, like who it was and
7   other information about the call. So the time, the
8   phone number and the city came from Verizon, I
9   supplied the rest of the information.
10      Q.   Could you turn to the second page of this
11  document at the top?
12      A.   Yes.
13      Q.   Could you tell me what is reflected in
14  that first, I'll call it paragraph at the top?
15      A.   It says, "9:38, (617) 954-5887, Boston,
16  Mass, didn't get through to Steve Nothern at Mass
17  Financial Services, left a short message, 10:00 a.m.
18  embargo and main points."
19      Q.   Is (617) 954-5887, was that Mr. Nothern's
20  phone number?
21      A.   Yes, his phone number at work at
22  Massachusetts Financial Services.
23      Q.   What do you mean by main points?
24      MR. THEODOROU: Objection.
25      THE WITNESS: They killed the 30-year and

---

Page 192

1   it might have -- well, I mean, that's the main point.
2       BY MS. WILLIAMS:
3       Q.   You also wrote in that paragraph, "10:00
4   a.m. embargo," do you see that?
5       A.   I see that, yeah.
6       Q.   Was this document drafted when the events
7   of October 31st, 2001 were fresh in your mind?
8       MR. THEODOROU: Objection.
9       THE WITNESS: Yes.
10      BY MS. WILLIAMS:
11      Q.   Do you believe the information in this
12  document is accurate?
13      MR. THEODOROU: Objection.
14      THE WITNESS: Yes.
15      MR. STANCIL: Pete, let me make clear,
16  because this is something we focused on before. Does
17  this document change your recollection sitting here
18  today or do you believe it was accurate at the time
19  that you wrote it?
20      THE WITNESS: It doesn't change my
21  recollection today. When I prepared this document,
22  that was the best of my recollection then. And, you
23  know, what I'm saying now is the best of my
24  recollection now, four and a half years later.
25      MS. WILLIAMS: I understand.

---

Page 193

1       BY MS. WILLIAMS:
2       Q.   But do you believe that what you wrote in
3   this document to your attorneys was accurate at the
4   time that you wrote it?
5       MR. THEODOROU: Objection.
6       THE WITNESS: It was the best of my
7   recollection at the time.
8       BY MS. WILLIAMS:
9       Q.   So at the time, you believed that you had
10  mentioned the 10:00 a.m. embargo to Mr. Nothern?
11      MR. THEODOROU: Objection.
12      BY MS. WILLIAMS:
13      Q.   At the time you wrote this document?
14      MR. THEODOROU: Objection.
15      MR. STANCIL: I'm going to object, too.
16  My client's interest is to answer each question one
17  time, and you know, I don't think it is fair to
18  repeat the same question over and over again.
19      MS. WILLIAMS: I understand. I just want
20  to clarify the record on this particular point.
21      MR. STANCIL: What's the question now?
22      BY MS. WILLIAMS:
23      Q.   The question is, at the time you wrote
24  this document, was it your understanding that you
25  mentioned a 10:00 a.m. embargo to Mr. Nothern?

49 (Pages 190 to 193)

Peter Davis, Jr.                                                                  April 19, 2006
Washington, DC

| Page 194 | Page 196 |
|---|---|

**Page 194**

1    MR. THEODOROU: Objection.
2    THE WITNESS: That's what this memo says.
3    BY MS. WILLIAMS:
4    Q.   So yes?
5    MR. THEODOROU: Objection.
6    MR. STANCIL: I object, too. I mean, I
7    don't know that you've established that he has a
8    recollection today about what he thought at the time.
9    He's testified this is the best his recollection at
10   the time.
11   MS. WILLIAMS: Right, and I'm talking
12   about --
13   MR. THEODOROU: That's correct.
14   MS. WILLIAMS: -- he wrote this document.
15   He said that this document was written when it was
16   fresh in his mind.
17   MR. THEODOROU: Objection to that.
18   MS. WILLIAMS: And that the information in
19   this document was accurate. So I'm just trying to
20   clarify if this information, "10:00 a.m. embargo,"
21   does he believe that that was accurate at the time he
22   wrote this document.
23   MR. STANCIL: And my objection is that he
24   can only tell what you he knows now. And I don't --
25   my concern is that your question suggests that he's

**Page 195**

1    vouching for the accuracy of the document or the
2    non-accuracy of the document. He's testified that
3    this would have been the best of his recollection at
4    the time, and he's given you the best of his
5    recollection today. And I don't think he can do
6    anything more for you.
7    MS. WILLIAMS: Right.
8    MR. THEODOROU: My objection is that he
9    has no present recollection. And you've asked him as
10   to whether it refreshed his memory, and it doesn't
11   refresh his memory.
12   MS. WILLIAMS: I actually never asked that
13   question.
14   MR. THEODOROU: I noticed that, because
15   you know the answer will be no.
16   MS. WILLIAMS: Because I'm really trying
17   to -- what I'm trying to establish is his -- the
18   accuracy of this particular document. I'm really not
19   asking about what you recall today, Mr. Davis.
20   MR. THEODOROU: Well --
21   MR. STANCIL: All he can tell you is
22   what --
23   MR. THEODOROU: I'm objecting.
24   MR. STANCIL: All he can tell you is what
25   he recalls today.

**Page 196**

1    THE WITNESS: I would point out that it
2    was my recollection then.
3    MS. WILLIAMS: Right.
4    THE WITNESS: And you know, it was a
5    recollection of something that happened in a very
6    compressed period of time. And I was upset, there
7    were newspaper articles coming out and that was the
8    best of my recollection at that time. And that's all
9    I can say.
10   MS. WILLIAMS: Okay.
11   BY MS. WILLIAMS:
12   Q.   Did you have any reason to put anything in
13   this document that was not accurate at the time that
14   you wrote it?
15   MR. THEODOROU: Objection.
16   MR. STANCIL: To the extent you remember.
17   THE WITNESS: I put down in this memo to
18   the best of my recollection at that time.
19   BY MS. WILLIAMS:
20   Q.   Do you know if your attorneys received
21   this document?
22   A.   Yes.
23   Q.   Did you have any conversations with your
24   attorneys about the document?
25   MR. THEODOROU: Objection.

**Page 197**

1    MR. STANCIL: We've waived privilege with
2    respect to the Southern District and these
3    proceedings. There's going to be a point at which I
4    am going to have to stop you. I mean, we have waived
5    privilege with respect to certain documents, but not
6    a blanket waiver of any and all conversations that
7    he's had with us. So I'd ask you to stick to the
8    document.
9    BY MS. WILLIAMS:
10   Q.   Can I refer you to the first page of the
11   document again?
12   A.   Yes.
13   Q.   We already went through 9:28. Can we go
14   to 9:32, do you see that on the first page?
15   A.   Yes, that's (914) 925-7707, Rye, New York.
16   And then I added that I had talked to Bill Cohen of
17   Capra Asset Management.
18   Q.   Do you --
19   A.   I'm reading the rest of it. It says,
20   "10:00 a.m. embargo, detailed conversation."
21   Q.   Do you have a recollection today of
22   talking to Mr. Cohen?
23   A.   Yeah, but I don't recall whether I
24   mentioned the embargo to him. I mean, this was a
25   long time ago. I --

50 (Pages 194 to 197)

Peter Davis, Jr.                                                April 19, 2006

Washington, DC

---

Page 198

1    Q.   Okay.
2    A.   Look, I'm real clear that I mentioned to
3  him that the 30-year had been killed. But I mean,
4  I'm fuzzy about what else happened in the
5  conversation. You know, these were short phone calls
6  of like a minute, and I was going one after the
7  other.
8        So, you know, it is not like my short-term
9  memory was able to just rest after each phone call
10  and engrave itself in my mind. I was talking to one
11  person after another, and so things tended to blur
12  together. You know, I had a general intention to
13  mention the embargo time, but I can't be sure I
14  always did. And this is the best of my recollection
15  on November 5th, 2001, and I've already told you what
16  my recollection is now.
17    Q.   Just to clarify, do you recall if you
18  actually had a conversation with Mr. Cohen when you
19  called at 9:32?
20    A.   I did talk to Bill.
21    Q.   Then it says 9:33, is this a call to Chris
22  Long?
23    A.   It may have been, I don't know for sure
24  who I talked to.
25    Q.   And you don't have a -- do you have any

---

Page 199

1  recollection today about that call?
2    A.   None. I don't have any recollection.
3  Mainly -- I mean, the recollections depend on how
4  well I knew the people before I called them. And so
5  obviously, I knew Ward well and, you know, obviously
6  I was going have a detailed conversation with him.
7  And the same with Bill. I have no idea who Chris
8  Long is, I've never met him.
9    Q.   And then the next line says 9:34, so one
10  minute later, and it says at the end, "don't know who
11  I talked to." Do you see that?
12    A.   Right. Yes, I do. That's not uncommon
13  when you call people at a financial management firm,
14  if you're talking to the trading desk, you call a
15  number, and you don't even know who you get.
16  Sometimes they'll say who it is, sometimes they
17  don't. They are pressed for time, too. They just
18  pick it up and that's it.
19    Q.   Do you believe you had a conversation --
20  or do you recall having a conversation with someone
21  at SAC, even if you don't remember who it was?
22        MR. THEODOROU: Objection.
23        THE WITNESS: I mean, I remember calling
24  SAC. I have no recollection of who I talked to or
25  much beyond, you know, the 30-year is killed. I

---

Page 200

1  mean, I just don't have any other recollection of
2  that call.
3        BY MS. WILLIAMS:
4    Q.   Let me just ask about one more. 9:35,
5  John Youngdahl of Goldman Sachs, do you see that
6  written?
7    A.   Yes, I do.
8    Q.   Do you recall having a conversation with
9  Mr. Youngdahl on October 31st?
10    A.   Yes, I do.
11    Q.   And it looks from this record like that
12  conversation may have lasted two minutes because the
13  next call was at 9:37, do you recall how long --
14    A.   You have to be careful about how the phone
15  company keeps records. I'm not sure that they keep
16  the records in a way that you could have a situation
17  where on the last second of the previous minute until
18  the next second after the next minute, it might
19  record as two or even three minutes, but it's
20  actually a one-minute call. So, you know, it was
21  a call. I remember talking with Youngdahl, and I
22  remember we had a detailed conversation, but you
23  know, it could have been a minute, it could have been
24  two.
25    Q.   Do you remember mentioning the 10:00 a.m.

---

Page 201

1  embargo to Mr. Youngdahl?
2    A.   I do remember in his case, and the reason
3  was that he was a new client. And I have a -- have a
4  specific recollection now, and then, when I wrote
5  this memo, that I had mentioned the embargo time to
6  him, because he hadn't really received a call like
7  this before except in the August, I had called him.
8  But I'm not sure he understood what it was.
9    Q.   Do you know if there are any -- sure, can
10  we take a short break?
11        THE VIDEOGRAPHER: Off the record at
12  3:54:47 p.m.
13        (Discussion off the record.)
14        THE VIDEOGRAPHER: Back on the record at
15  3:59:45 p.m.
16        BY MS. WILLIAMS:
17    Q.   Mr. Davis, before we went off the record,
18  I was asking you about Exhibit 30, and we were
19  talking specifically about the line, 9:35, where
20  Mr. Youngdahl's name is mentioned?
21    A.   Correct.
22    Q.   You said at this time, in October of 2001,
23  Mr. Youngdahl was a new client?
24    A.   Correct.
25    Q.   Which is one of the reasons you mentioned

51 (Pages 198 to 201)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

Page 202

1  the embargo.
2  A.   Correct.
3  Q.   Can I refer you back to what's been marked
4  as Exhibit 17, your plea agreement?
5  A.   Um-hum.
6  Q.   Not plea agreement, your plea sentencing
7  transcript.
8  A.   Right.
9        MR. THEODOROU: Plea colloquy?
10       BY MS. WILLIAMS:
11  Q.   And I'm on SEC NOTH 00145748.
12  A.   Yes.
13  Q.   Can you first refer to line 5 of that
14  page, starting with the word specifically, do you see
15  that?
16  A.   Yes.
17  Q.   "Specifically, in May of 2001, I made such
18  a call to John Youngdahl, a vice president and senior
19  economist at Goldman Sachs. Mr. Youngdahl was a new
20  client and I hoped that the pre-embargo refunding
21  information would persuade him to remain a client."
22       And then it goes on, line 10, "on July
23  12th, 2001, I received an E-mail from Mr. Youngdahl
24  in which Mr. Youngdahl acknowledged that I had
25  provided him with pre-embargo information, relating

Page 203

1  to the May 2001 refunding press conference. In that
2  E-mail, Mr. Youngdahl also asked me if I would give
3  pre-embargo information to him as a 'routine matter'
4  beginning with the August 1st, 2001 quarterly
5  refunding press conference."
6        Did I read that correctly?
7  A.   Yes.
8  Q.   So in October of 2001, was
9  Mr. Youngdahl -- did you still consider him to be a
10  new client?
11  A.   Yes.
12  Q.   But you had entered into an agreement with
13  him to provide him with pre-embargo information?
14  A.   Yes.
15  Q.   Do you know why you would have written on
16  here that you mentioned the 10:00 a.m. embargo to
17  him, because you said you recall mentioning it to
18  him?
19  A.   Even though this had occurred before in
20  August and before in May, I still have a strong
21  recollection now, and obviously had one then, that I
22  had mentioned the embargo time to him.
23  Q.   Do you know why?
24  A.   Because he was a new client, he was
25  someone that we had specifically talked about this,

Page 204

1  and so --
2  Q.   You had specifically talked about what?
3  A.   That I would call him up before the
4  embargo time.
5  Q.   Can you turn to page 145749 of that
6  transcript?
7  A.   Yes.
8  Q.   I am at line 11 at the very end, I --
9  starting with I, just the word I, do you see that?
10  It's line 11 at the very end.
11  A.   Yeah, I see it.
12  Q.   "I told Mr. Youngdahl that Treasury had
13  decided to discontinue the 30-year bond. I also told
14  Mr. Youngdahl that the information was embargoed
15  until 10:00 a.m. My call to him took place around
16  9:30 a.m. My expectation was that Mr. Youngdahl and
17  Goldman Sachs would use the information to their
18  advantage in trading government securities."
19       Do you recall -- do you agree that that
20  was your expectation in providing Mr. Youngdahl with
21  this information?
22  A.   Yes.
23  Q.   So you did not expect Mr. Youngdahl to
24  obey the 10:00 a.m. embargo?
25       MR. THEODOROU: Objection.

Page 205

1        THE WITNESS: I don't -- I don't -- yeah,
2  I mean, that's what I said.
3        BY MS. WILLIAMS:
4  Q.   I want to continue. "I believe that once
5  this information became public, prices of the 30-year
6  bond would escalate dramatically, and I knew my
7  pre-embargo" -- I believe that should have been
8  report --
9  A.   Yes, there is a typo there in line 19.
10  Q.   "Would allow Mr. Young" -- I think that
11  should be "dahl"?
12  A.   Right.
13  Q.   "And my other clients to make significant
14  moves in advance of the market responding to the
15  official public release," do you see that?
16  A.   Yes, I do.
17  Q.   Do you believe that that statement was
18  accurate when you made it at the plea hearing?
19  A.   Yes.
20  Q.   So you expected that this information
21  would allow Mr. Youngdahl and other clients to make
22  significant moves in the advance of the market
23  responding?
24  A.   Well, I mean, my recollection today of
25  what I was thinking on October 31st was that they

52 (Pages 202 to 205)

Peter Davis, Jr.
Washington, DC
April 19, 2006

## Page 206

1  would be ready to act right at 10:00 a.m. before
2  anybody. Now, obviously if they get the information
3  before 10:00, they can act before, I have no idea.
4  You know, obviously, the reason for telling them the
5  embargo time was that they could possibly wait and
6  act right at 10:00 a.m. And that was, you know, my
7  expectation. But they could clearly -- you know,
8  once they have the information, obviously they could
9  use it, sure.
10     Q.   And they could use it to make moves in
11  advance of the market's responding?
12     A.   Yes, they could, sure. Yes, that was
13  true.
14     Q.   You state in this plea hearing, "my other
15  clients," did that include Mr. Nothern, that you
16  expected this information would help Mr. Nothern make
17  significant moves in advance of the market
18  responding?
19        MR. THEODOROU: Objection.
20        THE WITNESS: I never got a hold of
21  Mr. Nothern, so I didn't have any expectation. I
22  mean, obviously, I called him and left a phone
23  message.
24        BY MS. WILLIAMS:
25     Q.   And did you expect that that message would

## Page 207

1  assist Mr. Nothern in making --
2     A.   It depends when he got it.
3        MR. STANCIL: Again --
4        MR. THEODOROU: I'm going to raise my
5  objection on this.
6        MR. ROSSETTI: First of all, let him
7  answer.
8        MR. THEODOROU: No, I get to --
9        MR. ROSSETTI: Let him finish answering
10  it.
11        MR. THEODOROU: No, no. She asked the
12  question, I was about to say -- give my objection. I
13  can raise my objection when she asks the question.
14  And I'm going to raise an objection, it is a standing
15  objection. I think you're playing games with this
16  plea. And if you'll look at the information that was
17  filed, which I noticed you've not shown him, he's not
18  pleading to anything concerning Steve Nothern. Steve
19  Nothern is not --
20        MS. WILLIAMS: I'm not asking --
21        MR. THEODOROU: Steve Nothern is not in
22  the information, this is unfairly prejudicial
23  evidence for the purpose of this deposition.
24        MS. WILLIAMS: I disagree with you. This
25  statement that Mr. Davis made at the plea hearing, he

## Page 208

1  stated that the statement was true and accurate and
2  he mentioned other clients. And I'm trying to
3  establish as to whether these other clients included
4  Mr. Nothern, whether or not it was in the
5  information. And so what I'm asking right now is his
6  independent recollection.
7        MR. THEODOROU: You're playing with -- I'm
8  just going on the record is you're dealing with not
9  only evidence that's not probative of what's going on
10  here, but unfairly prejudicial evidence. I'm just
11  raising that standing objection. I did it before and
12  it is standing.
13        MS. WILLIAMS: That's fine.
14        MR. THEODOROU: Okay.
15        BY MS. WILLIAMS:
16     Q.   And I am asking Mr. Davis his recollection
17  as to why he would provide Mr. Nothern with the
18  information which we've already established he
19  provided prior to the embargo time.
20        So if I could repeat my question to you,
21  Mr. Davis, I wanted to know, did you -- you said that
22  you believed that the information would allow other
23  clients to make significant moves in advance of the
24  market. Do you believe if Mr. Nothern retrieved your
25  voicemail prior to the embargo time that it would

## Page 209

1  allow him to make significant moves in advance of the
2  market?
3        MR. THEODOROU: Objection on form across
4  the board, in terms of asking for speculation and all
5  the rest.
6        MR. STANCIL: Pete, I want you to answer
7  the question if you have a specific recollection of
8  what you recall with respect to Mr. Nothern.
9        MS. WILLIAMS: As to your intent, my
10  question is about intent.
11        MR. STANCIL: I'm sorry, I don't think
12  anybody knows what the question is anymore. I just
13  want to be clear, you're asking him --
14        MS. WILLIAMS: What was his intent in
15  leaving the voicemail message to Mr. Nothern, what
16  did he believe that the information would allow
17  Mr. Nothern to do.
18        MR. THEODOROU: Objection.
19        MS. WILLIAMS: And he said that he
20  believed that it would allow other clients, and I'm
21  trying to figure out if that was with regard to
22  Mr. Nothern as well.
23        MR. STANCIL: I think you might be better
24  off asking him if he had a specific recollection
25  first with respect to Mr. Nothern.

53 (Pages 206 to 209)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

| Page 210 | Page 212 |
|---|---|

**Page 210**

1    BY MS. WILLIAMS:
2        Q.    What was your intent in leaving the
3    voicemail message for Mr. Nothern?
4            MR. THEODOROU: Objection to the question
5            MR. STANCIL: To the extent you recall,
6    answer the question. I don't want to -- this is your
7    record, and I'm not trying to get in the middle of
8    it, but I don't want -- my concern here is Mr. Davis
9    is being asked to answer very difficult and
10   conclusory questions, which it's impossible for him
11   to sort of pick through the different layers.
12           If the question is, do you have a
13   recollection as to what your intent was with a
14   message for Mr. Nothern, I think that's a fair
15   question, at least from our perspective.
16           MR. ROSSETTI: The question of what his
17   intent was is an equally fair question.
18           MS. WILLIAMS: Absolutely.
19           MR. ROSSETTI: And that's the question
20   that's pending, and we would like him to answer that
21   question.
22           MS. WILLIAMS: He stated that he had an
23   intent with regard to at least Mr. Youngdahl and my
24   other clients, and I'm trying to figure out what his
25   intent was in leaving this message for Mr. Nothern.

**Page 211**

1            MR. THEODOROU: Are you characterizing?
2    Maybe we ought to have his testimony read back,
3    because you are characterizing his testimony, what he
4    said in his plea colloquy.
5            MS. WILLIAMS: I read that --
6            MR. THEODOROU: No, his plea colloquy said
7    --
8            MS. WILLIAMS: "Would allow Mr. Youngdahl
9    and my other clients to make significant moves."
10           MR. THEODOROU: Where are you reading
11   from?
12           MS. WILLIAMS: I am on page 21, line 20 --
13   starting with line 19. If you want to start at the
14   beginning of the sentence, it's line 17.
15           MR. THEODOROU: All right.
16           MS. WILLIAMS: And I read that verbatim.
17           MR. THEODOROU: And you hear what my
18   standing objection is in terms of this. This is
19   playing games with this document.
20           MS. WILLIAMS: I disagree.
21           MR. THEODOROU: Of course you're going to
22   disagree.
23           MR. STANCIL: I think we ought to ask
24   Mr. Davis another question.
25           BY MS. WILLIAMS:

**Page 212**

1        Q.    I would like for Mr. Davis to answer the
2    question I asked, which was, what your intent was, do
3    you know what your intent was in leaving the
4    voicemail for Mr. Nothern on October 31st, 2001?
5            MR. THEODOROU: Objection.
6            MR. STANCIL: To the extent you recall, go
7    ahead and answer.
8            THE WITNESS: Look, I had a clear
9    preexisting agreement with Ward McCarthy and John
10   Youngdahl. I had no such agreement whatsoever with
11   Steve or any of my other clients.
12           When I called other people on that
13   morning, I was expecting them to honor the embargo
14   time. Obviously they didn't have to. I mean, that
15   was the extent of it. I mean, you know, my clients
16   are not in the habit of telling me of what they do
17   with my information. I've never had a client tell me
18   what their trades are or anything.
19           So all I can -- all I do is convey
20   information about Washington, and that's it. I mean,
21   there's never any conversations about what they are
22   using it for.
23           BY MS. WILLIAMS:
24       Q.    I'm trying to ask something differently
25   from what the clients told you that they intended to

**Page 213**

1    use your information for. I'm not asking that
2    question. I know -- I don't really want to know
3    that.
4            I wanted to know if you had any
5    expectation when you left the message for Mr. Nothern
6    as to what might happen -- as to what he might do
7    with the information?
8            MR. THEODOROU: Objection.
9            MR. STANCIL: Do you recall?
10           THE WITNESS: I just didn't have any
11   expectation. I mean, I didn't even -- I assumed he
12   wasn't even going to get it. I left a phone message.
13           BY MS. WILLIAMS:
14       Q.    But you did have an expectation, and I'm
15   going to read this, "my expectation was that
16   Mr. Youngdahl and Goldman Sachs would use the
17   information to their advantage in treating government
18   securities." Is that true?
19           MR. THEODOROU: Objection.
20           BY MS. WILLIAMS:
21       Q.    I'm on line 15 of page 21.
22       A.    I expected John Youngdahl to wait until
23   10:00 a.m., too. But, you know, it's clear that that
24   didn't -- that he was, once I conveyed the
25   information, that he could whatever he wanted with it

54  (Pages 210 to 213)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

Page 214

1    and --
2         MR. STANCIL: There's a couple of things I
3    just have to get on the record to make sure we're
4    clear. Pete, you knew that even if Mr. Youngdahl was
5    waiting at 10:00 a.m. to push the button right at
6    10:00 a.m., you knew that that was an advantage to
7    him in the marketplace?
8         THE WITNESS: Yes, it was.
9         MR. STANCIL: And, Pete, is it your
10   testimony today that everything you said in open
11   court -- in court in front of the magistrate judge in
12   Exhibit 17 was the truth at the time?
13        THE WITNESS: Yes, yes.
14        BY MS. WILLIAMS:
15   Q.   Okay. So did you also have an expectation
16   that your other clients who you left messages for
17   before the embargo expired might also use the
18   information to trade --
19        MR. THEODOROU: Objection.
20        THE WITNESS: I had no basis for any
21   expectation.
22        BY MS. WILLIAMS:
23   Q.   Excuse me -- let me finish the question.
24        Did you have any -- it says you had an
25   expectation that Mr. Youngdahl should use the

Page 215

1    information to his advantage in trading government
2    securities. Did you believe your other clients would
3    use the information to their advantage in trading
4    government securities?
5         MR. STANCIL: I'm sorry, I object.
6         MR. THEODOROU: Objection.
7         MR. STANCIL: Can we go off the record for
8    a second? I think we can clear a lot of this up.
9         THE VIDEOGRAPHER: Off the record at
10   4:13:32 p.m.
11        (Discussion off the record.)
12        THE VIDEOGRAPHER: Back on the record at
13   4:16:44 p.m.
14        BY MS. WILLIAMS:
15   Q.   Mr. Davis, before we went off the record,
16   I was asking you whether or not you had an
17   expectation that providing Mr. Nothern with the
18   voicemail that you left before the embargo would
19   allow him to use that information in trading -- to
20   his advantage in trading government securities?
21        MR. THEODOROU: Objection.
22        THE WITNESS: I just -- I just had no such
23   expectation. I mean, I have no way of knowing what a
24   client's going to do with my information. A lot of
25   times I give clients information and they don't do

Page 216

1    anything with it. Sometimes they use it. I never --
2    I never know. And in the case of Mr. Youngdahl, it
3    was clear, because we -- he and I had this exchange
4    on July 12th and so on. But there just was no such
5    exchange with Mr. Nothern.
6         BY MS. WILLIAMS:
7    Q.   Did you believe that this information that
8    you left on the voicemail would be beneficial to
9    Mr. Nothern?
10        MR. THEODOROU: Objection.
11        THE WITNESS: I had no way of knowing.
12   You know, it was possible it could have, it was
13   possible it couldn't have.
14        BY MS. WILLIAMS:
15   Q.   Do you know if Mr. Nothern in the capacity
16   of his job at MFS traded in the 30-year bonds?
17   A.   No, I don't know. I have no way of
18   knowing that.
19   Q.   Do you know what his job responsibilities
20   were at MFS?
21   A.   No, I know he worked there. I know he was
22   interested in Washington economic policy information.
23   I know he retained me. You know, clients are not in
24   the habit of detailing their trades to me. I've
25   never had a client tell me what -- any trades. They

Page 217

1    are asking me questions.
2    Q.   Can I ask you a question, and this is
3    going back to some questioning I asked earlier
4    regarding Ms. Bostjancic and Mr. Greenlawn, who asked
5    you not to call them anymore.
6    A.   Right.
7    Q.   And I also recall earlier in the
8    deposition, you said that you had discarded the
9    agreement?
10   A.   Yes.
11   Q.   That you signed with Mr. Anderson?
12   A.   That's correct.
13   Q.   Is that correct?
14   A.   That's correct.
15   Q.   And when did you discard that agreement?
16   A.   It was in early August, right after the
17   August quarterly refunding in 2001.
18   Q.   Why did you discard the agreement in early
19   August 2001?
20   A.   Because I had a habit of filing those
21   documents that I got from Treasury in a file. And so
22   I went and put the August documents in front of the
23   May documents. And I noticed there was an empty
24   folder next to it, and I had forgotten it was there.
25   And it wasn't marked, I didn't know what was in it,

55 (Pages 214 to 217)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

---

Page 218

1  so I pulled it out, and I opened it up, and there was
2  one page in there. And it was a copy of the
3  agreement.
4        And I looked at it, and I thought, geez.
5  You know, and I looked at it and I sort of refreshed
6  my memory that I -- you know, about promising to
7  honor the embargo. And here I was violating it, so
8  on my way to my car after work, I pitched it in the
9  trash can out back. And that's what I did.
10        MS. WILLIAMS: The court reporter has
11  passed me a note that he needs to change the tape.
12        THE VIDEOGRAPHER: This is the end of tape
13  number four in the video deposition of Peter Davis.
14  Off the record at 4:20:40 p.m., on April 19th, 2006.
15        (Recess.)
16        THE VIDEOGRAPHER: This is the beginning
17  of tape number 5 in the video deposition of Peter
18  Davis. On the record at 4:28:06 p.m. on April 19th,
19  2006.
20        BY MS. WILLIAMS:
21    Q.   Mr. Davis, I was asking you questions
22  about the agreement that you had with Mr. Fisher that
23  you said that you discarded in August.
24    A.   An agreement with who?
25    Q.   Excuse me, with Mr. Anderson.

---

Page 219

1    A.   Oh, right, Mr. Anderson, right.
2    Q.   The agreement that you had with Mr.
3  Anderson? And I believe you said you discarded it in
4  August of 2001?
5    A.   Early August, 2001, right.
6    Q.   Had you received calls from Mr. Greenlawn
7  or Ms. Bostjancic when you discarded this agreement?
8    A.   That's a good question. I'm trying to
9  remember. I'm not clear when they called me, I know
10  they called me. It could have been then, but I
11  don't -- it could have been in May, I just -- I
12  mean --
13    Q.   Do you recall if they called you after a
14  quarterly refunding conference?
15    A.   I think it was shortly after a quarterly
16  refunding conference, yes, or meeting on, you know,
17  one of those Wednesdays. I don't remember which one.
18    Q.   Do you think that it was either May or
19  August of 2001?
20    A.   It probably was, yeah. See, part of the
21  problem is I don't remember when I started calling.
22  May might have been the first time. I just -- I
23  just -- it was February, you know, I just don't -- of
24  course, I wasn't there in February. I don't know.
25        MR. STANCIL: Do you recall?

---

Page 220

1        THE WITNESS: No, I don't.
2        BY MS. WILLIAMS:
3    Q.   Do you believe it was in 2001?
4    A.   I just -- I have no recollection. I know
5  they called me. I just -- I'm not clear when it was.
6  I'm just not -- I just don't -- I have a clear
7  recollection of them calling me, I don't have a clear
8  recollection of when it was.
9    Q.   In the agreement with Mr. Anderson that
10  you discarded, you said that you had been violating
11  the embargo?
12    A.   Right.
13    Q.   After you discarded this agreement in
14  August of 2001?
15    A.   Right.
16    Q.   Did you at that time intend to call
17  clients before the embargo expired at the October
18  refunding conference?
19    A.   No, the opposite. I decided then and
20  there that I wouldn't. And in fact, I told my
21  assistant that. In fact, the morning of October
22  31st, before I went to the meeting, I instructed my
23  assistant to make sure she was off the phone, to make
24  sure she was ready, and to have a blank E-mail with
25  our logo on it ready to punch up. And that I was

---

Page 221

1  going to dictate to her something that I wanted her
2  to send out right at 10:00 a.m., you know, at the
3  embargo time.
4        I didn't say 10:00 a.m. at the embargo
5  time, because I didn't know what the embargo time
6  was. And I'd given her those clear instructions and
7  I just didn't do it. You know, I was angry about
8  what Treasury was doing at the meeting, I walked out
9  of the meeting and I did not follow through on my
10  intention to just wait for the embargo time, send an
11  E-mail out, you know, telling people what was said at
12  the meeting.
13    Q.   Besides the fact that you were angry about
14  what was announced, was there any other reason why
15  you decided not to wait and have Ms. Sullivan send
16  out the E-mail --
17    A.   No, that was the only reason. I mean, it
18  was just -- like I said, I told her and my intention
19  up until I heard what Treasury was doing was that I
20  would just wait until -- I would call her, I would
21  dictate something to her, and she would just send it
22  out because I wouldn't be able to get back to the
23  office before then, and she would just send it out.
24  But I didn't do that, I was upset about what Treasury
25  did and I just started calling people.

---

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

Peter Davis, Jr.

Washington, DC

April 19, 2006

## Page 222

1    Q.  Did you have -- at that time, did you
2  believe that informing your clients about the
3  cancellation of the bond would -- before the embargo,
4  would benefit you at all?
5    A.  I mean, one of the things that was going
6  on was I had lost some clients earlier in the year
7  that I felt I'd done a lot of really good honest
8  public work for.  And, you know, budget cuts were
9  coming at that time.  And I was -- one of the reasons
10  I was calling some of the people who were not clients
11  was, you know, to see if I could demonstrate to them
12  that I was knowledgeable and, you know, in the know
13  and that sort of thing.  So you will notice that some
14  of the calls were to people who were not clients, and
15  never were clients.
16    Q.  And did you think that by calling these
17  people would somehow be of benefit to you or Davis
18  Capital?
19    A.  Well, yeah.  Yes, on the chance they might
20  become a client.
21    Q.  Did you think that it was also benefit you
22  with your present clients?
23    A.  It's possible, but there was never any
24  expectation of any monetary reward, or there was
25  never any quid pro quo, or any participation in any

## Page 223

1  trades.  I mean, the only expectation was that
2  perhaps they might think twice about, you know, if
3  they had to let me go or something.  And so I've
4  never charged those clients anything other than my
5  standard fees, and I've never received any other
6  payment from them outside of standard fees.
7    Q.  Do you know whether Mr. Nothern placed
8  orders to trade in 30-year bond on October 31st,
9  2001?
10    A.  No, I have no such knowledge, I have no
11  way of knowing that.
12    Q.  Do you know if any of your other clients
13  traded in 30-year bond on October 31st, 2001?
14    A.  Well, there were some news accounts, I
15  don't know if they are accurate.  But, you know,
16  clearly there were news accounts about Goldman
17  trading in 30-year.
18    Q.  And was Mr. Youngdahl your contact at
19  Goldman?
20    A.  Yes.
21    Q.  Except for these news accounts, do you
22  have any other knowledge regarding any trading?
23    A.  No, there's no other way that I would know
24  that.
25    Q.  And except for Goldman, were you aware of

## Page 224

1  any other news accounts on any other clients
2  regarding any trading?
3    A.  No none.
4    Q.  Any other information at all about any
5  trading by any other clients?
6    A.  No, I -- no.
7    Q.  Did you call any other clients after you
8  called Mr. Nothern on October 31st, 2001?  And you
9  can refer to Exhibit 30 to help refresh your
10  recollection.
11    MR. STANCIL:  Be clear between what you
12  remember now --
13    THE WITNESS:  Sure.
14    MR. STANCIL:  And what the document shows.
15    THE WITNESS:  Right.
16    MR. STANCIL:  Tell her what you remember.
17    THE WITNESS:  Well, my recollection now
18  without referring to that document, Exhibit 30, is
19  that when I got to Steve, I was at the end of the
20  list.  And I was calling back trying to reach people
21  that I had not succeeded in reaching in the initial
22  round of calls.
23    And, you know, I -- I don't -- I mean, you
24  know, looking at the document, I guess I can refresh
25  my memory whether I actually talked to anybody after

## Page 225

1  that.  One of the problems then was that I didn't get
2  through, I didn't get through, I tried back.  And now
3  today, I'm sitting here and, you know, with the
4  exception of some of the ones that I remember very
5  clearly, like Ward McCarthy and John Youngdahl and
6  Bill Cohen, you know, I just don't have any clear
7  recollections of -- because I mostly didn't get
8  through.
9    Q.  Were you using a document to find the
10  phone numbers to call the clients on October 31st?
11    A.  Yes.  Well -- actually, no, I take it
12  back.  I had the main phone numbers already
13  programmed into my cell.  And so I was just calling,
14  you know, I forget what storage numbers they were in,
15  but I just called the storage number and then I
16  called the next one, and then I called the next one,
17  and then I called the next one.
18    Q.  Were they stored in a particular order?
19    A.  Yes, they were.
20    Q.  And was that the order that you referred
21  to before?
22    A.  Yes.
23    Q.  So they were stored in your phone in this
24  particular order?
25    A.  Right.  Yeah, it started out with Ward

57 (Pages 222 to 225)

Peter Davis, Jr.                                                              April 19, 2006
Washington, DC

| Page 226 |
|---|
| 1   McCarthy and went to Bill Cohen. And I sort of |
| 2   forget for sure what the order was after that, but |
| 3   whatever the order was, I just went punching it. And |
| 4   I remember Steve being last. |
| 5       Q.   On Exhibit 30, do you see any entries of |
| 6   calls made after the call entry for Mr. Nothern which |
| 7   appears at the top of page -- of the second page? |
| 8       A.   There's several entries, mostly not |
| 9   getting through to anybody. I did talk to Peter |
| 10  Hamilton at 9:51, that's a research firm, they don't |
| 11  trade. |
| 12      Q.   Just to clarify, do you recall talking to |
| 13  Mr. Hamilton, or do you just believe that this |
| 14  document is accurate? |
| 15      A.   I just believe this document's accurate. |
| 16  I don't have a clear recollection beyond Ward, Bill |
| 17  Cohen at Capra, and John Youngdahl. |
| 18      Q.   But you do have a recollection that you |
| 19  left a voicemail for Mr. Nothern? |
| 20      A.   Yes. |
| 21      Q.   Do you recall if any of the clients that |
| 22  you called on October 31st, 2001 in the morning told |
| 23  you that they'd already heard that Treasury was |
| 24  canceling the 30-year bond? |
| 25      MR. THEODOROU:   Objection. |

| Page 227 |
|---|
| 1       THE WITNESS:   That -- nobody said that. I |
| 2   mean, it was -- I mean, I would convey information |
| 3   and they would ask me questions about it. |
| 4       BY MS. WILLIAMS: |
| 5       Q.   Mr. McCarthy didn't tell you he had |
| 6   already heard that the bond was being cancelled? |
| 7       A.   No one said that. |
| 8       Q.   What did you do after you made these phone |
| 9   calls to your clients on the morning of October 31st, |
| 10  2001? |
| 11      A.   Boy, my recollection was that I called the |
| 12  guy over at the press building about the possibility |
| 13  of renting space for my office, because I had just a |
| 14  day or two earlier found out -- or a few days or I |
| 15  forget when, but sometime earlier had found out from |
| 16  my landlord that I was going to be getting kicked |
| 17  out. So I may have gone over and met with him, |
| 18  although I'm not positive when that happened. |
| 19      I do recall that I didn't get back into my |
| 20  office until later that morning. It wasn't direct. |
| 21  There was something else that I was doing, I think |
| 22  that was it, I think I was looking for space for my |
| 23  office. |
| 24      Q.   You mentioned that you had spoken to Ms. |
| 25  Sullivan before the conference. |

| Page 228 |
|---|
| 1       A.   Yes, that's right. |
| 2       Q.   And that you had discussed with her |
| 3   possibly having her send out an E-mail after the |
| 4   conference? |
| 5       A.   Right. |
| 6       Q.   Did you ever have Ms. Sullivan send out an |
| 7   mail regarding the information that you received at |
| 8   the October 31st, Treasury quarterly refunding |
| 9   conference? |
| 10      A.   I don't recall. I do recall sending out |
| 11  an E-mail later in the day, and taking some of those |
| 12  direct quotations from Fisher. And as I recall, I |
| 13  wrote that myself and just put it out when I got back |
| 14  into the office, but it wasn't right away. It was -- |
| 15  I forget when it was, it was late in the morning or |
| 16  maybe in -- it was some time later in the day. |
| 17      But there was some intervening activity, I |
| 18  may have gone up in the press building and met with |
| 19  this guy or I had some other errands, I forget what |
| 20  it was. There were things I did for like a half hour |
| 21  or an hour or something before I got back in the |
| 22  office. |
| 23      Q.   Do you recall calling Ms. Sullivan on the |
| 24  morning of October 31st? |
| 25      A.   I called her, and I'm trying to |

| Page 229 |
|---|
| 1   remember -- oh, I know, it was to get a phone number |
| 2   of somebody else at Fidelity, because Lisa |
| 3   Emsbo-Mattingly was out on maternity leave. And so I |
| 4   got her machine and left a message. And I was trying |
| 5   to find someone else to call to actually talk to a |
| 6   human being. I eventually got a receptionist, but I |
| 7   never got through to anybody. And so I called |
| 8   Allyson to get that phone number. And at that time, |
| 9   I told Allyson I just would do the E-mail when I got |
| 10  back to the office. |
| 11      Q.   I would like to have this marked as |
| 12  Exhibit 31. |
| 13      (Davis Exhibit No. 31 was marked for |
| 14      identification.) |
| 15      BY MS. WILLIAMS: |
| 16      Q.   Do you recognize this document, Mr. Davis? |
| 17      A.   Yeah, this fits my memory that late that |
| 18  morning, I put out an E-mail to my clients at 11:33, |
| 19  11:34. |
| 20      Q.   Is this a copy of the E-mail that you |
| 21  sent? |
| 22      A.   Yes. |
| 23      Q.   Did you draft this yourself? |
| 24      A.   I wrote it all myself. |
| 25      Q.   Do you see Mr. Nothern's name on this |

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

Peter Davis, Jr.                                                    April 19, 2006

Washington, DC

| Page 230 |
|---|

1  document? And I would refer you to eight lines up
2  from the bottom in the middle.
3      A. Yeah, he's on my standard E-mail list and
4  he is there.
5      Q. Why did you send this document to your
6  clients?
7      A. To give them additional information. You
8  know, I put in some of the quotations that I had
9  taken down when Undersecretary Fisher spoke.
10     Q. Do you recall if you sent any other
11 documents to your clients on October 31st regarding
12 the cancellation of the 30-year bond?
13     A. I don't have any recollection. I mean, I
14 recall sending the E-mail, it was our standard
15 practice to send out some of the additional tables.
16 I don't -- we probably faxed those out, but I don't
17 have a clear recollection of that.
18     Q. Do you recall if you had any actual
19 conversations with Mr. Nothern on October 31st, 2001?
20     A. Oh, I'm clear that I did not. Never, ever
21 talked to him. In fact, you know, I just hadn't had
22 that many conversations with him the whole year. I
23 mean, he was unavailable on a number of occasions,
24 and you know, I'm sure I didn't talk to him on
25 October 31st. In fact, I don't recall when I had

| Page 231 |
|---|

1  talked to him previously.
2      Q. Let me ask you about that. I'd like to
3  have this marked as Exhibit 32. I'm going to have
4  three exhibits, actually.
5          (Davis Exhibit No. 32 was marked for
6          identification.)
7          BY MS. WILLIAMS:
8      Q. Do you recognize this document?
9      A. It's a Sprint phone bill for billing
10 period ending August 26th, 2001.
11     Q. Who is the bill for?
12     A. It's -- yeah, it's to me. My business
13 office.
14     Q. Can I refer you to -- and I'm going to go
15 to the Bates number now -- the SEC NOTH 00107689, do
16 you see that page?
17     A. Um-hum, yes.
18     Q. And I'm looking at lines 36 and 37 on that
19 page, do you see those lines?
20     A. Yes.
21     Q. What do those lines show?
22     A. They show a brief call, which is probably
23 a phone message at 11:20 a.m. to Steve Nothern's
24 phone number. And then at 11:25, they show an
25 extensive 35 minute call to the same number.

| Page 232 |
|---|

1      Q. And then I also want to refer you to line
2  15 of that same page.
3      A. Um-hum.
4      Q. Do you see that line?
5      A. Yeah.
6      Q. What does that line show?
7      A. That shows a call on July 31st, 2001 at
8  10:36 a.m. to Steve Nothern's number. And it was
9  almost certainly just a phone message because it was
10 .6 minutes.
11     Q. Do you recall speaking to Mr. Nothern on
12 the 23rd of August, what's reflected at line 37, 34
13 minutes?
14     A. No, that was a long time ago.
15     Q. Do you have any reason to doubt the
16 accuracy of this phone record, though?
17     A. No, I probably talked to him, but --
18     Q. I would like to have this marked as
19 Exhibit 33.
20         (Davis Exhibit No. 33 was marked for
21         identification.)
22         BY MS. WILLIAMS:
23     Q. Do you recognize this document, Mr. Davis?
24     A. It is a Sprint phone bill to me at my
25 business.

| Page 233 |
|---|

1      Q. What's the date of this bill?
2      A. For the period ending September 26th,
3  2001.
4      Q. I'd like to refer you to SEC NOTH
5  00107672. Do you see that page?
6      A. Yes.
7      Q. I'm on line 34 on that page, do you see
8  that?
9      A. Yes.
10     Q. What's reflected there?
11     A. There's a call to Steve Nothern's number
12 for 1.7 minutes.
13     Q. On what date?
14     A. Oh, September 6th, 12:40.
15     Q. Do you recall making a call to Mr. Nothern
16 on that date?
17     A. No.
18     Q. Do you have any reason to doubt the
19 accuracy of this entry in the phone record?
20     A. No.
21     Q. And then also if you could refer to line
22 51, do you see that line?
23     A. Right, yeah.
24     Q. What is reflected there?
25     A. November 7, '01, 3:15 --

59 (Pages 230 to 233)

Peter Davis, Jr.                                                                April 19, 2006
                          Washington, DC

| Page 234 | Page 236 |
|---|---|

**Page 234**

1    Q.    September?
2    A.    I'm sorry, not November, yeah, September 7
3 at 3:15 to Steve Nothern's number for three minutes.
4    Q.    Do you recall that conversation?
5    A.    No.
6    Q.    Do you have any reason to doubt that the
7 entry here is accurate?
8    A.    No.
9    Q.    Can I ask you about line 19 of this same
10 page, where I see the phone number (617) 954-5397, do
11 you know whose phone number that was?
12    A.    No.
13    Q.    Is --
14    A.    I mean, sometimes when you call somebody
15 and you actually get a receptionist, and a client I
16 was calling for wasn't in.  Occasionally, I would get
17 transferred over to somebody else.
18    Q.    And if I could have this last document
19 marked as Exhibit 34.
20         (Davis Exhibit No. 34 was marked for
21         identification.)
22    BY MS. WILLIAMS:
23    Q.    This -- do you recognize this document?
24    A.    It's an excerpt from my October Sprint
25 phone bill.

**Page 236**

1    A.    Yes, it is a broadcast fax delivery
2 report.
3    Q.    For delivery of what?
4    A.    A broadcast fax to clients.
5    Q.    From Davis Capital --
6    A.    Yeah, on October 31st at --
7    Q.    2001?
8    A.    Yeah, 7:44 to 7:53 in the morning, I
9 guess.
10    Q.    Do you see Mr. Nothern's name on this
11 document?  And I will refer you to the third line
12 from the bottom.
13    A.    Sure, he is on my standard broadcast fax
14 list.
15    Q.    And I'm referring now to the PGS column,
16 do you see that?
17    A.    Yeah.
18    Q.    What does that show?
19    A.    It is 15 pages.
20    Q.    And then the last column, SUC?
21    A.    Yeah, that means successful delivery of
22 the -- it got picked up by another fax.
23    Q.    Do you have any recollection of what you
24 faxed to the clients on this list that was 15 pages
25 on October 31st, 2001?

| Page 235 | Page 237 |
|---|---|

**Page 235**

1    Q.    Just to clarify, the phone bill is related
2 to your office phone; is that correct?
3    A.    Yeah, it was the long distance carrier for
4 my business phone at 503 Capital Court.
5    Q.    If I could refer you to the second page of
6 the document, 107681.
7    A.    Um-hmm.
8    Q.    And I'm on line 54 of that document, do
9 you see that?
10    A.    Yes.
11    Q.    What's reflected there?
12    A.    October 16, 12:41 p.m. to Steve Nothern's
13 phone for 1.9 minutes.
14    Q.    Do you recall talking to Mr. Nothern on
15 the 16th of October 2001?
16    A.    Not -- no.
17    Q.    Do you believe that this record is
18 accurate, though?
19    A.    I have no reason to doubt it.
20    MS. WILLIAMS:  I would like to have this
21 marked as Exhibit 35.
22         (Davis Exhibit No. 35 was marked for
23         identification.)
24    BY MS. WILLIAMS:
25    Q.    Do you recognize this document, Mr. Davis?

**Page 237**

1    A.    I don't.
2    Q.    What was the first public document that
3 you saw announcing Treasury's cancellation of the
4 30-year bond?
5    A.    It was the -- Fisher's remarks in the room
6 3311 Treasury on the morning of --
7    Q.    Besides the press release or the documents
8 that you obtained at that conference.
9    A.    Right.
10    Q.    Did you see any other announcements that
11 day regarding the 30-year bond being cancelled?
12    A.    That was the only document I saw that
13 announced it.
14    Q.    Did you ever go on Treasury's website?
15    A.    Sure, I'd go on Treasury's website all the
16 time.
17    Q.    Did you go on the website on October 31st,
18 2001?
19    A.    It's possible.
20    Q.    Do you have any recollection of doing so,
21 though?
22    A.    Boy, I mean -- no, I don't, I don't have a
23 recollection.  Usually I would go on their website to
24 check things that I already had, make sure it was --
25 again, I don't have any recollection.

Alderson Reporting Company
1111 14th Street, NW Suite 400        1-800-FOR-DEPO        Washington, DC 20005

Peter Davis, Jr.                                                                    April 19, 2006

Washington, DC

## Page 238

1   Q.   Were you ever aware of an investigation by
2   the Treasury's Office of Inspector General regarding
3   trading in a 30-year bond on October 31st, 2001?
4   A.   I read about it in The Wall Street Journal
5   some point later that week.
6   Q.   Did you have any involvement in the
7   investigation?
8   A.   I don't think so, no.
9   Q.   You weren't -- were you interviewed by
10  anyone from Treasury?
11  A.   No, I was not.  I mean, a reporter called
12  me up and asked about it, but I was never contacted
13  by Treasury, or had any -- any involvement in the
14  Treasury investigation.
15  MS. WILLIAMS:  Can we go off record for
16  about five minutes?
17  MR. STANCIL:  Sure.
18  THE VIDEOGRAPHER:  Off the record at
19  4:58:09 p.m.
20  (Recess.)
21  THE VIDEOGRAPHER:  Back on the record at
22  5:04:09 p.m.
23  BY MS. WILLIAMS:
24  Q.   Mr. Davis, you stated that you attended
25  the August 1st, 2001 Treasury refunding conference;

## Page 239

1   is that correct?
2   A.   Yes.
3   Q.   What time did that conference start?
4   A.   They all started at 9:00, as I recall.
5   Q.   Did you stay for the entire conference?
6   A.   Yes.
7   Q.   Do you recall if the doors were closed
8   during that conference?
9   A.   Not particularly.  They were open for some
10  of them -- and some of the meetings were open, the
11  doors were opened.  You know, usually there would be
12  a staff person standing there.  And some of them the
13  meetings were closed.  I don't recall in August.
14  Q.   Do you recall who spoke at the August
15  refunding conference?
16  A.   Geez, I don't.
17  Q.   Do you recall whether an embargo was
18  discussed at the conference?
19  A.   There's always an embargo.
20  Q.   Do you know how long the embargo was at
21  the August --
22  A.   I don't recall.  Usually they were ten or
23  15 minutes.
24  MS. WILLIAMS:  Could I have this marked as
25  Exhibit 36.

## Page 240

1   (Davis Exhibit No. 36 was marked for
2   identification.)
3   BY MS. WILLIAMS:
4   Q.   Do you recognize this document?
5   A.   Yes, it's my handwriting, it says August
6   1, '01.  It's notes.  At the bottom it says,
7   embargoed 9:35 a.m.
8   Q.   When did you write these notes?
9   A.   It says -- the date on the notes is August
10  1, 2001, it says, Brian Rosborough who is the
11  Assistant Secretary for Financial Markets spoke.
12  Q.   Spoke where?
13  A.   At the refunding meeting on August 1st.
14  Q.   Do you believe you took these notes during
15  the refunding conference on August 1st, 2001?
16  A.   Yes.
17  Q.   And do you believe that this entry at the
18  bottom, embargo 9:35 a.m., that the embargo expired
19  at 9:35 a.m. on August 1st?
20  A.   Yes, yes.
21  Q.   What did you do immediately after the
22  August 1st, 2001 conference?
23  A.   I walked out and made similar calls to
24  what I did on October 31st.
25  Q.   Do you recall who you called that day?

## Page 241

1   A.   No.  I mean -- I'm sure I called Ward and
2   a few of the others, but I don't have any
3   recollection of who I called.
4   Q.   Do you know if you called Mr. Nothern that
5   day?
6   A.   I don't recall.
7   Q.   I'd like to have these marked as Exhibit
8   37.
9   (Davis Exhibit No. 37 was marked for
10  identification.)
11  BY MS. WILLIAMS:
12  Q.   Do you recognize this document?
13  A.   This is a mobile cell phone Verizon
14  telephone bill for the month -- well, for the month
15  ending August -- I'm not sure exactly when it ends,
16  but it is for August.
17  Q.   The billing date, do you see that at the
18  top, August 19th, 2001?
19  A.   Well, the billing date, that's a term of
20  art by Verizon.  I'm not sure what that means.  I
21  think that's the date they send it out or maybe it's
22  the last date of the calling period.
23  Q.   Can you turn to SEC NOTH 00114098?
24  A.   Yes.
25  Q.   Do you see any calls there that reflect

61 (Pages 238 to 241)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

Page 242

1   the calls you made to clients after the August 1st,
2   2001 quarterly refunding conference?
3       A.   Let's see, yes, starting out on line 11
4   and going through line -- well, I'm not sure, I guess
5   going to line 20 or maybe 21, I'm not sure.
6       Q.   Do you see any calls there reflecting a
7   call to Mr. Nothern on August 1st?
8       A.   On line 20 at 9:39.
9       Q.   How long was that call?
10      A.   12 minutes.
11      Q.   Do you have any recollection of that call
12  today?
13      A.   No.
14      Q.   Who was the first client that you called,
15  can you tell that from looking at this document?
16      A.   Yes, I can. It was always to Ward
17  McCarthy, so that would be line 11 at 9:19 a.m.
18      Q.   And who was line 12, was that a client?
19      A.   Line 12 would be Bill Cohen at Capra.
20      Q.   What about at line 13?
21      A.   It's probably SAC, but I don't remember
22  the number off the top of my head.
23      Q.   And above Mr. Nothern's call, do you
24  recognize any other calls to clients from this
25  record?

Page 243

1       A.   I just don't know the phone numbers well
2   enough now to be able to identify each and every one
3   of those.
4       Q.   What phone did you use to make the calls?
5       A.   Cell phone, it's listed at the top of the
6   page there.
7       Q.   And you said you left the Treasury
8   building when you made these calls?
9       A.   Correct.
10      Q.   Why did you leave the Treasury building on
11  August 1st to make the calls?
12          MR. THEODOROU: Objection.
13          THE WITNESS: Because I was violating the
14  embargo.
15          BY MS. WILLIAMS:
16      Q.   Do you know if in any of these calls to
17  clients that you mentioned the embargo?
18      A.   I don't have any recollection. I mean, I
19  probably did, but I don't have any recollection.
20      Q.   Do you ever recall having a conversation
21  with Mr. Nothern about Treasury war bonds?
22      A.   Yeah, that's right, I did, that's right.
23  You know, I can't swear it was him, but I remember a
24  client asking me to do some research about Treasury
25  war bonds. And I remember doing some research on the

Page 244

1   last time Treasury had issued war bonds, and what
2   the, you know, how they had gone about it. I don't
3   have any recollection who asked me, but I do remember
4   doing the research. And I assume I reported it back
5   and I -- that's all I remember.
6       Q.   Do you know what year you would have done
7   this research?
8       A.   Not -- no, I mean, I don't recall now.
9           I do have a recollection of calling Malvey
10  and asking him about Treasury's experience with war
11  bonds, and whether they had any historical documents
12  I might be able to get, you know, things like that.
13      Q.   Do you recall if Mr. Malvey provided you
14  any information about Treasury war bonds?
15      A.   I don't recall. I don't think he did.
16  I -- I don't recall where I got the information. It
17  was -- I just don't recall. I mean, you know, it was
18  a public source, it was some historical document that
19  I tracked down someplace. In fact, it might have
20  been in a history -- I just --
21      Q.   Let me ask a question going back to this
22  August 1st conference. Did you testify earlier that
23  your intent was not to call clients before the
24  embargo expired after this August 1st conference --
25  after you made the calls in the August 1st, and then

Page 245

1   you made a decision not to call --
2       A.   I sort of came to my senses after these
3   calls and said, geez, I shouldn't be doing this. You
4   know, my memory was jogged by seeing the -- a copy of
5   the agreement with Roger Anderson. As I was going to
6   my car to drive home, I tossed it in the trash, and I
7   sort of said to myself, I'm not doing this anymore.
8       Q.   But you said that the -- and I'm only
9   going to ask a couple of questions. At the October
10  31st, 2001 meeting, when you heard the information
11  about the 30-year bond, you got mad?
12      A.   Right.
13      Q.   And you decided that you were going to
14  call your clients?
15      A.   That's right.
16      Q.   Did you think that your clients would be
17  surprised by this information?
18      A.   Yes, in fact, the reason I was mad I felt
19  Treasury had misled the market for political reasons.
20      Q.   Did you ever have any conversations with
21  Mr. Nothern regarding any sources that you had at
22  Treasury?
23          MR. THEODOROU: Objection.
24          THE WITNESS: No.
25          BY MS. WILLIAMS:

62 (Pages 242 to 245)

Peter Davis, Jr.                                                                    April 19, 2006

Washington, DC

Page 246

1    Q.   No contacts that you had at Treasury?
2    A.   I mean, obviously he attended the meeting
3 I set up, we talked about earlier. But I -- no, when
4 I deal with clients, I don't convey sources
5 typically. I mean, usually I'm just saying, hey, I
6 found this out, I found that out. And I don't say
7 where I got it. I just say, you know, this is what I
8 understand's going to happen. And that's it.
9    Q.   Do your clients ever ask you where the
10 source of the information came from?
11   A.   Sure, sometimes they do.
12   Q.   If they did, would you disclose the
13 source?
14   A.   No, unless it's a public -- I mean,
15 sometimes sources will have said something in a
16 public setting, where maybe it didn't get picked up
17 by the media, for example. And I was there and so,
18 you know, then I would feel that was okay to quote
19 somebody in a setting like that.
20   Q.   You were just saying that you -- and I
21 know I'm skipping around a little bit, and I'm sorry.
22 I'm just coming to end here.
23   A.   Sure, sure, sure.
24   Q.   You said that on October 31st you felt
25 that Treasury had misled the market; is that right?

Page 247

1    A.   Right.
2    Q.   And how do you believe they misled the
3 market?
4    A.   By -- I mean, before every quarterly
5 refunding meeting, Treasury officials meet with
6 certain people on Wall Street, they meet with the
7 advisory committee, which is composed of key people
8 from Wall Street, you know, people from the bond
9 market who they are selling all this debt to.
10       And for at least a year and a half, the
11 market had been expecting Treasury to announce the
12 cessation of the 30-year bond, but when the -- over
13 the summer of 2001, when it became clear that the
14 deficit was turning around and going up, and I was
15 one of the first people to say that that was
16 happening, you know, for them to then announce in
17 October, at the end of October, when the deficit was
18 clearly going up, there was no doubt.
19       And so the whole view of the market had
20 changed and Treasury knew it, and they still went out
21 and announced the cessation of the 30-year bond, in
22 my opinion, as a guise to show their confidence that
23 the deficit wasn't really going up. But in fact,
24 that's when the deficit started going straight up.
25 It grew at very rapid rates thereafter.

Page 248

1    Q.   Did you think this information would
2 impact your client's business?
3        MR. THEODOROU: Objection.
4        THE WITNESS: I wasn't -- it was going to
5 affect the market. I had no idea whether it was
6 going affect them, or whether they were even going to
7 use it.
8    BY MS. WILLIAMS:
9    Q.   To the extent that any of your clients, if
10 any of them traded in that market, do you think it
11 would have affected their business?
12       MR. THEODOROU: Objection.
13       THE WITNESS: That's speculative, that's
14 speculative. I never knew what my clients were
15 doing. You know, clients have never shared trades
16 with me, I never know what they are trading.
17   BY MS. WILLIAMS:
18   Q.   My question is a little different, though.
19 If a client traded in that market, you said that this
20 would affect the market, do you think that it would
21 affect the client's business?
22       MR. THEODOROU: Objection.
23   BY MS. WILLIAMS:
24   Q.   Since they traded in that market?
25       MR. THEODOROU: Objection.

Page 249

1        THE WITNESS: It's possible, but you
2 know, you never know whether they are long or short,
3 you never know what they are in, who knows. I mean,
4 you know, it certainly could have, but I had no way
5 of knowing whether it did.
6    BY MS. WILLIAMS:
7    Q.   Before today, when is the last time you
8 talked to Mr. Nothern?
9    A.   Geez, I don't recall. I mean, looking at
10 some of these phone records, I guess it was in
11 September, but I know I didn't talk to him on October
12 31st and I certainly have not ever talked to him
13 since.
14   Q.   You don't believe you've spoken to him
15 since October 31st?
16   A.   If he was the person who asked about the
17 war bonds it's possible that I conveyed that
18 information shortly -- some other time after that.
19 But I don 't, I don't clearly -- I don't recall. I
20 mean -- and if we talked after October 31st, it was
21 not about anything to do with the 30-year bond or any
22 of that.
23   Q.   Do you know when MFS ceased to be a client
24 of Davis Capital?
25   A.   I'm not sure. It was some time late 2001

63 (Pages 246 to 249)

Peter Davis, Jr.                                                    April 19, 2006

Washington, DC

## Page 250

1   or early 2002, but I don't recall.
2       Q.   Do you know if between October 31st and
3   when MFS ceased to be a client, if you still sent
4   Mr. Nothern E-mails, like the mass E-mails?
5       A.   You know, I would usually keep people on
6   E-mail lists even after they left.  It might
7   possibly -- you know, on the hope that they might
8   come back or something like that.  I mean, it
9   didn't -- you know, if somebody wrote me a letter and
10  said we're no longer going to require your services
11  or something, then I would usually get around to
12  removing their E-mail addresses within a month or
13  two.
14      Q.   Before today, did you have any contact
15  with Mr. Nothern's counsel from Foley Hoag?
16      A.   This is the first time I've ever seen him.
17          MR. THEODOROU:  It was a grand time.
18          MS. WILLIAMS:  I have no further
19  questions.
20          MR. THEODOROU:  I do have quite a few
21  questions.  I thought maybe we'd break today and
22  start tomorrow morning.
23          MS. WILLIAMS:  That's fine with me.
24          MR. THEODOROU:  We'll start the cross
25  tomorrow.

## Page 251

1           THE VIDEOGRAPHER:  This concludes today's
2   portion of the deposition of Peter Davis.  Off the
3   record at 5:24:10 p.m. on April 19th, 2006 consisting
4   of five videotapes.
5           (Whereupon, at 5:24 p.m., the deposition
6   adjourned to be resumed on April 20, 2006, at 9:30
7   a.m.)
8
9
10          _____
11              Signature of the Witness
12
13  SUBSCRIBED AND SWORN to before me this _____ day
14  of _____, 200__.
15
16          _____
17              NOTARY PUBLIC
18  My Commission expires: _____
19
20
21
22
23
24
25

64 (Pages 250 to 251)

Peter Davis, Jr.                                                April 20, 2006
                            Washington, DC

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3      - - - - - - - - - - - - - - X

 4    UNITED STATES SECURITIES AND   :

 5    EXCHANGE COMMISSION,           :

 6              Plaintiff,           :

 7       v.                          :   Civil Action No.

 8    STEVEN E. NOTHERN,             :   05-10983(NMG)

 9              Defendant.           :   VOL. II

10      - - - - - - - - - - - - - - X

11                           Washington, D.C.

12                           Thursday, April 20, 2006

13              Continued videotape deposition of PETER

14    DAVIS, JR., a witness herein, recalled for further

15    examination by counsel for the Defendant in the

16    above-entitled matter, pursuant to notice and

17    subpoena, the witness being previously sworn by

18    PENNY M. DEAN, a Notary Public in and for the

19    District of Columbia, taken at the offices of U.S.

20    Securities and Exchange Commission, 100 F Street, NE,

21    Washington, D.C., at 9:44 a.m., Thursday, April 20,

22    2006, and the proceedings being taken down by

23    Stenotype by PENNY M. DEAN, RPR, and transcribed

24    under her direction.

25
```

Peter Davis, Jr.                                                April 20, 2006
Washington, DC

---

**Page 253**

```
1   APPEARANCES:
2
3      On behalf of the Plaintiff:
4         ERICA Y. WILLIAMS ESQ.
5         JOHN J. ROSSETTI, JR. ESQ.
6         U.S. Securities and Exchange Commission
7         100 F Street, NE
8         Washington, D.C.  20549-4010
9         (202) 551-4450
10        (202) 551-4819
11
12     On behalf of the Defendant:
13        NICHOLAS THEODOROU, ESQ.
14        ROBERT TOONE, ESQ.
15        Foley Hoag, LLP
16        Seaport World Trade Center West
17        155 Seaport Boulevard
18        Boston, MA  02210-2600
19        (617) 832-1000
20
21
22
23
24
25
```

**Page 254**

```
1   APPEARANCES (Cont):
2
3      On behalf of the Witness:
4         MARK STANCIL, ESQ.
5         Baker Botts, LLP
6         The Warner
7         1299 Pennsylvania Avenue, NW
8         Washington, D.C.  20004-2400
9         (202) 639-7894
10
11  ALSO PRESENT:
12     Michael Luetbecker, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 255**

```
1              C O N T E N T S
2   WITNESS         EXAMINATION BY COUNSEL FOR
3   PETER DAVIS, JR.    PLAINTIFF   DEFENDANT
4   By Mr. Theodorou              257
5   By Ms. Williams        336
6
7            E X H I B I T S
8   DAVIS EXHIBIT NO.            PAGE NO.
9   38  E-Mail from John Youngdahl, Goldman   311
10      Sachs 7/12/01
11  39  Letter to A.B. Sporkin, Branch Chief,   324
12      Securities and Exchange Commission
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 256**

```
1            P R O C E E D I N G S
2        THE VIDEOGRAPHER:  Here marks the
3   beginning of volume number II in the videotaped
4   deposition of Peter Davis, taken by counsel for the
5   defendant in the matter of the United States
6   Securities and Exchange Commission versus
7   Steven E. Nothern in the United States District Court
8   for the District of Massachusetts, Boston Division,
9   Civil Action Number 05-10983 (NMG).
10       This deposition is being held in the
11  offices of Securities and Exchange Commission located
12  at 100 F Street, Northeast in Washington D.C. on this
13  date, April 20th, 2006.
14       The time indicated on the video screen,
15  9:44:58.
16       My name is Michael Luetbecker.  I'm the
17  legal video specialist.  The court reporter today is
18  Penny Dean, we are employed by Alderson Reporting.
19       Counsel will now introduce themselves and
20  the parties they represent, after which the court
21  reporter will administer the oath to the witness.
22       MR. THEODOROU:  Nicholas Theodorou, Foley
23  Hoag, Boston, Mass, representing the defendant,
24  Steven Nothern.
25       MR. TOONE:  Robert Toone, Foley Hoag of
```

2 (Pages 253 to 256)

Peter Davis, Jr.                                                                                          April 20, 2006

Washington, DC

## Page 257

1  Boston representing the defendant, Steven Nothern.
2      MS. WILLIAMS:  Erica Williams representing
3  the United States Securities and Exchange Commission.
4      MR. ROSSETTI:  Jonathan Rossetti
5  representing the United States Commission, in the
6  United States Securities and Exchange Commission as
7  well.
8      MR. STANCIL:  Michael Stancil, Baker
9  Botts, Washington, D.C. representing Peter Davis.
10 Whereupon,
11         PETER DAVIS, JR.,
12 was called as a witness by counsel for Defendant, and
13 having been previously duly sworn by the Notary
14 Public, was examined and testified further as
15 follows:
16     EXAMINATION BY COUNSEL FOR DEFENDANT
17     BY MR. THEODOROU:
18     Q.  Good morning, Mr. Davis -- oh, I think I
19 was going to indicate that he's still under oath.
20     Good morning, Mr. Davis, my name is Nick
21 Theodorou.  I represent Mr. Nothern in this matter as
22 you know.  And this is a continuation of your
23 deposition that started yesterday on April 19th.  You
24 remain under oath during this deposition.
25     I will be asking you several questions

## Page 258

1  this morning.  If you have a problem understanding
2  any questions, you can ask me to clarify them.  If
3  there is something that you want -- where you want to
4  consult with your counsel, you may consult with your
5  counsel if we're dealing with any privilege matters
6  or work product.
7      If you think at any point you need a break
8  in the deposition, just tell me and we'll move on
9  from there.
10     The stipulations that are in effect are
11 the same as yesterday.
12     Ms. Williams?
13     MS. WILLIAMS:  Yes.
14     MR. THEODOROU:  That is all objections
15 except as to matter of form, including motions to
16 strike, including objections to hearsay are reserved
17 until the time of trial.
18     In terms of the exhibits, the parties have
19 agreed we will continue with the numerical order of
20 the exhibits from yesterday.  So you have those
21 before you, Mr. Davis.
22     THE WITNESS:  Yes, I do.
23     BY MR. THEODOROU:
24     Q.  Do you understand what I just said?
25     A.  Yes.

## Page 259

1      Q.  Great.  Mr. Davis, yesterday you were
2  asked by Ms. Williams about agreements that you may
3  have had with the Treasury Department regarding
4  confidentiality and maintaining the confidentiality
5  of information that you obtained from the Treasury
6  Department, do you remember that?
7      A.  Yes.
8      Q.  All right.  Other than the agreement you
9  testified about yesterday, that is an agreement with
10 Mr. Anderson, did you have any other kind of
11 agreement with the Treasury Department regarding
12 confidentiality of information?
13     A.  No.
14     Q.  Could you have any agreement with an
15 official at the Department of the Treasury regarding
16 confidentiality of information as opposed to simply
17 the Department of the Treasury?
18     A.  Oh --
19     MS. WILLIAMS:  Objection.
20     THE WITNESS:  The agreement I signed was
21 with the Treasury Department, not with any particular
22 official.
23     BY MR. THEODOROU:
24     Q.  Okay.  Did you have any agreement
25 concerning confidentiality of Treasury Department of

## Page 260

1  information with any other department other than the
2  Department of Treasury?
3      MS. WILLIAMS:  Objection.
4      THE WITNESS:  No.
5      BY MR. THEODOROU:
6      Q.  All right.  So the only agreement you had
7  was one agreement, correct?
8      A.  One agreement with the Department of
9  Treasury, signed in Roger Anderson's office some time
10 in 1994.
11     Q.  1994.
12     Now, when you met with Mr. Anderson, did
13 you -- did he discuss the terms of the agreement with
14 you?
15     A.  Very briefly and in a cursory fashion.  I
16 remember taking some time to attempt to read the
17 whole thing with fine print and front and back of one
18 page.  I skimmed it and basically he said if you want
19 him to get into these meetings, to get the charts,
20 you have to agree to not divulge the information
21 until the embargo time; I said fine and signed it.
22     Q.  And the agreement was one page with two
23 sides filled in?
24     A.  Yes.
25     Q.  So the agreement actually was two pages?

3 (Pages 257 to 260)

Peter Davis, Jr.                                                                April 20, 2006
Washington, DC

Page 261

1    A.  Right.
2    Q.  In one document?
3    A.  Yes.
4    Q.  So it had a front side that had writing it
5    on and a second side?
6    A.  That's right.  And it seemed to be a form,
7    it wasn't even necessarily a Treasury form and it had
8    some blanks to fill in.
9    Q.  Did the agreement mention embargo in it?
10   A.  Whew.
11        MS. WILLIAMS:  Objection.
12        MR. STANCIL:  If you recall.
13        THE WITNESS:  I don't recall.
14        BY MR. THEODOROU:
15   Q.  Did you review the agreement before you
16   signed it?
17   A.  I took three or four minutes to read it in
18   a cursory fashion, but said I was to keep the
19   information I received confidential and it mentioned
20   some U.S. code sections, if I didn't and I signed it,
21   that was it.
22   Q.  So the agreement as best you can recall
23   said what?
24   A.  That I --
25        MS. WILLIAMS:  Objection, sorry.

Page 262

1        THE WITNESS: -- was to withhold, divulging
2    any information that I obtained from the quarterly
3    refunding meetings, you know, until it was authorized
4    for public release.
5        BY MR. THEODOROU:
6    Q.  Did the agreement define what embargo
7    meant?
8        MS. WILLIAMS:  Objection.
9        THE WITNESS:  Not that I recall.
10        MR. STANCIL:  Make sure you -- wait for
11   him to finish the question, give her a chance --
12        MR. THEODOROU:  We have plenty of time,
13   don't worry about it.  Listen to the question and
14   then you can answer it.
15        BY MR. THEODOROU:
16   Do you remember the agreement defining
17   embargo?
18        MS. WILLIAMS:  Objection.
19        THE WITNESS:  I don't recall seeing the
20   word embargo in the agreement, there was no
21   definition section, there was -- I just don't recall
22   that much about the agreement.
23        BY MR. THEODOROU:
24   Q.  Were you the only party whose signature
25   appears in the agreement?

Page 263

1    A.  Anderson signed it, I signed it and he had
2    an assistant there who signed it as a witness.
3    Q.  And do you remember who that assistant
4    was?
5    A.  No.
6    Q.  How long did the meeting with Mr. Anderson
7    last?
8    A.  Ten minutes.
9    Q.  Did you obtain a copy of the agreement
10   after you signed it?
11   A.  Yes.
12   Q.  After you got the agreement, what did you
13   do with it?
14   A.  Took it back to my office and filed it.
15   Q.  Was there a particular file that you put
16   it in?
17   A.  It was a file folder, it was -- years
18   later I discovered it wasn't even marked, it was just
19   a blank file folder sitting next to my quarterly
20   refunding file.
21   Q.  Did you ever show that agreement to
22   anybody else?
23   A.  No.
24   Q.  Did you discuss the contents of that
25   agreement with anybody else?

Page 264

1    A.  No.
2    Q.  So it's fair to say you never discussed
3    the contents of that agreement with Mr. Nothern,
4    correct?
5    A.  Correct.
6    Q.  Where was the agreement signed?
7    A.  On the back, on the second page, bottom of
8    the second page.
9    Q.  Physically where were you when at the time
10   when you signed it?
11   A.  In Roger Anderson's office at the Treasury
12   Department.
13   Q.  Did you ever discuss the existence of the
14   agreement with anybody else?
15   A.  No.
16   Q.  So that it is fair to say you didn't
17   discusses the existence of that agreement with your
18   customers?
19   A.  No.
20   Q.  And you never discussed the existence of
21   the agreement with Mr. Nothern, correct?
22   A.  Correct.
23   Q.  Did you ever tell your customers what
24   embargo meant?
25   A.  No.

4  (Pages 261 to 264)

Peter Davis, Jr.                                          April 20, 2006
Washington, DC

| Page 265 | Page 267 |
|---|---|

**Page 265**

1    Q.   So you never told Mr. Nothern what embargo
2  meant?
3    A.   That's right, it just never came up.
4    Q.   Now, yesterday you were asked -- you were
5  asked several questions about your dealings with
6  Treasury and I just want to clarify some of them.
7  And so if we could proceed in chronological fashion
8  that would be great.
9        When was the first time that you ever
10  entered the Treasury building as a consultant?  I
11  understand this may be difficult to a specific
12  recollection, but approximately when was the first
13  time you entered the Treasury Department as a
14  consultant?
15    A.   You mean after I started my own business,
16  not when I was working for Prudential, not when I was
17  working on the Hill?
18    Q.   Yes, actually when you started your own
19  business, I want to focus on that.
20    A.   Okay.  I mean, I was in that building so
21  often it's hard to pick out a first time.  I mean I
22  co founded a professional group of the tax economists
23  in Washington and we would meet regularly at Treasury
24  every two weeks, throughout that whole period, so I
25  don't recall the specific time, but I mean I was in

**Page 266**

1  that building for that professional group meetings on
2  Wednesday morning every other week, they weren't
3  always at Treasury, sometimes they were at other
4  locations, but once in a while they were at Treasury.
5        I would often come down to visit with
6  people at Treasury when I was in the area, I just
7  call up and say, hey, can I come in and pick up that
8  report you just put out on the tax bill or something,
9  these were in the days before the web, so it was
10  important to physically retrieve documents.
11    Q.   When did you start that group of
12  economists?
13    A.   In 1983, just before I left the Senate
14  Budget Committee, it's called the Tax Economists
15  Forum.
16    Q.   Did you have to get any credentials to
17  enter the Treasury Department for those meetings?
18    A.   No.
19    Q.   Did you have to get prior approval to
20  enter the Treasury Department for those meetings?
21    A.   Um, there came a time when I did, I don't
22  remember when that started.  It used to be, just like
23  the Capitol, you could just walk into it.  At some
24  point in the '90s, security started tightening up, I
25  don't recall exactly when that was.  At some point in

**Page 267**

1  the late '80s or '90s, you had to call ahead to get
2  put on the Secret Service computer and get a badge
3  when you entered the building.  I don't recall when
4  that procedure was initiated.
5    Q.   Now, other than the meetings for the
6  economists where at some point had you to get a
7  badge, did you have to get a badge for other meetings
8  at the Treasury Department?
9    A.   Well, whenever they instituted that
10  system, I had to get a badge for every meeting.
11    Q.   Did you have a badge for the refunding
12  conferences?
13    A.   Yes.
14    Q.   And again when did you start attending
15  refunding conferences?
16    A.   To the best of my recollection, sometime
17  in 1994, I don't recall which -- whether it was the
18  May or August or even the November meeting, it was
19  some time that year.
20    Q.   And why did you again start attending
21  those refunding conferences?
22    A.   For the sole purpose to be able to get
23  copies of what's called a chart book and other
24  documents associated with refunding, which become
25  public documents when the meeting is concluded and

**Page 268**

1  the embargo time expires.  And I had been going to
2  pick up those public documents at the messenger
3  window and sometimes they didn't have them and so I
4  was told that the only way I could be sure to be able
5  to get the documents when they became public was to
6  start attending the meetings.
7    Q.   And who told you that?
8    A.   I think it was Lulu Tyler, but I couldn't
9  swear to it, it was an assistant to Roger Anderson or
10  possibly Paul Malvey, whoever I was dealing with to
11  get the documents.
12    Q.   After she told you that or someone else
13  told you that, what did you do?
14    A.   Well, at her suggestion, I wrote a letter
15  to Roger Anderson and requested authorization to
16  attend the meetings for the purpose of getting the
17  documents.
18    Q.   Mr. Anderson's position in 1994 was what?
19    A.   Assistant secretary for I think it was
20  financial markets or public finance or I forget the
21  exact title.
22    Q.   Did you know him before you met with him?
23    A.   I met him maybe twice at public meetings
24  where he had spoken or say at the National
25  Association of Business Economists meetings where he

5 (Pages 265 to 268)

Peter Davis, Jr.                                                                                      April 20, 2006
Washington, DC

| Page 269 | Page 271 |
|---|---|
| 1 spoke.<br>2    Q.  And how soon after you sent your letter?<br>3 Actually -- strike that.<br>4       Do you remember when you sent the letter?<br>5    A.  It was some time in 1994, a month or two.<br>6 I don't know, it was some -- I went to pick up<br>7 documents, I couldn't get them, I called up asking<br>8 for them, I still couldn't get them and then was told<br>9 well, maybe you should start attending the meetings,<br>10 when that happened I just wrote a letter to him.<br>11    Q.  How soon after you wrote the letter did<br>12 you meet with Mr. Anderson?<br>13    A.  I got a call from him a few days later and<br>14 was told if I wanted to attend the meetings to come<br>15 on down and meet with him briefly to sign a<br>16 confidentiality agreement and so I did that, we<br>17 made -- we made an arrangement to do that the next<br>18 day or the day after.<br>19    Q.  Other than yourself, do you know ever<br>20 anybody else whoever signed one of these<br>21 confidentiality agreements?<br>22    A.  As far as I know, I'm the only one. I<br>23 mean, I never saw anybody attending those meetings<br>24 except Prudential Press and me.<br>25    Q.  And after you speak to Mr. Anderson, you | 1      MS. WILLIAMS: Objection.<br>2      THE WITNESS: I don't recollect whether it<br>3 specifically mentioned Treasury refunding meetings or<br>4 not, it -- it had some language about certain<br>5 meetings at Treasury, but I don't recall how well<br>6 identified they were in the document.<br>7      BY MR. THEODOROU:<br>8    Q.  Well, let me ask a series of questions,<br>9 maybe it will refresh your recollection.<br>10    A.  Sure, sure.<br>11    Q.  My first question was, do you remember if<br>12 it just applied to refunding conferences?<br>13    A.  I don't recall.<br>14      MS. WILLIAMS: Objection.<br>15      BY MR. THEODOROU:<br>16    Q.  Do you remember if it applied to all<br>17 Treasury meetings?<br>18      MS. WILLIAMS: Objection.<br>19      THE WITNESS: I don't recall it being that<br>20 broad.<br>21      BY MR. THEODOROU:<br>22    Q.  Okay. Do you remember if it applied to<br>23 all Treasury information disclosed to you in any<br>24 context by anybody at Treasury?<br>25      MS. WILLIAMS: Objection. |

| Page 270 | Page 272 |
|---|---|
| 1 then met with him in the meeting you just testified<br>2 about yesterday and today?<br>3    A.  That's correct.<br>4    Q.  Did Mr. Anderson say anything about other<br>5 people signing this kind of an agreement at that<br>6 meeting?<br>7    A.  He didn't say anything like that.<br>8    Q.  Do you know if members of the press signed<br>9 this agreement?<br>10    A.  I have no idea.<br>11    Q.  Did Mr. Anderson -- I'll get to that.<br>12      Did that agreement just apply to you?<br>13      MS. WILLIAMS: Objection.<br>14      THE WITNESS: I assumed it did. I mean it<br>15 had a blank for Anderson's name as the authorizing<br>16 officer to, you know, and it had a blank for my name<br>17 and, you know, it went through all this legalese and<br>18 at the end it had places for signature.<br>19      BY MR. THEODOROU:<br>20    Q.  You testified earlier that you reviewed<br>21 the agreement before you signed it?<br>22    A.  That's correct.<br>23    Q.  Did the agreement only apply to a<br>24 particular Treasury refunding conference or to the<br>25 Treasury refunding conference? | 1      THE WITNESS: It -- it didn't, it was not<br>2 that -- it didn't say that.<br>3      BY MR. THEODOROU:<br>4    Q.  Okay. So it wasn't that broad.<br>5    A.  It was -- it was defined. I just can't<br>6 recall with specificity how well it was defined.<br>7    Q.  Now I'd like to ask you what your<br>8 understanding of what your duties were under the<br>9 agreement were.<br>10    A.  Right.<br>11    Q.  What did you agree to do under that<br>12 agreement or not to do?<br>13    A.  I agreed as a condition of attending the<br>14 Treasury refunding meetings to keep confidential the<br>15 information I received at those meetings until they<br>16 were authorized for public disclosure and I don't<br>17 recall the document using the word embargo, it had<br>18 some other language.<br>19    Q.  Did Mr. Anderson mention the word embargo<br>20 to you?<br>21      MS. WILLIAMS: Objection.<br>22      THE WITNESS: I don't recall that he did.<br>23 I mean, I don't recall the word embargo in the<br>24 document or in the conversation or in the discussion.<br>25 It was a ten-minute meeting. |

6 (Pages 269 to 272)

Peter Davis, Jr.                                                                April 20, 2006

Washington, DC

## Page 273

1      BY MR. THEODOROU:
2      Q.  Do you recall whether Mr. Anderson defined
3  for you what embargo meant under Treasury
4  regulations?
5          MS. WILLIAMS:  Objection.
6          THE WITNESS:  That definitely did not
7  happen.
8          BY MR. THEODOROU:
9      Q.  Did anyone at Treasury ever explain to you
10  what the term embargo means in the context of
11  Treasury press conferences?
12          MS. WILLIAMS:  Objection.
13          THE WITNESS:  No, just -- it just didn't
14  happen.
15          BY MR. THEODOROU:
16      Q.  Did anyone ever explain to you what the
17  term embargo meant in the context of refunding
18  conferences?
19          MS. WILLIAMS:  Objection.
20          THE WITNESS:  No.
21          BY MR. THEODOROU:
22      Q.  Now, yesterday do you remember you
23  testified that by working in government, you came to
24  understand generally what embargo meant.
25      A.  That's correct.

## Page 274

1      Q.  All right.  Isn't it true that embargo has
2  different definitions for different government
3  agencies under the regulations?
4          MS. WILLIAMS:  Objection.
5          THE WITNESS:  I'm not familiar with
6  regulations, but I am aware of different kinds of
7  embargoes.
8          BY MR. THEODOROU:
9      Q.  All right.  What different kinds of
10  embargoes are you aware of if based on your
11  experience in government?
12      A.  Some of them are very stringent like at
13  the Bureau of Labor and Statistics when they release
14  the CPI or the employment data, they actually take
15  reporters into the room and lock it up and they don't
16  open the door until a certain time.
17          On the Hill, we would actually receive,
18  regularly receive confidential government documents
19  like the President's budget or his tax proposals,
20  like a day before it was authorized for public
21  release.
22          It would say Printed on the front of it,
23  embargoed until Monday at Noon or a date in time and
24  we would be walking around openly discussing that
25  among ourselves in the hearing rooms and the hallways

## Page 275

1  of Congress for that all day until it was publicly
2  released, and so obviously that was a little looser
3  embargo and in the sense that it was released on sort
4  of the background basis so that when we held the
5  hearing with the Secretary of Treasury, you know, I
6  was responsibility for those hearings at the Senate
7  Budget Committee, so, you know, that way I could
8  write questions for the chairman of the committee to
9  ask the Secretary when he came up.
10          And sometimes maybe I had to consult with
11  some experts, somewhere else on the Hill about how to
12  formulate that question, by just asking that it was
13  sort of cross, you know, possibly crossing a line
14  because I wasn't divulging necessarily what was in
15  the budget but by the nature of the question, maybe
16  somebody could figure it out.  There were various
17  gradations of confidentiality.
18      Q.  Can you think of any other instances
19  besides the one you just described and the one
20  relating to the Department of Labor where there may
21  be differences in what embargo meant within the
22  government?
23          MS. WILLIAMS:  Objection.
24          THE WITNESS:  Well, you know, another
25  thing that would happen fairly regularly would be

## Page 276

1  that when we were about to release a conference
2  agreement on the tax bill which is the public
3  disclosure of the final details of a tax bill, when I
4  worked on the Joint Committee on Taxation, there
5  would be a briefing for the Press and it would be
6  embargoed for a certain time and not always, but
7  sometimes the Press would have questions, I mean
8  they'd write the story, they'd ship it back to their
9  editors at the paper, the editors would read it and
10  rewrite it and then come back with a whole bunch
11  questions.
12          A lot of the times the questions were
13  regarding the revenue cost provision, which was one
14  of the things that the agreement would identify and
15  I'd get questions about those numbers because I
16  created them or I was the economist who formulated
17  them on the computer model that I used, so I'd get
18  calls from people, from Press before the embargo time
19  saying what does that mean and amplifying on it so
20  they could get the story right before they released
21  it.
22          Now, I have no way of knowing whether they
23  honored that embargo or not.  Actually I can think of
24  a few instances where papers decided to go ahead and
25  publish some information because a member of Congress

7  (Pages 273 to 276)

Peter Davis, Jr.                                                                April 20, 2006

Washington, DC

---

### Page 277

1  had walked out of the meeting and started talking
2  publicly about it and then the paper decided because
3  of that the embargo no longer applied and that
4  happened all the time too.
5          And so when I was a staffer on the Hill,
6  there were always gray areas about what should be
7  released when. But when someone called me up and I
8  knew they were writing a story that was going on the
9  front page after major newspaper, I always felt I was
10  under an obligation to make sure that reporter
11  understood, because once they published something
12  wrong, it creates huge problems.
13          There were many instances where
14  information from the President's budget and
15  information for tax bills were publicly disclosed by
16  newspapers in advance of embargo time where a public
17  official had disclosed it first. And so, you know,
18  sometimes I didn't know whether the public official
19  had disclosed it or not and, you know, that put me in
20  an uncomfortable position, so I'd take a message and
21  I would call up to the front office and find out,
22  hey, is this divulged yet or not.
23          BY MR. THEODOROU:
24      Q.   So in your experience there on the Hill,
25  there was a wide variation how different government

### Page 278

1  agencies used that term embargo; is that right?
2          MS. WILLIAMS: Objection.
3          THE WITNESS: That's correct. And no
4  where in my experience did I ever see a clear legal
5  definition that I was presented with on the Hill or
6  Treasury or anywhere else.
7          BY MR. THEODOROU:
8      Q.   And you never provided any kind of
9  definition of what embargo meant in the context of
10  refunding conferences to your customers; is that
11  right?
12      A.   That's right.
13          MS. WILLIAMS: Objection.
14          BY MR. THEODOROU:
15      Q.   Including not providing anything to
16  Mr. Nothern about what embargo meant?
17          MS. WILLIAMS: Objection.
18          THE WITNESS: That's right.
19          BY MR. THEODOROU:
20      Q.   Under the agreement you testified about
21  yesterday and today with Mr. Anderson, what was your
22  understanding of when your duty not to disclose the
23  information ended? In other words, when could you
24  disclose?
25      A.   My understanding was it was at the end of

### Page 279

1  each of those meetings, someone would stand up and
2  say okay, here's the time at which you can disclose
3  this, here's the embargo time.
4      Q.   Okay.
5      A.   So they would announce a time.
6      Q.   Did you --
7      A.   I was supposed to keep it confidential
8  until that time.
9      Q.   Did you ever tell any of your customers
10  what embargo time meant?
11      A.   No.
12      Q.   So it's fair to say you didn't tell
13  Mr. Nothern about what it meant by embargo time?
14          MS. WILLIAMS: Objection.
15          THE WITNESS: Correct.
16          BY MR. THEODOROU:
17      Q.   You also never said anything else --
18  excuse me -- strike that.
19          Strike my own inability to form the
20  sentence.
21          You never -- you also never sent anything
22  out in writing that provided a definition of what
23  embargo time meant, correct?
24      A.   Correct.
25          MS. WILLIAMS: Objection.

### Page 280

1          THE WITNESS: That's correct.
2          BY MR. THEODOROU:
3      Q.   So let me see if I've got this right.
4          Was it your understanding if an embargo
5  ended at 10:00 a.m., you were free to disclose it at
6  one second after 10:00 a.m.?
7      A.   That's correct.
8          MS. WILLIAMS: Objection.
9          BY MR. THEODOROU:
10      Q.   Who did the embargo in the con -- what was
11  your understanding as to who the embargo -- strike
12  that.
13          What was your understanding as to who was
14  bound by the embargo refunding conferences?
15      A.   My understanding was it was I mean just
16  from watching it happen was that it applied to me and
17  to the Press who were present.
18      Q.   So everyone in the Press who attended; is
19  that right?
20      A.   Right.
21      Q.   It applied to you?
22      A.   Right.
23      Q.   Did it apply to every one who attended the
24  conference?
25      A.   I assumed the Treasury officials would not

---

8 (Pages 277 to 280)

Peter Davis, Jr.

April 20, 2006

Washington, DC

| Page 281 | Page 283 |
|---|---|
| 1 disclose it before the time and of course members of | 1 the quarterly refundings and all that information all |
| 2 the Treasury Borrowing Committee would be sitting | 2 the way back I think to '95. |
| 3 there and I assumed that they had some sort of | 3    Q.  And where is Capra Asset Management |
| 4 agreements as a condition of being part of that | 4 located. |
| 5 committee to honor that also. | 5    A.  They are in Rye, New York. |
| 6    Q.  And what is the Borrowing Committee? | 6    Q.  Besides the borrowing committee, who else |
| 7    A.  It's composed of leading Wall Street | 7 would attend the refunding conference? |
| 8 investors who are the main purchasers and marketers | 8    A.  Well, various Press members, there was |
| 9 of Treasury debt. | 9 myself and then there would be various Treasury |
| 10    Q.  Now, do you know if they have an agreement | 10 officials and staff. |
| 11 with Treasury like you did? | 11    Q.  Now, I may have asked this. Do you know |
| 12    A.  I've never seen one or heard of one so I | 12 if the Press members signed a confidentiality |
| 13 can't say, but -- I always assumed there must have | 13 agreement like yours? |
| 14 been one for them. | 14    A.  I've never seen one, I have no idea. |
| 15    Q.  In October of 2001, do you know who some | 15    Q.  Did you know members of the Press? |
| 16 of the members of the committee were? | 16    A.  Well, sure. |
| 17    A.  Geez. I could name a few of them, I | 17    Q.  Do you remember who were some of the Press |
| 18 think. My problem -- the haziness of my recollection | 18 members who attended the October 2001 conference? |
| 19 is were they members earlier and had they gone off or | 19    A.  Hmm, it's hard to say for sure because I'd |
| 20 were they there at that particular meeting in | 20 see most of them most of the time at most of the |
| 21 October. I think Jim Capra of Capra Asset was a | 21 quarterly refunding meetings. |
| 22 chair. | 22     My recollection about who specifically was |
| 23    Q.  He was one of your customers. | 23 at that particular meeting, it's hard to say. I'm |
| 24     MS. WILLIAMS: Objection. | 24 blanking on the name of the one guy who I'm pretty |
| 25     BY MR. THEODOROU: | 25 sure was there. |

| Page 282 | Page 284 |
|---|---|
| 1    Q.  Correct? | 1     It will come to me in a second, he worked |
| 2    A.  Correct. I think Dan Ahearn was there. | 2 for the G-7 group now. It will come to me. |
| 3    Q.  Dan Ahearn. How do you spell Ahearn? | 3    Q.  Did they use sign-in sheets for these |
| 4    A.  A-h-e-a-r-n. | 4 conferences? |
| 5    Q.  From where? | 5    A.  No. |
| 6    A.  I forget the name of the firm he worked | 6    Q.  Do you remember a reporter named Brian |
| 7 for, he used to work for Wellington but he didn't at | 7 Collins? |
| 8 that time. Those are the only ones I could name. | 8    A.  Vaguely, the name sounds familiar if I saw |
| 9 You know, there does exist -- every quarterly | 9 a picture I might recognize him, but, you know, I was |
| 10 refunding meeting would issue the minutes of the | 10 not a close -- I didn't know him well for sure, I |
| 11 meeting of that advisory committee and it would list | 11 might recognize him. |
| 12 every member of the committee who attended. | 12    Q.  He worked for National Mortgage News, does |
| 13    Q.  And the minutes are public? | 13 that ring any bell? |
| 14    A.  Yes, they are public information. | 14    A.  It doesn't ring any bells. |
| 15    Q.  If we wanted to get ahold of those | 15    Q.  Now, what was your understanding of again |
| 16 minutes, how do we go about doing that? | 16 of what this embargo, what they termed your |
| 17    A.  They are on the Treasury website right | 17 confidentiality duty was, what was your understanding |
| 18 now. | 18 of what it prevented you from doing? |
| 19    Q.  How about for the minutes from October of | 19    A.  It prevented me from informing anyone |
| 20 2001? | 20 before that time. I mean the reason for the embargo |
| 21    A.  Yeah, all of that's there. Treasury some | 21 was to give reporters a time to prepare their story |
| 22 time in '99 or maybe as late as 2000 went back and | 22 so they would be ready to go out at that time. |
| 23 put on their website all the quarterly refunding | 23    Q.  Did anyone explain to you that was the |
| 24 charts, advisory committee minutes and advisory | 24 reason for the embargo? |
| 25 committee recommendations and the press releases and | 25    A.  No, I just sort of knew that and that's |

9 (Pages 281 to 284)

Peter Davis, Jr.                                                    April 20, 2006
Washington, DC

## Page 285

1  how --
2    Q.  But what I'm asking about, did anyone ever
3  say to you, that's the reason we have the embargo?
4    A.  No, no one ever said that to me.
5    Q.  Did you ever read it anywhere, this is the
6  reason --
7    A.  No, I didn't read it anywhere.
8    Q.  So nobody at Treasury, including
9  Mr. Anderson ever told you why the embargo existed,
10 correct?
11       MS. WILLIAMS:  Objection.
12       THE WITNESS:  Correct, correct.
13       BY MR. THEODOROU:
14   Q.  Were you allowed to discuss embargoed
15 information with other people who had attended the
16 conference?
17   A.  Oh, we would -- as the meeting was
18 breaking up, sometimes I would discuss it with
19 another reporter or someone who's attending the
20 meeting, sometimes in the hallway, I'd talk with Jim
21 Capra or someone afterward, usually we weren't
22 talking about what was happening in the meeting, we
23 were talking about what was going on with the tax cut
24 or what was going on with the budget or the deficit.
25 So sometimes though there might be a confusion that

## Page 286

1  wasn't cleared up in the meeting and -- and
2  sometimes, you know, as people were milling around as
3  the meeting was breaking up, people would go up and
4  ask an additional question or a point of
5  clarification and so, sure, there were discussions in
6  the room.
7    Q.  So your understanding was that under that
8  agreement that you had with Mr. Anderson, you were
9  not to disclose the information of the refunding
10 conference until after the embargo time had expired,
11 right?
12   A.  Correct.
13       MS. WILLIAMS:  Objection.
14       BY MR. THEODOROU:
15   Q.  What did Treasury get out of this
16 agreement?
17       MS. WILLIAMS:  Objection.
18       BY MR. THEODOROU:
19   Q.  I can clarify that for you, usually when
20 you have an agreement, one party gets something.
21   A.  Right.
22   Q.  Clearly you got access?
23   A.  Right.
24   Q.  To this information, what did Treasury get
25 by allowing you in?

## Page 287

1        MS. WILLIAMS:  Objection.
2        THE WITNESS:  They got better quality
3  reporting and information to -- to the greater world.
4  If -- if -- if reporters are forced to react quickly
5  in a very time sensitive situation to very
6  complicated information, it results in all kinds of
7  spurious information going out and that was something
8  that happened to me all the time when I worked on the
9  Hill.
10       BY MR. THEODOROU:
11   Q.  Do you remember if that agreement had an
12 expiration date?
13       MS. WILLIAMS:  Objection.
14       THE WITNESS:  I don't -- I don't recall
15 any expiration date.  I don't think it had one.  It
16 wasn't a time certain agreement.  I mean it didn't --
17 it had -- I remember it had a date on the document
18 itself or whatever day I signed it and we signed, you
19 know, when we signed it, we signed our names and the
20 date, but there was no effective date in the
21 document, there was no termination date paragraph or
22 anything like we have in tax laws.
23       BY MR. THEODOROU:
24   Q.  So to your knowledge there was no renewal
25 date in the document?

## Page 288

1    A.  No.  In fact it was never renewed or
2  terminated that I was aware of.
3    Q.  You testified about reporters attending
4  the conference, could reporters share information
5  with others before the embargo time expired on the
6  condition that the people they were discussing it
7  honor the embargo?
8        MS. WILLIAMS:  Objection.
9        THE WITNESS:  Yes.  I mean I saw them --
10 what would typically happen would be everybody would
11 run out of the room, some of the reporters who were
12 in the Treasury Press room would run down to their
13 Treasury press room office, but some of the reporters
14 didn't have space in there.
15       There was only room in there for three
16 reporters or something.  So the rest of the reporters
17 would actually run out in the hallway, pull out their
18 cell phones and call in their stories to their
19 editors, at least I assumed it was their editors, I
20 didn't know who they were calling.  And so there
21 would all always be a bunch of reporters out in the
22 hallway afterward talking on their phones presumably
23 to their editors filing, you know, dictating a story
24 which would be presumably released at the embargo
25 time.

10 (Pages 285 to 288)

Peter Davis, Jr.                                                                April 20, 2006
Washington, DC

Page 289

1      BY MR. THEODOROU:
2      Q.   So there were cases where reporters called
3  in information to somebody before the embargo time
4  expired?
5      A.   For sure.
6          MS. WILLIAMS: Objection.
7          THE WITNESS: For sure.
8          BY MR. THEODOROU:
9      Q.   Did you ever discuss with Anderson at your
10 meeting the duration of the agreement, that is how
11 long it would last or allow you to do what you wanted
12 to do?
13         MS. WILLIAMS: Objection.
14         THE WITNESS: Never came up, it was
15 never -- it was never discussed.
16         BY MR. THEODOROU:
17     Q.   Based on your understanding of the
18 agreement, the agreement allowed you to share
19 information with others as long as they also honored
20 the embargo, correct?
21         MS. WILLIAMS: Objection.
22         THE WITNESS: That was -- yes.
23         BY MR. THEODOROU:
24     Q.   That was your understanding?
25     A.   Well, I was going to say that's what lead

Page 290

1  me to -- disclosing information, starting in 1999 to
2  Word McCarthy, because I knew he would keep the
3  embargo.
4      Q.   But you didn't review the terms of your
5  agreement with your customers, correct?
6      A.   Correct, that just never came up.
7      Q.   Which included not reviewing what embargo
8  meant?
9      A.   Correct. It was just something that was
10 never discussed.
11     Q.   Now, the agreement with Mr. Anderson, did
12 anyone else at Treasury know about that agreement?
13     A.   Well, I had no way of knowing whether they
14 knew it or not, all I knew is whether they let me
15 into the meetings.
16     Q.   I think you testified about this earlier,
17 you didn't tell anyone else about the agreement?
18         MS. WILLIAMS: Objection.
19         THE WITNESS: No. That's correct.
20         BY MR. THEODOROU:
21     Q.   Now after you enter into this agreement
22 you started attending the refunding conferences?
23     A.   Meetings, yes.
24     Q.   And what process did you follow in order
25 to attend?

Page 291

1      A.   On Monday of the meeting week, I would at
2  some point on Monday call up Lulu Tyler or whoever
3  was at that phone number and make sure that I was
4  cleared in, that they had my full name, they had my
5  birth date and Social Security number and so that
6  when I showed up to the Treasury window on Tuesday
7  for the Tuesday meeting and -- say I showed up at
8  8:45 or 8:30 or whenever it was, that I would be on
9  the computer, that the guard would give me a badge
10 and that I would be buzzed into the building to go
11 upstairs and attend the meeting.
12     Q.   Now, were you already in the computer when
13 you made the call? In other words, when you called
14 Lulu, did she know to look you up and were in the
15 computer and already signed off to attend the meeting
16 or was it ad hoc, that is meeting by meeting?
17         MS. WILLIAMS: Objection.
18         THE WITNESS: Most of the time, she would
19 tell me that she had already put me in and my call
20 was just to guard against the possibility that
21 somehow she had forgotten or she was on vacation or
22 whatever, because once or twice my name wasn't on the
23 list and I was in the position of having to call up
24 to Paul Malvey's office and someone would actually
25 come down an get me.

Page 292

1          BY MR. THEODOROU:
2      Q.   When you say that she said you were
3  already in the computer, what does that mean you were
4  already in?
5      A.   I took that to mean that she had entered a
6  list of names, I don't know if mine was the only name
7  on that list or not of authorized persons to get a
8  badge to go to that meeting.
9      Q.   And in 1994, what was Ms. Tyler's
10 position?
11     A.   I don't recall her title, I just knew her
12 as -- she was an assistant to either Mr. Malvey or
13 Mr. Anderson and she was the person who was my
14 contact for gaining authorization to attend the
15 meeting.
16     Q.   So you would call her on Monday?
17     A.   Right.
18     Q.   And then what would happen?
19     A.   I'd say, Hi, Lulu, it is Pete Davis, just
20 calling to make sure I'm on the computer to -- just
21 on the computer to gain authorization of the meeting
22 tomorrow. And she'd say, you're all set. And I'd
23 say, thanks, and that was it.
24     Q.   And then what happened?
25     A.   The next morning on Tuesday, I would

11 (Pages 289 to 292)

Peter Davis, Jr.                                                                                         April 20, 2006
Washington, DC

| Page 293 | Page 295 |
|---|---|
| 1  appear at 15th Street entrance at Treasury, I'd | 1  two of them attended. |
| 2  present my I.D. to the guard and say I'm going up to | 2    Q.  Let's take a look at the first where it |
| 3  the meeting in 3223 and he'd punch in my name and | 3  says Monday, it says call Lulu Tyler, correct? |
| 4  he'd hand me a badge. | 4    A.  Correct. |
| 5    Q.  And would you then go to 3223 unescorted? | 5    Q.  And Lulu Tyler again was -- |
| 6    A.  Yes. | 6    A.  She was the assistant to either Malvey |
| 7    Q.  Or would someone escort you? | 7  or -- or Anderson who was the point of contact for |
| 8    A.  Yes, unescorted. I mean, I knew the | 8  gaining access to the meeting. |
| 9  building well. Yeah, but -- | 9    Q.  It says to get cleared into the meeting, |
| 10    MR. THEODOROU:  Can we take a couple of | 10  do you see where it says that? |
| 11  minute break? | 11    A.  Yes. |
| 12    MS. WILLIAMS:  Sure. | 12    Q.  What is meant by to get cleared into the |
| 13    THE VIDEOGRAPHER:  Going off the record, | 13  meeting? |
| 14  time on the screen is 10:32:12. | 14    A.  Well, when I wrote that, what I meant was |
| 15    (Recess.) | 15  to be able to get a badge from the guard at the |
| 16    THE VIDEOGRAPHER:  Here marks the | 16  Treasury and to attend the meeting. |
| 17  beginning of videotape number 2, going back on the | 17    Q.  Your assistant, what was your assistant's |
| 18  record, the time on the screen is 10:48:12. | 18  name again? |
| 19    BY MR. THEODOROU: | 19    A.  Allyson Sullivan. |
| 20    Q.  Mr. Davis, after you started attending the | 20    Q.  Did you review your confidentiality |
| 21  refunding conferences, were you ever barred from the | 21  agreement you had with Mr. Anderson with Ms. Sullivan |
| 22  conferences at any time? | 22  before she attended? |
| 23    A.  No. | 23    A.  No. |
| 24    Q.  Do you recall ever being prohibited from | 24    Q.  Did you review the terms of the agreement? |
| 25  attending a conference? | 25    A.  No. |

| Page 294 | Page 296 |
|---|---|
| 1    A.  It just never happened, I mean -- I never | 1    Q.  Did you inform her what she could and |
| 2  tried to attend any after October 31st, 2001. | 2  could not do? |
| 3    Q.  Right. Now I'm talking about the period | 3    A.  Yes. |
| 4  1994 to 2001? | 4    Q.  Under that agreement? |
| 5    A.  I was never barred, every meeting I asked | 5    A.  Well, I just said, you know, I'm trying to |
| 6  to attend, I was able to attend. | 6  remember, um -- well, this is pretty |
| 7    Q.  If you would take a look at Exhibit 6, | 7  self-explanatory, I just -- |
| 8  please? | 8    Q.  Right, but my question is do you recall |
| 9    MR. TOONE:  16. | 9  telling her other than saying, Note embargo time, do |
| 10    MR. THEODOROU:  I'm sorry, I misread my | 10  you recall telling her what embargo meant? |
| 11  writing. | 11    A.  Oh -- |
| 12    BY MR. THEODOROU: | 12    MS. WILLIAMS:  Objection. |
| 13    Q.  Now, Mr. Davis, what is this document? | 13    THE WITNESS:  No, I didn't -- I didn't. |
| 14    A.  It's a description of the procedure for | 14    BY MR. THEODOROU: |
| 15  attending the quarterly refunding meeting from my | 15    Q.  Do you recall telling her that she could |
| 16  assistant, Allyson Sullivan, to attend the January | 16  not disclose the information at the conference before |
| 17  2001 -- actually it was the February refunding | 17  the embargo time? |
| 18  meeting, it was on January 31st, because I was going | 18    MS. WILLIAMS:  Objection. |
| 19  to be out of town. | 19    THE WITNESS:  I didn't -- no, I didn't |
| 20    Q.  And she was going to attend the meeting in | 20  discuss that. |
| 21  your place? | 21    BY MR. THEODOROU: |
| 22    A.  Correct. | 22    Q.  So you remember not discussing that with |
| 23    Q.  Did she in fact attend the meeting? | 23  her? |
| 24    A.  Yes. And I -- and I think my outgoing | 24    MS. WILLIAMS:  Objection. |
| 25  assistant, Kristen Caiola, attended also, I think the | 25    THE WITNESS:  I just wrote this memo and I |

12 (Pages 293 to 296)

Peter Davis, Jr.                                                          April 20, 2006
Washington, DC

| Page 297 | Page 299 |
|---|---|

**Page 297**

1  sat her down and gave her a copy and we read through
2  it.
3      BY MR. THEODOROU:
4      Q.  All right. Let's read through -- so
5  whatever's in this memo is what you reviewed with
6  her.
7      A.  That's right.
8      Q.  The next, there's another line where it
9  says on Tuesday -- excuse me. It talks about turn
10 left down the hallway, see where that paragraph is?
11     A.  Yeah. Those are physical instructions in
12 how to navigate the building.
13     Q.  Take that to the third floor and go
14 straight down the hall to room 3223, correct?
15     A.  Correct.
16     Q.  And what was room 3223?
17     A.  I forget what they call it, but it's very
18 ornate meeting room right across from the Secretary
19 of the Treasury's office.
20     Q.  Now, the January conference is held in
21 room 3223, correct?
22     A.  Correct. All the quarterly refunding
23 meetings were, with the one exception was the
24 October 31 meeting, because it as going to be more
25 heavily attended was shifted to another room.

**Page 298**

1      Q.  And that was shifted to what room?
2      A.  I think it was 3211, the diplomatic room
3  or something.
4      Q.  What is the difference between room 3233
5  and 3211?
6      A.  Size.
7      Q.  Would you please describe 3211 for me?
8      A.  It was down the hall. It was a larger
9  room, it permitted a large area of theater seating so
10 you could seat 50 or 60 people.
11         There was a podium at one end. 3223 was a
12 smaller room with a big conference table in it and
13 you could seat maybe, I don't know, maybe 20 people
14 around the conference table and maybe another 10 or
15 15 around the sides.
16     Q.  Now the next paragraph says sit on the
17 back left, do you see where that --
18     A.  Right.
19     Q.  -- is in the document?
20     A.  Yes.
21     Q.  Why did you tell her to sit on the back
22 left?
23     A.  Because that's where I usually sat and if
24 she was going to get questioned on who she was or why
25 she was there or something, you know, she's my

**Page 299**

1  assistant and she says I'm here in Pete Davis's
2  place, it makes sense to sit where Pete Davis usually
3  sat.
4      Q.  Except for the October conference, you
5  didn't sit in the back left, you sat in the front,
6  correct?
7      A.  Well, it was a different room, everything
8  was different about the October 31 meeting from the
9  other meetings.
10     Q.  Now directing your attention to the
11 exhibit where it says Wednesday, do you see that?
12     A.  Yes.
13     Q.  It says in that paragraph, Take careful
14 notes of anything Paul Malvey or anyone else says.
15     A.  Right.
16     Q.  What was Mr. Malvey's position at the
17 time?
18     A.  He was the senior staff at the Treasury in
19 charge of public debt issuance, I forget his exact
20 title, but maybe it was something like Director of
21 the Office of Federal Finance, I think it was or
22 something like that.
23     Q.  Okay. And how long had you known
24 Mr. Malvey?
25     A.  I forget exactly when I first met him, but

**Page 300**

1  it was some time in '93 or '94 or in the process of
2  trying to get quarterly refunding documents and also
3  in bringing clients in to meet with Treasury
4  officials about what was going on with the economy
5  and debt management and so on.
6      Q.  And what was your relationship with him?
7      A.  It was a professional relationship. I saw
8  him once in a while in Treasury, once in a while he
9  would take a phone call from me where I would ask him
10 for a document or for to answer a question.
11     Q.  Did you ever sit next to him at the
12 Treasury refunding meetings?
13     A.  Well, the meetings prior to October in
14 3223, he would usually be sitting at the head of the
15 table doing the chart show or assisting whoever was
16 presenting the information.
17         At the October 31 meeting, I was sitting
18 in the front row and he came in with Undersecretary
19 Fisher and there weren't enough seats for them to sit
20 down and so I offered up a seat so Paul could have a
21 seat.
22     Q.  Now, outside of the Treasury refunding
23 conferences, what kind of information did Mr. Malvey
24 give you?
25     A.  Usually it was historical information,

13 (Pages 297 to 300)

Peter Davis, Jr.                                                April 20, 2006
Washington, DC

## Page 301

1  like, hey, when was the last time Treasury managed
2  its debt that way or -- or -- or, you know, when are
3  you going to release a study on whatever they were
4  doing a study on or -- or has there ever been a study
5  on this or that sort of thing.
6          Sometimes I would ask him questions
7  like -- I mean there was a lot of interest in Wall
8  Street for a year and a half starting in early 2000
9  about the possible cessation of a 30-year bond. I
10 knew he couldn't talk about that but I could ask him
11 once in a while I do recall asking him like whether
12 they were studying that possibility, things like
13 that.
14    Q.   All right. So between 1994 and 2001, you
15 spoke to Mr. Malvey both in person and by phone?
16    A.   Yes, on occasional basis. I'd see him
17 most of those quarterly refunding meetings, and once
18 in a while, I'd have a question at some other time.
19 It wasn't a regular contact, but it was, you know,
20 certainly three or four times a year at the meetings
21 themselves and maybe a few other times by phone.
22    Q.   About how many times by phone?
23    A.   Geez. I don't know, maybe three or four
24 times a year, I don't know.
25    Q.   Between '94 and 2000, about three or four

## Page 302

1  times a year?
2    A.   Yeah, it's hard to say, it could have been
3  five or six or it could have been one or two some
4  years.
5    Q.   Outside of the quarterly refunding
6  meetings, did you also have personal meetings with
7  him outside of those meetings?
8    A.   Once in a while when I had clients who
9  were interested in coming into to come talk to
10 administration officials about the economy and the
11 budget and so on, I would arrange meetings at
12 Treasury and sometimes he would attend those.
13    Q.   About how many times was that?
14    A.   I don't recall the total number, there was
15 a handful. There were certainly meetings that he
16 attended, I think one in 2000 and once in 2001.
17    Q.   More than five?
18    A.   I don't -- I don't think so, but I just
19 can't remember how many -- I mean the meetings are
20 held with clients with officials in Washington were
21 sort of irregular, sometimes they would have two or
22 three meetings like that in a year and sometime they
23 would just have one, it was just it sort of when it
24 came together.
25    Q.   Now, if you turn further down to on

## Page 303

1  Exhibit 16, it says note the embargo time.
2          Do you see that?
3    A.   Yes, I do.
4    Q.   Now, did you review with your employee
5  what was meant by the embargo time?
6    A.   No, I just -- you know, there was going to
7  be someone who was going to stand up and say what the
8  embargo time was and I just wanted her to write it
9  down. I didn't want her to exit the meeting without
10 knowing -- without remembering the embargo time.
11    Q.   Did you give Allyson any instructions
12 about what to say about the embargo to your customers
13 when she called them?
14         MS. WILLIAMS: Objection.
15         THE WITNESS: Well, when she called them,
16 she was as I say here in this exhibit, when you call
17 them, tell them the embargo time, tell them to
18 describe the securities and cite any remarks.
19    BY MR. THEODOROU:
20    Q.   Right. You told her to note -- tell the
21 clients what the embargo time was, correct?
22    A.   Correct.
23    Q.   Did you give her any instructions about
24 informing the clients as to what embargo time meant?
25    A.   Certainly not. That didn't come up.

## Page 304

1    Q.   And did you give her any instructions as
2  to what embargo meant?
3    A.   I did not.
4    Q.   Now, if you take a look at after where you
5  note it says, excuse me, where it says note the
6  embargo time you have another set of comments,
7  immediately after you exit Treasury, call the
8  following clients in order.
9          Do you see that?
10   A.   Yes, I do.
11   Q.   When it says immediately after exiting
12 Treasury, why did she have to leave Treasury in order
13 to call the clients?
14   A.   Well, the call to Ward was certainly going
15 to be -- well not certainly, I mean there was a
16 possibility that she might be making it before -- the
17 call before the embargo time.
18         Now, in fact I -- I don't think she and
19 Kristen got out of the building before the embargo
20 time, I don't think any of the calls were made, at
21 least that's what she reported to me at the time,
22 before the embargo time.
23   Q.   Right, but why did you say to her
24 immediately after exiting Treasury, call the
25 following clients in order stating the embargo time

14 (Pages 301 to 304)

Peter Davis, Jr.                                                    April 20, 2006

Washington, DC

| Page 305 |
| --- |

1  number 1, 2, describe the securities, 3, cite
2  Treasury marks of interest.
3      A.   Right.
4      Q.   Why did you tell her to do this after you
5  exit Treasury?
6      A.   Because it was possible that she would be
7  making these calls before the embargo time.
8      Q.   So what's the significance of telling them
9  about the embargo time if she was going to make the
10  calls after the embargo time?
11      A.   I didn't know whether she was going to be
12  able to make the calls before or after the embargo
13  time, I was hoping she would make the call to Ward
14  before the embargo time so he could write his story
15  and possibly get it out at the embargo time.
16          Since the embarges were generally only 10
17  or 15 minutes, I didn't know whether she would be
18  able to did that or not. She told me after the fact
19  that she didn't -- wasn't able to make the call
20  before the embargo time. But in case she could, she
21  was in a situation where I didn't want -- I just
22  wanted her to convey the embargo time, that's what I
23  told her to do. She didn't necessarily know what
24  that meant, but she would convey the embargo time.
25      Q.   And how long did Allyson work for you?

| Page 306 |
| --- |

1      A.   About two years. She started in early --
2  in fact she started a week or two before this in
3  early January of 2001. No, that's not -- hold on a
4  second. I take it back. She started for me in early
5  2000, that's right.
6      Q.   So by this time she had worked with you
7  for about a year?
8      A.   For a year.
9      Q.   And you weren't sure that she knew what
10  embargo time meant; is that correct?
11      MS. WILLIAMS: Objection.
12      THE WITNESS: I didn't have any -- I mean
13  I didn't assume that she knew what embargo time was
14  and I didn't tell her anything, I just said note the
15  embargo time and conveyed that information.
16      BY MR. THEODOROU:
17      Q.   At the refunding conferences such as the
18  one in January of 2001 and October of 2001, were the
19  doors left open or closed during the conferences?
20      MS. WILLIAMS: Objection.
21      MR. ROSSETTI: What was your time period?
22      MR. THEODOROU: The refunding conferences,
23  such as the January 2001 and the October 2001
24  conference, were the doors left open or closed?
25      MS. WILLIAMS: Objection.

| Page 307 |
| --- |

1      THE WITNESS: I didn't attend the January
2  2000 or January 31st, 2001 meeting. At quarterly
3  refunding meetings, sometimes the doors were closed,
4  sometimes they were open, it just varied.
5          At the October 31, 2001 meeting, I mean
6  the doors were open but some of them were interior
7  doors, not doors out to the hallway, but it's a big
8  room, so my recollection is the doors were open.
9      BY MR. THEODOROU:
10      Q.   What do you mean interior doors?
11      A.   There is a little passage way that
12  connects some -- some of these rooms. It is sort of
13  an interior hallway to the main hallway out, you
14  know, the main outside hallway. So when you say
15  doors, I mean there's interior doors as well as
16  exterior doors.
17      Q.   Were the doors locked for the October
18  conference?
19      MS. WILLIAMS: Objection.
20      THE WITNESS: No, I saw them open.
21      MR. STANCIL: Can we take a short break
22  for my sake, please?
23      MR. THEODOROU: Sure.
24      MS. WILLIAMS: Sure.
25      THE VIDEOGRAPHER: Going off the record,

| Page 308 |
| --- |

1  the time on the screen is 11:08:48.
2      (Recess.)
3      THE VIDEOGRAPHER: The time on the screen
4  is 11:12:32, you're on the record.
5      MR. STANCIL: Mr. Davis, before we go
6  forward, could you clarify for us all what your
7  recollection is with respect to the various doors
8  that were in play in the October 31, 2001 refunding
9  conference.
10      THE WITNESS: Okay. The main entrance to
11  the room and at the back of the room off the main
12  hallway on the third floor of the Treasury was as I
13  recall a double door and that was open and there were
14  a lot of people that eventually came in, and I recall
15  that door -- I recall people, you know, even coming
16  and going through that door even during the meeting.
17          I was -- my back was to it so I wasn't
18  looking at it all the time, but I do recall that door
19  being open when I looked back at, you know, before
20  the meeting, once during the meeting and after the
21  meeting when I turned around to leave, it was open.
22  It's possible it was closed at some other point.
23          At the head of the room where the Treasury
24  officials enter the room, there's a doorway that's an
25  interior doorway, it does not lead to the main

Peter Davis, Jr.                                                        April 20, 2006

Washington, DC

## Page 309

1  hallway, the wall -- the other side of that wall is
2  the main hallway. That door was initially closed, it
3  was open when they came in and then it was closed
4  again. And so, that's my recollection of the doors.
5      BY MR. THEODOROU:
6      Q.  So the double door was open and that lead
7  to the main hallway?
8      A.  Correct.
9      Q.  Was there any one stationed at the double
10  door to prevent people from going in and out?
11      A.  I don't recall at the October 31 meeting,
12  there were so many people it was difficult to tell.
13      Now at other earlier meetings, sometimes
14  there would be Treasury staff person standing at the
15  door. It wasn't always the same person, people would
16  walk in and out of these meetings without being
17  challenged by that person. I assumed that the person
18  sort of recognized people, I never saw that person
19  bar entry to anybody. So it was not unusual at other
20  quarterly refunding meetings to have a Treasury staff
21  person standing at the door.
22      Q.  But October 31, you don't recall anybody
23  being there?
24      A.  I don't recall anybody being there.
25      Q.  And in fact you saw people going in and

## Page 310

1  out?
2      A.  I saw people going in and out, before the
3  meeting, during the meeting and after the meeting.
4      Q.  Turning to another subject, Jill Ousley,
5  did you know her?
6      A.  Not well, but I'd met her on several
7  occasions.
8      Q.  What kind of occasions?
9      A.  She was there at most of the, if not all
10  the Treasury quarterly refunding meetings and once in
11  a while when I had a question because I couldn't get
12  through to Malvey to ask, I call her.
13      Q.  Outside of the quarterly refunding
14  meetings, how often would you have telephone calls
15  with her?
16      A.  Once in a rare while, it was not frequent.
17      Q.  About how many calls did you have with her
18  between '94 -- 1994 and 2001?
19      A.  Geez. I don't know, between half a dozen
20  and a dozen maybe. I do in once in a rare while or
21  once or twice a year, I would call her up if I
22  couldn't get Malvey.
23      Q.  Did you have any meetings with her outside
24  of the refunding conferences?
25      A.  Well, once in a while, one, two, three

## Page 311

1  times a year, I would have clients in town and we'd
2  go meet with various officials including Treasury
3  officials. She may have attended one or two of those
4  meetings. The meetings were usually set up with
5  somebody else, but a lot of times they would bring in
6  subordinates, including her and Malvey.
7      Q.  And Ousley knew you, right?
8      A.  She knew me, yeah, sure.
9          (Davis Exhibit No. 38 was marked
10          for identification.)
11      MR. ROSSETTI:  This is 38?
12      MR. THEODOROU:  Exhibit 38.
13      MR. ROSSETTI:  You could have picked the
14  one that had the exhibit tab on it.
15      BY MR. THEODOROU:
16      Q.  All right, Mr. Davis, directing your
17  attention to Exhibit 38, do you recognize the
18  document?
19      A.  Yes, this is an E-Mail that I received
20  from John Youngdahl of Goldman Sachs on Thursday,
21  July 12th, 2001.
22      Q.  And in fact the E-Mail starts on the
23  second page, a string of E-mails. Do you see that?
24      A.  Right, um, okay, yeah, that's right. On
25  the next page, there's an E-Mail that preceded the

## Page 312

1  one on the first page and then there's my response to
2  the E-Mail on the first page.
3      Q.  All right. I want to you take a look at
4  the E-Mail on the first page. Who was John
5  Youngdahl?
6      A.  He was an economist at Goldman Sachs, he
7  was in a group of economists that worked with the
8  fixed income desk.
9      Q.  Okay. And when did you first meet or
10  speak with him?
11      A.  Some time in 2001, you know, like I don't
12  know, early 2001 some time, I'm not sure exactly
13  when.
14      Q.  Did you meet with him or did you speak to
15  him on the phone the first time you dealt with him?
16      A.  I met him over the phone first and then, I
17  don't know, some time that spring or early summer, he
18  dropped by my office when he was in Washington.
19      Q.  When you talked to him on the phone, did
20  you call him or did he call you?
21      A.  I don't really recall. I mean I had a --
22  I had established a relationship with his boss and I
23  can't remember -- I probably called him, but I can't
24  remember.
25      Q.  Who was his boss?

16 (Pages 309 to 312)

Peter Davis, Jr.                                                    April 20, 2006

Washington, DC

## Page 313

1    A.  I'm trying to remember the chief
2  economist -- I can see him, but I can't, right now at
3  this moment remember his name.
4    Q.  What would Mr. Youngdahl's duties at
5  Goldman Sachs?
6    A.  I didn't know all of his duties, I just
7  knew he was an economist working with the fixed
8  income desk.
9    Q.  When you spoke to him on the phone, what
10  was the substance of your conversation with him?
11    A.  The first time?
12    Q.  Yes?
13    MS. WILLIAMS:  Objection.
14    THE WITNESS:  Well, first of all, I don't
15  really recall the phone conversation but I mean I
16  must have introduced myself and told him what I do,
17  following economic policy in Washington.
18    BY MR. THEODOROU:
19    Q.  At some point, you started providing
20  services to Goldman Sachs?
21    A.  Yes, right.
22    Q.  And was Mr. Youngdahl your contact at
23  Goldman Sachs?
24    A.  He became my contact, he wasn't initially.
25    Q.  Who was your initial contact?

## Page 314

1    A.  His boss and I'm trying -- I'll have to
2  remember his name.
3    Q.  What services did you provide to Goldman
4  Sachs?
5    A.  Same thing I provide to all my clients,
6  E-Mail, faxing of information on an occasional basis
7  and availability by phone to answer questions and do
8  customized research.
9    Q.  And how long did you deal with
10  Mr. Youngdahl's boss directly?
11    A.  For a short period before I started
12  dealing with Mr. Youngdahl, I think also early in
13  2001, although it could possibly have started -- no,
14  it was 2001 because they became a paying client I
15  think in May and so I was probably doing some
16  preliminary dealings with them before then for a
17  month or two before then.  I think his boss came down
18  and met me and had lunch with me at some point early
19  in 2001.
20    Q.  Was the agreement with Goldman Sachs
21  different from your agreement with MFS?
22    A.  I vaguely recollect that I had a written
23  agreement with MFS.
24    Q.  Did you agree to a fee with Goldman Sachs?
25    A.  Yes.

## Page 315

1    Q.  What was it?
2    A.  $1500 a month.
3    Q.  Which was more than your agreement with
4  MFS?
5    A.  Correct.
6    Q.  Do you remember placing a phone call to
7  Mr. Youngdahl beginning in early May after refunding
8  conference?
9    A.  Yes.
10    Q.  What happened?
11    A.  I called up and told him what was going to
12  be announced at the refunding.
13    Q.  Was that the first time you had given that
14  kind of information to Mr. Youngdahl?
15    A.  Yes.
16    Q.  And what kind of information did you give
17  him?
18    A.  The embargo time, the amounts of 5, 10s
19  and 30s and I don't recall what else.
20    Q.  What do you mean 5s, 10s, and 30s?
21    A.  At the quarterly refundings, the Treasury
22  announces how much it is going to auction of 5-year
23  notes, 10-year notes and 30-year bonds.
24    Q.  And you gave him information about 5-year
25  notes, 10-year notes and 30-year bonds?

## Page 316

1    A.  Yes.
2    Q.  Specifically what kind of information?
3    A.  The amounts.  How many billions of dollars
4  of each were going to be auctioned.
5    Q.  Would be auctioned off?
6    A.  Right.
7    Q.  Did you tell Mr. Youngdahl that the
8  information you were giving him was embargoed?
9    A.  Yes.
10    Q.  Did you provide that information to him
11  before the embargo time was expiring?
12    A.  Yes.
13    Q.  Now, turning to Mr. Youngdahl's E-Mail of
14  July 12th, 2001 which was Exhibit 38, the first page,
15  you can see where he says, last quarter you called me
16  on the morning of the Treasury refunding press
17  conference to give me details from the
18  briefing -- last quarter you called me on the morning
19  of the Treasury refunding press conference to give me
20  details from the briefing just before they hit the
21  tape.
22    Were you in the press room that morning
23  other for the briefing or did you get the info from
24  somewhere else?  Is this something we can arrange as
25  a routine matter.

                                    17  (Pages 313 to 316)

Peter Davis, Jr.                                                          April 20, 2006
Washington, DC

| Page 317 | Page 319 |
|---|---|
| 1  The next occasion will be August 1, a.m.; <br> 2 do you remember getting that? <br> 3   A.  Yes. <br> 4   Q.  And did you respond? <br> 5   A.  Yes. <br> 6   Q.  How did you respond? <br> 7   A.  Oh, let's see.  I responded with an E-Mail <br> 8 at the bottom of the next page here where I said to <br> 9 him I attend the quarterly briefings and can call a <br> 10 few minutes before with the understanding that <br> 11 everything is embargoed until the embargo time. <br> 12   Q.  All right.  Now, turning to the first <br> 13 E-Mail, the one I read to you a minute ago, first <br> 14 page. <br> 15   A.  Right. <br> 16   Q.  What time was that sent to you? <br> 17   A.  Well, the time stamp on the E-Mail is 1:18 <br> 18 on Thursday afternoon, July 12th. <br> 19   Q.  All right.  And that was from <br> 20 Mr. Youngdahl to you, correct? <br> 21   A.  Correct. <br> 22   Q.  And then you responded at what time? <br> 23   A.  2:16. <br> 24   Q.  And in your E-Mail, you said I attend the <br> 25 quarterly meetings and a call a few minutes before | 1      BY MR. THEODOROU: <br> 2   Q.  And did you explain to him what embargoed <br> 3 meant? <br> 4      MS. WILLIAMS:  Objection. <br> 5      THE WITNESS:  No. <br> 6      MR. THEODOROU:  All right. <br> 7      BY MR. THEODOROU: <br> 8   Q.  But you specifically had a discussion with <br> 9 him as I will give you this information? <br> 10   A.  Right.  I mean, his main interest was the <br> 11 veracity of the information, you know, he -- he <br> 12 couldn't figure out how I was getting this.  And so I <br> 13 told him I attend the meetings. <br> 14   Q.  But followed up in that conversation by <br> 15 saying the information I'm giving you is embargoed <br> 16 until the embargo time, correct? <br> 17   A.  Correct. <br> 18      MS. WILLIAMS:  Objection. <br> 19      THE WITNESS:  Correct, that's what I said <br> 20 to him. <br> 21      BY MR. THEODOROU: <br> 22   Q.  Given that there's an objection, why don't <br> 23 you say again what you said to him? <br> 24      MS. WILLIAMS:  Objection. <br> 25      THE WITNESS:  I told John. |

| Page 318 | Page 320 |
|---|---|
| 1 with the understanding that everything is embargoed <br> 2 until the embargo time, correct? <br> 3   A.  Correct. <br> 4   Q.  And Mr. Youngdahl, did he respond to your <br> 5 E-Mail? <br> 6   A.  Yes, he did with the one just above on the <br> 7 second page there, 14 -- or at 2:22, he responded to <br> 8 me, we should chat about this just to be sure the <br> 9 ground rules are clear in advance. <br> 10   Q.  And did you talk to him about the ground <br> 11 rules? <br> 12   A.  I called him after that last E-Mail and we <br> 13 had a conversation. <br> 14   Q.  What did you say in that conversation? <br> 15      MS. WILLIAMS:  Objection. <br> 16      BY MR. THEODOROU: <br> 17   Q.  Did you say anything to him in that <br> 18 conversation? <br> 19   A.  Yes. <br> 20   Q.  What did you say? <br> 21      MS. WILLIAMS:  Objection. <br> 22      THE WITNESS:  I said I attend the meetings <br> 23 and I can call you before the embargoed time if -- <br> 24 with the understanding that everything's embargoed <br> 25 until the embargo time. | 1      BY MR. THEODOROU: <br> 2   Q.  What did you say to him? <br> 3      MS. WILLIAMS:  Objection. <br> 4      THE WITNESS:  I told John Youngdahl over <br> 5 the phone on the afternoon of July 12th that I <br> 6 attended the quarterly refunding meetings and could <br> 7 call him before the embargoed time with the <br> 8 information from those meetings with the <br> 9 understanding that it was embargoed until the embargo <br> 10 time. <br> 11      BY MR. THEODOROU: <br> 12   Q.  Now, you never had a discussion with my <br> 13 client about what embargo time meant, correct? <br> 14   A.  Correct. <br> 15      MS. WILLIAMS:  Objection. <br> 16      BY MR. THEODOROU: <br> 17   Q.  And you never had a discussion similar to <br> 18 the discussion you had with Mr. Youngdahl with my <br> 19 client, Mr. Nothern, correct? <br> 20      MS. WILLIAMS:  Objection. <br> 21      THE WITNESS:  That's right. <br> 22      BY MR. THEODOROU: <br> 23   Q.  Now at the time you talked to <br> 24 Mr. Youngdahl, did you believe that discussion was <br> 25 consistent with the terms of your agreement with |

18 (Pages 317 to 320)

Peter Davis, Jr.                                    April 20, 2006
Washington, DC

---

Page 321

1  Mr. Anderson?
2    A.  No.
3    Q.  Now, you testified that you got rid of
4  your agreement with Mr. Anderson, correct?
5    A.  Correct.
6    Q.  What did you do?
7    A.  In early August of 2001, after that
8  quarterly refunding meeting, I came back to the
9  office and when I was leaving for the day, I filed
10 the quarterly refunding documents in my desk file
11 drawer and noticed a blank file folder in the drawer
12 next to the one I was filing in and I pulled it out
13 and looked at it and there was the one page -- well,
14 one page with both sides, the confidentiality
15 agreement and I felt some remorse about what I was
16 doing and so on my way to my car to go home for the
17 evening, I pitched it in the trash.
18   Q.  Why did you feel remorse?
19   A.  Because I had violated the agreement.
20   Q.  Why did you get rid of the agreement even
21 though you felt remorse?
22   A.  I just said to myself, I'm not going to do
23 this any more and I'm going to get rid of this and
24 forget about it.
25   Q.  You're not going to do what any more,

---

Page 322

1  breach the agreement?
2    A.  Right.
3    Q.  So why didn't you keep the agreement?
4    A.  I don't know, I -- I just -- I just -- I
5  had already breached it and so, you know, I just
6  wanted to get it out of my sight.
7    Q.  It was your understanding that Treasury
8  had the original agreement, correct?
9    A.  Correct.
10   Q.  If we wanted to get that agreement, where
11 could we get that agreement from?
12       MS. WILLIAMS:  Objection.
13       MR. STANCIL:  If you know.
14       BY MR. THEODOROU:
15   Q.  If you know.
16   A.  The last time I saw the original it was
17 sitting in front of Roger Anderson, what happened to
18 it after that, I have no idea.
19       MR. THEODOROU:  Can we go off the record
20 for a second?
21       THE VIDEOGRAPHER:  Going off the record,
22 time on the screen is 11:33:53.
23       (Recess.)
24       THE VIDEOGRAPHER:  The time on the screen
25 is 11:52:42, you're on the record.

---

Page 323

1       BY MR. THEODOROU:
2    Q.  Mr. Davis, would you please look at
3  Exhibit 30.  Do you have the exhibit in front of you?
4    A.  Yes.
5    Q.  This is the E-Mail that you sent to your
6  lawyers on or about November 5th, 2001?
7    A.  Yes.
8    Q.  Do you remember this?
9    A.  Yes.
10   Q.  And you were asked several questions
11 yesterday?
12   A.  Yes.
13   Q.  And one of the questions was whether or
14 not you had a present recollection of the substance
15 of these E-mails?
16   A.  Right.
17   Q.  Remember that you said that you didn't.
18       MS. WILLIAMS:  Objection.
19       BY MR. THEODOROU:
20   Q.  Did I properly characterize what you said
21 or -- let me rephrase that.
22       You were shown this document yesterday,
23 correct?
24   A.  Correct.
25   Q.  And this was the E-Mail to your lawyers.

---

Page 324

1    A.  Right.
2    Q.  And you were asked about whether events
3  were fresh in your mind at the time when you wrote
4  this, correct?
5    A.  Yeah, right.
6    Q.  All right.  Now, I want to direct your
7  attention to the notation of 9:53 a.m.
8        Do you see that --
9    A.  Yes.
10   Q.  -- on page 2 of this E-mail?
11   A.  Um-hum.
12   Q.  And it says, didn't get through again to
13 Dean Maki?
14   A.  Right.
15   Q.  Putnam Investments.
16   A.  Um-hum.
17   Q.  No clear recollection, but I don't think I
18 left a message?
19   A.  Right.
20   Q.  Correct?
21   A.  Right.
22       MR. THEODOROU:  Now, I'd like a document
23 marked for identification, which will be the next
24 sequence number.
25       (Davis Exhibit No. 39 was marked

---

19 (Pages 321 to 324)

Peter Davis, Jr.                                                April 20, 2006
Washington, DC

---

Page 325

1          for identification.)
2          BY MR. THEODOROU:
3      Q.   There's another notation 9:45 a.m., didn't
4   get through to Dean Maki, Putnam Investments, he's
5   not a client but I hoped he'd become one; do you see
6   that?
7      A.   Yes.
8      Q.   There appears to be two notations relating
9   to Putnam, 9:45 and 9:53?
10     A.   Right.
11     Q.   Now, I'd like you to take a look at the
12  exhibit in front of you, Exhibit Number 39.  Exhibit
13  Number 39.  Why don't you take some time and just
14  read through it.  It's only a couple of paragraphs.
15         You notice this is a letter to Andrew B.
16  Sporkin, branch chief, Securities and Exchange
17  Commission?
18     A.   Yes.
19     Q.   And it's from Putnam Investments, do you
20  see that?
21     A.   Yes.
22     Q.   Right now, directing your attention to the
23  second paragraph of the exhibit, you see where it
24  says in this letter and this is a letter from Andrew
25  Hachey of Putnam Investments to Mr. Sporkin.

---

Page 326

1      A.   Um-hum.
2      Q.   You see what it says in the letter is
3   shortly before 10:00 a.m. on the morning of October
4   31st, Mr. Maki's administrative assistant answered
5   Mr. Maki's telephone line at Putnam.
6          Mr. Maki was not in his office at the time
7   of the call.  Mr. Maki's assistant does not remember
8   the name of the person who called, but she remembers
9   that the person told her to leave a particular
10  message for Mr. Maki and told her in words or
11  substance that the message was very time sensitive.
12         Mr. Maki's assistant does not remember the
13  content of the message.  And he asked me to ask
14  Mr. Maki's assistant whether the caller used the term
15  embargoed or confidential.  Mr. Maki's assistant does
16  not remember the caller using those similar words
17  during the call.
18         Does that refresh your recollection any
19  further as to the first call you made?
20     A.   No.
21     Q.   But when you wrote this E-mail, it's fair
22  to say that when you wrote the E-mail to your
23  attorneys, though, you may not have been as clear in
24  your recollection at that time?
25         MS. WILLIAMS:  Objection.

---

Page 327

1          THE WITNESS:  I agree, this was written on
2   November 5th, that was five days later.  I made a lot
3   of calls one after the other.
4          BY MR. THEODOROU:
5      Q.   Right.
6      A.   And five days later.  You're recalling
7   exactly what I said, because things blurred together.
8   One thought that does occur to me, sometimes when I
9   didn't get through to people I got a machine.
10     Q.   Correct.
11     A.   Obviously from my E-mail I didn't even
12  remember that I got a person in that case.
13     Q.   And in fact, turn to the second page of
14  that exhibit that I just gave you.  It says, Mr. Maki
15  returned to his office at or shortly after 10:00 a.m.
16  Mr. Maki remembers that the message his assistant had
17  taken for him while he was away was from Mr. Davis
18  and that the message read simply no more 30-year
19  Treasury bonds.  Mr. Maki did not return Mr. Davis's
20  call.
21         Now, if you look at Exhibit 30, 9:53 a.m.,
22  didn't get through again to Dean Maki, no clear
23  recollection, but I don't think I left message?
24         Do you see that?
25         Does reading this paragraph refresh your

---

Page 328

1   recollection any more about what you did with
2   Mr. Maki?
3      A.   Like I say right now today I don't even
4   recall that I talked to a person there and so, you
5   know, what I said in this memo on November 5th, and
6   my recollection then doesn't mention that I talked to
7   a person there so --
8      Q.   But given what you just read in
9   Exhibit 39, it's fair to say when you wrote this memo
10  to your attorneys given the constant movement of
11  events after the bond rally and the publicity
12  regarding what happened with the information being
13  disclosed that you may not have been entirely
14  accurate with what you were giving the attorneys?
15         MS. WILLIAMS:  Objection.
16         THE WITNESS:  There's an obvious
17  discrepancy between what I wrote on November 5th and
18  what this person at Putnam wrote Mr. Sporkin.  All I
19  can say is that I had -- the recollections that I had
20  when I wrote E-mail and I have my recollections now,
21  that's it.
22         BY MR. THEODOROU:
23     Q.   Right.  All right.  Yesterday you
24  testified that you did not meet with the SEC
25  attorneys before today's deposition?

---

20 (Pages 325 to 328)

Peter Davis, Jr.

April 20, 2006

Washington, DC

## Page 329

1    A.   Well, I mean four-and-a-half years ago I
2  met with some.
3    Q.   Right.  Let me just clarify that.
4         Did you meet with the SEC attorneys who
5  were here today representing the Securities and
6  Exchange Commission in this case before today's
7  deposition?
8    A.   Four-and-a-half years ago.
9    Q.   Mr. Rossetti?
10   A.   Mr. Rossetti was there.
11   Q.   But did you meet with them recently?
12   A.   No.
13   Q.   Now, four-and-a-half-years ago, you did
14 meet with the SEC attorneys?
15   A.   Actually it was the year -- I forget
16 exactly when that was, some time in 2002 I met with
17 the SEC.
18   Q.   Was this when you testified at the SEC?
19        MR. STANCIL:  To the best of your
20 recollection.
21        THE WITNESS:  Yeah.
22        BY MR. THEODOROU:
23   Q.   Now, subsequent to that when you
24 testified, before the SEC, you then entered into a
25 plea agreement with the United States and you settled

## Page 330

1  a case with the SEC, correct?
2    A.   Correct.
3    Q.   Now before you entered into the plea
4  agreement with the United States, did you meet with
5  the U.S. Attorney's Office?
6    A.   I don't recall what order or what sequence
7  of events.  There were times I was deposed here at
8  the SEC, there were other times I was up in New York
9  with the U.S. Attorney and I don't recall what the
10 order was or when.
11   Q.   Do you recall meeting with the prosecutors
12 in New York, Mr. Hoates and Mr. Coad?
13   A.   Yes, I do recall going up there I think on
14 two occasions.
15   Q.   And did you discuss the case with them and
16 give them information?
17   A.   They integrated me and yeah, I --
18   Q.   Was anybody from the SEC present at the
19 interview?
20   A.   Up in New York?
21   Q.   Yes.  When you met with Mr. Hoates?
22   A.   No, at least not that I recall.
23   Q.   Besides the pros -- how many prosecutors
24 were there, how many lawyers from the U.S. Attorney's
25 Office was there?

## Page 331

1    A.   There were two.
2    Q.   There were two of them?
3         Yes.  Brian Coad and I forget the other
4  guy's name.
5    Q.   Brian Coad or Rob Hoates?
6    A.   Rob Hoates.
7    Q.   Was there also an investigator there?
8    A.   Yeah, there was an investigator.  Well --
9  yeah, there was, because he gave me his card.
10   Q.   And the investigator's from the FBI?
11   A.   I don't recall, it could have been the
12 Postal Service, it could have been the FBI.
13   Q.   Was there more than one agent there?
14   A.   I don't recall.
15   Q.   How many times did they debrief you before
16 your plea?
17   A.   I don't recall.  I mean I -- I recall -- I
18 think I went up there twice before the trial, but I
19 couldn't swear to it, that's a long time ago.
20   Q.   Okay.  And how long were you in the
21 meetings?
22   A.   Well, several hours, I mean like two or
23 three as I recall.
24        (Interruption by a telephone call.)
25        MR. THEODOROU:  Off the record.

## Page 332

1         THE VIDEOGRAPHER:  Going offer the record
2  time on the screen is 12:04:17.
3         (Discussion off the record.)
4         THE VIDEOGRAPHER:  Time on the screen is
5  12:05:54, you're on the record.
6         BY MR. THEODOROU:
7    Q.   I think I asked when I left how long was
8  the debriefing?
9    A.   I think they were like two or three hours
10 each.
11   Q.   And during those meetings, did you tell
12 the U.S. Attorney's Office about the agreement with
13 the Treasury Department?
14   A.   Hmm, yeah, I did.
15   Q.   What else did you talk about with the
16 U.S. Attorney's Office?
17   A.   Everything, the whole case, I mean from
18 start to finish.
19   Q.   The substance of what we've talked about
20 the last couple of days?
21   A.   Yeah, yeah.  The nature of my business and
22 minute by minute through the phone records and
23 through call by call and all -- at least that's my
24 recollection, it was a fairly detailed thing.
25   Q.   Now, before you settled with the SEC, did

21 (Pages 329 to 332)

Peter Davis, Jr.                                                                April 20, 2006
Washington, DC

## Page 333

1  you meet with the SEC attorneys?
2      A.  Yes.
3      Q.  And were you debriefed by the SEC
4  attorneys?
5      A.  I was interrogated quite in detail, yeah.
6      Q.  Where was that?
7      A.  It was at the SEC office at the previous
8  location which I don't even know where --
9      Q.  Who was present for the SEC for those
10 meetings?
11     A.  I remember Mr. Rossetti was there, other
12 than that, I don't really recall.
13     Q.  Besides Mr. Rossetti, do you recall
14 anybody else being there?
15     A.  There were several other people.
16     Q.  Was Mr. Sporkin there?
17     A.  I think so.
18     Q.  Do you remember anybody else?
19     A.  There was a postal inspector or somebody
20 like that, some investigator.
21     Q.  How many times did you meet with them?
22     A.  You know, I don't really recall.  It might
23 have been once, it height have been twice, I just
24 don't recall.
25     Q.  Did you talk to them about your agreement

## Page 334

1  with Mr. Anderson at the meetings with the SEC
2  attorneys?
3      A.  Yes.
4      Q.  Did they ever show you the Treasury
5  Department's copy of your agreement?
6      A.  No.
7      Q.  What did the SEC attorneys focus on in
8  their meeting with you?
9      A.  Everything, they went through great
10 detail, the nature of my business and a lot of time
11 spent on the form of my business.  They couldn't
12 understand why I wasn't a C corporation or an L.L.P.,
13 I kept saying I'm a sole prop, I'm a sole prop, I
14 know what that means, I used to work on the Joint Tax
15 Committee, I'm a sole prop.
16     We spent a lot of time on that and then we
17 went through the procedures at Treasury and the
18 agreement, my recollection of the agreement, a lot of
19 time on that and then a lot of questions on, you
20 know, the meeting on the 31st and E-Mail traffic, you
21 know, the E-mail with Mr. Youngdahl and, you know,
22 the phone calls on October 31st.
23     Q.  What did they ask about Mr. Nothern?
24     A.  Whew, I don't recall.  It was mostly
25 focused on Mr. Youngdahl is my recollection.

## Page 335

1      Q.  Do you recall whether they asked you about
2  whether you communicated the terms of your agreement
3  with Treasury to Mr. Nothern?
4      A.  I don't -- I mean, I don't recall that.
5  The one -- the one thing I do recall is stating that
6  I was unsure on whether I'd left the embargo time on
7  the message that I left on Mr. Nothern's voicemail,
8  that's one thing I do remember, I was just unsure
9  whether I'd left that.
10     Q.  Did they ever ask whether you told
11 Mr. Nothern what embargo means?
12     A.  I just don't recall.
13     Q.  Do you recall whether they asked whether
14 you ever told Mr. Nothern what embargoed time means?
15     MS. WILLIAMS:  Objection.
16     THE WITNESS:  I just don't recall any of
17 that.
18     BY MR. THEODOROU:
19     Q.  When you met with the U.S. Attorney's
20 Office, what did they ask you about Mr. Nothern?
21     A.  I -- I just don't have any recollection of
22 that.  I think I -- I mean I do -- I'm sure I
23 repeated the same uncertainty about whether I left
24 the embargoed time, you know, but that's the only
25 thing I recall.

## Page 336

1      MR. THEODOROU:  Can we go off the record.
2      THE VIDEOGRAPHER:  Going off the record.
3  The time on the screen is 12:12 p.m.
4      (Discussion off the record.)
5      THE VIDEOGRAPHER:  Time on the screen is
6  12:18:42, you're on the record.
7      MR. THEODOROU:  I do not have any
8  questions -- further questions for Mr. Davis at this
9  time.
10     Thank you, Mr. Davis.
11     MS. WILLIAMS:  I have some follow-up
12 questions for Mr. Davis.
13     EXAMINATION BY COUNSEL FOR PLAINTIFF
14     BY MS. WILLIAMS:
15     Q.  Mr. Davis, can I ask you to pull back out
16 what's been marked as Exhibit 30.  This is an E-Mail
17 you drafted for your attorneys, dated November 5th,
18 2001, correct?
19     A.  Correct.
20     Q.  You tried to make the information in this
21 E-Mail as accurate as possible?
22     MR. THEODOROU:  Objection.
23     BY MS. WILLIAMS:
24     Q.  Is that a fair statement?
25     A.  That's what I wrote to the best of my

22 (Pages 333 to 336)

1111 14th Street, NW Suite 400                                  Washington, DC 20005

Peter Davis, Jr.                                                                April 20, 2006

Washington, DC

| Page 337 |
|---|

1    recollection on November 5th.
2        Q.   Is it fair to say that your recollection
3    of the events that are described in this E-Mail were
4    more fresh on November 5th than they are today?
5            MR. THEODOROU: Objection.
6            THE WITNESS: I guess. I mean memory does
7    deteriorate with time usually.
8            BY MS. WILLIAMS:
9        Q.   So you think that you remembered the
10   information in here -- that had you a better
11   recollection on November 5th of the events of
12   October 31st than you have today five years later?
13           MR. THEODOROU: Objection.
14           THE WITNESS: Yes.
15           BY MS. WILLIAMS:
16       Q.   Can I ask you to turn to the second page
17   of the exhibit?
18       A.   Okay.
19       Q.   Do you see at 9:53, Mr. Theodorou asked
20   you a few questions about the entry at 9:53?
21       A.   Correct.
22       Q.   Do you see that entry?
23       A.   Yeah, I do see it.
24       Q.   And the second line there, do you see the
25   phrase no clear recollection?

| Page 338 |
|---|

1        A.   Correct.
2        Q.   If I could point you to 9:49.
3        A.   Um-hum.
4        Q.   Do you see that?
5        A.   Yes, no clear recollection.
6        Q.   Do you see the words no clear recollection
7    starting on the end of the first line and going to
8    the second line?
9        A.   Um-hum.
10       Q.   So is it fair to say that when you drafted
11   this document, when you didn't have a clear
12   recollection, you noted it on the document at least
13   in these two places?
14           MR. THEODOROU: Objection.
15           THE WITNESS: When I wrote I had no clear
16   recollection that meant that I just didn't remember.
17   Other entries I remembered some things, but not
18   necessarily all the things so there are gradations of
19   recollection.
20           BY MS. WILLIAMS:
21       Q.   Can I point you to the top of that second
22   page 9:38?
23       A.   Yes, yes.
24       Q.   This is a description of a call to
25   Mr. Nothern?

| Page 339 |
|---|

1        A.   Yes.
2        Q.   Do you see the words no clear recollection
3    written in that description?
4            MR. THEODOROU: Objection.
5            THE WITNESS: It's not there.
6            BY MS. WILLIAMS:
7        Q.   Do you agree you did your best to record
8    your recollection accurately in this document?
9            MR. THEODOROU: Objection.
10           THE WITNESS: I did my best to put down my
11   recollections at that time.
12           BY MS. WILLIAMS:
13       Q.   I wanted to ask you a couple of questions
14   about the quarterly refunding conferences. You
15   stated that over the years you attended a number of
16   quarterly refunding conferences; is that right?
17       A.   Correct.
18       Q.   Did you always know every one who was in
19   attendance at the conferences?
20       A.   No.
21       Q.   So there may have been people there at the
22   conferences that you did not know?
23       A.   Correct.
24       Q.   And people that you did not know where
25   those people worked; is that right?

| Page 340 |
|---|

1        A.   Correct.
2        Q.   And I think you also said that there were
3    a number of people at the October 31st conference
4    more than usually attended the conference --
5        A.   Correct.
6        Q.   -- is that right?
7            So did you know all of the people who were
8    in attendance at that conference?
9        A.   No.
10       Q.   Do you know where the people who attended
11   that conference where they worked, or who they worked
12   for?
13       A.   No. Some of them I did, but many of them
14   I did not.
15       Q.   You described the layout of the room for
16   the October 31st conference. And I wanted to ask
17   you, you said that there were double doors in the
18   room?
19       A.   I thought so or large -- yeah, double -- I
20   thought there were double doors, maybe it was a large
21   door, it was a large opening.
22       Q.   When you say double doors, can you
23   describe to me what you mean exactly?
24       A.   That there are two doors and that they
25   open in or out.

23 (Pages 337 to 340)

|  | Page 341 |
| --- | --- |

1    Q.   Do you mean two doors right next to each
2  other?
3    A.   Right.
4    Q.   You said that at some point you saw people
5  going in and out of those doors?
6    A.   Right.
7    Q.   Could you tell me at what points during
8  the conference you noticed people going in and out of
9  the doors?
10    A.   Well, doors were open when -- before the
11  meeting and right up until the meeting started, I
12  wasn't paying attention back there and you know later
13  on I -- during the meeting I noticed there were some
14  people going in and out and at the end of the
15  meeting, you know they were open.
16    Q.   Do you recall whether Mr. Fisher had made
17  his statements when you recalled people going in and
18  out?
19        MR. THEODOROU: Objection.
20        THE WITNESS: I was paying attention to
21  Mr. Fisher. When I noticed people going in and out
22  during the meeting, it was during the question and
23  answer period.
24        BY MS. WILLIAMS:
25    Q.   Do you know who the people were who were

|  | Page 342 |
| --- | --- |

1  going in and out, can you identify any of the people?
2    A.   No, I can't.
3    Q.   Do you know -- could you -- do you know if
4  the people going in and out of the door were part of
5  the Press?
6    A.   No, not for sure, I mean I assumed they
7  were, but I had no idea who they were. There were a
8  lot of additional Press there than you would normally
9  have, there were television crews, there were extra
10  Treasury officials than normal, it was just a lot
11  additional people at that meeting.
12    Q.   Why do you believe there were a lot of
13  additional people at that meeting?
14        MR. THEODOROU: Objection.
15        THE WITNESS: It was Fisher's first
16  statement as Undersecretary and it had been announced
17  in advance and so it attracted a lot more media
18  attention.
19        BY MS. WILLIAMS:
20    Q.   The additional people at the meeting, do
21  you know if they were part of the Press?
22        MR. THEODOROU: Objection.
23        THE WITNESS: I mean I'd recognize certain
24  members of the press there. There were a lot of
25  additional people there that I assumed were Press

|  | Page 343 |
| --- | --- |

1  because they came in from the back doors, not from
2  the front and because they sat down, you know, in the
3  theater seating just like all the rest of the press
4  that I did know.
5        There were also some Treasury staff back
6  there, kind of organizing the meeting and there were
7  other Treasury staff that came with Fisher from the
8  interior entryway. And so I assumed most of those
9  people coming in and out were Press, but there were
10  also some Treasury staff back there, and so I knew
11  some of the Treasury staff but there were others that
12  I may not have known and so I could not be sure who
13  was staff and who was Press.
14    Q.   When Mr. Theodorou was asking you
15  questions this morning, you mentioned that on
16  occasion, you would see -- maybe after refunding
17  conferences in general, and I want you to clear that
18  up for me, you would see reporters leave the room and
19  make phone calls?
20    A.   Correct.
21    Q.   Was that after all of the quarterly
22  refunding conferences that you attended?
23    A.   Yeah, pretty regularly. I mean there were
24  a few quarterly refundings where there were only two
25  or three reporters and me and those were the

|  | Page 344 |
| --- | --- |

1  reporters who had offices down the first floor of the
2  Treasury. Nobody went out in the hallway and pulled
3  out their cell phone for that meeting, but most of
4  the meetings where there were more reporters, there
5  were some reporters who did not have space down in
6  the Treasury Press room and so after most quarterly
7  refunding meetings, the reporters who did not have
8  space down at the Treasury press room would go out in
9  the hallway and immediately as soon as the meeting
10  was over and before the embargo time be on their cell
11  phones.
12    Q.   You saw these reporters inside the
13  Treasury building making telephone calls on --
14    A.   Yes, I did.
15    Q.   Did you ever see any reporters inside the
16  press office making phone calls?
17        MR. THEODOROU: Objection.
18        THE WITNESS: On my way out of the
19  building, I could look into that room if the door was
20  open and sometimes I saw somebody with a phone in
21  their hand, but I mean that was an occasional
22  occurrence, it's not like -- I mean the meeting would
23  break up and people would kind of leave generally at
24  that time and go down the elevator or down the stairs
25  and down that hallway and sometimes I would see the

Alderson Reporting Company
1111 14th Street, NW Suite 400          1-800-FOR-DEPO          Washington, DC 20005

Peter Davis, Jr.                                                      April 20, 2006
Washington, DC

Page 345

1  reporters who had space in that Treasury press room
2  go into that room and pick up a phone.
3      BY MS. WILLIAMS:
4      Q.  Do you know who the reporters were
5  calling?
6      A.  No, I have no way of knowing.  I assume
7  they were calling their editors and their papers, but
8  I have no way of knowing who they were calling.
9      Q.  You didn't know who was on the other end
10  of the call?
11      A.  No, there was no way for me to know that.
12      By the way, I just remembered the name of
13  the reporter who is the one reporter I can name who
14  is at almost all of these meetings, it was Ed Keane,
15  K-e-a-n-e.  He was with Bloomberg then, he's with the
16  G-7 group now.  He and I would often sit next to each
17  other.
18      Q.  At the -- where would you sit next to each
19  other?
20      A.  At quarterly refunding conferences.  When
21  he was there, he would often show up after I had
22  arrived and he would often sit next to me because we
23  knew each other.
24      Q.  I want to ask you a little bit about your
25  agreement with Mr. Anderson.

Page 346

1      One follow-up question before I ask you
2  about your agreement with Mr. Anderson.  You talked
3  about noticing reporters inside of Treasury making
4  telephone calls after the quarterly refunding
5  conferences.
6      A.  Right.
7      Q.  Did you ever see any reporters outside
8  making any telephone calls?
9      A.  No.
10      Q.  Now, to the agreement that you had with
11  Mr. Anderson, I just had a couple of questions about
12  that.  You stated that you knew about the agreement
13  and Mr. Anderson knew about the agreement.
14      Am I also correct that there was an
15  assistant to Mr. Anderson, the assistant to
16  Mr. Anderson also knew about this agreement; is that
17  correct?
18      A.  Correct.  There were three of us in that
19  room when that agreement was signed.
20      Q.  And do you recall if that assistant was
21  male or female?
22      A.  It was female.  She was female.
23      Q.  Do you recall if the agreement had any
24  language in it that allowed you to tell other people
25  about embargoed information if those people agreed to

Page 347

1  honor the embargo?
2      MR. THEODOROU:  Objection.
3      THE WITNESS:  There was no such language
4  in the agreement.
5      BY MS. WILLIAMS:
6      Q.  Did you ask Mr. Anderson any questions
7  about the agreement before you signed the agreement?
8      A.  I asked him for a minute or two to read
9  it, but I didn't have time to give it a detailed
10  reading, I gave it a cursory reading for a minute or
11  two, no, I didn't ask any other questions.
12      Q.  When you say you didn't have the time,
13  what do you mean?
14      A.  Assistant Secretary of Treasury, he's a
15  busy guy, I didn't feel it was appropriate to take a
16  lot of his time.  He was sitting there and after a
17  minute or two I decided it was time to sign it.
18      Q.  Did you believe that you understood the
19  terms of the agreement before you signed it?
20      A.  I understood that I should not disclose
21  the information before it was made available to the
22  public.  I didn't understand every detail of what was
23  on those two pages.  I didn't recognize the U.S. Code
24  sections at the end of it and I -- no, I thought I
25  had a general understanding of it, I didn't have a

Page 348

1  specific detailed understanding of it.
2      Q.  You said that you understood that you were
3  not to convey the information before the embargo
4  time.
5      A.  Correct.
6      Q.  Are you referring to information you
7  received at Treasury's quarterly refunding
8  conferences?
9      MR. THEODOROU:  Objection.
10      THE WITNESS:  Yes.  I took the agreement
11  to be specifically to Treasury quarterly refunding
12  meetings.  I had numerous other meetings at Treasury
13  on a regular basis, with this professional group of
14  mine and when clients came in to talk about the
15  economy and deficits and tax cuts so that agreement
16  as I understood it was only about Treasury quarterly
17  refunding meetings.
18      BY MS. WILLIAMS:
19      Q.  And you were able to retain a copy of the
20  agreement; is that right?
21      A.  I left that room in 1994 with a one page
22  front and back copy of that document.
23      Q.  When you left in 1994 with a copy of the
24  document and I'm talking about before August of 2001
25  between that time, did you ever review the agreement?

25 (Pages 345 to 348)

Peter Davis, Jr.                                                    April 20, 2006

Washington, DC

| Page 349 | Page 351 |
|---|---|

**Page 349**

1    A.   No, in fact I got back to the office
2  obviously I filed it in an unmarked file folder and
3  forgot about it until like August of 2001 or so.
4    Q.   Did you have any further conversations
5  Mr. Anderson about the agreement?
6    A.   No.
7    Q.   You said that the embargo -- I believe you
8  testified the embargo was mentioned at every
9  Wednesday quarterly refunding conference that you
10  attended; is that right?
11        MR. THEODOROU: Objection.
12        THE WITNESS: That's correct.
13        BY MS. WILLIAMS:
14    Q.   Did you -- so you heard the term embargo
15  at the Wednesday quarterly refunding conferences?
16        MR. THEODOROU: Objection.
17        THE WITNESS: Yes.
18        BY MS. WILLIAMS:
19    Q.   Did you ever ask anyone what embargo
20  meant?
21    A.   No.
22    Q.   Did you have an understanding as to what
23  it meant?
24        MR. THEODOROU: Objection.
25        THE WITNESS: Yes.

**Page 351**

1    A.   At the corner of 14th and F Street on the
2  north side of the street.
3    Q.   Did you make any calls inside the Treasury
4  building?
5    A.   No.
6    Q.   Why not?
7        MR. THEODOROU: Objection.
8        THE WITNESS: I was calling people before
9  the embargo time and I was not going to do that
10  inside the building, I did it outside.
11        BY MS. WILLIAMS:
12    Q.   You discussed earlier when Mr. Theodorou
13  was asking you questions about your understanding of
14  the purpose behind an embargo --
15        MR. THEODOROU: Objection.
16        BY MS. WILLIAMS:
17    Q.   Could you tell me again what you thought
18  the purpose of an embargo was?
19        MR. THEODOROU: Objection.
20        THE WITNESS: It was to make sure that the
21  information went out at one time and to give
22  reporters an opportunity to have the time to put
23  together an accurate reporting of what had been
24  disclosed.
25        BY MS. WILLIAMS:

| Page 350 | Page 352 |
|---|---|

**Page 350**

1        BY MS. WILLIAMS:
2    Q.   And why didn't you ever ask anyone what
3  embargo meant?
4        MR. THEODOROU: Objection.
5        THE WITNESS: Because I thought I
6  understood what it meant.
7        BY MS. WILLIAMS:
8    Q.   Do you understand the term embargo
9  prohibited you from telling your clients about the
10  cancellation of the 30-year bond on October 31st
11  before 10:00 a.m.?
12    A.   Yes.
13        MR. THEODOROU: Objection.
14        Just for the record, could you just slow
15  down a little bit so I can raise my objections?
16        THE WITNESS: I understand.
17        MR. THEODOROU: Objection to the question
18        BY MS. WILLIAMS:
19    Q.   But you did call clients on October 31st,
20  before 10:00 a.m. and told them about the
21  cancellation of the 30-year bond; is that right?
22        MR. THEODOROU: Objection.
23        THE WITNESS: Yes.
24        BY MS. WILLIAMS:
25    Q.   Where did you make these telephone calls?

**Page 352**

1    Q.   How did you come to this understanding?
2    A.   I saw embargoes in operation in my
3  previous work experience. I don't recall anybody
4  ever explaining specifically what an embargo meant,
5  it was just assumed you won't. I never got into a
6  discussion with anybody like Mr. Anderson or anybody
7  else about what -- it just -- I just never had an
8  explanation and I never asked for one.
9    Q.   You testified earlier today about
10  embargoes that were you aware of in other agencies,
11  departments and on the Hill?
12    A.   Right.
13    Q.   In those others -- the other embargoes
14  that you're aware of in these other agencies and
15  departments on the Hill, did any of them allow
16  someone who received embargoed information to convey
17  that information to the public before the embargo
18  expired?
19        MR. THEODOROU: Objection.
20        THE WITNESS: No.
21        MS. WILLIAMS: I just have one final
22  question.
23        BY MS. WILLIAMS:
24    Q.   You entered into a plea agreement with the
25  U.S. Attorney's Office; is that right?

26 (Pages 349 to 352)

Peter Davis, Jr.                                                April 20, 2006
Washington, DC

Page 353

1    A.   Correct.
2    Q.   Was that agreement separate from the
3  agreement that you entered into with the SEC?
4    A.   I --
5        MR. STANCIL:  I don't know if he knows the
6  legal significance of that.
7        MR. THEODOROU:  Objection.
8        BY MS. WILLIAMS:
9    Q.   Do you know if anyone from the SEC signed
10  that plea agreement?
11    A.   I don't know, I really don't recall.  I
12  know there was a judgment from the SEC and I know
13  there was a judgment from the U.S. District Court.
14        MS. WILLIAMS:  I'd like to go off the
15  record.  There are only five minutes off the tape, I
16  don't know if I have any more questions but I want to
17  renew my notes.
18        THE VIDEOGRAPHER:  Do you want me to
19  switch?
20        MS. WILLIAMS:  Yes.
21        THE VIDEOGRAPHER:  Here marks the end of
22  video tape number two.  Going off the record, the
23  time on the screen is 12:39:39.
24        (Recess.)
25        THE VIDEOGRAPHER:  Here marks the

Page 354

1  beginning of videotape number 3, going back on the
2  record the time on the screen is 12:48:32.
3        MS. WILLIAMS:  I don't have any further
4  questions for you, Mr. Davis, at this time.
5        Thank you.
6        THE WITNESS:  Thank you.
7        MR. THEODOROU:  No further questions,
8  thank you, Mr. Davis.
9        THE VIDEOGRAPHER:  Here marks the end of
10  volume number 2 in the videotape deposition of Peter
11  Davis.
12        Going off the record the time on the
13  screen is 12:48:50.
14        (Whereupon, at 12:48 p.m., the taking of
15  the instant deposition ceased.)
16
17
18
19
20
21
22
23
24
25

Page 355

1
2
3    _____
4        Signature of the Witness
5
6  SUBSCRIBED AND SWORN to before me this _____ day of
7  _____, 20_____.
8
9
10    _____
10        Notary Public
11
12  My Commission Expires:_____
13
14
15
16
17
18
19
20
21
22
23
24
25

27 (Pages 353 to 355)

FOIA – Confidential
Treatment Requested

ADDRESS BOOK
List # 3
All Clients
Last Modified on 5/11/01
28 addresses

Page #1



| Fax Number | Company | Last Name | First Name | Phone Number | Billing Code | Department |
|---|---|---|---|---|---|---|
| 202-293-3416 | Bank of Tokyo- .. | Tochisako | Atsumasa | 202-463-0477 | | |
| 301-652-5831 | Capitol Analysts | Sweet | Stu | 301-951-9161 | | |
| 914-925-8856 | Capra Asset Ma... | Capra | Jim | 914-925-7777 | | |
| 212-834-6640 | Chase Securities | Glassman | Jim | | | |
| 212-429-3616 | Dresdner, Klein .. | Logan | Kevin | 212-429-4970 | | |
| 202-265-9473 | Embassy of Japan | Katayama | Kazuyuki | 202-238-6724 | | |
| 617-371-0673 | Fidelity Manage .. | Ernsbo-Mattingly | Lisa | 617-563-7788 | | |
| 212-902-4110 | Goldman Sachs | Youngdahl | John | 212-902-8124 | | |
| 212-486-6475 | International Inv... | Hyman | Ed | | | |
| 202-861-0790 | Johnson Smick I... | Johnson | Manley | 202-861-0770 | | |
| 212-586-6901 | Macquarie Holdi.. | Robertson | Rory | | | |
| 617-954-7641 | Massachusetts F... | Nothern | Stephen | 617-954-5887 | | |
| 212-219-9093 | Medley Advisors | Medley | Richard | | | |
| 212-761-0309 | Morgan Stanley ... | Greenlaw | Dave | 212-761-7157 | | |
| 212-664-1141 | Nexus | Jell | Tomas | | | |
| 312-444-4132 | Northern Trust | Kasrial | Paul | | | |
| 973-802-9138 | Prudential Secu... | Lamp | Evan | 973-367-4814 | | |
| 617-760-8383 | Putnam Investm... | Maki | Dean | | | |
| 203-614-2030 | SAC Capital Man... | Weiner | John | 203-614-2041 | | |
| 312-641-6955 | Sangamon Tradi... | Moore | Noel | 312-984-8293 | | |
| 0114402079B .. | Schroder Salom... | Horne | J. Paul | | | |
| 262-240-3274 | Stark Investment | Wood | John | | | |
| 609-683-9580 . | Stone & McCarthy | McCarthy | Ward | 609-683-5521 | | |
| 703-243-2266 | Strategic Invest... | Franz | Katy | 703-243-3737 x... | | |
| 212-980-7014 | The Conference ... | Fosler | Gail | 212-339-0300 | | |
| 617-737-9280 | Tudor Investme... | Monaco | Peter | | | |
| 202-833-4104 | Tudor Investme .. | Dugger | Rob | 202-833-4100 | | |
| 312-537-1203 | Zurich Kemper | Hale | David | 312-537-1760 | | |

DC  001496

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
by quarter.  There may be quarters with no buybacks."  Treasury has "no
target" amount to retire.

10 year reissuance in October won't be repeated.  Fisher said "I regret that
we felt it necessary to hold the October auction [reopening]…Given the
number of fails in October, we had to act [in the 10 year, but not the 5
year]…It seemed to work as we hoped…It's certainly something I hope we never
have to repeat."

Cash management bills will be avoided if possible.  "It's certainly our hope
to work with the 4 week bill instead."

Is Treasury concentrating its borrowing on the short end?  "You draw the
correct inference, but I wouldn't put too fine a point on it."

"There is a wrinkle in the yield curve in 2003 and 2004," Fisher said.  "We
have an opportunity to smooth out the curve."

© 2001  Davis Capital Investment Ideas    Call 202-544-7098


Subject: Pete Davis 10/31/01 calls
Date: Mon, 05 Nov 2001 16:38:59 -0500
From: Pete Davis <pete@daviscap.com>
To: "Minsker, Marty" <Martin.Minsker@BakerBotts.com>,
     "Bennett, Brad" <brad.bennett@bakerbotts.com>,
     "Spearing, Mary" <mary.spearing@bakerbotts.com>

Marty, Mary, and Brad:

A Verizon Wireless representative just read me the phone calls I made
last Wednesday morning, 10-31-01, before 10 a.m.  They record just the
city and the phone number.  I added who I talked to and what happened
with that call.

I can't explain how the phone calls start this early, because I left the
Treasury meeting, which supposedly ended at 9:28 a.m., and took at least
a few minutes to exit Treasury to a bench near the corner of 14th and F
Streets, N.W.  I remember looking at my watch, which I set regularly by
the National Time Clock, when I rose to leave the meeting, and it was
9:28 a.m.

9:28 a.m.  609-683-5521  Princeton, N.J. Ward McCarthy, Stone &
McCarthy 10 a.m. embargo.  Detailed conversation.

9:32 a.m.  914-925-7707  Rye, NY. Bill Cohen, Capra Asset Mgmt.  10 a.m.
embargo.  Detailed conversation.

9:33 a.m.  203-863-6715  Greenwich, CT. Chris Long, Tudor Investment
Corp., 10 a.m. embargo.  Detailed conversation.  I've never met Chris,
so I can't be sure I was talking to him.  I asked for him, and am
reasonably sure, it was him, but I can't be certain.

9:34 a.m. 203-614-2400 Stamford, CT _____, SAC Capital.  Don't know
who I talked to.  Larry Supinski wasn't in. 10 a.m. embargo.  Detailed
conversation.

9:35 a.m. 212-902-8124  NY,NY John Youngdahl, Goldman Sachs.  10 a.m.
embargo.  Detailed conversation.

9:37 a.m. 312-984-1331 Chicago.  Didn't get through to Bob Falconer,
Sangamon Trading.  Can't remember if I left a message. I don't think
so.  If yes, it was a short 10 a.m. embargo and main points.
Page 881

DC 002545

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt

9:38 a.m. 617-954-5887 Boston, MA. Didn't get through to Steve Nothern, Massachusetts Financial Services. Left a short message, 10 a.m. embargo and main points.

9:39 a.m. 617-563-7788 Boston, MA. Didn't get through to Lisa Emsbo-Mattingly, Fidelity Management & Research Co. She was still out on maternity leave. Left no message. Talked to a receptionist and ended the call with no message. I spent a minute trying to find that name and number in my Palm Pilot, gave up, and called my assistant.

9:41 a.m. 202-543-4324 Washington, DC. Allyson Sullivan, Davis Capital. She checked my computer contact information and gave me the information for Lisa's superior.

9:44 a.m. 617-563-0573 Boston, MA. Didn't get through to Lisa's superior at Fidelity, Ann Punzak. No message.

9:45 a.m. 617-760-8616 Boston, MA. Didn't get through to Dean Maki, Putnam Investments. He's not a client, but I hoped he would become one. No message.

9:46 a.m. 212-397-3672 NY, NY. Tomas Jelf, Nexus. He's not a client, although I hoped he would become one. He was a client at another firm a few years ago. Didn't get through. No message.

9:47 a.m. 212-834-5102 NY,NY. Jim Glassman, J.P. Morgan. Didn't get through. No message.

9:49 a.m. 212-834-5102 NY,NY. Jim Glassman, J.P. Morgan. No clear recollection, but I believe I left a short message, 10 a.m. embargo and main points.

9:51 a.m. 212-219-9096 NY,NY. Peter Hamilton, Medley Advisers. 10 a.m. embargo, short conversation re main points.

9:53 a.m. 617-760-8816 Boston. Didn't get through again to Dean Maki, Putnam Investments. No clear recollection, but I don't think I left a message.

9:55 a.m. 212-397-3672 Tomas Jelf, Nexus. 10 a.m. embargo and short conversation re main points.

9:56 a.m. 704-388-1839 Charlotte, NC. Habeeb Ahmed Bank of America. He's not a client, but I hoped he would become one. I helped him with some questions re fiscal policy a few weeks ago. He wasn't in. No message.

9:58 a.m. 662-7000. Washington, D.C. Tim Wiss of the National Press Building re new office space for me.

That's it.

Pete

**REDACTED**

Page 882

DC 002546

**Exhibit H**

**Cited Excerpts from the Deposition of Jill Ouseley
(July 24, 2006)**

Page 1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO. 05-CV-10983 NMG

Securities and Exchange
Commission,

    Plaintiff,

    vs.

Steven E. Nothern,

    Defendant.

------------------------------/

VIDEOTAPED DEPOSITION OF JILL OUSELEY

July 24, 2006
1:58 p.m. - 5:17 p.m.

Esquire Deposition Services
1819 Main Street
Suite 250
Sarasota, Florida 34236

----------------------------

REPORTED BY:
NANCY E. PAULSEN
Registered Professional Reporter
Notary Public, State of Florida at Large
Esquire Deposition Services - Sarasota, Florida
941-364-2200 (800-838-2814)
Job No.: N 811629

Page 2

APPEARANCES:

Robert E. Toone, Esquire
Foley Hoag, LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2600
617-832-1000 / fax 617-832-7000

    Attorney for Defendant

John J. Rossetti, Jr., Esquire
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-8549B

202-551-4819 / fax 202-772-9245

    Attorney for Plaintiff

Jordan A. Thomas, Esquire
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-8549B

202-551-4819 / fax 202-772-9245

    Attorney for Plaintiff

Page 3

Thomas M. McGivern, Esquire
Assistant General Counsel
U.S. Department of the Treasury
1500 Pennsylvania Avenue, NW
Washington, D.C. 20220
202-622-2317

    Attorney for Department of the Treasury

Also Present:

Cliff Biram, III, videographer

Page 4

INDEX

|  | | Page |
|---|---|---|
| DIRECT EXAMINATION BY MR. TOONE | | 6 |
| CROSS-EXAMINATION BY MR. ROSSETTI | | 92 |
| REDIRECT EXAMINATION BY MR. TOONE | | 118 |
| RECROSS EXAMINATION BY MR. ROSSETTI | | 124 |
| FURTHER DIRECT EXAMINATION BY MR. TOONE | | 124 |
| FURTHER RECROSS EXAMINATION BY MR. ROSSETTI | | 125 |
| CERTIFICATE OF OATH | | 127 |
| CERTIFICATE OF REPORTER | | 128 |
| SIGNATURE PAGE/ERRATA SHEET | | 129 |
| ATTORNEY NOTIFICATION LETTER | | 130 |

EXHIBITS

| No. | Description | Page |
|---|---|---|
| 1 | Subpoena | 24 |
| 2 | Minutes of Borrowing Advisory Committee from April 30th and May 1 of '96 | 42 |
| 3 | Transcript of deposition from 1/7/02 | 54 |
| 4 | Promotional material by Davis Capital Investment Ideas | 64 |
| 5 | Memorandum of Activity by Knorr dated 12/28/01 | 67 |

Page 25

1    A.  Certainly.
2    Q.  Now, are there any other documents that you
3 once had that --
4        THE DEPONENT:  May I borrow your pen for a
5 moment?
6        THE COURT REPORTER:  Yes.
7        MR. ROSSETTI:  No, don't write on that.
8        MR. TOONE:  Yeah.
9        THE DEPONENT:  No, don't write on that.  All
10 right.  Well, give me a --
11       MR. ROSSETTI:  We'll give you another copy.
12       THE DEPONENT:  Because I'll forget if I don't
13 write it down.
14       MR. THOMAS:  Actually, why don't we give her a
15 paper that's not -- doesn't look like an exhibit.
16       MR. TOONE:  Oh, okay.
17       THE DEPONENT:  Oh, it --
18 BY MR. TOONE:
19    Q.  We'll do this at break, we'll just write a
20 note, if that's all right.
21    A.  Perhaps you would just simply give me your
22 card and I'll write on that.
23    Q.  I will do that.
24       MR. THOMAS:  I think she wanted to do it now
25 so she didn't forget.

Page 26

1        MR. TOONE:  Okay.
2        MR. THOMAS:  So I think that's a legitimate
3 thing for her.
4        THE DEPONENT:  Thank you.
5        If he forgets, it's not my problem, right?
6 BY MR. TOONE:
7    Q.  There is my card.
8    A.  Thank you.
9    Q.  Are you ready?
10    A.  Yes.
11    Q.  Now, I had asked you before, are there any
12 other documents that you once had that would be
13 responsive to the subpoena but you no longer have?
14    A.  I don't remember any.
15    Q.  Now, you said that you had read some
16 information about Peter Davis from these documents that
17 you downloaded from the S.E.C.'s website; is that
18 correct?
19    A.  Yes.
20    Q.  Do you have any independent knowledge of who
21 Peter Davis is, aside from those documents?
22    A.  I don't remember any.
23    Q.  Do you recall ever meeting with a man named
24 Peter Davis during your time at Treasury?
25    A.  No.

Page 27

1    Q.  Do you recall ever speaking on the phone with
2 a man named Peter Davis during your time at Treasury?
3    A.  I don't remember.
4    Q.  Do you recall ever speaking with any of your
5 colleagues at Treasury about a man named Peter Davis?
6    A.  Before 2001?
7    Q.  I'm sorry, you're asking me?  Yes.
8    A.  Yes.
9    Q.  Before 2001.  Yes.  I'm sorry.
10    A.  No.
11    Q.  No.
12        Do you recall ever admitting a man named Peter
13 Davis to a meeting or conference at the Treasury
14 Department?
15    A.  I do not remember.
16    Q.  Did you ever observe Roger Anderson introduce
17 a man named Peter Davis to Paul Malvey?
18    A.  I don't remember that.
19    Q.  Did you ever hear Roger Anderson describe a
20 man named Peter Davis as, quote, one of the good guys,
21 end quote?
22    A.  I don't remember.
23    Q.  Did you ever --
24    A.  I'm smiling, because he turned not to be,
25 didn't he.

Page 28

1    Q.  Did you ever observe any employee at Treasury
2 introduce Peter Davis to Roger Anderson?
3    A.  No.
4    Q.  And do you recall yourself ever introducing
5 Peter Davis to Roger Anderson?
6    A.  No.
7    Q.  Do you recall Paul Malvey ever telling you,
8 when you were working at Treasury, that he had received
9 a telephone call from Peter Davis?
10    A.  No.
11    Q.  Do you recall ever telling Paul Malvey that it
12 was okay for Peter Davis to be admitted to a Treasury
13 conference?
14    A.  No.
15    Q.  Do you recall ever speaking with Lula Tyler
16 about Peter Davis?
17    A.  No.
18    Q.  Did Lula Tyler have authority on her own to
19 clear persons into Treasury meetings or conferences?
20    A.  No.
21    Q.  Who at Treasury had that authority?
22    A.  The Office of Public Affairs.
23    Q.  Anyone outside the Office of Public Affairs?
24    A.  There was no formal written document that I'm
25 aware of.

Page 49

1    A.  Well, I don't know about bylaws.  That might
2  be too strong.
3    Q.  But you believe that these documents included
4  guidelines that addressed, in part, issues of
5  confidentiality?
6    A.  Yes.
7    Q.  Are you aware of any other written
8  confidentiality agreements that were used by the
9  Treasury Department?
10    A.  No.
11    Q.  Are you aware of any written confidentiality
12  agreements that was signed by persons attending
13  quarterly refunding press conferences?
14    A.  Treasury document?
15    Q.  Yes, ma'am.
16    A.  No.
17    Q.  Are you aware of any written confidentiality
18  agreement that was signed by Roger Anderson?
19    A.  No.
20    Q.  Are you aware of any written confidentiality
21  agreement that was signed by a man named Peter Davis?
22    MR. ROSSETTI:  Objection.
23    A.  No.
24  BY MR. TOONE:
25    Q.  Did Treasury have any written policies or

Page 50

1  procedures on embargos?
2    A.  Not that I know of.
3    Q.  Were there any unwritten policies or
4  procedures?
5    A.  Yes.
6    Q.  And what were those unwritten policies or
7  procedures?
8    A.  That a release was -- it would have a time on
9  it, and it was embargoed for release, which meant don't
10  release it before the time that was on the press
11  release.
12    Q.  Who at Treasury was responsible for
13  establishing an embargo time?
14    A.  Public affairs or other Treasury officials.
15  It would be senior Treasury officials that asked for a
16  embargo -- an embargo.
17    Q.  Do you recall the procedure that was used to
18  arrive at embargo times during your time as Office --
19  Director of Office of Market Finance?
20    A.  The procedure was to have the embargo time be
21  ten minutes, maybe, after -- they would close a press
22  conference, no more questions, and then embargoed until
23  approximately ten minutes after that.
24    Q.  Do you recall a member of the Office of Public
25  Affairs ever asking or polling the reporters present as

Page 51

1  to what the embargo time should be?
2    MR. ROSSETTI:  Objection.
3    A.  No.  I -- I don't remember.
4  BY MR. TOONE:
5    Q.  And how long was the embargo time, in your
6  experience?
7    A.  About ten minutes.
8    Q.  Now, what was your understanding of what the
9  embargo at a quarterly refunding press conference
10  prohibited people from doing?
11    A.  Calling their offices, or any market
12  participants, or anybody but their wife.
13    Q.  A person could call his wife?
14    A.  Yes.
15    Q.  Yes.
16    Anyone else could be called under the embargo?
17    A.  No.  We didn't have a written rule, but that
18  would be a standing, you know.
19    Q.  Could a -- in your understanding, could a
20  reporter call his or her office with the news?
21    A.  No.
22    Q.  How did Treasury enforce its embargos at
23  quarterly refunding press conferences?
24    A.  If there was a problem, the person was not
25  allowed in again.

Page 52

1    Q.  So the penalty for violating the embargo was
2  not to be admitted to a future conference?
3    A.  That's right.
4    Q.  Was there any other penalty associated with
5  the embargo?
6    A.  Not that I know of.
7    Q.  If a person violated an embargo, would he be
8  subject to criminal penalties?
9    A.  I don't know.
10    Q.  Did you -- would you know if a person
11  violating an embargo, would he be subjected to civil
12  penalties, such as a fine?
13    MR. ROSSETTI:  Objection.
14    A.  I don't know.
15  BY MR. TOONE:
16    Q.  Were persons who attended Treasury press
17  conferences told anything about the penalties for
18  violating embargos?
19    MR. ROSSETTI:  Objection.
20    A.  I don't recall any discussion of it.
21  BY MR. TOONE:
22    Q.  Are you aware of any instance during your time
23  at Treasury in which an embargo was violated?
24    A.  No.
25    Oh.  Oh.  Oh.  Oh.  There was information that

13 (Pages 49 to 52)

Page 73

1 had with Mr. Malvey?
2     A.  No.
3     Q.  Do you have any recollection of that
4 conversation today other than what you've already
5 testified to?
6     A.  No.
7     Q.  Have you discussed with Mr. Malvey Peter
8 Fisher on subsequent occasions?
9         MR. ROSSETTI:  You mean subsequent to the
10 discussion --
11 BY MR. TOONE:
12     Q.  Subsequent to this -- this phone conversation
13 that took place sometime in late 2001.
14     A.  I'm trying to sort through my memory.
15     Q.  Sure.  Take your time.
16     A.  I don't recall any.
17     Q.  Do you know -- are you familiar with the
18 manner in which the quarterly refunding announcement was
19 released on October 31st, 2001?
20         MR. ROSSETTI:  Objection.
21     A.  I'm not sure I understand your question.
22 BY MR. TOONE:
23     Q.  Do you have any knowledge about how the
24 quarterly refunding announcement was released by the
25 Treasury Department on October 31st, 2001?

Page 74

1     A.  No.
2         MR. ROSSETTI:  Objection.
3     A.  I don't.
4 BY MR. TOONE:
5     Q.  Do you recall ever discussing this matter with
6 Mr. Malvey?
7     A.  No.
8         Excuse me.  Discussing the release time?
9     Q.  Yes, ma'am.
10     A.  I do remember talking about the release time.
11     Q.  What do you remember talking about?
12     A.  It was an unusually-long time to wait to
13 release the information to the public.  The embargo was
14 unusually long.
15     Q.  Is that your opinion or is that Mr. Malvey's
16 opinion?
17     A.  It was my recollection of the Treasury's
18 history.
19     Q.  And what is your recollection of what happened
20 differently on October 31st, 2001?
21         MR. ROSSETTI:  Objection.
22     A.  Having read the newspapers or any other?
23 BY MR. TOONE:
24     Q.  Based on all the information that you know
25 about what happened.

Page 75

1     A.  That I -- that Davis apparently called his
2 people that he -- or I guess they were subscribers to
3 his service, and told them about the refunding
4 announcement.
5     Q.  And how does --
6     A.  Prior to the 10 o'clock time.
7     Q.  Prior to the 10 o'clock time?
8     A.  Um-hum (affirmative).
9     Q.  Did Treasury ever use a 10 o'clock embargo
10 time on previous occasions?
11         MR. ROSSETTI:  Objection.
12     A.  I don't recall.
13 BY MR. TOONE:
14     Q.  Do you recall Treasury ever using a 10 o'clock
15 embargo time during your tenure as Director of Office of
16 Market Finance?
17         MR. ROSSETTI:  Objection.
18     A.  I don't recall.
19 BY MR. TOONE:
20     Q.  Do you recall Treasury ever using a fixed
21 embargo time, and by that, I mean fixed ahead of the
22 time that the conference was given?
23         MR. ROSSETTI:  Objection.
24     A.  No.
25 BY MR. TOONE:

Page 76

1     Q.  I'm sorry, no, that never happened; or no, you
2 don't recall?
3     A.  I don't recall.
4     Q.  You testified earlier that you recalled the
5 embargo being set ten minutes in advance?  Do you recall
6 giving that testimony today?
7     A.  Ten minutes from the end -- the end of that
8 press conference, usually.
9     Q.  Do you recall any quarterly refunding --
10     A.  We're only talking about quarterly refunding
11 press conferences.
12     Q.  That's right.
13     A.  Releases.  Okay.
14     Q.  Can you recall any quarterly refunding
15 conference where that procedure was not followed?
16         MR. ROSSETTI:  Objection.
17     A.  No.
18 BY MR. TOONE:
19     Q.  Do you have an opinion as to whether it's good
20 policy to use a fixed embargo time as opposed to setting
21 a time ten minutes after the conclusion of the press
22 conference?
23     A.  No.
24         MR. ROSSETTI:  Objection.
25 BY MR. TOONE:

19 (Pages 73 to 76)

Page 77

1   Q.  You have no opinion?
2   A.  No.
3       MR. ROSSETTI:  Objection.
4   A.  I have no opinion.
5       MR. ROSSETTI:  I would just note that she was
6  -- the witness was quick with her response.  I
7  didn't get the objections in there.  I just want
8  that noted for the record.
9       THE DEPONENT:  Excuse me.
10      MR. TOONE:  Standing objection to that line of
11  questions.
12  BY MR. TOONE:
13   Q.  Do you recall discussing with Mr. Malvey the
14  possibility that any type of embargo procedure might be
15  more likely to result in a leak of information?
16      MR. ROSSETTI:  Objection.
17   A.  It seems obvious on its face, the more time
18  you have, the more the possibility.
19  BY MR. TOONE:
20   Q.  And why is that obvious on its face?
21      MR. ROSSETTI:  I just want to object to the
22  answer as being nonresponsive, but.
23  BY MR. TOONE:
24   Q.  You testified that it is more -- it is obvious
25  on its face that a longer period results in a greater

Page 78

1  risk of early disclosure; is that correct?
2   A.  Yes.
3   Q.  And why is that?
4   A.  I -- I can't answer you.
5   Q.  Do you recall testifying earlier, and I'm
6  reading on page 31, line 4, "That normal practice had
7  been to try to get it out -- get the announcement out on
8  the wire as quickly as possible, because everybody knew
9  it was coming, and everybody knew there was a chance
10  that it would leak"?
11      MR. ROSSETTI:  Objection.
12  BY MR. TOONE:
13   Q.  Do you recall giving that testimony?
14   A.  No.
15   Q.  Do you agree or disagree with that statement?
16      MR. ROSSETTI:  Objection.
17      THE DEPONENT:  Should I answer?
18      MR. ROSSETTI:  Yes.
19  BY MR. TOONE:
20   Q.  Please.
21   A.  Yes.
22   Q.  Do you recall testifying in 2002 that
23  political appointees at Treasury were not as zealous
24  about guarding confidential information as career staff?
25   A.  No.

Page 79

1      MR. ROSSETTI:  Objection.
2  BY MR. TOONE:
3   Q.  No?
4      Let me refer you to --
5      MR. ROSSETTI:  Again, I would just note the
6  objection, that -- the objection was -- I tried to
7  get it in before she answered.  She's answering
8  quickly.
9      If you would -- if you wouldn't mind just
10  waiting a second after he asks the question --
11      THE DEPONENT:  Excuse me.
12      MR. ROSSETTI:  -- so I get an opportunity to
13  make or pose an objection.
14      THE DEPONENT:  Excuse me.  Of course.
15  BY MR. TOONE:
16   Q.  It's a little artificial to do, because we're
17  used to responding immediately, but please do give
18  Mr. Rossetti a chance to object.
19      Let me just refer you quickly to Exhibit --
20  this is Exhibit --
21      MR. MCGIVERN:  3.
22  BY MR. TOONE:
23   Q.  -- 3, page 40.  And I'm reading at line 10.
24      And let me read out loud.  "And we reinforced
25  that -- the staff, the Treasury staff reinforced that

Page 80

1  with the political appointees, because they would come
2  in and have a lot of Wall Street ties, and they were not
3  as zealous about guarding our information as the
4  Treasury staff was."
5      Did I read that correctly?
6   A.  That's what the page says, yep.
7   Q.  Do you have any recollection of giving that
8  testimony?
9      MR. ROSSETTI:  Objection.
10   A.  No.
11  BY MR. TOONE:
12   Q.  Do you agree or disagree with that statement?
13      MR. ROSSETTI:  Objection.
14   A.  I don't remember.
15  BY MR. TOONE:
16   Q.  But I'm asking now, right now, do you agree or
17  disagree with that statement?
18      MR. ROSSETTI:  Objection.
19   A.  I can't think of any instances now where this
20  would be the case.
21      MR. TOONE:  Can we take a quick break and I'll
22  just review my notes and see --
23      MR. ROSSETTI:  Sure.
24      THE DEPONENT:  Is it possible that we almost
25  are finished?

**Exhibit I**

**Cited Excerpts from the Deposition of Paul Malvey (June 23, 2008)**

Paul F. Malvey

June 23, 2006

Washington, DC

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - -  )

 4    UNITED STATES SECURITIES AND      )

 5    EXCHANGE COMMISSION,              )

 6              Plaintiff,              )

 7         v.                          ) No. 05-10983 (NMG)

 8    STEVEN E. NOTHERN,               )

 9              Defendant.             )

10    - - - - - - - - - - - - - - - -  )

11                        Washington, D.C.

12                        Friday, June 23, 2006

13    Deposition of PAUL FRANCIS MALVEY, a witness herein,

14    called for examination by counsel for Defendant in

15    the above-entitled matter, pursuant to agreement, the

16    witness being duly sworn by CHERYL A. LORD, a Notary

17    Public in and for the District of Columbia, taken at

18    the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

19    Suite 800, Washington, D.C., at 10:10 a.m., Friday,

20    June 23, 2006, and the proceedings being taken down

21    by Stenotype by CHERYL A. LORD, RPR, CRR, and

22    transcribed under her direction.

23

24

25
```

## Page 62

1    A.  -- wire services.

2    Q.  -- they have been able to?

3    A.  Because prior to October 31, the press
4  conference would start at 9 but get over whenever the
5  announcement and the Q's and A's were done.

6         Then the press officer would get up there,
7  look at the clock and say, it's 9:25, how about 9:40
8  for the embargo.  And she would have to get a
9  response.  It wasn't like, people, you know, walking
10 out of the room and not paying attention to her.

11        They -- the practice was, the people in
12 the room would say, okay, so that they actively
13 responded to the statement that the press officer
14 made.

15   Q.  Okay.  But that was also in connection
16 with sort of the press of- -- well, the press officer
17 was -- was proposing an amount of time as a period
18 that would be adequate for the reporters to prepare
19 their stories?

20   A.  Correct.

21        MR. ROSSETTI:  Objection.

22   A.  And the decision was made.

23        She would propose that, and sometimes they
24 would say, no, it's a lot, how about 9:50.

25   Q.  Okay.

## Page 63

1    A.  And so she would say, okay, 9:50, does
2  that work for everybody.  And everybody would
3  acknowledge it's 9:50, not 9:45.

4    Q.  Okay.  So the reporters could sometimes
5  say, we want it to be shorter, we want it to be
6  longer and --

7    A.  But the decision was the press officer's.

8         Usually if the Q's and A's went 20
9  minutes, the reporters probably wanted a little bit
10 more time to write up the story.

11   Q.  Okay.

12        MR. ROSSETTI:  John, we've probably been
13 going for about an hour, so if can we take a break.

14        MR. SHOPE:  We can take a short break if
15 you like.

16        MR. ROSSETTI:  Sure.

17        MR. SHOPE:  I'd like to keep moving just
18 so that I'm not delayed on my flight back to Boston
19 and Mr. Malvey isn't detained longer than necessary.

20        MR. ROSSETTI:  I have the same interest in
21 getting this over as quickly as you do, John,
22 although I don't have a flight to Boston.

23        MR. SHOPE:  This is off the record.

24        THE VIDEOGRAPHER:  This is the end of tape
25 number 1 in the video deposition of Paul F. Malvey.

## Page 64

1         MR. SHOPE:  What time is --

2         MR. ROSSETTI:  M-m-m?

3         THE VIDEOGRAPHER:  Off the record --

4         THE COURT REPORTER:  I have to hear what
5  he's saying, you guys.

6         THE VIDEOGRAPHER:  -- at 11:16:30 PM --
7  AM -- excuse me -- on June 23rd, 2006.

8         (Recess.)

9         MR. SHOPE:  Actually, before we go back
10 to -- this is on the record.

11        (Discussion off the record.)

12        MR. SHOPE:  Off the video record.

13        In the interest of keeping things moving
14 as quickly, Ms. Williams, I sent you a letter
15 yesterday regarding sort of more narrowly tailored
16 requests for documents that we're seeking on a
17 voluntary -- or that you're going to attempt to
18 obtain on a voluntary basis from other government
19 departments.

20        And one thing I'd like to make sure is
21 clear is that we would like to have the bylaws of the
22 borrowing advisory committee at least insofar as they
23 relate to confidentiality.

24        MS. WILLIAMS:  Is that in your letter?

25        MR. SHOPE:  It's not in my letter.

## Page 65

1         That's why --

2         MS. WILLIAMS:  If you could send me a
3  followup letter just stating that, that would be
4  helpful --

5         MR. SHOPE:  Sure.

6         MS. WILLIAMS:  -- because I'm not --

7         MR. SHOPE:  Okay.

8         MS. WILLIAMS:  -- going to get --

9         MR. SHOPE:  I'm probably not going to be
10 able to send you the followup letter today --

11        MS. WILLIAMS:  I understand.

12        MR. SHOPE:  -- just in the time that we
13 had discussed, so I just wanted to let you know.

14        MS. WILLIAMS:  Great.

15        MR. SHOPE:  I think we can go back on the
16 video record.

17        THE VIDEOGRAPHER:  This is the beginning
18 of tape 2 in the videotape deposition of Mr. Paul F.
19 Malvey.  On the record at 11:25:04 AM, on June 23rd,
20 2006.

21        BY MR. SHOPE:

22   Q.  And Mr. Malvey, I just wanted to follow up
23 on something that we discussed before the break.

24        When the borrowing advisory committee
25 would deliver its recommendation to the secretary in

Paul F. Malvey                                                          June 23, 2006

Washington, DC

<table>
<tr><td>

Page 78

1    Q.  Okay.
2    A.  It's --
3    Q.  M-hm.  So would it be fair to say that to
4  get into the diplomatic room, one has to get past the
5  guards to get into the Treasury building.
6        Correct?
7        You got to say yes or no.
8        MR. ROSSETTI:  Objection.
9    A.  Oh, I'm sorry.
10       Yes.
11       BY MR. SHOPE:
12   Q.  Okay.
13   A.  You say, get past the guards, if they've
14  been cleared in and have proper ID and all that -- I
15  don't --
16   Q.  Yes.
17   A.  Sure.
18   Q.  Once the person is in the building, there
19  is no further guard process to actually get into the
20  room; is that correct?
21   A.  Not --
22       MR. ROSSETTI:  Objection.
23   A.  Not formally.
24       Go ahead.
25       BY MR. SHOPE:

</td><td>

Page 80

1  quarterly refunding conference?
2    A.  I don't think so.
3    Q.  Was there a reason why it was used on
4  October 31, 2001?
5    A.  I'm not sure.
6        But part of it was, there's a big seal of
7  the Treasury -- secretary O'Neill had used this room
8  for some press conferences, so there's a big curtain
9  back here with the seal of the Treasury, and there
10  was a raised area in the back, I think was used for
11  cameras.
12   Q.  Okay.  Would it be fair to say that the
13  diplomatic reception room was something of a grander
14  room than the conference secretary --
15   A.  No, not at all.
16       MR. ROSSETTI:  Objection.
17       BY MR. SHOPE:
18   Q.  Okay.  Well, I mean, you mentioned that
19  the secretary of the Treasury himself would hold
20  press conferences in the diplomatic room from time to
21  time; is that correct?
22   A.  Paul O'Neill did, and I don't know where
23  other secretaries held conferences.
24   Q.  Okay.  But did you -- did you say that
25  there was -- there was a -- there was a seal of the

</td></tr>
<tr><td>

Page 79

1    Q.  Okay.  The -- well, is there one
2  informally?
3    A.  As I mentioned before, if -- if somebody
4  showed up -- I don't know -- I know I've done it
5  maybe 20 years ago.  Somebody looks in the room and I
6  say, can I help you.  And they say, I'm here for
7  this.  I say, okay, this is it.  Or if they say, oh,
8  what's going on in here.  I say, it's a press
9  conference, and it's --
10   Q.  Okay.  But there was nobody who was
11  charged with ascertaining the identity of every
12  single person who was attending this press
13  conference?
14       MR. ROSSETTI:  Objection.
15   A.  I don't know.  I don't know.
16       Because I -- I wasn't around the back door
17  of -- I wasn't around the door that everybody entered
18  for the prior 10, 15 years.  I was always up in the
19  front of the room.
20       BY MR. SHOPE:
21   Q.  Okay.  This is in the secretary's
22  conference room you're speaking of?
23   A.  Correct, and also in the other room.
24   Q.  Okay.  By the way, other than October 31,
25  2001, was the diplomatic room ever used for the

</td><td>

Page 81

1  Treasury behind the speaker in the diplomatic room?
2    A.  Yeah, like a little --
3    Q.  Okay.
4    A.  -- piece of carpet up on the wall.
5    Q.  Okay.  And that was lacking from the
6  secretary's conference room that was used on the
7  other occasions?
8    A.  I think there was a grandfather clock --
9        MR. ROSSETTI:  Objection.
10   A.  -- back there.
11       BY MR. SHOPE:
12   Q.  Okay.  And you mentioned that the
13  diplomatic room had a -- had a space for television
14  cameras in the bark?
15   A.  I'm not sure.
16       I recall seeing cameras in there --
17   Q.  M-hm.
18   A.  -- and it -- the layout was so different.
19  When I walked in, I looked around a little bit more
20  than usual, and I said, oh, that camera is back
21  there, oh, they're up there, and, oh, the seating is
22  now all facing --
23   Q.  M-hm.
24   A.  -- the front.
25   Q.  Was it -- was it stadium-type seating?

</td></tr>
</table>

21  (Pages 78 to 81)

## Page 98

1    Q.   Okay.
2    A.   You know, like congressional testimony,
3  the principal sits there on the back bench or has
4  index cards and hands him the index cards.
5    Q.   Oh, okay.
6    A.   I wouldn't use index cards.  I would just
7  tell him.
8    Q.   Okay.  Oh, so -- so there was never --
9  there was never a Q and A that was direct with Paul
10 Malvey.
11       It was always Paul Malvey --
12    A.   The principal.
13       Paul Malvey worked for the principal.  He
14 made sure the principal knew that.
15    Q.   Okay.  All right.
16       Now, prior to October 31, 2001, did you
17 ever hear of any discussion or question about the
18 propriety -- propriety of Mr. Davis's attending the
19 quarterly refunding conferences?
20    A.   I don't recall, no, because I didn't know
21 everybody in the room at any point in time.
22       I knew him, and I recognized most of the
23 faces, but I can't say that I looked around the room
24 and counted faces that I didn't recognize, but there
25 weren't many.

## Page 99

1    Q.   M-hm.  The -- so you never heard of
2  Mr. Davis being thrown out of a quarterly refunding
3  conference or anything like that?
4       MR. ROSSETTI:  Objection.
5    A.   I never heard of that.
6       BY MR. SHOPE:
7    Q.   Did you ever hear of anybody being thrown
8  out of a quarterly refunding conference?
9    A.   Don't recall hearing that.
10    Q.   Now, we were talking before about the
11 embargo that would govern the quarterly refunding
12 conferences.
13       Did anybody ever have to write -- to sign
14 anything or write anything down with regard to
15 agreeing to follow that embargo?
16    A.   Not that I'm aware of.
17    Q.   Okay.  Was there -- was there ever any
18 written policy about embargoes to your knowledge?
19    A.   I'm not aware of a written policy, but it
20 was a clear policy.
21    Q.   Well, if it wasn't written down, what --
22 how was it clear?
23    A.   Because it was announced at the beginning
24 of a press conference that -- the public affairs
25 person would get up there at the beginning of a press

## Page 100

1  conference -- in this case I think her name was Betsy
2  Holland -- and say, welcome to the da-da-da-da-da,
3  DAS, so-and-so --
4       (Discussion off the record.)
5    A.   Welcome to the quarterly financing press
6  conference, such and such an official will be
7  presenting the policy statement.  There will be time
8  for questions afterwards.  At the end of the press
9  conference, I will assign an embargo time.
10       That's how they all started.  And at the
11 end of the press conference, except for this one --
12 at the end of the press conference, the -- when the
13 questions were getting inane, I'd either high -- give
14 a high sign to the public affairs officer, or the
15 principal would give kind of a pleading sign, and she
16 would step in and say, okay, one more question.
17       And the last question is asked.  Then the
18 press affairs person would go to the podium, and on
19 all previous conferences would look up at the clock
20 and say, okay, it's 9:22, how about if it's embargoed
21 to quarter -- 9:45.
22       And the protocol was -- okay, and the
23 protocol was that people in the room responded, okay,
24 and if they didn't respond, she would say, okay,
25 again --

## Page 101

1    Q.   Okay.
2    A.   -- so that people would respond.
3    Q.   Okay.  Was there any kind of -- sometimes
4  there would be like 35 people in this room.
5       Right?
6    A.   Oh, 20 around the table, another 15 --
7  yeah, maybe as many.
8    Q.   Was there any kind of a -- sort of a roll
9  call of everybody there where every single person
10 says, yes, okay, I agree?
11    A.   It's -- there was not a roll call, but it
12 was very clear:  You wait till the embargo is over or
13 up.
14    Q.   So in other words --
15    A.   There was nothing unambiguous about it.
16    Q.   This was -- this was -- this was just a
17 unison, she says, okay, and then if somebody doesn't
18 like the period of time that's being assigned, they
19 can pipe up and say, no, I need more time, or --
20    A.   That happened on occasion, saying that
21 there's a lot this time, how about 5 more minutes,
22 how about 9:50, and she would look to me or somebody
23 else saying -- and she would say, okay, 9:50, is that
24 agreeable with everybody.
25       And people would respond.

26 (Pages 98 to 101)

## Page 114

1  assistant was permitted to attend the quarterly
2  refunding conference to which he refers in exhibit 4?
3      A.   I mean, I don't know whether she -- I
4  don't know.  I mean, if I saw this, I'd hand it to
5  Lula, and I'd say, clear this person in.
6      Q.   Okay.  So -- now, do you have any
7  knowledge -- was Mr. Davis ever required to sign
8  anything indicating that he would comply with the em-
9  -- comply with the embargo?
10         MR. ROSSETTI:  Objection.
11     A.   Not that I know of.
12         It would be just adding too much
13  information.  I think everybody in that room knew
14  that we embargo it, because it's such sensitive
15  financial market information that everybody in that
16  room knew that that embargo applied universally.
17         BY MR. SHOPE:
18     Q.   Actually, let me -- let me -- let me ask
19  about that.
20         Was -- was the information that was being
21  disclosed at all of the quarterly refunding
22  conferences of a sensitive market-moving nature?
23     A.   I would say it was a sensitive nature, but
24  not necessarily market-moving.
25     Q.   Okay.

## Page 115

1      A.   Some -- some -- some are ho-hum.
2      Q.   Okay.  I mean, if you had to estimate, how
3  often would you say that the information at the
4  quarterly refunding conference was going to be
5  mark- -- would have been market-moving?
6      A.   I've never put a pencil to something like
7  that.
8      Q.   I'm just asking you to give me, you know,
9  a ballpark estimate.
10     A.   I mean, I -- I'm not trying to be
11  difficult, but I don't recall how many -- let's say
12  out of 8 or 10 quarterly financings that how many out
13  of that had significant information.
14         I mean, we would go through periods of
15  time where they were ho-hum for 6, 8 in a row, and
16  other times not.
17     Q.   Okay.  Well, let me ask you this:  October
18  31, 2001 --
19     A.   M-hm.
20     Q.   -- was the information that was disclosed
21  at that quarterly refunding conference market-moving
22  in your view?
23     A.   It was enormous.
24     Q.   Okay.  Was there ever any other quarterly
25  refunding -- and let me ask you this:  Was it

## Page 116

1  anticipated that that information would be
2  market-moving?
3      A.   Was -- information such as eliminating a
4  security, one would expect that it would have -- have
5  an impact on the markets, yes.
6      Q.   Okay.  So was -- was there ever any
7  quarterly refunding conference where going into the
8  quarterly refunding conference you anticipated that
9  the information that was going to be disclosed at the
10  conference would have an effect on -- on the market?
11         And I'm talking about effect on pri- --
12  prices --
13     A.   Yeah, that's correct.
14     Q.   -- and securities.
15     A.   That's correct.
16         I mean, that's -- I never focused on that.
17  I mean, I didn't walk into a conference, say, boy, is
18  this going to move the markets.
19         I walked in the conference and say that
20  this is -- this is the decision we're making, and --
21     Q.   M-hm.
22     A.   -- hope it's the right one.
23     Q.   Okay.  Now, the decision that was made on
24  October -- or the decision that was announced on
25  October 31 was among other things that the lon- --

## Page 117

1  the issuance of the long bond was going to be
2  suspended.
3         Correct?
4      A.   Correct.
5      Q.   Okay.  First of all, were you involved in
6  the decision-making process that culminated in that
7  announcement?
8      A.   Yes, I was.
9      Q.   Okay.  And when did that process
10  begin?
11     A.   I'm not sure, but I would say weeks in
12  advance and probably at the direction of Pete Fisher
13  where he would say, I want you to take a hard look at
14  the long bond's performance and going ahead what our
15  financing needs would be -- or how our financing
16  needs would be met with or without it --
17     Q.   M-hm.
18     A.   -- because the -- the idea of eliminating
19  the long bond was not a novel concept.  It had been
20  thrown about over the previous couple of years a
21  number of times.  I mentioned earlier there was even
22  a conference over the AEI, American Enterprise
23  Institute, on Treasury financing going ahead, and
24  some of the papers they were talking about
25  eliminating, not eliminating the long bond.

30 (Pages 114 to 117)

## Page 158

1  long bond.
2       MR. ROSSETTI:  Objection.
3       BY MR. SHOPE:
4   Q.   Is that correct?
5   A.   The notion of no longer having to have a
6  long bond was related to the notion that the debt is
7  being paid down and we don't need as many vehicles to
8  finance the government.
9       We had already eliminated other things.
10  We eli- -- the long bonds are (phonetic) 30 years, we
11  had already eliminated a year ago --
12  Q.   M-hm.
13  A.   -- way into the short end.  We had gone
14  from monthly to quarterly on other issues.  We'd been
15  doing --
16  Q.   M-hm.
17  A.   -- things.
18  Q.   Okay.  And was it your view that
19  undersecretary Fisher would have announced suspension
20  of issuance of the long bond at the quarterly
21  refunding conference back in August if he had been
22  confirmed as of that point?
23       MR. ROSSETTI:  Objection.
24  A.   No.
25       I mean, a lot of arguments -- we do -- we

## Page 159

1  do a lot of discussing of policy before a final
2  decision is made, and so I -- no.
3       BY MR. SHOPE:
4   Q.   Okay.  Now, when was the -- so
5  undersecretary Fisher was confirmed approximately
6  when?
7   A.   Before October 31.
8   Q.   Okay.
9   A.   I -- before October 31.
10  Q.   All right.
11  A.   I -- Brian Roseboro I think may have been
12  confirmed in late July just before the August
13  refunding.  I'm not quite sure about Peter.
14  Q.   Okay.  And so you don't know whether he
15  was confirmed in August or not?
16  A.   I don't recall.
17  Q.   Okay.  Was --
18  A.   I know he didn't partake in the quarterly
19  financing as undersecretary.
20  Q.   The August --
21  A.   Right.
22  Q.   -- quarterly?
23  A.   But he could have been undersecretary and
24  just had Brian do it because he was so new.
25  Q.   Okay.  All right.

## Page 160

1       And -- well, once undersecretary Fisher
2  was confirmed, was -- was there a discussion under
3  way at that point about possibly suspending the
4  issuance of the long bond?
5   A.   I would say there was discussion under way
6  at some point before October 31 where Peter said,
7  let's vet this issue from all sides, and that was --
8  that was the task primarily of me and my office, and
9  probably had meetings with Tim Bitsberger and Brian
10  Roseboro in the days meeting up to a meeting with
11  Peter.
12  Q.   Okay.  Now, first of all, who -- who --
13  who made the decision?
14  A.   We had a meeting in Peter's office.  And
15  it was Peter, Brian Roseboro, Tim Bitsberger, Jeff
16  Huther, and myself.  We went around the table, and I
17  would say generally myself, Tim Bitsberger, Jeff
18  Huther were in favor of -- and probably Brian --
19  well, Brian wasn't from the financial markets.  He
20  was from the AIGA, so he -- and he was also very new,
21  so he wasn't -- he had -- he was still the -- going
22  down the learning curve on some of this, and he was
23  certainly a very, very bright man, but -- anyway, he
24  participated in the discussion.
25       And it was my opinion that if we were to

## Page 161

1  eliminate it, we should.  Phrase around the building
2  was, give the markets another bite at the apple,
3  meaning we could announce it now and -- but still
4  have another auction in February, or we could
5  announce it in February, that, hey, this is the last
6  auction.
7       And Peter made the case that that's not --
8  his view was, that's not practical, why wait until
9  February.  And there was some argument.
10       Number 1 was, we were already down to
11  offering only 15 billion a year versus a high of
12  maybe 44 billion, and to offer it again in February
13  the way we had been doing it, it was issuing 10
14  billion with a 5 billion reopening -- I'm going to
15  get technical -- but if -- if we just had the
16  February offering, that would have left a real
17  orphaned small amount 30-year out there as the last
18  one, so to commit to the February offering and still
19  give the markets, at least a more sizeable one would
20  be committing to a May or August '02 reopening.
21       So it wouldn't really be just one more
22  offering really.  It would be 2 more.  And Peter's
23  attitude was, why, we don't need the money, and if
24  we -- if we have the February one, we're actually
25  committing to 2, carries us to this next summer.

|  | Page 162 |  | Page 164 |
|---|---|---|---|

**Page 162**

1    And in that environment, there was -- in
2  October, we're still forecasting paying down the debt
3  by 2009. And as I mentioned before, I think I had --
4  the bond had already become toxic, meaning its value
5  was distorted in the markets because of the
6  incredible scarcity premium, and Peter's argument
7  was, this is a market distortion, let's just get rid
8  of it.
9        And he carried the meeting.
10   Q.   I'm sorry.
11       When you say, he carried the meeting,
12  meaning he outranked everybody?
13   A.   No, no.
14       I mean, his arguments -- he had stronger
15  arguments against -- let's say my position than I
16  could develop against his position.
17   Q.   Well, did you disagree with his position?
18       I mean, understanding of course that you
19  weren't going to be insubordinate, but did you
20  disagree with the decision that was taken?
21   A.   Well, in the absence of certainty, I mean,
22  I could think that I have a better view, but I'm not
23  quite sure my view in the absence of certainty is
24  better than his. And he has his reasons for -- I
25  could see what he was talking about.

**Page 164**

1  the attacks of September 11, 2001.
2        Correct?
3    A.   Yeah, that's what I mean, yeah.
4    Q.   And it was already participated that the
5  war on terrorism was going to have a fiscal effect on
6  the United States.
7        Correct?
8    A.   I bet if you go back and look at the
9  budget that was released in January of '02, it still
10  had surpluses as far as the eye could see.
11   Q.   Okay. You don't recall telling anybody
12  that the decision to eliminate the long bond was
13  based on a false premise that the surpluses were
14  going to continue for -- notwithstanding the fact
15  that we had a war on terrorism coming up?
16   A.   I mean, I don't recall that conversation
17  with Roger, but I mean, I might have conversations
18  with Roger I wouldn't have with anybody else.
19   Q.   Did you tell that to anybody?
20       MR. ROSSETTI: Excuse me.
21       What is "that" specifically, so that --
22       MR. SHOPE: Yeah.
23       BY MR. SHOPE:
24   Q.   Do you recall telling anyone that the
25  decision to suspend the long bond was either foolish

|  | Page 163 |  | Page 165 |
|---|---|---|---|

**Page 163**

1        And I thought differently. But at the end
2  of the day, you know, he thought his view outweighed
3  mine, and he argued more effectively.
4    Q.   Well, do you recall telling people
5  afterwards that you thought that it was a stupid and
6  politically driven decision?
7    A.   I would never say "stupid" about our --
8  politically driven?
9    Q.   Yeah.
10   A.   I don't recall saying that, no.
11   Q.   You don't recall telling Mr. Anderson that
12  this was a highly political decision?
13   A.   Roger Anderson?
14   Q.   Yeah.
15   A.   I might have said something to Anderson
16  like, he probably walked in the building wanting to
17  get rid of the long bond, but -- and I might have
18  said something to the effect that -- because I think
19  I went back and looked at it from 1990 -- or '89
20  forward that when we eliminated an issue, we had
21  given another auction, you know, and I may have
22  thought that, you know, this isn't the way we've done
23  bus-- -- done it in the past, and I disagree with
24  doing it this way.
25   Q.   This was about a month and a half after

**Page 165**

1  or imprudent in light of the fact that we'd had
2  terrorist attacks and budget -- continuing budget
3  surpluses could not be relied upon?
4        MR. ROSSETTI: Objection.
5    A.   Okay.
6        THE WITNESS: I'm holding this quarter so
7  I pause.
8    A.   The -- I worked on -- I worked with OMB on
9  the budget in December, and it was still -- and I
10  don't think we saw the magnitude of terrorism back
11  then.
12       The only context I could say that I
13  probably would have tell (sic) somebody close like
14  Roger is the notion I would have done it differently,
15  but I really felt more comfortable with giving them
16  another bite at the apple.
17       And that's -- that was the only thing that
18  if I were under secretary, I would have done
19  differently. I -- it wasn't, do we eliminate the
20  long bond or keep the long bond.
21       It was how do we eliminate the long bond.
22  That was the question.
23       It wasn't like, this is a stupid political
24  decision because of the war on terror. If someone
25  says that today in 2006, it's -- they aren't putting

42 (Pages 162 to 165)

Paul F. Malvey

Washington, DC

## Page 202

1　mean, I managed an issuance program of 3.8 trillion
2　dollars, and I had 11 people working for me, and if
3　we were in a meeting and somebody is going to get in
4　touch with the ECB, it's certainly not going to be
5　anybody from my office.
6　　　　It would be somebody from the
7　international side of the house, and it would
8　probably be somebody up the food chain talking to
9　somebody over on the food chain on the international
10　side of the house, but it's -- I don't recall.
11　Q.　M-hm. So this --
12　A.　But I also don't recall any resolution.
13　　　　And I mean, there -- there were fixed --
14　I'm sorry -- there were rumors in the fixed income
15　market -- supposedly specific rumors -- at least 5
16　since about a year ago now on when and why John Snow
17　was going to retire.  You know, he was going to
18　end -- he was going to end the -- supposedly last
19　year as soon as the congressional session was over,
20　he was going to go back to Richmond and play golf for
21　the rest of his life.
22　　　　The -- and I'm just saying, rumors are
23　common.  They -- they -- the -- even -- so common
24　there's even a phrase in the fixed income market:
25　buy on the rumor, sell on the news.

## Page 203

1　Q.　Well, did you ever learn that people were
2　buying on the rumor?
3　A.　I -- I printed out a -- yeah -- does --
4　buy on the rumor, sell on the news.
5　　　　I printed out a Bloomberg page on the
6　price of the bond sometime that morning, and I
7　printed it from my -- for some reason I think I
8　printed it -- it was probably around -- close to 11 I
9　did it, so I printed it probably from the opening
10　until -- I saw a page somewhere that ended at 10, and
11　I think I probably printed it until whatever time it
12　was, because I wanted to see what happened after the
13　announcement too.
14　Q.　Well, I think -- are you referring to a
15　page that I printed -- had here on the table?
16　　　　Why don't I mark that.
17　　　　Is this what you're referring to as what
18　you just saw recently?
19　A.　Yeah.
20　　　　I saw this recently.
21　MR. SHOPE:  This is exhibit 8.
22　　　　　(Malvey Exhibit No. 8
23　　　　　was marked for
24　　　　　identification.)
25　A.　First of all, this is the next day.  On

## Page 204

1　the bottom it says, November 1.  And I -- I don't
2　want to -- whatever.
3　　　　The person who did this wasn't a real
4　market follower or an economist, because he wouldn't
5　stop at 10, because you'd want to know what the price
6　action was after 10 in addition to before 10.
7　　　　See if I ran this thing, I'd run it from
8　8:30 through 3 in the afternoon.
9　　　　　BY MR. SHOPE:
10　Q.　Okay.
11　A.　And when I didn't run it, I think it was
12　like 8:30 through 11.
13　Q.　Well, this shows the price pretty much
14　going up from 20 after 9.
15　　　　Right?
16　MR. ROSSETTI:  Objection.
17　A.　I want to say 20 after 9 the price going
18　up, because look at 8:50 to 9.  Then look at like
19　9:05 to 9:10.  Net-net.  9:05 to 9:20, it went down.
20　And the range that it went down is about the range
21　that it went up until a little after 9:30.
22　　　　So I don't see trend movement until the
23　pop after 9:35, because I don't see any trend between
24　9 and 9:30.
25　　　　　BY MR. SHOPE:

## Page 205

1　Q.　Okay.  And did you ever hear about
2　tightness in the bond market the day before?
3　A.　The day before, you mean I think that
4　had been on special repo market for a year.  I don't
5　think the dealers were even trading because they were
6　afraid they weren't going to get it back.  This email
7　says something about more tightening, but -- well, 5s
8　30 flattening is a yield curve saying -- because at
9　5s/30s is a trade -- 5, slash, 30s.
10　MR. ROSSETTI:  Do you want to just
11　identify what he's talking about.
12　　　　　BY MR. SHOPE:
13　Q.　You're referring to something on the lower
14　portion of exhibit 7 where there's an excerpt of an
15　email apparently sent to Jill Cetina by a primary
16　dealer contact.
17　　　　Is that your reference, sir?
18　A.　Correct, in the first paragraph.
19　　　　We definitely heard rumors as early as 9
20　AM that -- which were flattening 5/30s, meaning the
21　5, slash, 30s trade prior to the official news.
22　Someone told me they actually saw it on your Web site
23　at 9:50.  I did hear something about from other
24　people it going up on our Web site prematurely, but
25　5/30s, the spread between 5-year notes and 30-year

| Page 226 | Page 228 |
|---|---|
| 1 refunding conferences? | 1     Okay. |
| 2     A.   I don't -- I do not think so.  I don't -- | 2     Q.   First of all, it had become apparent that |
| 3 I don't think so.  I don't recall. | 3 there were people who had been trading in the market |
| 4     Q.   You didn't call up Ms. Ousley to say, hey, | 4 on the news of the suspension of the long bond before |
| 5 what about Pete Davis coming into these conferences? | 5 10 o'clock. |
| 6     A.   I called her, and the conversation about | 6     MR. ROSSETTI:  Objection. |
| 7 Pete Davis came up, but it was -- I don't -- you | 7     BY MR. SHOPE: |
| 8 know, it's been so long.  I thought -- I thought I | 8     Q.   That was your surmise at that point? |
| 9 called her because somebody -- I don't know if it was | 9     MR. ROSSETTI:  Objection. |
| 10 SEC or our own lawyers or somebody -- was | 10 He's never made any statement to that |
| 11 interviewing me or setting up an appointment to | 11 effect, John. |
| 12 interview me, and they asked me if I knew Jill | 12     A.   I see the price movement.  I don't know. |
| 13 Ousley's telephone number. | 13 You know -- I mean, I don't want to get between the 2 |
| 14     And I said yes.  And they asked me for it. | 14 of you.  I see price movement. |
| 15 And I said, well, let me call her and give her -- you | 15     BY MR. SHOPE: |
| 16 know, out of courtesy, give her a heads-up that you'd | 16     Q.   Okay.  In other words, at least it was |
| 17 be calling. | 17 being -- it was being suggested that there had been |
| 18     And in the course of that conversation, | 18 trading on the news of the suspension of the long |
| 19 yeah, you know, what the hell is going on.  I said, | 19 bond before 10 clock. |
| 20 well, have you heard about this.  And then I probably | 20     Correct? |
| 21 asked her, you know, who -- who is Pete Davis. | 21     MR. ROSSETTI:  Objection. |
| 22     Q.   And what did she say? | 22     A.   I see price movement, and -- |
| 23     A.   She said she didn't -- she didn't | 23     BY MR. SHOPE: |
| 24 recognize the name. | 24     Q.   Well -- |
| 25     Q.   Now, did you discuss at all with | 25     A.   I mean, what I would like to do before I |

| Page 227 | Page 229 |
|---|---|
| 1 Ms. Ousley sort of who was to blame for the events of | 1 say that -- |
| 2 October 31, 2001? | 2     Q.   Is? |
| 3     A.   What do you mean, blame? | 3     A.   -- would be able to go back to when we |
| 4     MR. ROSSETTI:  Objection. | 4 went from monthly to quarterly 5s, when we went |
| 5     BY MR. SHOPE: | 5 monthly to quarterly 2s, and we went from 4 tens to 2 |
| 6     Q.   Well, it had become apparent that some | 6 a year, and see what the market movement was before |
| 7 people knew about the suspension of long bonds -- | 7 that. |
| 8     A.   Right. | 8     Q.   Let's not make this more complicated than |
| 9     Q.   -- before the general public? | 9 it needs to be. |
| 10     A.   Yeah. | 10     Okay? |
| 11     MR. ROSSETTI:  Objection. | 11     I'm not asking you to deliver an expert |
| 12     BY MR. SHOPE: | 12 opinion. |
| 13     Q.   Okay. | 13     Okay? |
| 14     A.   Yeah. | 14     What I am asking about is, what was your |
| 15     Q.   So that was something the Treasury | 15 state of mind after -- in the aftermath of the |
| 16 considered to be not a good idea. | 16 meeting that you had with Mr. Roseboro, Mr. Huther, |
| 17     Right? | 17 and so forth. |
| 18     MR. ROSSETTI:  Objection. | 18     A.   And Jimmy Capra saying they got the |
| 19     A.   I'm sorry. | 19 information from him. |
| 20     I did lose track of what you were saying. | 20     Q.   Yes. |
| 21     BY MR. SHOPE: | 21     A.   Jimmy Capra didn't say -- or Jimmy Capra |
| 22     Q.   Yeah. | 22 said he did not trade on it.  But I figured if he's |
| 23     I'm sorry. | 23 got Jimmy Capra as a client, he's got other people up |
| 24     I just want to take this in simple steps. | 24 there as a client. |
| 25     A.   Yeah. | 25     Q.   Okay.  All right.  So there was a concern |

| Page 230 |
|---|
| 1  at least that some people might have traded on this |
| 2  information before 10 o'clock. |
| 3      Correct? |
| 4      MR. ROSSETTI: Objection. |
| 5      BY MR. SHOPE: |
| 6   Q.  Okay. |
| 7      True? |
| 8   A.  Yeah. |
| 9   Q.  Okay. And there was inquiry going on as |
| 10  to how this whole thing might have happened. |
| 11     Right? |
| 12     MR. ROSSETTI: Objection. |
| 13  A.  I don't know about the inquiry, but I |
| 14  mean, there was something -- yeah, we were trying to |
| 15  get to the bottom of it. |
| 16     BY MR. SHOPE: |
| 17  Q.  Okay. And let's put it this way: |
| 18  Treasury was unhappy with the idea that some people |
| 19  might have traded on this information before 10 |
| 20  o'clock. |
| 21     Is that fair to say? |
| 22     MR. ROSSETTI: Objection. |
| 23  A.  I don't know Treasury -- SEC was more |
| 24  unhappy. I don't know. I mean, it's -- yeah, I |
| 25  mean, it's -- if it was some violation of the rules, |

| Page 232 |
|---|
| 1   See, other people were asking me questions -- |
| 2   Q.  M-hm. |
| 3   A.  -- you know, like asking for Jill's number |
| 4   and what her role was, asking for Roger's number and |
| 5   what his role, asking me about Darcy Bradbury. And I |
| 6   remember saying, you have to get that number from |
| 7   Roger Anderson. |
| 8       And the only 2 numbers I had were Jill and |
| 9   Roger, and so I may have -- again as I said as a |
| 10  courtesy to call them up and give them a heads-up |
| 11  that somebody from Washington may be calling them |
| 12  about their -- |
| 13  Q.  Okay. Do you recall telling Ms. Ousley |
| 14  that this problem had been caused by the hubris of |
| 15  Peter Fisher? |
| 16      MR. ROSSETTI: Objection. |
| 17  A.  No, I don't know. |
| 18      I'm smiling because everything changed |
| 19  that day, but -- I mean, the process all changed that |
| 20  day, and that's why I'm smiling. |
| 21      BY MR. SHOPE: |
| 22  Q.  Well, did you at any time believe that the |
| 23  problem of the premature disclosure of the suspension |
| 24  of the long bond had been caused by the hubris of |
| 25  Peter Fisher? |

| Page 231 |
|---|
| 1   we wanted to get to the bottom of it. |
| 2   Q.  Well, you weren't indifferent to the idea |
| 3   of people trading on the information before the |
| 4   embargo? |
| 5   A.  No, I'm not -- |
| 6       MR. ROSSETTI: Objection. |
| 7   A.  -- because I heard that, you know, Pete |
| 8   called Jimmy, and I assume that Pete called others, |
| 9   because he has -- he had on his Web site, you know, |
| 10  that was taken down a couple days later, but he |
| 11  had -- you know, get the Washington news before the |
| 12  rest of the markets, was a quote on his Web site. |
| 13      BY MR. SHOPE: |
| 14  Q.  Okay. All right. |
| 15      So the -- so you spoke to Ms. Ousley. |
| 16      Did you speak to anybody else about -- |
| 17  about who was responsible for this problem that some |
| 18  people seem to have known about the suspension of the |
| 19  long bond before 10 o'clock? |
| 20      MR. ROSSETTI: Objection. |
| 21  A.  I don't recall. No, I don't. |
| 22      BY MR. SHOPE: |
| 23  Q.  Did you talk to Mr. Anderson about this? |
| 24  A.  That's what I was trying to think. That |
| 25  would have been the other person, but I don't recall. |

| Page 233 |
|---|
| 1   A.  Objection. |
| 2       I'll tell you what I thought -- |
| 3   Q.  Could you just answer my question first |
| 4   and then -- |
| 5   A.  Well, I -- |
| 6       MS. WILLIAMS: He's answering your |
| 7   question. Don't cut off the witness. |
| 8       BY MR. SHOPE: |
| 9   Q.  Answer my question yes or no. If you want |
| 10  to elaborate further, go ahead. |
| 11      MR. ROSSETTI: Objection to -- hold on -- |
| 12  objection on instructing a witness how to answer a |
| 13  question. |
| 14      The witness will answer the question as he |
| 15  sees appropriate. If he doesn't answer your |
| 16  question, you can ask a followup, John. |
| 17  A.  I agree that what happened that day in |
| 18  terms of Treasury's process was due to Peter Fisher, |
| 19  because he changed all that stuff. |
| 20      Now, to say it's due to the hubris of |
| 21  Peter Fisher is kind of like editorializing. Peter |
| 22  was famous for changing things. And most of the time |
| 23  it was an improvement. |
| 24      When he got to the New York Fed, the open |
| 25  market -- I'm sorry -- the New York Fed would do |

Paul F. Malvey
June 23, 2006

Washington, DC

## Page 234

1  open-market operations any time between 11 and 11:30,
2  and the markets would be waiting, waiting, waiting.
3       So Peter decided to make it more just --
4  you know, rather than people deciding to, hey, how
5  about 11:20 this time, how about 11:24.
6       He got a 12-sided die, and the people in
7  the open market went to roll the die, and whatever
8  came up, that's when they went in for open-market
9  operations, so -- and that was when he first started.
10      He changed a lot of things. When he got
11 to Treasury, he did the same thing. Before he got
12 there, I read a book on -- his father had written --
13 a famous Harvard law professor.
14      And I also talked to half a dozen people
15 at the New York Fed on, how do you work for Pete
16 Fisher, he's a real challenging guy.
17      So and he want -- instead of having our
18 announcement come out at the way I've explained it,
19 it could be 9:40, 9:42, 9:45. He wanted to come out
20 at a fixed time, and that's why the press release
21 went out the day before.
22      He just wanted to change everything and
23 not wait until the next week. He just wanted to do
24 it now. That's just the way -- he's -- he's -- he's
25 quite a presence.

## Page 235

1       Q.  Have you ever said to anybody, sir, that
2  the premature disclosure of the suspension of the
3  long bond was the fault of Pete Fisher?
4       MR. ROSSETTI:  Objection.
5       A.  I don't think so. I don't remember.
6       Look I'll just finish. I remember looking
7  at the clock and saying, holy shit, that's a long
8  time, because I think it got over 9:25, and it's
9  10. But I wasn't thinking that there would be
10 disclosure.
11      I -- it was -- if -- if I drive --
12 whatever -- if I drive a -- I drive a Toyota, and all
13 of a sudden I'm driving some other car that's
14 completely different with stick transmission, and I
15 say, God, this is really different, not necessarily
16 good or bad, but it's really, really different -- I'm
17 sitting there looking at that clock saying, what's
18 different, what the heck is going on here. It was
19 just like now we sit around for 25 minutes rather
20 than 10 or 12 minutes.
21      BY MR. SHOPE:
22      Q.  Did you tell my colleague, Robin Toone,
23 last week, that the premature suspension of the long
24 bond -- the premature disclosure of the suspension of
25 the long bond was the fault of Peter Fisher?

## Page 236

1       A.  Did I talk to Robin Toone last week?
2       Q.  Did you speak -- do you recall speaking to
3  a colleague in my office about this matter?
4       A.  Last week?
5       Q.  Or last week or the week before, leading
6  up to your deposition.
7       A.  I don't think so.
8       Q.  You don't recall speaking to a fellow
9  named Robin Toone?
10      A.  No.
11      I recall him calling me and setting up an
12 appointment and stuff, but --
13      Q.  You don't recall talking to him at all
14 about the matter?
15      A.  I mean, we may have talked about it a
16 little bit, but --
17      Q.  You don't recall telling Roger Anderson
18 that this was the fault of Pete Fisher?
19      MR. ROSSETTI:  Objection.
20      A.  No.
21      I think ex post, I look back on the
22 process and see that that was a lot of time. It was
23 probably too much time.
24      Now, to make the further leap, why do we
25 have so much time. Well, the whole process was

## Page 237

1  changed. Well, who changed the process. Pete Fisher
2  changed the whole process.
3       MR. SHOPE:  It's 3:15 and Mr. Rossetti had
4  asked for a break at this time.
5       MR. ROSSETTI:  Yeah, thanks.
6       THE VIDEOGRAPHER:  Off the record at
7  3:18:33 PM.
8       (Recess.)
9       (Mr. Rossetti and Ms. Ruddy left the
10 room.)
11      THE VIDEOGRAPHER:  We are back on the
12 record at 3:40:51 PM.
13      MR. SHOPE:  Great.
14      A couple of things: First of all,
15 Mr. Rossetti has had to leave the deposition due to
16 another matter, and there's an intern from the SEC,
17 whose names escapes me.
18      MS. WILLIAMS:  Her is Erica, and she also
19 had to leave.
20      MR. SHOPE:  Yeah.
21      BY MR. SHOPE:
22      Q.  Now, while we were off the record,
23 Mr. Malvey, you indicated a desire to speak further
24 about some of the testimony that you've been giving.
25      Am I recalling that right?

## Page 246

1  of sales of the 30-year bond, so that is -- that's
2  not going to the question of whether or not there's a
3  last bite at the apple.
4       That's going to the question as to when
5  you announce.
6       A.  No, because --
7       MS. WILLIAMS:  Objection.
8       A.  -- the reason that January 30 would be
9  better is because we had a scheduled 30-year auction
10 in February, and that's why it would have been better
11 to announce it, because the investors -- it's just
12 not finished out in this sentence here, because
13 whoever wrote these notes didn't make the connection
14 between the January 30 announcement and the February
15 15 settlement of a 30-year bond.
16      That's what -- that's the reason I was
17 saying Jan 30 would would have been better for the
18 announcement, because that would have been right
19 before the sale of a preschedule -- already on the
20 schedule 30-year bond.
21      That's what I meant.
22      BY MR. SHOPE:
23      Q.  Yeah, but you could have made the
24 announcement on October 31 and then announced that
25 there would be a last bite at the apple in February.

## Page 247

1       Right?
2       MS. WILLIAMS:  Objection.
3       A.  He could have.
4       I mean, coulda, woulda, shoulda.
5       It's -- it would have -- I'm sorry.
6       I didn't mean to be disrespectful, but
7  because there was such a scarcity premium on the
8  security to start with, that would have given 3
9  months for the markets to gyrate around and be more
10 volatile at the long end because of all the
11 uncertainty about its future, where if you made the
12 announcement on January 30, the sale would be 5 days
13 later, and WY market would have established the
14 market price, and there was much less chance for
15 volatility.
16      BY MR. SHOPE:
17      Q.  Okay.  So what else was inaccurate in
18 exhibit 11?
19      A.  I'm not saying inaccurate.
20      I'm just saying it didn't convey the
21 flavor.
22      And it's -- it -- the next sentence says:
23 It was also Malvey's opinion that undersecretary
24 Fisher would have made the announcement at the
25 quarterly funding meeting if he had been confirmed of

## Page 248

1  the time.
2       And somebody asked me that, and after
3  having been at the other side of the table listening
4  to Peter's arguments about his view of the 30-year
5  and having made my arguments about my view of the
6  30-year, I think he would have made the same
7  arguments in August.
8       And so, yes, I -- I -- who the hell knows,
9  but I think he would have made the same arguments in
10 August.  Whether we would have made the announcement
11 in August is another thing, because he would have had
12 to justify making the announcement in August to the
13 rest of us too.
14      Q.  But I mean, but basically this gets the
15 gist -- that was your opinion?
16      A.  Yeah, it gets the gist, yeah.
17      Right.
18      MS. WILLIAMS:  Objection.
19      A.  All right.  And the one, 2, 3 -- third
20 full paragraph talking about Drew Matus.
21      He came in -- I think he may have
22 scheduled to meet with Jeff, but Jeff was also new.
23 I think Jeff had only been there since August, I
24 think.
25      BY MR. SHOPE:

## Page 249

1       Q.  You're speaking of Jeff Huther now?
2       A.  Jeff Huther.  Right.
3       And I think it was because Woody was
4  either about -- was -- oh, here it is.
5       He was vice chairman.  The -- usually the
6  chairman of the borrowing advisory committee, his
7  staff works up these pro forma forecasts that I
8  mentioned earlier today, and for some -- and the
9  vice-chairman usually follows the chairman -- that's
10 also almost pro forma.
11      And the October meeting would have been
12 the last meeting for the outgoing chairman, and Drew,
13 some reason Woody asked Drew to do these things.  He
14 had never done them before.
15      So he worked up these pro forma
16 forecasts -- he had access to other ones out there
17 and previous ones, and he worked up these pro forma
18 forecasts.  And I don't know if he came down to
19 Washington specifically for that, but he asked Jeff,
20 is it okay if I run these by you to tell me whether
21 they're reasonable, a reality test or something like
22 that.
23      And I mean, it says that I spoke with him
24 briefly, but it might have been -- "briefly" is --
25 the 2 of them came into my office, and we put these

1111 14th Street, NW Suite 400        Alderson Reporting Company        Washington, DC 20005
1-800-FOR-DEPO

Paul F. Malvey

Washington, DC

## Page 250

1  things out on the table in front of us, and asking
2  me, you know, does all this stuff look reasonable and
3  stuff, so I -- it was -- I forget exactly what the
4  nature of the conversation, but I might have said
5  something like, what if it -- do you have any
6  alternatives, what if Woody says, how about this, are
7  you ready to go with alternatives, I mean, because
8  the meeting is going to be next Tuesday, he's
9  going -- he has -- he has -- well, proper prior
10 preparation, so I was trying to help him out like I
11 help a lot of people.
12     Q.   One of those alternatives would have been
13 suspending the issuance of the long bond.
14        Right?
15        MS. WILLIAMS: Objection.
16     A.   It -- not necessarily would have been, but
17 it may have come up.  I don't recall it coming up.
18        I mean, I don't -- I don't recall him
19 having 2 scenarios, but maybe he did.  I don't know.
20        I just remember looking and seeing if it's
21 feasible, because we were making so many changes,
22 and, you know, I may have asked him, do you have an
23 alternative scenario if the long bond is not there,
24 or something like that.
25        I don't know.  I don't recall saying it,

## Page 251

1  but I -- it just seems like --
2        BY MR. SHOPE:
3     Q.   Well, that was the elephant in the room,
4  wasn't it?
5        MS. WILLIAMS: Objection.
6     A.   I don't think so.
7        BY MR. SHOPE:
8     Q.   I thought -- didn't you refer to that as
9  the elephant in the room earlier today in your
10 deposition?
11        MS. WILLIAMS: Objection.
12     A.   I don't recall my context.
13        BY MR. SHOPE:
14     Q.   To suspending the long bonds.
15     A.   Yeah, I know, but --
16     Q.   This is an issue at the October 30 --
17 there was an elephant in the room, as you say, at the
18 October 30 meeting of the borrowing advisory
19 committee.
20        MS. WILLIAMS: Objection.
21        I think this mischaracterizes his
22 testimony.
23     A.   I don't recall saying that.  And we just
24 went over the minutes, and it doesn't -- it's not
25 included in there.

## Page 252

1        BY MR. SHOPE:
2     Q.   So you're saying you just don't remember
3  one way or the other whether or not the suspension of
4  the long bond came up in your discussion with
5  Mr. Matus of William Brothers?
6     A.   I don't recall the discussion coming up.
7        But I wouldn't be surprised if I said
8  things like, do you have an alt-- what if -- what
9  if we -- the -- what if the long bond is eliminated
10 sometime in the next year, do you have an alternative
11 for that.  What if we go from quarterly to semiannual
12 tens, 10-year securities.
13        And it was more like I'd say, well, what
14 if Woody says, how about this.  It was kind of like
15 asking him questions trying to get him prepared for
16 his boss to get ready for this meeting, you know.
17     Q.   M-hm.
18     A.   But I don't recall the context of this
19 300- -- or 800-pound elephant.
20     Q.   Well, the testimony obviously will speak
21 for itself.
22        Now, were there any other inaccuracies
23 that you noted --
24     A.   Yeah.
25     Q.   -- in exhibit 11?

## Page 253

1     A.   I don't know.  All right.
2        The last paragraph on page 2 continues
3  on -- I'm not quite -- I'm -- it's a long time ago,
4  but I -- I remember answering the phone and asking
5  Jill.
6        Then the next page says, I introduced
7  myself to him at a press conference in 1996.  And
8  it's -- it -- this is something I have a recollection
9  of, is, I walked over, and Jill and Roger were
10 standing over -- point out exactly where they were
11 standing.
12        They were standing by the side door.  And
13 Roger had done the press conference, so I think -- so
14 that had to have been pre-Gensler.  They were just
15 standing there making small talk.
16        And I was Jill's deputy and just walked
17 over and say, good job, Roger, or something like
18 that.  And he introduced me to -- Paul, this is Pete
19 Davis, Pete Davis, Paul Malvey.  And, hi.
20        And Roger says, he's one of the good guys.
21 And I think I mentioned that earlier today, because
22 Roger just -- Roger is a man of few words.
23     Q.   M-hm.
24     A.   And for him to say, one of the good guys,
25 I remember saying, I wonder what he means by that,

## Page 326

1  showed that Reuters -- an email at 9:55 AM showing an
2  announcement from Reuters ostensibly with a timestamp
3  of 9:57 reporting the decision to suspend the
4  elimination of the long bond?
5          MS. WILLIAMS: Objection.
6      A.  I mean, you showed me that earlier.
7          Okay?
8          And I saw that.  I mean, you know, my mind
9  is on the cusp of turning to oatmeal right now.
10         MS. WILLIAMS: Exhibit 10?
11     A.  Yeah.
12         I mean, I -- yes, I did, yeah.
13         BY MR. SHOPE:
14     Q.  So in fact, Reuters was disseminating the
15 information in advance of any supposed embargo.
16         Correct?
17     A.  I don't know.
18         MS. WILLIAMS: Objection.
19     A.  I just saw the email.  I don't know
20 whether Reuters -- I saw the email and I saw the
21 discrepancy of time in the email, but that's all I
22 know.
23     Q.  So that at least calls into question
24 whether or not Mr. Davis and the Web site were the
25 only instances of disclosure before 10 o'clock.

## Page 327

1          Correct?
2          MS. WILLIAMS: Objection.
3      A.  I'm sorry.  I'm sorry.
4          I thought --
5          MR. SHOPE: Can I have the question
6  re-read?
7          (The reporter read the record as
8          requested.)
9      A.  I mean, I don't -- to be honest with you,
10 I don't know.  I mean, you know, this is dated 2
11 days -- this is a copy made 2 days later, and I see
12 what it says, and, you know, I assume everybody deals
13 with honest people, and that's -- and there are
14 inconsistencies.
15         BY MR. SHOPE:
16     Q.  M-hm.  Now, you mentioned that at the time
17 you thought that the lag in between the conclusion of
18 the press conference --
19     A.  Yeah.
20     Q.  -- at approximately 10:25 --
21     A.  9:25.
22     Q.  -- 9:25.
23         Excuse me.
24     A.  Right.
25     Q.  -- and the stated embargo time of 10

## Page 328

1  o'clock was unusually long?
2          MS. WILLIAMS: Objection.
3          BY MR. SHOPE:
4      Q.  Correct?
5      A.  It was different?  I mean, it's usually --
6  it was set as I've gone through by public affairs
7  officer querying the press as to, is X amount of time
8  sufficient.
9      Q.  Yeah.
10         But I mean, historically, that's been 10
11 or 15 minutes.
12         Correct?
13     A.  Yes, 10 to 15 minutes, but, yes, yeah.
14     Q.  So 35 minutes was a significant -- it was
15 a doubling in fact?
16     A.  It was an outlyer.
17     Q.  Yeah.
18         And you also mentioned that Mr. Fisher
19 had -- in addition to participating in the
20 question-and-answer session at the conclusion of the
21 press conference that he conducted was making himself
22 available to reporters for a further
23 question-and-answer session back in his office.
24         Correct?
25         MS. WILLIAMS: Objection.

## Page 329

1      A.  I'm less sure about that, but that's my
2  recollection.  I mean, if -- I'm less sure about
3  that.  It seemed that there was going to be a Q and A
4  thing in Peter's office about an hour after the
5  embargo ended.  And that would explain these 2 press
6  people entering the building at 10:30 or 11.
7          BY MR. SHOPE:
8      Q.  Okay.  And Mr. Fisher had caused the press
9  conference to be held not in the ordinary secretary
10 conference room but in the diplomatic conference room
11 that had the seal of the Treasury behind him.
12         Right?
13     A.  I don't think --
14         MS. WILLIAMS: Objection.
15         THE WITNESS: Okay.
16     A.  I don't think he had caused that.  I think
17 that we just switched with -- Paul O'Neill created a
18 little bit more of a television-friendly room in
19 there, and it wasn't just Peter Fisher, but you're
20 going to be on camera, people started using that
21 room.  I mean, it was so it's set up there more or
22 less permanently as a pressroom and studio, whereas
23 the other one was more of an ad hoc thing.
24         BY MR. SHOPE:
25     Q.  Well, how long had Mr. O'Neill been using

**Exhibit J**

**Deposition of Steven Nothern and Cited Exhibit
(January 30-31, 2007)**

Steven E. Northern                                          January 30, 2007
                          Boston, MA

```
 1                              Volume:  I

 2                              Pages:  1-221

 3                              Exhibits:  1-10

 4

 5              UNITED STATES DISTRICT COURT

 6               DISTRICT OF MASSACHUSETTS

 7                  (Boston Division)

 8   Civil Action No. 05-CV-10983 (NMG)

 9   - - - - - - - - - - - - - - - - - - - - - -

10   UNITED STATES SECURITIES AND EXCHANGE

11   COMMISSION,

12                    Plaintiff,

13   (    v.

14   STEVEN E. NOTHERN,

15                    Defendant.

16   - - - - - - - - - - - - - - - - - - - - - -

17        Deposition of Steven E. Nothern

18               January 30, 2007

19             9:19 a.m. - 4:00 p.m.

20        Securities and Exchange Commission

21                33 Arch Street

22              Boston, Massachusetts

23

24        Reporter:  Daria L. Romano, RPR/CRR

25
```

Steven E. Northern                                      January 30, 2007
                        Boston, MA

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  A P P E A R A N C E S :
2  UNITED STATES SECURITIES AND
3  EXCHANGE COMMISSION
4  (by Erica Y. Williams,
5  Assistant Chief Litigation Counsel;
6  John J. Rossetti, Jr., Senior Counsel
7  Division of Enforcement)
8  100 F Street, N.E.
9  Washington, D.C. 20549-4010
10  (202) 551-4450
11  williamse@sec.gov
12  rossettij@sec.gov
13  for the Plaintiff.
14
15  FOLEY HOAG, LLP
16  (by Nicholas Theodorou, Esq. and
17  John Shope, Esq.)
18  155 Seaport Boulevard
19  Boston, Massachusetts 02210
20  (617) 832-3061
21  jtheodorou@foleyhoag.com
22  jshope@foleyhoag.com
23  for the Defendant.
24
25  ALSO PRESENT:  Ian McWilliams, Videographer

**Page 4**

1          P R O C E E D I N G S
2
3          THE VIDEOGRAPHER:  Here begins
4  videotape number one in the deposition of Steven
5  Nothern in the matter of the United States
6  Securities Exchange Commission versus Steven
7  Nothern in the United States District Court for
8  the District of Massachusetts, Civil Action
9  05-CV-10983 (NMG).
10          Today's date is January 30th, year
11  2007.  The time on the video monitor is 9:19
12  a.m.
13          The video operator today is Ian
14  McWilliams of New England Trial Services
15  contracted by Jones Reporting Company.
16          This deposition is taking place at the
17  offices of the SEC, 33 Arch Street, Boston,
18  Massachusetts.
19          Counsel, please voice identify
20  yourselves and state whom you represent.
21          MS. WILLIAMS:  Erica Williams,
22  United States Securities and Exchange
23  Commission.
24          MR. ROSSETTI:  John Rossetti for
25  the plaintiff, US Securities and Exchange

| Page 3 | Page 5 |
|---|---|

**Page 3**

1              I N D E X
2  Deposition of:          Page
3  STEVEN E. NOTHERN
4  By Ms. Williams          6
5
6
7          E X H I B I T S
8  No.                      Page
9  1 Notice of deposition          8
10  2 Transcript                    9
11  3 Statement of Guidelines With Respect
12    to Receipt and Use of Material
13    Nonpublic Inside Information    69
14  4 Floor plan                    81
15  5 David Capital Investment Ideas    111
16  6 E mail                        131
17  7 E mail                        135
18  8 Treasury News document        148
19  9 Answers to interrogatories    166
20  10 Mass. Financial Services Department
21    Report from 10/31/2001 to 10/31/2001    182
22
23  *Original exhibits returned to Ms. Williams
24
25

**Page 5**

1  Commission.
2          MR. THEODOROU:  Nicholas Theodorou
3  for the defendant, Steven Nothern.
4          MR. SHOPE:  John Shope for the
5  defendant, Steven Nothern.
6          THE VIDEOGRAPHER:  The court
7  reporter today is Daria Romano of Jones
8  Reporting Company.
9          Would the reporter please swear in the
10  witness.
11
12          STEVEN E. NORTHERN DULY SWORN
13
14          THE VIDEOGRAPHER:  Please begin.
15          MR. THEODOROU:  Before we start, we
16  will talk about the stipulations.
17          MS. WILLIAMS:  Absolutely.  The
18  same stipulations that we've had in the other
19  depositions, all objections, except as to the
20  form of the question, are reserved, including
21  motions to strike.
22          MR. THEODOROU:  Reserved until the
23  time of trial.
24          MS. WILLIAMS:  Yes.
25          MR. THEODOROU:  Fine.

                                2  (Pages 2 to 5)

Steven E. Northern                                                        January 30, 2007

Boston, MA

| Page 6 | Page 8 |
|---|---|
| 1     MR. SHOPE: And the witness will | 1     If you need to take a break at any |
| 2  read and sign the transcript noting any errata. | 2  time, let me know. This isn't to be more |
| 3  And the signature before a notary is waived. | 3  painful than it has to be. So unless a question |
| 4     MS. WILLIAMS: Absolutely. | 4  is pending, we will take a break. |
| 5     MR. SHOPE: Okay. | 5     And if you have any questions or you |
| 6 | 6  don't understand my question, let me know. If |
| 7     DIRECT EXAMINATION | 7  you don't let me know, I'll assume that you |
| 8  BY MS. WILLIAMS: | 8  heard my question and that you understood it. |
| 9    Q. Mr. Nothern, could you please state | 9     Do you have any questions about the |
| 10  your full name? | 10  process? |
| 11    A. Steven E. Nothern. | 11    A. No. |
| 12    Q. What's the E stand for? | 12    Q. Okay. |
| 13    A. Eric. | 13     MS. WILLIAMS: I'd like to have |
| 14    Q. What's your date of birth? | 14  this marked as Exhibit 1. |
| 15    A. April 13, 1956. | 15     (Exhibit 1 marked |
| 16    Q. And what is your current home address? | 16     for identification) |
| 17    A. 20 Collier Ave. in Scituate, | 17  BY MS. WILLIAMS: |
| 18  Massachusetts. | 18    Q. Have you seen this document before, |
| 19    Q. Do you have an E mail address? | 19  sir? |
| 20    A. I have two E mail addresses. | 20    A. I don't believe so. |
| 21    Q. Could you tell me what both of those | 21    Q. What is it? |
| 22  are? | 22    A. It's labeled a Notice of Deposition. |
| 23    A. They both start snothern, | 23    Q. And I submit that this is a notice for |
| 24  S-N-O-T-H-E-R-N, one is @comcast.net, the other | 24  your deposition here today. |
| 25  is @satuit.com. And Satuit is spelled | 25    Are you appearing at this deposition |

| Page 7 | Page 9 |
|---|---|
| 1  S-A-T-U-I-T. | 1  pursuant to this notice? |
| 2    Q. Have you ever been deposed before, | 2    A. I assume so, yeah. |
| 3  Mr. Nothern? | 3    Q. You mentioned that you'd given some |
| 4    A. I gave testimony before the SEC in | 4  testimony to the SEC. |
| 5  2001. | 5    Do you know when you provided that |
| 6    Q. Except for the SEC testimony that you | 6  investigative testimony? |
| 7  gave in our pre-lawsuit investigation, have you | 7    A. Late 2001, early December. |
| 8  ever been deposed in any other matter? | 8    Q. And was that testimony also sworn in |
| 9    A. No. | 9  under oath? |
| 10    Q. I'm going to first start by describing | 10    A. Yes. |
| 11  the deposition process. | 11    Q. Did you review the testimony prior to |
| 12    Your testimony is being taken under | 12  this deposition today? |
| 13  oath and subject to penalty of perjury. | 13    A. Yes. |
| 14    It's being transcribed, so all of your | 14    MS. WILLIAMS: I'd like to have |
| 15  responses must be oral, no head nodding. | 15  this marked as Exhibit 2. |
| 16    The court reporter can only take down | 16     (Exhibit 2 marked |
| 17  one person speaking at a time, so I'm going to | 17     for identification) |
| 18  try to give you an opportunity to finish | 18  BY MS. WILLIAMS: |
| 19  answering the question before I ask a subsequent | 19    Q. Have you seen this document before? |
| 20  question so that we're not both talking over one | 20    A. Yes. |
| 21  another. | 21    Q. What is it? |
| 22    Likewise, your counsel may have | 22    A. I believe it's a transcript of the |
| 23  objections, so after I ask a question, it might | 23  testimony I gave in early December 2001. |
| 24  be a good idea to pause to allow your counsel to | 24    Q. And what was the date of that |
| 25  insert an objection before you respond. | 25  testimony? |

3 (Pages 6 to 9)

Steven E. Northern                                          January 30, 2007

Boston, MA

| Page 10 | Page 12 |
|---|---|

**Page 10**

1    A.  This document is dated December 4,
2  2001.
3    Q.  And do you agree that that was a
4  correct date, that your testimony was
5  December 4, 2001?
6    A.  Yes.  I have no reason to believe
7  otherwise.
8    Q.  I just want to note the Bates number
9  on this document is SECNOTH00117214 to 00117288.
10      Would you agree, sir, that the events
11  that gave rise to the SEC's complaint in this
12  case occurred around October 31st of 2001?
13    A.  Yes.
14      MR. THEODOROU:  Objection.
15  BY MS. WILLIAMS:
16    Q.  So this testimony was taken a little
17  over a month after that, after October 31, 2001?
18      MR. THEODOROU:  Objection.
19    A.  Yes.
20    Q.  Setting aside any typographical errors
21  you might have noticed in this testimony, is
22  there anything else that you notice in the
23  testimony that you didn't believe was correct?
24      MR. THEODOROU:  Objection.
25    A.  Some of the text is garbled and

**Page 12**

1    Q.  Did you meet with your attorneys prior
2  to this deposition?
3    A.  Yes.
4    Q.  Was there anyone present at that
5  meeting other than your attorneys or employees
6  from Foley Hoag?
7    A.  No.
8    Q.  Did you ever meet with attorneys from
9  the US Attorney's Office in connection with any
10  investigation related to trading in the 30-year
11  bond?
12    A.  I met with attorneys, I guess from the
13  Justice Department, Southern District New York.
14    Q.  Do you recall who you met with?
15    A.  I don't recall the names, no.
16    Q.  When was this meeting?
17    A.  I believe some time in 2002, perhaps
18  summer 2002.  I don't remember exactly when.
19    Q.  Do you recall how many attorneys from
20  the Southern District of New York were present
21  at the meeting?
22    A.  Yes.
23    Q.  How many?
24    A.  I believe one.
25    Q.  Was it a male or female?

| Page 11 | Page 13 |
|---|---|

**Page 11**

1  clearly, you know, mistranscribed.
2    Q.  Is there anything in particular that
3  you remember was mistranscribed?
4    A.  I'd have to go through and dig it out,
5  but there's some sections where clearly the word
6  as transcribed is nonsensical or out of context
7  or just doesn't seem to make any sense.
8    Q.  Okay.
9    A.  I think I remember one passage where
10  we were discussing people that might have
11  attended a meeting, and one is described as an
12  excellent saxophone player, or something of that
13  sort, whereas I think he was an ex-Goldman Sachs
14  employee.  So it got transcribed as a saxophone
15  player.  So there are some garbled passages of
16  that sort.
17    Q.  Okay.  If you recall any other
18  passages at any time, please let me know, but
19  I'm going to move on.
20      Have you ever testified at a trial?
21    A.  No.
22    Q.  Do you have any medical conditions
23  that might affect your ability to testify
24  truthfully here today?
25    A.  No.

**Page 13**

1    A.  It was a male.
2    Q.  Were there any attorneys from the SEC
3  present during this meeting?
4    A.  Not that I recall.
5    Q.  What did you discuss during this
6  meeting?
7    A.  We discussed the events surrounding
8  the treasury refunding announcement of
9  October 31, 2001.
10    Q.  Except for that meeting, did you have
11  any other meetings with anyone from the Southern
12  District of New York?
13    A.  No.  There was a second person in
14  attendance, but I don't think he was an employee
15  of the Justice Department.
16    Q.  Did you take any notes during that
17  meeting?
18    A.  No.
19    Q.  Besides your counsel, did you have any
20  discussions with anyone else about your
21  appearance here today?
22    A.  Outside of counsel, my wife.  So yes.
23    Q.  Did you discuss with anyone what your
24  testimony would be here today?
25    A.  No.

4 (Pages 10 to 13)

Steven E. Northern                                                      January 30, 2007
Boston, MA

Page 14

1    Q.  Could you please tell me your
2  education history since high school?
3    A.  I attended college at Middlebury
4  College in Vermont, graduated in '78.
5    Q.  What was your -- did you obtain a
6  degree?
7    A.  It was undergraduate, history.
8    Q.  Bachelor of arts in history?
9    A.  I believe so, yeah.
10       I attended Boston University and
11  completed my MBA at Boston University.
12    Q.  What year did you complete your MBA?
13    A.  I believe 1988, give or take.
14    Q.  Are you currently employed?
15    A.  Yes.
16    Q.  Where are you employed?
17    A.  I'm employed with Satuit Technologies,
18  S-A-T-U-I-T, Technologies.
19    Q.  What is Satuit Technologies?
20    A.  It's a software development and sales
21  company.
22    Q.  Where is it located?
23    A.  It's located in Norwell,
24  Massachusetts.  We have offices also in London,
25  the UK.

Page 15

1    Q.  So your office is in Norwell,
2  Massachusetts?
3    A.  Yes.
4    Q.  Would you tell me the office address?
5    A.  80 Washington Square.  It's unit M, as
6  in Mary, 50, 5-0.
7    Q.  What's your job title?
8    A.  I am -- I'm a director.  I'm acting
9  CFO and chief operating officer.
10    Q.  Could you tell me what your job
11  responsibilities are?
12    A.  Well, responsibilities as director are
13  very far ranging, so it's a supervisory -- it's
14  a firm that I own with my wife.
15    Q.  Okay.
16    A.  As CFO, I take responsibility for
17  obviously the financial matters, the
18  bookkeeping, the billing, filing of regulatory
19  tax statements.  So generally legal and
20  financial matters and HR matters, sort of
21  infrastructure, physical infrastructure matters,
22  like the office space, finding new office space,
23  renovating existing office space.
24       And as operating officer it's pretty
25  broad ranging as well.  Basically to keep an eye

Page 16

1  on operations, make sure things are moving
2  forward and people in the organization are
3  staying focused on our goals and they're being
4  held accountable to responsibilities that they
5  have in their areas.
6    Q.  When was Satuit Technologies formed?
7    A.  My wife founded the company in 1994.
8    Q.  When did you begin to work for Satuit
9  Technologies?
10    A.  In a formal way, in terms of being on
11  the payroll, I put myself on the payroll some
12  time last year.
13    Q.  So in 2005 -- 2006?
14    A.  Last year.
15    Q.  2006?
16    A.  2006, some time in the spring.  So
17  it's maybe been a year, a little less than a
18  year.  But I've been involved in the company
19  from the start.  I'm now working about three
20  days a week.
21    Q.  Prior to the spring of 2006 when you
22  put yourself on the payroll, how were you
23  involved with the company?
24    A.  Performing essentially those
25  responsibilities.

Page 17

1       As the company grows, it becomes more
2  and more of a full-time job.
3    Q.  Is there a board of directors of the
4  company?
5    A.  Yes.
6    Q.  Are you on that board?
7    A.  Yes.
8    Q.  How long have you been on the board?
9    A.  I'm not sure.  Possibly from the
10  start, which would be 1994.
11    Q.  How many employees does Satuit
12  Technology have?
13    A.  Including our fully owned sub in the
14  UK, I think it's 23 people, give or take one or
15  two.  I think we're 20 to 21 in the UK, and
16  currently we're two in the UK.  We're adding one
17  over there in March, so in about a month.
18    Q.  What is your -- I'm trying to find out
19  what your income is from Satuit.  Do you have a
20  salary?
21       MR. THEODOROU:  Objection.
22    A.  Yes, I have a salary.
23    Q.  How much do you make?
24    A.  Off the top of my head, I think it's
25  in the range of -- I don't know exactly off the

Steven E. Northern                                                January 30, 2007

Boston, MA

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  top of my head. I think it's in a range of 50
2  to $60,000.
3      Q. A year?
4      A. Yes.
5      Q. What's the name of the company in the
6  UK? You said there's a subsidiary.
7      A. Yes. It's Satuit Technologies, LTD.
8      Q. Is Satuit Technologies a public
9  company?
10     A. No.
11     Q. Do you know who the other members of
12 the board of directors of Satuit are?
13     A. Yes.
14     Q. Could you name them for me?
15     A. Karen Maguire, M-A-G-U-I-R-E, Joshua
16 Weiss, W-E-I-S-S, and Njal Larson, L-A-R-S-O-N.
17     Q. Does the company have any investors?
18         MR. THEODOROU: Objection.
19     A. The only outside investor is me, if I
20 can be considered an outside investor. I was an
21 original investor before taking a more active
22 role as I am now.
23     Q. Where were you employed prior to the
24 spring of 2006 when you were put on the payroll
25 at Satuit?

**Page 19**

1      A. My prior employment was with MFS,
2  investment management, here in Boston.
3      Q. And MFS stands for what?
4      A. MFS at one point stood for
5  Massachusetts Financial Services Company. I
6  think at one point they just actually went with
7  the name MFS, my understanding.
8      Q. Okay. So during this deposition, if I
9  refer to the company as MFS, no matter what time
10 period, will you understand what I'm talking
11 about?
12     A. Yes.
13     Q. Okay. When did you first go to work
14 at MFS?
15     A. I started at MFS in, I believe, the
16 spring of 1986, April, May, around that period.
17     Q. When did you stop working for MFS?
18     A. March of 2002.
19     Q. Why did you stop working at MFS?
20     A. They fired me.
21     Q. Were you fired for cause?
22         MR. THEODOROU: Objection.
23     A. It hasn't been put to me that way. In
24 Massachusetts you're an employee at will. They
25 don't actually have to give you reason.

**Page 20**

1      Q. Were you given a reason?
2      A. Eventually, yes.
3      Q. What was the reason that you were
4  given?
5      A. There were two or three reasons they
6  gave.
7         First you have to understand that I
8  indicated to them that I thought the charges
9  that were brought by the SEC had no merit, and I
10 was going to fight them.
11        So one reason they gave me was that
12 fighting the SEC was going to take up too much
13 of my time and would detract from my portfolio
14 responsibilities.
15        I think secondly they questioned my
16 judgment in transactions, trades I did
17 October 31 of 2001.
18        And thirdly, I think they felt I
19 should have been more forthright, more
20 forthcoming.
21     Q. When you say "more forthcoming," more
22 forthcoming about what?
23     A. About the incidents surrounding trades
24 we did in October 31 of 2001.
25     Q. Is there anything specific they felt

**Page 21**

1  you weren't forthcoming about?
2         MR. THEODOROU: Objection.
3      A. No. We didn't discuss that.
4      Q. Who gave you these reasons as to why
5  you were fired?
6      A. I believe Eric Burns.
7      Q. What was Mr. Burns's job title at MFS?
8      A. I don't know.
9      Q. Do you know what department he worked
10 in?
11     A. He was, I think, a lawyer and an
12 accountant by training. I think his
13 responsibilities were primarily with the Human
14 Resource Department. So he may have been part
15 of the Legal Department or the HR Department. I
16 couldn't tell you.
17     Q. Between the time that you were fired
18 by MFS, which you said was March of 2002, and
19 the time you went to work for Satuit in the
20 spring of 2006, did you have any employment?
21     A. In the sense of getting a paycheck?
22     Q. Yes.
23     A. No.
24     Q. What did you do for income during that
25 time?

6 (Pages 18 to 21)

Steven E. Northern                                                    January 30, 2007
                              Boston, MA

| Page 22 | Page 24 |
|---|---|

**Page 22**

1    A.  I had no income other than investment
2   income from my savings.
3        Q.  Did you take any steps to seek
4   employment during that time period?
5        A.  No.
6        Q.  I'm going to go back to MFS later, but
7   could you tell me where you worked prior to May,
8   or I think you said spring of 1986 when you
9   joined MFS, where were you employed prior to
10  that?
11       A.  I was employed with Merrill Lynch
12  Pierce Fenner & Smith.
13       Q.  When did you first go to work for
14  Merrill Lynch Pierce Fenner & Smith?
15       A.  I believe 1981.
16       Q.  What was your job title there?
17       A.  Initially I came in as a trainee
18  account executive I believe is what they called
19  it then.
20       Q.  What were your job responsibilities as
21  a trainee account executive?
22       A.  I was being groomed to be a salesman.
23       Q.  When you say "a salesman," could you
24  tell me a salesman of what?
25       A.  Initially I was hired in a department

**Page 23**

1   that handled futures, so we were to find clients
2   that would need the services of Merrill Lynch to
3   transact commodities futures contracts.
4        I was in a group that was relatively
5   newly formed to grow the what was then called
6   the financial futures business at the time,
7   primarily focused on interest rates futures
8   contracts.  The business was just developing at
9   the time.
10       Q.  Was there a name for this group that
11  you were part of?  You said it was a relatively
12  newly formed group.
13       A.  It was the Financial Futures Group, I
14  believe.
15       Q.  Were you ever promoted from this
16  position that you held initially, which was
17  trainee account executive?
18       A.  I became an account executive.
19       And at some point I was moved to a
20  different group which was on a different floor,
21  it was an institutional equity sales office, and
22  I was part of a small group that was to work
23  with the existing institutional equity accounts
24  to handle their needs with the new equity
25  futures contracts.

**Page 24**

1        Q.  As an account executive at Merrill
2   Lynch, what were your daily responsibilities?
3        A.  Excuse me?
4        Q.  As an account executive, what were
5   your responsibilities on a daily basis?
6        A.  My responsibilities were to develop
7   the business, to find new clients, and to
8   service those accounts, to handle their
9   investment and transaction needs, their
10  informational needs, deliver research.
11       Q.  How long did you work for Merrill
12  Lynch?
13       A.  '82, '83, '84.  About four years, I
14  believe.
15       Q.  And were you an account executive
16  that -- you said eventually you became an
17  account executive.  Did you have any other job
18  titles while you were there?
19       A.  Not that I recall.
20       Q.  Why did you leave Merrill Lynch?
21       A.  To come back to your prior question,
22  they may have not always used the term account
23  executive.  I think over time they've used
24  different names for that basic function.  But
25  whether it was always account executive that was

**Page 25**

1   my title, I don't recall at all.
2        Q.  So why did you leave Merrill Lynch?
3        A.  We, my wife and I, moved from New York
4   to Massachusetts.  The primary motivation for
5   moving was my wife's mother's health was not
6   good, so we moved to be closer to her.
7        Q.  Where did you work before you went to
8   Merrill Lynch?
9        A.  Before Merrill Lynch and before we
10  moved to New York, we lived in Middlebury,
11  Vermont.
12       And after graduating from college, I
13  held a job basically working in a restaurant, I
14  think, as a -- working as a waiter, maybe some
15  bartending.
16       My wife and I were also developing
17  real estate, so we worked on homes.  We bought a
18  dilapidated old house in Middlebury.
19       Q.  You said prior to that you were in
20  college; is that right?
21       A.  Yes.
22       Q.  Did you work while you were pursuing
23  your MBA?
24       A.  Yes.  I did, I think, a good half of
25  the MBA full time, and then I started at MFS and

Steven E. Northern                                              January 30, 2007
                              Boston, MA

---

| Page 26 |
|---|

1   completed it while I was working at MFS.
2       Q.  Have you ever earned any securities
3   licenses?
4       A.  Yes.
5       Q.  Could you tell me which ones?
6       A.  I believe three, but I couldn't
7   remember two.  Series 7 and the commodity
8   registration, and the number is slipping me.
9       Q.  63?
10      A.  I don't believe that's the commodity.
11  Isn't that the state registration?
12      Q.  Did you ever receive a Series 63?
13      A.  Yes.
14      Q.  And you believe there's one
15  additional -- the commodities registration?
16      A.  The commodities registration.
17      Q.  When did you earn your Series 7?
18      A.  Within the first early period I worked
19  at Merrill Lynch.
20      Q.  So some time around 1981?
21      A.  Yes.
22      Q.  What about the Series 63?
23      A.  I believe I completed them around the
24  same time.
25      Q.  And the commodities registration?

| Page 27 |
|---|

1       A.  I believe I completed all three as
2   part of my trainee program.  When I started at
3   Merrill Lynch, they immediately had us hit the
4   books.
5       Q.  Were you required to earn these
6   licenses as a result of your employment at
7   Merrill Lynch?
8       A.  It was a requirement.  For dealing
9   with the public, you had to have these
10  registrations to be a salesperson.
11      Q.  Are any of the registrations, are any
12  of them still current?
13      A.  No.
14      Q.  Do you know when they lapsed?
15      A.  I don't.
16      Q.  Was it some time after you left MFS?
17      A.  Yes.  One may have lapsed after I left
18  Merrill Lynch.  I'm not sure when they lapsed.
19          They lapse unless you work for a
20  member of one of the exchanges, I believe, and
21  they have to renew it for you.
22      Q.  We've been talking about MFS, but
23  could you tell me what MFS is?
24      A.  MFS is an investment management
25  company.

| Page 28 |
|---|

1       Q.  When you worked for MFS, where was
2   your office located?
3       A.  We worked at two different locations.
4       Q.  And could you tell me where those
5   were?
6       A.  They were both in the Back Bay.
7           MR. THEODOROU:  What time period?
8   When he first started or --
9           MS. WILLIAMS:  Well, it's not clear
10  to me now if there were two locations at the
11  same time.
12  BY MS. WILLIAMS:
13      Q.  Were the two locations at the same
14  time, covered the same time period?
15      A.  We moved locations in 1988.  So
16  initially we were at, I believe the address was
17  200 Berkeley, the old Hancock building with the
18  light tower on it.
19      Q.  In Boston, Massachusetts?
20      A.  In the Back Bay, yes.
21      Q.  And where did you move to in 1988?
22      A.  MFS relocated the office to 500
23  Boylston Street.
24      Q.  What was your job title when you were
25  first hired by MFS?

| Page 29 |
|---|

1       A.  I didn't have a job title.
2       Q.  What were your job responsibilities?
3       A.  I was working as a junior portfolio
4   manager.  Essentially a portfolio manager in
5   training.  I was brought in to be a portfolio
6   manager, but I wasn't given that title
7   immediately.
8       Q.  What did you do as a junior portfolio
9   manager?
10      A.  I assisted in portfolio
11  responsibilities.
12      Q.  What were those responsibilities?
13      A.  Developing strategy, executing the
14  strategy in the portfolios, monitoring portfolio
15  risks and exposures, monies coming in, monies
16  going out of the portfolios, representing our
17  portfolio management activities to other
18  interested parties such as the board of
19  directors or to brokers or wholesalers for
20  marketing purposes.
21          I was conducting fundamental research,
22  developing market views, opinions on how the
23  portfolios should be structured.
24      Q.  As a junior portfolio manager, did you
25  place any orders to trade securities?

8 (Pages 26 to 29)

Steven E. Northern                                                    January 30, 2007
Boston, MA

| Page 30 | Page 32 |
|---|---|

**Page 30**

1    A.  Yes.
2    Q.  And how long were you a junior
3  portfolio manager?
4    A.  I don't recall.
5    Q.  Did you ever take on any other job
6  responsibility at MFS?
7    A.  Other than?
8    Q.  Junior portfolio manager.
9    A.  Yes.
10    Q.  What other responsibilities?
11    A.  At some point I was made a portfolio
12  manager and given a title, a title of assistant
13  vice president.
14    Q.  And do you recall approximately when
15  that was?
16    A.  No, I don't.
17    Q.  Were you ever given any other titles
18  while you worked at MFS?
19    A.  Yes.  I was eventually made a senior
20  vice president.
21    Q.  Do you know when you became senior
22  vice president?
23    A.  I don't recall.
24    Q.  Do you know what your job title was in
25  October of 2001?

**Page 31**

1    A.  I was a portfolio manager and senior
2  vice president of the company.
3    Q.  As senior vice president and portfolio
4  manager, how did your job responsibilities
5  compare to when you were a junior portfolio
6  manager?
7    A.  The primary difference is that I was
8  named as portfolio manager officially on
9  different portfolios as a portfolio manager.
10    As a junior portfolio manager I was
11  working on portfolios where another person, my
12  supervisor, was the named responsible party for
13  the portfolios.
14    Q.  Other than that, were there any other
15  additional responsibilities you had as a
16  portfolio manager and senior vice president?
17    A.  No.
18    Q.  How many portfolios did you manage in
19  October of 2001?
20    A.  I managed -- I have to try to
21  remember.
22    Q.  If you want to name them, that's fine.
23    A.  I managed the Government Securities
24  Fund.
25    I managed -- and I know the acronyms

**Page 32**

1  better than -- GSS which was the acronym for an
2  annuity, government securities portfolio.
3    GSV, which is the acronym for a second
4  government securities portfolio that was sold as
5  an annuity.
6    I managed an institutional portfolio
7  for a publicly-traded corporation.
8    And I also managed as lead portfolio
9  manager two closed-end mutual fund portfolios,
10  one which went by the acronym of MIN, which was
11  Intermediate Income Trust, and the other went by
12  the acronym of MGF, which I believe was
13  Government Markets Income Trust.
14    Q.  Are those all of the portfolios you
15  managed in October of 2001?
16    A.  As I recall, those are the ones that I
17  was the named portfolio manager on.
18    Q.  Are you familiar with a portfolio that
19  went by the acronym MMT?
20    A.  Yes.
21    Q.  What is that?  What was MMT?
22    A.  MMT is an acronym for Multi Market
23  Income Trust.
24    Q.  Did you have any responsibility for
25  managing that portfolio?

**Page 33**

1    A.  I believe, now that you mention it,
2  that I was lead portfolio manager.  I think I
3  had been made lead portfolio for that -- lead
4  portfolio manager for that fund in 2001 some
5  time.
6    Q.  Prior to October 2001?
7    A.  Yes.
8    Q.  If we could go through those funds,
9  could you tell me what percentage of the funds
10  in October 2001, if any, were invested in
11  Treasury's securities?
12    MR. THEODOROU:  Objection.
13    A.  As a percentage of the portfolio
14  allocation?  I don't understand your question.
15  I'm sorry.
16    Q.  Let me rephrase that question.
17    Were any of these funds, did any of
18  them have any investment in Treasury securities?
19    A.  Yes.  They all did.
20    Q.  Were the funds open-ended?  Except
21  these two you mentioned were close-ended, the
22  MIN and MGF, were the other funds open-ended?
23    A.  MMT was also a closed-end fund.
24    The separately-managed portfolio for
25  that publicly-traded corporation I mentioned,

9  (Pages 30 to 33)

Steven E. Northern                                        January 30, 2007
                        Boston, MA

---

### Page 34

1  that's not an open-end fund.  That's an
2  institutional account, so that's a fixed asset
3  base.
4       Q.  What was the name of that
5  publicly-traded corporation?
6       A.  It was Service Corp. International,
7  SCI.
8       Q.  Do you know what the value of the
9  funds were in October of 2001?
10          MR. THEODOROU:  Objection.
11      A.  The funds or the -- the whole group of
12  accounts?
13      Q.  The whole group of accounts.
14      A.  I don't recall.  Specifically I
15  believe it was about $4 billion.
16      Q.  Did you manage more government
17  securities funds than the other portfolio
18  managers on your trading desk at MFS?
19      A.  Yes.
20      Q.  And why was that?
21      A.  That was my area of expertise and
22  responsibility in the group.
23      Q.  Did other portfolio managers have
24  other areas of expertise?
25      A.  Yes.

### Page 35

1       Q.  What were the other areas of
2  expertise?
3       A.  Across the Fixed Income Department?
4       Q.  Yes.
5       A.  We covered virtually every area.  So
6  we had a specialist in mortgage-backed
7  securities, a couple in corporate securities.
8  We covered emerging market debt.  We covered
9  international.  We had people responsible for
10  money market.  We had people responsible for
11  municipal bonds, national municipal bonds, as
12  well as different state municipal bond
13  portfolios.
14          And there might be other areas that
15  escape me, but it was pretty much we covered all
16  the bases for fixed income.
17      Q.  How many portfolio managers sat on
18  your fixed income desk in October of 2001?
19          MR. THEODOROU:  Objection.
20      A.  I don't know.  We had two different
21  desks.  We had one on the 22nd floor, which is
22  where the municipal bond portfolio team worked.
23  We had two trading desks on the 23rd floor, and
24  I couldn't tell you, you know, exactly how many
25  PMs that was.  I could guess for you.

### Page 36

1       Q.  No.
2           Which desk did you sit on?
3       A.  I sat on a desk that we called high
4  grade trading desk.
5       Q.  Where floor of the building was that
6  desk on?
7       A.  We were on the 23rd floor.
8       Q.  Do you know how many portfolio
9  managers sat on the high grade trading desk
10  where you sat?
11      A.  Yes.
12      Q.  How many?
13          MR. THEODOROU:  As of October --
14          MS. WILLIAMS:  October 2001.
15      A.  I can just count.  Six portfolio
16  managers, as I recall.
17      Q.  When you say "high grade trading
18  desk," what do you mean by high grade?
19      A.  The department I missed, we also have
20  a -- it was a High Yield Department.
21          So the distinction really was high
22  grade is primary quality.  So it distinguishes
23  from noninvestment grade, which is the junk,
24  High Yield Department, which I neglected to add
25  in as we surveyed all the different areas of

### Page 37

1  specialty in the fixed income area.  There's
2  actually -- they had their own trading desk also
3  on the other side of the 23rd floor.  There was
4  a High Yield Department.
5           So high grade is investment grade,
6  corporates and government securities, agency
7  securities and mortgage-backed securities.
8       Q.  You said there were six portfolio
9  managers.  Could you tell me their names in
10  October of 2001?
11      A.  Yes.
12      Q.  What are they?
13      A.  Myself, Rick Smith, David Kennedy,
14  Jeffrey Kurinsky, K-U-R-I-N-S-K-Y, Jim Calmes,
15  C-A-L-M-E-S, and Peter Varearn spelled, I
16  believe, V-A-R-E-A-M, Peter Varearn.
17      Q.  Did anyone -- besides portfolio
18  managers, were there any other people that sat
19  on the high grade trading desk where you sat?
20      A.  Yes.
21      Q.  Who else sat on desk?
22      A.  We had, I believe at that time two
23  traders, and I think we had -- as I recall, we
24  had open seats that the analysts could come and
25  use.

10  (Pages 34 to 37)

Steven E. Northern                                          January 30, 2007
                            Boston, MA

| Page 38 |
|---|

1    Q.   Who were the two traders in October of
2 2001?
3    A.   John Cadogan.  I'm not actually
4 100 percent sure either.  You may not better
5 than I do.  C-A-D --
6    Q.   O-G-A-N.
7    A.   John Cadogan, and the other fellow I'm
8 blanking on.
9    Q.   Does Aaron Mayo ring a bell?
10    A.   Yes, it does.  Thank you.
11    Q.   What did Mr. Cadogan trade?
12    A.   As I recall, he would trade anything.
13 His primary responsibility would have been for
14 government agencies, mortgages.
15    Q.   What about Mr. Mayo, did he have a
16 primary responsibility?
17    A.   I believe Aaron was a little bit
18 junior, but we were using him more on corporate
19 transactions, but I think the two were fairly
20 interchangeable.
21    Q.   Did you work with any of these two
22 traders more than the other?
23    A.   Yes.
24    Q.   Which one did you work with more?
25    A.   John.

| Page 39 |
|---|

1    Q.   I believe that you stated that one of
2 your job responsibilities as portfolio manager
3 was to help develop trading strategies; is that
4 right?
5        MR. THEODOROU:  Objection.
6    A.   Yes.
7    Q.   How did you do that?
8        MR. THEODOROU:  Objection.
9    A.   Apart from being portfolio managers,
10 we were all analysts in our different sectors of
11 expertise.
12        And it was from our research and
13 analysis that we developed ideas in terms of how
14 best to structure the portfolios.
15    Q.   What did you use in this research?
16 What sources did you use?
17    A.   We used research from most any
18 imaginable source, primarily -- Wall Street
19 brokerages and investment banks all had large --
20 well, some of them had large research
21 departments, and we would use their -- you know,
22 their product.
23        We had different research boutiques
24 that we were -- smaller shops that we might
25 directly hire or pay through doing transactions.

| Page 40 |
|---|

1        Information that was publicly
2 available through the wires, through tools such
3 as Bloomberg, Reuters.
4        We would basically try to keep our ear
5 to the ground and get information from any
6 source.
7    Q.   Did you ever use any outside
8 consultants?
9    A.   Yes.
10    Q.   Which outside consultant did you use
11 in 2001?
12    A.   We had many.  I remember we had ISI
13 which was a fairly important one for us.
14    Q.   Does ISI stand for anything?
15    A.   It does.  I just can't remember what
16 it was.
17    Q.   Okay.
18    A.   It's a shop in New York owned by Ed
19 Hyman who is an economist.
20        We had, you know, many other smaller
21 ones also.
22    Q.   Do you recall any of the names?
23    A.   We used Peter Davis.  I recall that
24 one.  I'm drawing a blank right now.
25    Q.   Okay.  Of the consultants that you

| Page 41 |
|---|

1 used, did any of them provide you with
2 information regarding treasury announcements?
3        MR. THEODOROU:  Objection.
4    A.   I don't think specifically.  I don't
5 recall.
6    Q.   In your job as portfolio manager, did
7 you develop views of economic releases by the
8 Federal Government?
9    A.   Yes.  Your prior question, if I can?
10    Q.   Oh, sure.
11    A.   Would you just repeat it?
12    Q.   The question before the views
13 question?
14    A.   Yeah.
15    Q.   I wanted to know if any of the
16 consultants provided you information regarding
17 Treasury Department announcements.
18    A.   I think the answer is yes.  It's
19 certainly not what we hired them for, but I
20 think yes.
21    Q.   Did you develop views as a portfolio
22 manager on what the Treasury Department was
23 going to do in terms of announcements?
24        MR. THEODOROU:  Objection.
25    A.   Yes.

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern                                        January 30, 2007
                        Boston, MA

| Page 42 | Page 44 |
|---|---|

**Page 42**

1    Q.   You mentioned Peter Davis.  Do you
2  recall the name of his company?
3    A.   I believe it was Peter Davis
4  Investment Capital, Investment Ideas or
5  something of that sort.
6    Q.   Does Davis Capital Investment Ideas
7  ring a bell?
8    A.   That sounds right.
9    Q.   Do you know what Mr. Davis's title was
10  at Davis Capital -- I'm just going to go call it
11  Davis Capital for short.  Is that okay with you?
12    A.   Yeah.
13    Q.   Do you know what Mr. Davis's title was
14  a Davis Capital?
15    A.   No, I don't.
16    Q.   Besides Mr. Davis, did you ever have
17  any contact with any other employees affiliated
18  with Davis Capital?
19    A.   I believe on at least one or two
20  occasions I spoke with an assistant who might
21  have answered the phone if he was not in.
22    Q.   Do you recall the assistant's name?
23    A.   No.
24    Q.   How would Mr. Davis communicate
25  information to you?

**Page 43**

1      MR. THEODOROU: Objection.
2    A.   Primarily through E mails, faxes,
3  occasionally through phone calls and
4  occasionally in person.  He came to visit our
5  office once.
6    Q.   Did you ever go to visit Mr. Davis?
7    A.   Yes.
8    Q.   And how many times did you go to visit
9  him?
10    A.   I didn't visit his office.  We did
11  visit or I had a visit with him on two occasions
12  in Washington, where he organized a day of
13  activities.
14    Q.   What kind of activities?
15    A.   Visiting with different government
16  officials in different departments of the
17  government.
18    Q.   Do you recall any departments?
19    A.   Sorry?
20    Q.   Do you recall which departments?
21    A.   I recall we visited at the Federal
22  Reserve, the Treasury.  We visited Capitol Hill.
23  We visited the Office of Management and Budget,
24  OMB.
25    Q.   Do you recall who you visited at the

**Page 44**

1  Treasury?
2    A.   We visited on two different trips.  I
3  believe one trip we visited with Mr. Anderson.
4    Q.   Do you recall Mr. Anderson's first
5  name?
6    A.   Roger, I believe.
7    Q.   Did you visit with anyone else during
8  that first trip?
9    A.   Excuse me?
10    Q.   Did you visit with anyone else at
11  Treasury you during the first trip besides
12  Mr. Anderson?
13    A.   I don't recall.
14    Q.   When was the first trip?
15    A.   I don't recall exactly.
16    Q.   Do you recall a year?
17    A.   I'm guessing, 1999, possibly 1998.
18    Q.   When was the second trip?
19    A.   I also don't recall exactly.  I'm
20  guessing the subsequent year.
21    Q.   It was after the --
22    A.   I think it was two years back to back.
23    Q.   And did you visit Treasury during the
24  second trip?
25    A.   Yes.

**Page 45**

1    Q.   Do you recall who you visited with at
2  Treasury during the second trip?
3    A.   I don't remember specifically who we
4  visited.  There were several -- I might have
5  made two stops, two different meetings.  I do
6  remember one meeting was attended by several,
7  and one of those people was Mr. Malvey.
8    Q.   Do you remember Mr. Malvey's first
9  name?
10    A.   I don't.
11    Q.   Does Paul ring a bell?
12    A.   Yes.
13    Q.   Except for these two trips to
14  Washington, did you ever visit with Mr. Davis in
15  Washington, D.C.?
16    A.   No.  As I mentioned, he came to our
17  offices.
18    Q.   When did Mr. Davis come to MFS's
19  office?
20    A.   When we first hired him, prior to
21  those visits in Washington.
22    Q.   Prior to October 31, 2001, were you
23  aware that the Treasury would periodically
24  announce its refunding needs?
25      MR. THEODOROU: Objection.

12 (Pages 42 to 45)

Steven E. Northern                                           January 30, 2007
Boston, MA

| Page 46 | Page 48 |
|---|---|
| 1    A.  Yes. | 1         And you answered, "Yes. |
| 2    Q.  Do you know how often this would | 2    "Is that a yes? |
| 3  occur? | 3    "Yes." |
| 4         MR. SHOPE:  Objection.  Are you | 4         So do you recall being asked those |
| 5  asking what his knowledge was in October of | 5  questions and giving those answers? |
| 6  2001, or are you asking what his knowledge is | 6    A.  I don't recall. |
| 7  today? | 7    Q.  Do you believe you were asked those |
| 8  BY MS. WILLIAMS: | 8  questions and you gave that answer? |
| 9    Q.  I want to know your knowledge in | 9    A.  Yes. |
| 10  October of 2001. | 10    Q.  So was the Treasury refunding |
| 11         MR. THEODOROU:  Objection. | 11  announcement a source of information for you in |
| 12    A.  And your question?  Sorry. | 12  your job? |
| 13    Q.  That as of October 31, 2001, did you | 13         MR. SHOPE:  Well, this says "in any |
| 14  know how often the Treasury Department would | 14  was."  That actually means was it in any way a |
| 15  announce its refunding needs? | 15  source of information, and that's presumably |
| 16    A.  Yes.  The Treasury held quarterly | 16  what the question was, correct? |
| 17  refundings, so presumably they had an | 17         MS. WILLIAMS:  That's correct.  I |
| 18  announcement prior to all of those. | 18  believe that's a typographical error. |
| 19    Q.  And do you know which month those | 19         MR. SHOPE:  So are you asking him |
| 20  refunding announcements took place? | 20  now the question whether or not -- |
| 21    A.  No. | 21         MS. WILLIAMS:  It was in any way a |
| 22    Q.  Were the Treasury refunding | 22  source of information for him in his job. |
| 23  announcements a source of information that you | 23    A.  Yes. |
| 24  used in your job as portfolio manager? | 24    Q.  In what way did you use these |
| 25         MR. THEODOROU:  Objection. | 25  announcements in your job? |

| Page 47 | Page 49 |
|---|---|
| 1    A.  No.  That's very second tier kind of | 1    A.  Like I said, it's very secondary |
| 2  information. | 2  information.  It points to what the primary |
| 3    Q.  When you say "second tier," what was | 3  dealers are focusing on. |
| 4  first tier type of information? | 4         For them this is a big deal.  To the |
| 5    A.  My interest is more in issues | 5  extent that they are an actor in the market, |
| 6  surrounding fiscal monetary policy, issues | 6  it's relevant.  It's very second tier. |
| 7  surrounding economic growth, the thrust of | 7         MS. WILLIAMS:  John would like to |
| 8  economic growth and how it interacts with the | 8  take a break.  Is it okay to take five minutes? |
| 9  policies, so the government, so the fiscal | 9         MR. THEODOROU:  Sure.  That's fine. |
| 10  policies and monetary policies of the | 10         THE VIDEOGRAPHER:  Going off the |
| 11  government.  Those are more macro issues. | 11  record, 10:22 a.m. |
| 12  Issues that were used at the quarterly | 12         (Recess taken) |
| 13  refundings are entirely secondary. | 13         THE VIDEOGRAPHER:  Back on the |
| 14    Q.  If I could ask you to turn to | 14  record, 10:33 a.m. |
| 15  Exhibit 2, page 89.  And you can start at line | 15  BY MS. WILLIAMS: |
| 16  five and read to line 16 or so. | 16    Q.  Mr. Nothern, before we broke, I was |
| 17         (Pause) | 17  asking about the way in which the Treasury |
| 18  BY MS. WILLIAMS: | 18  refunding announcements were used by you in your |
| 19    Q.  Let me know when you're finished. | 19  job, and you mentioned that they point to what |
| 20    A.  Okay. | 20  the primary dealers are focusing on. |
| 21    Q.  Okay.  You were asked, and I'm going | 21         And I wanted to know how that assists |
| 22  to start in the middle line 12, "Are these | 22  you in your job as portfolio manager? |
| 23  refunding conferences or announcements in any | 23    A.  Like I said, it's very secondary. |
| 24  was" -- I think that's a typo -- "a source of | 24    Q.  What do you mean by "very secondary"? |
| 25  information for you in your job?" | 25    A.  It's not very useful information. |

13  (Pages 46 to 49)

Steven E. Northern
Boston, MA

January 30, 2007

Page 50

1    You have to understand, we talk with
2 our counterparties with the primary dealers who
3 have direct lines. We talk with them on an
4 ongoing basis.
5    For them this is a big deal, so it's
6 something they talk about, you know, so to the
7 extent that they're talking about it, it's
8 affecting, impacting their business, you know,
9 it's something that, you know, they would be
10 aware of.
11    In terms of structuring portfolios and
12 doing our job for our shareholders, it's
13 irrelevant.
14    Q. Does it ever impact your business?
15    MR. THEODOROU: Objection.
16    A. Like I said, in terms of structuring
17 the portfolios and delivering good total returns
18 for shareholders, it's essentially irrelevant.
19    Q. Right. But my question was a little
20 broader.
21    As a portfolio manager, did those
22 announcements ever affect your business?
23    MR. THEODOROU: Objection.
24    A. Yes.
25    Q. In 2001 what time did you usually

Page 51

1 arrive at work at MFS?
2    MR. THEODOROU: Objection.
3    A. Generally around 7:30, 7, 7:30 in the
4 morning.
5    Q. What was your typical morning routine
6 after you arrived?
7    MR. THEODOROU: Objection.
8    A. As I remember, by then I read the
9 papers, which is sort of the first step.
10    You have to understand, even if you
11 come in at seven in the morning, UK's been up
12 and running for five or six hours. So the first
13 thing you do is try to get a lay of the land in
14 terms of events that are occurring, kind of
15 changes in the marketplace that might have
16 occurred overnight. Because essentially the
17 market is a 24-hour market, so it gets handled
18 from the US, the West Coast, the Far East, the
19 UK and back. So there's a period of time you
20 need to spend just to kind of get resituated,
21 what's happened since you went home last night.
22 That's the first order of business.
23    The second is while it's still quiet
24 and you have a little bit of time to think, you
25 know, what am I doing today, what is on my --

Page 52

1 what's on the plate today, so to kind of get
2 yourself set up.
3    If there's portfolio work to do, start
4 working on that. If there are meetings to plan
5 for, start getting ready for those.
6    Q. You said that you usually would read
7 the paper before you got to work?
8    A. Yes.
9    Q. And what did you do once you were at
10 work to get a lay of the land, so to speak?
11    MR. THEODOROU: Objection.
12    A. I would start reviewing market levels
13 on monitors that we had.
14    I would start reviewing with brokers,
15 kind of get their take -- actually, they're a
16 very good source of sort of a summary. You
17 know, what has occurred is basically their job
18 in the morning is to deliver sort of the
19 overnight recap of events. So you talk with
20 some dealers, review research.
21    And if it's portfolio work, start, you
22 know, reviewing analytic reports and start
23 basically the work of, you know, monitoring what
24 needs to be done at any given point in time in
25 the portfolios.

Page 53

1    Q. You said that you would review market
2 levels on monitors you had. What do you mean by
3 monitors?
4    A. Screens, old CRTs, tubes, television
5 screens.
6    Q. Okay. And how would the -- was there
7 any sort of host for the market level that --
8 let me rephrase that.
9    What appeared on these screens?
10    A. The screens were a delivery for
11 different services that we might subscribe to or
12 for different portfolio management or analytic
13 tools that we might use.
14    Q. And which services did you subscribe
15 to?
16    A. That I can remember now, we had
17 Bloomberg. We had Reuters. We had -- we used
18 Yield Book as a portfolio analytic tool.
19    We had an internal tool for doing
20 transactions, that was FITS, F-I-T-S, which was
21 sort of a -- it's an acronym for Fixed Income
22 Trading System, which was essentially a
23 home-grown work flow kind of product that they
24 built, and various other analytic and portfolio
25 tools.

14 (Pages 50 to 53)

Steven E. Northern                                                    January 30, 2007
                              Boston, MA

| Page 54 | Page 56 |
|---|---|

**Page 54**

1  Q.  When you were reviewing market levels
2  in the morning, which of these services did you
3  typically use?
4      MR. THEODOROU: Objection.
5  A.  As I recall, Reuters and Bloomberg.  I
6  think we used to have Telerate.  I'm not sure if
7  we still had Telerate at that point.  Telerate
8  is T-E-L-E-R-A-T-E.
9      And I think we had other data
10 services.  I just can't remember exactly what
11 they were.
12 Q.  What, if any, news did you review on
13 these services as part of your morning routine?
14 A.  News tickers do you mean?
15 Q.  Yes.  If there was news available on
16 the service, did you review any of the news?
17 A.  Not likely.  Particularly a service
18 like Reuters or Bloomberg, there's a constant
19 flow of stories, so it's just constantly
20 scrolling.  You could spend your whole day
21 monitoring that and not get anything else done.
22 So it was there.
23     If there was a release, like a CPI
24 release, it would it -- the headline would hit
25 there, and you might pull up the story if you're

**Page 55**

1  interested.  But generally it wasn't something
2  first thing in the morning I would start looking
3  at it, because it's just constantly scrolling.
4      You could go back and get a record of
5  the last hour, last two hours.  You could do
6  that sort of work.
7  Q.  Did you ever do that?
8  A.  Yes.
9  Q.  You mentioned that you would talk with
10 dealers in order to figure out what the changes
11 in the marketplace were.  Are there any dealers
12 that you would call more than others?
13     MR. THEODOROU: Objection.
14 A.  Yes.
15 Q.  Who?
16 A.  As I recall now, I'd call them the
17 usual suspects.  It would be the main US primary
18 dealers, Goldman Sachs, JP Morgan, UBS
19 Securities, Merrill, Bear Stearns, Greenwich
20 Securities.  And I may be leaving a few out.
21 Q.  Did you call or did you talk with
22 dealers every day in the morning to get an idea
23 of the change in the marketplace?
24 A.  Every day, maybe not every day, but
25 yes, that would be part of my morning routine

**Page 56**

1  would be to take those phone calls.  They would
2  typically call us.
3  Q.  They would typically call you in the
4  morning?
5  A.  Yes, and the other portfolio managers.
6      Part of the routine for -- these were
7  salesmen or salespeople.  Part of their morning
8  routine is to collect the information that
9  they've collected overnight, put that together
10 and call their clients.  So being one of the
11 clients for these dealers, we would receive
12 those phone calls.
13     So the fellow covering us for
14 government securities, for example, might
15 call -- make two or three phone calls to MFS to
16 portfolio managers that might be interested.
17 Q.  What, if any, E mails did you review
18 as part of your morning routine?
19     MR. THEODOROU: Objection.
20 A.  Your question? I'm sorry.
21 Q.  Did you review E mails as part of your
22 morning routine?
23 A.  I constantly reviewed E mails, so yes.
24 Q.  Are you familiar with a document
25 called a High Grade Trading Report?

**Page 57**

1  A.  Yes.
2  Q.  What is it?
3  A.  I remember -- if I'm thinking about
4  the right document, that we summarized once a
5  day the transactions that were done the prior
6  day and circulated that.  I believe one of the
7  PMs had to sign off on it to check it for
8  accuracy.
9  Q.  Only one of the -- did each portfolio
10 manager have to sign it for accuracy or only
11 one?
12     I'm just trying to understand.  You
13 said you believe one of the portfolio managers,
14 you believe, had to sign off.  Do you mean only
15 one on the desk or each of them had to sign off?
16 A.  I don't recall.  It could well have
17 been.
18 Q.  Do you recall what time of day you
19 received the High Grade Trading Report?
20 A.  I don't believe I received it so much
21 as it was -- I don't recall what the process was
22 for distributing that.
23     I do remember at the end of the day it
24 was one of the assistant's responsibilities to
25 compile this report, it would be the trades in

15  (Pages 54 to 57)

Steven E. Northern                                    January 30, 2007
                        Boston, MA

| Page 58 | Page 60 |
|---------|---------|

**Page 58**

1  particular to the day, and it would be left out
2  at a place where the assistants worked.
3        So anybody could review it. It was
4  actually interesting information. So if you had
5  been away from the office all day, you'd have
6  one place to go to review all the activity that
7  your colleagues had in their portfolios. So you
8  get a sense of what's gone on today.
9        Whether that got distributed to us
10 into our inboxes, I can't remember.
11    Q. What, if any, meetings did you attend
12 as part of your morning routine at MFS?
13        MR. THEODOROU: Objection.
14    A. We had a departmental meeting in the
15 mornings at nine o'clock.
16    Q. Was this Monday through Friday you had
17 a nine o'clock meeting?
18    A. Yeah. We tried to daily get everybody
19 together.
20    Q. What was the purpose of this meeting?
21    A. The purpose -- it's to capture the
22 synergy of having a large group of professionals
23 and put them in one place and review what
24 they've been doing, what they've been thinking,
25 what they're thinking of doing going forward,

**Page 59**

1  intelligence they might have garnered from the
2  marketplace. It's a vehicle for just staying in
3  touch.
4        And it's a vehicle for debate too.
5  You can have ideas or colleagues can have a
6  chance of challenging your ideas, you know, or
7  ask you to elaborate if they're interested.
8    Q. Who is the meeting for? Who attended
9  the meeting generally speaking? I don't want
10 you to name names.
11    A. Well, it was a departmental meeting.
12 Primarily the investment professionals. So it
13 would be the portfolio managers and the
14 analysts, but also the traders.
15        And I think anybody was invited to go.
16 I would encourage people to go. You know, even
17 our trading assistants or people that didn't
18 have direct portfolio responsibilities, the more
19 they learn about the business, you know, the
20 better, and that's a great forum for it.
21    Q. What kind of issues were discussed
22 generally in these meetings?
23    A. Like I said, the portfolio managers
24 might share their thoughts and their strategies,
25 what they've been doing in the portfolios, what

**Page 60**

1  they were planning on doing in the portfolios,
2  giving analysts the sense of, you know, what are
3  they interested in.
4        And the analysts could share if they'd
5  had meetings of significance with companies, if
6  there were meetings coming up that would be of
7  interest, strategies that they were developing.
8        Anyone could share, including the
9  traders, sort of intelligence, what they've
10 learned, you know, since we'd last met.
11        It was really an open forum for, you
12 know, everything from how the Patriots did on
13 Sunday.
14    Q. Was there any discussions of
15 announcements that were going to be made that
16 day?
17        MR. THEODOROU: Objection.
18    A. There could be.
19    Q. Who was your supervisor at MFS?
20        MR. THEODOROU: Objection.
21 BY MS. WILLIAMS:
22    Q. In October of 2001?
23    A. Joan Batchelder. The spelling, I
24 believe, is B-A-T-C-H-E-L-D-E-R. I'm not
25 exactly sure.

**Page 61**

1    Q. What was Miss Batchelder's title in
2  October 2001?
3    A. She was director of fixed income,
4  senior vice president of the company.
5    Q. What are you aware of that
6  Miss Batchelder did to supervise your
7  performance?
8    A. She would review our performance on an
9  ongoing basis.
10        We would have weekly reports that
11 would circulate at the 9 a.m. meeting, for
12 example, that would rank all the portfolios
13 relative to their peers by quintile of
14 performance relative to other funds.
15        So, for example, if we had 30 open-end
16 mutual funds between the municipal, the high
17 yield, the international and the high grade
18 groups, they were all there, and they're year to
19 date, and they're trailing one-year, maybe one-,
20 three-, five-year quintile performance levels
21 would be on this sheet of paper. So your
22 performance was monitored almost on a continuous
23 basis relative to your competitors.
24        She also scheduled, I don't remember
25 the frequency, but at a minimum it was annual,

16  (Pages 58 to 61)

Steven E. Northern                                                    January 30, 2007
Boston, MA

---

Page 62

1   review portfolio-by-portfolio manager of the --
2   all the portfolios they were responsible for.
3   And she would ask us to put together a pretty
4   detailed report of past strategy, past
5   performance, what worked, what didn't work, what
6   your strategies were going forward and just
7   basically get from you a sense of what you'd
8   been up to and what are you planning on being up
9   to and whatever other administrative or
10  portfolio managers -- portfolio management
11  issues might come up.
12       But she would meet with us in a fairly
13  formal setting to do that.
14       Q.  When you say she asked you for a
15  report, was that written?  Did she ask you for a
16  written report?
17       A.  Yes.
18       Q.  And how often would you have to
19  generate a written report for Miss Batchelder?
20       A.  The review -- the formal review I was
21  just talking about, at a minimum that was
22  annual.
23       Q.  Okay.
24       A.  We had to produce more frequent
25  reports that were for the directors.  Funds

---

Page 63

1   typically would meet -- for each fund I would
2   have to meet with the directors several times a
3   year.  And it could be annual, it could be
4   quarterly depending on the portfolio, but there
5   would be a review with the director, and she
6   would also review that report.
7       Q.  I want to go back to the 9 a.m.
8   meeting for a minute.
9       You said there could be announcements
10  of -- there could be discussion of announcements
11  that were going to take place that day.  Do you
12  recall any --
13       MR. THEODOROU:  Objection.
14       Q.  -- any discussion in the 9 a.m.
15  meetings that a GDP announcement was going to be
16  made that day?
17       MR. THEODOROU:  Objection.
18  BY MS. WILLIAMS:
19       Q.  I'm not talking about any particular
20  day.  I'm talking about generally speaking.
21       A.  I don't.
22       Q.  What about any discussion at 9 a.m.
23  meetings about Treasury refunding announcements?
24       A.  I don't recall.
25       Q.  Any discussion about Labor Department

---

Page 64

1   employment reports?  Do you recall any?
2       A.  I don't recall specifically, but
3   that's the sort of thing that very well could
4   come up.
5       Q.  As a portfolio manager, are you
6   required --
7       A.  And undoubtedly did on occasion.
8       If you're asking ever did that come
9   up, I don't recall specifically, but guaranteed
10  we did talk about labor reports.
11       Q.  Do you think you also talked about GDP
12  reports?
13       MR. THEODOROU:  Objection.
14       A.  I think that's unlikely.
15       GDP report is a backward-looking
16  report, and it's subject to very large amounts
17  of revision after the fact.
18       So you close out a quarter.  I think
19  the first preliminary GDP record comes out a
20  month down the road.  So it's -- for the
21  market's kind of time frame, it's already
22  ancient history.
23       And that is a number subject to very
24  large degrees of revision.
25       And then it comes out -- the second

---

Page 65

1   report comes out a month after that, and then a
2   third comes out a month after that.  You know,
3   so by the time you're done reporting GDP, it
4   could be five or six months old information.
5       Q.  Do you think that Treasury refunding
6   announcements were things that were discussed in
7   the meetings, but you don't recall specifically?
8       MR. THEODOROU:  Objection.
9       A.  I think that that's also unlikely.
10      Q.  Why?
11      A.  Partially the same reasons.  It's not
12  a -- it wouldn't be something of general
13  interest to the group.  It wouldn't be something
14  that would serve either to help us formulate our
15  investment strategies.
16      You know, we have to do a triage of
17  information that's important and not important,
18  and that's part of the job, and I don't think
19  that would make the cut.
20      Q.  Were Treasury refunding announcements
21  backward looking like GDP announcements?
22      A.  Part of the refunding announcement
23  is -- relates to sources and uses.  So part of
24  it is backward, its uses of funds, so some is
25  backward, some is forward looking.

---

17 (Pages 62 to 65)

Steven E. Northern                                        January 30, 2007
                           Boston, MA

Page 66

1    Q.  As a portfolio manager, were you
2  required to get any approval from anyone at MFS
3  before trading in your portfolios?
4    A.  No.
5    Q.  Did you have any supervisory authority
6  over anyone at MFS in October of 2001?
7    A.  No, I didn't have any direct reports
8  to me.
9    Q.  Did you have the authority to commit
10  capital at MFS in 2001?
11    A.  Yes.  That's one of my
12  responsibilities as portfolio manager.
13    Q.  What, if any, restrictions were placed
14  on your ability to commit capital?
15    A.  Well, different portfolios have
16  different investment guidelines that serve to
17  outline what restrictions there are.
18        Beyond that, I believe we also had for
19  some of the portfolios additional guidelines
20  that might be even more restrictive than what
21  you were theoretically allowed to do by, say, a
22  prospectus in an open-end mutual fund or by
23  investment guidelines from a private account.
24        So you might be able to go up to, say,
25  30 percent international or 30 percent high

Page 67

1  yield, for example, but -- by prospectus, but
2  you might have an internal guideline, and we
3  won't go more than 20 percent.
4    Q.  During your employment at MFS, what,
5  if any, training did you receive?
6        MR. THEODOROU:  Objection.
7  BY MS. WILLIAMS:
8    Q.  I want to talk about formal, not
9  informal training.
10        MR. THEODOROU:  In what area?
11        MS. WILLIAMS:  In any area.
12    A.  Well, I did attend classes, so that
13  was paid for by MFS.  After I started working
14  there, they paid for my -- the completion of my
15  MBA.
16        Training provided by MFS was
17  primarily -- other than on the job, we did have
18  formal sessions that were -- as Series 7 or
19  Series 63 or whatever registrations I had,
20  people with those registrations are required --
21  the companies are required to provide a meeting
22  annually, I think at a minimum, to review
23  current developments in terms of regulation.
24  And I would attend those.
25        And we had investment roundtables.  I

Page 68

1  think there would be some training provided by
2  our legal department.
3    Q.  Did you ever receive any --
4    A.  And --
5    Q.  I'm sorry.  I didn't mean to cut you
6  off?
7    A.  And possibly also compliance would
8  attend those meetings as well to discuss issues
9  surrounding compliance.
10    Q.  Did you ever receive any training at
11  MFS on the use of material nonpublic
12  information?
13    A.  Yes.
14    Q.  Could you tell me about that training?
15    A.  I don't recall specifically.  I think
16  it would have been in the context of what I just
17  reviewed with you, of the annual updates for
18  people that were registered and at our meetings
19  at our roundtable or maybe internally with our
20  legal compliance departments.
21    Q.  Did you receive this training prior to
22  October 31, 2001?
23    A.  Yes.
24    Q.  Do you recall if you ever received any
25  documents from MFS regarding the receipt and use

Page 69

1  of material nonpublic information?
2    A.  Yes.
3        MS. WILLIAMS:  I'd like to have
4  this marked as Exhibit 3.
5        (Exhibit 3 marked
6         for identification.)
7  BY MS. WILLIAMS:
8    Q.  Have you seen this document before,
9  sir?
10    A.  Yes.
11    Q.  What is it?
12    A.  It's labeled Statement of Guidelines
13  With Respect to Receipt and Use of Material
14  Nonpublic Inside Information.  It's adopted by
15  the Executive Committee May 15th of '89.
16    Q.  Did you receive this document prior to
17  October 31, 2001?
18    A.  Yes.
19    Q.  Do you know if you reviewed the
20  document when you received it?
21    A.  Yes.
22    Q.  Do you know if you received any other
23  documents from MFS regarding the use of material
24  nonpublic information?
25    A.  Yes.

18 (Pages 66 to 69)

Steven E. Northern                                                                    January 30, 2007
                                     Boston, MA

|  | Page 70 |
|---|---|

1    Q.  What other documents did you receive?
2    A.  I recall we had a briefing by our
3  counsel once at one of our roundtables. I think
4  he had a handout.
5    Q.  Was that before October 31, 2001?
6    A.  Yes.
7    Q.  Any other documents you recall
8  receiving at MFS?
9    A.  I think we had an ethics -- I think we
10  had another document. I don't recall what it
11  was titled.
12       I think we had an internal sort of --
13  I can't remember how you call it -- Code of
14  Conduct document.
15    Q.  Did you review the Code of Conduct?
16    A.  Yes.
17    Q.  Prior to October 31, 2001, had you
18  reviewed the Code of Conduct?
19    A.  Yes.
20    Q.  Did you ever receive any training on
21  the use of material nonpublic information from
22  any other employers besides MFS?
23    A.  Yes.
24    Q.  Could you tell me who you worked for
25  when you received that training?

|  | Page 72 |
|---|---|

1    A.  Yes.
2    Q.  Do you recall how much the bonus was?
3    A.  No.  The bonus I received in 2001
4  would have been for the year 2000 I received
5  some time in the beginning of the year.
6    Q.  Do you recall approximately how much
7  it was?
8    A.  I could tell you my total compensation
9  was in excess of a million dollars or close by.
10    Q.  And that total compensation, are you
11  including any compensation you received from the
12  profit-sharing, 401k plans?
13    A.  Yeah, in terms of total compensation,
14  it would have all added up. 401k, I think, is
15  an employee contribution. Actually, they had a
16  match. I think they might have had a match, I
17  remember. But, yeah, total compensation.
18    Q.  Was there any sort of vesting that you
19  needed to do in order to receive money from any
20  of the plans, profit-sharing, for example?
21    A.  Yeah, yes.
22    Q.  Do you know how long that vesting
23  period was?
24    A.  I don't remember the details of the
25  plans. I was way past being vested.

|  | Page 71 |
|---|---|

1    A.  Yes.
2    Q.  Who?
3    A.  Merrill Lynch.
4    Q.  What do you recall about -- scratch
5  that.
6       Do you recall when in your tenure at
7  Merrill Lynch you received that training?
8    A.  Yeah. Obviously it was part of my
9  Series 7 registration. It was part of the
10  training that you'd get to pass the Series 7
11  license.
12    Q.  How was your compensation structured
13  at MFS in 2001?
14       MR. THEODOROU:  Objection.
15    A.  We had a base salary and bonus. We
16  had a profit-sharing plan. We had a 401k plan.
17  And they may have capped it -- I think they had
18  a defined benefit plan as well that I
19  participated in.
20    Q.  What was your base salary in 2001?
21       MR. THEODOROU:  Objection.
22    A.  I don't recall exactly. As I recall,
23  it was capped at 150,000 across the company,
24  across most people in the company.
25    Q.  Did you receive a bonus in 2001?

|  | Page 73 |
|---|---|

1    Q.  Okay.
2    A.  It started in '86. We're talking
3  about 2001. So it's 15 years down the road. I
4  was fully vested.
5    Q.  In 2002 did you receive a bonus for
6  2001?
7    A.  Yes.
8    Q.  Do you recall how much that bonus was?
9    A.  I don't. But in terms of total comp,
10  it would have been comparable for the prior
11  year. It was probably a little bit more.
12    Q.  So more than a million dollars?
13    A.  Yeah. I think every year I worked at
14  MFS the pay was slightly higher.
15    Q.  When were the bonus us received; i.e.,
16  what time of year were these bonuses received?
17    A.  I don't recall.
18    Q.  Do you know if it was in -- what
19  season it was in?
20    A.  It was early the following year.
21    Q.  When you say "early," do you know
22  about a month?
23    A.  I don't remember.
24    Q.  So before June?
25    A.  Oh, yes.

                                                        19  (Pages 70 to 73)

Steven E. Northern
January 30, 2007
Boston, MA

Page 74

1    Q.  To what extent was your bonus based on
2  the performance of a portfolios you managed?
3    A.  The bonuses were determined by my
4  boss, and she didn't share with me.
5    Q.  Did the performance of the portfolios
6  affect your bonus at all?
7    A.  I'd hope so, yeah, yeah.
8        We tried to incent the portfolio
9  managers properly.  So the focus was on, you
10  know, not how you did that day, it was how you
11  did on the one-, three-, five-, 10-year basis.
12  So the goal is consistent, stable returns that
13  beat most of your competitors, and the emphasis
14  being on long-term and stable.  So it's really
15  three-, five-, 10-year returns that are crucial.
16    Q.  Okay.
17    A.  The determination of the bonus,
18  though, at the end of the day is entirely
19  subjective.  It's done by senior management.
20  And as any subjective process, you know, a lot
21  of things can come into play, and they don't
22  necessarily share with you how they go about
23  determining that.
24    Q.  Did you have a view that the better
25  your portfolios performed, the higher your bonus

Page 75

1  was likely to be?
2        MR. THEODOROU:  Objection.
3    A.  I would -- yes, I think particularly
4  long-term performance.
5    Q.  As a portfolio manager, did you
6  actually execute trades?
7    A.  At what point in time?
8    Q.  At what point in time is that?
9    A.  I'm asking you.
10    Q.  At what point in time?  In October of
11  2001.
12    A.  The answer is yes, I did transact.
13        What we started doing, I believe it
14  was in 2001, is trying rather than having the
15  portfolio managers transact to have the managers
16  transact.  So I think in the beginning of 2001
17  we were trying to follow those trades all
18  through the traders.
19        But the practically reality is if the
20  trader wasn't there, you'd do it yourself.
21    Q.  So in October of 2001, would it be
22  fair to say that most of the trades were
23  executed by the traders?
24    A.  Yeah, that's fair.
25    Q.  What did a trader have to do to

Page 76

1  execute a trade?
2    A.  Well, they had to use their judgment
3  in terms of how to accomplish the best
4  execution.
5    Q.  I mean practically speaking, what was
6  required?
7    A.  Obviously first they have to use some
8  judgment.
9    Q.  Okay.
10    A.  They have any number of different
11  dealers that they can turn to.  So they need to
12  select one or more dealers where they think they
13  could get the best price, you know, if you're
14  buying bond, the best price, or if you're
15  selling, try to select one or several dealers
16  from whom you think you're going to get the best
17  price.  So that's the first thing.
18        Second, you go out, call them, ask
19  them for the price and then collect that price
20  information and then pick the best one.
21    Q.  In October -- in October, not October,
22  just in 2001, how did you typically notify the
23  trader that you had an order that you wanted to
24  give them to execute a trade?
25    A.  Typically we used our order entry

Page 77

1  system.  They're referred to as FITS, F-I-T-S,
2  would enter a transaction on the system, and
3  then that would -- it was a work flow kind of
4  product.  So it would go from your station once
5  you're finished inputting the trade details, it
6  would go to the trader, and the trader would
7  take it from there.
8    Q.  What trade details did you have to
9  enter when you were trying to place an order?
10    A.  That's one.
11        The other method is to stand up and
12  talk to the trader and say let's do this.
13        Typically it was entered it in the
14  FITS system.  The details would be details of
15  what the security was, coupon maturity, whether
16  it's a treasury, an agency or a mortgage or
17  corporate.  So the name of the security, the
18  interest rate that's on the note and the
19  maturity of note.
20        You'd have to list the quantity.
21  You'd have to list whether you're buying or
22  selling.  You'd have to list when you wanted the
23  trade to settle.  It was like it could settle
24  today, it could settle tomorrow, or it could
25  settle trade date plus two or five.  So that was

20  (Pages 74 to 77)

Steven E. Northern                                                      January 30, 2007
Boston, MA

| Page 78 | Page 80 |
|---|---|

**Page 78**

1  another variable. I think that's it.
2      We may -- well, you had to list the
3  name of the portfolio that the trade was going
4  to be for.
5      Q.  Did any of this information that you
6  just mentioned automatically appear in the FITS
7  system?
8      A.  Well, if it's a buy transaction, not
9  likely. If it's a sell transaction, it may
10  have. You may pull up the security holding, but
11  I don't recall.
12      Q.  You said that sometimes you would
13  provide verbal orders, is that correct,
14  sometimes you would --
15      A.  Yes.
16      Q.  Why would you provide a verbal order
17  rather than entering an order into the FITS
18  system?
19      A.  Well, it was more likely to happen,
20  for example, buying corporate securities. New
21  issue corporates might not even be set up in the
22  system until you bought it, so the system
23  wouldn't recognize it.
24      And if it's a new issue corporate, you
25  also might get less than 100 percent of what you

**Page 80**

1      I mean, I think it's a tough type of
2  software to build. I admire the fact that they
3  were able to build it and get it to work. But
4  those things have become much more sophisticated
5  since then, and they're still pretty --
6      But it was an attempt to get orders to
7  go through the different stations that -- get
8  all the people that need to work on processing a
9  trade, which is more than just the portfolio
10  manager and the trader, to get all that
11  centralized into one piece of software so it
12  would go from one station to the next because
13  each station, certain inputs have to be --
14  certain functions have to be performed for that
15  trade before it's kind of completed.
16      Q.  How would the trader know that you had
17  inputted an order into the FITS system? Is
18  there any sort of notification that the trader
19  would receive?
20      A.  It's two questions.
21      Your first question is I don't know.
22      But the second is yes, I'm sure there
23  was some kind of notification that came up to
24  him. I think it was the form of a blotter --
25      Q.  Okay.

| Page 79 | Page 81 |
|---|---|

**Page 79**

1  ask for. So you might ask for 50 million, but
2  they might only allocate to you 20 million.
3      So the process is one of instead of
4  entering 50 million on a ticket and then having
5  to change the entry on FITS, and it might not
6  even exist on FITS get, so that might not even
7  be possible, you discuss it with a trader, and
8  they take down the details of the interest, say
9  50 million of a security, and he does his best
10  to get 50 million of that security. But he may
11  well not.
12      Q.  Would there be any other situations in
13  which you would more likely get a verbal rather
14  than an electronic order?
15      A.  Typically it was when we were working
16  as a group, putting a trade together.
17      Q.  Could you use the FITS system to
18  actually execute trades?
19      A.  No.
20      Q.  Was it more of a management -- trade
21  order management system?
22      MR. THEODOROU:  Objection.
23      A.  I'd say no. I think I would
24  characterize it as a work flow engine. Pretty
25  crude.

**Page 81**

1      A.  -- that would have a list of the
2  trades that were outstanding that he needed to
3  work on or she needed to work on.
4      Q.  When you gave a verbal order to the
5  trader, would you also enter any information
6  into the FITS system at any time?
7      MR. THEODOROU:  Objection.
8      A.  Yes.
9      Q.  And when would you do that?
10      MR. THEODOROU:  Objection.
11      A.  As soon as you could.
12      MS. WILLIAMS:  I'd like to have
13  this marked as Exhibit 4.
14      (Exhibit 4 marked
15      for identification)
16  BY MS. WILLIAMS:
17      Q.  Do you recognize this document, sir?
18      A.  Yes.
19      Q.  What is it?
20      A.  This is a schema, if that's a word.
21  This is an architectural drawing of our trading
22  desk, the high grade trading desk and part of
23  the trading floor at MFS on the 23rd floor.
24      Q.  And would you agree that this was the
25  layout of the desks in October of 2001?

21 (Pages 78 to 81)

Steven E. Northern                                                    January 30, 2007
                              Boston, MA

| Page 82 | Page 84 |
|---|---|

**Page 82**

1   A.  Yes.
2   Q.  Where is your work station on this
3  exhibit?
4   A.  The top right.
5   Q.  I see your name next to a circle that
6  says 241.  Is that what you're referring to when
7  you say "the top right"?
8   A.  Yeah, yes.
9   Q.  Who sat on your left at Station 242?
10   A.  Rick Smith.
11   Q.  And did anyone sit in front of you at
12  Station 240?
13   A.  No.  That was an open station for
14  analysts to use.
15       MR. THEODOROU:  For clarification,
16  Mr. Smith would have been to his right facing
17  240.
18       MS. WILLIAMS:  Towards the 241,
19  right.
20       MR. THEODOROU:  I know you like
21  precision and details.
22       MS. WILLIAMS:  I don't know which
23  way you're facing, but assuming you're facing
24  towards the desk, yes, to your right.
25   Q.  So then following up on that, if

**Page 83**

1  you're facing towards the desk, what was to your
2  left?
3   A.  Now you're killing me.  Station 253.
4   Q.  Okay.  Is there anything between your
5  station and Station 253?
6   A.  Yes.
7   Q.  What is between your station and
8  Station 253?
9   A.  There was an aisleway.  I think there
10  was a potted plant too.
11   Q.  Approximately how much -- what was the
12  distance between you and Mr. Smith?
13       MR. THEODOROU:  Objection.
14   A.  Roughly the distance between the two
15  of us today, four or five feet.
16   Q.  Sure.  About four feet?
17       MR. THEODOROU:  Objection.
18       MR. SHOPE:  Well, objection.
19       MR. THEODOROU:  Four or five feet.
20       MR. SHOPE:  I would say -- I would
21  say five.
22       MS. WILLIAMS:  I would say three,
23  but that's fine.
24       MR. THEODOROU:  The testimony is
25  four or five feet.

**Page 84**

1       MS. WILLIAMS:  I understand the
2  record reflects that.
3  BY MS. WILLIAMS:
4   Q.  When you were seated, could you see
5  Mr. Smith?
6   A.  Yes and no.  We are partially
7  obstructed by the computer monitors that we had
8  and piles of research.
9   Q.  And so those monitors would have set
10  in what I see is a square between you and
11  Mr. Smith; is that correct?
12   A.  Yeah, yes.
13   Q.  Were there monitors -- did you have
14  monitors and Mr. Smith also had monitors that
15  were sitting on this square?
16   A.  I don't recall.  I believe -- I don't
17  actually recall.  I think I had three monitors,
18  one to my right, one to my left and maybe one
19  more kind of in front of me.
20       He also had two or three monitors, so
21  I imagine -- well, I don't recall exactly how he
22  was configured, but likelihood, he had one to
23  his right and left also.  I can't remember how
24  he was set up.
25   Q.  When Mr. Smith was on the phone, could

**Page 85**

1  you typically hear him?
2       MR. THEODOROU:  Objection.
3   A.  Sometimes yes, sometimes no depending
4  on how loud he was speaking, whether he was
5  facing my direction or facing the other
6  direction possibly.
7   Q.  When you and Mr. Smith communicated
8  from your stations, how would you typically
9  communicate?
10   A.  Typically I think we'd have to push
11  our chairs back a little bit so we'd kind of get
12  a little bit away from the clutter, kind of look
13  around the screens a little bit.
14   Q.  Do you recall if Mr. Smith was at work
15  on October 31, 2001?
16   A.  Yes.
17   Q.  Okay.  Now you briefly talked about
18  the monitors on your desk, and you said you had
19  three monitors.
20       Could you just describe what your work
21  space looked like on October 31, 2001?
22   A.  The best I recall, I had one large
23  monitor on my left.  So starting at the outside
24  of the desk, there'd be an inbox, maybe piled
25  with, you know, research and maybe a pile of

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern                                        January 30, 2007
                          Boston, MA

| Page 86 |
|---|

1  computer reports that would show portfolio
2  holding information, sort of portfolio work
3  product stuff.
4          Then along that side a big monitor.
5          Then a small private phone.
6          In front of me was sort of a sloped
7  surface that had a telephone with many lines in
8  it, kind of built into the furniture.
9          Somewhere in front of me, kind of
10 dangling off in front of that work space was the
11 phone that worked with that phone bank that was
12 built in with all the little buttons.
13         Up from that sloped surface there was
14 a shelf. I don't recall, but that was the place
15 to put another monitor.
16         To my right was another large monitor.
17         And then on the edge of the space,
18 closest to the windows there, another pile of
19 research, probably one or two feet deep of just
20 paper.
21     Q.  What did you keep on the monitors?
22         MR. THEODOROU:  Objection.
23     A.  Typically?
24     Q.  Typically.
25     A.  Typically I had a portfolio analytic

| Page 87 |
|---|

1  tool that I used Yield Book. I used it a lot.
2  Or Microsoft type software for running Excel, if
3  I was doing Excel kind of spreadsheets.
4          I would have typically a Bloomberg
5  screen up because Bloomberg was a great source
6  of sort of ticker information on a very wide
7  array of different markets that you might be
8  interested in following.
9          And typically another market data
10 source, like Reuters. Reuters was great because
11 you could have a lot of flexibility in how to
12 configure it. So you could put up more live
13 data feeds, sort of monitor them in a more
14 creative way than looking at a ticker. So you
15 could look at spread graphs.
16     Q.  Did you -- when you say you could
17 configure it, you could determine what kind of
18 information that Reuters had available, you
19 could determine which of that information you
20 wanted on your screen?
21     A.  Exactly.
22     Q.  What kind of information did you have
23 typically on your Reuters screen?
24         MR. THEODOROU:  Objection.
25     A.  Sitting here now, I don't remember.

| Page 88 |
|---|

1  But I was interested in spreads, so I used to
2  graph real-time spreads, say, between two-year
3  treasuries and five-year treasures, and then
4  another box might be five-year treasuries versus
5  10-year treasuries. And then I might look at
6  a -- or I definitely looked at graphs of 10-year
7  treasuries versus 30-year treasuries.
8          So you got a sense of how the yield
9  spread relationships across different maturities
10 is shifting during the course of the day or over
11 time.
12         So that type of information you could
13 put up. It is a little bit more creative than
14 just looking at a ticker of 10-year prices or
15 yields or 30-year prices or yields and then in
16 your head kind of --
17         It's interesting when you graph
18 primarily because it gives you three months of
19 history or six months of history, so you also
20 get a sense of where we've been and what's the
21 overall trend in some of those spread
22 relationships. So Reuters is very useful for
23 that sort of thing.
24     Q.  Was there any news information
25 available on your Reuters screen?

| Page 89 |
|---|

1      A.  Yes.
2      Q.  You mentioned that there was usually
3  scrolling news? I don't know if I'm -- how did
4  the news information appear on screen?
5      A.  There would be a line, a news story
6  with a time stamp on it. And as a new story
7  came in, it would maybe move down, and then the
8  new one would appear above it so that you could
9  have a panel, a little window, and you could
10 have as much of it as you want. You could have
11 it fill a whole computer screen.
12         So you could look at essentially many
13 lines, you know, say 30 lines of this
14 information, or you could look at three lines of
15 this information in a smaller window.
16         You know, the Reuters screen gives you
17 the flexibility to configure it any way you want
18 to look at it.
19         MS. WILLIAMS:  We have to change
20 the tape.
21         THE VIDEOGRAPHER:  This marks the
22 end of videotape number one in the deposition of
23 Steven Nothern.
24         Going off the record, 11:27 a.m.
25         (Discussion off the record)

                                    23  (Pages 86 to 89)

Steven E. Northern
Boston, MA
January 30, 2007

Page 90

1      THE VIDEOGRAPHER: This marks the
2  beginning of videotape number two in the
3  deposition of Steven Nothern.
4      On the record, 11:36 a.m.
5  BY MS. WILLIAMS:
6      Q.  Mr. Nothern, before we changed tapes I
7  was asking you about the Reuters screen, and you
8  mentioned you could have more of the news -- you
9  had the ability to show more lines of the news
10  than others.
11      And I was wondering, typically how
12  much would you have viewable on your screen of
13  the Reuters news?
14      A.  A small amount.
15      Q.  Okay.
16      A.  I'm much more interested in, like we
17  talked about different charts of spread
18  relationships, that sort of a thing from
19  Reuters. Reuters is powerful because you could
20  graph things on. I could get basic tickers off
21  of Bloomberg.
22      Q.  In the screen that you had that showed
23  the Reuters news, would it show different
24  headlines, or did it show the substance of the
25  news story as well?

Page 91

1      A.  As I recall, the tickers are just the
2  headline.
3      Q.  Okay.
4      A.  You could access it. If you could see
5  quick enough what the index number was, you
6  know, story 831, then you could just type in
7  story 831 and look it up and see the story. So
8  there was a story behind the headline, but the
9  trick was they kind of move fast, so you'd have
10  to be actually paying attention to know what the
11  story number was or something.
12      Q.  Could you click on the headline and
13  display the story?
14      A.  I don't think it had that capability.
15  I think you needed to know the story number.
16      Q.  You mentioned that you also had a --
17      A.  But, you know, it's entirely possible.
18  I don't remember.
19      Q.  You mentioned you also had a Bloomberg
20  terminal?
21      A.  Yes.
22      Q.  What information did you typically
23  display on the Bloomberg terminal?
24      A.  As I recall, Bloomberg had a USD page
25  which was a standard format, government agency

Page 92

1  page with a fairly standard selection of sort of
2  benchmark securities and show constant updates
3  of price and yield levels that they were priced
4  at in the market.
5      Bloomberg had had a ticker, as I
6  remember, across the bottom of the page of the
7  USD page. I believe there was also a ticker on
8  the page.
9      Q.  On your Bloomberg terminal, did you
10  have access to Bloomberg E mail?
11      A.  Yes.
12      Q.  How often did you use Bloomberg E
13  mail?
14      MR. THEODOROU: Objection.
15      A.  I was not a big user of Bloomberg E
16  mail. I tried to funnel all my E mails through
17  my Outlook, my Microsoft Outlook E mail account.
18      Q.  Was that an MFS account?
19      A.  Yes.
20      Q.  Could you forward the Bloomberg E
21  mails to the MFS account?
22      A.  I wasn't a big user of it. I think it
23  did have that functionality. I just didn't use
24  that system much. So I think I don't know.
25  Sorry.

Page 93

1      Q.  That's okay.
2      Did you have access to the Dow Jones
3  on any of your monitoring screens?
4      A.  The Dow Jones news service?
5      Q.  Yes.
6      A.  I don't remember which news services
7  we had access to.
8      Q.  You mentioned that you had --
9      A.  The Dow is the main one, right? I
10  don't know what feed that Reuters had or
11  Bloomberg had. I think they were composites of
12  many news services.
13      Q.  You mentioned having a few phones on
14  your desk. And first I want to talk about what
15  you call the small private phone.
16      What was your number to that private
17  phone in October 2001?
18      A.  As best I can remember, it was
19  Extension 5887.
20      Q.  Was that a direct line to you?
21      A.  It was a regular phone, so it was my
22  assigned phone.
23      Q.  Now, what about these phone lines that
24  you said sat in front of you, what were those --
25  what did those go to?

24  (Pages 90 to 93)

Steven E. Northern                                                          January 30, 2007
Boston, MA

| Page 94 | Page 96 |
|---|---|

**Page 94**

1    A. That was a console that had two
2  different sets of phones.
3        As I remember, one was direct, as you
4  mentioned, to different brokerages, primary
5  dealers. And the other was a bank of phone
6  lines that sort of scrolled.
7        And I think the different groups, I
8  think there were maybe five in a column and each
9  sort of department had maybe a column that was
10  their primary number. But they would -- we
11  could use any of them, really.
12        But I think if our numbers were
13  lighting up, I think, you know, we would be the
14  first ones to -- one of the trading assistants
15  would be there to pick it up for us.
16    Q. Let me ask first about these direct
17  two phones that were direct to primary dealers.
18        Which primary dealers did you have
19  direct lines to in October of 2001?
20    A. The ones that we did the most business
21  with, Merrill Lynch, Goldman Sachs, JP Morgan,
22  UBS. The usual suspects.
23    Q. So what would happen when you picked
24  up one of these dedicated lines to a primary
25  dealer?

**Page 95**

1    A. My understanding is it had a little
2  light lights up on their end. So if they pick
3  it up, a little light lights up on our end.
4    Q. What, if any, dialing did you have to
5  do?
6    A. Direct line. There is no dialing.
7        Some of them may have been sort of an
8  automated speed dial. It might not have been
9  actually a dedicated phone line so much as maybe
10  it was built-in speed dial capability.
11        But either way, you just hit the
12  button, and it lights up at the other end so
13  they know to pick up the telephone.
14    Q. If, and I'll give an example, you pick
15  up the Merrill Lynch dedicated line, could you
16  get any other primary dealer on that particular
17  line?
18    A. No.
19    Q. Now, you mentioned that there were
20  also lines for your desk; is that right?
21    A. We had a bank of regular phone lines
22  with assigned phone numbers.
23    Q. Could external calls come in on those
24  lines?
25    A. Yeah, absolutely. If someone from the

**Page 96**

1  outside wanted to call the fixed income, high
2  grade desk, they would use that telephone from
3  an outside telephone.
4    Q. Besides this work station that we see
5  on Exhibit 4, did you have any other work space
6  at MFS?
7    A. Well, yes.
8    Q. Tell me about this other work space
9  that you had at MFS.
10    A. I had an office off the end of the
11  trading room.
12    Q. Was it on the same floor as this high
13  grade trading desk?
14    A. Yes.
15    Q. What floor was that?
16    A. The 23rd floor.
17    Q. Did you share your office with anyone?
18    A. No.
19    Q. Were there any phone lines available
20  in your office?
21    A. My office had the same phone --
22  exactly the same set of phones that -- the
23  private phone and the phone bank. So I could do
24  the same work essentially in my office.
25    Q. Did you have the same --

**Page 97**

1    A. Though --
2    Q. -- private phone number?
3        You said there was a direct phone to
4  you on the work station, Extension 5887. Did
5  you have that same phone number in your office?
6    A. Yes.
7    Q. What, if any, voicemail capability did
8  you have on any of the phones?
9    A. That telephone had a voicemail system
10  on it, so if you didn't pick up, someone could
11  leave a message for you.
12    Q. If I could refer you back to
13  Exhibit 4. Next to Space 242 -- actually, right
14  next to Space 243 I see the word Kennedy. Whose
15  space is 243?
16    A. David Kennedy.
17    Q. And approximately how far was from
18  Kennedy's work space from your work space?
19    A. I think maybe the distance between me
20  and John.
21    Q. Approximately how many feet?
22        MR. THEODOROU: Which John? John
23  Shope or John Rossetti?
24        THE WITNESS: Mr. Rossetti.
25    A. I'd say eight to 10 feet for a number.

25 (Pages 94 to 97)

Steven E. Northern

January 30, 2007

Boston, MA

| Page 98 | Page 100 |
|---|---|
| 1   Q. When you were seated at your work | 1   really to try to keep it as open as possible so |
| 2   station, could you see Mr. Kennedy if he was | 2   we could see one another. But the reality of |
| 3   seated at his work station? | 3   putting these screens and the piles of stuff |
| 4   A. Again, the desks were piled with | 4   that accumulated on trading desks, that often |
| 5   clutter, mostly screens and inboxes and | 5   people couldn't see one another. |
| 6   research. So if he was sitting forward, you | 6      So if he's sitting, I'm sitting, I |
| 7   know, closer to the -- more tucked in towards | 7   think it would be kind of hard to see unless we |
| 8   the phones, I probably wouldn't see him. If he | 8   stood up. |
| 9   slid back, we could talk. | 9      Q. When you wanted to talk to |
| 10   Q. If you wanted to talk to Mr. Kennedy | 10   Mr. Cadogan, what did you typically do? |
| 11   in 2001, what was your typical practice? What | 11      MR. THEODOROU: Objection. |
| 12   would you do? | 12      A. I'd stand up. I could address him. |
| 13   A. I'd get up and walk over there and | 13      Q. Could you hear Mr. Cadogan if he was |
| 14   talk to him. | 14   on the phone if you were seated at your work |
| 15   Q. Do you know if Mr. Kennedy was at work | 15   station? |
| 16   on October 31, 2001? | 16      A. I could probably -- I could hear him, |
| 17   A. Yes. | 17   but not clearly. I think he was just far enough |
| 18   Q. Now, on this Exhibit 4, next to | 18   away that I could hear that he was on the phone. |
| 19   Mr. Kennedy at 243 I see a 265 and the word | 19      Q. Was Mr. Cadogan at work on October 31, |
| 20   Kurinsky. Do you see that? | 20   2001? |
| 21   A. Yes. | 21      A. Yes. |
| 22   Q. Who sat at Station 265 in October of | 22      Q. I see next to Mr. Cadogan at 239 the |
| 23   2001? | 23   word Mayo. Do you see that? |
| 24   A. Jeffrey Kurinsky. | 24      A. Yes. |
| 25   Q. Approximately how far was | 25      Q. And who sat at position 239 in 2001? |

| Page 99 | Page 101 |
|---|---|
| 1   Mr. Kurinsky's work station from your work | 1      A. Aaron Mayo. |
| 2   station 241? | 2      Q. Was Mr. Mayo in the office on |
| 3   A. Add another six feet. | 3   October 31, 2001? |
| 4   Q. About approximately 14 feet or so? | 4      A. I don't recall. |
| 5      MR. THEODOROU: Objection. | 5      Q. I want to refer you to Station 264 on |
| 6   BY MS. WILLIAMS: | 6   Exhibit 4. Do you see that? |
| 7   Q. I was just adding the eight feet from | 7      A. Yes. |
| 8   Mr. Kennedy with the approximately six more | 8      Q. Who sat at Station 264 in 2001? |
| 9   feet. | 9      A. Peter Vaream. |
| 10   A. We're guessing. I don't know. | 10      Q. Was Mr. Vaream at work on October 31, |
| 11   Q. Okay. | 11   2001? |
| 12   A. I think 15 feet. | 12      A. Yes. |
| 13   Q. Do you know, was Mr. Kurinsky at work | 13      Q. What was located at position 266 on |
| 14   on October 31, 2001? | 14   this exhibit? |
| 15   A. Yes. | 15      A. That was an open work station reserved |
| 16   Q. Where did Mr. Cadogan sit in | 16   for our credit analysts to do some work if they |
| 17   October of 2001? | 17   wanted to come to the trading desk. |
| 18   A. If you want to refer to the diagram, | 18      Q. I see the word Bloomberg. Do you know |
| 19   it's location 238. | 19   what, if anything, that signifies? |
| 20   Q. When you were seated at your work | 20      A. There was probably a Bloomberg |
| 21   station, could you see Mr. Cadogan? | 21   terminal there for them to use. I guess they |
| 22   A. Same problem. I think with difficulty | 22   didn't have them if their office, so if they |
| 23   because of the clutter on the desks. Could I | 23   wanted to come in and use a Bloomberg, it's |
| 24   see him if he was standing up? Yeah. | 24   relatively expensive, so I had a couple of |
| 25      You know, the purpose of the desk is | 25   extras, so people could come and use it there on |

26 (Pages 98 to 101)

Steven E. Northern                                                January 30, 2007
                              Boston, MA

| Page 102 | Page 104 |
|---|---|

**Page 102**

1  the trading desk.
2      Q.  And what about position 268, what was
3  that position used for?
4      A.  It looks like the same thing, an extra
5  open station for primarily our credit analysts
6  to use.  And that would be the availability
7  there of the Bloomberg.  They could use the
8  Bloomberg for -- as an E mail system.  They
9  could use it for research.
10     Q.  Were there any television monitors in
11  or near your work area in October of 2001?
12     A.  Yes.
13     Q.  Where was the television monitor?
14     A.  There was a television monitor in back
15  of Mr. Kennedy along that wall.  And there was a
16  second television monitor along the opposite
17  wall, roughly behind station marked 233 there.
18     Q.  Okay.  What did the television
19  monitors sit on?
20     A.  The monitors were -- they were hung
21  from the wall, I believe, there in the ceiling.
22     Q.  From the ceiling?
23     A.  Well, yeah.  They were up.
24     Q.  Higher than you were when you were
25  seated?

**Page 104**

1      Q.  Was it turned to a particular channel
2  usually when it was on?
3      A.  You know, I don't recall.
4      Q.  Do you recall whether or not the
5  television was turned on on October 31, 2001?
6      A.  I don't.
7      Q.  When did you first hear about Pete
8  Davis?
9      A.  I don't recall.
10     Q.  Do you know how you first learned of
11  Pete Davis?
12     A.  He worked -- yes is the answer.
13     Q.  How did you first learn about Pete
14  Davis?
15     A.  He worked as an economist at Aubrey
16  Langston, a dealer in Manhattan.
17     Q.  And how did you learn about Mr. Davis?
18     A.  He was introduced to me and to MFS by
19  the person who covered us, a salesperson at
20  Aubrey Langston.
21     Q.  What was that person's name?
22     A.  Boy, I don't remember.
23     Q.  And do you recall approximately what
24  year this was?
25     A.  No.  Approximately mid '90s, early

| Page 103 | Page 105 |
|---|---|

**Page 103**

1      A.  Oh, yeah.  Just low enough so you
2  could bump your head.
3      Q.  Could you see the monitor behind
4  Mr. Kennedy if you turned around and if you were
5  seated at your station?
6         MR. THEODOROU:  Objection.
7      A.  The television monitor was on a pivot,
8  so if it was pivoted in my direction, I could
9  sit and be able to watch it.
10        The problem with the TVs is that
11  they're relatively distracting for people.  So
12  if the volume was on loud enough from me to hear
13  it from where I sat, it was maybe a distance of
14  maybe here to the corner, it was likely going to
15  be distracting other people, so we'd have it
16  sort of turned way down.
17     Q.  When you say "turned way down," was it
18  on mute typically?
19     A.  It was a little controversial, the TV.
20  If you sat next to the TV, you wanted it either
21  off or quiet or mute, so it was generally off or
22  mute.
23     Q.  Did it have closed-caption capability
24  on it?
25     A.  I don't know.

**Page 105**

1  '90s.  I don't remember.
2      Q.  When you say that Mr. Davis "was
3  introduced to us," what do you mean?
4      A.  MFS, the investment people at MFS.
5      Q.  What other investment people beside
6  yourself was Mr. Davis introduced to?
7      A.  I don't recall.  Oh, I'm sorry.  I've
8  actually been thinking of a different person.
9  You have to back up a few questions.
10     Q.  Okay.
11     A.  I totally apologize.  I'm actually
12  thinking of the person who introduced me to
13  Mr. Davis.
14     Q.  Let me back up.
15        How did you first learn about
16  Mr. Davis?
17     A.  I was introduced to Mr. Davis by Bob
18  Faulkner.
19     Q.  Who is Mr. Faulkner?
20     A.  Bob Faulkner was an economist at
21  Aubrey Langston.
22     Q.  So Mr. Faulkner introduced you to
23  Mr. Davis some time in the mid '90s; is that
24  right?
25        MR. THEODOROU:  Objection.

27 (Pages 102 to 105)

Steven E. Northern                                    January 30, 2007
                        Boston, MA

---

Page 106

1    A.  I don't recall when.
2    Q.  Okay.  So when you referenced the mid
3  '90s before, what were you referring to?
4    A.  I was referring to Bob Faulkner at
5  Aubrey Langston.
6    Q.  And that's when you met Mr. Faulkner?
7  I'm just trying to figure out what the mid '90s
8  referred to.
9    A.  I was first introduced to Mr. Faulkner
10  mid to early '90s.
11    Q.  Okay.
12    A.  He is the one who introduced me to
13  Mr. Davis.  It was subsequent to that.
14    Q.  And how did Mr. Faulkner introduce you
15  to Mr. Davis?
16    A.  I don't recall.
17    Q.  What did Mr. Faulkner tell you about
18  Mr. Davis, if anything?
19    A.  I don't recall specifically, but I
20  think he mentioned -- well, as best I can
21  remember, he described that Mr. Davis was a
22  Washington consultant and had a small practice.
23  And they were clients of him, and he thought
24  that we might also find Mr. Davis to be useful.
25    Q.  When you say "they were clients," is

---

Page 107

1  it Aubrey Langston was clients of Mr. Davis?
2    A.  The point in time that Bob Faulkner
3  introduced me to Mr. Davis, he had moved to
4  Chicago and was working with a small hedge fund
5  out there, so that hedge fund was a client of
6  Mr. Davis's.
7    Q.  Do you recall the name of the hedge
8  fund?
9    A.  I think it was Fanagammon, a name of
10  that sort.
11    Q.  What about Sangammom, Sangamon,
12  Sangamon Trading?
13    A.  You know, that sounds familiar.  I
14  don't remember.  I thought it sound started with
15  an F.
16    Q.  What was your first contact with
17  Mr. Davis?
18    A.  I don't recall.
19    Q.  Do you recall if you contacted him?
20    A.  I don't recall.
21    Q.  Do you have any recollection -- what's
22  your first recollection of Mr. Davis, of you
23  communicating with Mr. Davis?
24    A.  We communicated on the phone.
25      My practice with that sort of an

---

Page 108

1  analyst was to try to get a trial service.  So
2  we set up a trial service where we got his E
3  mails or faxes for a period of time.
4    Q.  When you say "we got his E mails or
5  faxes," who's the we?
6    A.  MFS.
7    Q.  Who at MFS received Mr. Davis's E
8  mails and faxes during this trial service?
9    A.  I don't remember.
10    Q.  Did you receive the E mails and faxes?
11    A.  Yes.
12    Q.  Do you believe other people at MFS did
13  as well?
14    A.  I believe so.
15    Q.  How long was the trial service?
16    A.  I don't remember.
17    Q.  What happened after the trial service?
18    A.  At some point in time we -- we made
19  the decision in the High Grade Group to try him
20  for a year.
21      He had an annual fee, I believe, and
22  we had him come up and -- actually, we had him
23  come up right before we made the decision to
24  hire him to meet with people in the Fixed Income
25  Department.  And I think it was after that

---

Page 109

1  meeting that we made a decision to try him for a
2  year.
3    Q.  Do you recall when Mr. Davis came to
4  meet with the people in the Fixed Income
5  Department?
6    A.  No.
7    Q.  Do you recall who was present at that
8  meeting?
9    A.  I remember my boss at the time, Les
10  Namberg, N-A-M-B-E-R-G, was there.  Les was
11  running the Fixed Income Department prior to
12  Joan Batchelder, and he was ultimately going to
13  sign off on the decision.
14    Q.  Do you recall if there were any other
15  portfolio managers present at the meeting?
16    A.  There were.
17    Q.  Do you know who?
18    A.  I don't remember.
19    Q.  Do you recall anything that was
20  discussed at that meeting?
21    A.  No.
22    Q.  Do you recall if --
23    A.  We did discuss his background.  He had
24  introduced himself because we didn't know who
25  this fellow was.

---

28 (Pages 106 to 109)

Steven E. Northern                                                                    January 30, 2007
                                        Boston, MA

| Page 110 | Page 112 |
|---|---|

Page 110

1    Q.   Okay.  Do you recall what Mr. Davis
2  said about his background?
3    A.   I recall that he had worked on Capitol
4  Hill.  He had worked for Alice Rivlin while she
5  had headed up, I guess it's the Congressional
6  Budget office.  It's under a different name now.
7  He worked for, I believe, Pete Domenici.  And I
8  believe he also worked for Democrats on the
9  Hill.
10       After that he worked for a Wall Street
11  house, I can't remember which, but he was their
12  Washington analyst.
13    Q.   Who was Pete Dominici?
14    A.   Senator, Republican Senator.
15    Q.   What, if any, discussion did you have
16  regarding the types of information that
17  Mr. Davis could provide to MFS?
18       MR. SHOPE:  I'm sorry.  Could I
19  have that question reread?
20       (Record read)
21       MR. THEODOROU:  Objection.
22       MR. SHOPE:  And this was at the
23  meeting --
24       MS. WILLIAMS:  At the meeting at
25  MFS.

Page 111

1       MR. SHOPE:  That precedes the
2  engagement of Mr. Davis?
3       MS. WILLIAMS:  Yes.
4       MR. SHOPE:  Okay.
5    A.   I don't remember.
6    Q.   Do you remember if that topic was
7  discussed?
8    A.   I don't remember.
9    Q.   What, if any, documents did Mr. Davis
10  provide to the attendees at the meeting?
11    A.   I don't remember.  I do remember he
12  had no marketing or biographical information.
13  He may have come with sample E mails.  I think
14  in those days it was faxes more than E mails.
15       MS. WILLIAMS:  I'd like to have
16  this marked as Exhibit 5.
17       (Exhibit 5 marked
18       for identification)
19  BY MS. WILLIAMS:
20    Q.   Let me know when you're finished
21  reviewing it.
22    A.   You want me to read the whole thing?
23    Q.   No.  I was going to ask you if you had
24  seen this document before, and I didn't know if
25  you had time to flip through it.

Page 112

1    A.   I think I have seen it before.
2    Q.   When did you see this document?
3    A.   At my SEC deposition in 2001,
4  December 2001.
5    Q.   Do you recall seeing this document
6  prior to October 31, 2001?
7    A.   No.
8    Q.   Do you recall seeing any brochures
9  from Davis Capital prior to October 31, 2001?
10    A.   Marketing brochures or biographical
11  brochures?
12    Q.   First let's go with marketing
13  brochures.  Do you recall seeing any of those
14  prior to October --
15    A.   No.
16    Q.   Do you recall seeing any biographical
17  information in the form of a document about
18  Mr. Davis prior to October 31, 2001?
19    A.   No.
20    Q.   Do you know if Mr. Davis or if Davis
21  Capital had a web site prior to October 31,
22  2001?
23    A.   Yes.
24    Q.   Did you ever visit that web site prior
25  to October 31, 2001?

Page 113

1    A.   Yes.
2    Q.   What did you review on that web site?
3    A.   I don't remember.
4    Q.   How often did you visit the web site?
5    A.   I think once.
6    Q.   And do you know why you visited the
7  web site?
8    A.   Just to see if it was something that
9  might be useful.  I imagine once he set it up,
10  he told us it was there, and I went to check it
11  out.
12    Q.   Do you recall if you thought it was
13  useful?
14       MR. THEODOROU:  Objection.
15    A.   Yep, yes.
16    Q.   Yes, you thought it was useful?
17    A.   No.  Yes, I recall.
18    Q.   Okay.  What did you think?
19    A.   No.  The problem is there are just too
20  many passwords, you know, and that was my
21  problem.  There are just too many web sites to
22  go to and remember the password.  It probably
23  had some security, and you got to remember the
24  web site, you got to remember the password, the
25  ID, and I couldn't go to all these web sites.

29 (Pages 110 to 113)

Steven E. Northern                                              January 30, 2007
                              Boston, MA

| Page 114 | Page 116 |
|---|---|

**Page 114**

1    Q.  Okay.  So just to clarify, the web
2  site was password protect?
3    A.  I'm just telling you in general why it
4  was not my practice to go looking at information
5  on web sites.
6    Q.  Okay.
7    A.  It's just way too overloaded with
8  opportunities for digging for information in
9  little web sites like this, and you have to draw
10  the line somewhere.
11       You have to understand, Goldman Sachs
12  has a web site.  JP Morgan has one.  You know,
13  they have every piece of research they've done
14  in 20, 30 years, and they're pumping out
15  100-page reports on a daily basis.  So there's a
16  limit to what you can do.
17    Q.  When you say Goldman Sachs had a web
18  site, was there a password required for you to
19  obtain certain information off of their web
20  site?
21    A.  I don't recall specifically Goldman
22  Sachs, but I think they're all protected.
23    Q.  When you went to the Davis Capital web
24  site, what did you think about the web site?
25    A.  I don't remember specifically what I

**Page 115**

1  looked at at the web site, but I can tell you I
2  made the determination that it wouldn't be
3  useful.  I can tell you that I made no effort to
4  go back to it.
5    Q.  When Mr. Davis met with you and
6  Mr. Namberg at MFS, what, if any, discussions
7  did you have about Mr. Davis's contacts in
8  Washington?
9       MR. THEODOROU:  Objection.
10    A.  I don't recall what we discussed at
11  that meeting.
12    Q.  What happened as a result of this
13  meeting with Mr. Davis when he came to MFS?
14    A.  We made the determination to try him,
15  try using his service.  I think it was an annual
16  review, you know, an annual renewal.  So we made
17  a decision to use it for a trial for a year.  If
18  we liked it, we'd keep using it.
19    Q.  What service did Mr. Davis provide you
20  after he was retained as a consultant?
21    A.  Well, primarily research and analysis
22  of budgetary legislative affairs in Washington.
23       We used him and -- MFS, the Investment
24  Group, we used him for some specific research
25  that was important to us at the time.

**Page 116**

1  I can remember our credit analysts
2  using him.
3       After 9/11 there was an issue of
4  airline bailout legislation.  And we own a lot
5  of airline mortgage bonds, so one of our
6  analysts who followed that area was interested
7  in, you know, the form the legislation might
8  take, the probabilities of any legislation
9  actually getting passed.  And I do remember that
10  he used Mr. Davis either as a source for
11  information or to refer -- as a referral source
12  for people that might have the information that
13  would be interesting to the analysts.  I wasn't
14  directly involved in that, but I do remember it
15  was an issue that fall.
16       I used him for research.  I had an
17  important or large position in my government
18  securities portfolio and FICO bonds, F-I-C-O,
19  which were thrift bailout bonds that had been
20  issued in the '88 to '92 period for the whole
21  thrift bailout that I guess first President Bush
22  had initiated.
23       And the position might have been
24  12 percent of the portfolio, which was
25  important.  It was large.

**Page 117**

1       By 10 years down the road, and I don't
2  remember exactly when I did this with him, but
3  it was 2000, 2001 period maybe, I did want to
4  kind of refresh my research on FICO and REFCO
5  bonds, but at that point, you know, 10 years
6  down the road, Wall Street had sort of dropped
7  any coverage so there was no source to sort of
8  do research on Wall Street.
9       And Davis was perfect for this because
10  he was able to find me the contact or the person
11  who was administering that program in one
12  agency in Washington, and I was able to contact
13  that person and kind of update my research on
14  the securities.
15       It's an important exercise, sort of
16  revalidate, you know, the reasons for owning it.
17  And I think at the time the agency market had
18  come under some pressure with underperforming
19  treasuries, so it was important for me to
20  decide, well, do you want to cut or are the
21  reasons for owning these no longer valid, or
22  conversely, maybe they represent great value, we
23  should be adding some now, or just very
24  basically, you know, revalidate the purpose for
25  the reason for just keeping them.

30 (Pages 114 to 117)

Steven E. Northern                                    January 30, 2007
                        Boston, MA

| Page 118 | Page 120 |
|---|---|

**Page 118**

1    So he was very helpful for those type
2  of research projects.
3    Q.  You might have stated this, but
4  approximately what year was it that you were
5  interest in this research on FICO and Mr. Davis
6  got you the contact of the person who was
7  administering the program?
8    A.  I don't remember.
9    Q.  How would Mr. Davis provide you with
10  research?
11    A.  Well, in those -- in that instance he
12  gave me a number of a person that would have the
13  information.  So he was good through his network
14  of contacts in being able to steer you the right
15  direction.
16    Q.  Okay.  And separate from just that
17  particular research, how else would Mr. Davis
18  communicate research to you?
19    A.  Well, we did some direct research.  We
20  went down to visit Washington a couple of times,
21  so he set up the meetings.
22    He was also available to our analysts
23  or the portfolio managers if they had a
24  particular question that he might know the
25  answer to.  So he was available as a resource,

**Page 119**

1  so we might be interested in his analysis.
2    Q.  Did you receive any E mails from
3  Mr. Davis?
4    A.  Yeah, yes.
5    Q.  And what kinds of things did Mr. Davis
6  send you in E mail?
7    MR. THEODOROU:  Objection.
8    A.  He used to send different types of E
9  mails.  He would send sort of compendium of
10  agendas of Washington which weren't that useful.
11    He would send what was much more
12  interesting, transcripts of Q and A at different
13  meetings that he might attend in Washington.
14    I found those in particular of
15  interest because as much as, say, Greenspan's
16  testimony for Humphrey Hawkins on the Hill might
17  be televised, as soon as they cut to Q and A,
18  after he's given his set speech, they might not
19  cover the full Q and A.
20    And the Q and A, his comments are
21  obviously less scripted, he might saying
22  something that's interesting, not that he did,
23  but it would be interesting to get a transcript
24  of his Q and A, and that was something that
25  Davis did, which I found to be useful.

**Page 120**

1    Q.  Besides agendas and transcripts of Q
2  and A, what else did Mr. Davis send via E mail?
3    A.  I believe he sent us on some occasions
4  materials from quarterly refundings.
5    Q.  Did Mr. Davis ever provide you with a
6  newsletter?
7    A.  I believe -- I don't recall
8  specifically, but I think, yes.
9    Q.  Do you know --
10    A.  Either it was a newsletter or agenda
11  or notes on meetings that he might have had or
12  analysis.  I'm not sure how to characterize
13  that, but it would be a summary of things that
14  he thought were of interest.
15    Q.  How often did you receive E mails from
16  Mr. Davis?
17    MR. THEODOROU:  Objection.
18    A.  Periodically.
19    Q.  How often?
20    A.  I don't know.  Several times a week.
21    Q.  Did you ever receive any faxes from
22  Mr. Davis?
23    MR. THEODOROU:  Objection.  Asked
24  and answered.
25  BY MS. WILLIAMS:

**Page 121**

1    Q.  Did you ever receive any faxes from
2  Mr. Davis?
3    A.  Yes.
4    Q.  What would Mr. Davis send via fax?
5    A.  The same materials that would have
6  come via E mail.
7    Q.  And how often did you receive faxes
8  from Mr. Davis?
9    A.  Well, we used to be in a pre-E mail
10  world, it's not that long ago everything was
11  faxed, so I imagine most of the service
12  initially was faxed.
13    My preference by far was E mail.  I
14  preferred electronically.  It's generally a
15  better quality to read.  So I encouraged
16  everybody to send everything E mail,
17  electronically.  Sometimes maybe he couldn't do
18  that, so he'd send a fax.  I couldn't tell you
19  how frequently that was.
20    Q.  You said that Mr. Davis would
21  sometimes send E mails about quarterly refunding
22  announcements.  How often did you receive E
23  mails about those announcements?
24    A.  I don't remember.
25    Q.  Just to back up.  Whose decision was

31 (Pages 118 to 121)

Steven E. Northern                                                January 30, 2007

Boston, MA

Page 122

1  it to hire Davis Capital as a consultant for
2  MFS?
3      A.  Collectively we made a decision as a
4  department. Les Namberg as head of the
5  department is the one that ultimately signed off
6  on it.
7      Q.  Did you agree that Mr. Davis should be
8  hired as a consultant to MFS?
9      A.  Yes.
10     Q.  In what way did you think his services
11 would be useful to you in your job?
12         MR. THEODOROU: Objection.
13         MR. SHOPE: You're asking at the
14 time of the decision to engage Mr. Davis?
15         MS. WILLIAMS: Yes.
16     A.  So your question again? I'm sorry.
17     Q.  In what way did you think that
18 Mr. Davis's services would be useful to you?
19     A.  We had several Washington consultants.
20 We had one, Charlie Cook, you may have heard of,
21 that had been useful who we weren't using
22 anymore. I don't know if he closed his business
23 or we decided not to renew it.
24         But we were obviously interested in,
25 you know, legislative and budgetary affairs in

Page 123

1  Washington, particularly myself where my primary
2  responsibility lie in the government securities
3  market, in the mortgage-backed securities market
4  and the agency market, I was often interested in
5  issues that were taking place, being hammered
6  out in Washington.
7      Q.  You said that the decision to hire
8  Mr. Davis was a department decision. Do you
9  know who in the department weighed in on that
10 decision?
11     A.  Ultimately Les Namberg who ran the
12 department.
13         We had a budget for outside
14 consultants, and we had to make room in our
15 budget for, you know, this expense, and he was
16 the one that had to sort of juggle the competing
17 interests.
18         But we had, I think, a couple of other
19 Washington consultants too. I'm not sure if the
20 Fixed Income Department paid for them or the
21 Equity Department paid for them. But obviously
22 the Equity Department were also interested in
23 legislative affairs in Washington.
24     Q.  Which department paid for Mr. Davis's
25 services?

Page 124

1      A.  The Fixed Income Department.
2      Q.  Do you know if anyone at MFS besides
3  yourself received Mr. Davis's E mails?
4          MR. THEODOROU: Objection. Asked
5  and answered.
6  BY MS. WILLIAMS:
7      Q.  Once he was retained, do you know if
8  anyone else besides you received his E mails?
9      A.  Yes.
10     Q.  Do you know who?
11     A.  No.
12     Q.  Do you know if anyone else once
13 Mr. Davis was retained received faxes from Davis
14 Capital?
15     A.  My understanding is that several or
16 many of us did. I don't remember specifically
17 who that would be.
18         MR. THEODOROU: Erica, it's almost
19 12:30. What do you want to --
20     A.  I could guess.
21         MR. THEODOROU: Hold on. Don't
22 speculate.
23         MS. WILLIAMS: I just have a couple
24 more questions, and we can break.
25         MR. THEODOROU: Okay.

Page 125

1  BY MS. WILLIAMS:
2      Q.  Did Mr. Davis ever send Treasury
3  refunding announcements to you via fax?
4      A.  Via fax or E mail, yes. I don't know
5  which specifically.
6      Q.  Did you review these announcements
7  when you received them from Mr. Davis?
8      A.  Yes.
9          MS. WILLIAMS: I think this would
10 be a good time to break.
11         MR. THEODOROU: Okay.
12         THE VIDEOGRAPHER: Going off the
13 record, 12:23 p.m.
14         (Lunch recess taken)
15
16
17
18
19
20
21
22
23
24
25

32 (Pages 122 to 125)

Steven E. Northern                                          January 30, 2007
Boston, MA

| Page 126 | Page 128 |
|---|---|
| 1       AFTERNOON SESSION | 1      A. I remember he called to mention that |
| 2     THE VIDEOGRAPHER: Back on the | 2 Treasury was considering issuing war bonds in |
| 3 record, 1:25 p.m. | 3 response to 9/11. |
| 4 BY MS. WILLIAMS: | 4      Q. Do you know where he got that |
| 5      Q. Mr. Nothern, did you ever communicate | 5 information? |
| 6 with Mr. Davis over the phone? | 6      A. No. |
| 7      A. Yes. | 7      Q. Did you ask him where he got that |
| 8      Q. How often did you communicate with | 8 information? |
| 9 Mr. Davis over the phone? | 9      A. No. |
| 10     MR. THEODOROU: Objection. | 10      Q. Prior to this conversation with |
| 11      A. Infrequently. | 11 Mr. Davis, had you heard the Treasury would be |
| 12      Q. When you say "infrequently," was it | 12 issuing war bonds? |
| 13 once a month? | 13      A. No. |
| 14      A. No. Less frequently than that. | 14      Q. Did the information that Mr. Davis |
| 15      Q. Could you give me approximately how | 15 gave you during that conversation turn out to be |
| 16 often -- how many times a year you might talk to | 16 accurate? |
| 17 Mr. Davis on the phone? | 17      A. Yes, though I don't remember if they |
| 18      A. A handful of times. | 18 actually did issue war bonds. |
| 19      Q. Is that five? | 19      Q. What, if anything, did you do as a |
| 20      A. Yeah. | 20 result of Mr. Davis's conversation when he told |
| 21      Q. Who would call whom? | 21 you that Treasury would be issuing war bonds? |
| 22      A. It could be either one. It could go | 22     MR. SHOPE: Objection. |
| 23 either direction. | 23      A. What did I do in what sense? |
| 24      Q. Prior to October 31, 2001, what | 24      Q. Did you take any action as a result of |
| 25 conversations over the phone do you recall | 25 receiving this information? |

| Page 127 | Page 129 |
|---|---|
| 1 having with Mr. Davis? | 1      A. In the portfolios? |
| 2      A. I remember having a conversation with | 2      Q. Did you take any action in the |
| 3 Mr. Davis when we first arranged to have him | 3 portfolios? We'll start there. |
| 4 come up to visit with us before we actually | 4      A. No. This was a retail product for |
| 5 hired him. | 5 individuals. It wasn't an institutional product |
| 6     I collected -- the other | 6 for portfolios or mutual funds or insurance |
| 7 conversations, I remember we had a conversation | 7 companies. |
| 8 about research I was doing on FICO and REFCO | 8      Q. Did you tell anyone about the |
| 9 bonds. | 9 information? |
| 10     That's all that comes to mind right | 10      A. Yes. |
| 11 now. | 11      Q. Who did you tell? |
| 12      Q. Do you recall any conversations with | 12      A. I shared it with colleagues on our |
| 13 Mr. Davis when you discussed whether Treasury | 13 trading desk. Mr. Kurinsky was the only one I |
| 14 would be issuing war bonds? | 14 recall specifically. |
| 15      A. Yes. | 15      Q. How long after the conversation with |
| 16      Q. Do you recall when that conversation | 16 Mr. Davis in which he said that Treasury would |
| 17 took place? | 17 be issuing war bonds did you communicate that |
| 18      A. Yes. | 18 information to Mr. Kurinsky? |
| 19      Q. When? | 19      A. I don't know. |
| 20      A. Roughly some time after September 11, | 20      Q. Do you know if it was a week later? |
| 21 2001. | 21      A. I don't know. |
| 22      Q. Did it take place prior to October 31, | 22      Q. So it could have been a week later, |
| 23 2001? | 23 but you don't recall? |
| 24      A. Yes. | 24     MR. THEODOROU: Objection. |
| 25      Q. What did you discuss? | 25     MR. SHOPE: Objection. |

33 (Pages 126 to 129)

Steven E. Northern

January 30, 2007

Boston, MA

Page 130

1      A.  I don't think it was a week later.  I
2   don't know.
3      Q.  Do you think it was less than a week?
4      A.  Yes.
5      Q.  Did you ever purchase any war bonds
6   after receiving this call from Mr. Davis?
7      A.  No.  Like I said, I have no knowledge
8   that they actually started a war bond program.
9      Q.  Why did you tell Mr. Kurinsky about
10  Mr. Davis's conversation with you?
11     A.  Perhaps it might be something he might
12  be interested in.  Not as an investment, more as
13  just general interest.
14         It was a political -- essentially this
15  is public relations thing.  It's not because the
16  government needs to raise money.  It was just a
17  gesture they were making.  It was sort of
18  interesting that they were going to the trouble
19  to make that kind of a gesture.
20     Q.  Did you tell other colleagues besides
21  Mr. Kurinsky?
22     A.  I believe so, but I can't remember
23  specifically who I talked with about it.
24         MS. WILLIAMS:  I'd like to have
25  this marked as Exhibit 6.

Page 131

1         (Exhibit 6 marked
2          for identification)
3         (Pause)
4         MS. WILLIAMS:  Do we need to take a
5   break?
6         MR. SHOPE:  No.  He was trying to
7   find his eyeglasses, and they were hiding
8   themselves in the case.
9         THE WITNESS:  They were right in
10  front of me.
11        (Pause)
12  BY MS. WILLIAMS:
13     Q.  If you could let me know when you have
14  finished reviewing the document.
15     A.  Okay.
16     Q.  Mr. Nothern, have you --
17     A.  I'm sorry.  I haven't finished.
18     Q.  Okay.
19        (Pause)
20     Q.  Have you seen this document before,
21  sir?
22     A.  Not that I recall.
23     Q.  This is an E mail from Pete Davis to,
24  and blind carbon copying a number of people, and
25  it's dated Friday, October 19, 2001.

Page 132

1         Do you see your E mail address on the
2   list of blind carbon copies?  And I would refer
3   you to the second page of the document 13 lines
4   down.
5      A.  Yes.
6      Q.  Is that what your E mail address was
7   when you were employed at MFS?
8      A.  Yes.
9      Q.  If I could refer you to the third page
10  of the exhibit, last paragraph, it says, "War
11  bonds will be sold by Treasury."
12         Do you see that?
13     A.  Yes.
14     Q.  Does that refresh your recollection at
15  all that the Treasury actually issued war bonds
16  or sold war bonds?
17     A.  No.
18     Q.  Do you recall ever seeing this E mail
19  in October 2001?
20     A.  No.
21     Q.  Do you know -- I'm also on the last
22  paragraph, it says, "Treasury sources confirm
23  the small denomination 17-year bonds with a put
24  will be sold via their web site."
25         Do you see that sentence?

Page 133

1      A.  Yes.
2      Q.  Do you know who the Treasury sources
3   are that Mr. Davis is referring to?
4      A.  No.
5      Q.  Do you know if Mr. Davis ever called
6   anyone else at MFS?
7      A.  Yes.
8      Q.  Who did he call?
9      A.  Our analyst Richard Hawkins and Peter
10  Sullivan, in all likely -- well, that's all.
11     Q.  Do you have any reason to believe you
12  didn't receive this E mail?
13     A.  No.
14     Q.  How do you know Mr. Davis called
15  Mr. Hawkins?
16     A.  Mr. Hawkins at that point was working
17  as a corporate credit analyst, and I believe he
18  had interests in issues in Washington and was
19  familiar with Mr. Davis and used him as a
20  resource.
21     Q.  Did you have any conversations with
22  Mr. Hawkins about Mr. Davis?
23     A.  Yes.
24     Q.  What do you recall about those
25  conversations?

34 (Pages 130 to 133)

Steven E. Northern                                                    January 30, 2007
                              Boston, MA

| Page 134 | Page 136 |
|---|---|

**Page 134**

1    A.  I don't recall anything from those
2    conversations.
3        Q.  What about Mr. Sullivan, how do you
4    know that Mr. Davis called Mr. Sullivan?
5        A.  I don't know that Mr. Davis called
6    Mr. Sullivan.
7            I know that Mr. Sullivan called
8    Mr. Davis because Peter is the analyst that
9    covered our airline mortgage bonds, and I know
10   that they worked on that together.
11       Q.  They being Mr. Sullivan and Mr. Davis?
12       A.  Yes.
13       Q.  How did they work on that together?
14       A.  My understanding, because I wasn't a
15   party to it, but my understanding was that Peter
16   Sullivan wanted to do some research on
17   legislation that was being proposed, bailing out
18   the airlines after September 11th, and that he
19   contacted Mr. Davis in the process of doing that
20   research.
21       Q.  Was this contact prior to October 31,
22   2001?
23       A.  Yes.
24       Q.  And after September 11, 2001?
25       A.  Yes.

**Page 136**

1        Q.  Where did you get the document in
2    order to produce it?
3        A.  I don't recall.
4        Q.  Do you know if you had the document in
5    electronic form prior to producing it?
6        A.  I don't know that.
7        Q.  Do you see the handwriting in the
8    upper-right-hand corner of the document?
9        A.  Yes.
10       Q.  Do you know whose handwriting that is?
11       A.  It looks like my handwriting.
12       Q.  And it appears to say Rick and a
13   number.
14           Do you know what that number
15   corresponds to, if anything?
16       A.  I do not.
17       Q.  Who is Rick?
18       A.  I don't know what this is referring
19   to.
20       Q.  What, if any, communications did you
21   have with Mr. Davis that led to this E mail?
22       A.  I don't remember specifically.  This
23   is a response to a request that I had to him,
24   put to him of who do I talk to at Treasury.
25           And I can't remember what the issue

| Page 135 | Page 137 |
|---|---|

**Page 135**

1        Q.  Do you know what, if any, services
2    Mr. Davis provided to Mr. Sullivan?
3        A.  I don't.  I wasn't a party to their
4    conversations.
5            MS. WILLIAMS:  I'd like to have
6    this marked as Exhibit 7.
7            (Exhibit 7 marked
8            for identification)
9            (Pause)
10   BY MS. WILLIAMS:
11       Q.  Have you finished reviewing the
12   document, sir?
13       A.  Yes.
14       Q.  Do you recognize this document?
15       A.  Yes.
16       Q.  What is it?
17       A.  This is an E mail that I produced for
18   your discovery purposes.  It was an E mail that
19   had been sent to me from Pete Davis.
20       Q.  What's the date of the E mail?
21       A.  From Pete Davis, Thursday, April 8,
22   1999.
23       Q.  You said you produced this in this
24   litigation.  Where was this document kept?
25       A.  I don't recall.

**Page 137**

1    was that I wanted to discuss with someone at
2    Treasury, but at the time I was looking for a
3    contact person at Treasury to address some
4    particular issue I had at the time.  I just
5    can't remember right now what that was.
6        Q.  Do you know if you -- you said that
7    you had asked Mr. Davis who do you talk to at
8    Treasury.  Do you know if you asked him this
9    question via phone?
10       A.  I don't recall.
11       Q.  Do you recall if there was an E mail
12   that you sent to him prior to this E mail in
13   which you asked who you talk to at Treasury?
14       A.  I don't remember.
15       Q.  The E mail subject is "Treasury
16   exchange offering."
17           Do you know what that refers to?
18       A.  I don't remember.
19       Q.  Underneath that, in the body it says,
20   "Steve, Treasury often listens, though I can't
21   guarantee it."
22           Do you know what Mr. Davis is
23   referring to when he writes "Treasury often
24   listens, though I can't guarantee it"?
25       A.  I think what he's telling me is these

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern

January 30, 2007

Boston, MA

| Page 138 | Page 140 |
|---|---|
| 1  people might listen to what I had to say, my | 1  know who he was. I just don't recall it right |
| 2  opinions on some matter but that he couldn't | 2  now. |
| 3  guarantee they would actually take my opinion | 3      Q.  After receiving this E mail, did you |
| 4  into consideration. | 4  contact Mr. Gensler? |
| 5      Q.  Were you working on anything related | 5          MR. THEODOROU: Objection. |
| 6  to a Treasury exchange offering in April of '99? | 6      A.  I don't recall. |
| 7      A.  I don't have any recollection of that. | 7      Q.  What about the next name, Lee Sachs, |
| 8      Q.  Why did you ask Mr. Davis who you | 8  did you know Mr. Sachs prior to receiving this E |
| 9  could talk to at Treasury? | 9  mail? |
| 10         MR. THEODOROU: Objection. | 10     A.  I'm familiar with the name. |
| 11     A.  I don't recall specifically what this | 11     Q.  Later down in that paragraph I see, |
| 12  was about. | 12  this is the third line, "He attended our meeting |
| 13         Clearly I was asking him for contact | 13  with David Wilcox, Assistant Secretary Economic |
| 14  names with regard to an issue that I had some | 14  Policy, on January 25th." |
| 15  interest in, and I wanted to express my opinion. | 15         Do you know what Mr. Davis is |
| 16  He was telling me they might listen, but that | 16  referring to in that sentence? |
| 17  might be all. | 17     A.  Yeah. I think that was the trip we |
| 18     Q.  I might have phrased my question in a | 18  took that we talked about earlier, the trip I |
| 19  confusing way. | 19  took down to Washington where we visited |
| 20         I meant why did you ask Mr. Davis | 20  Treasury officials. |
| 21  rather than someone else? Why did you go to | 21     Q.  Do you recall now meeting with |
| 22  Mr. Davis to ask who you could talk to at | 22  Mr. Sachs? |
| 23  Treasury? | 23     A.  Specifically I don't remember |
| 24         MR. THEODOROU: Objection. | 24  Mr. Sachs, but looking at this, I would say he |
| 25     A.  I don't remember specifically this, | 25  was one of the people we met with. |

| Page 139 | Page 141 |
|---|---|
| 1  but it looks to me that this is after one of our | 1      Q.  Does this refresh your recollection as |
| 2  meetings that we had had at Treasury perhaps a | 2  to when that meeting with Treasury officials |
| 3  few months down the road, and I was asking him | 3  occurred? |
| 4  for phone numbers of people that we met with. I | 4      A.  Yes. |
| 5  believe that's probably what these contacts are. | 5      Q.  And when did it occur? |
| 6      Q.  Okay. Well, let's go down the list. | 6      A.  January 25th of 1999. |
| 7          The first name I see is Gary Gensler. | 7      Q.  During that meeting in January of |
| 8  Do you see that? | 8  1999, did you meet with more than one Treasury |
| 9      A.  Yes. | 9  official? |
| 10     Q.  Prior to April 1999, had you met | 10     A.  I don't remember specifically those |
| 11  Mr. Gensler? | 11  meetings. |
| 12     A.  I don't remember specifically the | 12     Q.  Do you recall generally anything you |
| 13  people that we did meet at Treasury. I think | 13  all discussed during that meeting at Treasury? |
| 14  it's quite possible we did meet with him. | 14     A.  I don't remember the meetings |
| 15     Q.  Were you familiar with Mr. Gensler | 15  specifically or who we met with, how long we |
| 16  prior to receiving this E mail? | 16  were there and what was discussed. |
| 17     A.  I don't recall. It's possible that he | 17     Q.  Do you know if you -- did you contact |
| 18  was one of the people we met. | 18  Mr. Sachs after receiving this E mail from |
| 19     Q.  I meant did you know who he was? Did | 19  Mr. Davis? |
| 20  you know he worked for Treasury prior to | 20     A.  I don't have a recollection of that. |
| 21  receiving this E mail? | 21     Q.  The next name is Jill Ouseley. Did |
| 22     A.  I don't specifically remember. If I | 22  you know Miss Ouseley prior to receiving this E |
| 23  met with him at Treasury that January, | 23  mail? |
| 24  February of that year, he was introduced to me | 24     A.  I don't believe so. |
| 25  by his title, and the answer would be yes, I did | 25     Q.  Do you know if you had met with |

36 (Pages 138 to 141)

Steven E. Northern                                            January 30, 2007
Boston, MA

Page 142

1    Miss Ouseley prior to receiving this E mail?
2        A.  I don't know.
3        Q.  Did you contact Miss Ouseley after you
4    received this E mail?
5        A.  I have no recollection of that.
6        Q.  The next line says -- Mr. Davis
7    writes, "Let me know how it goes."
8            Do you see that?
9        A.  Yes.
10       Q.  Do you know what the it is he's
11   referring to in that sentence?
12       A.  A phone call.
13       Q.  A phone call to whom?
14       A.  If I call one of these people.  He
15   gave me their names and contact information, so
16   he was asking in effect if I contacted one of
17   them, let him know how it goes.
18       Q.  Did you have any communication with
19   Mr. Davis after receiving this E mail about any
20   of the subject matter of this E mail?
21       A.  I don't recall.
22       Q.  Do you know if you responded to the E
23   mail via E mail, you replied, excuse me?
24       A.  I don't recall.
25       Q.  Prior to October 31, 2001, did you

Page 143

1    have an understanding as to what Treasury
2    refunding conferences were?
3        A.  Yes.
4        Q.  What was your understanding?
5        A.  Treasury would use those meetings to
6    discuss three general topics.  One was looking
7    back at sources and uses of funds for the
8    overall government.
9            Second was anticipated needs of
10   spending for the government and how that would
11   translate into borrowing needs for the Federal
12   Government going forward.
13           Thirdly, they would translate that
14   into how many securities they'd be buying of
15   different maturities the following week.
16       Q.  How did you come to this
17   understanding?
18       A.  Well, I'd been at this point in the
19   industry for a long period of time, and it was
20   just general knowledge.
21       Q.  Do you know how often the Treasury
22   refunding conferences were held?
23       A.  They're quarterly.
24       Q.  And do you know which months of the
25   year they're held in?

Page 144

1            MR. SHOPE:  Objection.
2        A.  The auctions are quarterly.  They
3    settle February 15th, May 15th, August 15th, and
4    November 15th, unless those dates happen to be a
5    weekend, in which case it's adjusted to settle
6    on a business day.
7            The refunding announcement is the week
8    before the securities are auctioned, and the
9    auctions are three to five business days before
10   the settlement.
11           So if I back out from the settlement
12   dates which are Feb 15th, May, August, November,
13   you back out, the prior week they get auctioned,
14   and the prior week there's the refunding
15   announcement.  So for February it could be late
16   January, early February, that sort of a thing
17   would be the math.
18       Q.  Now, just to clarify.  I think today
19   we've talked about Treasury funding and
20   quarterly refunding conferences.  Do you
21   understand those to be the same thing?
22           MR. SHOPE:  Objection.
23   BY MS. WILLIAMS:
24       Q.  Treasury refunding conferences and
25   quarterly refunding conferences?

Page 145

1            MR. SHOPE:  Objection.
2        A.  Yes.
3        Q.  I just wanted to make sure that I was
4    using them synonymously, so I didn't know if you
5    were using them differently.
6            Do you have any understanding as to
7    how the Treasury refunding conferences were
8    structured?
9            MR. SHOPE:  I'm sorry, could you
10   have that question reread?
11           (Record read)
12           MR. SHOPE:  And you're asking about
13   his understanding today?
14           MS. WILLIAMS:  As of October 31,
15   2001.
16           MR. SHOPE:  What was his
17   understanding at --
18   BY MS. WILLIAMS:
19       Q.  What was your understanding at that
20   time as to how the Treasury refunding
21   conferences were structured?
22       A.  No.
23       Q.  No, you did not have an understanding
24   as of October 31, 2001 as to how --
25       A.  I thought that's what your question

37 (Pages 142 to 145)

Steven E. Northern                                                    January 30, 2007
                                Boston, MA

| Page 146 | Page 148 |
|---|---|

**Page 146**

1  was.
2      Q.  That was.  The way it was phrased was
3  what was your understanding, and your answer
4  came out no, so I was just clarifying that you
5  did not have an understanding as of October 31,
6  2001 as to how they were structured?
7      A.  Correct, I didn't.
8      Q.  Did you know as of October 31, 2001
9  who was allowed to attend the Treasury refunding
10  conferences?
11          MR. THEODOROU:  Objection.
12      A.  No.
13      Q.  Did you know if members of the media
14  attended those conferences?
15          MR. THEODOROU:  Objection.
16      A.  I didn't know how they proceeded with
17  the quarterly refunding conferences.
18      Q.  Did you know if there was a live news
19  feed available at the conferences?
20          MR. THEODOROU:  Objection.
21      A.  I don't know how they set up their
22  quarterly refunding conferences.
23      Q.  As of October 31, 2001, did you know
24  if -- were you aware if Peter Davis attended
25  these Treasury refunding conferences?

**Page 147**

1          MR. THEODOROU:  Objection.
2      A.  No.
3      Q.  Did you typically know in advance when
4  Treasury was going to hold a refunding
5  conference?
6          MR. THEODOROU:  Objection.
7      A.  No.
8      Q.  If I could refer you to Exhibit 2,
9  page 94.
10          MR. THEODOROU:  Which page?
11  BY MS. WILLIAMS:
12      Q.  Page 94, line one through three.
13      A.  Okay.
14      Q.  Do you see the question is, "Are you
15  typically aware in advance when a conference, a
16  quarterly refunding conference, will be held?
17      "Answer:  Yes."
18      Were you asked that question and did
19  you give that answer?
20      A.  Yes.
21      Q.  So just to clarify, as of October 31,
22  2001, were you typically aware in advance when a
23  quarterly refunding conference would be held?
24      A.  Yes.
25      Q.  How would you --

**Page 148**

1      A.  They're held -- like I told you a few
2  minutes ago, if the settlement date is
3  February 15th, the actual auctions of the
4  securities are the prior week, and the refunding
5  is the week prior to that.
6      So I'm certainly aware of when they're
7  held if I go to the trouble of backing out those
8  dates.  It was certainly not something I paid
9  any attention to.
10      Q.  Did you know in 2001 which day of the
11  week the conferences were usually held?
12      A.  No.
13      Q.  Did you know who -- as of October 31,
14  2001, were you familiar with the term embargo as
15  it referred to the release of information?
16          MR. THEODOROU:  Objection.
17      A.  Yes.
18      Q.  What, if any, knowledge did you have
19  prior to October 31, 2001 about whether Treasury
20  used an embargo procedure for the release of
21  information?
22      A.  None.
23          MS. WILLIAMS:  I'd like to have
24  this marked as Exhibit 8.
25      (Exhibit 8 marked

**Page 149**

1      for identification)
2      (Pause)
3  BY MS. WILLIAMS:
4      Q.  Mr. Nothern, have you seen this
5  document before?
6      A.  Yes.
7      Q.  What is it?
8      A.  It's titled Department of Treasury on
9  a headline, and the header Treasury News From
10  the Office of Public Affairs.
11      It's a statement from Under Secretary
12  Treasury for Domestic Finance Gary Gensler.
13  It's remarks that he gave at the November 2000
14  Treasury quarterly refund.
15      Q.  And this is a document that you
16  produced, correct?
17      A.  Yes.
18      Q.  Where did you obtain a copy of this
19  document?
20      A.  It was sent to me by Davis Capital.
21      Q.  And how was it sent to you?
22      A.  It looks like it was faxed.
23      Q.  If I could refer you to the fax line
24  at the top of the page "11/01/00 7:51," then I
25  see a number "202-544-7098."

                                38 (Pages 146 to 149)

Steven E. Northern                                          January 30, 2007
Boston, MA

| Page 150 | Page 152 |
|---|---|

**Page 150**

1      Do you see that?
2      A.  Yes.
3      Q.  Are you familiar with that number?
4      A.  No.
5      Q.  Then I see -- what was your fax number
6   at MFS?
7      A.  I don't remember.  Eventually we had
8   faxes in our computers, so somehow they could --
9   but I don't remember the number.
10     Q.  Okay.  Following that number I see
11  "Massachusetts Financial Se/Nothern,Steve."
12     Do you see that?
13     A.  Yes.
14     Q.  Is it your testimony that you received
15  this document from Mr. Davis?
16     A.  Yes.
17     Q.  I see some marginalia on the document.
18  Specifically about halfway down the first page I
19  see a circle on the left-hand side, and then
20  there's some underlining.
21     Do you see the marginalia I'm
22  referring to?
23     A.  Yes.
24     Q.  Do you know whose handwriting that is?
25     A.  It looks like it's mine.

**Page 152**

1      Q.  What about as of October 31, 2001?
2      MR. THEODOROU:  Objection.
3      A.  No.
4      Q.  Do you know if you ever had any
5   discussions with Mr. Davis about this document?
6      A.  I don't.
7      Q.  Did you ever receive any other
8   documents of this sort regarding Treasury
9   refunding conferences from Mr. Davis?
10     A.  Not that I recall.
11     Q.  Do you believe you did not receive any
12  documents like this from Mr. Davis?
13     MR. THEODOROU:  Objection.
14     A.  I have no reason not to -- I have no
15  reason to -- what was your question?  No reason
16  to believe that I hadn't?
17     Q.  Okay.  I just was trying to clarify.
18  When you say not that you recall, did that mean
19  that you did not receive any other documents
20  like this from Mr. Davis?
21     MR. THEODOROU:  I don't think that
22  was his testimony.
23  BY MS. WILLIAMS:
24     Q.  I'm just trying to clarify the not
25  that you recall.

| Page 151 | Page 153 |
|---|---|

**Page 151**

1      Q.  Is this a document that you kept in
2   your files?
3      A.  Yes.
4      Q.  Why did you keep this document?
5      A.  For future reference.  It was
6   apparently statistics that I had an interest in.
7      Q.  On the top-left-hand corner, under the
8   heading I see the words "Embargo time will be
9   set."
10     Do you see that?
11     A.  Yes.
12     Q.  Do you know what that statement means?
13     MR. THEODOROU:  As of what date?
14  November 1, 2000?
15     MS. WILLIAMS:  Sure, or October 31,
16  2001.
17  BY MS. WILLIAMS:
18     Q.  As of October 31, 2001, but you hadn't
19  received it yet, so as of November 1, 2000, did
20  you know what that statement meant?
21     A.  2001 I had received this.
22     Q.  Right.  But my question is -- okay.
23     As of November 1, 2000, did you know
24  what that statement meant?
25     A.  No.

**Page 153**

1      MR. SHOPE:  Can we maybe strike
2   that from the top, and if you could phrase it as
3   simply as possible without any double negatives
4   or anything like that.
5   BY MS. WILLIAMS:
6      Q.  Okay.  Did you receive any other
7   documents of this sort regarding Treasury
8   refunding announcements from Mr. Davis?
9      A.  As I sit here, not that I recall
10  having received.
11     Q.  And just to clarify, prior to
12  October 31, 2001, had you read this document?
13     MR. THEODOROU:  Objection.
14     A.  Yes.
15     Q.  Did you go to work at MFS on
16  October 31, 2001?
17     A.  Yes.
18     Q.  What time did you arrive?
19     A.  I don't recall specifically.  My
20  general practice was to get in 7, 7:30 in the
21  morning.
22     Q.  What did you do after you arrived at
23  work that day?
24     A.  I recall starting some portfolio work.
25  I was selling some intermediate maturity

Steven E. Northern                                                    January 30, 2007

Boston, MA

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  treasuries to buy longer maturity treasuries, so
2  I was beginning some work restructuring the
3  portfolios that morning.
4      Q.  You said that that morning you started
5  selling some intermediate maturity treasuries;
6  is that correct?
7      A.  Yes.
8      Q.  And did you buy any longer maturity
9  treasuries that morning?
10     A.  Yes.
11     Q.  When?
12     A.  Some time between 9:30, ten o'clock.
13     Q.  I want to know what you recall doing
14  prior to 9 a.m. that morning.
15     A.  I don't have any specific
16  recollections of what I did prior to 9 a.m.
17     Q.  Do you know if you started selling the
18  intermediate maturity treasuries prior to 9
19  a.m.?
20     A.  Yes, I know that.
21     Q.  Did you?
22     A.  No, I didn't.
23     Q.  When did you start selling the
24  intermediate --
25     A.  Actually, I take that back.  I don't

**Page 156**

1      Q.  Are you familiar with the Chicago
2  Index?
3      A.  The Chicago Purchasing Manager's
4  Index?
5      Q.  Yes.  All I have is Chicago Index.  Is
6  there something called a Chicago Purchasing
7  Manager's Index?
8      A.  Yes.
9      Q.  Is that what you were referring to
10  when you say "The purchasing manager's survey"?
11     A.  Yes.  There are two surveys.  One --
12  well, there are a series of surveys.  There are
13  regional ones, the Chicago Purchasing Manager's
14  Index being one, and then there's a National
15  Purchasing Manager's Index, and that's what we
16  were expecting that morning.
17     Q.  What time were you expecting that?
18     A.  10 a.m.
19     Q.  And how were you aware that that
20  purchasing manager's information was going to
21  come out at 10 a.m.?
22     A.  That was a release that I tracked as
23  being a very useful indicator.
24     Q.  How did you track the release?
25     A.  I made sure I was aware of what it

**Page 155**

1  know when I did those sales.
2      Q.  Did you review any E mails that
3  morning prior to 9 a.m.?
4      A.  Not as I sit here that I can remember.
5      Q.  Did you review any news that morning?
6      A.  I don't have any specific
7  recollections of what I did that morning prior
8  to nine o'clock.
9      Q.  On October 31, 2001 when you arrived
10  at work, were you expecting any announcements?
11         MR. THEODOROU:  Objection.
12  BY MS. WILLIAMS:
13     Q.  Were you expecting any announcements
14  to be made that day?
15     A.  What sort of announcements?
16     Q.  Any announcements by the government.
17     A.  I was expecting an announcement on the
18  purchasing manager's survey, and I don't know
19  whether that's a government survey.  I actually
20  think it's a private sector survey.
21     Q.  Were you expecting any releases that
22  day?
23     A.  The only release on my radar that I
24  was expecting that morning was the purchasing
25  manager's.

**Page 157**

1  was.
2      Q.  How did you do that?
3      A.  Well, if I'm at the trading desk at
4  ten o'clock, I'll watch for it, see how the
5  market reacts.
6         If it's a surprise to the market, if
7  it's higher or lower than expectations, I'll
8  monitor how the market reacts to that.
9         If I'm not at the desk, I'll get it
10  later on through research or through my
11  colleagues, or the trader would know the
12  information, someone who's been on the desk.
13     Q.  How did you know that that release was
14  going to be made on October 31st at 10 a.m.?
15     A.  It was a release that I tracked, so it
16  would be something I watched for when it was
17  going to be released.
18         These releases are on a set calendar,
19  so you know ahead of time when it's going to
20  come out.
21     Q.  Was the fact that the release was
22  coming out on October 31st noted on any wire
23  services?
24     A.  To my knowledge?
25     Q.  Yes.

40 (Pages 154 to 157)

Steven E. Northern                                              January 30, 2007
                          Boston, MA

| Page 158 | Page 160 |
|---|---|
| 1    A. To my direct knowledge?<br>2    Q. Yes.<br>3    A. No.<br>4    Q. I'm just trying to find out when you<br>5 say you tracked it, what did you look to to<br>6 track it?<br>7    A. Well, when it's released, if I'm on<br>8 the trading desk, I'll look at it, and there<br>9 will be a Reuters headline or something of that<br>10 sort.<br>11        If I'm on the phone with a dealer,<br>12 they might share with me what it was.<br>13        If I'm in my office, away from the<br>14 trading desk, if it is a significant release,<br>15 maybe a dealer might call me, but it would be a<br>16 piece of information that I would be careful to<br>17 make sure that I reviewed.<br>18    Q. How often did that purchasing<br>19 manager's release come out?<br>20    A. It was a monthly release.<br>21    Q. Besides the purchasing manager's<br>22 release you mentioned, were you looking for any<br>23 other releases that day?<br>24    A. No.<br>25    Q. Were you aware there was going to be a | 1    A. No.<br>2    Q. When did you become aware that<br>3 Treasury was going to be making a refunding<br>4 announcement on October 31, 2001?<br>5        MR. SHOPE: Objection.<br>6    A. I first became aware of it, I<br>7 remember, from -- our trader John Cadogan<br>8 mentioned it.<br>9    Q. Do you know approximately what time of<br>10 day that was?<br>11    A. It was about between 9:30 and 10,<br>12 about a quarter till.<br>13    Q. About 9:45?<br>14    A. (Witness nods).<br>15    Q. What did Mr. Cadogan say?<br>16    A. I don't remember specifically what he<br>17 said. What I took away -- he made a comment<br>18 that there was a quarterly refunding<br>19 announcement at ten o'clock.<br>20    Q. How did this come up?<br>21    A. This came up in response to my comment<br>22 that Mr. Davis had left a phone mail message<br>23 where Mr. Davis had indicated something about<br>24 there being an announcement at ten o'clock of a<br>25 cancellation of the long bond. |

| Page 159 | Page 161 |
|---|---|
| 1 GDP announcement that morning?<br>2    A. As of what time?<br>3    Q. Prior to 10 a.m. October 31st, were<br>4 you aware that there was going to be a GDP<br>5 announcement?<br>6    A. I don't --<br>7    Q. Let me rephrase.<br>8        Prior to the time the announcement was<br>9 made, were you aware that there was going to be<br>10 a GDP announcement?<br>11    A. No.<br>12    Q. Do you know what time that<br>13 announcement was made?<br>14    A. I don't remember when they put out the<br>15 GDP numbers.<br>16    Q. Do you know if it was before 10 a.m.?<br>17    A. I have -- I don't remember.<br>18    Q. Were you aware there was going to be a<br>19 Treasury refunding announcement on October 31,<br>20 2001 prior to 9 a.m.?<br>21    A. No.<br>22    Q. When did you -- you testified you use<br>23 Microsoft Outlook. Was there any function you<br>24 used on there to remind you of announcement<br>25 dates? | 1    Q. Before I talk about that voicemail,<br>2 let me just find out, when Mr. Cadogan informed<br>3 you that there was going to be a Treasury<br>4 refunding announcement, was anyone else involved<br>5 in that conversation?<br>6        MR. SHOPE: Objection to the form.<br>7    A. Involved in what way?<br>8    Q. Was anyone else present when<br>9 Mr. Cadogan made that statement that there was<br>10 going to be a Treasury refunding announcement?<br>11    A. Yes.<br>12    Q. Who else?<br>13    A. David Kennedy, Rick Smith, Jeffrey<br>14 Kurinsky, other trading assistants in that end<br>15 of the trading room.<br>16    Q. What were the names of the other<br>17 trading assistants?<br>18    A. I believe one was Michael Conn,<br>19 C-O-N-N. I believe one was Jody Nickerson. No,<br>20 no, that's not her name. I can't recall the<br>21 other names.<br>22    Q. Were they all within -- were they all<br>23 within earshot of Mr. Cadogan when he made this<br>24 statement?<br>25    A. Yes. |

41 (Pages 158 to 161)

Steven E. Northern                                                    January 30, 2007

Boston, MA

| Page 162 | Page 164 |
|---|---|
| 1    Q.  Was he talking to all of the people | 1    A.  Not my personal line but possibly a |
| 2  that you mentioned when he made this statement? | 2  direct -- possibly one of the general phone |
| 3    A.  This is a statement -- this was an | 3  lines on our phone turret. |
| 4  exchange between the two of us.  Others could | 4    Q.  Who called whom? |
| 5  well have overheard it. | 5    A.  I received the phone call from one of |
| 6    Q.  So Mr. Cadogan was just talking -- was | 6  the dealers. |
| 7  directing the statement to you? | 7    Q.  Approximately what time did you |
| 8    A.  As I recall, we were looking at each | 8  receive this call? |
| 9  other, maybe six feet apart having that -- and | 9    A.  Some time between 9:30 and ten |
| 10  he added that piece of information that they | 10  o'clock. |
| 11  were having a quarterly refunding announcement, | 11    Q.  What was discussed during this call? |
| 12  and it was at ten o'clock. | 12  I'm sorry. |
| 13    Q.  Was there anyone else that Mr. Cadogan | 13    A.  Ordinarily some time between 9:30 and |
| 14  was directing that statement to beside you? | 14  10 of, quarter of. |
| 15         MR. THEODOROU:  Objection. | 15         MR. ROSSETTI:  10 of 10? |
| 16    A.  I'm uncertain who he was trying to | 16         THE WITNESS:  Yeah, yes. |
| 17  address it to.  I know he was addressing it to | 17  BY MS. WILLIAMS: |
| 18  me.  I was chatting with him.  I think he was -- | 18    Q.  What did you discuss during this call? |
| 19  well, it was a general comment he was making, so | 19    A.  The broker was calling me to discuss |
| 20  I know he was addressing it to me. | 20  that the market had been moving, and he had a |
| 21    Q.  Do you know if anyone else overheard | 21  possible explanation for it. |
| 22  the comment that Mr. Cadogan made? | 22         He had heard talk that people on the |
| 23         MR. THEODOROU:  Objection. | 23  Chicago Board of Trade thought that the long |
| 24    A.  No. | 24  bond was going to be cancelled, and he was |
| 25    Q.  Was there a 9 a.m. meeting for the | 25  imparting that as a possible explanation for why |

| Page 163 | Page 165 |
|---|---|
| 1  Fixed Income Group on October 31, 2001? | 1  the market was drifting up that morning. |
| 2    A.  I don't recall specifically a 9 a.m. | 2    Q.  Do you know who on the Chicago |
| 3  meeting that day. | 3  Board -- excuse me. |
| 4    Q.  So just to clarify, you don't recall | 4         Do you know how the person that you |
| 5  attending a 9 a.m. meeting that day? | 5  were talking to learned about this information |
| 6    A.  I don't. | 6  on the Chicago Board of Trade? |
| 7    Q.  Do you recall participating in any | 7    A.  No. |
| 8  telephone calls that morning, October 31, 2001? | 8    Q.  Did the person you were talking to |
| 9    A.  Yes. | 9  work at this Chicago Board of Trade? |
| 10    Q.  What telephone calls do you recall | 10    A.  I don't believe so. |
| 11  participating in? | 11    Q.  Did the person you were talking to |
| 12    A.  I remember receiving a phone call from | 12  characterize the information, where you called |
| 13  one of our dealers. | 13  it talk, on the Chicago Board of Trade as a |
| 14    Q.  Which dealer? | 14  rumor? |
| 15    A.  I don't remember.  One of my principal | 15    A.  Yeah, yes. |
| 16  government coverage guys.  I can't remember | 16    Q.  Do you recall if this person told you |
| 17  specifically which one. | 17  anything else during the conversation? |
| 18    Q.  Do you recall where the dealer worked? | 18    A.  That's all I can recall. |
| 19    A.  I don't recall specifically which | 19    Q.  Prior to this conversation, what, if |
| 20  dealer it was.  So the answer to that question | 20  anything, had you noticed about the market? |
| 21  is no. | 21    A.  The market had been ticking up that |
| 22    Q.  What line did this call come in on? | 22  morning. |
| 23    A.  I don't remember. | 23    Q.  And specifically what market are you |
| 24    Q.  Would it -- did it come in on a direct | 24  referring to? |
| 25  line versus your personal line? | 25    A.  The bond market.  Specifically, the |

                                                    42 (Pages 162 to 165)

Steven E. Northern                                                     January 30, 2007

Boston, MA

Page 166

1  long bond had been moving up that morning at
2  that point in time at least a quarter point with
3  eight, 10 ticks.
4      Q.  And you said that this call came in
5  between 9:30 and 9:50?
6      A.  Some time after 9:30.  I don't know
7  exactly what time.
8      Q.  Was it around 9:30?
9      A.  I don't know exactly what time.
10         MS. WILLIAMS:  I'd like to have
11  this marked as Exhibit 9.
12         (Exhibit 9 marked
13         for identification)
14         MR. SHOPE:  Are there any
15  particular numbers you're going to be referring
16  to?
17         MS. WILLIAMS:  I'm going to be
18  talking about page five.
19  BY MS. WILLIAMS:
20      Q.  Do you recognize this document,
21  Mr. Nothern?
22      A.  Yes.
23      Q.  What is it?
24      A.  It's labeled Defendant Steven E.
25  Nothern's Responses to the Plaintiff US

Page 167

1  Securities and Exchange Commission's First Set
2  of Interrogatories.
3      Q.  If I could refer you to page 15.  And
4  on the second half of the page, do you see your
5  signature there, sir?
6      A.  Yes.
7      Q.  And it says, "I, Steven E. Nothern,
8  state under the penalty of perjury that the
9  foregoing responses are true and correct."
10         Did I read that correctly?
11      A.  Yes.
12      Q.  Okay.  On page five, I'm at the first
13  line, "Around 9:30 a.m. on October 31, 2001, I
14  had a telephone conversation with a bond broker
15  who informed me that there was information
16  circulating on the Chicago Board of Trade that
17  the Treasury was going to cancel the issuance of
18  the 30-year bond and that Treasury was going to
19  shift to a monthly issuance of five-year bonds
20  rather than the quarterly issuance of five-year
21  bonds."
22         Did I read that correctly?
23      A.  Yes.
24      Q.  Does that refresh your recollection at
25  all of anything else that was discussed during

Page 168

1  the conversation with the broker that morning?
2      A.  Yes.
3      Q.  What else was discussed?
4      A.  Apparently Treasury was going to shift
5  to a monthly issuance of five years as opposed
6  to a quarterly issuance.
7      Q.  And you agree that the conversation
8  took place around 9:30 a.m.?
9      A.  Yes.
10      Q.  Prior to receiving this call, what, if
11  anything, had you heard regarding Treasury's
12  possible cancellation of a 30-year bond on
13  October 31st?
14      A.  Prior to October 31, 2001?
15      Q.  No, no.  On October 31st, prior to
16  receiving this call, what, if anything, had you
17  heard about the possible cancellation of the
18  bond, just on that day?
19      A.  That morning?
20      Q.  Yes.
21      A.  Nothing that I recall.
22      Q.  What did you say in response to the
23  broker's -- information that the broker gave you
24  during this call?
25      A.  I don't recall.

Page 169

1      Q.  What was your reaction to this
2  information?
3      A.  It was twofold.  One is here we go
4  again.  We'd had a similar thing at the
5  August refunding.
6         And then it jogged my memory of what
7  had happened at the quarterly refunding, which
8  there had been wide anticipation at that point
9  in time that the treasurer was going to announce
10  the cancellation of the 30-year Treasury bond.
11         Their arrangements that they were
12  making was that it just didn't make sense to
13  continue issuing them.
14         So there was an expectation in
15  August that they were going to announce the
16  cancellation.  So I did remember that.
17         And I did remember also that the
18  postmortem on -- because they didn't in fact
19  announce that in August, postmortem was that
20  they didn't done it because the fellow in charge
21  while nominated hadn't yet been confirmed, and
22  he might not yet have the -- I guess the sort of
23  official ability to stand before the cameras and
24  make that sort of an announcement, to the extent
25  that he wanted to be the guy making that sort of

43 (Pages 166 to 169)

Steven E. Northern

January 30, 2007

Boston, MA

Page 170

1  announcement.
2     Q.   Do you recall if you'd received any
3  calls from brokers prior to the August refunding
4  conference?
5     A.   I don't recall.
6     Q.   When you say that a similar thing had
7  happened at the August refunding, what do you
8  mean?
9     A.   That there was a lot of talk about
10  whether they were going to do it or not do it in
11  terms of whether they were going to cancel
12  issuance of 30 years or not do it.  So there was
13  a lot of speculation about that.
14     This is an issue that had been
15  outstanding for a long period of time, well over
16  a year, and it dated to the prior
17  administration.
18     And in a sense the prior
19  administration, this is my take on it, that sort
20  of punted and left the issue to the new
21  administration.
22     Q.   How did you become aware of the talks
23  surrounding the August refunding?
24     A.   It was very -- I don't recall
25  specifically.  It was very widely talked about,

Page 171

1  though.
2     Q.   Prior to the August refunding
3  conference, do you recall there being any
4  movement in the market on the morning of the
5  conference?
6     A.   I don't.
7     MR. SHOPE:  I'm sorry, can I have
8  that question and answer read back?
9     (Record read)
10     MR. SHOPE:  Okay.  Thank you.
11  BY MS. WILLIAMS:
12     Q.   In the course of your work at MFS, how
13  often would you receive calls of this nature,
14  meaning the call that you got from the broker on
15  the morning of October 31st --
16     MR. THEODOROU:  Objection.
17     Q.   -- regarding rumors about market
18  activity?
19     MR. THEODOROU:  Objection.
20     A.   Rarely.
21     Q.   Do you not agree that you frequently
22  got calls from individuals with rumors regarding
23  what the market was going to do?
24     MR. THEODOROU:  Objection.
25     A.   What was your question?  Cow could you

Page 172

1  just repeat that, please?
2     Q.   Sure.  I said did you not frequently
3  get calls from individuals with rumors regarding
4  what the market was going to do?
5     A.   You're confusing me with your nots.
6     Q.   Okay.  Would you agree that you
7  frequently got calls from individuals with
8  rumors regarding what the market was going to
9  do?
10     A.   No.  I think it was extremely rare.
11     Q.   If I could refer you to Exhibit 2,
12  page 118.
13     MS. WILLIAMS:  And if we could go
14  off the record and change the tape.
15     MR. THEODOROU:  Can we just take a
16  short break?
17     MS. WILLIAMS:  Sure.
18     THE VIDEOGRAPHER:  This marks the
19  end of videotape number two in the deposition of
20  Steven Nothern.
21     Going off the record, 2:32 p.m.
22     (Recess taken)
23     THE VIDEOGRAPHER:  Here begins
24  videotape number three in the deposition of
25  Steven Nothern.

Page 173

1     On the record, 2:49 p.m.
2  BY MS. WILLIAMS:
3     Q.   Mr. Nothern, if you could read to
4  yourself on Exhibit 2, page 117, line 19 through
5  page 119, line --
6     A.   I'm sorry, page?
7     Q.   117.
8     A.   Okay.
9     Q.   Line 19 through page 118, line 8, and
10  let me know when you finished.
11     (Pause)
12     A.   Okay.
13     Q.   I wanted to refer you to page 118, and
14  I'm reading line four.  "It's just the nature of
15  business.  We have people calling us frequently
16  pounding the table that they're sure XYZ is
17  going to happen, or they're sure you should do
18  XYZ."
19     And I wanted to know what you meant by
20  that statement.
21     A.   We have people -- well, when I worked
22  in the business there were people calling
23  frequently, our insurer, the curve was going to
24  flatten, which is jargon to say that the
25  Treasury market yields with change in a certain

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern                                              January 30, 2007
                            Boston, MA

Page 174

1  manner, or that the Fed was at the next meeting
2  going to tighten 50 basis points, or that the
3  next CPI number was going to be .8.
4        You know, so we had people calling in
5  all the time who thought that, you know, they
6  had an analysis of how the market might react to
7  things that they were certain were going to
8  occur in their analysis, in their opinion
9  certain things were going to happen, and they
10 were darn sure of it.
11       At the end of the day, I think I say
12 that here, at the end of the day, we as
13 portfolio managers have to make our own analysis
14 of what we think, you know, the investment
15 environment is going to be going forward, and we
16 take the responsibility for structuring the
17 portfolios appropriately.
18       You can't rely on other people's
19 analysis. It's useful input. Often they're
20 darn sure, but they can also be darn wrong. And
21 if it's wrong, it's your responsibility as a
22 portfolio manager.
23       I don't blame them, but they call a
24 lot confident that such-and-such is going to
25 happen and, you know, you should do

Page 175

1  such-and-such, you know, as a consequence of it.
2     Q. When you received this call from the
3  broker saying that -- relaying the rumor about the
4  floor of the Chicago Board of Trade, you said
5  that one reaction you had was that this was
6  similar to information you heard surrounding the
7  August refunding conference; is that right?
8     A. Yes.
9     Q. What, if anything, in your --
10 triggered in your mind after you received the
11 call from the broker on October 31st as to
12 whether Treasury was going to make a refunding
13 announcement that day?
14    A. It didn't -- I didn't have any thought
15 of a refunding -- quarterly refunding at that
16 point in time.
17    Q. How long did the call with the broker
18 last?
19    A. I don't remember. It was brief.
20    Q. By "brief," can you give me a
21 ballpark?
22    A. Less than two, three minutes.
23    Q. What happened -- what did you do after
24 you had this call with the broker?
25    A. As I recall, I was doing portfolio

Page 176

1  work. I had several portfolios I was working to
2  restructure. I was doing trades, primarily
3  selling intermediate maturity or short maturity
4  notes and bonds in exchange for longer
5  maturities.
6     Q. Okay. You mentioned earlier you
7  received a voicemail from Peter Davis. Were you
8  doing this portfolio work prior to receiving
9  that voicemail?
10    A. Yes.
11    Q. Did you sell any intermediate
12 securities that day prior to receiving the
13 voicemail from Mr. Davis?
14    A. Yes.
15    Q. Did you purchase any longer term
16 securities that day prior to receiving the
17 voicemail from Mr. Davis?
18    A. No.
19    Q. What do you recall happening next?
20       MR. SHOPE: Next after what?
21       MS. WILLIAMS: He said that after
22 the call with the broker, he did some portfolio
23 work. I want to know what he recalls doing
24 thereafter.
25    A. At some point I was interrupted by

Page 177

1  Kathy Graham who was our receptionist. She had
2  an issue related to a laptop that was going to
3  be picked up for servicing by Dell.
4     Q. How were you interrupted by
5  Ms. Graham?
6     A. She came to my desk and presented me
7  the problem that we were having, and Dell was to
8  come pick up this computer for servicing, and
9  she explained to me the complexity.
10       After 9/11, vendors -- pick up
11 companies were no longer allowed up into the
12 building, so the laptop would have to be brought
13 down to, I guess, a receiving area of the lobby.
14    Q. Okay. How long was this conversation
15 with Miss Graham?
16    A. I don't remember. I'd say it was
17 fairly brief, a few minutes.
18    Q. Besides you and Ms. Graham, was there
19 anyone else involved in this conversation?
20    A. No.
21    Q. And just to clarify, were you sitting
22 at your station on the high grade trading desk
23 when you had this conversation with Ms. Graham?
24    A. Yes.
25    Q. What happened after you had this

45 (Pages 174 to 177)

Steven E. Northern                                    January 30, 2007
Boston, MA

## Page 178

1  conversation with Ms. Graham?
2      A.  I observed that on my phone, the
3  little light was on that indicated there was a
4  message on my telephone.
5      Q.  Did you recall receiving a call and
6  letting it go to voicemail?
7      A.  No.
8      Q.  Let me ask you a question first about
9  your purchase of the intermediate securities
10 that morning.
11     What, if any, information did you
12 enter into the FITS system regarding those
13 trades?
14     A.  Those weren't purchases.  Those were
15 sales.
16     Q.  For sales were you required to enter
17 any information in the FITS system?
18     A.  Yes.
19     Q.  Did you enter any information in the
20 FITS system?
21     A.  Yes.  I entered the transactions.  I
22 believe there were three.
23     Q.  How long after doing the transactions
24 did you enter the information in the FITS
25 system?

## Page 180

1  million, but I don't recall what all three were.
2      Q.  Why did you make those sales in the
3  intermediate securities that morning?
4      A.  That morning I was restructuring the
5  portfolios to give them more of a bias towards
6  long maturity, 30-year treasuries, away from
7  intermediate securities.
8      So I was in the process of selling to
9  raise cash to have the money to invest in longer
10 maturity treasuries.
11     Q.  What happened after this -- oh, you
12 mentioned that you noticed the voicemail light
13 was on after your discussion with Ms. Graham.
14 What did you do next?
15     A.  I reviewed the phone mail message that
16 had been left.
17     Q.  And what was this voicemail message?
18     A.  It was a message from Peter Davis,
19 Davis Capital.
20     Q.  What did Mr. Davis say in the
21 voicemail message?
22     A.  I don't remember specifically.  In
23 substance what I took away was two things.  One,
24 that Peter Fisher had told him they would be
25 cancelling the long bond; and two, that there

## Page 179

1      MR. SHOPE:  Objection.
2      A.  I don't recall that it was after.  I
3  don't recall the sequence.
4      Q.  Do you recall if you gave verbal
5  orders to sell those intermediate securities
6  that morning?
7      A.  I don't recall what the process was
8  for executing those trades.
9      Q.  Do you recall who the trader was that
10 executed the trades?
11     A.  As we sit here now, no.  We could
12 review, but I don't recall.
13     Q.  Do you recall which portfolio the
14 trades were made in?
15     A.  Yes.
16     Q.  Which ones?
17     A.  MIN, the Intermediate Income Trust;
18 MMT, the Multi Market Income Trust; and MGF, the
19 Government Markets Income Trust.
20     To the best of my recollection, I
21 think it's those three portfolios.
22     Q.  Do you recall how much -- what was the
23 value that you sold in those intermediate
24 securities that morning?
25     A.  I don't.  I believe two were for 4

## Page 181

1  was a press release embargo until ten o'clock.
2      Q.  Did Mr. Davis -- you said that they
3  would be cancelling the long bond.  Did
4  Mr. Davis mention Treasury in the voicemail?
5      A.  I don't remember specifically what his
6  words were except the words that Peter Fisher
7  told me this I think is what he said.
8      Q.  What, if any, understanding did you
9  have as to who the they were when you say "they
10 would be cancelling the long bond"?
11     A.  The government.
12     Q.  Any particular part of the government?
13     A.  The Treasury Department.
14     Q.  How long was the voicemail message?
15     A.  It was less than a minute.
16     Q.  How many times did you listen to the
17 voicemail that morning?
18     A.  I listened to it once.
19     Q.  What did you do after listening to the
20 voicemail?
21     A.  I deleted it.
22     Q.  Why did you delete it?
23     A.  To avoid having a lot of clutter in my
24 E mail inbox.
25     Q.  Voicemail?

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern                                    January 30, 2007
                          Boston, MA

| Page 182 | Page 184 |
|---|---|
| 1      A.  My -- clutter in my voicemail inbox. | 1    DID." |
| 2      After a week's vacation, the thing | 2         Do you see that? |
| 3    would max out.  You had to keep it clean. | 3      A.  Yes. |
| 4      Q.  Do you know what time Mr. Davis's -- | 4      Q.  And the calling number is |
| 5    what time you retrieved Mr. Davis's voicemail? | 5    "2023657624". |
| 6      A.  I don't have a recollection of when I | 6         Do you see that? |
| 7    retrieved his voicemail message. | 7      A.  Yes. |
| 8      Q.  Do you know what time Mr. Davis left | 8      Q.  Do you know whose phone number was |
| 9    the voicemail? | 9    202-365-7624? |
| 10     A.  I think it was left at 9:37. | 10     A.  No. |
| 11     Q.  Why do you think it was left at 9:37? | 11     Q.  Do you know what Mr. Davis's phone |
| 12     A.  After review -- I reviewed the phone | 12   number was? |
| 13   logs at some point. | 13     A.  No. |
| 14        MS. WILLIAMS:  I'd like to have | 14     Q.  Did you ever look at any MFS phone |
| 15   this marked as Exhibit 10. | 15   records regarding October 31, 2001? |
| 16        (Exhibit 10 marked | 16     A.  I don't remember having reviewed the |
| 17         for identification) | 17   phone documents. |
| 18   BY MS. WILLIAMS: | 18     Q.  Back to the substance of Mr. Davis's |
| 19     Q.  Do you recognize this document, | 19   voicemail. |
| 20   Mr. Nothern? | 20        Did Mr. Davis say anything about the |
| 21     A.  No. | 21   five-year note in his voicemail that you recall? |
| 22     Q.  At the top the document says, "Mass. | 22        MR. SHOPE:  I'm sorry, did he say |
| 23   Financial Services Department Report From | 23   anything about the what? |
| 24   10/31/2001 to 10/31/2001." | 24        MS. WILLIAMS:  Five-year note. |
| 25        Do you see that, sir? | 25     A.  Not that I recall. |

| Page 183 | Page 185 |
|---|---|
| 1      A.  Yes. | 1      Q.  The 10-year note, do you recall |
| 2      Q.  Then on the right-hand side, the | 2    Mr. Davis mentioning that in his voicemail? |
| 3    fourth line down, I see "Station 55887, Steven | 3      A.  I don't recall hearing that. |
| 4    E. Nothern." | 4      Q.  Did Mr. Davis mention anything about |
| 5         Do you see that? | 5    buybacks in his voicemail? |
| 6      A.  Yes. | 6      A.  I don't recall that. |
| 7      Q.  Do you know what 55887 refers to? | 7      Q.  Did you listen to the voicemail using |
| 8      A.  It looks like it refers to my | 8    speakerphone? |
| 9    extension, 5887.  This indicates 55887.  My | 9         MR. THEODOROU:  I beg your pardon? |
| 10   extension was 5887.  I think to dial internally | 10   What was the question? |
| 11   you had to add a five, so that was my internal | 11   BY MS. WILLIAMS: |
| 12   extension. | 12     Q.  Did you listen to the voicemail using |
| 13     Q.  Then the next -- after the line of | 13   speakerphone? |
| 14   stars and the headings, I see information | 14     A.  No, I didn't. |
| 15   underneath certain headings.  First I see the | 15     Q.  Do you know what -- scratch that. |
| 16   date "10/31/2001". | 16        Did this voicemail come into your |
| 17        Do you see that, sir? | 17   private, private meaning your direct, line? |
| 18     A.  Yes. | 18     A.  Yes. |
| 19     Q.  And then the time "9:37a". | 19     Q.  Who did you understand Mr. Fisher to |
| 20        Do you see that? | 20   be on October 31, 2001? |
| 21     A.  Yes. | 21     A.  I understood Mr. Fisher to be a |
| 22     Q.  Under "dialed number" I see "55887". | 22   low-level political appointee in the debt |
| 23        Do you see that? | 23   finance area. |
| 24     A.  Yes. | 24     Q.  When you say "low level," what do you |
| 25     Q.  Under "Call class" I see "Inbound | 25   mean? |

                                        47 (Pages 182 to 185)

Steven E. Northern                                                                    January 30, 2007
                                      Boston, MA

| Page 186 | Page 188 |
|---|---|

**Page 186**

1    A. I think he was one of the lowest
2 ranking appointees that the president gets to
3 make in the Treasury.
4    Q. Do you know if there were any other
5 political appointees who were under Mr. Fisher
6 in terms of hierarchy?
7    A. I don't.
8    Q. Have you --
9    A. Excuse me.
10    Q. Sorry.
11    A. At what point in time?
12    Q. As of October 31, 2001.
13    A. No, I don't.
14    Q. Did you know when Mr. Davis's
15 appointment had been confirmed? Did you know as
16 of October 31, 2001?
17       MR. SHOPE: You mean Mr. Fisher?
18       MS. WILLIAMS: Mr. Fisher.
19 BY MS. WILLIAMS:
20    Q. I'm sorry, let me restate that again.
21       As of October 31, 2001, did you know
22 when Mr. Fisher had been confirmed to his
23 appointment at Treasury?
24    A. I had heard that he had been
25 confirmed.

**Page 188**

1    Q. When you received Mr. Davis's
2 voicemail on October 31st, did you understand
3 Mr. Fisher to be a Treasury employee who would
4 have access to information about Treasury's
5 cancellation of the 30-year bond?
6       MR. THEODOROU: Objection.
7    A. Just please repeat that.
8    Q. Sure.
9       When you received Mr. Davis's
10 voicemail on October 31st, did you have an
11 understanding as to whether Mr. Fisher was a
12 Treasury employee who would have access to
13 information regarding the cancellation of the
14 30-year bond?
15       MR. THEODOROU: Objection.
16    A. Yes.
17    Q. You stated that you came away from the
18 voicemail with two understandings, and one was
19 that there would be -- one was that Mr. Davis
20 had learned from Peter Fisher that they were
21 going to cancel the 30-year bond.
22       What was the second understanding?
23    A. As I just stated?
24    Q. Yes.
25    A. There was going to be a press release

**Page 187**

1    Q. Do you know if he had been confirmed
2 between the August refunding and the
3 October refunding?
4    A. Yes.
5    Q. How did you learn that Mr. Fisher had
6 been confirmed?
7    A. I don't recall.
8    Q. Do you know what Mr. Fisher's job was
9 before he came to Treasury?
10    A. I believe he worked for the New York
11 Fed.
12    Q. Do you know what his position was at
13 the New York Fed?
14    A. I don't.
15    Q. How do you know Mr. Fisher worked for
16 the New York Fed?
17    A. I believe he did. I don't know that
18 for certain.
19       I think he was involved in the
20 meetings surrounding the bail out of long-term
21 capital when hedge fund sort of melted down. I
22 think the New York Fed did get involved. I
23 think McDonough was out of town. I think
24 Mr. Fisher was involved in coordinating the
25 meetings, but I could be wrong.

**Page 189**

1 embargo until ten o'clock.
2    Q. What did you understand would be
3 embargoed?
4    A. A press release.
5    Q. Anything else?
6    A. No.
7    Q. Why did you believe a press release
8 would be embargoed?
9    A. I believe that's what he indicated.
10 That's what I took away from what I heard.
11    Q. What did you understand the press
12 release would contain?
13    A. By inference, that it would contain
14 information that Peter Fisher had just given
15 him.
16    Q. Which was what?
17    A. That they would be cancelling the long
18 bond.
19    Q. What, if any, communications had you
20 had with Mr. Davis prior to October 31, 2001
21 regarding his providing you with -- regarding
22 embargoes?
23       Had you had any conversation with
24 Mr. Davis before October 31, 2001 about
25 embargoes?

Alderson Reporting Company
1-800-FOR-DEPO

## Page 190

1          MR. THEODOROU: Objection.
2     A.  Not that I can recall.
3     Q.  Before you listened to this voicemail,
4  had you seen any information on any wire
5  services about Treasury's cancellation of the
6  long bond?
7     A.  That morning?
8     Q.  Yes.
9     A.  No.
10     Q.  Did you -- had you received any
11  information from any other source, setting aside
12  this conversation you had with the broker, had
13  you received any information from any other
14  source about Treasury's cancellation of the long
15  bond?
16          MR. SHOPE:  This is as of the time
17  he received the voicemail?
18          MS. WILLIAMS:  The voicemail.
19          MR. SHOPE:  The voicemail message?
20          MS. WILLIAMS:  Yes.
21  BY MS. WILLIAMS:
22     Q.  I understand you had a call with a
23  broker, and then you received this voicemail.
24  Had you heard any other information from any
25  other sources --

## Page 191

1          MR. SHOPE:  As of the time --
2     Q.  -- as of the time you received the
3  voicemail?
4     A.  On that morning?
5     Q.  On that morning.
6     A.  No.
7     Q.  What did you do after you received
8  Mr. Davis's voicemail?
9     A.  I remember observing the market.  And
10  the market had been -- continued to move up that
11  morning.
12          And I got up and went over to
13  Mr. Kennedy's desk to relay to him and my
14  colleagues what I just heard from Mr. Davis and
15  to share with them what I would be transacting.
16  I was going to be buying some long bonds.
17     Q.  Was Mr. Kennedy at his desk when you
18  went over to talk to him?
19     A.  Yes.
20     Q.  You said you went to share with
21  Mr. Kennedy and colleagues.  What other
22  colleagues are you referring to?
23     A.  I'm referring to colleagues that were
24  on the trading desk at the time, so it would be
25  Rick Smith, David Kennedy, Mr. Kurinsky, and

## Page 192

1  Mr. Cadogan.
2     Q.  What happened next?
3     A.  In terms of?
4     Q.  You said you went over to
5  Mr. Kennedy's station to convey this
6  information.  What did you do when you got to
7  Mr. Kennedy's station?
8     A.  After relaying the information to him?
9     Q.  Did you relay information to him?
10  When you said you went over to his station to
11  relay the information, did you actually relay
12  the information?
13     A.  Yes, I did.
14     Q.  What did you say?
15     A.  I told him that I had gotten this
16  message from Mr. Davis, that the Treasury would
17  be cancelling the long bond, and I believed that
18  they would be announcing it at 10.
19          And I volunteered that I would --
20          I think then he asked me a question,
21  you know, what are we going to do about this?
22          I informed him that I was buying 25
23  million 30-year bonds.  And he volunteered that
24  he would be buying a similar amount.
25          Mr. Kurinsky volunteered that he would

## Page 193

1  be buying 10 million, I believe, and Mr. Smith,
2  that he'd be buying 5 million.
3     Q.  Was your statement regarding
4  Mr. Davis's voicemail directed to Mr. Kennedy,
5  Mr. Kurinsky, and Mr. Smith?
6     A.  Yes.
7     Q.  And was it also directed at
8  Mr. Cadogan?
9     A.  Yes.  It was for the group.
10  Mr. Kennedy sits right in the middle basically
11  of those, so strategically speaking, the best
12  place to stand if you were going to pass on some
13  information to the group without raising my
14  voice.
15     Q.  Was Mr. Vaream at the desk when you
16  made this statement to the group regarding
17  Mr. Davis's voicemail?
18     A.  I believe not.
19     Q.  Besides Mr. Kennedy who you said asked
20  what are we going to do about this, did anyone
21  else make any comments?
22     A.  At what point?
23     Q.  After you conveyed the information you
24  had received from Mr. Davis's voicemail.
25     A.  Mr. Kurinsky said he was going to buy

Steven E. Northern                                          January 30, 2007
                              Boston, MA

Page 194

1   10 million, and Mr. Smith said he would be
2   buying 5 million bonds.
3       Q.  What, if anything, did you tell the
4   group during this conversation about Peter
5   Fisher?
6       A.  I believe that Peter Fisher had -- I
7   actually don't recall specifically. I believe
8   that Davis had said that -- I actually don't
9   recall.
10      Q.  What, if anything, did you say at this
11  time about embargo?
12      A.  I don't recall bringing up embargo.
13      Q.  What, if anything, did you mention
14  about a press release?
15      A.  At that point in time?
16      Q.  Yes.
17      A.  When I was speaking with Mr. Kennedy?
18      Q.  And the group, yes.
19      A.  I didn't mention -- I think I
20  mentioned there would be -- they were going to
21  be announcing it at 10. I don't think I
22  mentioned a press release.
23      Q.  At the time that you told Mr. Kennedy
24  and the group this information that you received
25  from Mr. Davis, had you heard from Mr. Cadogan

Page 195

1   the Treasury was going to be announcing its
2   refunding needs at 10?
3       A.  You have to rephrase that. Can you
4   just repeat that?
5       Q.  Sure.
6           You previously testified that you
7   learned about the Treasury refunding
8   announcement, that that was going to be made on
9   October 31st from Mr. Cadogan; is that right?
10      A.  Yes.
11      Q.  And I wanted to know at the time you
12  had your conversation with Mr. Kennedy and the
13  other colleagues to convey the information you
14  got from Mr. Davis's voicemail, had you already
15  been told by Mr. Cadogan the Treasury was having
16  a refunding announcement?
17      A.  I don't think so. I believe not.
18      Q.  Besides stating that they were going
19  to buy certain amounts of bonds, what, if
20  anything, did Mr. Kennedy, Kurinsky, Smith, or
21  Cadogan say when you told them about Mr. Davis's
22  voicemail?
23      A.  I believe we discussed the fact that
24  we'd heard rumors from the Board of Trade that
25  morning to the same -- exactly the same effect.

Page 196

1       I think I might have shared with them
2   that I'd heard that, and I think they confirmed
3   that they also had heard that.
4       Q.  When you say "they," is there any
5   particular person who you recall confirming that
6   they'd heard about rumors?
7       A.  I don't recall.
8       Q.  What happened after you all stated how
9   much of the 30-year bond you were going to
10  purchase?
11      A.  I believe John Cadogan summed up, you
12  know, what the total amount would be amongst us,
13  and we authorized him to go ahead and make the
14  purchase.
15      Q.  At what I point did Mr. Cadogan tell
16  you there was going to be a Treasury refunding
17  announcement at 10?
18      A.  I'm not certain. I believe it was
19  subsequent to him starting to work on placing
20  the order, but I'm not certain.
21      Q.  I might have asked this before, but I
22  forgot. When Mr. Cadogan made the statement
23  about there being a Treasury refunding
24  announcement at 10 a.m., I know you said it was
25  directed to you, was it directed to anyone else

Page 197

1   on the high grade trading desk?
2       A.  Not to my knowledge. I was looking at
3   him the way that we are looking at each other
4   right now, so we were -- I know we were
5   communicating, as I was communicating to
6   Mr. Kennedy in a manner that everyone could
7   share in that information if they were
8   interested in listening, I believe he was doing
9   exactly the same.
10      Q.  Do you recall where you were standing
11  when Mr. Cadogan informed you about the
12  refunding announcement?
13      A.  Yes.
14      Q.  Where were you?
15      A.  I was standing.
16      Q.  Do you want to look at, I guess it's
17  Exhibit 4?
18      A.  I was standing behind or next to
19  Mr. Kennedy in 243 on your diagram Exhibit 4.
20      Q.  So Mr. Kennedy was either in front of
21  you or next to you when Mr. Cadogan made that
22  statement?
23      A.  Yes.
24      Q.  Do you know if Mr. Kennedy was sitting
25  when Mr. Cadogan made the statement?

50 (Pages 194 to 197)

Steven E. Northern                                                    January 30, 2007

Boston, MA

Page 198

1      A.   Yes, he was sitting.
2      Q.   After Mr. Cadogan made the statement,
3   what, if any, discussion did you have about the
4   fact the Treasury was announcing its refunding
5   needs at 10 a.m.?
6      A.   I think that's when I first
7   understood, and I reflected this to Mr. Cadogan,
8   that, oh, that's what Davis was talking about,
9   press release embargo until 10.  He must have
10  been referring to the quarterly refunding.
11     Q.   Is there any other discussion?
12     A.   No.  For me it was, oh.  It was one of
13  those V-8 moments, oh, that's what he was
14  talking about.
15     Q.   Do you recall if any other person on
16  the high grade trading desk said anything in
17  response to Mr. Cadogan's statement about the
18  refunding being made at 10?
19     A.   No.
20     Q.   Just to clarify, when did you make up
21  your mind that you were going to place a trade
22  in a 30-year bond on the morning of
23  October 31st?
24     MR. SHOPE:   Objection.
25     A.   This is -- I was restructuring the

Page 199

1   portfolios.  I hadn't made up my mind earlier.
2      My view for a couple of weeks was that
3   the long bond was attractive, and this is work I
4   needed to get done before Thursday and Friday
5   that week, for some reasons we didn't get into.
6   But that was my -- that was on my agenda of
7   things to do that morning.
8      So specifically when I arrived at that
9   decision, is that your question?
10     Q.   Yes.
11     A.   This was -- I was in the middle of
12  restructuring the portfolios a couple of weeks.
13     I had already done some of these
14  transactions on prior days, and I was continuing
15  that work that morning.  It was my work for that
16  morning.
17     Q.   What factored into your decision?
18     A.   That the long bond was cheap and
19  attractive.
20     Q.   Anything else?
21     A.   No.  I'm asking you a question.  I'm
22  sorry.
23     Q.   What factored into your decision to
24  trade in the 30-year bond on the morning of
25  October 31st?

Page 200

1      A.   From a portfolio point of view, I was
2   shifting from intermediate securities towards
3   the 30-year maturities.
4      The fact that the market was running
5   that morning kind of precipitated the issue.
6      Q.   How so?
7      A.   Well, the market was running up at
8   price.  I had already done some selling.  I had
9   some cash in some of the -- I believe in some of
10  the Open Income Securities Fund.  And if I
11  waited, I was going to be buying those bonds as
12  at a higher price, so it would not be good for
13  the portfolios or the shareholders.
14     Q.   Was this order that you put in for 25
15  million long bonds, was that the first trade in
16  the 30-year bond you did on the morning of
17  October 31st?
18     A.   Yes.  That was my first buy
19  transaction.
20     Q.   You said you'd noticed the market was
21  moving.  What did you use to check the market
22  that morning?
23     A.   The monitors that I had in front of
24  me.
25     Q.   Which ones?

Page 201

1      A.   I don't remember specifically.  It
2   would be either Reuters or Bloomberg or a
3   similar type of price kind of service, you know.
4      Q.   You testified that you had noticed the
5   market prior to the call with the broker who
6   conveyed the information about the rumor on the
7   Chicago Board of Trade.
8      Prior to trading in the long bond, did
9   you ever check the market again?
10     A.   Yes.  Not that I can recall
11  specifically sitting here, obviously, but, yeah,
12  if I'm at the trading desk, I'm working on the
13  portfolios, something seems to be going on in
14  the market, I'm probably watching pretty
15  frequently.
16     Q.   Do you recall checking the market
17  after you received the voicemail from Mr. Davis
18  and prior to placing your order for 25 million?
19     A.   I don't recall specifically, but I'm
20  sure I did.  In all likelihood, as I was
21  listening to the message, I was looking at the
22  market.
23     Q.   What happened after Mr. Cadogan, you
24  said, combined the orders and executed the
25  trade?

51  (Pages 198 to 201)

Steven E. Northern                                                January 30, 2007

Boston, MA

---

Page 202

1        MR. SHOPE: The question is what
2   happened next?
3   BY MS. WILLIAMS:
4        Q.   What happened? What did you do next?
5        A.   At sorry, at what point?
6        Q.   You said that Mr. Cadogan combined the
7   orders and executed the trade. And then I guess
8   you said that some time around there he
9   mentioned the Treasury refunding.
10       MR. SHOPE: Objection. That's not
11  his testimony. I think he said that he began
12  entering or placing the trade.
13       MS. WILLIAMS: Right. Which is why
14  I meant some time around the time of -- I
15  believe his testimony was he couldn't recall
16  exactly when the statement was made.
17       Q.   And I want to know what else do you
18  recall happening that morning? What happened
19  next?
20       A.   When John was working on the trade, we
21  had that exchange. After that, I headed back
22  towards my desk.
23       And as I was doing that, I think I
24  made one or two comments to Mr. Kennedy.
25       Q.   What comments did you make to

---

Page 203

1   Mr. Kennedy?
2        A.   I believe one was I wonder about the
3   ethics of all this.
4        And the other, I made sort of a joke
5   to him in that it will probably turn out that
6   the purchasing manager's number at 10 is a
7   bigger deal than this.
8        Q.   When you made the comment I wonder
9   about the ethics of all this, was it directed to
10  anyone besides Mr. Kennedy?
11       A.   As I best remember, I think it was a
12  general comment I made. I just tossed it out to
13  see if anybody had any thoughts.
14       Q.   Where were you when you made this
15  comment?
16       A.   I was -- well, I had been adjacent to
17  Mr. Kennedy, and I was going back towards my
18  desk. I couldn't tell you how far towards my
19  desk I'd gotten, whether it was half a step or
20  three steps, I don't know the answer.
21       Q.   And what did you mean when you said I
22  wonder about the ethics of all this?
23       A.   It was a question of fairness. The
24  Treasury clearly put -- spilled this information
25  out. They spilled it out to the Chicago Board

---

Page 204

1   of Trade.
2        They had -- Fisher apparently told
3   Davis and, you know, and others, I don't know
4   how many, but I knew he told Davis, and there
5   was a scheduled press release at ten o'clock.
6        I just wondered was there an issue of
7   fairness. Is this a way to run a railroad
8   basically is what I was saying.
9        Q.   When you say the Treasury had spilled
10  the information to the Chicago Board of Trade,
11  what do you base that statement on?
12       A.   Well, clearly some people on the Board
13  of Trade had this information. The market was
14  trading up based on something.
15       The call I got from the broker and the
16  call I got from Mr. Davis corroborated what the
17  reason was.
18       Q.   Was your understanding that the fact
19  the Treasury was going to cancel the 30-year
20  bond had been made public?
21       A.   Can you just repeat that, please?
22       Q.   Yes.
23       Was it your understanding that the --
24  you had information from Mr. Davis the Treasury
25  was going to cancel the 30-year bond.

---

Page 205

1        Was it your understanding when you
2   received the voicemail that that information was
3   public?
4        A.   I had no doubt in my mind that it was
5   public. The information at that point had the
6   look, touch, and feel of public information.
7   The market had moved half a point, three
8   quarters of a point. It was digesting, by all
9   appearances, this information.
10       Q.   What was your understanding of who in
11  the public had received the information?
12       A.   To my knowledge at that point, people
13  on the Board of Trade, Mr. Davis, us at MFS.
14  That's the knowledge I had.
15       Q.   And I understand how you received the
16  information. What was your understanding as to
17  how other people had received the information?
18       A.   I don't know.
19       Q.   Do you recall any information, similar
20  type of information in the past that --
21       MS. WILLIAMS: Maybe we could take
22  a short break.
23       THE WITNESS: I'm fine. Just a
24  little bit of water will be fine.
25       MS. WILLIAMS: Okay.

---

52 (Pages 202 to 205)

Steven E. Northern                                                     January 30, 2007

Boston, MA

Page 206

1          MR. THEODOROU:  Do you want to take
2    a break?
3          MR. ROSSETTI:  Yes.
4          THE VIDEOGRAPHER:  Going off the
5    record, 3:33 p.m.
6          (Recess taken)
7          THE VIDEOGRAPHER:  On the record,
8    3:44 p.m.
9    BY MS. WILLIAMS:
10   Q.  Okay.  We're back on the record.
11         Mr. Nothern, you mentioned that you
12   had -- that you were -- you had a strategy of
13   shifting from short and intermediate securities
14   to longer term securities prior to October 31st,
15   and I wanted to know, why you were doing that?
16   A.  I thought the 30-year Treasury
17   represented value.
18   Q.  Why?
19   A.  A little bit technical, if you'll
20   allow.
21   Q.  Sure.
22   A.  2001 we were in recession.  What
23   happened with 9/11 is it basically created from
24   an economic point of view, it created a hole.
25   People just stopped doing things.  Planes were

Page 207

1    grounded.
2          So clearly the economy missed a beat,
3    and it was going to create a hole in the data,
4    which is to say that the statistics were going
5    to be abnormally weak employment and just
6    measures of economic activity.
7          We didn't know yet how weak because in
8    October we received the data from September, but
9    it's a half month.  And at the end of October we
10   were going to start the first day of November,
11   which was Friday of the week we're talking about
12   now, we were going to get the employment report
13   for October.
14         So we were going to start getting the
15   whole month -- the first whole month post 9/11.
16   In a sense we were going to stick a thermometer
17   in the bird and see, you know, kind of what the
18   pace of the economic activity was.
19         My view is that that might actually
20   precipitate the end of the recision because the
21   growth had been so weak around this period
22   because of this event, that growth after that
23   fact would actually start going up.  So it was
24   in a sense potentially we were in the middle --
25   we were at a turning point in the economy.

Page 208

1          What it also meant is that because
2    economic activity clearly has taken a hit,
3    already weak inflation pressures were going to
4    be weaker, and in point of fact that's what
5    happened in the next two or three years, the Fed
6    was very concerned about deflation because
7    inflation -- you know, the pace of economic
8    activity and demand was such that inflation
9    pressures were absent, and that's why the Fed in
10   this past cycle ended up lowering rates as far
11   as it did.
12         What it meant for me strategically in
13   the portfolios, that we were going to come to
14   the end of the cycle of the weakness in the
15   economy, and the market would start looking
16   forward to the next step, the next cycle, which
17   is a growth cycle.
18         In a growth cycle with weak inflation,
19   the best performance securities are probably
20   going to be the longer end of the -- the 30-year
21   treasuries is probably going to be the best
22   performer because of lowering inflation
23   expectations, the bond benefits from that, and
24   the -- if rates are going to bottom out, it's
25   going to be at the short end, and eventually

Page 209

1    short rates will start to drift higher as the
2    economy begins to accelerate.
3          That's sort of the general notion of
4    how, you know, interest rates, different
5    maturities can move differently depending on
6    where you are in the business cycle.
7          I felt we were at that point possibly
8    at a turning point in the business cycle that
9    would represent a turning point in the way we
10   structured the portfolios.
11         In a weakening environment, you want
12   to own a lot of intermediates because the feds
13   are lowering rates, short-term, short-maturity
14   rates are being dragged down along with that.
15         In a stable economy, growing economy,
16   those rates can go up, and those bonds wouldn't
17   perform as well as bonds in the longer end of
18   the market.  Long rates might go up, but they
19   probably wouldn't go up as much.
20         What it means, if you digest it down
21   to a portfolio strategy level, it means you want
22   to start favoring 30-year bonds over five-year
23   notes.
24   Q.  Did you develop this strategy before
25   9/11?

53  (Pages 206 to 209)

Steven E. Northern
Boston, MA
January 30, 2007

| Page 210 | Page 212 |
|---|---|
| 1   A. And to finish, if I can. | 1  long bond? |
| 2   Q. Oh, I'm sorry. | 2   A. The market in general? |
| 3   A. I also had a general view that the | 3   Q. Yes. |
| 4  bond was cheap, was an attractive place to | 4   A. Yes. The National Purchasing |
| 5  invest from a value point of view, | 5  Manager's Index, which was scheduled for |
| 6  representative value. | 6  Thursday morning. Best I recall, the Purchasing |
| 7     Part of it related to the government | 7  Manager's Index is a ten o'clock release. |
| 8  surpluses that were running at the time. | 8   Q. Anything else? |
| 9  Treasury was going to stop issuing. By 2004, | 9   A. No. Those were two good leading sort |
| 10  2005 all the short maturities were basically | 10  of sign posts kind of what -- they're very |
| 11  scheduled to run off, and they would just be | 11  current -- it's the first current view you get |
| 12  left with surpluses of cash and longer maturity | 12  of economic activity for the prior month. |
| 13  treasuries that hadn't matured yet, and they | 13     You actually get the purchasing |
| 14  would be spending a lot of that cash to buy back | 14  manager I think on the last day of the month, |
| 15  those securities would be the only ones left | 15  and the employment report's always the first |
| 16  outstanding. | 16  Friday of the following month, so it's real |
| 17     It's kind of a good fundamental for | 17  fresh. |
| 18  that end of the market. | 18   Q. Now, after you receive a call from the |
| 19     I'm sorry. It's a bit of a technical | 19  broker regarding the rumors on the Chicago Board |
| 20  discussion, but my conclusion was for many | 20  of Trade and before you receive Mr. Davis's |
| 21  different reasons that the 30-year bond | 21  voicemail, did you make any trades in the |
| 22  represented really good value. | 22  30-year bond? |
| 23   Q. And did you have that view prior to | 23   A. No. |
| 24  September 11, 2001? | 24   Q. Did you tell any of your colleagues |
| 25   A. I don't recall. | 25  about the rumor on the Chicago Board of Trade |

| Page 211 | Page 213 |
|---|---|
| 1     A lot of the story that I'm telling | 1  before you received Mr. Davis's voicemail? |
| 2  you right now really grew out of the events | 2   A. No. |
| 3  after September 11th, the way it sort of | 3   Q. Why not? |
| 4  impacted the economy, and potentially it | 4   A. It didn't rise to the level of |
| 5  entirely changed expectations of what growth was | 5  something I would get up and go talk to them. |
| 6  going to be, what inflation was going to be. It | 6     I likely assumed that they were |
| 7  had a big impact on the markets. | 7  getting exactly the same information I was. |
| 8   Q. Did you recall reading any documents | 8   Q. When you say "it didn't rise to the |
| 9  prior to October 31, 2001 that included the same | 9  level," what do you mean? |
| 10  strategy that you just discussed that advocated | 10   A. I mean that as I said. I think my |
| 11  for that strategy? | 11  assumption would be that they were getting |
| 12   A. As I sit here now, documents -- I | 12  exactly the same information from the brokers |
| 13  don't recall documents produced by brokerage | 13  that I was. Like myself, if they're on the |
| 14  houses or other analysts, but I just don't | 14  trading desk, they're getting these phone calls, |
| 15  recall. | 15  and they're probably getting the same |
| 16   Q. Do you recall any documents produced | 16  information. The broker hangs up with me, he |
| 17  by brokerage houses that had a contrary view to | 17  might call Mr. Kurinsky. |
| 18  the strategy you just discussed? | 18   Q. Now, you said that -- you were talking |
| 19   A. I really don't. | 19  before the break about a comment you made, "I |
| 20   Q. You mentioned that there was going to | 20  wonder what the ethics are on all this." And |
| 21  be an employment report on November 1st; is that | 21  you recall making that comment? |
| 22  correct? | 22   A. Yes. |
| 23   A. Yes. | 23   Q. And you were saying that it was no |
| 24   Q. Were there any other announcements | 24  doubt in your mind that the information was |
| 25  that you were looking to that might affect the | 25  public, and one of the reasons is because it had |

54 (Pages 210 to 213)

Steven E. Northern                                                    January 30, 2007

Boston, MA

| Page 214 | Page 216 |
|---|---|
| 1  spilled into the Chicago Board of Trade. | 1  have the question reread, please? |
| 2      Now, my understanding is that the | 2      A.  You have to repeat that. |
| 3  broker told you that the Chicago Board of Trade | 3      Q.  Okay. |
| 4  information was a rumor; is that right? | 4      A.  I'm not sure what you're asking. |
| 5      A.  Yes. | 5      Q.  Let me rephrase. |
| 6      Q.  So when you say "it spilled into the | 6      You mentioned that this -- you believe |
| 7  Chicago Board of Trade," you mean there was a | 7  this information was public but that there was |
| 8  rumor on the Chicago Board of Trade? | 8  a -- a press release was embargoed until 10 a.m. |
| 9      A.  I mean people on the Board of Trade | 9      Do you know of any other announcements |
| 10  seemed to have this information.  Not to me.  I | 10  the Treasury made prior to October 31st where |
| 11  assumed they'd gotten it. | 11  the same kind of thing occurred? |
| 12      Q.  Did Mr. Davis characterize information | 12      MR. THEODOROU:  Objection. |
| 13  in his voicemail as a rumor? | 13      A.  I'm sorry.  I don't understand your |
| 14      A.  No, not to my recollection. | 14  question. |
| 15      Q.  If the information -- I understand you | 15      Q.  Okay.  You testified that Mr. Davis |
| 16  understood that the information was public. | 16  said that there was a press release that was |
| 17      Did you have any question in your mind | 17  embargoed until 10 a.m., and your understanding |
| 18  as to why the news wires had not reported this | 18  was that the press release would contain |
| 19  information? | 19  information the Treasury was cancelling the |
| 20      MR. SHOPE:  Objection. | 20  30-year bond; is that correct? |
| 21      A.  I don't know that the news wires | 21      MR. THEODOROU:  Objection. |
| 22  hadn't. | 22      A.  That there was a press release embargo |
| 23      Q.  Had you seen the information reported | 23  until 10 that implicitly would contain that |
| 24  on the news wires as of the time you placed the | 24  information, yes. |
| 25  trade for 25 million long bonds on October 31st? | 25      Q.  Okay.  And I'm wondering if prior to |

| Page 215 | Page 217 |
|---|---|
| 1      A.  No. | 1  October 31st, if you were aware of any other |
| 2      Q.  You mentioned that Mr. Davis said that | 2  announcements the Treasury made that had been |
| 3  there was a press release that was embargoed | 3  made public but had a press release that was |
| 4  until 10 a.m. | 4  embargoed until a certain time? |
| 5      Did you believe that the news wires | 5      A.  No. |
| 6  were allowed to report the cancellation of the | 6      Q.  What, if anything, did anyone say |
| 7  30-year bond prior to 10 a.m. on October 31st? | 7  after you made the statement I wonder what the |
| 8      MR. SHOPE:  Objection. | 8  ethics are? |
| 9      MR. THEODOROU:  Objection. | 9      MR. SHOPE:  I'm sorry, can I just |
| 10      A.  I don't know what they were allowed to | 10  have that question reread? |
| 11  do.  Point of fact, I think they did. | 11      (Record read) |
| 12      Q.  You believe who did what? | 12      A.  I don't recall anyone making any |
| 13      A.  Point of fact, I think the wire | 13  comment. |
| 14  services did report it before ten o'clock. | 14      Q.  Do you recall anyone asking any |
| 15      Q.  When did you first learn that the wire | 15  questions? |
| 16  services had reported the information? | 16      A.  Immediately after that? |
| 17      A.  I don't recall. | 17      Q.  Yes. |
| 18      Q.  Did you learn before you placed the | 18      A.  I don't remember anybody saying |
| 19  trade for 25 million long bonds? | 19  anything, so no. |
| 20      A.  No. | 20      Q.  Just one more question. |
| 21      Q.  Are you aware of any other | 21      You mentioned that you did some -- you |
| 22  announcements the Treasury made prior to | 22  made some sales in intermediate securities that |
| 23  October 31st that were made public prior to a | 23  morning.  And I was wondering if you were aware |
| 24  press release embargo time? | 24  of any documents that reflect those sales? |
| 25      MR. SHOPE:  Objection.  Can you | 25      A.  Yes. |

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern                                                    January 30, 2007

                                    Boston, MA

| Page 218 | Page 220 |
|---|---|

**Page 218**

1    Q.  What documents reflect those sales?
2    A.  I believe we have in this production a
3  log of transactions that we did on the high
4  grade trading desk that morning.
5    Q.  And how many sales did you do prior to
6  this purchase of 25 million long bonds?  How
7  many sales did you do of intermediate securities
8  the morning of October 31?
9          MR. SHOPE:  Objection.
10         MR. THEODOROU:  Objection.
11   A.  Before --
12   Q.  Before you purchased them.
13   A.  My recollection is I'd done three in
14  the three different portfolios that we
15  mentioned, the best I can recall.
16   Q.  And do you know if all of those
17  transactions are reflected on the log that you
18  referenced?
19   A.  I believe they are.
20         MS. WILLIAMS:  I think this is a
21  good time to break.
22         MR. THEODOROU:  Okay.
23         THE VIDEOGRAPHER:  One moment,
24  please.
25         This marks the end of videotape number

**Page 220**

1        C E R T I F I C A T E
2
3    I, STEVEN E. NOTHERN, do hereby certify
4  that I have read the foregoing transcript of my
5  testimony, and further certify that it is a true
6  and accurate record of my testimony
7
8
9          _____
10         STEVEN E. NOTHERN
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 219**

1  three in the deposition of Steven Nothern.
2          Going off the record, four o'clock
3  p.m.
4          (Whereupon the deposition was
5  suspended at 4:00 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 221**

1  COMMONWEALTH OF MASSACHUSETTS)
2  SUFFOLK, SS.            )
3
4    I, Daria L. Romano, RPR, CRR and Notary
5  Public in and for the Commonwealth of
6  Massachusetts, do hereby certify that there came
7  before me on the 30th day of January, 2007, at
8  9:19 a.m., the person hereinbefore named was
9  duly sworn by me and that such deposition is a
10  true record of the testimony given by the
11  witness.
12    I further certify that I am neither related
13  to nor employed by any of the parties or counsel
14  to this action, nor am I financially interested
15  in the outcome of this action.
16    In witness whereof, I have hereunto set my
17  hand and seal this 7th day of February, 2007.
18
19
20         _____
21         Notary Public
22         My Commission Expires
23         March 15, 2013
24
25

56 (Pages 218 to 221)

Page 222

```
 1                        Volume:   II

 2                        Pages:   222-326

 3                        Exhibits:   11-23

 4

 5           UNITED STATES DISTRICT COURT

 6           DISTRICT OF MASSACHUSETTS

 7                (Boston Division)

 8   Civil Action No. 05-CV-10983 (NMG)

 9   - - - - - - - - - - - - - - - - - - - - - - - -

10   UNITED STATES SECURITIES AND EXCHANGE

11   COMMISSION,

12                   Plaintiff,

13        v.

14   STEVEN E. NOTHERN,

15                   Defendant.

16   - - - - - - - - - - - - - - - - - - - - - - - -

17        Continued Deposition of Steven E. Nothern

18                 January 31, 2007

19             9:13 a.m. - 11:53 a.m.

20        Securities and Exchange Commission

21                  33 Arch Street

22               Boston, Massachusetts

23

24        Reporter:   Daria L. Romano, RPR/CRR

25
```

Steven E. Northern                                                    January 31, 2007
                              Boston, MA

Page 223

1  A P P E A R A N C E S:
2  UNITED STATES SECURITIES AND
3  EXCHANGE COMMISSION
4  (by Erica Y. Williams,
5  Assistant Chief Litigation Counsel;
6  John J. Rossetti, Jr., Senior Counsel,
7  Division of Enforcement)
8  100 F Street, N.E.
9  Washington, D.C. 20549-4010
10 (202) 551-4450
11 williamse@sec.gov
12 rossettij@sec.gov
13 for the Plaintiff.
14
15 FOLEY HOAG, LLP
16 (by Nicholas Theodorou, Esq. and
17 John Shope, Esq.)
18 155 Seaport Boulevard
19 Boston, Massachusetts 02210
20 (617) 832-3061
21 jtheodorou@foleyhoag.com
22 jshope@foleyhoag.com
23 for the Defendant.
24
25 ALSO PRESENT:  Ian McWilliams, Videographer

Page 225

1               E X H I B I T S
2  No.                              Page
3  22 Davis Capital Investment Ideas invoice    320
4  23 Treasury News From The Office Of
5     Public Affairs              322
6
7
8  *Original exhibits returned to Ms. Williams
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 224

1               INDEX
2  Deposition of:         Page
3  STEVEN E. NOTHERN
4  By Ms. Williams         226
5
6
7           E X H I B I T S
8  No.                        Page
9  11 Document                      282
10 12 Minutes of the meeting of the
11    Treasury Borrowing Advisory Committee
12    of the Bond Market Association,
13    January 30, 2001            292
14 13 Press release from the Office of Public
15    Affairs, Treasury News         294
16 14 Telephone records           294
17 15 E mail                   297
18 16 Treasury News, Treasury Department To
19    Hold Quarterly Refunding News
20    Conference                299
21 17 Fax cover sheet dated October 30, 2001    299
22 18 Document                   300
23 19 Document                   302
24 20 Agenda                    311
25 21 E mail                   315

Page 226

1              PROCEEDINGS
2
3       THE VIDEOGRAPHER:  Here begins
4  videotape number four in the deposition of
5  Steven Nothern in the matter of the United
6  States Securities and Exchange Commission versus
7  Steven Nothern.
8       Today's date is January 31st, year
9  2007.
10      All parties present at the January 30,
11 2007 proceedings are here.
12      Please begin.
13
14 STEVEN E. NOTHERN, PREVIOUSLY DULY SWORN
15
16    CONTINUED DIRECT EXAMINATION
17 BY MS. WILLIAMS:
18   Q.  Good morning, Mr. Nothern.
19      Yesterday when we left off we were
20 discussing the strategy that you were using to
21 shift away from intermediate and short-term
22 bonds towards longer term bonds.
23      And I wanted to know if you had
24 discussed that strategy with any of your
25 colleagues prior to October 31, 2001?

Steven E. Northern                                                    January 31, 2007
                              Boston, MA

| Page 227 | Page 229 |
|---|---|

**Page 227**

1    A.  Yes.
2    Q.  Who?
3    A.  The general -- my investment
4  colleagues, the general investment group.
5    Q.  Were any of those colleagues people
6  who sat on the high grade trading desk with you?
7    A.  Yes.
8    Q.  Could you tell me their names?
9    A.  I can't specifically tell you who I
10  met when we reviewed and discussed those views,
11  but the members of the High Grade Group were
12  myself, Rick Smith, David Kennedy, Jeffrey
13  Kurinsky, Jim Calmus and Peter Varearn.
14    Q.  When you say you can't say who you met
15  with when you discussed those views, was there a
16  meeting where you presented this strategy?
17    A.  Yes.
18    Q.  When was that?
19    A.  I don't recall.  We had periodic
20  meetings where we discussed our investment views
21  and documented on -- we had a form outlining our
22  individual views.
23      So we brought those forms to the
24  meeting, and someone was tasked to consolidate a
25  summary so the departments could see a

**Page 228**

1  summarized version of the collective views of
2  our group.
3    Q.  Was this summary written?
4    A.  Yes.
5    Q.  Did you receive a copy of the summary?
6    A.  We all received a copy.
7      This was a periodic meeting.  We
8  periodically put out a summary of the views.  It
9  was typed, Excel, one page.  And we circulated
10  it to other departments who might have an
11  interest.
12    Q.  Do you still have a copy of this
13  summary that includes the strategy we talked
14  about?
15    A.  We do in our documents.  I mean, I do.
16    Q.  You do?
17    A.  Yes.
18    Q.  And did you produce it in this
19  litigation?
20      MR. SHOPE:  Ms. Williams, I would
21  represent that it was produced, and I actually
22  reviewed the documents in question not too long
23  ago.
24      MS. WILLIAMS:  Okay.  I'm just
25  trying to figure out which document it is.

**Page 229**

1      MR. SHOPE:  I was hoping that I had
2  it with me here today, and I may still have it
3  in my briefcase, but it does exist.
4  BY MS. WILLIAMS:
5    Q.  Okay.  Is there a title of the
6  document?
7    A.  I can't recall the title.  It was the
8  High Grade Group Investment Outlook, something
9  to that effect.
10    Q.  You said you had periodic meetings.
11  How often were these meetings?
12    A.  I don't recall.  They were possibly
13  weekly, possibly monthly.
14      MR. SHOPE:  Ms. Williams?
15      MS. WILLIAMS:  Yes.
16      MR. SHOPE:  I don't mean to
17  interrupt matters, but I can refer you to the
18  Fixed Income Outlook Committee Report.  There's
19  actually a collection of them.  And the set that
20  I have begins at Bates NOTHERN0110 and continues
21  to 0395.
22      MS. WILLIAMS:  Great.
23      MR. SHOPE:  And there are
24  discussions at Bates 114 and 115 of the matter
25  about which you are asking dated October 10 and

**Page 230**

1  October 24, 2001.
2      MS. WILLIAMS:  Thank you.
3  BY MS. WILLIAMS:
4    Q.  Was this Fixed Income Outlook document
5  distributed to all of the members of the high
6  grade trading desk?
7    A.  To the best of my knowledge, yes.
8      The process we each came to the
9  meeting with a completed form, which was the
10  same form that we used for the summary, where we
11  filled in all the appropriate boxes surveying
12  our views on maybe 20, 30 different data points,
13  if you will, or issues just to get the portfolio
14  managers to commit to what their view was.
15      I believe it was based on a
16  three-month horizon, where do you think, for
17  example, you should favor short-term maturities,
18  intermediate maturities, long-term maturities,
19  corporates, do you favor mortgages over agencies
20  over treasuries, to have them express those
21  types of views.
22      So people came in individually
23  prepared.  We would meet, discuss the individual
24  views and in a sense debate.  And someone would
25  tasked to summarizing sort of collectively what

                    3 (Pages 227 to 230)

Steven E. Northern                                          January 31, 2007
                        Boston, MA

| Page 231 | Page 233 |
|---|---|

**Page 231**

1    our view was.
2         We would typically defer to the
3    person, for example, that covered corporates, we
4    would probably weight their opinions a little
5    more heavily than my opinion on corporates, for
6    example.
7         So it would get summarized and
8    distributed. I'm sure we individually got
9    copies, but it was distributed more widely
10   because really the intention was to have us have
11   a forum for discussing it and, B, to distribute
12   it other departments kind of one consolidated,
13   you know, consistent view from our group of what
14   our thoughts were.
15   Q.   And just to clarify, did you prepare
16   part of the summary for the government
17   securities?
18   A.   The process was we each went in
19   individually. So I went in with mine, which
20   would say Steve Nothern, and at some point there
21   was produced another, which would be called the
22   summary, and that would be the summary of -- I
23   mean, that was one forum for this type of
24   discussion.
25        The other forum for discussing my

**Page 233**

1    A.   Which strategy?
2    Q.   To shift away from intermediate and
3    short-term bonds towards longer term bonds?
4    A.   I don't know.
5    Q.   Now, you mentioned that around the
6    August refunding you had heard rumors about
7    possible cancellation of the 30-year bond, and I
8    believe -- and I'm wondering how, if at all, the
9    possible cancellation of the bond at some point
10   factored into your strategy?
11        MR. SHOPE: Objection.
12   A.   It was not just the August period.
13   We'd been talking about this in the market for
14   well over a year, probably two years.
15   Q.   Okay.
16   A.   The cancellation of the long bond was
17   an outcome of a much broader circumstance.
18        The government at that point was
19   running substantial surpluses. We were actually
20   running surpluses, 200 billion a year, I
21   believe, so at that time it was very substantial
22   and projected to grow. So that you can see --
23   it's almost like demographics. You can see, you
24   know, years ahead of time what the trends are.
25        So we'd been focusing on this issue of

| Page 232 | Page 234 |
|---|---|

**Page 232**

1    views was, as we discussed, we had a
2    departmental meeting at nine in the morning
3    pretty much as regularly as we could. There
4    were exceptions. That would be a forum for me
5    to discuss that type of a view, and undoubtedly
6    I did.
7    Q.   Now, you mentioned that the views that
8    were discussed, and some of them were included
9    in the Fixed Income Outlook document, were
10   three-month, forward-looking sort of views. Was
11   your strategy a three-month, forward-looking
12   strategy?
13   A.   I would have to review that document
14   to ascertain that.
15        My general thinking as a portfolio
16   manager, I'm looking out -- my investment
17   horizon is typically nine months. But as a
18   group, for practical purposes, we need to agree
19   on an investment horizon, and whether it's three
20   months, six months or nine months is somewhat
21   immaterial. You just agree. And I think it was
22   three months for that document, but I don't
23   recall specifically.
24   Q.   Do you know if any other portfolio
25   managers adopted the same strategy?

**Page 234**

1    basically the publicly-available and
2    publicly-traded debt. The US Treasury was going
3    to disappear from the marketplace. And the
4    shorter maturity debt would disappear sooner
5    because it rolls off sooner.
6         So that by 2004, 2005, basically you
7    wouldn't have a publicly-traded market in
8    two-years, three-years, five-year Treasury
9    securities anymore. There just wouldn't be a
10   need to borrow, and there would continue to be
11   surpluses, at which point you'd have to spend
12   that money to go buy the outstanding long bonds.
13        So the question is does it make sense
14   to be issuing long bonds if you know or if you
15   project by 2006, 2007, 2008 you're going to be
16   somewhat inefficiently forced to go out in the
17   marketplace and pay whatever premium they're
18   trading at to buy them back. The government on
19   its books would book that as a loss, as a cost.
20        And the question was -- it's pretty
21   clear, we'd been talking about it for a period
22   of time, the question is or was does it make
23   sense to continue issuing long maturity
24   treasuries.
25   Q.   And I'm --

4 (Pages 231 to 234)

Steven E. Northern

January 31, 2007

Boston, MA

Page 235

1    A.  This was on the table.
2    Q.  I understand.
3        And I'm wondering how, if at all, the
4    fact that you believe the long bond would be
5    eliminated at some point, how, if at all, that
6    factored into your strategy to shift away from
7    short term to long term?
8        MR. THEODOROU:  Objection.
9    A.  I did believe at the time that the
10   30-year treasury represented value.  Treasuries,
11   both tips and nominal bonds or regular bonds, it
12   was my opinion at the time represented value.
13       One of the reasons would certainly be
14   that -- that there were probably not going to be
15   enough 30-year treasury bonds to go around,
16   either because they stopped issuing, or they
17   slowed down issuing, or they were just put away
18   and not available in the marketplace.
19       30-year treasuries provide a useful
20   function for insurance company portfolios, for
21   mutual fund portfolios, for pension funds that
22   have long-term liabilities to match, and we were
23   facing the very real prospect of there just
24   plain not being enough to go around, at which
25   case they represent value.

Page 236

1        There are other reasons at the time,
2    but that was certainly one of them.
3    Q.  Prior to October 31, 2001, did you
4    have any idea as to when you thought Treasury
5    might cancel the 30-year bond?
6    A.  We'd been looking at that issue for a
7    long time.  I concluded that the prior
8    administration was probably inclined to suspend
9    issuance or stop issuing 30-year treasuries.
10       I had sort of concluded at the time
11   that they punted that issue sort of left it
12   to the next administration, which is the current
13   administration that took office in early 2001.
14       I think they didn't -- it was
15   appropriate.  They didn't want to tie the hands
16   of the next Treasury secretary, so they let the
17   next administration -- that was sort of my
18   judgment.  Otherwise, I think they were inclined
19   to do it in 2000.
20   Q.  So you thought it would happen with
21   the current administration, which you said took
22   office in early 2001.
23       Did you have any idea of how long
24   after the current administration took office as
25   to when it might be cancelled?

Page 237

1    A.  No.
2    Q.  Did you expect the bond cancellation
3    to be announced at a refunding?
4    A.  No.
5    Q.  Why not?
6    A.  I had no expectations of how they
7    would announce it or decide it.
8    Q.  But you had heard rumors surrounding
9    the August refunding, the possible cancellation
10   being announced at that refunding?
11   A.  I do recall that the August period
12   there had been a lot of talk about it.
13   Q.  I asked you yesterday some questions
14   about what factored into your decision to
15   purchase 30-year bonds on October 31st, and you
16   mentioned the strategy, and I wanted to follow
17   up on that.
18       Was there anything else besides your
19   strategy to shift from intermediate bonds to
20   long-term bonds that factored into your decision
21   to purchase 30-year bonds on October 31st?
22   A.  Yes.
23   Q.  What else?
24   A.  Generally I thought they represented
25   value.  We discussed some of the reasons.  There

Page 238

1    are many other reasons.
2        I think we touched upon yesterday
3    probably the most important reason is that we
4    were in a period of economic slow down.  The
5    shock -- you have to remember, this is just
6    after September 11.  We had taken a kick in the
7    teeth, in a sense.  And, you know, Americans
8    after a few days, we stiffened, but it was a
9    shock to the system.
10       And at this point in time, October 31,
11   there was a lot of uncertainty surrounding what
12   the impact -- and we were at war at that period
13   of time.  So there was a lot of uncertainty in
14   terms of moving forward what the economic
15   environment would be.
16       When business is faced with that and
17   households are faced with that kind of
18   uncertainty, they often become more
19   conservative.  So it tends to lead to more
20   conservative behavior, more modest economic
21   growth, which is the underpinnings for an
22   environment which is less inflationary.
23       We were already in a disinflationary
24   environment at that point in time.  My judgment
25   was that the disinflationary trends would, if

5 (Pages 235 to 238)

Steven E. Northern

January 31, 2007

Boston, MA

Page 239

1  anything, come downward, so inflation would
2  trend lower.
3       So inflation expectations for people
4  looking forward, oh, growth is going to be
5  slower, expectation for inflation would be
6  inflation is going to go down too. That was my
7  forecast nine months, you know, three, six,
8  quarters down the road through 2002, 2003.
9       Point of fact, inflation did go
10 perilously close to zero in that period of time,
11 and that was the environment we were in.
12      30-year treasuries, the longer the
13 maturity of the treasury, the more sensitive it
14 is to this inflation expectations idea, you
15 know, what people think inflation is going to be
16 because part of how we price what a 30-year bond
17 is worth is do we think the money we get paid 30
18 years from is now going to be worth anything.
19 So there's a view we have to have on how
20 inflationary is the world going to be over the
21 course of the next 30 years. So inflation
22 expectations play the largest role in the
23 longest maturity bond.
24      So my view is that inflation
25 expectations may go down sharply because of the

Page 240

1  environment that we found ourselves in. The
2  best way to express that view in the portfolios
3  is to own more 30-year treasury bonds.
4       Q. How, if at all, did the call you
5  received from the broker telling you about
6  rumors on the Chicago Board of Trade on
7  October 31st factor into your decision to buy 25
8  million long bonds that morning?
9            MR. SHOPE: Objection.
10      A. At that point the market was moving
11 higher. I believe the market had been drifting
12 higher for a week. At that particular morning
13 it was it drifting up, I believe, eight to 10
14 ticks. He called and shared with me what he
15 thought the reason was for that.
16      So to the extent that the market was
17 moving up and started to arrive at an
18 understanding why that did have -- that did play
19 a role in purchasing the 30-year treasury bonds.
20      Q. Did Mr. Davis's voicemail that you
21 received factor into your decision to purchase
22 25 million long bonds that morning?
23      A. Yes.
24      Q. Did anything else that we haven't
25 mentioned factor into your decision to purchase

Page 241

1  25 million long bonds?
2       A. Between the call from the broker that
3  this information was circulating on the Board of
4  Trade and the message that Peter Davis left when
5  I listened to his voicemail message, that the
6  market had actually started to run a little bit,
7  and it moved up another eight, 10, I can't
8  remember exactly what, but it actually was
9  starting to run, so it was moving up at a
10 slightly accelerated pace. So the fact that --
11 that fact alone also is a factor.
12      Q. Now, you said that the broker who
13 called you about the rumor on Chicago Board of
14 Trade used the word rumor.
15      What, if any, action did you take to
16 verify that there actually was a rumor on the
17 Chicago Board of Trade on October 31st?
18            MR. THEODOROU: Objection.
19            MR. SHOPE: Objection.
20      A. I don't understand your question.
21      Q. Did the broker who called you work at
22 the Chicago Board of Trade?
23      A. No, not that I can recall.
24      Q. Do you know how he obtained the
25 information that there was a rumor on the

Page 242

1  Chicago Board of Trade on October 31st?
2            MR. THEODOROU: Objection.
3       A. Is your question do I know?
4       Q. Yes.
5       A. No, I don't know.
6       Q. Did he tell you where he had gotten
7  this information?
8            MR. THEODOROU: Objection.
9       A. The source of the information was from
10 the Chicago Board of Trade.
11      Q. Do you know who his source was at the
12 Chicago Board of Trade that informed him that
13 there was a rumor?
14      A. No.
15      Q. Do you know anyone on the Chicago
16 Board of Trade? Did you on October 31st?
17      A. Did I know anybody that worked there?
18      Q. Yes.
19      A. No.
20      Q. And did you contact anyone at the
21 Chicago Board of Trade on the morning of
22 October 31st before you traded in the 30-year
23 bond?
24      A. No.
25      Q. When you came to work on October 31st,

6 (Pages 239 to 242)

Steven E. Northern                                                      January 31, 2007
                              Boston, MA

| Page 243 | Page 245 |
|---|---|

**Page 243**

1  did you have enough cash in the portfolios you
2  managed to buy 30-year bonds?
3      A.  I don't -- I don't know what my cash
4  was -- as we sit here today, I don't know what
5  my cash positions were.
6      Q.  Okay.
7      A.  I can tell you, if this is helpful,
8  that there were different types of funds.  There
9  were close-end funds and open-end funds and a
10  securities fund which was a Flagship Fund, that
11  fund I do believe had cash because it was
12  experiencing growth.
13          As to the level of cash and that of
14  the other funds, I don't have records to that
15  right now.
16      Q.  Yesterday you testified that you
17  believe the information that you received from
18  Mr. Davis was public at the time that you placed
19  your order to trade; is that correct?
20          MR. THEODOROU:  Objection.
21      A.  I believe I testified that the fact
22  that the Treasury was going to be cancelling the
23  bond, it had every appearance of being public
24  information to me at the time.
25      Q.  Okay.  And I just -- I don't want to

**Page 244**

1  misstate what your testimony was yesterday, so
2  I'm going to ask this one question again.
3          Why did you believe that the
4  information; i.e., the Treasury was going to
5  cancel the bond, why did you believe that was
6  public information at the time you traded?
7          MR. THEODOROU:  Objection.
8      A.  To me it seemed self-evident that this
9  explained what the market was reacting to.  It
10  was reacting to information.
11          I had heard that people on the Board
12  of Trade, you know, seemed to have this
13  information.  I heard Mr. Davis had it.  He's a
14  member of the public.  I'm a member of the
15  public.  This information had spilled out to the
16  public.  And the market was reacting to it.
17      Q.  Besides the fact that Mr. Davis had
18  the information and you had the information and
19  the market movement, was there anything else
20  that led you to believe that the information was
21  public?
22      A.  The broker had called me earlier and
23  said that people on the Board of Trade thought
24  this was going to happen.
25          It seemed at the time to corroborate

**Page 245**

1  why the market was moving.  When Mr. Davis left
2  his message, it corroborated both those things
3  once again.
4          It led me to believe that the people
5  on the Board of Trade indeed had the same
6  information that Mr. Davis did.
7      Q.  Now, the information that you had
8  received from the broker about the Chicago Board
9  of Trade had been characterized as a rumor,
10  though; is that correct?
11          MR. THEODOROU:  Objection.
12      A.  Yes.
13      Q.  After receiving Mr. Davis's voicemail,
14  did you give any thought to the possibility that
15  the information he provided in the voicemail
16  might not be true?
17          MR. THEODOROU:  Objection.
18      A.  Did I ever?
19      Q.  Let me rephrase.
20          Did you have any -- after you received
21  the voicemail, did you think that there was a
22  possibility that Treasury might not announce the
23  canceling of the long bond at 10 a.m.?
24          MR. THEODOROU:  Objection.
25      A.  That's certainly a possibility.

**Page 246**

1      Q.  Would you have been surprised that day
2  if Treasury had not announced the cancellation
3  of the long bond at 10?
4          MR. THEODOROU:  Objection.
5      A.  Just -- could you rephrase that, if
6  you don't mind?
7      Q.  Sure.
8          After you received Mr. Davis's
9  voicemail, you said there was a possibility that
10  Treasury might not have announced the
11  cancellation of the long bond.  And I was
12  wondering, if they hadn't, would you have been
13  surprised?
14          MR. THEODOROU:  Objection.
15      A.  No.
16      Q.  Why not?
17      A.  Nothing would surprise me.  It's
18  entirely possible that, you know, to the best of
19  his understanding, speaking of Mr. Davis, that
20  this is what Fisher had said.
21          Maybe he can get it wrong.  Maybe
22  Mr. Fisher could -- maybe that's what he wanted
23  to do but his supervisor could intervene.  In
24  fact, it's entirely plausible that would happen.
25          The markets are uncertain about the

Steven E. Northern                                                    January 31, 2007

Boston, MA

Page 247

1  growth in the economic environment, you know,
2  we're at war now, maybe we should wait a few
3  months even though we agree this is a good idea.
4  Some supervisor might tell him, okay, let's
5  wait. That would not surprise me.
6     Q.  Now, you mentioned that the market had
7  moved up some ticks on the morning of
8  October 31st before you traded in the 30-year
9  bond.
10       And I was wondering, would you have
11 expected the market to move more than it had
12 moved prior to the time you traded upon the
13 release of information that the bond was being
14 cancelled?
15    A.  Yes.
16    Q.  Why?
17    A.  I was worried that it might, and it
18 represented a risk to me that I'd have to buy
19 bonds at a higher price. It's a risk.
20    Q.  So just to clarify. I'm trying to
21 find out if you would have expected -- I think
22 you said the market had moved up eight to 10
23 ticks prior to the time you traded or prior to
24 the time you received the voicemail from
25 Mr. Davis, is that right, you had noticed the

Page 248

1  market move up eight to 10 ticks?
2     A.  No.
3     Q.  Okay. I'm sorry. What movement had
4  you seen in the market prior to the time you
5  received Mr. Davis's voicemail?
6        MR. THEODOROU: Objection.
7        MR. SHOPE: Objection.
8     A.  I believe the eight to 10 ticks you're
9  referring to is the market had moved up when I
10 received a phone call from a broker.
11    Q.  Okay. And then --
12    A.  And then there was subsequent --
13 continued to move, probably an accelerated rate
14 subsequent to that before listening to
15 Mr. Davis's phone mail message, continued to
16 move. So in total which is, I think, your
17 question.
18    Q.  Yes.
19    A.  I believe, as I sit here now, and I'll
20 have to review the price data to get a more
21 accurate guess, but I believe the market was up
22 half to three quarters of a point that morning.
23    Q.  Would you have expected the release of
24 news that Treasury was cancelling the long bond
25 to move the market more than half to three

Page 249

1  quarters of a point?
2        MR. THEODOROU: Objection.
3     A.  Yes.
4     Q.  Why?
5     A.  I thought bonds represented value. I
6  think that people are under invested in 30-year
7  bonds.
8        Peter Fisher at the Treasury thought
9  the bond market would go down on this news, so
10 as much as we know in hindsight what actually
11 happened, at the point in time it wasn't
12 apparent how the market would react.
13    Q.  When you first placed the order to
14 trade 25 million bonds, 25 million 30-year bonds
15 on October 31st, had you seen any news stories
16 that day regarding Treasury's cancellation of
17 the bond?
18       MR. THEODOROU: Objection. Asked
19 and answered.
20    A.  I'm sorry, could you just -- I just
21 missed the beginning of your question. I'm
22 sorry.
23    Q.  When you placed your order to buy 25
24 million long bonds on October 31st, had you seen
25 any news stories regarding Treasury's

Page 250

1  cancellation of the bonds?
2        MR. THEODOROU: Objection.
3     A.  No.
4     Q.  Had you seen any press releases?
5        MR. THEODOROU: Objection.
6     A.  No.
7     Q.  Did you ever check -- let me ask this:
8  When did you actually see a report on a news
9  service stating that Treasury had announced that
10 it was cancelling the 30-year bond?
11       MR. THEODOROU: Objection.
12    A.  I don't recall. Later in the day.
13    Q.  Later in the day on October 31st?
14    A.  I don't recall when I first saw it.
15    Q.  To clarify, do you recall if you saw
16 it on October 31st?
17    A.  As I sit here now, I don't recall.
18 You're asking a news wire?
19    Q.  News wire.
20    A.  Because it was in the paper the next
21 day, obviously.
22    Q.  Right. I meant a news wire on
23 October 31st.
24    A.  I don't recall.
25    Q.  Did you ever check Treasury's web site

8 (Pages 247 to 250)

Steven E. Northern                                                                      January 31, 2007
Boston, MA

| Page 251 | Page 253 |
|---|---|

**Page 251**

1   on October 31st?
2       A.   Not that I remember.
3       Q.   Was Treasury's web site a resource
4   that you used as a portfolio manager?
5       A.   No.
6       Q.   Prior to October --
7       A.   Just to clarify your question. I use
8   on a regular basis? I used ever?
9           I undoubtedly went to the Treasury web
10  site, but it wasn't a regular tool that I would
11  use.
12      Q.   Okay. But you had prior to
13  October 31st visited the Treasury's web site?
14      A.   Not that I recall, but I --
15      Q.   Were you aware of what information was
16  available on Treasury's web site prior to
17  October 31st?
18          MR. THEODOROU: Objection.
19      A.   No. I think that's where you go for
20  visa information.
21          MR. THEODOROU: Objection.
22          You answered the question,
23  Mr. Nothern.
24          MS. WILLIAMS: I'm sorry, I didn't
25  understand -- I hadn't asked another question.

**Page 253**

1       A.   If you're asking if I'm aware of what
2   information's on there, I think there is
3   information related to getting passports.
4       Q.   Prior to trading in the 30-year bond
5   on October 31st, did you see anything on the
6   television regarding Treasury's cancellation of
7   the 30-year bond?
8           MR. THEODOROU: Objection.
9       A.   That morning?
10      Q.   Yes.
11      A.   No.
12      Q.   Had you received any E mails that
13  morning regarding Treasury's cancellation of the
14  30-year bond before you purchased the 25
15  million?
16          MR. THEODOROU: Objection.
17      A.   Not that I can remember.
18      Q.   Did you believe Treasury's decision to
19  cancel the 30-year bond was market-sensitive
20  information?
21      A.   Yes.
22      Q.   Now, you stated that Mr. Davis had
23  mentioned a press release that was embargoed
24  until 10 a.m.
25          Who did you understand the embargo to

| Page 252 | Page 254 |
|---|---|

**Page 252**

1           MR. THEODOROU: Right.
2           MS. WILLIAMS: So if he wasn't
3   finished answering the question, then I don't --
4           MR. THEODOROU: Well, did you
5   answer the question that she asked as to what
6   you knew?
7           MS. WILLIAMS: I'm trying not to
8   cut the witness off. I'd ask you not to cut the
9   witness off.
10          MR. THEODOROU: All right. Fine.
11  I won't.
12          MS. WILLIAMS: So I didn't know if
13  he was finished.
14  BY MS. WILLIAMS:
15      Q.   If you were not finished, then --
16          MR. THEODOROU: Did you have
17  something else to add?
18      Q.   Is there something else you wanted to
19  add?
20          MR. SHOPE: Could we have the
21  question reread? Maybe that would help.
22          THE WITNESS: I think that would be
23  helpful, yeah.
24          (Record read)
25      Q.   Anything else that you wanted to add?

**Page 254**

1   apply to?
2       A.   The press.
3       Q.   Did you understand Mr. Davis to be a
4   member of the press on October 31st?
5       A.   No. I understood him to be Washington
6   consultant.
7       Q.   Did you think the embargo applied to
8   Mr. Davis?
9       A.   No.
10      Q.   Did you think the embargo applied to
11  you?
12      A.   No.
13      Q.   Did you ever mention embargo to any of
14  the other portfolio managers on October 31st?
15          MR. THEODOROU: Objection.
16      A.   I believe it came up twice.
17      Q.   Could you tell me when it came up?
18      A.   First was with Mr. Cadogan, and he
19  mentioned there was a quarterly refunding
20  announcement that was to be released at 10.
21          In which case I shared with him, oh,
22  that's what Davis must have said was embargoed.
23  I think at that point I did mention that.
24      Q.   Did you use the word embargo?
25      A.   Best I can recall, yes.

9  (Pages 251 to 254)

Steven E. Northern

January 31, 2007

Boston, MA

| Page 255 | Page 257 |
|---|---|
| 1     Q. And I know we talked about this<br>2 yesterday. Is this the conversation that you<br>3 had when you were standing at Mr. Kennedy's<br>4 station behind Mr. Kennedy talking to<br>5 Mr. Cadogan?<br>6     MR. THEODOROU: Objection.<br>7     A. Yes.<br>8     Q. What, if anything, was said in<br>9 response to your statement about embargo?<br>10     A. I don't recall how Cadogan responded<br>11 or if he responded.<br>12     Q. Was your statement directed to anyone<br>13 besides Mr. Cadogan?<br>14     MR. THEODOROU: Objection.<br>15     A. No. I was chatting directly with him.<br>16     Q. Do you know if anyone overheard your<br>17 statement about embargo?<br>18     MR. THEODOROU: Objection.<br>19     A. I don't know.<br>20     Q. Did you think the embargo applied to<br>21 any of your -- to Mr. Cadogan?<br>22     MR. THEODOROU: Objection.<br>23     A. No.<br>24     Q. Why did you mention embargo to<br>25 Mr. Cadogan? | 1 in his space where his work station was on the<br>2 trading desk. We were having a discussion, he<br>3 and I.<br>4     We volunteered that we were each going<br>5 to be buying 25 million. Other portfolio<br>6 managers volunteered what they would be buying.<br>7     At some point we summed it up, you<br>8 know, with Mr. Cadogan. We verified that, yes,<br>9 65 million, and we told him to go ahead and buy<br>10 it.<br>11     So it was entirely an oral<br>12 communication on my part and Mr. Kennedy's part<br>13 and Mr. Kurinsky's part and Mr. Smith's part.<br>14     Q. What was Mr. Cadogan doing when you<br>15 first got his attention to place this order?<br>16     MR. THEODOROU: Objection.<br>17     A. He was on the phone, I believe.<br>18     Q. Do you know who he was talking to?<br>19     A. No.<br>20     Q. When you got his attention, what did<br>21 he do with the phone?<br>22     A. I don't know.<br>23     Q. Do you recall if he put the person on<br>24 hold to talk to you?<br>25     MR. THEODOROU: Objection. |

| Page 256 | Page 258 |
|---|---|
| 1     MR. THEODOROU: Objection.<br>2     A. As I mentioned earlier, it was -- for<br>3 me it was one of these -- the only way I can<br>4 describe it is a V-8 moment, oh, that's what<br>5 Davis was talking about. That was, I think, the<br>6 first I recalled that he had said something<br>7 about that on the phone mail message, and it<br>8 jogged my memory, oh, that's what he was talking<br>9 about.<br>10     Q. At the time you made this statement,<br>11 had you already placed the order to purchase 25<br>12 million long bonds?<br>13     A. I don't know. I believe I'd given the<br>14 order to Mr. Cadogan, and he was in the process<br>15 of working on it, but I don't remember exactly.<br>16     Q. How did you convey your order to<br>17 Mr. Cadogan that morning?<br>18     And I mean we talked about sometimes<br>19 you put information in the FITS system,<br>20 sometimes you gave verbal orders. I'm trying to<br>21 find out how you conveyed the order for 25<br>22 million long bonds to Mr. Cadogan on<br>23 October 31st.<br>24     MR. THEODOROU: Objection.<br>25     A. I was standing adjacent to Mr. Kennedy | 1     A. I don't know. I can't see across the<br>2 desk what he's doing with his telephone.<br>3     Q. Do you -- what steps did Mr. Cadogan<br>4 take to execute the trade that morning?<br>5     A. To my knowledge?<br>6     Q. Yes.<br>7     A. I don't -- I don't have specific<br>8 knowledge of in terms of what he -- we leave<br>9 that to him. He's the trader.<br>10     Q. Was Mr. Cadogan still on the phone<br>11 when you had the discussion with him regarding<br>12 Treasury's having a quarterly refunding?<br>13     A. No. He was chatting with me at that<br>14 point.<br>15     If it's helpful, you have to<br>16 understand, the trading desk environment, you<br>17 multi task. So you could well be on the phone<br>18 or not be on the phone, put someone on hold and<br>19 chat with me. I wouldn't know.<br>20     Q. What, if anything, did Mr. Cadogan --<br>21 sorry.<br>22     Who did Mr. Cadogan contact to execute<br>23 the trade? And I don't mean specifically the<br>24 person. Do you know which firm he contacted?<br>25     MR. THEODOROU: Objection. |

10 (Pages 255 to 258)

Steven E. Northern                                                          January 31, 2007

Boston, MA

| Page 259 | Page 261 |
|---|---|

**Page 259**

1      MR. SHOPE:  And you're asking
2 whether he knows today as opposed to at that
3 moment.
4      MS. WILLIAMS:  No.
5 BY MS. WILLIAMS:
6    Q.  I want to know on October 31st, do you
7 know who he contacted?
8      MR. SHOPE:  Same objection.
9      MR. THEODOROU:  Objection.
10    A.  At what point in time?
11    Q.  At the time that Mr. Cadogan was
12 executing the trade, did you know who he was
13 calling to execute the trade?
14      MR. THEODOROU:  Objection.
15    A.  No, not that I can recall.
16    Q.  So just to clarify, you didn't
17 overhear Mr. Cadogan talking to anyone to
18 execute this trade, did you?
19      MR. THEODOROU:  Objection.
20    A.  No.
21    Q.  Do you know how much time elapsed
22 between the time you gave Mr. Cadogan the order
23 for the 65 million, you being you and your
24 colleagues, and the time he executed the trade?
25    A.  No.

**Page 260**

1    Q.  What prompted the conversation with
2 Mr. Cadogan about Treasury having a quarterly
3 refunding conference?
4      MR. THEODOROU:  Objection.
5    A.  Do you mind just repeating that?
6    Q.  What prompted the conversation with
7 Mr. Cadogan regarding Treasury having a
8 quarterly refunding conference on October 31st?
9    A.  Mr. Cadogan volunteered that.
10    Q.  Was it in response to anything?
11    A.  I can't speak to why he volunteered
12 that.  He volunteered that.
13    Q.  Had you said anything to Mr. Cadogan
14 prior to him volunteering that information?
15      MR. THEODOROU:  Objection.
16    A.  Possibly we were discussing, you know,
17 how many bonds to buy, you know, the amount and
18 giving him the instructions to go ahead and buy
19 them.
20    That was the extent of my interchange
21 with him.
22    Q.  If I could refer you to Exhibit 2,
23 page 156.  One second.
24    (Pause)
25      MR. THEODOROU:  Which page?

**Page 261**

1 BY MS. WILLIAMS:
2    Q.  Page 156, line 16 through line 25.
3      MR. SHOPE:  For completeness, could
4 we have him review line -- page 155, line 24?
5 It seems to be related to the question.
6      MS. WILLIAMS:  I have several
7 questions --
8    Q.  You're welcome to review that as well.
9    A.  Okay.
10    Q.  Sure.
11    (Pause)
12    Q.  Let me know when you're finished.
13    (Pause)
14    A.  I'm sorry, to --
15    Q.  I was going to line 25 on page 156.
16    A.  Oh, okay.
17    Q.  Okay.  And at line 16 there's a
18 question, "Did Mr. Cadogan tell you that he had
19 mentioned this information, this rumor, to
20 Merrill Lynch prior to ten o'clock?"
21    And the answer, "That's my
22 understanding is that he was doing this
23 transaction he was on the phone with them."
24    My first question is when did you
25 learn that Mr. Cadogan was on the phone with

**Page 262**

1 Merrill Lynch?
2    A.  I don't recall when he told me that.
3    Q.  At the time that he was executing the
4 trade, though, did you know that he was on the
5 phone with Merrill Lynch?
6    A.  I think we just covered that.  No, I
7 didn't.
8    Q.  Okay.  And then the rest of your
9 answer, "That's the reason he transacted -- when
10 we bought 65 million bonds, he was on the phone.
11 I'm standing across the opposite side of the
12 desk.  It's my understanding he was on the phone
13 at the time with Merrill Lynch, and my
14 understanding is that in that conversation that
15 he shared with them we're hearing this."
16    When did you reach the understanding
17 that Mr. Cadogan was on the phone with Merrill
18 Lynch at the time you gave him the order to buy
19 65 million?
20      MR. THEODOROU:  You might want to
21 turn to page 157, which is, "And you came to
22 that understanding from what Mr. Cadogan told
23 you?"
24      MS. WILLIAMS:  That's fine, but I'm
25 going to ask that -- it can be the same answer.

11 (Pages 259 to 262)

Steven E. Northern                                                                January 31, 2007

Boston, MA

| Page 263 | Page 265 |
|---|---|
| 1    MR. THEODOROU: Independent of | 1    Q. Yes, you being MFS, sorry, MFS high |
| 2 that. I just want to put it in context, that's | 2 grade trading desk. |
| 3 all. | 3    A. Yes. |
| 4    MS. WILLIAMS: Sure. | 4    But I have to be frank with you. I |
| 5 BY MS. WILLIAMS: | 5 wasn't doing trades primarily, I think starting |
| 6    Q. I'm trying to figure out when you came | 6 the beginning of 2001. So I actually lost a |
| 7 to the understanding that Mr. Cadogan was on the | 7 little bit of touch with who picked up the phone |
| 8 phone with Merrill Lynch when you gave him the | 8 on the other end. |
| 9 order to buy 65 million bonds? | 9    But typically there's an assigned |
| 10   A. I don't remember when. Mr. Cadogan | 10 coverage person, and there's a backup. So |
| 11 told me that at some point. I don't remember at | 11 there's a salesperson, but there are other |
| 12 what point he told me that. | 12 people, if the salesperson is on another line |
| 13   Q. Do you know if he told you that on | 13 pick up the line and can fully step in and take |
| 14 October 31, 2001? | 14 care of what the client needs to do to get a |
| 15   A. As we sit here now, I believe he did, | 15 price on a trade or that sort of a thing. |
| 16 but I don't recall when he told me that. | 16   So there is an assigned coverage |
| 17   Q. And then it says, "My understanding is | 17 person, there's a senior person, and there's |
| 18 that in that conversation that he shared with | 18 probably a team, so there can be more than one |
| 19 them we're hearing this." | 19 person. |
| 20   What is meant by the this in that | 20   Q. And just to clarify, at the time that |
| 21 sentence? What is your understanding | 21 Mr. Cadogan executed this trade, you don't |
| 22 Mr. Cadogan shared with Merrill Lynch? | 22 recall whether or not you had had the |
| 23   A. My understanding is he shared with | 23 conversation with him about the refunding |
| 24 them as openly as he could exactly what we were | 24 conference being taking place on October 31st? |
| 25 hearing. | 25   MR. THEODOROU: Objection. |

| Page 264 | Page 266 |
|---|---|
| 1    Q. Which was? | 1    A. Can you just phrase that? |
| 2    A. I don't know exactly what he shared | 2    Q. Yeah. I just want to make sure that I |
| 3 with them, but our practice would be to be | 3 understand that you had this conversation with |
| 4 pretty open with people. | 4 Mr. Cadogan in which he told you Treasury was |
| 5    So I would assume that he shared with | 5 having a refunding conference, and I wanted to |
| 6 them what we're here for the Board of Trade and | 6 know if at the time Mr. Cadogan executed this |
| 7 that we heard from one of our analysts or | 7 trade, had you had that conversation with him? |
| 8 consultants, same thing. | 8    A. I don't know. |
| 9    Q. And how did you learn that Mr. -- | 9    Q. Did you enter the $25 million trade in |
| 10   A. But I really have no knowledge of | 10 the FITS system on October 31st? |
| 11 exactly what he shared. | 11   Before I ask you that, can I ask |
| 12   I think he told me that he shared | 12 something different? I'll come back to that. |
| 13 this, you know, what we were hearing. | 13   MR. SHOPE: Actually, would you |
| 14 Implicitly I would think he shared the whole | 14 have the last question and answer reread? |
| 15 circumstances of what we were seeing and | 15   (Record read) |
| 16 hearing. | 16   MR. SHOPE: Okay. That's fine. |
| 17   Q. What, if anything, did Mr. Cadogan | 17 BY MS. WILLIAMS: |
| 18 tell you that Merrill Lynch said in response to | 18   Q. Before I go into the FITS system, you |
| 19 his sharing? | 19 mentioned that embargo came up twice on |
| 20   MR. THEODOROU: Objection. | 20 October 31st. When's the second time the word |
| 21   A. I don't recall1. | 21 embargo came up? |
| 22   Q. Do you have a regular salesperson at | 22   MR. THEODOROU: In what context? |
| 23 Merrill Lynch that you contacted to execute | 23   MS. WILLIAMS: He said that he |
| 24 trades? | 24 thought he mentioned embargo twice. The first |
| 25   A. You being MFS? | 25 occasion was with John Cadogan. |

12 (Pages 263 to 266)

Steven E. Northern                                                        January 31, 2007
Boston, MA

| Page 267 | Page 269 |
|---|---|
| 1 BY MS. WILLIAMS: | 1 take on. |
| 2    Q. What was the second occasion? | 2    Q. And when you joined the group, what, |
| 3    A. The second occasion was late in the | 3 if anything, did you say to the group? |
| 4 day, towards the end of business. | 4    A. I explained to them that I thought |
| 5    Q. Who were you speaking to? | 5 that Merrill getting a concession on the trade |
| 6    A. I was speaking directly with Mike | 6 was ridiculous. |
| 7 Roberge who was part of a large group of | 7     I further explained that if they'd |
| 8 colleagues that were waiting in the trading room | 8 lost money on it, it was because they had chosen |
| 9 for some sort of a visit from a potential | 9 to take a position. They had plenty of time to |
| 10 client. I think it was Lucent Technologies was | 10 lay off the risk from the transaction they'd |
| 11 potentially going to be investing pension monies | 11 done with us. |
| 12 or something of this sort with MFS. And so they | 12     After they transacted with us, the |
| 13 were waiting in the trading room. | 13 market had been relatively stable, if not a |
| 14     As I went from my desk to get some | 14 little bit lower. So they could have covered |
| 15 work done to over to my spot on the trading | 15 that position quite readily but chose not to. |
| 16 desk. | 16     I also went through a little bit of |
| 17    Q. How did this discussion of embargo | 17 the history with them because they didn't have |
| 18 come up? | 18 background in terms of what the actual issue was |
| 19    A. They were having a discussion about a | 19 of cancelling 30-year Treasury. |
| 20 phone call that apparently Mr. Cadogan received | 20     So I explained to them that this had |
| 21 from Merrill. | 21 been well rumored for a long period of time, |
| 22     Merrill apparently believed that they | 22 that we actually thought they were going to do |
| 23 should get a price concession. Apparently they | 23 it that summer and that the postmortem that I |
| 24 lost money that day on the trade that we'd done. | 24 had heard at the time was that the fellow in |
| 25     And so as I was walking to my trading | 25 charge of domestic finance, while nominated, |

| Page 268 | Page 270 |
|---|---|
| 1 desk position, I had to walk through this group. | 1 wasn't confirmed, so possibly he held off making |
| 2 Before I walked through the group, I paused for | 2 the announcement because he might not have felt |
| 3 just long enough to understand the gist of what | 3 he had the authority to make that announcement. |
| 4 they were talking about because I had more | 4     So in a sense this was his first hit |
| 5 information about this than I knew they would. | 5 at the cat, and in a lot of ways it's not that |
| 6     I asked them what they were talking | 6 big a surprise. |
| 7 about, and apparently that's what they were | 7     And I think I added from a portfolio |
| 8 talking about. So we engaged in a conversation | 8 port of view, I reiterated what we had been |
| 9 about that. | 9 talking about the prior couple of weeks, that |
| 10    Q. Who was in the group? | 10 this was consistent with what we were doing and |
| 11    A. As I recall, Joan Batchelder, John | 11 point of fact was what we were doing that day. |
| 12 Cadogan, Mike Roberge, Robin Stelmach, and at | 12     And basically I went through, you |
| 13 least two or three other people. | 13 know, the reasons why I'd cut my hand off before |
| 14    Q. Do you recall who those two or three | 14 I'd give Merrill Lynch a dime. |
| 15 other people are sitting here today? | 15    Q. How did the word embargo come up in |
| 16    A. No. | 16 this conversation? |
| 17    Q. What is Robin Stelmach's job at MFS? | 17    A. Towards the end, Mike Roberge asked, |
| 18    A. At the time? | 18 and I don't recall specifically what he said, |
| 19    Q. Yes. | 19 but something to the effect, Did he say this was |
| 20    A. She was part of the Fixed Income | 20 embargoed? |
| 21 Department. She would take care of a lot of the | 21    Q. He being? |
| 22 operational side of our business. She was the | 22    A. Going to Mr. Davis. |
| 23 one that ran the team, for example, that created | 23    Q. Okay. What was your response? |
| 24 FITS, our FITS income trading system. So that | 24    A. No. |
| 25 was a type of thing that -- a project she would | 25    Q. And why did you respond no? |

13 (Pages 267 to 270)

Steven E. Northern                                                January 31, 2007
Boston, MA

| Page 271 | Page 273 |
|---|---|

**Page 271**

1   A.  I was answering what I thought his
2   real question was is did Davis tell us that we
3   couldn't trade.  And the answer was no.
4       I never thought in my mind that we
5   were in any way restricted from trading, and I
6   never thought for a second that we'd done
7   anything wrong.
8   Q.  Did Mr. Roberge use the word embargo?
9   A.  Yes.
10  Q.  Did you tell him that Mr. Davis had
11  used the word embargo?
12  A.  No.
13  Q.  Did anyone say anything in response to
14  your response which was no?  Was there any other
15  discussion?
16  A.  That was the end of the discussion.
17  Q.  Did you take any notes during this
18  conversation?
19  A.  No.
20      I was walking through this group.
21  They were essentially killing time.  And I think
22  eventually they were stood up by Lucent and they
23  never came.  So they were waiting and waiting
24  and killing time and chatting.  I was trying to
25  get some work done.

**Page 273**

1       MR. THEODOROU:  That's not what his
2   testimony was.  Oh, he mentioning embargo.
3   BY MS. WILLIAMS:
4   Q.  Your testimony is that he told
5   Mr. Cadogan about embargo, and I wanted to know
6   was the word embargo said to anyone else besides
7   Mr. Cadogan?
8       MR. THEODOROU:  Objection.
9   Q.  Did you mention the word embargo to
10  anyone else at MFS on October 31st besides
11  Mr. Cadogan?
12  A.  No.
13  Q.  Do you recall --
14  A.  As best as I can recall.
15  Q.  Do you recall participating in any
16  discussions on any subsequent days with
17  co-workers at MFS regarding the word embargo?
18  A.  I can remember one other occasion.
19  Q.  Tell me about that occasion.  When was
20  that?
21  A.  Best I can recall, the following
22  Wednesday.
23  Q.  And who were you speaking to?
24  A.  Joan Batchelder.
25  Q.  Anyone else?

| Page 272 | Page 274 |
|---|---|

**Page 272**

1       This was an informal -- essentially it
2   was a water-cooler conversation they were
3   having.  They were sort of hanging out in the
4   trading room, sitting on the corners of the
5   desks, killing time, waiting for a prospect that
6   I think never showed up.
7   Q.  What was Mr. Roberge's position at MFS
8   at the time?  What was Mr. Roberge's position at
9   MFS at the time?
10  A.  Mike Roberge was a young portfolio
11  manager in the Unique Bond Department at the
12  time.
13      He was given responsibilities as an
14  assistant to the director of research -- the
15  director of credit research.  And he was a
16  member of my Fixed Income Policy Committee.
17  Q.  Did the word embargo come up with any
18  other -- at any other conversations on
19  October 31st?
20  A.  Not that I can remember.
21  Q.  So the only person that you recall
22  mentioning embargo to on that date was
23  Mr. Cadogan?
24      MR. THEODOROU:  Objection.
25      MR. SHOPE:  Objection.

**Page 274**

1   A.  She came to the trading desk
2   accompanied by Don Mycrans.
3   Q.  Who is Don Mycrans?
4   A.  Don Mycrans had been hired pretty
5   recently I think at that point.  And he was
6   coordinating our trading activities across the
7   Fixed Income Department.
8   Q.  Did Mr. Mycrans have any supervisory
9   authority over you on October 31st?
10  A.  No.  He supervised the traders, I
11  believe.
12  Q.  And where did this conversation take
13  place?
14  A.  In the trading room on the 23rd floor.
15  Q.  Besides Miss Batchelder and
16  Mr. Mycrans, was there anyone else involved in
17  this conversation?
18  A.  No.
19  Q.  What happened -- what was said during
20  the conversation?
21  A.  She had one question.  She came up to
22  my desk.  I was at the trading -- at my desk in
23  the trading room.  She came up with Don Mycrans
24  in tow and asked me, I believe, something to the
25  effect did Davis or did -- did Davis or did he

14 (Pages 271 to 274)

Steven E. Northern

Boston, MA

January 31, 2007

Page 275

1    tell you that this was embargoed, that you
2    couldn't trade on it.
3        Q.  What was your response?
4        A.  I answered no.
5        Q.  Why did you say no?
6        A.  That was the most forthright way I
7    could answer the question.  I was answering the
8    question that I thought they wanted to ask.
9        Q.  What question did you think they
10   wanted to ask?
11       A.  She asked the question, Did he say
12   that we couldn't trade on this?  And I said, No,
13   he didn't.
14       Q.  Did Miss Batchelder use the word
15   embargo?
16       A.  Yes.
17       Q.  Did you tell them that Mr. Davis had
18   used the word embargo?
19       A.  No.
20       Q.  Did you tell Miss Batchelder that
21   Mr. Davis had mentioned a press release?
22       A.  No.
23       Q.  Did you take any notes during this
24   conversation?
25       A.  No.

Page 276

1        Q.  Do you know if Ms. Batchelder took any
2    notes?
3        A.  No.
4        Q.  Did you discuss this conversation with
5    anyone else on the high grade trading desk?
6        A.  No.
7        Q.  Did you discuss it with anyone else at
8    MFS, other than counsel?
9        A.  No.
10       Q.  Do you recall participating in any
11   discussions with Mr. Kurinsky after October 31st
12   regarding the $65 million trade?
13       A.  I don't.  I have conversations on an
14   ongoing basis with Jeffrey.  He works two desks
15   away, so we meet on an ongoing basis.  I don't
16   recall, you know, any particular meeting with
17   him.
18       Q.  Do you recall any discussions with
19   Mr. Kennedy after October 31st about the
20   $65 million trade?
21       A.  Yes.
22       Q.  What do you recall about discussions
23   with Mr. Kennedy?
24       A.  I believe he volunteered some day
25   after October 31st that he'd seen an article in

Page 277

1    the press, the New York Times or the Journal
2    referencing this.  So he wanted to make sure I
3    had seen it.  Maybe it had information I hadn't
4    seen already.
5        Q.  What did you say in the conversation?
6        A.  I don't recall.  I think I already saw
7    the article.  I had read the paper.
8        Q.  Did embargo come up at all during this
9    conversation?
10       A.  Not that I can recall.
11       Q.  At some point on October 31, 2001 did
12   you become aware that Treasury had issued a
13   press release announcing the cancellation of the
14   30-year bond?
15       A.  Issued at some point?
16       Q.  Yes.  Did you become aware on
17   October 31st that Treasury had issued a --
18   Treasury had issued a press release announcing
19   the cancellation of the bond?
20       A.  Yes.
21       Q.  When did you become aware of
22   Treasury's press release?
23       A.  I don't recall.
24       Q.  Do you know if it was before 10 a.m.?
25       A.  I don't remember.

Page 278

1        Q.  Do you know how you became aware of
2    Treasury's press release?
3        A.  I don't remember.  I know they put it
4    out.  I don't remember how I learned that.
5            It was a bit messy because they put it
6    out early, and I think there was talk about,
7    hey, they put it out early.
8            I don't remember specifically, you
9    know, what conversation or when that occurred or
10   how I learned it.
11       Q.  What was the first press release,
12   either hard copy or electronic, that you saw
13   announcing Treasury's cancellation of the bond?
14           MR. THEODOROU:  Objection.
15       A.  On October 31st?
16       Q.  If you saw it on October 31st, then
17   yes.
18       A.  I don't recall seeing that quarterly
19   refunding announcement.
20       Q.  No, my question's different.
21           What, if any, news report by press
22   service of any sort did you see -- what was the
23   first press release, news story that you saw
24   that mentioned that Treasury had cancelled the
25   30-year bond?

15  (Pages 275 to 278)

Steven E. Northern                                                    January 31, 2007
                              Boston, MA

| Page 279 | Page 281 |
|---|---|

**Page 279**

1    MR. SHOPE: Objection.
2    A. I don't remember. I can tell you that
3 I was at my trading desk, and undoubtedly it
4 came across the news ticker, I saw it on a news
5 ticker. I don't -- in fact, I doubt that I even
6 pulled up the story. The story was the story,
7 you know, what you have to read.
8    Q. Okay. Do you know what time you saw
9 the story?
10    A. I don't.
11    MR. THEODOROU: Erica, can we take
12 a break?
13    MS. WILLIAMS: Sure. I don't have
14 much more, but yes.
15    THE VIDEOGRAPHER: Going off the
16 record, 10:21 a.m.
17    (Recess taken)
18    THE VIDEOGRAPHER: On the record,
19 10:36 a.m.
20 BY MS. WILLIAMS:
21    Q. Mr. Nothern, yesterday we were talking
22 about the fact that you were fired from MFS, and
23 one of the reasons you said that they provided
24 you was because you weren't forthright.
25    And I wanted to know if anything was

**Page 281**

1 Mr. Cadogan regarding Treasury's quarterly
2 refunding conference taking place that day?
3    A. Yes.
4    Q. Had you seen any news announcements
5 regarding the cancellation of the 30-year bond?
6    A. Not that I can recall.
7    Q. Why did you purchase an additional
8 14.25 million?
9    A. I needed 14.25 million additional for
10 the portfolios.
11    When I had done the initial trade for
12 25 million, it was just a safe guess. After
13 that transaction, I went back to my desk and put
14 a pencil to paper and figured out more precisely
15 how many I needed.
16    I deliberately bought fewer than I
17 knew I needed. I didn't know exactly how many I
18 needed, so I went back and did the math. Total
19 required another 14 and a quarter million.
20    Q. Did you enter any information in the
21 FITS system on October 31st regarding your
22 trades in the 30-year bond?
23    A. Yes.
24    Q. What did you -- when did you enter
25 information in the FITS system regarding the

| Page 280 | Page 282 |
|---|---|

**Page 280**

1 said regarding the conversation you had with
2 Mr. Roberge and Miss Batchelder as one of the
3 reasons what they fired you?
4    A. No.
5    Q. Did those conversations come up at all
6 in their explanation as to why you were fired?
7    A. No.
8    Q. Did you make any other purchases in
9 the 30-year bond --
10    A. To the best of my recollection, I
11 believe that statement was contained in a letter
12 that they sent.
13    Q. Okay. Did you make any other
14 purchases in the 30-year bond on the morning of
15 October 31st besides the 25 million?
16    A. Yes.
17    Q. What other purchase did you make?
18    A. I put in an order. I bought an
19 additional 14 and a quarter million, I believe.
20    Q. How long after authorizing the order
21 for 25 million did you place the order for 14.25
22 million?
23    A. I don't remember.
24    Q. At the time you placed the order for
25 14.25 million, had you had the conversation with

**Page 282**

1 $25 million purchase?
2    A. Subsequent to the trade.
3    Q. Was it prior to the $14.25 million
4 order being placed?
5    A. I don't recall. We have a document
6 that would show that for me.
7    MS. WILLIAMS: I'd like to have
8 this marked as Exhibit 11.
9    (Exhibit 11 marked
10    for identification)
11 BY MS. WILLIAMS:
12    Q. Is this the document that you're
13 referring to, Mr. Nothern?
14    A. Yes.
15    Q. What is this document?
16    A. The print is awful small.
17    Q. Sorry about that.
18    A. This looks to be a blotter, which is
19 to say a list taken out of one of MFS's systems
20 of -- I can't even read the headers on this, but
21 it looks to refer to the trades we did that
22 morning on 10/31/2001.
23    Q. Have you seen this document prior to
24 today?
25    A. I believe so, yes.

16 (Pages 279 to 282)

Steven E. Northern                                                    January 31, 2007
                              Boston, MA

| Page 283 | Page 285 |
|---|---|

**Page 283**

1    Q.  Okay.  If I could refer you to one,
2  two, three, four, five, five lines down.  If you
3  go to the middle of the document, I see
4  "nothern_s".
5        Do you see that?
6    A.  Yes.
7    Q.  Okay.  And next to that, to the right
8  I see "October 31, 2001".
9        Do you see that?
10   A.  Yes.
11   Q.  And "95134573AM".
12       Do you see that?
13   A.  Yes.
14   Q.  And then if you go to the left of your
15  name, nothern_s, I see a "B".
16       Do you see that?
17   A.  Yes.
18   Q.  And then skip over two columns, and I
19  see "25 million".
20       Do you see that?
21   A.  Yes.
22   Q.  Okay.  Does this entry reflect the
23  purchase of 25 million bonds that you made on
24  October 31st?
25   A.  Yes.

**Page 285**

1    A.  It's when the portfolio managers enter
2  the transaction into the system, the FITS
3  system.
4    Q.  Does the FITS system show the
5  execution time?
6    A.  The FITS system shows essentially a
7  work flow, and it's showing when, I believe,
8  different people that work on a trade finish
9  entering the information.
10   Q.  Okay.  So that is not the execution
11  time?
12       MR. THEODOROU:  Objection.
13   A.  No, not necessarily.
14   Q.  Is the time that the order was
15  actually placed with the trader reflected in the
16  FITS system?
17       MR. THEODOROU:  Objection.
18   A.  Not necessarily.
19   Q.  Do you -- is the purchase of 14.25
20  million 30-year bonds reflected on this first
21  page of this document?
22   A.  I don't see it there.  I see 12.25
23  million.  Is that right?
24   Q.  I see 12.25 million as well, and I was
25  wondering how -- if that was at all related to

| Page 284 | Page 286 |
|---|---|

**Page 284**

1    Q.  What does the 95134573 represent?
2    A.  I can't make out the header on that.
3    Q.  It says, "Order creation time."
4    A.  And two columns to the right, what is
5  the header on that one?
6    Q.  "Trade creation time."
7    A.  So one is order creation time, and the
8  second is trade creation time?
9    Q.  Yes.
10   A.  I can't tell you.  I don't know.
11   Q.  Can I refer you to Exhibit 2, page
12  173, line 18.
13   A.  I'm sorry, which page?
14   Q.  Page 173, line 18.
15       And that I'd like you to read through
16  page 174, line three.
17       (Pause)
18   A.  How far down?
19   Q.  Just 174, line three.
20   A.  Okay.
21   Q.  Okay.  And I was wondering if that
22  refreshes your recollection as to what the --
23  what order creation time means?
24   A.  Yes.
25   Q.  What does it mean?

**Page 286**

1  the purchase of 14.25?
2    A.  Either I'm wrong or -- but, yes, I
3  think that's the trade I'm referring to.
4    Q.  Okay.  Did you allocate any of that
5  trade to any other portfolio manager?
6    A.  As I recall, yes.
7    Q.  Who?
8    A.  Peter Vaream.
9    Q.  How much did you allocate to
10  Mr. Vaream?
11   A.  As best I can recall, 2 million.
12   Q.  Why did you allocate 2 million to
13  Mr. Vaream?
14   A.  Mr. Vaream was off the trading desk
15  when we did this trade.
16       So subsequently when he returned,
17  somebody informed him of what we'd done in the
18  portfolios.  And as was our practice, if he also
19  needed to or wanted to, you know, participate in
20  that trade, he would be able to.  So he was
21  allocated some of it.
22       You don't want to penalize people for
23  being off the trading desk.  So if he's off, he
24  has an opportunity to participate in the trade
25  when he gets back.

                                17  (Pages 283 to 286)

Steven E. Northern

January 31, 2007

Boston, MA

Page 287

1    Q.   Yesterday you mentioned some sales of
2  intermediate securities on the morning of
3  October 31st, and I was wondering if those sales
4  are reflected anywhere in Exhibit 11?
5        And I can refer you to one line on
6  page two in the second group of data on that
7  page.  Do you see there's a little space, and
8  there's a second group of data?  Line three and
9  the first line, I guess, of the first group of
10  data.
11        MR. THEODOROU:  In the middle?  I'm
12  sorry.
13  BY MS. WILLIAMS:
14    Q.   The first line on the page, and then
15  the third line in the second group of data.
16  There is a lot of data on this page.  I want to
17  try to refer to you passages.
18        But my question is are those
19  purchases, those three purchases you mentioned
20  on this?
21        MR. ROSSETTI:  Sales?
22        MS. WILLIAMS:  Sales, sorry, sales.
23    A.   I am now looking at the third line in
24  the second section that you mentioned?
25    Q.   Yes.

Page 288

1    A.   And as I understand that, there's an
2  S, for sale.  I can't read that number entirely.
3  It looks like 7 million.  It looks like it's
4  referring to a transaction done for MMT, Multi
5  Market Income Trust.
6    Q.   Yes.
7    A.   And it's a US Treasury note.  I think
8  it's 6.875, May 15, 2006.
9    Q.   Yes.
10    A.   So at this point in time, that is a
11  five-and-a-half-year security.
12    Q.   Okay.  What about the first line on
13  that page?
14    A.   I'm sorry.  The other detail --
15    Q.   It's the same thing.  Sorry.
16    A.   The other detail, there is a time
17  stamp here.  The column header is illegible.
18    Q.   I think "Order creation time, 9:26" --
19    A.   Cadogan.
20    Q.   Cadogan, yes, I see that.
21    A.   I don't know if that's execution time
22  or creation time or what that is.
23    Q.   I was just reading the heading.
24  Sorry.
25        Besides that sale, are the other two

Page 289

1  sales that you made that morning reflected on
2  this document?
3    A.   Okay.  The first line that you
4  referred to on the top section, let's just
5  review that one.
6        That also says S, for sale.  It
7  doesn't reference the portfolio, though.  It's
8  also 7 million.  So it may be same trade.
9        (Pause)
10  BY MS. WILLIAMS:
11    Q.   Do you see any other sales?
12    A.   I see one of the three.
13    Q.   Do you know why the other two are not
14  reflected in this report?
15    A.   I don't.
16    Q.   How much money did you and --
17    A.   But --
18    Q.   I'm sorry?
19    A.   Half of this, there are several lines
20  that are not legible.
21        MR. THEODOROU:  Just for the
22  record --
23        MR. SHOPE:  Ms. Williams, before we
24  try to tax Mr. Nothern's vision anymore, and not
25  to mention ours as well, I do have some

Page 290

1  documents here.  And I'll represent that these
2  have been produced to you.  I don't have them
3  with document numbers.  And I have the three
4  trades in question highlighted, so that might
5  facilitate matters.
6        MS. WILLIAMS:  Okay.
7        MR. SHOPE:  I also had Mr. Toone E
8  mail to me some other documents with the Bates
9  numbers on them.  And I can provide those to
10  you.  Unfortunately, my printer at home last
11  night broke.
12        MS. WILLIAMS:  We'll talk about
13  this after.
14        You said this is part of Nothern's
15  production to us?
16        MR. SHOPE:  My understanding is
17  that's part of Nothern's or perhaps the MFS
18  production which MFS made a production to you
19  and so forth.
20        MS. WILLIAMS:  Okay.  We'll talk
21  about that after.
22  BY MS. WILLIAMS:
23    Q.   Mr. Nothern, do you know how much
24  money you and the other portfolio managers made
25  for the portfolios you managed as a result of

18 (Pages 287 to 290)

Steven E. Northern                                                                January 31, 2007
                                    Boston, MA

| Page 291 | Page 293 |
|---|---|
| 1  the $65 million trade in the 30-year bond? | 1  Bond Market Association, January 30, 2001. |
| 2      A.  Made between when and when? | 2          Had you seen this document prior to |
| 3      Q.  Do you know -- | 3  October 31, 2001? |
| 4      A.  Between then and year end I think we | 4      A.  I don't recall having seen this. |
| 5  lost money. | 5      Q.  I can refer you to page two of the |
| 6      Q.  Between that and the end of the day? | 6  document, the first full paragraph that starts, |
| 7      A.  I don't know.  I don't.  I think the | 7  "The committee".  It's only three sentences, if |
| 8  market was up five points that day. | 8  you could read that to yourself. |
| 9      Q.  Do you recall -- you said the market | 9          (Pause) |
| 10  was up five points.  So by the end of the day, | 10      A.  Okay. |
| 11  do you recall if you had made money in the | 11      Q.  Prior to October 31, 2001, had you |
| 12  portfolios you managed as a result of that | 12  ever heard anything about the Borrowing Advisory |
| 13  trade? | 13  Committee recommending the elimination of the |
| 14      A.  Yes.  The bond continued to rally for | 14  30-year bond? |
| 15  several hours that morning. | 15      A.  I don't recall.  I may well have, |
| 16      Q.  Are you familiar with an entity called | 16  though. |
| 17  the Treasury Borrowing Advisory Committee?  Were | 17      Q.  Prior to October 31, 2001, had you |
| 18  you aware of it in October of 2001? | 18  ever received a call from Peter Davis on the |
| 19      A.  Yes. | 19  same day as a Treasury refunding announcement? |
| 20      Q.  What did you understand the Treasury | 20      A.  I now know that I did.  I don't have a |
| 21  Borrowing Advisory Committee to be? | 21  memory of that phone call at all other than |
| 22      A.  I understood it to be a group of | 22  through materials that you've presented to me or |
| 23  industry professionals, primarily from Wall | 23  that were actually presented at a deposition. |
| 24  Street, from the brokers and investment banking | 24      Q.  What was the date of that call? |
| 25  community, generally somewhat distinguished | 25      A.  I don't recall. |

| Page 292 | Page 294 |
|---|---|
| 1  members of the community. | 1          MS. WILLIAMS:  If I could have this |
| 2          There was -- I think they're a | 2  marked as Exhibit 13. |
| 3  self-selecting group.  They would meet with | 3          (Exhibit 13 marked |
| 4  Treasury on a regular basis.  It would be a | 4          for identification) |
| 5  forum for Treasury to bounce ideas, take the | 5  BY MS. WILLIAMS: |
| 6  temperature of the investment community, see | 6      Q.  Do you recognize this document, |
| 7  what issues the investment community was | 7  Mr. Nothern? |
| 8  concerned about or the brokerage community was | 8      A.  No. |
| 9  concerned about, have them make recommendations | 9      Q.  Okay.  This is a press release from |
| 10  on particular issues that Treasury might be | 10  the Office of Public Affairs, Treasury News. |
| 11  considering. | 11  And the heading is Assistant Secretary For |
| 12          It was a forum for exchange of just | 12  Financial Markets Brian Roseboro Remarks at the |
| 13  views and ideas. | 13  August 2001 Treasury Quarterly Refunding.  The |
| 14      Q.  Prior to October 31st, had you ever | 14  date is August 1, 2001. |
| 15  reviewed any minutes from the Treasury Borrowing | 15          Are you aware that Treasury held a |
| 16  Advisory Committee meetings? | 16  refunding conference on August 1, 2001? |
| 17      A.  Yes.  They put out minutes or | 17      A.  As we sit here today, I have no |
| 18  statements, and I had reviewed those. | 18  recollection of the August refunding. |
| 19          MS. WILLIAMS:  I'd like this marked | 19      Q.  Do you have any reason to doubt the |
| 20  as Exhibit 12. | 20  accuracy of the date of this document? |
| 21          (Exhibit 12 marked | 21      A.  No. |
| 22          for identification) | 22          MS. WILLIAMS:  If I could have this |
| 23  BY MS. WILLIAMS: | 23  marked as Exhibit 14. |
| 24      Q.  These are minutes of the meeting of | 24          (Exhibit 14 marked |
| 25  the Treasury Borrowing Advisory Committee of the | 25          for identification) |

                                                        19 (Pages 291 to 294)

Steven E. Northern                                    January 31, 2007
                        Boston, MA

Page 295

1  BY MS. WILLIAMS:
2      Q.  Do you recognize this document?
3      A.  This may be the document that I had
4  seen at a deposition.
5      MR. SHOPE:  Mr. Nothern, the
6  question is whether or not you recognize the
7  document.
8      A.  I don't.
9      Q.  Okay.  These are telephone records
10 from Peter Davis.  At the top do you see the
11 billing date August 19, 2001?  Do you see that
12 date?
13     A.  Yes.
14     Q.  If I could ask you to turn to what's
15 Bates numbered SECNOTH00114098.  And I wanted to
16 know if you see your phone number anywhere on
17 this document?  And I'd refer you to line 20 and
18 line 16.
19     (Pause)
20 BY MS. WILLIAMS:
21     Q.  Do you see your phone number anywhere
22 on this document?
23     A.  The first you mentioned, yes.
24     Q.  And is that line 20?
25     A.  Yes.

Page 296

1      Q.  And as reading across, the date on
2  that reflected on this document is 8/1/2001,
3  time 9:39 a.m., and the call is to
4  (617) 954-5887.
5      Was that your phone number on
6  August 1, 2001?
7      A.  Yes.
8      Q.  Do you recall receiving a call from
9  Peter Davis on August 1, 2001?
10     A.  No.
11     Q.  The call appears to be 12 minutes long
12 under minute of call, I see 12.
13     Do you have any reason to doubt the
14 accuracy of this phone record?
15     A.  No.
16     Q.  The number on line 16, (617) 563-7788,
17 do you recognize that number?
18     A.  No.
19     Q.  Just to clarify, you don't recall
20 receiving or talking to Mr. Davis on August 1,
21 2001?
22     A.  No.
23     Q.  Did you receive weekly calendars from
24 Peter Davis as part of the services he provided
25 MFS?

Page 297

1      MR. THEODOROU:  Objection.
2      A.  I don't know.
3      Q.  Do you recall receiving calendars of
4  events from Mr. Davis?
5      A.  Yes.
6      Q.  Did you review the calendars when you
7  received them?
8      A.  No.  It's not useful information for
9  us.
10     Q.  Did you ever review the calendars when
11 you received them?
12     A.  Yes, I'm sure I must have.
13     MS. WILLIAMS:  Let me have this
14 marked as Exhibit 15.
15     (Exhibit 15 marked
16     for identification)
17 BY MS. WILLIAMS:
18     Q.  Do you recognize this document?
19     A.  No.
20     Q.  If I could refer you to the first
21 page, about 12 lines up from the bottom, and
22 ask, do you see your E mail address reflected on
23 this document?
24     A.  Yes.
25     Q.  This appears to be an E mail from

Page 298

1  Peter Davis to blind carbon copying a variety of
2  different people, and your E mail address
3  appears under the BCC; is that correct?
4      A.  Yes.
5      Q.  And the date is Monday, October 29,
6  2001.
7      Do you see that date on the first page
8  of the document?
9      A.  Yes.
10     Q.  Do you have any reason to believe you
11 did not receive this E mail?
12     A.  No.
13     Q.  Do you recall seeing this E mail prior
14 to October 31st?
15     A.  No, I don't recall seeing this E mail.
16     Q.  And on the third page of the E mail,
17 about halfway down, more than halfway down, I
18 see "Wednesday, 31."
19     Do you see that?
20     A.  Yes.
21     Q.  "9 a.m., Fisher Treasury quarterly
22 refunding, D.C."
23     Do you see that?
24     A.  Yes.
25     Q.  Do you recall receiving any calendars

20  (Pages 295 to 298)

Steven E. Northern                                                      January 31, 2007

Boston, MA

| Page 299 | Page 301 |
|---|---|
| 1 prior to October 31st that included this | 1    Mr. Nothern? |
| 2 information, "9 a.m., Fisher Treasury quarterly | 2       A.  As we sit here today, no, I don't. |
| 3 refunding"? | 3       Q.  I see that it's Bates stamped |
| 4       A.  No. | 4    Nothern-0186 through 0195. |
| 5          MS. WILLIAMS:  I'd like to have | 5          Is this a document you produced in |
| 6 this marked as Exhibit 16. | 6    this litigation? |
| 7          (Exhibit 16 marked | 7       A.  I don't recall. |
| 8          for identification) | 8       Q.  Do you know if this is a document you |
| 9 BY MS. WILLIAMS: | 9    would have kept in your files? |
| 10      Q.  Have you seen this document before, | 10      A.  I don't recall this document. |
| 11 Mr. Nothern? | 11      Q.  Do you know who Bill O'Donnell is? |
| 12      A.  No. | 12      A.  Yes. |
| 13      Q.  Did you recall seeing it prior to | 13      Q.  Who is he? |
| 14 October 31, 2001? | 14      A.  Bill O'Donnell was a salesman with |
| 15      A.  No.  I didn't see this document. | 15   Greenwich Capital Securities.  He was our |
| 16         MS. WILLIAMS:  I'd like to have | 16   coverage guy for government securities. |
| 17 this marked as Exhibit 17. | 17      Q.  When you worked at MFS, did you |
| 18         (Exhibit 17 marked | 18   have -- how often did you have contact with |
| 19         for identification) | 19   Mr. O'Donnell? |
| 20      Q.  Have you seen this document before, | 20      A.  Frequent telephone contact. |
| 21 sir? | 21      Q.  And did Mr. O'Donnell ever send you E |
| 22      A.  Not that I can recall. | 22   mails? |
| 23      Q.  It appears to be a fax cover sheet | 23      A.  Yes. |
| 24 dated October 30, 2001 to clients from Pete | 24      Q.  Did you receive this document from |
| 25 Davis.  And it's five pages, including this | 25   Mr. O'Donnell? |

| Page 300 | Page 302 |
|---|---|
| 1 cover, charts from this morning's Treasury | 1       A.  I don't recall receiving this document |
| 2 refunding follow. | 2    from Bill O'Donnell. |
| 3          Do you recall ever receiving a fax | 3       Q.  Do you know how it got in your |
| 4 from Mr. Davis with charts from a Treasury | 4    document production in this case? |
| 5 refunding? | 5       A.  I don't recall. |
| 6       A.  Yes. | 6       Q.  The document entitled "Q4 Treasury |
| 7       Q.  When do you recall receiving charts | 7    Refunding Preview," and about halfway down it |
| 8 from a refunding? | 8    says, "Here are a few thoughts leading up to |
| 9          Let me ask this:  Prior to October 31, | 9    Wednesday's refunding announcement." |
| 10 2001, do you recall receiving charts -- | 10         Just to clarify, do you recall ever |
| 11      A.  Yes. | 11   reading that statement prior to October 31, |
| 12      Q.  Do you recall how many -- did you | 12   2001? |
| 13 receive charts from a refunding from Mr. Davis | 13      A.  No.  I don't recall ever having seen |
| 14 on more than one occasion? | 14   this. |
| 15      A.  I don't recall. | 15         MS. WILLIAMS:  I'd like to have |
| 16      Q.  Are you familiar with Treasury | 16   this marked as Exhibit 19. |
| 17 refunding previews that are put out by Greenwich | 17         (Exhibit 19 marked |
| 18 Capital? | 18         for identification) |
| 19      A.  No. | 19   BY MS. WILLIAMS: |
| 20         MS. WILLIAMS:  I'd like to have | 20      Q.  Do you recognize this document, sir? |
| 21 this marked as Exhibit 18. | 21      A.  No. |
| 22         (Exhibit 18 marked | 22      Q.  This also has Bates numbers |
| 23         for identification) | 23   Nothern-0225, and then the second document |
| 24 BY MS. WILLIAMS: | 24   actually has a different Bates number, |
| 25      Q.  Do you recognize this document, | 25   Nothern-1.  I'm not sure how they got stapled |

21 (Pages 299 to 302)

Steven E. Northern                                                                      January 31, 2007

Boston, MA

| Page 303 | Page 305 |
|---|---|

**Page 303**

1  together. In any event, I don't think they
2  should be stapled together, but they are.
3       Did you produce --
4       MR. THEODOROU:  That's the way that
5  they --
6       MS. WILLIAMS:  I don't know why.
7       MR. THEODOROU:  Go ahead. He just
8  tore the exhibit.
9       MS. WILLIAMS:  That's okay.
10      MR. THEODOROU:  It's one exhibit.
11 BY MS. WILLIAMS:
12    Q.  Do you know how these documents were a
13 part of your document production in this case?
14    A.  Apparently they are.
15    Q.  Do you know how they became part of
16 your document production?
17    A.  I don't recall my document production.
18    Q.  Do you know if these were documents
19 you kept in your file?
20    A.  I don't know.
21    Q.  What steps did you take when you were
22 producing documents?
23    A.  I systematically went through my
24 files. I systematically went through my Outlook
25 E mail account to see if there was anything that

**Page 305**

1  they were asking for.
2       I also went through E mail with the
3  Bloomberg system where there could potentially
4  be relevant materials.
5       And I believe I also looked at home
6  for anything that might be related as well.
7    Q.  When you were at MFS, what was your
8  practice regarding the deletion of E mails?
9    A.  My practice on Microsoft Outlook E
10 mails was to pretty aggressively just delete
11 them if I didn't need them further.
12      If there was a document attached that
13 was of interest, print the document, delete the
14 file.
15      Possibly if it was something that I
16 might want to refer to later on, I would store
17 it somewhere. But that's a bad practice.
18      We just received way too many to be
19 keeping even a few a day where it rapidly
20 becomes unmanageable. So my practice was really
21 to clean it up as quick as possible.
22    Q.  What about the Bloomberg E mail
23 system, what was your practice regarding
24 deletion?
25    A.  I don't -- I didn't use that all that

| Page 304 | Page 306 |
|---|---|

**Page 304**

1  would be related in any way in accordance with a
2  memo we received.
3       MR. THEODOROU:  Are you talking
4  about when he was in MFS or in this litigation
5  or both?
6       MS. WILLIAMS:  I'm talking about
7  both.
8       MR. THEODOROU:  Okay.
9  BY MS. WILLIAMS:
10    Q.  I'm sorry, were you finished?
11    A.  In terms of our document production,
12 when I was working at MFS?
13    Q.  Yes.
14    A.  We received a memo with instructions
15 on where to look.
16      I remember I combed through my files.
17 I went through every drawer and every file in my
18 office. I did a comparable thing at my work
19 location on the trading desk.
20      I also went through my Outlook E mail
21 folders, both the open ones and the deleted
22 ones. I just went through anything I could find
23 in there and produced -- subject to what the
24 outline of what they wanted, I produced things
25 that I found that would be consistent with what

**Page 306**

1  much. I don't recall that you had to delete
2  them.
3    Q.  Okay. Do you know who Joe Swirbalus
4  is?
5    A.  Yes.
6    Q.  Who is he?
7    A.  I don't know Joe well. He was our
8  coverage guy. He was assigned by JP Morgan in
9  their Boston office here to cover our account
10 with MFS.
11    Q.  Were you receiving E mails by
12 Mr. Swirbalus while you were a portfolio manager
13 at MFS?
14    A.  Yes.
15    Q.  Do you recall receiving this E mail
16 from Mr. Swirbalus?
17    A.  No.
18    Q.  Do you recall ever seeing this E mail
19 prior to October -- and I'm talking about the
20 first page of Exhibit 19 -- prior to
21 October 31st -- prior to 9 a.m. on October 31,
22 2001?
23    A.  No.
24    Q.  What about the second page of this
25 document, do you know R.J. O'Brien & Associates?

22 (Pages 303 to 306)

Steven E. Northern                                                    January 31, 2007

Boston, MA

| Page 307 | Page 309 |
|---|---|
| 1    A.  I'm familiar with the name.  I don't<br>2  know them.<br>3    Q.  How are you familiar with the name?<br>4    A.  They were a firm that I -- that we did<br>5  business with, not myself, but other one or<br>6  other portfolio managers in my group.<br>7    Q.  Do you know who W.I. Partners is?<br>8    A.  No.<br>9    Q.  While at MFS, do you recall receiving<br>10  any E mails addressed to W.I. Partners?<br>11    A.  No.<br>12    Q.  Do you recall seeing this document on<br>13  October 31, 2001?  That's page two of<br>14  Exhibit 19.<br>15    A.  No.<br>16    Q.  And just to clarify, for page two of<br>17  Exhibit 19, do you know how this document became<br>18  part of your production?<br>19    A.  I don't recall.<br>20    Q.  Setting aside any depositions in this<br>21  case, when's the last time you talked to<br>22  Mr. Davis?<br>23    A.  I don't remember specifically.  Some<br>24  time around the October period.  I believe he<br>25  called concerning Treasury may be issuing war | 1  depositions in this case, when's the last time<br>2  you had any communication with Mr. Kennedy?<br>3    A.  I believe the same thing, February,<br>4  early March period of 2002.<br>5    Q.  What about Mr. Kurinsky?<br>6    A.  Jeffrey's a friend.  We've had<br>7  contacts on an ongoing basis since I left MFS.<br>8    Q.  Have any of those contacts had to do<br>9  with any trading that went on on October 31,<br>10  2001?<br>11    A.  No, except in the most general sense<br>12  that this case is still a pending case that I'm<br>13  trying to clear my name.<br>14    Q.  Have you talked to Mr. Kurinsky since<br>15  his deposition in this case?<br>16    A.  I may have once.  I know we traded E<br>17  mails.  I can't recall if it was also telephone.<br>18    Q.  What was the subject of those E mails?<br>19    A.  I think he was proposing that we get<br>20  together and go for a jog in Boston or something<br>21  like that, get together for lunch, maybe go to<br>22  the gym.<br>23    Q.  Did you get together with Mr. Kurinsky<br>24  since his deposition in this matter?<br>25    A.  No. |

| Page 308 | Page 310 |
|---|---|
| 1  bonds.<br>2    Q.  October of what year?<br>3    A.  Sorry, 2001.<br>4    Q.  I know you -- so prior to October 31,<br>5  2001, you recall talking to Mr. Davis in the<br>6  October period.<br>7      What about any E mails, when's the<br>8  last time you received an E mail from Mr. Davis?<br>9    A.  I don't recall.  We kept him as a<br>10  consultant through the end of my career at MFS,<br>11  so we continued receiving materials from him<br>12  through, in this case, February or early March<br>13  of 2002.<br>14    Q.  Since leaving MFS and, again, setting<br>15  aside any depositions in this case, have you had<br>16  any contact Mr. Davis?<br>17    A.  No.<br>18    Q.  When is the last time, and, again, I<br>19  want to set aside any deposition in this case,<br>20  when's the last time you communicated with<br>21  Mr. Smith, Rick Smith?<br>22    A.  I was terminated at MFS.  So<br>23  that would be February, early March period of<br>24  2002.<br>25    Q.  What about Mr. Kennedy, setting aside | 1    Q.  What did you -- you said you think<br>2  that there may have been a phone call.  Do you<br>3  recall what you talked to Mr. Kurinsky about?<br>4      MR. THEODOROU:  Objection.<br>5    A.  I don't recall whether we -- I know we<br>6  communicated.  Whether we communicated by phone<br>7  or not, I don't know.<br>8    Q.  Have you had any business dealings<br>9  with Mr. Kurinsky since you left MFS?<br>10    A.  Yes.<br>11    Q.  What dealings have you had with<br>12  Mr. Kurinsky?<br>13    A.  It was with a firm that he was working<br>14  at, a small hedge fund he set up with a mutual<br>15  acquaintance Jim Delisle.<br>16    Q.  What was your involvement, if any, in<br>17  that fund?<br>18    A.  I invested some money in Jim Delisle's<br>19  hedge fund.<br>20    Q.  Is that fund also -- is Mr. Kurinsky<br>21  also somehow affiliated with that fund?<br>22    A.  I think he was helping Jim with it.  I<br>23  don't know his business relationship.  I think<br>24  he was a partner.  I think he put up some money<br>25  for it. |

23  (Pages 307 to 310)

Steven E. Northern                                                January 31, 2007
                              Boston, MA

| Page 311 | Page 313 |
|---|---|

**Page 311**

1    Q.  How much did you invest?
2    A.  I invested $250,000.
3         MS. WILLIAMS:  Can we go off
4    because we have five minutes left on the tape,
5    and I think I have five minutes.
6         MR. THEODOROU:  Okay.
7         THE VIDEOGRAPHER:  Going off
8    record, 11:23 a.m.
9         (Recess taken)
10        (Exhibit 20 marked
11        for identification)
12        THE VIDEOGRAPHER:  This marks the
13   beginning of videotape number five in the
14   deposition of Steven Nothern.
15        On the record, 11:33 a.m.
16   BY MS. WILLIAMS:
17        Q.  Mr. Nothern, I asked the court
18   reporter to mark this Exhibit 20 which is Bates
19   number Nothern-0307.
20        Do you recognize this document?
21        A.  Yes.
22        Q.  What is it?
23        A.  This is an agenda from or proposed
24   agenda from one of the two trips I mentioned
25   that I had taken to Washington, D.C. that Pete

**Page 313**

1    look kind of neat starting with "Meet at 9 a.m."
2    and "Our first meeting is."
3         Are those two lines your handwriting?
4         A.  No, those are not my handwriting.
5    There's a little bit of my handwriting above
6    that, but those two lines are not.
7         Q.  Okay.
8         A.  Inside the text there are some
9    somewhat scribbled notations that are mine.
10        There is a notation in the left-hand
11   column that does not look like mine.
12        And the notations on the bottom of the
13   page are all mine.
14        Q.  Okay.  The one you said doesn't look
15   like yours, is that under the column "Home
16   number, cell number"?
17        A.  The notation that I mentioned on the
18   left?
19        Q.  Oh, I'm sorry.  On the left.
20        A.  There's a little scribble in there, I
21   don't know what it is next to Wilcox, David.
22        Q.  Okay.  Okay.
23        A.  I don't recognize that.
24        Q.  Okay.  Could you just read your
25   handwriting on the document?

**Page 312**

1    Davis had set up an itinerary.  So this looks to
2    be the itinerary of the proposed visits we would
3    do that day.
4         Q.  At the bottom I see "Washington visit
5    1-15-98."
6         Do you see that?
7         A.  Yes.
8         Q.  Do you recall the visit being on
9    January 15, 1998?
10        A.  I actually don't remember what year
11   these were.  I remember we visited early in the
12   year, so January 15th, certainly.  But '98, '99.
13   They were back to back.  It could have been '99,
14   2000, but I don't have a recollection.
15        Q.  There's some handwriting on the
16   document.  Is any of the handwriting your
17   handwriting?
18        A.  Yes.
19        Q.  If you could indicate generally -- if
20   it's easier, you can tell me what handwriting is
21   not yours; if not, if you could tell me which
22   handwriting is yours.
23        A.  In general the neater handwriting is
24   not mine.
25        Q.  So I see two lines at the top that

**Page 314**

1    A.  Yes.  The top, the top right hand, and
2    I apologize for the scrawl, "Adjusted and
3    uncommitted."
4         Q.  Okay.
5         A.  On the line where it lists the second
6    appointment, "Lister, Jim, Department of
7    Treasury," I have a notation, "IMF liaison," and
8    then some notations "17B" and below that it
9    looks like "17B at Fed."
10        Q.  Okay.
11        A.  Below that, the third entry,
12   "Anderson, Roger, Treasury," and, again, a
13   scrawl, it looks something like "public issue."
14        Below that, the line appointment with
15   John Karl -- "Scholz, John Karl at US Treasury,"
16   and I have a notation "tax proposals."
17        And further across towards the right,
18   I really can't make that out, it looks like "13
19   months," M-O-S, abbreviated, underneath, "no
20   reason."
21        The following line, "Minarik, Joe at
22   OMB," I have a notation "chief ec," for
23   economist.
24        At the bottom on the last appointment
25   with Ken Kies, K-I-E-S, "Joint Committee on

                                              24  (Pages 311 to 314)

Steven E. Northern                                                                    January 31, 2007
Boston, MA

| Page 315 | Page 317 |
|---|---|

**Page 315**

1  Taxation," there's a notation, it looks like
2  "election" an abbreviation for year slash
3  "divided government," government abbreviated
4  slash, and this I can't make out.
5      Q.  Okay.
6      A.  It looks like chocolates.  I have no
7  idea what that is.
8      Q.  It does look like chocolates.
9      A.  Below that is "Good news_SS," Social
10 Security, "Bad news_minimum wage."  I guess it's
11 good news for some.  I'm sure that's bad news.
12         And below that "Auction cycle
13 changes."
14         Below that, "Surplus and IMF."  I
15 can't make that out.
16         To the right, "Projecting slower
17 growth - no evidence really."
18         And then upside down on the bottom,
19 "Will have" it looks like an abbreviation
20 "statement on Social Security."
21     MS. WILLIAMS:  Can I have this
22 marked as Exhibit 21.
23         (Exhibit 21 marked
24         for identification)
25 BY MS. WILLIAMS:

**Page 317**

1  there is an underline notation "1.6B" for
2  billion, "aid to Columbia."
3         I have below that a phone number and a
4  notation "7 p.m., lobby."
5         At the bottom of the page there's a
6  little bit of notations of some math of "460,"
7  underneath it says "maturing," so it would be
8  460 billion maturing.
9         Excuse me, do you want me to try to
10 interpret this, or do you want me to just read
11 it?
12     Q.  I kind of just want you to read it.
13 If I have a question, I'll go back.
14     A.  Next to that is "140," and below that
15 "surplus," and then "dash 24" and underneath
16 that "tips".
17         Below that there's a notation "gross
18 160," below that "284B," for billion, "minus
19 foreign add on."
20         And below that, "without buyback,
21 260B," for billion.
22         Below that, two bullet points, "only
23 effect is spread of" I believe something "to on
24 the run."
25         Second bullet is "not effect on

| Page 316 | Page 318 |
|---|---|

**Page 316**

1      Q.  Do you recognize Exhibit 21?
2      A.  Yes.
3      Q.  What is it?
4      A.  This is also an agenda for a
5  meeting -- a series of meetings that Mr. Davis
6  organized for clients.
7      Q.  And the date here is January 19, 2000.
8         Do you see that?
9      A.  Yes.
10     Q.  Do you recall if the meeting occurred
11 on or around January 19, 2000?
12     A.  I don't have any independent
13 recollection other than this document, but I
14 have no reason to doubt this is correct.
15     Q.  Do you recognize the handwriting on
16 this document?  It's a two-page document.
17     A.  Yes.
18     Q.  Whose handwriting is this?
19     A.  It's my handwriting.
20     Q.  And just to help me out, could you
21 read the handwriting on this document?
22     A.  Okay.  There's some check marks where
23 it says -- at the beginning of some of the lines
24 I guess ticking off meetings that we had.
25         On the right-hand side, toward the top

**Page 318**

1  interest" or "net effect on interest."
2         To the right of that, some bullet
3  questions.  "Anything off limits?  Biggest
4  priority?"
5         Two bullets below that, "Shift
6  maturity?  Saving on interest expense?  Ever
7  stop if it gets too small?  Trot them back out?
8  Bad faith?  Issue 8, I expect 8."
9         Second page, notes on the bottom --
10 actually, the notes on the top that -- I don't
11 recognize as being my handwriting.
12         Notes on the bottom, from two
13 meetings, one with Vince Reinhart, and the notes
14 are "Forecasts have been wrong for three and a
15 half years, 'seem to need mechanisms to damp
16 agg, as in aggregate, demand.'"
17         Couple of bullet points.  "Small rise
18 in long rates, more in short rates."
19         Another bullet, "Concern that pressure
20 for fiscal restraint easing."
21         And one more line, "Looser fiscal
22 arrow pointing to tighter monetary...impact for
23 dollar?"
24         Below that some notes, meeting with
25 Lee Sachs, couple of bullets, "Av mat extends by

25 (Pages 315 to 318)

Steven E. Northern                                                                          January 31, 2007
Boston, MA

| Page 319 | Page 321 |
|---|---|

**Page 319**

1  2004 to 7 and a half years."
2  Second bullet is "Debt retired, no
3  preference in objectives."
4  In quotes "'We are going to do what
5  Fed' (in coupon passes) does."
6  Q.  Are you still invested in the fund
7  that Mr. Kurinsky told you about?
8  A.  The Paid Vega Fund I think is what
9  you're referring to?
10  Q.  Yes.
11  A.  They closed some time last fall, so
12  I'm not.
13  Q.  Did you receive any profit from being
14  invested in that fund?
15  A.  I received most of my money back.
16  They had a small loss.
17  Q.  By "most," do you mean not all of your
18  money?
19  A.  They had a small loss for calendar
20  year -- for their operations in 2006.
21  Q.  How much was the loss?
22  A.  I don't recall specifically.  It was
23  relatively modest.  If I had to guess, 5,
24  10 percent.
25  This was a fund that was designed to

**Page 320**

1  be a hedge to other equity investments.
2  Q.  Okay.  Just a couple more quick
3  questions.
4  MS. WILLIAMS: Can you have this
5  marked as Exhibit 22.
6  (Exhibit 22 marked
7  for identification)
8  BY MS. WILLIAMS:
9  Q.  Do you recognize this document,
10  Mr. Nothern?
11  A.  Yes.
12  Q.  What is it?
13  A.  This is a fax or a copy of a fax that
14  was sent by Davis Capital Investment Ideas to
15  Bridgett Femino, MFS Investment Management, Inc.
16  It's a bill for consulting services.
17  Q.  How much did Davis Capital charge MFS
18  for its consulting services?
19  A.  $12,000 per year.
20  Q.  Do you recognize the handwriting on
21  this document?
22  Setting aside this, it looks like a
23  signature next to "Thank you for your valued
24  business," do you recognize the other
25  handwriting?

**Page 321**

1  A.  Yes.
2  Q.  Whose handwriting is that?
3  A.  Mine.
4  Q.  Could you read that handwriting?
5  A.  Yes.  Up in the upper-right-hand area
6  there, there's a note, the name, "Eric" with a
7  number below it "57349".
8  And then there's a notation by
9  Bridgett Femino's name which says "Spray in
10  foam."
11  MR. ROSSETTI: I'm sorry, what is
12  that?
13  THE WITNESS: "Spray in foam," I
14  believe.  It's a scribble.
15  BY MS. WILLIAMS:
16  Q.  Do you know what "Spray in foam," why
17  that's written on here?
18  A.  I don't remember.  It was a piece of
19  paper that I just scribbled a note onto.  I
20  can't remember why.
21  Q.  What was Miss Femino's position at
22  MFS?
23  A.  I don't know Bridgett Femino.
24  Q.  Did you receive a copy of this invoice
25  while you were at MFS?

**Page 322**

1  A.  Yes.  I produced this, I believe.
2  Q.  Did you generally receive copies of
3  invoices from Mr. Davis to MFS?
4  A.  I don't think so.  I think the reason
5  I received this one was because he wasn't paid
6  on time or something of that order.
7  Q.  Did you have to approve the invoices
8  from Mr. Davis before they could be paid by MFS?
9  A.  No.
10  Q.  Last question.
11  MS. WILLIAMS: Can I have this
12  marked as Exhibit 23.
13  (Exhibit 23 marked
14  for identification)
15  BY MS. WILLIAMS:
16  Q.  Do you recognize this document?
17  A.  Yes.
18  Q.  What is it?
19  A.  This is a Treasury news bulletin, I
20  imagine, from the Office of Public Affairs.
21  It's a transcript of the remarks at the
22  November 2001 quarterly refunding by Under
23  Secretary of the Treasury for Domestic Finance
24  Peter Fisher.
25  Q.  There's some handwriting on the

26 (Pages 319 to 322)

Steven E. Northern                                          January 31, 2007
                          Boston, MA

| Page 323 | Page 325 |
|---|---|
| 1  document. Do you see the handwriting? | 1  C E R T I F I C A T E |
| 2  A.  Yes. | 2  I, STEVEN E. NOTHERN, do hereby certify |
| 3  Q.  Do you know whose handwriting that is? | 3  that I have read the foregoing transcript of my |
| 4  A.  Yes. | 4  testimony, and further certify that it is a true |
| 5  Q.  Whose handwriting? | 5  and accurate record of my testimony |
| 6  A.  It's my handwriting. | 6   |
| 7  Q.  When did you first see this document? | 7   |
| 8  A.  I don't recall. | 8  _____ |
| 9  Q.  This is a document that's Bates | 9  STEVEN E. NOTHERN |
| 10  stamped Nothern-0137 to 139. | 10   |
| 11  Is this a document that you kept in | 11   |
| 12  your file at MFS? | 12   |
| 13  A.  Yes. | 13   |
| 14  Q.  Why did you keep this document? | 14   |
| 15  A.  I evidently had interest in some of | 15   |
| 16  the statistical information that's highlighted. | 16   |
| 17  Q.  One last question.  Were you | 17   |
| 18  Mr. Davis's point of contact at MFS? | 18   |
| 19  MR. THEODOROU:  Objection. | 19   |
| 20  Go ahead. | 20   |
| 21  A.  Not in any formal sense.  I was the | 21   |
| 22  one that had originally found him and suggested | 22   |
| 23  that we use him as a consultant, but really it | 23   |
| 24  was for anybody to use him. | 24   |
| 25  MS. WILLIAMS:  I have no further | 25   |

| Page 324 | Page 326 |
|---|---|
| 1  questions. | 1  COMMONWEALTH OF MASSACHUSETTS) |
| 2  MR. THEODOROU:  Could we just have | 2  SUFFOLK, SS.                   ) |
| 3  one minute?  We'll step out.  You stay here. | 3   |
| 4  THE VIDEOGRAPHER:  Going off the | 4  I, Daria L. Romano, RPR, CRR and Notary |
| 5  record, 11:52 a.m. | 5  Public in and for the Commonwealth of |
| 6  (Recess taken) | 6  Massachusetts, do hereby certify that there came |
| 7  THE VIDEOGRAPHER:  On the record, | 7  before me on the 31st day of January, 2007, at |
| 8  11:53 a.m. | 8  9:13 a.m., the person hereinbefore named was |
| 9  MR. THEODOROU:  We have no | 9  duly sworn by me and that such deposition is a |
| 10  questions of Mr. Nothern.  Thank you. | 10  true record of the testimony given by the |
| 11  MS. WILLIAMS:  Thank you. | 11  witness. |
| 12  THE VIDEOGRAPHER:  This concludes | 12  I further certify that I am neither related |
| 13  the January 31, 2007 proceedings in the | 13  to nor employed by any of the parties or counsel |
| 14  videotaped deposition of Steven Nothern. | 14  to this action, nor am I financially interested |
| 15  The number of tapes used is five. | 15  in the outcome of this action. |
| 16  Going off the record, 11:53 a.m. | 16  In witness whereof, I have hereunto set my |
| 17  (Whereupon the deposition was | 17  hand and seal this 7th day of February, 2007. |
| 18  concluded at 11:53 a.m.) | 18   |
| 19   | 19   |
| 20   | 20   |
| 21   | 21  _____ |
| 22   | 22  Notary Public |
| 23   | 23  My Commission Expires |
| 24   | 24  March 15, 2013 |
| 25   | 25   |

Alderson Reporting Company
1-800-FOR-DEPO

Steven E. Northern

Boston, MA

January 31, 2007

Page 327

**A**

abbreviated 314:19 315:3
abbreviation 315:2,19
able 286:20
accelerated 241:10 248:13
accompanied 274:2
account 303:25 306:9
accuracy 294:20 296:14
accurate 248:21 325:5
acquaintance 310:15
action 222:8 241:15 326:14 326:15
activities 274:6
actual 269:18
add 252:17,19 252:25 317:19
added 270:7
additional 280:19 281:7,9
address 297:22 298:2
addressed 307:10
adjacent 256:25
Adjusted 314:2
administration 236:8,12,13,17 236:21,24
adopted 232:25
Advisory 224:11 291:17,21 292:16,25 293:12
Affairs 224:15 225:5 294:10 322:20

affiliated 310:21
agencies 230:19
agenda 224:24 311:23,24 316:4
agg 318:16
aggregate 318:16
aggressively 305:10
ago 228:23
agree 232:18,21 247:3
ahead 233:24 257:9 260:18 303:7 323:20
aid 317:2
allocate 286:4,9 286:12
allocated 286:21
Americans 238:7
amount 260:17
analysts 264:7
Anderson 314:12
announce 237:7 245:22
announced 237:3,10 246:2 246:10 250:9
announcement 254:20 270:2,3 278:19 293:19 302:9
announcements 281:4
announcing 277:13,18 278:13
answer 252:5 261:21 262:9 262:25 266:14 271:3 275:7
answered

249:19 251:22 275:4
answering 252:3 271:1 275:7
anybody 242:17 323:24
anymore 234:9 289:24
apologize 314:2
apparent 249:12
apparently 267:20,22,23 268:7 303:14
appearance 243:23
appears 296:11 297:25 298:3 299:23
applied 254:7,10 255:20
apply 254:1
appointment 314:6,14,24
appropriate 230:11 236:15
approve 322:7
Arch 222:21
area 321:5
arrive 240:17
arrow 318:22
article 276:25 277:7
ascertain 232:14
aside 307:20 308:15,19,25 320:22
asked 237:13 249:18 251:25 252:5 268:6 270:17 274:24 275:11 311:17
asking 229:25 250:18 253:1 259:1 305:1
assigned 265:9

265:16 306:8
assistant 223:5 272:14 294:11
Associates 306:25
Association 224:12 293:1
assume 264:5
attached 305:12
attention 257:15 257:20
Auction 315:12
August 233:6,12 237:9,11 294:13,14,16 294:18 295:11 296:6,9,20
authority 270:3 274:9
authorizing 280:20
Av 318:25
available 235:18 251:16
aware 251:15 253:1 277:12 277:16,21 278:1 291:18 294:15
awful 282:16
a.m 222:19,19 245:23 253:24 277:24 279:16 279:19 296:3 298:21 299:2 306:21 311:8 311:15 313:1 324:5,8,16,18 326:8

**B**

B 224:7 225:1 231:11 283:15
back 234:18 266:12 281:13

281:18 286:25 312:13,13
317:13 318:7 319:15
background 269:18
backup 265:10
bad 305:17 315:10,11 318:8
banking 291:24
based 230:15
basically 234:1 234:6 270:12
basis 251:8 276:14,15 292:4 309:7
Batchelder 268:11 273:24 274:15 275:14 275:20 276:1 280:2
Bates 229:20,24 290:8 295:15 301:3 302:22 302:24 311:18 323:9
BCC 298:3
beginning 249:21 265:6 311:13 316:23
begins 226:3 229:20
behavior 238:20
believe 230:15 233:8,21 235:4 235:9 240:11 240:13 243:11 243:17,21 244:3,5,20 245:4 248:8,19 248:21 253:18 254:16 256:13 257:17 263:15 274:11,24

Northern
EXHIBIT NO. 10
1-30-07

November 12, 2001   8:37 am

Page:  60

Mass. Financial Services
Department Report
From 10/31/2001 To 10/31/2001

Company: 1 11
Department: 111          MFS
Sub-Dept/PROF: 11310     Fixed Income
                         Fix Inc Mun. - Mgmt Ctr

Building/Room: B 21/241

Station: 55887 STEVEN E. NOTHERN

PBX ID: MFS Mass. Financial Services

|  |  |  |  | Destination | Calls | PBX/Station |  |  |  |
| Date | Time | DAC | Dialed Number | Destination | Call Class | PBX/Station | Calling # | Duration | Charge Td |
| 10/31/2001 | 9:37a |  | 55887 | INBOUND DID |  |  | 2022657624 | 0.80 | 0.00  D |

************** Charge Summary **************

| Type of Charge | Calls | Duration | Charge |
| INBOUND DID | 1 | 0.80 | 0.00 |
| Usage | 1 | 0.80 | 0.00 |

Total Telecommunications Charges ----->    1    0.80    0.00

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 000082

SECNOTH00129719

**Exhibit K**

**Cited Excerpts from the Deposition of Lula Tyler
(September 14, 2006)**

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3    – – – – – – – – – – – – – – – – x

4    UNITED STATES SECURITIES AND        :

5    EXCHANGE COMMISSION,                 :

6                 Plaintiff,        : Civil Action

7            vs.                    : No. 05-1-093 (NMG)

8    STEVEN E. NOTHERN,                   :

9                 Defendant.        :  PAGES 1 - 182

10   – – – – – – – – – – – – – – – – x

11                      September 14, 2006

12                      Washington, D.C.

13        Videotaped Deposition of LULA TYLER, held at the

14   offices of Foley Hoag, LLP, 1875 K Street, Northwest,

15   Washington, D.C., commencing at 1:18 p.m., Thursday,

16   September 14, 2006, before Elizabeth Mingione, Notary

17   Public.

18

19

20

21

22

Lula Tyler                                                                                    September 14, 2006

Washington, DC

Page 54

1    reasons why I didn't want to come.
2         BY MR. SHOPE:
3         Q.    Okay. All right. So, first of all, how
4    did you first sort of come to learn that there was a
5    Peter Davis?
6         A.    Well, Jill Ouseley told me, as far as I can
7    recall, that somebody by the name of Pete Davis was
8    going to be calling me so that he could get into the
9    press conference, and that I was to get his
10   information and allow him to come in for the press
11   conference.
12        Q.    Okay. Now, you said as best you can recall
13   it was Ms. Ouseley who told you to allow Mr. Davis
14   into the press conference?
15        A.    Yes. I know it was her.
16        Q.    You are certain that it was her?
17        A.    Yes.
18        Q.    Okay. And would it be fair to say that at
19   least while she was the director of the Office of
20   Market Finance, or whatever it might have been called
21   at that point, you would not have allowed Mr. Davis in
22   or you would not have cleared him into the press

Page 55

1    conference unless you had gotten Jill Ouseley's
2    permission beforehand. Is that a fair statement?
3         A.    Yes. It is a fair statement.
4         Q.    Okay. And did Ms. Ouseley give you any
5    explanation as to why it was that Mr. Davis was going
6    to be attending this quarterly refunding conference or
7    why it was that you should be clearing him in?
8         A.    No, she didn't.
9         Q.    Okay. And the -- now, and other than after
10   October 2000 -- 2001, and we'll get into that period
11   in a little bit, but before that did anybody ever ask
12   you about Mr. Davis and, you know, why is Mr. Davis
13   coming into this press conference?
14        A.    No. Nobody ever asked me anything about
15   Mr. Davis.
16        Q.    Okay. Now, can you recall at all when it
17   was that Ms. Ouseley told you to -- told you to
18   start -- to allow Mr. Davis to attend the press
19   conference or at least to clear him in?
20        A.    No. I don't remember the year. I really
21   don't. I know it was prior to her being out on that
22   extensive sick leave. So I suppose it was prior to

Page 56

1    1996.
2         Q.    And was that when President Clinton was
3    still President?
4         A.    I guess so.
5         Q.    Now, do you know whether or not they ever
6    handed out any materials at these quarterly refunding
7    conferences, either at the meeting of the Borrowing
8    Advisory Committee or at the press conference the next
9    day?
10        MR. ROSSETTI:  Objection.
11        A.    They handed out information packages after
12   the press conference the second day.
13        Q.    That was a regular practice?
14        A.    Yes. Yes. I believe it was.
15        Q.    Okay. Do you know whether there were ever
16   materials that were made available the preceding day,
17   like charts or something like that?
18        A.    You know, they were doing -- they did a lot
19   of -- a lot of charts. And if they had the charts, it
20   would have been for Treasury personnel, I believe.
21   Because I didn't work directly with them with the
22   charts and things like that.

Page 57

1         Q.    Okay. You didn't work on the charts?
2         A.    No, I didn't.
3         Q.    Okay. Do you remember whether Mr. Davis
4    ever wanted to get his hands on some of the charts?
5         MR. ROSSETTI:  Objection.
6         A.    I really don't know because I never went to
7    the press conference. I don't know Mr. Davis. The
8    only thing that I gave him -- I got from him was his
9    name and his birth date.
10        Q.    Okay. Now, I want to get into the
11   nitty-gritty on that. Was that -- is that something
12   that you asked him for every time he was going to be
13   coming in or did you have it written down somewhere?
14        A.    Well, over a period of time I had it
15   written down. But he would call me and I would, when
16   he called, then I would let -- give him access to the
17   building, you know, clear him in.
18        Q.    And so when he called you would he -- would
19   you say, oh, Mr. Davis, could you tell me again what
20   your date of birth is and so forth?
21        A.    No. I had it written down.
22        Q.    Okay. Now, would you ever put him on the

<table>
<tr><td>

Page 58

1  list before he got around to calling you?
2      A.  No, I didn't.
3      Q.  Okay.  Okay.  Now, when he did call, did
4  you go back to Ms. Ouseley each time and say, okay,
5  should I let Mr. Davis in this time?
6      A.  Well, over a process of time she would --
7  she had told me that it was all right for him to come
8  to the press conference.  So it was like I knew to let
9  him in.
10     Q.  Okay.  So you didn't have to keep coming
11 back to her for permission?
12     A.  No.
13     Q.  Because she -- she had already given kind
14 of a blanket permission?
15     A.  Yes.
16     Q.  Okay.  And but then he would call you?
17     A.  Yes.  He would have to call me.
18     Q.  And say please put me on the list; correct?
19     A.  Yes.
20     Q.  And then you would call down to the guard
21 station or to the person who had the computer for the
22 guard station to say, okay, Peter Davis, such and such

</td><td>

Page 60

1  first told me.  No.
2      Q.  Okay.  So --
3      A.  I don't think, let me see, no, I don't -- I
4  don't know.  Because I'm trying to -- I'm not sure.  I
5  don't think so.
6      Q.  Okay.  So, in other words, your memory is
7  that Ms. Ouseley told you to start admitting Mr. Davis
8  to the quarterly refunding conference before
9  Mr. Anderson joined the Treasury Department.  Is that
10 your best memory?  Understanding that this was all a
11 long time ago, just asking as best as you can recall.
12     A.  I think -- I'm not sure.  Because he was
13 there during the time she was ill, I believe, I think.
14 I don't remember.
15     Q.  And your memory is -- your memory is that
16 she told you to start admitting Mr. Davis before she
17 went out on her sick leave; right?
18     A.  Yes.
19     Q.  So that would be consistent with her having
20 told you to admit Mr. Davis before Mr. Anderson came
21 on board?
22         MR. ROSSETTI:  Objection.

</td></tr>
<tr><td>

Page 59

1  date of birth, put him on the list for the press
2  conference?
3      A.  Yes.
4      Q.  Okay.  Now do you know of a Roger Anderson?
5      A.  Yes.  I know of him.  He worked -- Jill
6  worked under him.  He was, he was Assistant Secretary,
7  I think, of Federal Finance.
8      Q.  Did you ever do any secretarial work for
9  Roger Anderson?
10     A.  No, I did not.
11     Q.  Did you ever mention to Mr. Anderson that
12 Mr. Davis was going to be coming to the quarterly
13 refunding conference?
14     A.  No, I didn't.
15     Q.  Okay.  Was Mr. Anderson working at Treasury
16 when Ms. Ouseley told you to start letting Mr. Davis
17 attend the quarterly refunding conference?
18     A.  I'm -- I don't think he was working there
19 when -- when she first told me.  I don't think he was
20 during that time.  I think he probably came at some
21 point in time during the period of time that he was
22 coming, but he wasn't there during that time when she

</td><td>

Page 61

1      Q.  Is that fair?
2          MR. ROSSETTI:  I think that misstates facts
3  or misstates her testimony.
4      Q.  Well, I'm asking it as a question.  I am
5  not trying to put words in your mouth.
6      A.  I am not sure about because they had
7  such -- they had a big turnover in that office, and
8  like every two to three years they would have
9  assistant directors coming in there.  So I am not
10 really sure on that because I didn't work directly
11 with Mr. Anderson, so I --
12     Q.  Okay.  But in any event, would it be fair
13 to say there was a period of several years that
14 Mr. Davis was being admitted to the quarterly
15 refunding conferences?
16     A.  Yes.
17     Q.  Okay.  Now, did you ever hear of anyone
18 before October 31, 2001, anyone objecting to
19 Mr. Davis's attending the quarterly refunding
20 conference?
21     A.  No, I did not.
22     Q.  Do you know whether or not Mr. Davis was

</td></tr>
</table>

16 (Pages 58 to 61)

## Page 62

1  asked to sign anything in connection with his
2  attending the quarterly refunding conference?
3      A.  I do not know.
4      Q.  Okay.  Did you ever hear of there being any
5  discussion of that as a possibility?
6      A.  No.
7      Q.  Okay.  To your knowledge did Mr. Davis ever
8  meet with Ms. Ouseley outside of the quarterly
9  refunding conference?  In other words, did he -- would
10  he have a meeting for her on a day when there wasn't a
11  quarterly refunding conference?
12      A.  He never came to our office.  The only time
13  I heard from him was during the refunding time.  That
14  was it.  If he met with her, it was outside of the
15  office.
16      Q.  So if Mr. Davis was going to have a lunch
17  meeting with Jill Ouseley, you wouldn't necessarily
18  have been knowing about that?
19      MR. ROSSETTI:  Objection.
20      A.  If he --
21      Q.  Is that -- is that fair?
22      A.  Not really.  I mean most of the time if she

## Page 63

1  was having a luncheon date with somebody, she would
2  let me know, or either I would sometime on occasion
3  make reservations.  But most of the time she would let
4  me know.
5      Q.  Okay.  But if she was having a casual lunch
6  that didn't -- wasn't a fancy restaurant that needed a
7  reservation, she didn't have to tell you that she
8  was --
9      A.  No.  She didn't have to tell me.
10      MR. ROSSETTI:  Objection.  You have just
11  got to give me a second.
12      THE WITNESS:  I am sorry.
13      MR. ROSSETTI:  If I want to object.  I know
14  you want to get out of here.  So do we.
15      BY MR. SHOPE:
16      Q.  But it will go faster if you just pause for
17  a second so that we can get a clear record.  Now, have
18  you ever heard of a press embargo?
19      A.  Um-hmm.  Yes.
20      Q.  How have you heard about it?
21      A.  During the press -- when they announced
22  the -- the bonds or the notes, I think at the end of

## Page 64

1  it they would have something like a press release.
2  And then it would have embargo at the end of it.
3      Q.  Okay.  Now, how did you have occasion to
4  look at the press releases for the bond funding
5  announcements?
6      A.  Well, they came through our office and I
7  kept them on file and --
8      Q.  Okay.
9      A.  So --
10      Q.  Okay.  So these announcements would be
11  drafted in the Office of Market Finance.  Is that a
12  fair statement?
13      MR. ROSSETTI:  Objection.
14      A.  Some of them would, I think.  Yes.
15      Q.  Would Mr. Malvey sometimes participate in
16  the drafting of these announcements?
17      A.  Yes.
18      Q.  And now when you were working as a
19  secretary, sometimes would you type in changes that
20  were being made to drafts of the refunding
21  announcements?
22      MR. ROSSETTI:  Objection.

## Page 65

1      A.  I think so.  But I really didn't work with
2  those press releases directly.
3      Q.  Okay.  Well, you said they would -- you
4  said they would go through your office.  So I'm trying
5  to figure out how it was that you would be familiar
6  with what they would say?
7      A.  I said the copies would come through our
8  office and I would keep copies of all of them.
9      Q.  Oh, you would file them after the fact?
10      A.  Yes.
11      Q.  Okay.  So just in the course of filing, you
12  could glance at the document and see what it said?
13      A.  Yes.
14      Q.  Okay.  Now, did anybody ever explain to you
15  what was involved with the press embargo?
16      A.  No.
17      Q.  Okay.  Did you ever discuss the press
18  embargo with Mr. Davis?
19      A.  No.  I did not.
20      Q.  Did you ever discuss the press embargo with
21  anybody?
22      A.  No.  I did not.

Alderson Reporting Company
1-800-FOR-DEPO

**Exhibit L**

**Cited Excerpts from the
Deposition of Roger Anderson
(June 20, 2006)**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO.. CV-10983NMG
USDC-DMASS

**ORIGINAL**

SECURITIES AND                    :
EXCHANGE COMMISSION,              :
                                 :
          Plaintiff,             :        DEPOSITION UPON
                                 :        ORAL EXAMINATION
     vs.                         :             OF
                                 :
STEVEN E. NOTHERN,               :        ROGER L. ANDERSON
                                 :
          Defendant.             :
----------------------           :

        T R A N S C R I P T of the deposition of ROGER

L. ANDERSON, before ROSEMARY MARINO, a Certified

Shorthand Reporter and Notary Public of the State of

New Jersey, at the offices of MC CARTER & ENGLISH,

Gateway 4, Newark, New Jersey on Tuesday, June 20,

2006, commencing at 10:35 in the forenoon.



**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

6

1  the day goes on sometimes it just gets a little
2  harder to hear.
3      Lawyers can be confusing.  I think you are a
4  lawyer yourself, you probably know that.
5      A.    I used to be.
6      Q.    You're a recovering lawyer then.
7      A.    Yes, exactly.
8      Q.    I am no exception to that rule, and so
9  what I would ask is if I ever ask a question that you
10  don't understand, if you could please pipe up and say
11  that to me just so that we can make sure that your
12  testimony is as accurate as it can be.  Is that fair?
13      A.    Yes.
14      Q.    Now, do you recall receiving a subpoena
15  for your deposition today, sir?
16      A.    I do.
17      Q.    And do you recall that the subpoena
18  called upon you to bring documents that you might
19  have.
20      A.    I do.
21      Q.    Did you bring any documents in
22  connection with the subpoena?
23      A.    I did.
24      Q.    Okay, great.  And is this the first time
25  this morning that you've given copies of any of these

7

1  documents to anyone?
2      A.    No, the subpoena called for copies of
3  materials submitted to the SEC and so several of the
4  pages are copies of materials earlier submitted to
5  the SEC.
6      Q.    Okay.  And is -- what did you do to
7  gather the materials that were called for by the
8  subpoena that was issued in this case?
9      A.    I went back and found my copies of the
10  material that I had submitted to the SEC, I reviewed
11  the records of the conversations I had with the SEC,
12  that you called for, I reviewed my E-mail records as
13  well as my contact records and my Rolodex for other
14  information that you asked for.
15      Q.    And had you maintained copies of any
16  notes that you had taken while you were at the
17  Treasury Department?
18      A.    Yes, and I reviewed those when I replied
19  to the SEC subpoena, so I did not review them again.
20      Q.    And was there a reason why you did not
21  review them again?
22      A.    I reviewed them quite thoroughly when I
23  replied to the SEC subpoena.
24      Q.    So, in other words, when you replied to
25  the SEC subpoena you were quite sure that you

8

1  gathered everything that related to Peter Davis, for
2  example?
3      A.    I reviewed -- I was quite sure that I
4  had gone through all my records to find the
5  information related to Peter Davis, yes.
6      Q.    I am not suggesting that you did
7  anything improper, I just wanted to make sure there's
8  a complete understanding of what the subpoena called
9  for and so forth.
10      A.    I understand.
11      Q.    Well, perhaps, what we'll do is maybe in
12  a little bit when we take a break I'll have a chance
13  to go through these materials and then see if I have
14  any questions for you about them.  Okay?
15      A.    Okay.
16      Q.    Maybe just very briefly if you could
17  give me a review of your educational and professional
18  background leading up to the time that you began to
19  work for the Treasury Department.
20      A.    I was graduated magna cum laude from
21  Cornell University College of Arts and Sciences in
22  1978; graduated cum laude from the University of
23  Chicago Law School in 1981; clerked for then Chief
24  Judge Daniel Friedman of the U.S. Court of Claims
25  from 1981 to 1982; worked for the law firm of Cleary

9

1  Gottlieb in New York from 1982 until 1990; worked for
2  the New York City Controllers Office from 1990 to
3  1994; and worked for Elmrock Capital from '94 to '95.
4      Q.    Just very briefly, what was your
5  position at Elmrock Capital?
6      A.    Vice president at that point.
7      Q.    And in a one or two sentence description
8  you could give of what your duties and
9  responsibilities were as vice president of Elmrock
10  Capital.
11      A.    It was a family investment office, and
12  my responsibilities included reviewing potential
13  investments as well as finding financing for
14  investments that they wished to make.
15      Q.    And the -- at what point did you join
16  the Treasury Department?
17      A.    June of 1995.
18      Q.    So you were working for Elmrock up until
19  the point that you started to work for Treasury?
20      A.    I believe I took a week off in between.
21      Q.    Okay.  And what was your first position
22  when you worked for the Treasury Department?
23      A.    Senior advisor.
24      Q.    And what were your duties and
25  responsibilities as senior advisor?

3 (Pages 6 to 9)

**Rizman**
**Rappaport**
**Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

54

1 refunding conference?
2    MS. WILLIAMS: Objection.
3    A.    I don't recall.
4    Q.    Okay. Is it possible that you then sort
5 of saw Mr. Davis at the quarterly refunding
6 conferences, but you didn't have any occasion to talk
7 to him.
8    MS. WILLIAMS: Objection.
9    A.    Yes.
10   Q.    What was the next time that you had any
11 interaction with Mr. Davis?
12   A.    It was before one of the Wednesday press
13 conferences. He told me that there had been a prior
14 press conference where the press office had not --
15 had asked him to leave before it had started, and he
16 wondered if it was all right with me if he stayed. He
17 volunteered that he wouldn't ask any questions, and
18 then I told him, I made sure -- I told him that the
19 additional condition was that he honor the embargo.
20 He agreed to that, and I told him that I wouldn't get
21 in the way if the press office asked him to leave
22 again.
23   Q.    Let me -- why don't we take this into
24 baby steps.
25   The occasion on which Mr. Davis told you that

55

1 he had been asked to leave the press conference by
2 the press office, where were you physically during
3 that conversation with Mr. Davis?
4    A.    I don't recall if it was the back of the
5 conference room or outside the conference room.
6    Q.    So even though Mr. Davis had been asked
7 on the preceding occasion to leave the press
8 conference, nonetheless he had come again; is that
9 correct?
10   A.    Yes.
11   MS. WILLIAMS: Objection.
12   Q.    And did you have any understanding as to
13 how it was that Mr. Davis on that occasion, when you
14 were having -- the occasion of your having the
15 conversation with him, how it was that he had gotten
16 into the building?
17   A.    Could you say that again?
18   Q.    Sure.
19   A.    There are too many negatives in there.
20   Q.    I apologize. I am trying to be as
21 precise as possible.
22   There was the occasion of your having a
23 conversation with Mr. Davis in which he recounted
24 that he had been asked to leave a prior press
25 conference; correct?

56

1    A.    Yes.
2    Q.    Okay. And on the occasion of that
3 conversation that you had with Mr. Davis, you were
4 located in the Secretary's Conference Room during a
5 press conference; right?
6    MS. WILLIAMS: Objection.
7    A.    No. It was prior to the press
8 conference and it was either in the back of the
9 conference room or outside, just outside the
10 conference room, I don't recall which.
11   Q.    But when you say prior, you are meaning
12 just prior. In other words --
13   A.    Yes.
14   Q.    Okay. And so on that day, did you have
15 any understanding as to how it was that Mr. Davis had
16 gotten into the Treasury building so that he could
17 have the conversation with you just outside the press
18 conference room?
19   A.    No.
20   Q.    Okay. Now, this conversation in which
21 -- well, first of all, can you remember anything else
22 about what Mr. Davis recounted as far as the
23 circumstances of his having been asked to leave?
24   A.    He said something to the effect that the
25 press office didn't consider him a member of the

57

1 press.
2    Q.    Okay. And did you have any
3 understanding as to who at the press office was
4 seeking to exclude him from the press conference?
5    A.    I believe it was Mr. Murchinson.
6    Q.    And your response right then and there
7 to Mr. Davis was that subject to conditions you would
8 not oppose his remaining to attend the press
9 conference; correct?
10   A.    Correct.
11   MS. WILLIAMS: Objection.
12   Q.    And also that you would not oppose his
13 remaining to attend future press conferences of the
14 same nature.
15   A.    That was implied.
16   Q.    Now, the condition that you gave was
17 that he not disseminate the information at the press
18 conference until the embargo time; is that correct?
19   MS. WILLIAMS: Objection.
20   A.    Correct.
21   Q.    Okay. And now all of this is occurring
22 in the hallway outside the Secretary's Conference
23 Room?
24   MS. WILLIAMS: Objection.
25   A.    This conversation occurred either in the

15 (Pages 54 to 57)



**Rizman Rappaport Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

58

1 hallway or in the back of the conference room.
2     Q.    Okay.  And I apologize, I wasn't trying
3 to change your testimony at all.
4         And, I take it, this was a fairly brief
5 conversation?
6     A.    Yes.
7     Q.    Okay.  After that conversation -- first
8 of all, did you ask Mr. Davis to sign anything?
9     A.    No.
10    Q.    To your knowledge, did he sign anything?
11    A.    Not to my knowledge.
12    Q.    Did you ever go back to discuss the
13 matter with Mr. Murchinson?
14    A.    No.
15    Q.    Did Mr. Davis remain for the press
16 conference that very day?
17    A.    I believe so.
18    Q.    And he continued to attend press
19 conferences thereafter; correct?
20    A.    I saw him at subsequent conferences.  I
21 don't know if he came to every single one.
22    Q.    Okay.  After the conversation with
23 Mr. Davis that was either outside the Secretary's
24 Conference Room in the hall or in the back of the
25 conference room, and prior to the events of October

59

1 31, 2001, did you have any discussion with anybody
2 else about the circumstances of Mr. Davis attending
3 press conferences at Treasury?
4     A.    I don't recall.
5     Q.    Did you have any understanding as to how
6 Mr. Davis was getting into the building to attend the
7 quarterly refunding conferences after you had that
8 conversation with him out on the -- in the back of
9 the conference room or outside in the hall?
10    A.    No.
11    Q.    Who was your secretary during your
12 tenure at the Treasury?
13    A.    Patricia Walton was my secretary for the
14 whole time.  In addition, for the period of time
15 after Ms. Bradbury had left and before Mr. Gensler
16 started, Anna Hart reported to me.  H A R T.
17    Q.    Did a Lula Tyler ever work for you?
18    A.    She was secretary to Ms. Ouseley.
19    Q.    Now, Mr. Murchinson, I take it, he never
20 raised with you the issue of Mr. Davis' attendance at
21 the press conferences?
22    A.    No.
23    Q.    Did anyone else in the press office ever
24 raise that with you?
25    A.    I don't recall anything like that, no.

60

1     Q.    Did Mr. Murchinson report to you either
2 directly or indirectly?
3     A.    No.
4     Q.    To whom did he report?
5     A.    I forget the title.  There was a person,
6 Director of the Press Office, something like that, to
7 whom he reported, and then that person reported to
8 the deputy assistant secretary and assistant
9 secretary for public affairs.
10    Q.    So that was a completely different chain
11 of reporting than the public finance chain in which
12 you were involved.
13    A.    Yes.
14    Q.    Okay.  So did you ever come to hear how
15 it was that Mr. Davis was able to allay any
16 objections that the press office had had to his
17 attending the quarterly refunding conferences?
18        MS. WILLIAMS:  Objection.
19    A.    No.
20    Q.    The -- was there a reason that you
21 didn't ask Mr. Davis to sign anything?
22    A.    He had been introduced to me as a
23 Treasury regular, he indicated that he understood the
24 need for the embargo and his compliance, and would
25 comply with it, and it was right outside, right prior

61

1 to the press conference, so there was no opportunity
2 or seemed to me at the time need for anything in
3 writing.
4     Q.    Now, you said that you would not quote
5 get in the way if the press office wanted to continue
6 to exclude him; is that correct?
7     A.    Yes.
8     Q.    Why was that?
9     A.    Because Mr. Murchinson didn't report to
10 me, it wasn't my -- I didn't have the authority to
11 overrule him.
12    Q.    And just so I am clear, I take it, you
13 never consulted with anybody else about, at least
14 prior to October 31, 2001 you never consulted with
15 anybody else about the fact that you had told
16 Mr. Davis that you didn't object to his continuing to
17 attend the quarterly refunding conferences.
18        MS. WILLIAMS:  Objection.
19    A.    I don't recall.
20    Q.    Now, after the conversation that took
21 place either in the back of the conference room or
22 outside in the hall, what was your next contact with
23 Mr. Davis?
24    A.    It was either seeing him at another
25 quarterly conference or there was a meeting, he came

16 (Pages 58 to 61)

**Rizman
Rappaport
Dillon&Rose, LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

94

1  did you have any communication with anybody else
2  about Mr. Youngdahl's case?
3      A.    I discussed it with people in New Jersey
4  who knew Mr. -- who know Mr. Youngdahl, and I believe
5  also with Mr. Malvey.
6      Q.    And what did -- in that connection, what
7  did Mr. Malvey say to you and what did you say to
8  Mr. Malvey?
9      A.    We were both surprised because we liked
10 Mr. Youngdahl.
11     Q.    Anything else?
12     A.    No.
13     Q.    Did you discuss with Mr. Malvey whether
14 or not there were other people at Goldman, Sachs who
15 might have been aware prematurely of the suspension
16 of issuance of the long bond?
17     A.    I don't recall.
18     Q.    Did you discuss with Mr. Malvey the
19 possibility that other people besides Mr. Davis might
20 have been aware prematurely of the decision to
21 suspend issuance of the long bond?
22     MS. WILLIAMS:  Objection.
23     A.    No.
24     MR. SHOPE:  If I could just have a
25 short break, I can go through my notes.

95

1      MS. WILLIAMS:  Sure.
2      (Recess.)
3      Q.    Just want to clarify a few things.
4      First of all, just so I'm understanding the
5  chronology correctly, Mr. Davis was attending the
6  quarterly refunding conference before he ever had a
7  conversation with you about following embargoes; is
8  that correct?
9      MS. WILLIAMS:  Objection.
10     A.    That's my understanding.
11     Q.    And did you ever have any understanding
12 as to the circumstances under which he had gotten
13 into the quarterly refunding conferences prior to the
14 conversation that you had about -- with him about the
15 embargo?
16     A.    No.
17     Q.    Okay.  And did you ever -- so you don't
18 know whether it was Jill Ouseley, for example, who
19 authorized him to attend?
20     MS. WILLIAMS:  Objection.
21     A.    I do not.
22     Q.    Now, I believe you testified that you
23 said you would not stand in the way if the press
24 office wanted to continue to exclude Mr. Davis from
25 the quarterly refunding conferences; correct?

96

1      A.    That's correct.
2      MS. WILLIAMS:  Objection.
3      Q.    Is it, in fact, the case that you,
4  yourself, didn't really have authority to
5  affirmatively admit Mr. Davis to the quarterly
6  refunding conferences, you are simply stating that
7  you, yourself, had no objection.
8      MS. WILLIAMS:  Objection.
9      A.    Correct.
10     Q.    Who would have had authority to admit
11 Mr. Davis to the quarterly refunding conferences?
12     A.    Well, the press office dealt with the
13 press people and the various Treasury offices decided
14 which Treasury staff or Federal Reserve staff was
15 there, and I took it upon myself to allow one of the
16 Borrowing Advisory Committee members to attend one.
17     Q.    Now, when you said you took it upon
18 yourself to allow one of the Borrowing Advisory
19 Committee persons to attend, what did you have to do?
20     A.    I just invited him to stay.
21     Q.    Okay.  Was that something he had
22 requested or she had requested?
23     A.    No.  This was back when the Borrowing
24 Advisory Committee was making its report to the
25 undersecretary Wednesday morning.  He was not headed

97

1  back to his office, it was his last meeting, I
2  intended to say something to recognize his
3  contributions at the press conference. So since he
4  wasn't in a hurry to leave, I invited him to stay so
5  that I could be public about our thanks for his
6  efforts.
7      Q.    So you felt you had the authority to
8  invite him.
9      A.    Yes.
10     Q.    Okay.  But you didn't think that you had
11 the authority to invite Mr. Davis.
12     MS. WILLIAMS:  Objection.
13     Q.    Is that fair?
14     A.    I didn't think I had the authority to
15 overrule the press office.
16     Q.    Well, let me flip it around the other
17 way.
18     Let's suppose that the press office had no
19 objection to his being there, but you didn't want him
20 to be there, would you have had the authority to
21 exclude him?
22     A.    Oh, I probably would have had a
23 conversation with the press office about it, we would
24 have come to an agreement one way or another, but I
25 can't give a definite answer because it never

25 (Pages 94 to 97)

**Rizman
Rappaport
Dillon&Rose**, LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

98

1  happened.
2      Q.    Now, in theory if you and the press
3  office had not been able to see eye-to-eye you would
4  have had to go up higher in the chain of command in
5  the Treasury; fair statement?
6      A.    Yes.
7      Q.    And I apologize if I asked you this.
8  Did you or with your knowledge your secretary ever
9  clear Mr. Davis into the quarterly refunding
10 conference?
11     A.    I did not and I don't know whether my
12 secretary ever did.
13     Q.    Was there ever any handouts at the
14 quarterly refunding conferences besides press
15 releases of the sort that we reviewed with Exhibit 1?
16     A.    On Wednesday press conferences there
17 would be traditionally three handouts, the press
18 release, the recommendations of the Borrowing
19 Advisory Committee and the minutes of the Borrowing
20 Advisory Committee meeting as taken by member of the
21 Treasury staff.
22     Q.    Do you recall whether -- well, would Mr.
23 Davis has received those handouts in the ordinary
24 course if he attended the quarterly refunding
25 conference?

99

1      A.    He could of.
2      Q.    Do you remember whether or not he ever
3  asked for those items or had expressed interest in
4  those items?
5      A.    I don't recall.
6      Q.    Okay. Now, my client, Steven Nothern,
7  is he somebody that you know at all?
8      A.    I don't recognize the name at all.
9      Q.    Now, you mentioned before that although
10 you weren't sure where it came from you had an
11 understanding that if a reporter didn't follow the
12 embargo the reporter would not be permitted to attend
13 future refunding conferences. Did I remember that
14 right?
15     A.    Yes.
16     Q.    Did that ever occur during, to your
17 knowledge?
18     A.    Not to my knowledge.
19     Q.    And other than the one incident that you
20 heard about with regard to Mr. Davis, did you ever
21 hear about anyone else ever being excluded from a
22 quarterly refunding conference?
23     A.    No.
24     Q.    You mentioned that you had discussed
25 with Ms. Williams and Mr. Rossetti the question of

100

1  whether or not there was ever a written agreement
2  between -- that Treasury had made with Mr. Davis. Do
3  you recall that?
4      A.    Yes.
5      Q.    Okay. What did Mr. Rossetti and Ms.
6  Williams say to you and what did you say to them?
7      A.    They asked me if I knew of such an
8  agreement, I told them no. They mentioned that Mr.
9  Davis had testified that there was such an agreement
10 and I told them that my recollection was different.
11     Q.    Okay. If -- now this is, we are talking
12 about events that, if it did happen, it would have
13 been around like ten years ago; right?
14         MS. WILLIAMS: Objection.
15     A.    Nine or ten years ago, yes.
16     Q.    So bearing that in mind, is it at least
17 possible that you had some agreement or there was
18 some agreement, written agreement with Mr. Davis and
19 you just don't remember it?
20     A.    I never had any agreement with Mr.
21 Davis, no.
22     Q.    I am talking about something you would
23 have done on behalf of Treasury.
24     A.    No.
25     Q.    I know you don't remember having made

101

1  it, but if you had, is that the sort of thing that
2  you would have held on to?
3          MS. WILLIAMS: Objection.
4      A.    It is not something I would have
5  considered part of my personal papers. Had there
6  ever been such a document, it would have been part of
7  an official Treasury paper.
8      Q.    And where would a document like that be
9  stored in Treasury?
10         MS. WILLIAMS: Objection.
11     A.    I don't know.
12     Q.    When you left Treasury, did you have --
13 you had files that you had been maintaining in the
14 course of your duties; correct?
15     A.    Correct.
16     Q.    What happened to those?
17     A.    I left them there.
18     Q.    Was there somebody who was charged with
19 sort of going through your papers and figuring out
20 whether they go to the archives?
21     A.    I don't know. I mean there's a set
22 procedure for the secretary, but certainly not for
23 lower, and I don't know how far down the procedure
24 goes.
25     Q.    So nobody ever said to you in substance,

26 (Pages 98 to 101)



**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

102

1  hey, I've got to go through your papers and I've got
2  some questions about what relates to what?
3      A.   No.
4      Q.   Okay.  So as far as you are aware, they
5  could have been just thrown into an incinerator?
6      A.   I have no idea.
7      Q.   Was there ever any change in the embargo
8  policy, to your knowledge?
9          MS. WILLIAMS:  Objection.
10      A.   My understanding is that after I left,
11  Treasury decided to establish -- instead of
12  establishing an embargo, each press conference that
13  might be different from quarter to quarter, establish
14  one announcement time that would be good all the time
15  depending on, therefore, the length of the press
16  conference, the embargo period itself might be
17  shorter or longer than prior quarters.
18      Q.   By the way, during your tenure the
19  embargo time was being announced by the press
20  officer; right?
21      A.   Yes.
22      Q.   And do you know whether or not the press
23  officer would ever consult with the members of the
24  press to determine whether or not they thought that
25  that was an appropriate time, you know, appropriate

103

1  length of time, amount of time they would need to
2  write their stories, that sort of thing?
3      A.   He would say something like it's, I am
4  making these times up.  For example, it's now 10:10,
5  we'll set the embargo for 10:25, everybody agreed,
6  and that was it.
7      Q.   Okay.  So that was an opportunity for
8  people to say no, I think it's not enough time or no,
9  I think it's too much time, whatever?
10      A.   Well, nobody ever took that opportunity,
11  but it was an opportunity to say -- it would be an
12  opportunity for somebody to say I need more time.
13      Q.   Subject to Ms. Williams' questions, I
14  have nothing further at this time.  I may have a few
15  more after she asks you some questions.
16  CROSS-EXAMINATION BY MS. WILLIAMS:
17      Q.   Mr. Anderson, I have a couple of
18  questions.
19          Just to clarify, you stated that the Treasury
20  refunding conferences took place over two days; is
21  that right?
22      A.   The Borrowing Advisory Committee.  The
23  whole refunding -- I wanted to clarify that there are
24  two public -- two announcement events.  The one on
25  Tuesday morning, that was the public meeting of the

104

1  Borrowing Advisory Committee where Treasury made the
2  economic report and some market report, and the next
3  day would be the refunding press announcement.
4      Q.   Do you ever recall seeing Mr. Davis at
5  the Tuesday public meeting?
6      A.   I believe so, yes.
7      Q.   Do you ever recall seeing Mr. Davis at
8  the Tuesday public meeting before you had your
9  conversation with him when he asked permission to
10  attend the Wednesday meeting?
11          MR. SHOPE:  Objection.
12      A.   I am sorry, I can't recall the sequence.
13      Q.   Do you know if Mr. Davis ever attended a
14  Wednesday press conference and was allowed to stay at
15  a Wednesday press conference prior to the
16  conversation that you had with him when he asked
17  permission to stay at a Wednesday conference?
18          MR. SHOPE:  Note my objection.
19      A.   It was my understanding that he did.
20      Q.   That he had actually been allowed to
21  stay at a Wednesday press conference.
22      A.   That he had attended a Wednesday press
23  conference.
24      Q.   On what do you base that understanding?
25      A.   He might have told me himself or I don't

105

1  recall specifically, I am sorry.
2      Q.   Since you left Treasury in January '99,
3  have you attended any refunding conferences?
4      A.   No.
5      Q.   So you did not attend the October 31st,
6  2001 conference?
7      A.   No.
8      Q.   Just to clarify.  Before you had your
9  conversation with Mr. Davis in which he asked
10  permission to stay at a Wednesday press conference,
11  do you recall ever seeing him at a Wednesday press
12  conference?
13      A.   I don't recall.
14      Q.   Now, going back to the conversation that
15  you had with Mr. Davis which was either inside the
16  conference room or right outside the conference room
17  in which he asked permission to attend the
18  conference, is it correct that you gave him
19  permission to attend -- when he asked permission to
20  attend, am I correct that you allowed him to attend
21  the conference that day?
22          MR. SHOPE:  Objection.
23      A.   I said I had no problem with him
24  attending on the basis of the conditions set forth
25  earlier.

27 (Pages 102 to 105)

**Rizman
Rappaport
Dillon&Rose,LLC**
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

118

1    Q.    Given your responsibility, isn't it
2  likely you would have known about that if it
3  happened?
4          MS. WILLIAMS: Objection.
5    Q.    In other words, if there was such a
6  policy.
7    A.    What we would talk about was the
8  limitation until the release of the public
9  information, which was inclusive.
10         MR. SHOPE: If I could just have a
11 moment.
12         (Pause.)
13   Q.    You discussed security badges. Do you
14 know whether Mr. Davis actually wore a badge?
15   A.    I don't recall.
16   Q.    And did I infer properly from your
17 testimony that there were some people who simply
18 ignored the requirement of wearing a badge?
19   A.    It was not uncommon for Treasury
20 personnel to wear badges. It was not at all -- it
21 was -- it would not have been at all common for
22 visitors not to wear badges.
23   Q.    But if somebody was like an old Treasury
24 hand recognized by the guards, it's possible that
25 they weren't wearing a badge either; fair?

119

1          MS. WILLIAMS: Objection.
2    A.    Not likely.
3    Q.    Why do you say that?
4    A.    Secret Service was very careful about
5  admitting people and giving out badges.
6    Q.    Did you have an understanding as to why
7  Mr. Davis was attending these refunding conferences?
8    A.    He told me that because he was writing
9  his newsletter what he was looking for was color in
10 terms of what was discussed that might not appear in
11 the published press reports and beyond the dry words
12 of the press release.
13   Q.    And given the fact that it was market
14 moving information, did you have any concern that he
15 might disclose the information in advance of the
16 embargo?
17   A.    Well, A, he promised not to; and B, it
18 was my understanding that since he was writing a
19 newsletter, not -- his newsletter was published --
20 wasn't published on a, you know, minute-by-minute
21 basis.
22   Q.    But just so that I am clear, you had
23 absolutely no follow-up with Mr. -- with the press
24 office or anybody else at Treasury about the rules
25 that would apply to Mr. Davis' attendance at the

120

1  quarterly refunding press conferences; is that
2  correct?
3          MS. WILLIAMS: Objection.
4    A.    I did not discuss it with the press
5  office, I don't recall whether or not I discussed it
6  with anybody else.
7    Q.    I have nothing further.
8          MS. WILLIAMS: I don't have anything
9  more.
10         (Exhibits attached to transcript.)
11         (Deposition adjourned at 1:57 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

121

1          JURAT
2    I, ROGER L. ANDERSON, do hereby certify that I
3  have read the foregoing transcript of my testimony,
4  taken on June 20, 2006, and have signed it subject to
5  the following changes:
6    PAGE     LINE         CORRECTION
7
8
9
10
11
12
13
14
15
16
17         _____
18         ROGER L. ANDERSON
19
20 DATE:
21
22 Sworn and subscribed to before me on this ^ day of
23 NOTARY PUBLIC    _____
24
25

31 (Pages 118 to 121)

**Rizman Rappaport Dillon&Rose,** LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650   Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

**Exhibit M**

**Cited Excerpts from the Deposition of Elnora Bowser
(February 12, 2008)**

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3      - - - - - - - - - - - - - - x

 4   UNITED STATES SECURITIES AND    :
     EXCHANGE COMMISSION,            :
 5                                   :
                 Plaintiffs,         :
 6                                   :
     v.                              :  Civil Action No.
 7                                   :
     STEVEN E. NOTHERN,              :  05-10983 (NMG)
 8                                   :
          Defendant.                 :
 9      - - - - - - - - - - - - - - x

10

11        Videotaped Deposition of ELNORA BOWSER

12                  Washington, D.C.

13            Tuesday, February 12, 2008

14                    9:59 a.m.

15

16

17              *      *      *      *

18

19

20

21   Reported by:  Okeemah S. Henderson, LSR

22
```

Elnora Bowser                                                                    February 12, 2008
Washington, DC

|  | Page 46 |
|---|---|
| 1 | BY MR. TOONE: |
| 2 | Q.   And all the way the last line on this |
| 3 | page 2 of Exhibit 3, there is a name and below |
| 4 | that is Davis, Peter, J.  Do you see that? |
| 5 | A.   Yes. |
| 6 | Q.   And there's a date of birth that's |
| 7 | listed as well? |
| 8 | A.   Uh-huh. |
| 9 | Q.   Do you have any idea what this |
| 10 | document represents? |
| 11 | MS. LEVINE: Objection. |
| 12 | A.   No.  No, I don't. |
| 13 | MR. TOONE: Let's skip ahead to the |
| 14 | fifth page of this exhibit.  Just for the record, |
| 15 | the Bates label at the bottom is SEC NOTH |
| 16 | 00103605. |
| 17 | BY MR. TOONE: |
| 18 | Q.   Have you seen this document before? |
| 19 | A.   No, sir. |
| 20 | Q.   There appears to be a form here called |
| 21 | access control worksheet.  Do you see that title? |
| 22 | A.   I see it now.  I see this.  Yes. |

|  | Page 47 |
|---|---|
| 1 | Q.   Do you know what an access control |
| 2 | work sheet is? |
| 3 | A.   No, I don't. |
| 4 | Q.   Now, looking at this document, do you |
| 5 | see a box for date? |
| 6 | A.   Yes. |
| 7 | Q.   And listed there is 10-30 and 10-31? |
| 8 | A.   Yes. |
| 9 | Q.   And there is a time and it is 08:45. |
| 10 | Do you see that? |
| 11 | A.   Yes. |
| 12 | Q.   And under the box appointment with, |
| 13 | there's the name Malvey? |
| 14 | A.   Yes. |
| 15 | Q.   And below that there's a box titled |
| 16 | requested by and the name Bowser? |
| 17 | A.   Yes. |
| 18 | Q.   And then room No. 3327.  And then all |
| 19 | the way below in the box there is a listing for |
| 20 | last name, first name, middle name.  Do you see |
| 21 | that? |
| 22 | A.   Yes. |

|  | Page 48 |
|---|---|
| 1 | Q.   And there's a name Davis, Peter? |
| 2 | A.   Yes. |
| 3 | Q.   And there's also a line for |
| 4 | Mr. Davis's birth date there.  Do you see that? |
| 5 | A.   Yes. |
| 6 | Q.   Are you able to interpret what this |
| 7 | document means? |
| 8 | MS. LEVINE: Objection. |
| 9 | A.   No. |
| 10 | BY MR. TOONE: |
| 11 | Q.   Does this refresh your recollection as |
| 12 | to thinking that might have happened in October, |
| 13 | 2001? |
| 14 | A.   No.  Would this come from the Secret |
| 15 | Service? |
| 16 | Q.   This document was provided by the |
| 17 | Treasury Department, and at that time, Secret |
| 18 | Service was a component of Treasury. |
| 19 | A.   No.  Uh-huh. |
| 20 | Q.   So this doesn't jog any recollection |
| 21 | at all? |
| 22 | MS. LEVINE: Objection. |

|  | Page 49 |
|---|---|
| 1 | A.   Doesn't jog a recollection whatsoever. |
| 2 | Did Paul Malvey ever clear anybody in? |
| 3 | MR. FREEBORNE: I'm sorry.  He asks |
| 4 | questions, you just answer them. |
| 5 | A.   I'm sorry. |
| 6 | BY MR. TOONE: |
| 7 | Q.   Do you recall ever having any |
| 8 | conversation with Paul Malvey regarding the |
| 9 | admission of an individual to Treasury under any |
| 10 | circumstances? |
| 11 | A.   No. |
| 12 | Q.   Do you recall any conversation with |
| 13 | Lula Tyler regarding the admission of any |
| 14 | individual into Treasury? |
| 15 | A.   No. |
| 16 | Q.   To your knowledge, has the Treasury |
| 17 | Department ever used confidentiality agreements? |
| 18 | MS. LEVINE: Objection. |
| 19 | A.   I don't know. |
| 20 | BY MR. TOONE: |
| 21 | Q.   Have you ever seen a confidentiality |
| 22 | agreement at Treasury? |

13 (Pages 46 to 49)

Elnora Bowser                                                    February 12, 2008
                          Washington, DC

| Page 50 | Page 52 |
|---|---|
| 1   A.   No. | 1   (The last question was read back by the reporter.) |
| 2   Q.   Are you aware of any agreement that | 2        MS. LEVINE:  Objection. |
| 3   may have been reached involved a man named Peter | 3   A.   No. |
| 4   Davis? | 4        BY MR. TOONE: |
| 5   A.   No. | 5   Q.   Do you recall reading or hearing any |
| 6        MS. LEVINE:  Objection. | 6   news reports in November of 2001 concerning |
| 7        BY MR. TOONE: | 7   Treasury's announcement of its decision to suspend |
| 8   Q.   I'm sorry? | 8   the 30-year bond? |
| 9   A.   No. | 9   A.   No. |
| 10        BY MR. TOONE: | 10   Q.   Do you recall any news reports about |
| 11   Q.   Do you know who Roger Anderson is? | 11   alleged insider training and that it occurred in |
| 12   A.   Roger Anderson, he worked there.  I | 12   connection with Treasury's decision to suspend |
| 13   don't know what he was. | 13   issuance of the 30-year bond? |
| 14   Q.   Do you know approximately when he | 14        MS. LEVINE:  Objection. |
| 15   worked at Treasury? | 15   A.   No. |
| 16   A.   No. | 16        BY MR. TOONE: |
| 17   Q.   Did you ever work with Mr. Anderson in | 17   Q.   Did anyone from Treasury speak with |
| 18   any capacity? | 18   you in -- strike that.  Did anyone from Treasury |
| 19   A.   No, I did not. | 19   speak with you concerning anything that might have |
| 20   Q.   Did you ever speak with him? | 20   occurred in connection with the announcement of |
| 21   A.   No, I did not. | 21   the decision to suspend the 30-year bond? |
| 22   Q.   Do you recall the Treasury Department | 22   A.   No. |

| Page 51 | Page 53 |
|---|---|
| 1   announcing on October 31st, 2001 its decision to | 1   Q.   Were you ever contacted by the general |
| 2   suspend issuance of the 30-year bond? | 2   counsel's office? |
| 3   A.   No. | 3   A.   No. |
| 4   Q.   Does that sound even vaguely familiar | 4   Q.   Were you ever contacted by the Office |
| 5   to you? | 5   of Inspector General? |
| 6   A.   No. | 6   A.   No. |
| 7   Q.   Do you recall where you were during | 7   Q.   Were you ever contacted by the SEC? |
| 8   the quarterly refunding press conference during | 8   A.   No. |
| 9   October 31st, 2001? | 9   Q.   Have you ever spoken with the SEC at |
| 10        MR. FREEBORNE:  I'm not sure a | 10   all? |
| 11   predicate has been laid for it, she said she | 11   A.   No. |
| 12   doesn't recall, now you're asking her -- | 12   Q.   Were you ever contacted by the U.S. |
| 13   Q.   I'm sorry.  She didn't recall the | 13   Department of Justice other than your dealings |
| 14   substance of this issue.  I'm asking if she | 14   with Mr. Freeborne here? |
| 15   recalls where she was during -- | 15   A.   No. |
| 16   A.   No, I don't. | 16   Q.   When was the last time you spoke to |
| 17        MR. TOONE:  Let me restate the | 17   Paul Malvey? |
| 18   question. | 18   A.   I haven't. |
| 19        MS. LEVINE:  I just want to get my | 19   Q.   I'm sorry? |
| 20   objection on the record. | 20   A.   I haven't. |
| 21        MR. TOONE:  Fine.  Can we reread that | 21   Q.   You haven't since the time he left |
| 22   question back? | 22   Treasury? |

Alderson Reporting Company
1-800-FOR-DEPO

**Exhibit N**

**Cited Excerpts from the Deposition of Steven Berardi
(February 12, 2008)**

Stephen Berardi                                    February 12, 2008
                      Washington, DC

                                                         Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
2                    Boston Division

3     - - - - - - - - - - - - - - x
      UNITED STATES SECURITIES AND    :
4     EXCHANGE COMMISSION,            :
                                      :
5              Plaintiffs,            :
                                      :
6     v.                              : Civil Action No.
                                      :
7     STEVEN E. NOTHERN,              : 05-10983 (NMG)
                                      :
8          Defendant.                 :
      - - - - - - - - - - - - - - x
9

10        Videotaped Deposition of STEPHEN BERARDI

11                  Washington, D.C.

12            Tuesday, February 12, 2008

13                   11:32 a.m.

14

15

16              *     *     *     *

17

18

19

20

21   Reported by:  Okeemah S. Henderson, LSR

22

Page 38

1      A.   She was the secretary for the
2  director.
3      Q.   And in 2001, the director was Paul
4  Malvey; is that correct?
5      A.   Yes.
6      Q.   Looking at the message all the way at
7  the bottom of this E-mail from Lula Tyler to
8  Frances Anderson, can you just read that to
9  yourself quickly?
10     A.   (The witness complies.) Okay.
11     Q.   Ms. Tyler's message states, "Our
12  Office of Market Finance needs a table in the back
13  for handout materials after the press conference.
14  Would that be a problem? Also Steve Berardi would
15  like to look at the room so she can get a mental
16  picture of where to place the table." Did I read
17  that correctly?
18     A.   Yes.
19     Q.   Do you recall this exchange that you
20  had with Ms. Tyler?
21     A.   Yes.
22     Q.   What exactly was going on at that

Page 39

1  time?
2          MS. LEVINE: Objection.
3          BY MR. TOONE:
4      Q.   If you understand the question, you
5  can answer.
6      A.   We were told late that afternoon that
7  the normal room that we would be in was going to
8  be changed to a smaller conference room.
9      Q.   And do you recall telling Ms. Tyler
10  that you would like to look in the room before
11  it's set up?
12     A.   Yes.
13     Q.   What was the purpose of doing that?
14     A.   I needed to see if there was room for
15  a table to be set up so I could have the documents
16  inside the room.
17     Q.   And then Ms. Anderson in response to
18  Ms. Tyler, and this message is subsequently
19  forwarded to you, Ms. Anderson wrote "Yes. There
20  is no space for a table, it would have to go on
21  the outside of the room and I'll watch the
22  releases." Is that correct?

Page 40

1      A.   Yes.
2      Q.   And is this consistent with your
3  recollection of what happened prior to the
4  announcement?
5          MS. LEVINE: Objection.
6      A.   After reading this here. Yes, but she
7  wasn't responsible for watching the releases.
8          BY MR. TOONE:
9      Q.   She wasn't?
10     A.   No.
11     Q.   Who was responsible?
12     A.   I was.
13     Q.   Why were you responsible?
14     A.   Because that was the task of our
15  office.
16     Q.   What task?
17         MS. LEVINE: Objection.
18     A.   Of distributing the copies of minutes,
19  the reports, the charts and the tentative auction
20  schedules after the embargo time had been set.
21         BY MR. TOONE:
22     Q.   As of October, 2001, did Treasury have

Page 41

1  official policies on who could attend quarterly
2  refunding announcements?
3          MS. LEVINE: Objection.
4      A.   I do not know.
5          BY MR. TOONE:
6      Q.   Which office was responsible for
7  determining who could attend the announcements?
8      A.   I don't know which office was
9  responsible. It was my understanding it was open
10  to the public.
11     Q.   How many quarterly refunding
12  announcements do you believe you attended prior to
13  October 31st, 2001 approximate?
14     A.   All of them from May, 1991 forward
15  except the October, 2001.
16     Q.   So for that 10-year period, you
17  attended every quarterly refunding announcement?
18     A.   Yes.
19     Q.   What kind of people attended these
20  announcements?
21         MS. LEVINE: Objection.
22     A.   What do you mean by people?

Stephen Berardi                                              February 12, 2008
Washington, DC

Page 66

1    Q.   Aside from what you just described,
2    are you aware of any other kind of agreement
3    regarding the confidentiality of information at
4    Treasury quarterly refunding announcements?
5        MS. LEVINE:  Objection.
6    A.   I have no knowledge, that would have
7    been at the highest level of office.
8        BY MR. TOONE:
9    Q.   Did Roger Anderson ever mention
10   anything about an agreement he had reached with
11   Peter Davis?
12       MS. LEVINE:  Objection.
13   A.   I have no knowledge of that.
14       BY MR. TOONE:
15   Q.   Did Paul Malvey ever mention anything
16   to you about any kind of agreement reached with
17   Peter Davis?
18   A.   I just know that over time, Peter
19   Davis showed up often to these press conferences
20   and somebody was clearing him in, but I don't know
21   that there was an agreement.
22   Q.   Do you have any idea how Mr. Davis got

Page 67

1    cleared in to attend these announcements?
2    A.   Same way everyone else does, you have
3    to submit your name, social security number and
4    date.
5    Q.   Do you know who submitted that
6    information?
7    A.   No, I do not.
8    Q.   You had earlier described the
9    quarterly refunding announcements as open to the
10   public; is that correct?
11   A.   Yes.
12   Q.   So now we're talking about clearing in
13   Mr. Davis to the Treasury building; is that
14   correct?
15   A.   He's a member of the public.  Yes.
16   Q.   But when you say clearing Mr. Davis
17   in, I'm just trying to understand your testimony.
18   You're referring to clearing him into the Treasury
19   building itself, not to the announcement room?
20       MS. LEVINE:  Objection.
21       BY MR. TOONE:
22   Q.   Do you understand my question?

Page 68

1    A.   I do.
2    Q.   Well, what's the answer?
3    A.   That would depend on the person
4    whoever cleared them in, whether they said access
5    to Treasury or that they were attending a
6    conference in a particular room.
7    Q.   You say that Mr. Davis had been
8    attending these announcements on a regular basis?
9    A.   I had seen him before.  Yes.  I don't
10   know about regular but I had seen him before
11   several times at least.
12   Q.   Can you characterize the frequency of
13   Mr. Davis's attendance at these announcements?
14       MS. LEVINE:  Objection.
15   A.   Well, we have them four times a year.
16   I don't recall exactly how many times per year he
17   was there, but he was or if he was there every
18   time but I know he was there several times, so I'm
19   not sure the exact amount.
20       BY MR. TOONE:
21   Q.   Are you aware of any other person who
22   is not a member of the press or a government

Page 69

1    employee who attended these quarterly refunding
2    announcements?
3        MS. LEVINE:  Objection.
4    A.   I don't have any specific recollection
5    of others but I'm sure over time there were, but I
6    couldn't provide a name.  I don't specifically
7    remember.
8        BY MR. TOONE:
9    Q.   You say that it was your belief that
10   these announcements were open to the public?
11   A.   Yes.
12   Q.   Did it ever seem strange that you
13   didn't see other consultants or members of private
14   industry attending these announcements on a
15   regular basis?
16       MS. LEVINE:  Objection.
17   A.   When you say strange, I didn't
18   interact with these consultants the way a
19   political appointee or someone else higher up in
20   the office may have interacted with them.  So I
21   didn't take a head count or have to know who was
22   attending these meetings.  My function was to hand

18 (Pages 66 to 69)

Stephen Berardi                                                February 12, 2008

Washington, DC

| Page 142 | Page 144 |
|---|---|
| 1  about, but it wouldn't have been -- it was | 1  constantly monitoring both doors to see who was |
| 2  perfectly normal for someone to come up afterwards | 2  going in and coming out? |
| 3  and ask questions of whoever the political | 3     A.  I was sitting on the table with my |
| 4  appointee or Public Affairs or the director of the | 4  hand on the boxes of documents.  Was I actually |
| 5  office with a follow-up question. | 5  monitoring who was going in and out?  No. |
| 6     Q.  It was normal for anyone attending the | 6     Q.  You do recall, however, individuals |
| 7  press conference to speak with a Treasury official | 7  entering the room after the announcement had |
| 8  afterwards? | 8  started; is that correct? |
| 9     A.  If they had a follow-up question. | 9     A.  After the doors were closed for the -- |
| 10  Yes. | 10  yes, mostly when the doors were closed for the |
| 11     Q.  Do you recall Peter Davis having that | 11  press conference.  Yes. |
| 12  kind of conversation with Paul Malvey? | 12     Q.  When you say mostly closed; is that |
| 13     A.  I don't have specific recollection of | 13  right.  What does mostly closed mean? |
| 14  that.  No. | 14     A.  Sometimes members of Public Affairs |
| 15     Q.  On October 31st, 2001, how long did | 15  would go in and out, they would make phone calls |
| 16  the announcement by Peter Fisher last? | 16  or I think they ran out of the document so they |
| 17     A.  As I have told my counsel, I haven't | 17  had to come out and make a copy across the |
| 18  (inaudible) watch for 20 years, so I don't know. | 18  hallway. |
| 19  I'm -- I think it normally started around 9, they | 19     Q.  And lastly, Ms. Levine asked you about |
| 20  normally start a couple of minutes late, maybe | 20  people getting cleared in to attend the |
| 21  sometimes 10 minutes late.  I know it may have end | 21  announcement? |
| 22  at 9:30, 9:35.  I don't recall exact time. | 22     A.  Yes. |

| Page 143 | Page 145 |
|---|---|
| 1     Q.  And you said you were at a table in | 1     Q.  And just so I understand, anyone who |
| 2  the hallway? | 2  had managed to enter the Treasury building was |
| 3     A.  Yes. | 3  able to enter the room where the press conference |
| 4     Q.  Outside the doors to the diplomatic | 4  was being held; is that correct? |
| 5  reception room? | 5     A.  I would say that was fair to say. |
| 6     A.  Yes. | 6  Yes.  If you had access to the building.  Yes. |
| 7     Q.  And there were two sets of doors to | 7     Q.  And access for any reason? |
| 8  the room? | 8     A.  Well, if you had specific access to |
| 9     A.  From what I recall.  Yes. | 9  the room and you were to be escorted, I don't |
| 10     Q.  And the table was located on the other | 10  think you would be allowed into that room. |
| 11  side of the hallway between the two sets of doors? | 11     Q.  Okay.  So if you had access to the |
| 12     A.  Yes.  How far from? | 12  building without an escort, then you would have |
| 13     Q.  Approximately how far from the table | 13  also been able to enter the room where this |
| 14  were each set of doors? | 14  announcement was being made? |
| 15     A.  Diagonally maybe 20 feet or so. | 15     A.  I believe so.  Yes.  Since it was open |
| 16     Q.  Each direction? | 16 |
| 17     A.  Diagonally from one door to the table, | 17 |
| 18  from the other door to the table. | 18 |
| 19     Q.  20 feet from the table to one door, 20 | 19 |
| 20  feet from the table to the door? | 20 |
| 21     A.  Yes.  Just guessing? | 21 |
| 22     Q.  Were you, during this period, | 22 |

Stephen Berardi                                                    February 12, 2008
Washington, DC

| Page 146 | Page 148 |
|---|---|
| 1  to the public. | 1  CERTIFICATE OF STENOTYPE REPORTER - NOTARY PUBLIC |
| 2  MR. TOONE:  That's all I have. | 2  I, Okeemah S. Henderson, Professional |
| 3  MS. LEVINE:  Okay.  No more at this | 3  Shorthand Reporter, the officer before whom the |
| 4  time. | 4  foregoing deposition was taken, do hereby certify |
| 5  MR. TOONE:  Thank you very much. | 5  that the witness named herein was duly sworn by |
| 6  THE WITNESS:  You're welcome. | 6  me; that the foregoing transcript is a true, |
| 7  THE VIDEO OPERATOR:  The time is | 7  correct, and complete record of the testimony |
| 8  3:20 p.m.  This concludes the videotape deposition | 8  given; that said testimony was taken by me |
| 9  of Mr. Stephen Berardi. | 9  stenographically and thereafter reduced to |
| 10 | 10  typewriting by me; and that I am neither counsel |
| 11  (Deposition concluded at 3:20 p.m.) | 11  for, related to, nor employed by any of the |
| 12 | 12  parties to this litigation and have no interest, |
| 13 | 13  financial or otherwise, in its outcome. |
| 14 | 14  IN WITNESS WHEREOF, I have hereunto set my |
| 15 | 15  hand and affixed my notarial seal. |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19 | Okeemah S. Henderson, LSR |
| 20 | 19 |
| 21 | Notary Public in and |
| 22 | 20  for the District of Columbia |
| | My Commission expires February 28, 2010 |
| | 21 |
| | 22 |

| Page 147 | |
|---|---|
| 1  ACKNOWLEDGMENT OF DEPONENT | |
| 2  I, STEPHEN BERARDI, do hereby acknowledge | |
| 3  that I have read and examined the foregoing pages | |
| 4  of testimony, and the same is a true, correct and | |
| 5  complete transcription of the testimony given by | |
| 6  me, and any changes and/or corrections appear on | |
| 7  the attached errata sheet signed by me. | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12  (Date)        STEPHEN BERARDI | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |

Alderson Reporting Company
1-800-FOR-DEPO

**Exhibit O**

**Cited Excerpts and Corresponding Exhibit from
the Deposition of Brian Roseboro
(June 27, 2006)**

1

2       UNITED STATES DISTRICT COURT

3       FOR THE DISTRICT OF MASSACHUSETTS

4       ----------------------------------------X

5       UNITED STATES SECURITIES AND

6       EXCHANGE COMMISSION,

7                        Plaintiff,

8              - against -

9       STEVEN E. NORTHERN,

10                       Defendant.

11      CIVIL ACTION NO.: 05-10983(NMG)

12      ----------------------------------------X

13                        450 Lexington Avenue
                          New York, New York
14
                          June 27, 2006
15                        2:06 p.m.

16

17             VIDEOTAPED DEPOSITION of BRIAN

18      ROSEBORO, pursuant to Notice, before Melissa

19      Gilmore, a Notary Public of the State of New

20      York.

21

22

23

24

25

Page 58

1        MR. SHOPE: I got a note that they
2    are going to need to change the tape on
3    the video, so why don't we take a short
4    break right now.
5        THE WITNESS: Very short, please.
6        THE VIDEOGRAPHER: The time is 3:02.
7    This ends tape number one of the
8    videotaped deposition of Brian Roseboro.
9        (Recess taken.)
10       THE VIDEOGRAPHER: The time is 3:09.
11   This begins tape number two of the
12   videotaped deposition of Brian Roseboro.
13       MR. ROSSETTI: I just note for the
14   record that this is John Rossetti, counsel
15   for the plaintiff, Securities and Exchange
16   Commission. I arrived roughly ten minutes
17   after you started.
18   Q.   Mr. Roseboro, we have had just a
19   short break so that the videographer could
20   change the videotape. Has that break given you
21   a chance to think about any of your testimony?
22   Do you want to correct or amplify anything you
23   have said so far?
24   A.   No.
25   Q.   Now, is there such a thing as

Page 59

1    Borrowing Advisory Committee?
2    A.   Yes.
3    Q.   What is the Borrowing Advisory
4    Committee?
5    A.   A group of private sector
6    individuals who come down ahead of the
7    Treasury's quarterly refunding to offer advice
8    to questions that the Treasury puts before it
9    on debt management matters.
10   Q.   I take it this is a group of people
11   in the private sector who are essentially
12   self-selecting?
13       MS. WILLIAMS: Objection.
14   A.   Yes.
15   Q.   Would it be fair to say that this
16   group meets both publicly and privately in the
17   day that precedes the day of the quarterly
18   refunding conference?
19       MS. WILLIAMS: Objection.
20   A.   Correct.
21   Q.   Did you attend meetings of the
22   Borrowing Advisory Committee?
23   A.   Yes.
24   Q.   Did you ever discuss possible
25   elimination of the long bond with the Borrowing

Page 60

1    Advisory Committee?
2    A.   No. Oh, let me qualify that.
3    Definitely not in the October attended
4    meetings. I don't recall whether or not it was
5    mentioned at the July meetings, but it was not
6    an issue that Treasury brought to the
7    committee. It could be somebody brought it up
8    and they indicated it in the minutes, for
9    example, at the July meeting.
10       MR. SHOPE: Why don't we mark this
11   as the next exhibit -- the first exhibit,
12   rather.
13       (Roseboro Exhibit 1, Minutes of
14   Meeting of Treasury Borrowing Advisory
15   Committee, 7/31/01, marked for
16   identification.)
17   Q.   I'm showing you what has been marked
18   as Exhibit 1 to your deposition, Mr. Roseboro,
19   and I recognize that it doesn't have the charge
20   and so forth, but perhaps you could just take a
21   look at that, and, first of all, do you
22   recognize Exhibit 1 at all?
23   A.   Yes.
24   Q.   What do you recognize it to be?
25   A.   The Minutes of the Meeting of the

Page 61

1    Treasury Borrowing Advisory Committee of the
2    Bond Market Association, July 31, 2001.
3    Q.   Was this a document that you would
4    have seen prior to today's deposition at some
5    point? In other words, you would have seen
6    this back in July or August?
7    A.   Yeah, I would have saw this document
8    back in July, August '01.
9    Q.   Would Mr. Malvey -- this was a
10   document that was prepared by Mr. Malvey,
11   correct?
12       MS. WILLIAMS: Objection.
13   A.   That I don't recall exactly. There
14   were minutes that were prepared -- there was a
15   statement prepared by the Treasury Borrowing
16   Advisory Committee, and there were minutes. So
17   the nuance of their statement versus the
18   minutes -- so I don't exactly recall the
19   technical operational aspect of it, but
20   Treasury would have been involved in the
21   approval of the minutes before the Borrowing
22   Advisory Committee put them out though.
23   Q.   So you -- just so I'm clear, would
24   you have seen a draft of the minutes prior to
25   the posting of those minutes on the Treasury

16 (Pages 58 to 61)

|  | Page 62 |
|---|---|

```
 1   web site?
 2       A.   Correct.
 3       Q.   So, in other words, if you had had
 4   some edit to a draft that was being prepared,
 5   you would have had a chance to make that to it
 6   before the document went public?
 7       A.   Correct.
 8       Q.   Does looking at Exhibit 1 at all
 9   refresh your recollection as to whether or not
10   possible elimination of the long bond was
11   discussed by the Borrowing Advisory Committee?
12       A.   I haven't read it.
13       Q.   Perhaps I can help you if I draw
14   your attention to the second page, SM-000116.
15       A.   (Perusing.)  Okay.
16       Q.   Do you see the first full paragraph
17   on the second page there?
18       A.   Yes.
19       Q.   It says, "The Committee debated
20   whether to comment further on continued
21   issuance of the 30-year bond," and then
22   different people had different views.  Do you
23   see that?
24       A.   Yes.
25       Q.   Does that at all refresh your
```

|  | Page 63 |
|---|---|

```
 1   recollection?
 2       A.   No.
 3       Q.   But does that suggest to you that
 4   elimination of the long bond was, in fact,
 5   discussed at a meeting of the Borrowing
 6   Advisory Committee?
 7       A.   To this extent, yes.
 8       Q.   It says, by the way, "comment
 9   further".  Does that suggest to you that, in
10   fact, the Borrowing Advisory Committee had
11   discussed possible elimination of the long bond
12   on earlier occasions?
13           MS. WILLIAMS:  Objection.
14       A.   Again, as I indicated earlier, I had
15   been made aware that this was discussed earlier
16   in the previous administration.
17       Q.   You said that you were quite sure
18   that the possible elimination of the long bond
19   was not discussed on the meeting -- at the
20   meeting of the Borrowing Advisory Committee on
21   October 30, 2001.  Did I hear that rightly?
22       A.   Yes, that's what I recall.  We did
23   not discuss it with them on the 31st.
24       Q.   First of all, are you, in fact,
25   confident in that memory?
```

|  | Page 64 |
|---|---|

```
 1       A.   In that, to the best of my
 2   recollection, that's my memory.
 3       Q.   Is there any particular reason why
 4   you are pretty sure it wasn't discussed then,
 5   even though apparently it was discussed at the
 6   previous meeting?
 7       A.   Because by the time of the meeting,
 8   which is the day before the quarterly
 9   refunding, the decision had been made.
10       Q.   So in your view there would have
11   been no point to discussing that point?
12       A.   Exactly.
13       Q.   Was the decision to suspend issuance
14   of the long bond announced internally at
15   Treasury?  I mean not necessarily every person
16   in the building including the janitor, but to
17   some subset of Treasury personnel.
18           MS. WILLIAMS:  Objection.
19       A.   No, it was not announced internally
20   prior to the quarterly refunding announcement.
21       Q.   Let me just break that down.
22           Was Mr. Malvey aware before the
23   quarterly refunding conference that a decision
24   had been taken to suspend elimination of the
25   long bond?
```

|  | Page 65 |
|---|---|

```
 1           MS. WILLIAMS:  Objection.
 2       A.   Yes.
 3       Q.   So he had been told, right?
 4       A.   He -- again, he worked on the
 5   quarterly refunding Statement that, to the best
 6   of my recollection, he would have been involved
 7   in the editing process of the quarterly
 8   refunding Statement, which would have stated
 9   it.
10       Q.   So he -- in that capacity he would
11   have learned that the decision had been made?
12           MS. WILLIAMS:  Objection.
13       A.   Exactly.
14       Q.   Who else worked on the drafting of
15   the statement for the press conference that
16   included the announcement that the long bond
17   was no longer going to be issued?
18       A.   Myself, Peter Fisher.
19       Q.   That's it?
20       A.   To the best of my recollection.
21       Q.   So was there anybody else in the
22   Treasury Department other than Secretary O'Neal
23   himself?
24       A.   By that time, Tim Bitsberger was on
25   staff, so he would have known.  I don't know
```

17 (Pages 62 to 65)

08/01/01 07:29    202-544-7090->Stone & McCarthy/McCarthy,Ward    013
08/01/2001  09:13    2025447163    DAVIS CAPITAL INV    PAGE  12

## MINUTES OF THE MEETING OF THE
## TREASURY BORROWING ADVISORY COMMITTEE
## OF THE BOND MARKET ASSOCIATION
### July 31, 2001

The Committee convened at 9:00 a.m. at the Treasury Department for the portion of the meeting that was open to the public. All members were present except Messrs. Stark and White. The Federal Register announcement of the meeting and a list of Committee members are attached.

The Committee was welcomed by Brian Roseboro, Assistant Secretary for Financial Markets. Karen Hendershot, Acting Director of the Office of Macroeconomic Analysis, summarized the current state of the U.S. economy (statement attached). Paul Malvey, Director of the Office of Market Finance, presented the chart show, updating Treasury borrowing estimates, and debt and interest rate statistics.

The public meeting ended at 9:22 a.m.

The Committee reconvened in closed session at the Madison Hotel at 12:05 p.m. All members were present except Messrs. Stark and White. The Chairman read the charge to the Committee, which is also attached.

The Committee began by discussing any special considerations that should be taken into account in distributing Treasury's financing needs given economic and policy uncertainties. The general view of the Committee was that there is no need to change long-term financing at this time. Underlying this view, the Committee viewed upcoming releases of the updates to the Administration's and Congressional Budget Office's long-term projections as important considerations for planning long-term financing. In addition, the Committee noted that possible recommendations to change the Social Security system would influence long-term financing decisions.

The Committee recognized the effect that the current increase in bill issuance is having on average maturity and debt financing costs, but both factors were considered favorable to Treasury. Increased bill issuance is helping to keep the average maturity of debt from rising and the market has the capacity to absorb increased bill issuance at historically favorable rates. The Committee suggested fairly stable issuance of the new 4-week bill until performance of the bill can be ascertained. Given 4-week bill issuance, however, the Committee does not see the need for issuance of Cash Management bills this fiscal quarter. Aside from increased bill issuance, the Committee's projections suggested modest increases in 2-year notes since there are no end-of-month 5-year notes maturing in July 2003.

On the question of increasing the size of initial auctions while reducing the size of reopenings, the Committee, while generally in favor of the proposal, was hesitant to recommend changes to the current issuance pattern. Some members of the Committee were concerned that a larger-initial / smaller-reopening policy would lead to insufficiently large reopenings, although it



EXHIBIT
Roseboro-1
6/27/06    m.c.

SM-000115

SECNOTH00112870

08/01/01 07:29    202-544-7090->Stone & McCarthy/McCarthy,Ward    014
08/01/2001  09:13    2025447163    DAVIS CAPITAL INV    PAGE  13

2

was also pointed out that the larger impact of issuance really depended on the total amount of a security issued rather than the amount of any single opening or reopening.

The Committee debated whether to comment further on continued issuance of the 30-year bond. Some members of the Committee said that the market expects Treasury to make a statement on the 30-year bond, while others said that Treasury should keep its options given increased policy and economic uncertainty. Others suggested that Treasury should develop a framework for assessing the "public good" value of the 30-year bond before deciding on its fate.

The Committee next reviewed its position on the 35 percent rule given the alternatives Treasury laid out last week in its Advanced Notice of Proposed Rulemaking (ANPR). While there was some support for the first option, which is listed in the ANPR as Treasury's preferred option, the Committee reiterated its previous position as contained in the May Committee Report to the Secretary. This position is to redefine the NLP to include only the when-issued position when calculating the 35 percent limit on a reopening – an option which the Committee views as easy to comply with and consistent with the objective of ensuring wide distribution at auctions. The Committee also reiterated its support for making the reporting time of net long positions simultaneous with the submission of bids.

The meeting adjourned at 12:58 p.m.

The Committee reconvened at the Madison Hotel at 6:00 p.m. All members were present except Messrs. Stark and White. The Chairman presented the Committee report to the Assistant Secretary for Financial Markets, Brian Roseboro. A brief discussion followed the Chairman's presentation, but did not raise significant questions regarding the report's content.

The meeting adjourned at 6:15 p.m.

Paul F. Malvey
Director
Office of Market Finance
July 31, 2001

Certified by:

James R. Capra, Chairman
Treasury Borrowing Advisory Committee
of The Bond Market Association
July 31, 2001

2

SM-000116

SECNOTH00112871

**Exhibit P**

**Cited Excerpts from the Deposition of Jill Cetina
(February 8, 2008)**

1              UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF MASSACHUSETTS

3      - - - - - - - - - - - - - - x

4    UNITED STATES SECURITIES AND    :
     EXCHANGE COMMISSION,            :
5                                    :
              Plaintiffs,            :
6                                    :
     v.                              :  Civil Action No.
7                                    :
     STEVEN E. NOTHERN,             :  05-10983 (NMG)
8                                    :
          Defendant.                 :
9      - - - - - - - - - - - - - - x

10

11       Videotaped Deposition of JILL CETINA

12              Washington, D.C.

13          Friday, February 8, 2008

14                 9:56 a.m.

15

16

17             *     *     *     *

18

19

20

21    Reported by:  Okeemah S. Henderson, LSR

22

## Page 50

1  however, was that they had been buying the 30 year
2  that morning prior to 10 a.m.
3      BY MR. SHOPE:
4      Q.  Well --
5      A.  Which with the inference being that he
6  had some concern about the source of their
7  information and why they were engaging in those
8  trades.  I think he was also trying to be careful
9  in what he said to me and how he said it.
10     Q.  But the implication was that the
11 reason that Goldman Sachs and Lehman were buying
12 so heavily was that they had some knowledge?
13     A.  That they must have known that they
14 had preknowledge.
15     MS. WILLIAMS:  Objection.
16     BY MR. SHOPE:
17     Q.  That would be the reason why he would
18 be angry?
19     A.  Right.
20     MR. FREEBORNE:  Objection.
21     MS. WILLIAMS:  Objection.
22     A.  Again, as I indicated, you know, he

## Page 51

1  could have been angry because he got caught short
2  but clearly he could have also been angry because,
3  you know, if he felt that there was inside
4  information or information being leaked.
5      BY MR. SHOPE:
6      Q.  Do you know a Woody Jay?
7      A.  The name is familiar.
8      Q.  Are you aware that Woody Jay was a
9  vice chair of borrowing advisory committee in
10 2001?
11     A.  I may have been aware of it after the
12 fact.  At that time, I don't think I was.
13     Q.  At the time, was Woody Jay working for
14 Lehman Brothers?
15     A.  I don't know.
16     Q.  Lehman Brothers was a major market
17 participant with respect to treasury securities;
18 is that fair to say?
19     MS. WILLIAMS:  Objection.
20     A.  Lehman Brothers was one of the New
21 York Feds primary dealers in the treasury market,
22 one of, I don't know how many at that time, but

## Page 52

1  approximately 20 something.
2      BY MR. SHOPE:
3      Q.  And did you know of a Jack Malvey at
4  Lehman Brothers?
5      A.  Yes.  He's one of their fixed income,
6  analyst is too low.  I don't know what his title
7  is but he's one of their senior fixed income
8  strategists at Lehman.  Yes.
9      Q.  So he would be someone at Lehman whose
10 job would include strategizing about the 30-year
11 bond?
12     MS. WILLIAMS:  Objection.
13     A.  I mean, my experience from reading his
14 pieces is that he thinks about credit strategy
15 which could include the treasury market, it could
16 include other markets as well for Lehman Brothers.
17 So anything relating to fixed income, i.e. bonds
18 potentially.
19     BY MR. SHOPE:
20     Q.  And were you aware that Jack Malvey at
21 Lehman Brothers was related to Paul Malvey at the
22 Treasury Department?

## Page 53

1      MS. WILLIAMS:  Objection.
2      A.  I wondered about that at the time.  I
3  learned that later.
4      BY MR. SHOPE:
5      Q.  How did you learn that later?
6      A.  I asked someone.  Not in 2001 but
7  later.  I don't know what year.  It may have been
8  when I moved in domestic finance.
9      Q.  So possibly like 2002?
10     A.  2002 I wasn't in domestic finance.  I
11 don't think I moved until 2004.
12     Q.  Now, turning back to your interview
13 notes --
14     MR. FREEBORNE:  I think that misstates
15 the record about her notes.
16     MR. SHOPE:  Oh, I'm sorry.  The notes
17 of your interview.  I apologize.
18     BY MR. SHOPE:
19     Q.  There's reference to a meeting that
20 you had with a Drew Matus?
21     A.  Drew Matus.
22     Q.  Or Matus.  And he also was employed by

14  (Pages 50 to 53)

Page 54

1  Lehman Brothers, correct?
2      A.  Correct.
3      Q.  Do you know whether he was working for
4  Woody Jay at that time?
5      A.  They all worked at Lehman Brothers but
6  I presume but it's really beyond my -- I don't
7  understand.  I didn't understand in 2001 what the
8  reporting structure of Lehman Brothers was.
9      Q.  Sure.  And when you met with Mr.
10 Matus, he had just come from a meeting with Paul
11 Malvey and Jeff Huther, correct?
12      MS. WILLIAMS:  Objection.
13      A.  I believe that was what he told me or
14 that was my sense.  And later when I was in debt
15 management, I actually asked Jeff if he had met
16 with Drew and if he and Paul had met with Drew and
17 he confirmed that to me, he, being Jeff.
18      BY MR. SHOPE:
19      Q.  Jeff Huther had confirmed that.  Okay.
20 And I see in the notes on page 4 it says at the
21 top Drew --
22      MR. FREEBORNE:  Can you give her a

Page 55

1  second to catch up?
2      MR. SHOPE:  Certainly.  "Drew said he
3  was meeting with Paul Malvey, Jeff Huther of
4  treasury -- he met with them before he met with
5  her." So is that consistent with your memory?
6      A.  Yes.
7      Q.  At the meeting that you had -- first
8  of all, what was the purpose of the meeting with
9  Mr. Matus on -- first of all, that was on
10 October 22nd; is that correct?
11      A.  Right.
12      Q.  And what was the purpose of the
13 meeting with Mr. Matus on October --
14      A.  My meeting?
15      Q.  Yes.
16      A.  Drew was someone who I would speak to.
17 He was a contact and one of my, he had many
18 contacts in fixed income and foreign exchange
19 markets, so somebody that I talked to from time to
20 time.  He had let me know that he was going to be
21 in Treasury.  He said how about we get together
22 and talk.  So that was what we did.

Page 56

1      It was mostly just to discuss sort of big
2  picture what was going on in the financial
3  markets, particularly fixed income.
4      Q.  Mr. Matus in the past I gather had
5  told you that he was kind of plugged in as far as
6  what Treasury was going to be doing, correct?
7      MS. WILLIAMS:  Objection.
8      A.  I don't specifically recall that.
9  That's what's written here in the notes.  So.
10      BY MR. SHOPE:
11      Q.  I'm sorry.  You say it's written in
12 the notes but you're just sitting here
13 today you're --
14      MR. FREEBORNE:  I'm confused as to what
15 the question is.
16      BY MR. SHOPE:
17      Q.  Sure.  Well, the question is does she
18 recall Mr. Matus indicating that he was plugged
19 into what Treasury would be doing on debt
20 management?
21      MR. FREEBORNE:  When you say plugged
22 in, what do you mean?

Page 57

1      MR. SHOPE:  I'm simply quoting from the
2  notes of the interview.
3      A.  Drew always seemed very knowledgeable
4  about the treasury market, but that -- I don't
5  specifically remember that from that time.  It's
6  here in the notes from, you know, the interview
7  with me.  You just have to -- I'm not trying to be
8  difficult.  I just don't specifically recall that.
9      BY MR. SHOPE:
10      Q.  But you have no reason to believe that
11 you didn't say that; is that fair to say?
12      MS. WILLIAMS:  Objection.
13      MR. FREEBORNE:  You can answer.  I
14 mean, I don't think it's, there's no quotes around
15 it.  It could have very well been the person that
16 took the notes, that's her interpretation of what
17 was said or so I don't think that's a fair
18 question.
19      A.  It's just so long ago, I don't
20 remember that aspect of it.
21      BY MR. SHOPE:
22      Q.  But you're saying Mr. Matus always

15 (Pages 54 to 57)

| Page 58 |
|---|

1  appeared to be very knowledgeable; is that at
2  least a fair summary?
3      A.  I think that's a fair summary.
4      Q.  Again, going to the notes in Ms.
5  Kerner's subsequent memorandum, which we can
6  review in a minute --
7      A.  So we're done with --
8      Q.  No.  I think we're going to stick on
9  the notes for a second.  With regard to Mr. Matus,
10  do you recall in the course of your meeting on the
11  22nd he went on to suggest that Treasury would be
12  eliminating 30-year bond?
13      MS. WILLIAMS:  Objection?
14      A.  I seem to recall him saying that, and
15  I seem to recall being a bit taken aback by him
16  saying that.  I have some recollection of that, I
17  don't fantastic, you know, what his precise
18  sentence was, but I have some recollection of it.
19      BY MR. SHOPE:
20      Q.  And why were you taken aback by that
21  suggestion that Mr. Matus made about eliminating
22  30-year bond?

| Page 59 |
|---|

1      A.  Because it wasn't something that I
2  heard other dealers talking about as an
3  expectation that they had for treasury debt
4  management; hence, it was an unusual view and thus
5  I thought noteworthy.
6      MR. SHOPE:  I'd like to show you a
7  document here.
8      (Deposition Exhibit No. 5 was marked for
9          identification.)
10      BY MR. SHOPE:
11      Q.  I'm going to focus on the portion of
12  this memorandum that's under the heading
13  treasuries?
14      A.  Yes.
15      MR. FREEBORNE:  Is the underlining in
16  the original or is that somebody else's?
17      MR. SHOPE:  That's as it was produced
18  to us by the Government.  Just let me know when
19  you're ready.  I'm not going to ask you any
20  questions about the indices on the right.
21      THE WITNESS:  Okay.
22      BY MR. SHOPE:

| Page 60 |
|---|

1      Q.  Under the heading treasuries, there is
2  in Exhibit 5 there is an underline sentence that
3  says, "Some analysts wondered whether Treasury
4  might cancel buybacks and the long bond
5  simultaneously to prevent long term rates from
6  rising."  Do you see that?
7      A.  Yes.
8      Q.  First of all, this Exhibit 5 is a
9  document that you drafted, correct?
10      A.  Correct.
11      Q.  Does that sentence relate to your
12  meeting with Mr. Matus?
13      A.  Yes.  Because I would never -- 'm
14  sorry to speak over you, but when we would write
15  these type of reports, you were never supposed to
16  identify the firms because this was disseminated
17  very broadly within the Department.
18      You typically did not identify the firms
19  that or the people, the individuals that were
20  articulating those views.  So, I wouldn't have
21  said Drew Matus said blah.  I would have said some
22  analyst.

| Page 61 |
|---|

1      Q.  And so when it says analysts in the
2  plural, they're actually, for the reason you just
3  mentioned, there really weren't multiple analysts,
4  it was just Mr. Matus at Lehman Brothers?
5      MS. WILLIAMS:  Objection.
6      A.  That I was aware of.  I can't speak to
7  was there anybody in the market analyzing the
8  treasury market but at that moment in time the
9  person -- I only had one person in mind and that
10  was Lehman Brothers.  Drew at Lehman.
11      BY MR. SHOPE:
12      Q.  Sure.  And when you, I guess eight
13  days after you prepared this report, we had the
14  events of October 31, 2001, correct?
15      A.  Yes.
16      Q.  And there was obviously a lot of
17  controversy about allegations that some people
18  knew about the decision to cancel the long bond
19  before other people did, correct?
20      MS. WILLIAMS:  Objection.
21      A.  I'm sorry.  Can you -- whenever
22  there's an objection.  I get a little confused.

                                16 (Pages 58 to 61)

Page 74

1    a Norm Carlton the night before October 31?

2        A.    It wasn't a phone call. I believe

3    Norm came by and just we were talking.

4        Q.    And did he tell you that there might

5    be a market-moving event the next day?

6        A.    I recall having some conversation with

7    Norm in advance of the announcement that gave me

8    some sense that the 30 year might be, that

9    something was up, let's put that it way.

10       Q.    So he did give you an indication to

11   you that night before that the 30 year might be

12   eliminated?

13       MS. WILLIAMS:    Objection.

14       Q.    Or I said the night before. Is it

15   really the night?

16       MS. WILLIAMS:    Objection.

17       A.    I mean, during the afternoon of work

18   hours, you know, that afternoon prior that Norm

19   made some comment to me implying that there would

20   be something significant out of the quarterly

21   refunded.

22       BY MR. SHOPE:

Page 75

1        Q.    Do you recall anything else about the

2    conversation?

3        A.    I do think he may have even gone so

4    far as to explicitly say that he thought the

5    30 year might have been eliminated to me.

6        Q.    What was Mr. Carlton's position?

7        A.    He was the director of another group

8    in domestic finance, not the Office of Federal

9    Finance. I don't specifically recall the name of

10   that, again, there's been reorganizations, so I

11   don't recall at that time what that group was

12   called.

13       I do know that his group was involved in the

14   pricings of the savings bonds and hence, they

15   probably would have been aware from that point of

16   view of these discussions at some level.

17       Q.    What did you understand to be the

18   purpose of Mr. Carlton's having come by to give

19   you that information?

20       A.    So that as things unfolded in the

21   morning, I would be extra aware to kind of have my

22   eyes and ears looking for things the next morning,

Page 76

1    which I appreciated because it helped me do my job

2    better.

3        Q.    Did you go in extra early?

4        A.    Well, I mean, I don't know on that

5    particular day, but we had rotations and if you

6    were the morning person on the rotation, you could

7    be in as early as 5:30 in the morning. So it may

8    be that I went in extra early that day. Well, not

9    extra, extra early, but early.

10       Q.    I believe there is reference in the

11   notes to your actually having been in at 5:30 that

12   morning?

13       A.    Uh-huh. It's quite possible. The day

14   we did a foreign currency intervention, I was

15   there at 4 in the morning, so.

16       Q.    You mentioned earlier that you had

17   been interviewed in connection with the events of

18   October 31 by various individuals?

19       A.    Yes.

20       MR. SHOPE:    Maybe if we can mark this

21   as the next exhibit, that will help.

22

Page 77

1        (Deposition Exhibit No. 7 was marked for

2            identification.)

3        BY MR. SHOPE:

4        Q.    Do you recognize Exhibit 7?

5        A.    Yes.

6        Q.    Is that one of the documents that you

7    reviewed yesterday?

8        A.    Uh-huh.

9        Q.    Had you seen it before yesterday?

10       A.    No. I didn't even see it yesterday.

11       Q.    Oh, you didn't see it?

12       A.    I have never seen this document

13   before.

14       Q.    Oh, okay. Why don't you then take a

15   moment to read it.

16       A.    (The witness complies.) Okay.

17       Q.    So this confirms that you actually did

18   come to work at 5:30 that morning?

19       A.    Okay. So.

20       Q.    It indicates that you first noticed

21   price increases on the long bond at 9:35 a.m. Do

22   you see that?

20 (Pages 74 to 77)

Page 78

1    A.   Okay.

2    Q.   Is that consistent with your own

3  memory?

4    A.   You know, we're talking about interday

5  movements on a security that happened seven years

6  ago.  So I remember, my recollection is that I

7  thought there were price increases say half an

8  hour at least before the 10 a.m. announcement

9  window.

10    MR. SHOPE:  And would it be -- if I

11  have another document here which we can mark as

12  the next exhibit?

13    (Deposition Exhibit No. 8 was marked for

14        identification.)

15    BY MR. SHOPE:

16    Q.   Exhibit 8 is a memorandum from

17  Francine Kerner.  First of all, do you recall

18  meeting with Francine Kerner in connection with

19  the events of October 31, 2001?

20    A.   Vaguely.  Yes.  I mean, I have a

21  memory that I met with a woman in the general

22  counsel's office.  If you tell me her name is

Page 79

1  Francine Kerner, then I guess that's right.

2    Q.   Just to continue to keep things moving

3  along, I want to take you to the fourth paragraph

4  of Ms. Kerner's memorandum and the first sentence

5  says, "Based on their analysis of the trading data

6  and information they received from the trading

7  community, Jill Cetina and Jim Sharer, analyst in

8  Treasury's market room, believe that one or more

9  parties were trading on the basis of advance

10  information."  Do you see that?

11    A.   Mm-hmm.

12    Q.   So was that, in fact, your belief at

13  the time that the price started going up about a

14  half hour before the 10 o'clock, you know,

15  announcement time and that that was in your view

16  based on the advance knowledge of 30-year bond

17  decision?

18    MS. WILLIAMS:  Objection.

19    A.   I believe that was my view.  I had

20  concerns.  Yes.

21    BY MR. SHOPE:

22    Q.   Who was Mr. Sharer?

Page 80

1    A.   He was a coworker in that group,

2  though he actually worked -- he was actually an

3  employee of Domestic Finance.  So we were in the

4  same group but had different reporting chains in

5  effect.

6    Q.   Was his view the same as yours, i.e.

7  that is, that people were trading on the decision

8  to suspend the long bond to about a half hour

9  beforehand?

10    MS. WILLIAMS:  Objection.

11    A.   I think you would have to ask him

12  that.  I recall Jim and I had some discussions

13  about it, but I can't say for a fact that he had

14  the exact same view as myself.

15    BY MR. SHOPE:

16    Q.   Well, sitting here today, do you

17  recall his having a different opinion?

18    MS. WILLIAMS:  Objection.

19    A.   No.

20    BY MR. SHOPE:

21    Q.   Okay.  If we look back to the

22  interview notes which are Exhibit 2.  On page 3 of

Page 81

1  the interview notes about a third of the way down

2  there's a reference to MCM currency watch

3  9:45 a.m. suspension.  Didn't see it at 9:45 a.m.

4  Do you see that?

5    A.   Yes.

6    Q.   Do you recall MCM currency watch

7  having issued a report of the decision to suspend

8  issuance of the long bond around quarter to 10 on

9  the morning of October 31?

10    A.   I don't recall them.  I don't remember

11  this particular aspect of that.  I mean, if it's

12  here in the notes, presumably this is something

13  that we discussed.  Certainly, I'm aware, the MCM

14  currency watch was something that we kept abreast

15  of.  They were kind of a rumory, gossipy news,

16  they weren't news they were more like analysis

17  service and so, you know, given that they put

18  things out that sometimes were market moving, we

19  tried to keep abreast of what they were saying.

20  But I don't have a specific recollection of that

21  aspect of the morning.

22    Q.   And now there's some indication that

21 (Pages 78 to 81)

**Exhibit Q**

**Cited Excerpts from the Deposition of Brian Collins
(May 12, 2006)**

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - X

UNITED STATES SECURITIES AND   :

EXCHANGE COMMISSION,           :

       Plaintiff,            :

    V.                         :   Civil Action No.

STEVEN E. NOTHERN,             :   05-10983(NMG)

      Defendant.             :

- - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 12, 2006

Videotape Deposition of BRIAN COLLINS, a

witness herein, called for examination by counsel for

the Defendant in the above-entitled matter, pursuant

to notice and subpoena, the witness being duly sworn

by PENNY M. DEAN, a Notary Public in and for the

District of Columbia, taken at the law offices of

Foley Hoag, LLP, 1875 K Street, NW, Washington, D.C.,

at 10:44 a.m., Friday, May 12, 2006, and the

proceedings being taken down by Stenotype by PENNY M.

DEAN, RPR, and transcribed under her direction.

Brian Collins                                                    May 12, 2006

Washington, DC

| Page 34 | Page 36 |
|---|---|

**Page 34**

1    MS. WILLIAMS: Objection to that
2  characterization. Go ahead.
3    BY MR. SHOPE:
4    Q.  So again, before the press conference on
5  October 31, you'd attended press conferences at a
6  variety of other government agencies, true?
7    A.  Yes.
8    Q.  Now, at any of those other press
9  conferences that you attended before October 31,
10  2001, had the subject of press embargo ever come up?
11    MR. RITTINGER: I'm sorry -- his bottle is
12  blocking your face. We wouldn't want you not to
13  be --
14    THE WITNESS: Yes.
15    MR. SHOPE: Okay, all right.
16    BY MR. SHOPE:
17    Q.  How did it come up? In other words, can
18  we go through some of the different conferences that
19  you attended before October 31, 2001, and how a press
20  embargo came up.
21    MR. RITTINGER: In general, he's asking.
22    BY MR. SHOPE:
23    Q.  In general, we'll break it down to
24  specifics.
25    A.  Usually they say we don't want something

**Page 36**

1  relating to any quarterly refunding conference that
2  you were attending at the Treasury Department?
3    A.  No.
4    Q.  Okay. And I take it nobody had ever asked
5  you to sign anything in connection with any kind of
6  press embargo, is that fair?
7    A.  That's my recollection, yeah, yes.
8    Q.  This is probably obvious, but -- and you
9  never did sign anything, right?
10    A.  No.
11    Q.  Now, I want to turn now to October 31,
12  2001. You made a statement earlier, and I just want
13  to make sure I understand it. What's your best
14  recollection as to why you attended the press
15  conference on October 31, 2001?
16    MR. RITTINGER: Well, I object to the form
17  of the question. I also think it's -- the why is not
18  relevant, and it may -- but you can answer that. You
19  can answer without waiving anything beyond that.
20    THE WITNESS: I knew they had a press
21  conference that they were going to do, and I was -- I
22  tried to get over there. I was actually late.
23    MR. SHOPE: Okay.
24    BY MR. SHOPE:
25    Q.  Do you recall at all how you learned about

**Page 35**

1  published before a certain time of the day, or a --
2  or we're going to give this to you today, we don't
3  want you publishing anything later.
4    Q.  Were you ever asked to sign anything that
5  indicated that you would abide by a press embargo?
6    A.  No.
7    Q.  Did you ever go to any press conference
8  where the agency actually locked you into the room up
9  to a point in time when the embargo was expiring?
10    A.  I've heard of that. I don't think I have.
11  I know when I go to the like National Association of
12  Realtors, they release some information. And they
13  keep us in the room until 10 o'clock, when it is
14  officially released.
15    Q.  When you went to conferences at the
16  Federal Reserve, were you -- was there ever any
17  discussion of embargo that you can remember?
18    A.  No.
19    Q.  Can you remember any other agency where
20  embargo has come up, press embargo, that is?
21    A.  No.
22    Q.  All right. Now, I want to focus on
23  Treasury Department. And I apologize if we've
24  covered this before. But before October 31, 2001,
25  had anybody ever discussed with you a press embargo

**Page 37**

1  the press conference?
2    A.  I don't remember.
3    Q.  Now -- and I apologize, I meant to address
4  this earlier. When you had attended the quarterly
5  refunding conferences before October 31, 2001, how
6  did you get into the Treasury building?
7    A.  At one point, I had a Treasury press pass.
8  At another point, I had -- I gave that up, I let that
9  expire because I got a White House press pass and
10  they would accept it. Let me interject one thing.
11    Q.  Sure.
12    A.  I really never covered the quarterly
13  things on any type of regular basis.
14    Q.  Um-hum.
15    A.  It's just, you know -- it just wasn't my
16  thing.
17    Q.  You mentioned that on October 31, 2001,
18  there were a lot of people at the press conference.
19    A.  Um-hum.
20    Q.  Correct?
21    A.  Yes.
22    Q.  Had you attended quarterly refunding
23  conferences where there were a lot fewer people than
24  the number of people that you observed on October 31,
25  2001?

10  (Pages 34 to 37)

Brian Collins                                                    May 12, 2006
                          Washington, DC

| Page 38 | Page 40 |
|---|---|

**Page 38**

1    A.   To the best of my recollection, I think
2  when I had been at Treasury at something that might
3  be a quarterly thing or something, they usually just
4  sat around a big table and talked to you.
5    Q.   And was there any restriction on your
6  ability to go into that conference room?
7    A.   (No response.)
8    Q.   I'm sorry, let me rephrase the question.
9      Did you need to have the -- a pass of the
10 type that you mentioned before, either the Treasury
11 press pass or the White House press pass in order to
12 attend that?
13   A.   Yes, that's one way you get into the
14 building, or you can call up and just give them your
15 -- in advance, you can give them your Social Security
16 number, date of birth, and name, and news
17 organization.  And they will clear you through
18 normally.
19   Q.   Okay.  Now, did you ever go to the
20 Treasury Department to talk to people other than in
21 connection with attending one of these conferences?
22   A.   Yes.
23   Q.   And did you also have to go through the
24 clearance procedure to get into the building?
25   A.   Yes.

**Page 39**

1    Q.   Now, when you were going to the quarterly
2  refunding conferences, where you were just sitting
3  around the conference table, was there any physical
4  restriction on your ability to leave during the
5  middle of the conference, you know, if you needed to
6  go to the bathroom or realized you had another
7  appointment or anything like that?
8    A.   I don't remember.
9    Q.   In other words, you don't remember any
10 kind of sergeant-at-arms or anything sort of, you
11 know, keeping you in the room?
12   MS. WILLIAMS:  Objection.
13   MR. RITTINGER:  If you don't remember,
14 just say you don't remember.
15   THE WITNESS:  I don't remember.
16   MR. SHOPE:  Okay.
17   MR. RITTINGER:  Say what you remember
18 obviously, but if you don't remember, say you don't
19 remember.  And it is apparent that you don't
20 remember, so --
21   MR. SHOPE:  Yeah.
22   BY MR. SHOPE:
23   Q.   I'm not trying to torture you, Mr.
24 Collins?
25   MR. RITTINGER:  You got -- well, never

**Page 40**

1  mind.
2    BY MR. SHOPE:
3    Q.   I'm just trying to get as much as I can.
4    MR. RITTINGER:  I know, but in all due
5  respect, John, he is a witness here of certain
6  relevant events.  He's not an expert, and he's not --
7  he shouldn't be deposed as an expert as to how you do
8  or do not get into the Treasury Department.  That's
9  for other people.  And I don't think you have the
10 right to a third-party subpoena for that type of
11 thing.  We're giving you a lot of leeway, but --
12   MR. SHOPE:  Well, I disagree with your
13 statement.
14   MR. RITTINGER:  Well, you may disagree
15 with my statement, but let's move it on, okay?
16   MR. SHOPE:  That's what I was going to
17 say.  I think it will go faster if we just don't make
18 statements on the record.
19   MR. RITTINGER:  Well, look, he is -- we're
20 a third-party witness, we're here to testify about
21 facts that you say are relevant to your defense.  I
22 don't think that you have the right to go over his
23 entire experience in getting into press conferences.
24 I really don't think that's appropriate.  He's not
25 here as an expert, he's here as a fact witness for a

**Page 41**

1  limited purpose.
2    BY MR. SHOPE:
3    Q.   Mr. Collins, just so the record is clear,
4  as far as -- you can't recall any physical
5  restriction on your entry or exit into any of the
6  quarterly refunding conferences that you attended at
7  Treasury?
8    MR. RITTINGER:  Asked and answered, asked
9  and answered.  You can answer it one more time.
10   MS. WILLIAMS:  Objection.
11   MR. SHOPE:  Would you like to have the
12 reporter reread the question?
13   THE WITNESS:  No.
14   BY MR. SHOPE:
15   Q.   And your answer to the question is?
16   A.   I don't remember anything like that.
17   Q.   Thank you.  Do you ever remember whether
18 anybody who wasn't a newspaper reporter attended any
19 of the quarterly refunding conferences that you also
20 attended?
21   A.   I don't know, I wouldn't know that.
22   Q.   When you went to the quarterly refunding
23 conferences, did anyone escort you from the entry
24 into the Treasury building to the conference itself?
25   A.   No.

                                        11  (Pages 38 to 41)

Brian Collins                                          May 12, 2006
Washington, DC

| Page 42 | Page 44 |
|---|---|

**Page 42**

1    Q.   Okay.
2    A.   Can we have a time out here for just a
3 second?
4    Q.   Sure.
5    A.   I don't go to quarterly -- I mean, the
6 RTC probably was -- this is a time out. You keep
7 saying like I'm going there --
8         MR. RITTINGER:  Stay on the record.
9         BY MR. SHOPE:
10    Q.   Okay, I see. What you're saying is there
11 were only a few that you attended, so you just want
12 to make that clear.
13    A.   Yes.
14    Q.   Okay, that's fine. And when you attended
15 the conference on October 31, 2001, did anyone escort
16 you from the front entrance of the Treasury building
17 to the actual location of the press conference?
18    A.   No.
19    Q.   Do you remember whether the doors -- well,
20 first of all, what do you remember about the room on
21 that day, October 31, 2001, do you remember what kind
22 of a room it was?
23    A.   It was a good sized room with some chairs
24 and there was a lot of cameras.
25    Q.   Now, you mentioned that you came in late,

**Page 43**

1 was there anybody -- were the doors still open so
2 that you could come on in?
3    A.   Yes.
4    Q.   Did you stay for the entire duration of
5 the press conference?
6         MS. WILLIAMS:  Objection.
7         MR. RITTINGER:  You can answer.
8         THE WITNESS:  I was late, and I stayed
9 until they dismissed everybody.
10         BY MR. SHOPE:
11    Q.   First of all, do you remember who was
12 speaking that day?
13    A.   I would think it was Peter Fisher, he was
14 the Treasury guy then.
15    Q.   And what do you remember about what
16 Mr. Fisher said that day?
17    A.   I think I got there during the question
18 and answer period. So I don't think I actually heard
19 him speak directly.
20    Q.   And during the question and answer period,
21 was anybody answering questions? I'm sorry, let me
22 back up. Who was answering the questions during the
23 question and answer period?
24    A.   I don't really -- I don't remember now.
25    Q.   You don't know whether it was Mr. Fisher

**Page 44**

1 or somebody else, or some combination of people?
2    A.   Um-hum.
3    Q.   You've got have to say yes.
4    A.   Yes.
5    Q.   And do you remember anything about what
6 the questions were or what the substance was?
7    A.   No.
8         MR. RITTINGER:  Well, there's two
9 questions there. And you may not remember the
10 questions, but do you remember the substance? It was
11 about the 30-year bond --
12         THE WITNESS:  Right.
13         MR. SHOPE:  I mean, I guess that's what I
14 want to get at.
15         BY MR. SHOPE:
16    Q.   You remember that it was generally about
17 the suspension of the 30-year bond, right?
18    A.   Correct.
19    Q.   Do you remember anything beyond that about
20 those topics of discussion and so forth?
21    A.   No.
22    Q.   And this is not trying to torture you, but
23 just to see if this at all refreshes your
24 recollection. I mean, do you remember any discussion
25 about whether this was expected news or whether it

**Page 45**

1 was a shock or whether this, you know --
2         MS. WILLIAMS:  Objection.
3         BY MR. SHOPE:
4    Q.   In other words, do you recall any reaction
5 amongst the participants or the people asking
6 questions or any of the other reporters who were
7 there that day?
8         MS. WILLIAMS:  Objection.
9         MR. RITTINGER:  What you recall.
10         MR. SHOPE:  Yeah, I'm just asking what you
11 remember, Mr. Collins.
12         THE WITNESS:  By the time I got there,
13 they already knew about it.
14         MR. SHOPE:  Okay.
15         BY MR. SHOPE:
16    Q.   And did you -- okay. Do you remember --
17 you mentioned that people were dismissed. Do you
18 remember who did the dismissing? And this is by
19 function, you might not know the person's name.
20    A.   I assume it was one of the press people.
21 They said that concludes the press conference.
22    Q.   When you say one of the press people, are
23 you talking about one of the --
24    A.   A press officer, a Treasury official.
25    Q.   And was there any discussion of or mention

12  (Pages 42 to 45)

Brian Collins                                           May 12, 2006
                        Washington, DC

| Page 46 | Page 48 |
|---|---|

**Page 46**

1  of -- on October 31, 2001, of a press embargo?
2      A.   Yes.
3      Q.   What was that?
4      A.   The press woman said that there is an
5  embargo until 10 o'clock.
6      Q.   Okay.  Was there any -- did anybody in the
7  audience on October 31, 2001 respond to that comment
8  at all?
9          MS. WILLIAMS:  Objection.
10         THE WITNESS:  I don't remember anybody.
11     BY MR. SHOPE:
12     Q.   Okay.  So as far as you can remember,
13 there was nobody who asked for any kind of
14 clarification about what that meant?
15     A.   No.
16     Q.   Now, had anybody ever stated to you what
17 the purpose of the announced press embargo was?
18     A.   No.
19     Q.   With regard to the other federal agencies
20 that have had press conferences and press embargoes,
21 has there ever been any discussion of what the
22 purpose of the press embargo was?
23     A.   I don't think so.
24     Q.   And just to be clear, you were never asked
25 to sign anything about the press embargo on October

**Page 48**

1      Q.   And what -- did you receive any kind of a
2  press announcement or press release on October 31,
3  2001?
4      A.   I can't recall how I knew about it, but I
5  mean, I look through a lot of stuff every day, every
6  week and put a calendar together.  And, you know, and
7  maybe I went on their website and looked at it to see
8  if there was something announced, or whatever.  I
9  can't remember now.
10     Q.   I'm sorry, what I'm asking you, Mr.
11 Collins, is when you were at the press conference on
12 October 31, 2001, was there anything that was handed
13 out to you by way of a press release or something
14 that you took?
15     A.   Oh, yes.
16     Q.   Now, when you were actually on the
17 premises of the Treasury Department itself, did you
18 talk to anybody else about the subject matter of the
19 press conference?
20     A.   No.
21     Q.   And you had learned at the conference that
22 the long bond was being suspended, right?
23     A.   Yes.
24     Q.   Did you take any action with regard to
25 having learned that news once the conference was

| Page 47 | Page 49 |
|---|---|

**Page 47**

1  31, 2001; is that fair?
2      A.   No.
3      Q.   And just so that I'm absolutely clear, you
4  never discussed the embargo with any of the other
5  reporters that were there that day; is that fair?
6          MS. WILLIAMS:  Objection.
7          MR. RITTINGER:  You can answer, if you
8  recall.
9          THE WITNESS:  I don't remember.
10         MR. RITTINGER:  I honestly don't
11 understand the objection, but I guess I don't have
12 to, do I?
13         MS. WILLIAMS:  It's to the form of the
14 question.
15         MR. RITTINGER:  Anyway.
16     BY MR. SHOPE:
17     Q.   And again, just so I'm clear, there was
18 nothing that physically prevented you from leaving
19 the press conference before the period when the press
20 officer said that it was over or that you were
21 dismissed, right?
22         MS. WILLIAMS:  Objection.
23         THE WITNESS:  I wouldn't know if there
24 was, I wasn't intending to leave until it was over.
25     BY MR. SHOPE:

**Page 49**

1  over?
2      A.   I went back to my office, I sat down and I
3  tried to write a story.
4      Q.   How far is your office from the Treasury
5  Department, or how far was it on October 31, 2001?
6      A.   It's two blocks.
7      Q.   So how long would it take you to traverse
8  the distance?
9          MR. RITTINGER:  Just your best estimate.
10         BY MR. SHOPE:
11     Q.   Yeah, again, this is -- like I was saying
12 before, just give me your best estimate if you don't
13 know exactly.
14     A.   It can take probably seven to ten minutes
15 depending how long if you catch a light or two.
16     Q.   I'm sorry, if you catch a --
17     A.   You have to cross some intersections.
18     Q.   Oh, I see.
19     A.   Like what is that?  15th Street, 14th
20 Street.
21     Q.   Do you have any recollection as to when it
22 was that the press conference ended?
23     A.   I would guess it was probably about 9:30.
24     Q.   And do you remember -- and I'm sorry, this
25 may have been covered, but just so I'm clear, what's

                                        13  (Pages 46 to 49)

Brian Collins                                                    May 12, 2006
                        Washington, DC

| Page 50 | Page 52 |
|---|---|

**Page 50**

1  your best memory of exactly what it was the press
2  officer said about press embargo on October 31, 2001?
3      A.  My recollection is, "remember, there is an
4  embargo until 10 o'clock."
5      Q.  So that would have been approximately a
6  half hour time period between the conclusion of the
7  press conference and the expiration of the embargo
8  period, fair statement?
9      A.  Yes.
10      Q.  Was that half hour, how did that compare
11  to any previous press embargoes to which you had been
12  subjected in your service in Washington?
13      A.  Like I think I've said before, I haven't
14  dealt with a lot of embargo type situations.  And so
15  just -- that's what it was.
16      Q.  In other words, you have no idea whether a
17  half hour was longer or shorter, typical or atypical
18  compared to other press embargoes to -- in which
19  you've been involved?
20      A.  Right.
21      Q.  Now, you said that you tried to write a
22  story about the news that you had learned at the
23  conference, right?
24      A.  Right.
25      Q.  First of all, did you actually write a

**Page 52**

1      Q.  And before you did that, had anybody ever
2  told you that that was something that you shouldn't
3  be doing?
4      A.  No.
5      Q.  And do you remember the name of the person
6  with whom you left the message?
7      A.  I believe it was Janice Smith.
8      Q.  And did you have a prior acquaintance with
9  Janice Smith?
10      A.  Yes.
11      Q.  Just briefly, what was that?
12      A.  She has worked at other agencies that I've
13  covered, and I've known her as a press officer for
14  quite a few years.
15      Q.  Now, do you recall whether you spoke to
16  Ms. Smith in -- live?
17      A.  I recall leaving a message on her
18  voicemail.
19      Q.  And do you recall -- is it possible that
20  you spoke to her live?
21      A.  I recall leaving a message.
22      Q.  Did -- what did you say in your message to
23  the best as you can recall?
24      A.  I think I probably said something like,
25  Treasury is doing something with a 30-year bond and

| Page 51 | Page 53 |
|---|---|

**Page 51**

1  story?
2      A.  Yeah, I did a blurb.  We have a Daily
3  Wire.
4      Q.  And did the blurb actually appear on the
5  Daily Wire?
6      A.  Yes, it did.
7      Q.  And could you give me your best
8  recollection as to how long the blurb was?
9      A.  It was probably about four sentences.
10      Q.  And did it have your -- did it have a
11  byline?
12      A.  No.
13      Q.  And do you recall at all what the blurb
14  said?
15      A.  It probably said Treasury Department is
16  going to suspend 30-year bond, issuance of 30-year
17  bond.
18      Q.  Did you make any effort to try to get any
19  comment from anyone about the news that you had
20  learned about the suspension of the long bond?
21      A.  Yes.
22      Q.  What did you do?
23      A.  I called Fannie Mae's press office and I
24  left a message to -- that this happened, and I was
25  hoping to get some comment.

**Page 53**

1  I'd like to get some comment from the company.
2      Q.  And the company being Fannie Mae?
3      A.  Um-hum.
4      Q.  You've got to say yes.
5      A.  Yes.
6      Q.  And did you get any response to that
7  message?
8      A.  No.
9      Q.  After you had attended the conference on
10  October 31, and before 10 o'clock, did you have any
11  communication with anybody else about suspension of
12  the long bond, you know, for example, your executive
13  editor or anyone in the office?
14      MS. WILLIAMS:  Objection.
15      THE WITNESS:  I believe I did talk to Paul
16  Muolo, my executive editor.
17      MR. SHOPE:  Okay, okay.
18      BY MR. SHOPE:
19      Q.  And can you give me any recollection, in
20  substance, of course, since it's been five years,
21  about what you probably said to him and what he
22  probably said to you, if anything?
23      A.  I probably just told him I just got back
24  from the press conference, and this is what happened.
25      Q.  And had anybody ever told you that you

14  (Pages 50 to 53)

Brian Collins                                    May 12, 2006
                  Washington, DC

---

**Page 58**

1    Q.   Do you recall whether the person to whom
2  you spoke was Mr. Rossetti, who is here today?
3    A.   The name sounds familiar, but I can't -- I
4  don't remember.
5    Q.   Do you remember whether it was a man or a
6  woman with whom you spoke?
7    A.   I spoke with a man.
8    Q.   By the way, was it only one person with
9  whom you spoke, or was it two people or more?
10   A.   I think there was two people on the -- on
11 the phone.
12      MR. RITTINGER: It's the SEC, it's got to
13 be at least two. Sorry.
14      BY MR. SHOPE:
15   Q.   So -- and how long did the conversation
16 occur, do you remember?
17   A.   I don't remember.
18   Q.   Can you give me an estimate? In other
19 words, was it something where you had to spend half a
20 day on it, or was it just like a 15 minute call or a
21 half hour or an hour? Just any kind of parameters
22 you can put on it.
23   A.   I would say maybe 20 minutes.
24   Q.   And to the best of your -- can you give me
25 the best recollection you have about what was asked

---

**Page 59**

1  and what you -- in other words, what was the
2  conversation that you had with the SEC?
3    A.   They basically asked me about my call to
4  Fannie Mae.
5    Q.   And did you tell them what you've told us
6  here today?
7    A.   I told them that, yes, I had made a call
8  to Fannie Mae, just like I told you.
9    Q.   Did you tell them anything different from
10 what you have said today as far as you can recall?
11   A.   I don't think so.
12   Q.   And mark that as the next exhibit.
13      (Exhibit No. 2 was marked for
14      identification.)
15      MR. SHOPE:
16   Q.   Mr. Collins, I'm showing you what's been
17 marked as Exhibit 2 to your deposition; do you see
18 that?
19   A.   Yes.
20   Q.   Is this a -- do you recall having received
21 Exhibit 2?
22   A.   Yes, I do.
23   Q.   So is this -- in other words, does this
24 suggest to you that you did, in fact, speak with the
25 SEC staff on December 14th, 2001?

---

**Page 60**

1    A.   I think it was before December 14th, but
2  yeah, I received this after I spoke to them in the
3  mail. I think it might have been certified or
4  something, I can't remember now.
5    Q.   The -- well, Mr. Hathaway says, "thank you
6  for speaking with the staff today."
7    A.   Um-hum.
8    Q.   You don't have any reason to believe that
9  that was an incorrect statement?
10   A.   Oh, no.
11   Q.   And did you -- have you attended any
12 Treasury conferences, press conferences, refunding
13 conferences, conferences of any kind after October
14 31, 2001?
15   A.   I probably have.
16   Q.   And did anyone from the Treasury
17 Department ever say that your ability or right to
18 attend press conferences was going to be restricted
19 or diminished in any way?
20   A.   No, no one ever said anything.
21   Q.   Did anyone from the Treasury Department
22 ever tell you that -- or anyone from anywhere ever
23 tell you that -- I'm sorry, I'm tired today.
24      Did anyone within the government ever tell
25 you that your ability to -- whether you were going to

---

**Page 61**

1  be punished in any way for the events of October 31,
2  2001?
3    A.   I have not.
4    Q.   And just so I'm clear, as far as you're
5  aware, the SEC never conducted any investigation of
6  your conduct apart from simply having interviewed you
7  on or about December 14, 2001; is that correct?
8    A.   They interviewed me, they sent me this
9  letter and that's the last I've heard of it.
10   Q.   Okay.
11   A.   Until I got a subpoena from you guys.
12   Q.   Did you ever hear of any change in the
13 policy of the Treasury Department with regard to
14 press embargoes after the events of October 31, 2001?
15   A.   No.
16   Q.   Have you ever -- have you written any
17 stories about Treasury refunding conferences or press
18 conferences or -- yeah, Treasury conferences of any
19 kind after October 31, 2001?
20   A.   I'm sure I have, I can't -- I can't point
21 to one right now.
22      (Exhibit No. 3 was marked for
23      identification.)
24      BY MR. SHOPE:
25   Q.   Mr. Collins, we've passed to you what's

---

16  (Pages 58 to 61)

Brian Collins                                           May 12, 2006

Washington, DC

Page 66

1    Q.   I believe you testified before that you
2  recalled receiving a press announcement hand out on
3  October 31, 2001, correct?
4    A.   Yes.
5    Q.   As best you recall, is Exhibit 5 a copy of
6  what you received on that date?
7    A.   It looks very much like it.
8        (Exhibit No. 6 was marked for
9        identification.)
10  BY MR. SHOPE:
11    Q.   And just to save time, Mr. Collins, you're
12  welcome to read the entire Exhibit 6, but I'm going
13  to be asking you about the bottom paragraph on the
14  first page, and then the top of the second page.  And
15  just let me know when you're ready.  All set?
16    A.   Yes.
17    Q.   First of all, Exhibit 6 recounts a call
18  from you to Janice Smith.  And the letter, which is
19  Exhibit 6, states that this occurred approximately
20  9:35 a.m., is that consistent with your own memory?
21    A.   No.
22    Q.   That your call to her was some time before
23  10 o'clock that day, correct?
24    A.   Correct.
25    Q.   So when you say it's not consistent with

Page 67

1  your memory, what's -- what are you disagreeing with?
2  This is specifically on the 9:35 a.m. piece, we'll
3  break it down into bits and pieces.
4      MR. RITTINGER:  I object to the use of the
5  word or the form of disagreeing.  I don't think it's
6  a disagreement, I think it's just a different
7  recollection.
8      BY MR. SHOPE:
9    Q.   Okay, I'm asking -- basically, what I'm
10  asking for is just to get as best your memory I can.
11  And I recognize that this was five years ago, so I
12  understand that we're testing your memory to the
13  limit here.  I just -- what I'm trying to get at is,
14  what's your best memory as to when it was that you
15  called Ms. Smith at Fannie Mae?
16    A.   I would guess it would had to have been at
17  least about 10:45 or 10:50.  I mean 9:45 to 9:50.
18    Q.   And you're basing that on what?
19    A.   I'm basing it on the fact that I walked
20  back from the Treasury Department, got into my
21  office, I think I as I mentioned I talked to
22  Mr. Muolo for at least a minute or something.  I sat
23  down and tried to write something first, and it just
24  didn't have much pizzazz to it.  I went over and
25  looked at the TV, CNBC.  And then I put -- I figured

Page 68

1  I'd try to call somebody, see if I can get some
2  comment.
3    Q.   By the way, was there a reason why it was
4  Fannie Mae in particular?
5    A.   They are a big mortgage company.
6    Q.   And I apologize if I asked you this
7  before, but had you heard anything about the possible
8  suspension of the long bond before October 31, 2001?
9    A.   I can't recall.
10    Q.   Now, there's reference here to a Lesia or
11  Lesia Bullock, media relations manager; do you see
12  that?
13    A.   Um-hum, yes.
14    Q.   Do you know Ms. Bullock?
15    A.   I'm not sure, I don't think so.
16    Q.   And so did you have any awareness that she
17  was at all privy to what you were saying on October
18  31, 2001?
19    A.   No.
20    Q.   Okay, okay.  And I take it nobody from
21  Fannie Mae ever called you back with any kind of a
22  comment, right?
23    A.   No.
24    Q.   Did you make any notes of your -- the
25  message that you had left for Ms. Smith?

Page 69

1    A.   No.
2    Q.   Did you make any notes of your discussion
3  with Mr. -- with your executive editor?
4    A.   No.
5    Q.   Okay.  And did you take any notes at the
6  press conference itself?
7    A.   Geez, I don't remember.  I don't think I
8  even got a chance to sit down.
9    Q.   Was that because it was standing room only
10  in the room where the press conference was being
11  conducted?
12    A.   I know I was in the back, that's for sure.
13    Q.   So in other words, you came in late, you
14  were in the back, and at least there weren't any
15  chairs that were in close proximity to somebody
16  coming in at the back?
17    A.   I just don't remember sitting down.
18    Q.   But, I mean -- well, let me put this
19  way, would it have been your preference to sit if
20  there had been an open chair that was readily
21  accessible?
22      MR. ROSSETTI:  Objection.
23      THE WITNESS:  I don't know.  Usually I do
24  sit down at press conferences.
25      BY MR. SHOPE:

18  (Pages 66 to 69)

**Exhibit R**

**Cited Excepts and Corresponding Exhibit from
the Deposition of Frances Anderson
(August 3, 2006)**

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - - )

 4    UNITED STATES SECURITIES AND        )

 5    EXCHANGE COMMISSION,                 )

 6              Plaintiff,                 )

 7         v.                             ) No. 05-10983 (NMG)

 8    STEVEN E. NOTHERN,                   )

 9              Defendant.                 )

10    - - - - - - - - - - - - - - - )

11                        Washington, D.C.

12                        Thursday, August 3, 2006

13    Videotape Deposition of FRANCES ESTELLE ANDERSON,

14    called for examination by counsel for Defendant in

15    the above-entitled matter, the witness being duly

16    sworn by CHERYL A. LORD, a Notary Public in and for

17    the District of Columbia, taken at the offices of

18    FOLEY HOAG LLP, 1875 K Street, N.W., Suite 800,

19    Washington, D.C., at 10:10 a.m., Thursday, August 3,

20    2006, and the proceedings being taken down by

21    Stenotype by CHERYL A. LORD, RPR, CRR, and

22    transcribed under her direction.
```

Frances Estelle Anderson                                                August 3, 2006
                               Washington, D.C.

---

Page 66

1    Q.   Yeah. Yeah. Okay.
2         So other than when the secretary himself
3    is delivering the press conference, there's not
4    ordinarily at least going to be any kind of a Secret
5    Service officer right in that conference room?
6    A.   No.
7    Q.   Okay. Is there anybody in the quarterly
8    refunding conferences who goes around to check badges
9    or anything like that?
10   A.   No.
11   Q.   Okay. So in theory at least, somebody who
12   happened to be in the building and was interested in
13   the press conference could just walk into the back
14   and quietly take a seat?
15        MR. ROSETTI: Objection.
16   A.   Well, is nobody there to check and see if
17   they had a press badge or not, so it's correct.
18        BY MR. SHOPE:
19   Q.   Okay. Now, I don't want to -- have you
20   ever heard of a gentleman named Peter Davis?
21   A.   No.
22   Q.   Okay. So you don't know anybody by that

---

Page 67

1    name yourself?
2    A.   No.
3    Q.   Okay. All right.
4         Now, I want to turn --
5         MR. ROSETTI: Would this be a good time to
6    take a break?
7         MR. SHOPE: Sure.
8         We can take a short break. That's fine.
9         Off the record.
10        THE VIDEOGRAPHER: Here marks the end of
11   videotape number 1. The time on the screen is
12   11:07:25. We're going off the record.
13        (Recess.)
14        THE VIDEOGRAPHER: Here marks the
15   beginning of tape number 2. Time on the screen is
16   11:15:59. We're back on the record.
17        BY MR. SHOPE:
18   Q.   Okay. We've just had a short break,
19   Ms. Anderson.
20        During the break, did you discuss your
21   testimony with either Ms. Williams or Mr. Rosetti?
22   A.   No.

---

Page 68

1    Q.   Okay. Now, I want to ask you a little bit
2    about the events of October 31, 2001.
3         First of all, was there any change that
4    day in the procedures for the quarterly refunding
5    conference in relation to earlier refunding
6    conferences that you had attended?
7         MR. ROSETTI: Objection.
8    A.   I don't remember. I don't recall, because
9    most time, I had come in early and do what I have to
10   do. I don't remember.
11        BY MR. SHOPE:
12   Q.   You don't recall whether there was any
13   kind of a change?
14   A.   No.
15   Q.   Okay. Now, did you actually sit in the
16   room during the quarterly refunding conference?
17   A.   No.
18   Q.   Okay. So that was different.
19        Right?
20   A.   Right.
21        Correct.
22   Q.   Where did you -- what did you do during

---

Page 69

1    the quarterly refunding conference?
2    A.   I was outside the hallway.
3    Q.   Okay. Now, is that the hallway to which
4    you just referred onto which the 2 doors opened from
5    the diplomatic room?
6    A.   Correct.
7    Q.   Okay. And what were you doing out in the
8    hallway?
9    A.   Well, I was actually in the junior
10   (phonetic) counselor's office at their doorway
11   watching the work that was on the table.
12   Q.   Okay. Let's break that down.
13        The junior counselor's office, where is
14   that?
15        MR. ROSETTI: General counsel.
16        BY MR. SHOPE:
17   Q.   I'm sorry.
18        It was general counsel's office?
19   A.   It's right there beside the diplomatic
20   room.
21   Q.   Now, is the secretary's large conference
22   anywhere near the diplomatic room?

---

18 (Pages 66 to 69)

**Page 110**

1  A.  That's how they pull the documents up on
2  the Web site.
3  Q.  Okay.  So you added -- was that you
4  added -- is that just a sequential number you add
5  from previous versions?
6  A.  Whatever the last press release, we just
7  add the next number.
8  Q.  Okay.  So you presumably had that handled
9  from the last one you did?
10  A.  Correct.
11  Q.  So you added the number, and you made sure
12  that it was naming the proper -- where did you put
13  the current secretary's name?
14  A.  It's not -- okay.
15  At the top of the document when you
16  generate -- when you put this on the Web, the top of
17  the document is the date, whatever date is goes out.
18  Then under that, you will put -- to say, John Snow,
19  dash, 450, you add that.
20  You put -- just cut-and-paste and whatever
21  document put it in, and just make sure that the
22  document lines -- it don't have double lines.  And

**Page 111**

1  then you save it to staging, and then you look at it
2  and if it's okay, you send it to the Web.
3  Q.  Okay.  And so when you have to look --
4  when you look at the staging to make sure it's okay,
5  what is it that you're looking for in particular?
6  In other words what are the problems that
7  crop up?
8  A.  Double lines.
9  Q.  Okay.
10  A.  Or --
11  Q.  But I thought -- so let's clarify.
12  You're checking for double lines before
13  you FTP the document to the staging server?
14  True?
15  A.  Correct.
16  Q.  Okay.  So do you have to check for double
17  lines again when it's on the staging server?
18  A.  Sometimes after you do it, it may be --
19  sometimes it depends on how they generate the text.
20  They may put some in that when you put stuff on the
21  Web site, the Web site pulled out everything that
22  they put in.

**Page 112**

1  If it's not a final copy, it will pull up
2  a different area -- pull up a different format, and
3  sometimes you have to go back maybe once or twice to
4  try to correct the format.  And all I have to do is
5  to take the spaces out.
6  Q.  Okay.  And did you have to do that on that
7  day?
8  A.  No.
9  Q.  Okay.  So basically, after you've sent it
10  from your C drive to the staging server, you would
11  then look at it on the screen?
12  A.  Correct.
13  Q.  You just scroll through it to make sure
14  that there's no double lines or no other weird
15  formatting changes.
16  Right?
17  A.  Correct.
18  Q.  I mean, you're not actually reading the
19  text of this?
20  A.  Correct.
21  Q.  Okay.  And then you send a command that
22  sends it to the Treasury, the list -- the listed

**Page 113**

1  Treasury Web site.
2  Right?
3  A.  Correct.
4  Q.  Okay.  And that command, execute, that's
5  like a matter of seconds.
6  Right?
7  A.  Yeah.
8  MS. WILLIAMS:  Objection.
9  BY MR. SHOPE:
10  Q.  Okay.  Now, at the time you did this, I
11  gather you had no awareness of any embargo?
12  A.  Correct.
13  Q.  Okay.  Your belief was that this was for
14  immediate release?
15  A.  Correct.
16  Q.  Correct?
17  So would it be fair to say that you were
18  therefore trying to get it out as promptly as you
19  could?
20  MS. WILLIAMS:  Objection.
21  A.  My routine is, after the press conference
22  is over, if they say -- whatever embargo time, if

29 (Pages 110 to 113)

Frances Estelle Anderson                                                    August 3, 2006
                                Washington, D.C.

| Page 118 |
|---|
| 1    MR. SHOPE:  Sure. |
| 2    Off the record. |
| 3    THE VIDEOGRAPHER:  Going off the record. |
| 4 Time on the screen is 12:01:40. |
| 5    (Recess.) |
| 6    MR. SHOPE:  Mark this as the next exhibit. |
| 7    (Anderson Exhibit No.5 |
| 8    was marked for |
| 9    identification.) |
| 10    THE VIDEOGRAPHER:  Going back on the |
| 11 record.  Time on the screen is 12:05:46. |
| 12    BY MR. SHOPE: |
| 13    Q.  All right.  I'm showing you what's been |
| 14 marked as exhibit 5 to your deposition. |
| 15    Those are papers produced by the SEC in |
| 16 this case.  And they show the same email that we |
| 17 looked at on exhibit 2.  And then there's the |
| 18 attached text of a press release. |
| 19    Is that consistent with all the testimony |
| 20 you've been giving about what the press release that |
| 21 you received from Ms. Holahan looked like? |
| 22    A.  Correct. |

| Page 119 |
|---|
| 1    Q.  So in other words, that doesn't have any |
| 2 kind of embargo time on it? |
| 3    A.  Correct. |
| 4    Q.  Okay.  I see. |
| 5    And so there's no date on that either; is |
| 6 that correct? |
| 7    A.  Correct. |
| 8    MR. SHOPE:  So why don't we mark this as |
| 9 the next exhibit. |
| 10    (Anderson Exhibit No.6 |
| 11    was marked for |
| 12    identification.) |
| 13    BY MR. SHOPE: |
| 14    Q.  So Ms. Anderson, I'm showing you what's |
| 15 been marked as exhibit 6 to your deposition. |
| 16    Is exhibit 6 how the press release |
| 17 ultimately appeared on the Web site after you made |
| 18 the addition that you made and posted it on the Web |
| 19 site? |
| 20    MS. WILLIAMS:  Objection. |
| 21    A.  This is what I produced to give to the |
| 22 press people. |

| Page 120 |
|---|
| 1    BY MR. SHOPE: |
| 2    Q.  Okay.  So that was -- in other words, what |
| 3 you produced for purposes of photocopying that |
| 4 morning? |
| 5    A.  Correct. |
| 6    Q.  And that was what was handed out to the |
| 7 press people as they walked into the room? |
| 8    A.  Correct. |
| 9    Q.  And this Treasury News letterhead on |
| 10 exhibit 6, that was something that you had on your |
| 11 computer desktop? |
| 12    MR. ROSETTI:  Objection. |
| 13    A.  It's copies that we -- that back in 2000, |
| 14 we -- it was in I think green or blue.  We have |
| 15 copies from the print shop that we generate for press |
| 16 releases. |
| 17    BY MR. SHOPE: |
| 18    Q.  Okay.  So in other words, what you had |
| 19 from the print shop were blank -- pieces of paper |
| 20 that had a colored letterhead on the top.  They were |
| 21 blank on the bottom. |
| 22    And then you would use that as the |

| Page 121 |
|---|
| 1 photocopy paper for -- to generate the release that |
| 2 would be handed out to the press? |
| 3    A.  Correct. |
| 4    Q.  So each individual reporter was getting a |
| 5 version that had colored ink on it? |
| 6    A.  No. |
| 7    I would use the colored ink in one press |
| 8 release.  Then I would take the colored ink and paper |
| 9 and produce black-and-white copies, so they would get |
| 10 a black-and-white copy of the first copy would be in |
| 11 color. |
| 12    Q.  Okay.  So the first copy that you had in |
| 13 color, was that something where you took the text |
| 14 that you got from Ms. Holahan and then you printed it |
| 15 out on your desktop? |
| 16    A.  Correct. |
| 17    Q.  So you -- basically you put the colored |
| 18 letterhead paper in and fed that into the printer for |
| 19 purposes of generating the first version? |
| 20    A.  Correct. |
| 21    Q.  And then you would photocopy that and the |
| 22 reporters would get a black-and-white copy? |

31 (Pages 118 to 121)

Frances Estelle Anderson                                                      August 3, 2006
Washington, D.C.

| Page 122 | Page 124 |
|---|---|
| 1  A. Correct. | 1  A. Correct. |
| 2  Q. All right. That's helpful. | 2  Q. Right? |
| 3  You mentioned earlier in your testimony | 3  And that -- the words for immediate |
| 4  that there were -- that there was a press release | 4  release were not on what Ms. Holahan emailed you? |
| 5  number, and you would have the initials of the | 5  A. Correct. |
| 6  secretary of the Treasury at the time. | 6  Q. Okay. But you knew about -- because she |
| 7  Correct? | 7  hadn't put anything about an embargo that meant in |
| 8  A. Correct. | 8  your understanding for immediate release? |
| 9  Q. All right. Is that on exhibit 6, the | 9  A. Correct. |
| 10  Treasury News version? | 10  Q. Okay. And then exhibit 6 -- this is the |
| 11  A. Paul O'Neill, dash, 749. | 11  copy going out to the -- by hand to the reporters, |
| 12  Q. Okay. | 12  that has the October 31, 2001, date? |
| 13  MR. ROSETTI: John, I don't know if you | 13  A. Correct. |
| 14  want to clarify it. It doesn't actually say, Paul | 14  Q. And that again was something that you had |
| 15  O'Neill. It says, PO. | 15  added before 9 o'clock that morning? |
| 16  BY MR. SHOPE: | 16  A. Correct. |
| 17  Q. Is says, PO 749, and "PO" stands for Paul | 17  Q. Okay. Now, exhibit 6 says, contact Betsy |
| 18  O'Neill? | 18  Holahan, and a phone number. |
| 19  A. Correct. | 19  A. Correct. |
| 20  Q. Is that -- what Ms. Holahan emailed you, | 20  Q. Okay. Was that something that you added? |
| 21  you added that to the text? | 21  A. Correct. |
| 22  A. Correct. | 22  Q. Okay. Now, was that going to go on the |

| Page 123 | Page 125 |
|---|---|
| 1  Q. In fact PO 749 in exhibit 6 seems to be in | 1  Web site? |
| 2  a different font from her text? | 2  A. No. |
| 3  A. Correct. | 3  Q. Okay. So to -- exhibit -- |
| 4  Q. And that's consistent -- that makes sense | 4  MR. ROSETTI: When you say, "that" -- |
| 5  to you? | 5  MR. SHOPE: Okay. |
| 6  A. Yeah. | 6  BY MR. SHOPE: |
| 7  Correct. | 7  Q. The words contact Betsy Holahan on, and |
| 8  Q. All right. Now, so when it came time for | 8  the 202 phone number below it, were those going to go |
| 9  you to post the press release to the Web site, you | 9  on the Web site? |
| 10  had already added PO 749 earlier that morning for | 10  A. No. |
| 11  purposes of generating the photocopies for the | 11  Q. Why is that? |
| 12  reporters? | 12  A. That's just for the purpose of the press |
| 13  A. Correct. | 13  people, that if they wanted to contact the initial |
| 14  Q. Okay. And you had also added the words, | 14  press person about this subject, they know who to |
| 15  for immediate release. | 15  call. On the Web site is the site to send domestic |
| 16  A. On the 7- -- on the original document for | 16  finance text. They know who to call for that |
| 17  the press? | 17  particular person. |
| 18  Q. Yeah. | 18  Q. Okay. So before you took the text -- |
| 19  Exhibit 6, which you passed out and handed | 19  before you took the text from exhibit 6 to put it on |
| 20  to the reporters? | 20  the Web site, you had to delete the words, contact |
| 21  A. Correct. | 21  Betsy Holahan and the phone number? |
| 22  Q. That has the words for immediate release? | 22  A. No. |

32 (Pages 122 to 125)

Frances Estelle Anderson                                                    August 3, 2006

Washington, D.C.

| Page 286 | Page 288 |
|---|---|
| 1    A.   It's showing me the document. | 1    A.   I have no idea. |
| 2    Q.   It's showing you the document, but it's | 2        MR. SHOPE:  I have nothing further. |
| 3  showing you the document as reformatted by the | 3        MR. ROSETTI:  I don't have any further |
| 4  staging server? | 4  questions. |
| 5    A.   Correct. | 5        Thank you. |
| 6    Q.   Okay.  You're comparing that to the hard | 6        THE VIDEOGRAPHER:  Here marks the end of |
| 7  copy -- to a hard copy of what Ms. Holahan had | 7  videotape deposition of Frances Anderson.  Time on |
| 8  emailed you at the beginning of the day? | 8  the screen is 15:38:11.  We're going off the record. |
| 9    A.   Correct. | 9        (Whereupon, at 3:41 p.m., the taking of |
| 10    Q.   Okay.  You go through it to see -- to try | 10  the instant deposition ceased.) |
| 11  to match up your form -- the format on the staging | 11 |
| 12  server as closely as you can to what she had emailed | 12 |
| 13  you earlier in the day? | 13    _____ |
| 14    A.   Correct. | 14        Signature of the Witness |
| 15    Q.   Okay.  And at some point, you satisfied | 15  SUBSCRIBED AND SWORN to before me this _____ day of |
| 16  yourself that the 2 matched as closely as you were | 16  _____, 20_____. |
| 17  going to be able to make the match. | 17 |
| 18        Correct? | 18    _____ |
| 19    A.   Correct. | 19        Notary Public |
| 20    Q.   Okay.  So at that point you saved all the | 20  My Commission Expires:_____ |
| 21  work that you'd done. | 21 |
| 22        Correct? | 22 |

| Page 287 | Page 289 |
|---|---|
| 1    A.   Correct. | 1        CERTIFICATE OF COURT REPORTER |
| 2    Q.   Okay.  And thereafter, you began the | 2    UNITED STATES OF AMERICA  ) |
| 3  process to transfer from the staging server to the | 3    DISTRICT OF COLUMBIA      ) |
| 4  actual Treasury Web site? | 4        I, CHERYL A. LORD, the reporter before |
| 5    A.   Correct. | 5    whom the foregoing deposition was taken, do hereby |
| 6    Q.   Okay.  And that's simply the update | 6    certify that the witness whose testimony appears in |
| 7  command? | 7    the foregoing deposition was sworn by me; that the |
| 8        MS. WILLIAMS:  Objection. | 8    testimony of said witness was taken by me in machine |
| 9    A.   I forgot what the word was. | 9    shorthand and thereafter transcribed by |
| 10  BY MR. SHOPE: | 10    computer-aided transcription; that said deposition is |
| 11    Q.   You don't remember -- you don't | 11    a true record of the testimony given by said witness; |
| 12  remember -- you recall -- you said "post" before. | 12    that I am neither counsel for, related to, nor |
| 13    A.   Post, yeah. | 13    employed by any of the parties to the action in which |
| 14    Q.   So your memory is that the command is | 14    this deposition was taken; and, further, that I am |
| 15  called "post" or something like that? | 15    not a relative or employee of any attorney or counsel |
| 16        MS. WILLIAMS:  Objection. | 16    employed by the parties hereto, or financially or |
| 17    A.   Correct. | 17    otherwise interested in the outcome of this action. |
| 18        BY MR. SHOPE: | 18 |
| 19    Q.   All right.  You have no idea whether the | 19        CHERYL A. LORD |
| 20  staging server and the Web site are synchronized. | 20        Notary Public in and for |
| 21        Is that a fair statement? | 21        the District of Columbia |
| 22        MR. ROSETTI:  Objection. | 22  My Commission expires April 30, 2011 |

73 (Pages 286 to 289)



**DEPARTMENT OF THE TREASURY**

# TREASURY NEWS

OFFICE OF PUBLIC AFFAIRS • 1500 PENNSYLVANIA AVENUE, N.W. • WASHINGTON, D.C. • 20220 • (202) 622-2960

**FOR IMMEDIATE RELEASE**
October 31, 2001

Contact: Betsy Holahan
(202) 622-2960

## UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
## PETER R. FISHER
## REMARKS AT THE NOVEMBER 2001 QUARTERLY REFUNDING

As a consequence of the further weakening of the economy and the increased federal outlays that have occurred since the attacks of September 11th, the near-term financing requirements of the federal government are larger than we anticipated just three months ago at our last quarterly refunding in August. In this setting, the management of the Treasury's marketable debt needs to anticipate the possibility of a unified budget deficit for this fiscal year and, perhaps, the following fiscal year as well. However, even if this happens, we expect that the federal government will return to surpluses in the coming years.

With this outlook in mind, today we are announcing:

- The terms of the November refunding, including a new 5-year note in the amount of $16 billion and a reopening of the 5 percent 10-year note issued in August 2001 in the amount of $7 billion; and that

- We are adjusting the debt buyback program as follows:

  - We will continue to conduct buybacks for the remainder of this calendar year;

  - We will make no buybacks in January 2002; and

  - Beginning in February 2002, we will announce at our quarterly refundings the amount and timing of any buyback operations for the subsequent three-month period; and finally that

PO-749

---

*For press releases, speeches, public schedules and official biographies, call our 24-hour fax line at (202) 622-2040*



EXHIBIT

⊕ 

*U.S. Government Printing Office: 1998 - 619-559

- We are suspending issuance of the 30-year bond: there will be no auction of 30-year securities in February 2002 and we plan no further auctions of either 30-year nominal or inflation-adjusted bonds.

## Recent Changes in the Fiscal Outlook

Debt issuance over the past several years has been structured in an environment of large budget surpluses. However, the fiscal environment has changed substantially over the past few months due to the slowdown in economic activity and to the federal government's prompt response to the attacks of September 11th. The Treasury's debt management has adjusted already, and will continue to adjust, as we accommodate the federal government's increased financing needs during this period. But our expectation is that these heightened financing requirements will prove short-lived, as the economy eventually strengthens, and as the pressures for increased federal outlays stemming from the attacks of September 11th subside.

## Suspension of Thirty-Year Borrowing

The debt management strategy of the Treasury has been to strive to be regular and predictable in the issuance of debt while minimizing borrowing costs over many years and interest rate cycles. The Treasury does not try to outsmart the market at any one moment or to be a "market timer" with respect to any particular shape of the yield curve. However, debt management necessarily involves judgments about the size and duration of the federal government's borrowing needs. This compels us to focus on likely borrowing needs over the coming years but we also take into account the likely consequences of unlikely outcomes.

We do not need the 30-year bond to meet the government's current financing needs, nor those that we expect to face in coming years. Looking beyond the next few years, as I already observed, we believe that the likely outcome is that the federal government's fiscal position will improve after the temporary setback that we are now experiencing.

There are two less likely outcomes that we have also considered.

First, it is possible that the federal government will return to significant and sustained budget surpluses even more quickly than we now expect. In this event, maintaining current issuance levels of 30-year bonds would be unnecessary and expensive to taxpayers.

Second, we face the possibility that sustained surpluses do not materialize as promptly as we now expect. If later in this decade it turns out that 30-year borrowing is necessary to meet the government's financing needs, it is still likely that our decision to suspend 30-year borrowing at this time will have saved the taxpayers money. In addition, the reintroduction of the 30-year bond, at some point in the future, if necessary, would likely be costless to the Treasury.

The 30-year bond no longer maintains a position of significance in the financial markets. Its role and its liquidity have been significantly impaired by the substantial reduction of issuance that has occurred over the last decade. But the markets have functioned smoothly during this period while both activity and attention have shifted to our 10-year offerings.

As long as we have borrowing requirements to finance, the Treasury will seek to maintain the liquidity and depth of the instruments we issue as a means of achieving the lowest cost of borrowing for the taxpayer over time. At this time, the best means for us to do this is to suspend issuance of the 30-year bond and concentrate our borrowing needs on our other instruments.

Adjustment of the buyback program

In response to the altered budget outlook for this fiscal year, we are also making adjustments in our buyback program. Beginning in February 2002, our decisions on whether to conduct buyback operations, and on the amount and timing of any purchases, will be made at the time of our regular quarterly refunding announcements and will be based upon three factors:

- first, our projections of the federal government's annual, unified surplus or deficit position;

- second, our projections of that three-month period's cash position; and,

- third, our analysis of how best to minimize borrowing costs over time.

In making the transition to these new procedures, our buyback operations for the remainder of this calendar year will continue in line with our prior announcements. In August we stated that we would be purchasing approximately $9 billion during the fourth calendar quarter. So far we have purchased $2.5 billion and the remaining $6.5 billion will be purchased in November and December. Due to the holidays in November and December, however, the timing of our specific announcements will be altered from recent practice. We will make announcements of the specific amounts and maturities of our purchases on November 14 and 28 and on December 12 and 19 for operations to take place on the following day.

We will make no buyback purchases in January 2002. Beginning with our February 2002 quarterly refunding, we will include the details of any buyback operations to be conducted in the subsequent three months in our regular refunding announcements.

In light of the information that we now have, market participants should understand that there are likely to be periods in which we do not conduct buyback operations and that there are likely to be other periods in which we do conduct such operations, consistent with the ebb and flow of our cyclical cash position. But the

presence or absence of these operations will be clearly announced, in advance, as part of our refunding process.

**Terms of the November Refunding**

I will now turn to the terms of the November Refunding. We are offering $23 billion of notes to refund approximately $21.6 billion of privately held notes and bonds maturing on November 15, raising approximately $1.4 billion. The securities are:

1. A new 5-year note in the amount of $16 billion, maturing November 15, 2006.

2. A re-opening of the 5% 10-year note issued in August 2001 and previously reopened in October 2001, maturing August 15, 2011, in the amount of $7 billion.

These securities will be auctioned on a yield basis at 1:00 p.m. eastern time on __ Tuesday, November 6, and Wednesday, November 7, respectively. The balance of our financing requirements will be met through 2-year note and bill offerings.

As announced on Monday, we estimate that we will have a $35 billion cash balance on December 31 and a $30 billion cash balance on March 31.

Our next quarterly refunding announcement will take place on Wednesday, January 31, 2002.

**Exhibit S**

**Cited Excerpts from the SEC Investigative
Testimony of Robert Falconer (November 28, 2001)**

Page 7742

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
TRADING IN CERTAIN         )
TREASURY ISSUES            )      File No. HO-9353

WITNESS:  Robert T. Falconer

PAGES:    1 through 237

PLACE:    Securities & Exchange Commission
          450 5th Street, N.W. - Room 11602
          Washington, D.C. 20549

DATE:     Wednesday, November 28, 2001

          The above-entitled matter came on for hearing at
12:10 p.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

     JOSHUA RAVITZ, ESQ.
     WILLIAM M. HATHAWAY, ESQ.
     Securities & Exchange Commission
     450 5th Street, N.W.
     Washington, D.C. 20549
     (202) 942-4613

On behalf of the Witness:

     WILLIAM J. NISSEN, ESQ.
     Sidley, Austin, Brown & Wood
     Bank One Plaza
     10 Dearborn Street
     Chicago, Illinois 60603

---

Page 3

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|-----------|-------------|------------|
| 216 | Treasury News press release dated October 30, 2001. "Treasury Department to Hold Quarterly News Conference." | 165 |
| 217 | Two page document marked ST 21 and ST 22 | 167 |
| 218 | One page document | 180 |
| 219 | 23-page document marked ST 0154 - 176 | 215 |
| 220 | 21-page document marked ST 0133 - 0153 | 217 |

---

Page 2

C O N T E N T S

| WITNESS: | | Page |
|----------|--|------|
| Robert T. Falconer | | 3 |

| EXHIBITS: | DESCRIPTION | IDENTIFIED |
|-----------|-------------|------------|
| 202 | Copy of Securities and Exchange Form 1662 | 5 |
| 203 | Letter from the United States Securities and Exchange Commission dated November 8, 2001 to Sangamon Trading, includes subpoena duces tecum. | 22 |
| 204 | 6 page document | 60 |
| 205 | 2 page IPC Trading Turrent | 60 |
| 206 | Floor plan of Sangamon Trading | 60 |
| 207 | One page document | 84 |
| 208 | Eight page exhibit | 124 |
| 209 | Four page document | 150 |
| 210 | Treasury Press Release dated April 30, 2001 | 151 |
| 211 | Five-page document, ST0012 through ST0016 | 152 |
| 212 | Treasury Press Release dated May 2, 2001 | 154 |
| 213 | Document captioned, "Davis Capital Investment Ideas September 6, 2001, 12:00 p.m," C0017 | 156 |
| 214 | Document captioned, "Davis Capital Investment Ideas October 16, 2001, 5:15 p.m," C0018 | 159 |
| 215 | Copy of Lanston future calendar for the week of October 29th, 2001 | 161 |

---

Page 4

1          P R O C E E D I N G S
2          MR. HATHAWAY:  Okay, it is approximately 12:10.
3  This is November 28, 2001.  Would you raise your right hand.
4  Whereupon,
5          ROBERT T. FALCONER
6  was called as a witness and, having been first duly sworn by
7  the, was examined and testified as follows:
8          EXAMINATION
9  BY MR. HATHAWAY:
10     Q  Would you please state and spell your full name for
11  the record?
12     A  Robert -- R-o-b-e-r-t -- Thomas -- T-h-o-m-a-s --
13  Falconer -- F-a-l-c-o-n-e-r.
14     Q  I am William Maxwell Hathaway.  And with my to my
15  right is Joshua Ravitz.  And we are both officers of the
16  Commission for the purposes of this proceeding.
17          This is an investigation by the United States
18  Securities and Exchange Commission, In the Matter of Trading
19  in Certain Treasury Issues.  Our file number is HO-9353.
20          The purpose of the investigation is to determine
21  whether there have been any violations of the federal
22  securities laws.
23          However the facts developed in this investigation
24  might constitute violations of other state or federal civil
25  or criminal statutes.

SECNOTH00117447

## Page 173

1  office still, that calendar for that day?

2  A  Yes.

MR. RAVITZ: I believe we can add that to our

request.

5  MR. HATHAWAY: Yes. We'd like to see that

6  calendar.

7  BY MR. HATHAWAY:

8  Q  Did there, at some point in time on October 31st,

9  come a point in time that you learned that the Treasury had

10  announced some action regarding the 30-year bond?

11  A  Yeah.

12  Q  When did you hear something about what the Treasury

13  was doing about the 30-year bond?

14  A  Pete Davis called me.

15  Q  Approximately when did that occur?

16  A  Approximately 8:40 Chicago time.

17  Q  How do you place that in time? What is it that you

18  tie to the recollection of it being around 8:40?

19  A  I glanced at my watch.

20  Q  I'll represent to you that there are some records

21  that we have that on a preliminary reading suggest that a

22  phone call was placed to the number (312) 984-1331 at

23  approximately 9:37 Eastern time, which would be 8:37 Chicago

24  time. Is that consistent with your recollection now of when

25  the call occurred?

## Page 174

1  A  Surely.

2  Q  Do you have any reason to think that the call at

3  8:37 is not the correct time of the call?

4  A  No. I mean, is my watch accurate?

5  Q  Were you on the speaker phone when this call came

6  in?

7  A  I was punching --

8  Q  Were you sitting at your work station?

9  A  Sitting at my work station.

10  Q  Were you the only person on your end of the phone?

11  A  Yeah.

12  Q  As far as you knew, was Mr. Davis the only person

13  on his end of the phone?

14  A  Yes.

15  Q  Could you tell whether he was calling you on a cell

16  phone or a land line phone?

17  A  Couldn't tell.

18  Q  Was the reception good and clear?

19  A  Yeah.

20  Q  What did he say to you?

21  A  He said the Treasury was doing away with the 30-

22  year bond. They were also going to do away with the 30-year

23  TIPS security. The buybacks would be stopped, would continue

24  through the year and then be stopped in January and that

25  they'd also offer 16 billion of a new five-year and 7 billion

## Page 175

1  of a reopened ten-year.

2  Q  Did he say anything else?

3  A  No.

4  Q  Your testimony that he had Treasury was doing away

5  with the 30-year bond, were those his words, "was doing away

6  with"?

7  A  I can't say.

8  Q  As well as you can say what were the exact words

9  that Mr. Davis used in communicating what Treasury was doing

10  about the 30-year bond?

11  A  I can't really say exact words.

12  Q  Did he use the word "announced" at any point in his

13  conversation that you remember?

14  A  I don't recall.

15  Q  Did he use the word "abolished"?

16  A  I don't recall.

17  Q  "Eliminated"?

18  A  I don't recall.

19  Q  "Suspended"?

20  A  He didn't use the word "suspended."

21  Q  Did he use any words such as "probably, might,

22  could, likely" or possibly"?

23  A  No.

24  Q  Did he in any way qualify what Treasury was going

25  to do about the 30-year bond?

## Page 176

1  A  I don't recall anything.

2  Q  Did he say anything to suggest to you that this was

3  his forecast as to what Treasury was going to do about the

4  30-year bond?

5  A  No. He didn't suggest it was a forecast.

6  Q  Did he say anything to suggest to you that he was

7  passing on a rumor to you?

8  A  No, he did not.

9  Q  Did he say anything to the effect of this is what

10  he had heard that Treasury was going to do?

11  A  No, he did not.

12  Q  After your conversation with Mr. Davis ended, was

13  there any doubt in your mind that the Treasury had, in fact,

14  eliminated the 30-year bond?

15  A  No.

16  Q  Did Mr. Davis say anything to suggest that the

17  information he had just given you was embargoed?

18  A  No.

19  Q  Did he say anything to suggest to you that the

20  information he'd given you was non-public?

21  A  No.

22  Q  Did he saying anything to suggest to you that the

23  information he'd given you was confidential?

24  A  No.

25  Q  Did he say anything to you that in any way

SECNOTH00117493

Case 1:05-cv-10983-NMG    Document 107-22    Filed 06/16/2008    Page 4 of 4

Page 177

1 suggested to you that this information had not yet been
2 announced by Treasury?
3    A No.
4    Q Did he say anything in any way that suggested to
5 you that this information had not yet been released by the
6 Treasury to the public?
7    A No.
8    Q Did he say anything in any way suggesting to you
9 that this information had not yet been released by Treasury
10 to the media?
11    A No.
12    Q Did he say anything in any way to suggest to you
13 that this information would give Sangamon Trading a jump on
14 the market?
15    A No.
16    Q Did he tell you where he was calling from?
17    A No.
18    Q Were you able to surmise from what you'd heard in
19 the background or elsewhere where he was?
20    A No.
21    Q Could you tell whether he was in an office, as
22 opposed to a hallway?
23    A No.
24    Q Did you hear voices around him, other voices?
25    A No. I don't think I heard anyone other than Pete

Page 178

1 Davis.
2    Q Did you ask any questions of Mr. Davis?
3    A No.
4    Q Did you say or -- did you ask anything about where
5 he'd gotten his information?
6    A No.
7    Q Did he suggest to you in any way where he'd gotten
8 this information?
9    A No.
10    Q How long did this conversation, the entire
11 conversation with Mr. Davis, last?
12    A Very briefly.
13    Q Less than a minute?
14    A I would say less than a minute.
15    Q Did you say anything at all in this conversation,
16 any word at all? Did you say thank you?
17    A I don't recall.
18    Q Did you say good-bye?
19    A No.
20    Q Did he say good-bye?
21    A No. I don't believe so.
22    Q Did he impart this information that you've just
23 given us about the four different points that you have given
24 us and then simply hang up?
25    A That's my recollection.

Page 179

1    Q Did he say anything to the effect of, "Thought
2 you'd want to know this"?
3    A No.
4    Q Did he saying anything to the effect of, "I thoug.
5 this would be important information for you"?
6    A No.
7    BY MR. RAVITZ:
8    Q How about introducing himself when he first called
9 you?
10    BY MR. HATHAWAY:
11    Q Did he say, "Hey, this is Pete Davis"?
12    A I don't recall that. I don't think so.
13    Q How did you know it was Pete Davis?
14    A I just recognized his voice. I don't think he
15 said -- introduced himself any more than I introduced myself.
16 I said hello.
17    Q Did you just say hello?
18    A Yeah.
19    MR. NISSEN: Can we go off the record just a
20 second?
21    MR. HATHAWAY: We're off the record.
22    (Off the record.)
23    MR. HATHAWAY: We're back on the record. It's
24 approximately 4:25. After a discussion, Mr. Falconer has
25 agreed to try to get on the next flight out and push back his

Page 1

1 departure time, knowing that there is some risk that that may
2 not work out, and he does have other travel plans. I
3 appreciate very much your willingness to put yourself in that
4 situation. If you become too nervous about those travel
5 arrangements, let me know, and we will stop.
6    Let me have marked now as Exhibit 218 a one-page
7 document. I'm handing a copy to your attorney. This is a
8 document that was produced to us by your attorney. It has
9 the handwritten designation BF 1. The staff designation is
10 ST 0010.
11    (SEC Exhibit No. 218 was marked
12    for identification.)
13    BY MR. HATHAWAY:
14    Q I'm now handing a copy of that to you now. Have
15 you seen this before today?
16    A Yes, I have.
17    Q What is it?
18    A It's a photocopy of my notes associated with Pete
19 Davis' October 31st call regarding the refunding.
20    Q I would like to have you please read to me each of
21 the words that are on this.
22    A The first word is "anthrax," and it had nothing to
23 do with Pete Davis. That was a great mystery to me and took
24 me several looking at my -- with my attorney to figure out
25 what on earth it was. It's unrelated totally to today.

SECNOTH00117494

**Exhibit T**

**Cited Excerpts from the Deposition of David Harris
(July 25, 2006)**

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MASSACHUSETTS

3

4       - - - - - - - - - - - - - x

5    UNITED STATES SECURITIES          :

6    AND EXCHANGE COMMISSION,          :

7              Plaintiff,              : C.A. 05-10983 (NMG)

8    vs.                               :

9    STEVEN E. NOTHERN,                :

10             Defendant.              :

11      - - - - - - - - - - - - - x

12

13

14        VIDEOTAPED DEPOSITION OF DAVID HARRIS

15

16

17                              Reported by:

18

19                         Linda C. Mead, CSR, CCR

20                         Tampa, FL

21                         Tuesday, July 25, 2006

22

23

24

25

David Harris                                                                July 25, 2006
Tampa, FL

| Page 66 | Page 68 |
|---|---|
| 1   Q   Okay. | 1   When a file is changed into Unix, it records when |
| 2   A   So there would have been no clerical | 2   that file -- the time and date when that file was |
| 3   errors through there. | 3   last edited. |
| 4   Q   Okay. Let's go through your -- the | 4   Q   When it was last edited? |
| 5   information you have on your entry at 12:40 and 11 | 5   A   Edited. Changed. |
| 6   seconds. You say, The file has a timestamp of on | 6   Q   So in terms of the process going from |
| 7   the production server RWRR. What does that mean? | 7   desktop to staging, staging to production, what |
| 8   A   Okay. This file -- This information was | 8   would that mean? |
| 9   gathered from the production machine. That first | 9   A   The way that the -- our -- the WorldCom |
| 10   field, RWRR, is the file permissions. What that | 10   Solaris product worked is when a file was uploaded |
| 11   tells us is who has -- who has access to that file, | 11   from their desktop to the staging machine it got a |
| 12   whether it's read, write, execute, which are | 12   timestamp. And then when that file was pushed from |
| 13   standard Unix permissions. | 13   staging to production using CMS it would have |
| 14   Q   What does that -- What does that mean? | 14   preserved that timestamp that was on the staging |
| 15   A   Okay. This means that the world basically | 15   machine. |
| 16   has read access to the file and the owner has the | 16        So in this case it would have meant that |
| 17   ability to read and write or make changes to the | 17   file was moved from their desktop to the staging |
| 18   file. | 18   machine on October 31st at 9:40 a.m. |
| 19   Q   Then there's a 1UST press treas. What | 19   Q   Now, you say that's a -- it's an actual |
| 20   does that -- Actually I guess it's 1 space UST press | 20   timestamp that's put on the file? |
| 21   space. What does that 1 mean? | 21   A   That's correct. |
| 22   A   The 1 I have no idea. | 22   Q   All right. And you're saying that that |
| 23   Q   What does UST press mean? | 23   9:40 represents when it went from the desktop to the |
| 24   A   That would have been the user name that | 24   staging server? |
| 25   owned that file. | 25   A   That's correct. That is the time that the |

| Page 67 | Page 69 |
|---|---|
| 1   Q   And treas, t-r-e-a-s? | 1   staging server reports. |
| 2   A   Would have been the group that owned that | 2   Q   And the source of this information, this |
| 3   file. | 3   UST press, the 9175, the date and the time of 9:40 |
| 4   Q   What does 9175 indicate? | 4   and then the file name PO749, what was the source of |
| 5   A   That is the size of the file in bytes. | 5   that? |
| 6   Q   October 31, what is that? | 6   A   That was from the production server |
| 7   A   That is the date that that file was last | 7   itself. The operating system reported that as the |
| 8   changed. | 8   time, date, name and server of the owner and the |
| 9   Q   And then there's a date there at 9:40. | 9   file permissions. |
| 10   What does that mean? | 10   Q   And you cut and pasted that information |
| 11   A   That would have been 9:40 a.m. And that | 11   from the production server to the -- to your ticket |
| 12   would have been when the file was last changed. | 12   here? |
| 13   Q   How do you know that's 9:40 a.m.? | 13   A   That's correct. |
| 14   A   It would have been on 24-hour time. | 14   Q   And the reason why this 9:40 is listed on |
| 15   Q   Military time? | 15   the production server because that -- You get a |
| 16   A   That's correct. | 16   timestamp. When you go from desktop to staging, you |
| 17   Q   And then PO749 dot HTM. What does that | 17   get a timestamp. In this case it was 9:40, correct? |
| 18   mean? | 18   A   That's correct. |
| 19   A   That is the name of the file. | 19   Q   And then when it's pushed from the pro -- |
| 20   Q   That's the file that the treasury was | 20   staging server to the production server, it |
| 21   asking you when did it go from staging to | 21   preserves that timestamp, that original timestamp? |
| 22   production? | 22   A   That's correct. |
| 23   A   That's correct. | 23   Q   You say on page two, it says, This matches |
| 24   Q   Now, what does that time 9:40 mean? | 24   the timestamp of the file on the staging server when |
| 25   A   That means when the file was last changed. | 25   it was pushed using CMS. What does that mean? |

18 (Pages 66 to 69)

David Harris                                                            July 25, 2006

Tampa, FL

| Page 86 |
|---|
| 1 questions and I'll be finished and Mr. Toone can ask |
| 2 you some questions. |
| 3        With regard to when information is on the |
| 4 staging server, are you aware of any searches that |
| 5 you can do on Google, Yahoo, whatever, that would |
| 6 get you to information that would be on the staging |
| 7 server? |
| 8        MR. TOONE: Objection. |
| 9        THE DEPONENT: It's possible that they |
| 10     might. Like I said, I'm not exactly sure how |
| 11     they go about building their searching database |
| 12     to do stuff, but it's possible that they could. |
| 13     I doubt it, but it's possible. |
| 14 BY MR. ROSSETTI: |
| 15     Q    Why do you doubt it? |
| 16     A    I think most of the time those sites work |
| 17 by gathering what people already view and then |
| 18 indexing that and then making it easier to search |
| 19 from there. For the most part people who would be |
| 20 visiting the staging machine would only be people |
| 21 who would be involved in the development of the |
| 22 server. |
| 23     MR. ROSSETTI: Okay. Mr. Harris, I don't |
| 24 have any further questions for you. Mr. Toone |
| 25 will ask you questions, and then based on his |

| Page 87 |
|---|
| 1     questioning I might have some further |
| 2     clarifying questions for you. |
| 3        THE DEPONENT: All right. |
| 4        EXAMINATION |
| 5 BY MR. TOONE: |
| 6     Q    Are you okay with going ahead or would you |
| 7 like to take a break? |
| 8     A    Oh, no. I'm good right now. |
| 9     Q    Okay. Well, let me know if you want to |
| 10 take a break, because we've been going for awhile. |
| 11     A    Okay. |
| 12     Q    First of all, thank you very much for |
| 13 coming today and testifying. And my knowledge of |
| 14 computer technology is not very well advanced, so I |
| 15 apologize if I repeat or ask questions that you may |
| 16 have already covered with Mr. Rossetti, but I just |
| 17 want to make sure my understanding is clear. Okay? |
| 18     A    Okay. |
| 19     Q    What exactly is an IP address? |
| 20     A    IP address is what the internet uses to |
| 21 designate a server or a device on the internet. |
| 22 It's a method for identifying where something is. |
| 23 So the -- So each server would have at least one IP |
| 24 address on it where anybody who wants to find |
| 25 something would go to it, and devices would also |

| Page 88 |
|---|
| 1 have an IP address, routers, gateways, whatever, |
| 2 which is a method of identifying each individual |
| 3 piece of hardware. |
| 4     Q    So is an IP address a location on the |
| 5 internet? |
| 6     A    It's a location of a piece of device. It |
| 7 doesn't necessarily have to be on the internet. |
| 8 Every network device that exists that uses TCPIP has |
| 9 an IP address. It could be -- |
| 10     For instance, a home network, each device |
| 11 in a home network would also have an IP address. It |
| 12 may not be accessible to the entire internet itself, |
| 13 but anything that runs TCPIP as a network would have |
| 14 an IP address. |
| 15     Q    Well, how do you know if an IP address is |
| 16 accessible by the internet? |
| 17     A    You would know by -- There are certain IP |
| 18 addresses that are not routable to the internet. |
| 19 There are some that are firewalled that are not |
| 20 accessible by the internet. |
| 21     For instance, if you own a company you -- |
| 22 and you want to have internet access for all your |
| 23 employees but you don't want the internet to be able |
| 24 to connect to servers inside your company, you would |
| 25 block that access from the outside in. You can do |

| Page 89 |
|---|
| 1 that. |
| 2     Q    Can you tell by looking at an IP address |
| 3 whether or not it is available on the internet? |
| 4     A    Some of them you can. Some you can't. |
| 5     Q    How can you tell those that you can -- |
| 6 that you know are available on the internet, how can |
| 7 you tell? |
| 8     A    They have a specific network range that |
| 9 are called non-routable IP addresses that you know |
| 10 are not accessible. |
| 11     Q    Okay. Now, looking at Exhibit 3 at the |
| 12 first page there are 10 IP addresses listed on the |
| 13 first page. Can you tell by looking at those IP |
| 14 addresses whether or not they're available on the |
| 15 internet? |
| 16     A    They are all available. |
| 17     Q    They are. And how do you know that? |
| 18     A    Because they are all routable IP |
| 19 addresses. |
| 20     Q    And can you just explain what -- what in |
| 21 those IP addresses tells you that those -- that they |
| 22 are available on the internet? |
| 23     A    The first -- The first set of numbers, the |
| 24 208, is all you really need to know. |
| 25     Q    What does that tell you? |

23 (Pages 86 to 89)

David Harris                                                                    July 25, 2006

Tampa, FL

| Page 90 | Page 92 |
|---|---|

**Page 90**

1  A   It tells us that it's not in that list of
2  IP addresses that's public, that's private.
3      Q   Okay. Now, a file that is moved to one of
4  these IP addresses that is available on the
5  internet, does that mean that that document -- that
6  file, excuse me, is available at a particular
7  internet location?
8      A   That's correct. On the web. Because
9  we're all dealing with web servers for all this
10  stuff.
11     Q   Right. Can you just explain what that
12  distinction means.
13     A   The whole -- Using like Internet Explorer,
14  Netscape, whatnot, to view a serve -- view a web
15  page is a method of accessing files on the internet.
16  It's one specific program I guess basically using
17  html and stuff.
18          There are different parts of the internet
19  that most people don't deal with that don't involve
20  web pages. Because we did nothing but web pages --
21  well, mostly web pages here, all this stuff would
22  have been dealing with web pages.
23     Q   Okay. That's helpful. Thank you.
24          Now, in November 2001 you worked for
25  WorldCom, correct?

**Page 91**

1  A   I believe it was WorldCom, yeah.
2      Q   And you didn't work for the treasury
3  department directly?
4      A   No.
5      Q   Okay. Did you have any experience in
6  setting up either the production machine or the
7  staging machine used by treasury?
8      A   I may have done some initial setups. I
9  don't recall at that time.
10     Q   Okay. Do you recall now having worked on
11  any of the setups?
12     A   Actually physically setting them up?
13     Q   Yes.
14     A   I don't know.
15     Q   Do you have any specific knowledge as to
16  where exactly the IP address is listed on --
17  under -- on Exhibit 3, page 1, the five IP addresses
18  listed under host location 1 colon STAG dash 13A?
19  Do you have any direct recollection working on those
20  particular IP addresses?
21          MR. ROSSETTI: I'm sorry. What was the
22     question?
23  BY MR. TOONE:
24     Q   The question -- Well, let me --
25          Do you understand the question?

**Page 92**

1  A   I'm get -- I'm thinking you're asking me
2  if I've -- if I recall actually working on any of
3  those specific IP addresses.
4      Q   That is my question, yes.
5      A   Specifically no.
6      Q   Do you have any knowledge as to who had
7  access to any of those five IP addresses?
8      A   It would have been -- Specifically it
9  would have been any of the people listed under
10  technical contacts. Whether or not they actually
11  excess -- accessed them, I don't know.
12     Q   Okay.
13     A   We know the IP address they came from and
14  the user name and password -- well, user name they
15  used. Which individual person did all that we don't
16  know.
17     Q   Okay. So you're pointing to on page 1 of
18  Exhibit 3 the technical contacts; Brad Green,
19  Jeffrey West, Tim Clapin. Are those the contacts
20  that you're referring to?
21     A   That's correct.
22     Q   And your testimony is that you believe
23  that those people had access to the IP addresses
24  associated with the staging server?
25     A   They would have, yes.

**Page 93**

1  Q   Okay. Do you know who else did or did not
2  have access to those IP addresses?
3      A   No, I don't. We know that -- We know that
4  they were given a specific IP address and a user
5  name and password. Whether the customer had a
6  development team of more than 3 people or 20 people
7  we don't know.
8      Q   Do you know anything about whether
9  treasury had procedures to keep these IP addresses
10  from being known to other people?
11     A   I don't know.
12     Q   And just to clarify what I believe you
13  testified to earlier, a document that is FTP'd -- Is
14  that a proper term FTP'd?
15     A   That's correct.
16     Q   -- from a desktop to this staging server,
17  that document is placed on the internet; is that
18  correct?
19     A   That's correct.
20     Q   So looking on page 2 of Exhibit 3, the
21  second line down, the file was FTP'd to the staging
22  server at 9:40 colon 23 a.m. on October 31st -- Did
23  I read that correctly?
24     A   That's correct.
25     Q   That sentence means that the file in

24 (Pages 90 to 93)

David Harris
July 25, 2006

Tampa, FL

Page 94

1    question was moved to the internet at that time?
2        MR. ROSSETTI:  Objection.
3        THE DEPONENT:  On the staging server,
4    that's correct.
5    BY MR. TOONE:
6        Q    But in being moved to the staging server
7    it was placed on the internet; is that correct?
8        A    Yes.
9        Q    Let me just back up a little bit.  Do you
10   read computer magazines or other periodicals?
11       A    Yes.
12       Q    Which ones do you read?
13       A    Oh, God.  There are so many.
14       Q    Can you just list some that you tend --
15   that you typically read.
16       A    There's The Wired magazine.  Computer
17   Shopper.  Slash Dot's a website of computer
18   articles.  There's several of them.  Some of the
19   ones I can think of off the top of my head.
20       Q    Okay.  Great.
21            And why do you read those publications?
22       A    Basically to -- entertainment and to keep
23   up with what's going on.
24       Q    Right.  Right.  To keep yourself current
25   with current developments and information

Page 95

1    technology?
2        A    That's correct.
3        Q    What did you do to prepare for this
4    deposition?
5        A    I spoke with Mr. Rossetti on the phone
6    going over the contents of this ticket.
7        Q    And you're referring to Exhibit 3?
8        A    Yes.
9        Q    Sorry.  I need to do that for the record.
10       A    That's fine.  Yes.
11       Q    When did you speak with Mr. Rossetti?
12       A    I don't know the exact times and dates.
13       Q    Approximately how long ago did you first
14   speak with Mr. Rossetti?
15       A    Maybe a month ago I guess.  I don't have
16   the dates and times listed on me.
17       Q    That's fine.  Did you speak with him by
18   telephone?
19       A    That's correct.
20       Q    And how long did you speak with
21   Mr. Rossetti for?
22       A    The first time I believe may have been two
23   hours, three hours.  I don't recall.
24       Q    Two or three hours?
25       A    Something like that.

Page 96

1        Q    And what did Mr. Rossetti tell you he was
2    calling in regards to?
3        A    The contents of this ticket.  He said that
4    there was some investigation going on about what was
5    going on back then.
6        Q    Did he explain to you how this ticket was
7    relevant to the investigation?
8        A    He may have.  I don't recall.
9        Q    What knowledge do you have now about this
10   case?
11       A    I -- Basically from my understanding there
12   was -- that around this time frame that the treasury
13   department was -- excuse me, was making some kind of
14   notification they weren't going to be issuing the
15   30-year bond or something, and that this went out
16   early before it was supposed to.  Something around
17   that effect.  I don't know too many details.
18       Q    Anything else that you recall?
19       A    No, not really.
20       Q    And is that information based on your
21   conversation with Mr. Rossetti?
22       A    I don't know.  It could have been
23   knowledge from what was happening back then.  It
24   could have been from calls.  I don't know where that
25   came from.  It's floating around in here somewhere.

Page 97

1        Q    Now, you said you spoke with Mr. Rossetti
2    approximately maybe a month ago; is that correct?
3        A    I'm guessing, yeah.
4        Q    Okay.  Did you speak with him again since
5    then?
6        A    Yes.
7        Q    When do you last -- When did you speak
8    with him next, sir?
9        A    I don't recall.  Actually thinking back,
10   the first time might have been like two or three
11   months ago, and then another time maybe a month ago
12   when we were going over this again and setting up a
13   deposition date.
14       Q    And on both occasions you reviewed
15   Exhibit 3, the ticket?
16       A    I think so.  I don't know if we did it
17   when we actually set the date up.
18       Q    How did you have a copy of the ticket
19   during these phone calls?
20       A    It was e-mailed to me by Mr. Rossetti.
21       Q    Do you recall when he e-mailed the ticket
22   to you?
23       A    It would have been the first time we
24   talked.
25       Q    Had you seen the ticket before

25  (Pages 94 to 97)

**Exhibit U**

**Cited Excerpts from the Deposition
of Verizon Business (Anne Wilson)
(October 6, 2006)**

```
1              IN THE UNITED STATES DISTRICT COURT FOR THE

2                     DISTRICT OF MASSACHUSETTS

3                        (Boston Division)

4     - - - - - - - - - - - - - - - x

5     UNITED STATES SECURITIES AND    )

6     EXCHANGE COMMISSION,            )

7                    Plaintiff,       )

8          v.                         ) Civil Action

9     STEVEN E. NOTHERN,              ) No. 05-10983

10                   Defendant.       ) (NMG)

11    - - - - - - - - - - - - - - - x

12                        Washington, D.C.

13                        Friday, October 6, 2006

14    Video 30(b)(6) Deposition of:

15            ANNE LAWRENCE WILSON,

16    a witness called for examination in the

17    above-entitled action, beginning at 10:14 a.m.

18    before JOE W. STRICKLAND, RPR, CRR, a notary

19    public in and for the District of Columbia, taken

20    at the offices of the Securities and Exchange

21    Commission, 100 F Street, NE, Washington, DC

22    20549, when were present:
```

Anne L. Wilson 30(b)(6)

Washington, DC

October 6, 2006

Page 74

1    A.  Because of the way our system works,
2  the rdist system that copies the file from one
3  server to another maintains the file header info,
4  the timestamp.  So it would have, when it copied
5  the file from the staging server over to the
6  production server, it copied -- it used the same
7  timestamp.
8    Q.  So this 9:40, just to clarify, is not
9  the time that it landed on the production server?
10    A.  Right.
11    Q.  It would have been the time it was last
12  updated on the staging server?
13    A.  Uh-huh.  Yeah, updated on the staging
14  server or initially copied onto the staging
15  server.  FTP doesn't work the same way rdist
16  does.  Once the file was uploaded, it would have
17  gotten a new stamp on the staging server.
18  Because it was most likely changing operating
19  systems going from Windows to Solaris.
20    Q.  If you could turn to the second page of
21  the document.
22    A.  Uh-huh.

Page 75

1    Q.  The top line: "This matches the
2  timestamp of the file on the staging server when
3  it was pushed using CMS."  What does that mean?
4    A.  The timestamp -- well, when it -- I
5  think I may have misspoken here.  Because he's
6  telling you the time -- it matches the timestamp
7  that he shows us, which is when it was FTP'd to
8  the staging server.  The next line is more
9  relevant.
10    Q.  Okay.  Explain the next line to me.
11    A.  Okay.  The file was FTP'd to the
12  staging server at 9:40 and 23 seconds.  It was --
13  which means from the user or whether they were at
14  the Department of Treasury or Jeffery West's
15  house, they FTP'd, uploaded it on to the staging
16  server using the FTP protocol.  FTP keeps a log
17  of any file transfers and that's what he's pulled
18  out here.  So this is --
19    Q.  This TREAS underline?
20    A.  Underscore 1-FTP.LOG.  That's the file
21  name.  Then we have the time that that file entry
22  was made.  October 31st, 9:40:23 of 2001.  Then

Page 76

1  we have -- this is the host name where the file
2  was uploaded from.  This TIAS-GW7.TREAS.GOV.  The
3  size of the file that was uploaded, 9175 bytes,
4  and then the full name of the file including the
5  path that was in the releases directory.  The
6  name of the file was PO749.HTM.  HTM is an HTML
7  file or a web page.
8    Q.  Where did this entry come from, the
9  staging or production server?
10    A.  This came from the staging server.
11  There was no FTP running on the production
12  server.
13    Q.  And so in order to get this line, would
14  Mr. Harris need to cut and paste it?
15    A.  Correct.  He would have gone on the
16  staging server and gripped the log.  He would
17  have displayed the log file.  It's going to show
18  you the last entries first, so he would have just
19  gone and pulled -- you can display it on the
20  screen and do a copy and paste.
21    Q.  And the log file contains what kind
22  of -- what information?

Page 77

1    A.  The log file would include any uploads
2  or downloads, any transmission via FTP.  This log
3  file would only show FTP transmission.
4    Q.  And so this log file that we see in
5  this document tells us what about the timing?
6    A.  It tells us that the file first landed
7  on the staging server at 9:40 and 23 seconds.
8  These logs would have been more precise than what
9  we just looked at which just doesn't give
10  seconds.  As far as the file list itself, it
11  shows only hours and minutes.
12    Q.  Okay.  You said that TIAS-GW7.TREAS.GOV
13  is a host name?
14    A.  Yeah.
15    Q.  What is a host name?
16    A.  Host name would match up with an IP
17  address.  It's an origin identifier.  That's
18  where the person uploading was coming from.  In
19  some logs we record IP addresses and in some logs
20  we record host names.  Here host names give you
21  more information, it's just easier to read.  It
22  is less literal.

20 (Pages 74 to 77)

Anne L. Wilson 30(b)(6)                                              October 6, 2006
Washington, DC

Page 146

1    Q.  You were working for UUNET and UUNET
2  was owned by WorldCom?
3    A.  Yes, but UUNET paid my paycheck.  We
4  were a separate unit.
5    Q.  Okay.  When you were working for UUNET
6  in 2001, did you personally work on the servers
7  that the Treasury Department had?
8    A.  I may have in some capacity.  I was
9  responsible for backups and web reporting on
10  those servers.
11    Q.  Do you recall ever speaking to anyone
12  at the Treasury Department in the course of your
13  work?
14    A.  No.
15    Q.  Which employees at UUNET dealt directly
16  with representatives from the Treasury Department
17  at that time?
18    A.  Well, no one would have been
19  specifically assigned.  It would have been the
20  Level 1 people answering the phone and whoever
21  picked up the ticket per their request.
22    Q.  But there was never an occasion where

Page 147

1  you got drawn into a dialogue between -- a
2  dialogue with the Treasury Department?
3    MS. WILLIAMS:  Objection.
4    THE WITNESS:  Not that I recall.
5    BY MR. TOONE:
6    Q.  Do you recall ever speaking with any
7  employee from the Treasury Department?
8    MS. WILLIAMS:  Objection.
9    THE WITNESS:  No, but I wouldn't
10  necessarily remember.
11    BY MR. TOONE:
12    Q.  As with Ms. Williams, I apologize that
13  my level of technological knowledge isn't, you
14  know, a hundredth as developed as yours, so I'm
15  going to ask some kind of basic questions.
16    A.  Sure.
17    Q.  What is the Internet?
18    A.  Internet is a network of networks that
19  operates over the IP protocol.
20    Q.  A network of networks?
21    A.  Correct.  Meaning we can all work for
22  different companies.  All of our companies have

Page 148

1  our own networks.  But those networks can be
2  connected via the Internet.
3    Q.  Is there another term for the network
4  that exists within a particular company?
5    A.  A local area network.  A LAN.  Or even
6  a wide area network.  A WAN.
7    Q.  And the Internet is the network that
8  connects all of those smaller networks; is that
9  right?
10    A.  Yes.
11    Q.  You mentioned IP protocol.  What is
12  that?
13    A.  It's a standard way for computers to
14  talk to each other.  It's a way of transmitting
15  bits and bytes.
16    Q.  Is that protocol maintained by a
17  particular organization?
18    A.  It's a standard.  Used to be the
19  Internet Society that maintained those
20  standards.
21    Q.  Is that Internet Society, is that a
22  private organization?

Page 149

1    A.  With funding from the U.S. Government.
2    Q.  You said the Internet Society used to
3  maintain those standards.  They don't do it
4  anymore?
5    A.  I don't recall what the name of the
6  organization is now.
7    Q.  Are there parts of the Internet that
8  are not public?
9    MS. WILLIAMS:  Objection.
10    THE WITNESS:  By definition, the
11  Internet is public.  But certain things can be
12  secured.
13    BY MR. TOONE:
14    Q.  Let's go back.  By definition the
15  Internet is public.  What do you mean by that?
16    A.  We get into semantics here, I'm
17  afraid.  You know, there's a fine line when you
18  have a network of networks as to what is the
19  Internet and what is private space.  So I'm
20  sorry, your question again?
21    Q.  I'm just trying to get a better
22  understanding.  You said by definition the

Alderson Reporting Company
1-800-FOR-DEPO

Anne L. Wilson 30(b)(6)

October 6, 2006

Washington, DC

Page 150

1  Internet is public, but there are things that can
2  be secured. I'd just like you, if you can, to
3  say a little bit more about that.
4      A.  IP addresses, we call them publicly
5  routable, meaning they're announced to the -- to
6  the Internet. It's like having a telephone
7  network. But anybody that has a telephone number
8  generally can be dialed. Right? And that's a
9  public telephone because somebody can connect to
10  it via the network. Although you might have some
11  access control by having a switchboard in the
12  middle.
13      So the stuff behind the switchboard
14  would be on the big Internet, but it's local.
15  It's protected.
16      Q.  Can you have -- I'm sorry; I thought
17  you were finished.
18      A.  So someone may think they're on the
19  Internet, but they are really on a network
20  connected to the Internet.
21      Q.  If an IP address is publicly
22  routable --

Page 151

1      A.  Uh-huh?
2      Q.  -- can you control access to that IP
3  address?
4      A.  Yes, you can.
5      Q.  How?
6      A.  With the use of filters. Depends on
7  what operating system or software is running.
8  But you can configure a server. If, you know,
9  it's on a server, to reject connections if they
10  don't meet certain criteria. Perhaps you want
11  them only to come from a certain IP address or
12  within a certain range. You only want to allow
13  people from a certain network to attach.
14      Q.  So what does "publicly routable" mean,
15  then?
16      A.  Meaning it's -- it's announced. It's
17  like having a phone number, versus having an
18  extension. An extension -- like my extension
19  might be 347. That's not publicly routable.
20  Somebody in Kalamazoo couldn't call me if they
21  just knew my extension 347. But if I had a 703,
22  XYZ, XYZ, that, is publicly routable.

Page 152

1      Q.  So anybody can reach that main number,
2  but you may not be able to reach the extension?
3      A.  Right. But even in that main number,
4  to bring it back to the analogy, could have some
5  security protocols. And that's one way the
6  Internet would be different than your public
7  phone system, because you could control who dials
8  that number, so to speak, on the Internet.
9      Q.  So I'm just trying to understand this
10  better.
11      A.  Yeah.
12      Q.  There are publicly routable IP
13  addresses that I as a normal citizen cannot get
14  access to?
15      A.  Right. Right. Correct.
16      Q.  And how is that access controlled?
17      A.  Because someone may have configured the
18  system to only allow connections from specific
19  sources.
20      Q.  Let's look at the Exhibit Number 6.
21      A.  Uh-huh.
22      Q.  And on the first page -- we looked at

Page 153

1  this earlier. On the first page the Treasury
2  production server and the Treasury staging server
3  are listed. Do you see that?
4      A.  Uh-huh.
5      Q.  And below each of those are five IP
6  addresses each?
7      A.  Yes.
8      Q.  Can you tell from just looking at those
9  IP addresses whether or not they are publicly
10  routable?
11      A.  They would all be publicly routable,
12  yes.
13      Q.  How can you tell that?
14      A.  Because I know that those networks in
15  Tysons Corner were publicly routable. That all
16  of our networks in Tysons Corner were publicly
17  routable.
18      Q.  If you didn't have that information
19  about what was on the Tysons network, would it be
20  possible to look at these numbers and know
21  whether or not they were publicly routable?
22      MS. WILLIAMS:  Objection.

Alderson Reporting Company
1-800-FOR-DEPO

Anne L. Wilson 30(b)(6)                                                    October 6, 2006
Washington, DC

| Page 154 | Page 156 |
|---|---|

**Page 154**

1    THE WITNESS: Well, yes, you would
2  expect them to be because of the 208 and source.
3    BY MR. TOONE:
4    Q.  The 208, those are the first three
5  digits on each number?
6    A.  Yeah.
7    Q.  What does that tell you?
8    A.  That it's -- most nonroutable addresses
9  would be -- start with 111 or 193.  Other
10  prefixes.
11    Q.  Have you heard of the Internet assigned
12  number authority?
13    A.  Uh-huh.
14    Q.  What is that?
15    A.  They would keep track of the IP
16  addresses.
17    Q.  Has that authority set aside specific
18  blocks of IP addresses that are available for use
19  as nonroutable network addresses?
20    MS. WILLIAMS:  Objection.
21    THE WITNESS:  I don't know the
22  specifics of how that's done.

**Page 156**

1  from simply viewing them?
2    A.  Not those filters.  There would or
3  could have been additional filters, but those
4  were under control of the customer.
5    Q.  Are you aware of any such filters being
6  used by the Treasury Department in 2001?
7    A.  No.
8    Q.  And UUNET itself did not maintain any
9  filters that prevented outsiders from viewing
10  these IP addresses in 2001?
11    A.  Not to my knowledge.
12    MR. TOONE:  We will take a break, if
13  that's all right.
14    VIDEOGRAPHER:  This is the end of tape
15  2.  Off the record at 2:41:21.
16    (Recess.)
17    VIDEOGRAPHER:  This is the beginning of
18  tape 3 in the deposition in the corporate
19  deposition of Verizon by Anne Wilson.  On the
20  record at 2:44:47.
21    BY MR. TOONE:
22    Q.  Let me direct your attention briefly to

| Page 155 | Page 157 |
|---|---|

**Page 155**

1    BY MR. TOONE:
2    Q.  Now, you said earlier that you knew
3  from your experience that UUNET that all of these
4  IP addresses on the first page of Exhibit 6 were
5  publicly routable; is that right?
6    A.  But that doesn't mean that they're
7  publicly accessible.
8    Q.  Well, what do you know about these
9  numbers being publicly accessible?
10    A.  I know that the IP addresses on the
11  production server would have been publicly
12  accessible.  The IP addresses on the staging
13  server would have had filters on them so that
14  only specified addresses could FTP or otherwise
15  actually connect to that system.
16    Q.  Now, you're saying -- you've testified
17  that the IP filters prevented outsiders from
18  using the FTP function on these --
19    A.  Right.
20    Q.  -- on these staging servers; correct?
21    A.  Correct.
22    Q.  Did those filters also prevent people

**Page 157**

1  documents that were marked, I believe, Exhibit 4
2  and Exhibit 5.
3    A.  Okay.
4    Q.  Do you recall discussing these
5  documents with Ms. Williams?
6    A.  Yes.
7    Q.  Just now, just today.
8    A.  Oh, yes.
9    Q.  Did I understand you correctly that
10  this was a request from Jeffery West to be able
11  to FTP documents on Treasury's staging server
12  from his home computer?
13    A.  Uh-huh.
14    Q.  That's a yes?
15    A.  Yes.
16    Q.  Did you say that it wasn't necessary,
17  if the FTP request was coming from within
18  Treasury Department, to make this kind of a
19  request?
20    MS. WILLIAMS:  Objection.
21    THE WITNESS:  I don't think I
22  specifically said that.

40 (Pages 154 to 157)

Anne L. Wilson 30(b)(6)                                          October 6, 2006
Washington, DC

| Page 166 |
|---|

1 in-house or used another contractor?
2       A.  No.
3       Q.  Can I refer to you Exhibit Number 6
4 again, please.  Find it?
5       A.  Uh-huh.  Had help.
6       Q.  If I could refer you to the last line
7 on the first page again.
8       A.  Uh-huh.
9       Q.  The line above it says, "This file has
10 a timestamp of on the production server," and
11 then there is an entry below that.  Do you see
12 that?
13      A.  Uh-huh.
14      Q.  In general terms, what's a timestamp?
15      A.  It's the date and time of the file.  It
16 represents when the file was last modified.
17      Q.  Is this a UNIX function?
18      A.  No, it's universal to computers.
19      Q.  So the idea of timestamp isn't specific
20 to UNIX?
21      A.  Isn't unique.
22      Q.  Was UNIX involved in what's being

| Page 167 |
|---|

1 described at the end of this first page in
2 Exhibit 6?
3       A.  Well, a UNIX command, or Solaris
4 command, would have been performed in order to
5 get this information.
6       Q.  And what command would that be?
7       A.  Probably LS space dash AL.
8       Q.  And this is a command entered into the
9 production server?
10      A.  Correct.  It means logging onto the
11 production server.  LS is short for list.  List
12 files.
13      Q.  And you said that the timestamp
14 reflects when the file was last modified?
15      A.  Correct.  Which may not have been on
16 that server where it currently resides.
17      Q.  So this timestamp might reflect a
18 modification that took place -- strike that.
19          If you could just explain what you mean
20 by that.
21      A.  Sure.  When the file was last modified,
22 it could mean -- at a minimum it's when the file

| Page 168 |
|---|

1 was uploaded to the staging server it would get a
2 new timestamp there, because of the way the file
3 transfer protocol works.  It's actually writing a
4 new file, bits and bytes.  Now, when the file is
5 copied from the staging server to the production
6 server, it's using the rdist program which sort
7 of moves the file and it keeps its header
8 information intact, because it's really just
9 syncing the files on the two servers.  So it
10 carries the timestamp over from the first
11 server.
12      Q.  If a document had been FTP'd to the
13 staging server?
14      A.  Uh-huh.
15      Q.  And then edited on the staging server
16 at a subsequent time?
17      A.  Uh-huh.
18      Q.  Which time would be reflected in this
19 entry on Exhibit 6?
20      A.  The time of the edit.
21      Q.  So reading this line on Exhibit 6 --
22      A.  Uh-huh.

| Page 169 |
|---|

1       Q.  -- this means that the document was not
2 edited after 9:40?
3       A.  Correct.
4       Q.  If you could just look above that entry
5 at the bottom of page 1 of Exhibit 6.
6       A.  Uh-huh.
7       Q.  And I'm looking at the entry timed
8 12:40:11 p.m.  Do you see that?
9       A.  Yes.
10      Q.  And it states, "All dates and times on
11 both servers are accurate." Do you see that?
12      A.  Uh-huh.
13      Q.  Do you have any personal knowledge of
14 what, if anything, David Harris did before making
15 this entry?
16      A.  I know that he had logged onto both
17 servers.
18      Q.  Anything else?
19      A.  No.
20      Q.  Do you know whether he actually checked
21 the accuracy of the dates and times on the two
22 servers?

43 (Pages 166 to 169)

**Exhibit V**

**Cited Excerpts from the Deposition of John Cadogan
(November 29, 2006)**

Page 1

Volume:  I

Pages:  1-183

Exhibits:  1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND

EXCHANGE COMMISSION,

           Plaintiff,

   v.          Civil Action No.  05-10983(NMG)

STEVEN E. NOTHERN,

           Defendant.

- - - - - - - - - - - - - - - - - x

DEPOSITION OF JOHN CADOGAN

Wednesday, November 29, 2006

8:44 a.m.

FOLEY HOAG LLP

155 Seaport Boulevard

Boston, Massachusetts  02210-2600

Court Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

Videographer:  Jody Urbati

Page 138

1    would do in long bonds in 2001.
2            ATTY. SHAPIRO:  Objection.
3        Q.  Would this have been on the larger side,
4    smaller side, middle?   Any kind of size reference
5    you can give to me?
6        A.  I don't have any real recollection of the
7    size.  This doesn't stand out as anything out of the
8    ordinary.
9        Q.  And Mr. St. Pierre quoted a price to you, I
10   presume.
11           ATTY. SHAPIRO:  Objection.
12       A.  I would assume so, yes.
13       Q.  And did you accept the price indeed that he
14   quoted?
15       A.  I don't remember.
16       Q.  You don't remember whether or not you made
17   some kind of a counteroffer or anything like that?
18       A.  I don't remember.
19       Q.  Did you try to shop the purchase with any
20   other broker?
21           ATTY. SHAPIRO:  Objection.
22           ATTY. WILLIAMS:  Objection.
23       A.  In respect to this specific transaction we
24   are looking at?

Page 139

1        Q.  I'm sorry.  It was a bad question.  You had
2    gotten an order from Mr. Nothern, Mr. Kurinsky, Mr.
3    Kennedy, and Mr. Smith to buy a total of 65 million
4    long bonds, right?
5        A.  Yes, that's correct.
6        Q.  And this was made to you verbally?
7            ATTY. SHAPIRO:  Objection.
8        A.  I believe so, yes.
9        Q.  Was Merrill the only broker that you called
10   with respect to executing that order, or group of
11   orders?
12           ATTY. SHAPIRO:  Objection.
13           ATTY. WILLIAMS:  Objection.
14       A.  I don't remember for sure, but I believe
15   Merrill was the only person I spoke to, Merrill
16   Lynch was the only counterpart.
17       Q.  At that point, or at least going into the
18   discussion with Mr. St. Pierre, as a matter of
19   general practice would you have looked at one of
20   your screens to see how long bonds were trading at
21   that point?
22           ATTY. WILLIAMS:  Objection.
23       A.  Yes.  As a mode of practice, yes.
24       Q.  And so do you think that's likely, in fact,

Page 140

1    what you did on the morning of October 31?
2        A.  I would see no reason why I wouldn't.
3        Q.  And do you recall at all whether or not
4    there was any price movement that was occurring as
5    you were moving into that transaction?
6            ATTY. SHAPIRO:  Objection.
7        A.  From what I can remember, the prices --
8    prices were moving that morning.
9        Q.  That would have been a reason to call
10   Merrill directly, rather than looking at the Trade
11   Web?
12           ATTY. WILLIAMS:  Objection.
13           ATTY. SHAPIRO:  Objection.
14       A.  Could have been.
15       Q.  And the -- now there is another -- oh, I'm
16   sorry, so just finishing up on the -- so the
17   price -- so at some point you and Mr. St. Pierre had
18   an agreement on price, right?
19           ATTY. SHAPIRO:  Objection.
20           ATTY. WILLIAMS:  Objection.
21       A.  I guess agreement on price, what do you mean
22   by that?
23       Q.  I guess what I'm getting at is at some point
24   there was a price that --

Page 141

1        A.  Looking at this blotter, it looks like there
2    was a trade that was done at that price.
3        Q.  So there was a trade that was done at --
4            ATTY. SHAPIRO:  When you say looking at
5    the blotter, looking at Exhibit No. --
6            THE WITNESS:  I'm sorry, looking at
7    Exhibit No. 566, it looks like a trade --
8            ATTY. SHAPIRO:  Page 566.
9        Q.  So it looks like a trade.  Did you also have
10   to enter the information into the FITS system
11   besides keeping it in your handwritten blotter here?
12           ATTY. WILLIAMS:  Objection.
13       A.  I guess you have to be more specific.  What
14   do you mean by entering the information?
15       Q.  In other words, when you talked before about
16   when you would get the orders from the portfolio
17   managers electronically on the FITS system that
18   after you had done the trade you would type in
19   the --
20       A.  You are saying from an execution standpoint?
21       Q.  Yes, from the execution -- after you had
22   executed the trade, you would type in the FITS
23   system what the price had been and so forth?  That's
24   true with regard to the orders that you get on the

36 (Pages 138 to 141)

Page 178

1  Treasury website on October 31 regarding the
2  elimination of the 30-year bond?
3     A. I don't remember.
4     ATTY. SHOPE: Just one second.
5     Q. I believe you said that you noticed that the
6  price of the 30-year bond was moving when you
7  checked the Trade Web system before you executed the
8  $65 million trade; is that correct?
9     A. Yes, I believe so.
10    Q. Did you know why the prices were
11  moving?
12    A. I was not sure, no.
13    Q. Do you remember in what direction the price
14  was moving?
15    A. I believe the prices were moving up.
16    Q. Did you check the Trade Web system regarding
17  the price of the 30-year bond any other time on the
18  morning of October 31?
19    A. As a rule of thumb I'm constantly checking
20  the Trade Web for pricing.
21    Q. Do you recall if the price ever went down
22  that morning?
23    A. I don't recall if it did or not, but -- I
24  don't remember.

Page 179

1     Q. What did you have to do to access the Trade
2  Web system?
3     A. In terms of how to execute a trade or --
4     Q. In terms of how to see what the bid and ask
5  were.
6     A. The Trade Web screen, there are different
7  screens for different securities, from mortgage, to
8  agencies, to Treasuries, and you click on the
9  Treasury screen, and it brings you up a screen of
10  actively-traded issues that are constantly changing
11  prices.
12    Q. Did you have to enter any sort of log-in or
13  password?
14    A. You log in each morning when you start your
15  system.
16    Q. Do you recall whether you did that on
17  October 31?
18    A. I don't remember specifically. As a rule of
19  thumb, that system would be on.
20    ATTY. WILLIAMS: I don't have any
21  further questions at this time.
22    ATTY. SHOPE: Let's just take a short
23  break.
24    THE VIDEOGRAPHER: Off the record at

Page 180

1  12:58 p.m.
2     (Recess taken.)
3     THE VIDEOGRAPHER: Back on the record
4  1:04 p.m.
5     ATTY. SHOPE: I have nothing further. I
6  do note that we have been asking the witness to
7  read and sign the transcript, so, in other words,
8  you will get a transcript, Mr. Cadogan, you will
9  have a chance to make sure that the court reporter
10  has accurately transcribed what you said and also
11  that your testimony was accurate and note any
12  errors, Mr. Shapiro will help you with that, and
13  then you will have chance to sign and note any
14  errors, all right?
15    THE WITNESS: Okay.
16    ATTY. SHAPIRO: So can we all agree that
17  the deposition is over, concluded?
18    ATTY. SHOPE: Yes, we are concluded.
19    ATTY. SHAPIRO: Everyone has had an
20  opportunity to ask questions?
21    ATTY. SHOPE: Yes.
22    ATTY. SHAPIRO: Thank you all for your
23  assistance.
24    THE VIDEOGRAPHER: Here ends today's

Page 181

1  deposition of John Cadogan. Off the record at 1:05
2  p.m.
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

LegaLink Boston, Merrill Legal Solutions
(617) 542-0039

**Exhibit W**

**Cited Excerpts from the Deposition of David Kennedy
(June 26, 2006)**

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MASSACHUSETTS

 3

 4                                      )

 5     UNITED STATES SECURITIES AND     )

 6     EXCHANGE COMMISSION,             )

 7     Plaintiff,                       )

 8                                      )

 9     vs.                              )

10                                      )

11     STEVEN E. NOTHERN,               )

12     Defendant.                       )

13              C.A. 05-10983 (NMG)

14

15        VIDEOTAPED DEPOSITION OF DAVID

16     KENNEDY, a witness called on behalf of the

17     Plaintiff, pursuant to the provisions of the

18     Massachusetts Rules of Civil Procedure,

19     before Jill Shepherd, Registered

20     Professional Reporter and Notary Public, in

21     and for the Commonwealth of Massachusetts,

22     at the offices of U.S. Securities and

23     Exchange Commission, 33 Arch Street, Boston,

24     Massachusetts, on Monday, June 26, 2006,

25     commencing at 10:18 a.m.
```

|  | Page 102 |
|---|---|

1   used Rick Smith most often in the mortgage
2   market. It happens that the Lehman
3   aggregate is about 38 percent
4   mortgage-backed securities, so Rick really
5   was a partner with me on my funds. That's
6   how I viewed him.
7   Q. Okay. Mr. Kennedy, I don't have any further
8   questions for you at this time. Thank you.
9      MR. SHOPE: So it's 20 to 1:00.
10   Why don't we break for lunch right now.
11      MR. ROSSETTI: How much do you
12   think -- are we off? We can go off the
13   record.
14      THE VIDEOGRAPHER: Off the record
15   at 12:37.
16      (Lunch recess.)
17      THE VIDEOGRAPHER: On the record at
18   1:38.
19      * * * * *
20      EXAMINATION BY MR. SHOPE
21   Q. Good afternoon, Mr. Kennedy. We were
22   introduced informally before the deposition
23   began, but I'm John Shope, and I am one of
24   the lawyers for Steve Nothern. I just
25   wanted to follow-up on some of the things

|  | Page 104 |
|---|---|

1   Q. And, again, just to be fair to everybody, if
2   you could pause for a moment before
3   answering so that all the objections can be
4   caught in a clean way.
5      Now, you mentioned before that you
6   would monitor prices of different securities
7   on your Bloomberg screen; is that correct?
8   A. Yes.
9   Q. And among others, you would monitor the
10   price of 30-year bonds; is that correct?
11   A. Yes.
12   Q. Okay. And I believe that you testified back
13   in 2001 that on the morning of October 31,
14   2001, before you made any decision to
15   purchase, you had observed that the 30-year
16   bond was rising in price; is that correct?
17      MR. ROSSETTI: Objection.
18   A. Yes.
19   Q. Okay. And was this a factor in your
20   decision to go ahead and make a purchase
21   order once Mr. Nothern had given you the
22   news of what he had heard from Mr. Davis?
23   A. Yes.
24   Q. Okay. Now, the -- did you consider it to be
25   sort of a difficult call as to whether or

|  | Page 103 |
|---|---|

1   that Mr. Rossetti asked you about earlier
2   today.
3      First of all, I believe you indicated
4   that there had been discussion within the
5   financial world about a possible suspension
6   or elimination of the 30-year bond for some
7   time before October 31, 2001, correct?
8   A. Yes.
9   Q. Okay. And I don't believe that Mr. Rossetti
10   asked you about this, but I believe you
11   testified back in 2001 when you were first
12   interviewed by the SEC that, in fact, when
13   you had been at Harbor Capital you had
14   traded on the expectation at that point that
15   there was going to be an elimination or
16   suspension of the 30-year bond; is that
17   correct?
18      MR. ROSSETTI: Objection.
19   A. Yes.
20   Q. So this was something that you and many
21   others in the market had been thinking about
22   on and off for some time; is that fair to
23   say?
24   A. Yes.
25      MR. ROSSETTI: Objection.

|  | Page 105 |
|---|---|

1   not you would go ahead and place an order
2   given the price rise that you were
3   observing, plus the news that Mr. Nothern
4   was conveying about suspension of the long
5   bond?
6   A. No.
7   Q. In other words, it was an easy decision to
8   buy?
9   A. It seemed to be an easy decision at the
10   time.
11   Q. In fact, it was your assumption that even
12   though he hadn't been there for any of the
13   conversation, that Mr. Vaream would want to
14   buy some of the long bonds too, right?
15   A. Yes.
16   Q. So you were being a nice guy and sort of
17   sharing in the purchase, right?
18   A. Part of that teamwork that we're judged on,
19   yes.
20   Q. Okay. Did you make any assumption about
21   whether or not the movement of the price
22   related at all to dissemination of the news
23   that the long bond was being suspended?
24   A. Yes, I did.
25   Q. What was that connection?

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
1-800-FOR-DEPO

Page 106

1   A. That the market -- market players already
2      had this information and they were driving
3      the price of the Treasury, 30-year, up.
4   Q. Okay. So did you have any assumption about
5      whether or not the information that the long
6      bond was being suspended was public at the
7      point you were making your decision?
8   A. I assumed it was, yes.
9   Q. Okay. Now, Mr. Nothern reported that he had
10     gotten this call from Mr. Davis, right?
11  A. Yes.
12  Q. Okay. And I believe you testified back in
13     2001 when the SEC took your deposition in
14     this matter that your assumption was that
15     MFS was not going to be the first company
16     that would be called with information of
17     this type; is that correct?
18         MR. ROSSETTI: Objection.
19  A. Yes.
20  Q. And what was your assumption with regard to
21     which companies would get called first?
22  A. There's a pecking order in the marketplace.
23     I know very well that I'm not on top of the
24     totem pole. There are bigger managers out
25     there with, you know, bigger axes in the

Page 107

1      marketplace, that I was not anyone's first
2      call.
3   Q. So in other words, would it be more likely
4      that a bigger company, like a Fidelity
5      Investments, would get called before MFS
6      would get called?
7         MR. ROSSETTI: Objection.
8   A. Possibly, yes.
9   Q. I'm sorry?
10  A. Possibly, yes.
11  Q. Now, I believe that you indicated that when
12     Mr. Nothern relayed the news to the
13     high-grade fixed-income group that he had
14     heard that the Treasury bond was -- the
15     30-year bond was going to be suspended or
16     eliminated that he did that in a
17     matter-of-fact tone of voice. Did I hear
18     that correctly?
19  A. Yes.
20  Q. And, in fact, did Mr. Nothern give you any
21     suggestion that what he -- that he -- that
22     he believed that what he was doing was wrong
23     or improper in any way?
24  A. No.
25  Q. Okay. Now, is it common within your field

Page 108

1      for portfolio managers who received what
2      they consider to be important information to
3      sometimes share it with other market
4      players, other brokers, with whom they have
5      relationships, other portfolio managers,
6      people of that type?
7   A. No. I'm not sure I understand your
8      question.
9   Q. Sure. Okay.
10  A. I would share it with my peer group on the
11     trading desk.
12  Q. Would it sometimes be the case that, for
13     example, if you had a relationship with a
14     broker and you heard information that you
15     thought might move the market, you know,
16     there had been a revolution in some country
17     or some company was filing for bankruptcy,
18     something, any information that was of a
19     market-moving nature, you might say, "Hey,
20     if I give this information to this other
21     person, maybe some day he will reciprocate
22     the favor and give me information that's of
23     value to me"?
24  A. That's not the way I've worked.
25  Q. Are you aware that that's something that

Page 109

1      other portfolio managers will sometimes do?
2         MR. ROSSETTI: Objection.
3   A. Yes, sometimes.
4   Q. Okay. So when Mr. Nothern delivered the
5      information about what he had heard from
6      Mr. Davis, he didn't tell you or any of the
7      other portfolio managers to whom he was
8      speaking, "Keep this information under your
9      hat, don't share it with anybody else"; he
10     didn't say anything like that, did he?
11  A. No.
12  Q. Okay. Now, you remember that Mr. Rossetti
13     asked you about what Mr. Nothern had told
14     you about who Mr. Davis was, correct?
15  A. Yes.
16  Q. Okay. I want to ask you something that
17     Mr. Rossetti didn't ask you about, which is:
18     Did Mr. Nothern ever tell you that Mr. Davis
19     had access to confidential information?
20  A. No.
21  Q. Okay. So at the time that the fixed-income
22     group was making its decision about making
23     the trade, as far as you were aware, there
24     was no concept that this was somehow, you
25     know, secret, inside information or anything

28 (Pages 106 to 109)

**Exhibit X**

**Cited Excerpts from the
Deposition of Geoffrey Kurinsky
(September 7, 2006)**

Geoffrey Kurinsky                                        September 7, 2006

Boston, MA

Page 1

```
1                UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4      --------------------------------x

5    UNITED STATES SECURITIES AND    ) C.A. 05-10983

6    EXCHANGE COMMISSION,            ) (NMG)

7    Plaintiff,                      )

8                                    )VOLUME:        I

9    vs.                             )PAGES:    1-242

10                                   )EXHIBITS:  1-12

11   STEVEN E. NOTHERN,              )

12   Defendant.                      )

13     --------------------------------x

14

15        VIDEOTAPED DEPOSITION OF GEOFFREY

16   KURINSKY, a witness called on behalf of the

17   Plaintiff, pursuant to the provisions of the

18   Massachusetts Rules of Civil Procedure,

19   before Jill Shepherd, Registered

20   Professional Reporter and Notary Public, in

21   and for the Commonwealth of Massachusetts,

22   at the offices of U.S. Securities and

23   Exchange Commission, 33 Arch Street, Boston,

24   Massachusetts, on Thursday, September 7, 2006,

25   commencing at 10:18 a.m.
```

### Page 110

1   Steve Nothern and --
2   **A. It was before.**
3   Q. -- Rick's Smith --
4   **A. Right.**
5   Q. -- telling Cadogan they wanted to purchase
6      bonds?
7   **A. It was before.**
8   Q. So the first statement you heard was Nothern
9      making this announcement about what he heard
10      from Pete Davis?
11   **A. Correct.**
12   Q. At this point you are on the phone?
13   **A. Right.**
14   Q. All right. What's the -- after Nothern
15      makes that statement, what's the next thing
16      you observe?
17   **A. At this point, I'm on the phone and I'm**
18      **already aware that the Treasury market is**
19      **up.**
20   Q. You are seeing some information on your --
21   **A. I have a screen so I'm sort of like, oh, I'm**
22      **on the phone. I'm thinking, "Something is**
23      **going on," so...**
24   Q. When you say "the Treasury market is going
25      up," what do you mean by that?

### Page 111

1   **A. I have a screen that has actual quotes and**
2      **the 30-year Treasury bond is up. I don't**
3      **know, three-quarters of a point. Something**
4      **is happening.**
5   Q. All right. As you sit here today, do you
6      know how much it was going up or it had gone
7      up?
8   **A. I think it was three-quarters of a point.**
9   Q. After you see your screen and you see the --
10   **A. Right.**
11   Q. -- the bond going up, what's the next thing
12      you recall happening?
13   **A. Well, then they're standing up and doing**
14      **something, and then I -- that -- the Pete**
15      **Davis discussion, and then they are doing**
16      **the trade, and I'm saying, you know, "I**
17      **could use 10 million."**
18   Q. So you are saying "they're standing up," you
19      are referring to Steve Nothern --
20   **A. Steve Nothern --**
21   Q. -- and Rick Smith?
22   **A. And John Cadogan is taking instruction.**
23   Q. Is John Cadogan standing as well?
24   **A. I remember him sitting, but I don't know.**
25   Q. What's the discussion that's going on among

### Page 112

1      Cadogan, Steve Nothern and Rick Smith at
2      this point?
3   **A. It's figuring out a number. It's collecting**
4      **orders to get to how many did we want to**
5      **buy, to -- so John can go buy them.**
6   Q. Was there anyone who was taking the lead
7      and trying to find out how much everybody
8      wanted?
9   **A. I mean, not -- it seemed like Steve and Rick**
10      **were putting it together.**
11   Q. All right. And did there -- after you
12      observed this interaction between Nothern,
13      Cadogan and Rick Smith, what's the next
14      thing you recall occurring?
15   **A. John Cadogan executed, you know, the trade,**
16      **bought 70 million Treasury bonds.**
17   Q. So, by this point, you had heard whatever
18      Nothern wanted to purchase, whatever Rick
19      Smith wanted to purchase and whatever David
20      Kennedy wanted to purchase?
21   **A. Right.**
22   Q. And you told them, "I wanted to purchase 10
23      million"?
24   **A. Right.**
25   Q. How exactly did you tell them that "I wanted

### Page 113

1      to purchase 10 million"?
2   **A. I looked at John and said, "I will take 10."**
3   Q. When you say, "I will take 10," you were
4      intending for him to purchase for you
5      10 million Treasury bonds?
6   **A. That's correct.**
7   Q. You see, we will get this working out at
8      some point today.
9         After Mr. Nothern had made this
10      statement about Peter Davis, did you engage
11      in any discussion with anybody else about
12      what exactly Davis had said or get any
13      clarification or anything like that?
14   **A. No.**
15   Q. Did you engage in any conversation -- after
16      you heard this statement that Nothern said
17      about Davis, but before you asked Cadogan or
18      anybody else to purchase 10 million, did you
19      get involved in any other discussion with
20      anybody there about what was going on?
21   **A. No.**
22   Q. Prior to you indicating to Cadogan that you
23      wanted to purchase the 10 million in bonds,
24      did you see anything on the news wires
25      indicating that the Treasury refunding

29 (Pages 110 to 113)

| Page 198 |
|---|
| 1 years ago shortly after the events, and I |
| 2 believe you said on page 115 of your |
| 3 deposition that the market activity |
| 4 suggested it was in the public domain? |
| 5 **A. Right.** |
| 6 Q. Do you recall that? |
| 7 **A. Yes.** |
| 8 Q. And is that your testimony today? |
| 9 **A. Yeah. "Suggested," that's good.** |
| 10 Q. So at the time that you heard the |
| 11 information from Mr. Nothern and which was |
| 12 shortly after you had seen the price |
| 13 movement on your screen, you believed that |
| 14 the information the Treasury was going to be |
| 15 cancelling the long bond was actually -- or |
| 16 at least most likely in the public domain at |
| 17 that point? |
| 18 **A. Right.** |
| 19     MR. ROSSETTI: Objection. |
| 20 Q. In other words, there was nothing that |
| 21 suggested to you that it wasn't public |
| 22 information? |
| 23 **A. Right.** |
| 24     MR. ROSSETTI: Objection. |
| 25 Q. Okay. |

| Page 199 |
|---|
| 1     MR. ROSSETTI: Mr. Kurinsky, if you |
| 2 would just give me a little time if I need |
| 3 to interpose an objection after Mr. Shope -- |
| 4     THE WITNESS: Okay. |
| 5     MR. ROSSETTI: -- asks you a |
| 6 question, that would be appreciated. |
| 7 Q. And, again, in the transcript that you -- of |
| 8 the testimony that you gave when the SEC |
| 9 first deposed you five years ago, I believe |
| 10 at page 162, your recollection was that the |
| 11 market was up around three-quarters of a |
| 12 point? |
| 13 **A. That's correct.** |
| 14     MR. ROSSETTI: I would just ask if |
| 15 you directed the witness to the actual |
| 16 portion of the transcript. I see you are |
| 17 not reading from the transcript -- |
| 18     MR. SHOPE: Okay. Then -- |
| 19     MR. ROSSETTI: -- where we purport |
| 20 to be in the transcript to something that's |
| 21 actually correct as opposed to... |
| 22     MR. GOLDSTEIN: I'm sorry, John, I |
| 23 would ask if you are going to refer to |
| 24 transcript page, at least give the witness a |
| 25 chance to get the thing in front of him. |

| Page 200 |
|---|
| 1     MR. SHOPE: Okay. That's fine. |
| 2 Q. As I said, it's page 162. |
| 3     MR. GOLDSTEIN: And if you could |
| 4 just rephrase or restate your question, |
| 5 again, please. |
| 6     MR. SHOPE: Okay. |
| 7 Q. And the -- well, first of all, Mr. Kurinsky, |
| 8 have you been able to find that? Let me |
| 9 pull out my copy of the transcript in case |
| 10 we need to. |
| 11 **A. Yeah, I went through it.** |
| 12 Q. You got it? Okay? |
| 13 **A. (No audible response.)** |
| 14 Q. Okay. All right. So the -- and it's |
| 15 consistent with your memory today that you |
| 16 saw the market going up somewhere between |
| 17 half and three-quarters of a point? |
| 18     MR. ROSSETTI: Objection. I don't |
| 19 think that was your question referring to |
| 20 this transcript. |
| 21     Can we have the question -- I don't |
| 22 know if you are going to withdraw the |
| 23 question or you are going to proceed with |
| 24 the question, but we asked you to look -- to |
| 25 have him look at the transcript. You had a |

| Page 201 |
|---|
| 1 question pending. Now you are asking him |
| 2 something different. I don't know where you |
| 3 are. |
| 4     MR. SHOPE: I think it was the same |
| 5 question, basically the same question. |
| 6 Q. First of all, when you were deposed by the |
| 7 Treasury [sic] five years ago -- |
| 8     MR. ROSSETTI: SEC. |
| 9 Q. -- excuse me, by the SEC, the -- in the |
| 10 middle of page on 162, line -- line -- lines |
| 11 10 through 12, your recollection at that |
| 12 time was 30-year Treasuries were up a half |
| 13 to three-quarters of a point. |
| 14 **A. That's correct.** |
| 15     MR. ROSSETTI: Objection. |
| 16 Q. Okay. And that's your memory today as well, |
| 17 correct? |
| 18 **A. Yes.** |
| 19 Q. Okay. Now, for long bond, a half to a |
| 20 three-quarter point, is that a minor |
| 21 movement, a significant movement; how does |
| 22 that rate in sort of scale? |
| 23     MR. ROSSETTI: Objection. |
| 24 **A. It's meaningful.** |
| 25 Q. It's meaningful? |

Alderson Reporting Company
1-800-FOR-DEPO

**Exhibit Y**

**Cited Excerpts from the Deposition of Richard Smith
(June 19, 2006)**

David R. Smith
June 19, 2006
New York, NY

Page 1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2
        ------------------------------------X
 3   UNITED STATES SECURITIES AND          Civil Action No.
     EXCHANGE COMMISSION,                   05-10983 (NMG)
 4
                    Plaintiff.
 5
        v.
 6
 7   STEVEN E. NOTHERN,
 8                  Defendant.
        ------------------------------------X
 9   Volume I
                                   June 19, 2006
10                                 New York, New York
11
12         Videotape deposition of DAVID R. SMITH, taken on
13   behalf of the Plaintiff, at the United States Securities and
14   Exchange Commission, WTC, 3 World Financial Center, Suite
15   4300, New York, New York, 10281, commencing at 10:20 a.m.,
16   June 19, 2006, before Anthony Armstrong, a Certified
17   Shorthand Reporter of the State of New York.
18
19
20
21
22
23
24
25
```

Page 154

1   voice?
2      A.   Yes.
3      Q.   On October 31st, 2001, were you familiar with
4   Mr. Kennedy's voice?
5      A.   Yes.
6      Q.   On October 31st, 2001, were you familiar with
7   Mr. Kurinsky's voice?
8      A.   Yes.
9      Q.   After Mr. Nothern made this statement about
10  the elimination of the thirty year bond, did you hear a
11  discussion along Mr. Nothern, Mr. Kennedy and
12  Mr. Kurinsky?
13     A.   I believe they were talking.  I don't know
14  exactly what they were talking about.
15     Q.   And how long did this discussion continue?
16     A.   I'm not sure how long it lasted.
17     Q.   Did there come a point in time when the
18  discussion ended?
19     A.   The next thing I remember was our trader John
20  Catigan, who does have a very deep and distinguished
21  voice, asking for an offering of long bonds of thirty
22  year securities from Merrill Lynch.
23     Q.   What is it that you heard Mr. Kennedy say?
24     A.   He was calling up Merrill Lynch and asking
25

Page 155

1   them for an offering of 60 million long bonds, 60 year.
2   The terminology in the market if you're among two, I'll
3   say, industry professional, you could say offer 60
4   bonds and they would know exactly what you meant.
5      Q.   Okay.  With that little explanation, can you
6   tell me exactly what you recall Catigan saying?
7      A.   I recall exactly what I just said to you:
8   That he asked Merrill Lynch to offer 60 bonds.
9      Q.   How do you know it was Merrill Lynch?
10     A.   You know, at the time I probably didn't know
11  it was Merrill Lynch.
12     Q.   But did he --
13     A.   Might have known from looking at the light in
14  front of me, yes.
15     Q.   The panel --
16     A.   He was on the light with Merrill Lynch.  That
17  light would be on in front of me.
18     Q.   I see.
19     A.   Yeah.  But I -- you're correct in your comment
20  of I'm not sure at the time today, you know, what you
21  knew then versus what you know afterwards.  I know
22  certainly afterwards it was Merrill Lynch.  I'm pretty
23  I at the time it was Merrill Lynch.
24     Q.   And you say offer 60 bonds.
25          Again, what does that mean?

Page 156

1      A.   Offer 60 bonds?
2      Q.   Yes.
3      A.   That's a dealer, Merrill Lynch, somebody who
4   makes markets in securities.  Offer, means you, offer
5   the bonds to me.  Offer me 60 million.  Without any
6   qualifiers, it mean per regular settlement the next
7   day.
8      Q.   So Catigan is asking -- essentially asking to
9   buy $60 million --
10     A.   Exactly.
11     Q.   -- of bonds?
12     A.   Yes.
13     Q.   And how long was that estimate by
14  Mr. Catigan -- how long after Nothern's statement about
15  the elimination of the bond was Catigan's statement of
16  offer 60 bonds?
17          MR. THEODOROU:   Objection.
18     A.   I could say, you know, it was within five
19  minutes, but I'm not sure of the exact timing of the
20  sequence.  I was not looking at a watch or --
21     Q.   Okay.  What did -- what happened next after
22  you heard Catigan say offer 60 bonds?
23     A.   One of the things I recall about the market
24  that day is that -- when we came back from the
25  9:30 meeting the market was rallying.  It was contrary

Page 157

1   to what I thought the market would do that day.
2          As managers, one of the things we have to do is
3   manage our risk exposure.  Nobody is right all the time
4   about markets.  They are very humbling experience to work
5   in the financial markets.  And as a point you would say,
6   that's enough.  And one of the things that struck me
7   about the market between the time of the end, that whole
8   day, was just how strong the market was.  And when you're
9   looking at the market, it just -- there are times you
10  look at it and you say to yourself something is going on
11  here.  I don't know what's going on here, but I'm on the
12  wrong side of this trade, and if I stick with it and
13  fight the market, the only thing the market does is run
14  me over and destroy my job.
15          So there is a time to do analysis, to make
16  calculated investment decisions, and there are times when
17  there are things going on in the market you don't
18  understand.  And when I was sitting in there that day,
19  you know, what I remember is this market is really strong
20  and I don't know why, and I am one opinion and I am not
21  right about this opinion.  And when you're stubborn and
22  you're fighting markets, they're a lot bigger than any
23  one individuals.  And that's what I remember about
24  sitting near those fifteen or 20 minutes, between the
25  time I came back from the meeting and the time that we

40 (Pages 154 to 157)

## Page 166

1  elimination of the 30 year bond, did you buy any bonds
2  as a result of hearing those rumors?
3      A.  I don't recall.
4      Q.  The rumors that you did hear prior to
5  October 31st, 2001, over what period of time did
6  they -- had you been hearing those?
7      A.  I don't recall.
8      Q.  Was it a matter of years you were hearing
9  this?
10      MR. THEODOROU:  Objection, asked and
11  answered.
12      A.  I don't recall.  Yeah.
13      Q.  Matter of months?
14      A.  I don't recall specifically.
15      Q.  Okay.  You said there was -- when I was just
16  asking you questions about whether the Nothern
17  statement played a role, you had mentioned something
18  that there was a discussion.
19      What discussion were you referring to?
20      MR. THEODOROU:  Objection.
21      A.  I don't know what you are talking about.
22      Q.  You had -- I thought you had said that there
23  was a discussion about the bond, and I was -- did I not
24  hear that correctly?
25      A.  What you're saying is not triggering anything

## Page 167

1  that we have talked about today.
2      Q.  Okay.
3      A.  Yes.
4      Q.  Now, after you said to Mr. Catigan -- withdraw
5  that.
6      When you heard Catigan say -- state in his loud
7  voice buy 60 --
8      A.  Offer 60.
9      Q.  Offer 60.  Where were you?
10      A.  Sitting at my desk.
11      Q.  And when you told Catigan make it 65, were you
12  seated?  Did you stand up?
13      A.  I don't recall.
14      Q.  How did you communicate that to Catigan?
15      A.  Verbally.
16      Q.  Did you shout it out make it 65?
17      A.  Correct.
18      Q.  What's -- what happened after you said make it
19  65?
20      A.  He -- I believe he asked the broker-dealer to
21  refresh the offering for an amount of 65 million.
22      Q.  How long after he had said offer 60 did he
23  refresh his offer and say make it 65?
24      A.  I think when he was saying can you offer me
25  60 million bonds, I kind of looked up and I said, John,

## Page 168

1  make it 65.  I think it was -- I thought it was pretty
2  quick.
3      Q.  So a few seconds perhaps?
4      MR. THEODOROU:  Objection.
5      A.  I would be speculating if I said anything more
6  than what I said I think.
7      Q.  Well, after he said offer 60, did you sit
8  there contemplating it or did you immediately react and
9  say offer 65?
10      MR. THEODOROU:  Objection.
11      A.  I don't recall.
12      Q.  After you said make it 65, what did you
13  hear -- did you hear Catigan actually offer 65?
14      A.  He asked the salesperson on the line can you
15  make it 65.
16      Q.  What was the response?
17      MR. THEODOROU:  Objection.
18      A.  I don't know.  He was on the telephone with
19  the broker.  I don't know what was being said on the
20  other end of the line.
21      Q.  Did Mr. Catigan take any steps to acknowledge
22  that the -- he had gotten the offer in for the 65 --
23  acknowledge to you?
24      A.  I think -- as I said before, what was going on
25  at that point in time was the market was really

## Page 169

1  starting to move up pretty rapidly.  And I do recall
2  that there was -- you know, sometimes you look at
3  government bond markets, it will say 10 plus 11 on the
4  screen.  You say offer a large amount of securities.
5  Say offer them at 11.  And using my example, I have no
6  idea what the price was.  This is illustrative.
7      I do recall a market that was moving, and I
8  don't think that Merrill Lynch, or whoever the broker
9  was, was very fast at making the offering.  Typical in a
10  volatile market the trader is put at risk and they are
11  slower.  They want the market to settle down before they
12  make the offering.  And as I recall, the market was
13  rallying quite a bit that day.  It was at a point where
14  he probably felt that I offer it at X price, by the time
15  you say done, it would be higher.
16      It was one of those times that things were just
17  moving on its own.  So I do recall that John was -- John
18  was saying do you have an offering.  So it wasn't -- it
19  wasn't like immediate, you know.  It wasn't like a calm
20  market.  It took some time.
21      Q.  Did he get a confirmation, though, about the
22  65?
23      MR. THEODOROU:  Objection.
24      Q.  Catigan, that is.
25      A.  I believe he was offered a price that I

43 (Pages 166 to 169)

David R. Smith
June 19, 2006

New York, NY

## Page 250

1  that right?
2       MR. ROSSETTI:   Objection.
3    A.   Correct.
4    Q.   You also did not know -- you also did not know
5  about Treasury embargo regulations in October of 2001,
6  correct?
7    A.   Correct.
8       MR. ROSSETTI:   Objection.
9    Q.   In fact, my client never said or suggested to
10  you in any way that Mr. Davis had access to nonpublic
11  or confidential information; isn't that right?
12       MR. ROSSETTI:   Objection.
13    A.   Can you repeat the question, please?
14    Q.   Mr. Nothern never said or suggested to you
15  that Mr. Davis had access to nonpublic information;
16  isn't that right?
17    A.   That is correct, right.
18       MR. ROSSETTI:   Objection.
19    Q.   He also never suggested to you that Mr. Davis
20  was able to get information ahead of the media --
21    A.   No.
22    Q.   -- from press conferences; isn't that right?
23       MR. ROSSETTI:   Objection.
24    A.   That is correct.
25    Q.   He also suggested to you that Mr. Davis'

## Page 251

1  contacts in Washington D.C. provided Mr. Davis with
2  public -- excuse me, with nonpublic or confidential
3  information; isn't that right?
4       MR. ROSSETTI:   Objection.
5    A.   That is correct.
6    Q.   And Mr. Nothern never said or suggested to you
7  that Davis had access to any embargo information at
8  Treasury; isn't that right?
9       MR. ROSSETTI:   Objection.
10    A.   That's correct.
11    Q.   In fact, it's fair to say on
12  October 31st, 2001 you did not have any idea about how
13  Treasury made its quarterly refunding announcements to
14  the press; isn't that right, the details of it?
15       MR. ROSSETTI:   Objection.
16    A.   I did not have detailed information about how
17  they released the information to the press.
18    Q.   And let's see. And you didn't have any
19  knowledge as to whether Treasury used embargos in
20  connection with its quarterly refunding announcements;
21  isn't that right?
22       MR. ROSSETTI:   Objection.
23    A.   That's correct, yes.
24    Q.   Before October 31st, 2001, you also did not
25  know about whether Treasury implemented any procedures

## Page 252

1  to protect the confidential information it released at
2  quarterly refunding conferences; isn't that right?
3       MR. ROSSETTI:   Objection.
4    A.   Yes, I was not aware of their procedures.
5    Q.   Getting back to your own understanding about
6  the use of embargos by the government.
7       Your understanding again comes from that
8  television program that you watched about the Department
9  of Labor and how it handled employment statistics; is
10  that right?
11       MR. ROSSETTI:   Objection.
12    A.   That was my assumption of how it was handled
13  by the government.
14    Q.   Your understanding was based on the -- the
15  educational television show --
16       MR. ROSSETTI:   Objection.
17    Q.   -- that you watched?
18       MR. ROSSETTI:   You said that like three
19  times now, Nick.
20       MR. THEODOROU:   That's the pot calling the
21  kettle black.
22       MR. ROSSETTI:   Yes, but you have a plane
23  to catch right now.
24    A.   Yes, it's my understanding.  I want -- I'm
25  sorry.  I'm getting tired here.  I want to make sure I

## Page 253

1  answer your question appropriately.
2       Will you please repeat it?
3  BY MR. THEODOROU:
4    Q.   Yes.  What is your understanding about the use
5  of embargos by the Department of Labor based on an
6  educational television program that you saw?
7    A.   Yes.
8       MR. ROSSETTI:   Objection.
9       VIDEOGRAPHER:   The time is 6:20 p.m.  This
10  ends Tape No. 6 of the videotape deposition of
11  David R. Smith.
12       (There was a recess.)
13       *********
14       THE VIDEOGRAPHER:   The time is 6:22 p.m.
15  This is Tape No. 7 of the videotape deposition
16  of David R Smith.
17  BY MR. THEODOROU:
18    Q.   Directing your attention to the morning of
19  October 31st, 2001.  Before Mr. Nothern ever mentioned
20  any message from Mr. Davis, you yourself that morning
21  noticed -- you were monitoring activity in the bond
22  market that morning, correct?
23    A.   Correct.
24    Q.   And you noticed that the market was trading
25  higher and rallying, correct?

64 (Pages 250 to 253)

David R. Smith

June 19, 2006

New York, NY

| Page 254 |
|---|

1   A.  Yes.

2   Q.  When we say the market, we are talking about

3  the 30 year long bond, correct?

4   A.  When the market trades higher, typically the

5  long bond will trade -- it has the greatest level of

6  interest rate sensitivity.  I believe the whole market

7  was trading higher.

8   Q.  In fact, there have been talk in the

9  marketplace before October 31st about the elimination

10  of the long bond; isn't that right?

11     MR. ROSSETTI:  Objection.

12   A.  I had heard that comment in the past.  I don't

13  recall exactly when I heard it.

14   Q.  Is it fair to say that you heard that comment

15  before October 31st?

16   A.  I believe I did hear that comment before

17  October 31st, yes.

18   Q.  Just so we are accurate:  What did you hear

19  about the market and the long bond?

20   A.  When?

21   Q.  Before October 31st.

22   A.  I'd heard about the potential lesser -- lower

23  level of issuance of the 30 year bond or the possible

24  stopping -- stopping of auctions of the 30 year bond.

25  I don't know if that was from Treasury strategists in

| Page 255 |
|---|

1  the newspapers, but it was a story that was around.

2   Q.  Given your observation of the bond market on

3  October 31st, 2001, did you believe that the

4  information that Mr. Davis provided to Mr. Nothern was

5  already public?

6     MR. ROSSETTI:  Objection.

7   A.  I don't know.

8   Q.  You know, earlier today you were asked by

9  Mr. Rossetti whether Mr. Nothern was sitting down or

10  standing up when he spoke to you.

11     Do you remember that?

12   A.  Yes, I recall that.

13   Q.  Now, let's turn to the exhibit of your

14  transcript.  That is Exhibit 6.  And again, turn to

15  page 61.

16   A.  Okay.  I'm on page 61.

17   Q.  Right.  Now, if you turn to line 13 and the

18  question Mr. Rossetti read to you:  Where was

19  Mr. Nothern when he spoke these words you just

20  testified to?

21     I believe that he was -- I believe when he came

22  back to his desk - this was your response - he believe he

23  never sat down.

24     MR. ROSSETTI:  No.  He -- I believe he

25  never.

| Page 256 |
|---|

1   Q.  He -- I believe he never sat down.

2     So the question was, where was Mr. Nothern when

3  he spoke those words you just testified to?

4     I believe that he was -- I believe when he came

5  back to the desk, he -- I believe he never sat down.  So

6  he either checked his messages or picked up the phone

7  when he was standing.

8   A.  Yes.

9   Q.  And there he was standing here and he

10  mentioned he was standing approximately here.

11     Now, when you testified at that time you were

12  speculating as to when you said I believe, you were

13  speculating as to whether he was sitting down or standing

14  up, correct?

15     MR. ROSSETTI:  Objection.

16   Q.  Isn't that the fair reading of your deposition

17  testimony on that day that when you say I believe?

18     MR. ROSSETTI:  Objection.

19   A.  I believe what I would interpret to mean there

20  is a good probability of, but it's just -- it's not as

21  strong of a statement as I remember exactly.  It's I

22  recall with a high probability, what is are the words I

23  would use.

24   Q.  Now, when Mr. Nothern spoke to you about what

25  Mr. Davis had said --

| Page 257 |
|---|

1   A.  I'm sorry.  Can you start again?  I'm spacing

2  out.  I'm tired.

3   Q.  When Mr. Nothern spoke to you about what

4  Mr. Davis said?

5   A.  Yes.

6   Q.  He didn't lower his voice or whisper the

7  information, did he?

8   A.  No.  Yeah.

9   Q.  In fact, he didn't appear concerned about what

10  he was saying to you, did he?

11     MR. ROSSETTI:  Objection.

12   A.  I would share that opinion, yes.

13   Q.  In fact, did you see anything that was

14  different in his demeanor from the way he usually

15  behaved when he spoke to you?

16     MR. ROSSETTI:  Objection.

17   A.  No.  It was quite similar to his usual

18  demeanor.

19   Q.  Did he appear to be concerned about what he

20  was doing?

21   A.  No.

22   Q.  In fact, Mr. Rossetti asked you about the

23  level of his voice when he spoke to you.  Do you

24  remember that, the level of Mr. Nothern's voice?

25   A.  I don't recall that specific question.

65 (Pages 254 to 257)

**Exhibit Z**

**Cited Excerpts from the Deposition of Jeffry Davis
(May 1, 2008)**

Jeffrey L. Davis                                                    May 1, 2008
                              Washington, DC

Page 1

```
 1                    UNITED STATES DISTRICT COURT

 2                    DISTRICT OF MASSACHUSETTS

 3     --------------------------------X

 4     SECURITIES AND EXCHANGE           :

 5     COMMISSION,                       :

 6             Plaintiff,                :

 7         v.                            :   No. 05-10983 (NMG)

 8     STEVEN E. NOTHERN,                :

 9             Defendant.                :

10     --------------------------------X

11                          Washington, D.C.

12                          Thursday, May 1, 2008

13             Deposition of JEFFREY L. DAVIS, a witness

14     herein, called for examination by counsel for Defendant in

15     the above-entitled matter, pursuant to notice, the witness

16     being duly sworn by DENNIS A. DINKEL, a Notary Public in and

17     for the District of Columbia, taken at the offices of Foley

18     Hoag LLP, 1875 K Street, N.W., Washington, D.C. at

19     9:45 a.m., Thursday, May 1, 2008, and the proceedings being

20     taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and

21     transcribed under his direction.

22
```

Jeffrey L. Davis                                                    May 1, 2008
Washington, DC

| Page 122 | Page 124 |
|---|---|

**Page 122**

1   October.
2   BY MR. SHOPE:
3       Q.   I understand.
4       A.   And I think I point out in my report I
5   looked at some of the other refunding days in 2001
6   and found that there were fairly large movements on
7   those days before the announcement as well.
8       Q.   Now, did you -- you looked at three other
9   refunding days, right?
10      A.   Yes.
11      Q.   Did you consider that three was a
12  statistically meaningful data set?
13      A.   No.  I didn't think that at all.  I
14  thought it was simply a small sample to take a look
15  at and see how they compare.
16      Q.   It doesn't really tell you anything
17  scientific to look at three days, right?
18          MS. WILLIAMS:  Objection.
19          THE WITNESS:  No, but it does tell you on
20  at least one of the immediately preceding three
21  funding days there were refunding price changes early
22  on.

**Page 123**

1           MR. SHOPE:  Could you read back his answer
2   to me?
3           THE REPORTER:  "Answer:  No, but it does
4   tell you on at least one of the immediately preceding
5   three funding days there were refunding price changes
6   early on."
7           MR. ROSSETTI:  John, when you find a
8   convenient time to take a break, if we could?
9           MR. SHOPE:  Off the record.
10          (Discussion off the record.)
11  BY MR. SHOPE:
12      Q.   So I want to get back to the choice of
13  October 31 as the benchmark, or as the -- I'm sorry.
14  The average one-minute return of October 31 as the
15  benchmark.
16          Was there anything in the literature that
17  told you you should pick just that day as the
18  benchmark?
19      A.   No.  I don't think there was anything of
20  particular guidance in the literature.  As I said I
21  chose that day because I thought it was more
22  conservative in the sense that the return that is

**Page 124**

1   observed at 9:57 would be even -- would be far more
2   significant than it is with this benchmark.
3       Q.   But if there were smaller price spikes
4   before 9:57 your choice of that benchmark had the
5   effect of making them seem less significant, correct?
6           MS. WILLIAMS:  Objection.
7           THE WITNESS:  Yes.  But I explained -- I
8   point out in my report -- maybe I should look for
9   it --
10          Footnote 11 on page 9.  I'm not trying to
11  hide anything.  I point out it should be noted the
12  standard deviation returns on October 31 was nearly
13  10 times larger than the standard deviation the
14  previous day and more than twice larger the --
15          MS. WILLIAMS:  You have to speak up and
16  slow down.
17          THE WITNESS:  I'm forgetting I'm reading
18  for a reporter here.
19          It should be noted that the standard
20  deviation on October 31, 2001 was nearly 10 times
21  larger than the standard deviation of the previous
22  day and more than twice as large as any other day

**Page 125**

1   during October 2001.  And the average return was also
2   much larger than any other day in 2001.
3       Thus, abnormal for return -- found to be
4   significantly positive using the standard deviation
5   average return for October 31 would also be
6   significant if we used the standard deviation average
7   return from the prior day or any other day in October
8   2001.
9       So I'm pointing out what the effect of
10  using the average return and the standard deviation
11  October 31 would be.
12  BY MR. SHOPE:
13      Q.   Did you run any computations about how
14  many abnormal returns there would have been before
15  9:57 had you used a different benchmark?
16      A.   No, I didn't.
17      Q.   Was there any reason why you didn't other
18  than the reasons you've already given us?  The
19  reasons you already have given us for selecting
20  October 31?
21      A.   Are there any other reasons why I selected
22  October 31.

Alderson Reporting Company
1-800-FOR-DEPO

Jeffrey L. Davis                                                                    May 1, 2008
Washington, DC

| Page 126 | Page 128 |
|---|---|

**Page 126**

1    Q.   Any other reasons why you didn't run --
2    just out of curiosity, perhaps to see what the data
3    would show had you used as a benchmark an average
4    one-minute return broader than just October 31?
5        A.   Well, it's not any secret.  If you look at
6    the charts, for example Exhibit 11, no, it doesn't
7    tell you exactly what it would be; but it is clear
8    that some of those prior to 9:58 -- I'm sorry.  Go
9    back to the Exhibit 7.
10       You can see that there are some candidates
11   that probably would have been significant had I used
12   different average returns and different standard
13   deviations.  There are one, two, three possibly four,
14   it looks like to me.
15       Q.   So, for example, 9:30, if you used a
16   benchmark broader than October 31, there would have
17   been a spike at 9:30 that would have been
18   significant, right?
19       A.   That's possible, yes.
20       Q.   And same again at 9:35, right?
21       A.   9:37 it looks like.
22       Q.   9:37.  It's hard to read the precise time

**Page 128**

1    market observer.  I'm looking at what happened after
2    the fact.
3        Q.   Okay.  So -- but if those spikes at 9:30
4    and 9:35 became significant with a different
5    analysis, that would suggest -- would it not -- that
6    perhaps there were people acting on the information
7    as soon as 9:30 or 9:35?  Causing the price to go up?
8    Right?
9        MS. WILLIAMS:  Objection.
10       THE WITNESS:  What it would tell me is
11   simply that there were significant price reactions or
12   price increases at those times.
13   BY MR. SHOPE:
14       Q.   And do you have any explanation for those
15   price increases other than people knowing about -- in
16   advance -- about the decision to discontinue the
17   bond?
18       A.   I don't really have any explanation
19   whatsoever for those.  My point is simply had those
20   resulted in the information being reflected in the
21   price of the bond, then at 9:57, we wouldn't have
22   seen this happen.  We wouldn't have seen these bigger

| Page 127 | Page 129 |
|---|---|

**Page 127**

1    on these charts.
2        A.   Yes.  That's correct.  But what you'd also
3    see is that the one at 9:57 and the ones following
4    9:57 would shoot through the top of this chart.
5        Q.   Okay.
6        A.   And my point was simply that if the
7    information had been reflected in the price of the
8    bond prior to 9:57, then what happened at 9:57 we
9    wouldn't have seen.
10       Q.   But if you were a market observer at,
11   let's say, 9:42 or 9:43, you wouldn't know what was
12   going to happen 10 or 15 minutes later?  You would
13   only know what had happened in the preceding month
14   and in the preceding hour and a half, right?
15       MS. WILLIAMS:  Objection.
16       THE WITNESS:  I don't quite understand
17   what my analysis has to do with a market observer
18   looking at this.
19   BY MR. SHOPE:
20       Q.   Sure.  Okay.  So the -- well, let me ask
21   you --
22       A.   I'm not putting myself in the place of a

**Page 129**

1    spikes followed by a series of even larger spikes.
2        Q.   Were you aware that Peter Davis was
3    alleged to have called several market participants
4    starting around 9:30 to report the decision to
5    discontinue the long bond?
6        A.   Several market participants?  I don't
7    recall that from the complaint.  I can look at it if
8    you like.  I do recall that he made a phone call to
9    Mr. Nothern.
10       Q.   Do you know where Mr. Nothern was in the
11   number of calls that were placed?
12       MS. WILLIAMS:  Objection.
13       THE WITNESS:  No, I don't.
14   BY MR. SHOPE:
15       Q.   So you don't know whether he called
16   Mr. Nothern first, second, third, seventh, eighth,
17   fifteenth?
18       A.   I don't recall that.  I don't know if
19   that's in the complaint or not.
20       Q.   You do recall it was alleged that
21   Mr. Nothern -- Peter Davis, the other -- one of the
22   other Davises in the case -- you do recall it was

33 (Pages 126 to 129)

Alderson Reporting Company
1-800-FOR-DEPO

Jeffrey L. Davis                                                May 1, 2008
                        Washington, DC

| Page 134 | Page 136 |
|---|---|

**Page 134**

1  would have increased the number of statistically
2  abnormal returns on October 31, correct?
3      A.  In the same way that if I used a different
4  average return, yes.
5      Q.  Do you know what kurtosis is?
6  K-u-r-t-o-s-i-s.
7      A.  Yes.  I'm having trouble remembering the
8  definition of it, though.  It has to do with the
9  shape of the distribution, and I didn't make any
10  adjustments for kurtosis.
11     Q.  Can you give me your best explanation of
12  what kurtosis is?
13     A.  I think I may be confusing it with
14  something else.  I'm thinking about the possibility
15  of a bimodal distribution, but that won't be the case
16  here.
17         So no, I don't have a good definition for
18  you.
19     Q.  At this point, you can't remember what it
20  means?
21     A.  No.  I can't.
22     Q.  Okay.  I apologize, maybe you said it, but

**Page 136**

1      A.  Yes.
2      Q.  And that shows spikes at 9:25 and 9:35 as
3  well, correct?
4      A.  It's after 9:25 --
5      Q.  I'm sorry?
6      A.  Looks like 9:26.
7      Q.  9:27 and 9:35?
8      A.  9:36.
9      Q.  9:36.  In the neighborhood of the two
10  spikes that we saw with respect to the 30-year bond
11  information, correct?
12         MS. WILLIAMS:  Objection.
13         THE WITNESS:  In the neighborhood?
14  BY MR. SHOPE:
15     Q.  Well, within a minute or two?
16         MS. WILLIAMS:  Objection.
17         THE WITNESS:  Well, where's -- I don't see
18  a 9:27 spike.
19  BY MR. SHOPE:
20     Q.  Okay.  I'm sorry.  If we go back to 9 --
21  Exhibit 7, that shows one at 9:30, and then maybe
22  around 9:37, right?

**Page 135**

1  you didn't make any adjustment for kurtosis?
2      A.  No, I did not.
3      Q.  By the way, getting back to the Exhibit 7
4  where we talked about the price spikes at 9:30 and
5  9:35 and how they would have become significant had
6  you used a broader benchmark, I asked you about the
7  possibility of the -- of a spike at 9:37 being
8  explained by purchases by Goldman Sachs; you recall
9  that?
10     A.  Yes.
11     Q.  Did you read anything about any rumors on
12  the Chicago Board of Trade?
13         MS. WILLIAMS:  Objection.
14         THE WITNESS:  There was -- there may have
15  been something in the Goldman Sachs chronology.  I
16  don't recall exactly what was in there.  That would
17  have been the only place I would have seen anything I
18  think.
19  BY MR. SHOPE:
20     Q.  So if we went to -- if we go to the
21  exhibits that relate to the -- let's say we go to
22  Exhibit 13, you see Exhibit 13?

**Page 137**

1      A.  Exhibit 7?
2      Q.  Yes.
3      A.  9 -- looks like maybe 9:31.  I can't tell
4  for sure.  9:37 or 38.
5      Q.  Okay.  Then this one shows -- okay.  This
6  one shows, Exhibit 13 shows a spike around 9:27.
7  Would you agree 9:27 approximately?
8      A.  9:27, 9:28 maybe.
9      Q.  9:28.  Okay.
10         There's?
11     Q.  In this, the village chief Kapundwe was
12  entrusted by a man from a neighboring village,
13  Busangu, with a young sheep.
14         And one day, Chief Kapundwe's dog was
15  found eating the sheep.  The dog had never attacked a
16  sheep, and nobody had seen whether the dog killed the
17  sheep which had probably died a natural death; and
18  yet Kapundwe, the chief, who was taking care of the
19  sheep, gave his friend a sheep in compensation, and
20  then another, finally a third, and for good measure a
21  hundred francs, as well.
22         And it goes on, why did he do this?

Alderson Reporting Company
1-800-FOR-DEPO

| Page 150 | Page 152 |
|---|---|
| 1  Q. That's on the Chicago Board of Trade? | 1 BY MR. SHOPE: |
| 2  A. Yes. | 2  Q. The information we've been talking about |
| 3  Q. And this shows an abnormal return just | 3 all day, the discontinuance of the 30-year bond. |
| 4 about 10:15, an abnormal one-minute return that's | 4  A. But -- |
| 5 greater than the one that's shown here at 9:59, | 5  MS. WILLIAMS: Objection. |
| 6 correct? | 6  THE WITNESS: -- I mean there has to be -- |
| 7  A. Yes. | 7 what you were saying before was that there was |
| 8  Q. But the fact that there's a bigger one at | 8 information being disseminated or spread on the |
| 9 10:15 does not disprove your opinion that there was | 9 Chicago Board of Trade. |
| 10 market action on the information at 9:59, correct? | 10 BY MR. SHOPE: |
| 11  MS. WILLIAMS: Objection. | 11  Q. Yes. If you assume that that were true. |
| 12  THE WITNESS: That there was what? | 12  A. In general terms, the mere finding of a |
| 13 BY MR. SHOPE: | 13 larger significant return subsequent to a significant |
| 14  Q. Market action on the information? | 14 return does not mean that that doesn't reflect -- |
| 15  A. What do you mean by market action? | 15 that that isn't the market reflecting information; |
| 16  Q. Price action. Are you familiar with the | 16 but I think you have to look at the broader pattern |
| 17 term price action? | 17 as well. |
| 18  A. No. | 18  You have to look at -- there's a whole |
| 19  Q. Okay. We'll go back then. Would you say | 19 series of significant returns that start at 9:59. |
| 20 that Exhibit 13 confirms your opinion that there was | 20 Some of those are even larger than the 9:59 return. |
| 21 reflection of the decision to discontinue the bond in | 21  Q. Sure. |
| 22 the vicinity of 9:57? | 22  A. Also, we have information I found looking |

| Page 151 | Page 153 |
|---|---|
| 1  MS. WILLIAMS: Objection. | 1 at the spreads in the bond market which show a |
| 2  THE WITNESS: Yes. It shows that there | 2 significant widening of the spread at approximately |
| 3 was a significant price increase at 9:59. | 3 10:03 which is another indication that the market -- |
| 4 BY MR. SHOPE: | 4 that the information is being reflected in the price |
| 5  Q. Yes. | 5 of the bond. |
| 6  A. If that's what you are meaning, yes. | 6  Q. If we turn the page to Exhibit 14 to your |
| 7  Q. Yes. That conclusion is in no way | 7 exhibit -- to your report, so Exhibit 14 to Exhibit |
| 8 diminished by the fact that there's an even bigger | 8 1, this also shows spikes at around 9:26 and around |
| 9 spike at about 10:15; is that true? | 9 9:36, right? |
| 10  MS. WILLIAMS: Objection. | 10  MS. WILLIAMS: Objection. |
| 11  THE WITNESS: That's correct. In fact, I | 11  THE WITNESS: Around, yes. Looks like |
| 12 would suggest that the series of significant spikes | 12 9:27, 9:37, roughly. |
| 13 following the 9:59 probably strengthen that | 13 BY MR. SHOPE: |
| 14 conclusion. | 14  Q. But in other words -- well, but when you |
| 15 BY MR. SHOPE: | 15 say -- when you say around, those are meaningful -- |
| 16  Q. Okay. So likewise, the fact that there is | 16 the proximity of the spikes on the two charts is |
| 17 a spike at 9:59 that is bigger than the one at 9:37 | 17 meaningful, right? |
| 18 does not disprove the possibility that the | 18  MS. WILLIAMS: Objection. |
| 19 information was being reflected at 9:37, true? | 19  THE WITNESS: The proximity of the spikes |
| 20  MS. WILLIAMS: Objection. | 20 is meaningful; is that the way you put it? |
| 21  THE WITNESS: The information was being | 21 BY MR. SHOPE: |
| 22 reflected -- what information are we talking about? | 22  Q. Let's put it this way: They both have a |

Jeffrey L. Davis                                                        May 1, 2008
Washington, DC

| Page 154 | Page 156 |
|---|---|

**Page 154**

1  spike at 9:26; is that right?
2      A.  At approximately 9:26, yes.
3      Q.  And they both have -- so that suggests
4  that the spike is not just random?  It is showing up
5  in multiple securities, right?
6          MS. WILLIAMS:  Objection.
7          THE WITNESS:  Well, the option is a
8  derivative of the future; so it is not surprising
9  that what happens in the market -- in the options
10  market would largely reflect what's going on in the
11  futures market.
12  BY MR. SHOPE:
13      Q.  And just to follow up, Exhibit 13 shows a
14  spike at 9:35 and Exhibit 14 shows a spike maybe at
15  9:36, right?
16      A.  The times are approximate, yes.
17      Q.  So it looks like at both 9:25 and 9:35,
18  9:36, both the future and the -- the bond future Open
19  Outcry and the bond future Electronic are moving in
20  tandem?
21          MS. WILLIAMS:  Objection.
22          THE WITNESS:  I apologize.  Misspoke a few

**Page 156**

1          THE WITNESS:  -- there are similar spikes
2  in both of them.
3  BY MR. SHOPE:
4      Q.  And then if we go to Exhibit 16 to your
5  report, there is -- this is the call options.
6  There's a spike at -- is that 9:36?  9:37?  9:36.
7      A.  Looks like about 9:37.  One or the other.
8      Q.  Maybe somewhere in between the two?
9      A.  Uh-huh.
10      Q.  That shows a spike that's almost as big
11  as -- first of all, that spike is bigger than the one
12  that's in the vicinity of 9:57, right?
13          MS. WILLIAMS:  Objection.
14          THE WITNESS:  Yes, it is.
15  BY MR. SHOPE:
16      Q.  So --
17      A.  If you're talking about within a minute or
18  two, yes.  There's a larger spike at 10:04.
19      Q.  But the one at 9:37 is almost as big as
20  the one at 10:04, right?
21      A.  Almost as big, yes.
22      Q.  Okay.

**Page 155**

1  minutes ago.  We are simply looking at the Open
2  Outcry versus the Electronic market, which I would
3  expect to be -- to move very much the same.
4  BY MR. SHOPE:
5      Q.  Okay.  And then if we go to Exhibit 15 to
6  your report, so Exhibit 15 to Exhibit 1, this is the
7  Open Outcry; and again there's a spike at 9:26,
8  right?
9      A.  Around 9:26, yes.
10      Q.  9:26.  Maybe 9:26 30 seconds; and then
11  there's one at -- around 9:36, right?
12      A.  Around there, yes.
13      Q.  Again movement in tandem in the 9:26 and
14  9:36 time frames in parallel with the bond future,
15  both Open Outcry and Electronic?
16      A.  This is a different contract here in
17  Exhibit 15.  It is the March contract.
18      Q.  Yes.  Okay.  But it seems as if the market
19  in these different instruments is moving in tandem on
20  those times?
21      A.  There are --
22          MS. WILLIAMS:  Objection.

**Page 157**

1      A.  But there's nothing at 9:26.
2      Q.  Moving in tandem around the 9:37 time
3  frame but nothing at 9:26; fair to say?
4      A.  Yes.  Similar spike.  9:37.  Around 9:37.
5      Q.  Okay.  If we go to the Exhibit 17 to your
6  report, that's futures call options strike price 109,
7  so that's a slightly different instrument, right?
8      A.  Yes.  It's another call option with a
9  different strike price.
10      Q.  And that also shows a spike at 9:36 or
11  9:37 that's bigger than the spike at 9:59, right?
12      A.  Yes.  But not as big as the one shortly
13  after 10:00.
14      Q.  Yeah.  And even under the method that you
15  used, the one at 9:37 was significant, right?  Or
16  9:36 or 37?
17      A.  Yes.
18      Q.  All right.
19      A.  But again, the standard deviations in the
20  options are very small, largely because there are
21  either gaps in trading or just no price changes over
22  significant periods of time.

40  (Pages 154 to 157)

Jeffrey L. Davis                                                    May 1, 2008
Washington, DC

| Page 158 |
|---|

1    So that tends to bias the standard
2  deviation or at least produce a smaller standard
3  deviation, which makes it much easier for these
4  significant returns to show up.
5    Q.   You didn't go back and see what a broader
6  benchmark would have done for the bond futures, did
7  you?
8    A.   I didn't what?
9    Q.   Just to clarify, you didn't go back and
10  look to see whether or not taking the month of
11  October as a whole for your average, you didn't go
12  back to see whether or not that would have an effect
13  on the size of your benchmark for purposes of these
14  different --
15    A.   No --
16    Q.   -- calls and options --
17       MS. WILLIAMS:  Objection.
18       THE WITNESS:  No, I didn't.  But I assume
19  it would have a similar effect.
20  BY MR. SHOPE:
21    Q.   In other words, there would be more
22  significant spikes?

| Page 159 |
|---|

1    A.   That's correct.
2    Q.   We go to Exhibit 18, Exhibit 18 to your
3  report, that again shows a spike around 9:37, maybe
4  9:38, right?
5       MS. WILLIAMS:  Objection.
6       THE WITNESS:  Yes.  It is a rather small
7  spike, but it is a spike.
8  BY MR. SHOPE:
9    Q.   If we used the broader benchmark, that
10  would have become significant, right?
11    A.   It probably would be significant, yes.
12    Q.   Okay.
13    A.   Again nothing at 9:26, though.
14    Q.   Why don't we turn the page to Exhibit 19.
15  And that shows a spike at 9:26, 9:27, right?
16    A.   Yes.
17    Q.   If you used the broader benchmark, that
18  would have been significant; true?
19    A.   Most likely, yes.
20    Q.   And then at 9:37, there's a spike, a
21  significant spike, right?
22    A.   Yes.

| Page 160 |
|---|

1    Q.   And, in fact, that spike at 9:37 on
2  Exhibit 19 to your report is bigger than the spike at
3  9:57?
4    A.   Yes.  But nowhere near the spike at 10:03.
5    Q.   And if we go to Exhibit 20 to your report,
6  we see -- these are put options, right?
7    A.   Correct.
8    Q.   So you would expect their price movement
9  to move inversely to the call options, right?
10    A.   That's correct.
11    Q.   Okay.  So if we go to 9:26, there's a
12  spike, right?
13    A.   Going the wrong way, though.
14    Q.   I'm sorry.  Going the wrong way.  Yes.
15    But there's a spike at 9:31 that would
16  suggest parallel movement, right?
17       MS. WILLIAMS:  Objection.
18       THE WITNESS:  Well, yes; but it sort of
19  cancels out the previous spike that went in the wrong
20  direction.
21  BY MR. SHOPE:
22    Q.   Okay.  And then there's a spike at 9:36,

| Page 161 |
|---|

1  9:37.  That's moving in the right direction, right?
2       MS. WILLIAMS:  Objection.
3       THE WITNESS:  Yes.
4  BY MR. SHOPE:
5    Q.   And again if you had used the broader
6  benchmark, that would have been a significant spike,
7  true?
8       MS. WILLIAMS:  Objection.
9       THE WITNESS:  That's likely it would have
10  been, yes.
11  BY MR. SHOPE:
12    Q.   In fact, again, that spike is -- the 9:36,
13  9:37, that's almost as big as the one that's just
14  before 10:00; true?
15    A.   That's true.
16    Q.   And then if we turn the page to Exhibit
17  21, again this is puts that are moving inversely to
18  the -- one would expect to move inversely to the
19  calls, right?
20    A.   Yes.
21    Q.   Okay.  And again there's a spike at -- in
22  the 9:26, 9:27 time frame, correct?

41 (Pages 158 to 161)

Jeffrey L. Davis                                                        May 1, 2008
Washington, DC

| Page 162 |
|---|

1      A.   Yes.
2      Q.   And if you used the broader benchmark,
3   would that have been significant?
4      A.   I can't say for sure.  Probably, but I
5   can't say for sure.
6      Q.   And then if we go to -- looks like just
7   around 9:39, there's another spike, right?
8      A.   Yes.
9      Q.   And that -- that certainly would have been
10  significant had you used the broader benchmark,
11  right?
12     A.   Yes.  I think it would have been.
13     Q.   Yes.  That -- that is again bigger than
14  the spike at just before 10:00, true?
15     A.   Yes.  But again not as big as the
16  subsequent spikes.
17     Q.   Okay.  And if we go to Exhibit 22, we see
18  a spike -- there's a spike at about -- again this is
19  a put that's moving inversely to the calls, right?
20     A.   Yes.
21     Q.   Okay.  So we see a spike at 9 -- maybe
22  9:28?

| Page 163 |
|---|

1      A.   Yes.  That's rather small.  I don't know
2   without actually doing the numbers whether that would
3   have been significant or not.
4      Q.   Same is true for 9:35, right?
5      A.   Correct.
6      Q.   If we go to 9:40, though, there's a spike
7   that would have been significant with the broader
8   benchmark?
9      A.   Most likely, yes.
10     Q.   And again that spike is bigger than the
11  one shortly before 10:00?
12     A.   Yes.  And again much smaller than the one
13  shortly after 10:00.
14     Q.   And we're down to 23.  And Exhibit 23
15  showed -- again this is puts that move inversely to
16  the calls, right?
17     A.   Correct.
18     Q.   Okay.  This shows a significant spike at
19  just about 9:44, right?
20     A.   Looks like about 9:44.
21     Q.   Okay.
22     A.   Immediately following a significant spike

| Page 164 |
|---|

1   going in the wrong direction.
2      Q.   So the 9:44 is immediately on the heels of
3   the posting to the web site that you assumed to have
4   occurred at 9:43, right?
5      A.   I think that's the correct time, without
6   referring to my report.
7      Q.   I'll represent to you that that's what
8   your report says.
9           Would you think it's likely that there
10  would have been a connection between the information
11  being posted on the web site at 9:43 and a
12  statistically significant spike at 9:44?
13     A.   Well, we only find the spike in this
14  particular security, I believe.  I don't think you
15  find it in any of the others.
16     Q.   So, therefore --
17     A.   One thing I would point out about all of
18  these options, I was looking more closely at the
19  data.
20          It looks like for some reason the options
21  were somewhat sluggish to respond.  That's why I
22  think we find that in most of these cases, the post

| Page 165 |
|---|

1   9:57 reaction doesn't start until after 10:00; and
2   yet when that starts, however, we do observe the same
3   kind of pattern of a large number of other spikes
4   following closely thereafter.
5           I don't really understand the reason for
6   the sluggishness, but it seems to be consistent
7   across the options; and it is also consistent with
8   what I found with as I mentioned earlier the options
9   that I didn't examine closely, most of which didn't
10  even open until after 10:00 or didn't show any price
11  change at all until after 10:00.
12     Q.   But most of your charts are showing
13  significant spikes around 9:25, 9:26, and again in
14  the 9:36, 9:37 range; is that fair?
15          MS. WILLIAMS:  Objection.
16          THE WITNESS:  It's true of the options.
17  Let me look at the others.
18          MS. WILLIAMS:  Could you read that
19  question again?
20          THE REPORTER:  "Question:  But most of
21  your charts are showing significant spikes around
22  9:25, 9:26, and again in the 9:36, 9:37 range; is

42  (Pages 162 to 165)

Jeffrey L. Davis

May 1, 2008

Washington, DC

| Page 166 | Page 168 |
|---|---|
| 1 that fair?" | 1    Fair statement? |
| 2    MS. WILLIAMS: Objection. | 2    MS. WILLIAMS: Objection. |
| 3    MR. SHOPE: Do you want the question | 3    THE WITNESS: No. The significance is |
| 4 re-read? | 4 also scaled to the time period as well. The standard |
| 5    THE WITNESS: No. That's okay. | 5 deviation -- if you're using a longer period, your |
| 6    Yes, I think that's true if we modify that | 6 standard deviation applies. |
| 7 by saying that if I had used smaller average returns | 7 BY MR. SHOPE: |
| 8 or smaller standard deviations in computing these. | 8    Q.  What I'm getting at is let's suppose you |
| 9 BY MR. SHOPE: | 9 went by those gas stations every hour. A change of |
| 10    Q.  And had you used a broader data set going | 10 one cent from one hour to the next might not mean |
| 11 beyond October 31, you would have gotten that smaller | 11 very much, right? |
| 12 average return, correct? | 12    MS. WILLIAMS: Objection. |
| 13    MS. WILLIAMS: Objection. | 13    THE WITNESS: From one hour to the next? |
| 14    THE WITNESS: If I'd used other days in | 14    I guess. |
| 15 October rather than just October 31, that is true. | 15 BY MR. SHOPE: |
| 16 BY MR. SHOPE: | 16    Q.  Yeah. |
| 17    Q.  Why did you choose within minute returns | 17    A.  What's -- |
| 18 as opposed to returns based on a different duration? | 18    Q.  But if -- if every hour -- if it changed |
| 19 For example, five minutes, half hour, one hour, two | 19 by a penny every hour for 24 hours straight, you'd |
| 20 hours, whole day? | 20 have a very significant change, right? |
| 21    A.  I used one-minute returns because I wanted | 21    MS. WILLIAMS: Objection. |
| 22 to use small intervals because what we were talking | 22    THE WITNESS: I just pointed out, you'd be |

| Page 167 | Page 169 |
|---|---|
| 1 about was, in particular, looking at the market's | 1 using a different scale. If you're looking at |
| 2 reaction to the Reuters news announcement and the | 2 one-minute reactions, you're using a standard |
| 3 posting on the web site. | 3 deviation that is keyed to the one-minute reaction. |
| 4    I could have used a broader return, but I | 4 If you're using a wider reaction period, you're using |
| 5 think that might mask some information. | 5 a larger standard deviation. |
| 6    Q.  Okay. | 6    I don't think you're losing any |
| 7    A.  So I used a very narrow return. | 7 information. You could lose information -- I can see |
| 8    Q.  But a narrow return could mask information | 8 how you would lose information if you used a wider |
| 9 as well, right? | 9 one because you might miss the changes in the price |
| 10    MS. WILLIAMS: Objection. | 10 in between. |
| 11    THE WITNESS: How would it do that? | 11    But I don't see how you lose information |
| 12 BY MR. SHOPE: | 12 by using a very narrow one. |
| 13    Q.  Well, for example, just to take a common | 13 BY MR. SHOPE: |
| 14 example, let's suppose you drove down the street | 14    Q.  Let me pose this hypothesis. Suppose |
| 15 every hour at a turnpike pull-off and saw five gas | 15 information is being disseminated into the market in |
| 16 stations and you wanted to see what their gas prices | 16 a slow manner. Okay? |
| 17 were. | 17    A.  Okay. |
| 18    And so if you -- you know -- you went at | 18    Q.  For example, by word of mouth? |
| 19 8:00, and they all were offering gas for $3 a gallon; | 19    A.  I don't know that that's necessarily a |
| 20 and you went at 9:00, and they were offering gas for | 20 slow manner. But -- |
| 21 $3.01 a gallon, might not think that was particularly | 21    Q.  Okay. But it -- it might be fast? It |
| 22 significant. | 22 might be slow? Would that be fair to say? |

43 (Pages 166 to 169)

**Exhibit AA**

**Cited Excerpts from the SEC
Investigative Testimony of Steven Nothern
(December 4, 2001)**

Page 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

```
In the Matter of:              )
TRADING IN CERTAIN             )
TREASURY ISSUES                )    File No. HO-9353
```

WITNESS:  Steven E. Nothern

PAGES:  1 through 213

PLACE:    Securities & Exchange Commission
          450 5th Street, N.W. - Room 11602
          Washington, D.C. 20549

DATE:     Wednesday, November 28, 2001

        The above-entitled matter came on for hearing at
10:38 a.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

        ANDREW SPORKIN, ESQ.
        WILLIAM M. HATHAWAY, ESQ.
        Securities & Exchange Commission
        450 5th Street, N.W.
        Washington, D.C. 20549
        (202) 942-4613

On behalf of the Witness:

        JACK PIROZZOLO, ESQ.
        NICHOLAS THEODOROU, ESQ.
        Foley, Hoag, & Eliot
        One Post Office Square
        Boston, Mass., 02109.

Page 2

C O N T E N T S

WITNESS:                                        Page

Steven Nothern                                    3

EXHIBITS:     DESCRIPTION                      IDENTIFIED

222      Subpoena, nine-page document            5

223      Three-page Letter from the SEC,
         includes subpoena duces tecum          13

224      1/2 floor plan for 23rd floor
         on Boylston Street                      38

225      Other 1/2 of floor plan for 23rd
         floor on Boylston Street                38

226      Bloomberg message from WI Partners
         and RJ O'Brien & Associates            166

227      ITMO Trading in Certain Treasury Issues 167

228      Five page document; M-000113, 114, 114A,
         115 through M-116                      173

229      Legal and regulatory update by Steve
         Cavan                                  184

230      MFS Co. statement of policy on Personal
         Securities Transactions               190

231      MFS Statement of Guidelines           191

Page 3

1           P R O C E E D I N G S
2       MR. HATHAWAY:  We are on the record.  It's
3   approximately 10:30.  This is December 4, 2001.  Would you
4   raise your right hand, sir?
5       Whereupon,
6               STEVEN E. NOTHERN
7   was called as a witness and, having been first duly sworn by
8   the, was examined and testified as follows:
9               EXAMINATION
10  BY MR. HATHAWAY:
11      Q  Would you please state and spell your full name for
12  the record?
13      A  Steven Eric Nothern -- S-t-e-v-e-n -- Eric --
14  Nothern -- N-o-t-h-e-r-n.
15      Q  Thank you.  I am William Maxwell Hathaway.  I go by
16  Max.  I will be joined shortly by my branch chief on this
17  project, Andrew Sporkin.  Both Andrew Sporkin and myself are
18  officers of the Commission for the purposes of this
19  proceeding.
20          This is an investigation by the United States
21  Securities and Exchange Commission.  It's: In the Matter of
22  Trading in Certain Treasury Issues.  Our file number is --
23  HO-9353.
24          It is an investigation is to determine whether
25  there have been any violations of the federal securities

Page 4

1   laws.
2           However the evidence adduced in this investigation
3   or today's testimony session might constitute violations of
4   other state or federal, civil or criminal statutes.
5           Prior to the opening of the record, which means
6   prior to our actually going the tape recorder on and
7   beginning here today, you were provided with a copy of the
8   formal order of investigation which is in front of you here
9   and I am touching it as I speak.
10          This copy of the formal order will remain available
11  for your examination throughout the course of today's
12  testimony session.
13          Have you had an opportunity to review the formal
14  order of investigation?
15      A  Yes, I have.
16      Q  You were also provided prior to the opening of the
17  record with a copy Exhibit No. 202, which is a copy of the
18  Commission's Form 1662.
19          Have you had an opportunity to read Exhibit No.
20  202?
21      A  Yes, I have.
22      Q  Do you at this time have any questions at this time
23  concerning this exhibit?
24      A  No.
25      Q  Mr. Nothern, are you represented by counsel?

SECNOTH00117214

Page 97

1  Q  Did you know how information is disseminated at a
2  conference, refunding conference?
3  A  I don't.
4  Q  Did you know whether people were given press
5  releases?
6  A  I don't.
7  Q  Do you know whether persons attending a conference
8  are given reports of any nature?
9  A  I don't know.  Can I add one thing?
10  Q  Yes.
11  A  I am familiar with the fact that they distribute a
12  press release, because I've had those faxed to me.
13  Q  Do you know whether or not that distribution of the
14  press release occurred at the conference or --
15  A  That's what I don't know.
16  BY MR. SPORKIN:
17  Q  How did you get the faxes?
18  A  Mr. Davis would fax those after the quarterly
19  refunding announcements.  I've seen them before.
20  BY MR. HATHAWAY:
21  Q  Do these faxes occur the day of the conference or
22  the day after or --
23  A  I would guess same day.
24  Q  Why do you guess that?
25  A  Because I don't know specifically when they come

Page 98

1  in.
2  Q  Do you know whether there are any live feeds to the
3  media at a quarterly refunding conference?
4  A  No, I don't.
5  Q  Does CSPAN cover these conferences?
6  A  Not to my knowledge.
7  Q  Does CNN cover these conferences?
8  A  Not to my knowledge.
9  Q  Does any media or news service provide live
10  coverage of these conferences?
11  A  Not to my knowledge.
12  Q  Do persons attending a refunding conference receive
13  information from Treasury before Treasury makes it generally
14  available to the public?
15  A  I don't know the process.
16  Q  Are any restrictions placed on the ability of
17  persons to use the information that they receive from
18  Treasury at the refunding conference?
19  A  Not to my knowledge.
20  Q  Do persons receiving such information have to wait
21  any wait any amount of time before passing this information
22  along to others?
23  A  Not to my knowledge.
24  Q  Have you ever heard the term "embargo,"
25  e-m-b-a-r-g-o, as it relates to information?

Page 99

1  MR. THEODOROU:  As of what date?
2  BY MR. HATHAWAY:
3  Q  As of today, have you heard that term "embargo"
4  used in the context of information?
5  A  Yes.
6  Q  What does it mean to you, as you sit here today?
7  A  With regards to the Treasury, I don't know what it
8  means.  To me it's a term that applies to the press.
9  Q  What does it mean to you in terms of that?
10  A  Other departments, and I know Labor Department
11  specifically, so one other department, has a process for
12  release of what they deem to be market sensitive information
13  whereby they actually lock the press in a room, it's my
14  understanding at Labor Department, for releases such as the
15  employment report, and they also release the CPI report.
16  They give information to the press, and the doors
17  aren't unlocked at a point in, and also has access, to my
18  understanding, electronic media.  So they can actually digest
19  the information they're being given and write their story.
20  But there is some sort of mechanism whereby it
21  doesn't get filed with the home office, or whatever their
22  process -- you know, the reporter's procedures are, until
23  there's some sort of release of the electronic media.
24  So I think the Labor Department controls both the
25  physical environment and the electronic dissemination of the

Page 100

1  report, but they want to give them time to construct their
2  stories that will hit the wires.
3  Q  How did you learn of this process at Labor?
4  A  Specifically, it's just general knowledge.
5  Q  How long have you known this?
6  A  I don't know.  Specifically, it's just general
7  knowledge.
8  Q  Have you known this for at least a year?
9  A  Oh, yes.
10  Q  Five years?
11  A  I don't know the answer.
12  Q  It is your testimony that you've known for at least
13  a year that the Labor Department used the process you just
14  testified to when it came to releasing market sensitive
15  information?
16  A  Yes.
17  Q  How does the term "embargo, in your mind, fit in
18  that context that you just testified to?
19  A  That process is described as an embargo process.
20  BY MR. SPORKIN:
21  Q  Are you aware of any other U.S. agencies or
22  departments that use this process?
23  A  No, I'm not.
24  Q  Do you know whether the Federal Reserve uses this
25  process in releasing interest rates?

Diversified Reporting Services, Inc. (202) 296-9626

SECNOTH00117238

## Page 101

1    A  I don't.

2    Q  Do you know whether the Department of Treasury uses

3  this?

    A  I don't.

    BY MR. HATHAWAY:

6    Q  Is it any part of your understanding of a Labor

7  embargo process, as you've described it, that the release --

8  that the fact that if it's market sensitive information

9  that's being released that requires the use of these

10  procedures?

11    A  Can I stop you for one second?

12    Q  Yes.

13    A  Your questions with regard to the Treasury is

14  before 10/31?

15    Q  Yes.

16    A  My answer stands.

17    Q  Is any part of your understanding of the embargo

18  procedures that you've described regarding Labor that they

19  are needed because market sensitive information is being

20  released?

21    A  It's a process they employ.  I couldn't tell you

22  why.

23    Q  In your mind, do you connect this process with the

24  type of information that's involved?

25    A  In my mind, information that the Labor Department

## Page 102

1  releases marked sensitive the market is interested in its

2  data.

3    Q  And the fact in your mind that this is market

4  sensitive information, does that correlate to why these types

5  of procedures are being used by Labor?

6    A  Yes.

7    Q  Do you have any -- in terms of quarterly refunding

8  conferences, do you consider the type of information released

9  there to be market sensitive?

10    A  Yes.

11    Q  As you sit here today, do you have any reason to

12  think that Treasury would employ -- would not employ similar

13  procedures for safeguarding that market sensitive

14  information?

15    A  I'm sorry.

16    Q  You've testify to certain procedures used at Labor

17  surrounding market sensitive information.  You've testified

18  that to your mind information released at quarterly refunding

19  conferences is market sensitive.  My question now is whether

20  you have any reason to believe that the Treasury Department

21  would not also use some sort of procedures to safeguard the

22  market sensitive information?

23    A  I have no knowledge of what the procedures are at

24  Treasury.

25    Q  Aside from specific procedures that might or might

## Page 103

1  not be employed, do you have any reason to think that the

2  Treasury Department would not be interested in safeguarding

3  the market sensitive information before its release?

4       I'm putting my questions in a negative form, and I

5  apologize for that.

6    A  Right.  Can you just rephrase it?

7    Q  Let me see if I can.  To your way of thinking, does

8  the Treasury Department have a reason to safeguard the market

9  sensitive information that it will release at a quarterly

10  refunding conference?

11    A  I can't speak to their --

12    Q  To your mind.

13    MR. THEODOROU:  I think the reason why my client

14  might be confused is he has testified he doesn't really

15  know -- you're assuming that he says he knows it's absolutely

16  market sensitive.

17    MR. HATHAWAY:  He has testified, I believe, that

18  the information is market sensitive, to his mind.

19       BY MR. HATHAWAY:

20    Q  What I'm trying to get my arms around here is

21  whether, in your mind, have you any reason to believe that

22  the Treasury Department would not also have some sort of

23  procedures to safeguard that information.

24    A  I have no knowledge of what their procedures are

25  with regards to information.

## Page 104

1    Q  Aside from specific procedures, whether they lock

2  people in a room or whether they give them a fingerprint

3  test, or whatever, putting specifics aside, do you think the

4  Treasury Department has some procedures, whatever they may

5  be, for safeguarding market sensitive information at a

6  quarterly refunding conference?

7    A  Yes.

8    Q  What is your basis for thinking that?

9    A  It's speculation.

10    Q  Were you at work on October 31, 2001?

11    A  Yes.

12    Q  When did you arrive?

13    A  I don't recall specifically.

14    Q  Typically, when do you arrive?

15    A  7:30.

16    Q  Were there any events, announcements or releases

17  that you intended to look for that day?

18    A  Yes.  There was a 10 o'clock release of a Chicago

19  index.

20    Q  Any other reports and releases that you were

21  continuing to look for that day?

22    A  No.

23    Q  Have you heard of something called the G, as in

24  George, D, as in dog, P as in Peter, GDP?

25    A  Yes.

Diversified Reporting Services, Inc. (202) 296-9626

SECNOTH00117239

Page 137

1 the 30-year bond was embargoed? Is that what he asked you?
2     A  What I perceived he was asking --
3     Q  Yes.
4     A  -- was, "Did Pete Davis say we couldn't trade on
5 this information?" That was the perceived question.
6     Q  That's what you thought he was saying, but the
7 words he used to you were?
8     A  I don't know specifically. In substance, it was,
9 "Did Pete Davis say this was embargoed?"
10    Q  And the "this" that he referenced, did you
11 understand that to go to the press release or to the
12 information or --
13    A  I understood it to go to us, in terms of being
14 somehow restricted. I understood it secondarily to go to
15 petition Davis, that he was restricted and that he would have
16 said, you know, "We can't use this information for our
17 business purposes."
18    Q  Is it your testimony --
19    A  He didn't bring up the issue of press release.
20    Q  Thank you. I'm trying to get an understanding for
21 what was in your mind that day and perhaps still is. Is it
22 your understanding that information could be embargoed as
23 relates to certain people but not embargoed as it relates to
24 other people? Is that your understanding?
25    A  My understanding of "embargo," we talked about

Page 139

1 procedure by which to draw out in more clarity the events in
2 question.
3         MR. HATHAWAY: Thank you, Counsel.
4         BY MR. HATHAWAY:
5     Q  Before starting to start from the time the call
6 forward, I just had a couple questions, and then I'll try to
7 move you forward in a chronological fashion.
8         My first question is has Peter Davis ever in any
9 way explained to you what the term "embargo" means?
10    A  No.
11    Q  Have you ever had any discussion of any nature with
12 Peter Davis concerning the term "embargo"?
13    A  Not to my recollection.
14    Q  In the voice mail you received from Mr. Davis, did
15 he tell you in that voice mail that it was okay for you to
16 trade on the information that he was giving you? Is that a
17 yes or no?
18    A  The substance of it voice mail?
19    Q  Did Mr. Davis in the voice mail used words to the
20 effect of, "It's okay to trade on this information"?
21    A  Not to my recollection.
22    Q  Did Mr. Davis in the voice mail use words to the
23 effect of, "You cannot use this information to trade on"?
24    A  Not to my recollection.
25    Q  If you would, please, once again state as well as

Page 138

1 earlier, is that it's a term that applies to the press.
2     Q  And it means what when it applies to the press?
3     A  The only context that I know of it applying to the
4 press is in the context that we discussed of Labor Department
5 procedures where they're actually physically restrained from
6 leaving the room, to my knowledge. I actually -- I don't
7 have firsthand knowledge of how they actually do things
8 there.
9         MR. THEODOROU: Max, can we take a five-minute
10 break?
11        MR. HATHAWAY: We're off the record. It's about
12 ten until 3:00.
13        (A brief recess was taken.)
14        MR. HATHAWAY: We're back on the record at four
15 minute until 3:00. There were substantive discussions in the
16 break that involved the witness's counsel and the staff but
17 not the witness. Is that correct, sir?
18        MR. THEODOROU: Yes.
19        MR. HATHAWAY: And in those substantive
20 discussions, there were suggestions made by counsel for the
21 witness in terms of perhaps how best to structure the
22 sequence of questions to draw out the witness's understanding
23 of certain events and the import of certain terms in this
24 advice mail he received. Is that correct, Counsel?
25        MR. THEODOROU: Yeah, discussion in terms of

Page 140

1 you remember the substance of the voice mail that you
2 received from Mr. Davis.
3     A  In substance, I took two things away. One was
4 Peter Fisher had indicated to Mr. Davis that Treasury would
5 be canceling the long bond and, secondly, that there would be
6 a press release, but it was embargoed until 10:00.
7     Q  That there would be a press release on the
8 cancellation of the 30-year bond?
9     A  I don't recall him saying that specifically.
10        BY MR. SPORKIN:
11    Q  What was your understanding, though?
12    A  Yes, that that would include that information.
13        BY MR. HATHAWAY:
14    Q  Do you remember anything else about the substance
15 of that voice mail?
16    A  No.
17    Q  After you listened to that voice mail, did you
18 believe that it was okay for you to use that information in
19 making trading decisions?
20    A  Yes.
21    Q  Why?
22    A  There was no indication that it would not be okay.
23 There was nothing that raised a flag to that effect.
24        BY MR. SPORKIN:
25    Q  Including the use of the word "embargo" in this

Page 137 - Page 140

SECNOTH00117248

**Exhibit BB**

**Cited Excerpts from the Deposition of
Bloomberg LLP (Patrick Eldridge)
(November 2, 2006)**

Patrick Eldridge 30(b)(6)                                    November 2, 2006

New York, NY

## Page 2

```
 1        November 2, 2006
              9:42 a.m.
 2
 3
 4
 5      VIDEOTAPED DEPOSITION OF PATRICK ELDRIDGE, held
 6   at the offices of Securities and Exchange
 7   Commission, 3 World Financial Center, New York, New
 8   York, pursuant to 30(b)(6) Notice, before Dorothy H.
 9   London, a Registered Professional Reporter and
10   Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                    INDEX
 2
 3   WITNESS        EXAMINATION BY      PAGE
 4
 5
 6   PATRICK ELDRIDGE   Ms. Williams        6
 7                          79
 8
 9                  Mr. Toone      69
10                          83
11
12
13              EXHIBITS
14   ELDRIDGE
15        DESCRIPTION        PAGE
16
17   1    Notice and Subpoena issued     11
18        by the Securities and
19        Exchange Commission to
20        Bloomberg LP
21   2    Printout of a Bloomberg        23
22        function
23
24   3    Printouts from the TOMS        27
25        system for Merrill Lynch
```

## Page 3

```
 1   A P P E A R A N C E S:
 2
 3     U.S. SECURITIES AND EXCHANGE COMMISSION
          Attorneys for Plaintiff
 4        100 F Street, N.E.
          Washington, D.C.  20549
 5
       BY:  ERICA Y. WILLIAMS, ESQ.
 6
 7
 8     FOLEY HOAG, LLP
          Attorneys for Defendant
 o        Seaport World Trade Center West
          155 Seaport Boulevard
10        Boston, Massachusetts  02210
11     BY:  ROBERT E. TOONE, ESQ.
12
13
       BLOOMBERG
14        Attorney for Witness
          731 Lexington Avenue
15        New York, New York  10022
16     BY:  CATHERINE MARTEN, ESQ.
17
18   ALSO PRESENT:
19
20     JUAN TORRES, VIDEOGRAPHER
21
22
23
24
25
```

## Page 5

```
 1        THE VIDEOGRAPHER:  This is Tape No. 1 of
 2   the videotaped deposition of Mr. Patrick Eldridge in
 3   the United States Securities and Exchange Commission
 4   versus Steven Nothern in the United States District
 5   Court for the District of Massachusetts.
 6        This deposition is being held at the SEC
 7   offices, 3 World Financial Center, New York, New
 8   York on November 2, 2006 at approximately 9:42 a.m.
 9   My name is Juan Torres, and I'm the legal video
10   specialist.  The court reporter is Dorothy London.
11        Will counsel please introduce themselves
12   beginning with the party noticing this proceeding?
13        MS. WILLIAMS:  Erica Williams for the
14   plaintiff, United States Securities and Exchange
15   Commission.
16        MR. TOONE:  Robert Toone for the
17   defendant, Steven Nothern, from Foley Hoag, Boston.
18        MS. MARTEN:  Catherine Marten for
19   Bloomberg LP.
20        THE VIDEOGRAPHER:  Will the court reporter
21   please swear in the witness?
22   P-A-T-R-I-C-K  E-L-D-R-I-D-G-E,
23        Having been duly sworn by the Notary
24        Public, was examined and testified as
25        follows:
```

2 (Pages 2 to 5)

| Page 66 |
|---|
| 1  fttime, "(9:45) 35144," and I believe you said that |
| 2  that is 9:45 and 44 seconds. |
| 3      A.  Yeah, I believe that to be correct. |
| 4      Q.  And that reflects what? |
| 5      A.  The fttime reflects the actual time the |
| 6  salesman's version of this transaction was submitted |
| 7  into our system. |
| 8      Q.  And two lines below that, the ftastime, |
| 9  "(9:44) 35099," and I believe you said that was 9:44 |
| 10 and 49 seconds. |
| 11     A.  I think it was 59 seconds, actually. |
| 12     Q.  Fifty-nine seconds? |
| 13     A.  Yeah. That's -- |
| 14     Q.  And that reflects what? |
| 15     A.  That reflects the as of time of the |
| 16 transaction, a time that would default to the moment |
| 17 the salesman loads the ticket entry screen but can |
| 18 be adjusted manually. |
| 19     Q.  And the fttime could not be adjusted |
| 20 manually? |
| 21     A.  By going to the ticket, the salesperson |
| 22 cannot adjust the fttime.  They can adjust it by |
| 23 holding off on their submission of the transaction, |
| 24 but it will capture the exact time that that ticket |
| 25 is submitted. |

| Page 68 |
|---|
| 1  this? |
| 2      A.  The system is measured electronically, and |
| 3  we also have operators who monitor the screens that |
| 4  are watching the system.  There are also electronic |
| 5  alerts that will be generated when certain |
| 6  thresholds or barriers are broken. |
| 7      Q.  Would a user have received -- what, if |
| 8  any, notice would a user have received if TOMS was |
| 9  not functioning properly? |
| 10     A.  The user would not have received any |
| 11 notification if TOMS was not working correctly. |
| 12     Q.  Would the logs have represented any -- |
| 13 would there be any representation in the log if TOMS |
| 14 is not working properly? |
| 15     A.  In the logs that are represented here, |
| 16 there would be no indication of any TOMS failures. |
| 17     MS. WILLIAMS:  Just one second.  I have no |
| 18 further questions at this time.  I might have some |
| 19 after Mr. Toone. |
| 20     MR. TOONE:  Can we take a break? |
| 21     MS. WILLIAMS:  Sure. |
| 22     THE VIDEOGRAPHER:  The time is 11:18 a.m., |
| 23 going off the record. |
| 24         (Recess taken.) |
| 25     THE VIDEOGRAPHER:  The time is 11:28, and |

| Page 67 |
|---|
| 1      Q.  As soon as they push the go and submit |
| 2  one? |
| 3      A.  Correct. |
| 4      Q.  The time could not be altered thereafter? |
| 5      A.  That is correct. |
| 6      Q.  Okay.  Do you know if the TOMS system was |
| 7  experiencing any problems on October 31, 2001? |
| 8      A.  I do not know. |
| 9      Q.  What, if any, notices would Bloomberg have |
| 10 received if the TOMS system was not functioning |
| 11 properly? |
| 12     A.  We have significant metrics of all of our |
| 13 systems in terms of performance.  We have operators |
| 14 that monitor our hardware and our servers for any |
| 15 type of performance issues as well as general |
| 16 diagnostic tools that are used by a variety of teams |
| 17 within Bloomberg. |
| 18     Q.  When you say we have monitors who watch |
| 19 the system, what do they do? |
| 20     A.  We have an area of Bloomberg called the |
| 21 console room that has diagnostic monitors that |
| 22 measure the performance of these servers that the |
| 23 TOMS system is on. |
| 24     Q.  Is this measured electronically or are |
| 25 there people in there who are actually watching |

| Page 69 |
|---|
| 1  we're back on the record. |
| 2  EXAMINATION |
| 3  BY MR. TOONE: |
| 4      Q.  Mr. Eldridge, my name is Robert Toone.  We |
| 5  met earlier.  I'm just going to ask you a few |
| 6  questions to follow up on the questions that |
| 7  Ms. Williams asked you. |
| 8      A.  Okay. |
| 9      Q.  Do you recall testifying today about what |
| 10 the actual final time of this transaction was? |
| 11     A.  Yes. |
| 12     Q.  What is that time? |
| 13     A.  The time, as displayed here, would be 9:45 |
| 14 and 49 seconds. |
| 15     Q.  When you say "displayed here," you're |
| 16 referring to Exhibit No. 3? |
| 17     A.  Correct. |
| 18     Q.  How are ticket numbers generated by the |
| 19 TOMS system exactly? |
| 20     A.  The TOMS system generates ticket numbers |
| 21 on the database as an algorithm in a sequential |
| 22 order going up between 1 and 999,999.  Basically, |
| 23 the next action would create the next ticket number |
| 24 in that sequence.  And it's all done as a computer |
| 25 algorithm. |

18  (Pages 66 to 69)

Page 74

1 that data. That's a long version of that
2 transaction.
3     A quick slate allows the trader not to
4 have to go to that screen and input the data
5 manually. Rather, they can input it all as one line
6 item at the top of their screen, meaning, action --
7 security, action, amount and price as one string,
8 hit go once, and it inputs all the data in for them
9 immediately.
10     Q. So the four items entered during this
11 quick sale slate process are security, action,
12 amount, price?
13     A. That is correct.
14     Q. But during the quick sale slate process,
15 the trader does not enter information about the
16 counterparty; is that correct?
17     A. That's correct.
18     Q. Can you have a transaction without a
19 counterparty?
20     A. You cannot have a completed transaction in
21 the TOMS system without a counterparty.
22     Q. And that information is provided by the
23 salesperson under the TOMS system?
24     A. For this type of transaction, it is
25 provided by the salesperson. It's the salesperson's

Page 75

1 responsibility to input the counterparty.
2     Q. And looking at the documents in Exhibit 3,
3 when did the salesperson in this instance enter that
4 information regarding the counterparty?
5     A. Based upon the documents as I see here,
6 the salesperson put that information into their
7 version of events that created Ticket No. 606311.
8     Q. And when was that?
9     A. It's showing an as of time of 9:44 and 59
10 seconds with a submission time of 9:45 on Page 2 of
11 Exhibit 3.
12     Q. I'm sorry, so you're referring to the as
13 of time, and then can you determine once again what
14 the trade time is for the salesperson's entry?
15     A. Yes. If you refer to, I believe, we
16 identified it as Page 11 of Exhibit 3, it is the
17 document that has the Number 8 in the upper
18 left-hand corner.
19     Q. And what can you find from that page?
20     A. It's the page I'm referring to in the
21 center top column shows "fttktnum" of "606311,"
22 "fttktnum," referring to "606311." In the left-hand
23 column, Line 3 shows "fttime," which is the
24 transaction time, of "9:45," and next to that it
25 shows "35144," which represents 35,144 seconds past

Page 76

1 midnight when that submission was entered into the
2 system.
3     Q. And translate that into real-time?
4     A. The ticket, it looks to be, 9:45 and 44
5 seconds the ticket was submitted into the system.
6     Q. And then it was approved at what time
7 again?
8     A. The time of approval, if we go back to
9 Page No. 4 of the document, Line 3 in the left-hand
10 column, "fttime" shows as "9:45," and next to that
11 it shows a time of "35149," representing 35,149
12 seconds past midnight as the time that the ticket
13 was matched.
14     Q. And that is the time of this transaction?
15     A. That is the trade time of this
16 transaction.
17     Q. Let me just ask you a few more questions
18 about the conversations you had with the SEC. I
19 believe that you testified that you met with
20 Mr. Rosetti and Ms. Williams about a month ago?
21     MS. WILLIAMS: Objection.
22     Q. Is that correct?
23     A. We did not meet.
24     Q. Oh, I'm sorry, did you have a phone call
25 then?

Page 77

1     A. Yes.
2     Q. And that conversation lasted for about an
3 hour?
4     MS. WILLIAMS: Objection.
5     A. That's correct.
6     Q. And can you just briefly summarize the
7 subjects that you discussed with the SEC at that
8 time?
9     A. At that time we reviewed the transaction
10 and the series of events in similar fashion to the
11 way that they are outlined here in terms of
12 identifying what transpired and when it transpired
13 regarding Ticket 606314.
14     Q. And did you tell the SEC at that time what
15 you believed the transaction time was according to
16 these documents?
17     A. Yes.
18     Q. And what did you tell them?
19     A. I told them the transaction time, as I see
20 it in the transaction database, was the final
21 transaction time was 9:45 and 49 seconds.
22     Q. Have you ever been contacted by the
23 Department of Justice regarding this matter or any
24 related matter dealing with the trade on the 30-year
25 bond?

20 (Pages 74 to 77)

**Exhibit CC**

**Cited Excerpts from the SEC's
Responses to Nothern's Interrogatories**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Boston Division)

|  |  |  |
|---|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION,** | ) ) ) | **Civil Action No. 05-CV-10983 (NMG)** |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | |
| **STEVEN E. NOTHERN,** | ) ) | |
| **Defendant.** | ) ) | |

## PLAINTIFF'S RESPONSES TO DEFENDANT STEVEN E. NOTHERN'S INTERROGATORIES TO PLAINTIFF U.S. SECURITIES AND EXCHANGE COMMISSION

Plaintiff, the Securities and Exchange Commission ("Commission"), serves these responses and objections to defendant Steven E. Nothern's Interrogatories.

## PRELIMINARY STATEMENT

The Commission's detailed Complaint sets forth the bases of its allegations. On October 6, 2005, the Commission also filed and served Initial Disclosures complete with a listing of witnesses and subject matters as well as other relevant information. The Commission has also produced in electronic form approximately 52 boxes consisting of over 136,400 pages of documents, including sworn investigative testimony of the defendant and other witnesses. Answers to Defendant's Interrogatories have been produced either in the form of the Initial Disclosures or the documents. Thus, Defendant's Interrogatories are duplicative.

1

**INTERROGATORY NO. 3**

If you contend that on October 31, 2001 Davis had a duty of trust or confidence to Treasury, state the basis for this contention.

**OBJECTION TO INTERROGATORY NO. 3**

Plaintiff objects to this Interrogatory on the grounds that it calls for a legal conclusion.

**RESPONSE TO INTERROGATORY NO. 3**

Subject to and without waiving its general and specific objections, Plaintiff refers Defendant to the facts detailed in the Complaint and the facts described in detail in the documents and investigative testimony provided to Defendant in Plaintiff's Initial Disclosures. Plaintiff also refers Defendant to the April 19 and 20, 2006 deposition of Davis as well as the September 3, 2003 Criminal Plea Hearing transcript in *U.S. v. Davis*, 03 Cr. 1054 (SAS). As Davis testified during his deposition, sometime in 1994-95 he entered into a written agreement with Treasury in which he was granted permission to attend Treasury's quarterly refunding press conferences in return for his agreeing to abide by Treasury's embargo procedures and keep all information released at the press conferences confidential until after the expiration of the stated embargo time. According to Davis, Roger Anderson, then Treasury's Deputy Assistant Secretary for Federal Finance, entered into this agreement on Treasury's behalf. Davis further testified that this agreement was in effect on October 31, 2005. In addition Davis testified that although he received a copy of this agreement on the day he and Anderson signed it; he discarded his

copy in August 2001. The Plaintiff is unaware of the location of the original written agreement.

## INTERROGATORY NO. 4

Identify all documents evidencing or otherwise showing a duty of trust or confidence by Davis to Treasury. To the extent you are unable to identify such documents, state, to the best of your knowledge, whether any such documents exist or have ever existed.

## OBJECTION TO INTERROGATORY NO. 4

Plaintiff objects to this Interrogatory on the grounds that it calls for a legal conclusion.

## RESPONSE TO INTERROGATORY NO. 4

Subject to and without waiving its general and specific objections, Plaintiff refers Defendant to its Response to Interrogatory No. 3.

## INTERROGATORY NO. 5

Identify all confidentiality agreement forms, models, or templates used by Treasury between January 1, 1994 and October 31, 2001. To the extent you are unable to identify such documents, state, to the best of your knowledge, whether any such documents exist or have ever existed.

## OBJECTION TO INTERROGATORY NO. 5

Plaintiff objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to this request on the grounds that it seeks information from the

6

## OBJECTION TO INTERROGATORY NO. 8

Plaintiff objects to this Interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence. Plaintiff further objects to the phrase "manner in which each official or employee permitted Davis to attend the refunding press conferences" as vague and ambiguous.

## RESPONSE TO INTERROGATORY NO. 8

Subject to and without waiving its general and specific objections, Plaintiff refers to the facts detailed in the Complaint, the April 19 and 20, 2006 deposition testimony of Davis, the September 3, 2003 Criminal Plea Hearing transcript in *U.S. v. Davis*, 03 Cr. 1054 (SAS) and the facts described in detail in the documents and investigative testimony provided to Defendant in Plaintiff's Initial Disclosures. Plaintiff also refers Defendant to Plaintiff's Response to Interrogatory No. 3.

## INTERROGATORY NO. 9

If you contend that prior to 10:00 a.m. on October 31, 2001 Nothern knew or should have known about a duty of trust or confidence by Davis to Treasury, state the basis for this contention.

## OBJECTION TO INTERROGATORY NO. 9

Plaintiff objects to this Interrogatory on the grounds that it calls for a legal conclusion.

## RESPONSE TO INTERROGATORY NO. 9

Subject to and without waiving its general and specific objections, Plaintiff refers Defendant to the facts detailed in the Complaint and the facts described in detail in

9

Defendant's December 4, 2001 pre-lawsuit investigative testimony, provided to

Defendant in Plaintiff's Initial Disclosures. In this investigative testimony Defendant

admitted that before 10:00 a.m. on October 31, 2001, he received a voicemail from Davis

informing him that Peter Fisher – who Defendant knew to be a Treasury official – had

indicated to Davis that Treasury was going to be canceling the 30-year bond and that there

was an embargo in place until 10 a.m. Nothern further testified that he was familiar with

the term embargo as a mechanism that at least one other department of the federal

government used to protect market sensitive information. Plaintiff also refers Defendant

to Davis' April 19 and 20, 2006 deposition testimony documents produced by Davis in

response to Defendant's subpoena in this case, Plaintiff Initial Disclosures and documents

previously produced. These documents include, *inter alia*, facts that show that Nothern

was aware that Davis had contacts at Treasury and that Nothern attended meetings that

Davis arranged with Treasury officials. In addition Davis provided Nothern and his other

clients with documents and materials that referenced and/or were created by Treasury,

including, but not limited to, documents related to Treasury's quarterly refunding

conferences.

**INTERROGATORY NO. 10**

If you contend that prior to 10:00 a.m. on October 31, 2001 Nothern knew or

should have known that Davis breached a duty of trust or confidence to Treasury, state the

basis for this contention.

10

and/or were created by Treasury, including, but not limited to, documents related to

Treasury's quarterly refunding conferences.

**INTERROGATORY NO. 15**

State the basis for the allegation in Paragraph 35 of the Complaint that "Nothern

knew: (a) that Peter Fisher was an official at Treasury in the debt finance area who had

access to information of the nature reported by Davis; (b) that Treasury refunding

announcements conveyed market sensitive information; and (c) the meaning and nature of

an embargo."

**RESPONSE TO INTERROGATORY NO. 15**

Subject to and without waiving its general objections, Plaintiff refers Defendant

to the facts described in detail in Defendant's December 4, 2001 pre-lawsuit investigative

testimony, provided to Defendant with Plaintiff's Initial Disclosures. In this investigative

testimony Defendant admitted that he knew Peter Davis to be a Treasury official in the

debt finance area. He further admitted that he considered information released at

quarterly refunding conferences to be market sensitive. In addition, Defendant testified

that he was familiar with the term embargo as a mechanism used by at least one

department of the government to protect market sensitive information. Plaintiff also

refers Defendant to the April 19 and 20, 2006 deposition testimony of Davis and to

documents produced with Plaintiff's Initial Disclosures.

**INTERROGATORY NO. 16**

State (by date, hour, minute, and second) the times at which the trades described in

Paragraphs 37 and 38 of the Complaint occurred, noting specifically the times at which

15

the trades were initiated and when they were completed and identifying all clocks and/or

timekeeping systems on which you rely.

**RESPONSE TO INTERROGATORY NO. 16**

Subject to and without waiving its general objections, Plaintiff refers Plaintiff

refers to the facts described in detail in the documents and investigative testimony

provided to Defendant in Plaintiff's Initial Disclosures, including, but not limited to

documents SECNOTH00115359-384; SECNOTH00120002-00120006 and

SECNOTH00133770-772, Defendant's December 4, 2001 pre-lawsuit investigative

testimony, the investigative testimony of Geoffrey Kurinsky dated December 12, 2001,

the investigative testimony of David Kennedy dated December 11, 2001 and the

investigative testimony of D. Richard Smith dated December 11, 2001.  Plaintiff also

refers Defendant to the Verizon telephone records of Davis produced with Plaintiff's

Initial Disclosures, which indicate that Davis left a voicemail for Defendant on October

31, 2001 at 9:38 a.m.  According to information gathered by Plaintiff to date, and included

in the documents referenced above, Nothern's trade for $25 million of 30-year bonds (his

portion of a combined $65 million trade) was initiated between 9:38 and 9:42 a.m. and

was executed between 9:42 am and 9:42:49 am.   Nothern's trade for $14.25 million of

30-year bonds was initiated sometime between 9:38 am and 9:51 am and was executed on

or about 9:51 am.

**INTERROGATORY NO. 17**

Identify all documents evidencing or otherwise showing the times at which the

trades described in Paragraphs 37 and 38 of the Complaint occurred.  To the extent you

16

**Exhibit DD**

**Reuters Article:**
**"Wall Street sees red over leak of T-bond's demise"**
**(October 31, 2001)**

15:28  31 Oct   RTRS-Wall Street sees red over leak of T-bond's demise
  By Daniel Sternoff
  NEW YORK, Oct 31 (Reuters) - If Wall Street shed any tears over the U.S. Treasury's decision to send the 30-year bond to an early grave, they were tears of rage over a news leak that gave some dealers a head start on the biggest bond rally in history
  Not only did Treasury spring a Halloween surprise by declaring it had no further use for the one-time benchmark, it had bond dealers feeling doubly duped for posting the news on its Web site well before the scheduled announcement of its fourth-quarter borrowing needs.
  "There's going to be a lot of noise about that," said John Roberts, head of governments trading at Barclays Capital in New York.
  "It's a fluke and it's wrong that people have information. It's like being able to trade on inside information," he said.
  The Treasury was due to make its quarterly refunding announcement at 10:00 a.m. (1500 GMT) on Wednesday.
  But the news appeared on the Treasury's Web site around 15 to 20 minutes before the scheduled refunding announcement, leaving many players scrambling to understand why the soon-to-be scarce long bond started flying higher.
  And while the Treasury market has long mulled the eventual demise of the 30-year bond, few were expecting the government would retire the long bond at a time when Washington is raising funds to fight a war and a budding recession.
  "It came out of nowhere," said Steve Saslow, proprietary bond trader at HSBC Securities. "The rumors started going around and the bonds started going crazy, so obviously somebody had a lead of a few minutes.'
  That lead will probably earn some lucky traders a fat year-end bonus for an early jump on the long bond's unprecedented rally of more than 5-1/2 points and largest decline in yields since the 1987 stock market crash.
  Peter Fisher, Treasury's undersecretary for domestic finance, insisted the government was not manipulating the market in the world's most secure assets.
  "We cannot run this business if people think we are trying to time the market or outsmart the market," Fisher said in an interview with cable television network CNBC.
  But those remarks rang hollow for traders who at best saw ham-handed handling of the announcement, and at worst suspected insider trading by market players who sit on a Treasury Borrowing Advisory Committee.
  Barclays' Roberts recalled a similar flap earlier this month, when the Treasury decided to flood the market with more 10-year note to ease a liquidity logjam caused by failed trades after the Sept. 11 attacks on Washington and New York.
  "When they did the reopening of the 10-year, there was advance information on the Street. There's advance information here, and so there are a number of people on the Street who are pretty upset about it," Roberts said.
 ((U.S. Financial Markets Desk, 646 223 6323))

For related news, double click on one of the following codes:
[MNI] [E] [U] [M] [T] [D] [NAT] [RNP] [DNP] [PTD] [CRD] [US] [DBT] [GVD] [WASH] [FIN] [BNK] [DRV] [AGN] [MUNI] [MTG] [LEN] [RTRS]
[US30YT=RR\c]

For related price quotes, double click on one of the following codes:
<US30YT=RR>

Wednesday, 31 October 2001 15:28:21
RTRS [nN31550341]

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 000464

**Exhibit EE**

**Minutes of the Meeting of the**
**Treasury Borrowing Advisory Committee**
**of the Bond Market Association**
**(January 31, 2001)**

# MINUTES OF THE MEETING OF THE
# TREASURY BORROWING ADVISORY COMMITTEE OF
# THE BOND MARKET ASSOCIATION

January 30, 2001

The Committee convened at 10:15 a.m. at the Treasury Department for the portion of the meeting that was open to the public. All members were present except Mr. Lyski. The Federal Register announcement of the meeting and a list of Committee members are attached.

The Committee was welcomed by the Deputy Assistant Secretary for Federal Finance, Michael Paulus. John Auten, Director, Office of Macroeconomic Analysis, summarized the current state of the U.S. economy (statement attached). Fred Pietrangeli, Senior Economist for the Office of Market Finance, presented the chart show, updating Treasury borrowing estimates and historical debt and interest rate statistics.

The public meeting ended at 10:40 a.m.

The Committee reconvened in closed session at the Madison Hotel at 11:20 a.m. All members were present except Mr. Lyski. Deputy Assistant Secretary Paulus gave the Committee its Charge, which is also attached.

The Committee began by discussing the question in the charge regarding other adjustments to Treasury's future borrowing schedule given the continuing projected improvement in the fiscal situation. The Committee felt that the elimination of the 52-week bill was preferable to reducing the frequency of 2-year note issuance citing the same reasons originally stated by the Committee in the May 4, 1999 Report to the Secretary. First, the 52-week bill provided the least utility to the Treasury and to the market, relative to other regular offerings. Second, there are substantial secondary market alternatives, in terms of the supply of short coupons to meet investor needs in the 1-year maturity. Third, the timing of Treasury's cash flow requirements favor preserving the monthly issuance of 2-year notes to help meet the pattern of sizeable early month cash drawdowns for regular benefit payments, as well as monthly retirements of previously issued 5-year notes. Fourth, the market is expecting the 52-week bill to be eliminated. By unanimous consensus the committee agreed that the elimination of the 52-week bill should be the next adjustment to the borrowing schedule.

Next, the Committee considered the large swings in the Treasury cash balances. The idea of possibly issuing a 4-week bill on a weekly basis was raised by Deputy Assistant Secretary Paulus. The Committee noted that cash management bills tend to be an expensive means of financing; a regular 4-week bill issued weekly could serve to help mitigate large swings in cash balances so that reliance on large expensive CMB financing could be reduced. These bills could be issued weekly along with the regular weekly 13- & 26-week bills and vary in size between $6 billion to $16 billion. One member felt that there would be little interest in a 4-week bill with an issue size less than $6 billion. Another member noted that the 1-month point on the yield curve tends to be very liquid and that such an instrument might be well received as long as the issue size meets a minimal liquidity threshold. The committee generally felt that the 4-week bill idea had merit and warranted further exploration.

Following the discussion of short-term financing alternatives, the Chairman raised the topic of longer-term financing, particularly 30-year bond issuance. Some members felt that it was illogical to be issuing 30-year debt when the latest Administration forecasts indicated that the debt would be paid off in about 10 years. They argued that potential costs savings to Treasury from eliminating the 30-year bond would be substantial and that re-entry into this market, should Treasury need to, would be fairly easy since markets adapted quickly. Others argued that a riskless 30-year benchmark should be maintained because it provided a public utility function in that it increased capital markets efficiency; alternatives such as 30-year swaps were much less liquid. Some members remained skeptical about the budget and policy outlook and believed that the near-term elimination of the 30-year bond was

not justified. Others suggested that the 30-year bond should be maintained in order to finance the payment of social security benefits at a later date.

The committee held an informal vote regarding the elimination of the 30-year after the August reopening. The informal vote was 11 to 6 with one abstention for elimination of the 30-year after August refunding. The Committee refrained from issuing a formal recommendation at this time until the fiscal situation became clearer.

There was a brief discussion by Committee members regarding changes to handling of FIMA accounts in Treasury auctions. The Committee recommended that the Treasury briefly address the pending changes at the quarterly press conference to provide clarification to market participants.

Regarding the composition of the quarterly refunding, by a unanimous vote, the Committee recommended a reopening of the 5-3/4 percent 5-year notes of 11/15/05 in an amount of $11 billion and an $11 billion issue of a new 10-year note. Finally, the Committee unanimously recommended issuing a new 30-year bond in an amount of $10 billion. Looking at the remainder of the January-March quarter, the Committee recommended that 2-year notes be increased to $11 billion for February and March, and that weekly bills be reduced from $24 billion level to $22 billion level starting in March.

The Committee's recommendations for the April-June quarter are in the attached table.

The meeting adjourned at 12:25 p.m.

The Committee reconvened at the Madison Hotel at 6:00 p.m. All members were present except Mr. Lyski. The Chairman presented the Committee report to Deputy Assistant Secretary Paulus. A brief discussion followed the Chairman's presentation, but did not raise significant questions regarding the report's content.

The meeting adjourned at 6:15 p.m.


*Paul F, Malvey, Director*
*Office of Market Finance*
*January 30, 2001*


**Attachments**

**Certified by:**

James R. Capra, Chairman
Treasury Borrowing Advisory Committee
of The Bond Market Association


Last Updated January 30, 2001

January 30, 2001

# COMMITTEE CHARGE

The Treasury would like the Committee's specific advice on the following:

Treasury financing

- The Administration's FY 2002 Economic Outlook, released on January 16, projects a surplus of $256 billion for FY 2001, compared to the Midsession review estimate of $228 billion. Many private sector estimates are even higher. Given the fiscal forecasts, Treasury needs to make additional adjustments to its financing plans this year. In the past, the Committee has recommended that the next adjustment to its borrowing schedule should be either the elimination of the 52-week bill or a reduction in the frequency of 2-year notes. What would you recommend as the next adjustment to Treasury's financing calendar?

- In the process of paying down the marketable debt held by the public, the Treasury has sought to distribute the reduction in borrowing across various maturities in an effort to maintain large, liquid benchmark issues. In the process, the Treasury has reduced the member of coupon security auctions from 39 to 25 per year, and it has reduced the number of 52-week bill auctions from 13 to 4. The reduced number of financing opportunities, and larger swings in net revenues, has contributed to an increase in the magnitudes of the variations in Treasury's cash balances. What actions, if any, would the Committee recommend to help dampen the swings in Treasury cash balances?

- The composition of a financing to refund approximately $25.1 billion of privately held notes maturing on February 15 and to raise approximately $5-7 billion in cash in 5-year and 10-year notes and 30-year bonds.

- The composition of Treasury financing for the remainder of the January-March quarter and for the April-June quarter.

Federal Register / Vol. 66, No. 7 / Wednesday, January 10, 2001 / Notices

# DEPARTMENT OF THE TREASURY

# DEBT MANAGEMENT ADVISORY COMMITTEE MEETING

Notice is hereby given, pursuant to 5 U.S.C. App. §10(a)(2), that a meeting will be held at the U.S. Treasury Department, 15th and Pennsylvania Avenue, N.W., Washington, D.C., on January 30, 2001, of the following debt management advisory committee:

> The Bond Market Trade Association
> Treasury Borrowing Advisory Committee

The agenda for the meeting provides for a technical background briefing by Treasury staff, followed by a charge by the Secretary of the Treasury or his designate that the committee discuss particular issues, and a working session. Following the working session, the committee will present a written report of its recommendations.

The background briefing by Treasury staff will be held at 9:00 a.m. Eastern time and will be open to the public. The remaining sessions and the committee's reporting session will be closed to the public, pursuant to 5 U.S.C. App. §10(d).

This notice shall constitute my determination, pursuant to the authority placed in heads of departments by 5 U.S.C. App. §10(d) and vested in me by Treasury Department Order No. 101-05, that the closed portions of the meeting are concerned with information that is exempt from disclosure under 5 U.S.C. §552b(c)(9)(A). The public interest requires that such meetings be closed to the public because the Treasury Department requires frank and full advice from representatives of the financial community prior to making its final decision on major financing operations. Historically, this advice has been offered by debt management advisory committees established by the several major segments of the financial community. When so utilized, such a committee is recognized to be an advisory committee under 5 U.S.C. App. §3.

Although the Treasury's final announcement of financing plans may not reflect the recommendations provided in reports of the advisory committee, premature disclosure of the committee's deliberations and reports would be likely to lead to significant financial speculation in the securities market. Thus, these meetings fall within the exemption covered by 5 U.S.C. §552b(c)(9)(A).

The Office of Financial Markets is responsible for maintaining records of debt management advisory committee meetings and for providing annual reports setting forth a summary of committee activities and such other matters as may be informative to the public consistent with the policy of 5 U.S.C. §552b.

*Lee Sachs*

*Assistant Secretary*

*(Financial Markets)*

Dated: January 30, 2001

# Treasury Borrowing Advisory Committee
## of the Public Securities Association

**Chairman**
James R. Capra
President
Capra Asset Management, Inc.
555 Theodore Fremd Avenue, Suite C-204
Rye, NY 10580

**Vice Chairman**
Timothy W. Jay
Managing Director
Lehman Government Securities, Inc.
200 Vesey Street, 9th Floor
New York, NY 10285

Daniel S. Ahearn
President
Capital Markets Strategies Co.
50 Congress Street, Suite 816
Boston, MA 02109

Keith T. Anderson
Chief Investment Officer,
Fixed Income BlackRock
345 Park Avenue
New York, NY 10154

Richard A. Axilrod
Managing Director
Moore Capital Management, Inc.
1251 Avenue of the Americas, 53rd Fl
New York, NY 10020

Ian Godwin Banwell
Co-Chief Investment Officer
Bank of America
100 N. Tryon St, NCI-007-06-06
Charlotte, NC 2855-001

Edward J. Breslin
Managing Director
Chase Securities, Inc.
270 park Avenue, 8th Floor
New York, NY 10017

Richard S. Davis
Senior Vice President -
Head of Fixed Income Investments
Metlife Investments
334 Madison Avenue, PO Box 633
Convent Station, NJ 07961-0633

Stanley F. Druckenmiller
Chariman and Chief Executive Officer
Duquesne Capital Management LLC
900 Third Avenue, 29th Floor
New York, NY 10166

Stephen C. Francis
Vice Chairman
Fischer, Francis, Trees & Watts, Inc.
200 Park Avenue
New York, NY 10166

Lisa W. Hess
Managing Director
Zesiger Capital Group LLC
320 Park Avenue
New York, NY 10022

Thomas L. Kalaris
President Barclays Capital Inc.
222 Broadway
New York, NY 10038

James Marks Keller
Executive Vice President/Portfolio
Manager
Pacific Investment Management
Company
840 Newport Center Drive, Suite 300
Newport Beach, CA 92660

Wayne D. Lyski
Chairman & Chief Investment Officer
Alliance Fixed Income Investors
Alliance Capital
Management Corporation
1345 Avenue of the Americas
New York, NY 10105

G. Kelly Martin
Senior Vice President
Head of Global Debr Markets
Merrill Lynch
4 World Financial Center, 7th Floor
New York, NY 10080

Thomas G. Ma
FID Salomon Smith Barney
390 Greenwich Street, 4th Street
New York, NY 10013

Joseph Rosenberg
Senior Investment Strategist
Loews Corp.
667 Madison Avenue
New York, NY 10021-8087

Morgan Stark
Principal
Ramius Capital Group
Chrysler Center
666 Third Avenue, 26th Floor
New York, NY 10017

Mark B. Werner
Managing Director
JP Morgan Securities, Inc.
60 Wall Street
New York, NY 10260

Charles D. White
Managing Director
Wells Fargo
Mail Station S4753-040
3300 West Sahara Avenue
Las Vegas, NV 89102

**Exhibit FF**

**Letter from Thomas M. McGivern, Office of
General Counsel, Department of the Treasury,
to John A. Shope, Foley Hoag LLP
(November 2, 2006)**



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

November 2, 2006

**BY E-MAIL AND FAX**

John A. Shope, Esq.
Foley Hoag LLP
Seaport World Trade Center West
155 Seaport Boulevard
Boston, Massachusetts 02210-2600

Subject:  Request for the deposition testimony of Treasury Department employee Elnora
Bowser in *Securities and Exchange Commission v. Steven E. Nothern* (D. Mass.,
Case No. 05-10983)

Dear Mr. Shope:

The Department of the Treasury is in receipt of your August 16, 2006 letter that requests the
deposition testimony of Treasury employee Elnora Bowser, among others. The August 16 letter
was submitted pursuant to Treasury Department regulations found at 31 C.F.R. §§ 1.8-1.12
(commonly known as Touhy regulations, *see also United States ex rel. Touhy v. Ragan*, 340 U.S.
462 (1951)).

We have carefully reviewed and considered your letter pursuant to Treasury's Touhy regulations.
Following this review and consideration, we deny your request to depose Ms. Bowser. As
explained below, we found that the letter you submitted to Treasury fails to demonstrate, among
other things, that Ms. Bowser's deposition testimony is genuinely necessary to the proceeding, is
unavailable from other sources, and is not unduly burdensome.

- *The letter fails to demonstrate that the information requested is genuinely necessary to the
  proceeding.* Your letter does not demonstrate that Ms. Bowser is likely to possess
  information necessary to prove or disprove the allegations in this case. All of the topics for
  which you seek to depose Ms. Bowser have been addressed in Treasury's document
  production and in deposition testimony by a number of other current and former Treasury
  employees. Ms. Bowser's role was extremely limited. For example, a document produced
  by Treasury indicates that Ms. Bowser only cleared Peter Davis into the Treasury building
  one time, while Lula Tyler cleared Davis into the Treasury building a number of times. The
  deposition testimony of Paul Malvey (page 132) and Lula Tyler (page 30) demonstrates that
  this was not normally Ms. Bowser's responsibility. Instead, she performed this function only
  once when Ms. Tyler was not available. Since you have already deposed Ms. Tyler, it is
  unnecessary to also depose Ms. Bowser.

- *The letter fails to demonstrate that the information you seek from Ms. Bowser is unavailable
  from other sources.* Not only is the information you seek from Ms. Bowser available from

2

other sources, such as documents we provided in response to the SEC's Touhy request that also were sent to you, you also already have received such information from current and former Treasury employees in deposition testimony. Receiving the same information yet again simply adds to the excessive burden Treasury already has bore in responding to this case. For example:

- Information on Treasury's policies and procedures on "embargoes" can be found in the deposition transcripts of Tony Fratto (pages 37-64), Elizabeth Holahan (pages 44, 46-50, 60-61, 63), Peter Fisher (pages 101-107), Roger Anderson (pages 38-42, 47-49, 54), Brian Roseboro (pages 28-29, 31-35), Frances Anderson (pages 59-61, 90-91), Lula Tyler (pages 57-59) and Paul Malvey (pages 40, 99-102).
- Information on Treasury's policies and procedures on maintaining the confidentiality of market-sensitive information can be found in the deposition transcripts of Tony Fratto (pages 38-41, 85), Brian Roseboro (page 85), Paul Malvey (pages 255-256), Roger Anderson (pages 38-40), Jill Ousley (pages 77-80), and Elizabeth Holahan (pages 33-34, 44-46, 61).
- Information on the policies and procedures that specifically were followed on October 31, 2001 can be found in the deposition transcripts of Tony Fratto (pages 48, 94, 128-129, 156-171), Paul Malvey (pages 60-61, 79-85), Peter Fisher (pages 99-100, 114-122), Brian Roseboro (pages 80, 84-85), Elizabeth Holahan (pages 53-54, 101, 106-111, 113-116), Frances Anderson (pages 56, 58, 68-70, 79-100), and Lula Tyler (pages 98-100, 102).
- There is no information from any current or former Treasury employee to indicate that there was any written confidentiality agreement between Peter Davis and the Treasury Department. In fact, all these witnesses have denied that any such agreement existed, and searches of Treasury documents have failed to reveal evidence of any such agreement. This topic has been covered numerous times with current and former Treasury employees, all with the same conclusion that no such document existed. See the deposition transcripts of Roger Anderson (pages 100-101), Tony Fratto (pages 176-177), Jill Ousley (page 49), Elizabeth Holahan (page 141), and Paul Malvey (page 114).
- Information on Peter Davis's authority to attend Treasury conferences generally can be found in deposition transcripts of Elizabeth Holahan (pages 115-116, 137-138), Lula Tyler (pages 48-50, 54-57, 59), Roger Anderson (pages 53-64), Paul Malvey (pages 43, 90-92, 98-99), and Tony Fratto (pages 171-177, 180, 183-184).
- Information on how Davis was specifically able to attend the conference on October 31, 2001 can be found in the deposition transcripts of Elizabeth Holahan (pages 115-116, 137-138), Lula Tyler (pages 99-105), Paul Malvey (page 146), and Tony Fratto (pages 172-177).

- *The request to depose Ms. Bowser is unduly burdensome.* Treasury staff have dedicated hundreds of hours and hundreds of thousands of dollars to matters pertaining to this case in which the Treasury Department is not a party, including, among other things:
  - searching for hard- and soft-copy records, including restoring former employees e-mails, protecting privileged material, and producing documents;
  - considering your Touhy request for the deposition of current and former Treasury employees;
  - helping you to locate some of these former Treasury employees and coordinating with all parties to arrange mutually convenient times for their deposition; and

3

- attending the depositions of eight current and former Treasury employees, including Treasury's Assistant Secretary for Public Affairs, and traveling to New York (twice), New Jersey, and Florida for these depositions.

You have shown no restraint in requesting testimony on the same topics again and again from current and former Treasury employees. Deposing another current Treasury employee on these topics — many of which are not in dispute and already have been addressed numerous times in documents provided by Treasury and in the deposition testimony of current and former Treasury officials — imposes an undue burden on the Department.

To reiterate, Ms. Bowser is not authorized under applicable Treasury Department regulations to provide the requested testimony, and may not be compelled to testify. *See Bobreski v. EPA*, 284 F. Supp.2d 67, 73-74 (D.D.C. 2003) (agency employee cannot be forced to testify if an agency with valid Touhy regulations considers requests for testimony using relevant data and provides a rational basis for its decision).

The foregoing objections are not exclusive, and we reserve the right to assert further objections as appropriate.

If you have further questions, please contact me at 202-622-2317.

Sincerely yours,

*Thomas M. McGivern*

Thomas M. McGivern

cc: Erica Williams, Esq.
John Rosetti, Esq.
U.S. Securities and Exchange Commission

Nicholas Theodorou, Esq.
Robert Toone, Esq.
Foley Hoag LLP