## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05-CV-10983 (NMG) |
| Plaintiff, | ) | |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) | |

## U.S. SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT............................................................................................................4

    A.  The Standard For Summary Judgment Is Not Met By Nothern ........................4

    B.  There Is An Abundance Of Evidence That Supports The SEC's
        Claim That Nothern Traded On Nonpublic Information ...................................5

    C.  The SEC Has Raised Genuine Factual Issues That Support Its Claim
        That Peter Davis Tipped Nothern In Violation Of A Duty To Treasury ..........9

        1.  A Reasonable Jury Can Find That Davis Had A Duty To Treasury
            Based On His History Pattern and Practice Of Maintaining
            The Confidentiality Of Treasury's Refunding Information.................10

        2.  A Reasonable Jury Can Find That Davis Had An Agreement With
            Treasury That Created A Fiduciary-Like Duty Of Trust And
            Confidence .........................................................................11

        3.  Aside From Rule 10b5-2, The SEC Has Proffered Evidence
            That Establishes That Davis Accepted A Duty To Keep Treasury's
            Confidences.........................................................................14

    D. Whether Nothern Knew Or Should Have Known That Davis Violated A
        Duty To Treasury Is A Contested Factual Issue For The Jury .......................15

    E.  Nothern's First Amendment Challenge Is Spurious........................................17

        1.  Nothern Lacks Standing To Raise A First Amendment Challenge
            To Treasury's Temporary Embargo....................................................17

        2.  Treasury's Temporary Embargo Is A Constitutional Content-Neutral
            Reasonable Time, Place And Manner Restriction. ..............................18

        3.  Even If The Court Treats Treasury's Temporary Embargo As A Prior
            Restraint, The Temporary Embargo Was Constitutional....................19

CONCLUSION .....................................................................................................20

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Alexander v. United States*, 509 U.S. 544 (1993) ............................................................19

*Allen v. Wright*, 468 U.S. 737 (1984) .............................................................................17

*Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8 (1st Cir. 2004).....................................18

*Cadle Co. v. Hayes*, 116 F.3d 957 (1st Cir. 1997)..........................................................4, 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................4

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988)..............................18, 19

*Dirks v. SEC*, 463 U.S. 646 (1983) .........................................................................5, 10, 16

*Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115 (1st Cir. 1981) .................19, 20

*Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932
    (1st Cir. 1987) ...............................................................................................................5

*Landmark Communications, Inc. v. Virginia*, 435 U.S. 829 (1978) ..................................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................................17

*McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313 (1st Cir. 1995)....................................4

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ......................................................19

*New York Times Co. v. United States*, 403 U.S. 713 (1971)..............................................19

*Osediacz v. City of Cranston*, 414 F.3d 136 (1st Cir. 2005)..............................................17

*Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1 (D.D.C. 2008) ..................................13, 14

*Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986)....................................19

*SEC v. Falbo*, 14 F. Supp. 2d 508 (S.D.N.Y. 1998) .........................................................16

*SEC v. Falcone*, 257 F.3d 226 (2d Cir. 2001)............................................................14, 15

*SEC v. Kirch*, 263 F. Supp. 2d 1144 (N.D. Ill. 2003) ..................................................14, 15

*SEC v. Kornman*, 391 F. Supp. 2d 477 (N.D. Texas 2005) ................................13

*SEC v. Maio*, 51 F.3d 623 (7th Cir. 1995) .........................................16

*SEC v. Mayhew*, 121 F.3d 44 (2d Cir. 1997) ...................................5, 8

*SEC v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1988).........................16

*SEC v. Rocklage*, 470 F.3d 1 (1st Cir. 2006) ....................................10

*SEC v. Sargent*, 229 F.3d 68 (1st Cir. 2000)..................................8, 10

*SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974) ...................................7

*SEC v. Singer*, 786 F. Supp. 1158 (S.D.N.Y. 1992) .........................10

*SEC v. Texas Gulf Sulphur*, 401 F.2d 833 (2d Cir. 1968)................7, 8

*SEC v. Yun*, 327 F.3d 1263 (11th Cir. 2003) ....................................13

*Steele v. Isikoff*, 130 F. Supp. 2d 23 (D.D.C. 2000)......................13, 14

*Sullivan v. City of Augusta*, 511 F.3d 16 (1st Cir. 2007) ..................18

*United States v. Carpenter*, 791 F.2d 1024 (2nd Cir. 1986)..............19

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) .............10, 14

*United States v. Kim*, 184 F. Supp. 2d 1006 (N.D. Cal. 2002) ..........15

*United States v. Libera*, 989 F.2d 596 (2d Cir. 1993)..........................5

*United States v. O'Hagan*, 521 U.S. 642 (1997).............................8, 10

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ........................18

## FEDERAL STATUTES

Securities Exchange Act of 1934
  Section 10(b) [15 U.S.C. § 78(j)] ...........................................5, 8

17 C.F.R. § 240.10b-5...............................................................5, 8

17 C.F.R. § 240.10b5-2......................................................10, 11, 13, 14

31 C.F.R. § 407.5......................................................................13

17 C.F.R. §§ 243.100-103.................................................................................................8

Federal Rule of Civil Procedure 56(c) ...........................................................................4

## OTHER AUTHORITIES

Selective Disclosure and Insider Trading, Exchange Act Release 7881, 65 Fed.
    Reg. 51, 716-01 (Aug. 24, 2000) .............................................................................10

The Securities and Exchange Commission ("SEC" or the "Commission") files this opposition to Defendant Steven E. Nothern's Motion for Summary Judgment.[1]

## PRELIMINARY STATEMENT

The SEC did not move for summary judgment in this action because seldom has an action been less appropriate for summary judgment. The three central elements at issue in Nothern's motion – (1) whether the information about the cancellation of the 30-year bond was nonpublic at the time Nothern traded; (2) whether Peter Davis violated a fiduciary-like duty of trust or confidence to the U.S. Department of Treasury ("Treasury") when he tipped Nothern with embargoed information about Treasury's decision to cancel the bond; and (3) whether Nothern knew or should have known that Davis was acting in violation of a duty to Treasury – all involve the application of the legal standards to the facts. As shown in the SEC's Statement of Genuine Issues and Response to Defendant's Purported Statement of Undisputed Facts ("SGI"), filed herewith, nearly all of the material factual issues of importance to this action are open to genuine dispute, differing characterizations, conflicting interpretations and varying views of importance. Ignoring the fact that summary judgment is inappropriate where genuine issues of material fact exist, Nothern grounds his motion not in established law, but in his inaccurate version of the facts – the majority of which are contradicted by the evidentiary record.

The record shows that on October 31, 2001, Peter J. Davis Jr., a Washington, D.C.-based consultant, hired by Massachusetts Financial Services Company ("MFS"), attended a refunding press conference at Treasury. Treasury subjected the information released at this conference to a temporary 10 a.m. embargo.[2] The October 31, 2001 conference was not the first refunding press conference Davis attended. Davis had been regularly attending Treasury refunding press conferences since the mid-1990s "pursuant to an agreement that he had with the Treasury

---

[1] All references to Defendant's Memorandum In Support of His Motion for Summary Judgment, Dkt. # 106, will be referred to herein as ("Motion" or "Nothern's Motion").

[2] Prior to October 31, 2001, Treasury used an embargo procedure that did not involve a lockdown to protect the confidentiality of information released at its quarterly refunding conferences. *See* SGI ¶13. Treasury officials testified that they were not aware of any time prior to October 31, 2001 where an attendee at any of Treasury's press conferences had intentionally violated an embargo. *See* SGI ¶¶ 2, 12.

1

Department that he would abide by the embargo and keep all information disseminated there confidential until the embargo expired." SGI ¶ 33. (quoting plea hearing transcript in *U.S. v. Davis*, 03 CR__ (SDNY)). Davis only began attending refunding press conferences after entering into this agreement with Treasury. SGI ¶ 24. For years prior to October 31, 2001, Davis abided by the terms of the agreement and maintained the confidentiality of information he obtained at Treasury's refunding conferences during the temporary embargo period. SGI ¶ 31. Attendance at Treasury's refunding press conferences was not open to the public, but was limited to select individuals, including members of the press, certain government officials and Peter Davis (who had an express agreement to maintain the confidentiality of Treasury's refunding information). SGI ¶¶ 24, 25, 30, 46. All attendees, including Davis, were required to be cleared into the Treasury building through the Secret Service. SGI ¶ 46.

At the beginning and the end of the October 31, 2001 press conference, a Treasury Public Affairs Specialist announced that the information provided at the conference would be embargoed until 10 a.m. SGI ¶47. Despite his agreement with Treasury, and the directives given by the Treasury employee during the conference concerning the 10 a.m. embargo time, as soon as the conference ended, Davis left the Treasury building, and once outside called a number of his clients on his cell phone, including Nothern, to tell them about Treasury's decision to cancel the 30-year bond. SGI ¶¶ 54.

Davis called Nothern at approximately 9:38 a.m. on October 31 and left a voice-mail message. SGI ¶¶ 54, 68. Nothern retrieved and listened to the message, which he admits revealed that "Peter Fisher had indicated to Pete Davis that they'd be canceling the long bond and that there would be a press release because it was embargoed until 10 o'clock." SGI ¶ 58. Nothern has admitted that he understood that Peter Fisher was a Treasury official in the debt finance area who would have had access to market-sensitive information such as Treasury's decision to suspend or cancel the 30-year bond. SGI ¶ 58. Additionally, Nothern has admitted that when he received Davis's voicemail he was aware of the meaning of the term embargo as it applied to information from government agencies. SGI ¶¶ 10, 38, 58.

2

Immediately after retrieving Davis's voicemail message, Nothern relayed the material nonpublic information that he had received from Davis concerning Treasury's cancellation of the 30-year bond to three other MFS portfolio managers. SGI ¶ 69. When conveying this information Nothern neglected to tell the other portfolio managers that the information was embargoed, that Davis had gotten the information from Peter Fisher, or that Treasury planned to announce the bond cancellation in a 10 a.m. press release. SGI ¶ 69, 71. Nothern then placed an order to purchase $25 million in par value of the 30-year bond for the portfolios that he managed. SGI ¶ 70. Based, in part, on the limited information that they received from Nothern, the three other portfolio managers also placed orders to purchase 30-year bonds for the portfolios they managed. SGI ¶ 70. In total, the amount of bonds Nothern and the three other portfolio managers purchased equaled $65 million in par value. SGI ¶ 70. In the hours and days that followed his trading in the 30-year bond, Nothern participated in at least two conversations with at least six different MFS employees, including his supervisor, in which he was asked whether Davis had notified him that the information about the cancellation of the bond was embargoed. In all of these conversations, Nothern's response was "No." SGI ¶¶ 72-73.

Records from Merrill Lynch, the counterparty to MFS's trade in the 30-year bond, and testimony in this case indicate that the MFS trader, who Nothern and the three other portfolio managers instructed to purchase the $65 million in bonds, verbally confirmed the order for the bonds with the Merrill Lynch bond trader before 9:42 a.m.[3] SGI ¶ 75-76. At 9:43 a.m., Treasury inadvertently posted a press release on its website announcing that it was canceling issuance of the 30-year bond. SGI ¶¶ 56-58.[4] The price and volume data on the 30-year bond from October

---

[3] Merrill Lynch utilized a Trade Order Management System ("TOMS") maintained by Bloomberg, L.P. ("Bloomberg"). SGI ¶ 74. According to Bloomberg's records, the Merrill Lynch bond trader first entered the trade into TOMS at 9:42:02. SGI ¶ 75. The trader testified that he verbally confirmed that the trade was "done," or executed, sometime prior to entering the trade information into TOMS. *Id.*

[4] Testimony by Verizon Business ("Verizon"), which maintained Treasury's staging and production servers, confirms that, as a practical matter, Treasury's press release could not be viewed by the public on Treasury's website prior to the posting on its production server at 9:43:28 – after Nothern placed his order to trade the 30-year bond on October 31, 2001. SGI ¶¶ 56-59.

31, 2001, the facts underlying the report of expert witness Jeffry Davis, and other evidence, show that the information about Treasury's decision to cancel the bond was not broadly disseminated to the public, and was not reflected in the price of the bond until *after* Nothern placed his trade order and the trade was verbally confirmed.[5]  SGI ¶¶ 57-59, 65, 66.

On September 3, 2003, Davis pleaded guilty to three counts of a criminal indictment resulting from his providing the October 31, 2001 embargoed bond cancellation information to John Youngdahl, an economist at Goldman, Sachs & Co. SGI ¶ 32.  During his plea hearing, Davis admitted that he knew that "the information disseminated in the press conference was embargoed by Treasury officials, such that it could not be published or divulged before a specific time shortly after the press conference concluded." SGI ¶ 33.  He has also admitted that he violated his duty to Treasury to keep the information that he heard at the Treasury's October 31, 2001 refunding press conference confidential until the embargo expired by calling clients so they could "make significant moves in advance of the market responding to the official public release," which is exactly what Nothern did in this case. SGI ¶ 34.

## ARGUMENT

### A.    The Standard For Summary Judgment Is Not Met By Nothern.

Summary judgment is appropriate only where the parties' submissions demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (same).  Nothern bears the initial burden of showing that no genuine issue of fact exists. *See Catrett*, 477 U.S. at 323.[6]  In ruling on Nothern's motion for summary judgment,

---

[5] Nothern's claim that Brian Collins, a reporter from the *National Mortgage News*, leaked information about the cancellation during the embargo period is contradicted by Collins's own deposition testimony. Collins testified that he did not disclose the information to anyone in the public before sometime between 9:45 a.m. and 9:50 a.m. on October 31 – long after Nothern traded and after Treasury lifted the embargo by posting the refunding announcement on its website. SGI ¶ 51.

[6] An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir. 1997).  "Material" facts are those which possess the capacity to affect the outcome of the litigation under the applicable law. *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995) (citations omitted).

the Court should view the facts in the light most favorable to the SEC, and indulge all reasonable inferences in the SEC's favor. *Cadle Co. v. Hayes,* 116 F.3d at 959-960. "Only if the record, viewed in that manner and without regard to credibility determinations, reveals no genuine issue as to any material fact may the court enter summary judgment." *Id.* at 959-960. At the summary judgment stage, the Court may not weigh the evidence. *Greenburg v. Puerto Rico Maritime Shipping Authority*, 835 F.2d 932, 936 (1st Cir. 1987). Nothern's Motion improperly seeks to have this Court consider genuinely disputed issues of fact and weigh the credibility of witnesses in order to determine mixed issues of fact and law. Nothern does not satisfy the requirements to obtain summary judgment. His Motion should be denied.

### B.    There Is An Abundance Of Evidence That Supports The SEC's Claim That Nothern Traded On Nonpublic Information.

Noticeably absent from Nothern's Motion is any discussion of the legal standard used by federal courts to determine when information has become public in the context of insider trading cases. Nothern likely omitted citations to legal authority discussing the criteria used to define "public" information under section 10(b) and Rule 10b-5 because he cannot satisfy that criteria.

It is well-established that in the insider trading context, information remains nonpublic until either: (1) it is "disclosed 'to achieve a broad dissemination to the investing public generally and without favoring any special person or group,'" or (2) "although known only by a few persons, their trading on it 'has caused the information to be fully impounded into the price of the particular security.'" *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997) (quoting *Dirks v. SEC*, 463 U.S. 646, 653 n. 12 (1983)) and *United States v. Libera*, 989 F.2d 596, 601 (2d Cir. 1993)). Information "must be specific and more private than general rumor" to constitute "nonpublic" information for the purposes of Section 10(b) and Rule 10b-5. *Mayhew*, 121 F.3d at 50 (citations and internal quotations omitted). Nothern has failed to set forth any facts, let alone any undisputed facts, that prove that Treasury's decision to cancel the 30-year bond had been broadly disseminated to the general investing public or fully impounded into the price of the bond by the time he placed his first order to trade the bond on October 31, 2001.

5

There is an abundance of evidence in the record that supports the SEC's claim that Treasury's decision to cancel the 30-year bond had not been distributed to achieve broad dissemination to the investing public when Nothern placed his order to trade the bond on October 31, 2001. The evidence shows that Nothern placed his trade order before 9:42:02 a.m. on October 31, 2001. SGI ¶ 75. Thereafter, at 9:43:28, Treasury unexpectedly posted a press release on its website announcing the bond cancellation. SGI ¶¶ 57-59, 76. Several minutes later, between 9:52 a.m. and 9:57 a.m., Reuters published a news wire release announcing the cancellation of the bond. SGI ¶ 65. Despite Treasury's premature and inadvertent website posting, it was not until 9:57 a.m. – after the Reuter's wire release – that the price of the 30-year bond reacted in a manner that is consistent with the public release of market-moving Treasury announcements. SGI ¶¶ 65, 66. Based on this evidence, a reasonable jury can infer that Treasury's decision to cancel the 30-year bond did not achieve broad dissemination through the media of widest circulation until it was posted by Reuter's between 9:52 a.m. and 9:57 a.m.

Without acknowledging the severe reaction that occurred in the price of the bond after the Reuter's wire release, Nothern claims that Treasury caused information about the bond cancellation to become public when a Treasury employee uploaded the refunding press release to Treasury's pre-publication staging server at approximately 9:40 a.m. Motion at 7. Evidence obtained from Verizon, which maintained the servers that Treasury employees used to post information to Treasury's website, confirms that the earliest anyone from the investing public could possibly have viewed the refunding press release on Treasury's website was 9:43:28 a.m. on October 31, after the release was published to Treasury's publicly available production server, and after Nothern placed his order to trade. SGI ¶¶ 56-58. Significantly, Nothern fails to proffer any evidence that confirms that *anyone* in the investing public actually viewed the press release on Treasury's website prior to the time Nothern placed his trade order. In fact, statistical analysis of the price volume data for the 30-year bond on October 31, 2001, indicates that the investing public did not view the press release on Treasury's website, and did not become aware of Treasury's decision to cancel the bond until approximately 9:57 a.m., after the release of the

6

Reuter's news wire. SGI ¶ 14, 66. Even if Nothern were able to establish through undisputed facts that information concerning Treasury's decision to cancel the 30-year bond was publicly available on Treasury's website before he traded – which he cannot – he would still be unable to prove that the unexpected premature web posting caused the information to be broadly disseminated to the general investing public.

Nothern also fails to argue, let alone prove through undisputed facts, that Treasury's decision to cancel the 30-year bond had become fully impounded into the price of the bond at the time he traded. Strong evidence in the record indicates that Treasury's decision to cancel the bond *had not* become fully impounded, or fully reflected, in the price of the bond prior to 9:57 a.m. on October 31, 2001. SGI ¶ 66. The statistical analysis of expert witness Jeffry Davis shows that Treasury's decision to cancel the bond was not fully reflected in the price of the bond until 9:57 a.m. on October 31, 2001 at the earliest. SGI ¶ 66.

Instead of applying the legal definition of "nonpublic" information, Nothern attempts to make up his own definition. First, Nothern claims that because Treasury announced the cancellation of the bond to select individuals at a press conference within the Treasury building, to which access was restricted, it caused the information to become public as a matter of law at 9 a.m. on October 31, 2001 when the conference began. Motion at 7-10. This rationale has been rejected by the federal courts that have addressed it. In determining whether material information has "achieved broad dissemination to the investing public," courts have found that the analysis does not end when the information is initially announced to select members of the press. *See e.g., SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 854-855 (2d Cir. 1968) (concluding that the information the defendant used to trade was "nonpublic" as a matter of law even though it had been announced to members of the financial press at a press conference twenty minutes before the defendant placed his trade order, and finding that the defendant should have waited until the announcement "could reasonably have been expected to appear over *the media of widest circulation*," rather than hastening to insure a trading advantage) (emphasis added); *SEC v. Shapiro*, 494 F.2d 1301, 1037 n.4 (2d Cir. 1974) (finding that although the appellant had

7

received inside information about a possible merger and placed an order to trade after the public disclosure of an announcement of the merger agreement, he nonetheless traded based on nonpublic information because he placed the order "before investors had an opportunity to receive and react to the disclosure."). Indeed, the Second Circuit has held that "the reading of a news release . . . is merely the first step in the process of dissemination required for compliance with the regulatory objective of providing all investors with an equal opportunity to make informed investment decisions." *Texas Gulf Sulphur*, 401 F.2d at 854-855. "Before insiders may act upon material information, such information must be effectively disclosed in a manner to insure its availability to the investing public." *Id.*[7]

Nothern also contends that Treasury's decision to cancel the 30-year bond was public because Treasury did not maintain the confidentiality, or restrain the dissemination, of the information. Motion at 7, 19-20. This contention is legally inaccurate, and disputed by facts in the record. SGI ¶¶ 2, 7-9, 13, 48-49. While Nothern speculates that anyone in the Treasury building "was free to attend" the October 31 refunding press conference, there is no evidence that anyone other than the small number of attendees who had been pre-cleared by Treasury employees, actually did attend the conference. Motion at 7; SGI ¶ 46. Further, there is no

---

[7] Nothern also contends that in order to establish that the information about the 30-year bond cancellation that he received from Davis was nonpublic, the SEC must prove that *everyone* who attended Treasury's refunding press conference owed a duty to Treasury. Motion at 7-10. Nothern's contention misstates the law on both the duty and nonpublic elements of insider trading under the misappropriation theory. Whether or not attendees at Treasury's refunding press conference had a duty to abide by Treasury's embargo is immaterial to determining if the information that Davis conveyed to Nothern was "public"– i.e. whether the information had achieved broad dissemination to the investing public or been impounded into the price of the 30-year bond – at the time Nothern placed his order to trade the bond. *See Mayhew*, 121 F.3d at 50. Furthermore, the SEC is not required to prove that *all* of the refunding conference attendees owed a duty to Treasury, it need only prove that Nothern's tipper, Davis, owed a fiduciary-like duty to Treasury, the source of the information. *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997); *SEC v. Sargent*, 229 F.3d 68, 75 (1st Cir. 2000) (citing *O'Hagan*).

Additionally, Nothern's reliance on Regulation FD, 17 C.F.R. §§ 243.100-103, is misplaced. Motion at 9, 15. Regulation FD only applies to a list of defined persons, which does not include the attendees at Treasury's refunding press conference. Further, the presence or absence of facts relevant to an analysis of a Regulation FD violation does not establish facts for purposes of insider trading liability under Section 10(b) and Rule 10b-5. *See* 17 C.F.R. §243.102.

evidence that anyone who attended the conference, or received a copy of Treasury's press release during the embargo period, disclosed the embargoed information to the public. Indeed, the evidentiary record indicates that the *only* person who violated the embargo on October 31, 2001 was Davis, who disseminated Treasury's confidential information to a few clients, not the investing public in general. SGI ¶¶ 34, 54, 55. Notably, prior to October 31, 2001, Treasury had been using embargo procedures that did not include a lockdown for years. SGI ¶ 2. Contrary to Nothern's unsupported allegations, an abundance of evidence shows that prior to October 31, 2001, Treasury had not experienced any intentional embargo violations or premature leaks of its refunding or other market moving information for approximately thirty years. SGI ¶¶ 2, 3, 7, 12.

Viewing the evidence in the light most favorable to the SEC and drawing all reasonable inferences in favor of the SEC, Nothern cannot make the showing required for the entry of summary judgment on his claim that the advance nonpublic information he obtained from Davis on October 31, 2001 concerning Treasury's cancellation of the 30-year bond was public as a matter of law at the time he placed his order to trade. His request for summary judgment on this issue should be denied.

### C. The SEC Has Raised Genuine Factual Issues That Support Its Claim That Peter Davis Tipped Nothern In Violation Of A Duty To Treasury.

Overwhelming evidence in the record shows that: (1) Davis entered into a specific agreement with Treasury that allowed him to attend Treasury's quarterly refunding press conferences on the condition that he would keep all information disseminated at the conferences confidential during the embargo period, SGI ¶¶ 23-25; (2) from the mid-1990s until October 31, 2001, Davis regularly attended Treasury refunding press conferences pursuant to this agreement, SGI ¶ 26-29; and (3) for years Davis maintained the confidentiality of the information he obtained at Treasury's refunding press conferences during the embargo period. SGI ¶ 31. In the face of this evidence, Nothern makes the unbelievable claim that the Court should award him summary judgment on the issue of duty. Nothern's claim is not supported by law, is belied by facts in the record, and should be rejected.

9

The SEC's theory of liability in this case is based on the misappropriation theory of insider trading. "The misappropriation theory premises liability on a fiduciary-turned trader's deception of those who entrusted him with access to confidential information." *SEC v. Sargent*, 229 F.3d at 75-76 (citing *United States v. O'Hagan*, 521 U.S. 642, 652, (1997)). To succeed on its claims, the SEC must prove that Davis communicated material nonpublic information to Nothern, with scienter, in violation of a duty that Davis owed to Treasury. *See SEC v. Rocklage*, 470 F.3d 1, 7 (1st Cir. 2006).[8] The SEC is not required to prove that Davis had a strictly fiduciary relationship with Treasury; it need only show that Davis and Treasury had a "similar relationship of trust and confidence" that obligated Davis to maintain the confidentiality of Treasury's refunding information during the embargo period. *United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991).

Courts have found that the existence of a "similar relationship of trust and confidence" is a question of fact to be determined by the jury at trial. *See e.g.*, *SEC v. Singer*, 786 F. Supp. 1158, 1169 (S.D.N.Y. 1992) (citations and internal quotations omitted). Here, not only do the material facts create a genuine dispute on the issue of duty, but those facts lend strong support to the SEC's claim that Davis had a duty to maintain the confidentiality of the information that he received at Treasury's October 31, 2001 refunding press conference.

### 1.    A Reasonable Jury Can Find That Davis Had A Duty To Treasury Based On His History Pattern and Practice Of Maintaining The Confidentiality Of Treasury's Refunding Information.

In August 2000, over a year prior to the trading at issue in this case, the SEC adopted Rule 10b5-2, a regulation that defines non-exclusive circumstances under which a duty of trust or confidence exists for purposes of the misappropriation theory of insider trading. *See* 17 C.F.R. 240.10b5-2; Selective Disclosure and Insider Trading, Exchange Act Release 7881, 65 Fed. Reg. 51,716-01 (Aug. 24, 2000); *Rocklage*, 470 F.3d at 7 n.5. Under Rule 10b5-2, a relationship of

---

[8] As discussed in Section D. below, the SEC must also prove that Nothern knew or should have known that Davis tipped him in violation of a duty. *See Dirks v. SEC*, 463 U.S. 646, 660 (1983).

trust and confidence exists: (1) when a person has agreed to maintain that information in confidence; and (2) when a person involved in the communication has "a history, pattern, or practice of sharing confidences" that results in an expectation of confidentiality by the source.[9] 17 C.F.R. 240.10b5-2.[10]

The evidentiary record supports a finding that Davis had a duty to Treasury under Rule 10b5-2(b)(2), because Treasury had a history, pattern and practice of allowing Davis access to confidential information at its refunding press conferences and Davis had a history, pattern and practice of maintaining the confidentiality of Treasury's refunding information during the temporary embargo period. It is undisputed that for years prior to October 31, 2001, Davis was regularly granted permission by Treasury officials to attend, and did attend, Treasury's quarterly refunding press conferences. SGI ¶¶ 26, 27-29. The information announced at the conferences was always subject to a temporary embargo. SGI ¶¶ 10, 13, 33. For years Davis maintained the confidentiality of the information announced at the conferences during the temporary embargo period. SGI ¶ 31. Davis has admitted that he heard a Treasury official announce the 10:00 a.m. embargo at the beginning and end of Treasury's October 31, 2001 refunding press conference and he did not leave, or notify anyone at Treasury that he did not intend to abide by the temporary embargo as he had done in the past. Based on this evidence, a reasonable jury can find that Davis had a duty to Treasury under Rule 10b5-2(b)(2) because he had a history of regularly attending Treasury refunding conferences and complying with Treasury's refunding embargoes.

**2.    A Reasonable Jury Can Find That Davis Had An Agreement With Treasury That Created A Fiduciary-Like Duty Of Trust And Confidence.**

The record in this case also contains evidence that supports a finding that Davis had a duty to Treasury because he had expressly agreed that he would keep all information

---

[9] Rule 10b5-2 also contains a third circumstance in which a relationship of trust and confidence exists, which specifically addresses familial relationships and is not applicable here. 17 C.F.R. 240.10b5-2(b)(3).

[10] Rule 10b5-2 applies to this case. *See* 17 C.F.R. § 240.10b5-2(a) "Scope of Rule" (stating that the Rule applies to "any violation of Section 10(b)").

11

disseminated at Treasury's refunding conferences confidential during the embargo period. SGI ¶¶ 23-25, 33. Davis has admitted under oath that he began attending Treasury's refunding press conferences in the mid 1990s pursuant to an agreement he entered into with Treasury official Roger Anderson, Treasury's former Deputy Assistant Secretary for Federal Finance. SGI ¶ 23. Although a genuine issue exists as to the form of the agreement - Davis testified that the agreement was written, while Anderson believed it was oral – that issue is of no moment. SGI ¶¶ 23-25. The evidence indicates that Davis entered into an agreement with Anderson in which he promised to abide by Treasury's embargo and not disseminate information provided at Treasury's refunding press conferences, if Anderson allowed him to attend the conferences. *Id.*

While Nothern claims that there is no evidence that Anderson ever granted Davis entry to the refunding conferences, and that Anderson only understood his agreement with Davis to apply to one refunding conference, evidence in the record disputes these claims. SGI ¶¶ 27, 28. A chart produced by Treasury containing information about Davis's admission to the Treasury building shows that on numerous occasions, Anderson cleared Davis into Treasury for Tuesday refunding events.[11] SGI ¶ 27. This chart also shows that while Anderson was still at Treasury, and after he left Treasury in 1999, Davis was cleared into the Wednesday refunding press conferences on a regular basis by two Treasury employees who worked under Anderson's supervision, Jill Ousley and Paul Malvey. *Id.* Malvey testified that Anderson introduced him to Davis at one of Treasury's quarterly refunding conferences and told him that Davis was "one of the good guys." *Id.* Notably, in January 2000, Davis sent Malvey a letter requesting permission to have his administrative assistant attend the upcoming refunding press conference in his place, and confirming that he would "of course" maintain the confidence of the information obtained at the conference during the embargo period. SGI ¶ 29. Malvey approved Davis's request to attend the October 31, 2001 Treasury refunding conference and numerous other refunding conferences

---

[11] Although Anderson testified that he was not sure he had the authority to admit Davis to Treasury's refunding press conferences, the scope of Anderson's authority is a disputed factual issue. *See* SGI ¶¶ 27, 28, 30. At the very least, Anderson had the apparent authority to admit Davis to refunding conferences.

prior to October 31, 2001. SGI ¶ 27-28. Together this evidence creates a genuine factual dispute as to whether Davis had an agreement with Treasury that created a fiduciary-like duty of trust and confidence which required Davis to maintain the confidentiality of the embargoed information that he obtained at Treasury's October 31, 2001 refunding press conference.[12]

Relying on a single law review article, Nothern argues that this Court should find Rule 10b5-2(b)(1) "invalid" and refuse to consider whether Davis' agreement with Treasury established a fiduciary-like duty as defined by the Rule. Motion at 14-16. Nothern claims that the SEC stepped outside of its authority in adopting Rule 10b5-2(b)(1) because the Rule improperly expanded liability under § 10(b) of the Exchange Act. ***No federal court has ever adopted this argument.*** On the contrary, courts that have considered Rule 10b5-2(b)(1), have found that it properly defines circumstances in which a person has a fiduciary-like duty under the misappropriation theory of insider trading. *See e.g.*, *SEC v. Yun*, 327 F.3d 1263, 1273 n.23 (11th Cir. 2003) (noting that Rule 10b5-2, which was adopted since the underlying district court action, bolstered the Court's conclusion that an agreement to maintain business confidences would suffice to create a fiduciary-like duty); *SEC v. Kornman*, 391 F. Supp. 2d 477, 489-490 (N.D. Texas 2005) (applying Rule 10b5-2(b)(1) and finding that the complaint adequately alleged that the defendant had a fiduciary-like duty based on his receipt of agreements and memoranda that contained confidentiality provisions).[13]   Nothern's claim that Rule 10b5-2(b)(1) is "invalid" is baseless and should be rejected.

---

[12] Nothern argues that Davis's agreement with Treasury could not have established a duty because there is no evidence that Davis was admitted to the October 31, 2001 refunding press conference by someone knowledgeable about the agreement. Motion at 14. This argument lacks merit. Based on the evidence, a reasonable jury could find that Davis's admission to Treasury's quarterly refunding press conferences from the mid-1990's through October 31, 2001 was a direct result of the agreement he reached with Anderson. SGI ¶¶ 23-26. Further, in order to establish that Davis's agreement with Treasury created a fiduciary-like duty to abide by Treasury's embargo, the SEC need not prove that Davis was specifically admitted to the October 31, 2001 conference by someone knowledgeable about the agreement, it need only submit evidence to show that as of October 31, 2001, Davis had an agreement to maintain the confidentiality of Treasury's embargoed refunding information. *See* 17 C.F.R. 240.10b5-2(b)(1) (a fiduciary duty is created "whenever a person agrees to maintain information in confidence.").

[13] Nothern cites *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008) and *Steele v. Isikoff*, 130 F. Supp. 2d 23, 36-37 (D.D.C. 2000) in support of his claim that under District of Columbia law, the

### 3.    Aside From Rule 10b5-2, The SEC Has Proffered Evidence That Establishes That Davis Accepted A Duty To Keep Treasury's Confidences.

In this case Nothern's tipper, Davis, has admitted under oath that he accepted a duty to keep Treasury's refunding information confidential during the embargo period, and that he violated that duty by calling his clients on October 31, 2001, one of which was Nothern. Courts that have not specifically considered Rule 10b5-2 have nonetheless found that a fiduciary-like duty of confidentiality exists in cases, like this one, where a person expressly agrees to accept "a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties." *SEC v. Falcone,* 257 F.3d 226, 234 (2d Cir. 2001) (citation omitted). In *Falcone*, the Second Circuit found that there was sufficient evidence to allow a jury to find that an employee of Hudson News had a fiduciary-like duty to protect the confidences of *Business Week* absent a written confidentiality agreement, including evidence that: (1) Hudson News was told that *Business Week* had a policy of distributing its magazine on Thursday at 5 p.m. to protect the magazine's "highly confidential" content; (2) Hudson News employees understood that *Business Week* liked to make sure that "information in the magazine was held very closely"; and (3) Hudson News had a policy prohibiting its employees from stealing copies of *Business Week*.[14]  *Id.*  Similarly, in *SEC v. Kirch*, 263 F. Supp. 2d 1144, 1150-1151 (N.D. Ill. 2003) the court found a fiduciary relationship where one member of a business-oriented group, the "Software Executive Roundtable," shared a confidential business secret with other members, in light of an unwritten policy and understanding among members that

---

existence of a contract does not necessarily create a fiduciary duty. Motion at 15. *Paul* and *Isikoff* are not insider trading cases and do not involve an analysis of fiduciary-like duties under the misappropriation theory. This case also differs from *Paul* and *Isikoff* because Davis's duty was not merely predicated on his agreement with Treasury, but on all of the facts and circumstances of his attendance at Treasury's refunding press conferences, including, but not limited to, his admitted acceptance of a duty and his history of maintaining the confidentiality of Treasury's embargoed refunding information. Davis was also required to obey the Treasury official's announcement of the embargo pursuant to 31 C.F.R. § 407.5.

[14] *See also U.S. v. Chestman*, 947 F.2d at 571 (finding that an explicit agreement to assume a duty to maintain confidences, or a history of sharing business confidences can create a fiduciary-like duty).

confidential information would be kept confidential.[15]

The evidence in this case that supports the SEC's claim that Davis had the equivalent of a fiduciary duty to Treasury is arguably stronger than the evidence proffered by the SEC in *Falcone* and *Kirch* because here Davis has admitted that he: (1) entered into a written confidentiality agreement with Treasury; (2) heard and understood the instructions given by Treasury's press official announcing the 10 a.m. embargo on October 31, 2001; (3) had a full and complete understanding that he was obligated to maintain the confidentiality of Treasury's embargoed refunding information; and (4) purposefully violated his duty to Treasury by disclosing information about Treasury's decision to cancel the 30-year bond to Nothern and his other clients during the embargo period on October 31, 2001. SGI ¶¶ 23-24, 32-34, 47.

### D. Whether Nothern Knew Or Should Have Known That Davis Violated A Duty To Treasury Is A Contested Factual Issue For The Jury.

The SEC is not required to prove that Nothern knew for certain that Davis was breaching a duty to Treasury by providing him with embargoed information about Treasury's decision to cancel the 30-year bond, it need only prove that Nothern *should have known* that a fiduciary-like

---

[15] In his Motion Nothern relies on *United States v. Kim*, 184 F. Supp. 2d 1006, 1011-1014 (N.D. Cal. 2002), a criminal case in which a district court in California found that the relationship between members of a social club was not the functional equivalent of a fiduciary relationship, notwithstanding the fact that the members had entered into a general confidentiality agreement. *See* Motion at 16. In reaching its decision in *Kim*, the court held that fiduciary-like relationships under the misappropriation theory should be characterized by superiority, dominance or control and found that there was no legitimate purpose for one member of the social club to have disclosed information about merger negotiations to another member. The action against *Kim* began in 1999, prior to the enactment of Rule 10b5-2. Notably, no court in the First Circuit has followed the *Kim* decision and read an additional requirement of superiority dominance and control into the duty element of the misappropriation theory. In *Kirch*, the court distinguished *Kim* and found "the duty of loyalty and confidentiality . . . is not limited to fiduciary relationships in the limited sense that requires such factors as control and dominance on the part of the fiduciary." *Kirch*, 263 F. Supp. 2d at 1150-1151. Even if this Court were to apply the additional dominance and control requirement established by *Kim*– which it should not –a reasonable jury could find that the relationship between Treasury and Davis satisfied this requirement because Treasury had a legitimate business purpose in disclosing its market moving refunding information at its refunding press conference subject to an embargo, i.e. the predictable, broad, uniform dissemination of the information. SGI ¶ 13.

duty was being breached. *See Dirks*, 463 U.S. at 660.[16]  The SEC can satisfy its burden of proof

by offering direct or circumstantial evidence from which a jury can infer that Nothern knew or

should have known that Davis had a duty. *See SEC v. Musella*, 678 F. Supp. 1060, 1062-1063

(S.D.N.Y. 1988). It is clear from the facts set forth below, that whether Nothern knew or should

have known that Davis was violating a duty to Treasury is a genuinely disputed factual issue for

the jury and that Nothern's request for summary judgment on this issue is inappropriate.

There are sufficient facts in the evidentiary record that would allow a jury to find that the

SEC has met its burden of proving that Nothern knew or should have known that Davis violated

a duty to Treasury by providing him with embargoed information. First, Nothern has admitted

that Davis told him that he learned about the elimination of the 30-year bond from Peter Fisher, a

high-ranking Treasury official. SGI ¶ 38, 68. Second, Nothern admitted that he was told that

there as an embargo in place until 10 a.m. and was familiar with the term embargo as it related to

information released by other government agencies. *Id*. Third, Nothern admitted that he knew

Davis had contacts at Treasury because he had participated in meetings with Treasury officials in

the Treasury building arranged by Davis. SGI ¶ 19.

In addition to these damning admissions, the evidence shows that Nothern has made

several self-serving claims to downplay his knowledge about Davis's duty. Although Nothern

claims that he told the MFS portfolio managers that joined in his trade in the 30-year bond and

his trader that the information he received from Davis was subject to an embargo, *not one* of

them corroborate his claim. SGI ¶¶ 69-70. One of the portfolio managers testified that he was

surprised to eventually find out that Nothern had been told that the bond cancellation information

he received from Peter Davis was subject to an embargo. SGI ¶ 71. He further testified that if he

had known that the information was subject to an embargo, it might have indicated to him that

the information was not yet public. SGI ¶ 71. Not only did Nothern fail to mention the embargo

---

[16] *See also SEC v. Maio,* 51 F.3d 623, 634 (7th Cir. 1995) (tippee liability attaches when the tippee "knew or should have known" that the tipper's disclosure was improperly obtained); *SEC v. Falbo,* 14 F. Supp. 2d 508, 519 (S.D.N.Y. 1998) (quoting *Dirks,* 463 U.S. at 660).

to his trader and fellow portfolio managers, when asked by his supervisors if Davis had told him about the embargo, he responded "No". SGI ¶¶ 72-73. Additionally, while Nothern maintains that he had no idea that Davis attended Treasury refunding conferences, the evidence shows that Nothern participated in a telephone call with Davis minutes after the conclusion of the August 2001 Treasury refunding press conference which lasted for twelve minutes.[17]  SGI ¶ 36.  Over the years, Nothern also received numerous refunding announcements and other documents from Davis, including an announcement that referenced Treasury's refunding embargo. SGI ¶¶ 10, 37. Based on this evidence, a jury can find that Nothern either knew or should have known that Davis was violating a duty to Treasury by providing him with embargoed refunding information.

### E.    Nothern's First Amendment Challenge Is Spurious.

#### 1.    Nothern Lacks Standing To Raise A First Amendment Challenge To Treasury's Temporary Embargo.

Nothern has no standing to raise this claim.  Nothern fails to make clear in his pleading whether he is attempting to raise an as-applied claim or a facial challenge, but in either event his claim fails. *See* Motion at 10-11. To the extent he is challenging Treasury's embargo as-applied on October 31, 2001, courts have repeatedly recognized "the general prohibition on a litigant's raising another person's legal rights." *Allen v. Wright*, 468 U.S. 737, 751 (1984).  Nothern did not attend the Treasury briefing and Nothern's speech was not restricted by Treasury's embargo of approximately 35 minutes[18] on those who were present at the briefing.[19]  Moreover, the First Circuit has recognized: "The constitutional core of standing requires that a [party] make a tripartite showing: she must demonstrate that she has suffered an injury in fact, that her injury is fairly traceable to the disputed conduct, and that the relief sought promises to redress the injury sustained." *Osediacz v. City of Cranston*, 414 F.3d 136, 139 (1st Cir. 2005) (citing *Lujan v.*

---

[17] The evidence suggests that Davis made these calls to Nothern after the embargo period.

[18] Nothern asserts that the embargo time was 35 minutes. *See* Motion at 5

[19] Davis, who attended the October 31, 2001 Treasury briefing, may have had standing to raise a First Amendment challenge (albeit a meritless one) to Treasury's embargo – but Nothern does not.  As a factual matter, Davis pleaded guilty to insider trading and did not raise a First Amendment challenge to Treasury's temporary embargo. SGI ¶ 32.

*Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). Nothern does not meet any of these criteria. He has not made any colorable claim to have "suffered an injury in fact." He has failed to allege that that any "injury" he suffered is traceable to Treasury's temporary embargo, and he has not demonstrated that the relief he seeks (presumably exoneration from an insider trading conviction) would redress an "injury" he supposedly sustained. *See* Motion at 10-11.

To the extent that Nothern obliquely attempts to raise a facial challenge, he fails to identify what legal provision – statute, regulation or rule – he is purporting to facially contest. In addition, under the law of the First Circuit, a "party raising [a] First Amendment facial challenge must also satisfy the constitutional requirement of 'injury-in-fact.'" *Sullivan v. City of Augusta*, 511 F.3d 16, 25 (1st Cir. 2007). As noted above, Nothern has failed to plead any plausible "injury in fact." *See* Motion at 10-11. Finally, Nothern acknowledges that Treasury's October 31, 2001 temporary embargo practices are no longer in effect, thus a facial challenge to the temporary embargo is moot. *See* Motion at 7. Nothern's lack of standing should end the Court's inquiry into this claim.

### 2. Treasury's Temporary Embargo Is A Constitutional Content-Neutral Reasonable Time, Place And Manner Restriction.

Treasury's temporary embargo of its 30-year bond announcement on October 31, 2001 is a quintessential content-neutral reasonable time, place and manner restriction. "[H]ere, the [Government] has not sought to prevent speech, but, rather, to regulate the place and manner of its expression." *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 12 (1st Cir. 2004). Treasury's temporary embargo applied to all persons who attended the morning briefing, regardless of viewpoint or the content of what they intended to communicate. *See e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) ("the principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it

conveys.").[20] Even Nothern does not allege that Treasury's temporary embargo was based on content or viewpoint. *See* Motion at 10-11. Rather, Treasury's decision was a content-neutral, reasonable time, place and manner restriction: it permitted journalists to learn of the news several minutes before 10 a.m., in order to enable them to accurately communicate about the market-moving news at 10:00 a.m., as soon as it became public. *See* SGI ¶¶ 13, 14.

### 3.    Even If The Court Treats Treasury's Temporary Embargo As A Prior Restraint, The Temporary Embargo Was Constitutional.

If the Court were to analyze Treasury's temporary embargo as a prior restraint on speech,[21] the temporary embargo more than meets the constitutional threshold. The First Circuit has held:

> [I[t is clear that not all prior restraints are constitutionally impermissible. . . . Regulations governing in advance the time, place or manner of expression . . . are valid if they serve important state interests by the least restrictive means possible. . . . Put another way, a regulation that is directed primarily at conduct or at non-communicative aspects of protected expressive activities is permissible despite an incidental prior burden on expression if it is justified by sufficiently strong permissible government interests.

---

[20] *See also City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 763 (1988) ("[I]n the case of an ordinance that completely prohibits a particular manner of expression, the law on its face is both content and viewpoint neutral. In analyzing such a hypothetical ordinance, the Court would apply the well-settled time, place, and manner test.").

[21] None of the cases cited by Nothern in his discussion of prior restraint address factual scenarios comparable to the facts presented in this case. *See e.g., Alexander v. United States*, 509 U.S. 544 (1993) (holding no First Amendment violation where party was deprived of assets found to be related to prior racketeering violations); *United States v. Carpenter*, 791 F.2d 1024 (2nd Cir. 1986) (upholding insider trading convictions of newspaper reporter, newspaper clerk and stockbroker based on misappropriation of information from employer, the Wall Street Journal); *Matter of Providence Journal Co.*, 820 F.2d 1342 (1st Cir. 1986) (rejecting criminal contempt conviction where newspaper violated transparently invalid court order); *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) (rejecting court order which prohibited press from publishing accounts related to a criminal defendant's confessions in light of possible infringement on defendant's right to a fair trial where lower court did not adequately consider lesser measures or efficacy of prohibition); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) (holding statute which granted the mayor unfettered discretion over whether to grant or deny annual permits to place news racks on public property was unconstitutional); *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) (holding state may not criminally punish newspaper for divulging information regarding proceedings before a state judicial review commission when such proceedings are confidential under state law) (noting "the Supreme Court of Virginia held, and appellant does not dispute, [that] the challenged statute does not constitute a prior restraint or attempt by the State to censor the news media"); *New York Times Co. v. United States*, 403 U.S. 713 (1971) (holding government did not meet its burden in showing justification for enjoining the New York Times and Washington Post from publishing the contents of a classified study on the history of U.S. decision-making on Vietnam policy).

*Fantasy Book Shop, Inc. v. City of Boston*, 652 F.2d 1115, 1120 (1st Cir. 1981) (internal citation omitted). The temporary embargo more than meets this standard. It applied only to persons who chose to attend the briefing, or who received the embargoed press release by email from Treasury, imposed at most an approximately one-hour delay on communication, and was tailored to enable press to report on market-moving news while preventing tipping or trading on inside information, conduct which is illegal and which would ultimately harm investors. SGI ¶¶ 13, 14. Subsequent to the embargo violation and insider trading of October 31, 2001, Treasury implemented new announcement procedures: the information is announced in advance and embargoed until Treasury's public announcement, but participants are subject to a "lock-down," that is, they are not permitted to leave the room and no broadcast equipment is permitted. SUF, Dkt. # 105, ¶¶ 31, 32. Treasury shifted from a less restrictive embargo as of October 31, 2001 (no lock-down) to a more restrictive embargo (with lock-down) in order to further prevent illegal leaks, like the leak by Davis, that occurred under the more permissive policy. *See id.* Thus, Treasury's October 31, 2001 temporary embargo falls squarely within the constitutionally permissible category of prior restraints on speech which govern the time, place and manner of expression, in light of an important state interest and by the least restrictive means possible.

## CONCLUSION

For all of the foregoing reasons, the SEC respectfully requests that the Court deny Defendant's Motion for Summary Judgment.

Dated: July 15, 2008                          Respectfully Submitted,


                                              /s/ Erica Y. Williams
                                              Erica Y. Williams
                                              Sarah L. Levine
                                              John J. Rossetti, Jr.
                                              U.S. Securities and Exchange Commissions
                                              100 F Street, N.E.
                                              Washington, D.C. 20549-4010
                                              Phone:  (202) 551-4450
                                              Fax:     (202) 772-9245
                                              williamse@sec.gov

## CERTIFICATE OF SERVICE

I hereby certify that the SEC's Opposition to Defendant's Motion for Summary Judgment, the SEC's Statement of Genuine Issues and Response to Defendant's Purported Statement of Uncontested Facts and the supporting Declaration of John J. Rossetti Jr., filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated: July 15, 2008

/s/ Erica Y. Williams_____