# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS
### (Boston Division)

|  |  |  |
|---|---|---|
| | ) | |
| **UNITED STATES SECURITIES AND** | ) | |
| **EXCHANGE COMMISSION,** | ) | **Civil Action No. 05-CV-10983 (NMG)** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **STEVEN E. NOTHERN,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT AND RESPONSE TO DEFENDANT'S STATEMENT OF ALLEGED UNDISPUTED FACTS

**I.**

**INTRODUCTION**

Rather than limiting his Rule 56.1 statement to those facts that are material to this action, as required by the Federal and Local Rules, Nothern filed a statement that includes hundreds of alleged "undisputed" facts, most of which are not material to any issues in this case.[1]  In addition to being immaterial, the large majority of the facts contained in Nothern's SUF are contradicted by documents and testimony contained in the evidentiary record.  Notably, in footnote 1 of his SUF, Nothern reserves the right to dispute his own "undisputed facts" in subsequent proceedings, thereby acknowledging that the facts are not truly undisputed.  It is also worth noting that many of Nothern's characterizations of the evidence are not supported by the authority that he has cited.  However, unless there is a discrepancy, which is material, the SEC has refrained from commenting on the errors in Nothern's citations.

**II.**

**STATEMENT OF GENUINE ISSUES**

***Nothern's Proposed Expert's Immaterial Opinions On Press Embargoes***

1.    **Response to ¶¶ 1-16 of Nothern's SUF:**  ¶¶ 1-16 of Nothern's SUF do not state facts, let alone undisputed facts, rather they contain the conclusory opinions of Nothern's proposed expert witness, Clyde H. Bentley, Ph.D.  The only authority cited in support of these paragraphs is Dr. Bentley's declaration in which he states that, "I have been asked for Steven E. Nothern to provide an *expert opinion* regarding quarterly refunding conferences held by the U.S. Department of Treasury on October 31, 201 and the embargoed news release issued at that press conference." Bentley Declaration ¶ 3, Declaration of Robert E. Toone ("Toone Decl."), Dkt. 107, Exh. A (emphasis added).   The opinions offered in ¶¶ 1-16 fail to meet the requirements of Rule

---

[1] All references to Defendant's Rule 56.1 Statement of Undisputed Facts In Support of his Motion for Summary Judgment, Dkt # 105, will be referred to herein as "SUF" or "Nothern's SUF".  The referenced deposition excerpts and other documents are attached as exhibits to the Declaration of John R. Rossetti, ("Rossetti Decl.") filed herewith.

56.1 because they are not even based on facts in the evidentiary record.  During deposition, Dr.

Bentley admitted that in developing his opinions in this case, he did not review or conduct any

studies on embargoes.  Deposition of Clyde H. Bentley, Ph.D., ("Bentley Dep.") at 99 (Rossetti

Decl. Exh. A).  He also admitted that he could not recall ever being subject to an embargo

request by Treasury or any other federal government department or agency and that he made no

efforts to talk to any reporters who had been subject to Treasury embargoes. Bentley Dep. at 62-

63, 68-69 (Rossetti Decl. Exh. A).  He further admitted that he has never written any publications

or given any speeches on embargoes and that he obtained the research cited in his report from

conducting searches through Internet search engines such as Google, Yahoo and Dogpile.

Bentley Dep. at 46 (Rossetti Decl. Exh. A).  Some of the authority that Dr. Bentley obtained

from his internet searches and references in his expert report directly contradicts the opinions

stated in ¶¶ 1-16 of Nothern's SUF.  While Dr. Bentley alleges that embargoes are "outdated,"

"routinely disregarded," and "ignored," (Toone Decl. Exh. A ¶¶ 13, 16, 19, 20) the authority he

relies on states that:

- "Every Wednesday and Thursday, more than 1400 reporters around the world"
  receive research articles that are subject to an embargo. "What is most remarkable
  about this vast private traffic in science news is that it almost never leaks prematurely
  to the public." Eliot Marshall, *"Embargoes:  Good, Bad or 'Necessary Evil'"*,
  Science, October 30, 1998.  Bentley Dep. Exh. 6, (also cited on page 5 of Expert
  Report of Clyde H. Bentley, Ph.D.) (Rossetti Decl. Exh. A)

- "The odd [embargo] system has developed and flourished over several decades
  because it offers advantages for everybody involved. Journals get maximum
  publicity, journalists get time to report complex stories, and scientists get more
  widespread and more accurate public exposure for their work. Indeed, the system is
  so successful that it has recently expanded with the debut of Internet-based
  clearinghouses that funnel embargoed information from a variety of sources to
  reporters who agree to abide by the rules." *Id.*

- "[J]ournalists have both an ethical and a legal duty to abide by agreements with their
  sources, including embargo agreements. If a journalist obtains information under an
  embargo, that journalist is ethically bound to honor that embargo . . ." Vincent

2

Kiernan, Embargoed Science (2006) at 137. Bentley Dep. Exh. 4, (also cited on pages 14-15 of Expert Report of Clyde H. Bentley, Ph.D.) (Rossetti Decl. Exh. A)

- "[J]ournalists by and large have continued to embrace the embargo enthusiastically, with the greatest source of complaints being fears that the terms of the embargo confer an advantage over one set of journalists, such as those working in television, over others such as newspaper journalists." *Id.* at 81.

- "[E]mbargoes continued to expand in the 1990s . . . . The growing popularity of the Internet in the mid-1990s provided a new route for dissemination of embargoed information." *Id.* at 79.

Dr. Bentley's personal beliefs that embargoes are anti-competitive (SUF ¶¶ 2-4) and that journalists think they are unnecessary (SUF ¶ 9) is contradicted by testimony in the record by Treasury's Director of Public Affairs, Tony Fratto, that confirms that reporters who covered Treasury requested embargoes and often imposed embargoes on themselves. *See* Deposition of Tony Fratto ("Fratto Dep.") at 247 ("there were times where. . .we didn't have a strong interest on [sic] whether there was an embargoed time set or not . . . . so the reporters would announce that they would, on their own that they would like to have an embargo. So they would set their own embargo time.") (Rossetti Decl. Exh. B). Additionally, Bentley's claim that technology was readily available in 2001 that would allow Treasury to have distributed its refunding announcement to the press through the Internet or web casting (SUF ¶ 5, 6, 16) is contrary to Fratto's testimony that there was "a history of Treasury servers going down" and that "it wasn't a particularly reliable Internet infrastructure at Treasury" in 2001. Fratto Dep. at 131-133 (Rossetti Decl. Exh. B).

In sum, the opinions contained in ¶¶ 1-16 of Nothern's SUF are not facts, are not undisputed and are not material to any genuine issues in this case.

*__Treasury's Policies On Press Embargoes And Confidential Information__*

2.    __Response to ¶¶ 17-19 of Nothern's SUF:__  Although more than twenty

individuals were deposed in this case, not one of them testified that they had any personal

knowledge about leaks associated with Treasury's reopening of the 10-year note (or bond) as

alleged by Nothern in ¶¶ 17-18 of his SUF.   Nor has anyone testified that there were any leaks

of confidential information attributed to Treasury's Borrowing Advisory Committee or any other

individual as alleged in ¶ 19 of Nothern's SUF.  In fact, many Treasury employees testified that

they had no knowledge of any leaks surrounding the re-opening of the 10-year note or Treasury

quarterly refunding conferences.  *See* Deposition of Peter Fisher ("Fisher Dep.") at 57-60, 165-

167 (Rossetti Decl. Exh. C); Deposition of Michelle Davis ("M. Davis" Dep.) at 70, 226-229

(Rossetti Decl. Exh. D); Deposition of Elizabeth Holahan Schmutz ("Schmutz Dep.") at 76-77

(Rossetti Decl. Exh. E); Deposition of Stephen Berardi ("Berardi Dep.") at 57-61 (Rossetti Decl.

Exh. F); Deposition of David Aufhauser ("Aufhauser Dep.") at 13-15, 20(Rossetti Decl. Exh. G).

The evidence also shows that prior to October 31, 2001, Treasury employees were not aware of

any intentional embargo violations of Treasury's refunding information. *See* Fratto Dep. at 62-

63, 104-105, 111-112 (". . . I had never seen any event of a reporter willfully breaking an

embargo") (Rossetti Decl. Exh. B); Deposition of Paul Malvey ("Malvey Dep.") at 120-122

(noting that the only embargo violation he was aware of occurred thirty years ago) (Rossetti

Decl. Exh. H); Schmutz Dep. at 276 (Rossetti Decl. Exh. E); M. Davis Dep. at 218 (Rossetti

Decl. Exh. D).

3.    In support of the allegations contained in ¶¶ 17-19 Nothern cites to certain

statements by Timothy Bitsberger, Treasury's former Deputy Assistant Secretary for Federal

Finance, contained in an email dated October  31, 2001 (after Nothern traded) and the deposition

of Treasury Undersecretary for Domestic Finance, Peter Fisher. As an initial matter, Bitsberger has never been deposed or questioned under oath in connection with this action and therefore has not confirmed whether he had any personal knowledge of any leaks concerning Treasury's reopening of the 10-year note. It is also not clear how Bitsberger learned that Treasury's refunding process had been "criticized" for years. Significantly, the evidence suggests that Bitsberger only began working at Treasury a few weeks before the October 31, 2001 refunding conference and may not have even worked at Treasury when the 10-year re-opening occurred. *See* Berardi Dep. at 131-133 (Rossetti Decl. Exh. F); Malvey Dep. at 26 (Rossetti Decl. Exh. H). As stated above, Bitsberger's allegations, which Nothern relies on in ¶¶ 17-19 of his SUF, do not create undisputed facts given that other Treasury employees who testified in this case, including Paul Malvey, Treasury's former Director of Market Finance, who joined Treasury long before Bitsberger, stated that they were not aware of *any* leaks of Treasury's refunding information or *any* leaks surrounding Treasury's re-opening of the 10-year note. *See supra* ¶ 2; *see also* Malvey Dep. at 19-20 (noting that Malvey joined Treasury in June of 1978) (Rossetti Decl. Exh. H).

4.     While Fisher testified that he heard complaints in the press concerning a suspected leak in connection with Treasury's emergency re-opening of the 10-year note after the reopening had occurred, he did not testify that any of the press reports were valid or that they had ever been confirmed. *See* Fisher Dep. at 57-60 (Rossetti Decl. Exh. C).

5.     Finally, Nothern mischaracterizes the Stipulation and Agreement ("Stipulation") that the parties executed relating to Bitsberger's e-mail. In ¶¶ 17-19 of his SUF, Nothern clearly suggests it is undisputed that leaks associated with Treasury's reopening of the 10-year note and Treasury's refunding conferences actually occurred. In the Stipulation, the SEC did not agree or concede that any leak occurred. As noted above, Bitsberger's allegation of leaks is not supported

by evidence and is disputed by testimony in the evidentiary record. While, the parties agreed that they could seek to introduce certain statements in Bitsberger's email, which is attached as Exhibit A to the stipulation, the SEC did not concede that any leaks occurred. *See* Stipulation and Agreement ¶ 1, Toone Decl. Exh. B. The parties specifically agreed that they could *not* seek to introduce Bitsberger's statement contained in ¶ 19 of Nothern's SUF to prove that leaks associated with Treasury's refunding process occurred, nor could they use the statement referred to in ¶ 18 of Nothern's SUF to prove that the Treasury Borrowing Advisory Committee was responsible for any leaks, if any such leaks did in fact occur. *Id.* ¶ 1.a, c.

6.      Not only does the evidentiary record contains facts that dispute the allegations contained in ¶¶ 17-19 of Nothern's SUF, whether or not there were leaks in connection with Treasury's emergency reopening of the 10-year note in early October 2001 or any rumors of leaks associated with Treasury's previous refunding conferences is immaterial to any genuine issues in this insider trading case. Evidence of unsupported allegations of leaks concerning past Treasury announcements do not prove that anyone leaked confidential information about Treasury's decision to cancel the 30-year bond prior to Treasury's October 31, 2001 refunding press conference.

7.      **Response to ¶ 20 of Nothern's SUF:** Throughout his SUF Nothern refers to the existence of a document or testimony in an attempt to establish that the facts contained in the document or testimony are undisputed. *See* SUF ¶¶ 18-21, 25-26, 30, 35, 66, 69-71,108,109, 114. Paragraph 20 is an example of one of the paragraphs where Nothern employs this tactic. The fact that a document or testimony exists, however, does not by itself make the information contained in the document or testimony an "undisputed fact." While the SEC does not dispute that the November 15, 2001 email referenced in ¶ 20 exists, it does contest the statement by

Director of Public Affairs, Tony Fratto, contained in the email that suggests that prior to the time the Bush Administration appointees arrived at Treasury, the Treasury "leaked like a sieve." Fratto himself testified that he was unaware of *any* leaks of Treasury's refunding information or any intentional violations of Treasury's embargo prior to October 31, 2001. *See* Fratto Dep. at 62-63, 111-113 (Rossetti Decl. Exh. B). Other Treasury employees also testified that they were not aware of any leaks of Treasury refunding information or Treasury's decision to re-open the 10-year note. *See* Fisher Dep. at 57-60 (Rossetti Decl. Exh. C), 165-167; M. Davis Dep. at 70, 226-229 (Rossetti Decl. Exh. D); Schmutz Dep. at 76-77 (Rossetti Decl. Exh. E); Berardi Dep. at 57-61 (Rossetti Decl. Exh. F); Aufhauser Dep. at 13-15, 20 (Rossetti Decl. Exh. G). Fratto also testified that he did not have "independent knowledge of Peter Davis's attendance at any Treasury quarterly refunding conferences." Fratto Dep. at 180-184 (Rossetti Decl. Exh. B). He only learned that Davis had been admitted to previous conferences by talking to Paul Malvey. *Id*. Fratto further testified that he was not aware of anyone other than Peter Davis who had been admitted to attend Treasury refunding conferences by any previous administrations. *Id*.

Evidence in the record contradicts Nothern's allegation that there were any leaks of Treasury's refunding information in the years that preceded 2001, when the Bush Administration appointees joined Treasury. Even if such leaks existed, they are not material to any genuine issue in this case involving Nothern's alleged insider trading based on embargoed information he received from Peter Davis.

8. **Response to ¶ 21 of Nothern SUF**: In paragraph 21 of his SUF, Nothern cites an October 31, 2001 Reuter's article quoting a bond trader who alleged that "when [the Treasury] did the reopening of the 10-year, there was advance information on the Street. There's advance information here and so there are a number of people on the Street who are pretty upset

7

about it." As stated above testimony in the record disputes Nothern's allegation that there were

any leaks in connection with Treasury's re-opening of the 10-year note. *See supra* ¶¶ 2, 3, 4.

Evidence in the record also suggests that the only "advance information" that was "on the street"

concerning Treasury's October 31, 2001 decision to cancel the 30-year bond was conveyed in

the phone calls that Peter Davis made to his clients, including Nothern, during the embargo

period. *See* Deposition of Peter Davis ("P. Davis Dep.") at 168-183, Exh. 17 at 21 (Rossetti Decl.

Exh. I). Treasury officials also testified that they were not aware of anyone inside Treasury

leaking information concerning Treasury's decision to cancel the 30-year bond prior to the

October 31, 2001 refunding announcement. *See* Fisher Dep. at 165-167 (Rossetti Decl. Exh. C);

Berardi Dep. at 124 (Rossetti Decl. Exh. F); Deposition of Jill Cetina ("Cetina Dep.") at 172

(Rossetti Decl. Exh. J). While Nothern claims that Brian Collins, a reporter for the *National*

*Mortgage News* also violated Treasury's embargo on October 31, 2001, Collins's own testimony

contradicts this allegation. Collins testified that he did not disclose Treasury's embargoed

refunding information to anyone other than his editor prior to sometime between 9:45 a.m. and

9:50 a.m., after the expiration of Treasury's embargo. *See* Deposition of Brian Collins ("Collins

Dep.") at 67-68 (Rossetti Decl. Exh. K).

        9.      **Response to ¶¶ 22, 23, 24, 25, 26, 27, 28, 33, 34, 35, 36, 37, 38 and 39 of**

**Nothern's SUF:** Embargoes are a common, widely understood practice in public affairs and

among the media used to temporarily prohibit the release of certain information to the public. *See*

M. Davis Dep. at 29,162-163 (Rossetti Decl. Exh. D); Fratto Dep. at 72-74, 254 (Rossetti Decl.

Exh. B); Schmutz Dep. at 270, 321 (Rossetti Decl. Exh. E); P. Davis Dep. at114-117 (Rossetti

Decl. Exh. I). Michelle Davis, Treasury's Assistant Secretary for Public Affairs and Tony

Fratto, Treasury's former Director of Public Affairs, both testified that during their entire public

affairs careers, both inside and outside of Treasury, they had never had a reporter ask them what the term embargo meant or express any confusion about embargo policies and procedures. *See* M. Davis at 162-163 (Rossetti Decl. Exh. D); Fratto Dep. at 254 (Rossetti Decl. Exh. B).

       10.    The term "embargo" is also widely understood by members of the public as a practice used by government agencies to temporarily prohibit the release of certain information to the public. P. Davis Dep. at 114-117 (Rossetti Decl. Exh. I). Nothern admitted that he was aware of the meaning of the word embargo as it related to the release of information. *See* Nothern SEC Investigative Testimony ("IT") at 98-100 (Rossetti Decl. Exh. L). Prior to October 31, 2001, Nothern received a copy of Treasury's November 1, 2000 refunding press release from Davis, which stated at the upper left-hand side of the release "EMBARGO TIME WILL BE SET". *See* Deposition of Steven E. Nothern ("Nothern Dep.") at 148-151, Exh. 8 (Rossetti Decl. Exh. O). Geoffrey Kurinsky and D. Richard Smith, two of the portfolio managers who joined Nothern in MFS's $65 million trade in the 30-year bond, also testified that they were aware of the meaning of term embargo as it relates to the release of information. *See* Deposition of Geoffrey Kurinsky ("Kurinsky Dep.") at 86-90 (Rossetti Decl. Exh. M); Deposition of D. Richard Smith ("D. Smith Dep.") at 96-100 (Rossetti Decl. Exh. N). Treasury's practice was to use an embargo procedure for its quarterly refunding press conferences. *See* Paul Malvey Dep. at 58-63; 99-104 (Rossetti Decl. Exh. H); P. Davis Dep. at 117-118 (Rossetti Decl. Exh. I). It also employed press embargos when releasing many other types of information. *See* Fratto Dep. at 42-60 (Rossetti Decl. Exh. B). Fratto testified that Treasury "used embargoes on a relatively regular daily basis well up to October 31st . . . We used embargoes many times on a daily basis and sometimes multiple times on a given day." *Id*. at 72-73. Treasury's embargo policies and

procedures were explained orally to new Treasury public affairs staff. *See* M. Davis Dep. at 163-173 (Rossetti Decl. Exh. D); Fratto Dep. at 37-49 (Rossetti Decl. Exh. B).

11.     Fratto testified that he had several conversations with members of the Treasury press corps in which they explained that they wanted Treasury to use embargos when it released information. *See* Fratto Dep. 37; 49-59 (Rossetti Decl. Exh. B). The evidence shows that prior to October 31, 2001, at the end of Treasury refunding conferences, Treasury officials would poll the press corps about the amount of time they needed to prepare their stories and the press would then suggest and agree to the embargo times. *See id.* at 71-72, 250; Malvey Dep. at 99-102 (Rossetti Decl. Exh. D); P. Davis Dep. at 117-118 (Rossetti Decl. Exh. I). The length of the embargo period at Treasury refunding conferences varied. Malvey Dep. at 62-63 (Rossetti Decl. Exh. H). Assistant Secretary for Public Affairs Michelle Davis testified that each press event was unique. *See* M. Davis Dep. at 171-173 (Rossetti Decl. Exh. D). At times the Treasury's press corps would take it upon themselves to set an embargo, even if Treasury did not officially request an embargo. *See* Fratto Dep. at 42-47 (Rossetti Decl. Exh. B).

12.     Fratto testified that he was very impressed with the professionalism of the Treasury press corps and thought they recognized investors were reading and trading on their stories and it could cost investors money if the reporters' stories were inaccurate. *See* Fratto Dep. at 43-47 (Rossetti Decl. Exh. B). As stated above, many of the Treasury officials who testified in this matter confirmed that prior to October 31, 2001, they never experienced anyone willfully or intentionally violating a Treasury embargo. *See* Fratto Dep. at 62-62, 111-112 (Rossetti Decl. Exh. B); Malvey Dep. at 120-122 (Rossetti Decl. Exh. H); M. Davis Dep. at 59, 218 (Rossetti Decl. Exh. D).

13.     On and before October 31, 2001, Treasury used an embargo procedure that did not involve a lockdown to protect the confidentiality of information released at its quarterly refunding conferences and many of its other news releases. *See* Fratto Dep. at 62-63 (Rossetti Decl. Exh. B); P. Davis Dep. at 117-118 (Rossetti Decl. Exh. I).  Treasury's purpose in disclosing its market-sensitive or market-moving refunding information at its quarterly refunding press conferences subject to an embargo was to ensure the predictable, broad, accurate and uniform dissemination of its refunding announcements to the market.  *See* Fratto Dep. at 38, 44-46, 246-248 (Rossetti Decl. Exh. B); M. Davis Dep. at 173, 177-179 (Rossetti Decl. Exh. D); Malvey Dep. at 321-322 (Rossetti Decl. Exh. H); P. Davis Dep. at 287.  Fratto testified there was no more efficient way to communicate with the financial markets than through the financial wires and the Treasury press room, and that Treasury used embargoes to communicate Treasury news to the market in a "standard, predictable, and reliable way," Fratto Dep. at 44-46, 55-57 (Rossetti Decl. Exh. B).  Fratto further testified that embargoes allowed the reporters covering Treasury "sufficient time to consume the information and disseminate it as accurately as possible" to investors. *Id*. at 44-47.

14.     By releasing the information at a press conference within the Treasury building, subject to an embargo, Treasury also ensured that the information would be released at a uniformed time and that members of the press did not have an unfair advantage in being the first to release the information.  *See id*. at 246-248; M. Davis Dep. at 172-173; 177-179 (Rossetti Decl. Exh. D).   The three portfolio managers who joined in MFS's trade in the 30-year bond with Nothern,  David Kennedy, Geoffrey Kurinsky and D. Richard Smith, and the bond trader at Merrill Lynch which served as the counterparty on Nothern's trade, Galen Criqui, all testified that they relied on Bloomberg and the news wires – not Treasury's website - to obtain Treasury's

refunding announcements and other market-moving information.  *See* Kurinsky Dep. at 68-70

(Rossetti Decl. Exh. M); Deposition of David Kennedy ("Kennedy dep") at 37-38 (Rossetti Decl.

Exh. P); D. Smith Dep. at 62-66 (Rossetti Decl. Exh. N); Deposition of Galen Criqui ("Criqui

Dep.") at 131-132, 138-139 (Rossetti Decl. Exh. Q).

15.    While Nothern claims that Treasury's embargo was an "honor system" that

Treasury "merely assumed" reporters would follow, (SUF ¶¶ 36, 37), the evidence shows that

there were known and obvious penalties for violating Treasury's embargoes.  *National Mortgage*

*News* reporter, Brian Collins, testified that violating an embargo would cause "reputational risk"

because "[i]f you don't honor an embargo . . . people aren't going to trust you with information

anymore."  Collins Dep. at 85 (Rossetti Decl. Exh. K).   Treasury officials testified that penalties

for willfully or intentionally violating Treasury's embargoes ranged from limiting or revoking a

reporter's access to covering Treasury events, revoking a reporter's press credentials, or

removing a press organization from the Treasury's pressroom.  *See* Fratto Dep. at 105-106

(Rossetti Decl. Exh. B); M. Davis Dep. at 55-56 (Rossetti Decl. Exh. D).   Former Treasury

Director of Public Affairs Tony Fratto also testified that "reporters don't want to break

embargoes. That's the quickest way to find yourself off one of the best beats [covering Treasury]

in Washington is to try –is to break an embargo willfully." Fratto Dep. at 84 (Rossetti Decl. Exh.

B).

16.    In addition to learning about any embargo violations themselves, Treasury

officials testified that the Treasury press corps was good at "self-enforcing" Treasury's

embargoes.  *Id*. at 250-251.  If a reporter or news organization violated an embargo, another

news organization or reporter usually would bring it to the attention of Treasury officials.  *See id*.

at 111, 250-251.

17.    **Response to ¶¶ 29, 30, 31, and 32 of Nothern SUF:**  The alleged facts contained in these paragraphs are not material to any genuine issues in this case and do not contain information that should affect the outcome of this case.

*Peter Davis's Relationship With Steven Nothern*

18.    **Response to ¶¶ 40, 41, 42, 43, 44, 45, 46, 47, and 48 of Nothern SUF:**  Peter Davis began his consulting business, Davis Capital Investment Ideas ("Davis Capital"), in 1992. P. Davis Dep. at 21-23 (Rossetti Decl. Exh. I).  In promotional material that he provided to prospective clients and had posted on his company's website, Davis explained that his, "11 years on Capitol Hill and 16 years advising Wall Street clients have taught me how to get Washington information ahead of the media." *Id*. at 35-42, Exhs. 4, 6 (Rossetti Decl. Exh. I).  Nothern visited Davis Capital Investment Ideas' website at least once before October 31, 2001. *See* Nothern Dep. at 112-113 (Rossetti Decl. Exh. O).

19.    In the mid-1990s, MFS became a client of Davis Capital after Nothern met with Peter Davis and recommended that MFS retain the services of Davis Capital.  *See* P. Davis Dep. at 56-57 (Rossetti Decl. Exh. I).  Davis charged MFS $1000 per month for Davis Capital's services.  P. Davis Dep. at 54-55.  During the time MFS was a client of Davis Capital, Nothern served as Peter Davis's "main contact" at MFS.  *See id*. at 65.  Davis told Nothern that he had sources at Treasury and also arranged at least two meetings at Treasury, in 1999 and 2000, for Nothern to meet with officials from Treasury's Office of Market Finance, including Paul Malvey.  *See* P. Davis Dep. at 34-35, 69-87, 132, Exhs. 11, 12, 13 & 14 (Rossetti Decl. Exh. I); Nothern Dep. at 43-45 (Rossetti Decl. Exh. O); Nothern SEC IT at 60-74 (Rossetti Decl. Exh. L).

20.    From the mid-1990s through October 31, 2001, Nothern also received faxes and emails from Davis several times a week, including those containing Treasury refunding

information.  *See* P. Davis. Dep. at 24-25, 34-35, 50-51, 62-63 (Rossetti Decl. Exh. I), Nothern

Dep. at 120-121, Exhs. 6, 7, 8, 15, 17 (Rossetti Decl. Exh. O).  At least one of the refunding

press announcements that Davis sent to Nothern prior to October 31, 2001 referenced Treasury's

use of an embargo.  *See* Nothern Dep. at 148-153, Exh. 8 (Rossetti Decl. Exh. O).

21.     While Nothern claims in ¶¶ 47 of his SUF that he and Peter Davis only spoke on

the phone a "handful of times" each year, Davis testified that he called Nothern "once every

month or so."  P. Davis Dep. at 64 (Rossetti Decl. Exh. I).  Davis's telephone records confirm his

testimony and show that he called Nothern on July 31, 2001, August 1, 2001, August 23, 2001,

September 6, 2001, September 7, 2001 and October 16, 2001.  *Id*. at 232-236, 241-243; Exh. 32

at SECNOTH00107689, Exh. 33 at SECNOTH00107672, Exh. 34 at SECNOTH00107681, Exh.

37 at SECNOTH00114098.

22.     Sometime after September 11, 2001, Davis called Nothern to inform him of

Treasury's decision to cancel Treasury-issued war bonds.  *See* Nothern Dep. at 126-130 (Rossetti

Decl. Exh. O); P. Davis Dep. at 243-244 (Rossetti Decl. Exh. I).

***Peter Davis's Agreement With Treasury And History Of Attending Treasury Quarterly
Refunding Conferences***

23.     **Response to ¶¶ 49, 51, 57, 59, 60, 61, 62, 63 64, 65, 67, 69, 70, 71 and 72 of**

**Nothern's SUF:**  In or around 1995, Peter Davis entered into an agreement with Roger

Anderson, then Treasury Deputy Assistant Secretary for Federal Finance, in which Anderson

granted Davis permission to attend Treasury's quarterly refunding press conferences if Davis

agreed to "abide by the embargo and keep all information disseminated there confidential until

the embargo expired".  P. Davis Dep. at 93-100, Exh. 17 at 19 (Rossetti Decl. Exh. I).

24.     Davis testified that he sent Anderson a letter requesting permission to attend the

refunding press conferences.  Shortly thereafter, Anderson called Davis and told him that he

could attend the refunding press conferences if he swore to "honor the embargo" and sign a "confidentiality agreement." *Id*. at 94-95, 348. Sometime after this call, Davis met Anderson, and another Treasury employee whose name he could not recall, in Anderson's office where he signed a confidentiality agreement. *See id.* at 95-101. Prior to entering into this agreement with Anderson, Davis had not attended any refunding press conferences. *See id.* at 98. According to Davis, Anderson understood that Davis was not a member of the press. *See id.* at 102. Davis, however, had extensive experience with embargoes having used them while working as a congressional staffer. *See id.* at 114-117. Davis repeatedly testified that under the agreement he signed, he agreed, as a condition of attending the refunding press conferences, that he would keep confidential the information he learned at those conference until it was authorized for public disclosure at the embargo time. *See id*. at 95-100, 261-62, 271, 278-79, 284, 286, 347, 348.

25.     Anderson testified that he recalled having a conversation with Davis in which he agreed to allow Davis to attend Treasury refunding press conferences if Davis agreed not to disseminate the information he received at the press conferences until the embargo time. *See* Deposition of Roger Anderson ("Anderson Dep.") at 54-57 (Rossetti Decl. Exh. R).

26.     After entering into the agreement with Anderson in the mid-1990s through October 31, 2001, Davis regularly attended the refunding press conferences. *See* P. Davis Dep. at 290-294. Davis was cleared into every conference by Treasury officials, occasionally sat in the front row or at the table during the conferences, engaged in conversation with Paul Malvey and Jill Ousely at the conferences, and sometimes asked questions to the Treasury officials making the refunding announcements. *See* P. Davis Dep. at 109, 111 (Rossetti Decl. Exh. I); Berardi Dep. at 142-143 (Rossetti Decl. Exh. F).

15

27.     On numerous occasions, and on the date of three Tuesday refunding events, Anderson cleared Davis into the Treasury building. *See* Davis entry log (Rossetti Decl. Exh. S), Refunding Press Releases dated May 5, 1998 – October 31, 2001 (Rossetti Decl. Exh. T); P. Davis Dep. at 91-93 (noting that he attended the Tuesday meetings of the quarterly refunding conferences) (Rossetti Decl. Exh. I).  Additionally, the evidence shows that while Anderson was still at Treasury, and after he left Treasury in 1999, Davis was cleared into Treasury refunding press conferences on a regular basis by two Treasury employees who worked under Anderson's supervision, Jill Ousley, former Director of Treasury's Office of Market Finance and Paul Malvey, who at the time served as Associate Director for Treasury's Office of Market Finance, and who was eventually promoted to the position of Director of the Office of Market Finance. Davis entry log (Rossetti Decl. Exh. S); Deposition of Lula Tyler ("Tyler Dep.") at 54 (Rossetti Decl. Exh. U).  Malvey testified that Anderson first introduced Davis to Malvey and Ousley at one of Treasury's quarterly refunding press conferences and that Anderson described Davis as "one of the good guys."  Malvey Dep. at 86-87 (Rossetti Decl. Exh. H).

28.     After entering into the agreement with Anderson, Davis frequently contacted Lula Tyler, (who served first as secretary to Jill Ousley, and then as secretary to Paul Malvey when Ousley retired), to gain admittance to Treasury's quarterly refunding conferences.  *See* P. Davis Dep. at 103-104 (Rossetti Decl. Exh. I).  Tyler testified that she first obtained permission from Ousely before she began admitting Davis to quarterly refunding press conferences.  *See* Tyler Dep. at 54 Rossetti Decl. Exh. U).  She further testified that after Ousely retired, she obtained permission from Malvey, Ousely's successor, before she admitted Davis into the quarterly refunding conferences.  *See id*. at 70-71.  In addition, Elnora Bowser, another employee in Treasury's Office of Market Finance, occasionally cleared individuals into Treasury for its

16

refunding press conferences, but only if she was told to do so by a supervisor. *See* Deposition of Elnora Bowser ("Bowser Dep.") at 34-37, Exh. 1 (Rossetti Decl. Exh. V).  On October 31, 2001, documents show that Bowser cleared Peter Davis into Treasury's refunding press conference at the instruction of Paul Malvey.  *See* Bowser Dep. at 34-37, Exh. 1.

29.    On at least two occasions, Davis sent his assistant, Alyson Sullivan, to Treasury refunding press conference because he was unable to attend.  *See* P. Davis Dep. at 107, 123-126, Exhs. 15, 16 (Rossetti Decl. Exh. I).  When Davis could not attend the February 2000 refunding press conference, he sent a letter to Paul Malvey requesting permission for Sullivan to attend in his stead. In the letter Davis explained to Malvey that "of course" none of the information learned at the conference "would go out before the embargo time."  *Id*. at 107, Exh.15.

30.    In addition to Davis, employees in the Office of Market Finance routinely admitted employees of the Office of Management and Budget ("OMB"), the Congressional Budget Office ("CBO") and the Government Accountability Office ("GAO") to Treasury's quarterly refunding press conferences.  *See* Malvey Dep. at 147-148 (Rossetti Decl. Exh. H). Lula Tyler, Paul Malvey's secretary in the Office of Market Finance, testified that prior to October 31, 2001, nobody ever complained about the Office of Market Finance clearing individuals into Treasury's quarterly refunding press conferences.  *See* Tyler Dep. at 50-52 (Rossetti Decl. Exh. U). Malvey testified that he had the authority to admit individuals to quarterly refunding press conferences and his secretary also had the authority.  *See* Malvey Dep. at 67-68 (Rossetti Decl. Exh. H).

31.    For years Davis abided by the terms of his agreement with Anderson and maintained the confidentiality of the information he received at Treasury's refunding press conferences during the embargo period.  *See* P. Davis Dep. Exh. 17 at 19-21 (Rossetti Decl. Exh.

I).  In late 1999, Davis began calling certain client during the embargo period in violation of his agreement with Treasury.  *See id*.  In early August 2001 after attending a Treasury refunding conference, Davis was filing some documents in a filing cabinet and came across a folder containing the confidentiality agreement he signed with Anderson.  *Id.* at 217-218.  Feeling "remorse" because he "had violated the agreement" Davis threw the agreement in the trash and resolved not to violate the agreement anymore.  *See id*. at 97, 217-218, 321-322.

32.    On September 3, 2003, David pleaded guilty to three counts of a criminal indictment involving his providing the October 31, 2001 embargoed information about Treasury's decision to cancel further issuance of the 30-year bond to John Youngdahl, a then economist at Goldman, Sachs & Co.  *See id*., Exh. 17 at 22-24.  Specifically, Davis pleaded guilty in the U.S. District Court for the Southern District of New York to a three-count criminal information charging him with: (1) Conspiracy to Defraud the United States, Convert Property of the United States, Commit Fraud in Connection with the Sale of Securities, and Wire Fraud; (2) Conversion of Property of the United States; and (3) Securities Fraud.  *See id*., Exh. 17 at 22-24.  On March 18, 2005, the Court sentenced Davis to two years probation and a $30,000 fine.  *See id*., Exh. 18 at 14.

33.    During his plea hearing, Davis admitted that his attendance at the refunding conferences "was pursuant to my agreement with the Treasury Department that I would abide by the embargo and keep all information disseminated there confidential until the embargo expired. The information disseminated in the press conference was embargoed by Treasury Officials, such that it could not be published or divulged before a specific time shortly after the press conference concluded." *Id.*, Exh. 17 at 19.

18

34.     Davis has also admitted that he violated his duty to Treasury to keep the information that he heard at the Treasury's October 31, 2001 refunding press conference confidential until the embargo expired by calling clients that he thought might have an interest in the information so that they could "make significant moves in advance of the market responding to the official public release." *Id*. Exh. 17 at 19.

35.     **Response to ¶¶ 50, 58, 65, 66, 73, 74, 75, 76, 77, 78, 79 and 80 of Nothern's SUF:**  The alleged facts contained in these paragraphs are not material to any genuine issues in this case and do not contain information that should affect the outcome of this case.

### *Nothern's Knowledge Of Davis's Attendance  At Treasury's Refunding Press Conferences*

36.     **Response to ¶¶ 81-88 of Nothern's SUF :**  While Nothern claims in ¶¶ 81 and 85 of his SUF that Peter Davis never told him that "Davis was able to attend quarterly refunding press conferences" and that he "never expressed interest to Peter Davis in refunding conferences at Treasury," the evidence shows that in the minutes following the August 2001 Treasury refunding press conferences, Davis placed a telephone call to Nothern that lasted for 12 minutes. *See* P. Davis Dep. at 238-243, Exh. 37 (Rossetti Decl. Exh. I).  As of January 2001, Nothern's name appeared as the seventh name on Davis's list of clients that he called following Treasury refunding announcements.  *See id*. at 123-131, Exh. 16.

37.     Additionally, from the mid-1990s, when MFS became a client of Davis Capital, through October 31, 2001, Nothern received faxes and emails from Davis several times a week, including those containing Treasury refunding information and announcements.  *See id*. at 56-57, 62-64, 66 and Exhs. 22, 31; Nothern Dep. at 120-121, Exhs.  6, 8, 17 (Rossetti Decl. Exh. O).  At least one of the refunding press announcements that Davis sent to Nothern prior to October 31,

2001 referenced Treasury's use of an embargo.  *See* Nothern Dep. at 148-153, Exh. 8 (Rossetti Decl. Exh. O).

38.     Contrary to the assertions in ¶¶ 83 and 84 of Nothern's SUF, documents and testimony in the evidentiary record show that Davis called Nothern at approximately 9:38 a.m. on October 31, 2001 and left a voice-mail message in which he informed Nothern that "Peter Fisher had indicated to Pete Davis that they'd be canceling the long bond and that there would be a press release because it was embargoed until 10 o'clock." Nothern SEC IT at 111-112 (Rossetti Decl. Exh. L); Nothern Dep. at 180-181 (Rossetti Decl. Exh. O); P. Davis Dep. at 183-184, Exh. 29 at SECNOTH 00114193-00114194, (Rossetti Decl. Exh. I).  Nothern has admitted that Davis used the term "embargo" in his October 31, 2001 voicemail and that when he received Davis's voicemail he was aware of the meaning of the term "embargo" as it applied to information from government agencies. Nothern SEC IT at 98-100 (Rossetti Decl. Exh. L).

### *Treasury's Decision To Cancel The 30-Year Bond*

39.     **Response to ¶¶ 89-99 of Nothern's SUF** : Contrary to the allegation in ¶ 89 of Nothern's SUF, the Treasury Borrowing Advisory did not hold a formal vote or issue a formal recommendation on the issue of elimination of the 30-year bond at its January 30, 2001 meeting. The minutes from the January 30, 2001 meeting state that the "committee held an informal vote regarding the elimination of the 30-year after the August re-opening.  The informal vote was 11 to 6 with one abstention for elimination of the 30-year after August refunding.  The Committee refrained from issuing a formal recommendation at this time until the fiscal situation became clearer."   Toone Decl. Exh. EE.

40.     Contrary to the allegations in ¶ 90 of Nothern's SUF, at the July 31, 2001 meeting of the Treasury Borrowing Advisory Committee of the Bond Market Association "[t]he

Committee debated whether to comment further on continued issuance of the 30-year bond. Some members of the Committee said that the market expects Treasury to make a statement on the 30-year bond, while other said that Treasury should keep its options given increase policy and economic uncertainty.  Others suggested that Treasury should develop a framework for assessing the "public good" value of the 30-year bond before deciding on its fate." Toone Decl., Exh. O at Exh. 1 (July 31, 2001 Minutes of the Meeting of the Treasury Borrowing Advisory Committee of the Bond Market Association).

41.     In ¶¶ 92-96 of his SUF, Nothern claims that various White House personnel and Alan Greenspan, the Chairman of the Federal Reserve were told of Treasury's decision to cancel the 30-year bond before October 31, 2001.  There is no evidence that any of these individuals disclosed that information to anyone before it became public.  To the contrary, Peter Fisher testified that on or around October 26, 2001 he consulted with two employees in the White House about Treasury's intention to eliminate the 30-year bond, Larry Lindsey, the director of the National Economic Counsel and Glenn Hubbard, the chairman of the Counsel of Economic Advisors.  *See* Fisher Dep. at 79-81 (Rossetti Decl. Exh. C). He further testified that "they both understood the sensitivity of the information" and he "had no anticipation they would share it with others." *Id*. at 81.

### *Treasury's Decision To Use A Standard Embargo Procedure At The October 31, 2001 Refunding Press Conference*

42.     Employees in Treasury's Office of Public Affairs decided to impose a 10 a.m. embargo for the Treasury refunding conference on October 31, 2001 after consultation with Peter Fisher, Treasury Undersecretary for Domestic Finance. *See* Fratto Dep. at 130-138 (Rossetti Decl. Exh. B).

43.     Contrary to the statement made in ¶ 98 of Nothern's SUF, Michelle Davis, Assistant Secretary for Public Affairs, testified that she did not recall Peter Fisher ever telling her that he did not want to use an embargo procedure to release Treasury's October 31, 2001 refunding announcement.  *See* M. Davis Dep. at 89-91 (Rossetti Decl. Exh. D).

44.     Tony Fratto, former Treasury Director of Public Affairs testified that Fisher initially suggested to him that Treasury make the 30-year bond cancellation announcement via a webcast or live television rather than using an embargo.  *See* Fratto Dep. at 131-132 (Rossetti Decl. Exh. B); Fisher Dep. at 105 (Rossetti Decl. Exh. C).  Tony Fratto also testified that he and other officials in Treasury's office of Public Affairs explained to Fisher that they had a lack of confidence in the Treasury's internet structure to execute a timely and trouble-free webcast.  *See* Fratto Dep. at 131-135 (Rossetti Decl. Exh. B).  They further explained that if they made the announcement live on television, Treasury would have had to explain to the media why they should set up their equipment for a live announcement, thereby inadvertently tipping them about the announcement.  *See* Fratto Dep. at 131-135 (Rossetti Decl. Exh. B); Schmutz Dep. at 85-89 (Rossetti Decl. Exh. E).  Additionally, they advised Fisher that Treasury should not dramatically change its refunding announcement procedures in the face of a major announcement. *See* Fratto Dep. at 131-141 (Rossetti Decl. Exh. B); Fisher Dep. at 101-106 (Rossetti Decl. Exh. C).  Fisher testified that ultimately he felt the decision to impose an embargo was "as good a decision" as the Press Office could make, and that he had no regrets about the decision. Fisher Dep. at 177-179 (Rossetti Decl. Exh. C).

45.     The alleged facts contained in ¶¶ 93-96 of Nothern's SUF are not material to any genuine issues in this case and do not contain information that should affect the outcome of this case.

_**Attendance At Treasury's October 31, 2001 Refunding Press Conference**_

46.    **Response to ¶¶ 108-116 of Nothern's SUF** :  Contrary to the statements in ¶¶ 108 through 116 of Nothern's SUF, which allege that Treasury's refunding press conferences was "open to all press" or "open to the public," and that admittance to the conferences was not controlled, the overwhelming evidence shows that attendance at refunding conferences, including the October 31, 2001 conference, was limited to select individuals, including, certain members of the press, select government officials and Peter Davis (who had an express agreement to maintain the confidentiality of Treasury's refunding information during the embargo period).  _See_ Malvey Dep. at 67-68 (Rossetti Decl. Exh. H); P. Davis Dep. Exh. 17 at 19 (Rossetti Decl. Exh. I).  In its October 30, 2001 press release Treasury announced that the October 31, 2001 refunding conference would be embargoed until 10 a.m. and invited members of the media to attend.  The October 30, 2001 press release also instructed those members of the press who did not have Treasury or White House press passes to contact the Treasury with their name, social security number and dates of birth.  _See_ Fratto Dep. at 150, Exh. 7 (Rossetti Decl. Exh. B). All of the attendees were required to be placed on a list and cleared into the Treasury building through the Secret Service before they could attend the conference. _See_ Malvey Dep. at 67-68 (Rossetti Decl. Exh. H); Fratto Dep. at 156 -157 (Rossetti Decl. Exh. B); P. Davis Dep. at 109-110 (Rossetti Decl. Exh. I); M. Davis Dep. at 91 (Rossetti Decl. Exh. D); Bowser Dep. at 34 (Rossetti Decl. Exh. V).  Although the embargo at the October 31, 2001 refunding was set in advance, the manner in which Treasury set embargoes was not standard and depended on the event.  _See_ M. Davis Dep. at 47 (Rossetti Decl. Exh. D).

47.    **Response to ¶¶ 100-107, 117-128 of Nothern's SUF:** At the beginning and the conclusion of the October 31, 2001 press conference, Treasury Public Affairs Specialist,

Elizabeth Holahan Schmutz, announced that the information provided at the conference would be embargoed until 10 a.m. *See* Schmutz Dep. at 62-63 (Rossetti Decl. Exh. E); Fratto Dep. at 162-170 (Rossetti Decl. Exh. C); Malvey Dep. at. 338-339 (Rossetti Decl. Exh. H); P. Davis Dep. at 118 (Rossetti Decl. Exh. I). After announcing the 10 a.m. embargo time again at the end of the October 31, 2001 conference, Schmutz asked everyone in the room if they "understand that" and "everybody go [sic], yeah." Malvey Dep. at 339 (Rossetti Decl. Exh. H). Schmutz testified that none of members of the press or anybody attending the October 31, 2001 Treasury refunding press conference asked her any questions about what the word "embargo" meant "because they were members of the media and they understood what it meant." Schmutz Dep. at 320-321 (Rossetti Decl. Exh. E). Treasury employees, who were standing outside of the conference room during the October 31, 2001 refunding testified that no attendees left the conference before it concluded. *See* Berardi Dep. at 35-36, 126 (Rossetti Decl. Exh. F); Deposition of Francis Anderson ("F. Anderson Dep.") at 165-166 (Rossetti Decl. Exh. W).

48.     At approximately 9:30 a.m. on October 31, 2001, Ms. Schmutz emailed Treasury's quarterly refunding announcement to a reporter at the New York Times who appeared on her list of press with approved credentials. *See* Schmutz at 96-100 (Rossetti Decl. Exh. E). At approximately 9:32 a.m. on October 31, 2001, Schmutz emailed Treasury's quarterly refunding announcement to a reporter at the Wall Street Journal who appeared on her list of press with approved credentials. *See id.* Both emails contained the subject "EMBARGOED UNTIL 10AM TODAY!" *Id.* at 200-204, Exh. 10. There is no evidence that either the New York Times or the Wall Street Journal disclosed Treasury's refunding announcement on October 31, 2001 during the embargo period.

49.    Peter Davis admitted that "[t]he information disseminated in the press conference was embargoed by Treasury Officials, such that it could not be published or divulged before a specific time shortly after the press conference concluded." P. Davis Dep. Exh. 17 at 19 (Rossetti Decl. Exh. I). While the announcement handed out to attendees at the October 31, 2001 refunding press conference contained the heading "For Immediate Release," Director of Public Affairs Tony Fratto testified that Treasury had previously distributed documents that contained that heading to the press during embargo periods and that the heading did not have any effect on whether the document is subject to an embargo. *See* Fratto Dep. at 259-261 (Rossetti Decl. Exh. B). According to Fratto the press officer is responsible for announcing the embargo and reporters are required to follow the press officer's directive. *See id*. at 259-261. Fratto further testified that he had "no experience" with a reporter releasing information during an embargo period because the press release stated that it was for "immediate release." *See id*. at 259-261. Peter Davis also testified that although he received the October 31, 2001 announcement that contained the heading "for immediate release," he understood that the press official's announcement of the embargo "was the operative." P. Davis Dep. at 177-178 (Rossetti Decl. Exh. I).

50.    The alleged facts contained in ¶¶ 101-103, 116, 123, 124, 127, 128 of Nothern's SUF are not material to any genuine issues in this insider trading case concerning allegations of Nothern's trading in the 30-year bond on October 31, 2001.

***National Mortgage News Reporter Brian Collins' Call To Fannie Mae***
***After The Embargo Period***

51.    **Response to ¶¶ 129, 130, 131 of Nothern SUF:** Contrary to the assertion made in ¶ 130 of Nothern's SUF, Brian Collins testified that he did not disclose Treasury's refunding information to anyone at Fannie Mae until sometime between 9:45 and 9:50 am on October 31,

2001– after the information had been placed on Treasury's website.  *See* Collins Dep. at 66-68

(Rossetti Decl. Exh. K).  Brian Collins, a reporter with the *National Mortgage News*, attended

the October 31, 2001 Treasury refunding press conference and testified that he arrived during the

question and answer session and stayed until the conference ended at about 9:30 a.m.  *Id*. at 43,

49.  According to Collins, a Treasury "press woman said that there is an embargo until 10

o'clock."  *Id*. at 45-46.  After the conference concluded, Collins left the Treasury building and

walked backed to his office located at 1325 G Street, N.W., Suite 900, a trip he estimated took

"seven to ten minutes depending on how long if you catch a light or two."  *Id*. at 48-49.  Collins

testified that after arriving at his office he spoke with his executive editor, Paul Muolo, for a

minute or two about what occurred at the refunding conference, and then tried to write a story

about the bond cancellation.  *See id*. at 66-68.  However, his story did not have much "pizzazz to

it" so he went over to and "looked at the TV, CNBC" and then "figured I'd try to call somebody,

see if I can get some comment."  *Id*. at 66-68.

52.    Collins further testified that between 9:45 and 9:50 am, after Treasury lifted its

embargo by placing its refunding press announcement on its website, he called the press officer

at Fannie Mae and left her a voice-message in which he said, "something like the Treasury is

doing something with their 30-year bond, and there's an embargo and I would like to try to talk

with to someone or get some idea on how with would affect, you know, the mortgage interest

rates." Collins Dep. at 83 (Rossetti Decl. Exh. K).  This testimony contradicts Nothern's

allegation that Collins called Fannie Mae at 9:35 a.m. and disclosed embargoed information

about Treasury's decision to suspend issuance of the 30-year bond. *See id*. at 66-67.

53.    In addition to being disputed, the facts contained in ¶¶ 129-131 of Nothern's SUF are also not material to any of the genuine issues in this case and do not contain information that should affect the outcome of this case.

***Davis's Violation Of The Embargo On October 31, 2001***

54.    **Response to ¶¶ 132, 134, 135, 136 and 137 of Nothern SUF:**  Understanding that the 30-year bond cancellation information he just learned in the Treasury refunding press conference was embargoed until 10 a.m., and despite his agreement with Treasury and the directives he was given by a Treasury employee during the conference to abide by the embargo, as soon as the conference ended, Davis left the Treasury building, and once outside began using his cell phone to call a number of clients, including Nothern, to notify them about Treasury's decision to cancel the 30-year bond. *See* P. Davis Dep. at 168, 177-178, 190-192, Exh. 17 at 19-21, Exh. 30 (Rossetti Decl. Exh. I).  Davis left his voice-mail message for Nothern at 9:38 a.m. *See* P. Davis Dep. at 183-184, Exh. 29 at SECNOTH 00114193-114194.   Nothern immediately retrieved and listened to the message in which Davis informed Nothern that "Peter Fisher had indicated to Pete Davis that they'd be canceling the long bond and that there would be a press release because it was embargoed until 10 o'clock." Nothern SEC IT at 111-112 (Rossetti Decl. Exh. L); Nothern Dep. at 180-181 (Rossetti Decl. Exh. O).

55.    Davis considered Treasury's October 31, 2001 announcement about the bond cancellation to be market moving information.  *See* Davis Dep. at 51.  He further testified that Treasury's decision to cancel the bond made him "furious" and that he anticipated that the decision would hurt his clients so he "impulsively warned" them about it during the embargo period.  *See* P. Davis Dep. at 170-173 (Rossetti Decl. Exh. I).

*Treasury's Posting Of Its Refunding Announcement To Its Nonpublic Staging Server*

56.    **Response to ¶¶ 138, 139, and 140 of Nothern SUF:**  The SEC disputes the

claims made in ¶¶ 138-140 of Nothern's SUF concerning the public's ability to access

Treasury's October 31, 2001 refunding announcement on Treasury's staging server at 9:40 a.m.

In 2001, Treasury had a contract with Verizon Business (formerly known as UUNET) to

maintain staging and production computer servers for its public website. *See* Deposition of

Verizon Business, Anne Wilson, ("Wilson Dep.") at 35 (Rossetti Decl. Exh. X).  Treasury

employees charged with posting information to Treasury's website used the staging server to

preview how information would appear on Treasury's website and to ensure that the formatting,

etc., was correct before information was actually loaded on or pushed to the website, which was

located on the production server.  *See id.* at 30-32.  The fact that Treasury had a staging server

was not public knowledge.  *See* Wilson Dep. at 201 (Rossetti Decl. Exh. X).  Verizon considered

their client's use of a staging server to be "proprietary information" that was "tightly held."  *Id*.

at 201

57.    When a Treasury employee wanted to post information, such as press releases, to

Treasury's public website, they would transfer the computer file from a desktop computer to the

staging server after first accessing the staging server with a username and password.  *See id.* at

30-37; 54; Fratto Dep. at 261-265 (Rossetti Decl. Exh. B); F. Anderson Dep. at 104-113

(Rossetti Decl. Exh. W).  When the Treasury employee was satisfied with how the press release

appeared on the staging server, the press release would then be uploaded to the public website or

production server. Fratto Dep. at 261-265 (Rossetti Decl. Exh. B); F. Anderson at 104-113

(Rossetti Decl. Exh. W).

58.     On October 31, 2001 at 9:40:23 a.m., Frances Anderson, a secretary in Treasury's press office who was unaware of the 10 a.m. embargo, posted the final copy of the press release announcing Treasury's decision to cease issuance of the 30-year bond on Treasury's staging server. *See* Wilson Dep. at 71-77 (Rossetti Decl. Exh. X); F. Anderson Dep. at 106-113 (Rossetti Decl. Exh. W).  At 9:43:23, Ms. Anderson transferred the press release from the staging server to the production server. *See* Wilson Dep. at 78-79, Exh. 6 (Rossetti Decl. Exh. X); F. Anderson Dep. at 106-113 (Rossetti Decl. Exh. W).  Five seconds later, at 9:43:28, the transfer process was completed and the press release was accessible to the public via Treasury's website. *See* Wilson Dep. at 80, 190, Exh. 6 (Rossetti Decl. Exh. X).

59.     There is no evidence in the record that any member of the public accessed Treasury's October 31, 2001 press release announcing the cancellation of the 30-year bond while it was posted on Treasury's staging server.  Contrary to Nothern's assertion, the press release was not publicly accessible on the internet unless someone was somehow able to randomly guess the staging server's twelve-number internet protocol address, for which there are over 4.2 billion permutations (255 to the 4th power).  *See* Wilson Dep. at 181-183 (Rossetti Decl. Exh. X); David Harris Dep. at 123-124 (Rossetti Decl. Exh. Y).  Even if someone were able to randomly guess the staging server IP address, they still would not have been able to view Treasury's refunding press announcement on Treasury's staging server on the morning of October 31, 2001 unless they also knew the security safeguards Treasury may have employed, such as a username and password, or where trying to access the staging server from a computer whose IP address was on an access list.  *See* Wilson Dep. at 183 (Rossetti Decl. Exh. X).

60.     **Response to ¶¶ 141, 143 and ¶ 144 of Nothern's SUF:**  The facts contained in ¶¶ 141, 143 and 144 of Nothern's SUF are not material to any of the genuine issues in this case and do not contain information that should affect the outcome of this case.

### *Nothern's Trading In The 30-Year Bond On October 31, 2001 During The Embargo Period*

61.     **Response to ¶¶ 145 and 146 of Nothern's SUF:**  While Nothern claims in ¶ 145 of his SUF that he arrived at work around 7:00 a.m. or 7:30 a.m. on October 31, 2001, Nothern actually testified that he did not recall what time he arrived at the office on October 31, 2001, but his general practice was to arrive between 7 a.m. and 7:30 a.m.   Nothern Dep. at 153 (Rossetti Decl. Exh. O).  Additionally, contrary to the statement in ¶ 146 of Nothern's SUF, Nothern did not testify that he began selling shorter-maturity notes, rather, he testified that he began selling intermediate-maturity notes, but he did not know if he began selling such notes prior to 9 a.m. on October 31, 2001.  *Id*. at 153-55.  The alleged facts contained in ¶¶ 145-146 of Nothern's SUF are not only disputed by other evidence, they are also not material to any of the genuine issues in this case and do not contain information that should affect the outcome of this case.

62.     **Response to ¶ 147 Nothern's SUF:**  Nothern testified that on the morning of October 31, 2001, he received a call from a broker on the Chicago Board of Trade who stated that "he heard talk that people on the Chicago Board of Trade thought that the long bond was going to be cancelled." *See id* at 164.  He further testified, however, that he heard "a similar thing at the August refunding" and that there had been a lot of talk about whether the Treasury would be cancelling the 30-year bond at that time. *Id.* at 168-170; 175.

63.     Nothern did not place an order to trade in the 30-year bond when he finished speaking to the broker from the Chicago Board of Trade.  *Id*. at 212.  It was not until he received Peter Davis's voicemail several minutes later, which confirmed that Treasury official Peter

Fisher had told Davis that Treasury was canceling the bond and that there was an embargo until 10 a.m. that Nothern placed an order to trade in the 30-year bond.  *Id*. at 175-181, 191-193.

64.     **Response to ¶ 148 Nothern's SUF:**  Although Nothern testified that he observed the 30-year bond price move upward about 8-10 ticks "sometime around 9:30 a.m." on October 31, 2001, he also stated that while that movement was significant, it was not a "big movement." Nothern SEC IT at 123 (Rossetti Decl. Exh. L).  One of Nothern's colleagues also described the price movement as "meaningful," but not "significant." Kurinsky Dep. at 201-202 (Rossetti Decl. Exh. M).

65.     **Response to ¶¶ 150-151 Nothern's SUF:**  The alleged facts stated in ¶¶ 150-151 of Nothern's SUF are not material to any of the genuine issues in this case and do not contain information that should affect the outcome of this case.  Additionally, Jill Cetina testified that she observed increases in the price of the 30-year bond between 8:30 a.m. and 9:35 a.m. on October 31, 2001 following the release of the GDP data.  *See* Cetina Dep. at 224-226 (Rossetti Decl. Exh. J).  She further acknowledged that she believed there was a "big rally" in the bond around 10 a.m.  *Id*.  Documentary evidence in the record shows that sometime between 9:52 a.m. and 9:57 a.m., Reuters published a news wire release announcing the cancellation of the bond. *See* Schmutz Dep. Exh. 11 (Rossetti Decl. Exh. E).

66.     **Response to ¶¶ 152 of Nothern's SUF:**  None of the cited evidence supports Nothern's contention that "[t]he SEC's expert, Jeffrey [sic] Davis, testified there were several statistically significant increases in the price of the 30-year bond between 9:25 and 9:38 a.m. on October 31, 2001."  SUF ¶ 152.  Jeffry Davis, Senior Vice President of Economists Incorporated, testified that it was not until 9:57 a.m. on October 31, 2001 at the earliest that the market reacted significantly to the information about Treasury's decision to cancel the 30-year bond. *See*

Deposition of Jeffry Davis ("J. Davis Dep.") at 61-62 (Rossetti Decl. Exh. Z).  Jeffry Davis

further testified that "there weren't any reactions prior to 9:57 a.m. in the bond market that were

significant." *Id*. at 100.  Jeffry Davis noted that a "significant price change at 9:57 seems to

coincide with the Reuter's announcement." *Id*. at 87.  Additionally, the charts showing Jeffry

Davis's calculation of the minute-by-minute standardized returns for the 30-year bond in the

cash market did not show any significant price reactions prior to 9:57 a.m. on October 31, 2001.

*See* Jeffry Davis Dep. Exh. 1 at Exh. 6 (chart attached to Davis expert report) (Rossetti Decl.

Exh. Z).  Furthermore, Jeffry Davis noted that it was not until after 9:57 a.m. on October 31,

2001 that the bid-ask spread of the 30-year bond displayed a widening in the bond market, which

typically occurs when the market becomes aware of significant new information.  *Id*. at 152-153.

In Jeffry Davis's expert report, which is attached as Exhibit 1 to his deposition, he noted that the

"increase in the price [of the 30-year bond] from 8:30 a.m. to 9:56 a.m. is just 0.47%, while the

increase from 9:56 a.m. to 10:20 a.m. is 4.22%, that is nine times the increase from 8:30 a.m. to

9:56 a.m." *Id*. Exh. 1 at 8 (Rossetti Decl. Exh. Z).

      67.     Defendant's characterization in ¶ 152 is not supported by the cited testimony of

Jeffry Davis.  The testimony cited in ¶ 152 of Nothern's SUF involves Jeffry Davis's analysis of

the 30-year futures and options contracts – not the 30-year bond in the bond market, which was

what Nothern traded in this case.  ¶ 152 of the SUF also refers to Jeffry Davis's answers to

hypothetical questions posed by Nothern's counsel about which price reactions would have been

significant if Jeffry Davis had measured the reactions using a *less* conservative scale.  *Id*. at 123-

125, J. Davis Dep. Exh. 1 at Exhs. 13-22 (charts attached to Davis expert report which is Exh. 1

to Davis Dep.) (Rossetti Decl. Exh. Z).

68.    **Response to ¶¶ 149, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, of**

**Nothern's SUF:**  There are genuine disputes to the claims made in ¶¶ 149, 153-163 of Nothern's

SUF regarding Nothern's receipt and understanding of Peter Davis's voicemail, Nothern's

decision to trade in the 30-year bond on the morning of October 31, 2001, and the timing of

Nothern's trade order.  Peter Davis's telephone records shows that he called Nothern at

approximately 9:38 a.m. on October 31, 2001 and left a voice-mail message.  P. Davis Dep. at

183-184, Exh. 29 at SEC NOTH 00114193-114194 (Rossetti Decl. Exh. I).  Nothern

immediately retrieved and listened to the message in which Davis informed Nothern that "Peter

Fisher had indicated to Pete Davis that they'd be canceling the long bond and that there would be

a press release because it was embargoed until 10 o'clock." Nothern SEC IT at 111-112 (Rossetti

Decl. Exh. L); Nothern Dep. at 180-181 (Rossetti Decl. Exh. O).  Nothern has admitted that he

understood that Peter Fisher was a Treasury official in the debt finance area who would have had

access to market-sensitive information such as Treasury's decision to suspend or cancel the 30-

year bond.  *See* Nothern SEC IT at 116-117 (Rossetti Decl. Exh. L); Nothern Dep. at 185-188

(Rossetti Decl. Exh. O).  Nothern has also admitted that when he received Davis' voicemail he

was aware of the meaning of the term embargo as it applied to information from government

agencies. Nothern SEC IT at 98-100 (Rossetti Decl. Exh. L).

69.    Shortly after retrieving the voicemail message, Nothern relayed the information

that he had received from Davis concerning Treasury's cancellation of the 30-year bond to three

other MFS portfolio managers, Kennedy, Kurinsky and Smith. *See* Nothern SEC IT at 125-130,

149 (Rossetti Decl. Exh. L); Nothern Dep. at 191-193 (Rossetti Decl. Exh. O).  When conveying

this information, Nothern failed to tell the other portfolio managers that the information was

embargoed, that Davis advised Nothern he had gotten the information from Peter Fisher, or that

Treasury planned to issue a press release announcing the cancellation of the bond at 10 a.m.  *See*

Kurinsky Dep. at 101-102, 107-108, 115-116 (Rossetti Decl. Exh. M); D. Smith Dep. at 138-139

(Rossetti Decl. Exh. N); 141-143, 202-203; Kennedy Dep. at 61-63, 81, 84 (Rossetti Decl. Exh.

P).

   70. Nothern then verbally placed an order to purchase $25 million in par value of the

30-year bond for the portfolios that he managed with, John Cadogan, the MFS bond trader

responsible for such transactions.  *See* Nothern SEC IT at 125; Nothern Dep. at 192-196

(Rossetti Decl. Exh. O); Deposition of John Cadogan ("Cadogen Dep.") at 132-141 and Exh. 7 at

M000566 (Rossetti Decl. Exh. AA).  Based, in part, on the information that they received from

Nothern, the three other portfolio managers also placed orders with MFS trader John Cadogan to

purchase 30-year bonds for the portfolios they managed.  *See* Kurinsky Dep. at 99-114 (Rossetti

Decl. Exh. M); Kennedy Dep. at 61-68 (Rossetti Decl. Exh. P); D. Smith Dep. at 138-165

(Rossetti Decl. Exh. N); Cadogan Dep. at 133-141; 171-172 and Exh. 7 (Rossetti Decl. Exh.

AA).  In total, the amount of bonds Nothern and the three other portfolio managers purchased

equaled $65 million in par value.  *See* Nothern SEC IT at 128 (Rossetti Decl. Exh. L); Cadogan

Dep. at 133-141 and Exh. 7 (Rossetti Decl. Exh. AA); D. Smith Dep. at 154-158 (Rossetti Decl.

Exh. N). While Nothern testified that "contemporaneous with the trader [Cadogen] executing the

order," he discussed with the other portfolio managers, Kennedy, Kurinsky and Smith, "that Pete

Davis had said that there was a press release embargoed until 10 o'clock," none of the portfolio

managers corroborate this claim.  Nothern SEC IT at 149-150; Kurinsky Dep. at 101-102, 107-

108, 115-116 (Rossetti Decl. Exh. M); D. Smith Dep. at 138-139 (Rossetti Decl. Exh. N); 141-

143, 202-203; Kennedy Dep. at 61-63, 81, 84 (Rossetti Decl. Exh. P).

71.     Geoffrey Kurinsky, one of the portfolio managers who joined Nothern's trade in the 30-year bond, testified that he was surprised to find out that Nothern had been told that the bond cancellation information he received from Peter Davis was subject to an embargo. Kurinsky Dep. at 224-228 (Rossetti Decl. Exh. M).  He further testified that if he had known that the information was embargoed it might have indicated to him that the information was not yet public.  *Id.* at 224-228.  Additionally, Kurinsky testified that sometime after October 31, 2001, Kurinsky participated in a conversation with Nothern in which Nothern told Kurinsky that he "wasn't clear"  whether the information that he had received from Davis was public or nonpublic.  *See* Kurinsky Dep. at 169-172 (Rossetti Decl. Exh. M).

72.     After Nothern's trade in the 30-year bond on October 31, 2001, an assistant head of MFS's research department, who was with a group of five or six other people, asked Nothern, if Peter Davis had said that the information concerning the cancellation of the 30-year bond was embargoed and Nothern replied, "no." Nothern SEC IT at 134-135 (Rossetti Decl. Exh. L); Nothern Dep. at 268-272 (Rossetti Decl. Exh. O).

73.     On November 7, 2001, Nothern's supervisor, Joan Batchelder, and MFS's Director of Trading, Don Mycrans, asked Nothern if Peter Davis had said that bond cancellation information was embargoed and Nothern again replied, "no." *See* Nothern SEC IT at 202-203 (Rossetti Decl. Exh. L); Nothern Dep. at 273-275 (Rossetti Decl. Exh. O).

### *The Timing Of Nothern's Trade In The 30-year Bond*

74.     Merrill Lynch, the counterparty to Nothern's purchase order of $65 million par value 30-year bonds, utilized a Trade Order Management System ("TOMS") maintained by Bloomberg, L.P.("Bloomberg"). Deposition of Bloomberg, Patrick Eldridge, ("Eldridge Dep.") at 16 (Rossetti Decl. Exh. BB.)  TOMS is a trade order management system that allows Merrill

Lynch to manage administrative tasks such as managing positions, electronic ticketing, and profit and loss. *Id*. at 16.  TOMS does not execute trades electronically.  *Id.* at 22; Galen Criqui Dep. at 199-200 (Rossetti Decl. Exh. Q).

75.     According to Merrill Lynch's bond trader, Galen Criqui, and MFS's trader, John Cadogan,  MFS's trade of $65 million par value of the 30-year bond trade on October 31, 2001 was executed verbally. *See* Criqui Dep. at 65-71, 185 -187 (Rossetti Decl. Exh. Q); Cadogan Dep. at 133-141, 169-170 (Rossetti Decl. Exh. AA).  Criqui testified that after he verbally confirmed that the trade was "done," or executed, he "soon thereafter, but not immediately" "slated" or entered the trade information into TOMS. Criqui Dep. at 184-187 (Rossetti Decl. Exh. Q).  Cadogan also testified that a trade is executed when he says, "done."  Cadogen Dep. at 169-170 (Rossetti Decl. Exh. AA).  Criqui first entered or slated the trade into TOMS at 9:42:02 after the trade was executed.  *See* Eldridge Dep. at 44-46, Exh. 3 (Rossetti Decl. Exh. BB); Criqui Dep. at 184-187 (Rossetti Decl. Exh. Q).

76.     The time of the trade recorded in TOMS, 9:42:02, and the time recorded on Treasury's production server, 9:43:28, indicating when the October 31 press release was inadvertently posted to Treasury's website, were both synchronized via Network Time Protocol, a ubiquitous time synchronization computer program, to atomic clocks maintained by the United States Naval Observatory and the National Institute of Standards and Time. *See* Wilson Dep. at 84-85 (Rossetti Decl. Exh. X); Deposition of Bloomberg, Darin Langone, ("Langone Dep.") at 31 (Rossetti Decl. Exh. CC).  Treasury's press release could not be viewed by the public on its website prior to the posting on its production server at 9:43:28.  *See* Wilson Dep. at 81, 180-181, 199-200 (Rossetti Decl. Exh. X).

77.     In ¶ 163 of his SUF, Nothern claims that Merrill Lynch's records for his 30-year

bond trade indicate that the time of the transaction was 9:45:49 a.m.  Nothern's claim

mischaracterizes the testimony of Patrick Eldridge, the representative from Bloomberg, which

maintained Merrill Lynch's TOMS system, and is contradicted by the testimony of Galen Criqui,

the Merrill Lynch bond trader.  Eldridge explained that the 9:45:49 a.m. time Nothern cites is

simply the time that TOMS matched the ticket Criqui prepared with the information that Criqui's

salesperson entered for the transaction. Eldridge Dep. at 39-40, 72-73 (Rossetti Decl. Exh. BB).

Eldridge also further testified that he could not determine from the trading records when Criqui

and MFS agreed on the terms of this particular transaction. *See id*. at 82-83.  As stated above,

Criqui testified that he had agreed on the terms of the transaction and verbally executed the trade

before he entered his ticket into the TOMS system at 9:42:02.  *See* Criqui Dep. at 184-187

(Rossetti Decl. Exh. Q); Eldridge Dep. at 44-46, Exh. 3 (Rossetti Decl. Exh. BB).

78.     At this time, the SEC does not raise any genuine issues with the allegations

contained in ¶¶ 49, 50, 59, 91, 92, 100, 104, 105, 107, 118, 142 of Nothern's SUF.

Dated:  July 15, 2008                          Respectfully Submitted,


                                              /s/ Erica Y. Williams_____
                                              Erica Y. Williams
                                              Sarah L. Levine
                                              John J. Rossetti, Jr.
                                              U.S. Securities and Exchange Commissions
                                              100 F Street, N.E.
                                              Washington, D.C. 20549-4010
                                              Phone:   (202) 551-4450
                                              Fax:      (202) 772-9246
                                              williamse@sec.gov