UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | Civil Action No. 05-CV-10983 (NMG) |
| Plaintiff, | ) |  |
| v. | ) ) |  |
| STEVEN E. NOTHERN, | ) ) |  |
| Defendant. | ) ) |  |

## DECLARATION OF JOHN J. ROSSETTI JR. FILED IN SUPPORT OF U.S. SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

John J. Rossetti Jr., pursuant to 28 U.S.C. § 1746, declares under the penalty of perjury as follows:

1. I am a senior counsel for the Securities and Exchange Commission in the above-captioned matter. I am a member of good standing of the New York, Maryland, and District of Columbia bars. Except where otherwise indicated, I make this declaration based upon the documents thus far produced during discovery.

2. A true and correct excerpt from the May 6, 2008 deposition of Clyde H. Bentley, Ph.D. is attached hereto as Exhibit A.

3. A true and correct excerpt from the August 30, 2006 deposition of S. Antonio "Tony" Fratto is attached hereto as Exhibit B.

4. A true and correct excerpt from the August 8, 2006 deposition of Peter Fisher is attached hereto as Exhibit C.

5. A true and correct excerpt from the February 11, 2008 deposition of Michelle Davis is attached hereto as Exhibit D.

6. A true and correct excerpt from the August 23, 2006 deposition of Elizabeth Holahan Schmutz is attached hereto as Exhibit E.

7. A true and correct excerpt from the February 12, 2008 deposition of Stephen Berardi is attached hereto as Exhibit F.

8. A true and correct excerpt from the February 22, 2008 deposition of David Aufhauser is attached hereto as Exhibit G.

9. A true and correct excerpt from the June 23, 2006 deposition of Paul Malvey is attached hereto as Exhibit H.

10. A true and correct excerpt from the April 19-20, 2006 deposition of Peter Davis is attached hereto as Exhibit I.

11. A true and correct excerpt from the February 8, 2008 deposition of Jill Cetina is attached hereto as Exhibit J.

12. A true and correct excerpt from the May 12, 2006 deposition of Brian Collins is attached hereto as Exhibit K.

13. A true and correct excerpt from the December 4, 2001 SEC Investigative Testimony of Steven E. Nothern is attached hereto as Exhibit L.

14. A true and correct excerpt from the September 7, 2006 deposition of Geoffrey Kurinsky is attached hereto as Exhibit M.

15. A true and correct excerpt from the June 19, 2006 deposition of D. Richard Smith is attached hereto as Exhibit N.

16. A true and correct excerpt from the January 30-31, 2007 deposition of Steven E. Nothern is attached hereto as Exhibit O.

17. A true and correct excerpt from the June 26, 2006 deposition of David Kennedy is attached hereto as Exhibit P.

18. A true and correct excerpt from the September 27, 2006 deposition of Galen Criqui is attached hereto as Exhibit Q.

19. A true and correct excerpt from the June 20, 2006 deposition of Roger Anderson is attached hereto as Exhibit R.

20. A true and correct copy of correspondence dated October 19, 2006 from T. McGivern to E. Williams enclosing an entry log showing Peter Davis's entry to Treasury from May 1998 to October 2001 is attached hereto as Exhibit S.

21. True and correct copies of Treasury press releases dated May 5, 1998, August 4, 1998, October 27, 1998, October 28, 1998, May 4, 1999, August 3, 1999, August 4, 1999, November 2, 1999, May 2, 2000, May 3, 2000, August 1, 2000, August 2, 2000, October 31, 2000, November 1, 2000, May 1, 2001, May 2, 2001 and August 1, 2001 are attached hereto as Exhibit T.

22. A true and correct excerpt from the September 14, 2006 deposition of Lula Tyler is attached hereto as Exhibit U.

23. A true and correct excerpt from the February 12, 2008 deposition of Elnora Bowser is attached hereto as Exhibit V.

24. A true and correct excerpt from the August 3, 2006 deposition of Francis Anderson is attached hereto as Exhibit W.

3

25. A true and correct excerpt from the October 6, 2006 deposition of Verizon Business representative, Anne Wilson, is attached hereto as Exhibit X.

26. A true and correct excerpt from the July 25, 2006 deposition of David Harris is attached hereto as Exhibit Y.

27. A true and correct excerpt from the May 1, 2008 deposition of Jeffry Davis is attached hereto as Exhibit Z.

28. A true and correct excerpt from the November 29, 2006 deposition of John Cadogen is attached hereto as Exhibit AA.

29. A true and correct excerpt from the November 2, 2006 deposition of Bloomberg L.P. representative, Patrick Eldridge, is attached hereto as Exhibit BB.

30. A true and correct excerpt from the November 2, 2006 deposition of Bloomberg L.P. representative, Darin Langone, is attached hereto as Exhibit CC.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2008.

John J. Rossetti Jr.

4

Excerpt from the

May 6, 2008 deposition of

Clyde H. Bentley, Ph.D.

Exhibit A

Bentley, Ph.D., Clyde H.                    May 6, 2008
                    Columbia, MO

Page 1

                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS
                        (Boston Division)


    UNITED STATES              )
    SECURITIES AND EXCHANGE    )
    COMMISSION,                )
                               )
            Plaintiff,         )
                               )
        vs.                    )    No. 05-10983 (NMG)
                               )
    STEVEN E. NOTHERN,         )
                               )
            Defendant.         )


        DEPOSITION OF CLYDE H. BENTLEY, Ph.D.,

produced, sworn and examined on the 6th day of

May, 2008, between the hours of eight o'clock in the

forenoon and six o'clock in the afternoon of that day,

at the Courtyard Columbia, 3301 LeMone Industrial

Blvd., Columbia, Missouri, before Kim D. Murphy,

Certified Court Reporter, within and for the State of

Missouri.

Bentley, Ph.D., Clyde H.                    May 6, 2008
Columbia, MO

---

**Page 46**

1    A. I read numerous -- I reviewed numerous
2    items that are listed in the report.
3    Q. How'd you acquire these items?
4    A. Normal search procedures of databases and
5    text.
6    Q. What normal sort of search procedures?
7    A. One uses a number of general search
8    engines, such as Google, Yahoo, Dogpile. And then uses
9    the specific academic databases offered in the Missouri
10   School of Journalism library.
11   Q. When you say "one," I want to know when you
12   did. When you say one uses, did you?
13   A. Sure.
14   Q. Did you do a search on Google, a search on
15   Yahoo?
16   A. Yes.
17   Q. Did you do a search on Dogpile?
18   A. Yes.
19   Q. Did you search academic databases available
20   at the University of Missouri?
21   A. Yes.
22        MR. SHOPE: Wait until she's finished with
23   the question.
24        THE WITNESS: I'm sorry.
25   BY MS. WILLIAMS:

---

**Page 47**

1    Q. What databases did you search, academic
2    databases as you refer to them?
3    A. It's bookmarked on my computer. So I click
4    on it. But I believe it's called academic search
5    elite.
6    Q. Do you have to plug search terms into this
7    database?
8    A. Of course.
9    Q. What search terms did you plug in in
10   research for your expert report?
11   A. The normal search procedure is to plug a
12   general search term, like "embargo" into that. Then to
13   continuously modify it as you drill down into the
14   literature.
15       I don't generally record the search
16   criteria for a search. It is something any academic is
17   very, very comfortable with doing. And we generally
18   include counter -- if you have a word, you would also
19   try to take the opposite of it, where possible. By
20   that I mean if I search for "restricted," I would also
21   search for "unrestricted."
22   Q. Okay. I am trying to figure out what you
23   actually did. So I understand what your normal -- but
24   you answered there were normal things that people might
25   do. What specifically do you recall searching for in

---

**Page 48**

1    this academic search database?
2    A. I searched for articles on embargo. Press
3    embargo. I searched for articles on press releases.
4    I may have -- I don't recall particularly -- but it
5    would be typical that I would have in this case
6    searched for items from the U.S. Department of
7    Treasury, about the U.S. Department of Treasury or
8    similar federal agencies. And I believe -- I am
9    positive that I also searched various items on press
10   management, public management and press management.
11        MR. SHOPE: Can I just interrupt for
12   something? I'm having a little trouble hearing you.
13   If you'd slide up a little bit.
14   BY MS. WILLIAMS:
15   Q. Okay, before we went off record, you were
16   talking about a search that you ran in this academic
17   search elite database. What source or sources are in
18   that database?
19   A. There are thousands of popular press items
20   and academic journals.
21   Q. When you say "popular press items," what do
22   you mean?
23   A. Magazine articles, blog entries, or Website
24   entries. Items that would not be specific to academia.
25   Q. And did your search in the academic search

---

**Page 49**

1    elite database generate any results?
2    A. I believe so.
3    Q. Can you tell me what sources?
4    A. No, I can't. I can tell you the sources.
5    I can't tell you where -- which search engine I used.
6    Q. The sources that you received from the
7    academic search elite database that you're relying on
8    in your expert report, are they listed in either
9    Exhibit 1 or Exhibit 2?
10   A. If I cite it, it is listed. The citation
11   does not go to the database.
12   Q. I understand.
13   A. The citation goes to the original source of
14   it, or Website affiliated with that source.
15   Q. My question was slightly different though.
16   Any sources that you received from the search in the
17   academic search elite database that you're relying on
18   for your opinion in this case, did you list those
19   sources in either Exhibit 1 or Exhibit 2?
20   A. As I believe I said before, any -- the
21   report contains citations for all the material that I
22   relied upon that I specifically reviewed in the process
23   of preparing this report.
24   Q. So the answer is yes?
25   A. Yes.

13. (Pages 46 to 49)

Bentley, Ph.D., Clyde H.                                              May 6, 2008

Columbia, MO

Page 62

1  news story or in a journalistically written format.
2  The process for this introduction and the reference
3  comments is not a normal journalistic way of writing.
4       But it was my understanding from the
5  template that this was required, as was the heading.
6  I believe in my initial draft I had neglected to put
7  those single parenthesis there in the middle.
8       Q.  When you met with Mr. Shope for the first
9  time, did you take any notes during your meeting?
10      A.  No.
11      Q.  Did Mr. Shope ever provide you with
12  handwritten comments on your draft?
13      A.  No.
14      Q.  Did you consult with any colleagues about
15  your expert report before you finalized it?
16      A.  No.
17      Q.  Did you talk to any current or former
18  Treasury employees personally before you finalized your
19  expert report?
20      A.  No.
21      Q.  Did you talk to any journalists covering
22  Treasury prior to October 31st, 2001?
23      A.  No.
24      Q.  That covered --
25      A.  No.  Let me think.  I talked to an

Page 63

1  Associated Press person who's cited in there.  I have
2  no idea if that person covered the press Treasury.  But
3  they had worked on national stories.  I just have no
4  idea.  It was not a conversation about the Treasury.
5       Q.  Who is this Associated Press person?
6       A.  They are cited here.  Associated Press
7  Senior Managing Editor, Mike Silverman.
8       Q.  Why did you talk to Mr. Silverman?
9       A.  The Associated Press is one of the leading
10  news organizations that covers Washington.  And also
11  has its own manner of distributing material that may be
12  different from what a newspaper does.
13      Q.  Just to clarify, you don't know if
14  Mr. Silverman ever personally covered Treasury?
15      A.  No.
16      Q.  What did you discuss with him regarding
17  your expert report?
18      A.  Told him that I was being an expert witness
19  in a federal case and whether the SEC -- and that I was
20  interested in what the Associated Press -- how it was
21  dealing with new journalistic pressures of
22  non-traditional journalists, and for transparency, that
23  as a journalist and professor who works in on-line
24  media, I believed that it had substantially changed the
25  release of information, and I wanted his opinion on it.

Page 64

1       Q.  And what was his opinion?
2       A.  He said -- he defended the Associated Press
3  traditions as a mixed blessing, but he said that quote,
4  "More and more people are getting the AP report who are
5  not used to journalism traditions."
6       He told me that the Associated Press may
7  choose to place an embargo of its own on a piece of
8  material, but has no way of keeping someone from
9  enforcing that.  And that especially people who have no
10  such tradition routinely ignore it.
11      Q.  Okay.  Just to clarify the quote that you
12  read, is that on the bottom of page 7 of Exhibit 1?
13      A.  Yes.
14      Q.  Where in your report is Mr. Silverman's
15  comments about Associated Press placing -- did you say
16  can place its own embargo on material?  Is that
17  what you said?
18      A.  Yeah.  I think I say that somewhere else.
19  That it will routinely embargo material so that if it's
20  for a Sunday paper it is available to a Sunday paper
21  only.  However, if you only have a Saturday paper, you
22  ignore it.
23      And I am not sure if I actually discussed
24  that.  It was -- it seemed that I did mentioned it at
25  some point.

Page 65

1       Q.  So it's fair to say the Associated Press
2  routinely uses embargoes?
3       A.  A very different type of an embargo than
4  the government does.  It is an embargo within a paper
5  for logistical reasons.
6       Q.  And how is that different from a government
7  embargo, in your opinion?
8       A.  Most government embargoes are for political
9  reasons or are for convenience of the government
10  agency.  A newspaper, a wire-serviced embargo is for
11  the convenience of a particular group of customers.
12      Q.  And on what do you base your statement that
13  most government embargoes are for political reasons?
14      A.  My extensive history in the press.  My
15  experience in the press.
16      Q.  And --
17      A.  It's an opinion.
18      Q.  I understand that.  I was just trying to
19  figure out on what experience specifically you base
20  that opinion.
21      A.  I have been a reporter and editor for many,
22  many years.  I have dealt with many sizes of
23  government.  And I have good reason to believe that
24  most embargoes have no necessity in fact.  They are for
25  the convenience of the agency that requested the

17 (Pages 62 to 65)

Page 66

1  embargo.
2      Q.  Have you ever worked for a government
3  agency?
4      A.  I am a tenured professor for the University
5  of Missouri which is owned by the State of Missouri.
6      Q.  Okay.  Have you ever worked for a
7  government agency?
8      A.  That is a government agency, yes.
9      Q.  Your understanding is that the University
10  is a government agency?
11      A.  My paycheck says State of Missouri.
12      Q.  Okay.  Have you worked for a federal
13  government agency?
14      A.  No.
15      Q.  And besides the University, have you worked
16  for any other state government agency?
17      A.  No.
18      Q.  Have you worked for any local-level
19  government agencies?
20      A.  No.
21      Q.  Besides the rationale -- your opinion as to
22  the rationale behind why government agencies impose
23  embargoes, which is for political reasons and the
24  convenience of the agency, how else do those government
25  agency embargoes that are used routinely by the

Page 67

1  Associated Press affect it?
2          MR. SHOPE:  Note my objection to the form.
3          THE WITNESS:  In the most substantive
4  level, they do not, in that the receiving -- or the
5  editor or the reporter who has requested an embargo has
6  the -- uses their own news and competitive experience
7  and knowledge to decide whether to keep that embargo or
8  not.  And that if one operates a Saturday paper instead
9  of a Sunday paper, you may make that decision for the
10  Associated Press.
11          In the less substantive level, it is -- the
12  AP embargo is a marker for time flow, rather than a
13  restriction, so that the material simply cannot get
14  out.  It is an indication that this material is news
15  for a particular type of publication in the future, and
16  may not be as appropriate for publication at the time.
17      Q.  Okay.  Let me make sure I understand.
18  Under the AP embargo, if the embargo is until Sunday as
19  you said, it's supposed to come out --
20      A.  A Sunday paper.
21      Q.  And the reporter decides to honor that
22  embargo, can they release it before the Sunday paper if
23  they have decided to honor the embargo?
24      A.  Sure.
25      Q.  And how is that honoring the embargo?

Page 68

1      A.  It's not.  I mean, there is no agreement of
2  embargo.
3      Q.  My hypothetical -- I'm not being clear --
4  this reporter has decided they are going to honor the
5  embargo in my hypothetical.  And if they are honoring
6  the embargo, and the embargo release time is supposed
7  to be the Sunday paper, can they put it out before the
8  Sunday paper and still honor the honoring of that
9  embargo by the AP?
10      A.  No.
11      Q.  Okay.  So if they put it out before the
12  Sunday paper, they are, therefore, not honoring the
13  AP's embargo?
14      A.  Oh, absolutely they're not.
15      Q.  Okay.  Is the AP part of the Washington
16  Press Corps?
17      A.  It has members in the Washington Press
18  Corps.
19      Q.  Have you ever been personally requested to
20  obey a federal government embargo?
21          MR. SHOPE:  I'm going to say a federal
22  government embargo, that would encompass any request by
23  any federal government official?  Is that a fair
24  interpretation of your question?
25          MS. WILLIAMS:  Or agency.

Page 69

1          THE WITNESS:  I believe we at times in the
2  Coeur d'Alene Press --
3  BY MS. WILLIAM:
4      Q.  I'm sorry, I'm having trouble hearing you.
5      A.  I believe when I was editor of -- managing
6  editor and previously news editor of the Coeur d'Alene
7  Press in Northern Idaho, there were times that the U.S.
8  Forest Service embargoed information about actions in
9  the National Forest.  I don't recall a specific
10  embargo, but just knowing, working with the Forest
11  Service, I believe we did have some.
12      Q.  And that -- you worked for the Coeur
13  d'Alene Press from June of '81 to June of '88?
14      A.  Right.
15      Q.  Except for the embargo that you might have
16  been requested to honor by the U.S. Forest Service when
17  you worked for the Coeur d'Alene Press, can you recall
18  any other times that any federal government agency or
19  officer has requested you to abide by an embargo?
20      A.  Not specifically.  But one that's dealt
21  with hundreds of news releases from the government in
22  anything -- I was for many years a news manager rather
23  than a reporter, so I would not receive the embargo
24  information.  I might have looked at it and said, "Is
25  this worth going with or not."

Bentley, Ph.D., Clyde H.                      May 6, 2008
                Columbia, MO

---

**Page 98**

1      (An off-the-record discussion was held.)
2  BY MS. WILLIAMS:
3      Q.  I think that you were referring to this
4  paragraph on page 2 that starts "We." And it reads,
5  "We discovered that the local ABC/Fox television
6  stations were telling people at the airport about the
7  shutdown and had posted a story on their Websites." So
8  you see that?
9      A.  Yes.
10     Q.  Do you know if the local ABC/Fox television
11 station received any information from Skybus that was
12 included in their stories?
13     A.  No. I know what you have, the information
14 only that you have provided me. I know nothing about
15 the Columbus Dispatch receiving that information or
16 what's in this report.
17     Q.  You don't know --
18     A.  No.
19     Q.  -- how ABC or Fox received any information
20 about the shutdown that they posted on their Websites;
21 is that correct?
22     A.  Correct.
23     Q.  Okay. So you don't know if they violated
24 any embargo, do you?
25     A.  I don't know that there was a general

---

**Page 99**

1  embargo.
2      Q.  You don't know if ABC or Fox received any
3  embargo material, do you?
4      A.  No.
5      Q.  Now, I asked you, did you review any
6  studies on embargoes when preparing your expert report
7  in this case.
8      A.  No. And I found amazingly few academic
9  studies on embargoes.
10     Q.  Did you find any?
11     A.  I don't recall.
12     Q.  Did you conduct any studies yourself on
13 embargoes?
14     A.  No.
15     Q.  Have you ever done any studies on
16 embargoes?
17     A.  No.
18     Q.  One of the sources that you do rely on in
19 your report is Embargoed Science by Vincent Kiernan; is
20 that right?
21     A.  Correct. That was one I did review.
22     Q.  Do you know Mr. Kiernan personally?
23     A.  No.
24     Q.  How did you --
25         MR. SHOPE:  If you could just wait for the

---

**Page 100**

1  question to be complete; it will be easier for every
2  one of us to hear it.
3  BY MS. WILLIAMS:
4      Q.  How did you come to find his book Embargoed
5  Science?
6      A.  I found it in my review of the literature.
7      Q.  And in your report, which is Exhibit 1 on
8  page 10, paragraph 2, you referred to Mr. Kiernan as a
9  veteran science journalist; is that right?
10     A.  Correct.
11     Q.  Do you know anything about his professional
12 background?
13     A.  He is referenced many times for his
14 writing. I can't remember which publication he writes
15 for, but he is listed very often as a science writer in
16 the literature.
17     Q.  And when you say "in the literature," what
18 do you mean?
19     A.  Literature means any source of information,
20 academic or popular.
21     Q.  When he is referenced inside the
22 literature, what is -- what's he usually referenced
23 for?
24     A.  Science journalism.
25     Q.  Okay. Do you know anything about

---

**Page 101**

1  Mr. Kiernan's experience with embargoes?
2      A.  No.
3      Q.  Do you know anything about the research
4  he's done on embargoes?
5      A.  Just what I read here.
6      Q.  And you cited Mr. Kiernan a couple of times
7  in your expert report?
8      A.  Correct.
9      Q.  Do you consider him to be an authority on
10 the area of news embargoes?
11         MR. SHOPE:  I'm going to object to the
12 question as to the form. And maybe, are you
13 distinguishing science writing from news embargo, from
14 news or --
15         MS. WILLIAMS:  No.
16         THE WITNESS:  He is a commentator on
17 embargoes in science journalism, who is well-quoted and
18 has insight to the news of embargoes by science
19 journalists.
20 BY MS. WILLIAMS:
21     Q.  And why do you cite to him in your report?
22     A.  He was a critic of embargoes, and who I
23 cited to validate my own opinions.
24     Q.  Okay. And is it your opinion that
25 Mr. Kiernan's opinions are some that are shared by you?

---

26  (Pages 98 to 101)


PLAINTIFF'S
EXHIBIT

American Chemical Society
Information Resource Center
1155 16th St NW
Washington DC 20036

# Embargoed Science

VINCENT KIERNAN

UNIVERSITY OF ILLINOIS PRESS
Urbana and Chicago

reporting was not a violation of the news embargo because the papers had not yet been fully edited, much less distributed to journalists under the embargo. But Daniel Koshland, the editor of *Science*, decided to allow an exception to the Ingelfinger Rule and allow the researchers to discuss their findings with reporters. "Once Reuters had broken the story we thought it was unfair to the rest of the press to withhold the information," he said. Using private jets supplied by the Howard Hughes Medical Institute, the researchers held press conferences in Toronto and Washington, D.C., on the same day. At the same time, patent officials at the University of Michigan, home base of one of the key researchers, became concerned that the prepublication publicity might endanger the university's prospects for patenting the potentially lucrative discovery, so they raced to file a patent application at 11:45 P.M. on the day of Reuters's story.[93]

Despite the conflicts over the terms of the embargo and their interpretation, science journalists in this period still endorsed embargoes overwhelmingly. In a survey of its members by the National Association of Science Writers in 1989, 84 percent of respondents said that embargoes were justified under certain circumstances; when presented with a list of possible justifications for embargoes, 53 percent agreed with giving journalists an equal chance at the story. One-quarter said that they would break an embargo if they thought someone else would, and 20 percent said they would break an embargo on a story that was "too important to hold" (see table 2.1.).[94]

And the journals continued to defend embargoes. Relman, the editor of the *New England Journal of Medicine*, described his rationale: "The medical profession should hear about the results of research at least as soon as the public hears about it.... When the public hears about it, physicians should have their journals on their desk, or in the library so that they may consult the journal. They will then have the information to respond when patients call and ask, 'doctor what about this treatment or this operation?'"[95]

The Ingelfinger Rule also continued to cause consternation and confusion among scientists. In October 1988, the National Institutes of Health's Recombinant DNA Advisory Committee was asked to grant permission for the first experiment in which a new gene would be transplanted into human beings. But the researchers in charge of the experiment declined to provide the committee with important raw data, including data about the safety of the proposed experiment, out of fear that the data then would become part of the public record. That would make the data available to competitors and could also interfere with publishing the data in the *New England Journal of Medicine* or *Science*, the researchers told the committee. The committee

embargo because the papers had not
d to journalists under the embargo.
ce, decided to allow an exception to
chers to discuss their findings with
e story we thought it was unfair to
mation," he said. Using private jets
Institute, the researchers held press
, D.C., on the same day. At the same
Michigan, home base of one of the
the prepublication publicity might
patenting the potentially lucrative
application at 11:45 P.M. on the day

f the embargo and their interpreta-
ll endorsed embargoes overwhelm-
e National Association of Science
s said that embargoes were justified
ented with a list of possible justifi-
d with giving journalists an equal
at they would break an embargo if
o percent said they would break an
tant to hold" (see table 2.1.).[94]

d embargoes. Relman, the editor of
scribed his rationale: "The medical
s of research at least as soon as the
ic hears about it, physicians should
he library so that they may consult
ormation to respond when patients
atment or this operation?' "[95]

to cause consternation and confu-
the National Institutes of Health's
e was asked to grant permission for
would be transplanted into human
the experiment declined to provide
, including data about the safety of
at the data then would become part
ne data available to competitors and
e data in the *New England Journal*
old the committee. The committee

*Table 2.1* Embargo-Related Views in a 1989 Survey of Science Journalists

| Survey Question | % |
| --- | --- |
| **What reasons would justify the embargo of journal articles?** | |
| Not under any condition | 24 |
| To give everybody an equal chance at a story | 34 |
| To give the scientific community time to see the article | 26 |
| To coincide with the date the article is published | 39 |
| To ensure consistency and accuracy of coverage by the press | 30 |
| **What reasons would justify the embargo of news releases?** | |
| Not under any condition | 18 |
| To give everybody an equal chance at a story | 46 |
| To give the scientific community time to validate scientific results | 29 |
| To avoid irresponsible reporting of scientific results | 35 |
| To ensure consistency and accuracy of coverage by the press | 33 |
| **Under what conditions would you break an embargo?** | |
| If I have reliable information that the embargo will be broken by someone else | 18 |
| If someone else has broken the embargo | 51 |
| If the story is too important to hold | 14 |
| If I feel that withholding the story will compromise public welfare | 52 |
| For other reasons | 8 |

*Note:* N = 393. Responses are from survey participants who indicated that they were "science journalist[s] with no public information responsibilities." Source: National Association of Science Writers. Tabulations by the author.

unhappily endorsed the experiment, but the director of the NIH overruled them and delayed the experiment, declaring that the Recombinant DNA Advisory Committee "will not be held hostage to the *New England Journal of Medicine*." The editors of the two journals insisted that the disclosure would not have hurt their chances for publication because the journals permit researchers to provide data requested by governmental bodies, and the experiment subsequently proceeded.[96]

## New Technology in the Midst of Mounting Controversy: The 1990s and Beyond

The 1990s opened with a gambit by the *Journal of the American Medical Association* to fine-tune the embargo to its advantage: in April of that year, the journal changed its publication date from Friday to Wednesday, making it a day before the release date for the *New England Journal of Medicine* rather than a day after. "If two of the principal medical journals in the world are working on similar research, we want to be the first out on it," a spokesman for the American Medical Association said.[97]

It worked: coverage of the *Journal of the American Medical Association* by the *New York Times* jumped by 50 percent after the embargo time was made earlier in the week in 1990. The paper's coverage of the *New England Journal of Medicine*—the more elite of the two journals—remained unchanged. This suggests that the New England journal had overshadowed the AMA journal when the New England journal had an earlier embargo release time; when the AMA journal made its release time earlier, it emerged from the shadows.[98]

The importance of the two medical journals as news sources in this era was underscored by a 1991 survey of 262 U.S. medical journalists. Asked to identify their news sources in a normal one-month period, 34 percent cited the *New England Journal of Medicine* as a source that was used "often," and 33 percent placed the *Journal of the American Medical Association* in that category. *Science* was reported as used often by 25 percent, and the *Lancet* was reported as used often by 16 percent. By contrast, press releases were used often by 10 percent, research papers by 60 percent, and personal contacts in the medical community by 58 percent.[99]

Broadcasters and print journalists continued to tussle over the embargo as well, as evidenced by a dispute over who was responsible for an embargo violation in July 1995. *Nature* had disclosed to journalists, under embargo, the text of a paper describing a genetic cause for one form of Alzheimer's disease. But about twenty-four hours before the embargo expired, the paper was mentioned publicly during a congressional hearing on the importance of biomedical research: "At 6 tomorrow an embargo will be lifted to talk about a new gene that is the major gene for early Alzheimer's Disease," Allen D. Roses, the head of the research team, told the Senate Special Committee on Aging. "On Thursday it will be published in the journal *Nature*. With that gene . . . we cover the genetic field of Alzheimer's Disease by about 95 percent of the prevalent cases." Roses provided no details other than that the gene would be designated S-182, and the committee members did not question him. That evening, *ABC World News Tonight* reported Roses's statement but disclosed no additional details from the *Nature* paper. "There was very major news almost made here in Washington today about Alzheimer's disease," anchorman Peter Jennings said while introducing a report on the hearing. "Researchers writing [in] the magazine *Nature* will report in full tomorrow that they have isolated the gene that appears to cause Alzheimer's in people who are under 60. Alzheimer's is ultimately fatal and slowly destroys the brain. Today, the head of the panel that conducted the research would only tell a Senate committee that much."[100]

Judging that ABC News had violated the embargo and had consequently

*erican Medical Association* by
the embargo time was made
*e* of the *New England Journal*
—remained unchanged. This
*r*shadowed the AMA journal
*n*bargo release time; when the
merged from the shadows.⁹⁸
*l*s as news sources in this era
medical journalists. Asked to
*o*nth period, 34 percent cited
*c*e that was used "often," and
*fedical Association* in that cat-
5 percent, and the *Lancet* was
rast, press releases were used
*:*ent, and personal contacts in

*:*d to tussle over the embargo
*l*s responsible for an embargo
*)* journalists, under embargo,
for one form of Alzheimer's
*l*e embargo expired, the paper
*l* hearing on the importance of
*l*rgo will be lifted to talk about
*l*zheimer's Disease," Allen D.
Senate Special Committee on
the journal *Nature*. With that
*r*'s Disease by about 95 percent
*:*tails other than that the gene
*e*e members did not question
*e*ported Roses's statement but
*e* paper. "There was very major
*y* about Alzheimer's disease,"
*l*cing a report on the hearing.
*r*e will report in full tomorrow
*:*o cause Alzheimer's in people
fatal and slowly destroys the
*u*cted the research would only

*m*bargo and had consequently

freed other journalists to write about the project, *USA Today* published an article the next morning with details from the *Nature* piece. John Maddox, *Nature*'s editor, called *USA Today* "disingenuous," noting that *Nature* had mentioned plans for the paper in the front matter of its previous issue. (However, the mention was cryptic at best: a small box in the previous issue's table of contents listed several topics to be included in the journal's next issue; included in the list was "Alzheimer's mutation.") Maddox banned the newspaper from embargoed access for six months. "While it may seem to them they are being penalized unfairly for breaking bureaucratic rules, their real disservice is to their fellow journalists," Maddox wrote. Susan Weiss, the newspaper's managing editor, replied to Maddox that ABC's broadcast violated the embargo. "Your willingness to allow Peter Jennings to report the discovery . . . raises again the concern of favoritism by medical and science journals toward television networks. The embargo policy itself already discriminates against print media by giving scientific and medical news to network broadcasters a day ahead of newspapers."¹⁰¹

In the 1990s, the growing commercial importance of biotechnology undermined the strength of embargoes on research in the field, while companies sought ways to gain access to embargoed information and turn it to their benefit. For example, in 1996, the *New England Journal of Medicine* published a study that determined that the antiobesity drug Redux would cause a lung disorder in some people. The journal also published an editorial that concluded that the drug would save more lives than the deaths it would cause. American Home Products Corporation, which markets the drug, got an advance copy of the editorial; the source, the company said, was the French pharmaceutical company that sponsored the study. Before the embargo lifted, the company issued a unembargoed press release touting the journal's positive editorial, in an apparent effort to draw attention from the negative conclusion of the study. "The NEJM findings represent information we have already looked at very carefully and shared publicly," the press release said. "This paper does not represent a new study or new data." The stock of the drug's manufacturer rose, apparently because of investors' anticipation that the editorial's conclusions would promote increased sales of the drug, although the research subsequently became embroiled in controversy over an apparent financial conflict of interest by the editorial's authors.¹⁰²

The continuing iron grip of the Ingelfinger Rule was illustrated by one incident at the 1994 annual meeting of the American Association for the Advancement of Science, the publisher of *Science,* in San Francisco. Although the AAAS meeting had long developed a reputation among science journal-

ists as being thin on news, the 1994 meeting featured one nugget of interest to reporters: the presentation of results of a controversial experiment to combat global warming by depositing iron filings in the ocean, which would promote the growth of phytoplankton, which would remove carbon dioxide from the air through the process of photosynthesis. Despite journalists' interest in the research, the paper on the experiment was not made available to journalists, and the researcher who led the experiment did not attend a press conference organized by the AAAS to discuss the main points of the conference session. The reason was that the researcher had submitted a paper to *Science,* and such prepublication dissemination of the data could jeopardize his chances of publishing the paper. An irate David Baron, a science reporter for Boston's WBUR-FM, wrote in an open letter to the AAAS: "I now understand that your public affairs staff has been instructed to hide the most newsworthy studies from the media, and that the news conferences are, by design, where only old results will be discussed. . . . I thought the AAAS was committed to the advancement of science; I now realize it's committed only to the advancement of *Science.*" In response, the AAAS's director of communications said that her staff had an obligation to warn speakers who planned to submit papers to journals that follow the Ingelfinger Rule about the risk posed by appearing at a press conference at the session. But, she noted, the Ingelfinger Rule restricts researchers, not journalists. "Thus, any reporter is welcome—and encouraged—to comb the AAAS program for sessions of interest."[103]

Embargoes also figured in one of the most important research developments of the decade—the February 1997 announcement by Scottish researchers that they had cloned a sheep named Dolly. The research report was published in *Nature,* which had followed its usual practice of distributing advance embargoed copies of the paper to journalists. But because of the importance of the finding, many reporters expected that the embargo would be violated. For example, Gina Kolata of the *New York Times* and her editor decided that the embargo would probably fail. "We decided that I would get a major story ready to go and that the *Times*'s editors would . . . alert us immediately if another news organization had reported *Nature*'s cloning story. If and when that happened, the *Times* would rush my story into print."[104]

Indeed, the embargo did bust, but not because of a journalist with embargoed access. The Italian news service ANSA first carried news of the research during the weekend after *Nature* distributed the embargoed information to journalists, and three Italian newspapers then ran stories. Robin McKie of the London *Observer* also published a story, based on independent reporting, on

tured one nugget of interest
controversial experiment to
gs in the ocean, which would
would remove carbon diox-
ynthesis. Despite journalists'
ment was not made available
experiment did not attend a
scuss the main points of the
archer had submitted a paper
ition of the data could jeop-
. irate David Baron, a science
i open letter to the AAAS: "I
as been instructed to hide the
that the news conferences are,
issed. . . . I thought the AAAS
ce; I now realize it's commit-
esponse, the AAAS's director
i obligation to warn speakers
at follow the Ingelfinger Rule
conference at the session. But,
rchers, not journalists. "Thus,
–to comb the AAAS program

t important research develop-
uncement by Scottish research-
r. The research report was pub-
practice of distributing advance
But because of the importance
the embargo would be violated.
nes and her editor decided that
d that I would get a major story
uld . . . alert us immediately if
ure's cloning story. If and when
ory into print."[104]
ause of a journalist with embar-
first carried news of the research
l the embargoed information to
i ran stories. Robin McKie of the
ed on independent reporting, on

the Sunday before the scheduled release time. "Scientists have created the first clone of an adult animal. They have taken a cell from a sheep's udder and turned it into a lamb," began McKie's story, which did not mention *Nature*. Kolata's foresight was rewarded. She later crowed: "*The New York Times* immediately went into action, publishing its story in time for the second edition of the paper, which meant that only those readers who lived closest to New York City and got the edition of the Sunday paper that was printed late Saturday afternoon could have been unaware of the cloning of Dolly."[105]

Thanks to the reach of the paper's own wire service, versions of Kolata's story appeared in other newspapers' Sunday editions as well, including the *Austin American-Statesman*, the *Dallas Morning News*, the *Dayton Daily News*, and the *Palm Beach Post*. The national syndication of Kolata's story appears to be the basis for a claim made on the dust jacket of her 1998 book on cloning that she "broke the story nationally." Such a claim dubiously tries to take credit for having a story ready to run in case another journalist's enterprise or scrupulousness led to an embargo break. Moreover, Kolata's claim notwithstanding, she and the *New York Times* were not the only ones to move quickly: the *Los Angeles Times* was also able to report the cloning in its Sunday editions. The front-page story summarized the research and raised the ethical issue of cloning humans. One reporter for the *Los Angeles Times* later concluded that the Dolly story "illustrates how important science news often is more a product of news management by the journals that publish peer-review research, than of any one reporter's special expertise or investigative energy."[106]

Another example of the vulnerability of embargoes to enterprising reporters was the dramatic 1996 announcement of the discovery of evidence of fossilized life in a meteorite from Mars. The researchers were set to publish their findings in *Science*, but the American Association for the Advancement of Science and the National Aeronautics and Space Administration—where most of the research for the project was conducted—jockeyed back and forth about how the information would be released, with each side seeking embargo arrangements that would better suit its ends and needs. As the publication date for the paper drew near, presidential adviser Dick Morris bragged about the meteorite discovery to Sherry Rowlands, a prostitute with whom he had a long-running relationship. Rowlands recorded in her diary that Morris boasted that he was one of seven people who knew about the existence of life on another planet. After the news of the discovery subsequently broke, Rowlands would sell her story to the *Star*, a supermarket tabloid. News that a key presidential adviser had discussed government business with a prostitute would force Morris to resign from his job.[107]

However, before embargoed copies of the paper even were distributed to science journalists, an enterprising journalist who was not part of the embargo system broke the story in a space-industry trade newspaper, relying on confidential sources and information he had gleaned from a scientific conference. His article triggered an immediate media feeding frenzy in which science reporters scrambled to describe the findings without the luxury of several days' worth of an embargo. The meteorite had been discovered by researchers funded by the National Science Foundation, but the National Aeronautics and Space Administration influenced press coverage to build support for its plans for Mars exploration. In fact, foundation officials were taken by surprise by the researchers' announcement, even though the research team included the head of the National Science Board, which oversees the foundation; that researcher, like all others seeking to publish in *Science,* was barred by the journal from disclosing the substance of the research until it was published. This aspect of the story illustrates the possibility of using embargoed information to influence political processes.[108]

In another example of enterprising reporting, the London *Observer* broke the story in 2001 that analysis of the human genome had found that humans have a surprisingly low number of genes—even though the story had been embargoed by both *Nature* and *Science* in an unusual shared embargo. The *Observer* had not agreed to the embargo, however, and its reporter obtained details on the research at a public biotechnology conference, three days before the embargo was scheduled to lift, at which a key scientist in the project spoke.[109]

But such incidents did little to weaken journalists' devotion to embargoes. For example, Boyce Rensberger of the *Washington Post* strongly praised embargoes in a science-writing manual published in 1997 under the sponsorship of the National Association of Science Writers. The embargo system, he wrote, "is a very good thing because science stories are more complex than ever and it takes time, sometimes several days, to do a good job. The embargo system removes the temptation to beat the competition, giving us more time to do our jobs well and giving the readers better-written stories."[110]

One vocal critic of embargoes was the *New York Times*'s medical reporter, Lawrence Altman, who continued to blast the Ingelfinger Rule and the embargo system in a two-part essay published in 1996 in the *Lancet,* a British medical journal that itself provides embargoed copies to journalists. Altman concluded that there is little evidence that the Ingelfinger Rule improves the quality of scientific journals and therefore should be dropped. Altman's argument led the *Lancet*'s editor to write that he was inclined to rescind its

the paper even were distributed
urnalist who was not part of the
e-industry trade newspaper, rely-
n he had gleaned from a scientific
ate media feeding frenzy in which
ie findings without the luxury of
neteorite had been discovered by
ce Foundation, but the National
fluenced press coverage to build
In fact, foundation officials were
icement, even though the research
cience Board, which oversees the
seeking to publish in *Science*, was
substance of the research until it
lustrates the possibility of using
ical processes.[108]

rting, the London *Observer* broke
i genome had found that humans
—even though the story had been
an unusual shared embargo. The
owever, and its reporter obtained
chnology conference, three days
t, at which a key scientist in the

i journalists' devotion to embar-
: *Washington Post* strongly praised
olished in 1997 under the sponsor-
: Writers. The embargo system, he
ce stories are more complex than
iys, to do a good job. The embargo
competition, giving us more time
better-written stories."[110]

lew York Times's medical reporter,
ast the Ingelfinger Rule and the
shed in 1996 in the *Lancet*, a Brit-
bargoed copies to journalists. Alt-
that the Ingelfinger Rule improves
fore should be dropped. Altman's
that he was inclined to rescind its

version of the Ingelfinger Rule. "Perhaps the question boils down simply to this: can editors trust investigators to report their research responsibly, and if not, why not?"[111]

Nevertheless, embargoes continued to expand in the 1990s. The British medical journal *BMJ* started distributing embargoed press releases to journalists, and noted that the press began quoting the journal more frequently.[112] In fact, the number of journalists that participated in science embargoes undoubtedly grew during the 1990s, due largely to the dramatic growth that decade of computerized communications. Even before the Internet became popular, the National Association of Science Writers began operating a section of the CompuServe computer service that was restricted to NASW members. Embargoed information from *Science*, *Nature*, and other journals was posted regularly on this service. This effectively placed the National Association of Science Writers in the position of enforcing the journals' embargo rules.

The growing popularity of the Internet in the mid-1990s provided a new route for dissemination of embargoed information. A commercial venture called Quadnet, started in the early 1990s, sent press releases from universities and companies to science reporters by electronic mail. Journalists participating in the system were warned that they would be dropped from the service if they violated embargoes on the electronic press releases. Another commercial venture, called Newswise, started distributing embargoed university press releases to journalists in 1991. In 1996, it moved to the World Wide Web, where approved journalists can use a password to retrieve embargoed press releases. Also in 1996, the American Association for the Advancement of Science started offering a site on the World Wide Web called EurekAlert! that journalists could use to obtain embargoed information from its journal as well as from other journals and universities that participated in the service. By late 1998, 1,993 reporters from 863 media organizations around the world were registered to use EurekAlert! and 278 institutions were supplying information for posting on the service. The service's advisory board at the time included journalists from National Public Radio, the *Los Angeles Times*, the *Chronicle of Higher Education, U.S. News & World Report, Business Week*, the *Washington Post, Science,* the *New York Times,* and the *Wall Street Journal.*[113] As noted in Chapter 1, in 1998 European science organizations countered EurekAlert! with AlphaGalileo, a Web site that disseminates news about scientific research conducted in Europe.

The immediate popularity among journalists of sites such as EurekAlert! and AlphaGalileo is evidence of the continuing power wielded by publishers of embargoed journals. Indeed, journalists signed up for these services explic-

itly in order to receive embargoed materials, not to challenge the authority of embargoes. However, the high visibility of these Web sites may also have served to stimulate debate among some science and medical journalists about the wisdom of embargoes. For example, in late 1998 *Science*—one of the major beneficiaries of the embargo system—published a ten-page section of news articles that explored the benefits and drawbacks of journal embargoes. And several months later, the National Association of Science Writers held a morning-long workshop on embargoes that attracted several hundred journalists.[114]

Despite the popularity of the Internet for disseminating embargoed materials, some public relations officials found themselves wary of the use of e-mail and other electronic communications for disseminating embargoed materials, particularly as more and more reporters from around the world began to request to receive them. For example, Steve Maran, an astronomer and press officer for the American Astronomical Society, said in 1996 that he had stopped e-mailing embargoed details of scientific findings to be presented at the astronomical society's conferences. "There's a lot of people we don't know, a lot of people, now in South America and throughout Europe, on that list and in many different time zones," Maran said. Also, electronic distribution creates new ways for the information to leak, he said: "I have no doubt that when you broadcast a release, whether by e-mail the way I do it, or by a password-protected Web page . . . that inevitably, unauthorized parties gain access, not necessarily be surreptitious methods, but by, perhaps, simply insufficient care on the parts of recipients."[115]

Some science journalists did use the Internet to make end runs around the embargo system. For example, in 1995, a reporter from the *Chronicle of Higher Education* used an Internet newsgroup devoted to particle physics to gather information on the discovery of a new subatomic particle, called the top quark, days before the news was formally announced. A graduate student who had attended a seminar on the discovery posted details on the newsgroup—which the reporter read and used as the basis of telephone interviews with scientists. The reporter had all the information he needed days before the *New York Times* and *Chicago Tribune* broke the story. However, because of his publication's weekly schedule, he was unable to break the story first.[116]

Journal editors tried to prevent such incidents by construing the Ingelfinger Rule to forbid prepublication dissemination of scientific findings via the Internet. Although scientists decried this tactic, journalists were largely silent on the issue, perhaps because few yet use the Internet for news gather-

:, not to challenge the author-
ty of these Web sites may also
science and medical journalists
le, in late 1998 *Science*—one of
:m—published a ten-page sec-
·fits and drawbacks of journal
ational Association of Science
nbargoes that attracted several

isseminating embargoed mate-
themselves wary of the use of
; for disseminating embargoed
oorters from around the world
.e, Steve Maran, an astronomer
nical Society, said in 1996 that
of scientific findings to be pre-
ces. "There's a lot of people we
nerica and throughout Europe,
;," Maran said. Also, electronic
nation to leak, he said: "I have
whether by e-mail the way I do
. that inevitably, unauthorized
tious methods, but by, perhaps,
ients."[115]

rnet to make end runs around
reporter from the *Chronicle of*
up devoted to particle physics
new subatomic particle, called
rmally announced. A graduate
discovery posted details on the
used as the basis of telephone
all the information he needed
*Tribune* broke the story. How-
ledule, he was unable to break

dents by construing the Ingel-
nation of scientific findings via
; tactic, journalists were largely
se the Internet for news gather-

ing enough to understand the implications.[117] Alternatively, the journalists may have been satisfied with the current embargo arrangement and had little intention to use the Internet to subvert it.

## Conclusions

Journal publishers and scientific societies today dominate the operation of embargoes on scientific information by deciding which journalists will have embargoed access, the terms under which that access is exercised, and punishment for violations of the embargo terms. However, this state of affairs evolved from a very different starting point, early in the last century, in which journalists—not scientists or their associations or publishers—insistently demanded advance access to conference papers and journal articles. The vendors of scientific information subsequently came to understand the power that embargoes gave them over science and medical journalists, and they have not been chary of exercising that power. Meanwhile, journalists by and large have continued to embrace the embargo enthusiastically, with the greatest source of complaints being fears that the terms of the embargo confer an advantage over one set of journalists, such as those working in television, over others, such as newspaper journalists.

rchive and distribute preprints of
lars have long circulated preprints,
ted for publication in a journal, to
stions. With the advent of the Web,
scholars have created databases on
ies of their papers. Few journalists

editor of the *Dallas Morning News*.
re before they appear in journals,"
physics preprint servers, because
ere first. "In physics nowadays the
vant," he contends, with their role
copies of important papers and for
t has to use judgment in deciding
nany nuggets are there nonetheless,

aline scholarly communication, the
roviding new routes for embargoed
ere. "A lot of my reporting is Web
he *Dallas Morning News*. "Journals
blem is that many journalists focus

sites, and Web logs all provide ven-
information about research news.
pcoming issues. Scholarly societies
it their scientific meetings. Support
rticular diseases and their families,
information sources that discuss
se in question. Attentive journalists
lists could well glean information
bargo.

easingly create situations in which
at online information has vacated
Indeed, this was one of the justifica-
ournalists at other media organiza-
on a study of hormone-replacement
ere already being discussed online:
vere buzzing about what the study

Another way in which the Internet weakens the embargo is by amplifying the effects of an embargo violation by one media organization. Prior to the Internet, when a minor organization broke the embargo, other media organizations might not immediately realize what had happened. Most journalists might well continue to adhere to the embargo, either out of ignorance or out of a belief that the breach was a small one. Today, however, anyone can read freely available media Web sites published anywhere around the world. Embargoed information published on the Web site of one media organization can attract enormous attention and can start a major stampede among journalists to disregard the embargo. As Chapter 2 recounts, some journalists anticipated such a development when the news of the cloned sheep Dolly was distributed to science journalists under embargo. The predictions were proven true when media organizations in Italy and Great Britain reported the research before the embargo time. Under such circumstances, journal publishers are fooling themselves if they believe that they can use embargoes to control the timing of the release of major scientific news.

## A World without Embargoes

The embargo system should be replaced with full and open disclosure of research results as soon as they are ready for public consumption, which generally would mean as soon as peer review is complete. Once a scholarly paper has been accepted by a journal, scientists and their institutions should be free to tell the world about it, and journalists should be free to report on it if they deem it newsworthy. As many have already begun to do, the journal in question could make the accepted paper available to its subscribers online, so that the subscribers could consult the full text of the paper for themselves. Journalists would be freed of the perceived tyranny of the embargo, and they would have newfound time to visit scientists in laboratories and troll for investigative stories rather than leafing through press releases and password-protected Web sites in search of what the competition is probably going to report.

This is emphatically not to suggest that science and medical journalists should break embargoes. To the contrary, journalists have both an ethical and a legal duty to abide by agreements with their sources, including embargo agreements. If a journalist obtains information under an embargo, that journalist is ethically bound to honor that embargo, just as the journalist would be ethically bound to, for example, withhold the name of a source if the journalist agreed that the source would be unidentified.

138 · EMBARGOED SCIENCE

But although journalists are ethically bound to honor embargoes to which they have agreed, they are not ethically required to continue to agree to embargoes. Continuing the parallel to anonymous sources, many media organizations have established policies that govern the conditions under which they will grant anonymity to a source.[30] But the fact that a media organization has had a policy for granting anonymity in the past does not mean that it will always grant that anonymity to all sources in the future. Similarly, the fact that science and medical journalists have used embargoed information in the past, and have respected those embargoes, does not mean that those journalists or their media organizations must continue to agree to embargoes in the future.

In short, science and medical journalists, and their media organizations, should terminate their current embargo relationships with journal publishers and stop accepting embargoed information from them. Scientific societies and journal publishers should stop distributing information under embargo. Government research agencies and foundations should stop supporting the embargo, which provides a few with privileged early access to taxpayer-financed research. Universities, which cast themselves as champions of free expression, should oppose embargoes on their faculty members' research, rather than seeking to hitch their own publicity machines to the journals'. It is time for science and medical journalists to break out of their dependence on journals as a source of science news, and it is time for scholarly societies to stop trying to shape the flow of news in a way that suits their own political ends.

How would science and medical journalism be different if embargoes went away? Some have a dire vision of a feeding frenzy each week, as journalists clamber for whatever edge that can find over fellow journalists in finding out about the latest research. Of course, such incidents happen even now, with embargoes. If embargoes were eliminated, the more likely outcome is that the popular press would simply ignore much of the new research that seems so urgent today because of the false patina of newsworthiness that is conveyed by the embargo. Without the embargo's bogus news peg, editors and producers would judge many of those research reports to be less compelling. Knowing that their competitors at other newspapers and broadcast outlets would act the same, they would feel less competitive pressure to publish the "latest" research each week. That could well translate into an overall decline in news coverage about journal articles, particularly about marginal journal articles that advance science only incrementally and ambiguously.

When journalists and their organizations did choose to cover a certain

d to honor embargoes to which
[uired to continue to agree to
nymous sources, many media
: govern the conditions under
:e.[30] But the fact that a media
nonymity in the past does not
ity to all sources in the future.
urnalists have used embargoed
1ose embargoes, does not mean
:ations must continue to agree

and their media organizations,
onships with journal publishers
from them. Scientific societies
1g information under embargo.
ons should stop supporting the
eged early access to taxpayer-
1emselves as champions of
eir faculty members' research,
ity machines to the journals'. It
1 break out of their dependence
it is time for scholarly societies
way that suits their own politi-

n be different if embargoes went
renzy each week, as journalists
fellow journalists in finding out
cidents happen even now, with
he more likely outcome is that
1 of the new research that seems
of newsworthiness that is con-
)'s bogus news peg, editors and
:h reports to be less compelling.
wspapers and broadcast outlets
1petitive pressure to publish the
translate into an overall decline
icularly about marginal journal
:ally and ambiguously.
s did choose to cover a certain

paper, they would not have to release their work at an arbitrary time set
by an outside source. They would have total control over the timing of the
report; whenever a news organization judged that its coverage was ready to
run, it could run that news coverage. In some cases, that might be in as little
as a day. In other cases, a news organization could take several days, a week,
or even more. News organizations make this type of news judgment all the
time, balancing competing factors such as the completeness of the story and
editors' confidence in its accuracy against concerns such as staying ahead of
(or at least abreast of) the competition.

Indeed, editors would play a major role in the death of the embargo. Sci-
ence and medical reporters are not solely to blame for the embargo; they
adhere to the embargo so they can stay out of hot water with their editors,
who (the reporters believe) have little understanding of, or appreciation for,
the importance of news about science and medicine. Science and medical
journalists believe that it is at least potentially problematic for them not to
have reported on a scientific paper that a competing news organization had
elected to cover—regardless of how important that paper really was, and
regardless of the fact that covering that paper might divert time and energy
from covering more important topics.

Under such conditions, it is hardly surprising that reporters would agree
to an arrangement that circumscribes competition as sharply as journal
embargoes do, and in many cases asking individual journalists to abandon
embargoes would be asking them to commit professional suicide. Rather,
moving science and medical journalism away from an extreme reliance on
embargoes would first require a shift in the attitudes of editors who estab-
lish the work expectations for the science journalists who participate in
embargoes. Editors should understand the embargo and how it shapes the
way in which their news organizations cover science and medicine—and,
perhaps most important, what the embargo prevents their news organiza-
tions from covering. Some editors then may decide that their public service
obligations require their news organizations to move away from embargo-
assisted journalism.

Of course, even if some news organizations were to reduce their coverage
of journals, other news organizations might decide to continue to aggres-
sively cover research findings. It seems likely, for example, that the Associ-
ated Press and the *New York Times* would seek to continue to report, with
great promptness, on what they each judge to be the most important articles
published in elite journals each week. Even without embargoed access, these
media organizations would likely seek to develop reporting techniques and

approaches that would enable them to get access to journals as soon as they were published, such as dispatching a weekly courier to pick up a copy of each journal from the journal publisher's office.

Newspapers, Web sites, and broadcasters could take advantage of this breaking-news reporting, such as by running AP stories and articles distributed by the *New York Times*'s syndicate. Many, of course, already run such articles. But a better development would be for media organizations to ignore these breaking-news reports for all but the most important research papers. As this book has explored, breaking-news coverage of scientific and medical research misleads the public about science and gives them false hope (or unjustifiably dashes hopes) about new medical treatments. Media organizations would work more in the public interest if they ignored most research findings and instead delivered news about science and medicine that really mattered.

In the cases of truly major and significant research findings without an embargo, of course, science and medical journalists would probably have to work fast. Particularly with a major story, the journalists would have to scramble to get access to both the authors of the article and outside experts who could comment on the study's findings and implications. The journalists would have to quickly grasp the study and figure out a way to translate it into a newspaper story or television report that the general public would understand. And they would have to do all of this quickly—perhaps in as little as a single working day.

This would be a manageable challenge for skilled journalists and media organizations that provide them with the resources that they need, but journalists and media organizations that are not up to the task would produce second-rate coverage. Over time, it would become clear—to scientists, readers, viewers, and other journalists—which was which. Less capable journalists would no longer be sheltered from competition by the embargo's artificially level playing field. Some might be reassigned or disciplined, but the quality of science and medical journalism would rise over time.

It is a rough-and-tumble vision of the journalistic future, one lacking the gentility that now pervades journalism about science and medicine. But the public interest, not the interest of the scientific and medical establishments, should be the uppermost concern of science and medical journalists—and, in fact, of institutional science and medicine. The embargo should go.

Great westerns are just the beginning...

PLAINTIFF'S EXHIBIT

## Science

**AAAS** | Magazine | News | Signaling | Careers | Multimedia | Collections

Current Issue        Previous Issues        *Science* Express        *Science* Products        My *Science*

About the Journal

Home > *Science* Magazine > 30 October 1998 > Marshall , pp. 860 - 867

*Science* 30 October 1998:
Vol. 282. no. 5390, pp. 860 - 867
DOI: 10.1126/science.282.5390.860

ADVERTISEMENT

[x] Click Me!

ADVERTISEMENT

**NEWS FOCUS**

**EMBARGOES:**
# Good, Bad, or 'Necessary Evil'?

**Eliot Marshall**

*This special focus looks at the role of the embargo system in communicating scientific results to the public and to other scientists. Meetings and the special case of astronomy bring out some of the strains inherent in the system.*

**An arrangement aimed at keeping scientific findings out of the media until they are published by a journal draws mixed reviews; it is under pressure from Web-based publishing, and most physics publishers have already abandoned it**

Every Wednesday or Thursday, more than 1400 reporters around the world get a sneak preview of the research articles that will appear in *Nature* a week later. The journal sends out faxes and e-mails highlighting the most newsworthy stories, and reporters can order the full text of any article. Two days later, more than 1200 journalists get similar advance notice of articles to be published in *Science* the following week. FedEx or priority mail brings early copies of medical journals like *The New England Journal of Medicine* (*NEJM*) and *The Journal of the American Medical Association* (*JAMA*). Reporters' e-mail inboxes and fax machines, meanwhile, fill up with announcements from other journals, universities, and institutes promoting new scientific findings. Most of this information carries a prominent warning: EMBARGOED. Public use of the information is forbidden until a specified date and hour to coincide with a journal's publication date.

What is most remarkable about this vast private traffic in science news is that it almost never leaks prematurely to the public. Hundreds of news-hungry reporters sit on the information, as they are bidden by journal publishers, until the designated release time. Welcome to the embargo system--a gentlemen's agreement between science journals and reporters designed to manage the flow of new scientific results to the public. The embargo system is the final stage of a process in which journals impose vows of secrecy not only on journalists but on the authors of the scientific papers they publish. No other area of journalism has such a cozy, formalized arrangement between reporters and their sources of news.

This odd system has developed and flourished over several decades because it offers advantages for everybody involved. Journals get maximum publicity, journalists get time to report complex stories, and scientists get more widespread and more accurate public exposure for their work. Indeed, the system is so successful that it has recently expanded with the debut of Internet-based clearinghouses that funnel embargoed information from a variety of sources to reporters who agree to abide by the rules. Behind the scenes, however, the embargo system is increasingly embattled.

It's a system wracked by built-in tensions. Science is supposed to progress through rapid communication of results among scientists, but the embargo system can erect barriers to this exchange of information. Nowhere is this more apparent than at scientific meetings, where scientists are often unclear on the rules for discussing results that are under review or in press at a journal (see p. 867). Newspapers and their reporters thrive on scoops, yet scoops are ruled out by the embargo system-- and even some science reporters say the system encourages lazy reporting and undue attention to incremental advances. When a big science story comes along, however, competition is hard to suppress until a paper is published (see p. 862). Moreover, intense commercial interest in molecular biology has created new problems when information that can send a company's stock price soaring is distributed to hundreds of journalists under an embargo (see p. 865).

These built-in tensions are exacerbated by a new factor: the Internet and the World Wide Web. The Web is not only transforming scientific publishing, it's also changing the rules of the embargo system. In a world in which scientific papers can be disseminated to online subscribers as soon as they are accepted, the publication date of the printed version--and the embargo release time--becomes somewhat arbitrary. Moreover, the Web has created new avenues for circulating scientific information--from preprints of whole articles to bulletins of new astronomical observations--outside the embargo system, providing fodder for enterprising journalists (see p. 868).

All this is prompting many journals to rethink their embargo policies. Most physical science publishers have already abandoned the system, the American Chemical Society has virtually scrapped it, and even some biology and general science journals may follow suit. For example, Nicholas Cozzarelli, editor-in-chief of the *Proceedings of the National Academy of Sciences* (*PNAS*), says he's in favor of "getting rid of the embargo" in its present form and is proposing a new policy to his board this week.

This package of articles examines these issues from the perspectives of journal editors, reporters, and the scientists who are often caught in the middle. But first, by way of full disclosure, it should be noted that *Science* itself has a stake--or, rather, several different stakes--in the embargo system. The scholarly publishing side of the journal has a strict embargo policy (see Editorial, p. 877), and the American Association for the Advancement of Science, *Science*'s publisher, has launched an ambitious Web-based clearinghouse for scientific information, EurekAlert!, that includes embargoed press releases. The News section, on the other hand, is on the receiving end of the embargo system: *Science*'s journalists report independently on scientific developments published in this journal and others, and on data presented at meetings and elsewhere. Sometimes, the process even comes full circle when advance copies of *Science* news articles are distributed to other journalists under embargo.

**Lofty purposes**
Ask journal editors why they employ the embargo system, and the answer usually revolves around one issue: quality control. Insisting on secrecy from authors until their papers are published guards against public release of data that might not pass muster in peer review, and giving reporters a few days' advance access to papers that have passed review yields more accurate news. "The fundamental thing,"

Click Me!

To Advertise    Find Products

ADVERTISEMENT

FEATURED JOBS

explains Jerome Kassirer, editor-in-chief of the *NEJM*, "is the protection of the peer-review process." Says *JAMA* Editor George Lundberg: The system ensures that "quality is played out maximally in the public media."

It was the *NEJM* that formalized the current system almost 30 years ago, when it published a set of principles known as the Ingelfinger rule, after the journal's editor at the time, Franz Ingelfinger. The Ingelfinger rule (see p.861) is still the guiding principle for the *NEJM*, but an estimated 300 other journals follow guidelines laid down by a group of medical editors calling themselves "the Vancouver group," a reference to their first meeting place in Canada in 1978. The bottom line of their 25-page list of rules, updated most recently in 1997 (www.ama-assn.org/public/journals/jama/sc6336.htm), is virtually the same as that of the Ingelfinger rule. Journals "do not wish to receive a paper on work that has already been reported in large part," the Vancouver rules state, regardless of whether it has appeared "in print or in electronic media." They warn authors to expect "prompt rejection" of any manuscript judged by editors to be a "duplicate publication." Presenting the data at scientific meetings is fine, but sharing "tables and illustrations" with reporters is not.

The multidisciplinary journals have similar policies. *Science* uses "a variant of the Ingelfinger rule," says Editor-in-Chief Floyd Bloom, "to educate the public broadly and accurately." He says that there are benefits for scientists, too: Embargoes draw attention to new findings, and this builds public support for science. Publicity also attracts "the best authors." Philip Campbell, editor of *Nature*, says his journal's embargo rules are motivated by a sense of "fairness"--a wish to make results available to "everyone at the same time"--and by a wish to maintain quality. But he also acknowledges some "self-interest," in that the embargo system "maximizes the profile of the journal." Publishers also argue that editing increases the value of articles and that the embargo system helps reward journals for their contribution. (*Cell* Editor Benjamin Lewin declined to discuss the embargo policy of his journal, which has taken a strong line on prepublication publicity, especially at meetings; see pp. 866 and 867.)

Medical editors cite another reason for embargoes: They don't want physician-subscribers to be caught off guard by stories in the media before they have the issue in their hands. Says Lundberg: "We believe that physicians have a right to have access to the full information in the article prior to being asked by patients to explain what the TV or the newspapers said about a drug they're taking or a disease they may have." Richard Smith, editor of the *British Medical Journal* (*BMJ*) and a member of the Vancouver group, agrees, although he tries to take a flexible approach to embargoes. "It's in everybody's interest," Smith believes, "to publish simultaneously the full scientific paper together with any media coverage." That way, "if you're a critical reader, you can have a good stab at making up your own mind on whether you believe it or not."

Once the journals are ready to publish, a multifaceted public relations enterprise swings into action, sending embargoed press releases from journals, institutions, and funding agencies to accredited reporters. Web-based science news services have recently sprung up to provide a central point for such information. EurekAlert! (www.eurekalert.org), launched in May 1996 and financed in part by ads, is the prototype: It posts releases for university press offices, scientific societies, research institutes, publications, and government agencies in a public area and an embargoed news area, which 1860 certified reporters can access by password. Users pay nothing, but organizations pay up to $1000 a year to have material distributed. Adding to the PR blitz are several independent news services, notably Newswise (www.newswise.com), which has scientific, medical, and academic clients similar to EurekAlert!'s; business services such as PR Newswire and the Dow Jones News Service; and an astronomy PR clearinghouse run by astronomer Stephen Maran.

**Uneasy alliance**

AQUATIC BIOGEOCHEMIST
University of Montana
Montana

Institute for Diabetes, Obesity and Metabolism/Department of Radiology
University of Pennsylvania
Pennsylvania

Appointment of Executive Director
National University of Singapore
Singapore

Director
University of Wyoming
Laramie, WY

POSTDOCTORAL POSITION
University of Pittsburgh
Cancer Institute
Pittsburgh, PA

Research Specialist
Johns Hopkins University
School of Medicine
Baltimore, MD

Research Associate
Manchester Metropolitan University
Manchester, United Kingdom

More jobs

Journalists who use this embargoed news generally appreciate the ready access to privileged information and the extra time to prepare complex stories. Says Tim Friend of *USA Today*: "I don't support [the embargo system] for any deep moral or philosophical reason," but "I do think it's useful. It gives us all time to do the reporting and research that's needed." TV reporters are appreciative, too. "Embargoes are useful for us because TV has to get a picture to go with the story," which takes time, says NBC science correspondent Robert Bazell. Bazell also likes the way embargoes create news, as it's hard to get on the air without an event. "We can all have broadcasts the night before [publication], run headlines the next morning, and it's news," Bazell says. ABC's medical reporter Timothy Johnson sees the embargo system as an "honor code" among reporters that elevates the quality of information.

But journalists who benefit from the system are not dewy-eyed about its origins or its aims. Its chief purpose, many believe, is to generate publicity. "There's an awful lot of self-serving rhetoric about the orderly dissemination of information," says Bazell, adding that it's "shot through with hypocrisy." Dan Greenberg, founder and former editor of the biweekly *Science and Government Report*, allows "some rationality" in the idea that "you want to give science writers time to digest the material." Moreover, he sees nothing wrong with seeking publicity, because "the first obligation of a publisher is to stay in business." But he dismisses the high-minded defense of embargoes as wrapping "a selfish purpose in a flag of public good." As for the argument that doctors need to get the news before their patients, it's "absolute nonsense," according to Greenberg. "I don't think I've ever come across a physician who reads [*NEJM*] the instant it comes through the mail slot."

Lawrence Altman, a science writer at *The New York Times*, may be the system's most dedicated critic. He speaks of the "greed" of the journals, which in his view purvey "taxpayer-financed research" and boost their prestige--and hence their circulation and ad revenues--with embargoed news releases. In a two-part essay in *The Lancet* in May 1996, Altman suggested that journals seek to "swell advertising coffers by intimidating scientists and physicians into silence."

Others worry about the effects of the system on the way science is covered. Tom Siegfried, the science editor of the *Dallas Morning News*, says the system has "broken down from what it was intended to be"--a method of sifting wheat from chaff by helping reporters find the hottest news--and become "a barrier" to getting information. The worst effect is "what happens before a paper is submitted," he says: Scientists won't talk about research they're developing for fear that publicity will kill the chances of publication. The result, Siegfried says, is that embargoes "prevent precisely the kind of reporting that most people think would be better"--the type that seeks to document the gradual development of knowledge. Instead, he sees embargoes contributing to hype about "breakthroughs."

From the biological or biomedical scientists' perspective, however, the embargo may be a good thing, says molecular biologist Tom Cech of the University of Colorado, Boulder. It may chill relations with reporters a bit, Cech says, but "I think it inhibits people from making premature announcements" before their work has gone through peer review. That's just fine, he says, because "we shouldn't be rushing to the press." Others are less enthusiastic. Neuroscientist Solomon Snyder of Johns Hopkins University believes it is mainly the "vanity of the journals" that sustains the embargo system. Nathaniel Landau, a molecular biologist at the Aaron Diamond AIDS Research Center in New York City, who canceled a public talk in 1996 to avoid jeopardizing a paper under review in *Cell*, says the Ingelfinger rule is really about self-promotion. He questions whether journals "have any business" asking authors to be silent.

In spite of such complaints, most biology and medical journal editors--and the reporters who feed off them--seem to feel that the system's benefits outweigh its disadvantages, and they are prepared to hold the course. Says Lundberg: "I don't see [the embargo system] changing much in the near future."

**Cultural divide**

Yet one substantial branch of scientific publishing has been undergoing a radical change of course: the physical science journals. Many journals in physics and astronomy once maintained strongly worded embargo policies, but they have gradually relaxed them in recent years. "It was certainly quite strict back in the good old days," says Gene L. Wells, managing editor of *Physical Review Letters* (*PRL*), which has become the most prestigious journal in physics since its first issue on 1 July 1958. Now any restriction on publicity is at best informal, says Stanley G. Brown, administrative editor for The American Physical Society (APS), which publishes *PRL* and a number of journals focused on subfields of physics. Brown and Wells both say they doubt that early press coverage erodes the readership of their journals, pointing out that press reports seldom contain the scientific details of interest to readers of APS journals.

Embargo policies are no more draconian at the American Institute of Physics (AIP), an umbrella organization for APS and nine other learned societies, which publishes eight major journals itself, including *Applied Physics Letters*, *Chaos*, and *Physics of Plasmas*. Authors are simply asked--with little threat of enforcement--to wait until a paper is released to the printer before initiating any publicity, says Martin Burke, director of editorial operations at AIP. At that stage, peer review has run its course. Indeed, AIP itself often puts out an unembargoed tip sheet when a paper is accepted for publication in an APS or AIP journal, and reporters are free to write about the work well before it appears in print. Phillip Schewe, chief science writer at AIP, acknowledges that embargoes can catch attention: "There's nothing like putting an embargo on a press release to jack up the blood pressure of a reporter," he says. But "it's pretty transparently self-serving."

Topflight astronomy journals have followed the same route, relaxing previously strict embargo policies. "The change is that in recent years there have been huge numbers of reporters attending conferences," says Helmut A. Abt, editor-in-chief of *The Astrophysical Journal* (*Ap. J.*), which is owned by the American Astronomical Society (AAS) and published by the University of Chicago Press. Reporters listen to talks or attend press conferences on results that will appear later in *Ap. J.* and *Ap. J. Letters* and write stories from the meeting, says Abt. "So we gave up trying to have an embargo," he says. Paul Hodge, editor of *The Astronomical Journal*, another AAS publication, says that "when authors bring up the question about talking with reporters," he asks them not to do so until a paper has been accepted for publication. But there is no sanction for not adopting the suggestion, and no paper has been rejected just because its content was publicized too soon, says Hodge.

Why the difference between the life and physical science disciplines? It could boil down to an ingrained openness that helped erode the embargo system from the inside, and the reality that few physics discoveries have an immediate impact on a company's stock price or a patient's questions, says Benjamin Bederson, a physicist at New York University who was editor of *Physical Review A* from 1978 to 1992 and editor-in-chief of APS from 1992 to 1997. "Physicists have not only been free in spreading their results--they're eager," says Bederson. Asked whether there has been any change in the quality of press coverage of physics since embargoes have fallen by the wayside, Bederson says: "I didn't notice any serious change at all."

**The Internet: Changing the rules**

Despite the wide-open attitude of physics publishers, many of them have long disliked one development: an electronic preprint server based at Los Alamos National Laboratory in New Mexico that freely distributes full-text copies of unpublished articles deposited there by authors. The archive (xxx.lanl.gov) is the work of physicist Paul Ginsparg, who began it in 1991. It signaled that the Web was about to change the rules of scientific publishing, providing a way to circulate papers widely outside the formal embargo system and potentially undermining conventional journals (*Science*, 9 February 1996, p. 767). That's exactly what Ginsparg intended. "Embargoes are clearly not in the best interests of scientists," he said in an e-mail

interview, adding that they "are shamelessly self-serving on the part of the journals."

The archive posed an immediate challenge to journals that do not accept articles that have been published elsewhere. Most physical sciences journals have reluctantly decided, however, to consider papers that have been posted on Ginsparg's archive, although many would prefer not to. "It's a form of prepublication release," says Alex Dalgarno, editor of *Ap. J. Letters*, "and it could impact the value of the journal." The editors' dislike of the server is widely disregarded, says Frederick Lamb, an astrophysicist at the University of Illinois, Urbana-Champaign. Lamb says if journals decline to consider papers that have been posted on the Web, researchers would "vote with their feet ... and just go elsewhere."

*Nature* recently decided it will publish papers that have appeared on a public Web site. "Our policy," says Editor Philip Campbell, "is that preprint servers are operating primarily as an intrascientific communication network and have the same sort of significance as a conference talk or list of published abstracts." Internet release doesn't count as prior publication, he says, because the author is not implying that the article has been peer reviewed or that editors don't make an important contribution. "We haven't suffered yet," Campbell says. Elsevier Science, adding yet another twist, says papers submitted to its journals may appear in a public archive or a home page as first drafts, but not editor-improved versions.

*Science*, however, is standing by its policy of not publishing papers that have been posted on the Web. *Science* Editor-in-Chief Bloom says: "If a paper has been publicly released on the Internet in the form that it was sent to us, then we consider that prior publication," and *Science* may decline to take it. However, "if you assure us that you have a restricted site, we won't disqualify it" right off the bat. Monica Bradford, managing editor of *Science*, says physical scientists have been "very vocal" about their dislike of the policy. But, she says, "our physical sciences submissions have actually been on the increase, so I don't get the sense that it's been a problem." She adds that rapid changes in the online world ensure that *Science* will continue to assess the policy.

So far, Web-based preprint publishing is mostly limited to the physical sciences. Ginsparg has opened a biology section in the archive, but entries are relatively sparse. And a separate venture run by HUM-MOLGEN, a nonprofit human genetics resource in the Netherlands, recently announced that it would post biology preprints after "low-key peer review" of submissions (*Science*, 19 June, p. 1807). But biologists are not yet clamoring to be published in it.

Nevertheless, at least one medical journal, the *BMJ*, is thinking the unthinkable: allowing potential authors to post electronic preprints on its own Web site. Editor Smith says *BMJ* already regards its Web site as the "primary" route of publication that has allowed it to reach "an entirely new audience" in the United States. His staff is now debating "whether to move to e-prints, as the physicists do." *BMJ* might set up an area on its site where authors could post articles and receive comments, Smith says. If the author later wanted to submit the article for print publication, the *BMJ* would review it. "We're also looking at possibilities for doing peer review entirely openly on the Web," says Smith: "I'm absolutely convinced that this is going to change everything."

Few other editors are thinking of taking such radical steps, but a major scientific publisher, the American Chemical Society (ACS), has adopted a novel online publishing policy that changes the way papers are released to subscribers and the public. Beginning in January, the 26 ACS journals began releasing papers on the Web when they have been edited and checked by authors, sometimes as many as 11 weeks before they appear in print. ACS made the change because "authors wanted us to offer faster publication," says publications director Robert Bovenschulte, adding that the decision was driven mainly by the technology. ACS felt it was embracing "the wave of the future," adds ACS spokesperson Denise Graveline. Journalists are free to write about articles when they appear online, but

this hasn't ended embargoes. Graveline says that ACS still notifies some journalists in advance of "a selected number of articles" before they are posted online.

Some medical journals have also used the Web for quick public release of papers that have important public health implications. Last year, for example, *NEJM* used the Mayo Clinic Web site to release a paper on heart valve injury associated with the fen-phen diet drug combination. And *JAMA* used the Internet last summer to distribute a paper on the adverse effects of a drug for hypertension. Lundberg says publishing online allowed the journal to post the full text, "bango, the same afternoon" that it cleared his desk. "Everybody responded beautifully, and we felt really good," Lundberg says.

Does this new use of the Internet augur a major change in the way biology journals handle newsy reports? Lundberg is doubtful. High-priority articles are rare, he says, and *JAMA* is not planning to follow the ACS's lead yet and routinely post articles online before they appear in print. Kassirer, who says he tries "not to be too stiff-necked" about the rules, says things may change "over time ... but at the moment, we are holding to our Ingelfinger rule."

But some are ready to chuck tradition. PNAS's Cozzarelli, for example, would gladly go to early release on the Internet. "I believe that online preprints have made the embargo obsolete," he says, and he'd like to rid science of the embargo system's "arbitrary" rules. But for many writers and editors struggling to keep up with science news, embargoes remain, as a biotech reporter says, a "necessary evil" that make the job more manageable.

---

*With reporting by James Glanz.*

---

**THIS ARTICLE HAS BEEN CITED BY OTHER ARTICLES:**

**Communication Regimes in Competition: The Current Transition in Scholarly Communication Seen through the Lens of the Sociology of Technology.**
I. Bohlin (2004)
*Social Studies of Science* **34**, 365-391
   **Abstract »    PDF »**

Magazine | News | Signaling | Careers | Multimedia | Collections | Help | Site Map | RSS
Subscribe | Feedback | Privacy / Legal | About Us | Advertise With Us | Contact Us
© 1998 American Association for the Advancement of Science. All Rights Reserved.
AAAS is a partner of HINARI, AGORA, PatientInform, CrossRef, and COUNTER.

Excerpt from the

August 30, 2006

deposition of

S. Antonio "Tony" Fratto

Exhibit B

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


------------------------X

UNITED STATES SECURITIES :

AND EXCHANGE COMMISSION, :

      Plaintiff,  :

.   .  V.       :   Case No. 05-10983

STEVEN E. NOTHERN,   :

      Defendant.  :

------------------------X

Washington, D.C.

AUGUST 30, 2006

Videotaped deposition of ANTHONY

FRATTO, a witness herein, called for examination by

counsel for Defendant, in the above-entitled

matter, pursuant to notice, the witness being sworn

by Raymond Heer, a Notary Public in and for the

District of Columbia, taken at the offices of Foley

Hoag, Washington, D.C. on August 30, 2006, at 10:35,

a.m. and the proceedings being taken down by

stenotype by Desirae S. Jura, RPR, and transcribed

under her direction.

Page 34

1    A. Yeah. I spent a lot of time discussing how
2  the job works with some individuals there, and I
3  also talked to one tremendous resource. Well, one
4  resource that was at Treasury who was Michael Polis
5  who was in the Office of Domestic Finance, was a
6  great resource. And also the previous assistant
7  secretary of Treasury, a woman named Michelle
8  Smith, who had after the Clinton administration had
9  gone on to work at the Fed for Alan Greenspan was
10  someone who I spent a lot of time on the phone with
11  just asking advice on how Treasury conducts its
12  public affairs business.
13    Q. And you talked to these various individuals
14  including Mr. Polis and Ms. Smith when you were the
15  director of public affairs, when you were first
16  starting in that job?
17    A. Yeah. And I talked to Michael a lot when he
18  was there. He left in late spring, I think. I
19  actually can't remember the date now that Michael
20  left. Michael stayed for a while. But Michael's
21  office was close to mine, so I spent a lot of time
22  talking to Michael. And Michele, I probably spoke

Page 35

1  to weekly, just sometimes long conversations,
2  sometimes short.
3    Q. And what was Mr. Polis's position when you
4  were director of public affairs?
5    A. He was a deputy assistant secretary in the
6  Office of Domestic Finance.
7    Q. When did he leave Treasury?
8    A. I think it was the summer of -- maybe early
9  summer of 2001. I honestly can't remember the
10  date.
11    Q. Did you ever discuss with him how Treasury
12  was to handle the release of information to the
13  press and the public?
14    MS. WILLIAMS: Objection.
15    A. Yeah.
16    BY MR. THEODOROU:
17    Q. What did you discuss with him, or what do
18  you remember about those discussions?
19    A. Well, I had never -- I had never, you know,
20  watched a quarterly funding announcement before I
21  came to Treasury, so I asked him: How do you do
22  the announcements? Why do you do them this way?

Page 36

1    I admit at the time I was more -- I was very
2  interested in just learning more about the Treasury
3  bond market, but we spent a lot of time talking
4  about the process also, which I think it was fairly
5  straightforward.
6    Q. About how many times did you discuss with
7  him how the announcements were to be handled?
8    A. A handful of times. I couldn't put a finer
9  point on it.
10    Q. Do you recall what he told you about how
11  refunding conferences were to be conducted?
12    A. Refunding press conferences?
13    Q. Yes.
14    A. He said traditionally the press conference
15  is -- that someone at his level, someone like a
16  deputy assistant secretary or a director of market
17  finance would do a press conference. It wasn't
18  entirely unusual from time to time for an assistant
19  secretary to do a press conference, and maybe once
20  or twice an under secretary. But overwhelmingly it
21  was they were press conferences that were held by
22  someone at his level. There were -- they would

Page 37

1  prepare a statement and read the statement. He
2  would -- his preference was just read a statement
3  at the press conference, take some questions; and
4  my job was to basically run the press conference in
5  the sense of announcing who was speaking, what
6  the -- you know. And then cutting off questions at
7  the end. One of the great things we get to do is
8  to end a press conference when it's over.
9    Q. Did your discussions, did you ever discuss
10  the use of embargoes at Treasury?
11    A. I don't think I discussed them with Michael.
12  No.
13    Q. Did you discuss them with anyone else?
14    A. I'm fairly certain. I couldn't remember a
15  specific conversation, but I'm very certain that I
16  discussed embargoes with Michelle Smith.
17    Q. Do you remember anything else that Mr. --
18    A. I discussed embargoes with our reporters
19  also.
20    Q. With whom?
21    A. With our reporters, with Treasury press
22  corps reporters.

1    Q. With Mr. Polis, do you remember anything
2  else he told you about how to conduct conferences
3  and the release of information?
4       MS. WILLIAMS: Objection.
5    A. No. Other than to, you know, rescue him at
6  the end when the -- don't let the reporters try to
7  have too much time for more creative questions.
8       BY MR. THEODOROU:
9    Q. Did anyone at Treasury ever tell you that
10  the information at the refunding conferences was
11  market sensitive information?
12    A. Yes.
13    Q. Who?
14    A. I think everyone in the Office of Domestic
15  Finance that I spoke to was very sensitive to that
16  fact. It was also part of my -- I think it was
17  mentioned, not specifically quarterly refundings,
18  but we had -- you know, we were required to have
19  security, you know, security briefings and ethics
20  briefings and that. So we were sensitized coming
21  into the job in our early briefings that Treasury,
22  you know, information at Treasury is at least

1  market sensitive, and some of it reaches higher
2  classification levels, also. Although market
3  sensitive isn't technically you would call it a
4  classification level.
5    Q. What do you recall about the training that
6  you got on how information was market sensitive?
7    A. I think it was just noted that, you know,
8  information we deal with at Treasury, like
9  information on our securities markets, information
10  regarding future policy decisions could have an
11  impact on the market. I know that -- I mean, you
12  don't want to be remembered as the guy who
13  inadvertently crashed the dollar market by letting
14  information out that is out of context or not
15  authorized at that time.
16    Q. Now, you testified -- and you can correct me
17  if I'm wrong. You testified that when you started,
18  there were some briefings on this?
19    A. Um-hmm.
20    Q. Is that, yes, there were some briefings?
21    A. Yes. I remember being -- I remember having
22  briefings coming in to Treasury.

1    Q. Do you remember who told you this about
2  market sensitive information at these briefings?
3    A. No.
4    Q. Now, apart from Mr. --
5    A. Michael Polis certainly told me the fact
6  that it was market sensitive. No question about
7  that.
8    Q. That what was market sensitive?
9    A. That the quarterly funding information was
10  market sensitive. When I think you asked me, I
11  think I said everyone, I could tell you without a
12  doubt that Michael certainly told me that and
13  emphasized it.
14    Q. And you don't recall discussing embargoes
15  though with Michael?
16    A. No.
17    Q. Now, you testified that you may have
18  discussed embargoes with Michelle Smith?
19    A. Um-hmm. Yes.
20    Q. Do you remember discussing that with
21  Michelle Smith?
22    A. I do remember. I couldn't pinpoint the

1  exact conversation or what the context of
2  discussion of embargoes were, but I do recall
3  asking her how they use -- how they use embargoes,
4  and that they do use embargoes and what the
5  understanding at Treasury was of embargoes.
6    Q. What did she tell you about -- or, how many
7  times did you discuss the issue of embargoes with
8  her?
9    A. I remember one phone call. There might have
10  been more.
11    Q. How long was the phone call?
12    A. I don't recall.
13    Q. Do you remember when it was?
14    A. I couldn't put a specific date on it. I
15  would -- it must have been March of 2001.
16    Q. Do you remember how long it lasted?
17    A. No.
18    Q. Was anybody else on the phone call?
19    A. No.
20    Q. Where were you when you had the phone call?
21    A. In my office at Treasury.
22    Q. And where was she?

Page 42

1    A. She was at her office at the Fed.

2    Q. What was her job at the Fed at the time?

3    A. I'm not certain of her title at the Fed.

4  I'm sure it's on their Web site. I don't know what

5  their structure of titles are over there.

6    Q. Did she call you, or did you call her?

7    A. I'm sure I -- I'm sure I called her.

8  Whether I had to leave a message and she called me

9  back, I don't know.

10    Q. What did you call her --

11    A. I called her a lot.

12    Q. But I'm zooming in on this particular

13  conversation as to what you can recall. And what

14  do you recall about the discussion of embargoes in

15  that telephone call?

16    A. I asked her how they traditionally set

17  embargoes at Treasury for documents, because it

18  was -- it was impressive to me that the reporters

19  we were dealing with on our documents wanted

20  embargoes. They were -- it was very important to

21  them that we have, that we have embargoes on

22  documents. And certainly it was intuitive to me on

Page 43

1  something involving data, that we would want

2  embargoes, but it seemed to me that for any

3  document that came down to the Treasury pressroom,

4  the Treasury press reporters wanted to have

5  embargoes.

6    Q. And what was the substance of your

7  conversation with her? What did you say and what

8  did she say?

9    A. I asked her whether that was the case when

10  she was here, or whether it was something new with

11  the new group of people at Treasury. Did she set

12  the embargoes, or did the reporters set the

13  embargoes for themselves?

14    She said that there wasn't -- there wasn't a

15  standard way for doing it that way. Sometimes --

16  she agreed that reporters always do, they always

17  want embargoes. She confirmed what I thought, was

18  that it was probably in everyone's interest that we

19  do have an embargo. She said that it really

20  depended on the document, whether it was -- whether

21  we set the embargo or whether, if it was a document

22  that we didn't have much interest in in terms of

Page 44

1  whether an embargo is necessary or not, it was

2  perfectly fine to let the reporters set their own

3  embargo for themselves.

4    Q. Did she say in this conversation as to why

5  reporters wanted embargoes?

6    A. We had a conversation about that. There

7  was, it was -- yes. I mean, so it was -- I mean,

8  it was a dialogue back and forth, and what we were

9  discussing was the reason why reporters feel that

10  they need embargoes. And as I said earlier, in my

11  mind it made a lot of sense to have an embargo

12  because you're putting information out and you want

13  to make sure that reporters have sufficient time to

14  consume the information and disseminate it as

15  accurately as possible. And, you know, that's

16  obviously really important.

17    I understood why it was really important to

18  us, but one of the really pleasant surprises when I

19  came to Treasury was this, from my perspective, a

20  much higher standard for reporting accurately what

21  information is given to Treasury reporters. They

22  are -- there is no better -- you know, we talk

Page 45

1  about the markets. Right? A lot of people ask me

2  about the markets and, like, how do you talk to the

3  markets? Well, there is no more efficient way to

4  talk to the markets than through the financial

5  wires or in the Treasury pressroom. So we give

6  information to them directly. And, you know, when

7  I say the markets, you might think of some trading

8  floors up in New York, but the markets are

9  everywhere. They are in Tokyo, London, and

10  Johannesburg, and Chicago, and the only way to

11  speak directly to them quickly is through the

12  financial wires.

13    They recognize that a lot of investors are

14  looking at their stories and trading on the news

15  that comes from those stories; and if their stories

16  are inaccurate, they are probably going to cost

17  somebody some money or make -- you know, make money

18  for someone based on that information. Either way,

19  it hurts their reputation as reporters. So they

20  have -- and I distinguish that from reporters that

21  I dealt with in politics or on Capitol Hill, where

22  those reporters can get away with writing a he

Page 46

1   said/she said story.  It's really easy to have a
2   balanced story, you just get somebody on the other
3   side to say something in opposition and you throw
4   the story out and it's okay.  And that's sort of --
5   that's sort of okay for political rhetoric.
6       Q.  Like reporters in red states?
7       A.  Red states or blue states.  But it's real
8   easy, you know, to write that kind of story and
9   say -- they don't have to be as concerned with the
10  question of accuracy as they do with balance.  You
11  know.  Their ethic of fairness is balance, where it
12  seems like the ethic of fairness for reporters at
13  least covering Treasury is accuracy, to report
14  faithfully what the information is that they are
15  getting.  And it's not that they don't look for
16  opposition voices or, you know, ways to counter.
17  But on straight news for an initial story that
18  comes out, they want to make sure that they are
19  reporting accurately and faithfully the news,
20  because that information is going out to reporters.
21      That was a pleasant surprise for me at
22  Treasury.  It's great to deal with reporters that

Page 47

1   were very, you know, professional about reporting
2   the news that way.
3       Q.  So when you started at Treasury and when you
4   became the director of the Office of Public Affairs
5   and had these discussions with Ms. Smith, there was
6   no set embargo policy at Treasury?
7       A.  No.
8       MS. WILLIAMS:  Objection.
9       BY MR. THEODOROU:
10      Q.  There was no definition of embargo in any
11  Treasury policy?
12      A.  There was no --
13      MS. WILLIAMS:  Objection.
14      THE WITNESS:  Sorry.
15      A.  There was no -- I would say there was no
16  formal written -- if you were looking for a formal
17  written policy on embargoes, none that I was aware
18  of.
19      BY MR. THEODOROU:
20      Q.  So do you know if there was a written policy
21  on embargoes?
22      A.  I don't know.

Page 48

1       Q.  Do you know if there was a set of written
2   procedures on how embargoes are to be handled at
3   Treasury at that time?
4       A.  No.  Not at that time.  And, I mean, from my
5   perspective, it would have been a -- and especially
6   looking back, it would have been a, you know,
7   solution in search of a problem, because there
8   didn't seem to me to be an embargo problem at
9   Treasury.
10      Q.  Do you know, as of October 31, 2001, whether
11  there were any written procedures about how
12  embargoes were to be handled for refunding
13  conferences?
14      A.  No.
15      Q.  Do you know if there were such written
16  procedures?
17      A.  I don't know.
18      Q.  Getting back to your discussion with
19  Michelle Smith.  What else do you remember her
20  telling you about embargoes, other than she said
21  reporters wanted embargoes?
22      MS. WILLIAMS:  Objection.

Page 49

1       A.  I don't recall -- specifically on the
2   question of embargoes, I don't recall what else,
3   what other points we may have said.  I think we
4   agreed that having time between the release of the
5   news and the actual publication of the news, some
6   element of time was beneficial both for them and
7   for us.  And so we agreed, embargoes are good and
8   we should have embargoes.
9       BY MR. THEODOROU:
10      Q.  Now, was your call prompted by you, by
11  reporters talking to you about embargoes?
12      MS. WILLIAMS:  Objection.
13      A.  No.
14      BY MR. THEODOROU:
15      Q.  You had said that when you started -- let me
16  strike that.
17      You said that you had discussions with
18  reporters who wanted embargoes.  Is that right?
19      A.  Yes.
20      Q.  Do you remember who the reporters were?
21      A.  There were a number of reporters I had
22  discussions with about embargoes.  And I could tell

Page 50

1  you for certain Marty Krutsinger who was and still
2  is the Associated Press reporter covering Treasury.
3  Glenn Somerville.
4     Q.  Who is he with?
5     A.  He was a Reuters, he still is a Reuters
6  reporter also still covering Treasury.  Simon
7  Kennedy who was a -- he's a Bloomberg reporter.  He
8  is no longer covering Treasury, he is based in
9  Paris.  Those three in particular I know for
10  certain I had conversations with.
11    Q.  Now, did you have conversations with them
12  about the use of embargoes before October 31, 2001?
13    A.  Yes.  Before and after.
14    Q.  Let's focus on before.
15    A.  Okay.
16    Q.  Did they educate you about embargoes and how
17  they were used at these conferences?
18    A.  You're asking specifically about these
19  conferences?
20    Q.  Quarterly refunding conferences.
21    A.  Yeah.  I think our discussion -- we may have
22  touched on quarterly refunding conferences, but I

Page 51

1  doubt it.  I think our discussions were more
2  general than that.
3     Q.  What do you remember about your discussions
4  with Mr. Krutsinger?  If that's correct?
5     A.  Krutsinger.
6     Q.  Krutsinger?
7     A.  I'm not sure that -- I'll be honest, I'm not
8  sure the discussions -- I can, I'm certain that I
9  had individual one-on-one discussions with Simon
10  Kennedy from time to time, who at the time
11  actually, now that I also recall, he wasn't with
12  Bloomberg at the time, he was with Bridge News
13  which is now defunct.  So he was with Bridge News
14  at the time.  And I know that I had individual
15  conversations with Simon about it.
16    Q.  But you're not --
17    A.  About these and other -- I mean, I was
18  trying to get familiar with how the Treasury press
19  corps interacted with the press officers at
20  Treasury.
21    Q.  But you are not sure that you had
22  discussions with Mr. Somerville and Mr. Krutsinger

Page 52

1  about embargoes?
2     A.  No.  I definitely had --
3        MS. WILLIAMS:  Objection.
4     A.  They were absolutely present in discussions.
5  But you are asking if I had individual discussions
6  with them?  I don't recall if they were individual
7  or whether they were -- or whether those
8  discussions -- now that I'm thinking about it, I
9  think those discussions took place in the open
10  space of the Treasury pressroom.  So they were
11  there, there were others who were in the room as
12  well.  And so I just don't recall who else was
13  within listening distance.
14    Q.  So let's focus, before October 31st, 2001,
15  you recall having discussions with reporters about
16  the use of embargoes in the open space of the
17  Treasury pressroom?
18    A.  Yes.
19    Q.  Okay.  Do you remember what reporters were
20  present?
21    A.  Not at any one point in time.  No.  Other
22  than I know Marty was always there, and I remember

Page 53

1  talking to Marty.  And he was a long-time Treasury
2  reporter, so I was interested in his past.
3  Jonathan Nichols was maybe there.  There's no way I
4  can recall who specifically was there.
5     Q.  As best you can recall, how many discussions
6  did you have with reporters in the room about
7  embargoes and how they were to be used at refunding
8  conferences?
9     A.  I couldn't -- specifically about refunding
10  conferences?
11    Q.  Yes.
12    A.  I don't know.
13    Q.  How about embargoes generally as to
14  conferences, press conferences at Treasury?
15    A.  I would say two to three conversations in
16  the Treasury pressroom with the reporters who were
17  probably present there.
18    Q.  Now, and we are focusing again before
19  October 31, 2001.  So you remember two to three?
20    A.  Yeah.  If I can put it in a little better
21  context.  I was spending a lot of time in March of
22  2001, March and April of 2001 talking to Treasury

Page 54

1  reporters just about basic procedures, how we
2  interact with each other. We were, I talked to
3  them about things like, how early do you get
4  testimony, you know, before it's given on Capitol
5  Hill? I talked to them about, when we travel, who
6  gets -- if we're traveling and we give a speech,
7  who gets the speech? You know. You reporters who
8  are traveling, or does it go back to the Treasury
9  pressroom?
10      So lots of those really just sort of, you
11  know, what are the sort of standard operating
12  procedures for interaction on our business.
13  Q. So you were talking to the equivalent, the
14  equivalent of Helen Thomas --
15  A. Exactly.
16  Q. -- at Treasury about how things are
17  conducted?
18  A. Don't ever say that I characterized Marty
19  that way, though.
20  Q. What was the substance of the conversation?
21  So they were educating you about how embargoes were
22  to be conducted?

Page 55

1  A. Yeah, how they traditionally used embargoes.
2  And they said, they had a saying on embargoes.
3  They still have the same saying: Everyone goes in
4  together, everyone comes out together, nobody gets
5  hurt. You know? They want the -- you know, they
6  want to know that they are all getting the news at
7  the same time and that they will all be publishing
8  the news at the same time. And, you know, that's
9  helpful for them, it's good for the markets so that
10  the markets don't have to be searching across
11  different sources of news to find out who is
12  getting it first and who is getting it out first.
13  And that was -- that made me comfortable also.
14  Q. All right. These two to three meetings
15  regarding embargoes, what do you remember about the
16  substance of the conversation with the reporters?
17  A. I think, just what I said, that -- I mean,
18  there was also a discussion of the procedures for
19  the release of the Federal Open Market Committee
20  statements during FOMC meetings that comes from the
21  Treasury pressroom.
22  Q. Let's break it down as to the best you can

Page 56

1  recall. As best you can recall what the substance
2  of what was said about embargoes, what did you say,
3  what did they say at these two or three meetings?
4  A. I recall saying, do you like -- you know,
5  you guys seem to want embargoes for all documents.
6  Is that something that you want us to continue?
7  You know, you want embargoes?
8      And they said, yeah, we definitely want
9  embargoes. You know, it helps us. It helps us be
10  consistent in all of us delivering the news. You
11  don't have to worry about picking favorites for
12  releasing news. It's standard in the way that we
13  do our business, and it will make -- it just makes
14  life easier for all of us. And you can -- from
15  your perspective, you can be certain that when the
16  news goes out to the market, it's coming out in a
17  standard, predictable, reliable way.
18      And that all made sense to me.
19      We had conversations about whether they
20  prefer that I set the embargo or they set the
21  embargo. They said it doesn't really matter to
22  them which way it's done. Either way, you know,

Page 57

1  it's the same.
2      We talked a little bit about what an
3  embargo -- you know, about what an embargo means.
4  So, you know, who -- what do you do with the news
5  when you get it? Does it -- do you, you know, can
6  you send it back to your -- you know, can you send
7  it back to your news organization? And I know
8  that, from my perspective, you know, dissemination
9  and publishing, well, publishing news in a way
10  that -- you know, I make a distinction between news
11  organizations and general public. So if it's in a
12  place where the general public can get it, then
13  that's disseminating. If you're a news
14  organization, then, you know, you can definitely
15  communicate with your news organizations.
16  Q. So that was concluded, that they could
17  communicate with the news organizations, you said,
18  at one of these meetings?
19  A. I said I have no problem with reporters
20  communicating with their news organizations.
21  Q. Did you say anything about discussing the
22  information with anybody outside of the news

15  (Pages 54 to 57)

Page 58

1  organizations?

2    A. I don't recall.

3    Q. You mentioned that you discussed the time,

4  setting the time for the embargo.

5    A. (Nodding head.)

6    Q. In these discussions, did you arrive at any

7  procedure or conclusion as to how to set the time

8  for embargo?

9    A. Just that it would, you know, that we should

10  just, you know, whatever -- their feeling is it

11  should be left up to me. But where I didn't have

12  an interest in what the embargo time should be,

13  that they are going to want -- they are going to

14  set their own embargo on their own anyway.

15    So if I come down with a document that

16  wasn't going to generate news or going to be

17  anticipated to generate news, that maybe wouldn't

18  be market sensitive, they would still want to set

19  an embargo amongst themselves. And this happens

20  frequently. We bring down, say, a statement from

21  the senior Treasury official, and they will ask,

22  what's the embargo? And I'll say, you guys decide

Page 59

1  whatever you want. And they all talk amongst

2  themselves and say, you know, what do you think, 10

3  minutes, 15 minutes? Whatever the consensus agrees

4  to. And they note the time on the clock. So let's

5  say it's 9:25 and they say we need 10 minutes, and

6  they all agree, yeah, 10 minutes. And then they

7  will say, okay, let's lift it at 9:35. And

8  everyone goes back to their computers and agrees to

9  9:35. And then I make a commitment in that case

10  that, if they set an embargo, that I won't release

11  it on the Web site before their embargo is lifted.

12    Q. Were you aware of any Treasury Department

13  procedures as to how it was to be handled on the

14  Web site other than your discussions with the

15  reporters?

16    A. No.

17    Q. And was this the procedure followed before

18  October 31, 2001, that reporters set the embargo

19  time?

20    MS. WILLIAMS: Objection.

21    A. For?

22    BY MR. THEODOROU:

Page 60

1    Q. For quarterly refunding conferences before

2  October 31?

3    MS. WILLIAMS: Objection.

4    A. I had only -- I had only witnessed one

5  quarterly refunding announcement before October

6  31st, so I couldn't say whether that was standard.

7    BY MR. THEODOROU:

8    Q. Was --

9    A. But for?

10    Q. For press conferences.

11    A. Yeah. It just really depended.

12    Q. For the press conferences that you handled

13  and supervised before October 31, was the procedure

14  that the reporters would set the embargo time?

15    A. It really depended. They did set the

16  embargo time at the quarterly refunding press

17  conference in May, at the end of May.

18    Q. Reporters set the embargo time?

19    A. Um-hmm. Yes.

20    Q. Did they also set the time at which they

21  would get the statement, the copy of the statement?

22    A. No.

Page 61

1    Q. Okay. And when we say embargo time, we're

2  talking about the amount of time between getting

3  the statement and when it could be released?

4    A. Yeah. When we say the embargo time, we're

5  talking about the time that the statement will be

6  publicly released, where it can be allowed to be

7  disseminated to the public.

8    Q. In these two to three discussions that you

9  had with the reporters, did you discuss anything

10  about lockdown rules or keeping people in and out

11  from the press conferences?

12    A. We talked about -- not in terms of people,

13  letting people in or out for the press conferences.

14  We did discuss that, for FOMC announcements, that

15  there is a lockdown procedure.

16    Q. What is FOMC?

17    A. Federal Open Market Committee, Federal

18  Reserve Boards, Monetary Policy Making Committee.

19    Q. Why was there a lockdown procedure with the

20  Federal Open Market Committee and Federal Reserve

21  Open Policy Committee, and not with --

22    A. That's one thing.

Page 62

1    Q. I'm sorry.
2    A. FOMC. That was the way they had always done
3    it.
4    Q. Did anyone ever consider lockdowns for the
5    refunding conferences?
6        MS. WILLIAMS: Objection.
7        BY MR. THEODOROU:
8    Q. Before October 31st, 2001?
9    A. Not to my knowledge.
10   Q. Did you ever have a discussion with anybody
11   at Treasury about using a lockdown procedure for
12   refunding conferences?
13   A. No.
14   Q. Did anyone at Treasury ever suggest that the
15   lockdown should be used for refunding conferences?
16   A. No.
17       MS. WILLIAMS: Objection.
18       THE WITNESS: Sorry.
19   A. No, never. Again, I think it would be -- my
20   view is that it would have been a solution in
21   search of a problem.
22       BY MR. THEODOROU:

Page 63

1    Q. And why is that?
2    A. Because I had never seen any event of a
3    reporter willfully breaking an embargo.
4        MR. THEODOROU: Why don't we take a
5    five-minute break.
6        THE VIDEOGRAPHER: This concludes tape one
7    in the deposition of Tony Fratto. Off the record
8    at 11:41:30.,
9        (Recess taken.)
10       THE VIDEOGRAPHER: This begins tape two in
11   the deposition of Tony Fratto. On the record at
12   11:48:50.,
13       BY MR. THEODOROU:
14   Q. Mr. Fratto, turning your attention to
15   October 31st, 2001, after your discussions with
16   these reporters, what was your understanding as of
17   October 31st of Treasury's policy on the use of
18   embargoes?
19       MS. WILLIAMS: Objection.
20   A. That we had a -- in terms of, you know,
21   whether it was a policy, my view is that we had a
22   policy of setting embargoes, that it was a

Page 64

1    traditional thing. And, as I learned more about
2    it, that it was a useful and appropriate way to
3    release information at Treasury.
4        BY MR. THEODOROU:
5    Q. What exactly did an embargo prevent a person
6    from doing?
7    A. It prevented a member of the news media from
8    releasing the information that they received,
9    disseminating that information to the general
10   public.
11   Q. Before a particular time?
12   A. Before a particular time. That's right.
13   Q. Did it prevent them from disclosing the
14   information to anyone?
15       MS. WILLIAMS: Objection.
16   A. It -- no. I'd say, my view is the general
17   -- is that it prevented them from just releasing
18   the information to the general public. My view,
19   and I think it was the common understanding among
20   the reporters in the Treasury pressroom, that it
21   was perfectly appropriate to discuss information
22   with members of the news organization, like an

Page 65

1    editor.
2    Q. Did you define for them who at their press
3    organizations they could discuss the information
4    with?
5    A. No. Not specifically.
6    Q. Now, a press person who received the
7    information at a press conference could discuss
8    that information with another Treasury employee?
9        MS. WILLIAMS: Objection.
10   A. They could discuss that information with a
11   member of the Office of Public Affairs.
12       BY MR. THEODOROU:
13   Q. How about another, an employee who did not
14   work at the Office of Public Affairs?
15   A. Reporters are not -- let me put it this way.
16   Treasury employees outside the Office of Public
17   Affairs are not permitted to talk to reporters
18   except by authority granted to them and in the
19   presence of a member of the Office of Public
20   Affairs. That's been a standard policy at Treasury
21   for a long time, since the beginning.
22   Q. Now, before October 31st, 2001, did you

17 (Pages 62 to 65)

Page 66

1 attend any quarterly refunding press conferences at
2 Treasury?
3    A. Before October 31st?
4    Q. Yes.
5    A. Yes.
6    Q. Which one?
7    A. May 31st.
8    Q. May 31st, or May 2nd?
9    A. I remember it being in May. It was May.
10    Q. And who spoke at that conference?
11    A. Michael Polis.
12    Q. So you didn't attend Assistant Secretary
13 Roseborough's conference in August?
14    A. I don't believe I did. I think I had -- I
15 don't have a recollection. I remember that Brian
16 did do the quarterly refunding announcement. I
17 honestly don't even remember whether I was there or
18 not.
19    Q. Okay.
20        (FRATTO Exhibit Number 1 was marked for
21 identification.)
22        BY MR. THEODOROU:

Page 67

1    Q. I want you to look at this document. Have
2 you seen it before?
3    A. I think it was the one I saw yesterday.
4 Yeah.
5    Q. Now, it appears that -- and what is the
6 document?
7    A. It's titled a Memorandum of Activity.
8 Memorandum of Activity from the Office of Inspector
9 General.
10    Q. For what date?
11    A. November 14, 2001.
12    Q. Further on in the document there's another
13 memorandum of activity. Excuse me, I'm sorry.
14    MS. WILLIAMS: Mine doesn't have one.
15    MR. THEODOROU: I'm sorry.
16    MR. McGIVERN: It just has the one with the
17 exhibits that were attached to it initially.
18    MR. THEODOROU: Okay, I've got it. I'm
19 sorry. All right.
20    BY MR. THEODOROU:
21    Q. So this one is the November 14th, 2001
22 interview that you had?

Page 68

1    MS. WILLIAMS: Can I just get the copy back?
2    MR. THEODOROU: I'm sorry.
3    BY MR. THEODOROU:
4    Q. That's the November 14th, 2001 interview you
5 testified about earlier. Correct?
6    A. (Nodding head.)
7    Q. Now, besides being interviewed on November
8 14, 2001, you were interviewed again, weren't you,
9 by OIG?
10    A. I think so. I don't remember right now.
11        (FRATTO Exhibit Number 2 was marked for
12 identification.)
13        BY MR. THEODOROU:
14    Q. I want to show you what's been marked as
15 Exhibit 2. Have you seen that document before?
16    A. Not that I recall.
17    Q. You don't remember reviewing this yesterday
18 with the SEC attorneys?
19    A. No.
20    Q. This makes reference to a second interview.
21 Do you see that?
22    A. Yes.

Page 69

1    Q. On December 19, 2001?
2    A. Yes.
3    Q. Do you recall having a second interview with
4 the Office of Inspector General?
5    A. I honestly don't specifically remember it.
6 I don't doubt that it happened, I just don't
7 remember it.
8    Q. Now, turning to Exhibit 1, the first of the
9 two documents that I gave you. On page 2,
10 directing your attention to page 2, the fourth
11 paragraph on this page makes reference to the
12 October 31st, 2001 quarterly refunding press
13 conference.
14        Before I ask any questions of the document,
15 do you want to take some time reading it, or do you
16 think you're pretty familiar after having it?
17    A. I think I'm relatively familiar with it.
18 Yeah.
19    Q. Okay. Do you see where it says, Fratto said
20 this was the first time that they had set an
21 embargo time prior to the conference?
22    A. Yes.

Page 70

1    Q. And in fact it says: Fratto said this was
2 the first time they had set an embargo time, 10:00,
3 a.m., prior to the conference. Normally they poll
4 the press at the conclusion of the press conference
5 and then set the embargo time.
6    Correct?
7    A. Yes.
8    Q. Now, when you say this was the first time
9 that an embargo time was set prior to the
10 conference, is that in reference to a quarterly
11 refunding conference or to any news conference?
12    A. To my knowledge, a quarterly refunding
13 conference. Not -- no, definitely not referring to
14 other news conferences.
15    Q. So before this October 31st, 2001
16 conference, a public affairs official polled
17 reporters present to determine how much time they
18 needed to prepare their stories at the conclusion
19 of the conference?
20    MS. WILLIAMS: Objection.
21    A. At the one quarterly refunding announcement
22 that I recall attending, that's the way it was

Page 71

1 done. So when this says what is normal, I can't
2 really attest to that other than it definitely had
3 been done previously within my experience.
4    BY MR. THEODOROU:
5    Q. So when you attended the May 2001 quarterly
6 refunding conference, did you poll the reporters as
7 to determine how much time they needed to prepare
8 their stories?
9    A. Yes, I did.
10    Q. And how much time did they need?
11    A. I don't remember the exact time. It was
12 about -- it was about 15 minutes. I think the way
13 they did it was they picked a quarter hour, the
14 next closest quarter hour time period. So I
15 couldn't -- I can give you a type of example. I
16 don't remember the exact time. But it was, for
17 example, if it was -- if the press conference was
18 over at 9:17, they picked 9:30. So they picked a
19 round, a relatively round time that they could all
20 agree on.
21    Q. And when you say you polled the reporters,
22 did you have them take a vote?

Page 72

1    A. No.
2    MS. WILLIAMS: Objection.
3    BY MR. THEODOROU:
4    Q. How did they arrive at the time then?
5    A. I asked them out loud, with all of them in
6 attendance before they left the room, how much time
7 do you need for an embargo? And, actually, I
8 remember this fairly clearly. It was Simon Kennedy
9 who said out loud, suggested about 15 minutes. And
10 then another voice said a specific time, and they
11 all said, yeah, that's good, okay. So -- and then
12 said so then I repeated the time that they had all
13 agreed to.
14    Q. Did you tell them what they could and could
15 not do during that time period, other than setting
16 a time period?
17    A. No. That would have been unusual. They
18 knew exactly what they could and couldn't do: The
19 news that had been -- the news that they had gained
20 from the press conference could not be publicly
21 disseminated.
22    Q. And how do you know they knew that?

Page 73

1    A. I presume the same. Besides from the
2 conversations I had with a number of people, a
3 number of reporters in that group, the same way I
4 presume that you know how to conduct a deposition
5 interview. You know, I've witnessed it with other
6 documents, and I can see that -- you know, you know,
7 that wasn't the first time that we had used an embargo.
8 We used embargoes on a relatively regular daily
9 basis well up to October 31st. It wasn't like it
10 was an episodic event. We used embargoes many
11 times on a daily basis and sometimes multiple times
12 on a given day.
13    Q. But at that point with refunding
14 conferences, other than setting a time, nobody
15 defined for the reporters, both veteran and
16 nonveteran reporters, what they could and couldn't
17 do during the embargo?
18    MS. WILLIAMS: Objection.
19    A. That's right. No one defined it.
20    BY MR. THEODOROU:
21    Q. And nobody --
22    A. And if you're asking me why I didn't define

Page 74

1  it, I saw no reason to.
2      Q.  You assume they understood?
3          MS. WILLIAMS:  Objection.
4      A.  I had good reason to assume that they
5  understood.
6          BY MR. THEODOROU:
7      Q.  Okay.  Let me rephrase my question.
8          Do you know whether anyone at that May
9  conference told the reporters in the room what they
10  could and could not do during the embargo period?
11     A.  No.
12     Q.  Do you know -- now, you testified earlier
13  about Simon Kennedy.  Who is he again?
14     A.  At the time, he was a reporter with Bridge
15  News.
16     Q.  And do you recall having a discussion about
17  embargoes with Simon Kennedy, specifically with Mr.
18  Kennedy, as opposed to those two to three meetings
19  you talked about?
20     A.  Yes.
21     Q.  Before October 31, 2001, do you recall
22  having a discussion with Mr. Kennedy about the use

Page 75

1  of embargoes?
2      A.  Yes.
3      Q.  Okay.  How many discussions did you have
4  with him about the use of embargoes?
5      A.  I don't know if it was more than one.
6      Q.  What do you recall about your discussions
7  with Mr. Kennedy?
8      A.  They were similar to the other conversations
9  I had in the Treasury pressroom; just asking his
10  experience with the nature of embargoes, whether --
11  surveying lots of views on that particular practice
12  and other ways that we interacted with the Treasury
13  press corps.
14     Q.  Let me ask you this.  Specifically with your
15  discussion with Mr. Kennedy, what do you remember
16  about the specifics of the discussion regarding
17  embargoes, with just that specific discussion?
18     A.  Yeah.  I don't really remember a specific --
19  his specific reactions.  I think I would have
20  remembered if he had expressed views that differed
21  from mine.  But I don't -- I couldn't tell you the
22  words he used.

Page 76

1      Q.  Now, before the quarterly refunding press
2  conference of October 31st, 2001, did Treasury
3  require attendees at press conferences to stay in
4  the room during the embargo period?
5          MS. WILLIAMS:  Objection.
6      A.  I don't recall it being an issue.
7          MS. WILLIAMS:  I'm sorry, could we repeat
8  the question?
9          MR. THEODOROU:  Do you want me to restate
10  the question?
11         MS. WILLIAMS:  Yes.  Could you restate the
12  question?
13         BY MR. THEODOROU:
14     Q.  Before the October 31st, 2001 quarterly
15  refunding conference, did Treasury require those
16  attending the press conference, any press
17  conference, to stay in the room where the press
18  conference was being conducted during the embargo
19  period?
20     A.  And I responded, I don't recall it being an
21  issue that was specific, that ever came up.
22     Q.  I just have to rephrase the question.

Page 77

1          MS. WILLIAMS:  Thank you.
2          MR. THEODOROU:  You're welcome.
3          THE WITNESS:  And your objection on the
4  second retelling of the question?
5          MS. WILLIAMS:  No, I have no objection.
6          MR. THEODOROU:  She's all set.  She never
7  has a problem with objections.
8          BY MR. THEODOROU:
9      Q.  Before October 31st, 2001, did Treasury take
10  any steps to prevent attendees of news conferences
11  from making telephone calls before the embargo
12  period ended?
13         MS. WILLIAMS:  Objection.
14     A.  Yes.  If there was an embargo in effect,
15  reporters are not permitted to use their cell
16  phones.  And, in fact, we enforced the policy even
17  for open events of discouraging the use of cell
18  phones during events where there wasn't an embargo.
19         BY MR. THEODOROU:
20     Q.  Well, how were they allowed to communicate
21  with their press organizations during the embargo
22  period?

Page 82

1    A. Because the quarterly refunding
2  announcement, the way it had always been done, the
3  way it had always been released was in the form of
4  a press conference. And a press conference can
5  cannot be held in the Treasury pressroom, and the
6  reporters are not -- don't have the capability of
7  disseminating and producing the news from the
8  diplomatic reception room which we used at that
9  time for press conferences. So the only way to
10  allow the Treasury reporters to get to a place
11  where, A, where we can have a place to conduct our
12  press conference, and point B, where they can
13  produce their stories and disseminate it is to
14  allow them to walk from point A to point B.
15    Q. Right. So they were allowed to go to their
16  pressroom during the embargo time. Correct?
17    A. Correct.
18    Q. And to contact their media organizations?
19    A. Correct.
20    Q. Why weren't they locked down in their
21  pressroom? If they were there with the written
22  statement that they were writing their stories

Page 83

1  about, why weren't they locked down while they were
2  locked down in these securities auctions?
3    A. There was no need to. There was not -- to
4  my knowledge, speaking to people both reporters who
5  dealt with it in the past and public affairs
6  officials at Treasury, they had never had a problem
7  of broken embargoes. My experience at that point,
8  which was eight or nine months, or seven or eight
9  months at Treasury had not had experience with
10  broken embargoes; and, that this was relatively
11  customary and usual for the way we did lots of
12  briefings that involved embargoes.
13    Q. Right. But why did you have to lock them
14  down in the securities auctions?
15    A. That was the way they did it. That's the
16  way it had been done at Treasury, that they did a
17  lockdown for securities auctions. But I will tell
18  you, even out of -- you know, at the time, even for
19  securities auctions and for FOMC statements, you
20  know, we work in a unique place where the
21  facilities have not kept up with what they needed.
22  So, for example, there wasn't a copier in the

Page 84

1  Treasury pressroom. And in order for them to
2  disseminate the news of an auction or an FOMC
3  statement, they had to allow the reporters or the
4  reporters had developed the custom of doing
5  something, you know, which someone might look at as
6  unusual but it was relatively safe, which was
7  allowed to walk across the hall with an FOMC
8  statement, two reporters keeping an eye on each
9  other and making copies of the FOMC statement and
10  walking back into the Treasury pressroom. That was
11  even under a lockdown condition they were leaving
12  the room with a key document, but they were
13  self-enforcing.
14        You know, reporters do not want to break
15  embargoes. That's the quickest way to find
16  yourself off one of the best beats in Washington,
17  is to try to -- is to break an embargo willfully.
18    Q. What is a securities auction?
19    A. Treasury bonds, notes. You know, the
20  Treasury securities bonds that we sell, they are
21  auctioned at the Bureau of Engraving and Print --
22  I'm sorry, the Bureau of Public Debt. And they are

Page 85

1  electronic auctions. And the results of those
2  auctions are disseminated in the Treasury
3  pressroom.
4    Q. As to who bought?
5    A. How many were bought, what the, you know,
6  the price, how much, at what price.
7    Q. The materials?
8    A. Exactly. How did the -- what were the
9  results of the sale.
10    Q. So that information was certainly as market
11  sensitive as what was going on at the quarterly
12  refunding conference. Correct?
13        MS. WILLIAMS: Objection.
14    A. I couldn't compare. In fact, I don't think
15  I'm qualified to say which is more or less market
16  sensitive.
17        BY MR. THEODOROU:
18    Q. Were they both market sensitive, though?
19    A. Yeah. I would call them both market
20  sensitive.
21    Q. Did Treasury use a lockdown procedure for
22  any other kinds of press conferences other than --

Page 102

1  events of October 31, how important it was to be as
2  precise as possible --
3      A. That's right.
4      Q. -- in talking to OIG and lawyers for the
5  Treasury and the SEC?
6      A. Yes, I do. And I'm sure John's response is
7  reflective of the fact that he was asking me about
8  events that occurred upwards of a year previously.
9  So my ability to recall specific times a year or
10  five months later is probably limited, just as
11  limited as it is now.
12      Q. Now, you testified you do remember being at
13  the August 1st -- or the May 2nd conference, but
14  not the August 1st. Right?
15      A. Yeah.
16      Q. But at the May 2nd conference, did you tell
17  the attendees that the embargo would last 15
18  minutes from a certain time, or did you announce an
19  exact time at which it would end?
20      A. I announced an exact time.
21      Q. Do you recall today what that exact time
22  was?

Page 103

1      A. No.
2      Q. Is it written anywhere, that exact time?
3      A. No. But it is standard in -- any time. I
4  know of no case where the discussion of the time
5  required for an embargo is discussed with reporters
6  that isn't followed up by a consensus agreement on
7  a specific time. That's always the case.
8      Q. And what, is there -- is there to your
9  knowledge a record anywhere of this set time?
10      A. No. I would be surprised to find one.
11      Q. Now, if you'd turn to Exhibit 1. Directing
12  your attention to page 2. All right, the fourth
13  paragraph, beginning: Fratto said that this was
14  the first time they had set an embargo time 10:00,
15  a.m. prior to the conference.
16      Do you see that, Mr. Fratto?
17      A. I do.
18      Q. All right. And then later on in the
19  paragraph you say: He said he was not aware of any
20  member of the press violating the embargo. He said
21  -- let me take it in context for the purpose of
22  completeness here.

Page 104

1      A. Yeah.
2      Q. The whole paragraph.
3      Fratto said that this was the first time
4  they had set an embargo 10:00 a.m. prior to the
5  conference. Normally they poll the press at the
6  conclusion of the press conference and then set the
7  embargo time. He said he was not aware of any
8  member of the press violating the embargo. He said
9  that, if they did, he would revoke their Treasury
10  press credentials.
11      Do you remember talking to the OIG and the
12  SEC about that?
13      A. Yes.
14      Q. How did Treasury enforce embargoes at their
15  refunding conferences, refunding press conferences?
16      A. That's a more complicated question and more
17  complicated answer than what I think you are
18  asking. You are asking how we deal.
19      Q. Just like the case. It's a much more
20  complicated case?
21      A. How we deal with reporters who would violate
22  a an embargo. Say, first of all, I have no -- I

Page 105

1  have had in five and a half years in Treasury no
2  instances that I'm aware of a reporter willfully
3  violating an embargo. However --
4      Q. What do you mean by willfully?
5      A. Doing it on purpose. Purposely violating an
6  embargo. I'm aware of one instance, and I honestly
7  can't recall what the date was, but it was I
8  believe in 2003 where an Associated Press reporter
9  had accidentally violated an embargo, or the
10  Associated Press news organization had accidentally
11  violated an embargo. And that was because the
12  reporter, when they sent their story to their
13  editor for review, wasn't clear that the story was
14  embargoed and so they had -- they accidentally sent
15  the story out before the embargo was lifted, and
16  they self-reported themselves. They called me, as
17  did every other reporter in the pressroom
18  subsequent to that. But AP had called me to tell
19  me that they had violated the embargo and
20  apologized.
21      Q. But as of October 31, 2001, how did Treasury
22  enforce its embargoes?

Page 106

1      MS. WILLIAMS: Objection.
2      A. It up to that point had not had an
3  opportunity to use any of the potential penalties
4  at my disposal for someone violating an embargo.
5  But I was clear, and I think going back to some of
6  the conversations we had with reporters on this
7  topic -- and I couldn't tell you specifically which
8  reporters that we had this conversation with, but
9  it was -- I recall expressing my feeling that if a
10  reporter violated an embargo -- first of all, they
11  were clear in telling me that they would be sure to
12  let me know about it if anyone did because they
13  watch each other. But if a reporter violated an
14  embargo, that, you know, some of the potential
15  penalties that I can use to enforce an embargo
16  would be to limit access to that reporter to, you
17  know, covering Treasury events, and could revoke
18  that reporter's Treasury press credentials and not
19  allow them into the Treasury building to cover
20  Treasury events. I could even go so far as, if it
21  was a news organization that was based in the
22  Treasury building, had a permanent Treasury room

Page 107

1  press credentials, to remove the organization from
2  the Treasury pressroom. So those were just some of
3  the tools that I could use.
4      And it says here that I responded that I
5  would revoke their Treasury press credentials if I
6  found out that a reporters at that press conference
7  had broken the embargo. I think that is probably
8  accurate. That would have been my reaction.
9      BY MR. THEODOROU:
10      Q. Directing your attention to the May 1st
11  conference, which is the one you remember attending
12  before October 31st, how do you ensure that all of
13  the attendees of the press conference knew that
14  their press credentials were going to be revoked or
15  could be revoked if they violated the embargo?
16      MS. WILLIAMS: Objection.
17      BY MR. THEODOROU:
18      Q. Did you tell everybody who attended that day
19  what would happen if they did?
20      A. No.
21      MS. WILLIAMS: Objection.
22      A. No. And I saw absolutely no reason to do

Page 108

1  that. The Treasury -- this is a unique group of
2  reporters. I said this earlier and I'm going to
3  say it again. They don't want to -- it is career
4  threatening to break an embargo. Not just -- it's
5  not just a question of what I would do to them,
6  it's what their news organizations would do to
7  them. You know, none of these news organizations
8  would tolerate a reporter who breaks embargoes.
9      BY MR. THEODOROU:
10      Q. My question is, to your knowledge, did
11  anybody at Treasury address everybody attending
12  what would happen if the embargo was broken?
13      A. No.
14      Q. Okay. What steps did you take to ensure
15  that everybody who attended the refunding
16  conference in May 2001 understood what would happen
17  if the embargo was broken? I'm talking about
18  everybody. Not one particular person you talked to
19  or one discussion or a couple of reporters, but the
20  people, everybody attending that conference.
21      MS. WILLIAMS: Objection.
22      A. I'd take the step of announcing that an

Page 109

1  embargo -- that an embargo is in effect. And I
2  would see it no different than -- I don't see the
3  necessity when you put, you know, a speed limit
4  sign up on the highway to also state what the
5  penalties are for exceeding the speed limit. I
6  know what the speed limit is, and reporters know
7  what an embargo is.
8      BY MR. THEODOROU:
9      Q. But there's a record of people, when people
10  are driving there's a record that they have driver
11  education programs.
12      A. Um-hmm.
13      Q. In this case, did the reporters get training
14  on what the embargoes were about so you knew that
15  all reporters, veterans and cub reporters alike,
16  understood that?
17      MS. WILLIAMS: Objection.
18      A. I would consider it -- I would consider it
19  on-the-job training. But, again, like I said
20  earlier, you're talking about solutions in search
21  of a problem. I haven't had a problem prior or
22  since of reporters exceeding the speed limit, so to

28 (Pages 106 to 109)

Page 110

1   speak, of breaking an embargo. There's absolutely
2   no evidence of it. And so I don't -- didn't then
3   and I certainly don't today see the need at every
4   press event where we employ an embargo, which is a
5   daily occurrence, to cite the potential penalties
6   if the embargo is broken.
7       BY MR. THEODOROU:
8       Q. Did Treasury obtain the consent from
9   everybody attending the conference that they would
10  abide by the embargo?
11      A. No.
12      Q. Now, directing your attention to October
13  31st, 2001. You attended that refunding
14  conference. Correct?
15      A. Yes.
16      Q. Now, did Elizabeth Holahan ask the attendees
17  at that press conference whether they agreed to
18  honor the 10:00 a.m. embargo that day?
19      A. No. She simply announced the embargo time
20  twice.
21      Q. Did she require the attendees to sign a form
22  stating that or any document that they would honor

Page 111

1   an embargo?
2       A. No. We relied on their ethical
3   responsibilities.
4       Q. So that Treasury officials assumed that the
5   attendees would honor whatever embargo time was
6   announced. Correct?
7       A. Yes.
8       MS. WILLIAMS: Objection.
9       BY MR. THEODOROU:
10      Q. So as of October 31st, 2001, reporters were
11  governed by an honor system not to release
12  information before the embargo time expired?
13      MS. WILLIAMS: Objection.
14      A. Is that an honor system? I don't know.
15      BY MR. THEODOROU:
16      Q. But they were self --
17      A. They were self-enforcing.
18      Q. Self-enforcing.
19      A. Yeah.
20      Q. Now, you testified you were not aware of any
21  instance before October 31st in which an embargo at
22  Treasury was violated?

Page 112

1       MS. WILLIAMS: Objection.
2       A. Willfully violated. Before October 31st?
3   No, the only event that I really recall was
4   subsequent to October 31st.
5       BY MR. THEODOROU:
6       Q. Apart from willfully, do you remember --
7   prior to October 31st, 2001, do you remember any
8   instance of a premature disclosure of information
9   from a press conference at Treasury?
10      MS. WILLIAMS: Objection.
11      A. An event was brought to my attention, but I
12  wasn't -- I didn't have first-hand experience with
13  it.
14      BY MR. THEODOROU:
15      Q. What, so there was an event brought to your
16  attention where an embargo had been violated?
17      MS. WILLIAMS: Objection.
18      A. I couldn't make a judgment whether the
19  embargo was violated. I was asked -- I think I was
20  asked yesterday about an event involving our deputy
21  secretary Ken Dam, and in your letter specific date
22  referring to October 22nd, it was mentioned. I

Page 113

1   haven't had any first-hand knowledge or experience
2   with that. If I have, I'm just not aware. It
3   wasn't an issue area that was in my jurisdiction at
4   that time.
5       Q. Before the October 31st conference, did the
6   issue regarding Mr. Dam's press conference, was
7   that brought to your attention?
8       A. Before October 31st?
9       Q. Before October 31st, 2001.
10      A. I have no recollection of that.
11      Q. I will see if it refreshes your
12  recollection.
13      A. Okay.
14      Q. If it does, it doesn't.
15      MR. THEODOROU: Could we go off the record
16  just a second?
17      THE VIDEOGRAPHER: Off the record at
18  12:46:43.,
19      (Recess taken.)
20      THE VIDEOGRAPHER: On the record at
21  1:25:522.,
22      BY MR. THEODOROU:

Page 130

1  was obviously a unique announcement, and I wanted
2  to make sure, A, that they had enough time to, you
3  know, ask questions at the press conference,
4  thoroughly consume the news that they were getting,
5  and write thoughtful -- write thoughtful stories.
6  And, if they had any questions -- you know, it's
7  not unusual for after a press conference or the
8  release of information that the reporters, they get
9  down to their desks, they get down to their desk
10 and get into writing and they realize they have got
11 two or three questions on the news you just gave
12 them.
13     In this case, for example, they might ask
14 was it -- I mean, it wasn't the case, but, you
15 know, had 30-year ever been discontinued before?
16 They would want a little historical data to add
17 into their stories, things like that. So I wanted
18 to make sure going into this that they had enough
19 time on this important piece of news to write good
20 accurate stories, and so I wanted to make sure they
21 got that amount of time.
22     Q. And when did you decide it was going to be

Page 131

1  at 10:00 a.m.?
2     A. It was late the previous week.
3     Q. Did you discuss the issue of setting the
4  time with anybody?
5     A. Yes. I discussed it with -- discussed it
6  with Betsy. I discussed it with -- I certainly
7  discussed it with Peter Fisher. And there were
8  certainly others in the room when we had that
9  discussion, most likely Brian Roseborough and/or
10 Tim Bitsberger or Jeff Luther, maybe Paul Malvey.
11 I don't recall who else was in the room, but I know
12 there were others in the room and that's the likely
13 group that would have been there.
14    Q. Was there one discussion with the group?
15    A. There was at least one discussion. There
16 may have been more. I don't remember specifically.
17    Q. All right. And what was said in that
18 discussion?
19    A. Well, Peter -- Peter first had the idea that
20 he wanted to have the press conference be live web
21 cast. And I objected to that. I thought that, you
22 know, we already have a fairly sizeable piece of

Page 132

1  news here. I don't think we should try to be --
2  you know, let's not try to break ground everywhere.
3  You know, the time to try new things with
4  established events like a quarterly press
5  conference was not when you have a major piece of
6  news because you are just increasing the risk that
7  something could go wrong. And I never had a whole
8  lot of faith in the ability of Treasury's Internet
9  infrastructure to carry off a web cast in a timely
10 way. So I thought it was a bad idea and argued
11 against it. And I thought we should actually go,
12 you know, far more conservative to the other, on
13 the other extreme, which was what I in the end
14 advocated and what we agreed to, which was to set a
15 hard and fast time for lifting the embargo for all
16 the reasons I just said earlier.
17    Q. When you had this discussion with Mr.
18 Fisher, how did having a live web cast increase the
19 chances of something going wrong?
20    A. Well, I mean, most obviously, you know, we
21 have a history at Treasury of servers going down.
22 You know? I mean, it wasn't a particularly

Page 133

1  reliable Internet infrastructure at Treasury, and I
2  didn't have faith that we'd get to 10 minutes
3  before the press conference and someone from the IT
4  office would call up and say, you know, we can't
5  web cast it, or there's going to be a delay, or the
6  server went down. Something like that. And I
7  wanted us to be, you know, tried and true,
8  reliable, give the news to actual human beings who
9  will get the news out the normal, you know, the
10 normal way. The only change was to give them, you
11 know, more time in a hard set embargo.
12    Q. And your concern was that those who attended
13 the conference would have a leg up on others who
14 may be watching it in the general public if there
15 was something wrong with the web cast?
16    MS. WILLIAMS: Objection.
17    A. No.
18    BY MR. THEODOROU:
19    Q. What does the Internet have to do with it,
20 the Internet being down, if you are having a live
21 press conference on TV?
22    A. He was asking about web casting it, not

Page 134

1  doing a live --
2    Q.  Okay.
3    A.  And that would have been an additional
4  problem.  He said, well, why -- he said, well,
5  can't we go, can't we just go live?  And I said --
6  and in that case it would be broadcast on TV.  And
7  I said, "Peter, I can't guarantee that --" you
8  know, the only usual suspects on the TV side that
9  would consider coming to cover a quarterly
10  refunding announcement, you know, would have been
11  Bloomberg, CNBC, you know, maybe Reuters.  I would
12  have to ask them, do you plan on going live?  And
13  they would say, is he going to make news?  And I'd
14  say, I can't tell you.  And then you get into a
15  very tricky discussion that I definitely don't want
16  to have.  I don't want to tip TV guys that we might
17  be making special news at a quarterly refunding
18  announcement, so I can't talk them into covering
19  events.  So I couldn't guarantee to Peter that it
20  would be covered live.  The only way you could
21  guarantee that it would be broadcast live would be
22  in the form of a web cast, but I didn't have good

Page 135

1  confidence in the reliability of web casting.
2    Q.  Because of the Treasury's Internet
3  facilities?
4    A.  Yeah.
5    THE VIDEOGRAPHER:  This concludes tape two
6  in the deposition of Tony Fratto.  Off the record
7  at 1:48:53.,
8    (Brief recess taken.)
9    THE VIDEOGRAPHER:  This begins tape three in
10  the deposition of Tony Fratto.  On the record at
11  1:49:30.,
12    BY MR. THEODOROU:
13    Q.  Why was October 31st different than the May
14  and August press conference, quarterly refunding
15  press conferences where you had to set a time, as
16  opposed to polling the reporters?
17    A.  The news, you know, that we were
18  discontinuing the 30-year bond.  That it was
19  definitely -- you know, I knew that.  I knew that
20  it was going to be bigger news than, you know --
21  you know, a quarterly refunding press conference is
22  a relatively sleepy affair.  It's not usual that

Page 136

1  you find much news there.
2    Q.  And why did Mr. Fisher want to go live?
3    A.  Peter had been looking at -- Peter comes
4  from, had been up at the New York Fed and had a
5  high degree of interest in trying to find ways to
6  increase efficiency in markets, and one of the ways
7  that you increase efficiency in markets is by
8  reducing the time span in terms of information and
9  transmission of information.  So, for example, on
10  the auction results, there was, there had been, you
11  know, time lags.  You have to think about the size
12  of these markets and the margins that traders are
13  dealing with.  You know, you would get auction
14  results, and sometimes it would take four or five
15  minutes to get from the closing of an auction to
16  get the results published.  And Peter worked to
17  find ways to squeeze that down to one to two
18  minutes.  He would like to make it instantaneous.
19  So any way that you can find to get instantaneous
20  news to the market in the most transparent way
21  possible, that's something that Peter had a high
22  degree of interest in and just felt it would

Page 137

1  improve market efficiency.
2    Q.  Did he have any concern that there would be
3  a release, a premature release of the information
4  discussed at the press conference before the
5  embargo?
6    MS. WILLIAMS:  Objection.
7    A.  I don't recall him expressing that to me.
8    BY MR. THEODOROU:
9    Q.  And what was his response to your proposal?
10    A.  In the end he agreed.  I mean, he made this
11  philosophy of his, you know -- I was well aware, I
12  spent a lot of time with Peter and I knew that
13  that's what his reasoning was.  But I just told him
14  that, in my judgment, it wasn't worth the risk.  It
15  just wasn't -- you know, we don't -- if we want to
16  do that, let's do it, but let's do it over some
17  period of time.  Let's do it over the next three
18  quarterly refundings, you know, where we -- you
19  know, at one quarterly refunding we say we are
20  considering doing a live web cast.  You know?  Four
21  months later at the next quarterly refunding we
22  say, at the next quarterly refunding we will web

Page 138

1    cast. And then on the third quarterly refunding,
2    we actually web cast. And then that way, number
3    one, it gives us a lot of time to make sure that we
4    have a rigorous infrastructure to be able to
5    reliably web cast; and, number two, you tell the
6    markets what to expect and they have a lot of time
7    to know how, you know, how to expect news to come
8    to them. And, you know, so I just wanted us to be
9    cautious about doing big changes, and I just did
10   not think that it was appropriate to try to do a
11   major change when we were also making major news.
12   It just wasn't worth the risk.
13   Q. Was your concern -- well, given your
14   concerns about the Internet capability at Treasury,
15   was your concern that something could have gone
16   wrong with the web cast, and at the same time you
17   were releasing information to reporters who would
18   then have advanced information compared to the
19   general public?
20   A. Reporters always have advanced information
21   ahead of the general public. It's their job; we
22   rely on them to disseminate news to the general

Page 139

1    public. So I didn't have a concern about that. In
2    fact, I relied -- when I say, I really mean this.
3    I rely on the Treasury press corps to disseminate
4    news to the markets and the general public. I have
5    much more confidence in that part of dissemination
6    than I do on the web page dissemination. Everyone
7    who has a Web site that they deal with knows that,
8    you know, at the most unpredictable times you have
9    problems with the web page. So I'm not ready and I
10   certainly wasn't ready in the year 2001, I'm not
11   even sure I'm ready in the year 2006 to say I can
12   put full faith and confidence in Internet
13   infrastructure to get that information out on a
14   precise time. We're not there yet.
15   Q. Especially after what happened in October
16   2001.
17       MS. WILLIAMS: Objection.
18   A. No. I mean, that had nothing to do with it.
19   That was human error, that wasn't even
20   infrastructure error. There is lots of
21   infrastructure error. I have seen infrastructure
22   error with our web platform. But that was human

Page 140

1    error. You know? And that human error is going to
2    happen.
3        BY MR. THEODOROU:
4    Q. But I guess my question is, my question is,
5    you had concerns about their ability that -- their
6    Internet capability and, therefore, they might not
7    be able to web cast at the same time. So he would
8    be doing a live press conference to a group of
9    reporters and people attending the conference. And
10   if the web cast couldn't go out, so what? What
11   difference would that make?
12       MS. WILLIAMS: Objection.
13   A. We would have raised expectations that you
14   will find the news on the web cast, and then they
15   wouldn't see it. That was the risk.
16       BY MS. THEODOROU:
17   Q. So it wasn't an issue of market sensitive
18   information getting out ahead?
19   A. No.
20   Q. Okay.
21   A. No. Not at all.
22   Q. Did Mr. Fisher, was Mr. Fisher -- how many

Page 141

1    discussions did you have about this issue with Mr.
2    Fisher?
3    A. Just, I mean, no more than two.
4    Q. Was Mr. Fisher concerned about the danger
5    that that information might leak out before 10:00,
6    a.m.?
7        MS. WILLIAMS: Objection.
8    A. You would have to ask him. If he was, he
9    didn't express it to me.
10       BY MR. THEODOROU:
11   Q. So Mr. Fisher did not express a concern
12   about the leaking out of information?
13   A. Not that I recall.
14   Q. If you could go to Exhibit 1, Mr. Fratto.
15   A. Okay.
16   Q. Page 2, the second paragraph. Do you see
17   that?
18   A. Yes.
19   Q. Now, when did you first learn about the
20   decision to suspend the 30-year bond?
21   A. That sounds about right. I recall it being
22   on Thursday, the 26th.

Page 150

1    A. No.

2    Q. Do you have any notes?

3    A. I don't keep notes. I don't have any notes.

4    Q. So you don't have any notes about your

5  discussion with Ms. Holahan?

6    A. No.

7    THE VIDEOGRAPHER: Off the record at

8  20:04:29.,

9    (Brief recess taken.)

10    THE VIDEOGRAPHER: On the record at 2:07:35.,

11    (FRATTO Exhibit Number 7 was marked for

12  identification.)

13    BY MR. THEODOROU:

14    Q. Mr. Fratto, directing your attention to

15  what's been marked as Exhibit 7. Have you seen

16  that document before?

17    A. Yes.

18    Q. And what is it?

19    A. This is the media advisory announcing the

20  quarterly refunding news conference. It gives

21  direction to reporters on who, what, when, where,

22  and how the media event.

Page 151

1    Q. Were you involved in drafting this document?

2    A. I reviewed it.

3    Q. Do you know who drafted it?

4    A. Betsy Holahan did.

5    Q. Did the Office of Public Affairs always

6  distribute media advisories about upcoming

7  quarterly refunding conferences?

8    A. I'm not sure.

9    Q. Do you know if you had distributed such an

10  advisory before the May conference?

11    A. Before the May conference? I'm not sure. I

12  don't know.

13    Q. Was this advisory also posted on the Web

14  site?

15    A. I think so. Yeah. You mean would it be or

16  is it? You're asking me is it? Has it been?

17    Q. Well, let me go back to this one. Was this

18  posted on the Web site?

19    A. It would have been, yes, I presume. Yeah.

20  Definitely.

21    Q. And how do you know that?

22    A. Because it's got the PO. Well, this isn't

Page 152

1  exactly proof, but it's got the PO. This is a

2  tracking number. This is the Paul O' Neal 746.

3    Q. The left-hand corner of the document is

4  PO-746. What does that mean?

5    A. That means that Frances Anderson took a

6  draft and added what we call -- we called back then

7  the PO number, and which means that she would have

8  done the rest of the activity with it which to post

9  it and disseminate it.

10    Q. What does PO stand for?

11    A. Paul O' Neal.

12    Q. Who is the Treasury Secretary?

13    A. Was the Treasury Secretary at the time. So

14  we had a JWS number and now we have an HNP number.

15    Q. So --

16    A. It's just a tracking number.

17    Q. So this was the 746th --

18    A. That's --

19    Q. -- document?

20    A. I can only attest to what the first, the

21  initials mean. I don't know, that seems like a

22  high number of documents.

Page 153

1    Q. You don't know what 746 was?

2    A. It just seems like a high number for even

3  October of 2001. I don't know how they get the

4  numbers. But it's possible that it's the 746th

5  document to come through public affairs during the

6  term of Paul O' Neal, but I don't know that for

7  certain.

8    Q. So this is announcing that the quarterly

9  refunding news conference will take place at 9:00,

10  a.m. on Wednesday October 31st, 2001. Correct?

11    A. Correct.

12    Q. All right. Now, the document states that

13  the event will have a 10:00 a.m. news embargo.

14    Do you see where that's stated in the --

15    A. Yes.

16    Q. -- in the document? You've seen that.

17  Right?

18    A. Yes.

19    Q. All right. Now, what does the term news

20  embargo mean?

21    A. It means that members of the media cannot

22  disseminate the news that they gain from this event

Page 154

1   until 10:00 a.m. on that date.
2      Q. Were any steps taken to advise attendees who
3   were not members of the press that the news embargo
4   also applied to them when they attended these
5   conferences?
6      A. I wasn't aware --
7      MS. WILLIAMS: Objection.
8      A. I wasn't aware of anyone in attendance --
9   other than some Treasury policy staff, I wasn't
10  aware of others who were not members of the media
11  who were in attendance.
12     BY MR. THEODOROU:
13     Q. So before the October 31st, 2001 conference,
14  you were not aware of anyone other than media
15  attending the quarterly refunding conferences?
16     A. That's right.
17     MS. WILLIAMS: Objection.
18     BY MR. THEODOROU:
19     Q. Did you take any steps before October 31 to
20  determine whether anyone outside of the media
21  attended quarterly refunding press conferences?
22     A. No.

Page 155

1      Q. Do you know if anybody at Treasury ever took
2   any steps before October 31st, 2001 to determine
3   whether nonmedia persons attended the quarterly
4   refunding press conferences?
5      A. I don't know if they did.
6      Q. Now, directing your attention again to
7   Exhibit 1.
8      Before we get there, who was allowed to
9   attend quarterly refunding press conferences before
10  October 31st, 2001?
11     A. There wasn't a policy on who was allowed to
12  attend. But I never had any expectations that
13  anybody -- that anyone except excepting members of
14  the news media and Treasury staff would attend.
15     Q. But there was no policy as to who could
16  attend?
17     A. Not that I'm aware of. I didn't have a
18  policy.
19     Q. Have you ever heard anybody talk about a
20  policy as to who could attend the quarterly
21  refunding press conferences --
22     A. No.

Page 156

1      Q. -- before October 31st, 2001?
2      A. No.
3      Q. As of October 31st, 2001, do you know who at
4   Treasury was responsible for deciding who could
5   attend the quarterly refunding press conferences?
6      A. I'm sorry, could you say that again?
7      Q. As of October 31st, 2001, do you know who at
8   Treasury was responsible for deciding who could
9   attend press conferences, refunding press
10  conferences?
11     A. No. All I can say is the Office of Public
12  Affairs was responsible for inviting members of the
13  media and clearing them in for press conferences,
14  including quarterly refunding announcements.
15     Q. Do you know if there was a comprehensive
16  list of everyone who attended the October 31st,
17  2001 press conference?
18     A. No.
19     Q. Now, how did those individuals who were
20  attending the quarterly refunding press conferences
21  as of October 31st, 2001 get into the Treasury
22  Building on the morning of the press conference?

Page 157

1      A. Those individuals, meaning members of the --
2   are you make a distinction between members of the
3   media or nonmembers of the media?
4      Q. Anybody who was attending.
5      A. Well, for anyone to enter the Treasury
6   Building, they need to be cleared by Secret
7   Service. And unless they have a permanent badge,
8   they need to be -- a permanent Treasury badge, in
9   which they can't wouldn't have to be cleared in.
10  So if they were cleared in, they had to be escorted
11  to wherever they need to be in the building by a
12  Treasury official.
13     Q. And what room in the Treasury Building was
14  normally used for the quarterly refunding press
15  conferences?
16     A. The diplomatic reception room.
17     Q. And is there a reason why the diplomatic
18  reception room as opposed to another conference
19  room was used for that particular kind of
20  conference?
21     A. There is no other conference -- there was no
22  other conference room at the time. The cash room.

Page 162

1   A. No. I can't think of a reason why we would
2  prevent people from entering the room.
3   Q. Did you take any steps to check the identity
4  of people who were in the room at the time of the
5  press conference?
6   A. No.
7   Q. Did you take any steps to check the press
8  credentials of people in the room at the time of
9  the press conference?
10   A. Well, if they have press -- they couldn't
11  get into the Treasury Building without press
12  credentials. I mean, if they have a press
13  credential, check the press credential? No.
14   Q. Did you take any steps that day to determine
15  that only the press was attending the conference?
16   A. No.
17   Q. So what happened at the conference? What
18  time did it start?
19   A. It started at 9:00 or shortly after 9:00. I
20  walked into the press conference, into the
21  diplomatic reception room with Peter. I remember
22  Betsy was already in the room. We were about to --

Page 163

1  so Peter walked up to the podium. Betsy was about
2  to announce and then did announce that -- she
3  introduced Peter, and then announced that there
4  would be a 10:00 embargo on the press conference.
5  I stood up off to the side. If you want to imagine
6  it, think of it very much like this room with two
7  doors.
8   Q. I'm going to have you draw it out.
9   A. Sure.
10    (Witness complying.)
11    BY MR. THEODOROU:
12   Q. So now let's mark that. That's going to be
13  marked as Exhibit 8. You are going to draw out as
14  best you can --
15   A. As best I can.
16   Q. I don't have a ruler -- entitled The
17  Diplomatic Reception Room. Right?
18   A. Yep.
19    (FRATTO Exhibit Number 8 was marked for
20  identification.)
21    BY MR. THEODOROU:
22   Q. So if you could please mark the doors, the

Page 164

1  podium, and relevant hallways on that document.
2   A. Um-hmm. So here's the hallway. I will
3  just -- this may be helpful also. Peter fisher's
4  office was right across the hall.
5   Q. Could you please mark --
6   A. Sure.
7   Q. -- Mr. Fisher's office.
8    So when you say you came into the conference
9  room with Mr. Fisher, you entered into that door?
10  Could you mark that door as door A. And then mark
11  the other doors as B, C, and D.
12    All right. What else was in that room that
13  day?
14   A. So I've got a podium here.
15   Q. Could you mark that as podium.
16   A. And then I'm not going to get the number
17  right, but --
18   Q. And the Xs indicate chairs?
19   A. Chairs. This is -- I couldn't tell you how
20  many, I'm not good at this kind of estimating, but
21  how many chairs are in the room. But I think this
22  is probably fairly representative. So what we

Page 165

1  would call, yeah, classroom style seating.
2   Q. Now, you entered with Mr. Fisher. And
3  approximately where were you during the press
4  conference?
5   A. Standing right here.
6   Q. By the door which is -- if you'd indicate
7  with your last name where you were.
8   A. Sure.
9   Q. So your back was to door B?
10   A. Near door A. My back was to -- well.
11   Q. You would have been facing the podium?
12   A. I would have been facing the podium, and
13  then the reporters here.
14   Q. And where was Ms. Holahan?
15   A. I think Betsy was right next to me, but I
16  don't remember specifically.
17    MS. WILLIAMS: At what point?
18    BY MR. THEODOROU:
19   Q. To the best of your knowledge.
20    MS. WILLIAMS: At what point?
21   A. When we walked in, Betsy was here. And this
22  is --

Page 166

BY MR. THEODOROU:

1  Q. Why don't you mark that with H-1 as to where
2  she was when you first walked in.
3  A. Okay. You know, in terms of --
4  Q. And where were you and Mr. Fisher when you
5  first walked in?
6  A. In his office.
7  Q. And then you walked in, and then you went to
8  the right of -- to the right of door A?
9  A. I always stand in the same spot.
10  Q. And Mr. Fisher went to the podium?
11  A. And he went to the podium. Yeah.
12  Q. Now, did Ms. Holahan address the room while
13  Mr. Fisher was at the podium?
14  A. Yeah. As he approached the podium and while
15  he was standing there.
16  Q. And what did she say?
17  A. Just said, I want to introduce Under
18  Secretary Peter Fisher. He will lead this news
19  conference. And I just want to remind you that
20  this event has a 10:00 embargo.
21  Q. Did she tell those who were attending what

Page 167

1  embargo meant?
2  A. No.
3  Q. Do you remember any other Treasury employees
4  being in that room?
5  A. I know that there were. I just -- I don't
6  specifically remember seeing them in the room, but
7  I know that they were in there.
8  Q. You just don't know who they were?
9  A. No. I mean, I know that Peter Fisher and
10  Jeff Hoother for sure were in the room during the
11  press conference. I remember seeing them outside
12  just before the press conference, and I think I saw
13  them go in that door.
14  Q. Do you recall any other employees there?
15  A. Not specifically. I just remember those two
16  for sure.
17  Q. All right. So she announces this at the
18  beginning. Do you recall anything else she said
19  with her initial remarks?
20  A. No.
21  Q. Then what happened?
22  A. Then Peter began the press conference by

Page 168

1  reading his statement, his prepared remarks. And
2  at the conclusion of reading his remarks, he said
3  he would take some questions. And rather than
4  selecting for reporters for him, which I might do
5  on some occasions for some people, I let Peter call
6  on reporters on his own. So he called on I think a
7  total of three, maybe four reporters that had
8  questions. And I was surprised by the lack of
9  questions. I just remember thinking, I can't
10  believe there aren't more questions.
11  Q. And how long did it take him to read his
12  statement?
13  A. I would guess 15 minutes or so. Maybe a
14  little more.
15  Q. And did you and Mr. Fisher arrive there
16  promptly at 9:00?,
17  A. You know, I don't know for certain exactly
18  what time we started. It wasn't -- we definitely
19  didn't start before 9:00. I don't have a -- you
20  know, I knew that we were relatively close to on
21  time, but so it had to be somewhat short --
22  sometime shortly after 9:00.,

Page 169

1  Q. And how long did the give-and-take with the
2  reporters, the question-and-answer period take?
3  A. I mean, you know, it could be, what, eight
4  minutes, you know, ten minutes. I'm guessing. It
5  wasn't 20 minutes and it wasn't five minutes. It
6  was -- you know, I would say in the eight to ten
7  minute range.
8  Q. Then what happened after that?
9  A. Then so, you know, there was a lot of time
10  between like whether it was the second and third
11  question or the third and fourth question, I can't
12  remember exactly how many questions were asked.
13  But usually, you know, it's like making popcorn in
14  a microwave, you know, you wait until the pops slow
15  down and then try to end the press conference
16  before the kernels burn. Right? So it was sort of
17  the same thing. You know, you don't -- as soon as
18  there's a lot of space in between the questions,
19  you know, I'll get a sense that questions are
20  slowing down and I'll announce last question. In
21  this case, Betsy did it. So Betsy announced last
22  question. And then you end the conference by

43  (Pages 166 to 169)

Page 170

1   simply saying, thank you. You know? So the press
2   are there, which would say thank you. And Betsy
3   did. You know, after she announced last question
4   there was a last question, Peter gave the answer.
5   Betsy said thank you, and then said, and just as a
6   another reminder, the embargo is for 10:00.,
7       Q. And, again, did she state what the embargo
8   meant?
9       A. No.
10      Q. Then what happened? Where did you go?
11      A. I crossed the hall with Peter Fisher into
12  his office. And I remember just remarking, wow,
13  you know, I can't believe there weren't more
14  questions. You know. And then it was sort of at
15  that moment that it occurred to me that, you know,
16  the reason there weren't more questions is because
17  they realized that it was big news, and there would
18  be lots of times for questions later, they just
19  wanted to report the news.
20      Q. To your knowledge, has the Treasury
21  Department ever used confidentiality agreements?
22      A. Not --

Page 171

1       MS. WILLIAMS: Objection.
2       A. Not to my knowledge. I consider us all
3   under -- you mean with -- I only know what they do
4   with us as employees.
5       BY MR. THEODOROU:
6       Q. To your knowledge, has the Treasury
7   Department ever asked a non-Treasury Department
8   employee to sign a confidentiality agreement with
9   Treasury?
10      MS. WILLIAMS: Objection.
11      A. Not to my knowledge.
12      BY MR. THEODOROU:
13      Q. Do you know whether Treasury has ever used
14  confidentiality agreements?
15      MS. WILLIAMS: Objection.
16      A. I don't know.
17      BY MR. THEODOROU:
18      Q. Do you know who Peter Davis is?
19      A. I have learned a few things about him, but I
20  couldn't pick him out of a line-up.
21      Q. And when did you first learn about Peter
22  Davis?

Page 172

1       A. Someone on that day, on October 31st,
2   mentioned his name to me, and said that when there
3   was a -- there was a suspicion raised that the news
4   was -- that the news of the 30-year bond being
5   discontinued was in the markets even before
6   Treasury had inadvertently posted the statement.
7   Someone remarked that they thought that Peter Davis
8   was in the press conference.
9       Q. Who told you that?
10      A. It was someone from the Office of Domestic
11  Finance. I can't recall who used his name.
12      Q. And do you know how Mr. Davis was able to
13  attend the refunding press conference?
14      A. Paul Malvey, who told me that his office had
15  cleared in Peter Davis.
16      Q. Who is Mr. Malvey?
17      A. Paul Malvey at the time was the director of
18  market finance in the Office of Domestic Finance.
19      Q. And when did he tell you that his office had
20  cleared Mr. Davis to attend the conference?
21      A. That afternoon.
22      Q. The afternoon of October 31st?

Page 173

1       A. Yes.
2       Q. Now, was his attendance at the quarterly
3   refunding press conference consistent with your
4   understanding of Treasury Department policy?
5       MS. WILLIAMS: Objection.
6       A. I have no -- I know of no Treasury
7   Department policy having to do with either
8   specifically Peter Davis or any other individual in
9   terms of attending a quarterly refunding press
10  conference.
11      BY MR. THEODOROU:
12      Q. Are you familiar with any Treasury
13  Department policy that prohibited nonpress from
14  attending the quarterly refunding press conference?
15      A. Not specifically. No.
16      Q. Did you ever hear, have you ever heard about
17  Mr. Davis getting kicked out of prior Treasury
18  press conferences?
19      A. No. I heard the opposite; that he had
20  previous -- Paul Malvey told me that he had
21  previously been in previous quarterly refunding
22  press conferences.

Page 178

1  of the Securities and Exchange Commission.
2      Do you see that?
3      A. Yes.
4      Q. Now, if you look at that, if you look at
5  that page. Have you seen this letter before?
6      A. Yes.
7      Q. And do you see where it says, "Dear Mr.
8  Sporkin, pursuant to the SEC's request to clarify
9  it, I contacted Tony Fratto regarding his quote in
10  the November 15, 2001 Wall Street Journal piece by
11  Gregory Zuckerman. As reported in the column, Mr.
12  Fratto was quoted as saying, 'It's likely that
13  others in the past.' And then the reporter
14  paraphrased the remainder of the statement is, to
15  say that, have participated in press briefings
16  though they weren't members of the press."
17      Do you see that?
18      A. I do.
19      Q. Now, in that article -- by the way, I've
20  given you Exhibit 9. Have you seen that document
21  before?
22      A. Yes.

Page 179

1      Q. And that's the article that's talking about
2  Exhibit 9?
3      A. Yes.
4      Q. November 15, 2001 the Wall Street Journal.
5  Do you see that?
6      A. Yes.
7      Q. And there was is a quote in the middle of
8  page 1, "It's likely that others in the past have
9  participated in press briefings though they weren't
10  members of the press," said Tony Fratto, a
11  spokesman for the Treasury Department.
12      A. (Nodding head.)
13      Q. Correct?
14      A. Yes.
15      Q. Now, this statement in the Wall Street
16  Journal, was that correct?
17      MS. WILLIAMS: Objection.
18      A. Is what correct, exactly?
19      BY MR. THEODOROU:
20      Q. Well, it says here the statement that others
21  had attended. It is likely that others in the past
22  have participated in press briefings though they

Page 180

1  weren't members of the press.
2      MS. WILLIAMS: Objection.
3      A. Yeah. I mean, I think it's -- I think
4  that's true.
5      BY MR. THEODOROU:
6      Q. Okay.
7      A. I mean.
8      Q. What did you base that statement on?
9      A. Based on Paul Malvey's comment to me that,
10  as explained in Megan Hill's letter that Peter
11  Davis had attended quarterly refunding press
12  conferences for some time.
13      Q. Did Mr. Malvey tell you about any other
14  nonpress individuals who had attended these
15  conferences?
16      A. (Shaking head.)
17      Q. Is that a yes or a no?
18      A. I'm sorry. That's a no.
19      Q. So Ms. Hill's letter was a clarification of
20  what you said in the Journal?
21      A. Yes.
22      Q. Correct?

Page 181

1      A. Yes.
2      Q. And what you say in Ms. Hill's letter says,
3  Mr. Fratto says he meant that given that Mr. Davis
4  had been admitted by the prior administration for
5  years, he found it highly unlikely that someone
6  else may have wandered in during the past
7  administration.
8      Correct?
9      A. Correct.
10      Q. Do you know of anybody else who may have
11  wandered in?
12      A. I don't.
13      Q. You are speculating here?
14      A. Yes.
15      Q. Based on the fact that someone, that Mr.
16  Davis had attended a number of these press
17  conferences?
18      A. Based on the fact that I was told that he
19  had attended a number of press conferences.
20      Q. All right. Well, isn't it accurate that, in
21  Ms. Hill's letter, when she said that someone else
22  may have wandered in during the past

1    administration, he had wandered in also during the
2    current administration?
3         MS. WILLIAMS: Objection.
4    A. That's possible. Yeah. I don't know, I
5    don't have independent knowledge of Peter Davis's
6    attendance at any Treasury quarterly refunding
7    announcement. What I know is that he attended the
8    one on October 31st because he admitted to that.
9    And then I have the information that Paul Malvey
10   told me that he was in attendance that day and had
11   attended in the past, including -- and he was
12   specific about the previous administration. He had
13   said the previous administration had allowed Peter
14   Davis to attend. Now, I don't know whether that
15   was allowed or wanted him to attend or permitted
16   him to attend or what the nature of it was, but
17   Paul Malvey in his conversation with me was very
18   specific, the previous administration had allowed
19   Peter Davis to attend quarterly refunding
20   announcements. So that's what my quote is based
21   on.
22        BY MR. THEODOROU:

1    Q. And what do you mean by, previous
2    administration?
3    A. The Treasury secretaries during the Clinton
4    administration.
5    Q. Do you know, did Mr. Malvey tell you --
6    A. Let me -- just previous administration. I
7    don't really care previous administration or not.
8    It's immaterial to me. I'm not being -- in saying
9    that, I'm not trying to be critical of the previous
10   administration. That wasn't my point then, either.
11   Q. Do you know whether Peter Davis attended the
12   May and August 2001 conferences?
13   A. I don't know. Even honestly, today, if I
14   was walking down the street and someone said Peter
15   Davis walked by, I wouldn't know. I don't know
16   what he looks like or have never met him.
17   Q. Did Mr. Malvey tell you why he allowed Mr.
18   Davis to attend the conference?
19   A. When Paul Malvey told me that his office
20   cleared in Peter Davis, he heaved a huge sigh of
21   relief that the Office of Public Affairs didn't
22   clear in Peter Davis for some bizarre reason.

1    Whatever else we did wrong that day, we didn't
2    clear in Peter Davis. And I was pretty happy about
3    that. I was also, you know, very cognizant of the
4    fact that, you know, we were going to be spending
5    some time answering questions on the events of that
6    day with general counsel and others, and I actually
7    didn't want to have a whole lot of knowledge of
8    what the nature of Peter Davis's attendance was. I
9    figured someone will ask Paul and Paul can answer
10   for it but I'm not going to answer for him.
11   Q. So he didn't tell you why he let him in?
12   A. I told you everything of -- everything that
13   Paul told me about Peter Davis, I just told you.
14   Q. All right.
15   A. Yeah.
16   Q. If you would turn to Exhibit 9.
17        Do you see on the first page, this is
18   written November 15, 2001, this Wall Street
19   article. It says -- well, beginning on the first
20   paragraph. It says, "The Treasury Department,
21   facing criticism after an industry consultant
22   attended a press only briefing last month and

1    leaked market moving news yesterday, outlined new
2    rules to try to keep its news under wraps."
3         Do you see that?
4    A. I do.
5    Q. "The changes, which some bond traders said
6    were overdo, will bring the Treasury more in line
7    with the way other government agencies, including
8    the Federal Reserve and the Labor Department,
9    release market sensitive news."
10        Do you see that?
11   A. I do.
12   Q. All right. And then further on, about the
13   fifth paragraph, "Some of the changes are quite
14   elementary. Now, for instance, instead of
15   releasing information to the press an hour or so
16   before it is publicly available, the Department is
17   shortening the embargo period to a matter of
18   minutes, bringing the Treasury in line with the way
19   Federal Reserve operates."
20        Do you see that?
21   A. I do.
22   Q. And then the next paragraph, "In addition,

Page 246

1  their policy counterparts.
2     Q.  And when you say their policy counterparts,
3  are you referring to other offices in Treasury
4  besides the Office of Public Affairs?
5     A.  That's right.
6     Q.  During Mr. Theodorou's questioning, you
7  discussed embargoes that were Treasury imposed, and
8  then there were some embargoes that were imposed by
9  the press.  Is that accurate statement of your
10  testimony?
11     MR. THEODOROU:  Objection.
12     BY MS. WILLIAMS:
13     Q.  That sometimes Treasury imposed an embargo,
14  and sometimes the press self-imposed an embargo?
15     MR. THEODOROU:  Objection.
16     A.  There were times when Treasury would impose
17  the -- would state the time, a specific time for an
18  embargo.  There were other times that -- because
19  the press always wants an embargo, that they would
20  self-set an embargo on their own.  And then there
21  were times that it would happen within some
22  negotiation between us and the reporters.

Page 247

1     BY MS. WILLIAMS:
2     Q.  My question is a little different.  Not as
3  to what the embargo time would be, but whether
4  there would be an embargo at all.  Were there times
5  that Treasury decided there would be an embargo?
6     A.  Yes.
7     Q.  Were there times where the press themselves
8  decided there would be an embargo?
9     A.  I'm sorry.  Yes, there were times when we
10  had an interest in absolutely setting an embargo.
11  There were other times where we had -- we would
12  have documents that, you know, it wasn't -- we
13  didn't have a strong interest on whether there was
14  an embargoed time set or not.  So -- and so the
15  reporters would announce that they would, on their
16  own that they would like to have an embargo.  So
17  they would set their own embargo time.
18     Q.  What, if any, interest did Treasury have in
19  setting an embargo, having an embargo with respect
20  to Treasury refunding conferences?
21     MR. THEODOROU:  Objection.
22     A.  That the information would be released in a

Page 248

1  uniformed -- at a uniformed time, so that it wasn't
2  coming out from different outlets at different
3  times.  We didn't want to have -- we didn't want to
4  create a situation where -- you know, there's
5  nothing preventing us from giving the news to any
6  specific news organization.  We can choose to make
7  that decision, and decide that all of our news is
8  going to go to Bloomberg.  But we don't want to
9  pick favorites in terms of who delivers the news at
10  what time.  We don't want to get involved in that
11  competitive relationship between, especially the
12  financial wires, but all members of the media, and
13  so we want to have a standard and predictable time
14  for when news is disseminated and that all of the
15  relevant news outlets get it and release it at the
16  same time.
17     BY MS. WILLIAMS:
18     Q.  Do you recall there ever being a Treasury
19  refunding conference where Treasury decided it did
20  not want to impose an embargo?
21     MR. THEODOROU:  Objection.
22     A.  No.  I have never heard of one.

Page 249

1     BY MS. WILLIAMS:
2     Q.  And what kind of information was released by
3  Treasury that Treasury would decide they did not
4  want an embargo, did not feel one was necessary?
5     MR. THEODOROU:  Objection.  Foundation.
6     A.  There were occasions where we would release
7  a statement that, in our judgment, was after the
8  fact of a news event.  So we were maybe commenting
9  on something that already happened, and it
10  wasn't -- you know, it didn't involve the release
11  of data or didn't involve a policy change, it was
12  maybe just a statement on an event.  In those
13  cases, I could think of lots of them, there really
14  wasn't market -- there really wasn't a market
15  sensitive item from our perspective, probably not
16  sensitive in any way, and we would walk, you know,
17  the documents down to the pressroom and announce to
18  them, just tell them here's a statement from me or
19  the secretary or someone else.  And they would say
20  we would like to set an embargo.  And I'd say fine.
21  You know, if you want one, go right ahead.
22     BY MS. WILLIAMS:

Page 250

1    Q.  And I know that you also discussed the
2  setting of embargo times.  Sometimes the embargoed
3  times would be set by the press.  Is that an
4  accurate statement?
5    A.  Yes.
6    Q.  And I believe on direct examination you used
7  the term self-policing, the press?
8    A.  Self-enforcing.
9    Q.  Or self-enforcing.  What do you mean by
10  self-enforcing?
11    A.  I meant that all of the reporters, reporters
12  who cover Treasury that I've ever dealt with are
13  very aware of any potential infraction by their
14  colleagues.  And they don't want say, you know,
15  sort of a dog eat dog world with them.  But they're
16  competitors and they watch what each other does, or
17  news organizations watch what each other does.  So
18  if a news organization would break an embargo, you
19  know, I would hear about it, but they would hear
20  about it first.  They would hear about it from each
21  other.  And they are very aware and cognizant of
22  embargo times.  They know that their -- if the

Page 251

1  Treasury press corps had a problem with dealing
2  with embargoes, we would have absolutely no
3  recourse but to stop giving them news in advance.
4      Now, that wouldn't be optimal for us because
5  we gain something from having reporters having
6  sufficient time to thoughtfully look at the news
7  they get and report it accurately, and help them on
8  an occasion where during an embargo a reporter
9  noticed an error in one of the numbers in the
10  document, and we were able to correct that error
11  before they print it.  Now, I mean, they also
12  printed that they found an error in our original
13  document and that we had to correct it, but that's
14  a much better case than having the error go out
15  without any correction.  I mean, so like we get
16  something out of them, you know, looking at an
17  embargo time.
18      But if they had a problem dealing with
19  embargoes, if they were constantly or even with any
20  regularity breaking an embargo or releasing things
21  outside the embargo time, we would have no choice
22  but to just only deliver things live.  And that

Page 252

1  would be to, you know, to fix -- if that problem
2  existed, to fix that problem, but that you
3  shouldn't presume that it wouldn't come without
4  some costs.  And that's one of the costs, is that
5  stories would be written and that could have
6  misinformation or inaccurate information or
7  reported with little appropriate interpretation by
8  the reporters.
9    Q.  I wanted to draw your attention to the May
10  2001 Treasury refunding conference.
11    A.  Um-hmm.
12    Q.  And I believe you said that an embargo was
13  set at that conference?
14    A.  It was.
15    Q.  And it was set at the end of the conference?
16    A.  Yes.
17    Q.  By polling the press to see how much time
18  they needed?
19    A.  That's right.
20    Q.  Is that correct?  Do you recall anyone in
21  the room asking any questions about the embargo?
22    A.  No.

Page 253

1    Q.  Do you recall anyone asking what they were
2  allowed to do with embargoed information at that
3  May 2001 conference?
4    A.  No.
5      MR. THEODOROU:  Objection.
6      BY MS. WILLIAMS:
7    Q.  Do you recall receiving any questions from
8  any attendees regarding the embargo policies or
9  procedures at the May 2001 conference?
10      MR. THEODOROU:  Objection.
11    A.  No.
12      BY MS. WILLIAMS:
13    Q.  The Treasury refunding conferences, are they
14  open to press that does not have space in the
15  Treasury pressroom?
16    A.  Yes.
17    Q.  Do you know if any cameras were present at
18  the May 2001 conference, May 2nd, 2001?
19    A.  I don't remember.
20    Q.  Do you recall if anyone broke the embargo at
21  the May 2001 refunding conference?
22    A.  No.  No one broke the embargo.

Page 254

1   Q. What about the October 31st, 2001
2   conference? Do you recall anyone calling prior to
3   the conference but after the October 30th media
4   advisory came out asking you questions about
5   Treasury's embargoed policies or procedures?
6       MR. THEODOROU: Objection.
7   A. No.
8       BY MS. WILLIAMS:
9   Q. At that conference, do you recall any
10  questions being asked about what embargo meant?
11      MR. THEODOROU: Objection.
12  A. I've never had a reporter ask me what an
13  embargo meant.
14      BY MS. WILLIAMS:
15  Q. At the October 2001 refunding conference, do
16  you recall anyone asking what Treasury's embargo
17  procedures were?
18      MR. THEODOROU: Objection.
19  A. No.
20      BY MS. WILLIAMS:
21  Q. Do you recall if the doors were open during
22  the October 31st 2001 Treasury refunding

Page 255

1   conference?
2   A. I'm not sure that I can recall well enough
3   to answer. I have a feeling that they were closed,
4   but I don't know that I can say with absolute
5   certainty.
6   Q. Can I refer you to Exhibit 1. And before I
7   ask you any questions about this, do you recall if
8   anyone left the conference early?
9   A. I don't recall anyone leaving it early.
10  Q. And what about showing up late? Do you
11  recall if anyone showed up to the October 31st,
12  2001 conference late?
13  A. I don't remember anybody walking in late.
14  Q. Do you know if Betsy Holahan assigned anyone
15  to watch the doors to keep people from leaving the
16  room after the conference started?
17  A. I don't know.
18  Q. Do you recall seeing Tara Bradshaw at the
19  October 2001 conference?
20  A. I don't have a good memory of that, if she
21  was or wasn't there.
22  Q. Did Treasury make any changes to embargo

Page 256

1   procedures for any other conferences besides
2   Treasury refunding conferences after the October
3   31st, 2001 conference?
4   A. No.
5   Q. Why not?
6   A. Because we don't have any problem with
7   embargoes. Even the new procedures for -- the new
8   procedures for the quarterly refunding announcement
9   wasn't specifically to fix an embargo problem. It
10  was really to fix a room access problem. We
11  separated the statement from the press conference
12  and put in new procedures to -- you know, again,
13  not really to fix a problem that had to do with our
14  relationship with the news media, it had to do with
15  people that were not -- you know, not in the news
16  media. But we haven't had a reason to do it for
17  any other events. We keep -- the only thing we do
18  is keep a tighter rein and ensuring that we know
19  who is in our events, and that we have authority on
20  who is in our events. But we have never had a
21  problem of embargoes with members of the news
22  media.

Page 257

1   Q. So for --
2       MR. THEODOROU: Objection.
3       BY MS. WILLIAMS:
4   Q. For conferences at Treasury, other than
5   Treasury refunding conferences, after October 31st,
6   2001, were there any lockdown procedures put in
7   place for the release of information?
8   A. I'm sorry. After October 31st?
9   Q. After October 31st.
10  A. Just for the quarterly refunding
11  announcement statements, announcements.
12  Q. Prior to coming to the Treasury, did you
13  have an understanding of what an embargo was?
14  A. Yes.
15  Q. What did you understand embargo meant?
16  A. An embargo means that the news media can't
17  publish or broadcast information until the time
18  specified by the embargo has expired.
19  Q. How did you come to that understanding of
20  what an embargo was?
21  A. I think I first learned of it in a
22  journalism class in 1987 at the University of

65  (Pages 254 to 257)

1  Pittsburgh, and then used and dealt with embargoes
2  throughout my career.
3      Q. When you say you dealt with embargoes
4  throughout your career, in what jobs did you deal
5  with embargoes prior to coming to Treasury?
6      A. As a press secretary on Capitol Hill most
7  extensively.
8      Q. Who was imposing embargoes that you were
9  exposed to while you were a press secretary on
10 Capitol Hill?
11     MR. THEODOROU: Objection.
12     A. Sometimes we would impose our own embargoes,
13 but frequently we had embargoes associated with
14 major speeches that occurred on Capitol Hill,
15 testimony that would be given that we would have
16 access to and that reporters would have access to,
17 but it would be embargoed until the time was
18 delivered. We would get even, you know, advanced
19 copies on the evening of the State of the Union
20 address, for example, with the knowledge that it
21 was embargoed. So it's something that's used daily
22 in the news media and where the news media -- and

1  from my experience, where the news media and
2  government communicate and use documents, it's a
3  daily -- we use it daily. We use embargoes every
4  day.
5      BY MS. WILLIAMS:
6      Q. And these embargoes that you said you had
7  been exposed to when you were a press secretary on
8  Capitol Hill, did any of them involve lockdowns?
9      A. No. I don't think any of them involved
10 lockdowns.
11     Q. Can I refer you to what's been marked as
12 Exhibit 13. I notice at the top of the document it
13 says "for immediate release." Do you see that?
14     A. I do.
15     Q. In your experience at Treasury, did you ever
16 have press releases that said for immediate release
17 that were distributed to the press during an
18 embargoed period?
19     A. Yes.
20     Q. And what, if any -- why would the press
21 release say for immediate release even though there
22 was an embargo in place?

1      A. Because it was -- we didn't want, when that
2  document was further distributed, to just to have
3  -- by the time that document would be further
4  distributed, it would be for immediate release.
5      Q. And what, if any, effect is the fact that
6  the document said immediate release had on whether
7  it could have been distributed to the press during
8  the embargoed period?
9      MR. THEODOROU: Objection.
10     A. That depends. I mean, you know, my
11 perspective, my view of it is that -- and I don't
12 know whether or not this was the document
13 distributed. But the press officer who is
14 directing the press conference announces the
15 policy, you know, when it's -- or does it in
16 coordination with the press. And when it's
17 announced, it's announced. And that is -- that's
18 the rule.
19     BY MS. WILLIAMS:
20     Q. When you say that's the rule, does that mean
21 that -- I'm trying to figure out the fact that the
22 document makes it for immediate release and the

1  press officer makes it as an embargo, which one of
2  those apply?
3      A. The press officer.
4      Q. Have you ever had any experience where a
5  reporter released information because he thought
6  the document was for immediate release even though
7  there was an embargo in place?
8      MR. THEODOROU: Objection.
9      A. I have no experience with that.
10     BY MS. WILLIAMS:
11     Q. Have you ever posted any documents to the
12 Treasury Web site?
13     A. Myself?
14     Q. Yes.
15     A. Yes.
16     Q. Could you explain the procedure that you
17 have to go through in order to post something to
18 the Web site?
19     A. Sure. It's in its form, it's not a whole
20 lot different from composing an e-mail, except for
21 instead of giving an address at the top you give a
22 in -- what would be sort of the subject line you

Page 262

1  give a title, and then in what looks like a body
2  for creating an e-mail you can type in original
3  text or you can cut and paste from another document
4  like a Word document. You can cut and paste, you
5  know, text, and cut it, paste it into the body of
6  what would be -- what you intend to have posted.
7  And then you have usually a button that you can
8  click on that would say something like "publish."
9  You know. And you click that button, and what you
10 traditionally get is an intermediate step where you
11 get a chance to look at the document to see what it
12 looks like were it to be actually live and posted.
13 So it's not live, but it is translated into the
14 language they use for Web-based publications, and
15 it looks like a web page and you have a chance to
16 review it and see if it looks the way you want it
17 to look. And if there are any mistakes in it, you
18 can go back and edit it at that point. And then
19 there is another button that again would say
20 "publish" button. And it asks you, are you sure
21 that you're ready to publish this document? And so
22 there's usually a yes, no, check box. And if you

Page 263

1  are in fact ready to do that, you click yes, and it
2  goes to the live server that's available on the
3  Internet.
4      Q. Are you familiar with the term staging
5  server?
6      A. Yes.
7      Q. What is the staging server?
8          MR. THEODOROU: Objection.
9      A. My understanding is it's that intermediate
10 step, where the document is held while you're
11 looking at it; it's been translated into the web
12 language and it's on the -- it's waiting to be --
13 it's waiting for you to make that decision to do
14 actual final publication or not. So you need to --
15 it's that intermediate step that I talked about.
16 That's my understanding of it.
17         BY MS. WILLIAMS:
18     Q. And under your understanding, is information
19 on the staging server accessible by the public?
20     A. No.
21         MR. THEODOROU: Objection.
22     A. My understanding is that it's not.

Page 264

1          BY MS. WILLIAMS:
2      Q. When you say that you can make sure a
3  document looks the way you want it to look, what do
4  you mean?
5          MR. THEODOROU: Objection.
6      A. If you take a document like a document
7  created on Word or Word Perfect, it goes through a
8  -- you know, the software on the computer for web
9  publishing changes the code behind that document,
10 and it can change the, you know, it could change
11 the format. Also, when you publish to a web you're
12 not -- where you might have a document that's three
13 pages long, when you publish it to the web what you
14 get instead is one long page that you can scroll
15 all the way down. So you may have things that may
16 in your document like page numbers, you might have,
17 you know, a header and a footer that if you -- you
18 know, if you just cut and paste the whole document
19 and put it on the Web site, you would still see
20 those things like page numbers and headers and
21 footers that would seem bizarre to you reading it
22 on the web, you know, as you scroll down a

Page 265

1  document. So you want to -- you know, you want to
2  be able to remove those things and translate this
3  document better for web posting. And so it goes
4  through that process. And it also sometimes
5  changes things like simple characters, like
6  quotation marks or, you know, if you have bulleted
7  texts sometimes it changes the bullets to squares
8  and all kinds of funky things happen that you need
9  to just take a look at and be able to fix.
10         BY MS. WILLIAMS:
11     Q. Do you know if this procedure that you
12 talked about for posting information to the Web
13 site, was the same procedure in place on October
14 31, 2001?
15     A. Yes.
16         MR. THEODOROU: Objection.
17         BY MS. WILLIAMS:
18     Q. Once the information, the press release from
19 October 31st, 2001 was posted on the Treasury Web
20 site, was the embargo still in place?
21     A. No.
22     Q. What were reporters allowed to do after the



**DEPARTMENT OF THE TREASURY**

# TREASURY NEWS

OFFICE OF PUBLIC AFFAIRS • 1500 PENNSYLVANIA AVENUE, N.W. • WASHINGTON, D.C. • 20220 • (202) 622-2960

For Immediate Release
October 30, 2001

Contact:    Betsy Holahan
202-622-2960

### Treasury Department To Hold Quarterly Refunding News Conference

Treasury Under Secretary for Domestic Finance Peter R. Fisher will announce the U.S. government's quarterly refunding needs at a news conference at 9:00 a.m. EDT on Wednesday, October 31, 2001 in the Treasury Department's Diplomatic Reception Room (Room 3311), 1500 Pennsylvania Avenue, NW, Washington, DC.

Under Secretary Fisher will take questions following the announcement. The event will have a 10:00 a.m. news embargo.

The room will be available for pre-set at 8:00 a.m. on Wednesday. Media without Treasury or White House press credentials planning to attend should contact Frances Anderson at Treasury's Office of Public Affairs at (202) 622-2960 by 8:00 a.m. on Wednesday with the following information: name, social security number and date of birth. This information may also be faxed to (202) 622-1999.

-30-

PO-746



EXHIBIT
7
Fratto

For press releases, speeches, public schedules and official biographies, call our 24-hour fax line at (202) 622-2040

Excerpt from the

August 8, 2006 deposition

of  Peter Fisher

Exhibit C

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES SECURITIES | ) | |
| AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 05-10983 |
| | ) | (NMG) |
| STEVEN E. NOTHERN, | ) | |
| | ) | |
| Defendant. | ) | |
| ------------------------- | ) | |

VIDEOTAPED

DEPOSITION OF PETER R. FISHER

New York, New York

August 8, 2006

Reported by:
PAMELA J. MAZZELLA, RPR
JOB NO. 7046

Page 54

1       Fisher
2   in the market.
3       Q.  When you say a "snap auction,"
4   meaning it was not something that had been
5   regularly scheduled?
6       A.  That is correct.
7       Q.  It came up on very short notice?
8       A.  Yes.
9       Q.  And do you recall re-opening the
10  10-year note?
11      A.  I don't believe -- I may have it
12  backwards.  I know the question of the
13  10-year or the 5-year note, I know we, I
14  recall now we have reopened one of them.  I'm
15  not recalling right now which one it was.  I
16  thought it was the 5-year note.  Maybe in
17  your notes it tells you it's the 10-year
18  note.
19      Q.  So if there are new accounts that
20  say you opened the 10-year note, you believe
21  that is reliable?
22      A.  Then I'm inclined to believe that
23  that's what we did rather than reopen the
24  files.
25      Q.  Then did you consult with the

Page 55

1       Fisher
2   Borrowing Advisory Committee members in
3   advance of making a decision to reopen the
4   10-year note?
5       A.  We did have a telephone call with
6   them prior to announcing the decision to
7   reopen the 10-year note, yes.
8       Q.  And what was the purpose of that
9   conference call?
10      A.  To elicit their advice about
11  whether that would be, whether it was likely
12  to be effective in reducing the backlog of
13  fails.
14      Q.  And what did people say?
15      A.  There was a range of opinion, as is
16  often the case with Borrowing Advisory
17  Committee.
18      Q.  How often -- I'm sorry, how far in
19  advance of your announcement of the snap
20  auction was that meeting with the Borrowing
21  Advisory, the telephone conference with the
22  Borrowing Advisory Committee about re-opening
23  the 10-year note?
24      A.  It would have been measured in
25  hours.

Page 56

1       Fisher
2       Q.  And so when this telephone
3   conference occurred, people were still at
4   their offices.
5       Is that fair to say?
6       MS. WILLIAMS:  Objection.
7       A.  I don't recall whether they were at
8   their offices or somewhere else.
9       Q.  When the Borrowing Advisory
10  Committee meets ordinarily for the, in
11  connection with the Quarterly Refunding
12  Conference, the members actually travel to
13  Washington, correct?
14      A.  That's correct.
15      Q.  And then they meet privately,
16  correct?
17      A.  Yes.
18      Q.  Is there any restriction on their
19  communication with their offices during the
20  periods of their meetings?
21      A.  Yes, there is.
22      Q.  How is that set forth?
23      A.  Some of it I believe is set forth
24  in statute and some in Treasury rule, my
25  recollection.  It specifies that during the

Page 57

1       Fisher
2   period of the meeting, that until the
3   announcement of the Treasury action they are
4   prescribed from trading or communicating with
5   other members of their firms.
6       Q.  So these are written rules that you
7   have reviewed at some point?
8       A.  I may have reviewed them, I don't
9   recall now, but I was certainly aware of
10  them.
11      Q.  Are you aware of a rule that
12  prescribes their going back to their offices
13  for a set period?
14      A.  Yes.
15      Q.  So obviously when you arranged the
16  telephone conference call, that rule couldn't
17  be in effect?
18      A.  That's correct.
19      Q.  And do you recall hearing
20  complaints that people who were members of
21  the Borrowing Advisory Committee had known in
22  advance about the snap auction or the
23  re-opening of the 10-year bond, and that they
24  had derived a financial advantage from that
25  advanced knowledge?

15  (Pages 54 to 57)

Page 58

Fisher

1      Fisher
2      A.  I had not -- the latter part of
3  your statement, I have not heard that, that
4  anyone traded on or had some financial
5  advantages as a consequence.
6          There were complaints expressed
7  about the advance knowledge.  Yes, I was
8  aware of complaints about that by some
9  parties, I don't recall who, but it came up,
10 yes.
11     Q.  This is in connection with the snap
12 auction?
13     A.  Yes.
14     Q.  Well, why would anyone complain
15 about advance knowledge by the Borrowing
16 Advisory Committee if no one traded on it to
17 financial advantage?
18     MS. WILLIAMS:  Objection.
19     A.  I don't know what -- they can
20 complain for any reasons.  You're asking me
21 to get inside their heads.
22     Q.  Actually, what I'm trying to get
23 at, and I apologize since I asked it perhaps
24 inartfully, is I'm trying to get what more,
25 as best you can recall what the gist of the

Page 59

1      Fisher
2  complaint was.
3          In other words, you said you did
4  hear a complaint that members of the
5  Borrowing Advisory Committee knew in advance
6  about the snap auction re-opening the 10-year
7  note, correct?
8      A.  I recall.
9      Q.  Who made that complaint?
10     A.  I don't recall who.  I recall it
11 being such concerns were identified.  Staff
12 may have informed me.
13     Q.  Other than people being upset about
14 the fact that somebody else knew in advance,
15 there was no other meat on the bone as far as
16 why that was considered to be a bad thing?
17     MS. WILLIAMS:  Objection.
18     A.  I have no recollection of specific
19 allegations that any member of the Borrowing
20 Committee in fact traded on the information.
21 And on the telephone call we made clear to
22 them, I do recall, that they were going to be
23 prescribed from trading until we were able to
24 make the announcement.
25     Q.  You said you weren't aware of any

Page 60

1      Fisher
2  specific allegations.
3          Were you aware of any general
4  allegations or insinuations along that line?
5      A.  The complaints actually included an
6  insinuation, but I was not aware of any
7  accusation that members of the Borrowing
8  Committee actually traded on the information.
9  I have no recollection of that.
10     Q.  So now this complaint that you
11 heard, was that shortly after the decision
12 you had taken to, or shortly after the
13 announcement of the snap auction?
14     A.  I have no recollection whether it
15 was immediate or in subsequent days.
16     Q.  But now those people didn't wait a
17 month to make this complaint, right?
18     MS. WILLIAMS:  Objection.
19     A.  Presumably not.
20     MR. SHOPE:  In fact, why don't we
21 mark this as the next exhibit.
22     (Fisher Exhibit 3, two-page
23 article, marked for identification, as
24 of this date.)
25     MR. ROSSETTI:  While you're

Page 61

1      Fisher
2  marking the exhibit, can we take a one-minute
3  break here, please?
4      MR. SHOPE:  Sure.
5      THE VIDEOGRAPHER:  The time is
6  11:02 and we're going off the record.
7      (Recess taken.)
8      THE VIDEOGRAPHER:  The time is
9  11:06 a.m. and we're back on the record.
10 BY MR. SHOPE:
11     Q.  First of all, we just were off the
12 record and took a short break, Mr. Fisher,
13 and you had a chance to consult with Mr.
14 Vance.
15         Do you have any changes or
16 amendments or clarifications of any of your
17 testimony at this point?
18     A.  No.
19     Q.  You have in front of you what has
20 been marked as Exhibit 3, which is an article
21 from an outfit called AFX News, Limited.
22         Do you know that organization?
23     A.  No, I don't.
24     Q.  But you see this article here about
25 the re-opening of the 10-year note in

16  (Pages 58 to 61)

Page 78

Fisher

1   Fisher
2 the 30-year bond?
3  A. Prior to making the announcement I
4 consulted with both Larry Lindsey, who was
5 the director of the National Economic
6 Council, and with Glenn Hubbard, the chairman
7 of the Council of Economic Advisors,
8 informing them of our intention of
9 eliminating the 30-year bond.
10   I would not recall a date, but if
11 Brian's testimony is there is a specific date
12 where White House concurrence was sought,
13 that's likely to refer to the same event.
14  Q. It's consistent with your memory
15 this took place approximately a week before
16 the announcement?
17  A. Yes.
18  Q. And let's take those two
19 conversations one by one.
20   You said Mr. Hubbard, did I get
21 that right?
22  A. Yes, Mr. Hubbard.
23  Q. So how did that conversation take
24 place?
25  A. I called him on the telephone.

Page 79

1   Fisher
2  Q. And what did you say and what did
3 he say?
4  A. I explained to him of our intention
5 of eliminating the 30-year bond and the
6 rationale for doing so, and I don't recall
7 him saying anything other than generally it
8 made sense to him, he understood.
9  Q. What was the rationale that you
10 explained to him on that day?
11  A. Not an efficient form of financing.
12 With both Mr. Hubbard and Mr. Lindsey, they
13 had a great deal of contact and conversation.
14 I don't think it required a lot of ground to
15 be covered. I probably highlighted a few of
16 the points covered in my statement.
17  Q. So at that point you were already
18 drafting what your announcement was going to
19 be?
20  A. I think that's likely. I don't
21 have a specific recollection, but that seems
22 likely.
23  Q. That's what ultimately culminated
24 in your prepared remarks which were
25 distributed in a press release on October 31?

Page 80

1   Fisher
2  A. Yes.
3  Q. What about Mr. Lindsey, the
4 conversation with Mr. Lindsey?
5  A. I remember a similar conversation
6 with Larry Lindsey and perhaps a little
7 briefer than my conversation with Glenn
8 Hubbard.
9  Q. You may have said it, but just for
10 the record what was Mr. Lindsey's commission?
11  A. He was the director of the National
12 Economic Council.
13  Q. And that is something that is part
14 of the White House, right?
15  A. As is the Council of Economic
16 Advisors, both of them would report directly
17 to the president.
18  Q. And how many members are there of
19 those two council, the Council and the
20 Committee?
21  A. The Council of Economic Advisors
22 has I think three members by statute. I
23 wouldn't recall the membership of the
24 National Economic Council. A number of
25 cabinet officers, perhaps eight or nine. I

Page 81

1   Fisher
2 don't have a recollection.
3  Q. Do you know whether Mr. Lindsey or
4 Mr. Hubbard discussed the plan with the other
5 members of their respective Committee or
6 Council?
7  A. I don't know. Neither one of them
8 anticipated my conversation with them, so
9 from that I did not think this issue was
10 being discussed inside the White House prior
11 to my raising it with them.
12   They both understood the
13 sensitivity of the information. I have no
14 anticipation that they would share it with
15 others, but that was clearly up to them. I
16 don't know whether they did or not.
17  Q. You didn't ask them not to disclose
18 it?
19  A. No.
20  Q. And so I take it did both of them
21 concur in the decision?
22  A. I didn't ask for their concurrence.
23 I informed them of our intention and I didn't
24 ask for approval. That left it open to them
25 to object if they wanted to, and no

21 (Pages 78 to 81)

Page 98

```
 1              Fisher
 2  made?
 3       A.  When I was subsequently informed of
 4  the extreme price swings that took place
 5  prior to 10 o'clock, I certainly was
 6  surprised.
 7       Q.  And that was notwithstanding the
 8  fact that you were expecting price
 9  volatility?
10       A.  Yes, I was expecting some price
11  volatility.  I did not anticipate it would be
12  prior to the announcement.
13       Q.  But you were expecting price
14  volatility after the announcement?
15       A.  Yes.
16       Q.  But you did see the price start to
17  jump up before you made the announcement?
18       A.  I don't believe I was in a position
19  to actually follow the market during that
20  time.  I may have been working on another
21  matter.
22       Q.  But it was brought to your
23  attention after the fact that that had
24  happened?
25       A.  Yes, it was brought to my attention
```

Page 99

```
 1              Fisher
 2  after the fact, yes.
 3       Q.  So let's just go to the lead up to
 4  that day to October 31.
 5          First of all, did you make any
 6  changes to how Quarterly Refunding
 7  Conferences had been handled in the past by
 8  the Treasury Department?
 9       A.  I don't recall doing so on that
10  occasion.
11       Q.  Do you recall there having been a
12  press release announcing that you would be
13  the person giving the presentation at the
14  Quarterly Refunding Conference?
15       A.  I don't recall that, no.
16       Q.  That wasn't anything that you had
17  commissioned?
18       A.  I don't recall.
19       Q.  Okay.  Now, what room was the press
20  conference held on October 31?
21          That's not a grammatical sentence.
22          What was the room that you used for
23  the press conference for the quarterly
24  refunding on October 31, 2001?
25       A.  There is a conference room on the
```

Page 100

```
 1              Fisher
 2  third floor of the Treasury building just
 3  outside of the Office of Domestic Finance.
 4       Q.  And do you know what that room is
 5  called within Treasury?
 6       A.  Secretary's Conference Room.  I
 7  don't recall.
 8       Q.  Are you aware of a room called the
 9  Diplomatic Reception Room?
10       A.  That sounds like the name of the
11  room.
12       Q.  And are you aware of another room
13  called the Secretary's Conference Room?
14       A.  That would be the matching one on
15  the far side.
16       Q.  Do you know whether or not the
17  Diplomatic Reception Room had been used for
18  the Quarterly Refunding Conference before?
19       A.  Prior to -- no, I don't.  As I say,
20  I never participated in, never attended a
21  press briefing for the quarterly refunding
22  before, so I have no knowledge of what rooms
23  it took place in.
24       Q.  So would it be fair to say you had
25  no involvement in the selection of which room
```

Page 101

```
 1              Fisher
 2  to use?
 3       A.  Yes, that's correct.
 4       Q.  Okay.  And --
 5       A.  I don't recall having any
 6  involvement in that.
 7       Q.  Okay.  And now prior to the
 8  Quarterly Refunding Conference actually
 9  taking place on October 31, did you have any
10  discussion with anyone, this is not just on
11  October 31, but any other time in the lead up
12  did you have any discussion with anyone in
13  Treasury about the embargo procedure?
14       A.  Yes.  I recall a conversation with
15  Michelle Davis, the assistant secretary for
16  public affairs, about my discomfort with the
17  use of an embargo, that I would have been
18  much more comfortable with making a direct
19  announcement either on the internet or
20  without that use of an embargo.
21       Q.  And why were you uncomfortable with
22  the use of an embargo?
23       A.  I thought the risk of a leak or
24  some malfunction, some procedural malfunction
25  was too high.
```

26  (Pages 98 to 101)

Page 102

```
 1        Fisher
 2    Q.  And so in your view the embargo
 3  wasn't actually necessary in order for you to
 4  get out the information that you needed to
 5  get out?
 6    A.  I thought direct publication on the
 7  internet, direct release of some kind by the
 8  Treasury. I didn't -- I mean I didn't have a
 9  particular proposal, but I would have
10  preferred to have avoided the embargo and I
11  recall discussing that with Michelle Davis.
12    Q.  And when did you have that
13  discussion with Miss Davis?
14    A.  I don't recall the date, but again
15  probably within the 10 days prior to the
16  announcement.
17    Q.  And did you say anything else to
18  Miss Davis other than what you just
19  mentioned?
20    A.  I don't recall the conversation. I
21  undoubtedly described the nature of the
22  announcements we would be making.
23    Q.  In other words, you told her that
24  this was going to be suspension of the long
25  bond, it might meet the price volatility,
```

Page 103

```
 1        Fisher
 2  that sort of thing?
 3    A.  Yes, it would be a newsworthy item.
 4    Q.  And did she have any response to
 5  your comment that there really was no need to
 6  have an embargo?
 7    A.  We had a good conversation, I think
 8  she may have thought about it. I don't
 9  recall whether we concluded at the time or we
10  had a subsequent conversation. And her view
11  was that on reflection, changing procedures
12  in the face of a major announcement was not a
13  good policy, was not the right way to do it,
14  so we had a conversation about the pros and
15  cons, and she, in charge of public affairs,
16  felt strongly that changing procedures at
17  that moment was not a good idea.
18    Q.  And I'm going to see if I can get
19  as best your recollection, and I know you're
20  working hard and I appreciate that.
21        Beyond just a sort of general
22  avoidance or general desire not to change
23  procedures, was there anything that Ms. Davis
24  identified as a reason to keep the embargo?
25    A.  No, I don't recall anything other
```

Page 104

```
 1        Fisher
 2  than -- I mean I thought she made, I
 3  understood she made a good explanation of why
 4  she felt changing press procedures in the
 5  face of a major announcement was not, was not
 6  the appropriate thing to do, she felt
 7  strongly about that, and I deferred to her.
 8    Q.  And again --
 9    A.  I don't recall any other rationale
10  on her part.
11    Q.  Again, as far as I can get any meat
12  that may be on that bone, as far as why it
13  was that Ms. Davis thought that changing
14  procedures at this juncture was a bad idea?
15    A.  The short notice, sort of -- I
16  don't recall anything beyond that, that
17  changing procedures on relatively short
18  notice she thought was not a good idea.
19    Q.  Did she make any comment on what
20  the pros would think about the change in
21  procedures, or whether the press would prefer
22  to have an embargo, or anything like that?
23    A.  No, I don't recall that coming up.
24    Q.  Other than the conversation that
25  you had with Ms. Davis, did you discuss in
```

Page 105

```
 1        Fisher
 2  advance of the conference itself anything
 3  about the embargo?
 4    A.  I'm sorry, I'm not following your
 5  question.
 6    Q.  I apologize. You mentioned that in
 7  the run up to the October 31 conference you
 8  had a discussion with Ms. Davis that you have
 9  described in which you said let's get rid of
10  the embargo either then or in a follow-up
11  conversation she said no, let's not change
12  procedures now?
13    A.  Yes, that's correct.
14    Q.  Apart from that conversation with
15  Ms. Davis, did you have any discussion with
16  anyone about the embargo before the
17  conference itself began?
18    A.  I don't have a specific
19  recollection, but I, it's highly likely that
20  I also spoke to other members of her staff,
21  Tony Fratto and Betsy Holahan, who each
22  worked for her. It's likely that the same
23  topic came up, but it's more likely that we
24  simply worked on the process of preparing for
25  the press conference.
```

27 (Pages 102 to 105)

Page 106

Fisher

1        Fisher
2    Q.  And do you recall any comment by
3  either Mr. Fratto or -- is it Ms. Holahan?
4    A.  Holahan.
5    Q.  Holahan. Ms. Holahan about this
6  issue of getting rid of the embargo or not?
7    A.  As I say, I don't have a specific
8  recollection. It is likely that it came up
9  with them in addition to my conversations
10  with Miss Davis.
11    Q.  I guess I asked the question
12  poorly.
13        Did you get any sense from them as
14  to what their opinions were?
15    A.  I don't recall. Michelle Davis
16  seemed to have a strong opinion. I don't
17  recall Tony's or Betsy's opinions.
18    Q.  I believe you mentioned earlier
19  that at some point you were working on a
20  statement that you would be delivering at the
21  press conference itself, correct?
22    A.  Yes.
23    Q.  Who was working on that? Was there
24  anybody working on that with you?
25    A.  I -- these statements would

Page 107

1        Fisher
2  normally be worked on by Mr. Malvey and his
3  staff and Mr. Bitsberger and Mr. Roseboro.
4    Q.  Do you remember a gentleman named
5  Jared Gross?
6    A.  Yes, I certainly do.
7    Q.  And what was his position?
8    A.  He was a senior advisor actually
9  working for me, but had been working in the
10  Office of Assistant Secretary Financial
11  Markets.
12    Q.  Did he work on the draft of the
13  press release as well?
14    A.  It's possible. I don't have a
15  specific recollection.
16    Q.  And how many days, approximately,
17  did it take you to finalize this document?
18    A.  I don't recall.
19    Q.  But it was something that was in
20  the works for a week or so or possibly even
21  more?
22    A.  Well, the total statement was
23  undoubtedly in the works for several weeks.
24  There are components of it that are highly
25  routinized that come from the staff. The

Page 108

1        Fisher
2  parts having to do with the 30-year
3  announcement we would have been drafting more
4  uniquely for the occasion.
5        MR. SHOPE:  Why don't we mark this
6    as the next exhibit.
7        (Fisher Exhibit 5, document
8    bearing Bates numbers SECNOTH 00103772
9    through 00103777, marked for
10    identification, as of this date.)
11    Q.  I have shown you an E-mail from Mr.
12  Bitsberger to yourself and a group of others,
13  and subject to confirmation --
14        MR. ROSSETTI:  John, confirmation
15    is this:  The one that we used the other
16    day has the E-mail from Holahan sending
17    this on to Frances Anderson, so SEC
18    103773 is the E-mail from Holahan then
19    to Frances Anderson.
20        MR. SHOPE:  Sure, okay. So what
21    I'm -- my understanding from all of
22    those E-mails was SECNOTH 103772 was the
23    E-mail that transmitted the attachment
24    of 103774 through 103777.
25        Is that your understanding, Mr.

Page 109

1        Fisher
2  Rossetti?
3        MS. WILLIAMS:  Yes, but there is
4    an intermediate page missing, but yes.
5        MR. SHOPE:  And the intermediate
6    page is the E-mail that forwards this on
7    to other parties?
8        MR. ROSSETTI:  Yes.
9        MS. WILLIAMS:  That's correct.
10  BY MR. SHOPE:
11    Q.  So focusing on Mr. Fisher's piece,
12  we have the E-mail that is Exhibit 5 and that
13  is dated the morning of October 31.
14        Is that consistent with your
15  recollection that the final version wasn't in
16  fact created until the morning of the press
17  conference?
18    A.  I didn't have a specific
19  recollection about that, but that seems
20  reasonable.
21    Q.  Well, let me ask you another
22  question:  You were working on this up to the
23  last minute?
24    A.  That would be normal procedure for
25  most features.

28  (Pages 106 to 109)

Page 162

                    Fisher
1
2   recollection. I think the purpose of the
3   meeting would have been to sensitize her to
4   the fact that we would be announcing both the
5   discontinuation of the 30-year bond and a
6   suspension of the Buyback Program, so in all
7   likelihood I conveyed that information to her
8   so she would understand the sensitivity of
9   it, and thus I was concerned about the
10  embargo, but I don't have a specific
11  recollection of the conversation on those
12  points.
13      Q.  I understand.  On October 31, 2001
14  you stated that after the Treasury Refunding
15  Conference you had a conversation with some
16  people on your staff and they conveyed that
17  there had been extraordinary movement of
18  long-term interest rates; is that right?
19      A.  Yes.
20      Q.  What did you mean by "extraordinary
21  movement"?
22      A.  Well, a sudden movement of 3 or 4
23  or 5 basis points, which is, you know, seems
24  rather small, but a very abrupt movement of
25  that size would constitute abrupt volatile

Page 163

                    Fisher
1
2   movements.  10 basis points in a short period
3   of time would be a huge movement given the
4   context that we're talking about.
5           I don't recall the magnitude of the
6   movements that morning now, but I recall them
7   being -- them bringing to my attention and we
8   all felt rather nervous and awkward about
9   them and understood they portrayed something
10  we should be nervous about.
11      Q.  Now, were these movements -- do you
12  know about the time that the market started
13  moving?  Do you know if this was before or
14  after you made your statement at the
15  Refunding Conference?
16      MR. SHOPE:  Objection.
17      A.  I -- let me understand your
18  question.  I don't recall what time the staff
19  came to speak to me.
20      Q.  Okay.  That wasn't really my
21  question.
22      A.  I'm just trying to narrow it down.
23  I recall them showing me, taking me to either
24  a screen I could look at or showing me pieces
25  of paper that would show me movements in

Page 164

                    Fisher
1
2   long-term interest rates over the period of
3   time after 9 o'clock and before 10 o'clock,
4   so we would collectively be looking at a
5   graph that showed movements in those prices
6   that period of time between roughly 9:30 and
7   10 o'clock.
8       Q.  Okay.  Do you recall, and I don't
9   know if you just answered this, if the
10  movement was between 9 o'clock and 10
11  o'clock?
12      MR. SHOPE:  Objection.
13      A.  I -- my recollection is that it were
14  movements in prices after I finished speaking
15  in my press conference and prior to the
16  release, either 10 o'clock or the several
17  minutes before 10 o'clock when the mistaken
18  electronic announcement was made, so it was a
19  window of time between approximately 9:25 and
20  10 o'clock.
21      Q.  Prior to October 31 had you ever
22  heard of any rumors that the long bond would
23  be eliminated?
24      A.  Let me be very clear.  I don't
25  recall any rumors that the long bond would be

Page 165

                    Fisher
1
2   eliminated, that is, people speculating they
3   knew what I had concluded to do; that there
4   was debate about whether the Treasury would
5   or wouldn't and some people thought maybe the
6   Treasury will and some people thought maybe
7   the Treasury won't.
8           Do you see the distinction I'm
9   drawing?
10      Q.  Yes.
11      A.  I'm trying to draw a distinction
12  between people guessing or anticipating or
13  thinking they make an educated forecast about
14  what the Treasury would do versus someone
15  asserting they knew what the Treasury would
16  do, and I have no recollection of the latter.
17      Q.  Regarding the former, the
18  speculation, the kind of prognosticating what
19  the Treasury might do, do you know in your
20  experience, would those, I'm going to
21  characterize it as rumors, ever move the
22  market?
23      A.  Well, that's a very broad question
24  and the answer to the broad question is yes.
25  In anticipation of what the Treasury might do

42  (Pages 162 to 165)

Page 166

Fisher

1  at a quarterly refunding is something that
2  the market would position itself for.
3
4      I would like to draw a very clear
5  distinction. The market will naturally and
6  normally attempt to position itself for what
7  it expects the Treasury to do, so the market,
8  many market participants may have different
9  views, but collectively they will be trying
10 to anticipate a Treasury announcement, just
11 as they would try to anticipate an
12 announcement of interest rate changes by the
13 Federal Reserve or anticipate data releases
14 of the economy. So that is a normal process
15 of positioning before an announcement.
16 That's entirely in the normal course.
17     Occasionally there are
18 circumstances where someone thinks they know
19 what's going to happen or there is a rumor
20 that some people know what's going to happen
21 and there have been breaches of embargoes
22 from other agencies of the Federal Government
23 on data releases that have occasionally
24 occurred in my experience, and so those then
25 were the episodes of leaks that were

Page 167

Fisher

1
2  subsequently proved to be true, that someone
3  had factual information about what was about
4  to be released. I don't recall that
5  happening with Treasury borrowing
6  announcements.
7      Q. And when you say that, you mean a
8  leak?
9      A. A leak that is subsequently
10 confirmed that someone had prior knowledge of
11 something that was to be released.
12     I don't have any recollection of
13 that happening in particular with Treasury
14 borrowing announcements.
15     I can't recall now specifically,
16 but episodes of data releases by the Bureau
17 of Labor Statistics where information on
18 inflation or unemployment rates got out early
19 were breached through an embargo, so that
20 again would be an episode of a factual early
21 release subsequently confirmed.
22     Q. And just to clarify, with regard to
23 the October 31, 2001 Treasury Refunding
24 Conference, were you aware of any leaks by
25 anyone at Treasury of the information that

Page 168

Fisher

1
2  the long bond was going to be eliminated?
3      A. No.
4      Q. Have you ever heard of the
5  statement buy on the rumor, sell on the fact?
6      A. Certainly, it is common market
7  jargon.
8      Q. What does that mean?
9      A. It means that markets try to
10 anticipate what happens, that is, the price
11 action will be before the fact. If you want
12 to profit by a piece of data or something
13 that you expect to happen, you have to be
14 positioned before it happens.
15     Q. When Mr. Shope was asking you
16 questions, you stated I believe that you
17 regret the circumstances under which the
18 announcement of your elimination of a long
19 bond was handled.
20     What circumstances specifically do
21 you regret?
22     A. I regret that the embargo was
23 breached by someone in the room and I regret
24 that the Treasury staff mistakenly released
25 the information on the web prior to the

Page 169

Fisher

1
2  embargo time. Those are the two things I
3  recall, partular things that I recall. I
4  certainly regret both of those.
5      Q. Did you personally have any
6  responsibility for either of those?
7      A. No, I did not.
8      MS. WILLIAMS: I don't have any
9  further questions.
10 EXAMINATION (Cont'd.)
11 BY MR. SHOPE:
12     Q. I believe you said that you had
13 never heard of Mr. Davis before October 31,
14 2001, correct?
15     A. I'm not even sure I heard of him on
16 that day. It may have been a subsequent day,
17 early November when I heard of him.
18     Q. And how did you find out about him?
19     A. I don't recall who informed me, but
20 I was subsequently informed that he had been
21 by staff on the Treasury, that he had been
22 noncredentialed, he was not an official
23 reporter and not press credentials, that he
24 had been permitted to participate in that
25 briefing and at others prior, and that he had

43 (Pages 166 to 169)

Page 174

Fisher

1
2    Q.  And so he didn't give any more
3    detail other than it was a shame that the
4    information had gotten out early?
5    A.  I -- as I had been talking to
6    Michelle Davis, I assume the secretary had
7    also.  I didn't expect for him to talk to me
8    about, in any detail about press office
9    procedures.
10    Q.  Now, you mentioned to Ms. Williams
11    that the market is constantly trying to
12    anticipate what it is the Treasury is going
13    to do at the Refunding Conferences, correct?
14    A.  Yes.
15    Q.  And would it be also fair to say
16    that it is a goal of the Treasury to make its
17    announcement at those Refunding Conferences
18    regular and predictable?
19    MS. WILLIAMS:  Objection.
20    A.  The phrase "regular and
21    predictable" refers to the -- there is a term
22    used in Treasury debt management to convey
23    that auctions occur on regular and
24    predictable dates.
25    Many sovereign borrowers change

Page 175

Fisher

1
2    when they will be auctioning their bonds.
3    They do not provide a forward calendar that
4    commits them to auctioning securities at
5    particular dates.  Whereas the United States
6    Treasury since the 1970s has committed itself
7    to a practice of regular and predictable
8    auctions.
9    So that phrase refers to the
10    auction calendar.  The announcement process
11    is in advance of those auctions to specify
12    the quantities that will be announced, that
13    will be auctioned on those specified dates.
14    Q.  So there is no policy goal within
15    Treasury in your understanding of trying to
16    make policies themselves, as opposed to the
17    specific dates of auctions, regularly and
18    predictable?
19    MS. WILLIAMS:  Objection.
20    A.  Well, policies change from one
21    administration to another.  I think that it's
22    very important to recognize the difference
23    between creating a regular and predictable
24    calendar of auctions, which allows investors
25    to anticipate when they can acquire Treasury

Page 176

Fisher

1
2    securities at auction, and never changing
3    your policies or inducing a great deal of
4    inertia in the policy-making process.
5    I don't think there is anything in
6    the fact of regular and predictable auction
7    calendar that suggests a policy is best
8    pursued which changes the auction, changes
9    debt management policies the least.
10    Changes are being made all the time
11    in increments and are then being announced as
12    clearly as one can to the market.  So I would
13    see it rather differently than your question
14    implied.
15    Q.  Do you recall there being criticism
16    that the announcement on October 31 just took
17    the market by surprise?
18    A.  I recall some people saying it took
19    them by surprise and other people saying they
20    anticipated it.
21    Q.  But do you recall anyone saying in
22    substance that the Treasury did a bad job
23    here because it failed to prepare the market
24    for this information in advance?
25    A.  Well, you have shown me various

Page 177

Fisher

1
2    clippings which say as much, and that's the
3    distinction I'm trying to draw, is if you
4    leak it to the market in advance, then you
5    don't surprise the market, but then you've
6    leaked it, and that would be a bad process in
7    my view.
8    Q.  One last question.  Ms. Williams
9    was asking you about your regrets.
10    Do you regret not having been more
11    forceful with Michelle Davis about
12    distributing the decision to cancel the long
13    bond in the form of an internet announcement
14    without an embargo?
15    A.  No because I think that she and I
16    had a very full discussion about the pros and
17    cons of that.  I feel I informed her of my
18    feeling and she informed me of hers.  And I
19    feel I have been involved enough in
20    government and public decision-making to know
21    that you don't always get the outcome you
22    want, but if you got a chance to debate the
23    pros and cons of something and made as good a
24    decision as the responsible person could,
25    which was Michelle in that case, then it's

45 (Pages 174 to 177)

Page 178

Fisher

1
2  pretty good.
3      Q.  Did you ever tell anybody about the
4  conversation that you had had with Ms. Davis
5  in anticipation of the conference on October
6  31 in which you had suggested not using an
7  embargo?
8      A.  Did I ever -- have I ever told
9  anyone since or did I ever tell anyone at the
10 time?  Please rephrase.
11     Q.  Before today did you ever tell
12 anybody oh, by the way, I had this
13 conversation with Miss Davis in which I
14 suggested that we get rid of the embargo?
15     A.  I'm confident I discussed it with
16 my staff at the time, the pros and cons of
17 it.  I don't recall making a public matter of
18 it after the fact.
19     Q.  In other words, your memory is that
20 you discussed with your staff prior to
21 October 31 the fact that you were having a
22 conversation with Ms. Davis in which you were
23 proposing not using the embargo?
24     MS. WILLIAMS:  Objection.
25     A.  That's my recollection.

Page 179

Fisher

1
2      Q.  And did you ever hear any
3  suggestion by your staff that the events of
4  October 31 were attributable to your own
5  hubris?
6      A.  No.
7      MR. SHOPE:  I have nothing
8  further.
9      MS. WILLIAMS:  I have one
10 question.
11 EXAMINATION (Cont'd.)
12 BY MS. WILLIAMS:
13     Q.  Do you recall who told you that Mr.
14 Malvey had let Mr. Davis attend the October
15 31 conference?
16     A.  I don't recall, I don't recall who
17 informed me of that.
18     Q.  Did you have any knowledge about
19 the circumstances under which Mr. Malvey
20 allowed Mr. Davis to attend?
21     A.  No prior knowledge.  After the fact
22 only what I was told about, what I said a few
23 minutes ago, about his being, Mr. Malvey
24 signing him in somehow or giving him
25 permission to attend the press briefings.

Page 180

Fisher

1
2      Q.  Do you know if Mr. Davis had agreed
3  to abide by the embargo?
4      MR. SHOPE:  Objection.
5      A.  I don't have any specific knowledge
6  of that.
7      MS. WILLIAMS:  I have no further
8  questions.
9      MR. SHOPE:  I have nothing.
10     THE VIDEOGRAPHER:  The time is
11 1:27 p.m. and this marks the end of the
12 videotaped deposition of Mr. Peter
13 Fisher.
14     (Time noted:  1:27 p.m.)
15
16     _____
17     PETER R. FISHER
18 Subscribed and sworn to before me
19 this ___ day of _____, 2006.
20
21 _____
22
23
24
25

Page 181

1
2      C E R T I F I C A T E
3  STATE OF NEW YORK   )
4                     : ss.
5  COUNTY OF NEW YORK  )
6
7      I, PAMELA J. MAZZELLA, RPR, a
8  Notary Public within and for the State
9  of New York, hereby certify:
10     That PETER R. FISHER, the witness
11 whose deposition is hereinbefore set
12 forth, was duly sworn by me and that
13 such deposition is a true record of the
14 testimony given by the witness.
15     I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I
18 am in no way interested in the outcome
19 of this matter.
20     IN WITNESS WHEREOF, I have
21 hereunto set my hand this 11th day of
22 August, 2006.
23                        _____
24     PAMELA J. MAZZELLA, RPR
25

46  (Pages 178 to 181)

Excerpt from the

February 11, 2008

deposition of Michelle Davis

Exhibit D

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND    :
     EXCHANGE COMMISSION,            :
                             :
     Plaintiffs,        :
                             :
     v.                 : Civil Action No.
                             :
     STEVEN E. NOTHERN,     : 05-10983 (NMG)
                             :
     Defendant.        :

- - - - - - - - - - - - - - - x


Videotaped Deposition of MICHELE DAVIS

Washington, D.C.

Monday, February 11, 2008

12:57 p.m.



\*    \*    \*    \*




Reported by:  Okeemah S. Henderson, LSR

Page 26

1    A.   I don't really follow the question.  I
2  mean, I don't know who would, that's a decision
3  that the Department makes and the secretary -- I
4  mean, that's not, there is no --
5       BY MR. THEODOROU:
6    Q.   Let me be more specific.  Did you ever
7  receive any training on the use of embargoes at
8  press conferences?
9       MR. FREEBORNE:  When you say training,
10  do you mean formal training?
11       BY MR. THEODOROU:
12    Q.   We'll go from formal to informal.  Did
13  you ever receive any training --
14    A.   I'm not even sure who would do that.
15    Q.   Well, my question isn't whether you're
16  sure or not.  My question is did you ever get any
17  training on the use of embargoes with the press?
18       MR. ROSSETTI:  Objection.
19    A.   I had already been working in public
20  affairs for a number of years.
21       BY MR. THEODOROU:
22    Q.   Were you familiar with the use of

Page 27

1  embargoes?
2    A.   Yes.
3    Q.   In what context?
4    A.   Having issued press releases in
5  previous jobs.
6    Q.   Had you used embargoes on the press in
7  previous jobs?
8    A.   Yes.  In some circumstances.  Yes.
9    Q.   Which --
10       MR. ROSSETTI:  I'm sorry.
11    A.   In some circumstances.  Yes.
12       BY MR. THEODOROU:
13    Q.   And what circumstances had you used
14  embargoes?
15    A.   Whenever there was a reason to give
16  reporters a text or anything ahead of time that
17  was going to be delivered.  If someone was going
18  to give remarks at night, for example.  Reporters
19  don't want to wait around for that, we'd give them
20  the embargo text earlier in the afternoon so they
21  would have it embargoed because he wanted to do an
22  interview ahead of announcement but not have it

Page 28

1  hit the press until the announcement was done so
2  there would be full contact to the announcement.
3  It's a variety of circumstances.
4    Q.   What jobs had you used embargoes?
5    A.   In working on Capitol Hill and my job
6  before that I was, I did a lot of interviews
7  working for a group called Citizens for a Sound
8  Economy.
9    Q.   Well, let's talk about the use of
10  embargoes at Capitol Hill.  What circumstances
11  when you were at Capitol Hill were embargoes used?
12    A.   Again, if there was something going to
13  be happening late at night that you would want to
14  give it out to the media early so that, just so
15  they would have it, so you wouldn't have to be
16  tracking down whom.
17       Or again, you might grant an interview to
18  somebody ahead of an announcement and embargo it
19  because just schedule didn't permit for the
20  interview to take place after.  It just was
21  managing the new cycle and depending on the time of
22  day.

Page 29

1    Q.   Were there particular procedures that
2  governed the use of embargoes?
3    A.   No.  I mean, not that I'm aware of.  I
4  mean, not that, I guess I don't understand.  Again
5  I don't understand the question.
6    Q.   Were there any written procedures that
7  governed the use of embargoes when you, for
8  instance, let's take the first instance, when you
9  gave information that was going to be released
10  late at night, you gave the information earlier in
11  the day, was there any written procedures as to
12  how the embargo worked in that situation?
13    A.   I have never seen anything written
14  down about an embargo.  It's a common practice.
15  It's a widely-understood practice in public
16  affairs and among the media.
17    Q.   So you've never seen any written
18  procedures that govern the use of embargoes?
19    A.   No.
20    Q.   Are there any written procedures in
21  place at Treasury today governing the use of
22  embargoes?

1  be?
2      A.  I think it was just those that I just
3  said, what time was going to be the announcement,
4  how much time we thought the discussion would
5  take, so that the embargo, so that it would all
6  happen before the embargo was over.
7      Q.  When you say discussion?
8      A.  Q and A with reporters, with whatever.
9      Q.  Were you aware or did you ever become
10  aware that for quarterly refunding conferences
11  before October 31st, 2001 public affair officials
12  as Treasury pulled the reporters present to
13  determine how much time they needed to prepare
14  their stories?
15      MR. ROSSETTI:  Objection.
16      A.  I know we, that's a normal practice on
17  a lot of things, not just quarterly refunding.  We
18  try to do exactly that to make sure they have
19  enough time so they can write a complete story
20  rather than just having to scan something and not
21  necessarily understand it and put out headlines.
22      BY MR. THEODOROU:

1      Q.  So that before October 31st, 2001, did
2  Treasury set fixed embargo times in advance?
3      MR. FREEBORNE:  What do you mean by
4  fixed?
5      BY MR. THEODOROU:
6      Q.  Before the press conference.  Did they
7  set an embargo time in advance or was it through
8  this informal process you just described?
9      A.  Again, it would depend on the event.
10      MR. ROSSETTI:  I don't know if you were
11  talking strictly refunding conferences or all
12  press conferences.
13      MR. THEODOROU:  No.  I'm talking about
14  refunding.
15      A.  I don't know.
16      MR. THEODOROU:  Mark this, please.
17  (Deposition Exhibit No. 3 was marked for
18          identification.)
19      BY MR. THEODOROU:
20      Q.  I want to show you what's been marked
21  as Northern Exhibit No. 3.  Do you see that?  It's
22  a Washington Post article, Ms. Davis?

1      A.  Yes.
2      Q.  And the top it says, "Treasury
3  suspects insider bond trading."
4      A.  Yes.  I'm sorry.
5      Q.  Do you see that?  And it's dated
6  November 6, 2001?
7      A.  Yes.
8      Q.  Now, before I ask you something about
9  this press conference, I mean, excuse me, this
10  article.  Did Treasury's procedures for quarterly
11  refunding announcements, excuse me, did Treasury's
12  embargo procedures for quarterly refunding
13  announcements did they differ from the embargo
14  procedures that you used for securities auctions?
15      A.  I don't remember.
16      Q.  Well, let's turn to a few paragraphs
17  down and if you want to read the whole thing, feel
18  free to read it.  Okay.  You see a few paragraphs
19  down, seven paragraphs down it says, "Treasury
20  officials announce both before and at the end of
21  the news conference that Fisher's statement and
22  his replies to reporters' questions were embargoed

1  for release at 10 a.m., meaning that the people
2  present understood that their access to the
3  information was conditioned on their agreement not
4  to distribute it publically before 10 a.m., but
5  reporters and others who attended were not
6  required to remain in the room until the embargo
7  expired.
8      The reporters, many of whom work regularly
9  in the building's press room, left to prepare
10  stories to be sent to their media outlets and were
11  released at 10 a.m." Do you see that?
12      A.  Yes.
13      Q.  And this is making reference, when we
14  say to Mr. Fisher's statement, that's a reference
15  to his statement on October 31st, 2001, correct?
16      A.  Yes.
17      Q.  Now, look at a next paragraph, "That
18  procedure was far more casual, for instance, than
19  that followed regularly at Treasury when the
20  results of securities auctions are announced.  In
21  such cases, reporters are given the information
22  ahead of time so they can prepare stories but they

Page 54

1  website.
2      At that point, some news organizations felt
3  free to release the information." Then it says,
4  "Michele Davis, the Department's assistant
5  secretary of public affairs said the early posting
6  was a human error in her office. It was a
7  careless mistake." Right?
8      A.  Right.
9      Q.  Would you, please, describe for me how
10 it was a mistake?
11         MR. ROSSETTI:  Objection.
12     A.  It was supposed to be posted at
13 10 o'clock.
14        BY MR. THEODOROU:
15     Q.  And what happened?
16     A.  The person who posted it on the
17 website posted it early.
18     Q.  Do you know any other details about
19 that as to why she posted it early?
20     A.  No.
21     Q.  Go back to use of embargoes at
22 quarterly refunding press conferences, you said

Page 55

1  that the embargo time would be set at the time of
2  the conference?
3      A.  I said that in a general. I wasn't
4  speaking just about quarterly refunding?
5      Q.  But do you recall how they were set at
6  quarterly refunding conferences specifically in
7  October, 2001?
8      A.  No.
9      Q.  How did Treasury enforce embargoes at
10 press conference?
11        MR. FREEBORNE:  What do you mean by
12 enforce?
13        BY MR. THEODOROU:
14     Q.  Well, let me strike that. What would
15 happen to someone if they violated the embargo?
16     A.  To a reporter?
17     Q.  Yes.
18     A.  Again, it would depends on the
19 circumstances. But they're, usually an embargo is
20 a fairly self-enforcing thing because the wire
21 reporters, they all want to go to print, hit the
22 wire at the same time so that nobody is last

Page 56

1  because they think that's bad blood.
2      So you rarely run into a problem. When it
3  does happen, it can range from, depending on the
4  seriousness of it, it can range from sort of a
5  slap on the wrist to losing your Treasury press
6  pass depending how serious it is.
7      Q.  So if a reporter from a wire service
8  disclosed the news of the suspension of a 30-year
9  bond before that 10 a.m. on October 31st, 2001,
10 that reporter could face a penalty, correct?
11        MR. ROSSETTI:  Objection.
12     A.  Could. Yes.
13        BY MR. THEODOROU:
14     Q.  And as you said, it could range from a
15 slap on the wrist to having the press credentials
16 revoked, correct?
17     A.  Right.
18     Q.  Was it the practice at Treasury to
19 tell reporters about penalties for violating
20 embargoes?
21     A.  Not that I'm aware of. No.
22        MR. ROSSETTI:  I'm sorry.

Page 57

1      A.  No. I'm not aware of that. No.
2         BY MR. THEODOROU:
3      Q.  Was it the practice at Treasury to
4  obtain some type of signed agreement from
5  reporters that they would not disclose any
6  information before the embargo time expired?
7         MR. ROSSETTI:  Objection.
8      A.  No.
9         BY MR. THEODOROU:
10     Q.  Do you know who Elizabeth Holahan?
11     A.  Yes.
12     Q.  Who is she?
13     A.  She worked for me.
14     Q.  What was her position?
15     A.  Public affairs specialist.
16     Q.  Do you know if she had anything to do
17 with the quarterly refunding announcement press
18 conference on October 31st, 2001?
19     A.  Yes. She was part of getting it set
20 up and getting the materials ready and released.
21     Q.  Do you know whether she asked those
22 who attended the press conference to agree to

1   comply with a 10 a.m. embargo time?
2     A.  I wasn't there.
3     Q.  Did she ever tell you what she did at
4   the press conference?
5     A.  I'm sure she did but I don't remember
6   that --
7     Q.  No. I'm just asking, that wasn't my
8   question. My question was: Did she ever tell you
9   what she did at the press conference?
10     MR. ROSSETTI: Objection.
11     A.  We had many discussions after that
12   day. So I'm sure she did but that's all I know.
13     BY MR. THEODOROU:
14     Q.  So is it your testimony you don't
15   recall how she set the embargo time with the press
16   that day?
17     A.  Right.
18     MR. ROSSETTI: Objection.
19     BY MR. THEODOROU:
20     Q.  Did you ever learn that those
21   attending the October 31st, 2001 press conference
22   were essentially asked to abide by an honor system

1   not to release the information before the embargo
2   time?
3     MR. ROSSETTI: Objection.
4     A.  I'm sorry. They were asked that in
5   the room?
6     BY MR. THEODOROU:
7     Q.  Yeah. Did you ever learn that the way
8   the embargo was implemented that day was that
9   Ms. Holahan had basically called out those
10   attending and asked them -- strike that. Did you
11   ever learn that they were just basically pulled
12   and they all decided on an embargo time?
13     MR. ROSSETTI: Objection.
14     A.  I wasn't there, and I don't remember
15   discussion afterwards.
16     BY MR. THEODOROU:
17     Q.  Now, before October, 2001, were you
18   aware of any instance in which a reporter or
19   someone else violated the embargo at a Treasury
20   press conference?
21     A.  Not that I can recall. No.
22     Q.  Before October, 2001, do you recall

1   any instance in which the credentials of any
2   member of the press were revoked for violating a
3   Treasury embargo?
4     A.  No.
5     MR. THEODOROU: I'm going to show you
6   the next exhibit.
7     (Deposition Exhibit No. 4 was marked for
8      identification.)
9     BY MR. THEODOROU:
10     Q.  Do you have Exhibit 4 in front of you,
11   Ms. Davis?
12     A.  Yes.
13     Q.  This is a Reuters report, October
14   31st, 2001. Do you see that?
15     A.  Yes.
16     Q.  Have you ever seen this report before?
17     A.  I probably saw it then but I don't
18   recall.
19     Q.  Well, the report starts off by saying
20   if the Reuters report, "If Wall Street shed any
21   tears over the U.S. Treasury's decision to send
22   the 30-year bond to an early grave, there were

1   tears of range over a news leak that gave some
2   dealers a head start in the biggest bond rally in
3   history." Do you see that?
4     A.  Yes.
5     Q.  At the end of this where it quotes
6   Pete Fisher saying, We cannot run this business if
7   people think we're trying to time the market or
8   outsmart the market, Fisher said in an interview
9   with cable television network CNBC. Do you see
10   that?
11     A.  Yes.
12     Q.  Now, right under that there's a
13   paragraph that says, "But those remarks rank
14   haulover traders who had best saw hand handed
15   handling of the announcement and at worst,
16   suspected insider trading by market players who
17   sit on a Treasury borrowing advisory committee.
18   Barclay's Roberts recalled a similar flaque
19   earlier this month when the Treasury decided to
20   flood the market with more of the 10-year notes to
21   ease a liquidity log jam caused by failed trades
22   after the September 11 attacks on Washington and

Page 70

1    A.   Yes.
2    Q.   And he says in his E-mail,
3    Mr. Bitsberger, that there was a leak a few weeks
4    ago at the emergency reopening. And that he was
5    referring to the reopening of the 10-year bond,
6    correct?
7         MR. ROSSETTI: Objection.
8         MR. THEODOROU: You have to answer.
9    A.   Probably.
10        BY MR. THEODOROU:
11   Q.   So he probably was referring to the
12   emergency reopening of the 10-year bond, correct?
13        MR. ROSSETTI: Objection.
14   A.   Yes.
15        BY MR. THEODOROU:
16   Q.   Now, do you know or does this refresh
17   your recollection as to whether that leak
18   concerning the emergency reopening of the 10-year
19   bond was investigated?
20        MR. ROSSETTI: Objection.
21   A.   I don't know.
22        BY MR. THEODOROU:

Page 71

1    Q.   Now, the next E-mail is from Mr.
2    Fratto. Do you see that?
3    A.   Yes.
4    Q.   And it's from Mr. Fratto to
5    Mr. Bitsberger, Michele Davis, that's you,
6    correct?
7    A.   Yes.
8    Q.   And a fellow named Paul Malvey. Who
9    is Paul Malvey?
10   A.   I believe he was --
11   Q.   Do you know who Paul Malvey was?
12   A.   Yes.
13        MR. ROSSETTI: I was going to object to
14   that. I think it would be only fair, those
15   weren't the only recipients just to make it clear.
16        MR. THEODOROU: I know that. The
17   document speaks for itself. I'm trying to move
18   this so we can move. She's got to go back to the
19   workings of government here.
20        BY MR. THEODOROU:
21   Q.   Do you know who Paul Malvey was at the
22   time?

Page 72

1    A.   Yes.
2    Q.   Who was he?
3    A.   He worked for Tim Bitsberger.
4    Q.   Now, you see where Mr. Fratto says,
5    writes, "There was a leak during emergency
6    reopening?"
7    A.   Yes. I see that.
8         MR. ROSSETTI: Question mark.
9    A.   Question mark.
10        MR. THEODOROU: I was going to say
11   question mark but thought you would understand by
12   the tone of my voice that it was a question.
13        MR. ROSSETTI: Well, we don't get the
14   tone of your voice on the record.
15        BY MR. THEODOROU:
16   Q.   Well, there was a leak during the
17   emergency reopening. Do you see that?
18   A.   Yes.
19   Q.   Mr. Bitsberger responds, yes,
20   attributed to borrowing committee. Do you see
21   that?
22   A.   Yes.

Page 73

1    Q.   That's his answer. Now, what was the
2    borrowing committee, the Treasury borrowing
3    committee?
4         MR. ROSSETTI: Objection.
5    A.   It's a private sector group that makes
6    recommendations to the Treasury every quarter.
7         BY MR. THEODOROU:
8    Q.   So it's a private sector group?
9    A.   Yes.
10   Q.   How many members does it have?
11   A.   I don't know.
12   Q.   Does it have more than five, to your
13   knowledge. Do you know?
14   A.   I don't know the numbers.
15   Q.   You say that it is composed of
16   individuals from the private sector?
17   A.   Yes.
18   Q.   Do you know who were the individuals
19   who were members of the Treasury in October, 2001?
20   A.   No.
21   Q.   Did these individuals who you say
22   worked on the private sector, did they work for

Page 90

1    BY MR. THEODOROU:
2    Q.   So is it fair to say that you don't
3 recall objecting to his idea that there should not
4 be an embargo that day?
5    MR. ROSSETTI:  Objection.
6    A.   I don't recall that.
7    BY MR. THEODOROU:
8    Q.   And you don't recall Tony Fratto
9 objecting to Pete Fisher's plan to not have an
10 embargo?
11    MR. ROSSETTI:  Objection.
12    A.   I don't recall.
13    MR. THEODOROU:  Why don't we change the
14 tape.
15    THE VIDEO OPERATOR:  This concludes
16 tape 1 in the deposition of Michele Davis.  Off
17 the record at 2:28:52 p.m.
18    This begins tape 2 in the deposition of
19 Michele Davis.  On the record at 2:31:33.,
20    BY MR. THEODOROU:
21    Q.   As of, Ms. Davis, as of October 31st,
22 2001, who were allowed, excuse me.  Let me strike

Page 91

1 that.  As of October 31st, 2001, who was allowed
2 to attend quarterly refunding press conferences?
3    MR. FREEBORNE:  From the outside?
4    MR. THEODOROU:  Yes.
5    A.   It was supposed to be for media.
6    BY MR. THEODOROU:
7    Q.   So reporters could attend, correct?
8    A.   Yes.
9    Q.   But those reporters had to be
10 credentialed by the Department of Treasury to
11 attend?
12    A.   No.
13    MR. ROSSETTI:  Objection.
14    A.   No.  They had to either have the
15 Treasury press pass or call to be cleared in.
16    BY MR. THEODOROU:
17    Q.   Treasury employees could attend the
18 quarterly refunding press conferences?
19    A.   I believe so.  Yes.
20    Q.   Was there a particular group of
21 Treasury employees who could attend or any
22 Treasury employees?

Page 92

1    A.   I don't recall there being any rule
2 about that.
3    Q.   Could other Government employees
4 attend?
5    MR. ROSSETTI:  Are you saying outside
6 of Treasury?
7    MR. THEODOROU:  Outside of Treasury?
8    A.   No.
9    BY MR. THEODOROU:
10    Q.   What about nonreporters who were not
11 Treasury Department employees, could they attend,
12 other people?
13    A.   It was the event was meant for the
14 media only.
15    Q.   But my question is I guess you did
16 answer it in a way, but my question is could
17 nonreporters who were nonGovernment employees
18 attend quarterly refunding press conferences?
19    A.   That's not the way it was supposed to
20 work.
21    Q.   So is it your testimony that a private
22 business consultant could not attend the

Page 93

1 conference?
2    MR. ROSSETTI:  Objection.
3    A.   I mean, obviously they were physically
4 able to because it happened but it was not the way
5 it was supposed to work.
6    BY MR. THEODOROU:
7    Q.   Right.  But when you say it was not
8 the way it was up supposed to work, under the
9 practice at Treasury, only reporters and
10 Government employees could attend, correct?
11    A.   Treasury employees.
12    Q.   Treasury employees could attend?
13    A.   Correct.
14    Q.   Was there any type of written
15 procedure regarding who could attend and who could
16 not attend?
17    A.   Not that I'm aware of.  No.
18    Q.   So when you say that reporters and
19 Treasury employees could attend, you're talking
20 about the practice?
21    A.   Right.  Right.
22    Q.   Correct.

Page 162

1    Q.    So did when you used the embargo, was
2  it ever in Congress, was it in the setting of like
3  a press conference or was it just basically one on
4  one?
5    A.    Usually one on one interviews or
6  handing out paper.
7    Q.    I see. Was there any lock down
8  utilized when you worked on the Hill?
9    A.    No.
10    Q.    And when you worked on the Hill or
11  when you explained to a reporter that I'll give
12  you this information but it's embargoed, did you
13  have a reporter ask you what's embargoed
14  information?
15    A.    No.
16    Q.    Did you ever have any reporters while
17  you worked on the Hill express any confusion to
18  you about what the embargo was?
19    A.    No.
20    Q.    Did you have any written procedures on
21  the Hill of how you would implement the embargo
22  you were utilizing?

Page 163

1    A.    No.
2    Q.    Why is that?
3    A.    It's a widely understood practice in
4  the media.
5    Q.    In the six years you were on the Hill,
6  did you ever have any instances where another
7  reporter came to you and said, you know, working
8  with somebody else here and they don't seem to
9  understand what your embargo means?
10        MR. THEODOROU: Objection.
11    A.    No.
12        BY MR. ROSSETTI:
13    Q.    Did you have any instance on the Hill
14  where you thought that there was some
15  misunderstanding about what the embargo meant;
16  misunderstanding between you and any number of the
17  media?
18    A.    No, never.
19    Q.    Now, you left the Hill and then you
20  went to the Treasury as the assistant secretary,
21  correct?
22    A.    Right.

Page 164

1    Q.    And you explained that you got
2  confirmed and took your position officially in
3  August of '01 but that you were at Treasury
4  starting in January?
5    A.    Right.
6    Q.    Is that right. During that period
7  from January to August, you were an acting
8  secretary at that time?
9    A.    No. I was officially, I was there as
10  a consultant in the department.
11    Q.    Was there anybody who was the acting
12  assistant secretary at that time?
13    A.    My deputy or I hired someone to be the
14  deputy assistant secretary and he was the
15  acting -- he was technically the acting, just
16  waiting for me to be confirmed.
17    Q.    Who was that?
18    A.    Rob Nichols.
19    Q.    So Rob Nichols was basically caretaker
20  for your position for the seven months it took for
21  you to get confirmed?
22    A.    While I was there doing the job for

Page 165

1  the most part.
2    Q.    Did you, in fact, supervise him even
3  though he had -- did he have the title -- let me
4  withdraw that. Did he have the title of acting
5  assistant secretary?
6    A.    I'm not sure. I don't remember.
7    Q.    Were you actually supervising him
8  during that seven-month period of time?
9        MR. THEODOROU: Objection.
10    A.    Technically, I was just there as a
11  consultant.
12        BY MR. ROSSETTI:
13    Q.    Right. But in practice, were you
14  supervising him?
15    A.    Right. In the Public Affairs
16  Department.
17    Q.    You were?
18    A.    Yes.
19    Q.    Okay. And you explained to
20  Mr. Theodorou that your predecessor, Michelle
21  Smith, spent some time with you on a transition
22  period; is that right?

Page 166

1    A.   Yes.
2    Q.   How long did that period of time last,
3  that transition period?
4    A.   She and I met probably several times
5  over the first month and, you know, it wasn't a
6  set period of time, we just got together several
7  times over the first month and then talked on the
8  phone, you know, there wasn't a regularly
9  scheduled thing.
10    Q.   When was it that you started having
11  any discussions with Michelle Smith --
12    A.   Probably the first or second --
13    Q.   Let me withdraw that.  President Bush
14  came into office January 20st, 2000, correct?
15    A.   Right.  And I started --
16    Q.   2001.  I'm sorry?
17    A.   I started at Treasury one week later
18  and within a few -- she made contact very soon
19  just to offer to break me through up on anything
20  and we got together probably within the first
21  several days I'm sure.
22    Q.   So after Bush was inaugurated she

Page 167

1  stayed in that position --
2    A.   No.  She left the day of the
3  inauguration, she was not there at all.  She had
4  left and I was there but she would come in and
5  just to meet with me and walk me through things.
6    Q.   I see.  And how was that arranged for
7  her to come in after President Bush --
8    A.   She called and offered and I set up
9  meetings.
10    Q.   And how many hours do you think it was
11  that you met with her?
12    MR. THEODOROU:  Objection.
13    A.   It's very hard to remember.  I
14  don't -- I mean, I know her very well now because
15  so many years later, but it's hard to remember
16  exactly then.
17    Q.   What types of information were you and
18  she exchanging?
19    A.   Everything from standard practice on
20  the dealing with the press room guys and the guys
21  who worked down there in the building, their
22  access across the building, things like that, the

Page 168

1  new website, how to -- one thing I had never done
2  before was have traveling press go on an
3  international trip with us, so we spent a lot of
4  time on that and how that all works, just kind of
5  walked me through the mechanics of reporters
6  traveling with the secretary and then very much
7  just the mechanics of the building.  Because
8  obviously, I didn't need to be briefed on any of
9  the policy positions because it was a new
10  administration so it was just mechanics.
11    Q.   Right.  You mentioned there was a
12  press room, that was the room in the --
13    A.   It was a room in the basement of the
14  building where reporters work.
15    Q.   What you need to do is wait for me to
16  finish my question, you might be anticipating what
17  it is --
18    A.   Sorry.
19    Q.   -- and you might be correct, but for
20  purposes of making sure we have a clear record
21  here, you need to let me finish.  Okay.  You
22  explained there was a press room.  There's

Page 169

1  actually a room inside of Treasury where media
2  personnel can go and use as their office?
3    A.   Yes.
4    Q.   The other assignments only certain
5  press can go into that press room or how does that
6  work?
7    MR. THEODOROU:  Objection.
8    A.   There are -- different media
9  organizations have to apply for a desk in that
10  room and then they can assign a couple of, it
11  depends on the organization, they'll assign one,
12  two or three reporters to work out of that desk
13  which the desk that I was manned and then those
14  reporters have hard passes to get in and out of
15  the building.
16    Q.   Just getting back to your discussions
17  with Michelle Smith, what if any discussion did
18  you have with her about the embargo policy that
19  the Treasury had used or was using?
20    A.   I don't recall specific conversation
21  on about that and we talked about the way that
22  everything about the way she delivered information

Page 170

1  to the press room. So I'm sure we walked through
2  it, but I don't, nothing sticks out in my memory
3  about particular practice on embargoes. She just
4  explained that they bring down information on a
5  embargo basis and that is respected.
6      Q.   Let me ask you this: What were the
7  different ways that Treasury -- let me withdraw
8  that. How was it -- what did Michelle Smith
9  explain to you in terms of how the Treasury
10  released information to the media?
11      MR. THEODOROU: Objection.
12      A.   Again, it depends on the information,
13  but there are a lot of standard releases, whether
14  they're monthly or quarterly of data that are
15  simply hand-delivered on paper to that room with
16  an embargo set by the room itself.
17      Most of the time the reporters in the room
18  while a Treasury person is there before they hand
19  it out will say okay, here we are. I'm about to,
20  I have got the X, Y, Z data today and they would
21  all gather and look at their watches and set an
22  embargo and they would hand out the paper and they

Page 171

1  would all, you know, write the stories in time for
2  the embargoes.
3      BY MR. ROSSETTI:
4      Q.   Would it be fair to say that depending
5  to type of information that's being released,
6  there's a different way that the information is
7  actually released to the media?
8      MR. THEODOROU: Objection.
9      A.   Definitely. I mean, data things that
10  like that were much it's more of a -- there's
11  nothing really for anyone to say. It's just a
12  matter of going down there and handing them
13  something procedurally. Other times I or someone
14  on my staff directly or if we were handing out
15  testimony and speeches, things like that that they
16  have an embargoed just because we want them to
17  have it and be able to read it and post it and
18  write their stories the moment the secretary
19  starts speaking, those aren't necessarily news
20  making, but the embargo is set just to be equal
21  with the time that it marks.
22      BY MR. ROSSETTI:

Page 172

1      Q.   Let me just be clear about how that
2  operates, how it operated in 2001 in terms of
3  matter of releasing of information. Were there
4  press conferences that were actually being held?
5      A.   We have press conferences in the
6  building. Yes.
7      Q.   There was a discussion earlier about
8  treasury refunding conferences, do you recall
9  that? You got to answer yes or no.
10      A.   Yes. I'm sorry.
11      Q.   In addition to those press
12  conferences, were there other press conferences
13  held?
14      A.   Yes.
15      Q.   Was there a difference, did every
16  press conference, regardless of whether it was
17  just run-of-the-mill press conference or a special
18  Treasury refunding conference, did they all use
19  embargoes?
20      A.   No.
21      Q.   Why not?
22      A.   It depends on the nature of the event.

Page 173

1  If it was a press conference about leaving on a
2  foreign trip and having a press conference
3  beforehand to talk about it, there was no reason
4  to embargo it. Embargo was normally used for
5  something that's, something that's market
6  sensitive so that everyone gets the information
7  out exactly the same time.
8      Q.   You said the information was market
9  sensitive. What do you mean by market sensitive?
10      A.   Information that other people in the
11  building, the policy professionals in the building
12  felt would be a value to people trading somewhere
13  in the world.
14      Q.   So once that -- was it that if once
15  that information was released, market would trade
16  on that information?
17      A.   Yes.
18      MR. THEODOROU: Objection. You got to
19  wait until I raise my objections.
20      A.   Okay.
21      BY MR. ROSSETTI:
22      Q.   Did anyone explain to you in Treasury

1  what market sensitive meant?

2      A.   They would just say this is market

3  sensitive and you know, we treated all data as --

4  we treat every data release as something that is

5  being embargoed.

6      Q.   Just so we're clear, I just want to

7  focus on the 2001 time frame?

8      A.   Okay.

9      Q.   As opposed to your dealings there now.

10     A.   I see.

11     Q.   What was your understanding in 2001

12 about what market-sensitive information, what that

13 meant?

14     A.   You mean what that --

15     Q.   What was your understanding of what

16 that meant?

17         MR. THEODOROU:  Objection.

18         MR. ROSSETTI:  In 2001.

19     A.   Again, anything that someone would

20 trade on.

21     BY MR. ROSSETTI:

22     Q.   And why was it that -- with regards to

1  market-sensitive information, what was the

2  procedure that you had in place to release that

3  information?

4          MR. THEODOROU:  Objection.

5      A.   We would take other releases of I

6  guess of data we would take to the press room and

7  release I and give it to them with an embargo.

8          BY MR. ROSSETTI:

9      Q.   So you would give it to them and then

10 do what with it in terms of telling them it was an

11 embargo?

12     A.   We would either set an embargo on the

13 piece of paper we handed them or go into the room

14 and collectively they would all establish an

15 embargo.

16     Q.   So in the first instance, you could

17 have a piece of paper with the information on it

18 that you're releasing and on that, it would say

19 embargo at say, for example, 9 clock; is that

20 correct?

21     A.   Yes.

22     Q.   What would be the other way, another

1  matter of doing it?

2      A.   It would be to just walk in with a

3  paper and, you know, usually the press room knows,

4  they know when data releases are coming and you're

5  not walk in there with a surprise, it would be to

6  just walk in and say I've got such and such data

7  and they would all kind of finish what they were

8  doing and make sure everyone was ready for it, and

9  then they would among themselves whoever was the

10 most senior reporter in the room would be the buy

11 who everyone looked to and it was like, okay, it's

12 2:06, let the embargo for 2:15 and they would all

13 agree and they would get their paper.

14     Q.   So you would tell them that this

15 information is subject to an embargo and then

16 they, among themselves, would agree that this

17 information was going to be embargoed until X

18 time?

19         MR. THEODOROU:  Objection.

20     A.   It usually didn't even require us to

21 say this is going to be a embargoed.  These are

22 regular releases that are, they know as soon as we

1  walk in with it that they need to set an embargo.

2          BY MR. ROSSETTI:

3      Q.   But you wanted it to be embargoed,

4  it's not like you're going down there with

5  nonembargoed information and they're going to set

6  an embargo?

7      A.   I mean, they've done that before, too.

8  I mean, there are times when they have if they're

9  talking, they have an interview with the senior

10 official, they will among themselves set an

11 embargo just because none of them want to be last

12 to hit the wire.

13     Q.   I see.  What is the, why is it that

14 treasury wanted an embargo?

15         MR. THEODOROU:  Objection.  Asked and

16 answered three times.

17     A.   It again, it depends.  When there's

18 more information, it depends on the volume of

19 information that you're giving them.  An embargo

20 is useful when in a lot of circumstances but it's

21 also useful when there's information that needs to

22 be digested so that you don't just get someone

Page 178

1  scanning a piece of paper and throwing something
2  in the wire that's out of context.
3      BY MR. ROSSETTI:
4      Q.  And why does -- so would it be fair to
5  say that the Treasury wants orderly dissemination
6  of information it's providing?
7      MR. THEODOROU: Objection.
8      A.  To have the information be presented
9  as clearly as possible.
10     BY MR. ROSSETTI:
11     Q.  Does the, was the Treasury also
12 concerned that the information being released --
13 that the press was releasing was accurate.
14     MR. THEODOROU: Objection.
15     A.  Yes. Accurate and clear.
16     BY MR. ROSSETTI:
17     Q.  And those are at least two reasons for
18 Treasury employing an embargo?
19     A.  Yes.
20     MR. THEODOROU: Objection. You got to
21 wait for the objection.
22     MR. ROSSETTI: I'm sorry. Your answer?

Page 179

1      A.  Yes. In cases with a lot of data.
2      BY MR. ROSSETTI:
3      Q.  What about with market-sensitive
4  information?
5      MR. THEODOROU: Objection.
6      A.  Whenever the Treasury is releasing
7  market-sensitive information, we want to have
8  procedures in place to make sure that that
9  information is released accurately and clearly.
10     BY MR. ROSSETTI:
11     Q.  Are there any other reasons why you
12 want to, the Treasury wanted to use an embargo for
13 market-sensitive information.
14     MR. THEODOROU: Objection.
15     A.  I think that covers it.
16     BY MR. ROSSETTI:
17     Q.  Other than Treasury wanting it and
18 you've indicated the press wanted it, was there
19 anybody else who wanted an embargo?
20     MR. THEODOROU: Objection.
21     A.  Not that I can think of.
22     BY MR. ROSSETTI:

Page 180

1      Q.  When you got to Treasury you had a
2  staff of people working for you; is that right?
3      A.  Yes.
4      Q.  Who was that staff?
5      A.  When I first got there, all the
6  political slots were empty so the staff was only
7  the career staff which was the three staff
8  assistants and the photographer and two people who
9  do the clips.
10     Q.  Who were they?
11     A.  You want names of everybody?
12     Q.  Yes.
13     A.  Okay. This is a memory test.
14     Q.  In 2001?
15     A.  Yes. This is a test. Frances
16 Anderson, Sharon Lee, Sam Reese, Bill Robertson,
17 Chris Taylor and I cannot remember the other
18 assistant's name whose not there anymore. Marie
19 Stickler.
20     Q.  And what about Rob Nichols?
21     A.  No. I hired him.
22     Q.  When did he come on?

Page 181

1      A.  Maybe a month later.
2      Q.  But he was part -- that's what I'm
3  asking, who your staff was?
4      A.  He came on about a month later, Tony
5  Fratto a few months after that.
6      Q.  What about Betsy Holahan?
7      A.  Betsy was not until the summer.
8      Q.  Now, did you have conversations with
9  your staff about the use of embargoes at the
10 Treasury Department?
11     MR. THEODOROU: Objection.
12     A.  We would have conversations about
13 specific events and I mean, in the interview
14 process in interviewing anybody to come to work
15 there was when you would get an assessment of how
16 well they understood engaging with the press and
17 then, you know, every day we would talk about
18 upcoming events and how we would -- how that
19 specific event needed to be handled.
20     BY MR. ROSSETTI:
21     Q.  Did you interview Tony Fratto?
22     A.  Yes.

Page 218

1  recall anybody specifically raising that.
2      BY MR. ROSSETTI:
3      Q.   Do you know of anyone prior to October
4  31st, any media people intentionally violating the
5  Treasury Department embargo.
6      MR. THEODOROU: Objection.
7      A.   No.
8      BY MR. ROSSETTI:
9      Q.   You were asked some questions about
10  the early posting of the Treasury refunding press
11  release on the Treasury website. Do you recall
12  those?
13      A.   Yes.
14      Q.   And you said you learned that Frances
15  Anderson had posted it early; is that correct?
16      A.   Yes.
17      Q.   And Mr. Theodorou showed you some
18  exhibits. Exhibit 10 if you can get that in front
19  of you.
20      A.   Yes.
21      Q.   You sent an E-mail to some of your
22  colleagues in the public affairs office and the

Page 219

1  Office of Domestic Finance and you characterized
2  it as posting was unfortunate and you're
3  apologizing for carelessness in your office.
4      Did you reach any conclusion that the early
5  posting of the information on the website was
6  anything but was just carelessness?
7      MR. THEODOROU: Objection.
8      BY MR. ROSSETTI:
9      Q.   As opposed to anything else?
10      A.   Carelessness. To this day, I believe
11  it was just carelessness.
12      Q.   You didn't conclude there was any
13  intentional wrongdoing on anybody's part regarding
14  that?
15      A.   No.
16      Q.   Did anyone tell you that they had
17  learned that it was anything but carelessness?
18      MR. THEODOROU: Objection.
19      A.   No.
20      BY MR. ROSSETTI:
21      Q.   You were asked some questions about
22  the Treasury borrowing advisory committee. Did

Page 220

1  the Office of Public Affairs have any
2  responsibility for the treasury borrowing advisory
3  committee at all?
4      A.   Just releasing every quarter their one
5  document at the quarterly refunding -- the day
6  before the quarterly refunding announcement.
7      Q.   But did you have any responsibility
8  monitoring what the members of the committee did?
9      A.   No. Just that one quarterly release
10  that we did on their behalf.
11      Q.   Are you aware of any rules,
12  confidentiality rules that the members of the
13  Treasury borrowing advisory committee have to
14  abide by?
15      MR. THEODOROU: Objection.
16      A.   Not that I know of. I don't know
17  anything about them.
18      MR. ROSSETTI: I'm sorry?
19      A.   I don't know anything about them.
20      BY MR. ROSSETTI:
21      Q.   Were you aware of any sort of
22  confidentiality agreement being used at Treasury

Page 221

1  with nonemployees about setting forth their use of
2  any information that they learned at Treasury?
3      MR. THEODOROU: Objection.
4      A.   Not that I know of. No.
5      BY MR. ROSSETTI:
6      Q.   You indicated earlier that you learned
7  that Peter Davis had attended the Treasury
8  refunding conference. How is it you learned that?
9      A.   I read it in some wire story, it was
10  the first I heard of it.
11      Q.   And you had never heard of Peter Davis
12  prior to that?
13      A.   No.
14      Q.   Mr. Theodorou was asking you some
15  questions about if you look at Exhibit 7?
16      A.   (The witness complies.) Yes.
17      Q.   There's some comments attributed to
18  Tony Fratto about thinking it's likely that some
19  of those may have gotten into the conference or
20  his clarification that, quote, I think it is
21  unlikely that others have not gotten into these
22  things in the past.

Page 226

1    A.   It just looks like we were just trying
2  to decide what to say publically about the whole
3  incident.
4        MR. THEODOROU:  Objection.  Isn't this
5  what this remain confidential?
6        MR. ROSSETTI:  She said she doesn't
7  know.
8        BY MR. ROSSETTI:
9    Q.   He discusses there was a leak a few
10 weeks ago at emergency reopening.  Did you have
11 any discussions with Bitsberger about that?
12       MR. THEODOROU:  Objection.
13   A.   No.
14       BY MR. ROSSETTI:
15   Q.   Do you know what the basis for the
16 statement was?
17   A.   No.
18   Q.   Did he ever tell you what the basis of
19 his statement was?
20       MR. THEODOROU:  Objection.
21   A.   No.
22       BY MR. ROSSETTI:

Page 227

1    Q.   Did you ever learn what the basis of
2  his statement was?
3    A.   No.
4    Q.   Did you have discussions with anybody
5  else about his statement that there was a leak a
6  few weeks ago at the emergency reopening?
7    A.   It would have been with Tony.
8    Q.   I'm sorry?
9    A.   It would have been with Tony Fratto.
10   Q.   But --
11   A.   That's the only person I would have
12 discussed this with.
13   Q.   Do you recall having a discussion with
14 Tony Fratto?
15   A.   No.
16   Q.   Did you learn whether or not, in fact,
17 there was, in fact, ever a leak?
18   A.   No.
19   Q.   He says, "The refunding process has
20 been criticized for years because of suspected
21 leaks."  Do you have any -- did you have any
22 discussions with Bitsberger or who was

Page 228

1  criticizing?
2    A.   No.
3    Q.   Did you ever learn who was apparently
4  making this criticism?
5    A.   No.
6    Q.   Do you have any idea if Bitsberger's
7  statement that there was a leak a few weeks ago at
8  the emergency reopening was even true?
9        MR. THEODOROU:  Objection.
10   A.   No.
11       BY MR. ROSSETTI:
12   Q.   Do you have any personal knowledge of
13 any criticism about the refunding process and that
14 there had been suspected leaks?
15       MR. THEODOROU:  Objection.
16   A.   No.
17       BY MR. ROSSETTI:
18   Q.   In the last E-mail at 3:54 it says, in
19 response to a question from Tony Fratto, "There
20 was a leak during the emergency reopening,
21 question mark and Bitsberger responds, yes,
22 attributed to the borrowing committee."  Did you

Page 229

1  ever learn who attributed the leak to the
2  borrowing committee?
3    A.   Again, I wasn't a part of that E-mail,
4  so I didn't know.
5        MR. THEODOROU:  Objection.
6        BY MR. ROSSETTI:
7    Q.   Did you ever learn that the alleged
8  leak at the reopening was attributed to the
9  Treasury borrowing advisory committee?
10       MR. THEODOROU:  Objection.
11   A.   No.
12       BY MR. ROSSETTI:
13   Q.   If you look at Exhibit 6.
14   A.   (The witness complies.)
15   Q.   There's a sentence here, paragraph's
16 in the middle of the page it says Treasury
17 officials declined to comment on the early release
18 other than to determine the curve, that's the
19 release on October 31st.
20       This article then goes on to say it was the
21 second time the Department has posted embargo
22 information on the website before it was scheduled

Excerpt from the

August 23, 2006

deposition of

Elizabeth Holahan Schmutz

Exhibit E

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )

UNITED STATES SECURITIES AND          )

EXCHANGE COMMISSION,                   )

         Plaintiff,            )

          v.                  ) No. 05-10983 (NMG)

STEVEN E. NOTHERN,                     ) August 23, 2006

         Defendant.            )

- - - - - - - - - - - - - - - - )

Washington, D.C.

Videotape Deposition of ELIZABETH HOLAHAN SCHMUTZ, a

witness herein, called for examination by counsel for

Defendant in the above-entitled matter, the witness

being duly sworn by CHERYL A. LORD, a Notary Public

in and for the District of Columbia, taken at the

offices of FOLEY HOAG LLP, 1875 K Street, N.W., Suite

800, Washington, D.C., at 10:16 a.m., Wednesday,

August 23, 2006, and the proceedings being taken down

by Stenotype by CHERYL A. LORD, RPR, CRR, and

transcribed under her direction.

Page 62

1    Q.   Turning your attention -- directing your
2  attention to October 31, 2001, the refunding
3  conference, did you address the attendees?
4    A.   Yes.
5    Q.   What did you say?
6    A.   I informed the attendees of the press
7  conference that there would be an embargo in place
8  until 10 AM.
9    Q.   Did you tell them what embargo meant?
10    A.   I did not.
11    Q.   Were you aware that there were attendees
12  who were not members of the press at that conference?
13    A.   I was not aware of attendees at the press
14  conference not being members of the press or the
15  Treasury Department.
16    Q.   How long did you speak to the audience?
17    A.   A few seconds.
18    Q.   A few seconds?
19    A.   A few seconds.
20    Q.   About what time did you address them?
21    A.   Approximately 9 AM before the press
22  conference began.

Page 63

1    Q.   As best you can recall, could you please
2  tell us what you said.
3    A.   I said, approximately something along the
4  lines of, this information is embargoed until 10 AM.
5          I reannounced -- I reannounced that at the
6  end of the press conference.
7    Q.   And about what time was that?
8    A.   9:25 AM.
9    Q.   When you addressed them at about 9 AM, you
10  did not tell them what the embargo meant.
11          Correct?
12    A.   Correct.
13    Q.   When you readdressed them at 9:25 AM, did
14  you tell them what embargo meant?
15    A.   No.
16    Q.   Do you know before October 31, 2001, if
17  Treasury ever obtained the consent of the attendees
18  at quarterly refunding conferences to abide by the
19  embargoes?
20          MS. WILLIAMS:  Objection.
21          And just to clarify, back to the beginning
22  of time, or --

Page 64

1          MR. THEODOROU:  During the time that she
2  was there from October -- she started in August --
3          MS. WILLIAMS:  August.
4          MR. THEODOROU:  -- to her knowledge before
5  October 31st, 2001.
6    BY MR. THEODOROU:
7    Q.   To your knowledge, did Treasury ever
8  obtain the consent of the attendees to abide by
9  the -- by an embargo?
10    A.   To my knowledge, no.
11    Q.   All right.  Did you obtain a consent from
12  anybody who attended the October 31, 2001, refunding
13  conference to abide by the embargo?
14    A.   No.
15    Q.   Did you ask any of the attendees to
16  express their consent to the terms of the embargo?
17    A.   No.
18    Q.   So you simply told them an embargo time
19  and assumed that they would honor it?
20          MS. WILLIAMS:  Objection.
21    A.   I told members of the media the ground
22  rules for the press conference.

Page 65

1    BY MR. THEODOROU:
2    Q.   And those ground rules were what?
3    A.   There was an embargo in place until 10 AM.
4          MR. THEODOROU:  I have an exhibit.
5          (Holahan Exhibit No. 1
6          was marked for
7          identification.)
8    BY MR. THEODOROU:
9    Q.   All right.  Ms. Holahan, I'm showing you
10  what's been marked as exhibit 1.
11          Do you see that?
12    A.   I do see it.
13    Q.   Do you recognize that document?
14    A.   I do recognize it.
15    Q.   And what is it?
16    A.   It's a summary of an interview that I gave
17  on November 7th, 2001.
18    Q.   And you've seen that document before.
19          Correct?
20    A.   Correct.
21    Q.   When did you see it the first time?
22    A.   When I met with the attorneys from the

Page 66

1  Securities and Exchange Commission and the Treasury
2  Department this past spring.
3      Q.   And most recently, when did you see it?
4      A.   Yesterday.
5      Q.   And you reviewed it.
6          Correct?
7      A.   I reviewed it at both of those meetings,
8  yes.
9      Q.   All right.  Now, if you -- since you've
10  reviewed it, if you want to take your time and look
11  at it again, because I'm going to be asking you some
12  questions, you can take the time to look at it.
13          (Pause.)
14        BY MR. THEODOROU:
15      Q.   Do you see it?
16      A.   I see it.
17      Q.   All right.  And you recall being
18  interviewed by officials from the SEC and the
19  Treasury Department inspector general's office in
20  2001.
21          Correct?
22      A.   Correct.

Page 67

1      Q.   Now, during the interview, you told the
2  SEC and the OIG from the Department of the Treasury
3  that reporters were governed by the honor system not
4  to release the information before the embargo time.
5          Do you remember saying that?
6        MS. WILLIAMS:  Objection.
7        MR. ROSSETTI:  Which page are you on?
8          Which page are you on, Nick?
9        MR. THEODOROU:  I would quote it.
10        BY MR. THEODOROU:
11      Q.   Page 2, the end of the first paragraph:
12  She added that she gave -- all right?  -- the ground
13  rules and that the reporters are governed by the
14  honor system to not release the information prior to
15  the embargo time.
16          Correct?
17      A.   I do recall describing that to the
18  interviewers at that day.
19      Q.   Okay.  So by looking at this document, it
20  refreshes your recollection about some additional
21  details about what you said that day?
22      A.   Yes.

Page 68

1      Q.   All right.  And what did you tell them
2  about the honor system?
3      A.   I explained that there's an agreement
4  between the office of public affairs and the
5  reporters that we will give them information in
6  advance of the event to help them write their
7  stories, we will not post the item on the Web site
8  until the agreed-upon time, the embargo time, and
9  that then they are to hold their stories until said
10  time, and then release them at the same time, so if
11  that agreement is not honored, then we will not give
12  them the privilege of having the information in
13  advance.
14      Q.   You remember talking about an agreement
15  with the reporters?
16      A.   I don't recall my exact words.
17      Q.   Did you are tell reporters what would
18  happen to them if the embargo was not honored?
19      A.   When?
20      Q.   At the conference, the press conference --
21      A.   No, I did not.
22      Q.   -- when you spoke on October 31st?

Page 69

1      A.   No.
2      Q.   Now, you didn't obtain any consents from
3  them to honor the embargo.
4          Correct?
5      A.   Correct.
6      Q.   You simply spoke about the embargo time?
7      A.   Correct.
8      Q.   Now, you testified earlier you addressed
9  the reporters twice.
10      A.   That is what --
11      Q.   Right?
12      A.   -- I recall today, yes.
13      Q.   Now, you testified -- not "testified," but
14  when you were interviewed, you said you addressed
15  them 3 times.
16      A.   Correct.
17      Q.   Does this refresh your recollection as to
18  talking to them a third time?
19      A.   Sitting here today --
20      Q.   Exhibit 1?
21      A.   -- I do not recall addressing them the
22  third time before the question-and-answer period.

1         was marked for

2            identification.)

3         BY MR. THEODOROU:

4    Q.  Ms. Holahan, I want to show you what's

5    been marked as exhibit 2.

6         Do you see that document?

7    A.  I do see it.

8    Q.  Did you ever -- have you seen this before,

9    this document?

10   A.  Not to my recollection.

11   Q.  Why don't you take a look at it, read

12   through it.

13        (Pause.)

14        BY MR. THEODOROU:

15   Q.  Have you had a chance to look at it?

16   A.  Yes.

17   Q.  Now, does that refresh your recollection

18   about any instances where advance information got out

19   before a Treasury announcement?

20   A.  Repeat the question, please.

21   Q.  All right.  Well, if you take a look at

22   the document, you'll see that it deals with advance

1    information getting out before Treasury's

2    intermediate issuance of 10-year notes on October

3    4th, 2001.

4         Correct?

5         If you look at the lower portion of the

6    document.

7    A.  M-hm.

8    Q.  Last paragraph -- 2 paragraphs.

9    A.  Okay.  I'm sorry.

10        I was looking for the date.

11        Yes, I do see the last 2 paragraphs, m-hm.

12   Q.  And the document is -- it's a -- what is

13   the document?

14        It's a Reuters report.

15        Correct?

16   A.  It's a story, yes, a wire story.

17   Q.  It's a story from Reuters which talks

18   about what happened at Treasury on 10-31-

19   A.  Correct.

20   Q.  -- -2001?

21        Correct?

22   A.  That's the date the story was filed at

1    1528.

2    Q.  Correct.

3         Now, the last couple paragraphs in the

4    document state that:  Barclay's -- this man's name is

5    John Roberts -- recalled a similar flap earlier this

6    month when the Treasury decided to flood the market

7    with more 10-year notes to ease the liquidity logjam

8    caused by failed trades after the September 11

9    attacks on Washington and New York.

10        And it quotes Mr. Roberts as saying:  When

11   they did the reopening of the 10-year, there was

12   advance information on the street.  There's advance

13   information here, and so there were a number of

14   people in the street who were pretty upset about it,

15   Roberts said.

16        Now, were you aware of an instance where

17   advance information got out before Treasury's

18   intermediate issuance of the 10-year notes?

19   A.  No, I'm not.

20   Q.  You don't recall that incident?

21   A.  No.

22   Q.  Do you know if that incident was -- have

1    you ever heard of that incident happening where there

2    was concern about something happening on October 4th,

3    2001, concerning 10-year notes?

4    A.  I recall the issuance of the 10-year

5    notes, but I do not recall --

6    Q.  -- an issue about advance information?

7    A.  No.

8    Q.  So do you recall whether Treasury ever

9    investigated advance information getting out about

10   the 10-year notes in early October?

11   A.  I have no knowledge of that.

12   Q.  All right.

13        MR. THEODOROU:  Another exhibit.

14            (Holahan Exhibit No. 3

15             was marked for

16             identification.)

17        BY MR. THEODOROU:

18   Q.  I'm showing you now, Ms. Holahan, what's

19   been marked as exhibit 3.

20        Do you see that?

21   A.  I do.

22   Q.  All right.  Have you seen that document

Page 82

1  information of Kenneth Dam's remarks?
2  A.  I don't recall.
3  Q.  Do you know if any investigation was
4  conducted of that incident?
5  A.  I don't have any knowledge of that.
6  Q.  Did you learn anything about this early
7  disclosure of secretary Dam's remarks after October
8  31st?
9  A.  I have no recollection of that.
10  Q.  In other words, when people became
11  concerned about what happened on October 31st at the
12  refunding conference, did anybody talk to you about
13  what happened with secretary Dam's press conference?
14  A.  I don't recall any conversations taking
15  place.
16  Q.  So you had no involvement in coordinating
17  secretary Dam's conference; is that right?
18  A.  That's correct.
19  Q.  And to your recollection, Tasia Scolinos
20  may have been involved in it?
21  A.  I'm making an assumption.
22  Q.  Do you know who was responsible for

Page 83

1  posting secretary Dam's remarks on the Treasury Web
2  site?
3  A.  I know who was responsible for posting all
4  documents on the Web site.
5  Q.  Who was that?
6  A.  Frances Anderson.
7  Q.  And who is Frances Anderson?
8  A.  She's an administrative assistant within
9  the office of public affairs.
10  Q.  And did she report to you?
11  A.  No, she did not.
12  Q.  Whom did she report to?
13  A.  Tony Fratto.
14  Q.  Did you ever hear about any Treasury
15  employee being reprimanded about the Dam incident?
16  MR. McGIVERN:  Objection.
17  A.  Not to my recollection.
18  BY MR. THEODOROU:
19  Q.  Not to your recollection?
20  A.  No.
21  Q.  Are you aware of any changes that Treasury
22  made to its embargo procedures -- excuse me.

Page 84

1  Strike that.
2  THE VIDEOGRAPHER:  Excuse me,
3  Mr. Theodorou.
4  I need to change the tape in a minute.
5  MR. THEODOROU:  Oh, okay.
6  He's going to change the tape.
7  THE VIDEOGRAPHER:  This is the end of tape
8  number 1 of the video deposition of Elizabeth
9  Holahan.  Off the record at 11:45:42 AM on August
10  23rd, 2006.
11  (Recess.)
12  THE VIDEOGRAPHER:  This is the beginning
13  of tape number 2 in the video deposition of
14  Ms. Elizabeth Holahan.  On the record at 11:50:26 AM
15  on August 23rd, 2006.
16  BY MR. THEODOROU:
17  Q.  Ms. Holahan, earlier, you testified about
18  a conversation you had with secretary Fisher about
19  the sensitivity of the information at the refunding
20  conference.
21  Correct?
22  A.  Correct.

Page 85

1  Q.  All right.  Did secretary Fisher make a
2  proposal to put the announcement in the Internet
3  immediately at the start of the press conference?
4  A.  He did.
5  Q.  And what do you remember him saying?
6  A.  My recollection is that he suggested that
7  the information be released live without an embargo
8  time.
9  Q.  And why wasn't his proposal implemented?
10  A.  Tony Fratto objected.
11  Q.  What did Mr. Fratto say?
12  A.  To paraphrase, his concern was that there
13  would be TV cameras there, and for cameras to come
14  and carry something live, we would have to give them
15  some type of advance indication of what was to be
16  announced.
17  Q.  Were there TV cameras at the refunding
18  conference?
19  A.  There were.
20  Q.  From what outlets?
21  A.  I don't recall.
22  Q.  What did secretary Fisher say to

Page 86

1  Mr. Fratto?
2    A.   I don't recall the exact conversation.
3    Q.   Well, you do remember Mr. Fratto talking
4  to secretary Fisher about the issue?
5    A.   I do.
6    Q.   And again what do you remember?
7    A.   I remember that undersecretary Fisher made
8  a suggestion.  I relayed it to Mr. Fratto.
9         Mr. Fratto objected, and Mr. Fratto and
10  Mr. Fisher and myself had a quick meeting in
11  Mr. Fisher's office, where both sides stated their --
12  sort of their position, and Mr. Fisher agreed to go
13  with Mr. Fratto's plan of having it released with an
14  embargo time.
15    Q.   And what did Mr. Fisher say?
16    A.   I don't recall his exact words.
17    Q.   Well, what do you remember generally?
18    A.   I remember generally that he did not think
19  that was a good idea.
20    Q.   And what do you remember Mr. Fratto saying
21  in response?
22    A.   I don't recall exactly what he said.

Page 87

1    Q.   Well, what do you remember generally?
2    A.   That he thought that everything would be
3  fine and that this was the way to handle the event.
4    Q.   That everything would be fine how?
5         MS. WILLIAMS:  Objection.
6    A.   I'm just giving you an indication of the
7  conversation as I recall it.
8         BY MR. THEODOROU:
9    Q.   I thought you testified earlier that you
10  remembered him talking about television cameras.
11    A.   I do.
12    Q.   All right.  Did he talk to Mr. Fisher
13  about television cameras?
14    A.   Yes, he did.
15    Q.   All right.  So you remember a little bit
16  more?
17    A.   I remember the general conversation as
18  I've described it to you.
19    Q.   All right.  Just so I'm not confused, why
20  don't you describe for me what you remember about
21  that conversation.
22    A.   I remember sitting in Mr. Fisher's office

Page 88

1  with Mr. Fratto and Mr. Fisher saying that he was --
2  he was -- you know, I'm paraphrasing here -- that he
3  was generally, you know, uncomfortable with an
4  embargo with the opportunity for the information to
5  leak out somehow, and that I recall Mr. Fratto
6  explaining to him that -- I do remember him
7  explaining that there's always an embargo at these
8  events and that we have to allow for the television
9  cameras to be there, but for them to come and do it
10  live, they have to bring their satellite trucks.
11  Satellite trucks require parking, being parked at the
12  curb, running the lines into the building up into
13  this room.  It's a great deal of setup.
14         So for the TV cameras to do that, we would
15  have to give them some sort of advance notice of what
16  we were going to be announcing, and that in itself
17  would be more likely to result in a problem or a leak
18  of information.  So therefore, it was advisable to
19  have the embargo in place.
20         And I remember I recall Mr. Fisher
21  basically deferring to Mr. Fratto on this, saying
22  that, you are -- you know, this is your area of

Page 89

1  expertise, I don't agree, but I will go along with
2  it.
3         And I'm paraphrasing all of that.
4    Q.   That the advance notice of the conference
5  Mr. Fratto said would lead to a potential leak?
6         MS. WILLIAMS:  Objection.
7    A.   To the best of my recollection, he was
8  explaining to Mr. Fisher that to call a TV producer
9  and say that we were having a live event at the
10  Treasury Department, we would need to give them
11  additional details about what was to be announced.
12         And that in itself could tip off the
13  market that there was going to be a big
14  announcement.
15         BY MR. THEODOROU:
16    Q.   That it was a live event?
17    A.   Correct.
18         MS. WILLIAMS:  Objection.
19    A.   If it were to be a live event.
20         BY MR. THEODOROU:
21    Q.   Because you actually did give media
22  outlets advance notice of the conference.

1   Q.   Have you seen it before?
2   A.   I have.
3   Q.   When was the last time you saw it?
4   A.   Yesterday.
5   Q.   What is it?
6   A.   It's a media advisory.
7   Q.   For what?
8   A.   For the October 31st quarterly refunding
9   news conference.
10  Q.   Were you involved in drafting this
11  document?
12  A.   Yes, I was.
13  Q.   What did you draft?
14  A.   I wrote the media advisory and I -- I
15  wrote it.
16  Q.   Was anyone else involved in the draft of
17  this document?
18  A.   It was reviewed by others.
19  Q.   Reviewed by whom?
20  A.   Tony Fratto.
21  Q.   Anybody else?
22  A.   Not that I recall.

1   Q.   Were you involved in the distribution of
2   this document to the media?
3   A.   Somewhat.
4   Q.   How?
5   A.   I believe that it was posted to the Web
6   site by Frances Anderson and that I emailed it to
7   reporters from my personal computer in my office.
8   Q.   Was posted by Frances Anderson on the
9   Treasury Web site?
10  A.   That is my assumption.
11  Q.   Did you authorize Ms. Anderson to post it
12  on the Web site?
13  A.   I don't recall specifically giving her
14  those instructions, but it would be not unusual for
15  it to be posted and for me to have given it to her.
16  Q.   So it's fair to say it was your practice
17  to authorize Ms. Anderson to post press releases or
18  announcements on the Web site.
19      Correct?
20      MS. WILLIAMS:  Objection.
21  A.   Repeat the question, please.
22      BY MR. THEODOROU:

1   Q.   Was it your practice when it concerned
2   press conferences that you organized and were
3   responsible for and involved announcements on the Web
4   site -- was it your practice to authorize
5   Ms. Anderson to place announcements on the Web site?
6   A.   It was my practice to request that she
7   post items on the Web site.
8   Q.   Now, this was posted on the Web site to
9   your knowledge.
10      Correct?
11  A.   Correct.
12  Q.   All right.  You also said that you
13  notified certain members of the media yourself; is
14  that right?
15  A.   Correct.
16  Q.   Whom did you notify?
17  A.   I don't have a specific list in my head of
18  reporters that I had on my press list, but I had a
19  list of reporters.
20  Q.   Well, do you recall notifying anybody
21  about this notice?
22  A.   As I said I don't specifically remember

1   emailing this out, but I'm reasonably certain that I
2   did.
3   Q.   Do you recall who were the reporters on
4   your list?
5   A.   I recall members of the Treasury pressroom
6   were on the list.  I recall that reporters from
7   newspapers such as the Wall Street Journal, The New
8   York Times, Washington Post, the Financial Times, and
9   other financial publications would be on that list.
10  Q.   And when you say, members of the Treasury
11  pressroom, are these members of the press who are
12  credentialed by Treasury?
13  A.   Yes, they are.
14  Q.   And who determines their credentials?
15  A.   It's my understanding that their
16  credentials are reviewed by senior members of the
17  office of public affairs before issued.
18  Q.   And who would have been in October 31,
19  2001, the senior members of the office of public
20  affairs who reviewed the credentials of the press and
21  allowed them to become members of the Treasury
22  pressroom?

Page 98

1    A.   At that time, the senior members of the
2  office of public affairs were Michelle Davis,
3  assistant secretary for public affairs, Rob Nichols
4  was the deputy assistant secretary for public
5  affairs, and Tony Fratto was the director of public
6  affairs.
7    Q.   Now, you said that you contacted certain
8  newspapers yourself; is that right?
9    A.   Correct.
10    Q.   Okay.  Whom did -- what newspapers were
11  they?
12    A.   On my press list?
13    Q.   Yes.
14    A.   A variety of reporters on my press list.
15      Some of the examples I gave you were the
16  Wall Street Journal, The New York Times, The
17  Washington Post, the Financial Times.  There were
18  others.
19    Q.   Who did you contact at the Wall Street
20  Journal?
21    A.   When?
22    Q.   October 2001.

Page 99

1    A.   October what?
2    Q.   October 31st, 2001, about this notice.
3    A.   I don't recall.
4    Q.   Who was your contact at the Wall Street
5  Journal in --
6    A.   There were a number of reporters at the
7  Wall Street Journal that I talked to on a regular
8  basis.
9    Q.   And who were some of those reporters that
10  you can recall?
11    A.   I can recall Greg Ip being a reporter that
12  I spoke to on a regular basis, Jake Schlesinger,
13  David Wessel, Mike Schroeder.
14      There were others.
15    Q.   All right.  And who do you recall at The
16  New York Times?
17    A.   The reporter at The New York Times who
18  covered the Treasury Department at that time I
19  believe was Richard Stevenson, but there were other
20  reporters in New York as well that we worked with.
21      Jonathan Fuerbringer.
22    Q.   Anybody else that you can recall?

Page 100

1    A.   Floyd Norris was a columnist at The New
2  York Times.
3    Q.   How about The Washington Post?
4    A.   At that time, John Barry was at the
5  Washington Post.
6      And there were others, but I don't recall.
7    Q.   How about the Financial Times?
8    A.   Reporters that have since left, I don't
9  recall the names.
10    Q.   Now, why would you go out of your way to
11  call them about these conferences?
12      MS. WILLIAMS:  Objection.
13    A.   I didn't say that I called them.
14      BY MR. THEODOROU:
15    Q.   You said you called people on your list
16  about this.
17    A.   I emailed them the media advisory.
18    Q.   I'm sorry.
19      You're right.
20      Why would you contact them?
21    A.   To let them know the event was taking
22  place.

Page 101

1    Q.   And why was that?
2      Why couldn't they just check the Web site
3  on their own?
4      Why did you give them advance notice?
5    A.   It was standard operating procedure to
6  alert the media to an event.
7    Q.   Well, when you say, the media, you're not
8  talking about any media.
9      You're talking about -- you're not talking
10  about the Lowell Sun (phonetic) and Lowell Mast
11  (phonetic).
12    A.   Right.
13    Q.   I mean, you're talking about -- so --
14      THE COURT REPORTER:  I'm sorry?
15      MR. THEODOROU:  The Lowell (phonetic) --
16  (indiscernible).
17      BY MR. THEODOROU:
18    Q.   You're not talking about any media.
19      You're not talking about --
20  (indiscernible).
21    A.   I'm talking about financial reporters for
22  national publications.

Page 198

1    A.    Was that Treasury had made an announcement
2  that CNBC would be interested in and that we were
3  going to have a press conference and that he would
4  want to interview Peter afterwards, I could get him
5  the information before the press conference with the
6  understanding that it was embargoed until 10 AM, it
7  would help the reporter prepare for the interview
8  post-press conference.
9        And he agreed to that embargo.
10   Q.    He agreed to the embargo, but I don't hear
11 you saying that it was only restricted him talking to
12 the reporter.
13       Do you remember saying that to him, or you
14 don't have a recollection?
15   A.    I remember speaking to him and saying that
16 the embargo was at 10 AM and that he could give the
17 information to his reporter.
18       I do not recall saying he could not give
19 it to anyone else, if that's what you're asking.
20   Q.    That's what I was going to ask.
21   A.    Okay.
22   Q.    So you don't know whether you provided it

Page 199

1  to anybody else at CNBC, such as anchors or any other
2  people?
3    A.    I don't have any knowledge of that.
4    Q.    Okay.  Do you know when CNBC first
5  reported Treasury's decision to suspend the 30-year
6  bond?
7    A.    I do not.
8    Q.    Did you ever check?
9    A.    If I did, I don't recall.
10   Q.    What would have happened if CNBC had
11 reported before 10 AM?
12   A.    If -- in your hypothetical situation,
13 would this leak have occurred?
14       MS. WILLIAMS:  Objection.
15       BY MR. THEODOROU:
16   Q.    What would have happened if they had
17 reported it before 10 AM?
18   A.    It depends on the scenario.
19       MS. WILLIAMS:  Objection.
20       BY MR. THEODOROU:
21   Q.    Well, what do you mean, depends on the
22 scenario?

Page 200

1    A.    If the embargo was broken and they were
2  the only ones breaking the embargo, then it would
3  have been a real serious problem.
4    Q.    Now, the text of your mail says:  Again,
5  the number is 202-622-1703, leave reporter's name and
6  number with Anna Hart.
7        Do you see that?
8    A.    I do.
9    Q.    And Anna Hart was Mr. Fisher's
10 administrative assistant?
11   A.    Correct.
12   Q.    CNBC usually have a reporter cover
13 quarterly refunding conferences?
14   A.    You'd have to ask CNBC.
15   Q.    All right.  Let's turn to the next email.
16       Jonathan Fuerbringer.
17       Do you see that?
18   A.    I do.
19   Q.    Why did you send him an email at 9:30 AM
20 that day?
21   A.    The press conference was concluded.  The
22 information had been given to the press.

Page 201

1        Jonathan Fuerbringer works out of The New
2  York Times office in New York City, so he could not
3  have physically been at the press conference.  So I
4  sent it to him by email.
5    Q.    Well, it could have been the press
6  conference he flew down for.
7        Correct?
8        MS. WILLIAMS:  Objection.
9    A.    I'm not going to speculate.
10       BY MR. THEODOROU:
11   Q.    Well, you're speculating when you said he
12 couldn't have been there.
13       Right?
14       MS. WILLIAMS:  Objection.
15   A.    He was not present.
16       BY MR. THEODOROU:
17   Q.    All right.  Now, you attached the same
18 version of Fisher's statement that Tony Fratto had
19 sent you on this one too, on your email to --
20   A.    Yes.
21   Q.    -- Mr. Fuerber- --
22   A.    Fuerbringer.

Page 202

1    Q.   Fuerbringer.
2         Did The New York Times -- The New York
3    Times did not have a reporter at the press conference
4    that day?
5    A.   I don't know.
6    Q.   Did the Times usually have a reporter at
7    the quarterly refunding press conferences?
8    A.   I don't know.
9    Q.   Now, did you discuss the embargo policy
10   with Mr. Fuerbringer?
11   A.   In the subject line, it says, embargoed
12   until 10 AM today, and the document itself is --
13   indicates that it's embargoed until 10 AM.
14   Q.   But as is in the case of CNBC, did you
15   have an oral discussion with him about embargo and
16   what it meant?
17   A.   I did not.
18   Q.   Did you have any discussion with anybody
19   at The New York Times about embargo and what it
20   meant?
21   A.   No, I did not.
22        MS. WILLIAMS:  Objection.

Page 203

1         BY MR. THEODOROU:
2    Q.   Do you recall having a discussion with
3    anybody about The New York Times about the embargo?
4    A.   No, I do not.
5    Q.   From what computer did you send this
6    email?
7    A.   My own.
8    Q.   And how far away was that computer from
9    the diplomatic reception room?
10   A.   It was on the floor beneath the diplomatic
11   reception room.
12   Q.   Okay.  And do you remember when you left
13   the diplomatic reception room on October 31st,
14   approximately?
15   A.   Approximately 9:28.,
16   Q.   So it doesn't take that long to get to
17   your office?
18   A.   It doesn't.
19        MS. WILLIAMS:  Objection.
20        BY MR. THEODOROU:
21   Q.   Do you know when The New York Times first
22   reported the Treasury decision to suspend the 30-year

Page 204

1    bond?
2    A.   I don't have an exact recollection, but
3    the reasonable assumption is the next day.  They
4    publish on a daily basis.
5    Q.   Turning to the next document in this batch
6    in this exhibit, it's your email to Greg Ip.
7         Correct?
8    A.   Correct.
9    Q.   And who is Greg Ip?
10   A.   Greg Ip is a reporter at the Washington
11   Journal.
12   Q.   And why did you send him this email at
13   9:32 AM?
14   A.   For the same reason I sent it to Jonathan
15   Fuerbringer.
16   Q.   And again that was -- you sent him the
17   same version of Mr. Fisher's statement that Tony
18   Fratto had sent you at 8:53?,
19   A.   Correct.
20        But to clarify, Greg Ip does work out of
21   the Washington D.C. bureau.  He simply was not able
22   to attend.  But he's a reporter that covers the

Page 205

1    Treasury Department, covers domestic finance very
2    closely.
3    Q.   Did you discuss the embargo policy with
4    Mr. Ip?
5    A.   How so?
6    Q.   Did you have an oral -- besides sending
7    him the email, do you remember talking to him that
8    day?
9    A.   No.
10   Q.   The next -- Robert Nichols --
11        Do you remember sending Mr. Fisher's
12   statement to any other media outlet before 10 AM on
13   October 31st other than the ones you just testified
14   about?
15   A.   I do not recall sending it to anyone else.
16   Q.   Do you know if anyone at Treasury sent out
17   Mr. Fisher's statement to any other media outlets?
18   A.   I don't have any knowledge of that.
19   Q.   Other than your testimony about your
20   telephone conversation with the producer at CNBC, did
21   you have -- did you speak by telephone with any other
22   reporters or media officials before 10 AM on October

Page 270

1    MR. THEODOROU: Objection.
2    A.    Only someone else who was -- had the same
3  type of clearance that I did.
4    BY MS. WILLIAMS:
5    Q.    Okay.  We had some discussion today about
6  embargo.
7        How did you first come to the
8  understanding of what an embargo is?
9        And that's outside of the Treasury if your
10  understanding came before you started working at
11  Treasury.
12    A.    I don't recall when I first in my career
13  learned what an embargo was, but it's something that
14  when you work with the media, I mean, you just
15  understand what that is.  At some point, I had -- I
16  don't recall if it was in college or if it was
17  working physically with the press, but I was a member
18  of the media, so I just -- I knew what it was.
19    Q.    What, if any, exposure to the media did
20  you have or working for the media did you have in
21  college?
22    A.    I worked for the Syracuse University

Page 271

1  school newspaper.  I was a reporter there.  I was
2  enrolled in Newhouse school of communications as a
3  public relations major.  And I later was a reporter
4  at the Oil Daily Company for 3 years.
5        And then on the other side of the fence, I
6  dealt with the media from a communications manager
7  role at the Farm Credit Council and for Senator Pat
8  Roberts and for the joint economic committee.
9    Q.    Did you have any exposure to embargoes
10  while you were a reporter at Syracuse University?
11    A.    No.
12    Q.    What about at the Oil Daily?
13    A.    I don't think so, although -- I don't
14  recall.
15    Q.    And you mentioned that you also worked for
16  the Farm Credit Council?
17    A.    Correct.
18    Q.    Did you have any sort of exposure to
19  embargoes at the Farm Credit Council?
20    A.    No.
21        We didn't use embargoes there.
22    Q.    Do you know if you had any exposure to

Page 272

1  embargoes prior to coming to Treasury?
2    A.    I don't recall using them as -- there was
3  no need for me to use them as a public affair --
4  public relations person, and I don't remember what
5  the nature of my writing was -- I don't recall using
6  them as a reporter either, so, no.
7        I think my first time using them in
8  practice was at the Treasury Department.
9    Q.    And when you worked on the Hill, were you
10  ever involved in any sort of press conferences where
11  information was embargoed?
12    A.    No.
13    Q.    Besides the Treasury Department, do you
14  know if other government agencies employ embargoes?
15    A.    I don't have direct knowledge, but I'm
16  reasonably certain that they do.
17    Q.    And you haven't had any experience with
18  embargoes from other government agencies?
19    A.    No.
20        I mean, I was at -- I was at one
21  government agency.  Then I went back -- I was still a
22  federal employee, so --

Page 273

1    Q.    I mean, while you were a reporter.
2    A.    While I was a reporter.
3        I'm sorry.
4    Q.    At any time in your career.
5    A.    No.
6    Q.    Do you know if all -- do you know if other
7  than the Treasury embargo procedure if all other
8  embargo procedures -- excuse me.
9        Scratch that.
10        Do you know if the lockdown procedure is a
11  common procedure used with embargoes?
12    MR. THEODOROU: Objection.
13    A.    It's a reasonable assumption that it's
14  not -- it's not a regular operating procedure.  It's
15  fairly unusual.
16    BY MS. WILLIAMS:
17    Q.    Why do you say that?
18    A.    Because there aren't a lot of agencies
19  that have a Treasury -- a pressroom within the agency
20  itself.  So to have a lockdown, you do like a
21  location pressroom to do it in.  You can't just --
22  where else would you hold the reporters.

Page 274

1    So Treasury has a pressroom.  I believe
2  that -- I believe that State does.  And I think maybe
3  Justice does.
4    But those are the only 3 agencies that
5  have a pressroom within the building where something
6  like that could occur.
7    Q.   Do you know if the Department of Labor has
8  a pressroom?
9    A.   I don't know.
10   Q.   Before October 31, 2001, did Treasury use
11 embargoes for the release of information besides
12 information released at quarterly refunding
13 conferences?
14   A.   Yes.
15   Q.   What kinds of other press conferences did
16 Treasury use an embargo?
17   A.   Every speech was embargoed.
18   Q.   And how was the embargo set for those
19 press conferences?
20   MR. THEODOROU:  Objection.
21   A.   Actually it's a speech.
22   BY MS. WILLIAMS:

Page 275

1    Q.   Speeches.
2    A.   So if a government official at the
3  Treasury Department is giving a speech at let's say
4  hypothetically 2 PM, then at roughly, you know, 1:30,,
5  the text of the speech would be taken out of the
6  pressroom with an embargo on it and given to the
7  reporters, and we would reiterate that it's embargoed
8  verbally as well as being on the document itself.
9    Q.   Now, you were asked on direct about
10 exhibit 15.
11   Do you have that exhibit?
12   A.   I do.
13   Q.   And this exhibit discusses some changes in
14 the embargo procedure for a quarterly refunding
15 conferences.
16   Correct?
17   A.   Yes.  Correct.
18   Q.   Do you know if the embargo procedure
19 changed for other -- for speeches that were embargoed
20 after October 31, 2001?
21   A.   No, it did not change.
22   Q.   Do you know if a lockdown was put in place

Page 276

1  for speeches that were embargoed at Treasury?
2    A.   No, it was not.
3    MR. THEODOROU:  Objection.
4    BY MS. WILLIAMS:
5    Q.   After October 31, 2001.
6    A.   No.
7    The lockdown was not used for anything
8  except for the quarterly refunding.
9    Q.   Setting aside the events of October 31,
10 2001, in your tenure at Treasury, did you ever find
11 out if anyone ever intentionally violated the
12 Treasury embargo?
13   A.   Not to my knowledge.
14   Q.   What about unintentional violations?
15   MR. THEODOROU:  Objection.
16   A.   There were unintentional violations.
17   MR. THEODOROU:  Just for the record:  Now
18 it's my turn to get a chance to object, so after she
19 asks the question, you got to give me a little -- a
20 couple seconds to get my objection --
21   MS. WILLIAMS:  Now you see what my issue
22 was, Nick.

Page 277

1    MR. THEODOROU:  -- onto the record.
2    MS. WILLIAMS:  Could you repeat the
3  question and answer.
4    (The reporter read the last question, the
5    objection, and the last answer.)
6    BY MS. WILLIAMS:
7    Q.   How often did unintentional violations
8  occur during your tenure at Treasury?
9    MR. THEODOROU:  Objection.
10   A.   It's my experience that every 3 to 6
11 months, somebody would file their story early
12 accidentally.
13   BY MS. WILLIAMS:
14   Q.   How did these unintentional violations
15 come to your attention?
16   A.   Usually another member of the press corps
17 would contact me and complain.
18   Q.   Did you ever find out about these
19 violations through any other means?
20   A.   I think maybe once or twice I noticed it
21 myself in looking at the stories that they were filed
22 before the embargo time, but it was only by a minute

Page 278

1  or so, but, you know, we would follow up and remind
2  them of the procedure, and getting the information in
3  advance was a privilege and that we could revoke that
4  at any time if we wanted to.
5      Q.   Now, you said that it was usually a minute
6  or 2.
7          What was the longest period of time that
8  you found out that someone had violated an embargo
9  before the embargo time?
10     A.   No more than a minute or 2.
11     Q.   Did you ever take any action to prohibit
12 anyone from receiving embargoed information as a
13 result of their violation of the embargo?
14     A.   It was certainly threatened, but we never
15 actually revoked anyone else's ability to receive
16 information. We know -- we understood that for the
17 most part these are people that are just doing their
18 jobs and accidents happen, and it was never
19 intentional.
20     Q.   What explanations did you receive from
21 reporters who had filed their stories before the
22 embargo time?

Page 279

1          MR. THEODOROU: Objection.
2      A.   The explanations I received was that it
3  was an accident. The editors had inadvertently sent
4  the story a few minutes early, it was not anything
5  that was intentional.
6          They apologized. They were reporters that
7  we dealt with on a daily basis. They worked from the
8  Treasury Department building and they were people
9  that we knew and that, you know, we worked with
10 closely, so we gave them the benefit of the doubt.
11     BY MS. WILLIAMS:
12     Q.   Okay. Now, just to clarify, were there
13 any written procedures regarding embargoes or the
14 release of -- excuse me.
15         Were there any written procedures
16 regarding the embargo policy at Treasury?
17     A.   No.
18     Q.   What about unwritten policies or
19 procedures?
20     A.   Yes.
21         I mean, I think that, you know, the
22 understanding between the office of public affairs

Page 280

1  and members of the Treasury press corps was that, you
2  know, we -- it was a 2-way street and that we gave
3  them information in advance or to help them write
4  their stories and have everybody have their story out
5  at the same time, and so we wouldn't withhold the
6  information. We wouldn't post it on the Web site
7  until the embargo time that we agreed upon. It
8  helped them. It helped us.
9          And so we felt it was, you know, mutually
10 beneficial. It was an understanding that was not in
11 writing, but everybody was very clear on what the
12 rules were and what the understanding was.
13     Q.   Did you ever receive any questions from
14 any reporters about what they were or were not
15 allowed to do with embargoed information while you
16 were at Treasury before October 31, 2001?
17     A.   No.
18     Q.   And I think you were asked on direct about
19 whether there were written policies and procedures
20 regarding how refunding conferences were to be
21 handled.
22         Were there any written policies or

Page 281

1  procedures regarding how refunding conferences were
2  to be handled prior to October 31, 2001?
3      A.   There were not to my knowledge.
4      Q.   What about unwritten policies or
5  procedures?
6      A.   Yes.
7          There were traditions, long-standing
8  traditions of how these things had been done in the
9  past. As we acknowledge in exhibit 15, we talk about
10 the traditional practice of releasing the quarterly
11 refunding announcement at a news conference, so there
12 were traditional practices that the press corps,
13 especially those who worked at Treasury, grew to
14 expect to be handled a certain way, and a lot of
15 times they were pretty clear, this is how it's always
16 been done.
17     Q.   Were there also these traditional
18 practices about how Treasury was going to release
19 information regarding quarterly refunding
20 conferences?
21     A.   Well, that we had a press conference,
22 would be the expected manner of dissemination.

Page 282

1    Q.   And what about with regard to the press
2  release itself?
3         Any traditions as to how you were going to
4  distribute the press release or make the press
5  release public?
6         MR. THEODOROU: Objection.
7    A.   So we would -- that we would hand it out
8  to the media, either take it to the pressroom or wait
9  and hand it out at the press conference.
10        BY MS. WILLIAMS:
11   Q.   And what about with regard to posting on
12  Treasury's Web site?
13        Any traditional practices as to -- excuse
14  me -- traditional practices that Treasury employed
15  regarding the posting of the press release to its Web
16  site.
17        MR. THEODOROU: Objection.
18   A.   We traditionally posted things to the Web
19  site at the time of the embargo, so I mean, they
20  didn't expect things to be on the Web site until the
21  time of the embargo was lifted.
22        BY MS. WILLIAMS:

Page 283

1    Q.   Did you ever receive any complaints that
2  Treasury had delayed in posting a press release to
3  its Web site, had not put it up right at the embargo
4  time?
5    A.   Occasionally, we would get calls from
6  reporters outside of the building looking for a
7  document that had not yet been posted, so, yes.
8    Q.   And why would that occur, that delay in
9  posting?
10   A.   We either -- sometimes we had problems
11  with the computer. Frances was away from her desk,
12  didn't have a chance to post it. There were a
13  variety of reasons why she might be delayed somehow
14  in getting it posted at the time that we intended to
15  have it posted.
16   Q.   Did you ever post any press releases to
17  the Treasury Web site?
18   A.   I didn't know how to do it.
19        We -- Frances was the only person outside
20  of the Web team that had an understanding of how to
21  post documents to the Web site.
22        Tony might have, but I did not.

Page 284

1    Q.   So are you familiar with the term staging
2  server?
3    A.   I've heard it, but it's -- I have a very
4  vague understanding of how that works.
5    Q.   Have you ever posted something on the
6  staging server at Treasury?
7    A.   I think there was a time when Tony tried
8  to train all of us to do this, and no one wanted to
9  do it, and so we had the instructions, but it was so
10  complicated, it just was not worth doing. We had
11  Frances there to do it, and she was -- that was her
12  job.
13   Q.   Was that before or after October 31, 2001,
14  this training that Mr. Fratto tried to provide?
15   A.   I don't recall, but I think it was after.
16        I think we had some problems with things
17  not getting posted properly, and Frances was away,
18  and he thought he could do that by getting everyone
19  to post their own documents, and it didn't stick.
20   Q.   During your tenure at Treasury, did you
21  ever learn that a reporter had provided embargoed
22  information to anyone other than their editor during

Page 285

1  the embargo period, setting aside the events of
2  October 31, 2001?
3    A.   I wasn't aware of that happening, no.
4    Q.   Were you ever made aware that a reporter
5  had provided embargoed information to someone to
6  receive a comment for their article before -- during
7  the embargoed time?
8    A.   I wasn't aware of a specific instance, but
9  I certainly knew that reporters would call me trying
10  to get comment based on information, so it's not a
11  surprise to me that they might try to do that with
12  our information, but what can we do.
13   Q.   Was that something that was allowed under
14  the embargo procedures?
15   A.   No, but we didn't have written procedures.
16   Q.   What about the unwritten procedures?
17        Was that something that was allowed?
18   A.   No, it was not.
19        They -- I mean -- if that were to occur
20  with a reporter in the Treasury pressroom and I were
21  to hear about that, I mean, I would call them and be
22  upset about it, and I'd be -- I'd have reason to be,

Page 286

1 because it would be Treasury information that they
2 were then disseminating to a noneditor, to a
3 nonreporter. I mean, that's the same as just going
4 out and telling someone on the street.
5    Q.   Were you ever made aware that that
6 happened during your tenure at Treasury, that someone
7 had --
8    A.   I don't recall any specific instances
9 until I heard about this one today.
10    Q.   Do you have any personal knowledge that
11 Mr. Collins called anyone at Fannie Mae regarding the
12 October 31, 2001, announcement?
13    A.   I did not have any prior knowledge to
14 today of that happening.
15    Q.   Today, do you have any personal
16 knowledge --
17    A.   Right now?
18    Q.   Yes.
19    A.   I've been told by Mr. Theodorou that he
20 did.
21    Q.   And other than being told by
22 Mr. Theodorou, do you have any other independent

Page 287

1 knowledge yourself?
2    A.   No.
3    Q.   Have you read any documents that suggested
4 that Mr. Collins --
5    A.   No.
6    Q.   -- contacted someone?
7    Have you spoken to Mr. Collins to confirm
8 whether or not --
9    A.   No.
10    Q.   -- he's provided information to someone --
11    Have you spoken to anyone at Fannie Mae to
12 learn that Mr. Collins called October 31, 2001?
13    A.   No.
14    Q.   What about Mr. -- I think Mr. Theodorou
15 asked -- also mentioned 9 additional people who might
16 have learned information.
17    Do you have -- do you know of any -- do
18 you have any personal knowledge that 9 additional
19 people learned information from Mr. Collins?
20    A.   I do not.
21    Q.   You started working at Treasury in August
22 of 2001.

Page 288

1    A.   Correct.
2    Q.   Is that right?
3    Was Mr. Roger Anderson also working at
4 Treasury while -- when you started working there?
5    A.   My recollection is that he joined Treasury
6 after I was working there.
7    Q.   And what was his title?
8    A.   He was the deputy assistant secretary for
9 federal finance, I believe.
10    Q.   And you believe he worked in that position
11 while you were working --
12    MR. THEODOROU: Objection.
13    BY MS. WILLIAMS:
14    Q.   -- at Treasury?
15    A.   If we're referring to the same Roger
16 Anderson and he was there when I was there, but he
17 joined the Treasury Department after I started in
18 August of '01, so he came after I was already there,
19 but we worked together for the duration of my tenure
20 there. He was still there when I left.
21    Q.   Oh, he was still there when -- this is
22 Roger Anderson you're referring to was still at

Page 289

1 Treasury when you left?
2    A.   (Nodding head) -- am I thinking of the
3 right person?
4    Glasses, big guy?
5    MR. FUREY: Roger Kodat.
6    MR. THEODOROU: Why don't we let her
7 answer the question.
8    THE COURT REPORTER: Did you say a last
9 name?
10    A.   Need to clarify based on some information.
11 This is a different Roger. I'm thinking of somebody
12 else.
13    I'm sorry.
14    BY MS. WILLIAMS:
15    Q.   Okay. I'm asking about a Roger Anderson.
16    Did you know someone who worked at
17 Treasury during your tenure there named Roger
18 Anderson?
19    A.   His name is not -- no. His name is not
20 familiar to me right now. I don't recollect this
21 person. I was thinking of a different man named
22 Roger who worked at the Treasury Department.

73 (Pages 286 to 289)

Page 290

1    Q.   Okay.  And the person that you are
2    referring to, what was their position at Treasury?
3    A.   The deputy assistant secretary under -- he
4    reported to -- he reported to Brian Roseboro.  He was
5    the deputy assistant secretary for I think federal
6    finance, I think.  He handled the air transportation
7    stabilization board.  Roger Kodat.
8        I'm sorry.  I apologize.
9        It's been so long.
10   Q.   And so the Roger that you're referring to
11   last name is Kodat?
12   A.   That's correct.
13       THE COURT REPORTER:  Kodak?
14       THE WITNESS:  No.
15       K-O-D-A-T.
16       BY MS. WILLIAMS:
17   Q.   I'm going to be asking questions about
18   Roger Anderson.
19       Do you know Roger Anderson?
20   A.   I don't, no.
21   Q.   Do you know of any Roger Anderson who
22   worked at the Treasury Department before you started

Page 291

1    working with the Treasury Department?
2    A.   I just -- I can't recollect who Roger
3    Anderson is to be honest with you.  I may have known
4    him when I was there, but I don't at this -- today I
5    don't recollect who that is.
6    Q.   Okay.  So you don't know if Mr. Davis had
7    any agreement with Mr. Anderson regarding abiding by
8    Treasury's embargoes?
9    A.   No.
10       I have no knowledge of that.
11   Q.   You mentioned that the Treasury refunding
12   conferences were for the press.
13       Do you know if any attendees from -- any
14   people attended from other government agencies?
15   A.   It's possible.
16   Q.   Did you ever clear anyone in from any
17   other government agency to attend the quarterly
18   refunding conferences?
19   A.   It's possible that -- that there's a
20   couple people from the Office of Management and
21   Budget, OMB, and perhaps congressional budget office
22   or the Federal Reserve.

Page 292

1        I vaguely recall that there was a small
2    group of these other government like staff people
3    that came in for the Tuesday event in the conference
4    room.  It's the second stage of the quarterly
5    refunding process before the press conference that
6    takes place on Tuesday, and they like to attend that
7    particular slide show, so it's possible they may have
8    come for the press conference as well.
9    Q.   So just to clarify:  The Tuesday event,
10   was that open to the public?
11   A.   The first 10 minutes were open to the
12   press in order to make it a public meeting, but then
13   the press would be excused and the meeting would
14   continue without them.
15   Q.   And who would be continuing with this
16   meeting that the press was not --
17   A.   The Treasury borrowing advisory committee.
18   Q.   Did you participate in the Tuesday public
19   portion of the meeting?
20   A.   Yes, I did.
21   Q.   What about on October 30th, 2001 --
22       MR. THEODOROU:  31st.

Page 293

1        Oh, 30th.
2        I'm sorry.
3        BY MS. WILLIAMS:
4    Q.   No.
5        October 30th, 2001.
6        Did you attend --
7    A.   I did.
8    Q.   -- the public portion of that meeting?
9    A.   I did.
10   Q.   Do you know if Mr. Davis attended that
11   meeting?
12   A.   I don't know who Mr. Davis is, so it's my
13   understanding he did not.
14   Q.   Do you know if there were any nonpress and
15   non-Treasury employees present for that public
16   portion of the October 30th meeting?
17   A.   Well, yes.
18       The members of the borrowing advisory
19   committee themselves.  And then if -- a
20   representative from OMB came over or CBO or the Fed
21   came over, then they would have been there as well
22   for the public portion.

Page 294

1  Q.  What happened after the public portion of
2  the October 30th meeting?
3  A.  The borrowing advisory committee continued
4  the meeting behind closed doors.
5  Q.  Where was the October 30th, 2001, meeting
6  held?
7  A.  In the secretary's large conference room.
8  Q.  And you didn't stay for the borrowing
9  advisory committee's closed portion of the meeting?
10  A.  Correct.
11     I did not.
12  Q.  And was anyone who was a member of the
13  press allowed to stay for that portion of the
14  meeting?
15  A.  No.
16  Q.  What about members of these other offices
17  that you mentioned, OMB, CBO?
18  A.  No.
19  Q.  And you said that -- I think you testified
20  that the funding conference was a 3-day event.
21     What happened on Monday of the conference?
22  A.  At 3 PM, there's some charts and some

Page 295

1  other information that's released to the press, and
2  it sort of helps them prepare for the Wednesday
3  announcement.
4  Q.  How are these charts distributed?
5  A.  They're given to the pressroom by hand.
6  We take them down there and give them to them.  It's
7  like the bureau of public debt brings them a calendar
8  over and there's some charts, and we take them down
9  there and give them -- we would take them down there
10  and give them to the press.
11     And that was it.
12  Q.  Did you prepare any of the charts or other
13  information distributed for the October 29th, 2001,
14  Monday portion of the conference?
15  A.  No.
16  Q.  Besides just taking into the pressroom,
17  were these charts and other information distributed
18  any other way?
19  A.  I believe they were posted on our Web site
20  as well, I believe.
21  Q.  Okay.  So that was the Monday portion.
22     Now, going back to this Tuesday, October

Page 296

1  30th, meeting, do you know how non-Treasury
2  employees, specifically individuals who work for
3  other government agencies, gained clearance into the
4  Treasury building for the Tuesday portion of the
5  refunding conference?
6  A.  They asked permission of public affairs,
7  and I would agree and get -- and send their names,
8  their date of birth, and their Social Security
9  numbers to the Secret Service office for clearance.
10  Q.  Were any other offices at Treasury besides
11  the office of public affairs allowed to clear in
12  other government officials to this Tuesday portion of
13  the meeting?
14  A.  There wasn't really an issue of being
15  allowed.  I mean, I don't know they if did or not.  I
16  don't recall ever seeing anything that wasn't --
17  hadn't gone through public affairs there other than
18  the borrowing advisory committee themselves, so, you
19  know, I don't know if anyone else was clearing anyone
20  else in.
21  Q.  Did you know everyone who was at that
22  October 30th, 2001, Tuesday portion of the meeting?

Page 297

1  A.  I knew all the members of the media and I
2  knew who the people were that came over from other
3  agencies, because they all left with me.  I made sure
4  they were all out of the room.  So at that point, I
5  mean, whoever was left was a member of the borrowing
6  advisory committee, and while I didn't know those
7  people, they knew each other, and so if there was
8  somebody who didn't fit in any of the above groups,
9  it would kind of be obvious.
10     It's a conference room.  It's not --
11  Q.  Now, moving back to the Wednesday press
12  conference, specifically October 31, 2001, do you
13  know if other government -- officials from other
14  government agencies attended that press conference?
15  A.  It's possible.
16     I don't recall specifically that date if I
17  cleared in the OMB folks.
18  Q.  And if officials from other government
19  agencies did attend, would they have to be cleared
20  into the office of public affairs?
21  A.  Yes.
22  Q.  Were any other offices allowed to clear in

Page 298

1  officials from other government agencies?
2      MR. THEODOROU:  Objection.
3   A.  They should not have.
4      BY MS. WILLIAMS:
5   Q.  When you say, they should not have, why?
6   A.  Because --
7      MR. THEODOROU:  Objection.
8   A.  -- because the press conference was an
9  event being hosted and put on by the office of public
10 affairs, and therefore, it was a press event that --
11 it would not have been appropriate for another office
12 to start inviting people to a press event, any more
13 than it would be appropriate for us to show up at
14 their meetings.
15     BY MS. WILLIAMS:
16  Q.  Do you know if members of the Treasury
17 borrowing advisory committee attended that October
18 31, 2001, meeting?
19  A.  The 31st?
20  Q.  The 31st, yes.
21  A.  To my knowledge, they did not attend that
22 press conference.  They left Washington, went back up

Page 299

1  to New York prior to the press conference.
2   Q.  Do you know if they ever attended the
3  Wednesday press conferences for quarterly refunding?
4   A.  I don't have any knowledge prior to the
5  31st, but it's my understanding that they did not.
6   Q.  Individuals from other government
7  agencies, would they have been required to abide by
8  the embargo that was in place at the October 31,
9  2001, conference?
10     MR. THEODOROU:  Objection.
11  A.  They would be expected to respect that,
12 yes, and not be disseminating the information to the
13 media or to the general public, and they were
14 government employees.
15     BY MS. WILLIAMS:
16  Q.  During your tenure at Treasury, did you
17 ever hear any complaints that any official from
18 another government agency had violated the embargo?
19  A.  No.
20  Q.  On October 31st, 2001, did any attendees
21 ask any questions about what embargo meant after you
22 made your announcement about the 10 AM embargo?

Page 300

1   A.  No, they did not.
2   Q.  Could you refer to exhibit 1.  This is an
3  memorandum of activity.
4   A.  M-hm.  Yes.
5      I'm reviewing it.
6   Q.  Okay.  And on page -- if you could refer
7  to page 2, and I'm at the first full sentence:
8  Holahan said she announced 3 times at the press
9  conference that the information presented by
10 undersecretary Fisher and contained in the press
11 release was embargoed until 11 AM.
12  A.  10 AM.
13  Q.  10 AM.
14     Excuse me.
15     Now, today during Mr. Theodorou's
16 questioning, you said that you did not specifically
17 recall mentioning the embargo 3 times.
18     You only recall mentioning it 2 times; is
19 that right?
20  A.  I'm a hundred percent certain that I
21 announced at the beginning and at the end of the
22 press conference.  I vaguely remember making that

Page 301

1  second announcement, but I am not a hundred percent
2  certain.
3      That's why today I said -- I clarified
4  that, that this was a very -- this is an accurate
5  depiction of what I recall.  It was a week after the
6  event, less than a week after the event, and -- but
7  today, 6 years later, my memory is not as good.
8   Q.  Okay.  So this interview was taken
9  November 7, 2001.
10  A.  Correct.
11  Q.  Is that correct?
12  A.  That's right.
13  Q.  And at the time of this interview, the
14 events of October 31, 2001, were more fresh in your
15 mind.
16     Is that a fair statement?
17  A.  Yes, it is.
18  Q.  And do you have any reason to believe that
19 the statements in this memorandum are incorrect?
20  A.  Not at all.
21     MR. THEODOROU:  Objection.
22     BY MS. WILLIAMS:

Page 302

1    Q.   Did you review this memorandum today?
2    A.   Yes.
3    Q.   Did you see anything in here that you
4    believe is incorrect?
5    A.   No, I did not.
6    Q.   Do you know -- since you started at
7    Treasury August of 2001, do you know prior to your
8    tenure at Treasury prior to the time you started
9    there if an embargo time had ever been set in advance
10   of a press conference?
11   A.   Not to my knowledge.
12   Q.   When you say, not to your knowledge, are
13   you saying that none ever had or you just don't know
14   if one had ever been sent in advance of a press
15   conference?
16   A.   The latter.
17   Q.   When you worked with the Oil Daily, you
18   were a reporter; is that right?
19   A.   Correct.
20   Q.   And the Oil Daily distributed a
21   newsletter; is that right?
22   A.   Correct.

Page 303

1    Q.   Did you consider yourself to be part of
2    the press when you worked at the Oil Daily?
3    A.   Yes.
4    Q.   And one of your responsibilities was to
5    help write blurbs for the newsletter?
6    A.   Initially.
7    Q.   Okay.  And during that time initially when
8    you were writing blurbs for this newsletter, did you
9    consider yourself to be part of the press?
10   A.   Yes.
11   Q.   Did the Oil Daily put forth any other
12   publication besides the newsletter?
13   A.   They had several different newsletters.
14   Q.   Did they have any sort of newspaper that
15   they put out?
16   A.   No.
17   Q.   TV program --
18   A.   No.
19   Q.   -- that they did?
20        Radio program?
21   A.   No.
22   Q.   Do you know of any written Treasury policy

Page 304

1    that said only the office of public affairs could
2    clear people into refunding conferences?
3    A.   I'm not aware of that, no.
4    Q.   Could you refer to exhibit 5, the picture
5    of the hallway and the diplomatic room that you drew.
6        And I note that at the bottom there you
7    wrote, Peter Fisher's office.
8        Do you see that?
9    A.   Yes.
10   Q.   Did that doorway actually lead directly
11   into Mr. Fisher's office?
12   A.   No.
13   Q.   Where did it that doorway lead?
14   A.   It led into the area that -- where his 2
15   secretaries sat.
16   Q.   Could you draw in there where Mr. Fisher's
17   actual office was?
18   A.   (Complying.)
19   Q.   Do you know who Mr. Fisher's secretaries
20   were in October of 2001?
21   A.   Yes.
22   Q.   Who were they?

Page 305

1    A.   Anna Hart was his more senior secretary.
2    She's since retired.  And the other person was
3    Diana -- I can't remember Diana's last name, but it
4    was Anna and Diana.
5    Q.   Okay.  Could you refer to exhibit 10 for
6    me.
7        These are the emails that you sent out on
8    the morning of October 31, 2001; is that correct?
9    A.   Correct.
10   Q.   And I just want to go through a few of
11   them.
12        The first page, the email to Mr. Akin, a
13   CNBC producer, was sent at 8:57 AM?
14   A.   Correct.
15   Q.   And that was before the press conference
16   started?
17   A.   Correct.
18   Q.   Okay.  If you could turn to the next page.
19        The next email was sent at 9:30 AM to
20   Mr. Fuerbringer.
21        And that was after the press conference
22   had ended.

Page 306

```
1          Correct?
2     A.   Correct.
3     Q.   Were you in your office at the time you
4  sent this email?
5     A.   Yes.
6     Q.   If you could turn to the next page.
7          This is to Mr. Ip, Wall Street Journal
8  reporter, at 9:32 AM.
9          This is also after the press conference
10 had ended?
11    A.   Correct.
12    Q.   And were you in your office when you sent
13 this email?
14    A.   Yes.
15    Q.   And then the final page.
16         This is an email to Mr. Nichols.
17         Mr. Nichols worked inside the Treasury
18 Department?
19    A.   Correct.
20    Q.   And this was sent at 9:54 AM, also after
21 the press conference ended.
22         Right?
```

Page 307

```
1     A.   Correct.
2     Q.   Now, if you could refer to the subject
3  line: Rob, please send to your press list at 10 AM,
4  thanks.
5          Do you see this?
6     A.   Yes.
7     Q.   Do you know whether if at the time you
8  sent this email you knew that the information about
9  the cancellation of the 30-year bond had been placed
10 on Treasury's Web site?
11         MR. THEODOROU:  Objection.
12    A.   I don't recall if I knew at 9:54 whether
13 it was on the Web site or not.  I thought that I did,
14 but I don't.  I'm not sure now.
15         BY MS. WILLIAMS:
16    Q.   When you say you thought that you did,
17 what do you mean?
18         MR. THEODOROU:  Objection.
19    A.   Recalling conversations in the time line 6
20 years later, I could have had that conversation with
21 the reporters before 10, but now I'm thinking maybe I
22 did not, so I just don't recall.
```

Page 308

```
1          BY MS. WILLIAMS:
2     Q.   Do you know why you would tell Mr. Nichols
3  to send something out at 10 AM if it had already been
4  put on the Treasury's Web site?
5          MR. THEODOROU:  Objection.
6     A.   I don't know why I would tell him that.
7          It's a reasonable assumption that I didn't
8  know and that I was -- I didn't find out until after
9  10 o'clock, and at that point when I sent this email
10 that I still believed that the embargo was in place.
11         BY MS. WILLIAMS:
12    Q.   You stated that Ms. Anderson -- you saw
13 Ms. Anderson handing out the press release on the
14 hard Treasury letterhead when you were making your
15 first announcement about the embargo during the
16 October 31st conference.
17         Correct?
18    A.   Correct.
19    Q.   Do you know if she was listening to your
20 announcement?
21         MR. THEODOROU:  Objection.
22    A.   I can't answer that for her.
```

Page 309

```
1          BY MS. WILLIAMS:
2     Q.   Did you ever ask her if she heard you
3  announce the 10 AM embargo?
4     A.   I did not ask her, but I did make the
5  assumption that she was in the room and right in
6  front of me when I verbally said it, that she was
7  aware of it.
8     Q.   After you found out that the press release
9  had been posted before 10 AM, did you ask
10 Ms. Anderson then if she'd heard you announce the 10
11 AM embargo?
12         MR. THEODOROU:  Objection.
13    A.   Can you repeat the question?
14         BY MS. WILLIAMS:
15    Q.   Once you realized that the press release
16 had been put on Treasury's Web site by Mr. Anderson
17 before 10 AM, I believe you stated you had a
18 conversation with Ms. Anderson.
19    A.   Correct.
20    Q.   During that conversation, did you ask her
21 whether she had heard you announce the 10 AM embargo
22 at the conference?
```

Page 310

1    MR. THEODOROU: Objection.
2    A. I may have asked her that, but I don't
3 recall.
4    BY MS. WILLIAMS:
5    Q.    Did Ms. Anderson ever tell you that she
6 did not know about the 10 AM embargo?
7    MR. THEODOROU: Objection.
8    A. I don't recall.
9    MS. WILLIAMS: I don't have any further
10 questions at this time.
11    MR. THEODOROU: I just have a couple.
12
13    FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
14    BY MR. THEODOROU:
15    Q.    You were asked on cross-examination by
16 Ms. Williams about your understanding of embargoes
17 and the refunding conferences.
18    Do you remember that?
19    A. Yes.
20    Q.    Okay. Directing your attention to October
21 31, 2001.
22    You had only been at Treasury for 2

Page 311

1 months.
2    Correct?
3    A.    Correct -- 3 months.
4    Q.    And you had not received any training on
5 what embargo meant in the context of the press
6 conference; isn't that right?
7    MS. WILLIAMS: Objection.
8    A.    Correct.
9    BY MR. THEODOROU:
10    Q.    In fact, before you joined Treasury, you
11 had no exposure to embargoes before coming to
12 Treasury.
13    Correct?
14    A. No.
15    I said that I myself had not used them,
16 but I was exposed to them.
17    Q.    Well, I think you said -- well, all right.
18    I can go back to the testimony, but I
19 won't.
20    But when you were talking about embargoes,
21 on the day of October 31st, though, other than saying
22 there was an embargo in place, you didn't describe

Page 312

1 what the embargo meant.
2    Correct?
3    A.    Correct.
4    Q.    To the press.
5    Correct?
6    A.    Correct.
7    Q.    Now, you were also asked questions about
8 your memorandum of interview and the accuracy of that
9 memorandum.
10    Correct?
11    A.    Correct.
12    Q.    All right. You don't have any
13 recollection talking about an embargo today for the
14 third time that day, do you?
15    MS. WILLIAMS: Objection.
16    BY MR. THEODOROU:
17    Q.    Present recollection.
18    MS. WILLIAMS: Objection.
19    A.    My present recollection is very strong for
20 the beginning and the end of the news conference. My
21 recollection of announcing it before the
22 question-and-answer period is somewhat vague, but

Page 313

1 it's not -- I do recall something, yes. I do recall
2 something.
3    I believe it's -- once Peter Fisher
4 concluded his remarks, he turned to me, and I stepped
5 forward and said, now we'll have the
6 question-and-answer period, and a reminder that it's
7 embargoed --
8    BY MR. THEODOROU:
9    Q.    Well, you also --
10    A.    -- until 10 o'clock.
11    Q.    All right. You also said in your
12 statement -- you said you heard from Frances Anderson
13 that there was a problem in formatting the press
14 release so that it could appear on the Web site.
15    A.    Yes.
16    Q.    Correct?
17    A.    Correct.
18    Q.    Isn't it a fact though that she did not
19 have a problem with formatting the document with the
20 soft letterhead?
21    MS. WILLIAMS: Objection.
22    A.    To my knowledge, she didn't format it on

Page 314

1   the soft letterhead ever.
2          BY MR. THEODOROU:
3      Q.   Correct.
4          That's because Tony Fratto had done it
5   before as of 8:53 AM earlier that day.
6          Correct?
7      A.   Correct.
8      Q.   All right.  In fact, she did not have a
9   problem formatting the document so that it could
10  appear on the Web site after Tony Fratto had
11  formatted; isn't that right?
12         MS. WILLIAMS:  Objection.
13     A.   To post it on the Web site, you don't need
14  a letterhead.
15         BY MR. THEODOROU:
16     Q.   Okay.
17         (Pause.)
18         MR. THEODOROU:  Let me just check one more
19  thing in my notes.
20         (Pause.)
21         BY MR. THEODOROU:
22     Q.   You testified earlier today that you first

Page 315

1   learned about the premature posting on the Web site
2   from 2 reporters.
3          Correct?
4      A.   That was to the best of my recollection.
5      Q.   And that was before 10 AM?
6          MS. WILLIAMS:  Objection.
7      A.   I'm not sure about that now.
8          BY MR. THEODOROU:
9      Q.   So you're not sure about what you
10  testified about earlier today?
11         MS. WILLIAMS:  Objection.
12     A.   I'm not sure that I learned about it
13  before 10 AM or after 10 AM.  I'm simply not sure.
14  That was 6 years ago.
15         BY MR. THEODOROU:
16     Q.   All right.  Well, earlier today, you
17  testified -- you gave a sequence of events in which
18  you returned back to the room and you learned, they
19  said, that it's gone out on the Web site before 10 AM
20  and they're going to run with the story.
21         So are you saying that that was not true,
22  what you told me earlier today?

Page 316

1      A.   I'm telling you --
2          MS. WILLIAMS:  Objection, mischaracter-
3   -- sorry.
4          Objection, mischaracterizes testimony.
5      A.   I'm trying to be as honest and truthful as
6   I can based on what I recall from 6 years.
7          BY MR. THEODOROU:
8      Q.   Okay.  Then I will let stand what you
9   testified to when I asked those questions, and I
10  won't mischaracterize your testimony.
11         MR. THEODOROU:  I have no further
12  questions.
13         MS. WILLIAMS:  I have a couple.
14
15      FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
16         BY MS. WILLIAMS:
17     Q.   You said that you had been exposed to
18  embargoes before coming to Treasury.
19         How had you been exposed to embargoes?
20     A.   I worked in a newsroom at the Oil Daily,
21  and I had an understanding of what an embargo was.  I
22  just simply did not receive information with

Page 317

1   embargoes on them, so I was aware what they were.  I
2   just simply didn't use them.
3          And then when I was working as a public
4   relations manager at the Farm Credit Council and for
5   Senator Roberts, I didn't have occasion to use them,
6   but I was aware of what an embargo is, and -- but
7   being at Treasury and actually using them, that was
8   my first time actually using them in practice.
9      Q.   And when you became aware of what an
10  embargo was, do you know how you came to that
11  awareness?
12     A.   No --
13         MR. THEODOROU:  Objection.
14     A.   -- I don't.
15         BY MS. WILLIAMS:
16     Q.   Now, you testified that other information
17  besides quarterly refunding information was embargoed
18  at Treasury, specifically speeches?
19     A.   Correct.
20     Q.   Did you have any experience with embargoes
21  at Treasury before October 31, 2001?
22         MR. THEODOROU:  Objection.

Page 318

1    A.   Yes.
2        BY MS. WILLIAMS:
3    Q.   Could you tell me about that, the
4  experience you had with embargoes before October 31,
5  2001.
6    A.   Any speech that was given by a member of
7  the office of domestic finance, any of the officials
8  in that office, was embargoed and given to the press
9  corps in the Treasury pressroom roughly 30 minutes
10  before the speech began, and it was given the
11  embargo, and the embargo time was lifted, and they
12  were able to run their stories.
13       So I was very familiar with the way it
14  worked and what the procedure was.
15    Q.   Did you ever have occasion to give the
16  press the speeches that were embargoed before October
17  31st?
18       MR. THEODOROU:  Objection.
19    A.   Yes.
20       BY MS. WILLIAMS:
21    Q.   And about how many occasions had you done
22  that before October 31st, 2001, while you were at

Page 319

1  Treasury?
2    A.   At least a dozen.
3    Q.   Referring to exhibit 1, Mr. Theodorou
4  asked you about the last paragraph -- I mean, the
5  last sentence in the second-to-last paragraph -- I'm
6  sorry -- I'm on the second page.
7        It says, she heard -- she said she heard
8  from Frances Anderson there was a problem in
9  formatting the press release so it could appear on
10  the Web site.
11       Was the Web site letterhead the same
12  letterhead as the soft letterhead?
13    A.   No.
14       The second part of that sentence is that
15  it could appear on the Web site.  I heard from France
16  Anderson there was a problem in formatting the press
17  release that I asked for her to format and send back
18  to me.
19    Q.   Do you know if she had any problems
20  formatting it for the Web site?
21    A.   Not to my knowledge.
22       MS. WILLIAMS:  I have no further

Page 320

1  questions.
2
3        FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
4        BY MR. THEODOROU:
5    Q.   You were asked -- you were asked about
6  embargoes on the press conferences.
7        You said you had experience in them 2
8  months before the October 2001 press conference.
9        Correct?
10       MS. WILLIAMS:  Objection.
11    A.   I was asked if I had experience with
12  embargoes prior to October 31st and I said yes.
13       BY MR. THEODOROU:
14    Q.   At Treasury.
15       Correct?
16    A.   Yes.
17    Q.   Okay.  Could you please tell us:  Did you
18  define for the members of the press or anybody
19  attending those press conferences what embargo
20  meant?
21    A.   I did not.
22       MR. THEODOROU:  Thank you.  No questions.

Page 321

1        FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
2        BY MS. WILLIAMS:
3    Q.   One question.
4        Did anyone ever ask you or have any
5  questions about what embargo meant prior to October
6  31st, 2001?
7        MR. THEODOROU:  Objection.
8    A.   No one asked me any questions about it
9  because they were members of the media and they
10  understood what it meant.
11       MR. THEODOROU:  Objection.
12       And if I could strike -- I'd move to
13  strike that last.
14       MS. WILLIAMS:  However, it stands because
15  we have a stipulation.
16       MR. THEODOROU:  And I'll wait until we get
17  to trial.
18       MS. WILLIAMS:  I have no further
19  questions.
20       MR. THEODOROU:  One last question.
21
22

**Holahan, Betsy**

| | |
|---|---|
| **From:** | Holahan, Betsy |
| **Sent:** | Wednesday, October 31, 2001 8:57 AM |
| **To:** | Chip Aiken (E-mail) |
| **Subject:** | EMBARGOED UNTIL 10 AM |

*CNBC producer*

**Importance:** High

NOVQ - FINAL+ .doc

Again, the # is 202-622-1703 - leave reporters name and # with Anna Hart



SECNOTH00103779

**Holahan, Betsy**

| | |
|---|---|
| From: | Holahan, Betsy |
| Sent: | Wednesday, October 31, 2001 9:30 AM |
| To: | Jonathan Fuerbringer (E-mail) |
| Subject: | EMBARGOED UNTIL 10 AM TODAY! |

*NY Times reporter*

Importance:     High

NOVQ - FINAL + .doc

1

SECNOTH00103780

**Holahan, Betsy**

| | |
|---|---|
| From: | Holahan, Betsy |
| Sent: | Wednesday, October 31, 2001 9:32 AM |
| To: | Greg Ip (E-mail) |
| Subject: | EMBARGOED UNTIL 10 AM TODAY! |
| Importance: | High |

WSJ reports

NOVO - FINAL +.doc

· 1

SECNOTH00103781

**Holahan, Betsy**

| | | |
|---|---|---|
| From: | Holahan, Betsy | *DAS,* |
| Sent: | Wednesday, October 31, 2001 9:54 AM | *Public Affairs* |
| To: | Nichols, Robert | |
| Subject: | Rob - please send to your press list at 10 am - thanks! | |

Importance:          High

NOVQ - FINAL+.doc

1

SECNOTH00103782

US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS

MORE
Rtr 09:57 10-31-01


:SUBJECT: SPRC MU IR USPO USA
Copyright (c) 2001 Reuters
Received by NewsEDGE/LAN: 10/31/2001 9:52 AM



SECNOTH00103134

Excerpt from the

February 12, 2008 deposition

of Stephen Berardi

Exhibit F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
Boston Division

- - - - - - - - - - - - - - - x
    UNITED STATES SECURITIES AND  :
EXCHANGE COMMISSION,          :
           :
       Plaintiffs,      :
           :
v.               : Civil Action No.
           :
STEVEN E. NOTHERN,     : 05-10983 (NMG)
           :
    Defendant.       :
- - - - - - - - - - - - - - x

Videotaped Deposition of STEPHEN BERARDI

Washington, D.C.

Tuesday, February 12, 2008

11:32 a.m.

\*    \*    \*    \*

Reported by:  Okeemah S. Henderson, LSR

Page 34

1  announcement on October 31st, 2001?
2      MS. LEVINE: Objection.
3      BY MR. TOONE:
4      Q.   Is that correct?
5      A.   Correct. I was not in that room.
6      Q.   Do you recall where you were at that
7  time?
8      A.   I was outside the room standing next
9  to a table of documents.
10     Q.   Was there anyone else there with you?
11     A.   Intermittently.
12     Q.   Who was there intermittently with you?
13     A.   Frances Anderson.
14     Q.   When you say intermittently, what do
15 you mean?
16     A.   She would leave occasionally. I
17 believe Public Affairs needed her to do something,
18 whether it was to make copies or I don't know why
19 she would walk away.
20     Q.   Frances Anderson, what was her
21 position at that time?
22     A.   She worked in Public Affairs.

Page 35

1      Q.   But you don't know what her specific
2  position was?
3      A.   No.
4      Q.   And did you stand outside the room the
5  entire time that the announcement was being made?
6      A.   Yes.
7      Q.   Why did you stand outside the room
8  that day?
9      A.   It was decided I guess late the
10 evening before that the under secretary wanted to
11 make the announcement in a much smaller room than
12 we normally had the announcement in. I would
13 normally stand in the back of the room and not
14 allow anyone to have copies of the documents until
15 the embargo time had been set.
16     At that point, everyone would leave the room
17 and they would get copies of documents.
18     Q.   So we're talking about quarterly
19 refunding announcements other than October 31st,
20 2001. It was your practice to stand in the back
21 of the room?
22     A.   That's correct.

Page 36

1      Q.   And you said you would not allow
2  people to have access to the documents and charts
3  until the embargo time had been set?
4      A.   The four previous documents mentioned.
5  Yes.
6      Q.   When was the embargo time set during
7  those previous refunding announcements?
8      A.   I do not recall the exact times.
9      Q.   Not the amount of time that the
10 embargo involved, but when was the time actually
11 set by the press affairs official?
12     A.   When the under secretary was done and
13 the Public Affairs official determined that the
14 press conference was over.
15     Q.   Just to be clear, would you hold
16 documents until the embargo time that had been set
17 had expired or just until the embargo time had
18 been announced?
19     A.   I would hold the documents until
20 everyone was told the embargo time, the doors were
21 opened and as they left, they grabbed copies.
22     Q.   So when they grabbed copies, the

Page 37

1  embargo time would still be in effect?
2      A.   That's correct.
3      Q.   And do you recall how long the embargo
4  time would be during these prior refunding
5  announcements?
6      MS. LEVINE: Objection.
7      A.   No.
8      BY MR. TOONE:
9      Q.   So I'm not sure you answered the
10 question that I asked earlier because we've
11 discussed other things, but on October 31st, 2001,
12 you weren't in the room?
13     A.   That's correct.
14     Q.   And you said that it related to a
15 decision that had been made the day before to use
16 a smaller room for this --
17     A.   Yes.
18     Q.   -- press conference?
19     A.   So there was not enough room in there
20 for me to stand in the back of the room with a
21 table to secure the documents.
22     MR. TOONE: Let me introduce an

1  you see that?

2      A.  I see it.

3      Q.  Does this in any way sound familiar?

4          MS. LEVINE:  Objection.

5      A.  I -- no.

6          BY MR. TOONE:

7      Q.  Is it possible that you knew Davis for

8  a period of 10 years?

9      A.  No.

10     Q.  Did you have any opinion regarding

11 Mr. Davis's character?

12         MS. LEVINE:  Objection.

13     A.  Nothing -- no.  No.  No.

14         BY MR. TOONE:

15     Q.  Do you recall discussing Peter Davis

16 with Paul Malvey in a time period between October

17 31st and November 15, 2001?

18         MS. LEVINE:  Objection.  Asked and

19 answered.

20     A.  I have no recollection of talking to

21 him in that time period about that.  No.  I have

22 no personal notes.

1          BY MR. TOONE:

2      Q.  And can you tell me today how long you

3  had known Peter Davis prior to October, 2001?

4      A.  Well, I did --

5          MS. LEVINE:  Objection.

6          MR. FREEBORNE:  Go ahead and answer.

7      A.  I didn't know Peter Davis.  I knew

8  that he came to the meetings.  And I had heard

9  that -- well, I knew that he came to the meetings

10 and he would have called the office for data or

11 whatever to talk, but I was low enough a level

12 employee that he really didn't interact with me

13 so.

14         BY MR. TOONE:

15     Q.  What did you know about Mr. Davis

16 calming the office?

17         MS. LEVINE:  Objection.

18     A.  I -- I mean, I wasn't part of those

19 calls so I don't know.

20         BY MR. TOONE:

21     Q.  How did you hear about them?

22     A.  Well, you're telling me that he had a

1  relationship with the office.

2      Q.  I'm trying to know --

3      A.  I know over time he had called as

4  there are lots of consultants that called the

5  office.

6      Q.  But how did you know that Peter Davis

7  had called the office?

8      A.  I don't know.  May have been mentioned

9  by one of the directors at some point.

10     Q.  And by directors, you're referring to

11 Jill Ouseley or Paul Malvey?

12     A.  Yes.  So this is something that --

13         MR. FREEBORNE:  No.  He asks the

14 questions.

15         MR. TOONE:  You can just put that

16 aside, please.

17         BY MR. TOONE:

18     Q.  Do you know who Jack Malvey is?

19     A.  Jack Malvey.  I heard the name.  I

20 think he worked on Wall Street maybe.  I'm not

21 sure.

22     Q.  Are you aware of any relationship

1  between Paul Malvey and Jack Malvey?

2      A.  No, I'm not.

3      Q.  Do you recall Treasury's decision to

4  reopen the 10-year note in October, 2001?

5      A.  Not really, no.

6      Q.  Do you know what a snap auction is?

7      A.  Snap auction.  No.  I have never heard

8  of that.

9      Q.  Have you ever heard of the term

10 emergency reopening?

11     A.  Yes.

12     Q.  What is that?

13     A.  That is when a security is deemed to

14 be liquid enough where the Treasury would possibly

15 reopen the security to the market, Treasury

16 marketplace.

17     Q.  And you recall there being any kind of

18 emergency reopening at Treasury in the second half

19 of 2001?

20     A.  I seem to recall there was one in

21 maybe September or October for a small amount.

22     Q.  Are you aware of any advance

Page 58

1  information getting out prior to Treasury's
2  announcement of an emergency reopening in 2001?
3      A.  No.
4          MS. LEVINE:  Objection.
5          BY MR. TOONE:
6      Q.  I'm sorry.  Your answer?
7      A.  No.
8      Q.  Did you work on emergency reopenings?
9          MS. LEVINE:  Objection.
10     A.  I believe that's only been one
11 and that was when Peter Fisher was here, so I was
12 not involved.  I was probably at the highest level
13 made the decision and I don't recall being
14 involved in that.
15         BY MR. TOONE:
16     Q.  Is tell me what you know about the
17 reopening, emergency reopening that occurred in
18 connection with Peter Fisher?  Do you recall any
19 other details about that?
20     A.  It was a 10-year security.  I believe
21 it was for a $5 or $6 billion dollar reopening.
22     Q.  And did you have any involvement

Page 59

1  regarding the announcement of that reopening?
2      A.  No.
3          MR. TOONE:  Mark this, please.
4  (Berardi Deposition Exhibit No. 3 was marked for
5          identification.)
6          BY MR. TOONE:
7      Q.  Please take a look at this document
8  that's marked Exhibit No. 3.
9      A.  Okay.
10     Q.  Have you seen this E-mail before?
11     A.  No.
12     Q.  I want to draw your attention to the
13 E-mail from Timothy Bitsberger in the middle of
14 the page.
15     A.  Okay.
16     Q.  And the unredacted portion -- first of
17 all, this E-mail is dated October 31st, 2001 at
18 3:19 p.m.?
19     A.  Okay.
20     Q.  And the unredacted portion reads,
21 "There was a leak a few weeks ago at the emergency
22 reopening.  The refunding process has been

Page 60

1  criticized for years because of suspected leaks."
2  Did I read that correctly?
3      A.  Yes.
4      Q.  So first of all, I want to ask does
5  this refresh your recollection in any way
6  regarding anything that may have occurred in
7  connection with the emergency reopening in 2001?
8          MS. LEVINE:  Objection.
9      A.  I have never seen this E-mail.
10         MR. FREEBORNE:  Yeah.  He's not on this
11 E-mail.
12     Q.  That's fine.  I'm asking does it
13 refresh your recollection, this comment?
14         MS. LEVINE:  Objection.
15     A.  No.
16         BY MR. TOONE:
17     Q.  The next sentence the refunding
18 process has been criticized for years because of
19 suspected leaks.  Are you familiar with any leaks
20 that were suspected to have occurred in connection
21 with the refunding process?
22     A.  No.

Page 61

1      Q.  Prior to October 31st, 2001?
2          MS. LEVINE:  Objection.
3      A.  No.
4          BY MR. TOONE:
5      Q.  Then let me direct your attention
6  above.  There's a message, the next message from
7  Tony Fratto asks, "There was a leak during the
8  emergency reopening?"  Then Mark Bitsberger's
9  message at the top, "Yes, attributed to the
10 borrowing committee."  Did I read that correctly?
11     A.  Yes.
12     Q.  Are you familiar with any records or
13 suspicions of leaks involving the Treasury
14 borrowing committee?
15         MS. LEVINE:  Objection.
16     A.  No.
17         BY MR. TOONE:
18     Q.  Who is Timothy Bitsberger?
19     A.  I'm not sure if he was the deputy
20 assistant secretary or assistant secretary then.
21 I think he was the deputy assistant secretary
22 then.  He was fairly new.

Page 126

1  room from where you were standing?
2      A.   Yes.
3      Q.   During the time of the meeting, were
4  the doors opened or closed?
5      A.   They were mostly closed.
6      Q.   Did you see any one leave while the
7  meeting was going on?
8      A.   I do not remember seeing anyone leave.
9  No.
10     Q.   Did you see anyone enter the meeting
11 after it began?
12     A.   Yes.  It's fairly typical that
13 reporters show up late, they come straggling in.
14     Q.   Did you witness Frances Anderson hand
15 out any documents to anyone during the time of the
16 meeting?
17     A.   I have a vague recollection of
18 Frances, but someone came out of the room and
19 asked Frances to make more copies of the document
20 and I don't know where she went to make the copy
21 but then she came back.  I don't know what the
22 document was.

Page 127

1      Q.   So again, in that recollection or your
2  recollection of the time period, October 31st,
3  2001, do you specifically remember Frances
4  Anderson handing out documents to anyone during
5  the time of the meeting?
6          MR. TOONE:  Objection.
7      A.   I could not say yes, definitively.
8          BY MS. LEVINE:
9      Q.   You've been asked a fair number of
10 questions regarding this October 31st, 2001
11 quarterly refunding press conference meeting, so
12 forgive me for asking a couple more.  If you
13 recall, which office was in charge of coordinating
14 the quarterly press conference?
15     A.   That would have been the Office of
16 Public Affairs and I would assume that the under
17 secretary would have coordinated it with them.
18 The room setup and all of that.
19     Q.   Would the Office of Public Affairs
20 have been responsible for who was granted access
21 to the quarterly refunding meeting?
22         MR. TOONE:  Objection.

Page 128

1      A.   I don't think that they were the only
2  office that could clear someone in since it was a
3  public meeting.
4          BY MS. LEVINE:
5      Q.   Who had primary responsibilities for
6  granting access for the people that would
7  attend --
8      A.   I believe it was Public Affairs.
9      Q.   And aside from Public Affairs, were
10 there other groups within Treasury that would have
11 had authority to clear people in?
12     A.   I know that the previous director,
13 Jill Ouseley, had cleared people in but for that
14 refunding, I do not know.
15     Q.   Did you have any responsibility for
16 clearing people into the October 31st, 2001
17 quarterly refunding press conference?
18     A.   Not that I recall.
19     Q.   Did you, in general, have
20 responsibility for clearing people into the
21 quarterly refunding press conference?
22     A.   I seem to remember that was a function

Page 129

1  of the director of secretary to do that.  We may
2  have invited or those from the Office of
3  Management and Budget wanted to come over and they
4  normally like to come over just to get the
5  documents so they attended the press conference,
6  and that would have been something either myself
7  or Helen Anderson we would have cleared.
8      Q.   You just mentioned that you recall
9  Jill Ouseley may have cleared people; is that
10 accurate?
11     A.   Yes, through her secretary.
12     Q.   Do you remember any of the people
13 specifically that Ms. Ouseley cleared in or had
14 cleared in on her behalf?
15     A.   The only one that comes to mind is
16 Pete Davis.  I remember seeing him there before.
17 But I'm not certain that it was she who cleared
18 him in.
19     Q.   Did you ever see Ouseley speaking with
20 Davis during the quarterly meetings?  Obviously,
21 you weren't at the October 31st, 2001 but in
22 general at the other meetings where you were

Page 122

1    Q.    And after that time, were you in a
2    position of doing other work for him again before
3    he became director?
4    A.    I'm sure I probably did something, but
5    I don't think it was anywhere near as important as
6    that study he was working on.
7    Q.    Is it fair to say you disliked working
8    for him after that incident or would you have
9    preferred not to work with him?
10   A.    Yes.
11   Q.    Would it be fair to say you disliked
12   him?
13   A.    That would be fair to say.
14   Q.    You had described an incident after he
15   retired.  I believe it was after he retired when
16   he was in the building photocopying documents.  Is
17   that accurate?
18   A.    Yes.
19   Q.    And did you see him photocopying the
20   documents?  Did you witness the photocopy?
21   A.    Yes.
22   Q.    Did you see what documents he was

Page 123

1    copying?
2    A.    I did not see the exact documents, but
3    I know that they were from a particular portion of
4    the cabinet that held quarterly refunding
5    information.
6    Q.    I believe you had stated previously in
7    response to other questions that you reported what
8    you saw and the fact that he was photocopying
9    documents; is that accurate?
10   A.    Yes.
11   Q.    My understanding of your prior
12   testimony and again, direct me if this is wrong,
13   but you stated that you believe Mr. Malvey's
14   access may have been restricted in some way after
15   that incident although the particulars weren't
16   clear; is that correct?
17   A.    His access to our office files were
18   completely restricted.
19   Q.    And who made ead that decision to
20   restrict Paul Malvey's access to Treasury files?
21   A.    We were told by Brian Roseboro.  I
22   don't remember if he was the assistant secretary

Page 124

1    then or the under secretary.
2    Q.    Would Brian Roseboro have made the
3    decision or would he have just been communicating
4    another person's decision or do you not know?
5    A.    I do not know.
6    Q.    Do you know specifically the documents
7    that Paul Malvey was copying were nonpublic?
8    A.    I do not know.
9    Q.    Do you have any personal knowledge
10   that Paul Malvey leaked nonpublic information
11   before the October 31st, 2001 Treasury
12   announcement regarding 30-year bond?
13   MR. TOONE:  Objection.
14   A.    No, I have no knowledge.  I'm unaware
15   of anyone in our office ever leaking anything out
16   of our office.
17   BY MS. LEVINE:
18   Q.    You again, in response to prior
19   questions had testified regarding Dave Borowski
20   and the explanation that Dave Borowski provided to
21   you as to how the web posting was made prior to
22   expiration of the embargo; is that correct?

Page 125

1    A.    That's how I recall he told me.  Yes.
2    Q.    Was Dave Borowski's account your sole
3    source of information on that?
4    A.    For me, yes.
5    Q.    So you didn't personally engage in any
6    investigation as to those issues?
7    A.    No.  That wouldn't be my -- no, I was
8    told to correct it afterwards to make sure it
9    never happened again.
10   Q.    You had previously testified that you
11   weren't physically in the room during the October
12   31st, 2001 quarterly refunding press conference on
13   Wednesday; is that correct?
14   A.    Yes.
15   Q.    But instead you were by a table with
16   the releases across from the door to the room
17   where the meeting was held; is that correct?
18   A.    There was a door -- there are two
19   doors to that room separated by maybe 30 or 40
20   feet and I was, from what I remember, centrally
21   located across the hall from that.
22   Q.    Were you able to see the doors to the

Page 130

1  present?

2    A.  She wasn't there then but prior to
3  that but sometimes after the session where the
4  press conference was over, there would be
5  follow-up questions, off-the-record-type of
6  questions.

7    Q.  And do you recall Ouseley speaking
8  with Davis, witnessing that?

9    A.  I saw Pete Davis talk to Ouseley and
10  Paul Malvey.

11    Q.  Did Ouseley introduce you to Davis?

12    A.  I do not recall how I first learned of
13  Pete Davis.  My one recollection of the one time I
14  had a conversation with him was in a quarterly
15  refunding after everything was over with and
16  someone introduced him to me and that I'm sure was
17  the only real conversation I ever had with him.

18    Q.  Were you aware of what standards were
19  applied in the decisions whether to clear any
20  specific individuals or not to the quarterly
21  refunding meetings?

22    MR. TOONE:  Objection.

Page 131

1    A.  I do not know because I would have not
2  cleared anyone in on my own other than those who
3  officially could have been there, like someone
4  from O & B or someone from CBO but if it had been
5  a consultant, me personally, I wouldn't have
6  cleared them in.  I would have gone through the
7  director first.

8    BY MS. LEVINE:

9    Q.  So is it fair to say that you did not
10  have knowledge of the specific criteria that would
11  be used to decide whether to authorize clearance
12  for an individual who went to the quarterly
13  refunding meetings?

14    MR. TOONE:  Objection.

15    A.  Yes.

16    BY MS. LEVINE:

17    Q.  You previously testified, and correct
18  me if that's not accurate, that the once a
19  quarterly refunding meetings were generally open
20  to the public to persons that had been properly
21  cleared; is that correct?

22    A.  Yes.

Page 132

1    Q.  So would it be accurate to say that a
2  member of the public who had not been cleared but
3  literally was just off the street or decided they
4  wanted to attend could not just walk into one of
5  these meetings?

6    MR. TOONE:  Objection.

7    BY MS. LEVINE:

8    Q.  The quarterly refunding meetings; is
9  that correct, without having to have been cleared?

10    MR. TOONE:  Objection.

11    A.  Yes.

12    Q.  I'm going to return to what has been
13  marked as Exhibit 2.

14    A.  Okay.

15    Q.  You previously testified, and correct
16  me if this is not accurate, that you had not seen
17  this document, Exhibit 2, prior to today's
18  deposition?

19    A.  No, I have never seen it.

20    Q.  Do you know whose notes these are?

21    A.  I have no idea.

22    Q.  Do you know what the source of

Page 133

1  information is for these notes?

2    A.  Obviously it's someone who didn't work
3  at our office because they misspelled quite a few
4  names.

5    Q.  I'd like to turn now to Exhibit No. 3.
6  It's the document that has the redacted sections.
7  You previously answered questions about the
8  document at the top, there's a line that says from
9  and then Timothy Bitsberger and it says sent and
10  there's a date it says October 31st, 2001.  Do you
11  see that?

12    A.  Yes.

13    Q.  Can you recall when Timothy Bitsberger
14  began working at Treasury roughly?

15    A.  I believe it was some time just before
16  this refunding.  I seem to remember it was fairly
17  new, it was -- I don't think he had been here that
18  long but I don't know the exact date.

19    Q.  So it's your recollection that
20  Bitsberger was new to Treasury around the time of
21  October 31st, 2001?

22    MR. TOONE:  Objection.

Page 142

1  Affairs.
2      Q.   Did Jill Ouseley ever suggest that
3  people should be particularly careful in dealing
4  with Peter Davis?
5      A.   I don't remember that. No.
6      Q.   How often did you recall Ms. Ouseley
7  speaking with Davis at these quarterly refunding
8  conferences?
9      A.   I can remember one time there was a
10 follow up Q & A session, but I couldn't tell you
11 if it was one time or five times. I just remember
12 the one.
13     Q.   What do you recall?
14     A.   I don't recall anything about the
15 conversation. I just remember lots of times after
16 those press conferences ended, there would be
17 maybe someone from O & B had a follow-up question
18 that they had been wanted to ask but they would
19 just say to the director can I ask a follow-up
20 question or can you get me data on something and I
21 remember Pete Davis approaching her one time.
22     I don't know what the conversation was

Page 143

1  about, but it wouldn't have been -- it was
2  perfectly normal for someone to come up afterwards
3  and ask questions of whoever the political
4  appointee or Public Affairs or the director of the
5  office with a follow-up question.
6      Q.   It was normal for anyone attending the
7  press conference to speak with a Treasury official
8  afterwards?
9      A.   If they had a follow-up question.
10 Yes.
11     Q.   Do you recall Peter Davis having that
12 kind of conversation with Paul Malvey?
13     A.   I don't have specific recollection of
14 that. No.
15     Q.   On October 31st, 2001, how long did
16 the announcement by Peter Fisher last?
17     A.   As I have told my counsel, I haven't
18 (inaudible) watch for 20 years, so I don't know.
19 I'm -- I think it normally started around 9, they
20 normally start a couple of minutes late, maybe
21 sometimes 10 minutes late. I know it may have end
22 at 9:30, 9:35. I don't recall exact time.

Page 144

1      Q.   And you said you were at a table in
2  the hallway?
3      A.   Yes.
4      Q.   Outside the doors to the diplomatic
5  reception room?
6      A.   Yes.
7      Q.   And there were two sets of doors to
8  the room?
9      A.   From what I recall. Yes.
10     Q.   And the table was located on the other
11 side of the hallway between the two sets of doors?
12     A.   Yes. How far from?
13     Q.   Approximately how far from the table
14 were each set of doors?
15     A.   Diagonally maybe 20 feet or so.
16     Q.   Each direction?
17     A.   Diagonally from one door to the table,
18 from the other door to the table.
19     Q.   20 feet from the table to one door, 20
20 feet from the table to the door?
21     A.   Yes. Just guessing?
22     Q.   Were you, during this period,

Page 145

1  constantly monitoring both doors to see who was
2  going in and coming out?
3      A.   I was sitting on the table with my
4  hand on the boxes of documents. Was I actually
5  monitoring who was going in and out? No.
6      Q.   You do recall, however, individuals
7  entering the room after the announcement had
8  started; is that correct?
9      A.   After the doors were closed for the --
10 yes, mostly when the doors were closed for the
11 press conference. Yes.
12     Q.   When you say mostly closed; is that
13 right. What does mostly closed mean?
14     A.   Sometimes members of Public Affairs
15 would go in and out, they would make phone calls
16 or I think they ran out of the document so they
17 had to come out and make a copy across the
18 hallway.
19     Q.   And lastly, Ms. Levine asked you about
20 people getting cleared in to attend the
21 announcement?
22     A.   Yes.

37 (Pages 142 to 145)

Excerpt from the

February 22, 2008

deposition of

David Aufhauser

Exhibit G

```
                UNITED STATES DISTRICT COURT
   .     .      FOR THE DISTRICT OF MASSACHUSETTS

   .     .      ------------------------------x
UNITED STATES SECURITIES        :
   .     .      AND EXCHANGE COMMISSION,        :
                                :
   .     .      Plaintiff,      :
                                :  Civil Action No.
   .     .      vs.             :    05-10983 (NMG)
                                :
   .     .      STEVEN E. NOTHERN,              :
                                :
   .     .      Defendant.      :
------------------------------x
```

   .     .    Washington, D.C.

   .     .    Friday, February 22, 2008

Videotape Deposition of:

            DAVID AUFHAUSER,

the witness, was called for examination by counsel

for the Defendant, pursuant to notice, commencing

at 1:30 p.m., at the law offices of Foley

Hoag LLP, 1875 K Street, Northwest, Suite 800,

Washington, D.C., before Dawn A. Jaques, Certified

Shorthand Reporter and Notary Public in and for

the District of Columbia, when were present on

behalf of the respective parties:

Page 10

1    A  Yes, Zurich.
2    Q  Okay.  And would it be fair just to say
3  in layman's terms that you're the top lawyer in
4  the U.S.?
5    A  Yes.
6    Q  Okay.  And without getting into any
7  particulars, would it be fair to say that among
8  your duties and responsibilities would be
9  supervising responses to investigative inquiries
10  by the Securities and Exchange Commission or the
11  Treasury Department?
12    A  Yes.
13    MR. WARIN:  I don't --
14    THE WITNESS:  Yes.
15    BY MR. SHOPE:
16    Q  Okay.  And those do crop up from time to
17  time, would that be fair to say?
18    MR. WARIN:  Objection, relevancy.
19    THE WITNESS:  Yes.
20    BY MR. SHOPE:
21    Q  Now, I'd like to turn your attention
22  back to the time when you were still at the

Page 11

1  Treasury Department, in particular the fall of
2  2001, in particular October of 2001.
3    First of all, have you done anything to
4  prepare for today's deposition?
5    A  I met with my counsel twice.
6    Q  And did you look at any documents in
7  connection with preparing for the deposition?
8    A  I saw a limited number of documents.
9    Q  Okay.  Can you tell me what documents
10  you reviewed?
11    A  I think the document I recall reviewing
12  is a letter from me to Harvey Pitt.  There were
13  some other documents that I cannot recall
14  specifically right now.
15    Q  Sure, okay.  And we'll get to your
16  letter to Mr. Pitt in a bit.
17    So I want to focus you on the following
18  matter.  You may be aware -- or would it be fair
19  to say that you're aware that the case relates to
20  events on October 31, 2001?
21    A  I'm aware of that time period.  I
22  wouldn't have told you it was October 31st.

Page 12

1    Q  Okay.  But you recall that there was an
2  issue relating to the decision of the Treasury
3  Department to suspend issuance of a 30-year bond.
4  Do you recall that?
5    A  Yes.
6    Q  I want to ask you about something just a
7  little bit earlier in time.
8    Do you recall there being an issue in
9  early October of 2001 relating to a so-called
10  fails of treasury bonds -- trades and treasury
11  bonds following the events of September 11, 2001?
12    A  No, not specifically.
13    Q  You don't, okay.  Perhaps this will help
14  out a little bit.  If we can mark this as the next
15  exhibit -- or the first exhibit rather.
16    (Aufhauser Deposition Exhibit No. 1 was
17    marked for identification.)
18    BY MR. SHOPE:
19    Q  And I apologize, I didn't realize that
20  each interested party was going to have two
21  lawyers, so I only have one copy for the SEC, the
22  Treasury, and Mr. Aufhauser's counsel.  I

Page 13

1  apologize for that.
2    A  Are the blacked out items something the
3  government blocked out, or you did?
4    Q  The Treasury Department has blocked
5  those items out.
6    A  Okay.
7    MR. KOLLAR:  And those redactions have
8  been upheld by the court.
9    THE WITNESS:  Yeah, whatever they are.
10    MR. WARIN:  Yeah.  So what's the
11  question, John?
12    BY MR. SHOPE:
13    Q  Okay.  Well, first of all, I hadn't
14  asked a question yet.  I was going to -- I just
15  wanted to make sure he reviewed Exhibit 1.
16    A  Is this the complete exhibit?  Because
17  it seems to end with an e-mail at the bottom which
18  doesn't have the subject matter.
19    Q  Sure.  Well, this is how it was produced
20  to us by the Treasury Department.
21    A  Okay.
22    Q  So those were editing decisions made by

Page 14

1 the Treasury Department in responding to Freedom
2 of Information Requests that were made on behalf
3 of my client.
4     So as you can see, in the middle there's
5 an e-mail from a Timothy Bitsberger to a group of
6 people, including you, and he references in his
7 e-mail a leak a few weeks ago at the emergency
8 reopening. Do you see that?
9     A   Yes.
10    Q   Do you recall that there was an
11 emergency reopening of the 10-year note in early
12 October of 2001?
13    A   No.
14    Q   You don't recall that?
15    A   No.
16    Q   And so would it be fair to say then that
17 you don't recall there having been any reports of
18 a leak in connection with the emergency reopening?
19    A   No, I don't have a recollection. You
20 know, looking at these dates, as I'm confident
21 you've probably heard from others, you know, I was
22 in England at Cambridge on September 11th and got

Page 15

1 an emergency call and was put on a military
2 airplane the next day to fly home to Treasury on
3 the 12th and brought over to the White House and
4 given new assignments, which were all consuming
5 for some years thereafter, including wearing an
6 NSC hat in addition to my Treasury hat.
7     So I don't remember. I suspect I was
8 focused on the issues posed by the terrorism.
9     Q   Okay. So as far as you're aware, there
10 was no one in your -- under your supervision who
11 sort of followed up on reports of a leak by the
12 Treasury Department in connection with the
13 emergency reopening of the 10-year note in early
14 October of 2001?
15    A   I don't know whether there was somebody
16 who did that.
17    Q   Okay. Mr. Bitsberger -- now, speaking,
18 by the way, of your particular focus, just
19 speaking generally, the events of October 31,
20 2001, in connection with the decision to suspend
21 issuance of the 30-year bond and the announcement
22 of that was a matter of some attention on your

Page 16

1 part, would that be fair to say?
2     MS. WILLIAMS:  Objection.
3     MR. WARIN:  Objection.
4     THE WITNESS:  It's actually an
5 overstatement.
6     BY MR. SHOPE:
7     Q   Okay.
8     A   It was not a significant part of my
9 portfolio or counsel. First, I have no
10 recollection of it. Second, I ran about 1600
11 lawyers, if you count the IRS. Third, one of the
12 most capable lawyers in the group was the head of
13 domestic banking, who was a careerist and knew
14 more about this sort of thing than I did. So I
15 don't think that's correct what you said.
16     BY MR. SHOPE:
17     Q   Okay. Who is the career attorney to
18 whom --
19     A   Roberta McInerney.
20     Q   And can you spell that, please?
21     A   No. McInerney, M-C-I-N-H-E-R-N-E-Y
22 (sic), something akin to that.

Page 17

1     Q   Okay. And you say --
2     A   She's now I think recently retired.
3     Q   And your understanding is that
4 Ms. McInerney was the attorney who was supervising
5 the Treasury review of the events of October 31,
6 2001?
7     A   No, I don't think that's what I said.
8     MR. WARIN:  No, that's not his
9 testimony.
10     THE WITNESS:  No, no. She was in charge
11 of domestic banking law, and so was -- had
12 principal supervisory authority over what the
13 undersecretary to domestic banking or finance was
14 doing at that time on any subject matter, and she
15 had a posse of lawyers who worked for her who were
16 skilled in some of the arcane things that go on in
17 that.
18     BY MR. SHOPE:
19     Q   Uh-huh, okay. I just --
20     A   But she had nothing to do, to my
21 recollection, with the matter that you're looking
22 into.

Page 18

1    Q   Okay, okay. So -- so I was just trying
2  to figure out why it was that you had mentioned
3  her name.
4    A   I think you asked me whether --
5      MR. WARIN: You asked -- you asked a
6  predicate of whether he had knowledge of this and
7  so forth preexisting 12 -- 10/31, and he said no,
8  he didn't. Indeed, he had a very capable career
9  lawyer who had been responsible for that.
10     MR. SHOPE: Okay, maybe that's the
11 confusion, because I wasn't asking about the
12 preexisting 10/31. Maybe that's how it came out,
13 but that was not what I was intending to ask.
14     THE WITNESS: Yeah, no, I was answering
15 the question about the emergency reopening that's
16 referred to here about which I have no
17 recollection.
18     BY MR. SHOPE:
19     Q   Sure, actually, yes. So what I was
20 getting to is there was a gear shift there, at
21 least an intended gear shift, and maybe it was too
22 subtle.

Page 19

1      What I was getting at was after the
2  press -- the quarterly refunding conference that
3  occurred on October 31 and complaints in the press
4  about how that matter had been reported or
5  disseminated, the subject became a matter of your
6  own attention, would that be fair to say?
7      MS. WILLIAMS: Objection.
8      MR. WARIN: Objection as well.
9      THE WITNESS: You know, the answer is
10 yes because of my preparation for this deposition.
11 Otherwise, I would have said it was delegated to
12 people like the Enforcement Group and to the IG,
13 and eventually to the SEC.
14     BY MR. SHOPE:
15     Q   Okay. So bearing in mind that your role
16 was supervisory, there's a further portion of the
17 e-mail that is addressed at the top from
18 Mr. Fratto to Mr. Bitsberger stating that a leak
19 during the emergency reopening was attributed to
20 the Borrowing Committee. Do you see that?
21     MR. WARIN: At the very top, read those
22 two together.

Page 20

1      THE WITNESS: Yep.
2      BY MR. SHOPE:
3    Q   Okay. So did you have any understanding
4  in October of 2001 and November 2001 that a leak
5  had been attributed to the Borrowing Committee?
6    A   No.
7    Q   Okay. So as far as you're aware, there
8  was never any investigation of any such leak?
9      MS. WILLIAMS: Objection.
10     MR. WARIN: Objection.
11     THE WITNESS: No, I don't know.
12     BY MR. SHOPE:
13     Q   Okay. Well, that's fair. You can mark
14 this as the next exhibit.
15     (Aufhauser Deposition Exhibit No. 2 was
16      marked for identification.)
17     BY MR. SHOPE:
18     Q   If you could take a moment and read
19 through this exhibit.
20     A   Okay.
21     Q   First of all, did you ever see this
22 exhibit or the same essential content of this

Page 21

1  exhibit before?
2    A   I don't think so.
3    Q   Do you recall generally that there were
4  articles reporting criticism of the Treasury
5  Department after the events of October 31, 2001?
6    A   I don't recall.
7    Q   You don't recall?
8    A   No.
9    Q   All right.
10   A   Was this identified for the record?
11     MR. WARIN: He just marked it. He
12 didn't identify it.
13     BY MR. SHOPE:
14     Q   Yeah, what's that? Yes, this is a -- I
15 think you can see that this is an article from
16 Reuters.
17     A   No, yeah, I just want the folks who are
18 watching to know I'm looking at a news article.
19     Q   Oh, Exhibit 2. Yeah, it's Exhibit 2.
20 I'm sorry.
21     A   It's not just Exhibit 2. It's an
22 article written by somebody I never heard of and

Excerpt from the

June 23, 2006 deposition of

Paul Malvey

Exhibit H

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )

UNITED STATES SECURITIES AND    )

EXCHANGE COMMISSION,    )

        Plaintiff,    )

      v.    ) No. 05-10983 (NMG)

STEVEN E. NOTHERN,    )

        Defendant.    )

- - - - - - - - - - - - - - )

Washington, D.C.

Friday, June 23, 2006

Deposition of PAUL FRANCIS MALVEY, a witness herein,

called for examination by counsel for Defendant in

the above-entitled matter, pursuant to agreement, the

witness being duly sworn by CHERYL A. LORD, a Notary

Public in and for the District of Columbia, taken at

the offices of FOLEY HOAG LLP, 1875 K Street, N.W.,

Suite 800, Washington, D.C., at 10:10 a.m., Friday,

June 23, 2006, and the proceedings being taken down

by Stenotype by CHERYL A. LORD, RPR, CRR, and

transcribed under her direction.

Page 18

1    Q.   So just so that I'm clear:  Were there any
2   other documents that you reviewed in connection with
3   your -- with your deposition?
4    A.   I don't remember.
5    Q.   Okay.  Now, do you recall receiving a
6   subpoena in this case?
7    A.   Yes.
8    Q.   Okay.
9      MR. SHOPE:  And why don't we -- I have a
10  copy here that I can just mark.
11      (Malvey Exhibit No. 2
12       was marked for
13       identification.)
14      BY MR. SHOPE:
15   Q.   I'm showing you what's been marked as
16  exhibit 2 to your deposition.
17      Is that a copy of the subpoena that you
18  received in this case?
19   A.   Yes.
20   Q.   Okay.  And you'll see that the subpoena
21  called for you to provide any documents that you
22  might have had on various subjects.  And I believe
23  that just before we began the deposition, you
24  indicated that you did not have any documents that
25  responded to the requests that were on schedule A to

Page 19

1   this exhibit 2.
2    A.   No, I don't.
3    Q.   Okay.  And did you make any effort to try
4   to locate any such documents?
5    A.   I did look on my computer for whatever
6   documents I have from Treasury, and there were none
7   there.
8    Q.   Okay.  Obviously, a lot of time has gone
9   by since the events in question, so that's not
10  surprising.
11      Now, perhaps you could give us just a
12  brief summary of your education and career history in
13  chronological order, in other words, where you went
14  to college, if you had any graduate training, and
15  then the series of jobs that you had.
16   A.   Sure.
17      I received an undergraduate degree in
18  mathematics with a minor in physics from Merrimack
19  College, '64.  Received a master's in economics from
20  the University of Notre Dame in '70, Ph.D. in
21  economics in '74.
22      I taught at Catholic University from 1972
23  to 1978, and I was --
24   Q.   Actually can I stop you for a second?
25      Where did you get your Ph.D.?

Page 20

1    A.   Oh, I'm sorry.
2      Notre Dame.
3    Q.   Okay.
4    A.   And I taught at Catholic University from
5   1972 to 1978.  I was an adjunct there from '79
6   through '81.
7      I started at Treasury in June of '78 as a
8   financial economist.  Don't remember what the office
9   was called then, but I was in essentially the same
10  office my whole career with mergers and acquisitions.
11  And I was a financial economist, and then senior
12  financial economist.
13      I became associate director in around
14  1993.  I became deputy director -- well, acting
15  director in around 1997 when the director was out for
16  about 15 months with breast cancer.
17      And when she came back, I was made deputy
18  director, and she left in either '88 or -- I'm
19  sorry -- '98 or '99.  I was acting director again for
20  approximately 10 months, and then was appointed
21  director.
22      And I retired -- took an early retirement
23  and buyout in April of 2003.
24   Q.   Now, was the director whose departure
25  caused you to become the acting director Jill Ousley?

Page 21

1    A.   Yes.
2      It was Jill Ousley, correct.
3    Q.   Yeah.
4      And you've said you took a buyout, an
5   early retirement?
6      Can you briefly describe the circumstances
7   of that?
8    A.   Sure.
9      With the startup of Homeland Security in
10  March of '03, Treasury lost Secret Service, Customs,
11  and ATF, and it was -- it was a major reorganization,
12  and OPM authorized Treasury to offer a buyout and
13  early retirement for a 4-week window in March.
14      And I didn't -- initially didn't think I
15  was eligible for it, but I found out that I was, and
16  talked to my wife, decided to take it.  And because
17  it was so fast, I stayed around for another 6 to 8
18  weeks gratis to help with the transition to my
19  successor.
20   Q.   And what have you been -- and -- I'm
21  sorry -- what was the year in which you took the
22  early retirement?
23   A.   My last official day was April 3rd of '03.
24   Q.   Okay.  And what have you been doing since
25  that time?

6  (Pages 18 to 21)

Page 26

1    Q.   Okay.  And to whom did the deputy
2    assistant secretary for federal finance report?
3        A.   To the assistant secretary for financial
4    markets.
5        Q.   Okay.  And the -- to whom did the
6    assistant secretary for financial markets
7    report?
8        A.   To the undersecretary for domestic
9    finance.
10       Q.   Okay.  And in October of 2001, that was
11   Peter Fisher?
12       A.   Correct.
13       Q.   Okay.  In October of 2001, who was the
14   deputy assistant for federal finance -- if I'm
15   remembering these right?
16       A.   It was Tim Bitsberger, and I think he was
17   confirmed October 15, 2001, but he was on board a
18   little bit before that.
19       Q.   Okay.  And what was the name of the
20   gentleman to whom you were reporting directly at that
21   time in October of 2001?
22       A.   Tim Bitsberger.
23       Q.   Tim Bitsberger.  Okay.
24            And what was the name of the gentleman to
25   whom Tim Bitsberger was reporting?

Page 27

1        A.   Brian Roseboro.
2        Q.   Okay.  And just for clarity, what --
3    again, what was Mr. Roseboro's title?
4        A.   Assistant secretary for financial markets.
5        Q.   Okay.  And Mr. Roseboro reported to
6    Mr. Fisher?
7        A.   Correct.
8        Q.   Okay.  Now, the -- maybe if you could just
9    state in broad terms:  What was the role of the
10   office of market finance with regard to the funding
11   of the federal debt?
12       A.   A -- we -- we did research and kept
13   current on the developments in the money and bond
14   markets, kept current on fiscal projections as to the
15   fiscal policy outlook, the revenues and expenditures.
16            We advised policy makers on the conditions
17   in the financial markets, the outlook for financial
18   markets.  We -- we did the analysis of various
19   methods of financing the federal government and made
20   recommendations to the policymakers.
21            I was also liaison for the Treasury
22   borrowing advisory committee, the private sector
23   group of advisers, and worked closely with the
24   Federal Reserve Bank of New York in their fiscal
25   agency capacity.  In terms of debt management policy,

Page 28

1    I was lead contact with them.
2            And special projects, there aren't too
3    many financial economists in Treasury, so when there
4    was a special project, for example, we changed the
5    method that we sell securities from uni- -- from
6    multiple price auctions to uniform price auctions.
7    And that was -- I did 2 studies over a 5-year period,
8    longer-term policy studies.
9        Q.   Okay.  What was the role of the borrowing
10   advisory committee?
11       A.   To -- they brought to the table their
12   experience in financial markets.  They would -- they
13   cut across the -- a broad spectrum of financial
14   market participants from the major dealers like
15   Goldman and Soly or Citi to regional dealers to life
16   insurance companies, hedge funds, smaller regional
17   banks.
18            And they advised the secretary on debt
19   management policy in general, but at meetings, we
20   would provide them with an agenda of things that we
21   were interested in their advice at a particular
22   meeting.
23       Q.   Okay.  Now, with regard to the -- well,
24   let me just clarify:  The members of the borrowing
25   advisory committee were individuals in the private

Page 29

1    sector.
2            Correct?
3        A.   Yes.
4        Q.   Okay.  And I gather, this was a -- sort of
5    a self-nominating organization?
6        A.   A self-selecting, correct.
7        Q.   And -- and the -- the borrowing advisory
8    committee would make recommendations to the Treasury
9    Department about how much money ought to be borrowed
10   and what types of debt instruments broadly speaking.
11            Is that fair?
12            MR. ROSSETTI:  Objection.
13       A.   That's one of the things that they did.
14            They -- they would work out pro forma
15   financial forecasts, hand them out at the meeting,
16   and say if -- on the assumption that this is what
17   your needs are, here is how we recommend that you
18   finance.
19            BY MR. SHOPE:
20       Q.   Okay.
21       A.   But we would also ask them other
22   questions.  That was kind of a pro forma issue.
23       Q.   Okay.  So just to break -- just to break
24   it down in little pieces:  In the instance where the
25   borrowing committee said, okay, on the assumption

Page 58

1  advisory committee the preceding day?
2      A.  M-hm.
3      Q.  Correct?
4          And you would -- would you circulate
5  copies of any recommendations that had been made by
6  the borrowing advisory committee the previous day?
7      MR. ROSSETTI:  Objection.
8      A.  They -- what we would distribute, the
9  borrowing advisory committee's report to the
10 secretary and whatever was in that.
11     BY MR. SHOPE:
12     Q.  Okay.
13     A.  If there were recommen- -- a lot of times
14 they would vote, and if there were recommendations in
15 that, that's what -- that's where they would get it.
16     Q.  Okay.  And so I gather that there was some
17 sort of embargo associated with the press conference
18 that took place on Wednesday?
19     A.  Oh, yes.
20     Q.  Okay.  And so the members of the borrowing
21 advisory committee were free to trade upon the
22 information that they had learned in participating in
23 this conference once the embargo period of Wednesday
24 had expired?
25     MR. ROSSETTI:  Objection.

Page 59

1      BY MR. SHOPE:
2      Q.  Is that correct?
3      A.  I -- I -- I don't know -- I mean, it's
4  just -- the information that they'd learned in the
5  meeting, you mean?
6      Q.  Yes.
7      A.  There were decisions made in the meeting,
8  and so they knew the decision was made because
9  (phonetic) the rest of the world know the decision
10 was made by then.
11     Q.  That's right.
12         But once -- but the ultimate decision is
13 announced on Wednesday morning.
14         Correct?
15     A.  Ultimate, whatever the final --
16     Q.  Yeah.
17     A.  Sure.
18     Q.  So the members of the borrowing advisory
19 committee were -- were free to take positions in the
20 market based upon that decision, once the embargo for
21 the Wednesday morning press conference had expired.
22     MR. ROSSETTI:  Objection.
23     BY MR. SHOPE:
24     Q.  Is that correct?
25     A.  As far as I know, I know that they were

Page 60

1  not allowed to communicate with anybody until
2  everything was out in the public domain.
3      Q.  Okay.  Do you know whether or not the
4  members of the borrowing advisory committee were told
5  what the embargo was going -- period was going to be
6  with regard to the press conference the following
7  day?
8      A.  I think for all prior quarters, they found
9  out when the embargo was over with the rest of the
10 public, because the embargo would be over at varying
11 times.  It might be 9:45.  It might be 9:40.  It
12 might be 9:55.,
13     Q.  M-hm.
14     A.  There was a press release from Treasury
15 the previous day or 2 that said, this Wednesday, the
16 embargo is going to be a fixed time, 10 AM.
17     Q.  You're talking about October 31 --
18     A.  Yeah.
19     Q.  -- 2001?
20     A.  Correct.  Right.
21         And so they knew when the embargo was over
22 as did everybody else in the market because we put
23 out a press release for it.
24     Q.  Okay.  But -- but -- but that was -- but
25 that was an unusual instance on October 31, 2001,

Page 61

1  with regard to the advance announcement of what the
2  embargo time was going to be?
3      MR. ROSSETTI:  Objection.
4      A.  Well, it was a change.
5      BY MR. SHOPE:
6      Q.  Yeah.
7      A.  Usual -- we've been doing it since.
8      Q.  M-hm.  So as far as the period before
9  October 31, 2001, I take it that the members of the
10 borrowing advisory committee were not told in advance
11 when it was that the embargo for the following day's
12 press conference would expire?
13     MR. ROSSETTI:  Objection.
14     BY MR. SHOPE:
15     Q.  Because nobody knew.
16         Right?
17     A.  No.
18         That's what I'm saying.  They -- they
19 would have to find out when -- everybody found out at
20 the same time.
21     BY MR. SHOPE:
22     Q.  Okay.  How would they have found that out?
23         Do you know?
24     A.  Wire --
25     Q.  Or how would --

Page 62

1    A.   -- wire services.
2    Q.   -- they have been able to?
3    A.   Because prior to October 31, the press
4  conference would start at 9 but get over whenever the
5  announcement and the Q's and A's were done.
6         Then the press officer would get up there,
7  look at the clock and say, it's 9:25, how about 9:40,
8  for the embargo.  And she would have to get a
9  response.  It wasn't like, people, you know, walking
10 out of the room and not paying attention to her.
11        They -- the practice was, the people in
12 the room would say, okay, so that they actively
13 responded to the statement that the press officer
14 made.
15   Q.   Okay.  But that was also in connection
16 with sort of the press of- -- well, the press officer
17 was -- was proposing an amount of time as a period
18 that would be adequate for the reporters to prepare
19 their stories?
20   A.   Correct.
21        MR. ROSSETTI:  Objection.
22   A.   And the decision was made.
23        She would propose that, and sometimes they
24 would say, no, it's a lot, how about 9:50.,
25   Q.   Okay.

Page 63

1    A.   And so she would say, okay, 9:50, does
2  that work for everybody.  And everybody would
3  acknowledge it's 9:50, not 9:45.,
4    Q.   Okay.  So the reporters could sometimes
5  say, we want it to be shorter, we want it to be
6  longer and --
7    A.   But the decision was the press officer's.
8         Usually if the Q's and A's went 20
9  minutes, the reporters probably wanted a little bit
10 more time to write up the story.
11   Q.   Okay.
12        MR. ROSSETTI:  John, we've probably been
13 going for about an hour, so if we can take a break.
14        MR. SHOPE:  We can take a short break if
15 you like.
16        MR. ROSSETTI:  Sure.
17        MR. SHOPE:  I'd like to keep moving just
18 so that I'm not delayed on my flight back to Boston
19 and Mr. Malvey isn't detained longer than necessary.
20        MR. ROSSETTI:  I have the same interest in
21 getting this over as quickly as you do, John,
22 although I don't have a flight to Boston.
23        MR. SHOPE:  This is off the record.
24        THE VIDEOGRAPHER:  This is the end of tape
25 number 1 in the video deposition of Paul F. Malvey.

Page 64

1        MR. SHOPE:  What time is --
2        MR. ROSSETTI:  M-m-m?
3        THE VIDEOGRAPHER:  Off the record --
4        THE COURT REPORTER:  I have to hear what
5  he's saying, you guys.
6        THE VIDEOGRAPHER:  -- at 11:16:30 PM --
7  AM -- excuse me -- on June 23rd, 2006.
8        (Recess.)
9        MR. SHOPE:  Actually, before we go back
10 to -- this is on the record.
11        (Discussion off the record.)
12        MR. SHOPE:  Off the video record.
13        In the interest of keeping things moving
14 as quickly, Ms. Williams, I sent you a letter
15 yesterday regarding sort of more narrowly tailored
16 requests for documents that we're seeking on a
17 voluntary -- or that you're going to attempt to
18 obtain on a voluntary basis from other government
19 departments.
20        And one thing I'd like to make sure is
21 clear is that we would like to have the bylaws of the
22 borrowing advisory committee at least insofar as they
23 relate to confidentiality.
24        MS. WILLIAMS:  Is that in your letter?
25        MR. SHOPE:  It's not in my letter.

Page 65

1        That's why --
2        MS. WILLIAMS:  If you could send me a
3  followup letter just stating that, that would be
4  helpful --
5        MR. SHOPE:  Sure.
6        MS. WILLIAMS:  -- because I'm not --
7        MR. SHOPE:  Okay.
8        MS. WILLIAMS:  -- going to get --
9        MR. SHOPE:  I'm probably not going to be
10 able to send you the followup letter today --
11        MS. WILLIAMS:  I understand.
12        MR. SHOPE:  -- just in the time that we
13 had discussed, so I just wanted to let me know.
14        MS. WILLIAMS:  Great.
15        MR. SHOPE:  I think we can go back on the
16 video record.
17        THE VIDEOGRAPHER:  This is the beginning
18 of tape 2 in the videotape deposition of Mr. Paul F.
19 Malvey.  On the record at 11:25:04 AM, on June 23rd,
20 2006.
21        BY MR. SHOPE:
22   Q.   And Mr. Malvey, I just wanted to follow up
23 on something that we discussed before the break.
24        When the borrowing advisory committee
25 would deliver its recommendation to the secretary in

Page 66

1  the evening session, I take it there would be some
2  back-and-forth between the deputy assistant secretary
3  and the members of the committee?
4       MR. ROSSETTI: Objection.
5    A.   First of all, he wouldn't deliver it to
6  the secretary. It's called the report to the
7  secretary, but --
8       BY MR. SHOPE:
9    Q.   Yeah.
10   A.   -- usually there's a DAS or assistant
11 secretary there, or undersecretary, or all 3. There
12 may be -- they might say something, and DAS might
13 say, why did you recommend that.
14      But more often than not, it's, thank you
15 for your efforts.
16   Q.   Okay. And in the course of the meeting
17 with the borrowing advisory committee, would the
18 staff at some point say what the staff was
19 contemplating as far as the -- how to -- how to
20 structure the -- the borrowing?
21   A.   No.
22      MR. ROSSETTI: Objection.
23   A.   He's smarter than that.
24      No.
25      I mean, we've been dealing with people in

Page 67

1  financial markets, me, anyway, for 25 years. You
2  don't -- you don't reveal your book.
3       BY MR. SHOPE:
4    Q.   Now, with regard to the quarterly
5  refunding conferences, who -- who -- who could attend
6  those?
7    A.   I would not say they were open to the
8  public generally.
9       The members of Treasury who had an
10 interest, usually people in domestic finance, and
11 somebody from another agency who was following our
12 stuff -- for example, GAO was writing a report on
13 Treasury financing, they may call me up and ask to
14 get cleared in -- OMB or CBO, and I don't know who
15 else.
16      I mean, because I was not the only person
17 who may clear people in, but usually -- usually cast
18 of same characters, but there are probably 35 people
19 in the room, and I didn't necessarily know
20 everybody --
21   Q.   M-hm.
22   A.   -- but I know they had to get cleared into
23 the building. And they would say why they're coming
24 in.
25   Q.   Okay. And was there any -- well, who --

Page 68

1  who could clear somebody in for purposes of attending
2  a quarterly refunding conference?
3    A.   I'm not quite sure generally who could.
4       I know I had the authority and my
5  secretary had the authority.
6       And if somebody was visiting somebody on
7  my staff for a reason, I assume they would have the
8  authority to get somebody cleared in. You would give
9  their name, date of birth, and social, and the time.
10   Q.   Just as a -- putting aside any sort of
11 formal understandings, as a practical matter, if
12 someone was in the Treasury building for whatever
13 purpose, there would be nothing that would physically
14 prevent that person from walking in and attending the
15 committee -- the quarterly --
16   A.   I don't --
17   Q.   -- refunding conference?
18      Is that true?
19      MR. ROSSETTI: Objection.
20   A.   I don't know. I mean, I -- it's --
21 because it was a limited room. It was a small room,
22 and I -- if I saw somebody who I didn't recognize
23 walk in the door when I was a younger staffer, and
24 the younger staff back there would probably say, who
25 are you.

Page 69

1       MR. ROSSETTI: Mr. Malvey --
2       THE WITNESS: Yeah.
3       MR. ROSSETTI: -- if you could -- when
4  you -- just -- if you can just give a second or 2
5  after he finishes his question so that I can
6  interpose an objection that we can get clearly on the
7  record.
8       During the break --
9       THE WITNESS: Yeah.
10      MR. ROSSETTI: -- the court reporter was
11 mentioning she had a difficult time with some of the
12 objections.
13      THE WITNESS: Okay.
14      MR. ROSSETTI: So just for purposes of the
15 record, that would be great.
16      BY MR. SHOPE:
17   Q.   Now, you said it was a small room.
18      What -- what room are you referring to?
19      MR. ROSSETTI: Objection.
20   A.   Small is right (phonetic). I shouldn't
21 probably call it a small room.
22      Traditionally, the press conference was
23 held in the -- what was called a secretary's formal
24 conference room, and small like -- I have no idea --
25 20 by 70 -- that's not small.

Page 86

BY MR. SHOPE:

1    Q.  Okay.

2    A.  This door, by the way, I'm talking -- that

3  just leads to a kitchen.

4    Q.  Okay. But you're talking about the other

5  set of doors to the diplomatic room?

6    A.  Yeah.

7    Q.  Okay. Now, let's talk a little bit about

8  Mr. Davis.

9       When did you first learn of a Peter Davis?

10    A.  I'm not quite sure of the time, but I

11  would -- Roger Anderson -- and it was after a

12  quarterly financing conference. I think Roger was

13  the principal who spoke at the conference, and Jill

14  was director, and I was her -- I was either deputy or

15  associate director.

16       And the room emptied out, and sometimes

17  we'd walk up, say, hi, how do you think it went, or

18  whatever. And I walked over to this -- in the

19  secretary's conference room. Jill and Roger and

20  another person was standing there, and walked up, and

21  Roger introduced me to Pete Dave, this is Pete Dave,

22  Paul Malvey.

23       And -- and I just remember Roger saying,

24  he's one of the good guys. And it stuck in my mind

Page 87

1  because Roger is a man of few words, and it's -- he

2  would -- it -- he's a man of few words, and for him

3  to say, he's one of the good guys, it seems like --

4  you'd say he has a favorable impression of him.

5    Q.  And so I take it at that moment, you had

6  never previously heard of or met Mr. Malvey --

7  Mr. Davis; is that correct?

8    A.  I may have seen him around the room. I

9  don't recall talking to him or anything. I think

10  that was kind of an introduction.

11    Q.  Okay. But -- so you -- you certainly

12  didn't know him by name prior to that introduction?

13    A.  No.

14    Q.  Okay. And did -- did Mr. Anderson ever

15  elaborate on why it was that Mr. Davis was one of the

16  good guys?

17    A.  No.

18       And I didn't feel a need to ask. He had

19  his reasons. Just said he's a good guy, and so Roger

20  thinks he's a good guy.

21    Q.  Okay. The -- what else was said on that

22  occasion?

23    A.  Pleasantries.

24       I -- I have no recollection whatsoever,

25  just conversation didn't last more than a minute or

Page 88

1  2.

2    Q.  Okay. Was Ms. Ousley present for --

3    A.  Yes --

4    Q.  -- the conversation?

5    A.  -- she was standing there.

6    Q.  Do you recall what she said in substance?

7    A.  I have no idea.

8    Q.  Okay. Did you get any impression as to

9  whether Ms. Ousley already was acquainted with

10  Mr. Davis?

11    A.  I didn't have any impressions, but because

12  I was standing there, I assumed it, but I didn't have

13  any other impression.

14    Q.  Okay. The -- well, were Ousley and -- and

15  Anderson already talking to Davis before --

16    A.  I walked up to the 3 people --

17    Q.  Okay.

18    A.  -- yeah.

19    Q.  So it's possible -- as far as you're

20  aware, it's possible that Ms. Ousley was just meeting

21  Mr. Davis in that -- (indiscernible) -- and they'd

22  been introduced before you arrived?

23    A.  I have no idea.

24       MS. WILLIAMS: Objection.

25       BY MR. SHOPE:

Page 89

1    Q.  Okay. Approximately how far was this into

2  Mr. Anderson's tenure at Treasury?

3    A.  Don't recall.

4    Q.  Okay. Do you recall when his tenure

5  started?

6    A.  I kind of think -- he came in -- because I

7  remember the debt limit crisis of November '95. He

8  came in before that. And he came in -- he was

9  assistant to Darcy Bradbury, and he came in in the

10  summer before the debt crisis, so summer of '95.

11       And he worked as her special assistant,

12  and Darcy moved up to assistant secretary. Roger

13  moved in to deputy assistant secretary.

14       I don't know when that happened, but

15  sometime after the summer of '95.

16    Q.  Okay. So when the -- when the

17  conversation in which you first met Mr. Davis

18  occurred, was Mr. Anderson still a senior adviser, or

19  was he already the deputy assistant secretary?

20       MR. ROSSETTI: Objection.

21    A.  I don't recall, but it's my recollection

22  that he -- he led the press conference, which

23  suggested he was the DAS.

24    Q.  Okay. And DAS is deputy assis- --

25    A.  Deputy assistant secretary.

## Page 98

1  Q.  Okay.
2  A.  You know, like congressional testimony,
3  the principal sits there on the back bench or has
4  index cards and hands him the index cards.
5  Q.  Oh, okay.
6  A.  I wouldn't use index cards.  I would just
7  tell him.
8  Q.  Okay.  Oh, so -- so there was never --
9  there was never a Q and A that was direct with Paul
10  Malvey.
11  It was always Paul Malvey --
12  A.  The principal.
13  Paul Malvey worked for the principal.  He
14  made sure the principal knew that.
15  Q.  Okay.  All right.
16  Now, prior to October 31, 2001, did you
17  ever hear of any discussion or question about the
18  propriety -- propriety of Mr. Davis's attending the
19  quarterly refunding conferences?
20  A.  I don't recall, no, because I didn't know
21  everybody in the room at any point in time.
22  I knew him, and I recognized most of the
23  faces, but I can't say that I looked around the room
24  and counted faces that I didn't recognize, but there
25  weren't many.

## Page 99

1  Q.  M-hm.  The -- so you never heard of
2  Mr. Davis being thrown out of a quarterly refunding
3  conference or anything like that?
4  MR. ROSSETTI:  Objection.
5  A.  I never heard of that.
6  BY MR. SHOPE:
7  Q.  Did you ever hear of anybody being thrown
8  out of a quarterly refunding conference?
9  A.  Don't recall hearing that.
10  Q.  Now, we were talking before about the
11  embargo that would govern the quarterly refunding
12  conferences.
13  Did anybody ever have to write -- to sign
14  anything or write anything down with regard to
15  agreeing to follow that embargo?
16  A.  Not that I'm aware of.
17  Q.  Okay.  Was there -- was there ever any
18  written policy about embargoes to your knowledge?
19  A.  I'm not aware of a written policy, but it
20  was a clear policy.
21  Q.  Well, if it wasn't written down, what --
22  how was it clear?
23  A.  Because it was announced at the beginning
24  of a press conference that -- the public affairs
25  person would get up there at the beginning of a press

## Page 100

1  conference -- in this case I think her name was Betsy
2  Holland -- and say, welcome to the da-da-da-da-da-da,
3  DAS, so-and-so --
4  (Discussion off the record.)
5  A.  Welcome to the quarterly financing press
6  conference, such and such an official will be
7  presenting the policy statement.  There will be time
8  for questions afterwards.  At the end of the press
9  conference, I will assign an embargo time.
10  That's how they all started.  And at the
11  end of the press conference, except for this one --
12  at the end of the press conference, the -- when the
13  questions were getting inane, I'd either high -- give
14  a high sign to the public affairs officer, or the
15  principal would give kind of a pleading sign, and she
16  would step in and say, okay, one more question.
17  And the last question is asked.  Then the
18  press affairs person would go to the podium, and on
19  all previous conferences would look up at the clock
20  and say, okay, it's 9:22, how about if it's embargoed
21  to quarter -- 9:45.,
22  And the protocol was -- okay, and the
23  protocol was that people in the room responded, okay,
24  and if they didn't respond, she would say, okay,
25  again --

## Page 101

1  Q.  Okay.
2  A.  -- so that people would respond.
3  Q.  Okay.  Was there any kind of -- sometimes
4  there would be like 35 people in this room.
5  Right?
6  A.  Oh, 20 around the table, another 15 --
7  yeah, maybe as many.
8  Q.  Was there any kind of a -- sort of a roll
9  call of everybody there where every single person
10  says, yes, okay, I agree?
11  A.  It's -- there was not a roll call, but it
12  was very clear:  You wait till the embargo is over or
13  up.
14  Q.  So in other words --
15  A.  There was nothing unambiguous about it.
16  Q.  This was -- this was -- this was just a
17  unison, she says, okay, and then if somebody doesn't
18  like the period of time that's being assigned, they
19  can pipe up and say, no, I need more time, or --
20  A.  That happened on occasion, saying that
21  there's a lot this time, how about 5 more minutes,
22  how about 9:50, and she would look to me or somebody
23  else saying -- and she would say, okay, 9:50, is that
24  agreeable with everybody.
25  And people would respond.

Page 102

1    Q.   Okay.  Was there ever any explanation in
2  your hearing about what it was that was or was not
3  permitted under -- under the so-called embargo?
4    A.   I never heard --
5        MR. ROSSETTI:  Objection.
6    A.   -- of an explanation, but an embargo is an
7  embargo.
8        I mean, I had been working there for 25
9  years.  An embargo was, you know -- and it's not made
10  public until the embargo was lifted.
11        BY MR. SHOPE:
12    Q.   Okay.
13    A.   So I think everybody -- everybody knew
14  that.
15    Q.   Okay.  Well, was there any re- -- was
16  there any restriction on the reporters trading in
17  government securities once the embargo had been
18  lifted?
19    A.   I have no idea.
20    Q.   Okay.
21    A.   Once the embargo is lifted, I have no --
22  they don't have that kind of money.  I know most of
23  them.
24    Q.   So -- but as far as you -- as far as --
25  put aside whether or not you think it's obvious, you

Page 103

1  never heard any explanation being given.
2        Correct?
3        MR. ROSSETTI:  Objection.
4    A.   I mean, it's --
5        BY MR. SHOPE:
6    Q.   I mean, I think it's a simple yes-or-no
7  question.
8        MR. ROSSETTI:  Objection.
9    A.   And I'm just saying that I don't think
10  there's anybody in that room -- any adult in that
11  room did not understand what the process was.
12        BY MR. SHOPE:
13    Q.   That's -- that's -- that's -- you're just
14  assuming that based on being in Washington for a long
15  time?
16    A.   Based on --
17        MR. ROSSETTI:  Objection.
18    A.   -- 25 years' experience in Treasury and
19  attending these things.
20        BY MR. SHOPE:
21    Q.   Okay.  Now, when you said the press
22  officer would pick the embargo time --
23    A.   M-hm.
24    Q.   -- who is -- who is that person within the
25  press office?

Page 104

1        Is that a specific job title?
2    A.   Just somebody in the press office.
3        It could be the DAS.  It could be -- it's
4  somebody who handles the press.  And it used to be
5  that -- I don't know how many press officers there
6  were, but we would have one more or less assigned to
7  us.
8        And at the time, I think it was Betsy
9  Holland.
10    Q.   Holland?
11    A.   Holland, I think.
12    Q.   Just like the country?
13    A.   Correct, correct.
14    Q.   And the -- and by the way, you said DAS.
15        Are you referring to a deputy assistant
16  secretary for public affairs?
17    A.   Correct.
18    Q.   Okay.  That's -- in other words, that's
19  different from the deputy assistant secretary --
20    A.   Right.
21    Q.   -- that we've been talking about?
22    A.   Right.
23    Q.   And again --
24    A.   I'm sorry.
25    Q.   -- you got to wait until I'm done, and

Page 105

1  then give Mr. Rossetti a chance to object, and then
2  you can give your answer, and we'll get out faster.
3    A.   I have ADHD.  I'm very impatient.
4        I'm sorry.
5    Q.   Yeah.  Okay.
6        So, now, the -- I take it that typically
7  there would be a handout of the remarks that were
8  being delivered by what you call the principal at the
9  quarterly refunding conference.
10        Right?
11    A.   Correct.
12        There were -- a number of things were
13  handed out, the chart show that I had presented the
14  previous day --
15    Q.   M-hm.
16    A.   -- a copy of it, the committee report to
17  the secretary, the minutes that I wrote of the
18  meeting, the press release with a statement on it,
19  and then the actual what we call auction
20  announcements or technical detail of the securities
21  being issued and --
22    Q.   The amounts, the type of --
23    A.   -- the type and how to do it, and
24  da-da-da-da.
25    Q.   We have trouble transcribing, da-da-da-da.

Page 118

1    If -- if you go back, we're talking about
2  a period of time when we were talking about paying
3  down the federal debt by 2009 or 2011.
4    Q.  M-hm.
5    A.  We had paid down 670 billion dollars --
6    Q.  M-hm.
7    A.  -- so there was -- I remember briefing I
8  think Senate fi- -- or Senate budget and House
9  financial services committee staff about Treasury
10 financing and what the world would look like without
11 treasuries.
12   Q.  Okay.  And had there been reports that
13 Mr. Fisher had a view on -- on whether or not the
14 long bond should be eliminated?
15   A.  No, no.
16     I mean, that's -- no.  I don't mean to
17 smile, but I mean, we wouldn't -- if you're an
18 official in that position, you don't hold views in
19 public.
20   Q.  Okay.  No.
21     I'm talking about whether he had views on
22 the subject even before he was confirmed.
23   A.  Don't know.  He was in charge of the
24 market divisions of the New York Fed.
25   Q.  Okay.  Now, the --

Page 119

1    MR. ROSSETTI:  I'm sorry.
2    John, how much longer are you going to be
3  going before we break?
4    MR. SHOPE:  Well, I was hoping to go for a
5  little bit since I think both I and the witness had
6  something to eat not too long ago.
7    MR. ROSSETTI:  All right.  Can we just
8  take a quick break?
9    MR. SHOPE:  Okay.  Sure.
10     We can take it right now if you like.
11   MR. ROSSETTI:  Yeah.
12     Let me do that, and I'll be right back.
13   THE VIDEOGRAPHER:  Off the record at
14 12:21:42 AM.
15     (Whereupon, at 12:21 p.m., the deposition
16 in the above-entitled matter was recessed, to
17 reconvene at 12:50 p.m., this same day.)
18
19
20
21
22
23
24
25

Page 120

1    AFTERNOON SESSION
2      (12:50 p.m.)
3
4  Whereupon,
5      PAUL FRANCIS MALVEY,
6  the witness testifying at the time of recess, having
7  been previously duly sworn, was further examined and
8  testified further as follows:
9
10     THE VIDEOGRAPHER:  We're back on the
11 record at 12:50:33 PM.
12
13     EXAMINATION BY COUNSEL FOR DEFENDANT (RESUMED)
14     BY MR. SHOPE:
15   Q.  Actually, before we continue on to the
16 suspension of the long bond, I wanted to follow up on
17 a little bit of some of the things we were talking
18 about with regard to press embargoes before we had
19 the lunch break.
20     First of all, did you -- other than the
21 matter with -- regarding Mr. Davis that we'll get
22 into in some detail, did you ever hear of any other
23 violation of the embargo rule as you understood it
24 with regard to any quarterly refunding conference?
25   A.  I mentioned one, but it was 30 years ago.

Page 121

1    Q.  I'm sorry?
2    A.  30 years ago.
3      I don't have any direct information on it,
4  but there was -- and what -- wasn't like this, but
5  something happened 30 years ago.
6    Q.  And what was -- what was that?
7    A.  It was that the Federal Reserve used to --
8  I'm sorry -- Treasury would send the press release to
9  the Federal Reserve, and -- to the Federal Reserve
10 Bank in Philadelphia -- and the Federal Reserve Bank
11 in Philadelphia would fax it to the other 11 banks.
12     And so they would send it to -- fax it to
13 the Federal Reserve Bank in Philadelphia about 15
14 minutes in advance so that he could fax to the other
15 11 banks so the presidents of the other 11 banks
16 would have the news.
17     And it turned out that he was being wined
18 and dined and being taken to baseball -- Yankee
19 baseball fan -- games and other things by somebody in
20 New York and so he would give this one person in New
21 York a heads-up on the news, but that's -- was mid-
22 to late '70s.
23   Q.  Okay.  And that was a scandal about which
24 you heard at the time?
25   MR. ROSSETTI:  Objection.

Page 122

1    A.   It wasn't a scandal.
2    Q.   Oh.
3    A.   I mean, I don't think -- I have no idea
4  whether it was even in the public domain.
5       All I -- an old-timer told me that.
6    Q.   M-hm.  And do you know what happened to
7  the individual?
8    A.   I have no idea.
9    Q.   Okay.  And were there ever to your
10  knowledge any violations of the -- I'm sorry.
11       So just to be clear:  Other than that
12  incident about which you had heard from an old-timer,
13  there -- there -- there weren't any other re- --
14  violations of the quarterly refunding embargoes to
15  your knowledge?
16    A.   Not to my knowledge, no.
17    Q.   Okay?  Did you ever -- now, we talked
18  about earlier about the embargo that related to the
19  weekly auction notice.
20       Do you recall that?
21    A.   Yes.  Okay.  Right.
22    Q.   In other words we were talking about that
23  earlier today.
24    A.   M-hm.
25    Q.   Was that embargo ever violated to your

Page 123

1  knowledge?
2    A.   Not to my knowledge, no.
3    Q.   Okay.  If there had been a violation,
4  would you likely have been told about it?
5    A.   I suspect so.
6    Q.   M-hm.  By the way, if there had been an
7  embargo -- if there had been a violation of the
8  quarterly refunding embargo would you likely have
9  heard about it?
10    A.   I suspect so.
11    Q.   Okay.  And was there -- was there any
12  penalty if somebody did violate the embargo for the
13  quarterly refunding announcement?
14    A.   I'm an economist.  I have no idea.
15    Q.   Is the answer you don't know?
16    A.   I don't know.
17       Yeah.
18       No, I don't know.
19    Q.   I guess what I'm getting at, as far as --
20  as far as -- as far as -- I'm not just asking about
21  criminal penalty.
22       I'm just asking about, was there anything
23  that would happen to the person, you know --
24    A.   I have --
25    Q.   -- from the point of view of the Treasury

Page 124

1  Department, for example.
2    A.   I have no idea.
3       (Discussion off the record.)
4    BY MR. SHOPE:
5    Q.   Let me rephrase the question.
6       As far as you're aware, was there any
7  policy that the Treasury Department had with regard
8  to what would happen if one of the persons attending
9  the quarterly refunding conference were to fail to
10  abide the embargo and to disclose the information in
11  advance of the embargo?
12       MR. ROSSETTI:  Objection.
13    A.   I have no idea.  It's not my area.
14    BY MR. SHOPE:
15    Q.   Okay.  That's fine.
16       Were the press releases that were read at
17  the quarterly refunding conference, what you referred
18  to as the talking points earlier -- would those be
19  posted on the Treasury Web site?
20    A.   They would go up eventually.
21    Q.   Okay.  And do you know who was in charge
22  of making that happen?
23    A.   A career person in -- in the public
24  affairs office.
25    Q.   Do you know who that was?

Page 125

1    A.   I can't remember her name.
2       Florence or --
3    Q.   Frances?
4    A.   Frances.
5    Q.   Frances Anderson?
6    A.   I -- Helen Anderson worked for me --
7    Q.   I'm sorry?
8    A.   Helen Anderson worked for me --
9    Q.   Oh.
10    A.   -- and I just knew her as Frances.  I'm
11  not quite sure what her last name was.
12    Q.   Okay.  And the -- now, other than with
13  regard to October, the quarterly refunding conference
14  on October 31, 2001, did you ever hear of any
15  incidents where press releases were posted on the Web
16  site of the Treasury Department before it was
17  intended or at least intended by somebody that they
18  go up?
19       MR. ROSSETTI:  Objection.
20    A.   I -- I'm not familiar with that, no.
21    BY MR. SHOPE:
22    Q.   Do you know -- do you know who a Kenneth
23  Dam is?
24    A.   Ken Dam?
25    Q.   M-hm.

Page 146

1    Q.   Okay.  And -- and then below that, there
2    are some names of what appear to be some reporters,
3    somebody from Bloomberg News, CBS, AP.
4        Do you see that?
5    A.   Yes.
6    Q.   Okay.  First of all, do you know those
7    reporters?
8    A.   I don't recognize them.
9    Q.   All right.  Now, do you know of any reason
10   why it was that -- that their attendance was
11   requested by Frances Anderson, whereas
12   Mr. Malvey's --
13       MS. WILLIAMS:  He's Mr. Malvey.
14       BY MR. SHOPE:
15   Q.   I mean Mr. -- or excuse me --
16   Mr. Davis's -- Mr. Davis's clearance was -- was under
17   your name?
18       MR. ROSSETTI:  Objection.
19   A.   For example, the line number 1, Bloomberg
20   News, I knew the guy worked Treasury with Bloomberg
21   News, so if someone else was trying to get cleared
22   in, maybe for -- I'm speculating, but maybe these are
23   replacing 4 regulars --
24       BY MR. SHOPE:
25   Q.   M-hm.

Page 147

1    A.   -- and if so, they would go through the
2    press office.
3    Q.   M-hm.  Was there anybody besides Mr. Davis
4    who was ever cleared into the quarterly refunding
5    conference besides -- anybody besides Mr. Davis who
6    was cleared into the quarterly refunding conference
7    under your name?
8    A.   As I mentioned before, I would get calls
9    occasionally from OMB or CBO or GAO, people who are
10   studying or working on debt management.
11   Q.   Would those people actually need to be
12   cleared into the building?
13   A.   Everybody who is a nonbuilding employee --
14   I'm not quite sure -- for example, the bureau of
15   public debt is one of Treasury's bureaus.  They want
16   to get into the building, they have to get cleared
17   in, because they don't have a Treasury -- main
18   Treasury ID.
19       So you can work for the Treasury but in
20   another building and you may not have access to the
21   Treasury building.
22   Q.   By the way, do you know a reporter named
23   Brian Collins?
24   A.   It's been 5 years.
25   Q.   M-hm.  Have you ever heard of a

Page 148

1    publication called the Mortgage News?
2    A.   Can't say as I have.
3    Q.   Okay.
4    A.   Doesn't sound like one of the biggies.
5    Q.   Okay.  Now, if we continue on a couple
6    pages, there's an email that has been sent from a
7    Rowena Holloway.
8        Do you see that?
9    A.   Yes.
10   Q.   Do you know who Rowena Holloway was or is?
11   A.   I don't call -- I don't recall.  I don't
12   remember, don't recognize it.
13   Q.   And flip the page, there's an access
14   control worksheet where there's somebody from U.S.A.
15   Today who is being cleared in by an S. Lee.
16       Do you see that?
17   A.   I mean, do you mind just going back to the
18   previous one.
19       This is typical of -- these 2 people are
20   from the Federal Reserve board.  They're attending
21   the press conference.
22       So I mean, that's people coming over from
23   OMB or even the Fed New York or other places.  S.
24   Lee, Douglas Pardue -- what are you asking me about?
25   Q.   First question is, do you know who S. Lee

Page 149

1    is?
2    A.   I'm looking for -- oh, 10-31 -- no, I
3    don't.
4        Second floor, south corridor, sounds like
5    public affairs office.
6    Q.   Okay.  When -- and you're referring to the
7    2321 number as tel-- --
8    A.   Correct.  Yeah.
9        That's what -- public affairs are along
10   there.
11   Q.   Okay.  And then if we flip 2 pages,
12   there's another access control worksheet.  And
13   there's somebody -- there's a Michael Schroeder --
14   first of all, do you know who Michael Schroeder is?
15   A.   No.
16   Q.   Okay.  It says, company, Wall Street,
17   perhaps Wall Street Journal.
18       It says, requested by M. Strickler.
19       Do you see that?
20   A.   M-hm.
21   Q.   Do you know who M. Strickler is?
22   A.   No, I don't know, but if it's third floor,
23   south corridor -- I mean, south corridor, so it's
24   either -- who was up there?
25       It was Peter, and on the other side was

Page 318

1    was August of '98 or something.  He lost a ton of
2    money.
3        Q.    Do you know when he stopped working at
4    Treasury?
5        A.    He came on as a DAS in another position.
6    He didn't move into this position until after having
7    been here -- been there for a year or so.  I'm not
8    quite sure when.  But he was there on -- until
9    election day 2001 or the day before election day -- I
10   mean -- I'm sorry -- inauguration day.
11       Q.    Which position was Mr. Sachs promoted to
12   from the deputy assistant secretary?
13       A.    He was promoted from a DAS for -- I don't
14   even know the title -- it wasn't federal finance.
15           MR. SHOPE:  That's deputy assistant
16   secretary?
17           THE WITNESS:  Correct -- deputy -- I'm
18   sorry.
19           Yeah, deputy assistant secretary.
20       A.    And he was -- Gary Gensler was the
21   assistant secretary for financial markets.  Jerry
22   Hawke went over to OCC.  Gensler moved up to
23   undersecretary for domestic finance, and Lee Sachs
24   moved into assistant secretary for markets -- for
25   financial markets.  Lee was much more valuable as an

Page 319

1    assistant secretary for financial markets than he was
2    for the original job he started with.
3           BY MS. WILLIAMS:
4        Q.    Now, you said you don't recall which
5    office Mr. Sachs was the deputy assistance secretary
6    for.
7        A.    It was in domestic finance, but there were
8    3 DASs, and I just don't remember.  It used to be --
9    historically, it didn't do much policy work at all,
10   and it's developed now, but --
11       Q.    Do you recall when between August '98 and
12   I guess inauguration day 2001 this meeting occurred
13   in Mr. Sachs' office with Mr. Davis and clients?
14       A.    I think Lee was probably this DA- -- in
15   this DAS position for at least 6 months, could be a
16   year, so that means he probably doesn't move up to
17   the assistant secretary until '99, and sometime in
18   '99, and it was after that.
19       Q.    So sometime between '99 and
20   inauguration --
21       A.    Sometime --
22       Q.    -- inauguration 2001?
23       A.    Inauguration I think, yes.  That's the
24   best of my --
25       Q.    Who arranged the meeting?

Page 320

1        A.    Don't remember.
2        Q.    Did you arrange the meeting?
3        A.    I don't think so.
4        Q.    Why don't you think so?
5        A.    Because I usually wasn't the arranger.  I
6    mean, I would arrange for people to come in to see me
7    and talk to me, but usually if they wanted to do
8    that, I would tell them to call down to the assistant
9    secretary's office.
10       Q.    Do you know how Mr. Davis was cleared into
11   Treasury for that meeting?
12       A.    I assume it was the assistant secretary's
13   secretary.  That's the usual.
14       Q.    Besides you and Mr. Sachs, was anyone else
15   there from the Treasury Department?
16       A.    Probably Mr. Sachs' assistant for one
17   thing.
18       Q.    Who was that?
19       A.    I'm trying to -- it was a woman
20   from Kinsey -- is it Kinsey or McKenzie, the
21   consulting firm?
22           Whatever.  It was a woman from Kinsey.  I
23   can't remember her name.  She was at everything.  And
24   I don't know -- I don't know who else was there.
25       Q.    And you mentioned that Mr. McCarthy was

Page 321

1    one of the clients in attendance; is that correct?
2        A.    Yeah, Ward McCarthy.
3        Q.    Who was -- where did Mr. McCarthy work?
4        A.    I think it's -- I think they still have
5    this thing -- it's Stone & McCarthy, kind of a
6    financial analysis, slash, consulting firm.  I think
7    they're up in northern New Jersey.
8           I first -- I don't know if I ever met
9    them, but I've been talking to them on the phone
10   beginning in the early '80s.  I mean, they were
11   market analysts looking at the markets.  And I hadn't
12   talked to them for a long time.  But I remember
13   talking to them in the early -- early to mid-80s.
14       Q.    And so was Mr. Stone the Stone in Stone &
15   McCarthy?
16       A.    Correct.
17           Ray Stone and Ward McCarthy.
18       Q.    You said there may have been other people
19   in attendance at the meeting.
20       A.    Well, I think it was -- I think there was
21   another 1 or 2 clients.  I just don't recall.
22       Q.    Do you know if Steve Nothern was one of
23   those clients?
24       A.    I don't remember.  I just don't.
25       Q.    You were asked some questions earlier

Page 322

1  today about Treasury's embargo.
2      Can you tell me what your understanding
3  was of the purpose of Treasury's embargo?
4      MR. SHOPE: Objection.
5      A.  The purpose of the embargo?
6      BY MS. WILLIAMS:
7      Q.  Yes.
8      A.  The information is very market-sensitive.
9  With a lot of things that we release at Treasury, the
10  information is very, very market-sensitive, so our --
11  the interest is to get it out to the public and
12  through all venues simultaneously, so nobody would
13  have a market advantage over anybody else.
14     Q.  You mentioned that the embargo process
15  changed for the October 31st, 2001, conference?
16     A.  Correct. Right.
17     Q.  And I believe your testimony was the
18  change was that the embargo time was set in advance
19  of the conference; is that right?
20     A.  Correct.
21     It used to be 10, 15 minutes after the Q's
22  and A's ended, meaning that the release time was
23  variable. For this one, Peter wanted to have a fixed
24  time of release, so the -- no matter when the
25  conference got over, it was still going to be a 10 AM

Page 323

1  release.
2      Q.  And on October 31st, approximately how
3  much time did the press have to write their stories
4  between the end of the conference and the embargo --
5  end of the embargo period?
6      A.  The -- I remember looking at the clock,
7  and it was approximately 24, 25 after 9. And the
8  embargo was 10 o'clock. So it was approximately 35
9  minutes.
10     Q.  Was this longer or shorter than the
11  reporters were usually given time?
12     A.  It was longer.
13     Q.  Do you believe that this process
14  changed -- setting the embargo time ahead of time for
15  the October 31st conference called (phonetic) Peter
16  Davis to call his clients before the end of the
17  embargo?
18     MR. SHOPE: Objection.
19     A.  I'm not inside the mind of Peter Davis. I
20  felt uncomfortable, because I looked at the clock and
21  saw how much time, and it was -- I just wasn't used
22  to sitting around and waiting so long. It was
23  different, but I'm not necessarily -- I didn't
24  attach -- while I was sitting in the room, I didn't
25  attach any nefarious motive to anything, but it

Page 324

1  was -- it was like, wow, that's a long time.
2      BY MS. WILLIAMS:
3      Q.  Besides Mr. Davis and the posting on the
4  Treasury Web site, do you know of any other
5  dissemination of the information regarding the
6  elimination of the bond that took place between the
7  end of the October 31st conference and the 10 AM
8  embargo time?
9      MR. SHOPE: Hold on one second.
10     Can I have that question re-read?
11     I need to make sure I understand the
12  question and whether or not I have an objection to
13  it.
14     (The reporter read the last
15     question.)
16     A.  Yes.
17     BY MS. WILLIAMS:
18     Q.  Can you tell me how the information was
19  disseminated besides Mr. Davis and the Web site?
20     A.  Oh, besides Mr. Davis?
21     Q.  Yes.
22     A.  I mean, I know that Pete called Jimmy
23  Capra. I know that he called John Youngdahl -- well,
24  he called Goldman, and John just happened to be
25  standing by the trading desk.

Page 325

1      Q.  But besides the calls that Mr. Davis made
2  and the posting on the Treasury Web site, do you
3  know --
4      A.  No, no, no.
5      Q.  -- of any other dissemination of the
6  information between the end of the conference and the
7  10 AM embargo time?
8      A.  No, I don't.
9      MS. WILLIAMS: I don't have any further
10  questions.
11     Thank you.
12     MR. SHOPE: Short.
13
14  FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
15     BY MR. SHOPE:
16     Q.  With regard to the question Ms. Williams
17  just asked you about whether or not you knew of any
18  dissemination of the decision to suspend issuance of
19  the long bond before 10 AM besides Mr. Davis and the
20  posting on the Treasury Web site, you indicated that
21  to your knowledge there was none.
22     Correct?
23     A.  Correct.
24     Q.  Okay. Did we not review earlier in the
25  deposition today an email from Jill Cetina that

Page 338

1    I said that things were different. And I
2  also mentioned as an example, when something is
3  different and the outcome is different, you say,
4  well, if that hadn't happened, this wouldn't have
5  happened.
6      While it isn't a lot of times, you know,
7  if this, then that, are (phonetic) causally related.
8      MR. SHOPE: Okay. I have nothing further.
9      MS. WILLIAMS: I have just 2 questions.
10
11  FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
12      BY MS. WILLIAMS:
13   Q.   Mr. Malvey, on October 31st at the press
14  conference, do you recall anyone from Treasury
15  announcing the bargain time?
16   A.   Oh, that was -- that was part of the
17  protocol. At the beginning of the press conference,
18  the press person, Betsy -- I got up there and even --
19  and previous press conference, the press person would
20  get up there and lay out the protocol for the press
21  conference. This is the press conference,
22  da-da-da-da-da. Mr. So-and-so, So-and-So will be
23  giving the whatever. I just want to let everybody
24  know that at the end of it we're going to have an
25  embargo, and I'll set the embargo at the end and get

Page 339

1  everybody to agree, and then, here, Mr. So-and-so.
2      This time she got up and said, okay, my
3  name is Betsy, blah, blah, blah, blah, blah, and I
4  just want to go over the protocol with you. It's
5  different this time. After the Q and A, the embargo
6  is a fixed time -- and she mentioned 10 o'clock -- I
7  want to make sure everybody understands,
8  da-da-da-da-da, okay, Mr. Fisher, take it away.
9      And then when Peter was done, Betsy got up
10  there and said, thank you, okay, it's -- maybe that's
11  why I know it's 25 after -- I think she looked up at
12  the clock and says, it's 25 after 9, the embargo
13  isn't until 10 o'clock, does everybody understand
14  that, and everybody go, yeah.
15   Q.   Can I refer you to exhibit 10, the email.
16   A.   Yeah.
17   Q.   Do you know if this -- if Reuters
18  published this story on October 31st before the
19  information was put up on Treasury's Web site?
20   A.   I mean, to look at this at face value,
21  that's what it suggests, but I have no idea. I don't
22  know.
23   Q.   Okay. And just to clarify --
24   A.   On I don't recall. I'm one of the
25  addressees, and I don't recall seeing it before.

Page 340

1    Q.   And just let me clarify one other issue.
2      Before October 31, 2001, had secretary
3  O'Neill ever used the diplomatic room for a press
4  events?
5    A.   Sure.
6      That's where we -- that's where we used
7  them. So it's more or less set up -- rather than
8  being in front of a mirror and the grandfather clock,
9  you're set up in your -- front of the seal of the
10  Treasury. That's kind of what you're there for.
11   Q.   Do you know how -- when he started using
12  the diplomatic room for press events?
13   A.   O'Neill?
14   Q.   Yes.
15   A.   I don't know. But you saw him on TV and
16  that's where he was.
17   Q.   Do you know how far in advance of October
18  31st he was using the diplomatic room for press
19  events?
20      MR. SHOPE: Objection, asked and answered.
21      BY MS. WILLIAMS:
22   Q.   You can answer.
23      What event --
24   A.   O'Neill started sometime in -- I don't
25  even know when he started. Let's say -- it was

Page 341

1  early. Let's say he was on board by -- I think he
2  was on board but not confirmed by the end of January,
3  even, and the first time he -- he had a way of doing
4  things, and he'd look at something and say, I want it
5  done this way. And he would expect it to be done.
6      And from the beginning, it's my
7  recollection that he looked in the -- I'm sorry --
8  the large conference room and didn't like it, and
9  wanted to have something set up that would be
10  permanent.
11      And it was -- we're -- they're going
12  through a long remodeling process, and out of this
13  remodeling process, we now have a video room I think,
14  and that was part of O'Neill's planning I think. So
15  he just wanted to have something uniform.
16      MS. WILLIAMS: I have no more questions.
17      MR. SHOPE: I have nothing further.
18      THE VIDEOGRAPHER: This is the -- excuse
19  me.
20      This concludes the video deposition of
21  Mr. Peter F. Malvey. Off the record --
22      THE WITNESS: Paul -- call me Paul.
23      MS. WILLIAMS: Paul.
24      THE VIDEOGRAPHER: Excuse me.
25      -- Paul F. Malvey. Off the record at

Excerpt from the

April 19-20, 2006

deposition of Peter Davis

Exhibit I

Page 1

 1                    UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MASSACHUSETTS

 3        - - - - - - - - - - - - - - X

 4     UNITED STATES SECURITIES AND    :

 5     EXCHANGE COMMISSION,            :

 6              Plaintiff,             :

 7         V.                         :    Civil Action No.

 8     STEVEN E. NOTHERN,             :    05-10983(NMG)

 9              Defendant.             :

10        - - - - - - - - - - - - - - X

11                         Washington, D.C.

12                         Wednesday, April 19, 2006

13              Videotape Deposition of PETER DAVIS, JR.,

14     a witness herein, called for examination by counsel

15     for the Plaintiff in the above-entitled matter,

16     pursuant to notice and subpoena, the witness being

17     duly sworn by PENNY M. DEAN, a Notary Public in and

18     for the District of Columbia, taken at the offices of

19     U.S. Securities and Exchange Commission, 100 F

20     Street, NE, Washington, D.C., at 9:37 a.m.,

21     Wednesday, April 19, 2006, and the proceedings being

22     taken down by Stenotype by PENNY M. DEAN, RPR, and

23     transcribed under her direction.

24

25

Peter Davis, Jr.                                                       April 19, 2006

Washington, DC

| Page 2 | | Page 4 | |
|---|---|---|---|
| 1 APPEARANCES: | | 1 | CONTENTS |
| 2 | | 2 WITNESS | EXAMINATION BY COUNSEL FOR |
| 3 On behalf of the Plaintiff: | | 3 PETER DAVIS, JR. | PLAINTIFF |
| 4 ERICA Y. WILLIAMS ESQ. | | 4 By Ms. Williams | 8 |
| 5 JOHN J. ROSSETTI, JR., ESQ. | | 5 | |
| 6 U.S. Securities and Exchange Commission | | 6 Afternoon Session - Page 101 | |
| 7 100 F Street, NE | | 7 | |
| 8 Washington, D.C. 20549-4010 | | 8 E X H I B I T S | |
| 9 (202) 551-4450 | | 9 DAVIS EXHIBIT NO. | PAGE NO. |
| 10 (202) 551-4819 | | 10 1 Notice of deposition | 15 |
| 11 | | 11 2 Subpoena | 15 |
| 12 On behalf of the Defendant: | | 12 3 Documents subpoena | 16 |
| 13 NICHOLAS THEODOROU, ESQ. | | 13 4 Electronic brochure | 35 |
| 14 ROBERT E. TOONE, ESQ. | | 14 5 Electronic brochure | 35 |
| 15 Foley Hoag, LLP | | 15 6 Electronic brochure | 35 |
| 16 Seaport World Trade Center West | | 16 7 List from address book | 44 |
| 17 155 Seaport Boulevard | | 17 8 Call list | 46 |
| 18 Boston, MA 02210-2600 | | 18 9 Printout of contact manager data file 53 | |
| 19 (617) 832-1000 | | 19 10 Invoice to Femino | 67 |
| 20 | | 20 11 Meeting list for January 15th, 1998 | 72 |
| 21 | | 21 12 Letter from Davis to Sachs | 78 |
| 22 | | 22 13 E-mail from Davis to Hathaway, et al. 81 | |
| 23 | | 23 dated January 19th, 2000 | |
| 24 | | 24 14 Printout from contact manager | 82 |
| 25 | | 25 15 Document from Davis to Malvey | 107 |

| Page 3 | | Page 5 | |
|---|---|---|---|
| 1 APPEARANCES: | | 1 E X H I B I T S | |
| 2 | | 2 DAVIS EXHIBIT NO. | PAGE NO. |
| 3 On behalf of the Witness: | | 3 16 Document dated January 24th, 2001 123 | |
| 4 MARK STANCIL, ESQ. | | 4 from Davis to Sullivan | |
| 5 Baker Botts LLP | | 5 17 Plea hearing transcript | 142 |
| 6 The Warner | | 6 18 Transcript of sentencing hearing, 144 | |
| 7 1299 Pennsylvania Avenue, NW | | 7 March 18th of 2005 | |
| 8 Washington, D.C. 20004-2400 | | 8 19 Consent entered into with SEC | 147 |
| 9 (202) 639-7894 | | 9 20 Subpoena | 147 |
| 10 | | 10 21 Treasury news release dated | 151 |
| 11 ALSO PRESENT: | | 11 October 29, 2001 | |
| 12 Dustin Lavallee, Videographer | | 12 22 E-mail of calendar on October 29, 2001 154 | |
| 13 Steven E. Nothern, Plaintiff | | 13 23 Treasury press release dated | 158 |
| 14 | | 14 October 30th, 2001 | |
| 15 | | 15 24 Fax cover page dated | 160 |
| 16 | | 16 October 30th, 2001 | |
| 17 | | 17 25 Report of faxes dated | 162 |
| 18 | | 18 October 30th, 2001 | |
| 19 | | 19 26 Notes by Davis dated 10/31/01 | 173 |
| 20 | | 20 27 Written remarks of Fisher dated | 176 |
| 21 | | 21 October 31st, 2001 | |
| 22 | | 22 28 List of phone calls from | 181 |
| 23 | | 23 October 31st, 2001 | |
| 24 | | 24 29 Verizon Wireless phone bill dated | 183 |
| 25 | | 25 October 19th, 2001 | |

2 (Pages 2 to 5)

Peter Davis, Jr.                                                      April 19, 2006

Washington, DC

```
 1          E X H I B I T S
 2   DAVIS EXHIBIT NO.          PAGE NO.
 3    30 Memo from Davis dated        188
 4       November 5th, 2001
 5    31 E-mail from Davis            229
 6    32 Sprint phone bill for billing period  231
 7       ending August 26th, 2001
 8    33 Sprint phone bill for billing period  232
 9       ending September 26th, 2001
10    34 Excerpt from October Sprint phone bill 234
11    35 Broadcast fax delivery report     235
12    36 Notes from Davis dated August 1, 2001  240
13    37 Verizon phone bill dated         241
14       August 19th, 2001
15
16
17
18
19
20
21
22
23
24
25
```

```
 1          MR. THEODOROU:  Nicholas Theodorou for --
 2   from Foley Hoag representing Mr. Steven Nothern.
 3          MR. TOONE:  Robert Toone from Foley Hoag
 4   representing Steven Nothern.
 5          THE VIDEOGRAPHER:  Will the court reporter
 6   please swear in the witness?
 7   Whereupon,
 8          PETER DAVIS, JR.,
 9   residing at 3015 Tennyson Street, Northwest,
10   Washington, D.C., was called as a witness by counsel
11   for Plaintiff, and having been duly sworn by the
12   Notary Public, was examined and testified as follows:
13          EXAMINATION BY COUNSEL FOR PLAINTIFF
14          BY MS. WILLIAMS:
15      Q.  Good morning, Mr. Davis.
16      A.  Good morning.
17      Q.  Could you please state --
18          MR. THEODOROU:  Before we start, can we
19   put the stipulation on the record?
20          MS. WILLIAMS:  Absolutely.  The parties
21   have stipulated that all objections including hearsay
22   will be reserved and that question -- except for
23   questions -- objections as to the form of the
24   question.
25          MR. THEODOROU:  So that what we stipulate
```

```
 1          P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  This is tape number 1
 3   in the videotape deposition of Mr. Peter Davis, Jr.
 4   in the matter of United States Securities and
 5   Exchange Commission versus Steven E. Nothern in the
 6   United States District Court for the District of
 7   Massachusetts, Boston Division, Civil Action Number
 8   05-10983 NMG.
 9          The deposition is being held at the
10   Securities and Exchange Commission, 100 F Street,
11   Northeast, Washington, D.C., 20549, and we're on the
12   record at 9:37 a.m. on Wednesday, April 19th, 2006.
13   My name is Dustin Lavallee in association with
14   Alderson Reporting at 1111 14th Street, suite 400,
15   Washington D.C., 20005.  And I'm the legal video
16   specialist.  The court reporter is Penny Dean, also
17   in association with Alderson Reporting.
18          For the record, will counsel please
19   introduce themselves.
20          MR. STANCIL:  Mark Stancil for Peter J.
21   Davis.
22          MS. WILLIAMS:  Erica Williams for the
23   Securities and Exchange Commission.
24          MR. ROSSETTI:  John Rossetti for the
25   Securities and Exchange Commission.
```

```
 1   is all objections except as to the matter of form,
 2   including objections to hearsay, have been reserved
 3   until the time of trial.
 4          MS. WILLIAMS:  And also any motion to
 5   strike has been reserved until the time of trial.
 6          MR. THEODOROU:  Correct, including motions
 7   to strike.
 8          BY MS. WILLIAMS:
 9      Q.  Mr. Davis, could you please state your
10   full name and spell your last name for the court
11   reporter?
12      A.  It's Peter Joseph Davis, Jr., and it's
13   D-a-v-i-s.
14      Q.  What's your date of birth, Mr. Davis?
15      A.  May 12th, 1950.
16      Q.  And your Social Security number?
17      A.  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.
18      Q.  What's your home addresses?
19      A.  3015 Tennyson Street, Northwest, that's
20   T-e-n-n-y-s-o-n, D.C.
21      Q.  What is your home phone number?
22      A.  It's (202) 966-3386.
23      Q.  Do you have a cellular telephone?
24      A.  Yes.
25      Q.  What is your cell phone number?
```

Peter Davis, Jr.                                                April 19, 2006
Washington, DC

## Page 10

1    A.  (202) 365-7624.
2    Q.  Do you have a fax?
3    A.  Well, I take faxes over my home phone.
4    Q.  Do you have an E-mail address?
5    A.  Yes.
6    Q.  What is your E-mail address?
7    A.  It is Pete, p-e-t-e @daviscap.com, it's
8  daviscap.com.
9    Q.  Do you have any phone numbers that you
10  haven't already told us about?
11   A.  No.
12   Q.  Do you have any web addresses other than
13  an E-mail, do you have a website?
14   A.  No.
15   Q.  Have you ever been deposed before?
16   A.  I was deposed here, wasn't I?  Back four
17  years ago.
18   Q.  Are you referring to the testimony that
19  you gave in the SEC's investigation?
20   A.  Yeah.
21   Q.  And except for that testimony, have you
22  ever been deposed before?
23   A.  No.
24   Q.  Have you ever testified at trial?
25   A.  No.

## Page 11

1    Q.  Do you have any medical conditions that
2  might affect your memory or your ability to testify
3  truthfully today?
4    A.  No.
5    Q.  Are you represented by counsel?
6    A.  Yes.
7    Q.  Who is your counsel?
8    A.  Mark Stancil, Baker Botts.
9    Q.  Did you meet with Mr. Stancil prior to
10  this deposition?
11   A.  We had a telephone conversation yesterday.
12   Q.  How long was your telephone conversation?
13       MR. STANCIL:  Objection, privilege, how
14  long we talked, don't answer that.
15       BY MS. WILLIAMS:
16   Q.  Was anyone else present or anyone else on
17  the phone besides you and Mr. Stancil?
18       MR. STANCIL:  Objection.  Don't answer
19  that.
20       MS. WILLIAMS:  If anyone was on the phone
21  besides you, it might break the privilege.
22       MR. STANCIL:  I can stipulate that no one
23  else was on the telephone conversation.
24       MS. WILLIAMS:  Thank you.
25       BY MS. WILLIAMS:

## Page 12

1    Q.  Did you meet with any attorneys for the
2  SEC prior to this deposition?
3    A.  No.
4    Q.  Did you meet with -- have you ever met
5  with any attorneys from the U.S. Attorney's office?
6    A.  I'm trying to remember.
7       MR. STANCIL:  I think he may have misheard
8  you.
9       MS. WILLIAMS:  Okay.
10       BY MS. WILLIAMS:
11   Q.  Have you ever met with any attorneys from
12  the United States Attorney's Office, specifically in
13  connection with their investigation into trading in
14  the 30-year bond?
15   A.  I mean, I don't recall all the attorneys
16  that were there at the SEC four years ago.
17   Q.  Was there a meeting, though, between you
18  and some attorneys four years ago regarding an
19  investigation into the 30-year bond?
20       MR. STANCIL:  I don't want to mess -- I
21  don't want to dissuade you from where you're going, I
22  think she's talking about the criminal authorities in
23  New York.  Rod Hoates, Brian Coad.
24       THE WITNESS:  Oh, yeah.  Oh, up in New
25  York, sure, yes.

## Page 13

1       MR. STANCIL:  I don't think Mr. Davis --
2  he wasn't always sure who at the table was from which
3  office.
4       THE WITNESS:  Yeah, I mean, there were
5  lots of people at various times who interrogated me
6  including Mr. Hoates up in New York.
7       BY MS. WILLIAMS:
8    Q.  Do you know if any attorneys from the SEC
9  were present during that what you call an
10  interrogation?
11   A.  There was an interrogation here at the
12  SEC.  And then at a subsequent date, I went up to New
13  York and I was integrated up in New York.
14   Q.  So you don't know whether -- who was
15  present at that particular interrogation, except for
16  the individuals you just named, Mr. Coad and Mr. --
17   A.  Mr. Coad and the other guy up in New York.
18  And then there were a number of attorneys from the
19  SEC, including Mr. Rossetti here four years ago, so
20  those were two different occasions.
21   Q.  Mr. Rossetti was present during that
22  interrogation?
23   A.  I think so.  I mean, that was a long time
24  ago.
25   Q.  When you say analogy interrogation, can

4 (Pages 10 to 13)

Peter Davis, Jr.

Washington, DC

April 19, 2006

---

**Page 14**

1 you describe to me what went on during that meeting?
2    A.    Which one, the SEC or --
3    Q.    The one in New York?
4    A.    The one in New York?  They basically asked
5 me about the events leading up to and the events of
6 October 31st, 2001.  I disclosed information about
7 the 30-year bond.
8    Q.    Do you know if that meeting was on the
9 record, was it transcribed by a court reporter?
10    A.    Whew --
11       MR. STANCIL:  Do you know?
12       THE WITNESS:  I don't recall.
13       BY MS. WILLIAMS:
14    Q.    Before you go any further, I'm going to
15 describe the deposition process to you.  Your
16 testimony is being taken under oath and it is being
17 transcribed by the court reporter --
18    A.    Sure.
19    Q.    -- and it is taken under penalty of
20 perjury.
21    A.    I understand.
22    Q.    Please give oral, audible responses so the
23 court reporter can transcribe them.  Please don't
24 talk while I'm talking, and I will try to extend to
25 you the same courtesy, because then we will have a

---

**Page 15**

1 clean record.  If you need to take a break, let me
2 know and we will take a break unless a question is
3 pending.
4       Do you have any questions about the
5 deposition processes?
6    A.    No.
7    Q.    I want to go back to the meeting in New
8 York, was your counsel present during that meeting?
9    A.    Yes.
10    Q.    And who was present?  Mr. Stancil?
11    A.    And Mary Spearing from Baker Botts.
12       MS. WILLIAMS:  I'd like to have these
13 marked as Exhibits 1 and 2.
14       (Davis Exhibit Nos. 1 & 2 were
15        marked for identification.)
16       BY MS. WILLIAMS:
17    Q.    Do you recognize these documents?
18    A.    It's the first time I've seen them.
19    Q.    And were you aware that a notice was sent
20 for your deposition today?
21    A.    My counsel called me or E-mailed me a few
22 months ago, and said that I was going to be deposed
23 today.
24    Q.    Are you appearing today pursuant to that
25 notice of deposition?

---

**Page 16**

1    A.    Yes.
2    Q.    And the subpoena was also sent.  Are you
3 appearing pursuant to the subpoena that was sent for
4 your deposition?
5    A.    I guess, yes.
6       MR. THEODOROU:  So which -- excuse me,
7 counsel, which is Exhibit 1?
8       MS. WILLIAMS:  Exhibit 1 is the notice of
9 deposition and Exhibit 2 is the subpoena.
10       I'd like to have this marked as Exhibit 3.
11       (Davis Exhibit No. 3 was marked for
12        identification.)
13       BY MS. WILLIAMS:
14    Q.    Do you recognize this document, sir?
15    A.    This is the first time I've seen it.
16    Q.    Were you aware that a subpoena was sent in
17 this case, SEC versus Mr. Nothern, for documents
18 that -- for documents from you, that a subpoena was
19 sent requesting that you produce documents?
20    A.    I recall my attorney calling me or you
21 know, calling me a few months ago and discussing
22 that, but I never saw the subpoena, I have no idea
23 which documents, but --
24    Q.    Do you know if you did produce documents?
25    A.    You know, my attorneys had all my

---

**Page 17**

1 documents for like since four and a half years ago,
2 so I don't -- I don't recall what documents, if any,
3 were conveyed.
4    Q.    Can you please provide your educational
5 history since high school?
6    A.    Since high school, yeah.  I have a BA in
7 economics from the University of Rochester in 1972.
8 And I took nine courses towards a master's degree in
9 economics at American University, but I never
10 completed that degree.
11    Q.    After you come -- after you finished
12 college, what jobs did you hold?
13    A.    My first job was -- as a research
14 assistant at the Center for Naval Analysis in
15 Rosslyn, Virginia.  And that I started in August of
16 '72.  And in March of '74, I was hired by the Joint
17 Committee on Taxation, U.S. Congress.
18       February 1 of '81, I was hired by the
19 Senate Budget Committee.  October of '83, I was hired
20 by Prudential Bache Securities in their Washington
21 research office in Rosslyn, Virginia.  I forget, some
22 time early in 1990, February maybe or March, I was
23 hired by Ernst & Young in their national tax office.
24       In February of 1992, I was hired by the
25 president pro tempore of the Senate, Robert C. Byrd.

---

5 (Pages 14 to 17)

Peter Davis, Jr.                                                                    April 19, 2006

Washington, DC

| Page 18 |
| --- |

1  And I worked for him until some time in October '92,
2  at which point I established my own business which I
3  called Davis Capital Investment Ideas where I've
4  worked ever since as a sole proprietor.
5      Q.  I want to go back to some of the jobs that
6  you mentioned.  When you worked for Prudential Bache
7  Securities, what was your job title?
8      A.  Vice president.
9      Q.  And what were your job responsibilities as
10  vice president?
11      A.  To follow Washington policy developments
12  that might affect investors, clients of the firm, to
13  write a weekly article for the Strategy Weekly, which
14  was sort of the main publication of the research
15  department, to travel throughout the U.S. and Western
16  Europe visiting clients, and you know, giving
17  speeches and basically talking about what's going to
18  happen mostly to tax policy and to the deficit, what
19  fiscal policy changes were occurring in Washington.
20      Q.  And you left Prudential Bache Securities
21  to join Ernst & Young?
22      A.  Yes.
23      Q.  Why did you leave Prudential to join Ernst
24  & Young?
25      A.  I discovered that there was some things I

| Page 19 |
| --- |

1  didn't like in the firm, and so I just left.
2      Q.  What kind of things?
3      A.  The CEO, George Ball, was -- allegedly had
4  been doing some questionable activities regarding the
5  finances of the firm.
6      Q.  How did you find out about these alleged
7  questionable activities?
8      A.  I think it was in the papers.  I didn't
9  find it internally.
10      Q.  Do you know what -- what do you mean by
11  alleged questionable activities?
12      A.  My recollection is that he was -- well,
13  there were two areas.  One was questionable tax
14  shelters, which I had no involvement in, but I was
15  kind of surprised the firm was still selling them as
16  I was publishing articles on a regular basis pointing
17  out how the '86 Tax Reform Act was sharply curtailing
18  tax shelters.
19      The second area was, as I recall, he was
20  brought before the SEC on -- or some other regulatory
21  body possibly on issues about the float in finances
22  with local branches and the interest, you know,
23  whether there was, you know, improper management of
24  the float, you know, cash float of the firm.
25      Q.  What was your job title at Ernst & Young?

| Page 20 |
| --- |

1      A.  I think it was -- it was senior manager.
2      Q.  And what were your responsibilities there?
3      A.  They were similar, I was to follow tax
4  policy and economic policy, and to advise clients on
5  what sort of policy developments they should expect
6  from Washington.
7      Q.  And then you said you went to work for
8  Senator Byrd?
9      A.  Yes.
10      Q.  What was your job title when you worked
11  for Senator Byrd?
12      A.  I'm trying to remember.
13      MR. STANCIL:  If you remember.
14      THE WITNESS:  I should remember.  What the
15  heck was it?  Um, I don't recall.
16      BY MS. WILLIAMS:
17      Q.  Why did you leave Ernst & Young to go work
18  for Senator Byrd?
19      A.  I liked the people, but I didn't like the
20  culture.  Accounting firms were -- I mean, I had a
21  lot of friends at accounting firms, that's why I got
22  hired, but I just didn't like the culture.  And so
23  when I got an opportunity, I went back there.
24      Q.  Can you describe your job responsibilities
25  when you worked for Senator Byrd?

| Page 21 |
| --- |

1      A.  Yes, he was chair of the Senate
2  Appropriations Committee, he was very concerned that
3  the potential tax cuts might take funding away from
4  discretionary spending and -- which he's well-known
5  for caring a lot about discretionary spending.  So I
6  was there to supply arguments and speeches, testimony
7  to counter tax cuts.
8      Q.  You said that you left in October of '92
9  to start Davis Capital?
10      A.  Right.
11      Q.  Approximately how long did you work for
12  Senator Byrd?
13      A.  I worked for him for ten months, and I
14  forgot to mention, I was hired specifically on a
15  temporary basis, you know, I took the job knowing
16  that it would be at least six months and probably not
17  a year and --
18      Q.  When you left, was your temporary job up
19  or had it ended
20      A.  Yeah, well, you know, we got to the end of
21  the year, Congress was winding down and it was Jim
22  English, the staff director said, well, time's up.  I
23  said, fine, thanks, and went out and started
24  establishing my business.
25      Q.  Is it okay if I refer to Davis Capital

6  (Pages 18 to 21)

1111 14th Street, NW Suite 400                                  Washington, DC 20005

Peter Davis, Jr.

Washington, DC

April 19, 2006

Page 22

1  Investment Ideas as Davis Capital during the
2  deposition?
3      A.  Yeah, of course, that's how I refer to it,
4  too.
5      Q.  Why did you decide to start Davis Capital?
6      A.  A friend of mine who had worked at CBO,
7  Congressional Budget Office, and later had gone on to
8  run the bond desk at Shearson and then set up his own
9  hedge fund was in the habit of calling me every, I
10  don't know, four or five months to get my views on
11  what the deficit outlook was.
12      And so while I was working for Senator
13  Byrd some time that summer of '92, he called me and
14  asked me, you know, what I thought about the deficit
15  and we got into quite an extended conversation. And
16  at the end of the conversation, he said to me, gee, I
17  can't get this information anywhere else. And you
18  know, it's public information, but it's the judgment
19  of how to use the various sources of data, like what
20  potential tax cuts might look like and what potential
21  spending plans might look like.
22      And then I would come up with my own views
23  on those policies, and then come up with my own
24  estimate of what the deficit was going to be. So at
25  the end of the conversation, he asked me if I was

Page 23

1  thinking -- if I would think about going out and
2  forming my own business. And so it was at his
3  instigation that I did go out and form my own
4  business.
5      Q.  Does Davis Capital still exist?
6      A.  Sure. I work out of my home now, but I
7  have some paying clients left, and I send out an
8  E-mail occasionally describing Washington policy,
9  mostly fiscal policy developments that I think might
10  affect the market.
11      Q.  Could you tell me who your clients are?
12      A.  I have contractual arrangements with some
13  of them not to disclose that.
14      Q.  Okay. And the others you don't have
15  contractual arrangements?
16      A.  Some of these are just handshakes. I only
17  have contracts with one or two clients and it's
18  probably not a good idea to be disclosing clients. I
19  mean -- I don't know whether this becomes public
20  record.
21      MR. STANCIL: This will be public record
22  so if you have an agreement with a client not to
23  disclose it, we'd ask you to -- I don't think it will
24  be a big deal, but we would ask for some arrangement
25  to be made for it to be confidential.

Page 24

1      MS. WILLIAMS: That's fine.
2      THE WITNESS: If it remains confidential,
3  fine.
4      MR. STANCIL: It's not confidential until
5  we agree on how it would be. So for now, if we can
6  just set that aside, I'm sure we can work something
7  out.
8      BY MS. WILLIAMS:
9      Q.  Could you tell me how many clients you
10  have right now?
11      A.  Well, there's -- there's six and one that
12  gives me an occasional project, so seven maybe.
13      Q.  You said that you send out occasional
14  E-mails, how often do you send out E-mails?
15      A.  It's based on whether I have something
16  that I think is worse saying. So I mean, one of the
17  problems with Wall Street research is it comes out on
18  a regular basis and it just stacks up on managers'
19  desks. So I purposely put mine out on an irregular
20  basis. And when Congress is in town, I'll probably
21  put something out every day, usually in the morning,
22  but sometimes in the afternoon. Congress is out of
23  town this week, I put something out Monday morning
24  and I haven't put out anything since.
25      Q.  When Congress is out of town,

Page 25

1  approximately how many do you send out per month?
2      A.  Like I said, it's usually daily, so if
3  there's 20 days or 21 days in the month it might be
4  that many. Sometimes there's two in a day. It
5  depends on what's happening. I mean, if something
6  really important happens and I think the market is
7  misinterpreting it, I'll put out an E-mail instantly.
8      Q.  Besides E-mails, what other services do
9  you offer the clients?
10      A.  Well, now, basically available to talk to
11  them, to talk on conference calls to their clients,
12  to answer their questions, to do custom research on
13  the side. I mean, my standard maintenance product is
14  the E-mail, and but, you know, I -- especially for my
15  very good clients, I'm doing other research and
16  following issues on an ongoing basis and alerting
17  them.
18      There are some issues that are so esoteric
19  that they are not of general interest to all my
20  clients. So like this morning, I found out that, you
21  know, from the Bureau of National Affairs Daily
22  Report For Executives that U.S. may enter into
23  renewed trade negotiations on Canadian soft wood
24  lumber. I mean, there's only one client who cares
25  about that, I sent him an E-mail saying, hey, here's

7  (Pages 22 to 25)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

| Page 34 | Page 36 |
|---|---|
| 1   Q.  And as president of Davis Capital, what | 1   Q.  What are they? |
| 2  did you do? I understand what you do now, I'm trying | 2   A.  My electronic brochure for my business. |
| 3  to find out what you did before you moved the company | 3   Q.  Are they true and correct copies of an |
| 4  to your home? | 4  electronic brochure from your business? |
| 5   A.  Show up at work at 7:30 in the morning, | 5   A.  Yes. |
| 6  read a whole lot of information from various | 6   Q.  Could you tell me the dates of these three |
| 7  information services, newspapers, start writing | 7  documents? And I'd refer you to the first page at |
| 8  material for an E-mail to clients, you know, or get | 8  the bottom. |
| 9  my assistant to start writing it and start calling | 9   A.  October 4, '01, April 5, '01, and August |
| 10  around collecting information, searching the web for | 10  30 of 2000. |
| 11  information. | 11   Q.  Were you involved in the creation of these |
| 12     And, you know, at some point during the | 12  documents? |
| 13  day, put something out. I would also be developing | 13   A.  Sure. |
| 14  information sources, meeting new staff on the Hill or | 14   Q.  When you say they were electronic |
| 15  new people at Congress -- in the Administration. I | 15  documents, were they available on Davis Capital's |
| 16  would be helping people look for jobs, you know, as a | 16  website? |
| 17  way of getting to know them, and that sort of thing. | 17   A.  Yes. |
| 18     I would occasionally have clients in for | 18   Q.  Did anyone assist you in the creation of |
| 19  meetings with Administration officials and people on | 19  the documents? |
| 20  the Hill, but I mean, the last one of those meetings | 20   A.  Yes. |
| 21  was I think in, I don't know, some time in early | 21   Q.  Who? |
| 22  2001. I haven't had any since. | 22   A.  My assistant, Allyson Sullivan. |
| 23   Q.  Did you put out E-mails to clients when | 23   Q.  What was Ms. Sullivan's job title at Davis |
| 24  Davis Capital was located at 1100 17th Street? | 24  Capital? |
| 25   A.  Oh, sure. | 25   A.  Policy analyst. |

| Page 35 | Page 37 |
|---|---|
| 1   Q.  How often did the E-mails go out at that | 1   Q.  When did she come to work for Davis |
| 2  time? | 2  Capital? |
| 3   A.  Same, same frequency all along. | 3   A.  I don't remember the exact date, but it |
| 4   Q.  Did you also send faxes to clients? | 4  was some time in early 2000, like, I don't know, I |
| 5   A.  Yeah, faxes were the main way we -- we put | 5  can't remember whether it was January, February, |
| 6  things out up until, geez, I don't know, '95 or '96, | 6  March, some time early in 2000. |
| 7  I forget exactly when we stopped doing faxes and | 7   Q.  What were Ms. Sullivan's job |
| 8  shifted to E-mail. But when I started the business, | 8  responsibilities as policy analyst? |
| 9  I was faxing exclusively, you know, broadcast faxing | 9   A.  I would rely on her to take some of the |
| 10  and at some point in the mid-'90s, that shifted over | 10  information sources we'd get every morning. And you |
| 11  to E-mail. | 11  know, I'd pick out the ones that I thought were worth |
| 12     MS. WILLIAMS: I'd like to have this | 12  writing up. And she would summarize them into like a |
| 13  marked as Exhibit 4. | 13  paragraph and look for a link for any associated |
| 14     (Davis Exhibit Nos. 4, 5 & 6 were | 14  information source and that would be the basis for |
| 15     marked for identification.) | 15  forming our E-mail. |
| 16  BY MS. WILLIAMS: | 16   Q.  Were there any other employees of Davis |
| 17   Q.  I'd want to refer you to the date at the | 17  Capital, besides Ms. Sullivan? |
| 18  bottom, which is how you can distinguish the | 18   A.  Well, I had assistants before her, a |
| 19  documents. | 19  number of assistants, geez, I don't know, I |
| 20     MR. THEODOROU: So we have three exhibits, | 20  can't remember. Some time in '93 or '94, I started |
| 21  4, 5 and 6, right? | 21  hiring assistants and I had a succession of |
| 22     MS. WILLIAMS: Yes. | 22  assistants, you know, one at a time. |
| 23  BY MS. WILLIAMS: | 23   Q.  Did you have a secretary? |
| 24   Q.  Do you recognize these documents, sir? | 24   A.  I said I just had one assistant, that was |
| 25   A.  Yes, I do. | 25  it. |

10 (Pages 34 to 37)

Peter Davis, Jr.                                                                   April 19, 2006
Washington, DC

---

**Page 38**

1    Q.   So no secretary, just the one policy
2  analyst?
3    A.   Well, she'd pick up the phone, I'd pick up
4  the phone and you know --
5    Q.   Besides posting these brochures on your
6  website, did you do anything else with the brochures?
7    A.   We'd print them out and take them with us
8  when we went on a marketing trip.
9    Q.   When you updated the brochure, did you
10  remove the old brochure from the website and then
11  post the updated version?
12    A.   I don't really recall, but I think so.  I
13  mean, there's no reason to leave up old brochures.  I
14  couldn't swear to it that there wasn't an old one
15  hanging around, I mean websites get full of all kinds
16  of old stuff lying around.  In other words, it could
17  have been on the website and no link, I have no idea.
18    Q.   I'd like you to refer to Exhibit 4, it's
19  dated 10/4/01 and turn to the second page 106970?
20    A.   Okay.
21    Q.   I'm referring to the Bates number now.
22    A.   Right.
23    Q.   On this page, it states, and I'm looking
24  at the second sentence here that starts with "my."
25  "My 11 years on Capitol Hill and 16 years advising

---

**Page 39**

1  Wall Street clients have taught me how to get
2  Washington information ahead of the media."
3    A.   Um-hum.
4    Q.   How did you go about getting this
5  information ahead of the media?
6    A.   Because I can anticipate better than they
7  can what's going to happen in the areas I used to
8  work -- you know, work in.
9    Q.   Why were you able to anticipate better
10  than the media?
11        MR. THEODOROU:  Objection.
12        MR. STANCIL:  Don't answer.
13        THE WITNESS:  What's that?
14        MR. THEODOROU:  You can answer after I
15  object.
16        MR. STANCIL:  Unless I tell you not to
17  answer, go ahead and answer it.
18        THE WITNESS:  Oh, I wanted to make sure I
19  understand.  I'm sorry, repeat the question.
20        BY MS. WILLIAMS:
21    Q.   You said that you could anticipate better
22  than the media and I wanted it know why you were able
23  to anticipate Washington information better?
24    A.   Based on my experience.  I mean, for
25  example -- I mean, the House is working on a tax

---

**Page 40**

1  bill, there are certain things that the Ways and
2  Means Committee puts in it.  And as soon as I see
3  what they put in it, I know that certain of those
4  items are going to be a problem on the Senate side,
5  or something is likely to drop out in conference.
6  And I will say that to a client based on my
7  experience.
8    Q.   Can you turn to page 106975?
9    A.   Yes.
10    Q.   Sample weekly calendar, who would prepare
11  this calendar?
12    A.   Sometimes I would, my assistant would.  I
13  mean, it was a joint effort.  I would -- certainly I
14  would review it before it went out.
15    Q.   And what would you do with these weekly --
16  these weekly calendars after you prepared them?
17    A.   We'd send them out and we'd post them on
18  the website.
19    Q.   Where did you get the information
20  contained in the weekly calendars?
21    A.   Two main sources.  The National Journal
22  keeps a day book that lists a lost these hearings.
23  And then the BNA Daily Report For Executives has
24  another list.
25        And then there are a lot of things that

---

**Page 41**

1  happen on the Hill, or downtown, in the
2  Administration that aren't on those lists that I may
3  know are coming up.  And I will go directly to the
4  source and call up the press secretary of the Banking
5  Committee and say, hey, are you going to markup this
6  week and if I get it yes, then I will put it down.
7    Q.   So some of the information in the calendar
8  came from contacting people on the Hill or in the
9  Administration?
10        MR. THEODOROU:  Objection.
11        THE WITNESS:  Once in a rare while.  I
12  mean, usually it was just out of the National Journal
13  and the BNA Executive Daily Report.  But once in a
14  while, I would know of an impending hearing or -- you
15  know, I'd report it.
16        BY MS. WILLIAMS:
17    Q.   Going back to the questions I was asking
18  before about getting information ahead of the media,
19  did any of the information that you were able to
20  obtain ahead of the media come from any of your
21  contacts on the Hill?
22    A.   Of course.
23    Q.   Was it your practice to -- and also
24  contacts in the Administration?
25    A.   Sure.

---

11 (Pages 38 to 41)

Peter Davis, Jr.                                                                                         April 19, 2006
Washington, DC

Page 42

1    Q. · Was it your practice to notify clients
2  regarding events at Treasury in your weekly calendar?
3    A.   Oh, you know, sometimes I'd put down if --
4  I mean, Treasury posts a schedule for the Secretary
5  every Friday afternoon. And I'd -- in fact, they
6  expanded it to include the assistant secretaries and
7  undersecretaries, their appointments.
8        And so, you know, it's public record and
9  I'd sometimes pull that information in, the same way
10 I would -- you know, the Fed, Federal Reserve Bank
11 also has a calendar, the State Department has a
12 calendar. There are all kinds of calendars that are
13 available if you know where to go for them, they are
14 public. And I just -- sometimes I would fold that
15 information into this if I thought it was important
16 to investors.
17   Q.   Would you include information about the
18 dates of the Treasury's quarterly refunding press
19 conference?
20   A.   Yeah, I usually would. Not always, but
21 I -- yeah, I would usually put that down.
22   Q.   Was Davis Capital incorporated?
23   A.   No.
24   Q.   Was it registered as a partnership?
25   A.   No.

Page 43

1    Q.   Did it have any -- a board of directors?
2    A.   No.
3    Q.   What was the salary of Ms. Sullivan?
4    A.   It was -- the gross salary was $2,000 on
5  the 15th and 30th of each month so 24,000 per year.
6    Q.   How did Davis Capital go about obtaining
7  clients?
8    A.   I'd ask current clients to refer me to
9  people, I would -- in the course of my speeches
10 sometimes I would meet people. Sometimes people
11 would call me up out of the blue if they saw me on
12 CNBC or if they heard about -- I would encourage my
13 clients if they thought someone was interested in
14 another firm to forward my E-mail to them, and
15 sometimes that would generate some contact.
16 Sometimes I'd meet people at professional meetings of
17 the National Association of Business Economists or
18 the National Economists Club.
19   Q.   Approximately how many clients did Davis
20 Capital have in October of 2001?
21   A.   In the papers my attorney has, there's a
22 list, but I can't remember off the top of my head.
23 It was, I don't know, 15 or 16. But, you know,
24 that's a rough estimate. I don't, you know, there's
25 a list and --

Page 44

1    Q.   Okay. Was Massachusetts Financial
2  Services a client of Davis Capital in October of
3  2001?
4    A.   Yes, it was.
5    Q.   I'd like to mark this as Exhibit 7.
6        (Davis Exhibit No. 7 was marked for
7        identification.)
8        BY MS. WILLIAMS:
9    Q.   Do you recognize this document, sir?
10   A.   Yes.
11   Q.   What is it?
12   A.   It's a list out of my address book.
13   Q.   A list of what?
14   A.   Most of them are clients, there are one or
15 two on here that were comped.
16   Q.   When you say comped, what do you mean?
17   A.   No charge. Like for example, the second
18 one, Stu Sweet, capital analyst, he's a consultant
19 doing similar kinds of work that I am, we knew each
20 other on the Hill and we would share each other's
21 information. So I would send him what I wrote, he
22 would send me what he wrote. We had very different
23 ways of working, but it was helpful for him to see my
24 stuff and it was helpful for me to see his stuff.
25   Q.   I'd like to refer to you the top of the

Page 45

1  document, address book list 3, all clients last
2  modified on 5/11/01?
3    A.   Um-hum.
4    Q.   When you say all clients, you say this
5  also includes clients who were comped?
6    A.   I'm saying Stu Sweet never paid me a dime.
7  We would share information. I think all the rest on
8  here -- let me just check. Well, for example I don't
9  remember Macquarie Holdings being a client, they may
10 have been a potential client. So, you know, they
11 were -- I don't recall that they ever paid me, but
12 they would be on the list as a potential client.
13       Putnam, they were a client at one point,
14 but they were not a client at that time. And Dean
15 Mackey, for example, was an economist at the Fed
16 involved in tax policy and I knew him. And when he
17 went to Putnam, I put him on my list as a potential
18 client. Yeah, I mean -- I don't recall Stark
19 Investment, I mean, they must have been a potential
20 client. Gail Fosler of the conference board was
21 someone that I comped my service to.
22   Q.   So is it fair to say that this list
23 includes clients that were comped and some potential
24 clients and also it might include a former client?
25   A.   Right. But mostly it was my current

12  (Pages 42 to 45)

1111 14th Street, NW Suite 400                                          Washington, DC 20005

Peter Davis, Jr.                                                                    April 19, 2006
Washington, DC

| Page 50 | Page 52 |
|---|---|
| 1 we need some water at some point soon. I don't want | 1 in May. |
| 2 to interrupt where you're going, we can go a little | 2     Q.   Did you typically carry a hard copy of the |
| 3 bit longer. | 3 list with you? |
| 4          MS. WILLIAMS:  We can take a break here. | 4     A.   Yes. |
| 5          MR. STANCIL:  It's totally up to you. | 5     Q.   Did you consider Goldman Sachs to be a big |
| 6          MS. WILLIAMS:  Before I mark the next | 6 client? |
| 7 exhibit, absolutely. | 7     A.   Yes, they were new. |
| 8          MR. STANCIL:  Is that okay? | 8     Q.   Can you tell me why, and I'm referring to |
| 9          THE WITNESS:  Absolutely. | 9 the last typewritten line here, John Youngdahl, |
| 10          THE VIDEOGRAPHER:  This is the end of tape | 10 Goldman Sachs, do you see that on this document? |
| 11 number 1 in the video deposition of Peter Davis.  Off | 11     A.   Yes. |
| 12 the record at 10:38:19 a.m. on April 19th, 2006. | 12     Q.   Why Mr. Youngdahl's name appears near the |
| 13          (Recess.) | 13 bottom of the document? |
| 14          THE VIDEOGRAPHER:  This is the beginning | 14     A.   Because they were new, I had had him down |
| 15 of tape number 2 in the videotaped deposition of | 15 at the bottom, and just hadn't taken time to move him |
| 16 Mr. Peter Davis.  On the record at 10:56:46 a.m. on | 16 up.  I mean, I think he was a potential client when |
| 17 April 19th, 2006. | 17 this list was printed, whereas they became a client a |
| 18          BY MS. WILLIAMS: | 18 few months later. |
| 19     Q.   Mr. Davis, I wanted to ask you a few more | 19     Q.   Do you know if between May 2nd, 2001 and |
| 20 questions about what's been marked as Exhibit 8. | 20 October 31st, 2001 if you updated this list? |
| 21     A.   Um-hum. | 21     A.   I probably did, but I don't recall |
| 22     Q.   I notice that there are fax numbers listed | 22 specifically.  I updated whenever I got time to |
| 23 on the exhibit; do you see those? | 23 update it.  Sometimes I went around saying, geez, I |
| 24     A.   Yes. | 24 have to update this list and just not get around to |
| 25     Q.   Did you send clients faxes in 2001? | 25 it for a month or two. |

| Page 51 | Page 53 |
|---|---|
| 1     A.   Once in a rare while.  By that point, I | 1     Q.   Did you carry a PDA? |
| 2 was sending E-mail, but sometimes we'd get a document | 2     A.   Yes, I did at the time. |
| 3 or something that, you know, I couldn't get scanned | 3     Q.   Was the client information that is |
| 4 very easily or something.  So on rare occasions, we'd | 4 contained on this list also contained in your PDA? |
| 5 fax something. | 5     A.   Yes. |
| 6     Q.   You also -- you stated before we took a | 6     Q.   When did you first start using a PDA? |
| 7 break that you would send E-mails when there was some | 7     A.   I don't recall. |
| 8 market movement, when you said the market -- you had | 8     Q.   Were you still using a PDA October 31st, |
| 9 marked moving information? | 9 2001? |
| 10     A.   Right. | 10     A.   Yes. |
| 11     Q.   Do you recall saying that? | 11     Q.   Did you also have a Blackberry? |
| 12     A.   Right. | 12     A.   No. |
| 13     Q.   And you gave an example of some market | 13     Q.   I'd like to have it marked as Exhibit 9. |
| 14 moving information. | 14          (Davis Exhibit No. 9 was marked for |
| 15     A.   Right. | 15               identification.) |
| 16     Q.   Did you consider Treasury's announcement | 16          BY MS. WILLIAMS: |
| 17 on October 31st, regarding the cancellation of the | 17     Q.   Do you recognize this document, sir? |
| 18 30-year bond to be market moving information? | 18     A.   Yes. |
| 19          MR. THEODOROU:  Objection. | 19     Q.   What is it? |
| 20          BY MS. WILLIAMS: | 20     A.   It's a printout of my contact manager data |
| 21     Q.   You can answer. | 21 file. |
| 22     A.   Yes. | 22     Q.   Is it a true and correct copy of the |
| 23     Q.   Did you use this list on October 31st, | 23 printout from your data file? |
| 24 2001 to call clients? | 24     A.   Yes. |
| 25     A.   Yes, or one like it.  This was printed out | 25     Q.   Do you know the date of this document? |

14  (Pages 50 to 53)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

| Page 54 |
|---|
| 1    A.    Yeah, it was printed out 10:16 a.m. 11 -- |
| 2   November 9th, 2001. |
| 3    Q.    Who entered or created this data file? |
| 4    A.    I did. |
| 5    Q.    And could you tell me who -- what names |
| 6   appear on this data file, like what kind of |
| 7   information you entered into the data file? |
| 8    A.    Everybody that I called. |
| 9    Q.    And did this include clients of Davis |
| 10  Capital? |
| 11   A.    Yes. |
| 12   Q.    Did it include people who were not clients |
| 13  of Davis Capital? |
| 14   A.    Yes. |
| 15   Q.    Is it fair to say that this is -- this was |
| 16  an address for business and personal use? |
| 17   A.    Yes. |
| 18   Q.    Did Davis Capital, and I might have |
| 19  already asked this, charge a standard fee to clients? |
| 20   A.    Yes, but there was variation also. |
| 21   Q.    What was the variation based on? |
| 22   A.    Utilization. |
| 23   Q.    What was the standard fee? |
| 24   A.    $1500 a month. |
| 25   Q.    Do you know if that standard fee was |

| Page 55 |
|---|
| 1   charged to MFS? |
| 2    A.    I said earlier that I recall that they |
| 3   were paying me $1,000 a month. |
| 4    Q.    So less than the standard fee? |
| 5    A.    Right. |
| 6    Q.    Do you know why they were paying less than |
| 7   the standard fee? |
| 8    A.    Less demand.  We would negotiate, you |
| 9   know, every client based on their demand. |
| 10   Q.    When you say demand, what are you |
| 11  referring to? |
| 12   A.    How much of my time I spent.  Some clients |
| 13  needed explanations about Washington, others didn't |
| 14  so -- |
| 15   Q.    Did MFS receive E-mails that you would |
| 16  send to -- did you send mass E-mails to clients, |
| 17  meaning E-mails that were sent to more than one |
| 18  client? |
| 19   A.    Yes. |
| 20   Q.    Did MFS receive those E-mails as a general |
| 21  matter? |
| 22   A.    I assume they did, yeah.  I sent them. |
| 23   Q.    So when you say less demand, you don't |
| 24  mean that you would leave them off of E-mails that -- |
| 25   A.    No, the E-mail was my standard product, |

| Page 56 |
|---|
| 1   that was the base product.  Everybody got that.  And |
| 2   the additional services were phone calls, custom |
| 3   research, meetings, talking to their clients, |
| 4   answering their questions. |
| 5    Q.    How are you compensated by Davis Capital? |
| 6    A.    Clients send me checks, I deposit them. |
| 7    Q.    Let me be more specific.  Did you receive |
| 8   a salary from Davis Capital? |
| 9    A.    No. |
| 10   Q.    A set salary? |
| 11   A.    No, I'm a sole prop.  I mean, I take in |
| 12  gross income, I pay expenses and whatever's left is |
| 13  mine. |
| 14   Q.    Do you know approximately how much you |
| 15  earned from Davis Capital in 2001? |
| 16   A.    Geez.  Not offhand, I'd have to go check |
| 17  my tax records.  It was -- I don't know, it was a |
| 18  little over 200,000, I don't know, I'd have to check |
| 19  my tax records. |
| 20   Q.    You testified that MFS was one of Davis |
| 21  Capital's clients.  Do you know when MFS became a |
| 22  client of Davis Capital? |
| 23   A.    I don't recall specifically, some time in |
| 24  the mid-'90s. |
| 25   Q.    How did MFS become a client of Davis |

| Page 57 |
|---|
| 1   Capital? |
| 2    A.    It was a referral from another client. |
| 3    Q.    What other client? |
| 4    A.    Bob Faulkner at Sangamon Trading. |
| 5    Q.    How did -- and when you say it was a |
| 6   referral, did someone from MFS contact you? |
| 7    A.    Bob Faulkner at Sangamon Trading said you |
| 8   might call Steve Nothern over at MFS. |
| 9    Q.    So you contacted MFS? |
| 10   A.    Right. |
| 11   Q.    And specifically Mr. Nothern? |
| 12   A.    Yes. |
| 13   Q.    Do you recall what you discussed with |
| 14  Mr. Nothern when you contacted him? |
| 15   A.    Hi, Bob Faulkner said I should give you a |
| 16  call, just wanted to introduce myself, arrange to |
| 17  send you my material.  I seem to recall I paid a |
| 18  visit to Boston to visit Steve. |
| 19   Q.    Had you met Mr. Nothern before you called |
| 20  him regarding the referral that you had received from |
| 21  Mr. Faulkner? |
| 22   A.    No. |
| 23   Q.    Had -- was Mr. Nothern expecting your call |
| 24  when you called, had he also heard from Mr. Faulkner? |
| 25   A.    Yeah, I think so. |

15  (Pages 54 to 57)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

---

Page 62

1  A.   Not really.  I mean, it was a handful, I
2  really don't recall.
3      Q.   When you say a handful, less than 10?
4  A.   Yeah.
5      Q.   But more than just Mr. Nothern?
6  A.   Yeah, there were a few other people there.
7      Q.   Do you recall any of those other people's
8  names as far as the E-mails that you would send to
9  MFS?
10  A.   No.
11      Q.   Did you have any other contacts that you
12  recall at MFS besides Mr. Nothern?
13  A.   There was one other person that I talked
14  to once in a rare while, but I don't even remember
15  his name.
16      Q.   It was a man?
17  A.   Yes.
18      Q.   Do you know what department that person
19  worked in?
20  A.   No.
21      Q.   When you say that you sent -- did you add
22  MFS -- you eventually added MFS to your E-mail list?
23  A.   Correct.
24      Q.   Did they receive the weekly calendars that
25  you sent out?

---

Page 63

1  A.   Sure.
2      Q.   And if you sent faxes to clients, did they
3  also receive those?
4  A.   Yes.
5      MR. STANCIL:  To be clear, you sent them.
6  Do you have knowledge as to whether they received
7  them or not?
8      THE WITNESS:  No.
9      BY MS. WILLIAMS:
10      Q.   Did you ever discuss with Mr. Nothern if
11  he had received E-mails that you sent?
12      MR. THEODOROU:  Objection.
13      BY MS. WILLIAMS:
14      Q.   You can answer.
15  A.   Um, I don't recall.  I mean, all I know is
16  I sent the stuff out.
17      Q.   Did he ever complain that he wasn't
18  receiving E-mails?
19  A.   Not that I recall, no.
20      Q.   Do you recall ever having any discussions
21  with Mr. Nothern regarding any content of any E-mails
22  you might have sent him?
23      MR. THEODOROU:  Objection.
24      THE WITNESS:  Um, I don't have any
25  specific recollection.

---

Page 64

1      BY MS. WILLIAMS:
2      Q.   Do you have a general recollection?
3      MR. THEODOROU:  Objection.
4      THE WITNESS:  He might have called me up a
5  few times, usually I was calling him.
6      BY MS. WILLIAMS:
7      Q.   How often did you call Mr. Nothern?
8  A.   Not that often, once in a while, once
9  every month or so maybe.
10      Q.   Why did you call Mr. Nothern?
11  A.   To stay in touch, he was a client.
12      Q.   What kind of things were discussed during
13  these calls?
14      MR. THEODOROU:  Objection.
15      THE WITNESS:  Usually, you know, I'd be
16  calling about Washington policy information, you
17  know, that --
18      BY MS. WILLIAMS:
19      Q.   Was there any information that you felt
20  Mr. Nothern was particularly interested in?
21      MR. THEODOROU:  Objection.
22      THE WITNESS:  He was generally interested
23  in, you know, the deficit and what was -- what
24  federal borrowing was going to be required.
25      BY MS. WILLIAMS:

---

Page 65

1      Q.   And besides the deficit and fed -- federal
2  borrowing, was there anything else that you thought
3  Mr. Nothern was interested in?
4  A.   I don't recall him asking me to
5  investigate anything in particular, I -- I would just
6  give him what I was giving all my clients.
7      Q.   Did you ever call anyone else at MFS
8  besides Mr. Nothern?
9  A.   This other guy whose name I can't
10  remember, I might have called, oh, a few times you
11  know, over a few years.  I just -- I don't remember
12  the guy's name, I -- it was one other guy that I did
13  call once on a few occasions.
14      Q.   Did you ever meet Jeffrey Corinski?
15  A.   I have no recollection of meeting him.
16      Q.   Do you know Mr. -- did you ever speak to
17  Mr. Corinski?
18  A.   I have no recollection of him.
19      Q.   What about Peter Sullivan?
20  A.   I just don't recall these people.
21      Q.   Matt Ryan?
22  A.   The name sounds familiar, but I don't
23  recall.  My main contact was Steve.
24      Q.   What about Bob Persons?
25  A.   I don't recall that name at all.

---

17 (Pages 62 to 65)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

| Page 66 | Page 68 |
|---|---|

**Page 66**

1  Q.   Jim Swanson?
2  A.   That -- you know, that name sounds a
3  little familiar, but I don't recall any conversations
4  or meetings.
5  Q.   Mark Dow?
6  A.   I don't recall that at all.
7  Q.   What about Richard Hawkins?
8  A.   No recollection of that person.
9  Q.   Or Bill Adams?
10  A.   No recollection of that person.
11  Q.   When you sent faxes to MFS who did you
12  send them to?
13  A.   To Steve.
14  Q.   Do you know if you included the other
15  gentleman that you can't remember his name on that
16  fax?
17       MR. THEODOROU:  Objection.
18       THE WITNESS:  I don't recall.  Usually
19  when I sent a fax, it was to one person at each firm.
20       BY MS. WILLIAMS:
21  Q.   Did you ask that person to distribute the
22  fax to others?
23  A.   No.
24  Q.   Did you ever ask Mr. Nothern to spread
25  information that he received from you to other

**Page 67**

1  people?
2  A.   Well, like with a lot of my clients, you
3  know, I might have asked him if he knew of other
4  potential clients I might approach.  But no, other
5  than that, I can't -- and I don't have any specific
6  recollection of any of that.
7  Q.   Do you recall who at MFS you sent your
8  bills to?
9  A.   No.
10  Q.   I'd like to have this marked as Exhibit
11  10.
12       (Davis Exhibit No. 10 was marked for
13       identification.)
14       BY MS. WILLIAMS:
15  Q.   Do you recognize this document, sir?
16  A.   It looks like one of my invoices.
17  Q.   Who is this invoice to?
18  A.   Bridgett Femino.
19  Q.   Where did Ms. Femino work?
20  A.   MFS, Boston.
21  Q.   Are those your initials at the bottom?
22  A.   Yes, they are.
23  Q.   There's some handwriting at the top, do
24  you know whose handwriting that is?
25  A.   No idea.  When I send these out, I initial

**Page 68**

1  them at the bottom and mail them, or some clients I
2  faxed them to.
3  Q.   And why was this sent to Ms. Femino?
4  A.   She must have been the payable person at
5  that time.  I mean --
6  Q.   What was this invoice for?
7  A.   It was for $12,000 for a full year's
8  service from October 1, 2000 through September 30th,
9  2001.
10  Q.   Was it your practice to bill by the year?
11  A.   It varied from client to client depending
12  on what they felt was most convenient.  So evidently,
13  I was billing them on an annual basis at $1,000 a
14  month.
15  Q.   I see the document says consulting
16  services for Steven Nothern, Massachusetts Financial
17  Services?
18  A.   Right.
19  Q.   Were you consulting for anyone else at MFS
20  during this time period?
21  A.   Well, I would be available to basically
22  anybody at the firm who had a question that I could
23  answer about Washington policy.  Our standard
24  practice was when I had a client, there would be a
25  main contact, but I would be available to anybody who

**Page 69**

1  needed to, you know, for the same fee -- you know,
2  for that one fee, I would be available to answer
3  questions from other people at the firm.
4  Q.   So you were available to answer questions
5  from other people at MFS besides Mr. Nothern?
6  A.   Yes.
7  Q.   You stated that you met with Mr. Nothern
8  and possibly others at MFS, did you ever have any
9  other in-person meetings with Mr. Nothern?
10  A.   He came to Washington once or twice, and I
11  met with him here.
12  Q.   When did -- do you recall Mr. Nothern
13  first came to Washington to meet with you?
14  A.   I -- I don't recall.
15  Q.   Do you know approximately the year?
16  A.   Some time in the year or so maybe after he
17  became a client he -- I don't have any specific
18  recollection.
19  Q.   Who arranged the meeting?
20  A.   I don't recall.
21  Q.   Did you suggest that Mr. Nothern come to
22  Washington?
23  A.   One of my services was to arrange meetings
24  with people in Washington.  And I do recall that
25  Steve came down for one of those meetings, and so

18  (Pages 66 to 69)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

## Page 70

1  obviously that would have been at my suggestion. But
2  I don't -- you know, there were other reasons for him
3  to be here, like, say, he could have possibly
4  attended the National Association of Business
5  Economists meeting or something, just been here on
6  his own.
7      Q.  Who paid for Mr. Nothern's trip to
8  Washington?
9      A.  I don't know.
10     Q.  Did you pay for that trip?
11     A.  No, no.
12     Q.  Were there other clients involved in this
13 meeting?
14     A.  Yes.
15     Q.  Do you know who those other clients were?
16     A.  I think Ward McCarthy was there from Stone
17 & McCarthy.  And I think there were probably one or
18 two others, but I don't recall who they were.
19     Q.  Was anyone else there from MFS?
20     A.  No.
21     Q.  What was your purpose of setting up these
22 meetings with clients?
23     A.  To introduce my clients to leading
24 economists and policy makers, and the Administration
25 and on Capitol Hill.

## Page 71

1      Q.  Do you know where you took the clients
2  during this meeting?
3      A.  To -- I don't have a specific recollection
4  about that specific meeting, but my general practice
5  was to arrange for meetings with, say, three or four
6  economists on Capitol Hill in the morning, and maybe
7  at a lunch.  And then with Administration economists
8  in the afternoon, clients would typically fly home in
9  the afternoon.
10     Q.  And who would the economists that you
11 arranged the meeting with, who would they work for?
12     A.  They'd work for congressional committees
13 or the Congressional Budget Office, for other
14 government agencies.
15     Q.  Which agencies?
16     A.  Which agencies?  You know, I don't recall
17 specifically for that meeting, but typically it would
18 be OMB Council of Economic Advisors, the Fed,
19 Treasury, CBO, Joint Tax Committee, Senate Budget
20 Committee, House Budget Committee, Joint Economic
21 Committee.
22     Q.  How do you decide where to take the
23 clients during the meeting?
24     A.  Whoever's available and whoever is the
25 most knowledgeable person I can get to talk about how

## Page 72

1  the economy's doing, and how the -- you know, what's
2  going on with policy matters in Washington.
3      Q.  Had Mr. Nothern ever mentioned any people
4  that he would like to meet with in Washington?
5      A.  No.
6      Q.  Did he ever mention any agencies that he
7  was interested in visiting?
8      A.  No.
9      Q.  Did you notify your clients in advance as
10 to who they would be meeting with during their trips
11 to Washington?
12     A.  Yes.  However, that was always subject to
13 change, because meetings can evaporate very quickly.
14 So that was all in flux, right up until you would
15 walk into someone's office.
16     Q.  How did you provide the notification, what
17 means did you use?
18     A.  I don't recall.  It was probably E-mail or
19 a fax, but I don't recall.
20         MS. WILLIAMS:  I'd like to mark this as
21 Exhibit 11.
22             (Davis Exhibit No. 11 was marked for
23             identification.)
24         BY MS. WILLIAMS:
25     Q.  Have you seen this document before?

## Page 73

1      A.  Yes.
2      Q.  What is it?
3      A.  It's a meeting list for January 15th of
4  '98.
5      Q.  And why was this meeting list prepared?
6      A.  So I would have the contact information
7  for who we were meeting with.
8      Q.  Do you know if Mr. Nothern participated in
9  this January 15th, '98 meeting?
10     A.  I know he participated in some meeting
11 around, you know, this time.  But I don't know if it
12 was this specific meeting.  It easily could have
13 been.
14     Q.  Do you recognize the handwriting on the
15 document?
16     A.  Some of it.  The handwriting at the top is
17 mine, but the other handwriting is not.
18     Q.  And I -- who from Treasury was scheduled
19 to participate in this January 15th, '98 meeting?
20     A.  Allen Cohen, Jim Lister and Roger Anderson
21 and John Karl Scholz -- oh, and furthermore, I guess
22 David Wilcox, too.  It is cut off on the side, I
23 think it says TENT there, which would probably mean
24 tentative.
25     Q.  That's your handwriting?

1111 14th Street, NW Suite 400                                    Washington, DC 20005

Peter Davis, Jr.                                                      April 19, 2006
Washington, DC

| Page 74 | Page 76 |
|---|---|

**Page 74**

1   A.  Yeah, that looks like my handwriting on
2   the side there.
3   Q.  Who would you have sent this document to?
4   A.  It's possible that I faxed this to clients
5   who were going to attend.
6   Q.  Would you have sent this document to
7   anyone who was not planning to attend?
8   A.  No, at least not that I recall.  I have no
9   recollection of sending this.
10  Q.  What was Mr. Cohen's job title at
11  Treasury, if you recall?
12  A.  I think he was special assistant to the
13  Secretary.
14  Q.  What about Mr. Lister?
15  A.  I don't recall.  I think he was G-7 in
16  international, but I really don't recall.
17  Q.  Roger Anderson?
18  A.  He was Assistant Secretary for -- geez, I
19  forget.  You know, financial management, it was -- he
20  was the Assistant Secretary for debt manage -- it
21  wasn't -- the title wasn't debt management, but
22  that's what he was doing.
23  Q.  And what about Mr. Scholz?
24  A.  He's a tax economist who had been in the
25  Office of Tax Analysis.  In fact, I think he was

**Page 76**

1   A.  Occasionally, once every few months.
2   Q.  Did you consider Mr. Anderson to be a
3   friend of yours?
4   A.  It was a professional acquaintance, we
5   didn't socialize together.
6   Q.  What about Mr. Scholz, how did you know
7   him?
8   A.  He's a tax economist, he would
9   occasionally speak to this professional group of tax
10  economists that I co-founded.
11  Q.  How often would you speak to Mr. Scholz?
12  A.  Occasionally, not that often.
13  Q.  Where was the meeting held that you had at
14  Treasury in January '98?
15  A.  I don't recall.  It was probably in
16  Roger's office, but -- in fact, I don't even recall
17  whether it was one meeting, there might have been
18  two.
19  Q.  Okay.
20  A.  In other words, sometimes I would move
21  around within the building, visit with one group and
22  then visit another.
23  Q.  Did you and the clients that you brought
24  to Treasury have to go through any security to gain
25  access to the building?

**Page 75**

1   director of the Office of Tax Analysis.
2   Q.  And Mr. Wilcox, what was his job title?
3   A.  I don't recall.  He might have been
4   Assistant Secretary for Economic Policy.
5   Q.  How did you determine who the people you
6   were going to meet with on January 15th, '98?
7   A.  I mean, I -- I don't recall.  Generally, I
8   would be looking for people who could talk about
9   economic policy making, and then the state of the
10  economy.
11  Q.  To set up these meetings, did you contact
12  the individuals on this list directly?
13  A.  Yes.
14  Q.  Had you previously met Mr. Cohen?
15  A.  He and I worked together on the Hill.
16  Q.  And how did you know Mr. Lister?
17  A.  It was probably a referral from Alan or
18  someone else at Treasury, you know, I don't recall
19  Lister at all.  And that might have been the only
20  time I met him.
21  Q.  And what about Mr. Anderson, how did you
22  know him?
23  A.  I had met him on a number of occasions at
24  Treasury.
25  Q.  How often did you and Mr. Anderson talk?

**Page 77**

1   A.  Yes.
2   Q.  And did you have a contact that you left
3   the name with security, that you said you were going
4   to see?
5       MR. THEODOROU:  Objection.
6       THE WITNESS:  I don't recall.  It was -- I
7   mean, someone obviously cleared us in.  It could have
8   been Roger, Roger's secretary, but I have no
9   recollection of you know who cleared us in.
10      BY MS. WILLIAMS:
11  Q.  Do you know the name of Mr. Anderson's
12  secretary?
13  A.  I don't recall.
14  Q.  Does the name Patricia Walton ring a bell?
15  A.  No.
16  Q.  What about Anna Hart?
17  A.  No.
18  Q.  Do you know what you discussed during the
19  meetings at Treasury that you had on January -- in
20  January '98?
21  A.  I don't have any specific recollection.
22  Q.  Do you recall have any other meetings
23  where Mr. Nothern came to Washington?
24  A.  I remember he came once.  I don't recall
25  if -- it's possible there was another one.  But I

20 (Pages 74 to 77)

Peter Davis, Jr.                                                     April 19, 2006

Washington, DC

| Page 78 |
|---|

1  don't recall. I mean, I remember him coming down for
2  one for sure.
3      Q. I'd like to have this marked as Exhibit
4  12.
5          (Davis Exhibit No. 12 was marked for
6          identification.)
7      BY MS. WILLIAMS:
8      Q. Do you recognize this document, sir?
9      A. It's a letter from me to Lee Sachs.
10     Q. Is that your signature at the bottom?
11     A. Yes, it is.
12     Q. Did you prepare this document?
13     A. Yes.
14     Q. Is it a true and correct copy of the
15  letter that you prepared to Mr. Sachs?
16     A. Yes.
17     Q. What is this letter regarding?
18     A. It's about a meeting at Treasury on
19  January 20th of 2000.
20     Q. A meeting with whom?
21     A. I would assume with Mr. Sachs. I don't
22  recall who else was there.
23     Q. I'd like to refer you to the second line,
24  it says, attending will be and then there's a colon,
25  do you see that?

| Page 79 |
|---|

1      A. Yes, I do.
2      Q. Who did you list would be attending the
3  meeting?
4      A. Ward McCarthy and Ray Stone from Stone &
5  McCarthy, Steve Nothern and Larry Hathaway from --
6  yeah, Larry Hathaway from Warburg Dillon Read.
7      Q. Do you recall whether Mr. Nothern attended
8  a meeting at Treasury on, would have been January
9  20th?
10     A. I assume he attended this. This seems
11  documented. I know he attended some meeting at
12  Treasury that I was at, this was probably it.
13     Q. Do you know who arranged the meeting at
14  Treasury?
15     A. I did.
16     Q. Do you know if anyone besides Mr. Sachs
17  from Treasury participated in the meeting?
18     A. I don't have any specific recollection.
19  There were almost certainly other people there, you
20  don't just go in and meet with an Assistant Secretary
21  without somebody else being there.
22     Q. Do you know if Mr. Paul Malvey was in
23  attendance?
24     A. He probably was.
25     Q. Who was Mr. Malvey?

| Page 80 |
|---|

1      A. I forget his exact title. Something like
2  Director of Office of Tax -- Office of Debt
3  Management or something like that. He was the chief
4  civil servant under the Assistant Secretary.
5      Q. How did you know Mr. Malvey?
6      A. I met him on a number occasions at
7  Treasury.
8      Q. Were you introduced by someone to
9  Mr. Malvey?
10     A. I don't recall how I met him.
11     Q. Do you know when you first met Mr. Malvey,
12  about the year?
13     A. Some time in the mid-'90s, probably in '94
14  or '95, I guess. It's hard to say.
15     Q. How often would you speak to Mr. Malvey?
16     A. Not that often, once every few months
17  maybe.
18     Q. Did you and Mr. Malvey have a personal
19  relationship?
20     A. No.
21     Q. Your relationship was strictly
22  professional?
23     A. We had a professional relationship, there
24  would be questions and I'd call up and ask him.
25     Q. What kind of questions would you ask

| Page 81 |
|---|

1  Mr. Malvey?
2      A. Well, you know -- I don't know, I'm trying
3  to recall. When the quarterly refunding meetings
4  would be, when they might be releasing any studies
5  they were doing. Once in a while they do a special
6  study.
7      Q. How did you know Mr. Sachs?
8      A. That was probably the only time I met with
9  him, so I didn't really know him.
10     Q. How was this meeting with Mr. Sachs
11  arranged?
12         MR. THEODOROU: Objection.
13         THE WITNESS: I called up and asked to
14  meet and then followed up with this letter.
15     BY MS. WILLIAMS:
16     Q. Did you call Mr. Sachs directly?
17     A. No, and I put in -- I mean, almost
18  certainly I had a written request that went in, you
19  know, it was faxed or mailed to him, and then had to
20  follow up. And then when I knew who the clients were
21  who were going to go, then I sent this letter.
22         MS. WILLIAMS: I'd like to mark this as
23  Exhibit 13.
24         (Davis Exhibit No. 13 was marked for
25         identification.)

21 (Pages 78 to 81)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

| Page 82 | Page 84 |
|---|---|
| 1    MS. WILLIAMS: And I'd actually like to | 1    Q.    When you wrote this document, do you |
| 2  mark this as Exhibit 14. | 2  believe the information contained in it was |
| 3         (Davis Exhibit No. 14 was marked for | 3  fresh in your mind? |
| 4         identification.) | 4    A.    Sure. |
| 5  BY MS. WILLIAMS: | 5    Q.    Do you have any reason to doubt any of the |
| 6    Q.   Do you recognize what's been marked as | 6  accuracy of the information that's contained in the |
| 7  Exhibit 13? | 7  document? |
| 8    A.   Yes. | 8         MR. THEODOROU: Objection. |
| 9    Q.   What is it? | 9         BY MS. WILLIAMS: |
| 10    A.   It's an E-mail with a tentative schedule | 10    Q.    Besides the handwritten notes? |
| 11  of meetings in Washington. | 11    A.    Besides handwritten notes, it looks like |
| 12    Q.   Who is it an E-mail from? | 12  something I prepared. |
| 13    A.   From me to Larry Hathaway, Ward McCarthy, | 13    Q.    Exhibit 14, do you recognize this |
| 14  Steve Nothern and Ray Stone. | 14  document? |
| 15    Q.   What's the date of this document? | 15    A.    It's a printout from my contact manager, |
| 16    A.   January 19th, 2000, 8:58 a.m. | 16  the contact information of the people, some of the |
| 17    Q.   Did you draft this document? | 17  people we were going to meet with that day. |
| 18    A.   Yes. | 18    Q.    When you say that date, what date are you |
| 19    Q.   Do you recognize the handwriting on the | 19  referring to? |
| 20  document? | 20    A.    January 20th -- well, it's interesting |
| 21    A.   No. | 21  there it's cut off. There's no date on this, so I |
| 22    Q.   Why did you send this document? | 22  can't be sure of that, but it does list some of the |
| 23    A.   To notify my clients of the meeting | 23  same people that were on the previous exhibit. |
| 24  schedule. | 24    Q.    Did you create the document except for the |
| 25    Q.   The meeting schedule for what day? | 25  handwritten notes? |

| Page 83 | Page 85 |
|---|---|
| 1    A.   The following day, January 20th. | 1    A.    It's printed out from my contact manager |
| 2    Q.   And besides Mr. Sachs, does this document | 2  so I must have. |
| 3  help refresh your recollection as to other people you | 3    Q.    Do you recognize the handwriting on the |
| 4  met with on January 20th? | 4  document? |
| 5    A.   Yeah, I mean, it's got a list of other | 5    A.    No. |
| 6  people we met with. | 6    Q.    Do you know if you sent this document to |
| 7         MR. STANCIL: To be clear, she's asking | 7  anyone? |
| 8  you if based on this document you have an independent | 8    A.    I -- I don't recall. |
| 9  recollection or just reading the document -- | 9    Q.    Was it your practice to send a print out |
| 10         THE WITNESS: Oh, oh. | 10  from your contact manager to people? |
| 11         MR. STANCIL: I want you to be real clear | 11         MR. THEODOROU: Objection. |
| 12  about what you remember. | 12         THE WITNESS: I probably did. I don't |
| 13         THE WITNESS: Yeah. | 13  have any specific recollection. |
| 14         MR. STANCIL: And what the document says. | 14         MS. WILLIAMS: Okay. |
| 15  Maybe the document changes what you remember, maybe | 15         BY MS. WILLIAMS: |
| 16  it doesn't. | 16    Q.    Did you ever discuss with any clients how |
| 17         THE WITNESS: I have a specific | 17  you knew individuals that you were going to be |
| 18  recollection of a meeting with Vince Reinhardt at the | 18  meeting with in Washington? |
| 19  Fed. I recall a meeting at Treasury some, but I | 19    A.    Sure. |
| 20  don't remember Lee Sachs. And I -- you know, the | 20         MR. THEODOROU: Objection. |
| 21  rest of it, I don't really recall. | 21         BY MS. WILLIAMS: |
| 22         BY MS. WILLIAMS: | 22    Q.    And what would you tell your clients? Or |
| 23    Q.   Did you draft this document on January | 23  specifically what did you tell the clients regarding |
| 24  19th, 2000? | 24  this January 20th meeting about people that you were |
| 25    A.   Yes, I must have, it certainly -- | 25  going to be meeting with? |

22 (Pages 82 to 85)

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

---

Page 86

1    A.  Sometimes -- I don't have any specific
2  recollection of it, but I -- standard practice was to
3  discuss their backgrounds.
4    Q.  Do you know if you informed the clients
5  how you knew Mr. Malvey?
6    A.  No, I really don't recall.  I told them I
7  knew him, you know.
8    Q.  Do you have any recollection of what you
9  discussed with Mr. Malvey during the January 20th
10  meeting?
11    A.  I recall discussing the economic outlook,
12  the -- what effect that might have on the deficit and
13  Treasury borrowing requirements.  But other than
14  that, I don't have any specific recollections.
15    Q.  Do you know if there was any discussion
16  about Treasury's quarterly refunding conference?
17    MR. THEODOROU:  Objection.
18    THE WITNESS:  I mean, I don't -- I don't
19  recall any discussion like that.
20    BY MS. WILLIAMS:
21    Q.  Do you recall how long the meeting with
22  Mr. Malvey lasted?
23    A.  No.  It wasn't just him, there was --
24  there was a, you know, a group from Treasury, I
25  forget who was in it, but, you know, he was certainly

---

Page 87

1  there.
2    Q.  Do you know about approximately how many
3  people were in the group from Treasury?
4    A.  Two or three.
5    Q.  Do you know if Mr. Nothern said anything
6  during the meeting?
7    A.  I -- I don't recall.
8    Q.  Did you know Jill Ousley?
9    A.  Yes, I'd met her over at Treasury.
10    Q.  And when did you meet Ms. Ousley?
11    A.  Sometime in the mid-'90s.
12    Q.  How did you meet Ms. Ousley?
13    A.  Probably at quarterly refunding meetings.
14    Q.  And what was Ms. Ousley's title at
15  Treasury?
16    A.  I don't recall her title, she was under
17  Mr. Malvey.
18    Q.  How often would you and Ms. Ousley
19  communicate?
20    A.  Rarely.
21    Q.  When you say rarely, approximately how
22  many times a year?
23    A.  I don't recall.  Basically, I would call
24  her if I couldn't get through to Malvey.
25    Q.  Did you know Lulu Tyler?

---

Page 88

1    A.  Yeah, I recall she was the main contact
2  for me to attend quarterly refunding meetings, or to
3  try and get documents that had been publicly released
4  by the Treasury regarding debt management.
5    Q.  Do you know what Ms. Tyler's job title was
6  at Treasury?
7    A.  No, I don't know, no.
8    Q.  Do you know who she worked for?
9    A.  Not really sure whether she worked for
10  Malvey or whether she worked for the Assistant
11  Secretary, I don't recall.
12    Q.  How did Ms. Tyler become the main contact
13  for you to attend quarterly refunding meetings?
14    A.  I -- I don't -- I don't really recall.
15    Q.  Do you know how you met Ms. Tyler?
16    A.  I meet her over the phone some time in say
17  '94 maybe.  I'm unclear as to the year.  At the
18  quarterly refunding meetings, they would put out
19  documents and I would contact her to get them.  They
20  would release them and I would go over and pick them
21  up, fax them over to clients or fax select parts of
22  them to clients.
23    Q.  I'm trying to find out how you came to
24  contact Ms. Tyler to gain access to the quarterly
25  refunding conferences.

---

Page 89

1    MR. STANCIL:  Is there -- what's the
2  question?
3    BY MS. WILLIAMS:
4    Q.  How did you contact Ms. Tyler to gain
5  access to the quarterly refunding conference?
6    MR. THEODOROU:  Objection.
7    MR. STANCIL:  He answered that he didn't
8  recall.
9    MS. WILLIAMS:  Right.
10    BY MS. WILLIAMS:
11    Q.  And I'm asking --
12    MR. STANCIL:  If you're asking a different
13  question, that's fine, I want to make sure we're all
14  answering the same question.
15    BY MS. WILLIAMS:
16    Q.  Well, how did you come to contact Ms.
17  Tyler to obtain these documents that you were
18  referring to?
19    MR. THEODOROU:  Objection.
20    THE WITNESS:  Well, after quarterly
21  refunding meetings, it was standard practice to have
22  a stack of the documents available at the messenger
23  window, the 15th Street Treasury entrance to the
24  Treasury.  After Ward McCarthy became a client, he
25  was very interested in getting those documents and so

---

23 (Pages 86 to 89)

Peter Davis, Jr.                                                                    April 19, 2006

Washington, DC

| Page 90 | Page 92 |
|---|---|
| 1 starting in, I don't know, I can't remember when Ward<br>2 became a client, but sometime in '93 or '94, I<br>3 started going down to the Treasury to pick up those<br>4 documents, or send my assistant to pick them up.<br>5     Sometimes Treasury would not have the<br>6 documents there, even though they'd been released.<br>7 And so then I would call asking for the documents and<br>8 I would usually be referred to Lulu.<br>9   Q. How often would you speak to Ms. Tyler?<br>10   A. You know, basically whenever I went to the<br>11 window and the documents weren't there, I'd call her<br>12 up. So it wasn't that often. If the documents were<br>13 there, I'd just get them.<br>14   Q. You said she was also a contact, though,<br>15 for you to attend the quarterly refunding<br>16 conferences?<br>17   A. Right.<br>18   Q. Would you have conversations with her --<br>19   A. That was later.<br>20   Q. When did she become a contact, then, for<br>21 you to attend the conferences?<br>22   A. Boy, I don't recall when I started<br>23 attending quarterly refunding meetings. It was some<br>24 time in the mid-'90s and she would be the person that<br>25 I would call up to get cleared into Treasury. | 1 conferences a couple of times. What were the<br>2 quarterly refunding conferences?<br>3   A. They were a series of meetings to -- well,<br>4 Tuesday, on the first Tuesdays of like February, May,<br>5 August and November, they would have a meeting of<br>6 their advisory committee. And they would -- there<br>7 would be a briefing on the economy, and that would<br>8 end and then some of the charts and data about the<br>9 economy would be released at that meeting.<br>10     And then the next day on Wednesday, there<br>11 would be another meeting, and Treasury would put out<br>12 its press release identifying their debt schedule for<br>13 the next quarter, and also another set of additional<br>14 charts and data would be released also. And also the<br>15 minutes of the advisory committee's meeting.<br>16   Q. You mentioned a meeting on Tuesdays and<br>17 then there was a meeting on Wednesday.<br>18   A. Right.<br>19   Q. Were both of those meetings collectively<br>20 to be considered the quarterly refunding conference?<br>21   A. Right. There are other parts to it. The<br>22 advisory committee would meet elsewhere, and there<br>23 were other parts to it, but those were the two that I<br>24 would attend. And the press, you know, the press<br>25 would generally attend. |

| Page 91 | Page 93 |
|---|---|
| 1   Q. You said that you would call up Treasury<br>2 and someone would refer you to Ms. Tyler when you<br>3 were looking for the documents?<br>4   A. Right.<br>5   Q. Who would you first initially call?<br>6   A. I don't have a specific recollection, but<br>7 it was probably Malvey.<br>8   Q. And why would you call Mr. Malvey?<br>9   A. Because he was the person who produced the<br>10 documents.<br>11   Q. Would he create the documents?<br>12   A. Well, there were other people in Treasury<br>13 that put them together, but he was the person in<br>14 charge of those documents.<br>15   Q. Do you know if Ms. Tyler worked for<br>16 Mr. Malvey?<br>17   A. I think so, but I don't really recall.<br>18   MS. WILLIAMS: I was wondering if we went<br>19 until noon, we could break for lunch. That's about<br>20 ten more minutes. Is that all right?<br>21   MR. STANCIL: That's fine.<br>22   MS. WILLIAMS: Is that okay? So about ten<br>23 more minutes.<br>24   BY MS. WILLIAMS:<br>25   Q. We've mentioned quarterly refunding | 1   Q. So you would attend the Tuesday meetings<br>2 and then you would attend the Wednesday meetings?<br>3   A. Right.<br>4   Q. Do you know what time those meetings were<br>5 usually held?<br>6   A. Yeah, they start at 9 o'clock.<br>7   Q. How did you come to attend these quarterly<br>8 refunding conferences?<br>9   A. Some time in '94 or '95, Treasury was<br>10 unable to produce these charts that had already been<br>11 released publicly. And, you know, I'd be calling<br>12 Lulu to get them and I'd say, Lulu, I know they were<br>13 passed out, I was down at the window right on time<br>14 and they didn't get them. How can I get them?<br>15     And then the answer would be, well, gee,<br>16 we passed them all out, I don't have any more copies.<br>17 I'd say I need to get some, how can I get them? And<br>18 sometimes it took days to get somebody to give me a<br>19 copy. And so at some point, she suggested that I ask<br>20 the Assistant Secretary for authorization to attend<br>21 the meetings so I could get the charts.<br>22   Q. Who was the Assistant Secretary?<br>23   A. Roger Anderson.<br>24   Q. Did you contact Mr. Anderson?<br>25   A. Yes, I did. |

24 (Pages 90 to 93)

Peter Davis, Jr.                                                                                       April 19, 2006
Washington, DC

| Page 94 | Page 96 |
|---|---|

**Page 94**

1  Q. And would this have been around '94, '95?
2  A. I guess. That's so long ago, I can't be
3  certain about the date.
4  Q. But it was before the year 2000?
5  A. Oh, yeah, for sure.
6  Q. How did you contact Mr. Anderson?
7  A. I seem to recall a telephone -- a short
8  telephone conversation and a follow-up letter.
9  Q. What was discussed during the
10  conversation?
11  A. Same thing as in the letter, you know,
12  I've been having difficulty getting these documents
13  after they have been publicly released, would it be
14  possible for me to get authorization to attend the
15  meetings to get them -- get them there.
16  Q. Were you -- you say you had a conversation
17  and then you sent a letter?
18  A. Right.
19  Q. The letter was basically the same --
20  A. The letter that I attend the meetings.
21  MR. STANCIL: Make sure you let her finish
22  her question before you answer, because she's got to
23  take it all down and he's going to object.
24  THE WITNESS: I understand.
25  BY MS. WILLIAMS:

**Page 95**

1  Q. Were you ever given authorization to
2  attend the meetings?
3  A. Yes.
4  Q. By whom?
5  A. By Roger Anderson.
6  Q. And how did Mr. Anderson communicate to
7  you that you had been given authorization to attend
8  the quarterly refunding meetings?
9  MR. THEODOROU: Objection.
10  THE WITNESS: He called me up and said,
11  you can attend, if you swear to honor the embargo and
12  sign the confidentiality agreement.
13  BY MS. WILLIAMS:
14  Q. You say to honor the embargo, what do you
15  mean by that?
16  A. To not release the information that was
17  passed out at the meetings until the embargo time.
18  Q. What was an embargo?
19  A. It is a period of time after the
20  information is passed out until it can be released.
21  Q. And then you said -- did you agree to
22  honor the embargo?
23  A. Yes.
24  Q. You also mentioned signing a
25  confidentiality agreement. Could you tell me whether

**Page 96**

1  an agreement was signed?
2  A. Yes.
3  Q. Who was the agreement between?
4  A. It was between me and the Treasury
5  Department.
6  Q. Did you sign the agreement?
7  A. Yes.
8  Q. Did someone from Treasury sign the
9  agreement?
10  A. Yes, I -- I remember doing it in Roger's
11  office. I assume he signed it, but --
12  Q. And who drafted the agreement?
13  A. Treasury did.
14  MR. THEODOROU: Objection.
15  BY MS. WILLIAMS:
16  Q. So you did not prepare the agreement?
17  A. No.
18  Q. Did you retain a copy of the agreement?
19  A. Yes.
20  Q. Do you still have a copy of the agreement?
21  A. No.
22  Q. What happened to it?
23  A. I pitched it in August of 2001.
24  Q. Why did you throw it away?
25  A. At that point, I had violated it and I

**Page 97**

1  threw it away.
2  Q. Do you know if Mr. Anderson retained a
3  copy of the agreement?
4  A. When I walked out of his office, it was
5  sitting on his desk.
6  Q. Did you sign one document or did you sign
7  multiple documents?
8  A. It was one document.
9  Q. Did you have that document photocopied?
10  A. I was given a copy, which I pitched in
11  August 2001.
12  Q. Was anyone else given a copy of that
13  document that you know of?
14  A. No, not that I'm aware of.
15  Q. Do you know approximately how long after
16  you sent the letter to Mr. Anderson asking for
17  authorization to attend the conferences as to when
18  you met with him in his office to sign this
19  confidentiality agreement?
20  A. It was within a week, a few days later.
21  Q. Did you keep a copy of the letter you sent
22  to Mr. Anderson asking for authorization?
23  A. I really don't recall. It must have been
24  on my word processor, but hard drives die and I don't
25  recall seeing it.

25 (Pages 94 to 97)

Peter Davis, Jr.                                                April 19, 2006

Washington, DC

## Page 98

1    Q.  Before you had these conversations and
2 sent the letters to Mr. Anderson, had you ever
3 attended a quarterly refunding conference?
4    A.  No.
5    Q.  Just before we go to lunch, let me ask
6 you, you mentioned Mr. McCarthy was interested in
7 documents for the conference.
8    A.  Um-hum.
9    Q.  Did you start getting the documents that
10 you mentioned from the Tuesday conference as a result
11 of Mr. McCarthy's requesting those?
12    A.  Yes.
13    Q.  Did any other clients express interest in
14 documents from the quarterly refunding conference?
15    A.  Yeah, there were one or two. I just
16 started broadcast faxing them out to all of my
17 clients.
18    Q.  When you received them, you just started
19 to send them?
20    A.  Yeah.
21    Q.  How would you send them to your clients?
22    A.  I just said I would start -- when the
23 documents had been publicly released, I'd take them,
24 I would go back to my office and broadcast fax
25 portions of them. I didn't broadcast fax everything,

## Page 99

1 but there were certainly tables they cared about.
2    Q.  Initially you would send them via fax?
3    A.  Right.
4    Q.  Did you ever E-mail those documents?
5    A.  No, because they -- it was just easier to
6 broadcast fax them. At some point in the late '90s,
7 Treasury started posting them on their website.
8    Q.  I just have two more questions before we
9 go to lunch. Besides agreeing to honor the embargo,
10 was there anything else that you agreed to as a
11 condition to gain authorization to the quarterly
12 refunding conference?
13    A.  No.
14    Q.  Did you ever mention -- did you express to
15 Mr. Anderson why you wanted to attend the
16 conferences?
17    A.  I just told him I was having trouble
18 getting the documents, and I was told that if I
19 attended the meetings, I could get the documents.
20 There were certain tables of data that were of
21 interest, and I just wanted to find a way to get
22 those.
23    MS. WILLIAMS: I'd like to break for
24 lunch.
25    THE VIDEOGRAPHER: This is the end of tape

## Page 100

1 number 2 in the video deposition of Mr. Peter Davis.
2 Off the record at 12:04:01 p.m. on April 19, 2006.
3    (Whereupon, at 12:04 p.m., the deposition
4 in the above-entitled matter was recessed, to
5 reconvene at 12:45 p.m., this same day.)

## Page 101

1       AFTERNOON SESSION
2         (1:02 p.m.)
3 Whereupon,
4       PETER DAVIS, JR.,
5 the witness testifying at the time of recess, having
6 been previously duly sworn, was further examined and
7 testified further as follows:
8    EXAMINATION BY COUNSEL FOR PLAINTIFF (RESUMED)
9       THE VIDEOGRAPHER: This is the beginning
10 of tape number 3 in the videotape deposition of
11 Mr. Peter Davis. On the record at 1:02:56 p.m. on
12 April 19th, 2006.
13       BY MS. WILLIAMS:
14    Q.  Mr. Davis, before lunch, we were talking
15 about a meeting that you had with Roger Anderson in
16 which you discussed gaining access to the quarterly
17 refunding conferences at Treasury. Was anyone else
18 present at the meeting besides you and Mr. Anderson?
19    A.  One of his assistants.
20    Q.  Was it a male or female?
21    A.  It was a female.
22    Q.  And you don't recall the assistant's name?
23    A.  She was the one who brought in the
24 document.
25    Q.  Do you know what she looked like?

Peter Davis, Jr.                                                                                          April 19, 2006

Washington, DC

Page 102

1     A.   I really don't recall.
2     Q.   Did Mr. Anderson know that you worked for
3   Davis Capital when you met with him --
4     A.   Yes.
5     Q.   -- to discuss that?  Did he know that you
6   were not a member of the press?
7     A.   Yes.
8     Q.   Did you all have any discussions regarding
9   the fact that you wanted to gain access to the
10  conference, but you were not a member of the press?
11    A.   Yeah.
12    Q.   What did you discuss?
13        MR. THEODOROU:  Objection, go ahead.
14        BY MS. WILLIAMS:
15    Q.   You can answer.
16        MR. STANCIL:  If you recall.
17        THE WITNESS:  I mean, I don't recall it so
18  much being a discussion.  He told me that, you know,
19  I could attend these meetings if I signed this
20  confidentiality agreement.  And I said, fine.
21        BY MS. WILLIAMS:
22    Q.   So it did not appear to you that
23  Mr. Anderson had a problem with you attending the
24  meetings, even though you were not a member of the
25  press?

Page 103

1         MR. THEODOROU:  Objection.
2         BY MS. WILLIAMS:
3     Q.   You can answer.
4     A.   I mean, obviously he let me into the
5   meeting so --
6     Q.   After you had this conversation with
7   Mr. Anderson and signed the confidentiality
8   agreement, how did you go about gaining clearance
9   into Treasury to attend the quarterly refunding
10  conferences?
11    A.   I would call up Lulu and make sure I was
12  cleared in.  And I'd show up downstairs on the
13  appointed days and my name would be on the list and
14  I'd get a badge and I'd go up to the third floor.
15    Q.   Did Mr. Anderson have any conversations
16  with you about what you should do to gain access --
17  gain clearance into Treasury to attain -- to attend
18  the quarterly refunding conferences?
19        MR. THEODOROU:  Objection.
20        THE WITNESS:  No.  I mean, I had gone into
21  Treasury for lots of meetings for years, you know,
22  for tax policy.  So I knew the procedure for getting
23  into Treasury.
24        BY MS. WILLIAMS:
25    Q.   So Mr. Anderson did not tell you what to

Page 104

1   do to gain clearance into Treasury?
2     A.   No.  I mean, I already knew it.
3     Q.   What if any discussions did you have with
4   Ms. Tyler about your attending the quarterly
5   refunding conferences or having been given permission
6   to attend by Mr. Anderson?
7     A.   I just made a habit of calling her on
8   Monday to make sure I was cleared in.  And she'd say
9   yeah -- because you had to -- she had to put my name
10  into the computer and my birth date and my Social
11  Security number each time.  And so I'd call her and
12  she'd enter it into the Secret Service computer and
13  I'd show up and get a badge.
14    Q.   Did you tell Ms. Tyler that Mr. Anderson
15  had given you permission to attend the quarterly
16  refunding conferences?
17        MR. THEODOROU:  Objection.
18        THE WITNESS:  It didn't work that way.
19  She was the one who said, oh, gee, if you could go to
20  the meetings you could get the charts.  And then
21  Anderson approved it.  You know, she knew.
22        BY MS. WILLIAMS:
23    Q.   I'm trying to find out how she came to
24  find out that Mr. Anderson had approved it, because
25  you --

Page 105

1     A.   How am I supposed to know?
2     Q.   You said she wasn't in attendance at the
3   meeting that you had with Mr. Anderson?
4     A.   I didn't say that.
5     Q.   I asked who else was present at the
6   meeting, and you said Mr. Anderson's assistant.  Was
7   Ms. Tyler present?
8     A.   It's possible it was her.  I just don't
9   know.  She was a voice on the other end of the phone,
10  I'm not sure I met her maybe twice and that was a
11  long time ago.
12    Q.   Was it your understanding that Ms. Tyler
13  was one of Mr. Anderson's assistants?
14    A.   She could have been or she could have been
15  Mr. Malvey's, that's a matter of record at Treasury.
16  I just -- all I know is that she was the person that
17  I would call for clearance to attend the quarterly
18  refunding meetings.
19    Q.   Besides Ms. Tyler, did you ever -- and I
20  might have asked this before, but I've forgotten --
21  did you ever call anyone else to gain clearance into
22  Treasury?
23    A.   There was one meeting when I showed up and
24  somehow, even though she said I was on the list, I
25  wasn't.  And I called upstairs and Paul Malvey

27  (Pages 102 to 105)

Peter Davis, Jr.                                                                                                          April 19, 2006
                                                   Washington, DC

| Page 106 |
|---|
| 1  actually came down and cleared me in himself on the |
| 2  spot. |
| 3  Q.  Besides that time when Mr. Malvey came |
| 4  down, do you recall anyone else clearing you into |
| 5  Treasury? |
| 6  A.  Well, I mean, there were times when like |
| 7  she would be out or something and I'd call her number |
| 8  and she wouldn't be in, and somebody else would pick |
| 9  up and I wouldn't even know who I was talking to. |
| 10  Q.  I'm sorry. |
| 11  A.  I would just explain that I'm just calling |
| 12  to get cleared into the meeting.  And you know, |
| 13  whoever it was would take care of it. |
| 14  Q.  Did you ever -- were you ever denied |
| 15  access to the quarterly refunding conference after |
| 16  you had gotten permission from Mr. Anderson to |
| 17  attend? |
| 18  A.  No. |
| 19  Q.  Do you know Mr. John Merchantson? |
| 20  A.  I don't have a clear recollection of him |
| 21  at all.  The name sounds a little familiar, but I |
| 22  don't have any recollection. |
| 23  Q.  And just a variation of my previous |
| 24  question.  You said you were never denied access. |
| 25  Were you ever asked to leave a quarterly refunding |

| Page 108 |
|---|
| 1  instead of Ms. Tyler? |
| 2  A.  I don't know.  Paul was the person who -- |
| 3  I don't know.  It didn't occur to me to send it to |
| 4  her. |
| 5  MR. STANCIL:  To be clear, do you remember |
| 6  one way or the other or are you -- or do you know? |
| 7  THE WITNESS:  No, I don't recall why I |
| 8  sent to him. |
| 9  BY MS. WILLIAMS: |
| 10  Q.  You don't recall why you sent it to |
| 11  Mr. Malvey and not to Ms. Tyler? |
| 12  A.  Right or Mr. Anderson, I just don't recall |
| 13  why. |
| 14  Q.  Did you ever contact Ms. Ousley to gain |
| 15  access -- to gain clearance to the Treasury? |
| 16  A.  It's possible, but I don't recall any -- I |
| 17  don't recall ever doing that. |
| 18  Q.  Where in the Treasury building were the |
| 19  quarterly refunding conferences held, specifically |
| 20  the Wednesday meetings? |
| 21  A.  Well, they are all held in the same place. |
| 22  I'm trying to remember whether it was the third floor |
| 23  or the fourth floor.  I remember the room number was |
| 24  4323, and I -- what I can't remember is -- I think |
| 25  the second number is the floor number.  So it was the |

| Page 107 |
|---|
| 1  conference? |
| 2  A.  No. |
| 3  MS. WILLIAMS:  I'd like to mark this as |
| 4  Exhibit 15. |
| 5  (Davis Exhibit No. 15 was marked for |
| 6  identification.) |
| 7  BY MS. WILLIAMS: |
| 8  Q.  Do you recognize this document, sir? |
| 9  A.  Yes. |
| 10  Q.  What is it? |
| 11  A.  It's a request to Paul Malvey to allow my |
| 12  assistant, Allyson Sullivan, to attend the February |
| 13  2000 quarterly refunding in my absence. |
| 14  Q.  Who drafted the document? |
| 15  A.  I did. |
| 16  Q.  Is this your signature at the bottom? |
| 17  A.  Yes. |
| 18  Q.  Why did you send this document to |
| 19  Mr. Malvey? |
| 20  A.  Because I needed to get the charts to my |
| 21  clients as usual and I was going to be out of town. |
| 22  Q.  Did Mr. Malvey respond to this letter? |
| 23  A.  I don't recall that he did, I don't think |
| 24  he did.  But Allyson was cleared in. |
| 25  Q.  Why did you send this to Mr. Malvey |

| Page 109 |
|---|
| 1  main Treasury conference room opposite the |
| 2  Secretary's office for these meetings. |
| 3  Q.  How big is the room? |
| 4  A.  It's got a large conference table, it had |
| 5  seating around it for maybe 20 people.  There was |
| 6  seating around the edges for maybe another dozen. |
| 7  Q.  Did you usually sit during the meeting? |
| 8  A.  Yes. |
| 9  Q.  Where did you sit? |
| 10  A.  It varied.  Sometimes in the back; |
| 11  sometimes right at the table. |
| 12  Q.  Did you ever ask any questions during the |
| 13  meetings? |
| 14  A.  Not initially in the early meetings -- for |
| 15  years I would just attend, get the documents and |
| 16  leave.  And some time in the later '90s, I would |
| 17  start asking a question now and then, yeah. |
| 18  Q.  Was there a time set aside for asking |
| 19  questions? |
| 20  A.  Yes.  I mean, both on Tuesday and on |
| 21  Wednesday, once the Treasury officials made standard |
| 22  presentations, there would be a time for questions. |
| 23  Q.  Were these meetings open to the public? |
| 24  A.  No. |
| 25  Q.  Who could attend the meetings? |

28  (Pages 106 to 109)

Peter Davis, Jr.

Washington, DC

April 19, 2006

Page 110

```
1    A.   Basically --
2         MR. THEODOROU:  Objection.
3         MR. STANCIL:
4         BY MS. WILLIAMS:
5    Q.   You can answer.
6         MR. STANCIL:  If you know.
7         THE WITNESS:  It was the press and me.
8         BY MS. WILLIAMS:
9    Q.   Approximately how many people on average
10   attended the meeting?
11   A.   It varied a lot.  Sometimes there would
12   only be a few of the Treasury beat reporters there,
13   sometimes there would be more.
14   Q.   When you say a few, could you give me a
15   ballpark number there?
16   A.   There was always going to be about
17   anywhere from say 6 to 10 Treasury people there.  And
18   there was usually at least as many reporters.
19   Sometimes I think on a few occasions there were only
20   five or six reporters, but on other occasions, like
21   especially October 31st, 2001, there was like maybe
22   40 or 50 reporters and far more Treasury officials.
23   Q.   About how many Treasury officials would
24   you estimate were present at the October 31st, 2001
25   conference?
```

Page 111

```
1    A.   Well, that was Peter Fisher's first
2    announcement when he became undersecretary.  And
3    Malvey was there, Ousley was there, there were at
4    least another dozen Treasury officials of various --
5    you know, and staff.  And you know, there were
6    communications people just set up, you know, like,
7    you know, communications.  And there were people, you
8    know, clerks handling the documents and so on.
9    Q.   Did you speak to Mr. Malvey at the October
10   31st, 2001 meeting?
11   A.   Yes.
12   Q.   Do you recall what you discussed?
13   A.   I was sitting in the front row and he came
14   in with Fisher.  And before the meeting started and
15   this of course was on the Wednesday, on the final
16   announcement, I mean, there wasn't --
17   there weren't enough chairs for him and for Fisher
18   and for one other Treasury official.  And so I
19   forget, I said, Paul, do you went to take my chair
20   and we did some discussion about the chairs.
21   Q.   Did you have any other discussions with
22   Mr. Malvey?
23   A.   No.
24   Q.   Did you say Ms. Ousley was present?
25   A.   She must have been, but I don't
```

Page 112

```
1    specifically recall her there, it was a very crowded
2    meeting.
3    Q.   Were the doors to the Treasury quarterly
4    refunding conferences usually closed?
5    A.   It varied.  I mean, sometimes they were,
6    and sometimes they weren't.
7    Q.   Do you know why they were sometimes not
8    closed?
9    A.   No.
10        MR. THEODOROU:  Objection.
11        BY MS. WILLIAMS:
12   Q.   Do you recall whether they were open or
13   closed on October 31st, 2001?
14   A.   They were closed.
15   Q.   Did you stay for the entire October 31st,
16   2001 conference on that Wednesday?
17   A.   Yes.
18   Q.   Did you usually stay for the entire
19   Wednesday conference?
20   A.   Yes.
21   Q.   Do you know if Ms. Ousley still works for
22   the Treasury Department?
23   A.   I have no idea.  She was fairly close to
24   retirement age back then, but I have no idea.
25   Q.   How far in advance of the quarterly
```

Page 113

```
1    refunding conferences did you find out the date of
2    the conference?
3    A.   They would announce them in the documents
4    that came out at each quarterly refunding.  So when
5    you got the documents, it would say on it when the
6    next one was going to be.  And it was pretty standard
7    according to the calendar anyway, it was always the
8    first Tuesday and Wednesday of February, May, August,
9    November.  Sometimes it was straddled another month
10   like it did on October 31st, so therefore the
11   November meeting was actually in October.
12   Q.   You mentioned that the conference had an
13   element that went on on Tuesday, there was a meeting.
14   And then Wednesday.
15   A.   Right.
16   Q.   Did anything occur on Monday, the Monday
17   before --
18   A.   Well, on Monday afternoons usually at 2 or
19   3 o'clock, Treasury would issue a press release
20   announcing their borrowing requirement for the
21   quarter.  But that would not be at a meeting, they
22   would just announce it.
23   Q.   Would you pick up a copy of this press
24   release?
25   A.   I didn't deal with that.  That was
```

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

---

Page 114

1  something that was like just when it came out it
2  instantly went over the wires, there was no
3  particular reason for me -- I couldn't really add
4  anything, so I just didn't go to it. In fact, there
5  was no meeting, so there was just nothing to do there
6  so -- so that's not anything I paid any attention to.
7      Q.  Before lunch we were discussing the term
8  embargo.
9      A.  Right.
10     Q.  And that you agreed to abide by the
11 embargo at the Treasury quarterly refunding
12 conferences. How did you come to an understanding of
13 what the embargo was?
14     MR. THEODOROU: Objection.
15     THE WITNESS: I mean, when I signed that
16 confidentiality agreement, there was language in
17 there that said not to disclose the information until
18 the embargo time. So that was pretty much it.
19     BY MS. WILLIAMS:
20     Q.  Before you signed the confidentiality
21 agreement, had you heard the term embargo used with
22 regard to information at Treasury?
23     A.  No.
24     Q.  Did you have any discussions with
25 Mr. Anderson about what the term embargo meant?

---

Page 115

1      A.  Not really.
2      Q.  When you signed the confidentiality
3  agreement, did you have an understanding of what the
4  embargo --
5      A.  Sure. It's a common term of art in
6  Washington.
7      MR. THEODOROU: Objection.
8      BY MS. WILLIAMS:
9      Q.  When you say it is a common term of art in
10 Washington, can you tell me what you mean?
11     MR. THEODOROU: Objection.
12     THE WITNESS: I mean, like I was aware
13 that the Bureau of Labor and Statistics puts out the
14 unemployment rate. The reporters are given a report
15 for a period of time, and it is embargoed until it
16 comes out. This is sort of common knowledge.
17     BY MS. WILLIAMS:
18     Q.  When you say this is sort of common
19 knowledge, what do you mean by that?
20     MR. THEODOROU: Objection.
21     THE WITNESS: It's common knowledge, you
22 know, it's --
23     BY MS. WILLIAMS:
24     Q.  Had you had any prior experience with
25 embargoes before you started attending the Treasury

---

Page 116

1  quarterly refunding conferences?
2      A.  Sure.
3      Q.  Can you tell me where you had experience
4  with embargoes before you started attending the
5  quarterly refunding conferences?
6      A.  They happen all the time on the Hill where
7  I worked. When there are briefings for press,
8  certain kinds of information. And there's an embargo
9  until a certain time before it is released to the
10 public.
11     Q.  And during the time the embargo is in
12 place, what are people who are subject to the embargo
13 allowed to do or what are they not allowed to do?
14     MR. THEODOROU: Objection.
15     THE WITNESS: All I know is I'd be sitting
16 there as a staff person, there'd be a briefing, the
17 reporters would leave, I'd leave. And, you know,
18 that was -- that was -- you know, they were told it
19 was embargoed until a certain time and everybody
20 left. I -- that's all I saw.
21     BY MS. WILLIAMS:
22     Q.  Were the reporters allow to disclose the
23 information that was embargoed prior to the time the
24 embargo time was up?
25     MR. THEODOROU: Objection.

---

Page 117

1      THE WITNESS: They would be calling their
2  editors or whatever, or at least I assumed they were
3  calling their editors.
4      BY MS. WILLIAMS:
5      Q.  Were they allowed to release information
6  to the public before the embargo time was up?
7      MR. THEODOROU: Objection.
8      THE WITNESS: My understanding was that
9  embargo meant that it wouldn't be released to the
10 public until the embargo time.
11     BY MS. WILLIAMS:
12     Q.  What was your understanding of the purpose
13 of the embargo at Treasury?
14     MR. THEODOROU: Objection.
15     THE WITNESS: The purpose was not to
16 release it to the public before the embargo time.
17     BY MS. WILLIAMS:
18     Q.  How was the embargo with regard to the
19 Treasury quarterly refunding conferences set?
20     A.  It varied. There would usually be a press
21 officer of some kind from the Treasury at these
22 meetings, and it varied who it was. And at the end
23 of the question period, that press officer would
24 stand up and say, okay, it's such and such time, how
25 about a ten-minute embargo. And the reporters would

---

30 (Pages 114 to 117)

1111 14th Street, NW Suite 400                                     Washington, DC 20005

Peter Davis, Jr.                                                                April 19, 2006

Washington, DC

Page 118

1  nod and say -- he would say, okay, it's 10 minutes,
2  the embargo time would be X. It was usually ten
3  minutes.
4      Q.  And you said that sometimes it varied.
5      A.  Right.
6      Q.  How did it vary from what you just
7  discussed?
8      A.  It would -- well, first of all, it varied
9  in duration. Most of the embargoes were ten minutes.
10  I seem to recall one for 15 and the only other time
11  that I recall any other -- in other words, almost all
12  of them were ten minutes. One was I think 15 and the
13  one on October 31st, 2001 was half an hour, which was
14  unprecedented in my experience.
15      Q.  How was the embargo on October 31st, 2001
16  set?
17          MR. THEODOROU: Objection.
18          THE WITNESS: The press officer stood up
19  before the meeting and said this is embargoed and
20  we'll set the embargo time at the end. At the end,
21  he stood up and said, okay, this is embargoed until
22  10:00 a.m. and the meeting ended at 9:30.
23          BY MS. WILLIAMS:
24      Q.  Who was the press officer that stood --
25      A.  I don't recall.

Page 119

1      Q.  Do you recall if it was a male or a
2  female?
3      A.  It was a male.
4      Q.  Prior to the October 31st, 2001 meeting,
5  did you have any knowledge as to what the embargo was
6  going to be on October 31st?
7      A.  No. The only time you'd find out the
8  embargo time is on the spot in the room at the end of
9  the question and answer period.
10      Q.  Now, you stated that the purpose of the
11  embargo was not to release the information to the
12  public until the embargo time was up.
13      A.  Right.
14      Q.  Do you know why the information was not to
15  be released to the public until the embargo time?
16          MR. THEODOROU: Objection.
17          THE WITNESS: Nobody ever told me that.
18          BY MS. WILLIAMS:
19      Q.  Did you ever ask anyone?
20      A.  No.
21      Q.  Were you given any information as to
22  whether there was a penalty for violating the embargo
23  at Treasury?
24      A.  When I signed the confidentiality
25  agreement, there was language at the end of the form

Page 120

1  about that. I don't really recall what it said or --
2  but, you know, it did refer to some U.S. code section
3  or something like that.
4      Q.  Did you agree that if you violated the
5  embargo, you would be subject to that penalty?
6          MR. THEODOROU: Objection.
7          THE WITNESS: That was part of the written
8  document, that's what I signed, yeah.
9          BY MS. WILLIAMS:
10      Q.  Do you know who enforced the penalty at
11  Treasury?
12      A.  No.
13      Q.  For the quarterly refunding conferences
14  that you attended at Treasury, was there always an
15  embargo discussed during those conferences?
16      A.  Yes. On Wednesday --
17      Q.  On Wednesday.
18      A.  Well, I'm trying to think, on Tuesdays?
19  I'm not sure. I think there were embargoes on both
20  days, but I'm certain there were on Wednesdays. I'm
21  not sure.
22      Q.  With regard to the Wednesday portion of
23  the conference, do you recall whether an embargo was
24  always set?
25      A.  Yes, it was. Yes, there was -- there was

Page 121

1  always an embargo on Wednesdays.
2      Q.  What, if any, documents were distributed
3  at the Wednesday quarterly refunding conferences?
4      A.  There were several different sets of
5  documents. There would be the Treasury press release
6  announcing the quarterly refunding issuance itself,
7  particular notes and bonds and so on.
8          There would be the minutes of the advisory
9  committee, and the recommendation of the advisory
10  committee. And there would be the same set of charts
11  that had been handed out the day before, but with
12  certain additional tables added to it that pertained
13  to the other documents. And so there was a more
14  complete set of charts that came out. And so you'd
15  get a big stack of paper at the end of the meeting or
16  actually they'd have it available during the meeting
17  and, you know, you could ask questions off of it and
18  so on.
19      Q.  Did you obtain the documents -- just to
20  clarify, did you obtain the documents when you went
21  into the conference?
22      A.  Usually. Sometimes they had copying
23  problems or they discovered an error at the last
24  minute and you'd get the documents at the end.
25      Q.  Do you recall if any of the documents

31 (Pages 118 to 121)

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

---

Page 122

1  contained any language regarding an embargo?
2       A.  The Treasury press release on the
3  refunding details certainly had language like that.
4  None of the other documents did.
5       Q.  Do you know if any of the releases that
6  you obtained at the conference ever said that they
7  were -- this is a press release -- ever said that
8  they were for immediate release?
9       A.  You know, that was one of the weird things
10  on October 31st was I recollected it did say that on
11  the press release, which was kind of weird because
12  they still went ahead and set an embargo time.
13       Q.  Did you understand that the information
14  was still embargoed until 10:00 a.m. even though it
15  said for immediate release?
16           MR. THEODOROU:  Objection.
17           THE WITNESS:  Yes, yes.
18           MS. WILLIAMS:  Can we take a short break,
19  like a two-minute.
20           THE WITNESS:  Sure.
21           THE VIDEOGRAPHER:  Off the record at
22  1:32:38 p.m.
23           (Discussion off the record.)
24           THE VIDEOGRAPHER:  Back on the record at
25  1:34:30 p.m.

---

Page 123

1           MS. WILLIAMS:  I would like to have this
2  document marked as Exhibit 16.
3           (Davis Exhibit No. 16 was marked for
4              identification.)
5           BY MS. WILLIAMS:
6       Q.  Do you recognize this document, sir?
7       A.  Yes.
8       Q.  What is it?
9       A.  It was a sort of step by step instructions
10  for Allyson before that meeting that I couldn't
11  attend in early February of 2001.
12       Q.  Who drafted the document?
13       A.  I did.
14       Q.  Is it a true and correct copy of the
15  document you drafted --
16       A.  Yes.
17       Q.  -- January 24th, '01?
18           You said that this was created for Ms.
19  Sullivan?
20       A.  Um-hum.
21       Q.  Did you distribute this document to Ms.
22  Sullivan?
23       A.  Um-hum.
24       Q.  Did anyone else receive a copy of the
25  document?

---

Page 124

1       A.  I had an outgoing assistant, Kristen
2  Caiola, and so I think they both saw it.
3       Q.  Why did you draft this document?
4       A.  Because I wasn't going to be there, and I
5  just wanted to make sure that she knew how to get
6  there and knew what the drill was.
7       Q.  Did you follow these same instructions
8  when you attended Treasury's quarterly refunding
9  conferences?
10       A.  Yes.  So I see I had the room number
11  wrong, it was 3223.
12       Q.  Instead of the number --
13       A.  I remembered it was on the third floor,
14  but the room number was 3223 here in the
15  instructions.
16       Q.  And you believe that this was a correct
17  room number?
18       A.  Yes.
19       Q.  Was the -- that was for the Tuesday
20  meeting.  Was the Wednesday meeting also head in room
21  3223, you believe?
22       A.  Yes.
23       Q.  The memo states that -- and I'm 1, 2, 3,
24  the fourth paragraph down.
25       A.  Um-hum.

---

Page 125

1       Q.  Sit on the back left.  Why did you write
2  that?  Do you see where I'm referring, the fourth
3  sort of paragraph down?
4       A.  I guess that's just where I usually sat.
5       Q.  Is there any particular reason why you
6  instructed Ms. Sullivan in this document to sit on
7  the back left?
8       A.  I just said, it's where I usually sat.  I
9  mean, this is a fairly small room so you're still 20
10  feet away from the speaker.
11       Q.  And then under Wednesday, and I'm below
12  number 4, the line, when you get back to the office
13  fax the auction schedule 2, 3, 4 to list 3; what does
14  that mean?
15       A.  Those were particular pages in the -- 2, 3
16  and 4 -- those were particular pages in the charts
17  that I was talking about.  And list 3 was the
18  broadcast fax list for distributing those particular
19  pages to clients.
20       Q.  Who would have been listed on list 3?
21           MR. THEODOROU:  Objection.
22           THE WITNESS:  You know, clients.
23           BY MS. WILLIAMS:
24       Q.  Clients of Davis Capital?
25       A.  Right.

---

32 (Pages 122 to 125)

Peter Davis, Jr.                                                        April 19, 2006
Washington, DC

| Page 126 | Page 128 |
|---|---|

**Page 126**

1  Q.  You then wrote, note the embargo time,
2  what did you mean by that?
3       MR. THEODOROU: Objection.
4       THE WITNESS: That it shouldn't go out
5  before the embargo time.
6       BY MS. WILLIAMS:
7  Q.  When you say it, what are you referring
8  to?
9  A.  That facts of those particular charts and
10 schedules.
11 Q.  And then under that, I see, immediately
12 after exiting Treasury, call the following clients in
13 order; do you see that?
14 A.  Um-hum.
15 Q.  When you say immediately after exiting
16 Treasury, what do you mean by that?
17      MR. THEODOROU: Objection.
18      THE WITNESS: It says immediately after
19 exiting Treasury, call the following clients.
20      BY MS. WILLIAMS:
21 Q.  Let me be more specific.  Did you mean
22 during the time when the information was embargoed?
23      MR. THEODOROU: Objection.
24      THE WITNESS: Yes.
25      BY MS. WILLIAMS:

**Page 128**

1       THE WITNESS: Well, he was the person who
2  had originally expressed interest in getting these
3  charts.  And you know, it was his interest that
4  prompted me to go contact Treasury to get the charts
5  and set off the whole -- just set off the whole
6  sequence of events that led to my attending the
7  quarterly refunding meetings.
8       BY MS. WILLIAMS:
9  Q.  And what if any discussions did you have
10 with Mr. McCarthy about him honoring the embargo?
11 A.  Well, at some point in 1999, and I'm not
12 sure exactly when, but say a year and a half before
13 the October 31st 2001 meeting, somewhere around in
14 there, Ward McCarthy called me up and asked if I
15 could share the information with him before the
16 embargo time so that he could have his story ready to
17 go at the embargo time, you know, like as if he
18 were -- I mean, because otherwise, you know, he was
19 at a disadvantage because of all the reporters in the
20 room would have their stories go up right at the
21 embargo time and his would come out 15, 20, 30
22 minutes later.
23 Q.  Did you have any discussions with any of
24 the other people at the bottom of this list, 1
25 through 7, about honoring the embargo?

| Page 127 | Page 129 |
|---|---|

**Page 127**

1  Q.  And then under that, it says, stating,
2  number 1, the embargo time.  Do you see that?
3  A.  Yes.
4  Q.  Why did you include in these instructions
5  that immediately after exiting Treasury, call the
6  following clients, in order, stating the embargo
7  time?
8       MR. THEODOROU: Objection.
9       THE WITNESS: I wasn't sure they would
10 know it.  They might, and I just want to make sure.
11      BY MS. WILLIAMS:
12 Q.  What if any expectations did you have that
13 the clients would obey the embargo?
14      MR. THEODOROU: Objection.
15      THE WITNESS: I didn't.  There was no -- I
16 mean, Ward had asked me and said he would honor the
17 embargo time, but I had no understanding with anybody
18 else.
19      BY MS. WILLIAMS:
20 Q.  Mr. McCarthy had told you that he would
21 honor the embargo?
22 A.  (The witness nodded.)
23 Q.  You say he asked you, what had he asked
24 you?
25      MR. THEODOROU: Objection.

**Page 129**

1  A.  No, no.
2  Q.  Why did you include in this instruction to
3  state the embargo time?
4       MR. THEODOROU: Objection.
5       THE WITNESS: I just thought it was
6  important for them to know the embargo time, so
7  that's why it's there.
8       BY MS. WILLIAMS:
9  Q.  Why did you think it was important for the
10 people -- the clients to know the embargo time?
11      MR. THEODOROU: Objection.
12      THE WITNESS: So they could honor it.
13      BY MS. WILLIAMS:
14 Q.  You then on number 2, you write describe
15 the securities.  And then there's a parenthetical
16 there.
17 A.  Um-hum.
18 Q.  What securities are you referring to?
19 A.  Well, that's what's in the press release.
20 It's just the -- you know, the amount of 5, 10s and
21 30s that Treasury was going to issue in the coming
22 refunding?
23 Q.  And then under number 3, I see cite
24 Treasury and remarks of interest, do you see that?
25 A.  Yes, I do.

Alderson Reporting Company
1-800-FOR-DEPO

Peter Davis, Jr.                                                                April 19, 2006
Washington, DC

Page 130

1    Q.  Can you give some examples of what remarks
2  of interest?
3    A.  It was important to know if a particular
4  security was going to be new issue or whether it was
5  going to be reopened, reopening of an old issue.
6  Sometimes there would be buy backs, so there was
7  additional information that was important.
8    Q.  Was there -- were there any Treasury
9  remarks of interest mentioned at the October 31st,
10  2001 conference?
11    A.  Well, I mean, the most important and the
12  thing that dwarfed everything else was the cessation
13  of the 30-year bond.
14    Q.  At the bottom of this Exhibit 16, I see a
15  list of names.  Who are these individuals?
16    A.  Clients.
17    Q.  Does Mr. Nothern's name appear on this
18  list?
19    A.  Yes.
20    Q.  Does the number that appears next to
21  Mr. Nothern's name a number that you used to contact
22  him?
23    A.  Yes.
24    Q.  Do you know what number that was?
25    A.  It is a telephone number.

Page 131

1    Q.  Do you know if it was his home, cell, work
2  number?
3    A.  It's his work number, at MFS.
4    Q.  Is this list in any particular order?
5    A.  It's in the order I would make calls.
6    Q.  Why did you make the calls in this order?
7  Why did you, for example, call Mr. McCarthy first?
8    A.  Like I said before, it would depend on the
9  longevity and what my -- you know, if they were a big
10  client or small client.  And sort of, you know, how
11  important, you know, the information was to them and
12  so on.  So that was just my order in which I called
13  people.
14    Q.  In January -- specifically on January 24th
15  of 2001, did you have clients that do not appear on
16  this document?
17    A.  Sure, I had lots of clients.
18    Q.  How did you determine whose name would
19  appear on this document?
20    MR. THEODOROU:  Objection.
21    THE WITNESS:  It was -- in Ward's case, it
22  was his expressed interest.  In every other case, it
23  was people that I just, on my own volition, contacted
24  without any request on their part.
25    BY MS. WILLIAMS:

Page 132

1    Q.  What, if anything, did you tell the
2  clients on this list besides Mr. McCarthy, who we've
3  already discussed, the other people on the list, what
4  if anything did you tell them about your attendance
5  at the Treasury quarterly refunding conference?
6    MR. THEODOROU:  Objection.
7    THE WITNESS:  I'm not even sure if they
8  knew.  Ward knew, but, you know, I'm not -- in fact,
9  I'm pretty sure some of those people on that list
10  didn't know.
11    BY MS. WILLIAMS:
12    Q.  Did you ever tell Mr. Nothern that you
13  attended Treasury's quarterly refunding conferences?
14    A.  No.
15    Q.  Did you ever tell him you attended any
16  meetings at Treasury, besides the meetings that he
17  attended with you?
18    A.  No.
19    Q.  Did you ever tell him you had any sources
20  at Treasury?
21    A.  Sure.
22    Q.  Did Mr. Nothern -- did you ever discuss
23  with Mr. Nothern that were you able to obtain
24  information from Treasury before the information was
25  announced in the media?

Page 133

1    A.  No.
2    MR. THEODOROU:  Objection.  What was that
3  answer?
4    THE WITNESS:  No.
5    MR. ROSSETTI:  Object anyway.
6    BY MS. WILLIAMS:
7    Q.  So Mr. Nothern never expressed interest in
8  obtaining information from Treasury refunding
9  conferences?
10    A.  No, no, no.
11    Q.  But you would send him information from
12  those conferences?
13    A.  Right, when I got back to the office, long
14  after the embargo time, I'd broadcast fax the charts
15  that we selected.
16    Q.  You had instructions to call him before
17  the embargo was expired?
18    MR. THEODOROU:  Objection.
19    THE WITNESS:  You have to understand that
20  the embargo time almost invariably expired before any
21  such calls could be made.  In fact, on the particular
22  date that Allyson was there, she didn't even get out
23  of the building.  None of the calls were ever made.
24    BY MS. WILLIAMS:
25    Q.  Did you ever call Mr. Nothern before the

34  (Pages 130 to 133)

1    Q.  Do you believe that this fax cover sheet
2  was used to transmit documents to clients?
3        MR. THEODOROU:  Objection.
4        THE WITNESS:  Yes.
5        BY MS. WILLIAMS:
6    Q.  What charts -- do you know what charts you
7  would have been referring to here?
8    A.  I recall one particular table.  The other
9  ones, I don't recall.  But there was a particular
10  table about foreign holdings of Treasuries that was
11  the key piece of information that people wanted once
12  it was released.  There were other -- the chart book
13  had like 20, 30 pages of charts and tables in it and
14  I forget which other ones I would pull out.
15    Q.  I'd like to have this marked as Exhibit
16  25.
17        (Davis Exhibit No. 25 was marked for
18        identification.)
19        BY MS. WILLIAMS:
20    Q.  I'm just going to be referring actually to
21  the first page of the document.
22    A.  Um-hum.
23    Q.  Do you -- do you recognize this document?
24    A.  Yeah, I forget the name of the company,
25  but I had a -- you know, broadcast fax service.  And

1  I had a preexisting list to which I -- so remember
2  earlier when we talked about list 3, I just dial-up
3  the service, I'd punch in list 3, and it would send
4  out the documents to these.  And this is a report of
5  what was sent out.
6    Q.  On what date?
7    A.  October 30th.
8    Q.  Of what year?
9    A.  2001.
10    Q.  And so the people who are listed under
11  recipient on this list, would those have been people
12  on list 3?
13    A.  Yes, you notice on the left there, where
14  it says list number 3.
15    Q.  Do you see Mr. Nothern's name on this
16  list?  And I'd refer to you the third from the
17  bottom.
18    A.  Yes.
19    Q.  And then under PGS, which I think is
20  pages --
21    A.  Um-hum.
22    Q.  -- do you see the number 5?
23    A.  Yes, it says five pages.
24    Q.  If I could refer you back to number --
25  Exhibit Number 24, the fax cover sheet.

1    A.  Right.
2    Q.  That also was a five-page document that
3  you sent with the fax cover sheet?
4    A.  Um-hum.
5        MR. THEODOROU:  Objection.
6        BY MS. WILLIAMS:
7    Q.  Is that correct?
8    A.  Yes.
9    Q.  Do you know whether this report is related
10  to the fax that --
11    A.  I don't.
12    Q.  -- the fax cover sheet?
13    A.  I don't.
14    Q.  But do you think that you sent a five-page
15  fax on October 30th, 2001, which relates to this
16  delivery report?
17    A.  I don't know if this delivery report
18  relates to this cover page or not.
19    Q.  I understand.  Separating those two
20  documents, just this delivery report, does this
21  indicate to you that you sent a five-page fax to the
22  people on this list?
23    A.  Yes.
24    Q.  On October 30th.  And then if you could
25  refer to the last column, STAT?

1    A.  Right.
2    Q.  What does that show?
3    A.  It is just an indication on whether the
4  fax was received by another fax machine at the other
5  end, so it is an abbreviation for successful
6  transmission.
7    Q.  With regard to Mr. Nothern, the line with
8  Mr. Nothern, does this document indicate to you or
9  what does this document indicate to you with regard
10  to whether the fax was sent through successfully?
11    A.  It says that it was successfully received
12  by a fax machine at that phone number.
13    Q.  Sitting here today, do you have any
14  recollection as to what this five-page fax contained?
15    A.  None.
16    Q.  I want to talk to you a little bit about
17  the October 31st Treasury quarterly refunding
18  conference, did you attend that conference?
19    A.  Yes.
20    Q.  What time did the conference start?
21    A.  9:00 a.m.
22    Q.  Did you arrive on time?
23    A.  I was there early.
24    Q.  How early did you arrive?
25    A.  I don't know, 8:30, 8:40.  I was there at

Peter Davis, Jr.

April 19, 2006

Washington, DC

| Page 166 |
|---|

1 least 15 or 20 minutes ahead of the meeting.
2     Q.   Where was the conference held?
3     A.   It was in a different room. And I forget
4 which one. It was a bigger room. It's in this
5 release, yeah, 33 -- 3311.
6     Q.   Had you attended any other conferences in
7 room 3311?
8     A.   No.
9     Q.   You said it was a bigger room, could you
10 describe the layout of the room?
11     A.   It was just a larger room, there was a
12 podium set up in the front and there was theater
13 seating with an aisle down the middle with seating
14 for maybe 50 or 60 people.
15     Q.   What did you do when you arrived at 8:30?
16     A.   I moved to the front row and sat -- sat
17 down.
18     Q.   Did you speak to anyone when you arrived
19 before the meeting started?
20     A.   I might have. I -- the only specific
21 recollection I have is that when Malvey came in with
22 Fisher and there was not seating there, I remember
23 talking to Paul and offering him a seat.
24     Q.   And I might have asked this, but just to
25 clarify, how did you gain access to Treasury on

| Page 167 |
|---|

1 October 31st?
2     A.   I called up as usual, I don't have a
3 specific recollection as to whether it was to Lulu or
4 not, and it was that phone number -- but I got
5 cleared in. And when I went to get my badge that
6 morning I was given a visitor's pass, which was
7 different than what I had received at every other
8 meeting. And I didn't question it, I just took the
9 pass and went up to the room.
10     Q.   What did you usually receive at meetings
11 instead of a visitor's pass?
12     A.   Usually it was a yellow official -- I
13 forget what it said on it, but it was a different
14 badge. I mean, it's not like I was just going to see
15 the exhibits in the cash room or something, it was a
16 budge.
17     Q.   When you arrived at Treasury, did someone
18 come to greet you?
19     A.   No.
20     Q.   Where did you go once you arrived at the
21 building on October 31st?
22     A.   Well, you go through security, you go to
23 the officer who checks your I.D. and he sees me on
24 the list, he gave me a visitor's pass. And then he
25 buzzed me in, I was on my own to get up to the room

| Page 168 |
|---|

1     Q.   When the conference started, can you walk
2 me through what happened generally at that
3 conference?
4     A.   Lights and cameras came on, Peter Fisher
5 read a statement, took some questions. There was an
6 announcement that there would be an embargo before,
7 and then there was a specific -- in fact, that's
8 right, the embargo time was declared to be 10 o'clock
9 before, and that was unusual, too. And that was the
10 first I'd heard it. And then it was repeated at the
11 end.
12     Q.   Just to clarify, did someone make a
13 statement that the embargo time was 10:00 a.m.?
14     A.   Yes, the press officer, whoever it was,
15 made a statement at the beginning of the meeting that
16 this is embargoed until 10:00, and he repeated that
17 at the end, which was really unusual because it had
18 never happened before that there was an embargo time
19 announced before the meeting.
20     Q.   Did you pick up any documents before the
21 conference started?
22     A.   They eventually passed out documents
23 shortly before it started.
24     Q.   Do you recall what those documents were.
25     A.   It was a standard press release. I don't

| Page 169 |
|---|

1 recall whether the rest of the materials that were
2 usually released were released before or after -- you
3 know, there was a standard packet of documents,
4 advisory committee minutes and report and charts and
5 so on.
6     Q.   You said that Mr. Fisher read a statement.
7     A.   Yes.
8     Q.   What was his statement about?
9     A.   It was the quarterly refunding
10 announcement, but he had some additional remarks.
11 And I don't really remember what they were. I mean,
12 you know, something about sort of a general policy
13 statement about Treasury debt management or something
14 like that. I didn't focus on that part of it.
15     Q.   What, if anything, did Mr. Fisher's
16 statement include regarding the 30-year bond?
17     MR. THEODOROU:  Objection.
18     THE WITNESS:  Mr. Fisher stated that
19 Treasury would cease issuing the 30-year, it was not
20 going to issue the 30-year as the market expected.
21     BY MS. WILLIAMS:
22     Q.   Was this included in that statement that
23 he read?
24     A.   Yes.
25     Q.   You said that they took questions after --

43  (Pages 166 to 169)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

---

Page 170

1    A.  Yes, they did.
2    Q.  How long did Mr. Fisher speak before the
3    questions?
4    A.  Well, the meeting started at like 9:02 or
5    9:03 or something like that.  And he started taking
6    questions about -- I don't know, 9:15, 9:18,
7    something like that.  And my recollection -- I looked
8    at my watch when I left and it was 9:30.  And I'm
9    very careful about making sure my watch is accurate,
10   I always call up the national time clock.
11   Q.  Did you ask any questions during the
12   October 31st --
13   A.  I raised my hand and almost did, and then
14   I decided I was so angry about what they were doing
15   that I just put my hand down and he called on
16   somebody else.
17   Q.  Why were you angry about what they were
18   doing?
19   A.  Because they were going to stick the
20   taxpayers with roughly a billion dollars worth of
21   interest expense by not issuing long bonds when
22   interest rates were the lowest they had been in two
23   generations since the Depression.  And every other
24   homeowner in the country was trying to lengthen their
25   maturities to get lower payments, Treasury was doing

---

Page 171

1    the opposite, which was creating an expense, a future
2    expense when the shorter maturities rolled over,
3    taxpayers today are now paying a lot more interest
4    expense.
5    Q.  So what, if any, impact did you believe
6    that the announcement that the 30-year bond would no
7    longer be issued, what if any impact did you think
8    that would have on the market?
9        MR. THEODOROU:  Objection.
10       THE WITNESS:  I anticipated it was going
11   to surprise the market, that it was a total reversal
12   of Treasury policy, that it was done for political
13   reasons and I was just furious at what they were
14   doing.
15       BY MS. WILLIAMS:
16   Q.  Had you heard any rumors that the 30-year
17   bond might be cancelled before you attended this --
18   A.  No, but there was a lot of speculation
19   starting in early 2000 that they would.  And I kept
20   asking people and they kept saying the standard
21   response.  You know, several times Treasury officials
22   told me in these meetings, and you know, for
23   attribution later on and all that, that, you know, no
24   change in policy, you know, we anticipate offering
25   the 30-year.

---

Page 172

1        And so the last time, in my estimation,
2    that the market expected the 30-year to be -- you
3    know, expected the cessation of the 30-year was in
4    the May or possibly in the August meeting.  And by
5    the October 31st meeting of 2001, the market had
6    given up, just concluded that it doesn't make any
7    sense for Treasury to get rid of it now.
8        Over the summer, in fact, even earlier
9    than that, in the spring and the summer, I had been
10   one of the first people in Washington to say that the
11   federal deficit was going straight up.  And if the
12   deficit is going straight up, the last thing you want
13   to do is take away one of the ways to finance it,
14   especially when interest rates are the lowest they've
15   been in 70 years.  And so it just made no sense and
16   so I was pretty upset about it.
17   Q.  Did you think that this announcement that
18   the 30-year bond was going to be cancelled would have
19   any impact on your clients?
20   A.  Sure.
21   Q.  And what kind of impact did you think it
22   might have?
23       MR. THEODOROU:  Objection.
24       THE WITNESS:  I thought it might hurt
25   them.  I knew it was going to hurt the public, I

---

Page 173

1    impulsively warned people.
2        BY MS. WILLIAMS:
3    Q.  Did you think that this announcement would
4    have any effect on the price of the bond?
5    A.  Sure.
6    Q.  What kind of --
7    A.  Goes straight up, the biggest one day move
8    in the 30-year in history of the country.
9    Q.  Did you take any notes during this
10   conference?
11   A.  No, I had the materials in front -- at
12   least not that I recall.  I don't -- I don't recall
13   taking any notes.
14   Q.  Let me ask you to look at this --
15   A.  Maybe, I don't know.  It's a long time
16   ago, I don't recall.
17   Q.  Let me ask you to look at what I'm going
18   to have marked as Exhibit 26.
19       (Davis Exhibit No. 26 was marked for
20       identification.)
21       THE WITNESS:  Yes, I did take notes, this
22   is my handwriting.
23       BY MS. WILLIAMS:
24   Q.  You recognize the handwriting on this
25   document?

---

44 (Pages 170 to 173)

1111 14th Street, NW Suite 400                    Washington, DC 20005

Peter Davis, Jr.

Washington, DC

April 19, 2006

## Page 174

1    A.    It is my handwriting.

2    Q.    What date did you take these notes?

3    A.    It is dated 10/31/01.

4    Q.    Do you know where you were when you took

5    these notes?

6    A.    3311 U.S. Treasury Department.

7          MR. STANCIL:  Can I ask you a question?

8    I'm sorry to interrupt.

9          MS. WILLIAMS:  Sure.

10         MR. STANCIL:  Does this go with other

11   pages or --

12         MS. WILLIAMS:  This was the only page that

13   I found.

14         MR. STANCIL:  Can we go off the record for

15   one second?

16         MS. WILLIAMS:  Sure.

17         THE VIDEOGRAPHER:  Off the record at

18   3:06:26 p.m.

19         (Discussion off the record.)

20         THE VIDEOGRAPHER:  Back on the record at

21   3:07:59 p.m.

22         BY MS. WILLIAMS:

23    Q.   Mr. Davis, before we went off the record,

24   I was asking you about what's been marked as Exhibit

25   26.

## Page 175

1    A.    Um-hum.

2    Q.    You stated that these were handwritten

3    notes that you took and that the document was dated

4    10/31/01?

5    A.    Correct.

6    Q.    And as far as -- where were you when you

7    took these notes?

8    A.    I was in the quarterly refunding meeting

9    in room 3311 of the U.S. Treasury.

10    Q.   Can I refer you to the top right-hand

11   corner of the notes?

12    A.   Yes.

13    Q.   What's written in the top right-hand

14   corner?

15    A.   10:00 a.m. embargo.

16    Q.   Did you take any of these notes before the

17   conference started?

18    A.   No.

19    Q.   In the body of the document, I see some

20   phrases, and I see some quotation marks, do you see

21   those?

22    A.   Yes.

23    Q.   Do you know why there are certain things

24   on this document that are in quotation marks?

25    A.   I was quoting Fisher.

## Page 176

1    Q.    Peter Fisher was making the statement

2    during the Wednesday quarterly refunding conference

3    meeting?

4    A.    Correct.

5    Q.    Did you distribute these notes to anyone?

6    A.    No.

7    Q.    Did you use --

8    A.    Although I did -- I may have extracted

9    some of the quotes in an E-mail to clients later on.

10   In other words, I didn't just send out my notes, but,

11   you know, I may have taken some of the quotations and

12   put them into an E-mail to clients.

13         MS. WILLIAMS:  I'd like to have this

14   marked as Exhibit 27.

15         (Davis Exhibit No. 27 was marked for

16         identification.)

17         BY MS. WILLIAMS:

18    Q.   Do you recognize what's been marked as

19   Exhibit 27?

20    A.   Yes, these are the written remarks of

21   Undersecretary Peter Fisher on October 31st, 2001.

22    Q.   Do you know if you obtained a copy of this

23   document on October 31st, 2001?

24    A.   Yes, this was passed out just prior to his

25   making the remarks.

## Page 177

1    Q.    Did you -- were you able to read the

2    document before Mr. Fisher made his remarks?

3    A.    It was passed out shortly before, so

4    people were perusing it for a few seconds before he

5    started.

6    Q.    Can I refer you to the top left-hand

7    corner where it says for immediate release?

8    A.    Yes, it does say that.

9    Q.    Do you remember seeing that on the

10   document?

11    A.   Yeah, I did.

12    Q.   Did that phrase on the top of the document

13   have any -- or what -- what did that phrase for

14   immediate release appearing on this document do to

15   your understanding with regard to the embargo that

16   you mentioned was announced on October 31st?

17    A.   It was confusing.

18    Q.   Did you understand that Mr. Fisher's

19   remarks were embargoed?

20         MR. THEODOROU:  Objection.

21         THE WITNESS:  I believed that what the

22   press official was telling me, that it was embargoed

23   to 10:00, was the operative -- you know, there was

24   operative -- but it's still confusing.  It does say

25   for immediate release.

45  (Pages 174 to 177)

Peter Davis, Jr.                                                    April 19, 2006
Washington, DC

| Page 178 | Page 180 |
|---|---|
| 1    BY MS. WILLIAMS: | 1  to do it outside of the building. |
| 2    Q.  Did you believe that this release that you | 2    BY MS. WILLIAMS: |
| 3  obtained before the meeting, this was also subject to | 3    Q.  The embargo was in effect when you started |
| 4  the embargo? | 4  calling your clients on October 31st? |
| 5    A.  Yes. | 5    A.  Yes, it was. |
| 6    Q.  I might have asked you this, but did you | 6    Q.  Did you call the clients in any particular |
| 7  stay for the entire conference on October 31st? | 7  order on that day? |
| 8    A.  Yes. | 8    A.  Yes, I did. |
| 9    Q.  What time did you say the conference ended | 9    Q.  You mentioned Mr. McCarthy, did you call |
| 10  that day? | 10  Mr. McCarthy first? |
| 11    A.  I looked at my watch when I walked out and | 11    A.  Yes. |
| 12  it said 9:30.  My phone records for some reason | 12    Q.  Who else did you call before the embargo |
| 13  showed different times, but a few minutes earlier, | 13  expired on October 31st? |
| 14  but, you know, that was the time when I walked out of | 14    A.  I'd have to see my phone records to be |
| 15  that meeting. | 15  sure, but you know, I went down my usual list, |
| 16    Q.  What did you do after the conference | 16  starting with Ward. |
| 17  ended? | 17    Q.  Besides Mr. McCarthy, do you recall anyone |
| 18    A.  I walked out of the building and down F | 18  else that you called? |
| 19  Street to the end and called Ward McCarthy and other | 19    A.  Well, I know I talked to Bill Cohen, Capra |
| 20  clients for about the next 20 minutes or so. | 20  C-a-p-r-a, Asset Management.  And I remember I talked |
| 21    Q.  Did you speak to anyone before you left | 21  to John Youngdahl at Goldman.  There were others, but |
| 22  the building? | 22  I don't have a clear recollection.  It's in my phone |
| 23    A.  No. | 23  records, I mean, you know, I can -- if I saw my phone |
| 24    Q.  You stated that you walked down F Street | 24  records, I could tell you exactly who I talked to. |
| 25  and then you called clients? | 25    Q.  Okay.  Did you call Mr. Nothern before the |

| Page 179 | Page 181 |
|---|---|
| 1    A.  Right. | 1  embargo expired on October 31st? |
| 2    Q.  What did you use to make these phone | 2    A.  Yes. |
| 3  calls? | 3    MR. THEODOROU:  Objection. |
| 4    A.  I had a cell phone. | 4    THE WITNESS:  But I didn't reach him. |
| 5    Q.  Can you tell me what the number of your | 5    BY MS. WILLIAMS: |
| 6  cell phone was? | 6    Q.  But you left a voicemail? |
| 7    A.  I don't remember. | 7    A.  I did leave a voicemail. |
| 8    Q.  Do you know who provided your cell phone | 8    Q.  I would like to have it marked as Exhibit |
| 9  service at that time? | 9  28. |
| 10    A.  My lawyer has all that information, I -- I | 10    (Davis Exhibit No. 28 was marked for |
| 11  don't -- I don't remember it now, that was a long | 11    identification.) |
| 12  time ago. | 12    BY MS. WILLIAMS: |
| 13    Q.  Was anyone present when you made these | 13    Q.  Do you recognize this document, sir? |
| 14  calls? | 14    A.  Yes, it is a list of the phone calls of |
| 15    A.  No. | 15  that morning. |
| 16    Q.  Why did you -- | 16    Q.  When you say of that morning, what morning |
| 17    A.  I mean, I was -- I was sitting on a bench | 17  are you referring to? |
| 18  in front of Borders bookstore at 14th and F, I mean, | 18    A.  October 31st, 2001. |
| 19  there were people walking by and trucks and cars | 19    Q.  Whose handwriting is this? |
| 20  driving by. | 20    A.  It's my handwriting. |
| 21    Q.  Why did you leave the Treasury building | 21    Q.  Did you prepare the document yourself? |
| 22  before you called clients? | 22    A.  I must have.  I think I was copying my |
| 23    MR. THEODOROU:  Objection. | 23  phone records for some reason. |
| 24    THE WITNESS:  I just did.  You know, I was | 24    Q.  Does Mr. Nothern's name appear on this |
| 25  warning people before the embargo time, I was going | 25  list? |

46 (Pages 178 to 181)

Peter Davis, Jr.                                                    April 19, 2006

Washington, DC

Page 182

1      A.   Yes.
2      Q.   Where does his name appear?
3      A.   Seventh call. On the phone records, they
4   show 9:38. I think it was actually a little later
5   than that.
6      Q.   Why --
7      A.   And it says, and it says his phone
8   number -- it says Boston, his phone number, Steve
9   Nothern and dash message.
10     Q.   You said the phone records indicate the
11  call was made at 9:38?
12     A.   Right.
13     Q.   But you thought it was later than that?
14     A.   Well, I mean, the phone record showed that
15  I called Ward at 9:28, but I didn't leave the
16  building until at least 9:33 or 9:34 or so. I've
17  never been able to understand that discrepancy.
18     Q.   But were you looking at your phone records
19  when you made this document?
20     A.   Yes. I forget the company, but every
21  month I would get a bill, and it would have the phone
22  records. So, you know, I copied those down.
23     Q.   Do you know when you prepared this
24  document?
25        MR. STANCIL:  Do you have a specific

Page 183

1   recollection?
2         THE WITNESS:  I don't have a clear
3   recollection, but I must have done it for my
4   attorneys soon thereafter. I don't know when.
5         BY MS. WILLIAMS:
6      Q.   In 2001?
7      A.   Yes. I contacted attorneys a few days
8   later.
9      Q.   A few days after October 31st, 2001?
10     A.   Right, right.
11     Q.   Was it your understanding that the
12  information that you had obtained at the October 31st
13  meeting was still embargoed at 9:38?
14        MR. THEODOROU:  Objection.
15        THE WITNESS:  Yes.
16        BY MS. WILLIAMS:
17     Q.   You mentioned your phone records, and I
18  want to have this document marked as Exhibit 29.
19        (Davis Exhibit No. 29 was marked for
20           identification.)
21        BY MS. WILLIAMS:
22     Q.   Do you recognize this document?
23     A.   It's a Verizon Wireless phone bill with a
24  billing date of October 19th, 2001.
25     Q.   And if you refer to SEC NOTH 00114193.

Page 184

1      A.   Oh, okay, there is a phone record for
2   November 19, right.
3      Q.   What was -- do you believe -- do you see
4   your name on this 114193, and I'm near the bottom of
5   the page?
6      A.   Yes.
7      Q.   Do you believe this is a copy of the phone
8   bill that you received from Verizon Wireless?
9      A.   Yes.
10     Q.   November 2001?
11     A.   Yes, um-hum.
12     Q.   And if you could turn to the next page,
13  114194.
14     A.   Um-hum.
15     Q.   Do you recall if your cell phone number in
16  October of 2001 was 202-365-7624?
17     A.   Yes. Actually, that's still my current
18  one. For some reason, I thought that phone had died
19  and I had gotten another number. I guess not.
20     Q.   I'd like to refer you to line 21, the
21  lines go down the left-hand side of the page.
22     A.   Sure, I see it.
23     Q.   What does the line 21 reflect?
24     A.   It says there was a phone call at 9:38 to
25  Boston, Massachusetts.

Page 185

1      Q.   Do you recognize that phone number?
2      A.   It's Steve Nothern's phone number at MFS.
3      Q.   And the call was two minutes, do you --
4      A.   Yeah, um, it took a number of rings to get
5   to a voicemail, and it may have flipped to another
6   number to get to a voicemail, I don't know. It took
7   a while to get the voicemail and that's why it ran
8   over.
9      Q.   What did you say in the voicemail that you
10  left for Mr. Nothern?
11        MR. THEODOROU:  Objection.
12        THE WITNESS:  I have a clear recollection
13  of saying that they are going to kill the 30-year,
14  but I don't have any recollection of mentioning an
15  embargo time.
16        BY MS. WILLIAMS:
17     Q.   Do you believe you may have mentioned it
18  and you don't recall?
19        MR. THEODOROU:  Objection, that's not what
20  he said.
21        THE WITNESS:  No, I --
22        MS. WILLIAMS:  I asked the question.
23        MR. THEODOROU:  Correct.
24        BY MS. WILLIAMS:
25     Q.   Right. Do you believe you may have

47  (Pages 182 to 185)

1111 14th Street, NW Suite 400                          Washington, DC 20005

Peter Davis, Jr.                                                                        April 19, 2006
                                    Washington, DC

| Page 190 |
| --- |

1  afternoon.
2      Q.   And what does this E-mail contain?
3      A.   It says I called the Verizon Wireless
4  people and they read to me my phone calls of October
5  31 before 10:00 a.m. And I, further down, recorded
6  the time and the phone number and the place and who
7  talked to, and some notes about what transpired in
8  the conversation.
9      Q.   Independent of this document, do you
10 recall having a conversation with Verizon in which
11 they read your phone calls to you?
12     A.   Yeah. I called Verizon to -- I hadn't
13 received my bill yet, and I had gone to my attorneys
14 seeking counsel. And I called Verizon and got the
15 information over the phone.
16     Q.   Can you look down -- and I'm starting with
17 what's remarked as 9:28 a.m., do you see 9:28 a.m.?
18     A.   Yes.
19     Q.   That second line where it starts,
20 "McCarthy 10:00 a.m. embargo," and then I see
21 detailed conversation. Where did that part, the
22 detailed conversation part of the E-mail come from?
23     A.   What do you mean?
24     Q.   Did that -- did you --
25     A.   I wrote detailed conversation.

| Page 191 |
| --- |

1      Q.   So there's information contained in this
2  that you did not receive from the Verizon -- phone
3  call with Verizon that you had?
4      A.   I'm saying I took the information I got
5  from Verizon which was time, phone number, city and
6  supplied additional information, like who it was and
7  other information about the call. So the time, the
8  phone number and the city came from Verizon, I
9  supplied the rest of the information.
10     Q.   Could you turn to the second page of this
11 document at the top?
12     A.   Yes.
13     Q.   Could you tell me what is reflected in
14 that first, I'll call it paragraph at the top?
15     A.   It says, "9:38, (617) 954-5887, Boston,
16 Mass, didn't get through to Steve Nothern at Mass
17 Financial Services, left a short message, 10:00 a.m.
18 embargo and main points."
19     Q.   Is (617) 954-5887, was that Mr. Nothern's
20 phone number?
21     A.   Yes, his phone number at work at
22 Massachusetts Financial Services.
23     Q.   What do you mean by main points?
24          MR. THEODOROU: Objection.
25          THE WITNESS: They killed the 30-year and

| Page 192 |
| --- |

1  it might have -- well, I mean, that's the main point.
2          BY MS. WILLIAMS:
3      Q.   You also wrote in that paragraph, "10:00
4  a.m. embargo," do you see that?
5      A.   I see that, yeah.
6      Q.   Was this document drafted when the events
7  of October 31st, 2001 were fresh in your mind?
8          MR. THEODOROU: Objection.
9          THE WITNESS: Yes.
10         BY MS. WILLIAMS:
11     Q.   Do you believe the information in this
12 document is accurate?
13         MR. THEODOROU: Objection.
14         THE WITNESS: Yes.
15         MR. STANCIL: Pete, let me make clear,
16 because this is something we focused on before. Does
17 this document change your recollection sitting here
18 today or do you believe it was accurate at the time
19 that you wrote it?
20         THE WITNESS: It doesn't change my
21 recollection today. When I prepared this document,
22 that was the best of my recollection then. And, you
23 know, what I'm saying now is the best of my
24 recollection now, four and a half years later.
25         MS. WILLIAMS: I understand.

| Page 193 |
| --- |

1          BY MS. WILLIAMS:
2      Q.   But do you believe that what you wrote in
3  this document to your attorneys was accurate at the
4  time that you wrote it?
5          MR. THEODOROU: Objection.
6          THE WITNESS: It was the best of my
7  recollection at the time.
8          BY MS. WILLIAMS:
9      Q.   So at the time, you believed that you had
10 mentioned the 10:00 a.m. embargo to Mr. Nothern?
11         MR. THEODOROU: Objection.
12         BY MS. WILLIAMS:
13     Q.   At the time you wrote this document?
14         MR. THEODOROU: Objection.
15         MR. STANCIL: I'm going to object, too.
16 My client's interest is to answer each question one
17 time, and you know, I don't think it is fair to
18 repeat the same question over and over again.
19         MS. WILLIAMS: I understand. I just want
20 to clarify the record on this particular point.
21         MR. STANCIL: What's the question now?
22         BY MS. WILLIAMS:
23     Q.   The question is, at the time you wrote
24 this document, was it your understanding that you
25 mentioned a 10:00 a.m. embargo to Mr. Nothern?

49 (Pages 190 to 193)

Peter Davis, Jr.          April 19, 2006

Washington, DC

## Page 214

1 and --

2      MR. STANCIL: There's a couple of things I

3 just have to get on the record to make sure we're

4 clear. Pete, you knew that even if Mr. Youngdahl was

5 waiting at 10:00 a.m. to push the button right at

6 10:00 a.m., you knew that that was an advantage to

7 him in the marketplace?

8      THE WITNESS: Yes, it was.

9      MR. STANCIL: And, Pete, is it your

10 testimony today that everything you said in open

11 court -- in court in front of the magistrate judge in

12 Exhibit 17 was the truth at the time?

13      THE WITNESS: Yes, yes.

14      BY MS. WILLIAMS:

15    Q. Okay. So did you also have an expectation

16 that your other clients who you left messages for

17 before the embargo expired might also use the

18 information to trade --

19      MR. THEODOROU: Objection.

20      THE WITNESS: I had no basis for any

21 expectation.

22      BY MS. WILLIAMS:

23    Q. Excuse me -- let me finish the question.

24      Did you have any -- it says you had an

25 expectation that Mr. Youngdahl should use the

## Page 215

1 information to his advantage in trading government

2 securities. Did you believe your other clients would

3 use the information to their advantage in trading

4 government securities?

5      MR. STANCIL: I'm sorry, I object.

6      MR. THEODOROU: Objection.

7      MR. STANCIL: Can we go off the record for

8 a second? I think we can clear a lot of this up.

9      THE VIDEOGRAPHER: Off the record at

10 4:13:32 p.m.

11      (Discussion off the record.)

12      THE VIDEOGRAPHER: Back on the record at

13 4:16:44 p.m.

14      BY MS. WILLIAMS:

15    Q. Mr. Davis, before we went off the record,

16 I was asking you whether or not you had an

17 expectation that providing Mr. Nothern with the

18 voicemail that you left before the embargo would

19 allow him to use that information in trading -- to

20 his advantage in trading government securities?

21      MR. THEODOROU: Objection.

22      THE WITNESS: I just -- I just had no such

23 expectation. I mean, I have no way of knowing what a

24 client's going to do with my information. A lot of

25 times I give clients information and they don't do

## Page 216

1 anything with it. Sometimes they use it. I never --

2 I never know. And in the case of Mr. Youngdahl, it

3 was clear, because we -- he and I had this exchange

4 on July 12th and so on. But there just was no such

5 exchange with Mr. Nothern.

6      BY MS. WILLIAMS:

7    Q. Did you believe that this information that

8 you left on the voicemail would be beneficial to

9 Mr. Nothern?

10      MR. THEODOROU: Objection.

11      THE WITNESS: I had no way of knowing.

12 You know, it was possible it could have, it was

13 possible it couldn't have.

14      BY MS. WILLIAMS:

15    Q. Do you know if Mr. Nothern in the capacity

16 of his job at MFS traded in the 30-year bonds?

17    A. No, I don't know. I have no way of

18 knowing that.

19    Q. Do you know what his job responsibilities

20 were at MFS?

21    A. No, I know he worked there. I know he was

22 interested in Washington economic policy information

23 I know he retained me. You know, clients are not in

24 the habit of detailing their trades to me. I've

25 never had a client tell me what -- any trades. They

## Page 217

1 are asking me questions.

2    Q. Can I ask you a question, and this is

3 going back to some questioning I asked earlier

4 regarding Ms. Bostjancic and Mr. Greenlawn, who asked

5 you not to call them anymore.

6    A. Right.

7    Q. And I also recall earlier in the

8 deposition, you said that you had discarded the

9 agreement?

10    A. Yes.

11    Q. That you signed with Mr. Anderson?

12    A. That's correct.

13    Q. Is that correct?

14    A. That's correct.

15    Q. And when did you discard that agreement?

16    A. It was in early August, right after the

17 August quarterly refunding in 2001.

18    Q. Why did you discard the agreement in early

19 August 2001?

20    A. Because I had a habit of filing those

21 documents that I got from Treasury in a file. And so

22 I went and put the August documents in front of the

23 May documents. And I noticed there was an empty

24 folder next to it, and I had forgotten it was there.

25 And it wasn't marked, I didn't know what was in it,

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400          Washington, DC 20005

Peter Davis, Jr.                                                        April 19, 2006
Washington, DC

| Page 218 | Page 220 |
|---|---|

**Page 218**

1  so I pulled it out, and I opened it up, and there was
2  one page in there. And it was a copy of the
3  agreement.
4      And I looked at it, and I thought, geez.
5  You know, and I looked at it and I sort of refreshed
6  my memory that I -- you know, about promising to
7  honor the embargo. And here I was violating it, so
8  on my way to my car after work, I pitched it in the
9  trash can out back. And that's what I did.
10     MS. WILLIAMS: The court reporter has
11 passed me a note that he needs to change the tape.
12     THE VIDEOGRAPHER: This is the end of tape
13 number four in the video deposition of Peter Davis.
14 Off the record at 4:20:40 p.m., on April 19th, 2006.
15     (Recess.)
16     THE VIDEOGRAPHER: This is the beginning
17 of tape number 5 in the video deposition of Peter
18 Davis. On the record at 4:28:06 p.m. on April 19th,
19 2006.
20     BY MS. WILLIAMS:
21     Q.  Mr. Davis, I was asking you questions
22 about the agreement that you had with Mr. Fisher that
23 you said that you discarded in August.
24     A.  An agreement with who?
25     Q.  Excuse me, with Mr. Anderson.

**Page 219**

1      A.  Oh, right, Mr. Anderson, right.
2      Q.  The agreement that you had with Mr.
3  Anderson? And I believe you said you discarded it in
4  August of 2001?
5      A.  Early August, 2001, right.
6      Q.  Had you received calls from Mr. Greenlawn
7  or Ms. Bostjancic when you discarded this agreement?
8      A.  That's a good question. I'm trying to
9  remember. I'm not clear when they called me, I know
10 they called me. It could have been then, but I
11 don't -- it could have been in May, I just -- I
12 mean --
13     Q.  Do you recall if they called you after a
14 quarterly refunding conference?
15     A.  I think it was shortly after a quarterly
16 refunding conference, yes, or meeting on, you know,
17 one of those Wednesdays. I don't remember which one.
18     Q.  Do you think that it was either May or
19 August of 2001?
20     A.  It probably was, yeah. See, part of the
21 problem is I don't remember when I started calling.
22 May might have been the first time. I just -- I
23 just -- it was February, you know, I just don't -- of
24 course, I wasn't there in February. I don't know.
25     MR. STANCIL: Do you recall?

**Page 220**

1      THE WITNESS: No, I don't.
2      BY MS. WILLIAMS:
3      Q.  Do you believe it was in 2001?
4      A.  I just -- I have no recollection. I know
5  they called me. I just -- I'm not clear when it was.
6  I'm just not -- I just don't -- I have a clear
7  recollection of them calling me, I don't have a clear
8  recollection of when it was.
9      Q.  In the agreement with Mr. Anderson that
10 you discarded, you said that you had been violating
11 the embargo?
12     A.  Right.
13     Q.  After you discarded this agreement in
14 August of 2001?
15     A.  Right.
16     Q.  Did you at that time intend to call
17 clients before the embargo expired at the October
18 refunding conference?
19     A.  No, the opposite. I decided then and
20 there that I wouldn't. And in fact, I told my
21 assistant that. In fact, the morning of October
22 31st, before I went to the meeting, I instructed my
23 assistant to make sure she was off the phone, to make
24 sure she was ready, and to have a blank E-mail with
25 our logo on it ready to punch up. And that I was

**Page 221**

1  going to dictate to her something that I wanted her
2  to send out right at 10:00 a.m., you know, at the
3  embargo time.
4      I didn't say 10:00 a.m. at the embargo
5  time, because I didn't know what the embargo time
6  was. And I'd given her those clear instructions and
7  I just didn't do it. You know, I was angry about
8  what Treasury was doing at the meeting, I walked out
9  of the meeting and I did not follow through on my
10 intention to just wait for the embargo time, send an
11 E-mail out, you know, telling people what was said at
12 the meeting.
13     Q.  Besides the fact that you were angry about
14 what was announced, was there any other reason why
15 you decided not to wait and have Ms. Sullivan send
16 out the E-mail --
17     A.  No, that was the only reason. I mean, it
18 was just -- like I said, I told her and my intention
19 up until I heard what Treasury was doing was that I
20 would just wait until -- I would call her, I would
21 dictate something to her, and she would just send it
22 out because I wouldn't be able to get back to the
23 office before then, and she would just send it out.
24 But I didn't do that, I was upset about what Treasury
25 did and I just started calling people.

Alderson Reporting Company
1111 14th Street, NW Suite 400            1-800-FOR-DEPO            Washington, DC 20005

Peter Davis, Jr.                                                                    April 19, 2006

Washington, DC

| Page 230 | Page 232 |
|---|---|

**Page 230**

1  document? And I would refer you to eight lines up
2  from the bottom in the middle.
3      A.  Yeah, he's on my standard E-mail list and
4  he is there.
5      Q.  Why did you send this document to your
6  clients?
7      A.  To give them additional information. You
8  know, I put in some of the quotations that I had
9  taken down when Undersecretary Fisher spoke.
10     Q.  Do you recall if you sent any other
11  documents to your clients on October 31st regarding
12  the cancellation of the 30-year bond?
13     A.  I don't have any recollection. I mean, I
14  recall sending the E-mail, it was our standard
15  practice to send out some of the additional tables.
16  I don't -- we probably faxed those out, but I don't
17  have a clear recollection of that.
18     Q.  Do you recall if you had any actual
19  conversations with Mr. Nothern on October 31st, 2001?
20     A.  Oh, I'm clear that I did not. Never, ever
21  talked to him. In fact, you know, I just hadn't had
22  that many conversations with him the whole year. I
23  mean, he was unavailable on a number of occasions,
24  and you know, I'm sure I didn't talk to him on
25  October 31st. In fact, I don't recall when I had

**Page 231**

1  talked to him previously.
2      Q.  Let me ask you about that. I'd like to
3  have this marked as Exhibit 32. I'm going to have
4  three exhibits, actually.
5          (Davis Exhibit No. 32 was marked for
6          identification.)
7      BY MS. WILLIAMS:
8      Q.  Do you recognize this document?
9      A.  It's a Sprint phone bill for billing
10  period ending August 26th, 2001.
11     Q.  Who is the bill for?
12     A.  It's -- yeah, it's to me. My business
13  office.
14     Q.  Can I refer you to -- and I'm going to go
15  to the Bates number now -- the SEC NOTH 00107689, do
16  you see that page?
17     A.  Um-hum, yes.
18     Q.  And I'm looking at lines 36 and 37 on that
19  page, do you see those lines?
20     A.  Yes.
21     Q.  What do those lines show?
22     A.  They show a brief call, which is probably
23  a phone message at 11:20 a.m. to Steve Nothern's
24  phone number. And then at 11:25, they show an
25  extensive 35 minute call to the same number.

**Page 232**

1      Q.  And then I also want to refer you to line
2  15 of that same page.
3      A.  Um-hum.
4      Q.  Do you see that line?
5      A.  Yeah.
6      Q.  What does that line show?
7      A.  That shows a call on July 31st, 2001 at
8  10:36 a.m. to Steve Nothern's number. And it was
9  almost certainly just a phone message because it was
10  .6 minutes.
11     Q.  Do you recall speaking to Mr. Nothern on
12  the 23rd of August, what's reflected at line 37, 34
13  minutes?
14     A.  No, that was a long time ago.
15     Q.  Do you have any reason to doubt the
16  accuracy of this phone record, though?
17     A.  No, I probably talked to him, but --
18     Q.  I would like to have this marked as
19  Exhibit 33.
20         (Davis Exhibit No. 33 was marked for
21         identification.)
22     BY MS. WILLIAMS:
23     Q.  Do you recognize this document, Mr. Davis?
24     A.  It is a Sprint phone bill to me at my
25  business.

**Page 233**

1      Q.  What's the date of this bill?
2      A.  For the period ending September 26th,
3  2001.
4      Q.  I'd like to refer you to SEC NOTH
5  00107672. Do you see that page?
6      A.  Yes.
7      Q.  I'm on line 34 on that page, do you see
8  that?
9      A.  Yes.
10     Q.  What's reflected there?
11     A.  There's a call to Steve Nothern's number
12  for 1.7 minutes.
13     Q.  On what date?
14     A.  Oh, September 6th, 12:40.
15     Q.  Do you recall making a call to Mr. Nothern
16  on that date?
17     A.  No.
18     Q.  Do you have any reason to doubt the
19  accuracy of this entry in the phone record?
20     A.  No.
21     Q.  And then also if you could refer to line
22  51, do you see that line?
23     A.  Right, yeah.
24     Q.  What is reflected there?
25     A.  November 7, '01, 3:15 --

59 (Pages 230 to 233)

Peter Davis, Jr.                                                                          April 19, 2006
                                    Washington, DC

Page 234

1    Q.  September?
2    A.  I'm sorry, not November, yeah, September 7
3  at 3:15 to Steve Nothern's number for three minutes.
4    Q.  Do you recall that conversation?
5    A.  No.
6    Q.  Do you have any reason to doubt that the
7  entry here is accurate?
8    A.  No.
9    Q.  Can I ask you about line 19 of this same
10  page, where I see the phone number (617) 954-5397, do
11  you know whose phone number that was?
12    A.  No.
13    Q.  Is --
14    A.  I mean, sometimes when you call somebody
15  and you actually get a receptionist, and a client I
16  was calling for wasn't in.  Occasionally, I would get
17  transferred over to somebody else.
18    Q.  And if I could have this last document
19  marked as Exhibit 34.
20        (Davis Exhibit No. 34 was marked for
21         identification.)
22    BY MS. WILLIAMS:
23    Q.  This -- do you recognize this document?
24    A.  It's an excerpt from my October Sprint
25  phone bill.

Page 235

1    Q.  Just to clarify, the phone bill is related
2  to your office phone; is that correct?
3    A.  Yeah, it was the long distance carrier for
4  my business phone at 503 Capital Court.
5    Q.  If I could refer you to the second page of
6  the document, 107681.
7    A.  Um-hmm.
8    Q.  And I'm on line 54 of that document, do
9  you see that?
10    A.  Yes.
11    Q.  What's reflected there?
12    A.  October 16, 12:41 p.m. to Steve Nothern's
13  phone for 1.9 minutes.
14    Q.  Do you recall talking to Mr. Nothern on
15  the 16th of October 2001?
16    A.  Not -- no.
17    Q.  Do you believe that this record is
18  accurate, though?
19    A.  I have no reason to doubt it.
20    MS. WILLIAMS:  I would like to have this
21  marked as Exhibit 35.
22        (Davis Exhibit No. 35 was marked for
23         identification.)
24    BY MS. WILLIAMS:
25    Q.  Do you recognize this document, Mr. Davis?

Page 236

1    A.  Yes, it is a broadcast fax delivery
2  report.
3    Q.  For delivery of what?
4    A.  A broadcast fax to clients.
5    Q.  From Davis Capital --
6    A.  Yeah, on October 31st at --
7    Q.  2001?
8    A.  Yeah, 7:44 to 7:53 in the morning, I
9  guess.
10    Q.  Do you see Mr. Nothern's name on this
11  document?  And I will refer you to the third line
12  from the bottom.
13    A.  Sure, he is on my standard broadcast fax
14  list.
15    Q.  And I'm referring now to the PGS column,
16  do you see that?
17    A.  Yeah.
18    Q.  What does that show?
19    A.  It is 15 pages.
20    Q.  And then the last column, SUC?
21    A.  Yeah, that means successful delivery of
22  the -- it got picked up by another fax.
23    Q.  Do you have any recollection of what you
24  faxed to the clients on this list that was 15 pages
25  on October 31st, 2001?

Page 237

1    A.  I don't.
2    Q.  What was the first public document that
3  you saw announcing Treasury's cancellation of the
4  30-year bond?
5    A.  It was the -- Fisher's remarks in the room
6  3311 Treasury on the morning of --
7    Q.  Besides the press release or the documents
8  that you obtained at that conference.
9    A.  Right.
10    Q.  Did you see any other announcements that
11  day regarding the 30-year bond being cancelled?
12    A.  That was the only document I saw that
13  announced it.
14    Q.  Did you ever go on Treasury's website?
15    A.  Sure, I'd go on Treasury's website all the
16  time.
17    Q.  Did you go on the website on October 31st,
18  2001?
19    A.  It's possible.
20    Q.  Do you have any recollection of doing so,
21  though?
22    A.  Boy, I mean -- no, I don't, I don't have a
23  recollection.  Usually I would go on their website to
24  check things that I already had, make sure it was --
25  again, I don't have any recollection.

Alderson Reporting Company
1-800-FOR-DEPO
1111 14th Street, NW Suite 400                          Washington, DC 20005

Peter Davis, Jr.                                                        April 19, 2006
Washington, DC

| Page 238 |
| --- |

1   Q.   Were you ever aware of an investigation by
2   the Treasury's Office of Inspector General regarding
3   trading in a 30-year bond on October 31st, 2001?
4       A.   I read about it in The Wall Street Journal
5   some point later that week.
6       Q.   Did you have any involvement in the
7   investigation?
8       A.   I don't think so, no.
9       Q.   You weren't -- were you interviewed by
10  anyone from Treasury?
11      A.   No, I was not. I mean, a reporter called
12  me up and asked about it, but I was never contacted
13  by Treasury, or had any -- any involvement in the
14  Treasury investigation.
15          MS. WILLIAMS: Can we go off record for
16  about five minutes?
17          MR. STANCIL: Sure.
18          THE VIDEOGRAPHER: Off the record at
19  4:58:09 p.m.
20          (Recess.)
21          THE VIDEOGRAPHER: Back on the record at
22  5:04:09 p.m.
23          BY MS. WILLIAMS:
24      Q.   Mr. Davis, you stated that you attended
25  the August 1st, 2001 Treasury refunding conference;

| Page 239 |
| --- |

1   is that correct?
2       A.   Yes.
3       Q.   What time did that conference start?
4       A.   They all started at 9:00, as I recall.
5       Q.   Did you stay for the entire conference?
6       A.   Yes.
7       Q.   Do you recall if the doors were closed
8   during that conference?
9       A.   Not particularly. They were open for some
10  of them -- and some of the meetings were open, the
11  doors were opened. You know, usually there would be
12  a staff person standing there. And some of them the
13  meetings were closed. I don't recall in August.
14      Q.   Do you recall who spoke at the August
15  refunding conference?
16      A.   Geez, I don't.
17      Q.   Do you recall whether an embargo was
18  discussed at the conference?
19      A.   There's always an embargo.
20      Q.   Do you know how long the embargo was at
21  the August --
22      A.   I don't recall. Usually they were ten or
23  15 minutes.
24          MS. WILLIAMS: Could I have this marked as
25  Exhibit 36.

| Page 240 |
| --- |

1           (Davis Exhibit No. 36 was marked for
2           identification.)
3           BY MS. WILLIAMS:
4       Q.   Do you recognize this document?
5       A.   Yes, it's my handwriting, it says August
6   1, '01. It's notes. At the bottom it says,
7   embargoed 9:35 a.m.
8       Q.   When did you write these notes?
9       A.   It says -- the date on the notes is August
10  1, 2001, it says, Brian Rosborough who is the
11  Assistant Secretary for Financial Markets spoke.
12      Q.   Spoke where?
13      A.   At the refunding meeting on August 1st.
14      Q.   Do you believe you took these notes during
15  the refunding conference on August 1st, 2001?
16      A.   Yes.
17      Q.   And do you believe that this entry at the
18  bottom, embargo 9:35 a.m., that the embargo expired
19  at 9:35 a.m. on August 1st?
20      A.   Yes, yes.
21      Q.   What did you do immediately after the
22  August 1st, 2001 conference?
23      A.   I walked out and made similar calls to
24  what I did on October 31st.
25      Q.   Do you recall who you called that day?

| Page 241 |
| --- |

1       A.   No. I mean -- I'm sure I called Ward and
2   a few of the others, but I don't have any
3   recollection of who I called.
4       Q.   Do you know if you called Mr. Nothern that
5   day?
6       A.   I don't recall.
7       Q.   I'd like to have these marked as Exhibit
8   37.
9           (Davis Exhibit No. 37 was marked for
10          identification.)
11          BY MS. WILLIAMS:
12      Q.   Do you recognize this document?
13      A.   This is a mobile cell phone Verizon
14  telephone bill for the month -- well, for the month
15  ending August -- I'm not sure exactly when it ends,
16  but it is for August.
17      Q.   The billing date, do you see that at the
18  top, August 19th, 2001?
19      A.   Well, the billing date, that's a term of
20  art by Verizon. I'm not sure what that means. I
21  think that's the date they send it out or maybe it's
22  the last date of the calling period.
23      Q.   Can you turn to SEC NOTH 00114098?
24      A.   Yes.
25      Q.   Do you see any calls there that reflect

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                        Washington, DC 20005

Peter Davis, Jr.                                                                                         April 19, 2006
Washington, DC

Page 242

1  the calls you made to clients after the August 1st,
2  2001 quarterly refunding conference?
3      A.   Let's see, yes, starting out on line 11
4  and going through line -- well, I'm not sure, I guess
5  going to line 20 or maybe 21, I'm not sure.
6      Q.   Do you see any calls there reflecting a
7  call to Mr. Nothern on August 1st?
8      A.   On line 20 at 9:39.
9      Q.   How long was that call?
10     A.   12 minutes.
11     Q.   Do you have any recollection of that call
12  today?
13     A.   No.
14     Q.   Who was the first client that you called,
15  can you tell that from looking at this document?
16     A.   Yes, I can.  It was always to Ward
17  McCarthy, so that would be line 11 at 9:19 a.m.
18     Q.   And who was line 12, was that a client?
19     A.   Line 12 would be Bill Cohen at Capra.
20     Q.   What about at line 13?
21     A.   It's probably SAC, but I don't remember
22  the number off the top of my head.
23     Q.   And above Mr. Nothern's call, do you
24  recognize any other calls to clients from this
25  record?

Page 243

1      A.   I just don't know the phone numbers well
2  enough now to be able to identify each and every one
3  of those.
4      Q.   What phone did you use to make the calls?
5      A.   Cell phone, it's listed at the top of the
6  page there.
7      Q.   And you said you left the Treasury
8  building when you made these calls?
9      A.   Correct.
10     Q.   Why did you leave the Treasury building on
11  August 1st to make the calls?
12         MR. THEODOROU: Objection.
13         THE WITNESS: Because I was violating the
14  embargo.
15         BY MS. WILLIAMS:
16     Q.   Do you know if in any of these calls to
17  clients that you mentioned the embargo?
18     A.   I don't have any recollection.  I mean, I
19  probably did, but I don't have any recollection.
20     Q.   Do you ever recall having a conversation
21  with Mr. Nothern about Treasury war bonds?
22     A.   Yeah, that's right, I did, that's right.
23  You know, I can't swear it was him, but I remember a
24  client asking me to do some research about Treasury
25  war bonds.  And I remember doing some research on the

Page 244

1  last time Treasury had issued war bonds, and what
2  the, you know, how they had gone about it.  I don't
3  have any recollection who asked me, but I do remember
4  doing the research.  And I assume I reported it back
5  and I -- that's all I remember.
6      Q.   Do you know what year you would have done
7  this research?
8      A.   Not -- no, I mean, I don't recall now.
9          I do have a recollection of calling Malvey
10  and asking him about Treasury's experience with war
11  bonds, and whether they had any historical documents
12  I might be able to get, you know, things like that.
13     Q.   Do you recall if Mr. Malvey provided you
14  any information about Treasury war bonds?
15     A.   I don't recall.  I don't think he did.
16  I -- I don't recall where I got the information.  It
17  was -- I just don't recall.  I mean, you know, it was
18  a public source, it was some historical document that
19  I tracked down someplace.  In fact, it might have
20  been in a history -- I just --
21     Q.   Let me ask a question going back to this
22  August 1st conference.  Did you testify earlier that
23  your intent was not to call clients before the
24  embargo expired after this August 1st conference --
25  after you made the calls in the August 1st, and then

Page 245

1  you made a decision not to call --
2      A.   I sort of came to my senses after these
3  calls and said, geez, I shouldn't be doing this.  You
4  know, my memory was jogged by seeing the -- a copy o
5  the agreement with Roger Anderson.  As I was going to
6  my car to drive home, I tossed it in the trash, and I
7  sort of said to myself, I'm not doing this anymore.
8      Q.   But you said that the -- and I'm only
9  going to ask a couple of questions.  At the October
10  31st, 2001 meeting, when you heard the information
11  about the 30-year bond, you got mad?
12     A.   Right.
13     Q.   And you decided that you were going to
14  call your clients?
15     A.   That's right.
16     Q.   Did you think that your clients would be
17  surprised by this information?
18     A.   Yes, in fact, the reason I was mad I felt
19  Treasury had misled the market for political reasons.
20     Q.   Did you ever have any conversations with
21  Mr. Nothern regarding any sources that you had at
22  Treasury?
23         MR. THEODOROU: Objection.
24         THE WITNESS: No.
25         BY MS. WILLIAMS:

Alderson Reporting Company
1111 14th Street, NW Suite 400                1-800-FOR-DEPO                Washington, DC 20005

Peter Davis, Jr.

Washington, DC

April 20, 2006

Page 252

```
 1              UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - - X

 4    UNITED STATES SECURITIES AND   :

 5    EXCHANGE COMMISSION,           :

 6              Plaintiff,           :

 7       v.                         :    Civil Action No.

 8    STEVEN E. NOTHERN,            :    05-10983(NMG)

 9              Defendant.          :    VOL. II

10    - - - - - - - - - - - - - - X

11                   Washington, D.C.

12                   Thursday, April 20, 2006

13              Continued videotape deposition of PETER

14    DAVIS, JR., a witness herein, recalled for further

15    examination by counsel for the Defendant in the

16    above-entitled matter, pursuant to notice and

17    subpoena, the witness being previously sworn by

18    PENNY M. DEAN, a Notary Public in and for the

19    District of Columbia, taken at the offices of U.S.

20    Securities and Exchange Commission, 100 F Street, NE,

21    Washington, D.C., at 9:44 a.m., Thursday, April 20,

22    2006, and the proceedings being taken down by

23    Stenotype by PENNY M. DEAN, RPR, and transcribed

24    under her direction.

25
```

Peter Davis, Jr.                                                          April 20, 2006
Washington, DC

| Page 261 | Page 263 |
|---|---|

**Page 261**

1    A.  Right.
2    Q.  In one document?
3    A.  Yes.
4    Q.  So it had a front side that had writing it
5    on and a second side?
6    A.  That's right.  And it seemed to be a form,
7    it wasn't even necessarily a Treasury form and it had
8    some blanks to fill in.
9    Q.  Did the agreement mention embargo in it?
10   A.  Whew.
11        MS. WILLIAMS:  Objection.
12        MR. STANCIL:  If you recall.
13        THE WITNESS:  I don't recall.
14        BY MR. THEODOROU:
15   Q.  Did you review the agreement before you
16   signed it?
17   A.  I took three or four minutes to read it in
18   a cursory fashion, but said I was to keep the
19   information I received confidential and it mentioned
20   some U.S. code sections, if I didn't and I signed it,
21   that was it.
22   Q.  So the agreement as best you can recall
23   said what?
24   A.  That I --
25        MS. WILLIAMS:  Objection, sorry.

**Page 263**

1    A.  Anderson signed it, I signed it and he had
2    an assistant there who signed it as a witness.
3    Q.  And do you remember who that assistant
4    was?
5    A.  No.
6    Q.  How long did the meeting with Mr. Anderson
7    last?
8    A.  Ten minutes.
9    Q.  Did you obtain a copy of the agreement
10   after you signed it?
11   A.  Yes.
12   Q.  After you got the agreement, what did you
13   do with it?
14   A.  Took it back to my office and filed it.
15   Q.  Was there a particular file that you put
16   it in?
17   A.  It was a file folder, it was -- years
18   later I discovered it wasn't even marked, it was just
19   a blank file folder sitting next to my quarterly
20   refunding file.
21   Q.  Did you ever show that agreement to
22   anybody else?
23   A.  No.
24   Q.  Did you discuss the contents of that
25   agreement with anybody else?

| Page 262 | Page 264 |
|---|---|

**Page 262**

1        THE WITNESS:  -- was to withhold, divulging
2    any information that I obtained from the quarterly
3    refunding meetings, you know, until it was authorized
4    for public release.
5        BY MR. THEODOROU:
6    Q.  Did the agreement define what embargo
7    meant?
8        MS. WILLIAMS:  Objection.
9        THE WITNESS:  Not that I recall.
10       MR. STANCIL:  Make sure you -- wait for
11   him to finish the question, give her a chance --
12       MR. THEODOROU:  We have plenty of time,
13   don't worry about it.  Listen to the question and
14   then you can answer it.
15       BY MR. THEODOROU:
16       Do you remember the agreement defining
17   embargo?
18       MS. WILLIAMS:  Objection.
19       THE WITNESS:  I don't recall seeing the
20   word embargo in the agreement, there was no
21   definition section, there was -- I just don't recall
22   that much about the agreement.
23       BY MR. THEODOROU:
24   Q.  Were you the only party whose signature
25   appears in the agreement?

**Page 264**

1    A.  No.
2    Q.  So it's fair to say you never discussed
3    the contents of that agreement with Mr. Nothern,
4    correct?
5    A.  Correct.
6    Q.  Where was the agreement signed?
7    A.  On the back, on the second page, bottom of
8    the second page.
9    Q.  Physically where were you when at the time
10   when you signed it?
11   A.  In Roger Anderson's office at the Treasury
12   Department.
13   Q.  Did you ever discuss the existence of the
14   agreement with anybody else?
15   A.  No.
16   Q.  So that it is fair to say you didn't
17   discusses the existence of that agreement with your
18   customers?
19   A.  No.
20   Q.  And you never discussed the existence of
21   the agreement with Mr. Nothern, correct?
22   A.  Correct.
23   Q.  Did you ever tell your customers what
24   embargo meant?
25   A.  No.

4  (Pages 261 to 264)

Peter Davis, Jr.                                                                   April 20, 2006
Washington, DC

Page 269

1  spoke.
2      Q.   And how soon after you sent your letter?
3  Actually -- strike that.
4          Do you remember when you sent the letter?
5      A.   It was some time in 1994, a month or two.
6  I don't know, it was some -- I went to pick up
7  documents, I couldn't get them, I called up asking
8  for them, I still couldn't get them and then was told
9  well, maybe you should start attending the meetings,
10 when that happened I just wrote a letter to him.
11     Q.   How soon after you wrote the letter did
12 you meet with Mr. Anderson?
13     A.   I got a call from him a few days later and
14 was told if I wanted to attend the meetings to come
15 on down and meet with him briefly to sign a
16 confidentiality agreement and so I did that, we
17 made -- we made an arrangement to do that the next
18 day or the day after.
19     Q.   Other than yourself, do you know ever
20 anybody else whoever signed one of these
21 confidentiality agreements?
22     A.   As far as I know, I'm the only one.  I
23 mean, I never saw anybody attending those meetings
24 except Prudential Press and me.
25     Q.   And after you speak to Mr. Anderson, you

Page 270

1  then met with him in the meeting you just testified
2  about yesterday and today?
3      A.   That's correct.
4      Q.   Did Mr. Anderson say anything about other
5  people signing this kind of an agreement at that
6  meeting?
7      A.   He didn't say anything like that.
8      Q.   Do you know if members of the press signed
9  this agreement?
10     A.   I have no idea.
11     Q.   Did Mr. Anderson -- I'll get to that.
12         Did that agreement just apply to you?
13         MS. WILLIAMS: Objection.
14         THE WITNESS: I assumed it did.  I mean it
15 had a blank for Anderson's name as the authorizing
16 officer to, you know, and it had a blank for my name
17 and, you know, it went through all this legalese and
18 at the end it had places for signature.
19         BY MR. THEODOROU:
20     Q.   You testified earlier that you reviewed
21 the agreement before you signed it?
22     A.   That's correct.
23     Q.   Did the agreement only apply to a
24 particular Treasury refunding conference or to the
25 Treasury refunding conference?

Page 271

1          MS. WILLIAMS: Objection.
2          THE WITNESS: I don't recollect whether it
3  specifically mentioned Treasury refunding meetings or
4  not, it -- it had some language about certain
5  meetings at Treasury, but I don't recall how well
6  identified they were in the document.
7          BY MR. THEODOROU:
8      Q.   Well, let me ask a series of questions,
9  maybe it will refresh your recollection.
10     A.   Sure, sure.
11     Q.   My first question was, do you remember if
12 it just applied to refunding conferences?
13     A.   I don't recall.
14         MS. WILLIAMS: Objection.
15         BY MR. THEODOROU:
16     Q.   Do you remember if it applied to all
17 Treasury meetings?
18         MS. WILLIAMS: Objection.
19         THE WITNESS: I don't recall it being that
20 broad.
21         BY MR. THEODOROU:
22     Q.   Okay.  Do you remember if it applied to
23 all Treasury information disclosed to you in any
24 context by anybody at Treasury?
25         MS. WILLIAMS: Objection.

Page 272

1          THE WITNESS: It -- it didn't, it was not
2  that -- it didn't say that.
3          BY MR. THEODOROU:
4      Q.   Okay.  So it wasn't that broad.
5      A.   It was -- it was defined.  I just can't
6  recall with specificity how well it was defined.
7      Q.   Now I'd like to ask you what your
8  understanding of what your duties were under the
9  agreement were.
10     A.   Right.
11     Q.   What did you agree to do under that
12 agreement or not to do?
13     A.   I agreed as a condition of attending the
14 Treasury refunding meetings to keep confidential the
15 information I received at those meetings until they
16 were authorized for public disclosure and I don't
17 recall the document using the word embargo, it had
18 some other language.
19     Q.   Did Mr. Anderson mention the word embargo
20 to you?
21         MS. WILLIAMS: Objection.
22         THE WITNESS: I don't recall that he did.
23 I mean, I don't recall the word embargo in the
24 document or in the conversation or in the discussion.
25 It was a ten-minute meeting.

6 (Pages 269 to 272)

Peter Davis, Jr.                                                                          April 20, 2006
Washington, DC

Page 277

1  had walked out of the meeting and started talking
2  publicly about it and then the paper decided because
3  of that the embargo no longer applied and that
4  happened all the time too.
5        And so when I was a staffer on the Hill,
6  there were always gray areas about what should be
7  released when. But when someone called me up and I
8  knew they were writing a story that was going on the
9  front page after major newspaper, I always felt I was
10 under an obligation to make sure that reporter
11 understood, because once they published something
12 wrong, it creates huge problems.
13       There were many instances where
14 information from the President's budget and
15 information for tax bills were publicly disclosed by
16 newspapers in advance of embargo time where a public
17 official had disclosed it first. And so, you know,
18 sometimes I didn't know whether the public official
19 had disclosed it or not and, you know, that put me in
20 an uncomfortable position, so I'd take a message and
21 I would call up to the front office and find out,
22 hey, is this divulged yet or not.
23       BY MR. THEODOROU:
24    Q.   So in your experience there on the Hill,
25 there was a wide variation how different government

Page 278

1  agencies used that term embargo; is that right?
2        MS. WILLIAMS: Objection.
3        THE WITNESS: That's correct. And no
4  where in my experience did I ever see a clear legal
5  definition that I was presented with on the Hill or
6  Treasury or anywhere else.
7        BY MR. THEODOROU:
8     Q.   And you never provided any kind of
9  definition of what embargo meant in the context of
10 refunding conferences to your customers; is that
11 right?
12    A.   That's right.
13       MS. WILLIAMS: Objection.
14       BY MR. THEODOROU:
15    Q.   Including not providing anything to
16 Mr. Nothern about what embargo meant?
17       MS. WILLIAMS: Objection.
18       THE WITNESS: That's right.
19       BY MR. THEODOROU:
20    Q.   Under the agreement you testified about
21 yesterday and today with Mr. Anderson, what was your
22 understanding of when your duty not to disclose the
23 information ended? In other words, when could you
24 disclose?
25    A.   My understanding was it was at the end of

Page 279

1  each of those meetings, someone would stand up and
2  say okay, here's the time at which you can disclose
3  this, here's the embargo time.
4     Q.   Okay.
5     A.   So they would announce a time.
6     Q.   Did you --
7     A.   I was supposed to keep it confidential
8  until that time.
9     Q.   Did you ever tell any of your customers
10 what embargo time meant?
11    A.   No.
12    Q.   So it's fair to say you didn't tell
13 Mr. Nothern about what it meant by embargo time?
14       MS. WILLIAMS: Objection.
15       THE WITNESS: Correct.
16       BY MR. THEODOROU:
17    Q.   You also never said anything else --
18 excuse me -- strike that.
19       Strike my own inability to form the
20 sentence.
21       You never -- you also never sent anything
22 out in writing that provided a definition of what
23 embargo time meant, correct?
24    A.   Correct.
25       MS. WILLIAMS: Objection.

Page 280

1        THE WITNESS: That's correct.
2        BY MR. THEODOROU:
3     Q.   So let me see if I've got this right.
4        Was it your understanding if an embargo
5  ended at 10:00 a.m., you were free to disclose it at
6  one second after 10:00 a.m.?
7     A.   That's correct.
8        MS. WILLIAMS: Objection.
9        BY MR. THEODOROU:
10    Q.   Who did the embargo in the con -- what was
11 your understanding as to who the embargo -- strike
12 that.
13       What was your understanding as to who was
14 bound by the embargo refunding conferences?
15    A.   My understanding was it was I mean just
16 from watching it happen was that it applied to me and
17 to the Press who were present.
18    Q.   So everyone in the Press who attended; is
19 that right?
20    A.   Right.
21    Q.   It applied to you?
22    A.   Right.
23    Q.   Did it apply to every one who attended the
24 conference?
25    A.   I assumed the Treasury officials would not

8 (Pages 277 to 280)

Peter Davis, Jr.                                                        April 20, 2006
Washington, DC

---

**Page 281**

1  disclose it before the time and of course members of
2  the Treasury Borrowing Committee will be sitting
3  there and I assumed that they had some sort of
4  agreements as a condition of being part of that
5  committee to honor that also.
6      Q.   And what is the Borrowing Committee?
7      A.   It's composed of leading Wall Street
8  investors who are the main purchasers and marketers
9  of Treasury debt.
10     Q.   Now, do you know if they have an agreement
11 with Treasury like you did?
12     A.   I've never seen one or heard of one so I
13 can't say, but -- I always assumed there must have
14 been one for them.
15     Q.   In October of 2001, do you know who some
16 of the members of the committee were?
17     A.   Geez. I could name a few of them, I
18 think. My problem -- the haziness of my recollection
19 is were they members earlier and had they gone off or
20 were they there at that particular meeting in
21 October. I think Jim Capra of Capra Asset was a
22 chair.
23     Q.   He was one of your customers.
24         MS. WILLIAMS:  Objection.
25         BY MR. THEODOROU:

---

**Page 282**

1      Q.   Correct?
2      A.   Correct. I think Dan Ahearn was there.
3      Q.   Dan Ahearn. How do you spell Ahearn?
4      A.   A-h-e-a-r-n.
5      Q.   From where?
6      A.   I forget the name of the firm he worked
7  for, he used to work for Wellington but he didn't at
8  that time. Those are the only ones I could name.
9  You know, there does exist -- every quarterly
10 refunding meeting would issue the minutes of the
11 meeting of that advisory committee and it would list
12 every member of the committee who attended.
13     Q.   And the minutes are public?
14     A.   Yes, they are public information.
15     Q.   If we wanted to get ahold of those
16 minutes, how do we go about doing that?
17     A.   They are on the Treasury website right
18 now.
19     Q.   How about for the minutes from October of
20 2001?
21     A.   Yeah, all of that's there. Treasury some
22 time in '99 or maybe as late as 2000 went back and
23 put on their website all the quarterly refunding
24 charts, advisory committee minutes and advisory
25 committee recommendations and the press releases and

---

**Page 283**

1  the quarterly refundings and all that information all
2  the way back I think to '95.
3      Q.   And where is Capra Asset Management
4  located.
5      A.   They are in Rye, New York.
6      Q.   Besides the borrowing committee, who else
7  would attend the refunding conference?
8      A.   Well, various Press members, there was
9  myself and then there would be various Treasury
10 officials and staff.
11     Q.   Now, I may have asked this. Do you know
12 if the Press members signed a confidentiality
13 agreement like yours?
14     A.   I've never seen one, I have no idea.
15     Q.   Did you know members of the Press?
16     A.   Well, sure.
17     Q.   Do you remember who were some of the Press
18 members who attended the October 2001 conference?
19     A.   Hmm, it's hard to say for sure because I'd
20 see most of them most of the time at most of the
21 quarterly refunding meetings.
22         My recollection about who specifically was
23 at that particular meeting, it's hard to say. I'm
24 blanking on the name of the one guy who I'm pretty
25 sure was there.

---

**Page 284**

1          It will come to me in a second, he worked
2  for the G-7 group now. It will come to me.
3      Q.   Did they use sign-in sheets for these
4  conferences?
5      A.   No.
6      Q.   Do you remember a reporter named Brian
7  Collins?
8      A.   Vaguely, the name sounds familiar if I saw
9  a picture I might recognize him, but, you know, I was
10 not a close -- I didn't know him well for sure, I
11 might recognize him.
12     Q.   He worked for National Mortgage News, does
13 that ring any bell?
14     A.   It doesn't ring any bells.
15     Q.   Now, what was your understanding of again
16 of what this embargo, what they termed your
17 confidentiality duty was, what was your understanding
18 of what it prevented you from doing?
19     A.   It prevented me from informing anyone
20 before that time. I mean the reason for the embargo
21 was to give reporters a time to prepare their story
22 so they would be ready to go out at that time.
23     Q.   Did anyone explain to you that was the
24 reason for the embargo?
25     A.   No, I just sort of knew that and that's

---

Alderson Reporting Company
1-800-FOR-DEPO

1111 14th Street, NW Suite 400                          Washington, DC 20005

Peter Davis, Jr.                                                April 20, 2006

Washington, DC

Page 285

1  how --
2      Q.   But what I'm asking about, did anyone ever
3  say to you, that's the reason we have the embargo?
4      A.   No, no one ever said that to me.
5      Q.   Did you ever read it anywhere, this is the
6  reason --
7      A.   No, I didn't read it anywhere.
8      Q.   So nobody at Treasury, including
9  Mr. Anderson ever told you why the embargo existed,
10 correct?
11     MS. WILLIAMS: Objection.
12     THE WITNESS: Correct, correct.
13     BY MR. THEODOROU:
14     Q.   Were you allowed to discuss embargoed
15 information with other people who had attended the
16 conference?
17     A.   Oh, we would -- as the meeting was
18 breaking up, sometimes I would discuss it with
19 another reporter or someone who's attending the
20 meeting, sometimes in the hallway, I'd talk with Jim
21 Capra or someone afterward, usually we weren't
22 talking about what was happening in the meeting, we
23 were talking about what was going on with the tax cut
24 or what was  going on with the budget or the deficit.
25 So sometimes though there might be a confusion that

Page 286

1  wasn't cleared up in the meeting and -- and
2  sometimes, you know, as people were milling around as
3  the meeting was breaking up, people would go up and
4  ask an additional question or a point of
5  clarification and so, sure, there were discussions in
6  the room.
7      Q.   So your understanding was that under that
8  agreement that you had with Mr. Anderson, you were
9  not to disclose the information of the refunding
10 conference until after the embargo time had expired,
11 right?
12     A.   Correct.
13     MS. WILLIAMS: Objection.
14     BY MR. THEODOROU:
15     Q.   What did Treasury get out of this
16 agreement?
17     MS. WILLIAMS: Objection.
18     BY MR. THEODOROU:
19     Q.   I can clarify that for you, usually when
20 you have an agreement, one party gets something.
21     A.   Right.
22     Q.   Clearly you got access?
23     A.   Right.
24     Q.   To this information, what did Treasury get
25 by allowing you in?

Page 287

1      MS. WILLIAMS: Objection.
2      THE WITNESS: They got better quality
3  reporting and information to -- to the greater world.
4  If -- if -- if reporters are forced to react quickly
5  in a very time sensitive situation to very
6  complicated information, it results in all kinds of
7  spurious information going out and that was something
8  that happened to me all the time when I worked on the
9  Hill.
10     BY MR. THEODOROU:
11     Q.   Do you remember if that agreement had an
12 expiration date?
13     MS. WILLIAMS: Objection.
14     THE WITNESS: I don't -- I don't recall
15 any expiration date. I don't think it had one. It
16 wasn't a time certain agreement. I mean it didn't --
17 it had -- I remember it had a date on the document
18 itself or whatever day I signed it and we signed, you
19 know, when we signed it, we signed our names and the
20 date, but there was no effective date in the
21 document, there was no termination date paragraph or
22 anything like we have in tax laws.
23     BY MR. THEODOROU:
24     Q.   So to your knowledge there was no renewal
25 date in the document?

Page 288

1      A.   No. In fact it was never renewed or
2  terminated that I was aware of.
3      Q.   You testified about reporters attending
4  the conference, could reporters share information
5  with others before the embargo time expired on the
6  condition that the people they were discussing it
7  honor the embargo?
8      MS. WILLIAMS: Objection.
9      THE WITNESS: Yes. I mean I saw them --
10 what would typically happen would be everybody would
11 run out of the room, some of the reporters who were
12 in the Treasury Press room would run down to their
13 Treasury press room office, but some of the reporters
14 didn't have space in there.
15     There was only room in there for three
16 reporters or something. So the rest of the reporters
17 would actually run out in the hallway, pull out their
18 cell phones and call in their stories to their
19 editors, at least I assumed it was their editors, I
20 didn't know who they were calling. And so there
21 would all always be a bunch of reporters out in the
22 hallway afterward talking on their phones presumably
23 to their editors filing, you know, dictating a story
24 which would be presumably released at the embargo
25 time.

10 (Pages 285 to 288)

Peter Davis, Jr.                                                                    April 20, 2006

Washington, DC

Page 289

1        BY MR. THEODOROU:
2     Q.   So there were cases where reporters called
3  in information to somebody before the embargo time
4  expired?
5     A.   For sure.
6        MS. WILLIAMS:  Objection.
7        THE WITNESS:  For sure.
8        BY MR. THEODOROU:
9     Q.   Did you ever discuss with Anderson at your
10 meeting the duration of the agreement, that is how
11 long it would last or allow you to do what you wanted
12 to do?
13       MS. WILLIAMS:  Objection.
14       THE WITNESS:  Never came up, it was
15 never -- it was never discussed.
16       BY MR. THEODOROU:
17    Q.   Based on your understanding of the
18 agreement, the agreement allowed you to share
19 information with others as long as they also honored
20 the embargo, correct?
21       MS. WILLIAMS:  Objection.
22       THE WITNESS:  That was -- yes.
23       BY MR. THEODOROU:
24    Q.   That was your understanding?
25    A.   Well, I was going to say that's what lead

Page 290

1  me to -- disclosing information, starting in 1999 to
2  Word McCarthy, because I knew he would keep the
3  embargo.
4     Q.   But you didn't review the terms of your
5  agreement with your customers, correct?
6     A.   Correct, that just never came up.
7     Q.   Which included not reviewing what embargo
8  meant?
9     A.   Correct.  It was just something that was
10 never discussed.
11    Q.   Now, the agreement with Mr. Anderson, did
12 anyone else at Treasury know about that agreement?
13    A.   Well, I had no way of knowing whether they
14 knew it or not, all I knew is whether they let me
15 into the meetings.
16    Q.   I think you testified about this earlier,
17 you didn't tell anyone else about the agreement?
18       MS. WILLIAMS:  Objection.
19       THE WITNESS:  No.  That's correct.
20       BY MR. THEODOROU:
21    Q.   Now after you enter into this agreement
22 you started attending the refunding conferences?
23    A.   Meetings, yes.
24    Q.   And what process did you follow in order
25 to attend?

Page 291

1     A.   On Monday of the meeting week, I would at
2  some point on Monday call up Lulu Tyler or whoever
3  was at that phone number and make sure that I was
4  cleared in, that they had my full name, they had my
5  birth date and Social Security number and so that
6  when I showed up to the Treasury window on Tuesday
7  for the Tuesday meeting and -- say I showed up at
8  8:45 or 8:30 or whenever it was, that I would be on
9  the computer, that the guard would give me a badge
10 and that I would be buzzed into the building to go
11 upstairs and attend the meeting.
12    Q.   Now, were you already in the computer when
13 you made the call?  In other words, when you called
14 Lulu, did she know to look you up and were in the
15 computer and already signed off to attend the meeting
16 or was it ad hoc, that is meeting by meeting?
17       MS. WILLIAMS:  Objection.
18       THE WITNESS:  Most of the time, she would
19 tell me that she had already put me in and my call
20 was just to guard against the possibility that
21 somehow she had forgotten or she was on vacation or
22 whatever, because once or twice my name wasn't on the
23 list and I was in the position of having to call up
24 to Paul Malvey's office and someone would actually
25 come down an get me.

Page 292

1        BY MR. THEODOROU:
2     Q.   When you say that she said you were
3  already in the computer, what does that mean you were
4  already in?
5     A.   I took that to mean that she had entered a
6  list of names, I don't know if mine was the only name
7  on that list or not of authorized persons to get a
8  badge to go to that meeting.
9     Q.   And in 1994, what was Ms. Tyler's
10 position?
11    A.   I don't recall her title, I just knew her
12 as -- she was an assistant to either Mr. Malvey or
13 Mr. Anderson and she was the person who was my
14 contact for gaining authorization to attend the
15 meeting.
16    Q.   So you would call her on Monday?
17    A.   Right.
18    Q.   And then what would happen?
19    A.   I'd say, Hi, Lulu, it is Pete Davis, just
20 calling to make sure I'm on the computer to -- just
21 on the computer to gain authorization of the meeting
22 tomorrow.  And she'd say, you're all set.  And I'd
23 say, thanks, and that was it.
24    Q.   And then what happened?
25    A.   The next morning on Tuesday, I would

Peter Davis, Jr.                                                                April 20, 2006

Washington, DC

| Page 293 | Page 295 |
|---|---|
| 1  appear at 15th Street entrance at Treasury, I'd | 1  two of them attended. |
| 2  present my I.D. to the guard and say I'm going up to | 2      Q.   Let's take a look at the first where it |
| 3  the meeting in 3223 and he'd punch in my name and | 3  says Monday, it says call Lulu Tyler, correct? |
| 4  he'd hand me a badge. | 4      A.   Correct. |
| 5      Q.   And would you then go to 3223 unescorted? | 5      Q.   And Lulu Tyler again was -- |
| 6      A.   Yes. | 6      A.   She was the assistant to either Malvey |
| 7      Q.   Or would someone escort you? | 7  or -- or Anderson who was the point of contact for |
| 8      A.   Yes, unescorted.  I mean, I knew the | 8  gaining access to the meeting. |
| 9  building well.  Yeah, but -- | 9      Q.   It says to get cleared into the meeting, |
| 10      MR. THEODOROU:  Can we take a couple of | 10  do you see where it says that? |
| 11  minute break? | 11      A.   Yes. |
| 12      MS. WILLIAMS:  Sure. | 12      Q.   What is meant by to get cleared into the |
| 13      THE VIDEOGRAPHER:  Going off the record, | 13  meeting? |
| 14  time on the screen is 10:32:12. | 14      A.   Well, when I wrote that, what I meant was |
| 15      (Recess.) | 15  to be able to get a badge from the guard at the |
| 16      THE VIDEOGRAPHER:  Here marks the | 16  Treasury and to attend the meeting. |
| 17  beginning of videotape number 2, going back on the | 17      Q.   Your assistant, what was your assistant's |
| 18  record, the time on the screen is 10:48:12. | 18  name again? |
| 19      BY MR. THEODOROU: | 19      A.   Allyson Sullivan. |
| 20      Q.   Mr. Davis, after you started attending the | 20      Q.   Did you review your confidentiality |
| 21  refunding conferences, were you ever barred from the | 21  agreement you had with Mr. Anderson with Ms. Sullivan |
| 22  conferences at any time? | 22  before she attended? |
| 23      A.   No. | 23      A.   No. |
| 24      Q.   Do you recall ever being prohibited from | 24      Q.   Did you review the terms of the agreement? |
| 25  attending a conference? | 25      A.   No. |

| Page 294 | Page 296 |
|---|---|
| 1      A.   It just never happened, I mean -- I never | 1      Q.   Did you inform her what she could and |
| 2  tried to attend any after October 31st, 2001. | 2  could not do? |
| 3      Q.   Right.  Now I'm talking about the period | 3      A.   Yes. |
| 4  1994 to 2001? | 4      Q.   Under that agreement? |
| 5      A.   I was never barred, every meeting I asked | 5      A.   Well, I just said, you know, I'm trying to |
| 6  to attend, I was able to attend. | 6  remember, um -- well, this is pretty |
| 7      Q.   If you would take a look at Exhibit 6, | 7  self-explanatory, I just -- |
| 8  please? | 8      Q.   Right, but my question is do you recall |
| 9      MR. TOONE:  16. | 9  telling her other than saying, Note embargo time, do |
| 10      MR. THEODOROU:  I'm sorry, I misread my | 10  you recall telling her what embargo meant? |
| 11  writing. | 11      A.   Oh -- |
| 12      BY MR. THEODOROU: | 12      MS. WILLIAMS:  Objection. |
| 13      Q.   Now, Mr. Davis, what is this document? | 13      THE WITNESS:  No, I didn't -- I didn't. |
| 14      A.   It's a description of the procedure for | 14      BY MR. THEODOROU: |
| 15  attending the quarterly refunding meeting from my | 15      Q.   Do you recall telling her that she could |
| 16  assistant, Allyson Sullivan, to attend the January | 16  not disclose the information at the conference before |
| 17  2001 -- actually it was the February refunding | 17  the embargo time? |
| 18  meeting, it was on January 31st, because I was going | 18      MS. WILLIAMS:  Objection. |
| 19  to be out of town. | 19      THE WITNESS:  I didn't -- no, I didn't |
| 20      Q.   And she was going to attend the meeting in | 20  discuss that. |
| 21  your place? | 21      BY MR. THEODOROU: |
| 22      A.   Correct. | 22      Q.   So you remember not discussing that with |
| 23      Q.   Did she in fact attend the meeting? | 23  her? |
| 24      A.   Yes.  And I -- and I think my outgoing | 24      MS. WILLIAMS:  Objection. |
| 25  assistant, Kristen Caiola, attended also, I think the | 25      THE WITNESS:  I just wrote this memo and I |

12 (Pages 293 to 296)

Peter Davis, Jr.                                                                          April 20, 2006
                              Washington, DC

|  | Page 321 |
|---|---|

1    Mr. Anderson?
2       A.    No.
3       Q.    Now, you testified that you got rid of
4    your agreement with Mr. Anderson, correct?
5       A.    Correct.
6       Q.    What did you do?
7       A.    In early August of 2001, after that
8    quarterly refunding meeting, I came back to the
9    office and when I was leaving for the day, I filed
10   the quarterly refunding documents in my desk file
11   drawer and noticed a blank file folder in the drawer
12   next to the one I was filing in and I pulled it out
13   and looked at it and there was the one page -- well,
14   one page with both sides, the confidentiality
15   agreement and I felt some remorse about what I was
16   doing and so on my way to my car to go home for the
17   evening, I pitched it in the trash.
18      Q.    Why did you feel remorse?
19      A.    Because I had violated the agreement.
20      Q.    Why did you get rid of the agreement even
21   though you felt remorse?
22      A.    I just said to myself, I'm not going to do
23   this any more and I'm going to get rid of this and
24   forget about it.
25      Q.    You're not going to do what any more,

|  | Page 322 |
|---|---|

1    breach the agreement?
2       A.    Right.
3       Q.    So why didn't you keep the agreement?
4       A.    I don't know, I -- I just -- I just -- I
5    had already breached it and so, you know, I just
6    wanted to get it out of my sight.
7       Q.    It was your understanding that Treasury
8    had the original agreement, correct?
9       A.    Correct.
10      Q.    If we wanted to get that agreement, where
11   could we get that agreement from?
12      MS. WILLIAMS:  Objection.
13      MR. STANCIL:  If you know.
14      BY MR. THEODOROU:
15      Q.    If you know.
16      A.    The last time I saw the original it was
17   sitting in front of Roger Anderson, what happened to
18   it after that, I have no idea.
19      MR. THEODOROU:  Can we go off the record
20   for a second?
21      THE VIDEOGRAPHER:  Going off the record,
22   time on the screen is 11:33:53.
23      (Recess.)
24      THE VIDEOGRAPHER:  The time on the screen
25   is 11:52:42, you're on the record.

|  | Page 323 |
|---|---|

1       BY MR. THEODOROU:
2       Q.    Mr. Davis, would you please look at
3    Exhibit 30.  Do you have the exhibit in front of you?
4       A.    Yes.
5       Q.    This is the E-Mail that you sent to your
6    lawyers on or about November 5th, 2001?
7       A.    Yes.
8       Q.    Do you remember this?
9       A.    Yes.
10      Q.    And you were asked several questions
11   yesterday?
12      A.    Yes.
13      Q.    And one of the questions was whether or
14   not you had a present recollection of the substance
15   of these E-mails?
16      A.    Right.
17      Q.    Remember that you said that you didn't.
18      MS. WILLIAMS:  Objection.
19      BY MR. THEODOROU:
20      Q.    Did I properly characterize what you said
21   or -- let me rephrase that.
22            You were shown this document yesterday,
23   correct?
24      A.    Correct.
25      Q.    And this was the E-Mail to your lawyers.

|  | Page 324 |
|---|---|

1       A.    Right.
2       Q.    And you were asked about whether events
3    were fresh in your mind at the time when you wrote
4    this, correct?
5       A.    Yeah, right.
6       Q.    All right.  Now, I want to direct your
7    attention to the notation of 9:53 a.m.
8            Do you see that --
9       A.    Yes.
10      Q.    -- on page 2 of this E-mail?
11      A.    Um-hum.
12      Q.    And it says, didn't get through again to
13   Dean Maki?
14      A.    Right.
15      Q.    Putnam Investments.
16      A.    Um-hum.
17      Q.    No clear recollection, but I don't think I
18   left a message?
19      A.    Right.
20      Q.    Correct?
21      A.    Right.
22      MR. THEODOROU:  Now, I'd like a document
23   marked for identification, which will be the next
24   sequence number.
25      (Davis Exhibit No. 39 was marked

1111 14th Street, NW Suite 400                                    Washington, DC 20005

Peter Davis, Jr.                                                                              April 20, 2006
Washington, DC

---

Page 345

1  reporters who had space in that Treasury press room
2  go into that room and pick up a phone.
3       BY MS. WILLIAMS:
4       Q.  Do you know who the reporters were
5  calling?
6       A.  No, I have no way of knowing.  I assume
7  they were calling their editors and their papers, but
8  I have no way of knowing who they were calling.
9       Q.  You didn't know who was on the other end
10  of the call?
11      A.  No, there was no way for me to know that.
12         By the way, I just remembered the name of
13  the reporter who is the one reporter I can name who
14  is at almost all of these meetings, that was Ed Keane,
15  K-e-a-n-e.  He was with Bloomberg then, he's with the
16  G-7 group now.  He and I would often sit next to each
17  other.
18      Q.  At the -- where would you sit next to each
19  other?
20      A.  At quarterly refunding conferences.  When
21  he was there, he would often show up after I had
22  arrived and he would often sit next to me because we
23  knew each other.
24      Q.  I want to ask you a little bit about your
25  agreement with Mr. Anderson.

---

Page 346

1         One follow-up question before I ask you
2  about your agreement with Mr. Anderson.  You talked
3  about noticing reporters inside of Treasury making
4  telephone calls after the quarterly refunding
5  conferences.
6       A.  Right.
7       Q.  Did you ever see any reporters outside
8  making any telephone calls?
9       A.  No.
10      Q.  Now, to the agreement that you had with
11  Mr. Anderson, I just had a couple of questions about
12  that.  You stated that you knew about the agreement
13  and Mr. Anderson knew about the agreement.
14         Am I also correct that there was an
15  assistant to Mr. Anderson, the assistant to
16  Mr. Anderson also knew about this agreement; is that
17  correct?
18      A.  Correct.  There were three of us in that
19  room when that agreement was signed.
20      Q.  And do you recall if that assistant was
21  male or female?
22      A.  It was female.  She was female.
23      Q.  Do you recall if the agreement had any
24  language in it that allowed you to tell other people
25  about embargoed information if those people agreed to

---

Page 347

1  honor the embargo?
2       MR. THEODOROU:  Objection.
3       THE WITNESS:  There was no such language
4  in the agreement.
5       BY MS. WILLIAMS:
6       Q.  Did you ask Mr. Anderson any questions
7  about the agreement before you signed the agreement?
8       A.  I asked him for a minute or two to read
9  it, but I didn't have time to give it a detailed
10  reading, I gave it a cursory reading for a minute or
11  two, no, I didn't ask any other questions.
12      Q.  When you say you didn't have the time,
13  what do you mean?
14      A.  Assistant Secretary of Treasury, he's a
15  busy guy, I didn't feel it was appropriate to take a
16  lot of his time.  He was sitting there and after a
17  minute or two I decided it was time to sign it.
18      Q.  Did you believe that you understood the
19  terms of the agreement before you signed it?
20      A.  I understood that I should not disclose
21  the information before it was made available to the
22  public.  I didn't understand every detail of what was
23  on those two pages.  I didn't recognize the U.S. Code
24  sections at the end of it and I -- no, I thought I
25  had a general understanding of it, I didn't have a

---

Page 348

1  specific detailed understanding of it.
2       Q.  You said that you understood that you were
3  not to convey the information before the embargo
4  time.
5       A.  Correct.
6       Q.  Are you referring to information you
7  received at Treasury's quarterly refunding
8  conferences?
9       MR. THEODOROU:  Objection.
10      THE WITNESS:  Yes.  I took the agreement
11  to be specifically to Treasury quarterly refunding
12  meetings.  I had numerous other meetings at Treasury
13  on a regular basis, with this professional group of
14  mine and when clients came in to talk about the
15  economy and deficits and tax cuts so that agreement
16  as I understood it was only about Treasury quarterly
17  refunding meetings.
18      BY MS. WILLIAMS:
19      Q.  And you were able to retain a copy of the
20  agreement; is that right?
21      A.  I left that room in 1994 with a one page
22  front and back copy of that document.
23      Q.  When you left in 1994 with a copy of the
24  document and I'm talking about before August of 2001
25  between that time, did you ever review the agreement?

---

1111 14th Street, NW Suite 400          Alderson Reporting Company          Washington, DC 20005
1-800-FOR-DEPO



# DAVIS CAPITAL INVESTMENT IDEAS

*Wall Street Consultants*



## What's Inside:

- Dear Prospective Client
- Who We Are
- Sample Fax & Weekly Calendar

Date: 10/4/01

SECNOTH00106969

*Davis Capital Investment Ideas*

# _Dear Prospective Client_

Here's what I do to help my clients stay ahead of the Washington game.

My 11 years on Capitol Hill and 16 years advising Wall Street clients have taught me how to get Washington information ahead of the media. Examples include:

## 2001

August 16:  Reported CBO would show the Social Security surplus being spent.  It did on August 28th.

August 14:  Predicted the IMF would approve a $5 b. loan to Argentina.   It happened August 21st.

June 19:  Predicted OMB and CBO would cut their FY01 surplus forecasts to below $200 b. in mid-August.  Larry Lindsey confirmed this in a June 30th New York Times interview.

March 28:  Reported CBO wouldn't release its GSE subsidy report until late April or May and that it would estimate a $10 b. to $12 b. subsidy.  It was released on May 23rd showing a $10.6 b. subsidy.

February 22:  Predicted the Microsoft breakup ruling would be overturned by the U.S. Court of Appeals for the District of Columbia.  It was on June 28th.

January 18:  Predicted Greenspan would avoid rejecting Bush's tax cut on Jan. 25th.  He endorsed it.

January 10:  Predicted second quarter spectrum auction receipts of $15 b.  $16.9 b. came in on Jan. 24th.

## 2000

December 27: Predicted California's energy problems would get little help from Washington. So it was.

October 30:  Predicted the presidential election outcome wouldn't be known until days later.

SECNOTH00106970

Page 3                                    *Davis Capital Investment Ideas*

October 12:  Predicted the closest presidential election since 1960 and raised the possibility of an Electoral College win and a popular vote loss.  It happened.

September 27:  Reported 0.1% CPI error and predicted Treasury would not change indexed bond payments.  Two days later, Treasury made it official.

September 18:  Predicted China PNTR would pass the Senate the next day.  It did.

August 2:  Correctly predicted Sen. Hollings could not stop the Deutsche Telekom takeover of Voicestream.

June 5: Predicted Microsoft would win a reversal of Judge Jackson's breakup ruling.  The decision has not been made yet, but oral arguments at the end of February led many to agree.

June 1: Reported OMB would raise its surplus estimates by $1.2 trillion over ten years.  President Clinton announced a $1.3 trillion revision on June 30th.

My ability to generate such information, before it reaches the media, derives from relationships built over 26 years of working with Washington policymakers.  I also bring 15 years of experience working directly with investors, so I understand what money managers want.  I have learned that a quick phone call is worth far more than adding inches to the stack of research material on your desk.  My bullet pointed emails amplify and record what I tell you over the phone.  Additional documents and background information are provided on an as needed basis.  About half of my work is in direct response to client questions.

Advance information is only half the battle.  The other half is supplying the judgment to turn advance information into an investment idea.  Unless the papers are wrong, I avoid current news.  My clients pay me for the first call on investment issues they care about.

My standard fee for regular email and phone consultations with you and your colleagues is $1,500 monthly.  Some firms pay more for work with 10 or more of their people, and some firms pay less for less contact.

Sincerely,

Pete Davis

P.S. Visit my Web site: http://www.daviscap.com.
     Call Allyson, 202-544-4324, for a password.

SECNOTH00106971

Page 4 *Davis Capital Investment Ideas*

# *Who We Are*

Pete Davis served 11 years on Capitol Hill as an economist with the Joint Committee on Taxation, the Senate Budget Committee, and with Senator Robert C. Byrd.

In late 1983, he joined Prudential-Bache Securities in their Washington research office,, advising institutional investors throughout the United States and Europe, as he does now as      president of his own consulting firm.

Beginning in 1974, Pete computerized the revenue estimating at the Joint Committee on Taxation and formulated many of the tax cuts of the 1970s, including the Roth-Kemp tax cut.

In 1981, Pete went to the Senate Budget Committee as Chairman Pete Domenici's tax economist. There he worked on the ERTA and TEFRA, the reconciliation bills which shaped U.S. fiscal policy for the decade, and he helped formulate the economic assumptions underlying several budget resolutions.

With Senator Byrd, Pete worked on the balanced budget amendment and middle class tax cuts, among many issues. Having worked in the Senate and the House, for Republicans and for Democrats, Pete's broad Capitol Hill experience is unmatched by any other adviser.

Allyson Sullivan has been Pete's Policy Analyst since January 2000. She is a graduate of American University in Washington, D.C.

Previously, Allyson has worked on Jon Corzine's U.S. Senate campaign, for Senator Christopher Dodd and DC Shadow Senator Paul Strauss, and at the Spanish Center of International Relations in Madrid, Spain.



Peter J. Davis, Jr.
President



Allyson J. Sullivan
Policy Analyst

# Daily Faxes, Weekly Calendars & Custom Research

Do you need to know what is happening in Washington before it happens? We know you are busy. That is why we deliver information and analyses to you via email daily in the most concise fashion possible.

We specialize in what's happening in Congress, the Federal Reserve and the Administration. We have excellent contacts because we're a confidential source of quick answers for them too.

We are constantly watching Washington for what could affect your investments.



Do you want to know where Chairman Greenspan is speaking this week? Will Secretary Summers testify on the Hill? Are there any GSE hearings scheduled? On Monday morning, these are questions you don't have time to answer. You need to plan now for the week ahead. Often, you'll find listings here that you won't get anywhere else.

We offer custom research on a wide range of issues. We'll put you in touch with government analysts who can answer your most detailed questions. When you visit Washington we can set up appointments with staff who will become a resource for the future.

SECNOTH00106973

# *Sample Daily Fax*

**Davis Capital Investment Ideas**          **10-3-01**                      **2:40 PM**

**President Bush calls for $60 b. to $75 b. of additional stimulus.** He originally intended to say $60 b. to $80 b., but thought better of it to avoid rounding to a higher figure. The president took some questions this morning in New York City after he met with 30 business leaders. He specifically mentioned rebates, acceleration of last June's tax cut, expensing new investment, a temporary investment tax credit, and corporate rate cuts. A proposal could be announced tomorrow, but next week seems more likely.
http://www.whitehouse.gov/news/releases/2001/10/20011003-4.html

**Corporate AMT repeal, rate cut, expensing urged by Hubbard.** Yesterday, the CEA Chair became the first Admin. official to acknowledge that the U. S. is in a recession.

**Stimulus: Baucus expects temporary payroll tax cut, extended unemployment insurance, depreciation acceleration.** The Senate Finance Chair (D-MT) said staff has begun drafting legislation. His staff say no mark up has been scheduled yet, but the Senate could pass a bill within a week or two after they start.

**The Democrats are pushing for offsets to pay for the stimulus package.** They would take effect beginning in CY03. It will be interesting to see if that comes to pass.

**Domenici projected $52 b. surplus in FY02.** That's a little higher than the $40 b. that CBO Director Dan Crippen told the Budget Committees last week, but it reflects the desire by the politicians to make a little more room for their favorite stimulus proposals.

**Budget Committee leaders will release a new 10-year budget projection soon.** The Chairs and Ranking Members are meeting to re-estimate the budget in hope of maintaining some control as Congress rushes to compensate victims and stimulate the economy. Most Hill economists now expect the final FY02 numbers to show a deficit.

**O'Neill avoids the "R" word but says we shouldn't be surprised to see a worse unemployment rate Friday.** The Treasury Secretary testified this morning at the Senate Finance Committee. http://www.treas.gov/press/releases/po651.htm

**Trade Promotion Authority mark up could start Friday.** Ways and Means Committee. leaders from both parties will hold a joint news conference later today.

© 2001  **Davis Capital Investment Ideas**                **Call 202-544-7098**

*Davis Capital Investment Ideas*                                  Page 7

# Sample Weekly Calendar

**Davis Capital Investment Ideas**          **10-1-01**          **9:20 AM**

### Washington Calendar, October 1-5

**President Bush** visits the Federal Emergency Management Agency in Washington today. Tomorrow morning, he hosts congressional leaders at a White House breakfast. He talks with Qatar's Emir Sheikh Hamid bin Khalifa al-Thani about the Nov. 9th-13th WTO meetings on Thursday and Georgian President Eduard Shevardnadze on Friday.

**Congress…**An aviation security measure will be considered by both houses this week. The House will also take up the farm bill, H.R. 2646, and the intelligence authorization bill, H.R. 2883. The Senate will continue to consider defense authorization, S.1438.

| | | |
|---|---|---|
| **Tuesday 2:** | 10 AM | **FOMC** |
| | 10 AM | **Economic outlook** hearing, Senate Budget |
| | 10 AM | **Surface transport. security** hearing, Sen Commerce |
| | 10 AM | **AK Gov. Knowles**, oil pipeline hearing, Sen. Energy |
| | 10 AM | **Homeland defense** hearing, Senate Judiciary |
| | 10 AM | **Export promotion** hearing, Senate Banking |
| | | |
| **Wednesday 3:** | 9:30 AM | **Border security** hearing, Senate Appropriations |
| | 10 AM | **Anti-terrorism Act** mark up, House Energy |
| | 10 AM | **O'Neill, Ashcroft, terrorist funds** hearing, Fin. Serv. |
| | 10 AM | **Al Qaeda** hearing, House International Relations |
| | 10:30 AM | **Thompson, bioterrorism**, Senate Appropriations |
| | 10:30 AM | **Retirement Act** mark up of **H.R. 2269**, House Ed. |
| | 11 AM | **O'Neill, job training**, Senate Health |
| | 1 PM | **Atomic energy attacks** hearing House Intl. Relations |
| | | |
| **Thursday 4:** | 9:30 AM | **Wolfowitz, Quad. Defense Review**, Senate Armed Serv. |
| | 10 AM | **Arsenic in water** hearing, House Science |
| | 1 PM | **Iraq policy** hearing, House International Relations |
| | 2:30 PM | **Transit safety** hearing, Senate Banking |
| | | |
| **Friday 5:** | 10 AM | **Biological attack** hearing, House Govt. Reform |
| | 11 AM | **O'Neill, Pre-G7 press briefing**, DC |

© 2001  Davis Capital Investment Ideas          **Call 202-544-7098**

Page 8                                    *Davis Capital Investment Ideas*



**Davis Capital Investment Ideas**

503 Capitol Court, N.E.
Suite 200
Washington, D.C. 20002
202-544-7098
202-544-4324
202-544-7163 (fax)
pete@daviscap.com
allyson@daviscap.com
http://www.daviscap.com

SECNOTH00106976

EXHIBIT
Davis 6
4/19/06 PM



# DAVIS CAPITAL INVESTMENT IDEAS

*Wall Street Consultants*



## What's Inside

- Dear Prospective Client
- Who We Are
- Daily Faxes & Weekly Calendars
- Sample Fax & Calendar

Date: 08/30/00

# *Dear Prospective Client:*

Here's what I do to help my clients stay ahead of the Washington game.

My 11 years on Capitol Hill and 15 years advising Wall Street clients have taught me how to get Washington information ahead of the media. Examples include:

**2000**

June 1: Reported OMB would raise its surplus estimates by $1.2 trillion over ten years. President Clinton announced a $1.3 trillion revision on June 30th.

May 18: Predicted Patients' Bill of Rights would not be enacted this year. The votes are still not there.

May 11: Predicted House passage of China PNTR. It passed on May 24th.

May 11: Said Giuliani might abandon Senate race. He made the announcement May 19th.

May 3: Reported FCC might re-auction NextWave's wireless licenses. Senate Republicans rejected an amendment to allow NextWave to keep the licenses on May 19th. An FCC auction is expected next year.

March 20: Warned that EPA would reduce or eliminate MTBE use.

March 30: Predicted President Clinton would veto marriage penalty relief. He did on August 5th.

March 22: Predicted Rep. Baker's GSE bill would be nowhere this year. It hasn't.

January 20: Predicted bankruptcy reform would in die in the Senate. It did.

January 14: Predicted larger than expected FY01 surplus.

January 10: Predicted Sen. Kerry (D-NE) might retire. He made the announcement on January 21st.

**1999**

November 8: Predicted Schering-Plough would not get a Claritin patent extension. They didn't.



September 28: Predicted no Strategic Petroleum Reserve sale. No sale has occurred.

July 9: Predicted President Clinton would veto any large tax bill. Summers confirmed the veto on July 25. The President vetoed H.R. 2488 on September 23rd.
May 30: Reported CBO would raise it's FY99 surplus estimate to $115 b. CBO forecast $120 b. on July 1st.

May 27: Predicted the steel quota bill would die in the Senate. It did on June 22.

May 25: Refuted Washington Post article claiming Summers' confirmation was in trouble. Summers was confirmed by the Senate on July 1.

May 12: Reported Rubin's resignation 90 minutes before it happened.

April 20: Predicted a Medicare drug benefit wouldn't pass Congress. It didn't.

My ability to generate such information, before it reaches the media, derives from relationships built over 26 years of working with Washington policymakers. I also bring 15 years of experience working directly with investors, so I understand what money managers want. I have learned that a quick phone call is worth far more than adding inches to the stack of research material on your desk. My bullet pointed emails amplify and record what I tell you over the phone. Additional documents and background information are provided on an as needed basis. About half of my work is in direct response to client questions.

Advance information is only half the battle. The other half is supplying the judgment to just read in the morning papers. Unless the papers are wrong, I avoid current news. My job is to stay ahead of the news. My clients pay me for the first call on investment issues they care about.

My standard fee for regular email and phone consultations with you and your colleagues is $1,500 monthly. Some firms pay more for work with 10 or more of their people, and some firms pay less for less contact.

Sincerely,

Pete Davis

P.S. Visit my Web site: **http://www.daviscap.com**. Call Allyson, 202-544-4324, for a password.



# *Who We Are*

**Pete Davis** served 11 years on Capitol Hill as an economist with the Joint Committee on Taxation, the Senate Budget Committee, and with Senator Robert C. Byrd.

In late 1983, he joined Prudential-Bache Securities in their Washington research office,, advising institutional investors throughout the United States and Europe, as he does now as    president of his own consulting firm.

Beginning in 1974, Pete computerized the  revenue estimating at the Joint Committee on Taxation and formulated many of the tax cuts of the 1970s, including the Roth-Kemp tax cut.

In 1981, Pete went to the Senate Budget Committee as Chairman Pete Domenici's tax economist. There he worked on the ERTA and TEFRA, the   reconciliation bills which shaped U.S. fiscal policy for the decade, and he helped formulate the economic assumptions underlying several budget resolutions.

With Senator Byrd, Pete worked on the balanced budget amendment and middle class tax cuts, among many issues. Having worked in the Senate and the House, for Republicans and for Democrats, Pete's broad Capitol Hill experience is unmatched by any other adviser.

**Allyson Sullivan** has been Pete's Policy Analyst since January. She is a recent graduate of American University in Washington,  D.C.

Previously, Allyson has worked for Senator Christopher Dodd, DC Shadow Senator Paul Strauss and at the Spanish Center of International Relations in Madrid, Spain.



Peter J. Davis, Jr.
President



Allyson J. Sullivan
Policy Analyst

SECNOTH00110852



# *Daily Faxes, Weekly Calendars*
# *& Custom Research*

Do you need to know what is happening in Washington before it happens? We know you are busy. That is why we deliver information and analyses to you via email daily in the most concise fashion possible.

We specialize in what's happening in Congress, the Federal Reserve and the Administration. We have excellent contacts because we're a confidential source of quick answers for them too.

We are constantly watching Washington for what could affect your investments.



Do you want to know where Chairman Greenspan is speaking this week? Will Secretary Summers testify on the Hill? Are there any GSE hearings scheduled? On Monday morning, these are questions you don't have time to answer. You need to plan now for the week ahead. Often, you'll find listings here that you won't get anywhere else.

We offer custom research on a wide range of issues. We'll put you in touch with government analysts who can answer your most detailed questions. When you visit Washington we can set up appointments with staff who will become a resource for the future.

Visit our web site at http://www.daviscap.com

SECNOTH00110853



# *Sample Daily Fax*

**Davis Capital Investment Ideas**                    **7-14-00**    **11 AM**

**Humphrey-Hawkins reauthorization will pass this year and drop monetary targets.** So says a top Banking Committee staffer. The Fed would still be required to report monetary aggregates, but the target ranges would be dropped. Next week, we expect Mr. Greenspan to present the standard report with target ranges. The bill would require the Fed Chair to testify every 6 months before Congress, but only before one Banking Committee each time. Senate Banking postponed consideration of the measure yesterday because of unrelated disputes over a provision in the House-passed bill, H.R. 3046, which would reinstate 42 other federal reports.

**Dollarization passes Senate Banking, but it won't be enacted.** Yesterday, Senate Banking passed S. 2101 by a voice vote as a courtesy to retiring Senator Mack (R-FL). It's unlikely to become law in our opinion. Mack's bill would encourage emerging market countries to tie their currencies to the dollar by sharing 85% of the seignior age.

**China PNTR: Lott is playing a dangerous game that could jeopardize passage.** So say top Democratic trade staffers. It's the only lever the Senate Majority Leader (R-MS) has over President Clinton. Mr. Lott is using PNTR in an attempt to force President Clinton to accept Republican appropriations measures and Senator Thompson (R-TN)'s weapons proliferation amendment. President Clinton is unlikely to capitulate, in which case Lott risks failure to pass China PNTR before Congress recesses on July 28th. Passage in September would be much more difficult, although 75 Senators support it.

**China NTR: House will take up annual status on Tuesday.** Since PNTR has not yet become law, the annual process of voting on normal trade relations (formerly MFN) continues. Yesterday, the House Ways and Means Committee shot down a resolution to deny NTR until China joints the WTO and it will die again in the House next week.

**China needs 399 airliners by 2018** reported the State Aviation Industries Corporation in the July 13th *China Daily*. Boeing and Airbus will battle for these orders.

**Gas tax repeal rejected by the Senate yesterday 40-59.** An amendment to the estate tax bill, H.R. 8, it would have suspended the 18.4¢/gal. federal fuel tax until Dec. 31st. Highway construction advocates successfully fought the move.

**Trade: Administration again delays punitive tariff list over cashmere.** The WTO has ruled that the U.S. may impose tariffs against the EU over bananas and beef. The list was initially scheduled for release on June 19th, but UK Prime Minister Tony Blair interceded with President Clinton. The list is now not expected until at least next week.

© 2000  Davis Capital Investment Ideas        Call 202-544-7098



# Sample Weekly Calendar

**Davis Capital Investment Ideas**                    **7-17-00   9:30 AM**

### Washington Calendar, July 17-21

Today and tomorrow, **President Clinton** will continue Middle East peace negotiations at Camp David. Tuesday afternoon, he hosts the Super Bowl champions at the White House. Wednesday, he departs for the **G-8 economic summit** in Okinawa, Japan.

**Congress...** At 6:15 PM today, the **Senate** will pass **marriage penalty tax relief,** H.R. 4810. It will then resume debate on Interior Appropriations, H.R. 4578. This week, the **House** will take up Treasury-Postal Appropriations and a resolution disapproving the extension of **PNTR** to China, H.J. Res. 103, as early as tomorrow. On Thursday or Friday, the House is also expected to pass H.R. 1102, to increase **IRA contributions.**

| | | |
|---|---|---|
| **Monday 17:** | 8:30 AM | **Eizenstat,** German Foundation Agreement in Berlin. |
| **Tuesday 18:** | 9:30 AM | **Rx drug costs** hearing, Senate Health |
| | 9:30 AM | **Internet regulation** hearing, House Judiciary |
| | 9:30 AM | **Climate change** hearing, Senate Commerce |
| | 10 AM | **U.S. foreign oil dependency and alternative fuels** hearing, Senate Finance |
| | 10:30 AM | **China PNTR** hearing, Senate Foreign Relations |
| | 11 AM | **Summers,** U.S. Department of Labor Retirement Savings Education Campaign, DC |
| **Wednesday 19:** | 10 AM | **Sachs, Commodity Futures Modernization Act** hearing, Senate Banking |
| | 10 AM | **CEA reauthorization** hearing, House Banking |
| | 2 PM | **Internet piracy** hearing, House Intl. Relations |
| **Thursday 20:** | 9 AM | **Energy prices** hearing, Senate Agriculture |
| | 9:30 AM | **Internet airline tickets** hearing, Senate Commerce |
| | 9:30 AM | **Electronic devices on airlines,** House Trans. |
| | 10 AM | **Greenspan, Humphrey-Hawkins,** Senate Banking |
| | 10 AM | Rep. Baker's **GSE** hearing, House Banking |
| **Friday 21:** | | **G-7 Summit, Okinawa, Japan** |

© 2000  **Davis Capital Investment Ideas**       **Call 202-544-7098**





**Davis Capital Investment Ideas**

503 Capitol Court, N.E.
Suite 200
Washington, D.C. 20002
202-544-7098
202-544-4324
202-544-7163 (fax)
pete@daviscap.com
allyson@daviscap.com
http://www.daviscap.com

SECNOTH00110856



**Davis·Capital Investment Ideas**        **4-12-01      12 PM**

### Washington Tax Outlook, April 2001

**Tax cut: Some media have incorrectly reported $85 b. of stimulus this year.  $1.9 b. per month starting in September is more like it.**  Even if the House passed marginal tax rate cuts were signed into law by July 4th, it's unlikely that more than $1.9 b. per month of withholding reductions would be in place by September 1st, so total stimulus in CY01 would be about $7.6 b.

**My estimate of the House passed tax cut cash flows:**
Assumes only the marginal rate cuts, marriage penalty, and child credit changes of H.R. 3 and H.R. 6.

| | Jan | Feb | Mar | April | May | June | July | Aug | Sept | Oct | Nov | Dec | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | \$-Billion | | | | |
| 2001 | -- | -- | -- | -- | -- | -- | -- | -- | 1.9 | 1.9 | 1.9 | 1.9 | 7.6 |
| 2002 | 4.2 | 7.0 | 8.8 | 7.5 | 7.3 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.3 | 4.3 | 64.4 |

These estimates are approximate, but the general pattern will hold.  I have assumed that the first eight months of the 2001 retroactive marginal rate cut and almost all of the 2001 retroactive child credit increase will reach taxpayers through refunds or reduced final tax payments.

**Refund checks will carry the bulk of the retroactive, first year tax cut.**  Approximately $19.5 b. of the House passed tax cut would show up in refunds and reduced final tax payments from February until June of next year, about $14.7 b. from the marginal rate cut out (totaling about $22.6 b.) and nearly all of the $4.8 b. from the child credit increase.

**No rebate.**  Talk of a rebate has died down.  The White House is working actively to squelch the idea.  Larry Lindsey believes in the permanent income hypothesis and that temporary tax cuts are of little value to the economy.  Without a rebate, the only way for tax reduction to reach taxpayers is through withholding changes, which take approximately 60 days for employers to implement, or through refunds and reduced final tax payments.

**The Senate Budget Resolution confused people.**  The Senate Budget Resolution provided for a $1.6 tr. tax cut over 10 years, FY02-11.  It also provided for $85 b. of outlays over the same period.  Any tax cut in excess of tax liability is scored as an outlay.  This part of the resolution gives the Senate Finance Committee the flexibility to pass a rebate and to provide refundable tax credits.  This does not mean that $85 b. of stimulus will be implemented this year.

**Below are the official Joint Tax Committee revenue estimates of H.R. 3 and H.R. 6, a table showing present law INCOME tax liability, and our summary of tax legislation before Congress.**

© 2001  Davis Capital Investment Ideas                    **Call 202-544-7098**

SECNOTH00110857

## Estimated Revenue Effects of H.R. 3, The "Economic Growth and Tax Relief Act of 2001," as reported by the Committee on Ways and Means

### Fiscal Years 2001-2011
[Billions of Dollars]

| Provision | Effective | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 01-06 | 01-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Create new bracket for first $6,000 of taxable income for singles, first $10,000 for heads of households, and first $12,000 for married couples; no indexing bracket for inflation until 2007; rate set at 12% in 2001 and 2002, 11% in 2003 through 2005, and 10% in 2006 | tyba 12/31/00 | -5.6 | -35.7 | -30.0 | -32.4 | -32.3 | -37.9 | -40.7 | -41.3 | -41.8 | -42.4 | -43.0 | -174.0 | -383.2 |
| Reduce the various income tax rates (39.6% rate reduced to 38% in 2002, 37% in 2003, 36% in 2004, 35% in 2005 and 33% in 2006; 36% rate reduced to 35% in 2002 and 2003, 34% in 2004 and 2005, and 33% in 2006; 31% rate reduced to 30% in 2002, 29% in 2003, 28% in 2004, 27% in 2005, and 25% in 2006; 28% rate reduced to 27% in 2002 and 2003, 26% in 2004 and 2005, and 25% in 2006); repeal the AMT offset to refundable tax credits | tyba 12/31/01 | [1] | -13.4 | -24.4 | -38.4 | -48.5 | -65.2 | -72.8 | -74.7 | -76.9 | -79.3 | -81.7 | -189.8 | -575.1 |
| Transfer to Social Security and Medicare trust funds | tyba 12/31/00 | ------------------- No Revenue Effect ------------------- | | | | | | | | | | | | |
| **NET TOTAL [2]** | | -5.6 | -49.1 | -54.4 | -70.8 | -80.8 | -103.1 | -113.5 | -116.0 | -118.7 | -121.7 | -124.7 | -363.8 | -958.3 |

Joint Committee on Taxation

NOTE: Details may not add to totals due to rounding.
Legend for "Effective" column: tyba = taxable years beginning after
[1] Loss of less than $50 million.

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2001-06 | 2001-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [2] Includes the following effect on fiscal year outlays | [3] | 0.7 | 0.7 | 0.9 | 1.0 | 1.0 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 4.2 | 10.5 |

[3] Less than $50 million.

SECNOTH00110858

**Distribution of Present Law Federal Income Tax Liability**
**Calendar Year 2001**

| Income Category | Number of Returns | | Income | | Individual Income Tax | | Number of Returns with Zero or Negative Liability | |
|---|---|---|---|---|---|---|---|---|
| | Millions | Percent | Billions | Percent | Billions | Percent | Millions | Percent |
| Less than $10,000 | 19.9 | 14.0% | $83 | 1.0% | -$6 | -0.6% | $18.8 | 38.7% |
| 10,000 to 20,000 | 23.3 | 16.4 | 347 | 4.2 | -10 | -1.0 | 16.2 | 33.3 |
| 20,000 to 30,000 | 18.5 | 13.0 | 460 | 5.6 | 9 | 0.9 | 8.1 | 16.6 |
| 30,000 to 40,000 | 15.8 | 11.1 | 549 | 6.7 | 28 | 2.8 | 3.2 | 6.6 |
| 40,000 to 50,000 | 13.1 | 9.2 | 589 | 7.2 | 39 | 3.9 | 1.4 | 3.0 |
| 50,000 to 75,000 | 21.9 | 15.4 | 1337 | 16.4 | 112 | 11.1 | .8 | 1.6 |
| 75,000 to 100,000 | 12.9 | 9.1 | 1121 | 13.7 | 119 | 11.8 | 0.1 | 0.1 |
| 100,000 to 200,000 | 12.8 | 9.0 | 1683 | 20.6 | 237 | 23.6 | (4) | 0.1 |
| 200,000 and over | 3.8 | 2.7 | 1999 | 24.5 | 478 | 47.5 | (4) | (5) |
| Total, All Taxpayers | 142.0 | 100.0 | 8168 | 100.0 | 1008 | 100.0 | 48.6 | 100.0 |
| Highest 10 % | 14.2 | 10.0 | 3431 | 42.0 | 686 | 68.2 | (4) | 0.1 |
| Highest 5% | 7.1 | 5.0 | 2556 | 31.3 | 570 | 56.6 | (4) | (5) |
| Highest 1% | 1.4 | 1.0 | 1402 | 17.2 | 361 | 35.9 | (4) | (5) |

Source: Joint Committee on Taxation
Detail may not add to total due to rounding.

(1) Includes the outlay portion of the EIC.
(2) The income concept used to place tax returns into income categories is adjusted gross income (AGI) plus: [1] tax- exempt interest, [2] employer contributions for health plans and life insurance, [3] employer share of FICA tax, [4] worker's compensation, [5] nontaxable social security benefits, [6] insurance value of Medicare benefits, [7] alternative minimum tax preference items, and [8] excluded income of U. S. citizens living abroad. Categories are measured at 2001 levels.
The highest 10% begins at $107,455, the highest 5% at $145,199 and the highest 1% at $340,306.
(3) Includes filing and nonfiling units. Individuals who are dependents of other taxpayers and taxpayers with negative income are excluded.
(4) Less than 50,000.
(5) Less than 0.005%.

SECNOTH00110859

Estimated Revenue Effects of a Chairman's Amendment in the Nature of a Substitute to H.R. 6, The "Marriage Penalty and Family Relief Act of 2001," Scheduled for Markup by the Committee on Ways and Means on March 22, 2001

Fiscal Years 2001-2011
[Billions of Dollars]

| Provision | Effective | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 01-16 | 01-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Standard deduction set at 2 times single for married filing jointly | tyba 12/31/01 | — | -4.0 | -8.0 | -6.2 | -6.1 | -6.3 | -6.3 | -6.3 | -6.3 | -6.4 | -6.5 | -28.6 | -60.3 |
| 15% rate bracket set at 2 times single for married filing jointly beginning in 2004; 6-year phase in, repeal AMT offset of refundable credits; increase in AMT exemption amount ($1,000 in 2005, and $500 in 2006 and every other year thereafter) | tyba 12/31/01 & tyba 12/31/04 | — | -0.1 | -0.3 | -3.2 | -7.9 | -13.1 | -17.4 | -22.0 | -26.3 | -28.6 | -31.3 | -24.5 | -150.1 |
| Increase the earned income limit for purposes of the EIC for married filing joint returns by 10%; simplified computation of earned income | tyba 12/31/01 | — | [1] | -1.4 | -1.5 | -1.5 | -1.5 | -1.5 | -1.4 | -1.4 | -1.4 | -1.3 | -5.9 | -12.9 |
| Increase the child tax credit to $600 in 2001 and 2002, $700 in 2003, $800 in 2004, $900 in 2005, and $1,000 in 2006; apply large family refundability rule to all families; allow credits fully against the AMT | tyba 12/31/00 | [1] | -5.8 | -6.4 | -10.6 | -15.1 | -19.5 | -23.1 | -23.6 | -23.8 | -23.9 | -24.1 | -57.4 | -175.9 |
| Transfer to Social Security and Medicare Trust Funds | DOE | ---------------- No Revenue Effect ------------------- | | | | | | | | | | | | |
| NET TOTAL | | [1] | -9.9 | -14.1 | -21.5 | -30.6 | -40.4 | -48.3 | -53.3 | -57.8 | -60.3 | -63.2 | -116.4 | -399.2 |

Joint Committee on Taxation

NOTE: Details may not add to totals due to rounding.
Legend for "Effective" column:
DOE = date of enactment
tyba = taxable years beginning after
[1] Loss of less than $50 million.
[2] Estimate includes the following effects on fiscal year outlays ....................

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2001-06 | 2001-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | [3] | 1.5 | 3.0 | 3.7 | 4.4 | 5.1 | 5.8 | 5.7 | 5.4 | 5.3 | 5.1 | 17.7 | 44.9 |

[3] Less than $50 million.

SECNOTH00110860

**Tax cuts likely to pass the House of Representatives in 2001**

| Bill | Description | Prediction | Outcome |
|---|---|---|---|
| Marginal Rate Cut (H.R. 3) | Cut the 15% rate to 12%-'01, 11%-'02, and 10%-'03 for the first $6000 – singles, the first $10,000 for single parents, and the first $12,000 for couples; cut the 31% and 28% rates to 25% by '06; cut the 39.6% and 36% rates to 33% by '06 | A modified rate cut is likely to pass. Look for more relief in the bottom bracket and a top rate of 35%. | House- passed 230-198 on March 8th Senate- |
| Marriage Penalty (H.R. 6) | Couples get twice the standard deduction of singles and twice the 15% bracket width phased in '04-'09, expand earned-income credit for low-income couples | Likely to pass. Enjoys strong bipartisan support in both houses. | House- passed 282-144 on March 29th Senate- |
| Child Credit (H.R. 6) | Increase credit for children 17 and under from $500 to $600 in 2001, phase in to $1000 in 2006 | Likely to pass. | House- passed 282-144 on March 29th Senate- |
| Estate tax relief (H.R. 8) | Phase out and, in the 10th year, repeal the estate and gift tax. | Repeal unlikely, but doubling the tax free estate to $1.25 m. is likely. | House- passed 274-154 on April 4th Senate- |
| Charitable deduction | Create a charitable deduction for non-itemizers. | Could pass. | House- Senate- |
| R&D tax credit | Make the research and development tax credit permanent | Another one or two year extension is much more likely. | House- Senate- |
| IRA/401(k) increases (Portman-Cardin) | Raise the IRA cap to $5,000, and the 410(k) cap to $15,000 | Could pass. Passed the House last year 401-25. | House- Senate- |

SECNOTH00110861

*Adjusted & Uncommitted.*

MEET AT 9AM AT THE 15ᵗʰ ST. TREASURY VISITORS ENTRANCE.
OUR FIRST MEETING IS IN ROOM 3457, THEN AT 10AM, ROOM 1457.

| | Work # | Home #<br>Cell # | Fax #<br>Alt # |
|---|---|---|---|
| **Cohen, Alan**, U.S. Treasury | 202-622-0056 | | 202-622-0073 |
| 15th & Pennsylavnia Room 3424 N.W., Washington DC 20220 | | 202-494-8209 | 888-609-0183 |
| **Lister, Jim**, Department of Treasury *imF laison* *17B* | 202-622-0112 | | |
| 1500 Pennsylvania Ave. NW, Washington DC 20220 *17B at Fed.* | | | |
| **Anderson, Roger**, Treasury *Public Affairs* | 202-622-1715 | | 202-622-9373 |
| 1500 Pennsylvania Ave. NW, Washington DC 20220 | | | 202-622-2640 |
| **Scholz, John Karl**, U.S. Treasury *Tax proposals* | 202-622-0120 | *18 Pros.* | 202-622-0646 |
| 1500 Pennsylvania Avenue NW, Washington DC 20220 | | *no issuer* | |
| **Minarik, Joe**, OMB *Chief Ec.* | 202-395-5873 | | 202-395-1198 |
| OEOB Room 242, Washington DC 20503 | | | |
| **Wilcox, David**, U.S. Treasury | 202-622-2200 | | 202-622-2633 |
| 1500 Pennsylvania Avenue NW, Washington DC 20220 | | | |
| **Anderson, Barry**, OMB | 202-395-4630 | | 202-395-6170 |
| 258 Old Executive Office Building, Washington DC 20503 | | | |
| **Frymoyer, Bill**, Congressman Gephardt | 202-225-0100 | | 202-225-7296 |
| H204 Capitol, Washington DC 20515 | | | |
| **Kies, Ken**, Joint Committee on Taxation | 202-225-3621 | | 202-225-0832 |
| 1015 Longworth HOB, Washington DC 20515 | | | |

*declaring: dunded of 2 box of chocolate!*

*good news — $$*
*bad news — min wage*
*auction expl changes.*
*• Surplus*
*• iMF money*



*Prospects slowing up — no evidence helping*

**EXHIBIT**

*Will have slowdown!*

Nothern - 0307



FOIA - Confidential
Treatment Requested



### Davis Capital Investment Ideas
503 Capitol Court N.E.  Suite 200
Washington, D.C.  20002

202-544-7098
202-544-7163 fax

January 19, 2000

Lee Sachs
Assistant Secretary for Financial Markets
Department of Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Dear Mr. Assistant Secretary:

Thank you for meeting with us at 11 a.m. tomorrow to talk about federal debt management.  Attending will be:

Francis W. McCarthy  April 11, 1951 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        Stone & McCarthy
Raymond W. Stone  November 29, 1950  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        Stone & McCarthy
Steven E. Nothern    April 13, 1956  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  Massachusetts Financial Services
Lawrence Howell Hatheway  December 29, 1958 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  Warburg Dillon Read

Most have worked at the Fed and in senior positions on Wall Street.  All are active Treasury debt market participants.

Sincerely,

Peter J. Davis Jr.
May 12, 1950
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

DC  001664



**Nothern, Steven E.**

| | |
|---|---|
| From: | Pete Davis [daviscap2@mindspring.com] |
| Sent: | Wednesday, January 19, 2000 6:58 AM |
| To: | Hatheway, Larry; McCarthy, Ward; Nothern, Steve; Stone, Ray |
| Subject: | Tomorrow's meeting |

Everyone except Larry, please send me the following information asap:
1. your name as it appears on your drivers license;
2. your birthdate; and
3. your Social Security number.
Unfortunately, I lost that information in my computer meltdown last fall.

Joe Minarik, OMB Chief Economist, will meet with us at 2 p.m. tomorrow.

The day has shaped up quite well. We will meet at 8:45 a.m. at the Hay Adams Hotel, 16th & H Streets, N.W. My cell number is 202-365-7624.

9 a.m. Rob Wescott, White House G-7 economist

10 a.m. Vince Reinhart, Deputy Director, Division of International Finance, Board of Governors of the Federal Reserve. He served a long time in the Division of Monetary Affairs and was moved over last fall to broaden his experience. He's clearly moving up at the Fed.

11 a.m. Lee Sachs, Assistant Secretary of Treasury for Financial Markets

12 p.m. Larry Meyer, Fed Governor, speaking on "The Economic Outlook and the Challenges for Monetary Policy" at the National Economists Club meeting at the Chinatown Garden Restaurant, 618 H Street, N.W.

2 p.m. Joe Minarik, OMB Chief Economist.

I have Jim Klumpner, Chief Economist of the House Budget Committee Minority on reserve if we want a 3:30 p.m. appointment. He writes much of Senator Sarbanes attacks on Greenspan, which he admits is getting harder and harder to do. In spite of this, he is an excellent economist and someone who's opinion I value. Before coming to the Hill, he worked for many years at BEA, and is an expert on the inner workings of GDP and NIPA data.

Let me know whether that meeting is of interest.

The weather could interfere, although the latest forecast is not too bad, maybe 1" to 3" of snow early Thursday morning, this town often shuts down on the forecast of snow. I doubt planes or trains will be significantly affected, but the traffic might be.

*[handwritten notes:]*

1.6% and G Columbia

202 544 7058
7 pm Lobby

460   140   24
Maturing — surplus — TIPS
160   — foreign adinc.
gross  284 B
w/out buyback 260 B.

• only effect is spread of off the run
• not effect on interest

• Anything off limits?
• Biggest priority?
• Shift maturity?
• Saving interest expense?
• Ever stop if it gets too small
• Trot them back out?
• Bad faith? issue 8, I expect 8





**DAVIS CAPITAL INVESTMENT IDEAS**

PETE DAVIS
PRESIDENT

503 CAPITOL COURT, N.E.
SUITE 200
WASHINGTON, D.C. 20002

202-544-7098
202-544-7163 FAX

| | Work # | Home #<br>Cell # | Fax #<br>Alt # |
|---|---|---|---|
| Wescott, Rob,   The White House<br>  , Washington  DC  20036 | 202-456-5905 | | |
| Reinhart, Vincent R.    Federal Reserve<br>  20th & C NW,  Washington  DC  20551 | 202-452-2007 | | 202-452-6424 |
| Sachs, Lee,    Department of Treasury<br>  1500 Pennsylvania Ave. NW,  Washington  DC  20220 | 202-622-2245 | | 202-622-4774 |
| Malvey, Paul,    Department of Treasury<br>  1500 Pennsylvania Ave. NW,  Washington  DC  20220 | 202-622-1881 | | 202- |
| Meyer, Laurence,    Board of Governors of the Federal<br>  20th & C NW B-,  Washington  DC  20551 | 202-452-3211 | | 202-452-2271 |
| Minarik, Joe,   OMB<br>  OEOB  Room 242,  Washington  DC  20503 | 202-395-5873 | | 202-395-1198 |
| Klumpner, Jim,   House Budget Committee<br>  217 O'Neill,  Washington  DC  20510 | 202-226-7261 | 301-565-0314 | 202-225-9905 |

Forecasts have been wrong for 3½ yrs.

*Vince Reinhart*

"seem to need mechanisms to damp agg demand"
— small rise in long rates, more in short rates
— concern that pressure for fiscal restraint easing
looser fiscal → tighter monetary .... impact for $?

— Sachs · are not extending, but 2004 to 7½ yrs.
· disinterested. no preference in objectives
"We are going to do what Fed" (in coupon passes) does

Nothern - 0008



FOIA – Confidential
Treatment Requested



## Davis Capital Investment Ideas

503 Capitol Court N.E.  Suite 200
Washington, D.C.  20002

202-544-7098
202-544-7163 fax

January 28, 2000

Paul Malvey
Department of Treasury
1500 Pennsylvania Ave. NW
Washington, DC 20220

Dear Paul:

I will be out of town for next Wednesday's quarterly refunding meeting and was hoping it would be OK if my assistant, Allyson Sullivan, attends in my place.  As always, my clients are very interested in the Advisory Committee minutes and tentative schedule of debt issuance that the media often take more time to convey than we do.  Of course, none of that would go out before the embargo time.

Thanks.

Pete Davis

Allyson J. Sullivan
01-28-78
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

If for some reason the charts aren't available Monday afternoon, I'd need to clear a former assistant in for the Tuesday morning meeting to get those.

Kristin M. Caiola
02-08-78
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

DC 001660

NOV-29-2002  12:10                                                          P.02/02





### Davis Capital Investment Ideas          1-24-01   1 PM

#### Treasury Quarterly Refunding coverage instructions

**Monday:** Call Lulu Tyler, 202-622-1867, to get cleared in to the meeting.

**Tuesday:** Arrive at the 15th St. entrance of Treasury by 8:30 a.m. to clear security.
BRING DRIVERS LICENSE. Any problems getting in, call Lulu.

Turn left down the hallway. At the end you will decend a down ramp of a few steps to an elevator. Take that to the third floor and go straight down the hall to room 3223.

Sit on the back left. No need to take notes on John Auten's review of the economy.
GET THE CHART BOOK. RETURN TO THE OFFICE ASAP AND FAX SELECTED CHARTS TO LIST 3.

**Wednesday:** Repeat steps 2 and 3. Take careful notes of anything Paul Malvey or anyone else says.

1. GET REVISED CHART BOOK (auction schedule added in the back).
2. GET QUARTERLY REFUNDING PRESS RELEASE.
3. GET ADVISORY COMMITTEE MINUTES.
4. GET ANY PREPARED REMARKS.
When you get back to the office, fax the auction schedule, 2, 3, 4 to list 3.

Note the embargo time.

Immediately after exiting Treasury, call the following clients in order stating:
1. the embargo time;
2. describe the securities ($12 b. 5-year-reopening; $10 b. 10-year; $10 b. 30-year;
3. cite Treasury remarks of interest.

1. Ward McCarthy   1-609-683-5521
2. Bill Cohen        1-914-925-7707
3. Rob Dugger          202-833-4100
4. Kathy Bostjancic 1-212-449-5361 or 1-212-449-2650
5. Richard Medley   1-212-219-9096
6. Bob Falconer      1-312-984-1331
7. Steve Nothern    1-617-954-5887

© 2001  Davis Capital Investment Ideas              Call 202-544-7098

TOTAL P.02

1

393fdavp                    SEALED

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                           03 CR

5    PETER J. DAVIS, JR.

6                   Defendant.

7    ------------------------------x

8
                                           September 3, 2003
9                                          12:40 p.m.

10
     Before:
11
                    HON. DOUGLAS F. EATON,
12
                                           Magistrate Judge
13

14                      APPEARANCES

15   JAMES B. COMEY
          United States Attorney for the
16        Southern District of New York
     BY:  ROBERT H. HOTZ, JR. and BRIAN D. COAD
17        Assistant United States Attorneys

18   BAKER BOTTS
          Attorneys for Defendant Davis
19   MARY C. SPEARING and MARK STANCIL

20

21

22

23

24

25

SECNOTH00145728

393fdavp                    SEALED                    2

1          THE COURT:  All right.  I am calling the case of

2     United States against Peter J. Davis, Jr.

3          Mr. Davis is here in court.

4          I will ask the attorneys to state their names for the

5     record.

6          MR. HOTZ:  Good afternoon, your Honor.  Robert Hotz

7     and Brian Coad for the government.

8          MS. SPEARING:  Good afternoon, your Honor.  Mary

9     Spearing and Mark Stancil for the defendant, Mr. Davis.

10         THE COURT:  All right.  As I understand the situation,

11    the government filed a Notice of Intent to File a Felony

12    Information, and on that basis the case was assigned to Judge

13    Shira A. Scheindlin.  She has been advised that Mr. Davis has

14    entered into a plea agreement.  She has requested that I handle

15    the guilty plea questioning, if that is agreeable with

16    Mr. Davis.  Is that the situation?

17         MS. SPEARING:  Yes, it is, your Honor.

18         THE COURT:  Okay.  I think we will proceed first with

19    a series of boring questions from Mrs. Lewis about the waiver

20    of the right to have this case presented to a grand jury.

21         We had the waiver signed by Ms. Spearing and by

22    Mr. Davis, and Mr. Davis will now be asked a series of

23    questions about that waiver of grand jury.

24         THE DEPUTY CLERK:  You are Peter J. Davis, Jr.?

25         THE DEFENDANT:  That's correct.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145730

19

393fdavp                    SEALED

1    firms on federal policy development that will affect their
2    investments.  Beginning in the mid 1990's, I began following
3    the Treasury Department's quarterly refunding press conferences
4    for some clients, at which treasury officials would announce
5    the amounts and maturities of various debt issuances.  I
6    eventually obtained direct access to and personally attended
7    these press conferences.  My attendance was pursuant to my
8    agreement with the Treasury Department that I would abide by
9    the embargo and keep all information disseminated there
10   confidential until the embargo expired.

11          The information disseminated in the press conference
12   was embargoed by Treasury officials, such that it could not be
13   published or divulged before a specific time shortly after the
14   press conference concluded.  In 1999, in response to a request
15   from a client who ran a bond research firm but who did not
16   otherwise have direct access to the information in advance of
17   the embargo, I began relaying information to him by telephone
18   as soon as the press conference concluded so, his analyses
19   could come out at the same time as other reporters.  On some
20   occasions those calls occurred in advance of the embargo time.

21          Later in 1999, I began calling other clients I thought
22   might have an interest in the information distributed at the
23   press conferences.  At the time I was making pre-embargo calls,
24   I knew I was breaching my obligation to keep the information
25   confidential until the embargo expired.

SECNOTH00145747

393fdavp                    SEALED

1         With most of my clients, I had no formal agreement to

2    provide pre-embargo information.  With at least one of my

3    clients, however, I entered into an explicit agreement to call

4    and relay the information in advance of the embargo time.

5    Specifically, in May of 2001, I made such a call to John

6    Youngdahl, a vice president and senior economist at Goldman

7    Sachs.  Mr. Youngdahl was a new client, and I hoped that the

8    pre-embargo refunding information would persuade him to remain

9    a client.

10        On July 12, 2001, I received an e-mail from

11   Mr. Youngdahl in which Mr. Youngdahl acknowledged that I had

12   provided him with pre-embargo information relating to the May

13   2001 refunding press conference.  In that e-mail, Mr. Youngdahl

14   also asked me if I would give pre-embargo information to him as

15   a, quote, routine matter, unquote, beginning with the August 1,

16   2001 quarterly refunding press conference.  That same day, I

17   replied to Mr. Youngdahl via e-mail and informed him that I

18   would call him with that information before the embargo

19   expired, quote, with the understanding that everything is

20   embargoed until the embargo time, unquote.  Shortly thereafter,

21   I had a telephone conversation with Mr. Youngdahl in which the

22   details of this arrangement were confirmed.

23        On August 1, 2001, I attended the quarterly refunding

24   press conference at Treasury.  As was my practice, I made a

25   series of phone calls to clients, including Mr. Youngdahl,

SECNOTH00145748

21

393fdavp                          SEALED

1    before the embargo expired.

2              At the October 31st, 2001, quarterly refunding press

3    conference, the Treasury Department issued the surprising

4    announcement that it was discontinuing the 30-year bond.  The

5    move was widely unexpected and I anticipated that many clients

6    would potentially suffer financial harm when the news became

7    public.  The press conference concluded shortly before 9:30

8    a.m. and it was announced that the information would be

9    embargoed until ten a.m.  I immediately exited the Treasury

10   Department and began calling clients on my cell phone to report

11   the news.  Among the clients I reached was Mr. Youngdahl.  I

12   told Mr. Youngdahl that Treasury had decided to discontinue the

13   30-year bond.  I also told Mr. Youngdahl that the information

14   was embargoed until 10 a.m.  My call to him took place around

15   9:30 a.m.  My expectation was that Mr. Youngdahl and Goldman

16   Sachs would use the information to their advantage in trading

17   government securities.  I believed that once this information

18   became public, prices of the 30-year bond would escalate

19   dramatically, and I knew my pre-embargo repot would allow

20   Mr. Young and my other clients to make significant moves in

21   advance of the market responding to the official public

22   release.

23             THE COURT:  All right.  I had one question, which is

24   do you agree that this embargoed information was government

25   property having value of more than $1,000?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145749

22

393fdavp                          SEALED

1              THE DEFENDANT:  Yes, I do, your Honor.

2              THE COURT:  And do you agree that you intended to

3    defraud the government?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  Mr. Hotz, do you think any other questions

6    are needed?

7              MR. HOTZ:  No, your Honor.

8              THE COURT:  All right.  We are up to the final

9    question.  I'm going to read these counts.  I'm going to skip

10   practically all of the language, and then I am going to ask you

11   how do you plead, guilty or not guilty.

12             On Count One, I'm turning to paragraph 27.  The United

13   States Attorney charges from on or about July 12, 2001, to or

14   about October 31, 2001, in the Southern District of New York

15   and elsewhere, Peter J. Davis, Jr. and John Youngdahl, together

16   with other persons, unlawfully, willfully and knowingly did

17   conspire to defraud the United States and to commit offenses

18   against the United States, to wit, and now I am summarizing,

19   conversion of property of the U.S. and the Department of

20   Treasury, also securities fraud and also wire fraud.

21             And I am noting at paragraph 33 that there is a

22   detailed statement of some of the means and methods of this

23   conspiracy and then there is a statement about overt acts, and

24   I am just going to read paragraph 34.

25             In furtherance of this conspiracy, and to effect the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145750

23

393fdavp                          SEALED

1    unlawful objects of the conspiracy, the following overt acts

2    took place, and reading down to the fifth alleged overt act, E,

3    on or about October 31, 2001, Davis placed a cellular telephone

4    call from Washington D.C. to John Youngdahl at Goldman's

5    offices in New York, New York.  That is the essential elements

6    of this very lengthy Count One, a conspiracy to defraud the

7    United States and to commit wire fraud, securities fraud, and

8    conversion of U.S. property.

9              Mr. Davis, how do you plead to Count One of the

10   information?

11             THE DEFENDANT:  Guilty, your Honor.

12             THE COURT:  Count Two charges you with actually

13   committing the crime of conversion of property in the U.S.  It

14   starts off by re-alleging a number of prior paragraphs, and

15   then it says, as follows at paragraph 36, from at least 1999 up

16   to and including October 31, 2001, Peter J. Davis Jr., in the

17   Southern District of New York and elsewhere, did knowingly

18   convert to his own use and the use of others and without

19   authority, conveyed and disposed things of value of the United

20   States, and departments and agencies of the United States, with

21   a value greater than $1,000; namely, the embargoed

22   confidential, non-public information set forth above in

23   violation of Title 18, U.S. Code Section 641.

24             Mr. Davis, how do you plead to Count Two?

25             THE DEFENDANT:  Guilty, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

SECNOTH00145751

24

393fdavp                        SEALED

1        THE COURT:  And, finally, Count Three charges

2    securities fraud.  It re-alleges several prior paragraphs and

3    then it says on or about October 31, 2001, in the Southern

4    District of New York and elsewhere, Peter J. Davis, Jr. and

5    other persons unlawfully, willfully and knowingly, directly and

6    indirectly, by use of a means and instrumentalities of

7    interstate commerce and of the mails, did use and employ in

8    connection with the purchase and sale of securities

9    manipulative and deceptive devices by employing devices,

10   schemes and artifices to defraud and by engaging in acts,

11   practices and courses of business which would operate as a

12   fraud and deceit upon persons in connection with the purchase

13   and sale of 30-year Treasury bonds and 30-year bond futures

14   contracts.

15       That is the essential elements of Count Three.

16   Mr. Davis, how do you plead to Count Three?

17       THE DEFENDANT:  Guilty, your Honor.

18       THE COURT:  I make the following findings for the

19   benefit of Judge Scheindlin.

20       I find that Mr. Davis is fully competent.  I find that

21   he's capable of entering an informed plea.  I find that he's

22   aware of the nature of the charges and aware of the

23   consequences of the plea.  I find that his plea of guilty is a

24   knowing and voluntary plea, supported by an independent basis

25   in fact containing each of the essential elements of the

SECNOTH00145752

53IGDAVS

EXHIBIT
Davis 18
4/14/06 PM

1

| | |
|---|---|
| 53IGDAVS          Sentence | |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

     v.                    03 CR 1054 (SAS)

PETER DAVIS,

           Defendant.

------------------------------x

                       New York, N.Y.
                       March 18, 2005
                       4:35 p.m.

Before:

               HON. SHIRA A. SCHEINDLIN,

                       District Judge

                APPEARANCES

DAVID N. KELLEY
     United States Attorney for the
     Southern District of New York
BRIAN D. COAD
     Assistant United States Attorney

BAKER BOTTS, LLP
     Attorneys for Defendant
MARY C. SPEARING
MARK T. STANCIL

2

53IGDAVS          Sentence

         (Case called)
         (In open court)
         THE COURT:  Well, I was going to take the FCC case
first, but I see you're all lined up on the Peter Davis
sentence.  I'll go ahead with it.
         MR. COAD:  Thank you, your Honor.
         MS. SPEARING:  Thank you, your Honor.
         THE COURT:  I was going to take the other folks, but
we'll proceed as promptly as we can.  So good afternoon,
Mr. Coad.
         MR. COAD:  Yes, your Honor.  Good afternoon.
         THE COURT:  Right.  And Ms. Spearing?

53IGDAVS

13      MS. SPEARING:  Yes, your Honor.
14      THE COURT:  And who is with you, Ms. Spearing?
15      MS. SPEARING:  Mark Stancil, your Honor.
16      THE COURT:  Good afternoon.  And, Mr. Davis, good
17  afternoon.  I've reviewed the revised presentence report dated
18  February 25, 2005, together with the sentencing recommendation
19  and the addendum of February 24, 2005.  I've also reviewed
20  defense counsel's undated sentencing memorandum received on
21  March 11, 2005 and attached exhibits consisting of letters from
22  friends and family, as well as addressing other matters.  I've
23  also reviewed the government's letter motion pursuant to
24  section 3553(e) of title 18 of the United States Code, as well
25  as section 5K1 of the guidelines moving for a downward
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                          3

53IGDAVS                    Sentence
1   departure based on defendant's substantial assistance to the
2   government.
3       MS. SPEARING, have you reviewed the report, the
4   recommendation and the addendum, as well as the government's
5   letter?
6       MS. SPEARING:  Yes, your Honor.
7       THE COURT:  Do you have any objections to anything in
8   the report?
9       MS. SPEARING:  Yes, your Honor.  The objections that
10  we filed --
11      THE COURT:  Oh, right.  I should have said other than
12  what you addressed in the letters.
13      MS. SPEARING:  No, your Honor.
14      THE COURT:  And have you gone over these materials
15  with your client?
16      MS. SPEARING:  Yes, your Honor.
17      THE COURT:  And, Mr. Davis, do you have any
18  objections, other than what Ms. Spearing raised in her letter?
19      THE DEFENDANT:  No, your Honor.
20      THE COURT:  All right.  Mr. Coad, have you reviewed
21  the report, the recommendation, the addendum and defense
22  counsel's letter?
23      MR. COAD:  Yes, I have, your Honor.
24      THE COURT:  And do you have any objections to anything
25  in the report, other than what you addressed in your letter?
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

                                                          4

53IGDAVS                    Sentence
1       MR. COAD:  No, your Honor.
2       THE COURT:  Are there any fact issues here that
3   require a Fatico hearing?
4       MS. SPEARING:  No, your Honor.
5       MR. COAD:  Not that I'm aware of, your Honor.
6       THE COURT:  In light of the Booker case, the
7   guidelines are now advisory and no longer mandatory.  I shall,
8   of course, consider the guidelines but will impose a sentence I
9   consider reasonable under the sentencing factors set forth in
10  18 United States Code, section 3553(a).
11      So I begin by adopting the finding of fact set forth
12  in the presentence report but not in the guideline calculation.
13  In any event, defendant has pled guilty to three counts of a
14  felony information, charging him with conspiracy to defraud the
15  United States, conversion of government property and securities
16  fraud, pursuant to a plea agreement.  Because all three counts
17  are connected by a common criminal objective and are part of a
                            Page 2

53IGDAVS
18  common scheme and the offense level is determined largely on
19  the basis of the total amount of harm, all counts can be
20  grouped pursuant to section 3D1.2(b) and (d) of the guidelines.
21          The basic offense level for fraud is six, pursuant to
22  section 2F1.1(a).  In his plea agreement and in his guilty plea
23  allocution, defendant specifically agreed the amount of the
24  unlawful gain to Goldman, Sachs was approximately $3.8 million.
25  As a result, the base offense level must increase by 13 levels,
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

5

53IGDAVS                Sentence
1   bringing it to 19, pursuant to section 2F1.1(b)(1)(10).
2   Because the offense involved more than minimal planning, a
3   further two-level increase to level 21 is warranted, pursuant
4   to section 2F1.1(b)(2)(2).  The offense level is then decreased
5   by three levels to 18 based on the defendant's acceptance of
6   responsibility, as evident by his guilty plea and cooperation,
7   pursuant to section 3E1.1(a) and (b).
8           The probation department has recommended two
9   additional enhancements, one for abuse of a position of trust
10  and one for a violation of a prior specific judicial or
11  administrative order, injunction or a decree.  Defendant
12  opposes both enhancements, arguing that neither enhancement
13  applies to the facts of this case.  In its 5K1 letter, the
14  government agreed that neither enhancement should apply.  After
15  reviewing the presentence report and both the defense and
16  government's submissions, I, too, agree that neither
17  enhancement is applicable.
18          Because the defendant has no criminal history, he
19  falls in criminal history category I.  His guideline range at
20  offense level 18, criminal history category I is 27 to 33
21  months in custody.  This guideline also requires a fine of not
22  less than $6,000 and not more than $60,000.  Finally, no
23  restitution is required.
24          In addition to all of this, the government is moving
25  for a substantial assistance departure, and I do intend to
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

6

53IGDAVS                Sentence
1   grant that motion.  The only issue is how much to grant as a
2   departure from the range.
3           With that, Ms. Spearing, are you the one who is
4   speaking?  Right?
5           MS. SPEARING:  Yes, your Honor.
6           THE COURT:  You wish to be heard?
7           MS. SPEARING:  Yes, your Honor.
8           Your Honor, I have basically three points to make on
9   behalf of Mr. Davis.  I understand that your Honor has ruled on
10  the loss amount and agreed with the probation office on the
11  $3.8 million loss, but I would urge the Court to know in this
12  post-Booker environment Mr. Davis' motivation in this offense,
13  and that is that he, at no time, intended to trade on the
14  information.  He, at no time, did trade on the information.  He
15  did not profit from the information with Goldman, Sachs or any
16  of his other clients.
17          If you gained his gain was that of retaining these
18  clients and the retainer fee that they were paying him monthly
19  by disclosing the information, he received no additional money
20  by giving them this information, your Honor.  So his gain,
21  monetarily, was extremely small in the scheme of things and in
22  the scheme of the offense.  And I think in the post-Booker
Page 3

53IGDAVS

23  world, where you can consider, as the judge did in the Rainham
24  case, his motivation and his personal gain and the personal
25  loss that he incurred, I think it is a mere fraction of the
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

53IGDAVS                     Sentence
1  $3.8 million, and I would ask the Court to consider that.
2           Secondly, your Honor, with respect to Mr. Davis'
3  cooperation, his cooperation was extensive, it was complete,
4  and it was candid.  He has been a model cooperator.  I would
5  point to the strong -- in my judgment, the strong 5K letter
6  that the government submitted that said Mr. Davis was,
7  "completely forthright and candid," that the information was
8  highly valuable and essential and that he provided them
9  e-mails, provided voluntarily by Mr. Davis, "played a critical
10  role in bringing Mr. Youngdahl to acknowledge the wrongdoing
11  and the crimes that he committed."
12           Mr. Davis is responsible for having brought to justice
13  a high executive, who admitted not only insider trading but
14  also admitted to having lied, including under oath more than
15  once.  Your Honor, his cooperation has been particularly long.
16  It has gone on, because the government investigation has gone
17  on a substantial amount of time.  Mr. Davis has been available
18  to the government for the better part of two and a half to
19  three years, and his cooperation has been particularly
20  effective.
21           In addition, to Mr. Youngdahl's plea, it was the
22  catalyst for Goldman, Sachs and MFS implementing structural
23  safeguards in the way they hire consultants.  But, most
24  important, your Honor, and most unusual, I believe, is
25  Mr. Davis' reason for cooperating, and it was to make things
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

53IGDAVS                     Sentence
1  right.  It was immediate.  It was not done to see what he could
2  get for his information.  He was not even in a position at the
3  time he asked his lawyers to contact the government to know
4  whether Goldman, Sachs had indeed traded, and he certainly
5  wasn't in the position to know that John Youngdahl had lied and
6  had lied three times.  And when he proffered the e-mail to the
7  government which proved that lie, Mr. Davis was not in a
8  position to know how essential or how critical it was to the
9  government's case and how important it was.
10           When he started to cooperate, it was solely for the
11  purpose of reaching out to the government to admit what he did,
12  to acknowledge that he had made a huge wrongdoing and mistake
13  in his life and to try to get on with his life and to make
14  amends, and that was his sole motivation.  And in that sense,
15  your Honor, I think he is distinguishable from many cooperators
16  who appear before this Court, and I wanted to point that out.
17           Lastly, your Honor, the conduct for which he stands
18  before the Court today is truly out of character and truly
19  aberrant behavior, which even the probation officer in his
20  presentence report noted and thought that it was appropriate
21  that he get a significant downward departure for.  It stands in
22  sharp contrast to the rest of his life and his behavior.
23           More than anything I could say, your Honor, in the
24  letters that were written for the Court and for your attention,
25  they are replete with examples of giving to the community.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300
Page 4

53IGDAVS

9

53IGDAVS                         Sentence
1   This is a person who truly, genuinely has been engaged in his
2   community and selflessly so.  And it is not a recent rush of
3   activity that has been done to impress your Honor.  This is
4   activity and engagement and behavior that has run through his
5   entire adult life, and these letters show that.
6           Your Honor, Mr. Davis has basically organized his life
7   around helping other people and not taking advantage of them
8   but, instead -- or the system that we live in, but, rather, to
9   go about contributing to it.  This is a person who does not
10  need to be separated from the community.  The community would
11  be better served from having Mr. Davis in it.
12          For all those reasons, your Honor, we urge the Court
13  to look at this man in the complete context of his life, of his
14  cooperation, of the motivation for his cooperation and to give
15  him a probationary sentence.  Thank you.
16          THE COURT:  Thank you.  Mr. Davis, do you wish to be
17  heard?
18          THE DEFENDANT:  Yes, your Honor.
19          THE COURT:  Go ahead, Mr. Davis.
20          THE DEFENDANT:  I am very sorry for what I did that
21  brings me here today.  I understand it's wrong, and I make no
22  excuses.  I apologize to those who I've hurt and seek their
23  forgiveness.  I do ask you to consider that, other than this
24  instance, I've lived a good and ethical life.  Since this
25  happened, I've done everything I can to make amends.  I'd give
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

10

53IGDAVS                         Sentence
1   anything to undo it.  It's not consistent with my character,
2   and it will never happen again.  Thank you.
3           THE COURT:  Thank you, Mr. Davis.
4           Mr. Coad, do you wish to be heard?
5           MR. COAD:  Your Honor, it's certainly not my place to
6   comment on what my view of the appropriate sentence would be,
7   and I don't intend to do that, but I have had counsel speak,
8   and I certainly will say this:  I don't disagree with anything
9   that counsel for Mr. Davis has said.  Of course, I'm not privy
10  to, perhaps, conversations she's had with her client, but I
11  have read the many submissions, and I have had some dealings
12  with Mr. Davis over the course of the past several years.  And
13  I can say this is certainly an instance where I do not believe
14  that in any respect counsel for Mr. Davis has overstated, in
15  her remarks to the Court, anything.  Thank you, your Honor.
16          THE COURT:  Thank you, Mr. Coad.  Based on all of the
17  sentencing factors set forth in 18 United States Code, section
18  3553, as well as the information provided in the government's
19  5K1 motion, I conclude that a sentence of two years probation
20  is appropriate, together with a fine of $30,000 and a mandatory
21  assessment of $300.
22          For the record, I will review the statutory factors.
23  I begin with the nature and circumstances of the offense.  This
24  defendant released highly sensitive nonpublic information to
25  his client just before it became public, knowing that the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

11

53IGDAVS                         Sentence
1   information was embargoed until a fixed point in time.  His
2   client then traded on that information, but it doesn't appear
3   that he personally profited or knew the extent to which his
                          Page 5

53IGDAVS

4  clients would profit.  As his counsel said, the motivation
5  appeared to keep the client on the monthly retainer and to keep
6  them happy clients.
7         Turning next to the defendant's history and
8  characteristics, this 54-year-old defendant had a spotless
9  record until this offense.  He has always worked and has been
10  an excellent husband and father.  He has also been helpful in
11  his community.  The probation department believes that an
12  aberrant conduct departure may be warranted here, because this
13  conduct is completely inconsistent with defendant's prior
14  conduct.  Indeed, it appears that this conduct may have been
15  more akin to a grievous mistake in judgment than an intentional
16  effort to defraud the government.  In addition, the defendant
17  has provided full cooperation to the authorities, something
18  that he initiated very early on.
19         The next factor is the need for the sentence imposed.
20  While I am not planning to give a jail sentence, I believe the
21  sentence I impose is appropriate under the circumstances of
22  this case.
23         The next factor is to reflect the seriousness of the
24  offense and to promote respect for the law and to provide just
25  punishment.  I must say that a felony conviction itself does

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

12

53IGDAVS                    Sentence

1  reflect the seriousness of this offense and promotes respect
2  for the law.  I mean, having to go around being a felon for the
3  rest of one's life -- a prior convicted felon is a very serious
4  punishment.
5         Given the defendant's full and early cooperation, a
6  term of probation, in addition to being a convicted felon, does
7  provide the just punishment, together with a fine.
8         The next factor is to adequately deter such conduct.
9  Again, I think that a felony conviction, as well as a period of
10  probation supervision, does provide adequate deterrence to
11  people who might be able to commit the crime that this
12  defendant committed, which was, I gather, a very small group of
13  people.
14         The third factor is to protect the public from further
15  crimes by this defendant.  I don't think the public needs much
16  protection from Mr. Davis, and to the extent they do, I think
17  he's more than learned his lesson.
18         The next factor is to provide the defendant with
19  needed educational or vocational training, medical care, etc.
20  Being at liberty, in my view, will provide the most appropriate
21  access to those services.  The factors, the kind of sentence
22  that is available, the choices here would have been jail,
23  community confinement or probation.  I think probation is the
24  appropriate sentence of these types.
25         The next factor is the guidelines sentence and all

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13

53IGDAVS                    Sentence

1  applicable policy statements.  The guidelines here call for a
2  sentence of 27 to 33 months.  I agree with defense counsel that
3  this range would be high, even if there had been no
4  cooperation, because it is driven primarily by the loss amount.
5  I do not think this defendant had any knowledge or intention of
6  causing a loss in the range of $4 million, and I also believe
7  as to his probation that an aberrant conduct departure would
8  have been warranted.

Page 6

53IGDAVS

9      But overriding all of this is that cooperators almost
10  always received a sentence reduction from the guideline range
11  in recognition of the assistance they have provided to the
12  government.  So this sentence does account for the guideline
13  range but makes an appropriate adjustment based on the nature
14  and extent of the defendant's cooperation and all of the other
15  factors that I spoke about.
16      Finally, there is the need to avoid unwarranted
17  sentencing disparities, and that's important, because that was
18  the purpose behind the Sentencing Reform Act of 1984.  And it
19  survives the Booker case.  The guideline system was promulgated
20  to set a national norm for types of criminal conduct, but, as
21  I've noted, cooperators have always received a sentence
22  reduction for their substantial assistance, and this defendant,
23  considering his history and his circumstances and his
24  motivation, would have fallen outside the guideline range
25  anyway.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

14

53IGDAVS                    Sentence
1      The final factor is restitution, which was not a
2  factor here.  I, therefore, conclude that considering the
3  Goldman sentencing and the individual I'm sentencing, that this
4  is the appropriate sentence.  So I am imposing a sentence of
5  two years probation.  In addition, the defendant is required to
6  pay a fine of $30,000 in equal monthly installments throughout
7  the two-year period of probation.  He's also required to pay
8  the special assessment of $300.
9      The defendant is to be supervised in the district of
10  his residence, and the standard conditions of probation as
11  recommended by the probation department shall apply, and the
12  mandatory ones, which are, one, the defendant shall not commit
13  another federal, state or local crime; two, defendant shall not
14  illegally possess a controlled substance; and, three, defendant
15  shall not possess a firearm or other destructive device.
16      The mandatory drug testing condition is suspended due
17  to this Court's conclusion that this defendant poses little or
18  no risk of any drug abuse.
19      The following special conditions are imposed:  One,
20  the defendant shall provide the probation office with access to
21  any requested financial information; and, two, the defendant
22  shall not incur new credit charges or open additional lines of
23  credit without the approval of the probation department.
24      Are there any legal objections before sentence is
25  finally imposed?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

15

53IGDAVS                    Sentence
1      MS. SPEARING:  No, your Honor.
2      MR. COAD:  No, your Honor.
3      THE COURT:  All right.  Then the sentence is imposed
4  as stated.  Mr. Davis, you have the right to appeal the
5  sentence within ten days, but only to the extent permitted by
6  your plea agreement.  If you cannot pay the cost of appeal, you
7  have the right to apply for leave to appeal in forma pauperis.
8      Is there anything further, Mr. Coad to dismiss?
9      MR. COAD:  No, your Honor.
10      THE COURT:  Anything further?
11      MS. SPEARING:  No, your Honor.
12      THE COURT:  It's probably too late to report to
13  probation, but it has to be arranged for Monday.

Page 7

```
                          53IGDAVS
14        MS. SPEARING:  All right, your Honor.
15        MR. COAD:  Thank you, your Honor.
16                       o0o
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

EXHIBIT
Davis?
4|19|06 PMJ

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
From: Pete Davis <pete@daviscap.com>
To: David.Greenlaw@morganstanley.com
CC: Ted Wieseman <Ted.Wieseman@morganstanley.com>

I've seen one report on CNN that Titon Corp. in San Diego is already
treating the mail for the Post Office.

Subject: Davis Capital email
Date: Mon, 29 Oct 2001 09:15:07 -0500
From: Pete Davis <pete@daviscap.com>
To: "Davis, Pete" <pete@daviscap.com>
BCC: Shelley Black <sblack@senderocapital.com>,
    Ken Davis <kend@pistolcreek.com>, Mike DeLoose <mdeloose@aol.com>,
    "Fosler, Gail" <Gail.Fosler@conference-board.org>,
    Lynn Fox <foxl@frb.gov>,
    Matthew Gleckler <Geckol@worldnet.att.net>,
    Michael Light <mlight99@earthlink.net>,
    "McMaster, David" <David_McMaster@byrd.senate.gov>,
    "Sedlock, Tom" <tsedlock@cnuber.com>,
    Bob Stein <bob_stein@budget.senate.gov>,
    "Sweet, Stuart" <capnet@erols.com>,
    Jason Webb <Jason_Webb@byrd.senate.gov>,
    "Woodward, Joan" <Joan.Woodward@gs.com>,
    "Yamazaki, Kazutami" <yamazaki@erols.com>,
    "Yorke, Stephen" <stephenyorke@yorkecap.demon.co.uk>,
    "Gallagher, Tom" <tgallagher@isigrp.com>,
    Bob McNally <Robert_C._McNally@opd.eop.gov>,
    Xavier Bonnet <xavier.bonnet@amb-wash.fr>,
    Jim Carter <James_E._Carter@opd.eop.gov>,
    YASUHIRO KAWAGUCHI <yasuhiro.kawaguchi@mofa.go.jp>,
    Stan Collender <collends@fleishman.com>,
    Michael Light <MLight@frk.com>,
    Trevor Greetham <TGreetham@exchange.uk.ml.com>,
    Yasuhiro Kawaguchi <yasuhirokawaguchi@hotmail.com>,
    "Franks, Sarah (London)" <FrankSar@exchange.uk.ml.com>,
    "Cohen, Bill" <billc@imsi.com>,
    "Glassman, Jim" <jglassman@chase.com>,
    Stephen Jonathan <Stephen.Jonathan@chase.com>,
    "Sharp, Bill" <bill.sharp@chase.com>,
    "Emsbo-Mattingly, Lisa" <lisa.e.mattingly@fmr.com>,
    Yasutaka Fukahori <yasutaka.fukahori@mofa.go.jp>,
    Takehiro Kagawa <takehiro.kagawa@mofa.go.jp>,
    KAZUYUKI KATAYAMA <kazuyuki.katayama@mofa.go.jp>,
    Shinichi Kitajima <shinichi.kitajima@mofa.go.jp>,
    Atsushi Niigata <niigata@us2.so-net.com>,
    Yoko Tsuda <yoko.tsuda@mofa.go.jp>, masahiko.kiya@mofa.go.jp,
    satoru.takahashi@mofa.go.jp,
    Takehiro Kano <takehiro.kano@mofa.go.jp>,
    "Neusser, Josef" <jjneusser@bloomberg.net>,
    Bill Adams <wadams@mfs.com>, "Hawkins, Richard" <rhawkins@mfs.com>,
    "Kurinsky, Geoffrey" <gkurinsky@mfs.com>,
    "Nothern, Steve" <snothern@mfs.com>, "Ryan, Matt" <mryan2@mfs.com>,
    Peter Sullivan <psullivan@mfs.com>,
    "Swanson, Jim" <jswanson@mfs.com>, Bob Persons <rpersons@mfs.com>,
    "Mark E. Dow" <MDow@MFS.com>,
    "Altman, Emily" <Emily.Altman@morganstanley.com>,
    Diane Merdian <diane.merdian@morganstanley.com>,
    Gerard Gardner <gerard.gardner@morganstanley.com>,
    David Greenlaw <David.Greenlaw@morganstanley.com>,
    Debra Levin <debra.levin@morganstanley.com>,
    Richard Berner <richard.berner@morganstanley.com>,
    Lloyd Byrne <lloyd.byrne@morganstanley.com>,
    Jay Deahna <jay.deahna@morganstanley.com>,
                            Page 845

FOIA - Confidential
Treatment Requested

```
                                  Pete E-Mail Sent.txt
Mark Edelstone <mark.edelstone@morganstanley.com>,
Aisling Freiheit-Kinch <Aisling.Freiheit-Kinch@morganstanley.com>,
Marc Frost <marc_frost@morganstanley.com>,
Louis Gerhardy <louis.gerhardy@morganstanley.com>,
"Graham, Roderick" <Roderick.Graham@morganstanley.com>,
"Kimball, Paul" <Paul.Kimball@morganstanley.com>,
Allison Montgomery <a.Montgomery@morganstanley.com>,
Mita Nambiar <Mita.Nambiar@morganstanley.com>,
Scott Patrick <Scott.Patrick@morganstanley.com>,
Jay Pelosky <jay.pelosky@morganstanley.com>,
Kenneth Posner <Kenneth.Posner@morganstanley.com>,
"Roach, Steve" <Stephen.Roach@morganstanley.com>,
Rebecca Runkle <rebecca.runkle@morganstanley.com>,
Art Soter <art.soter@morganstanley.com>,
Tim Stewart <Timothy.Stewart@morganstanley.com>,
Heidi Wood <heidi.wood@morganstanley.com>,
Ted Weiseman <ted.weiseman@morganstanley.com>,
Gail Daniel <Gail.Daniel@morganstanley.com>,
Amy Falls <Amy.Falls@morganstanley.com>,
Justin Hakimian <justin.hakimian@morganstanley.com>,
Jay Deahna <jaydeahna@home.com>,
"Cohen, Steve" <stevec@saccapital.com>,
"Cohn, Brian" <brianc@saccapital.com>,
Ed Debler <edmundd@saccapital.com>,
"Foley, Larry" <larryf@saccapital.com>,
Rich Grodin <richg@saccapital.com>,
"Handler, Mike" <mikeh@saccapital.com>,
"Lewis, Mark" <marcl@saccapital.com>,
"Weiner, Jon" <jonw@saccapital.com>,
"Canally, John" <jcanally@smra.com>,
"Canavan, John" <canavan@smra.com>, "Kim, Young" <ykim@smra.com>,
"Liro, Joe" <jliro@smra.com>, "McCarthy, Ward" <ward@smra.com>,
"Saporta, Dana" <dsaporta@smra.com>,
"Stone, Ray" <rstone@smra.com>,
"VandenHouten, Nancy" <nancy@smra.com>, Ken Kim <kim@smra.com>,
Sanela Pecenkovic <sanela@smra.com>,
"Dugger, Rob" <rob.dugger@tudor.com>,
"Mathews, Steve" <smathews@tudor.com>,
Chris Gate <Chris.Gate@Tudor.com>,
Angel Ubide <angel.ubide@tudor.com>,
"Hamilton, Debra" <debra.hamilton@kemper.com>,
Peter Hamilton <phamilton@medleyadvisors.com>,
Richard Medley <rmedley@medleyadvisors.com>,
Kevin Muehring <kmuehring@medleyadvisors.com>,
Josh May <jmay@medleyadvisors.com>,
David Steinhardt <Davids@centinv.com>,
Allyson Sullivan <Allyson@Daviscap.com>,
Kevin Logan <klogan@drkw.com>,
John Youngdahl <John.Youngdahl@gs.com>,
William Dudley <william.dudley@gs.com>,
John Tormondsen <john.tormondsen@gs.com>,
Peter Gerhard <peter.gerhard@gs.com>,
Jason Evans <jason.evans@gs.com>, Irene Tse <irene.tse@gs.com>,
Christian Siva-Jothy <christian.siva-jothy@gs.com>,
Andrew Law <andrew.law@gs.com>, Karl Devine <karl.devine@gs.com>,
Max Trautman <max.trautman@gs.com>,
Chris Carrera <chris.carrera@gs.com>, Ed Eisler <ed.eisler@gs.com>,
Ashok Varadhan <ashok.varadhan@gs.com>,
David Blake <david.blake@gs.com>,
"Falconer, Bob" <bob@sangamon.com>, Chris <Chris@Sangamon.com>,
Gene <Gene@Sangamon.com>,
"Anderson, Lincoln" <Lincoln.Anderson@lpl.com>,
Paul Kasriel <plk1@ntrs.com>,
                                  Page 846
```

DC 002510

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
"Maki, Dean" <dean_maki@putnaminv.com>,
Adrian Weller <Adrian.Weller@wfg.com>,
Jonathan Francis <Jonathan_Francis@putnaminv.com>,
Tomas Jelf <tjelf@nexus.bm>, Evan Lamp <elamp@home.com>,
Jordan Grayson <grayson@midtowncap.com>,
Haseeb Ahmed. <haseeb.ahmed@bankofamerica.com>,
Timothy Martin <timothy.martin@bankofamerica.com>,
Caroline Baum <CABAUM@bloomberg.net>, D Brown <dbrown@iinews.com>,
"Gersh, Darren" <darren_gersh@wpbt.org>,
Angela Heath <angela_heath@wpbt.org>,
Toby McIntosh <tmcintos@bna.com>, Art Pine <apine@bloomberg.net>,
"O'Toole, Quinn" <Quinn_Otoole@wpbt.org>,
"Wade, Taron" <wadet@iinews.com>,
Anna Willard <Anna.Willard@reuters.com>,
Noam Neusner <nneusner@usnews.com>,
Simon Kennedy <SKENNEDY4@bloomberg.net>,
Brendan Murray <brmurray@bloomberg.net>

Davis Capital Investment Ideas   10-29-01    9:10 AM

Washington Calendar, October 29-November 2

President Bush speaks to the U.S.-Sub-Saharan Africa Trade and Economic
Forum at 11:15 AM and chairs the first meeting of the Homeland Security
Council at 2 PM today.

Congress…Wednesday, the House will take up the aviation security bill, H.R.
3150, and the Treasury-Postal Appropriations conference report, H.R. 2590.
The Senate will take up Labor-HHS Appropriations, H.R. 3061, and victims'
relief, H.R. 2884, this week.

Monday 29:
   9:30 AM   O'Neill, "Plenary on Terrorism Financing," DC
   4:15 PM   O'Neill, AGOA Forum Session, DC

Tuesday 30:
   2 PM        Postmaster General Potter, postal safety hearing, House
Government Reform

Wednesday 31:
   9 AM        Fisher, Treasury Quarterly Refunding, DC
   10 AM       O'Neill, National Association of Manufactures, DC
   10 AM       Ex-Im Bank mark up, House Financial Services
   10 AM       Internet gambling mark up, House Financial Services
   10 AM       Price-Anderson Act mark up, House Energy

Thursday 1:
   9:30 AM   Rail security hearing, Senate Commerce
   9:30 AM   Electric power emissions hearing, Senate Environment ·
   10 AM      Consumer credit hearing, House Financial Services
   10 AM      Fuel economy hearing, House Science
   1PM         MTBE hearing, House Energy
   2 PM        Chemical site security hearing, Senate Environment
   2 PM        Retirement account deposit insurance hearing, Senate Banking
   2:30 PM   Retirement security hearing, House Education

© 2001  Davis Capital Investment Ideas    Call 202-544-7098

**REDACTED**

DC 002511



EXHIBIT

Page: 1 of 15
Billing Date: October 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0313123836

## Your Monthly Statement

| Previous Balance | Payments Received | Adjustments to Prior Bill(s) | Total Balance Forward | Late Payment Charge | *Current Charges | Total Amount Due |
|---|---|---|---|---|---|---|
| 128.11 | 128.11 | .00 | .00 | .00 | 96.45 | 96.45 |

*Total current charges includes late payment charges if applicable.

### Summary of Current Charges

| | |
|---|---|
| Monthly Access | 79.97 |
| Additional Services | .00 |
| Other Charges and Credits | 1.26 |
| Equipment Charges | .00 |
| Home Airtime Charges | .00 |
| Related Call Charges | 2.64 |
| Roaming Charges | .00 |
| Other Fees and Surcharges | 9.80 |
| Federal Tax | 2.75 |
| State Tax | .03 |
| Local Tax | .00 |
| | |
| **Total Current Charges Due by 11/14/01** | **96.45** |

### Verizon Wireless News

Get the Number and Get Connected with 411 Connect(sm).

Important Information About the Federal Universal Service & Regulatory Fee. Important Security Notice to Customers. See Details inside this bill.

Thank you for choosing to add Enhanced Services.

**Call Customer Service at 1-800-922-0204 (or *611 from your cellular phone).**
**Visit us on our web site at www.verizonwireless.com**
* Please see reverse side for an explanation on how to read your bill and the address for all written communication.

---

**Please detach here and return this portion with your payment**

CUSTOMER ACCOUNT NO: 302481721-00001
INVOICE NO: 0313123836
BILLING DATE: October 19, 2001

KEY LINE

PETER J DAVIS
3015 TENNYSON ST NW
WASHINGTON DC 20015-2231
POSTNET

BALANCE FORWARD .00
CURRENT CHARGES 96.45

AMOUNT DUE BY 11/14/01    **$96.45**
MAKE CHECK PAYABLE TO
VERIZON WIRELESS
AMOUNT
PAID    $ ☐ ☐ . ☐ ☐

PO BOX 17464
BALTIMORE MD 21297-1464
2129714644

☐ Account or user address change? If yes, please check box and see reverse side.

031312393601030248172100001000000964500000096459

SECNOTH00114188

Page: 7 of 15
Billing Date: October 19, 2001
Customer Account No: 3024817721-00001
Invoice Number: 0313123938

## Mobile Telephone Number Detail for:
### PETER DAVIS - (202) 365-7624

### Current Pricing Plan Details

| Price Plan | Monthly Access | Monthly Allowance Minutes | Per Minute Charge | |
|---|---|---|---|---|
| 005195 | $29.99 | 200 General | $.30 Peak | $.30 Off-peak |

Active Additional Services: 3-Party-Conference - Call Forward Busy - Call Forwarding - Call Forward No Answer - Call Waiting - Call Delivery - Voice Mail - CDMA Digital W/Mob Msngr - CallerID - Message Waiting Ind - Mob Msngr: Off - Mob Msngr - Unlimited Msgs

### Monthly Access Charges

| | | |
|---|---|---|
| Monthly Access | 10/20/01 - 11/19/01 | 29.99 |
| | Total Monthly Access Charges..... | 29.99 |

### Other Charges and Credits

| | | |
|---|---|---|
| Fed Univ. Svc/Reg Chg | | .42 |
| | Total Other Charges and Credits..... | .42 |

### Home Airtime Charges - Band 1

| Description | Peak | Off-Peak | Weekend | Totals |
|---|---|---|---|---|
| **Current Month's Usage** | | | | |
| Airtime (Minutes) | 107 | 3 | 17 | 127 |
| Monthly Allowance | 105 | 3 | 17 | 125 |
| 1st Incoming Minute Allowance | 2 | 0 | 0 | 2 |
| Incoming Airtime* | 10 | 0 | 0 | 10 |

*Airtime amounts included within the Current Month's Usage Airtime (Minutes) section.

| | | | | |
|---|---|---|---|---|
| Total Number of Calls | 55 | 2 | 14 | 71 |

Total Home Airtime Charges.....    .00

SECNOTH00114189

Page: 8 of 15
Billing Date: October 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0313123936

## Related Call Charges - Band 1

| Description | Total Number of Calls | Peak Charges | Off-Peak Charges | Day/ Standard Charges | Evening/ Discount Charges | Night/ Economy Charges | Total Amount |
|---|---|---|---|---|---|---|---|
| **Long Distance Charges** | | | | | | | |
| Verizon Wireless (VWL) | 4 | 1.54 | .00 | .00 | .00 | .00 | 1.54 |
| Total Long Distance Charges | | | | | | | 1.54 |
| **Cellular Regional Calling** | | | | | | | |
| Verizon Wireless (REG) | 1 | .66 | .00 | .00 | .00 | .00 | .66 |
| Total Cellular Regional Calling and Local Charges | | | | | | | .66 |
| | | Total Related Call Charges..... | | | | | 2.20 |

## Other Fees and Surcharges

| | |
|---|---|
| Dist. of Columbia  Gross Receipts Surcharge | 3.04 |
| Total Other Fees and Surcharges..... | 3.04 |

## Taxes

| | |
|---|---|
| Total Federal Tax | 1.07 |
| State Tax: Maryland | .03 |
| Total State Tax | .03 |
| Total Other Fees, Surcharges and Taxes... | 4.14 |
| **Total Current Charges for PETER  DAVIS (202) 365-7624** | 36.75 |

SECNOTH00114190

Page: 9 of 15
Billing Date: October 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0313123936

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | Airtime Charges | | | | | Related Call Charges | | | Total Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | |
| 24 | 10/03 | 9:52 AM | 01 | Washington DC | Washington | DC 202-737-4000 | P | 1 | AF | | .00 | | | .00 | .00 |
| 25 | 10/03 | 4:01 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 26 | 10/04 | 5:20 PM | 01 | Chevy Chas MD | Washington | DC 202-663-2340 | P | 1 | AF | | .00 | | | .00 | .00 |
| 27 | 10/07 | 3:25 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2346 | W | 1 | AF | | .00 | | | .00 | .00 |
| 28 | 10/07 | 2:29 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2346 | W | 1 | AF | | .00 | | | .00 | .00 |
| 29 | 10/07 | 2:33 PM | 01 | Chevy Chas MD | Washington | DC 202-966-6147 | W | 1 | AF | | .00 | | | .00 | .00 |
| 30 | 10/07 | 3:06 PM | 01 | Chevy Chas MD | Washington | DC 202-482-9143 | W | 1 | AF | | .00 | | | .00 | .00 |
| 31 | 10/07 | 3:00 PM | 01 | Chevy Chas MD | Washington | DC 202-244-7090 | W | 2 | AF | | .00 | | | .00 | .00 |
| 32 | 10/08 | 2:55 PM | 01 | Washington DC | Washington | DC 202-484-5810 | P | 1 | AF | | .00 | | | .00 | .00 |
| 33 | 10/08 | 2:46 PM | 01 | Washington DC | Washington | DC 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 34 | 10/08 | 4:02 PM | 01 | Chevy Chas MD | Incoming | CL 202-365-7624 | P | 1 | IF | | .00 | | | .00 | .00 |
| 35 | 10/08 | 3:43 PM | 01 | Washington DC | Washington | DC 202-363-2346 | P | 1 | AF | | .00 | | | .00 | .00 |
| 36 | 10/08 | 3:05 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2346 | O | 1 | AF | | .00 | | | .00 | .00 |
| 37 | 10/09 | 1:50 PM | 01 | Chevy Chas MD | Washington | DC 202-544-4328 | P | 1 | AF | | .00 | | | .00 | .00 |
| 38 | 10/09 | 2:57 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 39 | 10/09 | 2:53 PM | 01 | Bethesda MD | Washington | DC 202-544-4324 | P | 1 | AF | | .00 | | | .00 | .00 |
| 40 | 10/09 | 3:15 PM | 01 | Washington DC | Washington | DC 202-966-6147 | P | 1 | AF | | .00 | | | .00 | .00 |
| 41 | 10/09 | 8:10 PM | 01 | Arlington VA | Washington | DC 202-966-3398 | P | 1 | AF | | .00 | | | .00 | .00 |
| 42 | 10/10 | 11:48 AM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 1 | AF | | .00 | | | .00 | .00 |

+Designates the location, city and state, of the cell tower or switching center which processed the call.

Legends

Airtime Rate Periods:          Usage Type:          Special Feature:          Related Call Type:

P   Peak                     A  Price Plan Allowance                          REG   Cellular Regional Call
O   Off-Peak                 F  Full Call                                     VWL   VWL Long Distance
W   Night/Weekend            I  Incoming Call

SECNOTH00114191

P.02

Page: 10 of 15
Billing Date: October 19, 2001
Customer Account No: 3024481721-00001
Invoice Number: 0313123836

Continued from previous page

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from~ | Called to | | Airtime Charges | | | | | | Related Call Charges | | | | Total Amt |
|---|------|------|------|--------------|-----------|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | | Rate Period | Type | Amt | |
| 43 | 10/10 | 2:36 PM | 01 | Washington DC | New York | NY 212-302-8124 | P | 2 | AF | | .00 | | PEAK | VWL | .44 | .44 |
| 44 | 10/10 | 2:58 PM | 01 | Washington DC | Bethesda | MD 301-051-3031 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 45 | 10/10 | 4:03 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3393 | P | 2 | AF | | .00 | | | | .00 | .00 |
| 46 | 10/10 | 4:05 PM | 01 | Chevy Chas MD | Washington | DC 202-224-3384 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 47 | 10/10 | 4:27 PM | 01 | Washington DC | Washington | DC 202-224-3394 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 48 | 10/10 | 7:26 PM | 01 | Sterling VA | Arlington | VA 703-294-6225 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 49 | 10/10 | 7:25 PM | 01 | Sterling VA | Washington | DC 202-244-7003 | P | 2 | AF | | .00 | | | | .00 | .00 |
| 50 | 10/11 | 5:20 PM | 01 | Washington DC | Washington | DC 202-585-2345 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 51 | 10/11 | 5:24 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2345 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 52 | 10/11 | 6:48 PM | 01 | Chevy Chas MD | Washington | DC 202-458-5513 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 53 | 10/11 | 7:02 PM | 01 | Washington DC | Washington | DC 202-453-5513 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 54 | 10/12 | 7:43 AM | 01 | Washington DC | Washington | DC 202-639-8800 | P | 2 | AF | | .00 | | | | .00 | .00 |
| 55 | 10/13 | 4:49 PM | 01 | Washington DC | Mailbox | CL 202-365-7624 | W | 2 | AF | | .00 | | | | .00 | .00 |
| 56 | 10/14 | 2:13 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2246 | W | 1 | AF | | .00 | | | | .00 | .00 |
| 57 | 10/14 | 2:27 PM | 01 | Chevy Chas MD | Mailbox | CL 202-365-7624 | W | 1 | AF | | .00 | | | | .00 | .00 |
| 58 | 10/16 | 1:43 PM | 01 | Chevy Chas MD | New York | NY 212-836-7724 | P | 1 | AF | | .00 | | PEAK | VWL | .22 | .22 |
| 59 | 10/16 | 1:43 PM | 01 | Chevy Chas MD | Princeton | NJ 609-827-4689 | P | 3 | AF | | .00 | | PEAK | REG | .66 | .66 |
| 60 | 10/17 | 10:02 AM | 01 | Washington DC | Washington | DC 202-543-3389 | P | 2 | AF | | .00 | | | | .00 | .00 |
| 61 | 10/17 | 10:54 AM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 7 | AF | | .00 | | | | .00 | .00 |
| 62 | 10/17 | 2:34 PM | 01 | Bethesda MD | Washington | DC 202-543-3389 | P | 2 | AF | | .00 | | | | .00 | .00 |
| 63 | 10/17 | 2:35 PM | 01 | Chevy Chas MD | Washington | DC 202-226-7261 | P | 10 | AF | | .00 | | | | .00 | .00 |
| 64 | 10/17 | 2:46 PM | 01 | Chevy Chas MD | Washington | DC 202-544-4324 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 65 | 10/17 | 2:51 PM | 01 | Bethesda MD | Incoming | CL 202-365-7624 | P | 1 | IAF | | .00 | | | | .00 | .00 |
| 66 | 10/17 | 4:01 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3389 | P | 2 | AF | | .00 | | | | .00 | .00 |
| 67 | 10/17 | 4:03 PM | 01 | Chevy Chas MD | Chicago | IL 312-557-4760 | P | 2 | AF | | .00 | | PEAK | VWL | .44 | .44 |
| 68 | 10/17 | 4:05 PM | 01 | Chevy Chas MD | Silver Spg | MD 301-608-3198 | P | 3 | AF | | .00 | | | | .00 | .00 |
| 69 | 10/18 | 12:23 PM | 01 | Washington DC | Arlington | VA 703-522-1700 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 70 | 10/18 | 5:20 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2246 | P | 1 | AF | | .00 | | | | .00 | .00 |
| 71 | 10/18 | 6:24 PM | 01 | Washington DC | Washington | DC 202-456-5350 | P | 2 | AF | | .00 | | | | .00 | .00 |

**Total Usage Charges.....**                    **2.20**

+Designates the location, city and state, of the cell tower or switching center which processed the call.
Legend:

**Airtime Rate Period:**    **Usage Type:**    **Special Feature:**    **Related Call Type:**

P    Peak
O    Off-Peak
W    Night/Weekend

A    Price Plan Allowance
F    Full Call
I    Incoming Call

REG    Cellular Regional Call
VWL    VWL Long Distance

TOTAL P.02

SECNOTH00114192

Page: 10 of 15
Billing Date: November 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0319403124

Continued from previous page

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | Airtime Charges | | | | | Related Call Charges | | | Total Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | |
| 43 | 11/02 | 11:24 AM | 01 | Washington DC | Washington | DC 202-775-7600 | P | 2 | | AF | | .00 | | | .00 | .00 |
| 44 | 11/02 | 11:59 AM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 1 | AF | | .00 | | | .00 | .00 |
| 45 | 11/03 | 3:37 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2346 | W | 1 | AF | | .00 | | | .00 | .00 |
| 46 | 11/05 | 1:25 PM | 01 | Washington DC | Silver Spa | MD 301-588-8802 | P | 1 | AF | | .00 | | | .00 | .00 |
| 47 | 11/06 | 3:27 PM | 01 | Washington DC | Washington | DC 202-344-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 48 | 11/07 | 11:33 AM | 01 | Washington DC | Washington | DC 202-592-4584 | P | 2 | AF | | .00 | | | .00 | .00 |
| 49 | 11/07 | 12:08 PM | 01 | Washington DC | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 50 | 11/07 | 12:17 PM | 01 | Washington DC | Washington | DC 202-496-9613 | P | 1 | AF | | .00 | | | .00 | .00 |
| 51 | 11/07 | 12:19 PM | 01 | Washington DC | Washington | DC 202-466-5613 | P | 1 | AF | | .00 | | | .00 | .00 |
| 52 | 11/07 | 12:19 PM | 01 | Washington DC | Washington | DC 202-502-4584 | P | 1 | AF | | .00 | | | .00 | .00 |
| 53 | 11/07 | 12:20 PM | 01 | Washington DC | Incoming | CL 202-365-7624 | P | 1 | IF | | .00 | | | .00 | .00 |
| 54 | 11/07 | 3:27 PM | 01 | Washington DC | Bethesda | MD 301-651-2521 | P | 2 | AF | | .00 | | | .00 | .00 |
| 55 | 11/07 | 7:14 PM | 01 | Sterling VA | Bethesda | MD 301-229-7766 | P | 3 | AF | | .00 | | | .00 | .00 |
| 56 | 11/07 | 7:17 PM | 01 | Sterling VA | Vienna | VA 703-242-3629 | P | 1 | AF | | .00 | | | .00 | .00 |
| 57 | 11/08 | 2:40 PM | 01 | Arlington Va | Washington | DC 202-543-3399 | P | 4 | AF | | .00 | | | .00 | .00 |
| 58 | 11/08 | 2:45 PM | 01 | Arlington VA | Washington | DC 202-429-7935 | P | 2 | AF | | .00 | | | .00 | .00 |
| 59 | 11/08 | 2:47 PM | 01 | Arlington VA | Washington | DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 60 | 11/08 | 2:49 PM | 01 | Arlington VA | Incoming | CL 202-365-7624 | P | 5 | IAF | CW | .00 | | | .00 | .00 |
| 61 | 11/08 | 2:53 PM | 01 | Arlington VA | Washington | DC 202-544-4324 | P | 4 | AF | | .00 | | | .00 | .00 |
| 62 | 11/08 | 2:57 PM | 01 | Arlington VA | New York | NY 212-901-2710 | P | 7 | AF | | .00 | PEAK | VML | 1.54 | 1.54 |
| 63 | 11/08 | 3:04 PM | 01 | Arlington VA | Washington | DC 202-452-5519 | P | 2 | AF | | .00 | | | .00 | .00 |
| 64 | 11/09 | 10:10 AM | 01 | Washington DC | Washington | DC 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 65 | 11/09 | 10:12 AM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 66 | 11/09 | 10:20 AM | 01 | Washington DC | Vienna | VA 703-650-2752 | P | 1 | AF | | .00 | | | .00 | .00 |
| 67 | 11/09 | 10:23 AM | 01 | Washington DC | Mailbox | CL 202-365-7624 | P | 1 | AF | | .00 | | | .00 | .00 |
| 68 | 11/09 | 11:13 AM | 01 | Washington DC | Washington | DC 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 69 | 11/09 | 11:16 AM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 3 | AF | | .00 | | | .00 | .00 |
| 70 | 11/09 | 11:17 AM | 01 | Washington DC | Washington | DC 202-897-2962 | P | 1 | AF | | .00 | | | .00 | .00 |
| 71 | 11/09 | 1:46 PM | 01 | Washington DC | Washington | DC 202-638-7894 | P | 1 | AF | | .00 | | | .00 | .00 |
| 72 | 11/12 | 9:50 PM | 01 | Washington DC | Washington | DC 202-452-5519 | P | 1 | AF | | .00 | | | .00 | .00 |
| 73 | 11/12 | 3:04 PM | 01 | Bethesda MD | WGN07NZN17VA | 703-658-9180 | P | 2 | AF | | .00 | | | .00 | .00 |
| 74 | 11/12 | 3:29 PM | 01 | Washington DC | Mobile | CL 202-365-7624 | P | 1 | AF | | .00 | | | .00 | .00 |
| 75 | 11/12 | 3:30 PM | 01 | Washington DC | Washington | DC 202-543-3369 | P | 1 | AF | | .00 | | | .00 | .00 |
| 76 | 11/12 | 3:42 PM | 01 | Chevy Chas MD | Washington | DC 202-966-6147 | P | 1 | AF | | .00 | | | .00 | .00 |
| 77 | 11/12 | 6:49 PM | 01 | Washington DC | Bethesda | MD 301-229-2259 | P | 1 | AF | | .00 | | | .00 | .00 |
| 78 | 11/13 | 1:38 PM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 79 | 11/13 | 1:10 PM | 01 | Washington DC | Washington | DC 202-224-3234 | P | 1 | AF | | .00 | | | .00 | .00 |
| 80 | 11/13 | 1:08 PM | 01 | Bethesda MD | Washington | DC 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 81 | 11/13 | 2:43 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3389 | P | 1 | AF | | .00 | | | .00 | .00 |
| 82 | 11/14 | 12:50 PM | 01 | Washington DC | Bethesda | MD 301-651-3931 | P | 1 | AF | | .00 | | | .00 | .00 |
| 83 | 11/14 | 2:22 PM | 01 | Bethesda MD | Washington | DC 202-543-3299 | P | 4 | AF | | .00 | | | .00 | .00 |

+Designates the location, city and state, of the cell tower or switching center which processed the call.

Legends

| Airtime Rate Period: | Usage Type: | Special Features: | Related Call Type: |
|---|---|---|---|
| P   Peak | A   Price Plan Allowance | CW   Call Waiting | REG   Cellular Regional Call |
| W   Night/Weekend | F   Full Call | | VML   VML Long Distance |
| | I   Incoming Call | | |
| | X   Partial Allowance | | |

SECNOTH00114195

Page: 11 of 16
Billing Date: November 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0319403124

Continued from previous page

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | | Called to | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | Total Amt |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Airtime Charges | | Related Call Charges | | | |
| 84 | 11/14 | 2:26 PM | 01 | Chevy Chas MD | Gaithersbg | MO 301-370-4034 | | P | 2 | AF | | .00 | | | .00 | .00 |
| 85 | 11/14 | 2:28 PM | 01 | Chevy Chas MD | Washington | DC 202-544-4324 | | P | 2 | AF | | .00 | | | .00 | .00 |
| 86 | 11/14 | 4:24 PM | 01 | Dorsey MD | Salt Lake | UT 601-363-7776 | | P | 6 | AF | | .00 | PEAK | VWL | 1.32 | 1.32 |
| 87 | 11/14 | 4:33 PM | 01 | Dorsey MD | Washington | DC 202-544-7003 | ~ P | 2 | AF | | .00 | | | .00 | .00 |
| 88 | 11/14 | 4:53 PM | 01 | Glen Burni MD | Washington | DC 202-458-5519 | | P | 2 | AF | | .00 | | | .00 | .00 |
| 89 | 11/19 | 5:50 PM | 01 | Washington DC | Washington | DC 202-646-4147 | | P | 1 | AF | | .00 | | | .00 | .00 |
| 90 | 11/19 | 6:35 PM | 01 | Washington DC | Bethesda | MD 301-229-691D | | P | 2 | AF | | .00 | | | .00 | .00 |
| 91 | 11/19 | 6:42 PM | 01 | Chevy Chas MD | Bethesda | MD 301-229-2255 | | P | 2 | AF | | .00 | | | .00 | .00 |
| 92 | 11/19 | 6:52 PM | 01 | Washington DC | Incoming | CL 202-365-7624 | | P | 1 | IF | | .00 | | | .00 | .00 |
| 93 | 11/19 | 6:59 PM | 01 | Washington DC | Bethesda | MD 301-229-6910 | | P | 10 | AX | | 1.20 | | | .00 | 1.20 |
| 94 | 11/19 | 7:14 PM | 01 | Great Fall VA | Bethesda | MD 301-229-3422 | | P | 1 | | | .30 | | | .00 | .30 |

Total Usage Charges.....                           14.26

+Designates the location, city and state, of the cell tower or switching center which processed the call.
Legends

| Airtime Rate Period: | | Usage Type: | | Special Feature: | | Related Call Type: | |
|---|---|---|---|---|---|---|---|
| P | Peak | A | Price Plan Allowance | CW | Call Waiting | REG | Cellular Regional Call |
| W | Night/Weekend | F | Full Call | | | VWL | VWL Long Distance |
| | | I | Incoming Call | | | | |
| | | X | Partial Allowance | | | | |

TOTAL P.11

SECNOTH00114196

Page: 1 of 16
Billing Date: November 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0319403124

## Your Monthly Statement

| Previous Balance | Payments Received | Adjustments to Prior Bill(s) | Total Balance Forward | Late Payment Charge | *Current Charges | Total Amount Due |
|---|---|---|---|---|---|---|
| 96.45 | .00 | .00 | 96.45 | .00 | 108.84 | 205.29 |

*Total current charges includes late payment charges if applicable.

### Summary of Current Charges

| | |
|---|---|
| Monthly Access | 79.97 |
| Additional Services | .00 |
| Other Charges and Credits | 1.55 |
| Equipment Charges | .00 |
| Home Airtime Charges | 1.50 |
| Related Call Charges | 12.76 |
| Roaming Charges | .00 |
| Other Fees and Surcharges | 9.92 |
| Federal Tax | 3.13 |
| State Tax | .00 |
| Local Tax | .00 |
| | |
| **Total Current Charges** | **108.84** |

### Verizon Wireless News

Important Information About the Federal
Universal Service & Regulatory Fee.

New – Telecommunications Relay Service.

See details inside this bill.

Just a reminder.... Our records indicate your account is now past due.  If payment has been mailed, please disregard this notice.

Call Customer Service at 1-800-922-0204 (or *611 from your cellular phone).
Visit us on our web site at www.verizonwireless.com
*Please see reverse side for an explanation on how to read your bill and the address for all written communication.

---

*Please detach here and return this portion with your payment*

CUSTOMER ACCOUNT NO:  302481721-00001
INVOICE NO:  0319403124
BILLING DATE:  November 19, 2001

KEY LINE

| | |
|---|---|
| BALANCE FORWARD | 96.45 |
| CURRENT CHARGES | 108.84 |

PAYMENT DUE IMMEDIATELY
MAKE CHECK PAYABLE TO
VERIZON WIRELESS

**$205.29**

PETER J DAVIS
3015 TENNYSON ST NW
WASHINGTON  DC 20015-2231
POSTNET

AMOUNT PAID   $ ☐☐☐.☐☐

PO BOX 17464
BALTIMORE MD 21297-1464
2129714644

☐  *Account or user address change?  If yes, please check box and see reverse side.*

0319403124010302481721000010000108840000205299

SECNOTH00114193

Page: 9 of 16
Billing Date: November 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0319403124

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | Airtime Charges | | | | | Related Call Charges | | | Total Amt |
|---|------|------|------|--------------|-----------|------|------|------|------|-----|------|------|------|------|
| | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | |
| 1 | 10/20 | 6:37 PM | B1 | Washington DC | Washington | DC 202-966-8356 | W | 1 | AF | | .00 | | | .00 | .00 |
| 2 | 10/22 | 2:12 PM | 01 | Silver Spr MD | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 3 | 10/23 | 2:41 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 4 | 10/24 | 2:56 PM | 01 | Chevy Chas MD | Chicago | IL 312-984-1321 | P | 6 | AF | | .00 | PEAK | VWL | 1.10 | 1.10 |
| 5 | 10/24 | 3:19 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 6 | 10/24 | 4:03 PM | 01 | Chevy Chas MD | Washington | DC 202-224-3394 | P | 1 | AF | | .00 | | | .00 | .00 |
| 7 | 10/24 | 4:06 PM | 01 | Bethesda MD | Washington | DC 202-225-6760 | P | 2 | AF | | .00 | | | .00 | .00 |
| 8 | 10/24 | 4:08 PM | 01 | Bethesda MD | New York | NY 212-219-0056 | P | 4 | AF | | .00 | PEAK | VWL | .88 | .88 |
| 9 | 10/25 | 7:39 AM | 01 | Washington DC | Washington | DC 202-363-2345 | P | 2 | AF | | .00 | | | .00 | .00 |
| 10 | 10/25 | 11:45 AM | 01 | Linthicum MD | Silver Spg | MD 301-645-6190 | P | 3 | AF | | .00 | | | .00 | .00 |
| 11 | 10/29 | 4:47 PM | 01 | Chevy Chas MD | Washington | DC 202-363-7265 | P | 1 | AF | | .00 | | | .00 | .00 |
| 12 | 10/29 | 4:48 PM | 01 | Chevy Chas MD | Washington | DC 202-362-1951 | P | 1 | AF | | .00 | | | .00 | .00 |
| 13 | 10/29 | 4:49 PM | 01 | Washington DC | Washington | DC 202-363-2345 | P | 3 | AF | | .00 | | | .00 | .00 |
| 14 | 10/29 | 4:55 PM | 01 | Chevy Chas MD | Washington | DC 202-363-2346 | P | 2 | AF | | .00 | | | .00 | .00 |
| 15 | 10/31 | 3:28 AM | 01 | Washington DC | Princeton | NJ 609-683-6521 | P | 4 | AF | | .00 | PEAK | REG | .36 | .36 |
| 16 | 10/31 | 9:32 AM | 01 | Washington DC | Rye | NY 914-925-7707 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 17 | 10/31 | 9:33 AM | 01 | Washington DC | Greenwich | CT 203-863-4715 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 18 | 10/31 | 9:34 AM | 01 | Washington DC | Stamford | CT 203-816-2400 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 19 | 10/31 | 9:35 AM | 01 | Washington DC | New York | NY 212-902-3124 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 20 | 10/31 | 9:37 AM | 01 | Washington DC | Chicago | IL 312-984-1321 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 21 | 10/31 | 9:38 AM | 01 | Washington DC | Boston | MA 617-856-5867 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 22 | 10/31 | 9:39 AM | 01 | Washington DC | Boston | MA 617-563-7728 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 23 | 10/31 | 9:41 AM | 01 | Washington DC | Washington | DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 24 | 10/31 | 9:44 AM | 01 | Washington DC | Boston | MA 617-573-0573 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 25 | 10/31 | 9:45 AM | 01 | Washington DC | Boston | MA 617-742-6873 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 26 | 10/31 | 9:46 AM | 01 | Washington DC | New York | NY 212-597-3672 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 27 | 10/31 | 9:47 AM | 01 | Washington DC | New York | NY 212-834-5102 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 28 | 10/31 | 9:49 AM | 01 | Washington DC | New York | NY 212-834-5102 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 29 | 10/31 | 9:51 AM | 01 | Washington DC | New York | NY 212-219-0096 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 30 | 10/31 | 9:53 AM | 01 | Washington DC | Boston | MA 617-742-6810 | P | 2 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 31 | 10/31 | 9:55 AM | 01 | Washington DC | New York | NY 212-597-3672 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 32 | 10/31 | 9:56 AM | 01 | Washington DC | Charlotte | NC 704-386-6829 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 33 | 10/31 | 9:58 AM | 01 | Washington DC | Washington | DC 202-662-7000 | P | 5 | AF | | .00 | | | .00 | .00 |
| 34 | 10/31 | 10:02 AM | 01 | Washington DC | Washington | DC 202-822-2133 | P | 6 | AF | | .00 | | | .00 | .00 |
| 35 | 10/31 | 10:08 AM | 01 | Washington DC | Washington | DC 202-739-0871 | P | 2 | AF | | .00 | | | .00 | .00 |
| 36 | 10/31 | 10:09 AM | 01 | Washington DC | Washington | DC 202-585-3353 | P | 2 | AF | | .00 | | | .00 | .00 |
| 37 | 10/31 | 10:19 AM | 01 | Washington DC | Washington | DC 202-585-5363 | P | 2 | AF | | .00 | | | .00 | .00 |
| 38 | 10/31 | 4:02 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 39 | 10/31 | 4:05 PM | 01 | Chevy Chas MD | New York | NY 212-761-6657 | P | 8 | AF | | .00 | PEAK | VWL | 1.76 | 1.76 |

+Designates the location, city and state, of the cell tower or switching center which processed the call.

Legenda

**Airtime Rate Period:**

P   Peak
W   Night/Weekend

**Usage Type:**

A   Price Plan Allowance
F   Full Call
I   Incoming Call
X   Partial Allowance

**Special Feature:**

CW   Call Waiting

**Related Call Type:**

REG   Cellular Regional Call
VWL   VWL Long Distance

SECNOTH00114194

FOIA - Confidential
Treatment Requested



Pete E-Mail Sent.txt
by quarter.  There may be quarters with no buybacks."  Treasury has "no
target" amount to retire.

10 year reissuance in October won't be repeated.  Fisher said "I regret that
we felt it necessary to hold the October auction [reopening]…Given the
number of fails in October, we had to act [in the 10 year, but not the 5
year]…It seemed to work as we hoped…It's certainly something I hope I never
have to repeat."

Cash management bills will be avoided if possible.  "It's certainly our hope
to work with the 4 week bill instead."

Is Treasury concentrating its borrowing on the short end?  "You draw the
correct inference, but I wouldn't put too fine a point on it."

"There is a wrinkle in the yield curve in 2003 and 2004," Fisher said.  "We
have an opportunity to smooth out the curve."

© 2001  Davis Capital Investment Ideas    Call 202-544-7098


Subject: Pete Davis 10/31/01 calls
Date: Mon, 05 Nov 2001 16:38:59 -0500
From: Pete Davis <pete@daviscap.com>
To: "Minsker, Marty" <Martin.Minsker@BakerBotts.com>,
    "Bennett, Brad" <brad.bennett@bakerbotts.com>,
    "Spearing, Mary" <mary.spearing@bakerbotts.com>

Marty, Mary, and Brad:

A Verizon Wireless representative just read me the phone calls I made
last Wednesday morning, 10-31-01, before 10 a.m.  They record just the
city and the phone number.  I added who I talked to and what happened
with that call.

I can't explain how the phone calls start this early, because I left the
Treasury meeting, which supposedly ended at 9:28 a.m., and took at least
a few minutes to exit Treasury to a bench near the corner of 14th and F
Streets, N.W.  I remember looking at my watch, which I set regularly by
the National Time Clock, when I rose to leave the meeting, and it was
9:28 a.m.

9:28 a.m.  609-683-5521  Princeton, N.J. Ward McCarthy, Stone &
McCarthy  10 a.m. embargo.  Detailed conversation.

9:32 a.m.  914-925-7707  Rye, NY. Bill Cohen, Capra Asset Mgmt.  10 a.m.
embargo.  Detailed conversation.

9:33 a.m.  203-863-6715  Greenwich, CT. Chris Long, Tudor Investment
Corp., 10 a.m. embargo.  Detailed conversation.  I've never met Chris,
so I can't be sure I was talking to him.  I asked for him, and am
reasonably sure, it was him, but I can't be certain.

9:34 a.m. 203-614-2400 Stamford, CT _____, SAC Capital.  Don't know
who I talked to.  Larry Supinski wasn't in.  10 a.m. embargo.  Detailed
conversation.

9:35 a.m. 212-902-8124  NY,NY  John Youngdahl, Goldman Sachs.  10 a.m.
embargo.  Detailed conversation.

9:37 a.m. 312-984-1331 Chicago.  Didn't get through to Bob Falconer,
Sangamon Trading.  Can't remember if I left a message.  I don't think
so.  If yes, it was a short 10 a.m. embargo and main points.
Page 881

DC 002545

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt

9:38 a.m. 617-954-5887 Boston, MA.  Didn't get through to Steve Nothern, Massachusetts Financial Services.  Left a short message, 10 a.m. embargo and main points.

9:39 a.m. 617-563-7788  Boston, MA.  Didn't get through to Lisa Emsbo-Mattingly, Fidelity Management & Research Co.  She was still out on maternity leave.  Left no message.  Talked to a receptionist and ended the call with no message.  I spent a minute trying to find that name and number in my Palm Pilot, gave up, and called my assistant.

9:41 a.m. 202-543-4324 Washington, DC. Allyson Sullivan, Davis Capital. She checked my computer contact information and gave me the information for Lisa's superior.

9:44 a.m. 617-563-0573 Boston, MA.  Didn't get through to Lisa's superior at Fidelity, Ann Punzak.  No message.

9:45 a.m. 617-760-8616 Boston, MA.  Didn't get through to Dean Maki, Putnam Investments.  He's not a client, but I hoped he would become one.  No message.

9:46 a.m. 212-397-3672  NY, NY.  Tomas Jelf, Nexus.  He's not a client, although I hoped he would become one.  He was a client at another firm a few years ago.  Didn't get through.  No message.

9:47 a.m. 212-834-5102  NY,NY.  Jim Glassman, J.P. Morgan.  Didn't get through.  No message.

9:49 a.m. 212-834-5102  NY,NY.  Jim Glassman, J.P. Morgan.  No clear recollection, but I believe I left a short message, 10 a.m. embargo and main points.

9:51 a.m. 212-219-9096 NY,NY.  Peter Hamilton, Medley Advisers.  10 a.m. embargo, short conversation re main points.

9:53 a.m. 617-760-8816 Boston.  Didn't get through again to Dean Maki, Putnam Investments.  No clear recollection, but I don't think I left a message.

9:55 a.m. 212-397-3672  Tomas Jelf, Nexus.  10 a.m. embargo and short conversation re main points.

9:56 a.m. 704-388-1839  Charlotte, NC.  Habeeb Ahmed Bank of America. He's not a client, but I hoped he would become one.  I helped him with some questions re fiscal policy a few weeks ago.  He wasn't in.  No message.

9:58 a.m. 662-7000.  Washington, D.C.  Tim Wiss of the National Press Building re new office space for me.

That's it.

Pete

**REDACTED**

DC 002546

FOIA - Confidential
Treatment Requested

**REDACTED**



-------- Original Message --------
Subject: **Davis Capital email**
  Date: Wed, 31 Oct 2001 11:33:48 -0500
  From: Pete Davis <pete@daviscap.com>
    To: "Davis, Pete" <pete@daviscap.com>
  BCC: Shelley Black <sblack@senderocapital.com>,Ken Davis <kend@pistolcreek.com>, Mike
       DeLoose <mdeloose@aol.com>,"Fosler, Gail" <Gail.Fosler@conference-board.org>,Lynn
       Fox <foxl@frb.gov>,Matthew Gleckler <Gecko1@worldnet.att.net>,Michael Light
       <mlight99@earthlink.net>,"McMaster, David"
       <David_McMaster@byrd.senate.gov>,"Sedlock, Tom" <tsedlock@cnuber.com>,Bob Stein
       <bob_stein@budget.senate.gov>,"Sweet, Stuart" <capnet@erols.com>,Jason Webb
       <Jason_Webb@byrd.senate.gov>,"Woodward, Joan" <Joan.Woodward@gs.com>,"Yamazaki,
       Kazutami" <yamazaki@erols.com>,"Yorke, Stephen"
       <stephenyorke@yorkecap.demon.co.uk>,"Gallagher, Tom" <tgallagher@isigrp.com>,Bob
       McNally <Robert_C._McNally@opd.eop.gov>,Xavier Bonnet <xavier.bonnet@amb-
       wash.fr>,Jim Carter <James_E._Carter@opd.eop.gov>,YASUHIRO KAWAGUCHI
       <yasuhiro.kawaguchi@mofa.go.jp>,Stan Collender <collends@fleishman.com>,Michael Light
       <MLight@frk.com>,Trevor Greetham <TGreetham@exchange.uk.ml.com>,Yasuhiro
       Kawaguchi <yasuhirokawaguchi@hotmail.com>,"Franks, Sarah (London)"
       <FrankSar@exchange.uk.ml.com>,"Cohen, Bill" <billc@imsi.com>,"Glassman, Jim"
       <jglassman@chase.com>,Stephen Jonathan <Stephen.Jonathan@chase.com>,"Sharp, Bill"
       <bill.sharp@chase.com>,"Emsbo-Mattingly, Lisa" <lisa.e.mattingly@fmr.com>,Yasutaka
       Fukahori <yasutaka.fukahori@mofa.go.jp>,Takehiro Kagawa
       <takehiro.kagawa@mofa.go.jp>,KAZUYUKI KATAYAMA
       <kazuyuki.katayama@mofa.go.jp>,Shinichi Kitajima <shinichi.kitajima@mofa.go.jp>,Atsushi
       Niigata <niigata@us2.so-net.ne.jp>,Yoko Tsuda <yoko.tsuda@mofa.go.jp>,
       masahiko.kiya@mofa.go.jp,satoru.takahashi@mofa.go.jp,Takehiro Kano
       <takehiro.kano@mofa.go.jp>,"Neusser, Josef" <jjneusser@bloomberg.net>,Bill Adams
       <wadams@mfs.com>, "Hawkins, Richard" <rhawkins@mfs.com>,"Kurinsky, Geoffrey"
       <gkurinsky@mfs.com>,"Nothern, Steve" <snothern@mfs.com>, "Ryan, Matt"
       <mryan2@mfs.com>,Peter Sullivan <psullivan@mfs.com>,"Swanson, Jim"
       <jswanson@mfs.com>, Bob Persons <rpersons@mfs.com>,"Mark E. Dow"
       <MDow@MFS.com>,"Altman, Emily" <Emily.Altman@morganstanley.com>,Diane Merdian
       <diane.merdian@morganstanley.com>,Gerard Gardner
       <gerard.gardner@morganstanley.com>,David Greenlaw
       <David.Greenlaw@morganstanley.com>,Debra Levin
       <debra.levin@morganstanley.com>,Richard Berner

DC 001651

11/05/2001

FOIA - Confidential
Treatment Requested

<richard.berner@morganstanley com>,Lloyd Byrne <lloyd.byrne@morganstanley.com>,Jay
Deahna <jay.deahna@morganstanley.com>,Mark Edelstone
<mark.edelstone@morganstanley.com>,Aisling Freiheit-Kinch <Aisling.Freiheit-
Kinch@morganstanley.com>,Marc Frost <marc_frost@morganstanley.com>,Louis Gerhardy
<louis.gerhardy@morganstanley.com>,"Graham, Roderick"
<Roderick.Graham@morganstanley.com>,"Kimball, Paul"
<Paul.Kimball@morganstanley.com>,Allison Montgomery
<a.Montgomery@morganstanley.com>,Mita Nambiar
<Mita.Nambiar@morganstanley.com>,Scott Patrick <Scott.Patrick@morganstanley.com>,Jay
Pelosky <jay.pelosky@morganstanley.com>,Kenneth Posner
<Kenneth.Posner@morganstanley.com>,"Roach, Steve"
<Stephen.Roach@morganstanley.com>,Rebecca Runkle
<rebecca.runkle@morganstanley.com>,Art Soter <art.soter@morganstanley.com>,Tim
Stewart <Timothy.Stewart@morganstanley.com>,Heidi Wood
<heidi.wood@morganstanley.com>,Ted Weiseman
<ted.wieseman@morganstanley.com>,Gail Daniel <Gail.Daniel@morganstanley.com>,Amy
Falls <Amy.Falls@morganstanley.com>,Justin Hakimian
<justin.hakimian@morganstanley.com>,Jay Deahna <jaydeahna@home.com>,"Cohen, Steve"
<stevec@saccapital.com>,"Cohn, Brian" <brianc@saccapital.com>,Ed Debler
<edmundd@saccapital.com>,"Foley, Larry" <larryf@saccapital.com>,Rich Grodin
<richg@saccapital.com>,"Handler, Mike" <mikeh@saccapital.com>,"Lewis, Mark"
<marcl@saccapital.com>,"Weiner, Jon" <jonw@saccapital.com>,"Canally, John"
<jcanally@smra.com>,"Canavan, John" <canavan@smra.com>, "Kim, Young"
<ykim@smra.com>,"Liro, Joe" <jliro@smra.com>, "McCarthy, Ward"
<ward@smra.com>,"Saporta, Dana" <dsaporta@smra.com>,"Stone, Ray"
<rstone@smra.com>,"VandenHouten, Nancy" <nancy@smra.com>, Ken Kim
<kim@smra.com>,Sanela Pecenkovic <sanela@smra.com>,"Dugger, Rob"
<rob.dugger@tudor.com>,"Mathews, Steve" <smathews@tudor.com>,Chris Gate
<Chris.Gate@Tudor.com>,Angel Ubide <angel.ubide@tudor.com>,"Hamilton, Debra"
<debra.hamilton@kemper.com>,Peter Hamilton.<phamilton@medleyadvisors.com>,Richard
Medley <rmedley@medleyadvisors.com>,Kevin Muehring
<kmuehring@medleyadvisors.com>,Josh May <jmay@medleyadvisors.com>,David
Steinhardt <DavidS@centinv.com>,Allyson Sullivan <Allyson@Daviscap.com>,Kevin Logan
<klogan@drkw.com>,John Youngdahl <John.Youngdahl@gs.com>,William Dudley
<William.Dudley@gs.com>,John Tormondsen <john.tormondsen@gs.com>,Peter Gerhard
<peter.gerhard@gs.com>,Jason Evans <jason.evans@gs.com>, Irene Tse
<irene.tse@gs.com>,Christian Siva-Jothy <christian.siva-jothy@gs.com>,Andrew Law
<andrew.law@gs.com>, Karl Devine <karl.devine@gs.com>,Max Trautman
<max.trautman@gs.com>,Chris Carrera <chris.carrera@gs.com>, Ed Eisler
<ed.eisler@gs.com>,Ashok Varadhan <ashok.varadhan@gs.com>,David Blake
<david.blake@gs.com>,"Falconer, Bob" <bob@sangamon.com>, Chris
<Chris@Sangamon.com>,Gene <Gene@Sangamon.com>,"Anderson, Lincoln"
<Lincoln.Anderson@lpl.com>,Paul Kasriel <plk1@ntrs.com>,"Maki, Dean"
<dean_maki@putnaminv.com>,Adrian Weller <Adrian.Weller@wfg.com>,Jonathan Francis
<Jonathan_Francis@putnaminv.com>,Tomas Jelf <tjelf@nexus.bm>, Evan Lamp
<elamp@home.com>,Jordan Grayson <grayson@midtowncap.com>,Haseeb Ahmed
<haseeb.ahmed@bankofamerica.com>,Timothy Martin
<timothy.martin@bankofamerica.com>,Candice Eggerss
<candicee@camelotcapital.com>,Caroline Baum <CABAUM@bloomberg.net>, D Brown
<dbrown@iinews.com>,"Gersh, Darren" <darren_gersh@wpbt.org>,Angela Heath
<angela_heath@wpbt.org>,Toby McIntosh <tmcintos@bna.com>, Art Pine

DC 001652

FOIA - Confidential
Treatment Requested

<apine@bloomberg.net>,"O'Toole, Quinn" <Quinn_Otoole@wpbt.org>,"Wade, Taron"
<wadet@jinews.com>,Anna Willard <Anna.Willard@reuters.com>,Noam Neusner
<nneusner@usnews.com>,Simon Kennedy <SKENNEDY4@bloomberg.net>,Brendan Murray
<brmurray@bloomberg.net>

**Davis Capital Investment Ideas**          **10-31-01   11:30 AM**

**30 year bond is history!  30 year TIPS too.**  Treasury Under Secretary Peter Fisher explained this
morning that past reductions in 30 year issuance had made the market illiquid and expensive for
taxpayers, so the decision was made to cease issuing them.  "After September 11th, it didn't move.
There was no flight to safety in the 30 year."

**Buybacks thru December.  None in January.  Then quarter by quarter.**  "We're not suspending
buybacks," Fisher said.  "We'll announce our program quarter by quarter.  There may be quarters with
no buybacks."  Treasury has "no target" amount to retire.

**10 year reissuance in October won't be repeated.**  Fisher said "I regret that we felt it necessary to
hold the October auction [reopening]...Given the number of fails in October, we had to act [in the 10
year, but not the 5 year]...It seemed to work as we hoped...It's certainly something I hope we never
have to repeat."

**Cash management bills will be avoided if possible.**  "It's certainly our hope to work with the 4 week
bill instead."

**Is Treasury concentrating its borrowing on the short end?**  "You draw the correct inference, but I
wouldn't put too fine a point on it."

**"There is a wrinkle in the yield curve in 2003 and 2004,"** Fisher said.  "We have an opportunity to
smooth out the curve."

© 2001  Davis Capital Investment Ideas   Call 202-544-7098

DC 001653

11/05/2001

 **Sprint.**



FOIA – Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS
503 CAPITOL CT NE STE 200
WASHINGTON, DC 20002-4937**

Page: 1
Billing Period Ending: 8/26/01
Invoice Date: 8/27/01
Customer Number: 921168736

## Summary of Charges

| Balance Forward | Account Adjustments | SPRINT Charges | Taxes and Regulatory Rel. Charges | Current Total | Payable Upon Receipt |
|---|---|---|---|---|---|
| $69.56 | $1.03 | $60.07 | $13.12 | $73.19 | $143.78 |

## Important Information from Sprint:

 ** SERVICE ALERT!  OUR RECORDS SHOW A PAST DUE BILL. **

 The Carrier Prop Tax/Reg Fees line item represents the Combined Property Tax Allocation and 0.22% Federal Regulatory Recovery Fee, which covers FCC mandated fees (other than USF contributions).

 Need a reliable, always-on connection to the Internet? Sprint Dedicated Access can keep your business in contact with remote employees, customers and partners anytime, virtually anywhere. Call 1-800-796-1787 today.

*If you have any questions about your invoice, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

 **Sprint.**    Fold, then Detach and Return this Portion with Your Payment.

**Customer Number: 921168736**



Payable Upon Receipt
$143.78
AMOUNT ENCLOSED

```
XXXXXXXXXXXXAUTOXX3-DIGIT 200
00010811   1 AT   0.269   01
DAVIS CAPITAL INVESTMENT IDEAS
503 CAPITOL CT NE STE 200
WASHINGTON, DC 20002-4937
```

SPRINT
P O BOX 530503
ATLANTA  GA 30353-0503

☐ Please check here if your address has changed and complete the reverse side.

290820110120706        0000014378921168736033

Thank You For Using Sprint.
Make Check or Money Order Payable to Sprint in U. S. Dollars.
Do Not Send Cash.

DC  000919

Sprint Recycles

SECNOTH00107685

FOIA – Confidential
Treatment Requested

## KEY RATING INFORMATION

The codes that appear in the "*" column describe the rate in effect at the beginning of the call.

D = DAY OR PEAK RATE          E = EVENING OR OFF-PEAK RATE          N = NIGHT OR OFF-PEAK RATE

## TERMS AND CONDITIONS

Thank you for using Sprint.

The following terms and conditions are applicable only to Sprint long distance services billed on this invoice. If you subscribe to Sprint PCS services whose charges may be included on this invoice, separate terms and conditions are applicable.

This bill is due and payable upon presentation, and is past due if unpaid after the date shown on page one of this invoice. Residential customers will be assessed a late fee on balances that remain unpaid for more than 30 days from the invoice date. The late fee will be applied to the entire unpaid balance, including taxes. The late fee will be an amount not greater than the maximum allowable by law in the state in which the customer resides. Please make check or money order payable to Sprint in U.S. Dollars. Do not send cash. If your payment is not received within 30 days of the invoice date, or within the time allowed by your state's Public Utility Commission, Sprint may begin procedures to cancel all service to you. You will be informed of such an action if required by law.

If any check sent to Sprint in payment for services is returned unpaid by your bank, you will be charged $15.00, or the highest amount allowed by applicable law, for each returned check, whichever is less.

If you have any questions about your bill, please call us: the number is shown on page one of this bill. Most of your questions can be quickly and conveniently handled to your satisfaction over the phone.

| If you would like to question an item on your bill or comment on our service in writing, please address your letter to: | SPRINT Customer Service P.O. Box 152046 Irving, TX 75015-2046 | OR | Register at www.sprint.com to view and manage your account online. |

Please include your name, account number, the specific question or comment about the bill, and the dollar amount of the item(s) in question. We assure you we will respond to your letter as soon as possible.

While the item(s) in question are being investigated, you do not have to pay them; however, the amount not in question is still due and payable upon receipt of your bill.

It is Sprint's policy to bill all calls to a customer within the next billing cycle after the calls are made. In some instances, however, you may receive a bill with calls that were made three or more months prior to the invoice date of the bill. In the event the total amount of such calls on one bill equals or exceeds $50, you may request a deferred payment plan.

## NOTICE OF JURISDICTION

Pursuant to K.S.A. 60-308 (b) (11), as a business customer, you may be subject to jurisdiction in Kansas for any dispute relating to your telephone service with Sprint. This is because you have arranged for or continued to receive phone service managed, operated or monitored in the State of Kansas.

## DEPOSITS

Sprint will refund any required deposit in accordance with the applicable rules of your Public Utility Commission.

## CUSTOMER REQUEST FOR DISCONNECT

Sprint will disconnect your service within 30 days after receiving your request for disconnect, or such shorter term and under such conditions as may be required by your Public Utility Commission.

## CHANGE OF ADDRESS OR ACCOUNT HOLDER NAME

Address changes may be noted on the form found on the back of page one or by calling Customer Service. If account name changes are necessary, please call the customer service number shown on page one of this invoice.

**Please complete the area below with your new billing address and/or phone number:**

| Address |
| Address |
| City |
| State | Zip Code |
| Phone # | Check if number is for: ☐ Contact Only   ☐ Long Distance *   ☐ Local Toll * |

Yes, I want Sprint as my long distance carrier. My signature on this form authorizes Sprint to notify the local telephone company to switch my long distance and/or local toll service to Sprint. I understand that my local phone company may assess a fee to switch my carrier(s) and may also assess a fee if I decide to change back to my original carrier(s). I am responsible for all valid Sprint charges for usage and will call Sprint with any questions regarding my invoices.

_____          Date ____ / ____ / _____
Signature (Required to Process Order)

DC  000920

* Both boxes must be checked if you want great Sprint rates for all your long distance calling. Local Toll refers to IntraLATA calling and, if indicated, will be switched only where IntraLATA presubscription is available.

SECNOTH00107686

FOIA - Confidential
Treatment Requested

 **Sprint.**

**DAVIS CAPITAL INVESTMENT IDEAS**

Page: 2
Billing Period Ending: 8/26/01
Customer Number: 921168736

## Account Summary

### BALANCE FORWARD

| Description | Date | Amount |
|---|---|---|
| Previous Balance | | $124.48 |
| Payment Received - Thank You | 8/02/01 | -54.92 |
| **BALANCE FORWARD** | | **$69.56** |

### ACCOUNT ADJUSTMENTS

| Reason | Account | Date | Amount |
|---|---|---|---|
| LATE FEE | | 8/26/01 | $1.03 |
| **TOTAL ACCOUNT ADJUSTMENTS** | | | **$1.03** |

### MULTIPLE ACCOUNT SUMMARY

| Account | Charges | Taxes/Reg | Total |
|---|---|---|---|
| DAVIS CAPITAL INVESTMENT IDEAS | | | |
| SPRINT BUSINESS FLEX(SM) DIAL-1 | | | |
| 424912866 | $30.75 | $6.59 | $37.34 |
| | | | |
| DAVIS CAPITAL INVESTMENT IDEAS | | | |
| SPRINT BUSINESS FLEX HOME DIAL-1 | | | |
| 424912876 | 29.32 | 6.53 | 35.85 |
| **CURRENT TOTAL** | **$60.07** | **$13.12** | **$73.19** |
| **TOTAL AMOUNT DUE -  Payable Upon Receipt** | | | **$143.78** |

### MINIMUM COMMITMENT SUMMARY

| Account Name | Plan | Period |
|---|---|---|
| Plan Description | Start | End |
| DAVIS CAPITAL INVESTMENT IDEAS | 1/12/00 | 8/26/01 |

ACCOUNT # 921168736

MONTHLY MINIMUM USAGE SUMMARY

| Unit Threshold | Attainment Current Month | Attainment To Date | Charge |
|---|---|---|---|
| $50.00 | $64.55 | $64.55 | $.00 |
| **TOTAL COMMITMENT CHARGES** | | | **$.00** |



FOIA - Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 3
Billing Period Ending: 8/26/01
Customer Number: 921168736

## Account Detail

**SPRINT CHARGES**

| | Calls | Minutes | Amount |
|---|---|---|---|
| *SPRINT BUSINESS FLEX(SM) DIAL-1* | | | |
| State-to-State | 70 | 430.9 | $29.70 |
| SUBTOTAL ITEMIZED CALLS | 70 | 430.9 | $29.70 |

| *LONG DISTANCE MONTHLY CHARGES* | *Amount* |
|---|---|
| PRESUBSCRIBED CENTREX LINE CHG | $1.05 |
| TOTAL SPRINT CHARGES | $30.75 |
| CURRENT MONTH SUBTOTAL | $30.75 |

**TAXES/REG. RELATED CHGS.**

| | |
|---|---|
| STATE GROSS RECPTS SURCHG | $2.97 |
| CARRIER UNIVERSAL SVC CHG | 2.30 |
| CARRIER PROP TAX/REG FEES | .32 |
| FEDERAL EXCISE TAX | 1.00 |
| TOTAL TAXES/REG. RELATED CHGS. | $6.59 |

| | |
|---|---|
| CURRENT TOTAL - ACCOUNT # 424912866 | $37.34 |

## Itemization of Calls

**ORIGINATING NUMBER: 202 544-4324**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 7/27/01 | 12:56 PM | D | MEMPHIS | TN | 901 748-8600 | 1.0 | .07 R |
| 2 | 7/30/01 | 4:23 PM | D | MEMPHIS | TN | 901 748-8603 | .9 | .06 R |
| 3 | 7/30/01 | 4:41 PM | D | NEW YORK | NY | 212 546-1990 | .4 | .03 R |
| 4 | 7/31/01 | 4:49 PM | D | MEMPHIS | TN | 901 748-8603 | 1.1 | .08 R |
| 5 | 8/02/01 | 10:26 AM | D | MINEOLA | NY | 516 578-1916 | 1.1 | .08 R |
| 6 | 8/02/01 | 10:34 AM | D | BOONTON | NJ | 973 263-1894 | 12.2 | .84 R |
| 7 | 8/02/01 | 1:46 PM | D | NEW YORK | NY | 212 546-1990 | .9 | .06 R |
| 8 | 8/02/01 | 5:09 PM | E | NEW YORK | NY | 212 331-9248 | 19.3 | 1.33 R |
| 9 | 8/03/01 | 11:46 AM | D | MORRISTOWN | NJ | 973 452-4015 | .4 | .03 R |
| 10 | 8/03/01 | 11:47 AM | D | BEACHHAVEN | NJ | 609 492-2446 | .8 | .06 R |
| 11 | 8/03/01 | 11:53 AM | D | NEW YORK | NY | 212 546-1990 | .9 | .06 R |
| 12 | 8/08/01 | 11:57 AM | D | BEACHHAVEN | NJ | 609 492-2446 | .6 | .04 R |
| 13 | 8/08/01 | 11:57 AM | D | MORRISTOWN | NJ | 973 452-4015 | 2.2 | .15 R |
| 14 | 8/09/01 | 9:14 AM | D | BEACHHAVEN | NJ | 609 492-2446 | 16.2 | 1.12 R |
| 15 | 8/09/01 | 11:32 AM | D | BEACHHAVEN | NJ | 609 492-2446 | 12.7 | .88 R |
| 16 | 8/09/01 | 3:09 PM | D | BEACHHAVEN | NJ | 609 492-2446 | .3 | .02 R |
| 17 | 8/09/01 | 3:10 PM | D | MORRISTOWN | NJ | 973 452-4015 | .3 | .02 R |
| 18 | 8/13/01 | 1:14 PM | D | NEW YORK | NY | 212 546-1990 | 4.9 | .34 R |
| 19 | 8/13/01 | 2:14 PM | D | MORRISTOWN | NJ | 973 452-4015 | 1.4 | .10 R |
| 20 | 8/13/01 | 2:16 PM | D | BOONTON | NJ | 973 402-7655 | .6 | .04 R |
| 21 | 8/13/01 | 2:38 PM | D | NEWARK | NJ | 973 493-8862 | 2.5 | .17 R |
| 22 | 8/14/01 | 9:35 AM | D | BOONTON | NJ | 973 263-1894 | 35.5 | 2.45 R |
| 23 | 8/15/01 | 2:55 PM | D | BOONTON | NJ | 973 263-1894 | 8.9 | .61 R |
| 24 | 8/15/01 | 3:06 PM | D | MINEOLA | NY | 516 578-1916 | 1.4 | .10 R |
| 25 | 8/16/01 | 1:39 PM | D | MORRISTOWN | NJ | 973 452-4015 | 1.6 | .11 R |
| 26 | 8/16/01 | 3:05 PM | D | HICKSVILLE | NY | 516 390-3113 | 1.1 | .08 R |
| 27 | 8/16/01 | 3:07 PM | D | HICKSVILLE | NY | 516 390-3112 | .3 | .02 R |
| 28 | 8/16/01 | 3:08 PM | D | MINEOLA | NY | 516 578-1916 | .6 | .04 R |
| 29 | 8/17/01 | 9:43 AM | D | BOONTON | NJ | 973 263-1894 | 5.3 | .37 R |
| 30 | 8/17/01 | 1:18 PM | D | HICKSVILLE | NY | 516 390-3113 | .4 | .03 R |

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*



FOIA - Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 4
Billing Period Ending: 8/26/01
Customer Number: 921168736

### Itemization of Calls

**ORIGINATING NUMBER: 202 544-4324**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 8/17/01 | 1:19 PM | D | HICKSVILLE | NY | 516 390-3113 | .3 | $.02 |
| 2 | 8/17/01 | 1:20 PM | D | HICKSVILLE | NY | 516 390-3118 | .3 | .02 |
| 3 | 8/17/01 | 1:20 PM | D | MINEOLA | NY | 516 578-1916 | 1.5 | .10 |
| 4 | 8/20/01 | 11:12 AM | D | BOONTON | NJ | 973 402-7655 | 17.5 | 1.21 |
| 5 | 8/20/01 | 12:50 PM | D | MORRISTOWN | NJ | 973 452-4015 | .5 | .03 |
| 6 | 8/20/01 | 12:50 PM | D | BOONTON | NJ | 973 402-7655 | .9 | .06 |
| 7 | 8/21/01 | 1:53 PM | D | BOONTON | NJ | 973 402-7655 | 26.8 | 1.85 |
| 8 | 8/22/01 | 2:19 PM | D | BOONTON | NJ | 973 263-1894 | .7 | .05 |
| 9 | 8/23/01 | 11:08 AM | D | BOONTON | NJ | 973 263-1694 | .5 | .03 |
| 10 | 8/23/01 | 12:30 PM | D | HICKSVILLE | NY | 516 390-2113 | 31.0 | 2.14 |
| 11 | 8/23/01 | 1:02 PM | D | NEW YORK | NY | 212 331-9248 | .9 | .06 |
| 12 | 8/24/01 | 9:23 AM | D | BOONTON | NJ | 973 263-1894 | 33.2 | 2.29 |
| | **TOTAL FOR 202 544-4324** | | | | | | **249.9** | **$17.25** |

**ORIGINATING NUMBER: 202 544-7098**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 13 | 7/27/01 | 12:58 PM | D | RYE | NY | 914 925-7777 | 1.9 | $.13 |
| 14 | 7/27/01 | 3:28 PM | D | NEW YORK | NY | 212 834-4630 | 7.3 | .50 |
| 15 | 7/31/01 | 10:36 AM | D | BOSTON | MA | 617 954-5887 | .6 | .04 |
| 16 | 7/31/01 | 3:07 PM | D | NEW YORK | NY | 212 429-4970 | 2.6 | .18 |
| 17 | 7/31/01 | 3:10 PM | D | NEW YORK | NY | 212 902-8124 | 18.3 | 1.26 |
| 18 | 7/31/01 | 3:29 PM | D | NEW YORK | NY | 212 219-9096 | 2.1 | .14 |
| 19 | 7/31/01 | 3:42 PM | D | NEW YORK | NY | 212 397-3672 | .6 | .04 ! |
| 20 | 8/01/01 | 8:21 AM | D | NEW YORK | NY | 212 761-2700 | 1.8 | .12 ! |
| 21 | 8/01/01 | 8:28 AM | D | STAMFORD | CT | 203 614-2400 | .3 | .02 ! |
| 22 | 8/01/01 | 8:28 AM | D | STAMFORD | CT | 203 614-2400 | 1.3 | .09 ! |
| 23 | 8/02/01 | 9:57 AM | D | NEW YORK | NY | 212 219-9096 | 31.9 | 2.20 ! |
| 24 | 8/07/01 | 11:04 AM | D | NEW YORK | NY | 212 761-2886 | 1.7 | .12 ! |
| 25 | 8/07/01 | 11:11 AM | D | NEW YORK | NY | 212 761-2886 | 5.6 | .39 ! |
| 26 | 8/07/01 | 11:52 AM | D | RYE | NY | 914 925-7707 | 17.3 | 1.19 ! |
| 27 | 8/07/01 | 3:33 PM | D | BOSTON | MA | 617 954-5397 | 1.5 | .10 ! |
| 28 | 8/07/01 | 3:49 PM | D | NEW YORK | NY | 212 720-8225 | 3.4 | .23 ! |
| 29 | 8/13/01 | 12:06 PM | D | NEW YORK | NY | 212 941-2710 | 18.8 | 1.30 ! |
| 30 | 8/15/01 | 1:15 PM | D | HILTON | NY | 716 392-2998 | 1.4 | .10 ! |
| 31 | 8/16/01 | 3:25 PM | D | HILTON | NY | 716 392-2998 | 1.2 | .08 ! |
| 32 | 8/20/01 | 1:49 PM | D | BOSTON | MA | 617 954-5397 | .9 | .06 ! |
| 33 | 8/21/01 | 3:54 PM | D | NEW YORK | NY | 212 834-5496 | 1.0 | .07 ! |
| 34 | 8/22/01 | 9:26 AM | D | NEW YORK | NY | 212 834-5102 | 1.0 | .07 ! |
| 35 | 8/22/01 | 10:54 AM | D | BELLEVUE | WA | 425 688-9310 | 20.3 | 1.40 ! |
| 36 | 8/23/01 | 11:20 AM | D | BOSTON | MA | 617 954-5887 | 1.6 | .11 ! |
| 37 | 8/23/01 | 11:25 AM | D | BOSTON | MA | 617 954-5887 | 34.7 | 2.39 ! |
| | **TOTAL FOR 202 544-7098** | | | | | | **179.1** | **$12.33** |

**ORIGINATING NUMBER: 202 544-7163**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 38 | 8/01/01 | 11:21 AM | D | PRINCETON | NJ | 609 683-9580 | .5 | $.03 ! |
| 39 | 8/01/01 | 1:04 PM | D | RYE | NY | 914 925-8856 | .5 | .03 ! |
| 40 | 8/22/01 | 9:29 AM | D | NEW YORK | NY | 212 834-6557 | .9 | .06 ! |
| | **TOTAL FOR 202 544-7163** | | | | | | **1.9** | **$.12** |

| | **TOTAL ITEMIZATION OF CALLS - ACCOUNT # 424912866** | | | | | | **430.9** | **$29.70** |

For a description of rate periods, please see terms and conditions.

**Call Legend:**
R = SPECIAL PROMOTIONAL RATE



FOIA - Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX HOME DIAL-1
Account #: 424912876

Page: 5
Billing Period Ending: 8/26/01
Customer Number: 921168736

### Account Detail

**SPRINT CHARGES**

| *SPRINT BUSINESS FLEX HOME DIAL-1* | Calls | Minutes | Amount |
|---|---|---|---|
| State-to-State | 29 | 424.5 | $29.32 |
| **TOTAL SPRINT CHARGES** | 29 | 424.5 | $29.32 |
| **CURRENT MONTH SUBTOTAL** | | | $29.32 |

**TAXES/REG. RELATED CHGS.**

| | |
|---|---|
| STATE GROSS RECPTS SURCHG | $2.97 |
| CARRIER UNIVERSAL SVC CHG | 2.19 |
| CARRIER PROP TAX/REG FEES | .37 |
| FEDERAL EXCISE TAX | 1.00 |
| **TOTAL TAXES/REG. RELATED CHGS.** | $6.53 |

| **CURRENT TOTAL - ACCOUNT # 424912876** | $35.85 |
|---|---|

### Itemization of Calls

**ORIGINATING NUMBER: 202 966-6147**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 7/28/01 | 3:39 PM | N | NEW HAVEN | CT | 203 436-0472 | 21.7 | $1.50 R |
| 2 | 7/31/01 | 7:32 PM | E | PERRINE | FL | 305 252-8668 | 9.0 | .62 R |
| 3 | 8/08/01 | 10:33 PM | E | ATLANTA | GA | 678 358-5049 | .3 | .02 R |
| 4 | 8/14/01 | 2:18 PM | D | TUCSON | AZ | 520 749-9000 | .9 | .06 R |
| 5 | 8/14/01 | 3:16 PM | D | TUCSON | AZ | 520 749-9000 | 1.0 | .07 R |
| 6 | 8/14/01 | 7:01 PM | E | TUCSON | AZ | 520 749-9000 | .8 | .06 R |
| 7 | 8/14/01 | 8:29 PM | E | TUCSON | AZ | 520 749-9000 | 42.5 | 2.93 R |
| 8 | 8/15/01 | 12:54 PM | D | CORAL SPG | FL | 954 752-6767 | 20.3 | 1.40 R |
| 9 | 8/15/01 | 9:10 PM | E | TUCSON | AZ | 520 749-9000 | 33.6 | 2.32 R |
| 10 | 8/15/01 | 11:46 PM | N | TUCSON | AZ | 520 749-9000 | .9 | .06 R |
| 11 | 8/16/01 | 8:07 PM | E | TUCSON | AZ | 520 749-9000 | 46.8 | 3.23 R |
| 12 | 8/17/01 | 8:34 PM | E | TUCSON | AZ | 520 749-9000 | .8 | .06 R |
| 13 | 8/17/01 | 8:42 PM | E | TUCSON | AZ | 520 749-9000 | 60.8 | 4.20 R |
| 14 | 8/18/01 | 12:06 AM | N | TUCSON | AZ | 520 749-9000 | 1.4 | .10 R |
| 15 | 8/18/01 | 12:19 AM | N | TUCSON | AZ | 520 749-9000 | .8 | .06 R |
| 16 | 8/18/01 | 12:33 AM | N | TUCSON | AZ | 520 749-9000 | 55.8 | 3.85 R |
| 17 | 8/18/01 | 8:34 PM | N | TUCSON | AZ | 520 749-9000 | 1.2 | .08 R |
| 18 | 8/18/01 | 8:49 PM | N | TUCSON | AZ | 520 749-9000 | .4 | .03 R |
| 19 | 8/18/01 | 8:50 PM | N | TUCSON | AZ | 520 749-9000 | 18.5 | 1.28 R |
| 20 | 8/18/01 | 11:10 PM | N | TUCSON | AZ | 520 749-9000 | 1.1 | .08 R |
| 21 | 8/19/01 | 12:19 AM | N | TUCSON | AZ | 520 749-9000 | 1.0 | .07 R |
| 22 | 8/19/01 | 12:41 AM | N | TUCSON | AZ | 520 749-9000 | 18.9 | 1.30 R |
| 23 | 8/19/01 | 9:56 PM | E | TUCSON | AZ | 520 749-9000 | .7 | .05 R |
| 24 | 8/19/01 | 11:34 PM | N | TUCSON | AZ | 520 749-9000 | .7 | .05 R |
| 25 | 8/20/01 | 12:14 AM | N | TUCSON | AZ | 520 749-9000 | .7 | .05 R |
| 26 | 8/20/01 | 12:25 AM | N | TUCSON | AZ | 520 749-9000 | 25.0 | 1.73 R |
| 27 | 8/22/01 | 7:20 PM | E | CORAL SPG | FL | 954 752-6767 | 57.7 | 3.98 R |
| 28 | 8/24/01 | 9:44 AM | D | ATLANTA | GA | 678 358-5049 | .5 | .03 R |
| 29 | 8/25/01 | 4:26 PM | N | LOSANGELES | CA | 323 341-4465 | .7 | .05 R |
| **TOTAL FOR 202 966-6147** | | | | | | | 424.5 | $29.32 |

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

FOIA – Confidential
Treatment Requested

 **Sprint.**

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX HOME DIAL-1
Account #: 424912876

Page: 6
Billing Period Ending: 8/26/01
Customer Number: 921168736

*Itemization of Calls*

| TOTAL ITEMIZATION OF CALLS - ACCOUNT # 424912876 | 424.5 | $29.32 |
|---|---|---|

For a description of rate periods, please see terms and conditions.

**Call Legend:**
R = SPECIAL PROMOTIONAL RATE

PU21PAAO-010811-04

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

 Sprint Recycles

DC  000925

SECNOTH00107691

FOIA - Confidential
Treatment Requested

## KEY RATING INFORMATION

The codes that appear in the "*" column describe the rate in effect at the beginning of the call.

D = DAY OR PEAK RATE    E = EVENING OR OFF-PEAK RATE    N = NIGHT OR OFF-PEAK RATE

## TERMS AND CONDITIONS

Thank you for using Sprint.

The following terms and conditions are applicable only to Sprint long distance services billed on this invoice. If you subscribe to Sprint PCS services whose charges may be included on this invoice, separate terms and conditions are applicable.

This bill is due and payable upon presentation, and is past due if unpaid after the date shown on page one of this invoice. Residential customers will be assessed a late fee on balances that remain unpaid for more than 30 days from the invoice date. The late fee will be applied to the entire unpaid balance, including taxes. The late fee will be an amount not greater than the maximum amount allowable by law in the state in which the customer resides. Please make check or money order payable to Sprint in U.S. Dollars. Do not send cash. If your payment is not received within 30 days of the invoice date, or within the time allowed by your state's Public Utility Commission, Sprint may begin procedures to cancel all service to you. You will be informed of such an action if required by law.

If any check sent to Sprint in payment for services is returned unpaid by your bank, you will be charged $15.00, or the highest amount allowed by applicable law, for each returned check, whichever is less.

If you have any questions about your bill, please call us: the number is shown on page one of this bill. Most of your questions can be quickly and conveniently handled to your satisfaction over the phone.

| If you would like to question an item on your bill or comment on our service in writing, please address your letter to: | SPRINT<br>Customer Service<br>P.O. Box 152048<br>Irving, TX 75015-2048 | OR | Register at www.sprint.com to view and manage your account online. |

Please include your name, account number, the specific question or comment about the bill, and the dollar amount of the item(s) in question. We assure you we will respond to your letter as soon as possible.

While the item(s) in question are being investigated, you do not have to pay them; however, the amount not in question is still due and payable upon receipt of your bill.

It is Sprint's policy to bill all calls to a customer within the next billing cycle after the calls are made. In some instances, however, you may receive a bill with calls that were made three or more months prior to the invoice date of the bill. In the event the total amount of such calls on one bill equals or exceeds $50, you may request a deferred payment plan.

## NOTICE OF JURISDICTION

Pursuant to K.S.A. 60-308 (b) (11), as a business customer, you may be subject to jurisdiction in Kansas for any dispute relating to your telephone service with Sprint. This is because you have arranged for or continued to receive phone service managed, operated or monitored in the State of Kansas.

## DEPOSITS

Sprint will refund any required deposit in accordance with the applicable rules of your Public Utility Commission.

## CUSTOMER REQUEST FOR DISCONNECT

Sprint will disconnect your service within 30 days after receiving your request for disconnect, or such shorter term and under such conditions as may be required by your Public Utility Commission.

## CHANGE OF ADDRESS OR ACCOUNT HOLDER NAME

Address changes may be noted on the form found on the back of page one or by calling Customer Service. If account name changes are necessary, please call the customer service number shown on page one of this invoice.

DC 000926

SECNOTH00107692



**DAVIS CAPITAL INVESTMENT IDEAS**
**503 CAPITOL CT NE STE 200**
**WASHINGTON, DC 20002-4937**

Page: 1
Billing Period Ending: 9/26/01
Invoice Date: 9/27/01
Customer Number: 921168736

FOIA – Confidential
Treatment Requested

### Summary of Charges

| Balance Forward | Account Adjustments | SPRINT Charges | Taxes and Regulatory Rel. Charges | Current Total | Payable Upon Receipt |
|---|---|---|---|---|---|
| $74.22 | $1.10 | $47.48 | $8.98 | $56.46 | $131.78 |

## *Important Information from Sprint:*



** SERVICE ALERT!  OUR RECORDS SHOW A PAST DUE BILL. **



Experience the ease and convenience of paying your Sprint bill online. Get the details and register today. Go to www.sprintbiz.com and click on "Sprint Online Bill Pay." Manage and pay your account online with a few clicks!



**ATTENTION**

Special savings for Sprint Long Distance customers! Save up to $100 on selected Siemens & IBM business phones. Call 877-629-5298 or visit www.sprint.com/bizphones. Offer ends 10/31/01, is subject to change, and restrictions may apply.

*If you have any questions about your invoice, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

  **Fold, then Detach and Return this Portion with Your Payment.**

Customer Number: 921168736

xxxxxxxxxxxxAUTOxx3-DIGIT 200
00009654    1 AT    0.269   01
DAVIS CAPITAL INVESTMENT IDEAS
503 CAPITOL CT NE STE 200
WASHINGTON, DC 20002-4937



Payable Upon Receipt
$131.78
AMOUNT ENCLOSED

SPRINT
P O BOX 530503
ATLANTA  GA 30353-0503

☐ Please check here if your address has changed and complete the reverse side.

290920110114160      00000131789211687360380

**Thank You For Using Sprint.**
**Make Check or Money Order Payable to Sprint in U. S. Dollars.**
**Do Not Send Cash.**

 Sprint Recycles

DC  000901

FOIA – Confidential
Treatment Requested

## KEY RATING INFORMATION

The codes that appear in the "*" column describe the rate in effect at the beginning of the call.
D = DAY OR PEAK RATE          E = EVENING OR OFF-PEAK RATE          N = NIGHT OR OFF-PEAK RATE

## TERMS AND CONDITIONS

Thank you for using Sprint.

The following terms and conditions are applicable only to Sprint long distance services billed on this invoice. If you subscribe to Sprint PCS services whose charges may be included on this invoice, separate terms and conditions are applicable.

This bill is due and payable upon presentation, and is past due if unpaid after the date shown on page one of this invoice. Residential customers will be assessed a late fee on balances that remain unpaid for more than 30 days from the invoice date. The late fee will be applied to the entire unpaid balance, including taxes. The late fee will be an amount not greater than the maximum amount allowable by law in the state in which the customer resides. Please make check or money order payable to Sprint in U.S. Dollars. Do not send cash. If your payment is not received within 30 days of the invoice date, or within the time allowed by your state's Public Utility Commission, Sprint may begin procedures to cancel all service to you. You will be informed of such an action if required by law.

If any check sent to Sprint in payment for services is returned unpaid by your bank, you will be charged $15.00, or the highest amount allowed by applicable law, for each returned check, whichever is less.

If you have any questions about your bill, please call us: the number is shown on page one of this bill. Most of your questions can be quickly and conveniently handled to your satisfaction over the phone.

If you would like to question an item        SPRINT          OR          Register at www.sprint.com
on your bill or comment on our service       Customer Service              to view and manage your
in writing, please address your letter to:   P.O. Box 152046               account online.
                                             Irving, TX 75015-2046

Please include your name, account number, the specific question or comment about the bill, and the dollar amount of the item(s) in question. We assure you we will respond to your letter as soon as possible.

While the item(s) in question are being investigated, you do not have to pay them; however, the amount not in question is still due and payable upon receipt of your bill.

It is Sprint's policy to bill all calls to a customer within the next billing cycle after the calls are made. In some instances, however, you may receive a bill with calls that were made three or more months prior to the invoice date of the bill. In the event the total amount of such calls on one bill equals or exceeds $50, you may request a deferred payment plan.

## NOTICE OF JURISDICTION

Pursuant to K.S.A. 60-308 (b) (11), as a business customer, you may be subject to jurisdiction in Kansas for any dispute relating to your telephone service with Sprint. This is because you have arranged for or continued to receive phone service managed, operated or monitored in the State of Kansas.

## DEPOSITS

Sprint will refund any required deposit in accordance with the applicable rules of your Public Utility Commission.

## CUSTOMER REQUEST FOR DISCONNECT

Sprint will disconnect your service within 30 days after receiving your request for disconnect, or such shorter term and under such conditions as may be required by your Public Utility Commission.

## CHANGE OF ADDRESS OR ACCOUNT HOLDER NAME

Address changes may be noted on the form found on the back of page one or by calling Customer Service. If account name changes are necessary, please call the customer service number shown on page one of this invoice.

**Please complete the area below with your new billing address and/or phone number:**

| Address | | | | | | | | | | | | | | | | | |
|---------|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| Address | | | | | | | | | | | | | | | | | |
| City | | | | | | | | | | | | | | | | | |
| State | | | Zip Code | | | | | | | | | | | | | | |
| Phone # | | | | | | | | | Check if number is for: ☐ Contact Only   ☐ Long Distance *   ☐ Local Toll * |

Yes, I want Sprint as my long distance carrier. My signature on this form authorizes Sprint to notify the local telephone company to switch my long distance and/or local toll service to Sprint. I understand that my local phone company may assess a fee to switch my carrier(s) and may also assess a fee if I decide to change back to my original carrier(s). I am responsible for all valid Sprint charges for usage and will call Sprint with any questions regarding my invoices.

_____                                    Date ____ / ____ / _____
Signature (Required to Process Order)

* Both boxes must be checked if you want great Sprint rates for all your long distance calling. Local Toll refers to IntraLATA calling and, if indicated, will be switched only where IntraLATA presubscription is available.

DC 000902

SECNOTH00107668

≈ Sprint.

## DAVIS CAPITAL INVESTMENT IDEAS

FOIA – Confidential
Treatment Requested

Page: 2
Billing Period Ending: 9/26/01
Customer Number: 921168736

### *Account Summary*

**BALANCE FORWARD**

| Description | Date | Amount |
|---|---|---|
| Previous Balance | | $143.78 |
| Payment Received – Thank You | 8/31/01 | -69.56 |
| **BALANCE FORWARD** | | **$74.22** |

**ACCOUNT ADJUSTMENTS**

| Reason | Account | Date | Amount |
|---|---|---|---|
| LATE FEE | | 9/26/01 | $1.10 |
| **TOTAL ACCOUNT ADJUSTMENTS** | | | **$1.10** |

**MULTIPLE ACCOUNT SUMMARY**

| Account | Charges | Taxes/Reg | Total |
|---|---|---|---|
| DAVIS CAPITAL INVESTMENT IDEAS | | | |
| 921168736 | $12.00 | $1.44 | $13.44 |
| DAVIS CAPITAL INVESTMENT IDEAS | | | |
| SPRINT BUSINESS FLEX(SM) DIAL-1 | | | |
| 424912866 | 34.96 | 7.42 | 42.38 |
| DAVIS CAPITAL INVESTMENT IDEAS | | | |
| SPRINT BUSINESS FLEX HOME DIAL-1 | | | |
| 424912876 | .52 | .12 | .64 |
| **CURRENT TOTAL** | **$47.48** | **$8.98** | **$56.46** |
| **TOTAL AMOUNT DUE - Payable Upon Receipt** | | | **$131.78** |

**MINIMUM COMMITMENT SUMMARY**

| Account Name | Plan | Period |
|---|---|---|
| Plan Description | Start | End |
| DAVIS CAPITAL INVESTMENT IDEAS | 1/12/00 | 9/26/01 |

ACCOUNT # 921168736

MONTHLY MINIMUM USAGE SUMMARY

| Unit Threshold | Attainment Current Month | Attainment To Date | Charge |
|---|---|---|---|
| $50.00 | $37.91 | $37.91 | $12.00 |
| **TOTAL COMMITMENT CHARGES** | | | **$12.00** |

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*


Sprint Recycles

DC  000903

FOIA – Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**

Account #: 921168736

Page: 3
Billing Period Ending: 9/26/01
Customer Number: 921168736

*Account Detail*

SPRINT CHARGES

| *LONG DISTANCE MONTHLY CHARGES* | *Amount* |
|---|---|
| MONTHLY MINIMUM CHARGE | $12.00 |
| **TOTAL SPRINT CHARGES** | **$12.00** |
| CURRENT MONTH SUBTOTAL | $12.00 |

TAXES/REG. RELATED CHGS.

| CARRIER UNIVERSAL SVC CHG | $.90 |
|---|---|
| CARRIER PROP TAX/REG FEES | .15 |
| FEDERAL EXCISE TAX | .39 |
| **TOTAL TAXES/REG. RELATED CHGS.** | **$1.44** |

| **CURRENT TOTAL - ACCOUNT # 921168736** | **$13.44** |
|---|---|

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

DC  000904

SECNOTH00107670

FOIA – Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 4
Billing Period Ending: 9/26/01
Customer Number: 921168736

## Account Detail

### SPRINT CHARGES

| | Calls | Minutes | Amount |
|---|---|---|---|
| SPRINT BUSINESS FLEX(SM) DIAL-1 State-to-State | 120 | 491.3 | $33.91 |
| SUBTOTAL ITEMIZED CALLS | 120 | 491.3 | $33.91 |

| | | | Amount |
|---|---|---|---|
| LONG DISTANCE MONTHLY CHARGES | | | |
| PRESUBSCRIBED CENTREX LINE CHG | | | $1.05 |
| TOTAL SPRINT CHARGES | | | $34.96 |
| CURRENT MONTH SUBTOTAL | | | $34.96 |

### TAXES/REG. RELATED CHGS.

| | |
|---|---|
| STATE GROSS RECPTS SURCHG | $3.42 |
| CARRIER UNIVERSAL SVC CHG | 2.59 |
| CARRIER PROP TAX/REG FEES | .33 |
| FEDERAL EXCISE TAX | 1.08 |
| TOTAL TAXES/REG. RELATED CHGS. | $7.42 |
| CURRENT TOTAL - ACCOUNT # 424912866 | $42.38 |

## Itemization of Calls

ORIGINATING NUMBER: 202 544-4324

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 8/27/01 | 2:12 PM | D | NEWARK | NJ | 973 493-8862 | .6 | $.04 R |
| 2 | 8/29/01 | 11:32 AM | D | BOONTON | NJ | 973 402-7655 | 24.3 | 1.68 R |
| 3 | 8/30/01 | 9:09 AM | D | BEACHHAVEN | NJ | 609 492-2446 | 30.9 | 2.13 R |
| 4 | 9/04/01 | 10:45 AM | D | BOONTON | NJ | 973 263-1894 | 2.0 | .14 R |
| 5 | 9/04/01 | 1:18 PM | D | SAN JOSE | CA | 408 436-6600 | 2.0 | .14 R |
| 6 | 9/06/01 | 3:46 PM | D | NEWARK | NJ | 973 493-8862 | 1.0 | .07 R |
| 7 | 9/07/01 | 12:54 PM | D | BOONTON | NJ | 973 402-7655 | .3 | .02 R |
| 8 | 9/07/01 | 12:55 PM | D | BOONTON | NJ | 973 263-1894 | 2.8 | .19 R |
| 9 | 9/10/01 | 10:33 AM | D | BOONTON | NJ | 973 402-7655 | 7.2 | .50 R |
| 10 | 9/10/01 | 12:35 PM | D | HICKSVILLE | NY | 516 390-2113 | 2.5 | .17 R |
| 11 | 9/11/01 | 9:01 AM | D | BOONTON | NJ | 973 402-7655 | 6.7 | .46 R |
| 12 | 9/11/01 | 11:40 AM | D | BOONTON | NJ | 973 263-7027 | 1.2 | .08 R |
| 13 | 9/11/01 | 11:51 AM | D | BOCA RATON | FL | 561 451-9956 | .9 | .06 R |
| 14 | 9/11/01 | 11:53 AM | D | BOCA RATON | FL | 561 451-9505 | .9 | .06 R |
| 15 | 9/11/01 | 12:05 PM | D | NEWARK | NJ | 973 493-8862 | .7 | .05 R |
| 16 | 9/11/01 | 12:24 PM | D | BOONTON | NJ | 973 263-1894 | 13.9 | .96 R |
| 17 | 9/12/01 | 11:23 AM | D | COLORDOSPG | CO | 719 963-0629 | .5 | .03 R |
| 18 | 9/13/01 | 9:52 AM | D | BOONTON | NJ | 973 402-7655 | 13.3 | .92 R |
| 19 | 9/13/01 | 10:08 AM | D | DAYTONABCH | FL | 386 761-5539 | 20.2 | 1.39 R |
| 20 | 9/13/01 | 10:29 AM | D | TULSA | OK | 918 640-2534 | .7 | .05 R |
| 21 | 9/13/01 | 12:05 PM | D | NEW YORK | NY | 917 566-6151 | 1.1 | .08 R |
| 22 | 9/13/01 | 1:22 PM | D | BOONTON | NJ | 973 263-1894 | 16.0 | 1.10 R |
| 23 | 9/14/01 | 12:26 PM | D | BOONTON | NJ | 973 402-7655 | 1.1 | .08 R |
| 24 | 9/17/01 | 10:14 AM | D | BOONTON | NJ | 973 402-7655 | .5 | .03 R |
| 25 | 9/17/01 | 5:11 PM | E | JERSEYCITY | NJ | 201 993-9477 | .3 | .02 R |
| 26 | 9/18/01 | 11:57 AM | D | BETHLEHEM | PA | 610 974-1509 | 1.9 | .13 R |
| 27 | 9/18/01 | 12:00 PM | D | BOONTON | NJ | 973 402-7655 | .6 | .04 R |
| 28 | 9/18/01 | 12:02 PM | D | BOONTON | NJ | 973 263-1894 | .3 | .02 R |
| 29 | 9/18/01 | 12:02 PM | D | MORRISTOWN | NJ | 973 452-4015 | 1.0 | .07 R |
| 30 | 9/18/01 | 12:08 PM | D | BETHLEHEM | PA | 610 954-3200 | .3 | .02 R |

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*


Sprint Recycles

DC 000905

SECNOTH00107671

FOIA - Confidential
Treatment Requested

**AVIS CAPITAL INVESTMENT IDEAS**
PRINT BUSINESS FLEX(SM) DIAL-1
ccount #: 424912866

Page: 5
Billing Period Ending: 9/26/01
Customer Number: 921168736

### *Itemization of Calls*

**ORIGINATING NUMBER: 202 544-4324**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 9/18/01 | 12:09 PM | D | BETHLEHEM | PA | 610 954-4000 | .3 | $.02 R |
| 2 | 9/18/01 | 12:50 PM | D | BEACHHAVEN | NJ | 609 492-2446 | 7.5 | .52 R |
| 3 | 9/18/01 | 1:01 PM | D | NEW YORK | NY | 917 543-9348 | .8 | .06 R |
| 4 | 9/19/01 | 8:56 AM | D | MORRISTOWN | NJ | 973 452-4015 | 9.5 | .66 R |
| 5 | 9/19/01 | 3:23 PM | D | BETHLEHEM | PA | 610 974-1509 | 10.3 | .71 R |
| 6 | 9/20/01 | 10:20 AM | D | BOONTON | NJ | 973 402-7655 | 23.3 | 1.61 R |
| 7 | 9/20/01 | 12:25 PM | D | JERSEYCITY | NJ | 201 985-0009 | .3 | .02 R |
| 8 | 9/20/01 | 12:26 PM | D | JERSEYCITY | NJ | 201 993-9477 | .6 | .04 R |
| 9 | 9/21/01 | 9:35 AM | D | BOONTON | NJ | 973 402-7655 | 18.1 | 1.25 R |
| 10 | 9/21/01 | 9:53 AM | D | BOONTON | NJ | 973 263-7027 | 1.4 | .10 R |
| 11 | 9/21/01 | 2:13 PM | D | JERSEYCITY | NJ | 201 993-9477 | .3 | .02 R |
| 12 | 9/21/01 | 2:14 PM | D | JERSEYCITY | NJ | 201 985-0009 | .5 | .03 R |
| 13 | 9/24/01 | 1:44 PM | D | NEW YORK | NY | 917 543-9348 | .7 | .05 R |
| 14 | 9/24/01 | 4:46 PM | D | BOONTON | NJ | 973 263-1894 | 20.3 | 1.40 R |
| 15 | 9/24/01 | 5:39 PM | E | BETHLEHEM | PA | 610 974-1509 | 23.0 | 1.59 R |

**TOTAL FOR 202 544-4324** — 272.6 — **$18.81**

**ORIGINATING NUMBER: 202 544-7098**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 16 | 8/27/01 | 10:58 AM | D | ATLANTA | GA | 678 358-5049 | 2.4 | $.17 R |
| 17 | 8/27/01 | 4:48 PM | D | CHICAGO | IL | 312 984-1331 | .4 | .03 R |
| 18 | 8/28/01 | 3:45 PM | D | STAMFORD | CT | 203 614-2400 | 1.8 | .12 R |
| 19 | 8/29/01 | 8:06 AM | D | BOSTON | MA | 617 954-5397 | 4.8 | .33 R |
| 20 | 9/04/01 | 3:14 PM | D | NEW YORK | NY | 212 440-9473 | 2.2 | .15 R |
| 21 | 9/04/01 | 4:03 PM | D | NEW YORK | NY | 212 761-4524 | .6 | .04 R |
| 22 | 9/04/01 | 4:25 PM | D | NEW YORK | NY | 212 761-4524 | .3 | .02 R |
| 23 | 9/06/01 | 11:43 AM | D | NEW YORK | NY | 212 429-4970 | 2.1 | .14 R |
| 24 | 9/06/01 | 12:04 PM | D | RYE | NY | 914 925-7707 | 2.5 | .17 R |
| 25 | 9/06/01 | 12:11 PM | D | PRINCETON | NJ | 609 683-5521 | 1.4 | .10 R |
| 26 | 9/06/01 | 12:12 PM | D | NEW YORK | NY | 212 902-8124 | .9 | .06 R |
| 27 | 9/06/01 | 12:14 PM | D | NEW YORK | NY | 212 397-3672 | 1.7 | .12 R |
| 28 | 9/06/01 | 12:16 PM | D | NEW YORK | NY | 212 219-0096 | 9.9 | .68 R |
| 29 | 9/06/01 | 12:26 PM | D | GREENWICH | CT | 203 863-6715 | 2.3 | .16 R |
| 30 | 9/06/01 | 12:30 PM | D | STAMFORD | CT | 203 614-2400 | 1.6 | .11 R |
| 31 | 9/06/01 | 12:33 PM | D | BOSTON | MA | 617 563-7788 | 1.2 | .08 R |
| 32 | 9/06/01 | 12:35 PM | D | BOSTON | MA | 617 563-7788 | .4 | .03 R |
| 33 | 9/06/01 | 12:35 PM | D | BOSTON | MA | 617 563-0573 | 1.0 | .07 R |
| 34 | 9/06/01 | 12:40 PM | D | BOSTON | MA | 617 954-5887 | 1.7 | .12 R |
| 35 | 9/06/01 | 12:42 PM | D | CHICAGO | IL | 312 984-1331 | 1.3 | .09 R |
| 36 | 9/06/01 | 12:44 PM | D | NEW YORK | NY | 212 834-5102 | 1.4 | .10 R |
| 37 | 9/06/01 | 12:51 PM | D | CHICAGO | IL | 312 537-1760 | 1.9 | .13 R |
| 38 | 9/06/01 | 12:53 PM | D | BOSTON | MA | 617 760-8616 | 1.6 | .11 R |
| 39 | 9/06/01 | 12:55 PM | D | BOSTON | MA | 617 760-8616 | 2.4 | .17 R |
| 40 | 9/06/01 | 12:58 PM | D | NEW YORK | NY | 212 236-7724 | 3.0 | .21 R |
| 41 | 9/07/01 | 2:58 PM | D | RYE | NY | 914 925-7707 | .7 | .05 R |
| 42 | 9/07/01 | 2:59 PM | D | STAMFORD | CT | 203 614-2400 | .7 | .05 R |
| 43 | 9/07/01 | 3:00 PM | D | STAMFORD | CT | 203 614-2400 | 1.2 | .08 R |
| 44 | 9/07/01 | 3:01 PM | D | GREENWICH | CT | 203 863-6715 | 1.5 | .10 R |
| 45 | 9/07/01 | 3:03 PM | D | NEW YORK | NY | 212 219-0096 | 3.2 | .22 R |
| 46 | 9/07/01 | 3:07 PM | D | NEW YORK | NY | 212 429-4970 | 1.6 | .11 R |
| 47 | 9/07/01 | 3:09 PM | D | NEW YORK | NY | 212 397-3672 | 1.0 | .07 R |
| 48 | 9/07/01 | 3:10 PM | D | NEW YORK | NY | 212 761-7157 | .7 | .05 R |
| 49 | 9/07/01 | 3:11 PM | D | BOSTON | MA | 617 563-0573 | 1.1 | .08 R |
| 50 | 9/07/01 | 3:13 PM | D | NEW YORK | NY | 212 761-3398 | 1.6 | .11 R |
| 51 | 9/07/01 | 3:15 PM | D | BOSTON | MA | 617 954-5887 | 3.0 | .21 R |
| 52 | 9/07/01 | 3:18 PM | D | NEW YORK | NY | 212 834-5102 | .5 | .03 R |
| 53 | 9/07/01 | 3:19 PM | D | CHICAGO | IL | 312 984-1331 | .6 | .04 R |
| 54 | 9/07/01 | 3:20 PM | D | CHICAGO | IL | 312 696-2099 | .7 | .05 R |
| 55 | 9/07/01 | 3:21 PM | D | BOSTON | MA | 617 760-8616 | 1.1 | .08 R |
| 56 | 9/07/01 | 3:22 PM | D | NEW YORK | NY | 212 902-8124 | 14.0 | .97 R |
| 57 | 9/10/01 | 3:24 PM | D | NEW YORK | NY | 212 975-5001 | 12.4 | .86 R |

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

DC 000906

SECNOTH00107672

 Sprint

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 6
Billing Period Ending: 9/26/01
Customer Number: 921168736

FOIA - Confidential
Treatment Requested

### *Itemization of Calls*

**ORIGINATING NUMBER: 202 544-7098**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 9/11/01 | 12:31 PM | D | RYE | NY | 914 925-7707 | .4 | $.03 R |
| 2 | 9/11/01 | 12:37 PM | D | PRINCETON | NJ | 609 683-5521 | 1.4 | .10 R |
| 3 | 9/13/01 | 10:27 AM | D | BOSTON | MA | 617 760-8616 | 1.5 | .10 R |
| 4 | 9/13/01 | 10:34 AM | D | PRINCETON | NJ | 609 683-5490 | 1.8 | .12 R |
| 5 | 9/13/01 | 11:59 AM | D | BELLEVUE | WA | 425 688-9310 | 12.6 | .87 R |
| 6 | 9/17/01 | 11:20 AM | D | NEW YORK | NY | 212 761-3398 | 12.4 | .86 R |
| 7 | 9/19/01 | 10:48 AM | D | NEW YORK | NY | 212 902-8124 | 3.6 | .25 R |
| 8 | 9/19/01 | 11:17 AM | D | NEW YORK | NY | 212 397-3672 | .3 | .02 R |
| 9 | 9/19/01 | 2:40 PM | D | NEW YORK | NY | 212 834-5102 | .3 | .02 R |
| 10 | 9/19/01 | 4:42 PM | D | NEW YORK | NY | 212 429-4970 | .5 | .03 R |
| 11 | 9/19/01 | 4:43 PM | D | NEW YORK | NY | 212 969-7859 | 16.9 | 1.17 R |
| 12 | 9/20/01 | 10:19 AM | D | BELLEVUE | WA | 425 688-9310 | .3 | .02 R |
| 13 | 9/20/01 | 10:48 AM | D | BELLEVUE | WA | 425 688-9310 | 13.4 | .92 R |
| 14 | 9/20/01 | 11:44 AM | D | NEW YORK | NY | 212 834-5102 | .5 | .03 R |
| 15 | 9/20/01 | 3:49 PM | D | RYE | NY | 914 925-7777 | .5 | .03 R |
| 16 | 9/21/01 | 10:50 AM | D | CHICAGO | IL | 312 537-1760 | 1.4 | .10 R |
| 17 | 9/21/01 | 11:14 AM | D | BOSTON | MA | 617 954-5397 | 1.3 | .09 R |
| 18 | 9/21/01 | 11:33 AM | D | NEW YORK | NY | 212 339-0300 | .9 | .06 R |
| 19 | 9/21/01 | 2:04 PM | D | BOSTON | MA | 617 954-5887 | 10.7 | .74 R |
| 20 | 9/21/01 | 4:24 PM | D | BOSTON | MA | 617 954-5397 | 1.5 | .10 R |
| 21 | 9/21/01 | 4:44 PM | D | NEW YORK | NY | 212 761-7157 | 1.4 | .10 R |
| 22 | 9/25/01 | 9:03 AM | D | NEW YORK | NY | 212 941-2710 | 12.0 | .83 R |
| 23 | 9/25/01 | 11:33 AM | D | CHICAGO | IL | 312 537-1760 | 5.1 | .35 R |
| 24 | 9/25/01 | 11:47 AM | D | NEW YORK | NY | 212 941-2710 | 1.1 | .08 R |
| 25 | 9/25/01 | 2:10 PM | D | NEW YORK | NY | 212 397-3672 | .5 | .03 R |
| 26 | 9/25/01 | 3:33 PM | D | NEW YORK | NY | 212 397-3672 | 7.7 | .53 R |
| 27 | 9/26/01 | 1:26 PM | D | NEW YORK | NY | 212 761-7157 | .6 | .04 R |
| | **TOTAL FOR 202 544-7098** | | | | | | **207.0** | **$14.29** |

**ORIGINATING NUMBER: 202 544-7163**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 28 | 8/29/01 | 2:17 PM | D | RYE | NY | 914 925-8856 | .6 | $.04 R |
| 29 | 8/29/01 | 2:18 PM | D | PRINCETON | NJ | 609 683-9580 | .7 | .05 R |
| 30 | 9/05/01 | 10:16 AM | D | NEW YORK | NY | 212 980-7014 | 5.6 | .39 R |
| 31 | 9/13/01 | 11:03 AM | D | PRINCETON | NJ | 609 683-9580 | 1.2 | .08 R |
| 32 | 9/21/01 | 2:11 PM | D | BOSTON | MA | 617 954-7641 | .8 | .06 R |
| 33 | 9/26/01 | 9:40 AM | D | NEW YORK | NY | 212 761-0309 | 2.8 | .19 R |
| | **TOTAL FOR 202 544-7163** | | | | | | **11.7** | **$.81** |
| | **TOTAL ITEMIZATION OF CALLS - ACCOUNT # 424912866** | | | | | | **491.3** | **$33.91** |

For a description of rate periods, please see terms and conditions.

**Call Legend:**
R = SPECIAL PROMOTIONAL RATE

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

 Sprint Recycles

DC 000907

DAVIS CAPITAL INVESTMENT IDEAS
SPRINT BUSINESS FLEX HOME DIAL-1
Account #: 424912876

Page: 7
Billing Period Ending: 9/26/01
Customer Number: 921168736

FOIA – Confidential
Treatment Requested

## Account Detail

**SPRINT CHARGES**

| SPRINT BUSINESS FLEX HOME DIAL-1 | Calls | Minutes | Amount |
|---|---|---|---|
| State-to-State | 1 | 7.5 | $.52 |
| TOTAL SPRINT CHARGES | 1 | 7.5 | $.52 |
| CURRENT MONTH SUBTOTAL | | | $.52 |

**TAXES/REG. RELATED CHGS.**

| | Amount |
|---|---|
| STATE GROSS RECPTS SURCHG | $.05 |
| CARRIER UNIVERSAL SVC CHG | .04 |
| CARRIER PROP TAX/REG FEES | .01 |
| FEDERAL EXCISE TAX | .02 |
| TOTAL TAXES/REG. RELATED CHGS. | $.12 |
| CURRENT TOTAL - ACCOUNT # 424912876 | $.64 |

## Itemization of Calls

**ORIGINATING NUMBER: 202 966-6147**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 9/21/01 | 11:49 PM | N | PROVIDENCE | RI | 401 598-8000 | 7.5 | $.52 R |
| TOTAL FOR 202 966-6147 | | | | | | | 7.5 | $.52 |
| TOTAL ITEMIZATION OF CALLS - ACCOUNT # 424912876 | | | | | | | 7.5 | $.52 |

*For a description of rate periods, please see terms and conditions.*

**Call Legend:**
R = SPECIAL PROMOTIONAL RATE

*If you have any questions, please call Customer Service at 1-800-800-7059, or visit us at http://www.sprint.com.*

DC 000908

SECNOTH00107674

FOIA - Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 4
Billing Period Ending: 10/26/01
Customer Number: 921168736

### *Account Detail*

**SPRINT CHARGES**

| *SPRINT BUSINESS FLEX(SM) DIAL-1* | Calls | Minutes | Amount |
|---|---|---|---|
| State-to-State | 112 | 434.8 | $30.02 |
| International | 1 | 4.5 | 1.35 |
| SUBTOTAL ITEMIZED CALLS | 113 | 439.3 | $31.37 |

| *LONG DISTANCE MONTHLY CHARGES* | Amount |
|---|---|
| PRESUBSCRIBED CENTREX LINE CHG | $.78 |
| TOTAL SPRINT CHARGES | $32.15 |
| CURRENT MONTH SUBTOTAL | $32.15 |

**TAXES/REG. RELATED CHGS.**

| | |
|---|---|
| STATE GROSS RECPTS SURCHG | $3.22 |
| CARRIER UNIVERSAL SVC CHG | 2.34 |
| CARRIER PROP TAX/REG FEES | .30 |
| FEDERAL EXCISE TAX | 1.04 |
| TOTAL TAXES/REG. RELATED CHGS. | $6.90 |

| CURRENT TOTAL - ACCOUNT # 424912866 | $39.05 |
|---|---|

EXHIBIT
Davis 34
7/9/02

### *Itemization of Calls*

**ORIGINATING NUMBER: 202 544-4324**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|---|---|---|---|---|---|---|---|---|
| 1 | 9/27/01 | 1:55 PM | D | NEW YORK | NY | 917 543-9348 | .9 | $.06 R |
| 2 | 9/27/01 | 2:03 PM | D | HICKSVILLE | NY | 516 390-2113 | .8 | .06 R |
| 3 | 9/28/01 | 9:24 AM | D | BOONTON | NJ | 973 402-7655 | 31.4 | 2.17 R |
| 4 | 10/02/01 | 12:49 PM | D | BOONTON | NJ | 973 402-7655 | .3 | .02 R |
| 5 | 10/02/01 | 12:49 PM | D | BOONTON | NJ | 973 263-1894 | .7 | .05 R |
| 6 | 10/02/01 | 12:50 PM | D | MORRISTOWN | NJ | 973 452-4015 | 12.7 | .88 R |
| 7 | 10/02/01 | 3:01 PM | D | BOONTON | NJ | 973 402-7655 | 9.4 | .65 R |
| 8 | 10/03/01 | 1:28 PM | D | MORRISTOWN | NJ | 973 452-4015 | .3 | .02 R |
| 9 | 10/03/01 | 2:49 PM | D | BOONTON | NJ | 973 263-7027 | 1.1 | .08 R |
| 10 | 10/03/01 | 2:50 PM | D | BOONTON | NJ | 973 263-1894 | .3 | .02 R |
| 11 | 10/03/01 | 2:51 PM | D | MORRISTOWN | NJ | 973 452-4015 | 2.7 | .19 R |
| 12 | 10/03/01 | 2:56 PM | D | JERSEYCITY | NJ | 201 993-9477 | 11.7 | .81 R |
| 13 | 10/04/01 | 3:26 PM | D | BOONTON | NJ | 973 402-7655 | .7 | .05 R |
| 14 | 10/04/01 | 3:27 PM | D | BOONTON | NJ | 973 263-1894 | 7.3 | .50 R |
| 15 | 10/05/01 | 10:49 AM | D | SALT LAKE | UT | 801 363-1776 | .7 | .05 R |
| 16 | 10/05/01 | 12:03 PM | D | HICKSVILLE | NY | 516 390-2113 | 5.2 | .36 R |
| 17 | 10/09/01 | 9:37 AM | D | BOONTON | NJ | 973 402-7655 | 12.8 | .88 R |
| 18 | 10/09/01 | 1:44 PM | D | JERSEYCITY | NJ | 201 993-9477 | .5 | .03 R |
| 19 | 10/11/01 | 2:17 PM | D | JERSEYCITY | NJ | 201 993-9477 | 6.0 | .41 R |
| 20 | 10/15/01 | 10:58 AM | D | BOONTON | NJ | 973 402-7655 | 13.2 | .91 R |
| 21 | 10/15/01 | 11:12 AM | D | HICKSVILLE | NY | 516 390-2113 | 31.8 | 2.19 R |
| 22 | 10/16/01 | 2:24 PM | D | NEW YORK | NY | 212 546-1563 | 2.1 | .14 R |
| 23 | 10/16/01 | 2:38 PM | D | BOONTON | NJ | 973 402-7655 | 2.5 | .17 R |
| 24 | 10/16/01 | 2:46 PM | D | JERSEYCITY | NJ | 201 993-9477 | 16.1 | 1.11 R |
| 25 | 10/16/01 | 3:02 PM | D | BOONTON | NJ | 973 402-7655 | .3 | .02 R |
| 26 | 10/16/01 | 3:03 PM | D | BOONTON | NJ | 973 263-7027 | .7 | .05 R |
| 27 | 10/16/01 | 3:25 PM | D | BOONTON | NJ | 973 402-7655 | .3 | .02 R |
| 28 | 10/16/01 | 3:26 PM | D | BOONTON | NJ | 973 263-7027 | 2.2 | .15 R |
| 29 | 10/17/01 | 8:39 AM | D | BOONTON | NJ | 973 263-1894 | .7 | .05 R |

*If you have any questions, please call Customer Service at 1-800-877-4020, or visit us at http://www.sprint.com.*

DC 000914

SECNOTH00107680



FOIA – Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 5
Billing Period Ending: 10/26/01
Customer Number: 921168736

### *Itemization of Calls*

**ORIGINATING NUMBER: 202 544-4324**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|-----|------|------|---|-----------------|---|------------|---------|---------|
| 1 | 10/17/01 | 8:39 AM | D | BOONTON | NJ | 973 402-7655 | .6 | $.04 F |
| 2 | 10/17/01 | 10:27 AM | D | BOONTON | NJ | 973 402-7655 | .3 | .02 F |
| 3 | 10/19/01 | 10:20 AM | D | BOONTON | NJ | 973 402-7655 | .5 | .03 F |
| 4 | 10/22/01 | 12:24 PM | D | MORRISTOWN | NJ | 973 452-4015 | .5 | .03 F |
| 5 | 10/22/01 | 12:25 PM | D | BOONTON | NJ | 973 263-7027 | 1.1 | .08 F |
| 6 | 10/24/01 | 11:33 AM | D | MORRISTOWN | NJ | 973 452-4015 | 1.0 | .07 F |
| 7 | 10/25/01 | 12:36 PM | D | MORRISTOWN | NJ | 973 452-4015 | 1.1 | .08 F |
| 8 | 10/25/01 | 12:37 PM | D | BOONTON | NJ | 973 263-7027 | 1.3 | .09 F |
| 9 | 10/25/01 | 1:09 PM | D | BETHLEHEM | PA | 610 758-3000 | 6.9 | .48 F |
| 10 | 10/26/01 | 9:06 AM | D | MORRISTOWN | NJ | 973 452-4015 | 1.8 | .12 F |
| 11 | 10/26/01 | 9:39 AM | D | CHICAGO | IL | 312 537-1907 | 2.7 | .19 F |
| 12 | 10/26/01 | 11:09 AM | D | MORRISTOWN | NJ | 973 452-4015 | 13.3 | .92 F |

**TOTAL FOR 202 544-4324**                                   206.5        **$14.25**

**ORIGINATING NUMBER: 202 544-7098**

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|-----|------|------|---|-----------------|---|------------|---------|---------|
| 13 | 10/01/01 | 11:18 AM | D | NEW YORK | NY | 212 902-8124 | 1.1 | $.08 F |
| 14 | 10/01/01 | 5:44 PM | E | BELLEVUE | WA | 425 688-9310 | 7.7 | .53 F |
| 15 | 10/01/01 | 5:55 PM | E | ALBANY | NY | 518 447-8601 | .8 | .06 F |
| 16 | 10/02/01 | 9:45 AM | D | NEW YORK | NY | 212 429-4970 | 1.2 | .08 F |
| 17 | 10/02/01 | 9:55 AM | D | RYE | NY | 914 925-7777 | 1.1 | .08 F |
| 18 | 10/02/01 | 3:55 PM | D | VINEYRDHVN | MA | 508 693-3601 | 3.6 | .25 F |
| 19 | 10/03/01 | 10:16 AM | D | ALBANY | NY | 518 447-8601 | 2.5 | .17 F |
| 20 | 10/03/01 | 1:30 PM | D | PRINCETON | NJ | 609 683-5521 | 4.2 | .29 F |
| 21 | 10/04/01 | 10:38 AM | D | RYE | NY | 914 925-7777 | 2.8 | .19 F |
| 22 | 10/04/01 | 10:41 AM | D | NEW YORK | NY | 212 761-5508 | .6 | .04 F |
| 23 | 10/04/01 | 10:42 AM | D | NEW YORK | NY | 212 761-7157 | 1.4 | .10 F |
| 24 | 10/04/01 | 3:36 PM | D | NEW YORK | NY | 212 761-5509 | 2.4 | .17 F |
| 25 | 10/04/01 | 4:21 PM | D | BOSTON | MA | 617 954-5397 | 2.1 | .14 F |
| 26 | 10/05/01 | 1:50 PM | D | SALT LAKE | UT | 801 363-1776 | 5.6 | .39 F |
| 27 | 10/05/01 | 3:06 PM | D | NEW YORK | NY | 212 761-5509 | .5 | .03 F |
| 28 | 10/05/01 | 3:09 PM | D | NEW YORK | NY | 212 761-5509 | 2.2 | .15 F |
| 29 | 10/05/01 | 3:55 PM | D | BOSTON | MA | 617 954-5403 | .8 | .06 F |
| 30 | 10/05/01 | 4:49 PM | D | BOSTON | MA | 617 954-5397 | .8 | .06 F |
| 31 | 10/09/01 | 4:33 PM | D | NEW YORK | NY | 212 761-0608 | 25.6 | 1.77 F |
| 32 | 10/10/01 | 9:23 AM | D | NEW YORK | NY | 212 834-4630 | .3 | .02 F |
| 33 | 10/10/01 | 9:24 AM | D | NEW YORK | NY | 212 834-4630 | 5.9 | .41 F |
| 34 | 10/10/01 | 9:30 AM | D | PRINCETON | NJ | 609 683-5521 | 9.6 | .66 F |
| 35 | 10/11/01 | 9:18 AM | D | BELLEVUE | WA | 425 688-9310 | .4 | .03 F |
| 36 | 10/11/01 | 2:48 PM | D | CHICAGO | IL | 312 984-1331 | .3 | .02 F |
| 37 | 10/15/01 | 4:47 PM | D | NEW YORK | NY | 212 761-6958 | 3.2 | .22 F |
| 38 | 10/15/01 | 5:06 PM | E | NEW YORK | NY | 212 761-8343 | 8.5 | .59 F |
| 39 | 10/15/01 | 5:22 PM | E | NEW YORK | NY | 212 697-6659 | .4 | .03 F |
| 40 | 10/16/01 | 10:38 AM | D | NEW YORK | NY | 212 761-6958 | 4.7 | .32 F |
| 41 | 10/16/01 | 10:50 AM | D | PRINCETON | NJ | 609 683-5521 | 2.1 | .14 F |
| 42 | 10/16/01 | 10:53 AM | D | RYE | NY | 914 925-7777 | .9 | .06 F |
| 43 | 10/16/01 | 11:00 AM | D | STAMFORD | CT | 203 614-2400 | 3.5 | .24 F |
| 44 | 10/16/01 | 11:22 AM | D | BOSTON | MA | 617 563-7788 | .8 | .06 F |
| 45 | 10/16/01 | 11:23 AM | D | NEW YORK | NY | 212 397-3672 | 1.8 | .12 F |
| 46 | 10/16/01 | 11:25 AM | D | DEVONSHIRE | BM | 4412928755 | 4.5 | 1.35 |
| 47 | 10/16/01 | 11:33 AM | D | BOSTON | MA | 617 563-0573 | .5 | .03 F |
| 48 | 10/16/01 | 11:34 AM | D | NEW YORK | NY | 212 893-3369 | 22.7 | 1.57 F |
| 49 | 10/16/01 | 12:00 PM | D | NEW YORK | NY | 212 902-8124 | 1.5 | .10 F |
| 50 | 10/16/01 | 12:03 PM | D | NEW YORK | NY | 212 357-0028 | 3.4 | .23 F |
| 51 | 10/16/01 | 12:18 PM | D | NEW YORK | NY | 212 761-7157 | 3.6 | .25 F |
| 52 | 10/16/01 | 12:28 PM | D | NEW YORK | NY | 212 834-5100 | 2.8 | .19 F |
| 53 | 10/16/01 | 12:31 PM | D | NEW YORK | NY | 212 429-4970 | 9.4 | .65 F |
| 54 | 10/16/01 | 12:41 PM | D | BOSTON | MA | 617 954-5887 | 1.9 | .13 F |
| 55 | 10/16/01 | 12:43 PM | D | NEW YORK | NY | 212 219-9096 | 8.5 | .59 F |
| 56 | 10/16/01 | 12:56 PM | D | BOSTON | MA | 617 760-8616 | 2.3 | .16 F |
| 57 | 10/16/01 | 1:01 PM | D | MILLBURN | NJ | 973 921-1985 | 3.0 | .21 F |

*If you have any questions, please call Customer Service at 1-800-877-4020, or visit us at http://www.sprint.com.*



PU21PAAG-006616-04

Sprint Recycles

DC 000915

SECNOTH00107681

FOIA - Confidential
Treatment Requested

**DAVIS CAPITAL INVESTMENT IDEAS**
SPRINT BUSINESS FLEX(SM) DIAL-1
Account #: 424912866

Page: 6
Billing Period Ending: 10/26/01
Customer Number: 921168736

## *Itemization of Calls*

ORIGINATING NUMBER: 202 544-7098

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|-----|------|------|---|-----------------|--|------------|---------|---------|
| 1 | 10/16/01 | 1:05 PM | D | CHICAGO | IL | 312 537-1760 | .9 | $.06 R |
| 2 | 10/16/01 | 1:06 PM | D | CHICAGO | IL | 312 984-1331 | 2.3 | .16 R |
| 3 | 10/16/01 | 3:56 PM | D | NEW YORK | NY | 212 761-4524 | 1.3 | .09 R |
| 4 | 10/16/01 | 4:57 PM | D | CHICAGO | IL | 312 537-1760 | 1.4 | .10 R |
| 5 | 10/16/01 | 5:04 PM | E | NEW YORK | NY | 917 940-9405 | 1.2 | .08 R |
| 6 | 10/18/01 | 3:29 PM | D | NEW YORK | NY | 212 941-2724 | 1.5 | .10 R |
| 7 | 10/18/01 | 3:32 PM | D | NEW YORK | NY | 212 357-0028 | 1.3 | .09 R |
| 8 | 10/18/01 | 3:44 PM | D | NEW YORK | NY | 212 761-6958 | 2.7 | .19 R |
| 9 | 10/18/01 | 3:47 PM | D | NEW YORK | NY | 212 761-8343 | 1.9 | .13 R |
| 10 | 10/18/01 | 3:51 PM | D | LAS CRUCES | NM | 505 521-4794 | 3.1 | .21 R |
| 11 | 10/23/01 | 9:02 AM | D | NEW YORK | NY | 212 941-2710 | 12.1 | .83 R |
| 12 | 10/23/01 | 11:00 AM | D | STAMFORD | CT | 203 614-2400 | 2.1 | .14 R |
| 13 | 10/23/01 | 11:10 AM | D | BOSTON | MA | 617 563-0573 | 1.3 | .09 R |
| 14 | 10/24/01 | 11:11 AM | D | BELLEVUE | WA | 425 688-9310 | .7 | .05 R |
| 15 | 10/24/01 | 11:22 AM | D | ALBANY | NY | 518 447-8601 | .8 | .06 R |
| 16 | 10/24/01 | 12:52 PM | D | CHICAGO | IL | 312 537-1760 | 2.4 | .17 R |
| 17 | 10/24/01 | 1:59 PM | D | CHICAGO | IL | 312 537-1760 | 4.0 | .28 R |
| 18 | 10/24/01 | 2:17 PM | D | CHICAGO | IL | 312 984-1331 | .3 | .02 R |
| | **TOTAL FOR 202 544-7098** | | | | | | **214.8** | **$15.87** |

ORIGINATING NUMBER: 202 544-7163

| Nbr | Date | Time | * | Called Location | | Called Nbr | Minutes | Charges |
|-----|------|------|---|-----------------|--|------------|---------|---------|
| 19 | 9/28/01 | 4:40 PM | D | BOSTON | MA | 617 954-6607 | 1.0 | $.07 R |
| 20 | 10/03/01 | 11:43 AM | D | ALBANY | NY | 518 447-8516 | 1.9 | .13 R |
| 21 | 10/04/01 | 11:02 AM | D | RYE | NY | 914 925-8856 | .6 | .04 R |
| 22 | 10/04/01 | 11:15 AM | D | PRINCETON | NJ | 609 683-9580 | .8 | .06 R |
| 23 | 10/05/01 | 10:33 AM | D | CHICAGO | IL | 312 537-1203 | .7 | .05 R |
| 24 | 10/10/01 | 9:08 AM | D | NEW YORK | NY | 212 834-6630 | 6.2 | .43 R |
| 25 | 10/18/01 | 10:28 AM | D | CHARLOTTE | NC | 704 386-1175 | 3.8 | .26 R |
| 26 | 10/18/01 | 11:48 AM | D | CHARLOTTE | NC | 704 386-1175 | 1.6 | .11 R |
| 27 | 10/23/01 | 9:24 AM | D | NEW YORK | NY | 212 219-9093 | 1.4 | .10 R |
| | **TOTAL FOR 202 544-7163** | | | | | | **18.0** | **$1.25** |
| | **TOTAL ITEMIZATION OF CALLS - ACCOUNT # 424912866** | | | | | | **439.3** | **$31.37** |

For a description of rate periods, please see terms and conditions.

**Call Legend:**
R = SPECIAL PROMOTIONAL RATE

*If you have any questions, please call Customer Service at 1-800-877-4020, or visit us at http://www.sprint.com.*

DC 000916
SECNOTH00107682

Page: **9 of 17**
Billing Date: **August 19, 2001**
Customer Account No: **302481721-00001**
Invoice Number: **0301355676**

### Mobile Telephone Number Detail for:
### PETER  DAVIS - (202) 365-7624

### Current Pricing Plan Details



| Price Plan | Monthly Access | Monthly Allowance Minutes | Per Minute Charge | |
|---|---|---|---|---|
| 005195 | $29.99 | 200 General | $.30 Peak | $.30 Off-peak |

Active Additional Services: 3-Party-Conference - Call Forward Busy - Call Forwarding
- Call Forward No Answer - Call Waiting - Call Delivery - Voice Mail - CDMA Digital
W/Mob Msngr - CallerID - Message Waiting Ind - Mob Msngr - Unlimted Msgs

## Monthly Access Charges

| | | |
|---|---|---|
| Monthly Access | 08/20/01 - 09/19/01 | 29.99 |
| | Total Monthly Access Charges..... | 29.99 |

## Other Charges and Credits

| | | |
|---|---|---|
| D Univ. Svc/Reg Chg | MT | .42 |
| | Total Other Charges and Credits..... | .42 |

## Home Airtime Charges - Band 1

| Description | Peak | Off-Peak | Weekend | Totals |
|---|---|---|---|---|
| **Current Month's Usage** | | | | |
| Airtime (Minutes) | 107 | 10 | 7 | 124 |
| Monthly Allowance | 106 | 10 | 7 | 123 |
| 1st Incoming Minute Allowance | 1 | 0 | 0 | 1 |
| Incoming Airtime* | 2 | 0 | 0 | 2 |

*Airtime amounts included within the Current Month's  Usage Airtime (Minutes) section.

| Total Number of Calls | 52 | 4 | 4 | 60 |
|---|---|---|---|---|

Total Home Airtime Charges.....     .00

SECNOTH00114096

Page: **10 of 17**
Billing Date: **August 19, 2001**
Customer Account No: **302481721-00001**
Invoice Number: **0301355676**

## Related Call Charges - Band 1

| Description | Total Number of Calls/Messages | Total Amount |
|---|---|---|

**Landline Charges**

| | | |
|---|---|---|
| 411 Connect | 1 | .99 |
| **Total Landline Charges** | | .99 |

| Description | Total Number of Calls | Peak Charges | Off-Peak Charges | Day/ Standard Charges | Evening/ Discount Charges | Night/ Economy Charges | Total Amount |
|---|---|---|---|---|---|---|---|
| **Long Distance Charges** | | | | | | | |
| Verizon Wireless (VWL) | 10 | 6.60 | .00 | .00 | .00 | .00 | 6.60 |
| **Total Long Distance Charges** | | | | | | | 6.60 |
| **Cellular Regional Calling** | | | | | | | |
| Verizon Wireless (REG) | 2 | 1.10 | .00 | .00 | .00 | .00 | 1.10 |
| **Total Cellular Regional Calling and Local Charges** | | | | | | | 1.10 |

Total Related Call Charges..... 8.69

## Other Fees and Surcharges

| | |
|---|---|
| Dist. of Columbia  Gross Receipts Surcharge | 3.15 |
| Total Other Fees and Surcharges..... | 3.15 |

## Taxes

| | |
|---|---|
| **Total Federal Tax** | 1.26 |
| Total Other Fees, Surcharges and Taxes... | 4.41 |

**Total Current Charges for PETER  DAVIS (202) 365-7624** 43.51

SECNOTH00114097

**Page:** 11 of 17
**Billing Date:** August 19, 2001
**Customer Account No:** 302481721-00001
**Invoice Number:** 0301355676

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | Total Amt |
|---|------|------|------|--------------|-----------|-------------|--------------|------------|-----------------|-----|-------------|------|-----|-----------|
| | | | | | | | | | | | | | | .44 |
| 1 | 07/21 | 11:01 AM | 01 | Washington DC | Washington | DC 202-966-6147 | W | 1 | AF | | .00 | | | .00 | .00 |
| 2 | 07/23 | 5:57 PM | 01 | Washington DC | Washington | DC 202-458-5519 | P | 1 | AF | | .00 | | | .00 | .00 |
| 3 | 07/24 | 8:19 PM | 01 | Arlington VA | Washington | DC 202-458-5519 | P | 1 | AF | | .00 | | | .00 | .00 |
| 4 | 07/25 | 9:44 AM | 01 | Washington DC | Washington | DC 202-429-6850 | P | 1 | AF | | .00 | | | .00 | .00 |
| 5 | 07/25 | 4:00 PM | 01 | Bethesda MD | Washington | DC 202-543-3399 | P | 3 | AF | | .00 | | | .00 | .00 |
| 6 | 07/25 | 4:04 PM | 01 | Bethesda MD | Gaithersbg | MD 301-370-6098 | P | 1 | AF | | .00 | | | .00 | .00 |
| 7 | 07/25 | 4:42 PM | 01 | Arlington VA | Washington | DC 202-687-5890 | P | 1 | AF | | .00 | | | .00 | .00 |
| 8 | 07/25 | 4:43 PM | 01 | Arlington VA | Gaithersbg | MD 301-370-6098 | P | 5 | AF | | .00 | | | .00 | .00 |
| 9 | 07/26 | 2:23 PM | 01 | Arlington VA | Washington | DC 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 10 | 07/27 | 5:04 PM | 01 | Washington DC | Washington | DC 202-458-5519 | P | 1 | AF | | .00 | | | .00 | .00 |
| 11 | 08/01 | 9:19 AM | 01 | Washington DC | Princeton | NJ 609-683-5521 | P | 3 | AF | | .00 | PEAK | REG | .66 | .66 |
| 12 | 08/01 | 9:22 AM | 01 | Washington DC | Rye | NY 914-925-7707 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 13 | 08/01 | 9:23 AM | 01 | Washington DC | Greenwich | CT 203-863-6715 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 14 | 08/01 | 9:25 AM | 01 | Washington DC | Stamford | CT 203-614-2409 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 15 | 08/01 | 9:27 AM | 01 | Washington DC | New York | NY 212-602-8124 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 16 | 08/01 | 9:29 AM | 01 | Washington DC | Boston | MA 617-563-7788 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 17 | 08/01 | 9:30 AM | 01 | Washington DC | Chicago | IL 312-984-1331 | P | 2 | AF | | .00 | PEAK | VWL | .44 | .44 |
| 18 | 08/01 | 9:32 AM | 01 | Washington DC | New York | NY 212-307-3672 | P | 2 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 19 | 08/01 | 9:33 AM | 01 | Washington DC | New York | NY 212-219-9096 | P | 4 | AF | | .00 | PEAK | VWL | .88 | .88 |
| 20 | 08/01 | 9:39 AM | 01 | Washington DC | Boston | MA 617-654-5887 | P | 12 | AF | | .00 | PEAK | VWL | 2.64 | 2.64 |
| 21 | 08/01 | 9:52 AM | 01 | Washington DC | Princeton | NJ 609-683-5521 | P | 2 | AF | | .00 | PEAK | REG | .44 | .44 |
| 22 | 08/01 | 4:03 PM | 01 | Chevy Chas MD | Washington | DC 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 23 | 08/01 | 4:05 PM | 01 | Chevy Chas MD | Kensington | MD 301-929-8855 | P | 2 | AF | | .00 | | | .00 | .00 |
| 24 | 08/01 | 4:06 PM | 01 | Chevy Chas MD | Washington | DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 25 | 08/01 | 10:18 PM | 01 | Sterling VA | Bethesda | MD 301-718-9682 | O | 4 | AF | | .00 | | | .00 | .00 |
| 26 | 08/06 | 6:48 PM | 01 | Washington DC | Washington | DC 202-966-6147 | P | 1 | AF | | .00 | | | .00 | .00 |
| 27 | 08/08 | 2:17 PM | 01 | Washington DC | Washington | DC 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 28 | 08/08 | 4:03 PM | 01 | Bethesda MD | Washington | DC 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 29 | 08/08 | 4:05 PM | 01 | Bethesda MD | Washington | DC 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 30 | 08/08 | 10:12 PM | 01 | Sterling VA | Washington | DC 202-966-3386 | O | 2 | AF | | .00 | | | .00 | .00 |
| 31 | 08/09 | 2:21 PM | 01 | Arlington VA | Washington | DC 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 32 | 08/09 | 2:23 PM | 01 | Arlington VA | Arlington | VA 703-294-6225 | P | 1 | AF | | .00 | | | .00 | .00 |
| 33 | 08/09 | 2:24 PM | 01 | Arlington VA | Washington | DC 202-544-4324 | P | 3 | AF | | .00 | | | .00 | .00 |
| 34 | 08/09 | 7:53 PM | 01 | Washington DC | Mobile | CL 202-365-7408 | P | 1 | AF | | .00 | | | .00 | .00 |
| 35 | 08/12 | 4:16 PM | 01 | Washington DC | Washington | DC 202-458-5519 | W | 2 | AF | | .00 | | | .00 | .00 |
| 36 | 08/13 | 3:40 PM | 01 | Washington DC | Washington | DC 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 37 | 08/13 | 5:42 PM | 01 | Washington DC | Washington | DC 202-458-5519 | P | 3 | AF | | .00 | | | .00 | .00 |
| 38 | 08/13 | 6:29 PM | 01 | Washington DC | Washington | DC 202-458-5519 | P | 1 | AF | | .00 | | | .00 | .00 |
| 39 | 08/13 | 6:30 PM | 01 | Washington DC | Mobile | CL 202-365-7408 | P | 1 | AF | | .00 | | | .00 | .00 |
| 40 | 08/13 | 6:59 PM | 01 | Washington DC | Mobile | CL 202-365-7408 | P | 1 | AF | | .00 | | | .00 | .00 |
| 41 | 08/13 | 7:01 PM | 01 | Washington DC | Incoming | CL 202-365-7624 | P | 2 | IAF | | .00 | | | .00 | .00 |
| 42 | 08/14 | 7:51 PM | 01 | Arlington VA | Washington | DC 202-458-5519 | P | 1 | AF | | .00 | | | .00 | .00 |

+Designates the location, city and state, of the cell tower or switching center which processed the call.

. Legends

| Airtime Rate Period: | | Usage Type: | | Special Feature: | | Related Call Type: | |
|---|---|---|---|---|---|---|---|
| P | Peak | A | Price Plan Allowance | | | LEC | Local Exchange Carr. |
| O | Off-Peak | F | Full Call | | | REG | Cellular Regional Call |
| W | Night/Weekend | I | Incoming Call | | | VWL | VWL Long Distance |

SECNOTH00114098

Page: 12 of 17
Billing Date: August 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0301355676

Continued from previous page

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | | Called to | | Airtime Charges | | | | | | Related Call Charges | | | Total Amt |
|---|------|------|------|--------------|--|-----------|--|-----------------|--|--|--|--|--|----------------------|--|--|-----------|
| | | | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | | Rate Period | Type | Amt | |
| 43 | 08/14 | 8:04 PM | 01 | Washington DC | Washington | DC 202-458-5519 | | P | 1 | AF | | .00 | | | | .00 | .00 |
| 44 | 08/16 | 7:06 PM | 01 | Washington DC | Washington | DC 202-458-5519 | | P | 1 | AF | | .00 | | | | .00 | .00 |
| 45 | 08/17 | 12:42 PM | 01 | Washington DC | Washington | DC 202-543-3399 | | P | 1 | AF | | .00 | | | | .00 | .00 |
| 46 | 08/17 | 3:26 PM | 01 | Washington DC | Washington | DC 202-543-3399 | | P | 4 | AF | | .00 | | | | .00 | .00 |
| 47 | 08/17 | 3:33 PM | 01 | Washington DC | Washington | DC 202-226-2762 | | P | 2 | AF | | .00 | | | | .00 | .00 |
| 48 | 08/17 | 3:40 PM | 01 | Washington DC | Washington | DC 202-224-0566 | | P | 1 | AF | | .00 | | | | .00 | .00 |
| 49 | 08/17 | 4:35 PM | 01 | Washington DC | Washington | DC 202-622-0120 | | P | 4 | AF | | .00 | | | | .00 | .00 |
| 50 | 08/17 | 4:42 PM | 01 | Washington DC | New York | NY 212-761-7157 | | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 51 | 08/17 | 4:44 PM | 01 | Washington DC | Washington | DC 202-968-6147 | | P | 2 | AF | | .00 | | | | .00 | .00 |
| 52 | 08/17 | 6:24 PM | 01 | Washington DC | Washington | DC 202-543-3399 | | P | 1 | AF | | .00 | | | | .00 | .00 |
| 53 | 08/17 | 6:25 PM | 01 | Washington DC | Washington | DC 202-458-5519 | | P | 3 | AF | | .00 | | | | .00 | .00 |
| 54 | 08/17 | 6:27 PM | 01 | Washington DC | Mailbox | CL 202-385-7624 | | P | 1 | AF | | .00 | | | | .00 | .00 |
| 55 | 08/17 | 8:29 PM | 01 | Washington DC | 411Connect | CL 411-000-0000 | | P | 1 | AF | | .00 | FLAT | LEC | .99 | .99 |
| 56 | 08/17 | 8:30 PM | 01 | Washington DC | Washington | DC 202-328-9852 | | P | 5 | AF | | .00 | | | | .00 | .00 |
| 57 | 08/17 | 9:07 PM | 01 | Washington DC | Washington | DC 202-543-3399 | | O | 2 | AF | | .00 | | | | .00 | .00 |
| 58 | 08/17 | 9:08 PM | 01 | Washington DC | Washington | DC 202-966-3386 | | O | 2 | AF | | .00 | | | | .00 | .00 |
| 59 | 08/18 | 4:36 PM | 01 | Washington DC | Washington | DC 202-966-3386 | | W | 2 | AF | | .00 | | | | .00 | .00 |
| 60 | 08/19 | 6:38 PM | 01 | Washington DC | Washington | DC 202-966-3386 | | W | 2 | AF | | .00 | | | | .00 | .00 |

Total Usage Charges.....                8.69

+Designates the location, city and state, of the call tower or switching center which processed the call.

Legends

| Airtime Rate Period: | Usage Type: | Special Feature: | Related Call Type: |
|---|---|---|---|
| P  Peak | A  Price Plan Allowance | | LEC  Local Exchange Carr. |
| O  Off-Peak | F  Full Call | | REG  Cellular Regional Call |
| W  Night/Weekend | I  Incoming Call | | VWL  VWL Long Distance |

SECNOTH00114099

Page:   **8 of 16**
Billing Date:   **September 19, 2001**
Customer Account No:   **302481721-00001**
Invoice Number:   **0307147269**

## Mobile Telephone Number Detail for:
### PETER DAVIS - (202) 365-7624

### Current Pricing Plan Details

| Price Plan | Monthly Access | Monthly Allowance Minutes | Per Minute Charge | |
|---|---|---|---|---|
| 005195 | $29.99 | 200 General | $.30 Peak | $.30 Off-peak |

Active Additional Services: 3-Party-Conference - Call Forward Busy - Call Forwarding
- Call Forward No Answer - Call Waiting - Call Delivery - Voice Mail - CDMA Digital
W/Mob Msngr - CallerID - Message Waiting Ind - Mob Msngr - Unlimted Msgs

### Monthly Access Charges

| | | |
|---|---|---|
| Monthly Access | 09/20/01 - 10/19/01 | 29.99 |
| | **Total Monthly Access Charges.....** | 29.99 |

### Other Charges and Credits

| | | |
|---|---|---|
| Fed Univ. Svc/Reg Chg | | .42 |
| | **Total Other Charges and Credits.....** | .42 |

### Home Airtime Charges - Band 1

| Description | Peak | Off-Peak | Weekend | Totals |
|---|---|---|---|---|
| **Current Month's Usage** | | | | |
| Airtime (Minutes) | 71 | 9 | 7 | 87 |
| Monthly Allowance | 70 | 8 | 7 | 85 |
| 1st Incoming Minute Allowance | 1 | 1 | 0 | 2 |
| Incoming Airtime* | 2 | 2 | 0 | 4 |

*Airtime amounts included within the Current Month's Usage Airtime (Minutes) section.

| | | | | |
|---|---|---|---|---|
| Total Number of Calls | 30 | 6 | 6 | 42 |
| | **Total Home Airtime Charges.....** | | | .00 |

SECNOTH00114112

Page: **9 of 16**
Billing Date: **September 19, 2001**
Customer Account No: **302481721-00001**
Invoice Number: **0307147269**

## Related Call Charges - Band 1

| Description | Total Number of Calls | Peak Charges | Off-Peak Charges | Day/ Standard Charges | Evening/ Discount Charges | Night/ Economy Charges | Total Amount |
|---|---|---|---|---|---|---|---|
| **Long Distance Charges** | | | | | | | |
| Verizon Wireless (VWL) | 3 | 1.76 | .00 | .00 | .00 | .00 | 1.76 |
| **Total Long Distance Charges** | | | | | | | 1.76 |
| | | | | Total Related Call Charges..... | | | 1.76 |

## Roaming Charges

| Description | Band 2 Totals |
|---|---|
| **Current Month's Usage** | |
| Airtime (minutes) | 2 |
| Airtime Charges | 1.23 |
| Related Call Charges | .12 |
| Roamer Tax | .01 |

| | |
|---|---|
| **Total Current Month's Roaming Charges** | 1.36 |
| Total Number of Calls | 1 |
| Total Roaming Charges..... | 1.36 |

## Other Fees and Surcharges

| | |
|---|---|
| Dist. of Columbia  Gross Receipts Surcharge | 3.04 |
| Total Other Fees and Surcharges..... | 3.04 |

## Taxes

| | |
|---|---|
| **Total Federal Tax** | 1.09 |
| Total Other Fees, Surcharges and Taxes... | 4.13 |
| **Total Current Charges for PETER  DAVIS (202) 365-7624** | 37.66 |

SECNOTH00114113

Page: 10 of 16
Billing Date: September 19, 2001
Customer Account No: 302481721-00001
Invoice Number: 0307147269

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | | Airtime Charges | | | | | Related Call Charges | | | Total Amt |
|---|------|------|------|--------------|-----------|--|-----------------|--|--|--|--|----------------------|--|--|-----------|
| | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | |
| 1 | 08/20 | 9:14 PM | 01 | Washington DC | Washington DC | 202-966-3386 | O | 1 | AF | | .00 | | | .00 | .00 |
| 2 | 08/20 | 9:15 PM | 01 | Bethesda MD | Washington DC | 202-966-6147 | O | 1 | AF | | .00 | | | .00 | .00 |
| 3 | 08/20 | 9:15 PM | 01 | Washington DC | Mailbox | CL 202-365-7624 | O | 2 | AF | | .00 | | | .00 | .00 |
| 4 | 08/22 | 2:48 PM | 01 | Chevy Chas MD | Washington DC | 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 5 | 08/22 | 2:52 PM | 01 | Chevy Chas MD | Washington DC | 202-530-3982 | P | 9 | AF | | .00 | | | .00 | .00 |
| 6 | 08/22 | 3:01 PM | 01 | Chevy Chas MD | New York | NY 212-002-3394 | P | 1 | AF | | .00 | PEAK | VWL | .22 | .22 |
| 7 | 08/22 | 3:01 PM | 01 | Bethesda MD | New York | NY 212-002-3394 | P | 3 | AF | | .00 | PEAK | VWL | .66 | .66 |
| 8 | 08/22 | 3:59 PM | 01 | Chevy Chas MD | Washington DC | 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 9 | 08/23 | 3:19 PM | 01 | Silver Spr MD | Bethesda | MD301-229-6334 | P | 3 | AF | | .00 | | | .00 | .00 |
| 10 | 08/23 | 3:21 PM | 01 | Silver Spr MD | Washington DC | 202-543-3399 | P | 1 | AF | | .00 | | | .00 | .00 |
| 11 | 08/23 | 3:22 PM | 01 | Silver Spr MD | Bethesda | MD301-229-5910 | P | 7 | AF | | .00 | | | .00 | .00 |
| 12 | 08/23 | 5:07 PM | 01 | Silver Spr MD | Bethesda | MD301-986-2500 | P | 12 | AF | | .00 | | | .00 | .00 |
| 13 | 08/23 | 5:18 PM | 01 | Silver Spr MD | Bethesda | MD301-652-0325 | P | 1 | AF | | .00 | | | .00 | .00 |
| 14 | 08/23 | 5:19 PM | 01 | Silver Spr MD | Bethesda | MD301-263-0575 | P | 1 | AF | | .00 | | | .00 | .00 |
| 15 | 08/23 | 8:13 PM | 01 | Chevy Chas MD | Washington DC | 202-966-3386 | P | 1 | AF | | .00 | | | .00 | .00 |
| 16 | 08/27 | 10:08 PM | 01 | Sterling VA | Incoming | CL 202-365-7624 | O | 2 | IAF | | .00 | | | .00 | .00 |
| 17 | 08/29 | 4:28 PM | 01 | Washington DC | Washington DC | 202-637-1328 | P | 1 | AF | | .00 | | | .00 | .00 |
| 18 | 08/29 | 10:16 PM | 01 | Sterling VA | Washington DC | 202-966-3386 | O | 2 | AF | | .00 | | | .00 | .00 |
| 19 | 08/30 | 2:14 PM | 02 | Rochester/B NY | Hilton | NY 716-392-2998 | | 2 | R | | 1.18 | | | .12 | 1.36 |
| | | | | Gross Receipts Surcharges | | | | | | | .22 | | | | |
| | | | | Tax on Above Air and Toll | | | | | | | .03 | | | .01 | |
| 20 | 09/05 | 4:00 PM | 01 | Bethesda MD | Washington DC | 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 21 | 09/05 | 4:52 PM | 01 | Bethesda MD | Washington DC | 202-544-4324 | P | 2 | AF | | .00 | | | .00 | .00 |
| 22 | 09/07 | 8:51 PM | 01 | Washington DC | Washington DC | 202-458-5519 | P | 1 | AF | | .00 | | | .00 | .00 |
| 23 | 09/08 | 2:58 PM | 01 | Reston VA | Washington DC | 202-458-5519 | W | 2 | AF | | .00 | | | .00 | .00 |
| 24 | 09/08 | 3:01 PM | 01 | Dranesvill VA | Mailbox | CL 202-365-7624 | W | 1 | AF | | .00 | | | .00 | .00 |
| 25 | 09/08 | 3:01 PM | 01 | Reston VA | Washington DC | 202-966-6147 | W | 1 | AF | | .00 | | | .00 | .00 |
| 26 | 09/08 | 6:13 PM | 01 | Sterling VA | Washington DC | 202-458-5519 | W | 1 | AF | | .00 | | | .00 | .00 |
| 27 | 09/12 | 2:57 PM | 01 | Bethesda MD | Washington DC | 202-463-6223 | P | 2 | AF | | .00 | | | .00 | .00 |
| 28 | 09/12 | 3:58 PM | 01 | Chevy Chas MD | Washington DC | 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 29 | 09/12 | 4:00 PM | 01 | Chevy Chas MD | Washington DC | 202-463-6223 | P | 2 | AF | | .00 | | | .00 | .00 |
| 30 | 09/13 | 5:39 PM | 01 | Chevy Chas MD | Washington DC | 202-363-2346 | P | 1 | AF | | .00 | | | .00 | .00 |
| 31 | 09/13 | 7:37 PM | 01 | Washington DC | Incoming | CL 202-365-7624 | P | 2 | IAF | | .00 | | | .00 | .00 |
| 32 | 09/13 | 7:40 PM | 01 | Washington DC | Washington DC | 202-244-7090 | P | 2 | AF | | .00 | | | .00 | .00 |
| 33 | 09/14 | 9:30 PM | 01 | Chevy Chas MD | Washington DC | 202-966-6147 | O | 1 | AF | | .00 | | | .00 | .00 |
| 34 | 09/15 | 4:52 PM | 01 | Chevy Chas MD | Washington DC | 202-363-2346 | W | 1 | AF | | .00 | | | .00 | .00 |
| 35 | 09/16 | 4:50 PM | 01 | Chevy Chas MD | Washington DC | 202-363-2346 | W | 1 | AF | | .00 | | | .00 | .00 |
| 36 | 09/17 | 11:36 AM | 01 | Washington DC | Washington DC | 202-544-4324 | P | 1 | AF | | .00 | | | .00 | .00 |
| 37 | 09/17 | 7:10 PM | 01 | Chevy Chas MD | Washington DC | 202-966-6147 | P | 1 | AF | | .00 | | | .00 | .00 |
| 38 | 09/18 | 11:44 AM | 01 | Washington DC | New York | NY 212-002-8124 | P | 4 | AF | | .00 | PEAK | VWL | .88 | .88 |
| 39 | 09/18 | 12:09 AM | 01 | Bethesda MD | Bethesda | MD301-229-7766 | P | 2 | AF | | .00 | | | .00 | .00 |

+Designates the location, city and state, of the cell tower or switching center which processed the call.

Legends

| Airtime Rate Period: | Usage Type: | Special Feature: | Related Call Type: |
|---|---|---|---|
| P    Peak | A    Price Plan Allowance | | VWL    VWL Long Distance |
| O    Off-Peak | F    Full Call | | |
| W    Night/Weekend | I    Incoming Call | | |
| | R    Roaming | | |

SECNOTH00114114

Page: **11 of 16**
Billing Date: **September 19, 2001**
Customer Account No: **302481721-00001**
Invoice Number: **0307147269**

**Continued from previous page**

## Call Detail for PETER DAVIS (202) 365-7624

| # | Date | Time | Band | Called from+ | Called to | | Airtime Charges | | | | | Related Call Charges | | | Total Amt |
|---|------|------|------|--------------|-----------|--|-----------------|--|--|--|--|---------------------|--|--|-----------|
| | | | | | | | Rate Period | Min. of Call | Usage Type | Special Feature | Amt | Rate Period | Type | Amt | |
| 40 | 09/18 | 8:18 PM | 01 | Arlington VA | Washington DC | 202-543-3399 | P | 2 | AF | | .00 | | | .00 | .00 |
| 41 | 09/19 | 5:49 PM | 01 | Washington DC | Washington DC | 202-363-2346 | P | 1 | AF | | .00 | | | .00 | .00 |
| 42 | 09/19 | 5:53 PM | 01 | Chevy Chas MD | Washington DC | 202-363-2346 | P | 1 | AF | | .00 | | | .00 | .00 |
| 43 | 09/19 | 8:26 PM | 01 | Washington DC | Washington DC | 202-363-2346 | P | 1 | AF | | .00 | | | .00 | .00 |

**Total Usage Charges.....**                    **3.12**

+Designates the location, city and state, of the cell tower or switching center which processed the call.

**Legends**

**Airtime Rate Period:**

| P | Peak |
| O | Off-Peak |
| W | Night/Weekend |

**Usage Type:**

| A | Price Plan Allowance |
| F | Full Call |
| I | Incoming Call |
| R | Roaming |

**Special Feature:**

**Related Call Type:**

| VWL | VWL Long Distance |

SECNOTH00114115

Excerpt from the

February 8, 2008 deposition

of Jill Cetina

Exhibit J

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND    :
EXCHANGE COMMISSION,            :

Plaintiffs,        :
                                :
v.                 : Civil Action No.
                                :
STEVEN E. NOTHERN,             : 05-10983 (NMG)
                                :
Defendant.         :
- - - - - - - - - - - - - - x


Videotaped Deposition of JILL CETINA

Washington, D.C.

Friday, February 8, 2008

9:56 a.m.


\*     \*     \*     \*


Reported by:  Okeemah S. Henderson, LSR

Page 169

1  debt management but I'm not completely sure of
2  that. At some point I did ask.
3      Q.  When were you in debt management?
4      A.  That started, I believe, in 2004.
5      Q.  So you found out that Mr. Malvey had a
6  relative at Lehman Brothers you believe in 2004?
7      A.  I believe.
8      Q.  So at the time that you had this
9  concern on the 22nd when you talked to Mr.
10  Matus --
11     A.  I knew there was someone at Lehman
12  Brothers who had a similar last name, I didn't
13  have the name.
14     Q.  Do you know how often Mr. Malvey
15  communicated with that person at Lehman Brothers?
16     A.  No, I don't.
17     Q.  Do you know if they were ever in
18  communications?
19     A.  No, I don't.
20     Q.  Do you know how close a relative that
21  person was to Mr. Malvey?
22     A.  In 2001?

Page 170

1      Q.  Yes.
2      A.  No.
3      Q.  Do you know now?
4      A.  I believe it's his cousin, but I'm not
5  100 percent sure.
6      Q.  Do you know how often he talks or
7  communicates with his cousin?
8      A.  No.
9      Q.  Do you know how often he communicated
10  with him in 2001?
11     A.  No, idea. Since we're on the issue
12  though of Paul --
13     Q.  Wait. No. Question. Unless it's in
14  response to the last question about whether or not
15  you knew he communicate with him?
16     A.  No.
17         MR. SHOPE:  Or if she needs to correct
18  or give a complete answer to the prior question.
19         MS. WILLIAMS:  Is there another answer
20  to a question that was incomplete?
21     A.  You were asking a question about my
22  perception of Paul and what colored that. One of

Page 171

1  the things that after 2001 colored my perception
2  of Paul was a story that was shared with me by
3  someone in debt management.
4          BY MS. WILLIAMS:
5      Q.  After you spoke to Mr. Huther and he
6  told you that the 30-year bond didn't come up in
7  his conversation with Mr. Matus, how did that
8  affect your perception about whether or not
9  Mr. Malvey had discussed the 30-year bond with Mr.
10  Matus?
11     A.  It affected it somewhat. But
12  candidly, I still had some concerns. Paul, after
13  leaving Treasury went to work as an advisor for a
14  primary dealer. In the role that I had, I saw
15  Paul fairly frequently at -- not -- I don't,
16  fairly frequently, I would see him from time to
17  time at conferences and -- I'm sorry. Your
18  question? I feel like I'm wandering on your
19  question, so.
20     Q.  That's okay. My question had to do
21  with Mr. Huther, but I'll ask a different
22  question. Do you have any personal knowledge that

Page 172

1  Mr. Malvey communicated anything about the 30-year
2  bond to Mr. Matus?
3      A.  No.
4      Q.  Do you have any personal knowledge he
5  communicated anything about the 30-year bond prior
6  to October 31st to anyone outside of Treasury?
7      A.  No.
8      Q.  Do you have any personal knowledge
9  that anyone inside Treasury leaked any information
10  about the elimination of the 30-year bond to
11  anyone outside of Treasury before October 31st?
12     A.  No.
13     Q.  Do you have any personal knowledge
14  that Lehman Brothers traded in a 30-year bond
15  prior to the announcement on October 31st?
16     A.  No. I have no way to verify what
17  people said to me.
18     Q.  Let me ask you about Exhibit 8,
19  Ms. Kerner's memo. Mr. Shope touched on this a
20  little bit. I want to ask some questions about
21  the form 450s. Could you first tell us what a
22  form 450 is?

Page 221

| | |
|---|---|
| 1 | curve and all of the securities, the government |
| 2 | securities. |
| 3 | Q.  What were you using to monitor the |
| 4 | prices of these securities? |
| 5 | A.  Bloomberg, also I would have been |
| 6 | monitoring other instruments as well like interest |
| 7 | rate features and stuff like that, but to go back |
| 8 | to your question, I would have been using |
| 9 | Bloomberg. We also had a proprietary spreadsheet |
| 10 | that had live Reuters feeds that pulled in |
| 11 | whatever work was going on. |
| 12 | The beauty of the spreadsheet was that it |
| 13 | had embedded in it the prior days prices, so you |
| 14 | could also easily see the change there and then if |
| 15 | there was something particular that you were |
| 16 | interested in that you saw that was moving in an |
| 17 | interesting or significant way, you could then go |
| 18 | to Bloomberg and pull it up separately and try to |
| 19 | drill down and think about it, and then I also had |
| 20 | Reuters on the desk top which allowed me to pull |
| 21 | something right up on my machine if there's |
| 22 | something I wanted to look at. |

Page 222

| | |
|---|---|
| 1 | Q.  So the live Reuters feed, where did |
| 2 | that come from, of your terminals where was that? |
| 3 | A.  It was on my desk. |
| 4 | Q.  Then you had a separate Bloomberg |
| 5 | terminal? |
| 6 | A.  Right. So I had an Excel spreadsheet |
| 7 | that was being populated with data from Reuters. |
| 8 | I also had Reuters screens up in addition to the |
| 9 | Excel spreadsheet, that would have been my usual |
| 10 | practice. Then sitting next to me was a Bloomberg |
| 11 | terminal which I could have stepped up and sat |
| 12 | down and pulled anything up. |
| 13 | Q.  Now, it says here, "She said she first |
| 14 | noticed price increases on the long bond on 9:35.", |
| 15 | Do you recall what you noticed at 9:35?, |
| 16 | A.  At this point, I don't. |
| 17 | BY MS. WILLIAMS: |
| 18 | Q.  Let me ask you to mark this as |
| 19 | Exhibit 17. |
| 20 | (Deposition Exhibit No. 17 was marked for |
| 21 | identification.) |
| 22 | BY MS. WILLIAMS: |

Page 223

| | |
|---|---|
| 1 | Q.  Have you seen this document before? |
| 2 | A.  Yes. |
| 3 | Q.  What is it? |
| 4 | A.  It's a graph. It looks like it's a 30 |
| 5 | year on October 31st an interday graph of the |
| 6 | price of the 30-year treasury group. |
| 7 | Q.  Between what would be 9:35 here the 5 |
| 8 | is marked with a little hash mark. Do you see |
| 9 | that? |
| 10 | A.  Yes. |
| 11 | Q.  And 9 -- and 10 o'clock, what if any |
| 12 | downturn did you see in the price of the bond? |
| 13 | MR. SHOPE: Hold on a second. Are you |
| 14 | just asking her what this document says? |
| 15 | MS. WILLIAMS: Yes. |
| 16 | A.  I'm sorry. So your question is what |
| 17 | if any price decline do I see? |
| 18 | Q.  Yes. |
| 19 | A.  A little bit of a dip around maybe |
| 20 | 8:35., |
| 21 | Q.  Okay. |
| 22 | MR. SHOPE: I'm sorry 8:35., |

Page 224

| | |
|---|---|
| 1 | BY MS. WILLIAMS: |
| 2 | Q.  My question is between 9:35 and 10? |
| 3 | A.  I'm sorry. I thought you were asking |
| 4 | broadly about the whole graph. I apologize. |
| 5 | Q.  No. Between 9:35 and 10:00 what, if |
| 6 | any, price declined? |
| 7 | A.  It's going up 9:35. 9:37 it kind of |
| 8 | comes down a bit. To the 115 level around 9:45, |
| 9 | then just from there it kind of takes off. |
| 10 | Q.  And in Exhibit 7 you say that she said |
| 11 | at 10 a.m. the time of the additional |
| 12 | announcement -- |
| 13 | MR. SHOPE: This is the memorandum of |
| 14 | activity signed by Michael Moore? |
| 15 | A.  Yes. I'm there. |
| 16 | Q.  The last sentence of the second to |
| 17 | last paragraph, "She said at 10 a.m. the time of |
| 18 | the official announcement, there was a big rally |
| 19 | in the bond price." Do you know why -- do you |
| 20 | recall making that statement, first? |
| 21 | A.  I don't recall it. But I presume that |
| 22 | I made it. So. |

Page 225

1    Q.   You do agree there was a big rally in
2  the bond price at 10 a.m.?
3    A.   This intraday picture stops at 10. So
4  what occurs --
5    Q.   I'm really not asking about the
6  picture. I'm more asking about the interview that
7  you gave back in '01 and what your recollection is
8  as far as?
9    A.   I believe there was a big really
10  around 10. I don't have any specific recollection
11  of it.
12    Q.   When you stated that you first noticed
13  the increase on the long bond at 9:35 and this is
14  in Exhibit 7. Do you see that statement?
15    A.   Yes.
16    Q.   How much did you notice the price of
17  the bond go up?
18    A.   I'm sorry.
19    Q.   How much did you notice the price of
20  the bond increase at 9:35?
21    A.   Again, I think my prospective was
22  again from 8:30 to 9:35, so you're moving from

Page 226

1  something, 114 and 1630 seconds all way up to
2  something above 115 dollars. So I think it was
3  more from the prospective of where the bond had
4  been earlier in the morning. Not necessarily.
5    Q.   Not a pinpoint at 9:35?,
6    A.   No, but just that the price of the
7  security had been rising since the release of GDP
8  data.
9    Q.   Between 8:30 and 9:35, were there any
10  price declines?
11    A.   This a little bit here, I guess,
12  around 8:32. Shortly after 8:30 but then, you
13  know, the price of it kind of coming back up, so.
14    Q.   Any other declines?
15    A.   Some minor leveling of -- nothing
16  significant.
17    Q.   Had you looked at the price of the
18  30-year bond on any other -- did you go back on
19  October 31st and do any analysis of what the bond
20  price did on any days when they were refunding
21  announcements?
22    A.   No, I wasn't -- I didn't. I don't

Page 227

1  believe I did.
2    Q.   Did you compare the price of the bond
3  prior to 9:35 and take just what the bond did
4  before 9:35? Did you look at any other days at
5  all to compare what it did between the time the
6  market opened at 9:35 on October 31st and what the
7  price of the bond did on any other day prior to
8  that?
9    A.   I'm sorry. Can you repeat your
10  question again?
11    Q.   Sure. My question is just starting
12  from when the market opened on October 31st to
13  9:35 a.m. and what the price of the bond did
14  there, did you compare, you said there was an
15  increase between what we see is like 8:30 and
16  9:35, did you compare that increase to any other
17  increases in the bond any other days?
18    A.   That morning or subsequently?
19    Q.   Subsequently did you?
20    A.   No.
21    Q.   Did you do it that morning?
22    A.   No, I didn't have any --

Page 228

1    Q.   In Ms. Kerner's memo, this is
2  Exhibit 8 now, and I'm in paragraph 4 that starts
3  based on their analysis?
4    A.   Yes.
5    Q.   "Based on their analysis of trading
6  data and information they received from the
7  trading community, Jill Cetina and Jim Sharer
8  analysts in Treasury's market room believe that
9  one or more parties were trading on the basis of
10  advanced information." Do you see that statement?
11    A.   Yes.
12    Q.   What -- let's just break that down.
13  What analysis of the trading data did you do?
14  Well, first, do you agree with that statement?
15        MR. SHOPE: That's asked and answered.
16        BY MS. WILLIAMS:
17    Q.   Do you agree with that statement
18  that's written here, the first sentence of
19  paragraph 4?
20    A.   Yes.
21    Q.   So what analysis of the trading data
22  that you do that led you to this belief that one

Excerpt from the

May 12, 2006 deposition of

Brian Collins

Exhibit K

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - X

UNITED STATES SECURITIES AND    :

EXCHANGE COMMISSION,            :

       Plaintiff,            :

   V.                         :    Civil Action No.

STEVEN E. NOTHERN,             :    05-10983(NMG)

      Defendant.            :

- - - - - - - - - - - - - - X

Washington, D.C.

Friday, May 12, 2006

     Videotape Deposition of BRIAN COLLINS, a

witness herein, called for examination by counsel for

the Defendant in the above-entitled matter, pursuant

to notice and subpoena, the witness being duly sworn

by PENNY M. DEAN, a Notary Public in and for the

District of Columbia, taken at the law offices of

Foley Hoag, LLP, 1875 K Street, NW, Washington, D.C.,

at 10:44 a.m., Friday, May 12, 2006, and the

proceedings being taken down by Stenotype by PENNY M.

DEAN, RPR, and transcribed under her direction.

Page 42

1    Q.  Okay.
2    A.  Can we have a time out here for just a
3  second?
4    Q.  Sure.
5    A.  I don't go to quarterly -- I mean, the
6  RTC probably was -- this is a time out.  You keep
7  saying like I'm going there --
8        MR. RITTINGER:  Stay on the record.
9        BY MR. SHOPE:
10   Q.  Okay, I see.  What you're saying is there
11  were only a few that you attended, so you just want
12  to make that clear.
13   A.  Yes.
14   Q.  Okay, that's fine.  And when you attended
15  the conference on October 31, 2001, did anyone escort
16  you from the front entrance of the Treasury building
17  to the actual location of the press conference?
18   A.  No.
19   Q.  Do you remember whether the doors -- well,
20  first of all, what do you remember about the room on
21  that day, October 31, 2001, do you remember what kind
22  of a room it was?
23   A.  It was a good sized room with some chairs
24  and there was a lot of cameras.
25   Q.  Now, you mentioned that you came in late,

Page 43

1  was there anybody -- were the doors still open so
2  that you could come on in?
3    A.  Yes.
4    Q.  Did you stay for the entire duration of
5  the press conference?
6        MS. WILLIAMS:  Objection.
7        MR. RITTINGER:  You can answer.
8        THE WITNESS:  I was late, and I stayed
9  until they dismissed everybody.
10       BY MR. SHOPE:
11   Q.  First of all, do you remember who was
12  speaking that day?
13   A.  I would think it was Peter Fisher, he was
14  the Treasury guy then.
15   Q.  And what do you remember about what
16  Mr. Fisher said that day?
17   A.  I think I got there during the question
18  and answer period.  So I don't think I actually heard
19  him speak directly.
20   Q.  And during the question and answer period,
21  was anybody answering questions?  I'm sorry, let me
22  back up.  Who was answering the questions during the
23  question and answer period?
24   A.  I don't really -- I don't remember now.
25   Q.  You don't know whether it was Mr. Fisher

Page 44

1  or somebody else, or some combination of people?
2    A.  Um-hum.
3    Q.  You've got have to say yes.
4    A.  Yes.
5    Q.  And do you remember anything about what
6  the questions were or what the substance was?
7    A.  No.
8        MR. RITTINGER:  Well, there's two
9  questions there.  And you may not remember the
10  questions, but do you remember the substance?  It was
11  about the 30-year bond --
12       THE WITNESS:  Right.
13       MR. SHOPE:  I mean, I guess that's what I
14  want to get at.
15       BY MR. SHOPE:
16   Q.  You remember that it was generally about
17  the suspension of the 30-year bond, right?
18   A.  Correct.
19   Q.  Do you remember anything beyond that about
20  those topics of discussion and so forth?
21   A.  No.
22   Q.  And this is not trying to torture you, but
23  just to see if this at all refreshes your
24  recollection.  I mean, do you remember any discussion
25  about whether this was expected news or whether it

Page 45

1  was a shock or whether this, you know --
2        MS. WILLIAMS:  Objection.
3        BY MR. SHOPE:
4    Q.  In other words, do you recall any reaction
5  amongst the participants or the people asking
6  questions or any of the other reporters who were
7  there that day?
8        MS. WILLIAMS:  Objection.
9        MR. RITTINGER:  What you recall.
10       MR. SHOPE:  Yeah, I'm just asking what you
11  remember, Mr. Collins.
12       THE WITNESS:  By the time I got there,
13  they already knew about it.
14       MR. SHOPE:  Okay.
15       BY MR. SHOPE:
16   Q.  And did you -- okay.  Do you remember --
17  you mentioned that people were dismissed.  Do you
18  remember who did the dismissing?  And this is by
19  function, you might not know the person's name.
20   A.  I assume it was one of the press people.
21  They said that concludes the press conference.
22   Q.  When you say one of the press people, are
23  you talking about one of the --
24   A.  A press officer, a Treasury official.
25   Q.  And was there any discussion of or mention

Page 46

1  of -- on October 31, 2001, of a press embargo?
2      A.   Yes.
3      Q.   What was that?
4      A.   The press woman said that there is an
5  embargo until 10 o'clock.
6      Q.   Okay.  Was there any -- did anybody in the
7  audience on October 31, 2001 respond to that comment
8  at all?
9          MS. WILLIAMS:  Objection.
10         THE WITNESS:  I don't remember anybody.
11     BY MR. SHOPE:
12     Q.   Okay.  So as far as you can remember,
13 there was nobody who asked for any kind of
14 clarification about what that meant?
15     A.   No.
16     Q.   Now, had anybody ever stated to you what
17 the purpose of the announced press embargo was?
18     A.   No.
19     Q.   With regard to the other federal agencies
20 that have had press conferences and press embargoes,
21 has there ever been any discussion of what the
22 purpose of the press embargo was?
23     A.   I don't think so.
24     Q.   And just to be clear, you were never asked
25 to sign anything about the press embargo on October

Page 47

1  31, 2001; is that fair?
2      A.   No.
3      Q.   And just so that I'm absolutely clear, you
4  never discussed the embargo with any of the other
5  reporters that were there that day; is that fair?
6          MS. WILLIAMS:  Objection.
7          MR. RITTINGER:  You can answer, if you
8  recall.
9          THE WITNESS:  I don't remember.
10         MR. RITTINGER:  I honestly don't
11 understand the objection, but I guess I don't have
12 to, do I?
13         MS. WILLIAMS:  It's to the form of the
14 question.
15         MR. RITTINGER:  Anyway.
16     BY MR. SHOPE:
17     Q.   And again, just so I'm clear, there was
18 nothing that physically prevented you from leaving
19 the press conference before the period when the press
20 officer said that it was over or that you were
21 dismissed, right?
22         MS. WILLIAMS:  Objection.
23         THE WITNESS:  I wouldn't know if there
24 was, I wasn't intending to leave until it was over.
25     BY MR. SHOPE:

Page 48

1      Q.   And what -- did you receive any kind of a
2  press announcement or press release on October 31,
3  2001?
4      A.   I can't recall how I knew about it, but I
5  mean, I look through a lot of stuff every day, every
6  week and put a calendar together.  And, you know, and
7  maybe I went on their website and looked at it to see
8  if there was something announced, or whatever.  I
9  can't remember now.
10     Q.   I'm sorry, what I'm asking you, Mr.
11 Collins, is when you were at the press conference on
12 October 31, 2001, was there anything that was handed
13 out to you by way of a press release or something
14 that you took?
15     A.   Oh, yes.
16     Q.   Now, when you were actually on the
17 premises of the Treasury Department itself, did you
18 talk to anybody else about the subject matter of the
19 press conference?
20     A.   No.
21     Q.   And you had learned at the conference that
22 the long bond was being suspended, right?
23     A.   Yes.
24     Q.   Did you take any action with regard to
25 having learned that news once the conference was

Page 49

1  over?
2      A.   I went back to my office, I sat down and I
3  tried to write a story.
4      Q.   How far is your office from the Treasury
5  Department, or how far was it on October 31, 2001?
6      A.   It's two blocks.
7      Q.   So how long would it take you to traverse
8  the distance?
9          MR. RITTINGER:  Just your best estimate.
10         BY MR. SHOPE:
11     Q.   Yeah, again, this is -- like I was saying
12 before, just give me your best estimate if you don't
13 know exactly.
14     A.   It can take probably seven to ten minutes
15 depending how long if you catch a light or two.
16     Q.   I'm sorry, if you catch a --
17     A.   You have to cross some intersections.
18     Q.   Oh, I see.
19     A.   Like what is that?  15th Street, 14th
20 Street.
21     Q.   Do you have any recollection as to when it
22 was that the press conference ended?
23     A.   I would guess it was probably about 9:30.,
24     Q.   And do you remember -- and I'm sorry, this
25 may have been covered, but just so I'm clear, what's

Page 66

1    Q.   I believe you testified before that you
2 recalled receiving a press announcement hand out on
3 October 31, 2001, correct?
4    A.   Yes.
5    Q.   As best you recall, is Exhibit 5 a copy of
6 what you received on that date?
7    A.   It looks very much like it.
8         (Exhibit No. 6 was marked for
9         identification.)
10 BY MR. SHOPE:
11    Q.   And just to save time, Mr. Collins, you're
12 welcome to read the entire Exhibit 6, but I'm going
13 to be asking you about the bottom paragraph on the
14 first page, and then the top of the second page. And
15 just let me know when you're ready. All set?
16    A.   Yes.
17    Q.   First of all, Exhibit 6 recounts a call
18 from you to Janice Smith. And the letter, which is
19 Exhibit 6, states that this occurred approximately
20 9:35 a.m., is that consistent with your own memory?
21    A.   No.
22    Q.   That your call to her was some time before
23 10 o'clock that day, correct?
24    A.   Correct.
25    Q.   So when you say it's not consistent with

Page 67

1 your memory, what's -- what are you disagreeing with?
2 This is specifically on the 9:35 a.m. piece, we'll
3 break it down into bits and pieces.
4         MR. RITTINGER: I object to the use of the
5 word or the form of disagreeing. I don't think it's
6 a disagreement, I think it's just a different
7 recollection.
8 BY MR. SHOPE:
9    Q.   Okay, I'm asking -- basically, what I'm
10 asking for is just to get as best your memory I can.
11 And I recognize that this was five years ago, so I
12 understand that we're testing your memory to the
13 limit here. I just -- what I'm trying to get at is,
14 what's your best memory as to when it was that you
15 called Ms. Smith at Fannie Mae?
16    A.   I would guess it would had to have been at
17 least about 10:45 or 10:50. I mean 9:45 to 9:50.,
18    Q.   And you're basing that on what?
19    A.   I'm basing it on the fact that I walked
20 back from the Treasury Department, got into any
21 office, I think I as I mentioned I talked to
22 Mr. Muolo for at least a minute or something. I sat
23 down and tried to write something first, and it just
24 didn't have much pizzazz to it. I went over and
25 looked at the TV, CNBC. And then I put -- I figured

Page 68

1 I'd try to call somebody, see if I can get some
2 comment.
3    Q.   By the way, was there a reason why it was
4 Fannie Mae in particular?
5    A.   They are a big mortgage company.
6    Q.   And I apologize if I asked you this
7 before, but had you heard anything about the possible
8 suspension of the long bond before October 31, 2001?
9    A.   I can't recall.
10    Q.   Now, there's reference here to a Lesia or
11 Lesia Bullock, media relations manager; do you see
12 that?
13    A.   Um-hum, yes.
14    Q.   Do you know Ms. Bullock?
15    A.   I'm not sure, I don't think so.
16    Q.   And so did you have any awareness that she
17 was at all privy to what you were saying on October
18 31, 2001?
19    A.   No.
20    Q.   Okay, okay. And I take it nobody from
21 Fannie Mae ever called you back with any kind of a
22 comment, right?
23    A.   No.
24    Q.   Did you make any notes of your -- the
25 message that you had left for Ms. Smith?

Page 69

1    A.   No.
2    Q.   Did you make any notes of your discussion
3 with Mr. -- with your executive editor?
4    A.   No.
5    Q.   Okay. And did you take any notes at the
6 press conference itself?
7    A.   Geez, I don't remember. I don't think I
8 even got a chance to sit down.
9    Q.   Was that because it was standing room only
10 in the room where the press conference was being
11 conducted?
12    A.   I know I was in the back, that's for sure.
13    Q.   So in other words, you came in late, you
14 were in the back, and at least there weren't any
15 chairs that were in close proximity to somebody
16 coming in at the back?
17    A.   I just don't remember sitting down.
18    Q.   But, I mean -- well, let me put it this
19 way, would it have been your preference to sit if
20 there had been an open chair that was readily
21 accessible?
22         MR. ROSSETTI: Objection.
23         THE WITNESS: I don't know. Usually I do
24 sit down at press conferences.
25 BY MR. SHOPE:

| | Page 82 |
|---|---|

1  the voicemail?
2      MR. RITTINGER:  That's fine.
3      THE WITNESS:  I believe I said something
4  like Treasury is doing something with their 30-year
5  bond, and there's an embargo and I would like to try
6  to talk to someone or get some idea on how this would
7  affect, you know, the mortgage interest rates.
8      BY MS. WILLIAMS:
9      Q.   What, if anything, did you say about the
10  embargo time?
11      A.   I believe I said it was an embargo until
12  10.
13      Q.   Approximately how many Treasury refunding
14  conferences do you recall having attended prior to
15  October 31st, 2001?
16      MR. SHOPE:  Objection to the form.
17      MR. RITTINGER:  You can answer.
18      THE WITNESS:  Maybe two or three at the
19  most.  You know, and I've been with National Mortgage
20  News since 1988, fall of 1988.
21      (Interruption by a telephone call.)
22      BY MS. WILLIAMS:
23      Q.   Besides Ms. Smith did you call anyone else
24  for a comment on October 31st, 2001?
25      A.   No.

| | Page 83 |
|---|---|

1      Q.   And in your message to Ms. Smith, do you
2  recall whether or not you said anything about the
3  30-year bond being cancelled?
4      A.   I could have, I don't remember, no.
5      Q.   Did you trade in a 30-year bond on October
6  31st, 2001?
7      A.   No.
8      Q.   Mr. Shope asked you some questions about
9  penalties for violating an embargo, do you -- what
10  was your understanding if there were any penalties
11  for violating the Treasury embargo?
12      MR. SHOPE:  Objection, asked and answered.
13      MR. RITTINGER:  Could you just rephrase
14  it?  Do you know if there are any penalties?
15      BY MS. WILLIAMS:
16      Q.   Do you know if there were any penalties
17  for violating the Treasury embargo?
18      MR. SHOPE:  Objection.
19      THE WITNESS:  Do I know if there are any
20  -- I don't know if there are any penalties.
21      MS. WILLIAMS:  Can we go off --
22      THE WITNESS:  Yes, can we just go off the
23  record for a minute?
24      MS. WILLIAMS:  Can we go off the record
25  for a minute?

| | Page 84 |
|---|---|

1      THE VIDEOGRAPHER:  Off the record at
2  12:51:22.,
3      (Discussion off the record.)
4      THE VIDEOGRAPHER:  On the record at
5  12:59:48.,
6      BY MS. WILLIAMS:
7      Q.   Mr. Collins, did you know what Ms. Smith's
8  position was at Fannie Mae when you called her on
9  October 31st?
10      A.   Yes.
11      Q.   What was her position?
12      A.   She's a public relations officer -- she's
13  a press -- press media person.  She handles calls
14  from reporters, and she deals in securities issues.
15      Q.   Did she have -- did you know whether or
16  not she did any trading for Fannie Mae?
17      A.   She does what?
18      Q.   Does she do any securities trading?
19      A.   Oh, no.
20      Q.   You said she handled securities --
21      A.   Well, she doesn't -- I would hope not.  I
22  would hope Fannie Mae has securities traders for
23  that.  Usually don't leave that to PR people.  Excuse
24  me, I'm sorry.
25      Q.   Just to be clear, prior to October 31st,

| | Page 85 |
|---|---|

1  had you ever heard of Lesia Bullock before?
2      A.   I don't think I have.  I don't think I've
3  heard of her name since.
4      Q.   I just have a couple of more questions.  I
5  asked you about penalties for violating Treasury's
6  embargo.  What were any adverse consequences that
7  would occur if you violated an embargo?  And this is
8  not just central to Treasury, you said you had
9  experiences with other organizations.
10      MR. SHOPE:  Objection.  I think it
11  misstates his testimony, and it's been asked and
12  answered.
13      MS. WILLIAMS:  You can answer.
14      THE WITNESS:  It is reputational risk.
15      BY MS. WILLIAMS:
16      Q.   What do you mean by reputational risk?
17      A.   If you don't honor an embargo, I mean,
18  people aren't going to trust you with information
19  anymore.
20      Q.   And you said that people would not trust
21  you.  Would it have any impact at all in your ability
22  to attend press conferences?
23      MR. SHOPE:  Note my objection.
24      THE WITNESS:  I don't know.
25      BY MS. WILLIAMS:

Excerpt from the

December 4, 2001

SEC Investigative Testimony

of Steven E. Nothern

Exhibit L

Page 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

In the Matter of:          )
TRADING IN CERTAIN         )
TREASURY ISSUES            )    File No. HO-9353

WITNESS:  Steven E. Nothern

PAGES:    1 through 213

PLACE:    Securities & Exchange Commission
          450 5th Street, N.W. - Room 11602
          Washington, D.C. 20549

DATE:     Wednesday, November 28, 2001

          The above-entitled matter came on for hearing at
10:30 a.m. pursuant to notice.

APPEARANCES:

On behalf of the Securities and Exchange Commission:

     ANDREW SPORKIN, ESQ.
     WILLIAM M. HATHAWAY, ESQ.
     Securities & Exchange Commission
     450 5th Street, N.W.
     Washington, D.C. 20549
     (202) 942-4613

On behalf of the Witness:

     JACK PIROZZOLO, ESQ.
     NICHOLAS THEODOROU, ESQ.
     Foley, Hoag, & Eliot
     One Post Office Square
     Boston, Mass., 02109.

---

1                    PROCEEDINGS
2       MR. HATHAWAY:  We are on the record.  It's
3  approximately 10:30.  This is December 4, 2001.  Would you
4  raise your right hand, sir?
5       Whereupon,
6                 STEVEN E. NOTHERN
7  was called as a witness and, having been first duly sworn by
8  the, was examined and testified as follows:
9                   EXAMINATION
10      BY MR. HATHAWAY:
11      Q  Would you please state and spell your full name for
12  the record?
13      A  Steven Eric Nothern -- S-t-e-v-e-n -- Eric --
14  Nothern -- N-o-t-h-e-r-n.
15      Q  Thank you.  I am William Maxwell Hathaway.  I go by
16  Max.  I will be joined shortly by my branch chief on this
17  project, Andrew Sporkin.  Both Andrew Sporkin and myself are
18  officers of the Commission for the purposes of this
19  proceeding.
20      This is an investigation by the United States
21  Securities and Exchange Commission.  It's: In the Matter of
22  Trading in Certain Treasury Issues.  Our file number is --
23  HO-9353.
24      It is an investigation is to determine whether
25  there have been any violations of the federal securities

---

Page 2

C O N T E N T S

WITNESS:                                        Page

Steven Nothern                                   3

EXHIBITS:    DESCRIPTION              IDENTIFIED

222          Subpoena, nine-page document      5

223          Three-page Letter from the SEC,
             includes subpoena duces tecum     13

224          1/2 floor plan for 23rd floor
             on Boylston Street                38

225          Other 1/2 of floor plan for 23rd
             floor on Boylston Street          38

226          Bloomberg message from MF Partners
             and RJ O'Brien & Associates       166

227          ITMO Trading in Certain Treasury Issues   167

228          Five page document: M-000113, 114, 114A,
             115 through M-116                 173

229          Legal and regulatory update by Steve
             Cavan                             194

230          MFS Co. statement of policy on Personal
             Securities Transactions           190

231          MFS Statement of Guidelines       191

---

Page 4

1  laws.
2       However the evidence adduced in this investigation
3  or today's testimony session might constitute violations of
4  other state or federal, civil or criminal statutes.
5       Prior to the opening of the record, which means
6  prior to our actually going the tape recorder on and
7  beginning here today, you were provided with a copy of the
8  formal order of investigation which is in front of you here
9  and I am touching it as I speak.
10      This copy of the formal order will remain available
11  for your examination throughout the course of today's
12  testimony session.
13      Have you had an opportunity to review the formal
14  order of investigation?
15      A  Yes, I have.
16      Q  You were also provided prior to the opening of the
17  record with a copy Exhibit No. 202, which is a copy of the
18  Commission's Form 1662.
19      Have you had an opportunity to read Exhibit No.
20  202?
21      A  Yes, I have.
22      Q  Do you at this time have any questions at this time
23  concerning this exhibit?
24      A  No.
25      Q  Mr. Nothern, are you represented by counsel?



EXHIBIT NO. 2
1-30-07        SECNOTH00117214

Page 57

1   Q If you're standing on that, standing by that spot,
2 can you look all the way down to, say, where -- on the left
3 side, where the Bloomberg terminal is on 268? Is that open?
4   A You could have a straight line of sight, yes.
5   Q Okay.
6    BY MR. HATHAWAY:
7   Q Do you know Peter Davis?
8   A Yes.
9   Q Who is he?
10   A He is a Washington consultant.
11   Q How do you know him? How did you get to know him?
12   A I was given his name by a mutual acquaintance.
13   Q And who was that mutual acquaintance?
14   A Bob Falconer.
15   Q How do you spell --
16   A I believe F-a-l-c-o-n-e-r.
17   Q And who is Mr. Falconer?
18   A Bob is someone I have known in the business. He
19 formerly worked at Aubrey Langston; now he is working in
20 Chicago with a hedge fund.
21   Q How long have you known Mr. Falconer?
22   A I would guess ten years.
23   Q Which hedge fund is he currently working at?
24   A I believe the name is Faniganem [sic.]
25   Q Could you spell that?

Page 58

1   A I'm sorry, I don't know.
2   Q Starts with an F?
3   A It does.
4   Q Faniganem?
5   A F-a- --
6   Q To your knowledge, how long has he been at
7 Faniganem?
8   A Several years. I would guess five.
9   Q What did Mr. Falconer tell you about Mr. Davis?
10   A I don't recall specifically.
11   Q As well as you do recall?
12   A That it was a consultant that they used -- that he
13 knew, that was of good quality. In essence, he recommended
14 him.
15   Q Did he recommend Mr. Davis?
16   A Not directly, but I think he was -- that was the
17 reason we were having the discussion. We discussed Mr.
18 Davis, who was a consultant that he did use.
19   Q Had you asked Mr. Falconer for the name of a
20 consultant?
21   A I don't recall.
22   Q Had you heard the name Peter Davis before you spoke
23 with Mr. Falconer about Mr. Davis?
24   A I don't recall.
25   Q How long ago was this conversation?

Page 59

1   A I don't know. Several years ago.
2   Q More than ten years ago?
3   A No. I would -- if I had to guess, five, seven
4 years ago.
5   Q Did you -- did you retain Mr. Davis at that point?
6   A Let me just go back to the former question -- maybe
7 four to six years. We did.
8    BY MR. SPORKIN:
9   Q You did what?
10   A Retained Mr. Davis.
11   Q How did that come about?
12   A He has a -- we would have had a trial service for a
13 period of time. He has an e-mail that he puts out. I
14 received that on a trial basis for a period of time, to
15 assess the value of the service.
16    BY MR. HATHAWAY:
17   Q What was your assessment of the value of it?
18   A That it would be useful to us.
19   Q In what way?
20   A To help us, you know, better understand legislative
21 or other fiscal matters that might be relevant to us in
22 Washington.
23   Q Your reference to "other fiscal matters" in
24 Washington -- can you be a little more specific about what
25 you mean?

Page 60

1   A Budgetary issues.
2   Q Any other types of issues?
3   A Legislative issues. Issues surrounding monetary
4 policy. Political issues.
5   Q Have you ever met Mr. Davis in person?
6   A Yes.
7   Q How often?
8   A I recall at least three occasions.
9   Q Which were those?
10   A On two occasions, I came down to visit in
11 Washington for the day and, with other clients of Mr. Davis',
12 visited different departments or agencies around town.
13   Q That happened on two occasions?
14   A Right.
15   Q The third occasion that you met Mr. Davis?
16   A I believe I had him, when we first signed him up,
17 come into the office to meet with other, other folks in the
18 office that might be interested.
19   Q The two occasions which you came to visit in D.C.
20 for a day, when did they occur?
21   A To the best of my recollection, it would have been
22 January '99 and January/February of 2000.
23   Q The first time, in January or so of '99, were there
24 other clients of Mr. Davis present as well?
25   A Yes.

SECNOTH00117228

Page 61

1   Q  Which other clients?

2   A  I don't remember specifically. I do remember there

3  were representatives from Merrill Lynch, which I do remember

4  specifically, two clients of his that were there: Ray Stone

5  and Mr. McCarthy of Stone-McCarthy research.

6   Q  Aside from the Merrill Lynch representatives, Mr.

7  Stone and Mr. McCarthy, is it your testimony there were other

8  persons there and you don't remember who they were?

9   A  On one of those two visits, Bob Falconer also

10  attended — I believe the second of the two.

11   Q  Focusing back on the first visit, where did you go

12  with Mr. Davis?

13   A  I don't recall specifically what the agenda was. I

14  know we visited on Capitol Hill, so I went to the Capitol

15  building. We went to the Treasury Department. We went to,

16  in the Old Executive Office Building, which is where OMB

17  is, to visit officials at OMB. And that's all I can recall

18  specifically.

19   Q  Was this an all-day sort of tour of various places

20  in D.C.?

21   A  Yes.

22   Q  Who had arranged the meetings at Capitol Hill,

23  Treasury, and OMB?

24   A  Mr. Davis had.

25   Q  At Capitol Hill, did you see any particular

Page 62

1  Representatives, or Congressmen or Senators?

2   A  Again, I don't recall specifically who we met with.

3  I believe it was -- a more junior level. Relatively senior

4  staff that would have worked in areas such as Finance

5  Committee. But I don't remember specifically.

6   Q  What was the purpose, in your mind, of going to

7  Capitol Hill and meeting with the staff persons you met with?

8   A  To my recollection, we met with some on the

9  Democratic and some on the Republican side to get a sense of

10  -- this was early in the year; they were still on vacation.

11  And they were beginning to flesh out what the agenda is for

12  the year. So you try to get a sense from the individuals we

13  spoke to, to, you know, what their agenda was for the year,

14  in terms of budgetary issues in particular.

15   Q  Did you have the impression that any of the staff

16  persons you met with were interested in getting information

17  from you or the other persons that were with you?

18   A  Yes.

19   Q  How so? What were you asked?

20   A  I don't recall specifically.

21   Q  Well, was it -- as to the side of the table where

22  Mr. Davis' clients were sitting, if you will, figuratively,

23  what types of questions were asked of any of those

24  individuals?

25   A  Of the clients of Mr. Davis?

Page 63

1   A  Yes.

2   A  I don't recall.

3   Q  Approximately how many different staff, in terms of

4  — not numbers of persons, but staff for how many different

5  representatives did you meet with?

6   A  On Capitol Hill?

7   Q  Yes.

8   A  Approximately two.

9   Q  How long did these meetings last?

10   A  To guess? Less than an hour.

11   Q  Each?

12   A  Yeah.

13   Q  Is that a yes?

14   A  Yes.

15   Q  Thank you. How did Mr. Davis introduce his group

16  of clients to the staff?

17   A  I don't recall.

18   Q  Did you at any point in time have the impression

19  that one of the purposes Mr. Davis had in setting up these

20  meetings was to impress upon his clients the level of

21  contacts he had on Capitol Hill?

22   A  I didn't have that impression.

23   Q  Had you asked Mr. Davis to set up any of these

24  meetings with the senior staff that you met with?

25   A  Not specifically, no.

Page 64

1   Q  In any way?

2   A  No.

3   Q  Um --

4   A  Did I — I would have told — I told him I was

5  coming to Washington, and if he set up meetings, it would be

6  of interest. So — I have to guess I initiated, or his

7  clients initiated, let's spend a day in Washington and visit

8  with people that you think would be interesting for us to

9  visit with. He would have selected the people to visit with.

10   Q  As best you remember, did he select the persons

11  with whom you visited?

12   A  Yes.

13   BY MR. SPORKIN:

14   Q  Did you tell Mr. Davis any sort of agenda or issues

15  that you were interested in, and then he picked the people?

16   A  I don't recall.

17   BY MR. HATHAWAY:

18   Q  Moving to the Treasury Department --

19   A  If you like --

20   Q  I'm sorry?

21   A  It's very likely we discussed that. I just don't

22  recall.

23   Q  Who did you meet with at the Treasury Department?

24   A  I don't remember.

25   Q  What level of official?

SECNOTH00117229

Page 65

1    A    I would guess mid-level.
2        BY MR. SPORKIN:
3    Q    Was this at the main Treasury building?
4    A    Yes.
5    Q    Next to the White House?
6    A    Yes.
7    Q    Do you know what department they were in?
8    A    I don't — I don't remember.
9    Q    Was it Domestic Finance?
10   A    I don't remember.
11   Q    How did you get into the building?
12   A    Through the side entrance, the visitors' entrance.
13   Q    Did you have to go through security?
14   A    Yes.
15   Q    Did you have to state who you were visiting there?
16   A    Yes.
17   Q    You don't recall who you were visiting, though?
18   A    Not specifically, no.
19   Q    And -- were you visiting one person, or more than
20   one?
21   A    I don't recall.
22   Q    Was this person male or female?
23   A    I don't recall specifically.
24   Q    You don't recall if the person you met with from
25   Treasury was a male or a female?

Page 66

1    A    I don't. I don't recall.
2    Q    Did Mr. Davis indicate in any way how he knew this
3    person in Treasury?
4    A    I don't remember.
5    Q    What did you discuss with the Treasury person?
6    A    I don't have recollection of those meetings at
7    Treasury. From the '99 — from the earlier of the two. I
8    remember specifically on the following meeting.
9        BY MR. HATHAWAY:
10   Q    In your first meeting at Treasury, how long were
11   you at the Treasury Department building?
12   A    It's a guess; an hour to two hours.
13   Q    The meeting with OMB, who did you meet there?
14   A    I don't recall.
15   Q    Male or female?
16   A    I think we met with several people.
17   Q    Approximately how long were you at OMB?
18   A    I don't recall. I could only guess.
19   Q    What sorts of discussions did you have with the
20   people at OMB?
21   A    Again, I don't recall. I can only guess.
22   Q    Moving to the second tour of persons in D.C., who
23   attended that from the client side, besides yourself?
24   A    There were, I believe, two representatives from UBS
25   Securities. Myself, Bob Falconer. And I don't remember what

Page 67

1    other participants there were.
2    Q    Were either Mr. Stone or Mr. McCarthy there?
3    A    I don't remember. I don't recall.
4    Q    The two representatives of UBS, who were they?
5    A    I don't remember their names.
6    Q    Where did you go on this particular tour?
7    A    Several visits again. The two that I can remember
8    would be OMB and Treasury.
9    Q    Did you make it to Capitol Hill?
10   A    Yes.
11   Q    To the Federal Reserve, did you make it?
12   A    Oh, we did. We went to the Federal Reserve, yes.
13   Q    Anywhere else that you can think of?
14   A    Not that I can remember.
15   Q    Who did you meet with at OMB?
16   A    I don't remember their name.
17   Q    More than one person?
18   A    My recollection is it was several persons.
19   Q    Approximately how long were you at OMB?
20   A    To guess, an hour.
21   Q    What sort of issues or discussions did you have
22   with the people at OMB?
23   A    At that point in time, the problem of the ongoing
24   surpluses.
25   Q    Was there any discussion, in terms of that, with

Page 68

1    regard to Treasury supply?
2    A    I don't remember specifically. To guess, yes.
3    Q    Who did you meet with at the Treasury Department?
4    A    We met with — at least four gentlemen. The fellow
5    that — and his name escapes me — who was in charge of debt
6    issuance. The fellow who — the political appointee in
7    charge of debt issuance. And then also the gentleman who was
8    the most senior staff member of that area. Both name escape
9    me right now.
10       BY MR. SPORKIN:
11   Q    Does the name Paul Malvey —
12   A    Yes. Paul Malvey would have been the more senior
13   staff.
14   Q    You met with Mr. Malvey?
15   A    He was in that meeting, yes. The more senior
16   political appointee was, I believe, an excellent saxophone
17   player.
18       BY MR. HATHAWAY:
19   Q    Approximately, again -- was this in January or
20   February of 2000?
21   A    That's my best guess. It's entirely possible this
22   was '98 or '99. In both cases, it was very early on in the
23   year, the January/February period, when Congress was still on
24   vacation.
25       BY MR. SPORKIN:

Page 65 - Page 68

SECNOTH00117230

Steven Nothern, 12/4/01 — Multi-Page™ — Trading in Certain Treasury Issues

Page 69

1   Q  Was this Clinton political appointees?
2   A  Yes.
3       BY MR. HATHAWAY:
4   Q  In addition to Mr. Malvey and the person in charge
5  of debt issuance, who were the other two persons, do you
6  recall?
7   A  I don't remember their names.
8   Q  What areas were they in?
9   A  I believe one would have been in an area related to
10 international affairs.  And I don't recall the other.
11  Q  Had you asked Mr. Davis to arrange any of these
12 meetings with the individuals?
13  A  Not specifically, no.
14      BY MR. SPORKIN:
15  Q  Did Mr. Davis attend these meetings?
16  A  Yes.
17  Q  He was present when you met with Mr. Malvey?
18  A  Yes.
19  Q  Do you know where this meeting took place?
20  A  At Treasury, in the office, I believe, of the
21 gentleman who heads up debt issuance.
22  Q  Did all the meetings take place in one office?
23  A  I just have memory of that particular meeting, a
24 conference table.  I'm not exactly sure whose office it was.
25  Q  So you were sitting in an office with a conference

Page 70

1  table?
2   A  Yes.
3   Q  And were there four Treasury officials sitting
4  there, or did one come in and when he was done talking to you
5  another person came in?  Can you explain that?
6   A  To the best of my memory, we started the meeting.
7  And the more senior fellow joined us in progress.  I don't
8  remember anybody leaving the meeting until we were all done.
9       BY MR. HATHAWAY:
10  Q  So all the Treasury officials were there at the
11 same time?
12  A  To the best of my memory, yes.
13  Q  How long did this meeting last?
14  A  To guess, an hour to an hour and a half.
15  Q  What sorts of discussions were had during the
16 meeting?
17  A  Issues that were current at the time, that were of
18 particular interest to me -- surrounded by TIPS, continued
19 TIPS issuance, how committed they were to the program.
20      There was the issue of Treasury buybacks, how
21 committed they were to that.  Those are the issues that I can
22 remember.
23  Q  Why was the level of commitment with regard to
24 issuing TIPS of importance to you?
25  A  I invested TIPS.  I have, you know, a two to five

Page 71

1  percent position.
2   Q  Why was the issue of Treasury buybacks important to
3  you?
4   A  It's a question of how they were going to manage
5  issues that arose from the surpluses.  The issue that was of
6  paramount importance to them was the -- as you run surpluses,
7  the short paper runs off, but the stock of longer paper
8  stays.  So the average maturity extends.  The average cost of
9  servicing debt increases.  So the issue at the time was
10 understanding how they were going to manage that process.
11      By 2004, 2005, they were going to -- that average
12 maturity would hit, like, seven and a half years, which was
13 probably unacceptable to them.  So how they were going to
14 manage that progress?  One manner is to start buying back
15 these long treasuries, so you're not just letting short paper
16 write off; you're also writing off longer-term paper.  And it
17 keeps that average maturity from extending.
18  Q  What were you told about the level of commitment to
19 the TIPS?
20  A  I don't believe they revealed much directly.  In
21 substance, I came away with the impression that they were
22 believers, and that was a long-term issue.
23  Q  What were you told with regard to the commitment
24 for Treasury buybacks?
25  A  That they were going to wait, I believe, a couple

Page 72

1  years before doing anything precipitous, because this was a
2  longer term problem.  It didn't really -- the problem didn't
3  sort of hit the wall until 2004, 2005, so they were willing
4  to let it run for a couple more years.
5   Q  Is there any discussion at all about whether the
6  long bond was going to continue to be issued?
7   A  Not specifically, that I can remember.
8   Q  What discussions were there about the long bond?
9   A  I can't remember specifically.
10  Q  Were there discussions about the long bond?
11  A  Not that I can recall.  The issue, though, the
12 table was you have to stop issuing.  They wouldn't have told
13 us what they were going to stop issuing, but that was an
14 issue at the time.  They had to start curtailing, and they
15 were in the process of curtailing that eliminated the 7-year
16 already, that had gone from monthly five years to quarterly
17 five years.  It's scaled back.  The sizes of issuance.  This
18 is a process that was going to be continuing.  They were not
19 going to be very forthcoming in terms of how they were going
20 to go about it.
21  Q  When you left that meeting, did you have a better
22 understanding of Treasury's commitment to TIPS and their
23 position on Treasury buybacks, than you had been able to
24 glean from press reports?
25  A  Sure, yes.

Page 69 - Page 72

Diversified Reporting Services, Inc. (202) 296-9626

SECNOTH00117231

Trading in Certain Treasury Issues          Multi-Page™          Steven Nothern, 12/4/01

### Page 73

1    Q  In what way?

2    A  In the way you do when you meet with people and you
3  see them eye to eye, and you just understand.  You get a
4  sense of their commitment to an issue -- I mean, how much
5  they like TIPS.  All that technology gives me the impression,
6  who likes TIPS?  It's a -- Alan Greenspan likes TIPS, and
7  there are theoretical appeal.  It is theoretically appealing
8  to have the market determine what the real rate is on certain
9  Treasuries, and this really allows that.  So there is good
10  feeling to having -- and I share that.  It's part discovery
11  mechanism; the market for forms on what the real interest
12  rates are, I sensed that same commitment from Paul Malvey.
13       The other gentleman, the political appointee, I
14  think was very non-forthcoming.

15    Q  Noncommittal?

16    A  Noncommittal.

17    Q  You mentioned that there were four people you met
18  with from Treasury.

19    A  To the best of my memory, yes.

20    Q  And you said one individual was Paul Malvey, and
21  another was a more senior political figure.

22    A  Exactly.

23    Q  Who were the other two?

24    A  I don't remember.

25    Q  Do you know what department they were in?

### Page 74

1    A  I don't.

2    Q  Were they political appointees?

3    A  I guess not -- well, I would go no.

4    Q  Do they work in -- in Paul Malvey's apartment?

5    A  I don't know.

6    Q  The first meeting you had at Treasury, was Mr.
7  Malvey in that meeting?

8    A  I don't remember.

9    Q  After you returned to MFS from the second meeting,
10  did you make adjustments to any of your portfolio holdings
11  based on the impressions you had out of that meeting?

12    A  I don't recall specifically.

13    Q  Just generally, do you recall having sat down and
14  made decisions on position or repositioning in any of the
15  portfolios?

16    A  I think it unlikely.

17    Q  Why do you think it unlikely?

18    A  This was general usage; it was not specific.  I
19  don't recall coming away with a specific "Eureka, we should
20  do this."

21    Q  With whom did you meet on Capitol Hill in the
22  second go-round?

23    A  I certainly don't remember.

24    Q  With whom did you meet at the Federal Reserve?

25    A  We met -- the gentleman's name, I don't recall.  He

### Page 75

1  was a fairly senior member of the Fed -- oh, come back to the
2  prior year.  I believe we met with Alice Rivlin at the Fed.

3       On this second visit to Washington that Pete Davis
4  had organized for us, I believe we met with a fairly senior
5  international economist.  I don't remember his name
6  specifically.  But he was a rather senior official.

7    Q  How long was the meeting with Alice Rivlin in the
8  first go-round?

9    A  To guess, an hour.

10    Q  What issues were discussed there?

11    A  Specifically, I remember we probed her on how she
12  felt about economic developments in Japan.  And I remember
13  her comments were interesting.  It showed that they had
14  appreciation and concerns about unit policies and things.

15    Q  What is your understanding as you sit here today of
16  Mr. Davis' background?

17    A  My understanding is that in the -- generally the
18  early '80s, very early '80s, late '70s -- he had work
19  experience with both Democrats and, on a different occasion,
20  Republicans on Capitol Hill.  Specifically who I'm not sure.
21  Possibly Pete Domenici's office, on the Republican side.  But
22  he had been able to establish working relationships with
23  people on the Hill, you know, 20 years ago.

24       Subsequent to that, I remember that he worked for a
25  Wall Street firm in the capacity of Washington analyst.  My

### Page 76

1  recollection is that it might have been Pru-Bache, but I
2  don't remember exactly which firm it was, except that he had
3  Wall Street work experience.  And subsequent to that, at some
4  point, I think he started his own consultancy.

5    Q  From whence did you arrive at this knowledge of his
6  background?

7    A  When he came to visit us, I know I did -- either he
8  produced one or he gave it to me orally, sort of a bio that I
9  shared with the group.

10    Q  What sorts of information does Peter Davis provide
11  to MFS?

12    A  On a regular basis, he has an e-mail he puts out,
13  which is typically a compendium of events.  So-and-so will be
14  speaking on such-and-such.  Or it would also include items on
15  the legislative calendar that may be -- you know, discussed
16  that day or that week.  And he also included from time to
17  time opinions on the relative likelihood of success of
18  different sorts of legislative measures.  So that's the e-
19  mail service.

20    Q  Was that daily, weekly, or monthly?

21    A  It's not daily, but it's more common than, more
22  frequent than weekly.  Give me three a week.  It's not on a
23  regular schedule.

24       This is somewhat ad hoc.  The other service that he
25  provides is a resource for our credit analysts.  He has been

SECNOTH00117232

Page 97

1    Q Did you know how information is disseminated at a
2 conference, refunding conference?
3    A I don't.
4    Q Did you know whether people were given press
5 releases?
6    A I don't.
7    Q Do you know whether persons attending a conference
8 are given reports of any nature?
9    A I don't know. Can I add one thing?
10    Q Yes.
11    A I am familiar with the fact that they distribute a
12 press release, because I've had those faxed to me.
13    Q Do you know whether or not that distribution of the
14 press release occurred at the conference or --
15    A That's what I don't know.
16    BY MR. SPORKIN:
17    Q How did you get the faxes?
18    A Mr. Davis would fax those after the quarterly
19 refunding announcements. I've seen them before.
20    BY MR. HATHAWAY:
21    Q Do these faxes occur the day of the conference or
22 the day after or --
23    A I would guess same day.
24    Q Why do you guess that?
25    A Because I don't know specifically when they come

Page 98

1 in.
2    Q Do you know whether there are any live feeds to the
3 media at a quarterly refunding conference?
4    A No, I don't.
5    Q Does CSPAN cover these conferences?
6    A Not to my knowledge.
7    Q Does CNN cover these conferences?
8    A Not to my knowledge.
9    Q Does any media or news service provide live
10 coverage of these conferences?
11    A Not to my knowledge.
12    Q Do persons attending a refunding conference receive
13 information from Treasury before Treasury makes it generally
14 available to the public?
15    A I don't know the process.
16    Q Are any restrictions placed on the ability of
17 persons to use the information that they receive from
18 Treasury at the refunding conference?
19    A Not to my knowledge.
20    Q Do persons receiving such information have to wait
21 any wait any amount of time before passing this information
22 along to others?
23    A Not to my knowledge.
24    Q Have you ever heard the term "embargo,"
25 e-m-b-a-r-g-o, as it relates to information?

Page 99

1    MR. THEODOROU: As of what date?
2    BY MR. HATHAWAY:
3    Q As of today, have you heard that term "embargo"
4 used in the context of information?
5    A Yes.
6    Q What does it mean to you, as you sit here today?
7    A With regards to the Treasury, I don't know what it
8 means. To me it's a term that applies to the press.
9    Q What does it mean to you in terms of that?
10    A Other departments, and I know Labor Department
11 specifically, so one other department, has a process for
12 release of what they deem to be market sensitive information
13 whereby they actually lock the press in a room, it's my
14 understanding at Labor Department, for releases such as the
15 employment report, and they also release the CPI report.
16    They give information to the press, and the doors
17 aren't unlocked at a point in, and also has access, to my
18 understanding, electronic media. So they can actually digest
19 the information they're being given and write their story.
20    But there is some sort of mechanism whereby it
21 doesn't get filed with the home office, or whatever their
22 process -- you know, the reporter's procedures are, until
23 there's some sort of release of the electronic media.
24    So I think the Labor Department controls both the
25 physical environment and the electronic dissemination of the

Page 100

1 report, but they want to give them time to construct their
2 stories that will hit the wires.
3    Q How did you learn of this process at Labor?
4    A Specifically, it's just general knowledge.
5    Q How long have you known this?
6    A I don't know. Specifically, it's just general
7 knowledge.
8    Q Have you known this for at least a year?
9    A Oh, yes.
10    Q Five years?
11    A I don't know the answer.
12    Q It is your testimony that you've known for at least
13 a year that the Labor Department used the process you just
14 testified to when it came to releasing market sensitive
15 information?
16    A Yes.
17    Q How does the term "embargo," in your mind, fit in
18 that context that you just testified to?
19    A That process is described as an embargo process.
20    BY MR. SPORKIN:
21    Q Are you aware of any other U.S. agencies or
22 departments that use this process?
23    A No, I'm not.
24    Q Do you know whether the Federal Reserve uses this
25 process in releasing interest rates?

Page 97 - Page 100

SECNOTH00117238

Steven Nothern, 12/4/01 — Multi-Page™ — Trading in Certain Treasury Issues

### Page 109

```
1     A  I have two phones.
2     Q  You have two phones.
3     A  So particular phone does scroll.  So yes, you can
4  be on that phone, and it will scroll to I think it's the same
5  line.
6     Q  So when you saw the voice mail indicator blinking,
7  you were just ending another phone conversation?
8     A  No.
9     Q  Where were you when you —
10    A  My recollection is I took a phone call on our
11  direct lines with a broker.  Subsequent to that I had a
12  conversation with a colleague.  And subsequent to that I
13  noticed the light was on.
14    Q  At the time you were talking to the direct line to
15  the broker, where were you located?
16    A  At the trading desk, at my slot.
17       BY MR. HATHAWAY:
18    Q  241 here on the —
19    A  We have it here.  (Examining) 241.
20       MR. HATHAWAY:  241 on Exhibit 224.
21       BY MR. SPORKIN:
22    Q  So you were sitting there at 241.  At the time you
23  were talking to your colleague, where were you?
24    A  The same, 241.
25    Q  And who were you talking to?
```

### Page 110

```
1     A  Kathy Graham.
2     Q  Where does she sit?
3     A  She's our receptionist.  She's on the south side,
4  central part of the floor.
5     Q  She doesn't work —
6     A  She's on the 23rd floor on the south side of the
7  building.  This (indicating) is the north side of the
8  building.
9     Q  She doesn't work in this room, though?
10    A  She just brings our mail.  She's the receptionist.
11  So she frequently is going through this delivering mail.
12    Q  And where does Mr. Cadagan sit?
13    A  John Cadagan is — the location marked here on 224
14  as spot 238.
15    Q  Okay.  It's marked as spot 238?
16    A  Yeah.  That's John Cadagan's.
17    Q  So at approximately 9:37, you were at your trading
18  desk slot.
19    A  Yes.
20       BY MR. HATHAWAY:
21    Q  How long was your conversation with the
22  receptionist?
23    A  About how —
24    Q  The conversation you were having with the
25  receptionist that you'd referenced —
```

### Page 111

```
1     A  Yeah.  I don't know specifically how long it would
2  have been.  It would have been, I could guess, less than a —
3  a couple minutes.
4     Q  When you listened to the voice mail from Mr. Davis,
5  was there anyone else listening with you on that line?
6     A  No.
7     Q  Had you placed the voice mail on speaker phone?
8     A  No.
9     Q  Did you, at any point in time after you first
10  listened to it, place the voice mail on speaker phone?
11    A  No.  I immediately deleted it.
12    Q  What did Mr. Davis say in the voice mail?
13    A  I don't remember verbatim what he said.
14    Q  Do the best you can, please.
15    A  Well, in substance, I took away two things, that
16  Peter Fisher had indicated to Pete Davis they'd be canceling
17  the long bond and that there would be a press release,
18  because it was embargoed until 10 o'clock.
19    Q  Anything else in substance you took away from
20  listening to that voice mail?
21    A  No.
22    Q  How many times did you listen to the voice mail?
23    A  Once.
24    Q  Did you understand that the press release that was
25  to be embargoed until 10 o'clock was to contain the
```

### Page 112

```
1  information about the canceling of the long bond?
2     A  That was my understanding.
3     Q  Did Mr. Davis in his voice mail mention anything
4  about TIPS?
5     A  Not to my recollection.
6     Q  Did he mention anything about the size and the
7  issuance of five-year notes?
8     A  No.  Not to my recollection.
9     Q  Did he mention anything about the need to reopen
10  the 10-year bond or 10-year note?
11    A  I don't recall that.
12    Q  Did he mention anything about Treasury buy-back of
13  the long bond?
14    A  I don't recall.
15       BY MR. SPORKIN:
16    Q  How long was the message?
17    A  Less than a minute.  I found out subsequent to this
18  the time was .8 minutes.
19       BY MR. HATHAWAY:
20    Q  Is this from the phone records you reviewed?
21    A  Yes.  Specifically, I think my counsel —
22       MR. THEODOROU:  Wait.  Don't go into what company
23  counsel asked you.  They're not going to get into it, I
24  assume.
25       BY MR. HATHAWAY:
```

Page 109 - Page 112

SECNOTH00117241

Page 121

1 was a reference to the Treasury web site, some reference to
2 there was information there.
3    Q  Did you check out the web site?
4    A  No.
5    Q  Did you already know what was on the web site?
6    A  No.
7    Q  Why did you not check out the web site?
8    A  I was otherwise occupied.
9       BY MR. SPORKIN:
10    Q  When did you see this e-mail?
11    A  I don't remember when I saw it first.
12    Q  Was it after 10 o'clock?
13    A  I don't remember.
14       BY MR. HATHAWAY:
15    Q  When an e-mail comes in of this nature, is there
16 some signal to you at your work station that you have an e-
17 mail?
18    A  If I have my e-mail up, it scrolls the top.
19    Q  Did you have your e-mail up at that time?
20    A  I don't recall.
21    Q  At the time that you stopped listening to the voice
22 mail and had in your mind the information about the
23 cancellation of the long bond, did you understand that to be
24 confidential information?
25    A  No.

Page 122

1    Q  Why not?
2    A  It was being shared with me. There was no
3 indication that it was confidential.
4    Q  Did you in any way in your mind connect Mr. Davis'
5 statement that the press release was embargoed until 10 a.m.
6 with the piece of information you had about the cancellation
7 of the long bond? Did you bring those two concepts together?
8    A  Part of the press release would have been to that -
9 - would have directly addressed that issue. Is that what
10 you're asking?
11    Q  Yeah. Did you --
12    A  There would be a connection, if that's your
13 question.
14    Q  Right. And what is the connection?
15    A  That the press release would contain that
16 information.
17    Q  Did you, at that point in time or at any point in
18 time until you saw that the information -- that the press
19 release had been made, did you draw the conclusion that the
20 information you had about the long bond being canceled was
21 embargoed information?
22    A  Yes.
23    Q  Did you think at that point in time that this was
24 therefore confidential information that you had?
25    A  No.

Page 123

1    Q  Did you consider the information about the
2 cancellation of the long bond to be important -- strike that.
3 Did you consider the information about the long bond being
4 canceled to be market sensitive?
5    A  Yes.
6    Q  Why?
7    A  The market is already reacting. By definition, it
8 was market sensitive.
9    Q  What do you mean the market was already reacting?
10    A  I observed that the market had been fairly stable
11 earlier in the day, if I'm using the long bond as an
12 indicator, or the Treasury futures contract as an indicator.
13 Sometime around 9:30 did observe the market went up 8 ticks,
14 10 ticks contemporary to the time that we're talking about
15 here of receiving the first call from the broker. At that
16 point, the market had already ticked up, you know, maybe a
17 quarter point.
18       BY MR. SPORKIN:
19    Q  Is 8 ticks a significant amount to you?
20    A  In what sense? Yeah. I mean, it's --
21    Q  Is that considered a big movement, 8 ticks?
22    A  It's not a big movement, but I think it's a
23 significant movement. The nature of the broker's call is
24 that the market is reacting, and this is possibly what the
25 market's reacting to.

Page 124

1       BY MR. HATHAWAY:
2    Q  Was this 8 ticks on the long cash long bond or
3 on --
4    A  Yeah, on the cash long bond.
5       BY MR. SPORKIN:
6    Q  You mentioned before that there was conversations
7 about this rumor, and you referenced this e-mail. Was there
8 any other conversations or discussions amongst any other
9 people?
10    A  The e-mail was referencing a Treasury web site.
11    Q  Right.
12    A  I think it was hindsight referencing the fact that
13 there was already information posted on the web site.
14    Q  Right. I understand that. But you responded to a
15 question that Mr. Hathaway asked about whether there was any
16 discussions about this prior to 10 o'clock, and you said
17 there were, and you referenced this e-mail. Was there
18 anything else? Did you have discussions with anyone else?
19    A  With my colleagues, yes.
20    Q  Anyone outside of MFS?
21    A  No.
22    Q  Who within MFS did you have discussions with?
23    A  David Kennedy and the trader John Cadagan.
24       BY MR. HATHAWAY:
25    Q  Let me just understand here. Are these discussions

SECNOTH00117244

Page 125

1 after the phone call with either Burfitt or Hinckley, or were
2 these discussions you had following hearing the voice mail
3 with Mr. Davis?
4    A   The latter.
5       BY MR. SPORKIN:
6    Q   Let's go chronologically.  After you received the
7 voice mail from Mr. Davis, what did you do?
8    A   I moved to David Kennedy's desk, which would be
9 location 243 on your Exhibit 224, and shared with Dave
10 Kennedy the fact that I received this phone mail message.
11   Q   The Davis phone message?
12   A   Exactly.  Yeah.
13      BY MR. HATHAWAY:
14   Q   What did you tell him was the content of the voice
15 mail?
16   A   That Pete Davis, our Washington consultant, had
17 said that they'd be canceling the long bond and that they'd
18 be announcing it at 10 o'clock.
19   Q   And did you mention to Mr. Kennedy that Mr. Davis
20 had said the press release was embargoed?
21   A   Not at that point.
22   Q   At what point did you mention that to him?
23   A   Subsequently, we did discuss the fact that this was
24 embargoed, that there was a press release that was going to
25 come at 10:00, but it was embargoed until 10 o'clock.

Page 126

1    Q   When was that discussion about the press release
2 that was to be embargoed?
3    A   Subsequent to describing taking the phone message
4 and that they were going to be announcing cancellation of the
5 long bond at 10 o'clock.
6    Q   Let me try to do it this way:  Did you, at some
7 point in time, place trades based on this information you
8 received from Peter Davis?
9    A   We did place trades, yes.
10   Q   In your subsequent conversation with Mr. Kennedy
11 about the press release and the embargo, did that occur
12 before or after these trades were placed?
13      MR. THEODOROU:  The press release and/or the
14 embargo or the press release or both?
15      MR. HATHAWAY:  Thank you, Counsel.
16      BY MR. HATHAWAY:
17   Q   Did you tell Mr. Kennedy that there was an embargo
18 on the press release about the cancellation of the 30-year
19 bond before or after the trades were placed?
20   A   I don't know exactly.
21   Q   What's your best guess?
22   A   My best guess is – I don't know.  I can't tell
23 you.  My best guess is that we placed the order and that that
24 discussion was subsequent, but I really don't recall the time
25 frame.

Page 127

1    Q   When you spoke with Mr. Kennedy about the substance
2 the voice mail you had from Mr. Davis, did he ask you any
3 questions?
4    A   Not that I can recall.  Excuse me.  Let me correct
5 that.  He put out the question, "What should we do about
6 this?"
7    Q   Did he say anything at all about, "Well, how did
8 Pete Davis know this?  Where is he getting this information?"
9    A   No.
10   Q   Did he ask you whether you thought this was a
11 rumor?
12   A   No.
13   Q   Did you say to him the word "I've heard a rumor
14 that"?
15   A   Yes.
16      BY MR. SPORKIN:
17   Q   What did you say?
18   A   We discussed the fact that – the rumor on the
19 Chicago Board of Trade.
20      BY MR. HATHAWAY:
21   Q   Did you present to Mr. Kennedy that Mr. Davis'
22 information to you was a rumor?
23   A   No.  I didn't characterize it like that.
24   Q   How did you characterize it?
25   A   Exactly the way I mentioned earlier, to the best of

Page 128

1 my recollection.
2    Q   What happened after you spoke with Mr. Kennedy?
3 What happened next?
4    A   He posed a question of, you know, what we should do
5 about this.  I said I'd be buying 25 bonds, 25 million bonds.
6 He also decided he was going to be buying 25 million bonds.
7 Two colleagues also – one bought 5, the other bought 10 or
8 intended to buy.  John Cadagan did the math.  I gave them
9 authorization to go ahead and buy them.
10   Q   The other two individuals, who are they?
11   A   Rick Smith.  On your Exhibit 224, it's in slot 242.
12 And Geoffrey Kurinsky in slot 265.  Rick Smith, 5 million.
13 Geoffrey Kurinsky, 10 million.
14   Q   Did you or Mr. Kennedy in your presence have some
15 conversation with either Smith or Kurinsky about this
16 information?
17   A   My conversation with Dave Kennedy was for general
18 purposes.  I was informing my colleagues.
19   Q   Looking at Exhibit 224, is it your testimony that
20 after you listened to the voice mail you moved from your
21 position 241 to in the vicinity of 2437  Is that correct?
22   A   Exactly.  I stood immediately behind them.
23   Q   Where was Mr. Kurinsky at that time?
24   A   At his desk.
25   Q   And where was Mr. Smith at that time?

Page 125 - Page 128

SECNOTH00117245

Trading in Certain Treasury Issues          Multi-Page™          Steven Nothern, 12/4/01

Page 129

1    A  Also at his desk.
2    Q  Did these individuals turn their attention to you?
3    A  I don't recall. They're both -- just to paint a
4  picture, there are large monitors on either side. So between
5  location 265 and 243, for example, Geoffrey Kurinsky had
6  those two large monitors on that desk space, occupying that
7  desk space between, you know, 265 and 243. So it virtually
8  creates a wall.
9        There is the same thing between location 243 and
10  242. Rick Smith has one large monitor creating a bit of a
11  barrier. Mr. Kennedy has one of his large monitors kind of
12  back to back with Geoffrey Kurinsky's monitors, I guess three
13  large monitors creating a bit of a barrier.
14    Q  Where was Mr. Cadagan at this time that you walked
15  over to --
16    A  His desk, which would be location 238.
17    Q  When you spoke to Mr. Kennedy about the substance
18  of the voice mail from Mr. Davis, were you speaking in a
19  conversational tone or louder or quieter?
20    A  Conversational tone.
21    Q  Did you intend for your words to be heard by
22  persons other than just Mr. Kennedy?
23    A  Yeah.
24    Q  Describe that for me. Explain that to me. I
25    A  It was sharing this information with a group. I

Page 130

1  had made a decision that my next ticket was going to be a buy
2  ticket; and I went over to the group to share, A, the
3  information that I collected and, B, the fact that I was
4  going to be doing a transaction, the intention being that if
5  we were going to be doing a similar thing that we should all
6  do it together and get in as one order, as opposed to a
7  series of sequential orders.
8    Q  How much type lapsed between hearing the voice mail
9  from Mr. Davis and you reaching the decision to buy 25
10  million of Treasury bonds?
11    A  I don't know specifically. I'd say within five
12  minutes.
13    Q  During that period of time, however long it took
14  before you reached your decision, did you speak with anyone
15  else about what you'd heard from Mr. Davis?
16    A  I had, in essence, made my decision before I got up
17  from my desk to go and share this with my colleagues.
18    Q  In that time frame between listening to the message
19  from Mr. Davis and making that decision in your mind to buy
20  25 million bonds, did you do anything else? Did you take any
21  steps? Did you look anywhere? Did you have an
22  understanding?
23    A  What do you mean "do anything"?
24    Q  Well, you have monitors in front of you. You've
25  got a phone. I mean, there's all kinds of things you could

Page 131

1  do. Did you do anything?
2    A  I observed the monitors, observed the market, which
3  I will typically do as I'm on the phone, in any case.
4    Q  Were you looking for anything in particular during
5  that time period?
6    A  Not that I recall. I mean, I would have been
7  looking at the price of the long bond and the Treasury market
8  in general, a wide array of information. I'm just looking
9  for market changes.
10    Q  Did you see anything in your monitors during that
11  time period that helped you reach the conclusion to buy the
12  bond?
13    A  The only thing I observed is that the bond had
14  moved up 8, 10 ticks in the last 10 minutes, 15 minutes.
15    Q  How did that help you reach a decision to buy
16  bonds?
17    A  The market was moving. It was digesting
18  information. It was collaborative of the fact that there was
19  information hitting the market.
20    Q  Did you give any conversation to the fact that the
21  8 to 10 ticks might represent the full digestion by the
22  market of the information?
23    A  You wouldn't -- couldn't know that.
24    Q  Did you give it any consideration?
25    A  I did not.

Page 132

1        BY MR. SPORKIN:
2    Q  Would you expect the market to react more than 8 to
3  10 ticks on news like this?
4    A  In the abstract?
5    Q  Yes.
6    A  Given what I know about the circumstances that day?
7    Q  Yes. Prior to 10 o'clock would you have expected
8  the market to react more than 8 to 10 ticks on the news that
9  the long bond was not going to be issued anymore?
10    A  I didn't quantify. If it moved 5 and a half points
11  that day, it was beyond anybody's expectation. It's, I
12  think, linked to circumstances not just linked to that,
13  linked to the condition of the market at the time. I'm just
14  telling you -- I'm struggling with -- I've read a Financial
15  Times story quoting Peter Fisher saying he thought the market
16  would go down.
17        So yes, this is information that you'd expect and
18  you would have expect the that morning to make the market
19  move up, but in the abstract you couldn't know how much of it
20  would go. You have one participant. I should think it would
21  go down.
22    Q  Did you think it would move more than 8 to 10
23  ticks?
24    A  No.
25    Q  Going back a second to the conversation -- the

Page 129 - Page 132

Diversified Reporting Services, Inc. (202) 296-9626

SECNOTH00117246

**Page 133**

1 voice mail from Mr. Davis, you mentioned two things that you
2 took from that. One was that Peter Fisher said he was going
3 to get rid of the long bond; is that right?
4     A   In substance, that Peter Fisher had said this to
5 Pete Davis.
6     Q   And said directly to Pete Davis?
7     A   I don't believe he used the word "directly," but
8 that was the substance of what I took away from it, yes.
9     Q   And the second thing was that this information was
10 embargoed until 10 o'clock?
11     A   There was a press release, but it was embargoed
12 until 10:00. There would be a press release, but it was
13 embargoed until:00. In substance, 10 o'clock announcement
14 embargo.
15     Q   He definitely used the word "embargo"?
16     A   That I recall, yeah.
17     Q   After 10 o'clock, did you tell anyone that the
18 information was not embargoed, that Mr. Davis did not mention
19 that it was embargoed?
20     MR. THEODOROU:  Information or press release?
21     MR. SPORKIN:  Okay. Let me start over.
22     BY MR. SPORKIN:
23     Q   Did you tell anyone after 10 o'clock that the voice
24 mail that Mr. Davis left did not include the word "embargo"?
25     A   No.

**Page 134**

1     Q   So any time after 10 o'clock that you mentioned the
2 information you learned from Mr. Davis you mentioned that he
3 told you it was embargoed?
4     A   Oh, I see. Can you ask that question again?
5     Q   Okay. After 10 o'clock, did you tell anyone — did
6 you tell anyone after 10 o'clock that the information that
7 Mr. Davis told you was not embargoed?
8     A   I was asked late in the day a question about
9 whether Pete Davis had indicated this was embargoed, yes.
10     Q   Who asked you this question?
11     A   Mike Robarish.
12     Q   Excuse me?
13     A   Michael Robarish.
14     Q   And who is that?
15     A   He is a colleague. He's number two head of
16 Research in our Fixed Income Department.
17     Q   And what did he ask you?
18     A   He asked me specifically — he asked me, in
19 substance, "Did Pete Davis say that this was embargoed?" I
20 took that — it was in the context of whether we had done
21 something that day that was inappropriate and in the context
22 of a question that we had whether we owed something to
23 Merrill Lynch, and I answered no. Can I explain?
24     Q   Sure.
25     A   I was answering the preceding question which was in

**Page 135**

1 the context of had we done something inappropriate or did we
2 owe something to Merrill, you know, "Did he say that we could
3 not transact on this?" And that's what I answered no to.
4     Q   So when Mr. Robarish —
5     A   Robarish.
6     Q   Robarish. Did he use the word "embargo"?
7     A   Yes.
8     Q   So he asked you whether the information was
9 embargoed or whether Mr. Davis told you this information was
10 embargoed?
11     A   Correct.
12     Q   And you said no to that?
13     A   Correct.
14     Q   Even though — you're now saying that Mr. Davis, in
15 fact, did say that the information was embargoed?
16     MR. THEODOROU:  That's not what his testimony is.
17 Press release was embargoed.
18     MR. SPORKIN:  Okay.
19     MR. THEODOROU:  Press release has been his
20 testimony.
21     MR. SPORKIN:  Okay.
22     MR. THEODOROU:  That's the thing. I don't think —
23 well, I'll let you develop it. I guess I'll have a chance.
24 But you've got to get — the press release is what he said
25 was embargoed.

**Page 136**

1     BY MR. SPORKIN:
2     Q   The press release was embargoed until 10 o'clock?
3     A   Correct.
4     Q   Did you take that to be different than the
5 information he was telling you about the 30-year bond?
6     A   The press release was going to contain that
7 information.
8     Q   Did you understand that that information was
9 embargoed until 10 o'clock?
10     A   I didn't not understand that Pete Davis was subject
11 to a restriction or that I would be subject to a restriction
12 with regard to that information.
13     Q   Other than Mr. Robarish, did you tell anyone else
14 that this information wasn't embargoed?
15     A   Was —
16     Q   Was not embargoed.
17     A   Was not embargoed?
18     Q   Yes.
19     A   No.
20     BY MR. HATHAWAY:
21     Q   When Mr. Robarish was asking you the question, did
22 he draw a distinction between the press release and the
23 information contained in the press release?
24     A   No.
25     Q   Did he ask you whether or not the information about

Page 149

1  Q  And happened next?
2  A  Subsequently, a couple things happened. One, John
3  Cadagan mentioned the fact that, "Oh, 10 o'clock is the
4  refunding announcement." And I said, "Oh, they're auctioning
5  the -- they're announcing the auctioning of next week's
6  auction." That was my first connection with the fact that
7  this was a refunding announcement period.
8       Dave Kennedy asked what we should do about this.
9  We combined our order. There was some discussion that Pete
10  Davis had said that there was a press release and that it was
11  embargoed until 10 o'clock; so it was consistent with
12  the notion of a refunding announcement that was embargoed.
13  Q  So prior to placing the trade there was discussion
14  amongst you and the other individuals that this information --
15  -- that the press release was embargoed until 10 o'clock?
16  A  The exact timing of when we might have talked about
17  embargo I'm not 100 percent clear on whether that was before
18  we placed the order or right after we placed the order. The
19  discussion that I've gotten this call from Pete Davis was
20  definitely prior to, and we talked about how many -- or what
21  we were going to do about it. So that was definitely prior
22  to.
23  MR. THEODOROU: Is your question, Mr. Sporkin, when
24  the term "embargo" was used?
25  MR. SPORKIN: Yes.

Page 150

1  BY MR. SPORKIN:
2  Q  You mentioned that you used the term "embargo" when
3  you were discussing amongst the people on the trading floor.
4  A  Right.
5  Q  When did the use that term "embargo"?
6  A  Right, during the process of entering the order and
7  having it executed, in all likelihood, my guess, be
8  subsequent to when we actually placed the order, but it would
9  be contemporaneous with the trader executing the trade.
10  Q  Now, you mentioned that Mr. Cadagan mentioned that
11  the announcement was coming at 10 o'clock?
12  A  That there was a refunding announcement.
13  Q  Did he hear your conversation at Mr. Kennedy's
14  desk?
15  A  Yes.
16  Q  He was reacting to hearing you talk about
17  Mr. Davis' phone message?
18  A  Yes.
19  Q  Did anyone else that you're aware of hear that
20  conversation?
21  A  I'm not specifically aware of who heard what.
22  Q  You've mentioned Mr. Kurinsky, Mr. Kennedy,
23  Mr. Smith and Mr. Cadagan. Did anyone else react to your
24  conversation?
25  A  The only other person that did a trade that morning

Page 151

1  that subsequently came to my desk after I returned to my
2  trading location on the trading desk was Matt Ryan, and I
3  don't know what prompted him, whether he overheard what we
4  were talking about or something else.
5  Q  Where does Mr. Ryan sit?
6  A  If you look at your Exhibit 225, Matt Ryan is at
7  location 248.
8  Q  Was he there at his desk at 248 around this time?
9  A  I don't know.
10  Q  Was he around where you were talking at
11  Mr. Kennedy's desk?
12  A  I don't believe so. I don't recall seeing him.
13  Q  Did you instruct Mr. Cadagan to place an order for
14  the long bond purchase?
15  A  Yeah. I authorized that he should go ahead and
16  execute.
17  Q  And what did he tell him to purchase?
18  A  He added up between us it was -- amongst us, it was
19  65 of the long bond, and I authorized him to go ahead and
20  just execute the trade.
21  Q  What happened next?
22  A  I believe we had the discussion that this press
23  release, the refunding announcement and that that was
24  embargoed. It would be coming out at 10 o'clock.
25  Q  Did anyone indicate that maybe you should not have

Page 152

1  done that trade if it was embargoed?
2  A  No.
3  Q  What happened next?
4  A  I made the comment, "I wonder about -- I wonder
5  what the ethics are of all this."
6  Q  Who did you make that comment to?
7  A  No one in particular. I was standing behind Dave
8  Kennedy at the time.
9  Q  Did anyone react to that?
10  A  Not to my recollection.
11  Q  What happened after that?
12  A  I made a comment to Dave Kennedy as I was leaving
13  his area to go back to my area that I believed there might
14  actually be more risk in the purchasing manager report at 10
15  o'clock than in this thing.
16  Q  What happened next?
17  A  I returned to my desk to enter the transaction into
18  our internal order entry system.
19  Q  And what happened next?
20  A  I allocated -- I bought 25 bonds. I allocated that
21  trade and entered. As I was trying to figure out if I needed
22  to buy more bonds for other accounts, Matt Ryan came over to
23  my desk, and we had a discussion about -- he was trying to
24  decide -- he wanted to know whether he should be buying
25  futures or whether he should be buying cash bonds. He wanted

**Page 201**

1    A  Yes.

2      MR. THEODOROU:  No.  Not with me.  It may be —

3      THE WITNESS:  With my counsel.

4      MR. THEODOROU:  No, not with your counsel.

5      THE WITNESS:  I'm sorry.

6      BY MR. HATHAWAY:

7    Q  With company counsel?

8    A  Yes.

9    Q  Have you spoken with any of your colleagues about

10 any conversation you've had with either of these two

11 gentlemen?

12    A  That I have had conversations with this gentleman,

13 yes.

14    Q  The substance of those conversations —

15      MR. THEODOROU:  No.  The substance of conversations

16 with —

17      THE WITNESS:  No.  No.

18      MR. THEODOROU:  However, corporate counsel he may

19 have had discussions.  Then you get into the corporate

20 privilege, which he can't waive.  I don't mean to —

21      MR. SPORKIN:  No.  I understand.

22      MR. THEODOROU:  But there may have been a

23 discussion about the call in the context of a corporate

24 counsel talking to somebody, and he's talking about what a

25 corporate counsel says.  Okay.

**Page 202**

1      BY MR. SPORKIN:

2    Q  Other than Mr. Robariah, the conversation that you

3 had with Mr. Robariah you've already testified to, and other

4 than conversation you've had with company counsel or your

5 counsel here today or conversations that you had with company

6 officials where you discussed what company attorneys told

7 you —

8      MR. THEODOROU:  Let me tell you the context,

9 Mr. Sporkin.  Discussions where someone may have spoken to

10 company counsel, relayed what they said to company counsel

11 and he relayed back to somebody.  That's in the context of

12 the corporate privilege —

13      MR. SPORKIN:  Right.

14      MR. THEODOROU:  — regarding the phone calls or

15 anything.

16      MR. SPORKIN:  Correct.

17      BY MR. SPORKIN:

18    Q  Did you have any other conversations about

19 Mr. Davis' phone call with anybody from the company?

20    A  Yes.

21    Q  Okay.  When was this?

22    A  I believe November 7th, which would be a Wednesday.

23    Q  And who did you have that conversation with?

24    A  My boss, Joan Batchelder.

25    Q  And —

**Page 203**

1    A  And Don Mycrans.

2    Q  Who is that?

3    A  He's director of Trading.  They came by.

4    Q  And what did you say to them?

5    A  They asked me the question if Pete Davis had said

6 that this was embargoed and that you couldn't trade on it.

7    Q  And what did you tell them?

8    A  I said no.

9    Q  Did you say anything else to them?

10    A  That was the substance of the conversation.

11    Q  Did they ask you anything else?

12    A  No.

13    Q  Why did you say no to that?

14    A  Because he hadn't indicated that we couldn't use

15 this — we couldn't trade on it.

16    Q  Did you tell them that he had mentioned the word

17 "embargoed" though?

18    A  That was the substance of the conversation as I

19 related to you.

20      MR. THEODOROU:  The question is did you tell them -

21 -

22      MR. SPORKIN:  Wait.

23      BY MR. SPORKIN:

24    Q  Did you mention that Mr. Davis had used the word

25 "embargoed"?

**Page 204**

1    A  No, I did not.

2      BY MR. HATHAWAY:

3    Q  Have you ever been named as a defendant or

4 respondent in any action or proceeding brought by the SEC or

5 any other state or federal securities regulatory agency?

6    A  No.

7    Q  By any stock exchange?

8    A  No.

9    Q  By any Self-Regulatory Organization of the

10 securities industry?

11    A  No.

12    Q  Have you ever been a defendant in any action

13 alleging violation of federal securities laws?

14    A  No.

15    Q  Have you ever been a defendant in any criminal

16 proceeding other than one involving a minor traffic offense?

17    A  No.

18    Q  Have you ever testified in any proceeding conducted

19 by any securities regulatory agencies?

20    A  No.

21    Q  By any stock exchange?

22    A  No.

23    Q  Have you ever testified in connection with a

24 proceeding in state or federal court?

25    A  No.

Page 201 - Page 204

SECNOTH00117264

Excerpt from the

September 7, 2006 deposition

of Geoffrey Kurinsky

Exhibit M

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES SECURITIES AND      ) C.A. 05-10983

EXCHANGE COMMISSION,              ) (NMG)

Plaintiff,                        )

                                  ) VOLUME:      I

vs.                               ) PAGES:    1-242

                                  ) EXHIBITS:  1-12

STEVEN E. NOTHERN,               )

Defendant.                        )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


VIDEOTAPED DEPOSITION OF GEOFFREY

KURINSKY, a witness called on behalf of the

Plaintiff, pursuant to the provisions of the

Massachusetts Rules of Civil Procedure,

before Jill Shepherd, Registered

Professional Reporter and Notary Public, in

and for the Commonwealth of Massachusetts,

at the offices of U.S. Securities and

Exchange Commission, 33 Arch Street, Boston,

Massachusetts, on Thursday, September 7, 2006,

commencing at 10:18 a.m.

Page 66

```
 1    raised platform, along with some outside
 2    lines.  And within that desk, I had little
 3    slots where I kept information sorted.  You
 4    know, I would keep my various reference
 5    information.
 6         On top, I kept books, bookcases, and I
 7    could see through to Peter Varean's desk.
 8    We both did -- he helped me with the
 9    corporate bond market.  We were both
10    corporate bond market specialists, so we
11    worked together.
12         And on the right was papers.
13 Q. You said you had direct dealer lines.  Did
14    you also have a telephone?
15 A. I also had a telephone to the right where I
16    could get, like, a private line.
17 Q. That was on the right side?
18 A. Right.  And a special -- a regular phone, on
19    the right side.
20 Q. Now, you said you could see -- if Varean was
21    sitting at his work station, you could see
22    him?
23 A. Yeah.
24 Q. You also said that on your left, you had
25    your computer screens and you said you
```

Page 67

```
 1    wanted to use them as a sort of a sound
 2    barrier.
 3 A. Yes.
 4 Q. If those computer screens are not there,
 5    could you see -- I guess it would have been
 6    David Kennedy?
 7 A. Oh, yeah.
 8 Q. While the screens were there, could you poke
 9    through them and --
10 A. Yeah.
11 Q. -- and see Kennedy on the other side?
12 A. Or I'd stand up, I could lean around the
13    left or, you know.
14 Q. If you were working at your work station,
15    could you generally hear what was going on
16    on the trading desk?
17 A. Oh, yeah.  Obviously, the closer to me, the
18    more I heard it.
19 Q. So if Kennedy was having a conversation with
20    somebody, you could hear that?
21 A. Well, some people talk softly, some people
22    talked loudly.  So courteous people talked
23    softly.  Even David, if he talked next door
24    softly, I couldn't hear what he was saying.
25    People change their tones depending on the
```

Page 68

```
 1    nature of their conversation.  If someone
 2    was speaking loud enough, you know, I could.
 3 Q. Was there somebody on the desk who had a
 4    particular habit of speaking loudly?
 5 A. Well, John Cadogan, because he was sending
 6    out information.  I mean, he would, you
 7    know, say something to make sure we all
 8    heard it.  It was his job.  He was a conduit
 9    of information.
10 Q. If somebody wanted to share information with
11    the whole desk, was it the practice for them
12    to speak loudly so everyone could hear it?
13 A. Or, you know, stand up, get someone's
14    attention.
15 Q. Did you ever do that?
16 A. I'm sure I did.  I don't remember anything
17    specifically.
18 Q. Okay.  You said on your computer screens you
19    had all your computer information.  What
20    type of computer information did you have
21    access to?
22 A. I had e-mail through Bloomberg, which was a
23    primary source.  Everybody in the
24    fixed-income market was on Bloomberg e-mail,
25    so I could get information from dealers,
```

Page 69

```
 1    other people in the fixed-income market, so
 2    that I would call them my professional fixed
 3    e-mail income.  I would also have my MFS
 4    e-mail information from, you know, inside
 5    the company, what was going on, and
 6    information related to my portfolio.  And I
 7    also got some of the optional services that
 8    we talked about.  I got one of screens with
 9    live Treasury prices.  I could look at
10    Moody's data.  Basically, it was a conduit
11    of all information I could get online.
12 Q. What about news?
13 A. I had Dow Jones news wire that I could get
14    various places.  I don't know.  I got Night
15    Ridder, if I could -- if I pushed the right
16    button.  I could get --
17 Q. What was your primary source for getting
18    financial news from the news sources as
19    opposed to e-mail?
20 A. Primary news on economics or --
21 Q. Any financial-related information.
22    Information that was pertinent to the
23    financial markets?
24 A. Probably the Bloomberg.
25 Q. Bloomberg news?
```

Page 70

1   A. Yeah. Bloomberg had a news service. You
2       could get say "top," and you could get top
3       stories.
4   Q. And was that something you would leave on
5       your screen and it would keep scrolling?
6   A. Yeah. Then it had a -- one of the pages had
7       a -- I also had a Dow Jones wire that
8       scrolled. I had all these things. There
9       was so much information, I don't remember
10      what I looked at. You know, depending on
11      the time of day and -- but Bloomberg, I
12      really looked at for -- you know, for my
13      e-mail, for -- to do quantitative analysis
14      of fixed income, to get information on a
15      particular security. There was more
16      information on General Motors in it -- and a
17      lot of news services fed it, so I could get
18      a lot of information.
19  Q. Through the Bloomberg?
20  A. Right.
21  Q. Now, the MFS e-mail that there was, was that
22      an Outlook system that you used?
23  A. Yeah, I believe it was.
24  Q. Did you have your Bloomberg e-mails
25      forwarded to your MFS e-mail?

Page 71

1   A. No.
2   Q. So you'd have to check each source for
3       e-mails?
4   A. Right. Right. I think people could send
5       either way if they -- some people -- you
6       could send it to either one, but...
7   Q. How often would you check your Bloomberg
8       e-mails?
9   A. Bloomberg, I probably checked when I was at
10      my desk every 20 minutes. That was my
11      primary source of information about the
12      corporate market.
13  Q. And the -- how often would you check your
14      MFS Outlook, e-mail Outlook?
15  A. Maybe every half an hour, if I was at my
16      desk.
17  Q. What type of information would generally
18      come across that e-mail?
19  A. That would be normally information from
20      inside the company about -- if it was --
21      people that helped support the fund, whether
22      it was helping calculate the dividends,
23      compliance, accounting, all that kind of
24      stuff related to the support functions of
25      managing a fund. I would get that. I would

Page 72

1       also get general MFS employee e-mail that
2       they blast to everybody.
3   Q. The e-mails that you were discussing earlier
4       that Pete Davis sent you, would they come
5       through the MFS e-mail?
6   A. Yeah. But I think I said it was probably a
7       fax.
8   Q. Okay. I thought you had stated earlier that
9       you received both, but you thought you
10      received a fax on a daily basis.
11  A. I thought. It was a long time ago. I
12      thought it was a fax.
13  Q. Right. To the extent you received e-mails
14      from Davis, they came through the MFS
15      Outlook account that you had?
16  A. Yeah.
17  Q. Okay. We can go off the record.
18          THE VIDEOGRAPHER: The time is
19      10:49. This is the end of tape 1, and we
20      are off the record.
21          (A recess was taken from
22          10:49 a.m. to 11:02 a.m.)
23          THE VIDEOGRAPHER: The time is
24      11:02 a.m. This is the beginning of tape 2,
25      and we are back on the record.

Page 73

1   Q. Mr. Kurinsky, when is it that you left MFS?
2   A. Did you say "when"?
3   Q. When did you leave MFS?
4   A. I left at the end of 2001.
5   Q. Why did you leave MFS?
6   A. I retired from MFS. I had been talking
7       about it for, like, the past year, with Joan
8       Batchelder, who was my boss.
9   Q. Who -- I was just going to ask you the
10      follow-up, who was Joan Batchelder?
11  A. But I had been there 14 to 15 years. We had
12      hired a young portfolio manager who was
13      ready. I was ready to do something
14      different. We had talked about it earlier
15      in 2001, and during the summer and the fall
16      we started again and it seemed to make
17      sense.
18  Q. When did you finalize your plans to leave
19      MFS?
20  A. Late summer. Maybe July or August.
21  Q. When was it that you actually gave notice?
22      Was it at that time?
23  A. You mean, give notice in terms of public
24      announcement?
25  Q. When I say "finalized," did you tell -- when

Page 74

1  was it that you finally told MFS, "I'm going
2  to be leaving at such-and-such a date"?
3  A. I think it was around that time, and we
4  discussed that it would be at the end of the
5  year, because that makes sense from the view
6  of the portfolio, a new person on the
7  portfolio. A year-end is a logical time.
8  Q. Can you just briefly discuss your employment
9  since leaving MFS.
10 A. I spent the -- first year, I have two kids
11 so I was playing kind of Mr. Mom for like a
12 year. I have done -- been involved in
13 various real estate ventures with various
14 partners. I mentioned I took a lot of the
15 -- just work?
16 Q. Work, yeah.
17 A. The formal work experience, I have been
18 involved with -- I have been working at
19 Chapel Street Partners since April of '05 to
20 now. That's my only formal work experience.
21 Before that, I was, you know, managing my
22 own investments, doing various vendors,
23 involved with family activities, taking
24 classes, as I mentioned, financial planning,
25 but that's the only formal employment.

Page 75

1  Q. And what is Chapel Street Partners?
2  A. It's a firm that manages an investment fund,
3  a hedge fund, called Paid Vega 1LP.
4  Q. So Chapel Partners just manages the assets
5  of this Paid Vega 1LP hedge fund?
6  A. Right. It's the general partner.
7  Q. What's your position at Chapel Street
8  Partners?
9  A. I'm one of the three partners.
10 Q. So you are one of the three people -- let me
11 withdraw that.
12    How many people do you have working
13 for you that manage the portfolio for Paid
14 Vega 1?
15 A. There are three of us. And we have a couple
16 of part-time people.
17 Q. Where is Chapel Street Partners located?
18 A. It's at Chapel Street in Needham,
19 Massachusetts; my hometown.
20 Q. Was there anybody at MFS that you looked for
21 particularly to get information about any
22 information coming out of the Federal
23 government?
24    MR. GOLDSTEIN: In what time
25 period?

Page 76

1     MR. ROSSETTI: Time period, 2001.
2  A. Information -- can you repeat the question?
3  Q. Was there anybody at MFS you looked to to
4  find out if there was any information coming
5  out of the U.S. government in Washington
6  that you thought might have affected your
7  position at MFS?
8  A. I mean, as a portfolio manager, that would
9  help make decisions in terms of the
10 portfolio.
11 Q. Yes.
12 A. I think in economic-related inquiries, you
13 know, I looked to Steve primarily, and
14 others as well.
15 Q. Steve Nothern?
16 A. Yeah.
17 Q. Why Steve Nothern?
18 A. Well, he was a specialist on the government
19 market. He managed the government
20 portfolios. So everybody -- you always
21 consulted the specialist. The structure was
22 having specialists. I was a corporate
23 specialist. Steve was a government
24 specialist. Rick was a mortgage specialist.
25 Q. Rick?

Page 77

1  A. Rick Smith. Peter Vaream was a corporate
2  specialist like me.
3  Q. I know that you know many of these people,
4  or knew them very well, and you know them on
5  a first name basis.
6  A. And I --
7  Q. Let me just --
8  A. Right.
9  Q. When you mention their names, please mention
10 their full names so it's clear who you are
11 referring to, okay?
12 A. Okay. Okay.
13 Q. And I'm sorry, you were saying?
14 A. I had a fund that could use all the sectors.
15 So, as a result, I probably used other
16 people's input more than most. My fund had
17 the broadest mandate.
18 Q. Were you involved in the decision at all to
19 hire Peter Davis?
20 A. No.
21 Q. During the break we had just taken earlier,
22 did you have any conversations with
23 Mr. Nothern about your testimony or any of
24 the facts of this case?
25 A. No.

Page 78

1  Q. Did you have any conversations with
2     Mr. Shope, Mr. Nothern's attorney, about the
3     facts of this case or your testimony here
4     this morning?
5  A. No.
6  Q. In October of 2001, did you know the name
7     Peter Fisher?
8  A. I knew he was a Treasury official. He was
9     often quoted in the newspaper.
10 Q. So in October of 2001, you knew that Peter
11    Fisher was a Treasury official?
12 A. (No audible response.)
13 Q. You have to --
14 A. Yes.
15 Q. -- verbalize your answer.
16 A. Yes.
17 Q. Did you know what Peter Fisher did at the
18    Treasury Department?
19 A. No.
20 Q. You said he was quoted in the paper a lot.
21    From that fact that he was quoted a lot, did
22    you draw any inference about what level he
23    was at the Treasury Department?
24 A. Yeah, he was a senior policymaker.
25 Q. What area of Treasury was he a senior

Page 79

1     policymaker in?
2  A. I don't know.
3  Q. Did you have any discussions with -- let me
4     withdraw that.
5        As of October of 2001, how long had
6     Peter Fisher been a senior policymaker at
7     the Treasury Department?
8  A. I don't know exactly, but I knew I'd heard
9     his name within the past year or two. I
10    can't say.
11 Q. In 2001, did you have any conversations with
12    anybody at MFS about Peter Fisher?
13 A. No.
14 Q. In October of 2001, were you aware of
15    something called a "Treasury refunding
16    announcement"?
17 A. Yeah.
18 Q. And what's your understanding about what a
19    Treasury refunding announcement was?
20 A. Well, Treasury announcements, every quarter,
21    exactly how much debt they are going to
22    issue in the next quarter, and they tell you
23    the -- which bonds are going to issue and
24    what amount. I believe it's called a
25    quarterly refunding. It happens four times

Page 80

1     a year.
2  Q. So at this quarterly refunding announcement,
3     do they announce -- does the Treasury
4     announce -- let me withdraw that.
5        You said they would announce how many
6     bonds they would issue. Would it be just
7     from the bonds or would there be other notes
8     or bills that you described earlier?
9  A. This particular, it was -- this particular
10    was whatever they were doing in the quarter
11    in the series of auctions. I believe it was
12    the three-year note, a 10-year note and a
13    30-year bond around this time.
14 Q. Okay.
15 A. There were other -- it was the big quarterly
16    refunding and there were also -- my
17    understanding -- other auctions. There was
18    a two-year note auction periodically, but
19    this was the big quarterly refunding and
20    typically was three auctions, I believe.
21 Q. And so there would be more than one issue --
22 A. Right.
23 Q. One would just be bonds?
24 A. Right.
25 Q. All right. Now, when did you first become

Page 81

1     aware of this quarterly refunding
2     announcement?
3  A. Oh, it had been going on for -- probably
4     when I started. I mean...
5  Q. Were the quarterly refunding announcements
6     an important source of information for your
7     position as a portfolio manager at MFS?
8  A. I guess maybe a secondary source, of
9     secondary importance.
10 Q. Okay. What do you mean "of secondary
11    importance"?
12 A. Well, decisions ahead of that I had were
13    decisions within the corporate market. Even
14    in terms of interest rates, there were the
15    more important releases, most notable the
16    employment report had the most impact.
17    There were other things that had more
18    impact. There were more economic indicators
19    that were more important.
20 Q. But there -- your portfolio consisted of
21    about 10 percent of Treasury securities,
22    correct?
23 A. Yes.
24 Q. And information that was released at the
25    quarterly refunding announcement could

Page 82

1  affect the Treasury market, correct?
2  A. That's correct.
3  Q. So to the extent that you had 10 percent of
4    holdings in your Treasury securities
5    holdings, the Treasury refunding
6    announcement could affect your Treasury
7    security holdings; is that correct?
8  A. That's correct.
9  Q. So to that extent, it was important to -- at
10    least to the Treasury holdings?
11  A. That's correct.
12  Q. Now, you said that the announcements were
13    quarterly. Did you have a general
14    understanding of when each quarter of the
15    announcements would be made?
16        MR. SHOPE: Objection.
17  A. Not especially. I didn't know exactly what
18    day it was. I mean, I did know that what
19    was more important, I knew the auctions were
20    mid October. It was more important when
21    they came, because they came on a regular
22    calendar.
23  Q. And what steps, if any, did you take when
24    you are getting into the October time frame
25    of trying to get a firm grip on when the

Page 83

1    Treasury refunding announcement would be
2    made?
3        MR. SHOPE: Note my objection.
4  A. I didn't really do anything. I mean, in the
5    9 o'clock meeting, it was a topic of general
6    conversation, because, you know, it was what
7    the Treasury was doing was important to
8    everybody in the fixed income. It could be
9    a subject we would talk about when it was
10    coming.
11  Q. So if there was a Treasury refunding
12    announcement or a quarterly refunding
13    announcement being made on a particular day,
14    it would be something that was discussed at
15    the 9 a.m. meeting that day?
16  A. Yeah. And I may or may not know it was that
17    day. I probably knew it was coming around
18    that time. I might have not even known the
19    same day. I might have know it was due to
20    come soon, but I really was focused on, you
21    know...
22  Q. Did you -- so did you learn from these
23    9 a.m. meetings that on that particular day
24    that quarterly refunding announcement would
25    be made?

Page 84

1        MR. SHOPE: Objection.
2  A. Not that I recall. I mean, I read the Wall
3    Street Journal, so I knew it was coming. I
4    don't know exactly when. I knew it was the
5    season for a refunding announcement.
6  Q. But on a day that the refunding announcement
7    was being -- going to be made --
8  A. Right.
9  Q. -- it would be discussed at the 9 a.m.
10    meeting, correct?
11  A. It would normally be a topic. I don't
12    remember that particular meeting. It was
13    something that could come up.
14  Q. Well, I'm not talking about a particular --
15  A. Right.
16  Q. -- meeting -- quarterly refunding
17    announcement at this point, I'm just talking
18    generally, okay?
19  A. (No audible response.)
20  Q. Was there anybody at MFS that you would look
21    to to find out when the quarterly refunding
22    announcement was going to be made?
23  A. You mean, if I really needed to know?
24  Q. Yeah.
25  A. I probably would have asked Steve, Steve

Page 85

1    Nothern.
2  Q. And if for some reason Steve Nothern wasn't
3    around, what other source would you turn to?
4  A. John Cadogan traded the securities. Rick
5    Smith, because his -- everybody was, you
6    know, it was important to -- Rick did a lot
7    of Treasuries and John was a conduit of
8    information.
9  Q. Prior to October 31, 2001, were you aware of
10    how the Treasury Department -- the mechanics
11    of how they made this quarterly refunding
12    announcement?
13  A. No.
14  Q. Prior to October 31, 2001, did you have
15    ideas about how this information was
16    released?
17  A. No. Other than that I would see the release
18    on the screen.
19  Q. What screen are you talking about?
20  A. On a new screen, a Bloomberg screen, it
21    would just say, "amount of X bonds, amount
22    of Y bonds, amount of Z bonds." The
23    results. I thought it was just an
24    announcement.
25  Q. Thinking it was just an announcement, did

22 (Pages 82 to 85)

Page 86

1    you have any ideas of how it got from the
2    Treasury Department to on the Bloomberg
3    screen?
4    A. I guess I don't understand the question.
5    Q. You said you thought it was an announcement?
6    A. Yeah.
7    Q. And it appeared on the Bloomberg screen?
8    A. Press release.
9    Q. Did you have -- prior to October 31, 2001,
10    did you have any ideas of how the
11    announcement went from the Treasury
12    Department to getting on to the Bloomberg
13    screen?
14    A. No idea.
15    Q. Prior to October 31, 2001, had you ever
16    heard the term "embargo" used in release of
17    information?
18    A. Yes, I had.
19    Q. What was your understanding what "embargo"
20    meant as it related to information?
21    A. The information was not to be made public
22    until a certain time, but that could be used
23    to prepare information to be released at
24    that time.
25    Q. Who could use the information before that

Page 87

1    time?
2        MR. SHOPE: Objection.
3    Q. Your understanding.
4    A. My understanding was, particularly in the
5    employment report, the most important factor
6    in the bond market that reported the data
7    came out at 8:30, but judged on the amount
8    of data that came out at 8:30 that was all
9    sorted and managed that they -- information
10    was given to them early and they were
11    allowed to look at it and sort it, so when
12    it was released at 8:30 -- so previous, it
13    was embargoed, they held it up for a few
14    minutes to sort it out and assemble it, but
15    couldn't issue it. Because at 8:30, I would
16    see this table of data, and it looked like
17    it took five minutes to complete, and that
18    was my impression.
19    Q. I must have missed -- you used the term
20    "they" and "them." I must have missed who
21    you were referring to.
22    A. Journalists who are sitting in the room. I
23    -- the Department of Labor meeting, the
24    number comes out at 8:30, and my assumption
25    was that journalists had access to the

Page 88

1    information at maybe 8:15, and they could
2    sort it through and compare it so they could
3    issue a story at 8:30, which had not only
4    the number, but historical analysis.
5    Q. All right. So let's see if I understand
6    what you just said.
7        It was your understanding prior to
8    October 31st that as far as the Department
9    of Labor was concerned that -- the
10    Department of Labor released information to
11    journalists, say, at about 8:15 to give them
12    time to write a story?
13    A. Right. Sort it, prepare it, get it ready to
14    go.
15    Q. At 8:30?,
16    A. At 8:30 they could push the button.
17    Q. What button?
18    A. The button that would send it out to their
19    news services.
20    Q. Which would then appear on your Bloomberg
21    screen?
22    A. Right.
23    Q. I see. How did you gain an understanding of
24    this procedure at the Department of Labor?
25    A. I think there was at one point maybe a Wall

Page 89

1    Street Journal story. I mean, I assumed it
2    because the data was -- all of a sudden this
3    data was done, though I assumed for some
4    period of time people had the information.
5    I think there was, you know, either a
6    sell-side research -- someone had mentioned
7    the process. I'm not sure if it was a Wall
8    Street Journal article or piece of economic
9    research. I don't remember specifically the
10    source.
11    Q. I'm sorry.
12    A. Because, to me, that was a very important
13    piece of information, so I thought about
14    that a lot.
15    Q. And you had this understanding that you have
16    just described about the Department of Labor
17    embargo before October 31, 2001?
18    A. Right.
19    Q. How much prior to October 31, 2001 did you
20    have this understanding about the Department
21    of Labor's procedures?
22    A. Maybe a couple of years. As soon as I read
23    that article, or whatever it was, that
24    talked about it.
25    Q. Did you have any understanding of other

23 (Pages 86 to 89)

Page 90

```
 1    government agencies, how they would have
 2    released whatever data points they were
 3    responsible for?
 4         MR. SHOPE: Objection.
 5  A. No.
 6  Q. Were you aware of any other U.S. government
 7    agencies using an embargo and releasing
 8    information?
 9  A. No.
10  Q. Were you aware of any private associations
11    or companies using an embargo when releasing
12    information?
13  A. No.
14  Q. Were you aware of anything, say, for
15    example, the National Association of
16    Realtors when it releases any kind of
17    housing data, were you aware prior to
18    October 31st if they had used any sort of
19    embargo?
20  A. No.
21  Q. Prior to October 31, 2001, did you hear the
22    term "embargo" used in connection with
23    quarterly refunding announcements?
24  A. No.
25  Q. Did you have any thought that the Treasury
```

Page 91

```
 1    Department used an embargo when it released
 2    the quarterly refunding information?
 3         MR. SHOPE: Objection.
 4  A. No.
 5  Q. You said that you suspected that -- in
 6    addition to reading some information, you
 7    suspected that the Department of Labor used
 8    an embargo because when the information was
 9    released it might have had all these charts
10    and comprehensive information?
11  A. Right.
12  Q. Did you draw -- after seeing the Treasury
13    releases on Bloomberg, did you draw any
14    conclusions that, you know, there was a
15    similar analysis performed here, therefore
16    they must have had the information
17    beforehand?
18         MR. SHOPE: Note my objection.
19         MR. GOLDSTEIN: Objection. You can
20    answer.
21  A. No. I thought it was typically a number of
22    three bond issues.
23  Q. Did you consider the Treasury refunding --
24    quarterly refunding announcement to be
25    market sensitive information?
```

Page 92

```
 1  A. Yeah. Yes.
 2  Q. Why was that?
 3  A. Well, again, it's supply and demand. I
 4    mean, there's -- if there's less of
 5    something, the price might be less than what
 6    the market thinks. The price will be higher
 7    if there's more in the market. So it's the
 8    supply and demand of securities.
 9  Q. So is it your understanding that the
10    Treasury refunding announcement may affect
11    the supply and demand of Treasury
12    securities, which in turn would affect the
13    price?
14  A. Right, to a small extent.
15  Q. Prior to October 31, 2001, had you ever
16    received information about a quarterly
17    refunding announcement prior to it appearing
18    on the Bloomberg screen?
19  A. No.
20  Q. Did you ever receive e-mails from anybody in
21    which they said, you know, "This
22    announcement is going to be made" and then
23    you subsequently see it on Bloomberg?
24  A. In other words, it was announced earlier?
25  Q. No, that someone had sent you an e-mail said
```

Page 93

```
 1    the announcement is going to be X, and then
 2    subsequent to that e-mail, you see it on
 3    Bloomberg and the announcement was X.
 4  A. No. Someone guessed it perfectly or --
 5  Q. No. They had told you this is what's going
 6    to happen?
 7  A. No.
 8  Q. Did anyone ever orally tell you that?
 9  A. No.
10  Q. Did Mr. Nothern ever tell you that prior to
11    October 31, 2001?
12  A. No.
13  Q. I've been asking you a number of
14    questions -- well. Let me go back a second.
15         You have described, I think, work
16    environment on the trading desk where
17    portfolio managers and the traders would be
18    working together and helping each other out;
19    is that fair?
20  A. Collegial.
21  Q. Would there be occasions that if a
22    particular portfolio manager was out of the
23    office for whatever reason, that, you know,
24    maybe there was some announcement was going
25    on in the market that you would buy X amount
```

Page 94

1   of whatever security with the understanding
2   that you are going to allocate a portion to
3   another portfolio manager?
4   A. Yes.
5   Q. Is that something that happened frequently?
6   A. Well, it -- Peter and I were the same
7      corporate specialists. If a corporate issue
8      came and he hasn't there, I might call him,
9      try to get him. If not, I would try to make
10     a judgment. Our portfolio had similar
11     structures.
12  Q. So even similar to the extent that its
13     holdings of Treasury securities?
14  A. Yeah. I was thinking more a corporate issue
15     for me.
16  Q. But Vaream's holdings were similar to yours
17     in the corporate sector as well as the
18     Treasury sector?
19  A. Correct. Correct.
20  Q. Okay. And were there occasions where other
21     people would purchase any sort of securities
22     with the understanding that they were going
23     to be sharing some with you?
24  A. Yes.
25  Q. Is that sort of an understanding that you

Page 95

1   all had on the desk?
2   A. Yeah. Yes. Yes. Yeah.
3   Q. Now, we have been talking about prior to
4      October 31st. What I'd like to do is talk
5      about October 31, 2001. Do you recall that
6      date?
7   A. To the extent that I can remember something
8      that happened five years ago, I mean -- I
9      have certain memories of that date.
10  Q. Okay. Was --
11  A. Halloween, maybe.
12  Q. That's a big stretch, right?
13  A. Yeah.
14  Q. Was there a quarterly refunding announcement
15     that day?
16  A. There was.
17  Q. What time did you get into the office that
18     day?
19  A. I typically get in the office at 8:30. I
20     don't remember exactly, so I'm going to
21     guess it was a typical day and I got into my
22     office at 8:30.,
23  Q. You said there was a quarterly refunding
24     announcement that day. Did you know that
25     there was going to be a refunding

Page 96

1   announcement that day when you got to work
2   or did you learn it after you got to work?
3   A. I don't recall. I might have known that it
4      was in the season, but I'm not sure I knew
5      that it was that day.
6   Q. All right. Was there a 9 a.m. meeting that
7      morning?
8   A. Yeah, I believe there was.
9   Q. Was there any discussion about that there
10     was going to be a Treasury refunding
11     announcement that day?
12  A. Not that I remember. Probably it was a
13     typical topic after 9 o'clock meeting.
14  Q. Was there somebody who was responsible for a
15     calendar who would tick off what all the
16     pertinent announcements were going to be
17     that -- on a particular day?
18  A. No, it was kind of free flow. People would
19     just give information about their market
20     that was important.
21  Q. I'm sorry. But it was typical that if there
22     was going to be a refunding announcement
23     that that would be one of the topics
24     mentioned?
25  A. Right. Right.

Page 97

1   Q. You said you got in about 8:30 in the
2      morning, typically.
3         Did there come a point in time in the
4      morning that you made an assessment of
5      whether or not you had cash available to use
6      that day to purchase securities or whatever
7      you wanted?
8   A. Yeah. I get a daily cash sheet early in the
9      morning, and, if I remember, I had about
10     $15 million of cash available to spend -- or
11     in the account, in the portfolio.
12  Q. Now, was this a calculation you needed to
13     perform or was it plainly on the sheet that,
14     you know, said "Geoff Kurinsky's got
15     $15 million"?
16  A. It was a sheet that listed all the accounts
17     and I just picked mine off and it says
18     $15 million.
19  Q. So you didn't have to do any analysis at
20     that point?
21  A. No.
22  Q. Okay. After you see what your cash position
23     is and how much you may have to invest that
24     day, what would you do to determine how, if
25     any, manner you were going to spend that

Page 98

1    money?
2    A.  Every day I would look at the, you know -- -
3        talking about the corporate bond market, I
4        mean, I could look at the portfolio.  There
5        was no rush to spend that money that day.  I
6        managed -- I used portfolio duration, which
7        is a measure of the interest rate
8        sensitivity as the prime position -- as the
9        prime input in the position of my portfolio,
10       what the duration was.
11   Q.  Based on what your most significant holdings
12       were?
13   A.  Right.  I got that from a system,
14       calculated.
15   Q.  Okay.  And when would you typically perform
16       that sort of analysis?
17   A.  First hour.  Get ready for the day, and I
18       had all my accounts.
19   Q.  In determining how you might spend the money
20       that was available to you on a given day,
21       what else would you do to do an analysis?
22   A.  You know, I'd get market color.  I mean, I'd
23       see if opportunities came up.  You know,
24       particular corporate issues that looked
25       attractive, an idea from any one of my

Page 99

1        specialists, mortgage idea, asset-backed
2        idea, Treasury idea, that I would evaluate.
3    Q.  When you said you'd get ideas from your
4        specialists, you are meaning whether it was
5        Mr. Nothern or Vaream or Smith?
6    A.  Right.  Right.
7    Q.  Okay.  You said you'd look to get market
8        color.  What did you mean by that?
9    A.  Talk to the dealers.  You know, what's going
10       on in the market?  What's happening to, you
11       know, corporate trends?  What's happening to
12       interest rates in general.  Sort of general,
13       you know, "How's the marketing opening?
14       What's the tone for the day?"
15   Q.  Did there come a point in time on
16       October 31st that you made a decision that
17       you were going to spend some of the
18       $15 million to buy some securities?
19   A.  Yes.
20   Q.  And what securities did you purchase?
21   A.  Bought 10 million Treasury bonds.
22   Q.  That's the 30-year bonds?
23   A.  Correct.
24   Q.  What led you to that decision to purchase
25       those Treasury bonds?

Page 100

1    A.  Well, it was a trade that they were doing on
2        the trading desk.
3    Q.  When you say "we," who are you referring to?
4    A.  It was a trade that Steve Nothern, Rick
5        Smith, Peter Vaream -- it was a general --
6        we were doing a Treasury trade, and it was
7        -- you know, it was a trade that I went
8        along with the group and I bought 10 million
9        bonds.
10   Q.  Do you know if David Kennedy was in on that
11       transaction?
12   A.  I believe he was.
13   Q.  Do you know if Peter Vaream was in on that?
14   A.  I believe Peter was out.  If that was the
15       case, we may have put some in his accounts.
16       I think he was out that day.
17   Q.  So as you sit here today, you think that
18       Peter Vaream was out of the office that day?
19   A.  Yeah, I'm not sure, but...
20   Q.  Okay.
21   A.  But I know the fact that Rick Smith, Dave
22       Kennedy, Steve Nothern, I was there, Jim
23       Calmas was there.
24   Q.  Of those people that you just mentioned, who
25       was involved in this purchase for Treasury

Page 101

1        bonds that you described?
2    A.  I think Steve, Rick, David and myself.  I
3        don't think Jim was.
4    Q.  What was the total amount of the purchase?
5    A.  Of the whole desk?
6    Q.  Yes.
7    A.  I believe it was 70 million.
8    Q.  Of that 70 million, you said you purchased
9        10 million?
10   A.  That's correct.
11   Q.  Do you know how much of that 70 million or
12       remaining 60 million the others purchased?
13   A.  Yeah.  I think Steve bought 25, Dave Kennedy
14       bought 25, Rick bought 10.  Again, this is
15       my recollection, and I bought 10.  And I
16       might have -- I'm thinking if -- I am not
17       sure if I was thinking Peter's accounts or
18       not.
19   Q.  Would have been included in the 10 million?
20   A.  Yeah.
21   Q.  I see.  Now, what led up to this group --
22       this was a group decision to purchase these?
23   A.  Yeah.
24   Q.  What led up to this decision to purchase
25       these bonds?

Page 102

1   A.  Well, there was discussion as to whether the
2       Treasury Department would eliminate -- you
3       know, there was a lot of speculation about
4       what the Treasury Department would do with
5       the 30-year Treasury, whether they would,
6       you know, auction bonds this time or not.
7       And there was discussion -- Steve got up and
8       said that there was a discussion that they
9       might -- you know, that they might -- that
10      someone thought the 30-year Treasury
11      bond might be eliminated from the auction.
12  Q.  Did he say who that someone was that thought
13      the Treasury would eliminate the 30-year
14      bond?
15  A.  Yeah, I recall it was from Pete Davis.
16  Q.  Can you tell me specifically what it is that
17      Steve Nothern mentioned about Pete Davis?
18  A.  He said that he had -- Pete Davis told him
19      that the Treasury was not going to have a
20      30-year bond auction in the refunding.
21  Q.  When did Steve Nothern make that statement?
22  A.  I remember it around 9:30ish. I don't
23      remember exactly.
24  Q.  I think you said "he got up." What did you
25      mean, "he got up"?

Page 103

1   A.  I was on the phone talking about a corporate
2       trade and Steve was standing up talking to
3       Rick, he's in his station, and then Dave
4       afterwards, and they are talking about it
5       and they are starting to put a trade
6       together. And then I got attention, and
7       then said, you know, "Take me along. I will
8       take 10 million." I was focused on a
9       corporate -- something else, and it was a
10      trade that the desk was doing, so take me
11      along.
12  Q.  Now, you said that you were on the phone?
13  A.  Yeah.
14  Q.  Who were you on the phone with at the time?
15  A.  I don't remember, but it was related to a
16      corporate trade. I don't remember whether I
17      was getting information but I think I stood
18      up, two people were up. I'm thinking,
19      "What's going on?" I'm still on the phone
20      and talking, and then I overhear the buy,
21      and I said, "I will take 10 million."
22  Q.  When you were on the phone, were you
23      standing or seated?
24  A.  I was seated, and then I got up because I
25      realized other people were up and discussing

Page 104

1       something.
2   Q.  While you were seated at your desk and on
3       the phone, did you see that other -- did you
4       notice that other people were standing?
5   A.  Yeah.
6   Q.  And the people that you noticed were
7       standing, were whom?
8   A.  If I remember, Steve and Rick.
9   Q.  Steve Nothern and --
10  A.  Right.
11  Q.  -- and Rick Smith?
12  A.  Correct.
13  Q.  Two of the portfolio managers you work with?
14  A.  That's correct.
15  Q.  All right. And you saw them standing. Were
16      they in a discussion with one other?
17  A.  Steve was in his work station standing up
18      and Rick was in his work station standing
19      up. The way we always -- they talked about
20      things all the time.
21  Q.  And at that point, did you notice anybody
22      else standing?
23  A.  Not that I can recall.
24  Q.  Did you notice David Kennedy at all at this
25      point?

Page 105

1   A.  No.
2   Q.  Was David Kennedy on the desk at that point?
3   A.  I think so.
4   Q.  Was he standing or seated?
5   A.  I don't -- I'm guessing he was probably
6       seated, but I don't remember.
7   Q.  Now, I thought you said when you were on the
8       phone you noticed some people standing and
9       then you stood up.
10  A.  Yeah.
11  Q.  What prompted you to stand up?
12  A.  Well, it's like commotion. I mean,
13      something is happening; something is going
14      on. It's a natural instinct to see what's
15      going on.
16  Q.  You said there was a commotion. What do you
17      mean, "There was a commotion"?
18  A.  People were up, discussing about a trade,
19      and I'm part of the team, and, you know, I,
20      like, want to know what's going on because
21      maybe I want to get involved. It was a --
22      happened many times a day. I mean...
23  Q.  How did you -- you said they were discussing
24      a trade. How did you know they were
25      discussing a trade?

27 (Pages 102 to 105)

Page 106

1  A. Well, I guess they were standing up. I
2     could see that there was conversation --
3     there was John Cadogan, not specifically,
4     there was some dialogue going on and John's
5     a trader, so something was happening.
6  Q. Could you hear what they were saying?
7  A. Not specifically.
8  Q. All right. And what did you do? Let me
9     withdraw that.
10 A. Right.
11 Q. At this point, you are on the phone, you see
12    Nothern standing, you see Rick Smith
13    standing --
14 A. Yeah. And people saying what they are doing
15    -- saying they are --
16       MR. GOLDSTEIN: Just wait for
17    Mr. Rossetti to finish his question.
18       MR. ROSSETTI: Thanks.
19 Q. You are hearing that they are going to be
20    doing something and they are talking with
21    John Cadogan; is that correct?
22 A. (No audible response.)
23 Q. You got to verbalize your answer.
24 A. They are talking among themselves.
25 Q. Rick, Steve Nothern?

Page 107

1  A. Right.
2  Q. And John?
3  A. Correct.
4  Q. The trader?
5  A. That's correct.
6  Q. At that point, could you hear what they were
7     discussing among themselves?
8  A. Well, I knew they were buying Treasuries.
9  Q. How did you know that?
10 A. Because I could hear it.
11 Q. What did you hear?
12 A. By then, I was aware of the refunding
13    announcement. At that point I was aware the
14    Treasury market was up, so my senses were
15    risen to the fact that there was information
16    that had been -- that had apparently been
17    released.
18 Q. Okay. So, specifically, what did you
19    hear -- you said there they were purchasing
20    Treasury bonds?
21 A. Right.
22 Q. What specifically did you hear at that
23    point?
24 A. I heard that there would have been a call
25    and -- from Pete Davis that the Treasury

Page 108

1     might be eliminating the 30-year Treasury
2     bond from the auction.
3  Q. When you heard that, were you still in your
4     work station or had you moved over to where
5     Steve Nothern --
6  A. I was in my work station.
7  Q. All right. So did Steve Nothern make that
8     statement?
9  A. Right. Yeah.
10 Q. So was he announcing it to you as well?
11 A. Yeah. He was talking -- talking about it
12    with Rick, I assume. I didn't hear what
13    they were talking about, but that was the
14    topic, topic du jour.
15 Q. But when Steve Nothern made this statement
16    about Peter Davis -- if you go to
17    Exhibit 3 --
18 A. Yeah.
19 Q. -- you see station 240 is where Nothern sat?
20 A. Right.
21 Q. And you sat at 265?
22 A. Correct.
23 Q. What was the distance between Nothern's work
24    station and your work station?
25 A. 25 feet. I don't know.

Page 109

1  Q. Okay.
2  A. Not a lot. I mean, you could easily be
3     heard.
4  Q. Right. But he'd have to be intending to
5     speak to you --
6  A. Right. Right.
7  Q. -- in a louder voice?
8  A. Right.
9  Q. And that's what he did to tell you what --
10 A. Right.
11 Q. -- Pete Davis had told him?
12 A. That's correct.
13 Q. All right. Was this before or after you had
14    heard people purchasing bonds?
15       MR. SHOPE: Note my objection.
16 A. Could you repeat the question?
17 Q. I thought you had said that at some point
18    you heard Steve Nothern and Rick Smith
19    giving an order to Cadogan to purchase
20    bonds. Did I have that correct?
21 A. Right.
22 Q. All right. This statement that Steve
23    Nothern said about Peter Davis --
24 A. Right.
25 Q. -- did that come before or after you hearing

Page 110

```
 1    Steve Nothern and --
 2  A. It was before.
 3  Q. -- Rick's Smith --
 4  A. Right.
 5  Q. -- telling Cadogan they wanted to purchase
 6      bonds?
 7  A. It was before.
 8  Q. So the first statement you heard was Nothern
 9      making this announcement about what he heard
10      from Pete Davis?
11  A. Correct.
12  Q. At this point you are on the phone?
13  A. Right.
14  Q. All right. What's the -- after Nothern
15      makes that statement, what's the next thing
16      you observe?
17  A. At this point, I'm on the phone and I'm
18      already aware that the Treasury market is
19      up.
20  Q. You are seeing some information on your --
21  A. I have a screen so I'm sort of like, oh, I'm
22      on the phone. I'm thinking, "Something is
23      going on," so...
24  Q. When you say "the Treasury market is going
25      up," what do you mean by that?
```

Page 111

```
 1  A. I have a screen that has actual quotes and
 2      the 30-year Treasury bond is up. I don't
 3      know, three-quarters of a point. Something
 4      is happening.
 5  Q. All right. As you sit here today, do you
 6      know how much it was going up or it had gone
 7      up?
 8  A. I think it was three-quarters of a point.
 9  Q. After you see your screen and you see the --
10  A. Right.
11  Q. -- the bond going up, what's the next thing
12      you recall happening?
13  A. Well, then they're standing up and doing
14      something, and then I -- that -- the Pete
15      Davis discussion, and then they are doing
16      the trade, and I'm saying, you know, "I
17      could use 10 million."
18  Q. So you are saying "they're standing up," you
19      are referring to Steve Nothern --
20  A. Steve Nothern --
21  Q. -- and Rick Smith?
22  A. And John Cadogan is taking instruction.
23  Q. Is John Cadogan standing as well?
24  A. I remember him sitting, but I don't know.
25  Q. What's the discussion that's going on among
```

Page 112

```
 1      Cadogan, Steve Nothern and Rick Smith at
 2      this point?
 3  A. It's figuring out a number. It's collecting
 4      orders to get to how many did we want to
 5      buy, to -- so John can go buy them.
 6  Q. Was there anybody who was taking the lead
 7      and trying to find out how much everybody
 8      wanted?
 9  A. I mean, not -- it seemed like Steve and Rick
10      were putting it together.
11  Q. All right. And did there -- after you
12      observed this interaction between Nothern,
13      Cadogan and Rick Smith, what's the next
14      thing you recall occurring?
15  A. John Cadogan executed, you know, the trade,
16      bought 70 million Treasury bonds.
17  Q. So, by this point, you had heard whatever
18      Nothern wanted to purchase, whatever Rick
19      Smith wanted to purchase and whatever David
20      Kennedy wanted to purchase?
21  A. Right.
22  Q. And you told them, "I wanted to purchase 10
23      million"?
24  A. Right.
25  Q. How exactly did you tell them that "I wanted
```

Page 113

```
 1      to purchase 10 million"?
 2  A. I looked at John and said, "I will take 10."
 3  Q. When you say, "I will take 10," you were
 4      intending for him to purchase for you
 5      10 million Treasury bonds?
 6  A. That's correct.
 7  Q. You see, we will get this working out at
 8      some point today.
 9          After Mr. Nothern had made this
10      statement about Peter Davis, did you engage
11      in any discussion with anybody else about
12      what exactly Davis had said or get any
13      clarification or anything like that?
14  A. No.
15  Q. Did you engage in any conversation -- after
16      you heard this statement that Nothern said
17      about Davis, but before you asked Cadogan or
18      anybody else to purchase 10 million, did you
19      get involved in any other discussion with
20      anybody there about what was going on?
21  A. No.
22  Q. Prior to you indicating to Cadogan that you
23      wanted to purchase the 10 million in bonds,
24      did you see anything on the news wires
25      indicating that the Treasury refunding
```

1  announcement had been released?
2  A. No.
3  Q. Had you received any e-mails or any
4     information from anybody in which they
5     indicated that the 30-year bond was going to
6     be cancelled?
7  A. No.
8  Q. So the only information you had that morning
9     that there may be a cancellation of the
10    30-year bond was coming from Steve Nothern?
11         MR. SHOPE:  Objection.
12 A. Correct, but there had been speculation for
13    weeks about whether they would or not.  I
14    mean, it was...
15 Q. And it had been speculation for --
16 A. Wall Street Journal, right.
17 Q. But the speculation had been going on for a
18    couple of years --
19 A. Right.
20 Q. -- correct?  And people thought because
21    the --
22 A. The surplus.
23 Q. -- surplus the U.S. government was running,
24    that they might cancel the 30-year bond?
25 A. Right.

1  Q. Right.
2  A. Now we'll probably need the 50 years, 60
3     years, 70 year and 80 year-bonds.  I'm sorry
4     I said that.
5  Q. That's because the government is now running
6     such huge deficits?
7  A. Right.  I won't do that again.
8  Q. Did you ever -- were you working as a
9     portfolio manager when there had been an
10    announcement about a cancellation of the
11    20-year bond?
12 A. I don't remember that.
13         MR. ROSSETTI:  We can go off the
14    record, take a quick break here.
15         THE VIDEOGRAPHER:  The time is
16    11:50, and we are off the record.
17         (A recess was taken from
18          11:50 a.m. to 12:00 p.m.)
19         THE VIDEOGRAPHER:  The time is
20    12 o'clock noon, and we are back on the
21    record.
22 Q. Mr. Kurinsky, when Mr. Nothern had made the
23    statement that Davis had -- when he made the
24    statement about what Davis had told him, did
25    Steve Nothern mention anything about an

1  embargo?
2  A. No.
3  Q. Did he mention that Peter Davis had just
4     gotten out of a meeting?
5  A. No.
6  Q. Did he mention -- did Steve Nothern say that
7     -- anything about Davis mentioning a press
8     release was going to be issued?
9  A. No.
10 Q. Did Mr. Nothern mention that Peter Davis
11    said the Treasury Department was going to
12    make an announcement at 10 a.m.?
13 A. No.
14 Q. Did Mr. Nothern mention anything about TIPS,
15    Treasury Inflation Protected Securities?
16 A. No.
17 Q. Did you make any mention of a buyback?
18 A. No.
19 Q. Did Mr. Nothern make any statement about
20    five-year notes?
21 A. No.
22 Q. Did he mention -- did Steve Nothern mention
23    that Peter Davis had mentioned the name
24    "Peter Fisher"?
25 A. No.

1  Q. Now, you had discussed earlier this morning
2     that you had provided some testimony to the
3     Securities and Exchange Commission back in
4     December of 2001; is that correct?
5  A. That's correct.
6  Q. When you provided that testimony to the
7     Securities and Exchange Commission, was the
8     testimony you provided under oath?
9  A. It was.
10 Q. And was that testimony subject to any
11    penalty of perjury?
12 A. I assume it was.
13 Q. When you gave your investigative testimony
14    in December of 2001, were the events of
15    October 31, 2001 fresh in your mind?
16 A. Yes.
17 Q. Did your investigative testimony reflect
18    your knowledge of the events of -- correctly
19    reflect your knowledge of the events of
20    October 31st correctly?
21 A. You mean, in terms of written notes that
22    came out of it?
23 Q. No, no, no, no, no.
24 A. Oh.
25 Q. The testimony you were providing --

Page 166

1  Q. What's the total amount of this fund as of
2     today?
3  A. About 4 million.
4  Q. 4 million?
5  A. Yeah.
6  Q. So Mr. Nothern's investment is about five
7     percent of that?
8  A. Well, yeah.
9  Q. Do you consider Steve Nothern to be a friend
10    of yours?
11 A. Can you repeat the question?
12 Q. Do you consider Steve Nothern to be a friend
13    of yours?
14 A. Yes. Yes.
15 Q. Other than you and he getting together at
16    various events, do you visit his house?
17 A. I'd say I visited him -- we had an event of
18    all the alumni from the trading desk once at
19    a dinner.
20 Q. When was that?
21 A. Two, three years ago. I think that's the
22    only time I have been to his house.
23 Q. Has he ever been over at your house?
24 A. Yeah. When we do this charity bike ride in
25    August, PMS Challenge, Karen and Steve have

Page 167

1     stayed over the night before because it
2     leaves from near my house.
3  Q. So it's just that one time or --
4  A. I think it's been twice.
5  Q. If we can go off the record. Let me just
6     see what we got here. And --
7        THE VIDEOGRAPHER: The time is
8  1:12 p.m., and we are off the record.
9        (A recess was taken from
10    1:12 p.m. to 1:16 p.m.)
11       THE VIDEOGRAPHER: The time is
12 1:16 p.m., and we are back on the record.
13 Q. Okay. Mr. Kurinsky, I just got a few more
14    questions and I will be finished here.
15 A. Okay.
16 Q. I want to refer you back to Exhibit 6, which
17    is the fixed-income trading report we were
18    looking at earlier.
19 A. Yeah.
20 Q. If you look at that, I asked you earlier if
21    you had sold the bonds -- if you sold any
22    Treasury bonds that day and you indicated
23    that you did.
24 A. Yes.
25 Q. If you look at page 1 of this FITS report.

Page 168

1  A. (Witness complies.)
2  Q. It appears that this is the last
3     transaction, the 30-year bond, the --
4     February 15, 31 --
5  A. Right.
6  Q. -- shows a $10 million sale there.
7        Do you see that?
8  A. I do.
9  Q. Is that the sale you were indicating
10    earlier?
11 A. Yes, it was.
12 Q. And there's a creation time here of 2:38.,
13    That would have been at least the time that
14    you put the trade into the system?
15 A. Correct.
16 Q. And if you orally told Cadogan to sell, the
17    bonds, it would have been sometime prior to
18    that?
19 A. Right.
20 Q. All right. And the amount of money that you
21    would have received -- the principal you
22    would have received is the 10,759,375?
23 A. That's correct.
24 Q. So if you took that amount and deducted what
25    you paid for the bonds earlier that day,

Page 169

1     you'd be able to figure out what you made on
2     that particular trade?
3  A. Right. But I bought -- it looks like I
4     bought nine and sold 10, so I had to adjust
5     for that.
6  Q. Nine was allocated to your account and you
7     believe the other one was to Vaream's
8     account?
9  A. Right.
10 Q. And on that sale, do you recall if you had
11    orally told Cadogan to sell the bonds before
12    entering it into the trading system?
13 A. No. I don't recall. My guess is that time
14    in the afternoon the market is slowing. I
15    probably told him to put it in and he
16    probably did.
17 Q. Now, I just want to go back. You had
18    mentioned earlier in the morning, you
19    mentioned this conversation you had with
20    Steve Nothern after October 31, and I think
21    you said it was prompted by a Wall Street
22    Journal article. Do you recall that?
23 A. Yes.
24 Q. All right. Where did this conversation take
25    place?

Page 170

1  A. In Steve's office.
2  Q. How did this -- how did you get into Steve's
3     office?
4  A. I was walking down the hall and he's in his
5     office and I walked in. My office is in the
6     same general area.
7  Q. Um-hum. And who started this conversation
8     about the Wall Street Journal article and
9     discussing the events of October 31st?
10       MR. GOLDSTEIN: Objection.
11 A. I don't remember who started it.
12 Q. And how did the topic come up about the Wall
13    Street Journal article on October 31st?
14       MR. SHOPE: Objection.
15       MR. GOLDSTEIN: Objection.
16 A. Can I object too? It has come up in a
17    situation that's occurred that you could be
18    involved. It was logical that -- you know,
19    sounded like something we could have been
20    involved in.
21 Q. And you and I have been discussing the
22    events of October 31st and other events --
23 A. Right.
24 Q. -- since roughly 9:30 this morning.
25 A. Right.

Page 171

1  Q. Is there anything else that you can tell me
2     about what you and he discussed during that
3     conversation?
4  A. Yeah, to say it was apparent in that
5     conversation that he was unclear whether it
6     was public or not public.
7  Q. Okay. The issue that he was unclear about,
8     was this the information that he had gotten
9     from Davis?
10 A. Right.
11 Q. Okay. And what specifically did he mention
12    specifically about the information he got
13    from Davis and his not being clear whether
14    it was public or nonpublic?
15       MR. SHOPE: I'm sorry. Can I have
16    that --
17       MR. ROSSETTI: I will rephrase the
18    question.
19 Q. You said he was unclear that the information
20    from -- whether the information from Peter
21    Davis was public or nonpublic; is that
22    correct?
23 A. That's correct.
24 Q. Okay. And what specifically about the
25    information was he unsure whether it was

Page 172

1     public or nonpublic?
2        MR. GOLDSTEIN: Objection.
3        MR. SHOPE: Note my objection.
4  A. The fact that the information he received
5     from Pete Davis about the Treasury bond, he
6     wasn't, you know, clear if that was public
7     or nonpublic information.
8  Q. What specifically did Steve Nothern say that
9     indicated to you that he was unclear or
10    unclear about whether it was public or
11    nonpublic?
12       MR. GOLDSTEIN: Objection.
13       MR. SHOPE: Note my objection.
14 A. I think he mentioned that he wasn't really
15    clear, whether it was public information or
16    nonpublic information.
17 Q. Do you recall him saying that he wasn't
18    clear if it was public or nonpublic?
19       MR. GOLDSTEIN: Objection.
20       MR. SHOPE: Objection.
21 A. Yeah. Yes.
22 Q. All right.
23       MR. GOLDSTEIN: I will just note
24    that, John, that you asked about these
25    before and I am going allow you to go back

Page 173

1     to it and fill in some areas you didn't ask
2     about before, which is fine. But you are
3     now asking him, you know, questions about
4     specific statements which you did ask about
5     earlier in the deposition. So I'm objecting
6     because I think you are trying to ask the
7     same questions again that you have asked
8     before.
9        MR. ROSSETTI: I'm asking the same
10    questions I may have asked before because he
11    wasn't sure. Now that we've talked about
12    the events, as I explained, asking if it
13    refreshes his memory, and to some stuff, it
14    apparently has, but I will move on.
15 Q. Mr. Kurinsky, during that conversation that
16    you had with Mr. Nothern, did he mention the
17    term "embargo" at all?
18 A. No.
19 Q. Did he mention whether or not Peter Davis
20    had mentioned that the information he was
21    providing was embargoed information?
22 A. No.
23       MR. SHOPE: I'm sorry. Objection.
24    "The information that he was providing," you
25    are talking about the conversation about

Page 198

1 years ago shortly after the events, and I
2 believe you said on page 115 of your
3 deposition that the market activity
4 suggested it was in the public domain?
5 A. Right.
6 Q. Do you recall that?
7 A. Yes.
8 Q. And is that your testimony today?
9 A. Yeah. "Suggested," that's good.
10 Q. So at the time that you heard the
11 information from Mr. Nothern and which was
12 shortly after you had seen the price
13 movement on your screen, you believed that
14 the information the Treasury was going to be
15 cancelling the long bond was actually -- or
16 at least most likely in the public domain at
17 that point?
18 A. Right.
19       MR. ROSSETTI: Objection.
20 Q. In other words, there was nothing that
21 suggested to you that it wasn't public
22 information?
23 A. Right.
24       MR. ROSSETTI: Objection.
25 Q. Okay.

Page 199

1       MR. ROSSETTI: Mr. Kurinsky, if you
2 would just give me a little time if I need
3 to interpose an objection after Mr. Shope --
4       THE WITNESS: Okay.
5       MR. ROSSETTI: -- asks you a
6 question, that would be appreciated.
7 Q. And, again, in the transcript that you -- of
8 the testimony that you gave when the SEC
9 first deposed you five years ago, I believe
10 at page 162, your recollection was that the
11 market was up around three-quarters of a
12 point?
13 A. That's correct.
14       MR. ROSSETTI: I would just ask if
15 you directed the witness to the actual
16 portion of the transcript. I see you are
17 not reading from the transcript --
18       MR. SHOPE: Okay. Then --
19       MR. ROSSETTI: -- where we purport
20 to be in the transcript to something that's
21 actually correct as opposed to...
22       MR. GOLDSTEIN: I'm sorry, John, I
23 would ask if you are going to refer to
24 transcript page, at least give the witness a
25 chance to get the thing in front of him.

Page 200

1       MR. SHOPE: Okay. That's fine.
2 Q. As I said, it's page 162.
3       MR. GOLDSTEIN: And if you could
4 just rephrase or restate your question,
5 again, please.
6       MR. SHOPE: Okay.
7 Q. And the -- well, first of all, Mr. Kurinsky,
8 have you been able to find that? Let me
9 pull out my copy of the transcript in case
10 we need to.
11 A. Yeah, I went through it.
12 Q. You got it? Okay?
13 A. (No audible response.)
14 Q. Okay. All right. So the -- and it's
15 consistent with your memory today that you
16 saw the market going up somewhere between
17 half and three-quarters of a point?
18       MR. ROSSETTI: Objection. I don't
19 think that was your question referring to
20 this transcript.
21       Can we have the question -- I don't
22 know if you are going to withdraw the
23 question or you are going to proceed with
24 the question, but we asked you to look -- to
25 have him look at the transcript. You had a

Page 201

1 question pending. Now you are asking him
2 something different. I don't know where you
3 are.
4       MR. SHOPE: I think it was the same
5 question, basically the same question.
6 Q. First of all, when you were deposed by the
7 Treasury [sic] five years ago --
8       MR. ROSSETTI: SEC.
9 Q. -- excuse me, by the SEC, the -- in the
10 middle of page on 162, line -- line -- lines
11 10 through 12, your recollection at that
12 time was 30-year Treasuries were up a half
13 to three-quarters of a point.
14 A. That's correct.
15       MR. ROSSETTI: Objection.
16 Q. Okay. And that's your memory today as well,
17 correct?
18 A. Yes.
19 Q. Okay. Now, for long bond, a half to a
20 three-quarter point, is that a minor
21 movement, a significant movement; how does
22 that rate in sort of scale?
23       MR. ROSSETTI: Objection.
24 A. It's meaningful.
25 Q. It's meaningful?

1   A. It's not significant. It's a meaningful --
2       a meaningful move.
3   Q. Just, generally speaking, are Treasury bonds
4       typically more or less or about the same as
5       volatility of the price in relation to other
6       kinds of instruments that you have purchased
7       over the years?
8           MR. ROSSETTI: Objection.
9   A. I'm not sure what you are asking me.
10  Q. Sure. Let me try to simplify it.
11  A. Yeah.
12  Q. Sometimes you will hear about stocks of
13      smaller companies where the share price can
14      fly up and down, you know, 15 percent or 100
15      percent in a day, and that's not even
16      necessarily considered unusual. You are
17      familiar with such circumstances?
18  A. Right.
19  Q. Okay. How would -- so that would be
20      considered to be a fairly volatile price
21      movement, right?
22  A. Yes.
23  Q. So, generally speaking, would Treasury bonds
24      be volatile in that same way?
25          MR. ROSSETTI: Objection.

1   A. No.
2   Q. Okay. So would it be fair to say that, in
3       fact, Treasury bonds were among the least
4       volatile instruments that could be purchased
5       on the markets?
6           MR. ROSSETTI: Objection.
7   A. Compared to stocks.
8   Q. Yeah. Okay. And what about compared to
9       corporate bonds?
10  A. Be about the same.
11  Q. Okay. The -- Mr. Rossetti asked you about
12      the quarterly refunding conference, correct?
13  A. Yeah.
14  Q. And you had never heard about embargo in
15      connection with a quarterly refunding
16      conference, correct?
17  A. No.
18  Q. Okay. But with regard to the Department of
19      Labor's employment information, you had
20      assumed that there was some kind of an
21      embargo, and then you later read about it as
22      well; is that correct?
23  A. That's correct.
24  Q. Okay. And I believe you testified that you
25      had assumed that there was some kind of

1       embargo because when the information was
2       presented, the reader could see not only
3       current data, but also historical data,
4       right?
5   A. That's correct.
6   Q. And that suggested that the journalists had
7       had a chance to collate or prepare the new
8       data with what they already had from past
9       experience?
10  A. That's correct.
11  Q. Now -- I want to switch now to the 30-year
12      bond information that you would see on your
13      Bloomberg screen, okay?
14  A. Right.
15  Q. So prior to October 31, 2001, you, from time
16      to time, would see information that was
17      being disseminated by the Treasury about
18      long-bond auctions, right?
19  A. That's true.
20  Q. And that would be reported on the Bloomberg
21      screen, correct?
22  A. Everywhere, Bloomberg, Telerate.
23  Q. Okay. Now, when it was reported on that
24      Bloomberg screen, it didn't provide any kind
25      of historical retrospective?

1           MR. ROSSETTI: Objection.
2   A. No.
3   Q. Okay.
4   A. Just a one-liner.
5   Q. Okay. And that was similar for the other
6       reporting services like Telerate and so
7       forth?
8   A. Right.
9   Q. So there was nothing about how the long-bond
10      auction information was being reported that
11      suggested to you that there had to have been
12      some kind of embargo process?
13          MR. ROSSETTI: Objection.
14  A. Yes, that's correct.
15  Q. Now, you recall that Mr. Rossetti had asked
16      you about whether or not you were aware that
17      there had been a quarterly refunding
18      conference schedule for that day, correct?
19  A. (No audible response.)
20  Q. You got --
21  A. That's correct.
22  Q. And I believe you testified that you don't
23      have any specific memory of knowing about
24      that --
25  A. Right.

Page 222

1  asked you if you had known Mr. Nothern for
2  14 years, correct?
3  A. Right.
4  Q. All right. And then Mr. Shope asked you if
5  you thought Mr. Nothern was an ethical
6  person.
7       Do you remember that?
8  A. Yeah.
9  Q. Okay. Would you -- would it be -- would you
10  be surprised to learn that Mr. Nothern had
11  testified before the SEC and told the SEC
12  that the information that Peter Davis left
13  was that Peter Fisher, who you previously
14  indicated was an official at Treasury,
15  indicated to Davis, Peter Davis, they'd be
16  cancelling the long bond and that there
17  would be a press release because embargoed
18  until 10 a.m.; would you be surprised that
19  that was information that Mr. Nothern got
20  from Peter Davis but he didn't share with
21  you?
22       MR. SHOPE: Objection.
23       MR. GOLDSTEIN: Objection.
24  A. Can you read it again?
25  Q. Yes. This is testimony from Steve Nothern.

Page 223

1       MR. SHOPE: Mr. Rossetti, I think
2  you need to present this to the witness
3  along the line of the discussion we had
4  earlier. Don't just take random bits. Give
5  him --
6       MR. ROSSETTI: It's not this
7  witness' testimony.
8       MR. SHOPE: I don't have that in
9  front of me. I don't know whether you are
10  quoting it accurately, and I suspect that
11  you may not be.
12       MR. ROSSETTI: Your objection is
13  noted and I take umbrage to your question
14  about my ethical character.
15  Q. Now, let me ask the question. Would it
16  surprise you to learn that Steve Nothern
17  testified before the SEC, and in describing
18  the phone call, whether it was the voice
19  mail, he spoke directly to Peter Davis,
20  Mr. Nothern's description of the call was
21  that Peter Fisher indicated to Davis, Peter
22  Davis, that they'd be cancelling the long
23  bond and that there would be a press release
24  because it was embargoed until 10 a.m.?
25       MR. SHOPE: Objection.

Page 224

1       MR. GOLDSTEIN: Objection. I
2  think, John, if you have some testimony you
3  want to show, you are going to ask the
4  witness to comment on, I think it's helpful
5  to actually have the testimony in front of
6  him, even if it's not, you know, his
7  document or he hasn't seen it.
8       MR. ROSSETTI: Well, I don't think
9  I have a copy of that testimony.
10       MS. WILLIAMS: Sure, we do. It's
11  highlighted.
12       MR. SHOPE: Well, I didn't bring a
13  copy of that today. I wasn't expecting such
14  a ridiculous line of question.
15       MR. ROSSETTI: Well, you shouldn't
16  have opened the door to the questioning.
17       MR. SHOPE: I didn't open any doors
18  to this questioning.
19       MR. ROSSETTI: I guess the judge
20  will have --
21       MR. SHOPE: I want to have a copy
22  of whatever you are showing to this witness.
23       MS. WILLIAMS: That's fine.
24       MR. SHOPE: I want to have it now
25  so I can cross-examine him, if I --

Page 225

1       MR. ROSSETTI: Counsel, calm down.
2       (Pause.)
3       MR. ROSSETTI: Okay.
4  Q. We'll have to share this for a moment here.
5       On the transcript of Steve Nothern
6  dated December 4, 2001, the testimony on
7  page 111, starting at line 12, the question
8  is: "What did Mr. Davis say in the voice
9  mail?
10       "Answer: I don't remember verbatim
11  what he said.
12       "Question: Do the best you can,
13  please.
14       "Answer: Well, in substance, I took
15  away two things, that Peter Fisher had
16  indicated to Pete Davis they'd be cancelling
17  the long bond and that there would be a
18  press release, because it was embargoed
19  until 10 o'clock.
20       "Question: Anything else in substance
21  that you took away from listening to that
22  voice mail?
23       "Answer: No.
24       "Question: How many times did you
25  listen to the voice mail?

Page 226

```
1         "Answer: Once.
2         "Question: Did you understand that
3    the press release that was to be embargoed
4    until 10 o'clock was to contain the
5    information about the cancelling of the long
6    bond?
7         "Answer: That was my
8    understanding."
9         Now, my question to you is: Are you
10   surprised to learn that Steve Nothern had
11   this information from Peter Davis on
12   October 31, 2001 and didn't share it with
13   you?
14        MR. SHOPE: Objection.
15   Q. And if you like, you can read the portion of
16   the transcript starting on line 11, down all
17   the way to line 2 there [indicating].
18        MR. GOLDSTEIN: I just want to read
19   it with you.
20        MR. SHOPE: Could I have your copy,
21   Mr. Rossetti, so I can look at it --
22        MS. WILLIAMS: He's borrowing one
23   copy, my copy --
24        MR. ROSSETTI: That is -- we've got
25   one copy.
```

Page 227

```
1         MR. GOLDSTEIN: Is it possible to
2    actually get some copies made right now? If
3    we're going to ask a series of questions
4    from it, it will make it easier.
5         MS. WILLIAMS: We can definitely
6    have copies made.
7         MR. GOLDSTEIN: What was your
8    question again?
9    Q. Again, would you be surprised to learn that
10   Mr. Nothern had all that information from
11   Peter Davis and didn't share it with you on
12   October 31, 2001?
13        MR. SHOPE: Note my objection.
14        MR. GOLDSTEIN: I'm going to object
15   to the form of the question, particularly
16   the use of the word "surprise," but if you
17   can answer it, go ahead.
18   A. Yes.
19   Q. Why is that?
20   A. Because it leads me to believe the
21   information was, you know -- I mean, there
22   was more information than I received. That
23   it was -- that it was embargoed and, you
24   know.
25   Q. Do you think that that information might
```

Page 228

```
1    have led you to believe that maybe this
2    information was not publicly -- was public
3    information at the time that he was
4    providing it to you?
5         MR. SHOPE: Objection.
6         MR. GOLDSTEIN: Yeah. Objection.
7    The question is a little ambiguous.
8         MR. ROSSETTI: Okay.
9    Q. Do you think the information in that
10   statement in Mr. Nothern's transcript would
11   have indicated to you that this information
12   may or may not have been public at the time
13   that you had received it?
14        MR. SHOPE: Objection.
15        MR. GOLDSTEIN: I'm going to
16   object. It really calls for a legal
17   conclusion.
18   Q. You can answer.
19        THE WITNESS: Can I answer?
20        MR. GOLDSTEIN: Yeah, you can
21   answer, if you can.
22   A. Yes.
23   Q. Now, you discussed this subsequent
24   conversation that you had with Mr. Nothern
25   in which he was, I think you had
```

Page 229

```
1    characterized it that he was wondering about
2    whether the information was public; is that
3    correct?
4    A. Yeah.
5    Q. All right. And during that conversation, he
6    didn't mention to you anything about that
7    Steve Nothern mentioned Peter Fisher; is
8    that right?
9         MR. SHOPE: Objection. Which
10   conversation are we talking about here?
11        MR. ROSSETTI: This conversation
12   that occurred a couple days after
13   October 31st.
14        MR. GOLDSTEIN: This would have
15   been the meeting in Mr. Nothern's office?
16        MR. ROSSETTI: That's correct.
17   A. No. I don't remember anything about
18   Mr. Fisher.
19   Q. Did he mention that --
20        MR. ROSSETTI: Can I have that
21   back, please?
22   Q. Did he mention anything that there would be
23   a press release that morning? Let me
24   withdraw the question.
25   A. No.
```

Excerpt from the

June 19, 2006 deposition of

D. Richard Smith

Exhibit N

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------X
UNITED STATES SECURITIES AND            Civil Action No.
          EXCHANGE COMMISSION,                  05-10983 (NMG)

          Plaintiff.

          v.


STEVEN E. NOTHERN,

          Defendant.
------------------------------------X
Volume I
          June 19, 2006
                              New York, New York


          Videotape deposition of DAVID R. SMITH, taken on

behalf of the Plaintiff, at the United States Securities and

Exchange Commission, WTC, 3 World Financial Center, Suite

4300, New York, New York, 10281, commencing at 10:20 a.m.,

June 19, 2006, before Anthony Armstrong, a Certified

Shorthand Reporter of the State of New York.

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

----------------------------------X
UNITED STATES SECURITIES AND          Civil Action No.
               EXCHANGE COMMISSION,         05-10983 (NMG)

               Plaintiff.

               v.


STEVEN E. NOTHERN,

               Defendant.
----------------------------------X
Volume I
               June 19, 2006
                                   New York, New York


          Videotape deposition of DAVID R. SMITH, taken on

behalf of the Plaintiff, at the United States Securities and

Exchange Commission, WTC, 3 World Financial Center, Suite

4300, New York, New York, 10281, commencing at 10:20 a.m.,

June 19, 2006, before Anthony Armstrong, a Certified

Shorthand Reporter of the State of New York.

Page 62

1    MR. THEODOROU:  Objection.
2    A.   There were a variety of tools that we used in
3    the course of managing portfolios.  There was a
4    Bloomberg terminal; e-mail; Yield Book; the fixed
5    income trading system; access, you know, to the web.
6    Q.   And these were tools you could access that
7    would appear on these monitors?
8    A.   Yes.  There were two monitors run off one of
9    one CPU, and you could move things back and forth
10   between the two monitors just by click and sliding it
11   or shrinking it and bringing it down to the tool bar.
12   Q.   Now, when you say CPU, you mean computer?
13   A.   Yes, computer.  Oh, CRT.  Cathode ray tube or,
14   you know, display.  Display.
15   Q.   Right.
16   A.   Yes.
17   Q.   But when you said the term CPU, you were
18   referring to a computer?
19   A.   Yeah.  I was actually -- I misspoke.  I should
20   have said the display or CRT or the display, not -- CPU
21   is in the main part of the computer.
22   Q.   Okay.
23   A.   Yes.
24   Q.   You mentioned Bloomberg?
25   A.   Yes.

Page 63

1    Q.   What is that?
2    A.   Bloomberg is a market data and news service.
3    Q.   When you say market data, what do you mean by
4    that?
5    A.   There are various screens that provide
6    information about what the current price levels are in
7    various global financial markets.
8    Q.   And it -- I'm going to focus you now to
9    October of 2001.
10   A.   Right.
11   Q.   Did you use Bloomberg while you were at MFS at
12   that time?
13   A.   Yes.
14   Q.   And what would you refer to on Bloomberg
15   during that time?
16       MR. THEODOROU:  Objection.
17   A.   I looked at a variety of data.  But I tended
18   to look at mostly the government bond market and the
19   mortgage-backed securities market probably the two
20   things I looked at the most.
21   Q.   Which of these two monitors -- monitors that
22   you described that Bloomberg information appeared?
23   A.   My suspicion -- my recollection would be the
24   upper one.
25   Q.   The one that was in the center?

Page 64

1    A.   The one that was in the center, yes.
2    Q.   Within these screens, were these screens
3    subdivided at all?
4        MR. THEODOROU:  Objection.
5    A.   There were two -- there were two discreet
6    monitors -- two monitors.  They weren't connected at
7    all.
8    Q.   Right.  But within one monitor, was that
9    subdivided at all into different portions of the
10   screen?
11   A.   You had the flexibility to make things smaller
12   or larger, so if you wanted to bring up multiple
13   screens at one time, you could do that.
14   Q.   Just like you could on any windows application
15   on any computer?
16   A.   Yes, that's correct.
17   Q.   Did you -- in addition to the market data, did
18   you also -- what kind of news service would you look at
19   on Bloomberg?
20   A.   What kind of news service?
21   Q.   Yes?
22   A.   Well, I typically -- I think they had some
23   headlines down at the bottom of the screen that ran,
24   and then I would look at the top news stories, and I
25   would look at -- those are the main things.

Page 65

1    Q.   You said there would be news headlines on the
2    bottom of the screen?
3    A.   Like scrolling news on the bottom of the
4    screen.
5    Q.   Where would the top news stories appear?
6    A.   Well, something like employment data you would
7    flash on the bottom of the screen there.  It's
8    basically rolling news all day long.  It moved pretty
9    quickly.  And I really didn't focus on it that much.
10   The top stories would -- general you typed top, T-O-P,
11   and the biggest stories would be out right there.
12   Q.   When you said YOU had the scrolling on the
13   bottom of the screen, which way would the news stories
14   scroll?
15   A.   I think it was about somewhere between three
16   or five lines on the bottom of the screen.  And I think
17   it scrolled from top to bottom, is my guess.
18   Q.   And where do the newer headlines appear?
19   A.   I suspect at the top.  I could be wrong about
20   that, but I think that's fair.  As new ones come in,
21   they push them down and then they disappear.
22   Q.   Okay.  Did you use any other services to
23   access news in October of 2001?
24   A.   Not really, no.
25   Q.   Bloomberg was your main source for news?

Page 66

1    A.   I think that's correct, yes.
2    Q.   What else would you access on this screen as
3  you're looking -- that was in the center of your desk?
4    A.   E-mail would be my -- would be my guess.
5  Bloomberg and e-mail. And then -- yes, that's what I
6  probably have up there.
7    Q.   How did you -- you had access to e-mail while
8  you were at MFS in October of 2001?
9    A.   Yes.
10   Q.   How did you have access to e-mail at MFS?
11   A.   I believe it was Microsoft Outlook was the
12  software I believe they used.
13   Q.   You had an e-mail address at MFS?
14   A.   Yes.
15   Q.   Did you have any other -- and what was that
16  e-mail address at MFS?
17   A.   I think at the time it was RSMITH@MFS.com.
18  It's possible that it was RSMITH3@MFS.COM.
19       Over my career I changed my e-mail address
20  because I was just getting bombarded with spam-type
21  stuff. So at some point during my career I changed my
22  e-mail address.
23   Q.   In addition to having an Outlook address, did
24  you have a Bloomberg e-mail address?
25   A.   I believe I did, but I don't remember what it

Page 67

1  was.
2    Q.   Did you -- would you receive e-mails via
3  Bloomberg while you were at MFS?
4    A.   Would I receive e-mails via Bloomberg.
5        I would receive -- yes. What I did, just to
6  clarify things, is I received a tremendous amount of
7  information everyday, and some people would send messages
8  through the Bloomberg terminal and other people would
9  send the messages through the e-mail, so what I did was I
10  forwarded my Bloomberg messages to my e-mail so
11  everything would end up in one place and I would monitor
12  e-mail. And I didn't monitor Bloomberg messages.
13   Q.   You mentioned a Bloomberg terminal.
14       What did you mean by that?
15   A.   I'm probably using the old style language
16  because they're usually terminals onto themselves. But
17  it's the Bloomberg software. I'm just dating myself.
18   Q.   So when you accessed Bloomberg, how would you
19  do that? And let me just clarify.
20       In October of 2001 when you wanted to access
21  Bloomberg, how would you do that?
22   A.   I would -- I would click on an icon on my
23  Windows software and it would come up, and I would put
24  my user name and password into the softer. I believe
25  that's correct.

Page 68

1    Q.   It would remain up all day once you were
2  signed on?
3    A.   Yes.
4    Q.   Would it time out at all if you didn't use it?
5    A.   I don't think so.
6    Q.   What other services did you use at your -- did
7  you access via computer while you were at MFS in
8  October of 2001?
9    A.   The things that I used the most, I used a
10  software package called the Yield Book. It was a
11  portfolio management and analytics package that was
12  provided by Citigroup, and so if you wanted to work on
13  any kind of sensitivity to your portfolios, that that
14  is the software that you would use.
15       The other software that I used a lot was a
16  software called Bond Hub, which is a collection of
17  probably the largest broker-dealers on the street
18  combined access to their websites into one location, Bond
19  Hub. I would spend a good deal of my day going through
20  different securities that we were thinking of purchasing
21  in the mortgage-backed market. So one way to get in
22  touch with the dealer inventories was to go on their
23  website and I would either read their research or I would
24  be looking at the different bonds that they had available
25  to them.

Page 69

1    Q.   Any other tools that you used?
2    A.   Let's see. I hate to repeat myself here.
3  That would be helpful.
4        I used e-mail; I used Bloomberg; I used Bond
5  Hub, which is internet; I used fixed income trading
6  system. That's all I'm thinking about right now.
7    Q.   Where would you have the Yield Book and the
8  Bond Hub information come up?
9    A.   That typically -- typically would be down
10  below at my own level right, right at the lower level.
11   Q.   So it would be the monitor between -- on the
12  work area between you and Kennedy?
13   A.   Yes, yes.
14   Q.   Did you also -- did you access to the
15  internet?
16   A.   Yes, yep.
17   Q.   Did you use that access to look at news sites?
18   A.   Typically I don't remember exactly that day.
19  But I was not a big user of other news websites.
20   Q.   You were or you were not?
21   A.   I was not, no, no.
22   Q.   Did you have any television -- access to
23  televisions at MFS?
24   A.   Yes.
25   Q.   Where were televisions located?

1    the word consultant a few times. I would continue to
2    use that word consultant about someone who did
3    investigative work about timely topics that were going
4    on in Washington for the platform.
5       Q.  For the platform. What do you mean for the
6    platform?
7       A.  For the MFS fixed income department.
8       Q.  What was your understanding of what Pete
9    Davis' background was?
10      A.  I'm not familiar with his background.
11      Q.  Did Mr. Nothern ever mention Pete Davis'
12    background?
13         MR. THEODOROU:  Objection.
14      A.  Not that I recall.
15      Q.  This meeting that you testified earlier about
16    that you said Nothern had traveled to D.C. with Alice
17    Rivlin in a meeting that Pete Davis arranged, did
18    Nothern mention that he visited with anybody else in
19    D.C. on that trip?
20      A.  I believe there was a time in our morning
21    meeting that he said I was in D.C. with Pete Davis. I
22    had these meetings. Let me share a few of my notes
23    with the group, as we would all expect each other to do
24    when we have been out of the office to do some -- to
25    investigate some timely topic or to attend some

1    industry conference.
2      Q.  Other than Mr. Nothern explaining this meeting
3    with Alice Rivlin, did he discuss any other meetings
4    that's had on this trip to Washington?
5      A.  I believe he did talk about other meetings.
6    But the exact message he shared with the group, I don't
7    recall exactly what he was talking about.
8      Q.  Did Mr. Nothern ever mention him visiting
9    anybody at Treasury during a meeting that Peter Davis
10    help arrange?
11         MR. THEODOROU:  Objection.
12      A.  Not that I recall.
13      Q.  In your conversations with Mr. Nothern about
14    Mr. Davis, were you aware of whether or not Mr. Nothern
15    would receive information from Mr. Davis?
16         MR. THEODOROU:  Objection.
17      A.  Can you either repeat or rephrase that
18    question, please?
19      Q.  Sure, sure. In your conversations -- in your
20    conversations with Mr. Nothern about Mr. Davis --
21      A.  Yes.
22      Q.  -- did you ever become aware of whether or
23    not Mr. Davis was providing Mr. Nothern with any sort
24    of information?
25         MR. THEODOROU:  Objection.

1      A.  I was not very knowledgeable about the
2    specifics of their relationship.
3      Q.  But were you aware whether or not Mr. Davis
4    was providing Mr. Nothern with any information?
5         MR. THEODOROU:  Objection.
6      A.  Well, I know they went to D.C. together. I'm
7    not sure of the specifics beyond that --
8      Q.  Do you know --
9      A.  -- was it written or oral or was it a frequent
10    publication or an as-needed -- I'm not sure. Just a
11    name came up occasionally.
12      Q.  Do you know if -- in your conversations with
13    Mr. Nothern, do you know if Mr. Nothern was receiving
14    any publications from Mr. Davis?
15         MR. THEODOROU:  Objection.
16      A.  No, I'm not aware of that.
17      Q.  Did you receive any publications from
18    Mr. Davis?
19      A.  Not to my knowledge.
20      Q.  Did you receive any e-mails from Mr. Davis?
21      A.  I'm almost certainly, no.
22      Q.  Do you know if Mr. Nothern was receiving
23    e-mails from Mr. Davis?
24      A.  I don't know.
25      Q.  Have you ever heard the term embargo used in

1    the context of information?
2         MR. THEODOROU:  Objection.
3      A.  I have heard the term embargo, yes.
4      Q.  And when did you hear -- you've heard the term
5    embargo used in the context of information?
6         MR. THEODOROU:  Objection.
7      A.  I mean certainly recently I have had heard
8    that.
9      Q.  Prior to October 31st, 2001, have you heard
10    the term embargo used in the term connection --
11      A.  I think I would be familiar with that concept,
12    yes.
13         MR. THEODOROU:  Objection.
14      Q.  And can you explain what your familiarity of
15    that concept was?
16      A.  Well, my impression of an embargo situation
17    would be that there was a point in time that someone --
18    privileged information would become more available to a
19    select group. I would usually think of it as being the
20    press. The example that I would use is that I'm under
21    the impression that when an employment report is
22    released, they are they release it into a small room
23    and that the press is able to write their stories and
24    then electronically put it into a cue that the press
25    stories and the information is released to the public

Page 98

1   at the same time, so it would create an situation where
2   people would have the opportunity to do analysis for
3   their news services so that when it's released their
4   analysis could be released at the same time.
5       Q.   And what was your understanding of who imposed
6   such an embargo on this employment information you
7   mentioned?
8           MR. THEODOROU:  Objection.
9       A.   It would be the government agency that
10  controlled -- calculated and controlled the release of
11  the information.
12      Q.   Did you have any understanding of why this
13  government agency would use an embargo for this
14  information?
15          MR. THEODOROU:  Objection.
16      A.   Well, my impression is when you have sensitive
17  information, you would like it released to the public
18  at the same time.
19      Q.   Same time as what?
20      A.   Everyone would receive equal access to the
21  information in a timely fashion.
22      Q.   What's your understanding of why it was
23  released to the public -- released to the press then?
24          MR. THEODOROU:  Objection.
25      A.   Well, I don't really know the history behind

Page 99

1   that.  I had just seen -- I say I thought I saw a
2   television show on one at time that they showed how it
3   was released to the public.  And I think that that's
4   the method that I saw, you know, yes.
5       Q.   Other than this TV show that you had seen, had
6   you ever heard the term embargo used with any release
7   of any sort of data the government was releasing?
8           MR. THEODOROU:  Objection.
9       A.   No.
10      Q.   Have you ever heard that term used in the
11  context of any economic data that some other group was
12  releasing?
13          MR. THEODOROU:  Objection.
14      A.   Not really, no.
15      Q.   Do you have any understanding of the term
16  embargo other than what you gathered from this TV show?
17      A.   I think what I saw in the TV show is
18  representative of my understanding of the concept of
19  embargo.
20      Q.   And what was your understanding of why the
21  information would be released to the press --
22          MR. THEODOROU:  Objection.
23      Q.   -- initially?
24          MR. THEODOROU:  Objection, asked and
25          answered.

Page 100

1       A.   I guess I would only speculate about that,
2   that it gave them the opportunity to write their news
3   stories at the same time.
4       Q.   That their news stories would be released at
5   the same time that the information was released by the
6   agency?
7       A.   Yes, yes.
8       Q.   Are you familiar something called a quarterly
9   refunding announcement from the US Treasury Department?
10      A.   I am familiar with refundings, yes.
11      Q.   And can you find what your understanding of
12  quarterly -- of refundings is?
13      A.   Well, the US Treasury periodically does
14  projections about its borrowing needs, and then on a
15  frequency basis they'll announce what they're going to
16  issue in bills, two year notes and five year notes.  I
17  believe those run on a monthly basis.
18          There tends to be a little bit higher
19  sensitivity to what was called the quarterly refunding
20  because that's the time they would announce I believe the
21  10 year note and the long bond.  So the quarterly
22  refunding I think would include five years -- five year
23  US treasury at some point in time before they switched
24  over a monthly cycle, and then the 10 and the 30 year,
25  which I believe has always been a quarterly cycle.  So I

Page 101

1   think that's what went on on a quarterly refunding
2   announcement.
3       Q.   The it would be every three months?
4       A.   Quarterly was four times a year, yes.
5       Q.   Okay.  I just want to go over some terms you
6   used.  You used term two and five year notes?
7       A.   Correct.
8       Q.   Ten year notes?
9       A.   Yes.
10      Q.   Can you explain what a note is?
11      A.   Sure.  Common terminology among the government
12  security market is there are three types of issues:
13  Bills which do not have a fixed -- don't have a fixed
14  coupon, or they should at a discount, and mature I
15  believe within one year.  Original issues between one
16  year for practical matters, it means two years.  And 10
17  years are dubbed notes.  And issues longer than 10
18  years, most likely the 30 year but actually included a
19  20 year at one point in time, were dubbed bonds.  I
20  believe they are called that for their entire life.  So
21  even if a bond has a year to go, it might still be
22  called a bond.
23      Q.   Alright.  And basically there's notes, bonds,
24  and bills are just IOU's that the government issues,
25  correct?

1    MR. GOLDSTEIN:  Yeah.
2    MR. ROSSETTI:  -- from the 9 a.m. meeting.
3    MR. THEODOROU:  Objection.
4    A.   I don't recall any specific conversations I
5  had with Steve Nothern.
6  BY MR. ROSSETTI:
7    Q.   Any general conversations you recall?
8    A.   No.
9    Q.   Did there come a point in time when you had
10  any discussions with Mr. Nothern about the 30th year
11  bond?
12    MR. THEODOROU:  When?
13    MR. ROSSETTI:  On October 31st, 2001.
14    A.   There was a point in time that I do recall
15  Steve being back at the desk. I do recall him being
16  next to me. I do recall something about Pete Davis and
17  elimination of the bond.
18    Q.   When you say the bond, what do you mean, the
19  long bond, the 30th year bond?
20    A.   The bond is industry -- industry terminology
21  for the US Treasury 30th year long bond -- 30 year
22  maturity bond.
23    Q.   You said that Steve Nothern was back at his
24  desk?
25    A.   Uh-huh.

1    Q.   When you say back at his desks, is that -- let
2  me hand you Exhibit 3.
3    A.   Uh-huh.
4    Q.   Are you referring to the area that's marked
5  241 on Exhibit 3?
6    A.   Yes, I believe that's correct.
7    Q.   Was he away from his desk prior to that that
8  you noticed?
9    MR. THEODOROU:  Objection.
10    A.   I believe he was.
11    Q.   Alright. What happened after he returned to
12  his desk?
13    A.   I believe that he was -- the tough part about
14  this is you don't know what's going on at that moment
15  or what you'll learn later. But I believe he was
16  either on the phone or checked his messages and then,
17  you know, he stated there was kind a Pete Davis, bond
18  elimination was part of the conversation.
19    Q.   Specifically, what did he state --
20    MR. THEODOROU:  Objection.
21    Q.   -- about Steve Nothern stating --
22    A.   I think I shared with you about the degree of
23  precision that I can share about that matter.
24    Q.   Okay. And when he was making this statement
25  about Pete Davis and elimination of the bond, where was

1  he?
2    A.   I believe he was -- I believe he was at his --
3  I believe Steve was at his trading station No. 241.
4    Q.   And was he sitting or standing in 241?
5    A.   I don't recall.
6    Q.   Let me have you turn back to Exhibit 6, which
7  is the copy of your transcript.
8    A.   Okay.
9    Q.   And I will have you turn to page 59.
10    A.   Okay.
11    Q.   Let me know when you get to 59 and I will
12  further direct you.
13    A.   Okay.
14    Q.   I want to have you start reading from line 11
15  there. Do you see that?
16    A.   Yes.
17    Q.   Okay. And I will have you read down to the
18  next page on page seven.
19    A.   From 59 to 60 on page seven?
20    Q.   That's correct.
21    A.   Can you remind me on page 59 what line I'm
22  supposed to --
23    Q.   Line 11.
24    A.   Line 11?
25    Q.   Yes.

1    A.   To seven on 60?
2    Q.   That's correct.
3    A.   Okay.
4    (Perusing.)
5    Q.   Actually I'm going to have you go down to line
6  16 on 60.
7    A.   Okay.
8    (Perusing.)
9    Q.   I'm sorry. I'm just going to have you read
10  eight lines down further on 24. I apologize.
11    A.   Okay. Let's try again here.
12    (Perusing.)
13    Okay, I have read it.
14    Q.   Okay. You had testified that your
15  recollection of what Mr. Nothern said was something
16  about Pete Davis and elimination of the bond.
17    After reading this section of the transcript
18  that I just asked you to read -- you've read that, by the
19  way?
20    A.   Yes, I have just read it.
21    Q.   Okay. I went just want to make sure that
22  have.
23    A.   Yes.
24    Q.   After reading that section of the transcript,
25  does it refresh your memory as to any other details of

1    what Mr. Nothern said that morning?
2        A.   I think the additional piece of information
3    was that they had just got out of some meeting which
4    seems like the piece of information I did not mention a
5    few moments ago.
6        Q.   And after reading this transcript, that
7    refreshes your recollection as to that point?
8            MR. THEODOROU:  Objection.
9        Q.   I'm sorry?
10       A.   I believe that's correct, yes.
11       Q.   Okay.  So when -- having read that transcript,
12   what is it you can recall now that Steve Nothern said
13   on October 31st, 2001?
14       A.   Right.  I think probably approximately the
15   same that I mentioned before:  That, you know, there
16   was a kind of blurb about the bond elimination, Pete
17   Davis.  You know I can't quote him directly of what
18   exactly he said.
19       Q.   You can't quote --
20       A.   -- to either me or the group.  I cannot quote
21   Steve Nothern directly.  I cannot even tell you that he
22   was speaking directly at me at that time.  I do believe
23   that there was elimination, Pete Davis, bond.
24            You have refreshed my memory that it had
25   something to do with the meeting at that point in time,

1    but I do remember what I have just shared with you.
2        Q.   And what was your understanding as to what
3    that all meant?
4            MR. THEODOROU:  Objection.
5        Q.   -- of what --
6        A.   Right.
7        Q.   Steve Nothern had said to you, what was your
8    understanding of what that meant?
9            MR. THEODOROU:  Objection.
10       A.   Right.  At that moment in time?
11       Q.   Yes.
12       A.   I don't recall it meaning a lot to me.  I
13   recall -- you know, I recall hearing the information.
14   And, you know, I don't remember thinking, oh, wow,
15   that's like a really great new piece of information, or
16   something like that.  I kind of heard it and didn't
17   really get too excited about it.
18       Q.   Did you understand, though, that the substance
19   of it was that Pete Davis was indicating that the
20   thirty year bond was going to be eliminated?
21            MR. THEODOROU:  Objection.
22       A.   I think there had been talk in the marketplace
23   about the elimination of bond for an extended period of
24   time.  It's kind of one of those old stories you
25   probably heard so many times and probably didn't

1    believe it by the time you heard it.
2        Q.   But what was your understanding as to the
3    substance of what Nothern was saying --
4        A.   Right.
5        Q.   -- about Pete Davis and the bond?
6            MR. THEODOROU:  Objection.
7        A.   What was the substance of what he was saying?
8        Q.   Yes.  What did you understand to be the
9    substance of what Steve Nothern was saying about Pete
10   Nothern -- Pete Davis --
11       A.   Pete Davis, yes.
12       Q.   -- and the thirty year bond?
13            MR. THEODOROU:  John Nothern.
14            MR. ROSSETTI:  I'm sorry?
15            MR. THEODOROU:  John Nothern.
16       A.   Are you talking about at that moment in time
17   what was I thinking about, or right now thinking about
18   it what are the possible interpretations to what you
19   are talking about?
20       Q.   Putting yourself back in time on
21   October 31st, 2001, you said that you -- Steve Nothern
22   made a statement, Pete Davis, elimination --
23       A.   Right.
24       Q.   -- thirty year bond?  And you also were
25   refreshed that Davis had just gotten out of the

1    meeting --
2        A.   A meeting or something, yeah, yeah.
3        Q.   What did you --
4        A.   Right.
5        Q.   What was your understanding of what that meant
6    at that time, October 31st, 2001?
7            MR. THEODOROU:  Objection, asked and
8            answered.
9        Q.   You can answer.
10       A.   Okay.  I think at that there is some
11   recognition of what he was talking about, but there was
12   not a real revelation or tremendous amount of thought
13   gone into what was said.
14       Q.   But what was your recognition of what he was
15   saying -- what Steve Nothern was saying?
16            MR. THEODOROU:  Objection.
17       A.   I don't know if I really --
18       Q.   Well, did you --
19       A.   Yeah --
20       Q.   Steve Nothern mentions Pete Davis gets out of
21   the meeting and says that -- the thirty year bond is
22   going to be eliminated.
23       A.   Uh-huh.
24       Q.   What did you take that to mean?
25            MR. THEODOROU:  Objection.

Page 146

1    A.   I don't -- I don't remember spending a lot of
2  time thinking about it right at that exact moment, you
3  know, thinking -- I think there is some recognition of
4  what he was talking about, but I don't think it took up
5  a lot of my thought at that moment in time.
6    Q.   Some recollection of recognition of what he
7  was saying -- some recognition of what he was saying --
8  meaning there was some recognition of what he was
9  saying?
10        MR. THEODOROU:   Objection.
11    A.   Well, I think he, you know, I know what each
12  individual word means, but I didn't spend a lot of time
13  thinking about what the impact or the consequences of
14  the market is.
15        We're flooded with information all day long,
16  and our job is to kind of separate out all that
17  information and try to prioritize another things.
18    Q.   I'm sorry.  Did you have an understanding of
19  who would be able to eliminate the bond?
20        MR. THEODOROU:   Objection.
21    A.   Well, the Treasury -- I would assume that the
22  Treasury would be able to eliminate the bond.
23    Q.   The United States Treasury Department?
24    A.   The United States Treasury I would perceive to
25  be the one who could eliminate the bond.

Page 147

1    Q.   That morning did you put more thought into
2  what Mr. Nothern had said?
3        MR. THEODOROU:   Objection.
4    A.   You mean after he said it did it say this is
5  like this new factor?
6    Q.   No, no, no.  At any point after he said --
7  Mr. Nothern made the statement about Pete Davis, got
8  out of the meeting, elimination of the bond, or the
9  substance of what you can recall --
10    A.   Yes.
11    Q.   -- did you give any thought about that
12  statement that morning?
13        MR. THEODOROU:   Objection.
14    A.   Not really.
15    Q.   Okay.  Where were you when Mr. Nothern made
16  this statement?
17    A.   I believe I was sitting at my desk, number 242
18  on your exhibit.
19    Q.   And you indicated earlier -- I thought you
20  said Mr. Nothern was standing up.
21    A.   Right now I don't remember him standing up or
22  sitting down.  If I testified five years ago that he
23  was standing up or sitting down, I would go with what I
24  said five years ago.
25    Q.   But you don't have a recollection as you sit

Page 148

1  here today --
2    A.   Right now --
3    Q.   -- whether he was sitting or standing?
4    A.   No, I don't.
5    Q.   Just one moment, please.
6        (There was a brief pause.)
7             ***********
8  BY MR. ROSSETTI:
9    Q.   Let me have you turn to the transcript,
10  starting at page 61, line eight.  Let me just read
11  this.  Question -- you at that --
12    A.   I am at page 61, line eight.
13    Q.   Okay.  Let me direct your attention to Exhibit
14  224.
15        MR. THEODOROU:   What is Exhibit 224 for
16      the doctrine of completeness?
17        MR. ROSSETTI:   Yes.
18    Q.   Exhibit 224 is the first page of Exhibit --
19  that's been marked Exhibit 3 for your deposition here
20  today, Mr. Smith, and also has the Bates stamp number
21  on it, M526.  And again, I'll start, Question:  Let's
22  see.  Let me direct your attention to Exhibit No. 224.
23  And there's a workstation for you, Mr. Smith.
24        Answer:  Yes.
25        Question:  242; is that not correct?

Page 149

1        Answer:  Yes.
2        Question:  Where was Mr. Nothern when he spoke
3  these words you just testified to?
4        Answer:  I believe he was -- I believe when he
5  came back to his desk he -- I believe he never sat down,
6  so he had checked his messages or picked up the phone
7  when he was standing and he was standing -- and he was
8  standing here and he mentioned -- he was standing
9  approximately there.
10        Indicating.
11        Question:  Let the record reflect that you're
12  pointing to the work space approximately between station
13  241 and 242; is that correct?
14        Answer:  Yes.
15    A.   Uh-huh.
16    Q.   Does that refresh your recollection, Mr.
17  Smith, as to where Mr. Nothern was standing when he
18  made this statement about Pete Davis, elimination of
19  the bond?
20    A.   Yes, I believe so.  Sure.
21    Q.   Okay.  Well --
22        MR. THEODOROU:   Objection.
23    Q.   Does it, yes or no?  It's not an in between
24  answer there.
25    A.   Sitting here today, as I just mentioned I

1  believe about two minutes ago, that I don't remember if
2  he was standing or sitting, that's the way I currently
3  remember it.
4      Q.  Okay. After me --
5      A.  After reading this --
6      Q.  Does it refresh your memory as to whether he
7  was standing or not?
8      A.  I do remember -- right now I don't remember
9  whether he was standing or sitting.
10     Q.  Okay.
11     A.  Right now.
12     Q.  Alright.
13     A.  You know.
14     Q.  And again, when you testified back in December
15  11th, 2001, the events of October 31st, 2001 were
16  fresh in your mind at that point, correct?
17         MR. THEODOROU:  Objection.
18     A.  I think they are probably fresher than today.
19     Q.  Okay. But were they fresh at that point in
20  time?
21         MR. THEODOROU:  Objection.
22     A.  It's all assumption in the matter of degree,
23  you know, about this. I mean --
24     Q.  What do you mean by that?
25     A.  Well, there are general things I remember

1  about that day, and there are things that you are or
2  are not paying attention to that could happen five
3  minutes ago. I wouldn't have a really specific
4  recollection.
5      Q.  But in terms of your testimony in December
6  of 2001 --
7      A.  Yes.
8      Q.  -- when you testified then --
9      A.  Right.
10     Q.  -- were the items that you were testifying to
11  fresh in your mind at that point?
12         MR. THEODOROU:  Objection.
13     Q.  Not just speaking about today.
14     A.  Okay. I think I've already said it back then
15  I probably believed it.
16         MR. THEODOROU:  Objection.
17     Q.  Well, at the time you were giving your
18  testimony, did you believe that these items -- things
19  you were testifying to were fresh in your memory?
20     A.  I believe so, yes.
21     Q.  And at that point you were testifying
22  truthfully; is that right?
23     A.  Yes.
24     Q.  When Mr. Nothern made this statement about
25  Peter Davis and elimination of the bond, what were you

1  doing?
2      A.  I believe I was sitting at my desk either
3  reading or working or looking at the market or
4  something.
5      Q.  Can you describe for me the level of
6  Mr. Nothern's voice when he made this statement?
7      A.  I don't recall.
8      Q.  Was it a statement that was being made
9  directly to you?
10     A.  I don't think it was being made directly to
11  me.
12     Q.  Was it will being made directly to somebody
13  else?
14     A.  I don't know.
15     Q.  Was it loud enough that other people could
16  hear it?
17     A.  Well, I heard part of it, so somebody must
18  have been able to hear it.
19     Q.  Somebody other than you, or you were just
20  saying you were that somebody?
21     A.  I'm sorry. Can you repeat the question?
22     Q.  Yeah. I will withdraw that question because
23  it was pretty poor.
24         Who is the statement directed towards?
25     A.  I'm not sure who the statement was directed

1  towards.
2      Q.  After Mr. Nothern made that statement, what if
3  anything did you see Mr. Nothern do?
4      A.  I believe he walked down the aisle and talked
5  with someone down the aisle.
6      Q.  And who was that?
7      A.  I mean there was a group of people there that
8  included Mr. Kurinsky and Mr. Kennedy. I believe they
9  had a conversation.
10     Q.  Okay. You say I believe?
11     A.  Yes.
12     Q.  Okay.
13     A.  Yes.
14     Q.  Did you see Mr. Nothern walk down and engage
15  in a discussion with Mr. Kennedy and Kurinsky?
16         MR. THEODOROU:  Objection.
17     A.  I did not see them speaking. I am aware that
18  there was a conversation going on among multiple
19  individuals that I believe included Mr. Kurinsky and
20  Mr. Kennedy. I know that from hearing things, not
21  seeing things.
22     Q.  Okay. What did you hear? Let me back up a
23  second.
24         Are you familiar with Mr. -- in October 31 --
25  October 31st, 2001, were you familiar with Mr. Nothern's

1  voice?
2      A.   Yes.
3      Q.   On October 31st, 2001, were you familiar with
4  Mr. Kennedy's voice?
5      A.   Yes.
6      Q.   On October 31st, 2001, were you familiar with
7  Mr. Kurinsky's voice?
8      A.   Yes.
9      Q.   After Mr. Nothern made this statement about
10  the elimination of the thirty year bond, did you hear a
11  discussion along Mr. Nothern, Mr. Kennedy and
12  Mr. Kurinsky?
13      A.   I believe they were talking. I don't know
14  exactly what they were talking about.
15      Q.   And how long did this discussion continue?
16      A.   I'm not sure how long it lasted.
17      Q.   Did there come a point in time when the
18  discussion ended?
19      A.   The next thing I remember was our trader John
20  Catigan, who does have a very deep and distinguished
21  voice, asking for an offering of long bonds of thirty
22  year securities from Merrill Lynch.
23      Q.   What is it that you heard Mr. Kennedy say?
24      A.   He was calling up Merrill Lynch and asking

1  them for an offering of 60 million long bonds, 60 year.
2  The terminology in the market if you're among two, I'll
3  say, industry professional, you could say offer 60
4  bonds and they would know exactly what you meant.
5      Q.   Okay. With that little explanation, can you
6  tell me exactly what you recall Catigan saying?
7      A.   I recall exactly what I just said to you:
8  That he asked Merrill Lynch to offer 60 bonds.
9      Q.   How do you know it was Merrill Lynch?
10      A.   You know, at the time I probably didn't know
11  it was Merrill Lynch.
12      Q.   But did he --
13      A.   Might have known from looking at the light in
14  front of me, yes.
15      Q.   The panel --
16      A.   He was on the light with Merrill Lynch. That
17  light would be on in front of me.
18      Q.   I see.
19      A.   Yeah. But I -- you're correct in your comment
20  of I'm not sure at the time today, you know, what you
21  knew then versus what you know afterwards. I know
22  certainly afterwards it was Merrill Lynch. I'm pretty
23  I at the time it was Merrill Lynch.
24      Q.   And you say offer 60 bonds.
25          Again, what does that mean?

1      A.   Offer 60 bonds?
2      Q.   Yes.
3      A.   That's a dealer, Merrill Lynch, somebody who
4  makes markets in securities. Offer, means you, offer
5  the bonds to me. Offer me 60 million. Without any
6  qualifiers, it mean per regular settlement the next
7  day.
8      Q.   So Catigan is asking -- essentially asking to
9  buy $60 million --
10      A.   Exactly.
11      Q.   -- of bonds?
12      A.   Yes.
13      Q.   And how long was that estimate by
14  Mr. Catigan -- how long after Nothern's statement about
15  the elimination of the bond was Catigan's statement of
16  offer 60 bonds?
17          MR. THEODOROU: Objection.
18      A.   I could say, you know, it was within five
19  minutes, but I'm not sure of the exact timing of the
20  sequence. I was not looking at a watch or --
21      Q.   Okay. What did -- what happened next after
22  you heard Catigan say offer 60 bonds?
23      A.   One of the things I recall about the market
24  that day is that -- when we came back from the
25  9:30 meeting the market was rallying. It was contrary

1  to what I thought the market would do that day.
2          As managers, one of the things we have to do is
3  manage our risk exposure. Nobody is right all the time
4  about markets. They are very humbling experience to work
5  in the financial markets. And as a point you would say,
6  that's enough. And one of the things that struck me
7  about the market between the time of the end, think about
8  day, was just how strong the market was. And when you're
9  looking at the market, it just -- there are times you
10  look at it and you say to yourself something is going on
11  here. I don't know what's going on here, but I'm on the
12  wrong side of this trade, and if I stick with it and
13  fight the market, the only thing the market does is run
14  me over and destroy my job.
15          So there is a time to do analysis, to make
16  calculated investment decisions, and there are times when
17  there are things going on in the market you don't
18  understand. And when I was sitting in there that day,
19  you know, what I remember is this market is really strong
20  and I don't know why, and I am one opinion and I am not
21  right about this opinion. And when you're stubborn and
22  you're fighting markets, they're a lot bigger than any
23  one individuals. And that's what I remember about
24  sitting near those fifteen or 20 minutes, between the
25  time I came back from the meeting and the time that we

Page 158

1  bought the securities.
2     Q.   Well, after you heard Catigan say offer 60
3  bonds, what's the next thing that you did?
4     A.   I said makes it 65.
5     Q.   And what did you -- when you said that to
6  Mr. Catigan, what were you conveying to him?
7     A.   Don't buy 60 million from the broker-dealer,
8  buy 65 million. I will take an incremental $5 million
9  more.
10    Q.   And why did you say that to Mr. Catigan?
11    A.   Because the market was rallying. I had money
12 to spend. Other members of my team were viewing it as
13 a good time to invest in the marketplace and it was at
14 the point where it was bring the portfolio back to
15 neutral.
16    Q.   And what about the statement to Mr. Nothern
17 had said Davis said eliminate the bond --
18    A.   Right.
19    Q.   -- got out of te meeting --
20    A.   Right.
21    Q.   -- bond is going to be eliminated?
22        MR. THEODOROU:   Objection.
23    A.   Yes.
24    Q.   Did you also consider that at that time when
25 you told Catigan to purchase $65 million in bonds?

Page 159

1        MR. THEODOROU:   Objection.
2     A.   I think there was one element in the
3  conversation that day, but I don't think there was a
4  major element of my decision-making process.
5        MR. THEODOROU:   John, could we take a
6      quick break?
7        MR. ROSSETTI:   Let me just remain for a
8      few moments. I would appreciate that.
9  BY MR. ROSSETTI:
10    Q.   Now, Mr. Smith, your decision to purchase the
11 5 million in bonds at that particular point after
12 Catigan said offer 60 bonds, did that statement from
13 Mr. Nothern about the elimination of bond play any role
14 in your decision to buy those 5 million bonds?
15        MR. THEODOROU:   Objection.
16    A.   It may have provided some input into the
17 decision, but if it was a part of the decision, it was
18 a very small part of the decision.
19    Q.   Right. Let me have you turn to page 81 of
20 your transcript, and I just -- page 81 starting -- I'll
21 start at the top.
22        Question:  My question is not would have or
23 could have or should have but what did happen, as well as
24 you remember.
25        Answer:  Yes.

Page 160

1        Question. Did that statement from Mr. Nothern
2  about the elimination of the bond play any in your
3  decision to buy 5 million in bonds?
4        Answer:  I would have to say yes.
5        Question: You do say yes?
6        Answer:  I would have to say yes.
7        MR. THEODOROU:   And then for the sake of
8      completeness, because there is a doctrine,
9      would you then follow through and ask him the
10     rest?
11        MR. ROSSETTI:   Sure. I was going to do it
12     in two pieces, but we can do it now.
13        Question:  And why do you say that?
14        Answer:  It was a piece of information
15     that had been discussed in the last five
16     minutes. It was not contrary to what was
17     going on. I may have not have put a greet
18     deal of credence or reliability, but it was
19     information that was mentioned within the

21     context. So to say that we purchased
22     securities and it did not factor in, I think
23     it really doesn't make any sense, you know.
24 BY MR. ROSSETTI:
25    Q.   Does that refresh your memory as to the --

Page 161

1  Mr. Nothern's statement about elimination of the bond
2  factoring into your decision to purchase bonds that
3  morning?
4     A.   (The witness nods.)
5        MR. THEODOROU:   Objection.
6     A.   I think my statement and this testimony and my
7  testimony today are fairly consistent.
8     Q.   Okay. So it did play whatever role in your
9  decision --
10    A.   Right.
11        MR. THEODOROU:   For the sake of
12     completeness, you really ought to ask him the
13     rest of these questions when he states,
14     perhaps likely, but I would only be
15     speculating.
16        MS. WILLIAMS:   You get to ask your
17     questions --
18        MR. THEODOROU:   Well, if we were at trial
19     and this was at trial I think --
20        MR. ROSSETTI:   And you would have --
21        MS. WILLIAMS:   You get the counter
22     designation --
23        MR. THEODOROU:   No, no I would not counter
24     designation. I mean you would be playing for
25     completeness --

Page 162

1    MR. ROSSETTI:  You could ask him on
2    cross-examination.
3    MR. THEODOROU:  Clearly it says perhaps
4    likely --
5    MS. WILLIAMS:  We read that part into the
6    record.
7  BY MR. ROSSETTI:
8    Q.  Mr. Smith, the -- your decision to purchase
9    bonds, the 5 million bonds on October 31st, 2001 --
10    A.  Yes.
11    Q.  -- it was motivated for however percentile you
12    would want to assign it by -- in part by Mr. Nothern's
13    statement about P. Davis and elimination of the bond;
14    is that correct?
15    MR. THEODOROU:  Objection.
16    A.  I would not say it was motivated by Steve
17    Nothern's statement.
18    Q.  You're saying by any degree?
19    A.  I think that it was something that was
20    mentioned in the conversation.  If something was talked
21    about in the room, it's very difficult to say it's
22    zero.  But I would say if he had said that and the
23    market was trading down, you know, I wouldn't have
24    bought it, you know.  The way I was looking at it was I
25    had a market that I was short that was running away

Page 163

1    from me and there was enough damage for something that
2    I really didn't understand what was going on.
3    I mean we're talking about an environment
4    that's October '01 after we went through September 11th
5    of '01.  And I remember that -- one thing I do remember
6    is on 9 o'clock in the morning September 11th, '01 the
7    market traded up like crazy.  From a pure portfolio
8    management standpoint, it was one of the best
9    opportunities to make money of that year because the
10    market was open and was trading up.  So there were times
11    that there are things that go on in the marketplace that
12    technicals take over and starts running, you don't know
13    what's going on.
14    And I look backwards at that information in
15    September of '01 and said that be it nimble at that one
16    important time could have been something that made my
17    year.  I mean as someone whose job is to look at the
18    portfolio, for all I know it could have been another
19    terrorist attack going on, you know.
20    Q.  Are you stating here today that Mr. Nothern's
21    statement about elimination of the bond didn't play any
22    factor at all in your decision to purchase bonds on
23    October 31st, 2001 you'd told Catigan make it 65?
24    MR. THEODOROU:  Objection.
25    MR. GOLDSTEIN:  I'm going to object to

Page 164

1    that also.
2    A.  Yes.
3    MR. ROSSETTI:  We'll go off the record.
4    It's --
5    THE VIDEOGRAPHER:  The time is 3:28 p.m.
6    This ends Tape No. 4 of the videotaped
7    deposition of Mr. David R. Smith.
8    (There was a recess.)
9    *********
10    THE VIDEOGRAPHER:  The time is 3:40 p.m.
11    This begins Tape No. 5 of the videotaped
12    deposition of Mr. David R. Smith.
13  BY MR. ROSSETTI:
14    Q.  Mr. Smith, did the statement from Mr. Nothern
15    about the elimination of the bond play any role in your
16    decision to buy 5 million bonds?
17    MR. THEODOROU:  Objection.
18    A.  I believe that it was something that was
19    discussed in the time period approximately associated
20    with the trading, and I think there were a large
21    variety of factors.  I don't believe that it was
22    something I was thinking a lot about, but I do
23    recognize it was something that was mentioned in the
24    room, so I can't say it was zero, but I can also say
25    that it wasn't a major part of my decision-making

Page 165

1    process.
2    Q.  Now, did the statement from Mr. Nothern about
3    the elimination of the bond, was it one of the factors
4    that entered into your decision to purchase
5    50 million -- 5 million in bonds?
6    MR. THEODOROU:  Objection.
7    A.  I would repeat the same response that I had
8    said to you in my previous response.
9    Q.  You had mentioned that there was an extended
10    period of discussion about the elimination of the
11    thirty year bond.
12    Can you explain what you meant by that?
13    A.  I don't recall there was an extended
14    discussion about the elimination of the thirty year
15    bond.
16    Q.  Let me put this way:  Prior to October 31st,
17    had you ever heard anything about the possible
18    elimination of the 30 year bond?
19    A.  I believe there were rumors in the marketplace
20    about the possible elimination.
21    Q.  Prior to October 31st, 2001, when was the last
22    time you had heard any rumors about the possible
23    elimination of the 30 year bond?
24    A.  I don't recall.
25    Q.  Upon hearing those other rumors about possible

Page 202

```
 1   say it was not frequent, you know, like -- I would just
 2   like to leave it at that. Not frequent.
 3      Q.   Was it once a year, twice a year, more often
 4   than that per year?
 5          MR. THEODOROU:  Objection.
 6      A.   I couldn't say the frequency. It's not
 7   something I kept track of. I --
 8      Q.   Okay. At any time, October 31st, 2001, did
 9   you hear Nothern state anything that the information he
10   got from Peter Davis, Peter Davis had gotten from Peter
11   Fisher?
12          MR. THEODOROU:  Objection.
13      A.   I don't think I heard the word Peter Fisher
14   that morning.
15      Q.   Did you hear the term embargo from Steve
16   Nothern before you traded on October -- before you
17   asked Catigan to increase the 65?
18      A.   No.
19      Q.   Did you hear the term embargo from Nothern at
20   all that day?
21      A.   No.
22      Q.   Did you hear from Nothern that day that there
23   would be -- that the information would be --
24   information about the elimination of the bond would be
25   released at 10 o'clock that day?
```

Page 203

```
 1      A.   No.
 2      Q.   Did Nothern indicate anything to you that led
 3   you to believe that the information about the bond was
 4   confidential to a certain time?
 5          MR. THEODOROU:  Objection.
 6      A.   No.
 7      Q.   Did Nothern say anything that the source of
 8   the information from Davis was the Treasury Department?
 9          MR. THEODOROU:  Objection.
10      A.   No.
11      Q.   Did you come -- did you come to learn after
12   you placed -- you told Catigan to increase the
13   65 million how was it that Nothern had gotten
14   information from Davis?
15          MR. THEODOROU:  Objection.
16      A.   Did I know?
17      Q.   Did you learn.
18      A.   When?
19      Q.   At any time after you told Catigan to place
20   65 -- to order -- to offer 65. I'm sorry.
21      A.   After did I learn?
22      Q.   Yeah. At any point after you told Catigan
23   offer 65 --
24      A.   Right.
25      Q.   -- did you learn how it was that Nothern got
```

Page 204

```
 1   this information from Davis?
 2          MR. THEODOROU:  Objection.
 3      Q.   Peter Davis.
 4          MR. GOLDSTEIN:  I would just caution the
 5      witness not to disclose any information you
 6      might have learned from counsel.
 7          THE WITNESS:  Yeah.
 8      A.   Sorry. A few distractions here.
 9          I -- can you repeat it one more time?
10      Q.   Yes. After you placed the -- or after you
11   told Catigan offer 65 --
12      A.   Right.
13      Q.   Any time after that, did you learn how it was
14   that Nothern got the information from Pete Davis the
15   information --
16          MR. THEODOROU:  Objection.
17      A.   I believe there was -- I believe it was in the
18   newspaper.
19      Q.   And what did you learn from the newspaper?
20          MR. THEODOROU:  Objection.
21      A.   I think the newspaper said that Davis had
22   called a variety of people.
23      Q.   Did you learn if Nothern had actually spoken
24   with Davis that important?
25          MR. THEODOROU:  Objection.
```

Page 205

```
 1      A.   I'm -- I don't know the answer to that
 2   question. I don't know if Steve talked to Pete Davis
 3   that day.
 4      Q.   Do you know if he had received a voice mail
 5   from Pete Davis that day?
 6          MR. THEODOROU:  Objection.
 7      A.   My understanding that day that there was some
 8   communication between Pete Davis and Steve Nothern. I
 9   believe I was unsure of whether it was a phone call or
10   a voice mail.
11      Q.   Did you -- at any time did you learn --
12      A.   At some point I did learn that it was a voice
13   mail.
14      Q.   And from who -- I'm sorry.
15          From whom did you learn that?
16          MR. THEODOROU:  Objection.
17      A.   I don't remember who it came from.
18      Q.   And what did you learn?
19          MR. THEODOROU:  Objection.
20      A.   What did I learn?
21      Q.   Yes. Was it a voice mail or did he actually
22   speak with him? Did Nothern speak with Davis?
23      A.   I believe I learned it was a voice mail, yes.
24      Q.   Was that something that you learned from the
25   newspaper article?
```

Excerpt from the

January 30-31, 2007

deposition of

Steven E. Nothern

Exhibit O

Page 1

Volume:  I

Pages:  1-221

Exhibits:  1-10


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Boston Division)

Civil Action No. 05-CV-10983 (NMG)

- - - - - - - - - - - - - - - - - - - - - -

UNITED STATES SECURITIES AND EXCHANGE

COMMISSION,

                Plaintiff,

     v.

STEVEN E. NOTHERN,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - -

Deposition of Steven E. Nothern

January 30, 2007

9:19 a.m. - 4:00 p.m.

Securities and Exchange Commission

33 Arch Street

Boston, Massachusetts


Reporter:  Daria L. Romano, RPR/CRR

Page 42

```
1      Q.  You mentioned Peter Davis.  Do you
2   recall the name of his company?
3      A.  I believe it was Peter Davis
4   Investment Capital, Investment Ideas or
5   something of that sort.
6      Q.  Does Davis Capital Investment Ideas
7   ring a bell?
8      A.  That sounds right.
9      Q.  Do you know what Mr. Davis's title was
10  at Davis Capital -- I'm just going to go call it
11  Davis Capital for short.  Is that okay with you?
12     A.  Yeah.
13     Q.  Do you know what Mr. Davis's title was
14  a Davis Capital?
15     A.  No, I don't.
16     Q.  Besides Mr. Davis, did you ever have
17  any contact with any other employees affiliated
18  with Davis Capital?
19     A.  I believe on at least one or two
20  occasions I spoke with an assistant who might
21  have answered the phone if he was not in.
22     Q.  Do you recall the assistant's name?
23     A.  No.
24     Q.  How would Mr. Davis communicate
25  information to you?
```

Page 43

```
1         MR. THEODOROU:  Objection.
2      A.  Primarily through E mails, faxes,
3   occasionally through phone calls and
4   occasionally in person.  He came to visit our
5   office once.
6      Q.  Did you ever go to visit Mr. Davis?
7      A.  Yes.
8      Q.  And how many times did you go to visit
9   him?
10     A.  I didn't visit his office.  We did
11  visit or I had a visit with him on two occasions
12  in Washington, where he organized a day of
13  activities.
14     Q.  What kind of activities?
15     A.  Visiting with different government
16  officials in different departments of the
17  government.
18     Q.  Do you recall any departments?
19     A.  Sorry?
20     Q.  Do you recall which departments?
21     A.  I recall we visited at the Federal
22  Reserve, the Treasury.  We visited Capitol Hill.
23  We visited the Office of Management and Budget,
24  OMB.
25     Q.  Do you recall who you visited at the
```

Page 44

```
1   Treasury?
2      A.  We visited on two different trips.  I
3   believe one trip we visited with Mr. Anderson.
4      Q.  Do you recall Mr. Anderson's first
5   name?
6      A.  Roger, I believe.
7      Q.  Did you visit with anyone else during
8   that first trip?
9      A.  Excuse me?
10     Q.  Did you visit with anyone else at
11  Treasury you during the first trip besides
12  Mr. Anderson?
13     A.  I don't recall.
14     Q.  When was the first trip?
15     A.  I don't recall exactly.
16     Q.  Do you recall a year?
17     A.  I'm guessing, 1999, possibly 1998.
18     Q.  When was the second trip?
19     A.  I also don't recall exactly.  I'm
20  guessing the subsequent year.
21     Q.  It was after the --
22     A.  I think it was two years back to back.
23     Q.  And did you visit Treasury during the
24  second trip?
25     A.  Yes.
```

Page 45

```
1      Q.  Do you recall who you visited with at
2   Treasury during the second trip?
3      A.  I don't remember specifically who we
4   visited.  There were several -- I might have
5   made two stops, two different meetings.  I do
6   remember one meeting was attended by several,
7   and one of those people was Mr. Malvey.
8      Q.  Do you remember Mr. Malvey's first
9   name?
10     A.  I don't.
11     Q.  Does Paul ring a bell?
12     A.  Yes.
13     Q.  Except for these two trips to
14  Washington, did you ever visit with Mr. Davis in
15  Washington, D.C.?
16     A.  No.  As I mentioned, he came to our
17  offices.
18     Q.  When did Mr. Davis come to MFS's
19  office?
20     A.  When we first hired him, prior to
21  those visits in Washington.
22     Q.  Prior to October 31, 2001, were you
23  aware that the Treasury would periodically
24  announce its refunding needs?
25        MR. THEODOROU:  Objection.
```

Page 110

1    Q.  Okay.  Do you recall what Mr. Davis
2  said about his background?
3    A.  I recall that he had worked on Capitol
4  Hill.  He had worked for Alice Rivlin while she
5  had headed up, I guess it's the Congressional
6  Budget office.  It's under a different name now.
7  He worked for, I believe, Pete Domenici.  And I
8  believe he also worked for Democrats on the
9  Hill.
10       After that he worked for a Wall Street
11  house, I can't remember which, but he was their
12  Washington analyst.
13    Q.  Who was Pete Dominici?
14    A.  Senator, Republican Senator.
15    Q.  What, if any, discussion did you have
16  regarding the types of information that
17  Mr. Davis could provide to MFS?
18       MR. SHOPE:  I'm sorry.  Could I
19  have that question reread?
20       (Record read)
21       MR. THEODOROU:  Objection.
22       MR. SHOPE:  And this was at the
23  meeting --
24       MS. WILLIAMS:  At the meeting at
25  MFS.

Page 111

1       MR. SHOPE:  That precedes the
2  engagement of Mr. Davis?
3       MS. WILLIAMS:  Yes.
4       MR. SHOPE:  Okay.
5    A.  I don't remember.
6    Q.  Do you remember if that topic was
7  discussed?
8    A.  I don't remember.
9    Q.  What, if any, documents did Mr. Davis
10  provide to the attendees at the meeting?
11    A.  I don't remember.  I do remember he
12  had no marketing or biographical information.
13  He may have come with sample E mails.  I think
14  in those days it was faxes more than E mails.
15       MS. WILLIAMS:  I'd like to have
16  this marked as Exhibit 5.
17       (Exhibit 5 marked
18       for identification)
19  BY MS. WILLIAMS:
20    Q.  Let me know when you're finished
21  reviewing it.
22    A.  You want me to read the whole thing?
23    Q.  No.  I was going to ask you if you had
24  seen this document before, and I didn't know if
25  you had time to flip through it.

Page 112

1    A.  I think I have seen it before.
2    Q.  When did you see this document?
3    A.  At my SEC deposition in 2001,
4  December 2001.
5    Q.  Do you recall seeing this document
6  prior to October 31, 2001?
7    A.  No.
8    Q.  Do you recall seeing any brochures
9  from Davis Capital prior to October 31, 2001?
10    A.  Marketing brochures or biographical
11  brochures?
12    Q.  First let's go with marketing
13  brochures.  Do you recall seeing any of those
14  prior to October --
15    A.  No.
16    Q.  Do you recall seeing any biographical
17  information in the form of a document about
18  Mr. Davis prior to October 31, 2001?
19    A.  No.
20    Q.  Do you know if Mr. Davis or if Davis
21  Capital had a web site prior to October 31,
22  2001?
23    A.  Yes.
24    Q.  Did you ever visit that web site prior
25  to October 31, 2001?

Page 113

1    A.  Yes.
2    Q.  What did you review on that web site?
3    A.  I don't remember.
4    Q.  How often did you visit the web site?
5    A.  I think once.
6    Q.  And do you know why you visited the
7  web site?
8    A.  Just to see if it was something that
9  might be useful.  I imagine once he set it up,
10  he told us it was there, and I went to check it
11  out.
12    Q.  Do you recall if you thought it was
13  useful?
14       MR. THEODOROU:  Objection.
15    A.  Yep, yes.
16    Q.  Yes, you thought it was useful?
17    A.  No.  Yes, I recall.
18    Q.  Okay.  What did you think?
19    A.  No.  The problem is there are just too
20  many passwords, you know, and that was my
21  problem.  There are just too many web sites to
22  go to and remember the password.  It probably
23  had some security, and you got to remember the
24  web site, you got to remember the password, the
25  ID, and I couldn't go to all these web sites.

Page 114

1    Q.  Okay.  So just to clarify, the web
2  site was password protect?
3    A.  I'm just telling you in general why it
4  was not my practice to go looking at information
5  on web sites.
6    Q.  Okay.
7    A.  It's just way too overloaded with
8  opportunities for digging for information in
9  little web sites like this, and you have to draw
10  the line somewhere.
11        You have to understand, Goldman Sachs
12  has a web site.  JP Morgan has one.  You know,
13  they have every piece of research they've done
14  in 20, 30 years, and they're pumping out
15  100-page reports on a daily basis.  So there's a
16  limit to what you can do.
17    Q.  When you say Goldman Sachs had a web
18  site, was there a password required for you to
19  obtain certain information off of their web
20  site?
21    A.  I don't recall specifically Goldman
22  Sachs, but I think they're all protected.
23    Q.  When you went to the Davis Capital web
24  site, what did you think about the web site?
25    A.  I don't remember specifically what I

Page 115

1  looked at at the web site, but I can tell you I
2  made the determination that it wouldn't be
3  useful.  I can tell you that I made no effort to
4  go back to it.
5    Q.  When Mr. Davis met with you and
6  Mr. Namberg at MFS, what, if any, discussions
7  did you have about Mr. Davis's contacts in
8  Washington?
9        MR. THEODOROU:  Objection.
10    A.  I don't recall what we discussed at
11  that meeting.
12    Q.  What happened as a result of this
13  meeting with Mr. Davis when he came to MFS?
14    A.  We made the determination to try him,
15  try using his service.  I think it was an annual
16  review, you know, an annual renewal.  So we made
17  a decision to use it for a trial for a year.  If
18  we liked it, we'd keep using it.
19    Q.  What service did Mr. Davis provide you
20  after he was retained as a consultant?
21    A.  Well, primarily research and analysis
22  of budgetary legislative affairs in Washington.
23        We used him and Mr. -- MFS, the Investment
24  Group, we used him for some specific research
25  that was important to us at the time.

Page 116

1        I can remember our credit analysts
2  using him.
3        After 9/11 there was an issue of
4  airline bailout legislation.  And we own a lot
5  of airline mortgage bonds, so one of our
6  analysts who followed that area was interested
7  in, you know, the form the legislation might
8  take, the probabilities of any legislation
9  actually getting passed.  And I do remember that
10  he used Mr. Davis either as a source for
11  information or to refer -- as a referral source
12  for people that might have the information that
13  would be interesting to the analysts.  I wasn't
14  directly involved in that, but I do remember it
15  was an issue that fall.
16        I used him for research.  I had an
17  important or large position in my government
18  securities portfolio and FICO bonds, F-I-C-O,
19  which were thrift bailout bonds that had been
20  issued in the '88 to '92 period for the whole
21  thrift bailout that I guess first President Bush
22  had initiated.
23        And the position might have been
24  12 percent of the portfolio, which was
25  important.  It was large.

Page 117

1        By 10 years down the road, and I don't
2  remember exactly when I did this with him, but
3  it was 2000, 2001 period maybe, I did want to
4  kind of refresh my research on FICO and REFCO
5  bonds, but at that point, you know, 10 years
6  down the road, Wall Street had sort of dropped
7  any coverage so there was no source to sort of
8  do research on Wall Street.
9        And Davis was perfect for this because
10  he was able to find me the contact or the person
11  who was administering that program in some
12  agency in Washington, and I was able to contact
13  that person and kind of update my research on
14  the securities.
15        It's an important exercise, sort of
16  revalidate, you know, the reasons for owning it.
17  And I think at the time the agency market had
18  come under some pressure with underperforming
19  treasuries, so it was important for me to
20  decide, well, do you want to cut or are the
21  reasons for owning these no longer valid, or
22  conversely, maybe they represent great value, we
23  should be adding some now, or just very
24  basically, you know, revalidate the purpose for
25  the reason for just keeping them.

Page 118

1    So he was very helpful for those type
2  of research projects.
3    Q.  You might have stated this, but
4  approximately what year was it that you were
5  interest in this research on FICO and Mr. Davis
6  got you the contact of the person who was
7  administering the program?
8    A.  I don't remember.
9    Q.  How would Mr. Davis provide you with
10  research?
11    A.  Well, in those -- in that instance he
12  gave me a number of a person that would have the
13  information.  So he was good through his network
14  of contacts in being able to steer you the right
15  direction.
16    Q.  Okay.  And separate from just that
17  particular research, how else would Mr. Davis
18  communicate research to you?
19    A.  Well, we did some direct research.  We
20  went down to visit Washington a couple of times,
21  so he set up the meetings.
22    He was also available to our analysts
23  or the portfolio managers if they had a
24  particular question that he might know the
25  answer to.  So he was available as a resource,

Page 119

1  so we might be interested in his analysis.
2    Q.  Did you receive any E mails from
3  Mr. Davis?
4    A.  Yeah, yes.
5    Q.  And what kinds of things did Mr. Davis
6  send you in E mail?
7    MR. THEODOROU:  Objection.
8    A.  He used to send different types of E
9  mails.  He would send sort of compendium of
10  agendas of Washington which weren't that useful.
11    He would send what was much more
12  interesting, transcripts of Q and A at different
13  meetings that he might attend in Washington.
14    I found those in particular of
15  interest because as much as, say, Greenspan's
16  testimony for Humphrey Hawkins on the Hill might
17  be televised, as soon as they cut to Q and A,
18  after he's given his set speech, they might not
19  cover the full Q and A.
20    And the Q and A, his comments are
21  obviously less scripted, he might saying
22  something that's interesting, not that he did,
23  but it would be interesting to get a transcript
24  of his Q and A, and that was something that
25  Davis did, which I found to be useful.

Page 120

1    Q.  Besides agendas and transcripts of Q
2  and A, what else did Mr. Davis send via E mail?
3    A.  I believe he sent us on some occasions
4  materials from quarterly refundings.
5    Q.  Did Mr. Davis ever provide you with a
6  newsletter?
7    A.  I believe -- I don't recall
8  specifically, but I think, yes.
9    Q.  Do you know --
10    A.  Either it was a newsletter or agenda
11  or notes on meetings that he might have had or
12  analysis.  I'm not sure how to characterize
13  that, but it would be a summary of things that
14  he thought were of interest.
15    Q.  How often did you receive E mails from
16  Mr. Davis?
17    MR. THEODOROU:  Objection.
18    A.  Periodically.
19    Q.  How often?
20    A.  I don't know.  Several times a week.
21    Q.  Did you ever receive any faxes from
22  Mr. Davis?
23    MR. THEODOROU:  Objection.  Asked
24  and answered.
25  BY MS. WILLIAMS:

Page 121

1    Q.  Did you ever receive any faxes from
2  Mr. Davis?
3    A.  Yes.
4    Q.  What would Mr. Davis send via fax?
5    A.  The same materials that would have
6  come via E mail.
7    Q.  And how often did you receive faxes
8  from Mr. Davis?
9    A.  Well, we used to be in a pre-E mail
10  world, it's not that long ago everything was
11  faxed, so I imagine most of the service
12  initially was faxed.
13    My preference by far was E mail.  I
14  preferred electronically.  It's generally a
15  better quality to read.  So I encouraged
16  everybody to send everything E mail,
17  electronically.  Sometimes maybe he couldn't do
18  that, so he'd send a fax.  I couldn't tell you
19  how frequently that was.
20    Q.  You said that Mr. Davis would
21  sometimes send E mails about quarterly refunding
22  announcements.  How often did you receive E
23  mails about those announcements?
24    A.  I don't remember.
25    Q.  Just to back up.  Whose decision was

1    AFTERNOON SESSION
2        THE VIDEOGRAPHER: Back on the
3    record, 1:25 p.m.
4    BY MS. WILLIAMS:
5        Q. Mr. Nothern, did you ever communicate
6    with Mr. Davis over the phone?
7        A. Yes.
8        Q. How often did you communicate with
9    Mr. Davis over the phone?
10        MR. THEODOROU: Objection.
11        A. Infrequently.
12        Q. When you say "infrequently," was it
13    once a month?
14        A. No. Less frequently than that.
15        Q. Could you give me approximately how
16    often -- how many times a year you might talk to
17    Mr. Davis on the phone?
18        A. A handful of times.
19        Q. Is that five?
20        A. Yeah.
21        Q. Who would call whom?
22        A. It could be either one. It could go
23    either direction.
24        Q. Prior to October 31, 2001, what
25    conversations over the phone do you recall

1    having with Mr. Davis?
2        A. I remember having a conversation with
3    Mr. Davis when we first arranged to have him
4    come up to visit with us before we actually
5    hired him.
6        I collected -- the other
7    conversations, I remember we had a conversation
8    about research I was doing on FICO and REFCO
9    bonds.
10        That's all that comes to mind right
11    now.
12        Q. Do you recall any conversations with
13    Mr. Davis when you discussed whether Treasury
14    would be issuing war bonds?
15        A. Yes.
16        Q. Do you recall when that conversation
17    took place?
18        A. Yes.
19        Q. When?
20        A. Roughly some time after September 11,
21    2001.
22        Q. Did it take place prior to October 31,
23    2001?
24        A. Yes.
25        Q. What did you discuss?

1        A. I remember he called to mention that
2    Treasury was considering issuing war bonds in
3    response to 9/11.
4        Q. Do you know where he got that
5    information?
6        A. No.
7        Q. Did you ask him where he got the
8    information?
9        A. No.
10        Q. Prior to this conversation with
11    Mr. Davis, had you heard the Treasury would be
12    issuing war bonds?
13        A. No.
14        Q. Did the information that Mr. Davis
15    gave you during that conversation turn out to be
16    accurate?
17        A. Yes, though I don't remember if they
18    actually did issue war bonds.
19        Q. What, if anything, did you do as a
20    result of Mr. Davis's conversation when he told
21    you that Treasury would be issuing war bonds?
22        MR. SHOPE: Objection.
23        A. What did I do in what sense?
24        Q. Did you take any action as a result of
25    receiving this information?

1        A. In the portfolios?
2        Q. Did you take any action in the
3    portfolios? We'll start there.
4        A. No. This was a retail product for
5    individuals. It wasn't an institutional product
6    for portfolios or mutual funds or insurance
7    companies.
8        Q. Did you tell anyone about the
9    information?
10        A. Yes.
11        Q. Who did you tell?
12        A. I shared it with colleagues on our
13    trading desk. Mr. Kurinsky was the only one I
14    recall specifically.
15        Q. How long after the conversation with
16    Mr. Davis in which he said that Treasury would
17    be issuing war bonds did you communicate that
18    information to Mr. Kurinsky?
19        A. I don't know.
20        Q. Do you know if it was a week later?
21        A. I don't know.
22        Q. So it could have been a week later,
23    but you don't recall?
24        MR. THEODOROU: Objection.
25        MR. SHOPE: Objection.

Page 130

1    A.  I don't think it was a week later.  I
2  don't know.
3    Q.  Do you think it was less than a week?
4    A.  Yes.
5    Q.  Did you ever purchase any war bonds
6  after receiving this call from Mr. Davis?
7    A.  No.  Like I said, I have no knowledge
8  that they actually started a war bond program.
9    Q.  Why did you tell Mr. Kurinsky about
10  Mr. Davis's conversation with you?
11    A.  Perhaps it might be something he might
12  be interested in.  Not as an investment, more as
13  just general interest.
14      It was a political -- essentially this
15  is public relations thing.  It's not because the
16  government needs to raise money.  It was just a
17  gesture they were making.  It was sort of
18  interesting that they were going to the trouble
19  to make that kind of a gesture.
20    Q.  Did you tell other colleagues besides
21  Mr. Kurinsky?
22    A.  I believe so, but I can't remember
23  specifically who I talked with about it.
24      MS. WILLIAMS:  I'd like to have
25  this marked as Exhibit 6.

Page 131

1      (Exhibit 6 marked
2      for identification)
3      (Pause)
4      MS. WILLIAMS:  Do we need to take a
5  break?
6      MR. SHOPE:  No.  He was trying to
7  find his eyeglasses, and they were hiding
8  themselves in the case.
9      THE WITNESS:  They were right in
10  front of me.
11      (Pause)
12  BY MS. WILLIAMS:
13    Q.  If you could let me know when you have
14  finished reviewing the document.
15    A.  Okay.
16    Q.  Mr. Nothern, have you --
17    A.  I'm sorry.  I haven't finished.
18    Q.  Okay.
19      (Pause)
20    Q.  Have you seen this document before,
21  sir?
22    A.  Not that I recall.
23    Q.  This is an E mail from Pete Davis to,
24  and blind carbon copying a number of people, and
25  it's dated Friday, October 19, 2001.

Page 132

1      Do you see your E mail address on the
2  list of blind carbon copies?  And I would refer
3  you to the second page of the document 13 lines
4  down.
5    A.  Yes.
6    Q.  Is that what your E mail address was
7  when you were employed at MFS?
8    A.  Yes.
9    Q.  If I could refer you to the third page
10  of the exhibit, last paragraph, it says, "War
11  bonds will be sold by Treasury."
12      Do you see that?
13    A.  Yes.
14    Q.  Does that refresh your recollection at
15  all that the Treasury actually issued war bonds
16  or sold war bonds?
17    A.  No.
18    Q.  Do you recall ever seeing this E mail
19  in October 2001?
20    A.  No.
21    Q.  Do you know -- I'm also on the last
22  paragraph, it says, "Treasury sources confirm
23  the small denomination 17-year bonds with a put
24  will be sold via their web site."
25      Do you see that sentence?

Page 133

1    A.  Yes.
2    Q.  Do you know who the Treasury sources
3  are that Mr. Davis is referring to?
4    A.  No.
5    Q.  Do you know if Mr. Davis ever called
6  anyone else at MFS?
7    A.  Yes.
8    Q.  Who did he call?
9    A.  Our analyst Richard Hawkins and Peter
10  Sullivan, in all likely -- well, that's all.
11    Q.  Do you have any reason to believe you
12  didn't receive this E mail?
13    A.  No.
14    Q.  How do you know Mr. Davis called
15  Mr. Hawkins?
16    A.  Mr. Hawkins at that point was working
17  as a corporate credit analyst, and I believe he
18  had interests in issues in Washington and was
19  familiar with Mr. Davis and used him as a
20  resource.
21    Q.  Did you have any conversations with
22  Mr. Hawkins about Mr. Davis?
23    A.  Yes.
24    Q.  What do you recall about those
25  conversations?

Page 146

1   was.
2     Q.  That was.  The way it was phrased was
3   what was your understanding, and your answer
4   came out no, so I was just clarifying that you
5   did not have an understanding as of October 31,
6   2001 as to how they were structured?
7     A.  Correct, I didn't.
8     Q.  Did you know as of October 31, 2001
9   who was allowed to attend the Treasury refunding
10  conferences?
11        MR. THEODOROU:  Objection.
12    A.  No.
13    Q.  Did you know if members of the media
14  attended those conferences?
15        MR. THEODOROU:  Objection.
16    A.  I didn't know how they proceeded with
17  the quarterly refunding conferences.
18    Q.  Did you know if there was a live news
19  feed available at the conferences?
20        MR. THEODOROU:  Objection.
21    A.  I don't know how they set up their
22  quarterly refunding conferences.
23    Q.  As of October 31, 2001, did you know
24  if -- were you aware if Peter Davis attended
25  these Treasury refunding conferences?

Page 147

1         MR. THEODOROU:  Objection.
2    A.  No.
3    Q.  Did you typically know in advance when
4   Treasury was going to hold a refunding
5   conference?
6         MR. THEODOROU:  Objection.
7    A.  No.
8    Q.  If I could refer you to Exhibit 2,
9   page 94.
10        MR. THEODOROU:  Which page?
11  BY MS. WILLIAMS:
12    Q.  Page 94, line one through three.
13    A.  Okay.
14    Q.  Do you see the question is, "Are you
15  typically aware in advance when a conference, a
16  quarterly refunding conference, will be held?
17      "Answer:  Yes."
18      Were you asked that question and did
19  you give that answer?
20    A.  Yes.
21    Q.  So just to clarify, as of October 31,
22  2001, were you typically aware in advance when a
23  quarterly refunding conference would be held?
24    A.  Yes.
25    Q.  How would you --

Page 148

1    A.  They're held -- like I told you a few
2   minutes ago, if the settlement date is
3   February 15th, the actual auctions of the
4   securities are the prior week, and the refunding
5   is the week prior to that.
6       So I'm certainly aware of when they're
7   held if I go to the trouble of backing out those
8   dates.  It was certainly not something I paid
9   any attention to.
10    Q.  Did you know in 2001 which day of the
11  week the conferences were usually held?
12    A.  No.
13    Q.  Did you know who -- as of October 31,
14  2001, were you familiar with the term embargo as
15  it referred to the release of information?
16        MR. THEODOROU:  Objection.
17    A.  Yes.
18    Q.  What, if any, knowledge did you have
19  prior to October 31, 2001 about whether Treasury
20  used an embargo procedure for the release of
21  information?
22    A.  None.
23        MS. WILLIAMS:  I'd like to have
24  this marked as Exhibit 8.
25        (Exhibit 8 marked

Page 149

1       for identification)
2       (Pause)
3   BY MS. WILLIAMS:
4    Q.  Mr. Nothern, have you seen this
5   document before?
6    A.  Yes.
7    Q.  What is it?
8    A.  It's titled Department of Treasury on
9   a headline, and the header Treasury News From
10  the Office of Public Affairs.
11       It's a statement from Under Secretary
12  Treasury for Domestic Finance Gary Gensler.
13  It's remarks that he gave at the November 2000
14  Treasury quarterly refund.
15    Q.  And this is a document that you
16  produced, correct?
17    A.  Yes.
18    Q.  Where did you obtain a copy of this
19  document?
20    A.  It was sent to me by Davis Capital.
21    Q.  And how was it sent to you?
22    A.  It looks like it was faxed.
23    Q.  If I could refer you to the fax line
24  at the top of the page "11/01/00 7:51," then I
25  see a number "202-544-7098."

Page 150

1      Do you see that?
2   A.  Yes.
3   Q.  Are you familiar with that number?
4   A.  No.
5   Q.  Then I see -- what was your fax number
6   at MFS?
7   A.  I don't remember.  Eventually we had
8   faxes in our computers, so somehow they could --
9   but I don't remember the number.
10  Q.  Okay.  Following that number I see
11  "Massachusetts Financial Se/Nothern,Steve."
12     Do you see that?
13  A.  Yes.
14  Q.  Is it your testimony that you received
15  this document from Mr. Davis?
16  A.  Yes.
17  Q.  I see some marginalia on the document.
18  Specifically about halfway down the first page I
19  see a circle on the left-hand side, and then
20  there's some underlining.
21     Do you see the marginalia I'm
22  referring to?
23  A.  Yes.
24  Q.  Do you know whose handwriting that is?
25  A.  It looks like it's mine.

Page 151

1   Q.  Is this a document that you kept in
2   your files?
3   A.  Yes.
4   Q.  Why did you keep this document?
5   A.  For future reference.  These were
6   apparently statistics that I had an interest in.
7   Q.  On the top-left-hand corner, under the
8   heading I see the words "Embargo time will be
9   set."
10     Do you see that?
11  A.  Yes.
12  Q.  Do you know what that statement means?
13     MR. THEODOROU:  As of what date?
14  November 1, 2000?
15     MS. WILLIAMS:  Sure, or October 31,
16  2001.
17  BY MS. WILLIAMS:
18  Q.  As of October 31, 2001, but you hadn't
19  received it yet, so as of November 1, 2000, did
20  you know what that statement meant?
21  A.  2001 I had received this.
22  Q.  Right.  But my question is -- okay.
23     As of November 1, 2000, did you know
24  what that statement meant?
25  A.  No.

Page 152

1   Q.  What about as of October 31, 2001?
2      MR. THEODOROU:  Objection.
3   A.  No.
4   Q.  Do you know if you ever had any
5   discussions with Mr. Davis about this document?
6   A.  I don't.
7   Q.  Did you ever receive any other
8   documents of this sort regarding Treasury
9   refunding conferences from Mr. Davis?
10  A.  Not that I recall.
11  Q.  Do you believe you did not receive any
12  documents like this from Mr. Davis?
13     MR. THEODOROU:  Objection.
14  A.  I have no reason not to -- I have no
15  reason to -- what was your question?  No reason
16  to believe that I hadn't?
17  Q.  Okay.  I just was trying to clarify.
18  When you say not that you recall, did that mean
19  that you did not receive any other documents
20  like this from Mr. Davis?
21     MR. THEODOROU:  I don't think that
22  was his testimony.
23  BY MS. WILLIAMS:
24  Q.  I'm just trying to clarify the not
25  that you recall.

Page 153

1      MR. SHOPE:  Can we maybe strike
2   that from the top, and if you could phrase it as
3   simply as possible without any double negatives
4   or anything like that.
5   BY MS. WILLIAMS:
6   Q.  Okay.  Did you receive any other
7   documents of this sort regarding Treasury
8   refunding announcements from Mr. Davis?
9   A.  As I sit here, not that I recall
10  having received.
11  Q.  And just to clarify, prior to
12  October 31, 2001, had you read this document?
13     MR. THEODOROU:  Objection.
14  A.  Yes.
15  Q.  Did you go to work at MFS on
16  October 31, 2001?
17  A.  Yes.
18  Q.  What time did you arrive?
19  A.  I don't recall specifically.  My
20  general practice was to get in 7, 7:30 in the
21  morning.
22  Q.  What did you do after you arrived at
23  work that day?
24  A.  I recall starting some portfolio work.
25  I was selling some intermediate maturity

1  treasuries to buy longer maturity treasuries, so
2  I was beginning some work restructuring the
3  portfolios that morning.
4      Q.  You said that that morning you started
5  selling some intermediate maturity treasuries;
6  is that correct?
7      A.  Yes.
8      Q.  And did you buy any longer maturity
9  treasuries that morning?
10     A.  Yes.
11     Q.  When?
12     A.  Some time between 9:30, ten o'clock.
13     Q.  I want to know what you recall doing
14  prior to 9 a.m. that morning.
15     A.  I don't have any specific
16  recollections of what I did prior to 9 a.m.
17     Q.  Do you know if you started selling the
18  intermediate maturity treasuries prior to 9
19  a.m.?
20     A.  Yes, I know that.
21     Q.  Did you?
22     A.  No, I didn't.
23     Q.  When did you start selling the
24  intermediate --
25     A.  Actually, I take that back.  I don't

1  know when I did those sales.
2      Q.  Did you review any E mails that
3  morning prior to 9 a.m.?
4      A.  Not as I sit here I can remember.
5      Q.  Did you review any news that morning?
6      A.  I don't have any specific
7  recollections of what I did that morning prior
8  to nine o'clock.
9      Q.  On October 31, 2001 when you arrived
10  at work, were you expecting any announcements?
11     MR. THEODOROU:  Objection.
12  BY MS. WILLIAMS:
13     Q.  Were you expecting any announcements
14  to be made that day?
15     A.  What sort of announcements?
16     Q.  Any announcements by the government.
17     A.  I was expecting an announcement on the
18  purchasing manager's survey, and I don't know
19  whether that's a government survey.  I actually
20  think it's a private sector survey.
21     Q.  Were you expecting any releases that
22  day?
23     A.  The only release on my radar that I
24  was expecting that morning was the purchasing
25  manager's.

1      Q.  Are you familiar with the Chicago
2  Index?
3      A.  The Chicago Purchasing Manager's
4  Index?
5      Q.  Yes.  All I have is Chicago Index.  Is
6  there something called a Chicago Purchasing
7  Manager's Index?
8      A.  Yes.
9      Q.  Is that what you were referring to
10  when you say "The purchasing manager's survey"?
11     A.  Yes.  There are two surveys.  One --
12  well, there are a series of surveys.  There are
13  regional ones, the Chicago Purchasing Manager's
14  Index being one, and then there's a National
15  Purchasing Manager's Index, and that's what we
16  were expecting that morning.
17     Q.  What time were you expecting that?
18     A.  10 a.m.
19     Q.  And how were you aware that that
20  purchasing manager's information was going to
21  come out at 10 a.m.?
22     A.  That was a release that I tracked as
23  being a very useful indicator.
24     Q.  How did you track the release?
25     A.  I made sure I was aware of what it

1  was.
2      Q.  How did you do that?
3      A.  Well, if I'm at the trading desk at
4  ten o'clock, I'll watch for it, see how the
5  market reacts.
6          If it's a surprise to the market, if
7  it's higher or lower than expectations, I'll
8  monitor how the market reacts to that.
9          If I'm not at the desk, I'll get it
10  later on through research or through my
11  colleagues, or the trader would know the
12  information, someone who's been on the desk.
13     Q.  How did you know that that release was
14  going to be made on October 31st at 10 a.m.?
15     A.  It was a release that I tracked, so it
16  would be something I watched for when it was
17  going to be released.
18          These releases are on a set calendar,
19  so you know ahead of time when it's going to
20  come out.
21     Q.  Was the fact that the release was
22  coming out on October 31st noted on any wire
23  services?
24     A.  To my knowledge?
25     Q.  Yes.

Page 162

1    Q.  Was he talking to all of the people
2  that you mentioned when he made this statement?
3    A.  This is a statement -- this was an
4  exchange between the two of us.  Others could
5  well have overheard it.
6    Q.  So Mr. Cadogan was just talking -- was
7  directing the statement to you?
8    A.  As I recall, we were looking at each
9  other, maybe six feet apart having that -- and
10  he added that piece of information that they
11  were having a quarterly refunding announcement,
12  and it was at ten o'clock.
13    Q.  Was there anyone else that Mr. Cadogan
14  was directing that statement to beside you?
15        MR. THEODOROU:  Objection.
16    A.  I'm uncertain who he was trying to
17  address it to.  I know he was addressing it to
18  me.  I was chatting with him.  I think he was --
19  well, it was a general comment he was making, so
20  I know he was addressing it to me.
21    Q.  Do you know if anyone else overheard
22  the comment that Mr. Cadogan made?
23        MR. THEODOROU:  Objection.
24    A.  No.
25    Q.  Was there a 9 a.m. meeting for the

Page 163

1  Fixed Income Group on October 31, 2001?
2    A.  I don't recall specifically a 9 a.m.
3  meeting that day.
4    Q.  So just to clarify, you don't recall
5  attending a 9 a.m. meeting that day?
6    A.  I don't.
7    Q.  Do you recall participating in any
8  telephone calls that morning, October 31, 2001?
9    A.  Yes.
10    Q.  What telephone calls do you recall
11  participating in?
12    A.  I remember receiving a phone call from
13  one of our dealers.
14    Q.  Which dealer?
15    A.  I don't remember.  One of my principal
16  government coverage guys.  I can't remember
17  specifically which one.
18    Q.  Do you recall where the dealer worked?
19    A.  I don't recall specifically which
20  dealer it was.  So the answer to that question
21  is no.
22    Q.  What line did this call come in on?
23    A.  I don't remember.
24    Q.  Would it -- did it come in on a direct
25  line versus your personal line?

Page 164

1    A.  Not my personal line but possibly a
2  direct -- possibly one of the general phone
3  lines on our phone turret.
4    Q.  Who called whom?
5    A.  I received the phone call from one of
6  the dealers.
7    Q.  Approximately what time did you
8  receive this call?
9    A.  Some time between 9:30 and ten
10  o'clock.
11    Q.  What was discussed during this call?
12  I'm sorry.
13    A.  Ordinarily some time between 9:30 and
14  10 of, quarter of.
15        MR. ROSSETTI:  10 of 10?
16        THE WITNESS:  Yeah, yes.
17  BY MS. WILLIAMS:
18    Q.  What did you discuss during this call?
19    A.  The broker was calling me to discuss
20  that the market had been moving, and he had a
21  possible explanation for it.
22        He had heard talk that people on the
23  Chicago Board of Trade thought that the long
24  bond was going to be cancelled, and he was
25  imparting that as a possible explanation for why

Page 165

1  the market was drifting up that morning.
2    Q.  Do you know who on the Chicago
3  Board -- excuse me.
4        Do you know how the person that you
5  were talking to learned about this information
6  on the Chicago Board of Trade?
7    A.  No.
8    Q.  Did the person you were talking to
9  work at this Chicago Board of Trade?
10    A.  I don't believe so.
11    Q.  Did the person you were talking to
12  characterize the information, where you called
13  it talk, on the Chicago Board of Trade as a
14  rumor?
15    A.  Yeah, yes.
16    Q.  Do you recall if this person told you
17  anything else during the conversation?
18    A.  That's all I can recall.
19    Q.  Prior to this conversation, what, if
20  anything, had you noticed about the market?
21    A.  The market had been ticking up that
22  morning.
23    Q.  And specifically what market are you
24  referring to?
25    A.  The bond market.  Specifically, the

1  long bond had been moving up that morning at
2  that point in time at least a quarter point with
3  eight, 10 ticks.
4      Q.  And you said that this call came in
5  between 9:30 and 9:50?,
6      A.  Some time after 9:30.  I don't know
7  exactly what time.
8      Q.  Was it around 9:30?,
9      A.  I don't know exactly what time.
10         MS. WILLIAMS:  I'd like to have
11  this marked as Exhibit 9.
12         (Exhibit 9 marked
13         for identification)
14         MR. SHOPE:  Are there any
15  particular numbers you're going to be referring
16  to?
17         MS. WILLIAMS:  I'm going to be
18  talking about page five.
19  BY MS. WILLIAMS:
20      Q.  Do you recognize this document,
21  Mr. Nothern?
22      A.  Yes.
23      Q.  What is it?
24      A.  It's labeled Defendant Steven E.
25  Nothern's Responses to the Plaintiff US

1  Securities and Exchange Commission's First Set
2  of Interrogatories.
3      Q.  If I could refer you to page 15.  And
4  on the second half of the page, do you see your
5  signature there, sir?
6      A.  Yes.
7      Q.  And it says, "I, Steven E. Nothern,
8  state under the penalty of perjury that the
9  foregoing responses are true and correct."
10         Did I read that correctly?
11      A.  Yes.
12      Q.  Okay.  On page five, I'm at the first
13  line, "Around 9:30 a.m. on October 31, 2001, I
14  had a telephone conversation with a bond broker
15  who informed me that there was information
16  circulating on the Chicago Board of Trade that
17  the Treasury was going to cancel the issuance of
18  the 30-year bond and that Treasury was going to
19  shift to a monthly issuance of five-year bonds
20  rather than the quarterly issuance of five-year
21  bonds."
22         Did I read that correctly?
23      A.  Yes.
24      Q.  Does that refresh your recollection at
25  all of anything else that was discussed during

1  the conversation with the broker that morning?
2      A.  Yes.
3      Q.  What else was discussed?
4      A.  Apparently Treasury was going to shift
5  to a monthly issuance of five years as opposed
6  to a quarterly issuance.
7      Q.  And you agree that the conversation
8  took place around 9:30 a.m.?
9      A.  Yes.
10      Q.  Prior to receiving this call, what, if
11  anything, had you heard regarding Treasury's
12  possible cancellation of a 30-year bond on
13  October 31st?
14      A.  Prior to October 31, 2001?
15      Q.  No, no.  On October 31st, prior to
16  receiving this call, what, if anything, had you
17  heard about the possible cancellation of the
18  bond, just on that day?
19      A.  That morning?
20      Q.  Yes.
21      A.  Nothing that I recall.
22      Q.  What did you say in response to the
23  broker's -- information that the broker gave you
24  during this call?
25      A.  I don't recall.

1      Q.  What was your reaction to this
2  information?
3      A.  It was twofold.  One is here we go
4  again.  We'd had a similar thing at the
5  August refunding.
6         And then it jogged my memory of what
7  had happened at the quarterly refunding, which
8  there had been wide anticipation at that point
9  in time that the treasurer was going to announce
10  the cancellation of the 30-year Treasury bond.
11         Their arrangements that they were
12  making was that it just didn't make sense to
13  continue issuing them.
14         So there was an expectation in
15  August that they were going to announce the
16  cancellation.  So I did remember that.
17         And I did remember also that the
18  postmortem on -- because they didn't in fact
19  announce that in August, postmortem was that
20  they didn't done it because the fellow in charge
21  while nominated hadn't yet been confirmed, and
22  he might not yet have the -- I guess the sort of
23  official ability to stand before the cameras and
24  make that sort of an announcement, to the extent
25  that he wanted to be the guy making that sort of

Page 170

1 announcement.
2 Q. Do you recall if you'd received any
3 calls from brokers prior to the August refunding
4 conference?
5 A. I don't recall.
6 Q. When you say that a similar thing had
7 happened at the August refunding, what do you
8 mean?
9 A. That there was a lot of talk about
10 whether they were going to do it or not do it in
11 terms of whether they were going to cancel
12 issuance of 30 years or not do it. So there was
13 a lot of speculation about that.
14 This is an issue that had been
15 outstanding for a long period of time, well over
16 a year, and it dated to the prior
17 administration.
18 And in a sense the prior
19 administration, this is my take on it, that sort
20 of punted and left the issue to the new
21 administration.
22 Q. How did you become aware of the talks
23 surrounding the August refunding?
24 A. It was very -- I don't recall
25 specifically. It was very widely talked about,

Page 171

1 though.
2 Q. Prior to the August refunding
3 conference, do you recall there being any
4 movement in the market on the morning of the
5 conference?
6 A. I don't.
7 MR. SHOPE: I'm sorry, can I have
8 that question and answer read back?
9 (Record read)
10 MR. SHOPE: Okay. Thank you.
11 BY MS. WILLIAMS:
12 Q. In the course of your work at MFS, how
13 often would you receive calls of this nature,
14 meaning the call that you got from the broker on
15 the morning of October 31st --
16 MR. THEODOROU: Objection.
17 Q. -- regarding rumors about market
18 activity?
19 MR. THEODOROU: Objection.
20 A. Rarely.
21 Q. Do you not agree that you frequently
22 got calls from individuals with rumors regarding
23 what the market was going to do?
24 MR. THEODOROU: Objection.
25 A. What was your question? Cow could you

Page 172

1 just repeat that, please?
2 Q. Sure. I said did you not frequently
3 get calls from individuals with rumors regarding
4 what the market was going to do?
5 A. You're confusing me with your nots.
6 Q. Okay. Would you agree that you
7 frequently got calls from individuals with
8 rumors regarding what the market was going to
9 do?
10 A. No. I think it was extremely rare.
11 Q. If I could refer you to Exhibit 2,
12 page 118.
13 MS. WILLIAMS: And if we could go
14 off the record and change the tape.
15 MR. THEODOROU: Can we just take a
16 short break?
17 MS. WILLIAMS: Sure.
18 THE VIDEOGRAPHER: This marks the
19 end of videotape number two in the deposition of
20 Steven Nothern.
21 Going off the record, 2:32 p.m.
22 (Recess taken)
23 THE VIDEOGRAPHER: Here begins
24 videotape number three in the deposition of
25 Steven Nothern.

Page 173

1 On the record, 2:49 p.m.
2 BY MS. WILLIAMS:
3 Q. Mr. Nothern, if you could read to
4 yourself on Exhibit 2, page 117, line 19 through
5 page 119, line --
6 A. I'm sorry, page?
7 Q. 117.
8 A. Okay.
9 Q. Line 19 through page 118, line 8, and
10 let me know when you finished.
11 (Pause)
12 A. Okay.
13 Q. I wanted to refer you to page 118, and
14 I'm reading line four. "It's just the nature of
15 business. We have people calling us frequently
16 pounding the table that they're sure XYZ is
17 going to happen, or they're sure you should do
18 XYZ."
19 And I wanted to know what you meant by
20 that statement.
21 A. We have people -- well, when I worked
22 in the business there were people calling
23 frequently, our insurer, the curve was going to
24 flatten, which is jargon to say that the
25 Treasury market yields with change in a certain

Page 174

1  manner, or that the Fed was at the next meeting
2  going to tighten 50 basis points, or that the
3  next CPI number was going to be .8.
4       You know, so we had people calling in
5  all the time who thought that, you know, they
6  had an analysis of how the market might react to
7  things that they were certain were going to
8  occur in their analysis, in their opinion
9  certain things were going to happen, and they
10  were darn sure of it.
11       At the end of the day, I think I say
12  that here, at the end of the day, we as
13  portfolio managers have to make our own analysis
14  of what we think, you know, the investment
15  environment is going to be going forward, and we
16  take the responsibility for structuring the
17  portfolios appropriately.
18       You can't rely on other people's
19  analysis. It's useful input. Often they're
20  darn sure, but they can also be darn wrong. And
21  if it's wrong, it's your responsibility as a
22  portfolio manager.
23       I don't blame them, but they call a
24  lot confident that such-and-such is going to
25  happen and, you know, you should do

Page 175

1  such-and-such, you know, as a consequence of it.
2       Q.  When you received this call from the
3  broker saying that -- relaying the rumor on the
4  floor of the Chicago Board of Trade, you said
5  that one reaction you had was that this was
6  similar to information you heard surrounding the
7  August refunding conference; is that right?
8       A.  Yes.
9       Q.  What, if anything, in your --
10  triggered in your mind after you received the
11  call from the broker on October 31st as to
12  whether Treasury was going to make a refunding
13  announcement that day?
14       A.  It didn't -- I didn't have any thought
15  of a refunding -- quarterly refunding at that
16  point in time.
17       Q.  How long did the call with the broker
18  last?
19       A.  I don't remember. It was brief.
20       Q.  By "brief," can you give me a
21  ballpark?
22       A.  Less than two, three minutes.
23       Q.  What happened -- what did you do after
24  you had this call with the broker?
25       A.  As I recall, I was doing portfolio

Page 176

1  work. I had several portfolios I was working to
2  restructure. I was doing trades, primarily
3  selling intermediate maturity or short maturity
4  notes and bonds in exchange for longer
5  maturities.
6       Q.  Okay. You mentioned earlier you
7  received a voicemail from Peter Davis. Were you
8  doing this portfolio work prior to receiving
9  that voicemail?
10      A.  Yes.
11      Q.  Did you sell any intermediate
12  securities that day prior to receiving the
13  voicemail from Mr. Davis?
14      A.  Yes.
15      Q.  Did you purchase any longer term
16  securities that day prior to receiving the
17  voicemail from Mr. Davis?
18      A.  No.
19      Q.  What do you recall happening next?
20          MR. SHOPE:  Next after what?
21          MS. WILLIAMS:  He said that after
22  the call with the broker, he did some portfolio
23  work. I want to know what he recalls doing
24  thereafter.
25      A.  At some point I was interrupted by

Page 177

1  Kathy Graham who was our receptionist. She had
2  an issue related to a laptop that was going to
3  be picked up for servicing by Dell.
4       Q.  How were you interrupted by
5  Ms. Graham?
6       A.  She came to my desk and presented me
7  the problem that we were having, and Dell was to
8  come pick up this computer for servicing, and
9  she explained to me the complexity.
10          After 9/11, vendors -- pick up
11  companies were no longer allowed up into the
12  building, so the laptop would have to be brought
13  down to, I guess, a receiving area of the lobby.
14      Q.  Okay. How long was this conversation
15  with Miss Graham?
16      A.  I don't remember. I'd say it was
17  fairly brief, a few minutes.
18      Q.  Besides you and Ms. Graham, was there
19  anyone else involved in this conversation?
20      A.  No.
21      Q.  And just to clarify, were you sitting
22  at your station on the high grade trading desk
23  when you had this conversation with Ms. Graham?
24      A.  Yes.
25      Q.  What happened after you had this

Page 178

1  conversation with Ms. Graham?
2      A.  I observed that on my phone, the
3  little light was on that indicated there was a
4  message on my telephone.
5      Q.  Did you recall receiving a call and
6  letting it go to voicemail?
7      A.  No.
8      Q.  Let me ask you a question first about
9  your purchase of the intermediate securities
10  that morning.
11      What, if any, information did you
12  enter into the FITS system regarding those
13  trades?
14      A.  Those weren't purchases.  Those were
15  sales.
16      Q.  For sales were you required to enter
17  any information in the FITS system?
18      A.  Yes.
19      Q.  Did you enter any information in the
20  FITS system?
21      A.  Yes.  I entered the transactions.  I
22  believe there were three.
23      Q.  How long after doing the transactions
24  did you enter the information in the FITS
25  system?

Page 179

1          MR. SHOPE:  Objection.
2      A.  I don't recall that it was after.  I
3  don't recall the sequence.
4      Q.  Do you recall if you gave verbal
5  orders to sell those intermediate securities
6  that morning?
7      A.  I don't recall what the process was
8  for executing those trades.
9      Q.  Do you recall who the trader was that
10  executed the trades?
11      A.  As we sit here now, no.  We could
12  review, but I don't recall.
13      Q.  Do you recall which portfolio the
14  trades were made in?
15      A.  Yes.
16      Q.  Which ones?
17      A.  MIN, the Intermediate Income Trust;
18  MMT, the Multi Market Income Trust; and MGF, the
19  Government Markets Income Trust.
20      To the best of my recollection, I
21  think it's those three portfolios.
22      Q.  Do you recall how much -- what was the
23  value that you sold in those intermediate
24  securities that morning?
25      A.  I don't.  I believe two were for 4

Page 180

1  million, but I don't recall what all three were.
2      Q.  Why did you make those sales in the
3  intermediate securities that morning?
4      A.  That morning I was restructuring the
5  portfolios to give them more of a bias towards
6  long maturity, 30-year treasuries, away from
7  intermediate securities.
8          So I was in the process of selling to
9  raise cash to have the money to invest in longer
10  maturity treasuries.
11      Q.  What happened after this -- oh, you
12  mentioned that you noticed the voicemail light
13  was on after your discussion with Ms. Graham.
14  What did you do next?
15      A.  I reviewed the phone mail message that
16  had been left.
17      Q.  And what was this voicemail message?
18      A.  It was a message from Peter Davis,
19  Davis Capital.
20      Q.  What did Mr. Davis say in the
21  voicemail message?
22      A.  I don't remember specifically.  In
23  substance what I took away was two things.  One,
24  that Peter Fisher had told him they would be
25  cancelling the long bond; and two, that there

Page 181

1  was a press release embargo until ten o'clock.
2      Q.  Did Mr. Davis -- you said that they
3  would be cancelling the long bond.  Did
4  Mr. Davis mention Treasury in the voicemail?
5      A.  I don't remember specifically what his
6  words were except the words that Peter Fisher
7  told me this I think is what he said.
8      Q.  What, if any, understanding did you
9  have as to who the they were when you say "they
10  would be cancelling the long bond"?
11      A.  The government.
12      Q.  Any particular part of the government?
13      A.  The Treasury Department.
14      Q.  How long was the voicemail message?
15      A.  It was less than a minute.
16      Q.  How many times did you listen to the
17  voicemail that morning?
18      A.  I listened to it once.
19      Q.  What did you do after listening to the
20  voicemail?
21      A.  I deleted it.
22      Q.  Why did you delete it?
23      A.  To avoid having a lot of clutter in my
24  E mail inbox.
25      Q.  Voicemail?

Page 182

```
1       A.  My -- clutter in my voicemail inbox.
2           After a week's vacation, the thing
3   would max out.  You had to keep it clean.
4       Q.  Do you know what time Mr. Davis's --
5   what time you retrieved Mr. Davis's voicemail?
6       A.  I don't have a recollection of when I
7   retrieved his voicemail message.
8       Q.  Do you know what time Mr. Davis left
9   the voicemail?
10      A.  I think it was left at 9:37.,
11      Q.  Why do you think it was left at 9:37?
12      A.  After review -- I reviewed the phone
13  logs at some point.
14          MS. WILLIAMS:  I'd like to have
15  this marked as Exhibit 10.
16          (Exhibit 10 marked
17           for identification)
18  BY MS. WILLIAMS:
19      Q.  Do you recognize this document,
20  Mr. Nothern?
21      A.  No.
22      Q.  At the top the document says, "Mass.
23  Financial Services Department Report From
24  10/31/2001 to 10/31/2001."
25          Do you see that, sir?
```

Page 183

```
1       A.  Yes.
2       Q.  Then on the right-hand side, the
3   fourth line down, I see "Station 55887, Steven
4   E. Nothern."
5           Do you see that?
6       A.  Yes.
7       Q.  Do you know what 55887 refers to?
8       A.  It looks like it refers to my
9   extension, 5887.  This indicates 55887.  My
10  extension was 5887.  I think to dial internally
11  you had to add a five, so that was my internal
12  extension.
13      Q.  Then the next -- after the line of
14  stars and the headings, I see information
15  underneath certain headings.  First I see the
16  date "10/31/2001".
17          Do you see that, sir?
18      A.  Yes.
19      Q.  And then the time "9:37a".
20          Do you see that?
21      A.  Yes.
22      Q.  Under "dialed number" I see "55887".
23          Do you see that?
24      A.  Yes.
25      Q.  Under "Call class" I see "Inbound
```

Page 184

```
1   DID."
2           Do you see that?
3       A.  Yes.
4       Q.  And the calling number is
5   "2023657624".
6           Do you see that?
7       A.  Yes.
8       Q.  Do you know whose phone number was
9   202-365-7624?
10      A.  No.
11      Q.  Do you know what Mr. Davis's phone
12  number was?
13      A.  No.
14      Q.  Did you ever look at any MFS phone
15  records regarding October 31, 2001?
16      A.  I don't remember having reviewed the
17  phone documents.
18      Q.  Back to the substance of Mr. Davis's
19  voicemail.
20          Did Mr. Davis say anything about the
21  five-year note in his voicemail that you recall?
22          MR. SHOPE:  I'm sorry, did he say
23  anything about the what?
24          MS. WILLIAMS:  Five-year note.
25      A.  Not that I recall.
```

Page 185

```
1       Q.  The 10-year note, do you recall
2   Mr. Davis mentioning that in his voicemail?
3       A.  I don't recall hearing that.
4       Q.  Did Mr. Davis mention anything about
5   buybacks in his voicemail?
6       A.  I don't recall that.
7       Q.  Did you listen to the voicemail using
8   speakerphone?
9           MR. THEODOROU:  I beg your pardon?
10  What was the question?
11  BY MS. WILLIAMS:
12      Q.  Did you listen to the voicemail using
13  speakerphone?
14      A.  No, I didn't.
15      Q.  Do you know what -- scratch that.
16          Did this voicemail come into your
17  private, private meaning your direct, line?
18      A.  Yes.
19      Q.  Who did you understand Mr. Fisher to
20  be on October 31, 2001?
21      A.  I understood Mr. Fisher to be a
22  low-level political appointee in the debt
23  finance area.
24      Q.  When you say "low level," what do you
25  mean?
```

Page 186

1    A.  I think he was one of the lowest
2  ranking appointees that the president gets to
3  make in the Treasury.
4    Q.  Do you know if there were any other
5  political appointees who were under Mr. Fisher
6  in terms of hierarchy?
7    A.  I don't.
8    Q.  Have you --
9    A.  Excuse me.
10    Q.  Sorry.
11    A.  At what point in time?
12    Q.  As of October 31, 2001.
13    A.  No, I don't.
14    Q.  Did you know when Mr. Davis's
15  appointment had been confirmed?  Did you know as
16  of October 31, 2001?
17      MR. SHOPE:  You mean Mr. Fisher?
18      MS. WILLIAMS:  Mr. Fisher.
19  BY MS. WILLIAMS:
20    Q.  I'm sorry, let me restate that again.
21      As of October 31, 2001, did you know
22  when Mr. Fisher had been confirmed to his
23  appointment at Treasury?
24    A.  I had heard that he had been
25  confirmed.

Page 187

1    Q.  Do you know if he had been confirmed
2  between the August refunding and the
3  October refunding?
4    A.  Yes.
5    Q.  How did you learn that Mr. Fisher had
6  been confirmed?
7    A.  I don't recall.
8    Q.  Do you know what Mr. Fisher's job was
9  before he came to Treasury?
10    A.  I believe he worked for the New York
11  Fed.
12    Q.  Do you know what his position was at
13  the New York Fed?
14    A.  I don't.
15    Q.  How do you know Mr. Fisher worked for
16  the New York Fed?
17    A.  I believe he did.  I don't know that
18  for certain.
19      I think he was involved in the
20  meetings surrounding the bail out of long-term
21  capital when hedge fund sort of melted down.  I
22  think the New York Fed did get involved.  I
23  think McDonough was out of town.  I think
24  Mr. Fisher was involved in coordinating the
25  meetings, but I could be wrong.

Page 188

1    Q.  When you received Mr. Davis's
2  voicemail on October 31st, did you understand
3  Mr. Fisher to be a Treasury employee who would
4  have access to information about Treasury's
5  cancellation of the 30-year bond?
6      MR. THEODOROU:  Objection.
7    A.  Just please repeat that.
8    Q.  Sure.
9      When you received Mr. Davis's
10  voicemail on October 31st, did you have an
11  understanding as to whether Mr. Fisher was a
12  Treasury employee who would have access to
13  information regarding the cancellation of the
14  30-year bond?
15      MR. THEODOROU:  Objection.
16    A.  Yes.
17    Q.  You stated that you came away from the
18  voicemail with two understandings, and one was
19  that there would be -- one was that Mr. Davis
20  had learned from Peter Fisher that they were
21  going to cancel the 30-year bond.
22      What was the second understanding?
23    A.  As I just stated?
24    Q.  Yes.
25    A.  There was going to be a press release

Page 189

1  embargo until ten o'clock.
2    Q.  What did you understand would be
3  embargoed?
4    A.  A press release.
5    Q.  Anything else?
6    A.  No.
7    Q.  Why did you believe a press release
8  would be embargoed?
9    A.  I believe that's what he indicated.
10  That's what I took away from what I heard.
11    Q.  What did you understand the press
12  release would contain?
13    A.  By inference, that it would contain
14  information that Peter Fisher had just given
15  him.
16    Q.  Which was what?
17    A.  That they would be cancelling the long
18  bond.
19    Q.  What, if any, communications had you
20  had with Mr. Davis prior to October 31, 2001
21  regarding his providing you with -- regarding
22  embargoes?
23      Had you had any conversation with
24  Mr. Davis before October 31, 2001 about
25  embargoes?

Page 190

1     MR. THEODOROU: Objection.
2     A. Not that I can recall.
3     Q. Before you listened to this voicemail,
4  had you seen any information on any wire
5  services about Treasury's cancellation of the
6  long bond?
7     A. That morning?
8     Q. Yes.
9     A. No.
10     Q. Did you -- had you received any
11  information from any other source, setting aside
12  this conversation you had with the broker, had
13  you received any information from any other
14  source about Treasury's cancellation of the long
15  bond?
16          MR. SHOPE: This is as of the time
17  he received the voicemail?
18          MS. WILLIAMS: The voicemail.
19          MR. SHOPE: The voicemail message?
20          MS. WILLIAMS: Yes.
21  BY MS. WILLIAMS:
22     Q. I understand you had a call with a
23  broker, and then you received this voicemail.
24  Had you heard any other information from any
25  other sources --

Page 191

1          MR. SHOPE: As of the time --
2     Q. -- as of the time you received the
3  voicemail?
4     A. On that morning?
5     Q. On that morning.
6     A. No.
7     Q. What did you do after you received
8  Mr. Davis's voicemail?
9     A. I remember observing the market. And
10  the market had been -- continued to move up that
11  morning.
12          And I got up and went over to
13  Mr. Kennedy's desk to relay to him and my
14  colleagues what I just heard from Mr. Davis and
15  to share with them what I would be transacting.
16  I was going to be buying some long bonds.
17     Q. Was Mr. Kennedy at his desk when you
18  went over to talk to him?
19     A. Yes.
20     Q. You said you went to share with
21  Mr. Kennedy and colleagues. What other
22  colleagues are you referring to?
23     A. I'm referring to colleagues that were
24  on the trading desk at the time, so it would be
25  Rick Smith, David Kennedy, Mr. Kurinsky, and

Page 192

1  Mr. Cadogan.
2     Q. What happened next?
3     A. In terms of?
4     Q. You said you went over to
5  Mr. Kennedy's station to convey this
6  information. What did you do when you got to
7  Mr. Kennedy's station?
8     A. After relaying the information to him?
9     Q. Did you relay information to him?
10  When you said you went over to his station to
11  relay the information, did you actually relay
12  the information?
13     A. Yes, I did.
14     Q. What did you say?
15     A. I told him that I had gotten this
16  message from Mr. Davis, that the Treasury would
17  be cancelling the long bond, and I believed that
18  they would be announcing it at 10.
19          And I volunteered that I would --
20          I think then he asked me a question,
21  you know, what are we going to do about this?
22          I informed him that I was buying 25
23  million 30-year bonds. And he volunteered that
24  he would be buying a similar amount.
25          Mr. Kurinsky volunteered that he would

Page 193

1  be buying 10 million, I believe, and Mr. Smith,
2  that he'd be buying 5 million.
3     Q. Was your statement regarding
4  Mr. Davis's voicemail directed to Mr. Kennedy,
5  Mr. Kurinsky, and Mr. Smith?
6     A. Yes.
7     Q. And was it also directed at
8  Mr. Cadogan?
9     A. Yes. It was for the group.
10  Mr. Kennedy sits right in the middle basically
11  of those, so strategically speaking, the best
12  place to stand if you were going to pass on some
13  information to the group without raising my
14  voice.
15     Q. Was Mr. Vaream at the desk when you
16  made this statement to the group regarding
17  Mr. Davis's voicemail?
18     A. I believe not.
19     Q. Besides Mr. Kennedy who you said asked
20  what are we going to do about this, did anyone
21  else make any comments?
22     A. At what point?
23     Q. After you conveyed the information you
24  had received from Mr. Davis's voicemail.
25     A. Mr. Kurinsky said he was going to buy

Page 194

1  10 million, and Mr. Smith said he would be
2  buying 5 million bonds.
3      Q.  What, if anything, did you tell the
4  group during this conversation about Peter
5  Fisher?
6      A.  I believe that Peter Fisher had -- I
7  actually don't recall specifically.  I believe
8  that Davis had said that -- I actually don't
9  recall.
10     Q.  What, if anything, did you say at this
11  time about embargo?
12     A.  I don't recall bringing up embargo.
13     Q.  What, if anything, did you mention
14  about a press release?
15     A.  At that point in time?
16     Q.  Yes.
17     A.  When I was speaking with Mr. Kennedy?
18     Q.  And the group, yes.
19     A.  I didn't mention -- I think I
20  mentioned there would be -- they were going to
21  be announcing it at 10.  I don't think I
22  mentioned a press release.
23     Q.  At the time that you told Mr. Kennedy
24  and the group this information that you received
25  from Mr. Davis, had you heard from Mr. Cadogan

Page 195

1  the Treasury was going to be announcing its
2  refunding needs at 10?
3      A.  You have to rephrase that.  Can you
4  just repeat that?
5      Q.  Sure.
6          You previously testified that you
7  learned about the Treasury refunding
8  announcement, that that was going to be made on
9  October 31st from Mr. Cadogan; is that right?
10     A.  Yes.
11     Q.  And I wanted to know at the time you
12  had your conversation with Mr. Kennedy and the
13  other colleagues to convey the information you
14  got from Mr. Davis's voicemail, had you already
15  been told by Mr. Cadogan the Treasury was having
16  a refunding announcement?
17     A.  I don't think so.  I believe not.
18     Q.  Besides stating that they were going
19  to buy certain amounts of bonds, what, if
20  anything, did Mr. Kennedy, Kurinsky, Smith, or
21  Cadogan say when you told them about Mr. Davis's
22  voicemail?
23     A.  I believe we discussed the fact that
24  we'd heard rumors from the Board of Trade that
25  morning to the same -- exactly the same effect.

Page 196

1          I think I might have shared with them
2  that I'd heard that, and I think they confirmed
3  that they also had heard that.
4      Q.  When you say "they," is there any
5  particular person who you recall confirming that
6  they'd heard about rumors?
7      A.  I don't recall.
8      Q.  What happened after you all stated how
9  much of the 30-year bond you were going to
10  purchase?
11     A.  I believe John Cadogan summed up, you
12  know, what the total amount would be amongst us,
13  and we authorized him to go ahead and make the
14  purchase.
15     Q.  At what I point did Mr. Cadogan tell
16  you there was going to be a Treasury refunding
17  announcement at 10?
18     A.  I'm not certain.  I believe it was
19  subsequent to him starting to work on placing
20  the order, but I'm not certain.
21     Q.  I might have asked this before, but I
22  forgot.  When Mr. Cadogan made the statement
23  about there being a Treasury refunding
24  announcement at 10 a.m., I know you said it was
25  directed to you, was it directed to anyone else

Page 197

1  on the high grade trading desk?
2      A.  Not to my knowledge.  I was looking at
3  him the way that we are looking at each other
4  right now, so we were -- I know we were
5  communicating, as I was communicating to
6  Mr. Kennedy in a manner that everyone could
7  share in that information if they were
8  interested in listening, I believe he was doing
9  exactly the same.
10     Q.  Do you recall where you were standing
11  when Mr. Cadogan informed you about the
12  refunding announcement?
13     A.  Yes.
14     Q.  Where were you?
15     A.  I was standing.
16     Q.  Do you want to look at, I guess it's
17  Exhibit 4?
18     A.  I was standing behind or next to
19  Mr. Kennedy in 243 on your diagram Exhibit 4.
20     Q.  So Mr. Kennedy was either in front of
21  you or next to you when Mr. Cadogan made that
22  statement?
23     A.  Yes.
24     Q.  Do you know if Mr. Kennedy was sitting
25  when Mr. Cadogan made the statement?

1    A.  And to finish, if I can.

2    Q.  Oh, I'm sorry.

3    A.  I also had a general view that the
4  bond was cheap, was an attractive place to
5  invest from a value point of view,
6  representative value.

7        Part of it related to the government
8  surpluses that were running at the time.
9  Treasury was going to stop issuing.  By 2004,
10  2005 all the short maturities were basically
11  scheduled to run off, and they would just be
12  left with surpluses of cash and longer maturity
13  treasuries that hadn't matured yet, and they
14  would be spending a lot of that cash to buy back
15  those securities would be the only ones left
16  outstanding.

17        It's kind of a good fundamental for
18  that end of the market.

19        I'm sorry.  It's a bit of a technical
20  discussion, but my conclusion was for many
21  different reasons that the 30-year bond
22  represented really good value.

23    Q.  And did you have that view prior to
24  September 11, 2001?

25    A.  I don't recall.

1        A lot of the story that I'm telling
2  you right now really grew out of the events
3  after September 11th, the way it sort of
4  impacted the economy, and potentially it
5  entirely changed expectations of what growth was
6  going to be, what inflation was going to be.  It
7  had a big impact on the markets.

8    Q.  Did you recall reading any documents
9  prior to October 31, 2001 that included the same
10  strategy that you just discussed that advocated
11  for that strategy?

12    A.  As I sit here now, documents -- I
13  don't recall documents produced by brokerage
14  houses or other analysts, but I just don't
15  recall.

16    Q.  Do you recall any documents produced
17  by brokerage houses that had a contrary view to
18  the strategy you just discussed?

19    A.  I really don't.

20    Q.  You mentioned that there was going to
21  be an employment report on November 1st; is that
22  correct?

23    A.  Yes.

24    Q.  Were there any other announcements
25  that you were looking to that might affect the

1  long bond?

2    A.  The market in general?

3    Q.  Yes.

4    A.  Yes.  The National Purchasing
5  Manager's Index, which was scheduled for
6  Thursday morning.  Best I recall, the Purchasing
7  Manager's Index is a ten o'clock release.

8    Q.  Anything else?

9    A.  No.  Those were two good leading sort
10  of sign posts kind of what -- they're very
11  current -- it's the first current view you get
12  of economic activity for the prior month.

13        You actually get the purchasing
14  manager I think on the last day of the month,
15  and the employment report's always the first
16  Friday of the following month, so it's real
17  fresh.

18    Q.  Now, after you receive a call from the
19  broker regarding the rumors on the Chicago Board
20  of Trade and before you receive Mr. Davis's
21  voicemail, did you make any trades in the
22  30-year bond?

23    A.  No.

24    Q.  Did you tell any of your colleagues
25  about the rumor on the Chicago Board of Trade

1  before you received Mr. Davis's voicemail?

2    A.  No.

3    Q.  Why not?

4    A.  It didn't rise to the level of
5  something I would get up and go talk to them.

6        I likely assumed that they were
7  getting exactly the same information I was.

8    Q.  When you say "it didn't rise to the
9  level," what do you mean?

10    A.  I mean that as I said.  I think my
11  assumption would be that they were getting
12  exactly the same information from the brokers
13  that I was.  Like myself, if they're on the
14  trading desk, they're getting these phone calls,
15  and they're probably getting the same
16  information.  The broker hangs up with me, he
17  might call Mr. Kurinsky.

18    Q.  Now, you said that -- you were talking
19  before the break about a comment you made, "I
20  wonder what the ethics are on all this."  And
21  you recall making that comment?

22    A.  Yes.

23    Q.  And you were saying that it was no
24  doubt in your mind that the information was
25  public, and one of the reasons is because it had

Volume:  II

Pages:  222-326

Exhibits:  11-23

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

(Boston Division)

Civil Action No. 05-CV-10983 (NMG)

- - - - - - - - - - - - - - - - - - - - - -

UNITED STATES SECURITIES AND EXCHANGE

COMMISSION,

                Plaintiff,

    v.

STEVEN E. NOTHERN,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - -

Continued Deposition of Steven E. Nothern

January 31, 2007

9:13 a.m. - 11:53 a.m.

Securities and Exchange Commission

33 Arch Street

Boston, Massachusetts

Reporter:  Daria L. Romano, RPR/CRR

Page 267

BY MS. WILLIAMS:

1   Q.   What was the second occasion?
2   A.   The second occasion was late in the
3   day, towards the end of business.
4   Q.   Who were you speaking to?
5   A.   I was speaking directly with Mike
6   Roberge who was part of a large group of
7   colleagues that were waiting in the trading room
8   for some sort of a visit from a potential
9   client. I think it was Lucent Technologies was
10  potentially going to be investing pension monies
11  or something of this sort with MFS. And so they
12  were waiting in the trading room.
13       As I went from my desk to get some
14  work done to over to my spot on the trading
15  desk.
16  Q.   How did this discussion of embargo
17  come up?
18  A.   They were having a discussion about a
19  phone call that apparently Mr. Cadogan received
20  from Merrill.
21       Merrill apparently believed that they
22  should get a price concession. Apparently they
23  lost money that day on the trade that we'd done.
24       And so as I was walking to my trading

Page 268

1   desk position, I had to walk through this group.
2   Before I walked through the group, I paused for
3   just long enough to understand the gist of what
4   they were talking about because I had more
5   information about this than I knew they would.
6        I asked them what they were talking
7   about, and apparently that's what they were
8   talking about. So we engaged in a conversation
9   about that.
10  Q.   Who was in the group?
11  A.   As I recall, Joan Batchelder, John
12  Cadogan, Mike Roberge, Robin Stelmach, and at
13  least two or three other people.
14  Q.   Do you recall who those two or three
15  other people are sitting here today?
16  A.   No.
17  Q.   What is Robin Stelmach's job at MFS?
18  A.   At the time?
19  Q.   Yes.
20  A.   She was part of the Fixed Income
21  Department. She would take care of a lot of the
22  operational side of our business. She was the
23  one that ran the team, for example, that created
24  FITS, our FITS income trading system. So that
25  was a type of thing that -- a project she would

Page 269

1   take on.
2   Q.   And when you joined the group, what,
3   if anything, did you say to the group?
4   A.   I explained to them that I thought
5   that Merrill getting a concession on the trade
6   was ridiculous.
7        I further explained that if they'd
8   lost money on it, it was because they had chosen
9   to take a position. They had plenty of time to
10  lay off the risk from the transaction they'd
11  done with us.
12       After they transacted with us, the
13  market had been relatively stable, if not a
14  little bit lower. So they could have covered
15  that position quite readily but chose not to.
16       I also went through a little bit of
17  the history with them because they didn't have
18  background in terms of what the actual issue was
19  of cancelling 30-year Treasury.
20       So I explained to them that this had
21  been well rumored for a long period of time,
22  that we actually thought they were going to do
23  it that summer and that the postmortem that I
24  had heard at the time was that the fellow in
25  charge of domestic finance, while nominated,

Page 270

1   wasn't confirmed, so possibly he held off making
2   the announcement because he might not have felt
3   he had the authority to make that announcement.
4        So in a sense this was his first hit
5   at the cat, and in a lot of ways it's not that
6   big a surprise.
7        And I think I added from a portfolio
8   port of view, I reiterated what we had been
9   talking about the prior couple of weeks, that
10  this was consistent with what we were doing and
11  point of fact was what we were doing that day.
12       And basically I went through, you
13  know, the reasons why I'd cut my hand off before
14  I'd give Merrill Lynch a dime.
15  Q.   How did the word embargo come up in
16  this conversation?
17  A.   Towards the end, Mike Roberge asked,
18  and I don't recall specifically what he said,
19  but something to the effect, Did he say this was
20  embargoed?
21  Q.   He being?
22  A.   Going to Mr. Davis.
23  Q.   Okay. What was your response?
24  A.   No.
25  Q.   And why did you respond no?

Page 271

1    A.  I was answering what I thought his
2  real question was is did Davis tell us that we
3  couldn't trade.  And the answer was no.
4        I never thought in my mind that we
5  were in any way restricted from trading, and I
6  never thought for a second that we'd done
7  anything wrong.
8    Q.  Did Mr. Roberge use the word embargo?
9    A.  Yes.
10   Q.  Did you tell him that Mr. Davis had
11 used the word embargo?
12   A.  No.
13   Q.  Did anyone say anything in response to
14 your response which was no?  Was there any other
15 discussion?
16   A.  That was the end of the discussion.
17   Q.  Did you take any notes during this
18 conversation?
19   A.  No.
20       I was walking through this group.
21 They were essentially killing time.  And I think
22 eventually they were stood up by Lucent and they
23 never came.  So they were waiting and waiting
24 and killing time and chatting.  I was trying to
25 get some work done.

Page 272

1        This was an informal -- essentially it
2  was a water-cooler conversation they were
3  having.  They were sort of hanging out in the
4  trading room, sitting on the corners of the
5  desks, killing time, waiting for a prospect that
6  I think never showed up.
7    Q.  What was Mr. Roberge's position at MFS
8  at the time?  What was Mr. Roberge's position at
9  MFS at the time?
10   A.  Mike Roberge was a young portfolio
11 manager in the Unique Bond Department at the
12 time.
13       He was given responsibilities as an
14 assistant to the director of research -- the
15 director of credit research.  And he was a
16 member of my Fixed Income Policy Committee.
17   Q.  Did the word embargo come up with any
18 other -- at any other conversations on
19 October 31st?
20   A.  Not that I can remember.
21   Q.  So the only person that you recall
22 mentioning embargo to on that date was
23 Mr. Cadogan?
24       MR. THEODOROU:  Objection.
25       MR. SHOPE:  Objection.

Page 273

1        MR. THEODOROU:  That's not what his
2  testimony was.  Oh, he mentioning embargo.
3  BY MS. WILLIAMS:
4    Q.  Your testimony is that he told
5  Mr. Cadogan about embargo, and I wanted to know
6  was the word embargo said to anyone else besides
7  Mr. Cadogan?
8        MR. THEODOROU:  Objection.
9    Q.  Did you mention the word embargo to
10 anyone else at MFS on October 31st besides
11 Mr. Cadogan?
12   A.  No.
13   Q.  Do you recall --
14   A.  As best as I can recall.
15   Q.  Do you recall participating in any
16 discussions on any subsequent days with
17 co-workers at MFS regarding the word embargo?
18   A.  I can remember one other occasion.
19   Q.  Tell me about that occasion.  When was
20 that?
21   A.  Best I can recall, the following
22 Wednesday.
23   Q.  And who were you speaking to?
24   A.  Joan Batchelder.
25   Q.  Anyone else?

Page 274

1    A.  She came to the trading desk
2  accompanied by Don Mycrans.
3    Q.  Who is Don Mycrans?
4    A.  Don Mycrans had been hired pretty
5  recently I think at that point.  And he was
6  coordinating our trading activities across the
7  Fixed Income Department.
8    Q.  Did Mr. Mycrans have any supervisory
9  authority over you on October 31st?
10   A.  No.  He supervised the traders, I
11 believe.
12   Q.  And where did this conversation take
13 place?
14   A.  In the trading room on the 23rd floor.
15   Q.  Besides Miss Batchelder and
16 Mr. Mycrans, was there anyone else involved in
17 this conversation?
18   A.  No.
19   Q.  What happened -- what was said during
20 the conversation?
21   A.  She had one question.  She came up to
22 my desk.  I was at the trading -- at my desk in
23 the trading room.  She came up with Don Mycrans
24 in tow and asked me, I believe, something to the
25 effect did Davis or did -- did Davis or did he

Page 275

1  tell you that this was embargoed, that you
2  couldn't trade on it.
3      Q.  What was your response?
4      A.  I answered no.
5      Q.  Why did you say no?
6      A.  That was the most forthright way I
7  could answer the question.  I was answering the
8  question that I thought they wanted to ask.
9      Q.  What question did you think they
10 wanted to ask?
11     A.  She asked the question, Did he say
12 that we couldn't trade on this?  And I said, No,
13 he didn't.
14     Q.  Did Miss Batchelder use the word
15 embargo?
16     A.  Yes.
17     Q.  Did you tell them that Mr. Davis had
18 used the word embargo?
19     A.  No.
20     Q.  Did you tell Miss Batchelder that
21 Mr. Davis had mentioned a press release?
22     A.  No.
23     Q.  Did you take any notes during this
24 conversation?
25     A.  No.

Page 276

1      Q.  Do you know if Ms. Batchelder took any
2  notes?
3      A.  No.
4      Q.  Did you discuss this conversation with
5  anyone else on the high grade trading desk?
6      A.  No.
7      Q.  Did you discuss it with anyone else at
8  MFS, other than counsel?
9      A.  No.
10     Q.  Do you recall participating in any
11 discussions with Mr. Kurinsky after October 31st
12 regarding the $65 million trade?
13     A.  I don't.  I have conversations on an
14 ongoing basis with Jeffrey.  He works two desks
15 away, so we meet on an ongoing basis.  I don't
16 recall, you know, any particular meeting with
17 him.
18     Q.  Do you recall any discussions with
19 Mr. Kennedy after October 31st about the
20 $65 million trade?
21     A.  Yes.
22     Q.  What do you recall about discussions
23 with Mr. Kennedy?
24     A.  I believe he volunteered some day
25 after October 31st that he'd seen an article in

Page 277

1  the press, the New York Times or the Journal
2  referencing this.  So he wanted to make sure I
3  had seen it.  Maybe it had information I hadn't
4  seen already.
5      Q.  What did you say in the conversation?
6      A.  I don't recall.  I think I already saw
7  the article.  I had read the paper.
8      Q.  Did embargo come up at all during this
9  conversation?
10     A.  Not that I can recall.
11     Q.  At some point on October 31, 2001 did
12 you become aware that Treasury had issued a
13 press release announcing the cancellation of the
14 30-year bond?
15     A.  Issued at some point?
16     Q.  Yes.  Did you become aware on
17 October 31st that Treasury had issued a --
18 Treasury had issued a press release announcing
19 the cancellation of the bond?
20     A.  Yes.
21     Q.  When did you become aware of
22 Treasury's press release?
23     A.  I don't recall.
24     Q.  Do you know if it was before 10 a.m.?
25     A.  I don't remember.

Page 278

1      Q.  Do you know how you became aware of
2  Treasury's press release?
3      A.  I don't remember.  I know they put it
4  out.  I don't remember how I learned that.
5          It was a bit messy because they put it
6  out early, and I think there was talk about,
7  hey, they put it out early.
8          I don't remember specifically, you
9  know, what conversation or when that occurred or
10 how I learned it.
11     Q.  What was the first press release,
12 either hard copy or electronic, that you saw
13 announcing Treasury's cancellation of the bond?
14         MR. THEODOROU:  Objection.
15     A.  On October 31st?
16     Q.  If you saw it on October 31st, then
17 yes.
18     A.  I don't recall seeing that quarterly
19 refunding announcement.
20     Q.  No, my question's different.
21         What, if any, news report by press
22 service of any sort did you see -- what was the
23 first press release, news story that you saw
24 that mentioned that Treasury had cancelled the
25 30-year bond?

FOIA – Confidential
Treatment Requested



Pete E-Mail Sent.txt
Date: Thu, 18 Oct 2001 16:44:10 -0400
From: Pete Davis <pete@daviscap.com>
To: "Youngdahl, John" <john.youngdahl@gs.com>

Right.


# REDACTED


Subject: Davis Capital email
Date: Fri, 19 Oct 2001 12:54:47 -0400
From: Pete Davis <pete@daviscap.com>
To: "Davis, Pete" <pete@daviscap.com>
BCC: Shelley Black <sblack@senderocapital.com>,
    Ken Davis <kend@pistolcreek.com>, Mike DeLoose <mdeloose@aol.com>,
    "Fosler, Gail" <Gail.Fosler@conference-board.org>,
    Lynn Fox <fox1@frb.gov>,
    Matthew Gleckler <Gecko1@worldnet.att.net>,
    Michael Light <mlight99@earthlink.net>,
    "McMaster, David" <David_McMaster@byrd.senate.gov>,
    "Sedlock, Tom" <tsedlock@cnuber.com>,
    Bob Stein <bob_stein@budget.senate.gov>,
    "Sweet, Stuart" <capnet@erols.com>,
    Jason Webb <Jason_Webb@byrd.senate.gov>,
    "Woodward, Joan" <Joan.Woodward@gs.com>,
    "Yamazaki, Kazutami" <yamazaki@erols.com>,
    "Yorke, Stephen" <stephenyorke@yorkecap.demon.co.uk>,
    "Gallagher, Tom" <tgallagher@isigrp.com>,
    Bob McNally <Robert_C._McNally@opd.eop.gov>,
    Xavier Bonnet <xavier.bonnet@amb-wash.fr>,
    Jim Carter <James_E._Carter@opd.eop.gov>,
    YASUHIRO KAWAGUCHI <yasuhiro.kawaguchi@mofa.go.jp>,
    Stan Collender <collends@fleishman.com>,
    Michael Light <MLight@frk.com>,
    Trevor Greetham <TGreetham@exchange.uk.ml.com>,
    Yasuhiro Kawaguchi <yasuhirokawaguchi@hotmail.com>,
    "Cohen, Bill" <billc@imsi.com>,
    "Glassman, Jim" <jglassman@chase.com>,
    Stephen Jonathan <Stephen.Jonathan@chase.com>,
    "Sharp, Bill" <bill.sharp@chase.com>,

DC 002464

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
"Emsbo-Mattingly, Lisa" <lisa.e.mattingly@fmr.com>,
Yasutaka Fukahori <yasutaka.fukahori@mofa.go.jp>,
Takehiro Kagawa <takehiro.kagawa@mofa.go.jp>,
KAZUYUKI KATAYAMA <kazuyuki.katayama@mofa.go.jp>,
Shinichi Kitajima <shinichi.kitajima@mofa.go.jp>,
Atsushi Niigata <niigata@us2.so-net.com>,
Yoko Tsuda <yoko.tsuda@mofa.go.jp>, masahiko.kiya@mofa.go.jp,
satoru.takahashi@mofa.go.jp,
Takehiro Kano <takehiro.kano@mofa.go.jp>,
"Neusser, Josef" <jjneusser@bloomberg.net>,
Bill Adams <wadams@mfs.com>, "Hawkins, Richard" <rhawkins@mfs.com>,
"Kurinsky, Geoffrey" <gkurinsky@mfs.com>,
"Nothern, Steve" <snothern@mfs.com>, "Ryan, Matt" <mryan2@mfs.com>,
Peter Sullivan <psullivan@mfs.com>,
"Swanson, Jim" <jswanson@mfs.com>, Bob Persons <rpersons@mfs.com>,
"Altman, Emily" <Emily.Altman@morganstanley.com>,
Diane Merdian <diane.merdian@morganstanley.com>,
Gerard Gardner <gerard.gardner@morganstanley.com>,
David Greenlaw <David.Greenlaw@morganstanley.com>,
Debra Levin <debra.levin@morganstanley.com>,
Richard Berner <richard.berner@morganstanley.com>,
Lloyd Byrne <lloyd.byrne@morganstanley.com>,
Jay Deahna <jay.deahna@morganstanley.com>,
Mark Edelstone <mark.edelstone@morganstanley.com>,
Aisling Freiheit-Kinch <Aisling.Freiheit-Kinch@morganstanley.com>,
Marc Frost <marc_frost@morganstanley.com>,
Louis Gerhardy <louis.gerhardy@morganstanley.com>,
"Graham, Roderick" <Roderick.Graham@morganstanley.com>,
"Kimball, Paul" <Paul.Kimball@morganstanley.com>,
Allison Montgomery <a.Montgomery@morganstanley.com>,
Mita Nambiar <Mita.Nambiar@morganstanley.com>,
Scott Patrick <Scott.Patrick@morganstanley.com>,
Jay Pelosky <jay.pelosky@morganstanley.com>,
Kenneth Posner <Kenneth.Posner@morganstanley.com>,
"Roach, Steve" <Stephen.Roach@morganstanley.com>,
Rebecca Runkle <rebecca.runkle@morganstanley.com>,
Art Soter <art.soter@morganstanley.com>,
Tim Stewart <Timothy.Stewart@morganstanley.com>,
Heidi Wood <heidi.wood@morganstanley.com>,
Ted Weiseman <ted.wieseman@morganstanley.com>,
Gail Daniel <Gail.Daniel@morganstanley.com>,
Amy Falls <Amy.Falls@morganstanley.com>,
Justin Hakimian <justin.hakimian@morganstanley.com>,
Jay Deahna <jaydeahna@home.com>,
"Cohen, Steve" <stevec@saccapital.com>,
"Cohn, Brian" <brianc@saccapital.com>,
Ed Debler <edmundd@saccapital.com>,
"Foley, Larry" <larryf@saccapital.com>,
Rich Grodin <richg@saccapital.com>,
"Handler, Mike" <mikeh@saccapital.com>,
"Lewis, Mark" <marcl@saccapital.com>,
"Weiner, Jon" <jonw@saccapital.com>,
"Canally, John" <jcanally@smra.com>,
"Canavan, John" <canavan@smra.com>, "Kim, Young" <ykim@smra.com>,
"Liro, Joe" <jliro@smra.com>, "McCarthy, Ward" <ward@smra.com>,
"Saporta, Dana" <dsaporta@smra.com>,
"Stone, Ray" <rstone@smra.com>,
"VandenHouten, Nancy" <nancy@smra.com>, Ken Kim <kim@smra.com>,
Sanela Pecenkovic <sanela@smra.com>,
"Dugger, Rob" <rob.dugger@tudor.com>,
"Mathews, Steve" <smathews@tudor.com>,
Chris Gate <Chris.Gate@Tudor.com>,
Angel Ubide <angel.ubide@tudor.com>,
Page 800

DC 002465

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
"Hamilton, Debra" <debra.hamilton@kemper.com>,
Peter Hamilton <phamilton@medleyadvisors.com>,
Richard Medley <rmedley@medleyadvisors.com>,
Kevin Muehring <kmuehring@medleyadvisors.com>,
Josh May <jmay@medleyadvisors.com>,
David Steinhardt <DavidS@centinv.com>,
Allyson Sullivan <Allyson@Daviscap.com>,
Kevin Logan <klogan@drkw.com>,
John Youngdahl <John.Youngdahl@gs.com>,
William Dudley <William.Dudley@gs.com>,
John Tormondsen <john.tormondsen@gs.com>,
Peter Gerhard <peter.gerhard@gs.com>,
Jason Evans <jason.evans@gs.com>, Irene Tse <irene.tse@gs.com>,
Christian Siva-Jothy <christian.siva-jothy@gs.com>,
Andrew Law <andrew.law@gs.com>, Karl Devine <karl.devine@gs.com>,
Max Trautman <max.trautman@gs.com>,
Chris Carrera <chris.carrera@gs.com>, Ed Eisler <ed.eisler@gs.com>,
Ashok Varadhan <ashok.varadhan@gs.com>,
David Blake <david.blake@gs.com>,
"Falconer, Bob" <bob@sangamon.com>, Chris <Chris@Sangamon.com>,
Gene <Gene@Sangamon.com>,
"Anderson, Lincoln" <Lincoln.Anderson@lpl.com>,
Paul Kasriel <plkl@ntrs.com>,
"Maki, Dean" <dean_maki@putnaminv.com>,
Adrian Weller <Adrian.Weller@wfg.com>,
Jonathan Francis <Jonathan_Francis@putnaminv.com>,
Tomas Jelf <tjelf@nexus.bm>, Evan Lamp <elamp@home.com>,
Jordan Grayson <grayson@midtowncap.com>,
Haseeb Ahmed <haseeb.ahmed@bankofamerica.com>,
Timothy Martin <timothy.martin@bankofamerica.com>,
Caroline Baum <CABAUM@bloomberg.net>, D Brown <dbrown@iinews.com>,
"Gersh, Darren" <darren_gersh@wpbt.org>,
Angela Heath <angela_heath@wpbt.org>,
Toby McIntosh <tmcintos@bna.com>, Art Pine <apine@bloomberg.net>,
"O'Toole, Quinn" <Quinn_Otoole@wpbt.org>,
"Wade, Taron" <wadet@iinews.com>,
Anna Willard <Anna.Willard@reuters.com>,
Noam Neusner <nneusner@usnews.com>,
Simon Kennedy <SKENNEDY4@bloomberg.net>,
Brendan Murray <brmurray@bloomberg.net>

Davis Capital Investment Ideas          10-19-01    12:50 PM

Stimulus bill not likely to reach the Senate floor for two to three weeks.
Enactment of a bill by Thanksgiving now seems the best bet. Anthrax testing
delayed yesterday's meeting of Treasury Secretary O'Neill and Senate Finance
Committee Democrats. The White House's Larry Lindsey downplayed the
differences between the President's desires and the House Ways and Means
Committee bill, H.R. 3090.

Spending freeze mentioned by OMB Director Daniels yesterday. Speaking to
the Schwab Capital Markets symposium, the Office of Management and Budget
Director said the rise in federal spending and the shrinking surplus may
force OMB to reestablish fiscal discipline.

Rx: Pediatric exclusivity bill passed the Senate yesterday. S. 838 would
give drug makers an additional 6 months of patent protection in return for
studying the effects of drugs on children until Oct. 1, 2007. The existing
incentive expires at the end of this year. The House bill, H.R. 2887,
passed committee on Oct. 11th, but it hasn't been scheduled for floor
consideration yet.

Insurance against terrorism legislation expected soon from Reps. Oxley,
Page 801

DC 002466

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
Baker.  The House Financial Services Chair (R-OH) and Capital Markets
Subcommittee Chair (R-LA) want to enact legislation this year.
Yesterday's hearing was postponed until October 22nd due to anthrax testing.

Internet tax moratorium failed to pass the Senate yesterday.  That will
allow the current moratorium to expire on Sunday.  The states are not likely
to rush forward with Internet access taxes, but they will seek more
enforcement of sales and use taxes on sales over the Internet.  A Supreme
Court decision protects sales where a vendor has no "nexus" (physical
presence) in the state of the purchaser, but an estimated $26 b. of taxes
are evaded where nexus does exist.  The House passed a two year moratorium
Tuesday.  Senate passage is a 40% chance in my estimation and declining with
time.

Money laundering bills proceed.  Staffers will work this weekend to
reconcile
H.R. 3004 and S. 1510, in hope of sending a compromise to the President next
week.

War bonds will be sold by Treasury.  Treasury sources confirm that small
denomination 17 year bonds with a put will be sold via their web site.  The
put would allow a purchaser to redeem the bond at par after 6 months from
purchase.  The bonds will not be sold through payroll withholding as savings
bonds can be currently.  It's unclear when Treasury will announce this or
how much they expect to raise.

© 2001   Davis Capital Investment Ideas    Call 202-544-7098

**REDACTED**

DC 002467

**Nothern, Steven E.**

| | |
|---|---|
| **From:** | Pete Davis [pete@daviscap.com] |
| **Sent:** | Thursday, April 08, 1999 8:25 AM |
| **To:** | Steve Nothern |
| **Subject:** | Treasury exchange offering |

Steve:

Treasury often listens, though I can't guarantee it.

Gary Gensler, Assistant Secretary (Financial Markets) 202-622-2710
His bio is at: http://www.treas.gov/press/officers/gensler.htm
He worked at Goldman for a long time under Mr. Rubin.

Lee Sachs, Deputy Assistant Secretary (Government Financial Policy)
He has good Wall St. experience, but I'm not sure where. 202-622-2720
He attended our meeting with David Wilcox, Assistant Secretary (Economic
Policy) on January 25th.

Jill Ouseley, Director, Office of Market Finance; 202-622-2630
She has day to day responsibility for managing Treasury debt and has
been there a long time.

Let me know how it goes.

Pete

Nothern
EXHIBIT NO. 7
1-30-07

1

Nothern - 0289

11/01/00 07:51        202-544-7090→Massachusetts Financial Se/Nothern,Steve                    002

11/01/2000  11:26    2025447163              DAVIS CAPITAL INV                    PAGE  01

# DEPARTMENT OF THE TREASURY

# TREASURY NEWS

**OFFICE OF PUBLIC AFFAIRS • 1500 PENNSYLVANIA AVENUE, N.W. • WASHINGTON, D.C. • 20220 • (202) 622-2960**



Nothern
EXHIBIT NO. 8
1-30-07

**EMBARGO TIME WILL BE SET**
November 1, 2000

## UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
## GARY GENSLER
### REMARKS AT THE NOVEMBER 2000 TREASURY QUARTERLY REFUNDING

Good morning. I am pleased to be with you today to discuss the government's refunding needs for the current quarter.

Last week, the President announced a budget surplus for fiscal year 2000 of $237 billion, the largest in American history. As a result of three years of budget surpluses, we have paid down $363 billion of publicly held debt.

Earlier this week, Treasury announced that we expect to pay down an additional $23 billion in marketable debt during the current quarter. This is the first paydown in publicly held debt during the fourth calendar quarter in the forty years for which Treasury has records on quarterly results. This paydown will bring us to a reduction in publicly held debt of almost $390 billion in just over three years.

**Buybacks**

In this new environment, Treasury's buyback program has become an important debt management tool. We have now conducted a total of 16 debt buyback operations, redeeming outstanding securities with a total par value of just over $25 billion and an average remaining life of 18.6 years. As previously announced, we anticipate completing $30 billion in purchases this calendar year.

We continue to be pleased with the results to date. Buybacks have been beneficial in a number a number of ways:

- First, debt buybacks have helped us manage the maturity structure of Treasury's outstanding debt, bringing more balance to our debt paydown. This year we paid down

LS - 995

·11/01/00 07:52      202-544-7098->Massachusetts Financial Se/Nothern,Steve                    003

11/01/2000  11:26   2025447163                DAVIS CAPITAL INV                      PAGE  02

approximately 8 percent of privately held marketable debt. This calendar year, net of issuance, we will paydown approximately 3 percent of our debt with remaining maturities of over 10 years. Absent buybacks, all of the paydown would have been in maturing shorter-term debt. Indeed, to date the average life of outstanding Treasury debt would have lengthened by an additional 2 months without the buyback program.

- Second, buybacks have enabled us to add to the liquidity of our benchmark issues. In fact, buybacks have enabled us to issue securities that we may not have otherwise been able to continue issuing.

This past quarter, we were pleased to extend the buyback program to include callable securities for the first time. We conducted two buybacks of callable bonds. These operations were very successful and we plan to conduct periodic operations in this sector.

In May, we instituted a regular schedule for buybacks, with announcements made on the third and fourth Wednesdays of each month for operations conducted the next day. We are satisfied with the results of using a regular schedule for operations and plan to maintain this schedule going forward. ·

Due to the timing of holidays in November and December, however, we will be announcing our buyback operations one week earlier in each of these months. Specifically, we will make announcements on November 8 and 15, and on December 6 and 13, for operations the next day. We expect to buy back just under $5 billion in these operations. In January our operations will return to the regular schedule.

In addition, we have accepted the recommendation of the Borrowing Advisory Committee to begin providing information on the estimated size of our buyback operations for the next calendar quarter. For the January to March quarter, we currently expect to buy back approximately $9 billion in Treasury debt.

## 52-Week Bills

Earlier this year, we announced that we were considering eliminating the issuance of 52-week bills as our borrowing needs decline. The Borrowing Advisory Committee has recommended that Treasury take that step, using its existing authority, early next year. We have worked with Congress to revise a number of statutes that reference the auction yield of the 52-week bill, proposing a reference to the one year Constant Maturity Treasury yield.

I am pleased to report that we have made significant progress. We have received bipartisan support and agreement on the language to be used for these technical and non-controversial revisions. Language to revise the relevant statutes is now before Congress. We are optimistic that some, if not all, of the revisions will be completed before Congress adjourns this session. We will continue to work with Congress to minimize any possible disruption from the

2

potential elimination of the 52-week bill.

**STRIPS Rules Changes**

Today, we are announcing two technical changes to Treasury's STRIPS program to help improve the liquidity of this market:

- First, we are expanding the STRIPS program to include all outstanding 5-year notes that had not previously been eligible for stripping. That is, 5-year notes issued between November 30, 1995, and September 2, 1997, will now be eligible for the program.

- Second, we are implementing a change referred to as "STRIPS to the penny." We are reducing the minimum and multiple limits for stripping all fixed-principal Treasury securities to $1000 par amount. This will eliminate the high dollar par amounts that have previously been required to strip certain securities.

Both of these changes should increase the amount of outstanding interest STRIPS available, making reconstitution of stripped securities easier and improving market liquidity.

The notice concerning these two rule changes is available today at the Federal Register and press releases will be available at the end of the press conference today. The expansion of eligible coupon securities will be effective on Friday, November 3. "STRIPS to the penny" will become effective on March 1, 2001.

**35 Percent Rule**

Treasury has had a long standing rule that limits the sum of a bidder's net long position plus its competitive awards to 35 percent of the auction. In the case of a reopening, holdings of the outstanding security are also counted in the calculation of a bidder's net long position. Recognizing that we have moved to a policy of regular reopenings, the issue has been raised that the 35 percent rule may adversely affect the ability of certain market participants to bid in certain Treasury reopening auctions. The Borrowing Advisory Committee has recommended that we revise the manner in which we apply the 35 percent limit reopenings. We are studying this issue and are seriously considering taking the Committee's recommendation to revise this rule.

**Terms of the November Refunding**

I will now turn to the terms of the November refunding. We are offering $20 billion of notes to refund approximately $23.9 billion of privately held notes maturing on November 15, paying down approximately $3.9 billion. The securities are:

1   A 5-year note in an amount of $12 billion, maturing November 15, 2005. If the auction of the 5-year note results in a yield in a range of 5.875 percent through and including

3

Nothern - 0310

11/01/00 07:53    202-544-7898->Massachusetts Financial Se/Nothern,Steve              005

11/01/2000  11:26    2025447163              DAVIS CAPITAL INV              PAGE  04

5.999 percent, the 5-year note will be considered a reopening of the 5-7/8 % 10-year note originally issued on Nov 15, 1995.

2    A reopening of the 5-3/4 % notes of August 2000, maturing August 15, 2010, in an amount of $8 billion.

These securities are scheduled to be auctioned on a yield basis at 1:00 p.m. Eastern Standard Time on Tuesday, November 7, and Wednesday, November 8, respectively.

As announced on October 30, 2000, we estimate that we will have a $30 billion cash balance on December 31 and on March 31. We expect to issue two more cash management bills, one in mid-November and the second in early December, to mature in mid-December.

The next quarterly refunding press conference will be held on January 31, 2001.

**Closing**

Before I close, I would like to say something on a personal note.  This will be the last quarterly refunding of the Clinton Administration.

This truly has been a remarkable period for Treasury debt management.  We have gone from the challenge of funding a deficit of $290 billion to managing a surplus of $237 billion.  That is over half a trillion dollars in improvement in annual budget results.  The past seven years also marks the longest series of consecutive years of fiscal improvement in American history.

As a result of these improvements, our publicly held debt now stands at just 34 percent of Gross Domestic Product, down from nearly 50 percent at the start of the Administration.

We have made significant changes in debt management while consistently maintaining a focus on our three key goals: sound cash management and achieving the lowest cost funding for the taxpayer over time, while promoting efficient capital markets.

We eliminated the seven- and three-year notes.  We reduced the frequencies and sizes of our remaining auctions.  We initiated a regular schedule of re-openings of our longer-term debt.  We extended uniform-price auctions to all of Treasury's marketable securities.  We worked closely with the Federal Reserve on revisions they made to purchases of Treasury debt for the System's Open Market account.  Most notably, we re-instituted debt buybacks, a practice first recommended by Alexander Hamilton, after a lapse of seventy years.

At the same time, we have sought to improve investor choices and promote savings by making Treasury securities more accessible.  We introduced inflation-indexed instruments, both as marketable Treasury securities and as savings bonds.  We lowered the minimum purchase requirement for all marketable Treasury securities to $1,000.  We made the Treasury Direct

4

Nothern - 0311

11/01/00 07:53       202-544-7090->Massachusetts Financial Se/Nothern,Steve                006

11/01/2000   11:26    2025447163             DAVIS CAPITAL INV          PAGE  05

program for individual savers fully electronic and accessible by telephone or the Internet.  We revamped our State and Local Government securities program to reduce costs and provide greater flexibility.  Finally, we made significant changes to the savings bond program to enhance returns to small savers and improve access, including making savings bonds available over the Internet.

We would not have been able to achieve these results without the commitment and professionalism of the staffs of Treasury's Offices of Cash and Debt Management and Market Finance.  The staffs of the Bureau of the Public Debt, other Treasury offices, and of our fiscal agent, the Federal Reserve Bank of New York, also have been indispensable to our debt management efforts.  I would like to thank all of them for their hard work and dedication throughout these eight years, and particularly during the three years I have spent here at Treasury.  Finally, I would also like to thank Treasury's Borrowing Advisory Committee for their support and counsel over these years, particularly the outgoing Committee chairman, Ken deRegt, and the new Chairman, James Capra.  We can all be very proud of our debt management accomplishments over the last eight years.

Thank you.

-30-

5

Nothern – 0312

FOIA – Confidential
Treatment Requested

Nothern
EXHIBIT NO. 15
1-31-07

Pete E-Mail Sent.txt
From: Pete Davis <pete@daviscap.com>
To: David.Greenlaw@morganstanley.com
CC: Ted Wieseman <Ted.Wieseman@morganstanley.com>

I've seen one report on CNN that Titon Corp. in San Diego is already
treating the mail for the Post Office.

Subject: Davis Capital email
Date: Mon, 29 Oct 2001 09:15:07 -0500
From: Pete Davis <pete@daviscap.com>
To: "Davis, Pete" <pete@daviscap.com>
BCC: Shelley Black <sblack@senderocapital.com>,
    Ken Davis <kend@pistolcreek.com>, Mike DeLoose <mdeloose@aol.com>,
    "Fosler, Gail" <Gail.Fosler@conference-board.org>,
    Lynn Fox <fox1@frb.gov>,
    Matthew Gleckler <Geckol@worldnet.att.net>,
    Michael Light <mlight99@earthlink.net>,
    "McMaster, David" <David_McMaster@byrd.senate.gov>,
    "Sedlock, Tom" <tsedlock@cnuber.com>,
    Bob Stein <bob_stein@budget.senate.gov>,
    "Sweet, Stuart" <capnet@erols.com>,
    Jason Webb <Jason_Webb@byrd.senate.gov>,
    "Woodward, Joan" <Joan.Woodward@gs.com>,
    "Yamazaki, Kazutami" <yamazaki@erols.com>,
    "Yorke, Stephen" <stephenyorke@yorkecap.demon.co.uk>,
    "Gallagher, Tom" <tgallagher@isigrp.com>,
    Bob McNally <Robert_C._McNally@opd.eop.gov>,
    Xavier Bonnet <xavier.bonnet@amb-wash.fr>,
    Jim Carter <James_E._Carter@opd.eop.gov>,
    YASUHIRO KAWAGUCHI <yasuhiro.kawaguchi@mofa.go.jp>,
    Stan Collender <collends@fleishman.com>,
    Michael Light <MLight@frk.com>,
    Trevor Greetham <TGreetham@exchange.uk.ml.com>,
    Yasuhiro Kawaguchi <yasuhirokawaguchi@hotmail.com>,
    "Franks, Sarah (London)" <FrankSar@exchange.uk.ml.com>,
    "Cohen, Bill" <billc@imsi.com>,
    "Glassman, Jim" <jglassman@chase.com>,
    Stephen Jonathan <Stephen.Jonathan@chase.com>,
    "Sharp, Bill" <bill.sharp@chase.com>,
    "Emsbo-Mattingly, Lisa" <lisa.e.mattingly@fmr.com>,
    Yasutaka Fukahori <yasutaka.fukahori@mofa.go.jp>,
    Takehiro Kagawa <takehiro.kagawa@mofa.go.jp>,
    KAZUYUKI KATAYAMA <kazuyuki.katayama@mofa.go.jp>,
    Shinichi Kitajima <shinichi.kitajima@mofa.go.jp>,
    Atsushi Niigata <niigata@us2.so-net.com>,
    Yoko Tsuda <yoko.tsuda@mofa.go.jp>, masahiko.kiya@mofa.go.jp,
    satoru.takahashi@mofa.go.jp,
    Takehiro Kano <takehiro.kano@mofa.go.jp>,
    "Neusser, Josef" <jjneusser@bloomberg.net>,
    Bill Adams <wadams@mfs.com>, "Hawkins, Richard" <rhawkins@mfs.com>,
    "Kurinsky, Geoffrey" <gkurinsky@mfs.com>,
    "Nothern, Steve" <snothern@mfs.com>, "Ryan, Matt" <mryan2@mfs.com>,
    Peter Sullivan <psullivan@mfs.com>,
    "Swanson, Jim" <jswanson@mfs.com>, Bob Persons <rpersons@mfs.com>,
    "Mark E. Dow" <MDow@MFS.com>,
    "Altman, Emily" <Emily.Altman@morganstanley.com>,
    Diane Merdian <diane.merdian@morganstanley.com>,
    Gerard Gardner <gerard.gardner@morganstanley.com>,
    David Greenlaw <David.Greenlaw@morganstanley.com>,
    Debra Levin <debra.levin@morganstanley.com>,
    Richard Berner <richard.berner@morganstanley.com>,
    Lloyd Byrne <lloyd.byrne@morganstanley.com>,
    Jay Deahna <jay.deahna@morganstanley.com>,
                          Page 845

DC 002509

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
Mark Edelstone <mark.edelstone@morganstanley.com>,
Aisling Freiheit-Kinch <Aisling.Freiheit-Kinch@morganstanley.com>,
Marc Frost <marc_frost@morganstanley.com>,
Louis Gerhardy <louis.gerhardy@morganstanley.com>,
"Graham, Roderick" <Roderick.Graham@morganstanley.com>,
"Kimball, Paul" <Paul.Kimball@morganstanley.com>,
Allison Montgomery <a.Montgomery@morganstanley.com>,
Mita Nambiar <Mita.Nambiar@morganstanley.com>,
Scott Patrick <Scott.Patrick@morganstanley.com>,
Jay Pelosky <jay.pelosky@morganstanley.com>,
Kenneth Posner <Kenneth.Posner@morganstanley.com>,
"Roach, Steve" <Stephen.Roach@morganstanley.com>,
Rebecca Runkle <rebecca.runkle@morganstanley.com>,
Art Soter <art.soter@morganstanley.com>,
Tim Stewart <Timothy.Stewart@morganstanley.com>,
Heidi Wood <heidi.wood@morganstanley.com>,
Ted Weiseman <ted.wieseman@morganstanley.com>,
Gail Daniel <Gail.Daniel@morganstanley.com>,
Amy Falls <Amy.Falls@morganstanley.com>,
Justin Hakimian <justin.hakimian@morganstanley.com>,
Jay Deahna <jaydeahna@home.com>,
"Cohen, Steve" <stevec@saccapital.com>,
"Cohn, Brian" <brianc@saccapital.com>,
Ed Debler <edmundd@saccapital.com>,
"Foley, Larry" <larryf@saccapital.com>,
Rich Grodin <richg@saccapital.com>,
"Handler, Mike" <mikeh@saccapital.com>,
"Lewis, Mark" <marcl@saccapital.com>,
"Weiner, Jon" <jonw@saccapital.com>,
"Canally, John" <jcanally@smra.com>,
"Canavan, John" <canavan@smra.com>, "Kim, Young" <ykim@smra.com>,
"Liro, Joe" <jliro@smra.com>, "McCarthy, Ward" <ward@smra.com>,
"Saporta, Dana" <dsaporta@smra.com>,
"Stone, Ray" <rstone@smra.com>,
"VandenHouten, Nancy" <nancy@smra.com>, Ken Kim <kim@smra.com>,
Sanela Pecenkovic <sanela@smra.com>,
"Dugger, Rob" <rob.dugger@tudor.com>,
"Mathews, Steve" <smathews@tudor.com>,
Chris Gate <Chris.Gate@Tudor.com>,
Angel Ubide <angel.ubide@tudor.com>,
"Hamilton, Debra" <debra.hamilton@kemper.com>,
Peter Hamilton <phamilton@medleyadvisors.com>,
Richard Medley <rmedley@medleyadvisors.com>,
Kevin Muehring <kmuehring@medleyadvisors.com>,
Josh May <jmay@medleyadvisors.com>,
David Steinhardt <DavidS@centinv.com>,
Allyson Sullivan <Allyson@Daviscap.com>,
Kevin Logan <klogan@drkw.com>,
John Youngdahl <John.Youngdahl@gs.com>,
William Dudley <William.Dudley@gs.com>,
John Tormondsen <peter.tormondsen@gs.com>,
Peter Gerhard <peter.gerhard@gs.com>,
Jason Evans <jason.evans@gs.com>, Irene Tse <irene.tse@gs.com>,
Christian Siva-Jothy <christian.siva-jothy@gs.com>,
Andrew Law <andrew.law@gs.com>, Karl Devine <karl.devine@gs.com>,
Max Trautman <max.trautman@gs.com>,
Chris Carrera <chris.carrera@gs.com>, Ed Eisler <ed.eisler@gs.com>,
Ashok Varadhan <ashok.varadhan@gs.com>,
David Blake <david.blake@gs.com>,
"Falconer, Bob" <bob@sangamon.com>, Chris <Chris@Sangamon.com>,
Gene <Gene@Sangamon.com>,
"Anderson, Lincoln" <Lincoln.Anderson@lpl.com>,
Paul Kasriel <plk1@ntrs.com>,

DC 002510

FOIA - Confidential
Treatment Requested

Pete E-Mail Sent.txt
"Maki, Dean" <dean_maki@putnaminv.com>,
Adrian Weller <Adrian.Weller@wfg.com>,
Jonathan Francis <Jonathan_Francis@putnaminv.com>,
Tomas Jelf <tjelf@nexus.bm>, Evan Lamp <elamp@home.com>,
Jordan Grayson <grayson@midtowncap.com>,
Haseeb Ahmed <haseeb.ahmed@bankofamerica.com>,
Timothy Martin <timothy.martin@bankofamerica.com>,
Caroline Baum <CABAUM@bloomberg.net>, D Brown <dbrown@iinews.com>,
"Gersh, Darren" <darren_gersh@wpbt.org>,
Angela Heath <angela_heath@wpbt.org>,
Toby McIntosh <tmcintos@bna.com>, Art Pine <apine@bloomberg.net>,
"O'Toole, Quinn" <Quinn_Otoole@wpbt.org>,
"Wade, Taron" <wadet@iinews.com>,
Anna Willard <Anna.Willard@reuters.com>,
Noam Neusner <nneusner@usnews.com>,
Simon Kennedy <SKENNEDY4@bloomberg.net>,
Brendan Murray <brmurray@bloomberg.net>

Davis Capital Investment Ideas  10-29-01    9:10 AM

Washington Calendar, October 29-November 2

President Bush speaks to the U.S.-Sub-Saharan Africa Trade and Economic
Forum at 11:15 AM and chairs the first meeting of the Homeland Security
Council at 2 PM today.

Congress…Wednesday, the House will take up the aviation security bill, H.R.
3150, and the Treasury-Postal Appropriations conference report, H.R. 2590.
The Senate will take up Labor-HHS Appropriations, H.R. 3061, and victims'
relief, H.R. 2884, this week.

Monday 29:
    9:30 AM    O'Neill, "Plenary on Terrorism Financing," DC
    4:15 PM    O'Neill, AGOA Forum Session, DC

Tuesday 30:
    2 PM        Postmaster General Potter, postal safety hearing, House
Government Reform

Wednesday 31:
    9 AM        Fisher, Treasury Quarterly Refunding, DC
    10 AM       O'Neill, National Association of Manufactures, DC
    10 AM       Ex-Im Bank mark up, House Financial Services
    10 AM       Internet gambling mark up, House Financial Services
    10 AM       Price-Anderson Act mark up, House Energy

Thursday 1:
    9:30 AM   Rail security hearing, Senate Commerce
    9:30 AM   Electric power emissions hearing, Senate Environment
    10 AM     Consumer credit hearing, House Financial Services
    10 AM     Fuel economy hearing, House Science
    1PM        MTBE hearing, House Energy
    2 PM        Chemical site security hearing, Senate Environment
    2 PM        Retirement account deposit insurance hearing, Senate Banking
    2:30 PM   Retirement security hearing, House Education

© 2001  Davis Capital Investment Ideas    Call 202-544-7098


                    REDACTED


                        Page 847

FOIA - Confidential
Treatment Requested

Nathern
**EXHIBIT NO.** 17
1-31-07



## Davis Capital Investment Ideas

503 Capitol Court N.E.  Suite 200
Washington, D.C.  20002

202-544-7098
202-544-7163 fax

October 30, 2001

**To:**     Clients

**From:**   Pete Davis

**5 pages including this cover.**

Charts from this morning's Treasury Refunding follow.

DC  000419

Excerpt from the

June 26, 2006 deposition of

David Kennedy

Exhibit P

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


            )

UNITED STATES SECURITIES AND )

EXCHANGE COMMISSION,     )

Plaintiff,        )

            )

vs.           )

            )

STEVEN E. NOTHERN,     )

Defendant.       )

     C.A. 05-10983 (NMG)


VIDEOTAPED DEPOSITION OF DAVID

KENNEDY, a witness called on behalf of the

Plaintiff, pursuant to the provisions of the

Massachusetts Rules of Civil Procedure,

before Jill Shepherd, Registered

Professional Reporter and Notary Public, in

and for the Commonwealth of Massachusetts,

at the offices of U.S. Securities and

Exchange Commission, 33 Arch Street, Boston,

Massachusetts, on Monday, June 26, 2006,

commencing at 10:18 a.m.

Page 34

1 right, what was present there?
2 A. It's been a while. On my left I had
3 several, I think, upright file holders, but
4 I was looking at the back of Rick Smith's
5 computer monitors. In front of me, it was a
6 kind of a tilted turret with the telephone
7 buttons that rose maybe 18 inches or so in
8 front of me. I could look right at John
9 Cadogan.
10 Q. Was there anything on his desk that obscured
11 your ability to see him?
12 A. Not really. I mean, every now and then
13 piles of paper could creep up high, but
14 normally I could see John pretty clearly.
15 Q. All right.
16 A. Unless he was trying to hide behind his
17 monitor. On my right I had two computer
18 screens. My telephone on the desk. There
19 was a separate telephone. Then I was also
20 facing the back of Geoff Kurinsky's computer
21 monitors.
22 Q. You said there was a tilted turret that had
23 phones on it. Can you describe what that
24 was?
25 A. Those were direct lines to the brokers.

Page 35

1 Q. Why would you have direct lines to the
2 brokers?
3 A. Easy access, so you didn't have to bother
4 dialing. You just pick up the line, push a
5 button and it would ring on a broker's desk,
6 the person who was covering you.
7 Q. Which brokers did you have direct access to?
8 A. There were a dozen or more, Lehman Brothers,
9 Goldman Sachs, Morgan Stanley. Some who are
10 no longer with us: PaineWebber, there was
11 --
12 Q. Was Merrill Lynch one of the --
13 A. Merrill Lynch, UBS and others.
14 Q. So if you picked up the phone and pressed
15 the button, somebody would be on the other
16 end?
17 A. Correct.
18 Q. You also said you had -- if you looked to
19 your right, you had your computer monitors
20 and a phone. What was that phone for?
21 A. That was an internal phone or a phone used
22 to make outside calls. Your basic land
23 line.
24 Q. You said you had two computer monitors.
25 What did you use those computer monitors

Page 36

1 for?
2 A. Primarily, I used it for Bloomberg.
3 Q. What's Bloomberg?
4 A. Bloomberg is a financial information
5 service. But also on the computer I had
6 Excel, Word, so I would use those programs
7 for other work.
8 Q. Did you have Internet access?
9 A. Yes, I think we did. Yes, we definitely
10 did.
11 Q. Did you use that for anything?
12 A. Yes.
13 Q. What did you use that for?
14 A. Primarily, almost exclusively to access
15 broker websites. I would have access to
16 Lehman Brothers' website, Morgan Stanley's
17 website, the Salomon Brothers' website. I
18 would use that to read their strategy
19 pieces. Rather than waiting for hard copies
20 in the mail, you could go online and read
21 strategy pieces.
22 Q. Did you need a password or anything to get
23 into --
24 A. Yes.
25 Q. Were you a client of theirs for their

Page 37

1 research?
2 A. Yes.
3 Q. Did you use the Internet access for anything
4 else?
5 A. No.
6 Q. Was there anything that you used to access
7 news?
8 A. Bloomberg provides news. That's really my
9 primary source through the electronic
10 system; they have a scrolling news wire on
11 several of their screens.
12 Q. Can you explain how the news scrolls on that
13 service for Bloomberg.
14 A. As they put out a news article, it would be
15 the No. 1, and then if something else comes
16 out, it scrolls to 2, and it's a fairly
17 constant stream of information. So if you
18 don't watch it for 30 seconds, you've
19 probably missed, you know, four news
20 articles.
21 Q. How many news articles -- which, the full
22 articles or headlines?
23 A. Just the headlines.
24 Q. Do you know how many -- excuse me -- how
25 many headlines would there be that you could

Page 38

1    see at one time?
2    A. Five, maybe six.
3    Q. Aside from the Bloomberg news, what else did
4       you use Bloomberg for?
5    A. Analytics, watching the markets, Treasury
6       markets, mortgage-backs, corporates. I
7       mean, it's kind of all-encompassing.
8    Q. So you would have price data for the various
9       securities?
10   A. Yes.
11   Q. That was through Bloomberg, correct?
12   A. Yes.
13   Q. In October of 2001, were you aware of
14      something called "Treasury refunding
15      announcements"?
16   A. Yes.
17   Q. What was your understanding in October of
18      2001 what Treasury refunding announcements
19      were?
20   A. It was when the Treasury announced the
21      various amounts for maturities to be issued.
22      We talked about new issues; these would be
23      the new issues.
24   Q. What was your understanding in October of
25      2001 how often the Treasury made those

Page 39

1    announcements?
2    A. They were usually done on a quarterly basis.
3    Q. Quarterly for which issue?
4    A. Oh, it varied. I don't -- I don't recall
5       exactly which maturities were in line for
6       October of 2001. With each refunding, they
7       don't always issue a two-year or they don't
8       always issue a five-year.
9    Q. Was the 30-year bond that we discussed
10      earlier, is that something that was done on
11      a quarterly basis?
12   A. No. I think that was done every six months.
13   Q. All right. And was the Treasury funding
14      announcement something that you followed as
15      part of your management of the total return
16      and the clone funds?
17   A. Yes.
18   Q. Why is that?
19   A. It was relevant to the market. Prior to the
20      announcements, the street had a pretty good
21      idea of what the government's borrowing
22      needs were. And so, you know, over the
23      two-week period prior to any announcement,
24      it would be mentioned in many strategic
25      pieces regarding the Treasury market or just

Page 40

1    the fixed income markets in general.
2    Whenever you have new supply coming to the
3    market, you need to be conscious of it. So,
4    yes, I mean, it was important.
5        If the announcement -- if the needs
6    were greater than expected, it could have a
7    detrimental effect on Treasury prices. If
8    it was less than expected, then it could be
9    advantageous.
10   Q. Now, did you take any steps to find out when
11      this Treasury refunding announcement was
12      going to be made?
13   A. I am sure I was aware of it. It could have
14      been through the Wall Street Journal, the
15      New York Times or a strategic piece, and it
16      could have been through general discussions
17      on the trading desk or in a meeting.
18   Q. And was there a Treasury refunding
19      announcement on October 31, 2001?
20   A. Yes.
21   Q. And did you know prior to October 31, 2001
22      that the Treasury was going to be making an
23      announcement that day?
24   A. Yes.
25   Q. How far in advance of the 31st were you

Page 41

1    aware that there was going to be an
2    announcement that day?
3    A. I don't remember.
4    Q. Did you know what time it was going to be
5       that day?
6    A. Yes.
7    Q. What time -- well, on the morning of
8       October 31, 2001, prior to the announcement,
9       did you know what time the announcement was
10      going to be that day?
11   A. Yes.
12   Q. When did you learn what time the
13      announcement was going to be?
14   A. I don't remember. Some time before
15      October 31st.
16   Q. And what time did you learn the Treasury
17      refunding announcement for October 31, 2001
18      was going to be?
19   A. When did I learn?
20   Q. What time did you learn the announcement was
21      going to be that day?
22          MR. SHOPE: Objection.
23   Q. You can go ahead and answer.
24   A. 10 o'clock a.m.
25   Q. Specifically for October 31, 2001, where is

Page 58

1  Q. Where was that TV?
2  A. It was directly behind me.
3  Q. And --
4  A. Hanging from the ceiling.
5  Q. Was that TV on during the workday?
6  A. Yes.
7  Q. Was the sound up on it?
8  A. No.
9  Q. Did you use the TV to get -- as a source of
10    information during the course of your
11    workday?
12 A. Not often.
13 Q. Did you glance up at it occasionally during
14    a workday?
15 A. Rarely.
16 Q. Do you know who did, if anybody?
17 A. No.
18 Q. Okay. Was it tuned to any particular
19    channel?
20 A. Yeah.
21 Q. What channel was that?
22 A. I believe it was MSNBC. I think that's what
23    it was. Anyone could have changed the
24    station and I would not have known it.
25 Q. Well, if there were guys present in the room

Page 59

1     and there was a remote control, I'm sure
2     somebody was changing it, right?
3  A. Whenever there was golf, it would have been
4     on.
5  Q. In your time in the industry, have you taken
6     any professional exams?
7  A. Yes.
8  Q. What professional exams?
9  A. I held my series 7 from 1985, I think, 1987.
10 Q. What was a series 7?
11 A. It's the -- you will know this better than
12    I. It's the broker's, you know, sales
13    license.
14 Q. Did you have any other professional exams
15    that you passed?
16 A. There was one other that went with it, and I
17    don't remember the designation.
18 Q. Series 65?
19 A. 65.
20 Q. And what did a series 65 do?
21 A. I don't remember.
22 Q. Were there any others that you have taken?
23 A. No.
24 Q. Do you have a series 65?
25 A. Not prior to October 31st.

Page 60

1  Q. After October 31st?
2  A. Yes.
3  Q. What have you taken?
4  A. With my current employer, I took the -- Oh,
5     series 55, 53. Something like that. We
6     don't really use it, so I have to kind of
7     take it and forget about it.
8  Q. Okay. On October 31, 2001, you said you
9     looked over your -- let me withdraw that.
10    You indicated that your typical day at work,
11    you'd come in and you'd look at the
12    portfolios and see that the trades were
13    done.
14       Would you make any determination
15    during the course of the day that you had
16    funds that you wanted to invest that day?
17       MR. SHOPE: I'm sorry, could I have
18    the question reread.
19       (Question read.)
20 A. Yes.
21 Q. When, during the course of the day, would
22    you make that determination?
23 A. I would be -- watch how much cash was
24    available in each portfolio and whether I
25    thought it was too little or too much.

Page 61

1  Q. On October 31, 2001, had you made any
2     determination of how much cash you had?
3  A. I only remember from what I have read in my
4     transcript that there was cash available.
5  Q. Okay. If you didn't have cash available,
6     would you be able to make purchases?
7  A. Yes.
8  Q. And how would you pay for those purchases if
9     you didn't have cash available?
10 A. I could sell something else.
11 Q. I see. On October 31, 2001, did you hear
12    information about the Treasury Department's
13    30-year bond?
14 A. Yes.
15 Q. All right. When was the first time you
16    heard anything about the Treasury
17    Department's 30-year bond on October 31,
18    2001?
19 A. When Steve Nothern said he had heard the
20    Treasury was going to eliminate the 30-year
21    Treasury.
22 Q. And did he say who he heard that from?
23 A. I think my memory was better when I gave my
24    first deposition, and I think according to
25    that it was that Pete Davis had told him

Page 62

1    that the Treasury was going to eliminate the
2    30-year Treasury.
3    Q. Did you know -- well, approximately what
4    time was it that Steve Nothern made this
5    statement?
6    A. Again, I'd have to refer to my transcript.
7    Q. Okay.
8    A. I just don't remember.
9    Q. All right. Why don't you go ahead and do
10    that and let me see if I can help you with
11    the page.
12    A. (Witness reading.)
13    Q. Well, you know, on that specific question,
14    we're going to come back to that --
15    A. Okay.
16    Q. -- and just move on to some other questions
17    regarding that.
18        When -- as you sit here today, what do
19    you recall is it that Steve Nothern said?
20    A. Again, my memory has been refreshed by the
21    transcript that, you know, Steve said, you
22    know, "I heard from Pete Davis that the
23    Treasury was going to eliminate the 30-year
24    Treasury."
25    Q. And had you -- prior to Steve Nothern making

Page 63

1    this statement, had you ever heard the name
2    Pete Davis?
3    A. No.
4    Q. And referring to Exhibit 4, can you indicate
5    for me on that exhibit where Steve Nothern
6    was when he made that statement?
7    A. I remember Steve standing roughly behind
8    Rick Smith's position.
9    Q. Let me hand you a pen and write the initials
10    "SN" for Steve Nothern, where he was.
11    A. Okay. (Witness complies.)
12    Q. Okay. And you've just circled that?
13    A. I have.
14    Q. We'll have the record reflect that the
15    witness has drawn in the initials "SN" and
16    circled it in the station between Nothern
17    and Smith, a little closer to Smith's
18    location.
19        MR. SHOPE: May I take a look at
20    that.
21        MR. ROSSETTI: Sure.
22    Q. And was he standing at that location?
23    A. Yes.
24    Q. Just prior to Mr. Nothern making that
25    statement, what were you doing?

Page 64

1    A. I don't remember.
2    Q. Where were you just prior to Nothern making
3    that statement?
4    A. I was sitting at my station.
5    Q. And that would have -- as you look at
6    Exhibit 4, that would have been station 243?
7    A. Yes.
8    Q. What would you say the approximate distance
9    from where you have noted Steve Nothern was
10    to where you were?
11    A. 10 feet.
12    Q. And how loud was the statement; you know,
13    what level of voice did he make that
14    statement in?
15    A. It was loud enough for me to hear it.
16    Q. When you heard it, did you hear it well or
17    did it seem faint to you?
18        MR. SHOPE: Objection.
19    A. It was clear.
20    Q. Okay. What did you do when you heard that
21    statement?
22    A. I don't remember specifically what I did
23    after. A conversation ensued about the
24    Treasury and what we should do.
25    Q. A conversation ensued between whom?

Page 65

1    A. Steve Nothern, Rick Smith, Geoff Kurinsky,
2    myself. That's what I remember.
3    Q. And what did you -- what was stated during
4    this discussion?
5    A. What we should do. Whether we should buy or
6    not buy the Treasury, the 30-year Treasury.
7    Q. What did you say?
8    A. I don't remember specifically what...
9    Q. Did Steve Nothern say anything?
10    A. I do recall at one point saying, "Well, what
11    are we going to do?" Or "What are you going
12    to do?" And, you know, Steve saying, "I'm
13    going to buy the Treasury" --
14    Q. When you say --
15    A. -- "the 30-year Treasury."
16    Q. Okay. The 30-year Treasury bond, is that --
17    A. Yes.
18    Q. Did Smith say anything?
19    A. At some point, he put in an order to buy --
20    Q. Smith?
21    A. -- Smith put in an order to buy the 30-year
22    Treasury bond with John Cadogan.
23    Q. Do you know how many Rick Smith put in an
24    order with Cadogan?
25    A. I don't remember.

Page 66

1  Q. What about Kurinsky?
2  A. He placed an order also.
3  Q. Do you know how much his order was?
4  A. I don't remember.
5  Q. Now, they, Smith and Kurinsky, were placing
6     an order for 30-year bonds as well?
7  A. Yes.
8  Q. Did you also place an order for 30-year
9     bonds?
10 A. Yes, I did.
11 Q. I'm just trying to run this chronologically
12    the best that we can. How much time elapsed
13    from the time that Nothern made this
14    statement that he had heard from Davis that
15    the Treasury was going to eliminate the
16    30-year bond and Nothern making the
17    statement that he was going to buy Treasury
18    bonds?
19 A. I'm sorry, could you --
20 Q. How much time elapsed from the time that
21    Nothern made the statement that he heard
22    from Davis that the Treasury was going to
23    cancel the 30-year bond and his statement
24    that he was going to buy Treasury bonds?
25 A. No more than a minute or so.

Page 67

1  Q. And did Nothern indicate the amount of
2     Treasury bonds he was going to purchase?
3  A. I don't know, but he must have.
4  Q. Between you, Smith and Kurinsky, who made
5     the next -- who was the next person to make
6     any statement that they were going to
7     purchase bonds?
8        MR. SHOPE: Objection to the form.
9  A. I don't remember if Steve was the first and
10    I don't remember the order in which it
11    happened. I think it was all within seconds
12    of each other.
13 Q. Okay. And did you actually place an order
14    with Cadogan to purchase bonds?
15 A. Yes.
16 Q. How much was that order?
17 A. 25 million.
18 Q. And prior to Nothern making this statement
19    that he heard from Peter Davis that the
20    Treasury was going to eliminate the bond,
21    did you hear anything else that morning
22    about the bond?
23 A. No.
24 Q. Had you received any e-mails about the
25    30-year Treasury bond that morning?

Page 68

1        MR. GOLDSTEIN: At any time that
2     morning?
3        MR. ROSSETTI: At any time that
4     morning prior to hearing Nothern's
5     statement.
6  A. No.
7  Q. At what point did you make a decision to
8     purchase the 30-year bonds?
9  A. You know, at that time, following Steve's
10    announcement, that's when I made the
11    decision.
12 Q. And what led you to that decision to
13    purchase the 25 million in Treasury bonds?
14 A. That if, in fact, the Treasury were
15    eliminating the bonds, you would want to own
16    the Treasury; the price probably would go
17    up.
18 Q. Was there anything else that factored into
19    your decision to purchase bonds?
20 A. Not at that moment.
21 Q. So prior to you purchasing bonds, the only
22    thing that prompted you to purchase them was
23    Nothern's statement?
24 A. Yes.
25 Q. Was there anything about the fact that he

Page 69

1     was purchasing bonds, did that affect your
2     decision?
3  A. Yes, it did.
4  Q. How so?
5  A. I have confidence in Steve Nothern and his
6     knowledge of the marketplace, and if Steve
7     thought this was an opportunity to purchase,
8     you know, the Treasury at a decent price,
9     then I would follow him.
10 Q. So if his purchasing bonds affected your
11    decision to purchase, would it be fair to
12    say then that his purchase occurred first or
13    his statement that he was going to purchase
14    came before yours?
15 A. Yes.
16 Q. Was there anything else other than this
17    statement that Nothern made in which he said
18    he heard Davis -- he heard from Davis that
19    the Treasury was going to eliminate the bond
20    and Nothern's statement that he was going to
21    purchase bonds, was there anything else that
22    influenced your decision to purchase bonds
23    at that point?
24 A. I probably at the time realized I was
25    sitting on some cash, and as a result -- I

Page 78

1  the 30-year Treasury as the government
2  surplus -- it actually was a surplus -- at
3  one point, the Treasury yield curve was flat
4  and it just didn't make sense to issue
5  30-year bonds. So it had been discussed in
6  different strategy pieces. It had been
7  discussed at Harbor Capital before I went to
8  MFS.
9  Q. You mentioned that there was a government
10  surplus. A government surplus of what?
11  A. That they were taking in more revenues than
12  they were spending.
13  Q. The good old days, right?
14  A. Good old days.
15  Q. And you mentioned this yield curve. What do
16  you -- when you said "yield curve," what are
17  you talking about?
18  A. The "yield curve" is nothing but a graphical
19  representation of the Treasury yields going
20  from the 90-day T-bill to the 30-year, and
21  if you graph it along a plot, you have the
22  yield curve.
23  Q. So would it be fair to say as a result of
24  the government surplus, it was one of the
25  things that was driving this discussion

Page 79

1  about the elimination of the bond, 30-year
2  bond?
3     MR. SHOPE: I'm sorry, can I have
4  that reread?
5     (Question read.)
6     MR. SHOPE: Objection to the form.
7  I don't think that's really a question.
8     MR. ROSSETTI: Yeah.
9  Q. So was it this discussion about -- or the
10  fact that the government was running
11  surpluses, budget surpluses, was that one of
12  the factors that was driving this discussion
13  about the potential cancellation of the
14  bond?
15  A. Yes.
16  Q. Now, when Nothern made this statement that
17  he had heard from Davis that the bond was
18  going to be eliminated, what was his tone of
19  voice?
20  A. Matter of fact.
21     MR. GOLDSTEIN: By that, you mean
22  Nothern's tone of voice?
23     MR. ROSSETTI: Nothern's tone of
24  voice.
25  A. Yes.

Page 80

1  Q. Nothern's voice was matter of fact?
2  A. Yes.
3  Q. Did there come a point in time on October
4  31, 2001 that you learned that the Treasury
5  had actually announced that they were going
6  to cancel the 30-year bond?
7  A. Yes.
8  Q. When was that?
9  A. I recall that John Cadogan announced that it
10  had appeared on the Treasury website.
11  Q. What time was it that John Cadogan made that
12  announcement?
13  A. I don't remember.
14  Q. Did John Cadogan state if he had gone to the
15  website to see for himself?
16  A. I don't remember if he did himself.
17  Q. And did John Cadogan state where he had
18  learned that information?
19  A. I don't remember.
20  Q. Did you go visit the Treasury Department's
21  website?
22  A. No, I did not.
23  Q. Did John Cadogan make that statement before
24  you placed the order for the bonds?
25  A. It was after.

Page 81

1  Q. How much after you placed the order for the
2  bonds did Cadogan make that statement?
3  A. I don't remember.
4  Q. Was it a matter of minutes?
5     MR. SHOPE: Objection.
6  A. Well, minutes, 20 minutes, five minutes? I
7  mean, I don't remember. It was after the
8  orders were placed.
9  Q. Okay. When you heard from -- when you heard
10  Cadogan make the statement that the
11  cancellation of the bond or elimination of
12  the bond was posted on the Treasury website,
13  did you connect that at all with the
14  statement that Nothern had made earlier?
15  A. Yes.
16  Q. And what connected it in your mind?
17  A. I guess it's true.
18  Q. When Nothern made this statement that he had
19  heard from Peter Davis that the Treasury was
20  going to eliminate the bond, did he mention
21  the name Peter Fisher?
22  A. Not that I remember.
23  Q. On October 31, 2001, prior to you placing
24  the trade, did you know who Peter Fisher
25  was?

Page 82

1  A. Yes.
2  Q. Who was Peter Fisher?
3  A. To the best of my recollection, Peter Fisher
4     at one time worked for the Treasury in
5     New York City, made some headlines with the
6     Long-Term Capital Management hedge fund
7     issue, and then at some point his career
8     moved from the New York office to
9     Washington.
10 Q. Do you know if he was with the Treasury
11    Department or the Federal Reserve?
12       MR. SHOPE: Objection.
13 A. I thought he was with the Treasury.
14 Q. So the morning of October 31, 2001, you knew
15    that Peter Fisher was a member of the
16    Treasury Department?
17 A. I think if someone had asked me about him I
18    would have said he works for the Treasury.
19 Q. I see. And you didn't hear Peter Fisher's
20    name mentioned that morning by Steve
21    Nothern?
22 A. I don't recall hearing his name that day.
23 Q. Did Steve Nothern mention anything in this
24    statement that he heard from Davis, the bond
25    was going to be eliminated, did he mention

Page 83

1     anything about a press release?
2  A. No, not that I remember. No.
3  Q. Did Steve Nothern mention anything about a
4     10 a.m. announcement?
5  A. When he stood up and made his statement to
6     the trading desk?
7  Q. Yes.
8  A. No.
9  Q. Did he make a statement that there was going
10    to be a 10 a.m. announcement at any point
11    that morning?
12 A. Not that I remember. Again, I only say that
13    he may have mentioned something at the
14    9 o'clock meeting and I just -- I don't
15    remember.
16 Q. When Steve Nothern had stood up and made the
17    statement that Pete Davis indicated -- he
18    heard from Pete Davis that the Treasury was
19    going to eliminate the bond, did Steve
20    Nothern mention anything else that indicated
21    to you that the information that he was
22    providing was confidential?
23       MR. SHOPE: Objection.
24 A. No.
25 Q. Did he say anything at that point indicating

Page 84

1     that the information was nonpublic?
2  A. No.
3  Q. Did he mention the term "embargo" at all?
4  A. No.
5  Q. Did you hear the term "embargo" from Steve
6     Nothern on October 31, 2001?
7  A. No.
8        MR. ROSSETTI: If we can go off the
9  record.
10       THE VIDEOGRAPHER: Off the record
11    at 12:02.,
12       (Short recess.)
13       THE VIDEOGRAPHER: The time is
14    12:04. This is the end of cassette one. We
15    are off the record.
16       (Short recess.)
17       THE VIDEOGRAPHER: The time is
18    12:14. This is the beginning of cassette
19    two in the deposition of Mr. David Kennedy.
20    We are on the record.
21       (Pause.)
22 Q. Mr. Kennedy, you indicated that you placed a
23    $25 million trade with Cadogan for the
24    bonds. In relation to other bond trades you
25    have made for the 30-year Treasury bond,

Page 85

1     where was this trade in order of magnitude
2     compared to others?
3  A. It was one of my larger trades.
4  Q. Did you typically trade blocks of $25
5     million in Treasury bonds?
6  A. No.
7  Q. Why did you place such a large trade on this
8     particular occasion?
9  A. The answer to your question: I thought the
10    news was significant enough to warrant a
11    larger position -- a larger single trade.
12    In the past, I would have broken the trades
13    down into smaller pieces, whereas the -- so
14    if you added my trades up throughout a day
15    or even two-day period, it would have been
16    more than 25 million.
17 Q. I see.
18 A. Another factor is the funds had grown over
19    the last -- it's a two-year period that I
20    managed them, so you had to buy increasingly
21    larger pieces.
22 Q. Did you -- you said Nothern placed a trade,
23    you placed a trade, you thought Smith and
24    Kurinsky did as well. Did you all place
25    individual trades or did you aggregate it

Excerpt from the

September 27, 2006

deposition of Galen Criqui

Exhibit Q

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES SECURITIES )
AND EXCHANGE COMMISSION, )
                         )
          Plaintiff,     )
                         ) Civil Action
          vs.            ) No. 05-10983(NMB)
                         )
STEVEN E. NOTHERN,       )
                         )
          Defendant.     )
------------------------)


VIDEOTAPED DEPOSITION OF GALEN CRIQUI

New York, New York

Wednesday, September 27, 2006


Reported by:
Elia E. Carrion
JOB NO. 7530

Page 62

G. Criqui

1
2    A.  Yeah, I mean -- I can answer,
3    though, right?
4    Q.  Yes, if you understand the
5    question.
6    A.  Sure.  And I kind of mentioned it
7    before.  You can do that all you want, you
8    just won't get any more calls back from that
9    customer.  And their boss, the PM, will
10   eventually call your desk and say, listen,
11   your trader's way off market, you're not
12   competitive, what reason do we have to
13   continue calling you?
14        So that's always an issue.  You've
15   got to be fairly close to the market, even
16   when the bond goes up six points in one day
17   and, you know, you're short 40 bonds or
18   something like that, for, you still have to
19   make markets for other people.
20        Now, you know, even if you're getting
21   destroyed, your P&L, it's a horrible day,
22   it's the most biggest one-day move in the
23   bond history, you still have to make markets
24   for other customers.
25   Q.  But your obligation as a

Page 63

G. Criqui

1
2    market-maker is to propose a price for
3    whatever inquiry is made?
4        MS. WILLIAMS:  Objection.
5        MR. FUMAI:  Objection.
6    Q.  Is that correct?
7    A.  Propose a price --
8    Q.  Or --
9    A.  I wait for the customer -- I wait
10   for the salesman to reflect to me what the
11   customer wants to do, and at that time I give
12   back a price.
13   Q.  Is, is this a legal obligation, or
14   is this a -- go ahead.
15        MS. WILLIAMS:  Objection.
16        MR. FUMAI:  Objection.
17   Q.  Is this a legal obligation?
18   A.  I don't know.  I'm not sure.
19   Q.  How do you understand the
20   obligation of being a market-maker?
21   A.  Just, just simply by working for a
22   competitive firm.  It's in a competitive
23   industry, and you know, that you have to, you
24   have to make markets for good, legitimate
25   institutional customers, and that's that; and

Page 64

G. Criqui

1
2    having a decent feel for liquidity of the
3    marketplace.  That's basically it.
4    Q.  Okay.  Is this an issue that you
5    were trained on?
6    A.  No.
7        I mean we all pretty much start out
8    as junior traders on the desk, and you get to
9    sit with the senior traders and you just
10   learn over time.  They certainly don't have
11   any guys that are there for just a few months
12   trading institutional for Merrill Lynch.
13   It's definitely you've spent your time
14   watching the senior guys, watching the prices
15   they put on trades for certain customers for
16   certain sizes, at different times when the
17   market's volatile or not that volatile.  It's
18   just over time you earn their respect, and
19   they give you a shot at some point.
20   Q.  Now, going back --
21        MR. TOONE:  I'm sorry.
22        MR. ROSSETTI:  Can we take a break?
23        MR. TOONE:  Sure.  Is this a good
24   time?
25        THE VIDEOGRAPHER:  The time is

Page 65

G. Criqui

1
2    10:56 a.m., and we're going off the
3    record.
4        (Recess taken.)
5        THE VIDEOGRAPHER:  The time is
6    11:12 a.m., and we are back on the
7    record.
8    Q.  So when we left off, Mr. Criqui, we
9    were talking about the general process that
10   took place with the trade as of October 2001.
11        And, you had just explained the
12   process that you went through, in terms of
13   announcing a price in response to a customer
14   inquiry?
15   A.  (Indicating.)
16   Q.  What happens next?
17   A.  Like I said, we were -- I'm on the
18   phone with the salesman, he reflects the
19   inquiry, I give him the price, he reflects
20   that price immediately to the customer, to
21   the trader who works with the customer's
22   shop, and the customer then agrees to the
23   price or passes.
24        And the way it usually works is if
25   the customer balks or hesitates and doesn't

17 (Pages 62 to 65)

G. Criqui

1  give an answer upon hearing my price or the
2  trader's price, the trader can break the
3  line, if he wants; meaning, the market's
4  moving, customer says offer 50 bonds, I put a
5  level on it, the customer -- the salesman
6  reflects the price back to the customer, and
7  the customer's like, doesn't say anything for
8  two or three seconds, I am then, I can, if I
9  want, I'm entitled, particularly if the
10  market's moving, I can reflect to the
11  salesman on the subject, if there's
12  hesitation on the customer's part on the
13  subject, meaning the price is no longer
14  binding, no longer held.
15       That means the bonds were 20, 21, I
16  offered him 50 at 21; and in the time that I
17  reflected the price, the bonds have gotten 23
18  bid, and the customer's hesitated a little
19  bit; so the customer -- so I have that right,
20  after a hesitation on the customer's part,
21  and then the customer can say, all right,
22  where can you offer them now? And I'll be
23  like, all right, I'm at 24 now. The customer
24  could be done then.

G. Criqui

1       But usually that doesn't happen too
2  often. Usually the case is offer 50 bonds, I
3  offer him, it's pretty vanilla stuff, the
4  customer says you're done, and I say okay.
5  And at the time that he says done and I agree
6  to him saying done and the timing's good, the
7  trade is done at that verbal commitment on
8  both our parts. That's when the trade is
9  done.
10     Q. Let's go back a second.
11         When you're talking about the
12  customer balking, are you now on the same
13  phone line as the customer in Boston and the
14  salesperson?
15     A. No.
16     Q. How exactly does it work, then?
17     A. Yes. That the customer is on the phone with
18  our salesman, our salesman kind of will
19  either put him on hold for a second, or maybe
20  he'll have two phones going, put him on hold,
21  Galen, offer 50 bonds at 21; John, 21, done.
22  That's how it works.
23     Q. Can you hear what the salesperson
24  in Boston is saying to the customer?

G. Criqui

1     A. No.
2     Q. So I'm just trying to understand,
3  under what circumstances would you say
4  subject?
5     A. In the customer, if I give him the
6  price back, again we're trading pretty
7  vanilla stuff here, we're not trading, you
8  know, mortgages or anything like that. I
9  give him the price quick, customer says done
10  right away, or the customer can say pass
11  right away, or the customer can be like kind
12  of hesitates, doesn't pull the trigger right
13  away, two or three seconds elapses, the
14  market moves a little bit, I can at that time
15  say subject on subject.
16     Q. I guess I'm just trying to
17  understand. You're playing a game of
18  telephone literally here, right? You're
19  communicating with the salesperson, the
20  salesperson is communicating with the
21  customer?
22     A. (Indicating.)
23     Q. But you were never in direct
24  communication with the customer during the

G. Criqui

1  process; is that correct?
2     A. No.
3       I will say this: On occasion, as I
4  said, we do talk to the customers direct
5  sometimes for market color and whatnot, and
6  sometimes they will do a trade directly with
7  us, while I'm speaking directly with the
8  customer; but that's pretty rare. There's
9  nothing wrong with it, but it's pretty rare.
10  99 percent of the time it's always done
11  through this, through the institutional
12  salesmen.
13     Q. During the period of time where
14  you're waiting for a response, you're waiting
15  for a response from your salesperson in
16  Boston, correct?
17     A. Yes. That's basically what I'm
18  waiting for, yeah. He's technically waiting
19  for the customer's response.
20     Q. And the salesperson is relaying
21  what the customer says to you?
22     A. Yes.
23     Q. So if the customer says done, and
24  the salesperson says done to you --

G. Criqui

1
2      A.  Yes.
3      Q.  -- and then what do you say in
4  response?
5      A.  Okay.  Done, okay, fine.
6          There's no real terminology for it.
7  It's just... but completion of the trade is
8  clearly a commitment on, a verbal commitment
9  on the trader's part and on the customer's
10  part that the trade is completed and agreed
11  to by both sides, verbal.
12     Q.  And what do you mean by completion
13  of a trade?
14     A.  When he agrees to my price in a
15  timely fashion, in an accepted, timely
16  fashion; I, I agree as well.  You know,
17  there's no delay or anything like that, just
18  a simple treasury vanilla trade, you know.
19     Q.  I'm trying to understand, what's
20  the effect of that happening?
21     A.  I don't understand what you mean.
22     Q.  I understand what you say amounts
23  to completion of a trade, but I'm trying to
24  understand, what's the consequence of that
25  happening?

G. Criqui

1
2      A.  When the trade is completed?
3      Q.  Yes.
4      A.  At that time I'm at risk.  We're
5  principal -- as a bond trader in the treasury
6  market, we take principal risk on these
7  customer inquiries.  I'm not working an
8  order, I'm not -- you know, if this
9  particular customer is a buyer of bonds, I'm
10  not waiting to find a seller from another
11  customer to do the trade.
12         I am principally a risk-taker here,
13  and I am getting short the market to this
14  customer.  In this situation I'm short 50
15  bonds to this customer at 21, for example.
16     Q.  But I guess, with the verbal
17  agreement, is there actually an exchanging of
18  securities or money at that time?
19     A.  No.  It, that all -- again, this is
20  not my specialty, this is more of a back
21  office type of question, administrative type
22  question.  But it's, that all falls into the
23  settlement date, which is in treasuries the
24  next day, the next trading day.  So if you do
25  the trade on a Tuesday, Wednesday is when

G. Criqui

1
2  that trade settles; that's when the money
3  changes hands.
4          Unless the customer specifies a
5  different settlement at the time of the
6  original inquiry.  If it's just a vanilla
7  inquiry, offer 50 bonds, that's assuming that
8  it's a regular next-day settlement.  But he
9  might say offer 50 bonds for six-day
10  settlement.  And if there's a repo issue
11  involved, that could affect the price that he
12  gets from me.
13     Q.  Okay.  There's no essential
14  exchange or meeting place in the bond market;
15  is that correct?
16     A.  I don't understand.  I don't know
17  what you mean.
18     Q.  Have you ever heard the term
19  "over-the-counter market"?
20     A.  Yes.
21     Q.  Is the bond market an
22  over-the-counter market?
23     A.  To my knowledge, it is, yes.
24     Q.  And what does that mean?
25     A.  From my understanding, it's always

G. Criqui

1
2  open.  It's not an exchange.  An exchange has
3  a definitive opening and closing time.  Bond
4  market, it's always open, technically.  I
5  trade bonds overnight with Tokyo, with London
6  in the morning time for me in New York here.
7  It's -- over-the-counter, to me, it's always
8  open.
9      Q.  Let's discuss what records are
10  generated during this process.
11         When the customer calls up the
12  salesperson at the desk, the sales desk in
13  Boston, are in any records generated at that
14  point?
15         MR. FUMAI:  Objection.
16     A.  I wouldn't know.
17     Q.  So you don't know; is that correct?
18     A.  I don't know.
19     Q.  When the salesperson in Boston
20  contacts you, the trader, are any records
21  generated at that point?
22         MR. FUMAI:  Objection.
23     A.  I don't know.
24     Q.  Do you generate any records at that
25  point?

Page 130

G. Criqui

1    blue sheet said about this announcement that
2    blue sheet said about this announcement that
3    day?
4        A.  I don't. I don't have that good of
5    a memory.
6        Q.  And you said you expected it to
7    come out at 10 a.m.?
8        A.  Yes.
9        Q.  What was your basis for thinking
10   10 a.m. was the time?
11       A.  Just that's what the sheet had
12   written down.
13           You know, I must say, usually
14   refunding announcements, they're not
15   earth-shattering events; 99 percent of the
16   time they're not. It just, you know, in this
17   situation something strange was part of the
18   announcement, and that's what made this one
19   very unique.
20       Q.  Did earlier notes regarding an
21   upcoming refunding announcement always have
22   the time of the announcement included?
23       A.  Yes.
24       Q.  And do you recall any previous
25   times for previous announcements?

Page 131

G. Criqui

1        A.  No. No, usually came out as
2    expected.
3        Q.  But it's your recollection that
4    there was always a fixed time for the
5    announcement?
6        MS. WILLIAMS:  Objection.
7        A.  Yes, but I wouldn't, I wouldn't
8    testify to that, though. I don't know for
9    sure, you know.
10       Q.  Do you know the process that the
11   Treasury Department used to make these
12   announcements?
13       A.  I actually do not know. It's
14   probably something I should know, as a
15   trader. But we get, we're so dependent on
16   this Bloomberg trading system, which also
17   releases news headlines as well. With
18   Bloomberg, you have all your functionality,
19   your trading functionality. At the bottom
20   there's like six or seven lines of news
21   headlines, so I would just look at that.
22           And they're pretty quick, and they
23   get stuff out there quick. Payroll number on
24   Friday morning at 8:30, it's right there

Page 132

G. Criqui

1    quick. It's just like the refunding
2    announcement is.
3        Q.  But did you have any knowledge
4    regarding whether this information was
5    announced live on TV or at a press
6    conference --
7        A.  No.
8        Q.  -- or through other means?
9        MS. WILLIAMS:  Objection.
10       A.  Not, certainly not at that time,
11   no.
12       Q.  Did you know whether the Treasury
13   Department released its information pursuant
14   to any kind of embargo?
15       A.  No.
16       Q.  Now, in 2001, were you familiar
17   with any kind of speculation about the
18   possible suspension or elimination of the
19   bond, prior to October 2001?
20       MS. WILLIAMS:  Objection.
21       A.  Yeah, I mean just, just
22   speculating, it was, it was a, it was a
23   remote, remote possibility.
24           And I really only say this more so

Page 133

G. Criqui

1    from a positional standpoint. At that time,
2    and I think this is relevant, at that time I
3    had my Galen book, I'm trading the bond,
4    yield bond; but I also mentioned I was part
5    of this strip book, which is bigger, bigger
6    operation and the, you know, we had a big
7    position over there. We were short some
8    bonds, and I was -- we were short a pretty
9    significant portion of bonds on spread versus
10   off-the-run bonds, just a spread trade, not a
11   duration, we're not short outright. And you
12   know, the treasury had just done buy-backs
13   the year before, so they bought at least 30
14   billion long bonds back, old bonds, old long
15   bonds in particular.
16           So, you know, I guess there's
17   always the possibility that they could cancel
18   it, but like I said, number one, they'd just
19   done all these buy-backs; and number two, we
20   were just about to go into war with
21   Afghanistan, which involves a lot of
22   spending, a lot of deficit spending and
23   whatnot, so the market was not anticipating a
24   cancellation whatsoever.

Page 138

```
1            G. Criqui
2      Q.  Do you know whether the borrowing
3  advising committee made any recommendations
4  in 2001, regarding the suspension or
5  elimination of the 30-year bond?
6      A.  It's ringing a bell, but nothing I
7  would be comfortable with answering, no.
8      Q.  So you weren't aware that in
9  January 2001, the committee recommended that
10 the bond be eliminated?
11         MS. WILLIAMS:  Objection.
12     A.  I wouldn't say I wasn't aware.  Now
13 I am, you know.
14     Q.  Do you know any details about how
15 treasury released information about the
16 30-year bond on October 31, 2001?
17     A.  I really don't.
18         Like I said, just, I just got
19 comfortable over the years looking at those
20 Bloomberg news headlines at the bottom of the
21 page.  It was -- they were pretty quick.  You
22 know, like I said, it was payroll numbers, so
23 I just dwelt on that.
24         I did not know the actual
25 intricacies of how they actually released
```

Page 139

```
1            G. Criqui
2  this information, through a press conference
3  or whatever.
4      Q.  Do you know anything as to whether
5  the information may have been released prior
6  to 10 a.m. on October 31, 2001?
7      A.  Do I know now or then?
8      Q.  Well, let's start now.
9      A.  I know now, just from reading the
10 newspaper a little bit; but at the time, no.
11     Q.  Do you know anything now about that
12 information having been posted on treasury's
13 website, prior to 10 a.m.?
14     A.  Yeah, I've read allegations of
15 such, yes.
16     Q.  But you did not know this at the
17 time in 2001?
18     A.  I did not, I did not.
19     Q.  Are you aware of a dispute that
20 arose between Merrill Lynch and MFS,
21 following the trade of 30-year bonds on
22 October 31, 2001?
23         MR. FUMAI:  Objection.
24     A.  No.  Nope.
25     Q.  You're not aware of any dispute
```

Page 140

```
1            G. Criqui
2  between MFS --
3      A.  A dispute, no.
4      Q.  Are you aware of any inquiry that
5  Merrill Lynch made of MFS, regarding a trade
6  in the 30-year bond --
7         MR. FUMAI:  Objection.
8      Q.  -- on that day?
9      A.  No.
10         MR. TOONE:  May I have this marked,
11 please.
12         (Criqui Exhibit 7, April 25, 2002
13 letter, marked for identification, as of
14 this date.)
15     Q.  I have showed you, I'm showing you
16 what's been marked as Exhibit Number 7.
17         Have you seen this document before?
18         (Witness looks at document.)
19     A.  Let me see one second.
20         Yes.
21     Q.  When did you last see this
22 document?
23     A.  This morning.
24     Q.  Had you seen it prior to this
25 morning?
```

Page 141

```
1            G. Criqui
2      A.  I had not --
3      Q.  Let me direct your attention to --
4      A.  -- but I will say this.
5      Q.  Okay.
6      A.  I did -- this is, yeah, Michael
7  Solomon.  I did meet with Michael.  I
8  couldn't give you the time, but it probably
9  corresponds to the time of this, where we
10 discussed my potential losses on the said
11 trade, and I went through it with Michael.
12         I did not produce this document,
13 but I certainly went through it with him with
14 my trading blotter that day, and we figured
15 out my positions and when I was actually flat
16 from this particular trade.
17     Q.  Now, this letter from Mr. Solomon,
18 I'm referring to Exhibit Number 7, is dated
19 April 25, 2002.  And the trade that is
20 discussed within the letter took place on
21 October 31, 2001.
22         Do you see that?
23     A.  Yeah.
24     Q.  And reading the letter, it refers
25 to a trade that occurred for 65 million par
```

Page 182

G. Criqui

1    G. Criqui
2    willing to sell bonds at par 21.
3        It might only be one million, it
4    might be 10 million, they might have 50
5    million offered there.
6        Q.  So is it safe to say the difference
7    the bid and the offer is the difference
8    between the price at which someone in the
9    market is going to buy a bond and the price
10   at which someone in the market is going to
11   sell the bond?
12       A.  Yes.
13       Q.  You had mentioned par in your
14   answer.
15       Could you explain what par is?
16       A.  Par, basically, is a hundred.  And
17   that's basically when the market, the present
18   yield or interest rate in the marketplace
19   coincides with the coupon --
20       Q.  Or interest rate?
21       A.  -- on the underlying -- or the
22   interest rate on the underlying whole bond.
23       So for instance, in
24   February of 2001 they issued this 5 and
25   three-eighths at Feb 31 as a 30-year bond.

Page 183

1    G. Criqui
2        At the time of this trade, the
3    October -- by October of '01, eight,
4    nine months later, it had rallied roughly 18,
5    19 basis points.  So the bond went from 100
6    par to 102, almost 103, 102.24 plus, that's
7    close to 103.  That reflects the fact that
8    the market has rallied.
9        So basically par is just when the
10   present yield, present interest rate on the
11   bond is the same as the coupon, the
12   underlying interest rate on the bond when it
13   was originally issued.
14       Q.  So when you say par in 20, is that
15   120 ticks --
16       A.  Thirty -- yes, that's correct.
17       Q.  Which would be 120.32.
18       A.  120 thirty-secondths.  Not a
19   hundred -- it's a little less than 101.
20       Q.  Right, 132 thirty-secondths --
21       A.  Would be 101.
22       Q.  Would be 101, okay.
23       Sorry.  I know that this is very
24   basic.
25       A.  No, I don't even know the answers.

Page 184

1    G. Criqui
2        Q.  Mr. Toone asked you to go through
3    the process that you generally went through
4    at Merrill Lynch, when you executed a trade
5    with a customer in Boston like MFS.  I want
6    to walk through what actually occurred on
7    October 31st, 2001, regarding this trade of
8    65 par value of 30-year bonds.
9        Could you tell me what you recall
10   on that morning?
11       A.  Certainly, certainly.  I'll refrain
12   from using the actual time at which it took
13   place, 'cause five years later I can't really
14   remember.
15       But at some point before the
16   expected 10 a.m. refunding announcement,
17   anywhere from 15 to 20 minutes before that,
18   Greg Saint-Pierre used the government's
19   squawk while he's in Boston, I'm in Jersey
20   City on a temporary basis.  He used the
21   government squawk, Galen, pick up Boston for
22   a trade.
23       I proceeded to press the Boston
24   direct, hey, Greg.  Hey, Galen, offer 65
25   million long bonds to MFS for regular

Page 185

1    G. Criqui
2    settlement.
3        And I can't exactly recall where
4    the bond market, where the bond was in the
5    broker screens at the time, where the bid and
6    offer was, but it was probably pretty close
7    to where I did the trade.  So anyway, let's
8    say there were 102.23, 102.24, which is
9    probably accurate, but I offered him at
10   102.24 plus, a plus concession for me,
11   plus --
12       Q.  A plus is --
13       A.  A half a tick.
14       Q.  -- a half of a thirty-secondth.
15       A.  Yes, one 64th.
16       Q.  Great.
17       A.  I offered a 24 plus, which was
18   fair, market was pretty volatile at the time
19   all that September 11th, and I offered him
20   there.  Greg reflects that to the customer,
21   and within a second or two Greg comes back to
22   me, you're done, customer accepts.  I go
23   okay, you're done, too, okay, fine.  Trade's
24   done.  Like millions of trades I've done
25   before.

47  (Pages 182 to 185)

Page 186

```
 1          G. Criqui
 2     Q.  At the time that you executed this
 3  trade, what, if anything, did you know about
 4  treasury's decision to cancel the 30-year
 5  bond?
 6     A.  At the time of the execution of the
 7  trade, zero.
 8     Q.  What, if any, rumors had you heard
 9  that morning about the possibility of the
10  bond being cancelled?
11     A.  I hadn't heard one word, one rumor.
12     Q.  What, if any, indication did you
13  get by the market that morning, prior to this
14  trade, that there might be a cancellation of
15  the bond?
16     A.  Zero.
17     Q.  Had --
18     A.  Sorry.
19     Q.  Had you been looking at the market
20  for the 30-year bond, before you executed
21  this trade?
22     A.  Oh, yeah.
23     Q.  What happened -- what did you
24  proceed to do, after you said done?
25     A.  I -- standard practice is I would
```

Page 187

```
 1          G. Criqui
 2  slate the trade, but I'm not required to
 3  slate the trade.  There's not like a rule
 4  that I have to slate it the second it's done.
 5     Q.  When you say "slate the trade" --
 6     A.  Remember, we were talking about
 7  that before, when I actually input it into my
 8  system, what I did.
 9     Q.  Okay.
10     A.  You know, where I put sell 65 bonds
11  at 102.24 plus to NOE.
12     Q.  In the Bloomberg?
13     A.  In my Bloomberg trading system,
14  yeah.  I have to do that at some point, but
15  it's not like I have to do it immediately.
16  It's not like that slate gets done the second
17  we verbally commit to this trade with the
18  customer.
19     Q.  Okay.
20     A.  So I don't know exactly when I
21  slated it with regard to this trade.  It was
22  probably pretty soon thereafter, but not
23  immediately.
24        But what I proceeded to do then was
25  try to get some bonds back, and I did; I got
```

Page 188

```
 1          G. Criqui
 2  roughly 30, 34 million back, at a profit,
 3  small profit, maybe a tick, tick and a half
 4  lower.
 5        And then, you know, when he was
 6  referring before, you know, basically, what,
 7  could you have gotten them all back, why
 8  didn't you buy 65 million, that's kind of
 9  like, that's why, you know, that's why I have
10  a job.  If it was just where you could offer
11  65 bonds and just buy 65 million back, there
12  really wouldn't be a need for me or anyone to
13  do this job, you know.  It's not very liquid,
14  there's not a lot of offers, there's not a
15  lot of bids for these things, they move
16  around a lot, not a lot of people want to
17  trade them.  So I was lucky to get half of
18  them back; and you know, I still had 15
19  minutes before this refunding announcement.
20  And refunding announcement is, you know,
21  they're not earth-shattering things.  They
22  never have been, you know.  So you know,
23  maybe, maybe I'll go a little bit short into
24  it.
25        But all of a sudden well before the
```

Page 189

```
 1          G. Criqui
 2  10 o'clock, I'd say about 9:45, 9:46, there
 3  was no offer, and it started to tick up a
 4  little bit, it got a little, a little weird,
 5  you know, but whatever.  It happens, you
 6  know.  And then all of a sudden it got really
 7  weird, you know.
 8     Q.  Okay.  Let me ask some follow-up
 9  questions.
10        First, did you proceed to put your
11  slate in while you were still on the phone
12  with --
13     A.  No.
14     Q.  -- with Greg Saint-Pierre?
15     A.  I mean I can't answer that
16  accurately, but most likely not.  I usually
17  just don't do that.  I guess I'm not that
18  talented, where I can do both at the same
19  time.  But I would probably -- I'm not on the
20  phone with Greg for very long, and I don't
21  know if the customer is going to say done
22  either.  Offer is 65 bonds, 102.24 plus,
23  done, okay, then, then you're off the phone.
24        So if I maybe started to slate it
25  while at the end of the phone call, sure, but
```

Page 190

```
 1         G. Criqui
 2   it would take me a little bit longer to
 3   finish the slate.
 4       Q.  What did you have to do to actually
 5   get into the Bloomberg system to enter your
 6   slate, what, if anything?
 7       A.  Well, like I said, Bloomberg is on
 8   the three big Sun System screens that I have.
 9   My Bloomberg is part of one of them, so I
10   would have to highlight that first, take my
11   mouse, highlight that, find the 30-year, pull
12   it up and then press ATS, which allows me to
13   go into the issue to slate the trade.
14       Q.  Okay.
15       A.  So I would do all that, basically
16   type in CT 30 government ATS.  That pulls it
17   up, and then I have to type in S 65 million,
18   two MMs, 102.24 plus, space, NOE, go.  Then
19   it shows me everything, and then I press one
20   go to confirm it.
21         So just typing it all in and all
22   that, I mean definitely, it probably takes a
23   minute or so.
24       Q.  Was there any log-in or password
25   that you needed to enter into the system?
```

Page 191

```
 1         G. Criqui
 2       A.  In the morning when I come to work
 3   there is, but not, not every time I had to
 4   slate something throughout the day.  I'm
 5   already logged in, so I just go right to it.
 6       Q.  So what was your practice as far as
 7   logging into the system?
 8       A.  When I got to work at like 7,
 9   7:15 a.m. I would log in then; and it would
10   stay logged in throughout the day.
11       Q.  You mentioned that after this trade
12   of 65 million, you proceeded to do some
13   covering transactions, and some of them were
14   at a profit.
15       A.  Yeah.
16       Q.  What, if anything, did you know
17   about the cancellation of the 30-year bond at
18   the time you were doing those covering
19   transactions --
20       A.  Nothing.
21       Q.  -- where you made a profit?
22       A.  If I knew something, I would've
23   covered them all, you know.
24       Q.  How did you find out that treasury
25   had announced they were canceling the 30-year
```

Page 192

```
 1         G. Criqui
 2   bond?
 3       A.  To be honest with you, the market
 4   moved before I saw it on the Bloomberg news
 5   headlines.  Again, it's five years ago, I'm
 6   not going to recollect perfectly, but I knew
 7   from the market that something was going on
 8   with the 30-year.  And it wasn't that they
 9   were issuing more of it, because it was
10   straightened up, you know.  So I definitely
11   could tell from the market.
12         The market's faster than anything,
13   the market's faster than news headlines even.
14   You know, you watch these numbers come out at
15   8:30 in the morning, the market moves before
16   it even hits the headline.  And some people
17   have quicker access to news than others.
18         But to make a long story short, the
19   market started grinding higher before any
20   sort of mention was made that the bond was
21   cancelled, by anyone on the trading floor.
22   We have, again, we have 50 salesmen talking
23   to the smartest customers in the world, who
24   have access to every information out there.
25   Nothing.
```

Page 193

```
 1         G. Criqui
 2       Q.  Okay.  Can I refer you to what's
 3   been marked as Exhibit 7.
 4       A.  Yes.
 5       Q.  And I'm going to be talking about
 6   that last page of the exhibit.  Okay.  At the
 7   top of the page, excerpted trading book of
 8   Galen Criqui, October 31, 2001.
 9         The first trade there is the trade
10   of the 65 million bonds to MFS; is that
11   correct?
12       A.  That's correct.
13       Q.  Okay.  And then down to, I'm now on
14   line 6, do you see that?
15       A.  (Indicating.)
16       Q.  Is it safe to say that that's the
17   last trade you made that day, where you
18   covered that transaction at a profit?
19       A.  Yes, without question.
20       Q.  Okay.  And then I see that there's
21   a three-minute, or there's a several-minute
22   gap between the 9:45 and 9:57.
23         Do you see that?
24       A.  Yes, I do.
25       Q.  Do you recall what, if anything,
```

Page 194

1         G. Criqui
2   you were doing during that gap in time?
3       A.   Yes, well, I just mentioned before
4   that all of a sudden, the market kind of
5   started grinding higher, and there was no
6   offer on the screens, there was no bonds
7   offered that I could lift or I could buy.
8   That's kind of what made me started thinking,
9   huh, what's going on here all of a sudden,
10  you know? This is not out until 10 a.m. and
11  this is clearly before 10 a.m., what's going
12  on?
13         And honestly, 'cause I was one of
14  the few guys probably involved in the market
15  at that time, in the 30-year, all of sudden
16  12 minutes go by, and I'm getting one
17  million. That shows you there's nothing
18  offered. I finally got one million at
19  103.25, which is 103.08. That's a half a
20  point higher than where I sold the 65 bonds
21  to MFS.
22      Q.   Do you know if, at the time of this
23  9:57 transaction, if you had gotten any
24  information over the Bloomberg about the
25  cancellation?

Page 195

1         G. Criqui
2       A.   I, I can't say for sure, but I
3   still -- I don't know.
4       Q.   Okay.
5       A.   You know, that's, that's
6   12 minutes. And I know just from reading the
7   papers and stuff that this press conference,
8   you know, adjourned early or that the
9   information was released a little bit early.
10  I don't know if it had hit the market by
11  then. I don't think it did, though.
12      Q.   And you say that because? You say
13  you don't think it did, because --
14      A.   Because I would've -- let's say at
15  9:52, I haven't done anything from 9:45 to
16  9:57, right? If I had heard by then, I
17  would've bought some bond contracts or
18  something. I'm still short 35 odd bonds. I
19  would've bought bond contracts or something
20  to hedge this up.
21         But -- so I don't think -- the fact
22  that I did nothing goes to show you, number
23  1, there was no offers in the screen. The
24  market was slowly but surely catching a
25  pretty big bid. There was no offer, but I

Page 196

1         G. Criqui
2   still hadn't heard anything yet.
3       Q.   Let me ask you about transactions
4   11 through 13.
5         Do you see those?
6       A.   Yes.
7       Q.   Those are sells, correct?
8       A.   Yes.
9       Q.   Do you know why you had engaged in
10  selling transactions right there?
11      A.   I mean, I wish I didn't, but that's
12  my market-making ability there, or
13  requirement there.
14         If you can see who I sold those to,
15  11, 12, and 13 are all customers, if you look
16  down below. Brook Street, Royal Bank of
17  Canada, and Hamilton Partners. Those are all
18  customers, who I believe I transacted with on
19  TradeWeb.
20      Q.   And when you say that was your
21  market-making responsibility, what do you
22  mean?
23      A.   Well, here I am short 35 bonds, and
24  these things, by this time, by 11 through 13
25  which you just reference, the market's now up

Page 197

1         G. Criqui
2   close to three points. Okay, I'm short, I'm
3   down a million now, easy. Any normal person,
4   you're down a million bucks, you don't want
5   to deal with -- you don't want to sell any
6   more bonds to anybody, but I have to. I work
7   for Merrill Lynch, it's imperative that we
8   continue to make markets, provide liquidity
9   for customers, or else we'll never see those
10  customers again. This guy can't handle, he
11  can't handle with this guy, you know. Of course, I
12  deal with this guy, you know. Of course, I
13  had to show them markets. They lifted me,
14  and they were higher after I sold them to
15  them.
16      Q.   So if a customer called up and
17  requested to purchase bonds from you, as a
18  market-maker, you have a requirement to
19  sell --
20      A.   Yeah.
21      Q.   -- the bonds to them?
22      A.   Sure. And these weren't huge size.
23  If you look at 15, 7, 20 million, I mean I
24  got to be at the market or close to it for
25  them. I can't show them a point higher, you

Page 198

```
 1        G. Criqui
 2   know, it just -- my boss wouldn't like that,
 3   and neither would the customer.
 4      Q.   You testified, when Mr. Toone was
 5   asking questions, about the usual size of
 6   trades that Merrill -- Merrill Lynch did with
 7   MFS.  And I believe you said that usually it
 8   was about 30 to 40 million; is that right?
 9      A.   That's fair, yeah.
10      Q.   So this trade of 65 million was
11   larger than that, right?
12      A.   It was, yes.  The one thing I will
13   state that might have been a little bit
14   different from trades with them in the past
15   is, like I said, there were 30, 35 million, a
16   lot of their trades were swaps, you know,
17   where they bought one issue and sold me back
18   another one.  They didn't really make a ton
19   of duration plays.
20        When someone buys 65 bonds, that's
21   definitely a duration play or maybe a
22   covering of short, if you will.  It seemed a
23   little out of character, but to be honest
24   with you, at the time I didn't think anything
25   of it.  It wasn't 265 bonds, you know.
```

Page 199

```
 1        G. Criqui
 2      Q.   I understand.
 3        So generally speaking, though, they
 4   wouldn't be buying 65 million 30-year bonds?
 5      A.   That's, that's pretty accurate,
 6   yes.
 7      Q.   Now, I know you were asked some
 8   questions about the Bloomberg system, and I
 9   just want to kind of ask a few to clarify.
10        The Bloomberg system, you have the
11   capacity to execute trades using that system?
12      A.   Well, I should say the keyboard
13   which -- the keyboard works for Bloomberg,
14   but if I highlight something over here like
15   an Excel spreadsheet, then the keyboard works
16   for that.  So I should make that clear, I'm
17   sorry.  The keyboard is what enables me to
18   transact and to execute trades.
19      Q.   Okay.
20      A.   So if I'm doing a trade on
21   BrokerTech, which is another broker, you
22   know, like eSpeed kind of, I would go up to
23   that, put my mouse on it, highlight and then
24   I could use my keyboard to trade or execute a
25   trade off of that.
```

Page 200

```
 1        G. Criqui
 2        As far as Bloomberg, could I
 3   execute -- I guess I really, technically,
 4   couldn't execute a trade on Bloomberg.
 5      Q.   So what did you use the actual
 6   Bloomberg system for?
 7      A.   That's my trading system, as far as
 8   recording my positions in the marketplace.
 9   If I do a trade with a customer, I slate it
10   into Bloomberg.
11        But as far as me buying 50 bonds
12   from eSpeed or BrokerTech, no, I guess
13   technically I wouldn't use Bloomberg.  The
14   trade I would do would go into Bloomberg as
15   part of my position, but the actual execution
16   of it would take, wouldn't take place with
17   Bloomberg.
18      Q.   Besides BrokerTech, what other
19   system did you have that would execute
20   trades?
21      A.   Obviously, BrokerTech, eSpeed which
22   is Cantor Fitzgerald, Liberty, Tullet, which
23   is owned by Tullet now, they had a small
24   electronic trading system.  It wasn't -- they
25   weren't much of a player, but nonetheless
```

Page 201

```
 1        G. Criqui
 2   they were involved.
 3        And Garban didn't have an
 4   electronic system at that point.  They were
 5   more just voice, guys that you would deal
 6   with in off-the-runs, mainly.
 7      Q.   One of the, one of the things that
 8   you said, when Mr. Toone was asking
 9   questions, is that the trade was completed
10   when you said done and the customer said
11   done.
12      A.   Yes.
13      Q.   What happened if a customer failed
14   to fulfill their obligations, after both of
15   you said the trade was done?
16      A.   I would immediately report it to my
17   boss, who would then contact the sales
18   manager in Boston and try and figure out what
19   was going on, and then ultimately try to
20   contact the management of the account of the
21   customer.
22      Q.   Have you ever had that actually
23   happen?
24      A.   I wouldn't say where I do a trade
25   with a customer, and they just completely
```

51 (Pages 198 to 201)

Excerpt from the

June 20, 2006 deposition of

Roger Anderson

Exhibit R

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. CV-10983NMG
USDC-DMASS

SECURITIES AND
EXCHANGE COMMISSION,           :

      Plaintiff,           :          DEPOSITION UPON
                   :          ORAL EXAMINATION
   vs.           :                    OF
                   :
STEVEN E. NOTHERN,           :          ROGER L. ANDERSON
                   :
      Defendant.           :
----------------------- :

COPY

      T R A N S C R I P T of the deposition of ROGER
L. ANDERSON, before ROSEMARY MARINO, a Certified
Shorthand Reporter and Notary Public of the State of
New Jersey, at the offices of MC CARTER & ENGLISH,
Gateway 4, Newark, New Jersey on Tuesday, June 20,
2006, commencing at 10:35 in the forenoon.



**Rizman
Rappaport
Dillon&Rose,**LLC
Certified Court Reporters

66 W. Mt. Pleasant Avenue
Livingston, NJ 07039
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

54

1  refunding conference?
2        MS. WILLIAMS:  Objection.
3     A.    I don't recall.
4     Q.    Okay.  Is it possible that you then sort
5  of saw Mr. Davis at the quarterly refunding
6  conferences, but you didn't have any occasion to talk
7  to him.
8        MS. WILLIAMS:  Objection.
9     A.    Yes.
10    Q.    What was the next time that you had any
11 interaction with Mr. Davis?
12    A.    It was before one of the Wednesday press
13 conferences.  He told me that there had been a prior
14 press conference where the press office had not --
15 had asked him to leave before it had started, and he
16 wondered if it was all right with me if he stayed.  He
17 volunteered that he wouldn't ask any questions, and
18 then I told him, I made sure -- I told him that the
19 additional condition was that he honor the embargo.
20 He agreed to that, and I told him that I wouldn't get
21 in the way if the press office asked him to leave
22 again.
23    Q.    Let me -- why don't we take this into
24 baby steps.
25        The occasion on which Mr. Davis told you that

55

1  he had been asked to leave the press conference by
2  the press office, where were you physically during
3  that conversation with Mr. Davis?
4     A.    I don't recall if it was the back of the
5  conference room or outside the conference room.
6     Q.    So even though Mr. Davis had been asked
7  on the preceding occasion to leave the press
8  conference, nonetheless he had come again; is that
9  correct?
10    A.    Yes.
11        MS. WILLIAMS:  Objection.
12    Q.    And did you have any understanding as to
13 how it was that Mr. Davis on that occasion, when you
14 were having -- the occasion of your having the
15 conversation with him, how it was that he had gotten
16 into the building?
17    A.    Could you say that again?
18    Q.    Sure.
19    A.    There are too many negatives in there.
20    Q.    I apologize.  I am trying to be as
21 precise as possible.
22        There was the occasion of your having a
23 conversation with Mr. Davis in which he recounted
24 that he had been asked to leave a prior press
25 conference; correct?

56

1     A.    Yes.
2     Q.    Okay.  And on the occasion of that
3  conversation that you had with Mr. Davis, you were
4  located in the Secretary's Conference Room during a
5  press conference; right?
6        MS. WILLIAMS:  Objection.
7     A.    No.  It was prior to the press
8  conference and it was either in the back of the
9  conference room or outside, just outside the
10 conference room, I don't recall which.
11    Q.    But when you say prior, you are meaning
12 just prior.  In other words --
13    A.    Yes.
14    Q.    Okay.  And so on that day, did you have
15 any understanding as to how it was that Mr. Davis had
16 gotten into the Treasury building so that he could
17 have the conversation with you just outside the press
18 conference room?
19    A.    No.
20    Q.    Okay.  Now, this conversation in which
21 -- well, first of all, can you remember anything else
22 about what Mr. Davis recounted as far as the
23 circumstances of his having been asked to leave?
24    A.    He said something to the effect that the
25 press office didn't consider him a member of the

57

1  press.
2     Q.    Okay.  And did you have any
3  understanding as to who at the press office was
4  seeking to exclude him from the press conference?
5     A.    I believe it was Mr. Murchinson.
6     Q.    And your response right then and there
7  to Mr. Davis was that subject to conditions you would
8  not oppose his remaining to attend the press
9  conference; correct?
10    A.    Correct.
11        MS. WILLIAMS:  Objection.
12    Q.    And also that you would not oppose his
13 remaining to attend future press conferences of the
14 same nature.
15    A.    That was implied.
16    Q.    Now, the condition that you gave was
17 that he not disseminate the information at the press
18 conference until the embargo time; is that correct?
19        MS. WILLIAMS:  Objection.
20    A.    Correct.
21    Q.    Okay.  And now all of this is occurring
22 in the hallway outside the Secretary's Conference
23 Room?
24        MS. WILLIAMS:  Objection.
25    A.    This conversation occurred either in the

15 (Pages 54 to 57)

**Rizman
Rappaport
Dillon&Rose,**LLC
**Certified Court Reporters**

**66 W. Mt. Pleasant Avenue
Livingston, NJ 07039**
(973) 992-7650  Fax (973) 992-0666
1-888-444-DEPS
E-mail: reporters@rrdrcsr.com

Correspondence dated October 19, 2006

from T. McGivern to E. Williams

enclosing an entry log showing Peter

Davis's entry to Treasury from May

1998 to October 2001


Exhibit S



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

October 19, 2006

**BY E-MAIL AND FAX**

Erica Y. Williams
Assistant Chief Litigation Counsel
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549

Re: Request for documents in *Securities and Exchange Commission v. Steven E. Nothern,*
Case No. 05-10983

Dear Ms. Williams:

This is the sixth in a series of responses to your letter dated June 30, 2006. Your letter requests documents related to the Treasury Department's quarterly refunding announcement for U.S. government securities on October 31, 2001. This production is Treasury's response to requests for documents in paragraphs (a), (c), (d), (e), (f) and (o) of Attachment A to your letter.

A document we are producing in response to paragraphs (a) and (c) of Attachment A to your letter addresses Peter Davis' admission to the Treasury Department's headquarters building at 1500 Pennsylvania Avenue, NW, Washington, DC, for quarterly refunding conferences and/or meeting with officials from the Treasury Department's Office of Domestic Finance. We were able to locate information from May 1998 to October 2001. Attachment A, paragraph (c) of your June 30 letter sought documents related to meetings with <u>any</u> official or employee at Treasury, and was not limited to Office of Domestic Finance officials. We have carefully considered your request under paragraphs (a) and (c) pursuant to Treasury's regulations found at 31 C.F.R. §§ 1.8-1.12, commonly known as Touhy regulations. *See also United States ex rel. Touhy v. Ragan,* 340 U.S. 462 (1951). Based on what we have learned about this case through the hundreds of hours we have spent on depositions, documents searches, documents reviews, and document productions, we are limiting Treasury's production of documents pursuant to paragraphs (a) and (c) of your request to the information in this production that relates to admission to the Treasury Department building of Mr. Davis for quarterly refunding conferences and/or meetings with officials from the Treasury Department's Office of Domestic Finance. To the extent that your request exceeds that scope, your request is denied because it fails to demonstrate that any information beyond this scope of documents is relevant and material to the case. Furthermore, the expenditure of additional Treasury resources for continued searching and production would constitute an undue burden. Therefore, we have completed our production with regard to paragraph (c).

2

We have not found, and do not anticipate finding, any documents responsive to paragraphs (d) and (e) of Attachment A to your June 30, 2006 letter. Therefore, we have completed our production with regard to paragraphs (d) and (e).

Paragraph (f) of Attachment A to your letter sought standard agreements, forms, or other documents concerning the confidentiality of information used by Treasury and was not limited to the Office of Domestic Finance or the Office of Public Affairs. This production includes documents responsive to paragraph (f) from the Office of Domestic Finance. We found no responsive documents from the Office of Public Affairs. We have carefully considered your request under paragraph (f) pursuant to Treasury's Touhy regulations. Based on what we have learned about this case through the hundreds of hours we have spent on depositions, documents searches, documents reviews, and document productions, we are limiting Treasury's response under paragraph (f) of your request to documents from the Office of Domestic Finance and the Office of Public Affairs. To the extent that your request exceeds that scope of documents, your request is denied because it fails to demonstrate that any information beyond this scope is relevant and material to the case. Furthermore, the expenditure of additional Treasury resources for continued searching and production would constitute an undue burden. Therefore, we have completed our production with regard to paragraph (f).

Unless we face additional, unexpected challenges in searching for potentially responsive documents, we plan to complete our production related to your June 30 request by November 30, 2006.

Please do not hesitate to contact me (202-622-2317) or Christian Furey (202-622-5441) if you have any questions.

Sincerely,

*Thomas M. McGivern*

Thomas M. McGivern

cc: John Rossetti, Esq. (By e-mail)
    U.S. Securities and Exchange Commission

    John A. Shope, Esq. (By e-mail)
    Nicholas Theodorou, Esq. (By e-mail)
    Robert Toone, Esq. (By e-mail)
    Foley Hoag LLP

| DAVIS | PETER | | 19980505 | 09:00 | 19980504 | ANDERSON | ROGER | 19980505 | 09:00 | WALTON | 3327 | | 6222840 | 19980504 | 15:52 | 19980505 | 08:12 | 08:48 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DAVIS | PETE | | 19980804 | 09:00 | 19980803 | ANDERSON | | 19980804 | 09:00 | WALTON | 3327 | P | 6222840 | 19980803 | 17:01 | 19980804 | 09:22 | 09:22 |
| DAVIS | PETER | | 19981027 | 08:00 | 19981028 | ANDERSON | | 19981027 | 08:00 | WALTON | 3327 | | 6221865 | 19981028 | 15:21 | 19980504 | 08:47 | 08:47 |
| DAVIS | PETER | | 19981028 | 09:15 | 19981028 | OUSLEY | | 19981028 | 09:15 | OUSLEY | 3327 | | 6222630 | 19981028 | 09:00 | 19981028 | 09:03 | 09:03 |
| DAVIS | PETER | | 19990504 | 09:05 | 19990504 | OUSLEY | | 19990504 | 09:05 | MALVEY | 3327 | | 6221883 | 19990504 | 09:05 | 19990504 | 09:05 | 09:05 |
| DAVIS | PETER | | 19990603 | 09:00 | 19990602 | MALVEY | | 19990603 | 09:00 | TYLER | 3327 | L | 6222630 | 19990802 | 09:46 | 19990603 | 08:57 | 08:57 |
| DAVIS | PETER | | 19990604 | 09:00 | 19990604 | MALVEY | | 19990604 | 09:00 | TYLER | 3327 | | 6222630 | 19990802 | 09:46 | 19990604 | 08:55 | 08:55 |
| DAVIS | PETER | | 19991102 | 09:00 | 19991101 | HENDERSON | | 19991102 | 09:00 | | 3327 | | 6222960 | | | 19991102 | 08:55 | 11:39 |
| DAVIS | PETER | | 19991102 | 09:00 | 19991101 | HENDERSON | | 19991102 | 09:00 | | 3327 | | 6222960 | | | 19991103 | 08:47 | |
| DAVIS | PETER | | 20000502 | 09:00 | 20000501 | MALVEY | PAUL | 20000502 | 09:00 | TYLER | 3327 | L | 6221867 | 20000501 | 17:19 | 20000502 | 08:54 | 08:54 |
| DAVIS | PETER | | 20000503 | 09:00 | 20000503 | MALVEY | PAUL | 20000503 | 09:00 | TYLER | 3327 | L | 6221867 | 20000501 | 17:14 | 20000503 | 08:55 | 08:55 |
| DAVIS | PETER | | 20000801 | 09:00 | 20000731 | MALVEY | PAUL | 20000801 | 09:00 | TYLER | 3327 | L | 6222630 | 20000731 | 16:07 | 20000801 | 09:04 | 09:04 |
| DAVIS | PETER | | 20000802 | 09:00 | 20000802 | MALVEY | PAUL | 20000802 | 09:00 | TYLER | 3327 | L | 6222630 | 20000731 | 16:08 | 20000802 | 08:53 | 08:53 |
| DAVIS | PETER | | 20001031 | 08:30 | 20001031 | MALVEY | PAUL | 20001031 | 08:30 | TYLER | 3327 | L | 6222630 | 20001030 | 13:31 | 20001031 | 07:56 | 07:56 |
| DAVIS | PETER | | 20001101 | 08:30 | 20001031 | MALVEY | PAUL | 20001101 | 08:30 | TYLER | 3327 | L | 6222630 | 20001030 | 13:32 | 20001101 | 08:52 | 11:10 |
| DAVIS | PETER | | 20010501 | 09:00 | 20010430 | MALVEY | PAUL | 20010501 | 09:00 | TYLER | 3327 | L | 6221867 | 20010430 | 16:47 | 20010501 | 08:57 | 08:57 |
| DAVIS | PETER | | 20010502 | 08:00 | 20010430 | MALVEY | PAUL | 20010502 | 08:00 | TYLER | 3327 | L | 6221867 | 20010430 | 16:47 | 20010502 | 08:53 | 08:53 |
| DAVIS | PETER | | 20010731 | 09:00 | 20010730 | MALVEY | PAUL | 20010731 | 09:00 | TYLER | 3327 | L | 6221867 | 20010730 | 15:30 | 20010731 | 08:52 | 08:52 |
| DAVIS | PETER | | 20010801 | 09:00 | 20010801 | MALVEY | PAUL | 20010801 | 09:00 | TYLER | 3327 | L | 6221867 | 20010730 | 15:30 | 20010801 | 08:45 | 08:45 |
| DAVIS | PETER | | 20011030 | 08:45 | 20011028 | BOWSER | | 20011030 | 08:45 | BOWSER | 3327 | L | 6220060 | 20011029 | 18:20 | 20011030 | 08:48 | 08:48 |
| DAVIS | PETER | | 20011031 | 08:45 | 20011028 | BOWSER | | 20011031 | 08:45 | BOWSER | 3327 | L | 6220060 | 20011029 | 18:21 | 20011031 | 08:49 | 13:09 |

Copies of Treasury press releases dated

May 5, 1998, August 4, 1998, October 27,

1998, October 28, 1998, May 4, 1999,

August 3, 1999, August 4, 1999,

November 2, 1999, May 2, 2000, May 3,

2000, August 1, 2000, August 2, 2000,

October 31, 2000, November 1, 2000,

May 1, 2001, May 2, 2001 and

August 1, 2001

Exhibit T

# PRESS ROOM
## U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

May 5, 1998
RR-2414

**REMARKS TO THE TREASURY BO**      **IE PUBLIC
SECURITIES ASSOCIATION BY DIREC**      **LYSIS JOHN H.**

When you were here three months ago, re   *Exhibit T*   inflation was
about 1-1/2 percent. The Asian situation st      ts on the U.S.
economy were fairly hard to find. Now thre      e are also
emerging differences.

Let's take the domestic side of the equatic      in the first quarter
were similar in overall magnitude. The four........ percent annual
rate, although we may have been quoting an advance estimate of 4.3 percent when you were here.
Those things happen. Suppose we split the difference and call it 4 percent for the fourth quarter. That, in
turn, is very close to the 4.2 percent advance estimate for the first quarter which was released last week.
Not much is lost by calling this a 4 percent quarter, too.

There is a world of difference between the two quarters in the composition of that 4 percent growth. This
quarter looks a lot better. In the fourth quarter of last year, final sales to domestic purchasers slowed
abruptly to growth of 2 percent annual rate and business capital investment actually moved into the
negative column.

The fourth quarter's 4 percent real growth was only achieved through some piling up of inventories and a
sizable improvement in net exports, widely recognized at the time as reflecting difficulties of seasonal
adjustment.

The first quarter's real growth is much more solidly based. Final sales to domestic purchasers rose at a 6
percent annual rate with business investment posting a large gain. Inventories were a relatively neutral
influence and the 4 percent real growth in the first quarter was achieved despite roughly a 2 percentage
point subtraction from net exports, some of which was a reversal of the fourth-quarter seasonal effect.

An improving pattern between the fourth and first quarters is also evident in inflation performance.

The GDP chain-weighted price index was up at an annual rate of only 0.9 percent in the first quarter,
down from 1.4 percent in the fourth quarter. The increase over the last year was also 1.4 percent -- the
smallest such four-quarter change since 1964.

The behavior of an alternative measure of prices was even more striking. The price index for gross
domestic purchases excludes exports and includes imports, hence reflecting the prices paid by U.S.
consumers, businesses, and the public sector. This index was flat in the first quarter for the first time
since 1954.

Part of this return to zero inflation was due to falling oil prices which may not last. But, another part can
probably be attributed to foreign competition and global disinflation, which may even intensify as Asian
adjustments proceed. In the past year, the prices of our nonpetroleum goods imports have fallen by
more than 4 percent.

The latest reading on the employment cost index for the three months ending in March was also
relatively encouraging in the inflation context. The seasonally adjusted quarterly index for total
compensation rose by only 0.7 percent, or a modest 2.7 percent annual rate and the smallest quarterly
increase in a year. The only reservation would be that quarterly changes in the series can be volatile and
that the first quarter result may be exaggerating the extent of improvement. By most other measures,
labor markets are extremely tight.

Still, it is impressive that after seven full years of expansion, with the unemployment rate at or below 5
percent for the past twelve months and real GDP growth close to 4 percent over the past six quarters,
inflationary pressures actually seem to have eased.

The emerging difference in the current situation is that adverse effects on real activity in the U. S. are
beginning to be felt from Asia. Up to this point, the chief impact had come in the form of lower inflation
and lower interest rates, both of which considered in isolation could certainly be viewed as desirable

developments.

The impact of the East Asian crisis is now beginning to show through in the U. S. trade data, in the form of a reduction in U. S. exports. From October through February, U. S. merchandise exports fell by nearly 5 percent, most of it recently, with the major East Asian countries accounting for 80 percent of the drop. These results are approximate and based on unofficial seasonal adjustment.

U. S. exports to the area are likely to fall further in most cases, not only because of income compression in Asia, but also because exchange rate movements have made U. S. goods relatively expensive and a further loss of market share is likely.

There has not been much sign yet in the published data of increased U. S. imports from Asian countries. If such an effect were to materialize, and it seems inevitable in the course of a successful Asian adjustment, it could imply some additional dampening influence on the growth of U. S. GDP.

Looking out to the future, slower U. S. growth seems sure to emerge. Continued growth at a 4 percent rate hardly seems feasible, even on the most favorable assumptions for productivity performance. But no drastic shift in the policy settings would seem to be required. The gradual emergence of restraint through the medium of a wider net export deficit would appear to be a highly probable development during the balance of the year.

Some recent indicators already seem to be pointing in that direction. Unfortunately, in this business, some indicators can usually be found pointing in any direction. But, it may be significant that industrial production has flattened out recently, growing at only 1 percent annual rate in the first quarter; and that the latest survey of the National Association of Purchasing Management reported a slower rate of growth in manufacturing in April. These might be early signs of the return to a more moderate pace of growth.

All things considered, growth near the economy's trend potential of 2-1/2 percent or so seems the most likely outcome going forward, along with the continuation of relatively low inflation and low interest rates.

That is a summary of recent economic developments and the near term economic outlook.



## PRESS ROOM
### U.S. DEPARTMENT OF THE TREASURY

**FROM THE OFFICE OF PUBLIC AFFAIRS**

August 4, 1998
RR-2624

**DIRECTOR OF THE OFFICE OF FINANCIAL ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE PUBLIC SECURITIES ASSOCIATION**

When you were here three months ago, the economy had completed a strong first quarter and seemed poised for further growth. It was recognized at the time that there had been a boost early in the year from unseasonably mild winter weather. For that and other reasons, it was widely anticipated that growth would be slower in the second quarter. The results are in now and that did prove to be the case. Growth slowed from a revised 5.5 percent annual rate in the first quarter to 1.4 percent in the second – a drop of about 4 percentage points.

That, in itself, may seem like quite a sizable move. But there was a phase during which an even larger decline was projected by many economists with growth expected to turn negative in the second quarter. Fortunately, we have been spared the potentially adverse effects on confidence that even a transitory negative quarter might have triggered. The fact of the matter is that the economy was strong in both the first and second quarters. If the economy was strong, how could growth fall by 4 percentage points? Since the now-settled GM strike cut from « to 1 full percentage point from the second quarter, the net decline might be taken as 3-1/2 percent or a little less.

Domestic final sales (the bulk of GDP) grew about as rapidly in the second quarter as in the first – over 6 percent annual rate increases in real terms in both quarters. What about Asia and foreign demand generally? That was an area of weakness. But net exports subtracted somewhat more than 2 percentage points in both the first and second quarters, dampening activity throughout. Hence, in a narrow arithmetic sense, this would not be a part of the 3-1/2 percent drop in growth. Instead, it was a swing in inventory investment which accounts for the entire 3-1/2 percent. The change in business inventories added 1.2 percentage points in real terms to growth in the first quarter when inventories rose by more than $90 billion, but subtracted 2.3 percentage points in the second quarter when inventories rose by nearly $45 billion – about one-half as much.

When inventories are piling up because sales are slow, there is cause for concern. A sharp rise in inventory-sales ratios has been a clear sign of trouble in the past, sometimes signaling oncoming recession. But sales have not been slow this year, inventory-sales ratios generally remain at low levels by historical standards and business surveys do not suggest that inventories are regarded as excessive by those that hold them. It makes a world of difference whether inventory adjustments take place when aggregate demand is strong, as has been the case this year; or whether unsold goods pile up when demand is weak, which has not been the case this year.

In any event, a sizable inventory adjustment did take place in the second quarter. Domestic demand continued to run close to its first-quarter pace, while production grew much more slowly, with selective cutbacks taking place, some of which were undoubtedly attributable to the Asian situation. With strong demand and flatter production, the rate of inventory accumulation fell sharply and pulled down growth in GDP.

It seems questionable whether the macroeconomic situation has really changed very much in the first half of this year, despite the big difference in first and second quarter growth rates. The feel that one had from monitoring the flow of statistics from week to week and month to month was not that things ran at a 5-1/2 percent annual rate part of the way and then dropped sharply to 1-1/2 percent. There seemed to be much more consistency in the way the economy performed. This may be a case in which the first half rate of growth gives a better picture of what was happening than either of its quarterly components.

It is a striking feature of recent economic performance that the economy could grow at a 3-1/2 percent annual rate in the first half of the year while extending its record of good inflation performance.

- The chain-weighted GDP price index (one of the broadest measures of inflation) rose at a little under a 1 percent annual rate in the first half of this year, down from about 1-3/4 percent during all of last year. (Recent GDP revisions introduced some technical changes in the indexes which slightly lowered these readings.)

- The consumer price index rose at a 1.4 percent annual rate in the first half of this year, down from a rise of 1.7 percent during all of last year. The core CPI, which excludes food and energy components, shows some acceleration, rising at a 2.5 percent annual rate, compared to 2.2 percent during all of last year.

- The employment cost index, released last week, also showed some acceleration. It rose 3.5 percent over the year ended in June, up from 2.8 percent a year earlier, and the biggest increase in 4-1/2 years. Wage growth accelerated from 3.2 percent to 3.8 percent, and benefits from 2.0 percent to 2.4 percent. Even so, the combination of productivity developments with these compensation costs can be taken to suggest little increase in inflationary pressure. Over the year ended in the first quarter, private nonfarm productivity growth was a rapid 2.1 percent, offsetting all but about 1-1/2 percentage points of the 3.5 percent increase in private industry compensation costs through the first quarter. It remains to be seen whether or not a similar productivity offset will persist in the future.

So, by and large, the economy did very well in the first half of the year. Real growth shaded down a little from about 3-3/4 percent last year to 3-1/2 percent in the first half of this year and might be expected to moderate somewhat further in the second half. Some key inflation rates actually edged lower in the first half and others showed only modest upward drift. The Asian situation continues to introduce an element of uncertainty into the economic outlook; but domestic considerations alone would seem to suggest a path of fairly steady expansion.

That is a summary of recent economic developments and the near term economic outlook.

# PRESS ROOM
U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

October 27, 1998
RR-2778

### DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE PUBLIC SECURITIES ASSOCIATION

When you were here three months ago, real growth had shaded down to a little above 3-1/2 percent annual rate in the first half of this year. The quarterly pattern of growth had been irregular: 5-1/2 percent annual rate in the first quarter and less than 2 percent in the second. But that reflected a swing in inventory investment. Domestic final demand was about equally strong in both the first and second quarters, more than offsetting the drag from an absolute decline in our exports to Asia and elsewhere.

Some key inflation measures actually edged lower in the first half of the year and others showed only modest upward drift. Strong growth and low inflation continued to coexist, despite low rates of unemployment and tightening labor markets. The Asian situation and the possibility of even broader financial contagion were recognized as a threat. But domestic considerations alone seemed to suggest a path of somewhat slower but healthy expansion in the second half of this year and beyond.

The domestic economic situation has evolved closely in line with expectation over the last three months. It is events in financial markets both here and abroad that have moved more rapidly and unpredictably than one could have anticipated. Inevitably, this introduces an element of uncertainty into the near term economic outlook that was not present to nearly the same degree when you were here three months ago. The basic difficulty is in knowing how much the process of financial deleveraging, which seems to be well underway, will exert an adverse and unwanted effect on real economic activity.

Some of the recent financial turmoil may have little lasting adverse impact, to the extent that it amounts to a zero-sum game with someone gaining what someone else has risked and lost. A heightened respect for risk may even have some beneficial consequences. But where leverage has been so excessive as to affect the functioning of markets, the situation must be taken very seriously. There is always the possibility that the pendulum may swing too far. After virtually disappearing, credit-quality spreads have widened sharply and credit availability has at least been temporarily interrupted in some markets. There is in such circumstances the potential risk that a market-induced process of credit restraint -- a private credit crunch, if you will -- could snowball and go farther than anyone desires. It is encouraging that some spreads have narrowed recently and that markets may be in the process of stabilizing.

One aspect of the current situation suggests that a favorable outcome is far more likely than might otherwise seem to be the case. Past episodes of credit excess and quality deterioration have typically occurred because of an inflationary environment and eventually only been brought to an end by monetary tightening. The current difficulties, whatever their ultimate origins, are occurring in a low-inflation environment within which the monetary authorities have already made offsetting moves toward ease. This may not completely forestall some adverse impact from the deleveraging process, but it would seem greatly to reduce the likelihood of any serious credit-dampening influence that might threaten the continuation of the current economic expansion.

As matters stand, the economy seems to be expanding at a rate fairly close to its longer- run potential, after a period of above-trend growth in the last two years. Unfortunately, we are viewing the recent past in the flow of current and immediately forthcoming official statistics. For example, the third-quarter was concluded a month ago. Yet we will not have the first look at third-quarter GDP until later this week. Obviously, those results will predate much of the recent financial turmoil and will tell us where the economy has been, rather than necessarily where it is going. But even that is worth knowing and may provide some guidance as to future developments.

The economy seems to have downshifted in the third quarter to a slower rate of expansion, from the first half's 3.7 percent annual rate, perhaps to something closer to 2 percent. Inventories had been a big swing item during the first half but will apparently exert a relatively neutral influence in the third quarter. More importantly, inventory-sales ratios remain at historically-low levels and there is little indication of the types of inventory imbalance that have sometimes given trouble in the past. Real personal consumption expenditure (two-thirds of GDP) seems to be on a sustainable track. The 6 percent annual rate increases in the first and second quarters were associated with a sharply falling personal saving rate and with some special factors (unusually mild winter weather in the first quarter and heavy discounting of autos and light trucks in the second quarter). If consumer spending were to have tapered down to a 3 percent annual rate of growth in the third quarter, as it may have, this would not signify any collapse in consumer spending but simply a return to a more sustainable path of expansion.

Rising anxiety about international turmoil is beginning to chip away a little at consumer confidence. Both

the University of Michigan's index of consumer sentiment and the Conference Board's consumer confidence index have backed off from their peaks earlier in the year. But the declines are from very high levels and may not translate into as much consumer retrenchment as would a clear threat to the continued growth of domestic employment and income.

Up to now, the most obvious consequence of the global financial crisis has been reduced demand for U.S. exports, largely but not entirely due to Asia, and a noticeable weakening in U.S. manufacturing activity since the beginning of the year. Increases in our manufacturing production have dwindled despite strong investment and consumer spending in this country. Excluding motor vehicles, where production has been distorted by the GM strike, manufacturing output slowed from growth of 6 percent over the four quarters of 1997 to less than half that in the first half of 1998 and to a small negative in the third quarter. As production has slowed, there has been a growing weakness in manufacturing employment as well. Factory jobs have fallen by about 150,000 since January after rising by more than 250,000 in 1997. These developments and their implications for the capital spending outlook will need to be followed closely.

So there have been significant shocks to both the U.S. real economy and to its financial markets. But the economy remains robust and there continues to be good forward momentum. The most probable outcome going forward would appear to be growth somewhere near the economy's potential and the continuation of low rates of inflation.

That is a summary of recent economic developments and the near term economic outlook.

# PRESS ROOM
U.S. DEPARTMENT OF THE TREASURY

**FROM THE OFFICE OF PUBLIC AFFAIRS**

October 28, 1998
RR-2782

**REMARKS BY GARY GENSLER ASSISTANT SECRETARY FOR FINANCIAL MARKETS
NOVEMBER 1998 TREASURY QUARTERLY REFUNDING**

Good morning. I am pleased to be with you today to announce the November quarterly refunding. I will also take this opportunity to discuss some other debt management matters, including uniform-price auctions, and our continuing efforts to encourage saving and to broaden access to our securities.

We are privileged to be here at a remarkable turning point in our nation's financial history. In the last fiscal year, Treasury debt managers made the transition from financing a deficit, to managing a surplus. We paid down $110 billion in marketable debt in FY 1998. This compares to net borrowing of $187 billion just three years ago. Our privately held marketable debt outstanding has declined to $2.857 trillion, compared to a peak of $3.010 trillion in September 1996.

The fiscal discipline imposed during the Clinton Administration has been critical to achieving this success. The net pay-down attributable to the surplus, combined with our financing and other accounts, and net of changes in our cash balance, accounted for approximately $55 billion of the pay-down. The rest of the pay-down was financed by our issuance of about $55 billion in non-marketable securities, primarily the State and Local Government Series (or "SLGS"). SLGS are a very cost-efficient form of financing for us. The $110 billion reduction in privately held marketable debt was a significant accomplishment.

Uniform-Price Auction

Before I turn to the terms of the quarterly refunding, I would like to announce that Treasury has decided to expand the use of uniform-price auctions to the sale of all marketable Treasury securities. This will include all bills, notes and bonds. We will begin implementing this change with the cash management bill to be auctioned on Monday. The Borrowing Advisory Committee was strongly in favor of adopting this change.

We have been using the uniform-price auction technique for 2- and 5-year note auctions since September 1992. For our bills and other coupon securities, we have been using a multiple-price approach. Based on our experience, we believe that there are several advantages to using uniform-price auctions: First, we have found that single-price auctions result in a broader distribution of auction awards. Second, the shift to uniform-price auctions will bring consistency to our auction procedures and techniques. And third, we have found that, consistent with auction theory, auction participants may bid more aggressively in uniform-price auctions. This is because successful bidders in uniform-price auctions are able to avoid the "winner's curse." They pay only the price of the lowest accepted bid, rather than the actual price they bid, as in the multiple-price approach. Thus, we believe that using uniform-price auctions will promote improved efficiency in the markets, and will reduce the costs of financing the Federal debt.

Terms of the November Refunding

I will turn now to the terms of the quarterly refunding. We are offering $38 billion of notes and bonds to refund $27 billion of privately held notes and bonds maturing on November 15, and to raise approximately $11 billion of cash.

The securities are:

- First, a 5-year note in the amount of $16.0 billion, maturing on November 15, 2003. This note is scheduled to be auctioned on a yield basis at 1:00 p.m. Eastern time on Tuesday, November 3.
- Second, a 10-year note in the amount of $12.0, maturing on November 15, 2008. This note is scheduled to be auctioned on a yield basis, at 1:00 p.m. Eastern time on Wednesday, November 4.
- Third, a 30-year bond in the amount of $10.0 billion, maturing on November 15, 2028. This bond is scheduled to be auctioned on a yield basis at 1:00 p.m. Eastern time on Thursday, November 5.

We are also announcing a cash management bill in the amount of $25 billion, to be auctioned on Monday, November 2, at 11:30 Eastern time, and to be settled on November 3. The bills will mature on January 21.

As announced on Monday, October 26, we estimate that our net market borrowing will total $30 billion in the October- December quarter. This is based on a conservative estimate that there will be no net new issuances of SLGS, which is a significant change for us. The borrowing estimate also assumes a $15 billion cash balance at the end of December. Including the securities we are announcing today, we have raised $10 billion of cash from sales of marketable securities. See the attachment for details.

Looking forward to the January-March quarter, we estimate that the Treasury will borrow between $15 and $20 billion in marketable securities during that quarter, assuming a $20 billion cash balance on March 31.

Savings Bonds

Next, I would like to say a few words about our continuing efforts to encourage savings, and to broaden access to U.S. savings bonds and marketable securities for all investors. I will start with an update on our savings bond program.

Today, we are announcing EasySaver, a new, convenient way to make regular investments in our Series I and Series EE savings bonds. Beginning Monday, November 2, an investor will be able make regular and automatic investments in savings bonds by authorizing direct transactions between the Treasury and the investor's bank. By completing a simple order form, the investor can authorize Treasury to charge the investor's bank account for the purchase of savings bonds, on any months and days specified by the investor. The only condition is that the investor must purchase at least two bonds per year per recipient either for the investor or for a family member. The order form may be requested on the Public Debt website, or by a toll-free telephone call. See the separate EasySaver press release for details.

We are very pleased to have with us today, John Fickewirth, who heads up the savings bond volunteer sales effort in Ventura County, CA. John is a small businessman who wanted to find a way to make it easy to enjoy the benefits of regular savings. He came to us with the basic idea that evolved into the EasySaver program. We would like to thank John for taking the initiative and bringing his idea to our attention.

I am also happy to report that the new inflation-indexed Series I savings bonds got off to a strong start. As many of you may recall, the new I Bonds went on sale on September 1. In the first month, sales hit $17.4 million, and we have sold $18.6 million more through October 22.

We are pleased with these initial results. The I Bond is a new type of investment for small investors it is an affordable Treasury security that protects the purchasing power of their principal and provides an attractive return over and above inflation. We look forward to continued growth in I Bond sales, especially as more investors learn about these new securities.

Marketables for Smaller Investors

In addition to making changes to our savings bond program, we have recently taken several steps to broaden investor access to our marketable securities. In August, we lowered the minimum purchase amount for all marketable securities to $1,000. We are pleased to report that in September, we received over 3,000 tenders for amounts below the old minimum levels for bills and notes in Treasury DIRECT, accounting for 14 percent of all Treasury DIRECT tenders.

On September 14, we modified Treasury DIRECT to allow investors to purchase marketable securities over the Internet at the Bureau of the Public Debt's website. Since the program's inception, more than 1,300 Treasury DIRECT customers have bought $31 million in bills and notes over the Internet.

Finally, our new telephone purchase program for Treasury DIRECT investors, which began on October 5, has also been successful. Treasury DIRECT customers are now able to put their tenders into the auction by touch-tone telephone. In less than three weeks, we received 1,700 telephone tenders for $65 million of bills and 2-year notes.

Thank you for your attention. The next quarterly refunding will be announced on February 3, 1999.

CASH RAISED

Including the securities that we are announcing today, we have raised $10 billion in sales of marketable securities.

This was accomplished as follows:

- raised $8.4 billion from the 30-year inflation-indexed notes issued on October 15;
- paid down $10.3 billion in the 7-year notes maturing October 15;
- paid down $3.9 billion from the 2-year notes to be issued November 2;
- will pay down a total of $33.9 billion in the 5-year notes maturing October 31, November 30, and December 31;

- raised $15.8 billion in the regular weekly bills including those to be issued tomorrow;
- paid down $2.1 billion in the 52-week bills issued October 15;
- raised $11.0 billion with the notes and bonds announced today; and raised $25 billion with 79-day cash management bills announced today.

---



**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

FROM THE OFFICE OF PUBLIC AFFAIRS

May 4, 1999
RR-3128

**DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE PUBLIC SECURITIES ASSOCIATION**

When you were here three months ago, the economy had completed a quarter of 6 percent real growth, more than twice the private consensus expectation when the fourth quarter began. It was clear at the time, however, that there had been special positive factors pushing up growth in the fourth quarter which were unlikely to be repeated in the first quarter, and some which might reverse. There had been a rebound in the fourth quarter from effects of the General Motors strike earlier in the year, unusually favorable weather for construction activity that persisted well into the winter months, and improvement in net exports which came at a time when the fundamentals seemed to point more toward further deterioration than improvement.

In view of those considerations, it seemed likely that a slower pace of real growth might emerge in the first quarter for statistical reasons alone. That turned out to be the case. Last week the Commerce Department reported first-quarter real growth of 4-1/2 percent, down from 6 percent in the fourth quarter. But one would be hard pressed to explain in what important respect the first quarter was weaker than the fourth. If anything, it appears to have been stronger. Gross domestic purchases, a measure of domestic demand calculated as GDP less net exports increased at a 6.8 percent annual rate in real terms in the first quarter after increasing at a 5.4 percent rate in the fourth.

The reason that growth in real GDP fell between the fourth and first quarters was that net exports subtracted nearly 2-1/2 percentage points from first quarter real growth after adding about a percentage point to the fourth quarter. There has been a recurrent tendency for net exports to improve temporarily in the final quarter of a year and then to deteriorate in the following first quarter. This seems to reflect residual problems in seasonal adjustment of the trade data and was probably aggravated in its effect late last year by a bunching of aircraft exports. While primarily a statistical phenomenon, it tends in the current situation potentially to obscure full recognition of the strength of domestic demand.

In terms of domestic considerations alone, there were few signs in the first quarter data of any emerging imbalances that might seem to threaten continued expansion. Business capital spending was well maintained a little below the fourth-quarter rate. Residential construction activity remained at a high level in the first quarter with good prospects for the future. Early last year, inventory investment seemed to be moving up to an unsustainable pace, but over the course of the year it gradually subsided. In the first quarter of this year, inventory investment was moderate and seemed to be closely aligned with sales. Inventory-sales ratios are currently at low levels by historical standards.

The economy has averaged close to 4 percent real growth for the last three years with only minor variations from quarter to quarter, such as between the final quarter of last year and the first quarter of this year. Perhaps the most remarkable feature of recent experience is the combination of solid growth with a low, and by some measures even declining, rate of inflation. In terms of the chain-weighted GDP price index, inflation fell over the past three years from about 2 percent to less than 1 percent. In the first quarter, this measure of inflation did rise to a 1.4 percent annual rate from 0.8 percent in the fourth quarter. A one-time Federal pay raise accounted for about 0.2 percentage point of the acceleration.

Good inflation performance received further confirmation last week with the release of the employment cost index, our most comprehensive measure of the cost to employers of employee wages, salaries and benefits.

- The employment cost index rose by only 3.0 percent in nominal terms during the twelve months ending in March, well below the market expectation of a 3.4 percent rise, and down from a twelve-month increase of 3.7 percent only six months ago.

- There was a 3.3 percent increase in wages and salaries (down from 4.0 percent six months ago) and a 2.3 percent increase in benefit costs (down from 2.6 percent six months ago). There is some indication that weakness in incentive pay in the high-flying finance, insurance and real estate sector may have had a measurable impact on the latest results.

- The recent behavior of compensation costs is most unusual given tight labor markets with the unemployment rate at 4-1/2 percent or below for the past year. In combination with the more rapid growth of productivity, it has meant less-than-expected inflationary pressures and sharp increases in private wages and salaries in real terms.

Direct information on the second quarter is still very limited but generally positive. The report this Friday on the April employment situation will provide the first comprehensive view.

- During the week ended April 24, initial claims for state unemployment insurance benefits fell by 20,000 to 294,000. The sizable decline reversed most of a runup that occurred at the beginning of the month. Along with the recent behavior of continued claims and the state-insured unemployment rate, this suggests that labor markets remain very tight.

- A sharp rise in orders for nondefense capital goods excluding aircraft at the end of the first quarter, as well as the fact that orders have been above shipments for several months, suggests that business equipment investment may post another solid increase in the second quarter.

- Scattered reports on chain store and auto dealer sales suggest some moderation from the steamy first-quarter pace with the early date of Easter possibly having pulled some retail sales into late March. Consumer confidence surveys remain at relatively high levels.

- The National Association of Purchasing Management index fell back a little in April but remained above the 50 percent level which indicates that manufacturing activity is expanding.

The economy grew strongly in the first quarter without signs of increased inflationary pressure or cyclical imbalance. This extends a long record of good performance, generally exceeding consensus expectation, and suggests that further gains lie ahead. Information on the second quarter is too limited at this stage to provide much guidance, but continued expansion, possibly at a rate closer to the economy's long-term potential, would seem to be a likely outcome.

That is a summary of recent economic developments and the near term economic outlook.

# PRESS ROOM
## U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

August 3, 1999
LS-40

**TREASURY DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE BOND MARKET ASSOCIATION**

When you were here three months ago, the economy had completed a quarter of a little over 4 percent real growth. That extended a record of 4 percent real growth which had persisted for some three years, with only occasional variation in quarter-to-quarter growth rates, frequently attributable to special factors. Now, according to last week's advance Gross Domestic Product estimate, growth in the second quarter fell a good deal short of 4 percent, to only a little more than 2 percent. A key question is whether the second-quarter result will turn out to have been just another one of those occasional quarterly variations, or whether it means that the economy is shifting down to a more sustainable pace.

The case for a smooth downshift rests primarily on the fairly general extent of the moderation in spending that emerged in the second quarter and the relative absence of any obvious imbalances.

- Real personal consumption expenditure (two-thirds of GDP) moved down to a 4 percent growth rate in the second quarter with roughly comparable degrees of deceleration in spending on durable and nondurable goods. By June, spending on consumer durables had flattened out.
- Growth in real fixed investment spending shaded down slightly in the second quarter with gains in producers durable equipment, especially computers and other high technology components, offsetting relative weakness in investment in structures, both residential and nonresidential.

- Federal sector outlays declined moderately in both defense and nondefense categories, while state and local outlays, as recorded in the national income accounts, were virtually flat in the second quarter.

Inventories are the main reason for questioning whether something like the lower second-quarter rate of growth is likely to persist. Inventory investment, while remaining positive, fell below the first-quarter rate and subtracted nearly a full percentage point from second-quarter real growth, with much of the inventory drop in the second quarter due to an inventory valuation adjustment for rising oil prices. The ratio of inventories to final sales is currently at very low levels by historical standards. Some will argue that these low inventory-sales ratios have set the stage for a faster rate of growth in the near future as firms rebuild their stocks. That is a possible outcome, but inventories are usually depleted when demand is stronger than expected. If anything, the second-quarter surprise seems to have been the softer pace of sales growth as the quarter progressed. Under the circumstances, inventory rebuilding on any significant scale may depend on the appearance of more positive sales performance, although some precautionary inventory buildup may occur more or less independently later in the year because of the Y2K transition

There are signs in the recent statistical record that the third quarter is opening at about the same moderate pace at which the second quarter closed. It should be emphasized that there is nothing in the recent record that would suggest outright weakness.

- Trade surveys imply that sales at major retailers in July were running a little behind June but remaining close to plan. Press reports suggest that industry analysts anticipate a slight decline in the auto sales rate in July when it is reported later today, although this would be from a high level.
- Consumer confidence readings are still at elevated levels but appear to be coming down a little. The Conference Board's index of consumer confidence declined in July for the first time in eight months. The University of Michigan index of consumer sentiment in July, released on Friday, also declined somewhat, although job and employment prospects were still regarded very favorably by consumers.
- The National Association of Purchasing Management index, released yesterday, was lower than markets expected in July at 53.4 percent, compared to 57.0 percent in June. Most components pointed toward continued but slower growth.
- A leading indicator of capital spending -- orders for nondefense capital goods excluding the volatile civilian aircraft component -- dropped by 4 percent in June following a decline of nearly 3 percent in May (actual declines, not annual rates). This could mean that growth in investment purchases of equipment may be entering a phase of slower growth.

Admittedly, these and other statistics that might be cited are only straws in the wind. They do point rather consistently to moderation in the pace of activity recently, rather than any sign of acceleration back to higher rates of speed. That probably should be regarded as a favorable development. For one important

sector that has gone unmentioned to this point is labor markets. And, they remain very tight.

That, of course, is a good thing from just about every point of view, except for inflation control. Once again, it has been shown that a rising tide does lift all boats. But there is the risk, latent to this point, but nonetheless real, that tight labor markets and strong final demands could begin to generate significant inflationary pressure. This may account at least in part for the fact that the other major statistic released last week -- the employment cost index -- had such a sizable impact at the time on financial markets.

The 1.1 percent jump in the employment cost index during the three months ending in June was the largest quarterly increase since the second quarter of 1991. It came on the heels, however, of a rise of only 0.4 percent during the first three months of the year -- the smallest in the history of the series, which dates back to 1982. Taken together, growth over the first six months of the year is a seemingly benign 2.9 percent annual rate, somewhat more subdued than the annual increases in both 1997 and 1998. On balance, therefore, last week's employment cost index results may have been more a reminder of inflation risk than a clear signal of trouble ahead.

Much will depend going forward on how rapidly the economy moves and how much or how little pressure this places on labor markets. Those markets are already tight but they do not yet seem to be radiating much inflationary pressure.

That is a summary of recent economic developments and the near term economic outlook.



**FROM THE OFFICE OF PUBLIC AFFAIRS**

August 4, 1999
LS-43

**UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE GARY GENSLER REMARKS
AT THE AUGUST 1999 TREASURY QUARTERLY REFUNDING**

Good morning. I am pleased to be with you today to discuss the governments refunding needs for the current quarter. We are about to record the nations first back-to-back budget surpluses since 1956 and 1957. That was before many of us in this room were born. We expect this quarter to pay down $11 billion in privately held marketable debt, bringing the total reduction to an estimated $95 billion by the end of FY 1999. Including changes in non-marketable borrowings, this will result in an overall reduction of $87 billion this fiscal year in our publicly held debt. This is a record decline in publicly held debt.

Treasury debt is taking up an ever smaller share of the capital markets. Prior to President Clinton taking office, privately held marketable Treasury securities represented 31 percent or just under a third of the U.S. debt market. Now, they represent only 23 percent, or just under one quarter of the U. S. debt market. Even more dramatically, Treasurys share of the volume of gross new issuance of long term debt has been cut by more than half. While we still have to issue debt to refund maturing securities, last year that debt represented only 18 percent of new long-term debt issuance in the United States, down from 40 percent in 1990.

The Clinton Administrations policy of fiscal discipline has been critical to achieving this success. As a result of reduced Federal borrowing, the net national savings rate has more than doubled from a low of 3.5 percent in 1993 to 7.2 percent this year. This has made more funds available for the private sector, fueling a surge in private business investment. More investment leads to higher productivity, which over the long term should produce a rising standard of living.

The significant reduction in debt over the last two years has left us with a set of challenges that we are delighted to have. We have needed to seek new debt management methods that will preserve the depth and liquidity of the Treasury markets in this era of budget surpluses. To this end, we have a number of announcements today concerning the manner in which we manage our nations debt.

First, we are announcing that we are reducing the frequency of our issuance of 30-year bonds. We will no longer issue a 30-year bond in November, but will continue to issue 30-year bonds in February and August. This allows us to continue to concentrate on fewer, but larger benchmark issues. In addition, this will enable us to counter the current lengthening in the average maturity of Treasurys debt.

Second, we will continue to examine the possibility of reducing the frequency of our issuance of 1-year bills and 2-year notes. A further decrease in the number of offerings would allow us to increase the liquidity of Treasurys remaining benchmark issues.

**Proposed rules on debt buy-backs**

Finally, as Secretary Summers announced, we are publishing a proposed rule that would establish a mechanism for Treasury to conduct debt buy-backs. While Treasury has not yet determined whether it will, in fact, conduct debt buy-backs, publication of the proposed rule is the first step to making buy-backs an actual debt management tool for Treasury. The Treasurys Borrowing Advisory Committee has strongly endorsed publication of this rule to provide Treasury with a full range of policy options.

We are now in our second year of budget surpluses. Thus far, we have managed the paydown of our debt by refunding our regularly maturing debt with smaller amounts of new debt. What we are proposing today would enable Treasury to repurchase debt that is not currently maturing.

This new tool would provide us with an important new means of managing the governments debt and responding to our improved fiscal condition. First, the use of debt buy-backs could allow Treasury to maintain larger issuance sizes, enhancing the liquidity of Treasurys benchmark securities. Over the long term, this enhanced liquidity should reduce the governments interest expense and promote more efficient capital markets. Secondly, debt buy-backs could enhance our ability to exert control over the maturity structure of Treasury debt. A buy-back program would provide us with the option of managing the maturity structure by selectively targeting the maturities of debt to be repurchased. Lastly, buy-backs could be used as a cash management tool, absorbing excess cash in periods such as late April when tax revenues greatly exceed immediate spending needs.

The proposed rule will be published tomorrow in the Federal Register and will be available today on the

Bureau of the Public Debts website (www.publicdebt.treas.gov). Attached is a one page summary of the main features of the proposed rule. We look forward to receiving comments over the next sixty days.

**Terms of the August Refunding**

I will now turn to the terms of the quarterly refunding. We are offering $37.0 billion of notes and bonds to refund $28.9 billion of privately held notes maturing on August 15, 1999, raising approximately $8.1 billion.

The securities are:

> 1) A 5-year note in the amount of $15 billion, maturing on August 15, 2004.

> 2) A 10-year note in the amount of $12 billion, maturing on August 15, 2009.

> 3) A 30-year bond in the amount of $10 billion, maturing on August 15, 2029.

These notes and bonds are scheduled to be auctioned on a yield basis at 1:00 p.m. Eastern time on Tuesday, August 10, Wednesday, August 11, and Thursday, August 12, respectively.

As announced on Monday, August 2, we estimate that net market borrowing for the July -September quarter will be a paydown of $11 billion. This estimate assumes a $45 billion cash balance on September 30. The Treasury also announced that net market borrowing for the October - December quarter will be approximately $65 billion with a cash balance of $80 billion on December 31.

We anticipate a larger than usual year end cash balance as part of our planning related to the Year 2000. Congress recently enacted legislation to ensure that there would be liquidity of up to approximately $20 billion available to credit unions at this year end. As a result, the Federal Financing Bank has entered into a note purchase agreement with the National Credit Union Administration (NCUA) to provide that liquidity should it be needed. The NCUA has indicated that they do not believe that there will be a need to access funds under the facility, but we plan to be prepared to fulfill our obligation should the need arise.

In addition, there is more uncertainty than historically related to Treasurys forecasts of daily receipts and outlays for the period around year end. Thus we plan additional funding to provide for the possibility that the timing of receipts or outlays do not follow historical patterns. As with the credit union facility, we do not anticipate any problems, but we believe it is appropriate to be prepared. All major Treasury financial systems, including those used to collect taxes, disburse payments, and auction marketable securities are Y2K ready. The Federal Reserve has also indicated that its systems supporting Treasury programs are Y2K ready.

The additional funding in the fourth quarter will be done by modestly increasing weekly bill offerings and through cash management bills.

We also expect to issue two cash management bills this quarter to bridge seasonal low points in our cash position, one in mid-August and another in late August or early September. Both will mature after the September 15 tax date.

The next quarterly refunding will be announced on November 3, 1999. Summary of the Proposed Buy-Back Regulations



**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

FROM THE OFFICE OF PUBLIC AFFAIRS

November 2, 1999
LS-199

### DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE BOND MARKET ASSOCIATION

When you were here three months ago, real growth had fallen below 2 percent annual rate in the second quarter. It was unclear at the time whether this was a temporary development, or an early signal of a downshift to a slower pace of growth going forward. Last week's advance Gross Domestic Product report settled that issue, at least for the third quarter, with real growth rebounding close to 5 percent. It still leaves unanswered the question of whether growth is likely to continue at such an elevated pace, or whether it will begin to move down toward the economy's longer-term growth potential.

The other major domestic economic development in the past three months had been the apparent intensification of concern over the threat of rising inflation. While the broad inflation measures in the Gross Domestic Product accounts were surprisingly well behaved in the third quarter, there have been some relatively high inflation readings recently from the monthly producer and consumer price indexes. The key question here was the extent to which the bulge in these indexes could safely be attributed to special factors, or whether it might be a signal of a more general increase of inflationary pressures. Recent data releases seem to have reduced, although perhaps not entirely removed, those concerns.

Turning first to the issue of economic growth, last week's Gross Domestic Product results also included a comprehensive benchmark revision of the national income and product accounts, a regular occurrence every 4 to 5 years which in this case changes results from 1959 through the second quarter of 1999. There has been insufficient time to examine the full implications of these revisions to the national accounts with the close attention that they deserve. The changes will undoubtedly prove to be important in appraising longer-term historical developments, and certainly they represent a commendable effort by the Commerce Department's Bureau of Economic Analysis to improve and modernize its accounts in order to keep pace with the ever-changing U.S. economy. But it seems questionable whether such data revisions have much immediate practical significance for us today in tracking the short-term behavior of the economy.

On the revised basis, real growth jumped from 1.9 percent annual rate in the second quarter to 4.8 percent in the third. But, domestic final demand only edged up from a 4.7 percent annual rate increase in the second quarter to 4.9 percent in the third. Consumer spending actually slowed a little from 5.1 percent in the second quarter to 4.3 percent in the third quarter. These are hardly significant changes and do not suggest any clear slowdown in consumer spending. But they do highlight the fact that higher growth in the third quarter was mainly accounted for by a turnaround in inventory investment. In the second quarter, inventory investment had dropped sharply, leaving inventory levels very low in relation to sales, and the third quarter seems to have been a period of voluntary inventory buildup -- one of replenishment. Aside from the inventory swing, the second and third quarters were fairly similar periods of strong final demand.

There are a few scattered signs currently that the economy may be shifting toward a more moderate pace of growth, but nothing that could yet be regarded as decisive. Consumer confidence seems to be slipping from its peak levels, although still remaining high. Largely anecdotal reports suggest that retail sales may have cooled a little. Residential construction is hobbled by shortages of construction labor and home sales have softened. Special explanations can be found for most of these possibly transient signs of weakness and the economy seems to be rolling along currently at generally undiminished speed.

The fourth quarter is regarded by many forecasters as likely to feature even more inventory buildup, as many businesses and perhaps even some consumers begin to practice a "just in case" inventory policy in advance of the Y2K transition into the new millennium. That may introduce some modification of the quarterly path. For example, the Blue Chip consensus forecast in early October from about fifty economists at major businesses, financial institutions and academic research organizations, was carrying a 3.8 percent real growth estimate for the fourth quarter and 2.0 percent for the first quarter of next year as precautionary inventory building ran its course. For the four quarters of next year, real growth was expected to average 2.6 percent, probably not far from many current estimates of the economy's trend rate of growth potential.

Inflation, or perhaps one should say its comparative absence, remains the major puzzle in the current situation.

- Broad measures of inflation in the national accounts remained well behaved in the third quarter. The GDP chain weight price index (which captures only prices for goods and services produced in the U.S.) rose at a 1.0 percent annual rate, down from 1.3 percent in the second

quarter. The price index for gross domestic purchases (which reflects only prices paid by U.S. residents) moved up by 1.6 percent at an annual rate in the third quarter following a 1.9 percent rise in the second. An upturn in the price of imported oil is primarily responsible for the higher -- but still low -- rates of inflation on this basis.

- The employment cost index (ECI) continues to defy the conventional expectation of an accelerating pattern in a period of such tight labor markets. During the three months ended September, the index rose by 0.8 percent. Growth over the twelve months ended September comes to only 3.1 percent -- a slowdown of 0.6 percentage point from 3.7 percent during the comparable year-ago period. The slowdown has been centered in wages and salaries, which grew by 3.3 percent during the latest twelve months compared to 4.0 percent a year earlier. Growth of benefit costs accelerated narrowly from 2.6 percent to 2.7 percent.

- In sharp, and at the time somewhat disturbing, contrast, producer and consumer price indexes for September rose rather abruptly. The 1.1 percent increase in producer prices was a nine-year high. Excluding aberrant jumps in cigarette and passenger car prices, the core PPI index would, however, have risen only 0.1 percent. Even without this deconstruction approach, the core PPI is up this year at only a 0.6 percent annual rate. The CPI core index was up 0.3 percent in September but roughly two-thirds of that increase was due to higher prices for cigarettes and apparel, believed to be temporary.

The economy continues to roll along with few clear signs of difficulty ahead and a remarkably quiescent inflation situation. That is a summary of recent economic developments and the near term economic outlook.

---



# PRESS ROOM
## U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

May 2, 2000
LS-595

**DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE BOND MARKET ASSOCIATION**

When you were here three months ago, the economy had completed a strong fourth quarter with real growth estimated near 6 percent. Because there had been some boost to the fourth quarter from precautionary inventory building and other transactions in advance of Y2K, a more moderate pace of growth was widely expected to emerge in the first quarter of this year. For example, in early February, shortly after you were here, the Blue Chip consensus of some 50 economists at major businesses, financial institutions and academic research organizations projected about a 3 percent real growth rate for the first quarter, roughly one-half of the fourth quarter rate. The first quarter turned out to be much stronger than expected.

Real growth of 5.4 percent in the first quarter did fall short statistically of the fourth quarter's upward-revised 7.3 percent, but in most key respects the first quarter appears to have been stronger than the fourth. Real personal consumption expenditure, two-thirds of gross domestic product, rose at an 8.3 percent annual rate in the first quarter, up from 5.9 percent in the fourth, and the fastest such quarterly rate since early 1982. Real business fixed investment rose at a 21.2 percent annual rate in the first quarter, up from a 2.9 percent rate in the fourth quarter, while residential investment rose at a 6.7 percent annual rate in the first quarter, up from 1.8 percent in the fourth. As a result, real domestic final demand grew at an 8 percent annual rate in the first quarter despite a sharp drop in federal spending. The 8 percent growth rate in domestic final demand was pulled down to the 5.4 percent headline figure for growth in gross domestic product by negative contributions of approximately equal size from net exports and inventory investment. Each, in its own way, was a reflection of strong domestic demand in the first quarter, rather than any sign of weakening in the pace of economic activity.

With domestic demand growing at such a strong pace, there is naturally some concern that inflationary pressures might begin to increase. The broad gross domestic product inflation measures did show some acceleration in the first quarter, but this was because of higher energy prices and the annual Federal pay raise which is treated as a one-time price increase. Excluding those factors, inflation was tame. The core price index for gross domestic purchases increased at a 1.7 percent annual rate in the first quarter after excluding the Federal pay raise, slower than the 1.9 percent increase in the fourth quarter. The personal consumption expenditure deflator, excluding food and energy, rose at a 1.8 percent rate in the first quarter after rising at a 2.0 percent pace in the fourth quarter.

The employment cost index, released last week, seemed to provide a more serious indication that inflationary pressures are beginning to emerge. The compensation of civilian workers (wages plus benefits) rose 4.3 percent in the twelve months ending in March, up from 3.4 percent in the twelve months ending last December. This latest 12-month increase consisted of a 4.0 percent increase in wages and salaries and a 5.0 percent increase in benefits. It should be noted that these employment cost increases do not translate one-for-one into an inflationary result, instead they are offset in whole or in part by increases in productivity. Official productivity results are not yet available for the first quarter along with their accompanying compensation measures which differ somewhat from those in the employment cost index. Still, it is possible to draw some provisional conclusions. It seems likely that there was another fairly strong gain in productivity in the first quarter, perhaps keeping the productivity gain over the past four quarters close to 3 percent and holding any rise in unit labor costs to relatively modest proportions, consistent with the observed gross domestic product inflation rates near 2 percent.

There has been a remarkable record of rising gains in productivity during this long expansion which has enabled strong growth to be combined with low inflation. In the two previous long economic expansions since World War II, those in the 1960's and in the 1980's, growth in productivity declined more or less steadily after initial cyclical gains, and had virtually disappeared by the late stages of those expansions with clear inflationary consequences. The key to keeping the economy on a sustained low-inflation growth path may well be the continued achievement of strong gains in productivity.

Information currently available suggests that the economy began the second quarter with considerable forward momentum. There is little in the statistical record which points to any sharp change of pace, but many indicators seem to be coming off their recent highs.

- Initial claims for state unemployment insurance benefits rose by 26,000 in the week of April 22, although this was from a 26-year low of 257,000 one week earlier. Both continued claims and the state insured unemployment rate have fallen to new lows and labor markets remain very tight.

- Consumer confidence is at high levels although some measures are slightly off their peaks. According to the Conference Board, consumer confidence was little changed in April after two months of easing from an all-time high in January. Press reports suggest that the University of Michigan index of consumer sentiment firmed somewhat in April, but it too has shaded down from a peak in January.

- Recent readings in retail sales are difficult to interpret because of a late date for Easter this year. There has apparently been some improvement in April, but sales are still reported to be running a little below plan for most retailers.

- The National Association of Purchasing Management index shaded down somewhat in April, suggesting continued growth in manufacturing but some deceleration over the past six months. There were signs of moderation in the rate of increase in prices paid by manufacturers.

It may be worth recalling that in each of the last two years, strong first quarters were followed by second quarters in which growth in real gross domestic product slowed to about 2 percent. Discretionary spending for goods has shown double-digit gains in the first quarter of each of the past three years, suggestive of a seasonal phenomenon perhaps not yet adequately captured in the seasonal adjustment process. Possible factors might include unusually mild winter weather, heavy discounting by merchandisers in the post-holiday sales seasons, increased bonus pay early in the year and earlier tax refunds because of electronic filing. The net effect on the statistical record may have been to pull some activity into the first quarter at the expense of the second. It is not beyond the realm of possibility that something like that could occur again this year. At the present time, though, the dominant feature of the current situation continues to be strong real growth combined with relatively low rates of inflation.

That is a summary of recent economic developments and the near term economic outlook.

---



May 3, 2000
LS-602

### UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
### GARY GENSLER
### REMARKS AT THE MAY 2000 TREASURY QUARTERLY REFUNDING

Good morning. I am pleased to be with you today to discuss the governments refunding needs for the current quarter. Fiscal discipline and economic strength have continued to generate growing budget surpluses. These surpluses represent an increase in our national savings, contributing significantly to the health of the economy and helping to prolong the longest running economic expansion in our nations history.

On Monday, Treasury announced that we expect to pay down an estimated $185 billion of outstanding marketable debt during the April-June quarter. This represents the largest quarterly reduction in the government's marketable debt in our nation's history, far surpassing the previous paydown of $114 billion for the similar quarter last year. When the additional paydown of $47 billion estimated for the July-September quarter is considered, we expect to achieve a reduction in marketable Treasury debt of $205 billion for the fiscal year. In addition, we estimate a paydown this fiscal year of $11 billion of non-marketable debt.

Thus, by the end of this fiscal year, we estimate that debt held by the public will be reduced by a total of $216 billion. This will represent the third year in a row in which we have achieved a reduction in our public debt, for an overall reduction of $355 billion over these three years.

### Debt Buybacks

Since we were last together, we have conducted the first buybacks of Treasury securities in 70 years. These buybacks renew a practice that was proposed by Secretary of the Treasury Alexander Hamilton when he submitted a plan to Congress in 1795 to extinguish the debt within thirty years. Albert Gallatin, the fourth Secretary of the Treasury, later conducted the first debt

repurchases. Over the course of the next 120 years, Treasury entered the market from time to time to repurchase its debt during periods of sustained budget surpluses. The last debt repurchases were conducted by Secretary Andrew Mellon's Treasury in 1930. Secretary Summers and all of us at Treasury are proud that President Clinton's economic program of fiscal discipline and growth has once again brought about economic strength to the point where buy-backs are both feasible and desirable.

There have been many challenges in initiating such repurchases after 70 years. I would like to recognize the staff of Treasury, the Bureau of the Public Debt, and the Federal Reserve Bank of New York and to thank them for their high level of professionalism and for all their efforts. We have been very pleased with the success of the initial debt buybacks.

Treasury will continue to pay down the debt principally by paying off debt as it matures. Debt buybacks, however, will provide an important additional means of retiring the debt in an era of continued fiscal discipline. Consistent with our previous announcements, we plan to purchase up to $30 billion in debt this year.

To date, we have conducted four operations resulting in the retirement of securities with an aggregate par value of $7 billion. The initial debt buyback operations were conducted smoothly and had broad participation. The operations have ranged in size from $1 to $3 billion each. Over the course of the four operations, we were offered securities with a par value of $34 billion in response to our offer to purchase $7 billion par value of securities. The operations were conducted in a manner consistent with the Federal Reserve Bank of New York's open market purchases.

We have discussed the results of our initial buyback operations with our Borrowing Advisory Committee. We will continue to consult the Committee on how we can best use this debt management tool, including with respect to size, regularity, and maturity sector covered by

We will conduct buybacks twice a month from now until the next Quarterly Refunding announcement. We anticipate that one operation will take place each week in the third and fourth weeks of the month. Consistent with the Borrowing Advisory Committee's recommendation, we will be moving to a one-day notice period rather than the two-day notice period in our four preliminary operations. Our next announcement will be on Wednesday, May 17th for an operation on Thursday, May 18th.

We expect these operations will be in size ranges approximating those we have conducted to date. We will give further consideration to the various suggestions made by the Borrowing Advisory Committee as to size, regularity, and maturity sector.

As we conduct further buybacks, we will continue to learn from these operations and adjust our procedures where appropriate to achieve the best results for the American taxpayers.

**Other Debt Management Issues**

As our nation's fiscal health continues to improve and the amount of maturing Treasury debt declines, we will consider how best to reduce Treasury's borrowings. Consistent with long practice, we will review the size, frequency, and issuance of our securities for further adjustments.

As we have discussed at these meetings several times over the last year, we will closely review the frequency and size of the one-year bills and two-year notes.

In February, we announced reductions in the frequency of issuance of one-year bills from thirteen to four times a year. As our borrowing needs decline, it is likely that we will reduce or eliminate issuance of one-year bills. As we move forward in this regard, there are currently a limited number of statutory provisions that reference the 52-week bill for the purpose of setting interest rates. We look forward to working with Congress to achieve a smooth transition to the eventual elimination of the one-year bill.

In February, we also announced modest reductions in the size of two-year note auctions. Beginning this month, we will again modestly reduce the size of our two-year note issuances. To the extent that our borrowing needs continue to decline, it is likely that we will consider reducing the frequency of our two-year note auctions, consistent with the recommendations of the Borrowing Advisory Committee.

**Terms of the May Refunding**

I will now turn to the terms of the May refunding. We are offering $20 billion of notes to refund approximately $27.8 billion of privately held notes maturing on May 15, paying down approximately $7.8 billion.

The securities are:

1. A 5-year note in the amount of $12 billion, maturing on May 15, 2005. If the auction of 5-year notes results in a yield in a range of 6.500% through and including 6.624%, the 5-year notes will be considered a reopening of the 6 1/2% 10-year notes originally issued on May 15, 1995.

2. A reopening of the 6 1/2% note of February 2000, maturing February 15, 2010, in the amount of $8 billion.

These securities are scheduled be auctioned on a yield basis at 1:00 p.m. Eastern time on Tuesday, May 9 and Wednesday, May 10, respectively.

In addition to the refunding, the 8 1/4% bonds of 2000-05 that were called for redemption on January 14, 2000, are also being redeemed. There are $4.2 billion of these bonds outstanding, of which $2.0 billion are held by private investors.

As announced on Monday, May 1, 2000, we estimate that we will have a $50 billion cash balance on June 30 and a $45 billion cash balance on September 30.

The next quarterly refunding press conference will be held on August 2, 2000.

---



**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

FROM THE OFFICE OF PUBLIC AFFAIRS

August 1, 2000
LS-819

**DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE OF THE BOND MARKET ASSOCIATION**

When you were here three months ago, the dominant feature of the economic situation was strong real growth combined with low rates of inflation. Now, three months later, that is still the case. But there has been a change. Growth now seems to be coming down from a peak rate of over 8 percent late last year on the basis of newly-revised Gross Domestic Product data, while inflation has been edging up from its recent lows. These developments have been gradual, and hardly unexpected, but their timing and eventual resolution is not easy to judge. This is a period in which the behavior of current statistical readings, particularly those with forward-looking properties, takes on unusual importance.

Last week's advance report on second-quarter Gross Domestic Product contained the usual quota of surprises. Not the least of these was a headline real growth number of 5.2 percent annual rate, compared to a downward-revised 4.8 percent rate in the first quarter. But, beneath the surface, there were signs that a slower pace of real growth might be emerging. Real personal consumption expenditures (two-thirds of Gross Domestic Product) grew at a 3 percent annual rate in the second quarter, down from more than 7-1/2 percent in the first quarter. Outlays on durable goods, particularly motor vehicles, fell in the second quarter for the first time in three years, admittedly from a very high level.

Partly as a result of the slower pace of consumer spending, an increased rate of inventory accumulation added a full percentage point to real growth in the second quarter. To the extent that this accumulation was involuntary, it could serve as a drag on production during the second half of the year. It should be noted, however, that aggregate inventory-sales ratios remain very low and survey data do not suggest that inventory holdings are currently regarded as excessive.

Second-quarter real growth was boosted about 1 percentage point and first-quarter real growth was cut by about the same amount by quarterly swings in federal spending, as recorded in the national income accounts, which are likely to net to a small positive for the year as a whole. With allowance for these and other special influences, it seems fair to say that there was some slowdown in the growth of underlying aggregate demand during the second quarter, despite the recorded rise in real growth from 4.8 to 5.2 percent. From a favorable point of view, much of the second-quarter strength was in productivity-enhancing private investment categories. For example, there was a 31 percent annual rate of growth in "information processing equipment and software" which accounted for about one-third of the total growth in second-quarter Gross Domestic Product.

Inflation remained relatively moderate in the second-quarter Gross Domestic Product report, although up somewhat from last year. The Gross Domestic Product chain price index rose at a 2.5 percent annual rate in the second quarter, down from a 3.3 percent rate in the first quarter when the Federal pay raise was a special influence. The 2.9 percent annual rate increase of Gross Domestic Product inflation in the first half of this year compares with a 1.6 percent increase during 1999. A roughly similar pattern is shown in the core Consumer Price Index which rose at a 2.6 percent annual rate in the first half of this year, up from 1.9 percent during 1999.

The employment cost index (wages plus benefits) rose by a seasonally adjusted 1.0 percent in the three months ending in June, a shade below market estimates. Over the twelve months ending in June, total compensation costs for civilian workers rose by 4.4 percent, up considerably from 3.2 percent in the same period one year ago and the biggest gain in nearly a decade. Mounting cost pressure from the benefits component is a major factor along with wage and salary growth in tight labor markets.

However, this does not necessarily imply much, if any, increased inflationary pressure as long as productivity growth continues its recent strong performance. Official productivity estimates for the second quarter are not available yet, but rough estimates on the basis of the second-quarter Gross Domestic Product results point to another strong gain in productivity, probably over 4 percent at an annual rate. This should hold any rise in unit labor costs to modest proportions, consistent with recently observed inflation rates.

Weekly and monthly statistical indicators present a mixed picture and do not yet fully resolve the uncertainties in the current situation.

- The index of leading indicators dipped by 0.1 percent in May and has been down or about flat for the last four months. Based upon past relationships, this points to sustained expansion but

not at the rapid pace seen earlier. Preliminary indications suggest a flat index or perhaps a slight rise in June.

- Initial claims for unemployment insurance are volatile and difficult to read at this time of the year because of the auto industry's annual summer downtime. The four-week average of initial claims has turned up sharply since dipping to a 26-year low at mid-April and continued claims have risen to levels not seen since last fall. These are potential signs of softening but difficult to reconcile with consumers' very optimistic perception of employment opportunities.

- The Conference Board index of consumer confidence rebounded in July and is close to its record high reached in May. Consumers' assessment of the current employment situation is now extremely favorable, with the share who believe jobs are "hard to get" at an all-time low. Press reports suggest that the University of Michigan index of consumer sentiment also remained at a high level in July.

- Orders for durable goods increased by 10 percent in June, driven by large increases in aircraft orders, both civilian and military. Excluding the volatile transportation category, orders were up a more modest 0.8 percent. Order backlogs indicate underlying strength in demand for capital goods.

- Existing home sales increased for the second consecutive month in June to a relatively high 5.23 million unit seasonally adjusted annual rate. Mortgage interest rates declined somewhat and may have given sales a temporary boost. Housing starts and permits, on the other hand, have begun to show some weakness.

The difficulty currently is in knowing whether the economy is likely to slow down even further, or whether it is likely to regain whatever forward momentum it may have lost. This uncertainty can probably only be resolved with the passage of time and further readings on the key economic variables. But at the present time and on the basis of the information currently available, the most likely outcome would seem to be the continuation of fairly strong growth, close to the economy's potential, possibly coupled with some mild increase in inflationary pressure.

That is a summary of recent economic developments and the near term economic outlook.

_____



**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

FROM THE OFFICE OF PUBLIC AFFAIRS

August 2, 2000
LS-821

**UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE**
**GARY GENSLER**
**REMARKS AT THE AUGUST 2000 TREASURY QUARTERLY REFUNDING**

Good morning. I am pleased to be with you today to discuss the governments refunding needs for the current quarter.

By the end of this fiscal year, we will have achieved three straight years of unified budget surpluses -- a feat unimaginable just a few years ago. The unified surpluses for the three years are estimated to total over $400 billion. These surpluses cap the longest series of improvements in budget results in the history of the United States.

As the President announced on Monday, this year we will pay down $221 billion of publicly held debt. This reduction in our publicly held debt consists of a reduction of $210 billion of privately held marketable debt and $11 billion of nonmarketable debt. In all, this will bring us to a total reduction in publicly held debt of approximately $360 billion in just three years.

**Adjustments to Date**

Paying down approximately $360 billion in debt in three years is a significant achievement. We have made adjustments to our debt management program to pay down this debt and to prepare for the years ahead in which we expect to continue running large, unified surpluses, leading to a paydown of over $200 billion in debt each year.

Since 1996, we have decreased bill issuance by 28 percent. This has been accomplished by reducing the size of weekly bill and moving to quarterly auctions of one-year bills. At the same time, we have decreased issuance of coupon securities by over 50 percent, based on our current auction schedule. We accomplished this by eliminating more than one-third of coupon auctions and by instituting a regular schedule of reopenings of five- and ten-year notes and thirty-year bonds.

As a result, the amount of Treasury coupon debt that matures each year has declined from its peak in 1998. Maturing coupon debt will be relatively stable this year and next. It is forecast, however, to decline by approximately $80 billion in 2002 to under $400 billion for the year. Maturing debt is forecast to decline even further in 2004 to approximately $260 billion, based on current issuance patterns.

While issuance of coupon debt has decreased significantly, the outstanding coupon debt has decreased much less dramatically, due to the length of time it takes for previously issued coupon debt to mature. To date, the outstanding stock of coupon debt has decreased by 14 percent from its peak. In contrast, however, outstanding debt with a remaining maturity of five years or more has actually increased by eleven percent.

**Debt Buybacks**

Paying down debt primarily by redeeming maturing debt is inherently asymmetrical, with the paydown occurring at the short end of the maturity spectrum. Buybacks have the potential to bring more balance to the paydown of the debt. For this and other reasons, earlier this year we reinstated buybacks for the first time in seventy years.

We are very pleased with the results of the buyback program to date. We have now conducted ten buyback operations. To date, we have redeemed securities with a total par value of $17.5 billion. This represents just over half of the up to $30 billion of buyback operations that we plan to conduct this calendar year. The operations have ranged in size from $1 to $3 billion. For the operations we have conducted thus far, we have purchased securities with remaining maturities of between 15 and 25 years.

In May, we instituted a regular schedule for buybacks. The buyback operations are conducted twice each month in the third and fourth weeks of the month, with a one day notice period. We plan to maintain this schedule going forward.

We have continued to analyze the buyback results and to discuss the program with Treasury's

Borrowing Advisory Committee. The Committee has recommended that we conduct buybacks of callable securities. This quarter, we plan to purchase securities with maturities of approximately ten years or more. For the first time, this will include callable securities.

**Federal Reserve Purchases of Treasuries**

Since the last Quarterly Refunding, the Federal Reserve announced changes in the management of the System Open Market Account, or the SOMA. The Federal Reserve will now set limits by maturity as to the percentage of each security that they will hold. Accordingly, the Federal Reserve will no longer consistently roll over 100 percent of their maturing securities into new issues.

While many things may change over the next 24 months, based on the Federal Reserve's current holdings and Treasury's current auction sizes, the new procedure could lead to redemption of $30 billion of maturing coupon securities over this period. In addition, this year there have been net bill redemptions by the Federal Reserve, primarily due to the reduction in Treasury's 52-week bill issuance. These bill redemptions were just over $7 billion in the last quarter and are likely to be somewhat higher this quarter. The Federal Reserve would meet their additional portfolio needs with purchases in the secondary market, subject to the same limits by maturity as for purchases at auction.

We consulted closely with the Federal Reserve concerning these changes, which may provide Treasury greater flexibility in the future to maintain the size of coupon issuance. We are pleased that the changes in SOMA portfolio management will meet both the Federal Reserve's portfolio management needs and Treasury's broad debt management objectives.

**Looking Ahead**

At the present time, we do not believe further changes in the overall pattern of our coupon debt issuance are necessary. This is based on the significant adjustments we have made to date, the fact that maturing coupon debt is not declining next year, and the additional flexibility we have gained as a result of the changes made by the Federal Reserve in the management of the SOMA portfolio. As we have done historically, we will use bills as an adjustment mechanism, both for seasonal and other adjustments to our borrowing needs. For the balance of the year, we expect the size of the regular weekly bill auctions to increase to meet these needs.

We have previously mentioned that we are considering the elimination of the one-year bill. In this regard, we are pleased with the progress to date in our discussions with Congress concerning revision of the limited number of statutory provisions that reference the one-year bill for the purpose of setting interest rates.

I would like to emphasize that it has been the Treasury's policy to give the markets ample notice should we decide to eliminate or curtail a particular issue. We will continue to follow this practice.

**Terms of the August Refunding**

I will now turn to the terms of the August refunding. We are offering $25 billion of notes and bonds to refund approximately $25.1 billion of privately held notes maturing on August 15, paying down approximately $100 million.

The securities are:

1. A reopening of the 6-3/4% notes of May 2000, maturing May 15, 2005, in an amount of $10 billion.

2. A 10-year note in an amount of $10 billion, maturing August 15, 2010.

3. A reopening of the 6-1/4% bonds of February 2000, maturing May 15, 2030, in an amount of $5 billion.

These securities are scheduled be auctioned on a yield basis at 1:00 p.m. Eastern time on Tuesday, August 8, Wednesday, August 9, and Thursday, August 10, respectively.

As announced on Monday, July 31, 2000, we estimate that we will have a $50 billion cash balance on September 30 and a $30 billion cash balance on December 30. We expect to issue cash management bills in mid-August and around the end of the month to bridge seasonal lows in our cash position.

The next quarterly refunding press conference will be held on November 1, 2000.

———————



# PRESS ROOM
## U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

October 31, 2000
LS-991

**DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN
REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE
OF THE BOND MARKET ASSOCIATION**

When you were here three months ago, there were signs that a slower pace of growth was emerging. But this was a slowing from what had been very rapid growth in aggregate demand throughout last year and into the early months of this year. The difficulty at the time was in knowing how much the economy might slow down and for how long. On the basis of the information available, the most likely outcome appeared to be that growth would continue at a reduced, but still fairly strong pace close to the economy's potential. Last week's advance report on third-quarter Gross Domestic Product seems to confirm that something like that has been taking place. Third-quarter real growth fell to a little below 3 percent from a little above 5 percent in the first half of the year.

Indeed, if attention were to be confined exclusively to such broad measures of economic activity, the term "soft landing" would seem to be altogether appropriate. But there have been changes since you were here three months ago, which introduce elements of uncertainty into the situation as we now find it. There have been rising crude oil prices, growing tensions in the Middle East, and a terrorist attack on a U. S. navy vessel. The stock market has been volatile with weakness spreading from the "new economy" sectors to the general market and broad indexes recently testing this year's lows. In the fixed income area, Treasury yields have been drifting down with credit-quality spreads widening against private securities, and widening very sharply in the case of speculative-grade corporate issues. In addition, commercial banks are being encouraged by the regulatory authorities to evaluate the credit quality of their portfolios with extra caution in view of the possible effects of a long business expansion on risk assessments.

It is difficult to judge the possible significance of these and related developments. While still modest in size and scope compared to some recent financial adjustments, there is always the potential for unwelcome surprises. But, as matters stand, there does not yet seem to be any clearly-defined threat from the financial side of the equation to the continued advance of the economy. Certainly, that would appear to be the consensus view. For example, the October Blue Chip forecast by some 50 economists at major businesses, financial institutions, and research organizations, which was released earlier this month, called for a slowing in real growth to 3 percent in the third quarter -- close to what actually occurred. On average, real growth was projected by the group to rise to about 3-1/2 percent in the current quarter and then to remain close to 3-1/2 percent over the four quarters of next year. None of the panel members predicted recession.

Last week's decline in the headline real growth number from 5.6 percent annual rate in the second quarter to 2.7 percent in the third quarter may suggest a more abrupt slowdown in growth than has actually taken place. A slower pace of growth in the economy was clearly apparent by the second quarter and did not emerge suddenly in the third. Indeed, real personal consumption expenditure (two-thirds of GDP) picked up to a 4-1/2 percent annual rate of increase in the third quarter from about 3 percent in the second. Second quarter growth in real GDP had been boosted by two special factors. First, there was a sharply higher rate of inventory accumulation, some of which now appears to have been involuntary. Second, there was a second-quarter spike in federal purchases associated with Census hiring and a shifting seasonal pattern of defense purchases. Rough allowance for those two factors would reduce second-quarter real growth closer to a notional 3 percent, not greatly different from the third-quarter pace. If anything, the quality of growth may have improved in the third quarter with a firmer tone for consumer spending, the apparent end of the second-quarter's rapid inventory buildup, and a much slower rate of deterioration in net exports.

Another favorable feature of third-quarter developments was the continuation of good inflation performance. The Gross Domestic Product chain weighted price index increased at a 2.0 percent annual rate in the third quarter, down from 2.4 percent in the second quarter. The gross domestic purchases price index, which excludes exports and includes imports, rose from 2.1 percent to 2.4 percent.

The employment cost index results for the three months ending in September, also released last week, were generally favorable. Compensation costs increased a shade less rapidly than in the prior three-month period, with growth in both wages and salaries and benefit costs, tapering off a little. Despite the benign performance in the latest quarter, rapid growth in compensation costs earlier in the year has led to a much larger increase in the employment cost index over the past 12 months than over the prior twelve-month period. The saving grace has been rapid increases in productivity which has held labor costs per unit of output to rates of increase consistent with good price performance. Productivity estimates available later this week seem likely to confirm that this state of affairs continued in the third quarter.

The third quarter is history by now and we must depend upon scattered statistical readings and anecdotal reports for a sense of where the economy is heading.

- Existing home sales fell back a little in September but remained surprisingly high at over 5 million units at a seasonally adjusted rate. Mortgage applications are still high, inventories of unsold homes are low and home prices are rising. Residential investment was a negative factor in third-quarter GDP but may be stabilizing.
- Durable goods orders rose a little more than expected in September, but the key series on nondefense capital goods excluding aircraft - followed closely by economists as a leading indicator of business capital spending - edged down for a third successive month. The National Association of Business Economists has recently reported that an intense profits squeeze was developing for goods producers in the third quarter and that some firms are cutting back on capital spending.
- The recent behavior of initial claims for unemployment insurance does not point to much change in the current situation. Labor markets remain tight but the claims data also reflect the slower economic pace since the spring of the year. The four-week moving average of initial claims now stands at 307 thousand, some 45,000 above lows near 262 thousand registered in April.
- Recent press and anecdotal reports suggest some erosion of consumer confidence recently, although from very high levels. Early reports on retail sales in October speak of modest gains, in some cases somewhat below plan.

The economy seems to have moved fairly smoothly to a more sustainable pace of growth. Strong gains in productivity continue to dampen inflationary pressures. There are some financial and other uncertainties but further economic expansion at a solid pace seems to be the most likely outcome.

That is a summary of recent economic developments and the near term economic outlook.

---

# PRESS ROOM
U.S. DEPARTMENT OF THE TREASURY

## FROM THE OFFICE OF PUBLIC AFFAIRS

November 1, 2000
LS-995

### UNDER SECRETARY OF THE TREASURY FOR DOMESTIC FINANCE
### GARY GENSLER
### REMARKS AT THE NOVEMBER 2000 TREASURY QUARTERLY REFUNDING

Good morning. I am pleased to be with you today to discuss the government's refunding needs for the current quarter.

Last week, the President announced a budget surplus for fiscal year 2000 of $237 billion, the largest in American history. As a result of three years of budget surpluses, we have paid down $363 billion of publicly held debt.

Earlier this week, Treasury announced that we expect to pay down an additional $23 billion in marketable debt during the current quarter. This is the first paydown in publicly held debt during the fourth calendar quarter in the forty years for which Treasury has records on quarterly results. This paydown will bring us to a reduction in publicly held debt of almost $390 billion in just over three years.

## Buybacks

In this new environment, Treasury's buyback program has become an important debt management tool. We have now conducted a total of 16 debt buyback operations, redeeming outstanding securities with a total par value of just over $25 billion and an average remaining life of 18.6 years. As previously announced, we anticipate completing $30 billion in purchases this calendar year.

We continue to be pleased with the results to date. Buybacks have been beneficial in a number a number of ways:

- First, debt buybacks have helped us manage the maturity structure of Treasury's outstanding debt, bringing more balance to our debt paydown. This year we paid down approximately 8 percent of privately held marketable debt. This calendar year, net of issuance, we will paydown approximately 3 percent of our debt with remaining maturities of over 10 years. Absent buybacks, all of the paydown would have been in maturing shorter-term debt. Indeed, to date the average life of outstanding Treasury debt would have lengthened by an additional 2 months without the buyback program.
- Second, buybacks have enabled us to add to the liquidity of our benchmark issues. In fact, buybacks have enabled us to issue securities that we may not have otherwise been able to continue issuing.

This past quarter, we were pleased to extend the buyback program to include callable securities for the first time. We conducted two buybacks of callable bonds. These operations were very successful and we plan to conduct periodic operations in this sector.

In May, we instituted a regular schedule for buybacks, with announcements made on the third and fourth Wednesdays of each month for operations conducted the next day. We are satisfied with the results of using a regular schedule for operations and plan to maintain this schedule going forward.

Due to the timing of holidays in November and December, however, we will be announcing our buyback operations one week earlier in each of these months. Specifically, we will make announcements on November 8 and 15, and on December 6 and 13, for operations the next day. We expect to buy back just under $5 billion in these operations. In January our operations will return to the regular schedule.

In addition, we have accepted the recommendation of the Borrowing Advisory Committee to begin providing information on the estimated size of our buyback operations for the next calendar quarter. For the January to March quarter, we currently expect to buy back approximately $9 billion in Treasury debt.

## 52-Week Bills

Earlier this year, we announced that we were considering eliminating the issuance of 52-week bills as our borrowing needs decline. The Borrowing Advisory Committee has recommended that Treasury take that step, using its existing authority, early next year. We have worked with Congress to revise a number

of statutes that reference the auction yield of the 52-week bill, proposing a reference to the one year Constant Maturity Treasury yield.

I am pleased to report that we have made significant progress. We have received bipartisan support and agreement on the language to be used for these technical and non-controversial revisions. Language to revise the relevant statutes is now before Congress. We are optimistic that some, if not all, of the revisions will be completed before Congress adjourns this session. We will continue to work with Congress to minimize any possible disruption from the potential elimination of the 52-week bill.

**STRIPS Rules Changes**

Today, we are announcing two technical changes to Treasury's STRIPS program to help improve the liquidity of this market:

- First, we are expanding the STRIPS program to include all outstanding 5-year notes that had not previously been eligible for stripping. That is, 5-year notes issued between November 30, 1995, and September 2, 1997, will now be eligible for the program.
- Second, we are implementing a change referred to as "STRIPS to the penny." We are reducing the minimum and multiple limits for stripping all fixed-principal Treasury securities to $1000 par amount. This will eliminate the high dollar par amounts that have previously been required to strip certain securities.

Both of these changes should increase the amount of outstanding interest STRIPS available, making reconstitution of stripped securities easier and improving market liquidity.

The notice concerning these two rule changes is available today at the Federal Register and press releases will be available at the end of the press conference today. The expansion of eligible coupon securities will be effective on Friday, November 3. "STRIPS to the penny" will become effective on March 1, 2001.

**35 Percent Rule**

Treasury has had a long standing rule that limits the sum of a bidder's net long position plus its competitive awards to 35 percent of the auction. In the case of a reopening, holdings of the outstanding security are also counted in the calculation of a bidder's net long position. Recognizing that we have moved to a policy of regular reopenings, the issue has been raised that the 35 percent rule may adversely affect the ability of certain market participants to bid in certain Treasury reopening auctions. The Borrowing Advisory Committee has recommended that we revise the manner in which we apply the 35 percent limit reopenings. We are studying this issue and are seriously considering taking the Committee's recommendation to revise this rule.

**Terms of the November Refunding**

I will now turn to the terms of the November refunding. We are offering $20 billion of notes to refund approximately $23.9 billion of privately held notes maturing on November 15, paying down approximately $3.9 billion. The securities are:

1 A 5-year note in an amount of $12 billion, maturing November 15, 2005. If the auction of the 5-year note results in a yield in a range of 5.875 percent through and including 5.999 percent, the 5-year note will be considered a reopening of the 5-7/8 % 10-year note originally issued on Nov 15, 1995.

2 A reopening of the 5-3/4 % notes of August 2000, maturing August 15, 2010, in an amount of $8 billion.

These securities are scheduled to be auctioned on a yield basis at 1:00 p.m. Eastern Standard Time on Tuesday, November 7, and Wednesday, November 8, respectively.

As announced on October 30, 2000, we estimate that we will have a $30 billion cash balance on December 31 and on March 31. We expect to issue two more cash management bills, one in mid-November and the second in early December, to mature in mid-December.

The next quarterly refunding press conference will be held on January 31, 2001.

**Closing**

Before I close, I would like to say something on a personal note. This will be the last quarterly refunding of the Clinton Administration.

This truly has been a remarkable period for Treasury debt management. We have gone from the challenge of funding a deficit of $290 billion to managing a surplus of $237 billion. That is over half a trillion dollars in improvement in annual budget results. The past seven years also marks the longest series of consecutive years of fiscal improvement in American history.

As a result of these improvements, our publicly held debt now stands at just 34 percent of Gross Domestic Product, down from nearly 50 percent at the start of the Administration.

We have made significant changes in debt management while consistently maintaining a focus on our three key goals: sound cash management and achieving the lowest cost funding for the taxpayer over time, while promoting efficient capital markets.

We eliminated the seven- and three-year notes. We reduced the frequencies and sizes of our remaining auctions. We initiated a regular schedule of re-openings of our longer-term debt. We extended uniform-price auctions to all of Treasury's marketable securities. We worked closely with the Federal Reserve on revisions they made to purchases of Treasury debt for the System's Open Market account. Most notably, we re-instituted debt buybacks, a practice first recommended by Alexander Hamilton, after a lapse of seventy years.

At the same time, we have sought to improve investor choices and promote savings by making Treasury securities more accessible. We introduced inflation-indexed instruments, both as marketable Treasury securities and as savings bonds. We lowered the minimum purchase requirement for all marketable Treasury securities to $1,000. We made the Treasury Direct program for individual savers fully electronic and accessible by telephone or the Internet. We revamped our State and Local Government securities program to reduce costs and provide greater flexibility. Finally, we made significant changes to the savings bond program to enhance returns to small savers and improve access, including making savings bonds available over the Internet.

We would not have been able to achieve these results without the commitment and professionalism of the staffs of Treasury's Offices of Cash and Debt Management and Market Finance. The staffs of the Bureau of the Public Debt, other Treasury offices, and of our fiscal agent, the Federal Reserve Bank of New York, also have been indispensable to our debt management efforts. I would like to thank all of them for their hard work and dedication throughout these eight years, and particularly during the three years I have spent here at Treasury. Finally, I would also like to thank Treasury's Borrowing Advisory Committee for their support and counsel over these years, particularly the outgoing Committee chairman, Ken deRegt, and the new Chairman, James Capra. We can all be very proud of our debt management accomplishments over the last eight years.

Thank you.

---



**PRESS ROOM**
U.S. DEPARTMENT OF THE TREASURY

### FROM THE OFFICE OF PUBLIC AFFAIRS

May 1, 2001
PO-340

### DIRECTOR OF THE OFFICE OF MACROECONOMIC ANALYSIS JOHN H. AUTEN
### REMARKS TO THE TREASURY BORROWING ADVISORY COMMITTEE
### OF THE BOND MARKET ASSOCIATION

When we met three months ago, the economy was in the early stages of a slowdown whose eventual resolution was difficult to judge. It was obvious that there was increased downside risk for the economy, but equally obvious that there were important elements of continuing strength. Now, three months later, that somewhat uneasy balance between strength and weakness still persists.

Strength can be said to have predominated in the first quarter Gross Domestic Product results reported at the end of last week -- certainly in the headline number -- with real growth rising to 2 percent annual rate from 1 percent in the final quarter of last year. It is even more impressive that auto sales which fell so precipitously late in the fourth quarter of last year recovered so quickly in the first quarter of this year. Coupled with cuts in production, auto and light truck inventories have been brought back into a more normal relationship with sales. Inventories early in the first quarter were averaging in the 90 to 100 day supply range and have since been reduced to the 60 to 65 day range generally regarded as closer to optimal.

While rapid resolution of the auto inventory problem is surely a sign of strength, the sluggish pace of inventory adjustment in the high-tech area in the early months of this year can only be regarded as a sign of weakness. High-tech inventories accumulated at a record rate for that industry in the fourth quarter of last year and in book-value terms even a little more than for autos. The difference is that auto inventories have quickly been reduced into better alignment with sales while high-tech inventories have not. High-tech inventory accumulation slowed in January and February at the manufacturing level but shipments slowed even more and inventory levels still appear to be excessive.

One reason that the auto inventory adjustment has gone more smoothly is that the industry sells its product largely, although not exclusively, to consumers where demand has been well maintained. The high-tech industry is heavily engaged in business-to-business transactions where demand has faltered at least temporarily. Real personal consumption expenditure has been remarkably unaffected by the recent slowdown, rising at nearly a 3 percent annual rate of growth in the fourth quarter and at a little more than a 3 percent rate in the first quarter. In marked contrast, business capital spending on information-processing equipment and software rose at a 10 percent annual rate in the fourth quarter and fell at about a 6-1/2 percent annual rate in the first quarter. Strength in consumption and weakness in business capital spending, particularly in the high-tech area, is becoming an increasingly important feature of the current economic situation.

Continuing strength in consumer outlays and growing weakness in capital spending is explained to some degree by recent developments in the wage-productivity-profit area. During the second half of last year, hourly compensation (wages plus benefits) for the nonfarm business sector rose at about a 6-1/2 percent annual rate in nominal terms and productivity grew at a little above a 2-1/2 percent annual rate, leaving nearly a 4 percent rise in unit labor costs. During the same period, the implicit price deflator for nonfarm output (the prices on average that corporations charged) rose by only about 1-1/2 percent annual rate, down from a 2-1/2 percent rate of increase in the first half of the year. In other economic environments, corporations might have passed through the increase in unit labor costs in the second half of the year with inflationary consequences. In the recent environment with very little corporate pricing power -- aside from some energy sectors -- the inevitable result has been a severe squeeze on unit profits and some increased uncertainty as to the outlook for capital spending. Comprehensive wage-productivity-profit data are not available yet for the first quarter, but from all indications much the same pattern has persisted.

Private consensus forecasts for the economy remain relatively optimistic. The Blue Chip consensus of 50-some economists at major corporations, financial institutions and academic research organizations provides a useful summary. Their growth projections have been scaled down considerably in the light of recent developments. For example, the consensus projection for real growth over the four quarters of this year was 3.5 percent last September, 3.0 percent last December and 2.0 percent by this April. That 2 percent path consisted of a slow start with only a 0.9 percent rate of growth in the first quarter, in contrast to the higher 2 percent figure released last week, followed by gradually firmer growth during the balance of the year, reaching a little more than a 3 percent rate by the fourth quarter.

This and similar private forecasts, such as that released last week by the National Association of Business Economists, are inherently plausible. There has not been much sign of the cumulative type of

economic weakness which might drive the economy sharply lower, and some signs that the economy may already have bottomed with growth still positive. So a cautiously optimistic view of near term economic prospects seems to be warranted. Caution is still indicated because economic strengths and weaknesses are closely balanced with downside risk not yet completely removed from the picture.

Recent high-frequency statistical readings, some of them more forward looking than the comprehensive first quarter Gross Domestic Product results, may provide additional perspective on the near-term outlook.

- The Conference Board's index of leading economic indicators continues to trend downward, but in a gradual fashion more consistent with slow growth than anything worse.
- Both the Conference Board's index of consumer confidence and the University of Michigan's index of consumer sentiment suggest an increasingly cautious attitude on the part of consumers.
- The Conference Board's quarterly survey of business confidence plunged to a very low level at the end of last year, but had rebounded considerably by the end of the first quarter. The assessment of current conditions was still depressed but expectations for business conditions over the next six months had improved relative to the previous survey.
- Weekly initial claims for unemployment insurance continue on an upward path. This suggests that even with the continuation of slow to moderate growth on an economy-wide basis, labor markets may soften somewhat further.
- Both new and existing home sales rose in March with mortgage rates hovering near a relatively low 7 percent. It may be significant that at the end of the first quarter both the housing and auto markets -- traditionally where any serious cyclical weakness might be expected to emerge -- remained relatively strong.

That is a summary of recent economic developments and the near-term economic outlook.



## PRESS ROOM
### U.S. DEPARTMENT OF THE TREASURY

FROM THE OFFICE OF PUBLIC AFFAIRS

May 2, 2001
PO-343

**DEPUTY ASSISTANT SECRETARY FOR FEDERAL FINANCE**
**MICHAEL J. PAULUS**
**REMARKS AT THE MAY 2001 TREASURY QUARTERLY REFUNDING**

———————

Good morning. I am pleased to be with you today to discuss the government's refunding needs for the current quarter. In addition, I will be making a few announcements with respect to other aspects of Treasury's debt management.

### Debt Paydown

On Monday, Treasury announced that we expect to pay down an estimated $187 billion of outstanding marketable debt during the April-June quarter. When the additional paydown of $57 billion that is currently estimated for the July-September quarter is considered, we expect to have paid down $252 billion in marketable Treasury debt for the fiscal year.

### Debt Buybacks

Since our last quarterly refunding announcement, we have successfully completed our buyback operations for the January-March quarter, purchasing $9 billion par amount of securities. We continue to be pleased with the results of our buyback operations.

In February we announced that we expect to conduct buybacks in the current April-June quarter of approximately $9 billion par amount. We now expect to slightly increase the amount of buybacks this quarter to approximately $10 billion.

Additionally, today we are announcing that we expect to conduct buybacks of approximately $10 billion par amount of securities in the July-September quarter.

### 4-Week Bill

One of Treasury's primary debt management goals is efficient cash management. This task has been made more challenging in recent years due to the increasing volatility of Treasury's cash balances. This volatility has been due to an increase in tax receipts, an increase in government expenditures, and a reduction in the frequency with which we issue debt as we have responded to growing budget surpluses.

Traditionally, the Treasury has adjusted its short term bill issuance in response to expected cash needs, and has issued cash management bills to cover periods of cash shortfall. Due to the greater volatility of our cash balances over the past few years, however, we have increasingly relied upon the use of cash management bills. Increasing the issuance of cash management bills is not the most cost-efficient means of financing our short-term cash needs. In addition, the Treasury's Borrowing Advisory Committee has recommended that we move to the regular issuance of a new short-term bill.

Consequently, we are planning to introduce a 4-week bill before the end of this fiscal year. This will provide Treasury with greater flexibility in managing our cash needs, reduce our dependence on cash management bills, and improve the cost-efficiency of our short-term financing. We will provide further details on the introduction of the 4-week bill at a later date.

### 35 Percent Rule

In the November 2000 refunding announcement, Treasury indicated we were studying potential changes to the application of the 35 percent rule to our auctions. This rule currently limits the sum of a bidder's net long position plus its competitive awards to 35 percent of the auction amount. In the case of a reopening, holdings of the outstanding security are counted in the calculation of a bidder's net long position. The Borrowing Advisory Committee has also recommended that we revise the manner in which we apply this rule.

Case 1:05-cv-10083-NMG    Document 110-25    Filed 07/15/2008    Page 35 of 37

During the upcoming quarter we will be releasing for public comment a proposed change to the rules that limit the size of awards in Treasury's auctions. We look forward to receiving comments from market participants on this issue and will review all responses carefully as we address this issue going forward.

**Terms of the May Refunding**

I will now turn to the terms of the May Refunding. We are offering $22 billion of notes to refund approximately $21 billion of privately held notes and bonds maturing on May 15, borrowing approximately $1 billion. The securities are:

- A 5-year note in an amount of $13 billion, maturing May 15, 2006.
- A re-opening of the 5% 10-year notes issued in February 2001, maturing February 15, 2011, in an amount of $9 billion.

These securities will be auctioned on a yield basis at 1:00 pm eastern time on Tuesday, May 8 and Wednesday, May 9, respectively.

As announced on Monday, we estimate that we will have a $60 billion cash balance on June 30 and a $60 billion cash balance on September 30. We expect to issue cash management bills this quarter to bridge seasonal low points in our cash position.

In keeping with Treasury's traditional practice, we will continue to announce any changes to our debt management policy at our quarterly refunding press conferences. Our next quarterly refunding announcement will take place on Wednesday, August 1.

# PRESS ROOM
## U.S. DEPARTMENT OF THE TREASURY

FROM THE OFFICE OF PUBLIC AFFAIRS

August 1, 2001
PO-527

**ASSISTANT SECRETARY FOR FINANCIAL MARKETS BRIAN ROSEBORO REMARKS AT THE AUGUST 2001 TREASURY QUARTERLY REFUNDING**

Good morning. I am pleased to be with you today to discuss the government's refunding needs for the current quarter. In addition, I will be making a few announcements with respect to other aspects of Treasury's debt management.

**4-Week Bill**

Yesterday, Treasury conducted its first auction of 4-week bills. We are pleased with the results of the first auction, which raised $10 billion, and we believe that these securities will become an important part of Treasury's ongoing debt management strategy. Regular weekly offerings of 4-week bills will help to smooth seasonal fluctuations in Treasury's cash balances and reduce reliance on cash management bills.

**Federal Register Notice on Net Long Position and the 35 Percent Rule**

On July 23, the Treasury announced the publication in the *Federal Register* of an Advance Notice of Proposed Rulemaking that solicits public comments on potential modifications to the calculation of the net long position (NLP) and the 35 percent award limit in marketable Treasury securities auctions. Treasury invites comments on alternatives to NLP reporting and the 35 percent award limit. Of particular interest are comments on an alternative which would permit bidders in re-openings to exclude a portion of their current holdings of the security being auctioned from their NLP calculation. We look forward to receiving comments from market participants on this issue.

**Debt Buybacks**

Since our last quarterly refunding announcement in May, we have successfully completed our buyback operations for the April-June quarter, purchasing $10 billion par amount of securities. We continue to be pleased with the results of our buyback operations.

In May we announced that we expect to conduct buybacks in the current July-September quarter of approximately $10 billion par amount. We now expect to decrease slightly the amount of buybacks this quarter to approximately $9 billion.

Additionally, today we are announcing that we expect to conduct buybacks of approximately $9 billion par amount of securities in the upcoming October-December quarter.

**Terms of the August Refunding**

I will now turn to the terms of the August Refunding. We are offering $27 billion of notes and bonds to refund approximately $12 billion of privately held notes and bonds maturing on August 15, raising approximately $15 billion. The securities are:

1. A re-opening of the 4 5/8% 5-year note issued in May 2001, maturing May 15, 2006 in the amount of $11 billion.
2. A 10-year note in the amount of $11 billion, maturing August 15, 2011.
3. A re-opening of the 5 3/8% 30-year bond issued in February 2001, maturing February 15, 2031, in the amount of $5 billion.

These securities will be auctioned on a yield basis at 1:00 pm eastern time on Tuesday, August 7, Wednesday, August 8, and Thursday, August 9, respectively.

As announced on Monday, we estimate that we will have a $55 billion cash balance on September 30 and a $30 billion cash balance on December 31.

In keeping with Treasury's traditional practice, we will continue to announce any changes to our debt management policy at our quarterly refunding press conferences. Our next quarterly refunding announcement will take place on Wednesday, October 31.

Excerpt from the

September 14, 2006

deposition of Lula Tyler

Exhibit U

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND        :

EXCHANGE COMMISSION,                 :

              Plaintiff,        : Civil Action

      vs.                           : No. 05-1-093 (NMG)

STEVEN E. NOTHERN,                   :

          Defendant.        :   PAGES 1 - 182

- - - - - - - - - - - - - - - - x

September 14, 2006

Washington, D.C.

Videotaped Deposition of LULA TYLER, held at the offices of Foley Hoag, LLP, 1875 K Street, Northwest, Washington, D.C., commencing at 1:18 p.m., Thursday, September 14, 2006, before Elizabeth Mingione, Notary Public.

Page 50

1  the building.

2      Q.   So, in other words, there was a computer

3  screen at the guards' desk.  And the guards could look

4  up information that had been previously inputted based

5  on your instruction?

6      A.   Yes.

7      Q.   Okay.  Now, the names that you were

8  submitting, either it was the Federal Reserve or

9  Mr. Davis or the members of the Borrowing Advisory

10 Committee, did you ever have to submit those names to

11 the Treasury press office before you gave them to the

12 guards' desk for clearing in?

13     A.   No.  I don't recall doing that.

14     Q.   Okay.  Did anybody ever complain to you or

15 complain to anybody that you heard about that the

16 Office of Market Finance was clearing people in to

17 attend the refunding conference?

18     A.   Did I ever hear --

19     Q.   Yeah.

20     A.   -- anybody complain?

21     Q.   Yes.

22     A.   No.  I never heard anything.

Page 51

1      Q.   Yeah.  In other words, no -- you never

2  heard any kind of a report that the press office was

3  upset that your office was clearing people in to

4  attend the quarterly refunding conference?

5      A.   No, I never --

6          MR. ROSSETTI:  Objection.

7          BY MR. SHOPE:

8      Q.   You never -- and just -- I am sorry, we --

9  Mr. Rossetti's objection just sort of crossed over

10 your answer.  So I think your answer was no, you never

11 heard that?

12     A.   No.  I never heard it.

13     Q.   Okay.  And just so I asked you now about

14 whether -- I just asked you whether you had ever heard

15 any complaint from the press office, did you ever hear

16 about any complaint from anybody that the Office of

17 Market Finance was not authorized to clear people in

18 to attend the quarterly refunding press conferences?

19         MR. ROSSETTI:  Objection.

20     A.   No.  I never heard that.

21     Q.   Okay.  Do you know whether the press office

22 folks would have been aware that you and your office

Page 52

1  were clearing people to attend the quarterly refunding

2  press conference?

3          MR. ROSSETTI:  Objection.

4      A.   They should have been aware of it because

5  we had been doing this even before I came.  And they

6  always worked together, as far as I know.

7      Q.   So your assumption would be that they knew

8  what you were doing every time you had one of these

9  quarterly refunding conferences?

10         MR. ROSSETTI:  Objection.

11         BY MR. SHOPE:

12     Q.   Is that -- is that your understanding?

13     A.   Yes.

14     Q.   Okay.  And would it be your understanding

15 that if they had a complaint about it, that they would

16 have told you?

17     A.   Exactly.  Yes.

18         MR. ROSSETTI:  Objection.

19         BY MR. SHOPE:

20     Q.   Okay.  Now, you mentioned Peter Davis.

21 Now, had Mr. McGivern from the Treasury Department

22 told you that Mr. Davis was going to be an issue in

Page 53

1  the deposition today?

2      A.   He told me, let me see what did he say

3  about him.  I think he did mention something about

4  him.

5      Q.   Okay.  And -- but you don't remember what

6  he said?

7      A.   Not really.  I don't remember.  I think he

8  just -- he mentioned his name, but I don't really

9  remember what he was saying.  Because I really had a

10 problem with coming here, so a lot of things I

11 didn't -- I probably just didn't really hear a lot.

12     Q.   I see.  You had a problem in coming here in

13 the sense that you didn't want to have to miss one of

14 your classes or have --

15     A.   No.  It had nothing to do with my classes.

16 I just didn't want to come.

17     Q.   Okay.  Well, I admit it's not the most

18 enjoyable way to spend an afternoon.  And we'll try to

19 minimize any discomfort for you.

20         MR. ROSSETTI:  At least it's raining

21 outside, so you are not missing a nice day.

22         THE WITNESS:  Well, that's one of the

Page 54

1 reasons why I didn't want to come.
2          BY MR. SHOPE:
3     Q.   Okay.  All right.  So, first of all, how
4 did you first sort of come to learn that there was a
5 Peter Davis?
6     A.   Well, Jill Ouseley told me, as far as I can
7 recall, that somebody by the name of Pete Davis was
8 going to be calling me so that he could get into the
9 press conference, and that I was to get his
10 information and allow him to come in for the press
11 conference.
12    Q.   Okay.  Now, you said as best you can recall
13 it was Ms. Ouseley who told you to allow Mr. Davis
14 into the press conference?
15    A.   Yes.  I know it was her.
16    Q.   You are certain that it was her?
17    A.   Yes.
18    Q.   Okay.  And would it be fair to say that at
19 least while she was the director of the Office of
20 Market Finance, or whatever it might have been called
21 at that point, you would not have allowed Mr. Davis in
22 or you would not have cleared him into the press

Page 55

1 conference unless you had gotten Jill Ouseley's
2 permission beforehand.  Is that a fair statement?
3     A.   Yes.  It is a fair statement.
4     Q.   Okay.  And did Ms. Ouseley give you any
5 explanation as to why it was that Mr. Davis was going
6 to be attending this quarterly refunding conference or
7 why it was that you should be clearing him in?
8     A.   No, she didn't.
9     Q.   Okay.  And the -- now, and other than after
10 October 2000 -- 2001, and we'll get into that period
11 in a little bit, but before that did anybody ever ask
12 you about Mr. Davis and, you know, why is Mr. Davis
13 coming into this press conference?
14    A.   No.  Nobody ever asked me anything about
15 Mr. Davis.
16    Q.   Okay.  Now, can you recall at all when it
17 was that Ms. Ouseley told you to -- told you to
18 start -- to allow Mr. Davis to attend the press
19 conference or at least to clear him in?
20    A.   No.  I don't remember the year.  I really
21 don't.  I know it was prior to her being out on that
22 extensive sick leave.  So I suppose it was prior to

Page 56

1 1996.
2     Q.   And was that when President Clinton was
3 still President?
4     A.   I guess so.
5     Q.   Now, do you know whether or not they ever
6 handed out any materials at these quarterly refunding
7 conferences, either at the meeting of the Borrowing
8 Advisory Committee or at the press conference the next
9 day?
10         MR. ROSSETTI:  Objection.
11    A.   They handed out information packages after
12 the press conference the second day.
13    Q.   That was a regular practice?
14    A.   Yes.  Yes.  I believe it was.
15    Q.   Okay.  Do you know whether there were ever
16 materials that were made available the preceding day,
17 like charts or something like that?
18    A.   You know, they were doing -- they did a lot
19 of -- a lot of charts.  And if they had the charts, it
20 would have been for Treasury personnel, I believe.
21 Because I didn't work directly with them with the
22 charts and things like that.

Page 57

1     Q.   Okay.  You didn't work on the charts?
2     A.   No, I didn't.
3     Q.   Okay.  Do you remember whether Mr. Davis
4 ever wanted to get his hands on some of the charts?
5         MR. ROSSETTI:  Objection.
6     A.   I really don't know because I never went to
7 the press conference.  I don't know Mr. Davis.  The
8 only thing that I gave him -- I got from him was his
9 name and his birth date.
10    Q.   Okay.  Now, I want to get into the
11 nitty-gritty on that.  Was that -- is that something
12 that you asked him for every time he was going to be
13 coming in or did you have it written down somewhere?
14    A.   Well, over a period of time I had it
15 written down.  But he would call me and I would, when
16 he called, then I would let -- give him access to the
17 building, you know, clear him in.
18    Q.   And so when he called you would he -- would
19 you say, oh, Mr. Davis, could you tell me again what
20 your date of birth is and so forth?
21    A.   No.  I had it written down.
22    Q.   Okay.  Now, would you ever put him on the

Page 70

1    A.    About a year or so later.

2    Q.    And were you working for anybody else in

3    that position before he became the --

4    A.    No. I worked with him. He was like the

5    Acting.

6    Q.    Okay. And either during the period when

7    Mister, well, let me back up just to keep the

8    chronology clear. After Ms. Ouseley ultimately

9    retired and then Mr. Malvey became first the Acting

10   and then permanently the Director of the Office of

11   Market Finance, did you ask Mr. Malvey whether it was

12   still okay to have Mr. Davis attending the quarterly

13   refunding conference?

14   A.    I think maybe he spoke with Mr. Davis and

15   he mentioned me on one occasion to let him in the

16   building or something.

17   Q.    Okay. In other words, Mr. Malvey knew that

18   Mr. Davis was continuing to be admitted to the

19   quarterly refunding conference?

20   A.    Well --

21   MR. ROSSETTI:  Objection.

22   BY MR. SHOPE:

Page 71

1    Q.    Is that fair?

2    A.    Well, he knew that he was coming. And he

3    knew -- I guess he had no problem with him coming.

4    And he never came to me to tell me not to allow him to

5    come. But I think he and Mr. Davis may have spoken

6    with each other prior to the conference, and he

7    mentioned to me to let him in or something to that --

8    Q.    I see. In other words, your recollection

9    is that there was some sort of occasion where

10   Mr. Davis was having some sort of conversation with

11   Mr. Malvey, or at least it was reported to you that he

12   had. And so Mr. Davis instead of making a separate

13   call to you had basically had Mr. Malvey make sure --

14   A.    I don't know if he had -- I'm sorry.

15   MR. ROSSETTI:  You have got to wait for him

16   to finish the question, and I've got to have time to

17   object.

18   BY MR. SHOPE:

19   Q.    So your understanding from Mr. Malvey was

20   that Mr. Malvey was passing on Mr. Davis's request to

21   be put on the list?

22   MR. ROSSETTI:  Objection.

Page 72

1    Q.    Is that your -- is that, just so I'm clear,

2    is that what your recollection is?

3    A.    Would you repeat that?

4    MR. ROSSETTI:  Objection.

5    BY MR. SHOPE:

6    Q.    Sure. Your recollection, admittedly many

7    years later, is that there was at least one occasion

8    when Mr. Malvey passed on to you Mr. Davis's request

9    to be put onto the list of -- for admission to the

10   quarterly refunding conference?

11   MR. ROSSETTI:  Objection.

12   A.    Yes. I believe so.

13   Q.    Okay. And so from that your inference was

14   still okay to keep admitting Mr. -- admitting

15   Mr. Davis?

16   A.    Yeah.

17   MR. ROSSETTI:  Objection.

18   BY MR. SHOPE:

19   Q.    Okay. And just so I'm clear, you never

20   discussed with Mr. Malvey any issue of press embargo

21   as it related to Mr. Davis or anybody else?

22   MR. ROSSETTI:  Objection.

Page 73

1    Q.    Is that fair?

2    A.    No, I did not.

3    Q.    Okay. That's fine. I know it may seem a

4    little tedious but sometimes I just have to make sure

5    that the record is absolutely clear.

6    MR. ROSSETTI:  John, can we take a quick

7    break here?

8    MR. SHOPE:  Oh, sure, that's fine. It's a

9    logical break point for me too.

10          - - -

11   (Recessed at end of Videotape 1 at 2:43 p.m.)

12   (Reconvened on Videotape 2 at 2:53 p.m.)

13          - - -

14   BY MR. SHOPE:

15   Q.    Ms. Tyler, we just took a break and the

16   videographer was able to change the tape. Did you

17   talk to anybody about your testimony during the break?

18   A.    No.

19   Q.    Okay. Great. I just want to circle back

20   to a few of the things that we went over before the

21   break. You might remember that I had asked you about

22   charts that would be handed out in connection with the

Excerpt from the

February 12, 2008 deposition

of Elnora Bowser

Exhibit V

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND  :
            EXCHANGE COMMISSION,           :
                                           :
            Plaintiffs,        :
                                           :
            v.                             : Civil Action No.
                                           :
            STEVEN E. NOTHERN,             : 05-10983 (NMG)
                                           :
            Defendant.            :
- - - - - - - - - - - - - - x


Videotaped Deposition of ELNORA BOWSER

Washington, D.C.

Tuesday, February 12, 2008

9:59 a.m.



*      *      *      *



Reported by:  Okeemah S. Henderson, LSR

Page 34

1   A.   This was a Secret Service appointment.
2   Q.   At the bottom it says appointment
3 office?
4   A.   Yes.
5   Q.   Did you deal with the Secret Service
6 appointment office during your time at Treasury?
7   A.   I only deal with them if I have lost a
8 pass or clearing in somebody or whatever.
9   Q.   So you have worked with the
10 appointment office to clear people into the
11 Treasury building, correct?
12   A.   That's the only way you have to, they
13 just can't walk in the building.
14   Q.   Under what circumstances have you
15 cleared individuals into the Treasury building?
16   A.   Only if I'm told to.
17   Q.   How often over your career at Treasury
18 have you actually done this?
19   MS. LEVINE:   Objection.
20   A.   I have no idea.
21   BY MR. TOONE:
22   Q.   Do you recall the last time you

Page 35

1 cleared someone into the Treasury building?
2   A.   The last time?
3   Q.   Yes, ma'am.
4   A.   The last time I cleared somebody into
5 the Treasury Department building, I can't recall.
6   BY MR. TOONE:
7   Q.   But it's something that you have done
8 during your time at working at Treasury?
9   A.   Yes.
10   Q.   More than once?
11   A.   If I'm told.
12   Q.   But it's something that you've done
13 more than once during your --
14   MS. LEVINE:   Objection.
15   A.   Yes.  If I'm told to do it, I have no
16 choice but to do it.
17   BY MR. TOONE:
18   Q.   Have you done it more than ten times
19 do you think during your time at Treasury?
20   MS. LEVINE:   Objection.
21   A.   I'm not for sure.
22   BY MR. TOONE:

Page 36

1   Q.   Is it possible that in October, 2001
2 you cleared Mr. Davis into the Treasury building
3 but don't recall it now?
4   MS. LEVINE:   Objection.  Calls for
5 speculation.
6   A.   I have no idea, sir.
7   BY MR. TOONE:
8   Q.   You have no idea whether it's possible
9 or not?
10   A.   Right.
11   Q.   Who do you recall directing you to
12 admit persons to the Treasury building?
13   MS. LEVINE:   Objection.
14   A.   Would you say that one more time?
15   BY MR. TOONE:
16   Q.   Sure.  Who do you recall directing you
17 to admit persons to the Treasury building?
18   A.   I can't recall that either, sir, of
19 who directed me.  I can't recall that.
20   Q.   Do you recall Helen Anderson ever
21 directing you?
22   A.   No.

Page 37

1   Q.   Do you recall Paul Malvey ever
2 directing you to admit persons?
3   A.   Paul Malvey, if his name is on here
4 for somebody to see him and if my name is down
5 there as said I did, then he must have told me.
6   Q.   So it's possible that Mr. Malvey
7 directed you to admit Peter Davis?
8   MS. LEVINE:   Objection.  Calls for
9 speculation and asked and answered.
10   A.   Yes.
11   BY MR. TOONE:
12   Q.   Do you understand the question?
13   A.   Again?
14   MR. TOONE:   Can you read the question
15 back?
16 (The last question was read back by the Reporter.)
17   A.   If Peter Davis was going to see him,
18 then he must have directed me to clear him in, but
19 I cannot recall that in 2001.  I cannot recall
20 that.
21   MR. TOONE:   Can I have this marked as
22 Exhibit 2.

**Furey, Christian**

| | |
|---|---|
| From: | SSAPPT |
| Sent: | Monday, October 29, 2001 4:31 PM |
| To: | Bowser, Elnora |
| Subject: | Treasury Appointment Request |
| Importance: | High |
| Sensitivity: | Confidential |



Davis, Jr. Peter J. with x wants an appointment with Paul Malvey in , room 3327 on 10/30/01 at 9AM. This was requested by Elnora Bowser (phone: 622-2630)

Comments:
please clear in this name for 10/30/01 and 10/31/01 at 8:45 a.m. Room 3327

Thank you
Appointment Office

12/6/2006

Excerpt from the

August 3, 2006 deposition

Francis Anderson

Exhibit W

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - )

UNITED STATES SECURITIES AND       )

EXCHANGE COMMISSION,               )

         Plaintiff,          )

      v.                        ) No. 05-10983 (NMG)

STEVEN E. NOTHERN,                 )

        Defendant.            )

- - - - - - - - - - - - - - - - )

                Washington, D.C.

                Thursday, August 3, 2006

Videotape Deposition of FRANCES ESTELLE ANDERSON,

called for examination by counsel for Defendant in

the above-entitled matter, the witness being duly

sworn by CHERYL A. LORD, a Notary Public in and for

the District of Columbia, taken at the offices of

FOLEY HOAG LLP, 1875 K Street, N.W., Suite 800,

Washington, D.C., at 10:10 a.m., Thursday, August 3,

2006, and the proceedings being taken down by

Stenotype by CHERYL A. LORD, RPR, CRR, and

transcribed under her direction.

Page 102

1    and we saw that in the earlier exhibit. It's exhibit
2    number 2.
3         Right?
4    A.   Correct.
5    Q.   Okay. So that -- so the text that was
6    attached to exhibit 2 didn't have any kind of a
7    letterhead on it?
8    A.   Correct.
9    Q.   Okay. So you had to add a letterhead.
10        Right?
11   A.   No.
12   Q.   Oh, you did not?
13   A.   No.
14   Q.   Okay. So in other words -- so was it the
15   case that when you would post this to the Web site,
16   the Web site already had letterhead that was part and
17   parcel of the Web site?
18   A.   When you post stuff to the Web, the
19   letterhead doesn't come up till after it's a final
20   copy for ready to send to the Web.
21   Q.   Maybe we'll take this in steps, and I mean
22   really baby steps here.

Page 103

1         MR. ROSETTI: Maybe, John, this email,
2    exhibit 2 that you have, I mean, the documents were
3    attached showing what this was. That might be
4    helpful.
5         MR. SHOPE: All right. Well, I'm not sure
6    that it was produced to us in sequential order.
7         MR. ROSETTI: Yeah, it was.
8         I mean, I have a copy of that.
9         MR. SHOPE: If you have that, we can deal
10   with it at a break, but I don't -- I think -- I just
11   want to continue on this line because I don't think
12   its -- I think everybody has agreed that what was
13   attached to exhibit 2 didn't have a letterhead on it,
14   so -- but --
15        MR. ROSETTI: I'm just trying to -- I
16   think it would help the witness, but --
17        MR. SHOPE: All right.
18        MR. ROSETTI: -- you do want you want.
19        BY MR. SHOPE:
20   Q.   Okay. Now, let's just start with the
21   basics.
22        I think I heard you earlier say that what

Page 104

1    Ms. Holahan sent you didn't have a letterhead on it.
2         Right?
3    A.   Correct.
4    Q.   Okay. What did you do to put the press
5    release on the Web site in the morning of October 31,
6    2001?
7    A.   I saved it to my C drive.
8    Q.   You saved what Ms. Holahan had sent I?
9    A.   To my C drive.
10   Q.   Okay.
11   A.   And then I opened up to the Web, and I put
12   the -- went through the steps to open it up. I put
13   the press release -- I gave it a name, whatever name
14   it was, and I pulled the release up from my C drive
15   to -- I put it up on the Web.
16   Q.   So you didn't need to add any kind of a
17   letterhead to what Ms. Anderson had sent you before
18   you posted this document?
19   A.   What Betsy had sent me?
20   Q.   Yeah.
21   A.   No.
22   Q.   In other words, you didn't alter Betsy's

Page 105

1    document at all?
2    A.   No.
3    Q.   You didn't change the context of it in any
4    way whatsoever?
5    A.   No.
6    Q.   So just to walk through the steps of that:
7    You went back to your office.
8         You said you had -- you got to --
9    A.   I opened up the email --
10   Q.   Okay. You opened up the email.
11   A.   -- what Betsy sent me to post.
12   Q.   Okay.
13   A.   I saved it to my C drive. Then I went to
14   open up the Internet to post it.
15   Q.   In other words, when you say you went
16   there, meaning you are --
17   A.   Right.
18   Q.   -- sitting at your computer, you executed
19   a command that would take you to the Web site?
20   A.   Right.
21        MR. ROSETTI: Objection.
22   A.   I pulled it from my C drive to the Web

1  that I had saved it, the document on.
2      BY MR. SHOPE:
3    Q.  M-hm.
4    A.  Then I went through the steps to FTP it to
5  post it on the Web site.
6    Q.  Okay.  And how long does the -- well, how
7  long does the FTP process take?
8    A.  Maybe like 5, 10 minutes.
9    Q.  Okay.  So now, have you ever heard of a
10  staging server?
11    A.  Yes.
12    Q.  What's the staging server?
13    A.  Before you put something on, you look at
14  it before it goes up to the Web.
15    Q.  And did you do that on October 31?
16    A.  Correct.
17    Q.  Is the FTPing -- is that --
18    A.  That's part of the stage.
19    Q.  That gets the document from your C drive
20  on your desktop to the staging server.
21      Correct?
22    A.  Correct.

1    Q.  And so did you then look at the document
2  when it was on the staging server?
3    A.  Yes.
4    Q.  Okay.  And how long did that take?
5    A.  About 2 minutes, 3 minutes.  I looked at
6  it to make sure that it was in the correct format.
7    Q.  And to look at it to see it was in the
8  correct format, meaning you had to see that the
9  existing letterhead that was already on the Web site
10  was there.
11      Right?
12    A.  Correct.
13    Q.  Okay.
14    A.  But that's generated anyway.
15    Q.  That's generated anyway.
16    A.  Right.
17    Q.  So -- so on -- and that's been done many
18  times before October 31.
19      Right?
20    A.  Correct.
21    Q.  Okay.  And you then -- so then you just
22  had to see that the -- that the text was still in

1  regular order.
2      Right?
3    A.  Correct.
4      And the date, that was right, and whether
5  the JS number or whatever number it was was in it.
6    Q.  What's the JS number?
7    A.  Whatever secretary is in office, we put
8  his initials.
9    Q.  And where do you put that?
10    A.  In the document, on the top of the
11  document.
12    Q.  Now, is that added before it gets FTPed?
13    A.  Yes.  Yes.
14    Q.  So that's before the FTP?
15    A.  Correct -- no.
16      After the FTP.  When it go to the final,
17  m-hm.
18    Q.  So -- I'm sorry?
19    A.  Okay.  When you pull in the document to
20  the FTP to process, you put the document into the
21  text area.  And at the top of the document, it's for
22  the date.  You put the date.

1      Only thing I would put in the document is
2  the date, the text, and the title.  And I add that.
3  Then I FTP it.  Then it goes to the staging server.
4  I open up the staging server, see if the document is
5  correct or if it has double lines.  If it has double
6  lines, you have to go back and add the document and
7  take the double lines out.
8    Q.  Did that happen on that day?
9    A.  I don't -- I don't -- back in 2001, I
10  mean, if it was double lines, I could have, but I
11  don't remember.
12    Q.  Okay.  So let me just make sure I'm clear
13  on this:  You've got the document that Ms. Holahan
14  emailed you.
15    A.  Correct.
16    Q.  You saved it to your C drive.
17    A.  Correct.
18    Q.  Do I understand that in fact you did add
19  some text to that document?
20    A.  The only text I added was the date and
21  whatever JS number I gave.
22    Q.  Okay.  And the JS number refers to what?

Page 110

1  A.  That's how they pull the documents up on
2  the Web site.
3  Q.  Okay.  So you added -- was that you
4  added -- is that just a sequential number you add
5  from previous versions?
6  A.  Whatever the last press release, we just
7  add the next number.
8  Q.  Okay.  So you presumably had that handled
9  from the last one you did?
10  A.  Correct.
11  Q.  So you added the number, and you made sure
12  that it was naming the proper -- where did you put
13  the current secretary's name?
14  A.  It's not -- okay.
15       At the top of the document when you
16  generate -- when you put this on the Web, the top of
17  the document is the date, whatever date is goes out.
18  Then under that, you will put -- to say, John Snow,
19  dash, 450, you add that.
20       You put -- just cut-and-paste and whatever
21  document put it in, and just make sure that the
22  document lines -- it don't have double lines.  And

Page 111

1  then you save it to staging, and then you look at it
2  and if it's okay, you send it to the Web.
3  Q.  Okay.  And so when you have to look --
4  when you look at the staging to make sure it's okay,
5  what is it that you're looking for in particular?
6       In other words what are the problems that
7  crop up?
8  A.  Double lines.
9  Q.  Okay.
10  A.  Or --
11  Q.  But I thought -- so let's clarify.
12       You're checking for double lines before
13  you FTP the document to the staging server?
14       True?
15  A.  Correct.
16  Q.  Okay.  So do you have to check for double
17  lines again when it's on the staging server?
18  A.  Sometimes after you do it, it may be --
19  sometimes it depends on how they generate the text.
20  They may put some in that when you put stuff on the
21  Web site, the Web site pulled out everything that
22  they put in.

Page 112

1       If it's not a final copy, it will pull up
2  a different area -- pull up a different format, and
3  sometimes you have to go back maybe once or twice to
4  try to correct the format.  And all I have to do is
5  to take the spaces out.
6  Q.  Okay.  And did you have to do that on that
7  day?
8  A.  No.
9  Q.  Okay.  So basically, after you've sent it
10  from your C drive to the staging server, you would
11  then look at it on the screen?
12  A.  Correct.
13  Q.  You just scroll through it to make sure
14  that there's no double lines or no other weird
15  formatting changes.
16       Right?
17  A.  Correct.
18  Q.  I mean, you're not actually reading the
19  text of this?
20  A.  Correct.
21  Q.  Okay.  And then you send a command that
22  sends it to the Treasury, the list -- the listed

Page 113

1  Treasury Web site.
2       Right?
3  A.  Correct.
4  Q.  Okay.  And that command, execute, that's
5  like a matter of seconds.
6       Right?
7  A.  Yeah.
8       MS. WILLIAMS:  Objection.
9       BY MR. SHOPE:
10  Q.  Okay.  Now, at the time you did this, I
11  gather you had no awareness of any embargo?
12  A.  Correct.
13  Q.  Okay.  Your belief was that this was for
14  immediate release?
15  A.  Correct.
16  Q.  Correct?
17       So would it be fair to say that you were
18  therefore trying to get it out as promptly as you
19  could?
20       MS. WILLIAMS:  Objection.
21  A.  My routine is, after the press conference
22  is over, if they say -- whatever embargo time, if

29  (Pages 110 to 113)

Page 162

1   clear them in.
2       Correct.
3       Q.  Now, was there any standard about who
4   would -- who -- or how you would decide whether or
5   not to clear somebody in?
6       A.  If someone would call up and say this
7   was -- when they called to be cleared in to Treasury,
8   I asked their name, their date of birth and Social
9   Security number and organization they're with.  If
10  it's an organization I'm not familiar with, I pull
11  their name, take it to a press office, say, what
12  organization is this, should I clear them in.
13      They give me the okay, yes.  If they say,
14  no, then I get back with the person and tell them,
15  I'm sorry, only press people can come to the press
16  conference.
17      Q.  Did it ever happen that somebody was
18  rejected because their organization wasn't considered
19  to be appropriate press?
20      A.  At what time?
21      Q.  At any time when you --
22      A.  Yes.

Page 163

1       Q.  Can you recall specific instances?
2       A.  No.
3       Q.  But in other words there was somebody who
4   wanted to attend.
5       You took it to the press office, and
6   somebody in the press office said, no, no, that's not
7   really a newspaper, or, that's not really a proper
8   journalist?
9       A.  Correct.
10      MR. ROSETTI:  Objection.
11      BY MR. SHOPE:
12      Q.  Okay.  Do you remember at all how many
13  times that happened, approximately?
14      A.  No.
15      Q.  I mean, did it happen once or twice, or is
16  this something that's happened fairly frequently?
17      MR. ROSETTI:  Objection.
18      A.  Well, if you put out a press release
19  about -- depends on what the subject is.  You may get
20  several calls to law firms, depends on what the
21  subject is, wanting to get in.  And we have to tell
22  them that it's only for press only.

Page 164

1       BY MR. SHOPE:
2       Q.  Okay.  Who is it in the press office who
3   makes that determination?
4       A.  It's a routine -- that's been the routine
5   since I've been in the press office.
6       Q.  No, no, the determination about whether or
7   not somebody qualifies as press or not.
8       A.  I take it to the press officers, and they
9   research it or tell me yes or no.
10      Q.  The press officers -- is that --
11      A.  Like Betsy Holahan, Tony Fratto, whoever
12  is in the press --
13      Q.  Okay.  So any of those.
14      Now, do you remember whether secretary
15  Fisher was receiving reporters later that day on
16  October 31?
17      A.  No, I don't remember.
18      MR. SHOPE:  If we could mark this as the
19  next exhibit.
20      (Anderson Exhibit No. 12
21      was marked for
22      identification.)

Page 165

1       BY MR. SHOPE:
2       Q.  I'm showing you what's been marked as
3   exhibit 12.
4       Do you recognize the name Charles
5   Schneider?
6       A.  No.
7       Q.  So do you see there's a reference to a
8   press event with a time of 11 o'clock AM on October
9   31, 2001?
10      A.  Correct.
11      Q.  Any idea what that would have been?
12      A.  No.
13      Q.  Okay.  I recognize it's 5 years ago.
14      I'm just -- sometimes people amazingly can
15  remember --
16      A.  No.
17      Q.  -- things, and sometimes they can't say.
18      By the way, I asked you before whether
19  anybody came late to the press conference.
20      Do you know whether anybody left early?
21      A.  No, didn't anyone leave earlier.
22      MR. ROSETTI:  You talking about the 10-31

Page 166

1 conference?

2  MR. SHOPE: Yeah.

3  A. No, didn't anyone --

4  BY MR. SHOPE:

5  Q. Is there a reason why you would remember

6 that no one left early but you couldn't remember why

7 anybody came late -- or whether anybody came late?

8  A. The doors was closed from the time they

9 closed the doors to the time they open up.

10  Q. But it wasn't locked.

11  Right?

12  A. No, but it -- it wasn't locked, but didn't

13 no one leave before time. In some press conference,

14 they come out to use their cell phones during the

15 press conference to send -- the reporters will send

16 whatever they need to send.

17  But this particular time, didn't know one

18 leave, didn't no one leave out early.

19  Q. And how are you so sure of that?

20  A. Because I was outside the hallway the

21 whole time.

22  Q. Okay. But if you were outside the hallway

Page 167

1 the whole time, you would have seen whether or not

2 somebody came late too.

3  Right?

4  A. Well, they could have came late. I just

5 don't say remember their coming late.

6  All I remember is, didn't no one leave out

7 the room before the press conference over.

8  Q. Now, the reporters are allowed to keep

9 their cell phone with them.

10  Right?

11  A. They allowed to keep their cell phones

12 with them, but I'm tell them at the beginning of the

13 press conference to put them on vibrate or shut them

14 down.

15  Q. Now, do you recall whether there was an

16 announcement the day before October 31 that there

17 would be a press conference?

18  A. Announcement?

19  It's something on the public schedule.

20 They sent out a media advisory.

21  MR. SHOPE: Okay. Why don't we mark this

22 as the next exhibit.

Page 168

1  (Anderson Exhibit No. 13

2  was marked for

3  identification.)

4  BY MR. SHOPE:

5  Q. Showing you what's been marked as exhibit

6 12.

7  Why don't you just take a minute to read

8 that.

9  MR. SHOPE: I apologize.

10  It should be exhibit 13.

11  A. I read it.

12  BY MR. SHOPE:

13  Q. Oh, you read it. Okay.

14  Do you recognize exhibit 13 at all?

15  A. It's a media advisory.

16  Q. That's the media advisory you were

17 referencing?

18  A. Right.

19  Q. Is that something that you would have

20 posted to the Web site?

21  A. I post it, but I don't read it.

22  Correct.

Page 169

1  MR. SHOPE: Mark this as the next exhibit.

2  (Anderson Exhibit No. 14

3  was marked for

4  identification.)

5  BY MR. SHOPE:

6  Q. By the way, exhibit 13 that we just looked

7 at, have you seen that before today?

8  A. No.

9  Q. Okay. Show you what's been marked as

10 exhibit 14.

11  Have you seen exhibit 14 before today?

12  A. No.

13  Q. Okay. So this appears to be similar to

14 the previous exhibit showing -- or announcing that

15 there's going to be the press conference with

16 undersecretary Fisher on October 31.

17  Would you have been involved in the

18 formatting of something like exhibit 14?

19  A. No.

20  Q. Okay. I asked you before about the

21 computer system, and I think you mentioned that -- at

22 your desktop, you had one of the various versions of

Excerpt from the

October 6, 2006 deposition of

Verizon Business

representative, Anne Wilson

Exhibit X

IN THE UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF MASSACHUSETTS

(Boston Division)

- - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND   )

EXCHANGE COMMISSION,           )

         Plaintiff,        )

    v.                         ) Civil Action

STEVEN E. NOTHERN,             ) No. 05-10983

       Defendant.            ) (NMG)

- - - - - - - - - - - - - - - x

Washington, D.C.

Friday, October 6, 2006

Video 30(b)(6) Deposition of:

ANNE LAWRENCE WILSON,

a witness called for examination in the

above-entitled action, beginning at 10:14 a.m.

before JOE W. STRICKLAND, RPR, CRR, a notary

public in and for the District of Columbia, taken

at the offices of the Securities and Exchange

Commission, 100 F Street, NE, Washington, DC

20549, when were present:

Page 30

1  center and take advantage of the power that we
2  had, the pipe, we call it power pipe, the pipe
3  meaning the network connectivity and so forth.
4  And then in addition we would manage that server
5  so they did not need to know about the Solaris
6  operating system. They didn't need to have
7  system administrators on hand. They could focus
8  on the content, meaning the web pages. They
9  created the web page. Customers were responsible
10 solely for their content. Any database -- any
11 data was also their responsibility.
12     Q.  Could you describe how -- I'm going to
13 be talking about the fall of 2001.
14     A.  Uh-huh.
15     Q.  Could you describe how, in the fall of
16 2001, UUNET would allow a customer to use its
17 service in order to make information public on
18 the Internet?
19     A.  Sure. And I'll focus on the Solaris
20 operating system, that product. They essentially
21 needed to upload their content to our system.
22     Q.  They, being the customer?

Page 31

1      A.  The customer. And would you like
2  detail on that process? Or --
3      Q.  I'm -- sure. Or if you want to give an
4  overview first.
5      A.  Okay. Overview would be that we
6  provided them with two different servers, one
7  being a production server. It was available
8  to -- on the public Internet. That's where the
9  files ultimately would land so that they were
10 available to the public. If you were going to
11 WWW.XYZ.COM you were landing at the production
12 server. The end user puts in a web address and
13 is able to view files on that system.
14     To get files on to that system, the
15 customer first needed to upload or transfer files
16 to a staging server where they could preview the
17 content, make any changes that they might need to
18 make, and then in a second step, they would
19 transfer those files -- we called it pushing --
20 to the production system. Nobody but our staff
21 had access to the production system directly.
22     Q.  By that, what do you mean?

Page 32

1      A.  Meaning -- oh, good point. I'm sorry;
2  I mean nobody could log onto the production
3  server directly except our staff. Nobody could
4  FTP content. No one could change or edit or add
5  or delete content directly except our staff and,
6  you know, those authorized individuals which
7  included the staging server. Staging server had
8  that right, but not other users.
9      Q.  So is it fair to say that a customer,
10 in order to get something on the production
11 server, would have had to go through the staging
12 server?
13     A.  Absolutely. Correct, as an end user,
14 they could only FTP to -- file transfer -- to the
15 staging server and they could log onto the
16 staging server.
17     Q.  Now, I understand that that was a
18 general overview. Let's talk about how that -- a
19 customer actually did that. And you mentioned
20 FTP. What does that mean?
21     A.  Right. File transfer protocol. It's
22 a -- the Internet has many different protocols

Page 33

1  that are based on IP, the Internet protocol.
2  Just like HTTP is one type of protocol, one way
3  of viewing information. It's really a way of two
4  computers talking to each other. FTP. File
5  transfer protocol, instead of viewing a file on a
6  web browser, you're actually transferring a file
7  from one computer to another.
8      Whereas HTTP, you are actually -- you
9  are viewing files, the files are coming from the
10 web site to you, FTP can go both ways. You
11 upload to -- copy files from yourself to another
12 system or you download to go backwards.
13     Q.  So how did customers FTP information to
14 the staging server?
15     A.  They would have some type of software
16 on their PC -- I shouldn't just say PC, MacIntosh
17 or laptop, desktop, whatever their local system
18 was. Local to them, remote to us. They would
19 give certain commands to transfer those files.
20 Now, to do that they would have to log onto the
21 server, meaning on to our server. They had to
22 enter a user name and password. And before that

Page 34

1   they actually had to come from a specified
2   address that we had preconfigured to be allowed.
3       Q. Okay. Let me break that down a little
4   bit. In order for a customer to get on to a
5   staging server hosted by UUNET, you mentioned
6   that they had to come from a certain IP address.
7   What do you mean?
8       A. Correct. This is -- we called it an IP
9   filter. A server can reject communication from a
10  system that it doesn't recognize if it's
11  configured that way. And one way to recognize
12  another system is by its IP address, which is a
13  numeric number with dots in the middle. It'll be
14  a number of digits a dot, a number of digits, a
15  dot, a number of digits, a dot.
16      And, for example, I'm just going to
17  make one up: 199.64.23.67 would be an example.
18  And it is an address. The Internet uses numbers
19  to identify which network something belongs to.
20  If you know something's IP address, you can know
21  where it is on the Internet because you can
22  follow the network via that address.

Page 35

1       Q. So you mentioned that only computers
2   with certain IP addresses could be used. What do
3   you mean?
4       A. Right. So an IP address is assigned to
5   a system. Sometimes it's assigned dynamically;
6   sometimes it's assigned on -- assigned on a more
7   permanent basis. So we would find out from the
8   customers what IP address their computer was
9   using. We would put it in the configuration file
10  on our server and tell the server to only allow
11  access from someone with that IP address.
12      Q. Okay. Before I flesh that out a little
13  bit, was the United States Department of Treasury
14  one of UUNET's clients in the fall of 2001?
15      A. Yes, they were.
16      Q. And what, if any, servers did UUNET
17  maintain for Treasury that supported their web
18  hosting ability?
19      A. There were two servers, production
20  server, PROD-311A and a staging server, STAG, we
21  called it -- dash 13A. Those were the host
22  names.

Page 36

1       Q. And so this overview that you gave
2   about how UUNET's systems allowed customers to
3   put information on the Internet, was that true
4   for Treasury using a staging and production
5   server?
6       A. Absolutely, uh-huh.
7       Q. And so we were just talking about how a
8   customer like Treasury would gain access to their
9   staging server to upload information.
10      A. Uh-huh.
11      Q. How did -- do you know if they had
12  computers with IP addresses that were -- excuse
13  me, scratch that question.
14      Do you know what they did in order to
15  get IP addresses to UUNET?
16      MR. TOONE: Objection.
17      BY MS. WILLIAMS:
18      Q. That would allow them to access the
19  server?
20      MR. TOONE: Objection.
21      BY MS. WILLIAMS:
22      Q. You can answer.

Page 37

1       A. When we first set them up, basic
2   configuration, they could have requested that
3   certain IP addresses be part of that filter. In
4   fact they would have had to at that time or they
5   couldn't have uploaded any content. They could
6   make changes to that list of IP addresses over
7   time by creating a trouble ticket with our
8   customer support group, which also required a fax
9   on letterhead for confirmation.
10      Q. Do you know if there was an access
11  control list of IP addresses for the Treasury
12  Department in 2001?
13      A. Yes, there absolutely was.
14      Q. How do you know that?
15      A. I know that because there had been
16  issues -- you know, at one time a user had
17  trouble accessing the staging server and one
18  question we asked them we verified to make sure
19  that their IP address was in the -- in the access
20  control list. At another time -- they had
21  requested changes to that access list. They were
22  unable to access the staging server until we

Page 54

1  if anything else did someone have to do to access
2  the Treasury staging server in 2001?
3       MR. TOONE: Objection.
4       THE WITNESS:  To access the server, as
5  in log on and be able to edit content or upload
6  content, delete content, they needed to have a
7  user name and password.
8       BY MS. WILLIAMS:
9       Q.  Do you know how someone obtained a user
10  name and password?
11      A.  Only through our customer support
12  team.  They would have been issued at the
13  beginning of the contract.  They could have
14  requested changes over time, but that would have
15  required a faxed request.
16      MS. WILLIAMS:  I'd like to have this
17  marked as Exhibit 6.
18          (Wilson Exhibit No. 6 was
19          marked for
20          identification.)
21      BY MS. WILLIAMS:
22      Q.  Are we okay?  Do we need to take a

Page 55

1  break?
2      A.  Good.
3      Q.  Ms. Wilson, have you seen this document
4  before?
5      A.  Yes, I have.
6      Q.  What is it?
7      A.  This is a trouble ticket from, you
8  know, number 106570 from November of 2001 about a
9  request from Treasury.  They wanted some
10  information about content that was uploaded to
11  their production site.
12      Q.  What was the ticket number on this
13  ticket?
14      A.  UUTT 0000106570.  And that's from the
15  Remedy Trouble Ticketing System that we discussed
16  earlier.
17      Q.  Do you know how -- where this -- how
18  this document was printed up?
19      A.  It would have been the same method that
20  I had used.  This is clearly from the work log
21  and starts with the original submission.  So the
22  text was copied from the work log.

Page 56

1      Q.  What's the date of this ticket?
2      A.  November 1st, 2001.
3      Q.  What was UUNET asked to do by Treasury
4  on this ticket?
5      A.  UUNET was asked to check logs -- well,
6  actually we chose to check logs to answer the
7  request.  The request was simply to know when the
8  file was pushed to production, when the file was
9  on the production web site and hence available to
10  the public Internet.
11      Q.  You mentioned pushed to production.
12  And I know that we talked about actually FTP'ing
13  something to a staging server.  Could you talk
14  about generally how information got pushed to
15  production?
16      A.  Sure.  Two-step process.  First the
17  file transfer protocol was used to copy the
18  files -- to I guess we've talked about this part,
19  but once it's on the staging server and starting
20  with that, the customer might need to make some
21  changes and do some previews.  But then they
22  would go to another web site address on the

Page 57

1  staging server and they would basically click a
2  button.  They had the option of pushing
3  individual files or pushing the whole
4  collection.  This was called the CMS system
5  incidentally, collection management system.
6          Once they've clicked that button, the
7  program which we had written -- this was a
8  proprietary at ANS program -- would compare the
9  file on the staging server with the files on the
10  production server, would look at date stamps,
11  size of files.  It would identify which files
12  were new or had been changed since the last
13  update to the production server, and then it
14  would copy those files over using the secure
15  authentication and method.
16      Q.  Was there a name for this program that
17  would compare the files?
18      A.  It was actually CMS that did the
19  comparing.  That part of it.  The program did
20  call other tools Kerberos and rdist.
21      Q.  What is you said Kerberos and what is
22  the other one?

Page 70

1    Q.  You mentioned that Level 1 answers the
2    phones.  Did they also receive e-mails from
3    customers?
4    A.  They did.  Right.  Any type of incoming
5    ticket would have been their responsibility,
6    whether it came in via the phone, via e-mail, or
7    if -- via the monitoring system.
8    Q.  As a Level 2 engineer on technical
9    support team what, if any, responsibility did
10   Mr. Harris have for configuring servers?
11   A.  He would not have done the initial
12   configurations.  He would have -- his work was
13   reactive, responding to customer issues.
14   Q.  And so I'm still -- I'm back on this
15   second-from-the-bottom line.
16   A.  Uh-huh.
17   Q.  Why does Mr. Harris's I guess initials
18   and last name appear here?
19   A.  Each of these entries you'll see a date
20   stamp.  The day, the time, and then this is a
21   user name.  CPASCOE for Carrie Pascoe.  CPASCOE
22   is her user name.  DAHARRIS was Dave Harris's

Page 71

1    user name.  His name -- the user name of the
2    individual making the ticket update is what
3    appears.
4        So Carrie made the initial entries and
5    then she would have escalated the ticket to Dave,
6    who made subsequent entries.
7    Q.  If you could review Mr. Harris's entry
8    which goes I think through the second page down
9    to the bottom.
10   A.  Okay.
11   Q.  What did Mr. Harris do?
12   A.  Well, he went onto the production
13   server, looked at what files -- went to that
14   directory and pulled out -- this is a file
15   listing basic command: List files.  And he
16   pasted in that entry, which shows not just the
17   timestamp but size and privileges of the file.
18   Q.  What are you referring to when you
19   say --
20   A.  I'm sorry; the -- his entry -- the file
21   has a timestamp of on the production server.
22   Q.  Okay.  And then below that RW-R-R-?

Page 72

1    A.  That would have been copied directly
2    from a command on the production server.
3    Q.  And what is this entry, what does this
4    stand for the RW-R-  1 USTPRESS TREAS?
5    A.  Those are qualities that the file has.
6    It refers to who can read and write the files.
7    Q.  And the rest?
8    A.  It gets a little complicated after
9    that.
10   Q.  You're referring to the RW-R-R?
11   A.  Right.  This is -- if you go on to --
12   if you're on a PC, you would use file Explorer or
13   something like that and it would list all of your
14   files, Windows Explorer -- a file name and the
15   type of file and the date of the file.  That's
16   the equivalent of this for Windows here on the
17   Solaris system, he's listed the files.
18       So going from left to right, the first
19   batch of letters, the Rs and the Ws, talk about
20   who can read and write the file.  USTPRESS is who
21   owns the file and USTPRESS being the user name of
22   how the file was pushed.  Actually it's the --

Page 73

1    it's the remote staging server there, since they
2    didn't access it directly.
3        TREAS would be, I believe, referring to
4    the group of files.  The 9174, the size, and then
5    this date is October 31, 9:40 and then the name
6    of the file.  The time date stamp refers to when
7    the file was created, not necessarily when it was
8    created on the production server.
9    Q.  The name of the file would be the
10   PO749.HTM?
11   A.  Right.
12   Q.  And so what this entire entry, what
13   does this show regarding the timestamp on the
14   production server?
15   A.  Well, this doesn't actually show when
16   the file landed on the production server.  It
17   shows when the file was last updated, which could
18   mean when it was edited or when it was first
19   copied on to the Solaris system.  In this case,
20   it would be when it was uploaded to the staging
21   server.  List changes were made there.
22   Q.  How do you know that?

Page 74

1    A.  Because of the way our system works,
2  the rdist system that copies the file from one
3  server to another maintains the file header info,
4  the timestamp.  So it would have, when it copied
5  the file from the staging server over to the
6  production server, it copied -- it used the same
7  timestamp.
8    Q.  So this 9:40, just to clarify, is not
9  the time that it landed on the production server?
10    A.  Right.
11    Q.  It would have been the time it was last
12  updated on the staging server?
13    A.  Uh-huh.  Yeah, updated on the staging
14  server or initially copied onto the staging
15  server.  FTP doesn't work the same way rdist
16  does.  Once the file was uploaded, it would have
17  gotten a new stamp on the staging server.
18  Because it was most likely changing operating
19  systems going from Windows to Solaris.
20    Q.  If you could turn to the second page of
21  the document.
22    A.  Uh-huh.

Page 75

1    Q.  The top line: "This matches the
2  timestamp of the file on the staging server when
3  it was pushed using CMS."  What does that mean?
4    A.  The timestamp -- well, when it -- I
5  think I may have misspoken here.  Because he's
6  telling you the time -- it matches the timestamp
7  that he shows us, which is when it was FTP'd to
8  the staging server.  The next line is more
9  relevant.
10    Q.  Okay.  Explain the next line to me.
11    A.  Okay.  The file was FTP'd to the
12  staging server at 9:40 and 23 seconds.  It was --
13  which means from the user or whether they were at
14  the Department of Treasury or Jeffery West's
15  house, they FTP'd, uploaded it on to the staging
16  server using the FTP protocol.  FTP keeps a log
17  of any file transfers and that's what he's pulled
18  out here.  So this is --
19    Q.  This TREAS underline?
20    A.  Underscore 1-FTP.LOG.  That's the file
21  name.  Then we have the time that that file entry
22  was made.  October 31st, 9:40:23 of 2001.  Then

Page 76

1  we have -- this is the host name where the file
2  was uploaded from.  This TIAS-GW7.TREAS.GOV.  The
3  size of the file that was uploaded, 9175 bytes,
4  and then the full name of the file including the
5  path that was in the releases directory.  The
6  name of the file was PO749.HTM.  HTM is an HTML
7  file or a web page.
8    Q.  Where did this entry come from, the
9  staging or production server?
10    A.  This came from the staging server.
11  There was no FTP running on the production
12  server.
13    Q.  And so in order to get this line, would
14  Mr. Harris need to cut and paste it?
15    A.  Correct.  He would have gone on the
16  staging server and gripped the log.  He would
17  have displayed the log file.  It's going to show
18  you the last entries first, so he would have just
19  gone and pulled -- you can display it on the
20  screen and do a copy and paste.
21    Q.  And the log file contains what kind
22  of -- what information?

Page 77

1    A.  The log file would include any uploads
2  or downloads, any transmission via FTP.  This log
3  file would only show FTP transmission.
4    Q.  And so this log file that we see in
5  this document tells us what about the timing?
6    A.  It tells us that the file first landed
7  on the staging server at 9:40 and 23 seconds.
8  These logs would have been more precise than what
9  we just looked at which just doesn't give
10  seconds.  As far as the file list itself, it
11  shows only hours and minutes.
12    Q.  Okay.  You said that TIAS-GW7.TREAS.GOV
13  is a host name?
14    A.  Yeah.
15    Q.  What is a host name?
16    A.  Host name would match up with an IP
17  address.  It's an origin identifier.  That's
18  where the person uploading was coming from.  In
19  some logs we record IP addresses and in some logs
20  we record host names.  Here host names give you
21  more information, it's just easier to read.  It
22  is less literal.

Page 78

1    Q.   So a host name corresponds to a
2  computer, an IP address?
3    A.   Exactly.  Right.  So it was the IP
4  address that was in the access control list, but
5  the computer can look one up and find the other.
6  It knows which belongs to which.
7    Q.   And would the host name be unique to a
8  specific computer at Treasury?
9    A.   Not necessarily.  They could have gone
10 through a proxy.  But it would definitely be
11 coming through the Treasury gateway.
12    Q.   I want to move down to the next entry
13 here:  "Here are the CMS push logs for USTPRESS"
14 and then I see a clump of information.  What is
15 all that?
16    A.   That would be the logs and it shows the
17 logs that this user or that for this web site.
18 It shows when files were updated.  They happen in
19 pairs, each update sequence.  There's an update
20 collection and then do update.  That's because a
21 number of things can happen, happen in a push and
22 it can take -- it can take several seconds or in

Page 79

1  some cases even minutes to do a push because the
2  system has to compare which files are on the two
3  systems and compare information about those
4  files.
5    Q.   So here which, if any, of these push
6  logs relate to this particular file, PO749?
7    A.   The second set.  So starting with the
8  third entry, USTPRESS, that's the user name of
9  the web site.  And then 9:43 and 23 seconds is
10 the beginning of the process.  And then 9:43 and
11 28 seconds is the end of the process.
12    Q.   When you say the beginning of the
13 process and that started at 9:43 and 23 seconds,
14 what do you mean?
15    A.   Of the update process.  I think I
16 referred before the user clicks a button and says
17 I want to push these documents to production.
18 And then it does the -- well, first of all it has
19 to get the Kerberos ticket and the two servers
20 have to open up that encrypted line of
21 communication.  And then there is a comparison of
22 which files are on each of the two servers and

Page 80

1  the date, time, size of those files.  And CMS
2  decides which files it's going to copy over and
3  then it does the copy.
4    Q.   Does the program do this automatically
5  when the person clicks whatever they need to do
6  to say push?
7    A.   Clicks the button; right.
8    Q.   What is this fourth entry here, the
9  9:43:28?  What does that signify?
10    A.   That would be when the process was
11 completed.  Or when that file was actually moved.
12    Q.   At what time would someone from the
13 public who logs onto the Treasury production
14 server via the Internet be able to view PO749?
15       MR. TOONE:  Objection.
16       THE WITNESS:  9:43 and 28 seconds.
17       BY MS. WILLIAMS:
18    Q.   And why do you say that?
19    A.   Because this log indicates that that's
20 when the CMS system was complete with its
21 transfer, which would mean that the file was then
22 on the production server.

Page 81

1    Q.   Would it have been possible at 9:43 and
2  23 seconds to view the information on the
3  production server?
4    A.   No.
5    Q.   Why not?
6    A.   The process was just starting.  The
7  file wouldn't have been copied yet.  And those
8  other things had to happen first.
9    Q.   If you could go down below the copy --
10 well, first, this -- these entries from the log,
11 which server would those have come from?
12    A.   I would have looked for them myself on
13 the staging server.  That's where the interface
14 was for the customers to view these logs.
15    Q.   Was it also available on the production
16 server?
17    A.   It may have been.  I personally don't
18 know.
19    Q.   Okay.  Below this information with the
20 CMS push logs, Mr. Harris writes some other
21 information interpreting the logs.  Do you see
22 that?

Page 82

1    A.  Uh-huh.
2    Q.  Is there anything in that that you
3  disagree with?
4    A.  No, not at all.  This is he's pulled
5  out, you know, just copied bits and pieces of
6  it.  What -- what looks odd is that this
7  101103107 is -- computers have a different way of
8  keeping time.  They don't use month, day, year.
9  So it's -- I don't know what the algorithm is.
10  It is like a number of seconds past some start
11  date.  So he's converted this numeric set of
12  strange numbers into the actual year, month, and
13  date that they convert to.
14    Q.  Was it possible for someone to type in
15  WWW.TREAS.GOV and connect to Treasury's staging
16  server?
17    A.  No.
18    Q.  Why not?
19    A.  Because that entry would have only been
20  made for the production system.
21    Q.  Were there any other WWW. type
22  addresses that connected to the production

Page 83

1  server?  At Treasury?
2    A.  Yes.  The WWW.USTREAS.GOV and
3  WWW.TREASURY.GOV.
4    Q.  And would all of those connect to the
5  same IP address on the production server?
6    A.  Right.  There would have been multiple
7  domain name entries, all with the same IP
8  address.
9    Q.  What is a domain name?
10    A.  Domain name is that host's name.  It
11  refers to the DNS, domain name system, which is
12  another protocol of how the Internet works.  And
13  there are servers, databases around the world
14  that match up domain names with IP addresses.
15  And it's the domain name that you're going to
16  write in your web browser, because people
17  wouldn't be expected to know what the IP
18  addresses are.  They're a little too confusing.
19    Q.  Do you know if Treasury's staging
20  server had a domain name in 2001?
21    A.  No, I don't know.  We did not create
22  one for that.

Page 84

1    Q.  UUNET didn't create one?
2    A.  Right.
3    Q.  So just to clarify, an IP address like
4  Treasury's production server's IP address could
5  have multiple domain names --
6    A.  Uh-huh.
7    Q.  -- that pointed to it?
8    A.  Right.
9    Q.  Are you familiar with the term network
10  time protocol?
11    A.  Yes.
12    Q.  What is it?
13    A.  It's a standard throughout the
14  Internet.  It's a method of synchronizing clocks
15  that's considered very robust and redundant, so
16  that no one is depending on a single clock but on
17  a network of clocks going back to very
18  authoritative sources.
19    Q.  When you say it's a standard throughout
20  the Internet, what do you mean?
21    A.  It's common, accepted practice that the
22  official clocks from U.S. Naval Observatory or

Page 85

1  the National Institute of Standards and
2  Technology distribute their time via NTP.  And it
3  syncs up with the universal coordinated time
4  worldwide.  So it's universally accepted.
5    Q.  Did UUNET have an NTP protocol in place
6  for its customer servers?
7    A.  Yes, we did.  That was a standard
8  package that was installed on all of our customer
9  boxes.
10    Q.  Was that true in the fall of 2001?
11    A.  Yes, it was.
12    Q.  Did UUNET have an NTP protocol in place
13  for the Treasury servers that it maintained?
14    A.  Yes.
15    Q.  Could you explain how the NTP --
16  actually, before you do that, let me mark this
17  document as an exhibit.
18        (Wilson Exhibit No. 8 was
19        marked for
20        identification.)
21        BY MS. WILLIAMS:
22    Q.  Ms. Wilson, do you recognize this

Page 178

1  protocol was running at the time?
2      A.  He would have done a process command to
3  see what processes were running.
4      Q.  Was there any process that Mr. Harris
5  could have performed on November 1st at 12:40,
6  p.m. as to whether the network time protocol was
7  running correctly on the morning of October 31st,
8  2001?
9      MS. WILLIAMS:  Objection.
10     THE WITNESS:  No.
11     BY MR. TOONE:
12     Q.  I'm sorry?
13     A.  Perhaps log files may have shown that.
14     Q.  Are you aware of any evidence showing
15  that -- showing whether the network time protocol
16  was running correctly on October 31st, 2001?
17     A.  Not direct -- I'm not sure.  How did
18  you phrase that?
19     Q.  Are you aware any of evidence that
20  shows whether or not the network time protocol
21  was functioning correctly on October 31st, 2001?
22     MS. WILLIAMS:  Objection.

Page 179

1      THE WITNESS:  I have no evidence to the
2  contrary.  And the server was working.  By
3  inference, it was.
4      BY MR. TOONE:
5      Q.  What do you mean the server was
6  working?
7      A.  CMS was working.  The server was up and
8  responding.  The operating system was running and
9  NTP is part of the operating system.
10     Q.  So because the other functions were
11  working, it's possible to conclude that the
12  network time protocol was also working?
13     A.  It certainly should have been.
14     Q.  It should have been, but can you say
15  for sure that it was?
16     MS. WILLIAMS:  Objection.
17     THE WITNESS:  Not for absolutely sure,
18  but with a high degree of certainty, yes.
19     MR. TOONE:  Could we take a short
20  break.  I would like to review my notes one more
21  time.
22     VIDEOGRAPHER:  Off the record,

Page 180

1  3:15:20.,
2      (Recess.)
3      VIDEOGRAPHER:  On the record at
4  3:33:58.,
5      BY MR. TOONE:
6      Q.  Ms. Wilson.  I'm done with all my
7  questions for now.  Thank you very much.
8  FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFF
9      BY MS. WILLIAMS:
10     Q.  I have a couple of follow-up
11  questions.
12     A.  Okay.
13     Q.  Mr. Toone asked you some questions
14  about the ability of someone in the public to
15  view content on Treasury's staging server?
16     A.  Uh-huh.
17     Q.  What would a person need to know to
18  view, rather than post, content on Treasury's
19  staging server?
20     A.  They would need to know that address.
21  The IP address of that staging server.
22     Q.  And how would someone in the public

Page 181

1  know the IP address of a staging server?
2      MR. TOONE:  Objection.
3      THE WITNESS:  I don't know how they
4  could come by that information.
5      BY MS. WILLIAMS:
6      Q.  Why do you say that?
7      MR. TOONE:  Objection.
8      THE WITNESS:  Because to my knowledge,
9  it was not part of the DNS record or announced in
10  that way.
11     BY MS. WILLIAMS:
12     Q.  When you say not part of the DNS
13  record, what do you mean?
14     A.  That I know of no -- well, even to know
15  the IP address they would have to know the domain
16  name, or they would have to know the domain name
17  to know the IP address.  They would have to know
18  that address.  It wouldn't have been posted on
19  the Treasury web site, for example.
20     Q.  I think you testified that you don't
21  know if there was a domain name for Treasury's
22  staging server?

Page 182

1    A.  Right.  I don't know of any domain
2  name.  I haven't found any in any records.
3    Q.  Would Treasury have had to create a
4  domain name for its staging server?
5    A.  No.
6    Q.  How difficult would it be to guess an
7  IP address?
8    MR. TOONE: Objection.
9    THE WITNESS:  Very difficult.
10    BY MS. WILLIAMS:
11    Q.  Why?
12    A.  Because of the number of -- of possible
13  IP addresses.  You just wouldn't guess one.
14    Q.  How many possible combinations are
15  there?
16    MR. TOONE: Objection.
17    THE WITNESS:  Well, in the way that an
18  IP address is written, you have three digits
19  going from 1 to 255, a period, and then the next
20  number, which going from -- could actually be
21  zero to 255, period, and then the next number.
22  So it is 255 times 255 times 255 times 255, so

Page 183

1  255 to the fourth roughly number of
2  permutations.
3    BY MS. WILLIAMS:
4    Q.  If someone was able to gain access to
5  the IP address to Treasury's staging server, I
6  think you mentioned when asked by Mr. Toone that
7  there may have been other security mechanisms
8  established by Treasury?
9    A.  There may have been.  That would have
10  been up to Treasury to install, because they had
11  access to that configuration of that web server.
12  As opposed to the production web server where
13  only we could make those changes.
14    On the staging server, they could have
15  put in IP filters like we had for the other
16  protocols for FTP.  They could have put in an HT
17  access file that required a user name and
18  password before viewing any content on the web
19  site.
20    Q.  Does Kerberos itself -- is Kerberos a
21  time function?
22    A.  No.  But it relies on time to

Page 184

1  function.
2    Q.  And so my understanding is that the NTP
3  was actually the time function program?
4    MR. TOONE: Objection.
5    BY MS. WILLIAMS:
6    Q.  Not Kerberos?
7    MR. TOONE: Objection.
8    THE WITNESS:  NTP was the time function
9  on the servers.  It is still.
10    BY MS. WILLIAMS:
11    Q.  And so both the Treasury and production
12  servers I think you testified had NTP loaded on
13  them?
14    A.  Correct.
15    Q.  And earlier this morning, I believe
16  your testimony was that on average a client
17  server that used NTP would only veer by
18  milliseconds when it polled a higher stratum time
19  server?
20    A.  That's typical.
21    Q.  And what is a millisecond?
22    A.  One 1,000th of a second.

Page 185

1    Q.  So is it fair to say that veering by 5
2  minutes would be atypical?
3    A.  Very atypical.
4    Q.  Do you have any reason to believe that
5  the NTP function was not working correctly on the
6  Treasury servers on October 31st, 2001?
7    MR. TOONE: Objection.
8    THE WITNESS:  No.
9    BY MS. WILLIAMS:
10    Q.  I think you said that the rest of the
11  network was working that morning?
12    A.  Correct.
13    Q.  How rare is it that the NTP would not
14  function, but the rest of the network would be
15  functioning?
16    A.  Extremely rare.  For NPT not to be
17  working it's either an issue at the client site
18  or the server site, which meant that all three of
19  those time servers in the farm would be not
20  working simultaneously.
21    Q.  By all three servers in the farm do you
22  mean the KDC-1A, KDC-2A and INFR-4A?

1 longest amount of time it might take?
2     A.  There were times when it could take
3 minutes.
4     Q.  Here it appears it took 5 seconds.
5     A.  Right.
6     Q.  Looking at this part of Exhibit 6, the
7 CMS push logs, could you -- do you know when the
8 PO749 would have first been publicly available on
9 Treasury's production server?
10     MR. TOONE: Objection.
11     THE WITNESS: Yes.
12     BY MS. WILLIAMS:
13     Q.  What time?
14     A.  At 9:43 and 28 seconds.  In that case,
15 you see there's a slash, that means everything in
16 the collection was copied over.  We know that
17 that file was in that collection.  That meant
18 that that file was then available on the web
19 site.  It doesn't necessarily mean that it was
20 indexed or, you know, listed with a link.
21     Q.  What do you mean by indexed?
22     A.  Well, actually, no other changes were

1 done, meaning I don't know enough about the
2 Treasury web site.  If you just upload a file to
3 a web site, that file will be available.  But
4 unless either, A, somebody knows the whole path
5 name of that file and types in the whole address,
6 they will -- then they can pull it up in the
7 browser or they go to say a home page that has a
8 link to that file.
9     Q.  So you're saying you don't know how the
10 Treasury web site was set up on October 31st,
11 2001 with regard to this particular file?
12     A.  Correct.  Because the files on the web
13 site doesn't mean that it's listed in a directory
14 or you know has a link off the home page or in a
15 list of press releases or whatever.
16     Q.  I'm just trying to clarify this whole
17 indexing.  If -- are you saying that you don't
18 know if the release was available on the home
19 page and you had to click other things to get to
20 the release?
21     A.  Correct.
22     Q.  Okay.  I don't have any further

1 questions.
2     FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT
3     BY MR. TOONE:
4     Q.  I have a few questions to recross.
5 Ms. Wilson, do you know anything about the extent
6 to which members of the public were able to
7 access Treasury's staging server in 2001?
8     MS. WILLIAMS: Objection.
9     THE WITNESS: Define access.
10     BY MR. TOONE:
11     Q.  Able to read it.
12     A.  No -- well, do I know anything?  I know
13 that they could not have accessed unless they had
14 certain information.
15     Q.  Okay.  Do you know whether members of
16 the public actually obtained access to the
17 staging server in 2001?
18     A.  I don't see how they could have.
19     Q.  What do you mean by that?
20     A.  Well, the point of the product was that
21 this was an area not publicly announced where
22 content could be previewed before it was made

1 public.
2     Q.  Not publicly announced by UUNET?
3     A.  Right.
4     Q.  Do you know anything about Treasury's
5 policies and procedures for protecting
6 information relating to the staging server?
7     MS. WILLIAMS: Objection.
8     THE WITNESS: No.
9     BY MR. TOONE:
10     Q.  Do you know whether Treasury trained
11 its employees not to disclose information about
12 the staging server?
13     A.  No.
14     MS. WILLIAMS: Objection.
15     BY MR. TOONE:
16     Q.  Do you know whether Treasury treated
17 the IP address associated with the staging server
18 as confidential information?
19     MS. WILLIAMS: Objection.
20     THE WITNESS: No.
21     BY MR. TOONE:
22     Q.  Do you know whether Treasury took any

Page 198

1  files posted on the staging server were available
2  on the Internet?
3      MS. WILLIAMS: Objection.
4      THE WITNESS: Yeah. I mean it said
5  that, you know, if you want to protect your
6  content, you can do XYZ to keep others from
7  viewing it.
8      BY MR. TOONE:
9      Q.  Did you produce those documents to the
10 S.E.C.?
11     A.  No, I don't believe we discussed that.
12     Q.  Are those documents still available?
13     A.  Perhaps.
14     Q.  Would it surprise to you learn that
15 Treasury's senior counsel for technology policy,
16 a man named Steven Vagle, believed that files
17 transferred to the staging server were not
18 available on the Internet?
19     MS. WILLIAMS: Objection.
20     MR. SCHULMAN: Objection.
21     BY MR. TOONE:
22     Q.  You can answer if you understand the

Page 199

1  question.
2      A.  I don't know. I mean I have no
3  opinion.
4      Q.  Do you know whether Treasury employees
5  received any specific training on this aspect of
6  the staging server?
7      MS. WILLIAMS: Objection.
8      THE WITNESS: I don't know.
9      MR. TOONE: That's all I have.
10     MS. WILLIAMS: I have a couple
11 follow-ups.
12 FURTHER EXAMINATION BY COUNSEL FOR PLAINTIFF
13     BY MS. WILLIAMS:
14     Q.  You never worked at the Department of
15 Treasury, did you Ms. Wilson?
16     A.  No.
17     Q.  You don't know Treasury's policies and
18 procedures?
19     A.  No.
20     Q.  Mr. Toone was asking you about files on
21 the staging server being available on the
22 Internet. What would someone need to do to get

Page 200

1  these files off the staging server on the
2  Internet?
3      A.  They would have -- to view the files?
4      Q.  Yes.
5      A.  They would have to know the IP address
6  of the staging server. They would have to -- if
7  a domain name existed, they could use that. But
8  that's only if that existed. They'd have to know
9  one or the other. And you know depending on how
10 the files were indexed, they might have to know
11 specific file name to view that file.
12     Q.  What if Treasury had additional
13 security protocols?
14     MR. TOONE: Objection.
15     THE WITNESS: In that case, they would
16 either have had to enter a user name password or
17 come from a specific network or range of IP
18 addresses.
19     BY MS. WILLIAMS:
20     Q.  Did UUNET advertise which of its
21 clients had staging servers?
22     A.  No.

Page 201

1      Q.  How would someone in the public know
2  that Treasury had a staging server at UUNET?
3      MR. TOONE: Objection.
4      THE WITNESS: It should not know. That
5  was considered proprietary information. Any
6  information about our customers was tightly held.
7      MS. WILLIAMS: I'd like to mark this as
8  Exhibit 10.
9          (Wilson Exhibit No. 10 was
10         marked for
11         identification.)
12     BY MS. WILLIAMS:
13     Q.  Have you seen this document before
14 Ms. Wilson?
15     A.  Yes.
16     Q.  What is it?
17     A.  It's a snapshot of a trouble ticket
18 from the Remedy Trouble Ticket Database.
19     Q.  Do you know how this document was
20 generated?
21     A.  I myself accessed this ticket from the
22 Remedy database.

UUTT-0000106570



11/1/2001 11:57:44 AM cpascoe
Submit Details:
Assigned Group has been set to: WCTS-L1

Assigned Individual has been set to: cpascoe

Owner has been set to: cpascoe

11/1/2001 12:12:33 PM cpascoe
Jeffery called and needs to know when the following file was pushed to prod-311a-IP 208.243.113.164:

path – press/releases/po749.htm

Notification has been sent to: unknown

Updated Details:
Customer Name : FC Business Systems
 Account Number: u22672
 Service Plan : Premium Dedicated Solaris
 Billing Status: Active (08/02/1999)
 Host(Location): PROD-311a
                 - 208.243.113.164 -> 80
                 - 208.243.117.174 -> 80
                 - 208.243.117.190 -> 80
                 - 208.243.118.113 -> 80
                 - 208.243.118.115 -> 80
 Host(Location1): STAG-13a
                 - 208.243.113.163 -> 80
                 - 208.243.117.173 -> 80
                 - 208.243.117.189 -> 80
                 - 208.243.118.112 -> 80
                 - 208.243.118.114 -> 80

Technical Contacts:
Brad Green (Alternate), Office Phone 1: 202.622.6796, bradley.green@cio.treas.gov
Jeffery West CONTACT FIRST , Office Phone 1: 202-622-7226, Jeffery.West@cio.treas.gov
Tim Clapin (Alternate), Office Phone 1: 202.220.5372, timothy.clapin@cio.treas.gov
Assigned Group has been set to: WCTS-L2

Assigned Individual has been set to: unknown

Status has been changed from: Open to: Pending

Pending Reason has been set to: Escalated

11/1/2001 12:14:30 PM cpascoe
Notification has been sent to: unknown

11/1/2001 12:16:27 PM cpascoe
Notification has been sent to: unknown

11/1/2001 12:16:29 PM cpascoe
Notification has been sent to: unknown

11/1/2001 12:18:15 PM daharris
Assigned Individual has been set to: daharris

Status has been changed from: Pending to: Work In Progress

11/1/2001 12:40:11 PM daharris
All dates and times on both servers are acurate.

The file has a time stamp of on the production server:
-rw-r--r--  1 ustpress treas      9175 Oct 31 09:40 po749.htm

The file was ftp'd to the staging server at 9:40:23 am on Oct 31:
treas_1-ftp.log:Wed Oct 31 09:40:23 2001 5 tias-gw7.treas.gov 9175 /releases/po749.htm a _ i g ustpress ftp 0 *



Here are the cms push logs for ustpress:



| ustpress | 101103107:08:24 | 199.196.144.16 Update_Collection |
| ustpress | 101103107:08:29 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103109:43:23 | 199.196.144.16 Update_Collection |
| ustpress | 101103109:43:28 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103110:19:48 | 199.196.144.16 Update_Collection |
| ustpress | 101103110:19:52 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103111:37:50 | 199.196.144.16 Update_Collection |
| ustpress | 101103111:37:57 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103112:17:21 | 199.196.144.16 Update_Collection |
| ustpress | 101103112:17:25 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103112:40:03 | 199.196.144.16 Update_Collection |
| ustpress | 101103112:44:54 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103113:53:54 | 199.196.144.16 Update_Collection |
| ustpress | 101103113:53:58 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103114:02:30 | 199.196.144.16 Update_Collection |
| ustpress | 101103114:02:34 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101103117:47:06 | 199.196.144.16 Update_Collection |
| ustpress | 101103117:47:12 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101110106:15:47 | 199.196.144.16 Update_Collection |
| ustpress | 101110108:15:56 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101110110:11:33 | 199.196.144.16 Update_Collection |
| ustpress | 101110110:11:40 | 199.196.144.16 Do_Update_Collection / |
| ustpress | 101110110:18:18 | 199.196.144.16 Update_Collection |
| ustpress | 101110110:18:23 | 199.196.144.16 Do_Update_Collection / |


You can interpret the logs as follows; The first column is the CMS username entered. The second column is the time/date stamp. The first three numbers state the year, 2001. The next two state the month (10 = october, 11 = november). The next two state the date. The next two state the hour (EST, 24 hour clock). then, minutes and seconds.

The next column is the IP address of the web browser doing the push. So, for all of these, the individual is coming from IP 199.166.144.16.

The final column indicates what was done. For all of the entries, we show that ustpress pushed everything they could.

So, taking the first entry apart, we see:

ustpress      101103107:08:24      199.196.144.16 Update_Collection

user = ustpress
year = 2001
month = October
date = 31
hour = 7 am EST
minutes = 08
seconds = 24
IP = 199.196.144.16
action = update CMS collection

dave

11/1/2001 12:42:08 PM daharris
Jeffrey west wants me to relay the above information to him and David borowski @ david.borowski@do.treas.gov

dave

11/1/2001 12:43:56 PM daharris
Email Sent
From: web-support@uu.net
To: Jeffery.West@cio.treas.gov

Subject: UUTT-0000106570: FC Business Systems
Cc: david.borowski@do.treas.gov

Please do not take the (UUTT-xxxxx) information out of the subject header
when replying to this problem. We use this number to track specific
customer issues. Thank You.


Hello Jeffrey and David,


All dates and times on both production and staging servers are acurate.

The file has a time stamp of on the production server:
-rw-r--r--  1 ustpress treas       9175 Oct 31 09:40 po749.htm

This matches the timestamp of the file on the staging server when it was pushed using CMS.

The file was ftp'd to the staging server at 9:40:23 am on Oct 31:
treas_1-ftp.log:Wed Oct 31 09:40:23 2001 5 tias-gw7.treas.gov 9175 /releases/po749.htm a _ i g ustpress ftp 0 *

Here are the cms push logs for ustpress:

| ustpress | 101103107:08:24 | 199.196.144.16 Update_Collection |   |
|---|---|---|---|
| ustpress | 101103107:08:29 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103109:43:23 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103109:43:28 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103110:19:48 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103110:19:52 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103111:37:50 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103111:37:57 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103112:17:21 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103112:17:25 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103112:40:03 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103112:44:54 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103113:53:54 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103113:53:58 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103114:02:30 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103114:02:34 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101103117:47:06 | 199.196.144.16 Update_Collection |   |
| ustpress | 101103117:47:12 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101110108:15:47 | 199.196.144.16 Update_Collection |   |
| ustpress | 101110108:15:56 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101110110:11:33 | 199.196.144.16 Update_Collection |   |
| ustpress | 101110110:11:40 | 199.196.144.16 Do_Update_Collection | / |
| ustpress | 101110110:18:18 | 199.196.144.16 Update_Collection |   |
| ustpress | 101110110:18:23 | 199.196.144.16 Do_Update_Collection | / |

You can interpret the logs as follows; The first column is the CMS username entered.
The second column is the time/date stamp. The first three numbers state the year,
2001. The next two state the month (10 = october, 11 = november). The next two
state the date. The next two state the hour (EST, 24 hour clock). then, minutes and
seconds.

The next column is the IP address of the web browser doing the push. So, for all
of these, the individual is coming from IP 199.166.144.16.

The final column indicates what was done.   For all of the entries, we show
that ustpress pushed everything they could.

So, taking the first entry apart, we see:

ustpress        101103107:08:24         199.196.144.16  Update_Collection

user = ustpress
year = 2001
month = October
date = 31
hour = 7 am EST
minutes = 08
seconds = 24
IP = 199.196.144.16
action = update CMS collection


If you need any further information, please let me know.

Thanks,

Dave Harris
Web Hosting Support
WorldCom


Telephone 1-800-900-0241 (options 2, 6)
Email web-support@wcom.com

END OF EMAIL MESSAGE

11/1/2001 12:44:09 PM daharris
Status has been changed from: Work In Progress to: Pending

Pending Reason has been set to: Timed Event

11/2/2001 7:12:08 AM AREmail
Email Received
From: David.Borowski@do.treas.gov
To: web-support@UU.NET, Jeffery.West@cio.treas.gov
Subject: RE: UUTT-0000106570: FC Business Systems
Cc: David.Borowski@do.treas.gov


Thanks dave the information was great.

Dave

Dave Borowski
Treasury Internet/Intranet Program Manager
202 622-3588

-----Original Message-----
From: web-support@uu.net [mailto:web-support@uu.net]
Sent: Thursday, November 01, 2001 12:44 PM
To: Jeffery.West@cio.treas.gov
Cc: david.borowski@do.treas.gov
Subject: UUTT-0000106570: FC Business Systems


Please do not take the (UUTT-xxxxx) information out of the subject header
when replying to this problem.  We use this number to track specific
customer issues.  Thank You.

Hello Jeffrey and David,

All dates and times on both production and staging servers are acurate.

The file has a time stamp of on the production server:
-rw-r--r--  1 ustpress treas       9175 Oct 31 09:40 po749.htm

This matches the timestamp of the file on the staging server when it was pushed using CMS.

The file was ftp'd to the staging server at 9:40:23 am on Oct 31:
treas_1-ftp.log:Wed Oct 31 09:40:23 2001 5 tias-gw7.treas.gov 9175 /releases/po749.htm a _ i g ustpress ftp 0 *

Here are the cms push logs for ustpress:

| | | | |
|---|---|---|---|
| ustpress | 101103107:08:24 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103107:08:29 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103109:43:23 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103109:43:28 | 199.196.144.18 | Do_Update_Collection |
| ustpress | 101103110:19:48 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103110:19:52 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103111:37:50 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103111:37:57 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103112:17:21 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103112:17:25 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103112:40:03 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103112:44:54 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103113:53:54 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103113:53:58 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103114:02:30 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103114:02:34 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101103117:47:06 | 199.196.144.16 | Update_Collection |
| ustpress / | 101103117:47:12 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101110108:15:47 | 199.196.144.16 | Update_Collection |
| ustpress / | 101110108:15:56 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101110110:11:33 | 199.196.144.16 | Update_Collection |
| ustpress / | 101110110:11:40 | 199.196.144.16 | Do_Update_Collection |
| ustpress | 101110110:18:18 | 199.196.144.16 | Update_Collection |
| ustpress / | 101110110:18:23 | 199.196.144.16 | Do_Update_Collection |

You can interpret the logs as follows;  The first column is the CMS username entered.
The second column is the time/date stamp.   The first three numbers state the year,
2001.  The next two state the month (10 = october, 11 = november).    The next two
state the date. The next two state the hour (EST, 24 hour clock). then, minutes and
seconds.

The next column is the IP address of the web browser doing the push. So, for all
of these, the individual is coming from IP 199.166.144.16.

The final column indicates what was done.   For all of the entries, we show that ustpress pushed everything they could.

So, taking the first entry apart, we see:

ustpress        101103107:08:24          199.196.144.16  Update_Collection

user = ustpress
year = 2001
month = October
date = 31
hour = 7 am EST
minutes = 08
seconds = 24
IP = 199.196.144.16
action = update CMS collection


If you need any further information, please let me know.

Thanks,

Dave Harris
Web Hosting Support
WorldCom


Telephone 1-800-900-0241 (options 2, 6)
Email web-support@wcom.com


Notification has been sent to: daharris

11/2/2001 7:58:47 AM daharris
Status has been changed from: Pending to: Fixed

11/2/2001 7:58:56 AM daharris
Status has been changed from: Fixed to: Closed

Excerpt from  the

July 25, 2006 deposition of

David Harris

Exhibit Y

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS


- - - - - - - - - - - - - x

UNITED STATES SECURITIES      :

AND EXCHANGE COMMISSION,      :

      Plaintiff,      : C.A. 05-10983 (NMG)

vs.      :

STEVEN E. NOTHERN,      :

      Defendant.      :

- - - - - - - - - - - - - x



VIDEOTAPED DEPOSITION OF DAVID HARRIS



Reported by:


Linda C. Mead, CSR, CCR

Tampa, FL

Tuesday, July 25, 2006

Page 122

1      A    No.  All the times that were listed from
2    the servers would have been a server that would have
3    been independent of what the treasury department or
4    whatever desktop would have thought the time was.
5          MR. TOONE:  Give me just a moment, sir.
6          THE DEPONENT:  Sure.
7          MR. TOONE:  Thanks.
8          That's all I have at this time.  Thank
9    you.
10         THE DEPONENT:  Okay.
11              EXAMINATION
12    BY MR. ROSSETTI:
13     Q    Mr. Harris, I have a few questions for
14    you.
15     A    Okay.
16     Q    The server -- The servers -- Let me
17    withdraw that.
18         WorldCom was maintaining the servers that
19    the treasury department was using; is that correct?
20     A    That's correct.
21     Q    Do you know if WorldCom had any oversight,
22    was doing anything connected with the treasury
23    department's e-mail system?
24     A    No.
25     Q    Had you ever heard that anyone at WorldCom

Page 123

1    was working on the treasury department's e-mail
2    system?
3     A    No.
4     Q    Now, in response to questions that
5    Mr. Toone was asking you, you had indicated -- he
6    was asking you about issues of IP addresses and some
7    IP addresses are connected to the internet and some
8    IP addresses are not connected to the internet.  Is
9    that correct?
10     A    That's correct.
11     Q    Okay.  If IP addresses are connected to
12    the internet, does that necessarily mean that anyone
13    floating around the internet can get access to
14    what's on those IP addresses?
15         MR. TOONE:  Objection.
16         THE DEPONENT:  Theoretically it does, yes.
17    BY MR. ROSSETTI:
18     Q    Okay.  What do you mean theoretically it
19    does?
20     A    It -- A lot depends on how a server or
21    whatever those devices are that have IP addresses is
22    configured.
23     Q    All right.  So when you said that --
24    Mr. Toone had asked you when the file was FTP'd from
25    the desktop to the staging server, you said it was

Page 124

1    placed on the internet.
2     A    In essence that's correct.
3     Q    Okay.  Did you mean that anyone could see
4    it or did you just mean that it was then placed on
5    the internet?
6         MR. TOONE:  Objection.
7         THE DEPONENT:  It means that anyone could
8    have seen it if they would have known where to
9    look for it.
10    BY MR. ROSSETTI:
11     Q    Okay.  Meaning if they knew one of those
12    five IP addresses on the staging server?
13     A    That's correct.
14     Q    And again, randomly guessing those
15    would be roughly one -- there would be 8 billion
16    combinations of IP addresses?
17         MR. TOONE:  Objection.
18         THE DEPONENT:  Somewhere around there.
19    BY MR. ROSSETTI:
20     Q    Okay.  Now, when you and I discussed this
21    ticket previously, did you -- during that
22    conversation did I tell you to say anything?
23     A    No.
24     Q    Do you have any reason to believe that the
25    information contained in this ticket, entries that

Page 125

1    you put in there are not what you put in there when
2    you were working on this ticket in November of 2001?
3     A    No.  It looks like what I would have
4    written.
5     Q    Okay.  You were discussing the process
6    earlier about putting the date command in for both
7    the staging server and the production server.  When
8    you put that command in there, would it give you a
9    snapshot time or would it give you realtime, meaning
10    would the clock be ticking as you had it up?
11     A    It would have been a snapshot time.
12     Q    I see.  If you saw a different time on the
13    production server and the staging server being
14    minutes, would you have stated that -- if in fact
15    that's what you did, you put the date for the
16    staging and you put the date for the production
17    server and you got the times, if there had been a
18    discrepancy of minutes, would you have indicated
19    that that was accurate?
20     A    I might have.  I don't know.
21     Q    But again, you don't know what you did to
22    determine that both servers were accurate?
23     A    That's correct.  I don't know.
24         MR. ROSSETTI:  I don't have any further
25    questions.

Excerpt from the

May 1, 2008 deposition of

Jeffry Davis

Exhibit Z

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

--------------------------------X

SECURITIES AND EXCHANGE          :

COMMISSION,                      :

        Plaintiff,            :

      v.                       :  No. 05-10983 (NMG)

STEVEN E. NOTHERN,               :

       Defendant.            :

--------------------------------X

Washington, D.C.

Thursday, May 1, 2008

      Deposition of JEFFREY L. DAVIS, a witness

herein, called for examination by counsel for Defendant in

the above-entitled matter, pursuant to notice, the witness

being duly sworn by DENNIS A. DINKEL, a Notary Public in and

for the District of Columbia, taken at the offices of Foley

Hoag LLP, 1875 K Street, N.W., Washington, D.C. at

9:45 a.m., Thursday, May 1, 2008, and the proceedings being

taken down by Stenotype by DENNIS A. DINKEL, FAPR, CRR, and

transcribed under his direction.

Jeffrey L. Davis
Washington, DC
May 1, 2008

Page 58

1    BY MR. SHOPE:
2        Q.   And your basis for that is what?
3        A.   It's in their economic interests to keep
4    track of these sorts of things.
5        Q.   Do you know where they would have been
6    able to find that release?
7        A.   No, I don't.
8        Q.   So you don't know whether any news service
9    actually reported that particular release?
10       A.   I don't know. My -- I assume that they
11   did, but I don't know for sure.
12       Q.   Why do you assume that they did?
13       A.   Looks like a relevant piece of
14   information.
15       Q.   Relevant to whom?
16       A.   To the market; therefore, to the press
17   that covers this sort of thing.
18       Q.   Do you know whether market participants
19   would monitor the Treasury web site?
20       A.   No, I do not.
21       Q.   Would it -- would it be in their interests
22   to do so?

Page 59

1        A.   I don't know enough about the Treasury web
2    site to answer that question.
3        Q.   Okay. Well if the Treasury web site
4    contained all of the press releases, would it be in
5    the interests of market participants to monitor the
6    Treasury web site?
7        MS. WILLIAMS: Objection.
8        THE WITNESS: I said I don't know what's
9    on the Treasury web site.
10   BY MR. SHOPE:
11       Q.   I'm asking you to assume as a fact, which
12   what is experts can do, I'm asking you to assume as a
13   fact that the Treasury web site contains press
14   releases by the Treasury Department?
15       A.   And the question is?
16       Q.   Would you, therefore, assume that market
17   participants who trade heavily in bonds would review
18   the web site in order to be able to view press
19   releases of the type you just described?
20       MS. WILLIAMS: Objection.
21       THE WITNESS: I have no idea. They
22   probably have other sources for press releases as

Page 60

1    well. I don't know whether they would look at this
2    web site or not.
3    BY MR. SHOPE:
4        Q.   Okay. What about quarterly refunding
5    announcements themselves? Would market participants
6    have an interest -- economic interest in learning the
7    content of the quarterly refunding announcement?
8        MS. WILLIAMS: Objection.
9        THE WITNESS: Yes.
10   BY MR. SHOPE:
11       Q.   If the quarterly refunding announcement
12   were posted on the Treasury web site, would they,
13   therefore, have an incentive to go to the Treasury
14   web site?
15       MS. WILLIAMS: Objection.
16       THE WITNESS: I have no idea. I have no
17   idea whether they considered the Treasury web site a
18   resource of any use to them or whether it is just
19   superfluous. I have no way of knowing that.
20   BY MR. SHOPE:
21       Q.   So as far as you are aware, it is
22   something they may consider to be invaluable or is it

Page 61

1    something they may consider to be worthless?
2        MS. WILLIAMS: Objection.
3        THE WITNESS: As I said, I have no idea.
4    BY MR. SHOPE:
5        Q.   I believe in your report you used the term
6    market awareness. Did I remember that right?
7        MS. WILLIAMS: Objection.
8        THE WITNESS: I don't recall having used
9    that term.
10   BY MR. SHOPE:
11       Q.   Perhaps I'm paraphrasing. I believe in
12   paragraph 4 -- sorry, paragraph 5, in your summary of
13   opinion, you say based on the analysis described
14   below, it is my opinion that the market became aware
15   of the Treasury Department's decision to cease
16   offering the 30-year bond at 9:57 a.m. on October 31,
17   at the earliest.
18       What do you mean when you say the market
19   "became aware"?
20       A.   What I mean is that the information began
21   to be reflected in the price of the bond.
22       Q.   So it was not fully reflected in the price

16 (Pages 58 to 61)

Jeffrey L. Davis                                                              May 1, 2008
Washington, DC

| Page 62 | Page 64 |
|---|---|

**Page 62**

1  of the bond; is that fair?
2     A.  I don't believe the information was fully
3  reflected by 9:57. That's why I say 9:57 at the
4  earliest.
5     Q.  But that's when it -- that's when the
6  process of its becoming reflected began?
7     A.  That's when the -- yes. That's when the
8  process began. That's when the market reacted
9  significantly to the information, and that was
10  followed by a number of other significant positive
11  returns.
12     Q.  Okay. Now, is there a term other than
13  market awareness you would use for the concept that
14  you've just described?
15     A.  I think I just told you, it means that the
16  information was reflected, began to be reflected in
17  the end price.
18     Q.  Do you have a one or two-word phrase you
19  use to describe that?
20         MS. WILLIAMS: Objection.
21         THE WITNESS: I don't think so.
22  BY MR. SHOPE:

**Page 63**

1     Q.  Okay. Well, have you ever heard the
2  phrase "price impoundment"?
3     A.  Yes.
4     Q.  Is that the same thing as what you
5  described?
6     A.  I think it's -- I think it's roughly the
7  same thing, yes.
8     Q.  When you say it's roughly the same thing,
9  what is -- what is the distinction?
10     A.  Well, different people may use the term
11  impoundment different ways.
12     Q.  Okay.
13     A.  To me if the information is impounded in
14  the price or begins to be impounded in the price,
15  that's the same as reflected in or begins to be
16  reflected in the price.
17     Q.  Okay. But it could be different because
18  impounded could mean fully impounded which you are
19  saying is different from begins to be impounded; is
20  that right?
21         MS. WILLIAMS: Objection.
22         THE WITNESS: Yes.

**Page 64**

1  BY MR. SHOPE:
2     Q.  Okay. Now, so what is your preferred
3  terminology for what happened, what began to happen
4  at 9:57, just so I can use it in the deposition and
5  we can be precise?
6     A.  I would say the information began to be
7  reflected in the price of the 30-year bond.
8     Q.  Can you give me two words so we can have
9  sentences that are short enough for our court
10  reporter here?
11         MS. WILLIAMS: Objection.
12  BY MR. SHOPE:
13     Q.  Price reflection? Is that acceptable?
14         MS. WILLIAMS: Objection.
15         THE WITNESS: How are we going to use it?
16  BY MR. SHOPE:
17     Q.  I'm going to use it in a number of
18  questions about the concept?
19         MS. WILLIAMS: Objection.
20         MR. ROSSETTI: He meant how are you using
21  it now, John? Not --
22         MR. SHOPE: Okay.

**Page 65**

1  BY MR. SHOPE:
2     Q.  My question to you is, this concept that
3  at a particular point in time, the security price
4  begins to reflect information, is there any legal
5  term that describes that?
6         MS. WILLIAMS: Objection.
7         THE WITNESS: I don't know.
8  BY MR. SHOPE:
9     Q.  You've studied securities law, right?
10     A.  Long time ago, yes.
11     Q.  Have you kept current?
12     A.  Not really.
13     Q.  You don't read the cases from the Supreme
14  Court when they come down on securities cases?
15         MS. WILLIAMS: Objection.
16         THE WITNESS: Not typically. I read some
17  of them.
18  BY MR. SHOPE:
19     Q.  Okay.
20     A.  Certainly read Basic 11. It seems like
21  that's an old one, too.
22         MS. WILLIAMS: John, I want to take a

17 (Pages 62 to 65)

| Page 86 | Page 88 |
|---|---|
| 1  beginning to reflect knowledge of the information? | 1  actually going through the process of calculating the |
| 2      A.   Just because somebody trades on the | 2  standardized abnormal returns, it is, in a sense, |
| 3  information doesn't necessarily mean it's going to | 3  irrelevant what else was going on, since I'm simply |
| 4  impact price. | 4  focusing on what happened at each minute in time. |
| 5          If other people in the market are not | 5  Was that price change significant or not? |
| 6  aware of the information, they don't realize that | 6  BY MR. SHOPE: |
| 7  whatever is doing the trading is doing it based on | 7      Q.   Okay.  Let me ask you this -- |
| 8  some insider information; and the market typically is | 8      A.   I think it's important, however, that |
| 9  not going to respond unless the trading is | 9  the -- that the finding of a significant reaction, a |
| 10  significant enough. | 10  significant price change at 9:57 seems to coincide |
| 11      Q.   Okay.  So in other words, if there are | 11  with the Reuters announcement. |
| 12  people who have the information and believe it is | 12      Q.   Assuming that it actually happened at |
| 13  going to make the price go up and, therefore, begin | 13  9:52, right? |
| 14  buying in large quantity, you would expect that to | 14          MS. WILLIAMS:  Objection. |
| 15  start affecting the price. | 15          THE WITNESS:  Somewhere in that range, |
| 16          Would that be fair? | 16  9:52 to 9:57. |
| 17          MS. WILLIAMS:  Objection. | 17  BY MR. SHOPE: |
| 18          THE WITNESS:  I didn't address this in my | 18      Q.   Let's suppose the Reuters announcement |
| 19  report.  And I didn't look to see whether there were | 19  happened at 9:57, right on the nose. |
| 20  people trading large quantities or not. | 20          Would it still be relevant to your |
| 21          But I would think it would take a very | 21  finding? |
| 22  large quantity to move this market. | 22      A.   Since the way that I constructed my |

| Page 87 | Page 89 |
|---|---|
| 1  BY MR. SHOPE: | 1  prices, my price changes, my standardized abnormal |
| 2      Q.   Do you have any idea how much it would | 2  returns, the 9:57 minute as I explain in my report is |
| 3  take? | 3  9:560001 to 9:5659999, if the announcement came out |
| 4      A.   No, I don't. | 4  after that point in time, then at least with respect |
| 5      Q.   I want to talk about how it was that you | 5  to the spot market, that would suggest that I found a |
| 6  came at the 9:57 number or the 9:57 time period. | 6  significant reaction before the announcement came |
| 7          Is it your testimony that -- just so I'm | 7  out. |
| 8  absolutely clear -- that the timing of the Reuters | 8      Q.   Okay.  So if, in fact, the Reuters |
| 9  article is really irrelevant to that analysis, right? | 9  announcement was at 9:57, because your analysis is |
| 10          MS. WILLIAMS:  Objection. | 10  actually in common terms finding a commencement of |
| 11          THE WITNESS:  No, I don't think so. | 11  the process somewhere around 9:56 and some seconds, |
| 12  BY MR. SHOPE: | 12  then that would suggest that it wasn't the Reuters' |
| 13      Q.   Why not? | 13  announcement that had actually caused the market to |
| 14      A.   As I mentioned, I'm focusing on two | 14  move up? |
| 15  events, the posting on the web site and the Reuters | 15      A.   It would do that; but nevertheless -- |
| 16  announcement, to see how the market reacted to those. | 16      Q.   I'm sorry.  It would do that or you would |
| 17  So I think -- | 17  agree? |
| 18      Q.   But if I'm -- | 18          MS. WILLIAMS:  He wasn't finished with his |
| 19      A.   But -- | 19  response. |
| 20          MS. WILLIAMS:  Wait.  Are you finished? | 20          THE WITNESS:  Repeat the question. |
| 21          MR. SHOPE:  Sure. | 21  BY MR. SHOPE: |
| 22          THE WITNESS:  My analysis in terms of | 22      Q.   I apologize.  I want to make absolutely |

Jeffrey L. Davis

May 1, 2008

Washington, DC

---

Page 98

1      MS. WILLIAMS: Objection.

2      THE WITNESS: I believe what I said or

3  what I should have said was that I don't think it

4  began before 9:57.

5  BY MR. SHOPE:

6      Q.   So sitting here today, it's possible -- or

7  your opinion is maybe it began at 9:57; maybe it

8  began at 9:58, maybe it began at 9:59; maybe it began

9  at 10:00. The only thing I can tell you is that it

10  didn't begin before 9:57; is that a fair summary?

11      MS. WILLIAMS: Objection.

12      THE WITNESS: A fair summary would be that

13  it didn't begin before 9:57 and based on the evidence

14  I have seen it looks like it probably began at 9:57.

15  BY MR. SHOPE:

16      Q.   Okay. But so is it possible that it began

17  before 9:57 but you just think that's not probable?

18      MS. WILLIAMS: Objection.

19      THE WITNESS: No. No. I don't think it's

20  possible.

21  BY MR. SHOPE:

22      Q.   Okay. So -- but it's possible that it

---

Page 99

1  didn't begin until 10:00, but you think it's probable

2  that it began at 9:57?

3      MS. WILLIAMS: Objection. I'm sorry.

4      THE WITNESS: I'm sorry.

5  BY MR. SHOPE:

6      Q.   Is that a fair summary of your opinion?

7      A.   If it didn't begin at 9:57, it began very

8  shortly after that.

9      Q.   Okay.

10      A.   Certainly did not begin before 9:57.

11      Q.   So -- so as far as you're concerned, it is

12  impossible that it began before 9:57?

13      MS. WILLIAMS: Objection.

14      THE WITNESS: Well, I wouldn't say that

15  anything is impossible.

16      I would say based on my analysis, my

17  conclusion is that it did not begin before 9:57.

18  BY MR. SHOPE:

19      Q.   Let's talk about that. What's the degree

20  of confidence that you have in that?

21      When you say anything is possible, I mean

22  you're not saying it is possible that there are

---

Page 100

1  elephants that will fly out of that laptop, right?

2      MS. WILLIAMS: Objection.

3      THE WITNESS: I've never seen that happen.

4  BY MR. SHOPE:

5      Q.   Okay. So I want to talk about what your

6  degree of confidence is in the 9:57. Are you saying

7  that that's 90 percent probable, 70 percent probable,

8  50 percent? 51 percent probable?

9      MS. WILLIAMS: Objection.

10      THE WITNESS: What I can tell you is that

11  the price reaction of 9:57, I have 95 percent

12  confidence that that reaction was unusual,

13  statistically significant; and that there weren't any

14  reactions prior to 9:57 in the bond market that were

15  significant.

16  BY MR. SHOPE:

17      Q.   And you define significance as how?

18      A.   That the deviation from the mean in this

19  particular case was greater than two standard

20  deviations.

21      Q.   Okay. Now, you mentioned that the -- in

22  your report that the standard deviation number you

---

Page 101

1  used was two; is that correct?

2      A.   The number of standard deviations, yes.

3      Q.   Okay. What number did you use for the

4  standard deviation itself?

5      A.   What was the value of the standard

6  deviation?

7      Q.   Yes.

8      A.   I don't know if that's in my -- I think it

9  is in my report. Yes.

10      Sorry. I'm trying to find it so that I

11  can give you --

12      Q.   What about footnote 12 on page 10.

13      A.   Footnote 12?

14      Q.   I'm sorry. No. I'm sorry. I'm wrong.

15  My notes are --

16      MR. ROSSETTI: Paragraph 21.

17      THE WITNESS: Paragraph 21. I give an

18  example. Say the standard deviation is .152 percent.

19  BY MR. SHOPE:

20      Q.   And did you go back and consult any

21  statistics textbooks before preparing your report?

22      A.   No.

---

Alderson Reporting Company
1-800-FOR-DEPO

Jeffrey L. Davis                                                    May 1, 2008
Washington, DC

Page 122

1  October.
2  BY MR. SHOPE:
3      Q.   I understand.
4      A.   And I think I point out in my report I
5  looked at some of the other refunding days in 2001
6  and found that there were fairly large movements on
7  those days before the announcement as well.
8      Q.   Now, did you -- you looked at three other
9  refunding days, right?
10     A.   Yes.
11     Q.   Did you consider that three was a
12 statistically meaningful data set?
13     A.   No. I didn't think that at all. I
14 thought it was simply a small sample to take a look
15 at and see how they compare.
16     Q.   It doesn't really tell you anything
17 scientific to look at three days, right?
18          MS. WILLIAMS: Objection.
19          THE WITNESS: No, but it does tell you on
20 at least one of the immediately preceding three
21 funding days there were refunding price changes early
22 on.

Page 123

1          MR. SHOPE: Could you read back his answer
2  to me?
3          THE REPORTER: "Answer: No, but it does
4  tell you on at least one of the immediately preceding
5  three funding days there were refunding price changes
6  early on."
7          MR. ROSSETTI: John, when you find a
8  convenient time to take a break, if we could?
9          MR. SHOPE: Off the record.
10         (Discussion off the record.)
11 BY MR. SHOPE:
12     Q.   So I want to get back to the choice of
13 October 31 as the benchmark, or as the -- I'm sorry.
14 The average one-minute return of October 31 as the
15 benchmark.
16          Was there anything in the literature that
17 told you you should pick just that day as the
18 benchmark?
19     A.   No. I don't think there was anything of
20 particular guidance in the literature. As I said I
21 chose that day because I thought it was more
22 conservative in the sense that the return that is

Page 124

1  observed at 9:57 would be even -- would be far more
2  significant than it is with this benchmark.
3      Q.   But if there were smaller price spikes
4  before 9:57 your choice of that benchmark had the
5  effect of making them seem less significant, correct?
6          MS. WILLIAMS: Objection.
7          THE WITNESS: Yes. But I explained -- I
8  point out in my report -- maybe I should look for
9  it --
10         Footnote 11 on page 9. I'm not trying to
11 hide anything. I point out it should be noted the
12 standard deviation returns on October 31 was nearly
13 10 times larger than the standard deviation the
14 previous day and more than twice larger the --
15         MS. WILLIAMS: You have to speak up and
16 slow down.
17         THE WITNESS: I'm forgetting I'm reading
18 for a reporter here.
19         It should be noted that the standard
20 deviation on October 31, 2001 was nearly 10 times
21 larger than the standard deviation of the previous
22 day and more than twice as large as any other day

Page 125

1  during October 2001. And the average return was also
2  much larger than any other day in 2001.
3          Thus, abnormal for return -- found to be
4  significantly positive using the standard deviation
5  average return for October 31 would also be
6  significant if we used the standard deviation average
7  return from the prior day or any other day in October
8  2001.
9          So I'm pointing out what the effect of
10 using the average return and the standard deviation
11 October 31 would be.
12 BY MR. SHOPE:
13     Q.   Did you run any computations about how
14 many abnormal returns there would have been before
15 9:57 had you used a different benchmark?
16     A.   No, I didn't.
17     Q.   Was there any reason why you didn't other
18 than the reasons you've already given us? The
19 reasons you already have given us for selecting
20 October 31?
21     A.   Are there any other reasons why I selected
22 October 31.

Alderson Reporting Company
1-800-FOR-DEPO

Page 150

1    Q.   That's on the Chicago Board of Trade?
2    A.   Yes.
3    Q.   And this shows an abnormal return just
4  about 10:15, an abnormal one-minute return that's
5  greater than the one that's shown here at 9:59,
6  correct?
7    A.   Yes.
8    Q.   But the fact that there's a bigger one at
9  10:15 does not disprove your opinion that there was
10  market action on the information at 9:59, correct?
11       MS. WILLIAMS:  Objection.
12       THE WITNESS:  That there was what?
13  BY MR. SHOPE:
14    Q.   Market action on the information?
15    A.   What do you mean by market action?
16    Q.   Price action.  Are you familiar with the
17  term price action?
18    A.   No.
19    Q.   Okay.  We'll go back then.  Would you say
20  that Exhibit 13 confirms your opinion that there was
21  reflection of the decision to discontinue the bond in
22  the vicinity of 9:57?

Page 151

1        MS. WILLIAMS:  Objection.
2        THE WITNESS:  Yes.  It shows that there
3  was a significant price increase at 9:59.
4  BY MR. SHOPE:
5    Q.   Yes.
6    A.   If that's what you are meaning, yes.
7    Q.   Yes.  That conclusion is in no way
8  diminished by the fact that there's an even bigger
9  spike at about 10:15; is that true?
10       MS. WILLIAMS:  Objection.
11       THE WITNESS:  That's correct.  In fact, I
12  would suggest that the series of significant spikes
13  following the 9:59 probably strengthen that
14  conclusion.
15  BY MR. SHOPE:
16    Q.   Okay.  So likewise, the fact that there is
17  a spike at 9:59 that is bigger than the one at 9:37
18  does not disprove the possibility that the
19  information was being reflected at 9:37, true?
20       MS. WILLIAMS:  Objection.
21       THE WITNESS:  The information was being
22  reflected -- what information are we talking about?

Page 152

1  BY MR. SHOPE:
2    Q.   The information we've been talking about
3  all day, the discontinuance of the 30-year bond.
4    A.   But --
5        MS. WILLIAMS:  Objection.
6        THE WITNESS:  -- I mean there has to be --
7  what you were saying before was that there was
8  information being disseminated or spread on the
9  Chicago Board of Trade.
10  BY MR. SHOPE:
11    Q.   Yes.  If you assume that that were true.
12    A.   In general terms, the mere finding of a
13  larger significant return subsequent to a significant
14  return does not mean that that doesn't reflect --
15  that that isn't the market reflecting information;
16  but I think you have to look at the broader pattern
17  as well.
18       You have to look at -- there's a whole
19  series of significant returns that start at 9:59.
20  Some of those are even larger than the 9:59 return.
21    Q.   Sure.
22    A.   Also, we have information I found looking

Page 153

1  at the spreads in the bond market which show a
2  significant widening of the spread at approximately
3  10:03 which is another indication that the market --
4  that the information is being reflected in the price
5  of the bond.
6    Q.   If we turn the page to Exhibit 14 to your
7  exhibit -- to your report, so Exhibit 14 to Exhibit
8  1, this also shows spikes at around 9:26 and around
9  9:36, right?
10       MS. WILLIAMS:  Objection.
11       THE WITNESS:  Around, yes.  Looks like
12  9:27, 9:37, roughly.
13  BY MR. SHOPE:
14    Q.   But in other words -- well, but when you
15  say -- when you say around, those are meaningful --
16  the proximity of the spikes on the two charts is
17  meaningful, right?
18       MS. WILLIAMS:  Objection.
19       THE WITNESS:  The proximity of the spikes
20  is meaningful; is that the way you put it?
21  BY MR. SHOPE:
22    Q.   Let's put it this way:  They both have a

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

SECURITIES AND EXCHANGE COMMISSION,

                         Plaintiff

               v.

STEVEN E. NOTHERN

                      Defendant.

:
:
:   Civil Action No.
:   05-10983 (NMG)
:
:
:
:
:
:
:

---

**EXPERT REPORT OF JEFFRY L. DAVIS**

## I. INTRODUCTION

1. My name is Jeffry L. Davis, and I submit this report on behalf of the Securities and Exchange Commission ("SEC"), the plaintiff in this matter. I have been retained by the SEC to analyze the trading prices of the then-most recently issued 30-year Treasury bond on October 31, 2001. Based on my analysis, I have been asked to offer my opinion as to when the market became aware that the U.S. Treasury would cease issuing 30-year bonds. Economists Incorporated is being compensated at the rate of $400-450 per hour for the time I spend on this matter.

2. I am a senior vice president of Economists Incorporated in Washington, D.C. I hold an M.A. degree in economics from the University of California at Los Angeles, a B.A. degree in economics from the University of California at Riverside, and a J.D. degree from George Washington University in Washington, D.C. Immediately prior to joining Economists Incorporated in September 1995, I was employed by the SEC, where I worked for 23 years, serving as Director of Economic and Policy Analysis for the final 13 years. Attached as



Exhibit 1 is my curriculum vitæ, which describes my background and qualifications and lists my publications.

3.  Within the last five years I have testified as an expert witness in the following matters:

I testified in deposition on behalf of plaintiff on the lost value of executive stock options resulting from the alleged breach of an employment contract. *Kevin T. Keleghan v. Sears, Roebuck and Co. and Alan J. Lacy,* Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois, No. 02 L 938.

I testified in deposition on behalf of the plaintiff on the effect on a company's stock price of promotional efforts carried out by the defendants. *Securities and Exchange Commission v. Spear & Jackson, Inc., et al.,* U.S. District Court for the Southern District of Florida, Case No. 04-CIV-80354.

I testified in deposition and at trial on behalf of the plaintiff with regard to the reasons given by the defendant in an insider trading case for purchasing a particular stock. *Securities and Exchange Commission v. Mark Michel,* U.S. District Court for the Northern District of Illinois, Eastern Division, Case No. 06-C-3166.

4.  The documents and materials I have reviewed in preparing this report are listed in the attached Exhibit 2. I obtained Treasury bond price information from BrokerTec[1] and price

---

[1] BrokerTec is an electronic trading network founded by a consortium of major dealers in Treasury securities in 1999. It began operations in 2000 and was acquired by ICAP PLC, a London-based inter-dealer broker in April 2003. BrokerTec and Cantor Fitzgerald's eSpeed electronic trading platform dominate trading in on-the-run Treasury issues. See Mizrach, Bruce and Christopher J. Neely, "The Transition to Electronic Trading in the Secondary Treasury Market," Working Paper 2006-012A, Federal Reserve Bank of St. Louis *Working Paper Series* (March 2006), available at http://research.stlouisfed.org/wp/2006/2006-012.pdf. Cantor Fitzgerald's operations were severely impacted by the terrorist attack on New York City in September 2001, and, as a result, price information from eSpeed for October 2001 is not available. The data provided by BrokerTec covered September-December 2001, January 2001, May 2001, and August 2001.

information on Treasury bond futures and futures options from the Commodity Futures Trading Commission (CFTC). For the purposes of my analysis, I have assumed that (1) at approximately 9:43 a.m. on October 31, 2001, an announcement of the suspension of issuance of the 30-year bond was inadvertently posted on the Treasury Department's website and (2) sometime between 9:52 a.m. and 9:57 a.m. on October 31, 2001, Reuters news service reported that the Treasury Department had decided to discontinue issuance of the 30-year bond. Unless otherwise indicated, all of the times referenced in this report are Eastern Standard Time (EST).

## II. SUMMARY OF OPINIONS

5.  Based on the analysis described below, it is my opinion that the market became aware of the Treasury Department's decision to cease offering the 30-year bond at 9:57 a.m. on October 31, 2001, at the earliest.[2] This opinion is supported by the patterns of transaction prices and bid-ask quotations for the 30-year bond and the patterns of transactions prices for futures and options on the 30-year bond. At 9:57 a.m. the price of the 30-year bond rose 0.365% from the previous minute. This return (or price increase) was the largest return of the day to that point and the sixth largest of the entire day. It was nearly twice as large as the largest return preceding it. The return at 9:57 a.m. was clearly statistically significant, in the sense that it was more than two standard deviations greater than the average return for the day. The behavior of the bid and ask quotations was quite similar. At 9:58 a.m. the midpoint of the bid and ask quotations increased 0.593%. This return was by far the largest of the day to that

---

[2] As explained more fully in footnote 9 below, I use minute-by-minute data throughout this report. When I refer to a price at a particular minute, what is meant is the last price of that particular minute segment. For example, when I refer to the price at 9:57 a.m., what is meant is the last price recorded between 9:56:00:000 and 9:56:59:999 a.m. (The times are expressed in thousandths of a second because that is the way they are recorded in the BrokerTec data.) Because of this timing convention, when I say, as above, that the market became aware of the news of the bond discontinuance at 9:57 a.m., at the earliest, what is meant is that it became aware of the news in the minute segment beginning at 9:56:00:000 a.m. and ending at 9:56:59:999, at the earliest.

point, and it was statistically significant. Furthermore, it was not until after 9:57 a.m. (at

10:03 a.m.) that the bid-ask spread of the 30-year bond displayed the widening typically

occurring at the time a market becomes aware of significant new information. The patterns of

transactions for the CBOT futures and options on the 30-year bond were also similar. There

were significantly positive abnormal returns in both the December 2001 and the March 2002

futures contracts at 9:59 a.m. As for the options, six of the eight options examined exhibited

significant abnormal returns at or shortly after 9:59 a.m., and the other two recorded their first

significant abnormal returns of the day at 10:10 a.m. and 10:18a.m.

6.   Sometime between 9:52 a.m. and 9:57 a.m., Reuters news service reported the news that the

Treasury Department had decided to discontinue issuance of the 30-year bond.[3] Such a report

by a major news service, if not already known to the market, would have put the market on

notice of the discontinuance, and would likely have produced a significant price reaction,

such as the price reaction that actually occurred at 9:57 a.m. If the market had already been

aware of the news of the bond discontinuance prior to the Reuters report, then it is my

opinion that the market would not have reacted so strongly at 9:57 a.m.

## III. ANALYSIS AND FINDINGS

### A. Background

7.   According to the complaint, the defendant received information prior to its release to the

public from an attendee at the U.S. Treasury Department's quarterly refunding conference

that the Treasury had decided to suspend the issuance of 30-year bonds. With that

information in hand, the defendant, a portfolio manager with Massachusetts Financial

Services Company ("MFS"), purchased 30-year bonds and passed the information on to three

---

[3] It is my understanding that Reuters reported the news between 9:52 a.m. and 9:57 a.m. but that
the exact time is not known.

4

other MFS portfolio managers, who also purchased 30-year bonds before the information was released to the public.

8. The information regarding the suspension of issuance of the 30-year bond was scheduled to be released to the public at 10:00 a.m. The attendee at the refunding conference made a call to the defendant at 9:38 a.m. and left him a voice-mail message containing the information regarding the suspension. The defendant retrieved the message promptly and passed it along immediately. The defendant promptly purchased $25 million of 30-year bonds, and the other three managers promptly purchased an aggregate of $40 million of the bonds. All of these purchases were completed prior to 9:43 a.m., according to the complaint.

9. At approximately 9:43 a.m., the announcement of the suspension of the 30-year bond was inadvertently posted on the Treasury Department's website. About eight minutes later, the defendant purchased an additional $14.25 million of 30-year bonds. Sometime between 9:52 a.m. and 9:57 a.m., Reuters news service reported on its newswire: "US TREASURY SAYS DISCONTINUING SALES OF REGULAR, INDEXED 30-YEAR BONDS."

**B. Studies of the Reaction of Treasury Security Prices to Surprise Announcements**

10. There have been a number of studies of the reaction of Treasury securities prices to the release of government macroeconomic and monetary policy announcements.[4] These studies

---

[4] See, for example, Ederington, Louis H. and Jae Ha Lee. 1993, "How Markets Process Information: News Releases and Volatility," *Journal of Finance*, Vol. 48, No. 4 (1993), pp. 1161-1191; Fleming, Michael J. and Eli M. Remolona, "What Moves the Bond Market?" *FRBNY Economic Policy Review* (December 1997), pp. 31-50; Fleming, Michael J. and Eli M. Remolona, "Price Formation and Liquidity in the U.S. Treasury Market: The Response to Public Information," *Journal of Finance*, Vol. 54, No. 5 (Oct., 1999), pp. 1901-1915; Balduzzi, Pierluigi, Edwin J. Elton, and T. Clifton Green, "Economic News and Bond Prices: Evidence from the U.S. Treasury Market," Journal of Financial and Quantitative Analysis, Vol. 36, No. 4 (December 2001), pp. 523-543; Goldberg, Linda and Deborah Leonard, "What Moves Sovereign Bond Markets? The Effects of Economic News on U.S. and German Yields," *FRBNY Current Issues in Economics and Finance*, Vol. 9, No. 9 (September 2003), pp. 1-7; Fleming, Michael J. and Eli M. Remolona, "The Term Structure of Announcement Effects," FRBNY Staff Report, Number 76 (January 2001).

have found significant price reactions to such announcements when the information deviates from what was expected, that is, when the information comes as a surprise to the market.

11. Those studies that use intra-day prices of Treasury securities in their analyses have found that the price reactions swiftly follow the announcements and the adjustment process generally takes no more than one or two minutes.[5] They also find that bid-ask spreads widen at the time of the announcements and remain wider than normal for up to 15 minutes thereafter.[6]

12. It should be noted that the studies discussed above deal with price reactions to news about regularly scheduled releases of information regarding particular measures of economic activity. In this matter, the information was released to the public prior to its scheduled time. Thus, the timing of the release to the public was a surprise, as was the content of the release.

### C. Analysis of the Price Reaction to the October 31, 2001 Announcement

13. On October 31, 2001, the price of the 30-year bond rose dramatically, and, correspondingly its yield dropped dramatically. As computed by the Federal Reserve, the yield on the constant maturity 30-year bond fell to 4.89% from 5.22% the day before. This was a decline of 6.3%, the largest change in the yield of this bond since October 20, 1987, the day after the equity markets crashed and investors flocked to the safety of Treasury securities.[7] The contrast between the price behavior of the most recently issued ("on-the-run") 30-year bond on October 31 and the behavior in the preceding days is depicted in Exhibit 3, which shows the daily maximum and minimum transaction prices for each day of October 2001. The difference between the maximum and the minimum prices on October 31 is more than 6

---

[5] Fleming, Michael J. and Eli M. Remolona, "The Term Structure of Announcement Effects," FRBNY Staff Report, Number 76 (January 2001), p. 1.

[6] See, for example, Balduzzi et al., op cit.

[7] The yields on shorter maturity bonds also fell but not nearly as sharply as did the 30-year maturity bond. Source: Federal Reserve Statistical Release H.15, http://federalreserve.gov/releases/h15/update/.

points, while the difference never exceeded 1.75 points on any of the other days in October 2001.

**1. Analysis of Transaction Prices**

14. The course followed by the transaction prices of the on-the-run 30-year bond on October 31, 2001, is shown in Exhibit 4. From the exhibit it can be seen that the price of the bond moved generally upward from 102.156 at 8:00 a.m. to 102.844 at 9:56 a.m. but then rose much more rapidly to an initial peak of 107.188 at 10:20 a.m.[8] The price dropped back to 105.688 at 10:38 a.m. and then rose again to its high for the day of 108.609 at 1:03 p.m. After that the price dropped briefly to 106.25 at 1:09 p.m., recovered to 107.688 at 1:22 p.m., and then remained relatively stable the rest of the day. At 4:30 p.m. the price stood at 107.641.

15. As noted above, the official announcement of Treasury's decision to discontinue issuance of the 30-year bond was not scheduled to be made public until 10:00 a.m., but the information was inadvertently posted on Treasury's website at approximately 9:43 a.m. and the decision was reported on Reuters' news service sometime between 9:52 a.m. and 9:57 a.m. The fact that Treasury inadvertently posted the announcement on its website at 9:43 a.m. does not resolve the issue as to when the market became aware of the news, nor does the fact that Reuters' wire service reported the announcement sometime between 9:52 a.m. and 9:57 a.m. resolve the issue. In order to determine when the market became aware of the information, it is necessary to look to the pattern of trading prices for indications as to when the information became impounded in the price of the bond.

---

[8] In order to examine whether the price change between 8:00 a.m. and 9:56 a.m. was unusual, I calculated the percentage price change between 8:00 a.m. and 9:56 a.m. on the three immediately preceding Treasury refunding announcement dates (January 31, 2001; May 2, 2001; and August 1, 2001). I found that the percentage price change on all three of those dates was positive and that the percentage price change on one of those dates (January 31, 2001) exceeded the percentage price change during the same time span on October 31, 2001.

16. As noted above, Reuters news service reported sometime between 9:52 a.m. and 9:57 a.m. that the Treasury had decided to discontinue issuing the 30-year bond. If the market had become aware of the news of the bond discontinuance prior to the Reuters report, either through the posting on Treasury's website or otherwise, then a significant price reaction at about 9:57 a.m. would not be expected because the information would have already been impounded in the price of the bond.

17. Exhibit 5 depicts the price pattern over the time interval of greatest interest. From the exhibit it is clear that the price changes from just before 10:00 a.m. are much greater than the price changes preceding them. The increase in the price from 8:30 a.m. to 9:56 a.m. is just 0.47%, while the increase from 9:56 a.m. to 10:20 a.m. is 4.22%, that is, nine times the increase from 8:30 a.m. to 9:56 a.m.[9] Even the one-minute increase from 9:56 a.m. to 9:57 a.m. (0.36%) is nearly as great as the increase from 8:30 a.m. to 9:56 a.m. These simple observations suggest that the market became aware of some important news at about 9:57 a.m. and that news caused the price of the 30-year bond to shoot upward. As explained below, a statistical analysis confirms this impression.

18. In order to determine whether the particularly sharp price increase beginning at 9:57 a.m. does in fact indicate that the market became aware of the news of the discontinuance of the 30-year bond at that time, as opposed to some earlier time, I performed a statistical analysis of the significance of the price movements.[10] Such an analysis provides a means of

_____

[9] The price of the 30-year bond declined from 8:00 a.m. to 8:30 a.m. on October 31, 2001, and the price at 8:00 a.m. on October 31, 2001(102.5) was the same as the price at 5:00 p.m. on October 30, 2001, which was down from 102.625 thirty minutes earlier (4:30 p.m.). The change in the price from 8:30 a.m. to 5:00 p.m. on October 30, 2001 was 0.73% (from 101.75 to 102.5). On October 29, 2001, the price of the bond was 101.797 at 8:30 a.m. and fell to 101.656 at 5:00 p.m.

[10] It should be noted that all of the prices referenced in this report are minute-by-minute last sale prices. In order to construct these prices from the raw data provided by BrokerTec, I identified the last trade of each minute of the period from 8:30 a.m. to 5:00 p.m. For example, if there were three trades between 8:30:00 a.m. and 8:30:59 (say, at 8:30:04, 8:30:21 and 8:30:55), the price at the time of the last of the three (that is, at 8:30:55) would be recorded as the price for 8:31 a.m. If there was no trade in a minute segment, the last trade from the previous minute segment was

identifying which price movements are sufficiently large as to be outside the typical range and are, therefore, considered to be statistically significant. In order to carry out such an analysis, I first computed minute-by-minute percent returns (that is, the change in the price from one minute to the next expressed as a percent of the earlier price) based on the transaction prices. For example, the price at 9:56 a.m. was 102.844, and it rose to 103.219 at 9:57 a.m. The return at 9:57 a.m. is calculated by subtracting 102.844 from 103.219 and dividing the result by 102.844. This return is 0.365%. The minute-by-minute returns are shown in Exhibit 6.

19. From Exhibit 6 it can be seen that the return at 9:57 a.m. was considerably larger than any return preceding it on October 31, 2001. It can also be seen that there were three even larger returns in the 25 minutes following 9:57 a.m.

20. The statistical analysis I performed requires measuring the amount by which a return differs from the average return and scaling that difference against a reasonable benchmark. The amount by which a return differs from the average return is referred to as an "abnormal return." It should be noted that the term "abnormal return" is a conventional term used in statistical analysis of returns. The term simply refers to the difference between a return and the average or predicted return and does not suggest that a given return is unusual in magnitude. Only a statistically significant abnormal return is deemed to be unusual in magnitude. A standard benchmark for determining whether a return is statistically significant is the standard deviation of the returns. I used the average return and the standard deviation of returns for October 31, 2001. [11]

---

carried forward. With respect to quotations, it was necessary to identify first the set of best quotations (highest bid and lowest ask) and then create the minute-by-minute best-bid and best-ask quotations using the same procedure as for the transaction prices.

[11] Both the average return and the standard deviation were computed over the period from 8:30 a.m. to 4:30 p.m. It should be noted that the standard deviation of returns on October 31, 2001, was nearly ten times larger than the standard deviation of the previous day and more than twice as large as any other day during October 2001, and the average return for October 31, 2001, was also much larger than any other day in October 2001. Thus, an abnormal return found to be

21. The standard deviation is computed as the square root of the average of the squared differences between the actual returns and the average return. The standard deviation can be thought of as a weighted average deviation from the average return, with the larger deviations given greater weights in computing the average deviation. Dividing the standard deviation into the abnormal return produces a standardized abnormal return. For example, the abnormal return for 9:57 a.m. is computed by subtracting the return for 9:57 a.m. (which is 0.365%, as explained above) from the average return for the day (which is 0.011%). This results in an abnormal return of 0.354% (0.365% - 0.011% = 0.354%). To compute the standardized abnormal, we simply divide the abnormal return (0.354%) by the standard deviation of returns (which is 0.152%). The resulting standardized abnormal return is 2.33 standard deviations (0.354% / 0.152%).

22. A standardized abnormal return of two standard deviations or greater is generally deemed to be statistically significant.[12] The standardized abnormal returns on October 31, 2001, are depicted in Exhibit 7. As can be seen in Exhibit 7, the standardized abnormal return at 9:57 a.m. was the first significant standardized abnormal return of the day.

23. In a normal distribution, 95% of all observations will fall within two standard deviations of the mean. Those observations that fall outside two standard deviations, therefore, are unusual and are generally considered to be significantly different from the mean. In this particular data set, however, a very large number of the returns are zero. Furthermore, the standard deviation is quite large relative to the typical abnormal return because of the existence of some very large returns. For these reasons, only 2.2% of the observations fall outside two

---

significantly positive using the standard deviation and average return for October 31, 2001, would also be significant if we used the standard deviation and average return from the prior day or any other day in October 2001.

[12] Technically, a standardized abnormal return of two standard deviations or greater is statistically significant at the 5% level of significance. This means that in repeated random sampling from the same population, one would expect to find a standardized abnormal return of two or more standard deviations only 5% of the time. Therefore, there is only a 5% chance of such a large abnormal return being found in random sampling.

standard deviations. This means that the abnormal return at 9:57 a.m. is among the 2.2% largest returns (in absolute value) of the day. In fact, it is the eighth largest return of the day in absolute value and the sixth largest positive return of the day. All of the seven returns that exceed it occurred after 9:57 a.m., and four of those occurred between 9:57 a.m. and 10:20 a.m.

24. It should be noted specifically that there were no significant abnormal returns close in time to 9:43 a.m.[13], the approximate time of the posting on the Treasury website of the news of the bond discontinuance. In fact, as noted above, the first significant abnormal return of the day was at 9:57 a.m. The lack of a significant abnormal return close in time to 9:43 a.m. strongly indicates that the posting on the website did not make the market aware of the news of the bond discontinuance.

25. In summary, the large and statistically significant abnormal return at 9:57 a.m. strongly indicates that the market did not become aware of the news of the bond discontinuance prior to 9:57 a.m. on October 31, 2001.

## 2. Analysis of Bid and Ask Quotations

26. A bid quotation is the price a dealer has indicated he is willing to pay to purchase a security, and an ask quotation is the price a dealer has indicated he is willing to accept to sell a security. In the market for Treasury bonds there are numerous dealers offering quotations. At any given time, the best bid quotation is the highest bid quotation among all the dealers, and the best ask quotation is the lowest ask quotation among the dealers.[14]

27. As I did with transaction prices, I analyzed the minute-by-minute best bid and best ask quotations for the on-the-run 30-year bond on October 31, 2001. Exhibit 8 shows the midpoints of the best bid and the best ask quotations on a minute-by-minute basis on October

---

[13] As noted above, there were no significant abnormal returns at all before 9:57 a.m.

[14] It should be noted that a quotation may also represent a customer order to buy or to sell.

31, 2001. The pattern is very similar to that shown in Exhibit 4. The midpoint price rose gradually upward from 8:00 a.m. to about 9:57 a.m. and then rose sharply to an initial peak at around 10:20 a.m. The price dropped back somewhat just before 10:30 a.m. and then rose again to its high for the day just after 1:00 p.m. The price dropped briefly thereafter, recovered, and then remained relatively stable the rest of the day.

28. Exhibit 9 shows the midpoint bid-ask prices for the 30-year bond from 8:30 a.m. to 10:30 a.m. The prices exhibit a gradual, uneven rise from 8:30 a.m. to about 9:57 a.m. The price rise thereafter appears to be much steeper. This pattern differs from the pattern for transaction prices in that the steep price increase begins one minute later, that is, at 9:58 a.m. rather than at 9:57 a.m. Also, there is a noticeable price decline at 10:03 a.m. that did not occur with transaction prices. In general, however, the pattern is very much the same as with transaction prices.

29. As I did with transaction prices, I computed minute-by-minute percent returns (that is, the change in the price from one minute to the next expressed as a percent of the earlier price) based on the bid-ask midpoint prices. These returns are shown in Exhibit 10.

30. I performed the same statistical analysis on the bid-ask midpoint returns as reported above for transaction prices. The abnormal returns were calculated, and each abnormal return was divided by the standard deviation of the returns for the day. For example, the return for 9:58 a.m. was 0.593%, and the average return for the day was 0.011%. The abnormal return, therefore, was 0.582% (that is, 0.593% - 0.011%). The standardized abnormal return is computed by dividing 0.582% by the standard deviation of returns (which was 0.11%), resulting in 5.28 standard deviations. All of the standardized abnormal returns are depicted in Exhibit 11.

31. As can be seen in Exhibit 11, the abnormal return at 9:58 a.m. was by far the largest of the day to that point. It was clearly statistically significant, since it measured 5.28 standard

deviations, and it was the first statistically significant abnormal return of the day. Four additional significant positive returns occurred over the next 25 minutes.

32. The abnormal return at 9:58 a.m. is the third largest positive return of the day, and the two returns that exceed it occurred shortly thereafter (at 10:07 a.m. and 10:19 a.m.).

33. I performed the same type of analysis using only bid prices and, separately, using only ask prices. The results were consistent with the results using the midpoints. The abnormal bid return at 9:57 a.m. was the eleventh largest positive return of the day, and the abnormal ask return at 9:58 a.m. was the second largest positive return of the day. Both were statistically significant and both were the largest that had occurred up to those times.

34. It should be noted specifically that there were no significant abnormal returns close in time to 9:43 a.m.[15], the approximate time of the posting on the Treasury website of the news of the bond discontinuance. In fact, as noted above, the first significant abnormal return of the day was at 9:58 a.m. The lack of a significant abnormal return close in time to 9:43 a.m. strongly indicates that the posting on the website did not make the market aware of the news of the bond discontinuance.

35. In summary, the behavior of the bid and ask quotations provides further evidence that the market became aware of the news of the bond discontinuance no earlier than 9:57 a.m. Had the news of the bond discontinuance been fully reflected in the bid and ask quotations prior to the Reuters news report, the significant abnormal returns observed at 9:58 a.m. and shortly after that time would not likely have been observed.

### 3. Analysis of Bid-Ask Spreads

36. The difference between the best (highest) bid and the best (lowest) ask quotation is referred to as the bid-ask spread, which is commonly viewed as a measure of liquidity. The quality of

---

[15] As noted above, there were no significant abnormal returns at all before 9:58 a.m.

liquidity refers to the ease with which a security can be bought or sold. If the holder of a

security can sell that security at low cost, then the market for that security is said to be liquid.

Obviously, there are degrees of liquidity: the lower the cost of buying or selling, the greater

the liquidity. A major component of the cost of buying or selling a security is the bid-ask

spread because this spread measures the difference between the price at which the security

can be bought and the price at which it can be sold. Studies of the impact of new information

on the Treasury bond market have found that bid-ask spreads tend to widen at the time of

announcements and remain wider than normal for approximately 15 minutes before reverting

to their normal levels.[16] Thus, a widening of the bid-ask spread on October 31 may be a good

indicator of the time at which the market became aware of the news of the bond

discontinuance.

37. Exhibit 12 shows the bid-ask spread of the on-the-run 30-year bond on a minute-by-minute

basis.[17] It appears from the exhibit that the bid-ask spread was not unusually large at any time

prior to 10:03 a.m.

38. The spread at 10:03 a.m. was several times larger than any spread preceding it.[18] As Exhibit

12 shows, the unusually large bid-ask spreads beginning at 10:03 a.m. persisted for roughly

20 to 25 minutes.

39. This widening of the bid-ask spread is a key indicator that new information has come into the

market. When new information becomes known to the market, that information creates some

degree of uncertainty and risk for market participants until the market has fully processed the

information. The risk for dealers is that either their bid quotations will be too high or their

---

[16] See, for example, Balduzzi et al., op cit.

[17] In computing the bid-ask spread for this exhibit, a value of zero was assigned to those
observations for which there was either no outstanding bid or no outstanding ask quotation.

[18] The average spread from 8:30 a.m. to 4:30 p.m. was 0.119, and the standard deviation was
0.178. The spread at 10:03 a.m. was more than 7 standard deviations greater than the average
spread, and no spread prior to that time was as much as one standard deviation greater than the
average spread.

ask quotations will be too low and they will suffer losses from transactions at those quotations. This is why the bid-ask spread has been found to widen when new information first reaches the market. The fact that the bid-ask spread did not widen significantly until 10:03 a.m., therefore, strongly indicates that the news of the bond discontinuance became known to the market at about that time. This is consistent with the findings above that indicate the market did not become aware of the news of the bond discontinuance before 9:57 a.m.

### 4. Analysis of Prices in the CBOT Futures Market

40. I also analyzed price data on Treasury bond futures and options trading provided by the CFTC. The data I examined consisted of transaction prices of futures and options traded on the Chicago Board of Trade (CBOT). In general, the price patterns exhibited by the trading of futures and options are very similar to the price patterns already examined for trading of the 30-year Treasury bond.

41. Shown in Exhibit 13 are the standardized abnormal returns from 8:30 a.m. to 10:30 a.m. on October 31, 2001 on the CBOT December 2001 Treasury bond futures contract as traded in the CBOT open-outcry market. This was the contract closest to expiration as of that date. As shown in the exhibit, there was a significant positive abnormal return at 9:59 a.m., which was just two minutes after the approximate time of the Reuters news report regarding the bond discontinuance. Several additional significantly positive abnormal returns followed over the next 20 minutes.

42. The return at 9:59 a.m. was the third largest positive return of the day and more than twice as large as any return preceding it.

43. I also examined price data for the December 2001 contract as traded in the CBOT electronic market. The standardized abnormal returns from 8:30 a.m. to 10:30 a.m. on October 31,

2001, for this contract are shown in Exhibit 14. As was found in the open outcry market, the abnormal return at 9:59 a.m. was statistically significant and was the largest return of the day to that point in time. It was the seventh largest positive return of the day.

44. The returns on the CBOT March 2002 Treasury bond futures contract (the next closest to expiration) are similar to those on the December 2001 contract. As shown in Exhibit 15, the abnormal return at 9:59 a.m. was the largest return of the day to that point in time, and it was statistically significant (that is, it exceeded two standard deviations). This return was the seventh largest positive return of the day, and it was followed by a series of significantly positive abnormal returns over the next 15-20 minutes.

45. Thus, the price patterns of both the December 2001 contract (both open outcry and electronic) and the March 2002 contract suggest that the futures market did not become aware of the news of the bond discontinuance earlier than 9:59 a.m. The significant abnormal returns found shortly after 9:57 a.m. are inconsistent with the view that the news was fully reflected in the prices prior to 9:57 a.m. This evidence is, therefore, supportive of the finding above that the market was not aware of the bond discontinuance before 9:57 a.m.

**5. Analysis of Prices in the CBOT Options Market**

46. There were a large number of CBOT Treasury bond call and put options with December 2001 expirations trading on October 31, 2001. The strike prices ranged from 80 to 120. Most of them appear to have had very little trading activity based on the tick data I examined; that is, there are rather large time gaps between the reported prices. Nevertheless, I selected the four call options and four put options with the most reported prices and examined them more closely.[19] These are the calls with strike prices of 108, 109, 110, and 111 and the puts with

---

[19] Many of the options did not even begin trading until after 10:00 a.m. and many had significant gaps in trading between 9:00 a.m. and 10:00 a.m. There was trading in options with January 2002 and March 2002 expirations, but there were also significant gaps in the trading of these options, and for this reason I did not closely examine them.

strike prices of 106, 107, 108, and 109. It should be noted that there are still rather large time

gaps between trades (or ticks) for these options, which tends to make the standard deviation

smaller than it might have been with more frequent trading.[20] For this reason, I have less

confidence in the reliability of the options data for identifying significant abnormal returns

than I have in the reliability of the data for the spot and futures market discussed above. With

this caveat in mind, my findings are reported below.

47. Exhibits 15–22 show the standardized abnormal returns for the eight CBOT December 2001

Treasury bond futures options. As described in more detail below, these exhibits generally

support the findings above that the market did not fully reflect the news of the bond

discontinuance prior to 9:57 a.m. Had the market fully reflected that news prior to the Reuters

news report, I would not expect to find statistically significant abnormal returns on or after

9:57 a.m. In fact, however, I find generally the same pattern of returns in these options as I

did in the other securities examined above. That is, I find significant abnormal returns shortly

after 9:57 a.m. in most of the options.[21]

48. Shown in Exhibit 16 are the standardized abnormal returns for the CBOT December 2001

Treasury bond futures call options with a strike price of 108 on October 31, 2001. As the

exhibit shows, the first significantly positive abnormal return did not occur until 10:18 a.m.

49. Exhibit 17 depicts the standardized abnormal returns for the CBOT December 2001 Treasury

bond futures call options with a strike price of 109 on October 31, 2001. As the exhibit

---

[20] These time gaps are apparent in the exhibits discussed below. They appear as flat line segments.

[21] It should be noted that some of the options display significant abnormal returns prior to 9:57 a.m. It is my view that the existence of these significant abnormal returns has no bearing on my opinion that the market did not become aware of the news of the bond discontinuance prior to 9:57 a.m. Regardless of these earlier significant abnormal returns, if the market had been aware of the news of the bond discontinuance prior to the Reuters news report, then we would not find significant abnormal returns on or shortly after 9:57 a.m. Furthermore, it should be kept in mind that the significant abnormal returns prior to 9:57 a.m. are not found for five of the eight options, and there are no significant abnormal returns prior to 9:57 a.m. in either the spot market or the futures market.

shows, there was a significantly positive abnormal return at 9:59 a.m. It was followed by four more significantly positive abnormal returns over the subsequent 20 minutes.

50. Shown in Exhibit 18 are the standardized abnormal returns for the CBOT December 2001 Treasury bond futures call options with a strike price of 110 on October 31, 2001. The significant abnormal return at 10:01 a.m. was the largest return of the day. Four additional significantly positive abnormal returns occurred over the following 20 minutes.

51. In Exhibit 19 the standardized abnormal returns for the CBOT December 2001 Treasury bond futures call options with a strike price of 111 on October 31, 2001, are shown. As can be seen in the exhibit, there was a significantly positive abnormal return at 10:03 a.m. This return was the largest of the day. Four additional significantly positive abnormal returns were recorded over the subsequent 20 minutes.

52. Shown in Exhibit 20 are the standardized abnormal returns for the CBOT December 2001 Treasury bond futures put options with a strike price of 106 on October 31, 2001. Since a put option gives the holder the right to sell a bond futures contract at the strike price, an increase in the price of the bond futures contract will cause the price of the put option to decline. Thus, with regard to put options, the returns of interest are negative returns. As the exhibit shows, the first significantly negative abnormal return did not occur until 10:10 a.m. A second, even larger, significant abnormal return occurred at 10:17 a.m.

53. Exhibit 21 shows the standardized abnormal returns for the CBOT December 2001 Treasury bond futures put options with a strike price of 107 on October 31, 2001. As the exhibit shows, the first significantly negative abnormal return occurred at 10:05 a.m. Only the return at 10:11 a.m. was more negative.

54. Shown in Exhibit 22 are the standardized abnormal returns for the CBOT December 2001 Treasury bond futures put options with a strike price of 108 on October 31, 2001. The first

18

significantly negative return occurred at 10:03 a.m. This was the second most negative return of the day, and it was followed by two additional significantly negative returns before 10:20 a.m.

55. In Exhibit 23 the standardized abnormal returns for the CBOT December 2001 Treasury bond futures put options with a strike price of 109 on October 31, 2001, are shown. As can be seen in the exhibit, there was a significantly negative abnormal return at 10:03 a.m. This return was the most negative of the day, and three additional significantly negative abnormal returns were recorded over the subsequent 20 minutes.

56. In summary, the findings with respect to prices in the CBOT options market are generally consistent with the findings for the CBOT futures market and the spot market in the 30-year bond. With respect to three of the four call options examined, significantly positive abnormal returns were observed at 9:59 a.m., 10:01 a.m. and 10:03 a.m., and two of these were the largest returns of the day. With respect to the fourth of these call options, the first significantly positive return did not occur until 10:18 a.m. With regard to the put options, significantly negative abnormal returns were found at 10:03 a.m. for two of the options and at 10:05 a.m. for a third. These three returns were either the most negative or the second most negative of the day. As for the fourth of the put options, the first significantly negative return did not occur until 10:10 a.m. These findings are consistent with the view that the market did not become aware of the bond discontinuance before 9:57 a.m. If the market had become aware of the news of the bond discontinuance prior to 9:57 a.m., then the significant abnormal returns shortly after 9:57 a.m. would not likely have been observed.

## IV. CONCLUSION

57. It is my opinion that the market became aware of the decision to discontinue issuance of the 30-year bond no earlier than 9:57 a.m. This opinion is based on my analysis of the patterns of prices observable in the market. In particular, the transaction prices and bid-ask quotations

for the 30-year bond and the transaction prices for the CBOT futures and options on the 30-year bond support this opinion. My analysis found a significant abnormal return at 9:57 a.m. based on transaction prices for the 30-year bond, a significant abnormal return at 9:58 a.m. based on bid-ask quotations for the 30-year bond, significant abnormal returns at 9:59 based on transaction prices for CBOT futures on the 30-year bond, and significant abnormal returns at or shortly after 9:59 a.m. based on transaction prices for the majority of the CBOT options on the 30-year bond that I examined. Had the market already been aware of the bond discontinuance prior to the Reuters news report, these prices would not have increased so significantly at approximately the time of that news report. Furthermore, it was only after 9:57 a.m. that the bid-ask spread significantly widened, which is an indication that new information has reached the market.

Dated: March 31, 2008

Jeffry L. Davis

**EXHIBIT 1**

# CURRICULUM VITÆ

## Jeffry L. Davis

| | |
|---|---|
| **Office** | Economists Incorporated<br>1200 New Hampshire Avenue, NW<br>Suite 400<br>Washington, DC  20036<br>(202) 833-5228<br>davis.j@ei.com |
| **Home** | 10346 Buglenote Way<br>Columbia, MD  21044<br>(410) 730-1109 |
| **Date of Birth** | April 11, 1947 |
| **Education** | B.A., Economics, University of California, Riverside, 1969 |
| | M.A., Economics, University of California, Los Angeles, 1970 |
| | J.D., George Washington University, 1978 |
| **Professional Experience** | Present Position:  Senior Vice President, Economists Incorporated |
| | 1982-1995, Director of Economic and Policy Research<br>Securities & Exchange Commission |

- Supervised a Staff of Financial Economists & Support Personnel

- Advisor & Consultant to the Commission's Division of Enforcement on Economic, Financial and Statistical Issues

1991-1995, Adjunct Professor, Georgetown University Law Center, teaching Economic Aspects of Securities Regulation in the Graduate Law Program

**Selected Consulting Matters**

Provided expert report on behalf of the SEC in *SEC v. Richard M. Scrushy* [U.S. District Court for the Northern District of Alabama, Southern Division, No. CV-03-J-0615-S]. My report estimated the appropriate amount of disgorgement of insider trading profits to be ordered by the court.

**Selected Consulting**
**Matters (continued)**

Prepared expert report, testified in deposition, and testified at trial on behalf of the SEC in *SEC v. Mark Michel* [U.S. District Court for the Northern.

District of Illinois, Eastern Division, Case No. 06C-3166 Castillo]. My report provided an economic evaluation of some of the reasons given by the defendant to explain his purchases of the stock of Blue Rhino Corporation.

Prepared expert report for defendant in an SEC administrative proceeding involving charges that an investment management company permitted employees to engage in market-timing and excessive short-term trading in mutual funds under its management. My report estimated losses suffered by investors in the mutual funds and opined on the appropriateness of disgorgement and civil penalties. *In the matter of Putnam Investment Management, LLC* (Administrative Proceedings File No. 3-11317).

Prepared expert report and provided consultation on the issue of materiality to attorneys representing defendants in a class action suit alleging securities fraud in connection with the IPO of *FirstWorld Communications*. *Michael Rasner et al. v. Donald Sturm et al.* [U.S. District Court for the District of Colorado, Civil Action No. 00-K-1376].

Provided expert report on behalf of the SEC's Division of Enforcement in an administrative proceeding brought against an investment adviser for failing to disclose the impact of its first-day IPO gains on its performance. *In the matter of Nevis Capital Management, LLC, et al.* (Administrative Proceedings File No. 3-11201).

Provided expert report on behalf of the SEC in *SEC v. WorldCom, Inc.* [U.S. District Court for the Southern District of New York, Civil No. 02, CV 4963 (JSR)]. My report estimated damages to shareholders and bondholders caused by WorldCom's massive fraud. Also served as consultant to the court-appointed Distribution Agent.

Provided expert report and testified in deposition on behalf of the SEC in *SEC v. Spear & Jackson, Inc., et al.* [U.S. District Court for the Southern District of Florida, Case No. 04-80354]. My report evaluated the effect of certain promotional efforts on the price of Spear & Jackson stock.

**Selected Consulting
Matters (continued)**

Prepared expert report for the SEC regarding the effect of alleged manipulative trading on the price of a stock. *SEC v. Chapman et al.* (U.S. District Court for the District of Maryland, Civil Action No. WDQ-03-1877).

Provided expert report and testified in deposition on behalf of Bankers Trust Securities Corp. (BTSC) in defense of suit filed by FTD Corp. for damages in connection with BTSC's underwriting of subordinated notes for FTD Corp. *FTD, et al. v. Bankers Trust, et al.*, U.S. District Court for the Southern District of New York, 96 Civ. 405 SHS.

Provided expert report, testified in deposition, and testified at trial on behalf of defendant in suit alleging damages due to a tainted food product supplied by defendant. *Eateries, Inc., and Fiesta Restaurants, Inc. v. J.R. Simplot Company*, U.S. District Court for the Western District of Oklahoma, Case No. CIV-99-1330-C.

Testified in deposition on behalf of defendant regarding punitive damages sought by plaintiffs alleging they were harmed from use of a drug. *Shaw v. Warner Lambert Company, et al.*, Circuit Court for Montgomery County, Maryland, Case No. 209074.

Provided expert report and testified in deposition on behalf of defendants on damages allegedly caused by erroneous financial statements in connection with plaintiff's purchase of five companies from defendant. *Creative Solutions Group, Inc. v. Pentzer Corporation v. Form House Holdings, Inc.*, U.S. District Court for the District of Massachusetts, Civil Action No. 00 CV 10684 NG.

Provided expert report on behalf of defendant on damages alleged by the IRS due to improper tax deductions. "Analysis of Effective Ownership of Certain Euro Disney Theme Park Assets: Reply to the Shapiro Report."

Provided expert report and testified in deposition on behalf of plaintiff on damages caused by alleged breach of an employment contract. *Kevin T. Keleghan v. Sears, Roebuck and Co. and Alan J. Lacy*, Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois, No. 02 L 938.

Provided economic support for Department of Justice in defense of suit filed by a failed savings and loan institution alleging breach of contract due to passage of FIRREA.

**Selected Consulting
Matters (continued)**

Provided expert report for defendants on damages allegedly caused by retaliation against an employee for whistle-blowing in regard to alleged improprieties by a government contractor. *Robert D. Ackley v. International Business Machines Corporation and Lockheed Martin Corporation,* U.S. District Court for the District of Maryland, Southern Division, Civil Action No. PJM 97-3189.

Provided economic support for plaintiff in suit alleging breach of contract for defendant's failure to convert plaintiff's business to Internet-based enterprise as agreed.

Provided economic analysis for Department of Labor regarding alleged imprudence on the part of a pension plan sponsor.

Provided expert reports on four additional insider trading cases for the SEC. Retained as expert on restitution damages in a criminal insider trading case.

Testified three times before Nasdaq panels on behalf of three separate companies, each of which was contesting the proposed delisting of its stock.

Provided economic support for the merger of the New York Stock Exchange and Archipelago Holdings Inc.; economic support for the merger of Nasdaq and the American Stock Exchange; consultation regarding a proposed merger of two Electronic Communications Networks; and analysis of antitrust issues relating to merger of two large investment banking firms.

Testified in a Nasdaq arbitration proceeding on behalf of an investor whose stock was mistakenly sold.

Co-authored a report submitted to the court in the pre-sentencing hearing for Michael Milken.

Served as consultant to U.S. Attorney in the prosecution of Patricia Ostrander.

Provided an affidavit as an expert to the U.S. Attorney (New Jersey) for use in the prosecution of certain officers of Coated Sales.

Carried out 18-month project to analyze non-public database of municipal securities prices for the Municipal Securities Rulemaking Board.

**Publications**

*"Regulatory Reform and Congressional Control of Regulation,"* New England Law Review (November 1982).

*"The Intermarket Trading System and the Cincinnati Experiment,"* Chapter 18 of Market Making and the Changing Structure of the Securities Industry, edited by Amihud, Ho and Schwartz (1985).

"The Effects of Multiple Trading on the Market for OTC Options," SEC (November 1986) [with 3 co-authors].

"Securities Regulation During the Reagan Administration: Corporate Takeovers and the 1987 Stock Market Crash," Chapter 8 of The Economic Legacy of the Reagan Years: Euphoria or Chaos?, edited by Sahu and Tracy (1991) [co-authored with Ken Lehn].

"Estimating the Value of Federal Deposit Insurance," SEC (1991) [with 4 co-authors].

"Information Asymmetries, Rule 13e-3 and Premiums in Going-Private Transactions," Washington University Law Quarterly (1992) [co-authored with Ken Lehn].

"Regulation of Going Private Transactions," Chapter 20 of Modernizing U.S. Securities Regulations, edited by Lehn and Kamphuis (1992) [co-authored with Ken Lehn].

"Using Finance Theory to Measure Damages in Cases Involving Fraudulent Trade Allocation Schemes," Business Lawyer (February 1994) [co-authored with Bill Dale and Jim Overdahl].

"Disgorgement in Insider Trading Cases - A Proposed Rule," Securities Regulation Law Journal (Fall 1994).

"A New Look at SEC Rule 12b-1," Securities Regulation Law Journal (Summer 1995).

"Fragmentation vs. Consolidation of Securities Trading: Evidence from the Operation of Rule 19c-3," SEC (March 29, 1995) [co-authored with Lois Lightfoot].

"Let Nasdaq be Nasdaq," Traders Magazine (February 1996).

"Materiality and SEC Disclosure Filings," Securities Regulation Law Journal (Summer 1996).

**Publications**
**(continued)**

"SEC Approves NYSE Fee Changes—Good or Bad?" Traders Magazine (August 1996).

"The Battle Over Preferencing," Traders Magazine (September 1996).

"Regional Exchange Bias," Traders Magazine (September 1996).

"About Those Decimals," Business Law Today (November/ December 1997 – letter to the editor).

"Fragmentation vs. Consolidation of Securities Trading: Evidence from the Operation of Rule 19c-3," Journal of Law & Economics (April 1998) [co-authored with Lois Lightfoot].

"Mutual Fund After-Tax Returns," Mercatus Center, George Mason University, Regulatory Studies Program, Public Interest Comment Series, RSP 2000-13 (June 28, 2000).

"Levitt Couldn't Stop Himself," Traders Magazine (March 2001).

"The SEC Big Brother," Traders Magazine (July 2001).

## EXHIBIT 2

### Documents Reviewed by Jeffry L. Davis

1. The complaint of the Securities and Exchange Commission filed against defendants Peter J. Davis, Jr., John M. Youngdahl and Steven E. Nothern (9/4/2003).
2. Mizrach, Bruce and Christopher J. Neely, "The Transition to Electronic Trading in the Secondary Treasury Market," Working Paper 2006-012A, Federal Reserve Bank of St. Louis *Working Paper Series* (March 2006), available at http://research.stlouisfed.org/wp/2006/2006-012.pdf.
3. Ederington, Louis H. and Jae Ha Lee. 1993, "How Markets Process Information: News Releases and Volatility," *Journal of Finance*, Vol. 48, No. 4 (1993), pp. 1161-1191.
4. Fleming, Michael J. and Eli M. Remolona, "What Moves the Bond Market?" *FRBNY Economic Policy Review* (December 1997), pp. 31-50.
5. Fleming, Michael J. and Eli M. Remolona, "Price Formation and Liquidity in the U.S. Treasury Market: The Response to Public Information," *Journal of Finance*, Vol. 54, No. 5 (Oct., 1999), pp. 1901-1915.
6. Balduzzi, Pierluigi, Edwin J. Elton, and T. Clifton Green, "Economic News and Bond Prices: Evidence from the U.S. Treasury Market," Journal of Financial and Quantitative Analysis, Vol. 36, No. 4 (December 2001), pp. 523-543.
7. Goldberg, Linda and Deborah Leonard, "What Moves Sovereign Bond Markets? The Effects of Economic News on U.S. and German Yields," *FRBNY Current Issues in Economics and Finance*, Vol. 9, No. 9 (September 2003), pp. 1-7.
8. Fleming, Michael J. and Eli M. Remolona, "The Term Structure of Announcement Effects," FRBNY Staff Report, Number 76 (January 2001).
9. Christie-David, Rohan, Mukesh Chaudhry and James T. Lindley, "The Effects of Unanticipated Macroeconomic News on Debt Markets," Journal of Financial Research, Vol. 26, No. 3 (Fall 2003), pp. 319-339.
10. Fleming, Michael J. and Monika Piazzesi, "Monetary Policy Tick-by-Tick," Working Paper (August 22, 2005), available at http://www.bank-banquecanada.ca/fr/conference/2006/flemming.pdf.
11. Fleming, Michael J., "Financial Market Implications of the Federal Debt Paydown," Brookings Papers on Economic Activity, Vol. 2000, No. 2 (2000), pp. 221-251.
12. Dupont, Dominique and Brian Sack, "The Treasury Securities Market: Overview and Recent Developments," Federal Reserve Bulletin (December 1999), pp. 785-806.
13. Fisher, Peter R., "Remarks at the November 2001 Quarterly Refunding," Treasury Department Press Release (October 31, 2001).
14. Bureau of Economic Analysis, "News Release: Gross Domestic Product and Corporate Profits," October 31, 2001.
15. Federal Reserve Statistical Release H.15, http://federalreserve.gov/releases/h15/update/.
16. Goldman Sachs chronology, GS 03295 – 03303.



**EXHIBIT 3**

**Minimum and Maximum Transaction Prices for the On-the-Run 30-Year Bond**
**October 2001**

Source: BrokerTec

**EXHIBIT 4**

Transaction Prices for the On-the-Run 30-Year Treasury Bond
October 31, 2001



Source: BrokerTec



**EXHIBIT 5**

Transaction Prices for the On-the-Run 30-Year Treasury Bond
8:30 to 10:30 EST - October 31, 2001

Source: BrokerTec

**EXHIBIT 6**

Minute-by-Minute Returns on the On-the-Run 30-Year Treasury Bond
Based on Transaction Prices
8:30 to 10:30 EST - October 31, 2001



Source: BrokerTec

**EXHIBIT 7**

Minute-by-Minute Standardized Abnormal Returns on the On-the-Run 30-Year Treasury Bond
Based on Transaction Prices
8:30 to 10:30 EST – October 31, 2001



Source: BrokerTec



EXHIBIT 8

Bid-Ask Midpoint Prices for the On-the-Run 30-Year Treasury Bond
October 31, 2001

Source: BrokerTec

**EXHIBIT 9**

Bid-Ask Midpoint Prices for the On-the-Run 30-Year Treasury Bond
8:30 to 10:30 EST - October 31, 2001



Source: BrokerTec

**EXHIBIT 10**

Minute-by-Minute Returns on the On-the-Run 30-Year Treasury Bond
Based on Bid-Ask Midpoint Prices
8:30 to 10:30 EST - October 31, 2001



Source: BrokerTec



EXHIBIT 11

Minute-by-Minute Standardized Abnormal Returns on the On-the-Run 30-Year Treasury Bond
Based on Bid-Ask Midpoint Prices
8:30 to 10:30 EST - October 31, 2001

Source: BrokerTec

**EXHIBIT 12**

Bid-Ask Spreads for the On-the-Run 30-Year Treasury Bond
8:30 to 10:30 EST - October 31, 2001



Source: BrokerTec



**EXHIBIT 13**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures (Open Outcry)
8:30 to 10:30 EST - October 31, 2001

Source: CFTC

**EXHIBIT 14**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures (Electronic)
8:30 to 10:30 EST - October 31, 2001



Source: CFTC



**EXHIBIT 15**

Minute-by-Minute Standardized Abnormal Returns
CBOT March 2002 Treasury Bond Futures (Open Outcry)
8:30 to 10:30 EST - October 31, 2001

Source: CFTC



**EXHIBIT 16**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Call Options - Strike Price 108
8:30 to 10:30 EST - October 31, 2001

Source: CFTC

**EXHIBIT 17**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Call Options – Strike Price 109
8:30 to 10:30 EST – October 31, 2001



Source: CFTC

**EXHIBIT 18**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Call Options - Strike Price 110
8:30 to 10:30 EST - October 31, 2001



Source: CFTC

**EXHIBIT 19**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Call Options - Strike Price 111
8:30 to 10:30 EST - October 31, 2001



Eastern Standard Time

Source: CFTC.



**EXHIBIT 20**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Put Options - Strike Price 106
8:30 to 10:30 EST - October 31, 2001

Eastern Standard Time

Source: CFTC



**EXHIBIT 21**

**Minute-by-Minute Standardized Abnormal Returns**
**CBOT December 2001 Treasury Bond Futures Put Options - Strike Price 107**
**8:30 to 10:30 EST - October 31, 2001**

Source: CFTC



**EXHIBIT 22**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Put Options - Strike Price 108
8:30 to 10:30 EST - October 31, 2001

Eastern Standard Time

Source: CFTC



**EXHIBIT 23**

Minute-by-Minute Standardized Abnormal Returns
CBOT December 2001 Treasury Bond Futures Put Options - Strike Price 109
8:30 to 10:30 EST - October 31, 2001

Source: CFTC

Excerpt from the

November 29, 2006

deposition of John Cadogen

Exhibit AA

Volume:  I

Pages:  1-183

Exhibits:  1-8

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - x

UNITED STATES SECURITIES AND

EXCHANGE COMMISSION,

            Plaintiff,

   v.           Civil Action No.  05-10983(NMG)

STEVEN E. NOTHERN,

            Defendant.

- - - - - - - - - - - - - - - - - - x


DEPOSITION OF JOHN CADOGAN

Wednesday, November 29, 2006

8:44 a.m.

FOLEY HOAG LLP

155 Seaport Boulevard

Boston, Massachusetts  02210-2600


Court Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

Videographer:   Jody Urbati

Page 130

1 called market thoughts?
2    A. Yes.
3    Q. So if we look in the top half of page 566,
4 are those market thoughts?
5    A. They could be. A lot of times when I'm
6 talking to someone, I'll jot down bullet points, or
7 things I might find interesting or may want to refer
8 back to.
9    Q. Can you read any of these other notes on the
10 upper portion of 565 -- excuse me, 566?
11    A. 566. Yes, I can read them.
12    Q. What do they say?
13    A. Looks like it has got a gentleman's name,
14 David Ging, interest rate strategist I think it
15 looks like. Again, I don't remember what reference
16 that would be to. Below that, BTMM, from what I
17 remember on that, I think it is referring to a
18 Bloomberg mortgage pricing function. MDF, below
19 that, is mortgage default. I believe that is a
20 sub-function of that above function. OAS1 and
21 ESPIEL, I'm not sure what that is in reference to.
22 NW 12 and NWEG, I'm not sure. I'm not sure what
23 that means.
24    Q. It looks like there is some notes below

Page 131

1 that, sort of directly below NWEG, about an inch
2 down?
3    A. I don't recognize those.
4    Q. And then, this is in the middle of page 566,
5 it looks like 2-5 147. Any idea what that is in
6 reference to?
7    A. I believe that is referencing the spread,
8 the yield spread, between 2-year Treasuries and
9 5-year Treasuries.
10    Q. And it looks like there is an arrow below
11 that, and then the word that begins with M; what
12 does that say?
13    A. It looks like the word "Move."
14    Q. So putting together the 2-5, the 147 spread,
15 does that say there is going to be movement in the
16 spread?
17    A. I'm not sure what it is saying.
18    Q. To the right there there is some words, and
19 then it says 3 years?
20    A. I think that word looks like it says
21 "Selling."
22    Q. Selling 3 years?
23    A. Yes.
24    Q. And 3 years would be -- is that a reference

Page 132

1 to a bond issuance?
2    A. I'm not sure what it is referencing. Given
3 the convention I use, I assume it would be in
4 reference to 3-year Treasuries.
5        ATTY. SHOPE: We need to change the
6 tape.
7        THE VIDEOGRAPHER: Here ends Tape 2.
8 Off the record 11:55 a.m.
9        (Recess taken.)
10        THE VIDEOGRAPHER: Here begins Tape 3.
11 Back on the record 11:56 a.m.
12    Q. So sticking on page Bates 566, a little bit
13 more than halfway down there is a rectangle where it
14 says buy 65,000,000 UST 5 3/8 2/31; do you see that?
15    A. Yes.
16    Q. What is that a reference to?
17    A. That looks to be a purchase of 65,000,000
18 of US Treasury with a coupon of 5 3/8 and a maturity
19 of Feb. 2031.
20    Q. So February 2031, that means it's a 30-year
21 bond, right, it would have been in October 2001?
22    A. It would depend on your definition of '31.
23 That makes it a 30-year -- it would have been
24 commonly known as the 30-year bond. It probably

Page 133

1 didn't exactly have a 30-year maturity, though.
2    Q. Now it says here on the left Merrill; I
3 presume that is a reference to Merrill Lynch.
4    A. That's correct.
5    Q. And then Greg, is that Greg St. Pierre?
6    A. Yes.
7    Q. So in this instance did you -- you talked
8 before about how sometimes you could use Trade Web,
9 sometimes you could call a broker directly. What
10 method did you use with regard to this particular
11 trade?
12        ATTY. SHAPIRO: Objection.
13    A. If I remember, I believe I used the
14 telephone.
15    Q. You called Merrill directly, or you were on
16 the phone with Merrill, either of those?
17    A. I believe I made the trade on the telephone.
18    Q. In other words, just to be clear, you didn't
19 use the Trade Web option?
20    A. I don't believe I used Trade Web.
21    Q. And on the right there is some numbers,
22 names and numbers; can you read those?
23    A. Yes.
24    Q. What do they say?

Page 134

1    A.  Starting from the left it looks like the
2  number 25, and then it says Steve N, comma, then it
3  says number 10, and then looks like the name Geoff,
4  G-e-o-f-f, and then below that on the left is David,
5  looks like the number 25, and then it looks like the
6  name Rick with the number 5.
7    Q.  And what are those names and numbers
8  referring to?
9    A.  Those are references of the portfolio
10  managers' names, and I believe those numbers would
11  represent the individual trades of the long bond
12  purchase.
13    Q.  So that would be Steve Nothern, Geoff
14  Kurinsky, David Kennedy, and Rick Smith?
15    A.  Yes.
16    Q.  And the 25, the 10, the 25, and the 5, those
17  are millions, right?
18    A.  Yes.
19    Q.  So you add those up and that's how you get
20  to the 65 million that is at the top of that block?
21    A.  That's correct.
22    Q.  And then in the middle there is a -- well,
23  if you could tell me what is circled in the middle
24  there.

Page 135

1    A.  That would be the execution price.
2    Q.  And so the execution price is, just
3  breaking it down, there is something like a symbol
4  that looks like an at sign?
5    A.  That's an at sign, and then it's the number
6  102 with a dash, then 24, and a plus symbol.
7    Q.  Let's break those down.  What does the 102
8  24 mean?
9    A.  I'm assuming that references the dollar
10  price of which I purchased the bond, so 102 would
11  be -- 102 is the price, 24 is represented for market
12  convention and thirty-seconds, a plus is the market
13  convention for half of one thirty-second.
14    Q.  And then in the lower right-hand corner,
15  what does it say, of that box?
16    A.  It looks like it says V, and it looks like a
17  slash d and then 11/1.
18    Q.  What is that a reference to?
19    A.  That would be the reference to the
20  settlement date of the trade.
21    Q.  So that would be the day after?
22    A.  Day after October 31?
23    Q.  Yes.
24    A.  Yes.

Page 136

1    Q.  Now, getting back to the price, first of all
2  do you remember -- I want to just break things
3  down -- you called up Mr. Saint -- or you were  on
4  the phone with Mr. St. Pierre?
5      ATTY. SHAPIRO:  Objection.
6      ATTY. WILLIAMS:  Objection.
7    A.  I'm not sure whether I was on the phone or
8  called him.
9    Q.  In any event, you began the conversation,
10  and what did you say to him?
11      ATTY. SHAPIRO:  Objection.
12      ATTY. WILLIAMS:  Objection.
13    A.  I'm not sure of any of the specifics of what
14  I said, other than -- no, I'm not sure of any of the
15  specifics.
16    Q.  Do you know whether you were interrupted by
17  any of the other investment managers while you were
18  speaking on the phone with Mr. St. Pierre?
19    A.  I don't remember.
20    Q.  And do you remember -- I take it you asked
21  him -- well, did you ask him for a price for 65
22  million, you know, 30-year bonds?
23      ATTY. SHAPIRO:  Objection.
24      ATTY. WILLIAMS:  Objection.

Page 137

1    A.  I don't remember, but I would think --
2  looking at this blotter I would say I did.
3    Q.  And ordinary practice at least would suggest
4  that is what you would have done?
5    A.  Yes.
6    Q.  Was there again the pause?
7      ATTY. WILLIAMS:  Objection.
8    A.  I don't remember.
9    Q.  Do you know whether you had any other
10  discussion with Mr. St. Pierre at that point?
11      ATTY. SHAPIRO:  Objection.
12      ATTY. WILLIAMS:  Objection.
13    A.  At the point of?  What point, getting the
14  price.
15    Q.  Yes, talking to him about price, talking
16  about what you were buying.
17    A.  I don't remember anything specific at that
18  point in time getting the price.
19    Q.  And now was this a large order?
20      ATTY. SHAPIRO:  Objection.
21    Q.  Small order?
22    A.  I'm not sure what your point of reference
23  is.
24    Q.  Just as far as typical transactions that you

Page 138

1   would do in long bonds in 2001.
2        ATTY. SHAPIRO: Objection.
3        Q. Would this have been on the larger side,
4   smaller side, middle?   Any kind of size reference
5   you can give to me?
6        A. I don't have any real recollection of the
7   size. This doesn't stand out as anything out of the
8   ordinary.
9        Q. And Mr. St. Pierre quoted a price to you, I
10  presume.
11       ATTY. SHAPIRO: Objection.
12       A. I would assume so, yes.
13       Q. And did you accept the price indeed that he
14  quoted?
15       A. I don't remember.
16       Q. You don't remember whether or not you made
17  some kind of a counteroffer or anything like that?
18       A. I don't remember.
19       Q. Did you try to shop the purchase with any
20  other broker?
21       ATTY. SHAPIRO: Objection.
22       ATTY. WILLIAMS: Objection.
23       A. In respect to this specific transaction we
24  are looking at?

Page 139

1        Q. I'm sorry. It was a bad question. You had
2   gotten an order from Mr. Nothern, Mr. Kurinsky, Mr.
3   Kennedy, and Mr. Smith to buy a total of 65 million
4   long bonds, right?
5        A. Yes, that's correct.
6        Q. And this was made to you verbally?
7        ATTY. SHAPIRO: Objection.
8        A. I believe so, yes.
9        Q. Was Merrill the only broker that you called
10  with respect to executing that order, or group of
11  orders?
12       ATTY. SHAPIRO: Objection.
13       ATTY. WILLIAMS: Objection.
14       A. I don't remember for sure, but I believe
15  Merrill was the only person I spoke to, Merrill
16  Lynch was the only counterpart.
17       Q. At that point, or at least going into the
18  discussion with Mr. St. Pierre, as a matter of
19  general practice would you have looked at one of
20  your screens to see how long bonds were trading at
21  that point?
22       ATTY. WILLIAMS: Objection.
23       A. Yes. As a mode of practice, yes.
24       Q. And so do you think that's likely, in fact,

Page 140

1   what you did on the morning of October 31?
2        A. I would see no reason why I wouldn't.
3        Q. And do you recall at all whether or not
4   there was any price movement that was occurring as
5   you were moving into that transaction?
6        ATTY. SHAPIRO: Objection.
7        A. From what I can remember, the prices --
8   prices were moving that morning.
9        Q. That would have been a reason to call
10  Merrill directly, rather than looking at the Trade
11  Web?
12       ATTY. WILLIAMS: Objection.
13       ATTY. SHAPIRO: Objection.
14       A. Could have been.
15       Q. And the -- now there is another -- oh, I'm
16  sorry, so just finishing up on the -- so the
17  price -- so at some point you and Mr. St. Pierre had
18  an agreement on price, right?
19       ATTY. SHAPIRO: Objection.
20       ATTY. WILLIAMS: Objection.
21       A. I guess agreement on price, what do you mean
22  by that?
23       Q. I guess what I'm getting at is at some point
24  there was a price that --

Page 141

1        A. Looking at this blotter, it looks like there
2   was a trade that was done at that price.
3        Q. So there was a trade that was done at --
4        ATTY. SHAPIRO: When you say looking at
5   the blotter, looking at Exhibit No. --
6        THE WITNESS: I'm sorry, looking at
7   Exhibit No. 566, it looks like a trade --
8        ATTY. SHAPIRO: Page 566.
9        Q. So it looks like a trade. Did you also have
10  to enter the information into the FITS system
11  besides keeping it in your handwritten blotter here?
12       ATTY. WILLIAMS: Objection.
13       A. I guess you have to be more specific. What
14  do you mean by entering the information?
15       Q. In other words, when you talked before about
16  when you would get the orders from the portfolio
17  managers electronically on the FITS system that
18  after you had done the trade you would type in
19  the --
20       A. You are saying from an execution standpoint?
21       Q. Yes, from the execution -- after you had
22  executed the trade, you would type in the FITS
23  system what the price had been and so forth? That's
24  true with regard to the orders that you get on the

Page 166

1    Q. But sitting here today you don't recall
2  whether or not the upcoming Refunding Conference was
3  mentioned that morning?
4        ATTY. SHAPIRO: Objection.
5        ATTY. WILLIAMS: Objection.
6    A. I don't remember.
7        ATTY. SHOPE: Subject to any questions
8  by Ms. Williams, I don't have anything further at
9  this time.
10       ATTY. SHAPIRO: Want to just go off the
11 record very quickly.
12       THE VIDEOGRAPHER: Off the record 12:42
13 p.m.
14       (Recess taken.)
15       THE VIDEOGRAPHER: Back on the record
16 12:42 p.m.
17       ATTY. WILLIAMS: Mr. Cadogan, I have a
18 few follow-up questions.
19          CROSS EXAMINATION
20 BY ATTY. WILLIAMS:
21    Q. Can you, please, refer to what has been
22 marked as Exhibit 8?
23    A. Okay.
24    Q. I just wanted to clarify, is this

Page 167

1  information that would have been entered into the
2  FITS system?
3    A. It looks like it would have been
4  information, yes.
5    Q. What information did you enter, generally
6  enter, into the FITS system, and my question is as
7  opposed to what Portfolio Managers entered into the
8  FITS system?
9        ATTY. SHOPE: You are asking about which
10 columns?
11       ATTY. WILLIAMS: Which columns, yes.
12    A. Typically settlement date, execution price,
13 and broker ID.
14       ATTY. SHAPIRO: I'm sorry, those
15 categories are the ones that --
16       THE WITNESS: -- I would have to input
17 and populate to execute the trade.
18    Q. When you entered information into the FITS
19 system, would a Portfolio Manager already have had
20 to enter in their information into the system before
21 you entered the settlement date, execution price,
22 and broker ID?
23    A. What do you mean by "their information"?
24    Q. The other trade details that appear on

Page 168

1  Exhibit 8; for example, the security, the issuing
2  name, the description.
3        ATTY. SHOPE: Objection to the form of
4  the question.
5    A. Again, I'm not familiar with exactly what
6  the Portfolio Managers would put in, and I'm not
7  sure all these columns themselves are actual inputs.
8  From my understanding, you have to enter a security
9  code in order to identify the security. After that
10 they would have to put in the buy or sell, so,
11 actually, did I say I did that? If I did, I
12 misspoke, but I don't think I did. No, I didn't.
13    Q. No.
14    A. They would put in the buy or sell, the CUSIP
15 or the security code, and they had the option to
16 change the settlement date if they wanted to; if
17 not, it will default to a standard settle date.
18    Q. And I probably didn't ask my question very
19 good. At the time that you entered the settlement
20 date, execution price, and broker ID, would the
21 security and the buy and sell already be entered
22 into the system?
23    A. Yes.
24    Q. Were there any protocols at MFS regarding

Page 169

1  when you, as the trader, had to enter your
2  information into the system, as far as how long
3  after the trade had been executed?
4    A. I don't remember any official protocols, no.
5    Q. Did you have any practice as to --
6    A. My practice would be to try to do that as
7  soon after I did a trade.
8    Q. Do you recall on October 31, 2001 how soon
9  after this trade of 65 million 30-year bonds did you
10 enter information into the FITS system?
11    A. I don't remember the exact time, no.
12    Q. I want to talk a little bit about that
13 trade. I think you did testify that you had a
14 conversation with Mr. St. Pierre.
15    A. Yes.
16    Q. And that, clarify me if I'm wrong, you
17 recall accepting the price Mr. St. Pierre quoted to
18 you?
19    A. Accepting the price? I can't remember if I
20 did or not, no.
21    Q. Generally speaking, when you were executing
22 trades and received a price from a salesperson, how
23 did you indicate that the price was acceptable?
24       ATTY. SHAPIRO: Objection.

Page 170

1    A. Market convention is typically you tell them
2  that they are done.
3    Q. So to actually say the word "done"?
4    A. That is correct.
5    Q. At the time that you say "done," is that
6  when the trade is executed?
7        ATTY. SHOPE: Objection.
8    A. As a rule of thumb market convention is when
9  I say "done," the trade is done. The only time
10  there is a change is if the salesperson says, before
11  I say "done," say "change" or "subject."
12    Q. Do you recall if Mr. St. Pierre, on October
13  31, said "change" or "subject" with regard to this
14  execution of $65 million?
15    A. I don't remember.
16    Q. If the salesperson says -- person says
17  "change" or "subject," what happens to the execution
18  of that trade?
19    A. There is no trade if they say "change" or
20  "subject," and I haven't already said "done."
21    Q. I believe you testified that you were on the
22  telephone and received some sort of indication from
23  the Portfolio Managers on the morning of October 31,
24  2001 before this execution of the $65 million

Page 171

1  trade; is that correct?
2    A. Yes.
3        ATTY. SHOPE: I'm sorry, may I have that
4  question and answer reread.
5        (Question and answer read.)
6        ATTY. SHOPE: Note my objection to the
7  form of the question.
8    Q. Do you --
9        ATTY. SHAPIRO: I'm sorry. Mr. Cadogan,
10  just -- I know we have been at it a while, just
11  before you answer a question, give a pause or two in
12  case Mr. Shope or myself wants to object, or Ms.
13  Williams wants to object to her own questions.
14    Q. Do you recall who was signalling to you?
15    A. I don't recall, no.
16    Q. I believe you also testified that you
17  received a verbal, verbal order, before you placed
18  the $65 million.
19    A. Yes.
20    Q. Did you check the FITS system to see if
21  there had been any orders entered into that system?
22    A. I don't believe I did, no.
23    Q. Do you know when the Portfolio Managers who
24  placed orders that then became the $65 million

Page 172

1  trade entered information regarding those orders
2  into the FITS system?
3    A. I don't remember the exact time.
4    Q. I believe you testified that you had heard
5  some rumors on October 31 regarding the possible
6  elimination of the long bond?
7        ATTY. SHAPIRO: Objection.
8    Q. Is that true?
9    A. I do have some memory of hearing that, yes.
10    Q. Do you know how you learned of these rumors?
11    A. I don't remember exactly, no.
12    Q. Did you ever, on October 31, learn that the
13  Treasury had made a refunding announcement
14  announcing the elimination of the 30-year bond?
15    A. Could you say that again.
16    Q. Did you ever learn on October 31 that the
17  Treasury Department had made an announcement
18  announcing the elimination of the 30-year bond?
19    A. I believe it was announced publicly at 10:00
20  a.m. that morning.
21    Q. How did you learn about this public
22  announcement?
23    A. I believe it was released on the news
24  services.

Page 173

1    Q. Do you recall seeing the announcement on a
2  news service?
3    A. I don't remember specifically, no.
4    Q. Do you recall having any conversations with
5  any Portfolio Managers about the announcement that
6  came at 10:00 a.m. from the Treasury?
7    A. Before 10:00 a.m. or in general?
8    Q. In general.
9    A. I believe it might have been discussed
10  generally on the desk, but I don't remember any
11  specifics.
12    Q. And this is after the announcement had been
13  made by the Treasury Department?
14    A. From what I can remember, yes.
15    Q. Do you recall having any discussions before
16  the announcement was made by the Treasury
17  Department?
18    A. No.
19    Q. If you could refer to Exhibit 7, please,
20  Page 2, and I'm referring to the bottom box
21  reflecting the $14 million trade; do you see that
22  box?
23    A. Yes.
24    Q. Did Mr. Nothern provide you any reasons for



2yr   2.462   100-11 7/8    2-5   +113.60
3yr   3.599   104-08 1/2   2-10   +195.70
10yr   4.419   104-18     2-30   +225.20
30yr   5.212   102-13 1/4   5-10   +81.40
              5-30   +161.30
10/31           10-30   +74.30

Margins (Naved)
FNb   100-18+
FN6 1/2   102-12
FN7   103-31+
FN7 1/2   104-17+
FN8   105-14+

Buy 400,000 VSF 4 5/8 5/15/06
@ 104-05      RBF
JPM
— ore       ✓   ML 11/1

Buy 34 FV21 (5yr Dec Futures)
GSCO    @ 109-10     MGC
— thm
Give up 22 to Goldman, 12-More   ML 11/1

Sell 7,000,000 VSF 6 7/8 5/15/06
@ 113-13+     MMFC
Greenwich
— BM     "CASH"   ✓   ML 10/31

EXHIBIT
Cadogan
7
11/29/06 cap

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 000565



CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
W 000566

Curve

16 8

7 10⁵

Buy 5  US Z1  (30yr. Dec. Futures)
3:

More       @ 108-24                    MED

— Carry                                "New position"

                    ✓

                                    Uld  11/1

Buy  5,000,000  FHLMC 6³/₈  11/03      +32
                                        10 3yr

More       @ 106-916              MGC

— Carry                           100+4'1/4
                                      3yc

                    ✓

                                    Uld  11/5

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
W 000567

Se4

Buy 10,000,00 UST 5.0 8/11

UBS
— Steve

@ 105-05

Dave K.

✓

Ud 11/1

Sell 8,000,000 FHLMC 5.0 5/15/07

marc
— Carly

@ 104.340

+63

MGF, MLN

100-10 7/7

+8 CASH 6

Mt 10/31

Sell 2,000,000 FNMA 6% 5/15/08

UBS
— JC

@108.94

@ 108.444

104-15

GSUS

+44 1/2

10 8%

Ud 11/1

+94 1/2

Sell 22,000,000 FNMA 6 1/2 8/15/04

UBS
— JC

@ 108.691

✓

Um 11/1

100-18

GSS, AFC

+75 1/2

2%

+76.5

+76

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 000568



Sell  17,767,000  UST 6 7/8  5/18/06

@ 113-28+          MMFC

Barclys
— Michel                          ✓

                                 did 11/1

Sell 8,000,000  FHLMC 5½  7/18/06   107-19

Barclys        @ 106.412           MGFC        JM
— Michel                  ✓        147.665

                                 mk 11/1

2 Mm ok longer term about by JM
         or 5h, 6h    5,000,000

2 Mm CSFB                    6.648

205-210  (18bp md)      → original Price

105-10    Sell 5,006,000  CAL 6.648  9/17   10520
                                             layer
         CSFB    @ 92.376           David K
4289    — Peter E        ✓           & RBF

                        mk 11/5     Sorting Rnt
                                   & 360 to Toy

CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO
M 000569



CONFIDENTIAL TREATMENT
REQUESTED BY MASS
FINANCIAL SERVICES CO.
M 000570

Excerpt from the

November 2, 2006 deposition

of Bloomberg L.P.

representative,

Patrick Eldridge

Exhibit BB

UNITED STATES DISTRICT COURT FOR THE
.    .        DISTRICT OF MASSACHUSETTS
            (Boston Division)
.    .    -----------------------------------x
UNITED STATES SECURITIES AND EXCHANGE COMMISSION,


.    .    Plaintiff,

.    .    Civil Action
                        No. 05-10983

            -against-


STEVEN E. NOTHERN,


.    .    Defendant.
-----------------------------------x



.    .    VIDEOTAPED DEPOSITION OF PATRICK ELDRIDGE

.    .    New York, New York

.    .    Thursday, November 2, 2006




Reported by:
.    .        DOROTHY H. LONDON, RPR

## Page 14

1    A.  These are functions that are used within
2  Bloomberg LP for the benefit of the employees.  They
3  would include online systems for management of their
4  own benefits or their own job, including things like
5  their personal calendars, for example, anything that
6  has to do with attendance, compensation, all types
7  of systems that are specific to the employee
8  themselves internal to Bloomberg.
9    Q.  How long have you had the title that you
10  currently hold?
11    A.  I took that job on September 26, 2006 of
12  this year.
13    Q.  What was your job title prior to
14  September 26, 2006?
15    A.  Prior to that I was the global manager for
16  Bloomberg's trading system, Customer Care
17  Department.
18    Q.  When did you first obtain that title?
19    A.  I took that title in October of 2003.
20    Q.  What were your job responsibilities as
21  global manager for the Bloomberg trading systems?
22    A.  We'll call it TSCC for simplicity.
23    Q.  That would be great.
24    A.  As the global manager for TSCC, I was
25  responsible for the customer support, the operations

## Page 15

1  and the internal systems development for Bloomberg's
2  trading systems products of which TOMS is one
3  product.
4    Q.  TOMS, does that stand for anything?
5    A.  TOMS stands for the Trade Order Management
6  System.
7    Q.  Prior to October 2003, what was your
8  title?
9    A.  Prior to that, I was the manager of a
10  group called TRAPS, which stood for transactional
11  performance and solutions.  It was the trading
12  system's customer service group prior to the
13  creation of the TSCC Department.  I held that job
14  from August of 2000 through October 2003, at which
15  point that group was disbanded and TSCC was created
16    Q.  Did this prior group, the TRAPS group --
17    A.  That's correct.
18    Q.  -- perform the same duties as the TSCC
19  group?
20    A.  It performed similar duties.  The TSCC
21  role was expanded greatly.  The TRAPS team did not
22  do operational or development work.  It was
23  primarily a customer service group.
24    Q.  Who did the operational and development
25  work --

## Page 16

1    A.  The operational development group was
2  worked on by our research and development teams.
3    Q.  Prior to August 2000, what was your job
4  title at Bloomberg?
5    A.  Prior to August of 2000, I was a team
6  leader for TOMS sales in New York.  I held that role
7  from December of 1999 through August of 2000.
8    Q.  What were your job responsibilities as a
9  team leader for TOMS sales?
10    A.  I managed a team of eight individuals
11  whose primary job was sales and account management
12  for our TOMS clients primarily based out of New York
13  City which was the larger broker/dealers clients.
14    Q.  When you say your TOMS clients, what do
15  you mean?
16    A.  With the TOMS product, Bloomberg provides
17  a solution for trade order management which is
18  called front end trading systems.  So for a
19  broker/dealer who does not wish to build their own
20  in-house system for traders or salesmen to manage
21  positions, do electronic ticketing, capture P & L
22  and feed their back office, Bloomberg provides a
23  platform, a solution that we will implement on
24  behalf of that client, specific to that
25  broker/dealer.

## Page 17

1    Q.  And just to clarify for the jury, who may
2  not know what P & L or other things mean, what does
3  P & L mean?
4    A.  P & L means profit and loss.  It's a
5  reflection of how a trader is doing in the market on
6  a given day, whether he's making or losing money, by
7  position or security or item macro level, by book or
8  by department.
9      MS. MARTEN:  May I take a moment to --
10      MS. WILLIAMS:  You need to take a break?
11      MS. MARTEN:  Yeah.
12      MS. WILLIAMS:  Yes.  Could we go off the
13  record?
14      THE VIDEOGRAPHER:  The time is 9:57 a.m.,
15  going off the record.
16      (Recess taken.)
17      THE VIDEOGRAPHER:  The time is 9:59 a.m.
18  We're back on the record.
19  BY MS. WILLIAMS:
20    Q.  Before we took a break, I was going
21  through your employment history at Bloomberg, and we
22  had just talked about your job title from
23  December '99 to August 2000 which you were team
24  leader for TOMS sales.  What was your job title
25  prior to December '99?

Page 22

1  type --
2  　　A.  The TOMS system is a --
3  　　　　MR. TOONE:  I'm sorry.  Objection.
4  　　Q.  You can answer.
5  　　A.  The TOMS system is a trade capture system.
6  It is not designed for, let's say, electronic
7  execution.
8  　　Q.  Do you know which Bloomberg server hosted
9  the Merrill Lynch TOMS system in 2001?
10 　　A.  N010.
11 　　Q.  Where was N010 located?
12 　　A.  In our New York data center.
13 　　Q.  How do you know that N010 was the center
14 that hosted the Merrill Lynch TOMS system in 2001?
15 　　A.  We went back and researched to confirm
16 which machine that price number was on at that time.
17 　　Q.  How did the Merrill Lynch TOMS system in
18 2001 differ from the system that's in place today?
19 　　A.  The difference is it's on a different
20 server today.  We've gone through an upgrade, so
21 it's no longer on N010.  That's it.
22 　　Q.  Does N010 still exist today?
23 　　A.  No.
24 　　Q.  When did it cease to exist?
25 　　A.  I don't know the exact answer to that.  I

Page 23

1  can give you an estimate of sometime around 2003.
2  　　　　MS. WILLIAMS:  I'd like to have this
3  marked as Exhibit 2.
4  　　　　　　(Eldridge Exhibit 2, Printout of
5  　　　　　　a Bloomberg function, marked for
6  　　　　　　identification, as of this
7  　　　　　　date.)
8  　　　　MS. WILLIAMS:  Actually, I've marked the
9  wrong exhibit, I'm sorry.  Yeah, I actually marked
10 the wrong exhibit.  Can you remark just one page?
11 　　　　　　(Discussion held off the
12 　　　　　　record.)
13 BY MS. WILLIAMS:
14 　　Q.  Mr. Eldridge, do you recognize this
15 document that's been marked as Exhibit 2?
16 　　A.  Yes, I do.
17 　　Q.  What is it?
18 　　A.  It is a printout of a Bloomberg function.
19 　　Q.  Do you know how this document was created?
20 　　A.  Yes, this document was created by I went
21 into our Bloomberg system and ran a function called
22 TBLT and then printed out this screen.
23 　　Q.  What does this document show?
24 　　A.  This document shows a representation of
25 trades done with a particular account on October 31,

Page 24

1  2001 as represented in the Bloomberg TOMS system.
2  　　Q.  Where was this information -- the
3  information in this document maintained?
4  　　A.  The information was maintained on file --
5  actually, I'm sorry, on storage tapes that we had
6  reloaded back into our demo systems for purposes of
7  extract.
8  　　Q.  The third line, the third heading where it
9  says "Counterparty," do you see that?
10 　　A.  Yes.
11 　　Q.  And the counterparty is listed as
12 "81730A26."  What does that code represent?
13 　　A.  That code is a Merrill Lynch derived
14 representation for a counterparty.
15 　　Q.  Do you know which counterparty?
16 　　　　MR. TOONE:  Objection.
17 　　Q.  You can answer.
18 　　A.  I know it's Mass Financial.
19 　　Q.  Massachusetts Financial Services?
20 　　A.  Uh-huh.
21 　　Q.  Yes, is that a yes?
22 　　A.  Yes.
23 　　Q.  What does the -- I want to go through the
24 headings.  What's the "Securities Description"
25 column represent?

Page 25

1  　　A.  "Security Description" column tells us
2  what security was transacted with the ticker.  If
3  it's a fixed income instrument, it would show the
4  coupon and the final maturity date.
5  　　Q.  And "Side"?
6  　　A.  "Side" would represent whether the
7  purchase, was it a purchase or a sell.
8  　　Q.  "Amount"?
9  　　A.  "Amount" is an indication of how many
10 securities were bought or sold.
11 　　Q.  "Price"?
12 　　A.  "Price" was the price of the transaction.
13 　　Q.  "Yield"?
14 　　A.  "Yield" is the calculation derived from
15 the price based upon settlement date for that
16 transaction.
17 　　Q.  We talked about counterparty.  What about
18 "Settlement Date"?
19 　　A.  That represents the settlement date of the
20 transaction in the system.
21 　　Q.  The "Total Commission" column?
22 　　A.  Commission is the commission that was
23 inputted on the transaction.
24 　　Q.  What about "Ticket Number"?
25 　　A.  The ticket number is a autogenerated

Page 38

1  how I'll refer to as a ticket.
2      Q.  And for the time it's listed under the
3  "Slate" column, when you refer to the user, are you
4  referring to the trader who entered that information
5  in the trader's slate?
6      A.  Yes.
7      Q.  What about "Login," what is that?
8      A.  The "Login" represents the user login that
9  they -- the slate was created under that's used to
10  access the Bloomberg system.
11      Q.  In order to access a system, what would a
12  trader need to do?
13      A.  In order to access the system, the trader
14  would need to log into the Bloomberg Professional
15  Service, using a -- their own login and password.
16      Q.  Who assigns a login and passwords?
17      A.  Login and passwords are autogenerated when
18  a user becomes a Bloomberg client.  They also have
19  the ability to customize and make their own logins,
20  but they're typically autoassigned.
21      Q.  And then the last row, there's "Terminal."
22  What does that stand for?
23      A.  That indicates the work station where the
24  slate was or the sales ticket was created and put
25  into the system, the Bloomberg work station.

Page 39

1      Q.  Okay.  So just to go through this bottom
2  box, for the time, do you know if -- and I'm looking
3  under "Slate" -- I see "9:42."  Do you see that?
4      A.  Yes.
5      Q.  Do you know if that's a.m. or p.m.?
6      A.  That is a.m.
7      Q.  How do you know that?
8      A.  Bloomberg times are on a 24-hour clock.
9      Q.  Do you know if the time is kept to the
10  second?
11      A.  Yes.
12      Q.  Why doesn't the second appear here?
13      A.  I don't know the final answer to that.  I
14  would surmise it was for ease of space or ease of
15  use.
16      Q.  Under the next column, "Sales Ticket,"
17  what does a "Sales Ticket" represent?
18      A.  The "Sales Ticket" represents the
19  salesperson, institutional salesperson's input and
20  version of events.
21      Q.  Is that a different ticket from the slate?
22      A.  Yes.
23      Q.  And under "Sales Ticket," I see the date
24  "10/31/01."  Is that also when the sales ticket
25  would have been entered into the Bloomberg system?

Page 40

1      A.  Yes.
2      Q.  "Time, 9:45," what does that represent?
3      A.  The 9:45 time stamp represents the minute
4  that the sales ticket was captured in the Bloomberg
5  system.
6      Q.  And then we mentioned KDEROCHE was the
7  login for the salesman on this particular trade.
8      A.  Correct.
9      Q.  Under the column "Matched Ticket," what is
10  "Matched Ticket"?
11      A.  "Matched Ticket" refers to the final event
12  where the slate and the sales ticket were matched to
13  create one final accepted transaction.
14      Q.  And the date there is also "10/31/01."  So
15  is that the date that the ticket was matched?
16      A.  Yes.
17      Q.  The time is "9:45."  What does that
18  reflect?
19      A.  That reflects down to the minute when the
20  sales ticket and the slate were matched to become
21  one final transaction.
22      Q.  For these times, is it possible for a user
23  to modify the times that are shown on this first
24  page of Exhibit 3?
25      A.  Once the time is captured, it is not

Page 41

1  possible for the user to modify the times
2  represented on this page.
3      Q.  Who would have had access to this page at
4  Merrill Lynch?
5      A.  The page would have been able to be
6  accessed by anyone with system administrator
7  permissioning as well as any person who is
8  permissioned to trade as Trader Galen or any
9  salesperson who was permissioned to write a ticket
10  as Salesman 817-9584.
11      Q.  How long after the date of this trade
12  would this particular screen have been able to be
13  accessed by someone at Merrill Lynch?
14      A.  Typically, the time would be ten days past
15  the trade date or five days past the settlement
16  date, which is ever greater.
17      Q.  And if we could -- if I could refer you
18  just to this middle box, I believe you said that
19  some of the information was automatically generated
20  in some -- the trader or salesperson would have had
21  to enter it.  Could you tell me what would have been
22  automatically generated?
23      A.  Going from top to bottom, the security
24  would have automatically loaded prior to the ticket
25  being completed.  The trader and salesman would come

Page 42

1  from the slate and sales ticket and would be
2  automatic, as well. Settlement date would autoload
3  on each version of events, as would the currency
4  code and the exchange rate.
5      Q. And what information would the trader have
6  had to enter?
7      A. The trader -- the trader at the slate
8  portion would enter the price and the amount.
9      Q. What would the salesperson have had to
10 enter?
11     A. The salesperson would have to enter the
12 price, the amount and the counterparty or account,
13 as it's listed here.
14     Q. You previously testified that there
15 were -- that a trader could enter information
16 manually or they could use -- excuse me, they could
17 enter information the long way or they could use
18 this quick sale slate.
19         Do you know how the trader on this
20 particular transaction entered the information into
21 the TOMS system?
22     A. Appearances are that this was entered as a
23 quick sale slate.
24     Q. Why do you say that?
25     A. I say that because as we looked through

Page 43

1  the data and looked in through the transactional
2  database at the varying time stamps, we noticed that
3  the slate, the two time stamps on the slate, which
4  is the actual time and the as of time, matched,
5  meaning, immediate input rather than a delay for a
6  manual input.
7      Q. What do you mean by "as of time"?
8      A. When a user, whether it's a trader or a
9  salesperson, is entering a transaction, they have
10 the ability to -- there are two time stamps on the
11 transaction. There is an as of time and there is a
12 trade time.
13     Q. What is the as of time?
14     A. The as of time is an inputtable date and
15 time stamp that the user can go in and adjust to
16 reflect an earlier or later time of the transaction.
17     Q. When is the as of time captured?
18     A. The as of time will load at the inception
19 of the ticket, meaning, that if I'm the user, I'm
20 the trader, I'm the salesman, and I run the function
21 to bring up the transaction, it will default to the
22 current time and date. It is overwritable if the
23 user chooses to.
24     Q. What about the trade time, when is that --
25 I use "captured"?

Page 44

1      A. The trade time will load again as at the
2  beginning of the transaction. So as I load the
3  screen and bring it up, the trade time at the top of
4  the screen will represent the point that I actually
5  bring up the screen. However, as the input -- the
6  data is input into the screen and is actually
7  finally captured and sent as a completed ticket, it
8  will update to the point of final capture. It is
9  not inputtable.
10     Q. So the trade time cannot be modified by a
11 user?
12     A. It can be modified to the extent that the
13 user can pick and choose when they want to finally
14 enter the transaction, but the user does not have
15 the ability to go in and actually change the data on
16 the ticket.
17     Q. Do you know what the as of time was for
18 the trader's slate in this particular transaction?
19     A. Yes.
20     Q. How do you know?
21     A. As we look through the exhibit, the times,
22 the initial time stamp of the transaction will
23 reflect back to the slate and the inception point of
24 the transaction.
25     Q. Could you tell me where in this exhibit do

Page 45

1  you find that information?
2      A. Yes. It would be on Page 4 of the
3  exhibit.
4      Q. Where on Page 4 do you see that
5  information?
6      A. On the left-hand column, the fifth -- I'm
7  sorry, yes, that's correct, the fifth line down
8  listed as "ftastime" or "ft as time" would indicate
9  the as of time of the slate, the earliest time of
10 the transaction.
11     Q. What is the as of time of this particular
12 slate?
13     A. The as of time is 9:42.,
14     Q. And is -- what is -- I see "34922." What
15 does that stand for?
16     A. 34922 represents the number of seconds
17 past midnight that that as of time was captured. It
18 goes to the second with those numbers.
19     Q. Do you know what the seconds would be
20 here?
21     A. I believe it was two seconds after 9:42,,
22 but you'd have to check the math on that. I
23 wouldn't want to...
24     Q. Okay. So you believe that it's 9:42 and 2
25 seconds?

Page 46

1    A.   I believe that's correct, yes.
2    Q.   What about the trade time for this
3  particular slate, do you know what that is?
4    A.   Yes.
5    Q.   Where is that information in this exhibit?
6    A.   You can find that on Page 5 of the
7  exhibit.
8    Q.   Where on Page 5 do you see the trade time
9  for the trader's slate?
10    A.   In the center section, there are a number
11  of -- called -- this is basically user and update
12  time section.  Going across, it says "ftusers,"
13  "ftudate," "ftutime."
14      As we go across, you'll see next to the
15  heading of Number 1, under the column "ftutime," a
16  time stamp of "34922," represented as 9:42 a.m.
17  That is the trade time.
18    Q.   How do you know that's not the as of time?
19    A.   The system is not designed -- it captures
20  both times, that is the way the system is
21  architected.  One is showing the as of time, but the
22  time that is shown here is actually the time this
23  system was updated or trade time.
24      MS. WILLIAMS:  I see we only have a couple
25  of minutes on the videotape, so I'd like to take a

Page 47

1  break and change the tape.
2      THE VIDEOGRAPHER:  The time is 10:39 a.m.
3  This ends Tape No. 1 of the videotaped deposition of
4  Mr. Patrick Eldridge.
5      (Recess taken.)
6      THE VIDEOGRAPHER:  The time is 10:49 a.m.
7  This begins Tape No. 2 of the videotaped deposition
8  of Mr. Patrick Eldridge.
9  BY MS. WILLIAMS:
10    Q.   Mr. Eldridge, when we -- before you took
11  the break, we were talking about, I guess, Page 5 of
12  Exhibit 3 and specifically, the information that's
13  in the middle of the page.  And I want to go back
14  and ask you a few questions.  First, at the top, I
15  see "FTDB."  What does that stand for?
16    A.   Firm transaction database.
17    Q.   And is this a screen that a user at
18  Merrill Lynch could have accessed?
19    A.   No.
20    Q.   What information, generally speaking, is
21  captured in this particular page of the document?
22    A.   On this page we capture certain aspects of
23  the transaction as well as user information about
24  who inputted the transaction, dates, times, as well
25  as note fields that may be on the particular

Page 48

1  transaction.
2    Q.   The top of this page on the left-hand
3  side, I see under "Help," "ftflag," "ftflag2" and so
4  on.  What is that information?
5    A.   That represents particular information
6  within the trading system's database.  It's --
7  basically identifies certain aspects of the
8  transaction, how the transaction may have been
9  executed, what the particular events surrounding
10  that transaction were from a programmatic
11  standpoint.
12    Q.   And then under that, there are headings.
13  First, I see "ftusers."  What is ftusers?
14    A.   The ftuser is the user number of the
15  person who entered the transaction.
16    Q.   And is that number assigned by Bloomberg?
17    A.   Yes.
18    Q.   "Ftudate," what is that?
19    A.   That stands for firm transaction update or
20  date.  I should say firm transaction date.
21    Q.   Under that, I see "20011031."  Do you know
22  what that date is?
23    A.   That represents October 31, 2001.
24    Q.   Okay.  The next heading is "ftutime," and
25  I think we were just talking about that, but could

Page 49

1  you explain what ftutime is?
2    A.   That represents the time, the actual
3  execution of each event as part of this transaction,
4  when those -- that event was updated into the
5  system.
6    Q.   And under ftutime, there's a five-digit
7  number, the parenthetical with a looks like a
8  traditional time inside.  Those five-digit numbers,
9  what are those?
10    A.   Those -- that number represents the number
11  of seconds past midnight that that action occurred.
12    Q.   What is "usn"?
13    A.   I believe that is the user number.  That
14  is also another Bloomberg identifier of the work
15  station over the user.
16    Q.   If I could just briefly have you turn back
17  to Page 1 of the document, keeping your hand in
18  this, and the third box down, the "Terminal" row
19  seems to be the same as the "usn."
20      Is the terminal and usn the same thing?
21    A.   Yes, it apparently is.
22    Q.   Then back to Page 5.  What is "wkst"?
23    A.   I don't know the answer to that.
24    Q.   What about "func"?
25    A.   For live transactions, we would capture

Page 70

1    Q.  But there is a sequential order in terms
2 of how the numbers are assigned; is that correct?
3    A.  The numbers may not -- they wouldn't show
4 outwardly in absolute sequence because every action
5 within the TOMS system can create a ticket, some of
6 which are not transparent to clients or even to, you
7 know, the logs, they wouldn't be seen; but each
8 action that occurs would be assigned a ticket
9 number.  But they do go in a sequential order from a
10 time perspective going up.
11    Q.  And with respect to the transaction at
12 issue here and displayed in Exhibit 3, are there
13 three ticket numbers at issue, total?
14    A.  In this case, yes, there would be three
15 ticket numbers.  There would be a ticket number for
16 the slate that was entered by the trader, there
17 would be a ticket number for the salesman, and then
18 there would be a new ticket number assigned to the
19 final matched transaction.
20    Q.  And we looked at these numbers during your
21 earlier testimony.  The slate ticket is
22 Number 606188; is that correct?
23    A.  That is correct.
24    Q.  The sales ticket is 606311?
25    A.  That is correct.

Page 71

1    Q.  And the approved ticket is 606314?
2    A.  Correct.
3    Q.  Now, aside from that reference that you
4 showed us regarding the slate ticket number and I
5 believe -- actually, I don't recall exactly where
6 you found it, but you found it somewhere on these
7 documents.  I'm looking at Page 4 of Exhibit 3.  Do
8 you see the sales -- I'm sorry, the slate ticket
9 number on Page 4 of Exhibit 3?
10    A.  Yes.  The slate ticket number is actually
11 represented in two locations on Page 4.  It's
12 represented, Line 3 in the center column, as
13 "606188."  It is also represented in the right-hand
14 column as Line No. 9, I believe.  That is labeled
15 "ftstkt," also showing "606188."
16    Q.  Now, could you generate a ticket along the
17 lines of the first three pages of Exhibit 3 that is
18 specific to Ticket No. 606188?
19    A.  I'm not sure I understand the question.
20    Q.  Well, is there a separate document that
21 represents Ticket 606188?
22    A.  Our system doesn't capture slates as
23 represented here.  It doesn't store them after the
24 day that it's done.  So looking back historically,
25 we wouldn't be able to bring that up as we've done

Page 72

1 with the matched ticket or the salesman's version of
2 events.
3    Q.  Is there a reason why the system doesn't
4 capture that information?
5    A.  At the time, in 2001, it was probably
6 done, and this is my speculation, more for just ease
7 of design.  We now do capture it in real-time today
8 for longer periods of time than one day.
9    Q.  But Bloomberg did not do that as of
10 October 2001; is that correct?
11    A.  Correct.
12    Q.  What exactly is an approved ticket?
13    A.  An approved ticket and a matched ticket in
14 our lexicon are the same thing.  It's a ticket that
15 has been viewed by the trader and matched, meaning,
16 that they've looked at it, they say it's okay, it's
17 now a good transaction, the trading desk agrees with
18 the salesman.
19    Q.  Is there any independent meaning to the
20 term "approved" other than matched?
21    A.  It would say "approved" on the top of a
22 sales ticket, I believe, and I think you can see
23 that on Page No. 2 of the document at the very top
24 where it says "Approved Ticket."
25       That is a salesman's version of the

Page 73

1 ticket, but because the ticket has been submitted,
2 an assumption is made.  It says it's approved.  It
3 doesn't have any, let's say, harder fact behind it.
4 It just shows that a ticket was submitted and
5 someone said yes, it's okay to put that ticket into
6 the system.
7    Q.  To your knowledge, does Bloomberg continue
8 to use this same -- these same terms for its TOMS
9 process?
10    A.  To my knowledge, yes.
11    Q.  Now, you had testified earlier that based
12 on your interpretation of the documents in
13 Exhibit 3, that you concluded that the trader at
14 Merrill Lynch did a quick sale slate; is that right?
15       MS. WILLIAMS:  Objection.
16    A.  Correct.
17    Q.  Just can you -- and I'm sorry to ask you
18 to repeat things, but can you just explain to me
19 quickly what a quick sale slate is again?
20    A.  A quick sale slate is the ability for a
21 trader to put in a ticket without having to go with
22 a long version.  And what I mean by a long version
23 is that you run a pneumonic or a function, and it
24 loads an input screen for you to go and input data.
25 You then hit the green go key and one go to submit

Page 82

1 overwriting the time and putting in a different time
2 stamp, so our system would capture when that ticket
3 was submitted as a trade time.
4    Q.   Is that the actual time the trade was
5 executed?
6       MR. TOONE: Objection.
7    A.   More than likely not.
8    Q.   Why do you say that?
9    A.   Because there's no way for me to know when
10 the actual transaction was executed on the -- with
11 the client.
12    Q.   So the actual trade time of 9:45 and 49
13 seconds, do you know if that was the time that the
14 Merrill Lynch trader and the MFS counterparty agreed
15 on the terms of the trade?
16       MR. TOONE: Objection.
17    A.   I don't -- I don't know the answer to
18 that.
19    Q.   Do you know -- at the time that the
20 Merrill Lynch trader entered their slate, would they
21 have had to have reached agreement on the terms of
22 the price of the trade?
23       MR. TOONE: Objection.
24    A.   I could not answer that with certainty.
25    Q.   When they enter in the price of the trade,

Page 83

1 what is the price supposed to reflect?
2    A.   The price of the trade would reflect the
3 actual price of that transaction. Whether it is a
4 final good price is entirely dependent upon the
5 trader and what they're using the system for.
6    Q.   So in this particular transaction, do you
7 have any information about when the trader and the
8 MFS counterparty agreed on the terms of this
9 particular transaction?
10       MR. TOONE: Objection.
11    A.   No, I don't have that information.
12    Q.   Could have been before the trader entered
13 in their information in the trader's slate?
14       MR. TOONE: Objection.
15    A.   Yes, that's possible.
16       MS. WILLIAMS: I have no further
17 questions.
18       MR. TOONE: I have just a few follow-up
19 questions.
20 BY MR. TOONE:
21    Q.   You have some background in bond trading;
22 is that correct?
23    A.   That's correct.
24    Q.   And you also are familiar with the bond
25 trading system in your capacity -- in your work

Page 84

1 related to the Bloomberg TOMS system; is that right?
2    A.   That's correct.
3    Q.   Is there a central exchange or meeting
4 place for the trading of bonds in this country?
5    A.   No.
6       MS. WILLIAMS: I have an objection that
7 this is outside the scope of 30(b)(6).
8       MR. TOONE: I think it's responding to
9 questions you just asked.
10       MS. WILLIAMS: I disagree. My questions
11 were related to the TOMS system, the timing of this
12 particular transaction.
13       MR. TOONE: You were asking him about the
14 actual time of the trades, and I responded --
15       MS. WILLIAMS: You were asking about the
16 general system in the world about trading. I think
17 that's outside the scope.
18       MR. TOONE: You made your record.
19 BY MR. TOONE:
20    Q.   So have you ever heard of the term
21 "over-the-counter market"?
22       MS. WILLIAMS: Objection.
23    A.   Yes.
24    Q.   What does that mean in your understanding?
25       MS. WILLIAMS: Objection.

Page 85

1    A.   In my understanding, an over-the-counter
2 market, it is a -- it has no central location. It
3 is a negotiated marketplace between buyer and seller
4 directly or with an anonymous third party but through
5 no central exchange.
6    Q.   Is there a central authority in the bond
7 market that records data relating to the execution
8 of trades?
9       MS. WILLIAMS: I renew my objection. This
10 has nothing to do with the redirect that I asked.
11 BY MR. TOONE:
12    Q.   You can answer the question.
13    A.   There are a few authorities, depending
14 upon the type of security.
15    Q.   And what authorities are those?
16       MS. WILLIAMS: Objection.
17    A.   The NASD and the MSRB both take trade data
18 post-transaction of trades.
19    Q.   Post-transaction?
20    A.   Uh-huh.
21    Q.   Is there a mandatory real-time trade
22 reporting requirement for the bond market?
23       MS. WILLIAMS: Objection.
24    A.   Define real-time. I'm not sure I
25 understand what you mean by real-time.

22 (Pages 82 to 85)

*Eldridge* EXHIBIT _3_
FOR IDENTIFICATION
11/2/06        D.H. LONDON

**CONFIDENTIAL**

```
<HELP> for explanation, WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  TWHO
Enter <PAGE> or <MENU> to see another ticket
```

| | TICKET NUMBER : | 606314 |
|---|---|---|

| SECURITY | : T 5 $^3_8$ 02/15/31 | | | |
|---|---|---|---|---|
| AMOUNT | : 65M(m) | PRICE : 102-24$^1_2$ | TRADER | : GALEN |
| SETTLEMENT | : 11/ 1/01 | YIELD : 5.18972 | SALESMAN | : 817-9584 |
| CURR CODE | : USD | EX RATE : 1.0000 | ACCOUNT | : 81730A26 |
| BENCHMARK | : | | SPREAD : | YIELD : |

| | SLATE | SALES TICKET | **MATCHED TICKET |
|---|---|---|---|
| DATE | 10/31/01 | 10/31/01 | 10/31/01 |
| TIME | 09:42 | 09:45 | 09:45 |
| LOGIN | CRICK | KDEROCHE | KDEROCHE |
| TERMINAL | 591210 - 0 | 877361 - 0 | 877361 - 0 |

**AutoMatched ticket

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
G230-82-2 07-Sep-06 15:00:50

**Bloomberg**
TERMINAL

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  TBLT
0<PAGE> to see matched ticket.
                                                         NY 10/31/01 09:45
              APPROVED  TICKET                           As of10/31/01 09:44:59
T 5  ³₈  02/15/31                                                       H2633
SELL                  65M (m)
Price        102-24¹₂       Yield    5.189718(  Yield to    02/15/31 at 100.00)
Settlement   11/01/01
A Account    81730A26    81730A26 MASS FINANCIAL SERVICES

Sales Commission  CodeC    Rate    .150      9750.00 USD

                                                              ↑↑

WIRE        NOE     9584 CONFIRM BY
ORIGIN      BLB2  606311 PARTIAL
FC #        9584    NOE  DELIV INST
SETT TYPES  DAC          DELIV INST
Principal   USD            66,797,656.25  Principal/Agency
Accrued                       740,523.10
Transaction Costs                   0.00  Settlement Loc
Total       USD            67,538,179.35
                                          Ticket Number
View in USD    Rate    1.00000      Invert N (Y/N)        606311
```

Australia 61 2 9777 8600    Brazil 5511 3048 4500    Europe 44 20 7330 7500    Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                   G230-82-3 07-Sep-06 15:30:15

Bloomberg
TERMINAL

CONFIDENTIAL

<HELP> for explanation, WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  TBLT
Enter 2 <GO> to cancel, 99 <GO> for options. 0 <PAGE> to see original sales tkt.

NY 10/31/01 09:45

GALEN          APPROVED  TICKET        As of 10/31/01 09:42:02
T 5 ³₈ 02/15/31                                          H2633

| SELL | 65M (m) | | | | |
|---|---|---|---|---|---|
| Price | 102-24¹₂ | Yield | 5.189718( | Yield to | 02/15/31 at 100.00) |
| Settlement | 11/01/01 | | | | |
| A Account | 81730A26 | 81730A26 MASS FINANCIAL SERVICES | | Sales | 817-9584 |

Sales Commission    CodeC    Rate    .150    9750.00 USD

↑↑

| WIRE | NOE | 9584 | CONFIRM BY |
|---|---|---|---|
| ORIGIN | BLB2 | 606311 | PARTIAL |
| FC # | 9584 | NOE | DELIV INST |
| SETT TYPES | DAC | | DELIV INST |

| Principal | USD | 66,797,656.25 | Principal/Agency | |
|---|---|---|---|---|
| Accrued | ( 78) | 740,523.10 | | |
| Transaction Costs | | 0.00 | Settlement Loc | FED |
| Total | USD | 67,538,179.35 | | |

Ticket Number
606314

View in USD    Rate    1.00000    Invert N (Y/N)

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
G230-82-3 07-Sep-06 15:30:10

Bloomberg

CONFIDENTIAL

8                                                                    M-Mkt  **FTDB**
`<Page> for next page or <MENU> to exit.`

| | | | | | |
|---|---|---|---|---|---|
| ftnumber | 22 | fttktnum | 606314 | fttrader | 379 | ftsetloc | 4 |

Rendering as a plain layout:

```
ftnumber    22          fttktnum   606314    fttrader     379   ftsetloc    4
ftdate    20011031      ftcxlnum        0    ftsales     2220   ftclntyp    0
fttime   (09:45)35149   ftrelnum   606188    ftrelno3        0  ftfpstrd        0
ftasofdt  20011031      ftrelno2        0    ftpurpose       0  ftnewtrd   12353
ftastime (09:42)34922   ftctbnum        0            fttkmtdr        0
ftcarodt         0      ftcount    14582            ftxtktno          0
ftrectyp    1 MT        ftlotnum   13853            ftrrn          14592
ftbuyflg  1             ftamt8       65000.0000 ftoldrec        0
ftcusip  912810FP       ftamt       65000          ftstkt      606188
ftticker  T             ftamt2           0         ftsaletkt   606311
ftcpn    5.375          ftyield      5.189718      ftpaflag    0
ftmty   20310215        ftprice   102.7656250      ftcusflg    0
ftseries      ** ***    ftprice2  0.000000         ftexdte          0
ftpool    <5..@..>      ftwrkdt   20310215         ftexdv      0
ftdept    7             ftwrkpx   100.000000       ftdisp      0
ftsflag   0             ftprin     66797656.250    ftcsn       0.00000
ftbastyp  1             ftaccr       740523.100    ftasscpn    0.00000
ftcurr    1             ftaidays        78         ftpptyp     0
ftexcde   US            ftmamt           0.00      ftpprt          0.00
ftexrte   1.000000      ftdtos     1              ftcredit   C
ftident   H2633         ftsetdt   20011101         ftdolcdt         0.1500
ftcntsze  5111808       ftdevflg   1               ftcomamt       9750.00
ftfactor  0.00000000    ftacct    81730A26         ftfilcom        0.00
```

Bloomberg

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
 HELP          0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5        Page 2
      ftflag       F  T  F  F
      ftflag2
      ftflag4                       X
      ftflag6   X
      ftflag7
      ftflag8
      ftflag9
      ftrecflg
   ftusers   ftudate   ftutime            usn     wkst  func
 1   11804  20011031     34922 (09:42)   591210     0   ↑↑↑↑    lot matching:
 2   242877 20011031     35144 (09:45)   877361     0   ↑↑↑↑    lotm_dt
 3   242877 20011031     35149 (09:45)   877361     0   ↑↑↑↑    lotm_amt
 4        0        0         0 (00:00)        0     0   ↑↑↑↑    lotm_num
   ftsnotes        ftlnotes
 1  NOE       9584
 2  BLB2   606311
 3  9584      NOE
 4  DAC
  ftbrdstrip   0.000        ftbrady1  0.000000000   ftbrady2   0.000000000
                6mo     1yr     2yr     3yr     5yr    10yr    30yr
   ftdbycurv    0       0       0       0       0       0       0
   ftdbydtm     0       0       0       0       0       0       0
Australia 61 2 9777 8600       Brazil 5511 3048 4500      Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                      6230-82-2 07-Sep-06 15:16:47
```

Bloomberg

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt   F T D B
<Page> for next page or <MENU> to exit.
                                                                    Page 3
fttcrec        0        fttrccode   fttrcrate       fttrcost   fttrctpc/2 fttrccurr
fttcbeg        0        · C              0.1500     9750.00    1001          0
fttcend        0                         0.0000        0.00       0          0
ftmlrrn            0                     0.0000        0.00       0          0
ftaeseq             0                    0.0000        0.00       0          0
ftaebrok            0                    0.0000        0.00·      0          0
ftaeappl            0          ftpost_transaction_position           0.000
ftaepend       0               ftassind  0.00000 ftclbrok         ↑↑↑↑↑↑↑↑↑↑
ftaffiliate          0         ftindnxt  0.00000 ftagytkt               0
ftswapspread            0.000 ftxptuser        0 ftmaccrd            740523.10
ftsource                       ftstrategy_code  ↑ ftreason_code      0
ftfinalstatus    0             ftuser_group     0 ftalloc_method       0
fttstamp       54601           ftdstamp  20060907 ftident_type       25
ftraewiretm    0         ftpre_rel_tktnum          0
ftcoverpx          0.0000 ftpre_rel_date            0      ftprclevel       0
ftraecmpdlr    0         ftpre_toace_tktnum         0      ftcplimit        0
ftquotetie     0         ftpre_toace_date           0      ftcusbnk         0
ftordnum       606188    ft_char_reason_code ↑↑           fttmflg      ↑
ftordid            0     fttran_code         ↑↑           ftaeswap_type     0
ftoruuid       0         ftoptns_delta     ↑↑↑↑↑↑↑↑↑↑↑↑
fttotalo           0     ftresidual_amt             0.0000
fthair_option  0         ftswap_pamt                   0.0000000000
```

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  F T D B
<Page> for next page or <MENU> to exit.
 HELP         0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5      Page 4
        ftflag10
        ftflag11
        ftflag12
        ftflag13
        ftcomflg
        ftmtflg
        ftflag14
        ftflag15
        ftflag16
  ftxtktnum      606314   ftxrectyp              1   ftprod_domicile     ↑↑
  ftxunique   539549442   ftdaccrued             0   fttba_stip_type    ↑↑↑↑
  fttdept            0   ftmaccount   ↑↑↑↑↑↑↑↑↑↑   fttbaxtkt            0
  ftsdept            0   ftmac_mas    ↑↑↑↑↑↑↑↑↑↑   ftfwdtktnum          0
  ftversion        130   ftsb_repo_rate      0.00   ftlockid             0
  fthis_tktnum       0   ftsb_repo_int       0.00   ftlocklvl            0
  fthis_pnum         0   ftcurrentered             ftlockpindex         0
  ftblk_upd_time     0   ftundrlyngtckr ↑↑↑↑↑↑   ftsecfeex         0.00
  ftcurrntcpn     0.00   ftundrlyngprc       0.00   ftfactorx         0.00
  ftcnvsnprm      0.00   ftavg_prc_allo_mthd    0   ftprice2x         0.00
  ftdltcnvsn      0.00   ftavg_prc_dcml_prcsn   0   ftspextkt            0
  ftswaprate   0.00000   ftpmscnum              0   fttrrepdest          0
  fttradeguid            ftcharcusbnk               ftsflag2
```

CONFIDENTIAL

<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  **FTDB**
<Page> for next page or <MENU> to exit.

| | | | |
|---|---|---|---|
| ftbe_fin_rate | 0.00 | ftorder_id | 0 Page 5 |
| ftfill_px | 0.00 | ftorder_agg_num | 0 |
| ftallo_amt | 0.00 | ftorder_ax_aggregate | 0 |
| ftorder_dir_brkr | 0.00 | ftorder_prim_num | 0 |
| ftorder_sent_alloc | 0.00 | ftorder_active_date | 0 |
| ftorder_work_flag | 0 | ftorder_active_time | 0 |
| ftorder_alloc_type | 0 | ftorder_flags | 0 |
| ftorder_exch ↑↑↑ | | fttrader_uuid | 0 |
| ftfill_amt | 0.00 | ftorder_type | 0 |
| ft_oa_refused | 0.000000 | ftwork_amt | 0.00 |
| ft_oa_ticketed | 0.000000 | ftwork_price | 0.00 |
| ft_oa_allocated | 0.000000 | ftavg_price | 0.00 |
| ftwork_yield | 0.00 | ftorder_tif | 0 |
| ftavg_yield | 0.00 | fttrade_status | 0 |
| ftbasket_num | 0 | ftplatform | 0 |
| ftorder_name_chr | ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑ | | |
| fttrace_conf_num | ↑↑↑↑↑↑↑↑↑↑ | 012345678901234567890123456789012345678901 | |
| fteff_duration | 0.000ftorder_bit_flags | | |
| ftallocation_amt | 0.00 ftorder_bit_flag | | |
| ftnet_wire | 0.00 ftturnpooltkt | 0  ftwac | 0.000 |
| ftroll_amt | 0.00 ftaverage_life | 0.000 ftwam | 0.000 |
| ftturn_amt | 0.00 ftstipcode | 0  ftmatch_amt | 0.00 |
| ftpairoff_amt | 0.00 ftsnd_trace_chng | 0  ftdlvrydt | 0 |

**Bloomberg**

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM      SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
 ftgentkt                0   ftnetyld      0.000000 ftcmpr_status ↑ Page 6
 ftgenamt             0.00   ftnetprc      0.000000 ftsprcode      0
 ftfutbrkclt   ↑↑↑↑↑↑↑↑↑    ftrltime (00:00)     0 ftportmgruuid          0
 ftfutbrkdlr   ↑↑↑↑↑↑↑↑↑    ftrluser             0 ft_assigned_trdr
 fttaxlot_id ↑↑↑↑↑↑↑↑↑↑↑↑   ftrldate             0    ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑
 fttotalamortcost     0.00   ftorda_num           0
 ftunitamortcost      0.00   ftpaycurr            0 ▓ ft_ipo_secondary ↑
 ▓ tax lot status 0          ftnewfos
 ftgood_till_date        0   fttktfos
 ftexec_instr       ↑        ftfos_date
 ftstoppx             0.00   ftfos_deno
 ftlimit             0.000
 ft_other_leg_tktnum     0
 ft_other_leg_parent     0                          ftecpbrate           0.0000
 ftjp_trd_dt            0                            ftinquiry_amt        0.0000
 ftaccount_group  ↑↑↑↑↑↑↑                           ftassign_amt         0.0000
 ftlsttrn_tranno        0   ftnasd_sym                 fttrace_conf_num
 ftorig_order_amt     0.00  ft8cntsze             0 +ftmsrb_conf_num
 fthfstrat_code         0     ftfxo_dis_px   0.0000000   ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑
 ftlotrestrictcode      0   ftstepout_amt         0
 ftlotmatchmethod       0   ftstepout_brkr
 ftlotclosetktnum       0   ftsoft_dollar_pct     0   ftcds_price    0.000000
 ftlot_sequence         0   ftcds_recrate   0.000000  ftcds_spread   0.000000
Australia 61 2 9777 8600      Brazil 5511 3048 4500    Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                 G230-82-2 07-Sep-06 15:16:49
```



CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
 HELP          0   1   2   3   4   5   6   7   8   9   0   1   2   3   4   5    Page 7
        ftflag17
        ftflag18
        ftflag19
        ftflag20
        ftflag21
        ftflag22
        ft_yasCflg
ftbnchmkcsp ↑↑↑↑↑↑↑↑↑   ftbnchmkyld    0.00000  ftsprdvbnchmk      0.00000
ft_isprdcrv                ftduration     0.00000  ftcalcstatus       0
ft_isprd        0.00000  ft_dsprd       0.00000  ftbench_price      0.000000
ft_asw_sprd    -0.00000  ft_oas_sprd    0.00000  ft_oas_vol         0.00000
ftbmdept        0        ft_zsprd       0.00000  ftbnchsetdt           0
ftbnchmksflag   0        ftvaldtrt1     0.00000  ftbnchqty             0
ftyld_conv               ftvaldtrt2     0.00000  ftaeswap_book      0
ftnumcustdays   0        ftspotrt1      0.00000  ftaextrader              0
ftnumaexprcdec  0        ftspotrt2      0.00000  ft_aep_trade_type        0
ftnumaexylddec  0        ftspotrate     0.00000  ft_autoquoter_option     0
ftaexyldflag    0        ftsplitccy     0  ftsplttdr1       0  ftsplttdr2    0
ftaerepo_rate   0.00     ft8amtlcl      0.00000  ft_handle_instr
ftestprc     0.0000000   ft_brkr_acct                     ftwala        0.000000
ftctl_contra ↑↑↑↑↑↑↑↑↑↑  ftsplit_strategy_code            ft_sprd_inq_type     0
ftsource_code        0  ftcomp_id  ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑  ftbm_stgy_cnt        0
```

Australia 61 2 9777 8600   Brazil 5511 3048 4500   Europe 44 20 7330 7500   Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
G230-82-2 07-Sep-06 15:16:49

Bloomberg
TERMINAL

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
```

| HELP | 0 1 2 3 4 5 6 7 8 9 0 1 2 3 4 5 | | Page 8 |
|---|---|---|---|
| ft_ndf_flag | | | |
| ft_adjrtflg | | | |
| | | | |
| | | | |
| ftdealtyp | 0 | ftoutrtspot | 0.00000000 | ft_fxopt_status | 0 |
| ftmktspotsrc | 0 | ftpoints | 0.00000000 | ft_fxopt_tkt | 0 |
| ftmktratesrc | 0 | ftmktrate | 0.00000000 | ftsuptkt | 0 |
| ftmktspotdt | 0 | ftxpnts | 0.00000000 | ftxiso | 0 |
| | 0 | | 0.00000000 | | 0 |
| | 0 | ftxrate | 0.00000000 | ftxsrc | 0 |
| ftcash_sett_date | 0 | | 0.00000000 | | 0 |
| ftcash_sett_date2 | 0 | | | ftexrate_firm | 1.00 |
| ftfxmsg_id | | | | ftexrate_book | 1.00 |
| ftfos_date | | ft_ndf_mkttyp | | ftinvertrate | 0.00000000 |
| ftfos_deno | | ft_ndf_settcurr | | ftinvertspot | 0.00000000 |
| | | ft_ndf_diffgmt | 0 | ftinvertpts | 0.00000000 |
| | | ft_ndf_fixdate | 0 | | |
| | | ft_ndf_fixtime | 0 (00:00) | | |
| | | ftaffiliate | 0 | | |
| | | ft_ndf_stlamt | 0.0000 | | |
| ftnewfos | | ft_ndf_fixrate | 0.0000000 | | |
| fttktfos | | ft_adjrate | 0.0000000 | | |

CONFIDENTIAL

8                                                    M-Mkt  **FTDB**
&lt;Page&gt; for next page or &lt;MENU&gt; to exit.

| | | | | | |
|---|---|---|---|---|---|
| ftnumber | 22 | fttktnum | 606311 | fttrader | 0 | ftsetloc | 4 |
| ftdate | 20011031 | ftcxlnum | 0 | ftsales | 2220 | ftclntyp | 0 |
| fttime | (09:45)35144 | ftrelnum | 606314 | ftrelno3 | 0 | ftfpstrd | 379 |
| ftasofdt | 20011031 | ftrelno2 | 0 | ftpurpose | 0 | ftnewtrd | 12353 |
| ftastime | (09:44)35099 | ftctbnum | 0 | fttkmtdr | 0 | | |
| ftcarodt | 0 | ftcount | 0 | ftxtktno | 0 | | |
| ftrectyp | 32 CPT | ftlotnum | 0 | ftrrn | 14582 | | |
| ftbuyflg | 1 | ftamt8 | 65000.0000 | ftoldrec | 0 | | |
| ftcusip | 912810FP | ftamt | 65000 | ftstkt | 0 | | |
| ftticker | T | ftamt2 | 0 | ftsaletkt | 0 | | |
| ftcpn | 5.375 | ftyield | 5.189718 | ftpaflag | 0 | | |
| ftmty | 20310215 | ftprice | 102.7656250 | ftcusflg | 0 | | |
| ftseries | ** *** | ftprice2 | 0.000000 | ftexdte | 0 | | |
| ftpool | <5..@..> | ftwrkdt | 20310215 | ftexdv | 0 | | |
| ftdept | 7 | ftwrkpx | 100.000000 | ftdisp | 1 | | |
| ftsflag | 0 | ftprin | 66797656.250 | ftcsn | 0.00000 | | |
| ftbastyp | 1 | ftaccr | 740523.100 | ftasscpn | 0.00000 | | |
| ftcurr | 1 | ftaidays | 78 | ftpptyp | 0 | | |
| ftexcde | US | ftmamt | 0.00 | ftpprt | 0.00 | | |
| ftexrte | 1.000000 | ftdtos | 1 | ftcredit | C | | |
| ftident | H2633 | ftsetdt | 20011101 | ftdolcdt | 0.1500 | | |
| ftcntsze | 5111808 | ftdevflg | 1 | ftcomamt | 9750.00 | | |
| ftfactor | 0.00000000 | ftacct | 81730A26 | ftfilcom | 0.00 | | |

Bloomberg

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
HELP              0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5      Page 2
          ftflag        F  T  F  F
          ftflag2
          ftflag4
          ftflag6
          ftflag7
          ftflag8
          ftflag9
          ftrecflg
    ftusers  ftudate   ftutime        usn    wkst  func
1        0        0         0 (00:00)     0     0  ↑↑↑↑     lot matching:
2   242877 20011031    35144 (09:45)  877361   0  ↑↑↑↑     lotm_dt
3        0        0         0 (00:00)     0     0  ↑↑↑↑     lotm_amt
4        0        0         0 (00:00)     0     0  ↑↑↑↑     lotm_num
    ftsnotes       ftlnotes
1  NOE      9584
2  BLB2   606311
3  9584     NOE
4  DAC
  ftbrdstrip   0.000       ftbrady1  0.000000000  ftbrady2   0.000000000
                    6mo    1yr    2yr   3yr    5yr   10yr   30yr
    ftdbycurv      0      0      0     0      0      0      0
    ftdbydtm       0      0      0     0      0      0      0
```

Australia 61 2 9777 8600       Brazil 5511 3048 4500       Europe 44 20 7330 7500       Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                              G230-82-3 07-Sep-06 15:31:13

Bloomberg
TERMINAL

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
                                                                    Page 3
 fttcrec       0       fttrccode   fttrcrate      fttrcost  fttrctpc/2 fttrccurr
 fttcbeg       0       C             0.1500      9750.00      1001        0
 fttcend       0                     0.0000         0.00         0        0
 ftmlrrn     204                     0.0000         0.00         0        0
 ftaeseq         0                   0.0000         0.00         0        0
 ftaebrok        0                   0.0000         0.00         0        0
 ftaeappl        0         ftpost_transaction_position         0.000
 ftaepend      0        ftassind   0.00000 ftclbrok         ↑↑↑↑↑↑↑↑↑↑↑
 ftaffiliate       0      ftindnxt   0.00000 ftagytkt              0
 ftswapspread         0.000 ftxptuser       0 ftmaccrd            740523.10
 ftsource                 ftstrategy_code  ↑ ftreason_code      0
 ftfinalstatus   0        ftuser_group     0 ftalloc_method      0
 fttstamp      55616      ftdstamp 20060907 ftident_type       25
 ftraewiretm    0       ftpre_rel_tktnum           0
 ftcoverpx        0.0000 ftpre_rel_date            0    ftprclevel      0
 ftraecmpdlr    0       ftpre_toace_tktnum         0    ftcplimit       0
 ftquotetie     0       ftpre_toace_date           0    ftcusbnk        0
 ftordnum          0    ft_char_reason_code ↑↑          fttmflg       ↑
 ftordid         0      fttran_code         ↑↑       ftaeswap_type     0
 ftoruuid       0       ftoptns_delta   ↑↑↑↑↑↑↑↑↑↑↑
 fttotalo          0    ftresidual_amt           0.0000
 fthair_option  0       ftswap_pamt                     0.0000000000
```

Australia 61 2 9777 8600        Brazil 5511 3048 4500        Europe 44 20 7330 7500        Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                    G230-82-3 07-Sep-06 15:31:14

Bloomberg

CONFIDENTIAL

<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  **FTDB**
<Page> for next page or <MENU> to exit.

| HELP | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 | 1 | 2 | 3 | 4 | 5 | | Page 4 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

```
        ftflag10
        ftflag11
        ftflag12
        ftflag13
        ftcomflg
        ftmtflg
        ftflag14
        ftflag15
        ftflag16
ftxtktnum      606311    ftxrectyp              32    ftprod_domicile    ↑↑
ftxunique   539549443    ftdaccrued              0    fttba_stip_type   ↑↑↑↑
fttdept            0     ftmaccount   ↑↑↑↑↑↑↑↑↑↑↑     fttbaxtkt             0
ftsdept            0     ftmac_mas    ↑↑↑↑↑↑↑↑↑↑↑     ftfwdtktnum           0
ftversion        130     ftsb_repo_rate       0.00    ftlockid              0
fthis_tktnum       0     ftsb_repo_int        0.00    ftlocklvl             0
fthis_pnum         0     ftcurrentered                ftlockpindex          0
ftblk_upd_time     0     ftundrlyngtckr ↑↑↑↑↑↑        ftsecfeex          0.00
ftcurrntcpn     0.00     ftundrlyngprc    0.00        ftfactorx          0.00
ftcnvsnprm      0.00     ftavg_prc_allo_mthd     0    ftprice2x          0.00
ftdltcnvsn      0.00     ftavg_prc_dcml_prcsn    0    ftspextkt             0
ftswaprate   0.00000     ftpmscnum            0       fttrrepdest           0
fttradeguid              ftcharcusbnk                 ftsflag2
```

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
                                                                    G230-82-3 07-Sep-06 15:31:14

Bloomberg
INTERNAL

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
ftbe_fin_rate            0.00      ftorder_id                   0 Page 5
ftfill_px                0.00      ftorder_agg_num              0
ftallo_amt               0.00      ftorder_ax_aggregate         0
ftorder_dir_brkr                   ftorder_prim_num             0
ftorder_sent_alloc       0.00      ftorder_active_date        0
ftorder_work_flag        0         ftorder_active_time        0
ftorder_alloc_type       0         ftorder_flags              0
ftorder_exch        ↑↑↑            fttrader_uuid                0
ftfill_amt               0.00      ftorder_type                 0
ft_oa_refused            0.000000  ftwork_amt                0.00
ft_oa_ticketed           0.000000  ftwork_price              0.00
ft_oa_allocated          0.000000  ftavg_price               0.00
ftwork_yield             0.00      ftorder_tif               0
ftavg_yield              0.00      fttrade_status               0
ftbasket_num             0         ftplatform                   0
ftorder_name_chr  ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑
fttrace_conf_num  ↑↑↑↑↑↑↑↑↑↑  01234567890123456789012345678901
fteff_duration           0.000ftorder_bit_flags
ftallocation_amt         0.00 ftorder_bit_flag
ftnet_wire               0.00 ftturnpooltkt         0    ftwac          0.000
ftroll_amt               0.00 ftaverage_life        0.000 ftwam         0.000
ftturn_amt               0.00 ftstipcode        0      ftmatch_amt        0.00
ftpairoff_amt            0.00 ftsnd_trace_chng  0        ftdlvrydt        0
```

Australia 61 2 9777 8600      Brazil 5511 3048 4500      Europe 44 20 7330 7500      Germany 49 69 920410
Hong Kong 852 2977 6000 Japan 81 3 3201 8900 Singapore 65 6212 1000 U.S. 1 212 318 2000 Copyright 2006 Bloomberg L.P.
G230-82-3 07-Sep-06 15:31:15

Bloomberg

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
ftgentkt                  0    ftnetyld     0.000000 ftcmpr_status ↑ Page 6
ftgenamt               0.00    ftnetprc     0.000000 ftsprcode        0
ftfutbrkclt     ↑↑↑↑↑↑↑↑↑     ftrltime (00:00)    0 ftportmgruuid           0
ftfutbrkdlr     ↑↑↑↑↑↑↑↑↑     ftrluser            0 ft_assigned_trdr
fttaxlot_id   ↑↑↑↑↑↑↑↑↑↑↑    ftrldate            0      ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑
fttotalamortcost       0.00    ftorda_num          0
ftunitamortcost        0.00    ftpaycurr           0 █ ft_ipo_secondary ↑
 █ tax lot status 0            ftnewfos
ftgood_till_date          0    fttktfos
ftexec_instr          ↑        ftfos_date
ftstoppx               0.00    ftfos_deno
ftlimit               0.000
ft_other_leg_tktnum       0
ft_other_leg_parent       0            ftecpbrate          0.0000
ftjp_trd_dt           0                ftinquiry_amt       0.0000
ftaccount_group    ↑↑↑↑↑↑↑↑             ftassign_amt        0.0000
ftlsttrn_tranno       0    ftnasd_sym               fttrace_conf_num
ftorig_order_amt   0.00    ft8cntsze           0 +ftmsrb_conf_num
fthfstrat_code        0    ftfxo_dis_px  0.0000000    ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑
ftlotrestrictcode     0    ftstepout_amt       0
ftlotmatchmethod      0    ftstepout_brkr
ftlotclosetktnum      0    ftsoft_dollar_pct   0    ftcds_price    0.000000
ftlot_sequence        0    ftcds_recrate  0.000000  ftcds_spread   0.000000
```

CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
  HELP            0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5      Page 7
           ftflag17
           ftflag18
           ftflag19
           ftflag20
           ftflag21
           ftflag22
        ft_yasCflg
ftbnchmkcsp  ↑↑↑↑↑↑↑↑↑   ftbnchmkyld      0.00000  ftsprdvbnchmk       0.00000
ft_isprdcrv              ftduration       0.00000  ftcalcstatus        0
ft_isprd     0.00000     ft_dsprd         0.00000  ftbench_price       0.000000
ft_asw_sprd  0.00000     ft_oas_sprd      0.00000  ft_oas_vol          0.00000
ftbmdept     0           ft_zsprd         0.00000  ftbnchsetdt          0
ftbnchmksflag 0          ftvaldtrt1       0.00000  ftbnchqty            0
ftyld_conv               ftvaldtrt2       0.00000  ftaeswap_book       0
ftnumcustdays   0        ftspotrt1        0.00000  ftaextrader                 0
ftnumaexprcdec  0        ftspotrt2        0.00000  ft_aep_trade_type           0
ftnumaexylddec  0        ftspotrate       0.00000  ft_autoquoter_option        0
ftaexyldflag    0        ftsplitccy       0 ftsplttdr1      0 ftsplttdr2        0
ftaerepo_rate   0.00     ft8amtlcl        0.00000  ft_handle_instr
ftestprc    0.0000000    ft_brkr_acct             ftwala         0.000000
ftctl_contra ↑↑↑↑↑↑↑↑↑↑  ftsplit_strategy_code          ft_sprd_inq_type       0
ftsource_code   0 ftcomp_id  ↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑↑ ftbm_stgy_cnt        0
```



CONFIDENTIAL

```
<HELP> for explanation. WORKING ON DEVELOPMENT SYSTEM    SD20 t M-Mkt  FTDB
<Page> for next page or <MENU> to exit.
 HELP          0  1  2  3  4  5  6  7  8  9  0  1  2  3  4  5      Page 8
    ft_ndf_flag
    ft_adjrtflg


 ftdealtyp          0  ftoutrtspot     0.00000000   ft_fxopt_status   0
 ftmktspotsrc       0  ftpoints        0.00000000   ft_fxopt_tkt          0
 ftmktratesrc       0  ftmktrate       0.00000000   ftswptkt              0
 ftmktspotdt        0  ftxpnts         0.00000000   ftxiso                0
                    0                  0.00000000                         0
                    0  ftxrate         0.00000000   ftxsrc                0
 ftcash_sett_date      0               0.00000000
 ftcash_sett_date2     0                            ftexrate_firm      1.00
 ftfxmsg_id                                         ftexrate_book      1.00
 ftfos_date            ft_ndf_mkttyp                ftinvertrate    0.00000000
 ftfos_deno            ft_ndf_settcurr              ftinvertspot    0.00000000
                       ft_ndf_diffgmt       0       ftinvertpts     0.00000000
                       ft_ndf_fixdate       0
                       ft_ndf_fixtime       0 (00:00)
                       ftaffiliate          0
                       ft_ndf_stlamt          0.0000
 ftnewfos              ft_ndf_fixrate       0.0000000
 fttktfos              ft_adjrate           0.0000000
```

Excerpt from the

November 2, 2006 deposition

of Bloomberg L.P.

representative,

Darin Langone

Exhibit CC

Page 1

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS
(Boston Division)
----------------------------------------x
UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

                            Plaintiff,

                            Civil Action
                            No. 05-10983

            -against-


STEVEN E. NOTHERN,

                            Defendant.
----------------------------------------x



    VIDEOTAPED DEPOSITION OF DARIN LANGONE

            New York, New York

        Friday, November 3, 2006




    Reported by:
    DOROTHY H. LONDON, RPR

Langone 30(b)(6), Darin - Vol. I                    November 3, 2006
New York, NY

---

Page 30

1  is used is it gives all the computers in this
2  particular grouping on a network the ability to keep
3  time with one another. It's almost as if -- you
4  know, we all wear watches. You know, some people's
5  individual watches are fast. Some people's
6  individual watches run slow. You know, the watch on
7  your wrist might be easily equated to the hardware
8  clock that's on your motherboard, so if you're going
9  to interact, if you're a computer and you're going
10 to interact with some other computers and then maybe
11 a clock is a little slower or faster, you're going
12 to have a difficult time doing these transactions.
13 You know, I might go to you and say hey, you know,
14 give me this and you give me that and I give you
15 something else, and we look at our watch to try to
16 synchronize, but there's differences.
17      But if somehow our watches were
18 interconnected and the statefulness of time was
19 maintained between two of them, we wouldn't have
20 this difficulty, and that's probably why it is that
21 NTP is utilized between systems on a network, and I
22 think it's going to also get into why it is that
23 there's differences between why a computer has a
24 hardware clock and why if it does have a hardware
25 clock, why it is that we need this NTP thing, as

---

Page 31

1  well.
2      Q. Without getting into too many technical
3  details, how did NTP or how did NTP affect the
4  accuracy of clocks on the TOMS system that Bloomberg
5  maintained in 2001?
6      MR. TOONE: Objection.
7      Q. You can answer.
8      A. Well, NTP maintains the statefulness of
9  the clocks on the TOMS system and every other system
10 that we have by basically going out on to the
11 Internet at that time and being in sync with some of
12 the well known atomic clocks, GPS clocks that are
13 out there for that specific purpose.
14      So it might have been a server for the
15 TOMS system or any other server for that matter.
16 It's really a generic thing. So that system would
17 be up and running, and it would essentially be
18 synchronizing its time with one of the well known
19 clocks on the Internet.
20      Q. Are you familiar with the NTP
21 configuration for Server N010?
22      A. Yes, I am.
23      MS. WILLIAMS: I'd like to have this
24 marked as Exhibit 2.
25      (Langone Exhibit 2,

---

Page 32

1              Configuration files for Server
2              N010, marked for identification,
3              as of this date.)
4  BY MS. WILLIAMS:
5      Q. Mr. Langone, if you could take a minute
6  and review Exhibit 2.
7      A. (Perusing.)
8      Q. Do you recognize what's been marked as
9  Exhibit 2?
10     A. Yes, I do.
11     Q. What is it?
12     A. These are configuration files that would
13 have been used at the time on these machines to --
14 for the NTP process.
15     Q. When you say "these machines," what do you
16 mean?
17     A. Oh, N010.
18     Q. If I could refer you to the document
19 that's immediately behind Section 3(a), so that
20 would be the fourth page of the exhibit.
21     A. Yes.
22     Q. Do you see that fourth page of the Exhibit
23 2?
24     A. Yes.
25     Q. Yes, okay. What is -- have you seen this

---

Page 33

1  page before?
2      A. Yes, I have.
3      Q. What is this?
4      A. This is the configuration file that would
5  have been on N010 for its NTP configuration.
6      Q. Is this a document that you printed?
7      A. Yes.
8      Q. Is it a true and correct copy of the
9  document that you generated?
10     A. Yes, it is.
11     Q. At the top of the document under the --
12 the sixth line down, I see a pound sign and then
13 less than sign and at and some other information and
14 then ntp.conf.proto and then some additional
15 information. Do you see that line?
16     A. Yes, I do.
17     Q. What does that line mean?
18     A. Well, this denotes this file as being the
19 NTP configuration prototype.
20     Q. When you say "NTP configuration
21 prototype," what is that?
22     A. Well, when the system would have come from
23 the vendor, the operating system, that is, it would
24 have come with this file, and it probably would have
25 been blank. So this serves as the prototype. It's

---

9 (Pages 30 to 33)