UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
(Boston Division)

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : : |
| v. | : : Civil Action No. 05-10983 (NMG) |
| STEVEN E. NOTHERN, | : : **Leave to file granted on Sept. 18, 2008** |
| Defendant. | : : : |

**DEFENDANT'S REPLY MEMORANDUM IN**
**SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO #6443249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Dated: August 1, 2008

## Table of Contents

Table of Authorities ......................................................................................................... ii

I.      BECAUSE THE SEC FAILS TO CONTROVERT NOTHERN'S STATEMENT OF UNDISPUTED FACTS, IT SHOULD BE DEEMED ADMITTED. ................................ 1

      A.      The SEC's Narrative Response Ignores Local Rule 56.1. ........................................1

      B.      Nothern's Statement Should Be Deemed Admitted. ................................................2

II.     THE INFORMATION WAS PUBLIC AFTER 9:00 A.M. ................................................ 2

      A.      Information Announced at a Government Press Conference Need Not Be "Broadly Disseminated" or "Impounded" into the Market. ........................................2

      B.      Treasury's Embargo Failed to Keep the Information Confidential. ..........................5

      C.      Any Embargo Violated the First Amendment. ..........................................................7

III.    DAVIS DID NOT OWE A FIDUCIARY-LIKE DUTY TO TREASURY. ...................... 8

      A.      There Is No Evidence of a Fiduciary-Like Relationship. .........................................9

      B.      The SEC Cannot Establish a Duty Under Rule 10b5-2. ........................................12

            1.      A mere agreement does not create a duty of "trust and confidence." ........12

            2.      The SEC may not redefine fiduciary-like duty. ..........................................14

            3.      Davis's alleged "history, pattern or practice of sharing confidences" did not create a fiduciary-like duty. ..........................................................15

IV.     NOTHERN DID NOT KNOW ABOUT ANY DUTY. ................................................... 16

      A.      The SEC Cannot Establish Actual Knowledge. ....................................................16

      B.      The SEC Cannot Establish That Nothern "Should Have Known" of a Duty. ........17

Conclusion ..................................................................................................................... 19

## Table of Authorities

### CASES

*Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8 (1st Cir. 2004) ....................................7

*Brown v. Armstrong*, 957 F. Supp. 1293 (D. Mass.), *aff'd*, 129 F.3d 1252 (1st Cir. 1997) .................................................................................................................... 1-2

*Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1 (1st Cir. 2007).........................2

*Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443 (1st Cir. 1995) .............................................2

*Chiarella v. United States*, 445 U.S. 222 (1980) ...............................................................13

*Cochran v. Quest Software, Inc.*, 328 F.3d 1 (1st Cir. 2003) ..............................................1

*Dirks v. SEC*, 463 U.S. 646 (1983) ....................................................................................18

*Doe v. Gonzales*, 500 F. Supp. 2d 379 (S.D.N.Y. 2007) ....................................................8

*Horta v. Sullivan*, 4 F.3d 2 (1st Cir. 1993) .........................................................................6

*Oklahoma Publishing Co. v. District Court*, 430 U.S. 308 (1977)......................................7

*Osediacz v. City of Cranston*, 414 F.3d 136 (1st Cir. 2005)...............................................7

*Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1 (D.D.C. 2008) .......................................13

*Poulis-Minott v. Smith*, 388 F.3d 354 (1st Cir. 2004)........................................................6

*Prunte v. Universal Music Corp.*, 484 F. Supp. 2d 32 (D.D.C. 2007).............................16

*Quinones v. Buick*, 436 F.3d 284 (1st Cir. 2006)................................................................5

*Reid v. Key Bank of S. Maine*, 821 F.2d 9 (1st Cir. 1987)................................................16

*SEC v. Falbo*, 14 F. Supp. 2d 508 (S.D.N.Y. 1998) .....................................................1, 11

*SEC v. Kirch*, 263 F. Supp. 2d 1144 (N.D. Ill. 2003) .......................................................11

*SEC v. Kornman*, 391 F. Supp. 2d 477 (N.D. Tex. 2005) ...........................................10, 14

*SEC v. Mayhew*, 916 F. Supp. 123 (D. Conn. 1995), *aff'd on other grounds*, 121 F.3d 44 (2d Cir. 1997)................................................................................................3, 10

*SEC v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1988)....................................................1, 11

*SEC v. Sargent*, 229 F.3d 68 (1st Cir. 2000) ....................................................................11

*SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974)...................................................................3

*SEC v. Singer*, 786 F. Supp. 1158 (S.D.N.Y. 1992) ........................................................11

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)...............................................3

*SEC v. Yun*, 327 F.3d 1263 (11th Cir. 2003) ......................................................14

*Steele v. Isikoff*, 130 F. Supp. 2d 23 (D.D.C. 2000)...........................................13

*Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997)..............................................15

*Stonkus v. City of Brockton Sch. Department*, 322 F.3d 97 (1st Cir. 2003) ................... 1-2

*Thibeault v. Square D Co.*, 960 F.2d 239 (1st Cir. 1992)...................................15

*Tilton v. National Union Fire Insurance Co.*, No. 07-10163-RWZ, 2008 WL 781921 (D. Mass. 2008)..........................................................................1

*United States v. Cassese*, 273 F. Supp. 2d 481 (S.D.N.Y. 2003) ......................................10

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) ...............................................9-16

*United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001) ............................................12

*United States v. Kim*, 184 F. Supp. 2d 1006 (N.D. Cal. 2002) ......................................9-14

*United States v. Libera*, 989 F.2d 596 (2d Cir. 2001)............................................3

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) .............................................16

*United States v. O'Hagan*, 521 U.S. 642 (1997)......................................................3, 16, 18

*Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796 (2d Cir. 1980).............................16

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .........................................................7

*Weiss v. Chrysler Motors Corp.*, 515 F.2d 449 (2d Cir. 1975)...........................................15

*Young v. IMO Industrial, Inc.*, 541 F. Supp. 2d 433 (D. Mass. 2008)................................2

## OTHER AUTHORITIES

17 C.F.R. § 240.10b5-2......................................................................................... 9, 12-15

17 C.F.R. § 240.14e-3 ..............................................................................................18

Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716 (Aug. 24, 2000) ..............5

Use of Electronic Media for Delivery Purposes, 60 Fed. Reg. 53,458 (Oct. 13, 1995) ..................................................................................................................6

3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 6:236 (2d ed. 2008)....................................3

4 Leonard B. Sand *et al., Modern Federal Jury Instructions*, Instruction 82-6 (2006) ....................................................................................................................4

I.    **BECAUSE THE SEC FAILS TO CONTROVERT NOTHERN'S STATEMENT OF UNDISPUTED FACTS, IT SHOULD BE DEEMED ADMITTED.**

    A.    **The SEC's Narrative Response Ignores Local Rule 56.1.**

The procedure required by Federal Rule of Civil Procedure 56 and Local Rule 56.1 is straightforward. The moving party offers "a concise statement of material facts of record as to which [it] contends there is no genuine issue to be tried." D. Mass. Local R. 56.1. The non-moving party must respond with "a concise statement" that identifies "'what *specific* facts are disputed and prevent summary judgment." *Id.*; *Brown v. Armstrong*, 957 F. Supp. 1293, 1297 (D. Mass.) (emphasis in original, citation omitted), *aff'd*, 129 F.3d 1252 (1st Cir. 1997). *See also Cochran v. Quest Software, Inc.*, 328 F.3d 1, 12 (1st Cir. 2003); *Stonkus v. City of Brockton Sch. Dep't*, 322 F.3d 97, 102 (1st Cir. 2003); *Tilton v. Nat'l Union Fire Ins. Co.*, No. 07-10163-RWZ, 2008 WL 781921, at *1 & n.1 (D. Mass. 2008). In two cases cited in the SEC's own opposition, the court deemed <u>the SEC's</u> stated facts to be admitted under a similar rule based on the defendants' failure specifically to controvert them. *See SEC v. Falbo*, 14 F. Supp. 2d 508, 520-21 (S.D.N.Y. 1998); *SEC v. Musella*, 678 F. Supp. 1060, 1061 (S.D.N.Y. 1988).

Here, Nothern set forth 163 concise and numbered facts ("UF") in his Rule 56.1 Statement of Undisputed Facts. Dkt. #105. Instead of admitting or denying each fact, the SEC responded with 78 separately numbered paragraphs. Dkt. #109 ("SGI"). The SEC identifies 11 of Nothern's facts that it "does not raise any genuine issues with" at this time, SGI ¶ 78, but there are many more that it fails to dispute.

The SEC's general tactic is to list various UFs in its headings, then respond with a narrative of what it considers to be related information – without stating whether it admits or denies each fact at issue. For example, in SGI ¶¶ 9-16 the SEC purports to respond to UF 22-28 and 33-39, but does not present any evidence actually controverting those facts. The SEC

improperly responds to other UFs by claiming that they "are not material to any genuine issues in this case" or "do not contain information that should affect the outcome of this case." *See, e.g.*, SGI ¶¶ 17, 35, 45, 50, 53, 60.  For example, in SGI ¶ 17 the SEC provides this response for UF 29-32, but again fails to admit or deny the stated facts.  In SGI ¶ 1, the SEC fails to admit or deny almost all of the facts set forth regarding the meaning and effect of press embargoes – an issue that is critical to its theory of liability.  UF 1-16.  The SEC provides no response at all to UF 52-56.

### B. Nothern's Statement Should Be Deemed Admitted.

Under Local Rule 56.1, a statement not "controverted" by the non-moving party in accordance with the rule shall be "deemed for purposes of the motion to be admitted." *See, e.g.*, *Stonkus*, 322 F.3d at 102; *Carreiro v. Rhodes Gill & Co.*, 68 F.3d 1443, 1446 n.3 (1st Cir. 1995); *Young v. IMO Indus., Inc.*, 541 F. Supp. 2d 433, 443 n.20 (D. Mass. 2008); *Brown*, 957 F. Supp. at 1298.  Applying a similar rule in *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1 (1st Cir. 2007), the First Circuit held that the district court "acted justifiably in rebuffing the [plaintiffs'] proffered counter-statement and crediting [the defendant's] version of the facts," where instead of admitting, denying, or qualifying the defendant's facts "paragraph by paragraph," the plaintiffs "submitted an alternative statement of facts in narrative form."  *Id.* at 7.

The same remedy is warranted here.  The SEC is an experienced litigant and knows how to oppose motions for summary judgment.  It may not conceal its inability to controvert facts behind a smokescreen of irrelevant verbiage.  *See id.*  Nothern's Rule 56.1 statement should be deemed admitted in full.

## II. THE INFORMATION WAS PUBLIC AFTER 9:00 A.M.

### A. Information Announced at a Government Press Conference Need Not Be "Broadly Disseminated" or "Impounded" into the Market.

As far as counsel can determine, this case is unlike any other insider-trading action the SEC has ever brought.  The SEC has never before argued that information first announced to a

defendant or tipper at a <u>press conference</u> remains confidential and nonpublic until some later time. It has never relied on a unilaterally requested "press embargo" as the means for preserving such information as confidential and nonpublic.  And it has never suggested that a government agency may restrain the further dissemination of information it has already announced.

The SEC devotes four pages of its brief to the argument that "[b]efore insiders may act upon material information, such information must be effectively disclosed in a manner to insure its availability to the investing public."  Opp. at 5-8.  It cites cases holding that the individuals in these cases were required to wait until the information has been "broadly disseminated" and "fully impounded into the price of the particular stock."  *SEC v. Mayhew*, 121 F.3d 44, 50 (2d Cir. 1997). All of these cases, however, presume that the defendant or tipper gained unique access to confidential information through his insider status or a selective disclosure from an insider.  In *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968), for example, the court ruled that a company director with <u>inside information</u> had to wait until it "could reasonably have been expected to appear over the media of widest circulation" in order to avoid "insur[ing] an advantage to himself."  *Id.* at 854; *see also SEC v. Shapiro*, 494 F.2d 1301, 1307 & n.4 (2d Cir. 1974) (defendant with "inside information" traded "before investors had an opportunity to receive and react to the disclosures").  In *United States v. Libera*, 989 F.2d 596 (2d Cir. 2001), the court held where there has been "no public announcement," an individual with "<u>stolen information</u>" must wait until it has been "fully impounded into the price of the stock" in order to avoid "misusing" such information by trading.  *Id.* at 600-01 (emphasis added).  The economic rationale for the rule is that an insider may not take advantage of his advance knowledge and opportunity to "digest" the relevant information at the very moment of an announcement, before the market has had an opportunity to do so.  *See* 3 Alan R. Bromberg & Lewis D. Lowenfels, *Bromberg and Lowenfels on Securities Fraud & Commodities Fraud* § 6:236 (2d ed. 2008).  Digestion and broad

dissemination, however, are not elements of whether information is "public" in the first place.  *See 4 Leonard B. Sand et al., Modern Federal Jury Instructions*, Instruction 82-6, at 82-39 (2006) (stating that "[i]n general, information is nonpublic if it is not yet available to the public through such sources as press releases, . . . rumors, word of mouth or other sources").  Otherwise, by definition the first recipient of non-confidential information could never trade.

Accordingly, any requirements of digestion and broad dissemination are inapposite here. Peter Davis, the alleged tipper, was <u>not</u> a Treasury insider.  He did not receive the information through illicit means or an unauthorized selective disclosure, but rather at an official Treasury press conference.

In misappropriation cases, the SEC must prove that a person "misappropriate[d] <u>confidential</u> information . . . in breach of a duty owed to the source of the information."  *United States v. O'Hagan*, 521 U.S. 642, 652 (1997) (emphasis added).  The information here was not "confidential" at the time of the trade.  In the first place, it is undisputed that Treasury posted its announcement on the Internet more than two minutes before the SEC contends Nothern traded. UF 138-41.  *See* SGI ¶ 58 (conceding that Treasury posted its press release on its staging server at 9:40:23 a.m.).  The SEC contends that "the press release was not publicly accessible on the internet unless someone was somehow able to randomly guess the staging server's twelve-numbered internet protocol address."  SGI ¶ 59.  There is no evidence, however, that Treasury did anything to conceal that address.  *See* Dkt. #107, Ex. T at 93 (Harris deposition); Verizon deposition at 193-94 (additional excerpts attached as Exhibit A to this Reply Memorandum). Furthermore, contrary to the SEC's speculation that Treasury "may have employed" security safeguards "such as a username or password" to prevent outsiders from accessing its staging server, SGI ¶ 59 (citing Verizon dep. at 183), it fails to acknowledge that <u>there is no evidence Treasury actually did so</u>, *see* Verizon dep. at 197 (Exhibit A).  Speculation, of course, cannot

overcome undisputed facts to defeat summary judgment.  *Quinones v. Buick*, 436 F.3d 284, 290 (1st Cir. 2006).

Second, the information was disclosed at a press conference starting at 9:00 a.m., and even earlier to CNBC.  The obvious purpose of a press conference is to eliminate confidentiality.  The SEC has itself identified press conferences as an effective way of disclosing market-sensitive information in a non-selective manner.  *See* Selective Disclosure and Insider Trading, 65 Fed. Reg. 51,716, 51,723 (Aug. 24, 2000).[1]  Here, it is undisputed that Treasury's press conference was open to anyone in the Treasury building, and that no physical or legal restraint was imposed on the ability of attendees to disseminate the information after it was announced.  UF 110-14, 119-21, 126.  The information on the 30-year bond therefore lost its confidential and nonpublic status when Treasury announced it – more than 40 minutes before Nothern traded.

**B.      Treasury's Embargo Failed to Keep the Information Confidential.**

The SEC resists this commonsense point by arguing that Treasury's declaration of an embargo at the press conference kept the information confidential and nonpublic until some later time.  Yet the SEC does not controvert the key factual points in Nothern's motion:

- Embargoes are simply <u>requests</u> by a source that information remain confidential for a period of time.  UF 1, 12-14.

- The attendees did not give any express consent to Treasury's declared embargo.  UF 120-21.

- No ethical or legal rule requires reporters to abide by embargoes, and reporters routinely disregard them.  UF 9-13.

---

[1] Without authority, the SEC argues (p.8 n.7) that Nothern may not rely on "the presence or absence of acts relevant to an analysis of a Regulation FD violation" to defend against this insider-trading claim.  But it is the SEC's accompanying final rule that discusses press conferences – and the SEC hypocritically relies on the same final rule in arguing that Rule 10b5-2 trumps the applicable case law on what constitutes a fiduciary-like duty for insider trading liability under § 10(b).  See § III, *infra*.

- A source has no ability to enforce an embargo other than to restrict a reporter's access to information in the future.  UF 15.

- Treasury could have easily provided for the uniform release of its information without use of an embargo.  UF 7-8, 16, 98.[2]

Furthermore, the SEC fails to dispute the critical legal point (Br. at 7-10) that, even if there had been agreement, no attendee at Treasury's press conference had a statutory, regulatory, contractual or other legal duty to follow the embargo.  Instead, it argues (p.8 n.7) that this point is "immaterial" to whether "the information had achieved broad dissemination to the investing public or been impounded into the price of the 30-year bond."  But, as explained above, there is no

_____

[2] Nothern's UF 1-16 are based on the declaration of Nothern's designated expert, Clyde Bentley, Ph.D.  In its Statement of Genuine Issues, the SEC attempts to discredit the facts set forth in Bentley's declaration as "personal beliefs" not based on the evidentiary record.  SGI ¶ 1.  It is clear, however, that a party moving for summary judgment may rely on the declaration of a designated expert, *see, e.g.*, *Poulis-Minott v. Smith*, 388 F.3d 354, 357-61 (1st Cir. 2004), and Bentley has relied on not only his extensive experience as a journalist and professor at the University of Missouri School of Journalism, *see* Dkt. # 107, Ex. A at ¶¶ 1-2 & Ex. A, but also a review of the key deposition transcripts and exhibits in this case, *id*, Ex. A at ¶ 4.  Even though the meaning and effect of "press embargoes" is critical to this case, the SEC chose not to designate its own expert on this issue.  Instead, it attempts to rebut Bentley's declaration by citing out-of-context statements from various articles reviewed by Bentley.  Because such statements are inadmissible hearsay, they may not be regarded in determining whether a genuine issue of material fact exists.  *Horta v. Sullivan*, 4 F.3d 2, 8-9 (1st Cir. 1993).

The SEC oddly argues (SGI ¶ 1) that Director Tony Fratto's testimony that reporters at Treasury "often imposed embargoes on themselves" somehow contradicts the point that embargoes have been used to advance "the anti-competitive interests" of media, UF 2.  To the contrary, this testimony – also cited by Nothern, UF 35 – proves the anti-competitive nature of embargoes, as well as the fact that Treasury did not have a compelling need for them.

Lastly, the SEC cites (SGI ¶ 1) Fratto's testimony that he feared that Treasury did not have "a particularly reliable Internet infrastructure" in 2001.  Even if that were so, it does not controvert the fact that "[t]echnology was readily available in 2001 to allow a federal agency like Treasury to distribute its 30-year bond decision to the press and public at a precise moment without of an embargo."  UF 16 (emphasis added).  Indeed, years before Treasury's press conference, the SEC itself observed that electronic media allows "for the rapid dissemination of information to investors and financial markets in a more cost-efficient, widespread, and equitable manner than traditional paper-based methods."  Use of Electronic Media for Delivery Purposes, 60 Fed. Reg. 53,458, 53,458 (Oct. 13, 1995).  Furthermore, given that a Treasury employee was indisputably able to post the announcement on the Internet 20 minutes before the 10:00 a.m. embargo, UF 138-41, Treasury could have easily provided the information to the press and the public at approximately the same time using whatever technology it had at the time.

general duty on the part of an individual who receives information at a press conference (as opposed to an insider or someone who obtains confidential information through a selective disclosure) to wait until it has been broadly disseminated or fully impounded in the price of a security.  The non-binding nature of Treasury's embargo negates any proof that the information was confidential and nonpublic, since any informational advantage gained by Davis resulted from the entirely voluntary decision of other attendees at the press conference to delay their publication, assuming that (unlike reporter Brian Collins) they did.

      **C.**      **Any Embargo Violated the First Amendment.**

In addition, this case is extraordinary in that the source of the information was Treasury, a government agency subject to the First Amendment.  The SEC makes the puzzling argument (pp.17-18) that Nothern lacks "standing" to "raise a First Amendment challenge to Treasury's temporary embargo."  But Nothern does not seek to strike Treasury's policy down, *cf. Osediacz v. City of Cranston*, 414 F.3d 136, 141-42 (1st Cir. 2005), but rather to explain why First Amendment principles rendered Treasury's declaration of an embargo ineffective regardless of any statute, regulation, or contract.

The SEC argues (pp.18-19) that Treasury's embargo was a permissible "restriction as to the time, place, and manner of speech in public fora."  *Bl(a)ck Tea Society v. City of Boston*, 378 F.3d 8, 12 (1st Cir. 2004); *see also Ward v. Rock Against Racism*, 491 U.S. 781 (1989) (upholding regulation requiring performers using park bandshell to use sound equipment provided by city).  But Treasury's embargo did not seek to regulate expressive activities in a public forum.  Rather, because it purported to inhibit the disclosure of information, it was a presumptively unconstitutional prior restraint, valid only if narrowly tailored to promote a compelling government interest.  *See, e.g., Doe v. Gonzales*, 500 F. Supp. 2d 379, 397-98 (S.D.N.Y. 2007) (applying strict scrutiny in striking down federal statute imposing nondisclosure requirement on

recipients of National Security Letters).  Treasury had the discretion to decide when to announce its information on the 30-year bond, but once it made the announcement, the First Amendment prohibited it from restraining its further dissemination.  *See, e.g.*, *Oklahoma Publ'g Co. v. District Court*, 430 U.S. 308, 311-12 (1977) (vacating injunction on publication of name of juvenile defendant disclosed at hearing attended by press).

While admitting (p.19) that it must show a compelling government interest and narrow tailoring in support of a prior restraint, the SEC demonstrates neither here.  It argues (p.20) that Treasury intended its embargo "to enable press to report on market-moving news while preventing tipping or trading on inside information."  But it is undisputed that to advance the goal of uniform release Treasury could easily have placed its announcement on its web site, sent a mass e-mail to press contacts, or conducted a live webcast of the conference, as Under Secretary Fisher himself urged.  UF 16, 98.  At a bare minimum, the SEC offers no justification for an embargo lasting 35 minutes after the press conference ended, rather than the 10-15 minutes used at prior refunding conferences.  *See* UF 33, 127-28.  (An embargo of the previous shorter duration would have unquestionably expired before Nothern's trade, since the press conference undisputedly ended at 9:25 a.m. and Nothern undisputedly traded after 9:40 a.m.)  The fact that Treasury subsequently adopted much shorter embargoes for its quarterly refunding announcements shows that there was no valid government interest, much less a compelling one, for what the SEC now concedes (p.20) was "an approximately one-hour delay on communication."  Because Treasury's purported declaration of an "embargo" was both ineffective and unconstitutional, the SEC cannot prove that the information remained confidential and nonpublic after its official announcement.

## III.    DAVIS DID NOT OWE A FIDUCIARY-LIKE DUTY TO TREASURY.

To proceed with its claim under the "misappropriation" theory, the SEC must also prove that Davis had a fiduciary-like duty to Treasury not to disclose information announced at its press

conferences until the "press embargo" expired.  In its opposition, the SEC does not dispute that

such a duty "cannot be imposed unilaterally by entrusting a person with confidential information."

*United States v. Chestman*, 947 F.2d 551, 566 (2d Cir. 1991).  And it has abandoned the

Complaint's assertion of such a duty based on Davis's alleged violation of Treasury's

housekeeping regulation requiring compliance with the directions of guards and a federal statute

forbidding the conversion of federal property.[3]  Instead, the SEC argues that it has established a

duty pursuant to an alleged "agreement with Treasury" under SEC Rule 10b5-2(b)(1) (pp.11-13);

pursuant to an alleged "history, pattern, or practice of sharing confidences" under subsection

(b)(2) of the same rule (pp.10-11); or under the case law interpreting § 10(b)'s fiduciary-like duty

requirement "aside from Rule 10b5-2" (pp.14-15).  Even apart from the ineffective and

unconstitutional nature of the supposed embargo, and therefore any agreement by Davis to honor

it, none of these arguments has merit.

### A.    There Is No Evidence of a Fiduciary-Like Relationship.

As Nothern has explained (Br. at 16-17), there is no evidence of a pre-existing fiduciary or

fiduciary-like relationship between Davis and Treasury.  No inherently fiduciary association (such

as attorney-client, principal-agent, or employer-employee) applied.  Davis was a consultant to

clients like Fidelity Investments and Goldman Sachs, not to Treasury.  Nor is there any evidence

that Davis exercised any kind of superiority, dominance, or control over Treasury – the hallmarks

of a fiduciary-like relationship under § 10(b).  *See Chestman*, 947 F.2d at 568; *United States v.*

*Kim*, 184 F. Supp. 2d 1006, 1011 (N.D. Cal. 2002).  The SEC argues (p.15 n.15) that a jury could

conclude that the relationship between Davis and Treasury involved superiority, dominance, or

control "because Treasury had a legitimate business purpose in disclosing its market moving

---

[3]  The SEC makes no reference to the conversion statute and refers to the housekeeping regulation only at the end of a footnote (p.14 n.13), without disputing Nothern's argument (Br. at 8, 13) that such a regulation cannot establish a duty under § 10(b).

refunding information at its refunding press conference subject to an embargo, i.e. the predictable, broad uniform dissemination of the information." But this is a *non sequitur*. Treasury's interest in the even dissemination of its information did not establish any superiority, dominance, or control in those to whom it released the information. The members of the press had no fiduciary duty to Treasury. To the contrary, the authority and responsibility lay with Treasury <u>not</u> to make uneven releases of its information at the outset. Furthermore, there is no evidence that disclosure to <u>Davis in particular</u> served any purpose of predictable, broad, or uniform dissemination by news media. In fact, no governmental purpose in permitting his attendance has ever been identified.

The SEC further argues (p.15 n.15) that this Court should reject *Kim*'s holding that a fiduciary-like duty involves some exercise of superiority, dominance, or control over the source of information. But *Kim* is not an outlier opinion. To the contrary, Judge Breyer's decision relied predominantly on the Second Circuit's influential analysis in *Chestman*. *See Kim*, 184 F. Supp. 2d at 1010. This analysis has been repeatedly applied in other jurisdictions – including in several of the cases on which the SEC relies in its opposition. In *SEC v. Kornman*, 391 F. Supp. 2d 477 (N.D. Tex. 2005), for example, the court applied *Chestman* and *Kim* in finding a fiduciary-like duty based on "reliance, de facto control and dominance" where the defendant attorney received confidential information for tax planning. *Id.* at 486-89. In *United States v. Cassese*, 273 F. Supp. 2d 481 (S.D.N.Y. 2003), the court concluded that the relationship of two potential business partners was "very far from a relationship marked by 'de facto control' and 'dominance' or entailing 'discretionary authority and dependency'" under *Chestman* and *Kim*, and therefore dismissed an indictment for insider trading under § 10(b). *Id.* at 486-87. Even before *Kim*, in *SEC v. Mayhew*, 916 F. Supp. 123 (D. Conn. 1995), *aff'd on other grounds*, 121 F.3d 44 (2d Cir. 1997), the court rejected a Rule 10b-5 claim after finding that the lunch at which the tipper obtained information "was much more akin to the proverbial 'old boy networking,' not the functional

equivalent of a fiduciary relationship, lacking indicia of de facto control and dominance resulting from the confidence reposed." *Id.* at 130 (citing *Chestman*, 947 F.2d at 568). *Contrast SEC v. Sargent*, 229 F.3d 68, 75-76 (1st Cir. 2000) (citing *Chestman* and noting "evidence of a pre-existing fiduciary relationship" between defendant and colleague "arising out of their status as sole shareholders of their closely-held business corporation"); *Falbo*, 14 F. Supp. 2d at 523 (duty established under *Chestman* where contractor was hired "to prevent leaks of information" concerning planned merger and obtained information from corporate employee); *SEC v. Singer*, 786 F. Supp. 1158, 1169-70 (S.D.N.Y. 1992) (evidence that defendant and source may have "shared an attorney-client relationship of confidentiality" was sufficient to present jury issue under *Chestman*); *Musella*, 678 F. Supp. at 1062 (law firm employee stole "confidential information belonging to the firm's clients").

It is true that in *SEC v. Kirch*, 263 F. Supp. 2d 1144 (N.D. Ill. 2003), the court rejected the defendant's reliance on *Kim* and the necessity for "control and dominance on the part of the fiduciary." *See id.* at 1150-51. In that case, however, the court's finding of a duty followed logically from the relationship at issue. Kirch belonged to a small group of software company executives who met in multi-day sessions to exchange confidential information for the purpose of obtaining advice from each other. *Id.* at 1147-48. The corporate CEO who disclosed the earnings information at issue did so in order to receive "input as to how to publicly announce this information and how to deal with employee and customer concerns." *Id.* at 1148. This mutual consulting arrangement involved the essence of a fiduciary-like relationship: the source relied on the experts in whom he reposed the confidential information in order to obtain their superior advice and guidance, as one would from a management consultant whose fiduciary obligation would be incontrovertible. *See Chestman*, 947 F.2d at 568. As the court observed, there were "critical distinctions" between those facts and *Kim*, where there was "no persuasive need" for

members of the business club to share confidential information and the particular communication at issue "was completely gratuitous." *See Kirch*, 263 F. Supp. 2d at 1150-51; *Kim*, 184 F. Supp. 2d at 1012.  Similarly, the existence of an employer-employee relationship – a paradigmatic fiduciary-like association, *see Chestman*, 947 F.2d at 566-68 – was sufficient to establish a duty in *United States v. Falcone*, 257 F.3d 226 (2d Cir. 2001).  *See Kim*, 184 F. Supp. 2d at 1011.

Here, by contrast, there were no hallmarks of a fiduciary relationship between Treasury and Davis.  Davis did not work for Treasury.  He did not pay Treasury any money, or vice versa.  He did not offer Treasury any advice or assistance.  He did not exercise any control over Treasury operations.  Treasury did not rely on him for anything.  In fact, no one has ever explained why Treasury admitted Davis to press conferences in the first place.  As in *Kim*, the disclosure to Davis, if not intended to be immediately public, was gratuitous.  Under these circumstances, to find a fiduciary-like relationship between Treasury and Davis would effectively eliminate the requirement of a fiduciary or like duty altogether.

**B.      The SEC Cannot Establish a Duty Under Rule 10b5-2.**

**1.      A mere agreement does not create a duty of "trust and confidence."**

Throughout this case, the SEC has relied upon a purported written agreement between Davis and Treasury official Roger Anderson as its primary basis for establishing a fiduciary-like duty.  It pled this supposed agreement and Rule 10b5-2(b)(1) in its Complaint.  Dkt. #1 at ¶¶ 45-47. Davis's testimony on his "written agreement with Treasury" is the only evidence described in the SEC's response to Nothern's interrogatory asking it to state the basis for Davis's asserted duty.  Resp. to Nothern's Int. No. 3 (Dkt. #107, Ex. CC at 5-6).  The SEC cites this supposed agreement throughout its opposition, including multiple references to Davis's 2003 plea colloquy in the Southern District of New York.  *See* Opp. at 1-2, 4, 14-15.  And it continues to argue (p.13 n.12) that, under Rule 10b5-2(b)(1), "a fiduciary duty is created 'whenever a person agrees to maintain

- 12 -

information in confidence.'"

No copy of Davis's alleged agreement with Treasury has ever been produced, the Treasury denies that it ever existed, and it is undisputed that no one working at Treasury had any knowledge of it when Davis was admitted on October 31, 2001.  UF 65-66, 72-80.[4]  Yet even assuming, as the SEC contends (p.13 n.12), that a jury could nonetheless find that Davis's admission on October 31, 2001 was "a direct result of [an] agreement he reached with Anderson," it still fails to establish a fiduciary-like duty under § 10(b).

Under District of Columbia law, which the SEC does not dispute is controlling, "the mere existence of a contract does not create a fiduciary duty."  *Paul v. Judicial Watch, Inc.*, 543 F. Supp. 2d 1, 6 (D.D.C. 2008) (emphasis added); *accord Steele v. Isikoff*, 130 F. Supp. 2d 23, 336-37 (D.D.C. 2000).  Instead, a plaintiff must show that the parties "extended their relationship beyond the limits of the contractual obligations to a relationship founded upon trust and confidence."  *Paul*, 543 F. Supp. 2d at 6 (citation omitted)

The SEC (pp.13-14 n.14) argues that "*Paul* and *Isikoff* are not insider trading cases and do not involve an analysis of fiduciary-like duties under the misappropriation theory."  But the Supreme Court itself has relied on the common law in interpreting § 10(b)'s duty requirement. *See, e.g.*, *Chiarella v. United States*, 445 U.S. 222, 227-28 & n.9 (1980).  And the reasoning in these cases is fully consistent with *Kim*'s holding that "an express agreement can provide the basis for misappropriation liability only if the express agreement sets forth a relationship with the hallmarks of a fiduciary relationship."  *Kim*, 184 F. Supp. 2d at 1015.

---

[4] The SEC does not dispute Treasury's denial of the agreement's existence, or the fact that no one working at Treasury at the time of the 2001 press conference knew about any purported agreement.  UF 73-80.  Instead, it claims that these facts "are not material to any genuine issue in this case."  SGI ¶ 35.

## 2.    The SEC may not redefine fiduciary-like duty.

The stated goal of Rule 10b5-2 is to redefine the duty element of § 10(b) as it has been defined by the courts.  Its preliminary note states that it defines additional "circumstances in which a person has a duty of trust or confidence."  17 C.F.R. § 240.10b5-2.  It continues, "The law of insider trading is _otherwise_ defined by judicial opinions construing Rule 10b-5, and Rule 10b5-2 does not modify the scope of insider trading law _in any other respect_." _Id._ (emphasis added).  A "full reading" of the SEC's accompanying releases makes clear that Rule 10b5-2 was "designed to establish new law, not clarify existing law." _Kim_, 184 F. Supp. 2d at 1014.

The SEC argues (p.13) that "[n]o federal court" has yet adopted the argument that Rule 10b5-2(b)(1) exceeds the SEC's authority.  But no court has rejected it, either.  Critically, the SEC does not dispute Nothern's point (Br. at 15) that it lacks the authority to promulgate rules that expand insider-trading liability beyond the scope of § 10(b) as interpreted by the courts.

The SEC instead cites (p.13) two cases for the proposition that Rule 10b5-2 "properly defines circumstances in which a person has a fiduciary-like duty."  In both cases, however, the court held that a fiduciary-like duty existed _under common-law principles_ and that the new rule merely "bolstered" that finding.  In _SEC v. Kornman_, the court ruled that the SEC alleged under _Chestman_ and _Kim_ "reliance, de facto control and dominance" sufficient to show that the defendant, a tax and estate-planner and licensed attorney, owed a fiduciary-like duty to the executives who disclosed the information to him "during confidential tax-planning discussions." 391 F. Supp. 2d at 480, 488-89.  The court's finding of a fiduciary-like duty, it observed, was "bolstered by the SEC's statements in adopting Rule 10b5-2." _Id._ at 489-90.  _See also SEC v. Yun_, 327 F.3d 1263, 1273 n.23 (11th Cir. 2003) (noting that court's conclusion "is bolstered by statements the SEC has made" in support of Rule 10b5-2, even though "the SEC's new rule goes farther than we do in finding a relationship of trust and confidence").  In short, no "bolstering"

was necessary, and the rulings do not endorse administrative expansion of liability under § 10(b).

       **3.      Davis's alleged "history, pattern or practice of sharing confidences" did not create a fiduciary-like duty.**

Alternatively, the SEC seeks to establish Davis's duty through Rule 10b5-2(b)(2), which

states that a "duty of trust or confidence" may also exist:

> [w]henever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality.

Because the SEC failed to cite subsection (b)(2) in its Complaint, its response to Nothern's

interrogatories, or any other document in this case, this argument has been waived.  *See Suna v.*

*Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (complaint in securities fraud case must "provide

defendant with fair notice of a plaintiff's claim"); *Thibeault v. Square D Co.*, 960 F.2d 239, 245

(1st Cir. 1992) (party that fails to provide proper response to interrogatory may be precluded from

presenting related evidence); *Weiss v. Chrysler Motors Corp.*, 515 F.2d 449, 455-56 (2d Cir.

1975) (reversing and remanding for new trial where party's failure to disclose key theory in

answer to interrogatories denied opposing party "fair notice").  Furthermore, the argument simply

rehashes the same allegations relied on for the SEC's argument under subsection (b)(1):  that

Davis attended Treasury's press conferences, at least for a while, without breaking his supposed

agreement.  At most this would be evidence consistent with Davis having made an agreement, not

that he assumed any duty beyond the scope of the supposed agreement.

The SEC's reliance on Rule 10b5-2(b)(2) also fails for the same reason discussed in § B.2,

*supra*:  it is an improper effort to expand liability under § 10(b) by redefining fiduciary-like duty.

The SEC does not cite any case law showing that such a duty can arise from the routine attendance

of a private consultant at a quarterly government press conference.  Such "ordinary and

intermittent transactions" do not give rise to "the special relationship of trust or confidence

required for fiduciary duty to be present." *Prunte v. Universal Music Corp.*, 484 F. Supp. 2d 32, 44 (D.D.C. 2007); *see also Reid v. Key Bank of S. Maine*, 821 F.2d 9, 16-18 (1st Cir. 1987) ("A good working relationship between two parties . . . is not sufficient evidence for a finding of the existence of the special legal obligations of a confidential relation."); *Walton v. Morgan Stanley & Co., Inc.*, 623 F.2d 796, 798-99 (2d Cir. 1980) (rejecting claim that banking firm traded in violation of fiduciary duty where "the fact that the information" exchanged with corporation "was confidential did nothing, in and of itself" to establish fiduciary relationship).

Because the SEC cannot establish a relationship between Davis and Treasury "with the hallmarks of a fiduciary relationship" under common law, and because it lacks authority to create such a duty by administrative fiat, summary judgment must be granted for Nothern.

## IV.    NOTHERN DID NOT KNOW ABOUT ANY DUTY.

### A.    The SEC Cannot Establish Actual Knowledge.

Finally, because "there is no 'general duty between all participants in market transactions to forgo actions based on material, nonpublic information,'" *O'Hagan*, 521 U.S. at 663 (citation omitted), the SEC may proceed against Nothern only if it can prove that he had a derivative duty to Treasury based on knowledge of any duty that Davis actually had.  As Nothern has explained (Br. at 17-18), in misappropriation cases "Rule 10b-5 requires that the defendant [tippee] subjectively believe that the information was obtained in breach of a fiduciary duty." *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996) (citing *Chestman*, 947 F.2d at 570).  The SEC disputes this point in its opposition, arguing (pp.15-16) that it "need only prove that Nothern *should have known* that a fiduciary-like duty was being breached," but cites a decision from the context of "classical" insider trading, not "misappropriation" from an outsider whose fiduciary duty is not readily apparent.  Because the SEC points to no evidence showing that Nothern actually knew about any duty owed by Davis, summary judgment is appropriate.

**B.      The SEC Cannot Establish That Nothern "Should Have Known" of a Duty.**

Even if the SEC's preferred standard of constructive knowledge is applied, the SEC still

cannot satisfy it.  It is undisputed that Nothern was unaware of any confidentiality agreement

entered into by Davis, UF 64, 82,[5] and the SEC presents no actual evidence that he should have

known about it.

Rather, the SEC points (p.16) to what it describes as three "damning admissions":  (i)

Davis said he had learned the information from Peter Fisher, a "high-ranking Treasury official";

(ii) Nothern knew how another federal agency (the Labor Department, not multiple "agencies" as

incorrectly suggested by the SEC at p.16) used embargoes; and (iii) he knew that Davis had

contacts at Treasury.  None of these admissions comes close to establishing Nothern's

constructive knowledge of Davis's purported duty.  It is safe to assume that many Washington

consultants who work on federal policy issues have contacts at federal agencies, including high-

ranking officials, and some unquestionably benefit from the high incidence of leaks in

government, *see* Br. at 19-20, but it is illogical to conclude that such consultants owe fiduciary-

like duties to the respective agencies.  Nor does Nothern's vague understanding of the "lockdown"

embargo procedures used at the Labor Department, *see* UF 159, suggest any knowledge of any

duty owed by non-journalists who received information under a Treasury "press embargo" –

particularly since it is undisputed that Treasury was extremely careless in the measures it took to

protect its purportedly confidential information, and if there had been a "lockdown," Davis could

not have called.  UF 91-128, 138-44.  Again, the SEC's theory is that Nothern should have

assumed that Treasury disclosed sensitive information to outsiders only under a strict fiduciary-

like duty of confidentiality, even though the evidence shows that it did not and, in fact, was widely

[5] The SEC simply ignores these facts in the paragraphs of its Statement of Genuine Issues that
purport to address them.  *See* SGI ¶¶ 23-34, 36-38.

criticized for a refunding leak just weeks before.  UF 17-21.

No other evidence cited by the SEC shows that Nothern should have known of Davis's alleged fiduciary-like duty.  It argues (p.17) that the various e-mails and faxes sent by Davis to his clients included "an announcement that referenced Treasury's refunding embargo," *See* Dkt. #110, Ex. O (Ex. 8), but such a reference discloses nothing about any duty.  The SEC cites Nothern's own testimony to suggest (p.17), falsely, that he deceived his supervisors about whether the information was "embargoed," while omitting Nothern's explanation that he understood their question to be whether MFS was restricted from trading, and that he "never thought in my mind that we were in any way restricted from trading."  Dkt. #110, Ex. O at 271.  Even construed most favorably to the SEC, this testimony fails to show how Nothern should have known about a duty imposed on Davis.  Similarly, the SEC cites the testimony of a colleague of Nothern that "if he had known that the information was subject to an embargo, <u>it might have indicated to him that the information was not yet public</u>."  Opp. at 16 (emphasis added).  But that is exactly the point. Knowledge – actual or constructive, direct or circumstantial – that information is not "public" is not by itself sufficient to make trading illegal.  *Dirks v. SEC*, 463 U.S. 646, 656 (1983).[6]  As a practical matter, moreover, Nothern would be remiss in his duties to his funds' investors in <u>refraining</u> from trading without knowledge that Davis had breached a fiduciary or like duty. Because the SEC has not and cannot show that Nothern had any knowledge of any fiduciary-like duty on the part of Davis to Treasury – even assuming that such a duty ever existed – summary judgment should be granted.

---

[6] The Rule 10b-5 claim here is distinct from claims brought under Rule 14e-3, which establishes liability for a defendant who possesses information relating to tender offers which "he knows or has reason to know is nonpublic . . . ."  17 C.F.R. § 240.14e-3(a).  In such cases, the SEC need not prove that the alleged tippee knew of breach of a fiduciary duty by the tipper.  *O'Hagan*, 521 U.S. at 666-76.  It must do so here.

**Conclusion**

For the reasons set forth above and in Nothern's initial memorandum, the Court should

enter a summary judgment of dismissal.

STEVEN E. NOTHERN

By his attorneys,

/s/ John A. Shope
Nicholas C. Theodorou, BB0 #495730
John A. Shope, BBO #562056
Robert E. Toone, BBO # 663249
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000
jjs@foleyhoag.com

Dated:  August 1, 2008

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ John A. Shope

B3529621.10