United States District Court
District of Massachusetts

|  |  |  |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 05-10983-NMG |
| v. | ) ) | |
| STEVEN E. NOTHERN, | ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM & ORDER**

**GORTON, J.**

In this case, the United States Securities and Exchange Commission ("SEC") alleges that the defendant, Steven E. Nothern ("Nothern"), obtained material, nonpublic information from consultant Peter J. Davis ("Davis") and used that information for profit, commonly described as insider trading, in violation of 15 U.S.C. §§ 78j(b) (Section 10(b) of the Securities Exchange Act of 1934) and 17 C.F.R. § 240.10b-5 (Rule 10b-5).  Currently before the Court is Nothern's motion for summary judgment.

**I.   Factual Background**

Nothern was a Senior Vice President at Massachusetts Financial Services Company ("MFS"), a Massachusetts-based investment management company.  His duties included management of seven fixed-income mutual funds worth approximately $4 billion. Davis, an economist by training, operated his business, Davis

-1-

Capital Investment Ideas, through the sale of his oral and written analyses of Washington, D.C., political and financial events to broker-dealers, financial analysts and investors.  MFS retained Davis as a consultant sometime between 1995 and 1997 and Nothern was Davis's primary contact at MFS.

At 9:00 a.m. on October 31, 2001, the United States Department of the Treasury ("Treasury") conducted a press conference at which it announced its intent to suspend the issuance of 30-year bonds, an announcement which normally would have been expected to drive up the price of outstanding bonds with that maturity because traders would anticipate a shortage.  Accordingly, all attendees of the press conference were instructed by Treasury officials to maintain strict confidentiality for one hour on all information disclosed in the meeting until the expiration of an embargo on the information at 10:00 a.m. that same day.

Davis attended the press conference and, immediately after it ended at 9:25 a.m., he left the Treasury building and made at least seven cellular phone calls to some of his clients, including Nothern.  He called Nothern at about 9:38 a.m. and left a brief voicemail alerting Nothern that 1) the 30-year bonds were being suspended and 2) the press release reporting the decision was under embargo until 10:00 a.m.  Shortly thereafter Nothern listened to the message and then told three other MFS portfolio

managers of the pending suspension of the 30-year bonds. Those managers, in turn, immediately purchased $25 million, $10 million and $5 million in par value 30-year bonds, respectively. Nothern himself made a $14.25 million purchase of bonds for the portfolios he managed.

The parties dispute the exact time at which Nothern made that trade: he claims that the time of the trade was 9:45:49 a.m. but the SEC claims that the trade was made prior to 9:42:02 a.m. They also dispute whether Nothern made the trade before the information concerning the 30-year bonds was made publicly available on the Treasury's website.

## II. <u>Procedural History</u>

The SEC filed a complaint on May 12, 2005, alleging that Nothern knew or should have known that Davis tipped him in breach of a duty owed to the Treasury, thereby violating § 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5 under the misappropriation theory of insider trading. Accordingly, it seeks to have this Court order Nothern 1) to refrain permanently from further violation of the Exchange Act, 2) to disgorge approximately $3.1 million, representing trading profits realized by the MFS portfolios managed by Nothern and the three other managers Nothern tipped, plus prejudgment interest and 3) to pay a civil penalty pursuant to § 21A(a) of the Exchange Act.

Nothern has denied all material charges with respect to this

claim and has asserted six affirmative defenses in his amended answer of August 22, 2005, including that: 1) the complaint fails to state a claim upon which relief can be granted, 2) some or all of the SEC's claims are barred by the doctrine of laches and/or the doctrine of estoppel, 3) the SEC's claims are barred because Treasury's embargo violates the First Amendment of the United States Constitution, 4) the relief the SEC seeks exceeds its authority or is otherwise not authorized by law and 5) the complaint fails to plead fraud with particularity. On November 4, 2005, this Court allowed the SEC's motion to strike Nothern's affirmative defense of estoppel due to Nothern's inability to prove that either the SEC or Treasury made any misrepresentation of fact upon which he could have reasonably relied.

On June 16, 2008, Nothern filed a motion for summary judgment based on the grounds that 1) the information upon which Nothern traded was already public before Nothern traded upon it, 2) the embargo on the information disclosed at the press conference on October 31, 2001, was unenforceable under the First Amendment, 3) Davis had no fiduciary duty upon which Nothern's liability under § 10(b) could be based and/or 4) Nothern was never informed of Davis's duty to comply with the embargo. The SEC has opposed that motion. After considering legal memoranda filed by the parties and hearing oral argument on the motion, the Court decides it as follows.

### III. <u>Legal Analysis</u>

#### A. Admission of Facts for the Purposes of Summary Judgment

Pursuant to Local Rule 56.1 for the United States District Court for the District of Massachusetts, a party moving for summary judgment must submit a concise statement of material facts of record as to which there is no genuine dispute and non-moving parties must, in turn, submit a concise statement of material facts of record as to which there exists a genuine dispute. The non-movants' concise statement must identify what "specific facts" are in dispute. <u>Brown</u> v. <u>Armstrong</u>, 957 F. Supp. 1293, 1297 (D. Mass. 1997), <u>aff'd</u>, 129 F.3d 1252 (1st Cir. 1997) (citation and internal quotation marks omitted). Any material facts set forth by the moving party that are not "controverted" by the non-movants' statement must be "deemed for purposes of the motion to be admitted". D. Mass. R. 56.1.

In support of his motion for summary judgment, Nothern has submitted a "concise" statement of undisputed facts in the form of a 21-page list of 163 numbered paragraphs. The SEC has submitted a "concise" statement of disputed facts in the form of a 37-page narrative of 78 numbered responses (each containing one or more paragraphs). Neither statement can accurately be described as "concise".

Response 78 of the SEC's statement specifically admits the facts included in 11 paragraphs from Nothern's statement

-5-

identified by number. Each of the SEC's remaining responses addresses one or more paragraphs from Nothern's statement identified by number. Those responses do one of the following: 1) explicitly dispute facts stated by Nothern, 2) state facts that directly contradict facts stated by Nothern, 3) state facts that otherwise relate to facts stated by Nothern and/or 4) state that certain facts stated by Nothern are not material.

Nothern argues that, because the SEC failed to admit or deny each of his 163 "facts", paragraph-by-paragraph, his Rule 56.1 statement should be admitted in full. That argument is unpersuasive. Nothern cites, in support of his contention, only cases from this District which are not, in fact, supportive and a case from the District of Puerto Rico applying its local rule which, unlike the Local Rule 56.1 for the District of Massachusetts, explicitly requires a party opposing a motion for summary judgment to "admit, deny or qualify the [moving party's] facts by reference to each numbered paragraph of the moving party's statement". D.P.R. Civ. R. 56(c).

Therefore, to the extent that the SEC's statement disputes certain facts set forth in Nothern's statement, either explicitly or by contradiction, those facts are deemed controverted. The remainder of Nothern's statement is deemed admitted (but, to the extent that the admitted facts are not material, they will not be taken into account in the discussion of the motion that follows).

**B. Legal Standard for Summary Judgment**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial". Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law". Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted". Id. A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party". Id.

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

**C.   Application**

   **1.   The Nature of the Information Upon Which Nothern Traded**

In order for Nothern to be liable for insider trading under the misappropriation theory, he must have traded on the basis of information that was "confidential" at the time he traded on it. United States v. O'Hagan, 521 U.S. 642, 652 (1997). Nothern asserts that he did not trade on confidential information because 1) at least two minutes before the SEC alleges he traded, the information was posted by a Treasury employee on a publicly available website and, alternatively, 2) at 9:00 a.m. the information had been announced at a press conference. The SEC has alleged facts that contradict those assertions (as described below) and, therefore, a genuine issue of material fact exists as to the nature of the information upon which Nothern traded.

Nothern's alleged facts in support of his first argument suggest that the information about the 30-year bonds became publicly available when it was posted on the Treasury's "staging server" at 9:40 a.m., or about two minutes before the SEC alleges he traded. According to the SEC, however, the "staging server" is not open to the public. The SEC's alleged facts indicate that

the information about the bond became publicly available no earlier than 9:43:28 (after the time at which the SEC alleges Nothern traded) when it was posted on the Treasury's "production server".

Nothern rests his second argument on alleged facts indicating that the Treasury did not restrain dissemination of the information about the 30-year bonds. He states that the press conference was effectively open to the public because 1) anyone at Treasury was free to attend, 2) no one checked the identities or credentials of the attendees and 3) attendees were free to communicate with whomever they liked because, despite the announcement of the embargo, compliance with the embargo was not required. The SEC responds that, to the contrary, 1) attendance at the press conference was limited, 2) all attendees were required to be placed on a list and cleared into the Treasury building through Secret Service and 3) all attendees were informed of the embargo and asked whether they understood it. The parties also dispute the effect of the announcement of an "embargo" and the issuance of a document with the heading "For Immediate Release" handed out at the beginning of the press conference.

Thus, there are numerous factual disputes concerning whether Davis provided Nothern with confidential information and summary judgment is not appropriate for that reason.

## 2. The Constitutionality of the Embargo

Nothern argues that the embargo on October 31, 2001, violated the First Amendment's protection against prior restraints on speech. He claims that ensuring the accurate, uniform and orderly dissemination of information is not an adequate justification for imposing an embargo such as that imposed by the Treasury. According to Nothern, the Treasury cannot assert any compelling interest for imposing an embargo that lasted 35 minutes beyond the end of the October 31, 2001, press conference (especially in light of the fact that, by Nothern's calculations, embargos normally extend for only 10 to 15 minutes after Treasury press conferences).

The SEC responds that the embargo is a valid, content-neutral, reasonable "time, place and manner" restriction because it is the least restrictive means to enable the press to report on market-moving news without facilitating insider trading. The SEC also argues that Nothern lacks standing to bring this claim because it was Davis's, not his, speech that was restricted by the Treasury and, therefore, Nothern cannot meet the requirement that the plaintiff must have suffered an injury-in-fact.

Nothern counters that he is not attempting to strike down the Treasury's policy of imposing embargoes and that he does not need standing merely to explain why the October 31, 2001, embargo was "ineffective". That two-fold argument is unpersuasive.

Regardless of whether Nothern is challenging the Treasury's embargo facially or as it applies to his situation, he is effectively asking the Court to declare the embargo unconstitutional and, therefore, he needs standing to do so. He does not have it.

Moreover, Nothern fails to explain why he would be entitled to a judgment on the merits if the embargo were unconstitutional. If it were, Nothern could presumably argue that the subject information was public and, therefore, he cannot be found liable under § 10(b) of the Exchange Act. At the time that Nothern traded, however, the effect of the embargo was to make the information confidential. A later declaration of the Court that the embargo was unconstitutional would not alter that fact.

Accordingly, Nothern's constitutional arguments are unavailing and summary judgment will not be granted on that basis.

### 3. Davis's Duty of Confidentiality

The liability of Nothern, as the misappropriation "tipee" (recipient of confidential information from a "tipper") is derivative from the misappropriation of Davis. If Davis breached a fiduciary duty, Nothern can be found liable and, conversely, if Davis did not breach such a duty, Nothern cannot be found liable. O'Hagan, 521 U.S. at 663. Thus, the SEC must prove that Davis had a fiduciary relationship with the Treasury or a "similar

relationship of trust and confidence". <u>United States</u> v. <u>Chestman</u>, 947 F.2d 551, 566 (2d Cir. 1991). The existence of such a "similar relationship" is a question for the jury. <u>See</u> <u>United States</u> v. <u>Reed</u>, 601 F. Supp. 685, 705 (D.C.N.Y. 1985), <u>rev'd on other grounds</u>, 773 F.2d 477 (2d Cir. 1985). Because the SEC does not contend that Davis owed a fiduciary duty to the Treasury, the only question now before the Court is whether no reasonable jury could find such a similar relationship of trust and confidence.

### a. SEC Rule 10b5-2(b)

Nothern argues that Davis owed no duty to maintain the confidentiality of the information disclosed at the October 31, 2001, press conference and that, therefore, he (Nothern) cannot be liable for trading on that information. The SEC responds that SEC Rule 10b5-2(b) sets forth certain circumstances that create a relationship upon which misappropriation liability may be premised, including:

(1) Whenever a person agrees to maintain information in confidence; [and]

(2) Whenever the person communicating the material nonpublic information and the person to whom it is communicated have a history, pattern, or practice of sharing confidences, such that the recipient of the information knows or reasonably should know that the person communicating the material nonpublic information expects that the recipient will maintain its confidentiality.

17 C.F.R. § 240.10b5-2(b). With respect to the first situation

enumerated in Rule 10b5-2(b), the SEC has presented evidence (Davis's own testimony) that he entered into an express, written agreement with Roger Anderson ("Anderson"), the Treasury's former Deputy Assistant Secretary for Federal Finance, pursuant to which Davis agreed to abide by Treasury embargos.

With respect to the second situation enumerated in the Rule, the SEC has presented evidence that, for years prior to the October 31, 2001, press conference, Davis attended Treasury press conferences subject to temporary embargos and maintained the confidentiality of the information released for the requisite amount of time. Nothern argues that the SEC may not rely on any argument pursuant to SEC Rule 10b5-2(b)(2) because that Rule does not appear in the complaint but that argument is unavailing under the "fair notice" rule of pleading.

Nothern presents the novel argument that SEC Rule 10b5-2(b) is invalid because it improperly expands liability under § 10(b) of the Securities Exchange Act. He asserts that caselaw interpreting liability under § 10(b) establishes that a fiduciary duty cannot arise out of the mere existence of a contract and that the SEC lacks the power to promulgate rules inconsistent with the language of § 10(b). Nothern's argument is based entirely upon a law review article and purports to contradict persuasive caselaw holding that Rule 10b5-2(b) properly defines those circumstances under which misappropriation

liability can arise. See, e.g., S.E.C. v. Yun, 327 F.3d 1263, 1273 n.23 (11th Cir. 2003); S.E.C. v. Kornman, 391 F. Supp. 2d 477, 489-90 (N.D. Tex. 2005). Thus, Nothern's argument is untenable.

Nothern also suggests that SEC Rule 10b5-2(b), according to its legislative history, was designed to apply to "certain non-business relationships, such as family and personal relationships" and that, therefore, it does not apply to Davis's relationship with the Treasury. Prop. Treas. Reg. § 240.10b5-2, 64 Fed. Reg. 72590, 72602 (Dec. 28, 1999); see also S.E.C. v. Talbot, 430 F. Supp. 2d 1029, 1061 n.91 (C.D. Cal. 2006), rev'd on other grounds, 530 F.3d 1085 (9th Cir. 2008) ("Rule 10b5-2 was not intended to apply to business relationships".). Neither the SEC release describing the then-proposed Rule 10b5-2 nor the text of the Rule itself indicates, however, that its scope is limited to only non-business relationships. Because it is not entirely clear whether the SEC may rely on Rule 10b5-2(b) to prove that Davis had a relationship upon which Nothern's misappropriation liability may be premised, the Court proceeds to evaluate another method of proof.

### b. Confidentiality Agreement

Regardless of SEC Rule 10b5-2(b), the SEC's allegation that Davis expressly agreed to maintain the confidentiality of Treasury information is sufficient to state a claim that he had a

-14-

"similar relationship of trust and confidence" upon which Nothern's misappropriation liability may be premised. Neither the First Circuit Court of Appeals nor the United States Supreme Court has defined in detail what constitutes a "similar relationship". The Supreme Court in O'Hagan identified misappropriation theory as

> designed to protec[t] the integrity of the securities markets against abuses by 'outsiders' to a corporation who have access to confidential information that will affect th[e] corporation's security price when revealed.

521 U.S. at 653 (citation and internal quotation marks omitted). There, the Court stated in a parenthetical that

> misappropriation theory bars only trading on the basis of information that the wrongdoer converted to his own use in violation of some fiduciary, <u>contractual</u>, or similar obligation to the owner or rightful possessor of the information.

<u>Id.</u> at 663 (emphasis added) (citation and internal quotation marks omitted).

Accordingly, it appears that the Supreme Court acknowledged that a contract providing a corporate outsider access to confidential information may be sufficient to create a duty from which misappropriation liability may arise. <u>See</u> <u>also</u> <u>S.E.C.</u> v. <u>Yun</u>, 327 F.3d 1263, 1273 (11th Cir. 2003) ("[A] breach of an agreement to maintain business confidences would also suffice [for purposes of misappropriation theory]"); <u>S.E.C.</u> v. <u>Talbot</u>, 430 F. Supp. 2d 1029, 1055 (C.D. Cal. 2006), <u>rev'd on other</u>

-15-

grounds, 530 F.3d 1085 (9th Cir. 2008) ("The existence of an express confidentiality agreement covering the information at issue is persuasive evidence that the parties had a relationship of trust and confidence".); S.E.C. v. Kirch, 263 F. Supp. 2d 1144, 1150 (N.D. Ill. 2003) (finding that businessmen in an unincorporated group that had an express, unwritten policy of keeping shared information confidential owed a duty of trust and confidence to each other); Prop. Treas. Reg. § 240.10b5-2, 64 Fed. Reg. at 72603 ("[W]henever a person agrees to maintain information in confidence, a duty of trust or confidence exists.... [S]ometimes, most commonly in a business context, the parties will sign an express, written confidentiality agreement.").

Nothern contends, to the contrary, that a confidentiality agreement between Davis and Treasury is insufficient to create a relationship underlying any § 10(b) liability. In support of that contention, Nothern cites United States v. Kim, 184 F. Supp. 2d 1006, 1015 (N.D. Cal. 2002), which held that an express "Confidentiality Commitment" between members of a social club for business executives did not give rise to any legal duty because it failed to set forth "a relationship with the hallmarks of a fiduciary relationship". That case is inapposite for two reasons.

First, as the court itself noted in Kim, the language of

Confidentiality Commitment "appealed only to the members' ethics and morality" and did not create a legal duty to refrain from disclosing confidential information. Id. at 1015. Here, the facts alleged by the SEC, if true, indicate that the agreement between Davis and Anderson created a contractual duty not to disclose embargoed Treasury information.

Second, Kim relies on the opinion of the Court of Appeals for the Second Circuit in United States v. Chestman, which, in turn, held that a "similar relationship of trust and confidence" must be the "functional equivalent of a fiduciary relationship", meaning that it must be characterized by superiority or dominance. Kim, 184 F. Supp. 2d at 1011-11 (citing Chestman, 947 F.2d at 568). The Second Circuit later clarified that holding, without reference to the existence of superiority or dominance, as follows:

> [A] fiduciary relationship, or its functional equivalent, exists only where there is explicit acceptance of a duty of confidentiality or where such acceptance may be implied from a similar relationship of trust and confidence between the parties. Qualifying relationships are marked by the fact that the party in whom confidence is reposed has entered into a relationship in which he or she acts to serve the interests of the party entrusting him or her with such information.

United States v. Falcone, 257 F.3d 226, 234-35 (2d Cir. 2001) (citing Chestman, 947 F.2d at 567-69) (finding that a "qualifying relationship" existed between Business Week and an employee of a news distributor where there was a policy that the magazine,

-17-

because it contained highly confidential information, was not to be distributed to the general public before a certain time). The alleged relationship between Davis and the Treasury "qualifies" under that Second Circuit's definition because Davis was bound to abide by Treasury embargos in order to serve the Treasury's interest in controlling the confidentiality of the information entrusted to him at its press conferences.

Moreover, this Court is not bound by Kim or the Second Circuit and is free to determine that a "similar relationship of trust and confidence" exists even in the absence of a scintilla of superiority or dominance, as other courts (including some federal district courts within the Second Circuit) have done. See Kirch, 263 F. Supp. 2d at 1150 (declining to follow Kim's requirement of control and dominance); S.E.C. v. Singer, 786 F. Supp. 1158, 1170 (S.D.N.Y. 1992) (not requiring proof of control or dominance and reading Chestman "not as setting forth a rigid checklist but as a general characterization" of a kind of fiduciary-like relationship); Reed, 601 F. Supp. at 712-14 (rejecting the argument that control and dominance are pre-requisites for the finding of a "confidential" relationship).

Nothern also argues that, even if Davis had a duty of confidentiality, it was unenforceable. That argument is based entirely on cases involving news reporters which are inapplicable here because Nothern is not a news reporter.

-18-

Notwithstanding the fact that Nothern presents some contrary evidence, the SEC has proffered sufficient evidence from which a reasonable jury could conclude that Davis had a fiduciary duty or similar relationship requiring him to maintain the confidentiality of the embargoed information with respect to the 30-year bonds. Accordingly, Nothern has failed to carry his burden of proving that he is entitled to summary judgment based on the lack of a duty underlying misappropriation liability.[1]

### 4. The Requirement of Knowledge of a Breach of a Fiduciary-Like Duty under SEC Rule 10b-5

Nothern argues that the SEC cannot prove that he knew that Davis breached a fiduciary duty or similar relationship in disclosing the information about the 30-year bonds and that, therefore, he is not liable under SEC Rule 10b-5. The SEC correctly points out that it must prove that Nothern, as the tipee, knew <u>or</u> should have known about the breach. <u>Dirks</u> v. <u>S.E.C.</u>, 463 U.S. 646, 660 (1983). Despite Nothern's contention to the contrary, that standard of knowledge applies under the misappropriation theory of insider trading. <u>Id.</u>

The SEC has presented evidence, through Nothern's own admissions, that Davis told Nothern that 1) he learned about the

---

[1] In further support of his contention that Davis lacked a qualifying duty, Nothern has moved for leave to file a copy of an amicus brief recently submitted in another pending insider trading case, <u>S.E.C.</u> v. <u>Cuban</u>, No. 3:08-cv-02050 (SAF) (N.D. Tex.). The Court has considered (and mostly rejected) the arguments made in that brief.

suspension of the 30-year bonds from a high-ranking Treasury official and 2) an embargo was in place until 10:00 a.m. Nothern allegedly also admitted that he knew that Davis had contacts at the Treasury and that he was familiar with the term "embargo" as it applied to the release of information from government agencies. A reasonable jury could conclude that Nothern knew or should have known that a person entrusted with confidential information had a fiduciary duty or similar relationship of trust and confidence which was breached by disclosure of such information. Regardless of the contradictory allegations made by Nothern, there is a genuine issue of a material fact as to his knowledge that prevents the entry of summary judgment on this issue.

### ORDER

In accordance with the foregoing:

1) Nothern's motion for leave to file further support of his motion for summary judgment (Docket No. 197) is **ALLOWED;** but

2) his motion for summary judgment (Docket No. 104) is **DENIED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 20, 2009